

**NEUROSCIENCE CONSULTING, INC.**

*154 Brookhill Road*
*Libertyville, IL 60048*
*Phone (847) 549-9141*
*Fax (847) 549-6752*

*Jonathan J. Lipman, Ph.D.*
*FACN, BCFE, BCFM*
*Neuropharmacologist*

Report of Neuropharmacological Consultation

Donald FELL

May 14, 2001

## Scope of consultation:

I am consulted by Alexander Bunin, Esq., of the Office of the Federal Public Defender for the Districts of Northern New York and Vermont, to opine on neuropharmacological influences acting upon Donald ("Donnie") Fell at the time of the November 2000 offenses responsible for his current incarceration.

## Opinions

Having interviewed and evaluated Donald Fell, and having relied upon the facts and information described more fully below, it is my opinion, which I hold to a reasonable degree of scientific certainty, that:

1.    Donald Fell suffers from a constitutional and historic predisposition toward the abuse of drugs. This is most likely in part genetic and in part results from chronic early exposure during a critical developmental period. As a result of this appetitive drive, his pre- and early-teen years were influenced by regular and intense intoxication, the neuropharmacological consequences of which impacted his maturation and personality development, both then and in later years.

2.    His early chronic history of abusing drugs and alcohol, began at age eight with beer, continued at age eleven with liquor, marijuana and LSD, at age twelve with cocaine and pharmaceutical drugs including the stimulants, depressants and opiates. This chronic early drug abuse existed comorbidly with developing mental illness characterized by depression with psychotic and borderline aspects, resulting in his repeated psychiatric hospitalization.

3.    Arrested and consigned to custodial care at age 13 he was maintained in a drug-free state until age sixteen when upon his release he recommenced his abuse of alcohol and drugs, including phencyclidine, hallucinogenic mushrooms, opiates, tranquillizers and various unidentified drugs including one which rendered him insensible for two days. He began to abuse ecstasy (MDMA) in the months before the offense and his LSD use increased, as did his use of alcohol (beer and liquor), particularly the latter in the pre-crime weeks




FELL-00000423

4.    Considering Mr. Fell's diagnostic history and his current psychometric and projective psychological test findings, these interpreted in light of his relatively normal current neuropsychological test performance, it appears that in addition to suffering a pathological drug appetite, he also suffers from a related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress. Historically this has been associated with uncontrolled rage. This vulnerability would be expected to increase when intoxicated and to increase further when chronically intoxicated, as was the case at the time of the offenses.

## Materials reviewed and considered

1. Records of First Hospital Wyoming Valley 9-30-91 to 10-30-91
2. School Records Wilkes Barre District, Grades 1-6
3. Records of Wyoming Valley Health Care System – Wilkes Barre General Hospital
4. Kingston Municipal Police Records, call sheets, sundry documents, pp16
5. Handwritten 4 pages with attachment titled 'Burger Kings from Bennington" faxed from VT ST. Police
6. Affidavit of FBI SA Christopher DESTISO, dated 1 Dec 2000
7. Newspaper Clip Files, on-line, including Lexis-Nexis output
8. Handwritten statement of Robert LEE, dated 12-1-00, pp11
9. Transcript of Interview of Robert Joseph LEE, Dec 2 2000, pp73
10. Transcript of Interview of Donald FELL, Dec 2, 2000, pp50
11. Report of Mark J. Mills JD MD dated May 7, 2001
12. Report of Wilfred VanGorp PhD dated April 19, 2001, MMPI-2 profile
13. Personal interview and testing of Donald Fell conducted by me on January 30, 2001 (about eight hours) including clinical history, Clinical Analysis Questionnaire / 16-PF, Addiction Proneness Scale, D2 test of concentration endurance and the Magical Ideation Scale

## Reasons for my opinions

### 1. Mr. Fell's self-reported drug abuse history: excerpted synopsis

At interview, Mr. Fell described his father and mother as being *"bad alcoholics."* His father, whom he described as abusive when drunk, would beat 'everyone' when he got into this state. His father kept in the basement a tapped keg of *Pabst Blue Ribbon* beer in a refrigerator modified for this purpose, for his own consumption, Donnie described his parents as not being very social, in that they *"never really had much company."*

FELL-00000424

Donnie started drinking at an early age, he estimated age eight, from his father's keg in the basement. He started to abuse liquor at age eleven, drinking with his friends.

The friends would drink mostly at his friend Pat Evans's house, he said, and they also enjoyed walking around drunk in the shopping mall. They kept beer in their lockers at school, and Donnie would 'chug' a couple of beers between classes.

It was also in his eleventh year that he began to use pot and acid (Lysergic acid diethylamide, LSD), he said. After his introduction to marijuana (pot), he used it *"every day,"* it's effect being to make him *"laugh a lot,"* and concerning the effect of acid (LSD), he said: *"amazing, it became my favorite. Everything was silhouetted in colors, things echoed...my body was numb...if it was raining I couldn't see or feel the rain...the trees were eerie... I'd lay down a lot and look at the sky, mostly at night... the stars and moon were wonderful...if I could I'd trip for the rest of my life."*

He used LSD twice in his eleventh year.

After his parents separated his mother began to abuse cocaine and he would steal this from her, when he was twelve years of age. Describing his alcohol consumption at age twelve, he said that he preferred whiskey, 151 Rum and tequila, and he would drink socially with his friends. It was in his twelfth year that he started "hanging out" with an eighteen year-old woman called Lacy LNU who dealt (sold) acid, and he and his friends sold it for her. He quickly discovered that acid cannot be used two consecutive days to the same intensity of effect: *"you'd do it one day and double [the dose] the next...I'd take two hits the first day, then four the next, then wait a couple, three, days, before taking more...the most I've ever taken is twenty five hits."* He has always taken it by mouth, he added, never by eye drops or injection.

He recalled images of times when he was on acid: *"some kid running around cutting people with a razor blade... and one time my friend's hair was on fire and I was smacking him on the head – but I discovered his hair wasn't on fire."* Summarizing the visual effects he most enjoyed, he offered: *"multiple vibrating images all shrouded in colors."*

The acid he began to use at age twelve, when enrolled (but hardly ever attending) Plains Junior High in Wilkes-Barre, was *"a better grade of acid,"* he said. He used it intermittently in his twelfth year – enjoying it for a few months then stopping for a few months when he was admitted to what he called *'the nut ward'* for psychiatric hospitalization. In those months that he consumed it he employed it twice per week *"at least ten hits at a time."* I asked if he described this to his psychiatrists at the time, but he said that he did not: *"I didn't feel like talking to them... the urine test came back with pot once, but they can't test for acid."*

He was prescribed various medications in his twelfth year. He recalled: *"Dexedrine, Tofranil and others of all shapes and sizes... they made me feel like a zombie... slowed*

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          3
                                on Donald FELL          May 14, 2001

FELL-00000425

*me down... I was always tired, taking them. One day I decided not to take them any more and mixed them with Vicodin – my mother's boyfriend's pills, his leg was screwed up by a car – and sold them at school."* His mother's then boyfriend, who has since died of a drug overdose, was named Ellery WILCOK, he recalled

In his thirteenth year, having to repeat seventh grade again at Plains Junior High, he: *"ended up locked in St. Michael's... a home for juveniles.* He was interned there from shortly before his fourteenth birthday, he said, and lived at St. Michael's until he had turned sixteen. Living at St. Michael's (for two years) his drug use came to a halt except for 'pot' that was smuggled in by the non-boarding children who attended 'day treatment.' He described St. Michael's as a Catholic Institute, and added that he volunteered for 'altar boy' duty so that he could steal matches and wine. The matches were valuable contraband needed for lighting cigarettes, he explained, and the wine *"goes down real easy,"* when it was his duty to pour it for the priest.

Two months before he was released from St. Mike's (as he called it), he attended a meeting at the school with his Aunt Jackie, where she offered to foster him since his natural mother (her sister) now lived in Vermont. This being agreed, when he was released from St. Michael's, then aged sixteen, he went to live with Jackie. She resided at her mother's, Donnie's grandmother's, house - who had recently died of bone cancer, 'on morphine,' Donnie said. He initially continued to attend St. Michael's for 'day treatment' and was transported back to Aunt Jackie's house after school. His aunt let him smoke cigarettes, he said, and he watched TV, and *"it was kinda like being in jail... she'd let me out twice a week, but when she was asleep I could do anything I wanted."* His sister and her boyfriend, Shawn CAMPBELL sometimes lived there also, he said. He attended school and in the evenings worked several casual jobs: first at a racetrack as a busboy, then as a dishwasher – a job that he took because it allowed him to drink the residues of beer pitchers the waitresses brought back from the tables. After work he would go out drinking, often staying out all night before returning home just in time to go to school. His aunt Jackie abused him physically, he said: she would hit him with a cane and push him through doors, evidently in a hopeless attempt to discipline him. Ultimately he was ejected from his Aunt Jackie's house at age seventeen as a result of his drug abuse, drinking and misbehavior. He said that: *"from that point on I drank every day and had lots of drugs..."*

Asked about his drug use in these two years before his arrest, Donnie said that acid was hard to find, but he was introduced to and used angel dust (phencyclidine, PCP) about fifteen times that first year after leaving Jackie's. He described the effects as : *"different... I really didn't trip from it... I was out in space from it... not myself... sometimes violent... once I blacked out and I was told I was swinging at people, smashing things.. I didn't believe them, but I came to believe them when I saw the fear in their eyes... they were scared, and there were holes in the walls they said I'd made."*

I asked him what it was about angel dust that he enjoyed, and he said: *"I'd feel like I was outside my body, looking in... that's basically why it was pleasurable.... I felt tingly, numb."* He denied self-injury under its influence.

Dr. Jonathan J. Lipman        Report of Neuropharmacological Consultation                    4
                              on Donald FELL              May 14, 2001

He also discovered (hallucinogenic) mushrooms in this year. A girl who returned from Florida with them gave these to him and his friends, he said. In response to my question regarding their type, he confessed that he did not know, but observed that she had picked them herself and they had 'cowshit' on them. He said: *"I was so drunk I couldn't taste them... next thing I know I'm pounding on car windows, telling people they're going to die... my friend was with me wearing a jester's hat... we went to the hangar* [a party venue] *and I was shaking people's hands."* Later he discovered that no one else had been there, that he had been shaking the hands of imaginary people, he said. He denied nausea or other adverse effects except 'wicked heartburn.'

The next time he did mushrooms was the following Summer 2000, attending the Woodstock festival, he added. He took them there twice.

He also 'took a lot of pills' he said. He described these as oxycontin, pain pills and tranquillizers, including Valium *"by the handful"*. Asked for details and doses, he was unable to supply these. He essentially took anything he could get his hands on, he said. The oxycontin he took on three occasions, he added.

He also snorted heroin on at least three occasions. The first time was unknowing: he was at a music concert (biohazard was performing): *"and this girl stuck four lines of powder in front of my nose, and I thought 'yellow coke?.. strange' and I snorted it all, and then they tell me it was heroin and I'm going to vomit and get tired... but I didn't, it gave me energy, I was full of energy in the mosh pit all night... my friend Gary Yale was vomiting, though... we got a couple bags of heroin after that,"* he added.

In his eighteenth year Donnie moved in with a female drug dealer. He declined to name her, to protect her identity. I suggested that we give her an arbitrary name for purposes of his present interview, and he offered 'Nancy.' She was 48 years old, he said, and lived with her boyfriend MARK (a.k.a 'Chopper') and her nine year old son MARKY. Nancy supplied Donnie with drugs.

In the year before his arrest he would drink liquor twice a week: Jack Daniels, Green or black label... *"two fifths in a day...most of it mine.... I'd chase the liquor with beer... most people chase beer with liquor, but I'd chase liquor with beer... in the summer of 1999 every day we had barrels of beer and rum and whisky and tequila... I could go for days drinking without sleep, till I passed out... I've never been able to sleep well, even now,"* he added.

He obtained occasional work at MEDICO INDUSTRIES, a weapons manufacturer situate on Route 315 in Plains. He continued drinking daily and smoking pot ("a lot") daily and taking 'a lot of pills,' also daily – sundry tranquillizers including valium, whilst working there, he said.

At Christmas 1999 Donnie stopped taking 'pills' after he 'blacked out' for two days. He described being with his friend Gary Yale at the time, and they found a purse containing

FELL-00000427

pills that were *shaped 'like houses – with a little chimney... tiny little things.'* He said they each took two: *"they fucked us up... we had six cases of beer, Rolling Rock, and Captain Morgan's rum and took more pills by the handful... next thing I know I wake up on the floor... my friends all surrounding me. They told me I was hitting people... knocked the Christmas tree over... then I blacked out for two days, from Friday to Monday."* Other blackout incidents had previously occurred, he mentioned: on one of these his friends had told him he had been complaining of 'demons.' He had no memory of this.

After abandoning 'pills' his typical daily consumption of alcohol was *"two cases of Budweiser between four of us."* He would drink faster than anyone but Mikey Raymond, he added. In response to my question concerning how many days per month he did not drink, he offered that: *"very seldom did I not drink... but on the days I didn't drink I didn't get the shakes... I was just a little bit bored... I'd pick up my guitar."*

In June 2000 he obtained employment with a carnival. The Carnival was immune from police incursion, Donnie said, and all the drugs he wanted were available. He started taking ecstasy in July 2000, a drug that he found did not make him want sex, as it did others. August was *"a big month for acid"* he recalled. He had used acid twice in June when he joined the carnival, taking six or seven hits at a time. He took more in July, eight or nine times per month, taking six or seven or ten hits at a time, and August was a 'big' month for acid more in quantity than in frequency, he explained. He found that a couple of times that he took it, it *'didn't work,'* and on one occasion a day after taking ten hits, he took fifteen hits to maintain the efficacy. *"When I wasn't working I was in a drunken stupor...I had a different girl every day, it was exciting,"* he said.

He used mushrooms once before visiting the Woodstock festival, in August, and he remained there four or five days. He recalled that in Woodstock he took two hits of acid one day and eleven the next. Two days later when he took more, it had no effect.

His last night at the carnival – and the reason he lost his job, he added - he took twenty-five hits of 'paper' acid and a bag of mushrooms. Someone was on stage playing Fleetwood Mack. People were appearing and disappearing, he said. He found himself unable to feel the rain, uncertain if it was in fact raining, and running around asking people if it was raining, if they could feel it. His sister was there that day, he recalled.

He continued: *"I was with STEPHANIE LNU that I worked with at the carnival... we went into the woods and stumbled on a campfire, with tents all over, and coolers and bottles of 'Parrot Bay' and we're out there sword fighting with light sticks, singing Pink Floyd... next thing I know I'm coming down and start feeling the rain and we try to go back to work but the cops have towed the car... me and Billy and his brother ANTHONY took a walk to smoke hash ... we come back and this kid, CHRIS, is trying to force himself on my sister... I beat him up...I broke his leg... I was in a frenzy... I pissed on him... then six guys came up and we ended up fighting with them... my sister smashed the shit out of one guy.."* After the battle they were walking down the road, smoking pot and *"a cop rolled up and they took us to jail... he found a bit of acid on me, but he made the*

FELL-00000428

*mistake of leaving it on the table when he left the room and I ate it. Me and my sister and Bobby and his brother went to court five days later... had to pay a fine but I didn't give my real name."*

He returned to Wilkes Barre after Woodstock, I understood him to say, and stayed at his Aunt DONNA's house. He said that he blacked out there after drinking a bottle of whisky, that his cousin Jamie WILLIAMS saw him pull a shelf off a wall, but he himself had no recollection of this.

Donnie said that he decided that he wanted to visit his mother, from whom he had been estranged since he entered St. Michael's at age fourteen. Once he had made the decision and plans had been made, he *"got a bad feeling about it,"* and discussed this with his aunt Donna: *"and she said I didn't have to go, that I could live with her, but plans had been made, so I felt I had to go... but I felt something bad was going to happen."*

He had been given the impression that she had sobered up, he said: *"I was expecting to find a new woman, but I found her worse."*

His grandmother Stella BANAS drove him to his mother's house, a six or seven-hour journey. On arrival he found himself isolated and bored, since he knew no one there. He drank heavily, and *"started blacking out more... I'd wake up and wonder how I'd got to bed or even when I'd went to bed."*

After a month of living at his mother's, he telephoned his friend (the codefendant) Bobby and invited him to come and visit. Bobby immediately agreed and arrived by bus. He and Bobby sat at home and drank most of the time, he said. His mother would return home, drunk, and try to start arguments *"but we'd ignore her."*

His drinking was not excessive when he was working, Donnie said: he drank after work, though, and that on thanksgiving he *"had quite a bit."* On Friday he had two beers after work at his boss's house, then went home. On Saturday he got paid and he and Bobby bought a hash pipe. The seller told them it had been used to smoke crack and still had crack in it. Donnie said that he enjoyed the 'high,': *"it was instant... I felt like I was floating... I was jamming on music, playing cards with Bobby in the kitchen... playing a drinking game with Budweisers... a good game to get drunk quick... I was playing a 'Cradle of Filth' CD on my CD player, through the tape player in the kitchen... Charlie and mom came in at about nine O'clock carrying a couple of cases of beer... we all started drinking and having a good time... mom and Charlie were in the TV room listening to music on digital cable. I took a pill I was told was ecstasy about an hour before mom came home... a little black pill with red writing on it... it didn't feel like ecstasy... I didn't feel any effects that I know of."* The pill came from by BOREN LNU, described as *"a black dude who used to live down the road from the Jiffy Mart in Rutland. He's missing his pinkie (finger) on his left hand... "* Donnie said.

To this point in the evening he and Bobby had worked their way through four cases of Budweiser starting at 9 AM and ending at 1 AM. He felt 'hammered.' He was

Dr. Jonathan J. Lipman  Report of Neuropharmacological Consultation   7
         on Donald FELL   May 14, 2001

FELL-00000429

responsible for half of the beer consumed, he said. He weighed 130 Lb at the time (weighs 140 now) and his height was 5' 8 ¾ "

The killing of his mother and her friend Charlie he described as unanticipated, unrehearsed and inexplicable. He could offer no explanation for what led up to it or the reason it occurred.

## 2. Factors related to early drug and alcohol abuse

Mr. Fell's parents were alcoholics. Although the mechanism(s) responsible for an inherited vulnerability are not entirely clear (but see below), alcoholism does have a high degree of genetic penetrance or phenotypic 'loading'. Human family studies have shown that first-degree relatives of alcoholics are more likely to be alcoholic than first degree relatives of non-alcoholics (Cotton 1979)[1]. Adoption studies have shown that adopted-away children are more likely to develop alcoholism than adopted-away children of non-alcoholic parents (Goodwin et al 1973)[2]. Twin studies have found that monozygotic twins are more likely to be concordant for alcoholism than dizygotic twins (Kaij, 1960)[3]. And as Schukitt has shown, children of alcoholics are at higher risk than children of non-alcoholics to develop alcoholism, and differ in their responses to alcohol (Schukitt 1985)[4]. These findings collectively reveal a clear genetic vulnerability (Pickens & Svikis, 1988)[5]. The biological basis of this inherited vulnerability is likely due to inheritance of the A1 allele of the D2R dopamine receptor gene – a mutation conferring susceptibility to alcoholism being present in the vicinity of the Taq 1 enzymes, located in the DRD2 gene. The number of DRD2 sites are found to be reduced in human alcoholics (Amadeno et al, 1993; Noble & Blum,1993; Gelemter et al, 1993 )[6]

Notwithstanding Mr. Fell's liability to genetic inheritance of drug, including alcohol, abuse, and unlike the children of alcoholic parents raised apart from their parents, as in the research cited above, Mr. Fell was raised in a home where alcohol- abusive behaviour was commonplace and available for patterning. He was introduced to beer drinking at a shockingly early age by modeling his father's beer consumption, taking it from his basement store. His graduation to liquor drinking also occurred earlier than is usual. Generally, in the experience of clinicians, the younger the drug-abuse habit is acquired the greater are the later and resulting consequences.

---

[1] Cotton NS (1979) The familial incidence of alcoholism, *J. Stud. Alcohol* 40:89-116.
[2] Goodwin DW et al (1973), Alcohol problems in adoptees raised apart from alcoholic biological patents, *Arch. Gen. Psychiat* 28:238-243
[3] Kaij L (1960) Alcoholism in twins: studies on the etiology and sequellae of alcohol abuse. Stockholm: Almqvist & Wiksell [cired in Roy & Pickens, 1988]
[4] Schukit M (1985) Studies of populations at high risk for alcoholism, *J. Psychiatr. Dev.* 3:31-63
[5] Pickens RW & Svikis DS (1988) Genetic vulnerability to drug abuse, in: Biological vulnerability to drug abuse, NIDA Research Monograph 89, USPHS (pubs).
[6] Amadeno S et al (1993), Dopamine receptor genes and alcoholism, *J. Psychiatr. Res.* 27:173-179; Noble EP & Blum K (1993) Alcoholism and the D2 dopamine receptor gene, *J.Am. Med. Ass.* 270:1547; Gelemter J et al (1993) Alcoholism and the D2 dopamine receptor gene, *JAMA* 270: 1547-1548

FELL-00000430

His suffering of sexual abuse in childhood at age 4, documented in the record at the hands of a babysitting couple, is a third factor to be considered in regard to Mr. Fell's adoption of an early drug abuse career. Although the association between such childhood abuse and the adoption of alcoholism is strikingly clear in females (Langeland & Hartgers, 1998)[7], the co-variance is not absent in males (Hummel 1999)[8]. In part this statistically may arise as a result of alcoholics tending to sexually abuse their first-degree relatives, the tendency to alcoholism being inherited rather than engendered by the abuse, but the proportions follow the abuse incidence rate rather than the incidence of alcoholism, which suggests a causal relationship between the abuse and the alcoholism resulting in the child.

### 3. Comorbidity of drug and alcohol abuse and other disorders

In children and adults alike, alcohol and drug abuse commonly coexists with other mental disorders. The cause and effect relationship is never entirely clear, in this or any other case, since mental problems may forecast drug and alcohol abuse as self-medication and for subjective pain relief as certainly as drug and alcohol abuse deranges the biological substrates of normal mental function, to engender mental disorders. The co-existence of such abuse and mental disorders is thus a complex inter-relationship. Notwithstanding this uncertainty, a syndrome of affective depression is known to be associated with chronic intoxication and depression is very common in alcoholics. Research conducted in a controlled setting has shown that prolonged drinking leads to progressive depression with rapid relief of symptoms and little recall after resolution and sobriety (Tamerin & Mendelson, 1969)[9]. Yet other studies have determined clear etiologies wherein chronic depression predates and precedes the alcoholic habitus, drinking arising from self-medication of subjective distress, with pathological consequences in the objective psychiatric sphere (see Solomon 1989 for review)[10]

Review of Fell's early institutional records reveals his comorbidity and most particularly reveals a stunning lack of appreciation by his therapists of the existence and relevance of his drug and alcohol abuse. As an eleven year old, in the sixth grade, he was admitted to hospital in Wyoming Valley with severe behavioral disorders, his alcohol abuse apparently going unrecognized at that time. He was psychiatrically admitted in a psychotic state at age 12 ½ and his borderline personality traits noted diagnostically (*vide infra*), but record review indicates that his therapists were unaware of his alcohol abuse or of his abuse of his mother's cocaine and other drugs (vide supra), or of the diagnostic relevance these would have had. He was treated with and responded well to thioridazine (mellaril), an antipsychotic drug. Although his urine screen tested positive for amphetamines (which he was not then prescribed at that time, though he was later), the

---

[7] Lagrland W & Hartgers C (1998), *J. Stud. Alcohol* 59(3):336-348
[8] Hummel P (1999) Familial alcohol abuse in the context of sexual and physical abuse offenses by male adolescents and young adults, *Prax Kinderpsychol Kinderpsychiatrr* 48(10):734-750;
[9] Tamerin JS & Mendelson JH (1969), The psychodynamics of chronic inebriation: Observations of alcoholics during the process of drinking in an experimental group setting, *Am. J. Psychiat.* 125:886-899
[10] Solomon J (1989) Alcoholism and psychiatric disorders, Chapter 9 in: *Alcoholism:Biomedical and genetic aspects*, Goedde & Agarwal, (eds), Pergamon Press

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          9
                                on Donald FELL          May 14, 2001

FELL-00000431

significance of his drug abuse seems to have been unrecognized and essentially unreported in his psychiatric records. His condition was seen as an atypical depression NOS.

Hospital admissions in the seventh grade at age thirteen, whilst ostensibly for treatment of injuries - including concussions and head injuries - suffered as a result of his misbehavior, also record his suspension from school, and continue to omit any consideration of his alcohol or drug abuse. His multiple psychiatric admissions this same year continue the oversight, yet capture his diagnosis of major depression with psychotic features and borderline personality traits, both of which increased in diagnostic relevance and prominence over time, in my opinion. His LSD use –and its contribution to his condition - went unrecognized. Had his therapists known that he was using increasing doses of LSD, and that he was employing ten 'hits' (doses ) at a time, more than once a week, it is reasonable to assume that they would have recognized the comorbid contribution to his psychiatric condition wrought by the organic changes in his brain underlying and mediating this developing tolerance to LSD's effects.

He responded well to antipsychotic medication, which observation in retrospect now provides useful diagnostic information, and when later he responded well to Ritalin (methylphenidate), prescribed ostensibly to treat his hyperkinetic condition, the observation appears not to have been made that Ritalin is also an excellent antidepressant drug. In children, depression often manifests as conduct disorder such as he was displaying. The distinction between conduct disorder manifestations secondary to primary depressive disorder vis-à-vis conduct disorder as an emergent and primary pre-antisocial trait is an important one, since the former can be treated with antidepressant drugs while the latter does not respond well pharmacotherapeutically.

## 4. Contributions of Fell's drug abuse to neurodevelopmental problems and personality maturation

Brain development does not cease prior to adolescence. The functional interconnections of this organ's constituent neurons continue to grow and multiply and to undergo selective 'pruning' through late childhood and into early adulthood. These changes occur naturally in response to learning experiences, to obstacles overcome, to emotional achievements reached, to milestones attained, to hormonal developmental stages achieved and to social skills acquired (Watkins & Williams, 1992; Sisman & Petersen, 1992)[11]. The abuse of drugs during these crucial years interferes with these maturational and neurodevelopmental processes and such interference leaves its mark on personality development, reality testing and emotional integration. The imposition of drug abuse and

---

[11] Watkins JM & Williams ME (1992) Cognitive neuroscience and adolescent development in: McAnarney ER et al (eds), *Textbook of adolescent Medicine*, WB Saunders (pubs) pp99-106 ; Sussman J & Petersen AC (1992) Hormones and behavior in: : McAnarney ER et al (eds), *Textbook of adolescent Medicine*, WB Saunders (pubs) pp125-130

Dr. Jonathan J. Lipman     Report of Neuropharmacological Consultation     10
                           on Donald FELL          May 14, 2001

FELL-00000432

neurotoxicity during these crucial years upon these maturational processes contributes to coping mechanisms not learned, to the mislearning of social skills and to barriers erected to the learning of emotional resilience - all of which contribute in turn to later adjustment problems of late adolescence and adulthood. Such drug-abusing children – like Donald Fell - appear and behave outwardly immature, suffer temper tantrums, act impulsively and fail to attain normal rates of emotional and neurological maturation – consistent with clinical observations made by his psychiatrists to age thirteen, when he was incarcerated. Although much of the drug-abusing child's maturational delays may ultimately be compensated neurologically and neuropsychologically after abstinence is achieved, the effects of such delay on personality development cannot so easily be rectified, if at all. His present personality structure likely represents, at least in part, the consequences of such deficits in formation.

## 5. Borderline Syndrome

As described above, Mr. Fell as a child was diagnosed with depressive disorder with psychotic and borderline features, and he was treated with and responded well to, antipsychotic drugs (thioridazine, trifluperazine and molindone), drugs which are unhelpful in the treatment of, and may even exacerbate, primary depressive disorders. His condition was described as 'borderline' by several of the psychiatrists treating him.

The borderline Syndrome – which has latterly been diagnostically fragmented into several different nosological entities in the United States due to the influence of the Diagnostic and Statistical Manual - imposes itself on all aspects of the individual's psyche. To the extent that it colors personality development, persons with this condition are labeled 'borderline personalities' – but the condition penetrates more than the domain of personality. The core feature of the Borderline sufferer is their inability to tolerate emotional stress, and their experiencing psychotic decompensation when such stress is unavoidable. Unlike the schizophrenias, the psychotic decompensation of the borderline sufferer is transient, but many researchers believe that the underlying condition taxonomically belongs in DSM's Axis-1. The condition was early considered a form of 'latent schizophrenia' sometimes called 'pseudoneurotic schizophrenia,' differing from classical schizophrenias by the absence of ongoing overt psychotic thought processes[12].

Further evidence for Fell's borderline condition having its origins in childhood –and a neuropharmacological factor in distinguishing his condition at that time from simple primary depression, is the fact that antipsychotic drugs helped him. The borderline syndrome does not respond very well to pharmacological treatment, but it does respond to drugs of this class. As with Fell, Trifluoperazine and related drugs have been employed with some success (see Cowdry 1987)[13].

---

[12] Hock P, Polatin P (1949) Pseudoneurotic forms of schizophrenia, *Psychiatr. Quart.* 23:248-276; Frosch J (1960) Psychotic character, *J. Am. Psychoanal. Assoc.* 8:544-551
[13] Psychopharmacology of borderline personality disorder: A review, *J. Clin. Psychatry* 48:8(supp)15-22

FELL-00000433

A historic examination of the etiology of the Borderline Syndrome is complicated by the changes of diagnostic names, a blurring of taxonomic boundaries, which have occurred over the past thirty years. The condition resides somewhere on the continuum that encompasses labile affective instability and attributes of schizotypy, penetrating at times the psychotic boundary, and a further discussion of this aspect of Mr. Fell's condition, diagnosed in childhood and manifested in present examinations by Drs Mills and Van Gorp, lies outside the scope of this present report.

The key features of the Borderline are encompassed by (1) affective dyscontrol, (2) behavioral dyscontrol and (3) intrapsychic and interpersonal problems. Within the term 'affective dyscontrol' are subsumed affective instability and inappropriate intense anger or lack of control of anger. Within the term 'behavioral dyscontrol' are subsumed potentially self-damaging impulsivity and self-damaging acts. Within the intrapsychic / intrapersonal domain are subsumed identity disturbance, chronic feelings of emptiness and boredom, intolerance of being alone and unstable and intense personal relationships.

## 6. Psychometric findings

Consistent with known Borderline characteristics, and as described by Dr. Van Gorp, Mr. Fell's Rorschach test results reflect atypical and idiosyncratic thought process with poor coping skills and abnormalities which scored just short of the schizophrenic range. Described further by Dr. Mark Mills, the combined disorganization exposed by his test findings reveals *"incipient psychosis or pre-psychotic breakdown."* Both doctors are describing a vulnerability to (quoting Dr. Van Gorp) *"frank breakdown in his thought process and in which he can display a frank psychosis if under sufficient stress."*

My review of the MMPI-2 profile provided by Dr. Van Gorp reveals a pattern (described as an 84 codetype in one convention, with an 896 peak). Neuropharmacologically, this pattern describes an individual with emotional pain who might drink alcohol to allay their subjective suffering and boredom, yet with a vulnerability to experiencing paranoid and psychotic thought when intoxicated and/or emotionally stressed[14].

Performed for the neuropharmacological insight it would provide into his sensitivity to the adverse effects of drugs, the CAQ/16- PF completed by Mr. Fell during my evaluation confirms his depression at the time of interview (in agreement with Dr. Van Gorp's Beck Inventory) and detected in his psychometric profile aspects of *'suspiciousness' 'paranoid'* and *'compulsive'* thoughts and *'impulsivity'*, while confirming his lack of overt 'psychoticism' – this latter in agreement with my impression

---

[14] A psychologist usually associates the 68 codetype with paranoid schizophrenia when 4 is elevated (as in the present case) but such considerations do not describe the present case and lie outside of the present neuropharmacological purview. When scale 7 lies ten points lower than the adjacent scales 6 and 8 (as here), this is termed the 'paranoid valley' and emphasizes the presence of paranoid ideation in such cases, as here. If the F scale is elevated when 6 and 8 are above T-scores of 80, this pattern does not necessarily indicate an invalid profile since high 'F' is characteristic for this condition. A paranoid state is also a frequent diagnosis with the 6/8 code [see: Groth-Marnat, G (1984) *Handbook of psychological assessment,* Van Nostrand (pubs)]

Dr. Jonathan J. Lipman        Report of Neuropharmacological Consultation                    12
                              on Donald FELL            May 14, 2001

FELL-00000434

formed over several hours of face-to-face interview. The CAQ likewise confirmed his being '*easily swayed by feelings*,' confirmed his '*immature hedonic*' nature and his characterological '*insecurity*' and '*apprehensiveness*' – all characteristics that would tend to drive an individual to seek solace and subjective relief of psychic pain in drugs and alcohol, and all consistent with the Borderline typology. The Addiction Proneness subscales calculated from his CAQ responses provided Sten scores (scaled to a possible maximum of 10) on his Alcohol Addiction Proneness of 4.6 and on his Narcotic Addiction Proneness[15] of 8.0, consistent with his abuse history, though perhaps somewhat underestimating his alcohol abuse liability based on history. His lack of overt psychoticism, mentioned above, was likewise consistent with his score on the Magical Ideation Scale of 15. This is outside of the normal male norm of $8.56 \pm 5.24$, but less than the two standard deviations above the norm that characterize psychotics, although consistent with the schizotypal aspects of a borderline syndrome.

Apropos of Dr. Mills' comments pendant from Dr. Van Gorp's MMPI observations that Mr. Fell scored very low on the Dominance Scale, I note that his score on the CAQ Dominance scale was likewise not elevated.

### 7. Neurotoxicological, including neuropsychological, impairments induced by drug abuse

Of possibly greatest relevance at the time of the offense is the identity of the drug Mr. Fell obtained from the drug dealer that evening, yet this is unknown. The effects of his acute alcohol intoxication at the time of the offense must be interpreted in terms of his own idiosyncratic case. Factors determining this effect include those specific for ethanol pharmacokinetics and pharmacodynamics (*vide infra*) and neurobiological factors engendered by his underlying mental condition (discussed above) and factors contributed by his history, and the effects such history has likely exerted on his underlying neurobiological state, including neuropsychological toxicities existing at the time of the present offenses. His chronic high-dose LSD abuse and his alcohol abuse are the factors of greatest import in this regard, since –of those he was consuming - these drugs when abused toxically and at high doses for considerable time produce chronic neurotoxic effects, which cumulatively outlast their presence in the body.

LSD:

---

[15] The naming of these scales being rather arcane, the 'Narcotic Addiction Proneness' index was derived by statistically discriminating alcohol abusers from abusers of all other drugs without differentiation and contrasting these by Principle Component Analysis with Sten scores of non-drug abusing controls, so that 'narcotic' in this context refers to any and all drugs except alcohol

FELL-00000435

LSD, an enormously powerful drug[16] induces depersonalization, hallucination, dissociative delirium and a condition essentially indistinguishable from psychosis, called 'psychotomimesis,' by neuropharmacologists[17]. This occurs against a backdrop of psychostimulation and activation with transcendent overtones. LSD is not a drug that one might sleep through. In most people who use the drug occasionally and recreationally no lasting harm is produced – though the experience is often of such profound intensity and import that users feel their lives have changed utterly by the epiphanies induced and the grandiose transcendency experienced. The effects of LSD were well studied by neuropharmacologists in the 1950s and 1960s and to a lesser extent (now that the drug has been placed in Schedule 1) it continues to be studied as a model psychosis-producing drug, against which potential antipsychotic drug candidates are tested.

In the experimental research setting the LSD effect is usually described as transient, limited to a few hours or at most a day. The persistence of ideational or emotional changes beyond 24 hours may be defined as 'prolonged effects' and in a medical setting – where subjects are well screened and selected for stability – is perhaps surprisingly rare. The adverse prolonged effects generally include spontaneous reoccurrences of the acute LSD experience, persistent psychotic decompensations, usually with a strong paranoid quality, with durations of between weeks and years and in certain individuals considered uniquely vulnerable (schizophrenics, other psychotics) these may be permanent.[18] Not all of the prolonged or recurrent adverse reactions to LSD are psychotic in nature. Spontaneous panic reactions are the most frequent non-psychotic reaction to LSD, followed by terror, confusion, anxiety and depressive reactions (Smart & Bateman, 1967)[19]. The breadth of variety of the psychotic adverse effects are quite wide: catatonia, schizoaffective and undifferentiated schizophrenias have been mimicked, maniacal episodes and depressive episodes have occurred and a number of borderline conditions identified, including dissociations. A hallucinosis in which the visual hallucinations persist with little or no associated thought disorder may also take place.

It is seemingly paradoxical, but those who are most vulnerable to undesirable adverse reactions are also those who are most attracted to the drug. Unstable, immature or rigid personalities are particularly susceptible and the excessively paranoid or depressed run into difficulties with the drug. Particularly vulnerable are schizoid persons or the close relatives of schizophrenics (Cohen, 1985, *ibid*). Vardy and Kay (1983)[20] studying a cohort of 52 LSD psychotics and 29 matched first-break schizophrenics have determined that the rate of parental alcoholism for LSD psychotics far exceeds that for schizophrenics and the general population (cf Mr. Fell's parentage). The two groups were distinguished on some clinical features but were equivalent in premorbid adjustment, on

---

[16] Cohen S (1985), LSD: the varieties of psychotic experience, *J. Psychoactive Drugs* 17(4):291-296
[17] Denson R (1967) Dissociative delirium after treatment with lysergide, *Can. Med. Ass. J.* 97:1222-1224; Dewhurst K & Hatrick JA (1972), Differential diagnosis and treatment of lysergic acid diethylamide induced psychosis, The Practitioner, 209:327-332
[18] Fink M et al (1966) Prolonged adverse reactions to LSD in psychotic subjects, *Ach Gen Psychiat* 15:450-454
[19] Smart RG & Bateman K (1967) Unfavourable reactions to LSD, *Canad. Med. Ass. J.* 97:1214-1221
[20] Vardy MM & Kat SR (1983) LSD psychosis or LSD-induced schizophrenia: A multimethod enquiry, *Arch. Gen. Psychiatry* 40:877-883

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          14
                                on Donald FELL          May 14, 2001

FELL-00000436

most cognitive measures when initially hospitalized or reassessed three to five years later and in a number of subsequent re-hospitalizations. Thus, in most respects LSD psychotics were found to be fundamentally similar to schizophrenics in genealogy, phenomenology and course of illness but with more parental drug and alcohol abuse. Their findings supported a model of LSD psychosis as *a drug-induced schizophreniform reaction in persons vulnerable to both substance abuse and psychosis.*

Donald Fell, whilst not overtly psychotic, harbors psychotic tendencies, thought patterns and cognitive styles characteristic of the Borderline sufferer and in common with the schizotypal patient. That his LSD use was excessive is self-evident from his history, and that his brain was organically altered as a result of his LSD use is manifest in the tolerance he developed to this drug, bordering on stupendous (ten 'hits' at a time). Just as the chronic high dose LSD user undergoes measurable changes in their color vision[21] (Fell's has not been tested) so do neurochemical changes occur in the biological substrates underlying their increased vulnerability to subsequent psychotic decompensation.

Ethanol:

By witness and self-report, Mr. Fell's crime was conducted while very heavily intoxicated. Alcohol's effect at any one time depends on a number of factors, including weight, medical condition, nutritional status, gender and –perhaps most importantly – drug abuse history. The pharmacokinetics of ethanol change on chronic drinking, altering the way that the body handles the drug both in terms of its metabolism, and clearance and in terms of its volume of distribution. Thus, in regular male drinkers of alcohol the apparent volume of distribution for ethanol is raised from 0.77 L/Kg to 0.88 L/Kg. The body's metabolic response is dynamic – such that heavy drinkers can metabolize very much faster than naïve drinkers, but since chronic use of large doses damages the liver – where ethanol is metabolized – those with cirrhotic livers suffer a failure in metabolism. Chronic use likewise wreaks pathological changes on multiple body systems, not least the endocrine system, and female-pattern adiposity and gynecomastia (breast growth, in men as well as women) is a commonly seen endocrine consequence of this toxicity in older persons. Similarly, chronic use of ethanol damages the brain. This toxicity, an enduring 'neurointoxication,' characterized as an Organic Brain Syndrome' persists for longer than the drug remains in the body and in some cases – such as Wernicke's and Korsakoff's encephalopathies – may be permanent. Between the extremes of acute intoxication (the common 'drunk' ) and end-stage encephalopathic psychosis, lies a continuum of damage induced by chronic ethanol abuse on the brain.

At the time of the offense, the intoxication from which Mr. Fell suffered was thus a combination of both the acute effects due to his recent consumption and the chronic and enduring effects caused by his past two years abuse.

---

[21] Abraham HD (1982) A chronic impairment of colour vision in users of LSD, *Brit. J. Psychiat.* 140:518-520

| Dr. Jonathan J. Lipman | Report of Neuropharmacological Consultation on Donald FELL        May 14, 2001 | 15 |

FELL-00000437

Although he currently tests –in his drug-free state - within the normal range on various neuropsychological measures of brain function (per Drs Mills and Van Gorp), a considerable body of work supports the conclusion that chronic heavy use deranges various tests of cognitive performance in a way that persists for weeks and sometimes months after the drug is withdrawn. Eckardt et al (1978)[22] have shown, in tests performed in drug-free alcoholics (n=95) seven days after their last drink, that intensity of drinking (time and dose) predicts neuropsychological deficits on eight cognitive tests and explains 20% or more of the variance on five others: TPT-total time, Digit Symbol, Object Assembly, Benton Visual Retention and Shipley-Hartford CQ. Other researchers have measured the chronic effects of alcohol intoxivation – measured after discontinuation of the drug – on tests of abstracting ability, conceptual shifting, associative learning, and complex visuospatial and visuomotor processing. These deficits have been associated with age and duration of drinking[23], time since last drink[24] and other variables. In Echardt's study (ibid), consumption variables predicted certain scores on Object Assembly and increased 'lifetime gallons consumed' predicted poorer performance on Trails-B. For all of their tests, increased consumption was associated with poorer performance. Parenthetically these researchers note that more education was associated with better scores (which protective benefit would not apply to Mr. Fell). Mr. Fell described himself as being at different times either a bout drinker (or binge drinker) and a continuous drinker. The influence of these different patterns of consumption has also been studied in the laboratory. Sanchez-Craige (1980)[25] has shown that the very simple trail-making test (on a version of which Mr. Fell scored in the normal range most recently) detects differences among these patterns. Thus: bout drinkers and young drinkers performed better on the Trail Making Test than did daily drinkers and older drinkers. Duration of problem drinking has a weaker effect on performance on part 'A' of the test – the simplest part. Sanchez-craige found that differences could not be detected between performances of those who were tested less than 2 weeks after abstinence and those who were tested more than two weeks after abstinence – from which conclusion one parsimoniously infers that the deficit in TMT performance persists beyond two weeks from abstinence.

---

[22] Eckardt MJ et al (1978) Relationship between neuropsychological performance and alcohol consumption in alcoholics, *Biol. Psychiat.* 13(5):551-565

[23] Jones BM (1971) Verbal and spatial intelligence in short term and long term alcoholics, *J. Nerv. Ment. Dis.* 153:292-297; Jones BM & Parsons OA (1971) Impaired abstracting ability in chronic alcoholics, *Arch. Gen. Psychiat.* 24:71-75; Tarter RE (1973), An analysis of cognitive deficits in chronic alcoholics, *J. Nerve. Ment. Dis.* 157:138-147; Tarter RE & Parsons OA (1971) Conceptual shifting in chronic alcoholics, *J. Abnorm. Psychol.* 77:71-75

[24] Page RD & Linden JD (1974) Reversible organic brain syndrome in chrobic alcoholics: a psychometric evaluation, *Q.J.Stud. Alc.* 35:98-107; Clarke J & Houghton HA (1975) A study of intellectual impairment and recovery rates in heavy drinkers, *Br. J. Psychiat.* 126:178-184; Goldman MS. et al (1978) Recovery of sensory and motor functioning following chronic alcohol abuse, *in:* Seixas FA (ed) Currents in Alcoholism Vol 3, Grune& Stratton, pp493-504

[25] Sanchez-Craige, M (1980) Drinking pattern as a determinant of alcoholics' performance on the train-making test, *J. Stud. Alc.* 41(11):1982-1090

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          16
                                on Donald FELL          May 14, 2001

FELL-00000438

# EXHIBIT 5

# MARK D. CUNNINGHAM, PH.D., ABPP

**Clinical & Forensic Psychology**
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas
972 459 0658    Fax:  972 459 0958    mdc@markdcunningham.com

06-14-05

Mr. Alex Bunin, Esq.
Office of the Federal Public Defender
39 North Pearl Street
Albany, New York 12207

Re: <u>U.S. v Donald Fell</u> (capital sentencing)

Dear Mr. Bunin:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Donald Fell relative to the presence of any factors that might be considered mitigating. As will be detailed below, these findings and opinions are based on interview of Mr. Fell, review of summaries of interviews by FBI personnel, review of reports of other mental health experts involved in the case, review of records, and review of scholarly literature. These sources are of a sort that are customarily relied upon by clinical and forensic psychologists in coming to expert opinions. I would caution that third party interviews and additional review of records are pending. Accordingly, my findings and conclusions may be modified by additional information that may be made known to me.

**Findings and conclusions:**

An extensive body of research is available to demonstrate a nexus between deleterious developmental events or factors and adverse outcome. More specifically, research on factors associated with an increased risk of chronic delinquency, substance abuse, and serious violence in the community has been conducted and synthesized under the sponsorship of the U.S. Department of Justice (DOJ) as part of their increasing commitment to violence prevention programs. Consistent with past explanations (e.g. Masten & Garmezy, 1985), DOJ sponsored reviews have concluded that risk of violent criminal outcome is a function of the interaction or balancing of risk and protective factors (see U.S. Department of Justice, June 1995; Hawkins et al., 2000; Wasserman et al., 2003). Other DOJ sponsored longitudinal studies detail the effects of child maltreatment (Widom, 2000; Kelley, Thornberry, & Smith, 1997); the effects of family disruption (Thornberry et al., 1999) and the cumulative effects of hostility, observed violence, and personal violent victimization within the family (Thornberry, 1994) on

FELL-00000439

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

criminal outcome and violence rates. Other publications such as the Surgeon General's Report on Mental Health (1999) also detail ways in which neglect and traumatic experience may deflect the developmental trajectory. Important research on the risks associated with various developmental factors has been published in the peer reviewed literature apart from the sponsorship of DOJ as well. Mr. Fell's developmental history demonstrates many of the risk factors and few of the protective factors identified in the above studies. These include the following (factors present in Mr. Fell's development identified with check marks or plus-minus sign):

*U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention*

Risk Factors:

**Conception to age 6:**
- ✓ Perinatal difficulties
- Minor physical abnormalities
- ± Brain damage
- ✓ Family history of criminal behavior and substance abuse
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

**Age 6 through adolescence:**
- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- ✓ Transitions and mobility
- ✓ Availability of firearms
- ✓ Media portrayals of violence
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- ✓ Early and persistent antisocial behavior
- ✓ Academic failure
- ✓ Lack of commitment to school
- ✓ Alienation and rebelliousness
- ✓ Association with peers who engage in delinquency and violence
- ✓ Favorable attitudes towards delinquent and violent behaviors
- ✓ Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

2

FELL-00000440

<u>U.S. v Donald Fell</u>
**Capital sentencing – Mark D. Cunningham, Ph.D., ABPP**

<u>Protective Factors</u>:

Individual characteristics:
  Female gender
  Intelligence
  Positive social orientation
  Resilient temperament

Social bonding to positive role models:
± Family members
  Teachers
  Coaches
  Youth leaders
  Friends

Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.

Effective early interventions

*Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.*

**Individual factors**
  ✓ Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
  ✓ Aggressiveness (x 1.5 - 6)
  ✓ Early initiation of violent behavior (x 6)
  ✓ Involvement in other forms of antisocial behavior
  ✓ Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
  ✓ Parental criminality (x 1 - 3.8)
  ✓ Child maltreatment
  ✓ Poor family management practices (x 2)
  ✓ Low levels of parental involvement
  ✓ Poor family bonding and family conflict
  ± Residential mobility (±)
  ✓ Parental attitudes favorable to substance abuse and violence (x 2)
  ✓ Parent-child separation

3

FELL-00000441

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

## School factors
✓ Academic failure
✓ Low bonding to school
✓ Truancy and dropping out of school
   Frequent school transitions
✓ High delinquency rate schools

## Peer-related factors
   Delinquent siblings
✓ Delinquent peers
   Gang membership (x 3-4)

## Community and neighborhood factors
   Poverty (x 2)
   Community disorganization (crime, drug-selling, gangs, poor housing)
✓ Availability of drugs and firearms
   Neighborhood adults involved in crime
   Exposure to violence and racial prejudice

## Situational factors

*Wasserman, G.A., Keenan, K., Tremblay, R.E., Coie, J.D., Herrenkohl, T.I., Loeber, R., & Petechuk, D. (April, 2003). Risk and protective factors of child delinquency. Child Delinquency Bulletin Series. U.S. Department of Justice, NCJ 193409.*

## Individual factors
✓ Early antisocial behavior
✓ Emotional factors such as high behavioral activation and low behavioral inhibition
   Poor cognitive development
   Low intelligence
✓ Hyperactivity

## Family factors
✓ Parenting
✓ Maltreatment
✓ Family violence
✓ Divorce
✓ Parental psychopathology
✓ Familial antisocial behaviors
   Teenage parenthood
   Family structure
   Large family size

4

FELL-00000442

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

**Peer factors**
- ✓ Association with deviant peers
- Peer rejection

**School and community factors**
- ✓ Failure to bond to school
- ✓ Poor academic performance
- ✓ Low academic aspirations
- Living in a poor family
- Neighborhood disadvantage
- Disorganized neighborhood
- ✓ Concentration of delinquent peer groups
- ± Access to weapons

The above research provides an explanation for the developmental trajectory observable from adolescence and early adulthood which culminated in the charged capital offenses. I anticipate that in my testimony at capital sentencing I will particularize these factors to Mr. Fell and the resulting trajectory of his life. These and other adverse factors including those listed below impacted not only on Mr. Fell's life trajectory, but also on his underlying value system, moral development, perception of life options and nature of choices.

Additionally, I anticipate describing in more extensive detail a number of damaging developmental factors present in Mr. Fell's history that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. Again, these will be supplemented by research findings demonstrating a nexus between such factors and disrupted developmental trajectory and adverse developmental outcomes including substance abuse, criminal activity, and criminal violence. These include:

**Generational and biological factors**
- Family dysfunction from generation to generation
- Genetic predisposition to alcoholism and drug addiction
- Genetic predisposition to psychological disorders
- Prenatal alcohol exposure
- Attention Deficit Hyperactivity Disorder in childhood
- Inhalant abuse
- Closed head injury
- Youthfulness

**Parenting**
- Inadequate maternal attachment
- Alcoholism of both parents
- Observed mutual combat of parents
- Disinterest and emotional neglect by both parents

5

FELL-00000443

<u>U.S. v Donald Fell</u>
**Capital sentencing – Mark D. Cunningham, Ph.D., ABPP**

- Physical abuse
- Abandonment by father
- Abandonment by mother
- Corruptive influence of mother
- Negligent supervision and structure

**Community**
- Sexual abuse and sexually traumatic exposures
- Inadequate social services intervention
- Corruptive peers
- Drug-related deaths of friends

**Disturbed Trajectory**
- Childhood onset psychological disorders
- Poly-drug abuse and dependence from childhood
- Institutionalization in early adolescence
- School dropout
- Intoxication at time of offenses

I also anticipate testifying regarding an additional mitigating factor of positive prisoner adjustment (i.e. Skipper evidence). There are a number of factors that point to Mr. Fell being likely to have a positive (i.e. without serious violence) adjustment to prison, including absence of serious violence in pretrial confinement, participation in constructive activities in pre-trial confinement, and correctional appraisal. Further, seriousness of offense and/or life-without-parole sentence is not predictive of serious violence in prison. More specifically, there is large scale research demonstrating that inmates convicted of murder and/or serving life without parole are not a disproportionate risk of violence in prison.

Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

6

FELL-00000444

# EXHIBIT 6

**Declaration of Mark D. Cunningham, Ph.D., ABPP**

**Re:** U.S. v Donald Fell

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

1.      I am a clinical and forensic psychologist, licensed as a psychologist in the States of Texas, Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oregon, South Carolina, and Tennessee. I have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.      I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977.  I completed a one-year internship in clinical psychology at the National Naval Medical Center of Bethesda, Maryland.  I subsequently served as an active duty Clinical Psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981.  I was an assistant professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981. My curriculum vitae is attached (Attachment A).

3.      I was board certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology.  This distinction follows a rigorous examination process and is held by approximately 200 psychologists in the United States. I have provided forensic evaluation services in over 450 cases.  I have participated in extensive continuing education in the area of forensic psychology.  I have been recognized as a clinical and forensic psychology expert, and testified regarding capital sentencing determination issues including mitigation and/or violence risk assessment, in federal courts including U.S. District Courts in Alabama, Arkansas, Colorado, Illinois, Iowa, Louisiana, Maryland, Michigan, Missouri, Pennsylvania, Puerto Rico, North Carolina, New York, Texas, Virginia, and West Virginia.

4.      I am the first author or co-author of twelve published or in-press peer reviewed papers in the field of forensic psychology. I am the author of two brief articles and two case reports published in a scholarly book describing standards for forensic assessment. I am first author of the chapter on capital sentencing evaluations in the 12-volume Handbook of Psychology.  I am the author of an invited chapter in an in press scholarly text regarding capital sentencing determinations. Four of these scholarly publications address the role of mitigation in capital cases and outline research demonstrating the nexus between deleterious developmental experiences and adverse outcome in adulthood including criminal violence:

> Cunningham, M.D. (2002). Capital sentencing [case study]  (152-171).  In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook.  New York:  Oxford University Press.

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

Cunningham, M.D. & Reidy, T.J. (2002). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M.D. & Goldstein, A. (2003). Sentencing determinations in death penalty cases (pp. 407-436). Chapter in A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

5.    The American Academy of Forensic Psychology is an association of psychologists who are board certified by the American Board of Forensic Psychology. A primary mission of the Academy is to raise the standard of practice of psychology to the courts. Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of the Academy I provided full day workshops under their auspices on: "The role of the forensic psychologist in death penalty litigation" (March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 – San Diego, California; September 2003 – Cincinnati, February 2005 - La Jolla, California.). These workshops emphasized research literature, statistics, and conceptualizations relevant to mitigation and violence risk assessment consultations regarding capital defendants. Since 2000, these workshops have prominently featured research published by the U.S. Department of Justice regarding risk and protective factors in delinquency and criminal violence.

6.    The U.S. Supreme Court in Lockett v. Ohio (1978) described mitigation at capital sentencing as including: "…any aspect of a defendant's character or record, or any of the circumstances of the offense that the defendant proffered as a basis for a sentence less than death." What may be considered as mitigating, then, is extraordinarily broad and multi-faceted. While mitigation is a multi-faceted consideration, a central component is the concept of moral culpability. Moral culpability involves what the Supreme Court in Woodson v. North Carolina (1976) characterized as "the diverse frailties of humankind" (at 304). Further, moral culpability implicates sentencing-phase issues of formative and situational influences, and associated risk factors for adverse outcomes (e.g. Eddings v Oklahoma, 1982; Penry v. Lynaugh, 1989). Thus the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice. In other words, while equally criminally responsible, capital defendants may vary in their moral culpability and, ultimately, in their blameworthiness. More specifically, the nature and quality of understanding, perception, impulse control, judgment, and values that underlie choice – even choice that results

2

FELL-00000446

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

in heinous violence – are influenced by developmental, cognitive, neuropsychological, relationship, cultural, community, and situational factors (Haney, 1995). Haney (1997), as well as others (Shah, 1978; Monahan, 1981, 1996), have identified this "interactional" convergence of "nature, situation, context, and structure" as the primary explanation for criminal violence.

7.      An obvious tension is present at capital sentencing between the perspectives of the defense and prosecution regarding moral culpability. The defense theory at sentencing is typically deterministic – embracing the view that bio-psycho-social factors underlie violent criminal behavior, and applying associated risk factors present in the defendant's life to the analysis of his or her moral culpability. In contrast, the perspective advanced by the prosecution emphasizes the operation of willful choice, asserting that "a defendant's crime stems entirely from his evil makeup and that he therefore deserves to be judged and punished exclusively on the basis of his presumably free, morally blameworthy choices…" (Haney, 1997, p. 1459). In the absence of expert testimony regarding current developmental research findings and the relationship of this research to deviant developmental trajectory, adverse adult outcome, and criminal violence, the jury is unable to test these contrasting assertions. Thus the ability of the defense to support its assertion of reduced moral culpability is not only dependent on delineating the specific developmental experiences of the defendant, but also on the presentation of scientific evidence regarding the developmental risks and impacts of those specific types of developmental experience and/or impairments. Further, these empirically validated findings regarding developmental outcome are critically important to rebut common prosecution assertions and juror misconceptions of "abuse excuse."

8.      An extensive body of research is available to demonstrate a nexus between deleterious developmental events or factors and adverse outcome. The U.S. Department of Justice has taken a leading role in sponsoring, synthesizing, publishing, and promulgating research regarding developmental risk and protective factors for delinquency, drug abuse, criminality, and criminal violence; so that these findings can illuminate public policy and prevention efforts with the best available science. More specifically, research on factors associated with an increased risk of chronic delinquency and serious violence in the community has been conducted and synthesized under the sponsorship of the U.S. Department of Justice (DOJ) as part of their increasing commitment to violence prevention programs. Consistent with past explanations (e.g. Masten & Garmezy, 1985), DOJ sponsored reviews have concluded that risk of violent criminal outcome is a function of the interaction or balancing of risk and protective factors (U.S. Department of Justice, June 1995). These are outlined in Table 1 in Attachment B.

9.      Hawkins et al. (2000), in research sponsored by the DOJ, identified a number developmental arenas and associated specific factors that have a cumulative effect on the risk for chronic delinquency and serious violence by young adulthood (See Table 2 in Attachment B). Other DOJ sponsored longitudinal studies detail the effects of child maltreatment (Widom, 2000; Kelley, Thornberry, & Smith, 1997); the effects of family disruption (Thornberry et al., 1999) and the cumulative effects of hostility, observed violence, and personal violent victimization within the family (Thornberry, 1994) on criminal outcome and violence rates. Other publications

3

FELL-00000447

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

such as the Surgeon General's Report on Mental Health (1999) also detail ways in which neglect and traumatic experience may deflect the developmental trajectory. U.S. Government sponsored research and publications relevant to mitigation conceptualizations are emphasized for two reasons. First, these research summaries are quite comprehensive and reflect the involvement of researchers of substantial stature. Second, the origins of the research almost entirely insulate the findings from being ridiculed as an "abuse excuse."

10.    Important research on the risks associated with various developmental factors has been published in the peer reviewed literature apart from the sponsorship of DOJ as well. For example, there are empirical findings illuminating adverse outcomes associated with teenage mother, father absence, disrupted attachment, youthfulness, learning disability, peer alienation and rejection, frequent moves and household instability, observed community violence, personal victimization, corruptive family and/or community, sexual abuse, trauma exposure, inadequate supervision and guidance, neuropsychological deficits, psychological disorders, substance abuse and dependence, and other adverse circumstances and developmental risks.

11.    A capital jury would almost certainly not be familiar with the research findings demonstrating a nexus between adverse developmental factors and criminally violent outcome. Further, a capital jury would almost certainly be unaware that the U.S. Department of Justice had embraced the nexus between developmental factors and criminal outcome in its own research findings and resultant prevention efforts.

12.    Knowledge of the developmental research regarding experiences in the defendant's background is necessary for the jury to make an informed consideration of what weight to give those adverse experiences in determining a capital defendant's moral culpability – and thus his death worthiness.

13.    The relevance of the above developmental research to a particular defendant is not dependent on either a defendant's personal insight or external "proof" regarding whether an adverse event in the defendant's developmental history "caused" a currently observed condition or outcome in adulthood in the defendant. Rather, certain historical/developmental factors are identified as risk factors that contributed to the adult outcome with varying degrees of weight - based on research on groups of similarly situated individuals. The clinical practice of medicine and psychology similarly rests on the application of such group derived "risk" data to the specific patient. This is demonstrated in diagnosis and diagnostic procedures, the meaning of clinical findings and genetic predispositions, establishing prognosis, and formulating sound treatment regimens – all of which are derived from group data and experience that did not specifically include the patient being assessed. To assert that such group-derived data is irrelevant to an explanation of the course and outcomes of a particular person represents a fundamental misunderstanding of the nature of scientific data in the fields of medicine and psychology, where virtually all clinical and scientific expertise rests on knowledge of extensive group-derived data. The larger the group on which such procedures are based, the greater the

4

FELL-00000448

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

reliability of the finding.

14.    The application of research findings to the developmental experiences of a particular patient of defendant is based on the presence or absence of these events in the defendant's history, not on whether this history was self-described or accompanied by insight. Further, it is not anticipated that a patient or defendant has comprehensive insight into how he has been affected by these developmental risk factors, nor is the impact dependent on his recognition of it. Thus, apart from the history obtained, interview observations and/or testing data do not illuminate the nexus between adverse developmental experience and criminal and/or violent outcome. Consistent with this conclusion, findings of the U.S. Department of Justice regarding the nexus between adverse developmental factors and criminal/violent outcome by late adolescence and early adulthood, and the associated prescription of preventative measures, are without recourse to interviewing or testing specific at-risk youth to determine whether the nexus applies to them.

15.    At sentencing in a capital case, a tragic adult outcome is an adjudicated certainty. Not uncommonly, the adult life trajectory has been deviant as well. A psychologist who is familiar with the research demonstrating the relationship between various damaging developmental factors and adverse adult outcomes including criminality and violence can reliably inform a capital jury of this nexus so that the jury can give informed weight to the presence of adverse developmental factors in the defendant's life.

16.    My testimony regarding adverse developmental factors present in a capital defendant's life, illustrative anecdotal examples, research studies (i.e. group derived data) have typified my testimony regarding mitigation in federal and state capital sentencing cases since 1995. Because of the impressive scholarship and broad acceptance of the above described research sponsored and published by the U.S. Department of Justice demonstrating the nexus between adverse developmental factors and adverse/criminal outcome, since 2000 my testimony regarding the implications of adverse developmental factors at capital sentencing has extensively cited this research by the Department of Justice. This has routinely been accompanied and illustrated by extensive demonstrative exhibits. Below I have listed federal capital cases where I described research regarding the nexus between adverse developmental factors and criminally violent outcome, with those heard in 2000 and following citing DOJ studies regarding risk and protective factors:

*Capital sentencing testimony regarding the nexus between adverse and/or protective developmental factors and criminally violent outcome:*

　　　　U.S. v Louis Jones, Jr. (1995),  Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas.

5

FELL-00000449

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

**U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana.

**U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas.

**U.S. v Trinity Ingle** (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division.

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division

**U.S. v Darryl Johnson** (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District Court for the Northern District of Alabama.

**U.S. v Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in U.S. District Court, Eastern District of Arkansas.

*Capital sentencing testimony citing DOJ risk and protective developmental factors for delinquency and criminal violence, as well as other scholarly sources:*

**U.S. v Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in U.S. District Court, Western District of Texas, Waco Division.

**U.S. v Willis Haynes** (2000), Criminal No. PJM 98 0520 in U.S. District Court for District of Maryland.

**U.S. v Daymon Smith** (2000), No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Aquilia Marcivicci Barnette** (2002), 3:97CR23-T in U.S. District Court for the Western District of North Carolina, Charlotte Division.

**U.S. v Aaron Haynes** (2003), CR-01-202-47 in the U.S. District Court for the Western District of Tennessee, Western Division.

6

FELL-00000450

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

**U.S. v John Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

**U.S. v Wesley Purkey** (2003), Cause No. 01-308-01-CR-W-1, in the U.S. District Court, Western District of Missouri, Western Division, Missouri.

**U.S. v Keon Moses, et al**. (2004), CCB-02-0410 in U.S. District Court for the District of Maryland, Northern Division

**U.S. v Styles Taylor** (2004), Cause No 2:01-CR-0073, in the U.S. District Court, Northern District of Indiana, Hammond Division

**U.S. v Hernaldo Medina-Villegas** (2005), in the U.S. District Court, Puerto Rico.

**U.S. v Angela Johnson** (2005), in the U.S. District Court, Sioux City, Iowa.

**17.**     As a result of having testified in so many federal capital cases regarding research in this arena sponsored and published by the U.S. Department of Justice, as well as other scholarly sources, the Government is quite familiar with my testimony and its typical basis; and routinely cross-examines me from transcripts of my sentencing phase testimony in multiple past federal capital cases. Despite this familiarity, to my knowledge, the Government has never put on expert testimony in rebuttal to assert that the DOJ studies I cited were scientifically flawed or their application in error. Indeed, Dr. Park Dietz, a forensic psychiatrist repeatedly retained by the U.S. Department of Justice in capital sentencing evaluations, did not rebut these studies when called by the Government in U.S. v Barnette (2002); and last month in People vs. Edgar Osorio (California) characterized these studies as the best available research. Following my capital sentencing testimony this last month in U.S. v Angela Johnson, which extensively cited DOJ research on risk and protective factors for delinquency and criminal violence, the Government waived my cross-examination.

Sworn and affirmed under penalty of perjury on June 27, 2005.


Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

7

FELL-00000451

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

References

Estelle v. Smith, 451 U.S. 454 (1981).

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Haney, C. (1995). Symposium: The social context of capital murder: Social histories and the logic of mitigation. Santa Clara Law Review, 35, 547-609.

Haney, C. (1997). Violence and capital law. Stanford Law Review, 49, 1447-1486.

Hawkins, J. D., Herrenkohl, T. I., Farrington, D. P., Brewer, D., Catalano, R. F., Harachi, T. W., & Cothern, L. (2000, April). Predictors of youth violence. OJJDP Juvenile Justice Bulletin. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C.: U.S. Department of Justice.

Kelley, B. T., Thornberry, T. P., & Smith, C. A. (1997, August). In the wake of childhood maltreatment. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention (NCJ-165257). Washington, D.C.: U.S. Department of Justice.

Lockett v. Ohio, 438 U.S. 604 (1978).

Masten, A. S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology. In Advances in clinical child psychology (Vol 8) (pp. 1-52). New York: Plenum Press.

Monahan, J. (1981). Predicting violent behavior: An assessment of clinical techniques. Beverly Hills, CA: Sage.

Monahan, J. (1996). Violence prediction: The past twenty years. Criminal Justice and Behavior, 23, 107-120.

Penry v. Lynaugh, 492 U.S. 1 (1986).

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

Thornberry, T.P. (1994, December). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C: U.S. Department of Justice.

Thornberry, T.P., Smith, C.A., Rivera, C., Huizinga, D. & Stouthamer-Loeber, M. (1999). Family disruption and delinquency. OJJDP Juvenile Justice Bulletin, U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C.: U.S. Department of Justice.

FELL-00000452

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

U.S. Department of Justice (1995, June).  Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. OJJDP Update on Programs. Juvenile Justice Bulletin.  U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention (NCJ 153571). Washington, D.C.: U.S. Department of Justice.

Widom, C.S. (2000, January). Childhood victimization: Early adversity, later psychopathology. National Institute of Justice Journal.

Woodson v. North Carolina, 438 US 304 (1976).

9

FELL-00000453

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

**Undergraduate:**    Abilene Christian College, Abilene, Texas
Bachelor of Arts, (May 1973)
Majors: Psychology, Mass Communications

**Graduate:**    Oklahoma State University, Stillwater, Oklahoma
Master of Science  (December 1976)
Doctor of Philosophy (December 1977)
Specialty:  Clinical Psychology  (APA accredited)

**Internship:**    National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty:  Clinical Psychology  (APA accredited)

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 | New Mexico #0768 |
| Oregon #1333 | South Carolina #764 | Tennessee #2255 |
| Texas #2351 | | |

10

FELL-00000454

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (2)

### PROFESSIONAL PRACTICE

**1981 – date**    Clinical and Forensic Psychologist, Private practice

**1978 – 1981**    Clinical Psychologist (Lieutenant, MSC, USNR)
                    Naval Submarine Medical Center, Groton, Connecticut


### ACADEMIC APPOINTMENTS

**1981 - 1983**    Assistant Professor: Psychology Department,
                    Hardin-Simmons University, Abilene, Texas

**1978 - 1980**    Instructor (part-time): Psychology Department,
                    Old Dominion University (U.S. Submarine Base Extension);
                    Mohegan Community College, Norwich, Connecticut

**1974 - 1977**    Teaching Assistant: Psychology Department
                    Oklahoma State University, Stillwater, Oklahoma


### PROFESSIONAL AFFILIATIONS

Board Certified in Forensic Psychology, American Board of Professional Psychology (examiner)
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)
Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology


### EDITORIAL

Ad hoc reviewer: Assessment
                    Behavioral Sciences & the Law
                    Law & Human Behavior

11

FELL-00000455

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

## CURRICULUM VITAE (3)

## HONORS AND AWARDS

John Augustus Award – for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004

Al Brown Memorial Award - for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

Navy Commendation Medal - for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980

Magna Cum Laude – Bachelor of Arts, Abilene Christian College, 1973

## SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M. D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.

12

FELL-00000456

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

Behavioral Sciences & the Law, 16, 333-351.

## CURRICULUM VITAE (4)

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law, 20, 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. Professional Psychology: Research and Practice, 34, 233-239.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review, 15, 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. Behavioral Sciences & the Law, 23, 307-320.

13

FELL-00000457

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

**CURRICULUM VITAE (5)**

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (*in press*) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? American Journal of Criminal Law.

*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (114-115). New York: Oxford University Press.

*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, U.S. Navy Medicine, 69, 26-28.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. Prosecutor's Brief: California District Attorneys Association, 20, 9-11.

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21, 2, 8-9.

14

FELL-00000458

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (6)

*Manuscripts under review:*

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*)   An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*)  Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates.

*Manuscripts in preparation:*

Sorensen, J. R. & Cunningham, M. D. (*manuscript in preparation*)  Does the severity of the offense predict prison adjustment? A comparative study of the violent institutional misconduct rates of convicted murderers and other offenders.

15

FELL-00000459

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

**Attachment B**

Table 1

U.S. Department of Justice Model: Risk Factors for Violence in
the Community

| Age 6 to Conception | Age 6 through Adolescence |
|---|---|
| • Perinatal difficulties | • Extreme economic deprivation |
| • Family history of criminal behavior and substance abuse | • Community disorganization and low neighborhood attachment |
| • Parental attitudes favorable toward, and parental involvement in, crime and substance abuse | • Parental attitudes favorable toward, and parental involvement in, crime and substance abuse |
| • Minor physical abnormalities | • Availability of firearms |
| • Family management problems | • Media portrayals |
| • Family conflict | • Family management problems |
| • Brain damage | • Family conflict |
| | • Early and persistent antisocial behavior |
| | • Academic failure |
| | • Lack of commitment to school |
| | • Alienation and rebelliousness |
| | • Association with peers who engage in delinquency and violence |
| | • Favorable attitudes towards |

16

FELL-00000460

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

          delinquent and violent behaviors
- Constitutional factors (e.g., low intelligence, hyperactivity, attention-deficit disorders)

---

Note. Adapted from "Guidelines for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders," by U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, June 1995.

17

FELL-00000461

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

Table 2

U. S. Department of Justice Model: Predictors of Youth Violence

**Individual Psychological Factors**

- Internalizing disorders
- Hyperactivity, concentration problems, restlessness, and risk taking
- Aggressiveness
- Early initiation of violent behavior
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior

**School Factors**

- Academic failure
- Low bonding to school
- Truancy and dropping out of school
- Frequent school transitions

**Peer Related Factors**

- Delinquent siblings
- Delinquent peers
- Gang membership

**Family Factors**

- Parental criminality
- Child maltreatment
- Poor family management practices
- Low levels of parental involvement
- Poor family bonding and family conflict
- Parental attitudes favorable to substance use and violence
- Parent-child separation

**Community and Neighborhood Factors**

- Poverty
- Community disorganization
- Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

Note. From "Predictors of Youth Violence," by J. D. Hawkins, T. I. Herrenkohl, D. P. Farrington, D. Brewer, R. F. Catalano, T. W. Harachi, and L.Cothern. U. S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, April 2000.

18

FELL-00000462

# EXHIBIT 7

# ⛨ Washington University in St.Louis

## SCHOOL OF MEDICINE

**Department of Psychiatry**

October 11, 2002

Gregory Waples, Esquire
Assistant United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

                              Re: United States v. Donald Fell

Dear Mr. Waples:

     As you know, I was asked to review the reports of three
experts (Drs. Mills, Van Gorp and Lipman) retained by the Federal
Public Defender's Office, to review documents relevant to the
charges against Mr. Fell and to perform an examination on him in
order to prepare rebuttal testimony, if clinically warranted, for
the penalty phase of the this capital murder trial.

     I reviewed the three reports, a large number of additional
documents (listed in Appendix A), including almost all of the raw
test data used to evaluate Donny by the Defense's experts.

     Donny Fell was interviewed on two occasions, September 18
and September 19, 2002, at the Northwest State Correctional
Facility in St. Albans Vermont. The interview on 9/18/02 began at
about 9:45 A.M. and lasted until about 12:00 noon. He then
completed the MMPI-2 finishing shortly before 1:30 P.M.  He was
given the cognitive examination from the Cambridge Examination
for the Elderly from about 9:20 A.M. until about 9:35 A.M. on
9/19/02.  He then was interviewed again for about one hour.

     Prior to my examination, the intended scope of my
examination was discussed with his counsel.  I noted that the
issue of Donny's dominance or submissiveness had been raised by
defendant's experts.  I disclosed my opinion that to evaluate
that claim properly, I would need to discuss his role and
relationship to any of his associates in each prior criminal act
and to explore the relationship between Donny Fell and Bobby Lee
in detail.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, www.wuphysicians.org., www.wustl.edu

FELL-00000463

Donny Fell Report

Prior to beginning the examination, his attorney, Paul Volk, informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes. He also indicated that no inquiry should be made about the use of knives. His counsel also indicated that the issue of dominance and submissiveness would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney and an investigator from the federal public defender's office. He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court. I left the room once each day briefly when his counsel and Donny conferred about my questions.

## Summary of opinions

1.    Donny Fell and Bobby Lee jointly committed the murders with which they are charged. (Author's note: Since I was not allowed to discuss the crimes Donny committed with Donny, I cannot offer any comments about his mental state at the time of the crime. His statements to the police do indicate a remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims. See appendix B for my summary of the relevant material.)

## Defense opinions that cannot, in my opinion, be rebutted

1.    Donny was the victim of sexual abuse as a young child. (Author's note: The documentation is such that I would support this conclusion as it relates to his baby sitters. I basically agree with Dr. Mills. See Appendix C for my history and analysis)

2.    Donny was the victim of physical abuse as a young child. (Author's note: The documentation is such that I would support this conclusion as it relates to his parents and baby sitters. I basically agree with Dr. Mills. See Appendix D for my history and analysis)

3.    Donny grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children.

2

FELL-00000464

Donny Fell Report

He did not receive even minimal parental guidance and supervision for many years at a time.

He had no role models for either sobriety or self control.

He was abandoned by both of his parents at times.

(Author's note: The documentation is such that I would basically support Dr. Mills' conclusion.  I may differ on details; his report is concise. See Appendix E for my history and analysis)

4.    Based on the his denial of the symptoms to me, I am unable to state with reasonable degree of certainty that Donny ever had or did not have hyperactivity or attention deficit disorder (ADHD).  The neuropsychological testing does not show any likely correlates of it today.  He certainly shows none of the characteristics of these disorders at present. The medical record is fairly clear that competent professionals thought he had ADHD or at least hoped he had it.  (Author's note: See Appendix F for my history and analysis.)

5.    Donny began abusing alcohol and drugs at a remarkably early age.  When not in custody, he has used an amazing amount of intoxicating substances.  He qualifies for the diagnoses of abuse and dependence on a number of substances.  (Author's note: The documentation is such that I would basically support Dr. Mills' and Dr. Lipman's conclusions.  I may differ on details.  See Appendix G for my history and analysis)

6.    Donny has received a competent neuropsychological evaluation. Dr. Van Gorp has concluded, correctly in my opinion, that he has no cognitive deficits detectable on neuropsychological testing.  My own, very limited examination also showed no deficit.  It is amazing that his extended use of alcohol and drugs has left no deficits. (Author's note: See Appendix H for my history and analysis. There are trivial differences in the history obtained.)

3

FELL-00000465

Donny Fell Report

7.    The available history shows that

    A.    His father lied to the authorities about the nature and extent of substance abuse and violence in Donny's home.
    B.    His mother lied to the authorities about the nature and extent of substance abuse and violence in Donny's home.
    C.    When Donny described the substance abuse problem in his home, he was not believed or received an inadequate response.
    D.    The Children and Youth Services had adequate information from the police and others (his grandmother *inter alii*) to alert them to these problems.
    E.    Multiple professionals failed to understand the problems that are now quite clear in retrospect. (Author's note: See Appendix I for my history and analysis.)

8.    It has been alleged that Donny has showed no signs of malingering.  The conclusion is mildly overstated, but broadly true.  (Author's note: See Appendix J for my history and analysis.)

9.    Donny began displaying the types of a social and antisocial behaviors called conduct disorder at an early age and to a degree that is more severe than average for persons with this diagnosis. (Author's note: The documentation is such that I would support Dr. Mills' conclusion to a significant degree.  I may differ on severity of the disorder.  See Appendix K for my history and analysis.)

**Defense opinions that could be qualified, if desired.**

1.    Donny meets some or all of the criteria for a number of Cluster B personality disorders, displaying antisocial, borderline and narcissistic traits.  These disorders along with his substance abuse do have a genetic and a familial basis.  (Author's note: The evidence is such that I will agree in part and disagree in part with Dr. Mills' conclusions. See Appendix L for my history and analysis.)

**Defense opinions that could be rebutted**

1.    It has been alleged that Donny shows signs of psychosis on testing; I disagree strongly.

4

FELL-00000466

Donny Fell Report

    A.    the use of projective drawings in 1993 was invalid for the conclusions reached.

    B.    the MMPI-2 does not support a diagnosis of psychosis or prepsychosis and

    C.    the Rorschach does not support a diagnosis of psychosis or prepsychosis.

    D.    On clinical examination, no defense expert has noted any indication of thought disorder, hallucination or delusion. I fully agree. (Author's note: See Appendix M for my history and analysis.)

2.    Donny has been diagnosed with an affective disorder in the past. His depression has been alleged to have been severe, even psychotic in degree. Based on the history that I obtained and the review of the relevant documents, I am unable to state that he ever had a depressive syndrome. If he did have one, it was neither severe nor psychotic in degree. (Author's note: See Appendix N for my history and analysis.)

3.    The issue of dominance versus submission has been raised by over-interpretation of one test score. The record alone is sufficient to disagree that Donny is submissive, although without direct examination the conclusions are surely less certain. (Author's note: See Appendix O for my history and analysis.)

These opinions can be offered to a reasonable degree of professional certainty.

## Comment

Donny Fell has been a full participant in three murders and the other crimes associated with those murders.

## Emotional, physical and sexual abuse

The defense and its experts have presented evidence that Donny was sexually abused. That it has occurred is indisputable. How often it occurred is unclear. The only issues are the number of people involved in his sexual abuse, their relationship to Donny and the duration of the sexual abuse.

5

FELL-00000467

Donny Fell Report

The defense and its experts have presented evidence that Donny was physically abused.  That it has occurred repeatedly is indisputable.  The only issue is whether the abusers include some of his second degree relatives as well as his parents and his baby sitters.

The defense and its experts have presented evidence that Donny was emotionally abused.  That it has occurred is indisputable.

Donny comes from a markedly dysfunctional family that did little to divert him from his asocial and intoxicated lifestyle. One cannot point to a good role model in his life.

It is obvious that Donny has had behavioral and substance abuse problems for many years.  His parents misrepresented to the case workers, to the mental health professionals and others about the nature and extent of the substance abuse problems, violence and other forms of abuse in his parents' home.  Their behavior was not simply a lack of insight.  This deception interfered with early, prompt and thorough interventions which *might* have affected the course of his development.  We will never know.

It is also clear that the public agencies did not respond competently to the information that was given to them.

The relationship of the abuse to the commission of the crimes is unknown.  I will offer no opinions on this point.

## Substance abuse

It must be conceded that he was quite intoxicated for months prior to the crimes and at the start of them.  It is uncertain (from my review of the police record; I did no examination of him on this point) that he was ever sober during these crimes. Voluntary intoxication is no defense to the elements of the crime in the guilt phase, but it has been accepted as a statutory mitigator in the penalty phase in some states.  When, as in this case, the "voluntary" intoxication begins at age eight and is full blown by age twelve, the meaning of "voluntary" is quite unclear.  This volitional behavior certainly began before what some would call the age of reason.

The defense and its experts opine that these murders would

6

FELL-00000468

Donny Fell Report

not have occurred were Donny Fell sober.  This conclusion seems
reasonable.  However, Donny had done his best not to be sober for
months or years.  In essence then, the argument becomes this
murder would not occurred if Donny were not Donny.  It has been
pointed out that there are genetic (and environmental) risks
factors for alcohol and drug abuse.  It should be added that
these factors also contribute to personality disorders.  All of
these seem present in Donny's case.

**Psychosis**

It has been alleged that Donny is prepsychotic, that is, he
might become psychotic in prison.  One cannot refute that someone
might become psychotic in the future.  The only person who would
not meet that description is someone who is already psychotic.
We know that Donny is not psychotic now.  We do know that he did
not develop alcoholic hallucinosis or alcoholic paranoia despite
consumption of incredible amounts of alcohol.  We do know that he
did not develop a psychosis as a result of his frequent, heavy
and unselective use of drugs.

The evidence that he might become psychotic in the future is
incredibly weak.

The defense argument is, "If the MMPI-2 given by Dr. Mills
is wrong and he does not have a severe personality disorder, then
he might have schizophrenia." The argument continues, "If the
Rorschach is wrong, then he might have schizophrenia."

If the MMPI-2 is right, he has the severe personality
disorder found on both administrations of the test.  If the
Rorschach is right, he has a severe personality disorder.  The
results of all three tests converge and match his history.

His score on the Rorschach is average for persons with
cluster B personality disorders (3 indicia present) and is below
the level where one might cautiously assert that schizophrenia is
present (4 indicia present).  Using the cutoff of 4 (which he
does not meet; he is just close), there is a 40% error rate in
diagnosis of persons with cluster B personality disorder and a
16% error rate in normals.  One does not have to resolve the
issue of the credibility of Rorschach findings that do meet Exner
standards to resolve the issue of the credibility of those that
do not.  Turning knowledge about the errors a test may make

7

FELL-00000469

Donny Fell Report

occasionally into evidence is odd.  If the test erred, it erred.
It can be discounted, but it cannot be turned into gold.

Obviously, given the state of present day knowledge, one
could not state that a person with any Axis I diagnosis was not
more likely to develop a psychosis than a person without any Axis
I diagnosis.  However, one cannot state the amount of the
increased risk; it would be small.

Obviously, given the state of present day knowledge, one
could not state that a person with a second degree family member
with a history of psychosis was not more likely to develop a
psychosis than a person without any such family history[1].
However, one cannot state the amount of the increased risk; it
would be small, especially in the case of schizophrenia.

Thank you for this interesting referral.  I have discussed
my impressions with Dr. John Rabun.  I have given him a typed
copy of my interview notes as well as the appendices relating to
the psychological testing.

_____

[1] (Author's note: During Donny's second hospitalization,
Mrs. Fell reported that his maternal grandmother had a chronic
psychosis and died in a state mental hospital.  During Donny's
third psychiatric hospitalization, Mrs. Fell reported that his
father was schizophrenic.  In addition, Donny's grandmother was
said to be chronically psychotic and chronically on psychotropic
medication.  During his fourth psychiatric hospitalization, Mrs.
Fell apparently asserted to a social worker, Robert Tryzenski,
that Donny's paternal grandfather was "schizophrenic" and
alcoholic.  She asserted that his paternal grandmother had
received shock treatment for depression.  She also reported that
her sister, Donny's aunt, had been in psychiatric treatment.
Mrs. Fell is not considered an accurate source of psychiatric
information.)

8

FELL-00000470

Donny Fell Report

**Diagnostic impression:**

Axis I      Polysubstance abuse
            Alcohol dependence
            Marijuana dependence

Axis II     Personality disorder - NOS with antisocial, borderline
            and narcissistic features

Axis III    S/P mild concussions without residual deficits
            S/P brain contusion

Axis IV     Legal problems, family problems, Substance abuse

Axis V      45

Sincerely yours,

Richard D. Wetzel, Ph.D.
Professor of Psychiatry
Professor of Neurology and of Neurological Surgery
Washington University School of Medicine

9

FELL-00000471

## Table of contents

**Report**                                                1-  9
Appendix A -    Documents Reviewed                        10- 17
Appendix B -    the Government's Account                  18- 32
Appendix C -    History of sexual abuse                   33- 34
Appendix D -    Physical Abuse                            35- 38
Appendix E -    Dysfunctional family                      39- 44
Appendix F -    Attention Deficit Hyperactivity           45- 46
                Disorder
Appendix G -    Alcohol and substance abuse               47- 52
Appendix H -    Cognitive functioning                     53- 61
Appendix I  -   Misrepresentation and
                misapprehension of the situation          62- 68
Appendix J  -   Malingering                               69
Appendix K -    Conduct disorder                          70- 75
Appendix L -    Personality disorder                      76- 77
Appendix M -    Depressive syndrome                       78- 83
Appendix N -    Psychosis and psychological testing       84-100
Appendix O -    Dominance and Submission - a
                misleading interpretation                 101-105

Appendix P -    Typed notes                               106-127

Computer output -   Mills MMPI-2
                Forensic                                  128-139
                Clinical                                  140-159

Computer output -   Wetzel MMPI-2
                Forensic                                  160-172
                Clinical                                  173-193

FELL-00000472

Appendix A - Documents Reviewed

**Appendix A**

**Documents reviewed prior to the evaluation**
**Provided by the United States of America**

1. Letter from Peter W. Hall, US Attorney, and Gregory Waples, AUSA, confirming my agreement to consult in this case with a description of the facts of the case as seen by the government.

2. The indictment dated 2/1/01.

3. The letter from the office of the federal public defender of Northern New York and Vermont reporting their view on and opposition to the death penalty in this case.

4. The notice from the USA to seek the death penalty.

5. The psychiatric report of Dr. Mark J. Mills, the defense's expert psychiatrist. His CV.

6. The report of a neuropsychological and psychological evaluation of Donny Fell conducted by Dr. W.G. van Gorp, assisted by Dr. Kimberly Walton, a neuropsychology fellow. His CV.

7. The report of Dr. Jeffrey J. Lipman, a self-designated neuropharmacologist[2], and his CV.

8. A background report labeled 7A-AL-44453 which summarizes multiple interviews and record checks performed by the FBI.

9. A letter by James J. Hudziak, M.D., dated 5/24/02.

10. Handwritten notes on an interview with Bobby Lee dated 12/2/00 at 2:15 P.M..

11. A Miranda warning apparently signed by Donny Fell on 12/1/00.

12. Handwritten noted on an interview with Donny Fell dated on 12/2/00 at 4:55 P.M.

13. A transcript of an interview between Sheriff Wes Kendrick of

---

2 He seems to have sought and obtained certification in multiple other areas.

10

FELL-00000473

Appendix A - Documents Reviewed

Johnson County, Tom Aiken of the N.Y. State Police, Donny
Fell and an unidentified male dated 12/1/00.

14.   A Miranda warning apparently signed by Donny Fell on
      12/2/00.

15.   A transcript of an interview between  Det. Sgt. James Cruise
      of the Vermont State Police, Det. Cpl. Rod Pulsifer and Det.
      David Schauwecker of the Rutland PD in Vermont, Special
      Agent James Caudle of the FBI and Donny Fell dated 12/2/00
      at 5:01 P.M.

16.   A hand written statement of Bobby Lee dated 12/1/00. (ten
      pages)

17.   The first hand written statement of Donny Fell dated
      12/1/00. (three pages with a map).

18.   A second hand written statement of Donny Fell dated 12/1/00.
      (two pages).

13.   A transcript of an interview between Sheriff Wes Kendrick of
      Johnson County, Tom Aiken of the N.Y. State Police, Bobby
      Lee and an unidentified male dated 12/1/00.

**Provided by the Federal Public Defender or its experts in the
mail**

1.   The report and raw data of a neuropsychological and
     psychological evaluation of Donny Fell conducted by Dr. W.G.
     van Gorp, assisted by Dr. Kimberly Walton, a neuropsychology
     fellow.

     A.   Five pages of notes are provided, apparently taken on
          4/6/01.
     B.   Five pages identified as psychotic screening module.
     C.   A six page neuropsychological testing summary sheet is
          enclosed.
     D.   Twenty two pages from the Wechsler IQ administered on
          4/6/01. Thirteen of fourteen scales were administered;
          this is a frequent or standard practice.
     E.   Twenty four pages from the Wechsler Memory Scale test.
          Only selected scales were used - Logical Memory I & II,
          Faces I & II, Letter Number sequencing and  Logical
          memory recognition were performed (six scales).
          Information and orientation, Verbal Paired Associates I
          & II, Family Pictures I & II, Word lists I & II, Visual
          Reproduction I & II, Spatial span, Mental control,

11

FELL-00000474

Appendix A - Documents Reviewed

        Digit span[3] were omitted (twelve scales).

   F.   Nineteen pages of output from the Psychological Corporations program for interpreting the WAIS-III and WMS-III (complete record).

   G.   The WRAT-3 was given and answers provided spelling, arithmetic and reading (complete record).

   H.   A structural summary blank, two location charts, two unmarked sheets of notes and calculations, a constellation worksheet and the output from the Rorschach.

2.   The psychiatric report of Dr. Mark J. Mills. (The raw data of the tests he said he did were sent to me with the raw data of Drs. van Gorp and Walton.)

   A.   The Validity Indicator Profile answer sheet and NCS output.

   B.   A two page answer sheet for the MMPI-2 which apparently was sent out for scoring and interpretation by the NCS service.  The NCS output was not enclosed; scores from 13 scales were included.

3.   The report of Dr. Jeffrey J. Lipman.

   A.   Dr. Lipman reported that he gave the CAQ / 16 PF (Clinical Assessment Questionnaire / 16 Personality Factors of Cattell).  This has not been provided yet.

**2.   Provided by the Federal Public defender on CD**

Label

1-11       Interview notes - Bobby Lee - 12/2/00 2:15 P.M.

12        Miranda rights form - Donny Fell - 12/1/00 - 2:50 A.M.

13-15[4]    Interview Notes - Donny Fell - 12/2/00 - 4:55 P.M.

17-66     Transcript - telephone interview with Donny Fell - 12/1/00.

67        Miranda rights form - Donny Fell - 12/2/00 - 5:01 P.M.

68-116    Transcript - Donny Fell - 12/2/00 - 5:01 P.M.

---

3 Scores from the IQ test were entered on the page, but the individual items are not marked.

4 13-16

12

Appendix A - Documents Reviewed

117          FBI label - handwritten statement of Bobby Lee - 10
             pages - 12/1/00.

118-127      Handwritten statement of Bobby Lee - 10 pages -
             12/1/00.

128          FBI label - Two pages original written statement of
             Donny Fell - 12/1/00 - 9:40 A.M. - third interview.

129-130      Two pages original written statement of Donny Fell -
             12/1/00 - 9:40 A.M. - third interview.

131          FBI label - Original hand written statement provided by
             Bobby Lee - 12/1/00 - 12:25 A.M.

132-135      Original hand written statement provided by Bobby Lee -
             12/1/00 - 12:25 A.M.

136-187      Transcript of telephone interview of Bobby Lee by N.Y.
             State Police - Aiken.

188          Miranda rights form - Bobby Lee - 12/2/00 - 2:15 P.M.

189-260      Transcript of interview with Bobby Lee - 12/2/00 - 2:15
             P.M.

261-264      Transcript of administrative segregation hearing -
             Donny Fell - 12/18/00

265-290      Transcript - grand jury testimony - S.A. Stephen B.
             Hardegree - 12/14/00

291-352[5]   Transcript - grand jury testimony - interstate movement
             of Neon and shot gun -S.A. Stephen B. Hardegree -
             12/14/00

296-352      Transcript - grand jury testimony - Det. Rod Pulsifer -
             Rutland City P.D. - title and pages 2 - 56 - 12/21/00 -
             1:27 P.M.

353-364      Transcript - grand jury testimony - Det. Rod Pulsifer -
             Rutland City P.D. - title and pages 2 - 11 - 12/21/00 -
             1:27 P.M.

365-408      Grand jury - Continuation of the reading of the
             transcript of Bobby Lee - 12/21/00

---

5 291-295

13

FELL-00000476

Appendix A - Documents Reviewed

409-461     Transcript of grand jury testimony of Bethany Brashears
            - 1/11/01.

462         Letter of AUSA to Christian Kolojeski stating he is not
            a target and granting use immunity for grand jury
            testimony.

463-497     Transcript of grand jury testimony of Christian
            Kolojeski

498-569     Transcript of grand jury testimony of Michael Leight

570-572     Statement of Glynn Edgar Baker

M1-M3       Letter from the Court Advocate Program of Catholic
            Social Services - 1996 - substance abuse - Donny Fell

M4-M82[6]   Letters from the Court Advocate Program of Catholic
            Social Services - 1996 - substance abuse - Donny Fell

M9-M24      Police reports

M39-M46     An affidavit prepared by an FBI agent

M47         Birth certificate - Theresa Kozersky Sharpe- child of
            Stephen Banas and Frances Kozersky - MGM

M48         Death certificate - Theresa K. Sharpe - MGM

M49         Death certificate - Frances Kozersky - MGGM

M50         Birth certificate - Frances Kozersky - MGGM

M51         Birth certificate - Marilyn Joan (Baby Girl) Fell -
            child of Donald T. Fell and Myrtle Fritz.

M52         Death certificate - Marilyn Joan Fell

M53         Death certificate - Donald T. Fell - PGF

M54         Birth certificate - Geraldine Ann Fell - PAunt

M55         Birth certificate - Donald R. Fell - Father

M56         Birth certificate - Sandra Jean Kotzer

---

6 M4-M8

14

FELL-00000477

Appendix A - Documents reviewed

| | |
|---|---|
| M57 | Birth certificate - Donna Marie Kotzer |
| M58 | Birth certificate - Donna Louise Fell - half sister |
| M59 | Birth certificate - Susan Jean Fell - half sister |
| M60 | Birth certificate - Robert Donald Fell - half brother |
| M61 | Birth certificate - Jacqueline Sharpe - MAunt |
| M62 | Birth certificate - Donald Robert Fell II - defendant |
| M63-M68 | Subpoenas for official certificates |
| M69 | Death certificate - Myrtle Jeanette Fritz Fell - PGM |
| M70 | Marriage certificate - Donald Fell and Debbie Fell |
| M71 | Marriage certificates - Raymond Kotzer and Theresa F. Banas - 8/29/53 |
| M72 | Marriage certificates - Donald Fell and Beatrice G. - first wife |
| M73 | Marriage records - Donald T Fell and Myrtle Fritz - PGP |
| M74 | Marriage records - John McDonald and Theresa Banas Sharpe. - MGM |
| M75 | Divorce decree - John McDonald and Theresa Sharpe - MGM |
| M76 | Divorce records - Raymond Kotzer and Theresa Kotzer |
| M77 | Marriage certificates - John Sharpe and Theresa Kotzer |
| M78-M79 | Petition for involuntary commit for Donny Fell on 6/13/00 |
| M80-M89 | Omission noted |
| M90-M95 | Medical records of Dr. John C. Gaudio, a pediatrician. |
| M96-M107 | Medical records First Hospital Wyoming Valley - Donny Fell 1991 |
| M108-M116 | Medical records of Pennsylvania State Greisinger - Donnie Fell - July 1999 |

15

FELL-00000478

Appendix A - Documents reviewed

M123-M146 The social service records from Monroe County for Donny
          Fell

M147      No juvenile records for Donny's father located

M148-M151 The arrest records of Debbie Fell, his mother.

M1520M157[7] Arrest records for Donnie Fell

M158-M279 Luzerne County Pennsylvania Children and Youth Services
          records for Donny Fell

M280-M288 School records for Donny Fell

M289-M292 Arrest records for Donny Fell

M293-M303 Application for appointment of a public defender -
          prior offense

M304-M319 School records for Donny Fell

M320-M322 School records for Donny Fell not located

M323-M325 School records for Donny Fell not located

M326-M333 School records

M334-M364 School records

M365-M416 Arrest records related to Donny Fell
          M392-M414 Arrest records for Debby Fell

M417-M474 Medical records related to the Fell Family

M475-M932 The medical records of the Wilkes-Barre General
          Hospital including

          M860-M926 Admission of 4/14/92 to 5/2/92
          M673-M860 Admission of 1/26/93 to 2/26/93
          M539-M672 Admission of 6/6/93 to 6/30/93
          M478-M538 Medical admission of 11/23/93 to 11/27/93
          M927-M932 ER visit

          Incorporated records

M933-M938 The report of Dr. Mark Mills

_____

7 M152-M157

16

FELL-00000479

Appendix A - Documents reviewed

M939-M949 The report of Dr. Jonathon Lipman

M950-M964 The report of Dr. William van Gorp.

**Documents provided after the evaluation**

1.    The autopsy report on Deborah Ann Fell by Dr. Paul L.
      Morrow.

2.    The autopsy report on Charles Thomas Conway by Dr. Paul L.
      Morrow.

3.    The autopsy report on Teresca King by Dr. Michael Baden.

17

FELL-00000480

FELL-00000481

## Appendix B - the Government's Account

**Opinion:** None

**Comments:** His statements to the police do indicate a remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims. This will be used to support the diagnosis of personality disorder - NOS.

### The Government's account
**11/30/00**

Donny Fell and Bobby Lee were arrested in Clarksville Arkansas in Mrs. King's Dodge Neon. When a local police officer ran the plates on her car, the plates were listed as stolen. He stopped them.

A police officer sent to his mother's house at 138 Robbins Street in Rutland to obtain information about Donny and Lee discovered the dead bodies by looking through the windows. He called it in and other officers responded to the scene.

Detective Rod Pulsifer was sent to Mrs. Fell's home after the bodies were discovered.

He was the first officer to enter the home. Both Charlie Conway and Mrs. Fell died of multiple stab wounds and a slicing of the neck from one side to the other.

### Donny Fell - first interview

According to a report by Special Agent Jimmie Caudle of the FBI, Donny Fell said he had left Vermont because of his mother's drug use and conflicts between them about her use. He reported that they had stolen Mrs. King's car from a man named John.

### 12/1/00
### Bobby Lee - first interview

Bobby Lee was interviewed shortly after midnight. He initially reported that they had left Rutland Vermont several days earlier. When informed that the police knew of the murders, Bobby made a number of admissions.

However, Bobby Lee admitted to being present at the murder scene. He minimized his role and said that Donny Fell had committed both murders. He stated that the motive was the complaints Mrs. Fell and Charlie Conway made about the noise that Donny and Bobby were making when they were trying to sleep. He

18

FELL-00000482

### Appendix B - the Government's Account

said that Donny alone had committed the car jacking and kidnaping. Donny alone had taken Mrs. King into the woods and had killed her.

### Donny Fell - second interview

When told of Lee's statement, Donny denied any participation in any murder again.

### Donny Fell - third interview

Later that morning, Donny requested and did have another interview with the FBI. Donny then said he killed Conway because he was going to turn him into the police. Mrs. Fell came upon the killing and was killed herself by Lee. They took a shotgun and went to Price Chopper. After 15 minutes, they car jacked Mrs. King's vehicle at gun point. When they released Mrs. King, she tried to flag down a car. Donny said that Bobby then told Donny that he had to kill Mrs. King. He agreed and they did. She was a witness who could identify them. They punched her, kicked her and then smashed her face, skull and head in with rocks.

### Bobby Lee - second interview

When informed by Special Agent Caudle that he believed Bobby was minimizing his involvement in the killings, Bobby insisted his first written statement was accurate.

### Bobby Lee - third interview

Shortly after being informed Donny had made a statement, Lee demanded to make a second statement. In that statement, he admitted killing Mrs. Fell and participating in the killing of Mrs. King.

### The New York State Police telephone interview with Donny Fell - the fourth interview

Donny Fell gave an interview over the phone to Senior Investigator Tom Aiken of the New York State Police. An unidentified officer from Johnson County Arkansas handled the phone at that end. Sheriff Wes Kendrick was said to be in the room.

He said that he had known Bobby Lee all of his life.

19

FELL-00000483

## Appendix B - the Government's Account

He had been arrested and fingerprinted once in Montecello New York.   Some "dude" tried to rape his sister.   He caught him and "I put him in a coma[8] for a day."   The charges were dropped.

He told Investigator Aiken that he did not really know what happened at his mother's home.   He was not arguing; "it just happened".   Bobby Lee had cut his mother's throat before he knew that would happen.   He said he was close to his mother[9].   He also said he had not seen her for seven years prior to the killings.

Donny said he did not know Terry [King].

The unidentified officer said that Donny wanted to help the police locate Terry (Mrs. Teresca King).   Donny stated that he did not know the Vermont or New York area well.   He said Bobby was equally unfamiliar with the area.   Donny said this had been his first visit to his mother's home in Rutland Vermont.   He was not familiar with the route by which he came [from Wilkes-Barre Pennsylvania] to Rutland Vermont.   His aunt had driven him there.

He said that after his mother and Charlie were dead, he and Bobby walked over to Price Chopper which was two blocks away. Terry was there going to work.

She was wearing a "white pullover sweater deal" and blue jeans.   She had another coat in the car.

He denied that she told him much about herself or her family.   He assumed she had children because there was a child seat in the back of the car.   She did offer them donuts.   He recalled that they were Dunkin' Donuts.   She had just been there. Donny admitted that she was trying to be nice to them.   She was also scared.

She had money on her, "a lot of money".   She had it with her when they picked her up.   They took the money without asking for it.

He said that he did not remember the route they took out of Rutland because "... I was pretty hammered.   Ah, I was real screwed up."   He thought, without certainty, that they had been on route 4.   He recalled the Diamond Run Mall at the intersection of route 7 and route 4 where he would have turned on to Route 4.

---

8 Drug-induced by physicians which he did not understand.

9 This is a very remarkable statement.

20

FELL-00000484

## Appendix B - the Government's Account

He said that they left Vermont at about 2:30 AM[10].  He said
her car clock said 2:30 A.M.  He also said Terry was in the car
with them for about four and a half hours.  It was just turning
light when they killed her[11].  Donny later said it was early
Monday morning.

He recalled a sign that said "Welcome to New York".  He
remembered the next town of Whitehall.  She was still with them
when they reached Whitehall.  He did not remember the terrain
well because he had to watch "her in the back seat".  She did try
to jump out of the car once while it was moving.  He had to grab
her back into the car.

He said they were driving, just driving.

He was sure that her body was in New York.

He said that he was getting nervous about her being in the
car.  He didn't want her in the car anymore.

They parked on the road shoulder on the "wrong side" of the
road facing oncoming traffic at a little dirt / gravel pull off.
He did observe a truck parked by the side of the road.  "I was
thinking maybe some guy was out hunting or something like
that.[12]" He said that they stopped about thirty feet away from
the truck, a white Ford F-150.  He did not observe any fence or
guide rails or center guide rail in the area.

He corrected himself to say that she got out on the driver's
side, agreeing that was away from traffic.  He told her to walk
up into the woods and she would be free to go.  He told her to
walk back through the woods and then she would be free.  Bobby
said that she had their names and descriptions and that they "had
to" kill her.  Donny said he didn't really want to kill her, but
"ya know".  "... well Bobby had a different idea."  They went and
followed her back a ways.  She had started to cut back toward the

---

10 It was probably sometime shortly after 3:30 A.M. since that was
the last time she was seen at a donut shop near the place where she
was abducted.

11 Donny did not explicitly use the words kill or murder or any
direct equivalent.

12 Stopping in the vicinity of someone they would reasonably expect
to be armed when they had no ammunition for their shotgun seems to
be remarkable poor planning.  It may suggest continuing
intoxication.

21

FELL-00000485

### Appendix B - the Government's Account

road.  Bobby caught her and pulled her back up the hill.    "... then it happened."

She initially walked about fifty feet into the woods to the edge of the woods.  There were trees with no leaves.  He did not recall seeing any water around the site.  He did not see any houses.

They killed her at the edge of the woods at a spot that could not be seen from the road.  They did not cover her body. Donny did not think there was any chance she was alive.    He mentioned, "Ah, there was a pretty big rock".    He said Bobby used the rock on her and he used his feet.

Donny admitted he took her pocket book and threw it in a dumpster at Burger King.  That was half an hour from where "we dropped her off".

They turned left off the highway to enter a Burger King.  He did not recall seeing anything around it, but noted that would be unusual.  He did not remember any stores or businesses around the Burger King.  He remembered they went through the drive through at Burger King.  He recalled that there were a couple of other customers there.  He got a couple of "sausage, egg and cheese, ah,  thingies".

He said that even after they left the body, "... I was still pretty much drunk ...."

He definitely recalled seeing the signs for Troy.

At some point they observed a sign for the Tappan Zee Bridge.  Bobby told him that they had to go on that bridge to get to Pennsylvania.

She had been killed by the time Donny and Bobby reached Stillwater / Mechanicville.  They did not go into those towns, but he remembered the signs.

About two and a half to three hours after the killing, they refilled with gasoline in Lebanon.  Bobby's grandmother lived there.  He recalled her home was about five miles from the station according to Bobby.

He said he was awake the entire time from leaving Rutland to coming to his friend's house [in Wilkes-Barre].

22

FELL-00000486

### Appendix B - the Government's Account

### Bobby Lee - the fourth interview

Bobby asked to be interviewed by Agent Caudle again.  He made a statement admitting that he helped to kill Mrs. Fell, Mr. Conway and Mrs. King.  He provided a ten page handwritten account.

### The New York State Police telephone interview with Bobby Lee - fifth interview

Bobby Lee gave an interview over the phone to Senior Investigator Tom Aiken of the New York State Police.  An unidentified officer, (Jim Cutty - p. 52) from Johnson County Arkansas handled the phone at that end.  This followed the conversation between Donny Lee and Investigator Aiken.

He was asked for information to help the police locate the body for the sake of the family of Mrs. King.

He reported that Donny and his mother were always fighting. She would come home drunk and find something about which to fight.  Charlie was a "dick"; he was behaving in his usual manner before the killing.

He admitted kidnaping her at the Price Chopper store.  She was completely out of her car  walking to the store when they grabbed her.  She said she worked in the Deli section.   He stayed with her while Donny got their stuff out of the Fell home; she did not see their bodies.  They went straight on a road that went by the Rutland Mall.  They turned when they saw a sign that said south and stayed on that road.

Bobby said eventually that they were on route seven into New York and probably turned off onto route 22.

He talked to her a little bit while she was in the car.  He confirmed she tried to get out of the car while it was moving. Donny grabbed her and Bobby sped up, keeping her in the car.   He recalled seeing the "Welcome to New York" sign before they killed her.   They passed route 22 and a Tappan Zee bridge.

She got out of the car on the passenger side.  She went thirty feet into the woods and stopped.  They yelled for her to go further.  She went another ten feet and stopped again.  They then got out of the car.  When she saw that, she ran up a hill. Donny followed her directly while he "flanked her" in case she tried to come back to the road.  She fell down the hill.  Bobby stopped her.  Donny came up to her.  They made her walk back up

23

FELL-00000487

## Appendix B - the Government's Account

the hill on a four wheeler path.  At the top of the hill Donny knocked her out.  Both threw rocks at her then.  Donny kicked her, but Bobby didn't because he did not want to hurt his foot. Bobby said there was no possibility she was still alive.  Her body remained at the top of the hill at the edge of a woods composed of bushes.  It was near a dumping site with a target attached to a hay bale and a "homemade motorcycle".  The site was 50 to 75 yards from the highway.  The site was one fourth to one half a mile from the nearest house.

Afterwards, they passed some children leaving their school buses.  Then they stopped at a Burger King.  He described what they ordered.  They attempted to obtain some marijuana[13].  Donny dumped her purse and other items in the dumpster.  Her wallet was thrown away later about fifteen minutes after they left the Burger King.  They kept her money and dumped the rest.  He described the Burger King attendant, the purse.  He said they got lost when they left the Burger King.

Her body was found by the New York State Police at 8:15 PM on 12/1/00.

## The autopsy of Deborah Ann Fell

The autopsy was performed by D. Paul L. Morrow who determined that the mode of death was homicide.  He found multiple sharp force injuries including a deep incised wound of the neck and the carotid artery at the bifurcation, multiple wounds to the larynx and multiple stab wounds to the head, face, back and left side.  Toxicology showed a blood alcohol level of 0.325%.  Toxicology was also positive for amphetamine and proplyphenethylamine.

## The autopsy of Charles Thomas Conway

The autopsy was performed by D. Paul L. Morrow who determined that the mode of death was homicide.  He found severe commingled stab wounds of the back of the head and neck, a posterior incision of the left internal carotid[14], bleeding into the neck tissues, multiple wounds in the face and chin, multiple wounds in the upper left chest and a few defensive wounds on both

---

13 The clerk at Burger King was later identified as Michael Leight who confirmed parts of this confession.

14 The diagram attached seems to show a larger wound on the right side of the neck.

24

FELL-00000488

## Appendix B - the Government's Account

hands.   Toxicology showed an alcohol blood level of 0.392% and a urine blood level of 0.439%.

### 12/2/00
### The autopsy of Mrs. Teresa King

The autopsy was performed by Dr. Michael Baden.  He determined that the mode of death was homicide.  She died from multiple blunt force injuries to the head with fractures of the facial and skull bones.  She also had contusions of the brain, She had a traumatic compression of the neck with asphyxia.

### Bobby Lee -the sixth interview

An interview was held with Robert Joseph Lee (Bobby Lee) by multiple investigators (Det. Sgt. James Cruise, Det. David Schauwecker, Det. Rod Pulsifer and  Special Agent James Caudle) at 2:15 P.M. (CST)   Bobby said his date of birth was 11/28/80. He was given his Miranda rights.  He admitted he was unable to read his own writing, but he could read typed materials.  He was not intoxicated, by his report.

As background, Bobby reported that, while in Pennsylvania, he and Donny got drunk and started robbing cars for the hell of it.  Somebody thought Donny was his brother and told the police that Bobby and his brother were robbing the cars.  The police went to his house and talked to Donny and his brother.  Because the police were interested in him, Donny called and asked him to go to Vermont with him.  Donny wanted to do that so the police would not find him.  The police did come by looking for him. Donny left Pennsylvania about one month before Bobby Lee.  As police interest in him continued, Bobby scheduled a meeting with a detective to give himself an extra day to flee Pennsylvania.

When he got to Vermont, Donny and his mother were having big fights when she came home drunk.  He would fight with his mother over some stupid little thing.  The whole thing in Vermont was "nothing but a big fight" between Donny and Donny's mom.  She would come back drunk and she would find something to bitch about.  Mrs. Fell was using alcohol and crack.

Charlie Conway and a woman friend came to visit Donny's Mom, Debbie Fell.  She said Charlie and the woman  were thieves and should be watched constantly.   Charlie got into a fight with Donny at Thanksgiving.  Charlie and his friend left.

The Sunday after Thanksgiving,  Bobby and Donny did some

25

FELL-00000489

**Appendix B - the Government's Account**

crack (10 hits apiece) and some marijuana. They had just finished the last hit when Mrs. Fell, Charlie and Charlie's female friend walked in. Donny, Bobby and another guy drank a case of beer. Mrs. Fell brought in some beer; they had some more.

Bobby pushed Charlie's female friend out so they would not have to watch her. Charlie was getting agitated and was wrestling with Donny. Bobby and Donny went out and got a third case of beer. They drank it. Charlie kept passing out and then waking up. Mrs. Fell was in the same condition, but not quite as drunk.

Bobby left the room. When he returned Charlie was threatening to call the cops to tell them about the cars in Pennsylvania. Donny got angry and pushed Charlie back into his chair. Donny threw the phone across the room. Charlie tried to call again about half an hour later when he awoke. He was stopped; he was told he couldn't leave the house until the next morning. Mrs. Fell got up and started yelling for the phone.

Charlie tried to leave the house. He was brought back in and told he couldn't leave. They gave him two more beers and he passed out again.

After that, Donny got into a fight with his mother, Debbie, in another room. Charlie woke up and was fighting with Donny again. Donny was angry and threatening to kill him. He asked Bobby to help him kill Charlie and his mother. Bobby said he went along with Donny's request. Donny grabbed a long serrated knife. He gave Bobby another knife. Bobby saw Donny run the knife across Charlie's throat. Seeing that cutting, Bobby cut Donny's mother's throat. She asked Donny why he was doing this to her. Bobby kept on cutting her repeatedly. Donny and Bobby kicked her as she lay on the floor.

Bobby hurt his foot repeatedly and said "ow" as he kept kicking her. Mrs. Fell did not respond; she just sat there. Bobby then kind of "blacked out" and "went nuts". He grabbed a shotgun and hit Mrs. Fell repeatedly in the head with the gun. He hit her in the head for about eight minutes. When his mother moved, Donny encouraged Bobby to cut her throat again. She was screaming for her life, "No, Binker[15], No."

They also kicked Charlie. That's how all the blood got on

---

15 A family nickname for Donny.

26

**Appendix B - the Government's Account**

the walls.  They both were covered with blood.   Bobby said Donny put his hand into Charlie's open throat to grab the muscles and pull them out; Donny looked odd or "fucked up" to Bobby.   Bobby put a finger into Charlie's open throat to see what it felt like.

Donny told Bobby to pack a bag while he took a shower. After Donny finished, Bobby also took a shower.  They left everything they packed  in the kitchen so they could grab it immediately and leave after they stole a car.

They thought about stealing a car to get away.   They took a gun with them.   They went to Jiffy Mart.   They then went to Wal Mart, which was closed.   Some man looked at them and watched them.   They decided to move on to another place.   They walked along the tracks to Price Chopper.

(Mrs. Teresca) Terry King pulled into the lot.   Donny said this was their chance. They decided to let her get completely out of her car so she would be more easily controlled.   After she got out of the car, they approached her and asked her for the keys. They showed her the gun.   She still refused.   They pushed her. They kept asking for the keys.   She gave them up.   Bobby said that the two of them decided to take Mrs. King.   They put her in the back seat.

They returned to the Fell home and picked up their bags. Donny was driving initially.   Mrs. King kept asking whey they were doing this.   She told them about her family - children and grandchildren.   At some point she tried to jump out of the car when it was moving.   Donny pulled her back in.

Later, Donny pulled over and told Terry to get out of the car.  She tried to wave down a passing car.  They got out and chased her into the woods.  Donny walked her into some bushes and punched her unconscious.  They threw rocks at her over and over again.  Donny kicked her in the head repeatedly.   Bobby did not since he said he knew from kicking Charlie that it would hurt his foot.

Bobby agreed that they made a number of decisions:

   1.   decided to put Terry in the car
   2.   decided not to leave her when she tried to escape
   3.   decided not to just leave her where she was killed
   4.   decided to kill her when she decided not to run
   5.   decided not to call help for her.

Bobby said his intention had been to allow her to escape.

27

FELL-00000491

## Appendix B - the Government's Account

Donny made the decision to kill her; he went along. Bobby reported that it was "like another person came into me and started controlling me."

After the killing, Donny and Bobby did weed and ecstasy in Wilkes-Barre, Pennsylvania.

Donny never talked about killing his mother before the day on which it happened. The police came repeatedly to Mrs. Fell's home because of complaints. Bobby volunteered that he would love to kill his own mother.

### Donny Fell- fifth interview

An interview was held with Donald R. Fell Jr. (Donny Fell) by multiple investigators (Det. Sgt. James Cruise, Det. Rod Pulsifer, Det. David Schauwecker, and Special Agent James Caudle[16]) at 5:01 P.M. (CST).

He stated that he understood his Miranda rights. He said he was not under the influence of any substance, prescribed or other.

He stated that he came to Vermont on 9/23/00, the day after his sister's birthday. Prior to that time, he had been traveling with a carnival. Sybil Banas, his great-grandmother, drove him to Vermont. He went to see his mother because he had not seen her for seven years[17] and he missed her.

Things went well between him and his mother for a while (p. 3). After a while, he called and asked Bobby Lee to join him. His relationship with his mother was "pretty decent" although they argued "every now and then". "My mom was pretty weird she liked to smoke crack and drink a lot and she'd get kind of rowdy." He had an argument with her at the "Stop Lite". After a woman kicked him, he spit on her. His mother smacked and punched him for that. He pushed his mother away without hitting her. She fell down. The police came and he spent the night in the drunk tank. The cops came to her home because of complaints by the neighbors "quite a few times".

---

16 Spelling of name changed by me.

17 She left the state when she was released from jail because she had warrants and fines she did not want to deal with. He was confined to St. Michael's at the time. When she tried to come back, his aunt would try to have her arrested.

28

FELL-00000492

## Appendix B - the Government's Account

Charlie was just a friend of his mother. Her boyfriend, Alan Reynolds, was in jail at the time. This was the third time Charlie had been at his mother's home of which he knew.

On the night of the murders, Donny said he and everyone else was pretty well "wasted". He didn't know what really happened except he was standing over a dude with his throat cut. Later in the interview, he recalled he had been drinking, playing cards and listening to the radio. He knew he was drunk. He got the knife when he was in the kitchen with Bobby. He remembered that the knife said Hawk on it and had a serrated edge. It was a pretty thick knife. Charlie and his mother were in the living room at that time. He did not remember. Despite not remembering, he said he ran into the living room and attacked Charlie in the recliner where he was sitting. He recalled cutting his throat and then stabbing him. Later in the interview, he said he did not remember the first cut, but he did recall the rest of the stabs. He recalled thinking that his behavior was wrong. He does not know why he did it; his mind must have snapped.

Bobby came back and found out Charlie was going to call the cops. Charlie did not know that Donny had legal problems in Pennsylvania. Bobby had legal problems there too, but Charlie was ignorant of that as well. His mother did know about their legal problems. She would not have told Charlie.

Then he saw Bobby had already cut his mother's throat. He said he had no idea why Bobby Lee killed his mother. While she was being stabbed to death, his mother told him she loved him[18]. She said "Bye." She called him by his nickname, "Binker". He said he did not understand why she was saying she loved him while his friend was cutting her throat. He admitted that he had made a mistake ("I fucked up so bad.")

He implied he played no role in her death. He did not try to defend or save her by his report; he knew it was too late. He then told Bobby to stop. He said Bobby listened to him. He did not call for help. He did nothing to help her; he knew it was too late. He left the room and took a shower. He put back on the clothes he had been wearing during the killing(s). He said that there was no blood on his clothes.

He briefly considered turning himself in for the murder of Charlie. However, when he saw his mother was dead, he decided

---

18 I find this a remarkable statement.

29

## Appendix B - the Government's Account

that no one would believe him if Bobby said he had done both murders. He briefly considered beating Bobby up, but rejected it.

He may have cleaned off the knives. He wrapped them in a towel, intending to take them. They were left by mistake.

He thought of turning himself in, but he was scared and just wanted to split.

(Author's note: When told he was not telling all because it was so bad, he provided more details.)

He said he did not recall the kicking of either victim.

Donny said Bobby suggested the car jacking. He agreed. They took Donny's shotgun and left. He stated that the shot gun was not loaded when he was asked whether Bobby Lee had ever threatened him with the shotgun. He added, " ... even if he did that I would have stuck it up his ass." He could have walked away at any time. He was pretty scared. He didn't want to get caught. He admitted that he chose to stay and participate in the car jacking. He said it would have been pretty stupid to try to flag someone down in order to get a car. "I'm not really stupid you know."

They waited for fifteen minutes until Mrs. King came. They could see that she was alone. They waited until she was out of the car to approach her. They waited until she got close to them before they showed the gun. They did not want her to panic and drive off. Bobby confronted her with the gun. Mrs. King pled for them not to take her. He said that Bobby could not have stopped him from letting her go. He was unsure what Bobby might have done if he had left her on the parking lot. Donny admitted he had taken her hostage and kidnapped her. She begged for them not to hurt her. She asked them not to kill her. Donny assured her that she would be fine. He really intended to let her live. Her name was Terry; this amused[19] him since it was his sister's name as well.

Originally, Donny intended to let her live. Mrs. King did

---

19 This statement is remarkable for the lack of empathy it displays for both his victim and his audience. One suspects they did not find it amusing.

30

FELL-00000494

**Appendix B - the Government's Account**

try to jump out of the car. He pulled her back in gently[20]. He did not hit her. Bobby was "pretty rotten" toward her; he yelled and screamed at her.

Donny stopped the car in a graveled pull over and parked about thirty feet from a light truck 150. He thought it might belong to a hunter. Donny opened her door and told her to walk up into the woods. When he got back into the car, Bobby said they had to kill her because she had their descriptions and knew their first names[21]. He said "Okay". He was scared and did not want to be caught. He got out of the car intending to kill her. She was not trying to hurt them. She was not trying to escape. She only knew their first names and about the car jacking. He walked up the hill and Booby went down to the hill and caught her as she tried to run to the road. Both of them started hustling her up the hill. It was "not harsh or nothing.[22]" Donny said he found a place that could not be seen from the road. He pushed her down to the ground. She started to pray with her hands together in front of her. They started kicking her in the head. She didn't struggle. She just took it. Then Bobby slammed a big rock down on her head. Donny wiped his boot off with her shirt. She looked dead to Donny, but she was still bleeding when they left her.

Killing Mrs. King was not premeditated. It was spur-of-the moment. They said "let's go" [do it].

After they left the Burger King, they drove to Wilkes-Barre and stayed for two nights with a friend, Chris Kolonjeski. When they left, they switched plates with another Neon car. They had to stop to buy a screwdriver and return to the Neon in order to get the plates. They threw Mrs. King's license plates into the river. Bobby talked about car jacking somebody else. Donny did not want to do it because he did not want to get more blood on his hands. They did not.

Donny expressed remorse several times about what he had done. "To tell the truth you should be smacking my head off the wall."

---

20 This statement shows a marked lack of empathy for both his victim and his audience.

21 The police could have connected them to the murders through her although she did not know that.

22 Another statement showing a lack of empathy with his audience.

31

FELL-00000495

**Appendix B - the Government's Account**

He stated that he was not a liar. He admitted killing Charlie and participating in the death of Mrs. King, but he did not touch a hair on his mother. He loved her.

He admitted a history of angel dust, marijuana, mushrooms, peyote, coke, crack, speed, pills and alcohol; he denied heroin[23].

He also admitted in the past that he had stabbed a person. His friend, Julie, fought with him and she "kneed him in the nuts" and pushed him through a fish tank. He picked up his fork and threw it at her and it stuck in her leg. He was put into a psychiatric unit.

He also had shot his friend, Johnny[24], in the shoulder. He had used a gun belonging to Johnny's father. A clip had been removed from the gun, but the cylinder was not emptied. His friend "jumped in the way[25]". They did not believe, he said, his claim that it was an accident and he was placed in a psychiatric unit ("Nut ward").

The interview ended at 6:08 P.M. (CST).

<u>12/18/00</u>

Donny Fell was interviewed again in an administrative hearing on whether he should be kept in administrative segregation. He said "I'm not wacky like those people back there." He needed things to do. He said he liked to talk to people. He said he was charged with three murders, but had only committed one. He said this was his first time in jail. When he "did it", he was heavily on drugs and did not know what he was doing.

---

23 This differs from the history I obtained from him.

24 Gasic

25 Again a lack of empathy for his audience is displayed.

32

FELL-00000496

FELL-00000497

**Appendix C - History of sexual abuse**

his history of sexual abuse.  Donny was discharged from care on 10/30/91.

**January-February 1993**

The record from his in-patient treatment at Wilkes-Barre Hospital revealed reports that he had been sexually abused at age four by a husband and wife baby-sitting team.

**Summer 1993 - psychiatric hospitalization**

Donny talked in group on 6/17/93 about the fact that he had been molested by two male baby sitters when he was five or six years old.

Dr. Mills stated that Donny told him he had no recall of the sexual abuse by his baby sitters.  He told me the same thing; he has no recall.

Dr. van Gorp does not refer to the issue, directly or indirectly.

Dr. Lipman reported that Donny said he had his first sexual contact with a young lady of eighteen who was drunk at the time. He reported that an adult male named Raymond and several other girls were present at the time.  It would seem difficult to characterize this as anything but sexual abuse of an eight-year-old child[26].  If he was eleven, I would still consider it sexual abuse.

I questioned Donny about his sexual history.  His initial report was that his first voluntary sexual contact was at age sixteen.  I reminded him of his comment to Dr. Lipman.   He confirmed that it had happened although he seemed vague on the details.  He was willing to accept my report that Dr. Lipman had said it had occurred at age eleven without comment or protest. Donny was definite that it occurred in Pittson which makes eleven more likely than age eight.

From reviewing the history of a drunken mother repeatedly bringing home men for short stays and a child fascinated by nakedness and frequently drunk as well, one suspects that additional sexual abuse may have occurred.  His sexual history suggests some psychological problems.  He denied that he has ever

---

26 Donny also said that this occurred in Pittston.  He attended the Pittston school in 1990 to 1991.

33

FELL-00000498

**Appendix C - History of sexual abuse**

had a meaningful relationship with a woman he liked despite hundreds of contacts.  His sexual behavior at the carnival seems to have been "out of control".

He denied any history of rape by him or of voluntary sexual contact with men.

The documentation is adequate to accept that he was sexually abused by his baby sitters.  One supposes, but does not know that there was more.

34

FELL-00000499

FELL-00000500

**Appendix D - Physical Abuse**

### Physical abuse

(Author's note: Donny had numerous well baby examination from Dr. Gaudio.  No references to indicia of physical abuse were noted.)

**12/12/82**

A police report was received from his mother alleging that Donny and his sister Terri were being abused by their father.  He had been slapped.

**5/2/85**

Donny reported to a worker and a detective that he had been hit with a board, locked in a room, etc.

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979.  Mrs. Fell said both had bad tempers.  They were both physically abusive to each other.  Both denied to Children and Youth Services that they had abused their children.

Both admitted that in the past they have had physical confrontations with each other.  When these confrontations occurred, the children became fearful and cried.  Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983).  The case worker, based on 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report.  Despite this, the case worker stated, "There is a great deal of love and support between parents and children."

He had another physical examination without references to injuries after this incident.

**1987 - 1990**

Donny attended the Flood Elementary School in Wilkes-Barre, Pennsylvania.  Donald Sabatino, the principal, recalled to investigators that Donny  was no problem and was easily controlled in the first and second grade.

**4/21/90**

A female police officer informed Children and Youth Services

35

FELL-00000501

**Appendix D - Physical Abuse**

of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police. The police officer involved noted that "the police were continuously at this home for domestic disputes".

The officer reported that she had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time.

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence.

**10/29/90**

Mrs. Fell forced Mr. Fell to leave the home because of drinking and physical violence. It was reported that he had slapped Donny (ten years and a half) in the face.

When asked, he told the officer his father had hit him. His mother agreed with his story. A restraining order was entered against his father.

**1/19/94**

The Children and Youth Services case file was re-opened. There was an allegation that, while drunk, Mrs. Fell hit Teri across the lip, splitting it. Children and Youth Services arranged for the children to move next door to be under the protection and supervision of his maternal grandmother, Therese Sharpe. (Author's note: The case worker incorrectly reported that this was the third time a file was opened; it was the fourth.)

It was noted that there was a long-standing history of alcohol abuse and violence in this family. "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell."

**2/1/94**

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulted her live-in boyfriend, Maxwell, leading to a call to the police. She was arrested for assault. Mrs. Fell said to the case worker she was

36

FELL-00000502

## Appendix D - Physical Abuse

"no different from her mother who used to beat her".

**5/25/94**

Mrs. Fell was arrested for public intoxication.  She also slapped her daughter.

**7/22/94**

According to Children and Youth Services records, Donny tore a telephone off the wall.  When she tried to fix it, he assaulted her.  She then "accidentally stabbed" him with a fork.

The worker commented, "Mrs. Fell states she is no different than her mother who used to beat her and remembers alcohol problems in her childhood."

**Donny's report**
**His relationship with his father**

He said he really did not like his father.  He was mean.  He "liked to beat us".  He beat his mother, his sister, Teri, and him.  He liked to beat them.  He used a belt at times.  He came home drunk and beat them.  This happened more that once a month. He yelled and screamed and beat them.  He did not recall whether his had any special target for abuse in the family.  He was uncertain when his father left and why he left.

His father never said anything positive to him.  He did say many things that were negative and demeaning.

**His relationship with his mother**

His relationship with his mother was fine in his earliest years.  They did not fight or nothing until his father left.  He amended that, saying there may have been, one or two conflicts a year.

He didn't fight with his mother until he started seventh grade or about age twelve.  He fell in with the wrong crowd. This change occurred when he changed schools from Flood Elementary to Plains Junior High.  He started to do what he pleased.  He hung out with a group of kids his age; one or two may have been a year or two older.  He hung out with them and they all got drunk or high.

Surprisingly, he said his mother never said anything

37

FELL-00000503

**Appendix D - Physical Abuse**

positive about him and nothing negative.

**Aunt Jackie**

His Aunt Jackie bad mouthed him repeatedly.

**St. Michael's**

He stated, when specifically asked, that he had also been physically abused at St. Michael's. A few of the aides wanted to find someone to restrain or pick on. One aide did that do him; he said another interfered and asked for an explanation from the first. On another occasion, an aide thought he was ignoring him and grabbed him. He said he did not really mind this because he could think of ways to embarrass the aides afterwards.

(Author's note: It is likely that Donny suffered some physical abuse from his mother, father and his aunt. The physical consequences of the abuse seems limited in that he never required nor received medical care as a result. Given the family dynamics, only a relatively severe injury to Donny or Teri would have been reported to the police or to medical personnel.)

38

FELL-00000504

## Appendix E - Dysfunctional family

### Dysfunctional family

Opinion:   Donny grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children.

He did not receive even minimal parental guidance and supervision for many years at a time.

He had no role models for either sobriety or self control.

He was abandoned by both of his parents at times.

It was reported by counsel for the defense that Mrs. Fell's parents divorced because of her father's physical abuse of her mother.

They also reported that she had some of the symptoms of conduct disorder herself, including repeated running away. She reportedly suffered sexual abuse at age thirteen.

### 11/10/79

Deborah Kotzer, his mother, and Donald R. Fell Sr., his father, were married. Mr. Fell had been married once before to Beatrice L. Gelsleichter on 10/9/59. Apparently, Mrs. Fell was three months pregnant at the time of the wedding[27].

### 4/30/80

Donald Robert Fell II (Donny[28]) was born. It has been reported that she continued to drink during her pregnancy, risking fetal alcohol syndrome for her son.

When Donald Fell refused to allow her to have her tubes tied after her second delivery, she threatened him with a knife.

### 4/21/85

Donny's parents were in a fight and stabbed each other.

---

[27] Letter of Alexander Bunin and Gene Primono, Esquires, dated 5/18/01.

[28] In order to avoid confusion, the defendant will be called Donny throughout and his father, Mr. Fell.

39

FELL-00000505

## Appendix E - Dysfunctional family

Mrs. Fell reported that she had wanted to talk to her husband. Instead, he went to sleep on the couch. She stabbed him in the back. He became furious and stabbed her back. He left. After the police found him limping and bleeding, walking in the street, they questioned him. Based on his answers, the police went to the Fell home and found Mrs. Fell bleeding heavily. Both adults had been drinking heavily.

### 6/6/85

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers. It was noted that both parents has tempers and an aggressive nature. They were both physically abusive to each other. Both denied to Children and Youth Services that they had abused their children. Both said that they were committed to their marriage despite the difficulties.

Both admitted that in the past they have had physical confrontations with each other. When these confrontations occurred, the children became fearful and cried. Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983).

The case worker, based on April 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report. Despite this, the case worker stated[29], "There is a great deal of love and support between parents and children." The parents were supportive of Donny and Teri.

### 6/31/85

Children and Youth Services closed the case. The report[30] said that the children receive appropriate care and love. Discipline has also been appropriate.

### 10/31/85

The supervising case worker stated that the parents had made progress in their relationship and the relationship was now stable[31].

---

29 One doubts the accuracy of this opinion.

30 One doubts the accuracy of this report.

31 One doubts the accuracy of this report.

40

FELL-00000506

**Appendix E - Dysfunctional family**

**4/21/90**

A police officer informed Children and Youth Services of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police.

A female police officer involved noted that "the police were continuously at this home for domestic disputes". She reported that a similar call alleging parental fighting and child neglect had been made to Children and Youth Services in September 1989. She noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." She reported that she had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time. Interestingly, his drinking was said to have started when Donny was molested.

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence.

Mrs. Fell reported that she and her husband had a good marriage and fought no more than other married couple. Mrs. Fell denied being abused by her husband (sic).

Oddly, Mrs. Fell said that she would rather have her children live with a stranger to having them stay with her mother.

Mr. Fell conceded that he had a drink occasionally at night, but said that neither he nor his wife had a drinking problem. His wife, Mrs. Fell, also told the worker that neither had a drinking problem. Interestingly, his mother-in-law, Theresa Sharpe, reported his first wife and the three children from that union had no contact with him because of his drinking.

**10/29/90**

Mrs. Fell forced Mr. Fell to leave the home because of drinking and physical violence. It was reported that he had slapped Donny (ten years and a half) in the face.

41

FELL-00000507

## Appendix E - Dysfunctional family

**May 1991**

Mr. Fell was living outside of the home. It was stated that there was no evidence that Debbie was drinking excessively.

**August 1991**

Children and Youth Services was informed that Mrs. Fell was drinking heavily. Her boyfriend had moved in.

**9/2/91**

Mrs. Fell, his mother, was arrested for public drunkenness. She fought with the officers.

**May 1992**

The Children and Youth Services caseworker stated that Mrs. Fell was providing a stable and safe environment for her children. She was not drinking excessively. However, she was not compliant with drug and alcohol treatment.

**1993**

The FBI report noted that a social worker reported in 1993 that Donny came from a "very dysfunctional family." He also said that Mrs. Fell home "was infested with rats, cockroaches and mice. The home was filthy, had litter, feces, and beer cans scattered in the living room. Mrs. Sharpe stated that Debra's home was in this shape for two years."

..."there were numerous inconsistencies in Donald's care. Mrs. Sharpe called Children and Youth weekly about the conditions that the children were living in, and she expressed personal anger toward Children and Youths Services of Luzerne Count. However, Mrs. Sharpe refuses to take responsibility for the condition her grandchildren were living under on the property she owns."

**1/14/94**

Mrs. Fell was arrested for hitting and injuring his sister.

**1/19/94**

The Children and Youth Services case file was re-opened. There was an allegation that, while drunk, Mrs. Fell hit Teri

42

FELL-00000508

### Appendix E - Dysfunctional family

across the lip, splitting it. It was noted that there was a long-standing history of alcohol abuse and violence in this family. "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell."

During the time that the case was closed, Children and Youth Services continued to receive calls[32] from Mrs. Sharpe regarding Mrs. Fell's continued drinking.

**1/29/94**

Mrs. Fell was arrested for public intoxication on simple assault. She tried to assault the man living with her, Ellery Wilcox, and was restrained by her son, Donny. She pulled the man out of his car, knocked him to the ground, scratched his face and broke his glasses.

**2/1/94**

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulting her live-in boyfriend, leading to a call to the police. She was arrested for assault. However, because of considerable bruising, she was released without prosecution and her live-in male companion was arrested and forced to leave the home under a protective order.

Mrs. Fell then went on a binge. Mrs. Fell said she was "no different from her mother who used to beat her".

**5/25/94**

Mrs. Fell was arrested for public intoxication. She also slapped her daughter.

**7/22/94**

According to Children and Youth Services records, Donny tore a telephone off the wall. When Mrs. Fell tried to fix it, he assaulted her. She then "accidentally stabbed" him with a fork.

The case worker, John Koslowski, performed an unannounced home visit one week prior to a dependency hearing and found that Mrs. Fell had left her children home alone unattended. He counted seventeen beer cans in the kitchen and living room. It

---

32 Interestingly, I saw no documentation in the CYS files of any calls at that time.

43

## Appendix E – Dysfunctional family

was alleged that Mrs. Fell was bringing multiple men home (in serial fashion) for a day or two at a time.

Despite the evidence, Mrs. Fell denied that she did "any drinking". The case worker commented, "... Mrs. Fell is quite intelligent when she is sober." "... it appears that she has not been sober long enough ... for two years." "Mrs. Fell's relationships have centered around her drinking." Mrs. Fell "went on the prowl, bring men home indiscriminately to meet her needs for companionship."

The case worker commented that Mrs. Fell took no responsibility for her actions and did not expect her children to be responsible for their behavior either.

### 10/26/94

The Children and Youth Services plan noted that the whereabouts of both Mr. and Mrs. Fell was unknown.

### June 1995

Mrs. Fell was jailed again.

(Author's note: One is aware that Mrs. Fell has an equal excuse to that of her son for her failures as a person and a parent. The same is probably true of Mr. Fell.)

### Knives

Donny's father stabbed his mother.

Donny's mother stabbed his father, held a knife to his father's throat and stabbed Donny with a fork.

Donny stabbed someone with a fork and repeatedly threatened to stab people.

44

FELL-00000510

### Appendix F - Attention Deficit Hyperactivity Disorder

### Attention Deficit Hyperactivity Disorder (ADHD)

During my interview, I asked about the symptoms of ADHD.

According to his report, when he was in school, he never had any problems with the details of his work. He never forgot to bring papers or pencils or books to school, because he never took them home. He had no problems in school until seventh grade. He did his homework in school until he got to seventh grade. He had no problems in school with finishing his work. He did not dislike mental tasks. He did not lose things. He did not remember whether he was ever easily distracted. He did not remember whether he had memory problems.

He had no problems sitting still in class. He did not fidget or squirm. He had no problems staying in his seat in school. He was never told that he should stay in his seat or reprimanded. He denied that he was a noisy kid. He learned not to annoy his father at home; it carried over. He was not restless. He did not have any problem relaxing. However, he was always on the go, doing something. He was not told that he talked too much in school. He did not blurt things out in class. He never was told not to interrupt conversations or to intrude into others' activities. He had no difficulty waiting his turn.

(Author's note: I find it cogent that an abused child would point out that it was not safe to be hyperactive at home. If he could control his behavior in one setting, the diagnosis is not appropriate. On the other hand, the medical record is fairly clear.)

### 1/26/93

The medical record reported that he had problems with keeping still and concentration when he did not receive his Tofranil and Dexedrine.

### 6/7/93

The psychiatric intake evaluation of Dr. Cyril Puhalla dictated on 6/7/93 notes that "Donald has an extensive history of psychiatric involvement going back to at least 9 years of age. He presented with a history of inappropriate overactivity, distractibility, cognitive social and behavioral impulsivity."

Dr. Puhalla noted that he was "fidgety", "restless", and had trouble paying attention. Dr. Puhalla diagnosed attention deficit - hyperactivity disorder.

45

FELL-00000511

### Appendix F - Attention Deficit Hyperactivity Disorder

The admitting nurse thought his motor activity was normal, but placed a "?" next to hyperactive.

It was noted that early in this stay in the hospital, he was fidgety and had difficulty staying still.  He was thought to be less hyperactive on Moban 5 mgs. It was increased to 10 mgs BID and perhaps increased again.  He developed akathisia.

He was placed on Ritalin.  Dr. Feusner said he saw some beneficial effects.

There are frequently neuropsychological correlates of ADHD, although there is not a definitive signature.  The examination by Dr. van Gorp did not show any problems with the control of attention or other executive functions at this time.  However, children with ADHD frequently outgrow their problems.

I saw no indications of ADHD during my examination.

46

FELL-00000512

**Appendix G - Alcohol and substance abuse**

Alcohol and substance abuse

**Opinion:** Donny began abusing alcohol and drugs at a remarkably early age.  When not in custody, he has used an amazing amount of intoxicating substances.  He qualifies for the diagnoses of abuse and/or dependence on a number of substances.

History of alcohol and drug abuse

Dr. Mills obtained a history according to which Donny began drinking at age six or seven.  He began being intoxicated at age eight or nine.  He began using drugs at an unusually early age.

Dr. Lipman obtained a history according to which he began drinking beer at age eight and hard liquor at age eleven.

He told me he started drinking at age eight.  His father had a keg in the basement.  He would be sent to get a glass of beer for his father or mother.  He would drink some and refill the glass.  He would sneak a taste or a drink.  He liked the taste of beer immediately, he said.  He did not understand my questions about beer being an acquired taste.  He liked the taste of beer immediately.  He said he began drinking on a daily basis at age eight.

(Author's note: Since he said he took beer from his father's beer keg regularly, he probably started drinking before his father left home.)

He drank to get drunk.  The first few times he drank he got sick to his stomach.  He did throw up.  He said he never got headaches.  He said that he has never been hung over.  When he was a young and inexperienced drinker, he had stomach upset.  It went away.  He denied any other symptoms from his alcohol consumption[33].

His first psychiatric hospitalization evaluation was in September 1991 when he was eleven.  It was mentioned that his mother was concerned about smoking and drinking, but there was no additional substantial reference to alcohol or drug abuse.  There was a report of significant behavioral problems consistent with conduct disorder.

_____

[33] Don Goodwin, one of the first serious students of the genetics of alcoholism, once commented to me that he thought that the absence of unpleasant effects, like hangover, was one of the genetic factors in alcohol dependence.

47

FELL-00000513

### Appendix G - Alcohol and substance abuse

His second admission (age close to twelve) to a psychiatric service occurred at the Wilkes-Barre General Hospital in the Spring of 1992 after he had shot his friend, John Gasic, accidentally. On this admission, there was no reference to any abuse of alcohol or drugs. Donny was receiving prescribed medication - Dexedrine and Tofranil.

Donny said he started really heavy alcohol drinking at age twelve. He began using whiskey and vodka. He continued to drink heavily until he was arrested in the current matter at age twenty. He admitted that he stopped drinking while locked up.

His third admission to a psychiatric service occurred at the Wilkes-Barre General Hospital in January and February of 1993. For the first time, there was an extended reference in his chart to alcohol abuse. He was twelve at the time. This seems to support his claim about when he started heavy drinking.

He did notice over time that it took more alcohol to get him drunk. He was able to quantify an increase in consumption from a six pack to eight, ten or twelve beers. It also took more alcohol to keep him drunk.

His fourth admission to a psychiatric service occurred at the Wilkes-Barre General Hospital in the Summer of 1993. He was thirteen. Dr. Puhalla suspected he was abusing alcohol and drugs, but he denied it. The belief that Donny was abusing alcohol was repeated by others.

While at St. Michael's, he had an alcohol and drug assessment at Catholic Social Services and completed the recommended counseling. It was noted that he was thought to be withholding information about the nature and extent of his substance use.

### 9/11/96

Donny completed an evaluation at Catholic Social Services. He met the criteria for a substance abuse disorder. He was accepted for treatment. He received the Western Personality Inventory, the Alcohol Use Profile, a psychosocial index he filled out and an Adolescent Problem Severity Index.

He reported he started drinking alcohol at age 8. He began regular use of alcohol at age 13. He said he drank two six packs daily and a fifth of rum on weekends. In addition, he did binge drinking. He said he stopped drinking in April 1994 (29 months earlier when he was confined).

48

FELL-00000514

**Appendix G - Alcohol and substance abuse**

He began using marijuana at age 13 on a daily basis. He used on weekends. He said he did not use marijuana for the period from April 1994 to August 1995 (when he was confined by the state). He returned to use in August, increasing to daily use again by winter 1995. He said his last use of marijuana was on 7/4/96. He said he tried LSD twice at age 13. The counselor, Lisa Randazzo, thought he was minimizing his use.

(Author's note: This record is consistent with his reports now and occurred prior to him being in any substantial legal difficulty.)

**1995-1996**

For a time, (from the end of his first year through the start of his second year at Aunt Jackie's) he worked at a race track, Pocono Downs. He started as a busboy and then was a dishwasher. He needed a ride and came home with his boss. His boss, "Speed", took him out drinking after work. He got home after a night of drinking at 5 or 6 A.M. and then went to school. He said he slept in class; the teachers frequently did not seem to mind.

After he left his Aunt Jackie's, he hung out at a friends house. He stayed at Sean's house for seven or eight months. He was drinking and getting high. He supporting himself by stealing. He broke into cars and stores. He never committed any holdups.

When he returned from Nebraska, he lived next door to Sean's house with a woman friend of his mother's. She was a nice lady who dealt pot. He got his pot free. He also used alcohol, but this woman did not like alcohol that much.

He moved back to his Aunt Jackie's home when he was about nineteen and a half. He complained that his Aunt Jackie controlled his drinking quite a bit. He never went as long as a month without drinking.

He attended a concert at Yasgur Farms for three days. He used drugs, acid in particular, very heavily with multiple hits starting at three and working up to twenty five hits at a time. He was really high - tripping. He saw "tracks". He was unsure whether it was raining or not. He could not see or feel rain, but it was muddy. (Author's note: From his comments, the people he asked to confirm his impressions were not reliable observers at that time.) His use of acid was much longer and more intense than ever before.

49

FELL-00000515

## Appendix G - Alcohol and substance abuse

During May 2000, Bethany Brashears reported that he was drinking at the time. Donny drank almost everyday. He also used drugs. He had weed laced with something. He had crack cocaine. She said that there were also needles around the home, suggesting other drugs or forms of drug use.

## Staying with his mother

While he was in Vermont (slightly more than two months), his mother was drinking and drunk every day. If she brought people home with her, they would sit up all night drinking. She also used crack whenever she could get it; then she would use crack and drink all night. Donny and Bobby would drink and drug with her and her friends; they would hang out together. She used crack or whatever else she could get all night.

| Substance | Lipman | Wetzel | Record |
|---|---|---|---|
| Alcohol | yes | yes | yes |
| Marijuana | yes | yes | yes |
| Cocaine | yes | yes | yes |
| Crack | yes | yes | yes |
| LSD | yes | yes | no |
| Angel dust | yes | yes | no |
| Mushrooms | yes | yes | no |
| Ecstasy | yes | yes | no |
| Heroin | yes | yes | no |
| | | | |
| Valium | yes | yes | no |
| Percocet | | yes | no |
| Clonopin | | yes | yes |
| Xanax | | yes | yes |
| Amphetamine | | yes | no |
| Oxycontin | yes | yes | |
| Unknown | yes | yes | no |

## Discussion

Dr. Mills has cited the excellent work of Dr. Marc Shuckit on the genetics of alcoholism. I would agree that there is both a genetic and an environmental component to alcoholism. In addition to Shuckit, I would refer to the interesting studies of Dr. Robert Cloninger.

Donny can be said to have type II alcoholism. Type II alcoholism begins early in adolescence and is usually associated

50

FELL-00000516

**Appendix G - Alcohol and substance abuse**

with criminal behavior[34]. The person drinks in order to feel euphoric. He has an inability to abstain from drinking, but the alcoholism is usually not progressive.

In a study of adoptees, it was found that "alcoholism in at least one birth parent increased the son's risk of abusing alcohol, whereas alcoholism in the adoptive parents did not." "Although type II alcoholism was much less common among male adoptees than type I alcoholism, men who were genetically predisposed to Type II alcoholics were at a significantly higher risk of becoming alcoholic themselves than men with a genetic or environmental predisposition to type I alcoholism."

**Rates of Alcoholism in Adopted Sons**

| | | |
|---|---|---|
| Father - Non-alcoholic | Mother - non-alcoholic | 14.7% |
| Father - Alcoholic | Mother - non-alcoholic | 22.4% |
| Father - Non-alcoholic | Mother - Alcoholic | 26.0% |
| Father - Alcoholic | Mother - Alcoholic | 33.3% |

When the father is non-alcoholic, alcoholism in the mother increases the risk of alcoholism by 12.3%. When the father is alcoholic, an alcoholic mother increases it by 10.9%.

"The strongest and most consistent co-morbid psychiatric disorder in substance abusers is antisocial personality disorder[35]." "Antisocial personality leads to early onset of a variety of behaviors that may be characterized as risk taking, danger seeking, or stimulation seeking. Antisocial individuals are easily bored and need stimulation ... including polydrug abuse with little concern for its illegal or dangerous complications." (p. 406).

"Polysubstance abuse is frequently associated with strong familial aggregation of substance abuse, childhood conduct disorder, teenage onset of substance abuse, and in adulthood, antisocial personality disorder, low adaptive functioning and

---

34 Cloninger, CR, Sigvardssen S and Bohman H. (1996) Type I and Type II alcoholism: an update. Alcohol Health and Research World. 20:18-23.

35 Cloninger CR and Dinwiddie SH. (1993) Genetic risk factors in susceptibility to substance abuse in Biological basis for substance abuse, New York, Oxford Press, pp. 405-412.

51

FELL-00000517

**Appendix G - Alcohol and substance abuse**

severe dependence ....[36]

Cloninger has pointed out that genes are not destiny. Character can modify the expression of genes. Many children of alcoholics are abstainers and avoid their parents' problems.

Of course, one may legitimately ask where in his family Donny might have observed character or learned to develop and display character.

---

36 Cloninger CR. (1998) Genetics of Substance Abuse in Galanter M and Kleber HD (eds.) <u>Textbook of substance abuse treatment: second edition</u>. Washington D.C. The American Psychiatric Press, p.59.

52

FELL-00000518

### Appendix H - Cognitive functioning

**Opinion:** Donny has received a competent neuropsychological evaluation. He has no cognitive deficits detectable on neuropsychological testing.

### Cognitive functioning and cognitive deficits

Donny Fell received what appears to be an excellent neuropsychological evaluation on 4/6/01 from Dr. van Gorp and Dr. Walton. The scoring, administration and interpretations appear quite competent. Due perhaps to an excess of caution, I decided to do a very quick evaluation of my own. I gave Donny the Cambridge Examination for the Elderly developed by Sir Martin Roth, M.D. on 9/19/02. This test can be described as an extended mini-mental status examination. This test is not an in-depth examination, but can reveal obvious deficits.

Focused neuropsychological history
4/88

On the Comprehensive Test of Basic Skills, Donny scored at the 77th percentile in reading, the 75th percentile in language arts, and the 91st percentile in math. His composite score was at the 81st percentile.

4/89

His reading total score on the Comprehensive Test of Basic Skills was 71st percentile in reading, the 90th percentile in language arts and the 72nd percentile in math. His composite score was at the 82nd percentile.

4/24/90

His composite score on the Sanford Achievement Test was at the 67th percentile, ranging from the 50th percentile to the 88th.

4/23/91

His composite score on the Stanford Achievement Test was at the 72nd percentile, ranging from the 60th percentile to the 86th percentile.

10/91

During his first psychiatric evaluation in October 1991, he received a standard psychological assessment. He was thought to have normal intelligence (verbal IQ = 95, performance = 104; full scale = 99). He received a typical psychological evaluation,

53

FELL-00000519

## Appendix H - Cognitive functioning

including IQ testing, projectives and a test of self-concept. Apparently he had relatively low scores on the information scale (8) and on the comprehension scale (7)[37].   He had a very high score (18) on digit span.

### 11/23/93 - A medical hospitalization

Donny was seen in the Wilkes-Barre General Hospital ER after being struck the right parietal region of the head.  He was suspended from school at the time of this incident.  He had thrown a brick at a boy who then hit him in the head.  He had a loss of consciousness estimated as less than one minute.  He complained of fatigue, nausea and headache.  He vomited in the ER.  He had peritraumatic amnesia.  His neurological examination in the ER was normal and nonfocal.

A CT scan showed a small, one centimeter "hemorrhagic contusion" in the right parietal region.  A repeat CT scan showed an additional hematoma in the right occipital region.

He told me that he suffered a brief loss of consciousness after he was hit by the brick.  He was tripping on acid.  The "little birds were making too much noise".  They wanted to make them go away by throwing bricks at the birds.  One brick hit him. He went to the ground.  (Author's note: He denied any loss of consciousness to Dr. van Gorp.)  He was sure that for a period he was unable to talk.  He got up, but had trouble walking because he was "so dizzy".  He sat down twice, but was able finally to make it to the street.  He told his friend to call to call an ambulance.  He passed out in the ambulance.  He said he woke up in the hospital and threw up.

He told me, as he told Dr. van Gorp, that he suffered no cognitive problems after this injury.  He specifically denied headache, neck problems, fatigue and problems with concentration and memory.

He was told that he had to be psychiatrically cleared. Someone thought, he said with indignation, he had jumped under the brick deliberately.

According to the record, a consultation was obtained from a psychiatrist.  He diagnosed "atypical conduct disorder".  His consult noted truancy, oppositional and defiant behavior.  His mother opined that he "needed to be put away".  His problems were

---

[37] This may be important since this scale measures one's ability to describe socially appropriate behavior.

FELL-00000520

### Appendix H - Cognitive functioning

of long standing.  No evidence of psychosis was noted.  He demonstrated no thought disorder, hallucinations or delusions.

### Testing in 1994

In one report from St. Michael's in 1994, Donny was called a seventh grade student.  His reading standard score was 124, at the post high school level.  Spelling was 107 and arithmetic 83. His scores on a more extensive reading test showed vocabulary at the 61st percentile and comprehension at the 68th percentile for grade seven.

### 8/25/95

Donny Fell left St. Michael's School.  He was described by the director of admissions as quiet and intelligent.

### Fights

He said that he has been in dozens of fights.  He was unwilling to estimate the number; he didn't keep track.  He was never knocked out in a fight.  However, he said he did not win them all.  He reported that he had been stunned several times. It was difficult to elicit any details, but it seems likely that he has had a number of very mild concussions (alteration in his sensorium without loss of consciousness.)  He declined to estimate the frequency.  He did not know whether he had any cognitive after effects.

### 7/9/99

According to the records, Donny Fell was taken to the Penn State Geisinger Wyoming Valley Medical Center after he was in a motor vehicle accident.  He suffered a blow to his head.  He was not knocked out.  Lumbar and cervical x-rays were read as normal. A mass was seen in the cervical area.   A lumbar strain was diagnosed.

Donny said he had been in one motor vehicle accident.  The car in which he was rear-ended.  His companion was shook up and taken to Mercy Hospital [sic] in an ambulance.  He went as well when offered the chance to do so.  He did not seem to think he had any cognitive problems from the accident.

### Substance abuse

Donny, as described at length elsewhere, has consumed a staggering amount of alcohol and drugs.  These can cause brain

55

FELL-00000521

**Appendix H - Cognitive functioning**

damage and brain dysfunction.  No persisting cognitive effects were elicited.

The sole exception was one occasion around Christmas 1999 when he took a large number of pills of unknown type.  He was told that he became combative (according to Dr. Lippman's report).  He reported to both of us that he was amnestic for two days later.  However, he was able to describe the pills and their effects to Dr. Lippman and to me.

**The Examination**
**Orientation**

The patient was fully oriented to person, place, date and time.  There were no signs of delirium or intoxication.

**IQ**

Dr. van Gorp gave a standard IQ test which showed that he had average intellectual abilities.  His working memory and his processing speed were distinctly above average.

**Academic achievement**

His reading score on the WRAT-3 given by Dr. van Gorp showed average ability.  His spelling level was also average, consistent with a high school graduate.  (Author's note: Arithmetic is the subject most dependent on schooling.)  His arithmetic score was lower, comparable to a seventh grade student.  This is consistent with his educational effort.  He told me that while he is weak in arithmetic, he has suffered no negative consequences in his life because of his weakness in mathematics.  (Author's note: This precludes any psychiatric diagnosis.)

**Simple Calculations**

On the Camcog, he was able to solve two simple arithmetic problems correctly.

**Attention and Concentration**

The patient was able to count backwards from 20 to one by ones without error.  He did serial sevens without error.

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly superior.  On the three scales for which a percentile was given, the lowest was at the 95th percentile.

56

FELL-00000522

## Appendix H - Cognitive functioning

This suggests excellent executive functions.

### Language

The patient understood and responded correctly to a series of verbal directions and questions. He correctly obeyed two directions he read. Mr. Fell was able to do a two-step command, but he obeyed only two parts of a three-step oral command. He was able to name seven of eight objects. The patient was able to name more than ten animals in one minute. Verbal fluency was average. He was able to define all of a series of simple terms in general or abstract ways. The patient was able to write a complete sentence of his own choice. Mr. Fell was able to address an envelope correctly when the name and address were dictated to him. Language comprehension and usage were in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly average or normal.

### Memory

Mr. Fell was able to recall five of six pictures previously seen. He was able to recognize all six of the same pictures when they were among a series of pictures shown to him. He was able to answer four of six easy questions about world history from 1914 to 1945. Because of his limited education, I did not expect him to know any of the questions about relatively remote history. He surprised me by knowing the date of the start of World War II, the roles of Hitler and Stalin in World War II, and that the Lindbergh baby had been kidnapped. His estimate of the start of World War I was close. He commented that he had been reading <u>The Rise and Fall of the Third Reich</u> recently. The patient was reasonably well acquainted with current events. The patient had no trouble registering the names of three items (apple, table, and penny). He was able to recall all three objects at five minutes. He remembered all five of the five elements on the address of an envelope he had written five minutes earlier. Total score on memory items was above average, well within in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was average or normal. His lowest score was at the 25th percentile.

### Praxis

He was able to copy correctly all three of three figures

57

FELL-00000523

## Appendix H - Cognitive functioning

shown to him. The patient was able to draw a clock, but not to represent the hands showing the requested time. (Author's note: The hour and the minute hands were appropriately placed but of equal length.) Mr. Fell was able to mime three requested actions in a concrete way. The patient's score for performance of requested behaviors was in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was average or normal.

## Motor functioning

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly superior.

## Perception

He was able to identify one of two coins by touch alone. The patient was able to recognize both of two famous persons' pictures. The patient was shown pictures of six common objects photographed from unusual angles. He identified five of them. Two bystanders were correctly identified by name or role. The patient's score on perceptual tasks was in the nondemented range.

## Abstract Thinking

Mr. Fell was able to respond in an appropriate, abstract way to some items in a series of verbal reasoning questions. The patient's performance on abstract thinking tasks was in the nondemented range.

Dr. van Gorp defined executive functioning as associated with "more complex cognitive operations such as shifting of cognitive set, planning and inhibiting responses. On the more extensive and intensive testing done by Dr. van Gorp, he was average or better than average. Dr. van Gorp said, ""thus, there were no abnormalities evident in the domain of executive functioning." If this is true, and the testing seems quite clear, Donny's inability to control his anger and rage relates to some combination of his intoxication, his personality and / or the inability of his family to model appropriate self-control or to insist that he learn it.

## Camdex Total Score

Donny's score on the Camcog I gave was excellent, well

FELL-00000524

## Appendix H - Cognitive functioning

within the nondemented range.  He had a perfect score on the mini-mental status examination.

### Symptom Validity Testing

Dr. van Gorp gave him the Validity Indicator Profile.  That test showed that he made an adequate effort on both verbal and nonverbal sections of that test.  Since he showed no deficits on the rest of the testing, one can conclude with confidence that he made an adequate effort.

59

FELL-00000525

**Appendix H - Cognitive functioning**

Neuropsychological Assessment Report
Psychological Assessment Laboratory
Renard Hospital-W.U.M.C.
4940 Children's Place
St. Louis, MO  63110
(314) 362-2465


Patient Name: Donny Fell

Sex: male      Age:    22 Marital Status: widowed      Race: white

Occupation:  Inmate                        Education: 9   (Years)

Type Patient: Forensic

Referring Doctor(s): Gregory Waples, Esquire
                     AUSA

Admitting Diagnoses:

 Conduct disorder by history
 Major depression by history
 Antisocial personality disorder by history
 Alcohol dependence
 Poly substance abuse and dependence

Date Tested:  09/19/02

Validity of Examination:

X   Adequate results; appears to be an adequate measure
    of current level of functioning

Remarks:

 Very co-operative with this part of the examination

60

FELL-00000526

**Appendix H - Cognitive functioning**

The Cambridge Examination for
Mental Disorders of the Elderly

Name:   Donny Fell                                      Age: 22

Referred by: Gregory Waples, Esquire             Sex: male

Date:   09/24/02                    Examiner: Richard D. Wetzel, Ph.D.

| SUB-SCALES | OBTAINED | POSSIBLE | PERCENT |
|---|---|---|---|
| Orientation | 10 | 10 | 100 |
| Language Comprehension | 9 | 9 | 100 |
| Language Expression | 18 | 21 | 86 |
| Total Memory | 24 | 27 | 89 |
| Remote Memory | 4 | 6 | 67 |
| Recent Memory | 4 | 4 | 100 |
| Learning | 16 | 17 | 94 |
| Attention | 7 | 7 | 100 |
| Praxis | 11 | 12 | 92 |
| Calculation | 2 | 2 | 100 |
| Abstract Thinking | 6 | 8 | 75 |
| Perception | 9 | 11 | 82 |
| Total Score | 96 | 107 | 91 |

Score is in normal range

MINI-MENTAL STATUS EXAMINATION
Scores and Ranges

Obtained Score                              30

Percentile-NORMALS                          91
Percentile-DEPRESSED PATIENTS               80
Percentile-DEPRESSED with COG. IMPAIR.      95
Percentile-DEMENTED PATIENTS                **

        **-Unlikely to be group member $P < 0.5$

61

FELL-00000527

**Appendix I - Misrepresentation and misapprehension of the situation**

**Opinion:** The available history shows that

1.  His father misrepresented to the authorities the nature and extent of substance abuse and violence in Donny's home.

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers and were physically abusive to each other. Both denied to Children and Youth Services that they had abused their children. Both said that they were committed to their marriage despite the difficulties.

**4/21/90**

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence. Mr. Fell conceded that he had a drink occasionally at night, but said that neither he nor his wife had a drinking problem.

The police officer involved noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." The report indicated that the officer had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time.

**6/16/90**

Both of Donny's parents were ordered by the court to undergo alcohol and substance abuse evaluations.

**7/16/90**

Mr. Fell was ordered to undergo alcohol counseling.

2.  His mother failed to disclose to the authorities the nature and extent of substance abuse and violence in Donny's home.

62

FELL-00000528

## Appendix I - Misrepresentation and misapprehension of the situation

### 6/6/85

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers and were physically abusive to each other. Both denied to Children and Youth Services that they had abused their children. Both said that they were committed to their marriage despite the difficulties.

Both admitted that in the past they have had physical confrontations with each other. Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983). The case worker, based on 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report.

### 4/21/90

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence. Mrs. Fell denied being abused by her husband. Mrs. Fell reported that she and her husband had a good marriage and fought no more than other married couple.

### January 1993

It was reported that his maternal grandmother had a "chronic psychosis" and died in a state hospital. (Author's note: The reader is reminded that his maternal grandmother, Theresa Sharpe, was his guardian after his mother abandoned him.) On 2/3/93, his mother told the staff that his father had been diagnosed with schizophrenia. She also called him alcoholic and physically abusive.

### Summer 1993

When he was admitted again to psychiatry, he blamed his mother for his problems and complained that she was an alcoholic. She countered that she drank a few beers, but his father was a psychopathic alcoholic.

In her discharge summary, Donny's social worker wrote "There remain questions regarding Donald's mother and her parental functioning." "There is a sense that the family is blocking some

63

FELL-00000529

**Appendix I - Misrepresentation and misapprehension of the situation**

aspect of their interaction which may be impinging upon Donald's growth and development."

**7/22/94**

Despite the evidence, Mrs. Fell denied that she did "any drinking". The case worker commented, "... Mrs. Fell is quite intelligent when she is sober." "... it appears that she has not been sober long enough ... for two years." "Mrs. Fell's relationships have centered around her drinking." Mrs. Fell "went on the prowl, bring men home indiscriminately to meet her needs for companionship."

3.  When Donny described the substance abuse problem in his home, he was not believed or received an inadequate response.

At admission to the psychiatric service on 1/26/93, he complained about his mother's drunkenness. He implied that she was quite nice until she drank and her personality changed. She drank only episodically according to Donny.

When brought to the hospital in the summer of 1993, he told the examiner that the real cause for his admission was that his mother did not want him around. He was depressed and was on the verge of tears when talking about his perception of his mother rejecting him.

He blamed his mother for his problems and complained that she was an alcoholic. She countered that she drank a few beers, but his father was a psychopathic alcoholic.

4.  The Children and Youth Services had adequate information from the police and others (his grandmother *inter alii*) to alert them to these problems.

**4/21/85**

After Donny's parents were in a fight and stabbed each other, the Children and Youth Services case worker apparently believed that his parents were unable to deal with or talk about the sexual abuse of their children, leading to drinking and fighting.

64

FELL-00000530

**Appendix I - Misrepresentation and misapprehension of the situation**

**6/6/85**

His parents reported that "in many ways Donald is blaming them for the assault upon him." They were reluctant to set limits on him or control him because of what he had been through. (Author's note: This seems a convenient spin on the facts.)

**6/31/85**

Children and Youth Services closed the case. The report said the children receive appropriate care and love. Discipline has also been appropriate.

**10/31/85**

The supervising case worker noted that supportive services and counseling had been provided to the Fell children and to the Fell parents by Children and Youth Services and the Victim's Resource Center. They stopped therapy at the Victim's Resource Center in July. The caseworker stated that the parents had made progress in their relationship and the relationship was now stable.

**4/21/90**

A police officer informed Children and Youth Services of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police.

A female police officer involved noted that "the police were continuously at this home for domestic disputes". She reported that a similar call alleging parental fighting and child neglect had been made to Children and Youth Services in September 1989.

She noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." The report indicated that the officer had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk,

FELL-00000531

## Appendix I - Misrepresentation and misapprehension of the situation

very belligerent and cursing all the time.

Interestingly, his mother-in-law, Theresa Sharpe, reported his first wife and the three children from that union had no contact with him because of his drinking.

The case worker thought that parental drinking was the primary problem, but that both Mr. Fell and his wife "had very little insight".

### May 1991

It was stated by the Children and Youth Service worker that there was no evidence that Debbie was drinking excessively.

### August 1991

Children and Youth Services was informed that Mrs. Fell was drinking heavily. Mrs. Fell was referred to the Wyoming Valley Alcohol and Drug Service.

### 9/2/91

Mrs. Fell was arrested for public drunkenness. She fought with the officers.

### November 1991

Children and Youth Services had been informed that Mrs. Fell was drinking frequently. At the urging of the case worker, she began treatment, but dropped out when Donny went into the hospital.

The focus of Children and Youth Services was now on Donny's behavior problems and Mrs. Fell not drinking in front of the children. (Author's note: *As opposed to not drinking?*)

### May 1992

The Children and Youth Services caseworker stated that Mrs. Fell was providing a stable and safe environment for her children. She was not drinking **excessively**. However, she was

66

**Appendix I - Misrepresentation and misapprehension of the situation**

not compliant with drug and alcohol treatment.

**1/19/94**

The Children and Youth Services case file was re-opened due to an allegation that, while drunk, Mrs. Fell hit Teri across the lip, splitting it.

It was noted that there was a long-standing history of alcohol abuse and violence in this family.  "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell." (Author's note: Right conclusion fairly late, despite evidence nine years earlier.)

During the time that the case was closed, Children and Youth Services continued to receive calls from Mrs. Sharpe regarding Mrs. Fell's continued drinking.

**1/29/94**

Mrs. Fell was arrested for public intoxication on simple assault.  She tried to assault the man living with her, Ellery Wilcox, and was restrained by her son, Donny.  She pulled the man out of his car, knocked him to the ground, scratched his face and broke his glasses.

**2/1/94**

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulting her live-in boyfriend, Maxwell, leading to a call to the police.  She was arrested for assault.  However, because of considerable bruising, she was released without prosecution.  Mrs. Fell then went on a binge.

**5/25/94**

Mrs. Fell was arrested for public intoxication.  She also slapped her daughter.

**7/22/94**

According to Children and Youth Services records, Donny tore

67

FELL-00000533

**Appendix I - Misrepresentation and misapprehension of the situation**

a telephone off the wall.  When she tried to fix it, he assaulted her.  His mother then "accidentally stabbed" him with a fork.

It was noted that Mrs. Fell then went on an extended bender that lasted until she was jailed.  She was jailed, according to the report, because Donny had attended school on only 14 days in a 21 month period.

The case worker, John Koslowski, performed an unannounced home visit one week prior to a dependency hearing and found that Mrs. Fell had left her children home alone unattended.  He counted seventeen beer cans in the kitchen and living room.  It was alleged that Mrs. Fell was bringing multiple men home (in serial fashion) for a day or two at a time.

The case worker commented that Mrs. Fell took no responsibility for her actions and did not expect her children to be responsible for their behavior either.

The case worker noted, "Due to the ongoing alcohol abuse by Mrs. Fell, Donald's lack of attendance at school and total neglect of the children, ... " services would be provided.

5.    Multiple professionals failed to understand the problems that are now quite clear in retrospect.

At admission to the psychiatric service on 1/26/93, he complained about his mother's drunkenness.  He implied that she was quite nice until she drank and her personality changed.  She drank only episodically according to Donny.

Dr. Feusner, his child psychiatrist, noted that his mother had withdrawn him from outpatient care at the partial hospital program.  Against medical advice, she had stopped his medication. When his behavior became worse, she had restarted him on medicine, but that had not changed his behavior for the better.

The record noted that his mother had been "in prison" for driving under the influence and for other additional offenses. Donny reported on 2/19/93, that his father had abused him too.

68

FELL-00000534

**Appendix J - Malingering**

**Opinion:** Broadly stated, Donny has showed no significant signs of malingering on psychological and neuropsychological testing.

### Malingering

Dr. Lipman made no comment on malingering.

Dr. van Gorp used one of the symptom validity tests that I prefer (the VIP). I agree with his comments on that test and on the neuropsychological battery as a whole. I concur on his comments on the Structured Interview of Reported Symptoms (SIRS). Donny did not claim psychotic symptoms that he does not have.

I differ in a minor way from Dr. van Gorp's statements about the MMPI-2. He did have sufficiently elevated scores on F(p) on both MMPIs that the NCS forensic program refused to accept it as a valid profile. This suggests a degree of exaggeration or embellishment. As I will state later, I believe this goes to the weight that should be placed on the MMPI-2s, not to a complete rejection.

I would concur with Dr. Mills' slightly more cautious statement that **overall** Donny was not malingering.

69

FELL-00000535

**Appendix K - Conduct disorder**

**Opinion:** Donny meets the criteria for severe, childhood onset conduct disorder.

### Criteria for personality disorders

**A.    Before age fifteen**

His first psychiatric hospitalization occurred at age eleven on 10/30/91.  He was admitted for ongoing behavioral problems of a severe nature.  He was oppositional, combative, assaultive, defiant, smoked, refused to do homework and caused problems at school.  He admitted hitting his mother.  She was said to be afraid of him.  He had a history of running away.  His mother said he had set fires.

The Children's Service Center[38] recommended admission because his behavior was becoming increasingly dangerous.

While there was some depression and anxiety on projective tests, "Aggression appears to be viewed as a major vehicle to express himself...."

While in the hospital, he was noted to be angry and threatening to other patients he considered threats to himself. He showed minor destructive behaviors, but none that could be called major.

Donny was discharged from First Hospital Wyoming Valley on 10/30/91.  The discharge diagnosis was conduct disorder, undifferentiated type (312.90), listed on Axis I.  No Axis II disorder was listed.

He was admitted to the psychiatric service of Dr. Feusner for his second admission, the first at Wilkes-Barre General Hospital.  Three days prior to this admission, Donald and his friend, John Gasic, were playing with a 9 mm. handgun belonging to the victim's father.  The gun fired, hitting John Gasic in his shoulder.  The bullet came close to his heart, but did not cause any major injury.

Initially, Donny was said to show no remorse.  His mother

---

38 I have not identified any records from this center in the materials submitted to me.

70

FELL-00000536

**Appendix K - Conduct disorder**

reported that he threatened to shoot her as well.   On the ward, it was said he initially bragged about the shooting.

The record includes a list of reported misbehavior.

1.   Keeping knives hidden in his room
2.   Punching his sister's girl friend
3.   Chasing his mother with a curtain rod
4.   Throws objects
5.   Hit his mother and sister
6.   Pulled out his mother's hair
7.   Curses authority figures
8.   Refused to follow household rules.

His mother said, "She fears that he will use it on her when he is angry, because he does violence without thinking of the consequences when he is angry."

Dr. Feusner[39] said he had personally observed that Donny

1.   Was demanding
2.   Was manipulative
3.   Was defiant
4.   Was oppositional
5.   Had severe temper tantrums with crying, screaming, kicking and threats to hurt others
6.   Had trouble with the law for throwing rocks at cars.

His affect was labile and "extreme".  His mood was angry and depressed.  He was thought to have less insight and judgement than expected for his age (almost twelve).  He was impulsive.

During this hospitalization, Dr. Feusner wrote that his oppositional, impulsive and disrespectful behavior to the staff was controlled by the medication he prescribed.  His behavior toward his mother changed from oppositional and defiant to very cooperative.  He apologized.  Near the end of his stay, he was confronted with the shooting of his friend.  This time he cried and seemed to show genuine remorse.

He was discharged to partial hospitalization at the

---

39 Apparently Dr. Feusner had treated Donny earlier before this admission at the Children's Service Center.

71

FELL-00000537

## Appendix K - Conduct disorder

Children's Service Center.  The discharge diagnoses were atypical depression - NOS and hyperkinetic conduct disorder.

On 5/31/92, Children and Youth Services closed out the Fell family file, noting that Donny continued to have behavioral problems.

On 1/26/93, he was admitted again to the Wilkes-Barre General Hospital under the care of Dr. Feusner on and stayed a full month.  On one form, the chief complaint was said to be school suspension and aggressive acting out behavior at home. His mother said that she was afraid to sleep because Donny might kill her in her sleep.

The record includes a long list of reported misbehavior.

1.   Keeping knives in his room
2.   Throwing a knife at his mother
3.   Repeatedly punching his mother's live-in boyfriend, including punching him in his broken leg[40].  He refused to allow the man to discipline him.
4.   Repeated truancy with no school attendance for months.
5.   A history of school suspensions.  He claimed the number was ten.
6.   Staying out late at night without permission.
7.   Breaking his mother's finger just before Christmas[41]
8.   A history of physically beating his mother
9.   A history of physically beating younger children
10.  A history of fights at school
11.  He was drinking enough for it to be described as alcohol abuse in the record.
12.  Shooting another boy "accidently" and without showing remorse.
13.  It was said that he cried profusely when he did not get his own way.
14.  It was said that he had temper tantrums when he did not get his own way.
15.  Allegedly, he told his younger sister that he planned to

---

40 He had been hit by a car several months earlier and was scheduled for surgery in the next few days.

41. He reported, in his own defense, that his mother had attacked him while drunk and the finger injury occurred while he was defending himself.

72

FELL-00000538

## Appendix K - Conduct disorder

kill his parents with a "razor sharp" knife.

16. He had been picked up by the police for throwing pebbles at patrons entering a gay bar.

The record indicates that on 1/28/93, his mother confronted him with his "violent, dangerous, disrespectful, defiant behavior".

His insight and judgement were impaired by the strength of his emotional reactions and by his impulsivity. When it was clear that he was lying, he maintained his statement unreasonably, "almost to the point of delusion[42]".

It was noted that he had difficulty sitting still and concentrating when he was off of his Dexedrine and Tofranil.

On 6/6/93, He was brought to the Wilkes-Barre General Hospital for fourth psychiatric hospitalization by commitment on papers signed by his mother because of increasing violence, particularly at home, but also in school, and depression on 6/6/93. The day before he had injured a friend sufficiently by throwing a fork that the friend had needed medical care. He denied he had any problems of his own.

Elsewhere in the record, it noted that he had refused his medication, Moban, for five days[43]. He was trashing his home. He had stabbed his friend[44]. He was drinking and smoking pot. He was fighting with his mother and sister. He had been suspended from school several times for violence. He was skipping school regularly and was failing seventh grade for the second time.

Unit records said he was very angry and he shouted demeaning things at his mother. He was described as sarcastic and argumentative. He disagreed with everything his mother said.

---

42 This could be said to cut against my opinions; therefore I included it.

43He initially did not explain why he had stopped taking his Moban when he admitted it calmed him down. He later suggested that it was because he was gone too much to take it regularly.

44 The record does not definitively say whether he threw the fork or stabbed with the fork.

73

FELL-00000539

## Appendix K - Conduct disorder

Donny denied at that time any use of alcohol or drugs. He admitted there were empty beer cans in his room, but he denied they were his. He said the condom in his pocket also did not belong to him.

His psychiatric problems went back to at least age nine (four years earlier). He was overactive and impulsive.

He told the examiner, a psychiatrist, Dr. C.M.J. Puhalla, that he was doing well in junior high school. However, it was noted that he might be failing. His mother reported that in school, he was disruptive, easily distracted, cursed at teachers, threw things and at times just walked out of school. He refused to obey the school rules as he did at home.

By history, he had poor judgment and insight. It was suspected, he was abusing alcohol and drugs, but he denied it.

A nursing note later said that he was much calmer after his mother left the unit. He denied that he had any problem with his mother. Later, he said that his sister was the whole problem, not his mother.

He became angry on 6/12/93 when another child said he wrote curses on a desk. He became angry enough that security was called and he was placed in four point restraints. He yelled that he would kill the boy when he got out. He then calmed down and was released.

On 6/22/93, Donny denied that he had received points for bad behavior in front of the staff person who gave him the points and his mother. She apparently listened to the staff.

He was discharged from the hospital on 6/30/93. Dr. Feusner noted that he continued to manifest disrespectful, silly and covertly oppositional behavior. He tried to induce others to misbehave as well.

Dr. Feusner noted on 6/11/93 that Donny expressed regret for hanging out with older boys arrested for burglary, but denied participating with them in any burglary. Dr. Feusner noted that his mother was trying to have criminal charges placed against Donny.

Donny was seen on 11/23/93 in the Wilkes-Barre General

74

FELL-00000540

**Appendix K - Conduct disorder**

Hospital ER after being struck the right parietal region of the head. He was suspended from school at the time of this incident. The record said that he had thrown a brick at a boy who then hit him in the head. Donny gave me a quite different version. He had been throwing bricks at birds while "tripping". It was an accident that he was hit in the head. He added that someone suspected he was trying to commit suicide by jumping under the brick.

A consultation was obtained from a psychiatrist. He diagnosed "atypical conduct disorder". His consult noted truancy, oppositional and defiant behavior. His mother opined that he "needed to be put away". His problems were of long standing.

St. Michael's School - 4/8/94 to 5/8/95

Donny was placed in the temporary custody of the Luzerne County Children and Youth Services by court order. He was admitted to the treatment program at St. Michael's[45]. St. Michael's stated that his diagnoses were adjustment disorder with disturbance of conduct and adolescent/authority conflict.

It was noted on 7/24/94 that Donny had been truant very frequently. It was noted that Donny had been suspended more than once for disruptive behavior.

Donny told me that St. Michael's was a "typical lockup" for kids.

---

45 Bobby Lee was at St. Michael's from 9/19/94 to 8/15/95 and from 12/12/96 to 6/13/97. They were both enrolled during the period from 9/19/94 to 8/25/95.

75

FELL-00000541

FELL-00000542

**Appendix L - Personality disorder**

**After age fifteen**

1. He has clearly failed to conform to social norms with respect to lawful behavior.

   A. He told me that after he left his Aunt Jackie's home, he hung out at Sean's house for seven or eight months. He was drinking and getting high. He supporting himself by stealing. He broke into cars and stores. He denied committed any holdups.

   B. Before he joined the carnival, he had sex with quite a few women. He denied that he ever had a relationship in which he cared for a woman or in which he restricted his sexual activity.

   C. When he was traveling with the carnival shortly before going to Vermont, he was have sex at least daily and frequently had sex with several women a day. They were doing drugs, drinking and having sex all the time.

   D. He attended a concert at Yasgur Farms (Woodstock) for three days. He used drugs very heavily with multiple hits starting at three and working up to twenty five hits at a time. He was really high - tripping. He was very active sexually. While there, he was involved in a beating. He beat up a young man who assaulted his sister, Teri. The young man tried to "push on" (rape) Teri. Donny beat him up, broke his leg and pissed on him. Donny said that man was in a coma for a day. He told Dr. Lipman this was followed by a confrontation with six other men. When arrested in this matter, he told Dr. Lipman he gave the police an alias.

   E. He reported that he had been arrested five times before age fifteen and three times after age eighteen. These included an arrest in Nebraska for being in a stolen car, an arrest in Pennsylvania for stealing a car and the arrest for assault at Yasgur Farms.

   F. He admitted a continuing pattern of shoplifting at stores.

2. He does not have a consistent work history.

76

FELL-00000543

## Appendix L - Personality disorder

3.   He is irritable and aggressive.

Donny certainly displays most of the features of antisocial personality disorders.

When examined, only his antisocial features were revealed by his admissions.

However, his history of explosiveness, his sensitivity to even the reasonable demands of teachers, his repeated attempts to defend his mother against his own accurate allegations strongly suggest borderline features as well.  His history demonstrates the love-hate relationship with his mother sometimes seen in borderline patients.

His history is replete with explosions into violence with trivial provocation.  One notes his report to Dr. Lipman of chasing a police officer with a red hot poker when the police came to take him to a hospital after he shot his friend, John Gasic.  One notes reports of multiple incidents during which he attacked his associates while under the influence of drugs.  One notes that he described himself in a frenzy when he beat the young man at Yasgur farms into a coma.

He has very little, if any, empathy for others.  He does not understand how others might respond to his attitudes.  This suggests narcissistic features as well.

Taken together, the diagnosis of personality disorder - NOS with antisocial, borderline and narcissistic (Cluster B) features seems the most accurate description.  Nothing in his history or his testing contradicts this impression.

Dr. Mills, Lipman and van Gorp in their reports avoided making any diagnosis of personality disorder; it should be made.

Personality disorders, like most psychiatric disorders, run in families.  This due both to environmental and genetic transmission.  Certainly one can see the roots of antisocial behavior in each of his parents and their behavior.  As Dr. Mills said Donny did not choose either his genes or his family of origin.  However, that does not relieve him of responsibility for his behavior.

77

FELL-00000544

**Appendix M - Does he have a depressive syndrome - now or in the past?**

### Does he have a depressive syndrome?

His first psychiatric hospitalization was on September 30, 1991 at First Hospital. He does not recall any symptoms or any treatment. He did recall he had been treated prior to that at the Children and Youth Child Welfare. He was said to be "sad and angry about coming into the hospital." His bad behaviors occurred when he was upset ("high affect state"). He was said to have "high anxiety levels". His performance on projective testing showed mild levels of anxiety and depression. His mood was characterized by hostility, anxiety and lability. He was said to have poor adjustment in school, but only since he came to the Wilkes-Barre school system. No diagnosis of depression, typical or atypical, was made. Sufficient symptoms to diagnosis depression were not listed.

**4/14/92**

During his second psychiatric hospitalization, Donny's affect was labile and "extreme". His mood was called angry and depressed. Toward the end of his stay, his behavior improved. Dr. Feusner wrote that his oppositional, impulsive and disrespectful behavior to the staff was controlled by the medication he prescribed. His discharge diagnosis was atypical depression. A depressive syndrome was not described. Sufficient symptoms to diagnosis depression were not listed.

**1/26/93**

He was admitted to the Wilkes-Barre General Hospital under the care of Dr. Feusner on 1/26/93 for his third psychiatric hospitalization; he stayed a full month. On one form, the chief complaint was said to be school suspension and aggressive acting out behavior at home. His mother said that she was afraid to sleep because Donny might kill her in her sleep. It was stated that he had a long history of beating his mother as well as beating younger children. It was stated that his maternal grandmother had chronic psychosis and died in a mental hospital[46].

---

46 This cannot be accurate. It may refer to the paternal grandmother.

FELL-00000545

**Appendix M - Does he have a depressive syndrome - now or in the past?**

During this hospitalization, he admitted that he "may have" had suicidal and homicidal ideation in the past. Three problems areas were identified and targeted for treatment; none of these included depression.

**6/6/93**

He was brought to the Wilkes-Barre General Hospital for a fourth psychiatric admission on 6/6/93 because of increasing violence at home and in school. He was also said to be depressed. When brought to the hospital, he told the examiner that the real cause for his admission was that his mother did not want him around. He was depressed and was on the verge of tears when talking about his perception of his mother rejecting him. He denied any problems of his own.

Dr. Puhalla diagnosed depressive disorder - NOS, attention deficit hyperactivity disorder and thought he had some borderline personality traits. Dr. Puhalla reported that Donny had a history of being "sad and depressed, not enjoying life as much as he should." At times, Donny talked of being better off dead, but denied any current suicide or homicide ideation.

Dr. Feusner placed him on Stelazine and Clonidine. He was thought to be doing the best he had ever done on these medications. Dr. Feusner noted that he seemed to be getting used to the Clonidine.

Dr. Feusner changed the discharge diagnoses to major depression with psychotic features, hyperkinetic conduct disorder and borderline personality traits.

**St. Michael's**

Donny was admitted to the treatment program at St. Michael's; he was there from 4/8/94 through 5/8/95. St. Michael's stated that his diagnoses were adjustment disorder with disturbance of conduct and adolescent/authority conflict. No mention was made of depression.

79

FELL-00000546

**Appendix M - Does he have a depressive syndrome - now or in the past?**

**His reports to me about a disorder of mood**
**Anxiety**

He has anxiety attacks **now** which come out of nowhere. His face, lips and arm go numb. He has a pins-and-needles sensation. He cannot breathe, He feels like he is going to have a heart attack. He perspires. He denied a lump in his throat. He said he did not really have anxiety attacks before he was charged with murder. He did have anxiety, but it was not really bad. He did have some pins-and-needles sensation in his left arm the summer before he went to find his mother in Vermont.

He then added that he thought he had an anxiety attack when he was younger when he got hit in the head by a brick. (Author's note: One anxiety attack, especially in a stressful situation, would not warrant a psychiatric diagnosis.)

The Prozac helps his anxiety attacks. His attacks are less severe and less frequent. The Prozac has had no effect on worrying; he never worried.

**Depression**

He does not recall being sad or depressed. He immediately commented that he was on antidepressants as a child beginning with the doctor from the Children's Service Center. He did not recall, but recognized the name of Dr. Feusner when I mentioned it. He did not like Dr. Feusner. He said that Dr. Feusner never listened to him. He told Dr. Feusner that he was not the one with a problem; his mom was the problem. "He didn't believe me. Nobody believed the kids. They always took the parents word." [on matters of fact]. Because Dr. Feusner did not listen to him, he never listened to Dr. Feusner. He said he was willing to listen, but Dr. Feusner was not.

Donny said he does not remember ever telling anyone that he had nothing to live for anymore. He says that he has never has considered suicide. He has never attempted suicide. He denied that he ever had scars on his right wrist as described on one admission physical. He displayed his wrists for inspection. I

80

FELL-00000547

**Appendix M - Does he have a depressive syndrome - now or in the past?**

detected no scars[47].

The record shows that at times Donny has been upset about his family life.  He has been upset about what he perceives to be rejection by his family, particularly his mother.  A depressive syndrome is never described as a syndrome or piece meal (one symptom at a time).  He never described nor did the record describe a two week period in which he was depressed or irritable or had a loss of pleasure with four other symptoms.

One could conclude that he had difficulty adjusting to a difficult family situations, but he had only limited anxiety and depressive symptoms.

**First comment**

I do not believe he has ever had a clinical depression, but it is reasonable for other experts to believe he did have a clinical depression based on the diagnoses reported on his three admissions at Wilkes-Barre General Hospital.

I am willing to listen to his report that his depression never lasted long enough to make the diagnosis.

**Has his depression, if present, been of psychotic degree?**

It has been suggested that the fact that Donny was calmer and better managed with antipsychotic medications also implies that he is psychotic or prepsychotic.  This seems to assume that each individual medication has only one use or indication.  The logic of this assertion is equivalent to the suggestion that juveniles with behavior disorders who respond to drugs like Tegretol have epilepsy or pre-epilepsy or that patients who are tranquilized with major tranquilizers before surgery are psychotic or prepsychotic.

**The standard for psychosis**

The presence of psychosis is shown by the report of or observation of psychotic symptoms.  No valid symptoms or

---

47 I would defer on this point to a physician.

81

FELL-00000548

**Appendix M - Does he have a depressive syndrome - now or in the past?**

indicators of psychosis are reported during his hospitalization. Dr. Mills did not elicit any hallucinations, delusions or thought disorder. Dr. van Gorp did not report any such symptoms. On the SCID-II psychotic screening module, not one symptom was elicited.

During his first psychiatric admission on 9/30/91, it was noted that he did not show thought disorder. There was no indication of "an underlying thought disorder or gross affective disturbance."

During his second psychiatric hospitalization (4/14/92), Donny denied hallucinations and delusions. He did not display thought disorder. "His thinking is goal oriented and easy to follow." The diagnosis was atypical depression - NOS. No reference to psychosis was noted.

Writing about his third psychiatric hospitalization (1/26/93), when he received antipsychotic medication, it was stated, "He shows no hallucinations or other signs of psychosis however." He showed no signs of thought disorder. His mood was described as anxious, angry and depressed. A careful reading of the medical record shows that he wanted to leave the hospital and go home. He began to bargain with his mother, promising good behavior, in order to get out of the hospital. At the same time, his (Mellaril) medicine was increased. His behavior on the unit improved. His psychiatrist attributed this change to the increase in medicine. The record also noted that he was trying to get his mother to trust him.

During his fourth psychiatric hospitalization (6/6/93), he was examined by Dr. Puhalla. He did not find any delusions, hallucinations or thought disorder. Dr. Feusner thought he did better on Stelazine than he did on Moban during that hospitalization. "He does well on antipsychotic medications, better than he does on oral tricyclics." He became calmer and more reasonable. Dr. Feusner did not identify any depressive symptom or any psychotic symptom which improved on medication. He did not voice any disagreement with Dr. Puhalla's statements about the absence of psychotic symptoms.

**My examination**

Donny reported to me that he has had visual hallucinations ("trails") only while taking hallucinogenic drugs. He had these

82

FELL-00000549

**Appendix M - Does he have a depressive syndrome - now or in the past?**

phenomena only with LSD and with mushrooms.  He obviously, by his report and his body language while describing them, enjoyed them.  The hallucinations lasted "quite a few hours"; they did not persist until the next day unless he took the pills close to midnight.  He did continue taking acid for up to three to four days.  The hallucinations never lasted as long as a week.

He never heard voices.  He never heard running comments on his behavior.  He never heard commands to do anything.  His thoughts about things he observed were his own and came from no one else.  He denied thought insertion and thought deprivation.

He denied any olfactory hallucinations.  He denied any tactile hallucinations.  Nothing has ever controlled any part of his body.

He denied any unusual experiences.

He stated that no one was plotting against him.  He paused, smiled, then added "except for the government."  No one is or has spied on him.  No one is or had been following him.  He never was concerned that "the narcs" were after him before his arrest.  Elsewhere in the interview, he denied going to Vermont because there were warrants out for his arrest.  (Author's note: He admitted that he might have had warrants related to unpaid fines, but he did not worry about that.  He said he is not a worrier.)

He reported that he had been talked to him about some stolen cars because an informant said he had something to do with the thefts.  He said the informant lied.  The police acted in good faith on bad information.  The police had been interested in him before but for good reason.  The police have nothing personal against him.

**Second comment**

**Based on his reports to Dr. Mills, to me and the medical record, he has never had a psychotic illness.**

83

FELL-00000550

FELL-00000551

**Appendix N - Psychosis and psychological testing**

**Psychosis on psychological testing?**

**Opinions:** It has been alleged that Donny shows signs of psychosis on testing; I disagree strongly.

    A.    the use of projective drawings in 1993 was invalid for the conclusions reached.

    B.    the MMPI-2 does not support a diagnosis of psychosis or prepsychosis[48] and

    C.    the Rorschach does not support a diagnosis of psychosis or prepsychosis.

The contention that Donny is prepsychotic or about to become psychotic rests on two prongs as I read the reports of the defense's experts. The first prong is a rather questionable interpretation of his psychological testing. The testing includes projective drawings described in 1993, the MMPI-2 and the Rorschach, both done after his arrest.

The second is the fact that he was given medications for depression (major tranquilizers) which are recognized as appropriate for the management of psychosis.

**1.   Projective drawings**
**Wyoming Valley - 1991**

He received a typical psychological evaluation, including IQ testing, projectives and a test of self-concept. He reported a very strong self confidence (93rd percentile) on the Piers - Harris.

It was noted that he did not show thought disorder. There was no indication of "an underlying thought disorder or gross affective disturbance." He had "Thinking disturbance characterized by impaired judgment[49]." His judgment became worse when he was more upset[50].

---

48 This is not a term of art in psychiatry or psychology. It is meaningless.

49 This is a very unusual way to describe poor judgement.

50 This is fairly normal in eleven-year-old children.

84

### Appendix N - Psychosis and psychological testing

There was some depression and anxiety on projective tests. "Aggression appears to be viewed as a major vehicle to express himself...."

### Wilkes-Barre Hospital - 1993

Dr. Feusner referred rather obliquely in his discharge summary to drawings during the second hospitalization in 1993 when he changed Donny's diagnosis from atypical depression to a psychotic depression. There is no psychological report in the record; it is unclear therefore who asked him to make the drawings, the criteria for supposing he had borderline or psychotic features. "His drawings suggest a psychotic or borderline process." He offered no other evidence for the change in diagnosis.

Projective drawings done by children are not accepted as a method of diagnosis of psychosis that is well established scientifically. Most academic child psychiatrists do not believe in that use. Studies have not been done with these drawings that state their accuracy rates or their error rates.

Rachel Klein[51], a well known child psychiatrist, has written, "In fact there is very little evidence to document the belief that children's personality characteristics are well estimated by projective testing..... It is a grave error to make diagnostic or psychotherapeutic decisions on the basis of projective testing.... It is important to repeat that the very negative picture presented here pertains only to projective testing. There are other psychological testing procedures, such as tests of cognitive ability, that have great merit."

The reproducibility of ratings of the same set of projective drawings is quite low, even when rated by the initial rater after several months[52].

---

51 Rachel G. Klein, Questioning the clinical usefulness of projective psychological tests for children. In: Chess S, Thomas A, Hertzig M (eds), Annual Progress in Child Psychiatry and Child Development, New York, Brunner and Mazel, 1987.

52 R.D. Wetzel, Psychological Testing in S.B. Guze (Ed.), Adult Psychiatry, St. Louis, Mosby, 1997 p. 42.

85

FELL-00000553

Appendix N - Psychosis and psychological testing

**The drawings should be ignored; they do not help with diagnosis.**

**2.    The MMPI-2**
**A. Should the MMPI-2 be interpreted?**

The MMPI-2 obtained by Dr. Mills apparently was submitted for scoring on 3/26/01 at 5:26 P.M. to the NCS. The first sheet implies that the test was completed on that day. The exact program requested[53] is not known to me. It was sent to the attention of Dr. Cliff Smith. The report was faxed back to 212-821-0617[54].

I also gave him an MMPI-2 on 9/18/02.

The MMPI-2™ (Minnesota Multiphasic Personality Inventory - 2) is a 567-item paper-and-pencil, true-false test thought particularly helpful in screening for Axis I psychiatric disorders. It also has excellent scales for assessing one's approach to the evaluation (defensiveness vs. openness vs. exaggeration or malingering of psychiatric disorder).

Comparison of the two MMPIs allows one to assess the stability and repeatability of the scores.

**Validity Scales**

The MMPI-2 has a number of validity scales[55]. One set of scales looks at whether it is likely that the person evaluated was able to respond in the way he wished to respond to the test.

_____

53 NCS has multiple programs for interpreting the MMPI-2 depending on the situation.

54 The results of the MMPI-2 seem central to the opinions of Dr. Van Gorp, but it apparently was obtained by Dr. Mills.

55 Validity as used in testing means something slightly different than it does in ordinary English usage. Validity in testing refers to one's approach to the test and the testing situation. As psychologists use the term validity, if one believed one was very ill and answered accordingly, the test would be valid. Even if one's opinion were incorrect, one would say the test was valid.

86

FELL-00000554

**Appendix N - Psychosis and psychological testing**

The Q scale measures the number of unanswered question; he answered them all which is expected. The VRIN scale consisted of 67 pairs of logically related items (e.g. I loved my father and my father was a good man). He agreed with then logical answer 59 of 67 times which is well above chance. This is slightly below average (T = 61[56]). The TRIN scale looks at inconsistency when both items are answered the same way (True or false). He was very close to average with a raw score of 8 and a T score of 57F. One can conclude that he was able to respond to the test as well as he wished. One can take his answers as representing how he wished to present himself.

|        | Q | VRIN   | T  | TRIN | T   |
|--------|---|--------|----|------|-----|
| Mills  | 0 | 59/67  | 61 | 8    | 57F |
| Wetzel | 2 | 59/67  | 61 | 9    | 50  |

In terms of his ability to understand item content and to respond as he wishes, there has been no change in ability or effort. While his limited education might theoretically cause concern, his IQ and his reading ability documented by Dr. Van Gorp indicates the MMPI-2 is potentially appropriate.

Another set of scales looks at defensiveness or the unwillingness to admit flaws or problems. He had an average score on the L (lie scale T = 52), a measure of claims of improbable virtue. He had an average score (T = 47) on the K scale (a measure of defensiveness) indicating the claim that he can handle the demands of everyday life as well as the average person. He has a comparable score on the S or superlative scale[57] (T = 44).

|        | L  | K  | S  |
|--------|----|----|----|
| Mills  | 52 | 47 | 44 |
| Wetzel | 48 | 43 | 36 |

He was slightly less defensive or slightly less inclined to report good ability to function to me.

---

56 A T score of 50 is dead average. Two thirds of scores from normal persons will be between 40 and 60. A T score of 61 would be at the 86th percentile.

57 One may wish to note that he is well below average in the denial of moral flaws. He admits flaws.

87

**Appendix N - Psychosis and psychological testing**

Another set of scales looks at the exaggeration or false representation that one has psychiatric disorder. These include the F scale (60 items infrequently endorsed - < 10% or less frequently endorsed by normals on the MMPI - interspersed between item #1 and #370). Mr. Fell had a high score on this scale (raw score - 17 T score = 89). Because almost two hundred items follow the last item on the F scale, a more recent development is a scale called F(B) of F on the back of the test. It runs from about item 250 to the end of the test - #567. Interestingly, his scorer on F(B) is lower (T = 67). The most recent development in this type of validity scale is the F(P) scale. A few very floridly psychotic patients (whom no reasonable clinician could miss) can have high score on the F scale up to a raw score of 23. This twenty seven item scale (Fp) includes items seldom endorsed either by normal persons or persons in psychiatric hospitals[58]. Mr. Fell had a very high score on the F(P) scale (T =94).

|        | F  | F-K | FB | FP |
|--------|----|-----|----|----|
| Mills  | 89 | 3   | 67 | 94 |
| Wetzel | 79 | 2   | 63 | 94 |

Donny has a consistently high score on FP; that is he endorses rare and unusual symptoms not endorsed by psychotic patients.

The forensic NCS output states, ""His high score on the F(P) scale suggests that the test is invalid as a result of extreme item endorsement. Individuals who score in this high range on F(P) may be malingering psychiatric symptoms. This individual presented more extreme psychological problems than most psychiatric inpatients."

Both the Mills and the Wetzel MMPI-2s were rejected by the NCS Forensic program. No graphs are printed and instead, across the graph space for the clinical scales and for the content scales, the program prints ""THIS IS AN INVALID PROFILES BECAUSE F(P) IS GREATER THAN 89".

The clinical NCS output for the Mills MMPI-2 says, "This MMPI-2 profile should be interpreted with caution. There is some

---

58 cf Graham JR. <u>MMPI-2: Assessing personality and psychopathology</u>. Oxford University Press 2000. pp. 35-36 and pp. 46-53.

FELL-00000556

**Appendix N - Psychosis and psychological testing**

possibility that the clinical report is an exaggerated picture of the client's present situation and problems. He is presenting an unusual number of psychological symptoms. This response set could result from poor reading ability, confusion, disorientation, stress, or a need to seek a great deal of attention for his problems."

It continued, "His test-taking attitudes should be evaluated for the possibility that he has produced an invalid profile. He may be showing a lack of cooperation with the testing or he may be malingering by attempting to present a false claim of mental illness. Determining the sources of his confusion, whether conscious distortion or personality deterioration, is important because immediate attention may be required. Clinical patients with this validity profile are often confused and distractible and have memory problems. Evidence of delusions and thought disorder may be present. He may be exhibiting a high degree of distress and personality deterioration."

The clinical NCS output for the Wetzel MMPI-2 says, "This is a valid MMPI-2 clinical profile. The client has cooperated in the evaluation, admitting to a number of psychological problems in a frank and open manner. Individuals with this profile tend to be blunt and may openly complain to others about their psychological problems. The client tends to be quite self-critical and may appear to have inadequate psychological defense mechanisms. He may be seeking psychological help at this time because he feels that things are out of control and unmanageable.

In a setting with a higher rate of malingering expected, these MMPI-2s would not be interpreted. In a setting where evaluees have less motivation to malinger, they would be. In this specific context, I would, based on my experience and training, suggest that less weight be given to these tests than usual, but that they be considered with some caution.

**Clinical Findings**
**Axis I**

For an individual with elevated scores on the F and F(P) scale, Mr. Fell did not have a very high elevations on the standard clinical scales on the Mills MMPI-2. His highest score

89

FELL-00000557

**Appendix N - Psychosis and psychological testing**

was on scale 4 (the Pd[59] scale T = 92, well into the top one percent of the population).  In addition, he had elevated scores on three other scores in the range between T = 89 and T = 86. These were scales 6[60], 8[61] and 9[62].  (Author's note: In general, profiles with scale 4 highly elevated tend to reflect personality disorders.  A profile dominated by 4 and 6 can suggest a person with a passive-aggressive[63] or antisocial personality disorder. A profile dominated by 4 and 8 can suggest a bizarre antisocial personality disorder[64].  A profile dominated by 4 and 9 is classic for antisocial personality disorder[65].

|            | Hs  | D   | Hy  | Pd  | Mf  | Pa  | Pt  | Sc  | Ma  | Si  |
|------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Mills      | 68  | 64  | 61  | 92  | 36  | 86  | 72  | 89  | 88  | 46  |
| Wetzel     | 51  | 57  | 42  | 74  | 32  | 61  | 53  | 70  | 75  | 59  |
| Difference | -17 | -7  | -19 | -18 | -4  | -25 | -19 | -19 | -13 | 13  |

---

59 Pd represents psychopathic deviant, a name for antisocial personality in use in the 1930s when the MMPI was first developed.

60 Scale 6 is also called the paranoia scale.

61 Scale 7 is also called the schizophrenia scale.  It measures a concept of schizophrenia popular in the 1930s that has been rejected by the psychiatric research community.  Using current concepts of schizophrenia, the schizophrenia scale does not discriminate between patients with and without schizophrenia. cf. Ben-Porath YS, Butcher JN & Graham JR (1991) Contribution of the MMPI-2 Content scales to the differential diagnosis of schizophrenia and major depression.  <u>Psychological Assessment: A Journal of Clinical and Consulting Psychology</u>, 3:634-640.  There is a residual belief that the schizophrenia scale has something to do with schizophrenia in some circles.

62 This is also called the mania scale.  One cannot get a true manic to sit still long enough to answer 567 items.  It was developed on manic patients while they were hypomanic.

63 Cf. Graham p. 100-101

64 Cf. Graham p. 101. But see also p. 108 on the 4-6-8 combination.

65 Cf. Graham p. 102-3.

90

FELL-00000558

**Appendix N - Psychosis and psychological testing**

usually quite stable with small changes[66]. He reported fewer problems on the second examination[67]. The pattern is relatively unchanged. He had a 4*896" codetype the first time and a 94'8 codetype this time. His paranoia score (scale 6) decreased markedly.

It is frequently helpful to look at the reasons for an elevation on a scale. This can be done by inspecting the Harris-Lingoes scales[68]. On the Mills MMPI-2, he had elevated scores on 4 - Pd2 (T = 92) due to authority problems (T = 80) and alienation from others (Pd4 T = 87). These remain the highest components on the Wetzel MMPI-2.

He had elevated scores on the Mills MMPI-2 on Pa (T = 86) because of persecutory ideas (T = 100). That remained the highest component on the Wetzel MMPI-2. He had an elevated score on schizophrenia because of social alienation (T = 84) and emotional alienation (T=88). These two remained the highest on the Wetzel MMPI-2.

The NCS forensic report did not comment at all, calling this an invalid profile.

The Mills NCS clinical report reports on the combinations of scales 4, 8 and 9 directly and of 6 in the added comments. It stated, "This report was developed using the *Pd* and *Sc* scales as the prototype. The client's MMPI-2 clinical profile suggests that he has many psychological problems at this time. He appears to be angry and alienated, and he tends to act out impulsively and unpredictably in antisocial ways. He may engage in dangerous or extremely pleasure-oriented behavior just for the thrill of it, and he has probably had many sexual problems. He is likely to be viewed as immature and irresponsible, and he may have a long history of deviant behavior including poor achievement, poor work history, and problems with authority."

The Mills MMPI-2 clinical output added, "His low *Mf* score

---

66 This could be considered a problem.

67 This is not a concern.

68 Cf. Graham p. 117-118, especially the first full paragraph on 118, which is exactly on point.

91

FELL-00000559

**Appendix N - Psychosis and psychological testing**

suggests a limited range of interests and a preference for stereotyped masculine activities rather than literary and artistic pursuits or introspective experiences."

Further, "He has endorsed a number of items suggesting that he is experiencing low morale and a depressed mood. He may feel somewhat estranged and alienated from people. He is suspicious of the actions of others, and he may tend to blame them for his negative frame of mind. He has endorsed a number of items reflecting a high degree of anger. He appears to have a high potential for explosive behavior at times. He reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past. He views the world as a threatening place, sees himself as having been unjustly blamed for others' problems, and feels that he is getting a raw deal out of life. He is rather high-strung and believes that he feels things more, or more intensely, than others do. He feels quite lonely and misunderstood at times. He endorses statements that show some inability to control his anger. He may physically or verbally attack others when he is angry."

The Mills MMPI-2 clinical output commented, "Profile interpretation can be greatly facilitated by examining the relative frequency of clinical scale patterns in various settings. The client's high-point clinical scale score (*Pd*) occurs in 9.1% of the MMPI-2 normative sample of men. However, only 3.3% of the normative men have *Pd* as the peak score equal to or greater than a T score of 65, and only 1.9% have well-defined Pd spikes. This elevated MMPI-2 profile configuration (4-8/8-4) is very rare in samples of normals, occurring in less than 1% of the MMPI-2 normative sample of men."

The Wetzel MMPI-2 clinical output said, "The clinical scale prototype used to develop this report incorporates correlates of *Pd* and *Ma*. Because these scales are not well defined in the clinical profile (the highest scales are relatively close in elevation), interpretation of the clinical profile should not ignore the adjacent scales in the profile code. The client appears to have long-standing impulse-control problems. Extroverted, uninhibited, and rather self-indulgent, he has a low frustration tolerance and a need for constant stimulation that cause him to behave recklessly or irresponsibly at times. He apparently has an exaggerated sense of importance and may have grandiose plans. He has a gift for charming others and for

92

FELL-00000560

### Appendix N - Psychosis and psychological testing

appearing self-confident, but he may actually feel quite insecure and inadequate."

The Wetzel MMPI clinical output continued, "He becomes involved in numerous activities, does not follow through sufficiently on commitments, and tends to deny problems or blame them on others. He may be having symptoms of irritation, agitation, changeable moods, and overactivity, and he may explode angrily when he becomes frustrated. Many individuals with this profile develop problems in day-to-day living."

"His low *Mf* score suggests a limited range of interests and a preference for stereotyped masculine activities rather than literary and artistic pursuits or introspective experiences."

The clinical output for the Wetzel MMPI-2 stated, "He has endorsed a number of items reflecting a high degree of anger. He appears to have a high potential for explosive behavior at times. He shows a tendency to reject authority and may have conflicts over rules. He reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past. He seems to be highly manipulative and self-indulgent. He seems to have had much past conflict with authority and is quite resentful of societal standards of conduct. The client does not appear to be an overly anxious person prone to developing unrealistic fears. Any fears he reports are likely to be viewed by him as reality-based rather than internally generated. He endorses statements that show some inability to control his anger. He may physically or verbally attack others when he is angry."

### Axis II

Neither NCS forensic report made any comment because the tests were seen as invalid.

The Mills NCS clinical report said, "He appears to have poor social skills and, although he is insecure in relationships, he may manipulate others through aggression and intimidation. He is overly sensitive and frequently misunderstands the motives of others. He seems to have great difficulty relating to the opposite sex. He may use other people for his own gratification with little concern for their needs. His lack of trust may prevent him from developing warm, close relationships. Many

93

FELL-00000561

### Appendix N - Psychosis and psychological testing

individuals with this profile type are unable to develop loving
relationships and never trust anyone enough to marry."

It continued, "He appears to be an individual who has rather
cynical views about life.  Any efforts to initiate new behaviors
may be colored by his negativism.  He may view relationships with
others as threatening and harmful.  He feels intensely angry,
hostile, and resentful of others, and he would like to get back
at them.  He is competitive and uncooperative, tending to be very
critical of others."

The output of the clinical program for the Wetzel MMPI-2
stated, "A natural ability to charm, persuade, or even con others
is usually found in individuals with this profile. They are very
sociable and outgoing, but their relationships are usually quite
superficial and manipulative. They tend not to be open and honest
in relationships. He appears to act impulsively and may become
involved in difficult relationships. He may hedonistically use
other people for his own satisfaction without concern for them."

The Wetzel output continued, "He appears to be an individual
who has rather cynical views about life. Any efforts to initiate
new behaviors may be colored by his negativism. He may view
relationships with others as threatening and harmful. He feels
like leaving home to escape a quarrelsome, critical situation and
to be free of family domination. He feels intensely angry,
hostile, and resentful of others, and he would like to get back
at them. He is competitive and uncooperative, tending to be very
critical of others."

### Diagnosis

The NCS forensic output offered no comment because the
profile was considered invalid.

The Mills NCS clinical profile opined, "Many individuals
with this profile receive a diagnosis of severe Personality
Disorder.  The possibility of a Schizophrenic Disorder should
also be considered, however.  His response content is consistent
with the antisocial features in his history.  These factors
should be taken into consideration in arriving at a clinical
diagnosis."

It added, "His extremely high scores on the addiction
proneness indicators suggest the possible development of an

94

FELL-00000562

**Appendix N - Psychosis and psychological testing**

addictive disorder.  Further evaluation of substance use or abuse problems is strongly recommended.  In his responses to the MMPI-2, he has acknowledged some problems with excessive use or abuse of addictive substances."

The content areas look at what the evaluee thinks is the problem.  He has significant elevations on anger (T=74), cynicism (T=74)  and antisocial practices (T=79).  He has mild elevations on anxiety (T = 67) and depression (T = 70).  (Author's note: The Biz scale - bizarre mentation - is the best indicator on the test of schizophrenia.  His score is in the normal range (T = 60 - 86th percentile for normal persons.)

The output for the Wetzel MMPI-2 stated, "Individuals with this profile are usually diagnosed as having a Personality Disorder. The possibility of a Cyclothymic Disorder should be evaluated, however. His response content is consistent with the antisocial features in his history. These factors should be taken into consideration in arriving at a clinical diagnosis."

The output for the Wetzel MMPI-2 stated, "His extremely high scores on the addiction proneness indicators suggest the possible development of an addictive disorder. Further evaluation of substance use or abuse problems is strongly recommended. In his responses to the MMPI-2, he has acknowledged some problems with excessive use or abuse of addictive substances."

Mills Wetzel

| | | Mills | Wetzel |
|---|---|---|---|
| Disconstraint | (DISC) | 85 | 89 |
| Aggressiveness | (AGGR) | 74 | 69 |
| Psychoticism | (PSYC) | 65 | 52 |
| Neuroticism | (NEGE) | 57 | 64 |
| Introversion | (INTR) | 52 | 54 |

This set of five scales are a relatively new addition to the MMPI-2.  They are intended to describe the personality of the individual taking the test.  Both agree that the most impressive features about Donny's personality are his lack of inhibition and his aggressiveness.  He does not particularly show indications of psychoticism (a disconnection with reality) or neuroticism.

The NCS program was used by Dr. Mills or his psychological consultant to interpret the MMPI-2.  That would seem to mean that the expert regards that as a clinically and scientifically

95

FELL-00000563