**Appendix N - Psychosis and psychological testing**

acceptable program.  At most, the NCS program suggests that if
the most likely explanation for this profile (severe personality
disorder - which seems to fit the clinical history very well) is
wrong, then second choices might be either schizophrenia (Mills
MMPI) or cyclothymic personality disorder (Wetzel MMPI).

There does not seem to be any clinical reason to look beyond
the reproducible first choice - severe personality disorder.

**Both MMPIs show that he has a significant personality
disorder with antisocial features.  Both are consistent with his
history of alcohol and drug abuse.  Both show his lack of
willingness to control himself and his aggressiveness.  *They are
not as helpful as his history in understanding why he is the way
he is today.***

**3.    The Rorschach**

.Dr. van Gorp alleges that Donny is prepsychotic or has a
potential to become psychotic, in part, on the basis of his
performance on the Rorschach.

The schizophrenia index on the Rorschach was developed in
1981, using the Research Diagnostic Criteria[69] for schizophrenia.
There were significant problems with the index and a series of
studies were done to improve it[70].  A series of more than 50
discriminant functions was run involved random drawings from
subject samples including nonpatients, schizophrenic patients and
non-schizophrenic patients.  Five different random drawings were
made from the same subject pools.  (Author's note: Drawing
repeatedly from the same pool would tend to improve the results
on an artifactual basis.)

---

69 These criteria are much more like current diagnostic standards
for schizophrenia than the concepts used in the development of
the MMPI schizophrenia scale.  They were the immediate
predecessor of DSM-III.  Thus, they are much more likely to agree
with the clinical diagnosis of schizophrenia than the MMPI.

70 Exner, John E. Jr., The Rorschach: a comprehensive system;
Volume 2: interpretation Second edition. New York, Wiley Inter-
science, 1991.

96

FELL-00000564

**Appendix N - Psychosis and psychological testing**

1.    Donny does not meet the criteria for schizophrenia on the
      Rorschach.  He had an adequate number of responses (N=19).
      His score on the index was 3.

    The research on the Rorschach showed that there were six
relevant tests for schizophrenia.  The SCZI was developed to
assess four basic areas of impairment (inaccurate impairment,
disordered thinking, inadequate controls, and interpersonal
ineptness) found in individuals with schizophrenia ....[71]  The
scores on the schizophrenia index can range from zero (none
present) to six (all six present).  "The critical value in the
SCZI[72] is 4; that is a value of 4 indicates a significant
probability that schizophrenia is present but also a possibility
of a false positive.  Values of 5 or 6 are more definitive,
indicating a strong likelihood of schizophrenia and a very low
probability of a false positive."

    The index was tested on samples drawn from the original
pool.  "The false positive rates vary from 0 to 11% depending on
the group studied.  However, 76 of 105 false positive records
(72%), have SCZI values of 4.  For this reason, SCZI values of 4
must be approached with caution.[73]"  Inspection of his table 6 on
p. 24 shows that 38 of the false positives occurred in
adolescents with behavioral problems, a 7.6% false positive rate.
Only one false positive was seen in nonpatients.

    The defense and its experts are trying to make their case on
a value of three because it is close to four which is less
reliable than a higher score.  The usual interpretation of a
score of 3 is that he does not have schizophrenia.

    Exner states, "if the value is not positive, it does not
rule out schizophrenia, but simply indicates that there is no
firm actuarial basis on which to develop a postulate that

_____

71 Hilsenroth, MJ. Fowler, JC, and Padawer, Jr. The Rorschach
Schizophrenia Index (SCZI): an examination of reliability,
validity and diagnostic efficiency. <u>Journal of Personality
Assessment</u> (1998) 70(3), p. 515.

72 This is the jargon for the SChiZophrenia Index.

73 Exner, pp. 22-23.

FELL-00000565

**Appendix N - Psychosis and psychological testing**

schizophrenia is present.[74]"

Hilsenroth et al (1998)[75] reported a study of the diagnostic efficiency of the Rorschach.  In describing their methods, they stated, "in accordance with the established SCZI cutoff of 4 (Exner, 1993), ..." they examined the effect of using the cut off of 4+, 5+ and 6.  Using the cutoff of 4+, they reported that 40% of non-psychotic patients with cluster B Axis II personality disorders were positive (9 of 23).

2.    Donny has psychological characteristics that "explain" a slightly elevated score in the normal range as well as or better than being prepsychotic.

Exner comments favorably on an article by Nancy Andreason (1989) who commented that the definition of schizophrenia has become very narrow, limited to severe forms.  She added that the idea of a schizophrenic spectrum had become more acceptable. Exner pointed out that , "... Rorschach features clearly overlap between the schizophrenic and the schizotypal personality disorders....[76]"  "Nevertheless, the false positive rate in the SCZI was often disconcertingly high, often between 10 and 20% for some groups, especially adolescent behavior problems, drug induced psychosis, and some more severe affective disorders. The false positive problem in the SCZI was highlighted further in a study comparing schizophrenics with schizotypal and borderline personality disorders (Exner, 1986).  In that study 66 of 80 schizophrenics (82%) were correctly identified , but 28 of 76 schizotypal (40%) and 11 of 84 borderlines (13%) were incorrectly identified as being schizophrenic.[77]"

Hilsenroth et al[78] found that the average score on the 0 to

---

74 Exner, op. cit. p. 258.

75 Hilsenroth, MJ. Fowler, JC, and Padawer, Jr. The Rorschach Schizophrenia Index (SCZI): an examination of reliability, validity and diagnostic efficiency. Journal of Personality Assessment (1998) 70(3), 514-534,

76 Exner, op. cit. p. 256.

77 Exner, op. Cit. P. 257.

78 Hilsenroth et al, Table 3, p. 521.

FELL-00000566

**Appendix N - Psychosis and psychological testing**

6 SCZI for psychotic patients was 4.5.  The average score for patients with Cluster B personality disorders was 3.0.  Donny's score was 3, exactly what was expected.  The most discriminating criteria for separating cluster B personality disorder patients from psychotic patients in this study were items 4 and 5 which measure thought disorder.  Sixty two percent of psychotic patients have these (tow) while only twenty three percent of patients with cluster B personality disorder do.  Donny is negative on both criteria four and five.  He did not show any thought disorder on the Rorschach.

It is difficult to see how a trier-of-fact is going to be helped by presenting a test with some reasonable validity in diagnosing schizophrenia as accurate when raising suspicions, but inaccurate when the scientifically determined criteria for schizophrenia are not met.  This is especially true when there is no clinical history that suggests schizophrenia and the score Donny obtained is average for the disorders everyone must admit he has.  There is much history that confirms personality disorder and drug abuse.

The qualitative nature of some of his responses has been raised.  Doctors and medical students see more anatomy on the Rorschach than the average person.  It is not surprising that a young man with a strong interest in the macabre, satanic material and violence sees blood or ninjas when being tested for the court.

He does meet the criteria for coping deficits.  Exner says, "The CDI[79] is not a second depression index.  People with scores of 4 or more on this index are likely to have impoverished or unrewarding social relationships.[80]"   There is abundant clinical history to support this score.

**The Rorschach is most consistent with a cluster B personality disorder.**

---

[79] Jargon for the Coping Deficit Index

[80] Exner, op. cit. p. 303.

99

**Appendix N - Psychosis and psychological testing**

*Comment*

*Both MMPIs and the Rorschach are more consistent with a cluster B personality disorder and substance abuse than they are with being psychotic or prepsychotic.*

100

FELL-00000568

**Appendix O - Dominance and Submission - a misleading interpretation**

**Opinion:** The issue of dominance versus submission has been raised by over-interpretation of one test score.  The record alone is sufficient to disagree that Donny is submissive, although without direct examination the conclusions are surely less certain.

**What is the evidence for Donny Fell being "exceedingly low on dominance" and "being quite submissive"?**

On the MMPI-2 obtained by Dr. Mills, he had a score of 10 on the Dominance Scale, resulting in a T-score of 30.  On the test I administered, he had a raw score of 8[81] and a T-score of 30. This T-score means that he is well below the fifth percentile.

Therefore, one can not dispute Dr. Van Gorp's descriptive statement that he has a low score on the dominance scale on that date.  However, Dr. Lipman also gave him a test, the CPI[82], with the dominance scale on it.  On any earlier occasion - 1/30/01, his score was in the average region[83].  It is usually unwise to base opinions on single scores, especially when they are not reproducible.

Persons high on the dominance scale are likely to be leaders.  Donny, based on his statements, believes in anarchy, that is, no leaders.  However, he does not believing in following either.

---

81 Any score equal to or less than a raw score of 10 receives a T-score of 30.

82 A dominance scale was developed by Harrison Gough and his associates early in the history of the MMPI; many items were taken from the original MMPI.  Gough later continued his work by using some 300 overlapping items from the original MMPI to develop the California Personality Inventory.  The goal of the MMPI is to predict how clinicians will describe someone.  The goal of the CPI is to predict how the average person on the street will describe an individual.

83 He had a sten (standardized score - ten) score of five.  A sten score divides the distribution of scores into ten groups; middle scores (5 and 6) are average. Lower sten scores reflect less dominance; higher more.

101

FELL-00000569

**Appendix O - Dominance and Submission - a misleading interpretation**

Graham[84] described high scores on the Dominance scale as:

1. poised and self-assured
2. secure ans self-confident
3. behaves in a straightforward manner
4. optimistic
5. resourceful and efficient
6. realistic and achievement oriented
7. can handle problems
8. persevering

9. has a dutiful sense of morality
10. has a strong need to face reality
11. comfortable in social situations
12. if a psychiatric patient, has fewer symptoms and complaints

One should note that Graham does not report any descriptors (adjectives research shows are more frequently applied to people with a certain score) that can be assigned to persons with low scores. The MMPI-2 manual[85] does not report any descriptors for low scores. Greene states[86], "Low scorers on the *Do* scale (T scores less than 45) have been less adequately investigated."

A low score on this scale seems valid. A relevant comparison might be the relationship between the scores of Donny and Bobby, not Donny and society as a whole.

Dr. Van Gorp's further comment that Donny is submissive is clearly wrong, ignoring his other test scores. For example the same MMPI-2 output states that "... he may manipulate others through aggression ...".

His history makes it clear that he has not been submissive.

---

84 Graham J.R. (2000) <u>MMPI-2: Assessing personality and psychopathology</u>, New York, Oxford University Press. pp. 174-176.

85 Butcher, Jn, Graham JR, Tellegen A, Dahlstrom WG and Kaemmer B. (2001) MMPI-2™ (Minnesota Multiphasic Personality Inventory - 2™: Manual for administration, scoring and interpretation - revised edition.

86 R.L. Greene (1991) The MMPI-2 / MMPI : an interpretive manual. Boston, Allyn and Bacon, p.210.

102

FELL-00000570

**Appendix O - Dominance and Submission - a misleading interpretation**

The CYS worker on 6/6/85 described Donny as "extremely aggressive and active."  At times he was uncontrollable.

On at least six occasions (10/23/95, 11/13/95, 2/6/96, 3/19/96, 3/27/96 and 3/28/96), he was suspended from school for insubordination.

Mr. Fell admitted to me all of the criteria for oppositional defiant disorder except vindictiveness.  He said that when he had been treated unfairly, he merely informed people that he felt he had been treated unfairly (sic). He admitted that he has a marked problem with temper, is touchy and easily annoyed, defies and refuses to accept directive from authority figures, blames others when his desires are not satisfied and is angry and resentful.

His life history as documented clearly supports this diagnosis.

The history of the crimes as described by Donny and in their multiple statements to the police show that Donny was not submissive.

**A.    Behavior**

Donny resisted and did not submit to the demands of the police to confess longer than Bobby did.

1.    During his first interview, Donny denied any wrong doing. He did not give in to the demands of the police.

2.    During his first interview, when informed that the police knew of the murders, Bobby made a number of admissions.

3.    When told of Lee's statement, Donny again denied any participation in any murder again.  (Author's note: He did not follow Lee's tactics.)

4.    Shortly after being informed Donny had made a statement, Lee admitted killing Mrs. Fell and participating in the killing of Mrs. King. (Author's note: It could be said that Bobby Lee followed Donny's tactics.)

103

FELL-00000571

**Appendix O - Dominance and Submission - a misleading interpretation**

**B.    Statements by Bobby Lee**

Bobby Lee in his statement on 12/2/00 did not describe Donny as submissive or dominated by him.  (Author's note: He had an obvious reason to represent himself as a lesser participant.)

1.    As background, Bobby reported that, while in Pennsylvania, he and Donny got drunk and started robbing cars for the hell of it.  Because the police were interested in him, Donny called and asked him to go to Vermont with him.  Donny wanted to do that so the police would not find him.  The police did come by looking for him.  Donny left Pennsylvania about one month before Bobby Lee.

2.    After that, Donny got into a fight with his mother, Debbie, in another room.  He asked Bobby to help him kill Charlie and his mother.  Bobby said he went along with Donny's request.

3.    Donny told Bobby to pack a bag while he took a shower. After Donny finished, Bobby also took a shower.  They left everything they packed  in the kitchen so they could grab it immediately and leave after they stole a car.

4.    Terry King pulled into the lot.  Donny said this was their chance.

5.    Bobby said that the two of them decided to take Mrs. King. They put her in the back seat.

6.    Bobby said his intention had been to allow her to escape.

7.    Donny made the decision to kill her; he went along.

**C.    Statements by Donny Fell**

Donny's statements in his confession on 12/2/00 show that he did not think he was dominated by Bobby or submissive to him.

1.    He implied he played no role in his mother's death.  He did not try to defend or save her by his report; he knew it was too late.  He then told Bobby to stop.  He said Bobby listened to him.

104

FELL-00000572

**Appendix O - Dominance and Submission - a misleading
interpretation**

2. Donny said Bobby suggested the car jacking. He agreed.
   They took Donny's shotgun and left.

3. He stated that the shot gun was not loaded when he was asked
   whether Bobby Lee had ever threatened him with the shotgun.
   He added, " ... even if he did that ·I would have stuck it up
   his ass." He could have walked away at any time. He was
   pretty scared about being caught.

4. They waited for fifteen minutes until Mrs. King came. Bobby
   confronted her with the gun. Mrs. King pled for them not to
   take her. He said that Bobby could not have stopped him
   from letting her go. He was unsure what Bobby might have
   done if he had left her on the parking lot.

5. Bobby talked about car jacking somebody else. Donny did not
   want to do it because he did not want to get more blood on
   his hands. They did not.

D. **Both made statements implying they made some decisions as
   equals.**

FELL-00000573

**Appendix P - Organized interview notes**

Donald Robert Fell II (Donny Fell) was interviewed on two occasions, September 18 and September 19, 2002, at the Northwest State Correctional Facility in St. Albans Vermont. The interview on 9/18/02 began at about 9:45 A.M. and lasted until about 12:00 noon. He then completed the MMPI-2 finishing shortly before 1:30 P.M. He was given the cognitive examination from the Cambridge Examination for the Elderly from about 9:20 A.M. until about 9:35 A.M. on 9/19/02. He then was interviewed again for about one hour.

Prior to my examination, the intended scope of my examination was discussed with his counsel. I indicated that I expected to evaluate his mental state at the time of the crime. I further noted that the issue of Donny's dominance or submissiveness had been raised by defendant's experts. I disclosed my opinion that to evaluate that claim properly, I would need to discuss his role and relationship to any of his associates in each prior criminal act and to explore the relationship between Donny Fell and Bobby Lee in detail. Prior to beginning the examination, his attorney informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes. He also indicated that no inquiry should be made about the use of knives. His counsel, Paul Volk, indicated that the issue of domination would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney and an investigator from the federal public defender's office. He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court. I left the room each day briefly when his counsel and Donny conferred.

I have reorganized my notes in order to bring related material together. I jumped around a great deal, not unintentionally.

106

FELL-00000574

**The Interview**

He said his name was Donny Fell. He was born on 4/30/80. When asked his name again, he said it was Donald Robert Fell. He was unaware that he was Donald Robert Fell II according to his birth certificate.

**Social and developmental history**

His father was Donald Robert Fell and his mother Debra Ann Fell. He was born in Wilkes-Barre, Pennsylvania in a hospital. He doe not know its name. He was their oldest child. As far as he knows, his mother had no problems with her pregnancy with him, her labor or delivery. As far as he knows, he had no problems after he was born - fetal distress or fetal alcohol syndrome. (Author's note: Some records indicate that, against medical advice, she continued to drink heavily during her pregnancy with Donny. The records of his birth have not been located as yet.)

Theresa Sharpe was his maternal grandmother. Stella Banas was called "Nanny": by him; he could not identify her relationship to him.

He lived in Kingston, PA during his early years. He recalled a teacher he really liked in kindergarten named Miss Henchy. He has few memories other than that.

When he was in school, he never had any problems with the details of his work. He never forgot to bring papers or pencils or books to school, because he never took them home. He had no problems in school until seventh grade. He did his homework in school until he got to seventh grade. He had no problems in school with finishing his work. He did not dislike mental tasks. He did not lose things. He did not remember whether he was ever easily distracted. He did not remember whether he had memory problems.

He had no problems sitting still in class. He did not fidget or squirm. He had no problems staying in his seat in school. He was never told that he should stay in his seat or reprimanded. He denied that he was a noisy kid. He learned not to annoy his father at home; it carried over. He was not restless. He did not have any problem relaxing. However, he was always on the go, doing something. He was not told that he talked too much in school. He did not blurt things out in class.

107

FELL-00000575

He never was told not to interrupt conversations or to intrude into others' activities.  He had no difficulty waiting his turn.

He did start a number of fires, a lot of fires, when he was a kid.  He set nearby fields on fire, burned up piles of paper, etc.  Fire trucks were called to the scene.  He only burned down one building, a shed, right behind his house.  He was going to Flood elementary school at the time.

**His relationship with his father**

He said he really did not like his father.  He was mean.  He "liked to beat us".  He beat his mother, his sister, Teri, and him.  He liked to beat them.  He used a belt at times.  He came home drunk and beat them.  This happened more that once a month.  He yelled and screamed and beat them.  He did not recall whether his had any special target for abuse in the family.  He was uncertain when his father left and why he left.

His father never said anything positive to him.  He did say many things that were negative.

When asked, he said he never had a father figure that he could respect and look up to.  However, he said he liked Ellery Wilcox.  He could remember nothing positive and nothing negative that Mr. Wilcox said or did with him.  He does not remember when he left.  When Mr. Wilcox left, it did not affect his mother's day-to-day life.

**His relationship with his mother**

His relationship with his mother was fine in his earliest years.  They did not fight or nothing until his father left.  He amended that, saying there may have been, one or two conflicts a year.

His mom was always drunk.  He told on one Christmas where he had to wrap the presents for himself and Teri so Teri could have a real Christmas.  His mother was too drunk to wrap them and put them under the tree.

He didn't fight with his mother until he started seventh grade or about age twelve.  He fell in with the wrong crowd.  This change occurred when he changed schools from Flood Elementary to Plains Junior High.  He started to do what he

108

FELL-00000576

pleased.   He hung out with a group of kids his age; one or two may have been a year or two older.   He hung out with them and they all got drunk or high.

Surprisingly, he said his mother never said anything positive about him and nothing negative.

His Aunt Jackie bad mouthed him repeatedly.

**Bobby Lee**

He met Bobby Lee in second grade.   Bobby's brother was a year older than Bobby.   Donny and his brother were in the same class.

**Substance abuse**

He said he started drinking at age eight.   His father had a keg in the basement.   He would be sent to get a glass of beer for his father or mother.   He would drink some and refill the glass. He would sneak a taste or a drink.   He liked the taste of beer immediately, he said.   He did not understand my questions about beer being an acquired taste.   He liked the taste of beer immediately.   He said he began drinking on a daily basis at age eight.

He drank to get drunk.   The first few times he drank he got sick to his stomach.   He did throw up.   He said he never got headaches.   He said that he has never been hung over.   When he was a young and inexperienced drinker, he had stomach upset.   It went away.   He denied any other symptoms from his alcohol consumption[87].

I mentioned that in one report to his doctors, Mrs. Fell claimed that she only drank about once a month. He denied that there was ever such a time.   She always drank daily.   She was not describing matters accurately.

---

[87] Don Goodwin, one of the first serious students of the genetics of alcoholism, once commented to me that he thought that the absence of unpleasant effects, like hangover, was one of the genetic factors in alcohol dependence.

FELL-00000577

After his father left, there was no keg in the basement[88]. He stole his alcohol from his mother from her supplies. He also provided alcohol taken from her to the group he hung with. One of the others in the group was the son of a bar owner; that boy stole liquor from his father. Another boy in the group had a big brother who would buy alcohol for them. Donny provided the price of the liquor without any fee paid to the brother. He was drinking daily.

Donny said he started really heavy alcohol drinking at age twelve. He began using whiskey and vodka. He continued to drink heavily until he was arrested in the current matter at age twenty. He admitted that he stopped drinking while locked up.

He did notice over time that it took more alcohol to get him drunk. He was able to quantify an increase in consumption from a six pack to eight, ten or twelve beers. It also took more alcohol to keep him drunk.

His first psychiatric hospitalization was in 1991 at First Hospital. He was there for about thirty days. He does not recall any treatment. He had been treated prior to that at the Children and Youth Child Welfare. He does not recall any benefit from this stay.

He was in the hospital again in 1992. He doesn't remember the reason for that stay.

He was in the hospital once for shooting a friend, John Gasic, the son of a police officer. John lived across the street; he was a good kid. They were playing with John's dad's gun. They had taken the clip out and put it up on the dresser. They did not know about the one remaining in the chamber. He pulled the trigger. He said there was a "delayed fire". He pointed to an area of his chest and said John got shot here. It was close to John's heart. John was able to run up the hill and tell his mother to call an ambulance. It was an accident, pure and simple. He was twelve. He visited the Gasic home the next day. He visited him in the hospital. Several days after that visit, he was put into a psychiatric unit.

---

88 Thus his age at the time his father left becomes a factor in evaluating his ability to describe his history of substance abuse.

110

FELL-00000578

He commented that he had seen John Gasic before he had come to Vermont and that John had visited him in jail after the murders.

He told me that he suffered a brief loss of consciousness (in 1993) after he was hit by the brick. He was tripping on acid. The "little birds were making too much noise". they wanted to make them go away by throwing bricks at the birds. One brick hit him. He went to the ground. (Author's note: He denied any loss of consciousness to Dr. van Gorp.) He was unable to open his eyes. He was sure that for a period he was unable to talk. He got up, but had trouble walking because he was "so dizzy". He sat down twice, but was able finally to make it to the street. He told his friend to call to call an ambulance. He passed out in the ambulance. He said he woke up in the hospital and threw up.

He told me, as he told Dr. van Gorp, that he suffered no cognitive problems after this injury. He specifically denied headache, neck problems, fatigue and problems with concentration and memory.

He was told me that he had to be psychiatrically cleared. Someone thought, he said with indignation, he had jumped under the brick deliberately.

He said that he has been in dozens of fights. He was unwilling to estimate the number; he didn't keep track. He was never knocked out in a fight. However, he said he did not win them all. He reported that he had been stunned several times. It was difficult to elicit any details, but it seems likely that he has had a number of very mild concussions (alteration in his sensorium without loss of consciousness.) He declined to estimate the frequency. He did not know whether he had any cognitive after effects.

He was again in the hospital in 1993. He said "I didn't do anything wrong." He was drinking a lot. He told them that his mother did it to get rid of him.

He said he had been in the hospital once for a sprain in the thoracic-lumbar region of his back. He was in the hospital another time when a vehicle was rear-ended.

He said he did not recall anything about his mother's

111

FELL-00000579

efforts to have him removed from her care and placed in custody. (Author's note: A the request of his counsel, I did not inquire about his interests in knives or his mother's expressed concerns about him killing her with a knife during his hospitalizations.)

When asked why his mother left him, he said his mother was in jail when he was sent to St. Michael's. She was there because he was truant and she did not do anything about it. He was curiously defensive about whether she had abandoned him. He would not accept that characterization (abandon) of her leaving the state without taking him or his mother.

**His memory**

He commented that his memory of his childhood is "mostly a blur". One should ask his sister, Teri, for the facts. He added that for considerable periods of time he was never home.

**St. Michael's**

He was "locked up" in St. Michael's for two years. His mother never came to see him. His grandmother, Theresa Sharpe, did come to visit him. His aunt Jackie came to see him as well. They came about as often as the rules would allow, he said. His grandmother Theresa died, he recalled, while he was in St. Michael's around Christmas or New Year's. He said he did not really have any feelings[89] about his mother not coming to see him. It did not bother him then. It does not bother him now. He does not give it much thought. He had been thrown in jail. She needed to get away.

He is unsure whether his grandmother and his aunt cared about him or not. Sometimes, it seemed like they cared and sometimes like they did not. His Aunt Jackie sometimes loved him and sometimes said he was too much. He described her as "just wacked". She had a temper and blew up frequently. She had one psychiatric hospitalization at First Hospital. He did not know

---

[89] Donny was very reluctant to talk about his feelings. When asked directly, he indicated that he was to an extent withholding information, to an extent was demonstrating a habitual pattern and that he has never paid much attention to his feelings other than anger and resentment. Some of his reluctance was a realistic suspiciousness in an adversarial relationship.

FELL-00000580

whether she was depressed or not.

St. Michael's was a place you don't want to be - a typical kid lockup. They had a gym, baseball field.

He just didn't want to be locked up. He didn't drink in there. (Later in the interview, he said he became an altar boy while at St. Michael's. He lit the candles or rang bells, He said he took the communion wine two or three times and drank it.) They had day students who could bring in drugs. He had pot about twice a week. The school was just like any school. There was nothing else to do.

What he liked was doing drugs and alcohol and being with his friends and hanging out.

He developed no relationships there. The teachers were boring. He did not talk about his problems there. He said he had difficulties talking about his problems.

He stated, when specifically asked, that he had also been physically abused at St. Michael's. A few of the aides wanted to find someone to restrain or pick on. One aide did that do him; he said another interfered and asked for an explanation from the first. On another occasion, an aide thought he was ignoring him and grabbed him. He said he did not rally ming this because he could think of ways to embarrass them afterwards.

**Aunt Jackie's**

He lived with his Aunt Jackie for about one and one half years after he left St. Michael's. He said that stay was "like being in jail". He could not do anything or go anywhere. He said he had no idea why she would treat him like this.

She abused him physically. She hit him a couple of times. On one occasion, she hit him with an iron. (When asked if any blood relative of his had not abused him physically, he thought and said his Aunt Donna had not. He lived with her a couple of times for short periods. His grandmother, Therese Sharpe, used a paddle on one occasion.)

The first year he lived with her, he attended the Vocational - Technical High School. He had vocational training (auto mechanics) in the morning and four classes in the afternoon.

113

FELL-00000581

(Author's note: He said he has never worked as a mechanic for pay.)  He said he went to school every single day.  He enjoyed school there.  He did get suspended, but not really that much. He was always there in the morning; he did skip classes in the afternoon.  When he skipped, he would go down into the woods.  He and his friends smoked pot there.

He repeated he was not suspended that much that year.  He never received any in-school suspensions.  Despite, his missing classes, they passed him any way.  He said he thought they did not really care about what he learned in class.

He did get into a number of fights with other students.  He said he did not get into any fights with teachers.  He did have multiple arguments with teachers.  One teacher did incorrectly report that Donny tried to hit him.  The teacher caught him shooting rubber bands in class.  He told him to take a rubber band off his wrist.  When the teacher tried to pull it off his wrist, it hurt and Donny pushed his hand away.

The second year after he left St. Michael's, he attended Vocational - Technical High School in the morning and Coughlin High School in the afternoon.  He said he did "pretty good there"; he did not get into too much trouble.  However, he refused to go to gym class.  He thought gym was pointless.  He didn't like sports.  He said he could play sports well, but he did not like them any way.  He was given detentions for his failure to attend gym class.  He refused to go to detention for missing gym class.  He was suspended from school for forty days for refusing to go to detention.  The school refused to accommodate his dislike of gym class.  He refused to accommodate their desire to send him to detention.  He returned to school after his first suspension.  He continued to refuse to go to gym class and detention.  He was suspended again.

His Aunt Jackie refused to take him back to school after his second suspension.  Someone from the school came to the house and informed him he had been expelled.  He denied that he quit school; he was kicked out.  However, he accepted his expulsion as a "vacation".

While he lived with his Aunt Jackie, he drank about once a week.  He also said he drank  "every chance he had".

For a time, (from the end of his first year through the

114

FELL-00000582

start of his second year at Aunt Jackie's) he worked at a race track, Pocono Downs. He started as a busboy and then was a dishwasher. He needed a ride and came home with his boss. His boss, "Speed", took him out drinking after work. He got home after a night of drinking at 5 or 6 A.M. and then went to school. He said he slept in class; the teachers frequently did not seem to mind.

Aunt Jackie kicked him out when he was seventeen. Someone called the cops. They came to the house. They agreed he could just go to the station if he left. He did. He was gone for several years.

He hung out with Bobby after he left St. Michael's.

**After Aunt Jackie's**

After he left his Aunt Jackie's, he hung out at a friends house. He stayed at Sean's house for seven or eight months. He was drinking and getting high. He supporting himself by stealing. He broke into cars and stores. He never committed any holdups.

He left Sean's house when a girl, Gerry (?), asked him to go to the state of Washington with her. They got as far as Lincoln, Nebraska. They were pulled over there. The license plates on the car were stolen. He was just a passenger on the trip. He did not know personally whether the car or the plates were stolen. He was taken to jail ands released the next morning. He waited for Gerry over the weekend at the Salvation Army.

When she did not get out, he hitched with a guy he met back east. The car, a Volkswagen, broke down. They pushed it into a creek and then hitch-hiked back to Wilkes-Barre.

**Next door to Sean**

He lived next door to Sean's house with a woman friend of his mother's. She was a nice lady who dealt pot. He got his pot free. He also used alcohol, but this woman did not like alcohol that much. He stayed there until he was about nineteen and a half.

He worked a factory called Medico, making mortar shells. He

115

ran a heat press to form the container for the explosive.  He worked there almost until he went to Rutland.

**Back to Aunt Jackie's**

He moved back to his Aunt Jackie's home when he was about nineteen and a half.  While there he was working construction. He quit the factory job because he had no car and it was too far to walk from her home.

He complained that his Aunt Jackie controlled his drinking quite a bit.  He never went as long as a month without drinking.

**The carnival period**

Despite the application for an involuntary commitment in the summer of 2000, he was never taken to a hospital for evaluation. He did not know whether Lynn Roberts ran away from a hospital or treatment center.  He did not want Bethany around.  He does not ever recall threatening her.  She was a pain.  He wanted her to leave.  "I just didn't like her."  Bobby did not like her either. She had nothing to do with his decision to go to Vermont.

He attended a concert at Yasgur Farms for three days.  He used very heavily with multiple hits starting at three and working up to twenty five hits at a time.  He was really high - tripping.  He saw "tracks".  He was unsure whether it was raining or not.  He could not see or feel rain, but it was muddy. (Author's note: From his comments, the people he asked to confirm his impressions were not reliable observers at that time.)  His use of acid was much longer and more intense than ever before.

**Staying with his mother**

He wanted to see his mother; there was no other reason.  He did not go in order to avoid warrants for his arrest.  There may have been warrants because of unpaid fines, but he was not aware of them.

His family nickname was Binker[90].

---

90 There were different versions in the records.  I asked for clarification.

116

While he was in Vermont (slightly more than two months), his mother was drinking and drunk every day. She did work, doing something at the Holiday Inn. After she left work, she went to the Stop Light bar. It was a typical bar with a pool table. After work, she would get drunk there and come home drunk. If she came home alone, she went to bed and slept until she had to get up to go to work. If she brought people home with her, they would sit up all night drinking. She also used crack whenever she could get it; then she would use crack and drink all night. Donny and Bobby would drink and drug with her and her friends; they would hang out together. She used crack or whatever else she could get all night. He said that she did not appear to let any concerns about going to work affect her partying. However, she always went to work.

He admitted reluctantly that he did argue with his mother occasionally, not too often. He estimated that between the end of September and the end of November, they argued about five times. Usually, when she complained to him, he could not understand what she wanted or was upset about. Her speech would be "too slurred to understand". He sometimes laughed at that. She did not appear to like his amusement. She slapped him a couple of times. He would push her away. When he pushed her away, she would start screaming that he had hit her.

There was one incident at the Stop Light bar. She called and asked him to come get her to take her home. She was having trouble walking. When he entered the bar to get her, one of her woman friends started hitting him. Since he does not believe in hitting women, he just spit on the woman. His mother had not seen the woman hitting him. She became upset when she saw him spit on her friend. She started hitting Donny. He backed away, going out the bar door. His mother followed him, hitting him. Outside, he pushed her away again. She fell down on her "butt". Someone advised that the police had been called, implying that he should leave. He said "good" and stayed, believing he was in the right. However, he was arrested and spent the night in the "drunk tank".

When asked specifically whether he was in fact drunk, he said he was unsure. He had been drinking. He hadn't started drinking much at that time; he would drink from Friday night to Monday night without stopping. He quit when he ran out of beer. When asked how he would determine whether he was drunk, he replied that he would have a pins-and-needle sensation throughout

117

FELL-00000585

his entire body and feel light headed.

His mother never told him to leave Vermont. He knew that Bobby was ready to split. However Bobby never said so explicitly.

She did volunteer several times while he was there that she loved him. He said he did not recall her reaction when he first arrived in Vermont. He does not remember that he told anyone that he was coming.

**Altercations with his mother prior to Vermont**

He said that he had physical altercations with his mother only twice in his life.

On one occasion, he was upstairs in his room with eight friends. His mother was drunk. She came up to his room. She was slapping him. He scratched her. She was on top of him, slapping him. He bit her finger which made her get off of him. His friends tried to pull her off of him. She hit one of his friends for that.

On the second occasion, they fought over his check for SSI. She ordinarily took "his" SSI money and spent it on her alcohol needs. He did not think that fair. He complained about it. He had the check in his hand and she tried to take it away from him. He said there was slapping and pushing and shoving.

He does not remember what she said to him during these altercations. It might have been derogatory, but he does not recall.

He commented that both of them were "very stubborn". They argued frequently. Both "always" maintained their opinions.

He added that he thought she was comical when she was drunk. He characterized her as a "mean sloppy drunk". I inquired about the meaning of mean. He said she was "always trying to start something with somebody".

**His interests**

He said he listened to a lot of "evil music" when he was at home. He was into "death metal" and "satanic" music. Death

118

FELL-00000586

metal music involves a lot of "blood and guts" - people get ripped to shreds. That appealed to him. He was angry and full of animosity at the time. He also liked the music. He started listening when he was in seventh grade. Two groups he liked were "Metallica" (heavy metal) and "Slayer" (heavy, heavy metal and satanic).

When asked, he stated he had never participated in any satanic worship or rituals.

He was a musician. He played the guitar. He was in two bands. One with his friends, including Bobby Lee, was just formed. They were learning how to play and how to play together. They did not play too well, but were not bad either. They never were paid to perform or performed publically.

He sang with the other group. They did Death Metal music.

### Tattoos

He has an upside down cross with three sixes. He got this tattoo at age twelve from a friend. 666 is from the Apocalypse and is the mark of Satan. Everything satanic interested me. He denied any participation in any form of satanic worship.

He has one tattoo with a symbol that represents anarchy. It is a non-professional tattoo acquired ate age 17. Anarchy, he said, means no rules. It is against the government. The concept of anarchy just appealed to him. He disliked the whole system.

He has started a tattoo of death on his left hand. He is doing itself in his cell. Death, he said, refers to a musical group.

He has also started a tattoo on his chest. At present, it is a very light circle. He intends a pentagram, a satanic symbol.

### Sexual history

He said , "I have a weakness for women."

Initially, he said his first sexual experience was at age sixteen. He said that he initiated the contact at age sixteen. After discussion, he said his second voluntary sexual experience

119

FELL-00000587

was at sixteen after he was released from St. Michael's.

His first sexual experience was with an older teen age woman named Stacey when he was eleven[91]. That occurred while he lived in Pittson in a trailer. The incident happened around a corner. He had met them at his sister's friend home.

When he was traveling with the carnival shortly before going to Vermont, he was have sex at least daily and frequently had sex with several women a day. They were doing drugs, drinking and having sex all the time. He stated that his male companions in the carnival life reported multiple contacts with Lynn Roberts. That is why he dropped her; he was never jealous about her.

Before he joined the carnival, he had sex with quite a few women. He denied that he ever had a relationship in which he cared for a woman or in which he restricted his sexual activity.

While reluctant to discuss his sexual conduct in any depth, he denied that he had any sexual difficulties. He has never had sex voluntarily with a male before his arrest. (Author's note: I did not ask about later behavior.) He says he has no recall of any sexual contact with a man or of the molestation reported early in his childhood. (Author's note: I do not find that remarkable.)

He admitted that he had cut each palm once at the request of two different young ladies. They drank his blood and he then had sex with them. His motivation for cutting was only to have sex. He would not comment on why they wanted to suck his blood; it didn't matter to him if it made them sexually available to him.

## Military

He has never been in the service.

## Medications

He is on Verapamil for high blood pressure and headache, Tetracycline for pimples and Prozac for anxiety attacks.

---

91 I suggested the age; he did not disagree. His recall of the incident seems hazy at best.

120

FELL-00000588

**The evidence for psychiatric disorder**
**Anxiety**

The anxiety comes out of nowhere. His face, lips and arm go numb. He has a pins-and-needles sensation. He cannot breathe, He feels like he is going to have a heart attack. He perspires. He denied a lump in his throat. He said he did not really have anxiety attacks before he was charged with murder. He did have anxiety, but it was not really bad. He did have some pins-and-needles sensation in his left arm the summer before he went to find his mother in Vermont.

He then added that he thought he had an anxiety attack when he was younger when he got hit in the head by a brick.

The Prozac helps. His panic attacks are less severe and less frequent.

The Prozac has had no effect on worrying; he never worried.

**Depression**

He does not recall being sad or depressed that he can recall. He immediately commented that he was on antidepressants as a child beginning with the doctor from the Children's Service Center. He did not recall, but recognized the name of Dr. Feusner when I mentioned it. He did not like Dr. Feusner.. He said that Dr. Feusner never listened to him. He told Dr. Feusner that he was not the one with a problem; his mom was the problem. He didn't believe me. Nobody believed the kids. They always took the parents word on matters of fact. Because Dr. Feusner did not listen to him, he never listened to Dr. Feusner. He said he was willing to listen, but Dr. Feusner was not.

He had no person who supported him that he could identify. That included neighbors and teachers. He had no one at the hospital on the staff who listened to him. He was certain that no one in his family believed him with the possible exception of his grandmother, Theresa Sharpe. He was uncertain about her.

Donny said he does not remember ever telling anyone that he had nothing to live for anymore. He says that he has never has considered suicide. He has never attempted suicide. He denied that he ever had scars on his right wrist as described on one

121

FELL-00000589

admission physical.  He displayed his wrists for inspection.  I detected no scars.  He denied any cutting or scratching of his wrists or forearms.  (Author's note: He has two female relatives who have.)

**Alcohol dependence**

He had stomach problems early in his use of alcohol.

He never had any headaches.

He is unable to say whether he had any loss of control because he never wanted to stop drinking.

Alcohol was his drug of first choice after he left St. Michael's.

He got into plenty of fights when he was drinking. However, he got into just as many fights when he was not drunk.  He does not think that the alcohol was the reason for the fights.

He was arrested once for driving while drunk.  He was driving a stolen car and drove it off the road getting it stuck on a dirt mound.

He was unsure whether he had any other arrests while drinking.

He had no other accidents while drinking.

He drank in the morning, around the clock, etc.  He did not drink to relieve any hangover or withdrawal symptoms.

He denied any history of shakes.

He initially denied any withdrawal symptoms from alcohol or any other substance.  Not drinking had no effect, other than leaving him bored.  He did not become jumpy, shaky, have nausea of vomiting or have seizures.  He did have some trouble going to sleep; he would toss and turn in bed.   He reported a mild sense of agitation, but no pacing.  He did feel like he had to do something.

He has seen other people withdrawal, including his mother.

122

He has not had those symptoms. (Author's note: He described the symptoms of opiate withdrawal.) He never developed any physical symptoms.)

**Time line for alcohol use**

| age eight | He began drinking | mild |
| age twelve | He increased drinking | heavy |
| age fourteen | He stopped - in custody | very mild to none |
| age sixteen | Aunt Jackie | mild |
| age seventeen | on his own | heavy |
| arrested | in custody | stopped |

Drinking, he said, was always his choice. He never experienced a loss of control.

**Drug history**
**marijuana**

| age twelve | heavy |
| At St. Michael's | twice a week |
| After St. Michael's | heavy, daily until arrest |

**Acid**

He first used at age twelve. He used it quite a bit, every now and then. During the three weeks at the carnival, he did it a lot.

He did report tolerance to LSD. He had to double the dose as he continued to use it. His high was about ten hits at a time before he joined the carnival and about twenty five while with the carnival.

**Mushrooms**

He used mushrooms once or twice before he joined the carnival. He used it to a much greater degree while with the carnival.

**Angel dust**

At times, he and his friends sprinkled angel dust on their marijuana.

123

FELL-00000591

**Ecstacy**

He first used this drug while traveling with the carnival. He really enjoyed it; it was an amazing drug.

**Cocaine**

He has snorted cocaine. He said that it calms him down. He has never injected it or any other drug.. He has smoked crack. He called it a "worthless" drug because the effect was too transitory. He has never tried methamphetamine.

**Heroin**

He has snorted heroin. The first time he took it, he thought it was cocaine. He found it stimulating.

**Prescription medications**

He has "eaten" a lot of pills, including Valium, Percocet, Clonopin, Xanax and possibly amphetamine. He has also taken Oxycontin.

He has taken pills (square like a house with a triangle on top) without knowing what they were. On one occasion, he took three bottles and had no recall for two days there after. He denied any other history of blackouts or amnesia at any time. He commented that he always washed the pills down with alcohol, partially because of the potentiating effect of the combination.

When he was using drugs, he just did not care. Now, he cares. He is done with it. "It's what got me here." "If I were sober, none of this would have happened[92]."

**Psychosis**

Donny reported that he has had visual hallucinations ("trails") only while taking hallucinogenic drugs. He had these phenomena only with LSD and with mushrooms. He obviously, by his report and his body language while describing them, enjoyed them. The hallucinations lasted "quite a few hours"; they did not

---

[92]  He used the subjunctive.

124

FELL-00000592

persist until the next day unless he took them close to midnight. He did continue taking acid for up to three to four days. The hallucinations never lasted as long as a week.

He never heard voices. He never heard running comments on his behavior. He never heard commands to do anything. His thoughts about things he observed were his own and came from no one else. He denied thought insertion and thought deprivation.

He denied any olfactory hallucinations. He denied any tactile hallucinations. Nothing has ever controlled any part of his body.

He denied any unusual experiences.

He stated that no one was plotting against him. He paused, smiled, then added "except for the government." No one is or has spied on him. No one is or had been following him. He never was concerned that the narcs were after him before his arrest. Elsewhere in the interview, he denied going to Vermont because there were warrants out for his arrest. (Author's note: He admitted that he might have had warrants related to unpaid fines, but he did not worry about that. He said he is not a worrier.)

He reported that he had been talked to him about some stolen cars because an informant said he had something to do with the thefts. He said the informant lied. The police acted in good faith on bad information. The police had been interested in him before but for good reason. The police have nothing personal against him.

## Mathematics disorder

Donny said he did have a problem with math. He has problems with diameter, fractions and the like. It has not affected his life, he said. No one else has told him his arithmetic has caused problems. He has no trouble making change and handling money. His skills in arithmetic do not interfere significantly with academic achievement or activities of daily living.

## Oppositional defiant disorder

Mr. Fell admitted all of the criteria for oppositional defiant disorder except vindictiveness. He said that when he had been treated unfairly, he merely informed people that he felt he

125

FELL-00000593

had been treated unfairly.  He admitted that he has a marked problem with temper, is touchy and easily annoyed, defies and refuses to accept directive from authority figures, blames others when his desires are not satisfied and is angry and resentful.

**Conduct disorder**

He admitted to me that he bullied other children in school, that he engaged in multiple fights with students[93] in school and out, that he was cruel to and teased some people, that he abused cats on a limited number of occasions, that he vandalized or broke into property, that he stole and shoplifted with significant frequency and that he disobeyed or ignored the rules laid down for him at school and at home. He stayed out all night frequently.  Even suspension from school was unable to induce him to obey school rules; accordingly, by his report he was expelled.

He denied plausibly that he had ever fought with a teacher and that he had ever forced anyone to have sexual contacts they wished to refuse.

His counsel advised him not to answer any questions about the use of weapons in fights at any time in his life; accordingly I did not ask.

He reported that he had been arrested five times before age fifteen and twice after age eighteen.  That was amended to three times. These included the arrest in Nebraska for being in a stolen car, for stealing a car and for the arrest when he beat up the young man who assaulted his sister, Teri.  He tried to "push on" (rape) Teri.  He beat him up and pissed on him.  Donny was that man was in a coma for a day.

**Family history of psychiatric disorder**

His mother, his Aunt Donna, his Uncle Willie and his grandmother, all on the maternal side of the family had / have problems with alcohol.  His father has a problem with alcohol. He does not know enough about the paternal side of his family to offer an opinion.

---

93 He said he only picked on kids his size or bigger.  He was perfectly capable of handling them in a fight.  He claimed he left smaller children alone.

FELL-00000594

His Aunt Jackie had a problem with alcohol when she was a kid.

His sister, Teri, has a problem with cutting herself.

His mother and father have been in jail.

He does not know about any drug problems in his family.

FELL-00000595

# EXHIBIT 8

**John S. Rabun, M.D.**
1034 Brentwood Blvd., Suite 1280
St. Louis, Missouri 63117

Telephone: (314) 727-8099  Facsimile (314) 727-6796

Diplomate, ABPN
  with board certification in General Psychiatry
  with board certification in Forensic Psychiatry
Diplomate, NBME
Licensed in Missouri and Illinois

December 31, 2002

Mr. Gregory L. Waples
Assistant United States Attorney
United States Department of Justice
United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

                                        RE: United States vs. Donald Fell
                                        DOB: 04/30/80

Dear Mr. Waples:

Pursuant to your request, the examiner evaluated Donald Fell to form opinions on issues related to mitigation in the instant case. Mr. Fell is a 22-year-old, single, never married, right-handed, white male, who allegedly was involved in three murders. The United States Attorney's Office has given notice that the government will seek the death penalty for Mr. Fell. Mr. Fell is presently detained at the Northwest State Correctional Facility in Vermont.

Prior to the formal interview, the examiner explained to Mr. Fell the reason for the evaluation. Mr. Fell was told that the examiner had been retained by the United States Attorney's Office to evaluate him and form opinions on whether or not any mitigating factors apply to his case. Mr. Fell was cautioned that the interview was on the record. Mr. Fell was warned that the examiner had to generate a report, which could include his statements in the interview, and this report would be distributed to his attorney, the U.S. Attorney, and the presiding judge. The examiner then asked Mr. Fell if he had any questions or needed to speak with his attorney. Mr. Fell responded that he understood the examiner's purpose in the evaluation and gave his consent to be interviewed. Throughout the interview, Mr. Fell's

FELL-00000596

attorney, Paul Volk, was present, and an investigator from the Federal Public Defender's Office. One 5-minute break occurred during the interview, and at that time, Mr. Fell conferred in private with his attorney. It is important to note that Mr. Fell's attorney did not interrupt or impede the interview. The examiner is of the opinion that the presence of the investigator and Mr. Fell's attorney in the interview did not significantly alter the evaluation process.

Before the evaluation, the examiner also discussed with Mr. Fell's attorney the scope of the interview. Mr. Fell's attorney indicated that his client would not discuss his state of mind during the charged offenses. Therefore, the examiner did not question Mr. Fell about his mental state at the time of the allegations. Accordingly, the examiner questioned Mr. Fell in detail about his personal history and then performed a mental status examination. Even though Mr. Fell was not questioned about the instant offenses, more than enough information was gathered from the interview and available records to allow the examiner to form opinions, within a reasonable degree of medical certainty, as to whether or not mitigation exists in this case.

### Sources of Information:

1. An interview with Donald Fell at the Northwest State Correctional Facility on 12/12/02. The interview began at 9:40 a.m. and was concluded at 1:10 p.m. A 5-minute break was taken between 11:40 and 11:45 a.m. The interview was not audio or videotaped.

2. The law enforcement reports regarding the charged offenses. The law enforcement reports included confessions from Mr. Fell and the co-defendant.

3. A forensic psychiatric evaluation conducted by Dr. Mark Mills.

4. A neuropsychological evaluation conducted by Dr. W.G. van Gorp.

5. An evaluation conducted by Dr. Jeffrey Lipman, a neuropharmagologist.

6. A letter written by Dr. James Hudziak concerning the instant case.

7. A psychological and neuropsychological evaluation conducted by Dr. Richard Wetzel.

8. Raw psychological data from Dr. van Gorp's evaluation of Donald Fell.

9. Several transcripts from Grand Jury testimony by S. Hardgeree, R. Pulsifer, B. Brashears, C. Kolojeski, and M. Leight.

10. Marriage certificates, birth certificates (including that of Mr. Fell), and divorce decrees from various family members related to Donald Fell.

11. Mr. Fell's pediatric medical records.

12. Mr. Fell's medical records from Pennsylvania State.

13. Mr. Fell's medical records from First Hospital Wyoming Valley.

14. Mr. Fell's medical records from Wilkes-Barre General Hospital.

15. School records regarding Donald Fell.

16. Social service records regarding Donald Fell.

17. Prior legal records regarding Donald Fell.

18. Autopsy reports regarding the three victims in the instant case.

## I.    **ALLEGATIONS**:

According to the law enforcement reports, the alleged criminal acts occurred on Sunday, November 26, and Monday, November 27, 2000. The reports indicate that Mr. Fell and a co-defendant were involved in three homicides, two of the victims were killed in Vermont, and the third victim was killed in New York. The reports suggest that on November 26, Mr. Fell and a co-defendant murdered Charles Conway and Deborah Fell at Ms. Fell's home in Vermont, and then abducted Teresca King, and murdered her during the early morning hours on November 27 in New York. Subsequently, Mr. Fell and the co-defendant were arrested on November 30 in Clarksville, Arkansas, driving Teresca King's vehicle. Mr. Fell and the co-defendant were questioned by law enforcement officials and provided several statements. Mr. Fell and the co-defendant admitted that they were involved in the three homicides, though they differed at times in regards to specific facts.

Mr. Fell's confessions, and those of the co-defendant, suggest that Deborah Fell and Charles Conway were murdered during the evening on Sunday, November 26, 2000. Mr. Fell and the co-defendant described how they used marijuana, crack-cocaine, and alcohol prior to the first two murders. Both individuals related that they were intoxicated around the time of the murders. The confessions relate that an argument started involving Mr. Fell, Mr. Conway, and Ms. Fell. A short time later, Mr. Fell and the co-defendant retrieved knives from the kitchen and entered the living room, where they stabbed to death Charles Conway and Deborah Fell. Apparently, Mr. Fell stabbed to death Charles Conway, and the co-defendant stabbed to death Deborah Fell. Following the initial two

FELL-00000598

murders, Mr. Fell and the co-defendant left the scene armed with a shotgun. Mr. Fell and the co-defendant then used the shotgun to abduct Teresca King. The confessions reveal that Mr. Fell and the co-defendant returned to the first murder scene to retrieve their belongings.

After Mr. Fell and the co-defendant obtained their belongings, they and the third victim left the area using the victim's vehicle. The confessions indicate that Mr. Fell and the co-defendant drove Teresca King into the state of New York, where they stopped and ordered her to run into the woods. The confessions relate that Ms. King did not comply with the instructions, so Mr. Fell and the co-defendant chased her into the woods, where they struck the victim with several rocks. In addition, Mr. Fell allegedly kicked and stomped the third victim until she was motionless. Mr. Fell and the co-defendant returned to the third victim's vehicle and drove away from the area. Following the third homicide, Mr. Fell and the co-defendant stopped at a Burger King and purchased breakfast. Both individuals then used the third victim's vehicle to drive south and west, though they were apprehended in Clarksville, Arkansas on November 30.

Subsequently, law enforcement officials discovered the bodies of Deborah Fell and Charles Conway at Ms. Fell's residence on November 30. After obtaining several statements from Mr. Fell and the co-defendant, law enforcement officials were able to locate Teresca King's body on December 1. Ms. King's body was found not far from Route 22 in New York. Moreover, police officers recovered Ms. King's wallet near Route 22, several miles south of her body. In addition, Ms. King's purse was found at the Burger King where Mr. Fell and the co-defendant stopped for breakfast. As well, one of the employees at the Burger King identified Mr. Fell and the co-defendant. Further, authorities interviewed an individual in Wilkes-Barre, Pennsylvania, who stated that Mr. Fell and the co-defendant stayed with him on November 27 and November 28. The individual recalled that Mr. Fell and the co-defendant left on November 28, stating they were driving to California.

Autopsies were performed by the medical examiner on all three victims. Teresca King's autopsy revealed that she suffered multiple blunt force injuries to her head and neck. The autopsies of Deborah Fell and Charles Conway revealed that both individuals died from multiple stab wounds to the head, neck, and chest. In addition, both Deborah Fell and Charles Conway were intoxicated at the time of their deaths. Deborah Fell's blood alcohol was ".325%," and Charles Conway's blood alcohol was ".392%." As well, Deborah Fell's blood tested positive for amphetamines.

## II. **PERSONAL HISTORY**:

Mr. Fell's entire personal history will not be summarized in the examiner's report. The examiner directs the parties involved in the case to Dr. Wetzel's report dated 10/11/2002, which contains a thorough summary of Mr. Fell's background. The examiner will instead

focus on specific areas of Mr. Fell's life that should be considered by all parties involved in the instant matter. The following is a summary of Mr. Fell's statements to the examiner about key areas of his personal history.

Home Environment: The examiner questioned Mr. Fell in detail about his home environment and relationship with his parents. Mr. Fell told the examiner on several occasions that he did not fully recall his home environment. He indicated that he has no current relationship with his father. He informed the examiner that his father left home when he was in the "fourth grade." He said that he has learned that his father lives in Jacksonville, Florida. The examiner asked Mr. Fell if his father has shown any interest in helping him now that he is facing the death penalty. Mr. Fell replied that he has learned from other sources that his father has no interest in wanting to help him with the instant matter.

The examiner asked Mr. Fell to describe what he remembers about his father. He said that he recalls his parents "fighting" and how his father "hit" him with his fists and "kicked" him. He reported that his father was an "alcoholic" who "drank every night." He informed the examiner that his home environment was filled with daily incidents of physical abuse, to him, his sister, and mother. He indicated that his mother "kicked my father out" after a "fight." He "vaguely" remembered that his parents' relationship ended with a stabbing incident, where his mother and father stabbed each other. He recounted that he saw his mother "cut [my father's] arm" and then "I ran back into my room." He added that, to the best of his recollection, the last time he saw his father was around the time of the stabbing incident. It is important to note that Mr. Fell's first and clearest memories of his father were that his father as an "alcoholic" who daily engaged in acts of physical violence.

The examiner also questioned Mr. Fell about his mother. He again said that he did not recall "much" about his mother when he was a young child. He noted that his mother "drank a lot too." In addition, by the "seventh grade," he realized that his mother "did drugs." He recalled that he saw his mother with "cocaine and pills." He told the examiner that his mother drank "everyday" and fought with his father. The examiner asked Mr. Fell if his mother ever gave him any positive reinforcement as a child, and to the best of his recollection, he did not know of any positive statements from his mother. In addition, he could not recall any positive reinforcements from his father. In fact, he stated that he never heard either parent telling him that they loved him or hoped that he achieved certain goals in life.

The examiner asked Mr. Fell what he thought about his parents as parents. He responded, "I don't think they were very good parents." He indicated that his father was "mean" and he "didn't see too much of my mom, she was always working or drunk." He was questioned about how he would raise children, this question was posed to him to help uncover how he was raised, since children as adults often mirror the parental practices of their parents. Mr. Fell answered, "I don't even know, a lot differently, I certainly wouldn't hit them, I would raise them to be independent." The examiner then probed for Mr. Fell's thoughts about how his home environment changed him as an adult. He replied with surprisingly good insight, "it

FELL-00000600

implanted some deep psychological scars that might pop out in intoxication, if I had guidance, I had no guidance, I wouldn't be in this situation now." As well, he believed that his own abuse changed him in the following manner, "it has made me more aggressive, I have a temper, it is hard to keep it in check, and when you are intoxicated, it is almost impossible to keep my temper at a level, and with such scars (i.e. abuse) in my past, they just appear, and it makes a person more susceptible to violence."

Mr. Fell discussed his mother's behavior after his father left the family. He reported that he never received any encouragement from his mother. He indicated in general that his family life did not change, even though his father was gone. He noted that his mother had "boyfriends" at the house who also drank alcohol and used drugs. He again told the examiner that if his mother was not working, she was intoxicated. He remembered that eventually his mother lost custody of him. He recounted how he was placed at "St. Michael's" for an extended period of time and then went to live with his grandmother. He informed the examiner that prior to the charged offenses, he had not had any contact with his mother since the age of "13." Mr. Fell spontaneously said that he was placed at "St. Michael's" and eventually with his grandmother and aunt because he was "an unwanted kid." He added that he did not find any support or love from his grandmother or aunt because "they told me I was uncontrollable, they didn't want me either." He remembered that at the age of 17, his aunt "kicked me out, and I was on my own."

Interestingly, at times, Mr. Fell defended his mother during the examiner's interview. For example, the examiner questioned Mr. Fell about the conditions of his mother's home when he was a child, and he responded, "there was always food in the house, the house was clean." The examiner reminded Mr. Fell of the allegations by social service agencies that his home was unsanitary and infested with vermin, and he answered that this description of his home was not what he remembered it was like. In addition, Mr. Fell blamed himself for one of his mother's periods of incarceration. He informed the examiner that his mother was arrested and placed in jail because he was not attending school. The available evidence reviewed by the examiner suggests that his mother was arrested and incarcerated for wholly different reasons.

The examiner asked Mr. Fell if he felt love from either parent. He responded that he was unsure if his father loved him. He again noted that his father never said that he loved him or provided him with any positive reinforcement. He also stated to the examiner that he never heard his mother say that she loved him. He instead related, "I guess she acted like it," meaning his mother's actions at times suggested to him that she loved him, though he was never sure. Importantly, he was completely unable to point to any actions or statements that would indicate that he was raised in a positive, loving environment.

Childhood Behavior: The examiner questioned Mr. Fell about his behavior as a child. The examiner focused on symptoms suggestive of Attention-Deficit/Hyperactivity Disorder. Mr. Fell indicated that he could not recall problems with hyperactivity or a limited attention span as a child. He indicated that he had at times difficulty "sitting still," a problem that he

FELL-00000601

said continues to bother him as an adult. Mr. Fell's descriptions of his behavior as a young child did not support or refute a diagnosis of Attention-Deficit/Hyperactivity Disorder. In other words, Mr. Fell noted that he could not remember any specific problems with his behavior as a child in regards to hyperactivity or deficits in concentration.

The examiner then questioned Mr. Fell about his capacity to concentrate as an adult. He indicated that since he has been in jail for the charged offenses, he has read a considerable number of novels. He reported that he reads "Tom Clancey" and the "sports section" of the newspaper. He informed the examiner that he can remain seated and read for "hours" in his cell. In addition, he has attempted to read law books to educate himself about his present legal difficulties, but discussed how this particular area is difficult for him because the law has a technical language all of it's own. Importantly, he did not provide any current information to suggest that he now meets criteria for Attention-Deficit/Hyperactivity Disorder. As Dr. Wetzel pointed out in his report, Mr. Fell's medical records document a childhood history of Attention-Deficit/Hyperactivity Disorder. In fact, Mr. Fell's medical records state that he was treated with Ritalin, with some benefit.

According to Mr. Fell, his behavior changed in the "seventh grade." He stated that he was "out of control," starting in the "seventh grade." He blamed his behavior problems on "the wrong crowd." He told the examiner that he lost interest in school, was frequently truant, and engaged in illegal acts. He estimated that his truancy was significant in that he only went "two days" during the second half of the seventh grade. In addition, he informed the examiner that his first illegal act occurred at the age of "12," he was then "shoplifting." Moreover, he "stole cars," vandalized property, and was involved in numerous physical altercations. Mr. Fell discussed how he developed a "bad temper" and had difficulty controlling his anger. He reported that his "temper" was fueled by his alcohol and illicit drug use. The examiner asked Mr. Fell if he was involved in an identified gang. He responded that although he "fell into the wrong crowd," he was not in an actual gang. While discussing his misconduct as an adolescent, Mr. Fell again showed remarkable insight by commenting, "I could kick myself for my lack of education, instead of going this way, I might have gone that way," meaning that he perceived his lack of education as, in part, contributing to his present situation. As well, he was questioned about whether or not his behavior as an adolescent mirrored his father's behavior as an adult. He replied, "I have given a lot of thought to that since I have been here, I was usually a happy drunk, but on certain instances I got drunk and I reminded me of my father." He added that he thought his misconduct was in part due to, "no concrete guidance, no one to steer me on the right path," again suggesting that Mr. Fell has both significant insight into his present situation and the capacity to engage in rational self-reflection.

Mr. Fell also discussed his prior arrests as a juvenile. He reported that he was arrested for "truancy." In addition, he told the examiner about his contacts with social services as a juvenile and his placement with family members after his mother lost custody of him. The examiner inquired about Mr. Fell's behavior following his arrest for the charged offenses. According to Mr. Fell, he has not received any conduct violations during his present period of

detention. He reported that he spends most of the day reading books and trying to educate himself. In fact, he informed the examiner that he has thought about pursuing a higher degree in "physics" or "chemistry." He said that he enjoys scientific subjects and hopes to obtain further education in this area in prison. Importantly, Mr. Fell's descriptions of his behavior and pursuits in jail suggest that in a controlled environment free from alcohol and illicit substances, he does not engage in acts of violence.

Use of Alcohol and Drugs: Mr. Fell indicated that his problems with alcohol and illicit substances started in the "seventh grade." He recalled that he first used alcohol at the age of "8." He said that his father had a "beer tap" in the basement, and he would "sample" the beer when he filled his father's mug. He noted that he started using alcohol daily in the seventh grade. He estimated that he was intoxicated "everyday" from the seventh grade to adulthood if alcohol was present. He described several signs suggestive of alcohol dependence, including: tolerance; realizing that alcohol was a problem in his life, but continued use despite this knowledge; drinking more alcohol and over a longer period of time than he originally intended; giving up important social activities to use alcohol; and, spending significant time and money to obtain alcohol. He, however, did not endorse any features associated with alcohol withdrawal.

Mr. Fell discussed with the examiner the illicit substances he has used. He estimated that his use of illicit substances began between the ages of "12 and 13." He noted that he started smoking "marijuana." He reported that after he left "St. Michael's," he smoked marijuana "everyday." In addition, he has used Valium, Vicodan, amphetamines, heroin, cocaine, Phencyclidine, LSD, Psilocybin, and ecstasy. He told the examiner that his drug of choice was "LSD." He related that he could use up to "25 hits" a day of LSD, suggesting tolerance for this substance. Mr. Fell also recalled that his mother used "cocaine." He indicated that on several occasions, he has seen cocaine in his mother's purse and at times has stolen this substance from his mother for his own use.

The examiner questioned Mr. Fell about how his use of alcohol and drugs altered his temperament, or disposition. Mr. Fell reported that in general, he was "shy" if he was sober. He related that if he was intoxicated, he was disinhibited. He then reflected that he has been "sober" for the past "2 years" due to his incarceration, and feels "good about being sober." He reported that he now understands how substances affected his "judgement" in daily life. He informed the examiner that now he would avoid the use of alcohol or illicit substances after recognizing the differences in his personality sober and not sober.

Psychosexual History: Mr. Fell has never been married. He reported that he has had numerous sexual relationships. He, however, has never maintained a monogamous relationship. He estimated that his first consenting sexual experience occurred as a "teenager." The examiner questioned Mr. Fell about an incident that he reported in earlier evaluations that involved him at a young age having sexual contact with an older female. He remembered that the incident the examiner referred to happened when he was "in the fourth or fifth grade." He

stated that the incident in the "fourth or fifth grade" involved an older female and several other individuals, but he had no other clear recollection for this incident. The examiner inquired if Mr. Fell had any memory of being sexually abused. He was aware of the allegations in his social service records which indicated he was sexually abused as a young child by a babysitter. He related that he did not remember the episodes of sexual abuse, but named the babysitters who were allegedly involved, "Frank and Cookie." He then spontaneously added, "I detest child molesters," describing how children are young and naïve. The examiner also inquired if Mr. Fell was ever physically or sexually abused by his mother's boyfriends. He replied that he was never physically or sexually abused by any of his mother's boyfriends. The examiner asked Mr. Fell if he ever engaged in a sexual relationship with his mother. He answered that he never had any sexual contact with his mother. He again noted that between the ages of "13 and 20" he did not have any contact with his mother.

Medical History: Mr. Fell was questioned about physical illnesses and injuries as a child and adult. He told the examiner that he now has "back pain" that began at the age of "19" while he was working at a factory. In fact, he said to the examiner he injured "one of my lower vertebra in the thoracic-lumber region." Mr. Fell reported that he has never had surgery. He did describe several head injuries. He noted that he had a significant head injury between the ages of "12 and 13." He indicated that he was struck in the head by a "brick." He described the head injury at the age of "12 or 13" for the examiner, saying that he was "on LSD" and "saw chickadee birds in the air, and they were getting on my nerves, so I lobbed a brick up into the air, and the brick came down on my head." He recalled that he did not lose consciousness, but could not see or talk for several moments. In addition, he has "seen stars" on several occasions during physical altercations. The examiner questioned Mr. Fell about symptoms suggestive of a generalized seizure. He said that on several occasions, he has been aroused from sleep by a "shaking" feeling. He, however, did not endorse specific symptoms associated with a generalized seizure. In regards to his physical integrity as a child, Mr. Fell did not remember any serious infections or chronic physical illnesses during childhood. Mr. Fell informed the examiner that presently, he is taking Tetracycline for acne, Verapamil for "headaches," and Prozac for "anxiety attacks."

Religious Affiliation: Mr. Fell indicated that he was raised "Catholic." He recalled that as a young child, he went to "Sunday school." The examiner inquired if Mr. Fell now considers himself Catholic, and he responded, "I have been through a lot of phases, I worshiped the devil at one point, but here I go to church," and "you can consider me a Catholic now." Mr. fell reported that between the ages of "16 and 20," he "worshiped the devil." He said that satanic activities "interested me, but I don't know why." He added that he was never a "real" practitioner of Satanism. For example, he never engaged in animal sacrifices or other ritualistic activities. He did show the examiner two homemade tattoos of a satanic nature, one on his left deltoid of an inverted cross with 666, and another of a pentagram. He described his interest in Satanism as "an adolescent phase, I was never a practitioner of the sordid arts." Mr. Fell related that he never believed he could communicate with Satan or have actual supernatural powers.

FELL-00000604

Psychiatric History: Mr. Fell was questioned about his history of psychiatric symptoms and treatment. He recalled that he was first treated by a psychiatrist as a "child." He was unsure as to the reason for his initial psychiatric treatment. He stated that as a child and adolescent, he was placed on several different psychotropic medications, including Dexedrine, Tofranil, Mellaril, and Thorazine. In addition, he remembered that he was hospitalized on several occasions for psychiatric treatment. He told the examiner that he saw no reason for his psychiatric hospitalizations at that time, or even now when he reflects on those hospitalizations.

The examiner reviewed Mr. Fell's extensive psychiatric records. Mr. Fell was treated as a child for symptoms consistent with Attention-Deficit/Hyperactivity Disorder. In fact, he was described by a psychiatrist as showing signs of "distractibility" and "impulsivity" since the age of "9." For his "hyperactivity," Mr. Fell was treated with several different medications, such as Moban, Tofranil, Dexedrine, and Ritalin. The medical records suggest that Mr. Fell's behavior improved with medication treatment.

Mr. Fell was also hospitalized on several occasions for his inappropriate behavior. His first psychiatric hospitalization occurred in 1991, and he was diagnosed with Conduct Disorder. Mr. Fell was described in his first hospitalization as being aggressive and oppositional. Mr. Fell's misconduct continued as an adolescent, and this precipitated three additional psychiatric hospitalizations to the Wilkes-Barre General Hospital. Mr. Fell was again treated with psychotropic medications that helped to control his pattern of oppositional, defiant, and aggressive behavior, a pattern of behavior well documented in the medical and social service records. As well, Mr. Fell received treatment at St. Michael's School between 1994 and 1995 for what was described as an adjustment disorder. In reviewing the medical records for Mr. Fell, the examiner found no evidence to suggest that he ever suffered from an episode of major depression or a psychotic illness. The medical record does suggest that Mr. Fell's misconduct and inappropriate behavior improved on psychotropic medications, some of which are used to treat depressive and psychotic disorders. Even though his behavior responded to certain antipsychotic and antidepressant agents, the medical record reflects that his pattern of behavior flowed from Conduct Disorder and not a major depressive or psychotic disorder.

Role Models: As documented earlier in this report, Mr. Fell described a chaotic home environment with no positive role model. Mr. Fell discussed with the examiner how he witnessed his parents use excessive amounts of alcohol on a near daily basis. In addition, he noted that his mother used cocaine, a substance that he stole from her on occasion. Mr. Fell's statements about his mother's use of alcohol and illicit substances are supported by the social service records and Deborah Fell's autopsy report, which document that she had an ethanol level of ".325%" and tested positive for amphetamines. Further, Mr. Fell stated to the examiner that he was abandoned by both his parents and his grandmother and aunt, who later cared for him. Starting as a young child, he also witnessed physical altercations and excessive

arguing between his parents. Interestingly, Mr. Fell informed the examiner that he was abandoned by the school system. He related that he actually did not quit school, but was instructed to leave school at the age of 17 due to his truancy and poor academic performance.

The examiner asked Mr. Fell about any positive experiences that he might have had with his parents as a child. Mr. Fell could not remember his dad taking him on any trips or vacations. Further, he could not recollect any family vacations. Moreover, he told the examiner that he never received any affectionate hugs or kisses from his parents. As well, his parents never surprised he or his sister with gifts. He recalled that during one Christmas, he had to wrap his sister's Christmas presents because his mother was "passed out drunk." The examiner inquired about family pictures and important stages in development, and Mr. Fell recounted a vivid memory of a picture of himself as a young child. He noted that in the picture, he was wearing "giant sunglasses," and in the background was a "stuffed Pabst blue ribbon beer can." In Mr. Fell's opinion, this picture of himself as a young child summarized his family experiences and the role model his father set for him.

The examiner asked Mr. Fell why he returned to Vermont just before the charged offenses. He reported that several family members suggested that he make contact with his mother, even though he had not had any contact with his mother for 7 years. He related that he went to Vermont, hoping to find a different person. He said that he hoped to enjoy a positive relationship with his mother. He, however, found that she was "no different." He told the examiner that his mother was still drinking alcohol and using crack-cocaine. He estimated that his mother drank alcohol everyday that he was visiting with her in Vermont. As well, he described how his mother "smacked" him at a bar during a verbal disagreement. The examiner inquired as to why Mr. Fell did not leave his mother's residence in Vermont. He responded that he had decided to leave his mother just before the alleged offenses took place. According to Mr. Fell, he decided to leave his mother because, "I could not deal with it, the aggravation, every time she got drunk, she had to start a fight." He informed the examiner that on the day of the incident, his mother and the male victim were both intoxicated. He added that "everyone" was "drunk and high" at the time of the allegations.

## III. MENTAL STATUS EXAMINATION:

Mr. Fell was a 22-year-old, white male, who was neat and clean in appearance. He maintained good eye contact with the examiner. He did not lose his train of thought during the evaluation. For example, he answered the examiner's questions on point. He was able to recite the months of the year in reverse order. As well, he did not exhibit any hyperactivity or involuntary movements. Further, he remained calm and controlled throughout the interview, even when the examiner questioned him about emotional topics.

Mr. Fell's flow of thought was logical, sequential, and goal-directed. He did not exhibit any features of a formal thought disorder. His speech was adequately modulated in rate and tone. His affect was serious. He smiled on several occasions at the appropriate

FELL-00000606

times during the interview. Further, while discussing his home environment and parents, his eyes were wet with tears. He, however, did not lose his composure. Mr. Fell described his mood as "okay." He did not endorse any symptoms consistent with major depression, now or in the past. He noted that before the charged offenses, he was "never a sad fellow, I never dwelled on things and got down." He told the examiner that following his arrest for the alleged offenses, he had some trouble feeling "depressed." His feelings of "depression" did not involve a loss of appetite, energy, changes in sleep, suicidal ideas, or anhedonia. Rather, he discussed a fluctuating pattern to his mood, reporting that "one minute" he would be "depressed," and then the next he would be "cheered up." In fact, he told the examiner that he has never considered suicide. Despite his present situation, he continues to hope for the best. He said, "I hope I don't get the death penalty" and "I just want to live out the rest of my life in a federal prison where I can learn, I hope to get several degrees, I would like to have a kid, but there is no way of doing that." In addition, Mr. Fell did not elaborate any thoughts of hopelessness or worthlessness. Instead, he described himself in positive terms, saying, "I'm not really a bad person" and "at first, I hated myself (i.e. after the homicides), I wasn't too happy with myself, it is not the type of person I am or the type I wanted to be, I am disturbed it came down to this, I am absolutely sorry about the things that allegedly happened."

Mr. Fell's content of thought did not reveal any psychotic ideas. Mr. Fell noted that he has experienced psychotic episodes while intoxicated on illicit substances, primarily LSD. For example, while using LSD, he saw a "little invisible green guy with red skin." Moreover, he discussed how he saw "trails" while intoxicated on LSD. He, however, did not endorse any psychotic experiences or beliefs absent intoxication. Mr. Fell did not affirm any examples of delusional thinking provided by the examiner, such as thought insertion, thought broadcasting, thought control, thought withdrawal, grandiosity, or paranoia. He related that he has never received messages from the television or radio or heard "voices" talking to him or about him.

The examiner questioned Mr. Fell about symptoms consistent with mania. He did not endorse any features associated with an acute manic episode. Moreover, given his documented history of physical and sexual abuse, the examiner asked Mr. Fell about symptoms associated with Posttraumatic Stress Disorder. Mr. Fell did not affirm any examples of symptoms found in Posttraumatic Stress Disorder.

Mr. Fell did describe clear evidence of a panic disorder. Mr. Fell likened his panic attacks to "anxiety attacks." He estimated that his "anxiety attacks" started at the age of "20." He noted that following his arrest for the charged offenses, he was placed on "Prozac," which has helped his "anxiety attacks." He estimated that before he was treated with "Prozac," he experienced "one to two attacks a week." His "anxiety attacks" involve acute episodes lasting 20 to 35 minutes and involving the following: facial numbness; upper extremity numbness; shortness of breath; dizziness; feeling "disoriented;" fears of "dying;" and, the thought that he is having a "heart attack." Although he related that he

has always had difficulty with crowds, he did not associate his "anxiety attacks" with being in crowded places or leaving his home. He told the examiner that he does "feel better" if he is with friends and avoids being alone in a crowded situation.

Mr. Fell's memory was intact. The examiner found no evidence to suggest that he suffers from a cognitive disorder. Mr. Fell was alert and oriented to time, place, person, and reason for the evaluation. He remembered three words immediately and after 5 minutes of distraction. He named the current president and listed the presidents in reverse order through Reagan. He listed 7 digits forward and 5 in reverse. He serially subtracted 7 from 100 to 58 without error. He discussed at length several events in the national news. He also commented on recent sports events around the nation. As well, Mr. Fell was able to provide a personal history that was consistent with the available sources of information.

Mr. Fell's higher executive functions were intact. He pantomimed the use of a comb, a toothbrush, and waving "bye." He copied intersecting pentagons without difficulty. He repeated "no ifs, ands, or buts," after the examiner, without hesitation. He wrote a complete sentence, "The dog ran through the field." He identified several colors in the exam room. He was able to name a metal attracted to a magnet, name four different materials used in building, and how he would find his way if lost in a forest. Mr. Fell could not describe what the two proverbs, living in glasshouses, and a rolling stone, meant to him. He said that he had never heard these proverbs. He appropriately related what he should do if he found a stamped, addressed envelope on the ground, or smelled smoke in a theater.

Mr. Fell's intellectual capacity was judged to be in the average range. Mr. Fell's use of language and capacity to live independently both suggested that he is of average intellectual abilities. In fact, Mr. Fell's use of language and insight into his own past suggested that, despite his excessive substance use, he retains excellent cognitive functioning.

IV. **DIAGNOSES**:

Axis I:        Panic Disorder Without Agoraphobia 300.01
               Alcohol Dependence, In a Controlled Environment 303.90

Axis II:       Personality Disorder, Not Otherwise Specified (Cluster B Features)
               301.9

Axis III:      No Diagnosis

In preparing this report, the examiner used the <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision</u>, published by the American Psychiatric Association in 2000.

FELL-00000608

Donald Fell                                                                                    Page 14

## V. **OPINIONS**:

After reviewing the discovery information and interviewing Mr. Fell, the examiner offers the following opinions to a reasonable degree of medical certainty:

1.  Mr. Fell is not afflicted by a psychotic disorder. Mr. Fell's medical records and prior evaluations do not support a diagnosis of a primary psychosis. The examiner's interview and mental status examination did not reveal any symptoms or signs suggestive of a psychotic disorder. Moreover, Mr. Fell did not even describe odd beliefs or unusual perceptual experiences outside of periods of drug intoxication. Accordingly, the examiner cannot support a diagnosis of a primary psychotic disorder of any type in this case.

2.  The examiner found no evidence to suggest that Mr. Fell is afflicted by a major depressive disorder. Mr. Fell did not endorse any features consistent with major depression. He did describe a fluctuating pattern to his mood, but not the pervasively low mood of two or more weeks associated with other symptoms found in major depression. Moreover, a review of Mr. Fell's medical records does not support a diagnosis of major depression. Mr. Fell's medical records point to a diagnosis of Conduct Disorder. Accordingly, the examiner cannot support a diagnosis of major depression of any degree in this case.

3.  Mr. Fell's intellect and cognitive functions are surprisingly intact despite his extensive use of alcohol and illicit substances. Mr. Fell does not show evidence of a limited intellectual capacity or a cognitive disorder. Mr. Fell's memory and executive functions are intact. His intellectual capacity is preserved as indicated by his use of language, reasoning, and thoughtful reflection during the examiner's interview. Accordingly, the examiner cannot support a diagnosis of Delirium, Dementia, Amnesia, or Other Cognitive Disorders, as described in DSM-IV TR, in this case.

4.  Mr. Fell has a documented history of sexual and physical abuse as a young child. Mr. Fell's history of sexual and physical abuse would effect his behavior as an adult. Male children who are victims of physical and sexual abuse are known in certain situations to become aggressive as adults. Accordingly, the examiner can support the finding that Mr. Fell's sexual and physical abuse are mitigating factor in this case.

5.  Mr. Fell qualifies for a diagnosis of Alcohol Dependence. Moreover, Mr. Fell has used many illicit substances leading up to the charged offenses. Further, Mr. Fell told the examiner, and other evaluators, that he was

intoxicated around the time of the alleged offenses. Clearly, Mr. Fell's intoxication did contribute to his commission of the instant offenses. Accordingly, the examiner can support the opinion that Mr. Fell's substance use is a mitigating factor in this case.

6. Mr. Fell was raised in a chaotic and dysfunctional family. Mr. Fell repeatedly witnessed acts of physical violence as a child. It is also clear that Mr. Fell had no positive role models in his life. Moreover, Mr. Fell felt abandoned by his parents and other significant caregivers. Mr. Fell's lack of supervision, chaotic home environment, and poor role models, would have negatively contributed to his personality development. Accordingly, the examiner can support the opinion that Mr. Fell's home environment is a mitigating factor.

7. Mr. Fell told the examiner that he hopes to achieve several higher degrees while in prison. He reported that he is interested in "physics" and "chemistry." Clearly, Mr. Fell has the intellectual capacity to pursue his dream of achieving a higher education, as indicated by his use of language and the material that he is presently reading for pleasure. Further, Mr. Fell displayed remarkable insight into his inappropriate behavior, especially the differences in his behavior when he is sober and when he is not. As well, Mr. Fell has recently demonstrated the capacity to modulate his behavior in a controlled environment. The combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs, suggests that he will adjust positively to a prison setting. Accordingly, the examiner can support the opinion that Mr. Fell will exhibit a positive prison adjustment.

Respectfully submitted,

John S. Rabun, M.D.

Cc: Richard Wetzel, Ph.D.

JSR/cs

FELL-00000610

# EXHIBIT 9

P-25-2005 10:35  FROM:                                    TO:9P18029516540P246463P.12

# ⚜ Washington University in St.Louis

## SCHOOL OF MEDICINE

Department of Psychiatry

June 27, 2005

William Darrow, Esquire
Assistant United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

> **Re: United States v. Donald Fell**
> Transmission by fax 1-802-951-6540
> **This is a revised, partial report**

Dear Mr. Darrow:

As you know, I was originally asked to review the reports of three experts (Drs. Mills, Van Gorp and Lipman) retained by the Federal Public Defender's Office and private counsel, to review documents relevant to the charges against Mr. Fell and to perform an examination on him in order to prepare rebuttal testimony, if clinically warranted, for the penalty phase of the this capital murder trial.

I reviewed the three reports, a large number of additional documents, including almost all of the raw test data used to evaluate Mr. Fell by the Defense's experts.

For my initial report, Mr. Fell was interviewed on two occasions, September 18 and September 19, 2002, at the Northwest State Correctional Facility in St. Albans Vermont. The interview on 9/18/02 began at about 9:45 A.M. and lasted until about 12:00 noon. He then completed the MMPI-2 finishing shortly before 1:30 P.M. He was given the cognitive examination from the Cambridge Examination for the Elderly[1] from about 9:20 A.M. until about 9:35 A.M. on 9/19/02. He then was interviewed again for about one hour, for a total of slightly more than three hours.

Prior to my examination, the intended scope of my

---

[1] The cognitive portion of an extensive mini-mental status examination.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, www.wuphysicians.org., www.wustl.edu

140

FELL-00000611

*Revised Report on Donny Fell - Fax June 27, 2005*

examination was discussed with his counsel. I noted that the issue of Donny's dominance or submissiveness had been raised by defendant's experts. I disclosed my opinion that to evaluate that claim properly, I would need to discuss his role and relationship to any of his associates in each prior criminal act and to explore the relationship between Mr. Fell and Bobby Lee in detail.

Prior to beginning the examination, his attorney present at that examination, Paul Volk, informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes. He also indicated that no inquiry should be made about the use of knives. His counsel also indicated that the issue of domination would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney, Mr. Volk, and an investigator from the federal public defender's office. He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court. I left the room once each day briefly when his counsel and Mr. Fell conferred about my questions.

Since that time, a decision was made by the defense to present mental health evidence at the penalty phase of his trial that might include references or opinions related to his mental state at the time of these crimes. Because of that, the Honorable William Sessions, Judge of the Federal District Court, entered an order on allowing a supplementary examination of Mr. Fell by the undersigned.

After reviewing additional materials and conversations with several people, I returned to Vermont and interviewed Mr. Fell again on Monday, June 13, 2005. The interview began approximately at 8:35 AM. It was concluded at about 6:00 P.M. By agreement between counsel approved by the court the court, a videotape was made of almost all of the interview. One tape ran out very briefly, less than five minutes. With the cooperation of Mr. Fell, we repeated the content of that brief interval to the best of our mutual memory. A break of about one hour for lunch was taken during the interview. Both Mr. Fell and I were provided with adequate liquids; it was extremely hot and humid,

2

141

FELL-00000612

*Revised Report on Donny Fell - Fax June 27, 2005*

reminiscent of St. Louis summer weather.  Mr. Fell was offered as many breaks as he wished; he took none.  He wished to complete this evaluation as quickly as possible.  He stated this in so many words.  I took one very brief break for water.

To the best of my knowledge and belief, Counsel for the defense and/or his assistant were available for consultation with Mr. Fell throughout the entire interview.  Counsel for the plaintiff was also present for all or almost all of the interview; he said he went to his car on one occasion to obtain something.

I had a list of points I wished to evaluate on my laptop in the interest of completeness.  I also made notes, somewhat briefer than usual, in the event of a videotaping disaster.  I am currently preparing a summary of the relevant points in that interview.  I will submit as soon as it is ready.

Based on these additional sources of information and this additional interview time, I have clarified, revised or supplemented my opinions as follows.

**Summary of opinions**

1.   Mr. Fell and Bobby Lee jointly committed the murder of Mrs. Teresca King after kidnaping her and car jacking her car. Prior to that, they had killed Charlie Conway and Debra Fell.  Mrs. King was killed in order to eliminate a witness that might lead the police to their prior crimes and to further their escape.

     The physical evidence, the statements of the Donald Fell, Robert Lee, Lee's letters and the interviews with Mr. Fell all indicate that Mr. Fell participated in this murder and bears criminal responsibility for it.

     By his own admissions, given multiple times with somewhat inconsistent detail, Mr. Fell also admitted that he murdered Mr. Conway.  He was present during the murder of his mother which took a significant period of time.  It is not unreasonable to conclude that he was also culpable for the murder of his mother.

2.   Mr.  Fell reported that he consumed extremely large

3

FELL-00000613

*Revised Report on Donny Fell - Fax June 27, 2005*

quantities of alcohol and drugs on the night of the murder. He reported that he had consumed large amounts of alcohol regularly while in Vermont for a considerable number of days, sufficient to cause physical addiction.

A.  In my opinion, he has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.

B.  He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.

C.  He denied that he has ever had withdrawal symptoms. He has claimed that he has unusual tolerance for alcohol.

3.  The available information indicates that Mr. Fell was generally the leader in his relationship with Bobby Lee. This is supported by many kinds of information. It is plausible that Bobby started something (the killing of Donny's mother) he thought Mr. Fell wanted done without Donny's explicit consent. It is not plausible, in my opinion, that Bobby Lee kidnaped Mrs. King or killed her without the explicit consent and active participation of Mr. Fell.

4.  If asked, I would offer the following additional opinions:

**Statutory Mitigators**

A.  Mr. Fell's capacity to appreciate the wrongfulness of the his conduct or to conform his conduct to the requirements of law was not significantly impaired.

B.  Mr. Fell was not under duress and was either the leading or equal participant in these murders.

C.  I will offer no comments on his criminal record except as it relates to psychiatric diagnosis.

D.  Mr. Fell was not under the influence of a severe mental or emotional disturbance at the time of the crimes.

4

143

FELL-00000614

EP-25-2005 10:33 FROM:                                   TO:9P18029516540P246463P.8

*Revised Report on Donny Fell - Fax June 27, 2005*

    E.    Mrs. King did not consent to her murder or any other participation in any crime. Neither of the other two victims consented to their murders.

**Other Factors in Mitigation That I Would Support to a Degree**

    A.    Mr. Fell was the victim of sexual abuse, probably repeatedly, as a young child by his baby sitters. I do not suspect anyone else.

        i.    Mr. Fell did not report any causal connection between this abuse and his participation in any of the murders, car jacking and kidnaping. I agree; I also do not see a causal connection.

        ii.    The abuse did occur and would affect his personality.

    B.    Mr. Fell was the victim of repeated physical abuse as a young child.

        i.    Mr. Fell did not report any causal connection between this abuse and his participation in any of the murders, car jacking and kidnaping.

        ii.    Mr. Fell's account of his mental state this year is inconsistent with any causal connection between his history of abuse and the murder of Mrs. King. His account is also inconsistent with any causal relationship between the physical abuse and the murder of Mr. Conway.

        iii. I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship.

        iv.   The abuse did occur and would affect his personality.

    C.    Based on additional information obtained from reports and from this year's interview of Mr. Fell, I am changing my opinion to a degree.

5

144

FELL-00000615

SEP-25-2005 10:33  FROM:                                    TO:9P18029516540P246463P.7

*Revised Report on Donny Fell - Fax June 27, 2005*

  i.   Mr. Fell grew up in a home with markedly
       dysfunctional parents who abused each other
       emotionally and physically in the presence of
       their children.

  ii.  Mr. Fell was physically abused by his father.

  iii. His mother made multiple ineffective attempts to
       control Mr. Fell's behavior and guide him. He
       refused and she accepted this defeat perhaps too
       easily.

  iv.  Members of his extended family also made some
       attempts, also ineffective, to control his
       behavior.

  v.   Placement at St. Michael's shows that the state
       also made ineffective attempts to control his
       behavior.

       a.  Mr. Fell seems to sincerely believe that his
           family did not try to guide him. He is aware
           that he defied them repeatedly.

       b.  He does believe that he was abandoned by his
           mother at about age thirteen when she went to
           Vermont. He does report that he felt
           responsible for her abandoning him and his
           sister.

       c.  The failure to seize control has had long
           term effects on his personality.

D.  Mr. Fell began abusing alcohol and drugs at a
    remarkably early age. When not in custody, he has
    reported he used an amazing amount of intoxicating
    substances documented in several sources. He qualifies
    for the diagnoses of abuse and/or dependence on alcohol
    and a number of other substances.

       I.  Mr. Fell and others have reported that he
           drank heavily while he was in Vermont prior
           to the day of the first murders. He reported
           heavy, controlled drinking that he did not

6

145

FELL-00000616

*Revised Report on Donny Fell - Fax June 27, 2005*

allow to interfere with his work schedule.

   ii.  He said that the murders in this case were caused by his intoxication alone. He "snapped" under the influence of alcohol and drugs.

   iii. While I would not dispute that it was likely that he was drinking excessive amounts of alcohol on that night, I would also state that over time he had developed considerable tolerance to alcohol. Further, his reported behavior, across his many statements, indicates that despite his drinking he was able to think cooly and make rational choices.

   iv.  If asked, I would say, in my opinion with reasonable professional certainty, that neither crack nor marijuana had any effects on the events of the day.

E.  Mr. Fell began displaying the types of asocial and antisocial behaviors called conduct disorder at an early age and to a degree that is more severe than average for persons with this diagnosis. Mr. Fell meets some or all of the criteria for a number of Cluster B personality disorders, displaying antisocial, borderline, narcissistic and paranoid traits. He meets the criteria for antisocial personality disorder fully. I have no doubt about this diagnosis.

This disorder, as well as his alcohol dependence, do *es* have a genetic and a familial basis.

F.  The history of his psychiatric care suggests that his parents consistently misrepresented the real problems in the family that needed to be dealt with if therapy were to have a reasonable chance to help him when he was a child or early teenager. Mr. Fell confirmed that his parents lied about the nature and extent of the problems in their home. He asserted that he did tell Dr. Feusner, his psychiatrist, about these problems. He asserted angrily that Dr. Feusner did not listen to

7

146

FELL-00000617

*Revised Report on Donny Fell - Fax June 27, 2005*

him and did not care. Dr. Feusner just wanted to give him drugs. Multiple other professionals failed to understand the problem that is now quite clear in retrospect.

**Other**

A.  On clinical examination, no defense expert has noted any indication of thought disorder, hallucination or delusion. No sign of psychosis was reported. I fully agree.

B.  Mr. Fell has received a competent neuropsychological evaluation. It was concluded, correctly in my opinion, that he has no cognitive deficits detectable on neuropsychological testing. Careful review of the test data offered and my own, very limited examination also showed no deficit.

**Proposed Matters in Mitigation That I Could Not Support**

A.  Based on the history that he gave to me and the limited documentation in his medical records, I am unable to state with reasonable professional certainty that Mr. Fell ever had hyperactivity or attention deficit disorder. He certainly shows none of the characteristics of these disorders at present. I would concede that most persons with these disorders outgrow them by his current age.

B.  Mr. Fell has been diagnosed with an affective disorder in the past. His depression has been alleged to have been severe, even psychotic in degree. Based on the history that I obtained and the review of the relevant documents, I am unable to state that he ever had a depressive syndrome.

D.  It has been alleged that Mr. Fell has showed no signs of malingering. The conclusion is true for the neuropsychological evaluation. There is apparent exaggeration on the MMPI-2, but not the Rorschach.

E.  It has been alleged that Mr. Fell shows signs of

8

FELL-00000618

*Revised Report on Donny Fell - Fax June 27, 2005*

psychosis on testing[2].  The test data do not show psychosis; they show personality disorder.

I.   The use of projective drawings in 1993 was invalid for the conclusions reached.
ii.  The MMPI-2 does not support a diagnosis of psychosis or prepsychosis.

iii. The Rorschach does not support a diagnosis of psychosis or prepsychosis.

F.   I would strongly oppose the contention that Mr. Fell was dominated by Bobby Lee.

G.   While it seems unlikely, I might comment on future dangerousness if asked.

**Comment**

Mr. Fell has been, in my opinion, a full participant in three murders and the other crimes associated with the murders. He was frequently intoxicated in the months prior to the crimes and probably was intoxicated when he murdered Charlie Conway. Voluntary intoxication is no defense to the elements of the crime in the guilt phase, but it has been accepted as statutory mitigator in the penalty phase in some jurisdictions.

When I interviewed Mr. Fell, he attributed these crimes to only two things - his state of intoxication at the time of the death of Mr. Conway and the decision of his friend, Bobby Lee, to kill Mrs. King because she could identify them and knew their names.

---

[2]   It has been alleged that Mr. Fell is prepsychotic, that is, he might become psychotic in prison.  One cannot refute that someone might become psychotic in the future.  We know that Mr. Fell is not psychotic now.  He was not at the time of the crime. We do know that he did not develop alcoholic hallucinosis or alcoholic paranoia despite consumption of unusually excessive amounts of alcohol.  We do know that he did not develop a psychosis as a result of his reported frequent, heavy and unselective use of drugs.

:9

148

FELL-00000619

EP-25-2005 10:32  FROM:                              TO:9P18029516540P246463P.3

*Revised Report on Donny Fell - Fax June 27, 2005*

Mr. Fell said to me that killing Mrs. King was a decision Bobby made **that needed to be done.** His second response was, "I stated I didn't want to hurt the woman." When I repeated that he reported that Bobby was stoppable before, he responded that "Bobby could not make me do anything I didn't want to." He added that he didn't try to stop him.    There would be no stopping Bobby. He said that he did not know whether or not he could have stopped Bobby. He didn't try. He really does not know whether or not he could have stopped Bobby. He did not think that Bobby was out of control. Eventually, he agreed with Bobby and the murder is what happened.

In addition to these two causal factors, there is evidence for a number of other factors that may have set Mr. Fell on his life path (or failed to deter him from it), but that do not explain his murderous actions. These include the genes he inherited from his parents predisposing him to antisocial personality disorder, the undisciplined environment (which he partially created) in which he was raised as a child, his exposure to sexual and physical abuse, the failure of his family and extended family to gain effective control of his behavior and the failure of psychiatric treatment. He, of course, contributed to this failure.

Thank you for this interesting referral.

**Diagnostic impression:**

Axis I     Polysubstance abuse
           Alcohol dependence
           Marijuana dependence

Axis II    Antisocial Personality disorder with borderline and
           narcissistic features

Axis III   S/P mild concussions without residual deficits
           S/P brain contusion

Axis IV    Legal problems, Family problems, Substance abuse

Axis V     45 in 2002, 60 now

10

FELL-00000620

SEP-25-2005  10:32  FROM:                    TO:9P180295165400P246463P.2

*Revised Report on Donny Fell - Fax June 27, 2005*

Sincerely yours,

*[signature]*

Richard D. Wetzel, Ph.D.
Professor of Psychiatry
Professor of Neurology and of Neurological Surgery
Washington University School of Medicine

11

150

FELL-00000621

# EXHIBIT 10



## THE FORENSIC PANEL

224 W. 30TH ST., SUITE 806  NEW YORK, NY 10001  TEL: 212.535.9286  FAX: 212.535.3259  MICHAEL WELNER, M.D., CHAIRMAN

Bill Darrow, Esq.
US Attorney
PO Box 570
Burlington, Vt. 05402-0570

United States v. Donald Fell, Jr.

July 5, 2005

Dear Mr. Darrow,

Pursuant to your request, I have completed a forensic psychiatric assessment of the above defendant. He is a 25 year old native of Pennsylvania who was convicted of the November 27, 2000 carjacking and kidnapping of Terri King with her death resulting. The incident occurred shortly after Mr. Fell's involvement in the killings of Charles Conway (a guest) and Debra Fell (his mother) in Mrs. Fell's home on 135 Robbins St. in Rutland Vt., where the defendant had been residing.

Also reportedly involved in the killings was Robert Lee, a friend of Mr. Fell's who was staying in the home as well. Both Mr. Fell and Mr. Lee were arrested within days of the three killings. Mr. Lee was found dead in his jail cell on September 20, 2001; cause of death was later ruled as sexual asphyxia.

Mr. Fell has been convicted of the subsequent carjack murder of Terri King, whom he and Robert Lee accosted near the scene of the first two killings.

In anticipation of an eventual trial, Mr. Fell was evaluated by several professionals, exploring the possibility of psychosocial, psychiatric, and forensic mitigating issues.

Mark Mills, M.D., Jonathan Lipman, Ph.D., and Wilfred van Gorp, Ph.D. submitted reports which engaged, to some degree, earlier diagnoses by mental health professionals, as well as their own diagnostic impressions and suggestions for what applied to Donald Fell on the day he was involved in the deaths of three people. Dr. Mills, in his report of May 7, 2001, characterizes Mr. Fell with a "mental impairment" and having had a "psychotic-like condition."

Dr. Lipman's narrative of Mr. Fell's self-report focuses in part on Mr. Fell's illicit substance use, contributing to Dr. Mills' impression of Mr. Fell as "the most drug abusing and chronically intoxicated individual whom I have evaluated." Dr. van Gorp and his assistant detailed their interpretations of various intelligence, cognitive and personality tests administered to Mr. Fell -- who has reported the inability to recall a number of details inquired of him -- in a report dated April 6, 2001.

FELL-00000622

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 2

Those three doctors, as well as Mark Cunningham, Ph.D., presented numerous opinions and inferences relating to Mr. Fell's personal background and family relationships, reports of sexual and physical abuse, substance abuse and intoxication, antecedents of his violence, brain damage, the availability of role models and supports, earlier life deprivation, previous agency failures, the dynamic between Mr. Fell and Mr. Lee, Mr. Fell's distinct personality qualities, and his remorse, with opinions linking their relevance to his homicidal and criminal behavior of November 27, 2000.

These doctors' reports have drawn from and been supplemented by the testimony of social service workers, family, and friends on the aforementioned issues.

Based upon Dr. Cunningham's portrayal of factors noted in scientific and non-scientific literature, he offers the impression, "These and other adverse factors impacted not only on Mr. Fell's life trajectory, but also on his value system, moral development, perception of life options and nature of choices."

The forensic psychologist also presented impressions of factors that predict Mr. Fell's likelihood of serious violence in prison. Dr. Cunningham's report of June 14, 2005 states his belief that Mr. Fell's adjustment will be positive, and points out features of Mr. Fell that he asserts are irrelevant to consideration of risk for violence in prison.

The case has been referred to me to review all of the available reports and evidence of psychiatric and psychosocial consequence, interview family, friends, and acquaintance sources to fully elucidate psychiatric and psychosocially relevant history. Then, to independently examine the scientific viability of each of the issues raised with respect to Mr. Fell's mental condition, substance use, adaptive intellectual functioning, family problems, sexual and physical abuse, violence and other behavioral problems, fantasy life and sexuality, relatedness to others such as Bobby Lee, emotional impact of the killings and their losses, and risk of violence in prison.

Given the information reviewed to date, I have been asked to address the following questions:

1) At the time of the murders of Debra Fell, Charles Conway, and Terri King, did Donald Fell meet criteria for any diagnoses? Are there diagnoses that have been mentioned that he is not likely to have?
2) What other aspects of Donald Fell's development distinguish themselves? How have these features impacted his life trajectory, underlying value system, moral development, perception of life options and nature of choices?

FELL-00000623



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 3

    3) *What is the relevance of his history of alcohol and illicit drug use to the murders of Debra Fell, Charles Conway, and Terri King?*

    4) *Do the murders of Debra Fell, Charles Conway, and Terri King reflect the disorganization of a major mental illness or intoxicated condition?*

    5) *How is Donald Fell distinguished in his cognitive abilities or shortcomings, specifically as it relates to his actions from the time of the murders until his capture?*

    6) *How spontaneous was the homicidal violence displayed?*

    7) *What distinguishes the violence history of Donald Fell and how his behavioral style manifested in these murders?*

    8) *Was Mr. Fell sexually abused as a child, and in what manner has he been affected by this history?*

    9) *Given his parents' qualities, what evidence is there that Mr. Fell's diagnoses, behavior, and circumstances are genetically driven?*

    10) *What role models have been available to Donald Fell to promote prosocial behavior, self-control, and sobriety?*

    11) *How has the relationship between Donald Fell and his mother evolved, from when she was raising him to when he was living with her in Vermont, and the how had the circumstances of each changed at the time Ms. Fell was killed?*

    12) *Was Donald Fell the product of a deprived childhood and adolescence?*

    13) *How did the relationship between Donald Fell and Bobby Lee relate to the eventuality of three people murdered? What evidence reflects on the prime mover, and the dynamic between the two?*

    14) *What evidence reflects on Mr. Fell's remorse for the crimes of November 27, 2000?*

    15) *Given all of the above diagnostic and developmental information, what aspects of Mr. Fell's history represent the most demonstrated nexus to a criminally violent and homicidal outcome?*

    16) *What history reflects on whether Mr. Fell will be a serious risk of violence in prison?*

## SOURCES OF INFORMATION

1) Police investigation reports, SA James Caudle
2) Initial interview transcripts, Donald Fell- Police 11/30/00 at 11:30pm
3) Interviews, Lee and Fell- Police, Dec. 1-2, 12:25a – 2:19pm
4) Autopsy Report, Robert Lee, Sep. 20, 2001.
5) Autopsy Report, Charles Thomas Conway, Dec. 1, 2000.
6) Autopsy Report, Deborah Ann Fell, Dec. 1, 2000.
7) Autopsy Report, Teresa King, May 3, 2001 date of autopsy Dec. 2, 2000.
8) Report of Mark Mills, M.D., May 7, 2001.

FELL-00000624



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 4

9) Report of Wilfred van Gorp, Ph.D., April 6, 2001.
10) Report of Neuropsychological consultation, Jonathon Lipman, Ph.D.
11) Report of James Hudzink, M.D., May 24, 2002.
12) Letter from AUSA Peter Hall to John Rabun, M.D., May 30, 2002.
13) Report of John Rabun, M.D., Dec. 31, 2002
14) Report of Richard Wetzel, Ph.D., Oct. 11, 2002.
15) F.B.I- Notes Evaluation records reviewed by Andrew Vaszaly MSW, March 30, 2001.
16) F.B.I- Notes Interviews of officials at Wilkes Barre Area Vocational - Technical School.
17) F.B.I- Notes Interviews of officials at James M. Coughlin High School, March 29, 2001.
18) F.B.I- Notes Interview of officials at Plains Junior High School, April 10, 2001.
19) F.B.I- Notes Interview of officials at Daniel J. Flood Elementary School, April 10, 2001.
20) F.B.I- Notes Interview of officials at Luzerne Intermediate Unit 18, April 10, 2001
21) F.B.I- Notes Interview of officials at Wilkes – Barre Area School District. April 3, 2001
22) F.B.I- Notes Interview of officials at Children's Service Center. Wyoming Valley, April 3, 2001.
23) Criminal records of Robert Lee.
24) Interviews of employer, Humanik Construction, April 3, 2001.
25) Interviews of employer, DJ Concessions, April 3, 2001.
26) Interviews of employer, Northeast Concessions, April 12, 2001.
27) Interview of probation officer John Cookus, Luzerne County Juvenile Probation Center, April 6, 2001.
28) Interview of Lt. Dale Rinker, Wilkes Barre Police Department, April, 10, 2001.
29) Interview of Jacqueline Sharp, aunt, by F.B.I.
30) Interview of Bonnie S. Toute, mother of Robert Lee, by James J. Glenn, April 5, 2001.
31) Interview of Terri Fell, sister of Donald Fell, April 5, 2001.
32) Interview of Donna Williams, relative of Donald Fell, April 11, 2001.
33) Autopsy and crime scene photos.
34) Court Advocate program, Wyoming Valley, records.
35) Records of Kingston Police Department investigating child abuse.
36) Report of suspected child abuse, May 22, 1985
37) Records of Assaults Proceeding, August 12, 2000.
38) Application for commitment of Donald Fell, June 13, 2000.
39) Grand Jury Testimony of Bethany Brashears, January 11, 2001
40) Records of Wyoming Valley Hospital
41) Records of Luzerne County Court
42) Investigation of Incident, Children and Youth Services, March 11, 1985

FELL-00000625

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 5

43) Update of records from Victim Resource Center, October 1985
44) Children and Youth Service recommendations, June 1990
45) Records of Pediatric Associates of Kingston, PA
46) Records of Wilkes Barre VoTech
47) Records of Luzerne Co. Day Treatment – April 30, 1994 – August 25, 1995
48) Arrest records of Deborah Fell
49) Hospital records of Donald Fell
50) Non-testimonial order, Rutland City Police
51) Interview of Alan Reynolds, boyfriend of Debra Fell, by Det. Raymond Lamoria, December 1, 2000
52) Interview of Florence Prescott, companion of Charles Conway, by Det. Raymond Lamoria, December 12, 2000
53) Interview of Carole Fraser, bartender at Spotlight Bar, by Det. Rod Pulsipher, December 8, 2000
54) Interview of Kevin Bodette, friend of Debra Fell, by Det. Raymond Lamoria, December 1&4, 2000
55) Investigative reports, Rutland City Police
56) Supplemental report of Raymond Lamoria, December 11, 2000
57) Supplemental report of Det. David Schauwecker, Jan 10, 2001
58) Pennsylvania State Police material
59) Notes of Jonathan Lippman, Ph.D.
60) Draft report of Mark Mills, M.D.
61) Belongings from apartment
62) Grand jury testimony of Lynn Roberts, January 25, 2001
63) Grand jury testimony of Bethany Brashears, January 11, 2001
64) Interview of John Kozerski, teacher, April 6, 2005
65) Discussion with Trooper Charlie Ptula, April 6, 2005
66) Interview of Lynn Roberts, April 6 & 7, 2005
67) Interview of Jeannette Banas, April 6, 2005
68) Letters of condolence for Debra Fell
69) Newspaper articles
70) Interview of Stanley Kowalski, April 6, 2005
71) Discussion with Jessie Williams, April 7, 2005
72) Discussion with Matt Cunningham April 7, 2005
73) Discussion with Janet Smith, mother of Lynn Roberts, April 7, 2005
74) Discussion with Joe Humanik, April 7, 2005
75) Discussion with Jackie Sharp, April 7, 2005
76) Discussion with Terri Fell, April 7, 2005
77) Discussion with Michael Baden, M.D. June 8, 2005
78) Interview of Janet Roberts, April 7, 2005
79) Interview of Cynthia Dazzi, Price Chopper employee, by SA Michelle Hellner, April 18, 2005

FELL-00000626



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 6

80) Interview of Nina Flory, Holiday Inn employee, by SA Michelle Heilner, April 12&18, 2005

81) Interview of Corporal Greg Phillips, Clarksville, AR PD, by SA Michelle Heilner, April 18, 2005

82) Interview of John Ketchum, Kimberton Fair mgr, by SA Michelle Heilner, April 20, 2005

83) Interview of Dora Carter, friend of Debra Fell, by SA Michelle Heilner, April 21, 2005

84) Interview of Mary Alice Waterman, Price Chopper employee, by SA Michelle Heilner, April 20, 2005

85) Interview of Vertith Oberle, Price Chopper employee, by SA Michelle Heilner, May 10, 2005

86) Interview of Kelly Calvin, Hawk Hill Mountain Inn employee, by SA Michelle Heilner, April 14, 2005

87) Interview of Terri Gates, witness, by SA Michelle Heilner, April 12, 2005

88) Interview of Patricia Hopp, Hawk Hill co-worker, by SA Michelle Heilner, April 14, 2005

89) Interview of Mike Lannon, employer, by SA Michelle Heilner, April 14-15, 2005

90) Interview of Joel Maranville, co-worker, by SA Michelle Heilner, April 15, 2005

91) Interview of Jeffrey vanBuren, acquaintance, by SA Michelle Heilner, April 14, 2005

92) Interview of Gwen West, employer, by SA Michelle Heilner, April 14, 2005

93) Interview of Shelley Wisell, co-worker, by SA Michelle Heilner, April 13, 2005

94) Grand Jury testimony of Christian Kolojeski, December 21, 2000

95) Grand Jury testimony of Michael Leight, January 4, 2001

96) Jail records

97) Dept. of corrections Incident reports

98) Medical records of John Gaudio, M.D.

99) Statement of Glynn Edgar Baker

100) Toxicology reports of Charles Conway and Debra Fell

101) Interviews of Robert Lee Sr., by SA James Glenn, May 10 & 24, 2005

102) Interview of Sandy Bowles, Debra Fell's sister, by SA James Glenn, May 18, 2005

103) Interview of Erika Balestra, employer, by SA Michelle Heilner, May 10, 2005

104) Interview of Theodore Settas, acquaintance of Don Fell, by SA James Glenn, May 9, 2005

105) Interview of Ellis Carle, former St. Michael's employee, by SA James Glenn, May 10, 2005

106) Interview of Diane Sergi, CYS employee, by SA William Mullins, May 11, 2005

107) Interview of Deanna German, CYS employee, by SA William Mullins, May 11, 2005

108) Interview of Sharon Hinchey, kindergarten teacher, by SA James Glenn, May 9, 2005

109) Letters from Robert Lee Jr. to father, from prison

FELL-00000627

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 7

110) MMPI raw data from 9/18/02

111) Interview of Gary Yale, April 7, 2005

112) Discussion with John, Sarah, Dan Ketchum, John and Dee's Fun and Games, June 22, 2005

113) Discussion with Shawn Campbell, June 22, 2005

114) Discussion with Robert Lee, Sr. June 22, 2005

115) Interview of Donald Fell, by Dr. Richard Wetzel, June 13, 2005

116) Discussion with Mark Innocenzi, July 1, 2005

117) Interview of June Kondraski, July 1, 2005

118) Interview of Carole Fraser, July 2, 2005

119) Investigation of Incident, Children and Youth Services, March 11, 1985

120) Interview of June Kondraski, by FBI SSA James Glenn, May 24, 2005

121) Interview of Christopher Fike, acquaintance, by SA Tim O'Malley and SA C Patrick Austin, June 15, 2005

122) Criminal records of Don Fell, Jenkins, PA

123) Interviews of Susan Fell Benczkowski, stepsister, by Cynthia Ayres, January 23, 2001 and June 5, 2002

124) Interview of Tim Brooks, July 2, 2005

125) Interview of Cindy Golden, neighbor, July 2, 2005

126) Interview of Leo Diamond, attorney for Robert Lee, July 2, 2005

127) Interview of Liz Jones, friend, July 2, 2005

128) Interviews of Terri Fell, sister, by Cynthia Ayres, April 25, 2001 and March 30, 2005

129) Interview of Carmen Devizia, landlord, by Cynthia Ayres, March 30, 2005

130) Interviews of Jackie Sharp, aunt, by Cynthia Ayres, January 22 & 23, 2001 and March 31, 2005

131) Interviews of Donna Williams, aunt, by Cynthia Ayres, January 22, 2001 and March 30, 2005

132) Interview of Sharon Hinchey, teacher, by Cynthia Ayres, April 1, 2005

133) Interview of Nancy Messersmith, acquaintance, by Cynthia Ayres, May 13, 2005

134) Interview of Cataldo Medico, employer, by Cynthia Ayres, May 13, 2005

135) Interview of Nancy Migatulski, friend, by Cynthia Ayres, May 18, 2005

136) Interview of Mark Migatulski, friend, by Cynthia Ayres, May 18, 2005

137) Interview of Mary Loncoski, teacher, by Cynthia Ayres, May 18, 2005

138) Vermont court documents of Debra Fell

139) Vermont court documents of Charlie Conway

140) Donald Fell corrections health records

141) Interview of Shane Lee, July 3, 2005

142) Records of Donald Fell from Victims Resource Center

143) Report of Mark Cunningham, Ph.D., June 14, 2005

144) Affidavit of Adam Barcomb, Corrections Officer, June 9, 2005

145) Report of James Aiken, June 15, 2005

FELL-00000628

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 8

146) School records
147) Interview of Donna Williams, aunt, by SA James Glenn, April 6, 2005
148) Interview of Justine Taylor, landlady, by SSA Michelle Heilner, May 19, 2005
149) Interview of Tim Brooks, acquaintance, by SSA Michelle Heilner, May 19, 2005
150) Interview of Geraldine Fell, relative, by SA Eric Pulwicz, May 13, 2005
151) Interview of Mark Balestra, acquaintance, by SSA Michelle Heilner, May 16, 2005
152) Interview of Jason Rushlow, Northwest State Correctional Facility, by SSA Michelle Heilner, May 11, 2005
153) Interview of Ronald Barclay, Correctional Officer, by SSA Michelle Heilner, May 11, 2005
154) Interview of Marianne Chiumento, police officer, by SSA Michelle Heilner, May 20, 2005
155) Interview of Mary Jo Scott, educator, by SSA Michelle Heilner, May 16, 2005
156) Interview of James Bailey, Correctional Officer, by SSA Michelle Heilner, May 11, 2005
157) Interview of Chris Purcell, Police Officer, by SSA Michelle Heilner, May 20, 2005
158) PCL-R, administered July 4, 2005
159) WRAG, administered July 4, 2005


FORENSIC PSYCHIATRIC ASSESSMENT

> *1) At the time of the murders of Debra Fell, Charles Conway, and Terri King, did Donald Fell meet criteria for any diagnoses? Are there diagnoses that have been mentioned that he is not likely to have?*

ANTISOCIAL PERSONALITY DISORDER
ALCOHOL DEPENDENCE

ANTISOCIAL PERSONALITY DISORDER

This diagnosis is given when there is a history, since age 15, of a pervasive pattern of disregard for and violation of the rights of others, as indicated by at least three of the following:

- failure to conform to societal norms by repeatedly performing acts that are grounds for arrest;
- deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;
- impulsivity or failure to plan ahead;
- irritability and aggressiveness, as indicated by repeated fights;
- reckless disregard for the safety of others;

FELL-00000629



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 9

- consistent work and financial irresponsibility;
- lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Moreover, history must demonstrate the presence of **Conduct Disorder** prior to age 15.[1] Conduct Disorder requires a history, over at least a one year period, the presence of three of the following:[2]

- often bullies, threatens, or intimidates others
- often initiates physical fights
- has used a weapon that can cause serious physical harm to others (eg; brick, knife, gun)
- has been physically cruel to people
- has been physically cruel to animals
- has stolen while confronting a victim
- has forced someone into sexual activity
- has deliberately engaged in fore setting with the intention of causing serious damage
- has deliberately destroyed others' property other than by fire setting
- has broken into someone else's house or car
- often lies to obtain goods or favors or to avoid obligations
- has stolen items of nontrivial value without confronting a victim
- often stays out at night despite parental prohibitions, beginning before age 13
- has run away from home overnight at least twice while living in parental or parental surrogate home
- often truant from school, beginning before age 13

Conduct Disorder is also distinguished based on onset of childhood vs. adolescent, and from mild to severe, based upon the number of problems and their impact on others.

At the time of the murders of Debra Fell, Charles Conway, and Terri King, Donald Fell demonstrated evidence for the following criteria of **Antisocial Personality Disorder.**

**Failure to conform to societal norms by repeatedly performing acts that are grounds for arrest** – Donald Fell admits to have killed; at approximately the same time, Mr. Fell carjacked, kidnapped, reportedly stole items from his mothers' home, stole a

---

[1] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 702
[2] Ibid, p. 98-99

FELL-00000630

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 10

license plate, and defrauded WalMart (by cashing in receipts they found in parking lots for items never purchased).

His lawbreaking did not limit itself to the occasion of the instant offenses. Mr. Fell assaulted his mother, used illegal drugs, brought an unregistered shotgun with him to Vermont, acknowledges that he participated in burglary and theft, and harbored a fugitive (Bobby Lee) while there. He did not pay fines mandated in Pennsylvania for other offenses committed there. And in the years from his 18th birthday on, he admitted to having seriously assaulted someone, broke into cars and stolen cash and items, and was identified by witnesses as having kidnapped, destroyed property, committed sexual abuse, and taken part in the destruction of cats and other animals.

**Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure** – Joe Humanik, a contractor who formerly employed him, observed, "I noticed I couldn't trust him. He would get back at you when your back was turned."

In the instant case, Mr. Fell gave statements that were blatantly untrue. For example, in his first interview, he told questioners that he and Bobby Lee stole the Neon they were driving from a person they had gotten a lift from while they were hitching across country. He volunteered -- notwithstanding his history of having assaulted his mother and sister in his youth, kidnapped Bethany Brashears at gunpoint in early 2000 and, according to witness Lynn Roberts, pointed a gun at her head and pulled the trigger, placed a knife to the throat of Shannon Irish in the presence of Robert Lee Sr., openly promised to one day go on a killing spree, beginning with his mother, and finally, killed Terri King and abetted his mother's murder – that he "wouldn't hurt a woman."

The defendant also made other statements that facts prove to be clear lies, including his assertion that Debra Fell did not struggle as she was being murdered, that he did not intervene to save her because she was already dead, that he thought about turning himself in after killing Charlie Conway, and that Debbie Fell had been using crack when they had the confrontation that culminated in her murder.

While Fell and Lee were on the run from police, and low on cash, Fell – a demonstrated Satan adherent -- hoisted up a sign for help from passersby with the expressed gratitude, "God Bless." Notes from interviews with Mr. Fell shortly after his arrest note his staring straight at officers, without blinking. His self-possessed apparent certitude in stating the incredible recalls a notation in his chart from his hospitalization at age 13, in which staff noted that he "lies to the point of delusion."

After his arrest on these charges, Mr. Fell made assertions about his drug use that prompted one professional to call him "the most drug abusing and chronically

FELL-00000631



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 11

intoxicated individual whom I have evaluated." Nevertheless, his friends and family offered history, as did findings from his neuropsychological testing, of a substantially less dramatic substance use history.

Likewise, Mr. Fell represented that he was "abandoned by school," a characterization markedly dissimilar from his available school record.

As for his communication on other occasions, Lynn Roberts, his ex-girlfriend, volunteered that he was a "compulsive liar...I never knew what to believe about him."

Mr. Fell used aliases when arrested for an August 12, 2000 assault on Chris Eile near Woodstock. Likewise, he furnished Rutland police with an alias when arrested October 6, 2000. The defendant reported to Dr. Wetzel that he would use aliases on a regular basis, only one of which is for an ID over 21 that he can use for alcoholic beverages. The defendant reveals that he has obtained social security numbers and through that information, has gone to the end of obtaining birth certificates and "legitimate fake IDs," in "planning for eventualities, in case I need them."

**Impulsivity of failure to plan ahead** – Among his friends, Donald Fell was the spark for the idea of what exploits they would undertake. In other aspects of his life, Mr. Fell has been impulsive as well; his cousin and former boss, Jesse Williams, describes his picking up and abandoning work obligations to go to a rock concert in Woodstock in August 2000. His September 2000 travel to Vermont to live with his mother was also without substantial deliberation and consideration of other options.

While he long dreamed of going on a killing spree, Mr. Fell's killing began without particular warning. No evidence has yet emerged that at the beginning of the evening of November 26, 2000, Donald Fell anticipated that the evening would end with three dead before breakfast.

The defendant's history reflects no sign that he was bothered by his lack of life direction. Donald Fell went to Vermont with no goals and no committed vocational direction; he liked music, he liked Satan, he liked weapons. The defendant left Vermont planning only where he and Bobby Lee could live if homeless during the winter months in the street. This would not have been the first time Mr. Fell reports having been homeless. In recent years, he relates traveling to Nebraska with a female friend, Jerry, who was arrested along the trip. On his return, as he made his way through several Midwestern states, notes Mr. Fell, he lived as a homeless person by train tracks.

His Vermont life path paralleled his existence in Pennsylvania, in which he dropped out of school, followed no vocational path or direction to self-reliance, drifted from home

FELL-00000632

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 12

to home, and left for Vermont only when he learned of warrants for his arrest because
of unpaid fines.

**Irritability and aggressiveness, as indicated by repeated fights** – Donald Fell has a
long history of emotional reactivity when annoyed, whether it be throwing tantrums to
challenging others to fight. Even before participating in the killing of his mother, Mr.
Fell was threatening and beating his mother up to the point that she was telephoning his
family in Pennsylvania, appealing to them for help; had called the police for assistance in
October; and was seeking out men to accompany her home at night and to protect her
should Donald attack her upon her return.

Gary Yale, another friend of Mr. Fell's characterized him as "having a short fuse – it
didn't matter who you were." Even those closest to him were afraid to anger him. John
Ketchum, a supervising concessionaire at Kimberton Fire Co. Fairgrounds, where
Donald Fell worked for his cousin Jesse, observed Mr. Fell's reaction, in summer 2000,
when Jesse set limits with Fell's repeated dress code violations. "just keep f'ing with me,
I'll burn down the house trailer with you (to Jesse) in it," recalls Ketchum.

Jesse Williams told Mr. Fell that Mr. Ketchum had warned Jesse that continued trouble
from Mr. Fell would result in Mr. Williams' losing access to sell at Kimberton. Shortly
afterward, Mr. Williams recalls that he spied Mr. Fell walking toward Mr. Ketchum's
trailer with a chainsaw. Jesse states he ran over to intervene, and Mr. Fell told him, "I'm
going to kill him, I'm going to kill the f'in a-hole." Had he not interceded, recounts Mr.
Williams, he believes Mr. Fell would have continued to the Ketchum trailer, chainsaw in
hand.

Liz Jones, another friend of Mr. Fell, spoke of how Mr. Fell would challenge people to
fight, and invite others along to watch.

**Consistent work and financial irresponsibility** - In all of Donald Fell's adult years,
he lived in the homes of others. Despite having manual skills to be offered construction,
roofing, and manufacturing work, he lived in the homes of Debra Fell without
contributing financially – and invited his friend Bobby in as well.

Financial pressures contributed to arguments between Mr. Fell and his mother,
according to her cousin, Jeanette Banas' recollections of her telephone calls. Indeed, the
week before the killings, Mr. Fell performed work at Rutland Plywood and Mark
Balestra's home. Even at Rutland Plywood, however, Mr. Fell did not return to work
the day after Thanksgiving – although the company had given him a free turkey.

His adult life before coming to Vermont also reflected consistent irresponsibility in
Donald Fell. Although Jesse Williams got him a job with his carnival, Mr. Fell wore out

FELL-00000633



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 13

his welcome, and repeated warnings, by defying the dress code and by refusing to follow the directives of his boss. Mr. Humanik experienced Mr. Fell as irresponsible – if able bodied – as well.

**Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another** – In summer 2000, according to his then-girlfriend Lynn Roberts, Mr. Fell kidnapped Bethany Brashears and held her at gunpoint for approximately 2 ½ weeks – until she escaped. Ms. Roberts observed that during the period of her confinement, he pointed a gun that Ms. Brashears mistakenly believed to be loaded at Ms. Brashears and pulled the trigger, among other things. Ms. Brashears, noticed Ms. Roberts, was clearly traumatized during the experience; Mr. Fell showed no remorse or regret over his conduct during the incident. Ms. Brashears described him as joking and laughing. Ms. Roberts adds that he later spoke to Ms. Roberts of killing and disposing of Ms. Brashears to eliminate her as a witness.

The impressions of Mr. Fell's lack of remorse for his actions is consistent with the impressions of his teachers. Whether it was threatening to stab one of his teachers, attempting to rile up his classmates, defying authority, or destroying property, recalls John Kozerski, Donald Fell would show no remorse. "He would return from suspension with a wry smile – that was it," added Mr. Kozerski.

Likewise in the instant case, Mr. Fell's response to what he had done was strikingly remorseless in behavior and expression.

**Conduct Disorder** – Prior to age 15, Mr. Fell clearly manifested a history of number of symptoms of conduct disorder. While other criteria may also have been present, viewed most favorably to the defendant, I note only those criteria for which documentation or witnessed input is clearly available, rather than implied.

**Bullying** – While smaller than others, Donald Fell still impressed a number of people as a bully. Jesse Williams, his cousin (who later employed him, recalled being bullied by him in earlier years to try a cigarette, and to rob the attic in his grandmother's house next door. "He probably bullied everybody – that was just his personality," reflects Mr. Williams. People were afraid of him, the way he talked about going on a killing spree and stuff. I didn't want to set him off."

**Often initiates physical fights** – Donald Fell would fight in the community and even in the controlled environment of the hospital – notes reflected that he would brag about the fighting afterward. His records noted multiple suspensions for fighting.

**Used a weapon that can cause serious physical harm to others (eg: brick, knife, gun)** – At age 12, Donald threw a brick at a bird; on another occasion at around the

FELL-00000634

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 14

same age, he threw a rock through the windshield of a passing motorist. On another occasion, he reportedly stabbed a female acquaintance with a fork. At age thirteen, Donald Fell shot John Gacek, a reported friend of his, in the chest, and did not show remorse after the fact when he was first admitted into the hospital. At the time of that same hospital referral, he reportedly had been threatening his mother that he would kill her while she slept at night – with a knife that he was keeping in his room.

Has been physically cruel to people – After Debra Fell separated from Donald's father Donald Sr., Ellery Wilcox moved in with the Fells. Records reflect that Donald did not experience Mr. Wilcox as mean, but on one occasion that Mr. Wilcox attempted to discipline him, Donald reported that he kicked him in a leg he had broken and was attempting to rest and heal.

Lies – Staff documented in his 1993 records, "Lies to the point of delusion."

Has been physically cruel to animals – Matthew Cunningham, a friend of Donald's witnessed his shooting off the tails of squirrels in the woods with a .22 caliber pistol. Jeanette Banas, a relative, revealed him to have cut off the tails of squirrels he had found in the woods, and amusedly told her of how they would run around in circles.

Shane Lee detailed a number of incidents he personally witnessed, although he notes that Mr. Fell would brag about things he would conjure up to do to animals he happened to catch. Shane Lee states that he witnessed Donald Fell catch a fish, stuff a "quarterstick" – a powerful firecracker – into its mouth, light the quarterstick and throw the fish back. When the fish exploded, according to Mr. Lee, Mr. Felll would express great satisfaction with himself.

While he did not actually witness other such attacks on fish, Mr. Lee reports that cats were a particular favorite target of Mr. Fell. On one occasion, he recounts, Mr. Fell led him to a clothesline, where the mutilated corpses of two cats slumped. Mr. Lee relates that Mr. Fell told him he had tied the cats' tails together, and slung them over the clothesline so that they could claw one another to death.

Other carcasses Mr. Lee reports being shown by Mr. Fell included a cat with its eyes burned out by cigarettes, cats set afire, and others that "were unrecognizable. One other cat corpse that Mr. Fell showed Shane Lee was one in which the defendant had somehow worked barbed wire up its anus. According to Shane Lee, what was left of the cat had been physically ripped up inside.

Mr. Lee indicates that "Donnie was the kind of guy that when he was bored, he'd go get a magnifying glass so he could light bugs on fire." "He thought it was funny to think of

FELL-00000635

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 15

different ways to torture animals," recalls Shane Lee, adding that these behaviors took place when he was approximately 15 years old.

**Has deliberately engaged in fire setting with the intention of causing serious damage** – Donald Fell reportedly burned down a shed behind his house while in elementary school. In 1991, Debra Fell told mental health professionals that she was afraid of him, for fires that he had set. Other records indicate that fire trucks were called to the scene of where he had set fires.

**Has deliberately destroyed others' property other than by fire setting** – Documentation from a hospital chart in 1993 noted, "destroys house when angry." Matthew Cunningham noted this, commenting, "I saw him smash plates when he had a fight with aunt, then he would go upstairs and smash everything so she wouldn't have it." Shane Lee talked of how Donald Fell would invite the group to come with him on sprees of smashing windows and slashing tires.

**Has stolen items of nontrivial value without confronting a victim** – According to Stanley Kowlaski, a former friend of Debra Fell, she told him that Donald "liked to steal." Available records note that, at age 13, in discussions with peers, he talked of stealing. Matthew Cunningham recalls Donald Fell smashing in the window of Philadelphia Subs and grabbing as many six packs as they can. Liz Jones recounts Mr. Fell and other being banned from stores for stealing "whatever they could."

**Often stays out at night despite parental prohibitions, beginning before age 13** – Notes from January 1993 noted Debra Fell's history that Donald was staying out late. He confirms in his interview, that this happened with regularity.

**Has run away from home overnight at least twice while living in parental or parental surrogate home** – 1991 records noted the history that Donald was running away from home when his mother was attempting to discipline him. Police records also noted Donald's history of running away. "I'd be gone a couple of days," explains Mr. Fell, adding that he would be back home before police would find him.

**Often truant from school, beginning before age 13** – According to Terri Fell, her brother's truancy began while he was enrolled at Plains Junior High. Donald Fell was truant to an exceptional degree, and he would not obey his mother's directives to go to school. Notes indicate his truancy may have contributed to his admission to St. Michael's in 1994.

Donald Fell's conduct disorder, according to records from previous evaluations, manifested itself from age 9. Given the multiplicity of his conduct disordered behavior,

FELL-00000636

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 16

and the impact of his conduct disorder on others, he met criteria for **Conduct Disorder, Childhood Onset, Severe.**[5]

## ALCOHOL DEPENDENCE

Donald Fell's primary substance of abuse was alcohol, by all accounts of those who knew him well and spent time around him. A number of friends drank with him, and these social activities were part of a recreational lifestyle that he maintained, especially during his stay in different homes in the Wilkes–Barre area in his late teens.

Friends such as Matthew Cunningham and Bobby Lee commented on his high tolerance for alcohol. Lynn Roberts, his ex-girlfriend, observed that he would tell her that he could drink a case of beer without getting drunk. She adds that while she observed him drink alcohol on many occasions, she did not at any time experience him as drunk.

Mr. Fell continued to use alcohol despite his recognition of how it impacted the functioning of his mother and father. As a person who was referred to Al-Anon, and who participated in structured mental health care with alcohol related groups and education, he was aware of the variety of potential problems associated with alcohol. He may have experienced blackouts, but this could not be confirmed by any history of his presenting for medical attention.

Clearly, he showed more oppositional, more antisocial, and more drug seeking behavior that coincided with his heavier use of alcohol. His relative Jeanette Banas observed that when he drank, he would be silly, but would want to drink more.

Donald Fell did not demonstrate a withdrawal syndrome; there is no history of seizures, no morning shakes, and he did not require medical attention after incarceration removed him from the opportunity to ingest alcohol.

Notwithstanding claims of prodigious amounts of alcohol Mr. Fell has cumulatively consumed for years, his neuropsychological testing does not show evidence for damage from the chronic effects of alcohol abuse. There is, likewise, no evidence for any physical damage to Mr. Fell from alcohol use – be it gastritis, impotency, or hepatitis. His provided history is therefore not an accurate representation of what his body tells us.

Neither did he demonstrate any efforts to cut down his alcohol abuse. When alcohol was available to him, he drank, but he did not demonstrate a history of spending exceptional time obtaining alcohol. Lynn Roberts remembers him struggling to keep up

---

[5] Ibid. p. 99

FELL-00000637



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 17

at the carnival after having drank heavily the night before. However, employers like Jesse Williams who noted him to be drinking at night would also recall him to be working, often unaffected, the next day. "It didn't affect him with customers," recounts Mr. Williams. I would hear he was drinking after work, but he always looked the same to me."

Shawn Campbell and Jackie Sharp, with whom he lived, curtailed his alcohol use; by their account, he usually complied with their rules for him to restrict his alcohol intake – even when Shawn chose to drink alcohol. Likewise, Nancy Miggatulski, with whom he reportedly lived for approximately one year, promoted his alcohol and drug abstinence.

Mr. Fell enjoys how alcohol makes him feel. Rather than drinking more alcohol than he had intended, he likely at times did not drink as much as he would have wanted. His available history reflects little regret over his alcohol use.

Because Mr. Fell led a lifestyle of reliance upon others, he had little to forego for his alcohol abuse. Independent of his alcohol and other drug abuse, he exhibited little initiative for responsible school and work. He gave up and reduced interest in school and in compliance with structure and hierarchy at work because of his psychopathy.

Socially, Mr. Fell enjoyed sex and music; these activities, as well as his social circle, intertwined with his alcohol use. He has not demonstrated other social and recreational interests that were otherwise submerged by his alcohol use.

Given the above, Mr. Fell's diagnosis could, realistically, be **Alcohol Abuse**. The diagnosis of Alcohol Dependence is given, in this case, because of Mr. Fell's clearly compulsive pattern of alcohol use in late November 2000.

**Other Conditions Considered, But Not Present**

While some of the above symptoms may also be found in other conditions – impulsivity with Borderline Personality Disorder,[4] depressive spectrum disorders,[5] adult ADHD,[6] or Intermittent Explosive Disorder,[7] for example – Mr. Fell did not have these conditions at the time of the crimes.

Those with **Borderline Personality Disorder** may be responsible for dramatic and occasionally violent behavior.[8] Exquisitely sensitive to emotional issues of attachment

[1] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 706-710
[5] Ibid. p. 345-400
[6] Ibid. p. 85-93
[7] Ibid. p 663-667
[8] Ibid. p. 706-707

FELL-00000638

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 18

and separation, it is frantic efforts to avoid abandonment that may result in violence – which may be self-inflicted." There is no history of Donald Fell's pathological attachment to anyone; his emotional attachments are distinguished for his indifference to them. He does not have Borderline Personality Disorder.

Nor was Donald Fell suffering from a depressive condition at the time he participated in the three killings. Only hours before, Cindy Oberle recalled him enjoying a card game. The days before, he worked, without impairment. Erika Balestra recalled his anticipating Christmas, and eyeing a coffee table as a gift for his mother – only one day earlier. His notes demonstrated that he was enjoying his musical interests, learning German and Satanism, playing Dungeons and Dragons, and video games. Mr. Fell told Ms. Balestra that he was happy to have been given the gift of a Thanksgiving turkey by his new employer, Rutland Plywood.

Subsequent to the homicide, their was no evidence for his despairing; soon after destroying Ms. King and discarding her belongings, Mr. Fell and Mr. Lee returned to trawling for marijuana while returning to Wilkes-Barre, Chris Kolojeski, and the same activities they typically enjoyed with him. Fell mused to Mr. Kolojeski, contemplating using drugs, that he had nothing to live for; he had stated that before. Notwithstanding that comment, Mr. Fell then undertook a number of evasive initiatives with Mr. Lee, to keep them from being captured and to collect the monies to get as far away as possible. Ultimately, the two were caught because of Bobby Lee's driving, not any manifestation of hopelessness of Mr. Fell.

**Major Depression and Dysthymia** (minor depression) require a history of low mood most of the day, most days, along with the persistence of other symptoms such as a decline – from previous baseline – of initiative, energy, concentration, physical activity, sleep, self-esteem, appetite, or desire to live. For some, symptoms may present as excessive worry, irritability, and overeating. But there was no evidence for Donald Fell suffering a decline in his mood accompanied by other depressive symptoms.[10]

Mr. Fell does not meet criteria for **Intermittent Explosive Disorder**. This diagnosis describes people who become wildly destructive out of proportion to the provocation, and demonstrate profound regret upon realizing what they have done.[11] Mr. Fell and others describe numerous instances of his belligerence and destructiveness, as was his handiwork on November 27, 2000. However, his violent episodes have historically occurred in the setting of his feeling provoked, and giving people what he believes they deserve.

---

[9] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 707
[10] Ibid, p. 378
[11] Ibid, p. 664

FELL-00000639



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 19

In the instant offense, Mr. Fell's behavior leading up to and after the attacks was organized, coolly composed, and involved elaborate crime concealment. His attacks stopped not when a condition subsided, but when he believed his victims were finally dead. Furthermore, Mr. Fell displayed no signs remorse or sadness long after it was clear that he was calmed. He does not meet criteria for Intermittent Explosive Disorder.

Mr. Fell also presents a history of using a number of other illicit substances. On the night he participated in the killing of Charlie Conway, Debra Fell, and Terri King, Bobby Lee said that at the beginning of the night, he and Bobby Lee ingested crack cocaine residue on a pipe. No crack paraphernalia was found at the scene, however.

Furthermore, Mr. Fell reported that he used acid in a number of occasions; he did not report acid use that November 26-27, 2000 night, however. There is no evidence that he was affected in a detrimental way by either of those medicines; cocaine calmed Donald Fell down, by his account, and acid was enjoyable to him.

The only other substance that he was using during the period preceding the Vermont murders was marijuana. There is no evidence, however, that Mr. Fell failed to fulfill his responsibilities and experienced work, personal, or scholastic failures because of his marijuana use. Nor is there evidence for recurrent legal problems because of his marijuana abuse, use of marijuana in physically hazardous situations (such as a construction site). He was not known to have experienced any social or interpersonal problems as a result of his marijuana use. Therefore, while marijuana is the only drug that history reflects even remotely approaches the frequency of his use of alcohol, Mr. Fell does not meet criteria for **Marijuana Abuse.**[12]

In the late 1980's and early 1990's, when Donald Fell was school age, many children who demonstrated behavioral problems, including impulsivity, were treated for **Attention Deficit Hyperactivity Disorder (ADHD).** Donald Fell's record notes that he was calmed by the psychostimulant drug dextroamphetamine (Dexedrine). That history is consistent supports a diagnosis of ADHD.

On the other hand, there is no evidence for Donald Fell having problems of hyperactivity and inattention before age 7 – a requirement for the diagnosis.[13] Sharon Hinchey, Mr. Fell's kindergarten teacher, recalls him as a "sweet boy, so nice" who "loved school" and posed no behavioral problems as her student (1985-86 school year). Donald Fell's school records reflect no decline in his performance before age 7, and he was not referred for medical attention then, either. Because Donald Fell's

---

[12] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 199
[13] Ibid. p 92

FELL-00000640

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 20

behavioral and management became an issue for school and home at age 9 or later, he did not meet criteria for Attention Deficit Hyperactivity Disorder.

Any remaining question about whether Donald Fell had ADHD persisting into adulthood is resolved in the neuropsychological testing performed after his arrest. Attention and concentration show no impairment, and there are no soft neurological signs that associate with adult ADHD.[14]

Other treatments given Donald Fell include the major tranquilizers molindone (Moban) and thioridazine (Mellaril). Mental health staff noted thioridazine to have produced a more noticeable improvement in his symptoms (fighting and oppositional behavior); because of thioridazine's sedating qualities, that would suggest that conduct disorder was his primary problem.[15] Molindone reportedly calmed Donald Fell as well; sedating major tranquilizers will reduce agitation of any type (with the notable exception of anticholinergic delirium).[16]

When Depression was suggested as a possible diagnosis, the speed with which his anger and irritability resolved was not consistent with any antidepressant effects of dextroamphetamine – which does not effect depression treatment in days.[17]

The available history therefore supports my professional opinion that Donald Fell's most likely diagnosis in his earliest contacts with mental health professionals was Conduct Disorder.

Psychosis refers to disturbances of the following domains – reality (delusions or hallucinations), communications, cognition, emotions, and behavior.

Mr. Fell's history reflects no history of delusions - fixed, false ideas that he truly believes and organizes his life around.[18] While he has used hallucinogens and has subsequently seen things that others do not, at the time, there is no evidence that on November 26 and 27, he was seeing or hearing things that others do not see. Likewise there is no evidence for disorientation or the frank confusion of psychotic disturbances in cognition. His communication was clear enough to collaborate with Mr. Lee on an escape plan; there is no history of his psychotic communication.

---

[14] Fargason RE, Ford CV. (1994). **Attention deficit hyperactivity disorder in adults: diagnosis, treatment, and prognosis.** South Med J, 87:302-9.
[15] Stahl, SM (2000). **Essential psychopharmacology: Neuroscientific basis and practical applications.** Cambridge: University Press: New York, p. 271
[16] Kaplan HI Sadoff BJ, Grebb JA (1991). **Synopsis of Psychiatry: Behavioral Sciences Clinical Edition.** 7th ed.: Williams & Wilkins, p. 946-947.
[17]

[18] Kaplan HI Sadoff BJ, Grebb JA (1991). **Synopsis of Psychiatry: Behavioral Sciences Clinical Edition.** 7th ed.: Williams & Wilkins, p. 305

FELL-00000641