7A-AL-44453

21

back into the school or are dismissed altogether from a public school system.

MUSTO stated that when ROBERT LEE was at ALC, it was a different program altogether. At that time, there were only 40 students in the program; and since LEE's departure, the program has tripled in size. MUSTO stated that he is very doubtful that LEE would have survived the program the way it exists today; because, there is a zero tolerance for any students acting out at ALC. Students displaying destructive behavior are immediately cited and taken before a local District Justice. MUSTO advised that ALC is going back to a traditional grading system where students are graded on assignments, and classes are textbook oriented. Back in 1995 - 1996, when LEE was placed at ALC, it was the proper placement for him.

MUSTO recalled that ROBERT LEE always wore black attire. He wore a black leather jacket with a chain that attached to his black wallet, he wore black boots and pants, and had rough, thick black hair. MUSTO stated that LEE had a cold and sneaky personality and was more likely to be verbally confrontational than physically confrontational with students and staff. In MUSTO's opinion, LEE knew how to play the system and was never known for his academic prowess. MUSTO stated that LEE never removed his jacket in the classroom and was not a socially interactive student. It seemed that LEE was more of a loner, and the other students knew that you would not want to go near LEE because you would not know what you might get. LEE slept a lot in class, and it appeared as though he never got the appropriate rest at home. MUSTO advised that LEE picked his battles and was smart enough not to pick on anyone bigger than he. MUSTO recalled that after leaving ALC, LEE entered the ninth grade at WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 11, 2001:

GREG ELLSWORTH, Gym Instructor, ALC, REDACTED - FELL Street, Plains, PA, advised that he was familiar with both DONALD FELL and ROBERT LEE, as ELLSWORTH was head of the Physical Education Department at ST. MICHAEL'S SCHOOL, Tunkhannock, PA. ELLSWORTH recalled that ROBERT LEE resided at ST. MICHAEL'S much longer than DONALD FELL and was known to be a quiet kid with an occasional outburst. ELLSWORTH recalled that one particular teacher, named JIM BRESKY, took an interest in LEE and tried to help him. BRESKY is no longer at ST. MICHAEL'S and lives out of state. ELLSWORTH recalled that LEE was not a participant in many of the gym classes but at least he tried. In some ways, he was

7A-AL-44453

22

picked on by the other kids because he was fairly small for his age.  ELLSWORTH stated that he had a hard time believing that LEE was responsible for killing anyone because he was more on the quiet side.

ELLSWORTH stated that DONALD FELL was also a small kid when he encountered him at ST. MICHAEL'S.  At that time, FELL was only about 14 years of age and had a series of confrontations at ST. MICHAEL'S.  It appeared that FELL had many more friends than LEE and was only at ST. MICHAEL'S for about a one year period.

FELL-00001198

7A-AL-44453

23

WILKES-BARRE AREA SCHOOL DISTRICT
730 South Main Street
Wilkes-Barre, Pennsylvania (PA)   18711

On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

REDACTED - FELL   Dr. EDWARD BLACEJEWSKI, Director of Pupil Personnel, Wilkes-Barre, PA, 18711, telephone number 570-826-7121, provided the interviewing Agent with information concerning ROBERT JOSEPH LEE's academic attendance.  LEE's records revealed the following:

1986-1987 - LEE attended kindergarten at the CHESTER STREET SCHOOL, Kingston, PA.

September 1987-February 1988 - LEE attended the first part of first grade in Brooklyn, New York.

March 1, 1998-May 25, 1988 - LEE completed first grade at the FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA.

1988-1992 - LEE attended school in the TUNKHANNOCK AREA SCHOOL DISTRICT.

January 1992-March 1993 - LEE attended classes at the CHILDREN'S SERVICE CENTER SERVICE CENTER (MILFORD BARNES SCHOOL), 335 South Franklin Street, Wilkes-Barre, PA; LEE also attended ST. MICHAEL'S SCHOOL FOR BOYS, Tunkhannock, PA.

1993-1995 - LEE attended grade sixth and seventh at ST. MICHAEL'S SCHOOL FOR BOYS (Court Adjudicated).

1995-1996 - LEE's eighth grade was spent in the DALLAS ALTERNATIVE SCHOOL, Dallas, PA.

1996-1997 - LEE attended ninth grade at the Head Start Program, WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL, Wilkes-Barre, PA.

1997-1998 - LEE attended tenth grade at COUGHLIN HIGH SCHOOL but quit SCHOOL on his 17th birthday.

BLACEJEWSKI advised that psychiatric and psychological evaluations contained within LEE's special education file may be obtained through subpoena through the Custodian of Records, Dr. KOURY, 730 South Main Street, Wilkes-Barre, PA, 18711.

FELL-00001199

7A-AL-44453

24

CHILDREN'S SERVICE CENTER
 OF WYOMING VALLEY
335 South Franklin Street
Wilkes-Barre, Pennsylvania (PA) 18702
January 1992 - March 1993

On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

ANTHONY B. BLACK, Director of Non-Residential Services, CHILDREN'S SERVICE CENTER OF WYOMING VALLEY, 335 South Franklin Street, Wilkes-Barre, PA, 18702, telephone number 570-825-6427, extension 244, reviewed records pertaining to ROBERT JOSEPH LEE and shared the following results:

A review of LEE's academic folder disclosed that LEE attended classes at the MILFORD BARNES SCHOOL contained within the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY at 335 South Franklin Street, Wilkes-Barre, PA, during the period January 1992-March 1993. While at the school, LEE was assigned a psychiatrist, therapist, and counselor for a myriad of emotional problems he had. LEE was referred to the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY as a result of his volatile behavior at home and in school. LEE was prescribed psychiatric medication to assist him in his anger management and was observed in class to see how his medication affected his relationship with staff and fellow students.

BLACK advised that the MILFORD BARNES SCHOOL is a partial hospitalization program for students experiencing emotional and/or behavioral problems and who cannot function on their own. BLACK advised that during the 1992-1993 academic year, LEE lived with foster parents and was involved in the school's parent/counselor program. BLACK stated that LEE's folder also indicates that LEE had a visit in the FIRST VALLEY HOSPITAL, a psychiatric hospital located on Dana Street, Wilkes-Barre, PA. BLACK advised that due to the sensitive nature of the psychological and psychiatric reports found in LEE's file, release of this information can only be made through the appropriate court orders or by subpoena. BLACK advised that LEE continued, on an out-patient basis, to visit the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY to see his therapist. Other appointments were to review LEE's psychiatric medication, and follow-up homebound services were provided to LEE's home. Upon release from the MILFORD BARNES SCHOOL, LEE attended ST. MICHAEL'S SCHOOL, Hoban Heights, Tunkhannock, PA.

FELL-00001200

7A-AL-44453

25

EMPLOYMENT

HUMANIK CONSTRUCTION
56 Kado Street
Wilkes-Barre, Pennsylvania (PA) 18705
October 4, 1999 - December 24, 1999
March 20, 2000 - May 26, 2000

        On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

        JOSEPH HUMANIK, Owner, HUMANIK CONSTRUCTION, <sup>REDACTED - FELL</sup> Street, Wilkes-Barre, PA, 18705, telephone number 570-824-9438, was interviewed concerning his knowledge of DONALD R. FELL. HUMANIK reviewed employment records which reflected that FELL was hired on a full-time basis beginning on October 4, 1999, and extending to December 24, 1999. HUMANIK rehired FELL during the period March 20, 2000 - May 26, 2000. HUMANIK stated that FELL was hired as a construction helper, and his job responsibilities included the removal of roofing material so that a new roof could be applied and general clean up.

        HUMANIK stated that in approximately September 1999, he was in need of extra help at his construction business and visited the WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and was fortunate to hire a student on a part-time basis. The student was JESSE WILLIAMS who was hired to work the hours 12:30 p.m.- 4:30 p.m. In the morning hours, WILLIAMS attended classes at WILKES-BARRE VOCATIONAL TECHNICAL SCHOOL. HUMANIK stated that his business was going so well that he asked WILLIAMS if he knew of anyone who would be interested in full-time employment. A short time later, WILLIAMS arrived at work with his cousin, DONALD FELL. HUMANIK stated that initially, FELL was a good worker who did what he was told. Since FELL did not drive, HUMANIK often picked him up at the TURKEY HILL MINI MARKET near his residence and would drop him off at night at his aunt's house on East Chestnut Street, Wilkes-Barre, PA. HUMANIK stated that he never observed FELL using drugs or alcohol on the job and stated that he came to work straight. In conversations with FELL, he learned that there was a large age difference between FELL's mother and father; the father being older. FELL was raised without a father for most of his life. HUMANIK advised that FELL never had a good word to say about his father and never cared for his mother.

        HUMANIK stated that FELL had a bad disposition about everything. He described him as a Dr. Jekyll and Mr. Hyde

7A-AL-44453

26

personality and would definitely describe FELL as a troubled kid. HUMANIK advised that FELL started to argue all the time and would not take instructions. HUMANIK advised that even when he tried to do nice things for FELL, no thank you was ever received. HUMANIK stated that FELL was very cold hearted individual who had no regard for anything. On one occasion, one of his aunt's dogs was giving her trouble, and FELL supposedly took the dog in the woods and shot it. HUMANIK recalled that on the day after the event, FELL joked about killing the dog.

HUMANIK stated that FELL was a slightly built boy, yet came off as being a tough guy. Since he was not manly enough to confront a person face-to-face, FELL would often say or do things behind HUMANIK's back. HUMANIK emphasized the fact that there were good times with FELL. HUMANIK believed that there were times when he thought he had him in control; however, FELL's hot headedness would get in the way. HUMANIK stated that one of his wife's friends had a son who attended a drinking party with FELL. During the course of the evening, FELL picked up an iron frying pay and smacked the boy in the face. HUMANIK did not know the outcome of that episode.

In approximately May 2000, FELL started to miss work, a day here and a day there. Eventually, FELL missed three days in a row and showed up on a Wednesday afternoon demanding his paycheck. HUMANIK stated that he had FELL's check at his residence and not at the job which angered FELL. As HUMANIK was working on a roof, he overheard FELL say to his cousin, JESSE WILLIAMS, "I'll break his kneecaps." HUMANIK stated that FELL was fired because of his not showing up for work. HUMANIK explained that he attempted to find FELL when he did not show up for work. HUMANIK called his Aunt JACKIE looking for FELL, and she informed him that FELL was tangled up with a girl who was committed to a mental health facility. HUMANIK learned that FELL convinced the girlfriend not to return to the facility which angered his aunt, and she requested that he find a different place to live.

HUMANIK stated that he was not surprised to read in the newspapers that FELL killed his mother and others. Although not physically intimidating, HUMANIK stated that FELL was "not wrapped too tight," i.e. he had some psychological problems. HUMANIK stated that he was relieved that FELL left his employment because he became an unreliable worker, and HUMANIK had to be on him all the time to get work out of FELL.

FELL-00001202

7A-AL-44453

27

DJ CONCESSIONS
115 Willow Street
Wilkes-Barre, Pennsylvania (PA) 18702
June 1999 - August 1999
June 2000 - August 8, 2000

      On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

      JESSE WILLIAMS, Date of Birth August 4, 1982, Social Security Account Number REDACTED-FELL 5935, was interviewed at his residence, REDACTED-FELL Wilkes-Barre, PA, 18702, telephone number 570-822-7360. WILLIAMS advised that his mother, DONNA WILLIAMS, and DONALD FELL's mother, DEBORAH KOTZER FELL, were sisters. As kids, WILLIAMS and FELL grew up a block away from each other. WILLIAMS resided on West Chestnut Street, and FELL resided on East Chestnut Street, Wilkes-Barre, PA. WILLIAMS stated that FELL is approximately two years his senior; and when they were approximately six and eight years of age, respectively, WILLIAMS would see FELL several times a week in the neighborhood. WILLIAMS stated that in approximately 1996, at about the age of 14, FELL moved in with his Aunt JACKIE at REDACTED-FELL Street, Wilkes-Barre, PA.

      Prior to that time, FELL was living with his grandmother; however, upon her death, JACKIE SHARPE became FELL's legal guardian. WILLIAMS explained that FELL's mother was an alcoholic and could not function as a mother. WILLIAMS advised that in approximately 1980, at age eight, WILLIAMS and his mother moved to another part of the city; therefore, his contact with FELL was not as often. A short time later, WILLIAMS' family moved to West Virginia, and did not return to Wilkes-Barre, PA, for another six years. WILLIAMS recalled that when he returned to Wilkes-Barre, FELL was approximately 16 years of age and was attending the WILKES-BARRE AREA VOCATION TECHNICAL SCHOOL. WILLIAMS recalled that as a youth, FELL attended FLOOD ELEMENTARY SCHOOL, ST. MICHAEL'S SCHOOL, WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL, and COUGHLIN HIGH SCHOOL.

      WILLIAMS stated that FELL always had a bad temper even as a kid. It was not uncommon for him to use profanity, and he often bragged about his fighting prowess; however, WILLIAMS never observed him physically fighting with anyone. WILLIAMS described FELL as a biker wannabe and advised that FELL emulated the look of a biker, i.e. wore a flannel shirt around his waist, wore his hair long, often wore jeans with holes in them, and biker boots. If FELL did not wear a baseball cap, he would then wear a

FELL-00001203

7A-AL-44453

28

bandanna.  WILLIAMS stated that FELL had fairly poor hygiene and was slightly built.

WILLIAMS stated that FELL always displayed a cocky attitude and enjoyed partying with his friends.  WILLIAMS stated that he never hung around FELL's friends because they drank alcohol and did drugs which WILLIAMS is totally against. WILLIAMS stated that he is a member of STRAIGHT EDGE, a group that is anti-smoking, anti-drugs, and anti-alcohol.  During the course of the interview, WILLIAMS wore a STRAIGHT EDGE tee shirt. WILLIAMS was aware that FELL was a troubled individual.  It seemed that he was always in and out of trouble at school and in the home.  Through family conversations, WILLIAMS learned that FELL had once broken the wrist of his Aunt JACKIE with whom he resided.  WILLIAMS advised that other than ROBERT LEE, he did not know the names of FELL's friends and did not care to know them.

WILLIAMS recalled that FELL dropped out of school in the tenth grade in the spring of 1997.  In the fall of 1999, WILLIAMS was offered a part-time job while attending WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL by JOSEPH HUMANIK, owner of HUMANIK CONSTRUCTION, Wilkes-Barre, PA.  At that time, HUMANIK needed workers in his construction business, and WILLIAMS recommended FELL to him as a full-time helper.  WILLIAMS advised that FELL ended up quitting the job and once threatened to break HUMANIK's kneecaps if he did not get his paycheck.  During the summer of 1999, WILLIAMS hired FELL to help him with his traveling carnival show.  WILLIAMS stated that he contracted with S&S AMUSEMENTS to run his concessions in the traveling carnival. WILLIAMS advised that he ran the rat game which involves a rat running in a wheel and picking a particular color when it stops. FELL ran the goldfish game which involves throwing a ball toward a fish bowl, and if it lands in the bowl, a contestant wins a fish.  WILLIAMS advised that once FELL was fired from HUMANIK CONSTRUCTION in May 2000, WILLIAMS rehired him for the traveling carnival show.  WILLIAMS stated that FELL was hired in June 2000, and that they traveled to carnivals held in Allentown, PA; Honesdale, PA; Hereford, PA; Bath, PA; Philadelphia, PA; and Cementon, PA.

WILLIAMS stated that FELL brought along his friend, ROBERT LEE, and asked that WILLIAMS introduce him to members of the carnival so that he could obtain employment. WILLIAMS described LEE as a small framed individual with long curly hair and glasses.  WILLIAMS stated that LEE acted like FELL, i.e. displayed a cocky attitude, when in the company in FELL but was nicer when alone.  During the period June 2000-August 8, 2000, WILLIAMS hired LEE to run the quarter throw concession in the

FELL-00001204

7A-AL-44453

29

traveling carnival. WILLIAMS stated that he may have met LEE through FELL one or two years prior to hiring him but really paid no attention to him. WILLIAMS advised that initially both LEE and FELL were fairly good workers and helped him set up his concessions at each town. Eventually, both became mouthy, and it was difficult getting any work from them. WILLIAMS stated that he towed an equipment trailer behind his camper and used the camper to sleep in. Each evening, WILLIAMS would lock the door of his camper at a certain hour; and if FELL and LEE were not back, they would not sleep in the camper. Since FELL and LEE were prone to drinking alcoholic beverages, practically every evening, LEE ended up buying a tent for them to sleep in. FELL's sister, TERI, and his friend JOHN EAVARONE also accompanied him during the carnival run. WILLIAMS remarked that TERI FELL saved every paycheck that she earned and used the money to pay rent when she returned to the Wilkes-Barre area. LEE and FELL, on the other hand, spent the money as fast as they earned it.

WILLIAMS stated that FELL often spent his free time reading fantasy books that involved dragons and wizards. He also liked to listen to hard rock music. LEE listened to music and engaged in devil worship. Both FELL and LEE sported upside down cross tattoos on their bodies with the number "666". WILLIAMS knew that both were engaged in drug activity and would use anything they could get their hands on to include Ecstasy and crack cocaine. WILLIAMS stated that he did not observe them actually taking the narcotics but overheard their conversations the next day.

WILLIAMS recalled that at one carnival near Monticello, New York, FELL and LEE decided to travel to Woodstock, New York, after work. WILLIAMS advised against them doing so because they had to work the next day, but the two did not listen and ended up assaulting a man and were arrested. WILLIAMS stated that FELL and LEE used fictitious names during their arrest and were also in the company of TERI FELL. Although TERI FELL was not involved in the actual assault, the police detained her until a family member could pick her up. WILLIAMS stated that he had to travel to Woodstock to bail out FELL and LEE. Since he lost so much business, both individuals were terminated. Upon their return to Wilkes-Barre, TERI FELL resided with WILLIAMS during the months of October, November, and part of December 2000. She eventually ran out of money, and WILLIAMS asked her to leave. He did not know where TERI FELL is presently residing but knew that she had been living with friends in Falls, PA. DONALD FELL made plans that same summer to travel to Rutland, Vermont, and to live with his mother. WILLIAMS stated that FELL was fairly excited about the trip and took LEE with him. TERI FELL would call her to get

FELL-00001205

7A-AL-44453

30

updates on FELL's behavior and learned that FELL was being disruptive and abusive to his mother.

WILLIAMS recalled one episode in the same week when FELL and LEE were fired in New York. Members of the carnival were extremely upset because a cat had been found beaten to death. Although WILLIAMS did not know the true account, rumor had it that FELL and LEE had torn the cat apart. Another account was that they had played hockey with the cat. The cat belonged to one of the girls working at the carnival. WILLIAMS recalled that FELL walked with a fake limp when carnival workers were trying to find out who was responsible for the cat's death. FELL told everyone that his foot got run over by a car which WILLIAMS said was a complete lie.

On another occasion, prior to New York, WILLIAMS and LEE got into an argument, and LEE threatened to burn down WILLIAMS' camper. WILLIAMS was asked if he ever observed FELL in possession of a weapon. WILLIAMS stated that he observed FELL holding a rifle inside of his camper. WILLIAMS stated that he was extremely angry at FELL for carrying the rifle and asked him if he had a license to carry it. FELL said that he did but added that the gun was not loaded. WILLIAMS described the weapon as being black in color but did not know the caliber or type since he does not like guns. WILLIAMS warned FELL to keep the weapon out of sight which he did. No further conversation about the weapon occurred, and WILLIAMS never asked FELL where he got the gun.

Based upon his knowledge of FELL and his observations of LEE, WILLIAMS stated that he was not surprised to know that both were involved in a homicide. FELL once told WILLIAMS that he was going on a killing spree some day and would keep on killing until the cops killed him. WILLIAMS related that after FELL left JACKIE SHARPE's residence, in late spring 2000, he briefly stayed with WILLIAMS' mother, DONNA WILLIAMS, REDACTED-FELL REDACTED-FELL    Wilkes-Barre, PA, telephone number 570-822-7188, for a few weeks. WILLIAMS' mother resides with BARRY SEIWELL.

FELL-00001206

7A-AL-44453

31

NORTHEAST CONCESSIONS, INCORPORATED
C/O POCONO DOWNS
1280 Highway 315
Wilkes-Barre, PA   18702

On April 12, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

MARIO PISANO, Director of Food Services, NORTHEAST CONCESSIONS, INCORPORATED at POCONO DOWNS RACETRACK, 1280 Highway 315, Wilkes-Barre, PA, telephone number 570-825-6681, advised that he has been employed as Director of Food Services at the racetrack for approximately 15 years.  PISANO stated that he was not familiar with the name DONALD FELL and reviewed past records, as far back as 1997, and no folder was found on FELL.  PISANO called his former secretary, KIM, in the Accounting Department, and FELL's name was not found in any computer record.

PISANO stated that he has a good feel for every employee he has ever hired, and FELL's name just does not ring a bell.  PISANO stated that every employee, part-time or full-time, must obtain a license from the PENNSYLVANIA HARNESS RACING COMMISSION.  To that end, CHRISTINE ABRAHAM, PENNSYLVANIA HARNESS RACING COMMISSION, was called, and no record of a license was ever issued to DONALD FELL.

PISANO stated that if FELL were employed by him, it may be under an alias, because no record of a DONALD FELL was found.

FELL-00001207

7A-AL-44453

32

LAW ENFORCEMENT CHECKS

LUZERNE COUNTY JUVENILE PROBATION CENTER
280 North River Street
Wilkes-Barre, PA  18702

On April 6, 2001, JOHN COOKUS, Juvenile Probation Officer, provided the juvenile records for ROBERT JOSEPH LEE, JR., DOB REDACTED-FELL 1980, REDACTED-FELL 4689, home residence 25 Hurley Street, Wilkes-Barre, PA, and also the records of DONALD R. FELL, DOB REDACTED-FELL 1980, REDACTED-FELL 7294, home address 32 East Chestnut Street, Wilkes-Barre, PA.

LEE's first encounter with the Juvenile Justice System occurred in an informal adjustment made on August 18, 1992, wherein, LEE was charged with Criminal Mischief.  The charges were filed by Detective WAYNE COONEY and JOHN GONOS, WILKES-BARRE POLICE DEPARTMENT, Wilkes-Barre, PA.  LEE was placed under temporary supervision and had to cooperate with authorities by use of a random blood, breath, and urine test and to cooperate with the CHILDREN'S SERVICE CENTER and CHILDREN AND YOUTH SERVICES.  LEE's mother was listed as BONNY TONTI, Route 92, Harding, PA, and his father was listed as ROBERT LEE, 25 Hurley Street, Wilkes-Barre, PA.

A copy of LEE's juvenile history is attached hereto this report.

LEE's history with the Juvenile Justice System begins in August 1992, and extends to his arrest in Arkansas in 2000. LEE's first appearance before a Court of Common Pleas Judge occurred on January 31, 1996, with the charges of Aggravated Assault, Resisting Arrest, Criminal Trespass, Disorderly Conduct, and Criminal Mischief.  LEE was adjudicated delinquent of Aggravated Assault, Resisting Arrest, Disorderly Conduct, and Criminal Mischief.  The charge of Criminal Trespass was amended to define Trespass which LEE was found delinquent.  By order of Judge CHESTER MUROSKI, LEE was remanded to the LUZERNE COUNTY JUVENILE DETENTION CENTER for a full-scale psychological evaluation with final disposition at a later date.  Additionally, LEE was to pay all court-related costs immediately.  LEE's parents were also responsible to contribute towards the cost of their son's stay in detention in the amount of $20 per day.

LEE's file reflects that on February 14, 1996, LEE was found to be in need of treatment, rehabilitation, and

FELL-00001208

7A-AL-44453

33

supervision.   LEE was ordered to abide by rules and regulations in his probation supervision plan.

A psychiatric evaluation conducted by THOMAS L. D'ZMURA, M.D., Child Psychiatrist, CHILDREN'S SERVICE CENTER, dated August 19, 1994, reflected the following, some of which is paraphrased:

"ROBERT is now 13 years, 9 months old.   He has been seen on an emergency basis.   ROBERT was seen before on July 26, 1994.   At that time, ROBERT was in ongoing treatment at CHILDREN'S SERVICE CENTER. ROBERT was extremely angry at his mother, perceiving her favoring of his siblings, particularly his four year old half brother.   A past diagnosis for ROBERT included major depressive disorder; recurrent and severe; conduct disorder; organic brain disorder, and temporal lobe epilepsy were not to be ruled out.

The evaluating psychiatrist learned that ROBERT's younger brother told the mother that ROBERT had taught him how to masturbate and that ROBERT abused him sexually.   ROBERT's mother confronted him about this, and he became extremely angry, violent, and threatening murder of his mother and half brother. He acknowledged all of these things when talked to, but he seemed to feel no remorse about it.   It seemed impossible for him to step back and view his own behavior in an objective fashion.

A foster home was discussed and noted when done before, as a follow-up to his first meeting with ROBERT, ROBERT had been very aggressive towards younger children in that home.   He did not want to be hospitalized.   He has been hospitalized four times prior because of his violence.

RECOMMENDATIONS

ROBERT should enter into the hospital again.   His behavior is indeed dangerous, he seems to have no real appreciation of his potential danger to other people, and he seems to have no motivation to make positive changes in his behavior.   It seems to me that he is indeed dangerous and should be hospitalized for his own safety as well as the safety of other people.

In my review of the chart, it does not show that diagnostic possibility of temporal lobe epilepsy has been ruled out.   This particular diagnostic entity might well be present here in ROBERT's case, and I think it should be searched for diligently."

FELL-00001209

7A-AL-44453

34

A second and earlier psychiatric evaluation was conducted on ROBERT LEE on March 17, 1993, by Dr. CYRIL M.J. PUHALLA, Board Certified Child and Adolescent Psychiatrist. PUHALLA's evaluation, again paraphrased in some parts, reads as follows:

"ROBERT LEE is a 12 year, 4 month old, white male brought by his Parent/Counselor Program (PCP) counselor and father for an updated, routine psychiatric evaluation.

Since September 1992, ROBERT has been living in PCP foster care with the PARNELLs, adjusting well to this environment. ROBERT has been involved in most therapeutic divisions of CHILDREN'S SERVICE CENTER, including outpatient treatment, partial hospitalization, and home base intensive family services program.

ROBERT's medications include Mellaril, up to 100 mgs per day, and Clonidine to help with severe behavioral disorganization, cognitive disorganization, and aggressiveness.

ROBERT has presented in the past with an ADHD-type of syndrome that has been relatively unresponsive to the usual stimulant medications and Tricyclic anti-depressants.

ROBERT's father has collaborated that ROBERT can get quite destructive, aggressive, and dangerous to himself. His history includes four hospitalizations, three at WILKES-BARRE GENERAL, and the first being at FIRST HOSPITAL when much younger.

ROBERT's father is concerned because ROBERT has always been the child who has been "easily led by others" and most recently has verbalized his obsession with sexual things. ROBERT's father reports that ROBERT says inappropriate sexual remarks to women and, on at least one occasion, brought home an audio tape that had inappropriate sexual music or verbal material on it.

The father describes his son as easily provoked by minor stresses, having excessive amounts of energy, and being explosive. The father denies mental history but through collateral references it became clear that the father, himself, admits to having an explosive temperament at slight provocation but never to the extent that ROBERT or his brother, SHANE, demonstrate.

ROBERT's father is hoping that once ROBERT is out of the PCP, he could be reunited with ROBERT and SHANE. The father

FELL-00001210

7A-AL-44453

35

plans to get a full-time nanny, at least during the daytime, to watch the boys when he is at long hours of work where he is the manager of a trucking company.

ROBERT's father is concerned about ROBERT's relationship with SHANE. He is very envious and has a jealous-type relationship that goes back to his earliest of childhood. At age three, the father vividly recalled ROBERT knocking SHANE out with a glass ashtray. SHANE was taken to the hospital and evaluated for a broken scull. The father has had problems in the past complying with the treatment recommendations, including his involvement in a Home Base Intensive Family Services Program; however, over the last one or two months, the father has become more compliant to our treatment recommendations.

ROBERT, age 12, presently attends ST. MICHAEL'S SCHOOL and is on Mellaril for aggressiveness and destructiveness. There is a 9 year old boy who has been adopted by the biological mother's new husband with whom he now lives. There is a heavy history of a biological-type of depression on the mother's side of the family with the biological mother being hospitalized at least three times for depression with suicide attempts and needing medication.

MENTAL STATUS EVALUATION

ROBERT's mother stated having a severe depressive illness when ROBERT was about four years of age. Even on his Mellaril and Clonidine, one could see that ROBERT barely has control of his aggressive drives and cognition; and if not continuously directed and helped to keep on track, he becomes circumstantial and tangential. More clinical observation needed to see if, in fact, his associations become loose enough to be considered diagnosed and illogical and to have a formal thorough process disorder.

In the past, some of his behaviors, which he admits to, include being aggressive, setting fires, and destroying property, do indicate he can have severe conduct problems that he engages in by himself. He is entering the early stages of puberty. He was open with his examiner in discussing some concerns and issues he has about his burgeoning sexuality and, in some ways, presented inappropriately, again almost hypo-manic in nature. He had very little insight into his problems; and by history, he shows poor social judgement.

FORMULATION

FELL-00001211

7A-AL-44453

36


        ROBERT brought in by KIM MARTINI, PCP, and his biological father.  ROBERT has had an extensive psychiatric history with four hospitalizations because of depression and severe aggressive behaviors.  He has done poorly in all treatment modalities and on all medications.  He is only maintaining tenuous control of his aggressive and newly found sexual drives. At times, he feels like he is two people and may, in fact, be having disassociative experience.  He may have other psychotic symptoms such as cognitive and behavioral disorganization to the point where he loses touch with reality, and can be collaborated by recent projective testing.  He has a history of being involved in severe conduct problems, including being physically aggressive, destructive to property, and setting fires.  He admits to impulses of wanting to runaway but is free of any present suicidal/homicidal ideation, intent, or plan.  The heavy family history of depression with psychosis on the biological mother's side of the family and perhaps some schizoid tendencies; and dad has known, himself, to have an explosive temper and to somatize his anxiety, depression, and aggressiveness into physiological illnesses, such as a chronic "ulcer" problem.  Dad, in some ways, is too optimistic about the future, believing he will do well with ROBERT and SHANE, two very aggressive boys, who require anti-psychotic medications and a nanny to watch them during the day.  When explained to the dad about this and tried to explain the reality of the situation that even under those circumstances, it still may require another very special kind of person to help understand and control these young men, dad seemed not to hear or understand my concerns or understand the seriousness, depth, and nature of both of his sons' mental health issues.

DIAGNOSIS

ACCESS I.  296.23-Major Depression Disorder, recurrent, severe, with psychotic features.

        312.00-Conduct Disorder, solitary aggressive-type.

ACCESS II.  None.

ACCESS III.  Presently, physically healthy.
             R/O organic brain disorder caused temporal lobe
             epilepsy (partial complex seizures) or other central
             nervous system disorders.

ACCESS IV.  Moderate.

ACCESS v.  CGAF:  35, highest in last year - 45.


FELL-00001212

7A-AL-44453

37

## RECOMMENDATIONS

ROBERT needs to remain in his present PCP home and receive ancillary outpatient treatment and remain in his partial hospitalization program. In the future, as he grows, it is likely that he will need an increase of his neuroleptic medication, perhaps a mood stabilizing medication, such as Lithium, Tegretol, or Depallote. There should also be given consideration to moving to a higher potentency neuroleptic, if there is a further deterioration and clear cut psychotic symptoms. At present, he presents almost hypo-manic nature and barely controlling his aggressive and newly found sexual drives. He shows some control in a structured situation and is showing no side affects, such as tardive dyskinesia eps from his neuroleptic medication. Further clarification needs to be gotten about the automaticity of his aggressive outbursts; and if a sleeping and awakening EEG has not been done, perhaps it should be considered to rule out some central nervous system problems, such as partial complex seizures as contributing to his behavioral discontrol, disorganization, and aggressive disruptiveness."

Contained within LEE's juvenile probation record was a day treatment discharge summary from ST. MICHAEL'S SCHOOL. The period covered was from September 19, 1994-August 15, 1995. LEE's date of arrival was May 25, 1993, and date of readmission was September 19, 1994. The referring agency was listed as the LUZERNE COUNTY CHILDREN AND YOUTH SERVICES. The day treatment discharge summary is as follows:

## "MEDICATION

Upon his readmission to ST. MICHAEL'S Day Treatment Program, ROBERT was taking 125 mgs of Mellaril, QHS, Clonidine .1 mgs, B.I.D., and Dexedrine 5 mgs. The Dexedrine was discontinued, Clonidine lowered to .1 mg, B.I.D. (noon and 3:00 p.m.), and Mellaril lowered to 50 mgs.

## EDUCATION STATUS

Upon readmission, ROBERT was placed in the seventh grade curriculum, EL3 Class, with ST. MICHAEL'S program. He was promoted to the seventh grade prior to discharge on June 17, 1994. During the past school year, he was able to demonstrate significant progress academically. He was placed on the honor roll, two out of four quarters, and was nominated one of twenty "students of the year" from all of ST. MICHAEL'S population. It is recommended that ROBERT return to a public school setting.

FELL-00001213

7A-AL-44453

38

PRIORITY NEEDS

Need #1 - BOB needs to respect the rules of authority figures and consistently use appropriate language.

Need #2 - BOB needs to identify and verbalize feelings regarding family relationships.

Need #3 - BOB needs to complete all class work.

*All needs addressed during treatment.

SECONDARY NEEDS

Need #4 - BOB needs to consider part-time employment. *Need met.

Need #5 - BOB needs to verbalize feelings and participate in individual counseling and possible involvement in the Sexual Offenders Program through CHILDREN'S SERVICE CENTER. *Need not met.

Need #6 - BOB needs to focus on and improve independent decision making skills.   #Need partially met.

Need #7 - BOB needs to be made aware of and discuss family feelings/concerns of father's current illegal status. #Need unmet.

EXTERNAL NEEDS

Need #8 - BOB needs to participate in an evaluation through the Adolescence Sexual Offenders' Program (ASOP) at CHILDREN'S SERVICE CENTER.  *Need unmet.

Need #9 - BOB needs to participate in a drug and alcohol evaluation through CATHOLIC SOCIAL SERVICES (WB Office). *Need unmet.

SUMMARY OF CHILD'S PROGRESS AND ADJUSTMENT

While in the Day Treatment Program, BOB's attitude and interactions with peers fluctuated.  BOB has been involved in a few altercations with peers, but these have been addressed with BOB in individual counseling sessions and have not repeated themselves.  He seems to take confrontation by staff as persecution and externalizes blame for many of his inappropriate and negative behaviors on others.  He seems to relate to younger

FELL-00001214

7A-AL-44453

39

peers better than older ones as evidenced by the peer group with which he selects to associate.

Throughout his placement, BOB generally maintained appropriate levels within ST. MICHAEL'S behavioral system. Within the Day Treatment Program, BOB basically follows the rules and staff directions. At times, he demonstrated verbal outbursts when confronted on rule infractions but, generally, was appropriate. These outbursts mainly occurred when he felt as if he was being treated unfairly. Upon discharge, BOB will remain in the care of Mr. ROBERT LEE and reside at 25 Hurley Street, Wilkes-Barre, PA. He will return to a public school setting and follow all the after care plans established by ST. MICHAEL'S and the referring agency.

AFTER CARE

Records will be forwarded to PLAINS JUNIOR HIGH SCHOOL.

COUGHLIN may be the most positive setting for the 1995-1996 academic year.

BOB will remain involved with LUZERNE COUNTY CHILDREN AND YOUTH SERVICES.

BOB will participate in and complete a drug and alcohol evaluation through CATHOLIC SOCIAL SERVICES.

BOB will participate in the Youth Advocate Program."

A psychological evaluation conducted by LENORA HERRMAN FINN, PhD, Clinical Psychologist, Director of Assessment, CHILDREN'S SERVICE CENTER, Wilkes-Barre, PA, was completed on February 5, 1996, and reads as follows:

"INTERVIEW OF ROBERT LEE, SR.

Mr. LEE is bitter and angry, reports that BOB's biological mother divorced him sometime prior to 1986. He believes that the ex-wife used the kids against him and brought charges just to get at him. Both parents may have made allegations of abuse and alcohol and/or involvement. ROBERT and his older sibling, SHANE, 16, were cared for by the paternal grandmother from 1986-1987, while Mr. LEE was a truck driver. From 1988, until late spring 1995, both boys resided with Mr. LEE, until his ex-wife obtained court custody. After 15 days with his mother (now remarried) and his four younger half brothers, ROBERT was accused of sexually molesting one of his

FELL-00001215

7A-AL-44453

40

half siblings and was hospitalized at the WILKES-BARRE GENERAL HOSPITAL, Adolescent Psychiatric Unit.  ROBERT has also been hospitalized on four or five prior occasions at WILKES-BARRE GENERAL HOSPITAL or FIRST HOSPITAL WYOMING VALLEY.  The father claims that ROBERT has been hit eight separate times by cars.  He just rides into the street.

ROBERT has attended at least six schools to include MAIN STREET, DAN FLOOD, NYC, ST. MICHAEL'S, and the Alternative Education Program, Dallas, PA.

Mr. LEE recalls that ROBERT first demonstrated violent behavior at age four-five when he "beat up" his Head Start teacher.  Expelled from public school in NYC for overturning desks, ROBERT threatened his principal at DAN FLOOD with some type of letter opener.  He has runaway for one week with a female youth and has been accused of shoplifting at least ten times at TURKEY HILL, FAY'S, POCONO DOWNS, PRICE CHOPPER, etc.  Most recently, ROBERT assaulted a Plains police officer, claiming that the officer first slapped his face for vulgar language during transport to the police station following a trespassing charge.

RECOMMENDATION

ROBERT's extensive past psychiatric history, explosive anger, alcohol abuse, chaotic family background, and alleged sexual molestation of his younger half sibling, all speak to the need for an updated psychiatric evaluation."

On August 19, 1994, ROBERT LEE, JR. was admitted to the care of Dr. FEUSSREN, Psychiatrist, and was dismissed on September 16, 1994.  The results of Dr. FEUSSREN's evaluation are as follows:

"ADMITTING DIAGNOSIS

Major depression with psychotic features.

Hyper-kinetic conduct disorder.

Atypical bi-polar disorder.

DISCHARGE DIAGNOSIS

Major depression with psychotic features.

Hyper-kinetic conduct disorder.

FELL-00001216

7A-AL-44453

41

Personality disorder traits.

Atypical bi-polar disorder.

REASON FOR REFERRAL

Actions and furtherance of homicidal and suicidal ·threats.

SUMMATION

ROBERT's four year old half brother, GEORGE, describes oral and anal sex with ROBERT.  ROBERT denies the oral and anal sex but admits to showing GEORGE how to masturbate.  ROBERT becomes angry and threatens to kill GEORGE, saying that he "blows things up" or exaggerates things.  He grabbed GEORGE by the throat and banged his head against the wall.  His parents stopped him, he threatened to shoot the mother and stepfather, and to cut their throats at night while they slept.  He described how he would cut their throats and how he could blow up their house with pipe bombs.  ROBERT admitted to all these things to the emergency worker but still denied oral and anal sex.

ROBERT and his one year older brother SHANE have been shuffled from one parent to the other since 1985, when the parents divorced.  The mother has a history of psychiatric treatment and suicidal behavior.  There is a six month old sister who died of Sudden Infant Death Syndrome.  A nine year old brother currently lives with the mother.  ROBERT was placed in a foster home for one and half years. Upon his return to the father in 1991, he was admitted to FIRST HOSPITAL for Active Violence, such as setting two fires in the house, attempting to stab the school principal, and acts of vandalism at the school.  He was discharged on 25 mgs of Thorazine, three times a day, which the father said helped to control the behavior.  At that time, ROBERT was age nine.  At the CHILDREN'S SERVICE CENTER, partial hospital, we tried medications for hyperactivity such as Ritalin and Tofranil which also worked well at that time.  His full-scale IQ was 100.

ROBERT was admitted to the WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on March 25, 1992, from the CHILDREN'S SERVICE CENTER, partial hospital, where he scratched teachers, damaged furniture, and tried to stab peers with a knife, and had to be physically restrained on the floor to prevent resuming such behavior.  He had been drawing pictures of a girl in his class having sex with animals.  ROBERT was admitted to WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on May 4, 1992, for beating up

7A-AL-44453

42

an eight year old boy very severely who had wanted to ride his bicycle. After being scolded by his father, ROBERT reacted by "trashing his room" and threw everything in the middle of the floor. The father was afraid of the severe temper tantrums ROBERT was having, during which ROBERT lost control of himself and became extremely violent. The father was afraid he might seriously hurt one of the younger children in the neighborhood.

ROBERT was again admitted to the WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on September 11, 1992, for fighting with his brother, SHANE, and for hitting younger children in the neighborhood. He had been attending CHILDREN'S SERVICE CENTER, partial hospital, where he was frequently aggressive towards peers and staff. He cried profusely and showed severe mood swings from anger through depression to silliness. He was always calmed down by the 25 mgs of Mellaril. He had to be admitted to the hospital when he refused to take Mellaril, and the severe behavior continued.

After his discharge from his last hospitalization at the WILKES-BARRE GENERAL HOSPITAL on September 28, 1992, he was placed at a PCP foster home, administered by CHILDREN'S SERVICE CENTER. While at the home, he showed improvement on his medications. He did attend the CHILDREN'S SERVICE CENTER for most of the year and was eventually transferred to a public school. He also spent a year of time at ST. MICHAEL'S, Day Program, which also had been attended by his older brother, SHANE, who did very well there. ROBERT did well there as long as he took his Mellaril and Clonidine.

In June 1994, ROBERT and SHANE were suddenly transferred to the custody of the biological mother. The mother had been wanting for the opportunity to take the children for years and finally jumped at the chance; and apparently, there is no objection by the father. At first, the mother questioned whether ROBERT and SHANE should be receiving any medications at all. She stopped SHANE's medicine altogether and, at first, was inconsistent in giving ROBERT his medications. Towards the end of the summer, the mother was requesting whether ROBERT's medications could be raised. She learned violent, impulsive, and dangerous ROBERT could be when unmedicated. The Clonidine increased to three times a day. A home base treatment team of the CHILDREN'S SERVICE CENTER called when the parents had the problem of GEORGE describing sex acts by ROBERT. The team will continue to be involved with the family after ROBERT's discharge."

FELL-00001218

7A-AL-44453

43

A discharge summary from the YOUTH SERVICES OF BUCKS COUNTY was found in LEE's folder.  The report was written by G. YEAGER.  The date of the intake was June 3, 1998, and LEE's discharge date was August 1, 1998.  According to Probation Officer STEVEN ADAMCHICK, ROBERT LEE was ordered to spend time in the Adventure Challenge Program which ADAMCHICK described as a camp setting to turn delinquent youth around.  The following is the counseling observation from G. YEAGER:

"ROBERT has developed a consistent pattern of negative interaction with others since his arrival.  Although he possesses potential, he is dramatically lacking in social skills with even simple chores and physical training that require a minimal amount of interaction.

This client's skill deficit has become so problematic that at present he lacks not only the social skills but also sufficient, positive relations with both staff and clients to engage him in the potent benefit available from the group oriented therapeutic design of the **ADVENTURE CHALLENGE PROGRAM**. In fact, at present, it has become routine to isolate ROBERT in order to minimize the risk he presents to himself and others. Initially, this was done to provide opportunities for ROBERT to compose himself and for staff to process his outbursts with the rest of his group.  However, unlike other clients, ROBERT's attitude grew worse with each new episode.  It has become apparent that this client is not only willing to challenge the limits of our behavioral expectation, he actually enjoys the attention he receives from violating them.

Consequently, it is the consensus opinion of the staff that ROBERT LEE is no longer appropriate as a client at Adventure Challenge.  Treatment goals should include helping ROBERT learn to take responsibility for his behavior, learning basic social skills, coming to terms with his life circumstances, and making the best of opportunity."

LEE's record at the JUVENILE DETENTION CENTER is approximately four inches thick.  On December 11, 1996, LEE was found to be delinquent and was committed to the Diagnostic Program at ST. MICHAEL'S under the supervision of LUZERNE COUNTY CHILDREN AND YOUTH SERVICES and the Juvenile Probation Department.  On February 5, 1997, LEE was discharged from ST. MICHAEL'S Diagnostic Program and was committed to ST. MICHAEL'S Residential Program effective February 5, 1997.  On June 12, 1997, LEE was released from ST. MICHAEL'S into his father's custody.  He was placed on parole for an indefinite period of time and must participate in ST. MICHAEL'S Weekender Program on

FELL-00001219

7A-AL-44453

44

July 25, August 22, and September 26, 1997. He was also ordered to attend A&A/NA meetings, have random blood, breath, and urine tests, plus pay court costs. On August 20, 1997, an amended court order from June 12, 1997, released LEE into the custody of his father and was placed on probation for an indefinite period of time.

On June 2, 1998, LEE was charged with Possessing Instruments of Crime. He was remanded to the LUZERNE COUNTY JUVENILE DETENTION CENTER for further planning/placement. On June 3, 1998, LEE received a hearing and was committed to the Adventure Challenge Treatment Program, ordered to pay restitution, and was placed on probation and supervision. On August 4, 1998, LEE was released from the Adventure Challenge Treatment Program. He was remanded to LUZERNE COUNTY JUVENILE DETENTION CENTER for further planning and/or placement. On August 10, 1998, LEE was committed to the Youth Forestry Camp #3 and was to be returned to the JUVENILE DETENTION CENTER upon completion of the program. On February 18, 1999, LEE was released from Youth Forestry Camp #3; no probation/supervision.

A complaint filed on October 20, 1994, by NANCY SMITH, Juvenile Officer, reported that ROBERT LEE was charged with three counts of Deviant Sexual Intercourse against his half brother, GEORGE TONTE, JR. The incident occurred between June 14-August 18, 1994. LEE shoved his finger into the victim's rectum even after the victim told LEE to stop; then LEE shoved his penis into the victim's rectum. The complaint was withdrawn on December 30, 1994, as the police requested informal disposition. It was believed that the victim being five years old would not be cooperative in prosecution. The charges were resolved by way of informal disposition which were approved on November 18, 1994.

In a complaint filed on December 22, 1993, by Mr. ED CASELLA, 28 Hurley Street, Wilkes-Barre, PA, ROBERT LEE took Christmas lights from CASELLA's home and smashed them in the driveway. On January 14, 1994, Magistrate MARTIN KANE sentenced ROBERT LEE, JR. to pay $170 for Deviant Trespass, Docket #NT-0001276-93.

According to the LUZERNE COUNTY JUVENILE PROBATION DEPARTMENT records, DONALD FELL, white male, DOB April 30, 1980, SSAN 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, first became known in the Juvenile Justice System through an informal adjustment on December 13, 1993. On that occasion, FELL was charged with Failure to Pay Fines/Costs (Disorderly Conduct) by District Justice 11-308. FELL was placed in temporary supervision and was to cooperate with random blood, breath, and urine testing and to cooperate with CHILDREN AND

FELL-00001220

7A-AL-44453

45

YOUTH SERVICES, CHILDREN'S SERVICE CENTER, and school officials.
A copy of FELL's summary sheet is attached hereto this report.

On December 5, 1995, in an informal adjustment, FELL
was charged with non-payment of fines, filed by Magistrate DIANE
MALAST.  FELL was ordered to pay $50 in restitution and $10. In
an informal adjustment, dated April 16, 1996, FELL was charged
with TERRORISTIC THREATS.  This was filed by Officer WASLOWSKY of
the Wilkes-Barre Area School District.  FELL's first court
appearance occurred on September 13, 1996, where he was
adjudicated delinquent by Judge GIFFORD CAPPELLINI.  FELL was
charged with terroristic threats and was released into the
custody of his aunt, JACKIE SHARPE; placed on probation for an
indefinite period of time; was to report to his probation officer
twice a week; cooperate with a court advocate program; follow
all recommendations; and pay all court-related costs immediately.
FELL was not to apply for an operator's license without
permission of the court.

On March 28, 1996, FELL entered Mr. KOZERSKI's class at
the WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and threatened
to stab him.  Mr. KOZERSKI subdued him, and FELL said he was
going to come back and kill him.

FELL's records indicate that he was admitted to ST.
MICHAEL'S, Diagnostic Intake Unit, Purcell Place, by CHILDREN AND
YOUTH SERVICES on April 8, 1994.  At that time, he was 13 years
old.  FELL's initial intake synopsis is as follows:

"DONALD comes from a very dysfunctional family.  He was
residing with his mother, DEBRA, and sister, TERI.  When DONALD
was fined for truancy from school, his mother did not pay the
fine so she was placed in jail.  The children were placed with
the maternal grandmother but stated that she could not care for
DONALD due to the out of control behavior he was displaying.

DEBRA and her mother resided in a side-by-side duplex
which the maternal grandmother, THERESA SHARPE, owns.  When her
daughter was placed in jail, she had the home condemned.  The
home was infested with rats, cockroaches, and mice.  The home was
filthy, had litter, feces, and beer cans scattered in the living
room.  Mrs. SHARPE stated that DEBRA's home was in this shape for
two years.

It should be noted at this time that there were
numerous inconsistencies in DONALD's care.  Mrs. SHARPE called
CHILDREN AND YOUTH weekly about the conditions that the children
were living in, and she expressed personal anger toward CHILDREN

FELL-00001221

7A-AL-44453

46

AND YOUTH SERVICES of Luzerne County. However, Mrs. SHARPE refuses to take responsibility for the condition her grandchildren were living under on the property she owns. DONALD has had a long history of mental health interventions, including hospitalizations. He was hospitalized at FIRST VALLEY in 1992, for out of control behavior and suicidal ideation. Mrs. SHARPE's home was very neat and clean in its appearance. Mrs. SHARPE stated that her son-in-law used alcohol regularly. The children were sexually abused; and on one occasion, he stabbed DEBRA during a drinking binge.

In an interview of DONALD, he claimed both parents beat him. The last school that he attended was PLAINS JUNIOR HIGH SCHOOL. He was repeating seventh grade, was chronically truant, and ungovernable when he was there. His grades were poor mostly due to him not paying attention and refusing to do the work.

SPECIAL CONCERNS

DONALD is a very confused young man. He has acted as his own caretaker for sometime and is not readily acceptable to help. His mother's drinking upsets DONALD. DONALD's grandmother, THERESA SHARPE, made allegations that DONALD was sexually abused by a babysitter and by DEBRA FELL's boyfriend, but DEBRA did nothing about it.

IMPRESSIONS

DONALD needs supervision and structure. He has to address issues surrounding alcoholism, truancy, and aggression. It is recommended that DONALD remain in a residential care unit until custody can be given to his grandmother or until his mother's situation becomes stable. DONALD will attend drug and alcohol counseling and individual therapy, as well as attend school on campus.

DONALD's parents were married on November 10, 1979. They separated after ten years of marriage and have two children, DONALD and TERI. Both parents abused alcohol and raised the children in a dysfunctional home. FELL abused his wife, and the police were called often to their home for domestic violence. At age six, DONALD's parents stabbed each other during a fight."

This assessment was written by MARK INNOCENZI, Social Worker.

On April 18, 1994, in the Court of Common Pleas of Luzerne County, Juvenile Division, it was ordered by the

FELL-00001222

7A-AL-44453

47

Honorable CHESTER B. MUROSKI, Juvenile Court Judge, that LUZERNE COUNTY CHILDREN AND YOUTH SERVICES and the JUVENILE PROBATION OFFICE shall share case management for the cost of placement OF the minor child, DONALD FELL.  Temporary legal custody of TERI FELL was transferred to her maternal grandmother, THERESA SHARPE. It was ordered that DONALD FELL be enrolled in ST. MICHAEL'S SCHOOL for a 30 day diagnostic evaluation.  The natural mother, DEBRA FELL, shall undergo a comprehensive drug and alcohol induction as arranged by LUZERNE COUNTY CHILDREN AND YOUTH SERVICES.  The natural mother and minor children, DONALD and TERI FELL, shall undergo comprehensive medical evaluations as arranged.

On May 28, 1993, DONALD FELL was cited by JAMES MURPHY, Home/School Visitor, Wilkes-Barre Area School District, for Disorderly Conduct.  FELL directed obscenities at a classroom teacher and walked on table tops in the cafeteria.  He was fined $375 by Magistrate DIANE MALAST on October 30, 1993.  An informal adjustment was entered on December 13, 1993, as FELL was already under the supervision of CHILDREN AND YOUTH SERVICES and the JUVENILE PROBATION DEPARTMENT.

FELL's juvenile probation records indicated that on September 16, 1996, an evaluation was written by LISA M. RANDAZZO, Drug/Alcohol Treatment Specialist, Court Advocate Program.

The evaluation was to determine the existence of a drug and/or alcohol issue, and recommendations were completed on DONALD FELL on September 11, 1996.  Diagnostic tools utilized in this evaluation consisted of administration of the Western Personality Inventory (WPI) and Alcohol Use Profile (AUP), a psycho-social assessment supplied by DONALD and an Adolescent Problem Severity Index (APSI).

"DONALD reported his first experience with alcohol occurred at age eight.  He reported drinking beer from a tap when serving beer to adults in his home.  DONALD reported regular use of alcohol began at age 13.  DONALD stated that he consumed one 12 pack of beer daily and one-fifth of rum on weekends for one and a half years.  DONALD stated that he also drank unknown amounts of alcohol on a binge basis during this time period. DONALD reported achieving an intoxicated state during each drinking episode.  DONALD reported his last use of alcohol occurred in April 1994.

DONALD report he began to use marijuana (THC) at age 13 on a daily basis.  DONALD reported unknown amounts of THC smoked

FELL-00001223

7A-AL-44453

48

daily and binged use of THC on weekends. DONALD stated he did not use THC from April 1994 to August 1995, due to an out of home placement. However, DONALD admitted he returned to almost daily and weekend usage of THC since the winter of 1995. DONALD reported he has noticed a significant decrease in the amount of THC currently smoked when compared to the amounts smoked prior to April 1995. DONALD was unable to give specific amounts of THC used. DONALD reported his last use of THC occurred on July 4, 1996.

DONALD reported he experimented two times with LSD at age 13. He denied further use of this drug.

Scores on the WPI correlate with those who are prone to abuse alcohol. Scores on the AUP revealed a profile associated with alcoholism-denied.

From the information collected from DONALD, it is apparent he has a current THC abuse problem. He may also have a current alcohol abuse problem although he has denied use of alcohol since April 1994. It is my opinion DONALD is minimizing his use of alcohol and THC.

It is recommended that DONALD be tested by the JUVENILE PROBATION DEPARTMENT on a random basis and participate in drug/alcohol counseling at the Court Advocate Program with continued monitoring for in-patient drug/alcohol treatment."

In a letter, dated September 9, 1996, LISA RANDAZZO informed ROBERT ROMAN, Juvenile Probation Supervisor, that DONALD FELL did not attend appointments at the Court Advocate Program on August 21, August 22, September 3, and September 5, 1996. As a result, on September 10, 1996, FELL was lodged in the JUVENILE DETENTION CENTER for Failure to Cooperate. On September 12, 1996, FELL was released on probation.

In a Court of Common Pleas Court Order, dated December 11, 2000, the JUVENILE PROBATION DEPARTMENT's recommendation for DONALD FELL was commitment into the YOUTH SERVICES AGENCY OF PENNSYLVANIA at Camp Adams. This was recommended because continuation in his residence would be contrary to the welfare of the child and said placement was necessary because reasonable efforts were made prior to the placement to prevent or eliminate the need for removal of this child from his home. Currently, it was hereby ordered that the case of DONALD FELL be closed, as he was detained in the State of Vermont on three counts of murder. Failure to pay fines and costs levied by a District Justice in the amount of $228.50 filed

FELL-00001224

7A-AL-44453

49

on April 20, 1999, by Martin Kane was also nol-prossed resulting from FELL's arrest in Vermont.

On April 6, 2001, ROBERT CHARLES NILON, Juvenile Probation Officer, REDACTED-FELL Wilkes-Barre, PA, 18702, was interviewed regarding his knowledge and dealings with DONALD R. FELL. NILON advised that he has been a Juvenile Probation Officer for 29 years and had DONALD FELL under his supervision for approximately a four month period in approximately 1994. NILON stated that FELL was respectful to him and was quiet in his presence. He recalled that FELL never ran the streets but was always at home. NILON stated that FELL could never give him a reason why he did not show up for school, but FELL just did not want to leave the house. During the period that NILON was supervising FELL, he was residing with his mother on East Chestnut Street, Wilkes-Barre, PA. At that time, NILON never recalled FELL to be using drugs or possessing any weapons. He was approximately 14 years of age during his supervision. FELL, at that time, was classified as a school refusal; and after a short period of supervision, the school basically handled FELL's attendance problem. During the short time that NILON supervised FELL, he noticed minimal progress with FELL's truancy. NILON stated that several informal adjustments occurred with FELL, but he never appeared before a Juvenile Judge during his tenure. NILON recalled that the Juvenile Justice System got involved with FELL when he was petitioned for non-payment of fines. NILON recalled FELL as being a short and skinny boy but never observed any outward violence on FELL's part.

NILON recalled ROBERT JOSEPH LEE and believed that he supervised him during a two month period when LEE was at ST. MICHAEL'S SCHOOL. NILON recalled that LEE was somewhat on the quiet side and was cooperative with him. His recollection was that LEE was referred for supervision as a result of him fighting with his brother. NILON seemed to recall that LEE's father brought him in to the JUVENILE DETENTION CENTER for NILON to meet with him.

On April 6, 2001, MATTHEW SKREPANEK, Juvenile Probation Officer, was interviewed regarding his supervision of ROBERT JOSEPH LEE and DONALD R. FELL. SKREPANEK advised that he has been a probation officer for approximately five years and took over supervision of ROBERT LEE from FRANK ANDRUKEWICZ who retired as a probation officer. SKREPANEK recalled that LEE was approximately 16 years of age when he first met him at the JUVENILE DETENTION CENTER. At that time, LEE was described as a rolly-polly boy who dropped out of school and who spent a great deal of time in residential facilities, as directed by the

FELL-00001225

7A-AL-44453

50

Juvenile Justice Court.  SKREPANEK stated that he always
interviewed LEE at the detention center and that LEE's father
always brought him in.  SKREPANEK recalled he met with LEE every
Thursday afternoon and that on a few occasions, LEE's urine was
hot for the use of marijuana.  Since the detention center has a
zero tolerance, LEE would have been housed in the JUVENILE
DETENTION CENTER.  SKREPANEK recalled that LEE was a frail kid
who was obviously disturbed and angry.  He never smiled, spoke in
a low monotone, was never disrespectful to him, but at the same
time, never expressed any pleasantries.  LEE was never social
among his peers and appeared destined for adult prison based on
his attitude.  SKREPANEK recalled that LEE had been referred to
the CHILDREN'S SERVICE CENTER and CHILDREN AND YOUTH SERVICES for
a myriad of problems.  SKREPANEK did not recall if LEE was
supervised by any other probation officer after being supervised
by SKREPANEK.

        SKREPANEK advised that he also supervised DONALD R.
FELL from April 1997, to August 1997.  SKREPANEK described FELL
as a small framed teenager who resided with his aunt on REDACTED - FELL
 REDACTED - FELL   Wilkes-Barre, PA.  Since the JUVENILE PROBATION
DEPARTMENT was not school based in 1997, he would have met FELL
at the JUVENILE DETENTION CENTER.  SKREPANEK recalled that FELL
was more personable than ROBERT LEE and appeared to have more
going on (intelligence) than LEE but did not like going to
school.  SKREPANEK stated that FELL respected his position as a
probation officer and did what he needed to do while under
supervision.  FELL was a vocational/technical student who quit
school in the tenth grade.  Among his hobbies were attending rock
concerts and listening to music.  SKREPANEK's recollection of
FELL was that he failed very few drug tests and worked part-time
in a traveling carnival show.

FELL-00001226

7A-AL-44453

51

WILKES-BARRE POLICE DEPARTMENT (WBPD)
15 North Washington Street
Wilkes-Barre, PA  18701

On April 10, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

Lieutenant DALE RINKER, Detective Bureau, WBPD, REDACTED - FELL
REDACTED - FELL     Wilkes-Barre, PA, telephone number 570-208-4225, reviewed criminal history records relative to ROBERT LEE, JR. and DONALD FELL.  A copy of the police records are attached hereto this report and reflect the following:

DONALD FELL

On December 2, 1992, DONALD FELL, DOB REDACTED - FELL 1980, REDACTED - FELL     Wilkes-Barre, PA, was suspected of throwing rocks at the window of MICHAEL DENNIS.  No disposition found, and no hard copy of the report was located.

On May 21, 1993, DEBRA FELL,     REDACTED - FELL Wilkes-Barre, PA, reported the theft of a Dyno 28 inch red bicycle, owned by DONALD FELL, that was taken in the vicinity of REDACTED - FELL     Wilkes-Barre, PA.  Disposition:  Bike theft report initiated.

On August 1, 1993, a Missing Person's Report was filed by DEBRA FELL,     REDACTED - FELL     Wilkes-Barre, PA.  She advised the police that 13 year old DONALD FELL, same address, has not been home since Thursday.  Disposition:  Returned home.

On March 21, 1997, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was cited for Disorderly Conduct. Disposition:  FELL cited and released.

On May 24, 1997, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was listed as a complainant and complained that he was pushed into a car; treated at GENERAL HOSPITAL.  FELL was cited for Harassment and released.

On February 3, 1998, DONALD FELL was issued a traffic violation at Penn Street, Wilkes-Barre, Pennsylvania. Disposition:  traffic citation issued.

On February 18, 1998, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was charged with Harassment, resulting from the theft of cigarettes from the TURKEY HILL MINI MART, 1056

FELL-00001227

7A-AL-44453

52

George Avenue, Wilkes-Barre, PA. Disposition:  Cited, then released.

On July 22, 1998, District Justice MARTIN KANE found FELL guilty of the above offense.

REDACTED-FELL   On September 6, 1999, DONALD FELL,   REDACTED-FELL Wilkes-Barre, PA, was arrested by the WBPD per dispatch to 112 Regent Street, Wilkes-Barre, PA, for a report of a person on the porch of that residence and that the resident wanted the person removed.  FELL, who matched the description, was on the front porch.  FELL was patted down for weapons and was found to be in possession of marijuana and drug paraphernalia.  A copy of this arrest report is attached hereto this report. Disposition: FELL was cited and released.

On September 13, 1999, DONALD FELL, 39 Westminster Street, Wilkes-Barre, PA, was arrested for Disorderly Conduct. FELL was observed at   REDACTED-FELL   Wilkes-Barre, PA, attempting to gain entry into a motor vehicle that did not belong to him.  Disposition:  FELL was cited and released.  A copy of this report is attached.

On August 30, 2000, DONALD FELL,   REDACTED-FELL Wilkes-Barre, PA, was cited for Driving Without a License; Failure to Make Payment; no hard copy found.

Lieutenant RINKER advised that hard copies of FELL's criminal citations were either purged or could not be located. RINKER did locate computer printouts of the aforementioned incidents and provided same to be included in this report.

ROBERT JOSEPH LEE, JR.

On December 9, 1993, ROBERT LEE, JR., DOB REDACTED-FELL 1980, was cited for Criminal Mischief after a report of a domestic dispute was occurring outside of 25 Hurley Street, Wilkes-Barre, PA.  An Offense Report was made for Criminal Mischief and Vandalism.  Disposition:  Dismissed.

REDACTED-FELL   On December 21, 1993, ROBERT LEE, JR.,   REDACTED-FELL Wilkes-Barre, PA, was charged with Defiant Criminal Trespass.  Disposition:  Dismissed.

On December 5, 1995, a Missing Person's Report was filed for ROBERT LEE, JR., REDACTED-FELL Wilkes-Barre, PA. Disposition:  Returned.

FELL-00001228

7A-AL-44453

53

On December 8, 1996, ROBERT LEE, JR., 25 Hurley Street, Wilkes-Barre, PA, was charged with Vandalism and Criminal Mischief as a result of kids spraying graffiti on a building in the BOG Park, Wilkes-Barre, PA. Disposition: LEE cited and released to parent.

On May 24, 1998, ROBERT LEE, JR., 25 Hurley Street, Wilkes-Barre, PA, was cited for the offense of Harassment and Implausible Assault regarding a domestic dispute. The subject was taken to NESBITT HOSPITAL. Disposition: LEE cited and released.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 10, 2001:

Detective WAYNE COONEY, Juvenile Division, WBPD, REDACTED - FELL REDACTED - FELL     Wilkes-Barre, PA, advised that he recalled both DONALD FELL and ROBERT LEE, JR. COONEY stated that he has been employed by the WBPD for nearly 30 years and checked his records but found nothing relative to juvenile petitions or arrests filed on behalf of the Juvenile Division of the WBPD. COONEY recalled that FELL resided on East Chestnut Street, Wilkes-Barre, PA, and was involved in the local drug scene. FELL was into drinking alcohol and listening to satanic music. FELL was known to hang out with BOBBY LEE from Hurley Street, Wilkes-Barre, PA. COONEY stated that LEE resided directly across the street from Wilkes-Barre Patrolman ED CASELLA.

COONEY stated that FELL and LEE had "tombstones" in their eyes, i.e. no future. COONEY stated that FELL was always getting himself cited, but COONEY recalled that the incidents were never of a violent nature. COONEY described FELL and LEE as psychopaths and stated that he was not surprised to read in the papers that they were involved in murder.

COONEY specifically recalled the wardrobe warn by LEE. It consisted of a black tee shirt, black pants, black boots, and silver chains. The associates of LEE dressed in a similar fashion, and every cop in the city knew LEE and his brother because they looked like freaks and could be spotted 200 yards away.

COONEY stated that his brother and he have a joint interest in a deli located in the Miners Mills Section of the City of Wilkes-Barre. Approximately two years ago, the front glass plate window of the deli was smashed, and the only things removed were two six packs of beer. COONEY stated that the surveillance tape depicted a young man dressed in all black

FELL-00001229

7A-AL-44453

54

committing the crime.  COONEY was convinced that LEE was
responsible but stated that he could not prove it.  LEE and his
brother, SHANE, were questioned at Police Headquarters and denied
any involvement in the crime.  COONEY stated that LEE had
emotional and mental health issues but was smarted enough or drew
the line far enough to become involved with the police.

FELL-00001230

7A-AL-44453

55

## FAMILY

On April 5, 2001, JACQUELINE SHARPE, white female, DOB REDACTED-FELL 1973, SSAN REDACTED-FELL 4131, home telephone number 570-819-2158, was interviewed at her residence, REDACTED-FELL REDACTED-FELL, Wilkes-Barre, PA. SHARPE is a single mother who is raising her four year old daughter, HALEY, and one year old son, ZACHARY. SHARPE advised that she has three sisters, DEBRA (deceased), DONNA WILLIAMS, and SANDRA SHARPE. SHARPE advised that her parents, THERESA SHARPE and JOHN SHARPE, are both deceased.

SHARPE advised that her nephew, DONALD FELL is the son of her late sister, DEBRA FELL. DEBRA FELL married her husband, DONALD FELL, who was approximately 20 years her senior, in the late 1970s. Initially, DEBRA and her husband resided in the 200 Block of East Bennett Street, Kingston, PA. SHARPE stated that both DONALD FELL, SR. and DEBRA FELL were alcoholics who constantly fought. When DONALD FELL, JR. was approximately seven years of age, FELL, SR. just got up one day and left and has not returned. SHARPE believed that FELL, SR. resides in Florida. He has never called nor written the children.

SHARPE stated that DONALD FELL attended first grade in Kingston, PA, and grades second to fourth at the FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA. At that time, DEBRA FELL and her two children were residing in an apartment on West Chestnut Street, Wilkes-Barre, PA. SHARPE stated that in approximately 1990, DEBRA FELL and her children moved to REDACTED-FELL Inkerman, PA, and that DONALD attended fifth grade at the LINCOLN ELEMENTARY SCHOOL, Pittston, PA. In 1992, her sister, DEBRA, DONALD, and TERI FELL moved into the left side of her duplex at REDACTED-FELL REDACTED-FELL Wilkes-Barre, PA. Also residing with DEBRA FELL was her boyfriend, ELLORY WILCOX. SHARPE stated that her mother and she lived next door at REDACTED-FELL SHARPE advised that DEBRA FELL lived in a filthy house and was abusive to both DONALD and TERI. Even as a child, DONALD was always being put down by his mother; and whenever they had a verbal altercation, she would call him a bastard and a good for nothing. SHARPE recalled that DONALD was once molested by his babysitters, a woman named COOKIE LAST NAME UNKNOWN and her husband. This happened for approximately a two year period when DONALD was between the ages of two and a half and four and half years of age.

SHARPE stated that as DONALD grew in age so did his problems at home. DEBRA FELL continued to drink all the time

FELL-00001231

7A-AL-44453

56

which led her boyfriend, ELLORY WILCOX, to leave her over seven years ago.  SHARPE specifically recalled that on Christmas Eve 1993, DEBRA FELL left her kids and started staying with an unknown male.  As a result, the FELL children were left abandoned, and THERESA SHARPE, DONALD's grandmother and JACQUELINE's mother, received temporary, legal custody.  In January 1994, DEBRA FELL came back, and THERESA SHARPE had to relinquish the children to her.  A few weeks later, DEBRA beat TERI FELL, and SHARPE recalled that she could hear the child crying through the paper thin walls between their homes. CHILDREN AND YOUTH SERVICES OF LUZERNE COUNTY eventually placed the FELL children in the custody of THERESA SHARPE.  SHARPE stated that when DONALD was 14 years of age, her mother got full and legal custody of DONALD and TERI FELL.

SHARPE stated that after attending FLOOD ELEMENTARY SCHOOL, DONALD FELL attended PLAINS JUNIOR HIGH SCHOOL, Plains, PA.  In approximately seventh grade, DONALD FELL became a constant truant.  On December 31, 1994, THERESA SHARPE passed away.  SHARPE advised that she received legal custody of DONALD FELL and his sister TERI in approximately March 1995.  SHARPE recalled that DONALD was placed on medications by Dr. FEUSNER (Phonetic), CHILDREN'S SERVICE CENTER, Wilkes-Barre, PA, because of his bad temper.  SHARPE recalled that DEBRA FELL would sell his medication for money and would tell the doctor that the medication was no good and that he needed some stronger prescriptions.  SHARPE stated that whenever DONALD got really mad, he would often black out and have no memory of the incident. She recalled that he actually received Supplemental Security Income for his problem.

SHARPE advised that DONALD FELL's truancy problems came to a head while he attended PLAINS JUNIOR HIGH SCHOOL.  SHARPE pointed to the fact that his mother, DEBRA, would allow him to miss school.  Additionally, DONALD had trouble with one particular teacher at the school who seemed to give him a hard time.  As a result, DONALD never wanted to go back to the school; and when he did, he was often suspended within days.  DONALD eventually resided at ST. MICHAEL'S SCHOOL, Tunkhannock, PA, in their residential treatment center. Once at ST. MICHAEL'S, DONALD started to get good grades and was returned to the public school system.  For a short while, a juvenile probation officer was assigned to supervise DONALD.  SHARPE recalled an incident where DONALD, his friend BOBBY LEE, and a third unrecalled friend threw a rock through someone's windshield when they were standing on a train trestle that crosses River Street in Wilkes-Barre.  DONALD never received any jail time for that event but was placed under her supervision.  SHARPE stated that she received approximately

FELL-00001232

7A-AL-44453

57

five to six fines resulting from DONALD's truancy.  The fines were approximately $180 to $200 a piece.

SHARPE recalled that throughout DONALD FELL's teenage years, his closest friend was BOBBY LEE.  Additionally, he was friends with a MICHAEL ROMUNDI (Phonetic) who was killed a few years ago when struck by a car on Route 309, Wilkes-Barre Township, PA.  FELL also hung out with LEE's brother, SHANE, who is now in the UNITED STATES ARMY in New York.  In his free time, FELL played the guitar and often associated with JASON JONES, Plains, PA.  SHARPE stated that more and more, LEE started hanging out at her house with FELL.  SHARPE stated that she tolerated LEE but found him to be cocky and bit of a smart ass at first.  Eventually, she had a verbal altercation with LEE, and he knocked off his attitude.  SHARPE stated that FELL has known LEE since age six and both were, at one time, in the CHILDREN'S SERVICE CENTER together.  On many occasions, FELL was content just to stay home and listen to music; however, LEE was more apt to get him to do things like go to the mall, skip school, etc.

SHARPE stated that she set a curfew for FELL to be home at night.  Generally, during the week, he had to be home by 11:00 p.m., and 12:00 midnight on weekends.  Most of the time, he was out with LEE.  On one occasion, SHARPE related that she dropped one of FELL's JIM MORRISON pictures which is a collector's item.  He flew into a rage and grabbed her by the arm and would not let go.  SHARPE stated that even though FELL is skinny and scrawny, he is also very strong.  He somehow bent back her thumb and sprained it.  At no time did he ever break her wrist.  SHARPE stated that she was not afraid of FELL and that he eventually cooled down after the above incident.

During FELL's ninth grade year, he attended the WILKES-BARRE AREA VOCATIONAL SCHOOL, Wilkes-Barre, PA, in what was known as the Head Start Program.  FELL continued his truancy problems and got in trouble once at school when he threatened a teacher.  The teacher never pressed charges, to her knowledge; however, FELL was adjudicated delinquent and was placed on probation for an indefinite period of time.  In approximately 1997, during his tenth grade year at COUGHLIN HIGH SCHOOL, FELL quit school.  SHARPE recalled that someone from the high school came to her residence to have him sign a document indicating that he was finished with school.

SHARPE recalled that her sister, DEBRA, spent some time at the LUZERNE COUNTY PRISON for writing bad checks or something to that affect.  Her sister was never in the picture during FELL's teenage years, and she eventually moved to Rutland,

FELL-00001233

7A-AL-44453

58

Vermont, mostly on a whim.  DEBRA would call only once a year to
ask how the kids were doing but still managed to cut FELL down.
DEBRA seemed to like TERI much better.

SHARPE stated that FELL was caring in his own way and
could be counted on whenever she was in need.  Even though he had
a bad outlook on life, he was protective of his sister and of
herself.  SHARPE stated that she saw indications of FELL
drinking; however, he never drank in her house.  SHARPE used to
take FELL and his sister to church with her on Sundays, but she
learned that he does not believe in God.  FELL was very close to
SHARPE's mother and was hurt when he could not be at her wake
while he resided at ST. MICHAEL'S SCHOOL.  This fact seemed to
always be embedded in FELL.  In his free time, FELL enjoyed
reading fantasy books like Dungeons and Dragons, constructing
model cars, and listening to his music.  Although he acted dumb
at times, he was actually fairly intelligent. SHARPE recalled
that FELL once held a dishwasher's job at POCONO DOWNS, Plains,
PA; however, BOBBY LEE managed to get him fired from that
position because FELL would end up skipping work to hang out with
LEE.

When FELL was approximately 17 years of age, he
obtained a job with the HUMANIK CONSTRUCTION COMPANY where he did
some roofing work.  FELL started to drink alcohol heavily; and in
approximately May 2000, he went on the run with his girlfriend,
LYNN ROBERTS.  SHARPE recalled that the WILKES-BARRE POLICE
DEPARTMENT came to her door looking for LYNN ROBERTS who was
apparently a runaway from a crisis intervention center.  FELL was
fired from his construction job when he failed to show.  After
losing the job, FELL hung around the house all day and was not
motivated to find employment.  This led SHARPE to ask him to find
a job or leave.  FELL eventually found employment with his
cousin, JESSE WILLIAMS, the son of her sister, DONNA WILLIAMS,
Wilkes-Barre, PA.  FELL assisted WILLIAMS in his traveling
carnival show, and FELL ran a concession where people would throw
balls into a fish bowl.  Also accompanying FELL and WILLIAMS was
LEE.  Soon after, TERI FELL went to work for WILLIAMS.

SHARPE asked her sister DONNA how FELL was doing and
learned that at the end of the summer of 2000, he was getting
ready to move.  SHARPE stated that she told her sister that FELL
would have to move his belongings from her house, or she would
throw them out.  In a conversation with FELL, FELL agreed to
visit SHARPE before he moved to Vermont.  SHARPE stated that when
she learned that FELL was moving to Vermont, she was upset
because this meant that he would be living with his natural
mother, thus, having access to more alcohol and possibly drugs.

7A-AL-44453

59

In addition, LEE was to accompany him.  SHARPE recalled that FELL left the area for Vermont in the fall of 2000; and in November 2000, SHARPE was awaken one night by an officer from the WILKES-BARRE POLICE DEPARTMENT and was told that FELL was being held and questioned for the murder of two people.  At the time, it did not dawn on SHARPE to ask the officer if one of the victims was her sister.  The next day, SHARPE, acting on a hunch, looked up her sister's name on the Internet and found an article in Vermont about the murder.  SHARPE stated that although she was angry at FELL for his actions, she believes it is 100 percent DEBRA FELL's fault for bringing this problem to her.  SHARPE stated that it was DEBRA who supplied the drugs and alcohol to FELL and LEE, and she firmly believes that FELL had no recognition of what he was doing under the influence of the drugs.  SHARPE expressed her remorse for the woman who was kidnapped in Vermont and later found slain in New York.

SHARPE stated that her nephew's life was one full of abuse, abandonment, and chaos.  SHARPE stated that she attempted to raise FELL as her own child; however, he did as he wanted under the influence of his friend LEE.

FELL-00001235

7A-AL-44453

60

On April 5, 2001, the following interview was conducted by Special Agent JAMES J. GLENN:

BONNIE S. TONTE, white female, DOB April 2, 1960, SSAN 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, RD 1, Box 93A, Harding, PA, 18643, telephone number 570-388-1077, advised that she is the biological mother of ROBERT JOSEPH LEE, JR. TONTE stated that she was reluctant to speak to any members of the Federal Government because she was keenly aware of the fact that the Federal Government was seeking the death penalty in the State of Vermont against her son for kidnapping and carjacking. TONTE provided the following information:

In approximately 1984, when ROBERT was four years of age, TONTE separated from her first husband, ROBERT LEE, SR. TONTE stated that her former husband had a very bad temper and was physically abusive to her. As a child, ROBERT exhibited hyperactivity and was absolutely uncontrollable. To that end, he was taken to the CHILDREN'S SERVICE CENTER and was prescribed Ritalin. As part of her divorce agreement, ROBERT LEE, SR. received custody of her sons, ROBERT, JR., presently 20 years of age, and SHANE, presently 21 years of age. TONTE took custody of her son, ANTHONY, presently age 17.

TONTE is presently married to GEORGE TONTE who is employed at CELOTEX, Route 92, Harding, PA. Together, GEORGE and she have four sons: GEORGE, JR., age 11; MICHAEL, age 9; and twin boys, KEVIN and KEITH, age 7.

TONTE stated that ROBERT, JR. has always exhibited poor self-esteem. Their relationship has not been very positive over the years, and she described him as having a "bad gene". For a brief time in the early 1990s (exact dates unrecalled), ROBERT, JR. attended ST. MICHAEL'S SCHOOL, Tunkhannock, PA. Initially, the school bus would pick him up in front of her home and take him to school for the day. Eventually, ROBERT was enrolled in the Residential Program at ST. MICHAEL'S. TONTE recalled that when ROBERT lived with her for a brief period in Harding, PA, he was approximately 14 years of age and molested her son, GEORGE. ROBERT was referred to the CHILDREN'S SERVICE CENTER and resided with foster parents for approximately one year. TONTE stated that ROBERT spoke often about sex and put sexual content in his normal language.

TONTE stated that she could not recall any employments held by ROBERT other than an animal training job in Florida. This job occurred after he quit school in the tenth grade from COUGHLIN HIGH SCHOOL. She recalled that he only worked in

FELL-00001236

7A-AL-44453

61

Florida for approximately one year sometime after 1998. Her telephone toll records indicate that he called from Florida; however, TONTE does not know the name of the business or its location. In the summer of 2000, ROBERT teamed up with DONALD FELL and worked in a traveling carnival. FELL's cousin hired the boys to work a concession stand. After returning to the area in the late summer of 2000, ROBERT and FELL stayed with her for approximately one month in October 2000. At about that same time, several cars in the area were being broken into, and an eyewitness provided authorities with a description which matched that of ROBERT. TONTE believes that ROBERT was caught by the police and that he provided them with the name of ANTHONY LEE. TONTE stated that ANTHONY had to travel to the PENNSYLVANIA STATE POLICE Barracks and undergo a polygraph test to prove his innocence. Shortly after this incident, FELL and ROBERT moved to Vermont and were accused of a triple homicide. At this point in the interview, TONTE stopped answering questions.

ANTHONY LEE was on hand to be interviewed but advised that he is age 17, DOB REDACTED-FELL 1983. ANTHONY LEE works at the PETRO STOP, off Interstate 81 in Dupont, PA. ANTHONY advised that he works in the IRON SKILLET cafeteria. ANTHONY agreed to answer questions but was awaiting a ride to work. Since he is a juvenile and needs to be interviewed in the presence of his mother, no further questioning was done.

On April 5, 2001, TERI FELL, white female, DOB REDACTED-FELL 1982, SSAN REDACTED-FELL 6064, home telephone number 570-819-2158, was interviewed in the front seat of Special Agent JAMES J. GLENN's Bureau vehicle at     REDACTED-FELL Wilkes-Barre, PA, where FELL is presently residing. FELL resides with her Aunt Jackie (JACQUELINE SHARPE) and has been there only a few weeks.

FELL stated that as a child, her family, which consisted of her father, mother, and brother, DONALD, resided in Kingston, PA, for approximately one or two years when she was about five years of age. The family then moved into an apartment on West Chestnut Street, Wilkes-Barre, PA, for about one year and then moved to Pittston, PA. After a one year period, the family then moved to     REDACTED-FELL     Wilkes-Barre, a double block residence adjacent to her grandmother's home. FELL stated that her grandmother, THERESA SHARPE, lived at REDACTED-FELL REDACTED-FELL with her aunt, BECKY SHARPE.

FELL stated that her brother and she attended elementary school at the DANIEL J. FLOOD ELEMENTARY SCHOOL, North Washington Street, Wilkes-Barre, PA. After elementary school,

FELL-00001237

7A-AL-44453

62

DONALD and she attended the PLAINS JUNIOR HIGH SCHOOL, Plains, PA. It was there that her brother DONALD started experiencing truancy problems. As a result, DONALD was placed at ST. MICHAEL'S SCHOOL, Tunkhannock, PA, for approximately two years.

FELL recalled that her father left the family when she was seven years of age. FELL recalled that her father did not want her and physically abused her and not DONALD. Once her father left the house, she believed he moved to Florida; but she has had no contact with him since 1989. FELL stated that her mother was an alcoholic who spent time in and out of jail. FELL recalled that on Christmas 1993, her mother gave up custody of herself and DONALD and moved out of the house. FELL recalled that her mother was jailed for bouncing checks and public drunkenness. At age 11, FELL and DONALD resided with their grandmother, THERESA SHARPE. In 1994, her grandmother died and her Aunt Jackie received custody of DONALD and herself.

FELL recalled that as early as eight years of age, DONALD struck up a friendship with ROBERT LEE. Their friendship was on and off over the years but became stronger during their teenage years. FELL stated that LEE always liked her, and he acted as her protector. In essence, LEE had the "hots" for her. FELL stated that she did not like LEE when she was growing up and found him to be a jerk and very cocky. He thought everything was funny and had one of the worse attitudes that she has ever seen. He had a smart remark for everything. FELL stated that DONALD seemed to take things more seriously than LEE, but DONALD was still fairly cocky in his own right.

FELL described her brother as funny, sarcastic, nice, and would do anything for her. FELL recalled that when DONALD lived with their mother, he was on medication to help with his temper problem. Once released from ST. MICHAEL'S SCHOOL, DONALD continued counseling at the CHILDREN'S SERVICE CENTER. Outside of LEE, FELL said that the only other true friend of DONALD's who is still living was GARY YALE. FELL recalled that YALE may be living in Exeter, PA. Two of DONALD's friends died of an overdose, and one was hit by a car a few years ago.

FELL recalled that DONALD was in and out of trouble as he was growing up. Besides his truancy problems, DONALD was once caught in 1996, with drugs by the WILKES-BARRE POLICE DEPARTMENT. She believed that he was fined for the offense. In his free time, DONALD liked to read fantasy medieval books, play his guitar, draw, construct model cars, work on jigsaw puzzles, and collected baseball cards. DONALD believed in Satan and not in Jesus and was prone to wearing dark clothing. FELL was aware of

FELL-00001238

7A-AL-44453

63

the fact that DONALD liked to drink alcohol and smoke marijuana. DONALD said that drinking alcohol and smoking marijuana seemed to relax him.

During DONALD's ninth grade year of school, he attended WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and quit COUGHLIN HIGH SCHOOL when he reached the age of 17. To her knowledge, DONALD had few jobs, but one specific job which she recalled was him working in the construction field for a person named JOE. She estimated that this occurred in 1999.

In the spring of 2000, FELL introduced DONALD to her friend LYNN ROBERTS. They spoke one day and found out that they had a mutual interest in playing the guitar. FELL stated that DONALD had a slapped together band that would jam, and the band needed a bass player. ROBERTS could play the bass; and soon after, DONALD started dating her. In approximately May 2000, ROBERTS was at a residential treatment facility in Pittston, PA. With the assistance of DONALD, ROBERTS left the facility and never returned. In approximately July 2000, ROBERTS briefly worked with DONALD and LEE at their cousin's traveling carnival show. FELL stated that her cousin, JESSE WILLIAMS, had a goldfish game, a quarter toss, and other amusements, and needed help during the summer. In July 2000, FELL met the show at Kimberton, PA. FELL stated that it was her job to relieve the other workers so that they could have a break. FELL stated that DONALD and LEE did not like their cousin JESSE and took money from his business on a daily basis. FELL advised that LEE and DONALD had the same tattoo which was an upside down cross over the number 666. She stated that both were devil worshipers but were not into animal slayings. FELL recalled an incident which she believed occurred in Kimberton, PA, wherein, LEE killed a cat. FELL stated that apparently the cat was suffering from an unknown illness, and LEE broke its neck. She stated that he hit its head off a concrete block. By the end of the evening, the girl who owned the cat had embellished the story to make it sound as though LEE had tortured and cut up the cat. LEE never disputed the various versions but only laid back and agreed with whatever story came forward. FELL described LEE as not much of a talker; but if he had something to say, he would say it and then shut up. In her opinion, DONALD was more of a leader than LEE, and it was not uncommon for DONALD to physically strike and hit LEE. Generally, LEE would aggravate DONALD to the point where he would lash out at him; and as kids, DONALD often punched LEE in the face. As they got older, DONALD stopped bossing LEE around.

FELL recalled that LEE's mother hated him; and therefore, LEE lived with his father and brother, SHANE. FELL

FELL-00001239

7A-AL-44453

64

stated that SHANE is one year older than LEE and also has a brother, ANTHONY, age 17; stepbrothers, GEORGE, age 11; MICHAEL, age 9; and twin brothers, KEITH and KEVIN, age 7. FELL believes that LEE's father now resides in Honesdale, Pennsylvania.

For approximately a one month period in January 2001, FELL lived with BONNIE TONTE, LEE's mother. She described her as being psychotic. FELL also lived with her cousin, JESSE WILLIAMS, during the latter part of November and December 2000. She eventually ran out of money and has moved around ever since.

FELL advised that when LEE, DONALD, and she worked in Monticello, New York (NY), they decided to go to a concert in Woodstock, NY. While they were partying, a man began to hit on her and tried to rape her. DONALD and LEE immediately came to her defense and beat the man senseless. All three of them were held by the police until JESSE WILLIAMS bailed LEE and DONALD out of jail.

When DONALD returned to the Wilkes-Barre area, he moved in with his Aunt Jackie again and then stayed with associates here and there. In approximately October or November 2000, he decided to visit their mother in Rutland, Vermont. LEE accompanied DONALD, and it was there that they were accused of killing her mother, her boyfriend, and another woman from the Rutland area. FELL stated that she heard that LEE and DONALD were smoking crack with her mother. It is FELL's belief that DONALD had no idea what he was doing at the time her mother was killed because he and LEE, from what she has heard, were under the influence of alcohol and drugs. FELL believes that her brother would never hurt her intentionally and has always been there when she needed him. She always felt protected with him nearby. To this day, she continues to write him in prison. FELL related that she has never seen DONALD in possession of any weapon. When questioned about a stolen rifle from the WILKES-BARRE POLICE DEPARTMENT, FELL stated that she never saw DONALD in possession of such a weapon.

FELL-00001240

7A-AL-44453

65

        The following investigation was conducted by Special
Agent JAMES J. GLENN on April 11, 2001:

        DONNA WILLIAMS, white female, DOB REDACTED-FELL 1959, SSAN
REDACTED-FELL 3523,        REDACTED - FELL      Wilkes-Barre, PA, telephone
number 570-822-7188, stated that she is the second oldest of four
daughters in the SHARPE family.  Her sister, SANDY, is the oldest
daughter and resides in South Carolina.  WILLIAMS is the second
oldest, then DEBRA (deceased), and JACKIE SHARPE, Wilkes-Barre,
PA.  WILLIAMS stated that after Special Agent GLENN called to
schedule an interview with her, she immediately contacted DONALD
FELL's Federal Public Defender to ask him if it was appropriate
for her talk with the FBI.  Upon getting the okay, WILLIAMS
granted the interview.

        WILLIAMS stated that her sister, DEBRA, married DONALD
FELL, SR. in approximately 1978.  Initially, the FELLs lived on
Church Street and then Bennett Street in Kingston, PA.  Their
marriage was abusive in nature, and both fought constantly.  The
police were always at their residence; and on one occasion, they
stabbed each other with a knife.  WILLIAMS stated that young
DONALD FELL appeared to get the brunt of everything from his
mother and father.  In addition to DONALD, her sister, DEBRA, had
a daughter named TERI who is two years younger than DONALD.
WILLIAMS recalled that DONALD FELL will be 21 later this month.
WILLIAMS recalled that DONALD FELL may have attended first grade
in Kingston; and in approximately 1984, DONALD FELL, SR. left his
family and has not been seen ever since.  WILLIAMS stated that
her sister, DEBRA, then rented a place on West Chestnut Street
for about a year before moving to Jenkins Township, PA.  WILLIAMS
stated that during the period 1986-1991, she resided in the left
half of a double block owned by her mother at 30 East Chestnut
Street, Wilkes-Barre, PA.  Her mother and sister, JACKIE, lived
at 32 East Chestnut Street.  WILLIAMS recalled that DEBRA moved
into 30 East Chestnut Street after WILLIAMS and her family moved
to the Greater Williamsport area, then returned to Wilkes-Barre
and bought their present home at 39 Westminster Street.  WILLIAMS
stated that she is a single mother of two girls and resides with
her boyfriend, BARRY SEWELL.  WILLIAMS stated that her sister,
DEBRA, was an alcoholic; and although she loved her sister, she
did not like the way she treated her children.  DEBRA, when
drinking, physically abused her children and did not take care of
their basic needs.  DEBRA lived with a steady boyfriend named
ELLORY who eventually left her and was found dead in a truck in
Kingston, PA.  WILLIAMS stated that her sister spent time in the
LUZERNE COUNTY PRISON for not paying fines relative to DONALD's
truancy.  WILLIAMS recalled that when DONALD FELL was
approximately 12 years of age (1992), her mother got custody of

FELL-00001241

7A-AL-44453

66

DONALD and his sister, TERI. WILLIAMS stated that after her mother died, her sister, JACKIE, got custody of the children. To her knowledge, DONALD FELL attended FLOOD ELEMENTARY SCHOOL; PLAINS JUNIOR HIGH SCHOOL; ST. MICHAEL'S SCHOOL, due to a truancy problem; WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL; and dropped out of COUGHLIN HIGH SCHOOL when he was approximately 17 years of age. WILLIAMS believed that DONALD FELL was a busboy at POCONO DOWNS and assisted her son, JESSE WILLIAMS, in his traveling carnival show that featured board games, a quarter toss, etc. DONALD FELL worked the traveling carnival during the summers of 1999 and 2000.

WILLIAMS stated that, to her knowledge, DONALD FELL was never jailed for any criminal acts he committed. WILLIAMS described DONALD FELL as a quiet, fairly even tempered person who never acted out his anger in her presence. In his free time, DONALD liked to read books and listen to his music. She recalled that he played guitar. Of all her relatives, WILLIAMS believed that DONALD was closest to her. WILLIAMS was questioned as to whether or not DONALD FELL had a drinking problem, and she denied that fact, stating that she never saw him drinking in her presence.

WILLIAMS stated that DONALD FELL associated with ROBERT LEE whom she did not like. WILLIAMS stated that LEE was very cocky and always had a smile on his face that looked more like a smirk. After September 2000, DONALD FELL resided with WILLIAMS for a couple of months and was in and out of the house at various times. In approximately October 2000, DONALD traveled to Rutland, Vermont, to see his mother. WILLIAMS recalled that FELL called her house on Thanksgiving to wish her a happy holiday and talked about returning to Wilkes-Barre to visit. After the murder of her sister, DEBRA, the WILKES-BARRE POLICE visited JACKIE SHARPE's home to make sure that they were not harmed. WILLIAMS stated that she did not learn of her sister's death until two days later. WILLIAMS stated that DEBRA FELL called her home on one or two occasions when she lived in Vermont. She usually was drunk, and WILLIAMS did not wish to talk to her.

WILLIAMS stated that DONALD FELL always seemed to hang out with ROBERT LEE but also had a friend who resided in a trailer park in Exeter, PA.

WILLIAMS stated that after DONALD FELL's arrest, the WILKES-BARRE POLICE DEPARTMENT came to her home and questioned her about a shotgun that was stolen from the police department and was in the possession of DONALD FELL. WILLIAMS stated that DONALD FELL showed up with that same shotgun in approximately

FELL-00001242

7A-AL-44453

67

November 1999, and stated that he had purchased the weapon for target practice.  WILLIAMS stated that FELL never confided in her as to where he purchased the weapon until last month (March 2001) when she spoke to FELL while he was in prison in Vermont.  On that occasion, FELL called her Collect and told her that he had purchased the weapon from a Wilkes-Barre Police Officer's son.  FELL would not identify the boy from whom he purchased the weapon.

WILLIAMS stated that based upon FELL's dysfunctional family background, she can almost understand why he was so angry at his mother.  WILLIAMS stated that FELL's pent up anger and hostility probably came to a boiling point, and she learned that FELL was very disappointed in his mother when he learned that she was still drinking in Vermont.  FELL felt betrayed because his mother had lied to him and said that she had quit her drinking.

FELL-00001243

7A-AL-44453

68

## FRIENDS

During the April 5, 2001, interview of TERI FELL, DONALD FELL's sister, she advised Special Agent JAMES J. GLENN that two of DONALD FELL's closest friends are now deceased. MICHAEL OMUNDI (phonetic) was stuck by a car and killed and another friend, name unrecalled, died from a drug overdose.

In an effort to expedite this report to FBI Rutland, Vermont, Gary Yale, REDACTED-FELL Plains, PA, 18705, former friend of DONALD FELL, was not interviewed. The Scranton Office of the FBI will locate and interview YALE should the Rutland RA deem it necessary.

To date, the only friends associated with ROBERT JOSEPH LEE, JR. have been DONALD R. FELL and LEE's brother, SHANE LEE.

# EXHIBIT 77

APPENDIX V

Vermont Department of Corrections
Division of Correctional Services

DISCIPLINARY HEARING REPORT

Page 1 of 2

01 c2c1-3
.D. (or Docket)

nate: _____ Robert Lee _____ (Print)

aring Officer: _____ (Print)

esenter: _____ (Print)

olation Charged: _____

(e.g.. Major "A" #4)

ate of Violation: 12 / 27 / 00
ate/Time Notice: 12 / 29 / 00  0750
ate/Time Hearing: 01 / 02 / 01  1230

id inmate waive 24 hours notice? __✓__ No _____ Yes

mate's plea: _____ not guilty   Determination   _____ not guilty
             __✓__ guilty                       __✓__ guilty

id the inmate attend the hearing? __✓__ Yes_____ No (briefly explain)

| FACILITY/CAMP | |
|---|---|
| □ CCWC | □ Chittenden RCF |
| □ Marble Valley CF | □ NERCF |
| ☑ Northwest SCF | □ NSCF |
| □ SESCF | □ Woodstock RCF |
| **CCSC** | |
| □ Barre | □ Bennington |
| □ Brattleboro | □ Burlington |
| □ Rutland | □ St. Johnsbury |
| □ WhiteRiver Jct. | |
| **CRSU** | |
| □ Barre | □ Bennington |
| □ Brattleboro | □ Burlington |
| □ Rutland | □ St. Johnsbury |
| □ WhiteRiver Jct. | |

.. NA
.ca
ame. NA
eason:

What alternative forms of testimony were used for witnesses (including reporting officer) who were not reasonably available? None

Did you limit inmate's presentation or participation in hearing because of misconduct or other reason? __✓__ No _____ Yes
briefly explain).

Was any of the evidence presented at the hearing confidential? __✓__ No _____ Yes (if Yes fill out Appendix VI and attach it to this report) Was inmate represented by a Hearing Assistant? _____ Yes __✓__ No (explain) did not want a hearing assistant.

Did inmate request continuance? __✓__ No _____ Yes (if Yes was it granted?) _____ Yes _____ No (briefly explain)

Did superintendent/designee order a continuance? __✓__ No _____ Yes (explain)

Presented at Hearing (e.g.. names of witnesses, list of contraband, etc.)

b6
b7C

By presenter: major B#21 DF, reports from   By Inmate: none.
CCI        ca        CESS

WHITE (CASE FILE)    YELLOW (CENTRAL OFFICE)    BLUE (ACCOMPANIES RECEIPT)    PINK (INMATE)

FELL-00001245

Lee, Robert                              Twenty-3                    B#21           APPENDIX V
                                                                                   Page 2 of 2

Findings of Fact to Support Determination: By a preponderance of the evidence I find you guilty
of a major B02, DE for the following facts.
(1) your own admission of guilt.
(2) report from cell ████████████ and CFs █████        b6
                                                        b7C

Sanctions Recommended: Sanction A  5 days lock in

Signature of Hearing Officer: ████████████████        Date: 01-02-01

████████████

                                                                                b6
                                                                                b7C

████████  01-02-01    ___ Determination    ___ Recommended
          Date            upheld               sanctions upheld
                          ___ Determination    ___ Recommended
          1/3/01          reversed               sanctions modified
          Date            ___ Findings Modi-     to: _____
                          fied to: _____

Superintendent's Review:
                                                        b6
                                                        b7C

████████  1/4/01  0815   X  Determination upheld
          Date. Time    ___ Determination reversed
                        ___ New proceedings ordered as follows: _____
                         X  Following sanctions approved: as recommended

WHITE (CASE FILE)    YELLOW (CENTRAL OFFICE)    BLUE (ACCOMPANIES RECEIPT)    PINK (INMATE)

# EXHIBIT 78

(Rev. 10-01-1999)

## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                      **Date:** 01/04/2001

**To:** Albany                    **Attn:** Rutland, Vermont RA
                                            SA
       Little Rock                          EC

**From:** Little Rock
         Squad 7/Fort Smith RA
         **Contact:** SA [                    ], (501) [              ]

**Approved By:** [                              ]                    b6
                                                                    b7C
**Drafted By:** [                    ] jdc                          b2

**Case ID #:** 7A-AL-44453-65 (Pending)

**Title:** ROBERT JOSEPH LEE;
        DONALD R. FELL;
        TERESCA RUTH KING - VICTIM;
        KIDNAPPING

**Synopsis:** Clarksville Police Department Reports being forwarded
to Rutland RA. Lead covered for receiving possession of Mossberg
shotgun and forwarding to FBI Rutland RA.

**Package Copy:** Being forwarded under separate cover is one black
Mossberg 12 gauge shotgun, serial number P224645.

**Enclosure(s):** Five (5) original and one copy each FD-302s for
the following:

> One FD-302 re faxed copy of affidavit, search warrant,
>         and return for the search of the Neon.
> One FD-302 re faxed copy of Clarksville PD Incident
>         Report completed on 11/30/00.
> One FD-302 re faxed copy of Clarksville PD Vehicle
>         Impoundment Record.
> One FD-302 re FBI receiving custody of black Mossberg
>         12 gauge shotgun, serial number P224645.
> One FD-302 re FBI preparation of shotgun, serial number
>         P224645 for shipping.

> Four (4) FD-340s (1As)(numbered 28-31) for the
following:

> 28.  FD-597 for custody of Mossberg shotgun from
>         Clarksville PD.

Registry Number 4316 5113 2308
Date Evidence Shipped 1-16-01
Employee sending evidence package DX
Method of Shipment Fedex
Reimbursable Value — 0 —

7A-AL-44453-1816

7A-AL-44453-65

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____

JAN 17 2001

FBI - ALBANY

To:  Albany  From:  Little Rock
Re:  7A-AL-44453, 01/04/2001

29.  Four (4) Polaroid photographs of wrapped Mossberg
       shotgun as prepped by Clarksville PD.
30.  Wrapping paper from Mossberg shotgun used by
       Clarksville PD.
31.  One Polaroid photo of Mossberg shotgun sans
       wrapping.

**Details:**  FBI Fort Smith RA has learned that Clarksville PD is
still in possession of two "crack" pipes and a small pocketknife
that were seized and removed from the Neon during the stop on
11/30/00.  CPD has maintained possession of these items to date
as evidence.  The FSRA will obtain possession of these items from
CPD and forward to FBI Rutland RA.

2

FELL-00001248

To: Albany  From: Little Rock
Re: 7A-AL-44453, 01/04/2001

**LEAD(s):**

**Set Lead 1:  (Adm)**

<u>**ALBANY**</u>

    <u>**AT RUTLAND, VERMONT RA**</u>

    Fort Smith Lead covered.

◆◆

3

FELL-00001249

# EXHIBIT 79



**U.S. Depart:    it of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                              *(802) 951-6725*
*Burlington, Vermont 05402-0570*                          *Fax: (802) 951-6540*

January 8, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

         Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

         Enclosed is additional discovery consisting of: search
warrant, application and inventory relating to the search of
Teresca King's car in Arkansas: various signed <u>Miranda</u> waiver
forms, interview notes and copies of handwritten statements that
you probably have already received; an immunity letter given to
Christian Kolojeski; and photographs taken by the Rutland Police
Department in connection with this case.  The photos are from the
scene of the murders of Charles Conway and Debra Fell; morgue
photos of Conway and Fell; from the Price Chopper where Teresca
King was abducted; and from the search of King's car in Arkansas.
Accompanying each roll of film is a photo log.

         The U.S. Attorney's Office has already reimbursed the
Rutland Police Department for your share of the cost of these
photographs.  To cover these costs, counsel for each defendant
should arrange to have a check for $123.24, payable to the U.S.
Attorney's Office, sent to my attention.  Thank you in advance
for your anticipated cooperation.

         Additional civilian witness whom the Government might call
include Michael Leight, REDACTED-FELL Brewster, NY; and Keith
Cancel,   REDACTED-FELL   Poughquag, NY.

Sincerely yours,

CHARLES R. TETZLAFF
United States Attorney

By:    GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

FELL-00001251

# EXHIBIT 80

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY · MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE · BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON · BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

January 9, 2001

Mr. Gregory L. Waples
Assistant United States Attorney
P.O. Box 570
Burlington, VT 05402-0570

      Re: USA v. Fell

Dear Greg:

      Please make sure Fell and Lee's clothing are preserved after they are examined by the government's forensic lab. We need to submit the clothing, or portions thereof, to an independent expert for examination.

                  Sincerely,

                  Alex Bunin

cc: John Pacht

FELL-00001252

# EXHIBIT 81

5:01-cr-00012-gwc    Document 301-32    Filed 03/21/11    Page 62 of 74

| 01/22/01<br>13:36:12 | ● | FD-192 | ● | ICMIPR01<br>Page  1 |
|---|---|---|---|---|

**Title and Character of Case:**

LEE, ROBERT, JOSEPH
FELL, DONALD, R

---

| Date Property Acquired: | Source from which Property Acquired: |
|---|---|
| 12/02/2000 | VEHICLE SEARCH/<br><br>CLARKSVILLE AR |

---

**Anticipated Disposition:** **Acquired By:**      Case Agent:

---

**Description of Property:**          **Date Entered**
  1B 24

b6
b7C

(1)  ONE (1) BOTTLE CONTAINING BROWN LIQUID, LABELED:
     "PATCHOULI TUNISIAN"
(2)  MARLBORO BOX CONTAINING SMALL PLASTIC BAGS
     ITEM A-30

Barcode: E01729699    Location: ECR1     DRUGS         12/02/2000

DRUG WEIGHT:     69.20 GRAMS      Est Dollar Value:      .00
Sealed By:                 Witnessed By:

---

Case Number:   7A-AL-44453 - 1B24
Owning Office:   ALBANY

SEARCHED   INDEXED
SERIALIZED   FILED

JAN 1 8 2001

FBI - ALBANY

**File Copy**

FELL-00001253

# EXHIBIT 82



**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                  *Fax: (802) 951-6540*

January 24, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

        Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

        Enclosed is additional discovery consisting of FBI and New York State Police reports.

        Also enclosed is a copy of all pages from Robert Lee's notebook which contain any writing or entries.  Agent Hardegree initialed and numbered each page, including blank pages.  We have reproduced for you only pages on which any writing appears.  The totally blank pages are 20-38, 125-215, and 217-268.  We will maintain custody of the original notebook at the U.S. Attorney's Office if you need to examine it.

        The Plymouth Neon which the defendants stole from Teresca King is being flatbedded back to the area and will be stored by the FBI in Albany.  The King family would like to sell the vehicle when it is no longer needed for evidence.  We have already examined the car and have no desire to retain it.  I assume neither defendant needs to have the car preserved after you have had the opportunity to perform a forensic examination. Please advise if this is incorrect.  I also ask that you try to have any examination of the car completed by the end of February so that it can then be released to the King family.

FELL-00001254

Sincerely yours,

DAVID V. KIRBY
United States Attorney

By:

GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

# EXHIBIT 83

To:
From:
Date:  03-15-01
Re:    Lee, Robert

On the above date at approx. 1220 hrs this officer was asked by
inmate Lee if I could give inmate [____] a magazine. This officer
honored the request, but checked the magazine prior to giving it to
inmate [____] for contraband.

While flipping through the magazine, I noticed a page that was
folded and taped shut. This officer inspected this page and found
a hand written note inside of the this folded page. SEE ATTACHED;)

The note basically explained the dangers of ingesting comet
cleaner, and basically something about taking a hospital trip.

Inmate Lee was the only inmate to use the comet cleaned this day,
and due to the nature of the note, This officer shook down inmate
Lee's cell for possible comet in his cell. I later shook inmate
[____] cell for comet and CO/II [____] found a container of water
with approx. 1/4 inch of comet on the bottom of the container.
When asked what it was, [____] stated it was cleaner for his toilet.
[____] was advised that he could not keep such items in his cell and
the item was removed.

From reading the note found it would seem that inmate [____] was
looking for a way to get to the hospital and it seems that he was
possibly going to drink the cleaner to get there..

What concerns me about this is why inmate [____] so intently wants to
go to the hospital. He was sent here from Newport as a high
security escape risk. Should we be watching inmate [____] a little
more closely when he is being transported out of the facility or
thinking of moving him from unit to unit in the future.

How do we want to deal with this issue.

[____] CO/I

b6
b7C

# EXHIBIT 84



**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                              *(802) 951-6725*
*Burlington, Vermont 05402-0570*                        *Fax: (802) 951-6540*


March 26, 2001


Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

    Re: <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

    Enclosed is additional discovery consisting of bank records for an account maintained by Robert Lee, and New York police and court records relating to what we believe was the arrest last summer of both Lee and Fell for assault.


                            Sincerely yours,

                            DAVID V. KIRBY
                            United States Attorney

           By:

                            GREGORY L. WAPLES
                            Assistant U.S. Attorney

P5 54

FELL-00001257

# EXHIBIT 85

STATE OF NEW YORK  ::  COUNTY OF SULLIVAN

   JUSTICE COURT  ::  TOWN OF BETHEL

_____ X

THE PEOPLE OF THE STATE OF NEW YORK

        -against-                                    CERTIFICATE OF

....Joshua Jones *AKA* Robert Lee............    DISPOSITION

                        DEFENDANT
                        REDACTED - FELL
                        D.O.B............*80*

_____ X


        The above named Defendant having appeared before this Court,
charged with the offense(s) of _Assault 2'd_____
in violation of section(s) __120.05_____ of the _Penal_ Law
of the State of New York, this is to certify that the charge(s)
aforesaid, on the _16th_ day of _August 2000_____
were disposed of by: _reduced to Assault 3rd Sect 120.00_
_fined $500°° plus $125°° Surcharge____
_1-8-01 resentenced to time served - four days_
_per ADA Joey Drillings_____


DATED: _March 28 2001.__
Kauneonga Lake, New York 12749



                                    _Elita Shapiro_
                                    ~~TOWN JUSTICE~~ / COURT CLERK
                                    TOWN OF BETHEL JUSTICE COURT


FELL-00001258

# EXHIBIT 86



**U.S. Depart      it of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                            *(802) 951-6725*
*Burlington, Vermont 05402-0570*      *Fax: (802) 951-6540*

April 5, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Bradley S. Stetler, Esq.
P.O. Box 1124
Burlington, VT 05402

      Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

      Enclosed is additional discovery consisting of more documents relating to Donald Fell's and Robert Lee's arrest for assault last summer in New York.

      Inquiry last week revealed that none of the autopsy reports on the three homicides is yet available.

                               Sincerely yours,

                                 DAVID Y. KIRBY
                                 United States Attorney

By:

                                 GREGORY L. WAPLES
                                 Assistant U.S. Attorney

FELL-00001259

# EXHIBIT 87