**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

_____

DONALD FELL,

             Movant,

     v.

UNITED STATES OF AMERICA,

             Respondent.

_____

)
)
)
)
)
) 2:01-CR-12-01
)
)
)
)
)
)
)
)
)

**<u>MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255</u>**

# VOLUME IV OF VII

# EXHIBITS 115-145

# TABLE OF CONTENTS

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

Exhibit

Donald Fell Mitigation Binder.................................................................................................1

Van Gorp Report (Apr. 6, 2001)..............................................................................................2

Mills Report (May 7, 2001) .....................................................................................................3

Lipman Report (May 14, 2001) ...............................................................................................4

Cunningham Report (June 14, 2005) .......................................................................................5

Declaration of Mark Cunningham, Ph.D., ABPP (June 27, 2005) ..................................6

Wetzel Report (Oct. 11, 2002) ................................................................................................7

Rabun Report (Dec. 31, 2002) ................................................................................................8

Wetzel Report (June 27, 2005) ................................................................................................9

Welner Report (July 5, 2005)................................................................................................10

CYS Contact Sheet (Apr. 22, 1985) .....................................................................................11

CYS Contact Sheet (May 8 1985) ........................................................................................12

CYS Contact Sheet (Sept.—Oct.1985).................................................................................13

CYS Contact Sheet (Aug. 8, 1991).......................................................................................14

CYS Contact Sheet (Aug. 8, 1991).......................................................................................15

CYS Contact Sheet (Aug. 8, 1991).......................................................................................16

CYS Contact Sheet (Oct. 1991)............................................................................................17

First Hospital Wyoming Valley Discharge Report (Oct. 31, 1991) .............................18

Wilkes-Barre General Hospital Progress Record (Apr. 1992)..............................................19

1

Wilkes-Barre General Hospital Adolescent Psych. Unit Interdisciplinary Progress Record (Apr. 1992)................................................................................................................20

Wilkes-Barre General Hospital Discharge Face Sheet (June 6, 1993) ........................................21

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Apr. 1992)..........22

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Jan. 1993) ..........23

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (June 1993) .........24

CRR Group Home Selection and Review (Sept. 22, 1993)...........................................................25

Psychological Consultation of Donald Fell (Apr. 12, 1994) ........................................................26

Service Plan (Medical) (1994)....................................................................................................27

Service Plan (Medical – Dental) (1995) .....................................................................................28

CYS Contact Sheet (May 26, 1995) ...........................................................................................29

Intentionally Left Blank.............................................................................................................30

Rutland City Police Department Incident Table (Jan. 11, 1996)..................................................31

Rutland City Police Department Incident Table (Sept. 4, 1996) ..................................................32

Rutland City Police Department Incident Table (Nov. 6, 1996) ..................................................33

Rutland City Police Department Incident Table (Nov. 6, 1996) ..................................................34

Rutland City Police Department Incident Table (Mar. 4, 1997)...................................................35

Rutland City Police Department Incident Table (July 3, 1997).....................................................36

Rutland City Police Department Incident Table (Sept. 16, 1997) ................................................37

Rutland City Police Department Incident Table (Jan. 14, 1998)...................................................38

Rutland City Police Department Incident Table (June 5, 1998)....................................................39

Rutland City Police Department Incident Table (July 28, 1998)...................................................40

Rutland City Police Department Incident Table (Apr. 30, 1999) .................................................41

Rutland City Police Department Incident Table (May 26, 1999)..................................................42

Rutland City Police Department Incident Table (Oct. 30, 1999) ..................................................43

Rutland City Police Department Incident Table (Feb. 20, 2000) ..................................................44

Luzerne County Detention Center Admission Page (Sept. 10, 1996) ...........................................45

Sullivan County Sheriff's Department Criminal Complaint (Aug. 12, 2000)...............................46

New York State Incident Report and Arrest Report (Aug. 12, 2000)............................................47

Sullivan County Sheriff's Department Statement of Donny McNeeley (Aug. 12, 2000) .............48

Sullivan County Sheriff's Department Statement Joshua Jones (Aug. 12, 2000) .........................49

New York State Incident Report (Aug. 12, 2000) ........................................................................50

Sullivan County Sheriff's Department Statement (Teri Fell) (Aug. 12, 2000) .............................51

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................52

Sullivan County Sheriff's Department Supporting Deposition (Aug. 12, 2000)...........................53

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................54

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................55

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................56

FBI FD-302 (Nov. 30, 2001 – Dec. 1, 2001) ...............................................................................57

Intentionally Left Blank ................................................................................................................58

Intentionally Left Blank ................................................................................................................59

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 1, 2000) .....................60

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................61

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................62

New York State Police Investigation Report (Dec. 1, 2000)........................................................63

New York State Police Supporting Deposition (Dec. 2, 2000) ....................................................64

Autopsy Report of Teresca King (Dec. 2, 2000) ..........................................................................65

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................66

United States Marshals Service Prisoner Intake ..........................................................................67

New York State Police Supporting Deposition of Francis Bellantoni (Dec. 1, 2000)..................68

Warrant Information Network Subject Report (Dec. 15, 2000) ....................................................69

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 22, 2000)  ...................................................................................................................70

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) .....................71

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) .....................72

NWSCF Facility Incident Report (Dec. 27, 2000) ......................................................................73

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 28, 2000) ....................................................................................................................74

Prison Medical Records of Donald Fell.......................................................................................75

2001 FBI Report ..........................................................................................................................76

Vermont Department of Corrections Disciplinary Hearing Report (Dec. 27, 2000).....................77

FBI Report (Jan. 4, 2001) ............................................................................................................78

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Jan. 8, 2001)........................................................................................................................79

Letter from Alex Bunin to A.U.S.A. Gregory Waples (Jan. 9, 2001) ..........................................80

FBI FD-192 (Jan. 22, 2001).........................................................................................................81

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
    (Jan. 24, 2001)......................................................................................................................82

Redacted E-mail (Mar. 15, 2001) ................................................................................................83

Letter from A.U.S.A Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Mar. 26, 2001) ....................................................................................................................84

New York State Certificate of Disposition (Mar. 28, 2001).........................................................85

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch (Apr. 5, 2001)..................................................................................................................86

Memorandum from Cynthia Ayres to Dr. Mark Mills (Apr. 23, 2001).........................................87

Letter from Peggy Peterson, Luzerne County CYS.......................................................................88

Letter A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht (Apr. 5, 2001)..................................................................................................................90

Handwritten D Management Team Meeting Notes (Apr. 21, 2001) .............................................91

Vermont Department of Corrections Facility Report Form (June 13, 2001)................................92

Correctional Medical Services Interdisciplinary Progress Notes (July 2001) ..............................93

Pennsylvania State Police Central Repository Criminal History of Christopher Eike .................94

Handwritten D Management Team Meeting Notes (July 16, 2001)..............................................95

D Wing Activity Sheet...................................................................................................................96

Redacted E-mail (Sept. 20, 2001) ...............................................................................................97

Redacted E-mail (Sept. 20, 2001)................................................................................................98

Redacted E-mail (Sept. 20, 2001)................................................................................................99

Redacted E-mail (Sept. 20, 2001)..............................................................................................100

Redacted E-mail (Sept. 20, 2001)..............................................................................................101

Vermont Department of Corrections Facility Report Form (Sept. 20, 2001)..............................102

Redacted E-mail (Sept. 20, 2001)..............................................................................................103

Handwritten note of Bobby Lee..................................................................................................104

Handwritten note of Bobby Lee..................................................................................................105

Individual Voir Dire (May 4, 2005).............................................................................................106

Redacted E-mail (Sept. 25, 2001)..............................................................................................107

Commonwealth of Pennsylvania Police Criminal Complaint against Christopher Eike (Nov. 7, 2001) ...................................................................................................108

Prison Health Records of Robert Lee ........................................................................109

Intentionally Left Blank.............................................................................................110

Intentionally Left Blank.............................................................................................111

Vermont Department of Corrections Incident Report (Mar. 17, 2004) .....................112

Intentionally Left Blank.............................................................................................113

FOIA 302 (Apr. 6, 2005) ...........................................................................................114

Letter to Judge Sessions from A. Bunin (Apr. 27, 2005) ..........................................115

Sealed Document Order, Case No.:2:01-CR-12 (Apr. 28, 2005) ..............................116

Jury Instructions.........................................................................................................117

Intentionally Left Blank.............................................................................................118

FOIA 302 (May 9, 2005) ...........................................................................................119

Intentionally Left Blank.............................................................................................120

Intentionally Left Blank.............................................................................................121

Letter from William B. Darrow and Stephen Kelly to Alexander Bunin, Gene Primomo, and Paul Volk.........................................................................................................................122

Blank Juror Questionnaire .........................................................................................123

Juror No. 26 Questionnaire (May 13, 2005) ..............................................................124

Juror No. 162 Questionnaire (May 23, 2005).............................................................125

Intentionally Left Blank.............................................................................................126

Intentionally Left Blank.............................................................................................127

FBI Report (June 14, 2005) .......................................................................................128

FBI 302 Report of Interview with Christopher Eike (June 15, 2005) ........................129

United States' Trial Memorandum, United States v. Donald Fell ...............................................130

Letter to Judge Sessions from David V. Kirby (June 29, 2005)..................................................131

FBI 302 Report of Interview with [Redacted] (July 5, 2005) .....................................................132

FedEx Air Bill from Town of Bethel Justice Court to Andrew Bartnick (July 6th, 2006)..........133

Letter to Judge Sessions from Alex Bunin (July 8, 2005) ..........................................................134

Stipulation (July 8, 2005)............................................................................................................135

Intentionally Left Blank..............................................................................................................136

Memorandum to Alex Bunin from Paul Volk (July 20, 2005)....................................................137

Donald Fell's Motions for Judgment of Acquittal and New Trial, United States v. Donald Fell
    (Aug. 26, 2005) ......................................................................................................................138

Affidavit of Richard Wetzel, Ph. D (Sept., 12, 2005).................................................................139

Appeal from the United States District Court for the District of Vermont, Brief of the United
    States, United States v. Donald Fell (May 25th, 2007) ..........................................................140

Letter to Victims Resource Center from Wanda Rivera (Apr. 21, 2005) ...................................141

Letter from Victims Resource Center to Andrew Bartnick (May 4, 2005) ................................142

School Heath Record of Donald Fell ..........................................................................................143

Intentionally Left Blank..............................................................................................................144

Wilkes-Barre General Hospital Progress Record of Donald Fell (June 1993) ...........................145

Raymond Kotzer and Theresa Kotzer Divorce Records (Oct. 22, 1967) ...................................146

Arrest Warrant Affidavit for Donald Fell, Sr. (Mar. 4, 1990) ....................................................147

CYS Contact Sheet (Apr. – May 1990) ......................................................................................148

Jenkins Township Incident Report (Apr. 21, 1990)....................................................................149

CYS Contact Sheet (June 1990) .................................................................................................150

Service Planning/Family Functioning Report (June 1990).........................................................151

CYS Contact Sheet (Nov. 28, 1990) .......................................................................................152

CYS Contact Sheet (Jan. 14, 1991) ......................................................................................153

CYS Contact Sheet (Feb. 14, 1991).......................................................................................154

Intentionally Left Blank.........................................................................................................155

Intentionally Left Blank.........................................................................................................156

CYS Contact Sheet (Mar. 19, 1991) ......................................................................................157

Suspected Child Abuse Referral Note (Apr. 18, 1993) ...............................................158

CYS Contact Sheet (May 1, 1991) ........................................................................................159

CYS Contact Sheet (May 2, 1991) ........................................................................................160

CYS Contact Sheet (June 4, 1991) ........................................................................................161

CYS Contact Sheet (June 24, 1991) ......................................................................................162

CYS Contact Sheet (July 8, 1991) .........................................................................................163

CYS Contact Sheet (Dec. 20, 1991) ......................................................................................164

CYS Contact Sheet (Dec. 23, 1991) ......................................................................................165

CYS Contact Sheet (Jan. 13, 1992) .......................................................................................166

CYS Contact Sheet (Mar. 3, 1992).........................................................................................167

CYS Contact Sheet (Apr. 20, 1992).......................................................................................168

Intentionally Left Blank.........................................................................................................169

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (1993) ......................170

CYS Client Information Profile (Apr. 18, 1993) ........................................................171

CYS Contact Sheet (Apr. 20, 1993).......................................................................................172

Police Report (Jan. 26, 2001).................................................................................................173

Intentionally Left Blank.........................................................................................................174

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (June 8, 1993)..........175

Office of the Sheriff, Luzerne County (Aug. 31, 1993)...............................................................176

CYS Client Information Profile (Jan. 19, 1994) ........................................................................177

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................178

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................179

CYS Contact Sheet (Feb. 4, 1993)..............................................................................................180

CYS Contact Sheet (Mar. 10, 1994) ..........................................................................................181

CYS Contact Sheet (Mar. 24, 1994) ..........................................................................................182

CYS Contact Sheet (Apr. 7, 1994)..............................................................................................183

CYS Contact Sheet (Apr. 12, 1994)............................................................................................184

CYS Contact Sheet (Apr. 12, 1994)............................................................................................185

St. Michael's School Psychiatric Note (May 1994).....................................................................186

St. Michael's School Psycho Social Summary (Apr. 1994) ........................................................187

FBI Identification Record for Debra Fell (June 9, 1994)..............................................................188

Wilkes-Barre Police Department Jailer's Report (Oc. 18, 1994) ...............................................189

Arrest Report for John Rhodes (Oct. 18, 1994) .........................................................................190

Citation for John Rhodes (Oct. 18, 1994) ..................................................................................191

Wilkes-Barre Police Special Report for John Rhodes (Oct. 18, 1994).......................................192

Risk /Severity Assessment Form (Oct. 26, 1994)......................................................................193

Arrest Report for John Rhodes (Jan. 12, 1995) .........................................................................194

Arrest Warrant for John Rhodes (Feb. 9, 1994).........................................................................195

Arrest Warrant for John Rhodes (Jan. 12, 1995) .......................................................................196

CYS Contact Sheet (Jul. 1995) ..................................................................................................197

Substance Abuse Evaluation for Donald Fell (Sept. 16, 1996) ....................................................198

Affidavits Submitted in Motion in Limine in United States v. Haynes (May 24, 2000).............199

Letter to Judge Niedermeier (Dec. 5, 2000) ...................................................................200

Letter to Charles Tetzlaff (Dec. 5, 2000).......................................................................201

Letter to Judge Murtha (Dec. 11, 2000)........................................................................202

Rutland Herald Article (May 13, 2002)..........................................................................203

Burlington Free Press Article (May 15, 2002)...............................................................204

Donald Fell's Objections to Punishment-Related Questions (Jun. 10, 2002)............................205

Declaration of Thomas V. Ryan .....................................................................................206

Letter to David Kirby (Feb. 23, 2005) ...........................................................................207

Letter to Judge Sessions (Jun. 29, 2005)........................................................................208

Special Verdict Form (Jul. 14, 2005)..............................................................................209

Criminal History Record of Deborah Fell (Apr. 10, 1996) ........................................................210

Rutland City Police Department Incident Report (1996) ............................................................211

Rutland City Police Department Report (1994-2000) ..................................................................212

New York State Police Investigation Report (Dec. 1, 2000).......................................................213

Criminal Docket for Christopher Eike (Oct. 8, 2002) ...............................................................214

Government Opposition to Motion (Jul. 10, 2002)......................................................................215

FBI Record (Apr. 25, 2005)............................................................................................216

Donald Fell Event Table (Apr. 30, 2005) .....................................................................217

FBI Record (May 11, 2005).............................................................................................218

FBI Record (May 16, 2005).............................................................................................219

FBI Record (Jun. 9, 2005)..............................................................................................220

FBI Record (Jun. 6, 2005)..................................................................................221

Adolescent Psychiatric Reports for Donald Fell (1993) ...............................................222

Bail Certificate (Mar. 4, 1997)..........................................................................223

CYS Contact Sheet (May 20, 1992) ......................................................................224

FBI Record (Jun. 27, 2005)................................................................................225

FBI Record (Jun. 9, 2005)..................................................................................226

Statement by Teri Fell to Sullivan County Sheriff (Aug. 12, 2000)............................227

Deposition of Lance Rowland (Aug. 12, 2000)......................................................228

Certificate of Disposition (Aug. 16, 2000) ...........................................................229

Individual Voir Dire (Jun. 1, 2005) ....................................................................230

Police Report (Nov. 1, 2002) .............................................................................231

Wilkes-Barre Times Leader Article (Oct. 5, 2004) ...............................................232

Law and Human Behavior Article (1991) .............................................................233

Specialty Guidelines for Forensic Psychology .......................................................234

United States v. Fell Court Order (Apr. 7, 2005)...................................................235

Transcript Excerpt (May 13, 2005).....................................................................236

Intentionally Left Blank.....................................................................................237

Fell Motion to Dismiss Notice of Intent to Seek Death Penalty ...............................238

Declaration of Juror 23 .....................................................................................239

Conviction Record of Juror 26 (Apr. 2, 1996).......................................................240

Declaration of Juror 143 ...................................................................................241

Declaration of Sally Fell Francis ........................................................................242

Declaration of Ronald Cupano.............................................................................243

Declaration of Rose O'Hop ...................................................................................244

Declaration of Claudia Bublo ...............................................................................245

Trial Transcript Excerpt (May 13, 2005) ..............................................................246

Declaration of Robert Fell ....................................................................................247

Declaration of Dorothy Grivner............................................................................248

Declaration of John Timek....................................................................................249

Declaration of Florence Wallace ..........................................................................250

Declaration of John Gacek....................................................................................251

Declaration of Adele Gacek .................................................................................252

Declaration of Ernie Schuldaski ...........................................................................253

Declaration of Jon Migatulski...............................................................................254

Declaration of Steve Ratte ...................................................................................255

Declaration of Marc Pelkey ..................................................................................256

Voir Dire Transcript..............................................................................................257

Declaration of Richard T. Callery, M.D., F.C.A.P. ................................................258

Intentionally Left Blank.........................................................................................259

Declaration of Mark J. Mills, J.D., M.D. ..............................................................260

Intentionally Left Blank.........................................................................................261

Declaration of Andrew Bartnick............................................................................262

Declaration of Gene Primomo ..............................................................................263

Declaration of Alexander Bunin ...........................................................................264

Declaration of Cynthia Ayres ...............................................................................265

Declaration of Sandra Shum .................................................................................266

Declaration of Deborah Wisell ................................................................................................267

Declaration of Anthony Mistretta ...........................................................................................268

Declaration of Dora Carter......................................................................................................269

Declaration of Jeff Van Buren ................................................................................................270

Declaration of Pat Johnson .....................................................................................................271

Declaration of Mary Bell ........................................................................................................272

Transcript of Juvenile Proceedings (Apr. 8, 1994) .................................................................296

Childline Record (Apr. 22, 1991) ...........................................................................................297

Officers Report........................................................................................................................298

Prison Record (Jun. 11, 2001).................................................................................................299

Declaration of Michael Sikirica ..............................................................................................300

Declaration of Francis Bellantoni ...........................................................................................301

Declaration of Lucinda Fruean ...............................................................................................302

Declaration of Michael Leight.................................................................................................303

Declaration of Paul Stoss.........................................................................................................304

Declaration of Paul Volk .........................................................................................................305

Declaration of Charles Wetli ..................................................................................................306

Birth Certificate of Theresa Kozersky (Aug. 9, 1935).............................................................307

Death Certificate of Frances Kozerski (Apr. 20, 2001) ...........................................................308

Declaration of John Edens ......................................................................................................309

Government Motion in Limine to Exclude Report (Jul. 6, 2005).............................................310

Individual Voir Dire Excerpt (Jun. 6, 2005)............................................................................311

Photographs of Fell Home .......................................................................................................312

Declaration of Jamie Dominick ...................................................................................313

**SEALED EXHIBITS**

15

# EXHIBIT 115

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

Albany - Main Office
39 North Pearl Street
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

Syracuse - Branch Office
4 Clinton Exchange
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

Burlington - Branch Office
P.O. Box 1112
BURLINGTON, VT 05402-1112
(802)951-6472
(802)951-6282 FAX

Respond to Albany Office

April 27, 2005

| EX PARTE & SEALED |
|---|

Honorable William K. Sessions
United States Chief District Judge
11 Elmwood Street
Burlington, Vermont 05401

> **Re:**    **USA v. Donald Fell**
> **Case No.: 2:01-CR-12**

Dear Judge Sessions:

Enclosed please find a proposed order with regards to obtaining records from the Luzern County Children and Youth Services. This agency is required by state law not to disseminate its records without a Court order.

It is anticipated that these documents may be utilized during the penalty phase, if any, in the above-reference trial, and may be discoverable to the government at that time. It is anticipated that the records may contain sensitive information involving Mr. Fell's treatment and counseling when he was a minor and therefore, the defense we are making this request ex parte and moves that the Order be sealed.

Respectfully submitted,

ALEX BUNIN
FEDERAL PUBLIC DEFENDER
Gene V. Primomo
Assistant Federal Public Defender

GVP/ls

enc.

cc:    Paul Volk, Esq.

FELL-00001342

# EXHIBIT 116

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF VERMONT

UNITED STATES OF AMERICA

v.                                             Case No.: 2:01-CR-12

DONALD FELL

**ORDER**

SEALED DOCUMENT

NOW, this 28 day of April, 2005, at 10:00 o'clock a.m., following a Court Review, Luzerne County Children and Youth Services is directed to provide a copy of its investigative file from 1982 to 1998 regarding the minor child, Donald Fell, DOB 4/30/1980 to Alex Bunin, Gene Primomo and Paul Volk, attorneys for Donald Fell. Referral sources, anyone who cooperated in any investigation, any reports originating from other agencies, medical records, confidential information concerning the foster home and foster parents, and any statements made by Donald Fell to his/her therapist shall not be released. A list of all of the documents not released shall be provided to defense counsel. These records shall be used for Court purposes only and shall not be released by the parties or counsel to any other person or entity. These records in their entirely shall be returned to Luzerne County Children and Youth Services following final disposition of this case.

BY THE COURT,

Honorable William K. Sessions, III
United States Chief District Judge

FELL-00001343

# EXHIBIT 117

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA        :
                                :
            v.                  :            2:01-CR-12-01
                                :
DONALD FELL                     :
                                :

JURY INSTRUCTIONS

Good Morning, Ladies and Gentlemen.  I want to welcome you to this proceeding of the United States District Court for the District of Vermont and thank you for coming here today.  My name is William K. Sessions III and I am the chief judge of the United States District Court for the District of Vermont.

I will be presiding over the case of United States v. Donald Fell.  I will be discussing this case briefly with you in a moment.

Before I get into the case, however, there are a couple of preliminary points that I want to make to you.  First, I want to repeat my thanks for your being here today.  The jury is central to the administration of justice under our American system of law.  The obligation of every citizen to appear and to participate on a jury is one of the few responsibilities of citizenship specifically mentioned in our Constitution.  In a very real sense your presence today and your participation in this jury selection process is part of a long and honored

1

tradition involving hundreds of thousands of Americans over the years.

At the same time, I want you to know that I recognize, and all of us at the court recognize, that, for some of you at least, your appearance here today is an inconvenience. The jury selection can be tedious and jury service does disrupt the jurors' daily lives. We will be doing everything we can at the Federal Court to make sure that the process runs as smoothly and efficiently as possible. Nevertheless, I do want to recognize that what is probably obvious to everyone, that it may for some of you be a bit of a pain to be here this morning.

You perhaps noticed that I said the obligation to serve as a juror falls on everyone. Recognizing that jury service is a duty of citizenship, and also something of an inconvenience, I hope that you will also come to find, if you serve as a juror, or even as you go through this jury selection process, that the experience is valuable, worthwhile and perhaps even inspiring. It is relatively rare that citizens gather to work together on something as important as a jury trial. I make it a practice after every trial to speak privately with the jury. I do not make any inquiry with regard to the substance of the jury's deliberations, which I consider to be sacred, but I do ask the jurors generally about their experience and if there is anything the court could have done to make that experience more convenient

2

or more interesting. I am told unanimously that jurors find their experience to be worthwhile and interesting, though at times difficult. I hope you will find the same if you come to serve on a jury in federal court.

Let me tell you something about the time involved this morning, and give you some information about the case that we will be addressing.

First, as to this morning. Once I finish these preliminary remarks, a questionnaire will be distributed to you. As you fill it out, please do not discuss the questions or your answers with anyone else in the room. Also, please remember that there are no right or wrong answers to the questions contained in the form. All we ask is that you answer the questions truthfully to the best of your ability. The questionnaires are not designed to pry into personal matters unnecessarily. By filling out the questionnaires, you will make the jury selection process move more efficiently and smoothly.

Returning again to this morning's proceedings, once you have filled out the questionnaire and given it to our clerk staff by the main door, you will be free to leave. The questionnaires will be photocopied and reviewed by the attorneys working on this case. No other person will be permitted to look at the questionnaires, and they will be maintained under seal for review only by the court and the lawyers connected with this case. In

3

FELL-00001346

other words, the questionnaires will be confidential.  They will not be disclosed to the public generally and will be reviewed only by court personnel, the attorneys and their staff.

The formal process of jury selection will begin on Wednesday, May 4, as groups of 15 to 30 jurors are called in daily for discussion about their ability to serve.  Because this is only a preliminary proceeding, and to avoid unnecessary complications, I have requested that neither Government witnesses, nor defense witnesses, nor the defendant himself be present here today.  The attorneys have agreed to this.  I have tentatively planned to begin the trial during the week of July 5th.  Once the trial begins, we will be sitting from 8:00 a.m. to 2:30 p.m. daily, with occasional breaks.  The trial is expected to last through the month of July.  As you can see, this is a relatively long case, but we will all do our best to try to complete it in a shorter period if possible.

Once again, I do want to stress also that I am not insensitive to the disruption jury service on this case could work on your daily lives and routines.  But I do ask you to keep uppermost in your minds the important goals that this process, and ultimately the jury itself, serves.  You will be given the opportunity to inform the court if service in such a lengthy trial will work an exceptional hardship on you.

It is important that the men and women who are selected as

4

FELL-00001347

jurors in this case be confident that they can hear the evidence offered at trial and render their verdict fairly and impartially. I will be using the terms "fairly and impartially" at times during the jury selection process. Let me explain to you what I mean, to serve "fairly and impartially" means to base any verdict in the case on the evidence presented in this courtroom and not on anything that you may have heard or read or experienced outside the courtroom. The purpose of this procedure we are about to go through is to try to insure the fairness and impartiality to both sides in this case.

In a minute, I am going to summarize the charges in this case, and the possible structure of the trial. Please keep in mind that I do this only so that you can understand what the case will be about. The charges against the defendant Donald Fell are not evidence in any way. As we begin the trial, the defendant, like all defendants, is presumed innocent. This is not merely a technicality. The defendant at the beginning of a trial is to be presumed innocent, in the same way that any other individual in this room – – you, me or anyone else – – would be presumed innocent. He cannot be found guilty of anything unless the Government proves him guilty beyond a reasonable doubt using evidence properly presented in the courtroom. You should not assume in any way that by describing the charges against the defendant here, I am suggesting that the defendant is guilty.

5

FELL-00001348

The burden is on the Government at the trial to prove the defendant guilty beyond a reasonable doubt before he can be found guilty of anything.

The Government has brought four charges against the defendant. The first charge:

**Count 1:** **On or about November 27, 2000, in the District of Vermont, the defendant DONALD FELL, with intent to cause death and serious bodily harm, took by force and violence and by intimidation from the person and presence of Teresca King a 1996 Plymouth Neon automobile, a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, and the death of Teresca King resulted from such taking of the automobile.**

**Count 2:** **On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL unlawfully seized, kidnapped, abducted and carried away Teresca King and held her for ransom, reward and otherwise, and willfully transported her, while she was alive, in interstate commerce from the State of Vermont to the State of New York, resulting in the death of Teresca King.**

**Count 3:** **On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL knowingly possessed and brandished a firearm, specifically a Mossberg 12-**

6

FELL-00001349

**gauge shotgun, in furtherance of crimes of violence for which they may be prosecuted in a court of the United States, namely, carjacking and kidnapping, in violation of 18 U.S.C. §§ 2119 and 1201.**

**Count 4:  On or about and between November 27, 2000 and November 30, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL, who was a fugitive from justice, transported a firearm, to wit, a Mossberg 12-gauge shotgun, in interstate commerce between the State of Vermont and the States of Arkansas.**

Having summarized the charges, it is important for me to emphasize again that these are only charges and no more.  Charges are not evidence.  The defendant has denied any involvement in the crimes charged against him and he is presumed innocent.  He may be found guilty only if the Government proves him guilty beyond a reasonable doubt by proper evidence offered to the jury.

I want to say something more about two of the charges brought against the defendant.  Counts 1 and 2 carry a possible sentence of death.  Counts 1 and 2 charge Fell with carjacking and kidnapping, both with death resulting

Such a charge is often referred to as "capital offense." The Government has advised both this court and Mr. Fell that, if he is found guilty by a jury of any one of these two counts, it will ask the jury to impose the death penalty.

7

FELL-00001350

Some of you may wonder how the Government can ask for a sentence of death given that the State of Vermont does not have the death penalty. The simple answer is that the two counts brought against Mr. Fell involve a federal, not state, crime, and that Congress, our national legislature, has provided for death as a possible penalty for this offense.

The most serious and difficult decision any jury can be asked to make is whether the death penalty should be imposed in a particular case. When we begin the further process of jury selection this week, with small groups of jurors coming to court every day, I will be asking the potential jurors individually about this subject. It may be useful for me to explain to you briefly how the death penalty statute at issue in this case works, so that you can begin to think about this subject with some care before I begin questioning you, and as you prepare to answer the questionnaire.

Because of the capital charges, the trial of this case will potentially involve two stages. During the initial stage, the jury's sole task will be to determine whether the Government has proved Mr. Fell guilty beyond a reasonable doubt of the charges brought against him. During this initial stage of the trial, the possibility of punishment may not enter into your deliberations at all. Indeed, as to all the charges with the exception of the two counts I mentioned, the issue of any possible sentence in a

8

FELL-00001351

case such as this would be for the court alone to consider. Except in capital cases, juries bear only the responsibility of deciding whether the Government has proved its case. Thus, if the jury should be determine that the Government has not carried its burden of proving the defendant guilty beyond a reasonable doubt with regard to any of the two charges, then the jury's responsibility will be completed. If the jury concludes that the Government has carried its burden of proving the defendant guilty beyond a reasonable doubt on any of the other charges, then the court will have the responsibility of determining the sentence, which would not include capital punishment.

On the other hand, if, at the conclusion of the first stage, the jury reports that it does find Mr. Fell guilty beyond a reasonable doubt of at least one of the two counts for which the death penalty may be imposed, we would proceed to a second stage, a sentencing hearing addressing whether the death penalty should be imposed.

During that further hearing, the Government would have the opportunity to introduce evidence as to certain things referred to in the law as "aggravating factors." Aggravating factors would be circumstances that make the offenses alleged particularly serious and, therefore, in the Government's view, tend to favor the imposition of the death penalty. Mr. Fell would have the opportunity at such a hearing to demonstrate to

9

you the existence of what are referred to as "mitigating factors." Mitigating factors are circumstances about the crime, or about Mr. Fell's background or character, that would suggest that the death penalty in not appropriate in this case.

Before a jury could vote to impose a death penalty, it would have to be unanimously persuaded that certain threshold factors that I would identify for you in my instructions had been proven beyond a reasonable doubt. Further, before a jury could vote to impose a death penalty, it would have to be unanimously persuaded that aggravating factors outweigh mitigating factors that one or more jurors found existed. Even if the jury did not find any mitigating factors in a given case, it would still have to be unanimously persuaded that the aggravating factors were themselves sufficient to justify a death sentence. Absent such unanimous agreement a jury could not vote to impose death upon the defendant. This decision whether or not to impose the death penalty is left exclusively to you, the jury. If you determine that the defendant should be sentenced to death, or to life imprisonment without possibility of release, the court is required to impose that sentence.

Obviously what I have just stated is only an overview of the law applicable to a jury's consideration of the death penalty. If this case were ever to require a sentencing hearing - - and I am by no means suggesting it will because I emphasize again Mr.

10

Fell, as he begins this trial, is presumed innocent under the law of the charges brought against him - - I would instruct the jury in much more detail about its duties.

I go over the law in this regard only to help you begin to think about the issues. During the jury selection process, I will be asking you whether you can fairly and impartially consider the death penalty should this case require a sentencing hearing. Specifically, I will be asking each of you whether, as a matter of moral or religious or philosophical or personal beliefs, you think you could ever vote to impose the death penalty under any circumstances. I will also be asking you a reverse type question: whether you think you would vote to impose the death penalty in any case in which intentional murder was proved, or in which intentional multiple murders were proved, without giving consideration to mitigating factors that might be presented.

There are no right or wrong answers to these questions. I will be asking them simply because, if this case goes to a sentencing hearing, both sides of the case are entitled to a jury that does not have its mind made up, one way or another, about the death penalty issue before the hearing begins.

Now, Ladies and Gentlemen, although you have only heard briefly about this case this morning and, indeed, have heard no evidence yet, it is extremely important that you do not discuss

11

FELL-00001354

this case with anyone.  This is because a jury's verdict must be free from outside influence.  So, I am ordering each and every one of you not to discuss this case with family, friends or any other persons from this point on until I either excuse you, or if you are selected as a juror, until the case concludes.  You may discuss the schedule with your family and employers, because they are entitled to know when you might not be available.  However, you are not to discuss anything else about this case, not even the nature of the case, whether it is civil or criminal, the names of the parties, or anything else, with anyone until you are either excused, or until the trial concludes.  In giving you this instruction I include the order that you are not to discuss the case amongst yourselves.

I have one other point to make before I let you begin the questionnaires.  It is possible this case will receive some coverage in the media.  Please do not read, look at, or listen to any reports about this case until you are either excused, or if you are selected as a juror, until the case concludes.  If you should by chance encounter a news story in the newspaper, on the radio, on television, or on the internet, please just turn the page, change the channel, or close the screen.  Do not read, listen to or watch anything related to this case.

To recap the schedule, once you have complete the questionnaire, please turn it in to one of the court staff.

12

Kathy will tell you when you need to return to the court for individual interviews.  Then you will be free to leave.  Remember not to discuss the answers with anyone else.  Remember also that there are no right or wrong answers to any of the questions.  We are only asking that you answer truthfully and to the best of your ability.  The answers to these questions will be used by the court and the attorneys solely for the selection of the jury in this case and for no other reason.  The confidentiality of these answers will be maintained by the court.  Please do write or print clearly.  If you cannot answer a question because you do not understand it, write "Do not understand" in the margin next to the question.  If you cannot answer the question because you do not know write "Do not know."  If you want to explain your answer, do so either in the space provided on the questionnaire, or on one of the sheets appended to the questionnaire.  Please write the number of the question, if you use one of the blank sheets.  If for any reason you do not wish to answer any particular question, please write the word "Private" in the margin next to the question and we will take this matter up with you privately, if necessary.

Because your answers are part of the jury selection process and become part of the record of this court, the answers must be truthful under the penalty of perjury, and you must sign the questionnaire at the end.

13

Let me conclude as I began, by thanking you for being here this morning and taking part in this questionnaire.  We will now distribute the questionnaire.

14

FELL-00001357

# EXHIBIT 118

# INTENTIONALLY LEFT BLANK

FELL-00001358

# EXHIBIT 119

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/10/2005

b6
b7C

White male, Date of Birth, Social Security Account Number: [____] cell phone number: [____] home phone number: [____] was interviewed at his [____] where he is employed as a [____] stated that he resides at [____] After being advised of the official identity of the interviewing agent and nature of the interview, [____] provided the following information:

[____] advised that he first became acquainted with DONALD FELL in approximately 1986 when [____] and FELL were five years of age. [____] explained that the FELL family resided in a double block home on Bennett Street, Kingston, PA. [____] grandparents resided in the other side of the double block and owned the building. The FELL family paid monthly rent to his [____] stated that the FELL family consisted of DONALD FELL, DONALD's mother; DEBRA, his father; [____] and [____] [____] stated that [____] as just a baby when he knew DONALD. [____] described DONALD FELL as his first childhood friend. [____] stated that he would play with DONALD on almost a daily basis from age 5 - 9. [____] visited his grandparents each day and made it a point to see DONALD. [____] stated that DEBRA FELL taught him to ride a bicycle.

[____] recalled that DEBRA and [____] argued a great deal. Even as a child, [____] could tell that DONALD's parents consumed beer a lot. [____] never recalled seeing the police at their home for any domestic reasons. [____] stated that he never attended the same school as DONALD FELL because he did not live in the same neighborhood. [____] stated that when he was ten years of age and in the fourth grade, he attended school in Greece. His father's side of the family still resides in Greece. [____] advised that as a child, he often vacationed in Greece during the summer months. When he was ten years old, his vacation in Greece was extended, therefore, it was decided by his parents, that he spend the entire school year in Greece. Right before he departed for Greece was the last time he saw DONALD FELL.

b6
b7C

[____] described FELL as a normal child who enjoyed riding his bike and playing board games. They would occasionally

b6
b7C

7A-AL-44453-302
-78

Investigation on   05/09/2005   at Kingston, Pennsylvania

File #  7A-AL-44453 (SRA) -302 - 78      Date dictated  05/10/2005

by  SA [____] jg
b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-AL-44453 (SRA)

Continuation of FD-302 of _____ , On __05/09/2005__ , Page __2__

spend time together at a local playground located on Church Street
in Kingston, PA. [          ] stated that he never observed FELL act in a
violent manner during the four years that he knew him. [          ]
stated that he heard about FELL'S parents being engaged in a
stabbing at their residence that occurred in approximately 1985,
however, he heard about this incident when he was much older and
did not recall the incident when it happened.

b6
b7C

FELL-00001360

# EXHIBIT 120

# INTENTIONALLY LEFT BLANK

FELL-00001361

# EXHIBIT 121

# INTENTIONALLY LEFT BLANK

FELL-00001362

# EXHIBIT 122



**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                          *Fax  (802) 951-6540*
May 18, 2005

**By Hand**:

Alexander Bunin, Esq.
Gene Primomo, Esq.
Office of the Federal Public Defener
39 North Pearl Street
Albany, NY 12207

Paul S. Volk, Esq.
Blodgett, Watts & Volk
P. O. Box 8
Burlington, VT 05402-0008

      Re:   <u>United States v. Donald Fell</u>
            Criminal No. 2:01-CR-12

Dear Messrs. Bunin, Primomo, and Volk:

     Please find enclosed copies of the defendant's prison file from the Northwest
Correctional Facility in St. Albans, Vermont. The United States may offer records from this file
and/or call witnesses to incidents described in these records as part of our rebuttal case in the
sentencing phase of the trial. Also, please be advised that the United States is seeking additional
materials from the Northwest Correctional Facility for its rebuttal case, which will be made
available to you upon receipt.

     If you have any questions concerning this matter, please contact me directly at (802) 951-
6725.

                            Sincerely,

                            DAVID V. KIRBY
                            United States Attorney

             By:                 
                            WILLIAM B. DARROW
                            STEPHEN D. KELLY
                            Assistant U.S. Attorneys

# EXHIBIT 123

## UNITED STATES v. DONALD FELL
### 2:01 CR 12-01

Juror No.

FELL-00001364

20

(d) If you answered "YES" to (a) or (b) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

YES _____ NO _____

IF YES, please explain _____

_____

_____

44.    Have you or any close friend or relative, ever been treated for a substance abuse problem?

IF YES, please explain _____

_____

_____

As a result of that problem, did you or your close friend or relative have any contact with the Criminal Justice system?

_____

_____

_____

45.    This case is being prosecuted by the United States Attorney's Office for the District of Vermont. The United States Attorney for this District is David V. Kirby. Do you or does any relative or friend know or have any connection with David V. Kirby or anyone associated with the office?

IF YES, please explain _____

_____

_____

FELL-00001365

# EXHIBIT 124

## UNITED STATES v. DONALD FELL
### 2:01 CR 12-01

Juror No. 26

5/13/05
9am

FELL-00001366

19

---

(d) If you answered "yes" to (a), (b) or (c) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

YES _____ NO _____

IF NO, please explain_____

_____

_____

43.  (a)  Have you or has a family member or close friend ever been involved in or been the target of a criminal investigation?

YES _____     NO ___✓_____

IF YES, please explain _____

_____

_____

(b) Have you or has a family member or close friend ever been charged with a crime?

YES _____     NO ___✓_____

IF YES, what was the result of that prosecution?

_____

_____

(c) If you answered "YES" to (a) or (b) above, was the individual who was investigated or charged treated fairly by the criminal justice system?

YES _____ NO _____

IF NO, please explain _____

_____

Juror # 26

# EXHIBIT 125

UNITED STATES v. DONALD FELL
2:01 CR 12-01

Juror No. *162*

5/23/05
1pm

FELL-00001368

16

IF YES, please explain.

_____

_____

_____

38.   (a) Have you or has a family member or close friend ever been a witness to or the victim of a crime?

YES _____        NO __✓__

IF YES, please explain _____

_____

(b) Did you or your family member or close friend report that crime to the police or other law enforcement agency?

_____

(c) Did law enforcement personnel respond to the report appropriately?

_____

(d) Were you, or was your family member or friend, called to testify?

_____

(e) Is there anything about this experience which would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?

YES _____        NO _____

IF YES, please explain _____

_____

Juror # _162_

FELL-00001369

# EXHIBIT 126

# INTENTIONALLY LEFT BLANK

FELL-00001370

# EXHIBIT 127

# INTENTIONALLY LEFT BLANK

FELL-00001371

# EXHIBIT 128

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** PRIORITY                    **Date:** 06/14/2005

**To:** Philadelphia                 **Attn:** Williamsport RA:
                                              SA

**From:** Albany
         Vermont - Rutland RA
         **Contact:** SA                          (802-

**Approved By:**

**Drafted By:**                                    *mch*          b6
                                                                 b7C
**Case ID #:** 7A-AL-44453     (Pending)                         b2

**Title:** ROBERT JOSEPH LEE, JR. (DECEASED);
          DONALD FELL;
          TERESCA KING - VICTIM (DECEASED);
          11/27/2000;
          KIDNAPPING/CARJACKING

**Synopsis:** To set lead for interview of
                                                                 b6
                                                                 b7C

**Administrative:** Reference telcal between SA
and SA                     on 06/14/2005.

**Details:** Captioned kidnapping/carjacking (death resulting) case
is scheduled to go to trial, in Burlington, Vermont, on
06/20/2005. Subject Donald Fell is facing the death penalty. (The
other subject, Robert Lee, Jr., "accidentally" killed himself in
jail in September 2001.) During captioned investigaiton, it was
learned that both subjects, Fell and Lee,

The manner to which King was killed by Fell and Lee was
                                                                 b6
                                                                 b7C
                                                                 b7D

                                    Background of captioned case as well as
additional information regarding                    Fell and
Lee, is listed below.

**Background of Case:** On 11/27/2000, the Vermont State Police, in
Rutland, Vermont, initiated an investigation into the mysterious
disappearance of Teresca Ruth King, aka Terry King, of Clarendon,

7A-AL-44453
-186

        CC   b6
             b7C

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

Vermont.  King had last been seen at the drive-up window of the Dunkin Donuts, Main Street, Rutland, Vermont at approximately 3:30 a.m. on 11/27/2000, while on her way to work (4am-8am shift) at the Price Chopper grocery store.  According to records at the Price Chopper, King did not report to work that morning. [          ] became concerned when he returned home from work at approximately 5:30 p.m. and did not find King at home.  King's normal routine was to return home from work by 8:00 a.m. and then spend the day with her daughter and grandchildren. The Vermont State Police then entered Teresca King and her vehicle into NCIC as missing.

        On 11/30/2000, the Clarksville, Arkansas Police Department stopped a vehicle matching the description of King's Dodge Neon pursuant to a motor vehicle violation.  The vehicle was missing the registered Vermont license plate and was instead displaying Pennsylvania license plate BAY8383 which had been reported stolen from Wilkes-Barre, Pennsylvania on 11/30/00.  The vehicle was being driven by Lee while Fell was in the driver's passenger seat.  The registration for the vehicle revealed the vehicle belonged to Teresca and [          ] of North Clarendon, Vermont.  The Clarksville Police Officer subsequently arrested Lee and Fell on traffic charges and misdemeanor drug charges. After Fell was arrested and placed into the patrol car, he attempted to escape by kicking the car's window out.

        Additional investigation by the Clarksville Police Department led to the discovery of pieces of clothing which matched the last known clothing that Teresca King was wearing at the time of her disappearance.  Also uncovered was a Mossberg shotgun.  The Clarksville Police Department then contacted the Vermont State Police after running the vehicle through the NCIC system.

        The Vermont State Police immediately contacted the Rutland, Vermont Resident Agency and requested the FBI's assistance with this investigation.  The Albany Division then initiated a kidnapping investigation with regards to the disappearance of Teresca King. The Albany Division then requested the Little Rock Division to have the subjects interviewed at the conclusion of a background check on the subjects in the Vermont and Pennsylvania areas.

        That same day, at approximately 6:30 p.m., the FBI directed officers from the Rutland Police Department to the residence of Debra Fell, Donald Fell's mother, at 135 Robbins Street, Rutland, Vermont.  Upon their arrival the officers observed two individuals in the front living room area who appeared to have been murdered.  FBI Special Agents and Rutland Police Detectives responded to the scene.  Further investigation

2

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

into the apartment revealed a white female, later identified as Debra Fell, and a white male, later identified as Debra Fell's male friend, Charles Conway.  Further investigation revealed that Conway's throat had been cut and Fell had been stabbed multiple times in the back and throat.  A folding knife was located in a bathroom sink and a steak knife, covered in what appeared to be blood, was found on the kitchen table.

After the discovery of the two murdered victims in Rutland, VT, the Albany Division immediately contacted the Little Rock Division to advise them that Fell and Lee were now the prime suspects in the Rutland, VT, double homicide, and most likely kidnapped and murdered Teresca King.  Special Agents of the FBI Little Rock Division, Ft. Smith Resident Agency, arranged to interview Lee and Fell.  After waiving their Miranda rights and agreeing to speak with the agents, Lee and Fell both confessed to their involvement with the murders of Fell's mother, Debra Fell, and her friend Charles Conway. Both Lee and Fell also admitted to kidnapping/carjacking King with an unloaded shotgun, then killing her by stomping on her and beating her with a rock, in the woods off of Route 22, in Dover Plains, New York, approximately 3 1/2 hours from Rutland, Vermont.  With information provided by Lee, King's body was found by the New York State Police on 12/01/2000, at approximately 8:15 pm.

On 12/01/2000, an affidavit was filed in the U.S. District Court of Vermont, Burlington, Vermont, in support of a complaint charging Fell and Lee with kidnapping and carjacking in violation of Title 18, U.S.C. 1201(a) and 2119.   Arrest warrants were then issued by U.S. Magistrate Judge Jerome J. Niedermeier for both subjects.

On 02/01/2001, Fell and Lee were indicted by a Federal Grand Jury, in the District of Vermont, Burlington, Vermont, on charges of kidnapping (death resulting), carjacking (death resulting), brandishing a firearm in furtherance of crimes of violence, and possessing a firearm while a fugitive from justice.

As previously mentioned, Lee accidently killed himself in jail, in September 2001, while awaiting trial for captioned matter. Fell's trial is scheduled to begin 06/20/2005. The U.S. Government will be seeking the death penalty against Fell.

**Background of the** _____ Captioned
investigation determined that subjects Fell and Lee

b6
b7C
b7C

3



To:   ??   From:  Albany
Re:   7A-AL-44453, 06/14/2005

b6
b7C
b7D

b6
b7C
b7D

Note:  Copies of all the reports obtained from the[          ]   b6
were previously provided to SA[                    ] via facsimile,   b7C
on 06/14/2005.   b7D

[                    ]occurred approximately[          ]   b6
prior to the murders in Rutland and the kidnapping and murder of   b7C
victim Teresca King.[                    ]during which both Fell   b7D
and Lee[                         ]the assault and murder
of kidnapping victim King. Fell and Lee killed King by kicking,
stomping and hitting her in her face with a rock, while she lay
on the ground praying for her life.

The Williamsport RA is requested to interview
[             DOB          ]who is currently[          ]
[                ]In an attempt to locate[     ]case agent SA   b6
[          ](writer) telephonically contacted[          ]   b7C
[                ]telephone number[          ]at which   b7D
time writer learned that[              ]Writer asked
[          ]to ask her[          ]the next time he called her,
whether he remembered the incident. On 06/13/2005,[          ]
told writer that she spoke with[          ]and that he recalled

4

FELL-00001375

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

the incident, including the guy named Don [____] is expecting to
be interviewed by the FBI regarding [____]

    An NCIC III and CCH conducted for [____] on 06/14/2005.
revealed the following criminal history for [____]

b6
b7C
b7D

b6
b7C

    During the interview, [____] should be questioned
regarding his knowledge of Donald Fell, Robert Lee, [____]
[____] and any others who associated with them.
should also be asked about [____] and to provide as many
details as he can remember, specifically [____]
[____] should be asked
about the drugs used by him and the others and the types of drugs
used. Other questions regarding any other violent or bizarre
incidents involving Fell and Lee should also be asked. (Note:
Investigation has determined that Fell tortured, dismembered and
killed a cat at a fair in Pennsylvania, not long before the
[____]
[____] Fell and Lee, may be used by
the prosecution as an aggravating factor in support of the death
penalty during the penalty phase after fell is convicted. It is
possible that [____] and brought to
Vermont to testify during the penalty phase.

b6
b7C
b7D

b6
b7C
b7D

    Due to the fact that the trial is scheduled to begin
06/20/2005, it is requested that the interview be handled
expeditiously. Albany/Rutland RA appreciates the receiving the
Williamsport RA's assistance with this short notice request.

5

FELL-00001376

To:    ??   From:  Albany
Re:    7A-AL-44453, 06/14/2005

**LEAD(s):**

**Set Lead 1:   (Action)**

    <u>PHILADELPHIA</u>

        <u>COAL TOWNSHIP, PENNSYLVANIA</u>

        Interview ▢▢▢▢▢ DOB ▢▢▢▢ who is
currently ▢▢▢▢▢▢▢▢▢▢ regarding the ▢▢▢▢▢▢▢▢
▢▢▢▢▢▢▢▢▢▢ and other issues as
requested in the EC.

                                              b6
                                            b7C
                                            b7D

♦♦

6

FELL-00001377

# EXHIBIT 129

SCI 302

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/15/2005

CHRISTOPHER EIKE, date of birth<sup>REDACTED - FELL</sup> 1983, was interviewed at the State Correctional Institute (SCI), Coal Township, Pennsylvania. After being advised of the identities of the interviewing agents and the purpose of the interview, EIKE provided the following information:

EIKE was asked if he recalled the events surrounding his being assaulted on August 12, 2000. EIKE said yes and provided the following information:

EIKE worked an ice cream concession stand at the Wayne County Fair. While working at the fair EIKE met a man named DON who also worked at the fair. EIKE did not recall what attraction or concession DON worked. EIKE also met a man he thinks was DON'S brother, and a girl he thinks was DON's sister while working at the fair. EIKE did not recall this man's name but said the girls first name was TERRI.

On the second day of the fair EIKE drove DON, DON's brother, his friend TIM, TERRI, and a girl named CRYSTAL LNU to Woodstock, New York in his Camero. EIKE recalled CRYSTAL LNU working the dart game at the fair and living in a trailer park near Beach Lake, Pennsylvania. The group went to Woodstock to drink and do drugs. EIKE recalled having a minor traffic accident on the way to Woodstock. His car slipped off the wet road into the woods where it became stuck. The group pushed his car out and continued on their way to Woodstock.

On the fourth day of the fair, two days after the first trip to Woodstock, DON, Don's brother, TERRI LNU, and CRYSTAL LNU asked EIKE to drive them to Woodstock again. Because his friend TIM would not be going, he initially told them no. EIKE changed his mind when they offered to pay for gas and give him drugs.

They arrived at Woodstock around midnight, listened to a band, and began smoking weed, doing acid and mushrooms. EIKE said the drugs were purchased at Woodstock. DONALD FELL provided mushrooms and TERRI LNU provided acid. This was the first time EIKE had done mushrooms or acid.

---

Investigation on   06/15/2005   at  Coal Township, PA

File # 7A-AL-44453                                    Date dictated  06/15/2005
        SA Timothy K. O'Malley
by   SA C. Patrick Austin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

04573

FELL-00001378

FD-302a (Rev 10-6-95)

7A-AL-44453

Continuation of FD-302 of   Christopher Eike _____ , On 06/15/2005 , Page __2__

       Around 6:00 AM that morning DON, DON's brother, TERRI
LNU, CRYSTAL LNU, and EIKE were in Yazgar's Barn.  EIKE told the
others that he had to drive them back because they had work that
day.  However, EIKE's Camero had been towed sometime during the
night.  Although his car had been towed, EIKE told the others that
he needed to drive them back several more times.  He did this
because "I was on acid so I was kind of messed up".

       When EIKE took the keys to his car out of his pocked and
again told the others he needed to drive them back, DON took off
his shirt and said "that's it".  DON came over to EIKE and punched
him in the face.  EIKE fell to the ground.  DON got on EIKE and
repeatedly punched him in the face and slammed his head into the
floor.  The floor was covered in rocks, possibly slate.  DON walked
away momentarily to drink beer.  When DON walked away, "another
guy" kicked EIKE in the back.  When DON returned, he urinated on
EIKE's leg and kicked him in the head and ribs.  EIKE does not
recall DON saying anything during the assault.  He heard the others
laughing and recalled seeing the girls laughing.

       Two men and an Italian looking girl with black hair
wearing a shiny blue jacket came to EIKE's assistance.  The two men
stopped the assault as the girl called 911.  EIKE passed out around
this time.  When he regained conscious he was in an ambulance and
recalled someone treating him say that they had brought him back.
EIKE believed that he had died and was resuscitated.

       EIKE claims the police told him it wasn't wise to file
charges because there were allegations that EIKE attempted to rape
DON's sister the night of the assault.  EIKE said the allegation
was untrue but was the basis for he and his parents decision not to
file charges.

       At the time of the assault EIKE had only known DON for a
few days.  EIKE said he had no idea why DON assaulted him.

       EIKE stated that he is willing to testify about this
assault.

**04574**

FELL-00001379

# EXHIBIT 130

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 JUN 17  AM 11 16

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA       )
                               )
            v.                 )      Criminal No. 2:03-CR-12-01
                               )
DONALD FELL,                   )
            Defendant.         )

## UNITED STATES' TRIAL MEMORANDUM

UNITED STATES OF AMERICA

DAVID V. KIRBY
United States Attorney
District of Vermont

WILLIAM B. DARROW
STEPHEN D. KELLY
Assistant U.S. Attorneys

FELL-00001380

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF EVIDENCE AT GUILT PHASE . . . . . . . . . . . . . . . . . 1

        A.      The Disappearance of Terry King on November 27, 2000. . . . . . . 1

        B.      The Arrest of Donald Fell on November 30, 2000. . . . . . . . . . . . . 3

        C.      The Discovery of Debra Fell and Charles Conway on
                November 30, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        D.      Statements of Donald Fell on
                November 30-December 2, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . 5

        E.      Evidence Regarding Accuracy of Fell's Statements . . . . . . . . . . . 7

                a.  Discovery of Terry King and New York Crime Scene . . . . . . . . 7
                b.  Wilkes-Barre, Pennsylvania Evidence and Witnesses . . . . . . . . 9
                c.  Rutland Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                d.  Search of Plymouth Neon . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        F.      DNA Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    GUILT PHASE IN LIMINE MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Motion *In Limine* Regarding Mitigation Evidence and
                Reference to Death Penalty at the Guilt Phase of Trial . . . . . . . . . 14

        B.      Response to Motion In Limine Regarding
                Background and 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Motion *In Limine* Regarding the Admission of Any
                Evidence by Defense at Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . 18

        D.      Motion for Production of Witness Statements
                Pursuant to Rule 26.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FELL-00001381

IV.    SENTENCING PHASE *IN LIMINE* MOTIONS . . . . . . . . . . . . . . . . . . . . . .19

  A. Response to Motion *In Limine* Concerning
   Offer to Plea by Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

  B. Response to Motion *In Limine* Concerning
   Letters of Robert Lee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

  C. Response to Motion In Limine Concerning
   Testimony of Dr. Welner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

FELL-00001382

## I.    PRELIMINARY STATEMENT

The United States of America, by and through its attorney, David V. Kirby, United States

Attorney for the District of Vermont, files this trial memorandum outlining the evidence it

intends to present at trial, identifying evidentiary issues that may arise, and responding to the

defendant's trial memorandum and his new *in limine* motions.

## II.    SUMMARY OF EVIDENCE AT GUILT PHASE

The government anticipates calling witnesses and offering evidence to present the case in

a chronological fashion as the investigators and victim's family learned of the crimes.  The

government has worked with defense counsel to streamline the guilt phase of the trial and

anticipates offering substantial evidence by stipulation, including certain fact witnesses and

expert testimony.  As discussed below, the government may also reduce the scope of testimony

and number of witnesses to be offered at the guilt phase, provided the Court and defense agree

that the testimony would be more appropriate at the sentencing phase of trial.  At present, the

government anticipates calling between 20 and 25 witnesses at the guilt phase.

### A.    The Disappearance of Terry King on November 27, 2000

The first witnesses called will establish the circumstances surrounding the disappearance

of Terry King.

Norman King, her husband, will testify concerning the morning of Monday, November

27, 2000, when he last saw his wife.  He will testify that Terry King was a woman of regular

routines and habits, and that when she and her car were unaccounted for that afternoon, the

family was concerned, contacted police, and filed a missing persons report.

William Liphardt, Terry King's co-worker at the Price Chopper, will testify that every

1

FELL-00001383

other Monday he and Terry King worked a special, early shift beginning at 4 in the morning. He will describe where Terry King parked at the Price Chopper and her work-related routines. For example, King routinely brought coffee and donuts to share with him before their early morning shift. He also will testify that on November 27th Terry King did not appear at work.

Peter Wink, an employee at Dunkin' Donuts on Route 7 in Rutland at the time, will testify that Terry King usually stopped at Dunkin' Donuts for coffee and donuts before work. He will describe how, consistent with her usual routine, on November 27th she stopped at Dunkin' Donuts between 3:30 and 4 in the morning. Wink was the last person, besides Donald Fell and Robert Lee, to see Terry King alive.

Finally, Joseph Trapasso, a baked goods delivery man, will testify that he arrived at the Price Chopper around 3 in the morning, and noticed two men lurking near the side of the Price Chopper building near where employees park. Initially, Trapasso noticed the two men as he drove by the Price Chopper on his way to pick up coffee at Dunkin' Donuts. Later, he stopped at the Price Chopper, as he did very early each morning, to check on what items he needed to deliver later in the morning. He parked near the front entrance to the Price Chopper and again noticed the two males near the building in the darkness. One was kneeling down, and the other was standing. He was suspicious of them and decided to lock the doors to his delivery van, something he did not normally do. As he walked toward the entrance to the Price Chopper, one of the males began walking toward him, then stopped, and Trapasso looked directly at him.[1] Trapasso was suspicious of the two men, but continued into the store. He spent approximately

_____

[1] Several days later, Trapasso saw this individual on television while watching news reports related to the arrest of Fell and Lee. The individual was Fell.

2

FELL-00001384

15 minutes in the Price Chopper and then returned outside to his delivery van. He looked for the two males, but could not see them.

**B.    The Arrest of Donald Fell on November 30, 2000**

Next, the government will introduce evidence of Fell's arrest in Terry King's car on November 30, 2000 in Clarkesville, Arkansas. The Court will recall the suppression hearing testimony of Clarkesville police officer Jeff Ross, who again will describe the arrests. Officer Ross will introduce evidence seized at the arrests, including Fell's shotgun, Lee's Florida license, and the Vermont registration for King's Dodge Neon. By stipulation, the government will also introduce booking photographs of Fell and Lee, as well as the clothing and footwear they wore when arrested.

**C.    Discovery of Debra Fell and Charles Conway on November 30, 2000**

After Clarkesville police found Terry King's Vermont registration in her car, they telephoned Vermont authorities and learned that King had been reported missing on the afternoon of November 27. When Vermont authorities learned that Donald Fell had been arrested in King's car, Rutland Police Officer Curtis Moore was dispatched to the apartment where Fell had been living with his mother, Debra Fell, at 135 Robbins Street in Rutland, Vermont.

Officer Moore was familiar with the apartment at 135 Robbins Street and had previously responded to several disturbances there. He will describe finding several unread newspapers lying outside the door to the Fell apartment, which was locked. Officer Moore then found an another entrance that was unlocked, but the door was blocked by furniture inside. He managed to push open the door several inches, and then he saw what appeared to be a dead male body

3

FELL-00001385

slumped in a chair and the hand of a second dead victim on the living room floor. He then secured the scene and contacted his supervisors.

Rutland Police Detective Chris Kiefer responded to the Robbins Street apartment, and she will testify about the initial entry into the apartment, as well as her processing of the crime scene that night and over the next several days. Det. Kiefer is trained in crime scene techniques and is Rutland's most senior crime scene technician. She and two other officers first entered the apartment to identify the bodies. At that time, officers did not know if one of the bodies might be Terry King. The officers later confirmed that the bodies were Charles Conway and Debra Fell. Det. Kiefer will also testify concerning her collection of evidence from the crime scene, including the two knives that appeared to be the murder weapons (they were wrapped in a towel on the kitchen table). Det. Kiefer also identified and took samples of numerous blood stains and droplets at the scene, and took photographs depicting the scene as it appeared. Det. Kiefer found no evidence of "crack" use at the apartment.

The government will offer photographs from the crime scene to show the layout of the apartment, the location of blood in the apartment, and the location of the bodies. The government has limited the photos of Conway and Debra Fell to four, three of which show an overall view of the living room and one of which shows the legs of Debra Fell only. Among the photographs available to the government (more than a hundred were taken at the scene), these are the least graphic and have the broadest overview. The defense has been advised of the four photographs depicting bodies that the government intends to offer.

At the guilt phase, the government may or may not call Medical Examiner Paul Morrow to explain the cause of death for the two Rutland murder victims. The government believes his

4

testimony is relevant to show the clear intent and state of mind of the attackers (there were multiple stab wounds to both bodies and clearly a struggle took place with Debra Fell at the scene) and to rebut Fell's claims that he did not know how or why the murders occurred (as Fell claimed in his later statements to police). Dr. Morrow would also testify that neither Debra Fell, nor Charles Conway had any illegal drugs in their systems, contradicting statements by Fell that everyone in the apartment was smoking "crack" cocaine that night. The government, however, may be willing to reserve the testimony of Dr. Morrow's for the penalty phase if the Court and the defense agree that his testimony would be more appropriate at that point (the government bears the burden of proving that Fell intentionally killed Conway and Debra Fell as aggravating factors in the sentencing phase). Thus, the government would offer the death certificates of Conway and Fell at the guilt phase, and call Dr. Morrow in the sentencing phase.

D.    **Statements of Donald Fell from November 30 to December 2, 2000**

On the afternoon of November 30, Clarkesville police officers placed Fell and Lee in detention at the Johnson County Detention Center. After Vermont officers found the two murder victims at the Fell apartment in Rutland, the FBI sent two Arkansas-based agents to interview Fell and Lee in Clarkesville. Over the next two days, Fell made five statements to various police authorities.

FBI Special Agent Jim Caudle will describe Fell's three initial statements to authorities. Before each statement, Fell was given Miranda warnings and each time he voluntarily agreed to speak to authorities.

In Fell's first statement, at around 11:30 pm on November 30, he claimed that a man named "John" driving King's car had picked him up hitchhiking with Lee. When the man

5

stopped at a store, Fell and Lee stole the car. Among other things, he claimed that the last time he saw his mother in Rutland she was fine.

The two FBI agents next interviewed Lee, who confessed to the three murders and the carjacking during an interview that lasted nearly two hours. Just before 3 in the morning, the agents then returned to speak with Fell again. The agents confronted Fell with the fact that the bodies (including the body of his mother) had been discovered in Rutland and Terry King, the owner of the car in which he had been arrested, had been missing for several days. In his second statement, Fell flatly denied wrongdoing ("I wouldn't kill my fucking mother", "I don't know any fucking Terry", and "I'm sticking by my first statement"). It was early in the morning, and the agents left the detention center to sleep.

The next morning (December 1), Agent Caudle learned that Fell had thought things over during the night and wanted to talk with the FBI again. Shortly after 9 in the morning, Agent Caudle returned to the detention facility and took a third statement from Fell. This time, Fell admitted to the killings and also wrote a two-page statement. Later that day (December 1), a New York State Police officer interviewed Fell and Lee by telephone, seeking to elicit information about where they had left King's body. Agent Caudle sat with Fell in Arkansas during the recorded interview, and he will introduce the recorded conversation (Fell's fourth statement).

Finally, the next day (December 2) three Vermont police officers who had viewed the Rutland crime scene flew to Arkansas and recorded a fifth statement by Fell. Detective Rodney Puslifer, then of the Rutland Police Department, will introduce Fell's final statement.

6

FELL-00001388

**E.    Evidence Regarding the Accuracy of Fell's Confession**

The next phase of the government's case will extend to evidence which corroborates and undermines, respectively, different parts of Fell's statements. In general, Fell admitted to certain facts that can be verified, while minimizing his responsibility for the crimes and at times lying about other facts.

**1. The Discovery of Terry King's Body and the New York Crime Scene**

On the evening of December 1, 2000, New York State police officers discovered Terry King's body in a wooded area near Route 22 in Dover, New York. Evidence from the murder scene corroborated aspects of Fell's confession. In his statements, Fell did not describe the area in any detail, but said that at some point not long after dawn on November 27, while he drove King's car south after passing into New York State (with King in the backseat and Lee in the front passenger seat), he stopped the car near a clearing. He told King to get out of the car and walk into the woods. He and Lee then got out, pursued her, and battered her to death – Fell kicking and stomping her, while Lee struck her with rocks. The two men left King's remains where they had killed her. They returned to King's car and proceeded south. Lee drove while Fell searched King's wallet for cash. After taking the cash, Fell tossed the wallet out the passenger window of her car. The two men then stopped at a Burger King and ate breakfast. Fell threw King's purse in a dumpster at the Burger King.

Three New York State Police officers and an FBI agent will describe the discovery of King's body and the evidence found at or nearby the crime scene.

Gary Mazzacano, a New York State Police Senior Investigator, will testify that on December 1, 2000 he participated in discussions regarding the possible location of Terry King's

7

FELL-00001389

body. Investigator Mazzacano received information that day from the telephonic interviews with Fell and Lee in Arkansas. Fell's information was too vague to be of much help. However, Lee recalled not only that they had killed King near a small clearing near a two lane north/south road in rural New York, but also that there was a target back-board in the clearing. Investigator Mazzacano, who had once been stationed in the Dover Plains, New York state police barracks, recalled that there was a clearing near Route 22 in Dover containing a target back-board near an abandoned gravel pit. Investigator Mazzacano drove to the area with two FBI agents. He also contacted the local Dover Plains barracks, which sent two troopers to assist in the search. Trooper Darren Bialiek will describe finding King's body in that area on December 1 as darkness fell. He will describe securing the crime scene that night.

The next morning, around sunrise, the New York State Police and the FBI sent evidence technicians to process the scene. New York State Police Senior Investigator Thomas Martin, one of the supervisors that morning, will describe the area and the location of the body, which was found more than 400 feet from Route 22 in the old gravel pit. He will introduce photographs and will describe finding two fiber samples on a thorn branch near the body. He also will describe how evidence technicians made footwear impression casts from foot prints leading from the road to the body. Martin also recovered a bloody rock near King's head. He will use a summary chart created by his team, which shows the area and the location of the footprints, the rock, the fiber, and other items. By stipulation, the government will offer the findings of FBI forensic examiners regarding the footwear impressions and one of the fiber samples. The footwear impressions were similar to the boots worn by Fell and Lee and one of the fibers matched clothing worn by Fell and Lee.

8

Next, FBI Special Agent Mark Promutico will describe finding King's wallet alongside Route 22 about 3.7 miles south of the body, and finding her purse at a Burger King in Pawling, New York, about 15 miles south of the body. He will introduce related photographs. There was also a Dunkin' Donuts bag found in King's purse. By stipulation, the government will offer evidence that a palm print of Robert Lee was found on the bag.

Michael Leight will testify that on November 27, 2000 he worked at the Pawling, New York Burger King. Leight took Fell's and Lee's breakfast orders that morning. When they asked him about buying marijuana, Leight later met with Fell and Lee outside the restaurant to discuss that possibility, but it never happened. Leight recalls that Fell and Lee were not acting out of the ordinary.

Finally, as with Dr. Morrow, the government will likely reserve the testimony of Medical Examiner Michael Baden, to describe Terry King's cause of death and offer his testimony only at the sentencing phase. At the guilt phase, the government will likely offer King's death certificate.

## 2. Wilkes-Barre, Pennsylvania Evidence and Witnesses

In his confessions, Fell stated that after killing Terry King in New York, he and Lee drove to their home town of Wilkes-Barre, Pennsylvania, where they stayed with neighborhood friends Matthew and Christian Kolojeski until the night of November 29. While in Wilkes-Barre, Fell found another Neon sedan like King's parked nearby and stole its Pennsylvania license plate. He then threw King's Vermont plates off a bridge into a brook not far from the Kolojeski apartment. The government will offer witnesses and evidence corroborating these admissions by Fell.

Matthew Kolojeski will testify that Fell and Lee arrived in Wilkes Barre on the afternoon

9

FELL-00001391

of November 27, 2000 driving a greenish car like a Neon sedan. Fell stated that he needed a screwdriver to do something with his car's license plates. The friends hung out for a couple days before Fell and Lee departed in the car, saying that they were going to California.

By stipulation, the government will offer the testimony of Wilkes-Barre resident Tara Richards, whose license plate was stolen by Fell and Lee. Richards parked her Pennsylvania plated Neon sedan near the street outside her home a few blocks from the Kolojeski apartment and she noticed that her license plate was missing sometime on November 29, 2000. Her stolen plate was found on King's Neon when Fell and Lee were stopped in Arkansas.

FBI Special Agent James Glenn will testify that he recovered the Vermont plates belonging to Terry King's car in a Wilkes-Barre brook near the Kolojeski residence.

### 3.   Rutland Witnesses

In his statements to authorities, Fell repeatedly claimed that he did not have serious arguments or disputes with his mother, that they had a good relationship in Rutland, and that he loved his mother. According to Fell, Lee also had a good relationship with his mother. He professed to have no idea why his mother and Conway were killed. Fell recalled an incident in mid-November 2000 when he was arrested by police in Rutland outside the Stop Lite bar on West Street. According to Fell, his mother called him from the bar and asked him to pick her up, then at the bar a patron came up to Fell and began kicking and spitting on him. According to Fell, his mother then began punching him, and pushing him out of the bar. Outside the bar, Fell said his mother fell to the ground after trying to kick him. Witnesses at the bar establish that Fell was lying: they observed Fell come in looking for his mother (not summoned by her), and then be ejected from the bar because of his aggressive behavior toward her and others. Outside the

10

FELL-00001392

bar, he knocked her down and spat on his mother. Other Rutland witnesses also describe Fell's intense animosity towards and assaults on his mother in the weeks before her murder. As argued in prior pleadings, this evidence is admissible on several grounds. *See* Opposition of the United States to Defendant's *In Limine* Motions for the Guilt Phase of Trial, Dkt. #112, at 7-13).

Vertith "Cindy" Oberle will testify that she was a friend of Debra Fell's in late 2000. In the late summer, she recalls discussions with Debra Fell before her son came to Vermont when she seemed excited, but nervous, about his arrival. After Fell's arrival, Oberle recalls visiting the apartment at 135 Robbins Street, where she observed Donald Fell interact with Debra Fell in a hostile and threatening manner. At that time, Debra Fell also told Oberle that she feared her son. Oberle told Fell to call the police, but Debra Fell was reluctant to do so.

Oberle also was present in the Fell apartment at 135 Robbins Street on the night of the murders. She stopped in sometime between 9 and 10 at night. Everyone at the apartment appeared to be in good spirits. She remembers Conway, Debra Fell, Donald Fell, and another young man that she did not know by name at the time (she later learned it was Lee) drinking beer and playing cards at the kitchen table. No one was doing drugs and no one appeared to be on drugs (Oberle did not know Debra Fell to do any illegal drugs).

Jeff Vanburen will testify that he was a very close friend of Debra Fell. He visited Debra Fell almost every day in the summer of 2000 and was in regular phone contact with her in the fall of 2000. Like Oberle, Vanburen recalled that Debra Fell initially was excited about her son's visit to Vermont, but then became fearful after his arrival. Vanburen observed how Fell dominated Debra Fell, often swearing at her while she talked with Vanburen on the phone. Vanburen recalls several visits to the Fell apartment in the fall of 2000, and he spent a full

11

FELL-00001393

Sunday with Donald Fell, Debra Fell, Lee, and another friend in the weeks just before the murders. Vanburen observed Donald Fell be verbally abusive of his mother. In other conversations, Vanburen recalls Debra Fell crying and saying her son had beaten her. Vanburen also interacted with Fell and Lee, and he observed Fell to be animated and outgoing, while Lee was quiet and reserved. In November 2000, Vanburen generally talked to Debra Fell everyday on the telephone, and then suddenly after Thanksgiving she did not answer her phone. He left a message on her answering machine (his message was found on the answering machine tape at the apartment), but she did not return his calls. He went to the apartment and noticed newspapers outside her door, which was locked (according to Vanburen, both were unusual as Debra Fell did the crossword puzzle every day and generally left her apartment door unlocked). A few days later he learned that Debra Fell and Conway had been murdered in the apartment.

Marsha Thompson will testify that she was working at the Stop Lite Bar the day that Fell assaulted his mother. Thompson was friendly with Debra Fell, and Fell told Thompson about her son. In the summer of 2000, Debra Fell seemed excited about her son coming to visit Vermont, but also apprehensive about reuniting with her son. After his arrival, Debra Fell brought her son to the bar and introduced him to Thompson. Throughout the fall, Donald Fell would call the bar trying to find his mother, and, at times, he would come to the bar looking for her. At this time, Debra Fell told Thompson that she was afraid of her son and he was threatening and assaulting her. Thompson told Debra Fell to call the police, but Debra Fell did not want to call the police on her son.

On November 2, 2000, Fell came to the Stop Lite Bar looking for his mother. He found her at the bar, and tried to take money from her. He swore at his mother and spat at others.

12

FELL-00001394

Debra Fell and her son then went outside where Fell proceeded to push her down to the ground and spit on her. Fell had brought Lee with him, and they proceeded to spit on others at the scene as well. The police were called and Fell was taken into custody for the night. After the incident, Debra Fell came back into the bar and began crying. She told Thompson that she was afraid of her son and did not want to return home.

The government may also call police officers who responded to the Stop Lite and to the apartment at 135 Robbins Street to corroborate the statements of these witnesses.[2] The police reports reflect that Debra Fell expressed concerns about her safety in staying in the same apartment with her son.

To the extent this evidence is not admissible at the guilt phase of trial, the government will offer it at any punishment phase.

### 4. Search of Plymouth Neon

FBI Special Agent Gerry Spurgers will describe searching King's Neon in Clarkesville, Arkansas after Fell and Lee were arrested. Agent Spurgers will introduce photographs of the Neon sedan and several items recovered from it, including Lee's wallet containing his bus ticket from Wilkes Barre to Vermont, and some of King's personal effects.

### F.   DNA Evidence

FBI Forensic Examiner Brendan Shea, from the FBI Laboratory's DNA Analysis I Unit, will describe examining stains on Fell's and Lee's boots, as well as the rock found next to King's

---

[2] Several Fell family members have also stated that Debra Fell called them during the fall of 2000 afraid that her son would kill her.

13

FELL-00001395

head.  The rock had King's DNA on it.  King's DNA also was found on Fell's left boot[3] and Lee's right boot.  Lee's left boot also had Debra Fell's DNA.

The government may offer additional evidence through other witnesses not summarized above.

## III.    GUILT PHASE *IN LIMINE* MOTIONS

The government seeks rulings from the Court addressing the following *in limine* motions related to the guilt phase of trial.

### A.    Motion *In Limine* Regarding Mitigation Evidence and References to the Death Penalty at the Guilt Phase of Trial

The government moves for an *in limine* order barring the defense, during the guilt phase, from presenting mitigation evidence or referring to the death penalty.  In its proposed jury instructions, the defense has indicated that they will seek to introduce mitigation evidence from expert and fact witnesses related to no less than 20 mitigating factors at any penalty phase in this case.  These factors include evidence related to a history of physical and sexual abuse as a child, a history of alcohol and drug use as an adolescent and an adult, the defendant's mental condition at the time of the offenses, the defendant's emotional disturbance at the time of the offense, the defendant's conduct in prison, and a myriad of other factors.  Much of this evidence may be admissible at the punishment phase, but it is inadmissible at the guilt phase.  At this point, the government has received no notice of any defense evidence for the guilt phase.  Therefore, as discussed below, the government will be seeking to exclude any evidence offered by the defense at the guilt phase unless it is provided notice, reciprocal discovery, and an opportunity to object.

---

[3]    There was DNA from another contributor on Fell's left boot.  That contributor is presumed to be Conway.  One of Fell's knife thrusts severed his carotid artery.

14

FELL-00001396

The defense may also argue or make reference to mitigating evidence during cross-examination of government witnesses, or in opening statements or arguments before the jury. Such evidence and argument is an improper appeal to sympathy at the guilty phase, and should be precluded.[4]

In addition, the jury should not be exposed during the guilt phase to consideration of the death penalty, and both parties should be barred from referring to it at the guilt phase. While the parties did refer to it during *voir dire*, the Court should not allow any issues related to the possible imposition of the death penalty on two of charged counts to interfere with the jury's guilt phase determinations. Again, both parties should be precluded from referring to the death penalty during addresses to the jury or in questioning of witnesses at the guilt phase.

**B.    Response to Motion *In Limine* Regarding Background and Potential 404(B) Evidence in the Guilt Phase of Trial**

The defendant's trial memorandum argues that the government will attempt improperly to introduce evidence related to the background of the charged crimes. Def. Trial Mem. at 3-4. The defendant has pled not guilty to all charges, and the government bears the burden of establishing all elements of the charged crimes beyond a reasonable doubt. Among other things, the government must prove the defendant's knowing participation in the charged crimes which begin with the murders of Charles Conway and Debra Fell. The circumstances leading up to the charged crimes are highly relevant and are admissible as intrinsic, background evidence under

---

[4] Notably, the government has already agreed to such a limitation in response to a defense *in limine* motion related to aggravating factors.

15

well-established case law.[5] Moreover, contrary to the defense's specious claims, the government will not offer expert testimony from Dr. Welner, M.D., at the guilt phase of trial, and, as outlined above, the government will only offer fact witnesses to events and circumstances that bear directly on the charged crimes.

The Rutland murders are not only at the center of this case, they are the genesis of the resulting offenses against King.[6] As discussed extensively in prior filings with the Court, Fell and Lee carjacked and kidnapped King immediately after their double murder in Rutland and fled in King's car to avoid arrest. They killed King several hours later because she was a witness to their flight from the Rutland murders. After his arrest, Fell made statements to authorities, but denied any knowledge about why the Rutland murders occurred and adamantly claimed that he

---

[5] Background evidence may be admitted to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed. *See United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997) (evidence of burglary admissible to prove possession of firearms and "to provide crucial background evidence that gave coherence to the basic sequence of events."); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.1991) (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988)). Furthermore, "evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed.R.Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.' " *United States v. Towne*, 870 F.2d 880, 886 (2d Cir.1989)(quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983) and citing *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983)). *See United States v. Chin*, 83 F.3d 83, 87-88 (4th Cir. 1996) (evidence of contract murder not 404(b) evidence where intrinsically intertwined with drug transaction); *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir.1992) (evidence of prior double murder not 404(b) evidence where directly relevant to prove firearm possession); *United States v. Roberts*, 933 F.2d 517, 520 (7th Cir. 1991) (evidence of shooting incident not 404(b) evidence where intrinsically intertwined with charged firearm possession); *United States v. Muhammad*, 928 F.2d 1461 (7th Cir.1991) (evidence of shooting incident not 404(b) evidence where relevant to unlawful possession of ammunition).

[6] Fell also is charged with possession of a firearm as a fugitive. He was a fugitive because he was fleeing the Rutland murders.

16

FELL-00001398

had nothing to do with Debra Fell's murder. As noted above, the government will be attacking the credibility of these statements at the guilt phase of trial, as the defense may use them to establish a defense. In fact, the evidence could not be more clear that, in his statements, Fell was minimizing and lying to authorities about his responsibility for the charged crimes, and the evidence from the weeks before the murder clearly demonstrates Fell's increasing hostility towards and assaults on his mother. Her murder was the logical and causal result of his conduct (as she anticipated and feared). The evidence rebuts Fell's claim that he did not have the intent necessary to commit the charged crimes and had no idea why they occurred. As discussed in the opposition to Fell's initial *in limine* motion regarding 404(b) evidence, the evidence is admissible as intrinsic, background evidence to the charged crimes, and alternatively is admissible under Rule 404(b) to prove intent, motive, opportunity, plan, and lack of mistake. *See* Dkt. #112.

Furthermore, by offering evidence of the charged crimes during the guilt phase, the government is not creating any new aggravating factors for the sentencing phase. *See* Def. Trial Mem. at 6-7. The government is obligated to present all the relevant, admissible evidence of the charged crimes to prove its case. Witnesses who describe crucial background are appropriate for the guilt phase. Indeed, it is vital if the jury is to understand the murders underlying the kidnaping and carjacking and the credibility of Fell's statements after his arrest. As such, evidence of the Rutland murders is not a new, aggravating factor in the case.

For all these reasons, the government fact witnesses should be allowed to testify at the guilt phase of trial.

**C.** **Motion *In Limine* Regarding Admission of Any Evidence at Guilt Phase by the Defense, Including Expert or Witness Testimony**

17

As noted in prior pleadings, the defense has provided no notice of any witnesses to be called at the guilt phase of trial and has produced no reciprocal discovery related to the guilt phase. The only reciprocal discovery provided by the defense relates to penalty phase fact and expert witnesses. The defense may not call any witnesses or offer any direct case in the guilt phase. Nonetheless, the government seeks an *in limine* motion from the Court barring the defense from calling witnesses or introducing evidence at the guilt phase unless reciprocal discovery is immediately provided to the government.

**D.     Motion for Production of Witness Statements
         Pursuant to Rule 26.2**

The government has requested that the defense provide witness statements pursuant to Rule 26.2 prior to the commencement of trial. *See* Fed. R. Crim. P. 26.2 (requiring production of a witness's prior statements that relates to the subject matter of the witness's testimony). It is not clear if the defense will offer any witnesses at the guilt phase of trial, but the government may have to seek a delay in the trial if statements are not produced sufficiently in advance for the government to prepare its cross-examination. The government has provided witness statements well in advance of trial and requests that the defense be required to provide the same. To avoid any delays at trial, the government moves for the production of statements by all defense witnesses at the guilt and penalty phases, and requests a Court order requiring the production of such statements under Rule 26.2.

18

FELL-00001400

## IV.    SENTENCING PHASE *IN LIMINE* MOTIONS

The government requests the opportunity to supplement its responses to the defendant's

*in limine* motions filed in his trial memorandum at a future date. At this time, the government

offers the following responses to various issues recently raised by the defense.

**A.    Response to *In Limine* Motion Concerning
the Defendant's Offer to Plead Guilty**

The government agrees to stipulate at the sentencing phase that the defendant offered to

plead guilty to Count 2 in return for the promise that the government would not seek to the death

penalty, and that offer was rejected by the government. We will draft an appropriate stipulation.

The other proposals suggested by the defense (calling AUSA Waples or offering a copy of the

plea agreement) would be unnecessary, unduly prejudicial, and infringe upon the Court's prior *in*

*limine* order.

**B.    Response to *In Limine* Motion Concerning Letters of Robert Lee**

Prior to his death Robert Lee wrote numerous letters to his father and other family

members. The government has provided copies of them to the defense and will offer them at the

penalty phase to rebut Fell's claim that he "would not have committed the crimes without the

influence of Robert Lee." Def. Jury Instructions at 14. The letters were handwritten by Lee and

provided to the government by his father. There is no question as to their authenticity.

It is apparent from the letters that Fell was the dominant personality in their relationship.

Lee felt that: "Something that he has that can control people. There is just something there."

He also wrote:

> That is like my friendship with Donnie. He always has to have his
> own way and if you do not live up to his expectations he'll fly

19

FELL-00001401

> throw a ___ or tantrum till he gets his own way and me have to do
> what he expects me to do put me into jeopardizing my friendship
> ___ with him and ___ the basically best friend that I ever had in my
> whole life . . .

Lee also describes how Fell, after killing Conway, urged him him to kill Debra Fell.  Lee

wrote:

> He started saying after he did Charlie he kept saying kill her come
> on you have to.  I killed him.  Fucken stab her, cut her fucken
> through.  She was on the floor moving.  Kick her, make her stop,
> stab her, cut her through some more.

* * * *

> When Donny grabbed me in the house and said do you realize what
> we just did.  This is only the beggining [sic].  Wile [sic] asking me
> if I am OK.  Telling me to take a shower and told me this was only
> the beggining [sic].

The letters of Robert Lee are not barred by *Crawford v. Washington*, 541 U.S. 36 (2004),

as the statements are non-testimonial.[7]  The letters are admissible hearsay at sentencing, where

the rules of evidence do not apply.  They are reliable and consistent with all of Lee's prior

---

[7] *Crawford* departs from prior Confrontation Clause jurisprudence by establishing a *per se* bar on the admission of out-of-court testimonial statements made by unavailable declarants where there was no prior opportunity for cross-examination.  Subsequent decisions have sought to define what constitutes a "testimonial statement" for purposes of *Crawford*.  *See United States v. McClain*, 377 F.3d 219 (2d Cir. 2004)(co-defendant's plea allocution is "testimonial"); *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004)(co-conspirator's statement to an undercover confidential informant is not "testimonial").  In *Saget*, the court observed that, "the types of statements cited by the Court [in *Crawford*] as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her reponses might be used in future judicial proceedings." 377 F.3d at 228.  Lee's letters do not share those characteristics.  The letters were written to confidants in a private and non-coercive setting.  Moreover, they contain multiple inculpatory statements strongly against his penal interest.

20

FELL-00001402

statements on these subjects. Further, as to Lee's relationship with Fell, his letters are consistent with the independent observations of witnesses who knew them. In all these circumstances, the evidence shows that Fell, not Lee, was the aggressor and Lee was the follower. Again and again, in his prior statements, Lee explained that it was Fell, not Lee, who initiated the murders in Rutland, the plan to commit the carjacking, and ultimately the murder of Terry King. In this context, the letters are reliable statements of an unavailable witness and should be admitted at the sentencing phase to rebut Fell's claims. Otherwise the jury could be misled by Fell's false evasions and minimizing in his post-arrest statements.

C.      Response to *In Limine* Motion Concerning Testimony of Dr. Welner

The defense continues to raise specious objections to the anticipated testimony of Dr. Michael Welner, a rebuttal witness for the government at the penalty phase. Dr. Welner has not completed his evaluation. In fact, the final videotaped interview of Fell only occurred this week. Instead of waiting to hear Dr. Welner's findings, the defense attempts to impugn his integrity and methodology without foundation. Needless to say, the defense will have ample opportunity to cross examine Dr. Welner if he testifies. The government will reserve a full response to Fell's latest objections until his report is complete and disclosed, but a limited response is appropriate at this time.

First, the defense cites to a recent New Jersey decision in a non-death penalty case. *See State v. Vandeweaghe*, 177 N.J. 229, 827 A.2d 10298 (2003). In *Vandeweaghe*, Dr. Welner offered testimony in a murder trial about the mens rea of the defendant. As the court is aware, the legal and evidentiary standards to be applied for the admissibility of expert testimony are substantially different for sentencing, as opposed to trial. The New Jersey case is inapplicable to

21

FELL-00001403

our case, where Dr. Welner would only be testifying at sentencing. *Vandeweaghe* does not suggest that Dr. Welner's methodology or his diagnosis were wrong, only that the trial judge erred in admitting portions of his testimony at trial.

Second, the defense mischaracterizes Dr. Welner's imagined rebuttal testimony as creating a new, aggravating factor. The scope of Dr. Welner's testimony will remain unknown until the defense presents its case at a potential penalty phase. Dr. Welner will be called only to rebut evidence of mitigation presented by the defense. Therefore, the scope of Dr. Welner's testimony will largely be determined by the defense mitigation evidence. Until the defense completes their case at the penalty phase, all discussions about Dr. Welner's testimony are premature and should be seen for what they are -- desperate attempts to impugn his credibility.

## V.    **CONCLUSION**

For all the foregoing reasons, the Court should make rulings on the pending in limine motions as requested by the United States in this memorandum.

Dated at Burlington, in the District of Vermont, this 17th day of June, 2005.

Respectfully submitted,

DAVID V. KIRBY
United States Attorney

By:

WILLIAM B. DARROW
STEPHEN D. KELLY
Assistant U.S. Attorneys

22

FELL-00001404

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA               )
                                       )
            v.                         ) Criminal No. 2:01-CR-12
                                       )
DONALD FELL                            )

## CERTIFICATE OF SERVICE

I, Stacie Brosky, do hereby certify that I have served a copy of the foregoing **UNITED**

**STATES' TRIAL MEMORANDUM** on the Defendant by faxing a copy to Defendant's

counsel:

Alexander Bunin, Esq.
Gene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl Street
Albany, NY 12207
*Fax: (518) 436-1780*

Paul S. Volk, Esq.
Blodgett, Watts & Volk
P. O. Box 8
Burlington, VT 05402-0008
*Fax: (802) 862-8997*

DATED and SIGNED at Burlington, Vermont on this 17th day of June, 2005.

Stacie Brosky
Legal Assistant

FELL-00001405

# EXHIBIT 131



**U.S. Departn    t of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                  *Fax: (802) 951-6540*

June 29, 2005

Hon. William K. Sessions, III
United States District Court
District of Vermont
Burlington, VT 05402-0928

      Re:    *United States v. Fell*
           No. 2:01-CR-12-2

Dear Judge Sessions:

After advising you this afternoon that our mental health expert, Dr. Michael Welner, would produce his evaluation in the above case by Friday of this week, I called Dr. Welner to advise him of the situation. He answered on his cell phone in Florida where he is working on an unrelated matter through Thursday. He reports that he won't even be back into his office until late Thursday this week, and cannot have the evaluation done on Friday. He added that he did not receive copies of Dr. Mark Cunningham's report and the June 13, 2005 defendant interview until recently.

I apologize for representing that Dr. Welner's evaluation would be done Friday, and ask your indulgence for a little more time. Dr. Welner reports that he will work over the weekend and get the report done on Tuesday. I note that the report at issue is a rebuttal report, which if provided by Tuesday would still give the defense ample time to prepare for cross examination on Friday next week.

Thank you for your attention to this matter.

                    Very truly yours,

                    DAVID V. KIRBY
                    United States Attorney

        By:                    
                    WILLIAM B. DARROW
                    Assistant U.S. Attorney

CC:    Alex Bunin, Esq.
        Gene Primomo, Esq.
        Paul Volk, Esq.

FELL-00001406

# EXHIBIT 132

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/05/2005

b6
b7C

_____ a male, born _____ SSN _____

_____ residing at _____
cellular phone number _____ was telephonically interviewed
regarding DONALD FELL. _____ was listed as a witness for the defense
for the penalty phase of the trial for DONALD FELL. After being
advised of the identity of the interviewing agent and the purpose
of the interview, _____ provided the following information:

_____ is currently employed as a _____ for grades 10
through twelve. _____ used to be employed at the St. Michael's
School. While _____ was at St. Michael's, DONALD FELL was a
residential student. _____ worked with FELL for about a year. _____
could not recall the dates or the year(s) that he worked with FELL.
When FELL first arrived at St. Michael's, _____ was employed in the b6
position of Child Care Worker. During this time, it was _____ job b7C
to make observations regarding FELL for 8 hours a day. _____ could
not recall how long of a period of time, such as number of months
or weeks, that _____ observed FELL. The observations would strictly
be for behaviors exhibited by FELL upon his admission to the
school. The behaviors observed by _____ would have been analyzed by
a psychologist and/or psychiatrist. _____ later became a Case
Manager, which is, essentially, a Social Worker. As a Case Manager,
_____ was assigned to a treatment team. _____ was on the treatment
team assigned to FELL. _____ advised that each treatment team was
assigned to approximately 15 to 30 students.

_____ recalled that FELL was placed into St. Michael's due
to truancy issues as he was not going to school. _____ could not
recall any specific incident that caused FELL to be admitted to the
school. _____ recalled that FELL was fairly cooperative, yet
despondent and depressed. _____ advised that, most of the time that
_____ knew FELL at the school, FELL was "flat," which meant
despondent and depressed. _____ stated that FELL was willing to do
whatever was necessary, as required by the school, to get out of
the school. _____ recalled that FELL followed the rules. As a social
worker, _____ would have met with FELL daily to monitor his progress
at the school.

b6
b7C

_____ stated that FELL participated in the alcohol and
drug program. However, the alcohol and drug program was kept
confidential at the school. Because of the confidentiality of the

7A-AL-44453-302 -105

| Investigation on | 07/05/2005 | at | Burlington, Vermont | (telephonically) |

File # 7A-AL-44453-302          b6          Date dictated 07/05/2005
                                b7C

by SA _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-AL-44453-302

Continuation of FD-302 of _____, On 07/05/2005, Page ___2___

b6
b7C

b6
b7C

program [____] would not have known any other information regarding FELL's participation in the program or anything about FELL's alcohol or drug use/abuse.

[____] monitored FELL's progress to determine if FELL could be discharged as a residential student. [____] advised that there would have been extensive reports written by him and others regarding FELL. However, some of these reports could not be located by the school for FELL's defense attorneys.

b6
b7C

[____] recalled that FELL had a bad family life. When asked to elaborate as to what he meant by a bad family life, [____] stated that he recalled that FELL's mom was "gone." [____] then explained that the most stable thing in FELL's life at that time was his grandmother. When FELL first arrived at St. Michael's, FELL's grandmother was alive. While FELL was at the school, FELL's grandmother died. [____] recalled spending a lot of time discussing FELL's grandmother's death with FELL. [____] stated that the grandmother's death was very traumatic for FELL.

b6
b7C

[____] left his employment with St. Michael's school sometime around the Fall of 1995. While still employed with St. Michael's, [____] was involved with the discharge of FELL from the school as a residential student. [____] working in conjunction with the treatment team and with the county's Child and Youth Services, decided that FELL should be placed into the custody of his aunt [____] who was only 21 years old at the time. [____] stated that [____] was thought to be FELL's "best chance." at the time. [____] made home visits to [____] residence. [____] advised that, although [____] residence was located in a "rundown," questionable neighborhood, [____] house was "okay" and suitable to place FELL in.

b6
b7C

The following conditions would have been placed on FELL upon his discharge from the residential program at St. Michael's: (1) FELL was required to receive follow up care which would have been arranged by St. Michael's and Child and Youth Services; and (2) FELL had to participate in the "day program" at St. Michael's. [____] advised that [____] residence was located approximately 35 minutes away from St. Michael's [____] did not know if FELL participated in the day program as required. [____] stated that he left St. Michael's shortly after FELL's discharge from the residential program.

b6
b7C

# EXHIBIT 133

# EXHIBIT 134

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

**ALBANY · MAIN OFFICE**
**39 NORTH PEARL STREET**
**5TH FLOOR**
**ALBANY, NY 12207**
**(518) 436-1850**
**(518) 436-1780 FAX**

**SYRACUSE · BRANCH OFFICE**
**4 CLINTON EXCHANGE**
**3RD FLOOR**
**SYRACUSE, NY 13202**
**(315) 701-0080**
**(315) 701-0081 FAX**

**BURLINGTON · BRANCH OFFICE**
**110 CHERRY STREET**
**2ND FLOOR**
**BURLINGTON, VT 05401**
**(802)862-6990**
**(802)862-7836 FAX**

**RESPOND TO ALBANY OFFICE**

**E-MAIL ALEX.BUNIN@FD.ORG**

July 8, 2005

Hon. William K. Sessions III
Chief United States District Judge
11 Elmwood Avenue
Burlington, VT 05401

   Re: USA v. Donald Fell, No. 01-12

Dear Judge Sessions:

   The defense will rest after the testimony of James Aiken. We withdrew our Notice of Expert Evidence of a Mental Health Condition, filed pursuant to FRCP 12.2 (b) (2). The Court indicated that there may still be a need to have a hearing to decide the admissibility of the government's mental health expert during rebuttal. I bring to the Court's attention FRCP 12.2 (c):

   (4) <u>Inadmissibility of a Defendant's Statements</u>. No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
         * * *
   (B) *has introduced expert evidence* in a capital sentencing proceeding requiring notice under Rule 12.2 (b) (2) (emphasis added).

The commentary to this section explains:

   As amended, Rule 12.2 (c) (4) provides that the admissibility of such evidence in a capital sentencing proceeding is *triggered only by the defendant's introduction of expert evidence*. The Committee believed that, in this context, it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant *has first introduced expert evidence* on the issue (emphasis added).

FELL-00001410

Therefore, since the defendant has presented no expert mental health testimony pursuant to Rule 12.2 (b) (2), the government is precluded from calling an expert witness regarding the defendant's mental health.

That leaves the question of what other rebuttal evidence the government may properly present. Rebuttal evidence in a capital case "must be reasonably tailored to the information the ... testimony is intended to rebut." United States v. Stitt, 250 F.3d 878, 897-98 (4th Cir. 2001); see also Dawson v. Delaware, 503 U.S. 159, 167-68 (1992) (gang membership improper to rebut good character evidence).

In this case, the Defendant's mitigation case had two facets: (1) evidence of the defendant's background until he was discharged from St. Michael's School at age 15, and (2) his acclimation to the Northwest Correctional Facility since December, 2000. Rebuttal reasonably tailored to these issues is proper.

No mitigation evidence was presented about Fell from age 15 until his incarceration in Vermont. The government apparently has a number of witnesses who may testify about misconduct by Fell between ages 15 to 20. Since there has been no mitigation evidence offered about this period of Fell's life, acts of misconduct during this time would not be proper rebuttal.

Respectfully submitted,

/ s /

Alex Bunin

cc: Stephen Kelly, AUSA
    William Darrow, AUSA

FELL-00001411

# EXHIBIT 135

FELL-00001412

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA    )
                            )
        v.                  )    Criminal No. 2:01-CR-12-01
                            )
DONALD FELL,                )
        Defendant.          )

## STIPULATION

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned parties that:

After his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; (3) and he did not suffer from any mental disease or defect. The examination also found that Fell was competent to stand trial and knew the difference between right and wrong at the time of the offenses on November 27, 2000.

Dated at Burlington, in the District of Vermont, this 8th day of July, 2005.

                                      UNITED STATES OF AMERICA

                                      DAVID V. KIRBY
                                      United States Attorney

                              By:     _____
                                      WILLIAM B. DARROW
                                      STEPHEN D. KELLY
                                      Assistant U.S. Attorneys

_____
Alex Bunin, Esq.
Attorney for Donald Fell

GOVERNMENT EXHIBIT
14

FELL-00001413

# EXHIBIT 136

# INTENTIONALLY LEFT BLANK

FELL-00001414

# EXHIBIT 137



MEMORANDUM TO FILE

**BY FAX 1-518-436-1780 and U.S. MAIL**

TO:        Alex Bunin, Esq. and Gene Primomo, Esq.

FROM:    Paul S. Volk, Esq.

RE:        United States v. Donald Fell
             Recent telephone conversations with John Rabun, M.D. and Richard Wetzel,
             Ph.D.

DATE:    July 20, 2005

This will summarize two telephone conversations which recently took place between Paul S.
Volk, Esq. and Drs. John Rabun and Richard Wetzel.

On April 21, 2005, Mr. Volk spoke with Dr. John Rabun at his office in St. Louis, Missouri. In
that conversation, Dr. Rabun indicated that he was not as of then under subpoena to testify in the
Fell matter. He further indicated that he was not sure if he would be called by the Government,
and that he would voluntarily accept service of a subpoena by either the Government or the
defense in this case.

Dr. Rabun indicated that he recently had several discussions with David Kirby and with William
Darrow and Stephen Kelley. He described his conversations with Mr. Kirby as being very
friendly and cordial. He described his conversations with Mr. Kelley and Mr. Darrow as being
extremely confrontational. He in essence indicated that he was essentially cross-examined by
Mr. Darrow and Mr. Kelley, who went to significant lengths to get him to say that while there
may have been mitigation evidence on the first two murders (Debra Fell and Conway), there was
none on the third homicide (Ms. King), particularly relative to intoxication or drug use at the
time of that killing. It should also be known that in subsequent conversations, Dr. Rabun backed
off this description of his subsequent discussions with Mr. Kelley and Mr. Darrow, and
attempted to explain their initial confrontational, cross-examination based style as being the
result as simply being nervous and/or unfamiliar with the facts of the case.

On ~~December~~ *July* 20, 2005 Paul Volk, Esq. spoke with Richard Wetzel, Ph.D., at his office in St.
Louis, Missouri. In this conversation, Dr. Wetzel indicated the following:

1. It is his position that a psychologist or psychiatrist is not supposed to testify about the mental
condition of someone whom you have not examined, under the so-called Apple rules. He offered
his unsolicited opinion that Dr. Welner was trying to get around this requirement by posing
various questions which he wanted Dr. Wetzel to ask Mr. Fell at the rule 12.2 interview
conducted by Dr. Wetzel on June 13, 2005 at the Northwest State Correctional Facility.

FELL-00001415

2. Dr. Wetzel indicated that prior to the rule 12.2 interview of Mr. Fell on June 13, 2005, he had received a received a list of questions posed by Dr. Welner which he was expected to ask of Mr. Fell. When questioned further, Dr. Wetzel indicated to Mr. Volk that he was not sure if this process began with Dr. Welner or with William Darrow, Esq., but that he was quite certain that the questions which he was asked to ask Mr. Fell were posed and/or drafted by Dr. Welner.

3. Dr. Wetzel indicated that he had spoken with William Darrow, Esq. two times prior to conducting the June 13, 2005 rule 12.2 interview of Mr. Fell. He further indicated that at some point in these discussions which took place prior to the June 13, 2005 interview, Mr. Darrow specifically informed him that it was fine and appropriate for him to ask Mr. Fell the questions that Dr. Welner wanted him to ask Mr. Fell.

4. Dr. Wetzel also spontaneously indicated to Mr. Volk "I am not a puppet" for Dr. Welner. He further indicated that Dr. Welner's list of questions were not necessarily the most intelligent questions which he had ever considered asking an individual in a proceeding similar to this.

5. Dr. Wetzel further indicated that the list of questions from Dr. Welner were some of the type of questions which he would ordinarily ask of a person in Mr. Fell's position.

6. Dr. Wetzel further indicated that he was offended by the sentence in Dr. Welner's subsequent report to the effect that Dr. Welner had provided the questions to be posed to Mr. Fell for use in his supposed examination and administration of the PCL-R psychopathy test.

7. Dr. Wetzel also indicated spontaneously that he was not too impressed with the report of the defense expert, Dr. Cunningham, which he obviously had reviewed. His position and opinion was that Dr. Cunningham focused too much on the aggravating factors themselves, rather than on attempting to focus attention on strong mitigating factors. This is included simply to state what Dr. Wetzel informed Mr. Volk, not to comment on the validity of the same.

8. Dr. Wetzel further informed Mr. Volk that his impression, from his discussions with Mr. Darrow, was that he was being asked to be the expert witness who was to ask Mr. Fell all questions for both sides as well as for the other experts involved in this matter.

9. Finally, Dr. Wetzel indicated that if he and Dr. Rabun had been called to testify at the penalty phase of the trial in this matter, they would have been both helpful and harmful to both sides. In his opinion, and in essence in his words, both sides would have "hated us by the time we were done testifying."

FELL-00001416

# EXHIBIT 138

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 AUG 26 AM 9 59

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA,       )
    Plaintiff,                         )
                             )
      v.                                )       Criminal No. 2:01-CR-12
                             )
DONALD FELL,                      )
    Defendant.                        )

## DONALD FELL'S MOTIONS FOR JUDGEMENT OF ACQUITTAL AND NEW TRIAL

Pursuant to Federal Rules of Criminal Procedure 29 (c) and 33, Defendant Donald Fell

moves the Court to impose a life sentence, or alternatively, to grant a new sentencing hearing.[1] A

jury returned verdicts of death as to Counts One and Two of the Superceding Indictment on July

14, 2005. Within ten days of that date, the Court extended the time for the filing of Rules 29 (c)

and 33 motions until August 26, 2005. This motion does not attack Fell's conviction but seeks

the imposition of a life sentence, or alternatively, a new sentencing hearing, based upon

violations of due process of law.

## I. ISSUES

There are three issues. All three involve violations of due process based upon misconduct

by the government causing a miscarriage of justice to occur. First, the government made false

representations to the Court about its compliance with Federal Rule of Criminal Procedure 12.2

(c), upon which the Court relied. The Court's reliance on those misrepresentations and

subsequent response harmed Fell by causing him to withdraw all expert mental health evidence.

---

[1] The standards for reviewing these motions by a district court in a federal capital case were recently discussed at length. See United States v. Honken, _ F.Supp. 2d _, 2005 WL 1793481 (N.D. Iowa July 29, 2005) (Bennett, C.J.).

1

FELL-00001417

Second, the government improperly took inconsistent positions about Fell's mitigation evidence, and because of previous rulings, Fell was prevented from explaining that discrepancy to the jury. Third, the government improperly argued that there must be a nexus between the defendant's mitigation evidence and the murder of Mrs. King, a proposition that has been repeatedly rejected by the Supreme Court.

## II. MENTAL HEALTH EVIDENCE

1. <u>Summary</u>. The Court ordered that any mental health interview or testing of Donald Fell be limited to Drs. Rabun and Wetzel and that any new tests performed either be consensual or by court order. The government violated this order by using Dr. Wetzel to perform an eight-hour interview of Fell so that a third expert, Michael Welner, M.D., could perform additional tests that had never been discussed by the parties, nor approved by the Court. Fell then moved to bar Welner's testimony because Dr. Wetzel was used to violate the Court's order, and that Welner then used a video recording of the interview in order to perform new tests for which the defense had not received notice, much less given consent.

When directly asked by the Court whether the government had violated the previous order in this manner, the government denied doing so, and claimed it was prohibited from discussing the matter with its experts. The Court accepted the government's assertion that the doctors had arranged the questioning on their own. However, the government's representations to the Court were false.

On two occasions before the interview, the government intervened by specifically telling Dr. Wetzel to use Welner's questions for the purpose of conducting the interview. Additionally, the government misrepresented its authority to perform the new tests upon the defendant without

2

FELL-00001418

consent or court order.

Relying upon these misrepresentations, the Court withheld its ruling on whether Welner would be allowed to testify. At that point, the defense could only be assured he would not testify by withdrawing its notice of mental health evidence.[2] The notice was withdrawn and the defense presented no expert mental health testimony. The Court's failure to exclude Welner, which was based upon the government's misrepresentations, caused Fell to be harmed.

2. Facts. On February 13, 2002, the government moved for mental health testing of Donald Fell by government experts in order to prepare for trial. (Documents 34 and 131, p. 11-12, n. 3). At that time, the government was represented by Assistant United States Attorneys Gregory Waples and John Tavana. On May 16, 2002, John Tavana was replaced by Assistant United States Attorney William Darrow. (Docket Sheet).

The government ultimately chose Psychiatrist John Rabun, M.D. and Psychologist Richard Wetzel, Ph. D. (Document 100, p.11). Fell and his counsel agreed to allow those doctors to test and interview Fell without court order. (Id.).

Dr. Wetzel administered two tests: the Minnesota Multiphasic Personality Inventory-2 and a portion of the Cambridge Examination for the Elderly. He issued a written opinion. (Letter from Richard D. Wetzel, Ph. D. To Gregory Waples, Assistant United States Attorney, dated October 11, 2002). Both tests consisted of oral questions posed to Fell by Wetzel. Dr. Wetzel recorded Fell's answers for later analysis.

Dr. Rabun also provided a written report. Some of his opinions were: "Mr. Fell's history

---

[2] The Court did schedule a hearing on the admissibility of Welner's testimony, but that was to be held after the appearance of defense mental health expert Mark Cunningham, Ph. D.

3

FELL-00001419

of sexual and physical abuse would affect his behavior as an adult." "Clearly, Mr. Fell's intoxication did contribute to his commission of the instant offenses." "Mr. Fell's lack of supervision, chaotic home environment, and poor role models, would have negatively contributed to his personality development." "The combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs, suggests that he will adjust positively to a prison setting."(Letter from John S. Rabun, M.D. to Gregory Waples, Assistant United States Attorney, dated December 31, 2002).

On September 24, 2002, the Court entered an order granting Fell's motion to strike the special findings from the Superceding Indictment. (Document 70). That ruling was appealed by the government. (Document 71). While the case was appealed, the Federal Rules of Criminal Procedure were amended on December 1, 2002, requiring defendants to give notice of their intention to introduce expert evidence of mental health conditions at capital sentencing hearings. FRCP 12.2 (c). The case was not remanded to the Court until November 5, 2004. (Document 73).

On November 8, 2004, Gregory Waples withdrew from the case and Assistant United States Attorney Stephen Kelly filed his appearance. (Docket Sheet). Sometime later that month, Assistant United States Attorneys Darrow and Kelly called Fell's counsel and requested that an unnamed third doctor be allowed to interview Fell. That was refused. On December 1, 2004, Fell filed notice of his intent to present expert evidence of a mental condition if the case proceeded to a capital sentencing hearing. (Document 74).

A pretrial conference was held on December 16, 2004. The Court scheduled jury selection to begin May 3, 2005. (Docket Sheet). The next day, the government filed a memorandum stating the government had retained psychiatrist Michael Welner, M.D. in early

4

FELL-00001420

5:01-cr-00012-gwc   Document 301-40   Filed 03/21/11   Page 120 of 126

2004. ("Dr. Welner has reviewed voluminous written materials and has met with government counsel") (Document 77, p. 3). The pleading sought a court order that Welner be allowed to interview Fell pursuant to newly amended Federal Rule of Criminal Procedure 12.2 (c). The memorandum promised, "The government is not seeking, and will instruct its expert not to seek, aggravation evidence." (Id, at 11).

Attached to the memorandum was a proposed order giving a mental health expert access to interview and test Fell. Most of the language was later adopted verbatim by the Court. (See Document 101). The proposed order required that any additional tests upon Fell be by agreement, or by court order. This command was later incorporated in the Court's order (Id).

Fell filed a response complaining that the government should not be allowed a third interview by a new expert. (Document 78). Fell also objected to the procedure proposed by the government, anticipating future problems. (Id, at 2) ("The government's proposed order makes no attempt to 'firewall' the two prosecutors in the case from Dr. Welner. Although the proposed order makes the final report inaccessible to the parties – unless a punishment hearing is held – it makes no provision to segregate the prosecutors from their expert before then."). Fell's reply suggested that  the prosecutors had already discussed the previous mental health reports with Welner, and that given Welner's history of diagnosing criminal defendants as psychopaths, the only thing the prosecutors lacked from him was a written report. (Id).

The government responded, mostly by invoking Welner's credentials and defending his theories, including his so-called "Depravity Scale."(Document 79). However, the response also alleged that no "firewall" was necessary because "the unexpected need to do additional testing ... would have to be communicated to a government attorney, to defense counsel, and to the court."

FELL-00001421

(Id, at 6-7, citing the procedure in United States v. Sampson, 335 F. Supp. 2d 166, 244 (D. Mass. 2004).

The Court held that the government had a right to have one expert interview Fell, but not three. (Document 100, p. 17). A separate order, issued the same day, outlined the procedures to be followed, and limited the examiners to Rabun, Wetzel, or both. It required that any new tests be performed either with the defendant's consent or by court order. Any disputes about testing had to be decided by the Court before the tests could go forward. (Document 101). The order, which was issued a month before jury selection was scheduled, required that the examination take place before the start of jury selection. (Id). It also stated that no "fire-walling" procedures were necessary. (Id).

Instead of complying with the order, the government sought its reconsideration. (Document 105). The government urged that Welner be allowed to examine Fell, promising that he "will not conduct new neurological, personality or intelligence testing." The government claimed that Rabun and Wetzel had been used "to inform the defense settlement offer, not for trial."(Id).

The motion suggested that the government had no intention of calling Rabun or Wetzel at trial, regardless of whether or not the Court changed its ruling. ("Those experts were not retained to prepare the case for trial, and were not anticipated as trial witnesses.") (Id). Instead, the government intended to call only Welner:[3]

During the ensuing 14 months Dr. Welner has been engaged in an extensive

---

[3] "The government expects to call Dr. Welner for the penalty phase rebuttal whether or not he conducts the final interview. He will testify based upon his extensive psychiatric inquiry, informed by the results of the 2005 interview (by whomever conducts it)."(Id, at 5).

6

FELL-00001422

evaluation of the defendant. He has reviewed thousands of documents relating to Fell, including work papers, interview reports and test results generated by the 2001-02 experts, as well as historical records from Pennsylvania schools and family service entities, and documents created during the criminal investigation, such as crime scene evidence, photographs and police reports. He has also spent three days in Fell's hometown of Wilkes-Barre, Pennsylvania, meeting with and personally interviewing over a dozen persons knowledgeable about Fell and Robert Lee, such as friends, school teachers, and family members. Dr. Welner has conducted a far more comprehensive study of Fell to date than either of the government's 2002 experts. Moreover, those 2002 experts have not worked on the case since 2002. It would be difficult and resource consuming at this point to prepare them for the interview and trial. In contrast, during 2004-05 government counsel has spent many hours in multiple face-to-face meetings and lengthy phone consultations with Dr. Welner. (Id, at 4-5).

Fell then filed a motion in limine seeking to limit Welner's testimony. (Document 107). In it, Fell pointed out that Welner would violate medical ethical rules if he testified about a person he had not examined. (Id, at 5). The government responded by arguing the ethical requirement was met as long as Welner made an earnest effort to do a personal examination of Fell. (Document 113). The government also attached the affidavit of Gregory Waples, allegedly to establish that Rabun and Wetzel were hired only to support plea negotiations. (Id). Additionally, for the first time, the government began to claim its communications with Welner were limited:

> Dr. Welner has not communicated his conclusions to the government. Nor has his inquiry been directed by the government. The independence of his examination was a written precondition of his agreeing to take on this case. He will file a report at the completion of his inquiry. If an interview is permitted, his report will be maintained and disclosed consistent with the provisions of Rule 12.2 and the Court's prior order. (Id, p. 4, n. 6).

Jury selection began on May 5, 2005. (Document 118). On May 26, 2005, the Court denied the government's motion for reconsideration. (Document 131). The Court found the government's claim that Rabun and Wetzel were merely hired to advise plea negotiations to be a

7

FELL-00001423

misrepresentation. ("To say these interviews were *only* to advise the Government concerning plea negotiations misrepresents what the experts were hired to do." (Id, p. 14). The Court held that the introduction of a third expert would be unfair:

> Here, the Government and defense knowingly and voluntarily entered into an agreement permitting the Government to select experts to evaluate Fell and report their findings regarding issues relevant to the penalty phase of the proceeding. The criminal justice system functions best when litigating parties enter into stipulations to resolve differences regarding process. Agreements of this sort are basic to the sound administration of justice. Implicit within the agreement was the representation that these were the experts whom the government chose. To permit the Government to enter into an agreement of this sort with Drs. Rabun and Wetzel, and then decide, for whatever reason, it wanted a different expert to go through the same process two or three years later, violates the spirit, if not the language, of the agreement. From the perspective of the criminal justice system, such a finding would discourage agreements between the parties. Simply put, such a finding would be unfair. (Id, at 15-16).

The following week, two months after the Court's original order permitting Rabun and Wetzel to re-interview Fell, the government requested that the interview proceed. Despite the fact that the original order required the interview to occur before jury selection began – and the only delay was the government's motion for reconsideration – the Court allowed the interview to go forward. An interview by Dr. Wetzel was scheduled for Monday, June 13, 2005, four days after a jury had been selected, and exactly one week before the trial was to begin.

On June 13, 2005, Dr. Wetzel interviewed Fell at the Northwest Correctional Facility in Swanton, Vermont for approximately eight hours. No defense counsel was in the room. The interview was recorded. Wetzel employed no psychological tests, but asked questions about the circumstances of the charged offenses and Fell's background.

The next day, Fell filed a Trial Memorandum. (Document 142). In it, Fell predicted that the government would call Welner as its sole mental health expert, that Welner would diagnose

8

FELL-00001424

Fell as a psychopath, that Welner would seek to testify about hearsay describing uncharged

misconduct, and that he would opine that the defendant is a liar. (Id, at 7-8). The basis for this

prediction was Welner's previous testimony in other cases, including two published opinions,

State v. Vandweaghe, 827 A. 2d 1028 (N.J. Sup. Ct. 2003) and United States v. Sampson, 335 F.

Supp. 2d 166, 22, n.27 (D. Mass. 2004).

The government responded that Fell's complaints were premature. (Document 143).

Welner allegedly had not completed his evaluation. ("In fact, the final videotaped interview of

Fell only occurred this week.") (Id, at 21).

The following week, June 20, 2005, trial began. (Document 144). The government had

tapes of Wetzel's interview digitized on DVDs and distributed them to Rabun, Wetzel, and

Welner, but not to defense counsel. Testimony in the guilt phase was completed on June 24,

2005. (Document 155). The jury returned guilty verdicts on all counts that same day. (Document

156).

It was not until late on June 27, 2005, that the defense received copies of the DVDs.

(Document 160). In a pleading, Fell complained that neither the defense attorneys nor defense

experts would be able to view the eight-hour recording before the government began its

punishment case the next day. (Id). On June 28, 2005, the government began its punishment case.

(Document 172).

On June 29, 2005, the government provided a "revised, partial report" of Dr. Wetzel to

the defense. The report was less favorable to Fell than Wetzel's original findings. However,

Wetzel still maintained that Fell's physical and sexual abuse as a child affected his development.

A cover letter from the government stated, "In discussions with Dr. Wetzel he

9

FELL-00001425

commented that he had been asked to write the 2002 report in a way that was sympathetic." The letter also said, "We would be interested in knowing whether you intend to call Dr. Wetzel as a witness. He repeatedly has asked whether and if he needs to come to Vermont, so that he can make advance plans."

In open court on June 29, 2005, the government reiterated it had no desire to call Wetzel at trial. ("As you know the expert we've been relying upon is Dr. Welner.") (Vol. VI, 1, p. 104). The Court pressed the government about producing Welner's report:

> THE COURT: All right. Well, I mean you can't wait until 24 hours before he testifies. So realistically it's got to be this week I would think.
>
> MR. DARROW: Okay.
>
> THE COURT: He's relying upon reports of others. He apparently now has the most recent report from Dr. Wetzel. He's done a lot of interviews. Is there any difficulty in setting a deadline of Friday so the defense has the opportunity over the weekend to take a look at his report?
>
> MR. DARROW: No, Your Honor.
>
> THE COURT: So we'll set the deadline for Friday in that regard. (Id, at 105).

In response to Wetzel's "revised, partial report," Fell filed a motion in limine challenging the admissibility of some of its statements. (Document 177). Fell also pointed out that the cover letter's reference to Wetzel's "sympathetic" 2002 report contradicted the previously filed affidavit of Assistant United States Attorney Gregory Waples that "neutral, professional opinions" had been sought. (Id, at 3).

Dr. Wetzel followed up his revised report with a letter to Assistant United States Attorney William Darrow on June 30, 2005. In it he wrote, "Both ASPD [Anti-Social Personality Disorder] and psychopathy are quite common in prison populations. Common characteristics in a

10

FELL-00001426

population seldom, if ever, become useful in predicting rare events, like homicide or suicide."

On Friday, July 1, 2005, the government reported to the Court that there would be no report from Welner before the three-day July 4th weekend. (Vol. VII, 1, p. 8). In explaining the delay, AUSA Darrow said, "Also we had Welner walled off after the interview until the guilt phase. So he didn't receive - - he hasn't reviewed the June 13, 2005 interview of the defendant." (Id, at 15). Later, the Court stated:

> I'm not going to exclude Dr. Welner from testifying. There's a request that I
> exclude him. I'm not going to exclude him from testifying, but in light of the late
> delivery of the letter, it seems to me that surrebuttal responds to that, so you'll
> have an opportunity to rebut as well as cross-examine. (Vol. VII, 2, p. 95).

Four days later, on July 5, 2005, at approximately 9:30 p.m., Fell's counsel received a faxed 72-page report written by Welner. In the report, Welner confirmed that Dr. Wetzel had been used as a proxy to ask Welner's questions at the re-interview. ("... a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Fell) (Welner Report, p. 27). The report also indicated Welner had performed several new tests, never disclosed to the defense: Psychopathy Check List-Revised ("PCL-R"), [4] administered July 4, 2005; Violent Risk Appraisal Guide ("VRAG"), administered July 4, 2005; The Historical/Clinical/Risk Management ("HCR-20"), date unspecified. (Id, at 8, 67).

As anticipated, Welner's report relied heavily on uncharged misconduct and the statements of persons who either, were not potential trial witnesses, or were not identified at all:

---

[4] "For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided the questions to be posed for Mr. Fell." Welner scored Fell at the 100th percentile. (Id, at 27, 32)."Mr. Fell scores a 29 on the VRAG. This places him at a percentile of 99 and with a likelihood of violent recidivism exceptionally high relative to his peer group." (66).

11

FELL-00001427