And in the years from his 18th birthday on, he admitted to having seriously assaulted someone, broke into cars and stolen cash and items, and was identified by witnesses as having kidnapped, destroyed property, committed sexual abuse, and taken part in the destruction of cats and other animals. (Id, at 10).

While Fell and Lee were on the run from police, and low on cash, Fell – a demonstrated Satan adherent – hoisted up a sign for help from passersby with the expressed gratitude, "God Bless." Notes from interviews with Mr. Fell shortly after his arrest note his staring straight at officers without blinking. His self-possessed apparent certitude in stating the incredible recalls a notation in his chart from his hospitalization at age 13, in which staff noted that he "lies to the point of delusion." (Id).

Dr. Welner chronicled every bad allegation provided to him about Fell, never once questioning the credibility of the sources or the information. He quoted persons saying that Fell was a liar (11, 14), that he dreamed of going on a killing spree (11, 46), that he engaged in Satanism (11, 45), that he was quick to become violent and threatening (12, 45), that he started fights (12, 28, 44), that he did not show remorse or accept responsibility for misconduct (13, 14, 30, 31, 32), that he was a bully (14, 32, 33, 40), that he was cruel to people and animals (14, 27, 30, 44, 58), that he set fires and destroyed property (15), that he liked to steal (15, 27), that his tolerance for alcohol allowed him to function unaffected (16, 32-33, 35), that he was belligerent and destructive (18, 32, 35, 43), that he engaged in risk taking behavior (28, 32, 35, 43, 45, 46), that he was superficially charming and manipulative (28-29, 31), and that he could control others (29, 31, 40).

Welner explained any problem in Fell's life as "psychopathy." Welner ascribed Fell's declining school work and erratic work history as evidence of psychopathy. (17). He depicted Fell's behavior leading up to and after the charged crimes as "organized, cooly composed, and involved elaborate criminal concealment."(19). "Describing himself as 'not a worrier' Mr. Fell's

12

FELL-00001428

social imperturbability is frequently described in psychopaths."(30). "Beyond psychopathy, Mr. Fell's moral development and life choices also reflect his having been told – and communicated his belief – that he could kill someone and get away with it." (32). "The traits of psychopathy – not to be confused with psychosis – endow him with the freedom to dispense with worrying about the sensitivities of others." (45).

Much of the report retold the events of the charged crimes and allowed Welner to put a spin on what they meant. In many respects, the report was little more than a very lengthy closing argument.[5] Absent the discussion of psychopathy, there was hardly any reference to psychology or psychiatry at all.

Welner downplayed Fell's sexual abuse and claimed it had no effect on him: "It is my professional opinion, therefore, that the impact of the sexual abuse – and of Donald Fell witnessing it – is indirect. Donald received care for the event, and was discharged from treatment as improved." (47). Welner claimed Fell had many positive role models, but that did not matter: "It is my professional opinion that this quality of Donald Fell, of answering only to himself, has rendered even the most effective of role models irrelevant." (53). Welner was even able to blame Donald Fell for his mother's desertion when he was Thirteen: "It is my professional opinion, with a reasonable degree of psychiatric certainty, that Ms. Fell's abandonment of Donald preserved her safety, indeed her life." (57).

According to Welner, virtually no external forces affected Fell's development: "Donald

---

[5] E.g.: "Donald Fell wouldn't fight the Mrs. Humanik who challenged him back, he wouldn't fight a drinking Charles Conway a few nights before. But with Conway – who may have been threatening to call police on two men with outstanding warrants in Pennsylvania – in repose, inebriating him with an otherwise valued commodity ensured Fell would not be backing down this night."(p. 43).

13

FELL-00001429

Fell is a man for whom there were no cracks he had to fall into, but a man who created cracks faster than others could fill them." (61). "It is my professional opinion, with psychiatric certainty, that from the point of recognition of what he had done, Donald Fell has demonstrated no more than superficial remorse for his actions." (67).

The day after receiving the report, July 6, 2005, Fell filed a motion to exclude Welner's testimony because the government had violated the Court's April 7, 2005 order, by using Dr. Wetzel as a proxy for Welner's interview, and by allowing Welner to perform tests that were neither consensual nor approved by the Court. (Document 182). The motion also complained about the hearsay and uncharged misconduct in the report, as well as the psychopathy diagnosis. (Id). The motion was discussed that day in open court:

> THE COURT: Did he use Dr. Wetzel to ask the defendant questions for his own testing? Is that what happened?
>
> MR. DARROW: We -- what happened, Your Honor, is we -- as you know, Dr. Welner was working on this case intensively, and I can't remember the exact dates. We've briefed it several times. But in -- I think it was 2003 and 2004, or maybe it's 2004 and 2005. But for a couple years coming into the trial. And we had been out of touch, frankly, with -- with Wetzel and Rabun, who had not been involved in the case since, I think it was, 2002. And again, I'm a little uncertain of my numbers. I think that's right. And that's why we had wanted to use him. He had done a lot of work. And in fact, when we were trying to get our motion for reconsideration in front of you, Welner had -- had flown out to Wilkes-Barre and started pounding the pavement and interviewing family members and friends and people who knew Mr. Fell when he was growing up in Wilkes-Barre, and so he was -- he had started with a very comprehensive psychiatric approach. We, as we indicated in the papers at the time, have all along regarded him as our -- as our first choice and our primary mental health rebuttal expert for those reasons, and we didn't give up on him when -- when the Court decided that he shouldn't be the one doing the interview.
>
> THE COURT: Did you tell him to tell Dr. Wetzel to ask the questions that Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel had to support his opinion? Is that what you did?

14

FELL-00001430

MR. DARROW: No. Those two were in consultation with each other prior to the interview. We told Dr. Wetzel to conduct the interview as -- as he saw fit, but we also told him that -- you know, to be in touch with Dr. Welner about it, and we know that Dr. Welner prepared some of the questions, not all of them, for him to ask. I didn't -- we were not involved in a lot of this stuff. Moreover, my understanding from speaking to him today is that the -- the name of the psychopathy test, which I can't remember, is not a test which was administered. It's a historical scale that was done after the fact. We had understood your court order saying, you know, any -- any further psychological testing, bring it up with counsel, to refer to psychological testing during the interview; in other words, with the defendant at the facility, and there wasn't any. You know, what Welner did was after he had gotten all this information together, including the DVD of the interview and all these collateral interviews that he's been doing, is he plugged in that -- whatever the name of that scale is and -- and reached results. Not dissimilar, Your Honor, to an antisocial personality disorder diagnosis, which is the primary diagnosis that Dr. Welner reaches. You know, it's not a piece of paper like the MMPI that you put in front of the defendant and have him fill things in. Instead, it's a review of his history. You know, what was he doing before the age of 15, for example. That's one of the primary factors for antisocial personality disorder diagnosis. And a lot of that stuff's just historical. (Vol. VIII, 2, pp. 72-75).

The Court accepted that answer and the government's explanation that the prosecutors were not telling the experts what to do:

THE COURT: You know, I'm not pointing the finger at one particular -- in one particular direction, because this has been going on both sides. I mean, we're now in the middle of a penalty phase. I understand that the government has to set up the wall so that there's some justification for you not having spoken with people in advance because you had to wait for the conviction, if there was to be a conviction. I understand that. But, you know, I'm just expressing my frustration on both sides that -- that discovery -- we're in the middle of a discovery phase in a capital punishment case and discovery is like -- it's just not happened. (Vol. VIII, 2, p. 77).

The next day, Fell withdrew his Notice of Expert Evidence of a Mental Health Condition. (Vol. IX, 2, p. 3). That was followed by a written declaration of the same. (Document 191).

After the trial ended, Dr. Wetzel was contacted by defense counsel. Dr. Wetzel said that on two occasions before his June 13, 2005 interview of Donald Fell he spoke to Assistant United

15

FELL-00001431

States Attorney William Darrow. At some point in these conversations, Darrow encouraged

Wetzel to use questions prepared by Michael Welner, M.D. for the interview. Wetzel stated it

was not his idea to ask Welner's questions.

3. <u>Argument</u>. Due process protects the accused from actions that violate "those

fundamental conceptions of justice which lie at the base of our civil and political institutions and

which define the community's sense of fair play and decency." <u>United States v. Lovasco</u>, 431

U.S. 783, 790 (1977). The requirement of "fundamental fairness" is a core value "embodied in

the Due Process Clause of the Fourteenth Amendment." <u>In Re Winship</u>, 397 U.S. 358, 369

(1970).

Prosecutors serve a unique role in assuring that an accused receives fair play and decency

in the judicial process. As opposed to being an ordinary party to a controversy, it is the

prosecutor who serves as a critical representative of the sovereignty, which has the "obligation to

govern impartially." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935). In a criminal prosecution,

the prosecutor's role "is not that it shall win a case, but that justice shall be done." <u>Id</u>. "It is as

much his [or her] duty to refrain from improper methods calculated to produce a wrongful

conviction as it is to use every legitimate means to bring about a just one." <u>Id</u>.

The Court was very specific in its May 26, 2005 order. The Court refused to reconsider its

previous order, which denied Dr. Welner an opportunity to interview Donald Fell. The Court said

that it would be unfair to allow a third expert when the parties had previously agreed to two.

(Document 131, p. 16). The circumvention of the Court's order by using Dr. Wetzel as a proxy

for Welner's questions was equally unfair. Secretly employing psychological tests in violation of

the order was also unfair. Misrepresenting to the Court that this was done was a violation of due

16

FELL-00001432

process of law.

On July 6, 2005, the Court asked the government if the prosecutors had violated the order in this manner. The response from the government to the Court was "no" and that the doctors had created the procedure themselves. The government even allowed the Court to believe that the prosecutors could not have intervened because the rules of procedure prevented such contact. The prosecutors explained the unauthorized testing by claiming they thought the prohibition referred only to paperwork that the defendant had to complete himself. None of these representations were true.

Even at that time, it was clear that the government's responses were not forthcoming. There was no credible reason why Dr. Wetzel would have agreed to ask Welner's questions without first speaking to a prosecutor. The two doctors have, and had, no professional relationship. Dr. Wetzel knew that his authority to re-interview Fell was by court order. He knew that the order limited the interview to be performed by either himself or Dr. Rabun. There was absolutely no way he would have assumed that Welner had the authority to write the questions for him.

It was only after the trial was over, and after speaking to Dr. Wetzel, that the defense learned the truth of what had only been previously suspected. Assistant United States Attorney William Darrow told Dr. Wetzel that he should accept Welner's questions and pose them to Fell. According to Wetzel, Darrow said so at some point in two different conversations. Darrow and Wetzel cannot both be correct.

The government was untruthful. After investing tremendous time and effort in trying to insert Dr. Welner into the case, the government overreached. Mr. Darrow did not want to be left

17

with the two doctors who he was heard to disparage as "Greg's experts" (referring to Gregory Waples's selection of Rabun and Wetzel).

However, more egregious than the use of Wetzel as a proxy was the additional testing performed by Welner. It was the government that proposed the condition that there be no new testing of Fell unless the defense consented or unless the court ordered it first. (Document 77). It was the government that wrote there needed to be no fire-walling from their expert because any new tests would have to first be presented to both parties and the Court. (Document 79). It was the government that wrote there was no need to be skeptical of an examination by Welner because he would not seek "aggravation evidence" and that the government would instruct him accordingly. (Document 77). It was the government that assured the Court that Welner "will not conduct new neurological, personality or intelligence testing."(Document 105). According to Welner's report, none of that was true.

The government may claim that a psychopathy diagnosis is not "aggravation evidence," but there is no conceivable parsing of "neurological, personality or intelligence testing" to exclude the PCL-R, VRAG, and HCR-20 tests. Mr. Darrow's rationale that the government thought new tests were those "that you put in front of the defendant and have him fill things in," is belied by the fact that none of the tests previously administered to Fell required him to do anything but answer questions – exactly like the eight-hour interview on June 13, 2005. Apparently, that was the only explanation Mr. Darrow could come up with for why there was such an obvious violation of the Court's order.

Prosecutors violate due process by concealing facts or presenting false evidence. See Mooney v. Holohan, 294 U.S. 103 (1935); Napue v. Illinois, 360 U.S. 264 (1959); Giglio v.

18

FELL-00001434

<u>United States</u>, 405 U.S. 150 (1972). This is true whether the misconduct affects the conviction or the sentence. <u>See</u> <u>Green v. Georgia</u>, 442 U.S. 95 (1979). As the Supreme Court stated in <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

Even overwhelming evidence of guilt does not immunize the sentencing phase evaluation of aggravating and mitigating factors. "[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978). Prosecutorial misconduct in the sentencing hearing can operate to preclude the jury's proper consideration of mitigation. "When a prosecutor's actions are so egregious that they effectively 'foreclose the jury's consideration of ... mitigating evidence,' the jury is unable to make a fair, individualized determination as required by the Eighth Amendment." <u>See</u> <u>Buchanan v. Angelone</u>, 522 U.S. 269, 277 (1998).

In this case, the government's actions precluded the jury's consideration of mitigation evidence by causing Fell to withdraw all expert mental health evidence. This was not a decision the defense took lightly, as counsel had promised expert mental health evidence to the jury during the opening statement. (Vol. V, 1, pp. 56-57). However, faced at the last moment with the toxic claims of Dr. Welner,[6] the defense had the choice of (1) withdrawing its notice of expert

---

[6] The differences between Rabun's and Welner's findings were dramatic. Even Wetzel's revised report maintained that Fell's childhood physical and sexual abuse affected his development. Welner completely discounted any explanations for Fell's development except

FELL-00001435

evidence, thereby preventing Welner's testimony entirely, or (2) calling its expert, Dr. Mark Cunningham, Ph. D., and then trying to limit Welner's testimony at a hearing outside the presence of the jury. Since the Court had already stated that Welner would be allowed to testify,[7] there was no assurance that the latter choice would be satisfactory.

Defense counsel would not have been handed this Hobson's choice if Welner's testimony had been excluded for being in violation of the Court's previous orders. This was not the Court's fault since the information the Court relied upon in making its decision was false. It was the government that made those misrepresentations to the Court. What the government did – surreptitiously using a third expert – was exactly what the Court had previously characterized as "unfair."(Document 131). It did not become any more fair because the government was able to secretly accomplish what the Court refused to order.

The Special Verdict Form indicated that of the 19 listed mitigating factors, there were only three that no jurors supported. (Document 200-1). Eight of the mitigating factors were found unanimously by all twelve jurors. A twentieth mitigating factor was added and supported by 10 jurors. It is impossible to know how the weighing process was employed. However, there is absolutely nothing in the record to assure that, absent the government's misconduct, a death sentence was a certainty.

This issue does not involve a technical interpretation of Federal Rule of Criminal

_____

"psychopathy." Further, Welner alleged that the psychopathy diagnosis predicted Fell's risk of danger in prison, a claim that was completely rejected by Wetzel.

[7] Although the Court held that the defense could call a different expert, Dr. Mark Mills, in surrebuttal, only the withdrawal of all defense expert testimony would have prevented the government from calling Welner. See FRCP 12.2 (c) and Document 101.

20

FELL-00001436

Procedure 12.2 (c). It is a question of fairness. The government repeatedly flouted this Court's orders and made misrepresentations to the Court. Those actions harmed Fell.

### III. INCONSISTENT POSITIONS

1. <u>Summary</u>. During settlement negotiations and in a plea agreement, drafted by the government, the government made the following assertions: that Fell was impaired at the time of the crimes; that his mental health history and background were mitigating; that he had shown remorse and had accepted responsibility for his conduct; that he assisted law enforcement in locating Mrs. King's body; and that he did not have a substantial prior criminal history. Fell moved to prevent the government from seeking the death penalty because these statements were judicial admissions. That motion was denied. Fell then requested to introduce evidence of the plea agreement and its contents as evidentiary admissions. That too was denied.

In its penalty case, and particularly in closing argument, the government not only argued against its previous positions, it belittled them. Because of the Court's previous rulings, Fell was not allowed to answer the government's argument. The government's inconsistent positions denied Fell a fair trial and due process of law because he could not respond.

Fell's previous arguments in favor of using the plea agreement relied on principles of estoppel and the evidentiary rules about admissions of a party-opponent. Here, Fell is arguing a more basic point of fairness: if a prosecutor takes an inconsistent position, opposing counsel must be allowed to bring the conflict to the factfinder's attention.

2. <u>Facts</u>. In 2001, the government drafted a plea agreement. (Document 40, Attachment). In exchange for pleading guilty to Count Two of the Indictment, Fell was to receive a sentence of life in prison without the possibility of release. The language of the plea agreement was

21

FELL-00001437

composed and written entirely by the government. It contained the following assertions of fact:

> The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history.

Fell and his attorneys signed the agreement. Pursuant to Department of Justice protocol, the Attorney General of the United States had to approve the settlement before the United States Attorney could sign the agreement. Attorney General John Ashcroft refused to allow the plea agreement and required the United States Attorney to file a Notice of Intent to Seek the Death Penalty. (Document 32).

Fell filed a motion to dismiss the government's Notice of Intent to Seek the Death Penalty. (Document 40). In a Memorandum Opinion and Order (Document 56), the Court denied Fell relief. The Court found that the plea agreement was neither a contract, nor a judicial admission, and thus could not be used as an estoppel to the government's capital prosecution. Later, in response to the government's motion in limine (Document 103), the Court ruled that the plea agreement was also not admissible as an evidentiary admission. (Document 131).

In closing argument at punishment, the government affirmatively took positions that contradicted the statements that were made in the plea agreement. Referring to the mitigating factors contained in the Court's instructions and verdict sheet, Assistant United States Attorney Stephen Kelly said:

> First one reads: After his arrest, Donald Fell truthfully admitted his responsibility for Terry King's murder. Simply not true. ... He has never been truthful about these crimes. (Vol. XII, pp. 42-43).

22

FELL-00001438

This one reads: Donald Fell assisted law enforcement in finding Terry King's body. Again, it's just not true. ... The fact of the matter is Donald Fell did not lead them to the scene where she was recovered. That's the evidence in this case. (Vol. XII, pp. 43-44).

Where, ladies and gentlemen, where in the evidence of this case is there any remorse for Terry King's murder? ... There's no evidence of remorse for his murder of Terry. (Vol. XII, pp. 44-45).

Let's move on to the next factor:  Donald Fell offered to plead guilty to kidnapping and murdering  Terry King knowing that the law requires a sentence of life imprisonment without the possibility of release and he has maintained that offer to this day.  Ladies and gentlemen, the judge instructed you.  You know the law.  Life imprisonment without the possibility of release is the minimum sentence that Donald Fell faces for kidnapping with death resulting.  It's the minimum sentence.  When he offered to make that plea, he knew the evidence against him was overwhelming. He knew there was no doubt he was going to be convicted, so he asked for the minimum sentence.  We rejected that,  ladies and gentlemen.  We wanted a jury to decide the appropriate sentence in this case. And, ladies and gentlemen, let's take a look at the last part of this: He's maintained that offer to this day. Ladies and gentlemen, we had to try and convict him.  If he wanted to plead guilty, he could have pled guilty.  We had a guilt phase in this case, ladies and gentlemen.  We put on our case.  We met our burden.  We proved it.  And now we are here to decide what is the just sentence.  The minimum sentence?  Or the death sentence?  (Vol. XII, pp. 49-50).

You will see that he began to develop the proclivity for violence when he was very young. It got worse and it got worse, and respectfully, ladies and gentlemen, it's not because of his childhood and background. (Vol. XII, p. 53).

3. Argument. A jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. United States v. GAF Corp., 928 F.2d 153, 1260 (2d Cir. 1991). This is because a jury, and not the government, must ultimately decide the case. United States v. Salerno, 937 F.2d 797, 812 (2d Cir. 1991).

It is one thing to say that a defendant may not use a failed plea agreement to attack the government. It is quite another for the government to be allowed make inconsistent arguments

23

FELL-00001439

without fear of having to answer for them. In this case, the government sought and received a ruling preventing Fell from mentioning the plea agreement. That left the government free to disparage Fell without consequence. That is exactly what happened.

At first, the government agreed that Fell accepted responsibility and was remorseful. Then at trial they argued he was not. The government first agreed that Fell assisted in finding Mrs. King's body. Then at trial they argued he did not. The government first agreed to allow Fell to plead guilty because of mitigating circumstances. Then at trial they argued they did not. The government first agreed that Fell's background and childhood were mitigating. Then at trial they argued they were not.

Recently, the Supreme Court addressed the issue of inconsistent positions by a prosecutor. Bradshaw v. Stumpf, 125 S.Ct. 2398 (2005). In that case, Stumpf pleaded guilty to a potential capital crime. A three-judge panel imposed a death sentence, in part because the prosecutor proved Stumpf shot the decedent. Later, Stumpf's accomplice Wesley was caught and tried before a jury for capital murder. The same prosecutor alleged that Wesley was the shooter. Wesley was convicted, but received a life sentence. Stumpf then challenged his conviction and death sentence for the reason that the prosecutor's inconsistent positions denied him due process of law. After litigation through the state and federal courts, the Sixth Circuit agreed with Stumpf and overturned his conviction and sentence.

The Supreme Court reversed on a narrow point. Justice O'Connor, writing for a unanimous Court, found that by pleading guilty Stumpf had voluntarily and intelligently admitted all the necessary elements of the crime. Therefore, what happened afterward – Wesley's

24

FELL-00001440

prosecution – was simply not relevant to the validity of Stumpf's conviction.[8]

More important, is what members of the Court opined about how inconsistent positions by a prosecutor should be treated. Justice O'Connor wrote that the case would be remanded to the court of appeals to decide whether, absent an invalid conviction, the facts justified vacating Stumpf's death sentence: "The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." Id, at 2407-08.[9]

In a concurrence by Justice Souter, joined by Justice Ginsberg, Souter pointed out the graveness of a sovereign taking inconsistent positions, and he quoted Justice Stevens, that "the heightened need for reliability in capital cases only underscores the gravity of those questions."Id, at 2409 (Souter, J., concurring), quoting Jacobs v. Scott, 513 U.S. 1067, 1070 (1995). However, more relevant to the case at bar, was Justice Thomas's concurrence, joined by Justice Scalia, that "a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention." Id, at 2419 (Thomas, J, concurring).

In other words, a clear majority of the Supreme Court believes that a defendant should at least be able to address a prosecutor's inconsistent statements. That did not occur in this case

---

[8] This ruling does not appear to affect precedents holding that a prosecutor's inconsistent arguments in obtaining convictions in successive jury trials violated due process. See e.g. Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000).

[9] Unless it is less offensive for a prosecutor to take inconsistent positions in the same case, as opposed to succeeding cases, the same reasoning should apply here.

FELL-00001441

because the Court twice previously ruled that the plea agreement was inadmissible. However, those rulings were based upon Fell's use of the evidence as a sword to attack the government, not a shield to protect him from inconsistent arguments. The government was then able to affirmatively take inconsistent positions without fear of a response from the defense. The jury was never given the opportunity to evaluate the credibility of those different positions.

The Second Circuit has consistently held that the remedy for addressing a party's use of inconsistent positions is to allow the opponent to expose them to the jury. See Salerno, 937 F. 2d at 812 (defendant should have been allowed to expose government's inconsistent positions in succeeding trials). The Circuit justified the practice as follows:

> To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of the facts within their personal knowledge between trials and to conceal these changes from the trier of fact.

United States v. McKeon, 738 F. 2d 26, 31 (2d Cir. 1984); see also GAF Corporation, 928 F. 2d at 1260 (successive trials of same defendant). Even when the policy of encouraging plea negotiations was overridden, the Circuit found that fairness required the admission of relevant evidence, in order to expose a party's inconsistent statements. See United States v. Barrow, 400 F.2d 109, 116 (2d Cir. 2005) (government could confront defendant with inconsistent proffer statements at trial).

Fell was clearly harmed by the government's inconsistent positions. Most of the reasons that the government offered for his execution – lack of remorse, failure to accept responsibility, the irrelevance of his childhood and background – refuted positions that the government had

26

FELL-00001442

originally taken in the plea agreement. This was unfair.

## IV. IMPROPER ARGUMENT

1. <u>Summary</u>. The government repeatedly argued to the jury that they should not consider mitigating evidence about Fell's background for the reason that its was not connected to the crimes. This was an incorrect statement of law, as Fell had a constitutional right to have the jury consider any mitigating evidence, regardless of whether or not it had a nexus to the charged crimes. Fell was harmed by that argument.

2. <u>Facts</u>. In closing argument during the penalty phase, Assistant United States Attorney Stephen Kelly asked rhetorically, "What do these [mitigating] factors have to do with the crimes in this case?" (Vol XII, p. 38); "What's the connection between [Fell's] background and childhood and these crimes?" (Vol. XII, p. 52); and, "What does the sexual assault when he was four or five have to do with the crimes in this case?" (Vol. XII, p. 55). He summed up his answer as follows:

> What's the evidence of the mitigating factors? To the extent you find some, there are not that many respectfully, and they really don't relate to the crimes. They really relate to his childhood. (Vol. XII, p. 64).

After the defense made a closing argument, Assistant United States Attorney William Darrow stated, "What you just heard was a very articulate expression of what's called the abuse excuse." (Vol. XII, p. 118). He went on:

> There are thousands and thousands of children, unfortunately, who grow up in rotten families with rotten backgrounds, without a parent, without any parents. There are tens of thousands of them in foster care, in abusive foster care homes. They don't all grow up to be murderers, particularly that kind of murderer. (Vol. XII, p. 125).

Nowhere in the Court's charge to the jury was there an explanation that mitigating factors do not

27

FELL-00001443

need to have any connection to the capital murder, in order for the mitigating factors to be found, and then to be weighed against aggravating factors.

3. Argument. A capital defendant's mitigating evidence need not have any link or nexus to the capital murder for which he has been convicted. Tennard v. Dretke, 124 S.Ct. 2562, 2571-72 (2004); Smith v. Texas, 125 S.Ct. 400, 405 (2004). A sentencer must be allowed to give full consideration and full effect to those mitigating circumstances. Penry v. Johnson, 532 U.S. 782, 797 (2001). The jury must be given a vehicle for expressing its reasoned moral response to that evidence and make a reliable determination that death is the appropriate sentence. Id, see also Woodson v. North Carolina, 428 U.S. 280, 304, 305 (1976).

In this case, the jury was told repeatedly by the prosecutors that Fell's mitigation evidence did not matter because it had nothing to do with Mrs. King's death. By saying this over and over, with no legal instruction to the contrary, it affected the ultimate decision to sentence Fell to death.

The prosecutors were on notice that their arguments were incorrect statements of law because the Court had issued a written memorandum opinion and order addressing the issue. (Document 139). In its order of June 9, 2005, the Court detailed the extent that a capital jury must consider and give effect to mitigating evidence. The Court specifically referred to information about a defendant's background and upbringing as the type of mitigating evidence that is relevant and must be considered by the sentencer.

In the order, the Court excused a potential juror because the person believed a defendant's background and upbringing were not an excuse for capital murder. That is exactly what the prosecutors argued that the jury should do in closing argument – to pay no attention to what the

28

FELL-00001444

government termed "the abuse excuse." This argument was improper.

The Second Circuit has held that the standard for prevailing on a claim of improper argument by the government is (1) that the prosecutor's remarks were improper, and (2) that the remarks, taken in the context of the entire trial, resulted in substantial prejudice. United States v. Bautista, 23 F.3d 726, 732 (2d Cir. 1994). The remarks by the prosecutors in this case were improper because they were false statements of the law regarding Fell's Eighth Amendment right to present, and to have the jury consider, mitigating evidence.

In assessing that context, the court of appeals focuses on three factors – (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990). First, the government's argument – that Fell's mitigation evidence had nothing to do with Mrs. King's murder – was repeated over and over and could not have been ignored by the jury. Second, the Court's instructions did not ameliorate the statements in any way. Third, absent the misconduct, a death sentence was not certain. The jurors found a majority of the mitigating factors, either unanimously or in part, and there is no way to know how the aggravating and mitigating factors were ultimately weighed.

In Friedman, 909 F.2d at 708-10, the court of appeals reversed the defendant's conviction when the prosecutor distorted the roles of prosecutor and defense counsel in closing argument and undermined the presumption of innocence. "Here, the gravity of the misconduct was substantial, the District Court's response was insufficient to preclude a significant risk of prejudice, and we cannot confidently say that a conviction would surely have been obtained in the absence of the misconduct." Id, at 710.

29

FELL-00001445

In Floyd v. Meachum, 907 F.2d 347, 354-55 (2d Cir. 1990), the prosecutor commented upon the defendant's failure to testify during closing argument. The court of appeals reversed the conviction for prosecutorial misconduct. A defendant's right to remain silent is a constitutional right in the same way the jury's consideration of mitigating evidence in a capital case is a constitutional right. Neither, is allowed to be undermined by a prosecutor's closing argument.

## V. CONCLUSION

The government misrepresented facts to the Court, took inconsistent positions about its evidence, and misstated the defendant's constitutional rights to the jury. For each of these reasons, and in combination, Fell was denied due process of law, resulting in a miscarriage of justice. The Court should hold a hearing at which the defense may subpoena Drs. Rabun, Wetzel, and Welner. Each of the doctors, and the prosecutors, should be ordered to preserve all correspondence and notes related to their work in this case. Any documents that are claimed to be privileged or work product should be first examined by the Court *in camera*.

Misconduct by the government can only be deterred if there are consequences. In this case, the appropriate consequence is that the Court should impose a sentence of life imprisonment. The sanction "should be tailored to the injury suffered for the Constitutional violation and should not unnecessarily infringe on competing interests." See United States v. Gordon, 156 F. 3d 376, 381 (2d Cir. 1998), quoting United States v. Morrison, 449 U.S. 361, 364 (1981). That result would be no different than if the jury had failed to reach a verdict on the punishment. In that situation, the Court would have imposed a life sentence. Alternatively, the Court should order a new sentencing hearing.

30

FELL-00001446

Respectfully submitted,

By:  _____

Alexander Bunin
Federal Public Defender

Gene V. Primomo
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

Paul Volk
Blodgett, Watts & Volk, P.C.
72 Hungerford Terrace
Burlington, VT 05401
(802) 862-8919

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United States Attorneys William Darrow and Stephen Kelly, on this 26th day of August, 2005.

_____

31

FELL-00001447

# EXHIBIT 139

# Washington University in St.Louis

## SCHOOL OF MEDICINE

Department of Psychiatry

**AFFIDAVIT**

STATE OF MISSOURI    )
                     )    ss:
CITY OF ST. LOUIS    )

I, Richard D. Wetzel, Ph.D., do hereby depose and state the following:

1.  I am a licensed psychologist in the state of Missouri (license #434; health service provider # PY00434) employed by the Department of Psychiatry at Washington University School of Medicine as a clinical psychologist and faculty member since Oct 1, 1970.  I currently hold appointments as Professor of Psychiatry, Professor of Neurology and Professor of Neurological Surgery.

2.  I would ask the readers of this affidavit to note that while I did my best to memorialize what was said in my interviews with the defendant, Mr. Fell, by taking reasonably complete notes except when I knew it was being videotaped[1], I never kept notes about my interactions with Dr. Hudziak, Mr. Waples, Mr. Volk, Mr. Darrow, Mr. Kirby or Mr. Kelly.  I am forced to rely on my memory and impressions for events that I did not suppose at the time to be very important.

3.  There seem to be three issues that I may be able to help the court to understand.

    A.  Why I called my report in 2002 "sympathetic" in 2005, apparently disagreeing with the affidavit of Mr. Waples.

---

1 Then, I took what I would call "disaster notes", less complete, in case the tapes were lost or destroyed or some other disaster occurred.  I had almost completed notes from the DVDs in anticipation of being a witness when it became clear I would not be called.  I have added to them after the motion for a new hearing.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, *www.wuphysicians.org.*,  www.wustl.edu

FELL-00001448

*Affidavit of Richard D. Wetzel, Ph.D.*

B.   Did I, with or without my personal knowledge, help the USA subvert the court's refusal to allow Dr. Welner to interview the defendant, Mr. Fell.

C.   Did I, with or without my personal awareness, assist Dr. Welner to circumvent the court's order that additional formal psychological testing could only be done with the consent of both parties or by order of the court.

**A.   Why I called my report in 2002 "sympathetic" in 2005, apparently disagreeing with the affidavit of Mr. Waples.**

**The Events of 2002**

1.   I was initially approached about serving as a forensic examiner in the case of the United States of America versus Donald Fell by Dr. James Hudziak, a former resident in our program, currently a Professor of Child Psychiatry at the University of Vermont. He mentioned that he had consulted on this case. He knew that I had participated for both the prosecution and the defense in many capital cases in Missouri before and after the initial trial and was known to some degree by the authorities in Missouri. I did not record the conversation or make notes to memorialize the conversation. He indicated that he and others thought that there were mitigating matters in this case that might justify accepting a plea to life without parole (LWOP). He asked whether or not I would be willing to participate in an evaluation for the United States Attorney's office in Vermont. I indicated that I was willing. He made no request or suggestion that I reach any particular conclusion. He did disclose his views which favored a plea bargain.

Page 2 of  25

FELL-00001449

*Affidavit of Richard D. Wetzel, Ph.D.*

2. Sometime after that I was called by Mr. Waples. He then offered to retain me as an expert in this case. Mr. Waples gave me his account of the history of this case. From my point of view as a forensic examiner not an expert on legal ethics, he behaved entirely properly. He expected me to perform a full, fair and honest professional evaluation. He never suggested that I change or shade my opinions in any way. At the same time, I thought I understood his view of the case. He indicated that the decision on seeking the death penalty properly belonged to a committee in Washington, DC that made recommendations to the Attorney General. The Attorney General, after considering that recommendation, then had the final decision on whether or not to seek the death penalty. He did disclose to me that the local office had recommended entering into a plea agreement for life without parole. The recommendation had been rejected. I did infer that he thought an objective professional evaluation would support LWOP.

3. When I was in Vermont to perform my evaluation in 2002, almost all of my interactions were with the counsel for the defendant, Mr. Volk, and an investigator, Andy Bartnik, from the Federal Public Defender's office. I was never requested to meet with Mr. Waples or anybody else in the United States Attorney's office. Both Mr. Volk and I commented to each other that this was quite unusual in our experience.

4. I was restricted in my evaluation appropriately, given the defendant's rights, to evaluating the matters in mitigation or extenuation presented by defense experts in their reports or that I came upon in my evaluation. I was prohibited specifically from evaluating his mental state at the time of the crime, at the time of any previous crime, his

Page 3 of 25

FELL-00001450

*Affidavit of Richard D. Wetzel, Ph.D.*

relationship with Mr. Lee or his interest in the use of knives. I learned from Mr. Waples' affidavit only this year that this assertion of his rights occurred just before my evaluation and was a surprise to the government.

5. After the evaluation was finished, I did stop off at the United States Attorney's Office and said hello to Mr. Waples. I was asked to write a report by Mr. Waples. He indicated two things multiple times before and after he heard my opinions. His office intended to send my report and my evaluation of the matters in mitigation back to Washington to the Attorney General with a request that the office reconsider its decision. He hoped, but did not request, that I could write a report that would lead that office to change its mind. At the same time, he repeated **several times** that I was not to present anything other than my honest professional opinions.

6. I have reviewed his affidavit dated 04/29/05. I agree that he described his communications with me fully, accurately and objectively. However, I did personally expect the matter to proceed to trial at that time because of my personal views about the very low probability of a change in decision by Mr. Ashcroft, not because of anything Mr. Waples said. I told him I believed that and expected the case to proceed to trial. I do not recall any statement that there was no possibility I would be used or called at trial.

7. I then wrote my report.

8. I described my 2002 report to Mr. Darrow in 2005, casually on the phone, using the word "sympathetic". He was concerned with my use of that word. He reported my characterization of my report which was then disclosed to the defense at the direction of the United State's Attorney.

Page 4 of 25

FELL-00001451

*Affidavit of Richard D. Wetzel, Ph.D.*

I used the word sympathetic for the following reasons.

A.   I accepted some of the opinions offered by the defenses experts and disagreed with others.  When I did not agree with some of the opinions offered by the defense, I did not simply just state my disagreement.  I wrote at great length the reasons why I disagreed with the opinion.  I did this so that the defense would not be surprised by my testimony at any time, even in the absence of deposition[2].  I also did this so the defense would have the option of withholding or withdrawing what I regarded as poorly founded opinions that I or Dr. Rabun would be forced to rebut.  I also did this so that the Attorney General's office would not think that I was accepting uncritically the subset of opinions about mitigation with which I did agree.
One of their experts failed to find any material in his field that would be mitigating.  I stated my agreement and my acceptance of their failure to find deficits strongly with supporting evidence.

B.   In order to have my views be persuasive and credible to the reviewers in Washington, I presented all of the facts I was aware of to support my opinions whether they agreed with or contradicted those of the defense experts.  The court may wish to note the unusual length and detail of my 2002 report.

C.   By sympathetic, I did not mean that I had biased my opinions or slanted my opinions.  I believed that I had met both of Mr. Waples' requests – presented my honest

---

2 An interesting difference between state courts and federal courts.  I have done much more in state courts.

FELL-00001452

*Affidavit of Richard D. Wetzel, Ph.D.*

professional opinions and produced a document that could be usefully presented in a reconsideration of the decision to seek the death penalty.  I was aware that there was some surprise that I was so little impressed by the history of hospitalization for "depression" and of treatment with anti-psychotic medications.

**B.    Did I, with or without my personal knowledge, help the USA subvert the court's refusal to allow Dr. Welner to interview the defendant Mr. Fell.**

**The Events of 2005**

1.    I was contacted by Mr. Darrow.  He made it clear that there was considerable ambivalence about using either me or Dr. Rabun as experts in the case.  He indicated that they had been consulting most recently with Dr. Welner, another forensic psychiatrist.  He said he was unsure whether or not the court would allow Dr. Welner to examine Mr.  Fell or to testify as a rebuttal witness.

2.    At some point, I had a discussion on the phone with Mr. Darrow, Mr. Kelly and Mr. Kirby.  We discussed my report in general and my views about Fell's psychiatric hospitalizations.

3.    Shortly after that, Mr.  Darrow called again.  If the court were to preclude Dr. Welner from testifying, he had to have some expert available for rebuttal testimony.  In addition, he did not know everything that might be offered by the defense.  He also had to be prepared for that contingency. He asked me to participate on that basis; I would be called if and only if needed for rebuttal testimony.  He asked me to do what I needed to do to be prepared to offer expert testimony in rebuttal of testimony by the defense's experts.

Page 6 of  25

FELL-00001453

*Affidavit of Richard D. Wetzel, Ph.D.*

4.  He indicated that a considerable amount of new material had been acquired by the FBI and by Dr. Welner.

5.  He sent that to me for review. For time, he continued to send me additional material. He made it clear that Dr. Welner would be willing to discuss material with me. He encouraged me to contact Dr. Welner and to do anything else I felt was necessary to become prepared. He offered to assist me in any way he could with Dr. Welner or anyone else. I did talk to two different FBI agents.

6.  At some point, after a telephone conversation with Mr. Volk, I accepted a subpoena via the mail from the defense. I reported this to Mr. Darrow's office.

7.  My memory of the sequencing of events is somewhat unclear. But I believe that shortly after that happened, I was informed that the defense proposed to offer testimony related to Mr. Fell's mental state at the time of the crime.

8.  Because I had been barred from exploring his mental state at the time of the crime, a second examination to evaluate that would be necessary and was allowed by the court. Without examining Mr. Fell on those issues, I would have been unable to offer any opinion on those issues.

9.  To the best my recollection, I first contacted Dr. Welner when it was uncertain whether Dr. Rabun or I would perform the evaluation. I commented to him that psychiatrists were likely to perform strictly psychiatric interviews better than neuropsychologists would, perhaps opening the door to Dr. Welner and his enthusiasm.

9.  Dr. Rabun and I discussed who would do the interview and what should be done as well. He pointed out some differences between his report and mine. It became clear to me that I needed the benefit of an additional interview more

Page 7 of  25

FELL-00001454

*Affidavit of Richard D. Wetzel, Ph.D.*

than he did.

9. I then began to prepare in earnest for that examination. It is not at all unusual in such cases for experts retained by the same party, especially when they represent different areas of expertise, to confer and to clarify the issues in the case. It is not unusual at times to agree upon a division of labor with each expert accepting an area of major focus. It is also not unusual to agree to asking a few supplementary questions in the other's area. This is routine clinical practice in medical settings and therefore unremarkable in medical legal situations.

10. I understood from Mr. Darrow that Dr. Welner might or might not be allowed to examine Mr. Fell; the point was to be reconsidered by the court.

I also received a call from Mr. Volk indicating his belief that no interview would occur because jury selection had started. I slowed down my preparation.

11. The court then amended its order allowing me to perform an interview after the start of jury selection. By that time, Dr. Rabun was unable to schedule a return visit.

12. I contacted Dr. Welner again. He expounded his belief that a careful interview was needed. In response, I explicitly asked Dr. Welner to give me whatever advice or help he wished. I do not recollect whether the initial suggestion to send questions came from him or from me. Whoever first mentioned it, I agreed to receive them. I was trying to be gracious. I was also being diligent; until one sees something, one cannot tell whether it would help. I have made such an offer before many times. (I made the same request of Dr. Rabun in this case.) I was expecting a few questions, five or ten at the most. A few questions as a

Page 8 of 25

FELL-00001455

*Affidavit of Richard D. Wetzel, Ph.D.*

favor was fine.  Dr. Welner e-mailed me a long list of questions which I reviewed before I came to Vermont.  To the best of my recollection, I left the printout of that list in St. Louis when I went to Vermont.  Dr. Welner knew when I was going to Vermont.  He sent a revised list of questions to Mr. Darrow's office for me.  Mr. Darrow handed them to me.  I had the impression, rightly or wrongly, that he was acting simply as a mail man.  I did keep that paper and reviewed it in my hotel room.  Dr. Welner's message in that e-mail implied I needed to ask his questions his way.

13. When I received the first set of questions, I was very surprised at the length and number of questions that he gave me.  I was also surprised at the instructions he included on how to ask them.  I inferred that he did not think I was knew what I was doing.  Rightly or wrongly, I was insulted.  He may have been trying to cover all contingencies, performing his own task diligently.  I did not take it that way.

14. I never intended before I did the examination or while I was doing the examination that I was doing anybody's examination, but my own.  I was doing the evaluation I thought appropriate to give the testimony I thought I might be required to give at trial (whoever called me), in the absence of details about the specific issues on which testimony would be expected.  What I asked Mr. Fell was based on my understanding of his history and the facts in the case and the reasonable hypotheses about Mr. Fell that could be derived from those facts.

15. I, of course, did know that the interview would be made available to Dr. Rabun, Dr. Welner, the defense and its experts and the United States Attorney's office.  I knew

Page 9 of  25

*Affidavit of Richard D. Wetzel, Ph.D.*

that what I asked might be helpful to any or all of them, including the defense, in preparing their testimony.

16.  I was told that there was a firewall until a verdict was rendered at the guilt phase.  At some point, I was sent or received a copy of the court's order dated 04/07/05.

**Mr. Darrow's Behavior**

15.  *Mr. Darrow did not direct me to do anything.*  At no time before or during my visit did Mr. Darrow direct me to modify or alter my evaluation.  I assume he is a very skillful attorney.  He said nothing improper to me or even anything approaching the improper.

A.  I did specifically ask him whether there was a problem in any way with using any of Dr. Welner's questions. He did say, after an apparent pause for reflection, that he could think of no legal reason why I should not use some of Welner's questions if I wanted to do so.

B.  On more than one occasion on the phone and in Vermont, I made a negative comment about Dr. Welner's long list of questions.  Mr. Darrow did not comment on my negative reactions as I recall except to chuckle at a mildly[3] sarcastic comment I made in Vermont about Welner being pushy.  I continued.  The word arrogant in some form was used by me.  Even after my comments about arrogance,  Mr. Darrow still did not respond by directing me to take Dr. Welner's advice or to ask his questions.

C.  There was a considerable overlap between the questions offered by Dr. Welner and those I would have asked

---

3 The qualification may be inaccurate; I hope I was not too impolite.

Page 10 of  25

FELL-00001457

*Affidavit of Richard D. Wetzel, Ph.D.*

anyway. He had presented new information recently obtained in his interviews about Mr. Fell's family. I wished to check that information out and would have inquired about it without his questions. I did and would have asked about all three killings since that was the focus now allowed by the court. The degree of overlap was related primarily to the facts in the case and the facts in the new interviews by Dr. Welner and the FBI, not his list of questions. He did not propose irrelevant questions.

D.    When I first read his report, I noted Dr. Welner's claim that he had directed my evaluation. I was insulted again. Forensic psychiatrists as a group tend to think that testifying about a live person one has not personally examined is dubious, although it is not proscribed[4]. As I said in my telephone conversations with Mr. Volk and Mr. Darrow, I thought he said this to deal with any ethical concerns about testimony about someone he had not personally examined (although he had substantial collateral information). Mr. Volk should have reasonably inferred that I thought Dr. Welner had overstated his influence on me. I said so explicitly.

16.    The defense refers to the inconsistency between what I said or what Mr. Volk understood me to say on the phone and what Mr. Darrow told the court (motion pages 15-16).

A.    I wished to do my own examination, not be a proxy for Welner. It was not my intent to ask a great number of questions for Dr. Welner. I was only willing to be

---

[4] Comments about an evaluee who refused to answer questions would be acceptable.

Page 11 of  25

FELL-00001458

*Affidavit of Richard D. Wetzel, Ph.D.*

helpful to him with a few questions. I would not knowingly have done an examination solely for Dr. Welner. I fully expected that the interview would produce information helpful to all the experts on both sides.

B. It appears now I stated the role of Dr. Welner's questions incorrectly, artlessly or imprecisely to Mr. Volk. I have no reason to suppose that Mr. Volk misrepresents what he thought I said. He may be more accurate about that conversation than I, especially if he took notes. It is possible, although I do not recall stating it poorly or incorrectly, that I just stated what happened poorly or incorrectly.

C. It was my belief, then and now, that Mr. Darrow was internally pleased that I would ask at least some of Welner's questions. I believed he wanted to have as many options as possible in presenting the government's case. To the extent I helped Welner, it offered Mr. Darrow more options.

D. Mr. Darrow[5] never said that. He never hinted that. He never asked me to help Dr. Welner. Most of the Welner questions related to the facts of the case. The rest dealt with his history of abuse, substance abuse and conduct disorder. In my opinion, I would have asked them anyhow since almost all were obviously pertinent. All forensic experts would walk someone through a series of crimes like this step-by-step. Of course, I asked many of my questions in the form I chose, not

---

5 For the sake of completeness, no one else in his office, including Mr. Kirby and Mr. Kelly, or affiliated with the government did that either.

Page 12 of 25

FELL-00001459

*Affidavit of Richard D. Wetzel, Ph.D.*

Welner's. Many were answered by Mr. Fell as he brought up material, without a specific question from me, and I followed his lead. Mr. Darrow never crossed the line and asked me to ask Welner's questions or to perform Welner's examination.

E.  I *may* have been careless in talking to Mr. Volk between distinguishing between what Mr. Darrow said and what I thought he wanted, but did not say.

F.  I did not think Dr. Welner had the authority to write questions for me. I did assume that he could give me his insights into the case which *might* benefit my understanding of the case. I did think that understanding which issues he thought important would be helpful which *might* be beneficial to me in my examination.

G.  If I said to Mr. Volk that Mr. Darrow directed me to ask the questions, I was wrong. That did not happen.

H.  I cannot and would not attempt to refute Dr. Welner's claim he used my examination as his. He told me that I was "gentle" and "informative" after he viewed the material.

I also note that the defense accurately predicted the substance of his report prior to his receipt of the DVDs showing my evaluation.

C.  **Did I, with or without my personal awareness, assist Dr. Welner to circumvent the court's order that additional formal psychological testing could only be done with the consent of both parties.**

1.  Dr. Welner stated in his report that he administered three additional psychological tests, the Hare Psychopathy

Page 13 of  25

*Affidavit of Richard D. Wetzel, Ph.D.*

Checklist - Revised (PCL-R), the Violent Risk Appraisal Guide (VRAG) and the Historical/Clinical/Risk Management (HCR-20)[6] to Mr. Fell after the date of my evaluation. He said he used part of that evaluation in this effort.

2.  From my point of view as a psychologist, frequently qualified as an expert on testing, I did not administer any of the three tests at issue in my evaluation on any of the three dates (9/18 and 9/19 in 2002 and 6/13 in 2005) on which I saw Mr. Fell.

    I have reviewed the test manual for the Hare Psychopathy Check List[7]. I did not ask any systematic, longitudinal questions about his life history of glibness / superficial charm, previous diagnosis as a psychopath, proneness to boredom, pathological lying, lack of affect, callousness, lack of empathy, promiscuity, irresponsible behavior as an adult or marital problems. This information would be needed to score the test reliably. I did inquire about a few specific events related to some but not all of the material to be explored for this test. I did not advertantly or inadvertantly administer any of these tests in a sufficient detail by using either my or Dr. Welner's questions.

3.  Dr. Welner wasn't there; he could not have administered them either.

4.  The only logical possibility that I see is that he interpreted or coded the material that I elicited along with all the other material he possessed *as if* he had

---

6 I enclose some material that may assist the court and counsel in a supplement to this affidavit.

7 Robert D. Hare. (1991) The Hare Psychopathy Checklist - Revised: Manual, North Tonawanda, NY, Multi-Health Systems.

Page 14 of 25

FELL-00001461

*Affidavit of Richard D. Wetzel, Ph.D.*

administered the tests.

5. There are so many different psychological tests and types of tests that it is relatively difficult to come up with a simple definition of what is a psychological test and what is not a psychological test. Checklists for elements in a history are used all the time in Social Security determinations and/ or criteria in psychiatric diagnosis. These are not considered psychological tests in ordinary practice. However, when there is an intent to quantify, scores are given and those scores are normed in specific populations, it is hard to say that this is not a psychological test. Most psychologists would agree that these three instruments are properly called psychological tests. I would agree that when properly given they are psychological tests.

6. It is important to understand that Hare's Psychopathy Checklist - Revised has two factors. One looks at psychological feelings and behavior while the other looks at lifelong patterns of behavior. These lifelong patterns of behavior are very similar to and correlate very highly with the diagnostic criteria of DSM-IV-TR[8] for antisocial personality disorder. The subjective feelings or reactions are less reliably measured. The goal of the estimates of these feelings and reactions is to rate lifelong patterns of

---

8 American Psychiatric Association. (2000) **Diagnostic and Statistical Manual of Mental Disorders: Fourth Edition – Text Revision**. Washington, D.C.: American Psychiatric Association. This is the current standard accepted by psychiatrists and frequently used by other mental health professionals.

Page 15 of  25

FELL-00001462

*Affidavit of Richard D. Wetzel, Ph.D.*

feelings and reactions[9]. Dr. Welner specifically used Mr. Fell's interview with me to gauge this, according to his report.

I reviewed his description of the Psychopathy Checklist as it related to my interview. He made no references to my interview under the grandiosity and stimulation seeking items. I saw none that day. I did not find Mr. Fell either glib or charming. He did on occasion come up with poor explanations for his behavior; apparently, Dr. Welner thought that his occasional verbal facility was glibness and charm. His life time examples were much less forced. I would agree that Mr. Fell showed little emotion and little remorse[10]. I would suggest that Mr. Fell was in a cruel, markedly stressful and atypical situation when I saw him. His death penalty trial was in progress. Remorse with full disclosure increased his risk of death. Lack of disclosure could be used against him. He had to make a choice. I would agree with his statements to me that he did not appreciate the legal nuances[11] of his situation. I would not say this was a typical day in his life or a reasonable sample of his lifelong emotional reactions. If this day were a typical example of his emotional reactions, I would not agree with Dr. Welner's scoring.

(I would have no problem with Dr. Welner inferring Fell's prevailing emotional reactions and feeling from his life-long history. His other examples are quite relevant.

---

9 We all have been insensitive or without remorse at some time. Typical, recurring reactions are the issue.

10 Note I did not say none. He isn't very good at it.

11 My word; he used "dumb".

FELL-00001463

*Affidavit of Richard D. Wetzel, Ph.D.*

However, that would be inferring, not administering the test.)

7. I regularly cause to people to receive tests through assistants or technicians or "puppets[12]". When I do so, I tell them they are giving the tests. I assure myself that they have been trained by me or someone else to administer each specific test. I expect them to administer the test **precisely according to protocol.** I expect them to do this according to the protocol so that the responses can be scored according to the protocol. Unless standard conditions for testing and standard rules for scoring are observed, the scores are invalid and meaningless.

8. Dr. Welner never attempted to give me the kind of direction that would have led me to believe I was operating as a technician and administering these three tests in his behalf. He never inquired into my experience with these tests.

9. It would be impossible to escape the conclusion that if I were thought to have administered these tests during my evaluation, that it was poorly done and the scores derived at a later time by Dr. Welner would be less valid than usual or invalid and would not assist a trier-of-fact to understand Mr. Fell or his behavior.

10. There is research in the literature that indicates that the these three tests can be validly used without any interview at all, if sufficient records are available. They then become ways of "coding" the information one has, without formally giving a test. Dr. Welner could reasonably, with

---

12 Whether rightly or wrongly, I have the feeling that the allegation that I was acting as a puppet has been made.

Page 17 of 25

FELL-00001464

*Affidavit of Richard D. Wetzel, Ph.D.*

sound scientific basis, allege that the checklists were used, but not that they were administered to Mr. Fell. As an expert on testing, I would state under oath that he could reasonably process or review the information he acquired in the light of these checklists and still believe and say in good faith that he did not give any new psychological tests.

**Other**

1. I have retained all of the materials I have received that are not duplicates. As far as I know, this is still a request by the defense and not an order of the court.

2. I attach the guide I prepared in St. Louis for my evaluation in Vermont.

Further affiant sayeth naught.

_____
Richard D. Wetzel, Ph.D.

SUBSCRIBED AND SWORN to before me, a Notary Public, this 12th day of September, 2005.

_____
Notary Public

My Commission Expires:

```
" NOTARY SEAL "
Kay L. O'Brien, Notary Public
St. Louis County, State of Missouri
My Commission Expires 1/27/2007
```

Page 18 of 25

FELL-00001465

*Affidavit of Richard D. Wetzel, Ph.D.*

## Supplementary Material

For the information of the court and counsel, I selected some material on each of these tests.

(Author's note: The following material is selected verbatim[13] from the following articles and websites (without permission, but with deference. I have reformatted this material, added my own emphasis and used a consistent type face.)

## A.    from Christopher D. Webster, PhD, FRSC, PRCPsych

"This material is provided courtesy of PsychDirect, a public education website of the Department of Psychiatry & Behavioural Neurosciences, McMaster University, Hamilton, Ontario, CANADA. All material is copyright protected and may be printed for personal use only. Any other use is strictly forbidden without the express written permission of the author."

## PsychDirect 2002,2003, 2004
Last Updated April 12, 2005
Risk Assessment:
Actuarial Instruments & Structured Clinical Guides

## Overview

"The research of the last two decades has produced a number of assessment tools designed to assess risk of violence. While it still may not be possible to predict risk with unequivocal accuracy, these tools have undoubtedly improved predictive assessment, particularly when used in combination with clinical evaluations. Many of the instruments continue to be refined, develop with continued research, and incorporate new findings. The tools are divided into two principal categories: *actuarial instruments* and *structured clinical guides*."

"*Actuarial instruments* attach specific statistical weighting to different variables which assess the risk. They are premised on the idea that, if accuracy of prediction is the most important factor, it is best to find out how members of a comparable group of individuals conducted themselves over time. This is achieved by pains-staking follow-up research on a particular group over set periods of time. With the follow-up data on violence

---

[13] Obviously, I omitted some sections to preserve a focus.

FELL-00001466

*Affidavit of Richard D. Wetzel, Ph.D.*

available, it is possible then to link these statistically to various data obtained at an earlier time. It is similar, in principle, to the way in which insurance companies evaluate risk for many types of eventuality in order to set their rates accordingly. A key defining aspect of actuarial instruments is that scores obtained on individuals can be related to massed statistical reference data."

"*Structured Clinical Guides*, in contrast, invite clinicians to consider a number of variables which will have some application to the assessment of risk in the case under consideration. This type of assessment is based on the idea that a great deal has been learned over the past two decades about the factors which should be taken in account when conducting risk assessments on various types of mental health, forensic, and correctional populations. The various structured guides (see below) define terms, provide items which seem merited on the basic of scientific and professional grounds, and suggest methods of scoring."

(Author's note: Psych Direct lists the three instruments for evaluating future dangerousness in adults, two actuarial risk assessment instruments and one structured clinical guide. These are the ones used by Dr. Welner. After the description of each test from PsychDirect, I included other descriptions.)

**Violent Risk / Violent Recidivism**

1.    Hare Psychopathy Checklist Revised (PCL-R)

2.    Historical Clinical Risk -20 (HCR-20)

3.    Violent Risk Appraisal Guide (VRAG)

**The Two Actuarial Risk Assessment Instruments:**

**Psychopathy Checklist - Revised (PCL-R) Hare, 1991 & 2002**

"Even though it was not originally designed as a risk assessment device, the Hare PCL-R has gradually come to be used to assess likely future recidivism and violent offending. It is a 20-item rating scale, scored on the basis of both semi-structured interview and collateral information. It has been validated for use in adult male correctional and forensic psychiatric samples. Over recent years, research has shown that it is a relatively good predictor of violence across diverse populations.  Hare

FELL-00001467

*Affidavit of Richard D. Wetzel, Ph.D.*

PCL-R scores are incorporated into a number of subsequently developed risk assessment tools and guides."

Another description of this test.

"**PCL-R.** The PCL-R (Hare, 1991) is a 20-item measure of the construct of psychopathy, first clearly described by Cleckley (1941). Although it is not a risk instrument per se, it has been found to relate to violence across many settings and samples (see Hare, 1996, for a review). The PCL-R is comprised of two subscales. One of these includes items that relate mainly to emotional and interpersonal deficits, such as callousness, shallow emotion, lack of guilt or empathy, and manipulativeness. The other scales pertain to behavioral aspects, such as poor behavior controls and parasitic lifestyles.

Items are scored in the same manner as those of the HCR-20, and, as noted above, the PCL-R scoring system is used by the HCR-20. The PCL-R has interrater reliability in the .90s (Hare, 1991). extensively researched with respect to violence (Andrews&Bonta, 1995b). Currently, there are no data on the HCR-20 in correctional samples. This is seen as a necessary step for its further development."

**VRAG (Violent Risk Appraisal Guide) Quinsey, Harris, Rice, Cormier (1998)**

"This instrument contains a 12-item actuarial scale which has been widely used to predict risk of violence within a specific time frame following release in **violent, mentally disordered offenders**[14]. Developed at Penetanguishene Mental Health Centre, the tool uses the clinical record, particularly the psycho-social history component, as a basis for scoring as opposed to interview or questionnaires. The Hare PCL-R (Psychopathy Checklist -Revised) score is incorporated into the VRAG calculations of risk.

The VRAG is not available as a stand-alone commercially available scheme but the current version is detailed in the text *Violent Offenders, Appraising and Managing Risk* (p.237) by Quinsey et al."

---

[14] Antisocial personality disorder and psychopathy are not included in the mentally disordered category.

Page 21 of  25

FELL-00001468

*Affidavit of Richard D. Wetzel, Ph.D.*

Another description of this test from its developers[15].

## What Is the Basis of the VRAG?

"These actuarial tools are not typical psychological tests[16] in which patients fill out questionnaires or answer questions in an interview. The research was based entirely on carefully assigning a numerical score for each variable to each case. *This scoring used only the clinical record, especially comprehensive psychosocial histories.* The VRAG requires a comprehensive psychosocial history addressing childhood conduct, family background, antisocial and criminal behavior, psychological problems, and details of the index offense. Psychosocial histories adequate to score the VRAG include more than past and present psychiatric symptoms and use a lot of information gathered from third parties (friends, family, schools, correctional facilities, police, and the courts). In the area of predicting crime and assessing risk, it is insufficient to rely on what an offender says about himself."

"The Violence Risk Appraisal Guide (VRAG)... [is an] actuarial tools for the prediction of violent recidivism. (At first, the VRAG was called the *Statistical Risk Appraisal Guide*[17]). The tools give the probability (from zero to 100%) that an offender will commit a new violent offense (including sex offenses) *within a specified period of community access.* It was not developed to predict violence while in custody in prison."

"Certainly, compiling an adequate psychosocial history requires skills on the part of a case historian. At our institution, it requires, on average, approximately 2.5 person-days to complete a suitable psychosocial history."

---

[15] Harris, G.T., Rice, M.E., & Quinsey, V.L. (1993). Violent recidivism of mentally disordered offenders: The development of a statistical prediction instrument. **Criminal Justice and Behavior,** 20, 315-335.

[16] One might then reasonably infer that it was an *atypical* psychological test.

[17] This title may reflect its nature more accurately. This title does not, however, help sales to psychologists.

FELL-00001469

*Affidavit of Richard D. Wetzel, Ph.D.*

**Structured Clinical Guides:**

**HCR-20, Version 2 (Historical, Clinical, Risk-20) Webster, Douglas, Eaves, & Hart, 1997**

"Originally made available in 1995, the HCR-20 Structured Guide for the Assessment of Violence Risk was later modified in light of actual clinical experience gained from initial trials. It is intended for use with civil psychiatric, forensic, and criminal justice populations. It consists of 20 items as well as the Hare PCL-R. There are 10 historical variables, 5 clinical variables, and 5 risk management factors. Each item is scored as 0 (not present), 1 (possibly present) or 2 (definitely present) to yield a score out of 40. It includes variables that capture relevant past, present, and future considerations. It can be regarded as an important first step in the risk assessment process. The manual provides information about how and when to conduct violence risk assessments, reviews the research on which ... into several different languages and is under active examination internationally. Its work is guided, to an extent, by a consortium of researchers and clinicians who make up the RISC-TEAM, a sub-group of the International Association of Forensic Mental Health Services."

Another description of this test.

"**The HCR-20.** This device, available as a manual (Webster, Douglas, et al., 1997;Webster, Eaves, et al., 1995), contains three scales and 20 variables. The Historical (H) scale contains 10 items of a mainly static nature that are unlikely to fluctuate greatly over time: (a) previous violence, (b) young age at first violent incident, ©) relationship instability, (d) employment problems, (e) substance use, (f) major mental illness, (g) psychopathy, (h) early maladjustment, (I) personality disorder, and (j) prior supervision failure. The Clinical ©) scale has five items, refers to current mental, emotional, and psychiatric status, and includes risk markers that are dynamic and changing in nature: (a) lack of insight, (b) negative attitudes, ©) active symptoms of major mental illness, (d) impulsivity, and (e) unresponsive to treatment. The Risk Management ®) scale also has five items and is concerned with forecasting the future social, living, and treatment circumstances of an individual and with attempting to anticipate the person's reactions to those conditions: (a) plans lack feasibility, (b) now published (Webster et al., 1997), the content of items is directly comparable to Version 1. Two other measures, treated as

Page 23 of  25

FELL-00001470

*Affidavit of Richard D. Wetzel, Ph.D.*

concurrent devices for comparison to the HCR-20, were the VRAG and the PCLR. Both of these instruments have more data in support of their relationship to violent behavior than does the HCR-20, and both are used in correctional assessments. For these reasons, they were considered useful comparison measures to the HCR-20."

Another description of this test from its developers.

Kevin S. Douglas, Christopher D. Webster. The HCR-20 Violence Risk Assessment Scheme, Concurrent Validity in a Sample of Incarcerated Offenders, **Criminal Justice and Behavior**

"The HCR-20 is a 20-item checklist to assess the risk for future violent behavior in criminal and psychiatric populations. Items were chosen based on a comprehensive review of the literature and input from experienced forensic clinicians. The HCR-20 includes variables which capture relevant past, present, and future considerations and should be regarded as an important first step in the risk assessment process. The manual provides information about how and when to conduct violence risk assessments, research on which the basic risk factors are based, and key questions to address when making judgments about risk. *Violence is defined as "actual, attempted, or threatened harm to a person or persons*[18].*"* The professional who completes the HCR-20 Coding Sheet must first determine the presence or absence of each of the 20 risk factors according to three levels of certainty (i.e., Absent, Possibly Present, Definitely Present). In some settings, responsibility for the assessment may be divided among several different professionals."

**Other**

Grann M. Langstrom N. Tengstrom A. Stalenheim EG. Reliability of file-based retrospective ratings of psychopathy with the PCL-R. Journal of Personality Assessment. 70(3):416-26, 1998 Jun.

"A rapidly emerging consensus recognizes Hare's Psychopathy Checklist-Revised (PCL-R; Hare, 1991) as the most valid and useful instrument to assess psychopathy (Fulero, 1995; Stone, 1995). We compared independent clinical PCL-R ratings of 40 forensic adult male criminal offenders to retrospective file-only

---

18 Emphasis added.

FELL-00001471

*Affidavit of Richard D. Wetzel, Ph.D.*

ratings. ***File-based PCL-R ratings, in comparison to the clinical ratings, yielded categorical psychopathy diagnoses with a sensitivity of .57 and a specificity of .96***[19]. The intraclass correlation (ICC)[20] of the total scores as estimated by ICC(2,1) was .88, and was markedly better on Factor 2, ICC(2,1) = .89, than on Factor 1, ICC(2,1) = .69. The findings support the belief that for research purposes, file-only PCL-R ratings based on Swedish forensic psychiatric investigation records can be made with good alternate-form reliability."

---

[19] Sensitivity means that they identified 57% of the persons thought to be psychopaths based on all available information from review of the files alone. Specificity means that they made almost no mistaken diagnoses of psychopathy (only 4%) when only the files were used.

[20] The Intraclass Correlation (ICC) assesses rating reliability by comparing the variability of different ratings of the same subject to the total variation across all ratings and all subjects. The reported difference in the correlations for the factors means that different raters agree on the pattern of behaviors much more than they agree on the pattern of emotional reactions.

FELL-00001472

### Ground Rules

- Usual information
- Any problems today
- Reviewed anything?
- Avoid advice from attorneys

### I Would Like to Get It Straight in My Mind

### Who you lived with
### and
### When?

### How Old Were You When Either One of Your Parents Was Gone for a Significant Period of Time?

- Which one left?
- For how long?
- What happened then?

- Who did you live with next?

### How Old Were You When Either One of Your Parents Was Gone for a Significant Period of Time?

- When did your mother leave?

- Who did you live with then?

### Parental Fighting

- When do you first recall your parents having problems, and fighting?
- How old were you?
- After that, how frequently did they fight?

### Your Father

- Tell me about him.
- What did you like about him?
- What didn't you like about him?

1

FELL-00001473

## Your Father

- Was he involved in criminal activity?
- Was he a fence?
- Did he buy your stuff?
- What has he had to do with the police difficulties you had in your hometown?
- Did he get you started?

## Maternal Grandmother

- What was your grandmother's name?
- Tell me about her.
- What did you like about her?
- Where did she live?
- Where was she when all of your parents' troubles were going on?
- What was she like?
- Did she drink?
- Did she use drugs?
- Was there a time in which she took care of you?

## Maternal Grandmother

- How did she relate to Jackie Sharpe?
- Was she ever violent to Jackie?
- Was Jackie ever violent to her?
- Was there a time when you lived with your grandmother?
- What was that experience like?

## Stella Banas

Did she drink?

Did she use drugs?

Was she ever violent?

What has your relationship been like, over the years?

What do you like about her?

What do you not like about her?

## Stella Banas

Where was she, when all of your parents' troubles were going on?

Did she ever offer for you to live with her?

And did you take her up on that offer?

(If no) — Why not?

Was there a time in which she was

## Jeanette Banas

Tell me about Jeanette Banas.

What has your relationship been like, over the years?

What do you like about her?

What do you not like about her?

2

FELL-00001474

## Jeanette Banas

Where was she, when all of your parents' troubles were going on?

Did she ever offer for you to live with her?

And did you take her up on that offer?

Why not?

Was there a time in which she was violent to others in her family?

## Donna Williams

What has your relationship been like, over the years?

Where was she, when all of your parents' troubles were going on?

What do you like about her?

What do you not like about her?

## Donna Williams

Did she ever offer for you to live with her?

And did you take her up on that offer?

Was there a time in which she was violent to others in her family?

## Teri Fell

• Tell me about your relationship with your sister, Teri.
• Are you close?
• How do you feel about that relationship?

## Mother Going to Jail

• How old were you when your mother started getting locked up because you weren't going to school?
• How did you feel about her getting locked up?
• Did her repeatedly getting locked up get you to be better in school with your attendance?

## Mother Going to Jail

• How did she feel about getting locked up over and over because you weren't going to school?
• How did she take that up with you?
• How did you respond?

3

FELL-00001475

## What Did You Want to Achieve in Your Life?

- Before you got locked up, what kinds of career plans did you have?
- How were you pursuing them?

## Which of the United States Have You Been In, Before This Happened?

- Nebraska
- When were you in Nebraska?

## Motivation for Going to Vermont

How did you come to go there?
- Did you go to Vermont, on that September 23, because you had to? (If yes) why?
- Bobbie lee seemed to report he had to go to avoid the police; How do you understand that

## What Did You Take With You to Vermont?

- Musical instruments?
- What did you play?
- Did you write songs there?

## Cards

- Who did you play cards with?
- Who else?

## Activities in Vermont

- When you lived with your mother in Vermont, what kinds of things did you do with your time?
- (If he says something vague like, 'hung out') what places did you hang out?
- What did you do when you hung out?

4

FELL-00001476

### Did You Work?

- Did you seek work there?
- (If yes) from whom?
- How?
- When?
- Did you fill out an application?

### Did You Work?

- Rutland Plywood
- Why didn't you go back the day after Thanksgiving?

### Three People

- Dora Carter
- Kevin Bodette
- Borne Spencer

### Contact With People in Pennsylvania?

- Did you keep in touch with them?
- How?
- Why?

### Money for Expenses

- How did you pay for food?
- How did you pay rent?
- How did you pay for cigarettes?
- How did you pay for alcohol?

### Money for Expenses

- Did you use drugs?
- Which?
- How did you pay for the drugs?

5

## Sleeping Arrangements

- Donny
- Debra
- Bobby
- Where in the house?

## Activities With His Mother

- What kinds of things did you do with your mom?

## Activities With His Mother

- How often would you drink together?
- How often would you be drunk together?

## The Gun

- How did you come to get the gun you bought to Vermont?

## The Gun

- Do you have problems with your memory?
- If you have problems with your memory, should I rely on Robert lee's input from before he died, and from other witnesses, instead of your input?

## Do You Remember the Names of the People Who Examined You?

- Do you remember what they did?
- Do you remember what you told them?

6

FELL-00001478

## Do You Remember the Names of the People Who Examined You?

- If you have problems, would you have any problem with my telling the court that you don't remember things, and so whatever you said to Dr. Mills, Lippman or van Gorp should not be believed?
- Or that what you told Dr. Rabun and myself should not be believed?

## The Gun Continued

- Who brought the gun to you?
- How did this person get it?
- When you bragged to Bethany Brashears and Lynn Roberts that the gun belonged to a police officer, did you not know then?
- Did you have ammunition 'for?
- What ammo did you have for it?
- How did you get the ammo?

## His Temper

- Can you describe your temper to me?
- What was your temper like, growing up?
- How would others experience your temper?

## Do You Remember Vandalizing Things, Like Spray Painting Them?

- Give me an example.
- Do you remember the things you may have trashed, like rooms, mailboxes, or other things?
- Please give me an example.

## Was There Ever a Time That People May Have Found You Unmanageable?

- Please tell me about that.

## Seeing Dead or Mutilated Persons

- What kind of homicidal violence were you exposed to, in your earlier years?
- How old were you when you saw your first picture or video of a truly dead person?
- Was that on the internet?

7

FELL-00001479

### Seeing Dead or Mutilated Persons

- What websites were you exposed to that had violent and graphic images?
- And were those the websites you saw at Jeanette Banas's Webtv?
- What other websites did you remember seeing there?

### Seeing Dead or Mutilated Persons

- How did those websites affect you?
- How did you find out about those websites?

### Mutilation

- Did you see mutilation?
- What kind?
- Where?
- How did that affect you?
- How often would you look at that stuff?
- Whom else would you see it with?

### Did You See Torture?

### Did You See a Murder?

- What kind?
- Where?
- How did that affect you?
- How often would you look at that stuff?
- Whom else would you see it with?
- What kind?

### Kicking to Death

- Did you ever see someone kicked to death?
- Where?
- What was your response to this?

8

FELL-00001480

## Stoned to Death?

- Where?
- What was your response to this?

## Video Games

- How often have you played video games?
- Has there been a time in your life when you played video games more frequently?
- How frequently?

## Video Games

- What were some of your favorites?
- What did you like about them?
- Did you bring any video games with you when you went up to Vermont?
- Which ones?
- Did you buy any there?
- Which ones?
- Did you like them?

## What Was the First Violent Thing You Did in Vermont?

- What was the first thing you did that other people might call violent?
- When did that occur in Vermont?

## Did Your Mother Ask You to Leave?

- How did you feel about that?

## At What Point Did You Speak to Your Family About Leaving?

- Did Stella Banas say you could not return to her home?
- Did Jeanette Banas say you could not return to her home?
- Did Paula Williams say you could not return to her home?
- What kept you from returning to Pennsylvania?

9

FELL-00001481

### Violence at the Bar

Were you hitting your mother in Vermont?

Did you get into an argument or a quarrel with her in a bar?

(If no) Is there a reason why witnesses at a bar would speak of your hitting your mother outside a bar?

Did you not drag her by the hair, as witnesses reported?

### Violence at the Bar

What would be the reason for people to say, specifically, that you dragged someone by the hair unless you had?

Did your violence toward your mom come up in your conversations with family back in Wilkes Barre?

### Accuracy of His Family's Information

• So if they have already made statements in this case about conversations they had with you about your violence, would Stella, Jeanette, Paula Williams and your sister all be lying, or is it possible there is a bit more you might now remember about those discussions?

### Accuracy of His Family's Information

• Should I consider all of them to be lying to me?
• What would be the reason they would all lie to me?

### Accuracy of His Family's Information

Do you feel your sister is trying to help your case?

### Accuracy of His Family's Information

• So if she lies to me, and makes herself unbelievable, or makes you unbelievable, does that help your case, or are each of you more likely to help your case if someone like myself can think that you are being straight with me when we speak?

10

FELL-00001482

## Accuracy of His Family's Information

- What was the reaction of the people in your family who your mother told you were hitting her?
- A number of people said you threatened your mother in Vermont, even in front of strangers? Why would you do that?
- Why did you not just leave?

## Charlie Conway

- How would Charlie Conway have described you, based on your experience with him?
- When did you meet him?
- What did you know about him?
- Had your mother, or anyone else told him that you had outstanding warrants in Pennsylvania?
- How did that come up?

## Charlie Conway

- When was the first time you and he had a confrontation?
- How many times had he come over the house?
- When was the first time he came over the house?
- Who else was there at the time?

## Charlie Conway

- What was that confrontation about?
- What happened (trace through carefully)?
- How did you feel, at the time, about how things ended up that night?

## Was Charlie Conway a Problem?

- Did you get a sense at that time that he might be a problem to you?
  What kind of problem?
  How, at that time, did you think you were going to resolve that problem?

## Charlie Conway

- Had your mother, or anyone else told him that you had outstanding warrants in Pennsylvania?
- How did that come up?

11

FELL-00001483

### Charlie Conway

Who else was there at the time?
- What was that confrontation about?
- What happened (trace through carefully)?

### Charlie Conway's Attempt to Flee

- When did Charlie Conway attempt to leave the house, on the night you killed him?
- How far away did he get?
- He had a girlfriend to go home to, how did you keep him from going?

### Charlie Conway's Attempt to Flee

- When you got him back inside, how did you come to get him in if he was so drunk?

### Charlie Conway's Attempt to Flee

- What was the reason you did not want him to leave?
- (If he says he was drunk) I wonder if there was another reason – because he was pretty drunk on thanksgiving, too, but you let him leave then.

### Confrontation

- On Thanksgiving night, according to your relatives, you had a confrontation with Charlie Conway and your mother.
- What was that about?

### Confrontation

What happened?
- So you have nothing to add to the details they already provided us?

12

FELL-00001484

## Confrontation

- What happened to Bobby Lee that night?
- Why?

## Did Your Mother See It Coming?

- Your family says your mother called them the night of her death and said you were going to kill her.
- What was their response to you?
- What was your response to them?

## Did Your Mother See It Coming?

- What made you pull the phone out of the wall after your mom was saying she was afraid you would kill her?

## Did You Behavior Surprise You?

- Did you think you were capable of killing someone before this happened?

## Did You Behavior Surprise You?

- You know that a number of your friends and family told us you talked about going on a killing spree in past years.
- What made that idea so appealing?
- What kept you from doing it sooner?

## Did You Behavior Surprise You?

- When did you first think about going on a killing spree?
- Whom did you include as logical targets?

13

FELL-00001485

### Did You Behavior Surprise You?

- Your friends mentioned you noted you would start with your mother.
- How high was she on your list?
- Did you consider that possibility, before you came up to Vermont?
- Did you consider that possibility, after you came up to Vermont?

### Did You Behavior Surprise You?

- Why did you ask Robert Spencer if he wanted to go on a killing spree with you?

### Did You Behavior Surprise You?

- Were there others you had hoped to kill, as well?
- What was the reason you wanted to kill that person?

### Did Charlie Suffer?

- Do you think Charlie Conway suffered when you killed him?
- How much of a struggle did Charlie Conway put up, when you killed him?
- How did he injure you?

### Hands in His Throat

- After you killed Charlie Conway, you put your hands inside his neck...what did that feel like?
- Did you touch the muscles?
- What did you do to them – did you pull them apart, or rip them?

### Hands in Her Throat

- Did you do the same thing with your mother?
- Why / why not?

14

FELL-00001486

**Passed Out**

Once Charlie Conway and your mother were passing out, what kind of problem could they then have represented?

---

**Did Charley Conway Deserve to Die?**

Why?

---

**Your Mother's Dying Statement**

- When your mother was dying, and she said, "I love you Binker," were you surprised?
- Why

---

**What Was the Reason You Allowed Your Mother to Be Killed?**

- How do you discuss your mother's killing with your relatives, seeing as you could have prevented it from happening?

---

**What Was the Reason You Allowed Your Mother to Be Killed?**

- Do you think your mother was a threat to you when she was killed?
- How?
- How does that relate to her saying, "I love you Binker" when she was dying?

---

**What Was the Reason You Allowed Your Mother to Be Killed?**

- Do you think she suffered?
- How?
- How do you feel about that?

15

FELL-00001487

## Options

- What did you consider doing after your mother was dead?

- List each?

- Advantages / disadvantages of each

## Showers

- Why did you take a shower after the death of your mother?
- Change clothes?
- Put on the same clothes / boots?
- Pack up?
- Wrap up the knives?

## Preparations for Fleeing

- The gun
- Ammo
- Places visited
- Why
- Problems

## If You Felt Bad

- Why did you shower?
- Pack carefully
- Help Bobby Lee escape?

## His Mother's Funeral

- What do you know about your mother's funeral (as much detail as possible)?
- Whom do you think was most affected by her death?
- How?

## Was Mrs. King the First Target?

- How many cars or trucks did you consider stealing that night before you happened upon Terri King?
- Tactics
- Picking her up

16

FELL-00001488

### The King Murder

- Were you concerned that whomever was in that truck would see you chase Terri King?
- What eased your concern?

### The King Murder

- Picking the spot
- When you got out of your car before you killed Terri King, when did you see a truck nearby?
- How far away?
- How did you know that you weren't seen?

### The King Murder

- What prompted you to stop the car to let Terri King out?
- What was the reason you hadn't done that sooner?
- Later

### The King Murder

- When was it decided that she would die?
- Who made the decision?

### The King Murder

- Anyone object?
- After you decided to kill her, were you not worried that they would see you?
- How did you account for that?

### The King Murder

- How was she killed?
- What was the reason you didn't shoot her, but killed her with your hands and feet?

17

FELL-00001489

### The King Murder

- You talked about kicking her, and stomping on her?
- When the blood shot out of her mouth, while she was on the ground, how high did it shoot?
- Did it get on your pants?

### The Autopsy Report

- The autopsy showed that when you stomped on her, you pressed your foot down on her neck.
- You mentioned that you stopped when her blood shot out of her mouth.

### The Autopsy Report

- What was her expression like, when you were stepping on her neck?
- What were her eyes doing?
- What was the reason you stepped on her neck, seeing as she was already pretty much immobilized?

### Any Struggle

- Was Terri King an athletic woman?
- Could she have outrun you when you chased her?
- And she fell down, correct?

### What Was the Reason You Chose to Kill Terri King?

- After you killed her, how long did it take for you to get back to the road?
- Did you run, or walk?
- Did you not worry that the people in the truck might see?

### The effect of Mrs. King's death

- How did you feel, at the time, about how things ended up that night?
- Now?

18

FELL-00001490

### The King Murder

- Whom do you think was most affected by Terri King's death?
- How do you think they were affected?
- What do you think they feel about your case?

### Bobby Lee

- Who was Robert Lee to you?
- Did you have contact with Robert Lee after the arrest?
- What ever happened to Robert Lee?
- Are you surprised?
- How do you feel about that?
- Who were you to Bobby Lee?

### Bobby Lee

- Who were you to Bobby Lee?
- He said he was so grateful to you – Why?
- He said you had a power over him?
- You could get into his head?

### Sad Moments

- When were the three saddest moments or experiences of your life that you can recall?
- Please tell me about them.

### Happy Moments

- When were the three happiest moments or experiences of your life that you can recall?
- Please tell me about them.

### Jail

- What has jail been like for you?
- Is there anyone whom you particularly like there?

19

FELL-00001491

### Religion

- What religious activities are you involved in jail?
- How did you come to be involved in them?
- What kinds of practices do you follow in jail?

### Religion

- Who is your religious guide?
- What books have you read, in that regard?
- (How about the Koran?
- Have you progressed? How?

### Violence in jail

- Have you been involved in any violent incidents while in jail?
- Tell me about them.
- Different in than out?

### Correctional officers

- How do you feel about the corrections officers at the jails you are in?
- Are they any different from any other facility you might find?
- Would you fight with any of them if you had the chance?
- Do the officers have any reason to be afraid of you?

### Correctional officers

- Were any of the officers injured in this fight?
- How do you feel about that?

### The Future As You See It

- Where do you see yourself in ten years?
- Twenty?
- How long do you think you will live in prison?
- What would you think about spending the rest of your life in prison?

20

FELL-00001492

### The Future As You See It

- How easy do you think it would be to escape from custody?
- Do you think you could pull something like that off?
- Could you ever see yourself trying, if you had the opportunity?

### Animal Abuse

- Terri, your sister, told Dr. Welner about the incident involving a cat, that led to your being dismissed from the job with Jesse's carnival. What can you tell and us about that incident, adding to what Jesse and Terri had to say?

### Animal Abuse

- How old were you when you killed Jackie's dog in the woods behind your house?
  - What would be the reason you would tell someone else about it, after it happened?
  - Is it something you find difficult to discuss, or do you recognize that many people have shot dogs before?

### Animal Abuse

- Which friends also were with you when you shot the dog?
  - Did someone else do the shooting?
  - Who?

### Animal Abuse

- Were there other animals you shot?
- What kind?
- People who were with you talked about the squirrels in the woods.
- Who would you go with to shoot squirrels in the woods?
- And what would you do?
- After the squirrels would be killed, what would you then do?

### In the Hospital

- When you were hospitalized in your early teens, your mother reported that you had threatened her. How old were you when you first threatened your mother?
- What were the circumstances?

21

FELL-00001493

## The First Assault

- How old were you when you first struck her?
- Did you ever consider that your mother may have left, to Vermont, because she was physically afraid of you?
- She seemed especially good at enraging you? Why do you think that was?

## In the Hospital

- When your mother communicated to you and to clinicians when you were hospitalized that you were scary and uncontrollable to her, did you ever consider, when you were younger, that she left because she couldn't parent you?
- Do you regret threatening your mother, under the circumstances?

## In the Hospital

- Did they understand?
- Did your Mom tell them what was really going on?

## In the Hospital

- Did anything help?
- Hurt?

## Aliases

- Have you ever used an alias?
- First time?
- Why?
- With whom?
- Did it work?
- How did you feel?

## Satanism

- When did you first take an interest in Satan?
- What was appealing about Satanism?
- Whom did you share this interest with?

22

### Satanism

- Bobby Lee?
- Tattoos?
- Worship?
- Group?

### Satanism

- Drinking blood?
- Cannibalism?
- Why?
- Bethany Brashears & Lynn

### Beliefs

- An eye or an eye?
- People who push you around?
- Any changes?

### Beliefs

- If anyone hurt your sister,
- What would be appropriate?

### Mistakes and Guilt

- What mistakes have you made, in all of this?
- What do you consider to be your fault?

### Statements to the Dead

- What would you say now to Charlie Conway, if you could?

23

FELL-00001495

**Statements to the Dead**

- What would you say to Terri King, if you could?

**Statements to the Dead**

- What would you say now to your mother, if you could?

The Pictures

Anything You Would Like to Add?

24

FELL-00001496

# EXHIBIT 140

Docket No. **06-2882-cr**

To Be Argued By
**William B. Darrow, Assistant U.S. Attorney**
**Paul J. Van de Graaf, First Assistant / Criminal Chief**

\* \* \* \* \* \* \*
**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**
\* \* \* \* \* \* \*

**UNITED STATES OF AMERICA,**
          Appellee,

   v.

**DONALD FELL,**
          Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Vermont**

---

**BRIEF OF THE UNITED STATES**

---

                         **THOMAS D. ANDERSON**
                         **United States Attorney**

                         **WILLIAM B. DARROW**
**THOMAS BOOTH**           **GREGORY L. WAPLES**
**United States Department of Justice**   **PAUL J. VAN DE GRAAF**
**Criminal Division**        **Assistant U.S. Attorneys**
**950 Pennsylvania Ave., Rm. 1511**   **P.O. Box 570**
**Washington, DC 20530**     **Burlington, VT 05402-0570**

FELL-00001497

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   THE OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   2001 - 2004 PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . 2

      C.   2005 JURY SELECTION AND TRIAL . . . . . . . . . . . . . . . . . . . 5

      D.   FELL'S POST-TRIAL MOTION . . . . . . . . . . . . . . . . . . . . . . 47

      E.   SENTENCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN
    DISMISSING THREE PROSPECTIVE JURORS WHO EXPRESSED
    DEEP RESERVATIONS ABOUT THEIR ABILITY TO IMPOSE THE
    DEATH PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      A.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . 53

      B.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      C.   THE INDIVIDUAL JURORS . . . . . . . . . . . . . . . . . . . . . . 58

II.   NO DUE PROCESS VIOLATION RESULTED FROM THE DISTRICT
    COURT'S EXCLUSION OF THE 2001 DRAFT PLEA AGREEMENT . 84

      A.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

i

FELL-00001498

B.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

C.    THERE WAS NO ABUSE OF DISCRETION IN EXCLUDING THE
DRAFT PLEA AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

D.    FELL'S "FAIR REBUTTAL" CLAIM FAILS TO MEET THE
PLAIN ERROR STANDARD AND MAKES NO SENSE. . . . . . 98

III.   THE PROSECUTORS' UNOBJECTED TO SUMMATION REMARKS
ABOUT FELL'S EXERCISE OF HIS RIGHT TO A JURY TRIAL, AND
ARGUMENT THAT FELL'S MITIGATION EVIDENCE DID NOT
EXCUSE HIS CRIMES, DID NOT INFRINGE ON FELL'S
CONSTITUTIONAL RIGHTS NOR DID IT AMOUNT TO PLAIN
ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

A.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

B.    THE STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . 115

C.    LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

V.    PROSECUTORS DID NOT VIOLATE THE TRIAL COURT'S ORDER
ABOUT HOW THE GOVERNMENT'S MENTAL EXAMINATION OF
FELL WAS TO BE CONDUCTED AND THE COURT DID NOT ERR IN
FAILING TO RULE ON FELL'S MOTION TO EXCLUDE A
GOVERNMENT REBUTTAL MENTAL HEALTH EXPERT UNTIL
AFTER THE DEFENSE COMPLETED ITS MITIGATION CASE. . . . 127

A.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

B.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

C.    DR. WELNER'S REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

D.    THE DEFENSE'S DECISION NOT TO OFFER MENTAL HEALTH
EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

FELL-00001499

VI.     IN THE ABSENCE OF ANY OBJECTION, THE COURT BELOW
        DID NOT COMMIT PLAIN ERROR IN ADMITTING EVIDENCE
        SHOWING FELL'S INTEREST IN SATANISM AND THE
        INSINCERITY OF HIS CLAIMED ADHERENCE TO ISLAM AND
        NATIVE AMERICAN BELIEFS. ............................... 157

        A.    BACKGROUND ................................. 157

        B.    LEGAL ANALYSIS ............................... 166

VII.    TO REPUTE ONE PROPOSED MITIGATING FACTOR, THE
        TRIAL COURT PROPERLY ADMITTED DEBRA FELL'S POST-
        ASSAULT STATEMENT THAT SHE WAS "AFRAID" OF HER
        SON. ..................................................... 173

        A.    STANDARD OF REVIEW ........................ 173

        B.    BACKGROUND ................................. 174

        C.    LEGAL ANALYSIS ............................... 176

VIII.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        PERMITTING REBUTTAL PENALTY PHASE TESTIMONY THAT
        FELL HAD PREVIOUSLY TALKED ABOUT KILLING HIS
        MOTHER. ................................................ 191

        A.    BACKGROUND ................................. 192

        B.    STANDARD OF REVIEW ........................ 199

        C.    ARGUMENT ................................... 200

IX.     REVERSAL IS NOT WARRANTED UNDER THE "CUMULATIVE
        IMPACT" RULE. ........................................ 207

FELL-00001500

X.    THE JURY'S CONSIDERATION OF ASSERTEDLY DUPLICATIVE
      NON-STATUTORY AGGRAVATING FACTORS DID NOT RENDER
      ITS DEATH SENTENCE UNCONSTITUTIONALLY ARBITRARY.  IN
      ANY EVENT, THE NON-STATUTORY AGGRAVATORS WERE NOT
      DUPLICATIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

      A.    STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

      B.    DOUBLE-COUNTING THEORY . . . . . . . . . . . . . . . . . . . . . . . 210

      C.    AGGRAVATING FACTORS IN THIS CASE  . . . . . . . . . . . . . . 215

      D.    HARMLESS ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

XI.   THE INDICTMENT DID NOT RUN AFOUL OF THE FIFTH
      AMENDMENT BY FAILING TO ALLEGE THE NON-STATUTORY
      AGGRAVATING FACTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

XII.  THE FEDERAL DEATH PENALTY ACT IS NOT UNCONSTI-
      TUTIONAL BECAUSE IT ALLOWS THE PROSECUTION TO
      INTRODUCE, DURING THE PUNISHMENT HEARING, EVIDENCE
      THAT IS RELEVANT TO AGGRAVATING FACTORS BUT WHICH
      MAY BE IRRELEVANT TO DEATH ELIGIBILITY. . . . . . . . . . . . . . 228

XIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

VIRUS PROTECTION CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

FELL-00001501

TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT CASES

*Apprendi v. New Jersey,*
     530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178-81, 224-25, 230

*Ayers v. Belmontes,*
     127 S. Ct. 469 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Barclay v. Florida,*
     463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166-168

*Berger v. United States,*
     295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Boyde v. California,*
     494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-19, 121

*Brady v. United States,*
     397 U.S. 742 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*Brown v. Sanders,*
     126 S. Ct. 884 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

*Brown v. Payton,*
     544 U.S. 133 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Buchanan v. Angelone,*
     522 U.S. 269 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 179

*Coy v. Iowa,*
     487 U.S. 1012 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Crawford v. Washington,*
     541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 173, 182-84

FELL-00001502

*Cunningham v. California,*
    127 S. Ct. 856 (2007) ............................... 52, 224-25, 227

*Darden v. Wainwright,*
    477 U.S. 168 (1986). .................... 55, 57, 63, 82, 117, 124, 128

*Davis v. Washington,*
    126 S. Ct. 2266 (2006) ....................................... 183

*Dawson v. Delaware,*
    503 U.S. 159 (1992) ............................... 166-67, 169

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982) .............................. 87-88, 99

*Gardner v. Florida,*
    430 U.S. 349 (1977) ....................................... 100

*Gray v. Mississippi,*
    481 U.S. 648 (1987) ........................................ 56

*Green v. Georgia,*
    442 U.S. 95 (1979) ....................................... 100

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ....................................... 180

*Harris v. United States,*
    536 U.S. 545 (2002) ....................................... 179

*Holmes v. South Carolina,*
    547 U.S. 319 (2006) ........................................ 87

*Jones v. United States,*
    527 U.S. 373 (1999) ... 92, 118, 122, 129, 157, 177, 190, 212-13, 222, 231

FELL-00001503

*Jurek v. Texas,*
  428 U.S. 262 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*Kyles v. Whitley,*
  514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Patton v. Yount,*
  467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 71

*Payne v. Tennessee,*
  501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Reynolds v. United States,*
  98 U.S. 145 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*Ring v. Arizona,*
  536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 178, 181, 230

*Sattazahn v. Pennsylvania,*
  537 U.S. 101 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 180

*Satterwhite v. Texas,*
  486 U.S. 249 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Simmons v. South Carolina,*
  512 U.S. 154 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-100, 102

*Skipper v. South Carolina,*
  476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-102

*Stringer v. Black,*
  503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*Tennard v. Dretke,*
  542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

FELL-00001504

*Thompson v. Keohane,*
    516 U.S. 99 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Tuilaepa v. California,*
    512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Booker,*
    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*United States v. Cotton,*
    535 U.S. 625 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*United States v. Dominguez Benitez,*
    542 U.S. 74 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*United States v. Olano,*
    507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *92*

*United States v. Robinson,*
    485 U.S. 25 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 180

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . 115, 117, 121

*United States v. Young,*
    470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Wainwright v. Witt,*
    469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 81

*Weeks v. Angelone,*
    528 U.S. 225 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Whorton v. Bockting,*
    127 S. Ct. 1173 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

FELL-00001505

*Williams v. New York,*
    337 U.S. 241 (1949) ..................................... 176, 180

*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993) ........................................ 166

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968) ...................................... 54, 56

*Zant v. Stephens,*
    462 U.S. 862 (1983) ..................................... 178, 179


OTHER FEDERAL CASES

*Allen v. Toombs,*
    827 F.2d 563 (9th Cir. 1987) ............................... 162

*Allen v. Woodford,*
    395 F.3d 979 (9th Cir.),
    *cert denied*, 126 S. Ct. 134 (2005) ..................... 211, 216

*Cargill v. Turpin,*
    120 F.3d 1366 (11th Cir. 1997) ............................. 119

*Corkle v. Johnson,*
    881 F.2d 993 (11th Cir. 1989). ............................. 168

*Ford v. McGinnis,*
    352 F.3d 582 (2d Cir. 2003) ................................ 167

*Fuller v. Johnson,*
    114 F.3d 491 (5th Cir. 1997) ............................... 167

*Goff v. Graves,*
    362 F.3d 543 (8th Cir. 2004) ............................... 167

ix

FELL-00001506

*Jackson v. Johnson,*
194 F.3d 641 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124-25

*Jackson v. Mann,*
196 F.3d 316 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Kapadia v. Tally,*
229 F.3d 641 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Malicoat v. Mullin,*
426 F.3d 1241 (10th Cir. 2005),
*cert. denied,* 126 S. Ct. 2356 (2006) . . . . . . . . . . . . . . . . . . . . . . . . 119

*Miranda v. Bennett,*
322 F.3d 171 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*O'Neal v. Delo,*
44 F.3d 655 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Patrick v. LeFevre,*
745 F.2d 153 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Paxton v. Ward,*
199 F.3d 1197 (10th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 189

*Searles v. Dechant,*
393 F.3d 1126 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Sims v. Brown,*
425 F.3d 560 (9th Cir. 2005),
*cert denied,* 127 S. Ct. 62 (2006) . . . . . . . . . . . . . . . . . . . . . . . 115, 119

*Szabo v. Walls,*
313 F.3d 392 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

FELL-00001507

*United States v. Alexander,*
    331 F.3d 116 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185-86

*United States v. Allen,*
    247 F.3d 741 (8th Cir. 2001),
    *vacated on other grounds,* 536 U.S. 953 (2002) . . . . . . . . . . . . . . . . . . 219

*United States v. Allen,*
    406 F.3d 940 (8th Cir. 2005)(*en banc*),
    *cert. denied,* 127 S. Ct. 826 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

*United States v. Barnette,*
    211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57

*United States v. Barnette,*
    390 F.3d 775 (4th Cir. 2004),
    *vacated on other grounds,* 126 S. Ct. 92 (2005) . . . . . . . . . . . . . . . 56, 64

*United States v. Beckford,*
    968 F. Supp. 1080 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*United States v. Bourgeois,*
    423 F.3d 501 (5th Cir. 2005),
    *cert. denied,* 126 S. Ct. 2020 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 223

*United States v. Brown,*
    441 F.3d 1330 (11th Cir. 2006),
    *cert. denied,* 127 S. Ct. 1149 (2007) . . . . . . . . . . 56, 182-83, 186, 223, 227

*United States v. Chanthadara,*
    230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Clemmons,*
    461 F.3d 1057 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

FELL-00001508

*United States v. Cusack,*
    229 F.3d 344 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

*United States v. Danford,*
    435 F.3d 682 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*United States v. Dunnaway,*
    88 F.3d 617 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*United States v. Elias,*
    285 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 117

*United States v. Espinal,*
    981 F.2d 664 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Feliz,*
    467 F.3d 227 (2d Cir. 2006),
    *cert. denied,* 127 S. Ct. 1323 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 184

*United States v. Fell,*
    217 F. Supp.2d 469 (D. Vt. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Fell,*
    360 F.3d 135 (2d Cir. 2004),
    *cert. denied,* 543 U.S. 946 (2004) . . . . . . . . . . . . . . . . . . . . . 5. 87, 166, 180

*United States v. Fell,*
    372 F. Supp.2d 766 (D. Vt. 2005) . . . . . . . . . . . . . . . . . . . . . . . 6, 58, 216

*United States v. Fields,*
    483 F.3d 313 (5th Cir. 2007) . . . . . . . . . . . . . . 116, 129, 173, 182, 229-30

*United States v. Flaherty,*
    295 F.3d 182 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Frank,*
    8 F. Supp. 2d 253 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 219

FELL-00001509

*United States v. Fulks*,
   454 F.3d 410 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 229

*United States v. Gordon*,
   974 F.2d 1110 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*United States v. Greer*,
   285 F.3d 171 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Hadley*,
   431 F.3d 484 (6th Cir. 2005),
   *cert. denied*, 127 S. Ct. 47 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 185

*United States v. Higgs*,
   353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 223

*United States v. Jackson*,
   327 F.3d 273 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Jones*,
   299 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185-86

*United States v. Kaczynski*,
   1997 WL 716487 (E.D. Cal., Nov. 7, 1997) . . . . . . . . . . . . . . . . . . . . . 220

*United States v. Kane*,
   452 F.3d 140 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*United States v. Lee*,
   374 F.3d 637 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

*United States v. MacDonald*,
   688 F.2d 224 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

xiii

FELL-00001510

*United States v. Martinez,*
   413 F.3d 239 (2d Cir. 2005), *cert. denied,* 126 S. Ct. 1086 (2006) . . . . . 177

*United States v. Melendez,*
   57 F.3d 238 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Mercedes,*
   287 F.3d 47 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Modica,*
   663 F.2d 1173 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Moore,*
   149 F.3d 773 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. McCullah,*
   76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

*United States v. Nelson,*
   347 F.3d 701 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Nussen,*
   531 F.2d 15 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

*United States v. Parker,*
   903 F.2d 91 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*United States v. Paul,*
   217 F.3d 989 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*United States v. Purkey,*
   428 F.3d 738 (8th Cir. 2005), *cert. denied,*
   127 S. Ct. 443 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 93, 223

*United States v. Robinson,*
   367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 178-79, 212, 227

FELL-00001511

*United States v. Rodriguez,*
        968 F.2d 130 (2d Cir. 1992) .................................. 118

*United States v. Ruiz,*
        987 F.2d 243 (5th Cir. 1993) ............................... 125

*United States v. Salameh,*
        152 F.3d 88 (2d Cir. 1998) ........................... 125, 166, 171

*United States v. Sampson,*
        2007 WL 1393742 (1st Cir., May 7, 2007) ............... 56, 88, 200

*United States v. Saunders,*
        973 F.2d 1354 (7th Cir. 1992) .............................. 124

*United States v. Scarpa,*
        913 F.2d 993 (2d Cir. 1990) ................................ 186

*United States v. Sepulveda,*
        15 F.3d 1161 (1st Cir. 1993) ............................... 208

*United States v. Stewart,*
        433 F.3d 273 (2d Cir. 2006) ................................ 53

*United States v. Stitt,*
        250 F.3d 878 (4th Cir. 2001) ........................... 190, 206

*United States v. Thomas,*
        453 F.3d 838 (7th Cir. 2006) ............................... 183

*United States v. Tipton,*
        90 F.3d 861 (4th Cir. 1996) ............................. 57, 211

*United States v. Tocco,*
        135 F.3d 116 (2d Cir. 1998) ......................... 116-17, 186

xv

FELL-00001512

*United States v. Verdoorn,*
    528 F.2d 103 (8th Cir. 1976) ................................. 95

*United States v. Villarreal,*
    324 F.3d 319 (5th Cir. 2003) ................................ 207

*United States v. Vitale,*
    459 F.3d 190 (2d Cir. 2006) ............................. 173, 189

*United States v. Webster,*
    162 F.3d 308 (5th Cir. 1998) ............................... 56

*United States v. Wellington,*
    417 F.3d 284 (2d Cir. 2005),
    *cert denied,* 126 S. Ct. 774 (2005) .......................... 130

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ........................... 91, 199, 207

*United States v. Yu-Leung,*
    51 F.3d 1116 (2d Cir. 1995) ............................... 130

*United States v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000). ................................ 92

*Walker v. Nationsbank of Florida,*
    53 F.3d 1548 (11th Cir. 1995) ............................. 95

*Williams v. Calderon,*
    52 F.3d 1465 (9th Cir. 1995) .............................. 124

## STATE CASES

*State v. Bennett,*
    81 P. 3d 1 (Nev. 2003) ................................... 168
*People v. Williams,*
    148 P. 3d 47 (Cal. 2006) ................................. 168

FELL-00001513

*State v. Crumb,*
    704 A.2d 952 (N.J. Super. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168


## FEDERAL STATUTES

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
18 U.S.C. § 3591(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
18 U.S.C. § 3591(a)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
18 U.S.C. § 3592(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
18 U.S.C. § 3592(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
18 U.S.C. § 3592(c)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
18 U.S.C. § 3593(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224
18 U.S.C. § 3593(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
18 U.S.C. § 3593(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179, 213
18 U.S.C. § 3594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
18 U.S.C. § 3595(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 199
18 U.S.C. § 3595(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189, 205
18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
21 U.S.C. § 848(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211


## FEDERAL RULES

Fed. R. Evid. 149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 185
Fed. R. Evid. 803(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 185, 188
Fed. R. Evid. 1101(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180


## OTHER AUTHORITIES
U.S.S.G. §3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123


Rory K. Little, "The Federal Death Penalty: History and Some
Thoughts About the Department of Justice's Role,"
26 *Fordham Urban L.J.* 347 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

FELL-00001514

## PRELIMINARY STATEMENT

Donald Fell appeals from the death sentence imposed on him on June 16, 2006 by Chief Judge William K. Sessions III in the U.S. District Court in Vermont. Fell was found guilty, after a jury trial, of kidnapping with death resulting, carjacking with death resulting and two non-capital crimes. The same jury unanimously agreed that the proven aggravating factors sufficiently outweighed Fell's mitigating evidence so as to warrant the punishment of death.

On this direct appeal, Fell challenges only his death sentence, raising a host of allegations, including facial attacks on the Federal Death Penalty Act and the indictment; argument that the court improperly excused death-qualified jurors; that prosecutors engaged in misconduct; and claims that the court wrongly admitted aggravating and rebuttal evidence and excluded mitigating evidence.

Although Fell's contentions are numerous and lengthy, they ultimately are groundless. This Court should affirm his sentence.

1

FELL-00001515

STATEMENT OF THE CASE

A.    THE OFFENSES

On November 27, 2000, at around 2:30 in the morning, Donald Fell and Robert Lee brutally murdered Fell's mother, Debra Fell, and her friend Charles Conway in Fell's Rutland, Vermont apartment. Around 3:45 a.m., the two killers carjacked and kidnapped Terry King, a 53-year-old grandmother, as she arrived for work at a local supermarket. Accosting King with Fell's shotgun in pre-dawn darkness, Fell and Lee forced her into the backseat of her car. Fell drove King's car out of Vermont while Lee, in the front passenger seat, held the shotgun on the terrified King in the back seat. After driving southwest for about four hours, Fell stopped in rural New York and ordered King out of the vehicle. Chasing King into the woods, Fell pushed her to the ground; he and Lee then battered and stomped their third victim to death by kicking her head, stepping on her neck, and smashing her face with a rock. Several days later, the two men were arrested in Arkansas in King's car.

B.    2001 - 2004 PROCEDURAL HISTORY

On February 1, 2001, a federal grand jury in Vermont charged Fell and Lee with four crimes: carjacking with death resulting (Count 1); kidnapping with death resulting (Count 2); use of a firearm during a crime of violence (Count 3); and

2

FELL-00001516

being fugitives in possession of a firearm (Count 4). Counts 1 and 2 were capital offenses.

In 2001, the government considered Fell's offer to plead guilty to kidnapping with death resulting, in exchange for a sentence of life imprisonment.[1] Ultimately, however, the government declined the deal. On January 30, 2002, the government filed a "Notice of Intent To Seek Death Penalty" (the "Original Notice"), in compliance with the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et seq.* The notice declared the government's intent to prove various "narrowing" elements. Those elements consisted of four threshold culpability factors under § 3591(a)(2),[2] three statutory aggravating factors under § 3592(c),[3]

---

[1] Lee died in prison in 2001.

[2] The threshold culpability factors related to Fell's mental state vis-a-vis the murder of Terry King. They were that Fell: (1) intentionally killed Terry King; (2) intentionally inflicted serious bodily injury that resulted in the death of King; (3) intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and King died as a direct result of such act or acts; and (4) intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and King died as a direct result of such act or acts.

[3] The statutory aggravating factors were that: (1) the death of King occurred during the commission of a kidnapping; (2) Fell killed King in an especially heinous, cruel or depraved matter that involved serious physical abuse; and (3) Fell

3

and four non-statutory aggravating factors under § 3593(a).[4]

On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same four offenses as the first indictment. The Superseding Indictment was sought in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), and alleged the threshold culpability factors and statutory aggravating factors set forth in the Original Notice. On the same date, the United States filed a Supplemental Notice of Intent to Seek Death Penalty, alleging the same non-statutory aggravating factors as the Original Notice.

In mid-2002, Fell filed various pretrial motions, including a motion to have the FDPA declared unconstitutional. On September 24, 2002, the district court granted the latter motion, holding that 18 U.S.C. § 3593(c), the FDPA's relaxed evidentiary standard for the penalty phase of a capital trial, rendered unconstitutional any jury findings as to the aggravating factors necessary to impose a sentence of death. The district court struck the aggravating factors from

---

intentionally killed more than one person in a single criminal episode.

[4] The non-statutory aggravating factors were that: (1) Fell participated in the abduction of King to facilitate his escape from the area in which he and Lee had committed a double murder; (2) Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking to authorities; (3) Fell participated in the murder of King after substantial premeditation to commit the crime of carjacking; and (4) the killing of King caused her family extreme emotional suffering and severe and irreparable harm.

4

the Superseding Indictment, as well as the Supplemental Notice. *United States v. Fell*, 217 F. Supp.2d 469 (D. Vt. 2002). A at 72.[5]

In November, 2004, on the government's appeal, this Court reversed the district court's order. *United States v. Fell*, 360 F.3d 135 (2d Cir. ), *cert. denied,* 543 U.S. 946 (2004). Judge Walker's opinion for the unanimous panel held that § 3593(c)'s standard was consistent with the requirement of heightened reliability in capital trials. "[I]n order to achieve such heightened reliability, *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors . . . ." *Id.* at 143 (original emphasis).

C.    2005 JURY SELECTION AND TRIAL

(1)    Jury Selection

Jury selection by individual *voir dire* began on May 4, 2005. Prior to the *voir dire*, prospective jurors filled out a 34-page questionnaire containing 75 questions divided into six parts. The questionnaire inquired as to each prospective juror's: (1) background; (2) experiences and beliefs; (3) grasp of basic legal principles; (4) views concerning the death penalty; (5) exposure to media treatment of the case or the death penalty; and (6) schedule during the anticipated

---

[5] Citation to pages of Fell's Appendix are in the form "A at ___."

5

three weeks of trial.[6] The parties had the opportunity to review completed questionnaires in advance of *voir dire*.

Individual *voir dire* continued, intermittently, through June 6. Each prospective juror was questioned first by Judge Sessions and then by attorneys for the parties. Judge Sessions set forth his views on the *voir dire* process in a written opinion. *United States v. Fell*, 372 F. Supp.2d 766 (D. Vt. 2005); A at 142.

(2)    Evidence Introduced During the Guilt Phase

The guilt phase of the trial began on June 20, 2005. The government called witnesses to describe (1) the disappearance of Terry King during the early morning hours of November 27, 2000; (2) the arrest of Fell and Lee in Arkansas on the early afternoon of November 30, 2000; (3) the discovery of the bodies of Debra Fell and Charles Conway in Rutland on the evening of November 30; (4) the interviews of Fell in Arkansas; (5) the discovery of King's body in New York on December 1; and (6) forensic evidence, including King's blood and DNA on one of Fell's steel-toed boots. The defense introduced no evidence.

---

[6] Citation to pages of the government's Supplemental Appendix are in the form "SA at ___."

6

(a)    The Disappearance of Terry King on November 27, 2000

Norman and Terry King, married 37 years, lived in the village of North Clarendon, Vermont, several miles south of Rutland.  Both Kings worked: Norman full-time and Terry about 15 hours a week at Price Chopper, a Rutland grocery store.

On Monday, November 27, 2000, Terry's shift began at 4:00 a.m.  Norman stayed in bed when his wife rose very early, showered, dressed, and ate breakfast. After a brief conversation about dinner that evening, Terry drove off to work, around 3:30 a.m., in her green Plymouth Neon.  Later that day, when Norman returned from work, Terry unexpectedly was not home.  He called their older daughter, who checked with their younger daughter and then called Price Chopper employees.  No one had seen Terry since she left home early that morning.

Anthony Mistretta worked the night-shift maintenance crew at the Rutland Wal-Mart close to Price Chopper and in the same mall.  The Wal-Mart was open 7 a.m. to 9 p.m.  Mistretta and his maintenance crew worked through the night to clean the store before it opened.  While the crew worked, store lights were on and the front doors were occasionally open for the crew to take breaks.  During the early morning hours of November 27, 2000, two males with wet hair and dry clothes came in the front door and asked to buy shotgun shells.  Mistretta told

7

FELL-00001521

them that the store was closed. Tr. IV-1 at 29.[7] The men needed to be told twice to leave, and swore at Mistretta as they departed.

William Liphardt was Terry King's co-worker at the Price Chopper for over ten years. On November 27, he arrived at the store at about 3:30 a.m. Terry usually brought in two cups of coffee, one for him and one for her, along with a bag of Dunkin Donuts for co-workers. She usually parked her car next to his, in the employee parking area on the east side of the building, around the corner from the main entrance. On the morning of November 27, Liphardt was surprised when King did not arrive for the start of the 4:00 a.m. shift. At 4:15 a.m., he went outside to look for her car, and checked again several minutes later. He discussed King's unusual absence with his manager; they decided that she must be sick. Tr. I-1 at 95.

Peter Wink worked the midnight shift at the Dunkin Donuts on U.S. Route 7, between North Clarendon and Rutland. Terry King was one of his regular morning customers. Between 3:30 and 4:00 a.m. on November 27, she stopped for her usual order of coffee and doughnuts. *Id.* at 101. Wink was the last person, besides Fell and Lee, to see Terry King alive.

---

[7] References to pages of the trial transcripts will be cited as "Tr. _-_ at __." The first, Roman numeral, refers to the day of trial, the following number 1 or 2 refers to the morning session or afternoon session, respectively.

8

FELL-00001522

Joseph Trapasso delivered baked goods to supermarkets and restaurants in and around Rutland. Trapasso stopped at his customer sites twice early in the morning: first to take the order, and later to deliver it. Between 3 and 4:00 a.m. on November 27, Trapasso parked his delivery van in front of the Price Chopper's main entrance. Walking toward the store, he saw two men standing by the eastern corner of the building near the employee parking area. One of them, a tall male with dark clothes and long hair, began to approach. After Trapasso returned to his van, locked it, then walked back toward the store, the man retreated. When Trapasso came out of the store, about 20 minutes later, the two men were gone. Tr. I-1 at 113.

(b)    The Arrests of Fell and Lee in Arkansas

Clarkesville, Arkansas is about an hour-and-a-half west of Little Rock on I-40, an interstate East/West highway. At about 1:30 p.m. on November 30, 2000, Clarkesville Police Officer Jeff Ross refueled his marked cruiser at a service station near I-40. As Officer Ross drove out of the station, he fell behind a green Plymouth Neon leaving a gas station across the street. He noticed that the male passenger repeatedly turned to look at him. After about a mile, the Neon turned right into a residential section of town. As it did so, the passenger turned again and looked at Ross. Ross decided to call his dispatcher to run a check on the

9

FELL-00001523

Neon's Pennsylvania license plate. Tr. I-1 at 127.

Dispatch reported that the plate had been stolen in Pennsylvania the night before. Ross stopped the Neon and secured its two male occupants. Ross found a .12 gauge pump-action shotgun in the car, along with two pot pipes and a knife in the front passenger door compartment. The shotgun was a police model, with extended magazine capacity, black synthetic stocks, and a shorter than usual length. In the glove box was a Vermont registration indicating that the car belonged to Norman and Theresa King. Ross detained Lee, the driver, and Fell, the passenger, on suspicion of possessing stolen property and drug instrumentalities.

Shortly after the stop, Clarkesville police called the Vermont State Police and learned the Neon had been missing from Vermont, with its owner, since November 27. Officers transported Fell and Lee to the nearby Johnson County Detention Center. During booking, two license plate screws were found in Fell's pants pocket.

(c)     The Discovery of the Bodies of Debra Fell and Charles Conway in Vermont

Early in the evening of November 30, after Vermont authorities learned that Fell and Lee had been apprehended driving the car of the still-missing Terry King,

10

FELL-00001524

Rutland Police Detective Curtis Moore went to Debra Fell's apartment on Robbins Street in Rutland to inquire about her son Donald Fell. When no one responded to his knock on the locked door, he contacted the landlord and learned of an alternate entrance. Pushing that unlocked door partially open, he saw two dead bodies in the apartment. He retreated and summoned forensics specialists.

Investigators found Charlie Conway's body in an easy chair and Debra Fell's body lying on the floor. Conway's neck had been "literally sawn, um, with his tendons and his insides . . . exposed." Tr. I-2 at 39. There was "blood spattered across the wall" behind Conway. *Id.* at 39. Debra Fell lay on her stomach on the floor, in a bathrobe, with blood on her legs and the bottoms of her bare feet. *Id.* at 39.

Officers photographed the scene and collected physical evidence. Blood samples were recovered from floors and walls in multiple rooms. *Id.* at 51. Among the items seized were two blood-stained knives, found wrapped in a towel on the kitchen table. *Id.* at 47. The only drug-related evidence in the apartment was a film container of marijuana seeds and some cigarette rolling papers. The apartment was littered with beer cans. *Id.* at 53-54.

11

FELL-00001525

(d)   The Interviews of Fell in Arkansas

On the evening of November 30, 2000, Jimmie Caudle, a Special Agent with the Federal Bureau of Investigation in Arkansas, received instructions to report to Clarkesville to assist with a developing double-murder, missing person investigation. Upon arrival, Agent Caudle and fellow FBI Agent Daniel Sturgill met with other investigators and spoke by phone with Rutland officers and the Vermont State Police.

At 11:30 p.m., the agents met with Fell at the Detention Center. Fell signed a written *Miranda* waiver, then described how he had come to Arkansas. He stated that he was hitch-hiking across the country with Lee when a man named "John" picked them up in the Neon. When John stopped and went into a convenience store, Fell and Lee stole the car. Fell admitted that the shotgun, the pipes, and some of the clothing in the car belonged to him. Asked about prior legal trouble, he mentioned "putting a guy in a coma" at the recent "Woodstock Festival." Tr. II-1 at 6. Fell said he had been visiting his mother in Rutland until the prior week. He claimed he left because she was a crack addict. He was intending to call her when he had access to a phone. *Id.* at 8. The interview ended at 12:17 a.m. on December 1.

12

FELL-00001526

The two agents then questioned Lee for several hours. Returning to Fell, they began a second interview at 2:50 a.m. After Fell signed a second *Miranda* waiver, the agents told him that his mother and Conway had been found murdered, and that Terry King, the owner of the Neon, had also been murdered. They asked Fell for his explanation. Fell stared at the agents without a blink and replied, "I wouldn't kill my fucking mother. I don't know any fucking Terry. I'm sticking with my first statement." With that, the interview ended. Tr. II-1 at 15.

At 9:40 a.m., Agent Caudle returned to the jail after learning that Fell wanted to talk again. After signing a third *Miranda* waiver, Fell stated that he and Lee had killed Conway and Debra Fell. He said that after the four had been playing cards, he got a knife from the kitchen and attacked Conway. He slashed Conway's throat and "kept stabbing him and stabbing him." At the same time, Lee was slashing and stabbing Debra Fell.

After the two murders, Fell and Lee showered, took the shotgun and walked through downtown Rutland to the Price Chopper. They waited there for about 15 minutes, looking for a car to steal. When Terry King drove in, they pointed the shotgun at her, forced her into the back seat and fled Vermont. King tried to jump out of the car but Fell restrained her. At some point after entering New York State, Fell stopped the car and told King she could leave. Fell said that Lee told

13

him they had to kill her because she could identify them. *Id.* Fell agreed and the two men took her up into the woods. Fell hit King and knocked her down. He and Lee then started kicking her. Fell said that Lee picked up a rock and slammed it down on her head and face. When she was dead, Fell wiped his boots off on her clothing.

Returning to the car, Fell and Lee continued south and stopped for breakfast at a Burger King restaurant. The killers paid for breakfast with money from King's purse, then discarded the purse in the restaurant's dumpster. *Id.* at 23, 25. The two men continued on to their hometown of Wilkes-Barre, Pennsylvania, where they stole a Pennsylvania license plate off another Plymouth Neon and put the stolen plate on King's car. *Id.* at 22. They threw King's Vermont license plates into a stream, and also tossed away a baby seat that Terry used to transport her grandchild.

After completing this oral statement, Fell agreed to write out a statement. Caudle invited Fell to "say anything he wanted," including whether he was sorry for what he had done. In its entirety, Fell's written statement reads:

> We were playing cards and smoking crack and drinking Budweiser. Then I don't even know what happened except that for some reason I grabbed a knife and I cut Charlie's throat. Then continued to stab him until I was sure he was dead. When I saw what I did I wanted to turn myself in, but I turned around and saw Bobby killing my mom, Debbie. I tried to stop it, but she

14

FELL-00001528

was already too far gone. We then took showers and grabbed my shotgun and left. We went to Price Chopper and grabbed a girl named Terry and took her car. That happened when she pulled up and Bobby ran up to her with the shotgun and told her to get in the back seat. He jumped in the passenger side and I drove. We went south. Somewhere along the way we stopped and let Terry out. I believe it was in New York. I told her to walk through the woods and we would leave and let her live. At which point Bobby said we could not let her live because she had our names and descriptions, that we had to kill her. So we followed her into the woods. And she was running towards the road. Bobby got her at the bottom of a hill. I came down from the top and told her to go back up. We found a spot where the traffic could not see. I proceeded to kick her. And Bobby found a rock and threw it on her face at which point we thought she was dead and left. We left Vermont at about 2:30 a.m. When we dropped her off it was light outside. We went to Burger King, got breakfast. And I threw her purse into the dumpster. And we left. We continued. I'm not sure which way we went, but we got into Wilkes-Barre, PA about 6:00 p.m.

We spent the day in Wilkes-Barre and left the next night. We switched license plates, threw her plates into the creek and headed to 81 south.

*Id.* at 28-29.

The interview concluded at 11:10 a.m. Caudle described Fell's manner as "neutral" and "matter of fact." Tr. II-1 at 29.

As of mid-day on December 1, King's body had not been found. Early that afternoon, Caudle sat with Fell in Arkansas as a New York State Police investigator interviewed Fell by telephone about the possible location of King's body.[8]

---

[8] The investigator also interviewed Lee on the same subject.

15

FELL-00001529

Rutland Detective Sergeant Rod Pulsifer was one of three Vermont law enforcement officers who flew to Arkansas to interview Fell and Lee. The officers had familiarized themselves with the Rutland murder evidence. By the morning of December 2, the Vermont officers learned that the New York State Police had found King's battered body. After discussing that crime scene with New York officers on the telephone, the Vermont officers tape-recorded interviews with Lee and then Fell. Pulsifer *Mirandized* Fell and at trial introduced the recording of the Fell interview.

Fell stated that he went to Vermont from Wilkes-Barre on September 23, 2000, to visit his mother, who previously had moved to Rutland. Prior to that, Fell had been traveling with a carnival and staying with his aunt and his great-grandmother in Pennsylvania. Fell described his mother as "a good person," who "cook[ed] us dinner" and "bought me cigarettes when I needed them and stuff like that." SA at 30. But she "liked to smoke crack and drink a lot." *Id.* He described an altercation with her at the Stop Lite bar in Rutland. Fell said that his mother had:

> called me up and asked me to come down and get her, so I went to get her and, ah, I went into the bar and I am talking to my mom, some old guy and some black dude named Reggie. And ah, next thing I know Tina Conway comes up behind me and starts kicking me. And ah, so I turned around and I spit on her, cause you know I don't feel right hitting a woman you know?

16

FELL-00001530

And ah, so my mom grabs hold of me, and the whole way as she is pushing me out of the bar she is smacking me and punching me, and she is yelling at me for spitting on her friend. And I am like, "she was kicking me," and when we got outside the bar she wouldn't stop, so I kind of shoved her off me. You know what I mean, instead of hitting her or anything I just kind of pushed her off me, I said "get away from me." I guess she was real drunk and she fell like a dump, and ah, I tried helping her up, she wouldn't let me help her up or nothing. They called the cops, and I waited there for them, and they ah, took me to the drunk tank.

SA at 39.

Fell described the brutal murders of Debra Fell and Conway as follows:

Ah, well, what happened was, is, ah, we were all kind of wasted, you know, pretty, pretty fucked-up. My mom was, we were all smoking crack, and, you know, drinking lots of alcohol and shit. Ah, to tell you the truth I don't really, ah, know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah, I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

SA at 40.

When Sgt. Pulsifer asked, "Well, why did Bobby cut your mom's throat?"

Fell replied:

I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it . . . .

*Id.*

17

FELL-00001531

Fell said that he had met Conway twice before, and that Conway and his mother "were just friends." He could offer no reason for the Rutland killings.[9]

Officers then questioned Fell about the senseless murder of Terry King. Fell recalled that when he and Lee grabbed Mrs. King, she pleaded, "please, please, leave me alone, don't hurt me." During the drive, she offered them doughnuts from a Dunkin Donuts bag. Fell and Lee took turns driving and holding the shotgun on King. Fell recalled that:

> at one point in time she, after we switched drivers, me and Bobby switched. And at one point in time, driving down the road, she tried to jump out of the moving vehicle and ah, I pulled her back in by her arm. I was gentle with her, I didn't hit her or nothing you know, and ah, I pulled her back in and I told her not to try it again. Well, Bobby continued driving he was pretty, he was pretty rotten towards her, he was screaming and yelling . . . .

SA at 46.

After driving for around four-and-a-half hours, Fell found "a nice little spot" on the side of the road and pulled the car over. He repeated that he intended to let King go, but Lee insisted that they had to kill her. The two men then brought her into the woods:

---

[9] When asked for a motive and a more detailed narrative, Fell said "I guess, I ran, ah, I don't remember, I'm telling you. I really don't, I ran in and I suppose, I started cutting Charlie apart man, but that's, that's all I can tell you. Like I said, I told him [Agent Caudle] plenty of times already. You, ah, I don't see how you figure that I am holding out information on it or nothing." SA at 42.

18

we both hustled her back up the hill, not, not harsh or nothing hard you know what I mean, just go ahead walk up the hill, you know. And, ah, I found a little, a little spot where you couldn't see from the highway, and ah, well we started kicking her in her head.

SA at 47-48.

When the officers asked how King wound up on the ground, Fell responded:

I pushed her down first, she was on her back. . . . [S]he started to pray. And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about, yah big, and ah, slammed it right down on her head.

SA at 48.   Fell said that King "wasn't struggling at all throughout the whole thing, she didn't even try to struggle, she just took it." Asked how he knew she was praying, he recalled that she had held her hands together in front of her.  SA at 48.

Fell stated that after "I was pretty sure she was dead . . . I wiped my boot off with her shirt, um, and we left."  SA at 48.  Returning to the car, the two men continued south.  Fell stated:

About a half hour later we, we pulled up to a Burger King, ah, and we, we got breakfast.  Um, I threw her purse and the doughnuts into the dumpster, ah, like we found like $220 on her, in, in bank envelopes and stuff like that. That's how we got gas and ate breakfast and stuff, for a while, and we just continued driving.

SA at 48.

Before leaving Wilkes-Barre, the two men "saw another Neon parked right by where [King's] car was.  So I thought we would take the tags off that Neon, the

19

FELL-00001533

Pennsylvania one." SA at 49.

Towards the close of the interview, the officers asked why Fell had come to Vermont. Fell said that he wanted to visit his mother, whom he had not seen for several years:

> I got locked up when I was 14 for not going to school, I skipped two complete years of school. So they threw me in a boy's home. And I, I was in the boy's home for two years, and they threw my mom in jail for it. Ah, after she got out of jail, ah, she split, she just left the State. Ah, she had warrants and fines, and she didn't want to deal with it, and, ah there were a couple points in time when she tried coming back into the state, and ah, my aunt would call the cops on her or something and have her arrested. So, she just decided to stay in Vermont.

SA at 50. Fell added that "every time she would call, my aunt, ah, was pretty rotten and she hated my mom's guts. Ah, she would never put me on the phone with her. Ah, she would always tell my mom that I wasn't around, um, so I never got a chance to talk to her." SA at 50.

Fell gave the Vermont officers a block-by-block description of his walk from the Robbins Street apartment to the Price Chopper. SA at 52. His demeanor during the interview was "matter-of-fact," "cooperative, [and] calm." Tr. II-1 at 34. The one exception was when the officers asked him about his mother's dying words ("I love you"), when he became emotional for 30-60 seconds. *Id.* at 33-

20

FELL-00001534

34.[10]

Fell also gave Pulsifer a detailed description of the murder weapons. Lee used a "black-handled steak knife" with a serrated blade. The one Fell used to slaughter Conway was a "pretty thick knife" with the word "Hawk" inscribed on the blade. SA at 44-45. Afterwards, Fell wrapped the murder weapons in a towel, planning to bring them with him, but mistakenly left them behind in the apartment. SA at 51. Before leaving, Fell showered ("I just . . . hopped right in the shower") and then put the same clothes back on. SA at 44.[11]

(e)    The Discovery of King's Body in New York

A day after the arrests of Fell and Lee in Arkansas, investigators in New York and Vermont were still trying to find Terry King. They had only very vague information: Fell remembered breakfast at Burger King shortly after the killing, and Lee described the location where King got out of the car as a gravel pull-off on a two lane road, next to a field with a back-board used for target practice. Investigators focused upon several north/south roads in New York State between Rutland and the Tappan Zee Bridge.

---

[10] The officers first learned of Debra Fell's last utterance from Lee's interview.

[11] Lee's post-arrest statement was far more detailed than Fell's. The district court excluded it under *Crawford v. Washington*, 541 U.S. 36 (2004).

21

FELL-00001535

Terry King's body was finally located on the night of December 1. Early that evening, officials consulted with Gary Mazzacano, a Senior Investigator with the New York State Police who once had been assigned to the Dover Plains, New York, Police Barracks. Mazzacano recalled a gravel pull-off in Dover Plains on Route 22, a north/south highway by a field with a target practice back-board. He also knew that there was a Burger King in Pawling, a town 13 miles south of Dover Plains on Route 22. Tr. III-1 at 15-16.

Picking up two New York State Troopers, Mazzacano drove to the area, arriving after dark. Trooper Darren Bialek found King's body. In the bitterly cold December night, officials secured the area for a forensics team scheduled to arrive the following morning.

Senior Investigator Thomas Martin of the New York State Police supervised the processing of the crime scene on the morning of December 2. *Id.* at 25-26. King lay face-up in a wooded area about 400 feet from Route 22. The brutality of her death was readily apparent: there were "extensive injuries to [her] face, head and neck . . . large bruising and markings and trauma-type wounds." *Id.* at 51. Forensics investigators photographed the scene, took plaster footwear impressions, collected fibre samples, and retrieved a rock and other items from near the body.

22

FELL-00001536

(f)   Miscellaneous Additional Guilt Phase Evidence

FBI Special Agent Mark Promutico was assigned to search for evidence along Route 22 south of the crime scene. Two to three miles south, down an embankment on the west side of the road, Agent Promutico found King's wallet. It contained her identification documents but no cash. *Id.* at 75-82. From a dumpster at the Burger King in Pawling, the agent recovered King's purse; inside was a Dunkin Donuts bag. *Id.* at 76-83.

Michael Leight worked the 7:30 a.m. shift at Burger King on November 27. Tr. At III-1 at 94. Early in his shift, two males in a small, greenish car ordered breakfast at the drive-through window. The driver asked if they could buy some marijuana. Leight met the men in the parking lot behind the restaurant. After a discussion about drug prices, a sale was declined. The driver was wearing a jean jacket with "heavy metal band patches" on it and glasses. *Id.* at 96. The men said that they were en route to New York City from Vermont. Leight gave them directions. Both men seemed "normal."

Matt Kolojeski, a recovering drug abuser, had lived in Wilkes-Barre, across the street from Donald Fell. Sometime in 1999 or 2000, Fell showed Kolojeski a shotgun and told him that it had been stolen from a police car. Tr. III-1 at 112-13. Late on November 27, 2000, Fell arrived at the Kolojeski's Wilkes-Barre

23

FELL-00001537

residence in a green car with a man named Bobby Lee. Fell and Lee both seemed normal and calm. That night they "started drinking and smoking a little weed with [Kolojeski's] brother." *Id.* at 115. Fell had done that before, and had a high tolerance for alcohol. *Id.* at 117-18. Fell and Lee stayed the night of November 27 and most of the following day. They talked about going to California. Before they left, they borrowed a screwdriver to do something with their car.

FBI Agent James Glenn recovered King's Vermont license plates from Mill Creek, a stream near Kolojeski's house. The plates had been folded in half, with Vermont's distinctive green coloring concealed on the inside of the fold.

In Arkansas, FBI Agent Jerry Spurgers searched King's car. He recovered clothing; a map of Vermont and New York; Lee's wallet (containing an October 22, 2000 bus ticket from Wilkes-Barre to Rutland); receipts from fast food restaurants on highways between Wilkes-Barre and Clarkesville; and a card-board sign reading, "Stranded travelers in need of food. Please help. God bless." *Id.* at 149.

Brendan Shea, a forensic examiner in the FBI Laboratory, testified as an expert forensic DNA analyst. Tr. III-2 at 4. Shea compared samples of King's and Debra Fell's blood with stains found on boots worn by Fell and Lee when arrested. Lee's boots were stained with blood from both Debra Fell and King.

24

FELL-00001538

Fell's right boot tested positive for blood, but Shea was unable to type the small amount of DNA. *Id.* at 21. Fell's left boot had mixed bloodstains on it, with King being the major contributor. The rock found near King's body was stained with her blood.

The government introduced stipulations that: (1) photographs, clothing and footwear (introduced as Exhibits 2(a) - (f) and 3(a) - (e)) were taken from Fell and Lee at the Johnson County Detention Center in Arkansas on November 30, 2000; (2) footwear impressions found at the New York crime scene, between King's body and Route 22, corresponded in design and size to the boots worn by Fell and Lee when arrested; (3) cotton fibers recovered at the New York crime scene, in close proximity to King's body, shared the same microscopic characteristics and optical properties as the fibers comprising the T-shirt worn by Fell and the jeans worn by Lee when arrested; (4) if called as a witness, Tara Richards would have testified that she lived in Wilkes-Barre near Matt Kolojeski's residence; that she owned a Plymouth Neon registered in Pennsylvania; and on the evening of November 29, 2000, she noticed that her rear license plate (found on Terry King's car in Arkansas) was missing and reported it to police immediately; (5) King's Plymouth Neon was manufactured in Mexico and had been shipped in interstate commerce; (6) the Mossberg 12-gauge shotgun found in the Neon on November

25

30 was a "firearm" under federal law; (7) blood samples from the bodies of Debra Fell and Terry King were forwarded to the FBI laboratory and maintained there in accordance with accepted forensic best practices; and (8) toxicology tests on blood samples from the bodies of Debra Fell and Charles Conway found high alcohol content but no illegal drugs.

On June 24, 2005, the government rested its guilt phase case. The defense introduced no evidence. That same afternoon, the jury returned guilty verdicts on all four counts.

### (3)    Evidence Introduced During the Penalty Phase

The penalty phase of the trial opened on June 28, 2005 with preliminary jury instructions, in which the court gave the jury an overview of the law.

### (a)    The Government's Direct Penalty Phase Evidence

During the penalty phase, the government supplemented the guilt phase evidence with graphic proof of the monstrously brutal manner in which Fell and Lee killed their victims; victim-impact evidence showing the devastating effect the murder of Terry King had on her close-knit family; and testimony about Fell's interactions with his mother in Vermont shortly before her murder.

FBI Agent T. Kevin Talley assisted in the search for evidence near Mrs. King's body in New York. After her body was removed by the medical examiner,

26

Talley recovered two teeth, an earring and an earring post from the area around where the body lay. Tr. V-1 at 64.

Dr. Michael Baden, an expert forensic pathologist, responded to the New York crime scene on the morning of December 2, 2000, and later performed an autopsy on King's body. At the crime scene, Dr. Baden observed that King lay "on her back, fully clothed, with extensive evidence of injury to the head and neck area." *Id.* at 79. During the autopsy, Dr. Baden first noticed that there was "no evidence of any droplets of blood falling downward," which is "something we look for to see if the person was standing or lying down when bleeding occurred." *Id.* at 82. There were no injuries below the neck; "[a]ll the injuries were confined to the face, the head, the neck area." *Id.* at 82.

The extensive injuries to King's head and neck included blunt force trauma on both sides of the head, extensive damage to the windpipe and the Adam's apple, and extensive fractures to the skull, many "emanating from . . . a severe blow to the . . . bridge of the nose." *Id.* at 83. There had been "severe compression to the neck by a powerful force" which had not broken the skin. That "crushing injury" was consistent with a forceful "stomp" by the boots worn by Fell and Lee when arrested. *Id.* at 87. Dr. Baden opined that the neck injury required "more than 150 pounds of pressure." *Id.* at 89. There were also separate impact

27

injuries to the mouth area, because there were fractures of the upper and . . . lower jaw." *Id.* at 88. The teeth recovered from the area around the body weren't broken: "these were teeth that popped out of their sockets . . . after the bone was cracked," indicative of "another stomping type injury." *Id.* The blow to King's nose was consistent with the blood-stained rock found near her body.

As to the cause of death, Dr. Baden testified that "there was a kind of overkill." King died from blunt force injuries to the face, head and brain and traumatic compression of the neck with asphyxia: "homicidal assault." *Id.* at 90-91. "[T]here were many more injuries than necessary to cause death." *Id.* at 95.

Dr. Paul Morrow, then-Chief Medical Examiner for Vermont, performed autopsies on Debra Fell and Charles Conway. Tr. V-1 at 104-05. Conway died of multiple stab wounds – "there were approximately 50 stab wounds on the body." *Id.* Dr. Morrow found a complex of deep stab wounds of the left side of Conway's neck – one of which cut his carotid artery – as well as serial stab wounds to the back of the neck, the front of the neck (including a long, gaping six to seven inch wound), the face, the back, the chest and the upper abdomen. Conway also had slicing wounds on his hands. The wounds were consistent with the bloody knives found in the apartment. Conway bled to death as a result of the wounds, and in particular the severing of his carotid artery. *Id.* at 120.

28

FELL-00001542

Dr. Morrow concluded that Debra Fell also died from "multiple sharp force injuries," or "approximately 40" stab wounds. Tr. V-2 at 3. Debra Fell had a 21 centimeter long cut across the front of her neck, made by several wounds, some of which were deep enough to reach her vertebrae. That complex of wounds severed her carotid artery. *Id.* at 5-6. There were also stab wounds on both sides of Debra's head, on her face, on her back, on her side, and on her hands. Debra had blood on the bottoms of her legs and feet, consistent with walking through blood. She bled to death.

Marsha Thompson worked at the Stop Lite Bar in Rutland. *Id.* at 40. Debra Fell was a regular customer during the last months of her life. In the Summer of 2000, Debra let it be known that her son was coming to live with her. When he arrived, Debra brought him into the bar and introduced him as "my son Donny." *Id.* at 43-44. One day in mid-November 2000, when Debra Fell was at the Stop Lite, Donald Fell entered the premises. After drinking from Debra's beer, he tried to take the change she had left on the bar. Debra tried to stop him, but Fell "grabbed her hair and punched her in the head." *Id.* at 45. When Thompson ordered Fell out, he spat and kicked at her. Debra said, "he'll leave if I leave," and walked towards the door. After Fell followed her out, Thompson saw Donald push Debra down on the sidewalk. Thompson called police, who arrived and took

29

Donald away. Afterward, Debra came back into the bar crying. She told Thompson that she was afraid of her son and didn't want to go back to her apartment. Thompson advised Debra to kick Donald out. Debra replied: "I can't. He's my son, and I love him." *Id.* at 49.

Vertith Oberle was a friend of Debra Fell's, and visited her a number of times in her apartment. *Id.* at 58-59. She never saw Debra use drugs or get angry. After Fell and Lee arrived in Vermont, Oberle saw them several times at Debra's apartment. Fell was "mean" to his mother. He was more "outgoing" than Lee, who was the "more quiet" of the two. *Id.* at 62. On the evening of November 26, 2000, Oberle visited Debra's apartment between 9:30 and 10 p.m. Debra, Conway, Fell and Lee were all sitting in the kitchen, playing cards and drinking beer. They seemed to be having a good time. No one appeared drunk or angry. No one was using drugs, and no drug paraphernalia were visible. *Id.* at 65.

The government's remaining penalty phase witnesses were five members of King's family: her two daughters and her three siblings. They described Terry King's personal characteristics, and the impact of her murder on their lives and the lives of other family members. The government then rested. Tr. VI-1 at 59.

30

(b)   The Defendant's Direct Penalty Phase Evidence

Fell introduced testimony from 14 penalty phase witnesses. The witnesses included family members, teachers, and social service providers who testified about Fell's past, as well as prison officials who testified about Fell's adaption to prison. The defense also introduced a "Mitigation Binder" – hundreds of historical documents from Fell's background generated by schools, social services agencies, and health-care providers.

The first defense witness was Susan Benczkowski, Fell's older step-sister and the daughter of his father and his father's first wife. Benczkowski's parents divorced when she was 10. She testified that her father, Donald Fell, Sr., drank alcohol on a daily basis. Her mother later told her that he was abusive. As a young teen, Benczkowski visited her father and his new wife, Debra Fell. Benczkowski once confronted Debra Fell about drinking beer when pregnant with Donald; Debra replied that "[b]arley is good for the baby." Tr. VII-1 at 58. When Benczkowski was 15 and Fell an infant, she lived with her father and Debra Fell for the summer. She often was responsible for feeding, changing and caring for the baby. Debra Fell and her father argued and drank constantly. Benczkowski once saw Debra Fell become enraged and attack her father with a knife. There was "blood everywhere" and her father locked himself in the bathroom.

31

FELL-00001545

Benczkowski called the police, who took her father away. She cleaned up the blood, and found a piece of her father's scalp.

Teri Fell, Fell's 22 year-old younger sister, testified that during their childhood her parents were always drunk and "yelling at each other." *Id.* at 81. She recalled one night, when she was very young, Donald Sr. and Debra got in a big fight and there was "lots of blood everywhere." Her grandmother came to take her and Fell out of the house. At one time, her father kept a beer keg in the basement. Sometimes she and Fell would sneak downstairs and "drink beer out of the keg without him knowing it." *Id.* at 84. Police came to the house when her parents fought. Her brother and Debra also fought. *Id.* at 87. She saw him hit her mother, and her mother hit him. Donald Fell protected Teri as she grew up. After Teri had a fight with her mother in January 1994, Debra moved out of the home and Teri did not see her again.

On cross-examination, Ms. Fell testified that Debra regularly worked during her childhood. Her brother frequently refused to go to school and stayed out late at night. She witnessed Fell engage in serial acts of violence. These included stabbing a childhood friend with a fork; taking the crutch of an injured friend of her mother's and striking him on his bad leg; throwing a door at the same man; and, in a joint assault with Bobby Lee in the Summer of 2000, beating another

32

man "very badly," kicking him violently and repeatedly when he was on the ground. *Id.* at 146. After stomping the victim into a coma, Fell urinated on him. *Id.* at 153. When arrested for the assault, Fell used a false name. After Fell went to Vermont in the Fall of 2000, Debra confided to Teri in a phone conversation that "she was afraid of him." *Id.*

The defense called two police officers from Jenkins Township, Pennsylvania, where the Fell family lived in 1989-90. In 1989, Officer Marianne Czanker-Chiumento twice arrested Donald Fell, Sr. for driving while intoxicated and without a license. In one instance, Fell, Sr. struck a child on a bicycle with his car; the other arrest occurred when he had children in the car. Czanker-Chiumento also responded to several domestic disputes at the Fell house, in which she found both parents intoxicated and arguing. Tr. VII-2 at 10-15.

Czanker-Chiumento acknowledged that her only contact with the Fells was between October 1989 and October 1990. Donald, Sr. was usually the aggressor in the domestic disputes. The officer never saw Debra Fell physically or verbally abuse a child. In October 1990, Debra "finally threw [Donald, Sr.] out." Tr. VII-2 at 25. After that, officers had no reason to respond to the residence.

Officer Christopher Purcell also responded to alcohol-related domestic altercations at the Fell residence in 1989-90. Officer Purcell perceived Mr. Fell to

33

be the main assailant, and Mrs. Fell to be essentially a battered spouse. Prior to late October 1990, Debra had been afraid to take legal action against her husband. On October 29, 1990, however, Officer Purcell responded after Debra Fell reported that her husband had slapped Donald, then age 10, for refusing to take a shower. Observing that the boy had "a bloody lip," the officer arrested Fell, Sr. That incident finally induced Debra Fell to obtain a court order requiring her husband to stay away from the house.

Ellis Carle was a former supervisor of Luzerne County, Pennsylvania Children and Youth Services ("CYS") and a medic with the Kingston Ambulance Association. Tr. VII-2 at 48. Late one night in April 1985, Carle was dispatched to the Fell house for a domestic altercation. Inside, he found Debra Fell with a knife wound in her leg, intoxicated and holding a beer she did not want to put down. Both children were sleeping upstairs. A "blood trail" led to the kids' bedroom and the bathroom; "she obviously had gone up to check the kids or something." *Id.* at 52. Carle arranged for the children to spend the night with their maternal grandmother, Theresa Sharpe. Sharpe was a trained foster parent with whom Carle had worked in past. *Id.* 57. Carle and another social worker collected the children. "[T]he boy [Donald] was kind of groggy" and "didn't want to wake up." *Id.* at 52. The girl (Teri) was "sound asleep" and "wasn't waking up

34

for nothing." *Id*. at 52, 58. Carle recalled that when the boy noticed the blood on the floor, they told him it was spilled paint. *Id*. at 58. Donald, Sr. was found on a nearby street, also with a knife wound.

Carle testified that in the wake of the Fell family's 1984-85 problems, which included a 1984 report of sexual abuse of the two children by a baby sitter, CYS and the Victim Resource Center began providing services to the family. This included counseling, home visits, office visits and phone conferences, as well as an evaluation of the family's housing, medical, emotional and physical needs. *Id*. at 81, 84.

In 1994-96, Donald Fell again came to Carle's attention when chronic truancy landed him in juvenile court. Tr. VII-2 at 86. Initially, the court penalized Debra Fell for her son's truancy (including jailing her a few times), but she convinced the court that "she had done everything she could to get him to school," after which the court focused on Fell. *Id*. at 87. Eventually, a juvenile court ordered Fell to St. Michael's, a residential facility for problem boys. *Id*. at 66.

At St. Michael's, Fell received anger management and drug and alcohol counseling. *Id*. at 90. Carle recalled that Fell initially had "a rough time" at St. Michael's but, after discharge a year or so later, did "pretty good." Carle's office continued to supervise the family for about six months after Fell's discharge in

35

FELL-00001549

mid-1995, then closed the case. *Id.* at 69-70. The last notation in Carle's file indicated that in 1996, Debra Fell sought to regain custody of her children but was told that it had been transferred to Donald Fell's aunt, Jackie Sharpe. *Id.* at 70.

Sharon Hinchey was Fell's Kindergarten teacher in 1985-86. She described Fell at the time as "a wonderful little boy" with whom she never had a problem. After he went on to first grade the following year, he used to "pop in and say hi." Tr. VIII-1 at 14.

Mary Grance Loncoski was Fell's fifth grade teacher in 1990-91. Fell was a "normal, likeable" boy. *Id.* at 37. He "was a very good reader," who assisted first graders learning to read. Academically he was "average and slightly above average." *Id.* at 33. Late in the year his attendance and work declined.

Mary Jo Scott was a teacher at the Northwest Correctional Facility in Vermont, where Fell was detained pending trial. After meeting Fell in mid-2001, Scott helped him prepare for a GED high school equivalency test. She described Fell as "well-read," "curious," "eager," "prepared," and "focused." *Id.* at 73-75. Based upon scores and testing, he was "in the upper percentile" in comparison with other inmates. *Id.* at 74. Scott opined that, "given the opportunity," Fell "would attend further educational opportunities." *Id.* at 76. Asked what impact Fell's execution would have upon her, Scott replied that she valued her ongoing

36

accomplishments with him and "would hate to see . . . an end to that." *Id.* at 82.

Ronald Barclay, a Correctional Officer from Northwest, never had difficulties with Fell. However, Barclay was not aware of Fell's prison disciplinary record.

James Bailey, another Correctional Officer, testified that during the time he worked in "Echo Unit," where Fell was held, Fell "followed policies [and] procedures" and was a "quiet" inmate. Tr. VIII-1 at 133. On direct, Bailey testified that Fell took part in "educational and religious opportunities" offered at the facility. *Id.* at 134. Cross-examination revealed that Bailey's only exposure to Fell was as an occasional "float" officer temporarily assigned to Echo Unit. Full-time officers in that Unit had a lot more interaction with him. *Id.* at 137.

Correctional Officer Jason Rushlow was also assigned to Echo Unit. On direct, he described Fell as a "quiet" inmate who "fit in well." Tr. VIII-2 at 27. He participated in "religious and Bible studies." Tr. VIII-2 at 11-12. On cross-examination, Rushlow reviewed a list of Fell's disciplinary violations. Rushlow recalled that Fell had an "anger management problem." *Id.* at 48-49 ("[h]e can be explosively angry, and you don't know when it's coming"). During one serious incident shortly before trial, Fell fought with and injured guards. *Id.* Fell sued the prison for infringing upon his right to practice Native American religion, *id.* at 54-

37

55, and sought to participate in Ramadan as a Muslim. *Id.* at 55-56. He had an "anarchy" tattoo on one arm, and an "upside down cross with 6, 6, 6" tattooed on the other. *Id.* at 60. Fell also filed a multitude of grievances and said derogatory things about officers (calling them "lazy," "stupid," and "things of that nature"). *Id.* at 58.

Deanna German Habib, a CYS case worker in Wilkes-Barre, worked with the Fell family in 1990-92, when Fell was 10-12 years old. She testified about Fell's youth, based upon documents in the defense "Mitigation Binder" and her own memory. She touched again on incidents already related to the jury by Carle and Officers Czanker-Chiumento and Purcell. German Habib identified as "risk factors" the facts that both parents abused alcohol and engaged in domestic violence while he was young, and that, according to her, "there was not a lot of extended family." Tr. IX at 20-26. She read into the record the 1985 allegation that Fell had been sexually abused by a baby sitter. *Id.* at 30-31.

German Habib said that at age 10-12, Fell "seemed like a normal kid." *Id.* at 64. He was on a Little League baseball team and in the Boy Scouts. *Id.* He was also "an A-B student in school," where he had no behavioral problems.

German Habib conceded that when CYS closed its initial supervision of the Fell family in late 1985, the file indicated the children were "receiving appropriate

38

care and love," that "discipline has also been appropriate," and that "there [were] no issues of abuse or neglect that would warrant further involvement." *Id.* at 75. Subsequently, when CYS reopened the case in 1990 and German Habib became involved, CYS documents noted that "there appear to be no behavioral or other attendance problems at school," "the children were dressed neatly and in clean clothes," and the "physical hygiene and appearance of Mr. and Mrs. Fell are not an area of concern." *Id.* at 79.

German Habib confirmed that the father left in late 1990, after Debra Fell had him "kicked out" for slapping young Donald. *Id.* at 80-81. German Habib's contemporaneous notes concluded that the mother had "acted appropriately" at the time. *Id.* at 81. Subsequent reports from the Spring of 1991 indicated that, after the father's departure, domestic violence abated and there was no more evidence of Debra Fell drinking excessively. *Id.* at 87. However, in 1991 Fell's behavior began to deteriorate and he became aggressive with his mother and his sister. *Id.* at 85, 89. By September 1991, Fell's violence had become "quite severe," and resulted in him being hospitalized. *Id.* at 89. By sixth grade, Fell was "aggressive and oppositional" at school, and had hit and thrown darts at his mother, who was afraid of him. *Id.* at 95.

In May 1992, Fell was hospitalized again for violence. He had shot a young

39

FELL-00001553

friend with a 9 mm pistol; punched his sister; chased his mother with a curtain rod; and kept knives in his room. *Id.* at 103. Debra Fell was afraid that he would use the knives on her. *Id.* at 104.

When German Habib closed her file on the Fell family in mid-1992, there were no concerns about excessive drinking or abuse by Debra Fell; on the contrary, she was "providing a safe and stable environment" for her children. *Id.* at 106. The agency's concern was with Donald Fell's behavior. *Id.* at 107.

William Kane taught at St. Michael's when Fell was at that facility in 1994-95. Kane testified that Fell "adjusted pretty well." He was "always respectful" to Kane. He "wasn't a communicator," and was "mostly flat and depressed." But "there were very few incidents that I can recall that were problematic." Tr. IX-2 at 15.

The last defense witness was James Aiken, a consultant and former prison warden and correctional commissioner in South Carolina, Indiana and the U.S. Virgin Islands. Aiken was retained by the defense to "make an assessment of Mr. Fell in relationship to his adjustment to a prison environment for a long period of time." In Aiken's opinion, Fell's history of prison disciplinary infractions was "fairly minor," and "fairly insignificant." *Id.* at 63-64. If Fell were sentenced to life imprisonment, he would be designated to a United States penitentiary, a "very,

40

FELL-00001554

very high-security facility" which keeps close control over inmates. *Id.* at 66. Aiken had met with Fell (for "at least an hour"), and concluded that he had begun to "mature" and "chill out." *Id.* at 70-71. Fell was a man who could "be adequately managed within the Federal Bureau of Prisons for the remainder of his life," *id.* at 71, "without causing an undue risk of harm to staff, inmates, and the public." *Id.* at 72.

(c)    The Government's Rebuttal Penalty Phase Evidence

The government's rebuttal witnesses in the penalty phase included three prison officials and two witnesses from Fell's past: a teacher, and a former friend.

Gregory Machia, a Correctional Officer from Northwest, described an incident on March 17, 2004, when a fight broke out among inmates in Echo Unit's outdoor "bull-pen." Tr. X-1 at 109. Responding officers secured the area by ordering all inmates to put both hands on the perimeter fence. Fell refused to put his hands on the fence or put down his cup of coffee. Machia forced the cup away from Fell and pushed him against the fence. Fell was then handcuffed and removed for disobeying orders. The ensuing scene was captured on videotape, which Machia introduced. The tape depicted Fell screaming obscenities and taunts at officers tasked with taking him back into the facility; it showed him kicking, threatening, and spitting in an officer's face. Tr. X-1 at 112-13.

41

FELL-00001555

Correctional Officer Michael Gordon testified about another violent encounter with Fell only a month before jury selection. After Fell refused to come out of his cell, an "extraction team" of four officers was sent to remove him. The incident was again videotaped. Gordon, a member of the team, introduced the tape and described what happened. As soon as the team opened the cell door, Fell charged them aggressively. He held a "property box" top in one hand, and had wrapped his head with a towel to mitigate the effects of pepper spray (which was not used). *Id.* at 137, 141-42. As the officers pushed back, Fell fought, kicked, and tried to bite them. One officer was kicked in the knee and injured – he was still out of work at the time of Fell's trial. *Id.* at 138-39. Once shackled and removed from the cell, Fell lay down on the floor and had to be carried. *Id.* at 139. Upon reaching another cell, he threatened an officer. *Id.* at 140.

David Duncan was a 20-year employee with the U.S. Bureau of Prisons and Associate Warden at FCI Manchester in Kentucky. Duncan had worked at four United States Penitentiaries. Tr. X-2 at 4. He was qualified as an expert in classification and security matters in federal prisons. Duncan told the jury that, ordinarily, inmates in pretrial detention are better behaved than those who have been convicted and sentenced. "Basically their life is hinging on the outcome of the trial still at that point, so they don't want to do anything negative to be used

42

against them." *Id.* at 17. Duncan found Fell's disciplinary violations on pre-trial detention "extremely excessive," and indicated Fell was an inmate "who has a real problem following instructions, following orders from anybody, and seems to be aggressive back at them." *Id.* at 18-19. Also, in light of the fact that Fell's disciplinary infractions increased in number and severity over time, Duncan believed that he "seems to be getting worse on his path rather than better." *Id.* at 19 ("he's not adjusting").

The two videotaped prison incidents alarmed Duncan. As to the cell extraction, he observed that Fell "seemed to have planned it out. He wanted the confrontation." *Id.* at 23. Similarly, with respect to the bull-pen incident, Duncan noted that Fell was trying to "goad" the officers into a confrontation. "He didn't want to avoid the conflict. He wanted to accelerate the conflict." *Id.* at 24. Duncan stated that, based upon his review of Fell's record, it appeared he would have "major conflicts or ongoing conflicts with staff" at a future prison facility. *Id.* at 34. He also testified that prisons were dangerous places: during his two-year tour of duty at the penitentiary in Florence, there had been "seven homicides and roughly 41 major assaults or stabbings." *Id.* at 30-31.

Matt Cunningham was a friend of Fell's during 1997–99. Since that time, Cunningham had married, had a child, and was employed as a concrete worker.

43

FELL-00001557

Tr. XI-1 at 39-40. He and Fell "hung out" together nearly every day. There were four other members of their group, one of whom was Bobby Lee. *Id.* at 43. The group drank, smoked pot, and committed low-level crimes. Cunningham never saw Fell take harder drugs, like heroin or crack. *Id.* at 48. They all carried knives. *Id.* at 48. Fell was more "outgoing" than other members of the group and "more of a leader than some of the rest of us." *Id.* at 46. In contrast, Bobby Lee was the quietest and least violent of the group; his nickname was "Twiggy." *Id.* at 47.

Cunningham testified that Fell "made it very clear that he didn't . . . like his mother at all," and said things like, "I could kill her." *Id.* at 51. Cunningham also recalled a conversation in which Fell said that, "if you killed one person, why stop there? Because you are going to get the same punishment anyway." *Id.* at 52.

John Kozierski was one of Fell's teachers at the Wilkes-Barre Vocational Technical School in 1995-96. Kozierski taught in the school's Head Start Program. Program students were mostly from dysfunctional families; the program was designed to help them get a "head start" and choose a vocation. *Id.* at 59. Kozierski loved his job because students really needed him: "these students don't really have anybody they can rely on outside of the school . . . they only have us to count on. . . . [W]ith these students, you can really foster something beyond that [traditional teacher-student relationship]. It makes it – it really fulfills me, and

44

that's why I love it." *Id.* at 63-65.

Fell left an indelible impression on Kozierski. He was "[c]onfrontational, disruptive, uncooperative, discourteous, ill-tempered, [and] hot headed." *Id.* at 65. Yet, testing indicated that Fell was "an intelligent person," *id.* at 70 ("very intelligent"), and "there was no reason why he couldn't excel." *Id.* at 71. Kozierski recalled a day in class when Fell refused to sit down, as requested. Fell became irate and began to curse the instructor. When Fell tried to leave, Kozierski stood in the doorway and said, "whoa, where are you going?" In response, Fell got "right in my face . . . and says, 'get the fuck out of my way or I will fucking stab you.'" *Id.* at 67. Kozierski testified that the threat "totally caught me off guard, to say the least." *Id.* The incident propelled Fell back into juvenile court, where he denied that it ever happened. *Id.* at 68. Upon returning to school, "there was no apology" or any "sign of remorse whatsoever." Fell later "smirk[ed]" at Kozierski, "like I got the best of you." *Id.* at 69.

According to Kozierski, Fell was "legendary" at the school. Of the "between 700 and 800" students he had worked with in the Head Start program, Fell was one of the most unforgettable. *Id.* at 79. He was "confrontational" and "hot-headed" with all teachers, and generated a multitude of disciplinary reports and referrals. *Id.* at 73.

45

FELL-00001559

The government's remaining rebuttal consisted of two stipulations. One concerned the accidental pretrial death of Robert Lee. The second, Exhibit 14, concerned Fell's mental health. It provided as follows:

> It is stipulated and agreed by and between the . . . parties that after his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that: (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; and (3) he did not suffer from any mental disease or defect. The examinations also found that Fell was competent to stand trial, and knew the difference between right and wrong at the time of the offenses on November 27th, 2000.

*Id.*

By way of brief surrebuttal, the defense introduced documents relating to Fell's August 2000 arrest in New York for assault. Summations and jury instructions were delivered the following afternoon, July 13.

(d)    Verdict

The jury returned its 20-page "Special Verdict Form" on July 14, 2005. A at 562. The jury unanimously found in favor of each of the eligibility and aggravating factors alleged by the government. The jury unanimously agreed that Fell had proven eight of the 19 mitigating factors, including six relating to his childhood. In addition, 10 jurors found an additional mitigator, handwritten on the form as follows:

46

FELL-00001560

Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*Id.*

The jury decided unanimously that the aggravating factors sufficiently outweighed the mitigating factors such that, as to both Count 1 and Count 2, "a sentence of death shall be imposed."

### D.   FELL'S POST-TRIAL MOTION

Fell filed a post-trial motion asking Judge Sessions to overturn the jury's capital verdict, and either empanel another jury for a new penalty phase hearing, or impose a life sentence. The motion did not challenge the sufficiency of the evidence or the accuracy of the court's legal instructions, but asserted that: (1) misstatements by prosecutors led Fell not to call mental health experts during the penalty phase; (2) prosecutors wrongfully took positions at the 2005 trial inconsistent with positions they took during 2001 plea negotiations; and (3) prosecutors improperly urged the jury, during penalty-phase summation, that certain of Fell's proposed mitigation factors should be discounted because they "didn't relate" to his crimes.

In a lengthy opinion filed on April 24, 2006, Judge Sessions denied Fell's motion. As to the mental health expert issue, the court noted that Fell raised the

47

FELL-00001561

issue during trial and the court scheduled a hearing to explore the allegation. However, prior to the hearing, Fell decided against presenting mental health evidence; by doing so, Judge Sessions ruled, Fell "abandon[ed]" and "waiv[ed]" the claim." A at 723-24.

Judge Sessions squarely rejected Fell's contention that it was either unfair or improper for the government to take one position about Fell's acceptance of responsibility in 2001, during failed plea negotiations, and another, assertedly inconsistent, position at the 2005 trial.

Finally, Judge Sessions agreed that the prosecutor should not have argued that mitigation evidence did not "relate to the crimes." However, the court found that the error, taken in context with jury instructions requiring the jury to consider all mitigation evidence, was harmless.

E.    SENTENCING

Formal sentencing took place on June 16, 2006. Judge Sessions complied with the FDPA's mandate that "the court shall sentence the defendant" in accordance with the jury's verdict. 18 U.S.C. § 3594. The court sentenced Fell to death on Counts 1 and 2 of the Superseding Indictment. The court also imposed 120 months of imprisonment as to Count 4, and 84 months of imprisonment on Count 3, consecutive to Count 4. This direct appeal followed.

48

FELL-00001562

5:01-cr-00012-gwc    Document 301-41    Filed 03/21/11    Page 138 of 138

## SUMMARY OF ARGUMENT

Fell argues that Judge Sessions erred during jury selection by dismissing three qualified jurors. Because the dismissed jurors gave ambiguous and equivocal responses to questions about whether they impartially could consider imposition of the death penalty, the court did not abuse its discretion by granting for cause challenges.

Fell argues that Judge Sessions erred by excluding the 2001 draft plea agreement the government considered, but ultimately declined without signing or filing. Judge Sessions' repeated and careful rejection of this claim below was not an abuse of discretion. The court did permit Fell to introduce into evidence his willingness to plead guilty in exchange for a sentence of life imprisonment.

Fell argues the prosecution made two improper arguments to the jury: (1) by pointing out that despite his claim to have accepted responsibility, he pleaded not guilty at the guilt phase of trial, and (2) by asking rhetorical questions about how Fell's unfortunate youth mitigated his responsibility for killing Terry King and urging that the background mitigation evidence had little weight in comparison to the aggravation evidence. Fell did not object to either argument during trial, and Judge Sessions rejected his second argument in his ruling denying the motion for a new trial. The prosecution's arguments were proper: in any event, no plain error

49

FELL-00001563