background generated by schools and social service agencies between 1985 and mid-1997.[50] Generally, as argued by counsel at the close of the penalty phase trial, the background and character evidence was offered to establish that the three murders in November 2000 were the result of factors beyond his control, and therefore made him less morally culpable.[51]

After Fell's attorneys completed their case in mitigation, Judge Sessions excused the jury and conducted a hearing regarding mental health evidence and two of the government's proposed rebuttal witnesses: Matt Cunningham and Bethany Brashears.[52] Cunningham had been Fell's friend in Pennsylvania during

---

[50] The last dated document in the Mitigation Binder (at Tab 43) appears to be the April 30, 1997 "Pupil Change in Status Report,"memorializing Fell's withdrawal from Coughlin High School in Wilkes-Barre.

[51] Counsel argued that Fell's ability to make sound decisions had been damaged during his deplorable youth. "We are talking about what formed Donnie's decisions. What made Donnie – what clouded his ability and shaped his choices. What was his moral system." Tr. XII-1 at 69. *See also* 70 ("damaging factors" in Fell's background reduced his "moral culpability" and "damaged" his "being"). In concluding, counsel argued, "[I]f Susan [Benczkowski] could have taken her little baby brother home and raised him in her house with her mother. . . . We wouldn't be here today. He would have been loved, cared for, nurtured, not abused." *Id.* at 113. "[B]y the time he got out, he was damaged beyond anything that Vo-Tech was going to do for him. . . ." *Id.* at 115.

[52] Both witnesses were identified in the government's April 20, 2005 witness list. In addition, the "United States' Sentencing Memorandum and *In Limine* Motions for Penalty Phase," filed on June 27, 2005, surveyed the government's penalty phase evidence, including proposed testimony to be given by Cunningham.

193

FELL-00001707

the period 1997-99, with whom Fell had discussed murders. Brashears, a teen-

ager, was a victim whom Fell kidnapped and threatened with death in early 2000.

The defense initially objected to those witnesses as not properly rebutting its direct

evidence: the defense case had been limited to describing "Donald Fell till age 15

and then Donald Fell in the correctional institution [from late 2000 through trial]."

Tr. X-1 at 63. The rebuttal witnesses, by contrast, would testify about Fell's

behavior during a different time frame – "in his late teens" up through 2000, to

shortly before the murders. *Id.* In other words, the defense background and

character evidence focused on the time periods 1980 - 1996, and December 2000

to the time of the trial, as opposed to 1997 through early 2000.

Judge Sessions responded as follows to the defense's attempt to prevent the

jury from hearing evidence about the three-year period of Fell's life that led up to

his move to Vermont:

> Well, do you really think that you've []offered this evidence to suggest that
> his character was only relevant . . . to [age] 15 and so that any acts after 15
> become totally irrelevant then the acts in 2000 become relevant again? I
> mean weren't you suggesting that this all contributes to who Mr. Fell is as a
> person? And if that's the case, you don't set-up artificial deadlines or time
> periods and exclude or include acts during that time period and exclude all
> other acts . . . outside that time period?

*Id.* at 55-56.

194

FELL-00001708

After further discussion with counsel, Judge Sessions observed:

Well, I guess I need to have a proffer from the Government. It seems to me that when you offered the testimony of persons who knew him when he was a youngster, or up to age of 15, you were doing so not necessarily with that kind of restricted relevance. You are, you are attempting to show who he is as a person. And, you know, to make artificial barriers into behaviors which occurred after 15 is really unfair. That's my sense.

Now, you are raising other questions about whether or not the information . . . is overly prejudicial and outweighs its probative value. And that your argument is that you haven't focused in upon that particular period of time. I think that time is relevant. No question about that.

I suppose that perhaps it plays a part in the balancing between prejudicial impact and probative value. But I, I think restricting the evidence based upon his age at 15 is totally unfair to the Government because they've got some conduct after 15 which bears question on character. But then you have to go through the prejudicial versus probative value analysis.

*Id.* at 65. That same day, the government provided the court with FBI reports of interviews of Cunningham and Brashears, as well as transcripts of 2001 grand jury testimony by Brashears (and Lynn Roberts, a witness to the Brashears kidnapping). *Id.* at 98, 105.

On July 11, 2005 the government filed a memorandum setting forth the proposed testimony to be given by Brashears and Cunningham, and explaining its evidentiary basis. SA at 242. This memorandum explained the relevance of the evidence and its function in rebuttal:

195

FELL-00001709

The defense contends that Fell's November, 2000 offenses must be understood in context with his troubled background. As explained by counsel during the first opening statement, in order to understand what Fell did, "[y]ou have to understand how . . . he got there."

The defense introduced nine witnesses and a multitude of historical documents to explain Fell's unfortunate background. The essence of the mitigation case appears to be that Fell endured adverse life experiences that fundamentally shaped him psychologically, socially, and emotionally, and thus contributed to his offense. . . . The defense suggests that Fell's life resulted in such a "complicated" relationship with his mother that her murder is understandable. The remaining killings were collateral to that primary event, and hence – so the argument would seem to go – also understandable. The defense background evidence generally left off when Fell dropped out of high school at 17, although his sister Teri Fell without objection described events on cross-examination during the Summer and Fall of 2000.

The government wishes to correct the portrayal of Fell as simply a tormented youth consumed with his mother's wrongs. That image is only possible if the critical few years between the ages of 17 and 20 – when Fell matured into an adult – are ignored. For during that time Fell's trajectory of deeply oppositional and aggressive ideation and conduct reached the homicidal. His violent acts and ideas, perhaps conceived in part in a wretched childhood, were not predetermined by it, but were fostered by him to become a defining attribute of his character. When that adult came to Vermont in late 2000, he was fully formed and ready to act on his homicidal ideas.

The government offers several witnesses to rebut, explain and disprove the false impression created by the defense evidence that Fell is a victim, a victim of 17 years of abuse, who is not fully responsible for his offenses.

SA at 242-43. That same day, the defense filed the "Defendant Donald Fell's

Memorandum on Extraneous Acts at the Punishment Hearing," arguing for

196

FELL-00001710

exclusion of the testimony. SA at 262.

On the morning of July 12, 2005, Judge Sessions resumed discussion of proposed rebuttal testimony by Cunningham (and John Kozierski, one of Fell's former teachers).[53] In a lengthy colloquy, the court focused on four issues: (1) whether Cunningham and/or Kozierski could describe Robert Lee's character; (2) whether Cunningham could mention that Fell had committed robberies, burglaries, and/or thefts; (3) whether Cunningham could testify that Fell talked about killing his mother; and (4) whether Cunningham could testify that Fell once stated that if he was going to murder one person, why stop there? Tr. XI at 5-29.

As to the third issue, counsel argued that evidence Fell had previously discussed killing his mother was "explosive," and that "the prejudice of admitting it outweighs any probative value." *Id.* at 27. The court responded that the defense case had already presented ample evidence supporting the notion that "Mr. Fell is extraordinarily angry at his mother for being abandoned. Is there any dispute over that?" *Id.* When counsel responded that the evidence was more than that, the court replied, "I appreciate that, but I think that that's relevant as well." As to

---

[53] By this point, the parties had agreed that, in exchange for the government not calling Brashears, the defense would withdraw its mitigation factor alleging Fell's lack of criminal history.

197

issue (4), whether Fell said, in effect, if he was going to murder one person he might as well kill others, counsel argued that such testimony was not relevant. *Id.* at 28.

After a recess, the court announced that it would allow Cunningham (and Kozierski) to testify about Fell's leadership role in his interactions with fellow-killer Lee, but not about "Mr's Lee's character independent of Mr. Fell, because that was not raised in the defense [direct case]." The court also permitted Cunningham to testify that Fell had talked about killing his mother and others. *Id.* at 33.

As a witness before the jury (and facing Fell), Cunningham was reserved and cautious, often minimizing his prior statements and evading questions. He did testify, however (after asking the prosecutor to "rephrase the question"), that Fell had stated about his mother, "I hate that bitch," and "I could kill her." *Id.* at 51. Cunningham also recalled a conversation (after noting that "Fell wasn't the only one involved" in it) that "went along the lines of, well, if you killed one person, why stop there? Because you are going to get the same punishment anyway." *Id.* at 52.

198

FELL-00001712

## B.    STANDARD OF REVIEW

This Court "review[s] a district court's evidentiary rulings for abuse of discretion, and will not reverse unless the district court's decision was 'manifestly erroneous.'" *Yousef*, 327 F.3d at 156.

Generally, "the trial court has a wide discretion over what evidence may or may not be presented on rebuttal." *United States v. Nussen*, 531 F.2d 15, 20 (2d Cir. 1979).  The FDPA provides that both parties, "shall be permitted to rebut any information received at the [penalty phase] hearing . . . ."  § 3593(c).

"[E]ven if the district court errs in admitting or excluding evidence, harmless error analysis applies in determining whether reversal is required." *Yousef, supra*, 327 F.3d at 156; *see also* 18 U.S.C. § 3595(c)(2)("The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless . . . where the Government establishes beyond a reasonable doubt that the error was harmless").  "To determine if an error is harmless, 'we consider principally whether the government's case against the defendant was strong, whether the evidence in question bears on an issue that is plainly critical to the jury's decision . . . whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury, and whether the case was

199

FELL-00001713

close.'" *United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000).

### C.    ARGUMENT

On appeal, Fell argues that the probative value of Cunningham's testimony was outweighed by the danger of unfair prejudice, and that the trial court abdicated its duty to perform the delicate balancing called for by § 3593(c).  Fell is wrong.  He fails to establish that the evidence was "unfairly prejudicial" (or that the government exploited any "unfairness" in summation).  In any event, when the evidence of Fell's homicidal fantasies are placed in context with the theory of the defense – that Fell had been irreparably damaged by a childhood of abuse and neglect – any danger of prejudice was slight.

Matt Cunningham's testimony that, in his late teens (within three years of the Rutland murders and carjacking), Fell talked favorably about murdering people was prejudicial in the sense that all probative evidence is prejudicial – it tends to support the proponent's case or rebut the opponent's.  But that reality does not render the evidence prejudicial for purposes of § 3593(c).  "Only *unfair* prejudice enters into the decisional calculus." *Sampson*, 2007 WL 1393742 * 25 *(original emphasis)*.  Fell cites as prejudicial the possibility that a juror "could have inferred" that he planned the 2000 murders years before, and that he

200

FELL-00001714

therefore had "premeditated intent" to commit them. Appellant's Brief at 172-73 (Cunningham's testimony "had potential to plant th[e] unsubstantiated suggestion [of planning and premeditation] in a juror's mind"). This argument is pure speculation, and falls far short of making the case for exclusion under § 3593(c)'s relaxed evidentiary standard.

The government did not allege that Fell premeditated any of the murders as a statutory aggravating factor (as provided in § 3592(c)(9)).[54] Nor did the government introduce evidence that Fell planned the murder of his mother, or argue years of premeditation to the jury. The idea that, years before, Fell planned and premeditated the triple slaying in late 2000 was simply never raised at trial.

Equally baseless is Fell's claim, raised for the first time on appeal, that the government "exploited" the "potential . . . unsubstantiated suggestion" in summation. In its penalty phase closing, the government, consistent with its position seeking admission of the Cunningham testimony, argued that Fell had evolved from a troubled youth to an adult predator harboring robust homicidal ideation. The prosecutor suggested that Fell had long thought about murder, and

---

[54] The government did allege as a non-statutory aggravator that Fell killed Terry King after substantial premeditation to commit carjacking, but there is no basis in the record for any suggestion that this factor embraced premeditation prior to November 27, 2000.

201

FELL-00001715

his serial murders in 2000 were consistent with long-standing ideation.

This line of argument was proper rebuttal to the evidence and argument Fell's attorneys offered about their client's character. The only place in his rebuttal summation in which the prosecutor commented on Fell's talk about killing occurred when he discussed the murder of Terry King. The prosecutor asked the jury to evaluate that gratuitous slaying within the context of a defendant who had long fantasized about murder:

> You know as a matter of common sense that people have free will, and particularly when they grow up, they have free will to do the right thing and to decide what's right and what's wrong. And you know that for years, Donald Fell thought about killing. He thought about killing John Kozierski, his teacher, back when he was starting out in high school. A couple more years went by, and in conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one.

> And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too.

> People are responsible for what they do, particularly when they do severe, heinous crimes like this. The killing of Terry King was completely unnecessary. Those guys could have driven her up a dirt road, several miles up some dirt road, off of Route 22, or it could have been in Vermont, and they could have dropped her off, and they could have said, "Give us your shoes and give us your clothes. You're staying here." And they would have

202

had hours to get out of there. They could have tied her to a tree, or in Dover they could have knocked her out. They could have punched her hard, and that woman, she would have been knocked out cold and they could have driven away.

But again, that wasn't the choice he made. Instead, again, she got subjected to that way-over-the-top ultra-violence.

Tr. XII at 127-29.

In this passage, the prosecutor did not even refer to the killing of Fell's mother (or to her co-deceased, Charles Conway), much less insinuate that those murders were the product of malice aforethought. Nor did he (nor could he) assert or intimate that Fell had somehow premeditated years before the killing of Terry King (a perfect stranger). To the contrary, it was argued that King's killing – both the fact and the manner – was so gratuitous (and brutal) that it could only be understood within the logic of Fell's predatory character.

This argument built upon the guilt phase evidence establishing that King was a random victim who had the ultimate misfortune of crossing paths with a latent murderer. It responded directly to Fell's selective mitigation evidence, which was offered to persuade the jury not to impose a death sentence upon a person of Fell's "character."

203

FELL-00001717

In short, the government did not misuse or exploit Cunningham's testimony and Judge Sessions did not abuse his discretion in permitting the jury to hear it. The evidence was clearly relevant to one or more mitigating factors proposed by the defense, and even on appeal Fell does not suggest otherwise. Even if the testimony carried with it some small potential for unfair prejudice, the court correctly concluded the balance tipped in favor of admissibility.

The primary thrust of Fell's long presentation of background and character evidence was that the abuse and abandonment he suffered as a youth had deformed him into a person not fully accountable for his crimes. Much of the evidence of abuse and neglect the jury heard about had been inflicted by Debra Fell (in an attempt, no doubt, to mitigate Fell's moral culpability for her murder). As Judge Sessions observed, in the context of that evidence, the fact that Fell was "extraordinarily angry at his mother" was hardly a surprise.

In short, Fell's penalty phase evidence cast his suffering as a child at the hands of a drunken, violent, neglectful mother who ultimately abandoned him as mitigating evidence. Judged against the backdrop of that defense evidence, the government's countervailing evidence – that as a teen Fell said that he hated his mother and could kill her, or had talked with friends about killing more than one person – was neither explosive nor weighty because such sentiments were still

204

FELL-00001718

arguably consistent with the position that the Donald Fell who murdered three people was the hapless product of a terrible upbringing.

Judge Sessions received extensive briefing on the admissibility of the government's proposed rebuttal evidence. He excluded some of that evidence (and the government withdrew other parts of it) and carefully circumscribed the scope of that which he did admit. His written opinions on the subject, and his colloquy with counsel, unequivocally demonstrate the care with which he balanced factors weighing in favor of and against admissibility. His decision to admit portions of Cunningham's proposed testimony reflected a consumate exercise of discretion.

Finally, even if this Court were to conclude that the admission of Cunningham's testimony was improper, any error was harmless beyond a reasonable doubt. 18 U.S.C. § 3595(c). Uncontested evidence established that Fell's homicidal ideas both preceded his statements to Cunningham (he threatened to kill Kozierski) and post-dated them (his 2000 killings). Taken in context with the defense evidence of Fell's dysfunctional and abusive childhood, proof that Fell hated and "could kill" the mother who abused and abandoned him was not very significant. Nor does talk by neer-do-well teenagers in Wilkes-Barre about killing more than one person change the calculus.

205

FELL-00001719

If the statements had not been admitted, it is highly unlikely the jury would have reached a different penalty phase verdict. The jury found unanimously every statutory and non-statutory aggravating factor with which it was presented, including multiple intentional killings; the killing of King in an especially heinous, cruel or depraved manner that involved serious physical abuse; and the imposition of extreme emotional suffering and severe and irreparable harm on King's family.

By contrast, the mitigating factors found by the jury were relatively "unremarkable." *United States v. Stitt*, 250 F.3d 878 at 898 (improper admission of government rebuttal testimony in capital case harmless error). Evidence of Fell's good adjustment to prison was undermined by testimony and video evidence of his several violent altercations with prison staff. It was undisputed (and found by the jury) that Fell had a wretched childhood. But, as the government pointed out to the jury, many are subjected to severe abuse and neglect in their youths. Fortunately, extraordinarily few do what Donald Fell did – turn into triple-killers. "Considered against the overwhelming force of the aggravating factors found by the jury which showed the violent and predatory nature" of Fell, it is clear beyond a reasonable doubt that the jury would have imposed the death penalty had Cunningham's testimony not been admitted. *Stitt*, 250 F.3d at 899.

206

FELL-00001720

IX.    REVERSAL IS NOT WARRANTED UNDER THE "CUMULATIVE IMPACT" RULE.

Fell argues that reversal is warranted under the "cumulative error" doctrine. But because the district court did not err or, alternatively, whatever errors did occur were harmless even when viewed in the aggregate, the cumulative error doctrine provides no basis for relief.

This Court has recognized claims that "the cumulative effect of all the district court's trial errors" may violate a defendant's right to a fair trial. *Yousef*, 327 F.3d at 161; *accord United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999). "There is case law to the effect that the cumulative effect of a series of errors may require reversal, even though a single one of those errors, standing alone, would not require such a result." *United States v. Villarreal*, 324 F.3d 319, 328 (5th Cir. 2003)(adding, "[w]e have stressed, however, that a reversal based on the cumulative effect of several alleged errors is a rarity").

Fell fails to establish any prejudicial errors at his trial, so there is nothing to accumulate. As found by the First Circuit dismissing this claim in *Sampson*, "the district court handled the case patiently and sensitively. None of its individual rulings worked any cognizable harm to [the defendant's] rights. It necessarily follows that the cumulative error doctrine finds no foothold in this appeal." 2007

207

WL 1393742, * 35.

Even if the district court erred, "the errors, in the aggregate, do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict." *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993). The evidence supporting the verdict is overwhelming, and the district court resolved many procedural and evidentiary issues in a manner favorable to the defense, providing Fell with more protection than the law required in many respects.  No accumulation of errors warrants overturning the verdict.

208

FELL-00001722

X.    THE JURY'S CONSIDERATION OF ASSERTEDLY DUPLICATIVE NON-STATUTORY AGGRAVATING FACTORS DID NOT RENDER ITS DEATH SENTENCE UNCONSTITUTIONALLY ARBITRARY.  IN ANY EVENT, THE NON-STATUTORY AGGRAVATORS DID NOT DUPLICATE EACH OTHER.

Fell argues that death sentence was arbitrary because the jury's weighing of aggravating and mitigating factors was skewed by improper consideration of "duplicative" non-statutory aggravating factors.  Fell's argument proceeds in two steps.  First, he invites this Court to join the Tenth Circuit, *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), in holding that if the jury returns a death sentence based upon duplicative aggravating factors, the death sentence must be vacated unless the government can show the error was harmless.  Second, Fell contends that three non-statutory aggravating factors found proven by his jury were duplicative.

Fell is wrong on both counts.  This Court should decline to follow *McCullah* because that decision is inconsistent with Supreme Court precedent – some new, some that was in place before *McCullah* was wrongly decided.  Regardless, each non-statutory aggravating factor properly called upon the jury to consider a different, relevant circumstance in making the individualized determination as to whether Fell should be sentenced to death.

209

FELL-00001723

A.    STANDARD OF REVIEW

The district court denied Fell's pre-trial claim that the alleged non-statutory aggravating factors were duplicative. This decision is subject to *de novo* review. For the first time on appeal, Fell now argues that the government's penalty phase summation, coupled with the court's jury instructions respecting the non-statutory aggravating factors, translated those aggravators into duplicative circumstances. This argument should thus be review for plain error. There was no error, much less plain error.

B.    DOUBLE-COUNTING THEORY

Fell's claim hinges on this Court adopting the Tenth Circuit's analysis in *McCullah*. The panel in *McCullah* reversed a death sentence because "the district court erred in submitting duplicative and cumulative aggravating factors to the jury." 76 F.3d at 1111. Specifically, the trial court submitted the following two factors, which "substantially overlapped": the defendant "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in death of the victim" and the defendant "committed the offenses as to which he is charged in the indictment." *Id.* The jury was also instructed to consider two overlapping mental culpability aggravators – first that

210

FELL-00001724

the defendant intended to kill the victim, and second that the defendant intentionally engaged in conduct which he knew created a grave risk of death, and death ensured. The *McCullah* court concluded that "double counting of aggravating factors, especially under a weighing scheme has a tendency to skew the weighing process and creates the risk that the death penalty will be imposed arbitrarily and thus, unconstitutionally." *Id*. Apparently because the court had already determined that a separate error necessitated a new penalty phase trial, *see id*. at 1102, the court did not attempt to determine whether the duplication was harmless. The Fourth and Ninth Circuits have expressed their agreement with the Tenth Circuit's conclusion that the submission of duplicative aggravating factors can result in the imposition of an arbitrary death sentence, in violation of the Eighth Amendment, but each concluded that the double-counting was harmless beyond a reasonable doubt under the circumstances. *See United States v. Tipton*, 90 F.3d 861, 899-901 (4th Cir. 1996); *Allen v. Woodford*, 395 F.3d 979, 1012-13 (9th Cir.), *cert denied*, 126 S. Ct. 134 (2005).[55]

--------------------

[55]*McCullah* and *Tipton* were capital prosecutions under the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e). That law identified as statutory aggravating factors each of the culpable mental states which, under the FDPA, make a defendant potentially death-eligible. In *McCullah*, as in Fell's case, the jury properly found that the defendant's conduct qualified under multiple culpable mental states. Under the ADAA, the jury was permitted to weigh multiple overlapping mental state aggravators in deciding whether aggravating factors sufficiently outweighed

211

Relying on the Supreme Court's first interpretation of the FDPA in *Jones v. United States*, 527 U.S. 373 (1999), however, the Fifth Circuit has bluntly rejected this double-counting analysis. *See United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004). As the unanimous court in *Robinson* put it,

> There is no legal basis for Robinson's claim that two of the aggravating factors specified by Congress were used in such a way as to be unconstitutionally duplicative. Although our caselaw once framed the issue in those terms, the Supreme Court recently admonished that it does not support that theory of review. *See Jones v. United States*, 527 U.S. 373, 398 (1999). Rejecting the idea that a similarity between two factors could make their combined use invalid, the Court explained that it had only held that "the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor." *Id.* (citing *Stringer v. Black*, 503 U.S. 222, 232 (1992)).

*Id.* at 292-93. *Robinson* went on to note that neither of the allegedly duplicative aggravating factors was invalid. *Id.* at 293.

Like *Robinson*, this Court should reject the double-counting theory of

---

mitigating factors so as to warrant a death sentence. Under the FDPA, in contrast, a jury finding that the government has proven one or more of the alleged culpable mental states merely makes the accused death eligible. In deciding whether a death sentence is justified, an FDPA jury weighs only the statutory and non-statutory aggravating factors, not the threshold mental culpability factors. Several Courts have recognized that the FDPA has eliminated the constitutional flaw identified in *McCullah v. Tipton. See, e.g., United States v. Beckford*, 968 F. Supp. 1080, 1086 (E.D. Va. 1997); *United States v. Nguyen*, 928 F. Supp. 1525, 1538-41)(D. Kan. 1996).

212

review. The submission of overlapping aggravating factors that are based on the same evidence does not skew the weighing process, particularly where, as here, the jury is instructed, in accordance with federal death penalty law, 18 U.S.C. § 3593(e), that the weighing task is not a mechanical tallying process. In *Jones*, the Supreme Court was presented with the double-counting theory adopted in *McCullah*, but chose to avoid consideration of the validity of the theory because "the factors as a whole were not duplicative." 527 U.S. at 399. Nevertheless, the Court went on to note that "any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a conclusion on which number is greater.'" *Id.*

The Supreme Court's recent decision in *Brown v. Sanders*, 126 S. Ct. 884 (2006), which Fell fails to acknowledge, further undermines his double-counting theory. Sanders had been sentenced to death after his jury found four "special circumstances" – any one of which made him death eligible. The California Supreme Court struck two of the special circumstances on state law grounds but nonetheless upheld Sanders' sentence. On habeas review, the Ninth Circuit invalidated the death sentence because it believed the jury's consideration of two invalid special circumstances skewed its deliberations in the direction of death.

213

The Supreme Court reversed the Ninth Circuit and reinstated Sanders' death sentence. The Court held that the submission of an invalid aggravating factor violates the Constitution by "adding an improper element to the aggravation scale in the weighing process" only when "the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id.* at 892. Applying that standard, the Court concluded that the jury's weighing of two invalid factors aggravating factors did not result in a constitutional error because "all of the facts and circumstances admissible to establish [the two invalid aggravators] were also properly adduced as aggravating facts bearing upon [one or more other, valid] sentencing factor." *Id.* at 894.[56]

*Sanders* forecloses Fell's double-counting claim. Even if this Court were to agree that there was overlap among the non-statutory aggravating factors submitted to Fell's jury, that would not have impermissibly skewed its deliberations. As in *Sanders*, all of the evidence the government introduced to establish its case in aggravation would have been admissible even if one or more of the allegedly duplicative non-statutory aggravating factors had been stricken.

---

[56] Although California is a weighing state (126 S. Ct. at 893) and the FDPA seems to establish a weighing scheme, the *Sanders* court constructed a single rule for assessing invalidated sentencing factors. *Id.* at 892.

214

FELL-00001728

Thus, the Court found no error not merely despite the submission of duplicative aggravating factors, but because one aggravating circumstance "necessarily subsume[d]" two others.

## C.    AGGRAVATING FACTORS IN THIS CASE

Even if this Court were to adopt the double-counting theory of review, it should reject Fell's claim that the three non-statutory aggravating factors were duplicative. The first non-statutory aggravating factor focused on Fell's motive for abducting Mrs. King: "Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder." The second factor addressed Fell's motive for killing Mrs. King: "Donald Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking." The third non-statutory aggravator concerned Fell's planning about the carjacking that led to Mrs. King's murder: "Donald Fell participated in the murder of King after substantial premeditation to commit the crime if carjacking." To be sure, these aggravators were factually interrelated, but each factor focused upon a different aspect of moral culpability. There was no real risk that the jury saw these as duplicate factors.

215

FELL-00001729

Prior to trial, the defense challenged the non-statutory aggravating factors, relying on this double-counting theory. The district court acknowledged the double-counting issue, but concluded that each non-statutory aggravating circumstance addressed a different fact. 372 F. Supp. 2d 753, 763-65, A at 99-111.

On appeal, Fell is not clear about whether he challenges the duplicity of the aggravating factors themselves, or whether his claim turns on what argument the government advanced to the jury in support of the non-statutory aggravating factors. To the extent that Fell is basing his challenge on the face of the allegations themselves, his claim is frivolous. No allegation subsumed another.

Rather, Fell places heavy reliance on the Ninth Circuit's analysis in *Allen v. Woodford*, 395 F.3d at 1012-13, that even where aggravating factors potentially address different facts, the trial court instructions and the prosecutor's arguments can force the jury to understand that the factors actually subsume each other. Fell has made no such showing here. To the contrary, the government's closing argument addressing the aggravating factors mirrored the precise terms of the written allegations, and the court's instructions did nothing to undercut the plain meaning of those allegations.

216

FELL-00001730

Fell acknowledges that the first factor addressed his motive in abducting Terry King, but then mistakenly claims that "the second addresses the same motive." Appellant's Brief at 185. This is wrong, as the prosecutor's closing argument demonstrates:

> So let's move on to the [second] nonstatutory aggravating factor. It reads, Donald Fell participated in the murder of Terry King to prevent her from reporting the kidnapping and carjacking to authorities. Again, absolutely no question about it. Alongside Route 22 in Dover, New York, Donald Fell made the decision to kill Terry King because she was a witness.

A at 468-69. The government clearly distinguished between the motive for the abduction and the motive for the murder of Mrs. King. The two events were separated by several hours in time and involved different moral calculations by the defendant. The government noted in its opening statement in the penalty phase that the two motives were related – Fell did not want to get caught – but that hardly means that the factors were duplicative. Fell unsuccessfully tries to transform two related facts into the same facts. None of the doubling-counting theory case law supports the notion that the jury's consideration of related, but logically distinct, aggravating factors unconstitutionally skews the balancing process.[57]

_____

[57] Fell mistakenly contends in a footnote that "[t]o the extent that the second nonstatutory aggravating factor retains any identity beyond the first onstatutory

217

Addressing the first and third factors, Fell claims that they are duplicative because they both "address[] the motive for the abduction." Appellant's Brief at 185. Again, this is just wrong. The first non-statutory aggravating factor focused on the *reason* for the abduction, while the third related to the *substantial planning* for the carjacking. Discussing the first factor in closing, the prosecutor noted that it addressed the reason for abducting Mrs. King "to facilitate his escape from the area." A at 467. In contrast, the prosecutor noted that the third factor focused on the amount of planning for the carjacking.

> You remember that they showered, they packed, they took the shotgun. What did they do with the shotgun, ladies and gentlemen?
>
> You remember the testimony of Anthony Mistretta. He was working in the Wal-Mart at the same plaza were the Price Chopper was. He told you that two young men came into the Wal-Mart that night, they had wet hair and dry clothes. Who was that, ladies and gentlemen? That was Donald Fell and Robert Lee. What did they do? They asked for shotgun shells for what you know, ladies and gentleman was the shotgun that they had. That, ladies and gentlemen, along with everything else you have heard, is substantial premeditation.
>
> . . .

---

aggravator, it is that Mrs. King was killed in the course of a kidnapping, which is subsumed in the (c)(1) statutory aggravator." Appellant's Brief at 185 n. 88. To the contrary, the jury properly considered the motive for killing Mrs. King as a separate aggravating circumstance from the simple fact that the killing took place during the commission of another offense, here kidnapping.

218

> They went to the Price Chopper, and they waited behind the Price Chopper, and what did they wait for?  They waited for the person that they wanted to kidnap, that they thought that they could.  They saw Mr. Trapasso.
>
> . . .
>
> One of them walked towards him.  They were thinking about doing what they did to Terry King to Mr. Trapasso.  But he was a man.  He had something in his hand that they thought they might get caught.  Again, more premeditation, ladies and gentlemen.  In fact, in this case, Donald Fell himself told you how careful they were in picking out Terry King as their perfect chance.

A at 469-71.  Granted, the reason for doing something can may bear some relationship to the amount of planning necessary to accomplish the task.  But the fact remains that the two concepts are different – one looks back on what happened before for the reason for a decision, and the other addresses the amount of effort needed to carry out what has been decided.  The jury properly could consider as independent reasons for imposing the death penalty the reason Fell abducted Mrs. King and the amount of planning he engaged in for the abduction.

The function of the non-statutory aggravating factors under the FDPA is to provide relevant information about the defendant to the capital sentencer – so that the sentencing decision is as nuanced and individualized as possible under the circumstances.  *See, e.g., United States v. Allen*, 247 F.3d 741, 757-58 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); *United States v. Frank*, 8

219

FELL-00001733

F. Supp. 2d 253, 267-70 (S.D.N.Y. 1998); *United States v. Kaczynski*, 1997 WL 716487 at \*5 (E.D. Cal., Nov. 7, 1987). Once the jury unanimously finds that at least one mental culpability factor and at least one statutory aggravating circumstance have been proven beyond reasonable doubt, the focus of the trial appropriately shifts to the task of providing the jury with all possible relevant evidence to assist it in tailoring its verdict to the individual defendant. The non-statutory aggravating factors submitted to Fell's jury each focused upon a different aspect of his moral culpability for the death of Terry King, and each was properly considered by that body as it strove to arrive at an "individualized" sentence. *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

D.    HARMLESS ERROR

To the extent the Court finds substantial overlap among the non-statutory aggravating factors, the Court should decline to vacate the sentence because any error was harmless beyond a reasonable doubt. The Fourth Circuit in *Tipton*, 90 F.3d at 899-900, found two potential ways that duplicate aggravators could prejudice a defendant:

> first, by causing the jury to assess the weight of the [duplicate] circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor . . . ; second, by allowing the jury to find a more morally culpable circumstance than was supported by the

220

sentencing information, including the guilt-phase evidence, that was before it.

*Id.* The *Tipton* court went on to examine the jury instructions and the evidentiary support for each of the duplicate aggravators. The court discounted any chance that the jury gave greater weight to these overlapping circumstances than it would have to the most severe. "We are bolstered in this conviction by the district court's careful instructions which emphasized both the impropriety of quantitative weighing of factors and the overlapping "lesser-included" relationship between the [duplicate] circumstances it allowed the jury to find." *Id.* at 900. Nor did the court find "any possibility" that the duplicate aggravators "permitted the finding of a higher degree of culpability that was supported by the evidence."

Similarly, here Judge Sessions carefully instructed the jury about the qualitative aspects of the weighing process.

> The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone if you find no mitigating factors, is by no means a mechanical process. In other words, you should not simply count the total number of aggravating and mitigating factors and reach a decision based on which number is greater; rather you should consider the weight and value of each factor. . . .

> The law contemplates that different factors may be given different weight or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors

221

FELL-00001735

proven, do not, standing along, justify the imposition of a sentence of death beyond a reasonable doubt.

A at 555-56. The jury here obviously exercised its duties diligently, as evidenced by its careful verdict. It is clear that any overlap did not taint the weighing process. Just as in *Jones*, 527 U.S. at 399-400, "any risk that the weighing process would be skewed was eliminated by the District Court's instruction."

Moreover, even if there was overlap among the non-statutory aggravators there were distinctions that allowed consideration of different circumstances the jury could legitimately consider. For example, it was appropriate for the jury to consider both the reason Fell abducted Mrs. King and the substantial planning for the carjacking. Even if these circumstances should have been included in one allegation, the government could argue and the jury could consider these distinct aspects of Fell's conduct in assessing the appropriate penalty. As in *Tipton*, there was no chance the allegations and the instructions permitted the jury to find a higher degree of culpability than was supported by the evidence. Any conceivable error was harmless beyond a reasonable doubt.

222

FELL-00001736

XI.    THE INDICTMENT DID NOT RUN AFOUL OF THE FIFTH
AMENDMENT BY FAILING TO ALLEGE THE NON-STATUTORY
AGGRAVATING FACTORS.

Fell attacks the sufficiency of the capital indictment, claiming the Fifth

Amendment's indictment clause prohibits a trial jury from considering non-

statutory aggravating factors that have not first been alleged by a grand jury. The

Court should reject this interpretation of the Indictment Clause.

Fell acknowledges that every federal appeals court to have addressed the

issue has rejected his argument. The courts of appeals have uniformly held that,

while an indictment under the FDPA must allege at least one statutory aggravating

factor, it need not allege any non-statutory aggravating factors. *See United States*

*v. Brown*, 441 F.3d at 1336; *United States v. Purkey*, 428 F.3d at 749-50; *United*

*States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005); *cert. denied,* 126 S. Ct.

2020 (2006); *United States v. Higgs*, 353 F.3d at 298-99. The rationale of these

decisions is that "a non-statutory aggravating factor is not one of those 'facts

legally essential to the punishment' that must be included within the indictment."

*Brown*, 441 F.3d at 1368. Put simply, the non-statutory aggravating factors are

not eligibility findings; rather, they are death-selection factors – circumstances the

jury can weigh in deciding the appropriate penalty.

223

FELL-00001737

Fell argues that, despite this uniform body of law, the courts of appeals have all got it wrong, as demonstrated by the Supreme Court's decision this term in *Cunningham v. California*, 127 S. Ct. 856 (2007). In *Cunningham*, the Court considered the constitutionality of California's determinate sentencing regime. That law prescribed three determinate sentences for a sexual assault conviction: 6 years, 12 years or 16 years. The Court considered whether the Sixth Amendment required a jury finding beyond reasonable doubt for facts that triggered eligibility for the 16 year sentence. The Court reviewed and relied on its line of cases addressing the jury-trial guarantee, from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), through *United States v. Booker*, 543 U.S. 220 (2005). Under these precedents, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by a defendant." 127 S. Ct. at 860. The California scheme violated this requirement. Based upon the jury's verdict, the statute obligated the judge to impose a 12-year term on Cunningham. The 16-year sentence actually meted out was based on additional facts found by the court, not the jury. The majority in *Cunningham* believed that *Apprendi-Booker* prohibited the sentencing judge making factual findings of her own to increase the sentence beyond the 12-year statutory

224

maximum authorized by the jury verdict.

Fell maintains "[t]he statutory scheme invalidated in *Cunningham* is indistinguishable from the FDPA fact-finding and weighing procedures". Appellant's Brief at 189. With respect, we believe this Court will have no great difficulty in concluding the FDPA differs in magnitudes from California's determinate sentencing law. Under the FDPA, the jury must make a series of determinations before an accused can be considered eligible for the death penalty. First, the jury must convict the defendant of a crime for which Congress has authorized imposition of the death penalty. Second, the jury must find the defendant committed the homicide with one or more of the requisite gatekeeping mental states. (It must also find the defendant was over 18 years old.) Third, the jury must find at least one statutory aggravating factor. Once these decisions are made, the jury has the power to impose the death penalty – the maximum sentence is then death. Of course, the federal scheme contemplates the jury weighing aggravating factors against mitigation factors. Moreover, federal law requires the jury to consider only those aggravating factors it found proven beyond reasonable doubt, but these aspects of federal law are not mandated by the jury-trial right developed in *Apprendi* and its progeny.

225

Fell's argument goes far beyond even the most extravagant reading of the Court's Sixth Amendment jurisprudence. If Fell's reading of precedent were correct, *any* fact that influences a sentencing decisionmaker's weighing of aggravating and mitigating facts – in other words, virtually every fact about every defendant facing sentencing in every courtroom around this country – would have to be alleged in the indictment (and found by a jury beyond a reasonable doubt). This simply is not the state of the law. The Supreme Court has repeatedly limited its jury-right holdings to facts which increase the statutory maximum sentence an accused faces, and those decisions are not applicable to facts that might be relevant to the appropriate sentence within the maximum range.

Indeed, the Supreme Court has never held that the Constitution requires a jury, as opposed to a judge, to perform the balancing in a death penalty case.

> What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring v. Arizona*, 536 U.S. at 612 (Scalia, J., concurring).

226

*Cunningham* does nothing other than define the statutory maximum under California law. Because Fell has not – and cannot – show that the non-statutory aggravating factors increased the statutory maximum sentence he faced, his Fifth Amendment objection fails.

Even if it were constitutional error to omit the non-statutory aggravating factors from Fell's indictment, however, such error would be harmless beyond a reasonable doubt here. Fell had written notice of the non-statutory aggravating factors. The jury here found each of the four non-statutory aggravators had been proven beyond reasonable doubt. The evidence overwhelmingly showed there existed probable cause to charge Fell with these aggravating factors. As alternative holdings, other courts have found harmless any putative error in an indictment's failure to allege aggravating factors. *See Brown*, 441 F.3d at 1368 (non-statutory aggravating factors not alleged in indictment); *United States v. Allen*, 406 F.3d 940, 945 (8th Cir. 2005)(en banc), *cert. denied*, 127 S. Ct. 826 (2006)(statutory aggravating factors not alleged in indictment): *United States v. Robinson*, 367 F.3d at 288-89 (same).

227

FELL-00001741

XII.    THE FEDERAL DEATH PENALTY ACT IS NOT UNCONSTI-
        TUTIONAL BECAUSE IT ALLOWS THE PROSECUTION TO
        INTRODUCE, DURING THE PUNISHMENT HEARING, EVIDENCE
        THAT IS RELEVANT TO AGGRAVATING FACTORS BUT WHICH
        MAY BE IRRELEVANT TO DEATH ELIGIBILITY.

Fell's final challenge to his death sentence is almost his shortest; certainly,

it enjoys the least support in existing caselaw.  He argues that despite the

bifurcated guilt/sentencing procedure Congress crafted in enacting the FDPA, the

statute nonetheless violates his Fifth and Sixth Amendment rights because it

permits the prosecution to introduce potentially prejudicial aggravating evidence

that may be irrelevant to the jury's threshold task of determining whether a

defendant is death-eligible.  As Fell himself acknowledges, no court seems to have

addressed this novel issue.

Fell's two-stage trial conformed to the format prescribed by the FDPA.  The

first or guilt phase called upon the jury to find whether Fell was guilty of

kidnapping and/or carjacking, the two charged crimes for which Congress has

authorized a sentence of death.  Following its return of guilty verdicts, the jury

turned to the question of punishment.

During this penalty phase trial, the jury first had to decide whether the

government had proven beyond reasonable doubt that Fell was eligible for the

228

death penalty (*i.e.*, that he was 18 years old at the time of the killings; that he possessed one or more of the requisite culpable mental states; and the existence of at least one statutory aggravating factor). Once the jury unanimously agreed that Fell was death-eligible, it proceeded to the ultimate deliberation about whether all aggravating factors sufficiently outweighed all mitigators so as to justify a death sentence. Fell maintains that his right to due process and a jury trial were abridged because the FDPA permits the jury to hear aggravating evidence (most particularly victim impact testimony) – which may be irrelevant to the death-eligibility determination – before the jury actually decides whether the threshold eligibility factors have been proven. This cart-before-the-horse order of proof, in Fell's estimation, undermines the presumption that a defendant is innocent of a capital crime until he is proven guilty by relevant evidence.

In the earlier appeal in this case, this Court roundly rejected the claim that the FDPA ran afoul of the Constitution because it authorized use of a relaxed evidentiary standard during the penalty trial. *United States v. Fell*, 360 F.3d at 143-46. Two other courts of appeals have reached the same conclusion. *See United States v. Fulks*, 454 F.3d at 438; *United States v. Lee*, 374 F.3d at 648. Although Fell is right that none of these cases directly addressed the claim he now advances, it is equally clear that none seemed to perceive the constitutional flaw

229

FELL-00001743

he now discerns. *See e.g.*, *Fell*, 360 F.3d at 140-41; 143-45 (discussing bifurcated trial requirement and relaxed evidentiary standard).

Because Fell apparently has found no cases which squarely (or even obliquely) buttress his constitutional argument, he has crafted it out of whole cloth – and first principles. Citing scarcely more authority than Justice Scalia's concurring opinion in *Ring v. Arizona* – the case in which the Court construed the Sixth Amendment as requiring a jury to find proven beyond reasonable doubt all facts that make a defendant eligible for the death penalty – Fell argues the Constitution requires a death penalty scheme that bifurcates not just the guilt determination on the underlying offense from the remaining penalty issues, but which separates the hearing on all death eligibility factors from the trial on other issues (non-statutory aggravating factors and mitigation).

*Ring* does not sweep this far, nor does any other precedent. *Ring*, like every *Apprendi* decision, addresses when the jury is required to make certain findings beyond a reasonable doubt. There, the Court held that Arizona law impermissibly allowed a judge to make a finding critical to eligibility for the death penalty. The Court's holding does not even attempt to prescribe the trial process.

230

FELL-00001744

Apart from the dearth of authority it enjoys, Fell's argument conflicts with the logic of this Court's decision in his earlier appeal. This Court recognized that a defendant has no right to have the government's proof concerning eligibility factors limited by the Federal Rules of Evidence. Congress has the power to decree that the jury shall consider these eligibility factors under the same evidentiary standards as applies to other relevant sentencing facts. By extension, Congress should have the power to order the jury to consider these facts during one unitary proceeding. Just as a defendant is not protected by the Federal Rules of Evidence with regard to eligibility factors, he should not be protected from the jury hearing, in a single proceeding, all evidence relevant to the question of punishment.

Fell's argument is rooted in a presumption that a jury cannot make findings based on relevant evidence. For example, the Fell jury heard testimony in the penalty phase relating to the "heinous, cruel, or depraved" statutory aggravating factor, and also heard mitigating evidence about his difficult childhood. Fell assumes that, in their minds, jurors could not separate the evidence bearing upon one factor from evidence relevant only to another. This assumption runs contrary to the Supreme Court's belief that, even in federal death penalty trials, juries are presumed to follow the court's instructions. *See Jones v. United States*, 527 U.S.

231

at 394.

As this case illustrates, the evidence relating to the eligibility factors is often easily distinguished from the death-selection proof. At Fell's trial, there was no real dispute about what happened during the murders of Terry King, Debra Fell and Charles Conway. The gatekeeping intent facts were easily established; indeed, they were admitted by Fell in his multiple confessions. Of the three statutory aggravating factors, two were undisputed, and the third (the heinous, cruel or depraved allegation) focused on the physical abuse inflicted upon Mrs. King, the medical and forensic proof of which was overwhelming. The jury could easily separate the distinct evidence relating to other aggravating factors and the mitigating factors. Moreover, in light of the uncontested nature of the evidence respecting the eligibility factors, Fell cannot seriously argue that death-selection evidence – victim impact testimony, for example – created any risk that the jury's consideration of the eligibility factors was tainted.

Finally, Fell complains about the absence of a procedure he failed to request. Some district courts have allowed the bifurcation of the penalty phase to address the concerns Fell points to here. *See, e.g., United States v. Henderson,* 2007 WL 1321722 * 37 (S.D. Ohio, May 4, 2007). The FDPA provides district courts with the flexibility to conduct sentencing hearings with procedures deemed

232

fair based on individual circumstances. Fell did not seek such an accommodation here – probably because it made little sense. His complaint about the rigidity of the FDPA should be rejected.

XIII. CONCLUSION.

The judgment of the district court should be affirmed.

Respectfully submitted,
THOMAS D. ANDERSON
United States Attorney

WILLIAM B. DARROW
GREGORY L. WAPLES
PAUL J. VAN DE GRAAF
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570

THOMAS BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530

233

FELL-00001747

## <u>VIRUS PROTECTION CERTIFICATE</u>

This .pdf file has been scanned for potential viruses using Trend Micro

Office Scan. United States Attorney's Office documents are scanned as written to

disk by Trend Micro Office Scan. When transmitted outside of the Department of

Justice, attachments are scanned by Trend Micro Virus Wall.

Dated at Burlington, in the District of Vermont, this 25th day of May, 2007.

Respectfully submitted,

UNITED STATES OF AMERICA

THOMAS D. ANDERSON
United States Attorney

WILLIAM B. DARROW
Assistant U.S. Attorney
P.O. Box 570
Burlington VT 05402-0570

FELL-00001748

These principles also apply in a capital case. *Dawson,* 503 U.S. at 163-68. In *Barclay,* the defendant's racist views showed his motive to murder a victim of a different race, and was thus relevant to the statutory aggravating factors that the crime posed a "great risk of death to many persons" and was "especially cruel, atrocious, and heinous." 463 U.S. at 949-50 & n.7. *See also Fuller v. Johnson,* 114 F.3d 491, 497-98 (5th Cir. 1997) (future dangerousness); *O'Neal v. Delo,* 44 F.3d 655, 661 (8th Cir. 1995) (motive). On the other hand, in *Dawson,* evidence of the defendant's membership in a racist prison gang was deemed not relevant because his crime was unrelated to race, the government did not link his beliefs to his future dangerousness and, under the circumstances, did not rebut his mitigation evidence. 503 U.S. at 164-68.

A defendant who charges that the government infringed on his religious beliefs has the threshold burden of showing those beliefs are sincerely held and are, in fact, religious in nature. *See, e.g., Ford v. McGinnis,* 352 F.3d 582, 588-89 (2d Cir. 2003); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir. 1999); *Searles v. Dechant,* 393 F.3d 1126, 1131 (10th Cir. 2004); *Goff v. Graves,* 362 F.3d 543, 547 (8th Cir. 2004). The sincerity requirement serves to distinguish a belief rooted in the individual's conscience from a belief motivated by fraud and deceit. *Ford,* 352 F.3d at 588; *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984).

167

FELL-00001749

(1)    Fell's Interest In Satanism Was Properly Admitted To Show
       Motive

Fell's motive was an issue in the case. He participated in three savage and

gratuitous killings. His brutal slaying of King was incomprehensible. The

"multiple killings" and the "heinous, cruel and depraved manner" statutory

aggravators made Fell's motive relevant to sentencing. *See Barclay*, 463 U.S. at

949-50. At the time of the killings, Fell had Satanic images on his body and on his

clothes -- he had an "anarchy" tattoo on one arm and an inverted cross and "666"

tattoo on the other; he also wore a "SLAYER" T-shirt with a large demonic image.

The number "666" refers to the "mark of the beast" in the New Testament, Book

of Revelation, 13:17-18, and is often a symbol of the Antichrist. *See United States

v. Gordon*, 974 F.2d 1110, 1114 (9th Cir. 1992). "Slayer" is a heavy metal band.

*See* www.myspace.com/slayer and www.slayerized.com. (last visited May 2,

2007). The heavy metal music culture trades in violent and Satanic imagery. *See,

e.g., People v. Williams*, 148 P. 3d 47, 60-61 (Cal. 2006); *State v. Bennett*, 81 P. 3d

1, 4-5 (Nev. 2003); *State v. Crumb*, 704 A.2d 952, 965 (N.J. Super. 1997) An

expert has observed that a Satanist believes he can "murder, rape or rob at will

without regard for the moral or legal consequences" and that "life should be lived

according to individual desires without regard for conscience." *See McCorkle v.*

168

FELL-00001750

*Johnson*, 881 F.2d 993, 995 (11th Cir. 1989).

The government permissibly presented evidence that Fell's interest in Satanism began when he was 15 or 16 years old to show that he had developed a deep and longstanding hatred toward society's mores and values – an attitude that helped explain the savagery of his killings. Fell's attitude was visible during the killings: he wore a demonic image on his "SLAYER" T-shirt and a satanic tattoo on his arm. Fell did not dispute that he had a longterm interest in Satanism. Indeed, he specifically linked the tattoos with his teenage interest in heavy metal music. The evidence that Fell's interest in Satanism corresponded to the development of his deep hostility toward the world was hardly surprising in light of mitigation evidence portraying him as the victim of a severely dysfunctional childhood and upbringing.[45]

---

[45] Fell's reliance (Appellant's Brief at 135) on *Dawson* is misplaced for two reasons. First, in *Dawson*, the government could not link the defendant's racists beliefs to the murder because the defendant and the victim were of the same race. 503 U.S. at 166. Here, in direct contrast, Fell's obsessive interest in Satanism was vividly displayed on his body and his clothes during the crime. Second, *Dawson* preserved his claim for review. Fell did not; indeed, Fell himself sought to demonstrate to the jury that his infatuation with Satanism and heavy metal music was longstanding.

169

FELL-00001751

# EXHIBIT 141

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

| | | |
|---|---|---|
| Albany - Main Office | Syracuse - Branch Office | Burlington - Branch Office |
| 39 North Pearl Street | 4 Clinton Exchange | P.O. Box 1112 |
| 5TH FLOOR | 3RD FLOOR | BURLINGTON, VT 05402-1112 |
| ALBANY, NY 12207 | SYRACUSE, NY 13202 | (802)862-6990 |
| (518) 436-1850 | (315) 701-0080 | (802)862-7836 FAX |
| (518) 436-1780 FAX | (315) 701-0081 FAX | |

Respond to Albany Office

April 21, 2005

Attn:   Records Department
Victims Resource Center
85 S. Main Street
Wilkes Barre, PA 18701

Re: records request

Dear Records Officer:

The Federal Public Defender Office is representing Mr. Donald Fell in a pending Federal criminal case.   The Office of the Federal Public Defender requests any and all records of Mr.   Fell, including but not limited to: notes; evaluations; counseling; in-patient and out-patient records; psychological reports; psychiatric reports, emergency room intake sheets, x-ray results, doctor's notes, nurse's notes, intake sheets and discharge sheets.

Enclosed you will find an Authorization for Release of Information signed by Mr. Fell, authorizing the Federal Defender Office access to these records.   Since we are Federal agency we can not pre-pay *any* bills for record requests.   If you could please forward a bill with the records a check will be sent quickly and promptly.   If you have any questions, please do not hesitate in calling our office at the above referenced number.   I thank you for your time and consideration in this matter and I eagerly await your reply.

Sincerely,


Wanda I. Rivera
Investigator

FELL-00001752

# EXHIBIT 142





www.vrcnepa.org

1.866.206.9050 Hotline

570.823.0766 Office
570.823.9115 Fax
support@vrcnepa.org Email

85 South Main Street
Wilkes-Barre, PA 18701
570.823.0765 Hotline

119 Warren Street
Tunkhannock, PA 18657
570.836.5544 Hotline

616 North Street
Jim Thorpe, PA 18229
570.325.9641 Hotline

May 4, 2005

Andrew Bartnick, Investigator
Office of the Federal Public Defender
110 Cherry Street, 2nd Floor
Burlington, Vermont 05401

Re: Donald Fell

Dear Mr. Bartnick

As per your request and with Mr. Fell's permission to release his records while he was a client at Victims Resource Center, the copy of Mr. Fell's records are enclosed.

If I can be of any further assistance, please do not hesitate to call or write.

Sincerely,

Tammi Burke
Counselor/Advocate
Supervisor Client Services

M1455

FELL-00001753

# EXHIBIT 143

H511.341   REV 3-79
(H 1R 320.6)

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF HEALTH
DIVISION OF SCHOOL HEALTH

## SCHOOL HEALTH RECORD

| NAME   LAST, FIRST, MIDDLE | BIRTH DATE  MONTH, DAY, YEAR | SEX: |
|---|---|---|
| *Fell, Donald Robert II* | 4-30-80 | ☑ MALE   ☐ FEMALE |

| HOME ADDRESS   REDACTED - FELL | HOME ADDRESS |
| HOME ADDRESS | HOME ADDRESS |

| | SCHOOL | DISTRICT | COUNTY |
|---|---|---|---|
| 1. | *Schuylervane* | *Wyoming Valley West* | *Luzerne* |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

| SCH.YR. | 85/86 86/87 | | | | | | | | | | | | | |
| GRADE | K 1 | | | | | | | | | | | | | |
| ROOM OR SECTION | | | | | | | | | | | | | | |

SPECIAL HEALTH PROBLEMS

FATHER'S NAME   LAST, FIRST, MIDDLE
*Fell, Donald R.*

MOTHER'S NAME   LAST, FIRST, MAIDEN
*Fell, Debbie Katien*

PERSON WITH WHOM PUPIL LIVES (IF OTHER THAN PARENT)

### IMMUNIZATIONS AND TESTS

| | DATE INITIAL SERIES COMPLETED | BOOSTERS AND DATES | | |
|---|---|---|---|---|
| DIPHTHERIA | 7/11/80 | 12/8/81 9/17/84 | | |
| TETANUS | 10/3/4/80 | | | |
| PERTUSSIS | | | | |

POLIO  1/4/80, 2/20/81, 4/28/81, 4/30/82

MEASLES VACCINE – TYPE _____  DATE 8/28/81  OR HAD MEASLES  YEAR _____
GERMAN MEASLES VACCINE   DATE 8/28/81   MUMPS VACCINE   DATE 8/28/81

| | DATE | RESULT | DATE | RESULT | DATE | RESULT |
|---|---|---|---|---|---|---|
| TUBERCULIN TESTS | 10-27-83 | neg. | 8-16-85 | neg. | 10-28-86 | neg. |
| CHEST X-RAYS | | | | | | |

HOME AND FAMILY CONDITIONS, FAMILY MEDICAL HISTORY, PARENT CONCERNS:

CONFIDENTIAL INFORMATION ON FILE AT:

PAGE 2

EXAMINATION I. GIVE SIGNIFICANT DETAILS OF CHILD'S MEDICAL HISTORY INCLUDING SERIOUS ILLNESS, CHILDHOOD DISEASES, OPERATIONS, ACCIDENTS, HANDICAPPING CONDITIONS (CONGENITAL OR ACQUIRED), ETC. NOTE SIGNIFICANT FACTORS RE SCHOOL ADJUSTMENT GROUP PLAY, PHYSICAL, SOCIAL, OR EMOTIONAL ABNORMALITY

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | 8/28/85 | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

DID PARENTS ATTEND  YES ☐  NO ☐

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

Physical by private doctor - negative

_____ SIGNATURE OF EXAMINER _____

EXAMINATION II.  INTERVAL HISTORY·  SUMMARIZE MEDICAL HISTORY AND NOTE SCHOOL PROGRESS, INTEREST IN GROUP AND EXTRA-CURRICULAR ACTIVITIES, GROUP GROWTH AND DEVELOPMENT.

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

_____ SIGNATURE OF EXAMINER _____

EXAMINATION III.  INTERVAL HISTORY·  SUMMARIZE MEDICAL HISTORY, NOTE SCHOOL PROGRESS, INTEREST IN GROUP AND EXTRA-CURRICULAR ACTIVITIES, STAGE OF ADOLESCENT GROWTH AND DEVELOPMENT

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

_____ SIGNATURE OF EXAMINER _____

PAGE 3

**PROGRESS NOTES**

NOTES: INCLUDE CONFERENCES WITH TEACHER, ADMINISTRATOR, PARENT, AGENCY, PERSONNEL, FAMILY PHYSICIAN, DENTIST AND OTHERS. INCLUDE REPORTS OF SPECIAL EXAMINATIONS.

| DATE | | NAME |
|---|---|---|
| | | |

FELL-00001755

PAGE 4

**VISION SCREENING**

Fell, Donald

| DATE OF EXAM. | SNELLEN | | WITH PLUS LENS | | OTHER DISORDER | REPORT OF EYE EXAMINER | CORRECTED VISION | |
|---|---|---|---|---|---|---|---|---|
| | Visual Acuity | | P | F | | | Right | Left |
| | Right | Left | | | | | | |
| 8/5/86 | 30 | 30 | | | | | | |
| 8/6/87 | 30 | 30 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**HEARING SCREENING**

PASS – INDICATE SCREENING LEVEL IN DB FOR EACH FREQUENCY
FAIL – INDICATE THRESHOLD LEVEL IN DB FOR EACH FREQUENCY

| DATE OF EXAM. | GRADE | TESTER | RIGHT EAR | | | | | | LEFT EAR | | | | | | Pass (P) Or Fail (F) | Wearing Hearing Aid | Date Report Received From Ear Examiner |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 250 | 500 | 1000 | 2000 | 4000 | 8000 | 250 | 500 | 1000 | 2000 | 4000 | 8000 | | | |
| 8/5/86 | K | ASE | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | P | | |
| 8/6/87 | 1 | TBS | 25 | → | | | | | 25 | → | | | | | P | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

**ANNUAL HEIGHT AND WEIGHT**

| | K | 1 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | 8/5/86 | 8/6/87 | | | | | | | | | | |
| HEIGHT | 44½ | 45½ | | | | | | | | | | |
| WEIGHT | 43 | 48 | | | | | | | | | | |

FELL-00001756

# EXHIBIT 144

# INTENTIONALLY LEFT BLANK

FELL-00001757 - FELL00001790

# EXHIBIT 145

FELL, DONALD
[illegible] 75499 383700
[illegible] 93 [illegible] 13Y [illegible]
824-5942
REDACTED - FELL
WILKES BARRE PA M S
COO

**WILKES-BARRE GENERAL HOSPITAL**

**PROGRESS RECORD**

02
2 [illegible]
3 [illegible]
9:21C

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerperal please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Vomiting etc.)

| DATE | |
|---|---|
| | Admission ~~Psychiatric~~ |
| 6/7/93 | 13 y/o S w ♂ [illegible] 201, [illegible] (m) for Truant |
| | behavior, depression & symptoms of ADHD. |
| | cc "I'm here because she (m) don't want me around" |
| | HPI This is the 4th psych admission (3rd WBGH) |
| | 1st at FHWV (1991) for depression, Truancy, |
| | & S&S of ADHD. Pt states [illegible] has stopped |
| | meds x 3-5 days Mellaril 15 mg/day "[illegible] |
| | [illegible]". Has been not taking care of self c̄ poor |
| | hygiene, [illegible] [illegible], [illegible] the [illegible] |
| | [illegible] [illegible] [illegible] "[illegible] 1 day [illegible]" |
| | OPD Pt sees [illegible] & Dr [illegible] at [illegible] SC. Pt |
| | [illegible] (m) of ETOH [illegible] [illegible] |
| | No current med prob or allergies. [illegible] [illegible] |
| | [illegible] "no problem" but [illegible] [illegible] |
| | Has [illegible] [illegible] [illegible], [illegible] [illegible] |
| | [illegible] [illegible] in hand c̄ gun, [illegible] property at |
| | home & school. |
| | MSE Pt is quiet, almost non verbal, appears |
| | depressed, tearful, blames (m) for admission, [illegible], |
| | [illegible] c̄ ↓ concentration & distractible, H/o severe |
| | impulsivity & [illegible] [illegible]. Denies [illegible] psychotic |
| | symptoms. O x 4 Memory intact, [illegible] judgment [illegible] |
| | very poor, impulse controls very poor. Pt denies all problems |
| | including ETOH, & THC use. Denies [illegible] [illegible] to |
| | self or others at present. [illegible] alone in his [illegible] room. [illegible] |
| | Dx: I Depression D. NOS, ADHD II Borderline [illegible] conduct III [illegible] |
| | Rx. [illegible] Adol. Psych Unit, [illegible], Individual, |
| | group [illegible] [illegible] [illegible] [illegible] meds. |
| | Pt [illegible] "[illegible]" PRN [illegible] / [illegible] & meds |
| | for [illegible] of [illegible] self. [illegible] [illegible] [illegible] |
| | Med/Ped clearance. [illegible] med [illegible] |
| | (dictated [illegible] 6/7/93) [signature] |

FELL-00001791

FELL, DORALD

REDACTED - FELL

WILKES BARRE
000

PA M S

383700
13Y  011380
324-5842

**WILKES-BARRE GENERAL HOSPITAL**

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Postpartum please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed,
Postpartum, Vital Pile)

| DATE | |
|------|---|
| 6/8/93 | *[handwritten clinical notes, largely illegible]* |
| 6/9/93 | *[handwritten clinical notes, largely illegible]* |

FELL-00001792

FELL, DONALD
3875499
383700
13Y 043080
824-5842
PA M S

REDACTED - FELL

WILKES-BARRE
CCO

WILKES-BARRE GENERAL HOSPITAL

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, hemorrhoids, Temperature etc.)

| DATE | |
|---|---|
| 6/10/73 | *[handwritten clinical notes — largely illegible]* |
| 6/11/73 | *[handwritten clinical notes — largely illegible]* |
| 6/12 | *[handwritten clinical notes — largely illegible]* |

FELL-00001793

FELL, DONALD
7975499
C:CF93 0936F   13Y   383700   043080
H SSNER. JI            824-5842
REDACTED - FELL
WILKES BARRE
COO                   PA M S

**WILKES-BARRE GENERAL HOSPITAL**

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Typhoid, etc.)

| DATE | |
|---|---|
| 6/13 | on level 5, was needed & first restraints yesterday — hostile, cursing, punched wall etc. wants to work on pass today. _[illegible signature]_ |
| 6/19/93 | Pt calmer, still fights, with poor impulse control, little insight, poor judgement, no real effects from meds. Much more reasonable & in control several admission. Cooperative but unwilling or unable to talk about personal issues. _[illegible signature]_ |
| 6/15/93 | We _[illegible]_ used to until 24hr after _[illegible]_. _[illegible]_ to 10pm _[illegible]_ PID with _[illegible]_ _[illegible]_. Him _[illegible]_ on the _[illegible]_ 2 show or no effect. Disposition _[illegible]_ _[illegible]_. St _[illegible]_ _[illegible]_ _[illegible]_ _[illegible]_ _[illegible signature]_ |

FELL-00001794

FELL. DONALD
3H75499                383700
C'0693 0936P    13Y  043080
FROSSNER. JA          824-5842
REDACTED - FELL
WILKES BARRE    ·    PA M S
OCU

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tumors etc.)

| DATE | |
|------|--|
| 6/16/9 3 | *[handwritten clinical notes — illegible]* |
| 6/17/9 2 | *[handwritten clinical notes — illegible]* |
| 6/18/9 - | *[handwritten clinical notes — illegible]* |

FELL-00001795

FELL, DONALD
3A754419          383700
GA069 0936P   13Y  043080
FEUSSIER JA        824-5842     WILKES-BARRE GENERAL HOSPITAL

REDACTED - FELL

WILKES BARRE           PA N S
000

## PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tonsils etc.)

| DATE | |
|---|---|
| 6/19/93 | had the family meeting yesterday after the meeting acted very angry & cursing |
| 6/20/93 | got in to the physical event. Further patient was place in the full restraint yesterday. Today, he is very calm |
| 6/21/93 | Pt remarkably calm on Mebau, no side effects except for some mild muscle fasciculations (in forearm). Pt does not E B or TD. Concentration & immediate recall, mood. Euthymic with thought appropriate to mood. Sleepy. Well. Frustration tolerance still very poor, easily triggered by perseveration. |

FELL-00000001796

FELL, DONALD
1975439
ICOS6603 C936P    383700
FESSNER, JA    13Y  043080
REDACTED - FELL    824-5842
WILKES BARRE
000
PA H S

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please enter: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Vaginal Skin)

| DATE | |
|------|--|
| 6/21/93 | *[handwritten notes, illegible]* |
| | *[handwritten notes, illegible]* |
| 6/23/93 | *[handwritten notes, illegible]* |
| 6/24/93 | *[handwritten notes, illegible]* |
| 6/25/93 | *[handwritten notes, illegible]* |

FELL-00001797

WILKES-BARRE GENERAL HOSPITAL

FELL, DONALD
**3075499**
**383700**
**(10693 0936P    13Y    043080**
**FRUSSNER, JA    824-5842**
REDACTED - FELL
**WILKES BARRE**    **PA M S**
COO.

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed,
Temperature, Pulse, etc.)

| DATE | |
|------|---|
| | *(handwritten clinical notes — illegible)* |

FELL-00001798

FELL, DONALD
7479499                    383760
( 0493 0936P   13Y  043080
RESSNER JA          824-5842
REDACTED - FELL
WILKES BARRE          PA M S
000

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tumors etc.)

| DATE | |
|------|---|
| 6/29/73 | *[handwritten progress notes — largely illegible]* |
| | Discharge Note |
| 6/30/73 | *[handwritten discharge note — largely illegible]* |

FELL-00001799

FELL, DONALD
3875499                  363700
CC0693 0936P      3Y   043080
FEUSSNER  JA          824-5842

REDACTED - FELL

WILKES BARRE          PA M S

000

**WILKES-BARRE GENERAL HOSPITAL**

*PROGRESS RECORD*

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tonsils etc.)

| DATE | |
|------|--|
|      |  |

FELL-00001800