Manuel provided the prescriptions.

The same prosecutors accused **Alexanderian** of earning $2,000 to $4,000 per day by providing painkillers and anxiety drugs to many drug-addicted patients, who had no legitimate need for the medications. In each case, **Alexanderian** provided only minimal medical care for the patients and made no effort to determine if the medical complaints were legitimate.

A jury convicted Manuel and Luzerne County Court of Common Pleas Judge Peter Paul Olszewski Jr. sentenced him to five to 10 years in prison, including the 3- to 6-year mandatory sentence.

**Alexanderian** pleaded guilty and was sentenced Wednesday by Senior Judge Gifford Cappellini to two years probation with the first six months on house arrest.

Albright wanted **Alexanderian** to go to jail, but she had no option to ask for the mandatory sentence, even though she wanted to.

"We couldn't because it depends on the type of drug," Albright said. "If I had it I would."

**Memo:** David Weiss, a Times Leader staff writer, may be reached at 831-7397.

---

*Edition: MAIN*
*Section: NEWS*
*Page: 1A*
*Record Number: 0507220082*
*Copyright (c) 2005 The Times Leader*

To bookmark this article, right-click on the link below, and copy the link location:
DRUG CLASS FACTORS INTO SENTENCING/ EXCLUSIVE DEPUTY ATTORNEY GENERAL SAYS HOW ADDICTIVE SUBSTANCE PLAYS ROLE IN FIGURING PUNISHMENTS.

**Back To Results**    ◀ Previous  **Article 16 of 36**  Next ▶

**Quick Links**
▸ Find articles by DAVID WEISS dweiss@leader.net
▸ Find more articles from page 1A
▸ Find more from section "NEWS"
▸ Find all articles from July 22, 2005

FELL-00002315

# EXHIBIT 233

*Law and Human Behavior*, Vol. 15, No. 6, 1991

# Specialty Guidelines for Forensic Psychologists'

## Committee on Ethical Guidelines for Forensic Psychologists[2]

*The Specialty Guidelines for Forensic Psychologists,* while informed by the *Ethical Principles of Psychologists* (APA, 1990) and meant to be consistent with them, are designed to provide more specific guidance to forensic psychologists in monitoring their professional conduct when acting in assistance to courts, parties to legal proceedings, correctional and forensic mental health facilities, and legislative agencies. The primary goal of the Guidelines is to improve the quality of forensic psychological services offered to individual clients and the legal system and thereby to enhance forensic psychology as a discipline and profession. The *Specialty Guidelines* for *Forensic Psychologists* represent a joint statement of the American Psychology-Law Society and Division 41 of the American Psycholog-

---

[1] The *Specialty Guidelines* for *Forensic Psychologists were* **adopted by** majority vote of the members of Division 41 and the American Psychology-Law Society. They have also been endorsed by majority vote by the American Academy of Forensic Psychology. The Executive Committee of Division 41 and the American Psychology Law Society formally approved these *Guidelines on March 9, 1991.* The Executive Committee also voted to continue the Committee on Ethical Guidelines in order to disseminate the *Guidelines* and to monitor their implementation and suggestions for revision. Individuats wishing to reprint these *Guidelines* or who have queries about them should contact either Stephen L. Golding, Ph.D., Department of Psychology, University of Utah, Salt Lake City, **UT** *84* 112, 80 1-58 1-8028 (voice) **or** 80 1-58 1-5841 (FAX) or other members of the Committee listed below. Reprint requests should be sent to Cathy Oslzly, Department of Psychology, University of Nebraska-Lincoln, Lincoln, NE 68588-0308.

[2] These Guidelines were prepared and principally authored by a joint Committee on Ethical Guidelines of Division *41* and the American Academy of Forensic-Psychology (Stephen L. Golding, [Chair], Thomas Grisso, David Shapiro, and Herbert Weissman [Co-chairs]). Other members of the Committee included Robert Fein, Kirk Heiibrun, Judith McKenna, Norman Poythress, and Daniel Schuman. Their hard work and willingness to tackle difficult conceptual and pragmatic issues is gratefully acknowledged. The Committee would also like to acknowledge specifically the assistance and guidance provided by Dort Bigg, Larry Cowan, Eric Harris, Arthur Lemer, Michael Miller, Russell Newman, Melvin Rudov, and Ray Fowler. Many other individuals also contributed by their thoughtful critique and suggestions for improvement of earlier drafts which were widely circulated.

0147-7307/91/1200-0655$06.50/0 © 1991 Plenum Publishing Corporation

FELL-00002316

ical Association and are endorsed by the American Academy of Forensic Psychology. The *Guidelines* do not represent an official statement of the American Psychological Association.

The Guidelines provide an aspirational model of desirable professional practice by psychologists, within any subdiscipline of psychology (e.g., clinical, developmental, social, experimental), when they are engaged regularly as experts and represent themselves as such, in an activity primarily intended to provide professional psychological expertise to the judicial system. This would include, for example, clinical forensic examiners; psychologists employed by correctional or forensic mental health systems; researchers who offer direct testimony about the relevance of scientific data to a psycholegal issue; trial behavior consultants; psychologists engaged in preparation of *amicus* briefs; or psychologists, appearing as forensic experts, who consult with, or testify before, judicial, legislative, or administrative agencies acting in an adjudicative capacity. Individuals who provide only occasional service to the legal system and who do so without representing themselves as *forensic experts* may find these *Guidelines* helpful, particularly in conjunction with consultation with colleagues who are forensic experts.

While the *Guidelines* are concerned with a model of desirable professional practice, to the extent that they may be construed as being applicable to the advertisement of services or the solicitation of clients, they are intended to prevent false or deceptive advertisement or solicitation, and should be construed in a manner consistent with that intent.

## I.    PURPOSE AND SCOPE

### A. Purpose

1. While the professional standards for the ethical practice of psychology, as a general discipline, are addressed in the American Psychological Association's *Ethical Principles of Psychologists,* these ethical principles do not relate, in sufficient detail, to current aspirations of desirable professional conduct for forensic psychologists. By design, none of the *Guidelines* contradicts any of the *Ethical Principles of Psychologists;* rather, they amplify those *Principles* in the context of the practice of forensic psychology, as herein defined.

2. The *Guidelines* have been designed to be national in scope and are intended to conform with state and Federal law. In situations where the forensic psychologist believes that the requirements of law are in conflict with the *Guidelines,* attempts to resolve the conflict should be made in accordance with the procedures set forth in these *Guidelines* [IV(G)] and in the *Ethical Principles of Psychologists.*

### B. Scope

1. The *Guidelines* specify the nature of desirable professional practice by forensic psychologists, within any subdiscipline of psychology

FELL-00002317

(e.g., clinical, developmental, social, experimental), **when engaged regularly** as forensic psychologists.

   a. "Psychologist" means any individual whose professional activities are defined by the American Psychological Association or by regulation of title by state registration or licensure, as the practice of psychology.

   b. "Forensic psychology" means all forms of professional psychological conduct when acting, with definable foreknowledge, as a psychological expert on explicitly psycholegal **issues, in direct** assistance to courts, parties to legal proceedings, correctional and forensic mental health facilities, and administrative, judicial, and legislative agencies acting in an adjudicative capacity.

   c. "Forensic psychologist" means psychologists who regularly engage in the practice of forensic psychology as defined in I(B)(l)(b).

2. The *Guidelines* do not apply to **a psychologist** who is asked to provide professional **psychological** ser**vices** when the psychologist was not informed at the time of delivery of the services that they were to be used as forensic psychological services as defined above. The Guide-*lines* may be helpful, however, in preparing the psychologist for the experience of communicating psychological data in a forensic context.

3. Psychologists who are not forensic psychologists as defined in I(B)(l)(c), but occasionally provide limited forensic psychological services, may find the Guidelines useful in the preparation and presentation of their professional services.

## C. Related Standards

1. Forensic psychologists also conduct, their professional activites in accord with the *Ethical Principles of Psychologists* and the various other statements of the American Psychological Association that may apply to particular subdisciplines or areas of practice that are relevant to their professional activities.

2. The standards of practice and ethical guidelines of other relevant "expert professional organizations" contain useful guidance and should be consulted even though the present *Guidelines* take precedence for forensic psychologists.

## II. RESPONSIBILITY

A. Forensic psychologists have an obligation to provide services in a manner consistent with the highest standards of their profession. They are responsible for their own conduct and the conduct of those individuals under their direct supervision.

FELL-00002318

B. Forensic psychologists make a reasonable effort to ensure that their services and the products of their services are used in a forthright and responsible manner.

## III. COMPETENCE

A. Forensic psychologists provide services only in areas of psychology in which they have specialized knowledge, skill, experience, and education.

B. Forensic psychologists have an obligation to present to the court, regarding the specific matters to which they will testify, the boundaries of their competence, the factual bases (knowledge, skill, experience, training, and education) for their qualification as an expert, and the relevance of those factual bases to their qualification as an expert on the specific matters at issue.

C. Forensic psychologists are responsible for a fundamental and reasonable level of knowledge and understanding of the legal and professional standards that govern their participation as experts in legal proceedings.

D. Forensic psychologists have an obligation to understand the civil rights of parties in legal proceedings in which they participate, and manage their professional conduct in a manner that does not diminish or threaten those rights.

E. Forensic psychologists recognize that their own personal values, moral beliefs, or personal and professional relationships with parties to a legal proceeding may interfere with their ability to practice competently. Under such circumstances, forensic psychologists are obligated to decline participation or to limit their assistance in a manner consistent with professional obligations.

## IV. RELATIONSHIPS

A. During initial consultation with the legal representative of the party seeking services, forensic psychologists have an obligation to inform the party of factors that might reasonably affect the decision to contract with the forensic psychologist. These factors include, but are not limited to
   1 the fee structure for anticipated professional services;
   2: prior and current personal or professional activities, obligations, and relationships that might produce a conflict of interests;
   3 their areas of competence and the limits of their competence; and
   4. the known scientific bases and limitations of the methods and procedures that they employ and their qualifications to employ such methods and procedures.

B. Forensic psychologists do not provide professional services to parties to a legal proceeding on the basis of "contingent fees," when those services involve the offering of expert testimony to a court or administrative body, or when they call upon the psychologist to make affirmations or representations intended to be relied upon by third parties.

C. Forensic psychologists who derive a substantial portion of their income from fee-for-service arrangements should offer some portion of their professional services on a pro bono or reduced fee basis where the public interest or the welfare of clients may be inhibited by insufficient financial resources.

D. Forensic psychologists recognize potential conflicts of interest in dual relationships with parties to a legal proceeding, and they seek to minimize their effects.

1. Forensic psychologists avoid providing professional services to parties in a legal proceeding with whom they have personal or professional relationships that are inconsistent with the anticipated relationship.

2. When it is necessary to provide both evaluation and treatment services to a party in a legal proceeding (as may be the case in small forensic hospital settings or small communities), the forensic psychologist takes reasonable steps to minimize the potential negative effects of these circumstances on the rights of the party, confidentiality, and the process of treatment and evaluation.

E. Forensic psychologists have an obligation to ensure that prospective clients are informed of their legal rights with respect to the anticipated forensic service, of the purposes of any evaluation, of the nature of procedures to be employed, of the intended uses of any product of their services, and of the party who has employed the forensic psychologist.

1. Unless court ordered, forensic psychologists obtain the informed consent of the client or party, or their legal representative, before proceeding with such evaluations and procedures. If the client appears unwilling to proceed after receiving a thorough notification of the purposes, methods, and intended uses of the forensic evaluation, the evaluation should be postponed and the psychologist should take steps to place the client in contact with his/her attorney for the purpose of legal advice on the issue of participation.

2. In situations where the client or party may not have the capacity to provide informed consent to services or the evaluation is pursuant to court order, the forensic psychologist provides reasonable notice to the client's legal representative of the nature of the anticipated forensic service before proceeding. If the client's legal representative objects to the evaluation, the forensic psychologist notifies the court issuing the order and responds as directed.

3. After a psychologist has advised the subject of a clinical forensic evaluation of the intended uses of the evaluation and its work product, the psychologist may not use the evaluation work product for

FELL-00002320

660

other purposes without explicit waiver to do so by the client or the client's legal representative.

F. When forensic psychologists engage in research or scholarly activities that are compensated financially by a client or party to a legal proceeding, or when the psychologist provides those services on a pro *bono* basis, the psychologist clarifies any anticipated further use of such research or scholarly product, discloses the psychologist's role in the resulting research or scholarly products, and obtains whatever consent or agreement is required by law or professional standards.

G. When conflicts arise between the forensic psychologist's professional standards and the requirements of legal standards, a particular court, or a directive by an officer of the court or legal authorities, the forensic psychologist has an obligation to make those legal authorities aware of the source of the conflict and to take reasonable steps to resolve it. Such steps may include, but are not limited to, obtaining the consultation of fellow forensic professionals, obtaining the advice of independent counsel, and conferring directly with the legal representatives involved.

## V.  CONFIDENTIALITY AND PRIVILEGE

A. Forensic psychologists have an obligation to be aware of the legal standards that may affect or limit the confidentiality or privilege that may attach to their services or their products, and they conduct their professional activities in a manner that respects those known rights and privileges.

   1. Forensic psychologists establish and maintain a system of record keeping and professional communication that safeguards a client's privilege.

   2. Forensic psychologists maintain active control over records and information. They only release information pursuant to statutory requirements, court order, or the consent of the client.

B. Forensic psychologists inform their clients of the limitations to the confidentiality of their services and their products (see also Guideline IV E) by providing them with an understandable statement of their rights, privileges, and the limitations of confidentiality,

C  In situations where the right of the client or party to cofidentiality is limited, the forensic psychologist makes every effort to maintain confidentiality with regard to any information that does not bear directly upon the legal purpose of the evaluation.

D  Forensic psychologists provide clients or their authorized legal representatives with access to the information in their records and a meaningful explanation of that information, consistent with existing Federal and state statutes, the *Ethical Principles Of Psychologists,* the *Standards for Educational and Psychological Testing,* and institutional rules and regulations.

FELL-00002321

# VI. METHODS AND PROCEDURES

A. Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional and legal developments within their area of claimed competence. They are obligated also to use that knowledge, consistent with accepted clinical and scientific standards, in selecting data collection methods and procedures for an evaluation, treatment, consultation or scholarly/empirical investigation.

B  Forensic psychologists have an obligation to document and be prepared to make available, subject to court order or the rules of evidence, all data that form the basis for their evidence or services. The standard to be applied to such documentation or recording *anticipates* that the detail and quality of such documentation will be subject to reasonable judicial scrutiny; this standard is higher than the normative standard for general clinical practice. When forensic psychologists conduct an examination or engage in the treatment of a party to a legal proceeding, with fore-knowledge that their professional services will be used in an adjudicative forum, they incur a special responsibility to provide the best documentation possible under the circumstances.

1. Documentation of the data upon which one's evidence is based is subject to the normal rules of discovery, disclosure, confidentiality, and privilege that operate in the jurisdiction in which the data were obtained. Forensic psychologists have an obligation to be aware of those rules and to regulate their conduct in accordance with them.

2. The duties and obligations of forensic psychologists with respect to documentation of data that form the basis for their evidence apply from the moment they know or have a reasonable basis for knowing that their data and evidence derived from it are likely to enter into legally relevant decisions.

C. In providing forensic psychological services, forensic psychologists take special care to avoid undue influence upon their methods, procedures, and products, such as might emanate from the party to a legal proceeding by financial compensation or other gains. As an expert conducting an evaluation, treatment, consultation, or scholarly/empirical investigation, the forensic psychologist maintains professional integrity by examining the issue at hand from all reasonable perspectives, actively seeking information that will differentially test plausible rival hypotheses.

D  Forensic psychologists do not provide professional forensic services to a defendant or to any party in, or in contemplation of, a legal proceeding prior to that individual's representation by counsel, except for persons judicially determined, where appropriate, to be handling their representation *pro se*. When the forensic services are pursuant to court order and the client is not represented by counsel, the forensic psychologist makes reasonable efforts to inform the court prior to providing the services.

1. A forensic psychologist may provide emergency mental health ser-

FELL-00002322

vices to a pretrial defendant prior to court order or the appointment of counsel where there are reasonable grounds to believe that such emergency services are needed for the protection and improvement of the defendant's mental health and where failure to provide such mental health services would constitute a substantial risk of imminent harm to the defendant or to others. In providing such services the forensic psychologist nevertheless seeks to inform the defendant's counsel in a manner consistent with the requirements of the emergency situation.

2. Forensic psychologists who provide such emergency mental health services should attempt to avoid providing further professional forensic services to that defendant unless that relationship is reasonably unavoidable [see **IV(D)(2)**].

E. When forensic psychologists seek data from third parties, prior records, or other sources, they do so only with the prior approval of the relevant legal party or as a consequence of an order of a court to conduct the forensic evaluation.

F. Forensic psychologists are aware that hearsay exceptions and other rules governing expert testimony place a special ethical burden upon them. When hearsay or otherwise inadmissible evidence forms the basis of their opinion, evidence, or professional product, they seek to minimize sole reliance upon such evidence. Where circumstances reasonably permit, forensic psychologists seek to obtain independent and personal verification of data relied upon as part of their professional services to the court or to a party to a legal proceeding.

1. While many forms of data used by forensic psychologists are hearsay, forensic psychologists attempt to corroborate critical data that form the basis for their professional product. When using hearsay data that have not been corroborated, but are nevertheless utilized, forensic psychologists have an affirmative responsibility to acknowledge the uncorroborated status of those data and the reasons for relying upon such data.

2. With respect to evidence of any type, forensic psychologists avoid offering information from their investigations or evaluations that does not bear directly upon the legal purpose of their professional services and that is not critical as support for their product, evidence or testimony, **except where such disclosure is required by law.**

3. When a forensic psychologist relies upon data or information gathered by others, the origins of those data are clarified in any professional product. In addition, the forensic psychologist bears a special responsibility to ensure that such data, if relied upon, were gathered in a manner standard for the profession.

G. Unless otherwise stipulated by the parties, forensic psychologists are aware that no statements made by a defendant, in the course of any (forensic) examination, no testimony by the expert based upon such

FELL-00002323

statements, nor any other fruits of the statements can be admitted into evidence against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has introduced testimony. Forensic psychologists have an affirmative duty to ensure that their written products and oral testimony conform to this Federal Rule of Procedure (12.2[c]), or its state equivalent.

1. Because forensic psychologists are often not in a position to know what evidence, documentation, or element of a written product may be or may lend to a "fruit of the statement," they exercise extreme caution in preparing reports or offering testimony prior to the defendant's assertion of a mental state claim or the defendant's introduction of testimony regarding a mental condition. Consistent with the reporting requirements of state or federal law, forensic psychologists avoid including statements from the defendant relating to the time period of the alleged offense.

2. Once a defendant has proceeded to the trial stage, and all pretrial mental health issues such as competency have been resolved, forensic psychologists may include in their reports or testimony any statements made by the defendant that are directly relevant to supporting their expert evidence, providing that the defendant has "introduced" mental state evidence or testimony within the meaning of Federal Rule of Procedure 12.2(c), or its state equivalent.

H  Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

# VII. PUBLIC AND PROFESSIONAL COMMUNICATIONS

A, Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will promote understanding and avoid deception, given the particular characteristics, roles, and abilities of various recipients of the communications.

1. Forensic psychologists take reasonable steps to correct misuse or misrepresentation of their professional products, evidence, and testimony.

2. Forensic psychologists provide information about professional work to clients in a manner consistent with professional and legal standards

FELL-00002324

fur the disclosure of test results, interpretations of data, and the factual bases for conclusions. A full explanation of the results of tests and the bases for conclusions should be given in language that the client can understand.

a. When disclosing information about a client to third parties who are not qualified to interpret test results and data, the forensic psychologist complies with Principle 16 of the *Standards for Educational and Psychological Testing.* When required to disclose results to a nonpsychologist, every attempt is made to ensure that test security is maintained and access to information is restricted to individuals with a legitimate and professional interest in the data. Other qualified mental health professionals who make a request for information pursuant to a lawful order are, by definition, "individuals with a legitimate and professional interest."

b. In providing records and raw data, the forensic psychologist takes reasonable steps to ensure that the receiving party is informed that raw scores must be interpreted by a qualified professional in order to provide reliable and valid information.

B. Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special responsibility for fairness and accuracy in their public statements. When evaluating or commenting upon the professional work product or qualifications of another expert or party to a legal proceeding, forensic psychologists represent their professional disagreements with reference to a fair and accurate evaluation of the data, theories, standards, and opinions of the other expert or party.

C Ordinarily, forensic psychologists avoid making detailed public (out-of-court) statements about particular legal proceedings in which they have been involved. When there is a strong justification to do so, such public statements are designed to assure accurate representation of their role or their evidence, not to advocate the positions of parties in the legal proceeding. Forensic psychologists address particular legal proceedings in publications or communications only to the extent that the information relied upon is part of a public record, or consent for that use has been properly obtained from the party holding any privilege.

D When testifying, forensic psychologists have an obligation to all parties to a legal proceeding to present their findings, conclusions, evidence, or other professional products in a fair manner. This principle does not preclude forceful representation of the data and reasoning upon which a conclusion or professional product is based. It does, however, preclude an attempt, whether active or passive, to engage in partisan distortion or misrepresentation. Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position.

FELL-00002325

**E. Forensic** psychologists, by virtue of their competence and rules **of discovery,** actively disclose all sources of information obtained in the course of their professional services; they actively disclose which information from which source was used in formulating a particular written product or oral testimony.

F. Forensic psychologists are aware that their essential role as expert to the court is to assist the trier of fact to understand the evidence or to determine a fact in issue. In offering expert evidence, they are aware that their own professional observations, inferences, and conclusions must be distinguished from legal facts, opinions, and conclusions. Forensic psychologists are prepared to explain the relationship between their expert testimony and the legal issues and facts of an instant case.

FELL-00002326

# EXHIBIT 234

SPECIALTY GUIDELINES FOR
FORENSIC PSYCHOLOGY

Prepared by Committee on the Revision of the Specialty
Guidelines for Forensic Psychology

**FIFTH DRAFT 8/1/10**

1. INTRODUCTION

1.01 History of the *Specialty Guidelines for Forensic Psychology*
1.02 Definitions and Terminology
1.03 Nature of Forensic Psychology
1.04 Services and Functions

2. NATURE AND SCOPE OF THE *GUIDELINES*

2.01 Intended Users
2.02 Aspirational Model
2.03 Goals
2.04 Professional Discretion and Judgment

3. RESPONSIBILITIES

3.01 Integrity
3.02 Impartiality and Fairness
3.03 Avoidance of Conflicts of Interest

4. COMPETENCE

4.01 Scope of Competence
4.02 Gaining and Maintaining Competence
4.03 Representation of Competencies
4.04 Knowledge of the Legal System and the Legal Rights of Individuals
4.05 Knowledge of the Scientific Foundation for Testimony and Sworn Statements
4.06 Knowledge of the Scientific Foundation for Teaching and Research
4.07 Considering the Impact of Personal Beliefs and Experience
4.08 Appreciation of Individual Differences
4.09 Appropriate Use of Services and Products

5. DILIGENCE

5.01 Provision of Services
5.02 Responsiveness
5.03 Communication
5.04 Termination of Services

6. RELATIONSHIPS

6.01 Responsibilities to Retaining Parties
6.02 Multiple Relationships
6.02.01 Therapeutic-Forensic Role Conflicts
6.02.02 Expert Testimony by Practitioners Providing Therapeutic Services
6.02.03 Provision of Forensic Therapeutic Services
6.03 Provision of Emergency Mental Health Services

7. FEES

7.01 Determining Fees
7.02 Fee Arrangements

8. NOTIFICATION, ASSENT, CONSENT, AND INFORMED CONSENT

8.01 Timing and Substance
8.02 Communication with Those Seeking to Retain a Forensic Practitioner
8.03 Communication with Forensic Examinees
8.03.01 Persons Not Ordered or Mandated to Undergo Examination
8.03.02 Persons Ordered or Mandated to Undergo Examination
8.03.03 Persons Lacking Capacity to Provide Informed Consent
8.04 Communication with Collateral Sources of Information es
8.05 Communication in Research Contexts

9. CONFLICTS IN PRACTICE

9.01 Conflicts with Legal Authority
9.02 Conflicts with Organizational Demands
9.03 Resolving Ethical Issues with Fellow Professionals

10. PRIVACY, CONFIDENTIALITY, AND PRIVILEGE

10.01 Release of Information
10.02 Access to Information
10.03 Acquiring Third Party Information
10.04 Use of Case Materials in Teaching, Continuing Education, and Other Scholarly Activities

11. METHODS AND PROCEDURES

11.01 Use of Appropriate Methods
11.02 Use of Multiple Sources of Information
11.03 Opinions Regarding Persons Not Examined

12. ASSESSMENT

12.01 Focus on Legally Relevant Factors
12.02 Appropriate Use of Assessment Procedures
12.03 Appreciation of Individual Differences
12.04 Providing Assessment Feedback
12.05 Documentation and Compilation of Data Considered
12.06 Provision of Documentation
12.07 Record Keeping

13. PROFESSIONAL AND OTHER PUBLIC COMMUNICATIONS

13.01 Accuracy, Fairness, and Avoidance of Deception
13.02 Differentiating Observations, Inferences, and Conclusions
13.03 Disclosing Sources of Information and Bases of Opinions
13.04 Comprehensive and Accurate Presentation of Opinions in Reports and Testimony
13.05 Commenting Upon Other Professionals and Participants in Legal Proceedings
13.06 Out of Court Statements
13.07 Commenting Upon Legal Proceedings

FELL-00002327

**APPENDIX I:  BACKGROUND OF THE *GUIDELINES* AND THE REVISION PROCESS**

A.  History of the *Guidelines*
B.  Revision Process
C.  Need for the Guidelines
D.  Developers and Support
E.  Background Literature
F.  Current Status

**APPENDIX II:  DEFINITIONS AND TERMINOLOGY**

Submit comments regarding this draft to:

sgfpdraft@yahoo.com

 or

Randy Otto, PhD
FMHI
13301 N. 30th St.
Tampa, FL  33612
 (F): 813-974-6411

When submitting comments please identify the specific section you are referencing (e.g., 7.01, 8.03.03) and provide recommended alternative language when appropriate.

FELL-00002328

## SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY

### FOURTH DRAFT
### RELEASED SEPTEMBER 2, 2008

## 1. INTRODUCTION

### 1.01 History of the *Specialty Guidelines for Forensic Psychology*

This document replaces the 1991 *Specialty Guidelines for Forensic Psychologists* which were approved by the American Psychology-Law Society, Division 41 of the American Psychological Association (APA) and the American Board of Forensic Psychology. The current revision has also been approved by the Council of Representatives of the American Psychological Association. Appendix I includes a discussion of the revision process, enactment, and current status of these *Guidelines*.

### 1.02 Definitions and Terminology

Appendix II includes definitions and terminology as used for the purposes of these *Guidelines*.

### 1.03 Nature of Forensic Psychology

For the purposes of these *Guidelines*, forensic psychology refers to all professional practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive) when applying the scientific, technical, or specialized knowledge of psychology to the law to assist in addressing legal, contractual, and administrative matters. Application of the *Guidelines* does not depend on the practitioner's typical areas of practice or expertise, but rather on the service provided in the case at hand. These *Guidelines* apply in all matters in which practitioners provide forensic psychological expertise to judicial, administrative, and educational systems including, but not limited to, examining or treating persons in anticipation of or subsequent to legal, contractual, administrative, proceedings; offering expert opinion about psychological issues in the form of *amicus* briefs

or testimony to judicial, legislative or administrative bodies; acting in an adjudicative capacity; serving as a trial consultant or otherwise offering expertise to attorneys, the courts, or others; conducting research in connection with, or in the anticipation of, litigation; or involvement in educational activities of a forensic nature.

Psychological practice is not considered forensic solely because the conduct takes place in, or the product is presented in, a tribunal or other judicial, legislative, or administrative forum. For example, when a party (such as a civilly or criminally detained individual) or another individual (such as a child whose parents are involved in divorce proceedings) is ordered into treatment with a practitioner, that treatment is not necessarily the practice of forensic psychology. In addition, psychological testimony that is solely based on the provision of psychotherapy and does not include psycholegal opinions is not ordinarily considered forensic practice.

For the purposes of these *Guidelines*, "forensic practitioner" refers to a psychologist when engaged in the practice of forensic psychology as described above. Such professional conduct is considered forensic from the time the practitioner reasonably expects to, agrees to, or is legally mandated to, provide expertise on an explicitly psycholegal issue.

### 1.04 Services and Functions

The provision of forensic services may include a wide variety of psycholegal roles and functions. For example, as researchers, forensic practitioners may participate in the collection and dissemination of data that are relevant to various legal issues. As advisors, forensic practitioners may provide an attorney with an informed understanding of the role that psychology can play in the attorney's case. As consultants, forensic practitioners may explain the practical implications of relevant research, examination findings, and the opinions of other psycholegal experts. As examiners, forensic practitioners may assess an individual's functioning and report findings to the attorney, a legal tribunal, an

3

FELL-00002329

employer, an insurer, or others. As treatment providers, forensic practitioners may provide therapeutic services tailored to the issues and context of a legal proceeding. As mediators or negotiators, forensic practitioners may serve in a third-party neutral role and assist parties in resolving disputes. As arbiters, special masters, or case managers with decision-making authority, forensic practitioners may serve parties, attorneys, and the courts.

## 2. NATURE AND SCOPE OF THE *GUIDELINES*

### 2.01 Intended Users

These *Guidelines* are intended for use by psychologists when engaged in the practice of forensic psychology as described above (1.02, 1.03, and 1.04), and may also provide guidance on professional conduct to the legal system, and other organizations and professions.

### 2.02 Aspirational Model

The *Guidelines* are aspirational in nature and recommend professional behavior and conduct for forensic practitioners. They are intended to inform the judgment of forensic psychologists and not replace it.    Forensic practitioners adhere to applicable codes of ethics and laws, rules and regulations; and consider all appropriate sources of professional authority to inform their behavior in forensic settings.

### 2.03 Goals

The goals of the *Guidelines* are to improve the quality of forensic psychological services; enhance the practice and facilitate the systematic development of forensic psychology; encourage a high level of quality in professional practice; and encourage forensic practitioners to acknowledge and respect the rights of those they serve.

### 2.04 Professional Discretion and Judgment

Guidelines differ from practice standards and other required codes of conduct. Standards are mandatory and may be accompanied by an enforcement mechanism; guidelines reflect aspirations for accomplishment and are not accompanied by an enforcement mechanism.

These *Guidelines* should be considered in conjunction with the Ethical Principles of Psychologists and Code of Conduct (EPPCC). The *Guidelines* are advisory and are to be understood only as providing further guidance for forensic practitioners and others. In cases in which *obligations* of forensic psychologists are referenced in these Guidelines, reference to the section of the EPPC that imposes such an obligation is provided.

The *Guidelines* are not mandatory or exhaustive and may not be applicable to every forensic situation or jurisdiction. As such, the *Guidelines* are advisory in areas in which the forensic practitioner has discretion to exercise professional judgment that is not prohibited or mandated by the EPPCC or by applicable law, rules, or regulations. The *Guidelines* neither add obligations to nor eliminate obligations from the EPPCC, but provide additional guidance for psychologists.

The modifiers used in the *Guidelines* (e.g., reasonably, appropriate, potentially) are included in recognition of the need for professional judgment on the part of forensic practitioners; ensure applicability across the broad range of activities conducted by forensic practitioners; and reduce the likelihood of enacting an inflexible set of guidelines that might be inapplicable as forensic practice evolves. The use of these modifiers, and the recognition of the role of professional discretion and judgment, also reflects that forensic practitioners are likely to encounter facts and circumstances not anticipated by the *Guidelines* and they may have to act upon uncertain or incomplete evidence. The *Guidelines* may provide general or conceptual guidance in such circumstances. The *Guidelines* do not, however, exhaust the legal, professional, moral,

4

FELL-00002330

and ethical considerations that inform forensic practitioners, for no complex activity can be completely defined by legal rules, codes of conduct, and aspirational guidelines.

## 2.05 Limitations

The *Guidelines* are not intended to serve as a basis for disciplinary action or civil liability. The standard of care is established by a competent authority not by the *Guidelines*. No ethical, licensure, or other administrative action or remedy, nor any other cause of action, should be taken *solely* on the basis of a forensic practitioner acting in a manner consistent or inconsistent with these *Guidelines*.

In cases in which a competent authority references the *Guidelines* when formulating standards, the *Guidelines* advise that the authority consider that the *Guidelines* attempt to identify a high level of quality in forensic practice. Competent practice is defined as the conduct of a reasonably prudent forensic practitioner engaged in similar activities in similar circumstances. Professional conduct evolves and may be viewed along a continuum of adequacy, and "minimally competent" and "best possible" are usually different points along that continuum.

The *Guidelines* are designed to be national in scope and are intended to be consistent with state and federal law. In cases in which a conflict between legal and professional obligations occur, forensic practitioners make known their commitment to the EPPCC and the *Guidelines* and take steps to achieve an appropriate resolution consistent with the EPPCC and *Guidelines*.

## 3. RESPONSIBILITIES

### 3.01 Integrity

Forensic practitioners seek to promote accuracy, honesty, and truthfulness in the science, teaching, and practice of forensic psychology and they strive to resist partisan pressures to provide services in any ways that might tend to be misleading or inaccurate.

### 3.02 Impartiality and Fairness

When offering expert opinion to be relied upon by a decision maker, providing forensic therapeutic services, or teaching or conducting research, forensic practitioners demonstrate commitment to the goals of accuracy, objectivity, fairness, and independence. Forensic practitioners recognize the adversarial nature of the legal system and strive to treat all participants and weigh all data, opinions, and rival hypotheses objectively.

When conducting forensic examinations, forensic practitioners strive to beunbiased and objective, and to avoid partisan presentation of unrepresentative, incomplete, or inaccurate evidence that might mislead finders of fact. This guideline does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based.

When providing educational services, forensic practitioners seek to represent alternative perspectives, including data, studies, or evidence on both sides of the question, in an accurate, fair and professional manner, and demonstrate a willingness to weigh and present all views, facts, or opinions impartially.

When conducting research, forensic practitioners seek to represent results in a fair and objective manner. Forensic practitioners strive to utilize research designs and scientific methods that adequately and fairly test the questions at hand, and they attempt to resist partisan pressures to develop designs or report results in ways that might be misleading or unfairly bias the results of a test, study, or evaluation.

### 3.03 Avoiding Conflicts of Interest

Forensic practitioners refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to impair their objectivity, competence, or effectiveness, or expose others with whom a professional relationship exists to harm (EPPCC Section 3.06).

5

FELL-00002331

Forensic practitioners identify, make known, and address real or apparent conflicts of interest in an attempt to maintain the public confidence and trust, discharge professional obligations, and maintain responsibility, objectivity, and accountability. Whenever possible, such conflicts are revealed to all parties as soon as they become known to the psychologist. Forensic practitioners consider whether a prudent and competent forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is likely to become impaired under the immediate circumstances.

When a conflict of interest is determined to be manageable, continuing services are provided and documented in a way to manage the conflict, maintain accountability, and preserve the trust of relevant others (also see Section 6.02 below).

## 4. COMPETENCE

### 4.01 Scope of Competence

In determining one's competence to provide services in a particular matter, forensic practitioners consider a variety of relevant factors including the relative complexity and specialized nature of the service, relevant training and experience, the preparation and study they are able to devote to the matter, and the opportunities for consultation with a professional of established competence in the subject matter in question. Even with regard to subjects in which they are expert, forensic practitioners may choose to consult with colleagues.

### 4.02 Gaining and Maintaining Competence

Competence can be acquired through various combinations of education, training, supervised experience, consultation, study, and professional experience. Forensic practitioners planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies that are new to them are encouraged to undertake relevant education, training, supervised experience, consultation, or study.

Forensic practitioners make ongoing efforts to develop and maintain their competencies (EPPCC Section 2.03). To maintain the requisite knowledge and skill, forensic practitioners keep abreast of developments in the fields of psychology and the law and engage in continuing study and education.

### 4.03 Representing Competencies

Consistent with the EPPCC, forensic practitioners adequately and accurately inform all recipients of their services (e.g., attorneys, tribunals) about relevant aspects of the nature and extent of their experience, training, credentials, and qualifications, and how they were obtained (EPPCC Section 5.01

### 4.04 Knowledge of the Legal System and the Legal Rights of Individuals

Forensic practitioners recognize the importance of obtaining a fundamental and reasonable level of knowledge and understanding of the legal and professional standards, laws, rules, and precedents that govern their participation in legal proceedings and that guide the impact of their services on service recipients (EPPCC Section 2.01).

Forensic practitioners aspire to manage their professional conduct in a manner that does not threaten or impair the rights of affected individuals. They may consult with, and refer others to, legal counsel on matters of law. Although they do not provide formal legal advice or opinions, forensic practitioners may provide information about the legal process to others based on their knowledge and experience. They strive to distinguish this from legal opinions, however, and encourage consultation with attorneys as appropriate.

6

FELL-00002332

## 4.05 Knowledge of the Scientific Foundation for Opinions and Testimony

When providing opinions and testimony that are based on novel or emerging principles and methods forensic practitioners, when possible, make known the limitations of these principles and methods. Forensic practitioners seek to provide opinions and testimony that are sufficiently based upon adequate scientific foundation, and reliable and valid principles and methods that have been applied appropriately to the facts of the case.

## 4.06 Knowledge of the Scientific Foundation for Teaching and Research

Forensic practitioners engage in teaching and research activities in which they have adequate knowledge, experience, and education (EPPCC Section 2.01, and they acknowledge relevant limitations and caveats inherent in procedures and conclusions (EPPCC Section 5.01).

## 4.07 Considering the Impact of Personal Beliefs and Experience

Forensic practitioners recognize that their own attitudes, values, beliefs, opinions, or biases may diminish their ability to practice in a competent and impartial manner. Under such circumstances, forensic practitioners may take steps to correct or limit such effects, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 4.08 Appreciation of Individual Differences

When scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, socioeconomic status, or other relevant individual differences affects implementation or use of their services or research, forensic practitioners first consider the boundaries of their expertise, make an appropriate referral if indicated, or gain the necessary training,

experience, consultation, or supervision (EPPCC Section 2.01,

Forensic practitioners do not engage in unfair discrimination based on such factors or on any basis proscribed by law (EPPCC Section 3.01). They strive to take steps to correct or limit the effects of such factors on their work, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 4.09 Appropriate Use of Services and Products

Forensic practitioners make reasonable efforts to guard against misuse of their services and exercise professional discretion in addressing such misuses.

## 5. DILIGENCE

## 5.01 Provision of Services

Forensic practitioners are encouraged to seek explicit agreements that define the scope of, time-frame of, and compensation for their services. In the event that a client breaches the contract or acts in way that would require the practitioner to violate ethical, legal or professional obligations, the forensic practitioner may terminate the relationship.

Forensic practitioners strive to act with reasonable diligence and promptness in providing agreed-upon and reasonably anticipated services. Forensic practitioners are not bound, however, to provide services not reasonably anticipated when retained, nor to provide every possible aspect or variation of service. Instead, forensic practitioners may exercise professional discretion in determining the extent and means by which services are provided and agreements are fulfilled.

## 5.02 Responsiveness

Forensic practitioners seek to manage their workloads so that services can be provided thoroughly, competently, and promptly. They recognize that acting with reasonable promptness, however, does not require the forensic practitioner

7

FELL-00002333

to acquiesce to service demands not reasonably anticipated at the time the service was requested, nor does it require the forensic practitioner to provide services if the client has not acted in a manner consistent with existing agreements, including payment of fees.

### 5.03 Communication

Forensic practitioners strive to keep their clients reasonably informed about the status of their services, comply with their clients' reasonable requests for information, and consult with their clients about any substantial limitation on their conduct or performance that may arise when they reasonably believe that their clients anticipate a service that may not be consistent with the *Guidelines*. Forensic practitioners attempt to keep their clients reasonably informed regarding new facts, opinions, or other potential evidence that may be relevant and applicable.

### 5.04 Termination of Services

The forensic practitioner seeks to carry through to conclusion all matters undertaken for a client unless the forensic practitioner-client relationship is terminated. When a forensic practitioner's employment is limited to a specific matter, the relationship terminates when the matter has been resolved, when anticipated services have been completed, when the agreement has been violated.

### 6. RELATIONSHIPS

Whether a forensic practitioner-client relationship exists depends on the circumstances and is determined by a number of factors which may include the information exchanged between the potential client and the forensic practitioner prior to, or at the initiation of, any contact or service, the nature of the interaction, and the purpose of the interaction.

In their work, forensic practitioners recognize that a relationship is established with those who retain their services (e.g., retaining parties, employers, insurers, the court) and those with whom they interact (e.g., examinees, collateral contacts,

research participants, students). Forensic practitioners recognize that associated obligations and duties vary as a function of the nature of the relationship.

### 6.01 Responsibilities to Retaining Parties

Most responsibilities to the retaining party attach only after the retaining party has requested and the forensic practitioner has agreed to render professional services and an agreement regarding compensation has been reached. Forensic practitioners are aware that there are some responsibilities, such as privacy, confidentiality, and privilege that may attach when the forensic practitioner agrees to consider whether a forensic practitioner-retaining party relationship shall be established. Forensic practitioners, prior to entering into a contract, may direct the potential retaining party not to reveal any confidential or privileged information as a way of protecting the retaining party's interest in case a conflict exists as a result of pre-existing relationships.

At the initiation of any request for service, forensic practitioners seek to clarify the nature of the relationship and the services to be provided including the role of the forensic practitioner (e.g., trial consultant, forensic examiner, treatment provider, expert witness, research consultant); which person or entity is the client; the probable uses of the services provided or information obtained; and any limitations to privacy, confidentiality, or privilege.

### 6.02 Multiple Relationships

A multiple relationship occurs when a forensic practitioner is in a professional role with a person and, at the same time or at a subsequent time, is in a different role with the same person; is involved in a personal, fiscal, or other relationship with an adverse party; at the same time is in a relationship with a person closely associated with or related to the person with whom the forensic practitioner has the professional relationship; or offers or agrees to enter into another relationship in the future with the person or a person closely associated with or related to the person (EPPCC Section 3.05).

8

FELL-00002334

Forensic practitioners recognize the potential conflicts of interest and threats to objectivity inherent in multiple relationships. Forensic practitioners recognize that some personal and professional relationships may interfere with their ability to practice in a competent and objective manner and they seek to minimize any detrimental effects by avoiding involvement in such matters whenever feasible or limiting their assistance in a manner that is consistent with professional obligations.

### 6.02.01 Therapeutic-Forensic Role Conflicts

Providing forensic and therapeutic psychological services to the same individual or closely related individuals involves multiple relationships that may impair objectivity and/or cause exploitation or other harm. Therefore, when requested or ordered to provide either concurrent or sequential forensic and therapeutic services, forensic practitioners disclose the potential risk and make reasonable efforts to refer the request to another qualified provider. If referral is not possible, the forensic practitioner considers the risks and benefits to all parties and to the legal system or entity likely to be impacted, the possibility of separating each service widely in time, seeking judicial review and direction, and consulting with knowledgeable colleagues. When providing both forensic and therapeutic services, forensic practitioners seek to minimize the potential negative effects of this circumstance.

### 6.02.02 Expert Testimony by Practitioners Providing Therapeutic Services

Providing expert testimony about a patient who is a participant in a legal matter does not necessarily involve the practice of forensic psychology even when that testimony is relevant to a psycholegal issue that is before the decision-maker. For example, providing testimony on matters such as a patient's reported history or other statements, mental status, diagnosis, progress, prognosis, and treatment would not ordinarily be considered forensic practice even when the testimony is related to a psycholegal issue before the decision-maker. Rendering opinions and providing testimony about a person on psycholegal issues

(e.g., criminal responsibility, legal causation, proximate cause, trial competence, testamentary capacity, the relative merits of parenting arrangements) would ordinarily be considered the practice of forensic psychology.

Consistent with their ethical obligations to base their opinions on information and techniques sufficient to substantiate their findings (EPPCC Sections 2.04, 9.01), forensic practitioners provide testimony only on those issues for which they have adequate foundation and only when a reasonable forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is unlikely to be impaired. As with testimony regarding forensic examinees, the testimony identifies any substantial lack of corroboration or other substantive limitation that may affect the reliability and validity of the fact or opinion offered and communicates these to the decision maker.

### 6.02.03 Provision of Forensic Therapeutic Services

Although some therapeutic services can be considered forensic in nature, the fact that therapeutic services are ordered by the court or are delivered to someone does not necessarily make them forensic.

In determining whether a therapeutic service should be considered the practice of forensic psychology, psychologists consider the potential impact of the legal context on treatment, the potential for treatment to impact the psycholegal issues involved in the case, and whether another reasonable psychologist in a similar position would consider the service to be forensic and these *Guidelines* to be applicable.

Therapeutic services can have significant effects on current or future legal proceedings. Forensic practitioners are encouraged to consider these effects and minimize any unintended or negative effects on such proceedings or therapy when they provide therapeutic services in forensic contexts.

9

FELL-00002335

**6.03 Provision of Emergency Mental Health Services to Forensic Examinees**

When providing forensic examination services an emergency may arise that requires the forensic practitioner to provide therapeutic services to the examinee in order to prevent imminent harm to the examinee or others. In such cases, the forensic practitioner strives to limit disclosure of information to that which is consistent with applicable law, code, statute, and order of the court, and informs the retaining attorney, legal representative, or the court in an appropriate manner. Upon providing emergency treatment to examinees, forensic practitioners consider whether they can continue in a forensic role with that individual so that potential for harm to the recipient of services is avoided.

**7. FEES**

**7.01 Determining Fees**

When determining fees forensic practitioners may consider salient factors such as their experience providing the service, the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the service, the fee customarily charged for similar forensic services, the likelihood that the acceptance of the particular employment will preclude other employment, the time limitations imposed by the client or circumstances, the nature and length of the professional relationship with the client, and any legal requirements.

**7.02 Fee Arrangements**

Forensic practitioners seek to avoid undue influence that might result from financial compensation or other gains. Because of the threat to objectivity presented by the acceptance of contingent fees and associated legal prohibitions, forensic practitioners strive to avoid providing professional services on the basis of contingent fees.

Letters of protection, financial guarantees, and other security for payment of fees in the future are not considered contingent fees unless payment is dependent on the outcome of the matter.

**8. INFORMED CONSENT, NOTIFICATION AND ASSENT**

Because substantial rights, liberties, and properties are often at risk in forensic matters and because the methods and procedures of forensic practitioners are complex and may not be accurately anticipated by the recipients of forensic services, forensic practitioners strive to inform service recipients about the nature and parameters of the services to be provided.

Forensic practitioners carefully consider the appropriateness of conducting a forensic evaluation of an individual who is not represented by counsel.

**8.01 Timing and Substance**

Forensic practitioners strive to inform clients, examinees, and others who are the recipients of forensic services as soon as is feasible about the nature and extent of reasonably anticipated forensic services.
In determining what information to impart, forensic practitioners consider a variety of factors including the person's experience or training in psychological and legal matters of the type involved and whether the person is represented by counsel. When questions or uncertainties remain after they have made the effort to explain the necessary information, forensic practitioners may recommend that the person seek legal advice.

**8.02 Communication with Those Seeking to Retain a Forensic Practitioner**

As part of the initial process of being retained, or as soon thereafter as previously unknown information becomes available, forensic practitioners strive to disclose to the retaining party information that would reasonably be anticipated to affect a decision to retain or continue the services of the forensic practitioner.

10

FELL-00002336

This disclosure includes all information that the reasonably prudent recipient of service would desire to know and may include, but is not limited to, the fee structure for anticipated services; prior and current personal or professional activities, obligations and relationships that would reasonably lead to the fact or the appearance of a conflict of interest; the forensic practitioner's knowledge, skill, experience, and education relevant to the forensic services being considered, including any significant limitations; and the scientific bases and limitations of the methods and procedures which are expected to be employed.

## 8.03 Communication with Forensic Examinees

Forensic practitioners inform examines about the nature and purpose of the examination (EPPCC Section 9.03). Information they may includes the purpose, nature, and anticipated use of the examination; who will have access to the information; associated limitations on privacy, confidentiality, and privilege including who is authorized to release or access the information contained in the forensic practitioner's records; the voluntary or involuntary nature of participation, including potential consequences of participation or non-participation, if known; and, if the cost of the service is the responsibility of the examinee, the anticipated cost.

## 8.03.01 Persons Not Ordered or Mandated to Undergo Examination

If the examinee is not ordered by the court to participate in a forensic examination, the forensic practitioner seeks his or her informed consent (EPPCC Sections 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may consider postponing the examination, advising the examinee to contact his or her attorney, and notifying the retaining party about the examinee's unwillingness to proceed.

## 8.03.02 Persons Ordered or Mandated to Undergo Examination or Treatment

If the examinee is ordered by the court to participate, the forensic practitioner can conduct the examination over the objection, and without the consent, of the examinee (EPPCC Sections 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may, as appropriate, attempt to conduct the examination, postpone the examination, advise the examinee to contact his or her attorney, or notify the retaining party about the examinee's unwillingness to proceed.

When an individual is ordered to undergo treatment but the goals of treatment are determined by a legal authority rather than the individual receiving services, the forensic practitioner informs the service recipient of the nature and purpose of treatment, and any limitations on confidentiality and privilege (EPPCC Sections 3.10, 10.01).

## 8.03.03 Persons Lacking Capacity to Provide Informed Consent

For examinees adjudicated or presumed by law to lack the capacity to provide informed consent for the anticipated forensic service, the forensic practitioner nevertheless provides an appropriate explanation, seeks the examinee's assent, and obtain appropriate permission from a legally authorized person, as permitted or required by law (EPPCC Sections 3.10, 9.03).

For examinees whom the forensic practitioner has concluded lack capacity to provide informed consent to a proposed, non-court-ordered service, but who have not been adjudicated as lacking such capacity, the forensic practitioner strives to take reasonable steps to protect their rights and welfare (EPPCC Section 3,10). This maybe accomplished by suspending the proposed service or notifying the examinee's attorney or the retaining party.

11

FELL-00002337

## 8.04 Communication with Collateral Sources of Information

Forensic practitioners disclose to collateral sources of information relevant information that may include, but may not be limited to, who has retained the forensic practitioner; the nature, purpose, and intended use of the examination or other procedure; associated limits on privacy, confidentiality, and privilege; and whether their participation is voluntary (EPPCC Section 3.10).

## 8.05 Communication in Research Contexts

When engaging in research or scholarly activities conducted as a service to a client in a legal proceeding, forensic practitioners attempt to clarify any anticipated further use of such research or scholarly product, disclose their role in the resulting research or scholarly products, and obtain whatever consent or agreement is required. In advance of any scientific study, forensic practitioners seek to negotiate the circumstances under and manner in which the results may be made known to others. Forensic practitioners strive to balance the potentially competing rights and interests of the retaining party with the inappropriateness of suppressing data, for example, by agreeing to report the data without identifying the jurisdiction in which the study took place.

Forensic practitioners represent the results of research in an accurate manner (EPPCC Section 5.01).

## 9. CONFLICTS IN PRACTICE

In forensic psychology practice, conflicting responsibilities and demands may be encountered. When conflicts occur, forensic practitioners seek to maintain a disciplined, fair, and professional demeanor.

## 9.01 Conflicts with Legal Authority

When their responsibilities conflict with law, regulations, or other governing legal authority, forensic practitioners make known their commitment to the EPPCC, and take steps to resolve the conflict. When the conflict cannot be resolved by such means, forensic practitioners may adhere to the requirements of the law, regulations, or other governing legal authority, but only to the extent required. In situations where the EPPCC or *Guidelines* may be in conflict with the requirements of law, attempts to resolve the conflict are made in accordance with the EPPCC (EPPCC Section 1.02).

## 9.02 Conflicts with Organizational Demands

When the demands of an organization with which they are affiliated or for whom they are working conflict with their professional responsibilities and obligations, forensic practitioners clarify the nature of the conflict and, to the extent feasible, resolve the conflict in a way consistent with professional obligations and responsibilities.

## 9.03 Resolving Ethical Issues with Fellow Professionals

When an apparent or potential ethical violation has caused, or is likely to cause, substantial harm, forensic practitioners take action appropriate to the situation and consider a number of factors including the nature and the immediacy of the potential harm; applicable privacy, confidentiality, and privilege; how the rights of the relevant parties may be affected by a particular course of action; and any other legal or ethical obligations (EPPCC Section 1.04).

Steps to resolve perceived ethical conflicts may include, but are not limited to, obtaining the consultation of knowledgeable colleagues, obtaining the advice of independent counsel, and conferring directly with the attorneys involved.

When forensic practitioners believe that there may have been an ethical violation by another professional, an attempt is made to resolve the issue by bringing it to the attention of that individual, if that attempt does not violate any rights or privileges that may be involved, and if an informal resolution appears appropriate (EPPCC Section 1.04). If this does not result in a satisfactory resolution, the forensic practitioner

12

may take further action appropriate to the situation, including consideration of making a report to third parties of the perceived ethical violation. In most instances, in order to minimize unforeseen risks to the party's rights in the legal matter, forensic practitioners consider consulting with the retaining party before attempting to resolve a perceived ethical violation with another professional.

## 10.  PRIVACY, CONFIDENTIALITY, AND PRIVILEGE

Forensic practitioners recognize their ethical obligations to maintain the confidentiality of information relating to a client or retaining party, except insofar as disclosure is consented to by the client or retaining party, or required or permitted by law (EPPCC Section 4.01).

### 10.01 Release of Information

Forensic practitioners recognize the importance of complying with properly noticed and served subpoenas or court orders directing release of information, or other legally proper consent from duly authorized persons, unless there is a legally valid reason to offer an objection. When in doubt about an appropriate response or course of action, forensic practitioners may seek assistance from the retaining party, retain and seek legal advice from their own attorney, or formally notify the drafter of the subpoena of their uncertainty.

### 10.02 Access to Information

If requested, forensic practitioners seek to provide the retaining party access to, and a meaningful explanation of, all information that is in their records for the matter at hand, consistent with the relevant law, applicable codes of ethics and professional standards, and institutional rules and regulations. Forensic examinees typically are not provided access to the forensic practitioner's records without the consent of the retaining party. Access to records by anyone other than the retaining party is governed by legal process, usually subpoena or court order, or by explicit consent of the retaining party. Forensic

practitioners may charge a reasonable fee for the costs associated with the storage, reproduction, review, and provision of records.

### 10.03 Acquiring Collateral and Third Party Information

Forensic practitioners strive to request information or records from collateral sources with the consent of the relevant attorney or the relevant party, or when otherwise authorized by law or court order.

### 10.04 Use of Case Materials in Teaching, Continuing Education, and Other Scholarly Activities

Forensic practitioners using case materials for purposes of teaching, training, or research strive to present such information in a fair, balanced, and respectful manner. They attempt to protect the privacy of persons by disguising the confidential, personally identifiable information of all persons and entities who would reasonably claim a privacy interest; using only those aspects of the case available in the public domain; or obtaining consent from the relevant clients, parties, participants, and organizations to use the materials for such purposes (EPPCC Section 4.07; see Sections 13.06 and 13.07 of these guidelines).

## 11. METHODS AND PROCEDURES

### 11.01 Use of Appropriate Methods

Forensic practitioners strive to utilize appropriate methods and procedures in their work. When performing examinations, treatment, consultation, educational activities or scholarly investigations, forensic practitioners seek to maintain integrity by examining the issue or problem at hand from all reasonable perspectives and seek information that will differentially test plausible rival hypotheses.

### 11.02 Use of Multiple Sources of Information

Forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible. When relying upon data that have not been corroborated,

13

FELL-00002339

forensic practitioners seek to make known the uncorroborated status of that data, any associated strengths and limitations, and the reasons for relying upon it.

### 11.03 Opinions Regarding Persons Not Examined

Forensic practitioners recognize their ethical obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings (EPPCC Section 9.01). Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony.

When conducting a record review or providing consultation or supervision that does not warrant an individual examination, forensic practitioners seek to identify the sources of information on which they are basing their opinions and recommendations, including any substantial limitations to their opinions and recommendations.

## 12. ASSESSMENT

### 12.01 Focus on Legally Relevant Factors

Forensic examiners seek to assist the trier of fact to understand evidence or determine a fact in issue, and they provide information that is most relevant to the psycholegal issue. In reports and testimony forensic practitioners typically provide information about examinees' functional abilities, capacities, knowledge, and beliefs, and address their opinions and recommendations to the identified psycholegal issues.

Forensic practitioners are sensitive to the problems posed by using a clinical diagnosis in

forensic contexts and consider and qualify their opinions and testimony appropriately.

### 12.02 Appropriate Use of Assessment Procedures

Forensic practitioners use assessment procedures in the manner and for the purposes that are appropriate in light of the research on or evidence of their usefulness and proper application (EPPCC Section 9.02). This includes assessment techniques, interviews, tests, instruments, and other procedures and their administration, adaptation, scoring, and interpretation, including computerized scoring and interpretation systems.

Assessment in forensic contexts differs from assessment in therapeutic contexts in important ways that forensic practitioners strive to take into account when conducting forensic examinations. Forensic practitioners seek to consider the strengths and limitations of employing traditional assessment procedures in forensic examinations. Given the stakes involved in forensic contexts, forensic practitioners recognize the need to take special care to ensure the integrity and security of test materials and results.

When the validity of an assessment technique has not been established in the forensic context or setting in which it is being used, the forensic practitioner seeks to describe the strengths and limitations of any test results and explain the extrapolation of these data to the forensic context. Because of the many differences between forensic and therapeutic contexts, forensic practitioners are aware and seek to make known that some examination results may warrant substantially different interpretation when administered in forensic contexts.

Forensic practitioners consider and seek to make known that forensic examination results can be affected by factors unique to, or differentially present in, forensic contexts including response style, voluntariness of participation, and situational stress associated with involvement in forensic or legal matters.

14

FELL-00002340

**12.03 Appreciation of Individual Differences**

When interpreting assessment results, forensic practitioners consider the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational, personal, linguistic, and cultural differences that might affect their judgments or reduce the accuracy of their interpretations (EPPCC Section 9.06). Forensic practitioners strive to identify any significant strengths and limitations of their procedures and interpretations.

**12.04 Provision of Assessment Feedback**

Forensic practitioners take reasonable steps to explain assessment results to the examinee or a designated representative in language they can understand (EPPCC Section 9.10). In those circumstances in which communication about assessment results is precluded, the forensic practitioner explains this to the examinee in advance (EPPCC Section 9.10).

Forensic practitioners seek to provide information about professional work in a manner consistent with professional and legal standards for the disclosure of test data or results, interpretation of data, and the factual bases for conclusions.

**12.05 Documentation and Compilation of Data Considered**

Forensic practitioners recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties. This documentation includes, but is not limited to, letters and consultations; notes, recordings, and transcriptions; assessment and test data, scoring reports and interpretations; and all other records in any form or medium that were created or exchanged in connection with a matter.

When contemplating third party observation or audio/video-recording of examinations forensic practitioners consider any law that may control such matters, the need for transparency and

documentation, and the potential impact of observation or recording on the validity of the examination and test security.

**12.06 Provision of Documentation**

Pursuant to proper subpoenas or court orders, or other legally proper consent from authorized persons, forensic practitioners seek to make available all documentation described in 12.05, all financial records related to the matter, and any other records including reports (and draft reports if they have been provided to a party, attorney, or other entity for review), that might reasonably be related to the opinions to be expressed.

**12.07 Recordkeeping**

Forensic practitioners establish and maintain a system of recordkeeping and professional communication that is consistent with law, rules, EPPCC Standards, and regulations, and that safeguards applicable privacy, confidentiality, and privileges. When indicated by the extent of the rights, liberties, and properties that may be at risk, the complexity of the case, the amount and legal significance of unique evidence in the care and control of the forensic practitioner, and the likelihood of future appeal, forensic practitioners strive to inform the retaining party of the limits of recordkeeping times. If requested to do so, forensic practitioners strive to maintain such records until notified that all appeals in the matter have been exhausted or they send a copy of any unique components/aspects of the record in their care and control to the retaining party before destruction of the record.
**12.08**

**13. PROFESSIONAL AND OTHER PUBLIC COMMUNICATIONS**

**13.01 Accuracy, Fairness, and Avoidance of Deception**

Forensic practitioners make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional reports and testimony, are communicated in ways

15

that promote understanding and avoid deception (EPPCC Section 1.01).

When in their role as expert to the court or other tribunals, the role of forensic practitioners is to facilitate understanding of the evidence or dispute. Consistent with legal and ethical requirements, forensic practitioners do not distort or withhold relevant evidence or opinion in reports or testimony. When responding to discovery requests and providing sworn testimony, forensic practitioners strive to have readily available for inspection all data which they considered, regardless of whether the data supports their opinion, subject to and consistent with court order, relevant rules of evidence, test security issues, and professional standards.

When providing reports and other sworn statements or testimony in any form, forensic practitioners strive to present their conclusions, evidence, opinions, or other professional products in a fair manner. Forensic practitioners do not, by either commission or omission, participate in misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny or subvert the presentation of evidence contrary to their own position or opinion (EPPCC Section 5.01. This principle does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based.

## 13.02 Differentiating Observations, Inferences, and Conclusions

In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are prepared to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

## 13.03 Disclosing Sources of Information and Bases of Opinions

Forensic practitioners recognize their obligation to affirmatively disclose all sources of all information obtained in the course of their professional services, and to be prepared to identify the source of each piece of information

that was considered and relied upon in formulating a particular conclusion, opinion or other professional product.

## 13.04 Comprehensive and Accurate Presentation of Opinions in Reports and Testimony

Consistent with relevant law and rules of evidence, when providing professional reports and other sworn statements or testimony, forensic practitioners strive to offer a complete statement of all relevant opinions that they formed within the scope of their work on the case, the basis and reasoning underlying the opinions, the salient data or other information that was considered in forming the opinions, and an indication of any additional evidence that may be used in support of the opinions to be offered. The specific substance of forensic reports is determined by the type of psycholegal issue at hand as well as relevant laws or rules in the jurisdiction in which the work is completed.

Forensic practitioners limit discussion of background information that does not bear directly upon the legal purpose of the examination or consultation. Forensic practitioners avoid offering information that is irrelevant and that does not provide a substantial basis of support for their opinions, except when required by law (EPPCC Section 4.04).

## 13.05 Commenting Upon Other Professionals and Participants in Legal Proceedings

When evaluating or commenting upon the work or qualifications of other professionals involved in legal proceedings, forensic practitioners seek to represent their disagreements in a professional and respectful tone, and base them on a fair examination of the data, theories, standards and opinions of the other expert or party.

When describing or commenting upon clients, examinees, or other participants in legal proceedings, forensic practitioners strive to do so in a fair and objective manner. Forensic

16

FELL-00002342

practitioners strive to report the representations, opinions, and statements of clients, examinees, or other participants in a fair and objective manner.

## 13.06 Out of Court Statements

Ordinarily, forensic practitioners seek to avoid making detailed public (out-of-court) statements about legal proceedings in which they have been involved. However, sometimes public statements may serve important goals such as educating the public about the role of forensic practitioners in the legal system, the appropriate practice of forensic psychology, and psychological and legal issues that are relevant to the matter at hand. When making public statements, forensic practitioners refrain from releasing private, confidential, or privileged information, and attempt to protect persons from harm, misuse, or misrepresentation as a result of their statements (EPPCC Section 4).

## 13.07 Commenting Upon Legal Proceedings

Forensic practitioners strive to address particular legal proceedings in publications or communications only to the extent that the information relied upon is part of a public record, or when consent for that use has been properly obtained from any party holding any relevant privilege (also see Section 10.04).

When offering public statements about specific cases in which they have not been involved, forensic practitioners offer opinions for which there is sufficient information or data and make clear the limitations of their statements and opinions resulting from having had no direct knowledge of or involvement with the case (EPPCC Section 2.04).

17

FELL-00002343

## APPENDIX I:  BACKGROUND OF THE *GUIDELINES* AND THE REVISION PROCESS

### A.  History of the *Guidelines*

The previous version of the *Specialty Guidelines for Forensic Psychologists* (Committee on Ethical Guidelines for Forensic Psychologists, 1991) was approved by the American Psychology-Law Society, Division 41 of the American Psychological Association, and the American Board of Forensic Psychology in 1991.  The current  revision, now called the *Specialty Guidelines for Forensic Psychology* (referred to as *Guidelines* throughout this document), replace the 1991 *Specialty Guidelines for Forensic Psychologists.*

### B.  Revision Process

This revision of the *Guidelines* was coordinated by the Committee for the Revision of the Specialty Guidelines for Forensic Psychology, which was established by the American Academy of Forensic Psychology and the American Psychology-Law Society/Division 41 of the American Psychological Association in 2002 and operated through 200x.  This Committee consisted of two representatives from each organization (Solomon Fulero, PhD, JD, Stephen Golding, PhD, ABPP, Lisa Piechowski, PhD, ABPP, Christina Studebaker, PhD) a Chairperson (Randy Otto, PhD. ABPP), and a liaison from APA Division 42 (Jeffrey Younggren, PhD).

This document was revised in accordance with American Psychological Association Rule 30.08 and the APA policy document *Criteria for the development and evaluation of practice guidelines* (APA, 2001).  The Committee posted announcements regarding the revision process to relevant electronic discussion lists and professional publications [insert footnote to all list servers and publications here].  In addition, an electronic discussion list devoted solely to issues concerning revision of the *Guidelines* was operated between December 2002  and July 2007, followed by establishment of an e-mail address in February 2008 (sgfp@yahoo.com).  Individuals were invited to provide input and commentary on the existing *Guidelines* and proposed revisions via these means.  In addition, [insert number] public meetings were held throughout the revision process at biennial meetings of the American Psychology-Law Society.

Upon development of a draft that the Revisions Committee deemed suitable, the revised *Guidelines* were submitted for review to the Executive Committee of the American Psychology-Law Society and Division 41 of the American Psychological Association, and to the American Board of Forensic Psychology.  Once the revised *Guidelines* were approved by these two organizations, they were submitted to the American Psychological Association for review, commentary, and acceptance, consistent with the American Psychological Association's Criteria for Practice Guideline Development and Evaluation (Committee on Professional Practice and Standards, 2001) and Rule 30-8.  The *Guidelines* were adopted by the American Psychological Association Council of Representatives on [insert date here].

### C.  Need for the Guidelines

Professional standards for the ethical practice of psychology as a discipline are addressed in the Ethical Principles of Psychologists and Code of Conduct (American Psychological Association, 2002, hereinafter EPPCC).  As such, codes of ethics are intended to describe standards for competent and adequate professional conduct.  In contrast to the EPPCC, these *Guidelines* are intended to describe the most desirable and highest level professional conduct for psychologists when engaged in the practice of forensic psychology.
The *Guidelines*, although informed by the EPPCC and meant to be consistent with them, are designed to be educative and to provide more specific and thorough guidance to psychologists who are determining their professional forensic conduct.

18

FELL-00002344

The 1991 *Specialty Guidelines for Forensic Psychologists* needed revision due to advancements in the field that have taken place and the need for a broader and more thorough document that addresses the wide variety of professional forensic practice areas that have developed and expanded since the adoption of the original guidelines.

## D. Developers and Support

The *Specialty Guidelines for Forensic Psychology* were developed by the American Psychology-Law Society, Division 41 of the American Psychological Association, and the American Board of Forensic Psychology, with additional financial support provided by the American Academy of Forensic Psychology.

## E. Background Literature

Resources reviewed in the development of the *Guidelines* include:

American Psychology-Law Society and American Academy Board of Forensic Psychology: Specialty Guidelines for Forensic Psychologists; American Academy of Psychiatry & Law: Ethical Guidelines for the Practice of Forensic Psychiatry; American Bar Association: Model Rules of Professional Conduct; American Psychiatric Association: The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry; American Psychological Association Committee on Psychological Tests and Assessment: Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision Making; American Psychological Association: Ethical Principles of Psychologists and Code of Conduct; American Psychological Association: Guidelines for Child Custody Evaluations in Divorce Proceedings; American Psychological Association: Guidelines for Psychological Evaluations in Child Protection Matters; American Psychological Association: Guidelines for Psychotherapy with Lesbian, Gay, & Bisexual Clients; American Psychological Association: Guidelines on Multicultural Education, Training, Research, Practice, and

Organizational Change for Psychologists; American Psychological Association: Professional, Ethical, and Legal Issues Concerning Interpersonal Violence, Maltreatment, and Related Trauma; American Psychological Association: Record Keeping Guidelines; American Psychological Association: Rights and Responsibilities of Test Takers: Guidelines and Expectations; Association of State & Provincial Psychology Boards: Supervision Guidelines; Joint Committee on Testing Practices: Code of Fair Testing Practices in Education; Mental Health Patient's Bill of Rights.

## F. Current Status

These *Guidelines* are scheduled to expire [insert date here]. After this date, users are encouraged to contact the American Psychological Association Practice Directorate to confirm that this document remains in effect.

**SUBMIT COMMENTS REGARDING THIS DRAFT TO:**

Randy Otto, PhD
FMHI
13301 N. 30th St.
Tampa, FL 33612
rotto@fmhi.usf.edu
When submitting comments please identify the specific section you are referencing (e.g., 7.01, 8.03.03) and provide recommended alternative language when appropriate.

19

FELL-00002345

## APPENDIX II: DEFINITIONS AND TERMINOLOGY

For the purposes of these *Guidelines*:

*Appropriate*, when used in relation to conduct by a forensic practitioner means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is apt and pertinent and is considered befitting, suitable and proper for a particular person, place, condition, or function. "Inappropriate" means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is not suitable, desirable, or properly timed for a particular person, occasion, or purpose; and may also denote improper conduct, improprieties, or conduct that is discrepant for the circumstances.

*Agreement* refers to the objective and mutual understanding between the forensic practitioner and the person or persons seeking the professional service and/or agreeing to participate in the service. See also Assent, Consent, and Informed Consent.

*Assent* refers to the agreement, approval, or permission, especially regarding verbal or nonverbal conduct, that is reasonably intended and interpreted as expressing willingness, even in the absence of unmistakable consent. Forensic practitioners attempt to secure assent when consent and informed consent can not be obtained or when, because of mental state, the examinee may not be able to consent.

*Consent* refers to agreement, approval, or permission as to some act or purpose.

*Client* refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

*Conflict of Interest* refers to a situation or circumstance in which the forensic practitioner's objectivity, impartiality, or judgment may be jeopardized due to a relationship, financial, or any other interest that would reasonably be expected to substantially affect a forensic practitioner's professional judgment, impartiality, or decision-making.

*Decisionmaker* refers to the person or entity with the authority to make a judicial decision, agency determination, arbitration award, or other contractual determination after consideration of the facts and the law.

*Examinee* refers to a person who is the subject of a forensic examination for the purpose of informing a decision maker or attorney about the psychological functioning of that examinee.

*Forensic Examiner* refers to a psychologist who examines the psychological condition of a person whose psychological condition is in controversy or at issue.

*Forensic Practice* refers to the application of the scientific, technical, or specialized knowledge of psychology to the law and the use of that knowledge to assist in resolving legal, contractual, and administrative disputes.

*Forensic Practitioner* refers to a psychologist when engaged in forensic practice.

*Forensic Psychology* refers to all forensic practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive).

*Informed Consent* denotes the knowledgeable, voluntary, and competent agreement by a person to a proposed course of conduct after the forensic practitioner has communicated adequate information and explanation about the material risks and benefits of, and reasonably available alternatives to, the proposed course of conduct.

*Legal Representative* refers to a person who has the legal authority to act on behalf of another.

*Party* refers to a person or entity named in litigation, or who is involved in, or is witness to, an activity or relationship that may be reasonably anticipated to result in litigation.

20

FELL-00002346

*Reasonable* or *Reasonably*, when used in relation to conduct by a forensic practitioner, denotes the conduct of a prudent and competent forensic practitioner who is engaged in similar activities in similar circumstances.

*Record* or *Written Record* refers to all notes, records, documents, memorializations, and recordings of considerations and communications, be they in any form or on any media, tangible, electronic, hand-written, or mechanical, that are contained in, or are specifically related to, the forensic matter in question or the forensic service provided.

*Retaining Party* refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

*Tribunal* denotes a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.

*Trier of Fact* refers to a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.

21

# EXHIBIT 235

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|                          |   |                |
|--------------------------|---|----------------|
| UNITED STATES OF AMERICA | : |                |
|                          | : |                |
| v.                       | : | 2:01-CR-12-01  |
|                          | : |                |
| DONALD FELL              | : |                |
|                          | : |                |

## ORDER

The Court orders that the interview of Fell by the government mental health expert be subject to the following conditions:

1) Having filed notice that the defendant plans to introduce mental health evidence or testimony at any penalty phase, the defendant shall make himself available for an examination by a government retained mental health expert.  The government's examination shall take place before jury selection begins.  The examination shall take place where the defendant is detained.  The examination may be conducted by either Dr. Rabun or Dr. Wetzel, or both.  The examiner shall be permitted to conduct a complete psychiatric examination, including inquiry into defendant's state of mind before, during and after November 27, 2000.  During the examination, the defendant shall not be accompanied by members of the defense team.  However, the examination will be videotaped or tape-recorded and if desired, a contemporaneous audio-video feed will be provided to the defense team.

FELL-00002348

2) The report of the examination shall be released to the government only in the event that the jury reaches a verdict of guilty on a capital charge and only after the defendant confirms his intent to offer mental health or mental condition evidence in mitigation.

3) Even if the defendant confirms his intent to offer mental health evidence, he may withdraw notice of intent to raise a mental health or mental defense at any time before actually introducing evidence on it, and, in that event, neither the fact of notice, nor the results of reports of any mental examination, nor any facts disclosed only therein shall be admissible against him.

4) Failure of the defendant to participate in the examination contemplated herein or to confirm his first notice shall result in forfeiture of the right to present mental health testimony.

5) Prior to any mental health testing being conducted by any expert for the government, the government shall provide to counsel a list of any tests its expert wishes to perform.  The government's expert shall not identify more than one test for the purpose of measuring the same mental function(s).  Within one week of receiving the government's list, the defendant shall identify any such tests to which he objects.  The defendant and the government shall attempt to come to an agreement as to the

2

FELL-00002349

designation of specific testing measures to be administered by the defense and prosecution witnesses and shall consider sharing data between the experts.  If a dispute exists which the government and the defense cannot resolve, the parties shall notify the Court and a hearing will be held.  No mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert.  In the event of such an unresolved conflict, nothing in this paragraph shall create a preference in favor of the government or a burden on the defendant at a hearing conducted pursuant to this paragraph.

6) The government shall provide counsel for the defendant one week's notice of its intended date(s) of examination.  At least three days before the examination, the defense or the mental health expert(s) for the defendant, shall provide the expert for the government all of the defendant's medical or other records which the mental health expert(s) relies upon to any extent for their report(s).  The records shall be treated by the government's mental health expert in the same fashion as above.  Additionally, the government shall not use in its case-in-chief during the penalty phase of this prosecution any document described herein that the government received from the defendant or the defendant's mental health experts.

7)   The Court finds the fire-walling procedures in

3

FELL-00002350

<u>United States v. Sampson</u>, 335 F. Supp. 2d 166 (D. Mass. 2004), by which United States Attorneys from other jurisdictions are utilized, are unnecessary.

Dated at Burlington, Vermont this 7th day of April, 2005.

/s/ William K. Sessions III
William K. Sessions III
Chief Judge, U.S. District Court

4

FELL-00002351

# EXHIBIT 236

saying of argument that you were a member of the victim's family in this case, someone who strongly wanted the death penalty. If you were that person, would you want you as a juror to decide this case?

MR. PRIMOMO: Your Honor, I don't believe the victim's family is a party.

THE COURT: Well, that's correct. But it can be couched in terms of the government. And I think it's an appropriate question in terms of the government.

MR. KELLY: If you were me, if you were the government, who is seeking the death penalty --

JUROR NO. 64: Right.

MR. KELLY: -- and you wanted a juror there who could be fair to both sides, as they sit there, not lean one way or the other before the beginning of the case, before hearing the evidence, not have a personal bias one way or the other that would interfere or substantially interfere with their verdict, are you the person that you would choose for such a serious case?

JUROR NO. 64: Yes, I would.

MR. KELLY: And why is that?

JUROR NO. 64: Well, part of the type of work that I do, I, myself, have to work with people who sometimes have done things that are not good things, but part of my responsibility is to, is to deal with the

FELL-00002352

process and give them as fair -- as fair a representation of that process, and not make that judgment. I mean, that -- I found -- my experience that if I just make a judgment about that person from what I have heard, there are many times I turn out that that isn't correct.

MR. KELLY: Fair enough. That's true of many, many things.

JUROR NO. 64: Right.

MR. KELLY: But we are talking here about what some people describe as the ultimate judgment.

JUROR NO. 64: Right.

MR. KELLY: The judgment to take someone else's life. And I am just trying to really understand how you feel about that. I am not trying to play word games. I am not trying to do anything else. We are trying to find jurors who can be really even and fair to both sides. And candidly, I'm asking you these questions out of a concern that you have expressed a strong view one way.

JUROR NO. 64: Right.

MR. KELLY: And the question is, is that personal view going to interfere, if you ultimately sat in that stage of the process of making that ultimate judgment about this man, Donald Fell, and whether or not

FELL-00002353

he is to be put to death, which could be the ultimate

decision you would have to make, are you the right, fair

juror to make that choice given your answers to these

questions?

JUROR NO. 64: I think that I could make that

decision.

MR. KELLY: Are you the fair juror to do that?

JUROR NO. 64: Well, I'm not going to be

someone that would rush into immediately saying, oh,

because someone has done something that someone else

might say is horrible, that they immediately deserve the

worst.

MR. KELLY: Completely, no one would just.

But in answer to some of your questions, you were asked

about the types of cases where you would think the death

penalty is appropriate, and you described them as you

did today, as genocide, mass murder and possible war

crimes. Those were the types of cases where you thought

capital punishment would be justified.

JUROR NO. 64: Right.

MR. KELLY: There's no genocide in this case.

There's no mass murder. There are no war crimes.

That's not what this case is about. So if you take

those off the table, the question is not that you

hypothetically could do it in those cases. The question

Page 245

FELL-00002354

# EXHIBIT 237

# INTENTIONALLY LEFT BLANK

FELL-00002355

# EXHIBIT 238



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          )
           Plaintiff,               )
                                    )
                                    )        Criminal No. 2:01-CR-12
      v.                            )
                                    )
DONALD FELL,                        )
           Defendant.               )

## MOTION TO DISMISS NOTICE OF INTENT TO SEEK DEATH PENALTY

TO THE HONORABLE UNITED STATES DISTRICT COURT:

INTO COURT COMES DONALD FELL, Defendant in the above-styled case and files this Motion to Dismiss Notice of Intent to Seek Death Penalty, and would show as follows:

I.

On February 1, 2001, Donald Fell was indicted in this case. Counts One (Carjacking) and Two (Kidnapping) alleged conduct which was facially sufficient to seek a capital sentence pursuant to 18 U.S.C. § 3591. At the time, the Department of Justice's (DOJ) protocol required United States Attorneys (USA) to submit potential capital cases to the United States Attorney General (AG) for review. The AG could either accept or overrule the USA's recommendation, but ultimately the USA had the authority to settle the case for a sentence less than death.

II.

On May 25, 2001, Fell's counsel met with local prosecutors in an effort to convince them to settle the case. Fell's counsel had completed a substantial mitigation investigation and provided that evidence to the prosecutors. Fell offered to plead guilty to Count Two in exchange for a sentence of life in prison without possibility of parole. A plea to kidapping, resulting in a

1

A0048
*Federal Public Defender's Office*

FELL-00002356

death, has a minimum punishment of a life sentence. 18 U.S.C. § 1201 (a) (1). The prosecutors agreed to consider the offer.

III.

On June 7, 2001, DOJ changed its protocol in potential capital cases. In a letter from DOJ to local USAs, those changes were summarized as follows:

"A. In cases where the death penalty has been approved, approval of the Attorney General is now required to enter a plea withdrawing the death penalty.

B. In addition, in death eligible cases the U.S. Attorney may no longer authorize a plea prior to submitting the case to the Department without obtaining the approval of the Attorney General for the plea."

This meant a USA could be forced to try a potential capital case and seek a death sentence even though the USA did not believe the death penalty was appropriate.

IV.

In early October 2001, the USA for Vermont contacted Fell's counsel and agreed to settle the case, subject to approval from the AG. The USA drafted a plea agreement. Although a draft of the agreement was sent to counsel for review, no changes were requested and none were made. The agreement was written entirely by the USA, with no input from Fell. On October 24, 2001, Fell and his counsel signed the plea agreement and returned it to the USA.

V.

The plea agreement stated in part as follows:

"The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and

2

A0049

*Federal Public Defender's Office*



impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history."(See attached Plea Agreement).

### VI.

On November 9, 2001, the USA informed counsel that the Attorney General's Capital Case Review Committee had scheduled a meeting for November 19, 2001 to discuss the case. Counsel for Fell and the USA were invited to make presentations to the Committee by video-teleconference. Counsel met with the USA before appearing in front of the Committee. The USA and his Assistants repeated their support for the plea agreement. Although counsel for Fell was not allowed to attend the portion of the meeting where the USA spoke directly to the Committee, there is every reason to believe the USA strongly supported approval of the plea agreement.

### VII.

At all times during these negotiations, USA Peter Hall, preceding USA David Kirby, AUSA Gregory Waples and AUSA John Tavana, behaved in good faith and with honorable intentions. They acted within their roles as representatives of the United States Government, they made truthful representations, and they were reasonable in their actions.

### VIII.

On or before January 30, 2002, the AG informed the USA that the plea agreement was rejected and required the USA to try the case seeking a death sentence. This was the first time that an AG required a USA to try a capital case. Previously, when capital prosecutions were

3

A0050

*Federal Public Defender's Office*

FELL-00002358

authorized over the objection of the USA they were ultimately settled by plea agreement. The June 7, 2001 change in DOJ protocol removed this possibility. The USA filed the Notice of Intent to Seek Death Penalty.

## IX.

On March 15, 2002, the parties met with the Court. Fell's counsel stated Fell's intent to plead guilty to the charges and allow the Court to determine punishment. Both Judge Sessions and local prosecutors agreed to this procedure. After the meeting, the local prosecutors were told by DOJ that only DOJ could approve the waiver of a jury at sentencing. DOJ promised to consider the matter. On April 16, 2002, the parties again met with the Court. Local prosecutors stated that they would try to get a decision from DOJ by May 1, 2002. Later, on the same day, Fell's counsel received a fax from the prosecutors stating that they had been told by DOJ that only Attorney General Ashcroft could make the decision, and that his schedule prevented him from deciding the matter until the week of May 5, 2002. On May 9, 2002, Fell's counsel received a voicemail message that the Attorney General had denied the request.

## X.

The USA is the representative of the United States Government in the district that he or she serves, prosecuting all offenses against the United States. 28 U.S.C. § 547. Therefore, representations made by the USA in criminal prosecutions are official statements of the United States. The declarations made by the USA in Fell's plea agreement are official statements of the United States.

## XI.

A statement by a party is an admission which may be introduced against the party under

4

A0051

Federal Public Defender's Office

FELL-00002359



the rules of evidence. FRE 801 (d) (2). Statements made by a USA during the prosecution of a criminal case may be introduced against the government. *United States v. GAF Corporation*, 928 F.2d 1253 (2d Cir. 1991).[1] The portion of the plea agreement excerpted in Paragraph V contains such admissions.

## XII.

The federal rules that limit the admissibility of plea negotiations are privileges that belong to the defendant, not the government. *See* FRE 410, FRCP 11 (e) (6). Justice Thomas writing for the Supreme Court in *United States v. Mezzanatto*, 513 U.S. 196 (1995), stated:

> "The Rules provide that statements made in the course of plea discussions are inadmissible 'against' the defendant, and thus leave open the possibility that a defendant may offer such statements into evidence for his own tactical advantage. Indeed, the Rules contemplate this result in permitting admission of statements made 'in any proceeding wherein another statement made in the course of the same ... plea discussions *has been introduced* and the statement ought in fairness be considered contemporaneously with it." *at* 205-206.

Therefore, the government's statements are admissible and violate no exclusionary rule.

## XIII.

The government's statements preclude the government from seeking the death penalty in this case. The government stated in the plea agreement that it sought a life sentence because of

---

[1] Government's original bill of particulars was admissible to support theory of defense when it was inconsistent with amended bill and government's argument. *See also United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) (Statement by agent in warrant affidavit was admission of government); *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) (Defense attorney's opening statement in prior trial was admission as to defendant).

5

A0052

Federal Public Defender's Office

substantial mitigating evidence. There is no reason to believe the USA was untruthful, mistaken, or acting beyond his authority in making those representations. Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal DOJ policy to force the USA to try the case. That administrative decision has no legal effect upon the authority of this Court.

## XIV.

The basis for this motion is not in contract. The plea agreement was contingent upon the AG's approval, and that was not given. Fell is not seeking to enforce a binding contract. However, the law does require that when facts have been admitted by a party then the party may not change its position unless there is a showing of changed circumstances that are not within the party's control. *See United States v. McKeon, supra,* at 31 ("A party thus cannot advance one version of facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change of stories"). A number of legal doctrines prohibit parties from changing positions to suit their needs: *United States v. Holloway,* 74 F.3d 249 (11th Cir. 1996) (Oral representation by AUSA that defendants would not be prosecuted barred later indictment); *United States v. Podell,* 572 F.2d 31 (2d Cir. 1978) (Criminal defendant who pleaded guilty could not later deny civil liability); *United States v. Abcasis,* 45 F.3d 39 (2d Cir. 1995) (Entrapment by estoppel barred conviction of defendant who relied upon government authorization); *United States v. Cox,* 964 F.2d 1431 (4th Cir. 1992) (Government could not renege on promise to pay defendant's psychiatric fees).

## XV.

6

A0053

*Federal Public Defender's Office*

The Notice of Intent to Seek the Death Penalty stated: "The Government believes that the circumstances are such that if the defendant is convicted of either of those offenses [Counts One or Two], a sentence of death is justified." In its written plea agreement, the government stated it was entering into a disposition for a life sentence because of the "substantial mitigating evidence" (detailed in V) and "because it will ensure that DONALD FELL is imprisoned for the rest of his life." Implicit in that statement, is that a death sentence is not justified. The only change that occurred between the time those two statements were made is the ruling by the AG that the USA was prohibited from entering into the plea agreement.

## XVI.

Material evidence was lost to Fell during the time the government was considering Fell's offer to plead guilty. On September 20, 2001, co-defendant Robert Lee died while in custody. Lee was the only living person (besides Fell) to witness (1) the events leading up to the deaths of Debra Fell and Charles Conway; (2) Fell's state of mind on November 27, 2000; (3) Fell's ingestion of drugs and alcohol on that date; (4) the events leading up to the abduction and death of Teresca King; and (5) Fell's actions and state of mind before, during, and following those events. Besides law enforcement officers and Fell, Lee was the only witness to the stop and arrest of Fell and Lee on November 30, 2001. Although, the plea agreement was created after Lee's death, the discussions of a plea began months before.

## XVII.

Estoppel generally requires reliance by the defendant. In this case, Fell has lost time and the availability of evidence, but he has neither pleaded guilty nor waived a constitutional right. The difference between this case and other examples of estoppel is that the procedure in question

7

A0054

Federal Public Defender's Office

FELL-00002362

was completely within the government's control. Only the government could decide to file a potential capital case and only the government could choose to select alleged aggravating factors and file a Notice of Intent to Seek Death Penalty. An abuse of this discretion should be measured strictly against the government. The government will lose only the ability to end a life, not the ability to prosecute or imprison for life.

## XVIII.

Allowing the government to change positions without consequence would deny Fell due process of law. Accepting the government's statements in the plea agreement as true, and weighed against the aggravating factors alleged by the government, no reasonable trier of fact could sentence Fell to death absent the influence of passion, prejudice, or an other arbitrary factor. For these reasons, the Court should hold the government to its initial position – that a life sentence is justified– and dismiss the Notice of Intent to Seek Death Penalty. .

## XIX.

In considering this Motion, the Court should order the government to provide to the Court in camera and ex parte, review of all materials in the government's possession that relate to its position on recommendation of the death penalty in this case, including: (1) all materials sent by the USA, or his Assistants, to DOJ or the AG, (2) all materials received from the AG or DOJ by the USA, or his Assistants, and (3) any recording or transcript of the November 19, 2001 conference between the USA and DOJ.

8

A0055

FELL-00002363



By: _____
Alexander Bunin
Federal Public Defender

Gene V. Primono
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United States Attorney Gregory Waples, on this ___14th___ day of May, 2002.

_____

9

A0056

Federal Public Defender's Office

FELL-00002364

FELL-00002365

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )
                                  )
           v.                     )    Criminal No. 2:01CR12-01
                                  )
DONALD FELL                       )
        Defendant                 )


## PLEA AGREEMENT

The United States of America, by and through the United States Attorney for the District of Vermont (hereafter "the United States"), and the defendant, DONALD FELL, agree to the following disposition of pending criminal charges. The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history. The United States has also agreed to this plea because it will ensure that DONALD FELL is imprisoned for the rest of his life.

1.    FELL agrees to plead guilty to Count 2 of the indictment, which charges him with kidnapping with death resulting, in violation of 18 U.S.C. § 1201(a)(1), based on

A0057

Federal Public Defender's Office

his participation in the November 27, 2000 kidnapping and murder of Teresca King.

2.    FELL understands, agrees and has had explained to him by counsel that the crime to which he will plead guilty is a felony for which the Court must impose a sentence of life imprisonment without the possibility of release, pursuant to 18 U.S.C. § 1201(a).  FELL thus understands that if the Court accepts his plea of guilty, he will never be released from prison.  FELL further understands that the Court may also sentence him to pay a fine of not more than $250,000, pursuant to 18 U.S.C. § 3571(b) and a $100 special assessment.  Full restitution must also be ordered.

3.    It is the understanding of the parties to this agreement that the plea will be entered under oath and in accordance with Rule 11 of the Federal Rules of Criminal Procedure.  The defendant represents that he intends to plead guilty because he is, in fact, guilty of the crime to which he will enter a plea.

4.    FELL agrees and understands that it is a condition of this agreement that he refrain from committing any further crimes, whether federal, state or local.

5.    The United States agrees that in the event that FELL fully and completely abides by all conditions of this agreement, the United States will:

(a)    not seek the death penalty against FELL on any charges relating to the death of Teresca King;

2

A0058

*Federal Public Defender's Office*

FELL-00002367

(b)   not prosecute FELL, in the District of Vermont, for any other offenses known to the United States Attorney at the time this agreement is signed.

6.    If the United States determines, in its sole discretion, that the defendant has committed any offense between the date of this agreement and sentencing, the United States' obligations under paragraph 5 of this agreement will be void; FELL'S plea may be vacated on the motion of the United States, and the United States will then have the right to continue the prosecution of FELL on the present indictment or on any other charges and will have the right to seek any sentence authorized by law, including the death penalty.

7.    It is further understood and agreed by the parties that should the defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn or vacated, this agreement may be voided at the option of the United States and the defendant may be prosecuted for any and all offenses otherwise permissible.  FELL understands that if the plea is not accepted or if the plea is withdrawn, the United States will have the right, in its discretion, to seek the death penalty for any capital offenses he may have committed.  If the plea is withdrawn or vacated, the defendant herein expressly agrees that the entire period of time that elapses between the signing of this agreement and the withdrawal or vacatur of the plea

3

A0059

Federal Public Defender's Office

FELL-00002368

shall be disregarded in calculating whether the prosecution of any previously-dismissed charges is timely under the applicable statute of limitations, the Speedy Trial Act or the speedy trial guarantees of the Constitution.

8. In voluntarily pleading guilty, FELL acknowledges that he understands the nature of the charge to which the plea is offered. He also acknowledges that he has the right to plead not guilty or to persist in a plea of not guilty; that he has the right to be tried by a jury and at that trial a right to the assistance of counsel; that he has the right to confront and cross-examine adverse witnesses; that he has the right against compelled self-incrimination; that if a plea of guilty is accepted by the Court, there will be no further trial of any kind, so that by pleading guilty he waives the right to a trial and the other rights enumerated here.

9. FELL expressly states that he makes this agreement of his own free will, with full knowledge and understanding of the agreement and with the advice and assistance of his counsel, Alexander Bunin and Gene Primomo. FELL further states that his plea of guilty is not the result of any threats or of any promises beyond the provisions of this agreement. Furthermore, FELL expressly states that he is fully satisfied with the representation provided to him by his attorneys and has had full opportunity to consult with his attorneys concerning this agreement, and, more

4

A0060

Federal Public Defender's Office

particularly, about the fact that if his plea is accepted pursuant to this agreement, he will be sentenced to life imprisonment without possibility of release.

10. No agreements have been made by the parties or their counsel other than those contained herein.

11. It is agreed that a copy of this agreement shall be filed with the Court before the time of the defendant's change of plea.

12. This agreement will not become effective until approved by the Attorney General of the United States or his delegate, and until thereafter signed by the United States Attorney for the District of Vermont.

5

A0061

Federal Public Defender's Office

FELL-00002370

Dated at Burlington, in the District of Vermont, this ___ day of _____, 2001.

UNITED STATES OF AMERICA

PETER W. HALL
United States Attorney

10-24-01
DATE

DONALD FELL
Defendant

I have read, fully reviewed and explained this agreement to my client, DONALD FELL, and I hereby approve of it.

10/24/01
DATE

ALEXANDER BUNIN
Counsel for the Defendant

10/24/01
DATE

GENE V. PRIMOMO
Counsel for the Defendant

[ N:\CRFORMS\PLEANOCO.MRG ]                6

A0062
*Federal Public Defender's Office*

FELL-00002371

# Exhibit 239

# Sealed pursuant to Stipulation

# Exhibit 240

DATE OF REQUEST: 11/18/2010

SUBJECT NAME:                          JUROR 26
                            REDACTED-FELL
SUBJECT DATE OF BIRTH:              1955

---

#### RECORD OF CONVICTIONS

---

DATE OF CONVICTION      04/02/1996

COUNTY           ESSEX CO.

OFFENSE FOR WHICH
SUBJECT WAS CONVICTED    UNLAWFUL MISCHIEF $250 OR LESS

CONVICTION LEVEL       MISDEMEANOR

SENTENCE           FINED $100

---

END OF RECORD

ONLY MOTOR VEHICLE OFFENSES WHICH WERE ARRAIGNED IN A VERMONT
DISTRICT COURT AFTER SEPTEMBER 1, 1995 ARE INCLUDED IN THIS RECORD.
The criminal record information provided above represents case
disposition data reported by courts indicated. Charges that are supported by
fingerprints are designated with a "Y" in the "FP" column. All responses are
based on file search criteria provided by the requestor at the date/time
of the request. The requestor agrees to use Criminal Conviction Record
information received from the Vermont Information Center for the purposes
intended by law. The requestor agrees not to disclose the contents of any
criminal conviction record without the applicant's permission to any person
other than the applicant and properly designated employees who have a
documented need to know the contents of the record. A violation may result
in a civil penalty of up to $5,000. Each unauthorized disclosure shall
constitute a separate civil violation.
Authorized: J.Wallin - Director, Vermont Criminal Information Center
              Waterbury, Vermont

ONLINE VALIDATION CODE: e8e53418eb1317278545e4fa8cea0a1d

FELL-00002375

# Exhibit 241

# Sealed pursuant to Stipulation