**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

_____

|  |  |
|---|---|
| DONALD FELL, | ) |
|  | ) |
| Movant, | ) |
|  | ) |
| v. | ) 2:01-CR-12-01 |
|  | ) |
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Respondent. | ) |
|  | ) |

_____ )

**MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255**

# VOLUME VII OF VII

# EXHIBITS 296-313

# TABLE OF CONTENTS

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

Exhibit

Donald Fell Mitigation Binder................................................................................................1

Van Gorp Report (Apr. 6, 2001)............................................................................................2

Mills Report (May 7, 2001) ...................................................................................................3

Lipman Report (May 14, 2001) ..............................................................................................4

Cunningham Report (June 14, 2005).......................................................................................5

Declaration of Mark Cunningham, Ph.D., ABPP (June 27, 2005) ..................................................6

Wetzel Report (Oct. 11, 2002) ...............................................................................................7

Rabun Report (Dec. 31, 2002) ...............................................................................................8

Wetzel Report (June 27, 2005) ...............................................................................................9

Welner Report (July 5, 2005)................................................................................................10

CYS Contact Sheet (Apr. 22, 1985) .......................................................................................11

CYS Contact Sheet (May 8 1985) ..........................................................................................12

CYS Contact Sheet (Sept.—Oct.1985).....................................................................................13

CYS Contact Sheet (Aug. 8, 1991).........................................................................................14

CYS Contact Sheet (Aug. 8, 1991).........................................................................................15

CYS Contact Sheet (Aug. 8, 1991).........................................................................................16

CYS Contact Sheet (Oct. 1991).............................................................................................17

First Hospital Wyoming Valley Discharge Report (Oct. 31, 1991) ..............................................18

Wilkes-Barre General Hospital Progress Record (Apr. 1992)......................................................19

Wilkes-Barre General Hospital Adolescent Psych. Unit Interdisciplinary Progress Record (Apr. 1992)................................................................................................................20

Wilkes-Barre General Hospital Discharge Face Sheet (June 6, 1993) .........................................21

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Apr. 1992)..........22

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Jan. 1993) ..........23

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (June 1993) .........24

CRR Group Home Selection and Review (Sept. 22, 1993)............................................................25

Psychological Consultation of Donald Fell (Apr. 12, 1994) .........................................................26

Service Plan (Medical) (1994)......................................................................................................27

Service Plan (Medical – Dental) (1995) .......................................................................................28

CYS Contact Sheet (May 26, 1995) .............................................................................................29

Intentionally Left Blank................................................................................................................30

Rutland City Police Department Incident Table (Jan. 11, 1996)...................................................31

Rutland City Police Department Incident Table (Sept. 4, 1996) ...................................................32

Rutland City Police Department Incident Table (Nov. 6, 1996) ...................................................33

Rutland City Police Department Incident Table (Nov. 6, 1996) ...................................................34

Rutland City Police Department Incident Table (Mar. 4, 1997).....................................................35

Rutland City Police Department Incident Table (July 3, 1997)......................................................36

Rutland City Police Department Incident Table (Sept. 16, 1997) ..................................................37

Rutland City Police Department Incident Table (Jan. 14, 1998)....................................................38

Rutland City Police Department Incident Table (June 5, 1998)......................................................39

Rutland City Police Department Incident Table (July 28, 1998).....................................................40

Rutland City Police Department Incident Table (Apr. 30, 1999) ...................................................41

Rutland City Police Department Incident Table (May 26, 1999)....................................................42

Rutland City Police Department Incident Table (Oct. 30, 1999) ..................................................43

Rutland City Police Department Incident Table (Feb. 20, 2000) ..................................................44

Luzerne County Detention Center Admission Page (Sept. 10, 1996) ...........................................45

Sullivan County Sheriff's Department Criminal Complaint (Aug. 12, 2000)...............................46

New York State Incident Report and Arrest Report (Aug. 12, 2000)............................................47

Sullivan County Sheriff's Department Statement of Donny McNeeley (Aug. 12, 2000) .............48

Sullivan County Sheriff's Department Statement Joshua Jones (Aug. 12, 2000) .........................49

New York State Incident Report (Aug. 12, 2000) ........................................................................50

Sullivan County Sheriff's Department Statement (Teri Fell) (Aug. 12, 2000) ............................51

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000).................................52

Sullivan County Sheriff's Department Supporting Deposition (Aug. 12, 2000)...........................53

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000).................................54

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000).................................55

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000).................................56

FBI FD-302 (Nov. 30, 2001 – Dec. 1, 2001).................................................................................57

Intentionally Left Blank ................................................................................................................58

Intentionally Left Blank ................................................................................................................59

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 1, 2000) ......................60

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................61

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................62

New York State Police Investigation Report (Dec. 1, 2000).........................................................63

New York State Police Supporting Deposition (Dec. 2, 2000) .....................................................64

Autopsy Report of Teresca King (Dec. 2, 2000) ..........................................................................65

3

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .......................66

United States Marshals Service Prisoner Intake ..........................................................................67

New York State Police Supporting Deposition of Francis Bellantoni (Dec. 1, 2000)...................68

Warrant Information Network Subject Report (Dec. 15, 2000) .....................................................69

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 22, 2000) .....................................................................................................................70

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................71

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................72

NWSCF Facility Incident Report (Dec. 27, 2000) ........................................................................73

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 28, 2000) .....................................................................................................................74

Prison Medical Records of Donald Fell.........................................................................................75

2001 FBI Report ............................................................................................................................76

Vermont Department of Corrections Disciplinary Hearing Report (Dec. 27, 2000)....................77

FBI Report (Jan. 4, 2001) .............................................................................................................78

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Jan. 8, 2001).........................................................................................................................79

Letter from Alex Bunin to A.U.S.A. Gregory Waples (Jan. 9, 2001) ...........................................80

FBI FD-192 (Jan. 22, 2001)..........................................................................................................81

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
    (Jan. 24, 2001).......................................................................................................................82

Redacted E-mail (Mar. 15, 2001) .................................................................................................83

Letter from A.U.S.A Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Mar. 26, 2001) .....................................................................................................................84

New York State Certificate of Disposition (Mar. 28, 2001)..........................................................85

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch (Apr. 5, 2001)........................................................................................................86

Memorandum from Cynthia Ayres to Dr. Mark Mills (Apr. 23, 2001)........................................87

Letter from Peggy Peterson, Luzerne County CYS.....................................................................88

Letter A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht (Apr. 5, 2001)........................................................................................................90

Handwritten D Management Team Meeting Notes (Apr. 21, 2001) ............................................91

Vermont Department of Corrections Facility Report Form (June 13, 2001)................................92

Correctional Medical Services Interdisciplinary Progress Notes (July 2001) ..............................93

Pennsylvania State Police Central Repository Criminal History of Christopher Eike .................94

Handwritten D Management Team Meeting Notes (July 16, 2001)............................................95

D Wing Activity Sheet................................................................................................................96

Redacted E-mail (Sept. 20, 2001) ...........................................................................................97

Redacted E-mail (Sept. 20, 2001)............................................................................................98

Redacted E-mail (Sept. 20, 2001) ............................................................................................99

Redacted E-mail (Sept. 20, 2001) ..........................................................................................100

Redacted E-mail (Sept. 20, 2001) ..........................................................................................101

Vermont Department of Corrections Facility Report Form (Sept. 20, 2001).............................102

Redacted E-mail (Sept. 20, 2001) ..........................................................................................103

Handwritten note of Bobby Lee...............................................................................................104

Handwritten note of Bobby Lee...............................................................................................105

Individual Voir Dire (May 4, 2005)..........................................................................................106

Redacted E-mail (Sept. 25, 2001) ..........................................................................................107

Commonwealth of Pennsylvania Police Criminal Complaint against Christopher Eike (Nov. 7, 2001) ................................................................................................................108

Prison Health Records of Robert Lee ..........................................................................109

Intentionally Left Blank................................................................................................110

Intentionally Left Blank................................................................................................111

Vermont Department of Corrections Incident Report (Mar. 17, 2004) .......................112

Intentionally Left Blank................................................................................................113

FOIA 302 (Apr. 6, 2005) ..............................................................................................114

Letter to Judge Sessions from A. Bunin (Apr. 27, 2005) ............................................115

Sealed Document Order, Case No.:2:01-CR-12 (Apr. 28, 2005) ................................116

Jury Instructions...........................................................................................................117

Intentionally Left Blank................................................................................................118

FOIA 302 (May 9, 2005) ..............................................................................................119

Intentionally Left Blank................................................................................................120

Intentionally Left Blank................................................................................................121

Letter from William B. Darrow and Stephen Kelly to Alexander Bunin, Gene Primomo, and Paul Volk................................................................................................................122

Blank Juror Questionnaire ...........................................................................................123

Juror No. 26 Questionnaire (May 13, 2005) ................................................................124

Juror No. 162 Questionnaire (May 23, 2005)..............................................................125

Intentionally Left Blank................................................................................................126

Intentionally Left Blank................................................................................................127

FBI Report (June 14, 2005) ..........................................................................................128

FBI 302 Report of Interview with Christopher Eike (June 15, 2005) ..........................129

United States' Trial Memorandum, United States v. Donald Fell ..............................................130

Letter to Judge Sessions from David V. Kirby (June 29, 2005) ...................................................131

FBI 302 Report of Interview with [Redacted] (July 5, 2005) .....................................................132

FedEx Air Bill from Town of Bethel Justice Court to Andrew Bartnick (July 6th, 2006)..........133

Letter to Judge Sessions from Alex Bunin (July 8, 2005) ...........................................................134

Stipulation (July 8, 2005).............................................................................................................135

Intentionally Left Blank ...............................................................................................................136

Memorandum to Alex Bunin from Paul Volk (July 20, 2005).....................................................137

Donald Fell's Motions for Judgment of Acquittal and New Trial, United States v. Donald Fell
    (Aug. 26, 2005) .....................................................................................................................138

Affidavit of Richard Wetzel, Ph. D (Sept., 12, 2005).................................................................139

Appeal from the United States District Court for the District of Vermont, Brief of the United
    States, United States v. Donald Fell (May 25th, 2007) ........................................................140

Letter to Victims Resource Center from Wanda Rivera (Apr. 21, 2005) ...................................141

Letter from Victims Resource Center to Andrew Bartnick (May 4, 2005) ................................142

School Heath Record of Donald Fell ...........................................................................................143

Intentionally Left Blank ...............................................................................................................144

Wilkes-Barre General Hospital Progress Record of Donald Fell (June 1993) ...........................145

Raymond Kotzer and Theresa Kotzer Divorce Records (Oct. 22, 1967) ...................................146

Arrest Warrant Affidavit for Donald Fell, Sr. (Mar. 4, 1990) ....................................................147

CYS Contact Sheet (Apr. – May 1990) .......................................................................................148

Jenkins Township Incident Report (Apr. 21, 1990).....................................................................149

CYS Contact Sheet (June 1990) ..................................................................................................150

Service Planning/Family Functioning Report (June 1990)..........................................................151

CYS Contact Sheet (Nov. 28, 1990)........................................................................................152

CYS Contact Sheet (Jan. 14, 1991) .......................................................................................153

CYS Contact Sheet (Feb. 14, 1991).......................................................................................154

Intentionally Left Blank.........................................................................................................155

Intentionally Left Blank.........................................................................................................156

CYS Contact Sheet (Mar. 19, 1991) ......................................................................................157

Suspected Child Abuse Referral Note (Apr. 18, 1993) ..............................................................158

CYS Contact Sheet (May 1, 1991) .........................................................................................159

CYS Contact Sheet (May 2, 1991) .........................................................................................160

CYS Contact Sheet (June 4, 1991) .........................................................................................161

CYS Contact Sheet (June 24, 1991) .......................................................................................162

CYS Contact Sheet (July 8, 1991) ..........................................................................................163

CYS Contact Sheet (Dec. 20, 1991) .......................................................................................164

CYS Contact Sheet (Dec. 23, 1991) .......................................................................................165

CYS Contact Sheet (Jan. 13, 1992) ........................................................................................166

CYS Contact Sheet (Mar. 3, 1992).........................................................................................167

CYS Contact Sheet (Apr. 20, 1992)........................................................................................168

Intentionally Left Blank.........................................................................................................169

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (1993) .....................170

CYS Client Information Profile (Apr. 18, 1993)  .....................................................................171

CYS Contact Sheet (Apr. 20, 1993)........................................................................................172

Police Report (Jan. 26, 2001).................................................................................................173

Intentionally Left Blank.........................................................................................................174

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (June 8, 1993)..........175

Office of the Sheriff, Luzerne County (Aug. 31, 1993)...............................................................176

CYS Client Information Profile (Jan. 19, 1994) ........................................................................177

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................178

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................179

CYS Contact Sheet (Feb. 4, 1993)..............................................................................................180

CYS Contact Sheet (Mar. 10, 1994) ..........................................................................................181

CYS Contact Sheet (Mar. 24, 1994) ..........................................................................................182

CYS Contact Sheet (Apr. 7, 1994)..............................................................................................183

CYS Contact Sheet (Apr. 12, 1994)............................................................................................184

CYS Contact Sheet (Apr. 12, 1994)............................................................................................185

St. Michael's School Psychiatric Note (May 1994)....................................................................186

St. Michael's School Psycho Social Summary (Apr. 1994) .......................................................187

FBI Identification Record for Debra Fell (June 9, 1994).............................................................188

Wilkes-Barre Police Department Jailer's Report (Oc. 18, 1994) ...............................................189

Arrest Report for John Rhodes (Oct. 18, 1994) .........................................................................190

Citation for John Rhodes (Oct. 18, 1994) ..................................................................................191

Wilkes-Barre Police Special Report for John Rhodes (Oct. 18, 1994).......................................192

Risk /Severity Assessment Form (Oct. 26, 1994).......................................................................193

Arrest Report for John Rhodes (Jan. 12, 1995) ..........................................................................194

Arrest Warrant for John Rhodes (Feb. 9, 1994)..........................................................................195

Arrest Warrant for John Rhodes (Jan. 12, 1995) ........................................................................196

CYS Contact Sheet (Jul. 1995) ...................................................................................................197

Substance Abuse Evaluation for Donald Fell (Sept. 16, 1996) ....................................................198

Affidavits Submitted in Motion in Limine in United States v. Haynes (May 24, 2000).............199

Letter to Judge Niedermeier (Dec. 5, 2000) ................................................................................200

Letter to Charles Tetzlaff (Dec. 5, 2000)......................................................................................201

Letter to Judge Murtha (Dec. 11, 2000)........................................................................................202

Rutland Herald Article (May 13, 2002).........................................................................................203

Burlington Free Press Article (May 15, 2002)...............................................................................204

Donald Fell's Objections to Punishment-Related Questions (Jun. 10, 2002)...............................205

Declaration of Thomas V. Ryan ....................................................................................................206

Letter to David Kirby (Feb. 23, 2005) ..........................................................................................207

Letter to Judge Sessions (Jun. 29, 2005).......................................................................................208

Special Verdict Form (Jul. 14, 2005).............................................................................................209

Criminal History Record of Deborah Fell (Apr. 10, 1996) ..........................................................210

Rutland City Police Department Incident Report (1996) ..............................................................211

Rutland City Police Department Report (1994-2000) ...................................................................212

New York State Police Investigation Report (Dec. 1, 2000).........................................................213

Criminal Docket for Christopher Eike (Oct. 8, 2002)  .................................................................214

Government Opposition to Motion (Jul. 10, 2002)........................................................................215

FBI Record (Apr. 25, 2005)...........................................................................................................216

Donald Fell Event Table (Apr. 30, 2005) .....................................................................................217

FBI Record (May 11, 2005)...........................................................................................................218

FBI Record (May 16, 2005)...........................................................................................................219

FBI Record (Jun. 9, 2005)..............................................................................................................220

FBI Record (Jun. 6, 2005)..................................................................................................221

Adolescent Psychiatric Reports for Donald Fell (1993) ...............................................222

Bail Certificate (Mar. 4, 1997)..........................................................................................223

CYS Contact Sheet (May 20, 1992) ..................................................................................224

FBI Record (Jun. 27, 2005).................................................................................................225

FBI Record (Jun. 9, 2005)...................................................................................................226

Statement by Teri Fell to Sullivan County Sheriff (Aug. 12, 2000)...........................227

Deposition of Lance Rowland (Aug. 12, 2000).............................................................228

Certificate of Disposition (Aug. 16, 2000) ....................................................................229

Individual Voir Dire (Jun. 1, 2005) .................................................................................230

Police Report (Nov. 1, 2002) ............................................................................................231

Wilkes-Barre Times Leader Article (Oct. 5, 2004) ......................................................232

Law and Human Behavior Article (1991) ......................................................................233

Specialty Guidelines for Forensic Psychology .............................................................234

United States v. Fell Court Order (Apr. 7, 2005)..........................................................235

Transcript Excerpt (May 13, 2005)..................................................................................236

Intentionally Left Blank....................................................................................................237

Fell Motion to Dismiss Notice of Intent to Seek Death Penalty ...............................238

Declaration of Juror 23 ......................................................................................................239

Conviction Record of Juror 26 (Apr. 2, 1996)...............................................................240

Declaration of Juror 143 ....................................................................................................241

Declaration of Sally Fell Francis .....................................................................................242

Declaration of Ronald Cupano.........................................................................................243

Declaration of Rose O'Hop ........................................................................................................244

Declaration of Claudia Bublo ...................................................................................................245

Trial Transcript Excerpt (May 13, 2005).................................................................................246

Declaration of Robert Fell ........................................................................................................247

Declaration of Dorothy Grivner................................................................................................248

Declaration of John Timek.........................................................................................................249

Declaration of Florence Wallace ..............................................................................................250

Declaration of John Gacek.........................................................................................................251

Declaration of Adele Gacek ......................................................................................................252

Declaration of Ernie Schuldaski ...............................................................................................253

Declaration of Jon Migatulski....................................................................................................254

Declaration of Steve Ratte .........................................................................................................255

Declaration of Marc Pelkey .......................................................................................................256

Voir Dire Transcript...................................................................................................................257

Declaration of Richard T. Callery, M.D., F.C.A.P. ..................................................................258

Intentionally Left Blank..............................................................................................................259

Declaration of Mark J. Mills, J.D., M.D. ..................................................................................260

Intentionally Left Blank..............................................................................................................261

Declaration of Andrew Bartnick.................................................................................................262

Declaration of Gene Primomo ...................................................................................................263

Declaration of Alexander Bunin ................................................................................................264

Declaration of Cynthia Ayres ....................................................................................................265

Declaration of Sandra Shum ......................................................................................................266

Declaration of Deborah Wisell ........................................................................................267

Declaration of Anthony Mistretta ....................................................................................268

Declaration of Dora Carter..............................................................................................269

Declaration of Jeff Van Buren ........................................................................................270

Declaration of Pat Johnson .............................................................................................271

Declaration of Mary Bell ................................................................................................272

Transcript of Juvenile Proceedings (Apr. 8, 1994) .........................................................296

Childline Record (Apr. 22, 1991) ...................................................................................297

Officers Report...............................................................................................................298

Prison Record (Jun. 11, 2001)........................................................................................299

Declaration of Michael Sikirica ......................................................................................300

Declaration of Francis Bellantoni ...................................................................................301

Declaration of Lucinda Fruean .......................................................................................302

Declaration of Michael Leight ........................................................................................303

Declaration of Paul Stoss................................................................................................304

Declaration of Paul Volk ................................................................................................305

Declaration of Charles Wetli ..........................................................................................306

Birth Certificate of Theresa Kozersky (Aug. 9, 1935).....................................................307

Death Certificate of Frances Kozerski (Apr. 20, 2001) ...................................................308

Declaration of John Edens ..............................................................................................309

Government Motion in Limine to Exclude Report (Jul. 6, 2005).......................................310

Individual Voir Dire Excerpt (Jun. 6, 2005).....................................................................311

Photographs of Fell Home ..............................................................................................312

Declaration of Jamie Dominick ..................................................................................................313

**SEALED EXHIBITS**

15

# EXHIBIT 296

IN THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY
PENNSYLVANIA

| IN THE INTEREST OF | : | JUVENILE DIVISION |
|---|---|---|
| | : | |
| DONALD FELL AND | : | |
| TERI FELL, | : | |
| | : | |
| MINORS | : | No. M-97 of 1990 |

TRANSCRIPT OF PROCEEDINGS
in the above-captioned matter
before
THE HONORABLE CHESTER B. MUROSKI
Luzerne County Courthouse
Bernard C. Brominski Building
113 West North Street
Wilkes-Barre, Pennsylvania 18711
April 8, 1994

APPEARANCES

MARSHA ANN BASCO, ESQUIRE
For Luzerne County Children and Youth Services

JANET NEUMAN, ESQUIRE
Guardian ad Litem for the Minors

DEBRA FELL, Mother
Pro se.



COPY

FELL-00002607

**2**

(NOW, this 8th day of April, 1994, at 10:16 a.m., proceedings are commenced.)

THE COURT: Why are we here?

MS. BASCO: This is In the Interest of Donald and Teri Fell, No. M-97 of 1990. Present in the courtroom today is the natural mother, who is currently incarcerated, and the maternal grandmother, Theresa Sharpe. Additionally, they are accompanied by a family member.

THE COURT: Mr. Nilon, what do I owe this visit to?

MS. BASCO: Apparently, he has had contact with --

THE COURT: Who has had?

MS. BASCO: Donald, the older child.

THE COURT: How old is he?

DONNA VRHEL: Thirteen.

THE COURT: Do we know where he is?

DEBRA FELL: He's home right now.

**3**

ROBERT NILON: Donald had an informal hearing in December for nonpayment of fine. That's our only contact with him.

THE COURT: No record aside from that?

ROBERT NILON: No, sir. My involvement has been trying to get him to school. He won't go. There have been no criminal charges pressed. I talked to him last night and this morning about today. My advice to him, I offered to pick him up this morning. He's not going.

THE COURT: What does the agency want to do? Why is mom incarcerated?

DEBRA FELL: Because my son didn't go to school they put me in jail.

THE COURT: What? Who put you in?

DEBRA FELL: Diana Malast.

THE COURT: How long have you been in jail?

DEBRA FELL: Your Honor, I've

**4**

been trying --

THE COURT: How long have you been in?

DEBRA FELL: She gave me 30 days. I've been trying for a year-and-a-half to get help for my son. I've been calling Children and Youth. I've been calling Children's Service Center. My son was active with Children's Service Center. He refused to go. They tell me they couldn't do nothing. I called the Wilkes-Barre Police when my son stole my car. I tried to get him on probation. I went to the magistrate, and I begged her for help to get my son on probation. I've been going all over in circles for a year-and-a-half to get help for my son, and nobody would help me. Now I'm sitting in jail because my son refuses to go to school, and I've been begging for help.

THE COURT: Does anybody know anything about this?

DONNA VRHEL: It was because she

**5**

didn't show up for a magistrate's hearing.

DEBRA FELL: There was no fines or nothing. I didn't know that -- I thought they were just to scare my son. There were no fines or nothing. I thought this was to scare my son because I went to the magistrate on my own.

THE COURT: I strongly recommend that you call the Public Defender's Office.

DEBRA FELL: I've been trying to request a Public Defender, and I can't get one.

DONNA VRHEL: Mrs. Fell, from what I understand, has a serious drinking problem. She has been out doing a lot of drinking. Donald has been home alone.

THE COURT: But you don't go to jail for that.

DONNA VRHEL: Donald has been running the streets unsupervised.

DEBRA FELL: I've been trying to

FELL-00002608

**6**

get him to go to school.

THE COURT: Is Donald a dependent child?

DEBRA FELL: Yes, he is.

DONNA VRHEL: That's what we're here today for.

THE COURT: This is the dependency petition.

MS. BASCO: For two children.

THE COURT: Why is there an old number on this? There's a 1990 number. Are we talking about Donald and Teri?

MS. BASCO: Probably through the agency the case has been inactive for a time.

THE COURT: In any event, Teri is how old?

DEBRA FELL: Eleven. I have her with my mother.

THE COURT: Teri is eleven. Which child are you seeking the dependency?

MS. BASCO: Both of them.

DEBRA FELL: Donald I would like

**7**

to get in St. Michael's Day Program so that he could go to school.

MS. BASCO: The plan, before I spoke with Donna this morning, was that custody of both children would be transferred to their maternal grandmother, but it's my understanding that just because Donald is how he is she doesn't want to take him.

THERESA SHARPE: I can't handle him.

DEBRA FELL: I've been trying to get him in St. Michael's Day Program.

THE COURT: What are we going to do with this kid? I don't have enough in front of me to determine if this lady merits being in jail, whether or not she hasn't done a good job. I don't know. I do know this: Everybody concurs in one thing. The kid isn't going to school and he needs direction. What do we do?

DEBRA FELL: I would like him in St. Michael's Day Care.

THE COURT: I understand.

**8**

DONNA VRHEL: He needs to be placed in a structured setting.

THE COURT: Do you know anything about this?

MS. NEUMAN: No.

THE COURT: First time you're hearing this. What do you know about this?

ROBERT NILON: Your Honor, I've talked to Donald and Mrs. Fell. Mrs. Fell and Donald say I'll be in school. That's been my focus, let's get him in school. He won't go. He won't give a reason.

MS. NEUMAN: How long has he been out of school?

DEBRA FELL: He's been in school four days this year.

THE COURT: We have to do something. First of all, let me advise you of this: You have a right to be represented by a lawyer. If you can't afford a lawyer in this proceeding, I'll appoint one to represent your interest. However, you

**9**

can enter into an agreement with the agency as long as you understand what they want done. If you have any questions, please ask them. If you don't want to go along with this dependency and the plan the agency is talking about, you should tell me that, and we'll have a full hearing.

What does the agency propose so that I can ask her if she's -- is there a father in this situation?

DEBRA FELL: No, there is not.

THE COURT: Is he dead?

DEBRA FELL: We don't know where he's at.

MS. BASCO: Whereabouts unknown on the father.

ALL PERSONS PARTICIPATING IN THE PROCEEDINGS WERE DULY SWORN.

THE COURT: When was the last time that you had contact with the natural father?

DEBRA FELL: About six years ago.

FELL-00002609

10

THE COURT: Do you collect any support?

DEBRA FELL: No.

THE COURT: Do you have any idea where he is?

DEBRA FELL: No.

THE COURT: Are you satisfied with that?

MS. NEUMAN: Yes.

THE COURT: Where are we going with this?

MS. BASCO: The proposal -- I'm modifying some of it from the original plan -- the minor children are deemed dependent.

Temporary legal custody of Teri Fell to be transferred to the maternal grandmother, Theresa Sharpe.

We would like temporary legal custody of Donald Fell to be transferred to Luzerne County Children and Youth Services.

In light of the situation of this transfer of custody -- and this is also new to Mr. Nilon -- I would ask

11

the Court to direct that these costs be split with the Juvenile Probation Office.

ROBERT NILON: I'd have to check that. He's never been in front of you.

DEBRA FELL: I don't agree with that myself.

THE COURT: Why?

DEBRA FELL: I don't believe he belongs to be put away. I believe if he was in St. Michael's Day Treatment Program that that would help him.

MS. BASCO: That isn't what I said. You didn't listen to what I said. Temporary legal custody has to be transferred to Children and Youth. That means the responsibile entity for the child is Children and Youth. We don't know at this point if he's going to St. Michael's, whatever. The last sentence that I said requested the Court to have the cost of either foster care or St. Michael's or whatever, wherever he's placed, to be

12

split between my agency and Juvenile Probation. That's what I said.

DEBRA FELL: I don't want him in foster care. He would run.

THE COURT: You can't have it five ways. You can't have a situation where you don't want to be responsibile and you want somebody else to be responsible but you want to call the shots.

DEBRA FELL: I want to be responsible for him, sir. I want help for him. I don't think putting him away is the answer. He just needs help, some guidance, more structured help than what he's getting.

THE COURT: That's exactly what the agency is saying.

DEBRA FELL: I don't want him put away.

THE COURT: They can't put him away, first of all, because that agency doesn't have the right to put him in that kind of an institution. Only that agency can, which is

13

Juvenile Probation. Children and Youth cannot put anybody in a secure locked facility. That's a basic rule. So no matter what they do, he can't be put in a locked facility, okay?

DEBRA FELL: All right.

MS. BASCO: Additionally, we would ask that the transfer of temporary legal custody to Children and Youth take place immediately, with any law enforcement agency that is appropriate or the Sheriff's Department or Juvenile Probation to assist Children and Youth.

THE COURT: Do you have any problem with this, ma'am?

DEBRA FELL: I don't understand what that means.

THE COURT: If he won't go, the sheriff will pick him up and take him where Children and Youth want to put him. That's what that means.

DEBRA FELL: Where do they plan on putting him?

DONNA VRHEL: I think that he

FELL-00002610

14

really needs to have a complete
evaluation, like a 30-day evaluation
at St. Michael's.
    THE COURT:  St. Michael's, 30
days, reasonable course of conduct.
St. Michael's for a 30-day evaluation.
Do a psychological evaluation for 30
days.  They do a good job.  Is there
any problem with that?
    DEBRA FELL:  No.  As long as he's
not going to be there forever.
    THE COURT:  I don't know what the
recommendations are.  When the
recommendations come in, that will be
another situation when we come in and
talk about it.
    Ms. Neuman?
    MS. NEUMAN:  I'm in agreement.  I
have a question.
    MS. BASCO:  One second.  I still
have some more proposal.
Additionally, we want the natural
mother to undergo a comprehensive drug
and alcohol evaluation.
    DEBRA FELL:  That I was going to

15

do on my own.
    MS. BASCO:  We'll arrange it for
you and assist.  We want you to follow
through with any recommendations.
    DEBRA FELL:  Right.
    MS. BASCO:  Additionally, we want
the natural mother and originally both
minor children to undergo
comprehensive mental health
evaluations as arranged by Children
and Youth and follow through with any
recommendations.  If it is
recommended, we want the maternal
grandmother to participate in this
evaluation process.
    THE COURT:  I think that's fair.
    MS. BASCO:  If appropriate, we
want Donald to meet regularly with
Juvenile Probation Office.
    We want all parties to cooperate
with Children and Youth including
announced and unannounced visits to
the parties' residences, with this
matter being subject to review.
    THE COURT:  Based upon the

16

cases -- this is an unofficial with
the Probation Office.
    ROBERT NILON:  That's correct.
    THE COURT:  I believe it's fair
in this kind of case based upon this
kid's background that you share costs.
    Teri, are you staying with your
grandmother now?
    THERESA SHARPE:  That's my
daughter.
    DEBRA FELL:  Teri is in school.
    MS. NEUMAN:  I was going to talk
about her evaluation.  You said Donald
has been in school four days since
September?
    DEBRA FELL:  Yes.
    MS. NEUMAN:  How long have you
been in jail?
    DEBRA FELL:  Three days.
    THE COURT:  Where has he been
spending the days?
    DEBRA FELL:  He stays up all
night over their house all night long
with them and comes home at 5:00, 6:00
in the morning and sleeps until 3:30,

17

4:00 in the afternoon.
    MATERNAL AUNT:  When she's
done --
    DEBRA FELL:  4:00 or 5:00 in the
morning.
    THE COURT:  Why?
    DEBRA FELL:  They let him.  I
tell them not to do it.  She lets them
on the CB.
    MATERNAL AUNT:  My nephew was 11,
12, 13, running the streets until 4:00
in the morning.  Police have --
    THE COURT:  At this point in
time, it appears that this is a very
appropriate case for dependency based
upon what we're hearing.  The kids
need structure.  We'll bring it back
and find out what happens when we get
recommendations.  You can have law
enforcement assist you.
    Where do you live?
    DEBRA FELL:  30 East Chestnut
Street, Wilkes-Barre.
    THE COURT:  Make sure
Wilkes-Barre Police know about it.  If

FELL-00002611

18

they want to confirm the Order, they can call me here.

MS. NEUMAN: The evaluations will be set up within 30 days --

THE COURT: If they get done --

DEBRA FELL: I shouldn't be in jail.

THE COURT: Write a letter. Tell her what happened here today. That might do you some good. I don't know why she put you in.

(Proceedings are concluded.)

FELL-00002612

# EXHIBIT 297

Page II

Screening
Worker: _____

Case
Name: _____ Fell

Date of
Call: _____ 4/25/91

Helpline
Worker: _____ Keith R. Rumbon
Signature

Time of Call: _____ 10:40

A (P) Service: Phone: Hrs.: _____ Min.: 25

| REFERRAL SOURCE CODES | REASON FOR REFERRAL CODES | RELATIONSHIP CODES | SCHOOL DISTRICT CODES |
|---|---|---|---|
| 01 = Anonymous | 01 = Neglect/Physical | AF = Adoptive Father | 19-110 = Berwick Area |
| 02 = Child - Self Ref. | 02 = Neglect/Mistreat/Emot. | AM = Adoptive Mother | 40-140 = Crestwood Area |
| 03 = Perpetrator | 03 = Neglect/Environment | BRO = Brother | 40-160 = Dallas Area |
| 04 = Parent/Guardian | 04 = Neglect/Medical | C = Child | 40-260 = Greater Nanticoke |
| 05 = Sibling | 05 = Abandonment | COU = Cousin | 40-300 = Hanover Area |
| 06 = Relative | 06 = Inadequate/No House. | F = Father | 40-330 = Hazleton Area |
| 07 = Friend/Neighbor | 07 = Inadequate Supervision | GUA = Guardian | 40-390 = Lake Lehman |
| 08 = Babysitter | 08 = Parent/Child Conflict | HBM = Half-brother Mat. | 40-600 = Northwest Area |
| 09 = Landlord | 09 = Behavioral Problems | HBP = Half-brother Pat. | 40-660 = Pittston |
| 10 = Private Dr./Nurse | 10 = Community Problems | HSM = Half-sister Mat. | 40-885 = Wilkes-Barre |
| 11 = Dentist | 11 = Conflict w/Law | HSP = Half-sister Pat. | 40-920 = Wyoming Area |
| 12 = Private Psych/Psycho | 12 = Runaway | M = Mother | 40-930 = Wyoming Valley West |
| 13 = Public Health Dept. | 13 = School Prob./Truancy | MA = Maternal Aunt | 99-000 = Other (Out of State) |
| 14 = Hospital | 14 = School Prob./Behavior | MC = Maternal Cousin | |
| 15 = Law Enforce. Agency | 15 = Drug/Alcohol Prob. | MGF = Maternal Grandfather | |
| 16 = School | 16 = Placement | MGM = Maternal Grandmother | (Circle One) |
| 17 = Day Care Staff | 17 = Day Care/Place. Prevent. | MU = Maternal Uncle | |
| 18 = Clergy | 18 = Court Ordered Superv. | O = Other (Not a Relative) | Placement Resolved |
| 19 = Res. Central Fac. | 19 = Medical Clearance | OR = Other Relative | |
| 20 = Coroner | 20 = Home Study | PA = Paternal Aunt | Vol.    C.O.    P.C. |
| 21 = Courts | 21 = Teenage Pregnancy | PAR = Paramour | |
| | 22 = Adoption Services | PC = Paternal Cousin | (Check One)    N/A |
| | 23 = Maternity Services | PE = Perpetrator | |
| | 24 = Hospitalized Parent | PGF = Paternal Grandfather | WI - Worker Informed ☐ |
| | 25 = Information/Referral | PGM = Paternal Grandmother | |
| | 26 = Inappropriate Discip. | PU = Paternal Uncle | WP - Worker Phone ☐ |
| | 27 = Other | SB = Step-brother | |
| | 28 = Protective Services* | SF = Step-father | Contact with Supv. ☐ |
| | | SIS = Sister | |
| | | SM = Stepmother | Supv. Out ☐ |
| | | SS = Step-sister | |
| ACTIVE WORKER: _____ | | | Supv. Phone Work ☐ |

Problem Identified by Referral Source: (Include information on prior ChildLine Numbers)

anonymous male caller states that clients are left home alone. He states mother is out drinking + father doesn't live w/ the family. He says he called to try + reach mother every hour on the hour since 7 p.m. + the kids always answered + said mom wasn't home. When I asked for their phone # he said he didn't know it. I reminded him he said he had been calling them all night. He gave me the number. He refused all other info + was very nervous.

I called + Mr. Fell answered the phone. He has been home almost all evening + hasn't spoken to any man on the phone + he is the only one there. His wife is out + the clients are both staying w/ friends. No further action taken.

FELL-00002613

# EXHIBIT 298

Narrative:
_____
Officers Report.   Ofc. Delpha/3062

Was assigned to REDACTED - FELL for a report of unwanted people at
██████████home.   On arrival, met with ████ who said she saw
Debbie Fell and █████████ outside wondering around her place.
████ said she lives with her mother.   She said a male friend of
hers is staying with her at her mothers house and the male friend
is going through a divorce with ███████.   She said the two
females have been harassing her friend and she believes that they
have been sneaking around the house and would like this to stop.
She is worried that the two females will do something to her
because she is friends with the male.

A notice of trespass was signed for by the mother (███████████)
for Debbie Fell and for █████████ for REDACTED - FELL

Debbie Fell was issued the notice against trespass.

Will attempt to locate ████████

Cont.

FELL-00002614

# EXHIBIT 299

D* UNIT MANAGEMENT TEAM MEETING
6/11/2001

b6
b7C

-= Present :

- CASE REVIEWS -

sent Pee (mit): Refusing Meds. Wants to see [ ]. Request noted.

old Fell : (Seen by DMT.) Requesting bullpen / Denied.

b6
b7C

[ ] Awaiting oos/movement.

No issues / No changes. Cell changed to be considered.

). Alot E-mail generated - up/down behaviors. Received another major DR this past weekend.

[ ] Moody / Agitating / Verbal challenges.

Unit janitor / Doing O.T.

[ ] Approved movement back to Podo.

[ ] : Behavior improving. Has gained some property back

b6
b7C

Off location. 6/12    CSS [ ] to review pts.

[ ] (Seen by DMT.) Denied legal paperwork - Signed t

( CONT )

FELL-00002615

②



Doing OK./Takes Denial/No need.

to forward paperwork

(Seen by M#.) Can't find property. Having some difficulty within unit. MH approves move to Unit II/Phase I.

On list for Med/placement _____ b6 b7C

(Seen by MT.) Wants Medium placement. Placed as #1 on "D" movement List

New to unit 6/9/01    FSU. Violation!

VTPSA Assessment person awaiting assessment. New to Unit 6/9/01.

— Special OBS — b6 b7C

N/C.

— Unit Issues —

NONE—

— Movement List —

2.)    3.)

-4.)    5)

# EXHIBIT 300

Dr. Michael Sikirica declares that the following to be true to the best of his knowledge and memory:

1.    I am a physician and pathologist in Waterford, NY. I own a private practice, Forensic Medical Services, and also act as county medical examiner and provide autopsy services as needed for approximately fifteen additional counties in the region.

2.    In January 2005, Alex Bunin from the Federal Public Defender office in northern New York and Vermont briefly consulted with me and asked me to review the autopsy report of Teresca King for Donald Fell's case.   Mr. Bunin provided me with Dr. Baden's autopsy report, the FBI laboratory reports of DNA analyses, and excerpts of transcripts of law enforcement interviews with Donald Fell and Robert Lee on December 1 and 2, 2000.

3.    Mr. Bunin asked me whether I would be able to examine the autopsy report produced by Dr. Michael Baden to see if it followed protocol and was complete. Mr. Bunin also asked to discuss what the report revealed about the culpability of Mr. Fell.

4.    Mr. Bunin never retained me to give my opinion on the cause of Teresca King's death and I did not give him an opinion on the cause of Teresca King's death, although I believe that I might have been able to do so had I reviewed additional materials beyond those that Mr. Bunin offered to me, including the autopsy photographs.

5.    Rather than rendering an opinion, I informed Mr. Bunin that the case was complicated and would require additional time to conduct a thorough analysis. Given my busy schedule, I suggested to Mr. Bunin that he consult with Dr. Richard Callery about the case.

6.    At the time, Dr. Richard Callery was Chief Medical Examiner for the State of Delaware. My understanding was that Mr. Bunin was going to consult with Dr. Callery.

7.    Aside from the 1-2 hours Mr. Bunin asked me to spend reviewing the limited materials he gave me and suggesting to him that he consult with Dr. Callery in January 2005, I did not spend any additional time on the case. I never heard from Dr. Callery or anyone else about Mr. Fell's case until January 13, 2011, when Mr. Fell's post-conviction lawyers contacted me. I do not know whether Mr. Bunin consulted with Dr. Callery.

I have had the opportunity to read the foregoing pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the foregoing is true and correct.

Date: _3-10-11_____

Dr. Michael Sikirica

FELL-00002617

# EXHIBIT 301

My name is Francis Bellantoni and I live in Dover Plains, New York.

One day in November of 2000 I was traveling to work in the morning along ST 22 when I saw two men standing outside a car. The men looked like they were arguing with each other. I could tell because one of the men was flapping his arms up and down like he was getting frustrated with the other man. They were arguing. I noticed a woman sitting in the back seat staring straight ahead. I also noticed the car had Vermont plates because they were green.

At the time I worked as an Insurance Specialist for First Union Bank. As part of my job I regularly received calls on my cell phone. I realized I had forgotten my phone at my home, turned around about a mile up the road by the Palumbo block sign and drove back past the car with the Vermont plates. The female was now walking towards the woods with the two men behind her. One of the men trailed behind the other. He was the man who was getting yelled at previously. I could not identify which man was which. I would not recognize either man, F b I couldn't tell the difference between them. F 15

After I got my phone and drove back down ST 22 the car was gone.

About a week later a road block was set up in the morning time. I was stopped and asked if I had seen anything the previous week. I wasn't paying close attention so I told the officer I hadn't and went to work. However, I quickly realized that the officer was asking about the day I saw the car with the Vermont plates. I went to the local police barracks and told the officer there what I saw. He took my statement on a computer. He then printed it out and I signed it.

Quite a while later, I received a phone call from FBI agent Michelle Heilner. She told me she would be coming to Dover Plains from Vermont and asked if we

F b

FELL-00002618

could meet. We arranged a time to meet in person a few days after we spoke on the phone.

In preparation for our meeting I took some photos of the area and timed the drive between where I saw the car and my home. When I met with Agent Heilner I gave her the pictures I took and the time estimates I had made. She was accompanied by two men and they provided me with a small album of photos to look at. The pictures contained a sequence of shots of the road and the area where I had noticed the car. They asked me to identify where the car was located and to go over what I saw. We spoke in person for about an hour. She mentioned that there would probably be a trial and that I could be called as a witness. She said that they would pay for my travel to Vermont and for a hotel for me to stay in. Agent Heilner gave me her business card, which I still have, and that was the last time I heard from her.

I have lived at the same address since my initial statement in 2000. I was never contacted by a member of the defense team. If I had been I would have spoken with them about what I observed.

I have had the opportunity to read and have read to me the foregoing _1-15_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _2 - 2 ur - 11_

_____
Francis Bellantoni

_____
Witness

FELL-00002619

# EXHIBIT 302

My name is Lucinda Fruean, and I am __56__ years old. My friends call me Cindy. I have lived in Rutland, Vermont since __all my life__. Debbie Fell was my neighbor at REDACTED - FELL Debbie's apartment was on the other side of the apartment building and sometimes the loud music coming from her apartment would echo across to my apartment. Debbie was not very outgoing or talkative. At that time, Debbie was dating a man named Tim, who ended up in jail. They were both big drinkers. The house across the street was a big drug house, and a man who lived there overdosed.

My husband Gordon was a bartender at the Stoplite Lounge before he passed away in __2005__. Charlie Conway and Debbie drank heavily at the Stoplite. Charlie would drink and then wander around the neighborhood. He partied with people and then passed out wherever he was. He used to sit and drink beer under the railroad tracks, underneath the bridge. He was a Vietnam veteran, and he seemed to have problems as a result. He wanted a drink, and he wanted to pass out. He drank and passed out at Debbie's house, then he would go out in the morning and start drinking again. Charlie's sister Tina used to live above the Stoplite bar.

I saw Debbie's son arrive in Rutland with a suitcase, and he opened the door to the apartment building for me. He was very polite and said please and thank you. After a few weeks, every time I saw him, he was with another boy with long hair. I was surprised that so many people were staying in that apartment. It

(L. F.)

1

FELL-00002620

was a very small apartment.  There is just one bedroom in there.  I'm sure they were overcrowded.

My husband and I saw a blood trail outside of Debbie's apartment on the night of Thanksgiving.  We did not think much of it, because we knew that Debbie fought with people a lot and there were a lot of incidents in her apartment, between her and her boyfriend, other people she would party with, and whoever she had over there.  *I mentioned the blood to (D.F) Neighbor Lisa Martelle and she said it was the Boys. She Thought was Norse Bleed*

My husband and I were questioned by the local police.  I was not contacted by anyone representing the defendant before trial.  The first time I had contact with anyone from Donald Fell's defense team was in 2010 during his appeal.

I have had the opportunity to read and have read to me the foregoing __1__ pages.  I have been given the opportunity to make any corrections, additions, and deletions that I see fit.  I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

*(D. F)  Between 2000 and 2005, I was living at  REDACTED - FELL, Rutland, Vermont.  I have not moved away from here at any time. I've been in the same apartment since 1972.*

*(D.F)*

2

FELL-00002621

Date: _March 2nd -11_

_Lucinda Fruean_

Lucinda Fruean

3/2/11

Witness

3

FELL-00002622

# EXHIBIT 303

My name is Michael Leight. I testified in the federal trial of Donald Fell in Burlington, Vermont. I also testified before the grand jury.

The first time I spoke with the FBI, they called me at my house and said that I sold these two guys some pot at the Burger King. I was nervous and then they said that they knew I didn't do it. I don't know why they did that to me, but then I told them what I saw. I saw the darker hair fellow driving and the passenger had lighter hair. I later heard that the driver, the darker haired guy, hung himself. They pulled up to the window and the driver asked if we sold alcohol. I guess it was because I was wearing a hat that said Jagermeister on it. He asked if I could get them some pot and I said I could. I only talked to the driver. The passenger did not say anything.

I called my friend about getting them some pot then came around the back to meet them. When I came around the back, close to the dumpsters, I only met with the driver. The driver told me the passenger went inside to use the bathroom. I didn't see him again. The driver, the guy with the darker hair, said he didn't want the pot anymore. We discussed prices and he decided against it.

I was surprised when the FBI called me. It was a man. I met with two or three agents next. I met them in a booth at the Burger King. There was one big black guy and definitely at least one other white guy. I don't remember how long I met with them at the Burger King, but it wasn't a short meeting. They told me things like those guys had committed murder and that they could have killed me. I didn't see any ropes, chains, or

FELL-00002623

knives in the car. The FBI agents were concerned about the case, but they also seemed concerned about the weed. At first, I was worried they didn't believe me. Eventually they just let it go and did not charge me with anything.

The FBI agents asked me a lot of questions about the 2 boys' attitude, about whether they seemed drunk or high. The one with the darker hair seemed preoccupied. I didn't talk to the other one. I only saw them for a very short time and I only talked to the one with the darker hair, so I really can't say whether the one with the lighter hair, the one that was on trial, was drunk or high or not.

Before trial, I had a couple of serious phone calls with the FBI or the prosecution about the case. We went over some things right before I testified at trial. If there are any differences between my statement at trial and my statement right when it happened, then my statement from when it happened would be more accurate. I was nineteen and I was nervous about the drugs. My freedom was important to me.

I've been arrested three times. The most recent time was in Connecticut, maybe in 2003, 2004, or 2005. I don't remember. I think I was about 22 or 23. It was a larceny charge. The other time I was 17 and I got caught with weed. I also got arrested for taking my mom's car without asking. I was convicted and had to do 100 hours of community service and pay $1,000 for the larceny charge.

FELL-00002624

I would have spoken with the defense if they contacted me. They did not. My grandfather's house has been my home base since I was little up until now. In fact I still get mail there. He knows where to find me. I think the FBI found me through him and the defense could have done the same thing.

I have had the opportunity to review and make changes to the foregoing _3_ pages. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _2/25/11_

_Michael Leight_ (signature)

Michael Leight

_Witness_ (signature)

Witness

# EXHIBIT 304

My name is Paul Stoss, and I am ~~33~~ 35 [PS] years old. I live in Wilkes-Barre, Pennsylvania. I ~~work~~ worked as a chef~~,~~ previously but I am currently taking care of my two daughters since my wife passed away. [PS]

When I was a child, my siblings and I were spread across different foster homes in Wilkes-Barre. My sister Janice Stoss lived with ~~Theresa Sharpe~~ Donny's grandmother [PS], and I was with a different foster family. Janice became friends with ~~Theresa's daughter~~ Donny's aunt [PS] Jackie Sharpe. I met Donny Fell through my sister because I spent a lot of time visiting her at ~~Theresa's~~ Donny's grandmother's [PS] house, when Donny lived next door. Later, Jackie ended up getting custody of Donny, so when my sister and I went over to visit Jackie, he was there.

Jackie was hard on Donny when she was his guardian. I think it was hard because they were so close in age, but she was grounding him and giving him chores.

Donny lived at my house in Wilkes-Barre in the summer of 2000 before he went off to work in the carnival. Donny was respectful of my house and always kept to himself. He was like family to me, so I did not mind if he stayed at my house for a while.

Donny, his girlfriend Lynn Roberts, and her friend Bethany Brashears stayed at my apartment for a couple weeks in the summer of 2000. I had a two bedroom apartment. Lynn and Donny stayed in one room, and at first, Bethany slept on the couch in the living room. After they were there a couple days, me and Bethany got

[PS]

1

FELL-00002626

together.  At that point, Bethany slept in my room.  Lynn was quiet and stayed in her room most of the time, and Bethany was shy.

While they were staying with me, I saw Lynn and Donny argue a few times, but these arguments were not violent or physical.  They usually ignored each other for a few hours.  Bethany and Lynn were not held against their will.  They were free to leave whenever they wanted, and I did not see them being mistreated in my home.  If I had seen Donny mistreat them, I would have kicked him out.

I was not contacted by anyone representing Donny before his trial.  The first time I had contact with anyone from Donald Fell's defense team was in 2010 during his appeal. I was available and willing to talk to Donny's lawyers. I have lived in Luzerne and Lackawanna County most of my life. My sister Janice always knows how to reach me so the lawyers could easily have found me before the trial. PS

I have had the opportunity to read and have read to me the foregoing _2_ PS pages.  I have been given the opportunity to make any corrections, additions, and deletions that I see fit.  I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _2- 28- 11_

_____
Paul Stoss

_____
Witness

2

FELL-00002627

# EXHIBIT 305

Pursuant to 28 U.S.C. § 1746, Paul S. Volk hereby declares as follows:

1. I am an owner and shareholder in the firm of Blodgett, Watts & Volk, P.C.

2. I was appointed by the United States District Court for the District of Vermont (Hon. William Sessions) to represent Donald Fell in June 2002. When I was appointed, the case had been proceeding for nearly a year and a half, and a lot of the decisions about how to handle the case had already been made.

3. Alex Bunin was lead counsel on Mr. Fell's case, was responsible for the overall management of the case, and oversaw all decisions. Mr. Bunin organized the defense team by giving me specific assignments. My specific assignments were limited to: providing "the Vermont perspective"; assisting with voir dire; preparing the portion of the presentation related to Mr. Fell's adjustment to prison; preparing selected witness examinations for trial; and otherwise assisting when needed and called upon.

4. I was heavily involved in selecting jurors for Mr. Fell's case. Among the items and issues presented in the jury questionnaires were questions intended to screen prospective jurors to determine their receptivity to mental health evidence, and I focused a substantial amount of my questioning of the jurors on voir dire on mental health issues. I would have changed the nature of my questions and selected different jurors if I had known that there would be no expert testimony regarding mental health and no attempt to link records from Mr. Fell's childhood and early adolescence to his conduct and behavior at the time of the offense. I also would have challenged for cause any jurors who said they could not consider mitigation evidence about substance abuse and childhood sexual abuse.

5. I was involved in the portion of Mr. Fell's case that related to his adjustment to prison. I was not aware, and the government did not inform me, about the disciplinary history of the guards involved in the prison incidents or that any of the guards had any grievances against them or any problems with alcoholism.

6. The trial team did not involve me in decisions regarding the selection of mental health experts in Mr. Fell's case. At the time I joined the defense, the defense had already hired its experts on mental health in connection with guilty plea discussions.

7. I recall reviewing the Welner report when it was first produced to the defense. My reaction to the Welner report was that it provided spectacular fodder for cross-examination and was vulnerable to challenge on Daubert grounds from both a procedural and content perspective. I also was of the view that there was evidence that the prosecutors had violated Judge Sessions' order preventing Dr. Welner from examining Mr. Fell and from performing any additional testing without either a consent from the defense or a further order of the court. I shared my impressions with Alex Bunin and Gene Primomo, and offered to either assist or conduct the cross-examination of Dr. Welner if Mr. Bunin did not want to do so.

8. Until the morning of July 7, I expected that we would go forward with a Daubert hearing about the Welner report. I would have happily cross-examined Dr.

FELL-00002628

Welner, and I believe that we would have had very strong arguments for excluding Dr. Welner's testimony and his report. On the morning of July 7, though, I learned from Gene Primomo that he and Alex Bunin had decided to pull the mental health evidence in the case instead of going forward with the <u>Daubert</u> challenge. I was not consulted about this decision, and I strongly disagreed with it. The decision to pull the mental health testimony without pursuing a <u>Daubert</u> hearing was incomprehensible to me and I so informed the other members of the defense team at the time.

     I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Date: 3/18/11

Paul S. Volk

FELL-00002629

# EXHIBIT 306



REDACTED - FELL

**Alpine, NJ
07620-0398**

**Charles V. Wetli, MD**
*FORENSIC PATHOLOGIST*

201-750-8220  (FAX 750-8221)

*Thanatopsis888@yahoo.com*

18 March 2011

Ms. Kristen Santillo, Esq.
c/o Cleary Gottleib Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Re:  Donald Fell Case

Dear Ms. Santillo:

Regarding the deaths of Debra Fell, Charles Conway and Teresca King, the following items were reviewed:

> Opening and Closing Arguments/Statements of Defense Attorneys at Trial
> Opening and Closing Arguments/Statements of Prosecuting Attorneys
>       at Trial
> Guilt Phase Testimony of Shea, Moore, Bialek, Mazzacano, Caudle, Primono,
>       Promutico and Martin
> Penalty Phase Testimony of Dr. Baden, Dr. Morrow and Special Agent Talley
> Affidavits (Evidentiary) of Caudle, Hardegree and Pulsifer
> Rutland PD Property Receipt
> Scene Investigative Reports and Photographs of Rutland PD, Rutland, VT
> Scene Investigative Reports and Photographs of NYS Police and FBI, Dover, NY
> Autopsy and Toxicology Reports of Debra Fell and Charles Conway
> Autopsy Report and Autopsy Photographs of Teresca King.

Very briefly, from the records reviewed, Donald Fell and his friend, Robert Lee, were at the apartment of Debra Fell (Donald Fell's mother) along with Ms. Fell's friend, Charles

FELL-00002630

Conway. During the evening, in which there was a good deal of alcohol consumption, Mr. Fell attacked Mr. Conway with a knife, cutting his throat and stabbing him numerous times. At approximately the same time, Mr. Lee cut the throat of Ms. Fell and stabbed her numerous times as well. They left the apartment and went to a parking lot of an all-night market whereupon they encountered Ms. Teresca King. They took Ms. King and her automobile and drove for several hours, crossing into New York State. It was decided they had to kill Ms. King since she could identify them. They drove to a relatively secluded area off the highway and Ms. King attempted to escape. She was nonetheless caught and thrown to the ground and kicked. One of the perpetrators, apparently Mr. Lee, threw a heavy rock into the face of Ms. King. The kicking and stomping apparently continued until she was thought to be dead. At the scene there was evidence of animal activity directed to the face of Ms. King, and several teeth and an earring were found in the nearby foliage and debris.

The postmortem examinations of both Debra Fell and Charles Conway revealed moderate putrefactive decomposition. Both had sustained multiple sharp force injuries (stab and incised wounds), with the lethal injury for both being severance of a carotid artery. The body diagrams revealed cuts to the hands of both victims which could be consistent with defensive wounds. It should be noted that multiple stab and incised wounds are common in fatalities of sharp force injuries because most wounds are not lethal, and the lethal wounds are generally not immediately incapacitating. Consequently, the attack continues for some time until the victim is essentially motionless. The presence of numerous sharp force injuries therefore is not indicative of torture or of "overkill". Further conclusions cannot be drawn without examining the autopsy photographs.

The autopsy of Teresca King revealed massive blunt force crushing injury to her head centered at the bridge of the nose and associated with a massive basilar skull fracture of the anterior cranial fossa, linear fractures of the frontal bone, and extensive subarachnoid hemorrhage typical for a global impact to the brain. This injury would result in an immediate loss of consciousness and possibly death. However, certain vegetative functions, such as heart beat and respirations, would continue for some time even if death was instantaneous. Therefore it is not surprising that extensive bleeding was associated with the fracture of the right clavicle, musculature of the neck, and around the fracture margins of the posterior central neck structures (viz. hyoid bone and cornua of the thyroid cartilage). It should be noted that despite the neck injuries there is no evidence for asphyxiation: there was no aspiration of blood into the upper airway or lungs, and no petechiae of the eyes or eyelids from increased vascular pressure in the facial region. Fractures of the hyoid bone and thyroid cartilage cornua indicate a significant amount of force was applied to the neck but does not indicate anything more than a transient respiratory embarrassment. It does not indicate death by suffocation, and healed fractures of these structures may be seen on occasion at autopsy as an incidental finding of past non-fatal neck trauma. Because of the persistence of vegetative functions of heart beat and respirations, the victim would appear to be still alive and the assault would continue until it was perceived she was dead. As with the multiple sharp force injuries noted above, the additional injuries to the neck do not indicate "overkill", but simply a perception that she had not died. The autopsy revealed that the stomping and kicking did

FELL-00002631

not inflict any lethal injuries to Ms. King, and therefore the cause of death is blunt craniocerebral trauma.

It has been asserted that about 150-190 pounds of pressure would be needed to cause the neck injuries found at the autopsy of Ms. King. This assertion is specious because there are no studies to substantiate this statement (for the obvious reason that one cannot subject humans to this type of trauma experimentally), and because the amount of force will vary depending on the age of the victim (young persons are more cartilaginous and elastic than older individuals where elastic cartilage has turned to bone and bone has become more fragile). The example that persons who hang themselves do not have such injuries despite their weight is absurd since hanging constricts the neck above the hyoid bone and thyroid cartilage cornua.

The neck trauma, fractures of the mandible, and the dislodged teeth are consistent with stomping of the victim while she was supine. The abrasions and other injuries are not patterned injuries which would allow one to conclude anything about the footwear of the perpetrator and therefore one cannot conclude who inflicted these injuries. The force vector from stomping on a supine individual is front to back and the dislodged teeth from such an action would be displaced posteriorly into the throat. The fact that teeth were found in the foliage and debris some distance away from Ms. King is due to the animal activity (which was also evident on some of the facial structures such as the right ear and an injury to the left side of her forehead). Likewise, the displaced earring would also be the result of animal activity and not from any blunt force trauma.

The opinions expressed are to a degree of reasonable medical certainty. As for my credentials, please refer to a copy of my *curriculum vitae* which is attached. This report may be supplemented upon the review of any additional material (e.g. autopsy photographs of Debra Fell and Charles Conway; toxicology report of Teresca King).

Yours Truly,

Charles V. Wetli, MD

FELL-00002632

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

## CURRICULUM VITAE

**(3 January 2011)**

## CHARLES V. WETLI, M.D.

**TEL 201-750-8220**
**FAX 201-750-8221**

thanatopsis888@yahoo.com

REDACTED - FELL

**Alpine, NJ  07620-0398**

1

FELL-00002633

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

## I.    GENERAL:

**Full name:**        **Wetli, Charles Victor**
**Place of birth:**   **Green Bay, Wisconsin**
**Date of birth:**    REDACTED - FELL**1943**

## II.    EDUCATION AND TRAINING:

**University:**

University of Notre Dame, South Bend, Indiana Pre-professional studies (concentration in chemistry) Degree - Bachelor of Science (6 June 1965)

**Medical School:**

St. Louis University School of Medicine, St. Louis, Missouri
September 1965 - June 1969
Degree - M.D., 31 May 1969

**Internship:**

Jackson Memorial Hospital and University of Miami School of Medicine, Miami, Florida, June 1969 - June 1970, Anatomic and Clinical Pathology

**Residency:**

Jackson Memorial Hospital, University of Miami School of Medicine and Veteran's Administration Hospital, Miami, Florida, June 1970 - June 1973

Dade County Medical Examiner Department and University of Miami School of Medicine September 1977 - September 1978, Forensic Pathology

2

FELL-00002634

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

**Government and Administration/Management:**

Forensic Administration - St. Louis University School of Medicine, Department of Pathology (Division of Forensic and Environmental Pathology) July 28-31, 1986, St. Louis, MO

Harvard Program for Senior Executives in State and Local Government, John F. Kennedy School of Government, Harvard University, Cambridge, MA, June 12 - July 1, 1988; Alumni Refresher Course (Harvard): 1989, 1990, 1991, 1992, 1993

## III.   CERTIFICATION AND LICENSURE:

**National Board of Medical Examiners No. 107806, 1 July 1970**

American Board of Pathology May 1974, Anatomic and Clinical Pathology

**American Board of Pathology, May 1979, Forensic Pathology**

State Board of Medical Examiners of the State of Florida, No. 16616, 4 September 1970  (inactive status as of January 1995; allowed to expire January 2008)

Medical Licensure, State of Missouri (lapsed)

New York State (25 January 1995 No. 198336)

State Board of Medical Examiners of New Jersey (license # 25MA08212100, effective 1 February 2007)

**FEMA Certification in IS-00100 and IS-00700, 26 June 2006**

## IV.   MILITARY EXPERIENCE:

Reserve Commission (Berry Plan) U.S. Army, November 21, 1969, active duty September 1973 to August 1976,

Rank:          Major
Station:       U.S. Army Medical Laboratory Pacific (Japan)
Function:      Chief of Pathology Unit;  Emergency Room Coverage
Awards:        Certificate of Appreciation, Far East

U.N.Command(April 1975)
Army Commendation Medal, August 1976

**3**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

**V.    APPOINTMENTS:**

Associate Instructor of Otolaryngology (part-time), University of Miami School of Medicine, 1 August 1970 - 30 June 1973

Associate Medical Examiner, Dade County Medical Examiner Department, Miami, Florida, 1 July 1973 - 31 August 1973

Staff Pathologist, Daniel Seckinger, M.D. & Associates, P.A., Staff, Appointment to Cedars of Lebanon Health Care Center, Miami, Florida, September 1976 - September 1977

Director, Physician's Reference Laboratory, Miami, Florida, September 1976, September 1977

Associate Medical Examiner, Dade County Medical Examiner Department, Miami, Florida, September 1977 - October 1980

Deputy Chief Medical Examiner, Dade County Medical Examiner Department

Miami, Florida, November 1980 - January 1995

Assistant Professor of Clinical Pathology, University of Miami School of Medicine Department of Pathology, Miami, Florida, September 1977 - June 1982

Clinical Associate Professor of Pathology, Department of Pathology, University of Miami School of Medicine, June 1982 - January 1995

Staff Instructor, Drug Enforcement Administration, 1980 – 1993

## Chief Medical Examiner, Suffolk County, New York, February 5, 1995 – 14 August 2006

**Note:** Accredited by National Association of Medical Examiners (NAME), April 2000 and May, 2005; American Board Forensic Toxicology, April 1999-present; National Society of Crime Laboratory Directors (ASCLD/LAB), March 1997-present

**Note:** National Association of Counties (**NACO**) Award for Mass Disaster Preparedness Program, May 2000 (Best in Category); semifinalist in **Innovations in American Government competition** (JFK School of Government, Harvard University).

**V.    APPOINTMENTS (Continued):**

Lecturer in Forensic Pathology, State University of New York at Stony Brook, March 23, 1995 - 30 April 1996

4

FELL-00002636

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

Clinical Professor of Pathology, State University of New York at Stony
Brook, 1 May 1996 – 14 August 2006
Regional Trauma Oversight Committee and
Trauma Peer Death Review Committee, 1999 - 2006

**Note: NYS Trauma Physician of Distinction, 1999**,
Presented by NYS Trauma Committee, American Trauma
Society, NY Division

Advisor/Reviewer for Canadian Police Research Committee, 2010-
present

## VI.    JOURNAL MANUSCRIPT REVIEWER:

Journal of the American Medical Association, January 1983 ff
American Journal Forensic Medicine & Pathology, January 1992 -
Present
American Society Clinical Pathology Check Sample (see addendum)
Annals Internal Medicine (Occasional, since approximately 1990)
American Journal of Clinical Pathology (Dec. 1996 - 2006)
Circulation (March 2004)

## VII.   PROFESSIONAL AFFILIATIONS:

1. **AMERICAN SOCIETY OF CLINICAL PATHOLOGISTS**, (**Fellow** No. F094661) -
Elected October 1972  - December 2006
**ASCP ACTIVITIES:    SEE ADDENDUM**

2. **AMERICAN ACADEMY of FORENSIC SCIENCES (FELLOW #84825)**,
February 1979 - present

Discipline/Assessment Task Force Committee Member for
Path/Bio Section, November 1991 - Feb. 1995

3. **NATIONAL ASSOCIATION of MEDICAL EXAMINERS**, August 1980 –
present (Fellow)

Ad Hoc Committee for **Guidelines for Use of Pathology
Assistants in    Medical Examiner Offices.** (11/95 -
11/96).

Ad-Hoc Committee on **Current Issues Response** (9/97 -
2/98)

Ad-Hoc Committee on **NTSB-ME Linkage** (9/97)

5

FELL-00002637

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

Ad-Hoc Committee on **Cocaine** (10/99 – 01/01)

Ad-Hoc Committee for the **Utilization of Pathology Assistants.**

Ad-Hoc Committee for **RelationshipBetween Tissue Procurement Agencies and Medical ExaminersCoroners** (10/01 – present); Appointed Chairman, February, 2004

Ad-Hoc Committee for **the Improvement of DeathCertification**; March, 2009 – present

Ad Hoc **NAME Committee on Research**; Jan. 2010-present.

Ad Hoc **Committee for NAME Journal RFP**; March, 2010 – September 2010.

**Accreditation Inspector for**: Bergen County, NJ, MedicaExaminerOffice (06-14-02);
 Los Angeles County Coroner/Medical Examiner  Office, Los Angeles, CA  (06-06,07-06);
 San Diego, CA, Medical Examiner Office, October 20, 2008.

**Board of Directors**, October 2006 – present
**Executive Committee**, 2009 - 2011

4.   **MEDICAL SOCIETY of the STATE of NEW YORK,** 1995 – 2006;  Forensic Committee, April 1995, and Vice-Chair April 2005 – December 2006

5.   **SUFFOLK COUNTY MEDICAL SOCIETY**  1995 - 2006

6.   **NYS ASSOCIATION of COUNTY CORONERS and MEDICAL EXAMINERS.** 1997 - 2006

7.   **NATIONAL DISASTER MANAGEMENT SYSTEM (D-MORT TEAM, REGION II),** 3/11/98 - 2006)

8.   **COLLEGE OF AMERICAN PATHOLOGISTS (FELLOW),** May 2000 (Member No. 0073905) – December 2006

6

FELL-00002638

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

9.  American Red Cross National Medical Examiner/Coroner Advisory Committee, 1998 – 2005

10. New York Organ Donor Network, Medical Advisory Board; Chairman Tissue Subcommittee, January 2002 – February 2009

**VIII.  PROFESSIONAL AFFILIATIONS (discontinued):**

1.  **College of American Pathologists**, Fellow No. 073905 - Elected May 1973 - December 1978 (resigned)

2.  **The American Board of Pathology**, Forensic Pathology Test Committee, 1985-1989 (five year maximum tenure)

3.  **Florida Medical Examiners Commission**, 1985 Committee on Standards & Training (ad hoc), 1989 Committee on Operations & Procedures (ad hoc)

4.  **South Miami Medical Forum**, July 1984 - January 1995

5.  **Dade County Association of Chiefs of Police**, May 1989 - January 1995

6.  **American Society for Public Administration**, Jan. 1989 - 1995

**IX.  FORMAL MEDICAL AND FORENSIC PRESENTATIONS:**

1.  Dermatofibrosarcoma Protuberans - Case Report, Zola Cooper Dermatology Seminar, at Convention of Southern Medical Association, Miami, Florida, November 1971, (Co-author, A. Bernard Ackerman)

2.  Cocaine-Related Deaths, Amer. Acad. Forensic Sci., Atlanta, Georgia, February 1979

3.  Potassium Chloride Overdose Deaths, Amer. Acad. Forensic Sci., Atlanta, Georgia, February 1979

4.  Propoxyphene Related Deaths, A Ten Year Assessment, Amer. Acad. Forensic Sci., New Orleans, Louisiana, February 1980

7

FELL-00002639

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

5.      Death from Primary Pulmonary Hypertension, Amer. Acad. Forensic Sci., New Orleans, Louisiana, February 1980 (Co-author, presented by Donna L. Brown, M.D.)

## IX.    FORMAL MEDICAL AND FORENSIC PRESENTATIONS (Continued):

6.      Fatal Hemorrhage from Peripheral Vascular Disease, Amer. Acad. Forensic Sci.; Los Angeles, California, February 1981 (Donna L. Brown, M.D., Co-author)

7.      The Body Packer Syndrome, Amer. Acad. Forensic Sci., February 1981 (Co-author, presented by R.E. Mittleman, M.D.)

8.      Forensic Aspects of Santeria, Amer. Acad. Forensic Sci., February 1981 (R.Martinez, Co-author)

9.      Symposium on Drug Abuse, Plenary Session (Moderator), at Seventh International Congress of Cuban Physicians in Exile; 30 June 1981, Bal Harbour, Florida

10.     Santeria:  A Magico-Religious System of Afro-Cuban Origin; Amer. Assoc. for Soc. Psychiatry, 29 October 1981 (Co-author, presented by Rafael Martinez, M.A.)

11.     Methaqualone-Related Death:  1971 - 1981 Amer. Acad. Forensic Sci., February 1982, Orlando, Florida (Poster Session)

12.     The Fatal Cafe Coronary:  A Two Decade Experience, Amer. Acad. Forensic Sci., February 1982, Orlando, Florida (Poster Session, Co-author, presented by R.E. Mittleman, M.D.)

13.     The Threaded Bolt Pattern Injury, Amer. Acad. Forensic Sci., Orlando, Florida, February 1982 (Co-author, presented by R.E. Mittleman, M.D.)

14.     Fungal Cerebritis in Intravenous Cocaine Abusers: Amer. Acad. Forensic Sci., February 1983 (Presented by Sigmund Menchel, M.D.)

15.     Cocaine Overdose Deaths:  Amer. Acad. Forensic Sci., February 1983 (Presented by Roger E. Mittleman, M.D.)

8

FELL-00002640

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

16. Cocaine Psychosis and Sudden Death in Recreational Cocaine Users: Amer. Acad. Forensic Sci., February 1985 (D. Fishbain, M.D., Co-author)

## IX.    FORMAL MEDICAL AND FORENSIC PRESENTATIONS (Continued):

17. Cocaine and Sudden "Natural" Death: Amer. Acad. Forensic Sci., February 1986 (Presented by R.E. Mittleman, M.D.)

18. Methods and Risk of Suicide:  Amer. Acad. Forensic Sci., February 1986 (Presented by David Neubauer, M.D.)

19. Forensic Significance of Petechiae:  Int. Acad. Forensic Sci: August, 1986, Sri Lanka (Presented by Dr. Valerie Rao)

20. Deaths from Hurricane Andrew and its Aftermath.  Amer. Acad. Forensic Sci.: February 1994, San Antonio, TX (Dr. Emma Lew, Co-author)

21. Altered Dopaminergic Synaptic Markers in Cocaine Psychosis and Sudden Death.  J.K. Staley, C.V. Wetli, A.J. Ruttenber, W.L. Hearn, and D.C. Mash.  College on Problems of Drug Dependency, June 1994, Palm Beach, Florida (presented by Dr. Staley).

22. Resnik, B.I. and Wetli, C.V.: Lichtenberg's Flowers.  Poster Exhibit (P341), Amer Acad Dermatology Annual Meeting (New Orleans, LA.) Feb. 4-9, 1995.

23. Raval, M.P. and Wetli, C.V.: Sudden Death from Cocaine-Induced Excited Delirium: An Analysis of 45 Cases.  Poster Session at Fall 1995 National Meeting, (New Orleans, LA) Sept. 18-20, 1995

24. Wetli, C.V., Rao, A., Rao, V.J.: Fatal Heroin Body Packing. National Assn. Medical Examiners (Traverse City, MI), 18 September 1996

25. Wetli, C.V.: The Crash of TWA-800:  Lessons Learned National Assn. of Medical Examiners, (Baltimore, MD) 13 Sept. 1997.

26. Wetli, C.V.: The History of Excited Delirium - 19th Century to the    Present, National Assn. Medical Examiners interim meeting, (San Francisco, CA), 11 February 1998.

**9**

FELL-00002641

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

27.   Wetli, C.V. with Sathyavagaswaran, L.:  The Medical Examiner and the News Media:  The Good, The Bad and The Ugly; American Society of Clinical Pathologists, Resident Physician Section, (Los Angeles, CA) April 1998


## IX.    FORMAL MEDICAL AND FORENSIC PRESENTATIONS (Continued):

28. Wetli, C.V., Kolovich, R., and Dinhofer, L.:  A Modified Cardiectomy Technique:  A Reasonable Solution to the Dilemma Regarding Determining Cause of Death vs. Heart Valve Procurement for Tissue Donation.  Amer. Assoc. Tissue Banks 24th Annual Meeting, 10 September 2000, Bal Harbour, FL (Platform and Poster Presentation).

29. Wetli, C.V., Kolovich, R., and Dinhofer, L.:  A Modified Cardiectomy Technique:  A Reasonable Solution to the Delimma Regarding Determining Cause of Death vs. Heart Valve Procurement for Tissue Donation.  National Assoc. of Medical Examiner 34th Annual Conference, 17 September 2000, Indianapolis, IN.

30. Wetli, C.V., Golden, R.M., Genna, R:  Medical Examiner Conducted Disaster Exercise with Electronic Mapping.  September 2000 (Poster Presentation), National Association of Medical Examners, Indianapolis, IN

31. Jentzen, J.M., Stephens, B., Wetli, C.V., Karch, S.:  The Certification of Cocaine-Related Deaths:  A Survey of Medical Examiner Offices.  18 September 2000 (Presented by Dr. Jentzen)

32. Shields, LBE, Hunsaker, D., Hunsaker, J., Holmes, R., Wetli, C.V.:Atypical Autoerotic Deaths: An Ultra Extreme Sport.  Presented at the 37th Annual Meeting of the National Association of Medical Examiners, 20 Sept. 2003 in San Jose, CA, by Dr. Shields

33. Davis, NL; Wetli, CV; and Shakin, JL:  The Retina in Forensic Medicine: Applications of Ophthalmic Endoscopy – The first 100 Cases.  Presented at the 38th Annual Meeting of the National

**10**

FELL-00002642

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

Association of Medical Examiners, 13 September 2004 in Nashville, TN by Dr. Neil Davis

34. Thomas, L and Wetli, CV: The Medical Examiner in the 21st Century. Presented to the Jurisprudence Section of the American Academy of Forensic Sciences, February 25, 1010, Seattle, WA (presented by Dr. Lindsey Thomas)

## X.    GOVERNMENTAL TESTIMONY AND SYMPOSIA:

1.    Cocaine Related Deaths:  U.S. House of Representatives Select Committee on Narcotics Abuse and Control, 96th Congress, 26 July 1979 (U.S. Govt. Printing Office SCNAC-96-1-9, 1980)

2.    Homicides and Drug-Related Deaths in Dade County, Florida, Dade County Grand Jury, 11th Judicial Circuit of Florida, Fall term, 1981, 23 March 1982

3.    Cocaine-Related Deaths, New York State Division of Substance Abuse Services, Symposium on Cocaine, May 3 and 4, 1982, New York, N.Y. (Julio Martinez, Director)

4.    Methaqualone-Related Deaths, U.S. Senate Committee on Labor and Human Resources, Subcommittee on Investigations and General Oversight Hearing: Drug Abuse - Quaaludes, 13 May 1982

(Senator Paula Hawkins, Chairperson); Ninety-Seventh Congress, second session, pp 57-60

5.    Drug Abuse, Turks and Caicos Islands (British West Indies), "Hearts and Minds" Campaign (Invitation of Governor C.J. Turner and Minister of Health In Conjunction With U.S. Drug Enforcement Administration; 1-4 March 1983; 19-23 July 1983; 8-10 November 1984)

6.    Death Related to Methaqualone and Cocaine in Current Topics in Drug and Alcohol Abuse Symposium, April 1983.  Sponsored by

**11**

FELL-00002643

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

the Academy of Medicine of New Jersey, the Medical Society of New Jersey, and the New Jersey State Department of Health

7. Cocaine, Governor's Council on Drug and Alcohol Abuse, September 12, 1984 - Miami, Florida

8. Cocaine, President's Commission on Organized Crime, 27 November 1984, Washington, DC, (Hon. Irving R. Kaufman, Chairman; James D. Harmon, Jr., Exec. Dir): Hearing IV, Organized Crime and Cocaine Trafficking, pp. 108-128

9. Cocaine, Governor's Task Force on Cocaine, Tallahassee, 4 September 1986, (Hon. Janet Reno, Chairperson); Senate Judiciary Committee (Criminal), Tallahassee, 2 Dec. 1986 (Sen. Robert Johnson, Chairman)

## X.    GOVERNMENTAL TESTIMONY AND SYMPOSIA (Continued):

10. Cocaine Toxicity:  Panel Evaluation of N.Y.P.D. Response to Emotionally Disturbed Persons & Victims of Cocaine Psychosis. New York, N.Y., 5 Dec. 1989

11. National Institute on Drug Abuse, Bethesda, MD. July 9-10, 1991: "Acute Cocaine Intoxication: Current Methods of Treatment" (see NIDA Research Monograph No 123, NIH Publication 93-3498, 1993)

12. National Transportation Safety Board - Investigative Hearings Concerning the Crash of TWA-800.  8 December 1997, Baltimore, MD

13. NIH Teleconference:  Iniative on "Cardiovascular Complications Related to Cocaine Abuse in HIV Infection".  20 January 1998

## BIBLIOGRAPHY:

1. Wetli, C.V.; Davis, J.H.; and Blackbourne, B.D.; **Narcotic Addiction in Dade County, Florida:  An Analysis of 100 Consecutive Autopsies**, Arch Path 93:330-343, 1972

12

FELL-00002644

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

2.    Wetli, C.V.; Pardo, V.; Millard, M.; and Gersten, K; **Tumors of Ceruminous Glands**, Cancer 29:1169-1173, 1972

3.    Wetli, C.V.; Heal, A.V.; and Miale, J.B.:    **A Previously Unrecognized Laboratory Hazard: Hepatitis-B Antigen-Positive Control and Diagnostic Sera**, Amer J Clin Path 59:684-687, 1973

4.    Wetli, C.V.; Noto, T.A.; and Fernandez-Carol, A.: **Immunologic Abnormalities in Heroin Addiction**, South Med J 67:193-197, 1974

5.    Tyler, T.C.; Chandler, J.R.; Wetli, C.V.; and Moffitt, B.M: **Olfactory Neuroblastoma**, South Med J 67:193-197, 1974


BIBLIOGRAPHY (Continued):
6.    Weissman, B.W. and Wetli, C.V.: **Ameloblastoma of the Maxilla**, South Med J 70:251-253, 1977

7.    Wetli, C.V. and Davis, J.H.:    **Fatal Hyperkalemia Due to Oral Overdose of Potassium Chloride**, JAMA 240:1339, 1978 (Letter to Editor)

8.    Wetli, C.V. and Wright, R.K.: **Death Caused by Recreational Cocaine Use**, JAMA 241:2519-2522, 1979

9.    Wetli, C.V.: **Application of the Tri-ess Mini Metal Detector to Forensic Autopsies (or, How to Find the Elusive Projectile)**, J Forensic Sci 24:656-659, 1979

10.    Wetli, C.V. and Bednarczyk, L.R.:    **Deaths Related to Propoxyphene Overdose: - A Ten Year Assessment**, South Med J, 73:1205-1209, 1980

11.    Wetli, C.V.:    **Cocaine-Related Deaths in Local Drug Abuse: Trends, Patterns, and Issues - Proceedings of Community Correspondents Group**, NIDA, 1:106-123 (Dec.), 1980

12.    Brown, D.L., Wetli, C.V., and Davis, J.H.: **Sudden Death from Primary Pulmonary Hypertension**, J Forensic Sci 26:381-386, 1981

13

FELL-00002645

**CURRICULUM VITAE
CHARLES V. WETLI, M.D.**

13.    Bednarczyk, L.R.; Wetli, C.V.; and Balkon, J: **Respirator Toxicology**, J Forensic Sci 26:373-380, 1981

14.    Wetli, C.V.; Wright, R.K., and Gressmann, E.: **A Case of Naked Hyperthermia, Forensic Pathology:  Check Sample**, ASCP #FP 81-1 (FP-114), Vol. 23, No. 1, 1981 (May)

15.    Wetli, C.V. and Mittleman, R.E.: **The Body Packer Syndrome - Toxicity Following Ingestion of Illicit Drugs Packaged for Transportation**, J Forensic Sci. 26:492-500, 1981

16.    Wetli, C.V., and Martinez, R.: **The Forensic Science Aspects of Santeria - A Religious Cult of African Origin**, J. Forensic Sci, 26:506-514, 1981

BIBLIOGRAPHY (Continued):

17.    Fishbain, D. and Wetli, C.V.: **Cocaine Intoxication, Delirium and Death in a Body Packer**, Ann of Emerg Med 10:531-532, 1981

18.    Wright, R.K., and Wetli, C.V.: **A Guide to the Forensic Autopsy-Conceptual Aspects**, Sommers, S.C. and Rosen, P.P. (eds) 16:273-288, 1981, Path Ann: 1981, Part 2

19.    Wetli, C.V.: **Methaqualone Abuse - Resurgence of the Quiet Epidemic** - Miami Medicine 51:21-25, 1981

20.    Mittleman, R.E. and Wetli, C.V.: **The Fatal Cafe Coronary - Foreign Body Airway Obstruction**, JAMA 247:1285-1288, 1982 (translated into Finnish edition) (Abstract and critique in: Emergency Medicine Survey 1:114-116, 1982) (Abstract in: Current Surgery 39:445-446, 1982

21.    Wetli, C.V. and Mittleman, R.E.: **Aspiration of Food by Psychiatric Patients**, JAMA 248:1712, 1982 (Reply to Editorial Letter by Wendkos, M.H.)

22.    Mittleman, R.E. and Wetli, C.V.: **The Threaded Bolt Injury** J Forensic Sci. 27:567-571, 1982

23.    Martinez, R., and Wetli, C.V.: **Santeria: A Religious System of Afro-Cuban Origin**, Amer J Soc Psych 2:32-38, 1982

14

FELL-00002646

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

24.    Lowery, S., and Wetli, C.V.:  **Sexual Asphyxia - A Neglected Area of Study**, Deviant Behavior, 4:19-39, 1982

25.    Wetli, C.V.:  **Methaqualone-Related Deaths - A Survey of 2 Fatalities**, JAMA 249:621-626, 1982 (translated into Japanese edition - August 1982)

26.    Deming, J.E., Mittleman, R.E., and Wetli, C.V.: **Forensic Science Aspects of Fatal Sexual Assaults on Females**, J Forensic Sci 28:527-576, 1983

27.    Wetli, C.V., and Martinez, R.:  **Brujeria - Manifestations of Palo Mayombe in South Florida**, J Fla Med Assoc 70:629-634, 1983

BIBLIOGRAPHY (Continued):

28.    Wetli, C.V., Roldan, E., and Fojaco, R.:  **Listeriosis as a Cause of Maternal Death - An Obstetrical Complication of the Acquired Immunodeficiency Syndrome**, Amer J Obstet Gyn 147:7-9, 1983

29.    Wetli, C.V., Weiss, S.D. Cleary, T.J., and Gyori, E.: **Fungal Cerebritis from Intravenous Drug Abuse**, J Forensic Sci 29:260-268, 1984

30.    Wetli, C.V.:  **Investigation of Drug-Related Deaths - An Overview**, Amer J Forensic Med and Path, 5:111-120, 1984

31.    Wetli, C.V., Roldan, E., and Fojaco, R.:  **Listeriosis and AIDS - An Unfounded Assumption (Reply letter)**, Am J Obst Gyn 149:805-806, 1984

32.    Mittleman, R.E., and Wetli, C.V.:  **Death from Recreational Cocaine Use - An Update**, JAMA 252: 1889-1893, 1984; JAMA Edition Fracaise 10:244-247, 1985; 1986 Yearbook of Pathology and Clinical Pathology, pp 95-97

33.    Wetli, C.V.:  **Drug Abuse Prevention:  The Physician's Responsibility**, N.Y.S. Journal of Medicine 84:587, 1984 (commentary)

34.    Wetli, C.V. and Hensley, G.T.:  **A Case of Haitian AIDS** - ASCP Check Sample: FP 84-5, Vol. 26. No. 5 (FP-136), 1984

FELL-00002647

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

35. Suarez, R.V. and Wetli, C.V.: **Sudden Death Due to Coronary Artery Dissection** - ASCP Check Sample: FP-84:6, Vol. 26, No. 6 (FP-137), 1984

36. Mittleman, R.E. and Wetli, C.V.: **Death Caused by Cocaine**, Human Sexuality 19:9, 1985

37. Micozzi, M.S. and Wetli, C.V.: **Intravenous Amphetamine Abuse, Primary Cerebral Mucormycosis and Acquired Immunodeficiency**, J Forensic Sci 30:504-510, 1985

38. Wetli, C.V., and Fishbain, D.A.: **Cocaine-Induced Psychosis and Sudden Death in Recreational Cocaine Users**, J Forensic Sci 30:873-880, 1985

BIBLIOGRAPHY (Continued):

39. Eber, M. and Wetli, C.V.: **A Case of Autoerotic Sexual Asphyxia**, Psychotherapy 22:662-668, 1985

40. Wetli, C.V.: **Let's Legalize Cocaine...and See What Happens**. The Miami News, pg 9A, 29 Sept., 1986 (editorial)

41. Beerman, R., Nunez, D., and Wetli, C.V.: **Radiographic Evaluation of the Cocaine Smuggler**, Gastrointestinal Radiol 11:352-354, 1986

42. Mittleman, R.E. & Wetli, C.V.: **Cocaine and Apparent "Natural Death"**, J Forensic Sci. 32:11-19, 1987

43. Wetli, C.V.: **Fatal Cocaine Intoxication - A Review**, Amer. J. Forensic Med. and Pathol 8:1-2, 1987

44. Wetli, C.V.: **Fatal Reactions to Cocaine, in Cocaine - A Clinician's Handbook**, Chapt. 4, pp 33-54; The Guilford Press, New York, 1987 (Washton, A. & Gold, M., eds)

45. Mittleman, R.E.; Mittleman, H.S and Wetli, C.V: **Pattern Injuries in Child Abuse**, Amer J Nursing 87:1185-1188, 1987

46. Wetli, C.V.: **The Medical Examiner as an Expert Witness**. The Practical Prosecutor, 1987:3-6, 1988 (Jan)

FELL-00002648

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

47.    Grey, T.C., Mittleman, R.E., Wetli, C.V., and Horowitz, S.: **Aortoesophageal Fistula and Sudden Death - A Report of Two Cases and a Review of the Literature**, Amer J Forensic Med and Pathol 91:19-23, 1988

48.    Rao, V.J. and Wetli, C.V.:    **The Forensic Significance of Conjunctival Petechiae**.  Amer J Forensic Med and Pathol 91:32-34, 1988

49.    Wetli, C.V.:  **The Medical Risks of Cocaine (editorial)** The West J of Med 148:456-457, 1988

BIBLIOGRAPHY (Continued):

50.    Wetli, C.V., Mittleman, R.E. and Rao, V.J.:  **Practical Forensic Pathology**. Igaku Shoin Publishers, Inc., April 1988, 1140 Avenue of the Americas, New York, New York 10036, ISBN 0-89640-144-8 (New York), ISBN 4-260-14144-9 (Tokyo)

51.    Wetli, C.V.: **CAP Handbook on Unidentified Human Remains,** J Forensic Sci 33:852-853, 1988 (book review)

52.    Wetli, C.V. and Mittleman, R.E.:  **Forensic Pathology for The Hospital Pathologist - Part I,** Laboratory Medicine 20 (4):233-240, 1989 (Reprinted in J Amer Assoc Med Transcription 8(2):11-20, 1989)

53.    Wetli, C.V. and Mittleman, R.E.:  **Forensic Pathology for The Hospital Pathologist - Part II,** Laboratory Medicine 20 (5):299-304, 1989 (Reprinted in J Amer Assoc Med Transcription 8(4):27-36, 1989)

54.    Wetli, C.V.:  **Foreword to:  Santeria - The Religion**, by M. Gonzalez-Wippler, Harmony Books, New York, 1989, pp VII-X

55.    Wetli, C.V.:  **On Being An Expert Witness**, Laboratory Medicine 20:545-550, 1989

56.    Wetli, C.V.: **Afro-Caribbean Religious Cults - Santeria and Palo Mayombe**, Training Key #395, International Academy of Chiefs of Police, August, 1989

**17**

FELL-00002649

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

57.    Martinez, R. and Wetli, C.V.: **Tattoos of the Marielitos**, Amer J Forensic Med and Path 10:315-325, 1989

58.    Rodriguez, M. and Wetli, C.V.: **Sudden Death from Falciparum Malaria**, ASCP Check Sample FP 89-6 (FPK7) Vol. 31, No. 6, 1989

59.    Vila, R.I., Martin, J.V., Wetli, C.V. and Freeman, R.: **Accidental Death from a Black-Powder Rifle Breech Plug**, Amer J Forensic Med and Path 11(3):241-243, 1990

BIBLIOGRAPHY (Continued):

60.    Hearn, W.L., Flynn, D.D., Hime, G.W., Rose, S., Cofino, J.C., Mantero-Atienza, E. Wetli, C.V. and Mash, D.C.: **Cocaethylene: A Unique Cocaine Metabolite Displays High Affinity for the Dopamine Transporter**, J Neurochemistry 56(2):698-701, 1991

61.    Escobedo, L.G., Ruttenber, A.J., Agocs, M.M., Anda, R.F., and Wetli, C.V.: **Emerging Patterns of Cocaine Use and the Epidemic of Cocaine Overdose Deaths in Dade County, Florida**. Arch Pathol and Lab Med 115:900-905, 1991

62.    Mittleman, R.E. and Wetli, C.V.: **The Pathology of Cocaine Abuse**, Adv Pathol and Lab Med 4:37-73, 1991

63.    Ruttenber, A.F., Sweeney, P.A. Mendlein, J.M., and Wetli, C.V.: **Preliminary Findings of an Epidemiologic Study of Cocaine-Related Deaths in Dade County, Florida**. NIDA Research Monograph 110, 1991 (Schober, S. and Schade, C., eds) pp 95-112 ISBN 0-16-035854-X, DHHS Publication No (ADM) 91-1787

64.    Bell, M.D., Rao, V.J., Wetli, C.V., and Rodriguez, R.N.: **Positional Asphyxiation in Adults - A Series of 30 Cases from the Dade and Broward County Florida Medical Examiner Offices from 1982 to 1990**. Amer J Forensic Med & Pathol 13(2):101-107, 1992

65.    Escobedo, L.G., Ruttenber, A.J., Anda, R.F., Sweeny, P.A. and Wetli, C.V.: **Coronary Artery Disease, Left Ventricular**

18

FELL-00002650

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

**Hypertrophy, and the Risk of Cocaine Overdose Death**. Coronary Artery Disease 3:853-857, 1992

66.   Wetli, C.V.: **The Pathology of Cocaine: Perspectives from the Autopsy Table in Acute Cocaine Intoxication: Current Methods of Treatment**. NIDA Research Monograph 123, 1993, pp 172-182 (NIH Publication No 93-3498) - Reprinted in Practical Reviews in Pathology, Vol 18, No 3, July 1993 (Guest Transcript)

67.   Wetli, C.V.: **Investigation of Child Abuse Deaths**; CME Audiotape in Practical Reviews in Pathology, Vol 18, No 4, August 1993 (Guest Presentation)


BIBLIOGRAPHY (Continued):

68.   Pardo, V., Wetli, C.V., Strauss, J. and Bourgoignis, E.: **Renal Complications of Drug Abuse and Human Immunodeficiency Virus, in Renal Pathology**, 2nd edition, Tischer, C.C. and Brenner, B.M. (eds), J.B. Lippincott, Phila. 1994, pp 390-418 (ISBN 0-397-51240-6)

69.   Wetli, C.V. and Davis, J.H.: **Participation of Physicians in Capital Punishment** (Letter to the Editor), New Eng J Med 330:936, 1994

70.   Wetli, C.V.: Review of **"Pathology of Drug Abuse"** by Karch, S.B., Arch Pathol and Lab Med 118:553, 1994


71.   Staley, J., Basile, M., Wetli, C.V., Hearn, W.L., Flynn, D.D., Ruttenber, A.J. and Mash, D.C.: **Differential Regulation of the Dopamine Transporter in Cocaine Overdose Deaths.** In NIDA Research Monograph **"Problems of Drug Dependence, 1993: Proceedings of the 55th Annual Scientific Meeting"**, Editor: Louis S. Harris, Ph.D., 141, pp 32-38, 1994

72.   Staley, J.K, Hearn, W.L., Ruttenber, A.J., Wetli, C.V., and Mash, D.C.: **High Affinity Cocaine Recognition Sites on the Dopamine Transporter are Elevated in Fatal Cocaine Overdose Victims.** J. Pharm. and Exptl. Therapeutics 271:1678-1685. 1994

**19**

FELL-00002651

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

73.  Wetli, C.V.: **Illicit Drug Abuse** in Pathology of Environmental and Occupational Disease, Craighead, J.D. (ed), Mosby-Year Book, Inc., St. Louis, Chapt. 15. pp 259-268, 1995 (ISBN 0-8016-C7776-9)

74.  Wetli, C.V.: **Answering the Call to Court,** Advance for Laboratory Administrators 4:53-55, 1995.
     Advance for Physicians Assistants 4:27-32, 1996

75.  Raval, M.P., and Wetli, C.V.: **Sudden Death from Cocaine Induced Excited Delirium: An Analysis of 45 cases** (abstract) Amer J Clinical Path 104(3):329, 1995

BIBLIOGRAPHY (Continued):

76.  Wetli, C.V.:  **Forensic Issues, in The Textbook of Penetrating Trauma, Part X, Special Considerations,** Ivatury, R.R. and Cayten, C.G. (eds) Williams & Wilkins, Philadelphia, 1995 (1996), Chapt. 85, pp 1084-1099 (ISBN 0-683-04338-2)

77.  Karch, S.B. and Wetli, C.V.: **Agitated Delirium Versus Positional Asphyxia** (letter to editor) Ann. Emerg. Med. 26(6): 760-761, 1995.

78.  Wetli, C.V.:  **Fatal Lightning Strike** Amer Soc. Clinical Pathologists Check Sample FP96-1, 38 (1), 1996

79.  Lew, E.O. and Wetli, C.V.: **Mortality from Hurricane Andrew** J Forensic Sci 41(3): 449-452, 1996.

80.  Wetli, C.V.: **Keraunopathology - An Analysis of 45 Cases** Amer J Forensic Med & Pathol. 17(2): 89-98, 1996.

81.  Resnik, B.I. and Wetli, C.V.:  **Lichtenberg Figures** Amer J Forensic Med & Pathol. 17(2): 99-102, 1996.

82.  Wetli, C.V.: **Death Certificate Completion by Physicians** JAMA 276:279-280, 1996 (letter to editor).

83.  Wetli, C.V., Mash, D., and Karch, S.B.: **Cocaine-Associated Agitated Delirium and the Neuroleptic Malignant Syndrome** Am J Emerg. Med. 14:425-428, 1996.14:425-428, 1996.

**20**

FELL-00002652

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

84.    Ruttenber, A.J., Lawler-Heavener, Yin, M., Wetli, C.V., Hearn, W.L. & Mash, D.C.: **Fatal Excited Delirium Following Cocaine use: Epidemiologic Findings Provide New Evidence for Mechanisms of Cocaine Toxicity** J. Forensic Sci 42:25-31, 1997.

85.    Wetli, C.V.: **When Lawyers Call: Pathologists and Laboratorians as Expert Witnesses.** ASCP Check Sample, Laboratory Practice Management (LPM 96-3) 2:35-48, 1997.

86.    DiPaolo, N., Fineschi, V., Dipaolo, M., Wetly (sic), C.V., Garosi, G., DelVecchio, M.T., and Bianciardi, G.: **Kidney Vascular Damage and Cocaine** Clinical Nephrology, 47:298-303, 1997.


BIBLIOGRAPHY (Continued):
87.    Fineschi, V., Wetli, C.V., DiPaolo, M. and Baroldi, G.: **Myocardial Necrosis and Cocaine.** Int J Legal Med 110:193-198, 1997.

88.    Wetli, C.V., Rao, A. and Rao, V.J.: **Fatal Heroin Body Packing.** Amer J Forensic Med & Pathol 18:312-318, 1997.

89.    Wetli, C.V. (ed): **Pathology of Drug Abuse** in **Drug Abuse Handbook**, Karch, S.B. (ed.-in-chief), CRC Press, Boca Raton, Chap. 1, pp 77-150, 1998, ISBN 0-8493-2637-0. Second Edition: Taylor and Francis Group, Boca Raton, FL, Chapter 2, pp 71-146, 2007 (ISBN 10-08493-1690-1; 13-978-0-8493-1690-6)

90.    Hollander, J.E., Levitt, M.A., Young, G.P., Briglia, E., Wetli, C.V., and Gawad, Y.: **Effect of Recent Cocaine Use on the Specificity of Cardiac Markers for Diagnosis of Acute Myocardial Infarction.** Am. Heart J 135:245-252, 1998

91.    Wetli, C.V.: Commentary on Genius vs State (986 F.Supp. 668 D. Mass 1997) **Hex Appeal: Did Voodoo Terror Bring Insanity?** Forensic Echo 2:3-4, 1998

92.    Wetli, C.V., Mittleman, R.E., and Rao, V.J.: **An Atlas of Forensic Pathology (subtitle Forensic Pathology - A Descriptive Atlas of the Latter Twentieth Century).** American Society of Clinical Pathologists (ASCP Press), Chicago, 1999   ISBN 0-89189-430-6

93.    Wetli, C.V.: **Disaster's Trauma to Rescuers (commentary)** Forensic Echo 3(6): 13-14, 1999 (May)

21

FELL-00002653

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

94.    Wetli, C.V.:  **Perspectives in Pathology:   The Two Worlds of Autopsy.**  Advance for Administrators of the Laboratory,  8(4):  14-16, 1999

95.    Okia, Z. and Wetli, C.V.:  **Arrythmogenic Right Ventricular Dysplasia and Sudden Death**.  Amer. Soc. Clin. Path. Check Sample FP 99-6  41(6): 75-92, 1999

96. Wetli, C.V.:  **Body Traces Bullet**.  The Forensic Panel Letter 3(11): 16, 1999

BIBLIOGRAPHY (Continued):

97. Wetli, C.V.:  **Dead Baby Diagnosis Valid?**  Commentary on People vs.Lind (Illinois, 718 N.E. 2d 316):  **When Do Injuries Establish Intent?**  The Forensic Panel Letter (online www.forensicpanel.com), April 26, 2000.

98. Wetli, C.V.:  Book Review: **Criminal Poisoning: Investigation Guide for Law Enforcement**, Toxicologists, Forensic Scientists and Attorneys by Trestrial III, John Harris Lab. Med 32:49, 2001

99.    Torres-Matundan, E., and Wetli, C.V.: **Salicylate Poisoning**.  ASCP    CheckSample FP00-09, 42(9): 113-124, 2001

100.    Wetli, C.V.:  **Autopsy Safety**.  Laboratory Medicine 32:451-453, 2001

101.    Wetli, C.V. and Golden, R.M.:  **Mass Disaster Management**, ASCP Check Sample FP01-10, 43: 119-138, 2001

102.    Wetli, C.V., Kolovich, R.M. and Dinhofer, L.:  **Modified Cardiectomy: Documenting Sudden Cardiac Death in Hearts Selected for Valve Allograft Procurement**. Amer J Forensic Med & Pathol.  23(2): 137-141, 2002

22

FELL-00002654

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

103.   Wang, J., Biedrzycki, L., Wetli, C.V.: **Delayed Cardiac Death from Vehicular Trauma: Heart Attack by Motorcycle**. ASCP Check Sample FP02-6, <u>44</u>:69-81, 2002 (ISSN 1056-5922)

104.   Wetli, C.V., Krivosta, G. and Sturiano, J.V.: **Open Revolver Cylinder at the Suicide Death Scene**.  Amer J. Forensic Med & Pathol.  <u>23(3)</u>: 229-233, 2002

105.   Wetli, C.V.: **The Medical Examiner's Role in Organ & Tissue Recovery**.  On the Beat (NY Organ Donor Network). <u>6</u>:12, 2003.  Update (publication of UNOS – United Network for Organ Sharing), May-June, 2003, p. 29.

106.   Xiong, Z., Avella, J., and Wetli, C.V.:  **Sudden Death Caused by 1,1-difluorethane Inhalation.** J Forensic Sci <u>49</u>: 627-629, 2004

BIBLIOGRAPHY (Continued):

107.   Stephens, B.G., Jentzen, J.M., Karch, S., Mash, D.C. and Wetli, C.V.:  **Criteria for the Interpretation of Cocaine Levels in Human Biological Samples and Their Relation to the Cause of Death**.  Amer J Forensic Med and Pathol <u>25</u>:1-10, 2004

108.   Stephens, B.G., Jentzen, J.M., Karch, S., Wetli, C.V., and Mash, D.C.:  **National Association of Medical Examiners Position Paper on the Certification of Cocaine-Related Deaths**.  Amer J Forensic Med and Pathol <u>25</u>:11-13, 2004

109.   Avella, Joseph; Wetli, Charles V.; Wilson, James C.; Katz, Michael and Hahn, Timothy:  **Fatal Olanzapine-Induced Hyperglycemic Ketoacidosis**.  Amer J Forensic Med Pathol___

23

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

<u>25</u>:172-175, 2004; reproduced in Psychiatry Review, <u>2</u>:21-23, 2005

110.  Shields, L.B.E.,  Hunsaker, D.M., Hunsaker, J.C., Wetli, C.V. and Holmes, R.M.: **Atypical Autoerotic Death: Part II**. Amer J Forensic Med Pathol 26:53-62, 2005

111.  Wetli, C.V.: **Foreword** to <u>Forensic Pathology: Principles</u> <u>and</u> <u>Practice</u> by Dolinak, Matshes and Lew, 2005 , xxi-xxii, Elsevier, MA  (ISBN 0-12-219951-0)

112.  Wetli, CV and Natarajan, GA:  **Death in Custody, United States of America.**  In Encyclopedia of Forensic and Legal Medicine, Vol. 2. pp 65-73, Payne-James, Byard, Corey and Henderson (eds.), Elsevier, Glasgow, 2005 (ISBN: 0-12-547970-0 {set})

113  Wetli,Charles V:  **Excited Delirium**.  Ibid, pp 276-288

114  Wetli, Charles V.:  **Excited Delirium** in <u>Deaths in</u> <u>Custody,</u> pp 99-112       Chapter 7,   (Ross, DL and Chan, TC, eds.), Humana Press,      Totowa, NJ, 2006

115.  Davis, NL, Wetli, CV and Shakin, JL: **The Retina in Forensic MedicineApplications of Ophthalmic Endoscopy: The first 100 Cases**.  Amer J Forensic Med and Pathol <u>27</u>:1-10, 2006

116.  Davis, NL, Wetli, CV, and Shakin, JL: **Ophthalmic Endoscopy – The     Retina in Forensic Medicine** Check Sample, American Society for Forensic Pathology, FP 06-5 (FP 316), <u>48</u> (5):61-73, 2006

**24**

FELL-00002656

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

117.    Pinckard, JK, Wetli, CV, and Graham, MA: **National    Association of Medical Examiner Position Paper on the    Medical Examiner Release of Organs and Tissues for    Transplantation.** Amer J Forensic Med and Pathol 28 (3):    202-207, 2007

118.    Wetli, C.V.: **Overview of Pathology of Drug Abuse:  Scene  of Death and the Autopsy** in Pathology, Toxicogenetics, and Criminalistics of Drug Abuse, Karch, S.B. (ed). CRC    Press/Taylor and Francis Group, Boca Raton, FL,  Chapter 2,    pp 71-78, 2008 ISBN 13:978-1-42005455-2

119.    Wetli, C.V.: **Sudden Unexpected Death in Custody (SUDIC)** in TASER Conducted Electrical Weapons:  Physiology,  Pathology, and Law; Kroll, M.W. and Ho, J.D. (eds.), Chapter    30, pp 379-388, Springer Science + Business Media, New    York, 2009; ISBN978-0-387-85474-8

120.    Wetli, CV; Ponzin, D; Womack, C; and McCann, G:    **Facilitating Donation – The Role of Key Stakeholders:  The Medical Examiner, the Coroner, the Hospital Pathologist,    and the Funeral Director**, in *Tissue and Cell Donation -  An Essential Guide*. Warwick, RM; Fehilym, D; Brubaker, S; and Eastlund, T (eds.); Chapter 9, pp 160-178,Wiley-Blackwell, Oxford, UK, 2009 ISBN 978-1-4051-6322-4

121.    Scheinin, L and Wetli, CV: **Sudden Death and Sickle Cell Trait – Medicolegal Considerations and Implications.** Amer J Forensic Med & Pathol 30:201-208, 2009

122.    Mash, DC; Duque, L; Pablo, J; Qin, Y; Adi, N; Hyma, B; Karch, S; Druid, H; and Wetli, CV: **Brain Biomarkers for Identifying Excited Delirium as a Cause of Sudden Death**. Forensic Science International, 190: e13-e19, 2009

25

FELL-00002657

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

## ADDENDUM I

### AMERICAN SOCIETY OF CLINICAL PATHOLOGISTS ACTIVITIES

**Forensic Council of Commission on Continuing Education** 1982-
1988 (Chairman, 1986-1988); ex officio 1989-2001
Forensic Resource Council, January 2002 - 2005

**Check Sample: Editor for Forensic Council, 1985 - 2005**

Associate Editor for Check Sample Program &
Editor-in-Chief of Anatomic Pathology, 1990-1993

Executive Committee, (Editorial Board) April 1993 - 2005
Abstract Review Subcommittee for Anatomic Pathology: May 1988 -
present
American Journal of Clinical Pathology Editorial Board (Dec. 1996 -
present)
Check-Path Program Forensic Expert Review Panel 1992 - present
Resident In-Service Examination ("RISE") National Contributing Editor
for Forensic Pathology (test committee) June 1998 - present
George F. Stevenson Society, Nov. 2000 - 2006

**ASCP Awards:**

Commission of Continuing Education Medal, November 1988
Distinguished Service Award, May 1989

**26**

FELL-00002658

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

# Check Samples Published:

**FP 81-- Naked Hyperthermia (ref. 14)**

**FP 84-5 - Haitian AIDS (ref. 34)**

**FP 84-6 - Coronary Artery Dissection (ref. 35)**

**FP 89-6 - Sudden Death from Falciparum Malaria (ref. 58)**

**FP 96-1 - Fatal Lightning Strike (ref. 78)**

**LPM-96-3 - When Lawyers Call:  Pathologists and Laboratorians as Expert Witnesses (ref. 85)**

**FP 00-09 – Aspirin Toxicity (ref. 99)**

**FP01-10 - Mass Disaster Management (ref. 101)**

**FP02-06 - Delayed Cardiac Death from Vehicular Trauma (ref.  103)**

**FP 06-5 (FP 316) – Ophthalmic Endoscopy – The Retina in Forensic Medicine (ref. 116)**

AMERICAN SOCIETY OF CLINICAL PATHOLOGISTS ACTIVITIES (cont'd)

*Teleconferences:*
    Drug Overdose Deaths June and October, 1985; September 1988
    Forensic Pathology for the Hospital Pathologist - Part I May 1989
Anatomy of Firearms Injuries (Dr. Geetha Ann Natarajan, Co-director):  October 1995

*ASCP Workshops:*
#4430:    **Man & Machine:** Evaluating the Auto Accident Victim (Co-director with Dr. James Benz), October 1982, October 1983; Revised, with Dr. Don Reay as Co-director: November 1985, April 1987, March 1993

27

FELL-00002659

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

#4436: **Forensic Pathology for the Hospital Pathologist** (with Dr. Roger Mittleman as Co-director), October 1984, April 1985, November 1985, April 1986, March 1987, October 1987, April 1988, March 1989 October 1989, March 1991, April 1992, September 1995

#4443:    **Pathology of Drug Abuse** (with Dr. Allen Jones, Co-director) October 1988, October 1989, October 1990; (with Dr. Geetha Natarajan, Co-director), September 1995

AMERICAN SOCIETY OF CLINICAL PATHOLOGISTS ACTIVITIES (cont'd)

#A-135:    **The Art of Courtroom Testimony,** October 1989 (Mini-workshop)

#4447:    **The Art of Courtroom Testimony,** October 1990, March 1991, October 1992, October 1993, October 1994, October 1996

#A-152:    **Euthanasia and Physician-Assisted Suicide** (Mini-workshop) October 1994

#4454:    **Anatomy of Firearms Injuries** (with Dr. Geetha Natarajan, Co-director) April 1995, April 1996, April 1997

#A-166:    **Death Certification,** October 1996, September 1997, October 2000 (Mini-Workshop)

#A-190    **Forensic Pathology Chat Room,** October 2000

#R-233    **Forensic Pathology Round Table (Lawyers, Courts & Judges),** October 2000

ASCP DINNER SEMINARS PRESENTED
(Workshop #4410)

**DINNER SEMINARS  (1982 - Present; Director 1986-1988)**

1982: Spontaneous Human Combustion;
Fungal Cerebritis in IV Cocaine Abuse

1983: The Body Packer Syndrome;
Graves, Skulls, and Blue Tattoos
(Afro-Caribbean Religions).

**28**

FELL-00002660

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

1984: Two Point Contact; (cylinder flare in GSW homicide)
Psychotic Heat (excited delirium and cocaine).

1985: Double Impact; (in automobile crash)
Silence Please: Murder in Progress (firearms silencers)
Lust Murder

**DINNER SEMINARS  (Cont'd.)**

1986: Potential Significance of the Hexagram;
Sudden Death in Crisis Intervention;
Delayed Symptoms (Amoxapine Overdose);
Blood, Alcohol and Trauma

1987: Trial by Press;
Hyperacute Cerebral Edema in an Adult

1988: Blackpowder Backfire; (breech plug fatality)
Sudden Death in Mental Illness (Neuroleptic Malignant
Syndrome)

1989: The Explosion  (deflagration vs bomb)
A Fatal Breeze (CO poisoning).

1990: An Epitaph of Adolfo De Jesus Constanzos;
From Natural Causes (not so apparent manner of death).

1991: A Maturational Arrest (in the grief reaction),
The Hemlock Debate, (assisted suicide, euthanasia)
If At First You Don't Succeed...; (multiple SGW suicide).
Tales Bullets Tell (bullet cytology).

1992: Time of Death;
Candomble
A Not-So-Spontaneous Subarachnoid Hemorrhage (vertebral
artery laceration).

1993: Colombian Entrepreneur  (heroin body packer)
Death of a Healthy Child  (child abuse)
Deaths From Hurricane Andrew

**29**

FELL-00002661

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

1994: A Matter of Position (gunshot wound problem solving);
The Naked Truth (autoerotic sexual asphyxia)
Chango's Revenge (Fatal Lightning Strike)

1995: "The Chameleon" (approach to the Police Shooting).
Fatal Firearm Facsimile (Black Powder Firearms)
Gasping Baby Syndrome (Benzyl Alcohol Toxicity)

**DINNER SEMINARS  (Cont'd.)**

1996: Degenerate Dissection (Heroin Body Packer)
Degenerative Deglutination (Food Aspiration in Elderly)
Acute Exhaustive Mania, Excited Delirium and the
Neuroleptic Malignant Syndrome

1997: Press, Politics and Mass Disaster (TWA 800 Disaster).
Of Broken Bones and Dry Gas (Homicidal Methanol Poisoning)
Forensic Stridor (Sudden Death from Laryngeal Tuberculosis)

2000: Modified Cardiectomy
Suicide with Open Revolver Cylinder

FELL-00002662

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**


**ADDENDUM   II**


ACTIVITIES ASSOCIATED WITH ORGAN AND TISSUE PROCUREMENT FOR TRANSPLANTATION

Medical Examiner and Coroner Advisory Committee for the **American Red Cross**, 1998-2005
**Ad Hoc Committee of the National Association of Medical Examiners** for Developing Guidelines for the Relationship between Tissue Procurement Agencies and Medical Examiners/Coroners, 01/01 – present; appointed chairman 02/05
Medical Advisory Board and Chairman of the Tissue Subcommittee for the **New York Organ Donor Network**, 10/01 – 02/09
Medical Examiner and Coroner Advisory Board for the **Musculoskeletal Tissue Foundation** (Co-Chair), February 2006-2011

## Publications:

Wetli, C.V.: **The Medical Examiner's Role in Organ &   Tissue Recovery**. On the Beat (NY Organ Donor Network).       6:12, 2003.  Update (publication of UNOS – United Network      for Organ Sharing), May-June, 2003, p. 29    (ref. 105)

**Wetli,C.V., Kolovich, R.M. and Dinhofer, L**.: Modified  Cardiectomy: Documenting Sudden Cardiac Death in        Hearts Selected for Valve Allograft Procurement. **Amer J        Forensic Med & Pathol. 23(2): 137-141, 2002 (ref. 102)**

Wetli, CV; Ponzin, D; Womack, C; and McCann, G: **Facilitating Donation – The Role of Key Stakeholders:  The          Medical           Examiner, the Coroner, the Hospital Pathologist, and the Funeral Director**, in *Tissue and Cell Donation - An Essential Guide*. Warwick, RM; Fehilym, D; Brubaker, S; and Eastlund, T (eds.); Chapter 9, pp 160-178,Wiley-Blackwell,     Oxford, UK, 2009 ISBN 978-1-4051-6322-4 (ref n119)

FELL-00002663

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

Presentations at the **American Association of Tissue Banks:**

**2001:  Modified Cardiectomy**

**2005:  Medical Examiners and Tissue Procurement (panel)**

# ADDENDUM III:  AWARDS

Far East United Nations Command:  Certificate of Appreciation, April, 1975

United States Army Commendation Medal, August, 1976

American Society of Clinical Pathologists Commission on Continuing Education Medal, 11/88

American Society of Clinical Pathologists Distinguished Service Award, May 1989

National College of District Attorneys Lecturer of Merit Award, June 1990

NYS Trauma Physician of Distinction, 1999
(Presented by NYS Trauma Committee, American Trauma Society, NY Division)
(Note:  The only pathologist to ever receive this award)

National Association of Counties Award (Best in Category):  Mass Disaster Preparedness Program, May 2000

St. Louis University School of Medicine:  The George E. Gantner Memorial Lecture Award, July 23, 2007

32

FELL-00002664

# EXHIBIT 307



COMMONWEALTH OF PENNSYLVANIA · DEPARTMENT OF HEALTH
VITAL RECORDS

## Certification of Birth

DATE OF BIRTH: REDACTED - FELL 1935

FILE NO.: 1061570-1935

DATE FILED: REDACTION - FELL 1935

COUNTY OF BIRTH: LUZERNE

DATE ISSUED: REDACTED - FELL 2001

NAME: THERESA KOZERSKY

SEX: FEMALE

FATHERS NAME: STEPHEN BANAS

MOTHERS MAIDEN NAME: FRANCES KOZERSKY

This is to certify that this is a true copy of the record which is on file in the Pennsylvania Department of Health, in accordance with Act 66, P.L. 304, approved by the General Assembly, June 29, 1953.

Robert S. Zimmerman, Jr., MPH
Secretary of Health

H105.105 (REV.09/00)

Charles Hardester
State Registrar

WARNING: IT IS ILLEGAL TO DUPLICATE THIS COPY BY PHOTOSTAT OR PHOTOGRAPH

DCN

10665696

# EXHIBIT 308

This is to certify that this is a true and accurate copy of the death record on file with the Division of Vital Records, and that I, Charles Hardester, am and was at the time of the issuance of this copy Director, Division of Vital Records of the Department of Health for the Commonwealth of Pennsylvania, duly appointed and commissioned as directed by Act 66 of the General Assembly, approved 29 June 1953, P.L. 304.

APR 2 0 2001

_Date Issued_

_Charles Hardester_

_Director_

---

HVS-5—200M—9-36

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF HEALTH**
**BUREAU OF VITAL STATISTICS**

Primary Dist. No. 40-28-01

**CERTIFICATE OF DEATH**

File No. 274

Registered No.

1. PLACE OF DEATH
County
Township
Borough
City Wilkes Barre

No. _____ St. _____ Ward

(If death occurred in a HOSPITAL or INSTITUTION, give its NAME instead of street and number)

Length of residence in city or town where death occurred ___ yrs. ___ mos. ___ days. How long in U. S., if of foreign birth? ___ yrs. ___ mos. ___ days.
(IF U. S. VETERAN, COMPLETE REVERSE SIDE OF CERTIFICATE)

2. FULL NAME (type or print) Frances Kozerski

Residence: No. REDACTED - FELL     Ward ____
(Usual place of abode)     REDACTED - FELL     (If nonresidence, give city or town, county, and State)

**PERSONAL AND STATISTICAL PARTICULARS**

3. SEX Female
4. COLOR OR RACE White
5. SINGLE, MARRIED, WIDOWED, OR DIVORCED (write the word) Single

5a. If married, widowed, or divorced
HUSBAND of
(or) WIFE of     REDACTED - FELL

6. DATE OF BIRTH (month, day, and year) 1914
7. AGE Years 23   Months ___   If less than 1 day, ___ hrs. or ___ mins.

8. Trade, profession, or particular kind of work done, as spinner, sawyer, bookkeeper, etc. Stripping Dept
9. Industry or business in which work was done, as silk mill, sawmill, bank, etc. Cigar Mill
10. Date deceased last worked at this occupation (month and year) Dec 13 1937
11. Total time (years) spent in this occupation 6 years

12. BIRTHPLACE (city or town) (State or Country) Kansas Mills Penna.

13. FATHER NAME Stanley Kozerski
14. BIRTHPLACE (city or town) (State or Country) Poland

15. MOTHER MAIDEN NAME Catherine Burkowski
16. BIRTHPLACE (city or town) (State or Country) Poland

17. SIGNATURE (name and address) OF INFORMANT Mary Shedlock 104 N. Chestnut St

18. BURIAL, CREMATION, OR REMOVAL: Date March 5, 1938
Place St Francis Plains County Luzerne State Pa
19. UNDERTAKER (name and address) 293 So. River St Michael J. Nabilski Plains, Pa

20. FILED 3-4 1938 Mrs Kathryn May ___ Registrar

**MEDICAL CERTIFICATE OF DEATH**

21. DATE OF DEATH (month, day, and year) 3-1 1938

22. I HEREBY CERTIFY, That I attended deceased from Feb. 24th 1938, to March 1st, 1938. I last saw her alive on March 1st, 1938; death is said to have occurred on the date stated above, at 10:20 P.m.

The principal cause of death and related causes of importance were as follows:

Pelvic Abscess
Pulmonary Embolism ?
Non-gonococcic
Non-puerperal     1396
Non-tuberculous     111a

Other contributory causes of importance:

Name of operation Vaginal Puncture Date of 2-28-38.
What test confirmed diagnosis? Operation. Was there an autopsy? No

23. If death was due to external causes (violence), fill in also the following:
Accident, suicide, or homicide? ___ Date of injury ___ 193_
Where did injury occur? ___
(Specify city or town, county, and State)
Specify whether injury occurred in industry, in home, or in public place:
___
Manner of injury ___
Nature of injury ___

24. Was disease or injury in any way related to occupation of deceased? ___
If so, specify ___
(Signed) M B Allison, Ph. G.-F. Donaheed M. D.
(Address)

# EXHIBIT 309

## JOHN F. EDENS, PH.D.

67 W. Gaslight Place
The Woodlands, TX 77382
(281) 367-1198
edens@shsu.edu

1. I, John F. Edens, Ph.D., am a licensed psychologist in the state of Texas (license #3-1105) and a tenured faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

2. I am professionally active in the field of forensic clinical psychology. For example, I am an associate editor both for the social science journal *Assessment* and the *American Psychology-Law Society News*, the official newsletter of Division 41 of the American Psychological Association. I am on the editorial board of several psychology-law journals (e.g., *Law and Human Behavior, Behavioral Science and the Law, International Journal of Forensic Mental Health*) and I serve as an ad hoc reviewer for numerous other social science journals (e.g., *American Psychologist, Journal of Personality Assessment, Psychological Assessment, Journal of Abnormal Psychology*). I have been conducting research in the area of aggression and violence risk since the mid-1990s and have published approximately 40 peer-reviewed journal articles, book chapters, and professional manuals related to forensic assessment generally, and more than 20 peer-reviewed journal articles and book chapters specifically concerning psychopathic personality disorder (psychopathy). At present, I am a co-investigator on a 3-year, $1.3 million research grant from the National Institute of Mental Health that is examining the role of psychopathy in the adjustment of prison inmates and substance abusers.

3. I am familiar with the published research literature regarding the Hare Psychopathy Checklist-Revised (PCL-R). I have used the PCL-R both in my clinical work, which includes conducting risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas, and in my research, which has specifically examined the relationship between PCL-R scores and institutional misconduct in correctional settings. I have provided consultative services and training to legal, correctional, and mental health professionals regarding violence risk and the PCL-R. I also have testified as an expert witness concerning the use of the PCL-R in the assessment of violence risk before criminal courts in Texas. I believe the PCL-R is an instrument that can be helpful in making judgments regarding the likelihood of future violence in certain instances in which there is sufficient scientific support to justify its use.

FELL-00002667

4. I have been asked in this declaration to provide my opinion on questions relating to the PCL-R and the appropriateness of reliance on this instrument to predict an individual's future dangerousness in a United States prison. I have published several articles that bear on these questions (see footnotes), and have additional work in this area in press and under review at scientific journals. These articles offer a more detailed and expansive discussion of the points I make in this declaration.

5. The PCL-R was not designed to be a measure of violence risk per se. The PCL-R is a 20-item instrument intended to assess traits associated with the construct of psychopathy. Although higher PCL-R scores have been found to be associated with a higher likelihood of aggression in certain contexts (e.g., individuals in the community), the PCL-R has not been demonstrated to be a valid and reliable indicator of increased violence risk for all people in all circumstances. As such, blanket statements that persons who are more psychopathic are 'more dangerous' than non-psychopathic offenders are significant oversimplifications of what is known about the relationship between psychopathy and violence across various contexts.

6. I am aware of four published studies (two of which were co-authored by me) and one unpublished doctoral dissertation that specifically have examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates.[1] Although these studies have found some significant correlations between PCL-R scores and various measures of institutional adjustment (e.g., non-compliance, hostility), *not one* has reported a statistically significant relationship between psychopathy and acts of physical violence. Moreover, it is important to note that one of these research projects (Walters, Duncan, & Geyer, 2003) specifically studied a large sample of prison inmates in the U.S. Federal Bureau of Prisons and failed to find a significant relationship between psychopathy and acts of physical aggression. Thus, the claim that a high PCL-R score indicates a high risk of future violence in a federal prison runs counter to existing evidence that does not support such an assertion. I do not believe that one could ethically and responsibly make such an assertion in the face of the available research in this area.

7. In a recent article,[2] I discussed a case in which a prosecution expert witness relied on the PCL-R to support an assertion that the defendant was a psychopath who was highly likely to engage in future acts of violence, even if he were incarcerated in a maximum security prison for the remainder of his life. I concluded in that article that, given the absence of research support for such a claim, this use of the PCL-R was misleading and

---

[1]    Buffington-Vollum, J. K., Edens, J. F., Johnson, D. W., & Johnson, J. (2002). Psychopathy as a predictor of institutional misbehavior among sex offenders: A prospective replication. *Criminal Justice and Behavior, 29,* 497-511.
    Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for disciplinary infractions: A comparison of two measures of psychopathy. *Behavioral Sciences and the Law, 17,* 435-443.
    Kosson, D. S., Steuerwald, B. L., Forth, A. E., & Kirkhart, K. J. (1997). A new method for assessing the interpersonal behavior of psychopathic individuals: Preliminary validation studies. *Psychological Assessment, 9,* 89-101.
    Walters, G., Duncan, S., & Geyer, M. (2003). Predicting disciplinary adjustment in inmates undergoing forensic evaluation: A direct comparison of the PCL-R and PAI. *Journal of Forensic Psychiatry and Psychology, 14,* 382-292.
    Westendorf, M. J. (2002). *Disciplinary institutional infractions: The role of psychopathy.* Unpublished doctoral dissertation, MCP Hahneman University, Philadelphia, PA.
[2]    Edens, J. F. (2001). Misuses of the Hare Psychopathy Checklist-Revised in court: Two case examples. *Journal of Interpersonal Violence, 16,* 1082-1093.

FELL-00002668

ethically questionable. The incident described in my article occurred in approximately May 2000, in a case called *U.S. v. Haynes*. At the request of defense counsel in that case, I provided an affidavit summarizing the then-current empirical literature regarding the relationship between psychopathy and institutional violence. Like several other forensic psychologists recognized as experts in the area of violence risk assessment who also submitted affidavits in the case, I noted my concerns about the scientific propriety of using the PCL-R to identify individuals as likely to commit acts of violence in prison. Had I been asked for such an affidavit in 1998, I would have made substantially the same statements I made in 2000. The basis for my view on this issue has only been strengthened by subsequent studies since 1998 that have replicated the lack of a meaningful correlation between psychopathy and U.S. prison violence found in earlier studies.

8. I have also written about and conducted research on the prejudicial impact that the label 'psychopath' and its associated traits may have on laypersons. In a recent article,[3] my colleagues and I discussed the means by which testimony about psychopathy may bias jurors who are considering whether to impose a death sentence. For example, to the extent that an examiner's description of PCL-R data comports with and adds 'scientific' credibility to preconceived notions of violence potential and remorselessness, as well as bolsters the prosecution's description of the defendant as a 'cold-blooded' killer, it is difficult to imagine that such testimony would not have a significant effect on jurors.

9. Based on these concerns, my colleagues and I have conducted several recent experiments[4] that have examined the effects of labeling criminal defendants as exhibiting psychopathic traits. The typical format of these studies has been to present laypersons with case history information relevant to an offender's crime(s) and to then manipulate whether he is described during testimony as psychopathic or as non-psychopathic (e.g., not mentally disordered or as suffering from some other form of mental illness such as schizophrenia). Participants in these studies are then queried about their perceptions of the defendant and what sanctions they would support in his case. The general pattern of findings from these studies is that laypersons who hear a defendant being described as psychopathic subsequently expect him to be much more violent and dangerous in the future than do laypersons who are exposed to the same case information but hear the defendant described as being non-psychopathic. Moreover, when participants in these studies are asked whether a death sentence is appropriate given the facts of the case presented to them, it is not surprising that a much higher percentage of those who hear the defendant described as psychopathic believe the appropriate sentence for his crimes is

---

[3]    Edens, J. F., Petrila, J., & Buffington-Vollum, J. K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29*, 433-481.

[4]    Edens, J. F., Colwell, L. H., Desforges, D. M., & Fernandez, K. (2003). *Psychopathy predicts death sentences in a mock murder trial.* Manuscript submitted for publication.

Edens, J. F., Desforges, D. M., Fernandez, K., & Palac, C. A. (in press). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime, and Law.*

Edens, J. F., Guy, L. S., & Fernandez, K. (in press). Psychopathic traits predict attitudes toward a juvenile capital murderer. *Behavioral Sciences and the Law.*

Guy, L. S., & Edens, J. F. (2003). Juror decision-making in a mock sexually violent predator trial: Gender differences in the impact of divergent types of expert testimony. *Behavioral Sciences and the Law, 21*, 215-237.

FELL-00002669

death. For example, in one of these studies (Edens, Colwell, Desforges, & Fernandez, 2003), 38% of the study participants who were informed that the defendant was not mentally disordered supported death and 30% of those who were exposed to testimony that the defendant was schizophrenic supported death. In the condition in which the defendant was described as psychopathic, however, 60% supported a death sentence, even though all other facts of the case were held constant across the three types of testimony. It is also noteworthy that these differing rates of support for the death penalty were obtained even when the prosecution expert acknowledged that the defendant was at 'low' risk for engaging in future acts of violence. Given these findings, it seems very likely that the introduction of psychopathy testimony into actual trials could increase the probability that jurors would support capital punishment.

10. In conclusion, it is my opinion that it is not, and never has been scientifically or ethically defensible to make claims that an individual offender high in psychopathic traits is significantly more likely than the typical prison inmate to commit serious acts of violence in a U.S. prison, given the absence of a meaningful association between the PCL-R and U.S. prison violence. The minimal probative value of the instrument in this context, combined with its likely prejudicial impact on jurors, raise serious concerns about testimony based on the construct of psychopathy.

I declare under penalty of perjury that the foregoing is true and correct.


John F. Edens, Ph.D                    11/24/03
                                       Date

FELL-00002670

# EXHIBIT 310

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2005 JUL 6 AM 8 11

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA,                )
          Plaintiff,                     )
                                         )
     v.                                  )     Criminal No. 2:01-CR-12
                                         )
DONALD FELL,                   )
          Defendant.                     )

MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF
MICHAEL WELNER, M.D.

I. INTRODUCTION

On April 7, 2005, this Court issued orders allowing Drs. Rabun, Wetzel, or both, to re-interview Donald Fell, as long as they provided Fell's counsel with a list of the tests to be performed and that they identified only one test for each measured mental function. On July 5, 2005, at approximately 9:30 p.m., Fell's counsel received a 72-page report authored by Michael Welner, M.D. that violates several of the Court's previous orders. First, Welner stated that Dr. Wetzel's June 13, 2005 re-interview of Fell was merely a proxy for Welner to test Fell ("...a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Fell") (Welner p.27). Second, Welner recently performed several new tests, never previously discussed with counsel (PCL-R, administered July 4, 2005; VRAG, administered July 4, 2005; HCR-20, date unspecified) (Welner pp. 8, 67). Third, the report is replete with statements taken by Welner, with the assistance of law enforcement, interviewing persons who will not be called as witnesses in this case. Fourth, the report is full of allegations of misconduct by Fell for which no previous notice has been given, and which are not relevant to any of the alleged aggravating factors. Fifth, the report is bad science.

FELL-00002671