Statements by the Government during both guilt and penalty phase arguments were improper, inflammatory and misstated both the facts and the law. Moreover the government elicited false or misleading testimony on multiple occasions. Finally, in its zeal to obtain a death sentence against Mr. Fell, the Government withheld critical documents from the defense it was required to turn over by law and violated the Court's April 7, 2005 order and performed unauthorized mental health testing upon Mr. Fell. This cumulative prosecutorial misconduct was egregious and deprived Mr. Fell of his rights under the Fifth, Sixth and Eighth Amendments. A death sentence resting on such egregious prosecutorial misconduct cannot stand.

Post-conviction counsel will file a discovery motion after the filing of this Motion seeking access to discovery material held in the Government's possession which counsel has been unable to obtain despite diligent efforts. It is anticipated that additional claims of prosecutorial misconduct may be identified during the course of discovery which warrant amendment to this motion.

## XXII. Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Right to an Impartial Jury

### A. Jurors who would have been Stricken for Cause if they had been Truthful were Empanelled after Making Material Misstatements or Omissions During Jury Selection.

Several instances of juror misconduct deprived Mr. Fell of his Fifth, Sixth, and Eighth Amendment right to a fair trial and impartial jury. As appropriate for a capital case in which there was extensive pretrial publicity, the parties and the Court devoted extensive attention to jury selection in this case. Both the parties and the Court agreed that, under the circumstances, individual juror questionnaires were appropriate. And, although the Government opposed the

323

defense's motion for case-specific questioning on voir dire, the Court granted that motion and determined that case-specific questioning was important. Anticipating the important issues at trial, it also specifically requested that each prospective juror be asked whether he or she "has a bias or opinion or experience with respect to relevant mitigating evidence, such as … physical abuse, [or] childhood exposure to violence," identifying those as issues that could make it difficult for the juror to be unable to consider and weigh Mr. Fell's background at the penalty phase of trial. Def's Motion re Punishment-Related Questions (June 10, 2002). And the Court stated that its "view is that if there is testimony about sexual abuse during the course of [Mr. Fell's] life, that to make a reasonable assessment as to how a juror would respond to that is important." Voir Dire Tr., JVD-1 at 35 (May 5, 2005), United States v. Fell, 372 F. Supp. 2d 766, 773 (D. Vt. 2005). See also *Voir Dire* Tr., JVD-12 at 115:16-20 (June 1, 2005) (Mr. Primomo explaining that there were at least "three main areas of mitigation evidence" that the defense wanted to be sure the jury would consider, namely "the alcohol and drug abuse, the child molestation which Mr. Fell experienced as a young boy, and the abandonment of the parental - the chaotic household and the abandonment and lack of parenting that he received.").

Thus, the parties and the Court devoted extensive attention and care to the formulation of the jury questionnaire. The parties submitted a mutually agreed-upon set of questions in the form of a joint proposed juror questionnaire to the Court and the Court revised that questionnaire. The individual juror questionnaires were tailored to eliciting the information that was necessary for the Court appropriately to permit those jurors who were qualified and could be impartial to sit and to permit the parties to strike – for cause – those jurors who because of their life experiences or exposure to information could not or should not sit. Thus, in the questionnaire, each of the jurors in Mr. Fell's case were asked, among other things: "Have you

or has a family member or close friend ever been a witness to or the victim of a crime?" They were also asked, "Have you or has a family member or close friend ever been charged with a crime?" The answer to that question was overwhelmingly important.

The jurors were also given guidance by the Court about how to respond to the questionnaire. The Court explained:

> If you cannot answer a question because you do not understand it, write "Do not understand" in the margin next to the question. If you cannot answer the question because you do not know write "Do not know." If you want to explain your answer, do so either in the space provided on the questionnaire, or on one of the sheets appended to the questionnaire ... If for any reason you do not wish to answer any particular question, please write the word "Private" in the margin next to the question and we will take this matter up with you privately, if necessary.
>
> Because your answers are part of the jury selection process and become part of the record of this court, the answers must be truthful under the penalty of perjury, and you must sign the questionnaire at the end. Script for Jury Instructions at Fell-·00001356 (Ex. 117) (videotaped before voir dire to be played to prospective jurors before they filled out their respective questionnaires).

Notwithstanding the Court's clear instructions to the jurors about the importance of answering these questions completely or truthfully, two of the jurors in Mr. Fell's case unfortunately did not comply and their failure to comply compromised Mr. Fell's jury trial rights. As a consequence, the judgment must be vacated.

### 1.    Juror #162.

Juror #162 failed to disclose on her juror questionnaire that she was the victim of the same crime as Mr. Fell and his sister, sexual abuse. Juror #162 answered "No" to the question "Have you or has a family member or close friend ever been a witness to or the victim of a crime?" Juror Questionnaire (Ex. 125 at Fell-00001369). However, in a post-conviction

interview with 2255 counsel, Juror 162 admitted that she was the victim of a crime. Specifically, Juror #162 admitted that she was the victim of repeated sexual abuse as a child. In a statement, Juror #162 reported:

> At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.

Statement of Juror #162, Jan. 5, 2011 (Ex. 280). This was extraordinarily important information that Mr. Fell and his counsel needed to know and had a right under the questionnaire to know. The failure of the juror to disclose the information – even in camera – prejudiced Mr. Fell and requires a new trial.

Specifically, one of the important pieces of mitigation evidence trial counsel presented during the penalty phase was testimony that Donald Fell and his sister were victims of sexual abuse by their babysitters when they were young children. The fact of Donald Fell's sexual and physical abuse as a child was presented as a mitigating factor. Moreover, social workers testified to the sexual abuse, and it was referenced in trial counsel's opening and closing statements in the penalty phase. In light of the importance of this mitigation evidence to Mr. Fell's case, the answer that a juror had suffered sexual abuse – and yet notwithstanding that sexual abuse had led a law-abiding life – plainly presented a substantial risk that the juror's partiality would be compromised and that the juror would not be able to consider Mr. Fell's mitigation claim that the fact of his childhood sexual abuse made him less culpable for his crimes and less deserving of the death penalty. Thus, without more, such answer would have required disqualification. See also Decl. of A. Bunin (Ex. 264 at 7) ("I would have wanted to know if a

326

juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly."); Decl. of P. Volk (Ex. 305 at 1) ("I also would have challenged for cause any jurors who said they could not consider mitigation evidence about … childhood sexual abuse.").

Indeed, the Court had granted trial counsel's challenge for cause for another juror, Juror 184, because of an inability to impartially consider mitigation evidence after, among other things, the juror answered during voir dire that he could not consider mitigating factors such as upbringing and sexual abuse because people are personally responsible for how they develop. Mem. of Order and Op., at 1, 4, 7 (June 8, 2005) (granting Mr. Fell's motion to challenge Juror 184 and discussing case law supporting evidence of child abuse as a mitigating factor); Voir Dire Tr., at 105-06 (June 1, 2005). It is also clear from Juror #162's statement that she was far from impartial in considering evidence of Mr. Fell's abuse and that it "prevent[ed] or substantially impair[ed]" her ability to follow the Court's instructions. See Mem. of Order and Op., at 6 (June 8, 2005). Instead, she discounted Mr. Fell's sexual abuse based upon her own prior experience as the victim of the same crime.

Under similar facts, courts have concluded that such a material misstatement constitutes juror misconduct. See Burton v. Johnson, 948 F.2d 1150, 1153 (10th Cir. 1991) (affirming the reversal of a habeas petitioner's murder conviction where a juror did not acknowledge during voir dire that she had been sexually abused where the defendant had offered at trial that she suffered from battered woman's syndrome); United States v. Colombo, 869 F.2d 149 (2d Cir. 1989) (remanding a conviction on direct appeal where a juror failed to disclose when asked that his brother-in-law was a government attorney).

There is evidence from which the Court could find that Juror #162 either knew that she was not being truthful or was unreasonable in being untruthful when she answered "No" on her questionnaire. Brown v. Fisher, 2010 U.S. Dist. LEXIS 89566 (S.D.N.Y. Apr. 29, 2010). Clearly, Juror #162 knew at the time she completed the questionnaire that she had been the victim of sexual abuse as a minor. The crime she failed to disclose was not one as to which the victim could have been, or was, ignorant. Just as clearly, sexual abuse of children is a crime. See also 18 U.S.C. § 2243 (2011); VT. STAT. ANN. CRIMES & CRIM. PRO. § 3253a; N.J. CODE OF CRIM. CONDUCT 2C:14-2b; 2C:14-3a (each criminalizing child sexual abuse). Juror #162 was thus under a duty to answer "Yes" to the question whether she was a victim of a crime.

Although the information Juror #162 was obliged – but failed – to disclose was clearly of a sensitive personal nature, that did not relieve her from the obligation to answer the question completely and honestly. Nor does it justify depriving Mr. Fell and his counsel of that critical information. The Court anticipated circumstances such as this and appropriately provided for them. It instructed the jurors that "If for any reason you do not wish to answer any particular question, please write the word 'Private' in the margin next to the question and we will take this matter up with you privately, if necessary." Thus, if Juror #162 did not wish to reveal such sensitive information on her jury questionnaire, she had an option short of answering "No" and depriving Mr. Fell of this essential information. She could have written "Private" in accordance with the Court's instructions, and she could have disclosed this important information to the Court privately.[111] She did not do so, and her failure to do so or to disclose her sexual abuse deprived Mr. Fell of his Sixth Amendment right to an impartial jury without the need to show any further prejudice.

---

[111] Further, if Juror #162 had any doubt about whether the sexual abuse she suffered was a crime, she could have answered "Do not know" or explained her answer.

2.    **Juror #26.**

Juror #26 misrepresented his prior criminal history. Juror #26 answered "No" to the question "Have you or has a family member or close friend ever been charged with a crime?" Juror Questionnaire (Ex. 125 at Fell-00001369). In fact, Juror #26 was convicted in April 1996 of criminal mischief, which Juror #26 informed 2255 counsel arose out of a marital dispute. Ex. 240. Juror #26's misrepresentation about his prior criminal conviction prevented trial counsel from obtaining critical information necessary to a fair jury selection. See Irvin v. Dowd, 366 U.S. 717, 722 (1961) (holding that the Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors). Juror #26's past criminal conviction in connection with a domestic dispute was highly relevant to whether he was qualified to serve as a juror in Mr. Fell's case and could objectively evaluate evidence of the domestic turmoil in Mr. Fell's life. That turmoil was important evidence with respect to at least two mitigating factors: "As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other" and "Donald Fell's parents were violent alcoholics who abandoned him as a child." Special Verdict Form (Ex. 209).

In addition, Juror #26 misrepresented his knowledge regarding Mr. Fell's case. During voir dire, he was asked by the Court the extent of his knowledge of the case. First, the Court asked whether Juror #26 had heard anything about Mr. Fell's case, to which he responded "No, not really. No." Voir Dire Tr. at 90:7-8 (May 13, 2005). When asked if he knew any of the facts of the case, Juror #26 responded, "No. I think at one point, a long time ago, I heard something in passing, but other than that, no." Id. When prompted by the Court he stated that he knew "just that a woman had been kidnapped." Id.

Juror #26 was interviewed by 2255 counsel on January 15, 2011. During that interview, Juror #26 was asked about his knowledge with respect to Mr. Lee. Juror #26 asked,

"The one who hung himself in jail?" Without any prompting, Juror #26 described that he had heard of Mr. Lee's death from a news report that had aired around the time of his death (years before the trial and juror voir dire). Knowledge of Mr. Lee's death from a news report years before the trial plainly evidences an immensely vaster knowledge of the underlying facts of Mr. Fell's case than Juror #26 represented during voir dire.

Juror #26's material misstatement did not allow trial counsel to lodge what would have been a successful challenge for cause. The evidence of Juror #26's exposure to pretrial publicity (particularly the pretrial publicity to which Juror #26 was exposed) would have required disqualification, without more, and would have supported a successful challenge for cause. Indeed, the details of Mr. Lee's death (and the nature of his relationship with Mr. Fell more broadly) were not admitted at trial, because of concern, *inter alia*, over the prejudicial implications with respect to the relative culpability of Mr. Fell and Mr. Lee. Indeed, evidence of Mr. Lee's death was the subject of a motion in limine, in which trial counsel argued that it would unfairly prejudice Mr. Fell and in which the Court preliminarily ruled that such evidence would be inadmissible, pending a specific Government proffer. Order of May 25, 2005 at 8. Trial counsel would have successfully removed Juror #26 for cause had it known of his actual knowledge of the facts. Accordingly, Juror #26's material misstatement prejudiced Mr. Fell and violated his Fifth, Sixth, and Eighth Amendment rights.

**B.    Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to a Fair and Unbiased Trial when Jurors Were Exposed to Extraneous Influences.**

**1.    Juror #143**

For decades, the law in this Circuit and as set forth by the Supreme Court has been clear: the right to a speedy and public trial by jury during which the accused has the right to be confronted with the witnesses against him carries with it the guarantee that the case not be

heard by a jury subject to extraneous evidence – which has not been the subject of cross-examination and that the accused has not had the opportunity to confront. See United States v. Simmons, 923 F.2d 934, 943 (2d Cir. 1991) (holding that "facts that relate to a defendant's guilt, but which are not admitted as evidence during trial, should not be exposed to a jury during deliberations. Any other conclusion would permit a jury to consider incriminating evidence that has not been subject to confrontation or cross-examination"); see also Turner v. Louisiana, 379 U.S. 466, 472-73 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.").

This Court was extremely sensitive to that precept and protective of Mr. Fell's constitutional rights. The Court stated in its opening instructions to jurors before voir dire, "[A] jury's verdict must be free from outside influence. So, I am ordering each and every one of you not to discuss this case . . . . Please do not read, look at, or listen to any reports about this case." Script for Jury Instructions at Fell-00001355 (Ex. 117). The Court instructed the jury at the outset of trial, after it was impaneled: "I just want to remind all of you, particularly now that the trial has started, that it's just extraordinarily important that you make sure that you don't have any contact with anyone, discuss the case with anyone, listen or hear anything at all. I need to know about that right away." Tr. Vol. I-2 at 89:3-8 (June 20, 2005). The Court repeated a similar admonition twice on each day of the trial with the exception of June 23, 2005, on which the Court only provided one such warning. Tr. Vol. I-2 at 89 (June 20, 2005); Tr. Vol. II-2 at 38 (June 21, 2005); Tr. Vol. IV-2 at 52 (June 24, 2005); Tr. Vol. V-2 at 69 (June 28, 2005); Tr. Vol.

331

VI-2 at 3, 61 (June 29, 2005); Tr. Vol. VII-2 at 98 (July 1, 2005); Tr. Vol. VIII-2 at 68 (July 6, 2005); Tr, Vol. IX-2 at 73 (July 7, 2005); Tr. Vol. X-2 at 68 (July 8, 2005).

The Court did not just instruct the jurors not to be exposed to extraneous information; it also asked the jurors whether they had honored that pledge. Tr. Vol. I, at 10 (June 20, 2005). On the first day of trial, the Court stated, "And again, as I have done in the past, I will be asking you that same question everyday, and also, by the way, it includes not discussing the case among yourselves for the same reasons that I have talked about before. … You need to tell me … if you have learned anything else from outside the courtroom." Id. On the second day of the court proceedings, after the jury was impaneled, the Court asked jurors if they had "learned anything about the case from outside the courtroom" and received a negative answer from each of the jurors. Tr. Vol. III-1 at 11:14-15 (June 23, 2005). The Court repeated that question in one form or another at the start of each day throughout the trial. Tr. Vol. I at 10, 15 (June 20, 2005); Tr. Vol. II at 3 (June 21, 2005); Tr. Vol. III at 11 (June 23, 2005); Tr. Vol. IV at 24 (June 24, 2005); Tr. Vol. V-1 at 18 (June 28, 2005); Tr. Vol. VII-1 at 41 (July 1, 2005); Tr. Vol. VIII-1 at 8 (July 6, 2005); Tr. Vol. 8-1 at 8 (July 7, 2005); Tr. Vol. X-1 at 3 (July 8, 2005); Tr. Vol. XI at 38, 114 (July 12, 2005); Tr. Vol. XII at 11 (July 13, 2005). It received the same answer.

Unbeknownst to the court and to the defense, however, Juror #143 violated his pledge. During the guilt phase of Mr. Fell's trial, he drove for over two hours to Rutland – the scene of the murder of Mrs. Fell and Charles Conway and the kidnapping of Mrs. King – to undertake his own independent examination of the Fells' residence at 135 Robbins Street, where Debra Fell and Charles Conway's bodies were discovered. This was also the apartment where Mr. Fell and Mr. Lee lived while in Vermont. The trip required two hours of travel back.

332

Juror #143 also inspected the area surrounding the Price Chopper where Mr. Fell and Mr. Lee first encountered Mrs. King. Moreover, according to his own account, Juror #143 shared his impressions of the crime scene with other jurors. Juror #143 provided a statement to counsel on December 19, 2010 describing his investigation in Rutland and his discussions about his trip with other jurors. He explained that during guilt phase deliberations:

> We discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper. The mother's neighborhood wasn't great, but it was okay. The house was decent. She was just trying to live her life. I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife into the dumpster in the parking lot … The lighting at the Price Chopper in Rutland was weak. At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit.

Statement of Juror #143, Dec. 19, 2010 (Ex. 241).

Finally, it cannot be said that Juror #143's exposure to extraneous evidence or his exposure of that evidence to other jurors was harmless. Loliscio v. Goord, 263 F.3d 178, 185 (2d Cir. 2001) (citation omitted). One of the critical issues at trial and in the penalty phase was whether, at the time of the kidnapping and carjacking at issue and thereafter, Mr. Fell was intoxicated or was otherwise acting with an impaired capacity. Mr. Fell was operating with an impaired capacity. The Government disputed that, and argued for death. And among the critical facts the Government alleged to support its argument was Mr. Fell's accurate recollection at the time of his post-arrest statements of the route he followed from 135 Robbins Street to the Price Chopper and his alleged conduct in "lurking in the shadows," immediately before the kidnapping of Mrs. King. Trial Tr., Vol. I-1 at 109 (June 20, 2005). The Government argued that because Mr. Fell remembered his route to the Price Chopper and sites on that route and because he had the forethought to wait in the dark for Mrs. King he could not have been highly intoxicated on

333

the night of the crimes, that his capacity was fully intact, that the crimes were deliberate and premeditated, and that he thus deserved the death penalty. Indeed, the Government emphasized that Fell "recalled the exact route block by block they took from the Robbins Street apartment, past Foley's, Uncle Sam's, Jiffy Mart, the Post Office, and the Stop Light Bar, and on down past the parking deck to the plaza." Trial Tr. Vol. IV-1 at 63:15-24 (June 24, 2005).[112] The defense argued to the contrary, that Mr. Fell was indeed intoxicated and his actions were not premeditated, saying, "[The Government] used this word plan over and over again" and, after noting the amount of beer consumed in the apartment that night by Mr. Fell and others, "There was some serious drinking going on that night." Trial Tr., Vol. IV-1 at 72:15; at 73:1-15 (June 24, 2005). And, putting the lighting of the Price Chopper parking lot directly at issue, "[L]et's talk about planning and what events happened here and whether they are consistent with some kind of plan or not ... They left the door unlocked to the apartment and went out in the street with an unloaded shotgun in the middle of Rutland in the morning where anyone could see them. And they went to a parking lot that was lit." Trial Tr. Vol. IV-1 at 74:17-19; 75:6-10 (June 24, 2005).

Juror #143's intentional trip to Rutland to inspect the crime scene put a heavy thumb on one side of the balance of this hotly contested issue. It exposed him to important, and prejudicial, information to evaluate this claim that was not presented in court and that the defense did not have an opportunity to confront. And the result was that Mr. Fell's rights to confront and challenge the evidence against him and his other jury trial rights were violated. First, Juror #143's inspection and experimentation in the area gave him the opportunity to experience the

---

[112] Although the Government made no specific reference to Mr. Fell's statements about the path he took to the Price Chopper, they did argue during the penalty phase closing that Mr. Fell acted with premeditation and was "careful." Mr. Fell's level of intoxication was also relevant to two mitigators during the penalty phase, including whether Mr. Fell's capacity to appreciate his conduct was significantly impaired and whether he planned to kill Mrs. King at the time she was kidnapped. See supra.

334

route from 135 Robbins Street to the Price Chopper that Mr. Fell traveled on the fateful night of November 27, 2000 in the way a person travelling that route would have experienced it – the distances between locations, how simple the route was, where different buildings were located, how easy they would be to remember, how easy the route would be to navigate, and the like. The jury was presented an aerial photograph that showed in a general, abstract way where certain locations in the downtown Rutland area were and witnesses described where the Price Chopper was relative to the nearby Dunkin Donuts and Wal-Mart. Trial Tr., Vol. I-1 at 72:21-23; at 89:14-21; at 106: 20-24 (June 20, 2005); Trial Tr., Vol. II-2 at 20:8-14; 21:13-18 (June 20, 2005). But, no witness described the path between 135 Robbins Street and the Price Chopper, or described where both 135 Robbins Street and the Price Chopper were. Indeed, a police officer who pointed the jury to the location of 135 Robbins Street on the map only noted that the house was "a few blocks from downtown Rutland." Trial Tr., Vol. II-2 at 21:13-18. Many of the individual buildings described by Mr. Fell were not visible from the aerial photographs, making them inadequate substitutes for a drive through the area, such as the one Juror #143 took. And no witness described what it actually was like to walk that route, how simple it was, how exposed Mr. Fell and Mr. Lee might have been to public view during their walk, or how memorable the sites and locations would be.

Juror #143 did so. He did so years after the events in question. And he did so in circumstances where the Court could not control his conduct and the defense had no opportunity to challenge what he was seeing – or to point out how his vantage might have been different from Mr. Fell's. He did so without telling anyone except, by his own account, his fellow jurors. By traversing that route himself, and doing so outside the presence and without the knowledge of the defense, Juror #143 took away from the defense one important argument it had – that the

335

Government had not proven that Mr. Fell was fully sober and acting without an impaired capacity. And (although unnecessary to this claim) Juror #143 did so under circumstances that undoubtedly would have created an erroneous impression – during the day in Rutland many years later and not during the early morning hours of 2000.

Moreover, Juror #143's inspection also was highly relevant to, and not harmless with respect to, the Government's argument that Mr. Fell acted with premeditation because he and Mr. Lee were "lurking in the shadows" of the Price Chopper parking lot. Trial Tr., Vol. I-1 at 109:10-11 (June 20, 2005); Trial Tr. Vol. IV-1 at 44:9-17 (June 24, 2005). Indeed, the Government offered no other evidence about the lighting conditions to support Mr. Trapasso's testimony. But, as reflected in Juror #143's statement, he clearly took note of the lighting conditions. Thus, Juror #143 alone was able to observe those lighting conditions and gain information with which to assess (consciously or subconsciously) the veracity of the Government's witness and thus whether Mr. Fell was acting in a premeditated fashion and deserved to die or not.

Finally, Juror #143's examination of 135 Robbins Street was also relevant to, and not harmless with respect to, the mitigation evidence in the penalty phase about Mr. Fell's troubled home life as a child. The violence and alcoholism in Mr. Fell's home were key features of the defense mitigation case. Juror #143's observations of 135 Robbins Street and the surrounding neighborhood from an outsider's perspective gave him a vantage point from which to form a view about Mrs. Fell that ran counter to the evidence presented about her violent tendencies and chronic alcoholism, and Mr. Fell's unstable home life. Indeed, Juror #143 concluded from his visit that Mrs. Fell's house was "decent" and she was "just trying to live her life," and thus necessarily (and as a result of his visit) was in a position to discount important

336

mitigating evidence about Donald Fell's life with his disastrously dysfunctional mother in Vermont. Statement of Juror #143 (Dec. 19, 2010).

### 2. Juror #26.

On the first day of the trial, immediately after the jury was sworn in, the Court asked jurors, "Has anyone, by inadvertence, for any other reason, heard any publicity, radio broadcast or TV on this case?" Tr. Vol. I at 10 (June 20, 2005). None of the jurors responded affirmatively. The Court made the same inquiry each and every other day of the proceedings. None of the jurors responded affirmatively.

However, by his own later admission, Juror #26 was exposed to a television news report that described the supposed suicide of Mr. Lee that he did not disclose to the Court or to counsel. The details surrounding Mr. Lee's death were not admitted at trial, and in fact were the subject of a motion in limine. Hr'g Tr. at 90 (May 13, 2005). The Court clearly recognized the prejudice that exposure to the news could cause Mr. Fell and therefore the importance that the jurors not be exposed, and that, if they were exposed, they inform the Court. The Court's instruction was clearly the prudent and appropriate measure. Had a juror been exposed and admitted it to the Court, the Court could have taken the appropriate measures, including questioning the juror in chambers, giving a curative instruction, or striking the juror and replacing the juror with an alternate. Unfortunately, Juror #26 defeated the Court's protective measures. News items had been specifically emphasized by the Court, in recognition of their prejudicial effect. Tr. Vol. I-1 at 10 (June 20, 2005).

Exposure to news of Mr. Lee's death was obtained without the evidentiary safeguards present at trial and was prejudicial to Mr. Fell for a number of reasons, only a few of which are laid out here. For one, the information was highly relevant to, and prejudicial with respect to, Mr. Fell's own culpability for the events at issue. The suicide of Mr. Lee was

337

information that could, and would, be understood to be reflective of Mr. Lee's guilty conscience. He killed himself because of the awful crime he had committed – or because he had no defense to charges with respect to that crime. But, if that was the implication with respect to Mr. Lee, it would also be the implication with respect to Mr. Fell. As the Court itself recognized in excluding this information, exposure to it was prejudicial.

The information also had a direct bearing on – and was prejudicial with respect to – the relative roles of Mr. Fell and Mr. Lee. Simmons, 923 F.2d at 943; Turner, 379 U.S. at 472-73. One mitigating factor read, "Robert Lee, equally culpable for the crimes, will not face execution." Out-of-court (and inaccurate) evidence with respect to how Mr. Lee died would prejudice a juror's consideration of this mitigating factor. There is a reasonable probability that Juror #26 would have a struck a different balance but for this exposure and Mr. Fell would not have been sentenced to death. Accordingly, Mr. Fell was deprived of his Fifth, Sixth, and Eighth Amendment rights.

C.    **Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to an Impartial Jury and an Uncoerced Jury Verdict when One Juror Coerced Another into Changing her Vote from a Life Sentence to a Death Sentence by Aiming a 12-Gauge Shotgun at her when she Resisted Voting for Death.**

Undersigned counsel undertook to interview the jurors in this case in order to determine whether there were any constitutional improprieties in the process of empanelling the juror and reaching a verdict. Without prompting, Juror #143 reported that during deliberations in the penalty phase, a female juror was among the jurors who believed that mitigating factors in Mr. Fell's life warranted the imposition of a life sentence, and not a death sentence. Among the factors she believed militated against a death sentence was the fact that the shotgun Mr. Fell and Mr. Lee were carrying on the night of the crimes was not loaded. Juror #143, who believed a death sentence was appropriate, pointed the shotgun Mr. Fell and Mr. Lee had used at the female

338

juror to intimidate her into changing her vote by instilling fear. According to Juror #143, he took the gun, "cocked and pointed" it at the juror and caused her to squirm. Juror #143 explained to 2255 counsel:

> A female juror pointed out that the shotgun was not loaded. The marshal then brought in the gun. We showed the jury that it was unloaded. I also made sure that the gun was unloaded. This was important to me because as a hunter, I am very serious about gun safety. I cocked and pointed it at her and she squirmed. I said, 'That's what they did, you were scared even though you knew it wasn't loaded.'"

Statement of Juror #143, Dec. 19, 2010 (Ex. 241). After Juror #143 pointed the shotgun at the juror, she acquiesced to voting for Mr. Fell's death. It would deprive him of his Sixth and Fourteenth Amendment rights to impose a death sentence on Mr. Fell that was obtained through such coercion. See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988); United States v. Pleva, 66 F.2d 529, 532 (2d Cir. 1933) (holding that jury coercion "strikes at the root of the right to a trial by jury"); see also United States v. Grieco, 261 F.2d 414 (2d Cir. 1958) (per curiam), cert. denied, 359 U.S. 907 (1959) (holding that threats of violence, as well as other forms of threats, can be sufficient to overturn a verdict). Accordingly, Mr. Fell's death sentence must be overturned.

Juror #143's conduct also constituted an impermissible juror experiment since he was attempting to simulate the fear Mrs. King might have felt. Juror #143's experiment was not subject to confrontation during trial, and thus violated Mr. Fell's Sixth Amendment rights. See Turner, 379 U.S. at 472-73 ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."); Simmons, 923 F.2d

339

at 943 (holding that "facts that relate to a defendant's guilt, but which are not admitted as evidence during trial, should not be exposed to a jury during deliberations. Any other conclusion would permit a jury to consider incriminating evidence that has not been subject to confrontation or cross-examination, in direct contravention of the Sixth Amendment's guarantees.").

**D.    Additional Jurors in Mr. Fell's Case Engaged in Misconduct in Violation of Mr. Fell's Rights under the Fifth, Sixth, and Eighth Amendments**

Petitioner's rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated by additional juror misconduct. Such misconduct included, but was not limited to, additional instances of improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, false or misleading responses of jurors on voir dire, and improper biases which infected the jury's deliberations. In particular, numerous prejudicial news reports were published at the time of Mr. Fell's arrest as well as shortly before and during the trial. These include (1) news reports, including photographs, of Mr. Fell's appearance at a hearing wearing a "Slayer" t-shirt, (2) news reports describing a possible witness who would testify that Mr. Fell "held a teenage girl against her will for three weeks" (which was not ultimately introduced as evidence at trial), (3) highly inflammatory quotes from Mr. Fell's family to the effect that Mr. Fell should receive the death sentence, (4) quotes describing the relationship and conversations between Mr. Fell and his mother, and (5) writings by Mr. Lee which were specifically excluded at trial. Counsel believe that there are numerous instances of such misconduct that would be further developed at a hearing.

Each of these instances of juror misconduct deprived Mr. Fell of his right to a fair trial and impartial jury under the Fifth, Sixth, and Eighth Amendments, requiring that the Court vacate Mr. Fell's unconstitutional conviction and vacate his sentence.

## XXIII.  Other Claims

    A.    **Mr. Fell was Deprived of his Rights under the Fifth, Sixth, and Eighth Amendments when the United States Attorney General Decided to Seek the Death Penalty Against him on the Basis of Race, Gender and Geography, Three Constitutionally Impermissible Sentencing Factors.**

Mr. Fell was deprived of his Fifth, Sixth, and Eighth Amendment rights when the Department of Justice ("DOJ"), through United States Attorney General John Ashcroft, rejected the plea agreement reached between the Government and trial counsel based in part on a discriminatory purpose – Mr. Fell's race.  On May 18, 2001, defense counsel sent a letter to the U.S. Attorney's Office requesting that it settle the case by way of a plea agreement and not seek the death penalty against Mr. Fell.  On October 24, 2001, Mr. Fell and the United States Attorney's Office for the District of Vermont reached an agreement for Mr. Fell to plead guilty to kidnapping with death resulting in exchange for a life sentence.  That agreement was drafted by the United States Attorney's Office in its entirety.  It was contingent on approval by the United States Attorney General.  To that date, the Attorney General had never rejected a plea agreement to life by a local United States Attorney's Office.

In January 2002, however, the DOJ, through Attorney General Ashcroft, rejected the plea agreement.  Based on that decision, the U.S. Attorney's Office for the District of Vermont subsequently filed a Notice of Intent to Seek the Death Penalty.  The rejection was not accompanied by any statement of reasons.  It merely stated, "[t]he Government believes that the circumstances are such that if the defendant is convicted of either of those offenses, a sentence of death is justified," and listed the threshold culpability factors and aggravating factors.  However, the rejection came at a time during which Attorney General Ashcroft advocated a wider use of the federal death penalty and sought to refute statistical studies reflecting racial disparities in its use.  Dan Eggen, Ashcroft Aggressively Pursues Death Penalty, WASH. POST, July 1, 2002, at A1

341

(describing Ashcroft's frequent overruling of local prosecutors on the decision to seek the death penalty and noting that without interference from Ashcroft, the Vermont U.S. Attorney's Office likely would have proceeded with the plea agreement with Mr. Fell, who is white, which would have affected the racial distribution numbers); David Stout, Attorney General Says Report Shows No Racial and Ethnic Bias in Federal Death Sentences, N.Y. TIMES, June 7, 2001, at A29 (describing Ashcroft's rebuttal of the September 2000 DOJ study which had found racial bias); Raymond Bonner & Marc Lacey, Pervasive Disparities Found in the Federal Death Penalty, N.Y. TIMES, Sept. 12, 2000, at A18 (describing the comprehensive September 2000 DOJ study, which had found evidence of racial bias and a lack of geographical uniformity).

In particular, on September 12, 2000, the DOJ released a study (the "September 2000 Study") of its use of the federal death penalty between its reinstatement in 1988 and 2000. The study found racial bias and a lack of geographical uniformity. See U.S. DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000) (Sept. 12, 2000). Among other indicia of bias, the study found that U.S. Attorneys were more than twice as likely to seek death against a black defendant than a white defendant and that white defendants were nearly twice as likely as minority defendants to receive plea agreements that took the death penalty off the table. Id. at 12, 32. On June 6, 2001, less than a month after trial counsel submitted a letter to the U.S. Attorney's Office requesting that it not seek the death penalty, the DOJ revised its death penalty protocol. The introduction to the report describing the new protocol (the "June 2001 Report") refers to the September 2000 Study, yet overlooks or dismisses much of the evidence found in the earlier study. See U.S. DEP'T OF JUSTICE, FEDERAL DEATH PENALTY SYSTEM: SUPPLEMENTAL DATA, ANALYSIS AND REVISED PROTOCOLS FOR CAPITAL CASE REVIEW (JUNE 6, 2001); Statement of Prof. David C. Baldus to the Senate Comm.

on the Judiciary (June 11, 2001), available at http://www.deathpenaltyinfo.org/node/86. It denied that bias played a role in the disparities illustrated in the study and significantly reduced the discretion afforded to U.S. Attorneys over capital cases. Id. at 1. In particular, the revised protocols required that the Attorney General approve any plea agreement that reduces the offense from a capital-eligible offense to a non-capital offense. Id. at 17 (noting that the measure is intended to prevent local U.S. Attorneys from "effectively negat[ing] a decision by the Attorney General" to seek the death penalty).

### 1.    The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Race Violates His Constitutional Rights

There is evidence that at the time of the decision here, Attorney General Ashcroft was particularly concerned about showing that the federal death penalty was being sought against white defendants as well as against black defendants. In 2001, Congress requested General Ashcroft's testimony and the Attorney General testified, using the June 2001 Report as evidence that there was no racial bias in the use of the federal death penalty. General Ashcroft reportedly declared, "[o]ur analysis has confirmed that black and Hispanic defendants were less likely at each stage of the department's review process to be subjected to the death penalty than white defendants. There is no evidence of racial bias in the administration of the federal death penalty." Dan Eggen, U.S. Death Penalty System Not Biased, Ashcroft Declares, WASH. POST, June 7, 2001, at A29; Karen Gullo, Justice Study Finds No Racial Bias, WASH. POST, June 6, 2001. A few months later, in January 2002, General Ashcroft announced his decision in this case, rejecting the plea agreement to life and demanding that the United States Attorney's Office seek the death penalty.

It is well established that the Government may not base its decision to seek the death penalty on a defendant's race. See United States v. Armstrong, 517 U.S. 456, 464 (1996)

343

(holding that one of the constraints on prosecutorial discretion is that "the decision whether to prosecute may not be based on an unjustifiable standard, such as race, religion, or other arbitrary classification"); Vasques v. Hillery, 474 U.S. 254, 264 (1986) ("[A] conviction is void under the Equal Protection Clause if the prosecutor deliberately charged the defendant on account of his race."); United States v. Roman, 931 F. Supp. 960, 965-66 (D.R.I. 1996) (holding that a capital defendant who suspects that racial considerations influenced the decision to seek the death penalty can bring a claim for selective prosecution). If the government acts with a discriminatory purpose, that would violate the Constitution. See McCleskey v. Kemp, 481 U.S. 279, 291-98 (1987).

Here, there is good cause to believe that the death penalty was sought and imposed on the basis of Mr. Fell's race, in violation of the Constitution. Among other things,[113] there is evidence that the original agreement for life between the U.S. Attorney and Mr. Fell was made on the basis of consideration of all of the relevant factors by experienced prosecutors; there is no evidence that the original decision was infected by consideration of race or that it differed in any significant way from decisions made in other comparable cases across the country; the death penalty here was sought reportedly through the intervention of Attorney General John Ashcroft; and the decision was made just after the DOJ had been vigorously criticized publicly and in Congress on the basis of statistical evidence that it sought the death penalty disproportionately against black defendants and was in the process of defending itself – again on the basis of statistics – against charges that the death penalty was imposed disproportionately against black defendants. See Furman v. Georgia, 408 U.S. 238, 253 (1972) (Douglas, J.)

---

[113]   Defense counsel have sought documents regarding the decision-making in this case and the basis on which the DOJ rejected the U.S. Attorney's carefully considered decision. However, public record requests have been rejected. At the appropriate time, counsel plan to present this Court with a motion seeking additional records with respect to this claim and presenting further good cause to believe that racial considerations impermissibly infected the decision-making in this case.

344

(criticizing the implementation of a system in which "[p]eople live or die, dependant on the whim of one man or of 12" on Eighth Amendment grounds).  Clearly, it was in the interest of the DOJ and Attorney General Ashcroft to find a white defendant against whom to authorize the imposition of the death penalty and to overrule the decision of the U.S. Attorney.  Indeed, this case is unlike McCleskey – here apparently the decision to seek death (unlike the careful decision to agree to life) was made by a single person.[114]  See United States v. Williams, 2004 WL 2980027, at **8-9 (S.D.N.Y. Dec. 22, 2004) (acknowledging a basis in the argument that McCleskey was inapplicable because "fewer entities" were present in the decision to seek the federal death penalty and acknowledging the Supreme Court's venire-selection and Title VII cases, in which statistical evidence is deemed sufficient to establish constitutional violation ).  See McCleskey, 481 U.S. at 295 (distinguishing venire-selection and Title VII cases on the ground that "[i]n those cases, the statistics relate to fewer entities"); Turner v. Fouche, 396 U.S. 346, 359 (1970) (statistical evidence of disparity between percentage of minorities in jury pool and percentage of minorities in population at large sufficient to establish constitutional violation in decisions of six-member county juror commission); Bazemore v. Friday, 478 U.S. 385, 400-401 (1986) (Brennan, J., concurring in part) (statistical evidence of salary disparities based on race sufficient to establish violation in decisions made by state university president and county commissioners).

Moreover, the timing of trial counsel's meeting with the Government regarding a plea agreement on May 25, 2001 and the release of the revised death penalty protocol, less than

---

[114] When both parties tried to agree to a bench trial on sentencing, and the Court agreed that in that event, it could impose a fair sentence and would accept a stipulation waiving a jury trial, the Government informed the Court that such an agreement was also at Attorney General Ashcroft's discretion and that his travel plans would influence when that decision was made. Hr'g Transcript at 2 (Mar. 15, 2002); Letter from Assistant U.S. Att'y Gregory Waples to the Court (Apr. 16, 2002) ("At that time, I was told (for the first time) that the decision whether to authorize a bench trial on the question of punishment will actually be made by the Attorney General.  I was also advised that, in light of the Attorney General's travel and schedule commitments, it is absolutely impossible for him to make this decision by May 1.").

two weeks later, represents a particularly cruel chance contingency.  Compare Furman, 408 U.S. at 306 (Potter, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").  In light of the amended protocol and the general lack of geographical uniformity in the implementation of the death penalty, Mr. Fell appears to be in the position of the petitioners in Furman, who were "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." Id.  That the ultimate punishment can be doled out in such an accidental manner is cruel and unusual, depriving Mr. Fell of his rights under the Eighth Amendment.

### 2.    The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Geographic Location Violates His Constitutional Rights

Mr. Fell was also deprived of his Sixth and Eighth Amendment rights when Attorney General Ashcroft rejected the plea agreement reached between the U.S. Attorney and trial counsel based in part on a campaign to nationalize the use of the federal death penalty, which is an arbitrary and capricious ground upon which to impose a death sentence.  Gregg v. Georgia, 428 U.S. 153, 189 (1976); United States v. Bin Laden, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (finding that the Eighth Amendment would be violated if the federal government had decided to seek the death penalty on the basis of geographic considerations, yet concluding that the defendant had not made a sufficient showing of discriminatory intent).  The September 2000 Study had found a striking lack of geographical uniformity in the decision to seek the death penalty.  It reported that forty-two percent of the cases submitted to the Attorney General came from five of the ninety-four federal districts, while U.S. Attorneys from forty districts never sought the death penalty.  See U.S. DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000), at 12.  Reportedly, Attorney General Ashcroft sought aggressively to impose the death penalty on defendants from states that had

346

sparingly or never used it. Dan Eggen, <u>Ashcroft Aggressively Pursues Death Penalty</u>, WASH.

POST, July 1, 2002, at A1 (finding that Ashcroft had sought the death penalty in Michigan,

Vermont and other states that have outlawed capital punishment).

In light of Attorney General Ashcroft's campaign to nationalize the death penalty,

among other things,[115] Mr. Fell's status as a defendant from Vermont, which had outlawed the

death penalty and not sentenced a defendant to death in over half a century, provides a

reasonable basis to conclude that the decision to seek the death penalty was based in part on the

geographical area in which Mr. Fell would be tried. Such a decision would violate Mr. Fell's

constitutional rights under the Fifth and Eighth Amendments. <u>Gregg v. Georgia</u>, 428 U.S. 153,

189 (1976); <u>United States v. Armstrong</u>, 517 U.S. at 464. The decision to seek the death penalty

in part because of Mr. Fell's race and location deprived Mr. Fell of his rights under the Fifth,

Sixth and Eighth Amendments.

### 3. The Attorney General's Decision to Seek the Death Penalty Based on the Race and Gender of the Victim Was Arbitrary and Capricious and Violated Mr. Fell's Constitutional Rights

Mr. Fell was also deprived of his Fifth, Sixth and Eighth Amendment rights when

Attorney General Ashcroft rejected the plea agreement reached between the local U.S. Attorney

and trial counsel, and instead made the decision that a sentence of death should be sought based

in part on consideration of the victim's race. The Department of Justice seeks the death penalty

in a disproportionately larger share of cases in which the victim was white, and a

disproportionately smaller share of cases in which the victim was black. Moreover, of the cases

that go to trial involving white victims, there is a much greater likelihood of a death sentence.

The Constitution does not tolerate a system in which capital-charging decisions are based in any

---

[115] Mr. Fell plans to request further documents on this claim as well and will support that application with further good cause.

347

part on the arbitrary fact of a victim's race. See McCleskey, 481 U.S. at 291 n.8 (holding that defendant has standing to raise a claim of discrimination based on the race of the victim).

The same is true for decisions based on the gender of the victim. A significantly higher percentage of cases involving female victims are selected as death cases. The likelihood that a defendant prosecuted for killing a white female will get a death sentence is disproportionately high. This trend was true at the time Mr. Fell's case went to trial, and trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions constituted deficient performance. Alternatively, statistics regarding the application of the federal death penalty since Mr. Fell's trial constitute new evidence that warrants review of this ground for relief. Although statistics regarding the race and gender of the victim may be insufficient alone to demonstrate purposeful discrimination, this trend warrants discovery and an evidentiary hearing concerning the Government's authorization and plea bargaining decisions. The Court should grant relief from Mr. Fell's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race and gender of the victim in violation of the Fifth, Sixth and Eighth Amendments.

Moreover, to the extent that trial and appellate counsel should have raised these issues regarding race, gender, and geography, the undersigned incorporate by reference the preceding facts and law and allege that prior counsel's failure to raise such issues constitutes ineffective assistance of counsel, and that Mr. Fell was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

348

**B.    Trial Counsel were Ineffective for Failing to Adequately Voir Dire the Jury in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

Trial counsel unreasonably failed to question jurors about whether they could fairly consider particular forms of mitigation evidence that were relevant to the case. The Supreme Court has emphasized that "*voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 183, 188 (1981) (plurality opinion) (emphasis in original) (italics omitted). The Supreme Court has also clearly stated that "general fairness and 'follow the law' questions" on *voir dire* are not sufficient to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." Morgan v. Illinois, 504 U.S. 719, 734-35 (1992). Indeed, as this Court has recognized, *voir dire* is designed to uncover prospective jurors' "biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing." United States v. Fell, 372 F. Supp. 2d 766, 773 (D. Vt. 2005); Lockett v. Ohio, 438 U.S. 586, 594 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

349

Trial counsel in capital cases must conduct a searching *voir dire* to uncover any potential biases in jurors that might impact their ability to consider the mitigation evidence to be offered during the penalty phase. As the ABA Guidelines make clear, "Jury selection is important and complex in any criminal case. In capital cases, it is all the more critical. Counsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of *voir dire* questions, planning a strategy for *voir dire*, and choosing a jury most favorable to the theories of mitigation that will be presented ... Counsel should conduct a *voir dire* that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law because they will either automatically vote for death in certain circumstances, or are unwilling to consider mitigating evidence." ABA Guidelines, Guideline 10.10.2, Commentary at 101-102 (emphasis in original).

In Mr. Fell's case, trial counsel's questioning on *voir dire* fell below this standard of care in capital cases. The Court granted trial counsel an opportunity to ask case-specific questions to determine whether the jurors could fairly consider aggravating and mitigating facts. See United States v. Fell, 372 F. Supp. 2d 766, 773 (D. Vt. 2005) ("[T]he Court will permit counsel to ask questions raising case-specific facts if the questions are reasonably directed towards discovering whether the juror will be able to fairly and impartially weigh aggravating and mitigating factors.") Despite their ability to conduct a case-specific *voir dire*, trial counsel failed to consistently ask the jurors whether they could fairly consider what they themselves considered to be critical aspects of Mr. Fell's mitigation case, including familial alcohol and drug abuse, and domestic violence.

350

For example, despite the centrality of alcohol and drug abuse to Mr. Fell's mitigation case, trial counsel asked very narrow questions about substance abuse on the questionnaire:

- Have you or any close friend or relative ever been **treated** for a substance abuse problem?

  o   If yes, please explain.

- As a result of that problem, did you or your close friend or relative have any contact with the criminal justice system?

Juror Questionnaire, Question 44 (Ex. 123 at FELL-00001365 ).

The narrow question about treatment for substance abuse failed to elicit important information about whether jurors had ever experienced any problems with untreated substance abuse. In addition, trial counsel failed to include questions that were aimed at soliciting prospective jurors' attitudes about drug abuse generally, such as, whether they might have been victims of drug-related crime or whether they were otherwise exposed to drugs in their neighborhoods or schools or community. Problems with untreated substance abuse had just as much, if not more, potential to create bias against Mr. Fell than these related topics. This oversight was not cured through follow-up questioning.

The questionnaire also failed to ask jurors about other factors relating to Mr. Fell's childhood or to determine any potential biases with regard to these mitigating factors. Given the importance of these mitigating factors, and the wide latitude trial counsel had to ask case-specific questions, trial counsel was objectively unreasonable for failing to consistently ask jurors about their ability to evaluate this mitigation evidence fairly.

Donald Fell was prejudiced by this deficient performance because jurors were seated who were in fact unable to fairly consider these factors. For example, Juror 203, who was

351

ultimately seated on the jury, said that he would not consider mitigation evidence in Mr. Fell's case in the absence of mental health testimony:

> Mr. Bunin: But if you heard things like the kind of things Mr. Darrow started talking about, about being abused as a child, not having parents, having no -- having your parents leave you at an early age and kind of being on your own, falling into drugs and alcohol, are those things that you could see as being mitigating, or are they just like -- would they have some other meaning to you?
>
> Juror 203: Well, if they are just said, then they aren't going to bear much weight. If there's a mental health testimony, things like that that brings some absolute facts to this situation, to be considered, then yes, I could see us considering that.
>
> Mr. Bunin: So if you heard evidence from folks that could tell you these things happened and then explanations of what they mean, that would be important to you?
>
> Juror 203: It would -- it would seem to be important to me, but more so to you.
>
> Mr. Bunin: If you sit on the jury, it's –
>
> Juror 203: It's important, yes.

Voir Dire Tr., JVD-12 at 164:24-165:19 (June 1, 2005).

Had trial counsel conducted a sufficient *voir dire* to expose these biases, these biased jurors would have been stricken for cause, and there is a reasonable probability that the outcome of the trial would have been different. See United States v. Fell, 372 F.Supp.2d 766, 773 (D.Vt. 2005) ("The Court will excuse a juror for cause whenever it finds that the juror cannot fairly weigh aggravating and mitigating factors as required by the Federal Death Penalty Act."), see also Strickland v. Washington, 466 U.S. 668, 688. Mr. Fell was therefore deprived of his Fifth, Sixth and Eighth Amendment rights to an impartial jury.

352

C.    **Trial Counsel Failed to Adequately Question or Attempt to Rehabilitate Prospective Jurors who Initially Suggested that they Could Not Vote for the Death Penalty**

"*Voir dire* need not establish juror partiality with 'unmistakable clarity.' Rather, it must be sufficient to permit a trial judge to form 'a definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' " United States v. Quinones, 511 F.3d 289, 301 (2d Cir. 2007) (quoting Witt, 469 U.S. at 424, 426) (internal citations omitted).The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." Gray v. Mississippi, 481 U.S. 648, 663 (1987).  In those situations where a prospective juror is opposed to the death penalty but states that he or she would be able to follow the applicable law, including considering the imposition of the death penalty, it is defense counsel's obligation to attempt to rehabilitate that prospective juror.

The 2003 American Bar Association guidelines for the appointment and performance of counsel in death penalty cases stated that "trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including rehabilitation of venire members who initially state opposition to the death penalty." ABA Guidelines, Guideline 1.1 Commentary at 5, see also Wiggins v. Smith, 539 U.S. 510, 524 (2003) (explaining that ABA guidelines provide guidance in assessing defense counsel's performance under Strickland and citing other cases that support the same principle).

Defense counsel's failure to rehabilitate prospective jurors permeated the entire *voir dire* and resulted in a record substantially different from the one reasonable counsel would have produced through adequate questioning.  Identifying with confidence all of the stricken potential jurors whom competent counsel might have rehabilitated is impossible.  However there

353

were multiple instances where defense counsel did not meaningfully attempt to question and

rehabilitate potential jurors whose initial indications of opposition to the death penalty made

them potentially unqualified to sit on a death penalty jury.

For example, there was Prospective Juror 64, who was the subject of a challenge

on appeal as an example of a juror who was erroneously excluded based on the fact that she

generally opposed the death penalty and who even the Second Circuit agreed presented "a closer

call" than the other contested prospective jurors as to whether she would be able to follow the

applicable law.  United States v. Fell, 531 F.3d 197, 211 (2d Cir. 2008).

Prospective Juror 64 expressed her willingness to "follow the law" and stated that

she believed she could be impartial to both sides:

> Mr. Kelly: If you were me, if you were the government, who is
> seeking the death penalty
>
> Juror 64: Right
>
> Mr.Kelly: -- and you wanted a juror there who could be fair to both
> sides, as they sit there, not lean one way or the other before the
> beginning of the case, before hearing the evidence, not have a
> personal bias one way or the other that would interfere or
> substantially interfere with their verdict, are you the person that
> you would choose for such a serious case?
>
> Juror 64: Yes, I would.
>
> ...
>
> Mr. Kelly: And the question is, is that personal view going to
> interfere, if you ultimately sat in that stage of the process of
> making that ultimate judgment about this man, Donald Fell, and
> whether or not he is to be put to death, which could be the ultimate
> decision you would have to make, are you the right, fair juror to
> make that choice given your answers to these questions?
>
> Juror 64: I think that I could make that decision.

Voir Dire Tr., JVD-5 at 243:10-20, 244:22-25, 245:1-6 (May 13, 2005).

Defense counsel then asked Prospective Juror 64 a line of follow-up questions:

Primomo: You in your own words, mentioned something that I would like to touch upon. You said "follow the laws of the government," and I assume - what do you mean by that? You feel obligated to follow the laws of government?

Juror 64: Well, the way our laws presently, in this type of case, allow for the death sentence. I'm not a supporter of that, but that is what is allowed presently.

Primomo: That's, that's – that's correct. And you understand that the law's part is going to be expressed to you by Judge Sessions. And as part of those laws, you will be asked to swear to an oath to follow those laws.

Juror 64: Yes.

Primomo: And it's pretty clear to me, and correct me if I am wrong, that you are willing to follow those laws as Judge Sessions expresses them to you?

Juror 64: Um hum.

Primomo: And even if those laws include your consideration, your honest consideration of imposing the death penalty; is that right?

Juror 64: Yes.

Voir Dire Tr., JVD-5 at 248:18-249:15 (May 13, 2005).

The Court then asked Prospective Juror 64 an additional follow-up question, and Prospective Juror 64 responded by saying that she "I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes." Voir Dire Tr., JVD-5 at 251:18-21, (May 13, 2005). At that point, as the Second Circuit observed, "after counsel for both sides declined the court's invitation to ask follow-up questions, Juror 64 was excused" pursuant to the prosecution's challenge for cause. Fell, 531 F.3d at 212. After getting a helpful response to its questioning and after a neutral response to the Court's follow-up questioning, defense counsel abandoned Prospective Juror 64 instead of asking

355

additional rehabilitation questions. There is a reasonable probability that counsel could have rehabilitated Prospective Juror 64 and prevented her excusal, and could have similarly rehabilitated other jurors. See Strickland v. Washington, 466 U.S. 668, 688. Trial counsel's abdication of their duty to rehabilitate jurors on *voir dire* constituted ineffective assistance of counsel under Strickland and rendered the *voir dire* so inadequate as to "lead us to doubt that [Mr. Fell] was sentenced to death by a jury empanelled in compliance with" the constitutional requirements of due process. Morgan, 504 U.S. at 739 (1992).

**D.    The Execution of a Man who was Developmentally a Juvenile at the Time of His Crimes is Cruel and Unusual under the Eighth Amendment**

In considering factors that mitigate culpability, the Supreme Court has recognized that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults... [and] often result in impetuous and ill-considered actions and decisions," that juveniles are "more vulnerable or susceptible to negative influences and outside pressures," and that "the character of a juvenile is not as well formed as that of an adult." Roper v. Simmons, 543 U.S. 551, 569-70 (2005) (holding that imposition of death sentence on those who were under eighteen at the time of their crimes constituted cruel and unusual punishment in violation of the Eighth Amendment). The Supreme Court reaffirmed and extended this holding in Graham v. Florida, 130 S. Ct. 2011 (2010), when it deemed cruel and unusual the imposition of a sentence of life imprisonment without parole for a non-homicide crime committed by someone under the age of eighteen.

Roper should be considered to apply with equal force in this matter. Mr. Fell's chronological age cannot be invoked talismanically to avoid Roper's import. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings v. Oklahoma, 455 U.S. 104, 115

356

(1983). "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper, 543 U.S. at 574. "[A]ge 18 is a necessarily arbitrary social choice as a point at which to acknowledge a person's maturity and responsibility, given the different developmental rates of individuals." In re Stanford, 537 U.S. 472, 474 (2003) (Stevens, J., dissenting from denial of certiorari in a case which would subsequently be abrogated by Roper).

Various amici in Graham, informed by the psychological and biological sciences, noted the considerable changes relevant to judgment and culpability that continue into young adulthood. The American Psychological Association and others explained that science "cannot, of course, draw bright lines precisely demarcating the boundary between childhood, adolescence, and adulthood." Brief for American Psychological Association et al. as Amici Curiae at 6, Graham v. Florida, No. 08-7412 (U.S. July 2009). It reported studies indicating that impulse control continues to develop into young adulthood, that "the skills required for future planning continue to develop until the early 20s," and that a shift in the brain's composition continues beyond adolescence "into young adulthood." Id. at 9, 12, 27.

While Mr. Fell was twenty years old when he was arrested – just two years beyond an age that would preclude his execution – and, functionally, he was still a juvenile. Mr. Fell suffered from chronic abuse and neglect throughout his childhood and adolescence, depriving him of a stable home environment from which to grow into a mature, responsible adult. He was abandoned by both of his parents by the age of 13, and dependent upon his abusive aunt Jackie and a corruptive community of peers throughout his teens. Moreover, multiple generations of his family suffered from mental impairments and drug and alcohol addiction, which resulted in Mr. Fell starting to abuse drugs and alcohol at a very young age, further stunting his development. Accordingly, Mr. Fell possessed precisely the same

immaturity and vulnerability to influence and psychological damage that the Supreme Court identified when it concluded that it was cruel and unusual to execute juveniles. Executing Mr. Fell would thus be cruel and unusual in violation of the Eighth Amendment.

To the extent that trial and appellate counsel should have raised this issue at the trial and/or appellate stage, the undersigned incorporate by reference the preceding facts and law in support of this claim and allege that prior counsel's failure to raise this use constitutes ineffective assistance of counsel, and that Mr. Fell was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

Moreover, trial counsel were ineffective for presenting the mitigation factor "Donald Fell was twenty years old at the time of the offense," while failing to investigate and explain to the jury the mitigating impact of Mr. Fell's youth. The Supreme Court decided Roper before Mr. Fell's trial, and thus trial counsel should have been aware of the powerfully mitigating evidence available to explain why Mr. Fell's youth made him less culpable and more likely to benefit from rehabilitation. Since trial counsel presented Mr. Fell's age as a mitigating factor, trial counsel's failure to investigate and present evidence about how Mr. Fell's age was mitigating was objectively unreasonable. If trial counsel had explained to the jury that Mr. Fell's character was still developing, and he was vulnerable to psychological damage and to peer influences at the time of the crimes due to his youth, the jurors would have reached a different result, and voted in favor of life. Mr. Fell was therefore prejudiced by counsel's deficient performance in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

358

### E.   The Manner in Which the Government Would Execute Mr. Fell Violates the Eighth Amendment

Pursuant to the FDPA, a United States marshall "shall supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." 18 U.S.C. § 3596(a); see also United States v. Hammer, 121 F. Supp. 2d 794 (M.D. Pa. 2000) (the sentencing court is the "appropriate forum for considering all claims by [defendant] regarding the details of his scheduled execution execution in Indiana"). Vermont, the state in which Mr. Fell was sentenced, does not have the death penalty, and as a result, it is unclear by which State's laws Mr. Fell's sentence would be implemented and whether those procedures would protect his constitutional rights.

Of the 36 American jurisdictions that authorize lethal injection as a method of execution, 30 of those states use the same three drug cocktail. See Baze v. Rees, 553 U.S. 35, 40, 44 (2008).[116] The three-step protocol entails (1) using a general anesthetic to induce a deep coma-like unconsciousness followed by (2) the administration of a paralytic agent that inhibits all muscular-skeletal movements, including respiration, and (3) the administration of a potassium-based drugs that induces cardiac arrest. Id. at 44. If the anesthetic is ineffective or adulterated, the three-step protocol will result in the condemned prisoner experiencing the severe pain and distress associated with paralysis, respiratory arrest and cardiac arrest. Since 2009, the

---

[116]   A condemned inmate may bring a challenge to lethal injection in a separate civil rights action under 42 U.S.C. § 1983. See Hill v. McDonough, 547 U.S. 573 (2006). To the extent Mr. Fell's death sentence is implemented under the laws of a state whose protocols are subject to challenge as cruel and unusual for a variety of reasons, including but not limited to the combination of drugs used, the protocols governing the execution, the use of untrained non-medical and unqualified persons to administer the protocol, and/or the physical space in which the execution is carried out, Mr. Fell could not be lawfully executed until such litigation was resolved

anesthetic drug used in the lethal injection trilogy, sodium thiopental, has not been available from any manufacturer in the United States. As a result, states have attempted to import sodium thiopental from foreign manufacturers or other states, and federal inmates have recently challenged the Food and Drug Administration's ("FDA") failure to regulate imported thiopental and have sought a permanent injunction prohibiting the FDA from releasing any future shipments of unapproved foreign thiopental into interstate commerce. See Complaint in Beaty v. Hamburg, 11 Civ. 289 (RJL) (D.D.C.) (Filed Feb. 2, 2011). This imported thiopental is not regulated to ensure safety, effectiveness, quality, or potency. To the extent the implementing state sought to administer imported sodium thiopental to Mr. Fell, such improper administration of sodium thiopental would very likely cause serious injury and needless suffering on the part of Mr. Fell and would therefore violate the Eighth Amendment. See Baze, 553 U.S. at 49-50.

In support of this claim, Mr. Fell incorporates by reference the facts and allegations set forth in this Motion along with all accompanying exhibits. Mr. Fell anticipates amending this claim if necessary after a full investigation, discovery, access to the Court's subpoena power, and an evidentiary hearing. Although Mr. Fell does not believe this claim is ripe, to the extent the Court finds that this claim should have been presented earlier and all prior counsel who failed to present the claim rendered ineffective assistance in not asserting it sooner, the Court should consider the claim on the merits.

## CONCLUSION AND PRAYER FOR RELIEF

Donald R. Fell, Jr., was convicted and sentenced to death at a trial where who he is was hidden: it was obscured by his lawyers' failures to investigate and present key information and by the Government's lies and misrepresentations; it was belied by the stipulation that he had no mental illness; and it was shrouded by the Government's misleading case for aggravation. Without question, the homicide of Mrs. King was a terrible crime, one which any reasonable lawyer would have known could only be effectively mitigated with a meticulously zealous defense. Unfortunately, that did not happen here. Mr. Fell did not even receive the effective defense to which he is entitled under the Constitution. And in its determination to win at all costs, the Government engaged in misconduct.

The penalty in this case would have been different and the vote of any one juror different had the Government or the defense not committed one of the errors identified here:

- Had trial counsel investigated powerful and readily available mitigation evidence showing that Mr. Fell lived a life of unrelenting trauma, and his troubled home life did not simply resolve itself when Mr. Fell's father left the home;

- Had trial counsel prepared a mental health case for trial, or even looked at the records it obtained or had a doctor do so after it became clear the case was going to trial;

- Or had someone explained – as should have been readily apparent to the defense and easily explicable by them to the jury – that the flat affect which Mr. Fell presented (and about which the Government asked over and over) was not an expression of lack of remorse but a symptom of Mr. Fell's illness – an illness the defense never bothered to investigate;

- Had the Government not violated this Court's order with respect to Dr. Welner;

- Or had trial counsel not foregone a meritorious motion to exclude Dr. Welner and withdrawn the expert witnesses essential to explaining the mitigating factors in Mr. Fell's life whom the defense had promised the jurors would

361

testify – all out of a mistaken assumption that the Court would not entertain the motion on a timely basis;

- Had trial counsel taken the most minimal steps to interview the Gaceks at any point in time from December 2000 until July 2005 – and learned that the shooting the Government presented as aggravation was an accident for which Donny had shown extreme remorse, or had the Government disclosed the accurate information about the Gaceks and not misstated the circumstances of that event;

- Had the Government not misrepresented Mr. Eike's injuries and falsely compared them to those inflicted on Mrs. King and misrepresented the circumstances of that fight;

- Or had trial counsel taken the most minimal steps necessary to obtain the evidence to prove the Government's version false;

- Had the Government turned over the prison records or revealed the grievances against Officer Pelkey;

- Or had trial counsel taken the most minimal steps necessary to obtain the evidence to prove the Government's version false;

- Had the Government turned over the 302s or records of the FBI's interview of Mr. Bellantoni who saw Mr. Fell engage in an argument with Mr. Lee before Mrs. King was killed;

- Or had trial counsel interviewed Mr. Bellantoni;

- Or had trial counsel taken any steps to investigate the crime scene, put on a defense of diminished capacity, or even hired a forensic pathologist;

- Or had trial counsel objected to numerous instances of inflammatory and misleading evidence and statements offered by the Government;

- Or had trial counsel asked the many readily available witnesses in Mr. Fell's life who would be deeply impacted by his execution how they would feel if he were sentenced to death.

Each of these errors alone caused Mr. Fell constitutional prejudice. A finding by this Court that any one of them occurred would require that the judgment be vacated.

The cumulative impact of all of these errors was to present the jury with a fundamentally different person than Mr. Fell is. Mr. Fell did not experience the childhood of

unimaginable horrors that the jury found only to emerge "intact" as the Government argued. And the horrors did not end at age 10. The Government argued that Mr. Fell's family "got help from social services" and things "got better" and "the abuse that he suffered got more and more removed, and as it did, he got more and more violent." Tr. Vol. XII at 56:2-9, 53:22-24 (July 13, 2005).

The true picture of Mr. Fell is different in critically mitigating ways. The Government's account to the jury that Mr. Fell had intentionally inflicted serious injury previously was wrong. As was the claim that he was remorseless. It turns out that he was not released from the dysfunctional home life with the departure of his father; rather, the abuse, neglect, disappointment and cruelty was actually unrelenting, and continued all the way through his adolescence, right up to the time of the crimes. Mr. Fell arrived in Vermont having been betrayed by every caregiver in his life, including not only his parents and his babysitters when he was an infant, but also his mother's boyfriends, his grandmother, his guardian, and finally by the Government social workers who were authorized to intervene for his protection. And the impact of all of those events has left him a fundamentally impaired person. Mr. Fell has been forever scarred by his genetics and circumstance, and these factors have indelibly impacted his development, personality and behavior.

The first time Mr. Fell had the structure he has needed (but of which his family deprived him) was in connection with his incarceration in this case. Furthermore, the external environmental factors that exacerbated his mental health vulnerabilities are absent in prison. Killing Mr. Fell is simply not necessary. Absent the multiple constitutional errors that corrupted his capital prosecution, it is clear that Mr. Fell would not have been sentenced to death.

Movant Donald R. Fell asks that this Court provide the following specific relief:

1.      That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

2.      Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.      Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.      Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedures 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defense thereto raised by the Respondent's Answer;

5.      Permit Movant to Amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and to allow the amendment to relate back to the dates of the filing of this motion;

6.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent.  Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.      Permit oral argument as appropriate and required;

8.      Vacate Movant's convictions and sentences and order that appropriate retrials be conducted; and

9.    Grant such further and additional relief as may be just.

Dated:  March 21, 2011                              RESPECTFULLY SUBMITTED,
Barre, Vermont

RICHARD RUBIN
Rubin, Kidney, Myer & DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514
Fax: (802) 479-2516

Dated:  March 21, 2011
New York, New York

LEWIS J. LIMAN
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2550
Fax: (212) 225-3999

Dated:  March 21, 2011
New York, New York

CATHLEEN PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193

*Counsel for Donald Fell*

365