Donny Fell[1] Report

occasionally into evidence is odd.  If the test erred, it erred. It can be discounted, but it cannot be turned into gold.

Obviously, given the state of present day knowledge, one could not state that a person with any Axis I diagnosis was not more likely to develop a psychosis than a person without any Axis I diagnosis.  However, one cannot state the amount of the increased risk; it would be small.

Obviously, given the state of present day knowledge, one could not state that a person with a second degree family member with a history of psychosis was not more likely to develop a psychosis than a person without any such family history[1]. However, one cannot state the amount of the increased risk; it would be small, especially in the case of schizophrenia.

Thank you for this interesting referral.  I have discussed my impressions with Dr. John Rabun.  I have given him a typed copy of my interview notes as well as the appendices relating to the psychological testing.

---

[1] (Author's note: During Donny's second hospitalization, Mrs. Fell reported that his maternal grandmother had a chronic psychosis and died in a state mental hospital.  During Donny's third psychiatric hospitalization, Mrs. Fell reported that his father was schizophrenic.  In addition, Donny's grandmother was said to be chronically psychotic and chronically on psychotropic medication.   During his fourth psychiatric hospitalization, Mrs. Fell apparently asserted to a social worker, Robert Tryzenski, that Donny's paternal grandfather was "schizophrenic" and alcoholic.  She asserted that his paternal grandmother had received shock treatment for depression.  She also reported that her sister, Donny's aunt, had been in psychiatric treatment. Mrs. Fell is not considered an accurate source of psychiatric information.)

8

02226

FELL-00000305

Donny Fell Report

## Diagnostic impression:

Axis I      Polysubstance abuse
            Alcohol dependence
            Marijuana dependence

Axis II     Personality disorder – NOS with antisocial, borderline
            and narcissistic features

Axis III    S/P mild concussions without residual deficits
            S/P brain contusion

Axis IV     Legal problems, family problems, Substance abuse

Axis V      45

Sincerely yours,

Richard D. Wetzel, Ph.D.
Professor of Psychiatry
Professor of Neurology and of Neurological Surgery
Washington University School of Medicine

9

02227

FELL-00000306

46

FELL-00000307

**John S. Rabun, M.D.**
**1034 Brentwood Blvd., Suite 1280**
**St. Louis, Missouri 63117**

Telephone: (314) 727-8099   Facsimile (314) 727-6796

**Diplomate, ABPN**
 with board certification in General Psychiatry
 with board certification in Forensic Psychiatry
**Diplomate, NBME**
**Licensed in Missouri and Illinois**

December 31, 2002

Mr. Gregory L. Waples
Assistant United States Attorney
United States Department of Justice
United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

RE: United States vs. Donald Fell
DOB: 04/30/80

Dear Mr. Waples:

Pursuant to your request, the examiner evaluated Donald Fell to form opinions on issues related to mitigation in the instant case. Mr. Fell is a 22-year-old, single, never married, right-handed, white male, who allegedly was involved in three murders. The United States Attorney's Office has given notice that the government will seek the death penalty for Mr. Fell. Mr. Fell is presently detained at the Northwest State Correctional Facility in Vermont.

Prior to the formal interview, the examiner explained to Mr. Fell the reason for the evaluation. Mr. Fell was told that the examiner had been retained by the United States Attorney's Office to evaluate him and form opinions on whether or not any mitigating factors apply to his case. Mr. Fell was cautioned that the interview was on the record. Mr. Fell was warned that the examiner had to generate a report, which could include his statements in the interview, and this report would be distributed to his attorney, the U.S. Attorney, and the presiding judge. The examiner then asked Mr. Fell if he had any questions or needed to speak with his attorney. Mr. Fell responded that he understood the examiner's purpose in the evaluation and gave his consent to be interviewed. Throughout the interview, Mr. Fell's

02066

FELL-00000308

Donald Fell                                                                    Page 2

attorney, Paul Volk, was present, and an investigator from the Federal Public Defender's Office. One 5-minute break occurred during the interview, and at that time, Mr. Fell conferred in private with his attorney. It is important to note that Mr. Fell's attorney did not interrupt or impede the interview. The examiner is of the opinion that the presence of the investigator and Mr. Fell's attorney in the interview did not significantly alter the evaluation process.

Before the evaluation, the examiner also discussed with Mr. Fell's attorney the scope of the interview. Mr. Fell's attorney indicated that his client would not discuss his state of mind during the charged offenses. Therefore, the examiner did not question Mr. Fell about his mental state at the time of the allegations. Accordingly, the examiner questioned Mr. Fell in detail about his personal history and then performed a mental status examination. Even though Mr. Fell was not questioned about the instant offenses, more than enough information was gathered from the interview and available records to allow the examiner to form opinions, within a reasonable degree of medical certainty, as to whether or not mitigation exists in this case.

### Sources of Information:

1. An interview with Donald Fell at the Northwest State Correctional Facility on 12/12/02. The interview began at 9:40 a.m. and was concluded at 1:10 p.m. A 5-minute break was taken between 11:40 and 11:45 a.m. The interview was not audio or videotaped.

2. The law enforcement reports regarding the charged offenses. The law enforcement reports included confessions from Mr. Fell and the co-defendant.

3. A forensic psychiatric evaluation conducted by Dr. Mark Mills.

4. A neuropsychological evaluation conducted by Dr. W.G. van Gorp.

5. An evaluation conducted by Dr. Jeffrey Lipman, a neuropharmagologist.

6. A letter written by Dr. James Hudziak concerning the instant case.

7. A psychological and neuropsychological evaluation conducted by Dr. Richard Wetzel.

8. Raw psychological data from Dr. van Gorp's evaluation of Donald Fell.

9. Several transcripts from Grand Jury testimony by S. Hardgeree, R. Pulsifer, B. Brashears, C. Kolojeski, and M. Leight.

02067

FELL-00000309

10. Marriage certificates, birth certificates (including that of Mr. Fell), and divorce decrees from various family members related to Donald Fell.

11. Mr. Fell's pediatric medical records.

12. Mr. Fell's medical records from Pennsylvania State.

13. Mr. Fell's medical records from First Hospital Wyoming Valley.

14. Mr. Fell's medical records from Wilkes-Barre General Hospital.

15. School records regarding Donald Fell.

16. Social service records regarding Donald Fell.

17. Prior legal records regarding Donald Fell.

18. Autopsy reports regarding the three victims in the instant case.

## I.    **ALLEGATIONS**:

According to the law enforcement reports, the alleged criminal acts occurred on Sunday, November 26, and Monday, November 27, 2000. The reports indicate that Mr. Fell and a co-defendant were involved in three homicides, two of the victims were killed in Vermont, and the third victim was killed in New York. The reports suggest that on November 26, Mr. Fell and a co-defendant murdered Charles Conway and Deborah Fell at Ms. Fell's home in Vermont, and then abducted Teresca King, and murdered her during the early morning hours on November 27 in New York. Subsequently, Mr. Fell and the co-defendant were arrested on November 30 in Clarksville, Arkansas, driving Teresca King's vehicle. Mr. Fell and the co-defendant were questioned by law enforcement officials and provided several statements. Mr. Fell and the co-defendant admitted that they were involved in the three homicides, though they differed at times in regards to specific facts.

Mr. Fell's confessions, and those of the co-defendant, suggest that Deborah Fell and Charles Conway were murdered during the evening on Sunday, November 26, 2000. Mr. Fell and the co-defendant described how they used marijuana, crack-cocaine, and alcohol prior to the first two murders. Both individuals related that they were intoxicated around the time of the murders. The confessions relate that an argument started involving Mr. Fell, Mr. Conway, and Ms. Fell. A short time later, Mr. Fell and the co-defendant retrieved knives from the kitchen and entered the living room, where they stabbed to death Charles Conway and Deborah Fell. Apparently, Mr. Fell stabbed to death Charles Conway, and the co-defendant stabbed to death Deborah Fell. Following the initial two

02068

FELL-00000310

Donald Fell                                                                                    Page 4

murders, Mr. Fell and the co-defendant left the scene armed with a shotgun. Mr. Fell and the co-defendant then used the shotgun to abduct Teresca King. The confessions reveal that Mr. Fell and the co-defendant returned to the first murder scene to retrieve their belongings.

After Mr. Fell and the co-defendant obtained their belongings, they and the third victim left the area using the victim's vehicle. The confessions indicate that Mr. Fell and the co-defendant drove Teresca King into the state of New York, where they stopped and ordered her to run into the woods. The confessions relate that Ms. King did not comply with the instructions, so Mr. Fell and the co-defendant chased her into the woods, where they struck the victim with several rocks. In addition, Mr. Fell allegedly kicked and stomped the third victim until she was motionless. Mr. Fell and the co-defendant returned to the third victim's vehicle and drove away from the area. Following the third homicide, Mr. Fell and the co-defendant stopped at a Burger King and purchased breakfast. Both individuals then used the third victim's vehicle to drive south and west, though they were apprehended in Clarksville, Arkansas on November 30.

Subsequently, law enforcement officials discovered the bodies of Deborah Fell and Charles Conway at Ms. Fell's residence on November 30. After obtaining several statements from Mr. Fell and the co-defendant, law enforcement officials were able to locate Teresca King's body on December 1. Ms. King's body was found not far from Route 22 in New York. Moreover, police officers recovered Ms. King's wallet near Route 22, several miles south of her body. In addition, Ms. King's purse was found at the Burger King where Mr. Fell and the co-defendant stopped for breakfast. As well, one of the employees at the Burger King identified Mr. Fell and the co-defendant. Further, authorities interviewed an individual in Wilkes-Barre, Pennsylvania, who stated that Mr. Fell and the co-defendant stayed with him on November 27 and November 28. The individual recalled that Mr. Fell and the co-defendant left on November 28, stating they were driving to California.

Autopsies were performed by the medical examiner on all three victims. Teresca King's autopsy revealed that she suffered multiple blunt force injuries to her head and neck. The autopsies of Deborah Fell and Charles Conway revealed that both individuals died from multiple stab wounds to the head, neck, and chest. In addition, both Deborah Fell and Charles Conway were intoxicated at the time of their deaths. Deborah Fell's blood alcohol was ".325%," and Charles Conway's blood alcohol was ".392%." As well, Deborah Fell's blood tested positive for amphetamines.

## II. **PERSONAL HISTORY**:

Mr. Fell's entire personal history will not be summarized in the examiner's report. The examiner directs the parties involved in the case to Dr. Wetzel's report dated 10/11/2002, which contains a thorough summary of Mr. Fell's background. The examiner will instead

02069

FELL-00000311

focus on specific areas of Mr. Fell's life that should be considered by all parties involved in the instant matter. The following is a summary of Mr. Fell's statements to the examiner about key areas of his personal history.

Home Environment: The examiner questioned Mr. Fell in detail about his home environment and relationship with his parents. Mr. Fell told the examiner on several occasions that he did not fully recall his home environment. He indicated that he has no current relationship with his father. He informed the examiner that his father left home when he was in the "fourth grade." He said that he has learned that his father lives in Jacksonville, Florida. The examiner asked Mr. Fell if his father has shown any interest in helping him now that he is facing the death penalty. Mr. Fell replied that he has learned from other sources that his father has no interest in wanting to help him with the instant matter.

The examiner asked Mr. Fell to describe what he remembers about his father. He said that he recalls his parents "fighting" and how his father "hit" him with his fists and "kicked" him. He reported that his father was an "alcoholic" who "drank every night." He informed the examiner that his home environment was filled with daily incidents of physical abuse, to him, his sister, and mother. He indicated that his mother "kicked my father out" after a "fight." He "vaguely" remembered that his parents' relationship ended with a stabbing incident, where his mother and father stabbed each other. He recounted that he saw his mother "cut [my father's] arm" and then "I ran back into my room." He added that, to the best of his recollection, the last time he saw his father was around the time of the stabbing incident. It is important to note that Mr. Fell's first and clearest memories of his father were that his father as an "alcoholic" who daily engaged in acts of physical violence.

The examiner also questioned Mr. Fell about his mother. He again said that he did not recall "much" about his mother when he was a young child. He noted that his mother "drank a lot too." In addition, by the "seventh grade," he realized that his mother "did drugs." He recalled that he saw his mother with "cocaine and pills." He told the examiner that his mother drank "everyday" and fought with his father. The examiner asked Mr. Fell if his mother ever gave him any positive reinforcement as a child, and to the best of his recollection, he did not know of any positive statements from his mother. In addition, he could not recall any positive reinforcements from his father. In fact, he stated that he never heard either parent telling him that they loved him or hoped that he achieved certain goals in life.

The examiner asked Mr. Fell what he thought about his parents as parents. He responded, "I don't think they were very good parents." He indicated that his father was "mean" and he "didn't see too much of my mom, she was always working or drunk." He was questioned about how he would raise children, this question was posed to him to help uncover how he was raised, since children as adults often mirror the parental practices of their parents. Mr. Fell answered, "I don't even know, a lot differently, I certainly wouldn't hit them, I would raise them to be independent." The examiner then probed for Mr. Fell's thoughts about how his home environment changed him as an adult. He replied with surprisingly good insight, "it

02070

FELL-00000312

Donald Fell                                                                Page 6

implanted some deep psychological scars that might pop out in intoxication, if I had guidance, I had no guidance, I wouldn't be in this situation now." As well, he believed that his own abuse changed him in the following manner, "it has made me more aggressive, I have a temper, it is hard to keep it in check, and when you are intoxicated, it is almost impossible to keep my temper at a level, and with such scars (i.e. abuse) in my past, they just appear, and it makes a person more susceptible to violence."

Mr. Fell discussed his mother's behavior after his father left the family. He reported that he never received any encouragement from his mother. He indicated in general that his family life did not change, even though his father was gone. He noted that his mother had "boyfriends" at the house who also drank alcohol and used drugs. He again told the examiner that if his mother was not working, she was intoxicated. He remembered that eventually his mother lost custody of him. He recounted how he was placed at "St. Michael's" for an extended period of time and then went to live with his grandmother. He informed the examiner that prior to the charged offenses, he had not had any contact with his mother since the age of "13." Mr. Fell spontaneously said that he was placed at "St. Michael's" and eventually with his grandmother and aunt because he was "an unwanted kid." He added that he did not find any support or love from his grandmother or aunt because "they told me I was uncontrollable, they didn't want me either." He remembered that at the age of 17, his aunt "kicked me out, and I was on my own."

Interestingly, at times, Mr. Fell defended his mother during the examiner's interview. For example, the examiner questioned Mr. Fell about the conditions of his mother's home when he was a child, and he responded, "there was always food in the house, the house was clean." The examiner reminded Mr. Fell of the allegations by social service agencies that his home was unsanitary and infested with vermin, and he answered that this description of his home was not what he remembered it was like. In addition, Mr. Fell blamed himself for one of his mother's periods of incarceration. He informed the examiner that his mother was arrested and placed in jail because he was not attending school. The available evidence reviewed by the examiner suggests that his mother was arrested and incarcerated for wholly different reasons.

The examiner asked Mr. Fell if he felt love from either parent. He responded that he was unsure if his father loved him. He again noted that his father never said that he loved him or provided him with any positive reinforcement. He also stated to the examiner that he never heard his mother say that she loved him. He instead related, "I guess she acted like it," meaning his mother's actions at times suggested to him that she loved him, though he was never sure. Importantly, he was completely unable to point to any actions or statements that would indicate that he was raised in a positive, loving environment.

Childhood Behavior: The examiner questioned Mr. Fell about his behavior as a child. The examiner focused on symptoms suggestive of Attention-Deficit/Hyperactivity Disorder. Mr. Fell indicated that he could not recall problems with hyperactivity or a limited attention span as a child. He indicated that he had at times difficulty "sitting still," a problem that he

02071

FELL-00000313

said continues to bother him as an adult. Mr. Fell's descriptions of his behavior as a young child did not support or refute a diagnosis of Attention-Deficit/Hyperactivity Disorder. In other words, Mr. Fell noted that he could not remember any specific problems with his behavior as a child in regards to hyperactivity or deficits in concentration.

The examiner then questioned Mr. Fell about his capacity to concentrate as an adult. He indicated that since he has been in jail for the charged offenses, he has read a considerable number of novels. He reported that he reads "Tom Clancey" and the "sports section" of the newspaper. He informed the examiner that he can remain seated and read for "hours" in his cell. In addition, he has attempted to read law books to educate himself about his present legal difficulties, but discussed how this particular area is difficult for him because the law has a technical language all of it's own. Importantly, he did not provide any current information to suggest that he now meets criteria for Attention-Deficit/Hyperactivity Disorder. As Dr. Wetzel pointed out in his report, Mr. Fell's medical records document a childhood history of Attention-Deficit/Hyperactivity Disorder. In fact, Mr. Fell's medical records state that he was treated with Ritalin, with some benefit.

According to Mr. Fell, his behavior changed in the "seventh grade." He stated that he was "out of control," starting in the "seventh grade." He blamed his behavior problems on "the wrong crowd." He told the examiner that he lost interest in school, was frequently truant, and engaged in illegal acts. He estimated that his truancy was significant in that he only went "two days" during the second half of the seventh grade. In addition, he informed the examiner that his first illegal act occurred at the age of "12," he was then "shoplifting." Moreover, he "stole cars," vandalized property, and was involved in numerous physical altercations. Mr. Fell discussed how he developed a "bad temper" and had difficulty controlling his anger. He reported that his "temper" was fueled by his alcohol and illicit drug use. The examiner asked Mr. Fell if he was involved in an identified gang. He responded that although he "fell into the wrong crowd," he was not in an actual gang. While discussing his misconduct as an adolescent, Mr. Fell again showed remarkable insight by commenting, "I could kick myself for my lack of education, instead of going this way, I might have gone that way," meaning that he perceived his lack of education as, in part, contributing to his present situation. As well, he was questioned about whether or not his behavior as an adolescent mirrored his father's behavior as an adult. He replied, "I have given a lot of thought to that since I have been here, I was usually a happy drunk, but on certain instances I got drunk and I reminded me of my father." He added that he thought his misconduct was in part due to, "no concrete guidance, no one to steer me on the right path," again suggesting that Mr. Fell has both significant insight into his present situation and the capacity to engage in rational self-reflection.

Mr. Fell also discussed his prior arrests as a juvenile. He reported that he was arrested for "truancy." In addition, he told the examiner about his contacts with social services as a juvenile and his placement with family members after his mother lost custody of him. The examiner inquired about Mr. Fell's behavior following his arrest for the charged offenses. According to Mr. Fell, he has not received any conduct violations during his present period of

02072

FELL-00000314

Donald Fell                                                                              Page 8

detention. He reported that he spends most of the day reading books and trying to educate himself. In fact, he informed the examiner that he has thought about pursuing a higher degree in "physics" or "chemistry." He said that he enjoys scientific subjects and hopes to obtain further education in this area in prison. Importantly, Mr. Fell's descriptions of his behavior and pursuits in jail suggest that in a controlled environment free from alcohol and illicit substances, he does not engage in acts of violence.

Use of Alcohol and Drugs: Mr. Fell indicated that his problems with alcohol and illicit substances started in the "seventh grade." He recalled that he first used alcohol at the age of "8." He said that his father had a "beer tap" in the basement, and he would "sample" the beer when he filled his father's mug. He noted that he started using alcohol daily in the seventh grade. He estimated that he was intoxicated "everyday" from the seventh grade to adulthood if alcohol was present. He described several signs suggestive of alcohol dependence, including: tolerance; realizing that alcohol was a problem in his life, but continued use despite this knowledge; drinking more alcohol and over a longer period of time than he originally intended; giving up important social activities to use alcohol; and, spending significant time and money to obtain alcohol. He, however, did not endorse any features associated with alcohol withdrawal.

Mr. Fell discussed with the examiner the illicit substances he has used. He estimated that his use of illicit substances began between the ages of "12 and 13." He noted that he started smoking "marijuana." He reported that after he left "St. Michael's," he smoked marijuana "everyday." In addition, he has used Valium, Vicodan, amphetamines, heroin, cocaine, Phencyclidine, LSD, Psilocybin, and ecstasy. He told the examiner that his drug of choice was "LSD." He related that he could use up to "25 hits" a day of LSD, suggesting tolerance for this substance. Mr. Fell also recalled that his mother used "cocaine." He indicated that on several occasions, he has seen cocaine in his mother's purse and at times has stolen this substance from his mother for his own use.

The examiner questioned Mr. Fell about how his use of alcohol and drugs altered his temperament, or disposition. Mr. Fell reported that in general, he was "shy" if he was sober. He related that if he was intoxicated, he was disinhibited. He then reflected that he has been "sober" for the past "2 years" due to his incarceration, and feels "good about being sober." He reported that he now understands how substances affected his "judgement" in daily life. He informed the examiner that now he would avoid the use of alcohol or illicit substances after recognizing the differences in his personality sober and not sober.

Psychosexual History: Mr. Fell has never been married. He reported that he has had numerous sexual relationships. He, however, has never maintained a monogamous relationship. He estimated that his first consenting sexual experience occurred as a "teenager." The examiner questioned Mr. Fell about an incident that he reported in earlier evaluations that involved him at a young age having sexual contact with an older female. He remembered that the incident the examiner referred to happened when he was "in the fourth or fifth grade." He

02073

FELL-00000315

stated that the incident in the "fourth or fifth grade" involved an older female and several other individuals, but he had no other clear recollection for this incident. The examiner inquired if Mr. Fell had any memory of being sexually abused. He was aware of the allegations in his social service records which indicated he was sexually abused as a young child by a babysitter. He related that he did not remember the episodes of sexual abuse, but named the babysitters who were allegedly involved, "Frank and Cookie." He then spontaneously added, "I detest child molesters," describing how children are young and naïve. The examiner also inquired if Mr. Fell was ever physically or sexually abused by his mother's boyfriends. He replied that he was never physically or sexually abused by any of his mother's boyfriends. The examiner asked Mr. Fell if he ever engaged in a sexual relationship with his mother. He answered that he never had any sexual contact with his mother. He again noted that between the ages of "13 and 20" he did not have any contact with his mother.

Medical History: Mr. Fell was questioned about physical illnesses and injuries as a child and adult. He told the examiner that he now has "back pain" that began at the age of "19" while he was working at a factory. In fact, he said to the examiner he injured "one of my lower vertebra in the thoracic-lumber region." Mr. Fell reported that he has never had surgery. He did describe several head injuries. He noted that he had a significant head injury between the ages of "12 and 13." He indicated that he was struck in the head by a "brick." He described the head injury at the age of "12 or 13" for the examiner, saying that he was "on LSD" and "saw chickadee birds in the air, and they were getting on my nerves, so I lobbed a brick up into the air, and the brick came down on my head." He recalled that he did not lose consciousness, but could not see or talk for several moments. In addition, he has "seen stars" on several occasions during physical altercations. The examiner questioned Mr. Fell about symptoms suggestive of a generalized seizure. He said that on several occasions, he has been aroused from sleep by a "shaking" feeling. He, however, did not endorse specific symptoms associated with a generalized seizure. In regards to his physical integrity as a child, Mr. Fell did not remember any serious infections or chronic physical illnesses during childhood. Mr. Fell informed the examiner that presently, he is taking Tetracycline for acne, Verapamil for "headaches," and Prozac for "anxiety attacks."

Religious Affiliation: Mr. Fell indicated that he was raised "Catholic." He recalled that as a young child, he went to "Sunday school." The examiner inquired if Mr. Fell now considers himself Catholic, and he responded, "I have been through a lot of phases, I worshiped the devil at one point, but here I go to church," and "you can consider me a Catholic now." Mr. fell reported that between the ages of "16 and 20," he "worshiped the devil." He said that satanic activities "interested me, but I don't know why." He added that he was never a "real" practitioner of Satanism. For example, he never engaged in animal sacrifices or other ritualistic activities. He did show the examiner two homemade tattoos of a satanic nature, one on his left deltoid of an inverted cross with 666, and another of a pentagram. He described his interest in Satanism as "an adolescent phase, I was never a practitioner of the sordid arts." Mr. Fell related that he never believed he could communicate with Satan or have actual supernatural powers.

02074

FELL-00000316

Psychiatric History: Mr. Fell was questioned about his history of psychiatric symptoms and treatment. He recalled that he was first treated by a psychiatrist as a "child." He was unsure as to the reason for his initial psychiatric treatment. He stated that as a child and adolescent, he was placed on several different psychotropic medications, including Dexedrine, Tofranil, Mellaril, and Thorazine. In addition, he remembered that he was hospitalized on several occasions for psychiatric treatment. He told the examiner that he saw no reason for his psychiatric hospitalizations at that time, or even now when he reflects on those hospitalizations.

The examiner reviewed Mr. Fell's extensive psychiatric records. Mr. Fell was treated as a child for symptoms consistent with Attention-Deficit/Hyperactivity Disorder. In fact, he was described by a psychiatrist as showing signs of "distractibility" and "impulsivity" since the age of "9." For his "hyperactivity," Mr. Fell was treated with several different medications, such as Moban, Tofranil, Dexedrine, and Ritalin. The medical records suggest that Mr. Fell's behavior improved with medication treatment.

Mr. Fell was also hospitalized on several occasions for his inappropriate behavior. His first psychiatric hospitalization occurred in 1991, and he was diagnosed with Conduct Disorder. Mr. Fell was described in his first hospitalization as being aggressive and oppositional. Mr. Fell's misconduct continued as an adolescent, and this precipitated three additional psychiatric hospitalizations to the Wilkes-Barre General Hospital. Mr. Fell was again treated with psychotropic medications that helped to control his pattern of oppositional, defiant, and aggressive behavior, a pattern of behavior well documented in the medical and social service records. As well, Mr. Fell received treatment at St. Michael's School between 1994 and 1995 for what was described as an adjustment disorder. In reviewing the medical records for Mr. Fell, the examiner found no evidence to suggest that he ever suffered from an episode of major depression or a psychotic illness. The medical record does suggest that Mr. Fell's misconduct and inappropriate behavior improved on psychotropic medications, some of which are used to treat depressive and psychotic disorders. Even though his behavior responded to certain antipsychotic and antidepressant agents, the medical record reflects that his pattern of behavior flowed from Conduct Disorder and not a major depressive or psychotic disorder.

Role Models: As documented earlier in this report, Mr. Fell described a chaotic home environment with no positive role model. Mr. Fell discussed with the examiner how he witnessed his parents use excessive amounts of alcohol on a near daily basis. In addition, he noted that his mother used cocaine, a substance that he stole from her on occasion. Mr. Fell's statements about his mother's use of alcohol and illicit substances are supported by the social service records and Deborah Fell's autopsy report, which document that she had an ethanol level of ".325%" and tested positive for amphetamines. Further, Mr. Fell stated to the examiner that he was abandoned by both his parents and his grandmother and aunt, who later cared for him. Starting as a young child, he also witnessed physical altercations and excessive

02075

FELL-00000317

Donald Fell                                                                Page 11

arguing between his parents. Interestingly, Mr. Fell informed the examiner that he was abandoned by the school system. He related that he actually did not quit school, but was instructed to leave school at the age of 17 due to his truancy and poor academic performance.

The examiner asked Mr. Fell about any positive experiences that he might have had with his parents as a child. Mr. Fell could not remember his dad taking him on any trips or vacations. Further, he could not recollect any family vacations. Moreover, he told the examiner that he never received any affectionate hugs or kisses from his parents. As well, his parents never surprised he or his sister with gifts. He recalled that during one Christmas, he had to wrap his sister's Christmas presents because his mother was "passed out drunk." The examiner inquired about family pictures and important stages in development, and Mr. Fell recounted a vivid memory of a picture of himself as a young child. He noted that in the picture, he was wearing "giant sunglasses," and in the background was a "stuffed Pabst blue ribbon beer can." In Mr. Fell's opinion, this picture of himself as a young child summarized his family experiences and the role model his father set for him.

The examiner asked Mr. Fell why he returned to Vermont just before the charged offenses. He reported that several family members suggested that he make contact with his mother, even though he had not had any contact with his mother for 7 years. He related that he went to Vermont, hoping to find a different person. He said that he hoped to enjoy a positive relationship with his mother. He, however, found that she was "no different." He told the examiner that his mother was still drinking alcohol and using crack-cocaine. He estimated that his mother drank alcohol everyday that he was visiting with her in Vermont. As well, he described how his mother "smacked" him at a bar during a verbal disagreement. The examiner inquired as to why Mr. Fell did not leave his mother's residence in Vermont. He responded that he had decided to leave his mother just before the alleged offenses took place. According to Mr. Fell, he decided to leave his mother because, "I could not deal with it, the aggravation, every time she got drunk, she had to start a fight." He informed the examiner that on the day of the incident, his mother and the male victim were both intoxicated. He added that "everyone" was "drunk and high" at the time of the allegations.

## III. MENTAL STATUS EXAMINATION:

Mr. Fell was a 22-year-old, white male, who was neat and clean in appearance. He maintained good eye contact with the examiner. He did not lose his train of thought during the evaluation. For example, he answered the examiner's questions on point. He was able to recite the months of the year in reverse order. As well, he did not exhibit any hyperactivity or involuntary movements. Further, he remained calm and controlled throughout the interview, even when the examiner questioned him about emotional topics.

Mr. Fell's flow of thought was logical, sequential, and goal-directed. He did not exhibit any features of a formal thought disorder. His speech was adequately modulated in rate and tone. His affect was serious. He smiled on several occasions at the appropriate

02076

FELL-00000318

times during the interview. Further, while discussing his home environment and parents, his eyes were wet with tears. He, however, did not lose his composure. Mr. Fell described his mood as "okay." He did not endorse any symptoms consistent with major depression, now or in the past. He noted that before the charged offenses, he was "never a sad fellow, I never dwelled on things and got down." He told the examiner that following his arrest for the alleged offenses, he had some trouble feeling "depressed." His feelings of "depression" did not involve a loss of appetite, energy, changes in sleep, suicidal ideas, or anhedonia. Rather, he discussed a fluctuating pattern to his mood, reporting that "one minute" he would be "depressed," and then the next he would be "cheered up." In fact, he told the examiner that he has never considered suicide. Despite his present situation, he continues to hope for the best. He said, "I hope I don't get the death penalty" and "I just want to live out the rest of my life in a federal prison where I can learn, I hope to get several degrees, I would like to have a kid, but there is no way of doing that." In addition, Mr. Fell did not elaborate any thoughts of hopelessness or worthlessness. Instead, he described himself in positive terms, saying, "I'm not really a bad person" and "at first, I hated myself (i.e. after the homicides), I wasn't too happy with myself, it is not the type of person I am or the type I wanted to be, I am disturbed it came down to this, I am absolutely sorry about the things that allegedly happened."

Mr. Fell's content of thought did not reveal any psychotic ideas. Mr. Fell noted that he has experienced psychotic episodes while intoxicated on illicit substances, primarily LSD. For example, while using LSD, he saw a "little invisible green guy with red skin." Moreover, he discussed how he saw "trails" while intoxicated on LSD. He, however, did not endorse any psychotic experiences or beliefs absent intoxication. Mr. Fell did not affirm any examples of delusional thinking provided by the examiner, such as thought insertion, thought broadcasting, thought control, thought withdrawal, grandiosity, or paranoia. He related that he has never received messages from the television or radio or heard "voices" talking to him or about him.

The examiner questioned Mr. Fell about symptoms consistent with mania. He did not endorse any features associated with an acute manic episode. Moreover, given his documented history of physical and sexual abuse, the examiner asked Mr. Fell about symptoms associated with Posttraumatic Stress Disorder. Mr. Fell did not affirm any examples of symptoms found in Posttraumatic Stress Disorder.

Mr. Fell did describe clear evidence of a panic disorder. Mr. Fell likened his panic attacks to "anxiety attacks." He estimated that his "anxiety attacks" started at the age of "20." He noted that following his arrest for the charged offenses, he was placed on "Prozac," which has helped his "anxiety attacks." He estimated that before he was treated with "Prozac," he experienced "one to two attacks a week." His "anxiety attacks" involve acute episodes lasting 20 to 35 minutes and involving the following: facial numbness; upper extremity numbness; shortness of breath; dizziness; feeling "disoriented;" fears of "dying;" and, the thought that he is having a "heart attack." Although he related that he

FELL-00000319

has always had difficulty with crowds, he did not associate his "anxiety attacks" with being in crowded places or leaving his home. He told the examiner that he does "feel better" if he is with friends and avoids being alone in a crowded situation.

Mr. Fell's memory was intact. The examiner found no evidence to suggest that he suffers from a cognitive disorder. Mr. Fell was alert and oriented to time, place, person, and reason for the evaluation. He remembered three words immediately and after 5 minutes of distraction. He named the current president and listed the presidents in reverse order through Reagan. He listed 7 digits forward and 5 in reverse. He serially subtracted 7 from 100 to 58 without error. He discussed at length several events in the national news. He also commented on recent sports events around the nation. As well, Mr. Fell was able to provide a personal history that was consistent with the available sources of information.

Mr. Fell's higher executive functions were intact. He pantomimed the use of a comb, a toothbrush, and waving "bye." He copied intersecting pentagons without difficulty. He repeated "no ifs, ands, or buts," after the examiner, without hesitation. He wrote a complete sentence, "The dog ran through the field." He identified several colors in the exam room. He was able to name a metal attracted to a magnet, name four different materials used in building, and how he would find his way if lost in a forest. Mr. Fell could not describe what the two proverbs, living in glasshouses, and a rolling stone, meant to him. He said that he had never heard these proverbs. He appropriately related what he should do if he found a stamped, addressed envelope on the ground, or smelled smoke in a theater.

Mr. Fell's intellectual capacity was judged to be in the average range. Mr. Fell's use of language and capacity to live independently both suggested that he is of average intellectual abilities. In fact, Mr. Fell's use of language and insight into his own past suggested that, despite his excessive substance use, he retains excellent cognitive functioning.

IV. **DIAGNOSES**:

Axis I:        Panic Disorder Without Agoraphobia 300.01
               Alcohol Dependence, In a Controlled Environment 303.90

Axis II:       Personality Disorder, Not Otherwise Specified (Cluster B Features)
                  301.9

Axis III:      No Diagnosis

In preparing this report, the examiner used the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, published by the American Psychiatric Association in 2000.

02078

FELL-00000320

## V. OPINIONS:

After reviewing the discovery information and interviewing Mr. Fell, the examiner offers the following opinions to a reasonable degree of medical certainty:

1. Mr. Fell is not afflicted by a psychotic disorder. Mr. Fell's medical records and prior evaluations do not support a diagnosis of a primary psychosis. The examiner's interview and mental status examination did not reveal any symptoms or signs suggestive of a psychotic disorder. Moreover, Mr. Fell did not even describe odd beliefs or unusual perceptual experiences outside of periods of drug intoxication. Accordingly, the examiner cannot support a diagnosis of a primary psychotic disorder of any type in this case.

2. The examiner found no evidence to suggest that Mr. Fell is afflicted by a major depressive disorder. Mr. Fell did not endorse any features consistent with major depression. He did describe a fluctuating pattern to his mood, but not the pervasively low mood of two or more weeks associated with other symptoms found in major depression. Moreover, a review of Mr. Fell's medical records does not support a diagnosis of major depression. Mr. Fell's medical records point to a diagnosis of Conduct Disorder. Accordingly, the examiner cannot support a diagnosis of major depression of any degree in this case.

3. Mr. Fell's intellect and cognitive functions are surprisingly intact despite his extensive use of alcohol and illicit substances. Mr. Fell does not show evidence of a limited intellectual capacity or a cognitive disorder. Mr. Fell's memory and executive functions are intact. His intellectual capacity is preserved as indicated by his use of language, reasoning, and thoughtful reflection during the examiner's interview. Accordingly, the examiner cannot support a diagnosis of Delirium, Dementia, Amnesia, or Other Cognitive Disorders, as described in DSM-IV TR, in this case.

4. Mr. Fell has a documented history of sexual and physical abuse as a young child. Mr. Fell's history of sexual and physical abuse would effect his behavior as an adult. Male children who are victims of physical and sexual abuse are known in certain situations to become aggressive as adults. Accordingly, the examiner can support the finding that Mr. Fell's sexual and physical abuse are mitigating factor in this case.

5. Mr. Fell qualifies for a diagnosis of Alcohol Dependence. Moreover, Mr. Fell has used many illicit substances leading up to the charged offenses. Further, Mr. Fell told the examiner, and other evaluators, that he was

02079

FELL-00000321

Donald Fell                                                              Page 15

intoxicated around the time of the alleged offenses. Clearly, Mr. Fell's intoxication did contribute to his commission of the instant offenses. Accordingly, the examiner can support the opinion that Mr. Fell's substance use is a mitigating factor in this case.

6. Mr. Fell was raised in a chaotic and dysfunctional family. Mr. Fell repeatedly witnessed acts of physical violence as a child. It is also clear that Mr. Fell had no positive role models in his life. Moreover, Mr. Fell felt abandoned by his parents and other significant caregivers. Mr. Fell's lack of supervision, chaotic home environment, and poor role models, would have negatively contributed to his personality development. Accordingly, the examiner can support the opinion that Mr. Fell's home environment is a mitigating factor.

7. Mr. Fell told the examiner that he hopes to achieve several higher degrees while in prison. He reported that he is interested in "physics" and "chemistry." Clearly, Mr. Fell has the intellectual capacity to pursue his dream of achieving a higher education, as indicated by his use of language and the material that he is presently reading for pleasure. Further, Mr. Fell displayed remarkable insight into his inappropriate behavior, especially the differences in his behavior when he is sober and when he is not. As well, Mr. Fell has recently demonstrated the capacity to modulate his behavior in a controlled environment. The combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs, suggests that he will adjust positively to a prison setting. Accordingly, the examiner can support the opinion that Mr. Fell will exhibit a positive prison adjustment.

Respectfully submitted,

John S. Rabun, M.D.

Cc: Richard Wetzel, Ph.D.

JSR/cs

02080

FELL-00000322

**47**

FELL-00000323

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas
972 459 0658    Fax:  972 459 0958    mdc@markdcunningham.com

06-14-05

Mr. Alex Bunin, Esq.
Office of the Federal Public Defender
39 North Pearl Street
Albany, New York 12207

Re: <u>U.S. v Donald Fell</u> (capital sentencing)

Dear Mr. Bunin:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Donald Fell relative to the presence of any factors that might be considered mitigating. As will be detailed below, these findings and opinions are based on interview of Mr. Fell, review of summaries of interviews by FBI personnel, review of reports of other mental health experts involved in the case, review of records, and review of scholarly literature. These sources are of a sort that are customarily relied upon by clinical and forensic psychologists in coming to expert opinions. I would caution that third party interviews and additional review of records are pending. Accordingly, my findings and conclusions may be modified by additional information that may be made known to me.

## Findings and conclusions:

An extensive body of research is available to demonstrate a nexus between deleterious developmental events or factors and adverse outcome. More specifically, research on factors associated with an increased risk of chronic delinquency, substance abuse, and serious violence in the community has been conducted and synthesized under the sponsorship of the U.S. Department of Justice (DOJ) as part of their increasing commitment to violence prevention programs. Consistent with past explanations (e.g. Masten & Garmezy, 1985), DOJ sponsored reviews have concluded that risk of violent criminal outcome is a function of the interaction or balancing of risk and protective factors (see U.S. Department of Justice, June 1995; Hawkins et al., 2000; Wasserman et al., 2003). Other DOJ sponsored longitudinal studies detail the effects of child maltreatment (Widom, 2000; Kelley, Thornberry, & Smith, 1997); the effects of family disruption (Thornberry et al., 1999) and the cumulative effects of hostility, observed violence, and personal violent victimization within the family (Thornberry, 1994) on

M1716

FELL-00000324

**U.S. v Donald Fell**
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

criminal outcome and violence rates. Other publications such as the Surgeon General's Report on Mental Health (1999) also detail ways in which neglect and traumatic experience may deflect the developmental trajectory. Important research on the risks associated with various developmental factors has been published in the peer reviewed literature apart from the sponsorship of DOJ as well. Mr. Fell's developmental history demonstrates many of the risk factors and few of the protective factors identified in the above studies. These include the following (factors present in Mr. Fell's development identified with check marks or plus-minus sign):

*U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention*

Risk Factors:

**Conception to age 6:**
- ✓ Perinatal difficulties
- Minor physical abnormalities
- ± Brain damage
- ✓ Family history of criminal behavior and substance abuse
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

**Age 6 through adolescence:**
- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- ✓ Transitions and mobility
- ✓ Availability of firearms
- ✓ Media portrayals of violence
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- ✓ Early and persistent antisocial behavior
- ✓ Academic failure
- ✓ Lack of commitment to school
- ✓ Alienation and rebelliousness
- ✓ Association with peers who engage in delinquency and violence
- ✓ Favorable attitudes towards delinquent and violent behaviors
- ✓ Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

M1717

FELL-00000325

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

Protective Factors:

Individual characteristics:
    Female gender
    Intelligence
    Positive social orientation
    Resilient temperament.

Social bonding to positive role models:
± Family members
    Teachers
    Coaches
    Youth leaders
    Friends

Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.

Effective early interventions

*Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.*

**Individual factors**
✓ Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
✓ Aggressiveness (x 1.5 - 6)
✓ Early initiation of violent behavior (x 6)
✓ Involvement in other forms of antisocial behavior
✓ Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
✓ Parental criminality (x 1 - 3.8)
✓ Child maltreatment
✓ Poor family management practices (x 2)
✓ Low levels of parental involvement
✓ Poor family bonding and family conflict
± Residential mobility (+)
✓ Parental attitudes favorable to substance abuse and violence (x 2)
✓ Parent-child separation

M1718

FELL-00000326

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

**School factors**
- ✓ Academic failure
- ✓ Low bonding to school
- ✓ Truancy and dropping out of school
- Frequent school transitions
- ✓ High delinquency rate schools

**Peer-related factors**
- Delinquent siblings
- ✓ Delinquent peers
- Gang membership (x 3-4)

**Community and neighborhood factors**
- Poverty (x 2)
- Community disorganization (crime, drug-selling, gangs, poor housing)
- ✓ Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

**Situational factors**


*Wasserman, G.A., Keenan, K., Tremblay, R.E., Coie, J.D., Herrenkohl, T.I., Loeber, R., & Petechuk, D. (April, 2003). Risk and protective factors of child delinquency. Child Delinquency Bulletin Series. U.S. Department of Justice, NCJ 193409.*

**Individual factors**
- ✓ Early antisocial behavior
- ✓ Emotional factors such as high behavioral activation and low behavioral inhibition
- Poor cognitive development
- Low intelligence
- ✓ Hyperactivity

**Family factors**
- ✓ Parenting
- ✓ Maltreatment
- ✓ Family violence
- ✓ Divorce
- ✓ Parental psychopathology
- ✓ Familial antisocial behaviors
- Teenage parenthood
- Family structure
- Large family size

M1719

FELL-00000327

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

## Peer factors
- ✓ Association with deviant peers
- Peer rejection

## School and community factors
- ✓ Failure to bond to school
- ✓ Poor academic performance
- ✓ Low academic aspirations
- Living in a poor family
- Neighborhood disadvantage
- Disorganized neighborhood
- ✓ Concentration of delinquent peer groups
- ± Access to weapons

The above research provides an explanation for the developmental trajectory observable from adolescence and early adulthood which culminated in the charged capital offenses. I anticipate that in my testimony at capital sentencing I will particularize these factors to Mr. Fell and the resulting trajectory of his life. These and other adverse factors including those listed below impacted not only on Mr. Fell's life trajectory, but also on his underlying value system, moral development, perception of life options and nature of choices.

Additionally, I anticipate describing in more extensive detail a number of damaging developmental factors present in Mr. Fell's history that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. Again, these will be supplemented by research findings demonstrating a nexus between such factors and disrupted developmental trajectory and adverse developmental outcomes including substance abuse, criminal activity, and criminal violence. These include:

## Generational and biological factors
- Family dysfunction from generation to generation
- Genetic predisposition to alcoholism and drug addiction
- Genetic predisposition to psychological disorders
- Prenatal alcohol exposure
- Attention Deficit Hyperactivity Disorder in childhood
- Inhalant abuse
- Closed head injury
- Youthfulness

## Parenting
- Inadequate maternal attachment
- Alcoholism of both parents
- Observed mutual combat of parents
- Disinterest and emotional neglect by both parents

M1720

FELL-00000328

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

- Physical abuse
- Abandonment by father
- Abandonment by mother
- Corruptive influence of mother
- Negligent supervision and structure

## Community

- Sexual abuse and sexually traumatic exposures
- Inadequate social services intervention
- Corruptive peers
- Drug-related deaths of friends

## Disturbed Trajectory

- Childhood onset psychological disorders
- Poly-drug abuse and dependence from childhood
- Institutionalization in early adolescence
- School dropout
- Intoxication at time of offenses

I also anticipate testifying regarding an additional mitigating factor of positive prisoner adjustment (i.e. Skipper evidence). There are a number of factors that point to Mr. Fell being likely to have a positive (i.e. without serious violence) adjustment to prison, including absence of serious violence in pretrial confinement, participation in constructive activities in pre-trial confinement, and correctional appraisal. Further, seriousness of offense and/or life-without-parole sentence is not predictive of serious violence in prison. More specifically, there is large scale research demonstrating that inmates convicted of murder and/or serving life without parole are not a disproportionate risk of violence in prison.

Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

M1721

FELL-00000329

48

FELL-00000330

# Expert Report of

# United States v Donald Fell

**Prepared By: James E. Aiken**

James E. Aiken & Associates, Inc.

Date: June 15, 2005

M1722

06/16/2005  08:41    9197511506    HIE GOLDSBORO 069    PAGE  02/06

FELL-00000331

1.

My name is James E. Aiken, since 1994, I have maintained a consulting concern in prison management and adjustment matters as James E. Aiken & Associates, Inc. I also served as Director of Corrections for the United States Virgin Islands, and Commissioner for the Indiana Department of Correction. I began my corrections career in 1971 at the South Carolina Department of Corrections as a counselor with the Comprehensive Drug Abuse Treatment Program. Also, while with the South Carolina Department of Corrections, I held positions as Deputy Regional Administrator in the Midlands Correctional Region, Deputy Warden and Administrative Assistant to the Warden of the Manning Correctional Institution, Deputy Warden and Warden at the Central Correctional Institution, and Warden of the Women's Correctional Center.

2.

Serving in these positions, I received extensive experience in the areas of prison classification and management of inmate population. During my years in the corrections profession, I have conducted thousands of inmate classification evaluations relative to their adjustment to prison and current/future danger to the public, prison staff, and other inmates. These reviews included minimum custody (low security offenders) to maximum security (violent, predator, aggressive inmates). Additionally, I have been directly involved in the design and development of prison classification systems in various jurisdictions to include both objective and internal systems. I have also managed inmates awaiting execution under death sentences and carried out such sentences.

3.

I received a Masters Degree in Criminal Justice from the University of South Carolina and Bachelors of Arts Degree from Benedict College, Columbia, South Carolina. I have also taught a number of courses in corrections at the university and technical college levels.

4.

I have reviewed Mr. Fell's prison records pertaining to his period of incarceration as well as information pertaining to the current proceeding. I also conducted a personal interview with him at the facility where he is presently confined.

2

M1723

FELL-00000332

5.

I have been retained to render an expert opinion as to the Federal Bureau of Prison's ability to safety incarcerate and manage Mr. Fell and to prevent or minimize a risk of escape and risk of harm to other inmates and prison personnel. I evaluated Mr. Fell as a corrections inmate, regarding risks that he might present to the public, other prisoners, to corrections staff, and his ability to adjust to prison life in general.

6.

Based upon my knowledge of the Federal Bureau of Prisons and prisons in general, the following is submitted relative to the Federal Bureau of Prisons' ability to house and safety incarcerate Mr. Fell:

1. The Federal Bureau of Prisons maintains a system that provides for the proper assignment and classification of inmate population in prisons. These assignments are made in accordance with acceptable correctional practice to protect the public, ensure staff and other inmate safety and security.

2. The Federal Bureau of Prisons has staff that is trained to manage inmate population with violent criminal histories. Training, equipment, supervision, and physical structures are provided to assist the staff in performing their duties of maintaining order and protecting the public.

3. The Federal Bureau of Prisons maintains a system that evaluates the inmate in regards to his aggressiveness while in prison.

4. The Federal Bureau of Prisons operates a harsh but constitutional correctional system.

5. If required, the Federal Bureau of Prisons has procedures in place that provides for lethal force being administrated to protect the staff, community, and other inmates.

6. The Federal Bureau of Prisons has the staff, equipment, physical structure, and operational experience to address inmate populations that demonstrate chronic and/or acute anti-social behaviors.

7. The Federal Bureau of Prisons has the expertise and ability to provide long term management of inmate population.

3

M1724

PAGE 04/06                    HIE GOLDSBORO 069                    9197511506    08:41    06/16/2005

FELL-00000333

8. The Federal Bureau of Prisons has the expertise and ability to protect the community, staff and other inmates from violent, aggressive, long term inmates; and

9. The Federal Bureau of Prisons has firearms, security perimeters, trained staff, and procedures to prevent, detect, respond, and contain inmate attempts to escape lawful custody.

Understanding these capabilities of the Federal Bureau of Prisons, the following factors are considered in formulating an expert opinion pertaining to Mr. Fell:

**Assumptions:**

- The defendant has been found guilty of offenses which warrants jury consideration of the death sentence as a sanction.
- A victim's family have the strongest objection to any alternative other than the death sentence.
- All available documents pertaining to the defendant's criminal history and periods of confinement are provided.

**Defendant Assessment:**

The following factors are considered in determining an expert opinion of the defendant:

- Prison rule violations
- Overall Prison Adjustment
- Gang/Security Threat Group Involvement
- Escape History
- Prison Hostage Events
- Age
- Attitude and Motivation
- Substance Abuse History
- Family Relations
- Physical Presence and Effect

4

M1725

FELL-00000334

- Religious Involvement

Prior Criminal History

- Number of Arrests
- Arrests and Convictions for Violent Acts
- Age of Defendant at First Arrest and Conviction
- Adjustment to Jail/Prison During Prior Confinement Periods
- Length and Type of Sanction(s) Imposed After Prior Conviction(s)

**Conclusion:**

Based upon my review of the documentation provided by counsel and other factors as stated above, Mr. Fell can be housed, managed and secured in a maximum security facility for the remainder of his life as provided by federal statue without causing an unusual risk of harm to staff, other inmates or the community.

James E. Aiken                    June 16, 2005

James E. Aiken                    Date

5

**M1726**

FELL-00000335

**49**

FELL-00000336

Chris,

Hey how are ya buddy, by now you probably heard what happened, Just to clarify a few things. I did not know my mom was dead until I was already in jail. So please make sure you let my sister know I had nothing to do with her death. On the other hand neone will ever see me again unless they come visit me in vermont cause I did kill someone else. Everyone will probably be dead by the time I get out of jail if I ever get out let everyone know whats going on. and when I get to vermont I will write with the address.

Donny.

0573

50

FELL-00000338



FELL-00000339

**51**

FELL-00000340



FELL-00000341

**52**

FELL-00000342



FELL-00000343

**53**

FELL-00000344

Donny Birth Photo.jpg



FELL-00000345

**54**

FELL-00000346