

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 21

While psychosis may manifest briefly in individuals with particular conditions such as Borderline Personality Disorder under conditions of extreme stress, there is no evidence that Mr. Fell has developed psychosis under stress – only that he becomes furious when others anger him. Not surprisingly, his psychological testing does not reflect a psychotic disorder.

Donald Fell's consistent presentation, before and during incarceration and with no medication, has reflected organized behavior for instrumental motives, no delusions, no hallucinations, organized cognition and communication.

   *2)   What other aspects of Donald Fell's development distinguish themselves?
        How have these features impacted his life trajectory, underlying value
        system, moral development, perception of life options and nature of
        choices?*

Donald Fell is the son of parents who had an erratic relationship in which both drank heavily. Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education. The sexual abuse incidents of early 1985 represented the first remarkable setback for the family that could not be adjusted for by family resources alone.

Records indicate that Mr. and Mrs. Fell were greatly tormented that the babysitting incident involving Frank and Cookie Bublos had happened to their own Fell children. The regrets undermined the Fell's union, even though Donald Sr. and Debra had sought and received help from Victim Services. Debra stopped working at a job she maintained in order to supervise the children, rather than trust a babysitter. Donald Sr. began drinking heavily, and became increasingly withdrawn. Hostilities between the defendant's parents escalated.

The next month, in April 1985, both parents stabbed each other while heavily intoxicated. Donald and Terri witnessed the blood on the ground from their father walking around before he ultimately exited the house. He was so intoxicated at the time that he was not aware that he had a knife blade stuck in his back. EMS workers found Debra with a knife protruding from her leg. While social services attempted to sort the crisis out, the children were removed to Theresa Sharp's home.

Evaluators eventually returned Donald and Terri to their parents, noting "a great deal of love and respect between parents and children." Donald Fell gave the impression of being attached to his father. The parents impressed social service employees as extremely protective of the children.

FELL-00000642

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 22

Notwithstanding the frequent fighting between the parents, Theo Settas, a playmate of Donald Fell's until age nine, experienced Donald Fell as a normal child whom he enjoyed spending time with on the playground, who was not violent or otherwise remarkable. That paralleled the impression of his school principal, who noted that Donald posed no problems in first and second grade. Whatever was going on in the home between the parents, and with Terri, Donald did not demonstrate remarkable behavior changes before age 9.

While Donald's father was in the home, no bruises or injuries were noted by school or CYS officials. Terri Fell asserts that her father was physically abusive to her, not to Donald.

On October 29, 1990, Debra Fell asked her husband to leave after he reportedly slapped Donnie Jr. in the face. Donald Sr. agreed; he did not seek custody, and faded from their lives. No reports ever followed of any physical, verbal, or sexual abuse toward Donald from the adult men he later lived with.

In May 1991, Ms. Fell requested counseling for her children to deal with the likelihood that she and Donald Sr. would not likely reconcile. In late September 1991, Debra referred the defendant to Wyoming Valley for hospital admission. It was clear from the hospital chart that Donald Fell's mother was afraid of him by then. She reported severe, ongoing behavioral problems, that he would not accept rules in home, was aggressive and oppositional at school, hit her and was increasingly aggressive towards her.

Donald reportedly threw darts at his mother and her boyfriend, and admitted this was dangerous. While Donald did not experience Mrs. Fell's boyfriend Ellery as "mean," as he described his father, he was noted to be oppositional and defiant towards him. By that time, according to Debra Fell, Donald had been setting fires.

During that fall 1991 inpatient evaluation, staff noted, "Fairly positive perception of family, but views mother as authoritarian, non-stimulating...views father more positively." He was noted to be calmer when his mother was not around. Still, staff referred to Debra's concerns as appropriate. However, staff described Donald as "bored...little motivation to deal with problem solving in effective fashion."

Mr. Wilcox, on disability after a motorcycle accident, remained in the home as well. When Mr. Wilcox, an alcoholic who was recuperating from a badly broken leg, would reportedly attempt to set limits with Donald Fell, Donald would kick his crutches out from under him. At around age 12, Donald reportedly tattooed himself with an upside down cross bearing the inscription "666." This was the earliest sign of his embracing Satanism.

FELL-00000643



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 23

Donald's behavior was problematic enough for Debra to have referred him for hospitalization three more times between 1992 and June 1993. There were no behavioral difficulties with Terri Fell; according to Stanley Kowalski, Ms. Fell's close friend, Debra characterized her daughter as a "good kid."

By then, Debra had been living in a house adjoining her sister, Jackie Sharp, and her mother, Theresa Sharp. Ms. Sharp had been trained as a foster parent and had taken a foster child, Ronnie Ebert, into the home.

According to Theresa Sharp, at least as early as 1991, Mrs. Fell's home was exceptionally dirty and neglected. Donald's hygiene was neglected as well, and he was found to have head lice. In the 1991 evaluation at Wyoming Valley however, psychological testing revealed strong self-confidence – a 93rd %ile, in fact, on the Pierce-Harris test.

There was no accusation or consideration that Debra Fell was physically abusive to Donald Fell before of during that time. However, Donald Fell was reported to have been pulling out his mother's hair, hitting her with a curtain rod, and threatening to stab her. The situation only worsened; however, in early 1993, records noted a long history of Donald beating his mother, resisting rules and curfew, and of Ms. Fell was expressing unwillingness to sleep at night for fear her 13-year old would kill her.

After she admitted him, hospital staff experienced Debra Fell as involved; she came to family meetings, supported his treatment, visited regularly, expressed concern for minor problems such as the warts on his hand, and delivered gifts to him on the unit.

Debra Fell remained willing to take Donald Fell back into the house even given the history of his threatening to kill her or shoot her, even though he had beaten her up in the past, even though he had shot a friend of his, and had threatened to shoot her as well. He was discharged to her custody.

While Donald expressed a strong preference to stay with his mother rather than institution, he would not listen to her and very hostile toward her. Donald remained truant, among other behaviors.

On Christmas Day 1993, according to Jackie Sharp, Debra left home telling her children she was going shopping, and did not return. Jackie and Theresa took Donald and Terri next door. Debra returned in January 1994, but on January 19, 1994 police came to the house when a drunk Debra Fell split the lip of her daughter Terri. The children moved next door once again; subsequently, Theresa and Jackie were unwilling to return the children; Theresa fought for and eventually gained custody.

FELL-00000644

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 24

In the years after taking custody of Donald and Debra, Jackie prevented her contact with Donald, according to Jeanette Banas, Furthermore, "She would belittle Donnie's mother to him. Jackie would pound into Terri and Donnie's head that mother was no good, that she doesn't care about him," remembers Shawn Campbell, Ms. Sharp's ex-live in boyfriend. Jackie would remind Donald that his mother "called him a bastard and a good for nothing," recounts Mr. Campbell.

Others described Donald Fell as close with his grandmother. His truancy and uncontrollable behavior continued, however. And in April 1994, Donald was committed to the St. Michael's reformatory.

The defendant later told his girlfriend Lynn Roberts that he experienced St. Michael's as "like a jail," and blamed and specifically blamed and resented Jackie for placing him there.

Mr. Fell remained in St. Michael's until well into 1995. Theresa died in December 1994. Debra expressed an interest in regaining custody of her children, but she did not comply with her community service, and so Donald was released to Jackie's custody. Debra reportedly had not visited Donald while he in St. Michael's; while she scheduled a meeting with New York social services in June 1995 to discuss her future plans, she did not appear.

After returning to Jackie Sharp's home, Donald Fell remained there for 2-3 years. According to Shawn Campbell, Jackie "Made him and his sister her slave for chores. When he worked, she would take all of his money. She chased him with knives, chased me with knives." When Mr. Fell broke her rules, according to Mr. Campbell, Jackie grounded him, for as long as weeks."

Ms. Sharp, however, had equal opportunity outbursts, according to Mr. Campbell, who asserts that the same Ms. Sharp threw a headboard at him, and once set his clothes on fire. When it came to Donald, according to Mr. Campbell, "we got along fine...I just kept him away from her."

Recalls Mr. Campbell, "Donnie played video games and worked on cars with me...and we bonded over music." Mr. Campbell adds, "I wasn't allowed by Jackie to drink around him – and I told him all the time not to smoke pot." Mr. Campbell and Jackie allowed Donald to drink "rarely."

Eventually, Mr. Campbell left the home. Sometime after his 17th birthday, Jackie asked Donald to leave as well. Mr. Fell reflected to Dr. Wetzel that this was the second most wonderful thing that had ever happened to him.

FELL-00000645



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page: 25

After living with other friends and leaving because he was not contributing to rent financially, or getting repeatedly evicted for antisocial behavior (such as from Robert Lee's father's home), Donald Fell lived on the road as a carnival employee and then, returned to different relatives in 2000.

He moved in for approximately one month and stayed with his aunt Donna Williams, before she asked him to leave. The defendant then went to great aunt Stella and Jeanette Banas' home. He was there when his mother, who would keep in touch with Jeanette, learned he was living there. Debra Fell asked to speak to him, and soon afterward, invited him to Vermont; he accepted. Dr. Mills noted in his report, "he and mother had come to some resolution about her abandoning him and his sister."

Repeated reference has been made to Debra abandoning her children. That she did. But even before leaving the state, if she were incarcerated for his truancy or for not paying other fines, she could not have been mothering her children from jail, and was inevitably going to be removed from them.

Before she relinquished custody in 1993-94, when Debra Fell found Donald Fell uncontrollable, and she referred him for hospital admissions that staff deemed appropriate. Theresa Sharp, held in high regard by Donald, could not inspire him to attend school or work with their home rules either. Jackie Sharp, who dealt with Mr. Fell's defiance by committing him to St. Michael's group home for over a year until mid-1995, arguably discarded Donald Fell even more meaningfully than did Debra.

At no time did Jackie Sharp engage Donald Fell to explore his role in driving Debra Fell from Pennsylvania. Ms. Fell was accountable for his truancy; and may have been fined and jailed, and he continued truant and unwilling to respond to her limit-setting. She did not leave the home, she left the state altogether.

While ample documentation notes that Debra Fell feared young Donald would kill her, little acknowledgment of that was made after she left for Vermont – although Terri Fell, Jeanette, and Stella all acknowledged they wondered about Donald's potential threat to Debra even before he traveled to re-unite with her.

Poor parental relationships in his first decade, along with neglect, contributed to his defiance of authority, and general oppositional demeanor.[19] The history demonstrates that Donald Fell, while posing some management problems, was not a particularly dangerous person in his first decade. Notwithstanding his parents' alcoholism and their

---

[19] Webster-Stratton, Carolyn, et al. (2004). Treating Children With Early-Onset Conduct Problems: Intervention Outcomes for Parent, Child and Teacher Training. Journal of Clinical Child and Adolescent Psychology. 33:1, 105-134.

FELL-00000646

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 26

marital collapse, a closer look at his chronological history demonstrates he had greater difficulty after the disintegration of his nuclear family unit.

Debra Fell was an alcoholic who neglected adequate care for her son Donald Fell at a time when his conduct disorder and own emerging alcoholism raised particularly special needs that a perfect parent would have enormous difficulty controlling and remedying. After all, hospital care did little to reverse what staff experienced as "criminal" attitudes visible in his relatedness to others. Debra Fell did, nevertheless, maintain a loving openness and interest in him, at times more visible than others.

Donald Fell emerged in his teens as a stimulation-seeking, drug-seeking hedonist who did not take to limit setting. While his unpleasant family experiences contributed to his alienation, there were many in his life who offered him love and nurturance. He gleaned positive traits such as charm and sophistication about a range of topics, and retained his callus alienation.

By early teens, Mr. Fell was insisting on making the rules of his life, and surrounded himself with others who would feed his hedonist life choices. As he said, "we were living like rock stars before we were rock stars." Moral development has not occupied Donald Fell's consideration, especially as he has demonstrated fascination with destruction. All of the constructive examples, programs, and models brought to him could not divert him from his taste for violent adventure. And, valuing only his concrete needs, Donald Fell did not seek to being integrated into society.

Mr. Fell observed of himself that he was "never a sad fellow, I never dwelled on things and got down. Given how meeting his immediate gratification was so important to him, the notion of life options, for Donald Fell, was strictly a matter of living in the moment. The nature of his choices related closely to his getting his perceived needs met as immediately as possible.

**Psychopathy** - Psychopathy is a construct that differs in criteria from antisocial personality disorder, although some of the criteria of psychopathy – specifically pathological lying, impulsivity, lack of remorse, poor behavioral controls, lack of realistic long-term goals, impulsivity, irresponsibility, lack of remorse, criminal versatility, juvenile delinquency, and early behavior problems [20] – are found in antisocial personalities, and although antisocial personality has, in the past, been sometimes referred to as psychopathy.[21]

---

[20] Hare, RD. (2003). Hare Psychopathy Checklist-Revised (PCL-R) technical manual. Multi-health Systems: Toronto, p. 35-46
[21] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 702

FELL-00000647



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 27

The PCL-R is a twenty item inventory is a twenty-item scale for the assessment of psychopathy in clinical and forensic settings.[22] The standard administration of the PCL-R involves the collection of history from interview in combination with collateral history. In certain instances, if interview is impossible, research has demonstrated that a valid PCL-R can be administered if the collateral information is of sufficiently high quality.[23] For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Mr. Fell.

In addition to those features noted in antisocial personality disorder, Mr. Fell met criteria for the following qualities:

Grandiose – Most vividly, Donald Fell's grandiosity manifested in his promises to go on a spree killing, that he would not be taken alive. In his grievances from jail, Mr. Fell dictates to corrections staff about laws and procedures, despite being unfamiliar with same.

Two of his relatives, Jesse Williams and Terri Fell, used the characterization "cocky" to depict the defendant's personality – as did observations from two hospitalizations. The latter notation, chronicled June 25, 1993 (just before his discharge after many days in the care of professionals), observed Donald Fell to be "cocky and has a wise guy attitude." Patrick Tosh, a teacher in the Head Start program acquainted with Mr. Fell in 1995-96, noted him to challenge even people who were bigger and stronger than him.

Even after intervention from St. Michael, Catholic Services, and Head Start agencies, James Murphy of the Coughlin High School observed Mr. Fell to be "a gangster wannabe" with a "cocky manner that intimidated other students." Joseph Humanik, a later employer, described Mr. Fell's attempts to intimidate him in order to immediately receive his paycheck. "He was cocky and mouthy," recalls the contractor. "If he didn't want to do something, he wouldn't do it.

Williams, as did Mr. Fell's carnival employer John Ketchum, remember Fell for defying a simple dress code for the carnival. Dan Ketchum, Mr. Ketchum's son and a manager with their concession business, recalls Mr. Fell bragging about torturing a cat. Shane Lee likewise recalled Mr. Fell bragging about the different things he would do to cats and other animals, with great pride. Lynn Roberts, the defendant's ex-girlfriend, spoke of how they considered stealing her mother's truck and traveling out of state; she recalls Donald Fell suggesting how they should change license plates when they move from

[22] Hare, RD. (2003). Hare Psychopathy Checklist-Revised (PCL-R) technical manual. Multi-health Systems: Toronto, p. 1
[23] Ibid, p.19

FELL-00000648

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 28

state to state, bragging about how smart he was at beating the system, and would say, "they'll never catch me because I'm too smart."

**Stimulation seeking** – Even from his early teens, when he reportedly chased police officers with a hot poker, Donald Fell has displayed a propensity for risk-taking behavior. Risk taking behavior reflected in Mr. Fell's criminal exploits as well – from his throwing pebbles at patrons of a gay bar, to his throwing rocks from an overpass though the windshield of a car below.

His April 2005 confrontation with six corrections officers in NWCF echoed history from his friends of a willingness to challenge even formidable opponents to fight him. The defendant's drug use has been experimental enough that he once took a number of pills without even knowing what they were – and suffered the consequences of prolonged sleep afterward.

Mr. Fell's work history reflected only short-term employment before voluntarily leaving; in the case of Rutland Plywood, Medico Industries, and Humanik Construction, he gave no warning. The latter employer recalled Mr. Fell openly refusing to do tasks he did not wish to do.

A similar disinterest reflects in Mr. Fell's school records, where he did not demonstrate sustained interest, and reportedly dropped out as soon as he legally could, the occasion of his 17th birthday.

**Glibness/Superficial Charm** –Admiring his slick manner, his friend Matthew Cunningham notes, "He could sell a TV to a blind man if he wanted to."

Bobby Lee wrote of admiring this quality as well. In his videotaped interview with Dr. Wetzel, Mr. Fell relates with an easy smoothness, voluble and verbally facile. His expression is self-serving, but he does not mind the improbability of his comments. For example, he endeavors to inform the examiner that he "gently" pulled Terri King into the car when she tried to escape, and that he "prodded her" along as he led her to her death, crediting himself for not having dragged her.

Mr. Fell is always ready with a quick comeback He was asked what the saddest three things that ever happened to him were. When the examiner then noted that Mr. Fell did not mention Bobby Lee or his mother's passing, he replied, "well, if you made the list longer…"At the same time, Mr. Fell notes that he knows nothing about the funeral arrangements or services after his mother's death.

**Manipulative** – Both Donald Fell and Bobby Lee acknowledge that the killing spree began with Donald Fell killing Charlie Conway. Bobby Lee later wrote that following

FELL-00000649



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 29

this killing, Fell turned to him and said, of his mother Debra, "kill her come on you have to I killed him." Bobby Lee had no reported conflict with Debra Fell – so for someone who had told his friends he wanted to kill his mother, this eventuality evokes Dr. Mills' interpretations that Mr. Fell, "may use other people for his own gratification with little concern for their needs."

As Robert Lee Jr. noted about Fell, "there is something he has that can control people." Likening Donald Fell to a co-worker in Florida, he added, "There was something about him that he can play with the mind of others very confident about his words he would have a baby reaching into his diaper for a twenty."

Lee's observations paralleled the impressions of mental health professionals from hospital referrals in his early teens, who noted how Donald Fell would attempt to get his needs met from throwing tantrums.

Mr. Fell "played me like a fiddle," relates Robert Lee Sr., recalling Donnie Fell's politeness when he needed a place to stay. Mr. Lee asserts he never experienced anything unusual about Donald Fell until the day he saw him holding a knife to Shannon Irish's throat – and then came to experience a more hostile and menacing side of Mr. Fell when Mr. Lee Sr. came to her aid.

According to the testimony of his sister Terri King, Don Fell would steal money daily from the carnival concessions business run by his cousin Jesse – who had hired him to a job that Mr. Fell needed.

Discussing his use of aliases, Mr. Fell revealed he used the name Ecix Vellum, purposely choosing it since it was so peculiar that police would never doubt it was real.

For a time, added Mr. Fell, he went by the name Joseph at the carnival, thinking that if he impregnated someone while he was working, to be later confronted by a relative looking for the father, he could reply that he was Donald Fell, and that if they were looking for Joseph, they had the wrong man.

Now in custody, according to corrections official Jason Rushlow, Mr. Fell – who tells the mental health examiner that he is now "a Christian" -- has assembled a pornography collection that he lends to others in exchange for canteen items. He signed himself up to observe Ramadan, in order to avail himself of the food offerings, although Mr. Fell acknowledges that he does not practice any other rituals of Islam.

**Shallow Affect** – Donald Fell's indifference toward his attachments manifests vividly in how abruptly they dissolve. He participated in his mother's death one day after speaking of buying her a coffee table for Christmas. Only hours after her killing, he was back to

FELL-00000650

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 30

smoking pot and playing cards. The same indifference presents in the recordings of his confessions in the instant cases.

Describing himself as "not a worrier," Mr. Fell's social imperturbability is frequently described in psychopaths. Ron Musto, a teacher at his intermediate school, described Mr. Fell as a "cold" personality.

A review of history reveals Mr. Fell to have had many personal encounters, through social gatherings at places like The Hangar in Wilkes-Barre, musical heavy metal concerts shared, and jobs such as carnival work in 2000 through which he met many girls. Very few of these relationships, however, achieved any personal intensity. "He really did love Terri (his sister), and that was it," commented Lynn Roberts, who has been characterized as the defendant's closest girlfriend.

In his videotaped interview, Mr. Fell discussed emotionally significant topics with very little depth of expression. After describing the specifics of the crime, he soon afterward was able to joke in lighthearted conversation.

**Callous/ Lack of empathy** – Mr. Fell watched as his mother was killed, even as she implored to him, "I love you Binker." According to Mr. Lee, who admitted to stabbing Mrs. Fell, Mr. Fell joined him in kicking his mother when she was dead, to ensure that she was deceased. These examples of callous behavior manifested on other occasions even earlier in Donald Fell's life.

According to Jesse Williams, Donald Fell persuaded him to join him in breaking into his own grandmother's attic, where they stole an antique violin of great value to Jackie Sharp, his aunt. Jackie later learned, she reported in our interview, that he pawned it. On another occasion, he shot a prized dog who had been living in the Sharp household; then, he laughed about it in when volunteering that he had done so to his employer, as contractor John Humanik drove him to work.

Mr. Fell told of how, shortly before he left Pennsylvania, he had been caught, virtually red-handed, stealing a car. The victim came with police to his home – only to identify Anthony Tonte – whom Mr. Fell says was not involved - as the guilty party. Mr. Fell relates that he spoke to the victim, who was waiting while police processed the situation, in a conventional, easy discussion; all the while, he was accepting of the notion that he was allowing Mr. Tonte to be fingered for a crime that Mr. Fell had actually attempted to commit.

During his time in Debra Fell's Vermont household, Mr. Fell demonstrated numerous examples of what Robert Lee Sr., Lynn Roberts, experienced as "he didn't care about nobody, or nothing." When his mother was on the phone, according to her friend Jeff

FELL-00000651

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 31

van Buren, he would play his music louder. Mrs. Fell slept on the couch while Donnie took her bedroom. When he visited Wilkes-Barre friend Chris Kolojeski's house before traveling to Vermont, he was so insistent on listening to his own music that the two came to blows. Cindy Oberle, an acquaintance of Ms. Fell's recalls him disrespectfully swearing at his mother and calling her names in front of Ms. Oberle as early as the very first time Ms. Oberle had met him. In a November confrontation, he spat at his mother.

**Parasitic Lifestyle** – Debra Fell cooked, cleaned, and worked two jobs to pay to support Donald Fell – and his friend. Yet writings from her home demonstrated him to be a person of initiative, studying German, using the computer, writing and learning his music, and with artistic and writing talents. It took Debra Fell engaging friends of hers and a former employer to find work for Donald Fell before he set out to bring some financial support into the home.

In his previous family stops – with Stella Banas and Donna Williams – there is no evidence that he assumed any financial contribution to the home. According to Liz Jones, this accounted for his being asked to move.

**Promiscuous Sexual Behavior** – Mr. Fell and notes a history of many sex partners, and from a relatively early age. He provided a history of "hundreds" of sexual contacts, with particular frequency when he was working for Jesse Williams at the carnivals. Mr. Fell told one interviewer that he was having sex regularly by age 11.

His ex-girlfriend, Lynn Roberts, also confirmed Donald Fell's significantly active sex life, recalling that he wanted to have sex 3-4 times a day. She asserts that he would force her to have sex even when she was not interested, by manipulating her fears about his infidelity.

**Failure to accept responsibility for his actions** – Be it in the Head Start program of his late teens, or hospital records, or later in Vermont with Debra Fell, Donald Fell showed no accountability for infractions large and small. He spurned detention for breaking rules to the point that he was suspended. In his opinion, however, he was "abandoned by the school system."

Even in the instant case, Mr. Fell has only accepted responsibility to the extent that his role can be demonstrated by evidence or his own previous admissions. His assertions portray a person who would deflect the responsibility for the three murders onto Bobby Lee whenever he can manage that impression. Recollection of events, Donald Fell now suggests that Bobby Lee slammed a rock down on Terri King's face as he "looked away," as if he could not bear to watch. When questioned about how he had DNA on his boot, he replied, "We must have stepped in some weird dirt."

FELL-00000652

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 32

Such a sense of responsibility is embodied in his statement to Dr. Rabun, "I am absolutely sorry about the things that allegedly happened."

Donald Fell scores a 38 on the PCL-R, with one item omitted as not relevant to him – many short term marital relationships. In addition to the above qualities, he meets the definition criteria for **Juvenile Delinquency**, and **Revocation of Conditional Release**. Mr. Fell ranks in the 100th percentile for both Factor One and Factor Two, and in his total prorated score of psychopathy.

As a psychopath, Mr. Fell's life trajectory, nature of choices, moral development, values, and perception of life options are all substantially affected, and in a far more direct manner than the aforementioned aspects of his development. While psychopathy may be caused by a variety of developmental factors, that question has not yet been resolved.[24] There is no way of knowing to what degree Mr. Fell's life circumstance contributed to his development of psychopathy – only that psychopathy has a direct devastating impact on the lives of those around him – such as his mother, Bobby Lee, Jacky Sharp, Lynn Roberts, Bethany Brashears, Charlie Conway, Terri King, Chris Eile, and others known only to Mr. Fell's aliases.

Beyond psychopathy, Mr. Fell's moral development and life choices also reflect his having been told – and communicated his belief – that he could kill someone and get away with it. While his Aunt Jacky reminded him that his previous psychiatric treatment would make that possible, he later bragged to people like Lynn Roberts that he had the destiny of a serial killer and the intellect that he would not be caught. Before then, his life experience of kidnapping, thefts, intimidation, assaults with weapons and other offenses passed without accountability to him. Even when he was arrested, as he was for a Woodstock assault in 2000, he gave an alias, a convincing story blaming the victim, and was released to brag once more of his achievement.

   3) *What is the relevance of his history of alcohol and illicit drug use to the murders of Debra Fell, Charles Conway, and Terri King?*

Alcohol

Clearly, Donald Fell ingested a considerable quantity of alcohol the night of November 26-27. That was not unusual for him, noted Chris Kolojeski, the friend Mr. Fell visited after the murders. And friends knew him to be able to drink a large quantity of alcohol without showing its effects. "I've seen him put a case of beer away with no problem, put the case down on the table and walk out like he was stone cold sober," noted Mr. Cunningham. "We would drink anybody under the table and be able to laugh about it and drink more," wrote Bobby Lee.

---

[24] Ibid, p. 7

FELL-00000653



Re: Donald Fell
*Michael Weiner, M.D.*
July 5. 2005

Page 33

"He didn't need to drink to get himself up to do a crazy stunt. He was up for anything," remembers Matthew Cunningham. "He was the same when he was sober," noted Cunningham, who added that Mr. Fell spoke about his homicidal fantasies when he was sober as well. Records documented Mr. Fell's menacing and fighting even when he had nothing to drink.

Mr. Kolojeski commented that when Mr. Fell drank, he would "feel he had to prove something," that "you don't mess with him." He recalled a 2000 confrontation over music playing in his apartment that Mr. Fell escalated into something physical. The killing on November 27, however, began with Mr. Fell attacking Charlie Conway – whose post-mortem blood alcohol concentration was .392 % and a urine alcohol concentration was .439% – and who was so intoxicated that he endured the entire knife assault on him without even the level of physical capacity to leave his chair. Indeed, Bobby Lee noted in his statement that he and Donald Lee were preventing him from leaving the scene, and were plying him with alcohol to keep him inebriated before he was killed.

Mr. Cunningham recounted that when Mr. Fell was truly affected by alcohol, he would have difficulty walking without staggering. Subsequent to the instant offense, Donald Fell and Bobby Lee moved around the neighborhood, ambushed Terri King, and then drove away. to kill Ms. King a few hours later. There is no history or indication of Donald Fell being ataxic or uncoordinated. The two seized upon Terri King, and did not even fall when she struggled briefly. The Neon did not attract attention for erratic driving; and when they killed Terri King a few hours later, it was Terri King who fell down in the wooded area in which they were chasing her down – not Mr. Fell.

The timing of the King murder is additionally significant because neither Fell nor Lee suggests they were drinking after they took control of Terri King and her automobile. By the time they killed her, therefore, the alcohol they ingested earlier in the evening would have been considerably metabolized. If Donald Fell had a particularly significant amount to drink, they would have been confronted with the sedating effects of alcohol metabolism by then.[25] But Donald Fell neither rested after the murders of Charlie Conway and his mother, nor after carjacking Terri King, and not even after they killed her.

Mr. Cunningham was one of a considerable number of friends who would drink with Donald Fell and Bobby Lee at a local abandoned building they dubbed The Hangar, and other places they hung out. A number of the group suffered tragic fate; two reportedly died of overdose, one was the victim of hit-and-run, and others have been jailed on

---

[25] Mark T. Fillmore & Jessica Weafer (2004). Alcohol impairment of behavior in men and women, *Addiction*. 99, 1237–1246.

FELL-00000654

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 34

drug related charges. None else, according to Liz Jones, have been incarcerated for violent crime, however.

Although Donald Fell had a longstanding history of heavy alcohol consumption since his early teens, there is no evidence of meaningful effects on his neuropsychological functioning, such that he might have been particularly impaired by any effects of brain damage from that alcohol use.

### Cocaine

Any ingestion of cocaine by Donald Fell, in my professional opinion, had no relevant impact on his decisions and participation in the killing of Charles Conway, Debra Fell, and Terri King.

There is no evidence or testimony that Mr. Fell and Mr. Lee ingested any cocaine around the time of the crime. No cocaine paraphernalia was found at the scene, nor in the carjacked Neon when later recovered. The Neon was not cleansed, either; police found marijuana when they unexpectedly stopped Mr. Fell and Mr. Lee.

According to Mr. Fell, the killing took place in the hour between 2 and 3 AM. Several hours earlier, Cindy Oberle saw Donald Fell, Bobby Lee, Charles Conway, and Debra Fell playing cards good-naturedly.

If, however, Mr. Lee's statement is accurate about his and Donald Fell's having ingested crack cocaine before Charlie Conway and Debra Fell arrived at her home, any crack would have been already metabolized in the hours before the killing took place.[26] If cocaine was influencing Mr. Fell's behavior that night, it would have done so after he ingested it, he would have been more hostile at the table earlier that evening when Cindy Oberle came calling.

The time course does not support cocaine being in a position, metabolically, to influence Donald Fell's actions when the killing began. Furthermore, Mr. Fell has asserted that cocaine calms him down, behaviors inconsistent with the events of the murders.

### Other Drugs

Notwithstanding the variety of drugs Donald Fell states that he has ingested, there is no evidence or history of his using amphetamines, LSD, heroin, or marijuana in the period

---

[26] Encyclopedia of Forensic Sciences, Vol. 3 (2000), Academic Press, p. 1241

FELL-00000655



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 35

preceding the instant offense. He has no history of withdrawal syndromes when he has not had access to these drugs.

Furthermore, there is no history that when intoxicated with LSD (or its analogs) or marijuana, he is violent. Mr. Fell has described acid as calming and enjoyable, not an agent that moves him to irritability or to homicidal fantasy. No account of this crime suggests that Mr. Fell was hallucinating when he participated in any of the three murders.

On other occasions, Mr. Fell became involved in fights, or became belligerent, and did not kill, even when having ingested a substantial amount of alcohol. A physical confrontation between Charlie Conway and Donald Fell just days earlier, on Thanksgiving, did not culminate in Fell attempting homicide.

That Donald Fell was homicidal on November 27, 2000, therefore, reflects that other factors fueled his homicidal decisions and actions. My opinion is further supported in that no alcohol or drug association can be drawn to the Terri King killing. Yet Mr. Fell killed her with his hands and feet, and as she prayed, certainly the most intimate of his attacks.

> 4) *Do the murders of Debra Fell, Charles Conway, and Terri King reflect the disorganization of a major mental illness or condition?*

It is my professional opinion that Donald Fell's behavior around the time of his participation in the murders of Charlie Conway, Debra Fell, and Terri King primarily reflected organization, and not signs of a mental illness or intoxication.

Shortly before launching the lethal assaults in the [REDACTED - FELL] apartment, Mr. Fell reportedly pulled the telephone out of wall. This prevented police or family from being called for help; Debra Fell had already called Jeanette Banas that night to express her fear that Donald Fell was going to kill her.

Charlie Conway died of a number of a number of stab wounds. The wounds were primarily directed at vital organs and the neck. As such they demonstrate an unwavering homicidal agenda.

Mr. Fell reportedly supplied Mr. Lee with the knife. Then, according to Mr. Lee, implored Mr. Lee to kill her, because Mr. Fell had killed Mr. Conway. Whatever their exchange, Bobby Lee then killed Debra Fell, while Mr. Fell remained in the area and watched. According to Mr. Lee, Mr. Fell directed him as to how he could more effectively end her life, specifically where to cut her. These actions and communications reflect Donald Fell's focus on the activity at hand.

FELL-00000656

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 36

After Mr. Lee stabbed and attacked Debra Fell, Donald Fell joined Bobby Lee in ensuring that she was dead, not merely wounded. This included, according to Mr. Lee, the two sitting together to watch that she did not move. Attention to this detail recognized that were she to have survived, she would have been able to identify them to a later investigator.

Mr. Fell and Mr. Lee wiped the murder weapon knives and replaced them in the kitchen. Eliminating traces of evidence shows their awareness of a need to make it harder for police to later prove their responsibility for the double-homicide.

According to Mr. Lee, he and Mr. Fell discussed whether to hide the bodies and clean the scene, and decided that it would be too cumbersome. With that, the two reportedly elected to steal a car and leave the area.

Subsequent to the killings, Donald Fell had the presence of mind to shower. The shower was quick, according to Mr. Lee, reflecting the sensible urgency of washing off blood combined with the priority of exiting the scene.

The two packed clothes, demonstrating their knowing they would be away for a while.

They also packed important personal effects, from Fell's Randy Rhodes tapestry to a camera and ceramics. This decision-making demonstrates how the killers were not panicked in their preparations to leave, and specifically considered items of personal value.

They also collected Donald Fell's gun to take with them. Arming themselves when going out to steal a car notes their awareness that a car might have to be taken by force, and that Mr. Fell and Mr. Lee might feel the need to defend themselves as fugitives.

They decided to leave their bags until they could secure a car, so that they would not have to carry around bags while looking for transportation. This demonstrates impressive foresight for recognizing it would be harder for them to find a car to steal quickly were they to be bogged down with carrying baggage.

According to Bobby Lee, the two first took up by the side of the road, with Donald Fell attempting to flag a passing motorist while Bobby Lee waited in the shadows, with the gun. This modus operandi exhibits the sensibility that a motorist would be far less likely to stop for two men (let alone one of them armed); and, that Mr. Fell, who was considerably more socially agile, was the better to engage an unsuspecting motorist. Mr. Fell disputes that this took place.

FELL-00000657

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 37

The two did seek to buy ammunition from Walmart, but the store was closed. This choice demonstrates that they knew the weapon was unloaded, and that they were prepared to use the weapon in order to secure whatever else they needed, car, safe passage, or otherwise.

In searching for a car, Mr. Fell and Mr. Lee were careful in their movements. This course included walking behind stores, on the train tracks, and behind trains. They changed course when they felt someone was watching them. A presence of mind to avoid the attention of passersby is organized behavior.

The two killers also exercised selectivity in deciding on which car to steal, and skipped options before Donald Fell identified Terri King as the target. There were no failed attempts. Mr. Fell's selection of an ultimately successful option reflects the organization of his thinking at that time.

When he spotted Terri King and immediately determined that she would be attacked, Donald Fell cautioned that he and Bobby do it only at the right time – after she turned off her car and could no longer escape. His identifying her as the target reflect quickness of his thinking, for she could have exited the car and made her way into the Price Chopper store soon enough. Furthermore, his sensitivity to timing and patience to wait until Terri King exited her car demonstrate organization of thinking.

Despite Terri King's panic and the tense and urgent demand of forcing her to calm down, Mr. Fell remembered to return to ^REDACTED - FELL ., and did so. He thus was not so panicked by the cargo of a kidnapped woman in a carjacked automobile to return to the scene of two murders.

The return to Robbins St. was not a sloppy undertaking, however. According to Mr. Lee, Donald Fell cautioned him to turn the lights off so that were the car door to be opened, the interior – with a hostage at gunpoint – would not be illuminated for neighbors to see. This reflects clever thinking in an awareness of the surroundings of potential witnesses.

Mr. Fell exited the car to retrieve the perpetrators' bags from the home, and did so. He accounted for keeping Ms. King secure by leaving Bobby in the car with a gun on her. This too reflects an attention to detail.

The two killers' attention to detail included the family cat; they discussed letting her go, knowing she would be without food for an uncertain period. This contemplation of time reflects their orientation to time and foresight, as well as an additional example of how they were capable of thinking outside of themselves.

FELL-00000658

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 38

Mr. Fell was not affected by returning to the scene and encountering his mother's corpse. According to Mr. Lee, Terri King never did learn that Debra Fell and Charlie Conway had been murdered. Therefore, in all of the time they were driving, Donald Fell did not emotionally unravel in any way as to speak about the killings in the presence of a potential witness. This too reflects the discipline of Mr. Fell's thinking.

At no time in their kidnapping of Ms. King did they note that she had trouble understanding them. Donald Fell and Bobby Lee revealed no difficulty in the organization of their communication with her.

Their communication was so effective that they were able to lie to her to get Terri King to calm down, according to Mr. Lee. Such assurance would have been hard to accomplish if Ms. King perceived them to be out of control, irrational, or impaired.

Mr. Fell reports that he later seized Ms. King's wallet and admonished her that if she jumped out, they would know where she lived and where to find her. This offers another example of how Mr. Fell was able to effectively manipulate her into passivity, and his awareness of the importance of keeping her composed while they attempted to flee the scene. Such higher level problem-solving too reflects the organization of Donald Fell's thinking.

Donald Fell elected to kill Ms. King for concern that she might alert someone to them. The decision to conceal their crime was rational and reflected no delusional or hallucinatory influence. Their choice to kill her paralleled the aforementioned choices and movements that furthered the rational plan of ensuring their escape.

After exiting the car, both men chased Ms. King into the woods. They pursued her on each flank, in order to cut off her potential for escape. This demonstrated an orientation to space and sensible, effective planning.

Ultimately, despite the pursuit taking place in dense woods, she fell – not they. This demonstrated how Mr. Fell had the clear faculties to chase someone in unfamiliar footing without uncoordination or misperception of the environment that would contribute to his fall or injury. This history further underscores my clinical impression that at this time, they were not intoxicated.

When the two men caught up to Ms. King, Mr. Fell reportedly led her to a small area where the ground was depressed – where he then immediately began the fatal assault as she prayed. This choice reflects his recognition that such an area would offer a natural concealment of the body.

FELL-00000659



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 39

After killing Ms. King, and leaving the scene, Mr. Lee recalls that Mr. Fell instructed him to walk slowly, "like we belong here." This demonstrates his awareness of passing motorists, and the need to avoid attracting attention – another example of Mr. Fell's discipline and focus.

Rather than discard her belongings there, Mr. Fell and Mr. Lee drove some distance until they could discard them in a waste bin at a Burger King. Taking care to avoid exposing evidence of the whereabouts of the now missing Terri King reflects discipline and awareness that littering her belongings where a scavenger might find them could lead to her discovery.

While at the Burger King, the two men engaged a drive-through attendant to purchase marijuana. He took them seriously enough to take a break and meet them in a private part of the premises. This demonstrates that they were intact enough as to be deemed approachable by someone who was risking his job by following up on their request.

When they could not agree on a price with him, Mr. Fell and Mr. Lee parted uneventfully from their intended source. Maintaining his sensibilities for what pot would be worth to him – relative to the money they had from looting Terri King's possessions – Mr. Fell moved on. There were no irrational displays of emotion by Donald Fell, and he remained just another passing drive through customer to the Burger King attendant until the FBI showed up to inquire about his now-important customer.

From there, the two men continued toward Wilkes Barre – and arrived there without further incident. Plenty of non-psychotic and non-intoxicated travelers get lost on such unfamiliar roads.

Donald Fell and Bobby Lee arrived at Chris Kolojeski's home and stayed over two days; Mr. Fell left no sense with Mr. Kolojeski that he was unusually different from his usual self. His behavior was normal for the Donald Fell he knew, and his communication, cognition were clear, and Mr. Fell expressed no irrational ideas.

When they were later apprehended, Mr. Fell's memory of the events was clear enough to present a detailed account of the killings. He helped guide police to where Terri King was located, no small feat given her having been killed by a highway he had never traveled, at dawn, and in a heavily wooded area.

*  *

While the above reflect organization of thinking and no evidence of psychosis, disorganization, or intoxication, a few aspects to the story remains unusual.

FELL-00000660

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 40

Matricide is a very uncommon crime. Debra Fell was killed while saying to Donald Fell, "I love you Binker (an affectionate name from his infancy)."

Subsequent to his killing Mr. Conway, according to Robert Lee, Donald Fell invited him over to put his hands into the neck muscles that had been cut into.

These items will be engaged in subsequent questions. Mr. Fell has a history of attempting to use intimidation and aggression to get what he wants from others. Furthermore, his history demonstrates his enduring ambition for embarking on a spree killing – including his mother as a prime target -- and fascination with death and gore even when sober.

It is my professional opinion with psychiatric certainty, based upon the history available about Mr. Fell, that neither of these two aspects of the case ultimately represented signs of the disorganization of mental illness or intoxication.

5) *How is Donald Fell distinguished in his cognitive abilities or shortcomings, specifically as it relates to his actions from the time of the murders until his capture?*

It is my professional opinion, with a reasonable degree of psychiatric certainty, that Donald Fell demonstrated no cognitive impairment, and in some respects, utilized superior cognitive capabilities for criminal success in the instant offenses.

Neuropsychological testing performed by a defense retained neuropsychologist demonstrated no soft neurological signs consistent with minimal brain dysfunction, and no signs of long term sequela of alcohol or drug induced brain damage, or head trauma. There were no signs of neurodevelopmental abnormalities – findings that could be attributed to his parents' genes.

Instead, Mr. Fell possessed very superior information processing speed and superior mental processing speed. He showed well-developed cognitive set shifting and superior attention and concentration (working memory).

It is therefore not surprising to consider how thoughtful he was in reacting and spotting events as they unfolded, in order to facilitate his and Bobby Lee's escape from the crimes scenes.

Mr. Fell's experience, as well as his cognitive skills, enhance his capacity for success in criminality. He has not parlayed his cognitive abilities into life successes because he

FELL-00000661



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 41

prioritizes hedonism and more immediate gratification. In the two men's jaunt across America, however, Mr. Fell's sensibilities were mobilized in order to accomplish the priority – staying free.

So mindful was Mr. Fell to not drawing attention that when he and Mr. Lee stopped in Pennsylvania, they parked a car with out of state plates covered. They engaged a parking lot attendant to avoid citation for a moving violation.

Mr. Fell, following through on a modus operandi he once reportedly boasted to Lynn Roberts about, replaced Terri King's Vermont license plates with those he stole from another vehicle – then discarded Ms. King's plates so that they would not be found.

So attentive were they to not attracting police attention that Mr. Fell and Mr. Lee avoided sitting in the middle of the seat, in order to avoid covering the rear view mirror.

When the two ran short of money, it was Donald Fell's preference not to rob; rather, he proposed, and they undertook, cashing in receipts that they found in the parking lot of Walmart for items they "returned." Robbery would have been a far more high visibility crime, and would have made it easier to track them.

The two made it all the way to Clarksville, AR before Bobby Lee's driving attracted the attention of local police.

### 6)  How spontaneous was the homicidal violence displayed by Donald Fell?

It is my professional opinion that the Conway-Fell murders were spontaneous events, but that Mr. Fell contemplated them beforehand.

There is no available history that Bobby Lee and Donald Fell plotted to kill Charlie Conway and Debra Fell that particular night.

According to Jeanette Banas, Debra Fell telephoned her earlier that evening, expressing her fear of assault by Mr. Fell, and suggested she would go to the laundry to watch the football game on television. Ms. Fell did not mention Mr. Conway to her sister. Sarah Prescott, who lived with Charlie Conway, indicated that Mr. Conway escorted Debra Fell home that night because Debra feared being beaten by Donald.

Cindy Oberle saw the four of them amiably playing cards, earlier that same evening at approximately 9 PM.

Ms. Oberle also noted that sometime earlier, the very first time she met Mr. Fell, he threatened his mother in her presence. The Fell family in Pennsylvania knew of the

FELL-00000662

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 42

threats; Debra Fell telephoned Stella and Jeanette Banas, as well as Terri, and advised them of her fears of his physically beating her.

Back in Vermont, Debra Fell would tell patrons and bartenders at the Stoplite Bar that she was afraid to go home without an escort, for fear that her son would beat her. Carole Fraser, a Stoplite bartender, recalls Donald Fell calling her at the bar repeatedly, as often as 2-3 times an hour, demanding that she come home, with such comments as "Are you going to stay in this bar all fucking night you fucking bitch?"

Donald and Debra Fell had a physical confrontation at Stoplite in mid-November 2000, in which he came to the bar, grabbed his mother by the hair and dragged her outside. Then, he spat at people who attempted to intervene, according to Ms. Fraser. Police were called that night. However, Ms. Fell had little confidence that police would protect her in the future. She expressed hesitation to evict Donald Fell. She told some, like Cindy Oberle, he had no place to go. To others like Mr. van Buren, Ms. Fell indicated that she feared he would violently retaliate if she put him out.

Mr. Fell had outstanding warrants in Pennsylvania, as did Mr. Lee – who hadn't even told his father Robert Lee Sr. that he was in Vermont. (rather than Florida).

Debra Fell hosted Charlie Conway and his companion for dinner Thanksgiving week, and they joined Donald Fell and Bobby Lee. That night, the mood turned foul; late in the evening, Mr. Fell reportedly confronted his mother by attempting to slap her, and Mr. Conway placed himself in the way, grabbed Mr. Fell's arm and warned Mr. Fell not to raise his hand to his mother. Mr. Conway and Ms. Prescott left that evening without further incident between Mr. Conway and Mr. Fell.

Jeff van Buren, an acquaintance, noted about Mr. Conway that he was obnoxious when drunk. His blood alcohol levels confirm the history that he was drinking heavily on the night he was murdered.

When later interviewed about the killings, Mr. Lee volunteered that Mr. Conway threatened to call the police that night. Mr. Lee added that Mr. Fell and he would not allow him to leave, and kept providing him with alcohol to inebriate him.

Debra Fell saw something coming. According to Jeanette Banas, Ms. Fell telephoned her exclaiming that Donald was going to kill her. When Jeanette asked to speak to Donald, she relates, the telephone went dead. She states that when she called back, the line was not even connected to the answering machine, suggesting that the phone had been disconnected.

FELL-00000663



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 43

Matthew Cunningham, a longtime friend of Mr. Fell's describes him thusly: "As soon as you made him mad, you were going to deal with him whether he won or lost. As soon as the opportunity arose. He wouldn't let you back down. If you said, "Don't worry about it," he wouldn't let it go, he'd say, "No, I'm going to worry about it, and so are you."

Others described his willingness to fight as intimidating. Those willing and able to stand up to Donald Fell confronted a small man, notwithstanding his barking and willingness to bite. John Humanik was threatened by Mr. Fell, who promised his boss that he would appear at Mr. Humanik's home expecting his due paycheck. The contractor, fearing for his family, made his way home – only to find that his wife met Fell's aggressiveness by going right back at him – and Fell backed off, threatening even as he retreated.

Robert Lee Sr. recalls a similar experience with Donald Fell: he told of "kicking his ass" when Mr. Lee intervened after Fell held a knife to a female peer's throat, and Fell "mouthed off to me." According to Mr. Lee, following the beating, "He told me that if I hadn't been on disability with a bad back, he'd have come back and killed me."

Charlie Conway ended an evening at the Fells by confronting Donald Fell. Donald Fell, whatever he had to drink that night, backed down. Only days later, Mr. Conway specifically went to the Fell home that night because of the degree of fear Debra Fell was experiencing. While the evening began gently enough, he drank heavily, and was known to others as an obnoxious drunk.

By the time the attacking started, Mr. Conway was in no position to be obnoxious or even physically provocative, let alone defend himself. Donald Fell wouldn't fight the Mrs. Humanik who challenged him back, he wouldn't fight a drinking Charlie Conway a few nights before. But with Conway – who may have been threatening to call police on two men with outstanding warrants in Pennsylvania – in repose, inebriating him with an otherwise valued commodity ensured Fell would not be backing down on this night.

As for Mrs. Fell, she feared dying at the hands of Donald since he was as young as 13 years old, and she expressed those fears quite openly to mental health professionals. Years later, even as she eagerly anticipated Donald's arrival that September 2000, she still entertained fears that Mr. Fell would kill her, according to her friend Kevin Bodette, with whom she shared those prescient concerns.

7) *What distinguishes the violence history of Donald Fell and how his behavioral style manifested in these murders?*

Different individuals experienced the menace and temper of Donald Fell differently.

FELL-00000664

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 44

Jeanette Banas and Stella Banas, with whom Mr. Fell lived just before he left for Vermont – and who drove him to Rutland while encouraging him to be nice to his mother – described him as polite and not a management problem at all. His aunt, Donna Williams, characterized him as an "even-tempered boy." So did Nancy Miggatulski, with whom he lived in his late teens.

Clearly that differed from the experience of Bethany Brashears, kidnapped and held hostage by Donald Fell, as he contemplated whether to kill her to keep her from revealing that he had helped his girlfriend Lynn Roberts escape from an institution. Bethany, who eventually escaped, had a more fortunate fate than Terri King. Ms. Roberts explains the distinction thusly: "If he knew he could not express it – if he knew he would get into trouble with the law, he would hold back. Jesse was his boss, and held his pay, so he would not flip out on him in any way."

Still, Donald Fell's temper is well chronicled from his early years. When he first came to the attention of social service agencies and mental health professionals, he had a history of frequent fighting. Stanley Kowalski, who once was a close friend to Debra Fell, recalled her observation of her then 12-13 year old son as having "a bad temper, and an evil look in his eyes." That same impression, from Don Ketchum, a passing acquaintance who worked at the Kimberton Fair, recounts Donald Fell bragging about having destroyed a cat. "I don't remember how he looked so much as I remember the look in his eye," he notes. "It gave me chills."

Shawn Campbell, who lived with Jackie Sharp and assumed a paternal role from Fells' age 15-18, acknowledged Mr. Fell's temper, but found him manageable. "His Aunt Jackie would set him off, she would push his buttons. She used to run around saying that he had papers saying he was certifiably crazy, and that if he wanted to kill somebody he could get away with it."

Asked if he felt Donald was 'crazy', Mr. Cunningham replied, "no, he was a good kid. He got into typical teenage stuff." Recalls Mr. Cunningham, "He used to talk about fighting with his aunt, but I never saw him go after her physically. When he got upset with her, he would go upstairs and smash everything so she wouldn't have it."

John Kozerski, a teacher of Mr. Fell's in the Head Start program, recalls Mr. Fell as among the most defiant of authority he has ever encountered. "He was ready to fight right off the bat, he would be always ready to react, observes Mr. Kozerski, whom Donald Fell once threatened to stab. "He would boast to whomever would listen about his threats."

FELL-00000665



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 45

Mr. Fell "liked to fight," recalls his old friend Matthew Cunningham. "We all carried knives, but he would show up with brass knuckles and a baton," he remembers. According to Jesse Williams, Mr. Fell would brag about his fighting prowess, and attempt to intimidate others. The cousin recalled how, in a dispute with Joe Humanik over a paycheck, he threatened to break Mr. Humanik's kneecaps. Mr. Fell got his paycheck.

Notwithstanding the criminal and unwise choice this approach may represent, Mr. Fell reserves the right to be violent, as a personal style and without reservation. The traits of psychopathy – not to be confused with psychosis – endow him with the freedom to dispense with worrying about the sensitivities of others.

The threat of his violence was enough for many to avoid setting him off. The same Thanksgiving night of his first confrontation with Charlie Conway, Donald Fell smashed Bobby Lee's head into a mirror, breaking it, according to Sarah Prescott. Mr. Lee later wrote, "He always has to have his own way and I do not live up to his expectations he'll flip."

Patrick Tosh, another staffer from the Head Start program who taught Mr. Fell in 1995-96, called him, "One of the most disturbed kids" he had taught in 30 years, the teacher reflecting that he "knew his temper would get the best of him."

For all the observations of the above, and the others unnamed, Jeanette Banas never experienced his outbursts. Still, she recounts, only weeks before he went to Vermont, Donald Fell availing himself of gory pictures and video on the internet. "Everything was about Satanism and how to kill animals," she reports. "He showed me gory things, dead people, people blown up, bodies blown apart. He went into all these websites about Satan. Heads missing, eyes missing, people blown up." When Donald showed her where he was browsing, she recalls she remarked, "this is sick shit."

Lynn Roberts recalls Donald Fell "Loved death. It would make him happy to see dead things." It would make him happy to see dead things. He liked 'Faces of Death' movies, he would think it was funny, to see people eaten by bears; he told me they showed a cannibal orgy – bunch of people having group sex, started eating each others' flesh, and about a monkey's head being cracked open and brains getting eaten. He thought it was funny."

Apart from the video, she recalled, "He loved the mausoleum on River St. across from General Hospital; it was fascinating to him. She also recalled his favorite website "The Gore Gallery – he showed me it; videos of people jumping off buildings, getting splattered, weird pictures of skin diseases, that kind of stuff."

FELL-00000666

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 46

Jesse Williams also recalls Mr. Fell's enthusiasm for the senses of death. On one occasion, during a leisurely drive, they passed by a dead animal along the road. "(Donald Fell) inhaled it, and said 'I love the smell of death.' It smelled awful, I almost puked." It looked like he meant it – I didn't think he was trying to get a rise out of me. The conversation, recalls Mr. Williams, gave rise to Mr. Fell musing about how he wanted to go on a spree killing one day.

"He told me he was eventually going to go on a killing spree. Probably even as far back as when we were kids," relates Mr. Williams. "Him and Bobby used to joke about a killing spree, and that they would get away with it. They would have half a case of beer in them, would cover their tracks, remembers Terri Fell, Donald's sister.

Recounts Lynn Roberts, "He said he was so angry with his mother, he would kill her first." Mr. Fell brought the idea up about three times, she recalls. He would say, if he was ever going to kill someone, he wouldn't just kill one person because he knew he would eventually get caught. So he would kill people he resented." Evidently Jackie Sharp took his threat seriously: when Mr. Fell was at large, according to Shawn Campbell, Ms. Sharp expressed a fear that he would come back for her.

According to Ms. Roberts, Donald Fell entertained the idea earlier in 2000, when she was institutionalized for behavior and drug problems. "He talked about going to the FDCC, to bring a shotgun up and hold everyone hostage and kill them off one by one and take someone with us." Ultimately, he helped her escape from the facility.

Away from his traditional group, Mr. Fell revealed his fantasies to even his mother's acquaintances in Vermont. Robert Spencer reported that Donald asked him if Mr. Spencer wanted to go on a killing spree with him, to see what it was like to kill someone.

Independent of his temper, independent of alcohol, independent of his heavy metal music passion, independent of his wayward friends, Donald Fell nurtured homicidal aspirations and a relish for the sensations of death with far more passion and determination than he did scholastic or vocational pursuits. And so three deaths became his destiny, capped by the emphatic stomp of his foot that crushed every bone of Terri King's neck.

### 8) Was Mr. Fell sexually abused as a child, and in what manner has he been affected by this history?

Social service records reflect that Donald and Terri Fell were sexually abused at age 5. A babysitter couple was involved. When the two children appeared to be obsessed with nakedness, Debra Fell and the children's father, Don Fell Sr. sought help and

FELL-00000667



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 47

terminated the babysitters immediately. Mrs. Fell stopped working at that point in order to stay at home.

Donald had no findings on physical exam, but reported nightmares, was aggressive, and refused to accept any limits on him. He subsequently reported to a counselor that he was struck with a board, locked in a room, and was forced to engage in anal sex.

Records indicate that from the time of the abuse report, the elder Mr. Fell began to drink heavily, and the parents' marriage suffered. Donald Fell's father was described as withdrawn, and fighting increased between the parents while Donald was neglected. Records indicate that subsequent to the event, his parents were reluctant to discipline Donald, though their interactions with him became more appropriate by social services observations.

In his earliest years, Donald Fell's intrafamilial aggression was directed most visibly at his sister, according to social service records. In the period following her being sexually assaulted by babysitters, Donald was more attention seeking, and his aggression manifested itself in the presence of his parents in that context.

The Fells placed Mr. Fell in the Victim Resource Center. He went through treatment and was eventually discharged, deemed improved. A positive outcome is consistent with a positive recollection of his teacher Ms. Hinchey. She found him, subsequent to the events, "A sweet boy" during the 1985-86 academic year. More personally, Theo Settas, a friend of his until age 9 offered that Donald Fell was never violent while he knew him.

While he was very upset at the time of the abuse report, Donald Fell, Jr. did not recall the event in years afterward – let alone suffer intrusive recollections of it.

Records from his previous hospitalizations note Donald Fell's acknowledging that the event happened. However, he did not raise his sister's abuse as an issue for him, nor did he demonstrate any pronounced emotional response when the reported history was raised, nor an avoidance of same. Mr. Fell has not displayed symptoms of emotional numbing either.

There was no history of Mr. Fell protecting his sister from sexual assault; Terri reports, for example, that she was sexually assaulted at age 9 – again – by two of Donald's friends, in the woods. He did not reportedly defend her at that time, or retaliate against the aggressors.

It is my professional opinion, therefore, that the impact of the sexual abuse – and of Donald Fell witnessing it – is indirect. Donald received care for the event, and was

FELL-00000668

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 48

discharged from treatment as improved. To that end, he has exhibited no signs of post-traumatic stress disorder.

His aggressive behavior, which he began to more clearly exhibit after the abuse, did go unchecked. Still, his ghoulishness and frank homicidality only manifested years later.

It is therefore unclear whether Donald Fell encrusted into a callous, oppositional, and hedonistic early teenager because of the abuse of years earlier, or because no limits were set on his acting out at a time when he was in emotional pain. Since a majority of sexually abused children do not receive any treatment and do not become psychopaths,[27] Mr. Fell's life outcome – both of committing multiple homicides and of meeting criteria for psychopathy - remains exceptional even for a person who has experienced sexual abuse – and especially, for someone who appeared to respond well to clinical treatment.

Given the absence of his PTSD symptoms, relative to Donald Fell's own experiences or those he once witnessed, evidence that the actual sexual abuse has emotionally tormented him is scant. Certainly in reams of later social service notes and documented interviews with him, he has been free about expressing many things, and communicating with mental health professionals – but exhibited no distress over an event that reportedly happened even before his 5th birthday. There is no evidence for Donald Fell sexually molesting or assaulting another, such as may be seen in history's trajectory for many abused.[28]

Yet by history, Donald Fell became highly sexually active and at an early age. Prior to his arrest, he was a keen consumer of internet porn. Donald Fell's sex life was highly enjoyable and not at all distressing to him. This history either reflects the hypersexuality of his psychopathy, a precocity that serves as a more direct link to the sexual abuse, or both.

### 9) Given his parents' qualities, what evidence is there that Mr. Fell's diagnoses, behavior, and circumstances are genetically driven?

With two parents who were alcoholics, the evidence for Mr. Fell's genetic contribution to his alcohol abuse is robust. Genetic factors are responsible for a person's low response to alcohol – and Mr. Fell presents a history of no significant effects despite drinking substantial quantities of alcohol.[29] The genetics support my earlier opinion,

[27]

[28] Romano E, DeLuca RV. (1997). **Exploring the Relationship Between Childhood Sexual Abuse and Adult Sexual Perpetration.** *Journal of Family Violence.* 12(1)
[29] Schuckit, Marc A. (2000). **Genetics of the risk for alcoholism.** American Journal on Addictions. 9:2, 103-113.

FELL-00000669



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 49

based upon additional information, that the crime does not reflect that Mr. Fell was intoxicated.

A genetic contribution to Donald Fell's psychopathy is more elusive. Donald Fell's behavior noticeably changed in the 7th grade, and particularly, as his parents' relationship was falling apart and he began abusing alcohol. By the time he was 11, this small pre-teen had his mother fearing for her life, and was not afraid to fight her boyfriends. By the time he was 15-17, he was distinguishing himself with brazen kidnapping and homicidal aspirations.

Mr. Fell's mother was not a psychopath. The defendant's father was a violent alcoholic who physically fought his mother, and physically struck his sister and to a lesser degree, Donald. There is no family history of homicide. Mr. Fell reports his father did not expose him to or involve him in criminal enterprise.

There is a family history of physical assault, and reactive aggression, sometimes with weapons.

There is, however, no family history of homicidal fantasy, or preoccupation with gore. His sister, exposed to the same elements only with greater physical violence from his father, has no history of violent arrests.

It is therefore my professional opinion, with a reasonable degree of psychiatric certainty, that Mr. Fell's alcoholism has a genetic antecedent. It is also my professional opinion that his reactive violence has roots in what he was exposed to, in his nuclear family environment.

It is, however, my professional opinion that Mr. Fell's homicidal fantasy and necrophilia do not have genetic or familial influences.

Notwithstanding Mr. Fell's genetic and environmental influences, the greatest predictive force on future violence in the community is psychopathy.[30] A family history of reactive violence does increase the likelihood that someone will later react to a given stressor violently.[31] However, Mr. Fell's psychopathy was the greatest predictive quality of his constitution that foretold his violence.

>   *10) What role models have been available to Donald Fell to promote prosocial behavior, self-control, and sobriety?*

---

[30]
[31]

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 50

Mr. Fell has been quoted as suggesting to psychiatrist Dr. John Rabun, "If I had guidance, I wouldn't be in this position."

From his earliest years, Mr. Fell knew his great aunt, Stella Banas, to be loving, prosocial, non-violent, responsible, and drug-free. He lived with her uneventfully for the two weeks preceding his sojourn to Vermont, and Ms. Banas accompanied him to his mothers' house. Ms. Banas admonished him to "be nice to your mother", and he advised her that he would.

Theresa Sharp, Mr. Fell's grandmother, was an available and nurturing presence from birth through his placement in St. Michael's at age 14. She fought to gain custody of him, and thus demonstrated her love for him. Mr. Fell spoke of seeing her every day during a period in which he was reported to be menacing to his mother, and others. Ms. Sharp did not drink, was not violent, cooked for him and showed him consistent good temperament. Notably, Theresa Sharp was eagerly there when Donald fell needed her most – as his mother progressively failed in her maternal responsibilities after Mr. and Mrs. Fell's breakup when Donald was eleven years old.

Donald Fell was described as polite by a number of people – Stella Banas, Donna Williams, Jeanette Banas, Robert Lee Sr., Janet Smith (Lynn Roberts' mother) -- who encountered him in the period preceding the homicides. He relates politely to Dr. Wetzel in the videotaped interview conducted this past month. This comportment reflects that he encountered models from whom he learned how to carry himself civilly.

When Mr. Fell was hospitalized on several occasions between ages 11-13, the record reflected his defiance and hostility to authority. Hospital notes chronicle that he refused household rules. That would mean there were rules to follow, set up by someone attempting to be a role model.

In the hospital, Mr. Fell composed his behavior in order to return home, rather than face commitment to St. Michael's group home. As Mr. Fell was able to compose his behavior sufficiently to convince his mother that he could be managed at home, he had some role model for controlling his belligerence, truancy, and alcohol abuse.

Interviews with teachers demonstrate that Donald Fell registered impressions of both his strengths and weaknesses. He was liked and made positive impressions on his earliest teacher, and his early grade marks reflected how school was constructive to him. From middle school, his defiance of authority and fighting led to repeated suspensions. When he returned to school, however, he did so under programs geared toward truants and behavior management problems. Faculty was particularly sensitive to be open and to promote adaptive choices, from drug and alcohol-free environment, to the mastery of a trade, to conflict resolution through non-violence.

FELL-00000671



Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 51

Mr. Fell challenged his teachers and abandoned school as soon as he could.

Therapeutic institutions have been available to Mr. Fell for years, promoting non-violence, adaptive thinking, and sobriety. In four hospital admissions, in some instances extended, Donald Fell was managed by numerous trained staff, working 24-hours a day, on a mileu that enforced and promoted non-violent conflict resolution and abstinence from drugs and alcohol.

Once committed to St. Michael's group home, Mr. Fell again was provided trained, concerned staff, familiar with issues confronting Mr. Fell from exceptional experience with his peer group. These staffers, as did those employees of the hospitals in which he was housed, were mandated to promote drug and alcohol abstinence, anger management, development of prosocial attitudes, and alternatives to violence. As Mark Innocenzi, a social worker who was employed at St. Michael's, explains, "There is no access to drugs and alcohol, regular blood monitoring, and a very nurturing attitude by the staff. Because of that, and a low turnover of staff, those committed there have the opportunity for well-established relationships with trained staff."

Likewise, through Catholic Youth Services, Mr. Fell was administered to by role models for a drug and alcohol free life, and elimination of behaviors that contributed to his earlier commitment to St. Michaels. In the Head Start program, he encountered numerous teachers who provided similar examples of mature presence, physical restraint, drug and alcohol abstinence, and willingness to work with him even when he was threatening. As such, Mr. Fell not only had role models, he had the uncommon advantage of a number of people who were even trained to be better role models.

Through his exposure to church agencies, Mr. Fell likewise gained exposure to spiritual role models who instilled the values in others that would lead one away from indulgence, violence, and the exploitation of others.

Even his employers were there to provide examples of responsible, drug and alcohol-free behavior. Joe Humanik was a family man who drove Mr. Fell to work; Mark Balestra exposed Mr. Fell to his own family. Jesse Williams was a cousin who abandoned his own irresponsible habits to become a responsible fixture in S&S Concessions. He hired Donald Fell and communicated and interacted with him closely and daily. Mr. Williams vividly embodied a person who matured into a law-abiding, non-violent, young man with direction who avoided dead-end habits.

Even among his family, Donald Fell had numerous relatives who were role models for non-violence, from Donna Williams to Stella Banas to Theresa Sharp.

FELL-00000672

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 52

Jackie Sharp, with whom he lived following his discharge from St. Michael's, was violent and tempestuous, by others' accounts. Ms. Sharp, however, was reportedly very strict about limiting Donald's access to alcohol. Shawn Campbell, who lived with Donald Fell and Ms. Sharp, was not reportedly violent to Donald, and engaged the defendant as a supportive, warm presence. Mr. Campbell did not use drugs nor get drunk in the home.

Mr. Fell lived for an extended period in the late 1990's with Nancy Miggatulski, who was loving, embracing, law-abiding, and non-violent.

Subsequent to actively participating in this triple homicide, Mr. Fell has needed no medicines to ensure his self-control, even earlier in his incarceration. Given that he could immediately respect authority, then obviously adaptive authority models were available to him at an earlier stage whom he could not bully and who taught him to control himself.

Possessed of particular cognitive skills for processing his environment, Donald Fell learned what knowledge to reflect to gain discharge from hospital commitments and a group home placement. This too demonstrates that role models for self-control and drug and alcohol abstinence were available – and accessed – by Mr. Fell.

Donald Fell's parents did not represent adequate role models for abstinence and behavioral self-control. In his interview with Dr. Wetzel, however, the defendant notes how he spent time with other children and away from his home in his earliest years. On his own, he sought out more comforting environments, be they a tree house or the woods. When his parents divorced, and when he was subsequently placed, Mr. Fell benefited from exposure to a variety of role models for drug and alcohol-free lifestyles and non-violence.

Was Donald Fell exposed to fighting? Yes.
Was Donald Fell exposed to violence? Yes.
Was Donald Fell exposed to alternatives to fighting? Yes.
Was Donald Fell exposed education that violence is wrong? Yes.
Was Donald Fell exposed to torture? Self-referred..
Was Donald Fell exposed to murder? He was self-referred to Faces of Death.

Whatever the variety of placements and professional role models available to him, and actively involved with him, Donald Fell continually opted for a drug lifestyle and violent persona. "I did what I want, when I wanted," he observes. Beyond that, Mr. Fell sought guidance from sources of media that appealed to his thirst and curiosity for gore and the capacity to inflict it.

FELL-00000673

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 53

Whether it was watching "Natural Born Killers" ten times – as he says that he did – or surfing gory pictures on the internet in Jeanette Banas' home, or marveling of the handiwork of his torturing animals to Shane Lee and others, Mr. Fell sought his own role models. His behavior is not the byproduct of a lack of role models; rather the example of the perverse role models that Donald Fell sought out for himself.

It is my professional opinion that this quality of Donald Fell, of answering only to himself, has rendered even the most effective of role models irrelevant.

> *11) How has the relationship between Donald Fell and his mother evolved, from when she was raising him to when he was living with her in Vermont, and the how had the circumstances of each changed at the time Ms. Fell was killed?*

Earlier records observed that Donald Fell was closer to his father when the family was intact. There is no documentation of Donald Fell's aggression towards his mother until he was admitted to the hospital at age eleven. At that time, he had been aggressive and fighting out of the home as well, and records portray his being generally uncontrollable and violent, rather than specifically in conflict with his mother.

Whatever the alcoholism of his mother, and her shortcomings as a homemaker and caregiver, Donald sought to return to home, rather than to other caregivers such as his grandmother Theresa. At the height of Debra Fell's instability – a lack of an intimate relationship, consequences from alcohol abuse, increasing abuse of drugs, pronounced neglect of her management of the home, legal problems from owed fines (and possibly, curtailed drivers' license and wage-earning consequences) and fears for her safety from Donald's threats to her – Donald still sought to return to her custodial home.

Donald's motivations may have had more to do with his freedom; for by his own account, he ignored his mother's curfew and attempts to establish rules, and did as he pleased.

Each time he returned from his four hospitalizations between 1991 and 1993, Mr. Fell's defiant unmanageability resumed. No matter how erratic Debra Fell was, however, she did not give any indication of abandoning Donald until she did so without warning in December 1993.

According to Jeanette Banas, Ms. Fell left for Rutland after seeing the name of the town and musing that were she to embark on a fresh start in a new location, that might be an appropriate place, because she felt that she was in a rut.

FELL-00000674

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 54

In January 1994, Ms. Fell returned to her home, and her children returned from Theresa and Jackie to stay with her. It was only after Debra Fell was arrested for assault, after she beat her daughter Terri, that Donald (and Terri) were removed from Debra's home indefinitely. Donald did not voluntarily leave the home; and Theresa Sharp petitioned for, and was granted, custody.

In the years that followed, Debra Fell lived out of state, as she faced contempt of court charges for failing to pay an outstanding court fine. She reportedly attempted on several occasions to contact Terri and Donald, but Jackie spurned her contact. Instead, according to Shawn Campbell, Jackie's previous live-in relationship, Jackie emphatically and repeatedly reminded the children that their mother had abandoned them, and of the mean things she said and did to them when they were all together.

Friends such as Lynn Roberts and Liz Jones recall Donald's expressing his desire to kill his mother from his adolescence. Ms. Jones recalls that the defendant would link his fantasy to his feelings over his mother abandoning him. At the same time, according to Shawn Campbell and Shane Lee, Jackie Sharp, with whom he lived, was more violent and more abusive to him. Indeed, Mr. Fell recalls the day she kicked him out of the house as one of the happiest days of his life. Nevertheless, Mr. Fell far less frequently vocalized homicidal dreams about Jackie.

Even before they resumed contact, Donald Fell entertained a reunion with his mother. By May 2000, Donald Fell was openly speaking of absconding to Vermont and living with his mother, according to Lynn Roberts and Bethany Brasheats – though he had not spoken to her in years.

Debra Fell maintained contact with Stella and Jeanette Banas. While Jackie Sharp continued to actively discourage Donald and Terri Fell from taking their mother's telephone calls, Donald did begin speaking with his mother in late summer 2000. Very soon afterward, he agreed to travel to see her, with no plans to return to the Wilkes Barre vicinity.                    (

To Terri Fell, Mr. Fell had the impression that his mother was no longer drinking. Employers interviewed for this examination indicate that Debra Fell maintained an excellent and responsible work record. Pictures from shortly after his arrival in Vermont show a well-maintained and furnished home at 135 Robbins St. Ms. Fell maintained both male and female peer friendships.

Numerous acquaintances remember Debra Fell's anticipating the arrival of her son, with hope for being able to be a mother to him. Kevin Bodette notes her apprehensiveness as well. The optimism of her preparations, however, is reflected in Price Chopper

FELL-00000675



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page: 55

employee Cynthia Dazzi's account of Ms. Fell shopping for lasagna ingredients as she planned to cook for her son.

However, Ms. Fell was still abusing alcohol, along with drugs. She had been again involved in an intimate relationship with a violent alcoholic -- Alan Reynolds -- who had only recently been incarcerated following his assault of her. Her nest was empty, and a violent alcoholic named Don Fell headed northward with Stella and Jeanette Banas.

This Donald Fell was not the thirteen year-old Debra could commit to the hospital when he got out of hand. He was a man now, and with ample experience of sensing and exploiting when someone was afraid of him; and memories of how he had his way with his mother when living with her years earlier. Stella Banas recalls how she admonished Mr. Fell, when they reached Vermont, to "be nice to your mother."

Within two weeks, according to Terri Fell and Jeanette Banas, Donald called to complain that Ms. Fell was still drinking. So, very much, was he. Ms. Banas recalls that Debra complained how he was not working; and she insisted that he get a job to contribute to paying expenses.

In 2000 Vermont, her friend Ms. Oberle observed that they played Donald's music and his television programs, and that she had relinquished her bedroom to him. On the occasion of her first meeting Donald in her friend Debra's home, he addressed his mother with profanity and threatened her. Their exchanges would arise over such matters as her wanting him to turn his music down. Mr. Fell "He had physical control over her," adds Ms. Oberle.

According to Mr. Fell, his mother now included him in get-togethers with his friends, some of whom would give him drugs for free. The defendant had been concerned enough about cost-effective ways to enjoy a high, he recounts, that he spent time researching locally grown intoxicants in the Rutland Public Library. Despite her own drug use, relates Mr. Fell, his mother would not use drugs in his presence.

In late October, Mr. Fell sent for Bobby Lee to join him in Vermont. This history is particularly notable in that Mr. Lee had a desirable option available to him -- and perhaps both of them -- in Florida, where Bobby was developing as a successful animal handler. So they didn't have to be in Vermont, in order to be far from Pennsylvania. For the early part of Mr. Lee's stay, Ms. Fell now also supported both able-bodied men.

Meanwhile, according to Terri Fell and Jeanette Banas, Ms. Fell telephoned them on more than one occasion and asserted that Donald was beating her. She did not demonstrate a secondary agenda, for she did not demand that he leave or that they take

FELL-00000676

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 56

him back. Rather, she only appealed to them to prevail upon him to stop battering her. According to Terri, Mr. Fell would reply that he was not striking his mother.

Mr. Fell asserted that he never hit his mother at all. Unlike the period of their living together in Pennsylvania, Donald Fell never characterized his mother as abusive. "We argued, but in five minutes we were fine," he explained. "Things were pretty decent," he reflected. Once Bobby arrived in late October, there is no indication that he had undertaken any plans to leave her home, or the area.

On November 2000, Donald Fell assaulted his mother outside the Stoplite Bar. Mr. Fell spat on his mother in the ensuing confrontation. One might consider this to be a manifestation of his rage. Nevertheless, Mr. Fell spat on other bystander as well – whom he had no ongoing conflict with. That demonstrates, in my professional opinion, the visceral resourcefulness of his aggression moreso than the focus of it.

Carole Fraser, a bartender at the StopLite, relates that Donald would telephone, looking for his mother, and demanding money from her. While Ms. Fraser indicates that Debra would not drink to the end of heavy intoxication, she would linger at the StopLite in order to avoid having to return home. Ms. Fell told many acquaintances of her fear to return home, and to beatings from her son.

Battering of a parent, as Mr. Fell did, is far less common than sex abuse, or physical abuse. Yet Donald Fell, by the accounts of is mother and his sister, did beat Debra Fell – and resumed battering her as a stronger and more intimidating presence seven years later.

Whatever her progress, Debra Fell was still a woman vulnerable to the clutches of a battering relationship. Employers who praised her optimism noted, following Donald's arrival in Vermont, a deterioration in her as her anxieties mounted over her own safety at home. History reflects that she was spending more time at the Stoplite – thus challenging her need for sobriety – for fear of coming home and being forced to confront Donald's intimidation and physical aggression.

Friends, learning of Mr. Fell's battering of his mother, suggested that she ask him to leave. To some, she suggested that he had no place to go, that she could not. To others, she expressed that she was afraid of what he would do if she did evict him – and that she feared the Rutland police would not be able to protect her.

On the last night of Debra Fell's life, Cindy Oberle encountered her enjoying a friendly card game with Donald Fell. There was no indication, from any documentation or accounts, that the evening was slated to end as it did.

FELL-00000677

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 57

The scene, of Debra Fell engaged with her adult son, sharing a game with him, showing him attention in the kitchen she cooked for him in, on a day off from the job she found for him, with the friend of his she took in and was supporting, was a substantially different Debra Fell from the woman who left Donald Fell in Pennsylvania seven years earlier.

When Donald Fell menaced his mother in his earlier teens, he was admitted as a minor to the hospital because he could have killed her at any time. Her being away only introduced his menace to a far more responsible – and less patient – Theresa Sharp, who promptly signed the unmanageable Donald Fell into St. Michael's group home.

It is my professional opinion, with a reasonable degree of psychiatric certainty, that Ms. Fell's abandonment of Donald preserved her safety, indeed her life. It was her later decision in Vermont, to not abandon him, that cost Debra Fell her life.

Ms. Fell's last words, "I love you Binker (referring to her affectionate nickname for him)," underscore how her killing was not borne of old antagonism or grudges. It is my professional opinion, however, with psychiatric certainty, that just as Terri King a short time later, she was a witness to a major crime – Donald Fell's killing Mr. Conway -- who could identify her assailant. At that point, the inconvenience of her life outpaced the convenience of her love.

There is no indication that Donald Fell killed Charlie Conway (victim 1) or Terri King (victim 3) because of lingering conflicts over Debra Fell(victim 2)'s leaving him to his grandmother and aunt when he was 14.

While emotions and emotional history earns consideration in patients seeking resolution of family conflicts, Mr. Fell's comportment after the crimes more clearly manifested his cold, detached psychopathy. According to Bobby Lee, Mr. Fell showered, helped him pack, cleaned the scene, and engaged Mr. Lee to see if *he* was all right – not the other way around.

Furthermore, Debbie Fell was found uncovered. Emotional connections to the victim are frequently expressed, when a perpetrator lingers at the crime scene, by the perpetrator covering some part of the victim.[32] That was not the case in Mr. Fell's reaction to Debra Fell's body – again reflecting Mr. Fell's detachment from his mother.

That account of the less affected Mr. Fell is consistent with Mr. Fell's choice -- after taking possession of Ms. King's Dodge Neon and returning to the 135 Robbins St.

---

[32] Douglas JE, Burgess AW, Burgess AG, Ressler RK. (1992). Crime classification manual: A standard system for investigating and classifying violent crimes. Jossey-Bass Publishers: San Francisco. p. 251.

FELL-00000678

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 58

address – to re-enter the death scene himself in order to pick up their packed bags, rather than avoid encountering his dead mother by delegating the duty to Mr. Lee, who remained in the car watching Ms. King.

It is therefore not surprising that in his accounts to Dr. Wetzel, in their videotaped interview, Mr. Fell does not express an emotional attachment to his deceased mother any different than he does the relative stranger Charlie Conway and the complete stranger Terri King. That includes the absence of contempt or rage for old emotional scores to settle. Rather, it is his detached lack of emotion, consistent with his being a psychopath, that demonstrates to the examiner how the emotions one conjures over a mother killed are the emotions of the beholder only – not Donald Fell.

Debra Fell drew abusive men to her; her family history and personal relationships repeatedly followed such a pattern. Any consideration of dynamics, genetics, and history must include Donald Fell as the last batterer of this repeatedly abused woman.

Such sadistic and controlling precedent was not unprecedented for Mr. Fell. According to Shane Lee, Mr. Fell maintained a relationship with a Wilkes Barre peer, Shannon Irish, in which he would humiliate her in a variety of ingenious ways, sometimes with her tacit permission. Shane Lee personally witnessed Mr. Fell handcuff Ms. Irish to a toilet, and leave her there without indication about when he would return. Or on other occasions, recalled Mr. Lee, Mr. Fell would dunk the restrained Ms. Irish face first in the toilet, for example.

Mr. Lee recalls one occasion in which Mr. Fell placed eggs inside Ms. Irish's vagina while she was passed out from intoxication. The point was, per Mr. Fell's intended prank, that she would go to the bathroom upon awakening, pass an egg into the commode, and then be left to contemplate whether she was capable fo laying eggs. Mr. Lee relates that when Ms. Irish told a group of them that he had done this, Mr. Fell laughingly replied, "Well you must be part chicken." /

While the sampling of what Mr. Fell has done is dramatic, and removed from the patina of mitigation that so much attention to his family background supplies, this recreational dehumanization is entirely consistent with what some have witnessed Mr. Fell doing to animals over the years – and consistent with Bobby Lee's account of his handling of Mr. Conway's neck, after stabbing him.

Large percentages of alcoholics, children of alcoholics, and products of abusive homes are neither abusive, homicidal, nor psychopathic, and are very much emotionally connected. Mr. Fell, based upon his history, has less in common with that very large population than he does the unusually rare population of eleven year olds who are lethal enough to represent a homicidal risk.

FELL-00000679



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 59

### 12) Was Donald Fell the product of a deprived childhood and adolescence?

Donna Williams, Mr. Fell's aunt, has remarked, "Donny was not treated well by anyone and did not get loved by anyone"

Mr. Fell was unable to derive the benefit of growing up with parents who were alcohol and drug free. Likewise, his parents contributed to a sense of chaos and hostility in the Fell household – although he was fed, clothed, and medically cared for. When his parents divorced, Donald Fell no longer had the opportunity to complete his development in an intact household of his own parents.

Donald and Terri Fell developed and fostered a true closeness. Lynn Roberts, the defendant's ex-girlfriend, offers that she believes Terri is the only person that he has felt close to. They shared experiences and supported each other.

The Fell family extended to a number of relatives locally and out of state. Donald maintained differing degrees of contact with those family members. Two of those family members, Stella Banas and Theresa Sharp, were supportive, embracing, and constructive, and grandmotherly in nature.

Over the course of his development, Mr. Fell lived close to and experienced the support of Jeanette Banas, Donna Williams, and her children. The oldest of those Williams children, Jesse, was close to Donald Fell.

Mr. Fell also had numerous friends, friendships, and a social circle that accepted him and at times, followed his whims. While Bobby Lee has received the most attention given the circumstances of this case, Mr. Fell's social network included many others.

When Mr. Fell's father left the Fell home when he was ten, Ellery Wilcox moved in soon afterward. Mr. Wilcox, while eventually an all-too-frequent abuser of alcohol, displayed concern for the Fell children and attempted to maintain a paternal presence and to solidify the rules of the home. Donald Fell did not experience him as mean; Mr. Wilcox reached out for continued contact with the Fell children, even providing them with some money, even after Ms. Fell and he broke up.

Ms. Fell was very much involved in Donald Fell's hospital evaluation and care. She participated in therapeutic programs for his benefit from early years through his 1993 hospitalization. He was afforded hospitalization for extended terms and treated in

FELL-00000680

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 60

individual as well as group modalities. Even as she felt threatened by Donald Fell, Debra Fell took him back rather than committing him to a group home.

When Ms. Fell left the home, or when violence and chaos required intervention, Theresa Sharp, who was trained and experienced as a foster parent, was there to take Donald Fell and his sister in. He experienced her in a wholly positive and nurturing way. Theresa Sharp fought for legal custody of him, contributing to the message that he was wanted. Indeed Donald Fell never reached the point of going into foster care, as so many products of dissolved marriages or alcohol-affected homes do.

When Mr. Fell overwhelmed Ms. Sharp's ability to manage him – even with her special training as a foster home – Ms. Sharp admitted him to St. Michael's group home. St. Michael's, according to social worker Mark Innocenzi, a veteran of twenty years and thirty facilities, is "One of the best well rounded, well-run residential placements I have ever worked in. The quality of care the residents received, there is no stone unturned."

It is my professional opinion, with psychiatric certainty, that Mr. Fell did not reap the benefits of sober, peaceful parents. The stormy and progressive disintegration of their marriage also kept Mr. Fell from experiencing the qualities of a more safe and secure household.

The problems of the Fell home were identified early, however, and excellent resources were made fully available to Donald Fell. When less intrusive supports did not prevent him from worsening aggression in his early teens, hospital inpatient care provided concerned, professional attention – with the provision of follow up.

When he continued to place himself on the periphery, breaking curfew, seeking trouble and those who could join him troublemaking – he was placed into St. Michael's, an exceptionally caring and nurturing facility. The St. Michael's program includes an integrated care model – so help was made available to Jackie Sharp as well, as she anticipated his return to her home.

In St. Michael's, and in Catholic Services after it, the programs have well-developed treatment and counseling arms to promote alcohol sobriety. These programs were provided to Mr. Fell as well.

With his having dropped out of school, Mr. Fell's social workers enrolled him in a Head Start education program. Head Start has a faculty and staff comfortable with students who share Mr. Fell's conduct problems. The examinee was also exposed to vocational rehab as well.

FELL-00000681



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 61

When Mr. Fell was evicted from Jacky Sharp's home, for his unwillingness to follow her rules, he found friends and friends parents' willing to house him. Nancy Miggatulski, for example, hosted Mr. Fell for one year. In the context of being interviewed for this case, she described a loving atmosphere free of chemical dependency in which Mr. Fell was supported and welcomed – which ultimately ended when she came to believe he had been involved in crime.

Mr. Fell had the social skills and manual capabilities, and the youthful vigor, to find work offered to him. While some workplaces maintained a positive impression, he could not sustain an interest and commitment to those opportunities. In some instances, he was frankly threatening, such as with S&S Amusements and Humanik Construction.

Even when Donald Fell left for Vermont, Mr. Fell knew he was welcome at Donna Williams' and Stella Banas' homes – both places where he had lived in the past. Even if his ruining his housing arrangements with his defiance of authority or incorrigible delinquency, he did not stay unwanted for long.

The available record supports my professional opinion, with psychiatric certainty, that Donald Fell was recognized for when he needed help, and was given exceptional help. On some occasions he refused or undermined the help through his absence or by defying clearly manageable rules. In the case of teachers, employers, and his mother, he has even attacked help.

Donald Fell is a man for whom there were no cracks he had to fall into, but a man who created cracks faster than others could fill them.

### 13) How did the relationship between Donald Fell and Bobby Lee relate to the eventuality of three people murdered? What evidence reflects on the prime mover, and the dynamic between the two?

From earlier in his adolescence, peers recount Donald Fell as a person who took initiative and sought to involve others in his exploits, be they destroying property, stealing beer from a local eatery, or killing squirrels. "It was always Donny's idea," recalls one of his friends, Matt Cunningham.

Mr. Cunningham recalls their group as "everyone was a tough guy but Bobby. He didn't start trouble. He definitely looked up to Donnie." Donald Fell is recalled by teachers such as John Kozerski as vocal and actively seeking to instigate others to misbehave. Mr. Lee, on the other hand, was described as quiet, and a loner. "Wherever Donnie went, Bobby was sure to go, like Mary and her little lamb," observes Terri Fell.

FELL-00000682

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 62

According to Robert Lee Sr., when Donald Fell would be suspended, he would encourage Robert Lee to join him and hang out. "Bobby would go in, tell a teacher, 'fuck you,' and they'd go hang out together," recalls Mr. Lee.

Further evidence of the dynamic between the two emerges in their comportment after arrest. Mr. Lee wrote long letters to his father, discussing his relationship with Mr. Fell.

Bobby Lee wrote, "he always has to have his own way and I do not live up to his expectations he'll flip, throw a tantrum till he gets his own way and me having to do what he expects me to do. Puts me into jeopardizing my friendship ((half of it) and lose the best friend I have ever had. He thinks he can read me like a book but he can't..."

The letters reveal how difficult it was for Mr. Lee to bear rejection or even disapproval of Mr. Fell.

Mr. Lee's records describe his history of behavior problems relating to jealousy over the attention his siblings got. He wrote of Mr. Fell, "He was a person that thought of me first...once we started something I would really have no choice but to finish it with him because he wanted me around..."

One of those more recent Fell exploits was the reported kidnapping of Bethany Brashears in late spring 2000. Ms. Brashears reports that after Donald Fell began to hold her against her will, Bobby Lee joined him in the apartment where they were holed up with Mr. Fell's girlfriend Lynn Roberts. Mr. Fell would, at times, assure her that were he to kill her in the woods somewhere, friends of his would help him to cover it up and to hide her body. Mr. Lee chimed in to affirm Mr. Fell's claim, contributing to her intimidation.

Jesse Williams employed both in his carnival in summer 2000. Bobby Lee was working for an animal preserve in Florida. Mr. Fell convinced Mr. Lee to join him in Pennsylvania that summer, working in the carnival. Given Mr. Lee's love of animals, there is no clear indication why Mr. Lee chose to work with Mr. Fell instead, other than his attachment to his friend.

According to Jesse Williams, "Bobby followed Donny; he looked up to Donnie, anything Donnie told him to do, he would do it. He would follow my direction whenever he was on a different game, but not when he was around Donnie. For that reason I would work them separately. Donnie was always his way or no way."

During that same period, Mr. Fell and Mr. Lee traveled one day to Woodstock with Chris Eile and Mr. Fell's sister Terri. Mr. Eile later reported to police that with little provocation, Donald Lee attacked him by kicking him in the head and ribs. Mr. Lee

FELL-00000683



Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 63

joined in by striking Mr. Eike as well; the assault ended with Mr. Fell urinating on Mr. Eike as he lay unconscious. Mr. Eike, according to Mr. Fell, ended up in a coma; Mr. Fell and Mr. Lee were arrested on assault charges.

Later, according to Ms. Kondraski, she challenged Bobby about why he took part in the assault that led to his arrest. Bobby replied, she relates, that Donald Fell had asked him to. Shane Lee recalls how Mr. Fell later bragged that he attacked Mr. Eike because he did not feel like paying the victim for the drugs Mr. Eile had given them; Mr. Lee asserts that Mr. Fell concocted a story, and Terri Fell joined them in a lie, that Mr. Eike had gotten fresh with her.

Both the Lee and some members of the Fell families assert that the other man brought out the worst in their relative. Both may be right.

There is evidence, however, that the Lee family more actively endeavored to keep Donald Fell away from Bobby Lee. Consequently, Bobby would conceal the contact he had with Donald Fell. When Donald Fell went to stay with Bonnie Tonte, for example, Bobby Lee never told his father that he was going to see him, recalls Robert Lee, Sr. "We thought he was going to see his step-brother Anthony," recalls June Kondraski.

On the other hand, while the Fell family did not express particular fondness for Bobby Lee during this evaluation, no history has emerged that the Fells or Williams attempted to keep them apart – to the end that Donald Fell needed to lie to hide his contact with Bobby. Robert Lee was in Vermont, a guest of Debra Fell. Yet Mr. Fell has long ago left Bonnie Tonte's home, and was no longer welcome in June Kondraski's home.

Donald Fell went to Vermont for a number of reasons: he had been invited by his mother, and he had outstanding warrants and increasing attention to a flurry of car break-ins he had been involved in. Other than Vermont, however, there were no established locations where Mr. Fell could attempt to start fresh and without the encumbrances of police familiarity with his delinquency.

Bobby Lee, meanwhile, had already spent considerable time in Florida, and was planning to return. There, he had discovered his unusual talent for exotic animal handling. Mr. Lee's family had expected him to return to his emerging calling in Florida; he prepared them, by saving his money, arranging a payday, and having his family drive him to the bus station. Two buses were leaving from Wilkes-Barre at the same time, reports Robert Lee, Sr. One was headed to Florida; the other, to Vermont.

Instead, however, Robert Lee secretly boarded the bus from Vermont. Mr. Lee had no job there, no family there, no familiarity with the area, and no plan. But Donald Fell asked him to come to Rutland, and so he did, that late October 2000 day.

FELL-00000684

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 64

All the while they were there, Mr. Lee never asked his family to return to Pennsylvania, and did not even advise them where he was. Yet the month he spent in Vermont provided no significant endpoint, gain, or opportunity for Mr. Lee.

Mr. Lee's decision to travel to Vermont and to stay indefinitely, solely as a result of the request of Mr. Fell, supports my professional opinion that Mr. Fell had a dominant influence on Mr. Lee, and was able to influence his significant life decisions.

There is no dispute that the fatal assaults began with Mr. Fell's attack on Charlie Conway. While the sequence of subsequent events is disputed, several points remain clear:

a) Bobby Lee was hosted by Debra Fell, and had no history of a particular ongoing conflict with her when he killed her

b) The conflict history between Mr. Fell and his mother has been well-documented

c) The attack took place so physically close to where Mr. Fell killed Charlie Conway that Mr. Fell could have easily and successfully intervened – especially since Debra Fell was addressing him with "I love you Binker."

d) Jeanette Banas received a telephone call that night in which Debra Fell indicated that she believed Donald Fell would kill her

e) Given that two people were killed – Debra Fell and Terri King, thus silencing them as witnesses to a major crime, Mr. Fell had everything to gain by enlisting Mr. Lee as an accomplice. Were Mr. Lee not to have killed Ms. Fell, Mr. Fell would have been faced with the dilemma of a murder on his hands and two witnesses. With Mr. Lee's involvement in Debra Fell's death, Mr. Fell eliminated witnesses and now cemented Mr. Lee to be invested in their successful escape from the scene.

According to Mr. Lee, Mr. Fell implored him to attack Ms. Fell with, "kill her come on you have to I killed him fucking stab her cut her though she was on the floor moving kick her make her stop stab her cut her through (sp?) some more  start kicking-hacking make me hear it keep cutting now good I am going to take a shower I want you to start packing the (clothes - ) and bring me some pants."

Mr. Fell asserts that he was not involved in his mother's death, and that he could not stop Mr. Lee from carrying out an attack on her, despite being in the same room. Still, Mr. Fell is quite clear that he had no fear of Bobby Lee, whom he had reportedly smashed head first into a mirror only days earlier. Asked what he would have done had Lee confronted him with a gun, Mr. Fell replied to investigators, "I would have stuck it up his ass."

FELL-00000685



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 65

Subsequent to Ms. Fell's killing, Mr. Fell did not confront Mr. Lee in any way. Chris Kolojeski, who encountered them only one day after the murders, observed Mr. Fell and Mr. Lee to be very active together, and the two left the Wilkes-Barre area as a team.

It is therefore my professional opinion, with psychiatric certainty, that Robert Lee would not have threatened or participated in the murder of Debra Fell, his friends mother without – at the very least -- Donald Fell's active approval.

Mr. Fell has indicated that seizing Ms. King and her car was his idea. There is not enough information to distinguish a leader and follower for the murder of Terri King. Both men took an active part, and each savaged her with rocks crushing her head and kicks and stomps that crushed her neck, respectively.

Subsequent to their arrest, Robert Lee asked to be separated from Mr. Fell. Mr. Fell sought appointment to NWCF janitorial detail and reportedly engaged Mr. Lee as he worked in the area. According to Robert Lee Sr., his son wrote letters to him, expressing a sense of intimidation by Mr. Fell.

Clearly, Donald Fell was an extraordinarily important person in Robert Lee's life. Mr. Fell's influence on him to take initiatives he would not otherwise take is well established and observed by others. Mr. Lee, as an explosive, emotionally unstable person, was exploited on other occasions by Mr. Fell, as an antisocial-by-proxy, extending Mr. Fell's ability to be destructive.[33]

Available history does not reflect the same level of influence of Robert Lee on Donald Fell. While the two were closest of friends, Mr. Fell did not demonstrate the level of affectedness that Mr. Lee did. When asked by Dr. Wetzel about Robert Lee's death, Mr. Fell showed no particular emotion, and did not even think to list the item among the three saddest things that had ever happened to him – although Mr. Fell reported seeing Mr. Lee's body taken away from his cell after its discovery. Some who had no acquaintance with Mr. Lee might be expected to register an emotional response to witnessing that spectacle alone.[34]

---

[33] Stanwat, TL. (1997). **Antisocial personality by proxy: The Norton-Sims Syndrome.** Journal of Psychology, January 1997, 131(1)

[34] Ursano, RJ & McCarroll, JE (1990). The nature of a traumatic stressor: Handling dead bodies. Journal of Nervous & Mental Disease, 178(6), 396-398.

FELL-00000686

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 66

**14) Given all of the above diagnostic and developmental information, what aspects of Mr. Fell's history represent the most demonstrated nexus to a criminally violent and homicidal outcome?**

Violence is a multifactorial public health problem. Like other public health issues, however, it is helpful to distinguish the most influential factors that elevate one's risk for future violence. As in risk assessment in other populations, actuarial prediction of violence outpaces the predictive accuracy of clinical judgment.[35]

The most demonstrated predictive link to future violence is psychopathy, as borne out by the PCL-R.[36] This instrument identifies traits that are stable over time and provides a measure of an enduring violence risk.

The VRAG, or Violent Risk Appraisal Guide[37], is the first well-researched and widely used actuarial risk assessment instrument that specifically explored recidivistic violence. Rather than clinical impressions, VRAG variables were measured with reference to detailed and complete psychosocial histories.

Twelve scorable and other variables of high and low risk comprise the VRAG, which reflect childhood history, adult adjustment, offense characteristics and test assessment. The PCL-R is the most potentially heavily weighted item on the VRAG, and contributes heavily to Mr. Fell's high score in this case.

Indicators of high risk are Mr. Fell's not having lived with his biological parents to age 16, school maladjustment before grade 8 featuring severe discipline and attendance problems, history of alcohol problems, having never married, failure to comply with court conditions, personality disorder diagnosis, not a schizophrenic, attitudes unfavorable toward convention, attitudes supportive of crime; and a PCL-R score of 35 or more.

Mr. Fell scores a 29 on the VRAG. This places him at a percentile of 99 and with a likelihood of violent recidivism exceptionally high relative to his peer group.

Other factors that show significant correlation are Mr. Fell's history of school suspension, first arrest before age 16, childhood behavior problems before age 16, short jobs only, living in a transient situation, admission to corrections, history of charges for

---

[35]
[36]

[37] Quinsey, V.L., Harris, G.T., Rice, M.E. & Cormier, C.A. (1998). Violent offenders: Appraising and managing risk. Washington, D.C.: American Psychological Association. pp 141-149

FELL-00000687

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 67

a violent offense in the past, age of offense below 26, a score of over 35 on the PCL-R, and stranger victim.

The Violence Risk Appraisal Guide, featuring twelve items, one of which is the PCL-R, outperforms clinical predictive efforts, but does not account for patient and life variables such as family support, access to weapons, and changes in procriminal attitudes.

The Historical/Clinical/Risk Management (HCR-20) incorporates 10 historical items (previous violence, young age at first violent incident, relationship instability, employment problems, substance use problems; major mental illness; psychopathy; early maladjustment; personality disorder; prior supervision failure), 5 clinical items (lack of insight, negative attitudes, active symptoms of major mental illness, impulsivity, unresponsive to treatment), and 5 risk management items (plans lack feasibility, exposure to destabilizers, lack of personal support, noncompliance with remediation attempts; stress).

While there is clearly overlap among the instruments, especially with regard to the historical factors, clinical qualities even in non-patients do enrich the sensitivity for identifying at risk individuals. Mr. Fell is clearly represented in the HCR, but not to the complete degree that his history reflects in the other instruments.

These factors also demonstrate how some psychosocial factors contribute to risk of future violence, but clearly represent less of a causal nexus than those arrives at through careful methodological study. Furthermore, clinical judgment is helpful to account for items that have not been sufficiently proven or disproven to relate. Mr. Fell's sadism and blood lust are unusual and rarely studied. The link of these items to Mr. Fell's violent trajectory embraces his stated threats and ambitions, and his source of passion.

### 15) What evidence reflects on Mr. Fell's remorse for the crimes of November 27, 2000?

It is my professional opinion, with psychiatric certainty, that from the point of his recognition of what he had done, Donald Fell has demonstrated no more than superficial remorse for his actions.

According to Robert Lee, Mr. Fell invited him to explore the neck muscles of Charles Conway's corpse. This depersonalizing relationship to the corpse is devoid of remorse.

After Debra Fell was killed, Mr. Lee recalled Mr. Fell engaging him excitedly. "Do you realize we're free?" he quoted Fell. "This is only the beginning!" Mr. Fell's reported expression of excitement is devoid of remorse.

FELL-00000688

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 68

There is no indication that Mr. Fell delayed his departure from the REDACTED death scene, or were disorganized in any way. That Mr. Fell did not show signs of contemplation or hesitation reflects his lack of remorse at the time.

According to Bobby Lee, after the killings, Mr. Lee felt panicked and distressed, and did not immediately pack clothes as Mr. Fell had directed. Meanwhile, Donald Fell took a shower and then, joined Mr. Lee as they packed belongings.

After kidnapping Ms. King, Mr. Fell drove with Mr. Lee and Ms. King for hours before killing her. There is no indication that they discussed what happened. Mr. Fell indicates that Ms. King was not aware of what they had already done. His not communicating about the crime also supports the impression of Mr. Fell's lack of remorse.

All three bodies were left with no attempt at covering them. Those gestures have been associated with remorse in the forensic literature.[38]

Upon disposing of Ms. King's belongings, Mr. Fell engaged Michael Leight, a Burger King employee, hoping to buy recreational drugs with money stolen from Ms. King. Mr. Fell showed no sign of emotional distress to Mr. Leight that would reflect remorse.

When the killers could not work out a deal with Mr. Leight on the marijuana they sought, Mr. Fell continued on. He displayed no deviation from his appointed escape out of need to cloud his head of what he had done. That Mr. Fell did not aggressively seek out intoxicants in the aftermath of the crime supports my professional opinion of a lack of remorse.

When he later reached Chris Kolojeski, Mr. Fell carried on as usual. He played cards, sought drugs, hung out, and displayed no unusual behavior to his friend. At one point, Mr. Fell observed that he had nothing to live for, this comment could reflect regret. However, it is a comment that Mr. Fell has made at other times as well. As such, that comment did not inspire any particular concern in Mr. Kolojeski. Nothing in Mr. Fell's behavior suggested the remorse of a person who had killed another – let alone his own mother.

Mr. Fell never turned himself into police, and never planned to.

---

[38] Douglas JE, Burgess AW, Burgess AG, Ressler RK. (1992). Crime classification manual: A standard system for investigating and classifying violent crimes. Jossey-Bass Publishers: San Francisco. p. 251.

FELL-00000689

Re: **Donald Fell**
*Michael Welner, M.D.*
July 5, 2005

Page 69

Mr. Fell never expressed an apology to his family in the aftermath of the killing. Even after he was arrested -- and no longer had to conceal himself from arrest -- Mr. Fell primarily used his communications to assert that it was not he who killed Debra Fell.

When taken into custody, Mr. Fell displayed no remorse in his first statements to police.

Even when confronted, by police, completely sober, he exhibited no remorse.

Only when he confirmed that Debra Fell referred to him as Binker did Mr. Fell acknowledge regret, in the context of his mother.

Mr. Fell contributed to the discovery of Ms. King's body, only in the context of fostering good relations with the authorities, not manifesting any regret over her passing.

Subsequent to his arrest, Mr. Fell has neither required nor requested mental health counseling to help him cope with his part in the three killings. In his interview with Dr. Wetzel, he does not mention any of the victim's names, nor note any distinct personal message.

"I was sorry for what occurred... There's not a day that I'm not sorry about this things. If I could change things, I'd rewind." Asked about another victim, he responds, "pretty much along the same lines...."

Later interviewed by Dr. Rabun, as he pursued his defense, Mr. Fell asserted, "I am absolutely sorry about the things that allegedly happened."

That he took no ownership of the crime reflected his lack of remorse. In the interview with Dr. Wetzel, Mr. Fell maintained a detached relationship to what happened, referring at most to what he attributes to Mr. Lee.

Reflecting on his actions several years later, Mr. Fell explains,. "At the end of April," he says, "I accepted Jesus Christ. It took that long to forgive myself so that I could ask forgiveness from God. Because if I couldn't forgive myself, how could God?" According to Mr. Fell, "Having found Jesus means I can try to put the worst of it behind me....whenever I think about it, I'll definitely be sad...I know I can definitely put it behind me" He adds,

"It's best to ignore (what he has done)....(You) don't want to put yourself in a position to tempt yourself to do wrong."

FELL-00000690

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 70

Mr. Fell's expressions are more conspicuous in their hollowness when compared to the writings of Mr. Lee, who penned to his father, "I will never be at peace with myself...there is no hard feelings about nothing blame me. You have never done anything to hurt me just to help. Tell Anthony I love him and to stay out of trouble."

### 16) What history reflects on whether Mr. Fell will be a serious risk of violence in prison?

The literature on risk of violence in prison is emerging. Actuarial prediction of violence continues to challenge the predictive value of clinical judgment. However, because prison violence is not as well studied, research is increasingly focusing on this important area.

VRAG Scores have shown some predictive value of assaults and other disciplinary infractions in a maximum security prison.[39] Mr. Fell's score of 29 is 99% among inmates.

One prison study independent of the VRAG and PCL-R found that violent prisoners were more likely to have a juvenile arrest history and a history of psychiatric hospitalization. They were less likely to be married. The violent prisoners were also more likely to have a history of violence by arrest or self-report, during the previous five years.[40]

A federal prison population, in which Mr. Fell resides, has demonstrated that the presence of psychopathy is a valid predictor of violent recidivism among the incarcerated.[41]

A recent study centered in a maximum security setting identified several variables to examine, among other things, the most influential predictors of prison violence. Inmates lower than 21 upon entry were 3 times more likely to commit violent acts than those ages 31-35. Those who had not completed high school were twice as likely to commit violent acts. Those with prior prison terms were likely to commit violence s well.[42]

---

[39] Kroner and Mills 1997

[40] Shaffer, C. Edward; Waters, William F.; Adams, Serrhel G.; **Dangerousness: Assessing the Risk of Violent Behavior** *Journal of Consulting & Clinical Psychology,* Vol 62(5), Oct 1994. pp. 1064-1068

[41] Serin R, Amos N **The role of psychopathy in the assessment of dangerousness** Int'l Jl of Law and Psychiatry Vol 18(2), Spr 1995.

[42] Cunningham 2005

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 71

As a young adult, it is unclear how much on Mr. Fell's institutional adjustment will parallel his earlier experience. At St. Michael's group home, according to Terri Fell, Donald Fell would "constantly" get into fights. The group home was well structured, but as Terri Fell relates, "he didn't like it because of the black kids."

Out in the community, Mr. Fell has the opportunity to choose his acquaintances. Behind bars, however, he may confront his sensitivities. Jesse Williams, his cousin, and his ex-girlfriend Lynn Roberts characterized him as a racist, and Mr. Fell acknowledged his mother brought a black man home to meet him because she had the same impression of him. While Mr. Fell, in his pre-sentencing psychiatric interview, asserted that he is not a racist, his possessions on REDACTED included a Ku Klux Klan patch and, inexplicably, a book on conversational German.

In the current pre-trial setting, Mr. Fell has been involved in occasional incident that have not led to major injury. His medical record notes, on one occasion, an ice pack to his hand after he had "got into a fight with the wall."

Asked if he has a problem with his temper in the psychiatric interview, Mr. Fell replies, "I did. Somehow I've managed to get a reign on it. I've come to see things in a different way since this has happened." When confronted about incident since he has been in custody, Mr. Fell replies, "Things that used to bother me don't bother me any more." He explains that the reason he "blew up" in custody is that "I don't have people to talk to, things build up...now I'm trying to relieve that pressure in a positive manner. I've started working out again."

Since actuarial methods have greater predictive value, it is unclear what can be discerned from Mr. Fell redirecting his anger and energies. He remains, in his grievances against corrections officials, prone to interpreting their actions as breaches of protocol and takes personal umbrage. While the grievance mechanism is a non-violent outlet, he expresses frustration with losing disciplinary reviews.

For a man who, by his own admission, is used to getting what he demands, Mr. Fell's adjustment to the limits ahead of him remains difficult to predict. He has initiated violence for far easier provocations than those confronting him in prison.

Ultimately, there is substantial risk that Mr. Fell will become violent in custody, based upon actuarial approaches. The newness of establishing a methodology for ascertaining risk of violence in maximum-security institutions is relatively new, however. Therefore, while Mr. Fell is a psychopath whose VRAG score is quite high, interpretations in this setting must allow for more progress to come in this area.

FELL-00000692

Re: **Donald Fell**
*Michael Welner, M.D.*
July 5, 2005

Page 72

#### Update

Additional documents have been submitted by defense counsel in recent days, and have not yet been made available for my review. These include Dr. Mills notes, Dr. Cunningham's notes and slides, and additional sources not noted above. When I have the opportunity to review these, I will supplement my findings accordingly. This report, however, is being provided in order to comply with the Court's request for timely notification to both sides of my findings.

Very truly yours,


Michael Welner, M.D.

Associate Professor of Psychiatry, NYU School of Medicine
Chairman, The Forensic Panel

FELL-00000693

# EXHIBIT 11

# CONTACT SHEET

**CASE NUMBER:** —

**CLIENT NAME:** fella

**ADDRESS:** —

**MONTH:** April '85

**WORKER:** JMc for F.K.

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE) |
| | 2.) OUTCOME: (WHAT TRANSPIRED) |
|---|---|
| **DATE:** 4/22/85 <br> **LOCATION:** fell home <br> **WHO SEEN:** <br> Mrs. fell <br> Don " <br> Terry " <br> Theresa Sharpe (maternal grandmother) | 1.) <br> 2.) Mrs. fell began expressing remorse for the incident which occurred on 4/21/85. She reports that she & husband began arguing over issue of sexual abuse of their daughter. Mrs. fell stated husband was angry & struck out at ~~____~~ a pillow & got her leg w/ the knife. She reports wound as being superficial. She states she retaliated w/ the knife and cut his back again states injury is superficial. Mrs. fell signed |

FELL-00000694

release of information for hospital record, verification of extent of injuries.
Questioned parents use of alcohol &
Mrs. Fell stated both she & her husband rarely drink. Mrs Sharpe verified this statement, both attribute it to recent stress in family. Children appeared to be very hyper, climbing all over this worker while speaking with their mother.

Worker explained that information recieved today will be given to Frank Kumski as he is active with the case.

Direction: children do not appear to be at risk at present. Children will remain at home. Follow up by active worker after 4/24/85.

FELL-00000695

# EXHIBIT 12

## CONTACT SHEET

CASE NUMBER:                                      MONTH: May 85

CLIENT NAME: Fell                                WORKER: Kminek

ADDRESS:    REDACTED - FELL

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE) |
|---|---|
| | 2.) OUTCOME: (WHAT TRANSPIRED) |

DATE: 5-2-85

LOCATION: Agency

WHO SEEN: Phone call to Mrs Fell

1.) Called Mrs Fell after a CPS referral

2.) Called to make arrangements to meet with the family. Made arrangements to meet with them on 5-6-85. The allegations are that Mr. Biddle had hit Donald with a board and performed anal Sex on him.

I called Det Keiper and he would accompany me to the interview on 6-6-85

Date: 5-6-85

Location: Fell Home

Who seen: Mr. Fell
Mrs Fell
Donald Fell
Terri Fell
Det Keiper

1.) Meeting with the family

2.) Interviewed Donald. Donald was very hyper and could not sit still. But he was able to state that Mr. Biddle penetrated him anally. Det Keiper felt that Donald can not be qualified as a witness. No Criminal charges.

Informed Family physical would be unfounded. Sexual would be indicated.

Date: 5-8-85

Location: Agency Office

Who seen: Called URC

1.) Called about the Fell Family Treatment Plan.

2.) Informed Pavlicek that our agency had indicated the Sexual abuse. Also informed that we would assign family to Services

Date: 5-16-85
Location: Agency office
Who seen: called Mrs Fell

1.) Called to set up of visit to the home
2.) Upset at her 5-21-85

Date: 5-22-85
Location: Agency office
Who seen: called URC, Paula

1.) Called about the family wanted to know if they are in related treatment
2.) Family members all in therapy

Date: 5-24-85
Location: Agency office
Who seen: Call from Mrs Fell

1.) Called about visit to the home
2.) Visit cancelled reset for 5-31-85

Date: 5-31-85
Location: Fell Home
Who seen: Mrs Fell
         Mr Fell
         Donald
         Terri

1.) Visit to the home
2.) Took Social History. D.+ intake assessment for Simon.

FELL-00000697

# EXHIBIT 13

## CONTACT SHEET

CASE NUMBER:

CLIENT NAME: *Fell*

ADDRESS:

MONTH: 7/85

WORKER: *Ciavarro*

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE) 2.) OUTCOME: (WHAT TRANSPIRED) |
|---|---|
| DATE: 7/12/85<br>LOCATION: *Homevisit*<br>WHO SEEN: *Transfer Visit W/ Frank Kremoke* | 1.) *Met Mr & Mrs Fell & the Children. Kids were healthy*<br>2.) *appeared happy. No issues Parents communicating better. Mr Fell working - Mrs Fell watches kids.* |

7/19/85

*Had scheduled H.V*
- *Had to be canceled due to emergency on mothers case.*

FELL-00000698

9/26

Unannounced H.V. — no one at home.

10/24
H.V
Mrs Fell
Donald
Terri

Had interview w/ Mrs Fell, Donald &
Terri, Mr. Fell was at work.
The Children appeared healthy &
well cared for. Donald had been
disciplined for not obeying mom —
He was sent to his room for
a short duration. Donald is reportedly
somewhat hyper in school. No major
issues at this time. Mrs Fell may
be laid off soon & will be staying
home w/ the Children. Mrs Fell showed
me the Holloween Costume she made
for the Children.

FELL-00000699

# EXHIBIT 14

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: August

WORKER: DiGiuma

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 8/8/91

Location: Phone

Who Seen:

Jackie Sharp (sister)

Kids were in Virginia all week

Last night - during - al beats her up

1. ) Jackie claims that Debbie is drunk every night & she has a different guy there every night (Al, Bud + Danny).

2. ) — She starts drinking around 4 pm. — Jackie said the kids stay at her place quite often. — Last night Terri stayed overnight b/c some guy Danny was there & he threatened to throw her in the pool. Jackie said her family is concerned ab/ the kids — Als

FELL-00000700

then put Danny J on the phone,
but he told her that Al &
his mom broke up & he has only
been to their new apt. once.
He said his mom doesn't drink.
Terri then got on the phone & she
said Al sometimes comes over on the
weekend & sometimes he hits her mom.
She said her mom does drink every
night. — Last night she slept at
her grandmothers b/c mom had a
friend, Danny, over & they were
drinking & she didn't like it b/c
he threatened to push her into the
pool.
        — while we were talking there was a
commotion in the background & Jackie got back
on the phone & said Debbie was there b/c
Danny told her that Jackie had called.
— Debbie's mother, Theresa Sharpe, then
got on the phone, she said "My
daughter has a drinking problem."

FELL-00000701

was afraid to go out she
she didn't want her mom to
be mad her.
Wkr then called Ellis Carle + he
said to [redacted] get Jeri to talk to.
— He also suggested that Debbie go to
her mom.
for a urinalysis.
Jeri then came outside + told her
mom she wanted her to get help for
denying. Debbie asked her why she
thought that + Jeri replied "B/c
aunt Jackie said so." they talked
a little while longer + Jeri agreed
to go home. The police officer left
+ Jeri went upstairs to [redacted] put her
clothes on.
Wkr talked to Debbie a/b having
men over + drinking. Wkr pointed out
that she could smell alcohol on her
now (however, she did not appear
intoxicated). — Debbie said it was
from last night — that she hasn't
even brushed her teeth yet, but she

Fell 52

She then asked wkr to come over. wkr could hear Debbie in the background asking wkr to call her. wkr said she'd ~~be~~ be over in an hour.

___

A few minutes later Theresa called Rach asking wkr to come out immediately b/c Debbie was leaving w/ the kids.

— wkr notified Ellis Carle, supervisor, of the situation. He said if Debbie is intoxicated now, wkr needs to assess if she is capable of taking care of the children.

___

When wkr arrived Debbie was outside, Donny was in his bedroom & Keri was in her grandmother's side of the house.

— Debbie had called the police + Sgt Smith arrived. — Debbie wanted Keri to come out. wkr went in & spoke to Keri, but she said she didn't want to come out — she said she wanted her L. + h.s. — she said she

FELL-00000703

told who the only had
One been. who explained that
it so aust probable that one
been could still be on her heart
after 10-12 hrs. — who then told
Richie that he would have to go
to the court advocate today for a
spot analysis — who asked her to
go it in the next 2 hrs.

→ who then went over to talk to
Theresa + Jackie → They told who
Richie has different men over all
the time: Lenny (4 East St, p: 43th),
Marty, Mike, Bud & Danny. — Concerned
the her dricking — Deb was at a picnic
& they + Mike & Deb got into a
an Tony' Bea — they say if the beat
light of cd — when car was impounded
Deb. up. but they dun't know why,
they police D.... is emotionally disturbed →

(Fell k3)

thinks he needs to be evaluated —
Beats up on Levi + his mom. + he
smokes.  — Says Debbie is on speed
given to her by her Doctor, Dr Alexan
on Susquehanna Ave in Pittston.

— Theresa then called her daughter Denna
William + gave her the phone. — Donna
told wkr last Sat. she saw Al pick
Debbie up + threw her on the floor. Al
was drunk. Denna said "I've seen
Debbie drinking, but I don't know if she's
ever been drunk around the kids."
        Theresa then asked wkr to call
Tony's Bar + Grill + talk to the waitress
her name is Rose + she told wkr
that als 5 wks ago Debbie was in there
drinking + the kids came in looking for
her + she chased them out. — She
said Debbie was intoxicated. — wkr asked
if she knew where the kids went +
she said they were staying at friends
she                 the bar.  — She

FELL-00000705