# New York State Police Investigation Report

CODE: Assault = A   Homicide = H   Suicide = S   Attempted Suicide = AS   Natural Death = ND   Accident Victim = AV   Other = O (Specify)

| | Code | Name (Last, First, Middle) | | | Sex | Age | DOB |
|---|---|---|---|---|---|---|---|
| S-1 | H | King, Teresca Ruth   REDACTED - FELL | | | F | 53 | 07 26 1947 |

**Nature of Injuries:** Strangulation & Blunt force trauma head

**Hospital and/or Physician:** St Frances Poughkeepsie

**Date of Death:** 12 02 2000   **Coroner or Medical Examiner:** Dr. Michael Del Monico   **Autopsy:** Yes ● No ○   **Pathologist:** Dr Michael Baden   **Kin Notified:** Yes ● No ○

| | Code | Name (Last, First, Middle)   Address | Sex | Age | DOB |
|---|---|---|---|---|---|
| S-2 | | | | | |

**Nature of Injuries:**

**Hospital and/or Physician:**

**Date of Death:**   **Coroner or Medical Examiner:**   **Autopsy:** Yes ○ No ○   **Pathologist:**   **Kin Notified:** Yes ○ No ○

| | Code | Name (Last, First, Middle)   Address | Sex | Age | DOB |
|---|---|---|---|---|---|
| S-3 | | | | | |

**Nature of Injuries:**

**Hospital and/or Physician:**

**Date of Death:**   **Coroner or Medical Examiner:**   **Autopsy:** Yes ○ No ○   **Pathologist:**   **Kin Notified:** Yes ○ No ○

CODE: Unknown Subject = U   Crim. Sum = C   Perpetrator = P   Accomplice = A   Defendant = D   Suspect = S   Wanted-Warrant = W   Juvenile = J   Other = O (Specify)

| | Code | Name (Last, First, Middle) | | Sex | Age | |
|---|---|---|---|---|---|---|
| T-1 | D | Lee, Robert J #REDACTED - FELL   Rutland Vermont | | M | 21 | [REDACTED - FELL |
| T-2 | D | Fell, Donald R #REDACTED - FELL   Rutland Vermont | | M | 20 | 04 30 1980 |
| T-3 | | | | | | |
| T-4 | | | | | | |
| T-5 | | | | | | |
| T-6 | | | | | | |
| T-7 | | | | | | |

| Title No. | Race | Ht. | Wt. | Hair | Eyes | Crime | | Section | Law |
|---|---|---|---|---|---|---|---|---|---|

**Judge - Name - Address - Title:**   County   Date Issued   Extradite Yes ○ No ○

| Title No. | Race | Ht. | Wt. | Hair | Eyes | Crime | | Section | Law |
|---|---|---|---|---|---|---|---|---|---|

**Judge - Name - Address - Title:**   County   Date Issued   Extradite Yes ○ No ○

| INQUIRY | DCJS | MESSAGE | No. | File | Date | Station | CANCEL | No. | Date | 35. STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| | ● YES | | 2987 | 3 | 12 01 2000 | Dover Plains | | | | ○C/A ●C/EC ○C/INV ○C/UNF ○Open |
| | ○ NO | | 2994 | 3 | 12 02 2000 | Dover Plains | | | | ○Other |
| NCIC ● YES | | | 2993 | 20 | 12 02 2000 | Dover Plains | | | | TOT BC ● Yes ○ No Date 12 01 2000 |
| ○ NO | | | 3038 | 20 | 12 07 2000 | Dover Plains | | | | Lead Request ○ YES   Continuation Sheet NO. 6 |

**Photos Taken:** Yes ● No ○   **By Whom:** FBI ID Unit & Troop K ID   **Dusted For Latent Prints:** Yes ○ No ○   **By Whom:**

**Name and Address of Agency Notified or Requested:** FBI Albany Field Office   **Responded:** Yes ● No ○   If "Yes" Name Of Person In Charge - If "No" Name   F "NO" Name Of Person Notified   Acting SSA DAN MATTHEWS

**Name(s) of Licensee(s):**   **Business Name:**   **Lic. No.:**

The Presence or absence of any individual factor is indicated by checking Yes or No

| | | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|---|
| Witness to Crime | | ○ | ● | Property Traceable / Identifiable | | ● | ○ |
| Identification / Description Of Suspect Vehicle | | ● | ○ | Distinctive / Significant MO | | ○ | ● |
| Significant Physical Evidence | | ● | ○ | Significant Community Interest | | ● | ○ |

| | |
|---|---|
| E-1 - Sketch of Burger King | E-8 - Genl 4 - WT-6 (Darlene Smalley) |
| E-2 - Consent to Search | E-9 - Genl 15 Receipt P-1 (Video) |
| E-3 - Genl 4- WT-1 (Michael S. Leight) | E-10- Genl 15 Receipt |
| E-4 - Genl 4 - WT-2 (Laura J. Place) | E-11 - Genl 4 - WT-7 (Francis Bellanto) |
| E-5 - Genl 4 - WT-3 (Tracey Fisher) | E-12 - Genl 15 Receipt P-1 (Video) |
| E-6 - Genl 4 - WT-4 (Keith T. Cancel) | E-13 - Copy of Death Certificate S-1 |
| E-7 - Genl 4 - WT-5 (Ronald H. Guerre) | |

| Complainants | Properties | Vehicles | Weapons | Documents | Witnesses | Victims | Titles | Wanted |
|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 1 | 0 | 0 | 7 | 1 | 2 | 0 |

**Signature And Rank:**   **Shield No.:**   **43 Signature And Rank:** Arthur C Wilson S/T   **Shield No.:** 3850

**Station:**   **42B Case No.:**   **Approved:**   **43A Station:** Dover Plains   **43B Case No.:** 00-833   **Approved:**

TZS   TZS K221

FELL-00001086

GENL-84b REV 11/97E

## NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                PAGE 1
OMPLAINANT - LAST, FIRST, MIDDLE                          CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |
|---|---|

Box # 29 WITNESSES:

WT5 - Guerrero,Ronald H - # REDACTED - FELL    Carmel NY - - - - - - - - - - 18 - - 08/28/82
WT6 - Smalley,Darlene S - # REDACTED - FELL    Poughquag NY - - - - - - - - - - - - 44 - - 07/04/56
WT7 - Bellantoni,Francis R - REDACTED - FELL    Dover Plains - - 52 - - 02/11/48

BOX # 34 NYSPIN:

3039- File 20 - 12/07/00 - SP Dover Plains
3041- File 20 - 12/07/00 - SP Dover Plains
3042- File 20 - 12/07/00 - SP Dover Plains
3043- File 20 - 12/07/00 - SP Dover Plains
3044- File 20 - 12/07/00 - SP Dover Plains
3054 - File 20 Added - 12/08/00 - SP Dover Plains
3055 - File 20 Added - 12/08/00 - SP Dover Plains
3056 - File 20 Added - 12/08/00 - SP Dover Plains
3057 - File 20 Added - 12/08/00 - SP Dover Plains
3058 - File 20 Added - 12/08/00 - SP Dover Plains

1. On 12/01/00, at approximately 6:25pm, Senior Investigator Gary Mazzacano of the State Police Claverack station, contacted Investigator John Ryan at SP Dover Plains. S/I Mazzacano requested Inv John Ryan patrol to the Burger King located on State Route 22 in the Town of Pawling, to obtain information regarding the location of the Burger King, and surrounding landmarks near the Burger King. S/I Mazzacano advised FBI Special Agents Gary Hoover (C-1), Kevin Hennessy and himself, are currently working information regarding the victim of a homicide, who could possibly be located in SP Dover Plains Patrol area. S/I Mazzacano advised Inv. Ryan, that two subjects responsible for the homicide are currently in custody in the state of Arkansas.

2. On 12/01/00 Inv. Ryan patrolled to the Burger King on State Route 22 in the Town of Pawling, and sketched the area on paper, with surrounding landmarks. Sketch attached as enclosure, (E-1). Inv Ryan returned to SP Dover Plains and advised S/I Arthur Wilson of the case status.

3. On 12/01/00 at approximately 8:45pm, S/I Mazzacano advised Inv. Ryan that FBI Special Agents Hennessy and Hoover and himself, with Dover Plains Uniform patrols, located a body on private property, the location being: east side of State Route 22, approx. 1 mile south of County Route 6, in the Town of Dover. S/I Mazzancano advised scene is secured. Inv Ryan contacted S/I Arthur Wilson and advised same of case status. Inv Ryan responded to scene from SP Dover Plains.

On 12/01/00 the following State Police supervisory personnel responded: Captain Frank Koehler BCI, Captain Frank Christensen Uniform, Lieutenant William Baker BCI, S/Inv Arthur Wilson BCI SP Dover Plains, S/Inv Thomas Martin Troop K Identification Unit, Station Commander Sgt Denis Murphy

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains

COMPLAINANT - LAST, FIRST, MIDDLE

PAGE 2

CASE NUMBER

| Hoover, Gary F.B.I. | 00-833, 841-845 |
| --- | --- |

SP Dover Plains. FBI agents at scene: SA Kevin Hennessy, SA Gary Hoover, SSA Dan Matthews, SA David Fallon, SA Darren Semprebon.

5.    On 12/01/00, Senior Investigator Gary Mazzacano advised Senior Investigator Arthur Wilson (writer) the following regarding the circumstances surrounding this investigation: On 11/30/00, T-1 (Robert Lee) and T-2 (Donald Fell), were being detained by the Clarksville Police Department in Arkansas on traffic violations and drug charges. T-1 and T-2 were in the possession of a vehicle, (V-1), which belonged to S-1 (TERESCA KING), who was an active NYSPIN entry as a Missing Person Endangered, from the Vermont State Police. Further investigation led to information being provided to the authorities by T-1 (Robert Lee) and T-2 (Donald Fell), that they were responsible for the kidnaping of S-1 (Teresca R. King) in the State of Vermont, and subsequently killed her in the State of New York. S/I Mazzacano advised the information provided did not give an exact location, only that T-1 and T-2 mentioned a pull off with some type of shooting range set up. After they disposed of T-1 (Teresca King), they stopped at a Burger King restaurant, which was on the left hand side of the highway they traveled in New York. S/I Mazzancano being familiar with the SP Dover Plains patrol area, located an area off ST 22, in the Town of Dover, that is an open area and is a make shift shooting range. S/I Mazzacano along with Troopers Bialeck and Larkin of the Dover Plains State Police Station, along with FBI agents Hennessy and Hoover, began a physical search of the pull off area, approximately one mile south of County Route 6, in the Town of Dover. During the search of the area, a deceased female subject was located near the woodline, east of ST 22, fitting the description of being S-1 (Teresca R. King). S/I Mazzacano advised the scene was secured.

7.    On 12/01/00 S/I Martin Troop K Identification Unit secured the scene for the evening under State Police and F.B.I. guard.

8.    On 12/01/00 further information was received by S/I Wilson that on 11/27/00, T-1 (Lee) and T-2 (Fell), made an attempt to purchase drugs from a drive through window employee at the Burger King on ST 22 Pawling New York. Writer assigned Investigator John Ryan of the Dover Plains station, to patrol to the Burger King in Pawling and identify the employee working the drive through window.

9.    On 12/01/00 Inv. John Ryan advised writer the employee working the drive through window is a subject named (Michael Leight) WT-1 of # 9 Wesley Rd Brewster. Inv. Ryan along with FBI agent Hennesey, attempted to locate WT-1, but met with negative results.

10.    On 12/02/00 at approximately 7:20am, S/I Martin - Troop K Identification Unit, along with the FBI Identification Unit, began the crime scene processing. All case evidence was turned over to the Federal Bureau of Investigation at the crime scene.

11.    On 12/02/00 at approximately 7:24am Dr. Michael Del Monicco of the Dutchess County Medical Examiners Office, arrived at the crime scene and pronounced S-1 (Teresca R. King) deceased. Dr Del Monico authorized removal of S-1 to St. Frances Hospital for autopsy.

FELL-00001088

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                                    PAGE 3

OMPLAINANT - LAST, FIRST, MIDDLE                                          CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |
|---|---|

12.    On 12/02/00 S/I Wilson along with Inv Ryan contacted Shepard Spunt 617-277-7265, who is the executor for the estate of Malcolm Fooshee, who is the land owner where S-1 was located. At approximately 8:20am, Shepard Spunt granted verbal consent to the State Police and FBI to enter the property. On 12/02/00 a consent to search was faxed to Shepard Spunt for his signature. On 12/07/00 Inv Ryan received consent to search from Shepard Spunt via US mail. Consent to search attached as enclosure, E-2.

13.    On 12/02/00 a physical search of State Route 22, south of the crime scene, was conducted by State Police members and FBI agents. Approximately 3.7 miles south of the crime scene, along the west shoulder of the southbound lanes of State Route 22, in the Town of Dover, a wallet with identification belonging to S-1 (Teresca King) was located. Wallet secured by F.B.I. SA Mark Promupico and retained as evidence by the F.B.I.

14.    On 12/02/00 Inv John Ryan interviewed ( Michael Leight) WT-1, who advised that he was employed at the Burger King in Pawling on 11/27/00, and at approximately 8:00am, two male customers approached the drive through window in a Saturn type vehicle. The subjects,while waiting for their food, asked him if the store sold alcohol, or he had any pot. WT-1 advised the subjects he could get some,and the cost would be $20.00. The driver advised WT-1 he would be back in five minutes. WT-1 advised he called a friend of his who advised he could get whatever they need. WT-1 advised the subjects returned and he advised them to wait by the speaker of the drive through. WT-1 went outside, and only the driver of the vehicle was present. WT-1 advised the driver it would be $20 a gram or $60 an 1/8 ounce, at which time the driver advised him to disregard. WT-1 further advised, the driver stated he was from Vermont, and heading to New York City, so WT-1 gave him directions and went back to work. WT-1 advised he didn't see the passenger again, but was advised by the driver of the vehicle, that the passenger went to use the bathroom. Genl.4 (deposition) obtained an attached as an enclosure, E-3.

15.    On 12/02/00 Inv. Thomas Fort interviewed (Laura Place) WT-2, who stated that at approximately 8:00pm on 11/30/00, an employee of Burger King restaurant, Keith Cancel. showed her a blue purse that he found in the grease bin outside of the restaurant, and that there was no ID in it. WT-2 could offer no further information. Genl. 4 (deposition) obtained and attached as enclosure, E-4..

16.    On 12/02/00 Inv. Darren Forbes interviewed (Tracy Fisher) WT-3, who stated that she is the manger at the Burger King Restaurant, on ST 22 Town of Pawling. WT-3 advised an employee named Keith Cancel had brought a pocket book into the store, which he found outside. WT-3 advised, Keith Cancel looked through the pocketbook and located nothing important in it, at which time Keith Cancel took the pocketbook outside and threw it in the garbage compactor. WT-3 advised she thinks the date of this occurrence was Thursday,11/30/00. WT-3 could offer no further information. Genl. 4 (deposition) obtained and attached as an enclosure, E-5.

17.    On 12/02/00 Inv. Ethan Fergus interviewed (Keith Cancel) WT-4, who stated that on 11/30/00 he was working the 5pm-9pm shift at the Burger King restaurant in Pawling.. WT-4 advised he went to dump the restaurant grease into the grease dumpster, located outside the store, at which time he located a blue purse, along with a box of crushed up donuts on the grease dumpster.. WT-4 moved the pocketbook and dumped the grease. WT-4 then brought the pocketbook inside the restaurant and looked

GENL-84b REV 11/97E

NEW YORK STATE POLICE
CONTINUATION SHEET

TROOP K    Dover Plains                                                                PAGE 4
COMPLAINANT - LAST, FIRST, MIDDLE                                    CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |

inside the pocketbook, observing a comb and empty pepsi bottle. WT-4 could not recall what he then did with the pocketbook. WT-4 could offer no further information. Genl. 4 (deposition) obtained and attached as an enclosure, E-6.

18. On 12/02/00 Inv. Ethan Fergus interviewed (Ronald Guerro) WT-5, employee of Burger King. WT-5 could offer no information. Genl. 4 (deposition) obtained and attached as an enclosure, E-7.

19. On 12/02/00 Inv Thomas Fort interviewed (Darlene Smalley) WT-6, an employee of Burger King who stated that she is the manager of the store. She stated an employee (Michael Leight) WT-1, brought it to her attention that a purse was found with no identification in it. WT-6 could offer no further information. Gen 4 (deposition) obtained and attached as an enclosure, E-8.

20. On 12/02/00 writer instructed Trooper Breen to secure the surveillance tape dated 11/27/00 from the Cumberland Farms store on ST 22 Town of Dover. Trooper Breen secured video tape from James Dunnaway, manager of store, Genl 15 (receipt) obtained and attached as enclosure E-9. Video tape secured as evidence and listed as P-1. Video tape was secured due to the surveillance camera records the traffic along ST route 22, in the Town of Dover.

1. On 12/02/00 writer instructed Inv. Darren Forbes to view P-1 (video tape). At approximatley 7:00am listed on video tape (P-1), it appears S-1's vehicle is photographed passing the Cumberland farms store in a southern direction on ST 22, in the Town of Dover.

22. On 12/02/00 writer instructed Inv. Forbes,Ryan, Fort and Fergus to patrol to the Burger King Restaurant, ST 22, Town of Pawling, in an effort to locate evidence in this case. During search of a field in the rear of the restaurant, Inv Forbes located two pieces of newspaper from the Rutland Shopper, 1- clear nail polish bottle, and 1 AMEX credit card receipt, items secured as evidence and turned over to FBI agent MAHER. Genl 15 (receipt obtained) and attached as enclosure E-10. A physical search was conducted on the contents of a garbage dumpster at the Burger King, which resulted in S-1's pocketbook being located by FBI Agent Mark Promupico, who retained custody of S-1's pocketbook as evidence. Burger King property photographed by the Troop K ID Unit.

23. On 12/02/00 at approximately 1:00pm, the body of (Teresca King) S-1, was removed from the crime scene and transported to St Frances Hospital for autopsy. Hufcut Funeral Home personnel (Frank Kelly & Larry House) transported S-1, followed by S/Martin and FBI S/A Woods.

24. On 12/02/00 the autopsy was preformed on (Teresca King) S-1, at St Francis Hospital in Poughkeepsie NY, by Dr. Michael Baden. Troop K Identification Unit, along with FBI identification unit personnel attended autopsy. All evidence retained by FBI personnel at autopsy. Dr. Michael Baden determined cause of death to be strangulation, and blunt force trauma to head. S/I Thomas Martin advised writer on the completion of the autopsy report by Dr.Baden, same will be sent to him directly and will be turned over to the FBI. S/I Martin advised upon his receipt of the autopsy report he will transmit a copy to writer for case file.

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains

PAGE 5

COMPLAINANT - LAST, FIRST, MIDDLE

CASE NUMBER

Hoover,Gary F.B.I.

00-833, 841-845

25. On 12/02/00 writer advised Sr. ADA Edward Whitesell, of the Dutchess County District Attorneys office the status of this investigation, who responded to SP Dover Plains.

26. On 12/04/00 SP Dover Plains BCI and Uniform personnel conducted a road check on State Route 22 in the Town of Dover, from 6:00am thru 8:00am, at the area where the pull off is located, in an effort to generate leads in this investigation. Trooper Trojanek advised writer the following people were interviewed by him as a result of this road check, RICK BOYNTON of Lakeville Connecticut # 805-435-1232 who advised at approx 8:15/20 am while northbound in his vehicle he saw a vehicle pulled off the roadway with two people out of the vehicle possibly pouring something on the ground. Subject could offer no further information. DAVID FELLER of Chatham NY 518-392-5439 advised he observed a vehicle at approx. 7:30am pointed southbound, but on the northbound shoulder of ST 22, subject described the vehicle as a 2dr possibly older/rusty dark color, subject could offer no further information.

27. On 12/04/00 Captain Frank Koehler, Troop K BCI advised writer that this homicide investigation will be prosecuted on a federal level, per Dutchess County District Attorney William Grady.

28. On 12/11/00 writer received S-1's (Teresca King) dental x-ray and dental records from Detective Kevin Stevens of the City of Rutland Police Department. Dental records TOT S/I Martin Troop K ID 12/11/00.

29. On 12/12/00 writer interviewed (Francis Bellantoni) WT-7, who stopped at SP Dover Plains. He advised writer he recalled traveling south on ST 22, and observed a vehicle facing north at the pull off on ST 22. He advised he saw two male subjects outside of a car, coming from the wooded area, and that the vehicle had Vermont plates. He stated inside the vehicle, he observed a female on passenger side. WT-7 stated he had to turn around due to forgetting his cell phone at his residence, and was now heading northbound, and upon approaching the pull off he observed a female walking towards the woods, with two males behind her. WT- 7 continued to his residence, retrieved his cell phone, then returned southbound on ST 22, passing the pull off area, at which time the vehicle and subjects were now gone. WT-7 advised the amount of time it took him from his second pass of the location and retrieving his cell phone at his residence and returning, was approximately ten minutes. WT-7 was unable to recall what time of day it was, only that the vehicle had Vermont plates, and the women wasn't being taken by force. WT-7 stated he was traveling 55MPH when he observed the above. WT-7 could offer no further information. Genl 4 (deposition) obtained and attached as enclosure, E-11.

30. On 12/13/00 S/I Thomas Martin of Troop K Identification Unit turned over P-1 (Video Tape) and S-1's dental records to FBI agent Elizabeth Maher. Genl 15 (receipt) obtained and attached as enclosure, E-12.

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains

COMPLAINANT - LAST, FIRST, MIDDLE

PAGE 6

CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |
| --- | --- |

31. On 12/21/00 writer completed VICAP Crime Analysis Report and forwarded same to S/I Ayling NYSP Forensic Center Albany NY. Copy of same retained in case folder.

32. On 12/26/00 writer received a copy of the death certificate for (Teresca R. King) S-1, which is on file with the Town of Dover Town Clerks Office. Death certificate attached as an enclosure, E-13.

32. As a result of this investigation SP Dover Plains BCI adopts the following cases which are closed EXCEPTIONAL CLEARANCE

```
00-833 - MURDER 1 - - - - - - - -    CLOSED
00-841 - KIDNAPING 1st - - - -     CLOSED
00-842 - ROBBERY 1st - - - - - -    CLOSED
00-843 - C.P. STOLEN PROP 3rd -  CLOSED
00-844 - C.P. WEAPON 4th -  - - -  CLOSED
00-845 - TRESPASS - - - - - - - - - -  CLOSED
```

*****************NO PROPERTY OR EVIDENCE RETAINED FINAL REPORT *****************



FELL-00001093

# EXHIBIT 64

SUPPORTING DEPOSITION (CPL Sec.100.20)   GENL-4 REV 01/98E   New York State Police
STATE OF NEW YORK

E-3

Local Criminal _____ COURT

COUNTY OF Dutchess

Town _____ of Dover

THE PEOPLE OF THE STATE OF NEW YORK )
)
--vs.-- )
_____ )
)
_____ )
)
(Defendant )

SUPPORTING DEPOSITION

STATE OF NEW YORK )
COUNTY OF Dutchess )
)   ss.
Town _____ of Dover )

PAGE 1 of 2

| DATE | TIME STARTED | | FULL NAME | | | |
|---|---|---|---|---|---|---|
| On 12/02/00 | at 1 :40 | ○am ○pm | I, Michael S. Leight | | | |
| DATE OF BIRTH REDACTED - FELL 81 | NO. & STREET REDACTED - FELL | | | C/T/V Brewster | | STATE NY |

state the following: On 11/27/00 at about 7:15am I arrived at Burger King, located on State Route 22 in Pawling, where I am employed. I was scheduled to work a 7:00am to 3:00pm shift. That morning I was responsible for serving customers at the drive-thru window. At about 8:00 am two male customers pulled up to the drive-thru window in a turquoise "Saturn type car" which was in good condition, probably an early 90's car. I would describe the two subjects as follows: The driver was in his earlier 20's, wore glasses, had a red bandanna on his head which he wore like a dew rag, from what I could see of his hair it was dark and it looked like he didn't keep it groomed, he was unshaven, a white male, wearing blue jeans, blue jean jacket with a Slayer Band patch on the top in the back, and his hands were dirty. The passenger was also a white male, in his early twenties (may even have been teenagers), he was wearing a black Harley Davidson cap (the kind with the squared off sides) with flames on it, his hair was like a dirty blonde & kind of scraggly, he was unshaven, wearing a dark bluish or grayish sweat-shirt & blue jeans, They were both probably average height and both were kind of skinny. ------- Upon pulling up to the drive-thru window, the driver paid for the food they ordered. Then while waiting for the food, he asked me if the store sold alcohol. I said "Yeah, I wish". Then when I gave him the food he asked me if I had "pot". I said "No, but I can get you some". I told him I could get him a "gram of weed for $20". The driver said "Fine, I'll be back in 5 minutes". So I went to the phone and called my friend Keith Kearney and talked to him about it and Keith said he can get whatever I need. About 5 minutes later they did come back and drove up to the drive-thru window. So I told them to go back by the outside speaker and wait for me. When I went outside to talk to them only the driver was there. The driver said his friend went inside to use the bathroom. The passenger must have been going around the front of the store to use the bathroom as I was going outside through the kitchen because I didn't see him. So I told the driver "$20 a gram or $60 an 1/8" (one eight of an ounce). He said "No, never mind, maybe if I was desperate". So I said something like "I'm sorry I can't help you then". He didn't seem upset at all and we got talking about directions and he said they were coming from Vermont and were headed to New York City. So I gave him some

## NOTICE
(Penal Law Sec.210.45)

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this 2nd _____ day of December _____, YR 2000

-- OR --

*Subscribed and Sworn to before me

_____ day of _____, YR _____

_____
(SIGNATURE OF DEPONENT)

_____
(WITNESS)

Inv John Ryan
(NAME OF PERSON TAKING DEPOSITION)

| TIME ENDED | |
|---|---|
| : | ○am ○pm |

FELL-00001094

GENL.61A REV.11/97E

## SUPPORTING DEPOSITION CONTINUATION SHEET

PEOPLE vs. _____

directions and then went back to work. I never did see the passenger again, but he could very well have used the bathroom like the driver said without me seeing him. I didn't notice anything unusual like weapons or anything inside their car. The only thing that stands out in my mind is a pack of Marlboro Ultra Light cigarettes on the passenger's side dash. Of course I wasn't paying any particular attention to what was inside their car. --- I did not see them put anything in the dumpster, nor did they comment about needing to get rid of anything. Also, I have never seen nor do I have any firsthand knowledge of a pocketbook or suitcase being found in the dumpster, although Laura Place (a co-worker at Burger King) did say yesterday that Keith (another co-worker) found a pocketbook in the dumpster used for the fryer oil. I have never had contact with the driver or passenger before that day or since that day. _ML_

## NOTICE

(Penal Law Sec.210.45)

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this 2nd day of December , YR 2000

-- OR --

*Subscribed and Sworn to before me

_____ day of _____ , YR ____

(SIGNATURE OF DEPONENT)

_____

(WITNESS)

Inv John Ryan

(NAME OF PERSON TAKING DEPOSITION)

TIME ENDED 3 : 03 am ● pm

# EXHIBIT 65

MICHAEL M. BADEN, M.D.
15 West 53rd Street
New York, New York 10019

~ ~ ~ ~

Telephone (212) 397-2732
Facsimile (212) 397-2754

## AUTOPSY REPORT

| | |
|---|---|
| Decedent: | Teresca King |
| Date of Birth: | REDACTED - FELL |
| Date of Death: | found December 1, 2000 |
| Place of Death: | Wooded area, Route 22, Dover Plains, New York |
| Examination of Scene: | December 2, 2000<br>10:45 a.m. to 11:45 a.m. |
| Date of Autopsy: | December 2, 2000 |
| Place of Autopsy: | St. Francis Hospital, Poughkeepsie, New York |
| Medical Examiner: | Joseph Ross, M.D. |
| Prosector: | Michael M. Baden, M.D. |
| Present: | S/A Beth Mahar and S/A Frank Woods, F.B.I.; Sr. Inv. Tommy Martin, Inv. James Holodook, Tpr. Lawrence Muller, Tpr. Michael Hottman, New York State Police; Elizabeth Marr, Joseph Forino; and Mathew Weishaupt, Esq., Dutchess County District Attorney's Office; Wayne Kochis, assisting |
| Cause of Death: | Multiple blunt force injuries to head with fractures of facial and skull bones and contusions of brain. Traumatic compression of neck with asphyxia. Homicidal assault. |

Michael M. Baden, M.D.

## SCENE

The body of a middle-aged Caucasian woman is laying supine on her back clothed in a corduroy-type gray winter jacket, beneath which is a pink sweater, white blouse, black pants, black loafer-type shoes. The right leg is bent under the left knee. There are apparent multiple blunt force injuries to the face, neck, forehead, nose and eye areas with purple echymoses about both eyes. A rock is present adjacent to the right side of her face above her right shoulder with red blood-type stains on it. The body is stiff and cold and partially frozen. There is a history that she was struck by blunt objects on Monday evening November 28 and was found Friday evening, December 1. The weather has been cold during that time internal. The body is a few hundred yards from Route 22 on hard frozen ground among trees and bramble and is not visible from the highway.

## EXTERNAL EXAMINATION

The body arrives at St. Francis Hospital in a zippered white body bag at 2:00 p.m. The hair is light brown; there are extensive fresh blunt force injuries to the face which have been modified in part by post-mortem animal activity with loss of facial soft tissues. The left earlobe shows an old earring perforation but no earring is present. The right earlobe is largely absent due to the animal activity; no hemorrhage is present. There is a prominent laceration at the base of the nose with protruding fragments of nasal bone and nasal septum; the fractures extend into the cribriform plate of the skull. The eyes are intact; there are fresh purple ecchymoses about both eyes and there is a laceration of the soft tissues beneath the right eye. The upper and lower eyelids bilaterally are partially absent due to animal activity with only thin smooth rims

FELL-00001097

remaining. Diffuse bulbar and non-bulbar ecchymoses are present in the conjunctivae of both eyes, more prominent on the left. There is a 1-inch laceration of the left forehead anteriorly with post-mortem loss of soft tissues exposing a linear skull fracture that extends inferiorly. The mandible is fractured superiorly and the upper left medial and lateral incisors are freshly absent; there are fractures of the mandible on the left and right in the midline extending to the soft palate. There is traumatic absence of teeth in the lower jaw, some laying loose in the mouth. On X-ray, two amalgam fillings are present in the teeth remaining. There is a superficial ½ inch laceration and diffuse dried abrasion of the chin. A dried abrasion is present on the right side of the neck over a diffuse area 1-1/2 inches longitudinal and 2 inches horizontal. There are diffuse injuries to both malar regions of the cheek. There are lacerations of the inner mucosa of the left upper lip and of the right lower lip.

The body is received clothed in an unzippered wool-lined winter jacket with hood attached by buttons with the label "The Great Outdoors B. Mors." There is blood-staining around the collar and clotted blood around the neck and left upper back area but there are no downward directional blood drippings. The jacket is moist consistent with the history of rain at the site that the body was found. A dry black cloth glove is present in each buttoned pocket of the lower jacket anteriorly; nothing is in the upper open zipper pockets. Beneath the jacket is a pink woolen long-sleeved, V-neck sweater. Four opalescent, round buttons are present. The topmost button is missing; the second button is closed; the third button is missing; the fourth button is open; the fifth and sixth buttons are closed. There are no obvious tears of the fabric. Beneath the pink sweater is a white moist blouse with the label "Alicia," blood-stained in the upper area, no dripping. It is buttoned in the front and all buttons are present anteriorly and on

FELL-00001098

the sleeves. Beneath the blouse is an athletic-type tee shirt labeled "Carreau Sport" and beneath it a brassiere, which is intact and closed. The abdomen is cold to the touch. Black stretch pants moist posteriorly are present beneath which are intact white undershorts. Black shoes with horizontal tread and soil in the interstices are present. Black socks are in place and wet.

Paper bags on both hands placed prior to transportation are collected. The hands and fingernails show no trace evidence with the naked eye and under a magnifying lens. The fingernail clippings from each hand are saved as part of a rape kit as are pulled head hairs and swabs of the body cavities. An intact Timex watch and stretch metal band is present on the left wrist with the proper time. There is a yellow metal ring with green, pink and clear glass-like stones present. Adherent to the left wrist of the pink sweater in a folded cuff is a round red sticker saying "Buy one get one free."

There is present in the left front stretch pants pocket two dollar bills, two dimes, two quarters and what appears to be torn silver gum wrapper. In the right front pocket are two dollar bills. The dollar bills are moist. The blood on the blouse, sweater and corduroy jacket is largely on the back where the fabric is wet. The brassiere and panties are intact and undisturbed; they are wet and diffuse blood staining is present posteriorly. There is no blood staining of the garments anteriorly.

Pink lividity is present posteriorly consistent with the cold and position in which she was found. The body measures 62-1/2 inches in height and weighs approximately 125 pounds. Multiple pale abdominal straiae are present as is a 4-1/2 inch long pale superpubic midline old surgical scar. A single ¼ inch horizontal laporoscopy-type surgical scar is present in the right upper quadrant ½ inch inferior to the rib margin and 3-1/2 inches to the right of the midline. The

FELL-00001099

hands show washer-woman type change in the palmar aspects of the skin bilaterally. The ring and watch are removed and given to Special Agent Frank Woods.

## INTERNAL EXAMINATION

Thoraco-abdominal incision shows the panniculus to be 4-1/2 cm thick. There is fibrocystic disease of the breasts with a 1 cm cyst on the left. There is no free fluid in the chest or abdominal cavities and no traumatic injury below the clavicles. The viscera are cold but not frozen.

Heart:
: The pericardial sac is intact. The heart weighs 265 grams. Epicardium, myocardium, endocardium, valves and coronary arteries are unremarkable. There is an accessory right coronary artery. The coronary arteries are widely patent. The left ventricle is 12 mm thick; the right 3 mm thick. The myocardium is natural. The valves are unremarkable.

Lungs:
: The right lung weighs 570 grams; the left 485 grams; they fill the hemithoraces and are congested. Bronchi and vessels are unremarkable. There is diffuse hemolysis of blood in all of the viscera.

: Diaphragms, aorta, spine are intact. There is a kyphosis of the lumbar vertebrae.

Liver:
: The liver weighs 1005 grams. The parenchyma is light brown and lobular architecture is intact. The gall bladder is surgically absent.

Spleen:
: The spleen weighs 40 grams with soft parenchyma.

Pancreas:
: Tan, lobular, with early autolysis.

Adrenal Glands:
: Thin bright yellow cortices.

Genital-urinary
Organs:
: The ovaries and uterus are surgically absent. The urinary bladder is empty.

FELL-00001100

Kidneys:    The left kidney weighs 55 grams, the right 60 grams. There is a 2 cm cyst in the middle third of the left renal cortex, smooth and unilocular.

Gastro-intestinal
Tract:    The esophageal mucosa is intact.    The stomach is empty and contains about 4 cc of pink mucus. No food or particular matter is present. The appendix is absent.    The small bowel is unremarkable and the colon contains abundant soft brown fecal material.

Neck Organs:    There is diffuse hemorrhage in the right side of the neck and overlying the right clavicle. The right clavicle is fractured in the lateral third irregularly with multiple small fragments present; there is much hemorrhage surrounding the fractures.    There is abundant hemorrhage in the strap muscles of the neck bilaterally more prominent on the right side.    There are focal hemorrhagic teeth marks on the under surface of the tongue and in the midline, none on the superior surface.    There are fractures of the right and left greater cornua of the thyroid cartilage at the juncture with the body of the thyroid cartilage.    There are fractures of the hyoid bone bilaterally in the middle third on the left and in the anterior third on the right near the body of the hyoid bone with extensive hemorrhage in the posterior pharyngeal tissues. The cricoid cartilages are intact.

Musculo-skeletal
System:    The ribs are intact. The spine is intact but for a slight lumbar scoliosis.

Head and Brain:    Sectioning of the scalp shows diffuse hemorrhage in the soft tissues bilaterally more prominent on the left. A fracture line extends across the base of the anterior cranial fossa extending to the left anterior frontal bone. There are multiple fractures at the base of the anterior cranial fossa and of the superior orbital plate bilaterally.    The brain weighs 1170 grams and there are prominent contusions of the undersurfaces of both frontal and temporal lobes. Pituitary gland is natural.

Laboratory
Studies:    Blood taken for toxicology. Rape kit completed.

FELL-00001101

Cause of Death:    Multiple blunt force injuries to head with fractures of facial and skull bones and contusions of brain.    Traumatic compression of neck with asphyxia.  Homicidal assault.

Michael M. Baden, M.D.

FELL-00001102

# EXHIBIT 66

DONALD FELL INTERVIEW 12-02-2000

JC: The date is 02 December 2000, the time is 1701 Central Standard Time. The location is the Johnson County Detention Center in Clarksville, Arkansas. We are in an interview room at the correction center. Present are myself, Det. Sgt. James Cruise of the Vermont State Police; Det. Cpl. Rod Pulsifer of the Rutland City Police Department; Det. David Schauwecker of the Rutland City Police Department; Special Agent James Caudel of the Fort Smith FBI Office; also present is Donald Fell.

JC: Donald could you give your date of birth please?

DF: 04/30/80.

JC: 04/30/80. Donald what we are going to do first is we are going to through, you've explained to us that you have already been mirandized and continue talking to us and there is no issues. We are going to go through your Miranda Warnings one more time start to finish. We want you to pay attention to them, and then we will kind of come at the end to a section where we are going ask you to read that section to us, to make sure you understand it fully.

DF: All right.

JC: Okay. Detective Pulsifer could you?

RP: Okay, you have the right to remain silent, do you understand that?

DF: Yes.

RP: Anything you say can will be used against you in a court of law, do you understand?

DF: Affirmative response.

RP: We need a yes or no.

DF: Yes.

RP: Okay. You have the right to talk a lawyer before questioning and to have a lawyer present with you during questioning, do you understand?

1

FELL-00001103

DONALD FELL INTERVIEW 12-02-2000

DF: Yes.

RP: If you cannot afford to hire a lawyer one will be appointed to represent you at public expense before any questioning if you wish, in Vermont this is called a Public Defender, do you understand?

DF: Yes.

RP: Do you understand each of the rights that I have explained to you?

DF: Yes.

RP: Do you want to talk to me now?

DF: Yes.

JC: Donald could you read that next paragraph on the bottom?

RP: Right here.

DF: I have been advised that I have the right to remain silent, to be represented by a lawyer, to talk with one prior to questioning and to have one present during questioning. Knowing my rights I agree to waive them and to talk to you now, no threats or promises have been made to me.

JC: Donald did you understand all that?

DF: Yeah.

JC: Donald one of the other questions I always ask during my interviews is currently, right now, are you under the influence of any alcohol, drugs or prescription medications?

DF: No.

JC: Okay.

RP: I think where I would like to start Don is down in Pennsylvania.

DF: All right.

2

FELL-00001104

DONALD FELL INTERVIEW 12-02-2000

RP: And were you living down in Pennsylvania, in Pennsylvania at one time?

DF: Yes.

RP: And when did you move from there?

DF: I am not sure of the exact date, actually I think it was just around September 23rd I came up here.

RP: Okay.

DF: Because it was the day after my sister's birthday, which is the 22nd.

RP: And that would be the year 2000?

DF: Yes.

RP: Okay. Where were you living down there?

DF: Well basically I was travelling with the carnival for a while, earlier, I got back and I stayed with my aunt for a while, and then, actually my great-grandmother I was staying with.

RP: Okay, what's her name?

DF: Sybil Bannis.

RP: Okay.

DF: I had her drive me up here, not here but Vermont, to visit my mom and after a while I called my friend up, Bobby, and he come up to visit. Things were going good for a while.

RP: Now when your, grandmother is it, brought you up?

DF: Yeah.

3

FELL-00001105

DONALD FELL INTERVIEW 12-02-2000

RP: Where did you stay in Vermont?

DF: At my mother's house.

RP: Okay and do you remember what the address is?

DF: REDACTED - FELL

RP: Okay. Did your mom know you were coming up?

DF: Yes.

RP: How were things, how were things there?

DF: Pretty decent, I mean we argued every now and then you know. My mom was pretty weird she liked to smoke crack and drink a lot and she'd get kind of rowdy. But I got a long with her you know, we got in a couple arguments here and there, but nothing major. That's about it, she would cook us dinner you know, she bought me cigarettes when I needed them stuff like that. She was a good person.

RP: Were you working anywhere in Vermont?

DF: I just started working at Rutland Plywood right before everything happened, but I just started working there.

RP: Had you put any time in there yet?

DF: Yeah like three days.

RP: Three days.

DF: Yeah.

RP: Were the police called down to your mom's apartment quite a bit?

DF: Yeah, quite a few times for loud music, stupid stuff like that. I guess neighbors complain about the loud music. I know the last time they came down the cops themselves even said the music wasn't loud, the neighbors must be crazy.

4

FELL-00001106

DONALD FELL INTERVIEW 12-02-2000

RP: What, did you and your mom get along okay, or did you ever inaudible?

DF: Yeah basically, we got in an argument once down outside the Stop Lite, I think it's called the Stop Lite, the bar down there. She called me up and asked me to come down and get her, so I went to get her and I went into the bar and I am talking to my mom, some old guy and some black dude named Reggie. Actually Tina Conway comes up behind me and starts kicking me and so I turned around and I spit on her, cause I don't feel right hitting a woman you know. And my mom grabs hold of me, and all the way as she is pushing me out of the bar she is smacking me and punching me, and she is yelling at me for spitting on her friend. And I am like, she was kicking, and when we got outside the bar she wouldn't stop, so I kind of shoved her off me. You know what I mean, instead of hitting her or any thing I just kind of pushed her off me, I said get away from me. I guess she was real drunk and she fell like a dump, and well I tried helping her up, she wouldn't let me help her up or nothing. They called the cops and I waited there for them and they took me to the drunk tank. And I spent the night there.

RP: Okay. But at the house were there any physical altercations with your mom?

DF: Not really, no, no.

RP: Arguing with your mom?

DF: We argued here and there about stupid things, but in five minutes we were fine you know. I mean that's mother and son you know what I mean; it's not like we're not going to argue about something.

RP: Did your mom work anywhere?

DF: Holiday Inn, I am not sure what road it's on.

RP: What hours did she work?

DF: In the morning, 8 o'clock I think until like 2 o'clock or whenever they let her out.

5

FELL-00001107

DONALD FELL INTERVIEW 12-02-2000

RP: Can you kind of explain to me what happened prior to you and Bobby leaving Vermont?

DF: Well what happened was, is we were all kind of wasted, you know pretty fucked up. My mom was pretty well smoking crack and you know drinking lots of alcohol and shit. To tell you the truth I don't really know what happened to lead up to what happened; you know what I mean. All I know I was standing over a dude and he had a cut throat and I continued to stab him and I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean.

RP: Why did Bobby cut your mom's throat?

DF: I have no idea I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife you know. But I don't know why, I don't even know why I did it, but.

RP: How long have you known Bobby?

DF: My whole life.

RP: Okay. Do you know the person whose throat you cut?

DF: Charlie.

RP: And how do you know Charlie?

DF: I met him, my mom brought him over.

RP: Okay, was he over there a lot?

DF: Yeah it was like the third time he was there.

RP: Okay, since you were living here?

DF: Yeah, yeah.

6

FELL-00001108

DONALD FELL INTERVIEW 12-02-2000

RP: Okay. Did he and your mom, where they in a relationship?

DF: Not really, just friends.

RP: Just friends.

DF: Yeah her boyfriend is in the jail down there.

RP: And what's her boyfriend's name?

DF: Ah Tim, not Tim, I guess she calls him Tim, but it is Alan Reynolds.

RP: Okay, so he does go by the name of Tim?

DF: Yeah.

RP: Okay. You said you found yourself standing over who was it?

DF: Charlie.

RP: Charlie okay.

DF: I looked down and I was trying to figure out why I did what I did and what I did and I was going to turn myself in until I turned around and I saw Bobby doing that to my mom, and then.

RP: Can I ask why that would make you stop from turning yourself in?

DF: I don't know, I just got scared, I just wanted to leave, I just wanted to split. So we took off, we went, we grabbed my, actually after we took showers, cause we both took a shower. We tied things up and put them in the kitchen and we grabbed my shotgun and we walked to Price Chopper. To tell you the truth I don't know how we didn't get caught carrying a shotgun to Price Chopper, but we walked to Price Chopper and looked at.

RP: Hold that thought a minute, let's back up, going back to where you were standing over Charlie. You had the knife in your hand?

DF: Yes, yes.

7

FELL-00001109

DONALD FELL INTERVIEW 12-02-2000

RP: Do you remember how many times you stabbed him?

DF: No, no, I am thinking maybe somewhere around twenty-five, I am not positive though.

RP: Where, can you kind of explain to me how maybe you held him when you slit his throat?

DF: I think, I am not quite sure about this.

RP: I understand.

DF: This is the part I'm not sure about, but I might cause when I realized what I was doing my hand was on his shoulder, on his left shoulder.

RP: On his left shoulder?

DF: Okay, I had the knife in my right hand, so what I am thinking, is I must have grabbed him by his left shoulder and just right across you know.

RP: Okay.

DF: But I'm not sure, I don't know how many times I did it, but then I moved the knife a different way and I started stabbing him in the side of the throat here.

RP: Okay.

DF: I believe it was, I knew what I was doing at this point, I think, I am not sure, I was thinking I am going to turn myself in you know what I mean?

RP: Right, right, I understand that.

DF: So that's when I turned around and Bobby had already slit my mom.

RP: Do you, do you know what caused you to do that to Charlie?

DF: I have no idea. I have no, you know I was getting along with him, we weren't mad and nobody was fighting or arguing we were all having a good time.

8

FELL-00001110

DONALD FELL INTERVIEW 12-02-2000

RP: He didn't say anything to you, to make you angry?

DF: No, nope. I guess I don't know what the hell happened something in my mind must have just snapped I don't know, I couldn't control myself you know, I don't know.

RP: Did he ever make mention to you about calling the police?

DF: No.

RP: Were there, was there a warrant for you out of Pennsylvania?

DF: There might have been, I don't know.

JC: Okay, Don I need you to listen to me for a minute here, okay, before we go too far. And we do a lot of this I don't know I'm not sure, and I don't remember, okay. You are at a point right now where I've got to honest with you, okay, about the only thing you've got is truthfulness and how much you want to be cooperative and tell he exactly what happened. Okay and you're telling us some of what happened, we greatly appreciate that, I got to be, I'll be up front with you there, okay. I can also tell you that you're holding back, and you need to kind of, look at me for a minute, you need to let go of that. All right the full truth, and I know this is not hard and this is probably something in your mind that I'm going, I can't believe I did this I don't know what I was thinking. And that's understandable but you have to, let me finish what I'm telling you Donnie. You have to understand that it's not, we are not only judged in life by what we do, but what we do afterwards, okay. And if I stand here and do something wrong and then kind of, kind of play, well I did this, I might have done this and I might have done that. People are going to look at it and say well he is talking about it a little bit which is good, cause you're not outright tonight, which is, as far as we are concerned that throws you in a favorable light to us, okay. But beyond that there is a little issue here, you are not telling everything, and I am going to tell you, I have interviewed a lot of people in your seat, and one of the things that they do is they block things out. It's not that they don't remember, they just don't want to remember cause it was pretty bad, okay. And what we are talking about is pretty bad, all right, but you got to understand that we have talked to Bobby too, at length, several times. Bobby was in here before you.

9

FELL-00001111

DONALD FELL INTERVIEW 12-02-2000

DF: I know.

JC: You have given some statements to Agent Caudel already, okay, we've got a lot of facts from the scene, and a lot of things that went on and we know what's gone on and we want you to try to help us piece them together. In some instances we might be able to help you piece things together if there is a void there. Okay, but I got to tell you right now, I don't think there is as many voids there as what you're actually telling us now. So what I'm going to bring you back to something here, okay, is when did you pick the knife up? Why don't we start with that? And where did you get it from?

DF: Well the knife that I used was above the kitchen sink.

JC: Was above the kitchen sink?

DF: Yeah, on a shelf.

JC: Do you remember what time? Who was with you when you picked the knife up, I mean was your mother in the kitchen with you?

DF: No.

JC: Or was Bobby in the kitchen?

DF: Bobby was in the kitchen.

JC: Bobby is in the kitchen with you, you pick up a knife that's above the kitchen sink?

DF: (Affirmative response.)

JC: Okay.

RP: Where was Charlie and your mom?

DF: Charlie and my mom were in the living room.

RP: Okay.

10

FELL-00001112

DONALD FELL INTERVIEW 12-02-2000

DF:  Charlie was on the chair I don't know where my mom was.

RP:  What were they doing?

DF:  I couldn't tell you.

RP:  Did you hear them say anything, talking?

DF:  I didn't hear nothing.

RP:  So you pick the knife up above the sink?

JC:  What do you do next?

RP:  Then what do you do?

DF:  I, I guess I ran, I don't remember I'm telling you.  I really don't, I ran in and I suppose I started cutting Charlie apart and that's all I can tell you.  Like I said, I told him plenty of times already.  You, I don't see how you figure that I am holding out information on it or nothing like that but.

JC:  I am not saying you're holding out information I am saying that maybe you are trying to block it out and you don't want to remember it, but understand if you take the time, maybe there's some things that you can remember that you're not telling us right now.  And maybe if we help you by asking right questions, like one of the questions I just asked you.  Do you remember when you were picking up the knife?

DF:  This has been running over and over in my mind, since the day it happened.

JC:  Okay, I can imagine it would.

DF:  And that's the way I remember it, that's all I can remember.

JC:  So you are over Charlie, and you remember cutting him and then you go from, one point you go from slashing his throat, to

DF:  Stabbing him.

11

FELL-00001113

DONALD FELL INTERVIEW 12-02-2000

JC: Stabbing him.

DF: Yeah.

JC: Where, you said you were stabbing in the throat?

DF: I'm pretty sure it was on the side of the throat here, somewhere around this area. I am not positive, but that's where I think it was, and it was on this side here.

JC: The left side, sure you are stabbing him on the left side of his throat, okay, you're thinking this is wrong?

DF: Yeah and I stopped.

JC: You stopped?

DF: I stopped and then I was thinking about turning myself in.

JC: Is he moving?

DF: No he was just slumped down over like this.

JC: Okay. What happens next?

DF: Then I turned around and there was Bobby with my mom.

RP: What's he doing?

DF: Cutting her and you know I was like, I tried, I was thinking whether I could stop it or not, but her throat was cut and she was bleeding, and he was stabbing away man, there was nothing I could do you know she was already dead.

JC: Did you push him off her?

DF: Not right, I just told him to stop, and he stopped and she dropped then.

RP: Were they saying anything to each other?

12

FELL-00001114

DONALD FELL INTERVIEW 12-02-2000

DF: No.

RP: Was your mom saying anything to you?

DF: No, actually yes, she told me that she loved me.

RP: Do you have a nickname?

DF: Yeah.

RP: Is it, what is it?

DF: Binker.

RP: Did your mom call you that?

DF: Yeah.

RP: Did your mom say anything to you when this was happening?

DF: Bye.

RP: Did your mom say anything to you when Bobby was cutting her throat?

DF: That's what I'm telling you man, she was telling me that she loved me and shit.

RP: Did she call you by your nickname?

DF: Yeah.

JC: Here you go.

DF: Fucked up.

JC: Donnie I want you to just sit and relax for a minute, do you want some water?

DF: Need a cigarette.

13

FELL-00001115

DONALD FELL INTERVIEW 12-02-2000

JC:  We'll try to get you one, do you want some water right now Bud?

DF:  Yeah I could use some thanks.

JC:  I'll try to get you some water here right.  Donnie I appreciate you doing this.

DF:  I fucked up so bad, I mean why would she be telling me this when my friend is cutting her throat.

JC:  Donnie, your mom is laying there and she's not moving now, or is she moving now, when she's on the floor?

DF:  She was stopped then, she was lying face down on the, where the table was, the coffee table.

JC:  What do you do to her, do you do anything to her?

DF:  No I just left, then I tried to take a shower, that's what I did.  After I just showered cause I felt dirty.

JC:  Okay, let me ask you something now.  After Charlie is dead in the chair and your mother is dead on the floor, did anybody do anything to their bodies, did anybody hit them, kick them do anything?

DF:  No, no not that I recall, no.  I didn't touch nobody after they were dead.

JC:  What did you and Bobby talking about?

DF:  The first thing I said was I'm taking a shower.

JC:  And you go take a shower?

DF:  I went

JC:  What did Bobby do?

DF:  I don't know what he did, cause I was in the shower, you know what I mean I just went right in the back, and hopped right in the shower.

14

FELL-00001116

DONALD FELL INTERVIEW 12-02-2000

JC:  The clothes that you had on where are they?

DF:  They're here.

JC:  The clothes that you had on before you went in the shower?

DF:  Yes, yes.

JC:  You put those back on?

DF:  I threw them right back on.

JC:  Okay.

RP:  Did you, when Bobby was doing that to your mom, did you say anything to him?

DF:  No I just told him to stop.

RP:  Oh that's what I mean, did you say something to him?

DF:  I just told him to stop and he.

RP:  And he stopped.

DF:  Yeah.

RP:  And he did?

DF:  Yeah.  I listened.

RP:  You saw him cut her throat?

DF:  Yeah.

RP:  Did you see him do anything else with, what, did he use a knife?

DF:  Yeah.

RP:  And you didn't see him do anything else with the knife?

15

FELL-00001117

DONALD FELL INTERVIEW 12-02-2000

DF: No.

RP: Do you know what kind of a knife it was?

DF: I think it was a black handle steak knife.

RP: Okay, how was the blade on that, I mean was it

JC: Smooth blade or serrated?

DF: I don't know, I don't know, she had all sorts of different steak knives you know, I don't even know.

RP: The knife that you used on Charlie what kind of a knife was that?

DF: It was kind of little serrated edges on it, it was it said Hawk on it.

RP: Oh okay.

DF: From Hawk Inn, from Hawk Inn I suppose.

RP: And was that on the handle on the blade?

DF: Yeah it was on the blade the Hawk.

JC: From Hawk Mountain Inn you think maybe?

DF: Yeah, yeah.

JC: Like one of the one's that he uses for dinner settings up there?

DF: Yeah, I think so, it was a pretty thick knife, and it was, I guess my mom had it cause she use to work up there, and she had all sorts of towels from there and other stuff.

JC: Up at Hawk Mountain Inn she did?

DF: Yeah.

16

FELL-00001118

DONALD FELL INTERVIEW 12-02-2000

RP: Okay, well jump back, you're taking your shower, you get out of the shower and you put your, the clothes that you were wearing when you cut Charlie's throat, you put those clothes back on?

DF: Yep. There was no blood on the outside I just put them right on.

RP: Okay and then what did you do?

DF: Well I just started packing everything up, everything that I wanted to take.

RP: And what stuff was that?

DF: Clothes, I started grabbing my tapes out of my stereo, I left all the rest of my tapes that I like inaudible or something.

RP: Okay.

DF: That's really it, clothes and my tapes, and a CD player I took.

RP: Was there a curtain in between the living room and the hall?

DF: That was my tapestry that had Randy Rhodes on it.

RP: Okay do you have that?

DF: No, actually it might be in my army bag, it might be in my bag of clothes it might be if it's not hanging up there still. I probably have it.

RP: Okay.

DF: But that would be in the lady's car wherever they towed it to. That's where all my stuff is.

JC: Did you and Donnie talk about?

DF: I'm Donnie.

JC: I mean did you and Bobby talk about what to do, while you were there in the house, what you had to do next?

17

DONALD FELL INTERVIEW 12-02-2000

DF: We just had to go, and Bobby suggested that we hijack a car and I agreed with him on that one. So we left and we took my shotgun and we left.

JC: Okay, talk about that.

DF: Okay, we, well what happened was, we grabbed the shotgun. Everything was packed up and put in the kitchen and we walked to Price Chopper and at Price Chopper we sat on the side of the building for about 15 minutes, and some lady pulled up and she gets out of the car and Bobby runs up to her with the shotgun and says get the fuck back in the car. Said get the fuck in the back seat right, and at this point I jumped in the driver's seat, and Bobby jumped in the passenger side, he had to watch her with the gun while I drove. Well we left and we hit the highway south somewhere, I don't know which highway it was. I'm not positive, there could be a chance, three different highways that we were thinking about, Route 7, Route 4 and the guy from New York said I might have ended up on 22 some way along the lines.

JC: Sure.

DF: So I don't know and I've been trying to like if I can to figure out where her body is, you know. But I can't think.

JC: You can use this as an ashtray Don.

DF: All right.

JC: Donnie where exactly on Price Chopper were you?

DF: Right on the side, you know, right on the side of it.

JC: Is it the side that faces Pip's Barbershop?

DF: I, yeah I guess, I remember where that barbershop is now. That's closed down isn't it?

JC: Well it would have been closed at that time but.

18

FELL-00001120

DONALD FELL INTERVIEW 12-02-2000

DF: Okay, yeah, but it's facing the road?

JC: Yeah.

DF: Right by that wall, yeah that's the side. Cause the other side would have been all the way by Wal Mart. But yeah, it was on that side.

JC: You start heading south, you don't know where you're going?

DF: No.

JC: What is this lady saying?

DF: Nothing really she was quiet, very cooperative.

JC: When you first grabbed her what was she saying?

DF: Please, please leave me alone don't hurt me, this and that you know, and I told her that she'd be fine, and I, I really had no intentions of letting her live, I really didn't. And well we drove and that was it, and then she was quiet and I asked her, her name and she said it was Terry and I got a chuckle out of that because that's my sister's name. And then we just drove in silence then basically. She offered us donuts.

JC: Did she have donuts with her?

DF: Yeah, she bought them from Dunkin Donuts I believe. Yeah, she offered us donuts, we just kept driving, at one point in time she, after we switched drivers, me and Bobby switched. And at one point in time driving down the road she tried to jump out of the moving vehicle and I pulled her back in by her arm, I was gentle with her, I didn't hit her or nothing you know. I pulled her back in and I told her not to try it again. Well Bobby continued driving he was pretty rotten toward her, he was screaming and yelling but.

JC: Were you both holding the shotgun on her?

DF: At separate times while he was driving I was holding the shotgun and when I was driving he was holding the shotgun and I was sitting in the

19

FELL-00001121

DONALD FELL INTERVIEW 12-02-2000

passenger side and say he was in the back seat, sit there like this you know, and that's.

JC:  Was the barrel pointed between the two seats?

DF:  Yeah.

RP:  Did she have the donuts with her when you took her?

DF:  No, no, no I don't think she did, I'm not sure actually.

RP:  Did you stop at the donut store for a donut?

DF:  No, no, no, she had them, okay I see what.

RP:  I'm sorry I didn't make my self clear.

DF:  No she had them in the car, they were in the car.  We drove and drove and I don't where we were, what highway we were on.

JC:  Did you switch places a couple of times?

DF:  Yeah we switched places a couple of times and about when I started driving again we drove some more and I think, I am pretty sure we crossed over into New York State line.  I saw a nice little spot somewhere over on the side of the road, down the road a ways, and like we were on the highway, like we left Vermont on he highway it was about 2:30 in the morning.  Yeah I looked at the clock in the car, it said 2:30 we drove south the whole time I think.  I am pretty sure we drove south the whole time and about I don't know it was just turning light it was pretty much light we could see now. About that time, I am gathering it turned light maybe 6:30 in the morning, I'm not sure what time it was the sun came out.  But I am gathering about four and half-hours after we grabbed her; I stopped over on the side of the road.  What happened was there's this traffic coming and the traffic going down this way, there was no divider or nothing?  I drove over toward the on-coming traffic and on that side of the road.

RP:  There's a pull off?

20

DONALD FELL INTERVIEW 12-02-2000

DF: Yeah, there was a little dirt gravel thing, and there was a little tiny square field there with a hill on this side, and there is a tree line in the background. There was a truck about 30 feet away, it was a light truck Ford F150, 89 I believe, I paid no attention to it, I thought the guy might have been hunting or something. At which point I got out of the car and I opened her back door, she was on the driver's side. And I said walk up through the woods just keep on walking and we'll go. And she said I'll be safe right, and I said yeah. So I let her go and I get back in the car, and Bobby says to me we can't let her go, he says she's knows our descriptions, she knows our names, he said we have to kill her. So I said okay, so we walked.

JC: You agreed with him at that point?

DF: Yeah, I walked up, I walked up to the top of the hill and Bobby went down to the bottom of the hill and she was already running down toward the road. Bobby intercepted her, and I went down the hill and we both hustled her back up the hill, not harsh or nothing you know what I mean, just go a head walk up the hill you know. And I found a little, a little spot where you couldn't see from the highway and well we started kicking her in her head. And Bobby

JC: Was she standing up when you were kicking her?

DF: No I pushed her down first, she was on her back.

JC: Was she saying anything?

DF: No, she started to pray. And we started kicking her and Bobby went and he found a rock, and it was about yay big and slammed it right down on her head.

JC: Was she conscious at that point?

DF: I don't know.

JC: Was she still struggling when he slammed the rock down on her head?

DF: No, she wasn't struggling at all throughout the whole thing, she didn't even try to struggle, she just took it.

21

FELL-00001123

DONALD FELL INTERVIEW 12-02-2000

JC: And praying?

DF: Yeah.

JC: How do you know she was praying?

DF: She had her hands

JC: Together in front of her?

DF: Yeah. So after Bobby slammed the rock down I was pretty sure she was dead and I wiped my boot off with her shirt and we left. We went back into the car.

JC: Did you slam the rock down on her head at all?

DF: No.

JC: You sure about that it?

DF: Affirmative response, I used my feet.

JC: You used your feet, you were pretty sure she was dead when you left?

DF: Yeah. There was blood pouring out of her mouth, her nose, her eyes were bleeding, she was, she didn't look like she was breathing, so we left. We went back to the car and continued driving about a half hour later we pulled up to a Burger King and we got breakfast. I threw her purse and the donuts into the dumpster, like we found like $220.00 on her in bank envelopes and stuff like that. That's how we got gas and ate breakfast and stuff for a while and we just continued driving. Somewhere in New York where we crossed the Tappenzee Bridge, and continued on to Wilkes Barre, Pennsylvania.

JC: After crossing the Tappenzee Bridge? Okay.

DF: We continued on to Wilkes Barre, Pennsylvania, and at this point we went to my friends house and we stayed there the night, we didn't tell them anything that happened, or nothing like that.

22

FELL-00001124

DONALD FELL INTERVIEW 12-02-2000

JC: What did you tell them about the car?

DF: I told them it was stolen, that's all I told them.

RP: Who's your friend?

DF: Chris.

JC: His last name?

DF: Kolonjeski.

JC: Where does he live?

DF: 13 East Chestnut Street.

JC: Does he have a phone number?

DF: No he didn't have a phone.

JC: Does he work anywhere?

DF: No he can't work, he takes seizures he is epileptic. We stopped there for the night and then we stayed the night, and at which point we got a little nervous with the car, we parked it on Franklin Street, it is a hill off of West Chestnut Street. And we left it there overnight, and until the next night and the next night is when we left. We left maybe 1:30 2:00 in the morning. We saw another Neon parked right by where the car was. So I thought we would take the tags off that Neon, the Pennsylvania one and we tried to get the tags off the Vermont Neon but the screws were rusted in. So we had to go to Turkey Hill on North Washington Street to buy a screwdriver. And we did that and we switched the tags, we drove up and we threw her tags into the creek over this little bridge on North Main Street and from that point we hit 81 south and then we drove, just kept on driving. Believe we crossed into Virginia, Tennessee, somehow we got into Tennessee, I think we started bearing west I'm not sure. Then we ended up in North Carolina and then back in Tennessee again, going west right across Tennessee. And at which point we were low in funds, low in money for gas, so we started stopping at, well we were trying to figure out what to do for gas, charged enough. Bobby though we should mug somebody and it was the only idea we had for

23

FELL-00001125

### DONALD FELL INTERVIEW 12-02-2000

a while. And he was also thinking about hijacking another car and I really didn't want to do it, and I really didn't want no more blood on my hands at this point, you know what I mean. Cause I am not a monster, you know I am not a bad person, I don't like what we did to begin with. Basically I feel like I don't want to be alive right now, you know what I mean, but I feel like I'm a worthless piece of shit now, which I am. But ah we went to Wal Mart and I saw a receipt sitting on a game, and I opened the receipt up and it was for something that costs about $25.00. A small item. And so I went into the store, I guess a little light bulb lit above my head. And I went to the store and I grabbed the item that was on the receipt I matched the numbers and I took the receipt and the item from the shelf to the courtesy desk and I exchanged it for money. So they were paying me for their own product. Basically we did this we figured that's the only way we can get gas, and I figured it's better than mugging people or hijacking another car you know.

RP: This was your idea?

DF: Yes, so that's what we did from that point on for gas and it worked pretty well, did pretty good on gas. We were just about out of gas when we got here in Arkansas. And we were actually at the Wal Mart and we had receipts but Bobby went onto the side looking for this one, looking for a receipt and this lady saw him, and she told the other Wal Mart place to watch us, so we left. And that's when I guess, I don't know what happened Bobby must have made a wrong turn or something like that, but there was a cop behind us and he pulled us over, and that was it right there.

JC: Well we are going to go back and try to clarify some things. Donnie you have done excellent okay. You came right through from start to finish where we needed you, okay. And you were able to give a lot good detail, maybe with our help right now and the right questions you might be able to fill in some other spots for us okay? Why don't we start back toward the beginning again?

DF: All right.

JC: Okay we are going to bring you back in your moms house, okay. Understand some of the questions that we are going to ask you, are maybe based on stuff we know, physically at the scene and some of it's going to be on stuff that Bobby told us.

24

FELL-00001126

DONALD FELL INTERVIEW 12-02-2000

DF: All Right.

JC: Okay and we want you to be able to clarify some of it. If you remember it if you don't, but we need you to try to think real hard, I know it's not easy, and you are thinking bad about yourself right now. But you got to understand you are a human being and as humans we do things wrong, okay, we make mistakes. Some of them are heinous some of them are worse than others, and some of them we have a tougher time living with but you got to be able to try to help us out. At least think about the families involved so we can try and have some answers for them, okay. We are going to go back in to the house and Rod 's got some questions on the house, about how things happened okay?

RP: We are going to make this just a little bit further. Why did you come up to Vermont?

DF: I came to visit my mom, I haven't seen her in like seven years. I wanted to see her pretty bad. I missed her.

RP: Any particular reason you hadn't seen in her that long?

DF: Well, question I got locked up when I was 14 for not going to school, I skipped two complete years of school. So they threw me in a boy's home. And I was in the boy's home for two years, and they threw my mom in jail for it. After she got out of jail she split, she just left the state. She had warrants and fines and she didn't want to deal with it. There were a couple points in time when she tried coming back into the state and my aunt would call the cops on her or something and have her arrested. So she just decided to stay in Vermont.

RP: Had you been in contact with her to a phone or anything like that?

DF: No, no because every time she would call my aunt was pretty rotten and she hated my mom's guts. She would never put me on the phone with her; she would always tell my mom that I wasn't around, so I never got a chance to talk to her.

RP: Okay. Thanks I just wanted to know, you know why all of a sudden you decided to come up, to come up to Vermont. Did your mom have a phone?

25

FELL-00001127

DONALD FELL INTERVIEW 12-02-2000

DF: Yes.

RP: Do you know what?

DF: 773-7920. 802 is the area code.

RP: When you saw Bobby stabbing your mom, did you try to go to the phone and try to call anybody?

DF: No, no.

RP: Where was your mom's phone located?

DF: Right by the doorway coming into the living room, as you are walking into the living room from the kitchen, it's on the right hand side on the little table.

RP: The knife that you used and the knife that Bobby used, do you know what happened to those?

DF: We had them wrapped up in a little towel.

RP: Do you know why?

DF: Well we were going to bring them with us, but I forgot to grab them.

RP: Okay, did you wrap them?

DF: Yeah.

RP: Okay. Did you clean them off first?

DF: I believe I did, I'm not positive but I think I did.

RP: Okay. Did you see your mom struggling with?

DF: She didn't struggle.

RP: Okay, did Charlie struggle with you?

26

DONALD FELL INTERVIEW 12-02-2000

DF: No.

RP: Okay. As soon as you take showers, you put the same clothes back on, do you know what Bobby did, he went in and took a shower, you said that earlier?

DF: Yeah, yeah.

RP: Do you know what he put on for clothes?

DF: I have no idea I wasn't really paying attention.

RP: Do you remember what he was wearing when he was stabbing your mom?

DF: Probably just jeans and a tee shirt his boots.

RP: Were those the same clothes he had on after he took a shower?

DF: I don't know, I wasn't in the bathroom I come in also, I don't know, I don't know if he changed or what not.

RP: How long, do you remember about what time this may have happened?

DF: No I don't. The only time, the first time I looked at the clock was when we were on the highway in Terry's car.

RP: Okay, about what time was that?

DF: That was about 2:30 over here on the highway in Terry's car.

RP: Morning or afternoon?

DF: Morning, early morning.

RP: Okay, so this was shortly after you left the house?

DF: Yes.

27

FELL-00001129

DONALD FELL INTERVIEW 12-02-2000

RP:  You, do you remember what day of the week it was?

DF:  Sunday.

RP:  Sunday?

DF:  Or early Monday morning.

RP:  Okay.  So did you pack some things?

DF:  Yes.

RP:  Your clothes?

DF:  Yes.

RP:  Any other?

DF:  Tapes, CD's the shotgun came with us.

JC:  How did you get all the stuff into the car?

DF:  After we got the car we came back to the house, Bobby watched her while I had the trunk popped open and I went in and I grabbed everything all at once and I just brought it out and threw it all in the trunk and closed it and we left.

RP:  When you left the house, do you remember what route you took to get down to Wal Mart?

DF:  I am not quite possible okay, you make a left coming out of my mom's steps, there is a little tiny alleyway next to a Foley's, Foley's laundry.  Cut through there up on the side of Uncle Sam's.  We went across, I'm not sure which street it is, but right there we went kind of behind Stewart's or whatever that store is that's there, not Stewart's it's something else, Stewart's is down the road.

RP:  Could it be a Jiffy Mart?

28

FELL-00001130

DONALD FELL INTERVIEW 12-02-2000

DF: Yeah, Jiffy Mart, behind the Jiffy Mart down on the side of the post office, across the street, underneath that parkcade we went where people park cars.

RP: Parking deck.

DF: Yeah, and we walked straight through there, the parking lot I believe right beside Price Chopper.

JC: What was your intention about waiting on the side of Price Chopper?

DF: I don't know we were thinking about hijacking a car.

JC: You guys talked about that before this.

DF: Hijacking a car and just getting out of there.

JC: Whose idea was it to hijack the car?

DF: I don't know, I think we just both came up with it. Just both said hijack the car.

JC: While you were on the side of Price Chopper waiting for somebody in a car or a victim or something how long did you wait there?

DF: About 15 minutes.

JC: About 15 minutes. In that 15 minutes did Donnie ever hold the gun on you and tell you, you couldn't run?

DF: Bobbie.

JC: Bobbie, did Bobbie ever hold the gun on you and tell you, you couldn't leave?

DF: No, there was no bullets in the gun.

JC: You knew that?

DF: Yeah and if even if he did that I would have stuck it up his ass.

29

FELL-00001131

DONALD FELL INTERVIEW 12-02-2000

JC: Okay so you could he left if you wanted to. You could have walked away?

DF: Yes.

JC: But you stayed there waiting for somebody to come along that you could hijack.

DF: Yeah. I was scared I didn't know what to do, I know.

JC: But you're telling me now that you know you had time. Bobby is not going to stop you from leaving, you want to leave you can leave but he doesn't and you don't leave, you chose to stay there and be part of what the next step is?

DF: Yes, yes.

RP: On your way from your house down to Price Chopper, did you try to get a car in between that time?

DF: No.

RP: At all?

DF: No.

JC: Did you stop in the road and try to flag somebody down?

DF: No.

JC: Sure about that?

DF: I'm positive. That would have been just stupid.

JC: Okay.

RP: Did, you said you didn't, did Bobby?

DF: Not that I know of, I don't think so.

30

DONALD FELL INTERVIEW 12-02-2000

RP: The two of you were together the whole time?

DF: I probably would have yelled at him cause that would have been stupid.

RP: Okay.

DF: I'm not really stupid you know. Well I am I guess now after this I am in the shit but I'm not.

JC: You're there in Wal Mart Parking lot and you grab the, you see somebody come in, a female come in, is she alone?

DF: Yeah she was alone.

JC: You clearly identify she's alone?

DF: Yeah, yeah. We were sitting on the right.

JC: Did you ever think maybe wait for somebody else or maybe just try to steal another car?

DF: No, no that was a perfect chance.

JC: Perfect chance.

DF: She was alone, we were right there by where she pulled in, we could clearly see nobody was in the car with her, so we thought that was when we would take the chance to just go.

JC: When you guys approached the car was she still in the car or was she out of the car?

DF: She got out and in fact we had waited for her to get out of the car and walk around and start coming closer to us.

JC: Why did you wait for that?

DF: We didn't want her to see the gun and panic.

31

FELL-00001133

DONALD FELL INTERVIEW 12-02-2000

JC: And drive off?

DF: Yeah, so we thought we would wait for her to get a little closer that way, and then Bobby just took the gun out and that was it. He said get the fuck back in the car.

JC: Did she?

DF: Yeah. Most certainly.

JC: What did you do, you said you got in the drivers seat and you guys started driving off?

DF: Yeah.

JC: She's saying why are you doing this, don't do this.

DF: No she was just asking, I said it before ah, she was saying don't kill me or?

JC: Was she begging for her life?

DF: Yeah. But I told her she would be fine.

JC: She's begging for her life, you got the keys to the car and you got what you wanted the car?

DF: Yeah.

JC: Could you have just let her go right there in the parking lot?

DF: No, then the cops would have been right on us.

JC: Okay, but physically there was nothing barring you from leaving her right there in the parking lot?

DF: No.

JC: Bobby wasn't going to prevent you from doing that?

32

FELL-00001134

DONALD FELL INTERVIEW 12-02-2000

DF:  No.

JC:  If you wanted to tell her to get out of the car you could have done that?

DF:  Yeah.  Oh well I don't personally I don't really know if Bobby would have done anything to her if I just told her to leave right there.

JC:  But you didn't give her that opportunity?

DF:  No.

JC:  You and Bobby continued to threaten her to keep her in the car?

DF:  Yeah, we didn't verbally threaten her just had the gun on it so, it's a threat on it's self?

JC:  Let's clarify that right, let's clarify that.  You didn't verbally threaten her, but did you threaten her?

DF:  Kind of like with the gun.  We told her.

JC:  I don't think it's a kind of.

SIDE TWO TAPE ONE.

JC:  Okay you are saying that's a definite because?

DF:  Yes there's a gun.

JC:  The gun is pointed at her?

DF:  The gun is pointed right at her, I'd take it as a threat too.

JC:  Okay that's what I was getting at.  You would take that as a threat?

DF:  Yes.

JC:  Did you ever tell her there weren't any bullets in it?

33

FELL-00001135

DONALD FELL INTERVIEW 12-02-2000

DF: No, me and Bobby were the only two that knew that there were no bullets in it.

JC: So if you were her, and you are in the backseat and you've got this gun pointed at you, what are you thinking?

DF: I am thinking there's a lunatic with a gun pointed at me.

JC: And what?

DF: If I tried anything I would probably be shot.

JC: Okay. So she is now basically your hostage?

DF: Yeah.

JC: You held her hostage kidnapped her, in her car, and you're headed out?

DF: Yeah.

JC: Where do you go, can you describe that route that you take?

DF: Well first we went and picked up the stuff, and we went up past the diner up north I believe, too, I'm not sure if we turn off on 4 or if we continue on 7, but that's the route that we took.

JC: You head down 7 and you're not sure now whether you turn to 4 or 7?

DF: Yeah.

JC: But eventually you keep going which direction, east, west, south?

DF: South.

JC: Okay. And eventually like you've told us before you come to an area where you pull off and you're going to leave her?

DF: Affirmative response.

34

FELL-00001136

DONALD FELL INTERVIEW 12-02-2000

JC: Okay. You're going to leave her, now let's clarify some things on that. But there's conversation between you and Bobby about what specifically?

DF: When I let her go and I got back in the car, he says we have to kill her, we can't let her go, she knows our faces, she knows our names, and I guess I was pretty scared and I didn't want to get caught. Now at this point in time I agreed with him so that's when we followed her and.

JC: You followed her and got her?

DF: Yeah.

JC: Okay. Now let me clarify something on this cause I just want to understand it, cause some people say different words for different things, but I want to make sure that what I'm thinking in my mind and what you're telling me is exactly what it is. Okay? You and Bobby formulate a plan that because you don't want to get caught, you have to kill her?

DF: Yes.

JC: You understood that when you got out of the car? You and Bobby get out of the car, you track her down, she is already away from you, you could have left?

DF: Yep.

JC: Did you feel that you could have left or Bobby would have stopped you?

DF: I don't know, I really at this point I was just afraid and I could –

JC: But could you have driven right off?

DF: Maybe, maybe most likely, I don't know what Bobby might have done at this point.

JC: Fear of her getting you caught?

DF: Yes.

35

FELL-00001137

DONALD FELL INTERVIEW 12-02-2000

JC: You formulated a plan that you got to kill her?

DF: Yes.

JC: And now with that intent, you get out of the car?

DF: Yeah.

JC: And you track her down? What do you physically do to her? I mean lets clear this up if you can, really clear. Because if they haven't yet, because we haven't called back, if they haven't yet, we are going to find her and we're going to do an analysis on her, and it's going to tell us about the injuries and the extent of those. I want to be able to say who did what. We have to answer too things to the family.

DF: Yeah. Of course she wasn't sexually molested or assaulted or anything like that. If that's what you're coming to?

JC: That's important we hadn't asked that.

DF: She was not touched like that in anyway, she has all her clothes on. The only thing that happened was I was kicking her and Bobby threw a rock on her head.

JC: Bobby threw a rock on her head, you told me before that she was praying while this was going on?

DF: Yeah.

JC: So she's not trying to hurt you?

DF: No.

JC: She's not trying to escape anyone, she's not trying to run?

DF: No.

JC: She's not trying to hurt Bobby?

DF: No.

36

FELL-00001138