DONALD FELL INTERVIEW 12-02-2000

JC: She's not threatening you?

DF: Negative response.

JC: She's laying on the ground praying?

DF: Yep.

JC: And you're kicking her?

DF: Affirmative response.

JC: And Bobby is throwing a rock on her head?

DF: Affirmative response.

JC: To try to kill her?

DF: Affirmative response.

RP: Did you or Bobby ever tell her what you had done at the house?

DF: No.

RP: So she knew nothing about that?

DF: No she didn't.

RP: So the only thing you were concerned about was when you say, with what, nothing you were concerned about is that she would go and tell about you just taking her car?

DF: Yeah, well that and she knew our names. Not our last

RP: Correct I mean as far as you're fear or concern about what you had done, she knew nothing about, she couldn't tell them what you had done at the house?

37

FELL-00001139

DONALD FELL INTERVIEW 12-02-2000

DF: No, no, but I knew that, that it would link us to the crime so I knew that once, once that she told you guys our names and that we took the car and that. They'd have a location of where we were.

RP: Okay.

JC: So you'd get caught.

DF: Yeah. And pretty quick cause you can't out run the radio.

JC: Yeah, it's true. So your intentions of killing her was so you wouldn't get caught?

DF: Yeah.

JC: Let me ask you this. Now you're going back for some other things okay? You had made a comment about Bobby okay in the house. There some issues I want to clarify with Bobby okay, in earlier that night. Were there arguments going on and Bobby argued with Charlie, and Bobby argued with your mom, when we said conversations with Charlie. Later that evening about Charlie maybe turning you two in to the police because he knew that you had some legal problems in Pennsylvania?

DF: Nope. Charlie had no idea I had legal problems in Pennsylvania in fact I didn't know I had legal problems in Pennsylvania.

JC: Did Bobby have legal problems in Pennsylvania that he let people know about?

DF: I believe he was on the phone once, and they were looking for him for robbing a house and stealing guns out of it or something like that.

JC: Did Charlie know about this?

DF: No, no.

JC: Did you know about it?

DF: I knew about it yes.

38

FELL-00001140

DONALD FELL INTERVIEW 12-02-2000

JC:  Did your mom know about it?

DF:  Yeah my mom knew about it.

JC:  So your mom knows that Charlie is wanted in Pennsylvania?

DF:  Bobby.

JC:  I mean Bobby.

DF:  Yes.

JC:  Is wanted in Pennsylvania?

DF:  Yeah.

JC:  But you don't know if Charlie knew or nor?

DF:  What?

JC:  You don't know whether Charlie knew that or not?

DF:  Well my mom wouldn't tell Charlie that, none of his business, my mom, my mom is a person like that, she keeps things to herself basically.

JC:  Sure.

RP:  Did your mom have a concern about Charlie stealing things?

DF:  yes, yes she did, she, she had a concern about, just about everybody she brought over stealing things.  Not, that's why I don't know why she brought them over.

RP:  Good point.

DF:  I guess it was I don't know to have herself a good time or whatever, but why would you bring people over if you think they are going to rob you, you know.  She had lots and lots and lots of expensive stuff there.  She inaudible just about that big, I don't why, but yeah she's, she's concerned about that.

39

FELL-00001141

DONALD FELL INTERVIEW 12-02-2000

JC: I want you thinking back now, okay, I just want you to think a minute to reflect on something here. Okay? Thinking back about the events more specifically in the house, can you think of any other things that you worked out or that Bobby did to Charlie or your mom or to Terry, any of those incidents that you haven't been able to remember or tell us right know. I want you to think clearly; maybe it's something that's real, not such a good thing to tell us something?

DF: No. That's just with the knife you know and the car. I mean we never sexually molested her you know that would just be sick. And then if we tried that with my mom you know, cause I didn't even want her to get it any ways you know what I mean?

JC: What were you going to do with your mom if you had killed Charlie, I mean how were you going to explain that to mom?

DF: Well I was just going to go right down to the police station and that's what I was going to do. Until Bobby killed my mom and then there was two murders you know and

JC: Let me ask you this, did you kill your mom?

DF: No I most certainly did not.

JC: You didn't kill your mom?

DF: No I most certainly did not.

JC: You look at me right now and you're going to tell me that you did not kill your mom?

DF: I most certainly did not.

JC: But you killed Charlie?

DF: Yes I did.

JC: And you would have gone and turned yourself in for killing Charlie?

DF: Yes.

40

DONALD FELL INTERVIEW 12-02-2000

JC: Why didn't you turn around and beat the ever loving stuff out of Bobby an turned him in for killing your mom?

DF: Well because I mean she was already dead you know.

JC: Right, okay. Using that logic I am having asking you that question all right, cause if what you wanted to do was turn yourself in here Donnie.

DF: Cause at this point

JC: Why didn't you, why didn't you take the advantage of that, say hey you killed my mother, that's beyond what we were doing.

DF: At this point, if I did that, if I did that to Bobby then it would have been my word against his. He would have blatantly told them that I murdered both of them probably, you know what I mean. Because at this point them two are dead and Bobby is lying in a heap of blood because I 'd beat him up you know what I mean. So that wouldn't really look to good on me either you know.

JC: Did you think about that?

DF: I did yes. I most certainly did in fact I even thought about beating him up and saying that he did both of them. But I am not a liar man, I can't lie to much you know, I grew up, I can say I'm not a liar man, because if I was a liar right now I would be telling that Bobby did it all, and I did nothing, you know what I mean. But I told you flat out I killed Charlie and I had a part in killing Terry and kidnapping her and so on and so forth. But I would never ever harm a hair on my mother's head. I love my mother.

JC: Don you just made a big statement okay. When you're talking about that and you're talking about truth and lie and all that. One of the things you told me you can't lie too much, can you define too much for me?

DF: Well most of the time, if I got caught breaking a law by cops, I would tell them a fake name you know and get a citation under a fake name or something like that you know. That's about, this is a just a little too serious, you know what I mean and like I said I don't even want to be alive right now. If I could have what I was trying to look for in Wilkes Barre, I was

41

FELL-00001143

DONALD FELL INTERVIEW 12-02-2000

trying to get some heroin, I don't like needles myself, I've never done it, you know what I mean. But I was going to get some and I was going to fill a needle up and when the cop pulled us over here, I get that chance as he came up I was going to stick it in my arm and just go deep, you know what I mean. But I couldn't find none so.

JC: You were going to have yourself a little way out is that what you were looking for?

DF: Yes, yes I was just going, I was just going, I was just going to die, you know in fact I would have been much more happy.

JC: Have you used heroin in the past?

DF: I never have no.

JC: Never used heroin in the past?

DF: No but I've seen thirteen of my friends die on it. So I knew it would, especially to be put over in to a definitely over dose. You know.

RP: Inaudible.

DF: What.

RP: What inaudible.

DF: And actually, actually used angel dust, marijuana, mushrooms, I had a payote once, coke, pills alcohol.

RP: Crack?

DF: Crack yes, well I can say coke, coked up. Speed, never heroin, I never tried heroin.

RP: Were you and Bobby using anything the day you killed Charlie and your mom?

DF: Crack and a lot of alcohol. I drank quite a bit, and when I drink, I drink quick and I go through, well me and Bobby can only go through 24 beers in

42

FELL-00001144

DONALD FELL INTERVIEW 12-02-2000

an hour, between the two of us. So when we get beer, we like to play a card game, flip a card and flip another card and then if the suits match or the numbers match, you got to drink that many beers and what not. Or that many sips of beer you know, so we would go through about 24 beers in an hour, and play about an hour with 24 beers and two people we were pretty hammered you know.

RP: So how was your mom relationship with Bobby?

DF: Oh they got along, as far as I knew I had never seen them fight or argue when I was at work and I'd come home they would sitting there laughing having a good time you know, watching TV or whatever.

RP: Your mother ever complain to you about him?

DF: Never, not once.

RP: Did he ever complain to you about your mom?

DF: No, nope. In fact we were all pretty friendly man that's I don't understand why he killed my mom but.

RP: I know he's asked you this, but probably a couple of times already. And I will ask one more time. Is it what was happening or what was going on just before you grabbed that knife?

DF: The way I've been looking at this I was sitting there drinking playing our card game, the radio was on, classic rock was playing on the Foxx. I don't know why I remember getting up and picking the knife up, I don't remember my way through the hallway, I don't really remember the first cut, but I remember the rest of the stabs.

RP: But backing up just before you grabbed the knife, what were you saying to Bobby or what was Bobby saying to you?

DF: I don't know really the stage but really laughing and having a good time playing cards, getting drunk I know we were already drunk but just getting more you know.

RP: Do you understand what I'm looking for?

43

FELL-00001145

DONALD FELL INTERVIEW 12-02-2000

DF:  No I don't.

RP:  Okay.  Well what I'm looking for is what triggered you?

DF:  You mean like a motive?

RP:  Yes a motive perhaps, but what triggered you to grab the knife and go do this.

DF:  I couldn't tell you.

RP:  It's nothing you have ever done this before I'm assuming.

DF:  Well act, well not, not recently ah a long time back I was locked up in Nut wards about eight times, for stupid shit when I was a kid.  I had stabbed a person; I shot somebody a lot of violence things like that.  The one time I ripped my bedroom door of the hinges and threw it down the steps at my stepfather.

JC:  Who did you shoot?

DF:  I shot my friend Johnny in the shoulder.

RP:  Was that reported to the police?

DF:  Yes it was in fact his dad was a cop, it was his dad's gun.  We were kids, that was an accident, that one they never believe me, they thought I did it on purpose.  What happened was we were little kids and he said you want to see my dad's gun, and I said yeah?  So we looked at his dad's gun and I mean his dad kept the gun in the kids' bedroom door, loaded with two little clips, and it wasn't even on safety.  I took the clip out and pointed at the wall and I didn't know nothing about guns or anything about one being in the chamber or anything like that you know what I mean.  I pulled the trigger and he jumped in the way and it went through his shoulder.  And they threw me in the Nut ward for that.  They didn't believe me that it was an accident but the fact that, the doctor tell him that there is no such thing as accidents.  I was pretty shaken up myself, but I was still friends with him, I still am now.

RP:  Who did you stab?

44

FELL-00001146

DONALD FELL INTERVIEW 12-02-2000

DF: Ah, a girl named, Julie, Julie Cross, we were kids, we were fighting in my house, and she kneed me in my nuts, and she pushed me through, right through my dad's fish tank. And she went into the kitchen and I took my fork off my dinner plate, I was eating dinner, and I threw it and it stuck in her leg, right there. And they hauled me away for that one.

JC: To clarify again just so we all understand, okay. You knew what you were doing when you picked up Terry?

DF: Yes.

JC: You told us that?

DF: Yes.

JC: You could have walked away?

DF: Yes.

JC: You chose not to?

DF: Yes.

JC: And you could have let her go free?

DF: I could have, yes.

JC: But you chose not to. You and Bobby formulated a plan and you articulated that. I mean you spoke about to each other so you each knew that you were going to kill her?

DF: Well it really wasn't premeditated, it was just spur of the moment.

JC: Spur moment there by the side of the road?

DF: Yes.

JC: But you talked about it and said let's kill her, and you got out of the car and did it?

45

FELL-00001147

DONALD FELL INTERVIEW 12-02-2000

DF: Like two seconds it wasn't premeditated or nothing, it was just let's go you know.

JC: But when you went out of the car, could you have gotten back in the car and gone away?

DF: Yes.

JC: Okay, so you didn't do that and continued on?

DF: Affirmative response.

JC: And you killed Terry?

DF: Yes.

JC: You and Bobby together?

DF: Yes, yes we both killed Terry.

RP: Just a couple quick things. Where are the clothes that you were wearing to Pennsylvania, you changed into, where are those clothes now?

DF: I didn't change. I didn't change from the time I left Vermont until I got here, I was in the same clothes, I had no time to shower, I didn't shower at my friends house or nothing like that.

RP: What were you wearing, I don't know if we asked you that or not?

DF: Army pants army fatigues, I had my black boots on, or brown boots, I think they're brown. But I had a Slayer's shirt on, a black Slayer shirt that had a demon looking think on it. And I had my hooded pullover and I had a brown leather fringed jacket.

JC: What's with the window shades in the back of the car?

DF: The what?

RP: Window shades are those yours?

46

FELL-00001148

DONALD FELL INTERVIEW 12-02-2000

DF:  Window shades?

RP:  In the trunk?

DF:  Oh no they're not mine.

JC:  There's a diary in the car, talks a lot about suicide?

DF:  You mean that little black book?

JC:  Yeah.

DF:  That's Bobby's songs.

JC:  Bobby's songs.

JC:  Did he write one while you guys were together in the last couple of days?

DF:  No, I didn't see him write one.

DS:  Well I was just wondering I forgot to ask Bobby, I wanted to see if, I was just going to take a picture of you guys, but never mind.

JC:  I am going to ask him one more thing before we clarify everything else. Okay.  Did you understand everything we've talked about today?

DF:  Yeah.

JC:  Did we threaten you at all?

DF:  No.

JC:  Have we treated you humanely?

DF:  Most certainly, most certainly.

JC:  With respect?

47

FELL-00001149

DONALD FELL INTERVIEW 12-02-2000

DF: Yes, definitely. To tell you the truth you should be smacking my head off the wall, but.

JC: But we didn't do that did we?

DF: No, no you didn't, but I am saying you should have.

JC: Okay. We didn't threaten you to make a statement?

DF: No.

JC: You did this voluntary?

DF: Most certainly.

JC: You understood what you're doing now?

DF: Yeah.

JC: You understood what you were doing when you kidnapped and killed Terry?

DF: Yeah, yeah.

JC: What you were doing at that house?

DF: Yeah.

JC: You understood the Miranda thing?

DF: Yeah.

JC: That was given to you tonight?

DF: Yeah.

JC: All right. Donnie, I am going to have you raise your right hand.

48

FELL-00001150

DONALD FELL INTERVIEW 12-02-2000

JC: Donnie do you swear under the pains and penalties of perjury that the information you have provided on this taped statement is true and accurate to the best of your knowledge?

DF: I most certainly do.

JC: Okay thank you. At this time this completes the taped statement of Donald Fell. The time is 1808 hours Central Standard Time.

Ntb 12-07-00.

Reviewed and checked by Det Sgt Cruise on 12 Dec 2000

49

FELL-00001151

# EXHIBIT 67

**PRISONER INTAKE**
**USM 129**
WESTERN DISTRICT OF ARKANSAS

USMS NO          LAST NAME          FIRST NAME    MIDDLE
05305-010    *LEE*          *Robert    Joseph*

SEX      RACE      HAIR      EYES      HEIGHT      WEIGHT
*M*      *W*      *bro*      *HZL*      *508*      *135*

BIRTH DATE    PLACE OF BIRTH          STATE      CITIZENSHIP
REDACTED - FELL
*-80*      *Staten*          *NY*      *US*

FBI NO        SOCIAL SECURITY NO        ALIEN NO
              REDACTED - FELL
              *-4689*

STREET ADDRESS          CITY          STATE      ZIP


PHONE NO


---

**MEDICAL:**

USMS PERSONNEL PROCESSING NEWLY ARRESTED PRISONER(S) WILL VERBALLY INQUIRE OF
ARRESTING/TRANSPORTING OFFICIAL WHETHER

1) The prisoner(s) displayed any suicidal tendencies while in their immediate custody.

NO_____    YES __X__    If yes, explain.    *Talked about wanting to die.*

2) The official has any independent knowledge of a suicidal history of the prisoner(s).

NO __X__    YES_____    If yes, explain.

3) Has the prisoner(s) had previous suicide attempts.

NO __X__    YES_____    If yes, explain.

VA BENEFITS __NO__    MAJOR MEDICAL? __NO__

*ARREST*

AGENCY CODE          LOCATION OF ARREST          ARREST DATE   CASE NO

_[handwritten: AGT]_          _[handwritten: Clarksville AR]_

CHARGES

_____

\*\*\*\*\*\*NOTE\*\*\*\*
IF SUBJECT IS ARRESTED ON OUR CHARGES, USE THE ARREST DATE OF THE ARRESTING AGENCY
TO GENERATE A JAIL BILL FROM DATE OF ARREST.

*STATUS*

(USE IN-ADMIN WHEN SUBJECT IS RELEASED ON BOND) OTHERWISE, USE WT-TRIAL.)

LOCATION

_____

SPECIAL-HANDLING

_____

PROPERTY

_____

FELL-00001153

# EXHIBIT 68

SUPPORTING DEPOSITION (CPL Sec. 100.20)   GENL-4 REV 01/98E   New York State Police

STATE OF NEW YORK                                              COUNTY OF   Dutchess

_____ COURT                       Town _____ of _Dover_

THE PEOPLE OF THE STATE OF NEW YORK )                                                    E-11
                                    )
            --vs.--                 )
                                    )
_____   )             SUPPORTING DEPOSITION
                                    )
_____   )
                                    )
                (Defendant          )
-----------------------------------

STATE OF NEW YORK                   )
COUNTY OF   Dutchess                )              ss.
                                    )
Town _____ of __Dover_____     )

| On | DATE 121200 | at | TIME STARTED 4 :00 ○am ●pm | I, | FULL NAME Francis R Bellantoni | | |
| DATE OF BIRTH REDACTED - FELL 48 | | NO. & STREET REDACTED - FELL | | | | C/T/V Dover Plains | STATE NY |

state the following: I recall that one day I was travelling to work along ST 22 in the morning hours , I saw a car facing north along the pull off on ST 22. I saw two males outside of the car coming from the wooded area , they were about fifteen feet apart from each other, it appeared that one of the males was agitated with the other. I noticed the car and and as I passed the car I saw it had vermont plates, I also noticed a female inside the car in the rear on the passenger side. I went further down the road and realized I forgot my cell phone, so I turned around by the Palumbo block sign and headed north on ST Route 22, When I approached tthe area that the car was pulled off the road, I noticed that a female was walking towards the woods with two males behind her. They were about eight to ten feet behind her. I continued to my house and on my return trip heading south on he car and the people I saw were now gone, I estimate approx ten minutes elapsed.

Q. ou you recall what day or time it was?

A. No

Q. Can you describe the car?

A. No, I just remember the Vermont plates

Q. The people you saw, was the women being taken by force?

A. No

Q. How fast were you driving your car on ST 22?

A. 55 mph

Q. Do you have anything to add?

A. No

## NOTICE

(Penal Law Sec.210.45)

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this __12th__ day of __December__ , YR __2000__

                    -- OR --

*Subscribed and Sworn to before me

_____ day of _____ , YR _____

_____
(SIGNATURE OF DEPONENT)

_____
(WITNESS)

_____
(NAME OF PERSON TAKING DEPOSITION)

| TIME ENDED 4 :25 ○am ●pm |

# EXHIBIT 69

```
          Warrant Information Network
              LIMITED OFFICIAL USE
                 SUBJECT REPORT           PAGE   1
         Generated by Transaction - Interactive Query
              Date: 12/15/2000 Time: 07:57:14 EST


               Name : LEE,ROBERT
               FID # : 526229
               Status : HISTORICAL   Subject is NOT in NCIC for USMS
```

*Alias:
 Seq. #  Alias
    1    LEE,ROBERT JOSEPH
    2    LEE,ROBERT L

*Date and Place of Birth:
 Seq. #  Date of Birth  Place of Birth
    1    REDACTED-FELL 1980    NY - NEW YORK
    2    REDACTED-FELL 1979         -

*Social Security Number:
 Seq. #  Soc. Sec. Num.
    1    REDACTED-FELL -4689

*Description:
 Seq. #  Eyes   Hair  Height   Weight   Skin   Race   Sex   Marital Stat
    1    HAZ    BRO    508      135      MED    W      M     SINGLE

               Nationality : US - USA
               Citizenship : US - USA
Descriptive Remarks :
 DISPLAYS SUICIDAL TENDENCIES

*Scars, Marks, and/or Tattoos:
 Seq. #  Scar/Mark/Tattoo
    1    SC R HND    3" PALM
    2    SC L HND    3" BACK

*USMS Number:    (from PTS/PPMS)
 Seq. #  USMS Number
    1    05305-010

*Subject Address:
 Seq. #  Phone          Address
    1    802-773-7920   REDACTED - FELL
                        RUTLAND, VT 05702    USA


*Profile Information:
```

| | | | | |
|---|---|---|---|---|
| Money Launderer | No | DEA - GDEP | | |
| "Kingpin" | No | Violent Offender | | Yes |
| Triggerlock Case | No | International Lookout Placed | | No |

```
*Name: LEE,ROBERT      SUBJECT REPORT      PAGE 2
*FID #: 526229 Generated by Transaction - Interactive Query
*                      Date: 12/15/2000  Time: 07:57:14 EST
```

*Criminal History:

|  | Arrests | Convictions |  | Arrests | Convictions |
|---|---|---|---|---|---|
| Immigration | 0 | 0 | Homicide | 0 | 0 |
| Kidnapping | 0 | 0 | Rape/Sex Assault | 0 | 0 |
| Assault/Battery | 0 | 0 | Robbery | 0 | 0 |
| Burglary/Larceny | 0 | 0 | Narcotics | 0 | 0 |
| Weapons (Firearms) | 0 | 0 | Extortion | 0 | 0 |
| Weapons (Other) | 0 | 0 |  | 0 | 0 |
| Forgery/Fraud | 0 | 0 |  | 0 | 0 |

*Threat(s):
*Warrant(s):

FELL-00001156

# EXHIBIT 70

```
*Name: LEE,ROBERT       SUBJECT REPORT      PAGE 3
*FID #: 526229 Generated by Transaction - Interactive Query
*                  Date: 12/15/2000  Time: 07:57:14 EST


                Warrant Number: 0182-1204-0294-J


                Warrant Status: CLOSED
          Originating District: 082 VT    BURLINGTON


Charge Information:
                        Agency: FBI  - Federal Agency
                                Federal Bureau of Investigation
                        Charge: 1006, KIDNAP ADULT -
                  Warrant Date: 12/01/2000
                 Date Received: 12/01/2000
                          OCDE: No
Warrant Remarks:
ORG CHG:UNLAW SEIZE, KIDNAP, ABDUCT IN INTERSTATE COMMERCE AND CARJACKING


Close Information:
                   Date Closed: 12/04/2000
                 Date Executed: 12/01/2000
                Execution Code: ARREST BY OTHER AGENCY
          Arrested in District: 010
              Arresting Agency: LOC2
       Arresting Agency Case ID:
              To Be Prosecuted: Y


Close Summary:
SUBJECT WERE ARRESTED IN AR AFTER A VEHICLE STOP.
```

FELL-00001157



**U.S. Depart  t of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                 *Fax: (802) 951-6540*


December 22, 2000


Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

        Re:  United States v. Donald Fell and Robert Lee

Gentlemen:

        The Magistrate Judge has signed an order enlarging until
February 1, 2001 the time within which an indictment in this case
may be returned.  Accordingly, the Government will begin turning
over all discovery to which you are now entitled under the
Federal Rules of Criminal Procedure and Vermont's Local Rules.

**I.    Statements of the Defendants**

        Both defendants have made numerous statements to law
enforcement authorities, and to others.  Enclosed is a copy of a
three-page written statement Robert Lee gave to the FBI in
Arkansas.  Reports of oral statements to the FBI by Lee and
Donald Fell are not yet available to us, but will be turned over
promptly upon receipt.  The same is true of written <u>Miranda</u>
waivers.

        Lee and Fell both made lengthy statements to New York State
Police Investigator Thomas Aiken in the course of attempting to
help authorities locate Teresca King's body.  Aiken tape recorded
those conversations and copies of the tapes, together with
Aiken's scanty handwritten notes, are enclosed.  Transcripts are
not yet available, but will be turned over upon completion.

        Both defendants also made tape recorded statements to
Rutland City Police and Vermont State Police investigators.  Jim
Cruise of the Vermont State Police and Rod Pulsifer of Rutland
each had a recorder and separately taped the interviews.
Enclosed are copies of Cruise's tapes, transcripts and the

FELL-00001158

written <u>Miranda</u> waivers.  Detective Pulsifer had a micro-cassette recorder and we are in the process of obtaining the best possible copies of those tapes.  They will be turned over upon receipt.

Enclosed also is a copy of a letter that Fell sent to Chris Kolojeski after Fell's arrest.  The original letter, and the envelope (which I am told bears Donald Fell's name) are in the custody of the FBI.  I will try to get a copy of the envelope to you as soon as possible.

## II.   Defendants' Prior Records

Records of any prior arrests, convictions, juvenile adjudications and any related matters will be turned over as they become available.

## III. Documents and Tangible Objects

Enclosed are copies of photographs taken by the New York State Police at the scenes where Teresca King's wallet and purse were found.  Also enclosed is a CD-Rom containing digital pictures taken where King's body was recovered.  35-millimeter photographs from the location where King's body was found; from the Rutland murder scene; and from the search of King's car have been requested for you and will be turned over upon receipt. Also enclosed are videotapes from the Robbins Street murder scene, and from a surveillance camera situated at a convenience store not far from where King's body was found.  That tape may or may not depict King's car passing by before her murder.

Enclosed also are miscellaneous police reports, teletypes, search inventories and other documents.  Many additional reports are in the final stages of preparation and will be turned over when completed.

King's car is being transported to an FBI lot in Albany where it will be safeguarded for your inspection.

Substantial quantities of physical evidence were recovered from the Rutland murder scene, from the place where King's body was found, and from her car.  That evidence will be sent to the FBI and the Vermont Crime Lab for analysis.  Upon its return, it can be inspected at a mutually convenient time and place.

Copies of the contents of Lee's wallet are enclosed.

## IV.   Reports of Examinations and Tests

We anticipate many such reports but none are now available, other than the preliminary autopsy reports pertaining to Debra

2

FELL-00001159

Fell and Charles Conway, copies of which are enclosed. All such reports received in the future will be promptly turned over.

## V.    Search Warrants and Electronic Surveillance

No electronic surveillance was conducted. Search warrants, affidavits, applications and inventories will be turned over as they become available.

## VI.   List of Witnesses

The following law enforcement authorities participated in various interviews of the defendants: Detectives Rodney Pulsifer and David Schauwecker of the Rutland City Police; Detective James Cruise of the Vermont State Police; Special Agent Jimmie Caudle of the FBI in Ft. Smith, AK; Thomas Aiken of the Brunswick Station of the New York State Police. Jeff Ross of the Clarksville, Arkansas, Police Department will also testify about the stop of the car being driven by Fell and Lee. Many other law enforcement officials participated in the recovery of evidence. Reports of those seizures are being or will be disclosed as they become available. Until the relevance of specific pieces of evidence becomes apparent, we cannot determine who may be witnesses.

Non-law enforcement witnesses who may testify at the guilt phase of any trial include Norman King, 23 Fire Lane Rd., North Clarendon, VT; Tara Richards, 695 North Franklin St., Wilkes-Barre, PA; and Christian Kolojeski, 13 East Chestnut St., Wilkes-Barre, PA. Other witnesses will be identified as they come to our attention.

The names of witnesses whom the Government may call at any penalty-phase trial will be disclosed if and when the Attorney General determines that the Government should seek the death penalty in this case.

## VII.  Exculpatory Evidence

The Government recognizes its obligation to turn over exculpatory evidence and will promptly do so if and when such information comes into our possession. At the present time, we are unaware of any information that we would consider to be exculpatory.

## VIII. Rule 404(b) Notice

Pursuant to Rule 404(b) of the Federal Rules of Evidence, please take notice that, at the trial of any charges relating to the kidnapping and killing of Teresca King, the Government

3

FELL-00001160

intends to introduce evidence that shortly before hijacking King's car at shotgun-point, Fell and Lee murdered Debra Fell and Charles Conway.

Sincerely yours,

CHARLES R. TETZLAFF
United States Attorney

By:

GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

4

FELL-00001161

# EXHIBIT 71

_____
L. D. (or Docket)·

**Vermont Department of Corrections
Division of Correctional Services**

### FACILITY CAMP

- ☒ NWSCF
- ☐ NWRCF
- ☐ MVRCF
- ☐ SESCF
- ☐ SERCF
- ☐ NESCF
- ☐ NERCF
- ☐ NECSC

### FSU

- ☐ ST. ALBANS
- ☐ BURLINGTON
- ☐ RUTLAND
- ☐ BENNINGTON
- ☐ BRATTLEBORO
- ☐ WHITE RIVER JCT
- ☐ BARRE
- ☐ ST. JOHNSBURY

## INMATE DISCIPLINARY REPORT

### (TO BE COMPLETED BY REPORTING OFFICER)

Name of Inmate: _Lee, Robert_  Date of Incident: _12-27-00_  Time: _2009 HRS_

Living Assignment: _Delta_  Security Level: _Close_  Place of Incident _Cell #51_

Description of Violation: _Major B# 21 Conduct which disrupts or interferes with inmate safety or security or the orderly running of the facility_

Witness(es) of Incident: _S_▮ _COI_  ▮ _COI_  ▮ _COI_    b6 b7C

▮ _COI_ ▮ _and_

iscription of Physical or Documentary Evidence: _See Reports_

| Signature of Reporting Officer | Date and Time | Name and Title (Printed) |
|---|---|---|
| ▮ | 12-27-00 2033 HRS | ▮ COI |

### (TO BE COMPLETED BY SHIFT SUPERVISOR AT TIME OF INCIDENT)

Was Inmate's Security Level Changed?    Yes _____    No _0_
Date and Time of Change_____
Signature_____ If Yes, to What _____

Does hearing need to be held within 72 hours?    Yes _____    No _____

INVESTIGATION ▮ erintendent/Designee    Date _12-2?_    b6 b7C

### (TO BE COMPLETED BY INVESTIGATING OFFICER)

Delive ▮    Date and Time  12-27-00  2036 HRS

1. Wi▮ _____ No ___ Yes (if yes then suspend investigation)
2. Did you interview confidential informants?    ___ No    ___ Yes    (See Appendix VI for guidance)
3. Did you interview inmate?    ___ Yes    ___ No (briefly explain_____

Did you compile available documentary evidence and statements of witnesses?    ___ Yes    ___ No (briefly explain)_____

5. Did you contact and/or interview the relevant witnesses?    ___ Yes    ___ No (briefly explain)_____
6. Recommendation:    ___ Refer for resolution
    ___ Do not refer for resolution
    ___ MODIFY VIOLATION TO: _____

WHITE (CASE FILE)        YELLOW (CENTRAL OFFICE)        PINK (INMATE)

FELL-00001162

# EXHIBIT 72

_____
*ΛΛιΙGΛΛi - 4*
I. D. (or Docket)

**Vermont Department of Corrections**
**Division of Correctional Services**

### · FACILITY/CAMP

☐ NWSCF    ☐ SERCF
☐ NWRCF    ☐ NESCF
☐ MVRCF    ☐ NERCF
☐ SESCF    ☐ NECSC

**FSU**

☐ ST ALBANS      ☐ BRATTLEBORO
☐ BURLINGTON     ☐ WHITE RIVER JCT
☐ RUTLAND    .   ☐ BARRE
☐ BENNINGTON     ☐ ST. JOHNSBURY

## INMATE DISCIPLINARY REPORT

### (TO BE COMPLETED BY REPORTING OFFICER)

Name of Inmate: _LEE, Robert_    Date of Incident: _12-27-00_  Time: _2009 hrs_

Living Assignment: _Delta_    Security Level: _Closed_    Place of Incident _Cell 51_

Description of Violation: _Major B #20, Possession, introduction or use of_ _Any alchol, Narcotics, depressants, stimulants, Hallucinegenic substance_ _or marijuana or related Paraphernalia N_    b6 b7C

Witness(es) of Incident: _S-[____]_ _CoI_ _[____]_ _CoI_ _[____]_ _CoI_ _[____]_ _CoI_ _[____]_ _and_ _[____]_

_____ription of Physical or Documentary Evidence: _See Reports_

| Si[____] | | Date and Time _12/27/00_ _2037hrs_ | Name and _CoI_ [____] |

### (TO BE COMPLETED BY SHIFT SUPERVISOR AT TIME OF INCIDENT)

Was Inmate's Security Level Changed?    Yes _____    No _/_
Date and Time of Change_____
Signature_____    If Yes, to What _____    b6 b7C

Does hearing need to be held within 72 hours?    Yes _____    No _____

INVESTIGATION Employee Assigned by Superintendent/Designee    Date

### (TO BE COMPLETED BY INVESTIGATING OFFICER)

Delivered to Above Inmate by (Signature)    | Date and Time _12/27/00_ / _2041 hrs_

_____ nal investigation?    ___ No    ___ Yes (if yes then suspend investigation)
2. Did you interview confidential informants?    ___ No    ___ Yes  (See Appendix VI for guidance)
3 Did you interview inmate?    ___ Yes    ___ No (briefly explain _____

___ id you compile available documentary evidence and statements of witnesses?    ___ Yes    ___ No (briefly explain)_____

5. Did you contact and/or interview the relevant witnesses?    ___ Yes    ___ No (briefly explain) _____
6. Recommendation:    ___ Refer for resolution
                      ___ Do not refer for resolution
                      ___ MODIFY VIOLATION TO: _____

WHITE (CASE FILE)        YELLOW (CENTRAL OFFICE)        PINK (INMATE) ·

FELL-00001163

# EXHIBIT 73

# Northwest State Correctional Facility
## Facility incident report

To: Hearing Officer

From: CFSS [          ]

Date: 12-27-00

Re: Robert Lee

On the above date this writer was called via radio to go to Delta when I arrived in the unit I was informed that inmate Lee had flooded his cell, I observed a large amount of water covering the unit #2 floor, I also observed water coming out from under the door of inmate Robert Lee. I went to inmate Lee's cell door and asked him why he flooded he stated that he was bored, I then asked him to put his hands out the chute as he was going to be moved to shower, he was then placed in handcuffs and escorted to the shower, I then told staff to strip his cell while they were stripping his cell Co/I [          ] found to cups containing homebrew, as it had the odor of alcohol, I asked the booking officer to bring the breathalyzer to delta, I administered the breathalyzer to inmate Lee, I had to do this 2 times do to him giving small breaths, the last reading I got registered .002BAC, I asked him if he had drank any of this homebrew he stated that he had a little bit. After his cell was stripped he was brought back to his cell, This writer heard and observed inmate Lee talk out his window to inmat[    ] that we had taken his homebrew, I then informed staff that he would be receiving 3 major DR's for flooding, and possession of alcohol, and for use of alcohol, I then departed the unit. I was called approx. 15min later I was called by Co/I [      ] tating that inmate Lee was trying to smash out his cell light and that he was acting very strange, I went down to Delta and observed inmate Lee running from the window to his cell door hitting both, I asked him why he was doing this he would just glare at me, I then decided to move him to booking for his own safety and to stop the unit from escalating any further, as they were getting vocal. Inmate Lee was then placed in Cuffs and escorted up to booking cell, he was stripped and informed that when the cuffs were removed he was to keep his hands on the bunk, if he failed to comply with my commands he would be sprayed with OC, inmate Lee cooperated with the commands.

b6
b7C

b6
b7C

# EXHIBIT 74



**U.S. Departi    it of Justice**

*United States Attorney*
*District of Vermont*

_____

*United States Courthouse and Federal Building*
*Post Office Box 570*                          *(802) 951-6725*
*Burlington, Vermont 05402-0570*          *Fax: (802) 951-6540*


December 28, 2000


Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

        Re:   United States v. Donald Fell and Robert Lee

Gentlemen:

        Enclosed is additional discovery that I just received.  This
package consists of written statements Fell and Lee made to the
FBI in Arkansas; summaries of oral statements that the defendants
made to the FBI; and miscellaneous investigative reports.

        Also enclosed is a copy of the tape of Fell's administrative
segregation hearing at the Northwest State Correctional Facility.
At the beginning of the hearing, Fell was advised of the decision
to place him in segregation because, among other things, he was
charged with killing three people.  Fell responded, in substance,
that he committed only one murder.

        Additional discovery will be turned over as it becomes
available.


                              Sincerely yours,

                              CHARLES R. TETZLAFF
                              United States Attorney

                    By:

                              GREGORY L. WAPLES
                              Assistant U.S. Attorney


Enc.

FELL-00001165

# EXHIBIT 75



CHS 99-206

## Correctional Healthcare Solutions, Inc.

### SICK CALL REQUEST

**PART A:**    To be completed by inmate              Date: 12-28-00

Inmate's Name: Donald Fell

ID #:

DOB: 4-30-80

Facility: St AlBANS Northwestern State Correctional facility

Housing Location: Delta

Problem: I have trouble breathing followed by Chronic Severe chest Pains, I cant sleep and nose has been Bleeding and I have severe headaches

How long have you had this problem?    Hours:              Days: 5 days

Past Treatment(s) for this Problem? None

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PART B:**    To be completed by medical personnel (Do not write below this line)

T 98²    P 70    R 16    BP 102/80    WT

**S.** haven't had a cig in 31 days & drugs either. Ir alwayshad trouble breathing. Now my Chest hurts. HA's too-

**O.** Pt presents disheveled and odorous. lungs CTA bilaterally. ⊕ tenderness over Chest ē palpation. From neck, shoulders, waist. long hx of drug use.

**A.** Pt in comfort r/t CP.

**P.**

| Diagnostic Tests: | |
|---|---|
| Request Specialty Referral: | MD. |
| Referral to Chronic Care Clinic? | ☐ Yes ☐ No Will refer to MD |

for evaluation. Notify medical if breathing problems worsen.

**Education:**    Discuss with patient follow-up care:    ☑ Yes    ☐ No
Discuss with patient medication side effects:    ☐ Yes    ☑ No
Discuss with patient alternative therapies such as:

Follow up Appointment:                              Check if RTC prn acceptable ☐

C Bean LPN

Medical Staff Signature        Date 1/5/01        Time 0934

FELL-00001166



CHS 99-206

## Correctional Healthcare Solutions, Inc.

### SICK CALL REQUEST

**PART A:**     To be completed by inmate          Date: 3-1-01

Inmate's Name: Don Fell

ID #:

DOB: 4/30/80

Facility: Northwest Correctional facility

Housing Location: Delta

Problem: I have trouble sleeping I wish to have a pillow sent in to correct that problem I was told to request this from you

How long have you had this problem?     Hours: _____     Days: 77

Past Treatment(s) for this Problem?

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**PART B:**     To be completed by medical personnel (Do not write below this line)

T _____ P _____ R _____ BP _____ WT _____

**S.** "I need a pillow to sleep." I don't have one

**O.** Per officer inmate does not have pillow.

**A.** alt. comfort R/T need for pillow.

**P.**
| Diagnostic Tests: | |
| Request Specialty Referral: | |
| Referral to Chronic Care Clinic? | ☐ Yes  ☐ No |

Per Security - They -DOC will provide a pillow. Request denied for pillow - not in P.

**Education:**     Discuss with patient follow-up care:          ☐ Yes  ☐ No
Discuss with patient medication side effects:     ☐ Yes  ☐ No
Discuss with patient alternative therapies such as: _____

**Follow up Appointment:** _____          Check if RTC prn acceptable ☐

_____ Medical Staff Signature          Date 3/2/01          Time 0930

FELL-00001167

## MENTAL HEALTH EVALUATION

**Inmate Name:** Fell, D

**Facility:** NW

**DOB:** 2/ /80

**Date:** 6/25/01

| Mental Health History |
|---|
| • Mental Health: *Include indicated and contraindicated medications and placements, major side effect/dangerous behaviors, and estimated intellectual ability need for further assessment*<br>• Alcohol and Drug Use/Abuse: *include the need for further evaluation, as indicated*<br>• Physical Health: *Include any potential interactions between mental and physical health problems/needs* |
| IM reports being hospitalized x6 at General Hospital in Wilkes Barre PA for anger and being an uncontrollable minor. He was last admitted in 1994. Reports having a hx of taking Tonfrival and Dexadrine for a couple of years. IM reports having a polysubstance dependance problem. States his drug of choice was LSD. He also stated he smoked marijuana daily - drank alcohol daily. Has used crack cocaine, Extasy, and heroin. Was in outpatient counseling briefly to address those issues. IM denies any self injurious behavior. Denies suicidal ideation. |

| Family/Social History |
|---|
| *Include Education, Military History (Discharge Status), Family Criminal History and History of Victimization* |
| IM has completed through the 10th grade. Denies any military service history. States that he grew up with his family in Wilkes Barre, PA. Says that prior to coming to VT and murdering his mother he hasn't didn't see her for 8 years. |

| Legal/Criminal History |
|---|
| *Include Prior Imprisonment, Prior Arrests/Charges, History of Sex Offenses and/or Violence* |
| IM was on probation in PA for punching a school teacher |

FELL-00001168

| Diagnostic Impressions | DSM Code | ✓ Primary Diagnosis |
|---|---|---|
| AXIS I: Adjustment Disorder | | |
| Primary Insomnia | | |
| AXIS II: ASPD | | |
| | | |
| AXIS III: None. | | |
| | | |

AXIS IV:  Psychosocial Stressors

A.  Stressor(s): ☑ Solitary Confinement.

B.  Severity:  ☑ None   ☐ Severe   ☐ Inadequate Info/No Change
             ☐ Mild    ☐ Extreme
             ☑ Moderate ☐ Catastrophic

C.  Duration:  ☐ Predominantly Acute Event   ☑ Predominately Enduring Circumstances

AXIS V:  Global Assessment of Functioning *(enter two digit scores from 00-100)*

A.  Current GAF Score   50        B.  Past Year GAF Score   50

**Treatment Needs and Recommendations**
*Include Needs/Problems, Strengths/Assets, Emotional Response to Incarceration, Prognosis, & Recommendations*

Im has been in facility for 8 months - Asking to See MH to address insomnia and anger problems. WMH read for records and refer to Bill Cote.

MH Staff Signature and Degree: _____ L-ru/CMC  Date 6/8/01

FELL-00001169

## MENTAL STATUS EVALUATION

Inmate Name: Fell, D    DOB: 2/x0    Facility: NW

| PSYCHIATRIC HISTORY | ☑ Yes ☐ No |
|---|---|

Where: _General Hospital Wilkes Barry Penn._    When: _93-94_

| SUBSTANCE ABUSE TX HISTORY | ☑ Yes ☐ No |
|---|---|

Where: _Drug/Alcohol County - did not go_    When: _several years ago_

| HISTORY OF MEDICATION | ☑ Yes ☐ No |
|---|---|

_Tonfrinal, Dexadrine_

| CURRENT MEDICATIONS | ☐ Yes ☒ No |
|---|---|

| APPEARANCE | OK | POOR |
|---|---|---|
| Hygeine | ☑ | ☐ |
| Eye Contact | ☑ | ☐ |
| Psychomotor | ☑ | ☐ |

Notable Physical Characteristics: _____

| ORIENTATION | OK | POOR |
|---|---|---|
| Person | ☑ | ☐ |
| Place | ☑ | ☐ |
| Time | ☑ | ☐ |

### MOOD

| | | | | | |
|---|---|---|---|---|---|
| Normal | ☑ | Irritable | ☐ | Depressed | ☐ |
| Euphoric | ☐ | Anxious | ☐ | | |

### AFFECT

| | | | | | |
|---|---|---|---|---|---|
| Appropriate | ☑ | Flat | ☐ | Blunted | ☐ |
| Inappropriate | ☐ | | | | |

### SPEECH

| | | | | | |
|---|---|---|---|---|---|
| Normal | ☑ | Pressured | ☐ | Monotonous | ☐ |
| Slurred | ☐ | Poverty of Content | ☐ | Slowed | ☐ |

### THOUGHT PROCESSES

| | | | | | |
|---|---|---|---|---|---|
| Normal | ☑ | Tangential | ☐ | Disorganized | ☐ |
| Circumstantial | ☐ | Loose Assoc. | ☐ | Flight of Ideas | ☐ |
| Delusional | ☐ | | | | |

### PERCEPTUAL PROCESSES

| | | | |
|---|---|---|---|
| Normal | ☑ | Visual Hallucinations | ☐ |
| Illusions | ☐ | Tactile Hallucinations | ☐ |
| Auditory Hallucinations | ☐ | Olfactory Hallucinations | ☐ |

### ATTENTION & CONCENTRATION

| | | | |
|---|---|---|---|
| Normal | ☑ | Impaired | ☐ |

### MEMORY

| | Short-Term | Long-Term |
|---|---|---|
| Grossly Intact | ☑ | ☑ |
| Impaired | ☐ | ☐ |

### PHOBIAS, OBSESSIONS, COMPULSIONS

| | | | |
|---|---|---|---|
| None (Normal) | ☑ | Obsessive | ☐ |
| Phobic | ☐ | Compulsive | ☐ |

| INSIGHT | Good ☐ | Fair ☑ | Poor ☐ |
|---|---|---|---|
| JUDGEMENT | Good ☐ | Fair ☐ | Poor ☑ |

### DRUG ABUSE

| | None/Minimal | Abusive/Dependent |
|---|---|---|
| Alcohol | ☐ | ☑ |
| Cocaine | ☐ | ☑ |
| Opiods | ☐ | ☑ |
| Cannabis | ☐ | ☑ |
| Hallucinogens | ☐ | ☑ |
| Inhalents | ☐ | ☑ |
| Other: LSD | ☐ | ☑ |

### PROVISIONAL DIAGNOSIS     ☐ None

Axis I   R/o Adjustment Disorder / Primary Insomnia.

Axis II   _____

Axis III   _____

### TREATMENT RECOMMENDATIONS

☐ No further intervention needed at this time
☐ Outpatient treatment
☑ Scheduled for further evaluation
☐ Inpatient treatment
☐ Addiction services
☐ Other: _____

Signature of MH Staff: _____ Licsw/nppc    Date/Time: 6/x8/xx

DOC/CO/PRO/361.01.04-A
Rev. 1/98

FELL-00001170

███████████████ OBSERVATION SHEET

Inmate Name: _Fell, Donald_
Facility: _NwSCF_

DOB: _____
Date: _____

| Start Date: 9-21-01 | Start Time: 0001 | Cell Location: E-76 | Discontinuation Date/Time: |

## Suicide Watch Conditions

| ✓ | STANDARD - Physical checks at staggered intervals not to exceed every 30 minutes (e.g., 5,10, or 12 minutes) |
| | SPECIAL - Continuous, uninterrupted observation |
| | Special Accommodations: |

## Code for Inmate Behavior and Staff Interventions

A. Quiet
B. Sleeping  Appears
C. Agitated Behavior
D. Destructive Behavior
E. Eating
F. Threatening Behavior
G. Out of Cell Activities
H. Other

| Time | Codes | Correctional Officer | Time | Codes | Correctional Officer | Time | Codes | Correctional Officer |
|------|-------|----------------------|------|-------|----------------------|------|-------|----------------------|
| 0001 | A | R. Marcoux | 0800 | B | | 1600 | E/F | |
| 0030 | A | R. Marcoux | 0830 | B | m | 1630 | E/g | |
| 0100 | B | R. Mou | 0900 | B | M | 1700 | E/g | |
| 0130 | B | R. Marcoux | 0930 | B | m | 1730 | E | |
| 0200 | B | R. Marcoux | 1000 | B | | 1800 | 6 | |
| 0230 | B | R. Marcoux | 1030 | B | m | 1830 | 6 | |
| 0300 | B | R. Marcoux | 1100 | E | M | 1900 | 6 | |
| 0330 | B | R. Marcoux | 1130 | A | M | 1930 | 6 | |
| 0400 | B | R. Marcoux | 1200 | A | M | 2000 | 6 | |
| 0430 | B | R. Marcoux | 1230 | A | m | 2030 | 6 | E Baca |
| 0500 | B | R. Marcoux | 1300 | B | m | 2100 | 6 | E/B |
| 0530 | B | R. Marcoux | 1330 | B | m | 2130 | A | EB |
| 0600 | 3 | M Alfred | 1400 | B | M. Garlow | 2200 | A | R. Marcoux |
| 0630 | E | m | 1430 | B | | 2230 | A | R. Marcoux |
| 0700 | B | | 1500 | B | | 2300 | A | R. Marcoux |
| 0730 | B | | 1530 | B | E Turcotte | 2330 | A | R. Marcoux |

Robert MARCOUX

Shift Supervisor's Signature: _____    Date: _____    Time: _____

Fell -30-

F 76

***DO NOT THIN***

# MENTAL HEALTH TREATMENT PLAN/PROGRESS REPORT

Inmate Name: _Donald Fell_

Facility: _NWSCF_

Provider Name: _Todd Hill Licsw/LADC_

Date of Birth: _____

Date of Report: _3/25/02_

---

**Problem:** _Panic attacks_

**Goal:** _To be able to reduce # of attacks and control sx of attacks_

**Target Date:** _7/25/02_

**Interventions:** _medication management - counseling as needed on closed custody minds_

**Evidence of Progress:** _Self report of ↓ in sx_

---

**Problem:** _____

**Goal:** _____

**Target Date:** _____

**Interventions:** _____

**Evidence of Progress:** _____

---

**Problem:** _____

**Goal:** _____

**Target Date:** _____

**Interventions:** _____

**Evidence of Progress:** _____

---

**Problem:** _____

**Goal:** _____

**Target Date:** _____

**Interventions:** _____

**Evidence of Progress:** _____

---

## Area(s) of Concern (Please check all that apply)

| | | |
|---|---|---|
| ☐ Depressed Mood | ☐ Impulsivity | ☐ Emotional/Physical/Sexual Trauma Perpetrator |
| ☐ Decreased Energy | ☐ Hyperactivity | ☐ Substance Use (check one) |
| ☐ Grief | ☐ Disruption of Thought Process/Content | ☐ Active Substance Abuse |
| ☐ Hopelessness | ☐ Delusions | ☐ Early Full Remission |
| ☐ Worthlessness | ☐ Hallucinations | ☐ Early Partial Remission |
| ☐ Guilt | ☐ Paranoia | ☐ Sustained Full Remission |
| ☐ Anxiety | ☐ Dissociative States | ☐ Sustained Partial Remission |
| ☑ Panic Attacks | ☐ Oppositional/Defiant Behavior | ☐ Antisocial Personality Disorder |
| ☐ Obsessions/Compulsions | ☐ Somatic Complaints | ☐ Borderline Personality Disorder |
| ☐ Elevated Mood | ☐ Concomitant Medical Condition | ☐ Other (specify):_____ |
| ☑ Irritability | ☐ Emotional/Physical/Sexual Trauma Victim | ☐ Other (specify):_____ |

(PLEASE CONTINUE ON THE OTHER SIDE)

FELL-00001172

**Primary Treatment Approach (check all that apply)**
☐ Problem Focused
☑ Symptom Focused
☐ Complex Case
☐ Therapeutic Stabilization
☐ Medication Management Only
☐ Psycho-educational

Expected Treatment Outcomes (check all that apply)
☐ Reduction in symptoms and discharge from active treatment
☐ Return to highest GAF and discharge from active treatment
☐ Transfer to self-help/other supports and discharge from active treatment
☑ Provide ongoing supportive counseling and maintain stabilization of symptoms
☐ Provide ongoing medication management

**Progress in Treatment (check one)**
☐ Treatment recently initiated
☐ Continues with/or recurrence of acute presenting symptoms
☐ Somewhat improved
☐ Much improved
☐ Needs support/maintenance only    as of 7/25
☐ Near completion of treatment
☐ Inmate discharged from mental health roster (complete section below)
☐ Other

Psychotropic Medications
Is the patient on medications?    ☑ Yes    ☐ No
Is s/he compliant with taking her/his medications?    ☑ Yes    ☐ No    as if 7/25/02
Has there been clinical improvement related to medications?    ☑ Yes    ☐ No

**RATE OF PARTICIPATION IN TREATMENT (please circle)**
Refusal    1    2    3    ④    5    High

Clinical Summary/Formulation:
_____
_____
_____
_____
_____

**Plan discussed with inmate:    ☑ Yes    ☐ No**

Discharge Summary
Inmate discharged to:    ☐ Other Facility    ☐ Community    ☐ General Population    ☐ Residential Program
Reason for discharge:    ☐ Treatment Complete    ☐ Refused Services    ☐ Transfer    ☐ Max Out    ☐ Other
Follow-up and recommendations:    ☐ Continued Tx    ☐ Substance Abuse Tx    ☐ Inpatient Tx    ☐ Self-help

Reviewed by treatment team: 3/25/02    Todd Hill LICSW/CADC (intake)
(Date/Provider Signature)    4/25/02    Todd Hill LICSW/LADC (one-month)
7/25/02    Todd Hill LICSW/LADC 1 (quarterly)    4 4/25/03    Todd Hill LICSW, LADC
10/25/02    Todd Hill LICSW/LADC 2 (quarterly)    5 8/4/03    dB/ac/therapy
1/25/03    Todd Hill LICSW/LADC 3 (quarterly)    6 3/3/04    Jane Doe, M.A.

Todd Hill, LICSW, CAC    6/16/04
9/20/04

## CORRECTIONAL MEDICAL SERVICES
## HEALTH SERVICES REQUEST FORM

| FOR MEDICAL USE ONLY | |
| --- | --- |
| Date Received: | 2·25·03 |
| Time Received: | 0530 |

Print Name: _Donald Robert Fell_    Date of Request: _2-24-03_

ID #: _56467_    Date of Birth: _4/30/80_    Housing Location: _Echo_

Nature of problem or request: _a screw fell out of my glasses, I would also like to see the doctor, I have been having trouble sleeping for quite some time due to back and neck pain._

I consent to be treated by health staff for the condition described.

_Donald R. Fell_
SIGNATURE

### PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA
### DO NOT WRITE BELOW THIS AREA

Triaged by: _Km_
                Initials

Referred to: (Circle ONE)    (NSC)    Mid-level SC    Physician SC    MH    Dental
Other: _____

### HEALTH CARE DOCUMENTATION

Subjective:

Objective: BP _____ T _____ P _____ R _____ Wt _____

_I/m Refused to come to sick call_
_C o S Melcher_

Assessment:

Plan: _f/u if I/m request_

☐    Inmate education handout reviewed with and given to the patient.
Refer to : (Circle any applicable)    Mid-level    Physician    MH    Dental    Other: _____

Signature & Title: _Bessette LPN_    Date: _4/1/03_ Time: _____

CMS 7166 Rev 6/01

**Jim Bessette, LPN**

CORRECTIONAL MEDICAL SERVICES

## INTERDISCIPLINARY PROGRESS NOTES

Patient Name _FELL, DDARD_ I.D. # _4/30/80_ Institution _____

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 12/3/13 | | 4 YRS L-S BACK PAIN | - |
| | | INSOMNIA ... CAUSATION | |
| | | ... LACK OF SLEEP | |
| | | L-S BACK FROM, NO WEAKNESS ... | |
| | | ... | |
| | | CN INTACT | |
| | | IMP L-S PAIN (M-S) ... | |
| | | NAPROXEN 500 B/D | |
| | | RTU 2 WKS | |
| | | X ... | |
| 2/4/04 | 1035 | S - c/o persistent frontal h/a, b/l, almost daily in p.m. Also, momentary postural dizziness. Did not notice if relief c̄ naproxen. Back pain + sleep improved. Has been taking verapamil for h/a prophylaxis x 2½ yrs. Also fluoxetine + tetracycline. Denies pulsatile h/a, photophobia. Admits to mild occasional nausea not assoc. c̄ h/a. Drinks 7-10 cups coffee QD | |
| | | O - General: Well 23 yo male. Vitals: T 98.6, HR 76, RR 16, BP 110/68, wt 183 lb HEENT: Normocephalic, TM's ... canals clear, sinus tenderness pharynx clear. cont (over) Seth Well, PNP | |

FORM #7113 8/94

FELL-00001175

2/4/04 | cont

① Cardio: RRR S₁S₂ ∅ M.

Chest: CTAB

Neuro: CN I-XII intact . Strength 5/5

DTR's 2/4 . ⊕ Khamber.

A/P ① h/a, presumed tension-type

→ ibuprofen 800 mg BID prn

use + risks reviewed.

d/c verapamil.

↓ coffee consumption to 1-2 QD.

↑ water. Discussed risks with dad

h/a .

② dizziness likely, 2° postural hypotension

→ see above plan.

Seth Zuller, FNP-c



FELL-00001176

# EXHIBIT 76

7A-AL-44453
JJG:mh

1

EDUCATION

ST. MICHAEL'S SCHOOL
HOBAN HEIGHTS
P.O. BOX 37
TUNKHANNOCK, PENNSYLVANIA (PA) 18657

On March 30, 2001, ANDREW M. VARZALY, MSW, LSW, Executive Director, reviewed the academic records of DONALD R. FELL, Date of Birth (DOB) April 30, 1980, Social Security Account Number (SSAN) REDACTED-FELL-7294, and ROBERT JOSEPH LEE, DOB REDACTED-FELL 1980, SSAN REDACTED-FELL 4688. VARZALY advised that DONALD FELL attended ST MICHAEL'S SCHOOL from April 8, 1994-August 25, 1995. ROBERT JOSEPH LEE attended ST. MICHAEL'S SCHOOL from September 19, 1994-August 15, 1995. LEE was once again admitted to ST. MICHAEL'S during the period December 12, 1996-June 13, 1997.

VARZALY advised that ST. MICHAEL'S SCHOOL is a residential treatment facility which serves the academic and psychological needs of delinquent and deprived youngsters who have demonstrated behavioral and mental health issues at school. ST. MICHAEL'S provides elementary, secondary, and special education classes to its students. The school provides in-house group counseling and/or individual counseling as needed. VARZALY stated that if the student does not succeed at ST. MICHAEL'S, chances are good that the student will end up in a lock-down facility.

VARZALY advised that copies of FELL's and LEE's academic records could not be shared without a subpoena.

On March 30, 2001, LISA LUCKE, Director of Admissions, ST. MICHAEL'S SCHOOL, was interviewed regarding her knowledge of DONALD FELL and/or ROBERT JOSEPH LEE. LUCKE advised that her job responsibilities include reviewing references of students wishing to attend ST MICHAEL'S SCHOOL. The requests are then presented to a Multi-Disciplinary Admissions Committee which has the final say as to whether a student will be admitted into their academic program. LUCKE stated that ST. MICHAEL'S is very selective as to who is admitted to the school, and students with a long history of criminal acts are excluded. LUCKE specifically recalled ROBERT JOSEPH LEE attending ST. MICHAEL'S SCHOOL. Initially, LEE was admitted to the day treatment area of ST. MICHAEL'S SCHOOL but was eventually moved into residential treatment. LUCKE described LEE as a disheveled, uninterested, and bizarre boy who made absolutely no progress from the day he entered treatment

FELL-00001177

7A-AL-44453

2

until the day he was released from ST. MICHAEL'S. LUCKE stated that LEE had a particular look in his eye that forebode trouble. LUCKE stated that she worked with LEE in day treatment, and he did poorly. LUCKE stated that LEE's father tried to stay involved in LEE's treatment; however, LUCKE saw his efforts as doing the minimum that was required and no more. LUCKE stated that LEE attended the CHILD SERVICE CENTER, Wilkes-Barre, PA, where he received additional counseling and prescription medicine. LUCKE stated that while at ST. MICHAEL'S, LEE demonstrated poor socialization skills, did not respond well to adults, and would never allow anyone to get close to him. On several occasions, LEE acted out and had to be physically restrained so as not to harm himself or others. LUCKE advised that LEE seemed to be attracted to those boys who would create trouble at the school. She described LEE as a follower more so than a leader. LEE seemed to act out more often when confronted by teachers and staff to do his work. LEE wished to be left alone to do what he wanted to do. LEE would very seldom initiate any conversation with staff members and seemed quiet until provoked. LUCKE recalled that LEE was referred to ST. MICHAEL'S SCHOOL because of his chronic absenteeism. LUCKE stated that one word used to describe BOBBY LEE would be "psychotic." LUCKE stated that it did not surprise her to read in the newspapers that LEE was involved in a homicide. This view is based upon her observations and direct work with LEE at ST. MICHAEL'S SCHOOL.

LUCKE advised that she did not recall and that she never worked with DONALD R. FELL.

On March 30, 2001, WALTER OPSHINSKI, Director of Child Care, ST. MICHAEL'S SCHOOL, stated that he has been employed at ST. MICHAEL'S for approximately 25 years. OPSHINSKI advised that he recalled DONALD FELL being a seventh grade student at ST. MICHAEL'S during the academic year 1994-1995. FELL was housed in the Hoban Dormitory, a residential building that houses younger students. OPSHINSKI described FELL as a relatively quiet youngster who demonstrated some intelligence and one who remained relatively quiet during his stay at ST. MICHAEL'S. OPSHINSKI could not recall any violent episodes involving FELL. OPSHINSKI stated that FELL was freckled faced and of small stature.

OPSHINSKI stated that BOBBY LEE was admitted and re-admitted to ST. MICHAEL'S SCHOOL on two or three occasions. Initially, LEE was in day treatment but was soon moved into residential treatment. OPSHINSKI stated that LEE, in his opinion, was more problematic than FELL and often acted out against other students and staff members. OPSHINSKI recalled that LEE's brother was also once a resident at ST MICHAEL'S.

FELL-00001178

7A-AL-44453

3

OPSHINSKI stated that LEE, like FELL, was of small stature and wore long black hair.

WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL (WBAVTS)
JUMPER ROAD, P.O. BOX 1699
WILKES-BARRE, (PA) 18705

On March 30, 2001, PATRICK TOSH, Teacher, WBAVTS, provided academic records to Special Agent JAMES J. GLENN for review related to former students DONALD R. FELL and ROBERT JOSEPH LEE. FELL attended WBAVTS in the Headstart Program from September 1995-June 1996. LEE was also enrolled in the Headstart Program during the academic year September 1996-June 1997.

TOSH explained that in the 1980's, the Headstart Program was designed solely for students entering the ninth grade to give them a chance to take both vocational training and academics. The program focused on "high risk" students, i.e. those with poor study habits or truancy problems who may be prone to quit school. The class sizes were small in number and offered students more individual attention and less academic pressure.

TOSH advised that during the time that FELL was a student at WBAVTS, TOSH was coordinator of the in-school suspension program. Students receiving detention were sent to TOSH's classroom with an assignment that had to be completed at the end of the day. Tosh recalled meeting FELL in September 1995 when he was sent to TOSH during one of his many in-school suspensions. TOSH described FELL as a very angry and volatile young man who often acted out in and out of the classroom. TOSH stated that profanity was FELL's basic vocabulary. TOSH further advised that FELL had a short fuse and had difficulty diffusing his anger. TOSH stated that he has been involved in the teaching profession for nearly 30 years, 10 of them involving emotionally disturbed youngsters. TOSH stated that in all of his years in teaching, DONALD FELL ranks first or second as being the most emotionally disturbed students that he has ever had to deal with. TOSH advised that FELL had an apparent dislike for stronger male authority figures. TOSH stated that it was a chore to diffuse FELL's anger, and it would often take 20 minutes for FELL to cool down.

TOSH stated that he saw FELL in the in-school suspension room between 30-40 times in just one academic year. TOSH stated that he was aware of FELL's home situation as he also taught FELL's aunt, JACKIE SHARPE, with whom FELL resided. TOSH advised that SHARPE was somewhat emotionally disturbed herself; however, TOSH respected her for graduating from high SCHOOL. TOSH

FELL-00001179

7A-AL-44453

4

stated that FELL was small in stature yet challenged students and staff alike who were physically bigger and stronger than he. TOSH related that FELL had to be physically removed from the Auto Shop when he refused to leave after class. FELL's response was to run out of the school building. TOSH stated that even at the age of 15 he could tell that FELL's temper would one day get the best of him.

A review of FELL's academic record reflected the following incidents/student referrals:

| DATE | CLASS | OFFENSE | DISPOSITION |
|------|-------|---------|-------------|
| 9/19/1995 | Auto Mech I | Vulgarity | In-School Suspension |
| 9/29/1995 | Auto Mech I | Profanity | In-School Suspension |
| 10/12/1995 | Auto Mech I | Disruptive Behavior in Class | Detention |
| 10/23/1995 | Auto I | Disruptive Behavior | 2 day suspension |
| 11/13/1995 | HVEP | Throwing snowballs Profanity | 5 day suspension |
| 1/11/1996 | Auto Mech I | Absenteeism | |
| 2/6/1996 | HVEP | Insubordination Disruptive Behavior | 2 day suspension |
| 2/21/1996 | HVEP | Fighting with another student | 2 day suspension |
| 3/18/1996 | HVEP | Insubordination toward an instructor | 3 day suspension |
| 3/27/1996 | HVEP | Insubordination toward an instructor; horseplay | 3 day suspension |
| 3/28/1996 | HVEP | Use of profanity; Insubordination toward an instructor; shop safety violation | 10 day suspension |
| 5/23/1996 | HVEP | Safety Violation; Lying; Horseplay; Unmodified behavior; Disruptive Behavior (Throwing Objects that could cause injury). | 9 day suspension |

In one student referral form, dated March 28, 1996, FELL entered the Social Science classroom of Mr. JOHN KOZERSKI and said he was going to "stab him". KOZERSKI attempted to subdue FELL. FELL said he was going to come back and kill him.

On April 16, 1996, FELL was adjudicated delinquent, Petition #96-503.

7A-AL-44453

5

On December 11, 1996, FELL's Auto II teacher wrote that FELL has been absent 26 out of 65 days. The teacher commented that FELL needed intense guidance and communication with his parole officer.

TOSH advised that his last encounter with FELL occurred in 1997, when he ran into FELL at a local hospital. On that occasion, FELL was very pleasant to him. TOSH stated that it did not surprise him to read in the local papers that FELL was involved in a homicide. He felt that FELL never controlled his anger and was destined to either commit violence or become a victim of it.

TOSH recalled that FELL returned to WBAVTS during the first half of the 1996-1997 academic year but ended up quitting school on his 17th birthday.

TOSH recalled ROBERT JOSEPH LEE as a quiet yet truant student who did as little as possible to get by. TOSH described LEE as a follower who was never confrontational with him. TOSH did not believe that LEE came to school as often as DONALD FELL. TOSH found a student referral form on LEE dated December 5, 1996. LEE was reported for insubordination and received a four day suspension. TOSH believed that Mr. KOZERSKI and Mr. LoBRUTTO could provide additional information relative to ROBERT JOSEPH LEE.

On March 30, 2001, JOHN KOZERSKI, Social Studies Teacher, WBAVTS, advised that he taught Social Studies to both DONALD FELL and ROBERT LEE. KOZERSKI stated that he first met FELL in January 1996. KOZERSKI described FELL as a bit of a loner who came from a troubled family life. KOZERSKI went to high SCHOOL with FELL's aunt, JACKIE SHARPE, with whom FELL resided. KOZERSKI stated that SHARPE was emotionally disturbed herself, thus, possibly contributing to FELL's disruptive family background. KOZERSKI stated that FELL always appeared to be dirty looking and always wore a baseball cap to conceal his greasy hair. Generally, FELL was quiet unless instructed to do some schoolwork. On those occasions, FELL became belligerent and would "flip out," i.e., act out inappropriately. FELL's basic vocabulary consisted of obscenities, and he was not afraid to get right in the face of a teacher. KOZERSKI did not believe that the other students were afraid of FELL because, like FELL, they too were part of an at risk class and were tough in their own right. On one occasion, FELL got into a fight with another student during class simply because he wanted a particular computer disk. FELL ended up throwing a chair at the other student that resulted in a fist fight. KOZERSKI related that he threatened to call

FELL-00001181

7A-AL-44453

6

FELL's guardian if he did not behave. FELL simply would say, "Go ahead and call." KOZERSKI recalled that FELL failed ninth grade and was suspended from class all the time. FELL would associate with only a select few, usually other trouble makers. KOZERSKI stated that he was not surprised when he read about FELL's involvement in a triple homicide. He always believed that FELL would either end up in prison or killed.

KOZERSKI recalled teaching Social Studies to ROBERT LEE. KOZERSKI stated that LEE was not enrolled very long at WBAVTS and had a long history of absenteeism. KOZERSKI believed that he had LEE in class during the first semester of 1996. KOZERSKI described LEE as a somewhat quiet student who never did a lick of work. KOZERSKI related that he is an assistant football coach at COUGHLIN HIGH SCHOOL, Wilkes-Barre, PA, and was surprised to learn that LEE had tried out for the team. LEE was small in stature and never completed any tasks. Shortly after joining the football team, several players complained that personal items were missing from their lockers. LEE was eventually kicked off the football team when it was learned that he had something to do with the thefts. KOZERSKI advised that LEE was strictly a loner. Like FELL, LEE wore combat boots and rarely washed himself. LEE's clothing always looked dirty, and he made no effort to improve his hygiene. KOZERSKI stated that FELL had some intelligence, but LEE was as "dumb as a stump". LEE could not read or write very well. KOZERSKI related that LEE was the kind of kid who would enter the classroom, put his head down on the desk, and show total disinterest. On a few occasions, KOZERSKI saw LEE in the company of DONALD FELL and thought to himself, "trouble attracts trouble". KOZERSKI stated that when seen together, FELL would be the leader and LEE the follower.

On March 30, 2001, CARMEN LoBRUTTO, Science Teacher, WBAVTS, was interviewed regarding his knowledge of DONALD FELL and ROBERT LEE. LoBRUTTO advised that he first met FELL in 1996, when FELL was in his science class. LoBRUTTO described FELL as a small framed person with a high frustration level. FELL displayed average hygiene for a person enrolled in the at risk curriculum. FELL often used profanity but seldom acted out in LoBRUTTO's class. LoBRUTTO related that he takes a soft approach with his students, and FELL somewhat responded to this approach. As a result, FELL mingled with the rest of the class yet seemed an outcast.

LoBRUTTO described ROBERT LEE as a very quiet and unmotivated student. LEE was dirtier in appearance than the average student. LEE was more of a loner than FELL and never acted out in LoBRUTTO's class. Having observed both FELL and LEE,

FELL-00001182

7A-AL-44453

7

LoBRUTTO was not surprised to read in the local papers that both were involved in the death of others. LoBRUTTO stated that many of the at risk students enrolled at WBAVTS share some of the same traits and behavioral problems exhibited by FELL and LEE.

JAMES M. COUGHLIN HIGH SCHOOL
80 N. Washington Street
Wilkes-Barre, PA 18701

On March 29, 2001, the following investigation was conducted by SA JAMES J. GLENN:

Dr. BERNARD S. PREVUZNAK, Assistant Principal, COUGHLIN HIGH SCHOOL (CHS), provided the academic records on file for DONALD R. FELL and ROBERT JOSEPH LEE. Copies of the records were not available without a release signed by FELL and LEE or an appropriate court order. PREVUZNAK verified that DONALD R. FELL was born on April 30, 1980, Social Security Account Number: 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. FELL was enrolled at CHS in September 1996, and dropped out of school on April 30, 1997. FELL was in the 10th grade when he quit school. FELL's listed legal guardian was JACKIE SHARPE, aunt,        REDACTED - FELL        , Wilkes-Barre, PA. FELL's records indicate that he attended the following educational institutions:

        1986-1987 - SCHUYLER AVENUE ELEMENTARY SCHOOL,
                    Kingston, PA
        1987-1988 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1988-1989 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1989-1990 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1990-1991 - LINCOLN ELEMENTARY SCHOOL, Pittston, PA
        1991-1992 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1992-1993 - PLAINS JUNIOR HIGH SCHOOL, Plains, PA
        1993-1994 - PLAINS JUNIOR HIGH SCHOOL, Plains, PA/ST.
                    MICHAEL'S SCHOOL, Tunkhannock, PA
        1994-1995 - ST. MICHAEL'S SCHOOL, Tunkhannock, PA
        1995-1996 - HEAD START - WILKES-BARRE AREA VOCATIONAL-
                    TECHNICAL SCHOOL, Wilkes-Barre, PA
        1996-1997 - Enrolled COUGHLIN HIGH SCHOOL (10$^{TH}$
                    grade); Dropped Out: 4/30/1997.

PREVUZNAK stated that he first met DONALD FELL in approximately 1992, when FELL was a seventh grade student at the PLAINS JUNIOR HIGH SCHOOL. At that time, PREVUZNAK taught seventh grade art and had FELL in class. During the period, 1992-1994, PREVUZNAK generally saw FELL in school two to three times a week. PREVUZNAK related that he never had any serious disciplinary problems with FELL during class but was aware that FELL may have

7A-AL-44453

8

caused other teachers problems because he was often observed sitting outside the principal's office. PREVUZNAK described FELL as a low functioning student who earned a D grade in his class. PREVUZNAK explained that if a student just gave some effort during class, the student would be assured at least a C grade. This was not the case with FELL, as he never put forth the effort.

PREVUZNAK described FELL's appearance as "an unkept bed". FELL always looked disheveled. He looked as though he slept in his clothes and wore his hair long. His hair was rarely washed and looked greasy. FELL usually wore a baseball cap and associated with students who would be described as behavioral problems. PREVUZNAK recalled that once classes were dismissed for the day, FELL would make a bee line for the curb across the street from the school to have a cigarette with his buddies. PREVUZNAK remembered that FELL had to repeat the seventh grade at PLAINS JUNIOR HIGH SCHOOL and spent the eighth grade at St. MICHAEL'S SCHOOL, Tunkhannock, PA.

PREVUZNAK stated that FELL spent the ninth grade in the Head Start Program, housed at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL, Wilkes-Barre, PA. PREVUZNAK advised that FELL was the perfect candidate for Head Start because the program worked with high risk students, i.e. those students identified by their home schools, as most likely to drop out of school in the future. Head Start worked with students demonstrating behavioral difficulties, delinquent tendencies, and aggressiveness. The focus of the program was to expose the students to various trades with the hope that the student may become interested and stay in school.

PREVUZNAK advised that FELL's academic folder was replete with referrals for disciplinary action, suspensions, and juvenile adjudication. As early as 1991, FELL attended the WYOMING VALLEY HOSPITAL, 149 Dana Street, Wilkes-Barre, PA, for psychiatric testing.

Based on the initial assessment and classroom observation, FELL experienced difficulty with interpersonal relationships with both peers and adults. He demonstrated poor impulse control, attending to and completing tasks, and appeared to have poor self-esteem.

PREVUZNAK located FELL's year end grades at PLAINS JUNIOR HIGH SCHOOL, dated June 22, 1993. They reflected the following:

FELL-00001184

7A-AL-44453

9

English: D; Developmental Reading: E (Below 70%- Fail);
Social Studies: E; Math: E; Science: E; Art: D;
Voc. Explor.: C; Music: E; Physical Ed.: F

In 1994, FELL successfully completed the summer session at ST. MICHAEL'S SCHOOL, and was promoted to Grade 8. His grades are as follows:

Reading: A; English: A; Spelling: A; Math: C;
Science: B; Social Sciences: A; health: A; Art: B;
Computers: C; Physical Ed.: B

PREVUZNAK advised that his last contact with FELL occurred sometime in May 2000, when FELL came to CHS to provide a ride to his sister, TERRI FELL, who resided with her aunt, JACKIE SHARPE, Wilkes-Barre, PA. During their conversation, FELL alluded to the fact that TERRI's living conditions were bad and that TERRI was looking for a new place to live. PREVUZNAK stated that FELL looked raggedy, his hair was long and greasy, yet he remained respectful to him. PREVUZNAK stated that he was not surprised to read that FELL was involved in a triple homicide, as he always hung with a rough crowd and appeared destined for failure.

PREVUZNAK advised that he never had any contact with ROBERT JOSEPH LEE. LEE's academic file had little paperwork in it but reflected the following information:

LEE attended the Head Start Program at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL during school term 1996-1997. In a report dated June 11, 1997, LEE missed 22 days of school due to absenteeism.

An Alternative Learning Center Report Card for the term 1995-1996 reflected the following grades earned by LEE:

| CLASS | 1st | 2nd | Leave of Absence | 4th | Final |
|---|---|---|---|---|---|
| English | 80 | 54 | x | 83 | 72 |
| Science/Health | 75 | 45 | x | 84 | 68 |
| Math | 90 | 45 | x | 87 | 74 |
| Social Studies | 80 | 45 | x | 82 | 69 |
| Literature | 80 | 50 | x | 80 | 70 |
| Computer App. | 80 | 80 | x | 80 | 80 |

On November 12, 1996, LEE's report card at Head Start reflected the following grades:

7A-AL-44453

10

English: 65; Social Studies: 60;   Mathematics: 68;
Science: 65; Pre Voc: 65.

On March 29, 2001, JAMES S. MURPHY, Home/School Visitor, JAMES M. COUGHLIN HIGH SCHOOL, was interviewed concerning his knowledge of DONALD R. FELL and/or ROBERT JOSEPH LEE. MURPHY advised that he has no knowledge of LEE but knew DONALD FELL.

MURPHY stated that he has been a teacher for 20 years and a Home/School Visitor for the last 11 years. MURPHY's first encounter with DONALD FELL occurred sometime in 1993, when FELL was a student at the PLAINS JUNIOR HIGH SCHOOL, Plains, PA. As part of MURPHY's duties, he would send legal notices to the home of a truant student. On January 28, 1992, MURPHY contacted DEBRA FELL, FELL's mother, concerning FELL's truancy. MURPHY explained that years ago, parents were cited when their child did not show up for school. The law changed in the mid-1990's, to the point where both the parent and child are now cited to assure compliance.

MURPHY stated that on May 28, 1993, DONALD FELL was cited at the PLAINS JUNIOR HIGH SCHOOL for disorderly conduct. FELL had called his teacher an obscenity and was walking on the tops of cafeteria tables.  The disorderly citation was filed with the local magistrate, and FELL's mother received a copy from MURPHY via registered mail.

MURPHY recalled that when FELL attended COUGHLIN HIGH SCHOOL, circa 1996 - 1997, he resided with his aunt, JACKIE SHARPE, at 32 East Chestnut Street, Wilkes-Barre, PA. SHARPE was listed as FELL's legal guardian, and MURPHY dealt directly with her. On November 9, 1996, SHARPE was sent a legal notice indicating that DONALD FELL had missed 12 days of school. According to school policy, a doctor's note must be sent to the school whenever a student was absent three days in a row or longer. No such note was ever received from SHARPE. On February 13, 1997, a citation was sent to SHARPE and DONALD FELL because at that point, FELL had 87 illegal days (truant days) on file. FELL and SHARPE were no shows at the magistrate's office.

MURPHY stated that SHARPE never liked him and wrote several nasty letters with excuses why FELL missed school or why she never contacted the school. MURPHY described FELL as having a slight build but a tough guy attitude. He described FELL as a gangster wanna be who was extremely antagonistic. FELL was generally uncooperative and cocky and quit high school on the day of his 17th birthday. According to school policy, a student may

FELL-00001186

7A-AL-44453

11

quit school at the age of 16 provided they had a job on the outside that provided 35 - 40 hours per week. If a student had no job outside of school, they had to wait until they attained the age of 17.

On April 30, 1997, MURPHY advised that he made a home visit to the SHARPE residence to find out why DONALD FELL had not been attending school. JACKIE SHARPE simply said, "He quit." MURPHY advised that SHARPE never had the decency to notify school officials of FELL's intentions. MURPHY stated that FELL intimidated other students by his cocky attitude. Once he quit school he was often observed out in front of the school at dismissal time to meet up with his friends. It was FELL's way of saying to the other students, "look at me I'm cool".

MURPHY recalled that FELL was on probation with the LUZERNE COUNTY JUVENILE PROBATION OFFICE. His Probation Officer was ROBERT NILON.

MURPHY related that FELL came from a problem family and exhibited behavioral problems throughout his school years. MURPHY stated that FELL never displayed his temper in his presence, but he knew FELL was a powder keg just waiting to go off.

On March 30, 2001, ELIZABETH DiPASQUALE, Guidance Counselor, JAMES M. COUGHLIN HIGH SCHOOL, Wilkes-Barre, PA, was interviewed concerning her knowledge of DONALD R. FELL and ROBERT JOSEPH LEE. DiPASQUALE advised that she first met DONALD FELL in August 1995. On that occasion, DiPASQUALE had to meet with FELL's legal guardian and aunt, JACKIE SHARPE, to get her signature/ authority on a form which would allow FELL to enroll in the ninth grade Head Start Program housed at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL, Wilkes-Barre, PA. DiPASQUALE stated that she vividly recalls the visit to SHARPE's residence on East Chestnut Street, Wilkes-Barre, PA, because the house and yard were in deplorable condition. There were broken bottles in the front yard, the exterior fence was broken, and the house was in general disarray. DiPASQUALE met SHARPE on the front porch and had her sign the appropriate paperwork. FELL was present that day but remained at the front door.

DiPASQUALE recalled that DONALD FELL was lethargic and a marginal student at best. He had a long history of truancy and was the product of a broken home. FELL was emotionally, socially, and culturally deprived. It was believed that he could benefit from the Head Start Program which provided marginal students with the opportunity to learn various trades coupled with a more relaxed academic schedule. DiPASQUALE stated that FELL showed

7A-AL-44453

12

absolutely no progress in Head Start and was constantly in detention or was suspended from school. DiPASQUALE stated that FELL's sister, TERRI, was a year or two younger than FELL and also resided at SHARPE's home. TERRI FELL never graduated from high school. DiPASQUALE believed that FELL's mother had a history of alcohol abuse. No father figure was ever present in FELL's life. DiPASQUALE stated that FELL dropped out of high school in the 10th grade. This was the last time she saw him in school until May 2000, when FELL came to the school to pick up his sister. On that occasion, DiPASQUALE briefly spoke to FELL in her office and learned that it was his sister's intention to drop out of school. FELL wanted his sister to remain in school which may have lead to some friction between the two of them. FELL alluded to the fact that things were not going so well for his sister at the SHARPE residence. TERRI FELL was making plans to move to a new residence. DiPASQUALE advised that this was the last time she saw DONALD FELL. DiPASQUALE's recollection of FELL was that he always looked dirty and needed a good bath.

DiPASQUALE stated that her recollection of ROBERT LEE was not as vivid as DONALD FELL. She recalled that LEE resided with his father on Hurley Street, Wilkes-Barre, PA. She described LEE as a person who was lost. LEE had a history of detentions and suspensions and was a chronic truant. During his ninth grade, LEE attended the Head Start Program at WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL. DiPASQUALE remembered that LEE's father came to the school to sign the form necessary to enroll LEE into the Head Start Program.

DiPASQUALE reviewed LEE's academic records and advised that LEE was a Special Education student who attended the DALLAS ALTERNATIVE SCHOOL and admitted to the Luzerne Intermediate Unit (LIU) on September 28, 1995.

On March 30, 2001, THOMAS M. ZELINKA, English teacher, was interviewed regarding his knowledge of DONALD R. FELL and ROBERT JOSEPH LEE. ZELINKA advised that prior to being transferred to the COUGHLIN SENIOR HIGH SCHOOL, he taught English in the Head Start Program at WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL (WBAVTS), Wilkes-Barre, PA. ZELINKA advised that he first encountered DONALD FELL and ROBERT LEE in approximately 1996, when both were ninth graders at WBAVTS. ZELINKA found FELL to be relatively bright yet extremely undisciplined. ZELINKA advised that FELL appeared to have a chip on his shoulder and tried to intimidate others by his boisterous behavior. ZELINKA recalled FELL as wearing the same outfit all the time, a flannel shirt wrapped around the waist, a long jacket, and a bandana worn on the head. ZELINKA stated that FELL attempted to do some school

7A-AL-44453

13

work; but, when confronted, he would strike out aggressively. ZELINKA described FELL and his temper as a "loaded gun"; one never knew when he would unload on somebody. ZELINKA recalled one incident wherein FELL was physically carried from the Social Science class because he was acting out. FELL pointed his finger into the face of the instructor, JOHN KOZERSKI, and told him that he was going to kill him.

ZELINKA stated that he last saw FELL in approximately December 2000, smoking cigarettes outside the Top Dog fast food restaurant, Wilkes-Barre, PA. FELL was in the company of ROBERT LEE, just hanging out and playing video machines. FELL never recognized ZELINKA who was at the restaurant to celebrate his daughter's birthday. FELL looked as he always did; dirty, unkept, with an attitude.

ZELINKA stated that ROBERT LEE was nicknamed "The General" by staff members at the WBAVTS. LEE never got the connection between his name and that of General ROBERT E. LEE. ZELINKA described LEE as a dirty looking and disruptive student who just took up space in the classroom. LEE never did any School work and missed an extraordinary amount of school days due to truancy. ZELINKA stated that LEE was definitely a loner and that the other students found him a bit strange. On several occasions ZELINKA observed LEE and FELL together at the school. ZELINKA advised that FELL and LEE were two of a kind. ZELINKA stated that based on LEE and FELL's attitude, he seriously doubted that either boy would be productive members of society. ZELINKA stated that he was not surprised to read in the papers that LEE and FELL had killed someone because both were going nowhere fast.

FELL-00001189

7A-AL-44453

14


PLAINS JUNIOR HIGH SCHOOL
62 Abbott Street
Plains, PA
September 1992 - June 1993
September 1993 - June 1994

On April 10, 2001, the following investigation was
conducted by Special Agent JAMES J. GLENN:

WAYNE WASLOWSKY, Home/School Visitor, PLAINS JUNIOR
HIGH SCHOOL (PJHS), REDACTED-FELL                  telephone
number 570-826-7224, advised that he first became familiar with
DONALD FELL in approximately September 1993, when FELL was a
seventh grader at PJHS.  At that time, FELL was residing with his
mother, DEBRA FELL, at    REDACTED-FELL      Wilkes-Barre, PA.
FELL was becoming a recurrent truancy problem; and during the
academic year 1993-1994, it was safe to say that FELL was never
in school. WASLOWSKY reviewed notes in an old folder which
indicated that on December 9, 1993, he spoke with DEBRA FELL, and
she had been petitioned to the Juvenile Court because of non-
payment of fines relating to FELL's truancy.  WASLOWSKY advised
that the Juvenile In-Take Worker recommended that FELL be placed
at ST. MICHAEL'S SCHOOL for dependent and delinquent children.
On December 13, 1993, a meeting was held to discuss FELL's
academic future, and it appeared that the court was going to
agree that FELL be sent to the Day Treatment Unit of ST.
MICHAEL'S.

WASLOWSKY stated that although FELL had the reputation
of being a "foul mouth" at school, he never had any real
significant dealings with FELL.  WASLOWSKY stated that FELL just
did not give a "shit" about school.  WASLOWSKY recalled that his
mother was relatively compliant with school officials but
demonstrated little control over FELL.  WASLOWSKY stated that he
never observed FELL's temper; however, he recommended Special
Agent GLENN to teacher THOMAS MC DERMOTT who once observed FELL
firsthand in a rage.  WASLOWSKY related that he can still
visualize FELL attired in his black tee shirt, black pants, and
black steel toed boots.  After FELL left PJHS, WASLOWSKY has had
no further contact with him.

On April 10, 2001, THOMAS M. MC DERMOTT, Social Science
Teacher, PJHS, was interviewed concerning his recollection of
FELL.  WASLOWSKY advised that his first encounter with FELL
occurred in the cafeteria as opposed to the classroom.
MC DERMOTT recalled that in the academic year 1992-1993, he
observed FELL engaged in a heated exchange with a female
colleague.  MC DERMOTT recalled that FELL was shouting

FELL-00001190

7A-AL-44453

15

obscenities in the middle of the cafeteria and was totally out of control. To that end, MC DERMOTT, sensing that FELL may get violent, intervened and confronted FELL. At that point, FELL called him a "fucking asshole" and then ran from the cafeteria. MC DERMOTT pursued FELL and grabbed him in the hallway before he had a chance to leave the school building. MC DERMOTT stated that he immediately marched FELL into the principal's office and told the principal about FELL's actions. To MC DERMOTT's surprise, ten minutes later, FELL returned to the cafeteria. At that point, FELL attracted everyone's attention by walking across the tabletops in the cafeteria. MC DERMOTT stated at that point, he had enough and spoke to the Home/School Visitor, JAMES MURPHY. MC DERMOTT stated that he wanted FELL cited for his abuse of language; however, MURPHY told MC DERMOTT that language alone would not be enough to cite a student. MC DERMOTT then related to MURPHY how FELL had walked across the tabletops in the cafeteria. With that, MURPHY was able to cite FELL for disorderly conduct.

MC DERMOTT recalled that during the academic 1993-1994, he was scheduled to have FELL in his Social Science class. FELL showed up for the first day of class, walked out of the class, and MC DERMOTT has yet to see him again. From what MC DERMOTT could remember of FELL, he was a small framed, little boy, with long hair. To his knowledge, FELL was not in school very often as opposed to his sister, TERI FELL, who was a cooperative and quiet student.

On April 10, 2001, JAMES LASIEWICKI, Assistant Principal, PJHS, advised that he has been involved in the teaching profession for nearly 28 years. His first recollection of DONALD FELL was when he taught him English in the seventh grade, circa 1992. LASIEWICKI described himself has a strict disciplinarian, therefore, had little behavioral difficulties with FELL. LASIEWICKI stated that he taught FELL during the first period of the day; and initially, FELL did the assigned work. He described FELL as a quiet and reserved boy who slacked off as the year progressed. LASIEWICKI stated that FELL was a D student. LASIEWICKI observed FELL with other students and recalled that FELL was a small boy for his age whose temper could be explosive when agitated by the other children. Eventually, FELL would calm down during these periods of trial. LASIEWICKI knew nothing of FELL's home life and has not seen him since the seventh grade.

FELL-00001191

7A-AL-44453

16

DANIEL J. FLOOD ELEMENTARY SCHOOL
565 North Washington Street
Wilkes-Barre, PA  18702
March 1, 1988-May 25, 1988

     The following investigation was conducted by Special
Agent JAMES J. GLENN:

     On April 10, 2001, BRIAN BENEDETTI, Principal, FLOOD
ELEMENTARY SCHOOL (FES), provided the academic records of ROBERT
JOSEPH LEE, JR.  A copy of these records is attached hereto this
report.  BENEDETTI was not working at FES when LEE was enrolled
at the school; however, he believed that the former Principal,
DONALD SABATINO, now retired, may have some knowledge of LEE.

     LEE's records indicate that he attended FES for only
three months during the period March 1, 1988-May 25, 1988, and
was enrolled in the first grade.  LEE had transferred in from a
school in Brooklyn, New York, where he spent the first half of
first grade.  On May 25, 1988, LEE transferred from FES to attend
school in Tunkhannock, PA.  Records indicated that LEE spent his
kindergarten year, 1986-1987, at the CHESTER STREET SCHOOL,
Kingston, PA.  Records indicated that LEE was born on November
28, 1980, in Brooklyn.

REDACTED-FELL On April 10, 2001, DOANDL SABATINO, white male, DOB
1931, REDACTED-FELL 0214, was interviewed at his
residence,      REDACTED-FELL     Wilkes-Barre, PA, 18702.  SABATINO
was employed by the Wilkes-Barre School District for
approximately 33 years before retiring in 1993.  SABATINO stated
that he opened the FLOOD ELEMENTARY SCHOOL in 1969, where he
worked as the school's principal until 1993.  SABATINO recalled
the names of students DOANDL FELL and ROBERT LEE; and to his
recollection, neither was a behavior problem.  SABATINO stated
that both boys were probably only in the first or second grade
when he knew them; and generally, at that age, they are much more
controllable than the older grades.  SABATINO recalled that LEE's
father was very cooperative with school officials and that LEE
may have possessed some emotional problems.  SABATINO could add
no additional information but added that most of their teachers
have either been transferred or retired.

7A-AL-44453

17

LUZERNE INTERMEDIATE UNIT 18
Alternative Learning Center (ALC)
33 West Carey Street
Plains, PA 18702
1995 - 1996

     The following investigation was conducted by Special
Agent JAMES J. GLENN:

     On April 10, 2001, SANDRA OSTROWSKI, Secretary, ALC, 33
REDACTED-FELL   Plains, PA, provided academic records for
ROBERT LEE, JR. which indicated his attendance at ALC from 1995 -
1996.  Contained within LEE's folder was an Individualized
Education Program, dated May 31, 1995, and a Comprehensive
Evaluation Report, dated May 4, 1995.  Both reports are attached
hereto this report.  According to LEE's 1995 - 1996 report card,
he was absent only four days, and it was recommended that he be
promoted to grade nine.  LEE took the following medications:
Dexidrene, Clonidine, and Thorazine.  LEE was described has
hyperactive and explosive.  LEE's report card reflected the
following:

| Course | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 | Final |
|---|---|---|---|---|---|
| English | 80 | 45 | Incomplete | 83 | 72 |
| Science/ Health | 75 | 45 | Incomplete | 84 | 68 |
| Math | 90 | 45 | Incomplete | 87 | 74 |
| Social Studies | 80 | 50 | Incomplete | 82 | 69 |
| Literature | 80 | 80 | Incomplete | 80 | 70 |

     A equals 90 to 100
     B equals 80 to 89
     C equals 70 to 79
     D equals 60 to 69
     F equals Fail

     ROBERT LEE was admitted from March 21, 1996, to
April 4, 1996, and he was enrolled in the Genesis School at FIRST
HOSPITAL WYOMING VALLEY.  His teacher was TIM LAVELLE who
provided the following Progress Report, dated April 8, 1996:

Subject Areas

     English        - 80
     Math           - 93
     Social Studies - 80

FELL-00001193

7A-AL-44453

18

```
Science              -   72
Reading              - 100
Physical Education   - Pass
Art                  - Pass
Music                - Pass
```

Work/Study Skills

1.  Follows Directions - shows improvement.

2.  Completes Assignments - needs strengthening.

3.  Works Independently - shows improvement.

4.  Works Cooperatively in a Group - shows improvement.

5.  Participates in Class - needs strengthening.

Social/Emotional Growth

1.  Practices Good Health Habits - satisfactory progress.

2.  Shows Respect for Others and Their Property - shows improvement.

3.  Obeys Rules - shows improvement.

4.  Demonstrates Self Control - satisfactory progress.

5.  Shows Courtesy in Speech and Behavior - shows improvement.

6.  Expresses Feelings Verbally - shows improvement.

7.  Demonstrates Concern for Others - shows improvement.

8.  Shows Ability to Act Appropriately in a Variety of Situations - shows improvement.

9.  Demonstrates the Ability to Attend - shows improvement.

10. Demonstrates the Ability to Relate to Peers - satisfactory progress.

FELL-00001194

7A-AL-44453

19

11. Demonstrates the Ability to Relate to Staff - shows improvement.

Recommendations

LEE was discharged from FIRST HOSPITAL WYOMING VALLEY on April 5, 1996.  Recommendation is to return to previous school setting and follow up on appropriate after care services that have been arranged.

LEE's file indicates an Incident Report at the ALC.

Date of Incident:    February 27, 1996
Class:               Lunch

LEE was written up for insubordination, threatening or intimidating another person, profanity, and other (destruction of property).

Narrative:  "ROBERT was brought to the office for his lunch period because of inappropriate classroom behavior.  ROBERT threw two items over the wall and proceeded to pick them up when instructed by Mr. MUSTO.  He then threw and busted a glass salt shaker off the wall. He was removed by Mr. MUSTO and brought to another empty room.  After being restrained for approximately two minutes, he proceeded to throw a desk across the room, causing institutional vandalism to another desk.  ROBERT again needed to be restrained and expressed that he would clean the office and pick up the desk.  He intentionally continued to bang the broom into doors and walls before hitting a student in the legs with the broom."  Signed by Mr. RON MUSTO.

Comments:  "I entered the Quiet Room, and ROBERT was out of control.  I interceded and placed ROBERT in an upper torso.  After one minute, he indicated he could speak rationally. He sat in the chair and was able to talk about his responsibilities and our expectations. The session ended on a positive note."

LEE was engaged in a second incident, dated October 16, 1995, at ALC.

Details:  "BOBBY was placed in the Time Out Room by Mr. DOMBROSKI.  While in the room, he displayed poor behavior and became verbally abusive to the staff, had an altercation with another student, and kept making noises and throwing objects. Mr. LEE also kicked a hole in the wall, approximately 16 inches by 14 inches.  He eventually put his hands down and calmed down."

FELL-00001195

7A-AL-44453

20

Comments: "Student should pay for the damage to the wall."

A report of the Woodcock Reading Mastery Test - Form G was administered and dated January 25, 1998, Grade: 10.5. The following instructional level profile is as follows:

Word Identification:      Grade Level   9.3
Word Attack:              Grade Level  12.9
Word Comprehension:       Grade Level   6.0
Passage Comprehension:    Grade Level   8.9

Observation: "BOBBY said he does not like to read; however, he does possess adequate ability to enjoy a diversified reading diet. He needs motivation and later a vocabulary progression." Signed by KAREN MISOLEK, Reading Specialist.

The following 1997 - 1998 report card for ROBERT LEE, Grade 10, was found in the ALC file:

| Course | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| English | 85 | 85 | Incomplete | Incomplete |
| Science/ Health | 85 | 86 | Incomplete | Incomplete |
| Math | 85 | 87 | Incomplete | Incomplete |
| Social Studies | 85 | 89 | Incomplete | Incomplete |
| Literature | 85 | 85 | Incomplete | Incomplete |

Recommendations: Remain in grade 10. Remain at ALC.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 11, 2001:

RONALD MUSTO, Head Teacher, ALC,          REDACTED - FELL
Plains, PA, 18702, telephone number 570-208-3823, advised that he has been in the education field for 11 years. MUSTO described ALC as an institution that has been developed for "at risk" youth, i.e. those children having problems functioning in the public school system. The aim of the program is to structure the student's daily functioning and to nurture their emotional and leaning needs. The violations of the students who attend ALC range from truancy to weapons violations. The majority are here for disruptive classroom behavior. Presently, there are approximately 110 students at ALC, and MUSTO described the center as a temporary set-up until those students can either be placed

FELL-00001196