**ATTORNEY/CLIENT WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

TO:         Dr. Mark Mills
FROM:       Cynthia Carter Ayres
RE:         Donald Fell
DATE:       April 23, 2001

I gather from Wanda Rivera that you are most interested in my interview with Donnie's father and any psychotic or bizarre behavior exhibited by Donnie reported to me by other informants.   I have summarized my interview with Donnie's father and pulled together the pertinent information from my other interviews.  I am hoping to interview Donnie's sister, Teri, and his maternal grandfather (described by all informants as a chronic alcoholic) this week and will provide you with those notes as soon as possible afterward.  Please feel free to call me any time: (804) 353-0113 or (757) 259-9007 or cell phone (757) 291-3294.

I interviewed Donald Robert Fell (DOB ᴿᴱᴰᴬᶜᵀᴱᴰ 39) in Neptune Beach, Florida, on February 19, 2001, in the bar he frequents on a daily basis.  His sister Geraldine had told me that he was not willing to talk to me, but after tracking him down at Pete's, I was able to talk with him for a couple of hours.   I am combining the information I obtained from both Geraldine and Donald.

Mr. Fell completely acknowledges his long history of alcoholism and seems to recognize that his drinking has been a way of coping with lifelong depression.  His mother suffered from depression and underwent electroshock treatments when he was a young child.   Mr. Fell's mother was also an alcoholic, as her father may have been.

Mr. Fell was born and raised in Wilkes-Barre, Pennsylvania, by his parents, Donald Townsend Fell (d. 1977) and Myrtle Fritz Fell (d. 1980).   Donald T. Fell worked for American Auto Stores all his life.  Donald and Myrtle's oldest child, a girl, was born in 1929 and died of a strep infection when she was five.   Donald's living siblings are Geraldine Fell (70), a retired social worker who never married, and Sally Fell Francis, a nurse who lives in California with her husband, an attorney, and two children.  Sally has no contact with her brother.

Mr. Fell attended public schools in Wilkes-Barre and graduated from Meyers High School there.   However, during his senior year he was arrested for joyriding and sent to a local juvenile facility for approximately one month. Mr. Fell states that he was very small as a teenager and would do anything to impress his peers.

Mr. Fell married Beatrice Gelsleichter in 1959, when he was twenty and she was eighteen.   They had three children, Robert Donald Fell (b. 1965), Donna Fell Christner (b. 1960), and Susan Fell Benczkowski (b. 1964).    Donald and Beatrice

FELL-00001260

were divorced in 1976 because she could no longer tolerate his drinking and occasional physical abuse. Mr. Fell has no contact with his youngest daughter and only minimal contact with his two other children.

Mr. Fell met Debra Kotzer in a bar where he was working in Wilkes-Barre in 1976 or 1977. According to Mr. Fell, Debra was extremely promiscuous and their relationship was based primarily on sex. Debra was then twenty. Mr. Fell states that Debra told him she had been raped at age thirteen by a bar owner. Mr. Fell also states that Debra and all her sisters left home when they were around thirteen. Mr. Fell could not explain exactly what led them to leave home so young other than to describe Debra's mother, Theresa Banas Kotzer, as a monster. Mr. Fell states that Debra was already a serious alcoholic when he met her. He describes her as unable to hold a glass because her hands shook so badly. Mr. Fell also states that Debra abused amphetamines, made several suicide attempts, and had numerous sexual partners.

Mr. Fell married Debra in October 1979 after learning that she was pregnant. He did not want to marry her but felt it was the right thing to do. Donnie was born six months later. Mr. Fell reports that Debra drank daily during her pregnancy with Donnie. Mr. Fell states that he kept a refrigerator in the basement full of beer with a tap.

Mr. Fell recalls that Donnie and his sister Teri were sexually abused by a babysitter and her husband. Mr. Fell states that Claudia (Cookie) and Frank Bublo babysat for the children in the Fells' home; Donnie was attending preschool at the time, but Cookie Bublo picked him up and brought him home in the afternoons. Mr. Fell recalls noticing that the blinds in the living room were always closed when he and Debra returned home. At some point Donnie told them that Frank Bublo was hanging Terri by her diaper from a plant holder in the living room. Mr. Fell recalls that the police investigated the case, but did not pursue it. Mr. Fell states that in retrospect he realizes how affected Donnie was by the abuse. Mr. Fell states that before the abuse Donnie was a "sweet little boy" but that he became increasingly diffcult afterward. Mr. Fell also states that Donnie became very protective toward Teri on the school bus.

Mr. Fell confirms that his marriage was combative and violent. He states that Debra stabbed him on several occasions and that he still has the scars (Mr. Fell does have numerous scars on his arms and back). He recalls that after Teri was born, Debra wanted to have her tubes tied, for which she had to have his permission. He thought she was too young to have the procedure and told her he would not sign the papers. He woke up the next morning to find Debra holding a knife to his throat and threatening to cut his throat if he refused to sign the papers.

Mr. Fell states that his marriage to Debra ended because several of the men she was having extramarital affairs with threatened to beat him if he did not leave. He recalls that he returned to the trailer where they had been living to collect his

FELL-00001261

belongings and found them outside where Debra had thrown them. The dog, which had been left for days in their bedroom, had chewed through the waterbed to get to the water, which was still all over the floor. Mr. Fell states that Debra never kept a clean house and that he did the majority of the domestic chores while they were married.

The last time Mr. Fell tried to see Donnie was when Mr. Fell learned from his oldest son, Robert, that Donnie was in the hospital. When Mr. Fell went to see Donnie, Mr. Fell was informed by staff that Donnie did not want to see him and that a visit was not advisable. Mr. Fell has not had any contact with Donnie since then.

After splitting up with Debra, Mr. Fell eventually ended up living in a homeless shelter in Wilkes-Barre. He lost his job in 1993 and started collecting welfare. His sister Geraldine invited him to live with her in Florida; he lives in a self-contained unit in the basement of her house.

**Stella Kozerski Banas** is often identified as Donnie's great-grandmother, but is in fact his great-greataunt. She raised her niece Theresa Banas Kotzer Sharpe (d. 1995), who was Donnie's maternal grandmother and the mother of Debra Kotzer Fell. Stella Banas still lives in Wilkes-Barre with her daughter Jeannette. Donnie stayed with Stella and Jeannette from August 5 until September 23, 2000, when Stella and Jeannette drove Donnie to Vermont to stay with his mother.

Stella and Jeannette both report that during the time Donnie stayed with them he was polite and kind and was not a bother in any way. He read books, cut the grass, and earned some money locally by cutting wood and picking tomatoes. Donnie built Stella an outdoor swing to replace her broken one. They were disturbed when he brought home a gun he said he had borrowed from a friend of his aunt Donna. He also told Jeannette that he had cut off a squirrel's tail; his sister Teri told them that Donnie had tortured other animals. Jeannette and Stella stated that when they arrived in Vermont, Donnie ran to his mother and hugged her.

**Donna Kotzer Williams** (41) is Donnie's maternal aunt. She states that Donald Fell used to slap Donnie around when Donnie was very young and that there was constant violence in Donald and Debra's house. After Debra was on her own, Donna tried to involve Child and Youth Services because Debbie was constantly drunk and often left Donnie and Terri alone.

Donnie told Donna that he participated in Satanic worship, which included sacrificing animals.

**Jessie Williams** (18) is Donnie's first cousin on his mother's side. Donnie worked for Jessie last summer as a carnival game operator. Jessie states that he only hired Donnie because he was desperate for help; Jessie states that Donnie did not have the knack for encouraging people to play the game. Donnie was disrespectful to Jessie, and Jessie finally got fed up with Donnie when he started stealing from him and not

FELL-00001262

showing up for work. Jessie states that Donnie has been in trouble as long as he can remember and has been constantly drunk or high in recent years. Jessie also states that Donnie told him he was going to kill someone some day and that when he did he would never stop.

While they were working at a carnival in New York State last August, Donnie got into a fight with a guy who had sexually assaulted his sister Teri.

Teri told Jessie that Donnie and Bobby (codefendant) had played hockey with a cat, tortured and killed it. Donnie told Jessie that the cat had gotten hurt and that he had simply put it out of its misery. Donnie has told Jessie that he worships Satan.

**Sandy Kotzer Bowles** (44) is Donnie's maternal aunt. She now lives in the Myrtle Beach area of South Carolina. Sandy recalls that Debbie and Donald fought constantly during their marriage and that they were both drunk constantly. Sandy avoided going to see Debbie because the atmosphere in her house was so upsetting. Sandy recalls that Donnie and Teri always had head lice when they were living with Debbie.

When Donnie was about eleven or twelve, Sandy invited him and Teri to visit her for a week in Virginia, where she lived at the time. Donnie enjoyed himself and did not cause any problems for Sandy.

Sandy states that by the time her mother died, Donnie and Teri were "so far gone that no one else wanted them."

**Jackie Sharpe** (27) is Debra Fell's younger half-sister. Theresa Banas Kotzer married Jackie's father, John Sharpe, in the late 1960s; he died while she was pregnant with Jackie. Jackie was living with her mother when she had custody of Donnie and Teri, and after Theresa's death Jackie had temporary custody of them. Jackie states that Donnie lived with her after he was released from St. Mike's in 1995 until she kicked him out in 1999. Jackie states that she took care of her niece and nephew because no one else would. Everyone I spoke with stated that Jackie was at best difficult and at worst violent and unpredictable. Nonetheless, Jackie provided information that if verified could be helpful.

Jackie states that Debbie's boyfriends used to beat Donnie, that his mother allowed him to smoke marijuana and drink from the age of seven, and that Debbie used to sell Donnie's prescription medicines to her friends. Jackie states that Dr. Feussner at General Hospital described Donnie as psychotic and capable of blacking out and having no memory of things he had done. Jackie recalls that when Donnie got mad, his eyes would get very dark and he would occasionally black out.

Jackie states that Donnie is involved in Satan worship. Donnie told Jackie that he and Bobby and another boy had sacrificed a cat and drunk its blood.

FELL-00001263

Donnie told Jackie when he was drunk that he remembered being sexually molested; that he remembered being tied up and put in a closet.

Jackie states that when Donnie and Teri were still living with Debbie her house was littered with beer cans and ashtrays, smelled of dog urine, and was infested with rats and roaches. According to Jackie, Donnie kept his room very neat. He had a hamster for years that he loved. When he went to St. Mike's, Jackie kept it for him, and when she told him the hamster had died he was devastated.

Donnie's close friend Mikey Ramondi died in a car accident two months before Donnie left for Vermont. Jackie states that Donnie took it really hard.

FELL-00001264

# EXHIBIT 88

LUZERNE COUNTY COMMISSIONERS
THOMAS A MAKOWSKI, ESQ., CHAIRMAN
THOMAS P PIZANO
STEPHEN A URBAN



EUGENE N CAPRIO, M S NCC
*DIRECTOR*

EUGENE R KLEIN
*Chief Clerk / Administrator*

JAMES P BLAUM, ESQ
*County Solicitor*

JACQUELINE S ORKISZ
*Executive Administrative Assistant*

## LUZERNE COUNTY

CHILDREN AND YOUTH SERVICES

111 North Pennsylvania Boulevard, Wilkes-Barre, Pa 18701-3697 • 570-826-8710
Fax Number 570-821-7355
TDD (570) 825-1860

Office of the Federral Public Defender
District of Northern New York & Vermont
39 North Pearl Street
5th Floor
Albany, NY 12207

Re. Donald Fell
    DOB 4-3-80

Dear Ms. Rivera,

Enclosed please find the information you requested from the Luzerne County Children
and Youth Services' record of Donal Fell..

If you have any questions, please do not hesitate to contact me at 570-826-8710 ext
1165

Sincerely,

Peggy A Peterson, MSW
Adolescent Unit Supervisor



FELL-00001265

LUZERNE COUNTY COMMISSIONERS
THOMAS A MAKOWSKI, ESQ  CHAIRMAN
THOMAS P PIZANO
STEPHEN A URBAN



EUGENE N CAPRIO, M S NCC
DIRECTOR

EUGENE R KLEIN
Chief Clerk / Administrator

JAMES P BLAUM ESQ
County Solicitor

JACQUELINE S ORKISZ
Executive Administrative Assistant

## LUZERNE COUNTY

CHILDREN AND YOUTH SERVICES

111 North Pennsylvania Boulevard, Wilkes-Barre  Pa  18701-3697 • 570-826-8710
Fax Number  570-821-7355
TDD (570) 825-1860

Re: Donald Fell
DOB 4-30-80

Please be advised that additional information regarding Donald Fell may be obtained from the following sources:

The Victims Resource Center
85 South Main Street
Wilkes-Barre, Pa, 18701


Saint Michael's School for Boys
Hoban Heights,
PO Box 370
Tunkhannock, PA, 18657


First Hospital of Wyoming Valley
149 Dana Street
Wilkes-Barre, PA, 18702

The Children's Service Center
335 South Franklin Street
Wilkes-Barre, PA, 18702



# EXHIBIT 89

Dun't / "D" MANAGEMENT TEAM MEETING
4/30/2001

FF PRESENT:                                                                    b6
                                                                               b7C

— CASE REVIEWS —

Robert LEE : More vocal lately. Negative attitude, maybe learning from others

Donald Fell : (Seen by DMT.) Received request. Review again in 60 day

Maybe providing other inmates. Monitor carefully.

Has been joking around / laughing / more open — Appropr

2 more DR's pending. Threw water/liquid on

Denied clothes. Denied change of rooms. Behavior inappropri
Review again next week.
                                                                               b6
                                                                               b7C

Investigation still pending [  ] will update w/info.

(Seen by DMT.) Review again next week for Medi
5/6. Denied movement this week. Still verbally aggress

Dineen has results of investigation. [  ] will Determi
status. OOS still on option / ISC.

(Seen by DMT.) [  ] ✓/pts. DR (minor)
not heard yet.

CONT.

FELL-00001267

[BOX] Needs Officer instruction . [BOX] will movable
this guy

[BOX] DR sent him to D Unit 4/17/01 . (Seen by DMT.)
Review for Event 5/17 (30 days)

b6
b7C

[BOX] off lockin today (Seen by DMT.) Reviewed status
[BOX] will determine placement .

[BOX] Mostly/Verbally aggressive .

— Special OBS —

2Q placed on 30's — CODE #3

— Movement List —

— O —

# EXHIBIT 90

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY · MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE · BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON · BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

May 18, 2001

Mr. David V. Kirby, Acting United States Attorney
Mr. Gregory L. Waples, Assistant United States Attorney
Mr. John P. Tavana, Assistant United States Attorney
United States Courthouse and Federal Building
Post Office Box 570
Burlington, VT 05402-0570

Re: *United States of America v. Donald Fell*, No. 2:01-CR-12

Gentlemen:

This letter and its attachments are submitted in anticipation of our meeting on May 25, 2001 in your offices.[1] Our purpose in writing and meeting with you is to attempt to convince you that the United States should not seek capital punishment for Mr. Fell. We believe that there is much in Mr. Fell's history, mental health, and the circumstances of this case, that weigh against the imposition of the death penalty.

1. A short history of Donny Fell. Born on April 30, 1980, Donald Robert Fell II (hereinafter "Donny") is the child of Donald Robert Fell, Sr. and the late Debra Kotzer Fell. They married in Wilkes-Barre, Pennsylvania, three months after Debra became pregnant with Donny. Donald Fell, Sr. was previously married to Beatrice Gelsleichter Fell, who divorced him after years of physical abuse.

Debra Kotzer was born to Theresa and Ray Kotzer. Her parents' marriage ended in divorce because of Ray's violence toward Theresa and his abuse of alcohol. Debra repeatedly ran away from home. At thirteen, she was raped by a bartender. She finally left home for good, living with bikers for several years. She later returned to Wilkes-Barre with her first husband.

---

[1] This information is provided pursuant to §9-10.000 (B) of the United States Attorneys Manual with the understanding, that any statement made here cannot be used against the defendant in any way inconsistent with Federal Rule of Criminal Procedure 11 (e) (6) and Federal Rule of Evidence 410.

Page 1 of 9

FELL-00001269

Debra Kotzer and Donald Fell, Sr. met for the first time in a Wilkes-Barre bar. They were both chronic alcoholics. When Debra became pregnant with Donny, she continued to drink and smoke daily. She rationalized her drinking by claiming "barley" was good for the baby.

After Donny's birth, his parents fought constantly. They regularly went to bars where they became drunk and violent toward each other. These fights often involved weapons, particularly knives. On one occasion in their home, each parent stabbed the other. The police took them away, leaving baby Donny with his sixteen-year-old stepsister, who had to clean up the blood.[2]

When Donny was two, Debra filed charges against Donald Sr., accusing him of beating herself and Donny. When Donny was three, Debra became pregnant with his sister, Teri. Debra wanted to have her tubes tied to prevent further pregnancies. Donald, Sr., refused to agree. He woke up the next morning to find Debra holding a knife to his throat, demanding his consent.

When Donny was four, he and his younger sister Teri were regularly left with a man and his wife. When Teri complained that the couple had "hurt her pee pee," Children and Youth Services began an investigation. It was discovered that the man had been hanging Teri from her diaper on a hook. He performed oral sex upon her and required her to perform oral sex upon himself. This occurred in Donny's presence. After therapy, two months later, Donny finally disclosed that the man hit him with a board, locked him in a room, and engaged in anal sex with him. Today, Donny denies any memory of this.

Shortly after these events, Debra and Donald Sr. had a fight in their home. Debra stabbed Donald, Sr. in the back. He retaliated by stabbing her in the thigh. The police arrived to find blood all over the house. Debra was seated in a chair with a beer in her hand. The knife was still stuck in her thigh. When the police tried to assist her, she fought furiously to maintain her beer. Emergency medical technicians followed a trail of blood upstairs to find Donny and Teri, unhurt but alone. Another trail of blood led police to a local bar where Donald Fell, Sr. sat drinking a beer, with a broken blade still in his back. Donny and Teri were placed in the temporary custody of Debra's mother.

After the sexual abuse, Donny began having nightmares. He became less compliant at home. He did very well in school during first and second grade, but was getting only passing marks by third grade. His father keep a keg of beer constantly on tap in the basement. It was around this time Donny began drinking from the keg.

In fourth grade, Donny's father left home for good and entered a detoxification program for alcoholism. Twice during the school year, Donny and Teri were discovered to have head lice. In fifth grade, Donny took the Stanford Achievement Test. Despite declining school work and chaos at home, he scored above grade level in every area.

---

[2] All events are confirmed by police, hospital, and social services reports made at the time of the occurrence. The reports are corroborated by recent interviews with persons who were present at the events.

Page 2 of 9

FELL-00001270

During this time, Debra was drinking frequently. She was arrested for driving under the influence of alcohol, and later for public drunkenness. She began living with boyfriend Ellery Wilcox, who later died of a drug overdose. Donny began actively abusing alcohol with friends and used cocaine that he stole from his mother. His drinking included whiskey, rum and tequila.

When Donny was in sixth grade he started using marijuana and LSD. Debra admitted him to a hospital where he was diagnosed with conduct disorder. Testing revealed that he viewed his mother as an authoritarian figure who related poorly to her children. In the winter, he withdrew from elementary school.

He was again admitted to a hospital when he accidently shot his friend in the shoulder with a handgun that the friend's father had left available. Neither boy apparently knew it was loaded. Donny was found shivering and scared. The hospital psychiatrist noted that Donny appeared angry and depressed. He found that Donny's insight and judgement were below age level, and were impaired by mood swings and impulsivity. He was put on medication and treated for head lice. Against medical advice, Debra stopped giving Donny his medication.

The next fall, he entered middle school, where he was absent 56 out of 181 school days and failed most classes. He took the Iowa Tests and scored significantly lower than on earlier standardized tests.

Donny was still only twelve when Debra admitted him to the hospital for behavioral disorders. Donny was again treated for head lice. The psychiatrist noted that Donny greatly improved on 50 mg. of Mellaril per day. On the medication he showed "no anxiety, depression, mood swings, temper tantrums, impulsiveness, or hyperactivity."

Debra called the police one day to complain that Donny was next door with relatives who would not let him come home. When officers investigated, they found Donny asleep in his room and that Debra was intoxicated.

Several months later, Debra again admitted Donny to the hospital. Donny had stopped taking prescribed medication, which he admitted made him calmer. He increased his use of illegal drugs, particularly LSD. The psychiatrist described Donny as depressed and on the verge of tears, "especially when discussing the fact that he feels that his mother does not want him anymore and basically she does not care for him." He was discharged with diagnoses of Major Depressive Disorder with Psychotic Features, Hyperkinetic Conduct Disorder, and Borderline Personality traits. He was prescribed Stelazine and Clonidine.

In November, Donny was knocked unconscious by a brick. Debra Fell told the doctors that Donny "needs to be put away." The doctors recommended that the entire family participate in outpatient treatment. The day Donny was discharged, Debra acknowledged she had been drinking all day.

FELL-00001271

On Christmas Eve of that year, Donny was thirteen. When their mother failed to return home, Donny and Teri wrapped their own presents and went to bed. The children woke up on Christmas morning, to find Debra passed out on the couch. Unable to wake her, they unwrapped their presents alone. Debra got up sometime that afternoon and told her children that she was going out to buy a ham for dinner. She never returned.

A month later, Debra was arrested for harassment and public drunkenness after slapping eleven-year-old Teri with the back of her hand, leaving a small laceration. Two weeks later, Debra was arrested for assault and public drunkenness. Donny watched as she dragged, punched, and scratched her boyfriend while he attempted to leave the house. The police found lacerations on the man's face and pieces of his glasses on the sidewalk. Debra was too drunk to sign the citation.

By spring, Debra was in prison and the children were placed in temporary custody of Debra's mother, Theresa Sharpe. By the fall, Theresa was diagnosed with cancer. She died on New Years' Eve. Donny and Teri were placed with Debra's sister, twenty-one-year-old Jackie Sharpe. When Debra got out of prison she moved to Vermont without the children. Donny did not see her again for almost seven years. She never visited Donny or Teri.

Jackie was unable to substitute as a parent to Donny. For almost three years, Donny was confined to St. Michael's School. He responded well there. He had little access to drugs or alcohol. His grades were good. When he was released, he returned to live with Jackie Sharpe. He briefly attended a vocational school but then left school permanently at sixteen.

The rest of his teenage years were filled with illegal drug use, temporary hospitalizations, and juvenile detentions. He had a series of odd jobs. Some of the drugs he used during this time were angel dust, mushrooms, oxycontin, pain pills, tranquilizers, valium, heroin, marijuana, LSD, cocaine, and alcohol. However, he was taking no medication to address his psychiatric conditions.

In summary, there was no sustained period of Donny's life that could be described as normal. As a small child he was abused and neglected. His mother allowed their home to become filthy, exposing her children to vermin and lice. Only twice did social services intervene. When he was finally taken from his home it was only because Debra was going to prison.

As soon as he was old enough to pour his own drinks Donny began abusing alcohol. Once drugs became available he abused those. He was abandoned by his father at age ten and by his mother at age thirteen. From then on, he had no parent or role model. He lived with serious mental health conditions that were unaddressed and aggravated by his use of illegal drugs and alcohol.

2. Donny Fell's Mental Health. An assessment of Donny Fell's mental health is attached in the form of reports by Psychiatrist Mark J. Mills, J.D., M.D.;Clinical Psychologist Wilfred G.

Page 4 of 9

FELL-00001272

van Gorp, Ph.D.; and Neuropharmacologist Jonathan J. Lipman, Ph.D., MIBiol., FACN. The curriculum vitae of each is also attached.

In summary, these reports found that Donny had a psychotic-like condition since at least adolescence. This condition was treated with success when Donny was first hospitalized. However, Donny stopped taking the prescribed medications. Instead, he treated himself with illegal drugs and alcohol, which only aggravated the underlying conditions.

Dr. Lipman cited studies indicating "schizophreniform reactions" in persons with borderline psychosis who use LSD. He referred to Donny's use of LSD as "bordering on stupendous." Dr. Mills stated, "It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated."

Even without the introduction of drugs and alcohol, Doctors Mills and van Gorp amply documented Donny's damaged mental health. As Dr. van Gorp stated, "The Schizophrenia Index failed to be positive by one point, and I believe this is further evidence of the somewhat atypical thought process he has which makes him vulnerable to a frank psychosis if under sufficient stress."

3. The circumstances of the offense. The charged offense involves the murder of Teresa King. However, it is impossible to isolate that murder from the deaths of Debra Fell and Charles Conway.

When Donny went to visit his mother in Rutland, Vermont in September, 2000, he had not seen her in almost seven years. His great-great-aunt Stella Banas, and her daughter Jeanette Barnes, drove Donny to Rutland to reunite him with his mother. Donny hoped he could reestablish a relationship with his mother.

Donny quickly found that his mother still abused drugs and alcohol. She had a series of male visitors. She gave him drugs, alcohol and cigarettes. She and Donny argued regularly. By the time of her death, Donny had come to the conclusion that he could never have a normal mother-son relationship with Debra.

The physical evidence and the statements of the defendants are what remain of November 27, 2000. In most important respects, each corroborates the other two. The murders of Debra Fell and Charles Conway appear to have been spontaneous acts that were carried out with great fury. The acts were fueled by tremendous amounts of drugs and alcohol. Donny's actions are consistent with the type of impulsive behavior and uncontrolled anger described by the doctors who examined him.

No rational motive has ever been stated by the defendants for the murders of Debra Fell and Charles Conway. Donny has repeatedly stated that he liked "Charlie" and could not explain his actions. It seems possible that Donny's fury, expressed toward Conway, was actually anger

Page 5 of 9

FELL-00001273

toward his mother.

According to Robert Lee, Donny asked him to kill Debra. If this was true, it does much to confirm that Donny's actions toward Conway were directed toward his mother. He had many years of rage built up inside, but she was still his mother and he may have felt that he could not personally harm her.

Both defendants have expressed the feeling that they were not acting like themselves at the time of the murders. When faced with the enormity of what they had done they clearly had trouble making decisions about what to do next. Donny showered, but put the same clothes back on. He washed and wrapped the knives used in the murders, but left them on the kitchen table.

Because the defendants were strangers in a small city in a mostly rural state, they agreed to get a car. However, they left the apartment with no clear plan. They wandered around town on foot with an unloaded shotgun. They were incapable of stealing an unoccupied locked car.

By seeking to take an occupied car, the defendants placed themselves in a hopeless situation. Upon stopping Mrs. King, they quickly realized that unless they took her with them, she would inform the police and capture was imminent. Once they had her, the only perceived option was to release her in a place where she was too far from others to immediately report their whereabouts. This proved impossible because they did not know the area well enough to drive to such a place. When they finally let her out on a less traveled section of road, her reaction was to try to flag down another vehicle. When they told her to run into the forest they then realized they could not stop her from coming right back to the road.

The defendants made what any clear-thinking person would consider an irrational decision. They decided to murder Mrs. King. They later said it was because she could identify them. However, there was already so much evidence linking them to the murders of Debra Fell and Charles Conway, that King's possible identification of them as robbers seems inconsequential. Their only real need at that point was to restrain her long enough to allow them time to drive away. They could have done this by simply tying her up.

There is nothing in Donny's history to indicate he was otherwise predisposed to murdering someone in order to steal their property. The murder of Mrs. King was the irrational act of two very young men who were influenced by drugs, alcohol, and the stress of the previous murders. In Donny's case, this is another situation in which his borderline psychosis may have also played a role, preventing critical thinking.

4. Why capital punishment is inappropriate in this case. The federal death penalty statute (18 U.S.C. §3591) lists factors that the finder of fact shall consider mitigating against the imposition of the death penalty. Of those, relevant to this case are:

(1) Impaired capacity - The defendant's capacity to appreciate the wrongfulness of

Page 6 of 9

FELL-00001274

the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

\* \* \*

(5) No prior criminal record - The defendant did not have a significant prior history of other criminal conduct.

\* \* \*

(6) Disturbance - The defendant committed the offense under severe mental or emotional disturbance.

\* \* \*

(8) Other factors - Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death penalty.

The basis for the application of those factors is covered in the sections above, relating to Donny's upbringing, mental health, and the circumstances of the offense. However, one of the most compelling reasons against the death penalty in this case is not specifically listed among the statutory mitigating factors. That factor can best be described as a lack of future dangerousness.

Under some capital punishment schemes, such as Texas, the jury must answer special issues. One of those issues is whether the defendant poses a future danger to the community. If the jury answers negatively, a death sentence cannot be imposed.

There is a great deal of evidence that Donny Fell thrives in a controlled environment that is free from drugs and alcohol. This was proven by his temporary hospitalizations, his confinement to St. Michael's School, and his imprisonment for over five months in this case. Confined to prison, there is no reason to believe Donny Fell will be a danger to other inmates, prison personnel, or himself.

Due to the seriousness of his charges, Donny has been locked in the mental health/punitive segregation wing of the Northwest Correctional Facility for his entire pretrial detention. During that time, no disciplinary reports have been filed against him. He has managed to cope under stressful circumstances. Disturbed inmates in his ward often scream all night and smear feces in their cells.

Initially, he was completely locked down without contact with other inmates and got only one hour outside his cell each day. In March, there was a meeting to discuss moving Donny into the general population. A corrections officer came on his day off to advocate for Donny based upon his good behavior. Donny was given the privilege of going to the recreation room and the job of mopping floors.

Page 7 of 9

FELL-00001275

Donny has not been moved to general population. According to Superintendent Steven Maranville, the reason for this is that a previous federal capital defendant tried to escape after entering general population. Maranville is understandingly apprehensive about repeating those circumstances. He agreed that there were no disciplinary problems with Fell.

The State of Vermont considers prison an adequate punishment for convicted murderers. The community standards of Vermont should be considered in this case. Vermont Senator Patrick Leahy proposed legislation that would bar the federal government from seeking the death penalty for this crime in states which do not have capital punishment under their own laws. (Section 401, Innocence Protection Act of 2000).

There is also a regional bias against the use of the death penalty. Of the New England states, only New Hampshire and Connecticut have death penalties. No person has been executed in New Hampshire since 1939 and no inmate is on death row. Last year, the state legislature voted to abolish capital punishment, but the bill was vetoed by the governor. There are seven death row inmates in Connecticut, but none have been executed since 1960.

Recently, the first federal capital case was tried in New England. The defendant, Kristen Gilbert, was convicted of multiple premeditated murders of patients in a veterans' hospital. Even though she would not accept responsibility for the crimes, a jury refused to impose a death sentence.

New York State does have a death penalty. There are six inmates on death row, but there have been no executions and none are imminent. More important, no federal jury has imposed a death sentence in any of New York's four federal districts. Those capital trials involved multiple contract killings by members of the Mafia, drug organizations, and street gangs. None got death sentences.

The only federal case in the Northeastern United States where a death sentence was rendered was in the Middle District of Pennsylvania. In that case, an Oklahoma prisoner serving a 1200+ year sentence at the Allenwood federal prison, strangled his cellmate to death.

5. Conclusion. The deaths of Teresa King, Charles Conway and Debra Fell are tragedies. The defendants immediately and repeatedly confessed their guilt to their murders. The only question is how they should be punished.

In the case of Donny Fell, there is extensive evidence of impaired capacity and disturbance. These alone should mitigate against capital punishment. One of the charges is for kidnapping in which a death resulted. If convicted, this crime requires a life sentence.

An agreed resolution provides certainty. Certainty not only benefits the parties, but the relatives of the victims. In the case of the Oklahoma City bombing, relatives of the victims were promised they could witness the execution of Timothy McVeigh on May 16, 2001. The

Page 8 of 9

justification was that witnessing his death would provide closure so they could go on with their lives. That execution was postponed because thousands of documents had not been provided to the defense prior to trial. McVeigh's sentence and conviction may now be challenged.

McVeigh's prosecution was the most thorough and expensive criminal case in history. If certainty cannot be guaranteed in that case, it can be guaranteed in no other. Given the certainty of a prison sentence, and the uncertainty of a death sentence, seeking the death penalty is not warranted in this case.

Sincerely,

Alexander Bunin, Federal Public Defender

Gene V. Primomo, Assistant Federal Public Defender

Page 9 of 9

FELL-00001277

# EXHIBIT 91

"D● Management Team Meeting
5/21/2001

Present: _____                                    b6
                                                        b7C

— Case Reviews —

Robert LEE: (MH)  Maybe smoking in cell — officers be aware. Superintendent request denied/radio. ( DMT will revisit every 90 days)

Donald Fell:  Quiet / No issues / Reviewed status / No changes.
                                                        b6
                                                        b7C

[___]: OOS Hearing held last week — / awaiting OOS placement.

[___] Very vocal. Security needs to revisit the inside of cell.

[___]: Currently in Medical office/infirmary. Medical not

[___] Reviewed status / Investigation completed — to remain in D unit until OOS is reviewed with possible move back to NH.

                                                        b6
                                                        b7C

[___] Moved over to E unit 5/21/01.

) Currently under review for move back to Windsor pr T

(Seen by DMT.) Mostly, Verbally Aggressive. Abusive towards female nurse. Reviewed status.
(CONT.)

FELL-00001278

(Seen by DMT.) High profile case prohibits medium placement at this time. Review case in 2 weeks.

: No issues. Doing good. Review in 1 wk for Fac' (no DR/unit)

: Reviewed smoking issue as it pertains strictly to him. Needs to be medium for Newport consideration    b6
b7C

AD/SEG Hearing held last week. (Seen by DMT.) Hearing officer recommended: AD/SEG to unit (Restrictions) not 23/7 (30 days/Phase I). Inmate questions a possible Transfer from this Facility. Review status: 6/9/01

(Seen by DMT.) Requests to be moved to Unit I so he can be closer to Aquino.

More DR Lock-IN Time coming DRUG/Possession ( Consider AD/SEG to unit.

Move to "D" unit / Major DR – tampering w/ fire alarm.    b6
b7C

— Special OBS.—
— off OBS/per        .
— No change
— No change.

③

## - Unit Issues -

Reviewed MH program for unit ✓ & unit II    Officers have a copy.
Tobacco issue reviewed. [     ] will put out a [     ]/UNIT II
Handbook after all officers get a chance to review new program.

b6
b7C

FELL-00001280

# EXHIBIT 92

 

VERMONT DEPARTMENT OF CORRECTIONS
FACILITY REPORT FORM

Page__1__of__1__                              _XX_N.W.S.C.F.

TO: Hearing Officer                 ·        Type of Report;
                                             _X_Incident _X_DR
FROM: C/O [          ]

                                             ___Informational___Confidential .
DATE: 13 June 2001

RE: Lee, Robert


Report: On the above date at approx 1037hrs I heard a noise comming
from Activity room 2. C/O I [        ] also heard the noise and was
ahead of me in checking it out. He told me to hurry up as he called     b6
a "33" in Delta. As I looked in the activity room I observed inmate      b7C
Lee, Robert repeatedly punching inmate [          ] in the head and
shoulder area. I kicked the door and yelled for inmate Lee to stop.
He did not. As staff had not yet responded and the fact that inmate
[        ] was taking alot of punches, I asked inmate [        ] to try to
pull inmate Lee off of inmate [      ] At first he refused and when
I asked again he complied, to which Lee immediately stop his
aggression and went to the back of the activity room. Staff were
responding at this time, so I ordered the door to be openned and I
entered the activity room and ordered all inmates to face the wall.
I approached inmate Lee and placed him in handcuffs. He was then
escorted back to his cell by C/O's [                ] All inmates
present in the activity room were then escorted back to their
cells.///////////////////END OF REPORT\\\\\\\\\\\\\\\\\\\\\\\\\

# EXHIBIT 93

**CORRECTIONAL MEDICAL SERVICES**

## INTERDISCIPLINARY PROGRESS NOTES

Patient Name _Don Fell_    I.D. # _043080_    Institution _MWSCF_

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 7/5/01 | | S) Acne under control. needs benzoyl peroxide renewal & would like to continue doxycycline. O) Skin mostly clear. few papules + a couple of small pustules forehead & back. A/P) Acne. cont current meds. [signed] M.D. | |
| 7/6/01 | 1800 | RN called to Delta c ice pack to assess pt Ⓡ hand p̄ punching walls. I/M stated just angry and "got into a fight c̄ the wall" reminded I/M by d/w RN to talk to infirmary staff if MH ∅ available. [signed] APreston RN | Ann C. Preston RN |
| 7/6/01 | 1100 | Addendum to above note: pt hand swollen, ltm c̄ pain ∅ obvious injury. v'd chart - ∅ documentation of pt having been seen for last MH referral by RN. [signed] APreston RN | Ann C. Preston RN |
| 7/20/01 | 00³⁰ | S/M still in Housing on 10" CUTDC. Per Bill Cont., if S/M asks, should be told of "friend's" death. ∅ S/Tptms at this time. W— | Heather E. Cornell RN |
| 7/21/01 | 05⁰⁰ | S/M informed of "friend's" death. offers to make appointment. MH referral in. WP | Heather E. Cornell RN |

FORM #7113 8/94

FELL-00001282

# EXHIBIT 94

SP4-137B
COMPILED: 2010/11/16                                                    PAGE: 1 of 3

PENNSYLVANIA STATE POLICE
CENTRAL REPOSITORY
1800 ELMERTON AVENUE
HARRISBURG, PENNSYLVANIA 17110
(717) 787-9092

==============================================================================
    USE OF THE FOLLOWING CRIMINAL HISTORY RECORD *** SID 261-88-59-8 ***
                    REGULATED BY ACT 47, AS AMENDED.
==============================================================================
                            IDENTIFICATION
NAME: EIKE,CHRISTOPHER ALLEN
SID: 261-88-59-8                       DOB: 1983/REDACTED-FELL    SOC: XXX-XX-4689
SEX: MALE            RAC: WHITE        HAI: BROWN            EYE: HAZEL
HGT: 6'00"           WGT: 175
POB:                 US CITIZEN: YES
COUNTRY OF CITIZENSHIP:
==============================================================================
                            CRIMINAL HISTORY
NAME: EIKE,CHRISTOPHER ALLEN                 OTN: H099521-2
ARRESTED: 2001/11/07  PAPSP5800  BLOOMING GROVE PSP            OCA: R4450286
DISPO DATE: 2002/10/08            COMMON PLEAS DOCKET: CP-52-CR-0000010-2002

OFFENSE                                        DISP
DATE         CHARGE              COUNT  GRADE   CHG    DISPOSITION
-------      ------              -----  -----   ------ ------------
2001/07/06   CC6301A1 CORRUPTION   1     M1            PLEAD GUILTY/
             OF MINORS                                 COUNTY PRISON/
                                                       06 MOS - 24 MOS/
                                                       FINES AND COSTS
==============================================================================
NAME: ELKE,CHRISTOPHER ALLEN                 OTN: H486876-5
ARRESTED: 2003/03/05  PAPSP4000  HONESDALE PSP               OCA: R30466661
DISPO DATE: 2004/09/10            COMMON PLEAS DOCKET: CP64CR459-03
DISTRICT JUSTICE: 22301

OFFENSE                                        DISP
DATE         CHARGE              COUNT  GRADE   CHG    DISPOSITION
-------      ------              -----  -----   ------ ------------
2002/02/28   CC3921A THEFT BY      1     M1            PLEAD GUILTY/
             UNLAWFUL TAKING                           REGIONAL
             OR DISPOSITION                            CORRECTIONAL
                                                       FACILITY/
                                                       04 MOS - 002
                                                       YRS/
                                                       COSTS/
                                                       RESTITUTION
==============================================================================
NAME: EIKE,CHRISTOPHER A                      OTN: L349397-6
ARRESTED: 2007/05/03  PAPSP4000  HONESDALE PSP               OCA: R03065161
DISPO DATE: 2007/11/15            COMMON PLEAS DOCKET: 0267-2007

OFFENSE                                        DISP
DATE         CHARGE              COUNT  GRADE   CHG    DISPOSITION
-------      ------              -----  -----   ------ ------------
2007/05/03   CC3921A THEFT BY      2     F3            PLEAD GUILTY/
             UNLAWFUL TAKING                           STATE
             OR DISPOSITION                            CORRECTIONAL
                                                       FACILITY/
                                                       12 MOS - 24 MOS/
                                                       FINES/
                                                       RESTITUTION

FELL-00001283

SP4-137B
CRIMINAL HISTORY RECORD - CONTINUATION FOR *** 261-88-59-8 ***
COMPILED: 2010/11/16                                                    PAGE: 2 of 3

| OFFENSE DATE | CHARGE | COUNT | GRADE | DISP CHG | DISPOSITION |
|---|---|---|---|---|---|
| 2007/05/03 | CC2705 RECKLESSLY ENDANGERING ANOTHER PERSON | 1 | M2 | | PLEAD GUILTY/ COUNTY PRISON/ 06 MOS - 24 MOS |
| 2007/05/03 | VC1543 DRIVING WHILE DRIVING PRIVILEGE IS SUSPENDED OR REVOKED | 1 | S | | PLEAD GUILTY |
| 2007/05/03 | VC3733A FLEEING OR ATTEMPTING TO ELUDE POLICE OFFICER | 1 | | | PLEAD GUILTY/ STATE CORRECTIONAL FACILITY/ 03 MOS - 24 MOS |
| 2007/05/03 | VC3743A ACCIDENTS INVOLVING DAMAGE TO ATTENDED VEHICLE PROPERTY | 1 | M3 | | PLEAD GUILTY |
| 2007/05/03 | CC3928A UNAUTHORIZED USE OF AUTOMOBILES AND OTHER VEHICLES | 1 | M2 | | PLEAD GUILTY/ STATE CORRECTIONAL FACILITY/ 03 MOS - 24 MOS |
| 2007/05/03 | CC3928A UNAUTHORIZED USE OF AUTOMOBILES AND OTHER VEHICLES | 1 | M2 | | PLEAD GUILTY/ STATE CORRECTIONAL FACILITY/ 03 MOS - 24 MOS |

=================================================================================
NAME: EIKE,CHRISTOPHER A                          OTN: K607578-6
ARRESTED: 2007/05/17  PA0640100  HONESDALE PD                   OCA: 44007400
DISPO DATE: 2007/11/15              COMMON PLEAS DOCKET: CP-64-CR-0000263-2007
DISTRICT JUSTICE: 22302

| OFFENSE DATE | CHARGE | COUNT | GRADE | DISP CHG | DISPOSITION |
|---|---|---|---|---|---|
| 2007/05/16 | CC2702A1 AGGRAVATED ASSAULT | 1 | F1 | | PLEAD GUILTY/ FINES AND COSTS/ REGIONAL CORRECTIONAL FACILITY/ 006 YRS - 012 YRS |
| 2007/05/16 | CC2702A3 AGGRAVATED ASSAULT | 1 | F2 | | PLEAD GUILTY/ REGIONAL CORRECTIONAL FACILITY/ 18 MOS - 36 MOS/ FINES AND COSTS |

FELL-00001284

SP4-137B
CRIMINAL HISTORY RECORD - CONTINUATION FOR *** 261-88-59-8 ***
COMPILED: 2010/11/16                                            PAGE: 3 of 3

| OFFENSE DATE | CHARGE | COUNT | GRADE | DISP CHG | DISPOSITION |
|---|---|---|---|---|---|
| 2007/05/16 | CC901 CRIMINAL ATTEMPT ESCAPE (CC5121A) | 1 | F3 | | PLEAD GUILTY/ REGIONAL CORRECTIONAL FACILITY/ 002 YRS - 004 YRS/ FINES AND COSTS |
| 2007/05/16 | CC5122A2 WEAPONS OR IMPLEMENTS FOR ESCAPE | 1 | M1 | | PLEAD GUILTY/ REGIONAL CORRECTIONAL FACILITY/ 06 MOS - 24 MOS/ FINES AND COSTS |

============================================================================
                          CUSTODY INFORMATION

| FACILITY/ INSTITUTION | ADMISSION DATE | RELEASE DATE |
|---|---|---|
| PA021025C  DEPT OF CORRECTIONS | 2007/11/19 | |

APPLIES TO OTN(s): K607578-6
============================================================================
                     PROBATION/PAROLE INFORMATION

| AGENCY | OCA | START DATE | END DATE | PAR/PRO | LIFE CODE |
|---|---|---|---|---|---|
| PA052013G PIKE COUNTY PROBATION | 186301A | 2002/09/03 | 2004/08/03 | PAROLE | |

APPLIES TO OTN: H099521-2

| PA064013G WAYNE COUNTY PROBATION | 182702A1 | 2007/11/15 | 2019/11/15 | PROBATION | |

APPLIES TO OTN: K607578-6
============================================================================
                       ADDITIONAL IDENTIFIERS
AKAs: EIKE,CHRIS / EIKE,CHRISTOPHER(DOC) / EIKE,MIKE / ELKE,CHRIS
DOBs:
SOCs:
MNUs:
============================================================================
          F=FELONY, M=MISDEMEANOR, S=SUMMARY AND THE NUMERIC=DEGREE
               ARREST(S) SUPPORTED BY FINGERPRINT CARD(S) ON FILE

RESPONSE BASED ON COMPARISON OF REQUESTER FURNISHED INFORMATION AND/OR
FINGERPRINTS AGAINST A NAME INDEX AND/OR FINGERPRINTS CONTAINED IN THE FILES OF
THE PENNSYLVANIA STATE POLICE CENTRAL REPOSITORY ONLY, AND DOES NOT PRECLUDE
THE EXISTENCE OF OTHER CRIMINAL RECORDS WHICH MAY BE CONTAINED IN THE
REPOSITORIES OF OTHER LOCAL, STATE, OR FEDERAL CRIMINAL JUSTICE AGENCIES.


*************************** END OF RAP SHEET ****************************

# EXHIBIT 95

● D Management ● Team Meeting
7/16/01

Staff Present: [redacted]  b6 b7C

## Case Reviews

Robert Lee (MH): Acting Strange - Not coming out of room. Not eating. Probs [redacted] Will continue to monitor. b6 b7C

Donald Fell: No problems / No issues. Need to review radio on 7/23/01. per [redacted]

[redacted] No changes / No issues other than Lee. Awaiting movement to Minnesota. [redacted] says "Any day now."

[redacted] Remains verbally aggressive / agitated.

Asking to go to Echo. Also having problems with [redacted] - Giving him fail. Ad-seg to the unit. b6 b7C

[redacted] Ad-seg hearing today. Many threats from behind the door. Remains on 3-man / cuffs / chase Status. Review next week.

[redacted] Off lock today. Behavior has been ok this week

[redacted] Has been grief. Has been removing himself from situations where probs may arise. Move to MH Level #5
(Con't)

②

[REDACTED] Locked in for ⊕ TB test. Will have X-ray done on @ Tuesday.

[REDACTED]: (seen by Dent) Has been acting very aggressive. Challenged CO II [REDACTED] this weekend. Very rude. — Will do Full 30 Days in Delta. (7/25/01)

[REDACTED] out to Pods asap.

[REDACTED] OOS soon — review next week.

[REDACTED] (seen by Dent) Stabilization + return from RC for MH level #2 Well review on 7/03/01

[REDACTED] New from Chitt — aggressive behavior — Fine here so far — Here for a while.

[REDACTED] Very aggresive — Major A⁼ in Echo, 15 Days Lockin pending — Delta for a while.

[REDACTED] Came over on a Major A⁼1 Dismissed by CO II [REDACTED] for reasons of self def

(cont)

b6
b7C

FELL-00001287

(3)

[ ] ) Returned from Court. Will go out again tomorrow — Mood has been good. Looking to be released from Court

b6
b7C

[ ] On Level 1. Been quiet. Ad-Seg hearing to be arranged.

[ ] Out to court — arraignment today. Ad-Seg hearing pending — Nature of crime. Very quiet

Special Obs.

[ ] s - 30.S [ ] - N/c
N/c
- Off Checks

b6
b7C

Movement

[ ] - Pods
Echo when signed off

FELL-00001288

# EXHIBIT 96

## D - WING ACTIVITY SHEET

### UNIT 1

| ROOM # | NAME | ACTV 900 | ACTV 1300 | REC START | REC FINISH | POINT FAIL | ROOM CLEAN | SHOWER | LEVEL | |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 | | | | | | | | | 3 | |
| 38 | | | | | | | | | 4 | |
| 39 | | | | | | | | | 3 | |
| 40 | | | | | | | | | 1,3 | |
| 41 | | LOCK | IN | (1210 ) | | | | | 2 | 1 |
| 42 | | | | | | | | | | |
| 43 | | LOCK | IN | (1010 -1110 ) | | | | | 2 | 2 |
| 44 | LEE, ROBERT | IN | IN | | | | | | 1,3 | |
| 45 | | | | | | | | | 3 | |
| 46 | | IN | | | | | | | 3 | |

### UNIT 2

| ROOM # | NAME | ACTV 900 | ACTV 1300 | ACTV 1800 | REC START | REC FINISH | POINT FAIL | ROOM CLEAN | SHOWER | LEVEL |
|---|---|---|---|---|---|---|---|---|---|---|
| 47 | | LOCK | IN | — | (0920 - 0945) | | | | | 2 |
| 48 | | LOCK | IN | — | (1730 - 2030) | | | | | 2 |
| 49 | | LOCK | IN | — | (0900 - 0917) | | | | | 2 |
| 50 | | | | IN | | | | | | 1,4 |
| 51 | | | | IN | | | | | | 3 |
| 52 | | | | IN | | | | | | 3 |
| 53 | | | | IN | | | | | | 6 |
| 54 | | | 3 | | | | | | | |
| 55 | | | | | | | | | | |
| 56 | FELL, DONALD | | | IN | | | | | | 1,3 |

STATUS CODES:  1. ADMINISTRATIVE SEG   2. DISCIPLINARY SEG   3. UNIT 1

4. MH LEVEL 1   5. MH LEVEL 2   6. MH LEVEL 3

| TIME | PHONE | NOTES: |
|---|---|---|
| | | 3 MAN / CC / CUFFS |
| | | - FOOD LOG |
| | | GETS NOTHING - FINGER FOODS - (TP) AS NEEDED |
| | LEE - | - NO CONTACT w/EACH OTHER |
| | | NO BULLPEN |

FELL-00001289

## D - WING ACTIVITY SHEET

### UNIT 1

| ROOM # | NAME | ACTV 900 | ACTV 1300 | REC START | REC FINISH | POINT FAIL | ROOM CLEAN | SHOWER | LEVEL |
|---|---|---|---|---|---|---|---|---|---|
| 37 | | | | | | | | | 3 |
| 38 | | | | | | | | | 4 |
| 39 | | | | | | | | | 3 |
| 40 | | | | | | | | | 1,3 |
| 41 | | LOCK | IN | (1310) | ) | | | | 2 |
| 42 | | | | | | | | | |
| 43 | | LOCK | IN | (1010 | 1110) | | | | 2 |
| 44 | LEE, ROBERT | IN | IN | | | | | | 1,3 |
| 45 | | | | | | | | | 3 |
| 46 | | 2 IN | | | | | | | 3 |

b6
b7C

### UNIT 2

| ROOM # | NAME | ACTV 900 | ACTV 1300 | ACTV 1800 | REC START | REC FINISH | POINT FAIL | ROOM CLEAN | SHOWER | LEVEL |
|---|---|---|---|---|---|---|---|---|---|---|
| 47 | | LOCK | IN | — | (0920 | 0945) | | | | 2 |
| | | LOCK | IN | — | | | | | | 2 |
| | | LOCK | IN | — | (0910 | 0917) | | | | 2 |
| 50 | | | | IN | | | | | | 1,4 |
| 51 | | | | IN | | | | | | 3 |
| 52 | | | | IN | | | | | | 3 |
| 53 | | | | IN | | | | | | 6 |
| 54 | | | 3 | | | | | | | |
| 55 | | | | | | | | | | |
| 56 | FELL, DONALD | | | IN | | | | | | 1,3 |

b6
b7C

| STATUS CODES: | 1. ADMINISTRATIVE SEG | 2. DISCIPLINARY SEG | 3. UNIT 1 |
|---|---|---|---|
| | 4. MH LEVEL 1 | 5. MH LEVEL 2 | 6. MH LEVEL 3 |

| TIME | PHONE | NOTES: |
|---|---|---|

- 3 MAN / CC / CUFFS
- FOOD LOG
GETS NOTHING - FINGER FOODS - (TF) AS NEEDED
LEE - NO CONTACT W/EACH OTHER
NO TRIILDEAI

b6
b7C

FELL-00001290

# EXHIBIT 97

**From:**
**To:**
**Sent:** Thursday, September 20, 2001 6:20 PM
**Subject:** Delta (fwd)

b6
b7C

---------- Forwarded message ----------
Date: Wed, 25 Jul 2001 21:45:21 -0400 (EDT)
From:
To: dunit <dunit@doc.state.vt.us>
Cc: nwcfss <nwcfss@doc.state.vt.us>,

Subject: Delta

Quiet night for the most part.

[          ] - quiet and appropriate. He stated to me he is going to be staying in Delta for about 3 more weeks and then he will be leaving. I am guessing he thinks he is headed for PODS or whereever he came from. He wasnt real specific.

[          ] - Quiet. He doesnt say much, but does have the appearance of running the ACT #2. As soon as food comes in the room at dinner time he is looking at what he is getting from the others. I have never seen him take anyones food.

[          ] Quiet. Stays low key and reads most of the shift

b6
b7C

[          ] - quiet. does his regular thing everynight, and rarely changes in behavior.

Lee - came out to the Act #1 tonight. He was in there by himself, so there are no issues there. I only recommend that he does stay "NO CONTACT" with [          ] I believe all the unit staff know this.

[          ] Read most of the night. Seems to be adjusting well to being here. doesnt say much at all on 2nd shift and is polite.

[          ] Is acting strange and getting stranger the longer he keeps refusing his meds. As in previous emails, for those that dont know [          ] and his past. We all need to watch him and not give himt the oppurtunity to assault anyone.

b6
b7C

[          ] talked to me tonight for a short time. wants to talk to [          ] in the AM. he states that he wants out of his cell and that he spends too much time alone.

[          ] got his rec on 2nd shift. he was quiet but is starting to have alot of wants again.

9/20/01

FELL-00001291

# EXHIBIT 98

**From:**
**To:**
**Sent:**    Thursday, September 20, 2001 6:21 PM
**Subject:**    Delta Night Report (fwd)

read where [          ] name is
it is about Lee not making friends

---------- Forwarded message ----------
Date: Sat, 28 Jul 2001 21:54:12 -0400 (EDT)
From [          ]
To: dunit <dunit@doc.state.vt.us>
Cc: NWSCF Shift Supervisors #3 [          ]
Subject: Delta Night Report

b6
b7C

Quiet Night in Delta...

[          ] This offender has a lot of attitude.  I have noticed
that he seems to be talking t[          ] a lot.  Looks like he found a
friend.  He has that quietness about him...I'm not sure if he's a leader
or a follower yet.

[          ] This offender seems to be doing okay in Delta.  He has
been attending the activity rooms.  No issues.

[          ] ·Spends most of his time reading or talking t [          ]
We haven't had any problems in activity 2 since [          ] has been attending.

[          ] This offender made the statement that if he ever catches
Lee out of his cell that he's "going to Kill him".  [          ] said that Lee
has been wispering threats to him through the vents at night.  Threats
like "I'm going to rape your mother" and other statements.  Lee isn't
making any friends!

[          ] Quiet...reads all night!  no issues.

[          ] Still displaying negative anti social behaviors.  He made
the statement to me two days ago while on rec. that I would pay for his
aggrivation.  After this comment was made, he acted like he was going to
brake the hallway door window out with the broom handle.

b6
b7C

[          ] Has been realativly quiet today compared to past days.  Still
has a lot of wants.  He is always trying to get us to call the supervisor
down to talk to him about issues that can be handeled by unit officers.

[          ] Didn't eat dinner today or lunch.  Offender [          ] cell is full
of food, feeces, and urian. [          ] as been placed on dry foods and no
liquids do to his actions the past couple of days.  He has been throughing

9/20/01

the already mentioned items at staf through the cell door.

[redacted] Taking his meds.  Quiet...no issues.

[redacted] This offender has been learning a lot about the Leaning Tower of Peisa.  Just ask him!  I have been carrying on a three day conversation with him about the subject.  He always seems to pick up where he left off....No issues!

[redacted] Quiet tonight...no issues.

b6
b7C

Fell, Donald: Getting along really well with offenders in activity 2.  He has been cleaning every night.  No issues as of yet...but watch closely!

Offenders [redacted] oth put in requests for no contact visits. An email was sent out with dates and times.

CO [redacted]
CO

9/20/01

FELL-00001293

# EXHIBIT 99

**From:**
**To:**
**Sent:** Thursday, September 20, 2001 6:19 PM
**Subject:** Night Report (fwd)

---------- Forwarded message ----------
Date: Sat, 14 Jul 2001 21:43:46 -0400 (EDT)                b6
From:                                                      b7C
To: dunit <dunit@doc.state.vt.us>
Cc: NWSCF Shift Supervisors #3 <nwcfss3@doc.state.vt.us>,

Subject: Night Report

QUIET.NO ISSUES.

-QUIET. NO ISSUES.

STATED HE HAD AN EMERGENCY PHONE CALL TO MAKE TO CO2
STATED IT HAD TO DO WITH A PENDING LAW SUIT AND NEEDED TO CALL HIS WIFE
DECISION WAS MADE BY CO2          THAT PHONE CALL COULD BE MADED IN THE
A.M-PHONE NUMBER IS ON HIS PIN SHEET..

-QUIET. NO ISSUES.

QUIET. NO ISSUES.

- QUIET. NO ISSUES.

QUIET. NO ISSUES.

LEE- QUIET. SPENT ALL SHIFT IN HIS CELL SLEEPING. BEEN ACTING REALLY OUT
OF THE NORMAL FOR THE LAST 3 DAYS. AGAIN TONIGHT, DID NOT EACH CHOW. THIS          b6
HAD HAPPENED FOR THE LAST THREE DAYS. WAS PLACED ON 30 MINUTE                      b7C
OBSERVATIONS
BY CO2          ALSO, DID NOT WANT TO COME OUT TO SHOWER TONIGHT (POINT
FAILURE).

QUIET TODAY. SEEMED TO BE IN A GOOD AND HAPPY MOOD.

QUIET. NO ISSUES. DR INVESTIGATION ON MAJOR A#1 COMPLETED.
HEARING DATE SET FOR 7-16-01.

QUIET. SPENT MOST OF SHIFT SLEEPING. DR INVESTIGATON ON MAJOR A#1
COMPLETED. HEARING DATE SET FOR 7-16-01.

- QUIET. NO ISSUES.

QUIET. NO ISSUES.

9/20/01

FELL-00001294

[REDACTED] ACTUALLY SPENT ALOT OF TIME SLEEPING AND LYING ON HIS BUNK DURING SHIFT. QUIET NIGHT FOR [REDACTED]

[REDACTED] QUIET. STILL NOT TB CLEARED. SEEMS TO BE A LITTLE ON THE DOWN SIDE. SITTING ON HIS BUNK AND JUST STARING AT THE WALLS. THIS OFFICER THEN ASKED HIM IF HE WAS FEELING DOWN AND [REDACTED] STATED HE WAS FEELING A LITTLE BIT DOWN.

[REDACTED] QUIET. NO ISSUES.

b6
b7C

[REDACTED] QUIET. NO ISSUES.

[REDACTED] QUIET. NO ISSUES.

FELL- QUIET. NO ISUES.

BULLPEN WAS OFFERED TO [REDACTED] ALL THREE WENT OUT FOR A FIFTEEN MINUTE BULLPEN.

9/20/01

FELL-00001295

# EXHIBIT 100

From:
To:
Sent:        Thursday, September 20, 2001 6:15 PM                    b6
Subject:     1st shift report (fwd)                                  b7C
Mike
this is where Lee assualted _____

--------- Forwarded message ---------
Date: Wed, 13 Jun 2001 13:31:51 -0400 (EDT)
From _____
To: dunit <dunit@doc.state.vt.us>
Cc: nwcfss <nwcfss@doc.state.vt.us>
Subject: 1st shift report

Busy day in Delta.

_____ was found with tobacco by C/O _____ and it was confiscated. He
then proceeded to get highly agitated and punched the side of the TV box
in Act 3 to which he broke the metal away from the box. S/S _____ was
called to the unit and after speaking with him he was escorted back to his
cell without further incident. When in his cell he proceeded to cover his
window and was highly agitated for most of the morning. He seemed to calm
down this afternoon.

Inmate Lee assaulted inmate _____ in Act 2. Apparently according to Lee,
_____ has been put feces under his(Lee's) door and was running his mouth
about it in the activity room, so he took care of it.                       b6
   Note:  When putting out shift reports and when info is passed on to the   b7C
dunit login, the supervisors have asked that they be cc'd. They would like
to be more informed of activity in Delta. It is apparent that they are not
recieving the information necessary to fully comprehend what is going on
in the unit.

_____ is agitated because he has not been sent out of state yet.
_____ were moved to Echo today.

9/20/01

FELL-00001296

# EXHIBIT 101

**From:**
**To:**
**Sent:** Thursday, September 20, 2001 6:11 PM
**Subject:** Lee

---------- Forwarded message ----------
Date: Thu, 20 Sep 2001 06:51:27 -0400 (EDT)
From
To: dunit <dunit@doc.state.vt.us>
Cc: NWSCF Acting Shift Supervisors <nwcfactss@doc.state.vt.us>
Subject: Lee

b6
b7C

Inmate [ ] has exhausted the use of any activity room. He has issues
with inmates in 2 and 3.
Inmate Lee has issues with inmates in Act 2 and I don't trust him in Act
3.
  I suggest alternating them into the activity rooms.

9/20
AM
PM - Lee

9/21
AM - Lee
PM

ETC. ETC. ETC.

---------- Forwarded message ----------
Date: Wed, 19 Sep 2001 23:16:04 EDT
From
To: dunit@doc.state.vt.us
Subject: (no subject)

b6
b7C

keep Lee and [ ] away from each other.
...[ ] will have to go into ACT#2 or #3.
they both lost their points for the morning activity period.

9/20/01

FELL-00001297

# EXHIBIT 102

VERMONT DEPARTMENT OF CORRECTIONS
NORTHWEST STATE CORRECTIONAL FACILTY
FACILTY REPORT FORM

TO:   CFSS ON ▓▓▓▓▓ 7C          __X__   INCIDENT

FROM ▓▓▓▓▓▓▓ COII              __X__   INFORMATIONAL

DATE: 9-20-01                   _____   DR

RE:   ROBERT LEE                _____   CONFIDENTIAL

REPORT: ON 9/20/01 AT APPROX. 1412 HOURS ▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓ I OBSERVED INMATE ROBERT LEE WITH HIS CELL DOOR
WINDOW COVERED.  I WENT BACK TO THE UNIT OFFICERS DESK AND DID THE
1415 SPECIAL OBS. ON 3 OFFENDERS. AS I SAT AT THE DESK ▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

AT APPROX 1420 HOURS I WALKED DOWN UNIT 1 SIDE TO TELL LEE TO
REMOVE THE COVERING FROM HIS WINDOW.  I KNOCKED ON LEE'S DOOR (D-
044) AND GOT NO RESPONSE.  I HAD MY BACK TO ▓▓▓▓▓▓ AND HE 7C
CALLED FOR ME.  I TURNED TO FACE ▓▓▓▓ AND HE WAS HOLDING A NOTE IN
THE WINDOW STATING THAT THE WINDOW HAD BEEN COVERED FOR AN HOUR.
I AGAIN KNOCKED ON LEE'S DOOR AND GOT NO RESOPNSE.  I THEN OPENED
THE DOOR AND OBSERVED ROBERT LEE HANGING FROM HIS WINDOW.  ROBERT
LEE HAD HIS BACK TO THE WINDOW FACING THE CELL DOOR.  LEE HAD WHAT
APPEARED TO BE A SHEET AROUND HIS NECK.  I CALLED A MEDICAL 33
TWICE OVER THE RADIO.  CFSS ▓▓▓▓▓▓ AND MECIAL AND SECURITY STAFF 7C
ARRIVED IN THE UNIT.  LEE WAS TAKEN FROM THE WINDOW AND PLACED ON
THE FLOOR AND CPR WAS INITIATED.  AMCARE ARRIVED IN THE UNIT AND
CPR CONTINUED.  AT APPROX 1450 HOURS AMCARE AND ROBERT LEE LEFT THE
UNIT.



signature ▓▓▓▓ COII

Withessed By:

9/20/01 @ 4:20 PM

(Name)

Signature

Det. Sgt. ████████████  7C
CN#: 01A204370

The following is a taped statement being obtained at the Northwestern Correctional Facility in St. Albans, Vt.  The person being interviewed is ███████████████████████████████ ████████████ do you give the following statement freely and voluntarily and with the knowledge that it may be used in a court of law?

A:   I do.

Q:   And you swear the following statement is the truth, so help you, God?

A:   I do.

Q:   Um, would you state your full name, please?

A:   It's ████████████████  7C

Q:   And your date of birth?

A:   Is ████████████████.   7C

Q:   Okay, now, um, you were working at the facility today, is that correct?

A:   Correct.

Q:   What time did you arrive here?

A:   I entered the facility probably around 13:45 hours.

C    What time does your shift normally begin?

A:   14:00 hours.

Q:   Okay, um, what are your beginning duties when you arrive at work?

A:   Enter the building just like everybody does, through the one door.  We turn in our car keys, punch in the time clock.  I enter through that two door and that enters me into the facility.

Q:   Okay, now after you've made entry, uh, you work in what portion of the building?

A:   I work in what we call Delta Unit, which is our closed custody unit which is pretty much our lock down unit.

Q:   Okay, so it's at the southeast corner of the building, is that correct?

A:   Correct.

Q:  And when you reported there who did relieve from shift?

A:  I relieved two officers.  It's a two ah, the unit is a two man post.

Q:  Okay.

A.  So that would be me and one other officer relieving first shift officers.

Q:  Okay, who was with you when you went into relieve the other shift?

A:  It would be a CO1 and his name is ▓▓▓▓▓ last name is ▓▓ ︎ ︎ ▓▓▓▓▓▓▓▓▓▓

Q:  Okay, and when you relieve your other shift who was on shift?

A:  Uh, CO2 ▓▓▓▓▓▓▓ and CO1 ▓▓▓▓▓▓▓▓

Q:  Okay, and when you replaced these two individuals did they tell you of any unusual happenings prior?

A:  Uh, they told me that one offender was a little, I don't want to say agitated but he had some issues, and just to keep a close eye on him.

Q:  And who was that you're speaking of?

A:  That was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Q:  Okay, but, okay.  Now um, you periodically check the rooms, is that correct?

i   Right, we go around the entire unit once an hour and we check each person.

Q:  Okay, and when was the first time that you made a room checks, was it immediately upon your arrival there?

A:  Right, the first room, the first ah, when we take over shift the first thing we do is go around and count heads.

Q:  Okay.

A:  When we accept the unit.

Q:  Okay and everybody, when you did that you actually visually saw or spoke with people, is that correct?

A:  I didn't do the unit check, I was doing some of the paperwork when we started, the other officer who was with me did the unit tour.

Q:  Okay, ▓▓▓▓▓ did that at your arrival when your shift

A:  Right.

Q:  At two o'clock, is that correct, P.M.?

A:  Correct.

Q:  All right, um, when did anyone check on the individual in room 44 of the Delta Unit?

A:  ▓▓▓▓ would have checked on him at the beginning of our shift. That should have been the first time.

Q:  Okay, so that's at two.  Did you perform a second check after two o'clock?

A:  Um, I didn't do a second check but what I did was, I needed to go down the hallway and while I was down there I happened to see, I could see in the rooms as I walked down the hallway.

Q:  Okay and what time was that?

A:  That was at 14:12.

Q:  Okay and at 14:12 did you notice anything about room 44?

A:  Yeah, there's a small, I would say probably maybe five inches by five inch window on the doors, on all the doors down there and that particular window was covered with what looked like um, one of those things you tear out of a magazine and mail back in, you know, it looked like a little piece of, it was heavier than paper but not as thick as maybe cardboard.

Q·  Okay, like an advertising tear out, is that what you're r  erring to?

A:  Right, right.

Q:  And ah, do the inmates occasionally cover the windows?

A:  They do.

Q:  And what is their purpose for doing that?

A:  For privacy when they're using the bathroom.

Q:  Okay, um, you saw the card was in place at 2:15, is that correct?

A:  Ah, twelve after.

Q:  Okay, twelve past two and is the individual in room 44, do you know his name?

A:  It is Robert Lee.

FELL-00001301

Q:  Okay and you know how old Robert Lee is?

A:  I would say in his early twenties.

Q:  Is he in solitary confinement?

A   He is not what we consider a lock down, he's in the unit because he's a high profile case, um, high security, therefore he's in a, he's in the lock down unit but he has the full privileges of the unit as far as he gets to watch TV, he comes out of his room on two periods a day, um, the second being on my shift which starts at 13:00 hours and they get secured back in their rooms at 14:30 um, right after we eat dinner and he has that privilege so he has as much privilege as anybody can possibly have in that unit.

Q:  Okay, um, from your time of arrival until the time that this discovery was made, were you aware of any visitors going into room 44?

A:  Um, the door was secured.  Starting at 14:00 hours I'm the only one that has the cell keys in the unit.  The other officer, he only carries another set of keys, but not cell keys.

Q:  Okay.

A:  Um, up until 14:12 I had an offender in the hallway doing his one hour rec and that's how I went down the hallway at 14:12 was to lock him back in and to take another inmate out of his room. And that's when I saw the cardboard in the window.

Q:  Okay, um, however, the door to room 44 was secured and you didn't see anyone at that time or doing that time period enter that room?

A:  Correct.

Q:  And you presented nobody with a key to be able to enter that room?

A:  I had the keys the entire time.        .

Q:  Okay, um, now what led you to come down to room 44 at the time of discovery.  First of all, what time was the discovery?

A:  Um, between 14:20 and maybe a few minutes after.  It was around there, it was approximate.  I went, the first time I went down the hallway was 14:12, I locked one in, pulled another one out and that's when I saw that.

Q:  Who was the person that was pulled out?                  7C

A:  ████████████████████████████████████████████

Q:  Okay, so ███████ is let out and the door to room 44 is
          7C

A:  Right.

Q:  And you left from there but you were observing the hallway, is that correct?

A   Right.

Q:  Okay and what led you to come down and what specifically was the time when you actually ended up being back down there?

A:  Well, since window coverings is really not allowed in the unit, I went back down there around 14:20 to tell him to take that off his window and which is the reason I went back down the hallway because his window was covered.

Q:  Okay.

A:  Otherwise I wouldn't have gone down until the 14:30 checks.

Q:  Okay, so upon going down there did anything else happen while you were there getting ready to open the door?

A:  No, other than me taking one out of his room at 14:12 and me coming back down that hallway at 14:20, there's nothing happened in between.

Q:  Okay, so you opened the door, tell me what you saw.

A:  Um, I knocked on the door because the window was covered and I didn't know what he was doing so I knocked on the door to get a response from him and got no response.  Knocked again, inmate who was directly across from the hall, their doors are straight across from each other, which would be ███████████ in 41, yelled a ██e and that's when I turned around, I looked at ██████to see what he wanted and he held up this little piece of paper in the window that says his window's been covered an hour.

Q:  Okay, so he gave you some indication that the window had been covered for an hour?

A:  Right and I believe he held on a piece of paper as opposed to telling me out loud because he didn't, I mean, offenders have this thing about being rats.

Q:  He didn't want people to know that he was telling you something?

A:  Right which is why I believe it was on paper so I turned back around to 44 and knocked one more time and got no answer and because of not knowing what was going on inside the cell I put my foot on the floor so that I could open the door and catch it with my foot in the event say the inmate was to charge out.

Q:  Yup, sure.

FELL-00001303

A:  So I put my foot down, put my left hand on the door with my right hand with the keys, unbolted the lock, opened it up five or six inches and so I could see in and that's when I saw Robert Lee hanging.

Q:  What did you see, exactly?

A:  I saw Robert Lee hanging from what, I guess it was the window, how he wrapped it around the window.

Q:  He wrapped what around the window?

A:  What appeared to be a sheet.

Q:  Okay.

A:  It was white and it looks like the sheets we give out.  Um, he was facing the door so when I opened the door I could see his face and his body, he had his back to the window.

Q:  Anything about his facial features that you noticed?

A:  Um, a couple of things.  Um, he had some blood on his chest, a small amount of blood on his chest, um, his face was discolored and it was drooling a little bit and his face was ah, I don't want to say, maybe gray.

Q:  Grayish color?  Anything about his clothing?  Do you remember his clothing?

A:  Yep, all he had on was a pair of the red jumpsuit pants that we issue.

Q·  Okay, so they're like sweatpants or what kind of pants are t  y?

A:  They're not, there's no elastic in them.

Q:  Okay.

A:  Well, there's elastic on the waist to hold it but I mean there not elastic around the ankles like a pair of sweatpants. Um, they're a little thicker fabric than sweatpants but not as thick as maybe a pair of jeans.

Q:  Okay now did you notice anything about um, the closure in the front of the pants, ah, in the fly area, anything about that?

A:  Not at that particular moment.

Q:  What did you do then?

09/22/01 ████ 7C

9/22/01 ████

FELL-00001304

A:   I called on my radio.  I had a medical 33 in delta.  I said it again, "Medical 33 in delta."  And after I said that I said, "Delta to 811 call Amcare."

Q:   Okay, so you're summoning an ambulance, is that correct?

I    Right.  And then I waited for staff, medical staff and security staff to arrive in the unit before I entered.

Q:   Okay.  And, um, what did you do after that?

A:   Staff started arriving in the cell.  The supervisor was one of the first ones in.  I said, I opened the door wide now, I said, "This is," I don't remember my exact words, but more or less point, "This is what I've got."  Medical staff went in.  He said, "Take him down."  I didn't touch, we didn't enter the room or anything.

Q:   Yup.

A:   'Till the supervisor or medical showed up.

Q:   Yup.

A:   The supervisor said, "Take him down."  So me and two other staff, he said, "Lift him up."  I didn't have any gloves on, but one of the other staff members did, so he lifted him up.

Q:   Okay.

A:   And I tried to untie to sheet from his neck.

Q:   Okay, could you tell me how the sheet was tied?

.    I honestly don't remember.  All I remember...

Q:   What side of his head was it on?

A:   The back, onto the back side.

Q:   The knot was to the back side?

A:   Yeah.

Q:   Okay.

A:   I honestly don't remember...

Q:   You don't remember.

A:   ...where the knot was located.

Q:   Well if you could just think for a second, when you went to untie the knot, did you go to the left of the individual or to the right of the individual?

FELL-00001305

A:  I think I was trying to reach around behind him.

Q:  Okay.

A:  And see the knot.  'Cause when I first did it, there was two knots.  One to the above, which I believe was around the window. O   to what was around his neck.

Q:  Okay.  Which one did you untie?

A:  Well, actually, I didn't untie it.  I started to, and I couldn't get my fingers in there.

Q:  Okay.

A:  We have a pair of, ah, like medical scissors.

Q:  Yup.

A:  And they have the, you know like an EMT would carry, they have the little curved one.

Q:  Yup, yup, sure.

A:  I have a pair in my uniform for these type of things.

Q:  Yup.

A:  I have the key, so I left the cell to go get them to cut him down.

Q:  Yup.

A·  And when I come back...

Q:  In the mean time, the other individual is still holding him up, is that correct?

A:  Right.

Q:  And his name is?

A:  I believe it was, ah, the Supervisor ████████████████████ ████████████████ had gloves on.

Q:  Okay.

A:  The black leather ones we wear

Q:  And ████████████████████ are holding him up?

A:  Right.

Q:  Even when you went to get the scissors, is that correct?

Q:   Okay.   What happened then?

A:   Then I returned with the scissors, and they had already undid the knot.   He was laying on the bunk.

Q    Okay, he was laying on the bunk.   His head towards the wall, is that correct or not or do you know?

A:   He was laying on the bunk in the opposite way that he would sleep, so his feet were where his head would normally be.

Q:   Okay, so his feet were to the wall, his head was towards the cell door, is that correct?

A:   Right, right.

Q:   Okay.   And he's on his back?

A:   Right.

Q:   Did you then notice anything more about his clothing or about his person?

A:   No.   Not about that.

Q:   Okay.   Um, the ambulance arrived, is that correct?   How long until the ambulance arrived?

A:   Maybe ten minutes.

Q:   Okay, and in the mean time, did the medical staff, what did they do?

A    Well, he, when he was on the bunk, he was only there maybe fifteen seconds.   I said, "Take him off the bunk, put him on the floor."   And we started CPR.

Q:   Okay.

A:   Um, we didn't have a mask.   He had obviously the drool and the I think it was a little bit of blood on his face too.

Q:   Um-hum.

A:   And we waited for the mask, in my desk drawer we have a CPR mask that we use.

Q:   Yup, yup.

A:   The nurse had, um, one of those air balls that you squeeze to give him breath.   I told ████████to start chest compressions, do that while we get ready to do the breaths.   At least the chest compressions would have been started.

A: So we picked him up off the bunk, he was on the floor, started chest compressions. Um, they brought me, and it's green in color, the mask, um, I gave it, the nurse got, I un, I took it out of the cover, unpopped it so it could be used.

Q    Yup.

A: And gave it to the nurse and they started CPR and I backed out of the cell.

Q: Okay. Um, did you find any other paper materials in the room? In other words on the bed, any documents on the bed.

A: Honestly, I wasn't even looking. I was looking, I was concentrating on him.

Q: Okay.

A: And I didn't even, I wasn't even paying attention to what was going on around us other than the fact that the sheet was...

Q: In the hurry of what you were doing, you didn't really notice anything beyond that?

A: No.

Q: Did you notice any other injuries to him at all?

A: Nope, just there was a little couple drops of blood on his chest.

Q: Okay.

A   Which I couldn't see where it was coming, I only can assume that it came from his nose or up above. But I couldn't see where it had come from for sure.

Q: Okay. So this was at 1420 hours that the discovery was made and the calls were made and the medical staff arrives and additional security. Um, when, did you make, ▓▓▓▓▓▓ 7C apparently had made a check of the room doors before. Did he indicate whether or not a card was up? Or do you know if the card was up at that time?

A: Um, he had told me that he had done the check and at the time there was nothing in the window.

Q: Okay, so when you took over shift at 1400 hours or 2:00 p.m.

A: Right.

Q: There was no card in the window at that time.

A: That's what I was told.

Q:  Okay.

A:  Right.

Q:  All right.  Um, were there anything, during all of this, that any of the other inmates told you when this was going on or immediately following this?  Did any of the inmates make any statements to you?

A:  Um...

Q:  Other than ▓▓▓▓ holding a note up?

A:  Previous to this note, during all the Amcare and the commotion in the unit, I did have some inmates after the fact, and this was probably around 1630, 1645 hours, um, make a bunch of comments, screaming and yelling at each other in the hallway 'cause they weren't happy about being locked in their rooms now. Um, because of the incident that took place, we have a bunch of unhappy inmates.

Q:  Okay.

A:  Losing some privileges tonight.

Q:  Okay, but not any statements about having any knowledge, is that correct?

A:  Correct.

Q:  Okay, um, did this individual in room 44, Robert Lee, make any previous comments to you, ah, in the past about a suicide or anything relating to autoeroticism?

A  Nope.  I've never, um, never got any indication that he was any kind of suicidal inmate.

Q:  Okay.

A:  And that was a complete, to see him when I found him in the cell just....

Q:  He never made comments to you in the past?

A:  No.

Q:  That he was depressed?

A:  Nope.

Q:  Or anything indicating that he wanted to end his own life?

A:  No.

Q:  Or heard any such thing?

FELL-00001309

A:   No.

Q:   From him.  Okay.  Um, so basically one of our other questions here, is the person on the time checks was Robert Lee on time checks?

A    No.

Q:   He was not.  So you would be checking on him normally how often?

A:   Hourly.

Q:   Okay.  So if you started at 2, the next check would be at three.

A:   Three.

Q:   And then four, five.

A:   Right.

Q:   Through your entire shift.

A:   Right.

Q:   That ends when?

A:   At 2200 hours.

Q:   And your reason for going down there earlier than the house check was because of the card in the door and to speak to him about that?

A    At 1420.

Q:   Yes.

A:   Right.

Q:   Um, and I'm going to ask you this question, it's probably going to sound repetitive, but you hold the keys to that room and you didn't see anyone else enter that room since you arrived at work and the time of discovery?

A:   Correct.

Q:   Okay.  And there's absolutely, because you hold the key, no way that someone could have entered that room?

A:   Right.

Q:   Were you watching the hallway during your shift?

A:   Shift just started, so we're not that deep in the shift.

FELL-00001310

Q:  Right.

A:  I'm still getting to know what's going on in the unit.

Q:  Okay.

A   Haven't even had a chance to check the log book for the whole
day, yet.

Q:  Right.

A:  And then this happened.

Q:  Okay.

A:  So I'm not even twenty minutes in shift.

Q:  So it was within twenty minutes of arriving at work.  And it
happened.  But in the twenty minutes that you're there, it's not
like you're sitting at the end of the hallway constantly watching
down the hallway.

A:  Right.

Q:  But you do know that you hold the key and that no one could
enter the room without the use of that key.

A:  Right.

Q:  Is that correct?

A:  That's correct.

Q·  Okay.  And you didn't give anyone the key?

A:  Nope, I had it right up until, even after I unlocked it, I
had that key, that cell key the whole time.

Q:  Okay.  Um, are you aware of Robert Lee receiving any
medications?

A:  Yes.

Q:  Okay, and is it multiple medications or just one type of
medication?

A:  Multiple pills.

Q:  Okay.

A:  I don't know what it is, but I know at p.m. med-call, which
is about 8:00 at night, I know he receives multiple pills.

Q:  Okay, but usually his medication provided to him at 8:00.

FELL-00001311

A:    Right.

Q:    And to obtain the names of the specific drugs that he is taking, or would be taking, we could obtain those from who?

A:    From the facility nurse.

Q    Okay, but you don't specifically know what he takes?

A:    No, I don't.

Q:    Okay.  Um, is Robert Lee a federal detainee?

A:    Yes, he is.

Q:    And is he on closed custody with no access?

A:    No access to?

Q:    In other words, no access by others?

A:    He has contact with others.

Q:    Okay.

A:    He goes into the activity rooms to watch TV.

Q:    Okay.

A:    There can be up to five inmates at a time.

Q:    Okay.  And generally, when is that?

A:    It starts from 9:00 a.m. to I believe 12:30 p.m., to 11:30 r ther and then again from 1:00 p.m. to 14:30.

Q:    Okay, we'll get to this last question that I have for you, um, and I think you may have answered it during the questioning already.  What you thought, ah, ▮▮▮▮▮▮▮ was doing when he 7C held the note to the window in his room across from room 44, he's in room 41.  When he held that note up, it was just to let you know something about the door and card blocking the window, is that correct?

A:    Right.

Q:    And was there anything else that he was, did he give you any other indication on any other notes?

A:    He, what he did was, I'm sitting at my desk because we have some people who are on fifteen minute checks.

Q:    Okay.

A:    And every fifteen minutes we check on those people, then we write it down on our special ops for each individual person, what

FELL-00001312

Q: Okay.

A: Um, at 1412 is when I noticed the card. I came back up, locked ██████████ in the activity room. I went down, did my 7C quarter after checks because I have three of them. One on his s: , ████████ and two on unit two.

Q: Okay.

A: So at 1415 I'm writing down what those three people were doing. I have ████████████ yelling up the hallway still. "I need a pencil! I need a pencil! I need a sharp pencil!" 7 C Something to that effect, he kept yelling at me.

I yelled back, "Wait a moment, I'll be right there!"

But he was adamant about, "I need a pencil, I need a pencil!" Ah, that and the fact that I just barely locked him in.

Q: Yup.

A: He could have asked me for a pencil then 'cause I was standing right next to him when I locked him in.

Q: Yup.

A: Um, and then I went, that's when I went back down the hallway.

Q: Okay.

A: And he was yelling and screaming at me to get him a pencil. He was very adamant about that.

Q: Okay, did you provide him with the pencil?

A: No, I didn't.

Q: Okay.. Then how did he manage to get the note, to write out the note?

A: I'll assume he had a pencil in his property already.

Q: Okay. So he was calling for a pencil, but in the end he already had a pencil, is that correct?

A: Right.

Q: Okay. And he held up the note and you weren't there dealing with him, you were there to check on Robert Lee and to basically speak to him about the card in the window.

A: Yup.

FELL-00001313

Q: And you were actually, other than glancing over to see the note in the window, you were there to check that door.

A: Right. I was there to tell Lee to take that out of his window.

Q: Okay.

A: And then, ah, ▮▮▮▮▮ yelled at me through his door. Or called my name and that's why I turned around and saw the note. Otherwise I wouldn't even have saw the note.

Q: Okay. Are there any other, does this individual, Robert Lee, have any trouble with any other of the inmates in that unit?

A: He, yes.

Q: And who is that?

A: Actually, there's been a few. Um, I had a problem with him last night with another inmate, who's handicap. Um, I'd have to look to see what time that happened, but there was an altercation between the two inmates and this other inmate was calling him a murderer and all kinds of names. I was in the office which is, the wall is right next to the activity room they were in. I could hear the voices getting louder and I heard, ah, one inmate, ah, ▮▮▮▮▮▮▮▮▮▮, who was having an issue with Lee, they were the only two people in that room.

Q: Right.

A: Using the f word.

Q: Yup.

A And I had come out and I told them, I said, "I don't want no more of that. I'm done hearing it."

Q: Okay.

A: I didn't know what was going on, I thought they were just being loud, watching TV and horsing around.

Q: Okay.

A: I go back in my office. I hear their voices raised again. I come back out. Robert Lee's pacing, he's very mad looking. He looked like he wanted to kill ▮▮▮▮▮▮▮

Q: Okay. What was ▮▮▮▮▮▮ saying to him?

A: I, afterwards, I called the supervisor and we locked both in their room. Michael Carpenter, I talked to Lee first. Lee said, "You know, he was running his mouth, he's dirty, he's nasty, he's got blood on his hands."

FELL-00001314

I said, "All right, let me check things out. I'll be back." So I went in to, well, he said, "He was trying to touch me and he's got blood on his hands."

So I go into ███████████ cell and I said, "Show me your hands." He holds his hands like this, I don't see anything on them. Um, ████████ was upset because he called him a snapper, which for us is another term for a sex offender. Um, called him a snapper, called him a child molester, called him all kinds of names. So I turned and he calls Lee a murderer and yells out, "Why don't you go kill three more."

Q:   Yup.

A:   And really cranks him up.

Q:   Yup.  But basically there wasn't any contact between the two of them during your shift?

A:   Right.  Because after that happened last night I told them there would be, those two would be complete separated and not be put together.

Q:   Okay.

A:   But Lee's also had problems, he can't be in contact with ████████████████████████████████████████████████

Q:   Okay.

A:   Ah, ████████████ who was in his same unit, but not to be in the same activity room.

Q:   Okay.

A    Because they've had problems before.  Um, I'm trying to think of all the names.  I have them listed on the board of all the people he can't be in contact with.

Q:   Okay.  Have you talked with ███████████ since this happened?

A:   Ah, we still worked in the same unit up until about an hour ago.

Q:   But after the incident happened, did you talk about ████ ███████

A:   Yup.

Q:   Did ██████████ talk to you about whether or not the card was in the window when he was doing the room checks at the beginning of your shift?

A:   Yup.  And I asked him, I said, he said when he went down at 1400 check there wasn't a card in the window.

Q:   And you're positive that's what he said?

A:   He told me Lee was lying on the bunk.   Is what he said to me.

Q:   Okay.   When he made his checks at 1400 or 2:00 p.m., Robert Lee was lying on the bunk?

A    Yeah, which is what got relayed to me.   That was what was relayed to me.

Q:   Okay, very good.  Um, do you have anything else you'd like to add to your statement?

A:   Um, I don't believe so.

Q:   Okay, do you swear the following statement you've given is the truth, the whole truth and nothing but the truth, so help you God?

A:   I do.

Q:   Would you raise your right hand?   Do you swear that is the truth?

A:   I do.

Q:   Okay.   This will conclude the statement of, ah, ████████ 1C

████████████████████

9/22/01  ███ 1C

FELL-00001316

# EXHIBIT 103



From: ▓▓▓▓▓▓▓▓@doc state vt.us> 7C
To: ▓▓▓▓▓▓▓▓▓▓
Sent:      Thursday, September 20, 2001 6 16 PM
Subject:   night report (fwd)
Issue with inmate ▓▓▓▓ 7C

---------- Forwarded message ----------
Date: Tue, 3 Jul 2001 13:56:36 -0400 (EDT)  7C
From ▓▓▓▓▓▓▓▓▓▓@doc.state.vt.us>  7C
To: dunit <dunit@doc.state.vt.us>
Cc: nwcfss <nwcfss@doc.state.vt.us>
Subject: night report

▓▓▓▓▓▓▓▓▓▓▓▓▓ 7C
▓▓▓▓▓▓▓▓▓▓▓▓ but according to Lee these two have
issues ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓ away from Lee ▓▓▓▓
▓▓▓▓▓▓▓▓▓▓ maybe Lee 7C
didn't have a confrontation with ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  7C
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Lee,Robert       Robert exited the act#2 stating if ▓▓▓▓ wasn't
moved there would be an issue. I asked what the issue
was Robert didn't want to reveal any info at this
time. We should keep a close eye on these 2. While
Robert exited his room for activity period 2 I again
Question Robert,Robert stated that he was real close
to going off on ▓▓▓▓ 7C

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 7C

9/20/01

FELL-00001317

# EXHIBIT 104

why dont They JusT Die,
JusT Drop like Flies / JusT Drop Dead

FELL-00001318

# EXHIBIT 105

5:01-cr-00012-gwc   Document 304-23   Filed 03/25/11   Page 78 of 109

FELL-00001319

I DonT wanT wanT To Hear your shiT
GeT ouT of my face with those lies

The Nerve of you comming Here
looking into my eyes

The visions of me beating you
Fille my mind blood red

I JusT wanT To Kill you ~~one shoot~~
~~between~~ your blow away your chest

GoT ~~I~~ love my shot gun
puts assholes like you To resT

I am sick of all the pain I go Through
To siT Here and not Kill you

# EXHIBIT 106

5/4/2005  9:08:00 AM

JVD-1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA   *

                           *

        V         *

                  *

DONALD FELL          * Criminal File No. 01-12

INDIVIDUAL VOIR DIRE OF PROSPECTIVE JURORS

(Nos. 19, 23, 27, 31, 32, 41, 42, 57, 65,

70, 78, 86, 88 and 91

Wednesday, May 4, 2005

Burlington, Vermont

BEFORE:

THE HONORABLE WILLIAM K. SESSIONS III

Chief District Judge

APPEARANCES:

WILLIAM B. DARROW, ESQ. and STEPHEN D. KELLY, ESQ.,

Assistant United States Attorneys, Federal

Building, Burlington, Vermont; Attorneys for the

United States

ALEXANDER BUNIN, ESQ. and GENE PRIMOMO, ESQ.,

Office of the Federal Public Defender, 39 North

Pearl Street, Albany, New York; Attorneys for

the Defendant

PAUL S. VOLK, ESQ., Blodgett, Watts & Volk, P.C.,

72 Hungerford Terrace, Burlington, Vermont;

Attorney for the Defendant

ANNE E. NICHOLS

Registered Professional Reporter

United States District Court

Post Office Box 5633

Burlington, Vermont  05402

(802) 860-2227

Page -

FELL-00001320

5/4/2005  9:08:00 AM

THE COURT: I appreciate that. But I gotta say it's a very delicate line. The fact is if you have reason to believe that is going to be relied upon, by the defendant or the government, a juror's response to that in the abstract is significant.

Now, it's a question of degree, it seems to me. You raised actually the same thing in your pleadings; actually it was Mr. Waples' pleadings, in 2002. Your concern about getting involved in the actual facts.

My view is that if there is testimony about sexual abuse during the course of his life, that to make a reasonable assessment as to how a juror would respond to that is important.

Now, it was limited, the questions were limited to two particular areas. I am sure that psychologists have other things to say, but those are big areas. And in light of the fact that it's only limited to two areas, I'm not going to try to stop that concern.

MR. DARROW: Thank you, your Honor. Could we just ask you if -- to maybe keep those questions relatively brief and narrow and not let an entire 10 minute voir dire go on that?

THE COURT: Right.

MR. DARROW: Thank you, your Honor.

MR. BUNIN: I didn't file any response to the

Page 35

FELL-00001321

# EXHIBIT 107

From: ▓▓▓▓▓▓
To: ▓▓▓▓▓▓
Date: 9/25/01 10:15am
Subject: chronology of events/contacts

on thurs 09/20/2001 at approx 1445 hours, sdusm ▓▓▓ received notification from staff of nwscf that prisoner robert lee had been found hanging in his cell. rescucitation efforts were underway, he was being transported to northwestern medical center, st. albans, but the prognosis was grim. he immediately notified me.

dusm was immediately dispatched to the facility and dusm ▓▓▓ was dispatched to the hospital. nwscf advised that they had contacted lee's attorney (john pacht) for family notification. sdusm ▓▓▓ and i maintained a cp at the office until 2030 hours.

after receiving a report from the hospital that lee was on life support, i contacted his other attorney brad stetler at his residence at approx 1700 hours. stetler advised that he would look into family notifications

at approx 1830 hours lee's aunt ▓▓▓ representing the family called our office for an information update she was provided with an update and the contact information at the hospital. she confirmed that lee's father had been notified, and instructed that the family did not want lee's mother notified at all.

usao and fbi were notified thursday afternoon.

notifications were received that lee had been pronounced deat at 2225 hours. hospital staff notified the family. usm is coordinating with vsp and autopsy is required. vsp coordinates with medical examiner.

i notified john pacht and brad stetler friday morning that lee had died. pacht advised that his father had been notified. usms support was offered for transporting the body back to the family. pacht was instructed to contact me if they needed anything.

judge sessions was advised by me on friday morning at 1030 hours

medical examiners office called friday afternoon, advising that body could be picked up.

robert lee's father contacted sdusm ▓▓▓ monday 09/24/2001 afternoon.

FELL-00001322

# EXHIBIT 108

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: PIKE

**POLICE CRIMINAL COMPLAINT**

Magisterial District Number:
**60-3-02**

District Justice Name: Hon.
**William N. SANQUILLY**
Address. REDACTED - FELL
**Hawley, PA 18428**

Telephone: (570)226-9650

**COMMONWEALTH OF PENNSYLVANIA
VS.**

DEFENDANT:

NAME and ADDRESS

Christopher Allen EIKE
REDACTED - FELL
Lake Ariel, PA 18436

Docket No.: **CR-121-01**

Date Filed: **11/7/01**

OTN: **H 099521.2**

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | Defendant's Social Security Number | Defendant's SID (State Identification Number) |
|---|---|---|---|---|
| ☒ White ☐ Black<br>☐ Asian ☐ Native American<br>☐ Hispanic ☐ Unknown | ☐ Female<br>☒ Male | 3/3/83 | REDACTED - FELL 4689 | |

| Defendant's A.K.A. (also known as) | Defendant's Vehicle Information<br>Plate Number     State | Registration Sticker (MM/YY) | Defendant's Driver's License Number<br>State |
|---|---|---|---|
| | | | |

| Complaint/Incident Number | Complaint/Incident Number if other Participants | UCR/NIBRS Code |
|---|---|---|
| R4-450286 | | 170 |

District Attorney's Office ☐ Approved   ☐ Disapproved because:

(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing  Pa:R:Cr.P. 107 )

| (Name of Attorney for Commonwealth-Please Print or Type) | (Signature of Attorney for Commonwealth) | (Date) |
|---|---|---|
| I,  Tpr Mark H. MURRAY | 7037 | |
| (Name of Affiant-Please Print or Type) | (Officer Badge Number/I D ) | |
| of  Pennsylvania State Police | PaPSP5800 | |
| (Identify Department or Agency Represented and Political Subdivision) | (Police Agency or ORI Number) | (Originating Agency Case Number (OCA)) |

do hereby state: (check appropriate box)

1.  ☒ I accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as _____

    ☐ I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I
       have therefore designated as John Doe

with violating the penal laws of the Commonwealth of Pennsylvania at   Residence at corner of
                                                                        (Place-Political Subdivision)

Smithview Rd and  Deep Hollow Rd in Tranquility Falls Greene Twp

in   PIKE          County on or about   between 07/06/01 and 07/30/01

Participants were: (if there were participants, place their names here, repeating the name of the above defendant)

Christopher Allen EIKE

AOPC 412A- 01/25/99                           1-2

FELL-00001323



| Defendant's Name: EIKE |
| Docket Number: CR-121-01 |

**POLICE**
**CRIMINAL COMPLAINT**

2.  The acts committed by the accused were:
(Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statute allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)

INDECENT ASSAULT (M1):   The defendnat who was 18 years of age at the time of this incident, did have indecent contact with the complainant, who was 11 years of age at the time of this incident.   To Wit: The defendant did on two occaisions, use his hands to feel the breast of the victim.

CORRUPTION OF MINORS (M1):   The defendant who was 18 years of age and upwards at the time of this incident, did engage in an act which corrupted or tended to corrupt the morals of a minor who was 11 years of age at the time of the incident.   To Wit: The defendant did on two occaisions, engage in indecent contact with the victim by kissing the victim and feeling her breasts with his hands.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | (Section) | (Subsection) | of the | (PA Statute) | (counts) |
|---|---|---|---|---|---|
| 1. | 3126 | (a)(7) | of the | PACC | 02 |
| 2. | 6301 | (a)(1) | of the | PACC | 02 |
| 3. | | | of the | | |
| 4. | | | of the | | |

3.  I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. **(In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.)**

4.  I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief.  This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA.C.S.§4904) relating to unsworn falsification to authorities.

_NOV 07, 2001_ ,                                            _____
                                                        (Signature of Affiant)

AND NOW, on this date, _11/15/01_ , _____ I certify that the complaint has been properly completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

_____          _____          **SEAL**
(Magisterial District)                            (Issuing Authority)

AOPC 412B- 01/25/99                                   2-2

FELL-00001324

| Defendant's Name: Christopher EIKE |  | **POLICE** |
| Docket Number: CR-121-01 | | **CRIMINAL COMPLAINT** |

## AFFIDAVIT of PROBABLE CAUSE

Your afffiant is a member of The Pennsylvania State Police (PSP) currently assigned to The PSP Blooming Grove Station in Pike County, PA.  On 08/26/01, your affiant spoke with the victim, a female with a date of birth of 09/02/89.  The victim informed your affiant that she and the defendant, who was 18 years of age at the time of the incident,  had been together and that they had engaged in open mouth kissing several times. The victim also informed your affiant that the defendnat  had felt her breast and that he had felt between her legs, indicating her genital area.   The victim advised that the defendant had  felt her body on top of her clothes and that he did not contact her skin.

On 10/19/01 at approx 1230 hrs, your affiant spoke with the defendant  at PSP Blooming Grove.  During  interview, the defendant advised your affiant that he had kissed the victim several times and that on two seprate occaisions, he had felt  the victims breast with his hands.   The defendant advised that this occurred one time at his apartment and one time in the victims bedroom. At the time of these incidents, the defendant had an apartment attached to the victims residence.

I,    **Tpr. Mark H. MURRAY,**    BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____ , ___

_____ Date _____ , District Justice

My commission expires first Monday of January, _____        **SEAL**

AOPC 412-(6-96)                                3 - 3

FELL-00001325

# EXHIBIT 109

Attachment 1

## Correctional Healthcare Solutions, Inc.

### RECEIVING SCREENING

Inmate's Name: Robert Lee _____ DOB REDACTED-FELL ☉ Sex: male ID#: 112880

Screened By: ████████████ (PW)

Date: 12.13.00         Time: 1815

Vital Signs:   T _____   P _____   R _____   BP _____

Was inmate a medical, mental health or suicide risk during any prior confinement with department?
☐ NO   ☐ YES   If Yes, when: _____

Do you believe the inmate is a medical, mental health or suicide risk now?
☐ NO   ☐ YES

### OBSERVATIONS

| YES | NO | | YES | NO | |
|-----|-----|---|-----|-----|---|
| ☐ | ☒ | Assaultive/Violent Behavior | ☐ | ☒ | Confused |
| ☐ | ☒ | Bizarre Behavior | ☐ | ☒ | Uncooperative |
| ☐ | ☒ | Alcohol/Drug Withdrawal | ☐ | ☒ | Intoxicated |
| ☐ | ☒ | Unusual Suspiciousness | ☐ | ☒ | Incoherent |
| ☐ | ☒ | Hearing Voices/Seeing Visions | ☒ | ☐ | Cooperative |
| ☒ | ☐ | Awake and Alert | ☐ | ☒ | Frequent Cough |
| ☐ | ☒ | Physical Disability | ☐ | ☒ | Obvious pain, bleeding or injury |
| ☐ | ☒ | Other Observable Signs of Depression | | | |

Explain: _____

### MEDICAL HISTORY

| YES | NO | |
|-----|-----|---|
| ☐ | ☒ | Are you injured?   If Yes, explain. |
| ☐ | ☒ | Are you currently under a physician's care?   If Yes, explain: _____ |
| ☐ | ☐ | If female, are you pregnant? |
| ☐ | ☒ | Are your currently taking any medications?   If Yes, list type(s), dosages, and frequency: _____ |

### DO YOU SUFFER FROM ANY OF THE FOLLOWING:

| YES | NO | | YES | NO | |
|-----|-----|---|-----|-----|---|
| ☐ | ☒ | Hepatitis | ☐ | ☒ | Chest Pain |
| ☒ | ☐ | Shortness of Breath | ☐ | ☒ | Heart Disease |
| ☒ | ☐ | Abdominal Pain sometimes | ☐ | ☒ | Asthma |
| ☐ | ☒ | High Blood Pressure | ☐ | ☒ | Venereal Disease |
| ☐ | ☒ | Tuberculosis (TB) | ☐ | ☒ | Diabetes |
| ☐ | ☒ | Alcohol Addiction | ☒ | ☐ | Drug Addiction |
| ☒ | ☒ | Epilepsy/Blackouts/Seizures | ☐ | ☒ | Ulcers |
| ☐ | ☒ | Cancer | ☐ | ☒ | Special Diet |
| ☐ | ☐ | Pregnant | ☐ | ☒ | Hospitalization within past year |
| ☐ | ☒ | Other Medical Problems or Disease? | ☐ | ☒ | (Optional) AIDS |

FELL-00001326

## SUICIDE ASSESSMENT

**YES   NO**

☐   ☒   Have you ever attempted suicide?   If Yes, when? _____
Why? _____   How? _____

☒   ☐   Have you ever considered suicide?   If Yes, when? 4 yrs ago
Why? family problems

☒   ☐   Are you now or have you ever been treated for mental health or emotional problems?  If Yes,
When? all my life  Inpatient: ✓   Outpatient: ✓   Both: _____

☒   ☐   Have you recently experienced a significant loss (job, relationship, death or family member/close
friend, etc.)? If Yes, explain: friend

☐   ☒   Has a family member or close friend ever attempted or committed suicide? If Yes, explain:

☒   ☐   Do you feel that there is nothing to look forward to in the immediate future (expressing helplessness
and/or hopelessness?) If yes, explain:

☐   ☒   Are you thinking of killing yourself? If Yes, explain:

Additional Remarks:

## DISPOSITION

☐ General Population        ☐ Medical        ☐ Special Watch (please complete below)

1. Supervision Levels. Close (5-15 minutes): _____   Constant: _____
2. Housing Assignments: Cell #: _____   Other: _____
3. Other precautions taken: _____
   (removal of clothing, bedding, etc, if appropriate)

☐ Medical Hospital: If inmate is later returned to facility, list any special watch recommendations.

☐ Mental Health Service: If inmate s later returned to facility, list any special watch recommendations:

☐ Other disposition/referral/transfer:

## CONSENT/REFUSAL OF TREATMENT (please check appropriate box and have inmate sign below)

☒ My signature acknowledges that I have been given the opportunity to satisfy myself by asking questions about health
services. I voluntarily give my consent to health care and i consent to the conditions of care and services.

☐ Inmate refused to answer (circle) or unable to answer (circle and state why) the verbal response sections of this screening
form. _____  refuse any type of medical treatment.

X _____  (print name)                          12-13-00
Inmate's Signature                                        Date

_____  (PJ)
LScreener's Signature

FELL-00001327

Attachment 5
## Correctional Healthcare Solutions, Inc.

## INTAKE EXAMINATION AND TREATMENT PLAN

NAME: Robert Lee    DOI: 12-13-00    DOB: 80    REDACTED - FELL

FACILITY: NWSCF    ID# 112880

VITAL SIGNS:    T 97$^8$    P 78    R 12    BP 128/88

CURRENT COMPLAINTS/SYMPTOMS: Toothache 2° cracked tooth.

PAST MEDICAL HISTORY (List illnesses, surgeries, injuries, hospitalizations and medications):
Testicular trauma years ago → noted @ side c veiny/lumpiness p that

Medications:    1. _____    3. _____    5. _____
               2. _____    4. _____    6. _____

## FEMALES

LMP: _____    # of Preg. _____    #LB _____    #T: _____

Birth Control: _____    Date/Last Pap: _____    Date/Last Mammogram: _____

| | | NORMAL | ABNORMAL | OBSERVATION |
|---|---|---|---|---|
| 1. | Skin: | ☑ | ☐ | |
| 2. | H.E.E.N.T.: | | | |
| a. | Head: | ☑ | ☐ | |
| b. | Eyes: | ☑ | ☐ | |
| c. | Ears: | ☑ | ☐ | cerumen Ⓑ |
| d. | Nose: | ☑ | ☐ | |
| e. | Throat: | ☑ | ☐ | @ Tonsil in Throat ⊘ |
| f. | Teeth/Gums: | ☑ | ☐ | |
| 3. | Neck: | ☑ | ☐ | |
| | Thyroid: | ☑ | ☐ | × |
| 4. | Chest: | ☐ | ☐ | |
| a. | Breast: | ☐ | ☐ | |
| b. | Lungs: | ☑ | ☐ | CTA Ⓑ |
| c. | Heart: | ☑ | ☐ | RRR I m/r/g |
| 5. | Lymph Nodes: | ☑ | ☐ | BKG, S/NT |
| 6. | Abdomen: | ☑ | ☐ | |
| 7. | Hernia: | ☐ | ☐ | |
| 8. | Rectum/Anus: | ☐ | ☐ | |
| 9. | Spine: | ☑ | ☐ | |
| 10. | Extremities: | ☑ | ☐ | ⊘ C/C/e |
| 11. | Neurological: | ☑ | ☐ | A&O×3, NL g. +, 2+ reflex |
| 12. | Gu/Gyn (female): | ☐ | ☐ | |
| a. | External Genitalia: | ☐ | ☐ | |
| b. | Vagina: | ☐ | ☐ | |
| c. | Cervix: | ☐ | ☐ | |
| d. | Uterus: | ☐ | ☐ | |
| e. | Adnexa: | ☐ | ☐ | |
| 13. | GU/Male: | ☐ | ☐ | |
| a. | External Genitalia: (TS): | ☐ | ☐ | |
| b. | Penis: | ☐ | ☐ | large ⊘ |
| c. | Testes/Scrotum: | ☐ | ☑ | (B) vein T multiple varicocele. |

MD    Date: 1/25/01

JC

Attachment 4

## Correctional Healthcare Solutions, Inc.

### INTAKE MEDICAL HISTORY

**NAME:** Robert Lee      **DATE:** 12·13·00

**VITAL SIGNS**   T _____   P _____   R _____   BP _____   W _____

| HAVE YOU EVER? | YES | NO | | DO YOU? | YES | NO | |
|---|---|---|---|---|---|---|---|
| Lived with anyone who had TB? | | ✓ | | Wear glasses or contacts? | ✓ | | |
| Coughed up blood? | no | ✓ | | Have vision in both eyes? | ✓ | | |
| Bled excessively after injury? | | ✓ | | Wear a brace or back support? On occ | ✓ | | |
| Attempted Suicide? | | ✓ | | | | | |

| HAVE YOU EVER HAD OR HAVE YOU NOW? | YES | NO | DON'T KNOW | HAVE YOU EVER HAD OR HAVE YOU NOW? | YES | NO | DON'T KNOW |
|---|---|---|---|---|---|---|---|
| Asthma | | ✓ | | Night Sweats | ✓ | | |
| Tuberculosis | | ✓ | | Tumors, Cysts or Growths | | ✓ | |
| Cancer or Tumor | | ✓ | | Cramps in your Legs | ✓ | | |
| Diabetes | | ✓ | | Rupture or Hernia | | ✓ | |
| Emphysema | | ✓ | | Recent Gain or Loss of Weight | | ✓ | |
| Ear Nose Throat Trouble airplane ride | ✓ | | | Frequent Indigestion | | ✓ | |
| Hearing Loss | | ✓ | | Stomach Trouble or Ulcer | | ✓ | |
| Chronic or Frequent Colds | | ✓ | | Hepatitis or Jaundice | | ✓ | |
| Hay Fever | | ✓ | | Gall Bladder Trouble | | ✓ | |
| Severe Gum or Tooth Trouble bleeding gums | ✓ | | | Hemorrhoids or Rectal Trouble | | ✓ | |
| Shortness of Breath | ✓ | | | Head Injuries | | ✓ | |
| High Blood Pressure | | ✓ | | Epilepsy or Seizures | | ✓ | |
| Pain or Pressure in Heart | | ✓ | | Frequent or Severe Headaches | ✓ | | |
| Pounding Heart | ✓ | | | Loss of Memory or Amnesia | ✓ | | |
| Arthritis or Bursitis | | ✓ | | Periods of Unconsciousness | | ✓ | |
| Fracture (Broken Bones) | | ✓ | | Paralysis, Numbness, Weakness whole body | ✓ | | |
| Bone, Joint or other Deformity | | ✓ | | Dizziness, Fainting Spells | ✓ | | |
| Painful or Trick Shoulder | | ✓ | | Nervous Problem of Any type | | ✓ | |
| Foot Trouble | | ✓ | | Alcoholism | | ✓ | |
| Recurrent Back Trouble all of back | ✓ | | | Syphilis, Gonorrhea | | ✓ | |
| Swollen or Painful Joints elbows | ✓ | | | Drug Allergies | | | |
| Kidney Trouble | | ✓ | | Lump, Pain, Discharge on Breast | | | |
| Frequent or Painful Urination | ✓ | | | Change in Menstrual Pattern | | | |
| Blood in Urine | | ✓ | | Pregnancy, Abortion, Miscarriage | | | |
| Recurrent Infections | | ✓ | | Treated for Female Disorder | | | |
| Rheumatic Fever | | ✓ | | Thyroid Trouble | | | |

YOUR PRESENT DOCTOR'S NAME (Address and Phone)

Doctor ███████ Pennsylvania

Have you ever been treated for a mental condition? If Yes, state reason and give details. Yes

Hospitalized ×7 Pennsylvania

Highest Level of Education (years)? 10th

Have you ever been incarcerated in this facility before? If so when?
no

Have you ever been a patient or received treatment in a hospital (surgery/injuries)? State where, when, why and address:
Gysenor Med Center - Penn + NY

Have you ever taken narcotics? If Yes, state what kind, when you last took and if you are in a treatment program: Yes
anything but inhalents - No Heroin

Additional Comments (use reverse side if necessary):

5:01-cr-00012-gwc    Document 304-23    Filed 03/25/11    Page 93 of 109

CHS 137

# CORRECTIONAL HEALTHCARE
# SOLUTIONS, INC.

# TB SCREENING

NWSCF
**Institution:**

Name: Robert Lee, Jr I.D. # 112880          DOB.  REDACTED - FELL  0

Admission_____          Annual_____

Tuberculosis Skin Testing: unless otherwise indicated 12/5/00  8mm – Federal
Implant Date: _____ Deferred – done     Read Date:_____
Nurse Signature: ███████████████          _____mm
                                    JC     Nurse Signature: _____

Anergy Testing:  If indicated: Right Forearm

Implant Date:_____          Read Date:_____
Type 1:_____                _____mm
Type 2:_____                _____mm
Nurse Signature:_____       Nurse Signature:_____

Annual Assessment Check List

B/P_____     H&H_____     RPR_____     CXR_____

Rev: 1 Feb.98

FELL-00001330

## MEDICAL SUMMARY OF FEDERAL PRISONER/ ALIEN IN TRANSIT
### U.S. Department of Justice

TB Clearance ☒ Yes ☐ No

1) PPD Completed. _____
Date

Results: _____

2) CXR Completed: _____
Date

3) Health Authority Clearance _____

_____ Date

Note:
Dates listed above must be within one year of this transfer.

**I. PRISONER/ALIEN**    05305-01

Name: _Lee Robert Joseph_    Prisoner/Alien Reg. # 39044-081    D.O.B. REDACTED - FELL

Departed From: _____    Date Departed: _____

Destination: _____    Reason for Transfer: _____

Dist. Name: _____    Dist. # _____    Date in Custody: _____

**II. Current**
**Medical**
**Problems**

| 1. | 4. |
| 2. _None_ | 5. |
| 3. | 6. |

### Medication Required For Care En Route

| Medication | Dose | Route | Instructions For Use (Include proper time for Administering) | Stop |
|---|---|---|---|---|
| None | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Additional Comments:

## III. SPECIAL NEEDS AFFECTING TRANSPORTATION

| | | | |
|---|---|---|---|
| Is prisoner medically able to travel by BUS, VAN or CAR? | ☒ Yes | ☐ No | If no, Why not? |
| Is prisoner medically able to travel by airplane? | ☒ Yes | ☐ No | If no, Why not? |
| Is prisoner medically able to stay overnight at another facility en route to destination? | ☒ Yes | ☐ No | If no, Why not? |
| Is there any medical reason for restricting the length of time prisoner can be in travel status? | ☐ Yes | ☒ No | If yes, state reason: |
| Does prisoner require any medical equipment while in transport status? | ☐ Yes | ☒ No | If yes, What equipment? |

Sign & Print Name- Certifying Health Authority: _____ R.N.

R.N.

Phone Number: _____    Date Signed: _____

Original-Upon Transfer

Form USM-
(Ex.

FELL-00001331

## INTAKE MEDICAL SCREENING

12-13-00

Date _4-28-_ _____ Resident Name _LEE, ROBERT_ ___ DOB _____ REDACTED-FELL

Anticipated Commitment Period:    30 days     Over      Not
                                  or less ____ 30 days ____ Known _X_

                                  Interrupt
                                  daily ____ Weekend ____

---

I. ADMITTING OFFICER - ASK THE FOLLOWING QUESTIONS OF EACH OFFENDER ADMITTED.

1. Are you allergic to any medications?          ____ Yes  _✓_ No

   If yes, which ones?

2. Are you allergic to any foods or food additives?   ____ Yes  _X_ No

   If yes, what are they?

3. Are you currently taking, or are you supposed to be
   taking any prescribed medications?            ____ Yes  _X_ No

   A. IF MEDICATION WAS BROUGHT WITH THE RESIDENT
      COMPLETE "PRE-EXISTING MEDICATION" (on reverse side).

   B. IF NO MEDICATION BROUGHT, BUT ANSWER "YES", FILL IN
      ALL DATA AVAILABLE ON REVERSE SIDE OF THIS FORM.

4. Are you currently on a diet which has been ordered
   by a physician for medical reasons?           ____ Yes  _X_ No

5. Do you have:

   | | | | |
   |---|---|---|---|
   | Diabetes | ____ | T.B. | ____ |
   | High Blood Pressure | ____ | Hepetitis | ____ |
   | Heart Trouble | ____ | AIDS | ____ |
   | Mental Illness | _X_ | Body Lice or Crabs | ____ |
   | Seizures/Epilepsy | ____ | Veneral Disease | ____ |

1. Alcohol Use in Past 24 hours?____ NONE _____

   a. Number of Drinks _____ How Long Ago? _____

2. Drug Usage?_CRACK, MARIJUANA, METH, COCAINE, VALIUM, BARBITUATES_

   a. Which one/s? _WEED CRACK___ How Long Ago? _3 weeks_ Ago

Name of Most recent Physician_____ When Seen_____

FELL-00001332

1-2
M-4

## SCARS, TATTOOS, TRAUMA MARKS

(Mark location & indicate design)

Admission Date: _12·13-OU_          Resident's Name: _Lee,    ROBERT_

Time of Admission: _1548_

(Indicate abrasions, bruises, other trumas, etc.)





DC 45.0        VT.I.I.

White: Resident Case File, Yellow: Medical File

Admitting Officer:

Signature

FELL-00001333

II.  ADMITTING OFFICER - NOTE THE FOLLOWING OBSERVATIONS

    Tearful or Crying       Flushed          Pale
    Artificial Limb/s       Slurred Speech   limp or other probs. walking
    Other Problems, Specify Depressed        Obvious cuts, sores, rashes,
    Confusion of thought    Nervous          needle marks, or bleeding

III.  NOTIFY SUPERVISOR OF ANY POSITIVE ITEMS.

    INTAKE OFFICER'S COMMENTS: _CALM - no C_____

    INTAKE OFFICER'S SIGNATURE ████████████████ DATE: _12-13-0__ TIME: _17¥0_

    SUPERVISOR'S SIGNATURE_____ DATE:_____TIME:_____

IV.  PRE-EXISTING MEDICATION

    The following medication was brought with the new inmate or is
    reported by the inmate as having been prescribed for use:

    Description: _____ Dosage:_____

    Prescribing Physician:_____

    Physician's Address:_____ Physician's Phone #:_____

Have inmate read and sign if medications accompanied inmate: It is understood
by me that the medication as listed above is believed by me to be essential
for my immediate health.  I do understand that it will be made available to me
as prescribed pending decision by the Institution's Physician as to further
need for continuing the medication.
                            Inmate's Signature_____

                            Date of Admission:_____Time:_____

                            Witness:_____

The medication as listed above was turned over at the time of intake in the
following amount:
                            Officer's Signature_____

                            Date:_____ Time:_____

Prescription as listed above was:      _____Verified    _____Denied

    Verified or denied by (Physician's Name)_____
    on (date)_____ DOC Personnel Signature_____

The following described medication was received:

_____      _____
Correctional Facility Health Care Specialist        Date

FELL-00001334

# EXHIBIT 110

# INTENTIONALLY LEFT BLANK

FELL-00001335

# EXHIBIT 111

# INTENTIONALLY LEFT BLANK

FELL-000001336

# EXHIBIT 112

Fell

Directive 405.02

VERMONT DEPARTMENT OF CORRECTIONS
INCIDENT REPORT
Log Number:9158   SiteLog#:2399

Date: 03/17/2004   Time: 13:15
NWCF: Northwest State Correctional Facility
Specific Location: echo bullpen
-----------------------------------------------------------------
Originated By: ███████████ 7C

Notifications:
WorkSite Manager   Operations Mgr.   Dir.Corr.Svcs.   Superintendent signoff
03/17/2004 13:30

_Superintendent's Signature_  03-(?-04
Superintendent's Signature/Date

-----------------------------------------------------------------
Incident Code(s)/Description(s):
2-11-1    24 Hour Notification
  Other Serious but not Urgent incident
-----------------------------------------------------------------
Was Video Camera Used? Y   If not, explain in narrative.
-----------------------------------------------------------------
Inmates Involved            7C    Staff Involved
                                                      CO/2
███████████████████ 7C  ████████████████  CO/1
                                        ███████████ 7C  CFSS
                                                      CO/1
                                                      CO/2
                                                      CO/1
                                                      CFSS

-----------------------------------------------------------------
Summary of the Event:

    On this date at approx.1315 hrs CO/1 ████████ called a 1033 in the echo
bullpen. when staff arrived in the bullpen CO/1 ████████ informed us that
██████████████████████████████████████████████████████████
████ and were on their way out of the bullpen at which time i heard CO/2
████ and CFSS ████████ telling inmate Donald Fell to place his hands back on  7C
the fence inmate Fell didn't comply with CO/2 ████ or CFSS ████
instructions at which time he was handcuff and walked out of the bullpen By
CO/2 ████ and Co/1 ████ as we got out side the 5 door inmate Fell started
to resist complaining about his wrist being hurt at this time I observed that
CO/2 ████ had his arm and that CO/1 ████ had his wrist which he had bend
up. I informed CO/1 ████ that I would take his place.There were no more proble
informed inmate Fell to get on his knees and cross his legs the reason for
this was inmate fell was calling staff names and his behavior was getting out
of control. Once on his Knees CO/2 ████ again informed inmate Fell to crss  7C
his leg Fell didn't follow his instructions so CO/1 ████ cross his legs and
then held them. Co/2 ████ and myself started remove the cuff and as we did
inmate Fell asked who was on his legs. When inmate Fell saw it was CO/1 ████
he called CO/1 ████ a fag and a fucking punk and then spit in his direction.
██████████████████████████████████████████████████████████

got between inmate Fell and  Co/1        again started to advance
toward Fell at which time CO/1

return to the

cell and stripped searched inmate Fell. Inmate Fell then was secured with out

Vermont Dept. of Corrections
Incident Report - Log Number 9158   SiteLog#:2399                    Page 2
---------------------------------------------------------------------------

further incident. when I had finished with inmate Fell

03-18-04

Reporter's Signature/Date

---------------------------------------------------------------------------
Outcome comments:

Inmates              Fell were moved to delta locked in pending
major drs. there were checked by the nurse,                and fell
                              all placed on 15 minutes checks code #3

FELL-00001338

# EXHIBIT 113

# INTENTIONALLY LEFT BLANK

FELL-00001339

# EXHIBIT 114

574R05

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    04/12/2005                    b6
                                                       b7C

[_____] white female, Date of Birth [_____]
was interviewed by Special Agent (SA) [_____] Scran-
Resident Agency, FEDERAL BUREAU OF INVESTIGATION (FBI) and [____]
[_____] M.D., Forensic Psychiatrist, [_____] residence located at [_____]
After being advised of
the official identities of the interviewing personnel, [_____]
provided the following information:

① mcl

[_____] stated that she found DONALD FELL to be a nice kid
and recalled years ago having attended a picnic at [_____]
home on [_____], where
DONALD resided. On that occasion, FELL asked [_____] how she liked    b6
his new leather jacket. She also recalled that FELL's hair looked    b7C
nice. Also present at the picnic was [_____] friend, [_____]
LAST NAME UNKNOWN, another unknown male, and [_____] little girl.

[_____] described DONALD FELL as a nice and sociable kid,
who dressed nice, and would do things for you if asked. [_____]
stated that FELL wasn't a mouthy kid and described him as a clean    b6
cut kid. DEBRA FELL was last seen in her home when DONALD [_____]    b7C
[_____] asked [_____] if she would take DONALD in. [_____]
stated that she didn't have any room at her home so FELL arrived
with his clothing [_____] stated that he was family, therefore, she
told him to help himself to any food in the refrigerator.

[_____] advised that FELL played the guitar with songs he
heard on the radio. FELL stated that he wanted to go away and
start a band with his other buddies who played instruments. [_____]    b6
stated that when FELL stayed with her, he was good. She recalled    b7C
that FELL once built her a swing in the back yard. She recalled
one incident when the phone rang and [_____]
[_____] LAST NAME UNKNOWN (LNU), asked for DONALD. FELL went with
[_____] and did not return until later that evening. On that
occasion, FELL crawled in an upstairs window even though he had a
house key. Additionally, he climbed out the same window to exit
the house. [_____] daughter, [_____] asked him about it, but she
did not remember his response.

[_____] recalled that one of FELL's friends, ROBERT LEE,    b6
came by one day when DONALD had gone to visit his mother in    b7C

7A-AL-44453-302
-68

Investigation on    04/06/2005    at    Wilkes-Barre, PA

File #    7A-AL-44453 (SRA)-302 -68

Date dictated    04/08/2005
                                                       b6
by    SA [_____]                                b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FELL-00001340

FD-302a (Rev. 10-6-95)

7A-AL-44453 (SRA)

Continuation of FD-302 of _____ , On 04/06/2005 , Page 2      b6
                                                                                          b7C

Vermont.  She stated that DONALD had a bag of change and that DONNY
told him he could take some of it.

        [____] advised that she and [_____] took
DONNY to Vermont, exact date not recalled, to visit his mother,        b6
DEBRA.  [_____] put his clothes in the car and DONALD sat in the     b7C
backseat and read a paperback book. [_____] told DONALD, "Remember
treat your mother good."

        [_____] recalled that there was trouble between DEBRA FELL
and her mother, THERESA SHARPE. [_____] stated that she envied DEBRA
FELL.  DEBRA worked hard and handed her pay over to her mother.
There was always friction between the two. [_____] recalled that
DONALD FELL was once sent to ST. MICHAEL'S SCHOOL because THERESA
SHARPE was having trouble with him.  She couldn't keep him any
longer.  THERESA SHARPE kept DONALD [_____] at home.  In
[_____] opinion, the grandmother, THERESA SHARPE, should have kept
both children. [_____] described DEBRA FELL as a good mother, who     b6
tried to keep her house together.  The kids were always well-          b7C
dressed and had enough food.  The kids lacked nothing in her
opinion and they had a T.V.  Additionally, they sat at a big table
where she baked. [_____] recalled that DEBRA FELL once had a guy
with a broken leg who resided with her.  She believed his leg
injury was caused by being hit by a car.  She could not recall this
man's name.

        [_____] stated that when DEBRA FELL went to Vermont, [_____]
was mad at DEBRA's mother for disrupting the household.  THERESA      b6
SHARPE and DEBRA FELL were always arguing.  When DONALD FELL was      b7C
sent to ST. MICHAEL'S SCHOOL, DEBRA had to go to jail or pay a fine
every time DONALD missed a school day.

        [_____] stated that she did not know DONALD FELL's friends.
She recalled that DEBRA FELL had a nice three bedroom apartment in
Vermont that was clean and nice.  She worked at PRICE CHOPPER and     b6
also at a hotel in Vermont.                                           b7C