Page II

Screening Worker: _____

Case Name: _____ Fell _____

Date of Call: ___ 3/24/94 ___

Helpline Worker: _X. Keith R. Krumbower_
Signature

Time of Call: ___ 11:30 ___    A (P) Service: Phone: Hrs.: _____ Min.: __ 20 __

| REFERRAL SOURCE CODES | REASON FOR REFERRAL CODES | RELATIONSHIP CODES | SCHOOL DISTRICT CODES |
|---|---|---|---|
| 01 = Anonymous | 01 = Neglect/Physical | AF = Adoptive Father | 19-110 = Berwick Area |
| 02 = Child - Self Ref. | 02 = Neglect/Mistreat/Emot. | AM = Adoptive Mother | 40-140 = Crestwood Area |
| 03 = Perpetrator | 03 = Neglect/Environment | BRO = Brother | 40-160 = Dallas Area |
| 04 = Parent/Guardian | 04 = Neglect/Medical | C = Child | 40-260 = Greater Nanticoke |
| 05 = Sibling | 05 = Abandonment | COU = Cousin | 40-300 = Hanover Area |
| 06 = Relative | 06 = Inadequate/No House. | F = Father | 40-330 = Hazleton Area |
| 07 = Friend/Neighbor | 07 = Inadequate Supervision | GUA = Guardian | 40-390 = Lake Lehman |
| 08 = Babysitter | 08 = Parent/Child Conflict | HBM = Half-brother Mat. | 40-600 = Northwest Area |
| 09 = Landlord | 09 = Behavioral Problems | HBP = Half-brother Pat. | 40-660 = Pittston |
| 10 = Private Dr./Nurse | 10 = Community Problems | HSM = Half-sister Mat. | 40-885 = Wilkes-Barre |
| 11 = Dentist | 11 = Conflict w/Law | HSP = Half-sister Pat. | 40-920 = Wyoming Area |
| 12 = Private Psych/Psycho | 12 = Runaway | M = Mother | 40-930 = Wyoming Valley West |
| 13 = Public Health Dept. | 13 = School Prob./Truancy | MA = Maternal Aunt | 99-000 = Other (Out of State) |
| 14 = Hospital | 14 = School Prob./Behavior | MC = Maternal Cousin | |
| 15 = Law Enforce. Agency | 15 = Drug/Alcohol Prob. | MGF = Maternal Grandfather | |
| 16 = School | 16 = Placement | MGM = Maternal Grandmother | (Circle One) |
| 17 = Day Care Staff | 17 = Day Care/Place. Prevent. | MU = Maternal Uncle | |
| 18 = Clergy | 18 = Court Ordered Superv. | O = Other (Not a Relative) | Placement Resolved |
| 19 = Residential Fac. | 19 = Medical Clearance | OR = Other Relative | |
| 20 = Coroner | 20 = Home Study | PA = Paternal Aunt | Vol.    C.O.    P.C. |
| 21 = Courts | 21 = Teenage Pregnancy | PAR = Paramour | |
| 22 = Pub. MH/MR Agency | 22 = Adoption Services | PC = Paternal Cousin | |
| 23 = Other Priv. Soc. Svcs. | 23 = Maternity Services | PE = Perpetrator | (Check One) |
| 24 = Other | 24 = Hospitalized Parent | PGF = Paternal Grandfather | |
| | 25 = Information/Referral | PGM = Paternal Grandmother | WI - Worker Informed ☐ |
| | 26 = Inappropriate Discip. | PU = Paternal Uncle | |
| | 27 = Other | SB = Step-brother | WP - Worker Phone |
| | 28 = Protective Services* | SF = Step-father | Contact with Supv. ☐ |
| | | SIS = Sister | |
| ACTIVE WORKER: _____ | | SM = Stepmother | Supv. Out ☐ |
| | | SS = Step-sister | Supv. Phone Work ☐ |

Problem Identified by Referral Source: (Include information on prior ChildLine Numbers) Call was a
general referral from Jim Pruett at childline based on a
call from an anonymous female reporter. Deborah went
drinking tonight & left children alone. Theresa went next
door to her grandmothers — Don stayed in the home. Reporter
also mentioned that Don won't go to school, mother doesn't
make meals, mom drives w/o a license, & mom brings
different men home all the time. Reporting source says
she & MGM have made numerous reports about situation
& they want something done.
Theresa w/ her & Don & this worker felt Don was safe in
the other half of the double block. Refer for A.m. follow-up.

# EXHIBIT 184

CONTACT SHEET

CASE NUMBER:                          MONTH: *April, 1994*

CLIENT NAME: *Fell*                   WORKER:

ADDRESS:                              *Dr for GK*

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |
| Date: 4-7-94 | 1. ) |
| Location: *office* | |
| Who Seen: | 2. ) *MGM at MDS — will call* |
| | *Dick* |
| *phone: Jackie,* | *Debbie in in jail for Dorny* |
| *Debbie's sister* | *not going to School —* |
| | *went to Magistrate in Plain* |
| | *put her in jail* |

*Debbie gave Dorny the car*
*Kays, he been riding around,*
*w/ stolen plate    Cops advised*
*of thi*

*36 yr. old mans John stays*
*at Debbie's — just drinks & sleeps*

*called for Nelson at the school,*
*but Ronan not in yet — due @*
*11:30 AM —   Left Message*

—

# EXHIBIT 185

### PSYCHIATRIC NOTE

RE:      Donald Fell

DATE:    4-12-94

Donald Fell is almost fourteen years old and was admitted to the Diagnostic Program of St. Michael's on 4-08-94. He is in the 7th grade but has been involved in chronic truancy. He tells me he only attended the 7th grade four days during the entire school year. Apparently, his mother is incarcerated for thirty days because of failure to have Donald attend school. Apparently the family is quite dysfunctional. He was referred to this facility from Luzerne County Children & Youth, John Koz1loski, Caseworker.

Donald has a history of Wilkes Barre General Hospital Adolescent Psychiatric Unit admission. He apparently had been medicated with Tofranil and Melaril in the past. He was apparently directed to outpatient services but failed to utilize their availability.

A full battery of psychological tests will be conducted by Mr. Reakes as part of the overall treatment program. Information gathered will be utilized with regard to providing appropriate treatment recommendations and also to determine any evidence of underlying psychopathology.

The Clinical Psychiatric Evaluation reveals a fairly cooperative thirteen year old . He was oriented regarding time, place and person. He readily admitted to chronic truancy throughout the school year. Affect was appropriate. No increased or decreased psychomotor activity was noted. No marked disorder of perception such as illusion, delusion or hallucination was admitted to. He denies any illicit drugs or alcoholic intake.

He was mildly anxious during the interview but demonstrated no significant depressive features, obsessive-compulsive tendencies or phobias. Fund of general information is deemed within the lower levels of normal range. Insight and judgement into his difficulties, although superficial, is intact. He is competent with regard to handling simple monetary affairs.

PSYCHIATRIC NOTE
RE:  Donald Fell
Page II

Psychodynamically, Donald Fell shows manifestations of:

1. Axis I     - Adjustment Disorder with Disturbance of
                Conduct (309.30).
2. Axis II    - adolescent/authority conflicts (V71.02)
3. Axis III   - no significant physical impairment
4. Axis IV    - moderate
5. Axis V     - current 40 , highest 60

It is felt that Donald Fell could benefit from a consistent and structured environment. This could be provided through the residential placement at St. Michael's. Positive male role models can be provided. Behavioral modification therapies can be initiated. Drug and alcohol educational program can be part of the overall treatment program. Academic deficits can be improved through the scholastic program.

Donald might be considered an appropriate candidate for the Intensive Treatment Unit. Certainly his dysfunctional family bears further investigation through casework study.

John P. Lesniak, M.D.
Consulting Psychiatrist

JPL/dlw

FELL-00002018

# EXHIBIT 186

**Diagnostic and Evaluation Service**
**Residential Treatment Center**
**Group Homes**
**Foster Care**
**Day Treatment**
**Educational Services**



**Hoban Heights, P.O. Box 370**
**Tunkhannock, Pennsylvania 18657**
**717-388-6155     Fax 717-388-6979**

**James F. Huff, ACSW**
**Executive Director**

**Established 1914**

May 1994

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>REPORT OF DIAGNOSTIC AND EVALUATION</u>

RE:     Donald Fell                    PARENT: Ms. Theresa Sharpe
DOB:    4/31/80
DOA:    4/8/94                         ADDRESS: REDACTED - FELL
                                                Wilkes-Barre, Pa   18702


ORDERED BY:        Luzerne County Family Court


REQUESTED BY:      Luzerne County Children and Youth


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ENCLOSED:    Impressions and Recommendations
             Psycho-Social Summary
             Psychiatric Evaluation
             Psychological Evaluation
             Educational Summary
             Behavioral Adjustment Summary
             Medical Summary
             Dental Summary

THIS EVALUATION CONTAINS CONFIDENTIAL INFORMATION. IT HAS BEEN
DEVELOPED FOR PROFESSIONAL, AGENCY, AND COURT USE ONLY, AND IT
SHOULD BE CONSIDERED AS LIMITED ACCESS MATERIAL. ANY IMPROPER USE
CONSTITUTES A BREACH OF THE INDIVIDUAL'S RIGHT OF PRIVACY.



Caring for the youth of today, the hope of tomorrow.



ACCREDITED

FELL-00002019

-2-

On May 10, 1994, a Final Planning and Recommendation Conference was conducted on behalf of Donald, who was admitted to the Diagnostic Evaluation Program on April 8, 1994.

It is the recommendation of St. Michael's Diagnostic Evaluation Team that Donald's needs can best be met by continued placement in the Intensive Treatment Unit.

Our investigation into the case of Donald reveals that he first became known to Luzerne County Children and Youth in March of 1994 when his mother was incarcerated.

Psychodynamically speaking, Donald seems to show manifestations of:

    1. Axis I    - Adjustment Disorder with disturbance of conduct (309.30)
    2. Axis II   - adolescent/authority figure conflicts (71.02)
    3. Axis III  - no significant physical impairment
    4. Axis IV   - moderate
    5. Axis V    - current 40, highest 60

The mental status examination reveals a fairly pleasant and cooperative young man.  He was oriented regarding time, place and person.  Affect, or mood state, was appropriate.  No increased or decreased psychomotor activity was noted.  No marked disorder of perception such as illusion, delusion or hallucination was admitted to.  He did admit to extensive alcohol use and a desire to live with his grandmother.

Psychological evaluation reveals a 13 year old youth who is currently functioning within the average range of intelligence and compared to the general population, he is placed at the 50th percentile rank. Donald presents himself as pleasant and cooperative.   Central features of his personality structure at this time include: overwhelmed of current family affairs, underlying feelings of confusion and a strong need for nurturance.

FELL-00002020

-3-

Donald's academic achievement was evaluated through the administration of the following tests: Wide Range Achievement Test; Woodcock Reading Mastery Test; and the Key Math Diagnostic Arithmetic Test. For specific analysis of each test, please refer to the section contained within this report titled Educational Summary.

While in Purcell Place at St. Michael's, Donald's overall attitude, behavior and performance have been positive in nature.

RECOMMENDATIONS

St. Michael's Diagnostic Evaluation Team recommends continued placement would be in Donald's best interest.

Essentially, we are suggesting a six step plan for the care and treatment of Donald Fell.

1.    Continued participation within St. Michael's Intensive Treatment Program is indicated within this client's best interests at this time;

2.    Intensive individual and group counseling sessions shall be implemented within the Intensive Treatment Program to address problem areas identified within the client's individual Psycho-Social Service Plan;

3.    Behavioral modification approaches shall be implemented to help this client develop and maintaing a positive stability within his behavior, and to address problem areas (of a behavioral nature) identified within his interests;

4.    Participation within St. Michael's structured educational program is indicated at this time;

5.    In light of admitted drug or alcohol usage, a Drug and Alcohol Evaluation shall be conducted to determine the necessity of ongoing out-patient drug and alcohol counseling;

6.   Lastly, trusting relationships with appropriate adult role models will hopefully help this client to internalize appropriate social values, and help to maintain emotional support on a consistent basis.

FELL-00002021

# EXHIBIT 187

<u>PSYCHO SOCIAL SUMMARY</u>

<u>IDENTIFYING INFORMATION</u>

NAME:              Donald Fell

AGE:               13.11

DATE OF BIRTH:     4-30-80

DATE OF ADMISSION: 4-8-94

ADDRESS:           REDACTED - FELL
                   Wilkes-Barre, Pa  18705

<u>SOURCE OF REFERRAL/PRESENTING PROBLEMS/HISTORY OF PREVIOUS INTERVENTIONS</u>

Donald Fell was admitted to St. Michael's Diagnostic Intake Unit, Purcell Place on April 8, 1994.  He was referred by Luzerne County Children and Youth Services, his social worker is Mr. John Kosloski.

The referral was due to chronic truancy, ungovernable behaviors at home, alcohol issues with both parent and client and alleged sexual abuse.

Donald comes from a very dysfunctional family.  He was residing with his mother Debra and sister Terri.  When Donald was fined for truancy from school, his mother did not pay the fines so she was placed in jail.  She is currently in prison.  The children were placed with the maternal grandmother, but stated she could not care for Donald due to the out of control behavior he was displaying.

Debra and her mother resided in a side by side duplex which Mrs. Sharpe owns.  When her daughter was placed in prison she had the home condemed.  The home was infested with rats, cockroaches and lice.  Though this worker did not go through the home the grandmother did show me pictures.  The home was filthy, litter, fecus and beer cans were scattered in living room.  This worker questioned Mrs. Sharpe how long this had been going on to which she stated "two years".  When questioned why she did act sooner on having her property condemed, she failed to respond.  It should be noted at this time that there were numerous inconsistencies in Donald's care, the grandmother's involvement and Mrs. Sharpe's personal anger toward Children

FELL-00002022

PSYCHO SOCIAL SUMMARY
RE:     Donald Fell
Page II

and Youth Services of Luzerne County.  Mrs. Sharpe stated that
she called Children and Youth weekly about the conditions the
children were living in, the abuse and neglect she felt the
children were living under.  Mrs. Sharpe stated that the case
was closed in January 1994, against her wishes.

However, Mrs. Sharpe refuses to take responsibility for
the condition her grandchildren were living under on property she
owns.

Donald has had a long history of mental health
interventions including hospitalizations.  He was hospitalized at
First Valley in 1992 for out of control behaviors and
Wilkes-Barre General twice in 1993 for the same behaviors and
suicidal ideations.

Donald attended the Childrens' Service Center of
Wilkes-Barre in 1992 and up rumoved from the program due to poor
and ungovernable behaviors.  He had been diagnosed with attention
deficit disorder.

PRESENT FAMILY CONSTELLATION

| NAME | D.O.B. | RELATIONSHIP | ADDRESS |
|---|---|---|---|
| Terri Fell | REDACTED - FELL | sister | REDACTED - FELL Wilkes-Barre, Pa |
| Jackie Cotzer | | aunt | "            " |
| Theresa Sharpe | | grandmother | "            " |
| Debra Ann Fell | | mother | Luzerne County prison |

PRESENT HOME ENVIRONMENT

As previously stated, Donald resided with his mother
Debra at    REDACTED - FELL    in Wilkes-Barre, Pa.  The house is
a side by side duplex and by Donald's maternal grandmother,
Theresa Sharpe who resides at REDACTED - FELL

When the children were removed from the mother's home it
was comdemed by Mrs. Sharpe.  The home was filthy and
infested with rats, lice and cockroaches.  Mrs. Sharpe had
photos taken of the house.

Mrs. Sharpe's home was very neat and clean in its
appearance.  There does however seem to be a tug-of-war for
Donald and his sister between Mrs. Sharpe and Debra Fell.

FELL-00002023

PSYCHO SOCIAL SUMMARY
RE:    Donald Fell
Page III

FAMILY HISTORY/DYNAMICS

        Natural Father: Donald Fell Sr.
                D.O.B. :    unknown
              Phone # :    unknown
               Status :    separated
             Children :    two
               Health :    unknown
            Education :    unknown
           Employment :    unknown
               Income :    unknown
        D&A Involvement:  Mrs. Sharpe stated that her
son-in-law used alcohol regularly.  She was not sure if he used
drugs.
        Criminal History:  Mrs. Sharpe did not know if Donald
Sr. used drugs.

        Relationship with child/spouse:  According to Mrs.
Sharpe, Mr. Fell has had no contact with the children since
1990.  She stated that her son-in-law was abusive towards both
Debra and the children.

        Mrs. Sharpe had also alleged that her son-in-law was
sexually abusive to the children as well as on one occasion,
stabbed his wife Debra during a drinking binge they were both
on.  These allegations could not be substantiated.

        Natural Mother: Debra Ann Cotzer Fell
                D.O.B. :   REDACTED - FELL
              Address :    currently in Luzerne County Prison
                           REDACTED - FELL
                           Wilkes-Barre, PA      - Condemned
              Phone # :    unknown
               Status :    separated
             Children :    two
               Health :    poor
            Education :    10th grade
           Employment :    nonw
               Income :    DPA
        D&A Involvement:  Mrs. Sharpe stated that her daughter,
Debra is a chronic alcoholic, "who slept, drank and slept".  She
is unsure if her daughter uses drugs.
        Criminal History:  Mrs. Sharpe stated that her daughter
had numerous court fines and was currently in prison for not
attending a court hearing and not paying truancy fines.

        Relationship with child/spouse:  Due to Mrs. Fell's

FELL-00002024

PSYCHO SOCIAL SUMMARY
RE:    Donald Fell
Page IV

incarceration the homestudy was conducted at her home of Mrs. Sharpe, Donald's natural grandmother. She stated that Donald's relationship with his mother could only be described as "poor". Donald was physically abusive towards his mother on numerous occasions.  When she drank heavily she would give Donald her car keys and he would run errands for her.

Mrs. Sharpe also stated that her daughter was physically abusive towards the children when they were younger.  She also made allegations that Donald was sexually abused by a babysitter and her boyfriend but Debra did nothing about it.

Donald's parents were married on November 10, 1979.  Debra and Donald had two children, Donald Jr. and Terri.  They separated after 10 years of marriage.  Both parents abused alcohol, and raised the children in a dysfunctional home.  Mr. Fell physically abused his wife and the police were called on numerous occasions for domestic violence.  On one occasion Mr. and Mrs. Fell had stabbed each other during a fight.  Donald was six years old at the time.

```
         Significant Other:  Theresa Sharpe
                   D.O.B. :   REDACTED - FELL
                  Address :
                            Wilkes-Barre, Pa
                  Phone # :  717-822-7135
                   Status :  divorced
                 Children :
                   Health :  good
                Education :  N/A
               Employment :  N/A
                   Income :  N/A
         D&A Involvement:   Mrs. Sharpe states that she does not
                              use drugs or alcohol.
         Criminal History:  Mrs. Sharpe states that she has no
                              criminal history.
```

RELATIONSHIP WITH CHILD/SPOUSE

Mrs. Sharpe has gained custody of Terri Fell, Donald's sister and will request Donald's custody after his placement. Mrs. Sharpe has also stated that she will be a visiting resource for Donald.  Her relationship with both children appears to be nurturing and healthy.

FELL-00002025

PSYCHO SOCIAL SUMMARY
RE:    Donald Fell
Page V

CLIENT'S PERSPECTIVE

Donald has readily admitted to being difficult and understands the need for placement.

DRUG AND ALCOHOL INVOLVEMENT

A drug and alcohol evaluation has been requested due to Donald's environment as well as his admitted use of alcohol (beer) on a regular basis.

HISTORY OF ABUSE (Physical, Sexual, Emotional)

Donald has not spoken about the allegations of sexual abuse but does talk about the physical abuse that have taken place.  He states that both his mother and father "beat" him.

EDUCATIONAL HISTORY

The last school attended by Donald was Plains Junior High School.  He was repeating 7th grade.  He was chronically truant and ungovernable when he was there.  His grades were poor mostly due to his paying attention and refusing to do the work.

SPECIAL CONCERNS

Donald is a very confused young man.  He has acted as his own caretaker for sometime and is not readily acceptable to help.  His mother's drinking continues which only upsets Donald more.  He has not expressed any interest in seeing her at this point.

IMPRESSIONS AND RECOMMENDATIONS

Donald is in need of supervision and structure.  He has to address issues surrounding alcoholism, truancy and aggression. It is strongly recommended that Donald remain in residential care until custody can be given to his grandmother or until his mother's situation becomes stable.  Donald will attend drug and alcohol counseling, group and individual therapy as well as attend school on campus.

FELL-00002026

PSYCHO SOCIAL SUMMARY
RE:    Donald Fell
Page VI


SOURCES OF INFORMATION

       Information provided within this Psycho-Social Summary was
obtained primarily through contact with Mrs. Sharpe; contact
with Luzerne County Children and Youth; review of referral
materials and through individual social work sessions conducted
with Donald Fell.

                         Mark Innocenzi
                         Social Worker

FELL-00002027

# EXHIBIT 188

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
IDENTIFICATION DIVISION
WASHINGTON, D.C. 20537

PA0401300                                                PCN 941291625705


BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME, A NEW COPY
SHOULD BE REQUESTED WHEN NEEDED FOR SUBSEQUENT USE.

        - FBI IDENTIFICATION RECORD - FBI NO-31339NA8

WHEN EXPLANATION OF A CHARGE OR DISPOSITION IS NEEDED, COMMUNICATE
DIRECTLY WITH THE AGENCY THAT FURNISHED THE DATA TO THE FBI.


NAME                              FBI NO.        DATE REQUESTED
FELL,DEBORAH ANN                  31339NA8       06/09/94


SEX  RACE  BIRTH DATE  HEIGHT  WEIGHT  EYES  HAIR  BIRTH PLACE
F    W     REDACTED - FELL  502   140     HAZ   RED   UNITED STATES

FINGERPRINT CLASS
PI PO 18 CO 13
PO PI 18 PI 18

1-ARRESTED OR RECEIVED 03/13/91   SID-PA20111852
   AGENCY-POLICE DEPARTMENT PITTSTON (PA0401100)
      AGENCY CASE-91-027
      CHARGE 1-RETAIL THEFT

2-ARRESTED OR RECEIVED 01/29/94   SID-PA20111852
   AGENCY-POLICE DEPARTMENT WILKES-BARRE (PA0401300)
      AGENCY CASE-15064       NAME USED-FELL,DEBBIE ANN
      CHARGE 1-SIMPLE ASSAULT
      CHARGE 2-PUBLIC DRUNK


RECORD UPDATED 06/09/94




ALL ARREST ENTRIES CONTAINED IN THIS FBI RECORD ARE BASED ON
FINGERPRINT COMPARISONS AND PERTAIN TO THE SAME INDIVIDUAL.

THE USE OF THIS RECORD IS REGULATED BY LAW.  IT IS PROVIDED FOR
OFFICIAL USE ONLY AND MAY BE USED ONLY FOR THE PURPOSE REQUESTED.


FELL-00002028

# EXHIBIT 189

48

CELL #7

# WILKES-BARRE POLICE DEPARTMENT

15 N. WASHINGTON STREET
WILKES-BARRE, PA. 18701

### JAILER'S REPORT

23

8620

| SURNAME | FIRST | MIDDLE | IRC NO. |
|---|---|---|---|
| RHODES | JOHN | | JI89432 |

| ADDRESS | SOC. SEC. NO. |
|---|---|
| REDACTED - FELL w-B | REDACTED - FELL |

| AGE | SEX | RACE | DATE OF BIRTH | NICKNAME |
|---|---|---|---|---|
| 63 | M | W | REDACTED - FELL | |

| PLACE OF BIRTH | ALIAS |
|---|---|
| w-B. | |

| MARRIED | DRUNK | DATE OF ARREST | TIME | DATE OF CRIME | ON VIEW |
|---|---|---|---|---|---|
| SINGLE | SOBER | 18 OCT 94 | 1850 | 18 OCT 94 | WARRANT |

| HEIGHT | WEIGHT | PLACE OF CRIME | STATE | COUNTY |
|---|---|---|---|---|
| 5 FT. 9 IN. | 153 | REDACTED - FELL | PA. | LUZERNE |

| HAIR | EYES | PLACE OF ARREST | AUTHORITIES |
|---|---|---|---|
| BROWN | BROWN | 32 CHESTNUT ST. | POLICE W-B. PA. |

| BUILD | COMPLEXION | CHARGE: |
|---|---|---|
| MED | FAIR | P.C.C. 5505 |

| OCCUPATION |
|---|
| NONE |

| SCARS-MARKS-DEFORMITIES | VICTIM | RACE: |
|---|---|---|
| | | |

| | ADDRESS |
|---|---|
| | |

| | OFFICER | UNIFORM |
|---|---|---|
| | PTLMA. R. SIMONETTI | DETECTIVE |

| PRELIMINARY HEARING | DATE | TIME | MAGISTRATE |
|---|---|---|---|
| | | | |

BAIL.                    ROR.

RELEASED 2400 HOURS - CITATION ISSUED

JAILER SIGNATURE _____

SUPERVISOR SIGNATURE _____

DATE: 10-18-94

# EXHIBIT 190

LCPR-8

| 1. ZONE | | ☑ ADULT ☐ JUVENILE | ARREST REPORT | WILKES-BARRE POLICE DEPARTMENT | 2. IRC J1894 32 |
|---|---|---|---|---|---|

**OFFENSE**

3. CHARGE: Pub. Drunk  DATE CHARGED: 10/18/94  4. OFFENSE DATE: 10/18/94  5. ARRESTING OFFICER'S NAME: Simonetti  BADGE NUMBER: 473

6. OTHER CHARGES

7. LOCATION OF ARR: Near. REDACTED - FELL
ONT — OFFENSE TRACKING NUMBER

8. WHEN ARRESTED: 10/18/94  1853 HOURS  9. TYPE OF ARREST: ☑ ON VIEW ☐ WARRANT ☐ SUSPICION

REDACTED - FELL

10. NAME OF ACCUSED: Rhodes John A  11. AGE: 63  12. RACE: W  13. SEX: M

REDACTED - FELL

15. ALIAS/NICKNAME  16. TEL:

18. PLACE OF EMPLOYMENT/SCHOOL  19. DATE REDACTED - FELL PLACE OF BIRTH

MO.  DA.  YR.

**ACCUSED**

21. HEIGHT  22. WEIGHT  23. EYES  24. HAIR  25. BLOOD TYPE  26. MARKS, SCARS, TATOOS  27. COMPLEXION

28. SSN  29. FBI NO.  30. SID NO.  31. PDID NO.  32. MILITARY NO.

33. VETERANS CLAIM NO.  34. OPERATOR PERMIT NO.  35. FINGERPRINT CLASSIFICATION  36. PHOTO TAKEN ☐ YES ☐ NO  NUMBER

37. FINGERPRINT CARD TO ☐ FBI ☐ PSP  38. INDICATION OF DRUGS: ☐ YES ☐ NO  ALCOHOL: ☑ YES ☐ NO  39. DEFENDANT ARMED ☐ YES ☑ NO  TYPE WEAPON(S)

40. ARTICLES CONFISCATED FROM DEFENDANT  41. PERSONAL ARTICLES RECEIPT GIVEN ☐ YES ☐ NO  NUMBER

**VEH**

42. DEFENDANT VEHICLE IDENTIFICATION  YEAR  MAKE  MODEL  LICENSE NO./ST  DEFENDANT FAMILY CODE FOR BLOCKS 43 – 46
F — FATHER  W — WIFE  B — BROTHER  S — SON
M — MOTHER  S — SISTER  D — DAUGHTER

**FAMILY**

| 43. | NAME | ADDRESS | PHONE (RESIDENCE/OFFICE) |
|---|---|---|---|
| 44. | | | |
| 45. | | | |
| 46. | | | |

**ACC**

47. NAME/ALIAS/NICKNAME OF ACCOMPLICE  48. ADDRESS

49. NAME/ALIAS/NICKNAME OF ACCOMPLICE  50. ADDRESS

**ATT**

51. ATTORNEY NAME  TELEPHONE NO.  52. RIGHTS READ ☐ YES ☐ NO  BY WHOM

**STAT**

53. STATUS OF DEFENDANT  ☐ DETAINED AT ___  ☐ RELEASED  ☐ PERSONAL BOND
☐ MONEY BOND — AMOUNT $ ___  ☐ PROPERTY BOND  ☐ TURNED OVER TO

**NARRATIVE**

ITEM NO.  54. CONTINUATION OF ABOVE ITEMS (INDICATE ADDITIONAL INFORMATION.)

Cited For Pub. Drunk C.I # A630119
Magistrate Stated To Hold Till Sober

**CHARGE INFORMATION**

55. ADJUDICATION  DATE AND TIME: ___ / ___ / ___ MO. DA. YR.  HOURS

56. CHARGE: Pub. Drunk  56A. OTN  57. MAGISTRATE/DISTRICT COURT: 11-1-2  58. DATE  59. FINAL DISPOSITION

**CONTROL**

60. COMM. CENTER WANT/WARRANT INQUIRY  ☐ YES ☐ NO ☐ CANCEL  ___ / ___ / ___ MO. DA. YR. HOURS  WARRANT NO.

61. DISTRIBUTION ☐ CHIEF ☐ DETECTIVE ☐ JUVENILE ☐ NARCOTICS ☐ OTHER

62. ARRESTING OFFICER SIGNATURE: [signature] 473  10/18/94  63. REVIEWING OFFICER SIGNATURE: JHOR  [signature]  10/18/93

# EXHIBIT 191

**Commonwealth of Pennsylvania**
**CITATION**
(NON-TRAFFIC)

CITATION No.
A 630119

MAGISTERIAL DISTRICT NO. 11-1-2

DOCKET NUMBER

DEFENDANT — FIRST NAME: John    MIDDLE NAME: A    LAST NAME: Rhodes

REDACTED - FELL    STATE: WB    ZIP CODE: PA

CHARGE: Public Drunkeness

OFFENSE

NATURE OF OFFENSE: Def appeared in public under the influence of alcohol to the degree he was a donger to himself

DATE: 10/18/94    TIME: 850    PLACE: REDACTED - FELL    COUNTY: Lun 40

DAY: Tues    CITY-TWP-BORO: WB 304

VIOLATION

STATUTE OR ORDINANCE: PCC    MAGISTERIAL DISTRICT NO.: 11-1-2 D

SEC.: 5505    FINE:    ADDRESS: 150 S. Penn Ave

SUB. SEC.:    COSTS:

TOTAL DUE:    RECEIPT OF CITATION IS ACKNOWLEDGED SIGNATURE OF DEFENDANT

DATE ISSUED: 6/18/94    I VERIFY THAT THE FACTS SET FORTH IN THIS CITATION ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE OR INFORMATION AND BELIEF. THIS VERIFICATION IS MADE SUBJECT TO THE PENALTIES OF SECTION 4904 OF THE CRIMES CODE (18 PA.C.S. §4904) RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES.

OFFICER'S SIGNATURE:    BADGE NO.: 473

STATION ADDRESS: WB P.P.    CODE:

RACE: W    SEX: M    REDACTED - FELL    INCIDENT NO.: 527 32    UCR CODE (IF APPLICABLE):

REMARKS: J189432

Staggering

Odor alcohol

Locked out by

landlady.

AOPC 407-86    DISTRICT JUSTICE

## USE BALL POINT --- PRINT & PRESS HARD

CCA GRAPHICS • West Chester, Pa • 215-793-2775

# EXHIBIT 192

# BUREAU OF POLICE OF THE CITY OF WILKES-BARRE

## SPECIAL REPORT

Joseph T. Coyne, *Chief of Police*

Wilkes-Barre, Pa. .......10/18........,19 94

S,P,

J 189432

In Reference to the Arrest of John A. Rhodes For Public Drunkenss. Magistrate Feissner stated to cite him, hold him to the point Mr. Rhodes was Sober and Release him.

Submitted

R Simoncti
473

HOR

FELL-00002032

# EXHIBIT 193

CASE. NAME: F911                                                           DATE: 10/26/94

**RISK/SEVERITY ASSESSMENT SUMMARY FORM**

D.  Note specific evidence supporting high risk and intermediate risk conclusions and clarify ambiguous factors.  You must provide
conclusions regarding overall severity/risk based on interaction of all factors.  Attach extra pages if needed.

3. IN — Mothers neglect has resulted in both children demonstrating behavioral problems

5. H — both children were sexually abused by baby-sitter in 1985

6. IN — Donald's emotional/social impairment has resulted in behavioral problems which led to his placement at St Mikes

7. IN — Debbie has poor reasoning, poor impulse control and criminal history

8. IN — Debbie is known abuser not in treatment

9. IN — Debbie's parenting skills are impaired by her addiction

11. IN — Debbie's whereabouts are unknown; She is not participating in any services

12. IN — Debbie's housekeeping skills were substandard and there are photos which document deplorable conditions of her home

19. IN — Debbie's depression has led her to substance abuse

20. H — Debbie's whereabouts are unknown

Overall Severity: H: Children were sexually abused due to mothers failure to protect

Overall Risk: IN: 2) Neglect/abuse caused them to experience emotional problems — Donald refused treatment Teri has accepted treatment

FELL-00002033

RISK/SEVERITY ASSESSMENT FORM
PHILADELPHIA MODEL

PRELIM.RPT:  PR____
DETERMIN:  DR____
SPECIAL:  SP  X

ASSESSMENT CODES:    Z = NO RISK    L = LOW RISK    IN = INTERMEDIATE RISK    H = HIGH RISK
X = UNABLE TO ASSESS    NA = NOT APPLICABLE

CASE NAME: Fell    CASE #: 000056

| A. CHILD FACTORS | name: | DONNY | | TERi | | | | | | | | HIGHEST RISK FACTOR | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | age: | 14 | | 12 | | | | | | | | | |
| | | PR | DR | PR | DR | PR | DR | PR | DR | PR | DR | PR | DR |
| 1.AGE,PHYSICAL/MENTAL ABILITY | | | L | | L | | | | | | | | L |
| 2.SEVERITY/FREQ OF ABUSE | | | H | | H | | | | | | | | H |
| 3.SEVERITY OF NEGLECT | | | IN | | IN | | | | | | | | IN |
| 4.LOCATION OF INJURY | | | H | | H | | | | | | | | H |
| 5.CHILD'S PRIOR ABUSE/NEG. | | | H | | H | | | | | | | | H |
| 6.EXTENT OF PSYCHO/HARM | | | IN | | L | | | | | | | | IN |

| B.PARENT/PERP.ADULT HOUSEHOLD MEMBER FACTORS | name: | DEBBiE | | | | | | | | | | HIGHEST RISK FACTOR | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | age: | 41 | | | | | | | | | | | |
| | | PR | DR | PR | DR | PR | DR | PR | DR | PR | DR | PR | DR |
| 7.AGE,PHYSICAL/MENTAL ABILITY | | | IN | | | | | | | | | | IN |
| 8.ALCOHOL/SUBSTANCE ABUSE | | | IN | | | | | | | | | | IN |
| 9.PARENTING SKILLS/KNOWLEDGE | | | IN | | | | | | | | | | IN |
| 10.LEVEL OF COOP. W/INVSTGTN | | | L | | | | | | | | | | L |
| 11.IMPACT OF INTERVENTION | | | IN | | | | | | | | | | IN |
| 12.PERP. ACCESS TO CHILD | | | L | | | | | | | | | | L |
| 13.PRIOR ABUSE/NEGLECT | | | Z | | | | | | | | | | Z |
| 14.IMPLEMENT | | | Z | | | | | | | | | | Z |
| 15 PARENT/CHILD RELATIONSHIP | | | L | | | | | | | | | | L |
| 16.PRESENCE PARA/PARENT SUB/O | | | NA | | | | | | | | | | NA |

C. ENVIRONMENTAL/ECOLOGICAL FACTORS:
17.CONDITION OF THE HOME                                                    IN
18.FAMILY SUPPORT SYSTEM                                                    L
19.STRESSES                                                                IN
20.FAMILY MOBILITY                                                          H

D. USE PAGE 2 FOR NARRATIVE REQUIRED

| | | |
|---|---|---|
| TOTAL HIGH RISK= | 21 |
| TOTAL INT RISK = | 8 |
| TOTAL LOW RISK = | 5 |
| TOTAL NO RISK = | 2 |
| TOTAL UNABLE = | 0 |
| TOTAL NOT APPLI= | 1 |
| OVERALL SEVERITY | H |
| OVERALL RISK | IN |

PR WORKER _____  DATE _____  DR WORKER *Donna Boynron* 10·26·94  DATE _____

PI SERVISOR _____  DATE _____  DR SUPERVISOR _____  DATE _____

SOC. SER. CO-ORDINATOR _____  DATE: _____

School Problems    YES X   NO ____        Drug & Alcohol Issues   YES X   NO ____        YES    NO
Teen-age Programs

FELL-00002034

# EXHIBIT 194

W-C

LCPR-8

| 1. ZONE C-6 | ☒ ADULT ☐ JUVENILE | ARREST REPORT | WILKES-BARRE POLICE DEPARTMENT | 2. IRC A1295'46 |
|---|---|---|---|---|

**OFFENSE**

3. CHARGE WARRANTS FOR PUBLIC DRUNKNESS

DATE CHARGED 10/18/84

4. OFFENSE DATE 10/18/99

5. ARRESTING OFFICER'S NAME CASELLA - RODRIGUEZ

BADGE NUMBER 339-540

6. OTHER CHARGES

7. LOCATION OF ARREST **REDACTED - FELL**

ONT — OFFENSE TRACKING NUMBER

8. WHEN ARRESTED 1/12/85 2019

9. TYPE OF ARREST ☐ ON VIEW ☒ WARRANT ☐ SUSPICION

10. NAME OF ACCUSED JOHN Amos RHODES

11. AGE 63

12. RACE W

13. SEX m

14. ADDRESS **REDACTED - FELL**

15. ALIAS/NICKNAME

16. TELEPHONE

17. OCCUPATION RETIRED

18. PLACE OF EMPLOYMENT/SCHOOL

19. DATE OF BIRTH **REDACTED - FELL** /30

20. PLACE OF BIRTH W-B PA

**ACCUSED**

21. HEIGHT 5'9½"

22. WEIGHT 145

23. EYES Brown

24. HAIR Brown

25. BLOOD TYPE

26. MARKS, SCARS, TATTOOS

27. COMPLEXION

28. SSN **REDACTED - FELL**

29. FBI NO.

30. SID NO.

31. PDID NO.

32. MILITARY NO.

33. VETERANS CLAIM NO.

34. OPERATOR PERMIT NO.

35. FINGERPRINT CLASSIFICATION

36. PHOTO TAKEN ☐ YES ☐ NO

NUMBER

37. FINGERPRINT CARD TO ☐ FBI ☐ PSP

38. INDICATION OF DRUGS: ☐ YES ☒ NO   ALCOHOL: ☒ YES ☐ NO

39. DEFENDANT ARMED ☐ YES ☐ NO

TYPE WEAPON(S)

40. ARTICLES CONFISCATED FROM DEFENDANT

41. PERSONAL ARTICLES RECEIPT GIVEN ☐ YES ☐ NO

NUMBER

**VEH**

42. DEFENDANT VEHICLE IDENTIFICATION

| YEAR | MAKE | MODEL | LICENSE NO./ST |
|---|---|---|---|

DEFENDANT FAMILY CODE FOR BLOCKS 43 – 46
F – FATHER   W – WIFE   B – BROTHER   S – SON
M – MOTHER   S – SISTER   D – DAUGHTER

**FAMILY**

| 43 | NAME | ADDRESS | PHONE (RESIDENCE/OFFICE) |
|---|---|---|---|
| 44. | | | |
| 45. | | | |
| 46. | | | |

**ACC**

47. NAME/ALIAS/NICKNAME OF ACCOMPLICE

48. ADDRESS

49. NAME/ALIAS/NICKNAME OF ACCOMPLICE

50. ADDRESS

**STAT ATT**

51. ATTORNEY NAME

TELEPHONE NO.

52. RIGHTS READ ☐ YES ☐ NO

BY WHOM

53. STATUS OF DEFENDANT ☐ DETAINED AT _____ ☐ RELEASED ☐ PERSONAL BOND
☐ MONEY BOND – AMOUNT $ _____ ☐ PROPERTY BOND ☐ TURNED OVER TO

**NARRATIVE**

ITEM NO.

54. CONTINUATION OF ABOVE ITEMS (INDICATE ADDITIONAL INFORMATION.)

DEF PLACED IN LOCKUP   NO ONE TO PICK HIM UP.
AT 2019 HRS OFFICERS DETAILED TO 32 E. CHESTNUT ST ON A 10-8 CALL. UPON
ARRIVAL SUBJECT WAS OUTSIDE LOCATION. WARRANT CHECK FOUND 2 FOR SUBJECT.

**CHARGE INFORMATION**

55. ADJUDICATION DATE AND TIME: ___/___/___ MO. DA. YR. HOURS

| 56. CHARGE | 56A. OTN | 57. MAGISTRATE/DISTRICT COURT | 58. DATE | 59. FINAL DISPOSITION |
|---|---|---|---|---|
| 5505 | | 11-1-2 | | |
| 5505 | | 11-1-2 | | |
| | | | | |
| | | | | |

**CONTROL**

60. COMM. CENTER WANT/WARRANT INQUIRY ☐ YES ☐ NO ☐ CANCEL ___/___/___ MO. DA. YR. HOURS

WARRANT NO.

61. DISTRIBUTION ☐ CHIEF ☐ DETECTIVE ☐ JUVENILE ☐ NARCOTICS ☐ OTHER

62. ARRESTING OFFICER SIGNATURE E. Casella · A Rodriguez 339/540 1/12/85 MO. DA. YR.

63. REVIEWING OFFICER SIGNATURE 1/12/85 MO. DA. YR.

FELL-00002035

# EXHIBIT 195

## COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LUZERNE

To any authorized person:

In the name of the Commonwealth of Pennsylvania, you are commanded to take into custody DOB: REDACTED - 30 M
(Name):    RHODES, JOHN A
(Address):  **REDACTED - FELL**
WILKES-BARRE, PA 18705

If the defendant be found in said Commonwealth, and bring the defendant before us at  MARTIN R. KANE
(Address):   150 S. PENNSYLVANIA AVE.
WILKES-BARRE, PA 18701-3399

to answer the Commonwealth or WILKES BARRE CITY
                                        (Political Subdivision)
upon the complaint or citation of FEIBUS, RONALD
charging the defendant with 18 §5505 $$
PUBLIC DRUNKENNESS
and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.

Witness the hand and official seal of the issuing authority on this

_____ day of ____Feb____, 19 __

SEAL    _____
                    (Signature)

Magisterial District No.: 11-1-02

Citation No.:  A600792
   FILED:   1/04/94
Docket No.:  NT-0000035-94

Amount needed to satisfy collateral: $    170.00

OPC 417-91     COPY : SHERIFF/CONSTABLE

Amount required to satisfy sentence:
Fine: $
Costs:$
Other:$
Total: $

---

### RETURN WHERE DEFENDANT IS FOUND

By authority of this warrant
_12 JAN_ , 19 _95_

☒ I took into custody the within named
_____

☐ He is now at liberty on bail posted before_____
_____

☐ in the_____
_____ jail.

☐ before you for disposition.
☐ I accepted a guilty plea and collected
$_____
for fine and costs.

☐ I accepted a not guilty plea and collected $_____
for collateral.

☐ I accepted the fine and costs due in the amount of
$_____

_____
(Signature of Officer - Name & Title)

### RETURN WHERE DEFENDANT IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

## WARRANT OF ARREST

WARRANT CONTROL NO.:
4673015

DOCKET NUMBER:
NT-0000035-94

**COMMONWEALTH OF PENNSYLVANIA**

VS

RHODES, JOHN A.

OFFENSE DATE    1/03/94
CHARGE

**18 §5505 $$**

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs stated in the warrant in the amount of

$ _____

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral for my appearance at trial stated in the warrant in the amount of

$ _____

_____
(Defendant's Signature)

Officer's costs:
Warrant              _____
Miles @       ¢      _____
Commitments          _____
Miles @       ¢      _____
Conveying to hearing _____
Miles @       ¢      _____
        Total        _____

FELL-00002036

# EXHIBIT 196



# COMMONWEALTH OF PENNSYLVANIA

## COUNTY OF LUZERNE

To any authorized person:

In the name of the Commonwealth of Pennsylvania, you are commanded to take into custody DOB: REDACTED /30 M
(Name): RHODES, JOHN A.
(Address): REDACTED - FELL
WILKES-BARRE, PA

If the defendant be found in said Commonwealth, and bring the defendant before us at MARTIN R. KANE
(Address): REDACTED - FELL
WILKES-BARRE, PA 18701-3399

to answer the Commonwealth or __WILKES BARRE CITY__
(Political Subdivision)
upon the complaint or citation of SIMONETTI, ROBERT
charging the defendant with 18 §5505 §§
PUBLIC DRUNKENNESS
and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.
Witness the hand and official seal of the issuing authority on this

_____ day of _____, 19 ___.

**SEAL** _____
(Signature)

Magisterial District No.: 11-1-02

Citation No.: A630119
 FILED: 10/20/94
Docket No.: NT-0001259-94

Amount required to satisfy sentence:
Fine: $
Costs:$
Other:$
Total: $

Amount needed to satisfy collateral: $  171.00

AOPC 417-91      COPY : SHERIFF/CONSTABLE

---

## RETURN WHERE DEFENDANT IS FOUND

By authority of this warrant
__ 2  Jan __, 19 9__
☑ I took into custody the within named
_____

☐ He is now at liberty on bail posted before_____
_____

☐ in the_____
_____ jail.

☐ before you for disposition.
☐ I accepted a guilty plea and collected
$_____
for fine and costs.

☐ I accepted a not guilty plea and collected $_____
for collateral.

☐ I accepted the fine and costs due in the amount of
$_____

E Casella - a Rodriguez  338/540
(Signature of Officer - Name & Title)

## RETURN WHERE DEFENDANT IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

# WARRANT OF ARREST

WARRANT CONTROL NO.:
6221790

DOCKET NUMBER:
NT-0001259-94

COMMONWEALTH
OF
PENNSYLVANIA

VS

RHODES, JOHN A.

OFFENSE DATE    10/18/94

CHARGE

18 §5505 §§

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral for my appearance at trial stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

Officer's costs:
Warrant           _____
Miles @      ¢    _____
Commitments       _____
Miles @      ¢    _____
Conveying to hearing_____
Miles @      ¢    _____
     Total        _____

FELL-00002037

# EXHIBIT 197

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: 7/95

WORKER: Boysen

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 7/7/95

Location: PC

Who Seen: PC

Ken McCurdy
St Michael's

1. )

Ken called to report

2. ) some problems Donnie is having. He is paling around w/ Bob[redacted] — took off from work group and went to get drinks on their own

Donnie stayed for detention on Thurs, went to school instead of work

Is in school today.

If he continues to get in trouble, he will lose his job. Also, Ken thinks he's been smoking on campus.

FELL-00002038

7/7/95
PC. 11:30AM
Jacqui Sharp

Not available

7/7/95
Fell/SHARP Home
Teri Fell
JACKIE SHARP

Home visit - Donald
wasn't home yet from
St Mikels.

■■ reports she misses Tom. She's
mad at Aunt Jackie and blames her
for Tom leaving them. I tried to
explain to Teri why her aunt
needs her support rather than anger.
I advised Jackie and Teri that Teri
needs to return to CSC, as Jackie reported
and Teri confirmed, she had thoughts of
hurting herself.
    I also tried to explain to ■■
why I cannot arrange visitations for her
w/Tom, as he is not a relative.
    Finally, I reviewed w/Jackie concerns
Ken McCurdy had shared about Donnie's behavior in day

FELL-00002039

# EXHIBIT 198



# THE COURT ADVOCATE PROGRAM

### of Luzerne County

A Program of Catholic Social Services

September 16, 1996

Mr. Robert Roman, Supervisor
Luzerne County Juvenile Probation Department
280 North River Street
Wilkes-Barre, Pa. 18702

RE: Donald Fell
D.O.B.: 4-30-80
REDACTED - FELL -7294

Dear Mr. Roman:

Consistent with your request, an evaluation to determine the existence of a drug and/or alcohol issue and recommendations was completed on Donald Fell on September 11, 1996. Diagnostic tools utilized in this evaluation consisted of administration of the Western Personality Inventory (WPI) and Alcohol Use Profile (AUP), a Psychosocial Assessment supplied by Donald, and an Adolescent Problem Severity Index (APSI).

Donald reported his first experience with alcohol occurred at age eight. He reported drinking beer from a tap when serving beer to adults in his home. Donald reported regular use of alcohol began at age thirteen. Donald stated he consumed one twelve pack of beer daily and one-fifth of rum on weekends for one and one-half years. Donald reported he also drank unknown amounts of alcohol on a binge basis during this time period. Donald reported achieving intoxicated states during each drinking episode. Donald reported his last use of alcohol occurred in April 1994.

Donald reported he began to use THC (Marijuana) at age thirteen on a daily basis. Donald reported unknown amounts of THC smoked daily and binge use of THC on weekends. Donald stated he did not use THC from April, 1994 to August, 1995 due to an out of home placement. However, Donald admitted he returned to almost daily and weekend usage of THC since the winter of 1995. Donald reported he has noticed a significant decrease in the amount of THC currently smoked when compared to the amount smoked prior to April, 1995. Donald was unable to give specific amounts of THC used. Donald reported his last use of THC occurred on July 4, 1996.

33 East Northampton St., Wilkes-Barre, PA 18701-2484
(717) 829-3489 • FAX (717) 829-7781

 

ACCREDITED

FELL-00002040

Mr. Robert Roman                         September 16, 1996
RE: Donald Fell                          Page 2

Donald reported he experimented two times with LSD at age thirteen. He denied further use of this drug.

Scores on the WPI correlate with those who are prone to abuse alcohol. Scores on the AUP revealed a profile associated with alcoholism-denied.

From the information collected from Donald, it is apparent he has a current THC abuse problem. He may also have a current alcohol abuse problem although he has denied use of alcohol since April, 1994. It is my opinion, Donald is minimizing his use of alcohol and THC.

It is recommended Donald be drug tested by the Juvenile Probation Department on a random basis and participate in drug/alcohol counseling at the Court Advocate Program with continued monitoring for inpatient drug/alcohol treatment.

I hope this information is helpful.

                         Sincerely,

                         Lisa M. Randazzo
                         Drug/Alcohol Treatment Specialist
                         Court Advocate Program

LMR/dp
cc: Frank Andrukiewicz

FELL-00002041

# EXHIBIT 199

Affidavits Submitted in Support of
Motion in Limine to Exclude Expert Testimony
Regarding the PCL-R and HCR-20 Risk Assessment Instruments
and the Diagnosis of Psychopathy,
in *U.S. v. Willis Haynes*, May 24, 2000

1

FELL-00002042

AFFIDAVIT OF STEPHEN D. HART

I, Dr. Stephen David Hart, do declare the following:

1. I am an Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada, where I teach, conduct research, and supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

2. I obtained a doctoral degree in clinical and forensic psychology from the University of British Columbia in Vancouver, British Columbia, Canada, a graduate training program accredited by the American and Canadian Psychological Associations, where my studies focused on the assessment of psychopathy and my clinical training included supervised practice in the assessment and treatment of violent offenders.

3. I have written more than 150 books, chapters, and peer-reviewed articles in the area of forensic psychology and, more specifically, assessment of psychopathy and violence risk; presented more than 150 papers at academic and professional meetings on the same topics; and have co-authored psychological test and assessment procedures for assessing psychopathy and violence risk.

4. I am professionally active in the field of forensic psychology being, *inter alia*, a member of the executive committee of the American Psychology-Law Society (Division 41 of the American Psychological Association); a member of the editorial boards of academic journals, including *Law and Human Behavior* and *Legal and Criminological Psychology*; and a reviewer of articles submitted to academic journals and applications for funding submitted to granting agencies in Canada and the United States.

5. I have conducted more than 100 training workshops for legal, law enforcement, correctional, and forensic mental health agencies in the United States (including the U.S. Federal Bureau of Prisons, the U.S. Army, and the U.S. Navy), Canada (including the Correctional Service of Canada and the Royal Canadian Mounted Police), and the United Kingdom (including Her Majesty's Prison Service and the Scottish Prison Service), as well as in Sweden, Norway, Germany, and New Zealand.

6. I have testified as an expert witness concerning the topic of forensic psychology and, specifically, assessment of violence risk before courts, hearings, and tribunals in the Canadian provinces of British Columbia, Alberta, Manitoba, and Ontario; in the states of Florida, Washington, and Wisconsin; and before the Canadian Parliament.

7. I worked with Prof. Robert Hare, first as a student and later as a colleague, on the development and validation of the Hare Psychopathy Checklist-Revised (PCL-R), a psychological test for the assessment of psychopathic personality disorder; and I have conducted numerous training workshops on the use of the PCL-R, often with Prof. Hare.

2

FELL-00002043

8.    I worked with Prof. Christopher Webster, Dr. Derek Eaves, and Mr. Kevin Douglas on the development and validation of the HCR-20, a set of structured professional guidelines for the assessment of violence risk; and I have conducted numerous training workshops on the use of the HCR-20, often with Prof. Webster.

9.    The PCL-R, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the test manual allows that the PCL-R can be administered on the basis of case history information if that information is sufficiently detailed.

10.    Research indicates that PCL-R Total scores are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the North America.

11.    Research indicates that PCL-R Total scores are reliable when assessed in many populations; but to date only one published, peer-reviewed study has examined systematically the reliability of PCL-R scores in African-American correctional offenders in the United States. The results of that study were ambiguous, suggesting the need for further research on the reliability and applicability of the PCL-R in this context.

12.    Research indicates that PCL-R Total scores are correlated violence when scored on the basis of case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items 1, 2, 6, 7, 8, 13, and 16).

13.    The HCR-20, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the manual allows that the HCR-20 can be administered on the basis of case history information if that information is sufficiently detailed.

14.    A limited body of scientific research indicates that HCR-20 ratings are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of HCR-20 ratings with respect to institutional violence in correctional offenders in the United States.

15.    A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in correctional offenders in the United States.

16.    A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in African-American individuals.

3

17. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence when based on case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of HCR-20 scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items C1 through C5 and R1 through R5).

18. It is my opinion, which I hold with a reasonable degree of scientific certainty, that there is no direct scientific evidence that the PCL-R and HCR-20 are predictive of institutional violence in correctional offenders in the United States; and that the PCL-R and HCR-20 are not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Stephen D. Hart, Ph.D.
19 May 2000

4

FELL-00002045

Affidavit of Kirk Heilbrun

I, Kirk Heilbrun, state as follows:

1. I am currently Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. I am also Co-Director of the Law-Psychology Program, joint program in the Department of Clinical and Health Psychology at MCP Hahnemann and Villanova School of Law. I hold a Ph.D in Clinical Psychology from the University of Texas at Austin (1980), and completed a Postdoctoral Fellowship in Psychology and Law at Florida State University (1981-82). I am a Diplomate in Clinical Psychology and in Forensic Psychology, American Board of Professional Psychology.

2. I currently serve as a Violence Risk Assessment Consultant to the New Jersey Department of Human Services, Division of Mental Health Services and to the Pillsbury Corporation and the Giant Food Corporation as a Fitness for Duty Assessment consultant. I serve on the Advisory Board to the Forensic Psychology Program of the Federal Bureau of Investigation, and have previously served as a grant reviewer for the Office of Victims of Crimes for the United States Department of Justice. Between 1991 and 1993, I was the Clinical Director of Forensic Services for Central State Hospital in Florida, and prior to that was staff psychologist and later Chief Psychologist in the Forensic Service, Florida State Hospital.

3. Since 1981, I have presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. These have included invited lectures and presentations to the United States Department of Justice, the Federal Bureau of Prisons, the U.S. Medical Center for Federal Prisoners, the American Academy of Forensic Psychology, and the Forensic Services Unit of the Cook County Circuit Court. I have been the

5

FELL-00002046

principal investigator or co-principal investigator on several grants to conduct research on risk assessment and criminal recidivism.

4. I have published extensively in the leading journals in my field on risk assessment and criminal behavior. These publications include more than 40 peer reviewed articles, five book chapters, and eight technical manuals. I am currently on the editorial boards of Law and Human Behavior, Journal of Threat Assessment, Criminal Justice and Behavior, Correctional Mental Health Report and the Journal of Behavioral Health Services and Research, and am an ad hoc reviewer for numerous additional journals.

5. Risk assessment and risk management have been a primary focus of my work since completion of my doctorate in 1980.

6. As a result of my extensive work in the field of risk assessment, I am familiar with the use of Psychopathy Checklist - Revised (PCL-R), having used it as a research instrument and in some applied clinical settings and forensic contexts with adults. I have administered the PCL-R and supervised its use in research. I am familiar with the published literature on the PCL-R and other risk assessment tools. Additionally, I have personal expertise in risk assessment and in the evaluation of reliability and validity as it relates to assessment instruments such as the PCL-R. I believe that the PCL-R can be a useful too with which to assess the risk of future violent and nonviolent criminal behavior when used in the proper context and for the proper purposes.

7. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual=s score on the instrument is related to the likelihood that this individual will commit acts of violence or

6

FELL-00002047

aggression while in a secure prison environment. This is particularly true for prison settings that are the most structured and restrictive (the highest level of security). While it is certainly possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, very few studies have addressed the institutional adjustment of *any* population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) according to PCL-R score, let alone the specific population from the immediate case (death-sentenced or life-sentenced inmates) in the particular environment in which the defendant will be incarcerated (a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer reviewed literature to assess the instrument=s predictive capacity in a prison setting, the PCL-R should not be used to judge an individual=s risk of future violence in such a prison setting.

8. Although the predictive accuracy of the PCL-R has been studied in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Those studies do not allow us to reach any conclusions about the predictive validity of the PCL-R in the secure correctional institution setting because it is expected that a) civil and forensic psychiatric patients and convicted prisoners are dissimilar in significant ways, b) the treatment and psychiatric intervention needs of psychiatric patients are different than for prisoners, and c) the highly structured environment of prison is different in certain respects from even a structured forensic psychiatric hospital. Research based on psychiatric and community samples are substantially different from incarcerated samples, with whom little research has been focused on institutional adjustment. At this time, there is insufficient research to make

7

FELL-00002048

generalizations from community behavior to prison behavior, and from psychiatric to life or death-sentenced correctional populations.

9. In any event, even the research conducted upon a secured psychiatric population suggests that the PCL-R may not be a strong predictor of institutional violence. I am the lead author on a study that examined how well the PCL-R predicted aggression in a mentally disordered offender population while in a forensic hospital (see, Kirk Heilbrun, Stephen Hart, Robert Hare, David Gustafson, Catherine Nunez and Adam White (1998) AInpatient and postdischarge aggression in mentally disordered offenders@ Journal of Interpersonal Violence 13(4) 514-27). We measured the PCL-R=s predictive validity during the first two months and the last two months of secure forensic hospitalization. The PCL-R failed to predict aggressive behavior for the last two months of custody, as PCL-R scores were not significantly correlated with aggression during these final two months. The PCL-R had a statistically significant but modest-sized correlation with physical aggression during the first two months of custody. That correlation coefficient was .14, meaning that the PCL-R was accounting for approximately 2% of the variance in observed aggression. One conclusion of the study was that the PCL-R was not a consistent predictor of institutional behavior, ranging from a modest association with aggression early in hospitalization to no association with aggression later in hospitalization. Any attempt to use the PCL-R to predict institutional aggression, therefore, would have resulted in a substantial rate of error. It should be added that none of the aggression observed in this study resulted in the death or serious injury of another individual.

8

FELL-00002049

10. While this study does not provide evidence about behavior in a prison setting, and should not be generalized to do so, it does provide some information concerning the overall predictive power of the PCL-R in a setting more similar to prison than in previous studies, which have followed individuals after they have been released into the community. Such research could be done, but has not, in a maximum security prison setting to determine the predictive validity of the PCL-R in relation to institutional violence by incarcerated life- or death-sentenced offenders. At this time, the PCL-R has not been tested and evaluated in this context.

11. There is also limited research at present using the PCL-R with African Americans or youth. Insufficient research has been performed to date to determine whether the meaning of PCL-R scores are comparable when the PCL is administered to African Americans.

12. Similarly, insufficient research has been done to determine whether the instrument is reliable and valid when used with a youthful or adolescent population. We do not currently know whether an adolescent who scores high on the PCL-R at the age 16 will persist in aggressive behavior beyond the late teens or early 20s. We do not yet have data to discriminate between Alife course persistent@ vs. Adesistent@ youth with respect to aggression; both may score high on the PCL when administered at the ages of 15 or 16, and the score may fail to discriminate between those who will persist and those who desist in aggression later in life. In addition, not all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end

9

FELL-00002050

of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult Acore personality structure@ has been formed.

13. Absent such research, we cannot assume that the instrument possesses similar predictive validity when administered to African Americans or youths as it does with adult white males.

14. The PCL-R is a useful tool when used with a population and in a context in which it has been validated. Research conducted in non-prison settings cannot be generalized to the prison setting, and currently, there is insufficient scientific research to validly apply the PCL-R toward assessing future violence risk in a highly structured prison environment. Until sufficient research has been conducted with the PCL-R with this population and for this purpose, the scientifically sound conclusion is that it should not be used in this way.

15. The HCR-20, which is a risk assessment instrument that incorporates the PCL-R score as one of its items is a promising but new tool. Only in the past 1-2 years have studies begun to be published in the scientific literature. At this time, insufficient validation and research has been completed on the HCR-20 to determine its predictive power. Use of the HCR-20 at present to predict violent behavior in a correctional setting would result in all the problems discussed in relation to the PCL-R (in the context of correctional populations and sentencing). As with the PCL-R, the HCR-20 should not presently be used to assessing future violence risk in a highly structured prison environment until that research has been conducted, peer reviewed, and published.

10

FELL-00002051

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____          _____
Kirk Heilbrun                              Date

11

FELL-00002052

Affidavit of Norman Poythress

I, Norman Poythress, state as follows:

1. I am currently a professor in the Department of Mental Health Law and Policy at the University of South Florida, where I teach forensic assessment (psychological evaluations for legal contexts) and conduct research on a variety of law-and-psychology issues.

2. I hold a Ph.D in clinical psychology from the University of Texas at Austin (1977) and am currently licensed to practice psychology in Florida. I have previously been licensed in Michigan and Alabama. I am a fellow of the American Psychological Association (APA) and past-president of the American Psychology-Law Society (Division 41 of APA).

3. I have published more than 50 book chapters and articles in peer-reviewed journals, most on psychology-and-law issues. I am a co-author of Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (1997), which is widely recognized as a leading resource on issues relating to psychological evaluations in the courts. I have served as faculty on risk assessment and risk management workshops for both clinical and legal (FBI, Secret Service) audiences and have served as a consultant to the Secret Service on issues related to risk management of persons who threaten government officials under their protection.

4. Prior to my academic career at the University of South Florida (1990-present) I worked as a forensic psychologist in maximum security forensic psychiatric hospitals (Center for Forensic Psychiatry, Ann Arbor, MI; Taylor Hardin Secure Medical Facility, Tuscaloosa, AL). In these settings my primary clinical duties were to conduct forensic psychological evaluations for the state courts on issues such as competence-to-proceed, insanity defense, and sentencing (including, in Alabama, capital sentencing). I have testified as an expert witness in state courts

12

FELL-00002053

in Michigan, Florida, Alabama, and New Mexico, and before the House Armed Services Committee of the U.S. Congress regarding the U.S.S. Iowa incident.

5. Only very limited research is available that investigates the utility of the Psychopathy Checklist - Revised (PCL-R) in correctional settings for assessing the risk of violence posed by an individual while in custody. There is no such research available on individuals sentenced to life terms in federal prisons in the United States.

6. Error rates for the PCL-R, including false positive rates (the number of people who test high on the PCL-R and do not act aggressively), have not been established for estimates of risk for institutional violence for prison inmates. In order to assess these error rates, prospective studies which followed people sentenced to sufficiently long terms in custody need to be conducted. As a result of the lack of research, the predictive validity of a high score on the PCL-R in this context is unknown.

13

FELL-00002054

7. In a study which I co-authored, we administered the PCL-R to a group of youthful offenders in Florida and retrospectively assessed in-custody aggressive behavior [John Edens, Norman Poythress and Scott Lilienfeld (1999) *Identifying Inmates at Risk for Disciplinary Infractions: A Comparison of Two Measures of Psychopathy*, Behavioral Sciences and the Law 17:435-43]. We found a relatively low statistical association between PCL-R scores and institutional violence during the first year of incarceration, and we concluded that the PCL-R has only limited utility for purposes of individual classification. As our study is one of the few to assess in-custody behavior, albeit using a retrospective methodology, and given our findings, it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores.

8. I know of no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness of persons serving a life sentence in a federal prison. In my opinion, the conclusions reached by Cunningham and Reidy in their recent review article [Mark D. Cunningham and Thomas J. Reidy (1998), *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, Behavioral Sciences and the Law: 16, 333-351] fairly represent the state of the field:

AIn summary, there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. Although some promising trends are apparent, estimations of the institutional assaultive potential of psychopaths remain tentative, particularly as a few studies cite no differences according to psychopathy

14

FELL-00002055

ratings.  Until a better research base develops caution should be exercised in utilizing the

PCL-R in forecasting the likelihood of future serious prison violence@ (p. 343).

I hereby declare under penalty of perjury that the foregoing is true and correct.


_____          _____
Norman Poythress                                    Date

15

FELL-00002056

## AFFIDAVIT OF JOHN F. EDENS

1.    I, John F. Edens, Ph.D., am a licensed clinical psychologist in the state of Texas (license number 3-1105) and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

I have conducted research on the area of risk assessment since 1997 and have published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

I also occasionally conduct risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas. These evaluations by statute require an assessment of psychopathy. When conducting these assessments I administer the Psychopathy Checklist-Revised (PCL-R).

2.    I am familiar with the PCL-R, having used it in both clinical and research settings. Being familiar with the literature on it and having published original research related to its use, I believe it is an appropriate risk assessment instrument that can be helpful in making judgments regarding future violence in certain instances in which there is sufficient scientific support to justify its use.

3.    At this time, however, there are relatively few studies examining the utility of the PCL-R in estimating the likelihood or risk for aggressive acts of incarcerated people. Those studies that have been conducted among inmates suggest an inconsistent association (e.g., some studies showing a weak to moderate relationship and others showing no significant relationship) between being identified as a "psychopath" (i.e., PCL-R score $\geq 30$) and engaging in higher rates of various forms of prison violence. I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates with life sentences who are kept in 23-hour per day lock-down facilities.

4.    In my own study of a multi-cultural (54% African American, 32% Caucasian, 12% Hispanic) sample of 50 youthful offender prison inmates incarcerated in Florida (Edens, Poythress, & Lilienfeld, 1999), which is one of the few to use the PCL-R to assess in-custody infractions, my colleagues and I found a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration. More specifically, we found that 5 of the 10 (50%) PCL-R-identified psychopaths committed some form of violent act that was judged by staff to warrant a disciplinary report. Of the 40 inmates whose PCL-R score was below 30 (i.e., "non-psychopaths"), 18 (45%) committed a violent infraction during this same time period. Notably, our study, as well as most others that have examined institutional misbehavior among psychopaths, was a postdictive (rather than predictive) design, in that we used PCL-R scores in an attempt to

16

FELL-00002057

predict behavior that had already occurred, rather than predict future behavior. Whether it would have performed similarly in terms of predicting inmates' subsequent violent acts is unknown.

5.    In conclusion, I have significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated.

I declare under penalty of perjury that the foregoing is true and correct.


_____          5/22/00
John F. Edens, Ph.D                    Date


17

FELL-00002058

## AFFIDAVIT OF DONALD N. BERSOFF

I, Donald N. Bersoff, Ph.D., J.D., state that:

1.      I am a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School. I have served in those capacities since January 1990.

2.      As a faculty member in the above universities, I direct a J.D./Ph.D. Program in Law & Psychology jointly sponsored by both institutions.

3.      I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

4.      I have been a full member of the American Psychological Association (APA) since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and am a Fellow of that group.

5.      I have been a faculty member at several universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and the Ohio State University.

6.      From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee and conducted all appeal hearings from decisions of the Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the current APA Code of Conduct (Code of Ethics) in 1992. From 1994-1997 I served on APA's 11-member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics

18

FELL-00002059

Committee that led to expulsion or a stipulated resignation of APA members. I currently serve again on the Council of Representatives (1999-2001) and served as chair of the APA's Policy and Planning Board (1999-2000).

7.    I am the author of Ethical Conflicts in Psychology, originally published by APA in 1995, and subsequently published in a second edition in 1999. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

8.    In all, I have published four texts, 25 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of those publications and presentations concern ethical, legal, and policy issues in psychology. Most particularly, I have written and presented on the use and misuse of social science evidence in the legal system. In March 2000, I served as chair of a symposium on the impact of Daubert v. Merrell Dow Pharmaceutical Co. on the admissibility of social science evidence and presented a paper on that topic at the biennial meeting of the American Psychology-Law Society. In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges on The Application of Daubert to Forensic and Social Science Evidence in Denver, Colorado. In March and April 1996 I presented papers on the admissibility of expert psychological testimony at the Sixth Annual National Symposium on Mental Health and the Law and at American Psychology-Law Society, respectively. I am currently drafting a law review article entitled, The Admissibility of Forensic and Social Science Evidence from Daubert to Kumho: A Quantitative and Qualitative Analysis. I have been selected to moderate an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute

19

FELL-00002060

of Justice, the Criminal Justice Section of the ABA, the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an amicus curiae brief in the original Daubert case before the U.S. Supreme Court in 1993.

9.    I have been retained, on a pro bono basis, by counsel for Defendant in the instant case for the purpose of advising this court regarding the validity of the conclusion drawn by Thomas V. Ryan, Ph.D. that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary," based on the Psychopathy Check List Revised (PCL-R) and the HCR-20. Ryan, Capital Sentencing Evaluation, May 12, 2000, at 7.

10.   For the purposes of this affidavit, I have reviewed Dr. Ryan's Capital Sentencing Evaluation ("Evaluation") of the instant defendant, and the affidavits of Kirk Heilbrun, Ph.D., Stephen D. Hart, Ph.D., Norman Poythress, Ph.D., and John F. Edens, Ph.D. in this case.

11.   Dr. Ryan's psychological evaluation of the defendant, a 22 year old African-American male, consisted solely of administration of the PCL-R, the HCR-20, and Dr. Ryan's assessment of a variety of historical and demographic factors deemed to be associated with violence recidivism. In arriving at his opinion, he also relied on materials supplied by county, state and federal agencies, including audio and videotapes. He never personally saw, interviewed, nor tested the defendant. Nevertheless, Dr. Ryan asserted "that the impact of not personally examining Mr. Haynes resulted in essentially no limitations regarding conclusions rendered." Evaluation at 2.

12.   Dr. Ryan makes three other statements that are relevant herein. First, he concludes that the defendant exhibits psychopathic features and asserts, "There is a plethora of empirical studies which

20

FELL-00002061

demonstrate that individuals with psychopathic personalities are at very high risk for violence recidivism, including those who are institutionalized." Evaluation at 6. Second, based on the HCR-20, Dr. Ryan concludes the defendant is "at the high range regarding final risk judgement." Evaluation at 6. Finally, his ultimate conclusion is that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary." Evaluation at 7.

13.   Based on my knowledge of the American Psychological Association's Code of Ethics[1] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[2] ("Specialty Guidelines"), the Heilbrun, Hart, Pothress, and Edens affidavits, and my research on the application of Daubert to forensic psychological testimony, it is my opinion, to a reasonable certainty, that the opinions of Dr. Ryan, quoted above, do not represent an appropriate application of generally accepted ethical principles to the issues presented and violate the generally accepted standards of forensic psychological practice.

14.   One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that empirically-supported and generally accepted scientific conclusions are presented to the court. Forensic experts recognize that their credentials and testimony may have a profound impact on jury decisionmaking and, therefore, have a responsibility to confirm that their opinions are firmly grounded in science and that any inferences they draw from science are generally supported.

---

[1]    APA, Ethical Principles of Psychologists and Code of Conduct, 47 **Amer. Psychologist** 1597 (1992).

[2]    Committee on Ethical Guidelines for Forensic Psychologists, 15 **L. & Hum. Behav.** 655 (1991).

FELL-00002062

15.   Dr. Ryan first states that a plethora of empirical studies demonstrates that institutionalized psychopaths are at a very high risk of recidivism for violent conduct.  That statement is misleading because it implies that the studies referred to involved criminal offenders in correctional institutions. In fact, there are many kinds of institutionalized populations, including those with mental disabilities who are civilly committed and those who are in forensic criminal institutions.  Based on the affidavits of Drs. Hart, Heilbrun, and Edens, there are no published, peer-reviewed studies examining the predictive validity of the PCL-R or the HCR-20 with respect to institutional violence in correctional offenders in the United States.  See Hart Affidavit at paras. 10, 14, 20; Heilbrun Affidavit at paras. 7, 8, 9, 14, 15; Edens Affidavit at para. 4.

16.   Second, Dr. Ryan fails to acknowledge the fact that the defendant is a young African-American adult.  Both Drs. Hart and Heilbrun indicate that at most there is one study on the PCL-R and none on the HCR-20 evaluating the psychometric soundness (i.e., reliability) of these instruments with African-American correctional offenders, particularly youthful ones.  See Hart Affidavit, paras. 11, 15, 16; Heilbrun Affidavit, paras. 11, 12, 13, 15.  Dr. Ryan makes no mention of this fact and fails to acknowledge the resulting potential for inaccuracy in his conclusion.

17.   Third, Dr. Ryan, based solely on a subjective impression, concluded that his opinions were in no essential way limited by the fact that he did not personally examine the defendant.  This opinion is at variance with that of Dr. Hart, one of the authors of the PCL-R, that "the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores," particularly on 7 of the 20 items that rely heavily on behavioral observations and the assessment of future plans.  Hart Affidavit at para. 11.  See also para. 17 (same conclusion regarding the HCR-20). It is also at variance with at least one study indicating that administration of the PCL-R based solely

22

on file review, as here, results in higher psychopathy scores than when combined with a personal interview.[3]  Dr. Ryan fails to acknowledge this source of inaccuracy as well.

18.    Based on the evidence of Drs. Hart, Heilbrun, Poythress, and Edens that: (1) There is not a generally accepted set of published, peer-reviewed studies examining violent recidivism on the population of offenders represented by defendant (young African-American males incarcerated in secure correctional facilities); (2) there are no studies using the PCL-R or the HCR-20 that establish error rates for in-custody populations concerning predictions of violent recidivism; (3 ) the use of the PCL-R and the HCR-20 to predict institutional violence in correctional offenders in the United States is not generally accepted in the relevant scientific community; and given that many federal cases have rejected psychological evidence in situations where the tests have not been validated for the specific purposes used in litigation, where there is insufficient published literature addressing the validity of the technique used in litigation, where there is the absence of a personal evaluation of the party by the expert, or, in the alternative, where the expert relied improperly on statements by the party calling the expert, it is my opinion that the evidence represented by Dr. Ryan's evaluation is inadmissible under Daubert.

19.    Dr. Ryan's conclusions are not only inadmissible in my opinion under Daubert, but may also be at variance with accepted  professional standards.  The following provisions of the APA's Code of Ethics are relevant:

> Standard 1.06:  Psychologists rely on scientifically and professionally derived knowledge when making scientific or professional judgments . . . .

> Standard 1.15:  Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence.

---

[3]    R. C. Serin, Diagnosis of Psychopathy With and Without an Interview, 49 J. Clin. Psychology 367 (1993).

23

FELL-00002064

Standard 2.01(b):   Psychologists' assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation of their findings.

Standard 2.02:   (a)  Psychologists who . . . administer, score, interpret, or use psychological assessment techniques . . . do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of techniques.

(b)  Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these techniques provide.

Standard 2.04:   (a)  Psychologists who . . . administer, score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper application and the uses of the techniques they use.

(b)  Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c)  Psychologists attempt to identify situations in which particular . . . assessment techniques or norms may not be applicable or may require adjustment in administration or interpretation because of factors such as individuals' . . . age, race, ethnicity . . . .

Standard 2.05:   [P]sychologists . . . indicate any significant reservations they have about the accuracy of their interpretations.

Standard 3.03:   Psychologists do not make public statements that are false, deceptive [or] misleading . . . .

Standard 7.01:   Psychologists who perform forensic functions . . . base their forensic work in appropriate knowledge of and competence in the areas underlying such work, including specialized knowledge concerning special populations.

Standard 7.02:   (a)  Psychologists' forensic assessments, recommendations and reports are based on information and techniques (including personal interviews of the individual, when appropriate) sufficient to provide appropriate substantiation for their findings.

(b)     Except as noted in (c) below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

(c)     When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

24

FELL-00002065

Standard 7.04(b): Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions.

20.     Similarly, Dr. Ryan's report may be at variance with

relevant provisions of the Specialty Guidelines:

Guideline VI(A): Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional, and legal developments within their area of claimed competence.

Guideline VI(H): Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statement, opinion, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Guideline VII(A): Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will . . . avoid deception.

Guideline VII(B): Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special reponsibility for fairness and accuracy in their public statements.

Guideline VII(D): Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence . . . .

21. Only the APA ethics committee can judge whether an APA member has violated the APA's code of ethics. However, it is my opinion, to a reasonable certainty, that in rendering the conclusion that the defendant is a "relatively high risk for engaging in violence recidivism," given the dearth of data generally accepted in the relevant psychological community to support his opinion, his improper generalization of the test scores to the defendant, his failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview, and his misleading use of extant studies, Dr. Ryan acted below the professional standards of those holding themselves out as forensic psychologists.

25

I declare under the penalty of perjury that the foregoing is true and correct.

_____

Donald N. Bersoff, Ph.D., J.D.
May 24, 2000

26

FELL-00002067

# EXHIBIT 200

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY - MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE - BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON - BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

December 5, 2000

Hon. Jerome J. Niedermeier
United States Magistrate Judge
District of Vermont
P.O. Box 836
Burlington, VT 05402-0836

Re: Donald Fell and Robert Joseph Lee

Dear Judge Niedermeier:

I am waiting to hear from Charlie Tetzlaff about whether his office intend to continue to prosecute Fell and Lee for potential capital crimes. I have seen conflicting reports about which jurisdiction will handle the case. By federal statute, if there is a potential capital case, the Court must seek the advice of the Federal Public Defender about appointment of counsel.

If the case is prosecuted in the District of Vermont, I will personally seek appointment. Federal statute also encourages that capital defendants receive the assistance of two attorneys. Therefore, the Court will also need to consider the appointment of three other lawyers, if both defendants are prosecuted for capital crimes.

I have a suppression hearing later this morning. I will be around the rest of the day, if the Court needs to speak with me. If necessary, I can come to Burlington tomorrow. I am planning to come Friday, otherwise.

Sincerely,

Alex Bunin

cc: David Kirby

FELL-00002068

# EXHIBIT 201

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

| ALBANY - MAIN OFFICE | SYRACUSE - BRANCH OFFICE | BURLINGTON - BRANCH OFFICE |
|---|---|---|
| 39 NORTH PEARL STREET | 4 CLINTON EXCHANGE | 110 CHERRY STREET |
| 5TH FLOOR | 3RD FLOOR | 2ND FLOOR |
| ALBANY, NY 12207 | SYRACUSE, NY 13202 | BURLINGTON, VT 05401 |
| (518) 436-1850 | (315) 701-0080 | (802)862-6990 |
| (518) 436-1780 FAX | (315) 701-0081 FAX | (802)862-7836 FAX |

RESPOND TO ALBANY OFFICE

December 5, 2000

Mr. Charles R. Tetzlaff
United States Attorney
District of Vermont
P.O. Box 570
Burlington, VT 05402-0570

Re: Donald Fell and Robert Joseph Lee

Dear Charlie:

Please let me know as soon as possible whether your office intends to prosecute Fell and Lee. I have seen conflicting reports about what jurisdiction will handle the case. By federal statute, if there is a potential capital case, the Court must seek the advice of the Federal Public Defender about appointment of counsel.

If the case is prosecuted in the District of Vermont, I will personally seek appointment. Federal statute also encourages that capital defendants receive the assistance of two attorneys. Therefore, the Court will also need to consider the appointment of three other lawyers, if both defendants are prosecuted for capital crimes.

I have a suppression hearing later this morning. I will be around the rest of the day. If necessary, I can come to Burlington tomorrow. I am planning to come Friday, otherwise.

Sincerely,

Alex Bunin

cc: David Kirby

FELL-00002069

# EXHIBIT 202

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY - MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE - BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON - BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

December 11, 2000

Hon. J. Garvan Murtha
Chief Judge
United States District Court
P.O. Box 760
Brattleboro, VT 05302-0760

Re: USA v. Fell and Lee

Dear Judge Murtha:

Pursuant to 18 U.S.C. §3005 and the District of Vermont's CJA Plan, I am making recommendations regarding appointment of counsel in the potential capital prosecutions of Donald Fell and Robert Joseph Lee.

I recommend that my office represent Mr. Fell. Myself and Gene Primomo will be responsible for that representation. We will also have death qualified counsel from other federal defender offices assisting us.

I recommend that John Pacht and Brad Stetler represent Mr. Lee. I have discussed this choice with the Administrative Office's death penalty resource counsel, David Bruck, Kevin McNally and Richard Burr, as well as New York State Capital Defender Kevin Doyle. They agree this appointment is appropriate.

If the Court needs any further information about these recommendations, please contact me.

Respectfully,

Alex Bunin
Federal Public Defender

FELL-00002070

# EXHIBIT 203

The Rutland Herald Online -                                                    Page 1 of 2

  

# Fell makes move to avoid receiving death sentence

May 13, 2002

(from the *Front Page* section)

By ALAN J. KEAYS Herald Staff

Lawyers for accused killer Donald Fell will ask a federal judge to uphold a plea agreement that would spare his life.

U.S. Attorney General John Ashcroft decided this year to seek the death penalty against Fell, 21, rejecting a plea agreement signed by Fell's lawyers and supported by the U.S. Attorney's Office in Vermont.

The plea deal required Fell to plead guilty to charges of kidnapping with death resulting. In exchange, he would receive a life sentence with no chance for parole.

In a motion expected to be filed today, Alexander Bunin, a federal public defender representing Fell, wants to have the court dismiss Ashcroft's intention to seek the death penalty.

"The government's statements preclude the government from seeking the death penalty in this case. The government stated in the plea agreement that it sought a life sentence because of substantial mitigating evidence," the motion read.

"Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal DOJ (Department of Justice) policy to force the USA (United States Attorney) to try this case. That administrative decision has no legal effect upon the authority of this court."

U.S. Attorney for Vermont Peter Hall said Monday that he could not comment on the motion since it hadn't been filed yet. He added that any response would be made in writing to the court.

Fell is accused of kidnapping Teresca King, 53, of North Clarendon at gunpoint when she arrived at work at the Price Chopper in Rutland at 3 a.m. on Nov. 27, 2000. Fell and a co-defendant, the late Robert Lee, allegedly beat King to death just off Route 22 in Pawling, N.Y., later that morning.

The two men were fleeing Rutland after allegedly committing two other murders. They allegedly killed Fell's mother, Debra Fell, and her friend, Charles Conway, at Debra Fell's apartment in Rutland. No charges have been filed in connection with their deaths.

Lee accidentally hanged himself in his prison cell last September.

In addition to the federal kidnapping charge, Fell faces a charge of carjacking with death resulting.

Conviction on either charge could result in execution. Vermont does not have a death penalty, but since the federal government has jurisdiction in the case, the federal death penalty applies.

FELL-00002071

The Rutland Herald Online -

In October, Fell and his attorney signed a plea agreement that had been supported by the U.S. Attorney's Office in Vermont. But the deal was contingent on Ashcroft's approval.

In January, Ashcroft decided to seek the death penalty, without ever mentioning the proposed plea agreement.

In the motion to be filed today, Fell's attorneys noted that it was the U.S. Attorney's Office in Vermont who initially drafted the agreement.

"In early October 2001, the USA for Vermont contacted Fell's counsel and agreed to settle the case, subject to approval from the AG. The USA drafted a plea agreement," the motion read.

"Although a draft of the agreement was sent to counsel for review, no changes were requested and none were made. The agreement was written entirely by the USA, with no input from Fell.

On October 24, 2001, Fell and his counsel signed the plea agreement and returned it to the USA."

Prosecutors listed six mitigating factors that influenced their decision, including Fell's mental health and impaired capacity at the time of the murder, his age, lack of a substantial criminal history, his mental health history and background, his assistance in locating King's body and his remorse and acceptance of responsibility.

Several of King's family members had sent letters to Ashcroft supporting the death penalty.

Following Ashcroft's decision, the two sides met with the court on March 15. At that time, Fell's attorney said his client would plead guilty to the charges and allow U.S. District Judge William Sessions to determine the sentence.

"Both Judge Sessions and local prosecutors agreed to this procedure," the motion read. "After the meeting, the local prosecutors were told by DOJ that only DOJ could approve the waiver of a jury at sentencing. DOJ promised to consider the matter."

On May 1, Fell's attorneys received a fax from prosecutors stating that only Ashcroft could make the decision, the motion read.

"On May 9, 2002, Fell's counsel received a voice-mail message that the attorney general had denied the request," the motion said.

Now, Fell's attorneys want to have the court uphold the first plea agreement.

"Allowing the government to change positions without consequences would deny Fell due process of law," the motion read.

"The Court should hold the government to its initial position — that a life sentence is justified — and dismiss the notice of intent to seek the death penalty."

Contact Alan Keays at Alan.keays@rutlandherald.com

© 2000 Rutland Herald and Times Argus

FELL-00002072

# EXHIBIT 204

**LOCAL NEWS**    Wednesday, May 15, 2002     Print this page

More Local News    Local News Archives for:  Mon  Tue  Wed  Thu  Fri  Sat  Sun

## Government should not seek death penalty in Fell case, Bunin argues

By Emily Stone
Free Press Staff Writer

The federal government is contradicting itself by seeking the death penalty against murder suspect Donald Fell, his lawyer said in court papers filed Tuesday.

Federal Public Defender Alex Bunin asked a judge to prohibit prosecutors from arguing for the death penalty at trial. Prosecutors stated in January that they intend to ask for a death sentence.

Bunin said the government's logic is inconsistent because prosecutors last year offered Fell a plea deal that would spare his life. The deal, which would have given Fell a sentence of life in prison without a chance of parole, was at that time considered appropriate by prosecutors.



Fell, 22, has pleaded innocent to kidnapping Teresa King from a Rutland parking lot, driving her to New York and killing her in November 2000. His trial in U.S. District Court in Burlington is scheduled for September.

Prosecutors in the local U.S. Attorney's Office wrote up the proposed plea agreement, which Fell signed in October. The deal said that Fell's history of mental illness, his age and his remorse should qualify him for a life sentence instead of the death penalty.

However, the deal was never finalized. All plea agreements in potential death penalty cases must be approved by U.S. Attorney General John Ashcroft.

In January, Ashcroft turned down the plea deal in favor of pursuing the death penalty. The local prosecutors then filed papers saying the death penalty was warranted because of the brutality of the crime. This is a contradiction of the prosecutors' earlier position that life in prison would suffice, Bunin said.

He said this was the first time the attorney general has required a U.S. attorney to seek the death penalty after the local prosecutor indicated he or she wanted to settle the case. The Justice Department's rule requiring Ashcroft's personal approval of all plea deals in death penalty cases has only been in place since last year.

U.S. Attorney Peter Hall would not comment on Bunin's motion to withdraw the death penalty. Hall's office will file written comments with the court within the next two weeks. A hearing has been set for this summer.

Hall did say that these decisions are out of his office's control.

"The only person in the country who has the authority to make these decisions, finally, is the attorney general," Hall said.

Fell was accused along with his friend Robert Lee. Lee, 20, was found hanging in his cell in September. His death was ruled an accident.

The two men were also linked to the deaths of Fell's mother and her friend in Rutland. Fell has not been charged with these deaths because federal charges carry heavier penalties. King's murder is being prosecuted federally because she was brought across a state line before being killed.

Fell again offered to plead guilty in March, Bunin said. This time, Fell would have allowed the judge to set a sentence. Local prosecutors agreed to this, but stipulated again that Ashcroft had to approve the deal.

Bunin said he was told last week that Ashcroft had denied the request.

FELL-00002073

Burlington Free Press - Local Stories

"The Court should hold the government to its initial position -- that a life sentence is justified," Bunin wrote in his motion. "Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal (Department of Justice) policy to force (Hall) to try the case."
Contact Emily Stone at 660-1898 or estone@bfp.burlingtonfree- press.com.

Email this news item to:

[          ]   Send

Back to index

http://www.burlingtonfreepress.com/bfpnews/local/2000h.htm                    05/15/2002

FELL-00002074

# EXHIBIT 205

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,       )
    Plaintiff,                  )
                     )
                     )
      v.                          )    Criminal No. 2:01-CR-12
                     )
DONALD FELL,                    )
    Defendant.                  )

**FELL'S OBJECTIONS TO PUNISHMENT-RELATED QUESTIONS OR, ALTERNATIVELY,
MEMORANDUM IN SUPPORT OF REQUEST FOR APPROPRIATE PUNISHMENT-
RELATED VOIR DIRE, ATTORNEY QUESTIONING, USE OF A JURY QUESTIONNAIRE
AND FOR INDIVIDUAL, SEQUESTERED VOIR DIRE ON CERTAIN TOPICS**

## I. INTRODUCTION

Donald Fell, by counsel, submits this memorandum in order to lodge his objection to

qualifying a jury based on moral, religious, political or other views about punishment and, in the

alternative, to summarize the relevant legal principles governing voir dire in capital cases,

including the proper standards for challenges for cause and appropriate methods of questioning.

Fell also submits this memorandum to advise the Court of methods and means by which

the voir dire in the upcoming trial may be conducted lawfully, fairly, and efficiently, while

simultaneously eliciting all necessary information to discern whether potential jurors harbor any

disqualifying prejudice. Such will allow counsel to intelligently request removal of venire-

members for cause and to exercise peremptory challenges.[1]

Specifically, this memorandum proceeds from the fundamental constitutional principle

---

[1] Voir dire lays "the predicate for both the judge's and counsel's judgment about the qualifications and impartiality of potential jurors. Without an adequate foundation, counsel cannot exercise sensitive and intelligent peremptory challenges, that suitable and necessary means of ensuring that juries be in fact and in the opinion of the parties fair and impartial." *United States v. Baker*, 638 F.2d 198, 200 (10th Cir. 1980).

1

FELL-00002075

that any juror who would 1) automatically vote for the death penalty if the defendant is found guilty of intentional, aggravated murder, or who is 2) so supportive of capital punishment as to be "substantially impaired" in considering any alternative, or 3) who cannot consider and give effect to mitigating circumstances relating to the defendant or this case, must be disqualified for cause. In order to implement these concepts, we request that the scope of voir dire be defined accordingly, so as to allow inquiry and follow-up inquiry by defendant's counsel sufficient to determine whether individual jurors are (1) predisposed to give the death penalty in all or nearly all such cases (so called, but misnamed, *"automatic* death penalty," or ADP's), (2) incapable of considering and giving effect to all relevant mitigating evidence, or (3) do not think life in prison without parole is an adequate punishment for someone who intentionally kills another person in the course of multiple killings and by beating the victim to death.

Fell also asks that the Court inform each individual juror that punishment questions are required in every such case and there is absolutely no suggestion that Fell is guilty merely because such questions are asked. To this end, Fell requests that the Court employ the draft admonition tendered by defendant [attached as Exhibit "A"] and employ a jury questionnaire as will be tendered to the Court, and to permit counsel to ask certain questions of individual jurors in a location separate from other members of the panel.

II.    EXCLUSION OF JURORS WITH A REVERENCE FOR LIFE
       VIOLATES THE EXPRESS TERMS OF 18 U.S.C. §3592(a)

The federal death penalty statute pursuant to which Fell is being tried, 18 U.S.C. § 3592 (a), specifically instructs that, "in determining whether a sentence of death is to be imposed on a defendant, [the jury] shall consider *any mitigating factor*." The statute further provides that each

2

FELL-00002076

juror shall consider "other factors in the defendant's background, record, or character . . . that mitigate against imposition of the death penalty." § 3592 (a) (8).

Thus, that a juror may view human life as sacred and be inclined to believe that defendant's existence as a human being, in and of itself, is a death-trumping mitigating factor, cannot be considered a basis for disqualification under the federal death statute.

The process of "death qualification," held to be constitutionally permissible – if state law provides for it – *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985) – is neither required nor permitted under the federal death scheme. The *Witherspoon/Witt* rule is predicated on the notion that some jurors may possess death penalty views that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, *quoting Adams v. Texas*, 448 U.S. 38, 45 (1980). But *Witherspoon* does *not* provide a "ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude." *Adams*, 448 U.S. at 47-48. Congress can, and has, given the defendant more protection than the Constitution requires.

A juror who enters the box believing absolutely in the sanctity of human life as a mitigating factor will not be "prevented or substantially impair[ed]" from doing his duty under federal law. This is because under federal law, first, *anything* may be considered a mitigating factor, and second, under the federal statute a sentence of death is never required. *See* § 3592 (e). In short, the systematic removal of jurors who believe in the sanctity of human life violates the intent and the explicit directive of the statute that jurors "shall consider any mitigating factor."

*Witherspoon* and *Witt* simply permit the state to exclude jurors under certain conditions.

3

The federal statute at issue here does not mandate exclusion of anyone. Nor, like many state statutes, does it limit or channel juror consideration of mitigating evidence. A juror who believes that the defendant's human life is sacred may consider that to be mitigating factor, and regardless of what other jurors think, may give the factor decisive weight. The statute says "any" – and the word should be held to mean what it says.

This literal reading of "any" and the other statutory terms is consistent with the Supreme Court's teaching about statutory interpretation. *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991) (Rejecting argument that "the congressional purpose in enacting [a statute] must prevail over the ordinary meaning of statutory terms").

Moreover, we are dealing with a criminal statute. Ever since Chief Justice Marshall's opinion in *Wiltberger v. United States*, 18 U.S. (5 Wheat) 76 (1820), it has been clear that the courts cannot fill statutory gaps by judicial legislation. From *Wiltberger*, there is a straight line to holdings that criminal statutes must be construed strictly, in favor of the accused, under the principle of lenity. *See, e.g., Kozminski v. United States*, 487 U.S. 931 (1988). Indeed, the principle of strict construction, or lenity if you will, was developed in England precisely to mitigate the rigor of capital statutes. *See generally*, Kahan, *Lenity and Federal Common Law Crimes*, 1994 Sup. Ct. Rev. 345, 358-59 and *passim* (Citing authorities, discussing the principle, but disagreeing with its application). The "ordinary meaning" of this statute is that the individual juror is a sovereign in her own right when it comes to respect for life.

4

FELL-00002078

Congress has given us an ever-expanding list of capital crimes. It is fair to insist that courts observe the limits inherent in the language Congress has chosen. The remaining portion of this jury selection memorandum argues in the alternative, without waiving the above contention.

III.    THE CONSTITUTION DEMANDS THAT FELL BE TRIED BEFORE A JURY COMPOSED OF INDIVIDUALS WHO WILL CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE.

The Sixth and Eighth Amendments of the United States Constitution guarantee a capital defendant the right to a fair trial before a panel of impartial and indifferent jurors. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Duncan v. Louisiana*, 391 U.S. 145, 147-158 (1968); *Turner v. Louisiana*, 379 U.S. 466, 471-473 (1965); *Irwin v. Dowd*, 366 U.S. 717, 722-723 (1961).

In *Morgan*, the Supreme Court confirmed, as it had previously suggested in *Ross*, that, in order to protect a capital defendant's right to a fair trial, a juror is properly removed for cause at any stage of the proceedings if it becomes clear that the juror's views in favor of the death penalty would "*prevent or substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 728-729, *quoting Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980).[2] In *Morgan*, the Court "reiterate[d]" that a juror, for example, who would "automatically" impose a death sentence

---

[2] Death qualification, which "[limits] the State's power to exclude" jurors for cause based upon their conscientious scruples against the death penalty, *Wainwright*, 469 U.S. at 423, is governed by the same standard. *See Morgan*, 504 U.S. at 728, 734-735 ("Jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath...whether they be unalterably *in favor of or opposed to* the death penalty in every case...by definition are ones who cannot perform their duties in accordance with the law") (emphasis added); *Wainwright*, 469 U.S. at 423-424; *Adams*, 448 U.S. at 47-48; *Witherspoon v. Illinois*, 391 U.S. 510, 512-513 (1968).

FELL-00002079

following conviction for murder is properly excluded under this standard. *Morgan*, 504 U.S. at 729, 736. Such "ADP" jurors are properly excused because they "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736.

The *Morgan* standard of exclusion (sometimes referred to as "life qualification"), however, encompasses more than the class of ADP jurors, i.e., those who would "automatically" choose death as a general proposition for all convicted of murder. Pursuant to *Morgan*, "[a]ny juror to whom mitigating factors are. . . irrelevant"—not merely those jurors who "obviously" deem it so--"should be disqualified for cause, for [they have] formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 738-739. This much was recognized by Justice Scalia: "The Court today holds that the Constitution requires that voir dire directed to this specific 'bias' be provided upon the defendant's request; and that the more general questions about 'fairness' and ability to 'follow the law' that were asked during voir dire in this case were inadequate." *Id.* at 739 (Scalia, J., dissenting).[3]

*Morgan* establishes, then, that any person whose preconceptions about the propriety of the death penalty—either generally or related to the specific case — are such that the juror's ability to follow the trial court's penalty phase instruction that he or she consider the mitigating evidence presented by the defendant is substantially impaired, should not be qualified. In other

---

[3] Furthermore, Justice Scalia noted in his dissent in *Morgan v. Illinois*, 504 U.S. at 7 n. 3, that under the majority's holding a juror who does not think that a particular mitigating factor is mitigating -- the examples he used were "extreme mental or emotional disturbance" or "bad childhood" -- "must also be excluded." This provides further support for a capital defendant's ability to ask questions about the factors in a particular case.

6

FELL-00002080

words, if a juror is substantially impaired in his or her ability to meaningfully consider and give

effect *to any mitigating evidence relevant in the defendant's particular case*, the juror must be

removed.[4]

It is important to emphasize that the "consideration" of mitigating evidence required by

the post-*Lockett* cases, *see* note 4, *supra*, is more than a passive willingness to listen to the

defendant present his case. As used by the Supreme Court, the term "consider" means to actively

---

[4] *Morgan*'s holding is rooted in a long line of Supreme Court cases requiring that jurors consider and be permitted to give effect to mitigating factors relating to the individual defendant before assessing the ultimate punishment. *See, e.g., Morgan*, 504 U.S. at 736 (Explaining that the dissenting opinion rejects "the line of cases tracing from *Woodson* and *Lockett*, developing the nature and role of mitigating evidence in the trial of capital offenses").

In *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), the Supreme Court first held that imposition of a mandatory death sentence without consideration of the character and record of the individual offender is inconsistent with the fundamental respect for humanity that underlies the Eighth Amendment. The Court reaffirmed and extended this principle in *Shuman v. Sumner*, 483 U.S. 66 (1987), by invalidating a mandatory death sentence imposed on a Nevada inmate (who had been serving a life term without parole) for killing a prison guard on the ground that the sentencing scheme failed to give individualized consideration to the defendant's character and record. The Court's holdings in *Woodson* and *Shuman*--that the Constitution does not permit mandatory death sentencing in theory—are given practical effect in *Morgan*, which prohibits mandatory death sentencing in fact.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court struck down the Ohio death penalty statute based on this principle because it did not permit the type of individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments. *See id.* at 605 ("A statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"). The Court went further in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), vacating a death sentence because the state court declined to consider the defendant's unhappy upbringing, emotional disturbance, and turbulent family history as relevant mitigating circumstances. As the Court explained this extension of *Lockett*, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Id.* at 113-114. The Court exercised this principle in *Skipper v. South Carolina*, 476 U.S. 1 (1986), reversing a death sentence where the petitioner was prevented from introducing the testimony of prison guards and a frequent jail visitor as evidence of his good adjustment in prison. *Id.* at 9. Exclusion of this testimony at the sentencing phase, the Court found, "deprived [petitioner] of his right to place before the sentencer relevant evidence of mitigation of punishment." *Id.* at 4.

Finally, in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Court extended the *Lockett* principle once again. Although, consistent with *Lockett* and *Eddings*, neither the Texas legislature nor the Texas trial court prohibited the jury from "considering" mitigating factors, that was not enough. The Court held that the trial court had to allow the jurors to "give effect" to these factors by specifically instructing them that they must be considered in making the life or death decision. *Id.* at 328.

7.

FELL-00002081

take into account, "enter into the decision" or "weigh in the balance." As Justice Powell explained in *Eddings,* "[the jurors] may determine the weight to be given relevant mitigating evidence...[b]ut they may not give it no weight by excluding such evidence from their consideration." *Eddings,* 455 U.S. at 114. *Penry* reinforced this notion by requiring that the trial court not only ensure that the jurors "consider" mitigating evidence in the passive sense of listening, but also guarantee that jurors both "consider and give effect to" the mitigation in their deliberation. *Penry,* 492 U.S. at 319 ("*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence"); *compare id.* at 355 (Scalia, J., concurring/dissenting in part) ("What the Court means by 'fully consider' is to consider for all purposes . . .").

In sum, a capital defendant's constitutional right to a fair trial is protected--and the constitutional mandate satisfied--only where each individual juror actively considers and gives effect to all relevant mitigating evidence as a meaningful part of his or her life or death decision.

IV.    FELL IS ENTITLED TO A MEANINGFUL VOIR DIRE, WHICH ALLOWS INQUIRY SUFFICIENT TO ENSURE THAT THE JURY IS COMPOSED OF INDIVIDUALS WHO WILL CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE.

"Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan,* 504 U.S. at 729; *see Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981); *Dennis v. United States,* 339 U.S. 162, 171-172 (1950); *Morford v. United States,* 339 U.S. 258, 259 (1950). An adequate voir dire enables a capital defendant to exercise his constitutional right to an impartial jury by challenging prospective jurors for cause

8

FELL-00002082

before a judge able to accurately rule on their removal. *See Morgan*, 504 U.S. at 729-730; *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

Of course, voir dire is "conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristiano v. Ross*, 424 U.S. 589, 594-95 (1976). Yet, in exercising this discretion, the court must keep in mind the requirements of the Constitution. "[A] suitable inquiry is permissible in order to ascertain whether the juror has *any* bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Mu'Min*, 500 U.S. at 431. *Morgan* clarifies that, in a capital case, questioning of potential capital jurors as to whether they would automatically or nearly always vote for the death penalty on the facts of the particular case, or could consider and give effect to the relevant mitigating factors in the case, is not only suitable, but constitutionally required if a capital defendant is to receive a voir dire adequate to protect his right to a trial before an impartial tribunal.

During voir dire, therefore, a capital defendant is not limited to general or theoretical inquiries as to whether a prospective juror has a bias for the death penalty as a general proposition. Fell must also be allowed to question potential jurors as to whether they will consider and give effect to the mitigating factors relevant in the particular case.[5]

Federal capital sentencing statutes include similar provisions. *See* 18 U.S.C. § 3592 (a), 21 U.S.C. § 848 (m). Here, as in *Morgan*, only if jurors actively consider and give effect to mitigating evidence can the statutory mandate be satisfied. Accordingly, the Sixth Amendment

---

[5] *See, e.g., McQueen v. Scroggy*, 99 F.3d 1302, 1329 (6th Cir. 1996) (Allowing exploration of jurors' attitudes toward drugs and alcohol intoxication as a mitigating circumstance).

9

FELL-00002083

right of a capital defendant to adequate voir dire of potential jurors must include the right to

inquire into a juror's ability to consider and give effect to any and all relevant mitigating

evidence in a particular case. This includes the use of hypothetical questioning of jurors insofar

as it is necessary to ascertain a juror's ability to weigh particular, case-specific mitigating

evidence.

V.    FELL IS ENTITLED TO A MEANINGFUL VOIR DIRE, WHICH
      ALLOWS INQUIRY SUFFICIENT TO ENSURE THAT THE JURY IS
      COMPOSED OF INDIVIDUALS WHO WILL CONSIDER A LIFE
      SENTENCE ASSUMING ALL RELEVANT STATUTORY
      AGGRAVATING FACTORS HAVE BEEN PROVEN.

In this case, Fell must also be allowed to qualify jurors on aggravating factors which will

be in issue. The real question is whether a juror can consider a sentence other than death for

someone who intentionally kills another person in the course of multiple killings and by beating

the victim to death. To allow a juror whose beliefs would compel a vote for death under such

circumstances to serve in this case would have the same effect, for example, as the Nevada

statute mandating death sentences for those who murder while incarcerated. Of course, that law

was struck down as unconstitutional in *Shuman v. Sumner*, 483 U.S. 66 (1987). In other words,

just as the legislature may not mandate death for inmates who kill while imprisoned--nor for

another particular type of aggravated murder--neither may a juror's beliefs be allowed to

accomplish the same impermissible result. Thus, in order to determine whether jurors can follow

the law as set forth in *Shuman*, the Fell must be allowed to question them on the salient

aggravating facts of this case.

The scope of questioning that Fell seeks to pursue regarding the ability of potential jurors

to meaningfully consider mitigating evidence--to establish that they *could* truly consider and

10

FELL-00002084

evaluate it--is distinct in form and intent from an inquiry into *how* jurors *would* weigh particular evidence at trial. The latter approach, to which the labels "staking out," "sneak preview" or "loaded questioning" are frequently applied, is often prohibited. *See United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) (Overruling *United States v. Evans*, 917 F.2d 800 (4th Cir. 1990)) (No error to disallow question whether juror would give more weight to testimony of a "[corrections officer], police officer or member of the FBI" than to that of "any other citizen in the community"); *State v. Southerland*, 316 S.C. 377, 382, 447 S.E.2d 862, 866 (S.C. 1994) ("An inquiry as to the weight a juror would give one kind of witness over another invades the province of the jury"). Nonetheless, many federal courts allow this type of questioning. *Lancaster*, 96 F.3d at 747-49 (Dissent); *see, e.g., Brown v. United States*, 338 F.2d 543 (D.C.Cir. 1964); *United States v. Martin*, 507 F.2d 428, 432-33 (7th Cir. 1974); *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979); *United States v. Gelb*, 881 F.2d 1155, 1164-65 (2d Cir. 1989); *United States v. Victoria-Peguero*, 920 F.2d 77, 84 (1st Cir. 1990); *United States v. Amerson*, 938 F.2d 116, 117-18 (8th Cir. 1991); *United States v. Nielsen*, 1 F.3d 855, 859 (9th Cir. 1993).

In contrast, the scope of questioning which Fell seeks asks jurors neither for a relative assessment of the weight they would give certain substantive evidence nor for an assessment of the weight they would give to evidence presented by certain classes of people. Regardless of whether it would be inappropriate during voir dire to ask jurors how they would weigh certain aggravating or mitigating factors, if jurors already have prejudice, then it is an appropriate subject for inquiry and a basis for disqualification.

Therefore, by making inquiry on voir dire to ascertain a juror's *ability* to weigh or give effect to mitigating evidence, the defendant is not obtaining an unsanctioned "sneak preview" of

11

how jurors will weigh specific mitigating or aggravating evidence at trial. Rather than an improper "preview," such inquiry is a necessary and constitutionally sanctioned *view* into whether a juror is already biased. Such case-specific penalty bias remains a basis for disqualification even if the juror, in the hypothetical capital case, could consider a penalty less than death. *Morgan, supra.* Nor is the scope of inquiry proposed by Fell an improper attempt to "stake out" jurors. Fell is merely protecting his constitutional right to a fair trial by assuring that all jurors before whom he is tried *are capable of* weighing all relevant mitigating factors.

During voir dire, therefore, Fell's counsel should be allowed, at the very least, to inquire (or have the Court inquire) about each juror's ability to consider and give effect to the relevant statutory mitigating factors listed in 18 U.S.C. § 3592 (a) such as the fact that "the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform to the requirements of the law was significantly impaired." 18 U.S.C. § 3592 (a) (1). Additionally, counsel must also be permitted to inquire into each individual juror's ability to consider and give effect to all other relevant evidence of mitigation,[6] including the following:

_____

[6] Any evidence is mitigating which leads to an inference that "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5, *quoting Lockett*, 438 U.S. at 604. Under *Lockett*, relevant mitigating evidence includes, per se, anything which bears upon the record, background and history of the defendant or the circumstances of the crime, and lessens the defendant's moral culpability. *Cf. Skipper, supra* at 7 n.2 (Evidence of defendant's 'personal hygiene practices' would be irrelevant to a sentencing determination); *State v. Plath*, 313 S.E.2d at 627 ("'How often [defendants] will take a shower' is irrelevant to the sentencing determination"). All relevant mitigating evidence must be considered by the jury. *Morgan*, 504 U.S. at 729; *see Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Eddings*, 455 U.S. at 114 (1982); *Lockett*, 438 U.S. at 604 (1978). Accordingly, defense counsel must be allowed to pursue on voir dire the ability of each potential juror to consider and give effect to such evidence.

Moreover, defense counsel must be allowed to inquire as to any bias that would impair a juror's ability to follow the law with respect to mitigating evidence presented or elicited at either the guilt/innocence or sentencing phase of the trial. Indeed, the question that the Supreme Court insisted should have been asked in *Morgan*, "[i]f you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?," *Morgan*, 504 U.S. at 733, refers to the "facts" to be elicited at trial. By requiring the proposed question in *Morgan*, the Supreme Court mandated inquiry into whether jurors harbor any preconceptions that would prevent them from considering the "facts" elicited at trial because they have "predetermined the terminating issue of [the]

12

FELL-00002086

1.   Whether the juror has any bias with respect to the death penalty in a hypothetical case that would prevent or substantially impair his or her ability to perform his or her duties as a juror to consider all evidence, mitigating and aggravating, prior to rendering a penalty verdict.

2.   Whether the juror has any bias or opinion with respect to individuals who have been involved in a kidnapping or carjacking resulting in death, that would prevent or substantially impair his or her ability to perform his or her duties as a juror to consider all evidence, mitigating and aggravating, prior to deciding upon a penalty verdict.

3.   Whether the juror has any bias or opinion with respect to multiple killings that would cause him or her to impose a verdict of guilty or a sentence of death without regard to other evidence that may be adduced at either phase of trial.

4.   Whether the juror has a bias or opinion with respect to an alleged beating death that has been characterized as especially heinous, cruel or depraved, that would cause him or her to impose a verdict of guilty or a sentence of death without regard to other evidence that may be adduced at either phase of trial.

5.   Whether the juror has a bias or opinion or experience with respect to relevant mitigating evidence, such as poverty, neglect, physical abuse, childhood exposure to violence, that would cause him or her to be unable to consider and weigh such a background at the penalty phase of trial.

6.   Whether the juror has a bias or opinion because of exposure to pretrial publicity or discussion about this case or that would cause him or her to render a verdict of guilty without regard to evidence that may be adduced at trial.

7.   Whether the juror has a bias or opinion because of exposure to pretrial publicity or discussion about this case that, in the event the defendant is convicted of a capital offense, would prevent or substantially impair the juror from considering a life sentence.

VI.   THE FORM OF ORAL VOIR DIRE: SPECIAL PRECAUTIONS.

Case law, social science studies, and experience teach that the process of a capital voir

trial, that being whether to impose the death penalty." *Id.* at 736.

13

FELL-00002087

dire can have deleterious effects on the ability of counsel and the Court to obtain all necessary information and, all other things held equal, may indeed incline jurors toward conviction and a sentence of death. For these reasons, we ask that the Court take specific precautions during the voir dire at the defendants' trial to ensure fairness of process.

1.    Avoiding "Processing" Effect.

Social science studies establish that the process of death qualification itself has a prejudicial effect on the jurors who end up sitting on the jury. *See, e.g.*, Haney, *On the Selection of Capital Juries*, 8 Law & Hum. Behav. 121-33 (1984) ("Haney I"); Haney, *Examining Death Qualification: Further Analysis of the Process Effect*, 8 Law & Hum. Behav. 133-151 (1984) ("Haney II").

Death qualification biases capital juries "not only because it alters the composition of the group 'qualified' to sit, but also because it exposes them to an unusual and suggestive legal process." Haney I at 121. The "process" of death qualification involves the asking of questions that presume the likelihood of a penalty phase. This inclines jurors toward returning a guilty verdict in the initial phase and a death verdict at sentencing:

> Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the defendant. The death qualification process led subjects to perceive both prosecutor and judge as more strongly in favor of the death penalty, and to believe that the law disapproves of people who oppose the death penalty. And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it. Thus, persons who had been exposed to death qualification not only differed from non-death-qualified subjects, but they differed in ways that were consistently prejudicial to the interests and rights of the defendants.

Haney I at 128-29.

14

The "processing effect" stems from the necessarily extended discussion of penalty before any determination of guilt. Jurors in novel or unfamiliar situations are especially sensitive to cues from authority figures like judges. When judges, from the very start of voir dire, begin to focus and dwell on the death penalty, it resolves uncertainty in the minds of the jurors in a way prejudicial to the defendant.[7] Because expectations are important determinants of the way subsequent information is received, interpreted, and acted upon, "[o]nce jurors have imagined themselves in the penalty phase of the trial, they may come to assume that it will occur, and begin to organize subsequent information in a manner consistent with that assumption." *Id.* at 130, 131.

Another distorting factor is that death qualification requires jurors to take a public stand, affirming their willingness to consider imposing the death penalty. Because public advocacy of a position intensifies one's belief in it, "[t]he public affirmation required by death qualification may thus intensify jurors' commitments to use the death penalty . . . [or cause jurors to] become invested in a 'tough' image that will affect them in deliberations." *Id.* at 130-31.

The Court, therefore, should remain vigilant at all times that the method by which questions are asked does not implicitly convey the notion that a penalty phase is likely or inevitable or that the law would favor a guilty verdict followed by a death sentence.

Fell asks that the Court make strong efforts to minimize the processing effects of the death penalty voir dire on the prospective jurors by employing the tendered admonition prior to voir dire. [Attached as Exhibit "A"]. The Court must carefully ascertain whether the prospective

---

[7] Without attorney participation these process effects are magnified because it is the judge who seems so very focused on the defendant's punishment.

15

juror recognizes that the procedure must be followed in every potential capital case--namely the questioning on punishment issues being conducted before trial. The prospective juror must be able to understand that the procedure cannot be allowed to affect either the prospective juror's view of the defense, the presumption of innocence, or the prosecution's burden of proof.

2.    Obtain Information Before Instructing.

Fell asks that the Court permit counsel to fully explore the depth and strength of any punishment-related feelings, biases, opinions or prejudices *before* the jurors are instructed about legal obligations or requirements of the law. Otherwise, both counsel and the Court are deprived of the opportunity to learn the jurors' true feelings, on which counsel must rely to intelligently exercise challenges, and which the Court must assess if it is to reliably and fairly rule on cause challenges. "[S]ufficient information concerning the juror's predilections . . . is much more likely to be expressed freely when the juror is not constrained by an instruction from the court on what kind of answer leads to automatic dismissal." *State v. Williams*, 550 A.2d 1172, 1182 (N.J. 1988).

3.    Leeway To Ask Open-Ended Questions.

Fell asks that the Court permit counsel to ask open-ended questions designed to inquire into the actual feelings, opinions, and knowledge of prospective jurors relating to punishment views.

To conduct a proper capital voir dire that fully protects the defendant' rights and interests, the Court must permit counsel to fully develop each prospective juror's feelings about the death penalty in general, with repeated inquiries if the questionnaire, in-court answers, demeanor and body language of the person suggest that repetition is advisable and necessary. It is only through

16

FELL-00002090

a penetrating voir dire that a juror's feelings, beliefs, views, opinions, attitudes, and convictions about the death penalty can be adequately explored.

Moreover, such voir dire is particularly important in order to discover those jurors who may harbor pro-death penalty views that are well camouflaged:

> [A] far greater percentage of death penalty skeptics identify themselves at voir dire than do death penalty supporters. Review of the voir dire transcripts of automatic appeals decided by this court confirms the existence of the problem. Although death penalty supporters vastly outnumber opponents, it is a rare voir dire transcript where more venire persons acknowledge support for capital punishment than opposition.

*People v. Turner*, 690 P.2d 669, 699 (Cal. 1984) (Bird, C.J., concurring and dissenting). *Compare Ross v. Oklahoma*, 487 U.S. 81, 83-84 (1988) (Juror initially indicated he could vote to recommend life if the circumstances were appropriate, but "on further examination by defense counsel declared that if the jury found petitioner guilty, he would vote to impose death automatically").

4.     Leeway to Probe Jurors' Understanding of the Concept of Mitigation.

The case law is clear that jurors may not make their life or death decision on the basis of the crime itself, no matter how horrific. The circumstances of the offense *and the offender* must be considered. *See, e.g., Penry v. Lynaugh,* 492 U.S. 302 (1989); *Shuman v. Sumner,* 483 U.S. 66 (1987); *Spaziano v. Florida,* 468 U.S. 447 (1984); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Bell v. Ohio,* 438 U.S. 637 (1978); *Lockett v. Ohio,* 438 U.S. 586 (1978); *Woodson v. North Carolina,* 428 U.S. 280 (1976).

Unfortunately, a growing body of social science research demonstrates that capital sentencing jurors often fail to understand the mitigating significance of evidence concerning the

17

FELL-00002091

defendant. See Sandys, *Cross-Overs–Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 Ind. L. J. 1183, 1220-21 (1995); Constanzo & Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 L. & Hum. Behav. 185 (1992). Capital instructions typically use complex language, unfamiliar words, one-sentence definitions of terms, and many sentences with double negatives, all of which make the instructions difficult for jurors to understand. Luginbuhl & Howe, 70 Ind. L. J. at 1169. Without a coherent guiding explanation, jurors fall back on their own knowledge, but have little appreciation of many of the concepts in a capital sentencing trial, especially mitigation.[8] *Id.*

Specifically, many jurors believe that they must unanimously agree that a mitigating circumstance is present in the case before it can be considered. In fact, as Eisenberg and Wells report, over sixty percent of jurors in South Carolina capital cases labor under this significant misperception. Eisenberg & Wells, 79 Corn. L. Rev. at 11;[9] *see, also* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (49% of jurors thought unanimity was required to give effect to mitigating

---

[8] According to Haney,

> Some of this derives from the fact that we seem to have become a society that has, at this time in our history, a very difficult time conceptualizing and legitimizing compassion, mercy, charity, and understanding — all concepts that are intertwined with mitigation but which now have become terribly hard for our citizens to define, harder to assert, and virtually impossible to connect to something resembling a principled point of view.

Craig Haney, 70 Ind. L.J. at 1227.

[9] Moreover, in a test conducted by the Cornell Death Penalty Project to study juror comprehension (hereinafter "Cornell Study"), the subject of greatest confusion was whether unanimity was required in considering mitigating evidence. In the study, conducted at Cornell Law School, twenty-three mock jurors were read a set of model South Carolina instructions for a capital sentencing jury. The jurors were then immediately given a questionnaire to assess their comprehension of the substance of the instructions. Even with the instructions having just been read to them, only five of the twenty-three jurors understood that they did not have to unanimously agree as to the existence of a mitigating circumstance in order to give it effect. Fifteen of the twenty-three jurors said they all had to agree, and three did not know. *Id.*

18

FELL-00002092

circumstances); Diamond & Levi, 79 Judicature at 224.

Many jurors also believe that mitigating circumstances must be established beyond a reasonable doubt. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (41% of jurors thought standard of proof for mitigating factors was 'beyond a reasonable doubt'); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (Almost half); Cornell Study (Four of twenty-three thought standard was 'beyond a reasonable doubt'; seven thought standard was 'preponderance of the evidence'; four did not know).

Moreover, many jurors do not understand that they can consider *any* factor in mitigation. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (Only 59% understood that they could consider any evidence as be constituting a mitigating factor); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (Less than a third of the jurors understood that a mitigating circumstance must be proven only to the juror's satisfaction).

Furthermore, of particular relevance here, a significant number of jurors believe that the death penalty is mandatory for an intentional or vicious or heinous murder. *See* Eisenberg, Garvey & Wells, 44 Buff. L. Rev. at 360 ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness"); Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings*, 70 Ind. L. J. 1043, 1091 n.32 (1995) (Many jurors); Geimer & Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L. 1, 41 (1989) (Significant number of jurors believed that death penalty was mandatory or presumed for first degree murder). In the Cornell Study, only nine of twenty-three jurors understood that once an aggravating circumstance was established, there was neither a

19

presumption leaning towards a life sentence nor a presumption leaning towards the death penalty. Of those remaining, six thought the death penalty was presumed.

Indeed, empirical research suggests that capital jurors enter the sentencing phase with a substantial bias in favor of, or a "presumption" of, death. *See* Eisenberg & Wells, 79 Corn. L. Rev. at 12-14, 38 n.12; *compare* Bowers, 70 Ind. L. J. at 1090, Table 6 (In study of actual capital jurors, one-half had made up their minds as to penalty once they had convicted the defendant); Sandys, 70 Ind. L. J. at 1228 ("One half of the jurors had actually made up their minds – were 'absolutely convinced' or 'pretty sure' – about the appropriate penalty once they had convicted the defendant at the guilt phase").

Even when jurors do understand, they are likely to operate independently of the judge's instructions and fail to properly utilize that information in reaching a fair and just verdict. For example, in Geimer and Amsterdam's study of Florida jurors, over half of the jurors interviewed attached little or no significance to the aggravating circumstances and mitigating circumstances presented. Geimer & Amsterdam, 15 Am. J. Crim. L. at 24. To the extent such circumstances were considered important, it was for the wrong reasons. "Some jurors indicated that the list may have helped confirm their understanding that death was the mandatory or expected recommendation." *Id.* In the words of one juror, "[i]t seemed that the State of Florida called for the death penalty. There didn't seem to be any choice." *Id.* at 25.

Thus, the Court at voir dire should permit counsel to probe deeply into jurors' understanding of the concept of mitigation. In particular, counsel should be free, in formulating these questions, to "clearly articulate and underscore the importance of broadening the focus of the penalty phase inquiry" and assure himself that the jurors can extend their "moral assessment

20.

FELL-00002094

to the issues beyond the guilt-phase crime itself." *Id.* at 1229. Otherwise, Fell may be confronted with a jury likely to decide the punishment issue during the guilt phase, and unlikely to consider fairly all mitigating evidence.

## VII.  THE COURT SHOULD ALLOW COUNSEL TO QUESTION POTENTIAL JURORS

### 1. Introduction.

Some federal judges personally conduct voir dire. In courts where such is the practice, lawyers don't even bother to ask to participate. The Supreme Court has never held there is a constitutional right compelling judges to permit defense counsel an opportunity to question prospective jurors.[10] *See e.g., United States v. Duke,* 409 F.2d 669, 671 (4th Cir. 1969), (Claim that Rule 24(a) is unconstitutional is "frivolous") *cert. denied,* 397 U.S. 1062 (1970); *Turner v. Commonwealth,* 221 Va. 513, 273 S.E.2d 36, 41 (1980), *cert. denied,* 451 U.S. 1011 (1981), *rev'd on other grounds,* 476 U.S. 28 (1986). But this is no ordinary case. Defense counsel in this case "ask to ask."

Of course, Rule 24 (a) of the Federal Rules of Criminal Procedure gives trial courts discretion in deciding the scope and method of jury voir dire. *United States v. Magana-Arevalo,* 639 F.2d 226 (5th Cir. 1981). However, this Court has the duty to ensure that Fell receives a fair trial under the Fifth Amendment to the United States Constitution by uncovering and neutralizing

---

[10] In contrast, some courts do see constitutional rights implicated when attorneys are not allowed to participate in voir dire. *See, e.g., Maddux v. State,* 825 S.W.2d 511, 514 (Tex. App. 1992) ("The right to pose such questions is part of the *right to counsel under ... the Texas constitution ...*"). *See also, Oden v. State,* 90 N.W.2d 356, 358 (Neb. 1958) ("The usual and better practice is to permit counsel to conduct the examination under the direction and supervision of the court."); *State v. Hankins,* 441 N.W.2d 854, 866 (Neb. 1989) ("The defendant... has the right to put pertinent questions to prospective jurors..."). *Cf. Strube v. State,* 739 P.2d 1013, 1016 (Okl. Cr. 1987) ("Rule six, as well as the ABA Standards Relating to Trial Courts, Section 2.12 (1976) and the ABA Standards for Trial by Jury, section 15-2.4 (1978), make clear that participation by ... the defense in voir dire, at least in criminal proceedings, is a right).

21

FELL-00002095

juror prejudice. *See generally Turner v. Louisiana*, 379 U.S. 466 (1964) (Bailiffs who were also prosecution witnesses were never asked whether they talked to the jury about the case); *Irvin v. Dowd*, 366 U.S. 717 (1961) (Jury infected by prejudice due to pretrial publicity); *Turner v. Murray*, 476 U.S. 28 (1986) (Voir dire required on racial bias when interracial capital crime alleged). While this Court may well be able to meet any constitutional minimum, or to choose a procedure which will mask any failing, Fell asks the Court to exercise its discretion and to err, if at all, on the side of fairness and caution.

In recent years, federal courts have recognized, even in non-capital cases, the importance of attorney participation in order to ensure both parties a more effective jury selection process. *See, e.g., United States v. Ible*, 630 F.2d 389 (5th Cir. 1980); *United States v. Ledee*, 549 F.2d 990 (5th Cir. 1977). In *Ible*, 630 F.2d at 389 n.8., the Court stated:

> [W]hile Federal Rule of Criminal Procedure 24 (a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court does not take into account the fact that it *is the parties, rather than the court, who have a full grasp of the nuances and the strengths and weaknesses of the case* ... Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill the need than an exclusive examination in general terms by the trial court.

> \*   \*   \*   \*   \*   \*

> More recently, records reviewed in this court reflect a new pattern by trial courts. The trial judge will explain the nature of the case in general terms, point out the parties and counsel, cover the most basic points of law (burden of proof, presumption of innocence, right to remain silent, etc.), explain the procedures and schedule to be followed and then turn the questioning over to trial counsel. We encourage this approach.

630 F.2d at 395; emphasis added. As federal judges experiment with attorney-participation in voir dire, a majority have come to view the practice is preferable in certain cases. *See*, Report of

22

FELL-00002096

the Committee on Juries of the Judicial Council of the Second Circuit, 12-31 (August 1984)

(Judges in criminal cases favored the experimental procedure by a 12-4 vote.)

### 2. Capital Punishment Questioning is Unique.

In capital cases, requests for attorney participation in voir dire are routinely made and *routinely granted*. Both the legislative[11] and judicial branches have recognized that death penalty cases are different when it comes to determining the structure of jury selection. Fed. R. Crim. P. 24 (b) itself evidences that capital trials are different from non-capital actions.[12] Death penalty cases are different, and nearly every member of the Supreme Court since *Furman* has so declared.[13] Any lawyer who has experienced voir dire in a capital case knows why.

In the modern era, probing juror punishment views, particularly about death as a sanction, is unfamiliar in federal courts. Experience from the trial of capital cases in state courts teaches that extracting reliable information regarding venire members' views on the death penalty is a delicate operation. To the uninitiated, it can be confusing and complex. "Given the important, delicate and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry...." *State v. Williams*, 550 A.2d at 1182.

For example, every knowledgeable court and commentator recognizes that, with many

---

[11] 18 U.S.C. § 3432 requires that "at least three entire days before commencement of trial ... a person charged with ... [a] capital offense ... shall ... be furnished with ... list of the veniremen."

[12] Fed. Crim. Proc., Rule 24 (b) requires "20 peremptory challenges" for "each side" in cases where the "offense charged is punishable by death ..." Otherwise, the "defendant or defendants jointly" are entitled to "10 peremptory challenges."

[13] "[E]very member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any punishment, and hence must be accompanied by unique safeguards ...." *Spaziano v. Florida*, 468 U.S. 447, 468 (1985) (Stevens, J., dissenting); *Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976).

23

FELL-00002097

jurors, initial responses to death-qualifying questions cannot be taken at face value. *See Gray v.*

*Mississippi*, 481 U.S. 648, 662-663 (1987) ("[D]espite their initial responses, the venire members

might have clarified their positions upon further questioning and revealed that their concerns

about the death penalty were weaker than they originally stated. It might have become clear that

they could set aside their scruples and serve as jurors.") The Court in *Wainwright v. Witt*, 469

U.S. 423, 425 (1985), recognized that a searching inquiry is often necessary before jurors can be

excluded on the basis of moral, philosophical or practical reservations regarding a particular

punishment. "[T]hese veniremen may not know how they will react when faced with imposing

the death sentence, or may be unable to articulate, or may wish to hide their true feelings."[14] It is

for this reason that the Supreme Court has often assumed, without suggesting it was deciding,

that counsel would at least be permitted to participate in the death qualification process.

> As with any other trial situation where an adversary wishes to exclude a juror
> because of bias, then, it is the adversary seeking exclusion who must demonstrate,
> through questioning, that the potential juror lacks impartiality.

*Wainwright v. Witt, supra*, 469 U.S. at 423.

The Supreme Court has often noted defense counsel's failure to participate in death-

qualification as indicative of support for, or at least acquiescence in, the court's ruling on a juror's

impartiality. "In this regard it is noteworthy that in this case the court was given no reason to

think that elaboration was necessary; defense counsel did not ... attempt rehabilitation." 469 U.S.

---

[14] By way of example, the *Witt* Court cited excerpts from voir dire in *O'Bryan v. Estelle*, 714 F.2d 365, 379 (5th Cir. 1983), *cert. denied*, 465 U.S. 1013 (1984), demonstrating a juror's confused and seemingly contradictory answers to punishment related questions. 469 U.S. at 425 n. 6.

24

FELL-00002098

at 430-431.[15]

*Adams v. Texas*, 448 U.S. 38 (1980), as interpreted in *Wainwright v. Witt*, 469 U.S. 412 (1984), modified the stringent "automatic" and "unmistakably clear" standard that must be met before a juror's punishment views could result in disqualification from service in a capital case. *Compare Witherspoon v. Illinois*, 391 U.S. 510, 520 n. 9, 522 n. 21 (1968) *with Adams v. Texas*, 448 U.S. 38, 45 (1980) (Before a cause challenge is granted, the juror's punishment views must "*prevent or substantially impair* the performance of his duties as a juror ... ") *and Wainwright v. Witt*, 469 U.S. at 424 ("Standard is whether the jurors views would '*prevent or substantially impair* the performance of his duties as a juror . . . .'"). While this relaxed somewhat the rigors of inquiry on the "anti-death penalty" side of the punishment equation, in the long run it complicates matters. This is because "death-qualification," actually "punishment-qualification" now becomes a three-dimensional phenomenon for the interrogator.

First, jurors who are "substantially impaired" by virtue of anti-capital punishment views must be identified.[16] Second, jurors who are "substantially impaired" by virtue of *pro*-capital punishment views must be identified.[17] *See Morgan, supra.* Third, venire members must be

---

[15] "Defense counsel did not object or attempt rehabilitation." *Witt*, 469 U.S. at 416. "We note in addition that respondent's counsel chose not to question Colby himself . . . . This questioning might have resolved any perceived ambiguities in the questions . . . ." *Id.*, at 434.

[16] Anti-death penalty venire members may be referred to as "*Witherspoon-Witt* excludables," or "WEs". *See Lockhart v. McCree*, 476 U.S. 162, 167 n. 1 (1986).

[17] Sometimes phrased in now-outdated *Witherspoon* terms, courts refer to such jurors as having "automatic death penalty" views. This means they are jurors "biased in favor of the death penalty under all circumstances," *Patterson v. Commonwealth*, 222 Va. 653, 659, 283 S.E.2d 212, 216 (1981), or who have "an unalterable bias in favor of . . . the extreme death penalty." *Clozza v. Commonwealth*, 228 Va. 124, 142, 321 S.E.2d 273, 276 (1984) *cert. denied*, 469 U.S. 1230 (1985). After *Witt*, "automatic" is not the applicable standard. Nevertheless, these potential jurors are often referred to as "automatic death penalty jurors" or ADPs.

25

FELL-00002099

identified who are substantially impaired *in considering lawful mitigating evidence.*

"Presumably, under today's decision *a juror who thinks a 'bad childhood' is never mitigating*

*must also be excluded."* *Morgan*, 504 U.S. at 7, n. 3 (Scalia, J., dissenting). Counsel is simply in

a better position to accomplish this required line of questioning, especially as to mitigation

questions.[18]

### 3. The Judge As Referee Or Advocate?

Each of the participants in capital voir dire has a role which is highly differentiated. It is

unwise and indeed unseemly for a trial judge to be placed in a position of pulling a juror in one

direction or another[19] (i.e., trying to rehabilitate) when the juror is clearly uncertain of his own

views or, perhaps, even dissembling.[20]

Second, the judge simply does not know enough of the facts, from the defense

---

[18] In *State v. Williams*, 550 A.2d at 1182 - 1173, this type of death qualification was discussed.

Our examination of the record indicates ten instances in which the trial court, faced with a jury who favored the death penalty in certain cases, refused defendant's request to inquire whether a conviction for both murder and rape should cause the juror to refuse to consider mitigating factors. As we stated in *State v. Bey II*, 112 N.J. 123, 152 (1988), the standard for exclusion for cause of jurors derived from *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *Adams v. Texas*, 448 U.S. 38 (1980), and *Wainwright v. Witt*, 469 U.S. 412 (1985), applies to jurors who support the death penalty as well as those opposed . . . The issue is whether the juror's capacity to credit the evidence in mitigation would be 'substantially impaired' within the meanings of *Adams and Witt*. *Bey II, supra,* 112 N.J. at 154.

[19] "The purpose of voir dire is not to elicit from a potential juror the correct answer; it is to draw out the potential juror's views, biases, and inclination and to provide both counsel and the court . . . with sufficient information with which to challenge potential jurors intelligently--whether for cause of peremptorily." *State v. Biegenwald,* 126 N.J. 1, 39, 594 A.2d 172 (1991).

[20] Citizens are unfortunately not always candid during death qualification. They may wish to "get on" or "get off" the jury depending on their motivation. *See, e.g., Gray v. Mississippi,* 481 U.S. at 653 n. 4, where the "plurality . . . hints that . . . potential jurors may not have been properly excludable for cause because they were merely feigning objections to capital punishment in order to avoid jury service." Although the dissent argues "the Constitution certainly permits the exclusion for cause of potential jurors who lie under oath about their views of capital punishment", no one suggests such jurors do not exist. *Gray,* 481 U.S. at 676 (Scalia, J., dissenting).

26

FELL-00002100