perspective, to do a thorough job. "This Court has previously stressed that voir dire examination not conducted by counsel has little meaning." *United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980). While a defense lawyer's failure to adequately cover all critical aspects of capital voir dire is almost certain to meet constitutional standards,[21] no such presumption of competency or tactical motivation will aid a trial judge in his or her lonely journey across the jury selection minefield.[22] *See, e.g., State v. Williams*, 550 A.2d at 1186 (Reversing death penalty case) ("Based on an independent review . . . we find the trial court relied much too heavily on close-ended questions, and on several occasions did not ask adequate follow up questions. . . . ").

On a more practical level, it is essential for the Court to pay strict attention to the jurors' responses and demeanor. "[T]he manner of the juror while testifying is oft times more indicative of the real character of his opinion than his words." *Reynolds v. United States*, 98 U.S. 145, 156 (1879). Such a focus is "peculiarly within a trial judge's province" and is undermined by concentration on the next question or topic required of the interrogator. *Witt*, 469 U.S. at 428.

### 4. Other Jurisdictions.

Many states, either through statute or court rule, specifically permit attorney-conducted voir dire *as of right* in all criminal proceedings.[23] Some only do so in capital cases.[24] But the

---

[21] *But see generally, Marzullo v. Maryland*, 561 F.2d 540, 546 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011 (1978) (The attorney's conduct at the voir dire . . . failed to protect client); *Cannellas v. McKenzie*, 160 W.Va. 431, 236 S.E.2d 327, 331 (1977) ("other instances" of ineffective assistance included counsel's failure to interrogate prospective jury members about whether they had read prejudicial newspaper articles immediately before trial).

[22] It seems counter-productive to appoint "learned" counsel, pursuant to 18 U.S.C. §3005, experienced in capital jury selection and then limit counsel's input to the awkward and time consuming role of suggesting follow-up questions to the Court for each juror.

[23] *See, e.g.*, Ala. Rule Crim. Proc. 18.4(c) ("The court shall permit the parties or their attorneys a reasonable examination of prospective jurors."); *Fields v. City of Alexander City*, 597 So.2d 242, 244 (Ala. Cr. App. 1992) ("It is readily apparent that the use of mandatory term 'shall' in Rule 18.4(c) . . . *requires* that parties or their attorneys have the absolute right to conduct a reasonable examination of prospective jurors . . ." The rule is "in line with

27

FELL-00002101

common practice in American death penalty trials is to permit the lawyers to ask. Citing

Gutman, *The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right*, 39 Brooklyn

L.Rev. 290, 324 (1972), the Commentary to the American Bar Association Standards for

Criminal Justice (2nd Ed. 1986), Trial by Jury, § 15-2.4, states that "'the overwhelming majority

of state courts hold that attorney-conducted voir dire in criminal cases is essential to fundamental

fairness under state con-stitutions, as well as the Sixth Amendment.'" *Id*. at 55. This is surely

true of the *practice* in the vast majority of states.[25]

### 5. Cause Challenges.

While a judge is obviously capable of asking whether a prospective juror would "lay

aside" any objectionable opinions or impressions and "render a verdict based upon admissible

evidence alone", or similar boilerplate and rhetorical questions, such standard fare is unlikely to

---

Alabama practice and local custom." *Id*.); Ark. Rule Crim. Proc. 32.2 (The judge shall also permit such additional questions by the defendant or his attorney . . ."); *Fauna v. State*, 582 S.W.2d 18, 19 (Ark. 1979) (The trial judge is required to permit reasonable questions by the defendant or his attorney.); Article 786, La. Code Crim. Proc. ("The court, the state and the defendant shall have the right to examine prospective jurors."); Nev. Rev. Stat. 175.031 ("The . . . defendant or his attorney . . . are entitled to supplement the examination by such further inquiry as the Court deems proper. Any supplemental examination must not be unreasonably restricted."); N.C. Gen. Stat. §15 A-1214(c) ("The . . . defense counsel . . . may personally question the prospective jurors individually . . . . [and] is not foreclosed from asking a question merely because the court has previously asked the same or similar question."); Ohio Rule Crim. Proc. 24(A) (The "court shall permit the state and defense to supplement the examination by further inquiry."); Okl. Rule Dist. Courts 6 (1992) ("The parties or the attorneys *shall be allowed* a reasonable opportunity to supplement such examination.").

[24] South Carolina and Texas confer upon defense counsel a right by statute to personally question jurors in death penalty cases. *See* S.C. Rev. Stat. § 16-3-20 (In "cases involving capital punishment any person called as a juror shall be examined by the attorney for the defense."); *State v. Atkins*, 350 S.E.2d 302, 304 (S.C. 1987) (Denial of attorney participation in capital voir dire error); Tex. Code Crim. Proc. Art. 35.17(2) ("Then, on demand of the state or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principle propounded by the court.").

[25] *Compare Turner v. Commonwealth*, 273 S.E.2d at 41 with the common Virginia practice. "Although the statute formerly required the judge alone to ask the questions, in practice most trial courts permitted counsel to ask directly." Boyd, *Practice and Pleading-- The Twelfth Annual Survey of Virginia Law: 1966-1967*, 53 Va.L. Rev. 1763, 1781 (1967).

28

FELL-00002102

be seen as adequate in a racially sensitive death penalty case. In *State v. Williams, supra,* the Court reversed a death sentence in part because "the tenor of the questions often appears to lead the juror inevitably to the 'correct' response . . . " A capital defendant has a due process right to ferret out venire members who are prejudiced. It is not up to the Court to do this for Fell. "[O]ur jury selection system permits parties *to protect themselves* against prejudice by allowing [attorney voir dire] . . . to exclude unacceptable jurors." *State v. Hedgepath,* 310 S.E.2d 920, 922 (N.C. App. 1984). In capital cases, attorney participation will lead to an "enhanced record [which] is imperative to society's interest in a fair trial." *State v. Williams,* 550 A.2d at 1182. As a practical matter, how can a judge actually and thoroughly commit to using his or her considerable authority to "discover basis for intelligent exercise of cause and peremptory challenge . . . " *State v. Jones,* 596 So.2d 1360, 1366 (La.App. 1992). "We are convinced that prohibiting attorney-conducted voir dire altogether may seriously impede that objective." *Whitlock v. Salmon,* 752 P.2d 210, 212 (Nev. 1988).

### 6. Peremptory Challenges.

Peremptory challenges remain one of the most important rights of the accused. *Swain v. Alabama,* 380 U.S. 202 (1965). In view of the sensitive and complex issues in this case, counsel's participation in questioning of prospective jurors on certain limited topics is essential. Such a ruling would permit counsel to make an individual judgment regarding peremptory challenges rather than a stereotypical assumption or a crude guess, thereby impairing the peremptory challenge right. *See United States v. Harris,* 542 F.2d 1283, 1294 (7th Cir.), *cert. denied,* 430 U.S. 934 (1976) ("The defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective jurors to enable them to exercise intelligently their

FELL-00002103

peremptory challenges"); *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir.), *cert. denied*, 434

U.S. 902 (1977) ("Peremptory challenges are worthless if trial counsel is not afforded an

opportunity to gain the necessary information upon which to base such strikes.").

### 7. Social Science Evidence.

When the judge conducts the voir dire, it usually consists of leading questions which

cause prospective jurors to agree unquestioningly. It is not uncommon to hear a judge ask a

prospective juror, "You can be fair and impartial, can't you?" to which the obvious appropriate

answer is, "Yes." Few jurors ever dare to disagree. However, simply opting for a more open-

ended, court-conducted voir dire fails to address the inherent constraints on the inquiry which

arise naturally from the average juror's view of his or her relationship to the court. Social

science studies have repeatedly shown that jurors are acutely aware of even the most subtle cues

or indications from the judge. Fearing the court's disapproval, jurors will usually respond to the

court's queries in a manner they believe is acceptable to the court without actually considering

their own individual, personal and honest responses. Note, *Judges' Non-Verbal Behavior in Jury*

*Trials: A Threat to Judicial Impartiality*, 61 Va. L. Rev. 1266 (1975); *see* Broeder, *Voir Dire*

*Examinations: An Empirical Study*, 38 S.Cal. L. Rev. 503, 506, 513 (1965). The Supreme Court

has noted:

> The influence of the trial judge on the jury "is necessarily and properly of great
> weight" and "his lightest word or intimation is received with deference, and may
> prove controlling."

*Oeurcia v. United States*, 289 U.S. 466, 470 (1933), *quoting Starr v. United States*, 150 U.S. 614,

626 (1894).

Attorney conducted voir dire is a more effective tool for eliciting bias than questioning

30

FELL-00002104

conducted by the court alone. The social distance between the questioner and the prospective

jurors is reduced and jurors may feel less inhibited about offering more candid responses to an

attorney. Furthermore, the judge cannot have the same interest in discerning juror bias as does an

adversary, and the adversaries may be more sensitive to those juror responses which may need

follow-up inquiry. Moreover, the trial judge is less familiar with the evidence and case theories

than are the parties. In *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977), the Court

stated:

> A judge cannot have the same grasp of the facts, the complexities and nuances as
> the trial attorneys entrusted with the preparation of the case. The court does not
> know the strength and weakness of each litigant's case. Justice requires that each
> lawyer be given an opportunity to ferret out possible bias and prejudice of which
> the juror himself may be unaware until certain facts are revealed.

*See also* Frates & Green, *Jury Voir Dire: The Lawyer's Perspective*, 2 A.B.A. Litigation (1976).

Attorney conducted voir dire is the standard practice in most state courts in death penalty

cases, and for good reason. Social science research demonstrates that attorneys are more

effective than judges in eliciting candid self-disclosure from potential jurors. Attorney conducted

voir dire minimizes the pressure to conform to a set of perceived judicial standards that arises

due to questions from the judge. In one study, subjects changed their answers almost twice as

much when questioned by a judge as when interviewed by an attorney. Jones, *Judge-Versus

Attorney-Conducted Voir Dire*, 2 Law and Human Behavior 131 (1987). Thus, "trial courts

should be especially sensitive to counsel's requests to supplement the court's voir dire

examination [and] should be sensitive to permitting attorneys to conduct some voir dire." *State

v. Williams*, 550 A.2d at 1189, n. 10 (Reversing conviction and death sentence due to erroneous

cause challenge and to overall inadequacy of judge-conducted voir dire).

FELL-00002105

## 8. ABA Standards.

After initially recommending that judges have the option of conducting voir dire without permitting counsel to question jurors personally, the American Bar Association reversed its position. It now recommends at least some personal participation in voir dire by counsel in every case, not just death penalty cases. American Bar Association, *Standards for Criminal Justice* (2nd ed. 1986), *Trial by Jury*, § 15-2.4 provides:

> Interrogation of jurors should be conducted initially and primarily by the judge, but counsel for each side should have the opportunity, subject to reasonable time limits, to question jurors directly, both individually and as a panel.

The Standard further advises that if there is reason to believe that jurors have been previously exposed to information about the defendant's case "counsel should be given liberal opportunity to question jurors individually about the existence and extent of their preconceptions." *Id.*

The Commentary to the Standard recognizes "[t]here are limits to what a trial judge can do in conducting an adequate examination." *Id.* at 54. This is so because the trial judge will not be familiar with many important aspects of the case. "The court's task in voir dire examination must be to control counsel's inquiry and not to presume unto itself the role of defendant's advocate." Gutman, *supra* at 326-327.

## 9. Judicial Economy.

Upon request, certain topics must be covered and certain questions must be asked[26] by the

---

[26] A trial judge does not have unlimited discretion to ignore proposed questions, nor to arbitrarily refuse such questions. *See United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). For example, in *United States v. Hill*, 738 F.2d 152 (6th Cir. 1984), the district court refused to ask the venire regarding the presumption of innocence. Reversing, the Court of Appeals reasoned: "A negative or hesitant answer from any prospective juror would surely have produced a defense challenge and, if the judge did not excuse the prospective juror, the exercise of a peremptory challenge by defense counsel." 738 F.2d at 153. *See also United States v. Contreras-Castro*, 825 F.2d 185 (9th Cir. 1987) (Although the court questioned prospective jurors regarding their relationship with law enforcement officers and general questions regarding impartiality, the court's failure to question the entire panel

32

FELL-00002106

Court. It seems more efficient to permit counsel to simply ask rather than waste time approaching the bench, or asking the juror to step outside, to request follow up questions after a juror discloses information on certain critical topics. This seems a small request from a citizen who is facing death.

## VIII. THE COURT SHOULD EMPLOY USE OF AN EXTENSIVE JURY QUESTIONNAIRE AND SHOULD CONDUCT SEQUESTERED QUESTIONING OF INDIVIDUAL JURORS.

It has become common practice in complex federal criminal cases to employ the use of an extensive jury questionnaire. This practice is becoming uniform in federal capital prosecutions. Use of a jury questionnaire is time efficient and a relatively non-obtrusive way of gathering important information regarding prospective jurors.

Individual questioning of jurors is necessary in a capital case. This is the near uniform practice in federal capital cases. Likewise, district courts consistently perform or permit such individual questioning out of the presence of other jurors so as to avoid the potential contamination of an entire group of jurors and to reduce the deleterious effects of questions regarding punishment. Since individual questioning is already necessary, it takes no additional time to question jurors separated from the pool.

---

about specific bias concerning the veracity of government-agent witnesses was reversible error); *United States v. Ible*, 630 F.2d 389 (5th Cir. 1980) (Questions concerning prospective jurors' moral or religious beliefs regarding alcohol was a "very appropriate" area for inquiry in a trial for possession of counterfeit currency where the government intended to introduce evidence that the defendant traded the currency for alcohol); *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972) (Failure to conduct minimal inquiry into jurors' attitudes regarding the Vietnam protest and towards the youth culture was held to be error in a prosecution arising out of anti-war demonstration), *cert. denied*, 410 U.S. 970 (1973); *United States v. Poole*, 450 F.2d 1082 (3rd Cir. 1971) (Reversed for failure to ask whether "you or any member of your family ever been the victim . . ."); *United States v. Napoleone*, 349 F.2d 350 (3rd Cir. 1965) (Reversible error to refuse to inquire into whether jurors had a repugnance towards liars or lying where crux of defense to charge of false impersonation was that while defendant had lied regarding the purpose of his investigation he did not present himself as a federal officer); *cf. United States v. Magee*, 821 F.2d 234 (5th Cir. 1987) (Refusal to question jurors in a drug conspiracy case regarding their use of marijuana was not error where the court questioned jurors concerning their use and attitude regarding drugs in general).

33

FELL-00002107

## IX. THE COURT SHOULD EMPLOY THE STRUCK-JURY METHOD OF JURY SELECTION.

A struck-jury method of jury selection is designed to facilitate the overall intelligent exercise, by both sides, of peremptory challenges. In a November 1978 report of the Federal Judicial Center, two researchers examined the utility of the struck jury method and wrote:

> We have already seen that, in the words of Justice White, a primary purpose of peremptory challenges is to "eliminate extremes of partiality on both sides." (*Swain v. Alabama*, 380 U.S. 202, 219). The struck jury method's superiority in accomplishing this purpose is manifest. On this basis, therefore, subject to verification with other input distributions, modifications of method, and uncertainty about our scale of measurement, we agree . . . that the struck jury method of peremptory challenge should be used.

Bermant & Shepard, *The Voir Dire Examination, Juror Challenges, and Adversary Advocacy* (Federal Judicial Center 1978), at p. 36. The method was commented upon approvingly by the United States Supreme Court in *Swain v. Alabama*, 380 U.S. 202, 217-18 (1965), by the Fifth Circuit in *United States v. Sames*, 470 F.2d 751, 754 (5th Cir. 1972), by the Ninth Circuit in *Amsler v. United States*, 381 F.2d 37, 44 (9th Cir. 1967), and, by the Tenth Circuit in *United States v. Morris*, 623 F.2d 145, 152 (10th Cir. 1980). In *United States v. Blouin*, 666 F.2d 796 (2d Cir. 1981), the sole issue on appeal was whether the trial court's denial of defendant's request to use the struck jury method, as distinct from the "jury box" method, amounted to a denial of fair trial rights. While concluding that the defendant's rights had not been violated, the Second Circuit discussed at length the differences between the two systems of jury selection:

> By permitting full comparative choice among a panel of . . . prospective jurors, the "struck jury" system lets the parties make the most effective use of their challenges, in the sense that through their choices, they are able to determine from the initial panel not only who will not serve but also who will serve as the petit jury . . . .

34

FELL-00002108

> The "jury box" system does not afford the opportunity, or the danger, of full comparative choice, for the parties do not know ahead of time who the replacement for a challenged juror will be. While avoiding opportunity for an enhanced and perhaps undue impact upon the profile of the petit jury, this system has the inherent disadvantage that each side must accept at least one juror whom he has not had an opportunity to challenge. Whoever goes second in the final round will have used his last challenge before knowing the identity of the juror who replaces that last challenge.

*United States v. Blouin,* 666 F.2d at 798.

The struck method is used as a matter of course in many states, VanDyke, *Jury Selection Procedures,* Appendix D, 282-84 (1977) and is recommended by the American Bar Association:

> The approach of striking jurors, as opposed to other types of peremptory challenge, the Court observed in *Swain,* has been praised "as a fairer system to the defendant and prosecutor and a more efficacious, quicker way to obtain an impartial jury satisfactory to the parties." Ibid. It is true that each party, at the time he exercises each peremptory challenge, is confronted with the total number of persons from whom the final jury will be formed, and thus is always in a position to exclude the person most objectionable to him. Under the other systems, by contrast, there is always the chance of some other person or persons coming on the panel who are more objectionable than those already challenged.

*American Bar Association Standards for Criminal Justice* (2d Ed. 1982), § 15-2.6, Commentary at p. 70. In *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987), the New Jersey Supreme Court, while rejecting an argument that the struck jury method is constitutionally required in death penalty cases, stated:

> We understand the attraction of the struck jury procedure: under it, the parties are confronted with all of the jurors who might hear the case, enabling the parties to make a comparative assessment before exercising a peremptory challenge . . . Certainly the struck jury system is not necessarily more fair for defendants; its benefits accrue also to the prosecutor, who will likewise use the opportunity to make a comparative assessment of potential jurors.

*State v. Ramseur,* 106 N.J. at 241-42 (citations omitted).

The suggested procedure for implementation of the struck-jury method of selection is as

35

FELL-00002109

follows: On September 10, 2002, a panel of prospective jurors is brought to the courthouse,[27] with all parties present. The Court, in a prepared statement that has been reviewed by the parties for comment and/or objection, summarizes the charges in the indictment and discusses general principles concerning burdens of proof, the function of an indictment and an overview of how a criminal trial proceeds in general and how the federal death penalty operates. Fell and all counsel are introduced to the panel. The Court explains that defense counsel are court-appointed.

Following the initial orientation to the case, the potential jurors complete the questionnaires under the supervision of court staff. As the questionnaires are completed, each juror is given information on how to find out whether they will be called back for additional individual questioning, but that in no event will they be required to return until Tuesday, September 17, 2002.

The process of orientation/questionnaire-completion continues until the Court has an initial group of potential jurors. At this juncture, depending on the ability of the court staff to duplicate the questionnaires, it is requested that the parties be given the opportunity to undertake an initial evaluation of the questionnaires and that the Court endorse a procedure by which the parties reach agreement on the exclusion, by consent, of those prospective jurors whose questionnaire answers clearly demonstrate either a legitimate hardship or views that make it unlikely, in all counsels' judgment, that the particular juror will "survive" further questioning.

Once this initial "culling" has been completed, jurors would be scheduled to return for individual questioning in groups of 12 to 18, numbers which can be adjusted up or down based

---

[27] The Court may want to reserve someplace larger than its normal courtroom for the initial jury assembly.

36

FELL-00002110

on experience. On the day they return, each individual juror is brought to the courtroom for follow-up questioning by the Court and counsel as seems appropriate, in light of answers on the questionnaire and, as well, in regard to topics such as the criminal-justice system and the death penalty. It is suggested that the prospective juror be seated in the jury box for that interview. At the conclusion of the juror's individual *voir dire,* the Court immediately hears and decides any cause challenge. Those jurors who are not excused for cause are sent home with instructions to remain on call. This process continues until the requisite number of pre-qualified jurors is obtained. That number will be the number of jurors and alternates to be empaneled plus the total number of available peremptory challenges allocated among the parties and a few additional jurors over the absolute bottom number in the event that pre-qualified jurors, for any number of reasons, wind up not being able to serve after all.

Finally, strikes be exercised in alternating rounds so that each side is always aware of which jurors actually remain in the pool, and, thus, which jurors remain actually eligible to sit on the final jury. The final "striking" process, once a sufficient qualified pool has been chosen, need not be a lengthy one and would not require the actual presence of the jurors themselves.

## X. CONCLUSION.

WHEREFORE, for all the foregoing reason, Fell respectfully requests that the Court prohibit "punishment qualification" or, at least, permit counsel to conduct meaningful voir dire so that both the Court and counsel may identify all potential jurors who may harbor any bias with respect to either the guilt-or-innocence or penalty phases of the trial. This requires voir dire sufficient to determine whether jurors are predisposed to give the death penalty or incapable of considering and giving effect to all mitigating evidence relevant to this case. Fell further requests

37

that the Court remain especially vigilant that jurors not be preconditioned during the voir dire process into surmising that a penalty phase is inevitable. In addition, Fell requests that this Court use a juror questionnaire tendered by Fell and permit counsel to question jurors individually in a sequestered setting. Finally, Fell requests that peremptory challenges be exercise by use of the struck-jury method of jury selection.

Respectfully submitted,

By: _____

Alexander Bunin
Federal Public Defender
Federal Bar ID No. 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

Gene V. Primomo
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United States Attorney Gregory Waples, on this 10th day of June, 2002.

_____

38

FELL-00002112

## EXHIBIT A

### COURT'S INSTRUCTION TO THE VENIRE IN
### A CAPITAL PROSECUTION

In most criminal cases, the jury only determines whether the accused is guilty or not guilty. For those defendants whom the jury finds guilty, the question of sentence is then decided by the judge, and the jury has nothing to do with choosing the punishment. However, whenever a defendant is charged with a crime which carries the death penalty as a possible sentence, the jury decides not only whether the defendant is guilty or innocent, but also--if he or she is found guilty--whether the death penalty or life in prison without the possibility of release should be the punishment.

Of course, the jury only has to decide on a defendant's punishment if the government first proves beyond a reasonable doubt that he or she committed a crime that permits the death penalty as one possible punishment. If the jury does not find the defendant guilty, then there is obviously no need to decide what the punishment should be. However, if the jury does find beyond a reasonable doubt that the defendant committed a crime for which the death penalty can be imposed, then a second trial must be held so the jury can consider additional evidence on the question of whether the defendant should be sentenced to death or life imprisonment without possibility of release. The jury, guided by the judge's instructions, would decide what would be the most appropriate punishment under the circumstances.

Now, in this case one of the charges against the defendant is that he intentionally killed someone during a kidnapping or carjacking. If a jury convicts someone of such an intentional killing, the jury can, under some circumstances, impose the death penalty after hearing additional evidence at the second, sentencing part of the trial. The death penalty is never automatic, and the jury is never required to impose the death penalty in any case, no matter what the facts and circumstances may be. However, when the jury finds itself in a situation where it must consider the death penalty at the end of the trial, the law requires that each possible juror be questioned at the beginning of the process about any feelings and opinions, if any, he or she may have about the death penalty or about life in prison without the possibility of release and the potential juror's ability to follow the law.

It is very important, however, that you understand something about this questioning. As I have told you, the defendant is presumed innocent of all the charges against him. Unless the government proves his guilt beyond a reasonable doubt, he must be found not guilty, and in that case there will be no sentencing hearing. The fact that I and the attorneys question you about punishment views now certainly does not mean that any defendant is guilty of any crime. It does not mean that I think he is guilty, or that I or the attorneys expect him to be convicted. This questioning is simply a routine part of every trial of this nature. We will ask you about your views concerning punishment for intentional murder before the trial even starts only because this is, under our required procedures in every case, the only chance to do so. You are not to draw any conclusions about the case or the evidence from the fact that we are asking you about punishment before a decision has been made about whether the defendant is guilty or innocent.

FELL-00002113

# EXHIBIT 206

I, Thomas V. Ryan Ph.D., ABPP, declare as follows:

1. I testified as an expert witness on the issue of future dangerousness in the case of *United States v. Richard Thomas Stitt.*

2. Based on the defendant's score on a psychological instrument called the Psychopathy Checklist-Revised (PCL-R), I testified that he met the criteria for psychopathy. I testified about the defining characteristics of psychopathy and about the utility of the PCL-R as a predictor of future violence in prison. Based upon the defendant's PCL-R score, I offered the opinion that he would be a future danger if sentenced by the jury to life without parole.

3. Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.

4. My testimony to the best of my recollection, without reviewing the transcript of my testimony about the defendant, included the following statements relating to the PCL-R and psychopathy:

   a) that based on his score on the PCL-R, the defendant presented a high risk of future violence even in the context of a maximum security federal prison;
   b) that because he was a psychopath as defined by the PCL-R, the defendant was essentially untreatable and not amenable to rehabilitation;
   c) that because he was a psychopath as assessed with the PCL-R, the defendant would not "burn out" after age forty like other violent offenders, but instead would continue to be violent;

5. The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes.* In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

FELL-00002114

6. Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt*.

7. My experience in *Haynes* prompted me to review my future dangerousness testimony in the *Stitt* trial.

8. At the time I testified in Stitt, there was enthusiasm among psychologists about the PCL-R's potential use as a tool for assisting mental health professionals in determining whether mentally disordered individuals could safely be released into the community. Because it was a newly developed instrument, however, there were few published, peer reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in North America. It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

9. In a comprehensive review of the literature relating to institutional violence and the PCL-R that focused on the use of the PCL-R in capital sentencing proceedings, John Edens, a psychologist with extensive experience in the area of risk assessment, concluded, "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable...." Edens, J., Petrila, J., & Buffington-Vollum, J.K, 2001, Psychopathy and the death penalty: can the PCL-R identify offenders who represent "a continuing threat to society?" Journal of Psychiatry and Law, 29, 433-481. Although other experts have expressed different opinions, I generally agree with Dr. Edens' conclusion, and believe it is an accurate summary of the prevailing view among forensic psychologists.

10. Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*. The government's continued confidence in my work speaks, I believe, to the integrity of my assessments and my professional decision-making.

11. In addition to the PCL-R, I based my testimony in the *Stitt* trial on documents pertaining to the defendant and his history provided by the government, my own clinical interview of Mr. Stitt, my administration and interpretation of both the PCL-R and another psychological instrument, the Minnesota Multiphasic Personality Inventory

FELL-00002115

(MMPI), and the psychological assessment of the defense psychologist, Dr. Thomas Pasquale, which was provided to me.

12. In the course of discussions with counsel assisting Mr. Stitt in his post-conviction proceedings, I have been advised of significant historical and background facts pertaining to Mr. Stitt that I did not know of at the time of my evaluation and testimony and were not brought to my attention. Had I known of these facts at the time of my evaluation, they may have caused me to arrive at conclusions different from the ones I testified to at trial. Had I not known of them at the time of my evaluation but simply been cross-examined based on assertions that such facts were true, I probably would have testified that such facts, if true, would cause me to question the conclusions that I had previously reached about this individual.

13. I am speaking specifically of information regarding the family history and upbringing of the defendant. I believed and testified that although the defendant was born to a mother who was young and unable to appropriately care for him, he had been raised by a warm and nurturing grandmother until the age of twelve, in a home that was across the street from his maternal and paternal grandfathers, who engaged in fatherly activities with the defendant during his childhood. I believed that the pattern of behavioral problems manifested by the defendant as a child were unexplained by any major mental illness or other factor and therefore that he had manifested a conduct disorder at an early age. This, together with the defendant's continued criminal conduct as an adult, and the psychological profile indicated by his MMPI results, led me to conclude that as an adult the defendant did not suffer from a major mental illness or other mental disorder and was best described as having an antisocial personality disorder.

14. Post-conviction counsel for Mr. Stitt have advised me that their investigation has indicated that in fact his grandmother's home was a chaotic, violent and frequently terrifying environment; that Mr. Stitt lost even that home when his grandmother died when he was eight years old; and, most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings.

15. Although all of this information would have been important for my evaluation, the information about the diagnoses of the defendant's mother and her first-degree relatives would be very helpful. I have been advised that the defendant's mother experienced repeated involuntary emergency psychiatric hospitalizations for acute episodes of bipolar disorder, and that at least one aunt has been diagnosed with bipolar disorder as well.

16. Bipolar and other mood disorders have a higher than normal genetic link, and are diagnosed on the basis of an individual's behavior and family history. With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light. For example, Mr. Stitt scored high on the mania scale of the MMPI, leading to a recommendation in the report of his scores to consider a diagnosis of mood disorders including manic episodes, hypomanic states, and cyclothymia. I certainly would have seriously considered this result more heavily had I been aware of the diagnoses of Mr. Stitt's mother and his aunt. Instead, I focused on the

FELL-00002116

psychopathic deviance scale, on which Mr. Stitt also scored high, and emphasized personality qualities that were similar to the features of psychopathy that he had scored high for on the PCL-R.

17. Similarly, I would most likely interpret differently statements that Mr. Stitt made to me during our clinical interview. For example, when asked to rate himself on a scale of one to ten, Mr. Stitt awarded himself a fifteen. He told me that if released he would pursue an acting career in Hollywood, and that he could anticipate no difficulty in achieving such a goal. With an awareness of his bipolar family history, this could be alternatively viewed as those indicative of mania or hypomania, suggesting the possible presence of a mood disorder.

18. Furthermore, information about a bipolar family history would have caused me to question whether the early behavior problems manifested by Mr. Stitt were indications of early onset bipolar disorder. The out-of-control behavior described in the information I was provided about Mr. Stitt's childhood could be consistent with the behavior of children suffering from early onset bipolar disorder, and therefore could have been symptomatic of a mental illness rather than a volitional decision by Mr. Stitt not to conform to societal expectations. If, on cross-examination at trial, Mr. Stitt's counsel had questioned me in this area and informed me about the family history of bipolar disorder, I certainly would have conceded that it raised substantial concerns about the possibility of mental illness in Mr. Stitt.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection at this time.

_____
Thomas V. Ryan, Ph.D., ABPP
May 12, 2003

FELL-00002117

# EXHIBIT 207

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY - MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE - BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON - BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

February 23, 2005

Mr. David V. Kirby
United States Attorney
United States Courthouse and Federal Building
11 Elmwood Avenue
Burlington, VT 05401

Re: *United States of America v. Donald Fell*, No. 2:01-CR-12

Dear David:

In 2001, I wrote to you, documenting the mitigation evidence in this case. Based upon meetings with you, and United States Attorney Peter Hall, we reached an agreement to settle the case for a plea of guilty to kidnapping with death resulting. Under federal law, that would have resulted in a mandatory life sentence. The agreement was later rejected by the United States Attorney General and a notice of intent to seek the death penalty was filed.

The purpose of this letter is to provide you with additional, new mitigation evidence so that the Department of Justice, and the United States Attorney General, may reconsider the decision to seek the death penalty in this case. The Department of Justice's Manual provides that if the United States Attorney seeks withdrawal of a death penalty notice, any changes in facts and circumstances must be provided to the Attorney General. See Section 9-10.090.

Since the original decision to seek the death penalty in this case, there have been at least three major developments that affect the appropriateness of seeking a death sentence. First, are the findings by the government's mental health experts that there is substantial mitigating evidence against seeking a death sentence in this case. Second, is Donald Fell's adjustment to confinement, and contributions to institutional life at Vermont's Northwest Correctional Facility. Third, are changes to case law that preclude the admission of the statements of deceased co-defendant Robert Lee. Each of these, separately, or in combination with the mitigation evidence previously provided, warrants a reexamination of the original decision to seek a death sentence.

On December 31, 2002, Dr. John S. Rabun, a forensic psychiatrist chosen by the government, issued a report on his examination of Donald Fell. Dr. Rabun was assisted by

Page 1 of 4

FELL-00002118

psychologist Dr. Richard Wetzel, who performed psychological testing on Fell. Both doctors met with Fell in person on separate occasions. Rabun's examination of Fell lasted approximately 3 hours and 25 minutes.

The decision to allow the government to test and question Fell was made by Fell and his attorneys. The testing preceded the amendment of Federal Rule of Criminal Procedure 12.2, which now allows a judge to order testing of a capital defendant who gives notice that he will present mental health evidence during the punishment phase. However, even that rule prohibits prosecutors from viewing the results until, and if, the defendant has first been convicted of a capital offense. In this case, it was agreed that the government could view the results immediately. The reports and conclusions of the defense mental health experts, were seen by Doctors Rabun and Wetzel before they reached their own conclusions.

Doctor Rabun's report was 15 pages. Since you have the report, I will not quote verbatim. He specifically confirmed factors that mitigate against a death sentence in this case. First, he pointed to Fell's history of being sexually and physically abused as a child. Second, he referred to Fell's prolific use of alcohol and illicit drugs, both on the day of the offense, and for years before. Third, he focused on Fell's chaotic and dysfunctional family, which made him a victim of violence, as well as having to witness violence committed against other family members. Fourth, he cited Fell's acclimation to prison and his history of reacting positively to institutional life.

Doctor Rabun wrote his report over two years ago. Fell has now been confined to Vermont's Northwest Correctional Facility for more than four years. Recently, we interviewed staff at the facility and examined Fell's institutional record there. We spoke to several correctional officers who have worked with Fell while he has been there. We spoke to his teacher, who is preparing him for his High School General Equivalency Degree (GED).

The consensus was that Donald Fell is respectful, polite, and deferential to authority. All of those interviewed genuinely like him. Those who have known him since he arrived, said that he had progressed from a scared kid to a more mature and social adult. One officer said that Fell has a "respect for the officer's job, and not just respect for the person." Another, said that Fell "adapted well to the structure" of the institution. A third, pointed out that although the break rooms tend to be divided racially, Fell has a unique ability get along with everyone.

Fell's teacher has been working with inmates at Northwest Correctional Facility for over 24 years. She said, "he devours every opportunity to learn like a sponge." She is a petite woman, who often works alone with Fell. She stated that she has never felt threatened or in danger. She described Fell as "timid," "polite," and "always very appreciative." She has dealt with many manipulative inmates, and says Fell is not. "He has never asked for anything extra," she said.

During his time in custody, Fell weathered several stressful events. First, was the death of long-time friend Robert Lee, who was in the same unit. Second, was his year-long incarceration in D Unit, which is the most restrictive location, allowed him no outdoor access, and houses the

FELL-00002119

mentally ill inmates. Third, was the institution's change to a smoke-free environment, which required Fell to eliminate use of tobacco at once.

Donald Fell has been given several positions of trust at the institution. He began with a base level cleaning duty and now has the more desirable laundry position. Fell was elected by other inmates as the Echo Unit representative to the Echo Management Team, a group of corrections employees and an inmate representative, who meet regularly to defuse grievances in the unit. Fell's institutional records are consistent with what we were told. They are available for your review.

The third development, since the death notice was filed, is the change in the law related to the admission of out-of-court statements. When Judge Sessions found the Federal Death Penalty Act unconstitutional, he pointed to the fact that the government argued for the admission of deceased co-defendant Robert Lee's statements at the punishment stage, even though they were inadmissible during the guilt-innocence portion. United States v. Fell, 217 F.Supp. 2d 469, 485 (D. Vt. 2002). The judge found that it violated due process for some elements of capital murder to be proven by a lesser standard.

On appeal, the Second Circuit held that while the Sixth Amendment guarantee of confrontation also applies to the punishment stage, the FDPA protects that right by allowing a trial judge to exclude such evidence. United States v. Fell, 360 F.3d 135, 145 (2d Cir. 2004) (Under the FDPA, "the judge is the gatekeeper of constitutionally permissible evidence"). The court found that the constitutional rule requiring confrontation was consistent with such a balancing test.

One week later, the United States Supreme Court ruled that the right to confrontation absolutely barred testimonial statements that were not previously subject to cross-examination. Crawford v. Washington, 124 S.Ct. 1354 (2004). Lee's statements were made under custodial interrogation, as part of the investigation in this case. Therefore, since the right to confrontation applies to the punishment stage, and that right is an absolute prohibition, Lee's testimonial statements are now clearly barred from either portion of the trial. Another district court recently found similar evidence was barred from proving eligibility for the death penalty at a capital sentencing hearing. See United States v. Jordan, __F.3d__, 2005 WL 399679 (E.D. Va. Feb. 9, 2005).[1]

The exclusion of Lee's statements at the guilt stage detract little from the government's case. Fell made lengthy and detailed statements admitting his conduct. However, it makes a difference at a sentencing hearing. Lee's statements are more favorable to Lee than Fell. Fell's

---

[1] The court indicated it planned to bifurcate the sentencing phase between evidence supporting the "eligibility" for and "selection" of the death penalty, and intended to admit the voluntary statements of an unavailable witness only at the "selection" phase. However, all of Lee's statements were the product of custodial interrogation. None were voluntary. Therefore, bifurcation will not solve the problem of their reliability.

Page 3 of 4

FELL-00002120

statements, which will be admitted, are more favorable to Fell than Lee. Because the jury will weigh the relative culpability of Lee and Fell, this will have an impact upon their choice of imposing a death sentence on Fell or not. Recent changes in case law have limited the government's punishment evidence on this point.

In summary, by the time this case begins jury selection, it will be close to five years since the events of the crime. Much has happened since. It is appropriate to reconsider the basis for going forward with such a lengthy and expensive trial that may be avoided by a guilty plea and a guaranteed life sentence.

Sincerely,

Alexander Bunin
Federal Public Defender

Page 4 of 4

FELL-00002121

# EXHIBIT 208



**U.S. Departm    : of Justice**

*United States Attorney*
*District of Vermont*

COPY

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                         *Fax: (802) 951-6540*

June 29, 2005

Hon. William K. Sessions, III
United States District Court
District of Vermont
Burlington, VT 05402-0928

      Re:    *United States v. Fell*
             No. 2:01-CR-12-2

Dear Judge Sessions:

This letter responds to this morning's letter from counsel regarding the government's rebuttal case.

First, counsel cites authority for the proposition that the government may not introduce statements from a defendant's Rule 12.2 government expert interview absent defense expert mental health testimony. Counsel recognizes, of course, that the government may introduce expert mental health evidence that does not include such statements.

The fact that the defense will not call a mental health expert does not remove from the case the issue of defendant's mental health. The second mitigating factor cited by the defense directing places mental health at issue. Moreover, documents introduced in the defense mitigation binder repeatedly raise the defendant's mental health, including documents showing multiple psychiatric hospitalizations which refer to mental health diagnoses and prescriptions for drugs. Further, at least one recent defense witness, Michael Kane, testified that the defendant's mental condition required him to be placed in a special dormitory for mental health students at St. Michael's when he was 14-15 years old. Finally, the fact that the defendant is implicated in the murder of his mother raises mental health issues. For all these reasons, we are concerned that at least some jurors will be troubled by the question of mental health.

We are proposing to resolve this matter with the defense without calling a government mental health expert by: (1) withdrawal of the second mitigating factor, and (2) a short stipulation regarding the defendant's mental health at the time of the offense.

Second, the defense seeks to bar any rebuttal evidence regarding the defendant's activities between the age of 15 and 20, on the theory that they presented no evidence regarding that time period. That claim is specious. The defense called multiple witnesses regarding the defendant's life from infancy through kindergarden and early teens. Certainly his life in the following years is highly pertinent. Moreover, the remaining years prior to the murders are placed at issue by the

FELL-00002122

defense mitigation factors (such as his lack of criminal history). Accordingly, the government will offer testimony regarding those intervening years.

Thank you for your attention to this matter. Looking forward to seeing you in about 11 minutes.

Very truly yours,

DAVID V. KIRBY
United States Attorney

By:

WILLIAM B. DARROW
Assistant U.S. Attorney

CC:    Alex Bunin, Esq.
Gene Primomo, Esq.
Paul Volk, Esq.

FELL-00002123

# EXHIBIT 209

U.S. DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES DISTRICT COURT    FILED

DISTRICT OF VERMONT    2005 JUL 14 AM 11 53

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA    )
                            )
            v.              )    Crim. No. 2:01-CR-12-01
                            )
DONALD FELL                 )

## SPECIAL VERDICT FORM

**GENERAL DIRECTIONS:**

This verdict form is supplied to you because you have previously found Donald Fell guilty of the two counts contained in the Superseding Indictment. Therefore, this form applies only as to your findings on Count One (carjacking with death resulting) and Count Two (kidnapping with death resulting).

1

FELL-00002124

### I. DEFENDANT'S AGE AT THE TIME OF THE OFFENSE

**COUNT ONE**

That the defendant Donald Fell was at least 18 years of age at the time of the offense charged in Count One of the Superseding Indictment.

Unanimous Yes _____X_____    Not Unanimous _____

**COUNT TWO**

That the defendant Donald Fell was at least 18 years of age at the time of the offense charged in Count Two of the Superseding Indictment.

Unanimous Yes _____X_____    Not Unanimous _____

2

FELL-00002125

## II.    THRESHOLD ELIGIBILITY FACTORS

For each count, place an "X" next to "Unanimous Yes," for each "threshold eligibility factor" you unanimously find that the Government has proven beyond a reasonable doubt.  If you do not find that the Government has proven the eligibility factor beyond a reasonable doubt to your unanimous satisfaction, then place an "X" next to "Not Unanimous."  If you find at least one threshold eligibility factor for a count, unanimously and beyond a reasonable doubt, then move on to Section III, Statutory Aggravating Factors.

**COUNT ONE**

1.    Donald Fell intentionally killed Teresca King.

Unanimous Yes _____ X _____    Not Unanimous _____

2.    Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Teresca King.

Unanimous Yes _____ X _____    Not Unanimous _____

3.    Donald Fell intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts.

Unanimous Yes _____ X _____    Not Unanimous _____

4.    Donald Fell intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts.

3

FELL-00002126

Unanimous Yes ____X____    Not Unanimous _____

**COUNT TWO**

1. Donald Fell intentionally killed Teresca King.

Unanimous Yes ____X____    Not Unanimous _____

2. Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Teresca King.

Unanimous Yes ____X____    Not Unanimous _____

3. Donald Fell intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts.

Unanimous Yes ____X____    Not Unanimous _____

4. Donald Fell intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts.

Unanimous Yes ____X____    Not Unanimous _____

If you answered "Not Unanimous" with respect to all four of the "threshold eligibility factors" as to one count, then that ends your consideration of the death penalty as to that count. You must stop your deliberation as to that particular count.

If you answered "Not Unanimous" with respect to all four of the "threshold eligibility factors" as to both counts, that ends your consideration of the death penalty completely. You

4

FELL-00002127

should stop your deliberations, sign this Special Verdict Form, and advise the Court you have reached a decision.

If you answered "Unanimous Yes" with respect to one or more of the "threshold eligibility factors" as to any of the counts, then continue with your deliberations as to the count or counts for which you found a "threshold eligibility factor," by proceeding to Section III below.

5

FELL-00002128

### III.   STATUTORY AGGRAVATING FACTORS

For each of the counts for which you answered "Unanimous Yes" with respect to one or more of the "threshold eligibility factors" in Section II, place an "X" next to "Unanimous Yes" or "Not Unanimous" as to whether you, the jury, unanimously find that the Government has established beyond a reasonable doubt the existence of the statutory aggravating factors.

**COUNT ONE**

1.   The death of Teresca King occurred during the commission of a kidnapping.

Unanimous Yes _____X_____    Not Unanimous _____

2.   Donald Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

3.   Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode.

Unanimous Yes _____X_____    Not Unanimous _____

**COUNT TWO**

1.   The death of Teresca King occurred during the commission of a kidnapping.

Unanimous Yes _____X_____    Not Unanimous _____

2.   Donald Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

6

FELL-00002129

3.  Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode.

Unanimous Yes _____X_____    Not Unanimous _____

For each count that you are considering, if you do not unanimously find that the Government has proven beyond a reasonable doubt at least one of the above statutory aggravating factors with respect to that count, then your deliberations are over as to that capital count.

If you answered "Not Unanimous" with respect to all of the statutory aggravating factors as to both counts, that ends your consideration of the death penalty completely. You should stop your deliberations, sign this Special Verdict Form, and advise the Court you have reached a decision.

If you answered "Unanimous Yes" with respect to one or more of the statutory aggravating factors with regard to one or both counts, continue on to Section IV.

7

FELL-00002130

## IV.  NON-STATUTORY AGGRAVATING FACTORS

For each of the following non-statutory aggravating factors, answer "Unanimous Yes" or "Not Unanimous" as to whether you unanimously find that the Government has proven beyond a reasonable doubt the existence of that non-statutory aggravating factor for each count.

**COUNT ONE**

1.  Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder.

Unanimous Yes _____X_____    Not Unanimous _____

2.  Donald Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities.

Unanimous Yes _____X_____    Not Unanimous _____

3.  Donald Fell participated in the murder of Teresca King after substantial premeditation to commit the crime of carjacking.

Unanimous Yes _____X_____    Not Unanimous _____

4.  As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the Defendant caused loss, injury and harm to the victim and the victim's family, including but not limited to the following:

> a) Infliction of distress on the victim. During the four-hour interval between her kidnapping and murder, Teresca King suffered extreme anxiety and emotional suffering.

> b) Impact of the offense on the family of the victim. The kidnapping and murder of Teresca King have caused the King family extreme emotional suffering, and the victim's family

8

FELL-00002131

has suffered severe and irreparable harm. Donald Fell caused loss, injury and harm to Teresca King and her family.

Unanimous Yes _____X_____    Not Unanimous _____

## COUNT TWO

1. Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder.

Unanimous Yes _____K_____    Not Unanimous _____

2. Donald Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities.

Unanimous Yes _____X_____    Not Unanimous _____

3. Donald Fell participated in the murder of Teresca King after substantial premeditation to commit the crime of carjacking.

Unanimous Yes _____X_____    Not Unanimous _____

4. As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the Defendant caused loss, injury and harm to the victim and the victim's family, including but not limited to the following:

    a) Infliction of distress on the victim. During the four-hour interval between her kidnapping and murder, Teresca King suffered extreme anxiety and emotional suffering.

    b) Impact of the offense on the family of the victim. The kidnapping and murder of Teresca King have caused the King family extreme emotional suffering, and the victim's family has suffered severe and irreparable harm. Donald Fell caused loss, injury and harm to Teresca King and her family.

Unanimous Yes _____X_____    Not Unanimous _____

9

FELL-00002132

After you have completed your findings in this section (whether or not you have found any of the above non-statutory aggravating factors to have been proven), continue on to Section V.

FELL-00002133

## V.  MITIGATING FACTORS

For each count, you should indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

Recall that your vote as a jury need not be unanimous with regard to each question in this section.  A finding with respect to a mitigating factor may be made by one or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in making his or her individual determination of whether or not a sentence of death shall be imposed, regardless of the number of jurors who agree that the factor has been established.

In addition to the mitigating factors outlined by this court, this section also contains blank lines in which you may write any additional mitigating factors that any member or members of the jury may have found.  You may consider during your deliberations any other factor or factors in Donald Fell's background, record, character, or any other circumstance of the offense that mitigates against the imposition of the death sentence.  You may write these additional mitigating factors on the blank lines.  If you need additional space, simply write "continued" at the end of the

11

FELL-00002134

blank lines and write any additional factors on the back side of the paper. It is not necessary, however, for you to list a mitigating factor in order to consider it.

**COUNT ONE**



1. Donald Fell's capacity to appreciate his conduct was significantly impaired.

   _____0_____ Number of Jurors who so find.

2. Donald Fell did not plan to kill Teresca King at the time she was kidnapped.

   _____1_____ Number of Jurors who so find.

3. After his arrest, Donald Fell truthfully admitted his responsibility for Teresca King's murder.

   _____6_____ Number of Jurors who so find.

4. Donald Fell assisted law enforcement officers in finding Teresca King's body.

   _____6_____ Number of Jurors who so find.

5. Donald Fell does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release.

   _____0_____ Number of Jurors who so find.

6. Donald Fell has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances.

   _____1_____ Number of Jurors who so find.

7. Donald Fell's execution would detrimentally affect persons who care about him.

   _____3_____ Number of Jurors who so find.

12

FELL-00002135

8.  Donald Fell has shown remorse for killing Teresca King.

_____ *0* _____ Number of Jurors who so find.

9.  Robert Lee, equally culpable for the crimes, will not face execution.

_____ *12* _____ Number of Jurors who so find.

10.  Donald Fell and Robert Lee acted in concert in committing the crimes.

_____ *12* _____ Number of Jurors who so find.

11.  Donald Fell offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day.

_____ *12* _____ Number of Jurors who so find.

12.  Donald Fell was sexually and physically abused as a child.

_____ *12* _____ Number of Jurors who so find.

13.  As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other.

_____ *8* _____ Number of Jurors who so find.

14.  Donald Fell was raised without positive role models.

_____ *10* _____ Number of Jurors who so find.

15.  As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions.

_____ *12* _____ Number of Jurors who so find.

16.  Donald Fell was twenty years old at the time of the offense.

13

FELL-00002136

_____12_____    Number of Jurors who so find.

17.  Donald Fell's parents were violent alcoholics who abandoned him as a child.

_____12_____    Number of Jurors who so find.

18.  Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.

_____12_____    Number of Jurors who so find.

19.  Any other factors that favor imposition of life imprisonment without possibility of release, including factors in Donald Fell's childhood, background or character.

_____10_____    Number of Jurors who so find.

Any additional mitigating factors:

_Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior_

_____10 Number of Jurors who so find_

14

FELL-00002137

**COUNT TWO**

1.  Donald Fell's capacity to appreciate his
    conduct was significantly impaired.

    _____*0*_____    Number of Jurors who so find.

2.  Donald Fell did not plan to kill Teresca King at the
    time she was kidnapped.

    _____*1*_____    Number of Jurors who so find.

3.  After his arrest, Donald Fell truthfully
    admitted his responsibility for Teresca
    King's murder.

    _____*5*_____    Number of Jurors who so find.

4.  Donald Fell assisted law enforcement
    officers in finding Teresca King's body.

    _____*6*_____    Number of Jurors who so find.

5.  Donald Fell does not present a risk to
    prison officials or other inmates if he is
    sentenced to life in prison without
    possibility of release.

    _____*0*_____    Number of Jurors who so find.

6.  Donald Fell has made positive
    contributions to the Northwest
    Correctional Facility by working, gaining
    an education, and helping to resolve
    inmate grievances.

    _____*1*_____    Number of Jurors who so find.

7.  Donald Fell's execution would detrimentally affect
    persons who care about him.

    _____*3*_____    Number of Jurors who so find.

8.  Donald Fell has shown remorse for killing Teresca
    King.

    _____*0*_____    Number of Jurors who so find.

15

FELL-00002138

9.  Robert Lee, equally culpable for the crimes, will not face execution.

_____*12*_____  Number of Jurors who so find.

10. Donald Fell and Robert Lee acted in concert in committing the crimes.

_____*12*_____  Number of Jurors who so find.

11. Donald Fell offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day.

_____*12*_____  Number of Jurors who so find.

12. Donald Fell was sexually and physically abused as a child.

_____*12*_____  Number of Jurors who so find.

13. As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other.

_____*9*_____  Number of Jurors who so find.

14. Donald Fell was raised without positive role models.

_____*9*_____  Number of Jurors who so find.

15. As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions.

_____*12*_____  Number of Jurors who so find.

16. Donald Fell was twenty years old at the time of the offense.

_____*12*_____  Number of Jurors who so find.

17. Donald Fell's parents were violent alcoholics who abandoned him as a child.

16

FELL-00002139

_____*12*_____    Number of Jurors who so find.

18. Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.

_____*12*_____    Number of Jurors who so find.

19. Any other factors that favor imposition of life imprisonment without possibility of release, including factors in Donald Fell's childhood, background or character.

_____*10*_____    Number of Jurors who so find.

Any additional mitigating factors:

_Total life experience, failure of the State of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior._

_10 Number of Jurors who so find_

17

FELL-00002140

## VI.  DECISION

**COUNT ONE**

**1.    Sentence of Life Imprisonment without the Possibility of Release.**

We the jury decide, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed upon Donald Fell.

_____ Yes    ____X____ No

**2.  Death Sentence**

We the jury decide, by unanimous vote, that a sentence of death shall be imposed upon Donald Fell.

____X____ Yes    _____ No

**3.  Lack of Unanimity**

After making all reasonable efforts, the jury has been unable to reach a unanimous verdict regarding the proper and justified sentence to be imposed upon Donald Fell.

_____P. Guin_____

Foreperson

18

FELL-00002141

**COUNT TWO**

1. **Sentence of Life Imprisonment without the Possibility of Release.**

We the jury decide, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed upon Donald Fell.

_____ Yes    _____X_____ No

2. **Death Sentence**

We the jury decide, by unanimous vote, that a sentence of death shall be imposed upon Donald Fell.

_____X_____ Yes    _____ No

3. **Lack of Unanimity**

After making all reasonable efforts, the jury has been unable to reach a unanimous verdict regarding the proper and justified sentence to be imposed upon Donald Fell.

_P. Quin_    _7/14/05_
Foreperson

Note: If you have unanimously decided to impose the death penalty, proceed to Section VII. If you have not imposed the death penalty, leave Section VII blank. The foreperson should, in any event, sign the verdict slip and date it.

19

FELL-00002142

## VII.    CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or a victim was not involved in reaching his or her individual decision, and that the individual juror would make the same decision regarding the sentence for Donald Fell.

4. _____    #3 _____
11. _____    #8 _____
10. _____    #22 _____
5. _____    #7 _____
12. _____    #9 _____
#6 _____    1  P. Geiss _____

                                Foreperson

Dated at Burlington, Vermont, this __14__ day of July, 2005.

_____
Foreperson

20

FELL-00002143

# EXHIBIT 210

# Fax Transmission

**Administration Department**
470 Main Street
Edwardsville, PA 18704-3299
phone: 570.288.6484
fax: 570.288.7041



Edwardsville Borough
Luzerne County
Pennsylvania
Incorporated 1884

## TO:
CLEARY GOTTLIED STEEN + HAMILTON

## # OF PAGES:
19

## FROM:
EDWARDSVILLE BOROUGH
POLICE CHIEF
DAVID SOUCHICK

## DATE:

## RE:
RECORDS REGARDING 1996 INCIDENT INVOLVING DEBORAC (DEBRA) FELL

OTHER REQUEST SHOULD BE ON STANDARD RIGHT-TO-KNOW REQUEST FORM

☐ Urgent    ☐ FOR REVIEW    ☐ Please Comment    ☐ Please Respond

NOTE: THIS FAX IS INTENDED FOR THE SOLE USE OF THE PERSON TO WHOM IT IS ADDRESSED. UNAUTHORIZED DISBURSEMENT, MISUSE, OR COPYING THE CONTENTS OF THIS TRANMISSION IS PROHIBITED AND MAY RESULT IN LEGAL ACTION.

## MESSAGE:
Leo J Martin Jr
Borough Secretary
Right To Know Officer

c Page 1

FELL-00002144

FELL-0002145



# pennsylvania
### OFFICE OF OPEN RECORDS

## STANDARD RIGHT-TO-KNOW REQUEST FORM

**DATE REQUESTED:**

**REQUEST SUBMITTED BY:**    ◯ E-MAIL     ◯ U.S. MAIL     ◯ FAX     ◯ IN-PERSON

**NAME OF REQUESTER :**_____

**STREET ADDRESS**        :_____

**CITY/STATE/COUNTY/ZIP(Required):** _____

**TELEPHONE (Optional):**_____

**RECORDS REQUESTED:** *Provide as much specific detail as possible so the agency can identify the information.*

**DO YOU WANT COPIES?  YES or NO**
**DO YOU WANT TO INSPECT THE RECORDS?  YES or NO**
**DO YOU WANT CERTIFIED COPIES OF RECORDS? YES or NO**

**\*\* PLEASE NOTE: RETAIN A COPY OF THIS REQUEST FOR YOUR FILES \*\***
**\*\* IT IS A REQUIRED DOCUMENT IF YOU WOULD NEED TO FILE AN APPEAL \*\***

---
### *FOR AGENCY USE ONLY*

**RIGHT TO KNOW OFFICER:**

**DATE RECEIVED BY THE AGENCY:**

**AGENCY FIVE (5) BUSINESS DAY RESPONSE DUE:**

*\*\*Public bodies may fill anonymous verbal or written requests. If the requestor wishes to pursue the relief and remedies provided for in this Act, the request must be in writing. (Section 702.) Written requests need not include an explanation why information is sought or the intended use of the information unless otherwise required by law. (Section 703.)*

P. 003

TEL:5702886484

EDWARDSVILLE BOROUGH

FEB. -17' 11(THU) 15:45

PAGE  1 OF  2
EDW401-7596 - CHR      04/10/96 18:45:46 - 04/10/96 18:45:45 BTK7YGWGO6N5

SP4-137B
              PENNSYLVANIA STATE POLICE CENTRAL REPOSITORY
     1800 ELMERTON AVENUE HARRISBURG, PENNSYLVANIA  17110  717-783-5592

ATTN: SGT SLUSARK                    ORI: PA0400400 EDWARDSVILLE PD

--------------------------------------------------------------------------

  USE OF THE FOLLOWING CRIMINAL HISTORY RECORD FOR  *** SID/201-11-85-2 ***
  REGULATED BY ACT 47, AS AMENDED.  *** III - SINGLE STATE OFFENDER ***
---------------------------------------------------------------------------
    REDACTED - FELL                         REDACTED - FELL
DOB:        54   SEX: F   RAC: W   SOC:         8195   FBI: 31339NA8
---------------------------------------------------------------------------
NAME: FELL,DEBORAH ANN                  OTN: C494141-4
ARRESTED: 03/13/91  PA0401100 PITTSTON PD                    OCA: 91027

          CC3929   RETAIL THEFT               DISPOSITION UNREPORTED
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
NAME: FELL,DEBBIE ANN                   OTN: E620483-3
ARRESTED: 01/29/94  PA0401300 WILKES-BARRE PD               OCA: 15064

FELL-00002146

PAGE  1  OF  1

EDW401-7595 - CHR        04/10/96 18:44:16 - 04/10/96 18:44:16 BT27YGWG059P

*** RESPONSE FROM PA COMPUTERIZED CRIMINAL HISTORY FILE ***

ORI/PA0400400.NAM/FELL,DEBORAH              .DOB$^{REDACTED-E}$54.RNG/ .
SOC/        .OTN/        .FBI/          .SID/.
PUR/C.ATN/SGT SLUSARK              .OPR/.

*** RESPONSE FROM PA CCHRI - BASED ON IDENTIFIERS ABOVE ***

NAM/FELL,DEBORAH ANN          .  DOB/$^{REDACTED}$54.  SEX/F.  RAC/W.
SID/201-11-85-2. FBI/31339NA8 . III/S. RAP STATUS/AUTOMATED          .
HGT/502. WGT/150. HAI/RED. EYE/HAZ. PRO-PAR MAX/        .
REDACTED-FELLB195.
OTN/C494141-4:E620483-3.
OTHER NAMES/FELL,DEBBIE              :FELL,DEBBIE ANN          .
THIS CCHRI RECORD LAST UPDATED : 062894

FINGERPRINTS REQUIRED FOR POSITIVE ID

FELL-00002147

**ARREST REPORT**

| | |
|---|---|
| 1. CONTROL NUMBER | ☒ ADULT  ☐ JUVENILE |

**OFFENSE**

4. OFFENSE DATE: 4 / 10 / 96  MO. DA. YR.

5. OTHER CHARGES

7. LOCATION OF ARREST: MAIN ST EDWARDSVILLE PA

8. WHEN ARRESTED: 4 / 10 / 96  MO. DA. YR.  HOURS

9. TYPE OF ARREST: ☐ ON VIEW  ☐ WARRANT  ☒ SUSPICION

**ACCUSED**

10. NAME: DEBORAH...

15. ALIAS / NICKNAME

16. TELEPHONE: NONE

17. OCCUPATION: NONE

18. PLACE OF EMPLOYMENT / SCHOOL: NONE

20. PLACE OF BIRTH: WILKES BARRE PA

25. BLOOD TYPE

REDACTED - FELL

29. FBI NO.

30. SID NO.

31. PDID NO.

32. MILITARY NO.

33. VETERANS CLAIM NO.

34. OPERATOR PERMIT NO.

35. FINGERPRINT CLASSIFICATION

36. PHOTO TAKEN: ☒ YES  ☐ NO   EDW0293   NUMBER / TYPE WEAPON(S)

37. FINGERPRINT CARD TO: ☒ FBI  ☒ PSP

38. INDICATION OF: DRUGS: ☐ YES ☒ NO   ALCOHOL: ☒ YES ☐ NO

39. DEFENDANT ARMED: ☒ YES  ☐ NO   KNIFE

41. PERSONAL ARTICLES RECEIPT GIVEN: ☐ YES  ☐ NO

40. ARTICLES CONFISCATED FROM DEFENDANT: NONE

**VEH**

42. DEFENDANT VEHICLE IDENTIFICATION: YEAR  MAKE  MODEL  LICENSE NO./ST

DEFENDANT FAMILY CODE FOR BLOCKS 43 - 46
F - FATHER  W - WIFE  B - BROTHER  S - SON
M - MOTHER  S - SISTER  D - DAUGHTER

**FAMILY**

| | NAME | ADDRESS | PHONE (RESIDENCE / OFFICE) |
|---|---|---|---|
| 43. | | | |
| 44. | | | |
| 45. | | | |
| 46. | | | |

**ACC**

47. NAME / ALIAS / NICKNAME OF ACCOMPLICE: NONE    48. ADDRESS

49. NAME / ALIAS / NICKNAME OF ACCOMPLICE    50. ADDRESS

**ATT**

51. ATTORNEY NAME    TELEPHONE NO.

52. RIGHTS READ: ☐ YES  ☐ NO    BY WHOM

**STAT**

53. STATUS OF DEFENDANT: ☐ DETAINED AT ___  ☐ MONEY BOND - AMOUNT $___  ☐ PROPERTY BOND  ☐ RELEASED  ☐ TURNED OVER TO  ☐ PERSONAL BOND

**NARRATIVE**

ITEM NO.    54. CONTINUATION OF ABOVE ITEMS (INDICATE ADDITIONAL INFORMATION.)

SEE AFFIDAVIT

55. ADJUDICATION  DATE AND TIME: ___ / ___ / ___

FELL-00002148

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

Mag. Dist. No.:

11-2-02

DJ Name: Hon.

Address: JOHN J. HOPKINS
470 MAIN STREET
EDWARDSVILLE, PA

Telephone: (717) 287-9645        18704-0000

OFFICER :

MICHAEL SLUSARK
EDWARDSVILLE BORO POLICE
470 MAIN ST
EDWARDSVILLE, PA 18704

**SUBPOENA
CRIMINAL/SUMMARY CASE**

COMMONWEALTH OF

PENNSYLVANIA

VS.

DEFENDANT:        NAME and ADDRESS
FELL, DEBORAH
REDACTED - FELL
EDWARDSVILLE, PA 18704

L

Docket No.: CR-0000121-96
Date Filed: 4/10/96
OTN:        E 410135-5

TO: GILBERT, LAWRENCE
_____
(Name of Witness)

1. You are ordered by the court to come to:

| Event: PRELIMINARY HEARING | COMPLAINT NO. |
|---|---|
| Date: 4/16/96 | Place: DISTRICT COURT 11-2-02 470 MAIN STREET EDWARDSVILLE, PA 18704-0000 |
| Time: 1:30 PM | |

to testify on behalf of  SLUSARK, MICHAEL _____
                        (Commonwealth) (Defendant) (Court)
_____ , in the above case, and to remain until excused. **If you are disabled
and require assistance, please contact the Magisterial District office at the address above.**

2. And bring with you the following: (complete if applicable)

_____

_____

_____

COMPLETE FOLLOWING IF APPLICABLE:

This subpoena is issued upon application of: _____
                                            (Attorney)

Attorney's address and phone number: _____

( ____ )
_____ Date ____ _John J. Hopkins_____ , District Justice

**WARNING:** Failure to comply with this subpoena may result in a finding of **CRIMINAL CONTEMPT** pursuant to
42 Pa.C.S. § 4137. This offense is punishable by a fine and/or imprisonment.

My commission expires first Monday of January,  2000  .                **SEAL**

AOPC 605-94

FELL-00002149

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: LUZERNE

**RELEASE OF PRISONER**

Mag. Dist. No.:

    11-2-02

DJ Name: Hon:

   JOHN J. HOPKINS
Address: 470 MAIN STREET
   EDWARDSVILLE, PA

Telephone: (717) 287-9645         18704-0000

Server

**COMMONWEALTH OF**

**PENNSYLVANIA**

**VS.**

DEFENDANT:                    NAME and ADDRESS
FELL, DEBORAH
REDACTED - FELL
EDWARDSVILLE, PA 18704

Docket No.: CR-0000121-96
Date Filed: 4/10/96
OTN:      E 410135-5

18 §2702 §§A4 AGGRAVATED ASSAULT
                              (Charge)

18 §2701 §§A1 SIMPLE ASSAULT
                              (Charge)

To the Keeper of __LUZERNE CO CORR FAC_____ Prison in said County,

You are hereby commanded to release the above named Defendant, if detained for no other cause than that mentioned in the attached commitment or other detainer of record. I hereby certify that this case has not been returned to court.

REASON FOR DISCHARGE:

☐ Hearing to be held at:

| Date: | Place: |
|---|---|
| Time: | |

☐ Bail Posted

☐ Not Guilty of a Summary Offense

☒ Court Case Dismissed

☐ Charges withdrawn by Prosecution

☐ Other_____

Witness my hand and official seal at my office _____

this _16th_ day of ___April___, 19_96_

_4/16/96_ Date _____, District Justice

My commission expires first Monday of January, 2000.          **SEAL**

AOPC 602-95

FELL-00002150

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

| |
| --- |
| Mag. Dist No.: |
| 11-2-02 |
| DJ Name: Hon. |
| JOHN J. HOPKINS |
| Address: 470 MAIN STREET |
| EDWARDSVILLE, PA |
| Telephone: (717) 287-9645    18704-0000 |

Server

**RECOMMITMENT**

**COMMONWEALTH OF**

**PENNSYLVANIA**

**·VS.**

DEFENDANT:          NAME and ADDRESS
FELL, DEBORAH
REDACTED - FELL
EDWARDSVILLE, PA 18704

| |
| --- |
| Docket No.: CR-0000121-96 |
| Date Filed:  4/10/96 |
| OTN:      E 410135-5 |

18 §2702 §§A4 AGGRAVATED ASSAULT
                                    (Charge)

18 §2701 §§A1 SIMPLE ASSAULT
                                    (Charge)

To ANY AUTHORIZED PERSON of the above named County of this Commonwealth:

You are hereby commanded to convey and deliver into the custody of the Keeper of the county prison the above named defendant. You, the Keeper are required to receive the defendant into your custody to be safely kept by you until discharged by due course of law or for:

☐ A PERIOD OF_____ DAYS UNTIL_____

☐ A HEARING AT

| Date: | Place: |
| --- | --- |
| Time: | |

☐ A FURTHER HEARING

| Date: | Place: |
| --- | --- |
| Time: | |

☐ COMMON PLEAS COURT ACTION

☐ OTHER: _____

CURRENT AMOUNT OF BAIL:  25,000.00

Witness my hand and official seal this _16_ day of _April_, 19 _96_

_____ Date _____, District Justice

My commission expires first Monday of January,  2000                SEAL

AOPC 614-93

FELL-00002151

4/16/96
11-2-02

DISTRICT JUSTICE SYSTEM
COMMONWEALTH OF PENNSYLVANIA

PAGE   1
ADDITIONAL CHARGES

RECOMMITMENT

CR-0000121-96

COMMONWEALTH OF PENNSYLVANIA
VS
FELL, DEBORAH

CHARGE                          DESCRIPTION

18 §2701 §§A3 SIMPLE ASSAULT

PRINTED:  4/16/96 13:47:03

4/16/96
11-2-02

RELEASE OF PRISONER                 COMMONWEALTH OF PENNSYLVANIA
                                                VS
     CR-0000121-96                       FELL, DEBORAH

CHARGE                              DESCRIPTION

18 §2701 §§A3 SIMPLE ASSAULT

PRINTED:  4/16/96 13:47:44

JUR......ANO.........CTK.........
OFF.......SOF......IDN..........

**FOR RECORDS OFFICE USE ONLY**
## OFFENSE REPORT

........ATT.........DTC.....
TPC........PRP.....DE.....DT.......

**OFFENSE**

1. CONTROL NO.

2. COMPLAINT NO.

EDWARDSVILLE POLICE DEPT.

3. NATURE OF OFFENSE / UCR CD

5. TYPE OF PREMISE — APARTMENT

7. WHEN DISCOVERED    4 /10/96    1646    HOURS

9. METHOD OF CRIME (ATTACK) — STABBING    HOW ENTERED/EXITED    10. MEANS OF CRIME (ATTACK), WEAPONS OR TOOLS USED — PEARING KNIFE

11. LATENT FINGERPRINTS TAKEN — [X] YES [ ] NO    12. PHOTOGRAPH TAKEN — [X] YES [ ] NO NUMBER:    13. METHOD OF ESCAPE    14. EVIDENCE LEFT BEHIND

**VICTIM**

15. VICTIM'S NAME — LAWRENCE GILBERT    16. AGE 35    17. RACE WHT    18. SEX M    19. ADDRESS — 733 MAIN ST. APT #4 EDWARDSVILLE PA.

20. PHONE (RESIDENCE/OFFICE) — NO PHONE    21. JUVENILE [ ] YES [X] NO    22. DATE OF BIRTH — REDACTED - FELL 61    23. INDICATION OF DRUGS: [ ] YES [X] NO    ALCOHOL: [X] YES [ ] NO

24. OCCUPATION (EMPLOYER/SCHOOL) — UNEMPLOYED    25. INJURY — LEFT UPPER BICEP    26. HOSPITALIZED/TREATED AT [XX] YES [ ] NO

**COMPLAINANT**

27. NAME OF COMPLAINANT (IF NOT VICTIM) — SAME AS #15    28. AGE    29. RACE    30. SEX    31. ADDRESS

32. PHONE (RESIDENCE/OFFICE)    33. JUVENILE [ ] YES [ ] NO    34. DATE OF BIRTH    35. INDICATION OF DRUGS: [ ] YES [ ] NO    ALCOHOL: [ ] YES [ ] NO

36. OCCUPATION (EMPLOYER/SCHOOL)    37. CODE FOR BLOCK 38    W — WITNESS    P — PARENT    G — GUARDIAN

**PARENT**

38. NAME    40. AGE    41. RACE    42. SEX    43. ADDRESS

44. PHONE (RESIDENCE/OFFICE)    45. JUVENILE [ ] YES [ ] NO    46. OCCUPATION    47. INDICATION OF DRUGS: [ ] YES [ ] NO    ALCOHOL: [ ] YES [ ] NO

**SUSPECT**

48. SUSPECT NAME — DEBBIE FELL    49. AGE    50. RACE WHT    51. SEX F    52. ADDRESS — 733 MAIN ST. APT #4 EDWARDSVILLE PA.

53. ALIAS    54. OCCUPATION — UNEMPLOYED    55. PHONE (RESIDENCE/OFFICE) — NO PHONE

56. DATE OF BIRTH — REDACTED - FELL 54    57. JUVENILE [ ] YES [X] NO    58. RELATIONSHIP TO VICTIM OR OWNER — GIRLFRIEND    59. HEIGHT 504    60. WEIGHT 200    61. COLOR EYES BRN    62. COLOR HAIR BRN    63. COMP. MED.

64. CLOTHING WORN — BLUE JEANS, BROWN SUADE COAT, RED HOOD    65. SCARS, MARKS, TATOOS    66. WANT/WARRANT ON FILE [X] YES [ ] NO    67. ARRESTED [X] YES [ ] NO

68. KNOWN HAUNTS — C-MAJORS BAR, MAIN ST. EDWARDSVILLE    69. KNOWN ASSOCIATES

70. IF JUVENILE INVOLVED AS WITNESS, VICTIM, COMPLAINANT, SUSPECT — PARENT OR GUARDIAN NOTIFIED: [ ] YES [ ] NO    TIME: / /    MO. DA. YR.    BY WHOM

**VEH**

71. IF VEHICLE WAS INVOLVED IN CRIME — [ ] STOLEN [ ] RECOVERED [ ] USED IN CRIME [ ] OTHER (EXPLAIN)

**NARRATIVE**

ITEM NO.    72. NARRATIVE: CONTINUATION OF ABOVE ITEMS. DESCRIBE OTHER WITNESSES OR SUSPECTS, EVIDENCE, PROPERTY DISPOSITION, INCIDENT.

PRELIMINARY INVESTIGATION: ON THE ABOVE STATED DATE AND TIME THESE OFFICERS RESPOND

TO A CALL FROM THE VICTIM, LAWRENCE GILBERT, THAT HE WAS STABBED IN THE ARM BY HIS

GIRLFRIEND, DEBBIE FELL. THIS CALL WAS MADE FROM VIC MARS RESTAURANT. UPON PROCEEDING

TO SAID LOCATION THE VICTIM WAS OBSERVED WALKING WEST ON MAIN STREET IN THE AREA OF

MAIN AND GROVE STREETS. THE VICTIM WAS STOPPED BY SGT MICHAEL SLUSARK AND OFFICER

HAROLD BOND. THE VICTIM STATED THAT HE WAS STABBED IN THE LEFT ARM BY HIS GIRLFRIEND

**CONTROL**

74. COMM. NOTIFIED BY    75. WHEN NOTIFIED / / MO. DA. YR. HOURS    76. MESS. NO.    77. CANCELLED BY    78. WHEN CANCELLED / / MO. DA. YR. HOURS

79. DISTRIBUTION — [ ] CHIEF [ ] DETECTIVE [ ] JUVENILE [ ] NARCOTICS [ ] OTHER (EXPLAIN)

80. INCIDENT STATUS — [ ] OPEN [ ] INACTIVE    INVESTIGATION DATE

82. REVIEWING OFFICER'S NAME    DATE / / MO. DA. YR.

| POLICE DEPARTMENT | SUPPLEMENT REPORT | 1. COMPLAINT NUMBER |
|---|---|---|
| EDWARDSVILLE PD | | 96-1573 |

| 2. OFFENSE | 3. NAME OF VICTIM | 4. DATE |
|---|---|---|
| ASSAULT-STABBING | LAWRENCE GILBERT | 4-10-96 |

| 5. ☒ USED AS CONTINUATION SHEET OF CURRENT REPORT | 6. TYPE REPORT CONTINUED OR SUPPLEMENTED ☒ INITIAL CRIME ☐ VEHICLE ☐ ARREST |
|---|---|

| 7. ☐ USED TO REPORT SUPPLEMENTAL INVESTIGATION | 8. NEW OFFENSE IF CHANGED | 9. VALUED RECOVERED PROPERTY $ |
|---|---|---|

| 10. STATUS ☐ CLEARED ☐ UNFOUNDED ☐ NOT CLEARED | 11. FURTHER ACTION & REPORT REQUIRED ☐ YES ☐ NO (EXPLAIN BELOW) | 12. MULTIPLE CLEAR-UP? ☐ YES (LIST OTHER INCIDENT NOS. IN NARRATIVE) ☐ NO |
|---|---|---|

13. NARRATIVE: IN FOLLOW-UP USAGE, RECORD ALL DEVELOPMENTS TO LAST REPORT. LIST ANY ACCUSED AND/OR SUSPECTS AS FIRST ITEM, INCLUDE ARREST REPORT NUMBERS OF PERSONS ARRESTED, VALUE AND DISPOSITION OF RECOVERED PROPERTY (ATTACH PROPERTY RECORD), AND EXPLAIN ANY CHANGE IN OFFENSE.

ACCUSED/SUSPECT
DEBORAH FELL

WHO'S NAME IS DEBORAH FELL.GILBERT STATED THAT THEY BOTH WERE IN THE APPARTMENT AND AN ARGUEMENT STARTED OVER THE USE OF THE OVEN.THE ARGUEMENT ESCOLLATED TO WHERE BOTH ACCUSED EACH OTHER OF HAVING SEXUAL AFFAIRS WITH OTHER PERSONS.GILBERT STATED THAT FELL GRABBED A PEARING KNIFE AND SWUNG AT GILBERT WITH THE KNIFE,STRIKING HIM IN THE LEFT ARM.GILBERT STATED THAT FELL THEN FLED TO C-MAJORS BAR ON MAIN ST WHICH IS LOCATED SEVERAL DOORS AWAY FROM THE APPARTMEN' GILBERT WRAPPED A CLOTH AROUND HIS ARM AND WENT TO C-MAJORS BAR.THERE GILBERT BEGAN TO ARGUE WIT PATRONS IN THE BAR AND WAS ASKED TO LEAVE THE BAR.GILBERT THEN PROCEEDED TO WALK TO VIC MARS RESTAURANT WHERE HE CALLED POLICE AND PURCHASED 2 QUARTS OF BEER.

GILBERT REFUSED TO BE TRANSPORTED TO THE HOSPITAL VIA THE AMBULANCE AND REQUESTED THAT THE POLICE TRANSPORT HIM TO THE HOSPITAL,WHICH POLICE DID.AT THE HOSPITAL GILBERT TOLD OFFICER BOND THAT AFTER FELL STABBED HIM,SHE CLEANED UP BLOOD FROM THE FLOOR WITH A MOP.HE SAID THAT SHE STILL HAD THE KNIFE AND WOULD NOT LET HIM LAEVE THE APPARTMENT.HE WAS NOT ABLE TO LEAVE THE APPARTMENT UNTIL FELL WENT TO C-MAJORS.

GILBERT WAS TREATED AT THE NESBITT HOSPITAL IN KINGSTON BY THE ATTENDING EMERGENCY ROOM PHYSICIAN,DR RAINEY.THE INJURY WAS DESCRIBED AS EXTENSIVE WITH THE OBJECT (KNIFE) PENETRATING INTO AND THROUGH THE MUSCLE OF THE UPPER ARM.GILBERT WAS ADVISED TO CONTACT A BONE DOCTOR FOR EXAMINATION. THE WOUND WAS OBSERVED AS AN L-SHAPPED WOUND.

OFFICERS,AFTER LEAVING THE HOSPITAL WENT TO C-MAJORS BAR AND FOUND THE SUSPECT,DEBORAH FELL SEATED AT THE BAR.FELL WAS TAKEN INTO CUSTODY PURSUANT TO THE DOMESTIC VIOLENCE ACT AND PLACED UNDER ARREST FOR SIMPLE ASSAULT. SHE WAS TAKEN TO THE EDWARDSVILLE POLICE STATION FOR PROCESSING.

| 14. PAGE NO. | 15. REPORTING OFFICER'S SIGNATURE | BADGE NO. | 16. DATE OF INCIDENT | 17. SUPV. INITIALS |
|---|---|---|---|---|

TP

FELL-00002155

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

Mag. Dist. No.:

**11-2-02**

DJ Name: Hon.

Address: **JOHN J. HOPKINS**
**470 MAIN STREET**
**EDWARDSVILLE, PA**

Telephone: **(717) 287-9645**        **18704-0000**

**COMMITMENT**

**COMMONWEALTH OF**

**PENNSYLVANIA**

**VS.**

DEFENDANT: NAME and ADDRESS

*Deborah Fell*

REDACTED - FELL

*Edw., Pa*

Docket No.:

Date Filed: *4-10-96*

REDACTED - FELL

7.2. 2702.A-4. agg. assault. + Simple assault
(Charge)

A-1-3    2 Counts
(Charge)

DoB    REDACTED - FELL    *54*

SS#    REDACTED - FELL    *8495*

To ANY AUTHORIZED PERSON of the above named County of this Commonwealth:

You are hereby commanded to convey and deliver into the custody of the Keeper of the county prison the above named defendant. You, the Keeper are required to receive the defendant into your custody to be safely kept by you until discharged by due course of law or for:

☐ A PERIOD OF _____ DAYS UNTIL _____

☑ A HEARING AT

| Date: *Tues. 4-16-96* | Place: *470 Main St.* |
| Time: *1.30 PM* | *Edw Pa* |

☐ A FURTHER HEARING

| Date: | Place: |
| Time: | |

☐ COMMON PLEAS COURT ACTION

☐ OTHER: _____

CURRENT AMOUNT OF BAIL: *$25,000*        *PA. 9PM*

Witness my hand and official seal this *10* day of *april*, 19*96*.

*4-10-96* Date _____, District Justice

SEAL

My commission expires first Monday of January, 2000.

AOPC 609-93

FELL-00002156

CRIMINAL COMPLAINT    (POLICE)

JOHN HOPKINS
DISTRICT JUSTICE
MAGISTERIAL DISTRICT NO.    11-2-02
470 MAIN ST EDWARDSVILLE PA 18704

Complaint Numbers if Other Participants

COMMONWEALTH OF PENNSYLVANIA
DEFENDANT:         VS.

NAME
AND
ADDRESS

R.S.A.
A K A

I, **SGT MICHAEL SLUSARK**
_(Name of Affiant)_
of **EDWARDSVILLE PD**

do hereby state:

(1) ☒  I accuse the above named defendant, who lives at the address set forth above or,
☐  I accuse an individual whose name is unknown to me but who is described as

☐ his nickname or popular designation is unknown to me and, therefore, I have designated him herein as John Doe; with violating the penal laws of the Commonwealth of Pennsylvania at   **733 MAIN ST APT 4 EDWARDSVILLE**
_(Place-Political Subdivision)_

in **LUZERNE**        County on or about   **4-10-96   BETWEEN 1630 AND 1745 HRS**

participants were _(if there were participants, place their names here, repeating the name of above defendant)._

_(Check appropriate box)_

(2)  The acts committed by the accused were: Ⓐ **PENNA CRIMES CODE SECTION 2702 (A)(4) AGGRAVATED ASSAULT-(F-2)**

**IN THAT THE DEFENDANT ON THE ABOVE STATED DATE,TIME AND PLACE SPECIFIED DID THERE AND THEN WITH INTENT,DID KNOWINGLY AND INTENTIONALLY CAUSE BODILY INJURY TO ANOTHER PERSON,THAT BEING ONE LAWRENCE GILBERT,BY STABBING HIM IN THE LEFT BICEP-TRICEP AREA OF HIS ARM WITH A PARING KNIFE.**

**PENNA CRIMES CODE SECTION 2701 (A)(1)(3) SIMPLE ASSAULT-(M-2) IN THAT THE DEFENDANT ON THE ABOVE STATED DATE,TIME AND PLACE SPECIFIED DID THERE AND THEN INTENTIONALLY AND KNOWINGLY DID CAUSE BODILY INJURY TO ANOTHER PERSON,THAT BEING LAWRENCE GILBERT,AND DID PLACE THAT PERSON IN FEAR OF IMMINENT SERIOUS BODILY INJURY WITH A DEADLY WEAPON BY STABBING HIM IN THE BICEP-TRICEP AREA OF THE LEFT ARM WITH A PARING KNIFE.**

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of                              and                              of the Act of
_(Section)_                    _(Sub-section)_

or the                              Ordinance of
_(Political Sub-division)_

(3)  I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made.

(4)  I, verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

_April 10_ , 19 _96_            _____
_(Signature of Affiant)_

AND NOW, on this _April 10_ , 19 _96_, I certify the complaint has been properly completed and verified, and that there is probable cause for the issuance of process.

_11-2-02_
_(Magisterial District)_                    _____ (SEAL)
_(Issuing Authority)_

# ARREST WARRANT AFFIDAVIT

### DISTRICT JUSTICE
Magisterial District No. 11-2-02

JOHN HPOKINS 470 MAIN ST EDWARDSVILLE PA

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LUZERNE

} SS

| Complaint No. | Year | Type | Number |
|---|---|---|---|

Complaint Nos. of other Participants

OTN:

COMMONWEALTH OF PENNSYLVANIA

vs.

DEFENDANT: (Name and address)

DEBORAH FELL
REDACTED - FELL EDWARDSVILLE PA 18704
DOB-REDACTED - FELL

SGT MICHAEL SLUSARK   BADGE 2702   EDWARDSVILLE PD          717-288-8462

(Name of Affiant) ......... (Police Department or Address of Private Affiant) ......... (Telephone Number)

being duly sworn (or affirmed) before me, according to law, deposes and says that there is probable cause to believe that:

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES: (see instruc. below)

ON 04-10-96 AT APPROXIMATELY 1746HRS,THIS OFFICER AND OFFICER HAROLD BOND OF THE EDWARDSVILL
POLICE RESBONDED TO THE AREA OF 733 MAIN ST EDWARDSVILLE ON A REPORT OF A STABBING.UPON ARRIVAL
TO THE AREA,OFFICERS OBSERVED LAWRENCE GILBERT STANDING ON THE SIDEWALK.GILBERT STATED THAT
HE HAD BEEN STABBED BY HIS GIRLFRIEND,DEBORAH FELL,ABOUT AN HOUR AGO.OFFICERS OBSERVED THE WOUN
TO HIS LEFT BICEP-TRICEP AREA OF HIS LEFT UPPER ARM.THE WOUNB WAS BLEEDING AND AN ATTEMPT WAS
MADE BY GILBERT TO CONTROL THE BLEEDING WITH A CLOTH.GILBERT AGREED TO GO TO NESBITT HOSPITAL
ONLY WITH THE POLICE AND NOT BY AMBULANCE.UPON ARRIVAL TO THE HOSPITAL GILBERT STATED THAT HE
AND FELL HAD AN ARGUEMENT IN THIER APPARTMENT AT 733 MAIN ST APT 4 EDWARDSVILLE.HE SAID THE FEL
GRABBED A PARING KNIFE AND SWUNG AT HIM WITH THE KNIFE,STRIKING HIM IN THE LEFT ARM.HE SAID THA
FELL CLEANED UP THE KNIFE AND MOPPED UP THE BLOOD FROM THE FLOOR AND WOULD NOT LET HIM LEAVE
THE APPARTMENT AS SHE WAS STILL IN POSSESSION OF THE KNIFE.GILBERT WAS UNABLE TO LEAVE THE
APPARTMENT UNTIL FELL WENT SEVERAL DOORS AWAY TO C-MAJORS SPORTS BAR.GILBERT FOLLOWED HER TO TF
BAR WHERE THE ARGUEMENT CONTINUED UNTIL THE BARTENDER FORCED GILBERT TO LEAVE.GILBERT WNET TO V
MARS RESTAURANT ON MAIN ST AND CALLED POLICE REPORTING THE CRIME.

(CONTINUED)

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1. If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained. State also the factual basis for believing such other person to be reliable.

2. If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and state date, time and place of such surveillance.

3. State other pertinent facts within personal knowledge of affiant.

4. State any additional information considered pertinent to justify this application.

SIGNATURE OF AFFIANT          ADDRESS OF PRIVATE CITIZEN          BADGE NO.          DISTRICT/UNIT

Sworn to and subscribed before me this 10 day of april , 19 96

(Signature of Issuing Authority)                              (SEAL)

DISTRICT JUSTICE COURT No. 11-2-2 OFFICE ADDRESS: 470 Main St,

Date Commission Expires: 1-3. 2000          PHONE: 28.7-96.45

FELL-00002158

# ARREST WARRANT AFFIDAVIT

### DISTRICT JUSTICE
Magisterial District No. 11-2-02

JOHN HOPKINS 470 MAIN ST EDWARDSVILLE PA

| Complaint No. | Year | Type | Number |
|---|---|---|---|

Complaint Nos. of other Participants

OTN:

COMMONWEALTH OF PENNSYLVANIA } SS

COUNTY OF  LUZERNE

COMMONWEALTH OF PENNSYLVANIA
vs.

DEFENDANT:     (Name and address)

DEBORAH FELL
REDACTED - FELL    EDWARDSVILLE PA 18704
REDACTED - FELL  SSN-REDACTED-FELL-8195

SGT MICHAEL SLUSARK BADGE 2702   EDWARDSVILLE PD        717-288-8462

(Name of Affiant)                    (Police Department or Address of Private Affiant)              (Telephone Number)

being duly sworn (or affirmed) before me, according to law, deposes and says that there is probable cause to believe that:

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES:  (see instruc. below)
(CONTINUATION OF PROBABLE CAUSE)

GILBERT WAS TREATED AT THE NESBITT HOSPITAL BY DR RAINEY, EMERGENCY ROOM PHYSICAN. THE INJURY WAS DESCRIBED AS EXTENSIVE WITH THE OBJECT (KNIFE) PENETRATING INTO AND THROUGH THE MUSCLE OF THE ARM. GILBERT WAS ADVISED TO SEEK FURTHER MEDICAL ATTENTION FROM A BONE DOCTOR. THE WOUND WAS L-SHAPPED.

OFFICERS ARRIVED AT C-MAJORS BAR AND OBSERVED THE SUSPECT DEBORAH FELL SEATED AT THE BAR. OFFICERS PLACED FELL UNDER ARREST PERSUANT TO THE DOMESTIC VIOLENCE ACT AND TRANSPORTED FELL TO THE EDWARDSVILLE POLICE STATION FOR PROCESSING. FELL WAS ALSO SERVED A WARRANT FOR HER ARREST ON A SUMMARY WARRANT FOR PUBLIC DRUNKENNESS SIGNED BY JUDGE JOHN HOPKINS ON OCTOBER 31, 1995.

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1.  If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained.  State also the factual basis for believing such other person to be reliable.

2.  If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and state date, time and place of such surveillance.

3.  State other pertinent facts within personal knowledge of affiant.

4.  State any additional information considered pertinent to justify this application.

SIGNATURE OF AFFIANT            ADDRESS OF PRIVATE CITIZEN            BADGE NO. 2702          DISTRICT/UNIT

Sworn to and subscribed before me this ...... 10 day of ........ April ................................ , 19 96

(Signature of Issuing Authority)                    (SEAL)

DISTRICT JUSTICE COURT No. 11-2-02 OFFICE ADDRESS: 470 Main St, Edw. PA

Date Commission Expires: 1-3-2000    PHONE: 287-96...

FELL-00002159

5:01-cr-00012-gwc   Document 304-29   Filed 03/25/11   Page 65 of 68

STATED SHE USED a Pearing Knife and STABBED iN ARM.

AFTER STABBING him She started cleaning up Blood with a mop. SHE would not let Him leave SHE STILL Had Knife.

She left APT. and went TO BAR.

He went TO Bar, Had words with Her and BARTENDER.

He left Bar, went to Vic Mars, called Police.

MR RAILING -
SKIN WAS Clean
ADVISES   Bar Doctr in Future.
Extensive INJ.
Polin News now Muscle - T TROUGH

FELL-00002160

BOTH WERE IN APPARTMENT, APGEIRE
FELL GRABBED a KNIFE
SWUNG AT GILBERT - STRUCK IN LEFT
BICEP.

FELL FLED TO C-MATAS
ARGUMENT W/ BATENGA - LOU
FELL + LOU WERE THOUGHT TO BE
HAVING AN AFFAIR - ARGUMENT

GILBERT WANTED 2 GTS of BEER
C-MATAS - WOULD NOT SHRE.
GILBERT WENT TO VIC MAS BANK 290
+ CAME BACK TO MEET HER AT 733 MAI

SHE MIGHT SEEN IT - IT WAS AN AFFAIR.
NO CHARES -
WANTS KEYS BACK.

FELL-00002161

Fell accused Cursed of Affmi
Arbucket air Food -
Tramo to Slopps
Berp Begun to weard T.V.
Tell hes up. to Foot - Mother About Store.
Swure Steale Knife

FELL-00002162

REDACTED - FELL

# COMMONWEALTH OF PENNSYLVANIA

## COUNTY OF <u>LUZERNE</u>

To any authorized person:

In the name of the Commonwealth of Pennsylvania, yc take into custody DOB: <span style="color:red">REDAC</span>

(Name):  FELL, DEBORAH ANN <span style="color:red">REDAC</span>

(Address):

WILKES BARRE, PA 18705

If the defendant be found in said Commonwealth, and bring the defendant before us at   JOHN J HOPKINS

(Address):   470 MAIN STREET
EDWARDSVILLE, PA 18704-0000

to answer the Commonwealth or <u>EDWARDSVILLE BORO</u>
(Political Subdivision)

upon the complaint or citation of SOUCHICK, DAVID charging the defendant with 18 §5505 §§
PUBLIC DRUNKENNESS
and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.

Witness the hand and official seal of the issuing authority on this

<u>31st</u> day of <u>October</u>, 19<u>95</u>

SEAL _____
(Signature)

Magisterial District No.: 11-2-02

Citation No.: A601296
FILED:    2/18/94
Docket No.:  NT-0000114-94

Amount required to satisfy sentence:
Fine:  $
Costs:$
Other:$
Total: $

Amount needed to satisfy collateral: $   171.00

*Return after 60 days*

C417-91     COPY : DEFENDANT

---

## RETURN WHERE DEFENDANT IS FOUND

By authority of this warrant

_____, 19 _____

☐ I took into custody the within named

_____.

☐ He is now at liberty on bail posted
before_____

_____

☐ in the_____

_____ jail.

☐ before you for disposition.

☐ I accepted a guilty plea and
collected
$_____
for fine and costs.

☐ I accepted a not guilty plea and
collected $_____
for collateral.

☐ I accepted the fine and costs due
in the amount of
$_____

_____
(Signature of Officer - Name & Title)

## RETURN WHERE DEFENDANT IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

## WARRANT OF ARREST

WARRANT CONTROL NO.:
4685439

DOCKET NUMBER:

NT-0000114-94

COMMONWEALTH
OF
PENNSYLVANIA

VS

FELL, DEBORAH ANN

OFFENSE DATE       2/16/94

CHARGE

<u>18 §5505 §§</u>

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral for my appearance at trial stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

Officer's costs:
Warrant          _____
Miles @     ¢   _____
Commitments      _____
Miles @     ¢   _____
Conveying to hearing_____
Miles @     ¢   _____
Total            _____

FELL-00002163