**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

_____

DONALD FELL,

                    Movant,

        v.

UNITED STATES OF AMERICA,

                  Respondent.

_____

)
)
)
)
)
) 2:01-CR-12-01
)
)
)
)
)
)
)
)

**<u>MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO
VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW
TRIAL PURSUANT TO 28 U.S.C. § 2255</u>**

# VOLUME VI OF VII

# EXHIBITS 211-272

## TABLE OF CONTENTS

### INDEX TO EXHIBITS

### NON-SEALED EXHIBITS

Exhibit

Donald Fell Mitigation Binder............................................................................................1

Van Gorp Report (Apr. 6, 2001)........................................................................................2

Mills Report (May 7, 2001) ...............................................................................................3

Lipman Report (May 14, 2001) .........................................................................................4

Cunningham Report (June 14, 2005) .................................................................................5

Declaration of Mark Cunningham, Ph.D., ABPP (June 27, 2005) ...................................6

Wetzel Report (Oct. 11, 2002) ..........................................................................................7

Rabun Report (Dec. 31, 2002) ..........................................................................................8

Wetzel Report (June 27, 2005) ..........................................................................................9

Welner Report (July 5, 2005).............................................................................................10

CYS Contact Sheet (Apr. 22, 1985) ..................................................................................11

CYS Contact Sheet (May 8 1985) .....................................................................................12

CYS Contact Sheet (Sept.—Oct.1985)..............................................................................13

CYS Contact Sheet (Aug. 8, 1991)....................................................................................14

CYS Contact Sheet (Aug. 8, 1991)....................................................................................15

CYS Contact Sheet (Aug. 8, 1991)....................................................................................16

CYS Contact Sheet (Oct. 1991).........................................................................................17

First Hospital Wyoming Valley Discharge Report (Oct. 31, 1991) ..................................18

Wilkes-Barre General Hospital Progress Record (Apr. 1992)...........................................19

1

Wilkes-Barre General Hospital Adolescent Psych. Unit Interdisciplinary Progress Record (Apr. 1992)...............................................................................................................20

Wilkes-Barre General Hospital Discharge Face Sheet (June 6, 1993) ........................................21

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Apr. 1992)..........22

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Jan. 1993) ..........23

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (June 1993) .........24

CRR Group Home Selection and Review (Sept. 22, 1993).........................................................25

Psychological Consultation of Donald Fell (Apr. 12, 1994) .......................................................26

Service Plan (Medical) (1994)...................................................................................................27

Service Plan (Medical – Dental) (1995) ....................................................................................28

CYS Contact Sheet (May 26, 1995) ..........................................................................................29

Intentionally Left Blank.............................................................................................................30

Rutland City Police Department Incident Table (Jan. 11, 1996)..................................................31

Rutland City Police Department Incident Table (Sept. 4, 1996) ..................................................32

Rutland City Police Department Incident Table (Nov. 6, 1996) ..................................................33

Rutland City Police Department Incident Table (Nov. 6, 1996) ..................................................34

Rutland City Police Department Incident Table (Mar. 4, 1997)...................................................35

Rutland City Police Department Incident Table (July 3, 1997)....................................................36

Rutland City Police Department Incident Table (Sept. 16, 1997) ................................................37

Rutland City Police Department Incident Table (Jan. 14, 1998)..................................................38

Rutland City Police Department Incident Table (June 5, 1998)....................................................39

Rutland City Police Department Incident Table (July 28, 1998)..................................................40

Rutland City Police Department Incident Table (Apr. 30, 1999)..................................................41

Rutland City Police Department Incident Table (May 26, 1999)..................................................42

Rutland City Police Department Incident Table (Oct. 30, 1999) ..................................................43

Rutland City Police Department Incident Table (Feb. 20, 2000) ..................................................44

Luzerne County Detention Center Admission Page (Sept. 10, 1996) ...........................................45

Sullivan County Sheriff's Department Criminal Complaint (Aug. 12, 2000)...............................46

New York State Incident Report and Arrest Report (Aug. 12, 2000)...........................................47

Sullivan County Sheriff's Department Statement of Donny McNeeley (Aug. 12, 2000) .............48

Sullivan County Sheriff's Department Statement Joshua Jones (Aug. 12, 2000) ........................49

New York State Incident Report (Aug. 12, 2000) .......................................................................50

Sullivan County Sheriff's Department Statement (Teri Fell) (Aug. 12, 2000) ............................51

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................52

Sullivan County Sheriff's Department Supporting Deposition (Aug. 12, 2000)...........................53

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................54

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................55

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................56

FBI FD-302 (Nov. 30, 2001 – Dec. 1, 2001) ..............................................................................57

Intentionally Left Blank...............................................................................................................58

Intentionally Left Blank...............................................................................................................59

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 1, 2000) ......................60

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................61

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................62

New York State Police Investigation Report (Dec. 1, 2000).........................................................63

New York State Police Supporting Deposition (Dec. 2, 2000) .....................................................64

Autopsy Report of Teresca King (Dec. 2, 2000) .........................................................................65

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................66

United States Marshals Service Prisoner Intake ...........................................................................67

New York State Police Supporting Deposition of Francis Bellantoni (Dec. 1, 2000)..................68

Warrant Information Network Subject Report (Dec. 15, 2000) ....................................................69

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 22, 2000)  .....................................................................................................................70

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................71

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................72

NWSCF Facility Incident Report (Dec. 27, 2000) ......................................................................73

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Dec. 28, 2000) .....................................................................................................................74

Prison Medical Records of Donald Fell........................................................................................75

2001 FBI Report ..........................................................................................................................76

Vermont Department of Corrections Disciplinary Hearing Report (Dec. 27, 2000)....................77

FBI Report (Jan. 4, 2001) ............................................................................................................78

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Jan. 8, 2001)........................................................................................................................79

Letter from Alex Bunin to A.U.S.A. Gregory Waples (Jan. 9, 2001) ..........................................80

FBI FD-192 (Jan. 22, 2001)..........................................................................................................81

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
    (Jan. 24, 2001)......................................................................................................................82

Redacted E-mail (Mar. 15, 2001) ................................................................................................83

Letter from A.U.S.A Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
    (Mar. 26, 2001) ....................................................................................................................84

New York State Certificate of Disposition (Mar. 28, 2001).........................................................85

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
(Apr. 5, 2001)..................................................................................................86

Memorandum from Cynthia Ayres to Dr. Mark Mills (Apr. 23, 2001).........................................87

Letter from Peggy Peterson, Luzerne County CYS.......................................................88

Letter A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
(Apr. 5, 2001)..................................................................................................90

Handwritten D Management Team Meeting Notes (Apr. 21, 2001) .............................................91

Vermont Department of Corrections Facility Report Form (June 13, 2001).................................92

Correctional Medical Services Interdisciplinary Progress Notes (July 2001) ..............................93

Pennsylvania State Police Central Repository Criminal History of Christopher Eike ..................94

Handwritten D Management Team Meeting Notes (July 16, 2001)..............................................95

D Wing Activity Sheet..................................................................................................96

Redacted E-mail (Sept. 20, 2001) ...................................................................................97

Redacted E-mail (Sept. 20, 2001)...................................................................................98

Redacted E-mail (Sept. 20, 2001)...................................................................................99

Redacted E-mail (Sept. 20, 2001) ..................................................................................100

Redacted E-mail (Sept. 20, 2001) ..................................................................................101

Vermont Department of Corrections Facility Report Form (Sept. 20, 2001)...............................102

Redacted E-mail (Sept. 20, 2001) ..................................................................................103

Handwritten note of Bobby Lee......................................................................................104

Handwritten note of Bobby Lee......................................................................................105

Individual Voir Dire (May 4, 2005)..................................................................................106

Redacted E-mail (Sept. 25, 2001) ..................................................................................107

Commonwealth of Pennsylvania Police Criminal Complaint against Christopher Eike
(Nov. 7, 2001) ..........................................................................................................108

Prison Health Records of Robert Lee ...........................................................................109

Intentionally Left Blank ................................................................................................110

Intentionally Left Blank ................................................................................................111

Vermont Department of Corrections Incident Report (Mar. 17, 2004) ........................112

Intentionally Left Blank ................................................................................................113

FOIA 302 (Apr. 6, 2005) ..............................................................................................114

Letter to Judge Sessions from A. Bunin (Apr. 27, 2005) .............................................115

Sealed Document Order, Case No.:2:01-CR-12 (Apr. 28, 2005) .................................116

Jury Instructions ...........................................................................................................117

Intentionally Left Blank ................................................................................................118

FOIA 302 (May 9, 2005) ..............................................................................................119

Intentionally Left Blank ................................................................................................120

Intentionally Left Blank ................................................................................................121

Letter from William B. Darrow and Stephen Kelly to Alexander Bunin, Gene Primomo, and Paul
Volk.............................................................................................................................122

Blank Juror Questionnaire ............................................................................................123

Juror No. 26 Questionnaire (May 13, 2005) .................................................................124

Juror No. 162 Questionnaire (May 23, 2005) ...............................................................125

Intentionally Left Blank ................................................................................................126

Intentionally Left Blank ................................................................................................127

FBI Report (June 14, 2005) ..........................................................................................128

FBI 302 Report of Interview with Christopher Eike (June 15, 2005) ..........................129

United States' Trial Memorandum, United States v. Donald Fell ...............................................130

Letter to Judge Sessions from David V. Kirby (June 29, 2005)................................................131

FBI 302 Report of Interview with [Redacted] (July 5, 2005) ....................................................132

FedEx Air Bill from Town of Bethel Justice Court to Andrew Bartnick (July 6th, 2006)..........133

Letter to Judge Sessions from Alex Bunin (July 8, 2005) .........................................................134

Stipulation (July 8, 2005)..........................................................................................................135

Intentionally Left Blank.............................................................................................................136

Memorandum to Alex Bunin from Paul Volk (July 20, 2005)....................................................137

Donald Fell's Motions for Judgment of Acquittal and New Trial, United States v. Donald Fell
     (Aug. 26, 2005) ...................................................................................................................138

Affidavit of Richard Wetzel, Ph. D (Sept., 12, 2005)................................................................139

Appeal from the United States District Court for the District of Vermont, Brief of the United
     States, United States v. Donald Fell (May 25th, 2007) ........................................................140

Letter to Victims Resource Center from Wanda Rivera (Apr. 21, 2005) ...................................141

Letter from Victims Resource Center to Andrew Bartnick (May 4, 2005) ................................142

School Heath Record of Donald Fell .........................................................................................143

Intentionally Left Blank.............................................................................................................144

Wilkes-Barre General Hospital Progress Record of Donald Fell (June 1993) ...........................145

Raymond Kotzer and Theresa Kotzer Divorce Records (Oct. 22, 1967) ...................................146

Arrest Warrant Affidavit for Donald Fell, Sr. (Mar. 4, 1990) ...................................................147

CYS Contact Sheet (Apr. – May 1990) .....................................................................................148

Jenkins Township Incident Report (Apr. 21, 1990)...................................................................149

CYS Contact Sheet (June 1990) ................................................................................................150

Service Planning/Family Functioning Report (June 1990).........................................................151

CYS Contact Sheet (Nov. 28, 1990).......................................................................................152

CYS Contact Sheet (Jan. 14, 1991) ......................................................................................153

CYS Contact Sheet (Feb. 14, 1991).......................................................................................154

Intentionally Left Blank.........................................................................................................155

Intentionally Left Blank.........................................................................................................156

CYS Contact Sheet (Mar. 19, 1991) .....................................................................................157

Suspected Child Abuse Referral Note (Apr. 18, 1993) ........................................................158

CYS Contact Sheet (May 1, 1991) ........................................................................................159

CYS Contact Sheet (May 2, 1991) ........................................................................................160

CYS Contact Sheet (June 4, 1991) ........................................................................................161

CYS Contact Sheet (June 24, 1991) ......................................................................................162

CYS Contact Sheet (July 8, 1991) .........................................................................................163

CYS Contact Sheet (Dec. 20, 1991) ......................................................................................164

CYS Contact Sheet (Dec. 23, 1991) ......................................................................................165

CYS Contact Sheet (Jan. 13, 1992) .......................................................................................166

CYS Contact Sheet (Mar. 3, 1992).........................................................................................167

CYS Contact Sheet (Apr. 20, 1992).......................................................................................168

Intentionally Left Blank.........................................................................................................169

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (1993) ......................170

CYS Client Information Profile (Apr. 18, 1993) ...................................................................171

CYS Contact Sheet (Apr. 20, 1993).......................................................................................172

Police Report (Jan. 26, 2001).................................................................................................173

Intentionally Left Blank.........................................................................................................174

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (June 8, 1993)..........175

Office of the Sheriff, Luzerne County (Aug. 31, 1993)................................................................176

CYS Client Information Profile (Jan. 19, 1994) ........................................................................177

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................178

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................179

CYS Contact Sheet (Feb. 4, 1993).............................................................................................180

CYS Contact Sheet (Mar. 10, 1994) ..........................................................................................181

CYS Contact Sheet (Mar. 24, 1994) ..........................................................................................182

CYS Contact Sheet (Apr. 7, 1994).............................................................................................183

CYS Contact Sheet (Apr. 12, 1994)...........................................................................................184

CYS Contact Sheet (Apr. 12, 1994)...........................................................................................185

St. Michael's School Psychiatric Note (May 1994)....................................................................186

St. Michael's School Psycho Social Summary (Apr. 1994) ........................................................187

FBI Identification Record for Debra Fell (June 9, 1994).............................................................188

Wilkes-Barre Police Department Jailer's Report (Oc. 18, 1994) ...............................................189

Arrest Report for John Rhodes (Oct. 18, 1994) .........................................................................190

Citation for John Rhodes (Oct. 18, 1994) .................................................................................191

Wilkes-Barre Police Special Report for John Rhodes (Oct. 18, 1994).......................................192

Risk /Severity Assessment Form (Oct. 26, 1994).......................................................................193

Arrest Report for John Rhodes (Jan. 12, 1995) .........................................................................194

Arrest Warrant for John Rhodes (Feb. 9, 1994).........................................................................195

Arrest Warrant for John Rhodes (Jan. 12, 1995) .......................................................................196

CYS Contact Sheet (Jul. 1995) .................................................................................................197

Substance Abuse Evaluation for Donald Fell (Sept. 16, 1996) ....................................................198

Affidavits Submitted in Motion in Limine in United States v. Haynes (May 24, 2000).............199

Letter to Judge Niedermeier (Dec. 5, 2000) ...............................................................................200

Letter to Charles Tetzlaff (Dec. 5, 2000).....................................................................................201

Letter to Judge Murtha (Dec. 11, 2000)........................................................................................202

Rutland Herald Article (May 13, 2002)........................................................................................203

Burlington Free Press Article (May 15, 2002)..............................................................................204

Donald Fell's Objections to Punishment-Related Questions (Jun. 10, 2002).............................205

Declaration of Thomas V. Ryan ....................................................................................................206

Letter to David Kirby (Feb. 23, 2005) .........................................................................................207

Letter to Judge Sessions (Jun. 29, 2005)......................................................................................208

Special Verdict Form (Jul. 14, 2005)............................................................................................209

Criminal History Record of Deborah Fell (Apr. 10, 1996) .........................................................210

Rutland City Police Department Incident Report (1996) .............................................................211

Rutland City Police Department Report (1994-2000) ..................................................................212

New York State Police Investigation Report (Dec. 1, 2000)........................................................213

Criminal Docket for Christopher Eike (Oct. 8, 2002)  ...............................................................214

Government Opposition to Motion (Jul. 10, 2002).......................................................................215

FBI Record (Apr. 25, 2005)..........................................................................................................216

Donald Fell Event Table (Apr. 30, 2005) .....................................................................................217

FBI Record (May 11, 2005)..........................................................................................................218

FBI Record (May 16, 2005)..........................................................................................................219

FBI Record (Jun. 9, 2005).............................................................................................................220

FBI Record (Jun. 6, 2005)..................................................................................................221

Adolescent Psychiatric Reports for Donald Fell (1993).............................................................222

Bail Certificate (Mar. 4, 1997)..........................................................................................223

CYS Contact Sheet (May 20, 1992) ..................................................................................224

FBI Record (Jun. 27, 2005)...............................................................................................225

FBI Record (Jun. 9, 2005)................................................................................................226

Statement by Teri Fell to Sullivan County Sheriff (Aug. 12, 2000)...........................................227

Deposition of Lance Rowland (Aug. 12, 2000).....................................................................228

Certificate of Disposition (Aug. 16, 2000) ..........................................................................229

Individual Voir Dire (Jun. 1, 2005) ...................................................................................230

Police Report (Nov. 1, 2002) ...........................................................................................231

Wilkes-Barre Times Leader Article (Oct. 5, 2004) ..............................................................232

Law and Human Behavior Article (1991) ............................................................................233

Specialty Guidelines for Forensic Psychology .....................................................................234

United States v. Fell Court Order (Apr. 7, 2005)..................................................................235

Transcript Excerpt (May 13, 2005).....................................................................................236

Intentionally Left Blank....................................................................................................237

Fell Motion to Dismiss Notice of Intent to Seek Death Penalty ...............................................238

Declaration of Juror 23 ....................................................................................................239

Conviction Record of Juror 26 (Apr. 2, 1996)......................................................................240

Declaration of Juror 143 ..................................................................................................241

Declaration of Sally Fell Francis ......................................................................................242

Declaration of Ronald Cupano..........................................................................................243

Declaration of Rose O'Hop ............................................................................................244

Declaration of Claudia Bublo ......................................................................................245

Trial Transcript Excerpt (May 13, 2005)......................................................................246

Declaration of Robert Fell ...........................................................................................247

Declaration of Dorothy Grivner....................................................................................248

Declaration of John Timek............................................................................................249

Declaration of Florence Wallace ..................................................................................250

Declaration of John Gacek............................................................................................251

Declaration of Adele Gacek .........................................................................................252

Declaration of Ernie Schuldaski ..................................................................................253

Declaration of Jon Migatulski.......................................................................................254

Declaration of Steve Ratte ...........................................................................................255

Declaration of Marc Pelkey .........................................................................................256

Voir Dire Transcript......................................................................................................257

Declaration of Richard T. Callery, M.D., F.C.A.P. .....................................................258

Intentionally Left Blank................................................................................................259

Declaration of Mark J. Mills, J.D., M.D. .....................................................................260

Intentionally Left Blank................................................................................................261

Declaration of Andrew Bartnick...................................................................................262

Declaration of Gene Primomo ......................................................................................263

Declaration of Alexander Bunin ...................................................................................264

Declaration of Cynthia Ayres ......................................................................................265

Declaration of Sandra Shum .........................................................................................266

Declaration of Deborah Wisell ..............................................................................................267

Declaration of Anthony Mistretta ..........................................................................................268

Declaration of Dora Carter...................................................................................................269

Declaration of Jeff Van Buren ..............................................................................................270

Declaration of Pat Johnson ..................................................................................................271

Declaration of Mary Bell ......................................................................................................272

Transcript of Juvenile Proceedings (Apr. 8, 1994) ..............................................................296

Childline Record (Apr. 22, 1991) .........................................................................................297

Officers Report....................................................................................................................298

Prison Record (Jun. 11, 2001)..............................................................................................299

Declaration of Michael Sikirica ............................................................................................300

Declaration of Francis Bellantoni .........................................................................................301

Declaration of Lucinda Fruean .............................................................................................302

Declaration of Michael Leight ..............................................................................................303

Declaration of Paul Stoss.....................................................................................................304

Declaration of Paul Volk ......................................................................................................305

Declaration of Charles Wetli ................................................................................................306

Birth Certificate of Theresa Kozersky (Aug. 9, 1935)...........................................................307

Death Certificate of Frances Kozerski (Apr. 20, 2001) .........................................................308

Declaration of John Edens ...................................................................................................309

Government Motion in Limine to Exclude Report (Jul. 6, 2005).............................................310

Individual Voir Dire Excerpt (Jun. 6, 2005)...........................................................................311

Photographs of Fell Home ...................................................................................................312

Declaration of Jamie Dominick .................................................................................................313

## SEALED EXHIBITS

15

# EXHIBIT 211

```
03/24/2010                  Rutland City Police Department                           1470
09:21                           LAW Incident Table:                        Page:      1

Incident Number: 96RL00085

Nature: Suspicious          Partition: 1119
  Addr: REDACTED - FELL                                    Area: 1119  RUTLAND CITY
  City: Rutland City       ST: VT   Zip: 05701    Contact:
  Complainant&
  Lst: ██████████             Fst: ███████        Mid: ██
  DOB: ██████   SSN: ████████  Adr: ██████████     ST: ██ Zip: ███████
  Rac: W Sx: M Tel: ███████    Cty: █████████

  Offense Codes: _USP 0711                 Reported: SUSP  Observed: 0711
  Circumstances: LT20
Rspndg Officers: Gaiotti, W      LaChance, D      Greene, C         &
Rspnsbl Officer: LaChance, D     Agency: 1119         CAD Call ID:     401336
   Received By: Wentworth, L       Last RadLog:
  How Received: T  Telephone          Clearance: RBS  Reviewed by Sergeant
 When Reported: 02:15:55 01/04/1996   Disposition: ACT  Disp Date: 01/04/1996
Occurrd between: 01:30:00 01/04/1996   Judicial Sts:
           and: 02:15:55 01/04/1996Supervisor Apprl: Sgt JR Sly
MO: Solvability     Suspects Named      Time of Day     0001-0300            &
 Narrative: (See below)


= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =


INVOLVEMENTS:
Type  Record #    Date     Description              Relationship
 LW  96RL00088  01/04/1996  Theft                   Companion Case
 NM  ██████████████████████████████████████         *Person of Interest
 NM  ██████████████████████████████████████         *Victim
 NM  ██████████████████████████████████████         *Complainant
 NM  ██████████████████████████████████████         *Suspect
 NM   225239    01/04/1996  Fell, Deborah Ann        *Suspect
 VH   102044    01/25/1996  BLU 1992 OLDS CUTLASS VT  Attempted to Steal
 CA   401336    01/04/1996  02:15 01/04/1996 Suspicious  *Initiating Call

LAW Incident Offenses Detail:
                 Offense Codes
Seq Code                          Amount
  1 _USP Suspicion (Old)            0.00
  2 0711 ATTEMPTED THEFT AUTOMOBILE  7000.00


LAW Incident Circumstances:
              Contributing Circumstances
Seq Code                          Comments
  1 LT20  Residence/Home
```

FELL-00002164

Narrative:

Upon my arrival at REDACTED - FELL  for an attempted theft of a
vehicle the Complainant ████████ advised that his vehicle had been
parked in his garage prior to him leaving it. he advised that
just prior to calling the police he was notified by a neighbor
that she observed 2 male subjects, 1 carrying a hockey stick, in
his vehicle at the bottom of ████████ driveway. She advised him
that the 2 subjects had became stuck in a snow bank after
striking a telephone pole at the bottom of said driveway. She
advised that these subjects they fled from the vehicle and
travelled West on Oak Street then turned around and proceeded
east on Oak and out of her sight. ████████ looked out his window
and observed his vehicle, a 1992 Oldsmobile Cutlass color blue
bearing
VT reg AKM968 running stuck in a snow bank. he observed that
there
was a dent and scrape in the passenger side rear quarter panel
from striking a telephone pole. The damage to said vehicle is
estimated at approx $100.00. ████████ advised that he observed that
his vehicle was entered into as it was parked in his garage and
unlocked. Said vehicle had been rummaged through and the spare
set of keys were taken from the glove box. These keys were used
to start said vehicle and back it into the pole and ultimately
get stuck in the snow bank.

The neighbor was not available due to her going to bed and she
will contact this station in the morning to give statement and
description of subjects.

The area was immediately checked. Numerous vehicles were located
and had been rummaged through on numerous surrounding streets
including, 8BT79 and 5EF42 on Seabury Street. The footprints were
tracked around the Northern end of Baxter Street, North Church
Street as far as North Street, Seabury Street, The chicken coop
apts, Kingsley Ave, Roberts Ave, and Crescent Street. We were
unable to continue tracking these footprints due to continuing
snow and numerous sets of prints going in several different
directions.

Just after arriving to the REDACTED - FELL call ████████████ called
and advised that he had just observed a couple of subjects run in
the rear of Kings garage on Grove Street. Units responded to this
area and that was when the footprints were located on Seabury
Street. Said prints led to numerous vehicles parked in driveways
that had been approached and rummaged through or the windows
wiped off and looked into. I observed the prints led to the rear
of a residence located near the Eastern end of Seabury Street,
said prints went behind the garage to a rear window of the garage
as if the subject was attempting to gain entry into the garage
then the prints led to another adjacent garage's rear window. The
prints then led over a fence and through the yard of a residence
on Crescent Street(East of Pearl Street). the prints then
continued North on Pearl Street and they also led to several
vehicles along the way and either entered them or looked inside.

This pattern continued to North Street then the prints were lost again as if they had a vehicle that picked them up.

While on Seabury Street I observed a set of prints travel to the residence of ███████████. It appeared that the prints may have entered said residence via the side door but it was hard to tell. I observed another set of different prints enter the yard of said residence via the parking lot of the chicken coop apts. These prints seemed to go past said residence and back onto Seabury Street. ████████████ vehicle was not at said residence at this time.

At this time we were discovering several different prints in the snow around different streets. I observed ██████████ travelling North on Elm Street from West Street. ██████ was followed and observed. I approached ██████ on Church Street. ██████ was 56 and his walking(staggering) did not fit the other prints followed. I patted him down and located no items of importance which would have been stolen from any vehicle. I did confiscate a marijuana pipe from his person- to be destroyed.

Before approaching ███████ I observed a subject wearing a black coat and jeans walking South on Church Street. This subject continued South and onto Cottage Street.

After speaking with ██████ I went to the area of Stewarts at State and Grove and observed ████████████ and debbie Fell standing in front of Stewarts. I approached these subjects and located nothing of any value on their person. These subjects advised that they had bee walking around all night and went to Stewarts to meet another unidentified subject. ███████ was attempting to phone this subject for a ride when I approached them. ███████ advise that he had moved from Seabury Street to 99 Park Ave and that's where he advised that his vehicle was parked al night. fell did mention that they had been at Two Shey's bar earlier that evening.

1 of the prints in the snow that was involved in the attempted theft of the vehicle was a sorel boot print. Other prints located near all the parked vehicles were smaller, unidentifiable prints, and larger winter boot prints(similar to those ███████ was wearing).

# EXHIBIT 212

11/30/20      Rutland City Police Department      2729
20:46          Main Names Table:          Page:   1

me Number:    225239
Last: Fell            Fst: Deborah      Mid: Ann
Addr: REDACTED - FELL          Prev: REDACTED - FELL
City: Rutland City    St: VT   Zip: 05701      Rutland City    , VT 05701
Deceased:   /   /     Alias For:
Personal Identification
DL Numbr: 5184119A       Name Typ: INDIVR     SSN:   REDACTED - FELL  8195
DL State: VT   Class: ____ _    Image: ____ _   Local ID: _____
Home Tel: (802)775-2575          State ID: 230190
Work Tel: ( )   -            FBI Number: 31339NA8
Physical Description
  DOB:  REDACTED - FELL 1954   46yrs    Eyes: HAZ   Hazel     Cmplxn: _____
  Race: W White/Non Hi>   Glasses:             Speech: _____
  Sex: F Female        Hair: RED   Red       Teeth: _____
Height: 5'02"   157cm    Hstyle: _____     Build: _____
Weight: 140lbs   64kg     Beard: _____     Ethnic: _____
Traits            SMT:       TATO/L /HAND cross _____
MO: _____
Alert Codes: AUST DUSR DOMV ____ ____ ____ ____ ____ ____ ____ ____
   Comments: _____
            Premis: &    Xtra: &    Visited Inmates: _    Had Visitors: _

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

INVOLVEMENTS:

| Type | Record # | Date | Description | Relationship |
|------|----------|------|-------------|--------------|
| WA | 1943 | 12/16/1999 | DWI#1 | *Arrested |
| AR | 88016 | 11/21/1999 | DUI | *Arrested |
| AR | 73990 | 04/13/1999 | Noise in the Nighttime | *Arrested |
| LW | 00RL12411 | 11/15/2000 | Noise Disturban | Offender |
| LW | 00RL11311 | 10/17/2000 | Family Fight | POI |
| LW | 00RL10903 | 10/05/2000 | Citizen Dispute | *Complainant |
| LW | 00RL09163 | 08/26/2000 | Noise Disturban | POI |
| LW | 00RL08315 | 08/07/2000 | 911 Hangup | *Complainant |
| LW | 00RL08315 | 08/07/2000 | 911 Hangup | Victim |
| LW | 00RL08072 | 08/01/2000 | Intoxication | POI |
| LW | 00RL08078 | 08/01/2000 | Assault | *Complainant |
| LW | 00RL07740 | 07/29/2000 | Citizen Assist | POI |
| LW | 00RL04332 | 05/04/2000 | Family Fight | *Complainant |
| LW | 00RL04332 | 05/04/2000 | Family Fight | Victim |
| LW | 00RL04009 | 04/25/2000 | 911 Hangup | POI |
| LW | 00RL01708 | 02/21/2000 | Fire | POI |
| LW | 00RL01369 | 02/18/2000 | Suspicious | Intoxicated Person |
| LW | 99RUC0976 | 12/15/1999 | Wanted Person | arrested on warrant |
| LW | 99C106046 | 11/21/1999 | Accident PI | Offender |
| LW | 99RL12066 | 11/13/1999 | Intoxication | POI |
| LW | 99RL11522 | 10/31/1999 | Citizen Assist | POI |
| LW | 99RL11272 | 10/24/1999 | Citizen Dispute | *Complainant |
| LW | 99RL10984 | 10/16/1999 | Citizen Dispute | Person Of Interest |
| LW | 99RUC0803 | 10/09/1999 | DUI | person of interest |
| W | 99RL09100 | 08/28/1999 | Vandalism | *Complainant |
| LW | 99RL09100 | 08/28/1999 | Vandalism | Victim |



Incident Reports

01233

FELL-00002167

```
LW   99RL08662   08/19/1999   Citizen Assist        *Complainant
LW   99RL07441   07/20/1999   Theft-Automobil       *Complainant
,W   99RL07441   07/20/1999   Theft-Automobil        Victim
LW   99RL06440   06/29/1999   Family Fight           Involved in Incident
LW   99RL05019   05/26/1999   Family Fight           POI
LW   99RL04744   05/19/1999   Noise Disturban        Offender
LW   99RL03946   04/30/1999   Suspicious             Issued Trespass Noti
LW   99RL03952   04/30/1999   Noise Disturban        POI
LW   99RL03438   04/16/1999   Agency Assist         *Complainant
LW   99RL03084   04/06/1999   Assault               *Complainant
LW   99RL03084   04/06/1999   Assault                Victim
LW   99RL02776   03/29/1999   Fraud                 *Complainant
LW   99RL02776   03/29/1999   Fraud                  Victim
LW   99RL02627   03/25/1999   Noise Disturban        Offender
LW   99RL02284   03/14/1999   Citizen Dispute        Person Of Interest
LW   99RL01824   03/12/1999   Family Fight           suspect
LW   99RL01751   02/25/1999   Family Fight           POI
LW   99C100783   02/15/1999   DLS                    Front passenger
LW   99RL00916   01/28/1999   Assault               *Complainant
LW   99RL00916   01/28/1999   Assault                Victim
LW   98RL07113   08/02/1998   Family Fight           Victim
LW   98RL06930   07/29/1998   Family Fight           Girlfriend
LW   98RL06918   07/28/1998   Family Fight          *Complainant
LW   98RL06918   07/28/1998   Family Fight          *Complainant
LW   98RL06918   07/28/1998   Family Fight           VO
LW   98RL06930   07/28/1998   Family Fight          *Complainant
LW   98RL06930   07/28/1998   Family Fight          *Complainant
LW   98RL04810   06/05/1998   Family Fight           POI
,W   98RL04353   05/23/1998   Theft-Automobil       *Complainant
LW   98RL00371   01/15/1998   Intoxication           POI
LW   98RL00371   01/14/1998   Intoxication          *Complainant
LW   97RL07770   09/19/1997   Intoxication           Intoxicated Person
LW   97RL07770   09/16/1997   Intoxication          *Complainant
LW   97RL05882   07/20/1997   DUI                    Person of Interest
LW   97RL05323   07/08/1997   Assault                Person of Interest
LW   97RL05300   07/03/1997   Theft                 *Complainant
LW   97RL01594   03/04/1997   Intoxication           Intoxicated
LW   96RL09679   11/06/1996   Disorderly             POI
LW   96RL08625   10/04/1996   Family Fight           Intoxicated Person
LW   96RL07632   09/04/1996   Disorderly            *Person of Interest
LW   96RL00291   01/11/1996   Family Fight           Person of Interest
LW   96RL00295   01/11/1996   Citizen Dispute       *Offender
LW   96RL00085   01/04/1996   Suspicious            *Suspect
LW   95RL10438   12/12/1995   Agency Assist          Person of Interest
LW   95RL10438   12/12/1995   Agency Assist         *Offender
LW   95RL10128   12/04/1995   Family Fight          *Person of Interest
LW   95RL10161   12/01/1995   Citizen Assist        *Complainant
LW   95RL08328   09/30/1995   Family Fight          *Person of Interest
LW   94RL10485   12/05/1994   Assault               *Victim
LW   94RL10247   11/28/1994   Assault               *Complainant
LW   94RL10247   11/28/1994   Assault               *Victim
LW   94RL09372   10/29/1994   Intoxication          *Offender
NM     306256    08/02/1998   Gilbert, Lawrence Louie  BOYFRIEND/GIRLFRIEND
VM     224807    12/06/1994   Haydt, Ronald Delbert    BOYFRIEND/GIRLFRIEND
AC      68886    11/13/1999   Accident               Operator #1
VH     289659    10/11/1999   BLK 92 HYUN EXCEL VT   *Owner
```

01234

FELL-00002168

```
VH    242873   02/15/1999   BLU 86 PONT SW VT                    *Owner
VH    153872   05/23/1998   BLU 86 PONT SW VT                    *Owner
CA   1472920   10/05/2000   01:45 10/05/2000 Assault             *Complainant
CA   1416867   08/07/2000   01:24 08/07/2000 911 Hangup          *Complainant
CA   1411764   08/01/2000   21:14 08/01/2000 Assault             *Complainant
CA   1333018   05/04/2000   15:47 05/04/2000 Family Fight        *Complainant
CA   1187415   10/24/1999   21:55 10/24/1999 Citizen Dispu       *Complainant
CA   1143113   08/28/1999   00:32 08/28/1999 Vandalism           *Complainant
CA   1113799   07/20/1999   18:05 07/20/1999 Theft-Automob       *Complainant
CA   1039507   04/16/1999   13:27 04/16/1999 Agency Assist       *Complainant
CA   1032544   04/06/1999   16:47 04/06/1999 Assault             *Complainant
CA   1027019   03/29/1999   13:30 03/29/1999 Fraud               *Complainant
CA    987934   01/28/1999   07:05 01/28/1999 Assault             *Complainant
CA    853522   07/28/1998   04:38 07/28/1998 Family Fight        *Complainant
CA    853522   07/28/1998   04:38 07/28/1998 Family Fight        *Complainant
CA    853876   07/28/1998   15:09 07/28/1998 Family Fight        *Complainant
CA    853876   07/28/1998   15:09 07/28/1998 Family Fight        *Complainant
CA    804178   05/23/1998   01:45 05/23/1998 Theft-Automob       *Complainant
CA    719411   01/14/1998   23:41 01/14/1998 Intoxication        *Complainant
CA    652070   09/16/1997   01:44 09/16/1997 Intoxication        *Complainant
CA    604748   07/03/1997   03:17 07/03/1997 Theft               *Complainant
CA    389070   12/01/1995   02:22 12/01/1995 Citizen Assis       *Complainant
CA    263864   11/27/1994   19:10 11/27/1994 Assault             *Complainant
PR    229535   08/07/2000   BRO Hair human              $0       *Owner
PR    208209   02/14/2000   Miscellaneous assorted      $0       *Owner
PR    187054   08/28/1999   Window Vehicle          $1,250       *Owner
PR    182381   07/21/1999   BLK Car Hyundai Excel   $2,000       *Owner
PR    174994   05/20/1999   Paraphernalia Pot Pipe      $0       *Owner
PR    173667   05/07/1999   BLK Wallet black leather u $45       *Owner
PR    171779   04/19/1999   Check Bank                $200       *Owner
PR    170646   04/08/1999   GLD Glasses unknown wire  $100       *Owner
PR    170365   04/06/1999   MUL Shirt T-shirt type      $1       *Owner
PR    110884   09/16/1997   Key Motel                   $0       *Owner
PR     98665   03/05/1997   Miscellaneous assorted      $0       *Owner
PR     87509   09/04/1996   Cash                   $26.25       *Owner
PR     73642   03/06/1996   Key Miscellaneous           $0       *Owner
PR     73643   01/11/1996   Key Miscellaneous           $0       *Owner
PR     46390   11/28/1994   GRN Cash U.S. Currency    $150       *Owner
```

Name history:
## Previous Name/Address History

| Expired | Address | City | St | Zip | Last Name | First | M |
|---|---|---|---|---|---|---|---|
| 08/01/2000 | REDACTED - FELL | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 04/25/2000 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 10/11/1999 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 08/20/1999 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 02/15/1999 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 07/28/1998 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 05/23/1998 | | Plymouth | VT | 05056 | Fell | Deborah | An |
| 07/03/1997 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |
| 12/04/1995 | | Rutland Ci | VT | 05701 | Fell | Deborah | An |

01235

FELL-00002169

Scars/Marks/Tattoos Detail:
                Scars, Marks, Tattoos, and Other Characteristics
Seq NCIC Code                            Type Pos Part Comments
   1                                     TATO L   HAND cross


Alert codes for names:
                Alert Codes
Seq Code
   1 AUST Alcohol User
   2 DUSR Drug User
   3 DOMV Domestic Violence


Premises Information Table:
Premises ID:      188        Hazard:
+- Name:    225239 ----------------------------------------------------------+
| Lst: Fell REDACTED-FELL        Fst: Deborah       Mid: Ann                  |
| DOB:       1954 SSN: REDACTED-FELL 8195 Adr& REDACTED - FELL                |
| Rac: W Sx: F Femal(802)775-2575    : Rutland City    St: VT Zip: 05701      |
t- Owner:          -------------------------------------------------------- u
| Lst:                          Fst:                Mid:                      |
| DOB:        SSN:              Adr                                           |
| Rac:    Sx:   Tel:            Cty:                St:    Zip:                |
+----------------------------------------------------------------------------+
 Contacts:

   Alarms:
Law Agncy:                         Type:
   Officer:                        Area:                 Img Dtl:
Fire Dept:                         Floors:    0          Img Cnt:
   Officer:                        GPM Req:              Plans #:
Description Detail                                       Alarm #:


 Comments: (None)


Additional Name Information:

01236

```
Name ID Number:      225239
  Last: Fell                           First: Deborah        Mid: Ann
  Addr& REDACTED - FELL                           Phone: (802)775-2575
  City: Rutland City      ST: VT  Zip: 05701 .. DOB: REDACTED - SSN: REDACTED-FELL8195

Birth City: Wilkes-Barre    State: PA        Education:  0 years
Citizenshp: US   United States               Shoe Size:
  Religion:                                  Cover Size:
   Marital: N   Not Married                  Misc. Size:
    School:                                  Commissary: Y Yes
   Contact:                                  Relationship:
   Address:                                        Phone: (    )    -
  Employer: Foleys                   Employer Phone: (    )    -
   Address: State Steet Rutland City VT
  Job Desc:                                Job Phone: (    )    -
Job Locatn:                                Date Hired:    /  /
Supervisor:                           Super Work Phon: (    )    -
                                      Super Home Phon: (    )    -
  Probation:                             Prob Officer:
     Henry:                                  Attorney:
                              NCIC Print:
```

01237

FELL-00002171

# EXHIBIT 213

GEIJL-84 REV 01/98E

# New York State Police Investigation Report

| 1. Troop | 2. Station | 2A. TZS | 4. Case No | 3. Station Dover Plains | 3A. TZS K221 | 5. Case No. 00-833,841-845 |
|---|---|---|---|---|---|---|

**C O** 

| 6. Complainant Name (Last, First, Middle) | | 7. DOB UNK |
|---|---|---|
| C-1 Hoover | Gary | Edward | |

8. Street # Name  REDACTED - FELL   Apt.  C/T/V Kingston   State NY   Zip 12401   County Ulster   9. Phone 8453319807

**COMPLAINT** section:
U. Employer Federal Bureau of Investigation   Address 249 Stockade Drive Kingston NY 12401   10A. Occupation Agent   10B. Bus. Phone 8453319807

11. Place of Occurrence - Specific Location  Private Property East of State Route 22 - 9/10 mile south of County Route 6   11A. County Dutchess

| 11B. C-T-V Town of Dover | 11C. C-T-V CODE K1453 | 12. Date Occurred: From - To 120100 — | Time Occurred: From/To 8:45 PM — | 13. Date Reported 12 01 2000 | Time Reported 8:45 PM |
|---|---|---|---|---|---|

14. Owner if other than Complainant   Address   15. Weather: ● Clear ○ Cloudy ○ Rain ○ Fog ○ Sleet ○ Snow

**CASE DATA**

| 16. Character of Case | 17. Counts | 18. Case No. | 19. CC Code |
|---|---|---|---|
| Murder 1st degree | 2 | 00-833 | MUR1688 |
| Kidnapping 1st degree | 2 | 00-841 | KDN1860 |
| Robbery 1st degree | 2 | 00-842 | RBY3060 |
| Crim. Poss. Stolen Property 3rd degree | 2 | 00-843 | STP3800 |
| Crim. Poss. Weapon 4th degree | 2 | 00-844 | CPW1045 |
| Trespass | 2 | 00-845 | TRE0737 |

Code: Stolen (S)  Used in Crime (C)   Crim. Misch. (M) Recovered (R)   Evidence (E) Genl. 2 (A)   Term. Msg (T) Other (O) (Specify)

**20. PROPERTY**

| | Code | Qty | Description | ID - Serial Number | 21 Monetary Value |
|---|---|---|---|---|---|
| P-1 | E | 1 | VHS Video Tape | | 2.50 |

**22. VEHICLE** V-1

○ Used in Crime  ○ Acc. MV  ○ Acc. Non MV  ○ Suspect
○ Crim. Misch.  ● Stolen  ● Recovered  ● OTHER (Specify) S-1's Property

Description - Make  Plymouth   Year 1996   Reg. No. BNR602   State VT

Color eal Gr   Body - Model Neon   Vin No. 3P3ES47C1TT213957

Stolen MV - Keys in Ignition  Yes ○ No ○
Recovered - Running Condition  ○ ○

**23. WEAPON** W-1

○ Used in Crime  ○ Lawful Surrender  ○ Unlawful Poss.  ○ Stolen  ○ Other (Specify)

○ Revolver ○ Pistol ○ Rifle ○ Shotgun ○ Other
D-E-S-C-R-I-P

Make - Type Model   CAL - GA   Name of Owner or Licensee
Ser. No.   ○ Loaded  Tot Capacity   Address
Finish ○ Blue ○ Silver  ○ Other (Specify)   ○ Unloaded  Rds Fired   Lic. No.   Date of Issue
Unexpended Rounds   County of Issue

**24. DOCUMENT** D-1

Kind of Document   Name of Receiver   Reason ○ No Acct ○ Insuff Funds ○ Acct. Closed ○ Forgery
Name of Maker - ID or Address Given   Identifiable Yes ○ No ○
Bank Drawn On - Address   Doc No.   Photo-Suspect ○ ○
Doc Date   Doc Amount   Money, Property or Service Obtained

**25. DAMAGE** Describe or List Physical Damage or Any Other Loss

26. INSUR  Property Insured? ○ Yes ○ No   Name of Insurer   Amt. Insurance   27 Total Value 2.50

**28. DISPO**

| No. | Date | Disposition | | 30. RCN Retained/Destroy |
|---|---|---|---|---|
| P1 | 12 13 2000 | TOT FBI AGENT Elizabeth Maher | | |
| V1 | 12 01 2000 | Recovered and Retained by Clarksville Arkansas PD | | |

**29. WITNESS**

| | Name (Last, First, Middle) - Address | Age | DOB |
|---|---|---|---|
| WT-1 | Leight, Michael S REDACTED - FELL | 19 | REDACTED-FE 1981 |
| 2 | Place, Laura J - | 32 | 1967 |
| WT3 | Fisher, Tracy L - | 21 | 1979 |
| WT4 | Cancel, Keith T - | 16 | 1984 |

30A. Report Date  122700

0001146

FELL-00002173

# New York State Police Investigation Report

CODE: Assault = A    Homicide = H    Suicide = S    Attempted Suicide = AS    Natural Death = ND    Accident Victim = AV    Other = O (Specify)

| | Code | Name (Last, First, Middle)    Address | | | | | Sex | Age | REDACTED - FELL |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | H | King, Teresca Ruth    REDACTED - FELL | | | | | F | 53 | 1947 |

**Nature of Injuries** Strangulation & Blunt force trauma head    **Hospital and/or Physician** St Frances Poughkeepsie

**Date of Death** 12 02 2000    **Coroner or Medical Examiner** Dr. Michael Del Monico    **Autopsy** Yes ● No ○    **Pathologist** Dr Michael Baden    **Kin Notified** Yes ● No ○

| | Code | Name (Last, First, Middle)    Address | Sex | Age | DOB |
|---|---|---|---|---|---|
| S-2 | | | | | |

**Nature of Injuries**    **Hospital and/or Physician**

**Date of Death**    **Coroner or Medical Examiner**    **Autopsy** Yes ○ No ○    **Pathologist**    **Kin Notified** Yes ○ No ○

| | Code | Name (Last, First, Middle)    Address | Sex | Age | DOB |
|---|---|---|---|---|---|
| S-3 | | | | | |

**Nature of Injuries**    **Hospital and/or Physician**

**Date of Death**    **Coroner or Medical Examiner**    **Autopsy** Yes ○ No ○    **Pathologist**    **Kin Notified** Yes ○ No ○

CODE: Unknown Subject = U    Crim. Sum. = C    Perpetrator = P    Accomplice = A    Defendant = D    Suspect = S    Wanted-Warrant = W    Juvenile = J    Other = O (Specify) REDACTED - FELL

| | Code | Name (Last, First, Middle) Address - Alias | Sex | Age | |
|---|---|---|---|---|---|
| T-1 | D | Lee, Robert J #REDACTED - FELL Rutland Vermont | M | 21 | 979 |
| T-2 | D | Fell, Donald R #    Rutland Vermont | M | 20 | 980 |
| T-3 | | | | | |
| T-4 | | | | | |
| T-5 | | | | | |
| T-6 | | | | | |
| T-7 | | | | | |

| Title No. | Race | Ht. | Wt. | Hair | Eyes | Crime | Section | Law |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Judge - Name - Address - Title | County | Date Issued | Extradite Yes ○ No ○ |
|---|---|---|---|
| | | | |

| Title No. | Race | Ht. | Wt. | Hair | Eyes | Crime | Section | Law |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Judge - Name - Address - Title | County | Date Issued | Extradite Yes ○ No ○ |
|---|---|---|---|
| | | | |

| | | No. | File | Date | Station | | No. | Date | 35. ○ C/A ● C/EO ○ C/INV ○ C/UNF ○ Open |
|---|---|---|---|---|---|---|---|---|---|
| I N N Q U I R Y | DCJS M E S S ● YES ○ NO | 2987 | 3 | 12 01 2000 | Dover Plains | C A N C E L | | | STATUS ○ Other |
| | | 2994 | 3 | 12 02 2000 | Dover Plains | | | | |
| | NCIC A G E S ● YES ○ NO | 2993 | 20 | 12 02 2000 | Dover Plains | | | | TOT BC ● Yes ○  No  Date 12 01 2000  Lead Request  Continuation Sheet |
| | | 3038 | 20 | 12 07 2000 | Dover Plains | | | | ○ YES  NO. 6 |

**Photos Taken** Yes ● No ○    **By Whom** FBI ID Unit & Troop K ID    **Dusted For Latent Prints** Yes ○ No ○    **By Whom**

**Name and Address of Agency Notified or Requested** FBI Albany Field Office    **Responded** Yes ● No ○    If "Yes " Name Of Person In Charge - If "No" Name  F "NO" Name Of Person Notified  Acting SSA DAN MATTHEWS

**Name(s) of Licensee(s)**    **Business Name**    **Lic. No.**

The Presence or absence of any individual factor is indicated by checking **Yes** or **No**

| | | | |
|---|---|---|---|
| Witness to Crime | ○ Yes ● No | Property Traceable / Identifiable | ● Yes ○ No |
| Identification / Description Of Suspect Vehicle | ● Yes ○ No | Distinctive / Significant MO | ○ Yes ● No |
| Significant Physical Evidence | ● Yes ○ No | Significant Community Interest | ● Yes ○ No |

| | |
|---|---|
| E-1 - Sketch of Burger King | E-8 - Genl 4 - WT-6 (Darlene Smalley) |
| E-2 -Consent to Search | E-9 -Genl 15 Receipt P-1 (Video) |
| E-3 - Genl 4- WT-1 (Michael S. Leight) | E-10- Genl 15 Receipt |
| E-4 - Genl 4 - WT-2 (Laura J. Place) | E-11 - Genl 4 - WT-7 (Francis Bellanto) |
| E-5 - Genl 4 - WT-3 (Tracey Fisher) | E-12 - Genl 15 Receipt P-1 (Video) |
| E-6 - Genl 4 - WT-4 (Keith T. Cancel) | E-13 - Copy of Death Certificate S-1 |
| E-7 - Genl 4 - WT-5 (Ronald H. Guerre) | |

| Complaints | Properties | Vehicles | Weapons | Documents | Witnesses | Victims | Titles | Wanted |
|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 1 | 0 | 0 | 7 | 1 | 2 | 0 |

**Signature And Rank**    **Shield No.**    43 **Signature And Rank** Arthur C Wilson  S/T    **Shield No.** 3650A  Approved

**Station**    **42B Case No.**    **Approved**    43A **Station** Dover Plains    43B **Case No.** 00-833

TZS

TZS K221

0001147

FELL-00002175

GENL-84b REV 11/97E

## NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                    PAGE 1
COMPLAINANT - LAST, FIRST, MIDDLE                          CASE NUMBER

| Hoover, Gary F.B.I. | 00-833, 841-845 |
| --- | --- |

Box # 29 WITNESSES:

WT5 - Guerrero, Ronald H                                              32
WT6 - Smalley, Darlene S - REDACTED - FELL 56
WT7 - Bellantoni, Francis R                                           '48


BOX # 34 NYSPIN:

3039- File 20 - 12/07/00 - SP Dover Plains
3041- File 20 - 12/07/00 - SP Dover Plains
3042- File 20 - 12/07/00 - SP Dover Plains
3043- File 20 - 12/07/00 - SP Dover Plains
3044- File 20 - 12/07/00 - SP Dover Plains
3054 - File 20 Added - 12/08/00 - SP Dover Plains
3055 - File 20 Added - 12/08/00 - SP Dover Plains
3056 - File 20 Added - 12/08/00 - SP Dover Plains
3057 - File 20 Added - 12/08/00 - SP Dover Plains
3058 - File 20 Added - 12/08/00 - SP Dover Plains

1.  On 12/01/00, at approximately 6:25pm, Senior Investigator Gary Mazzacano of the State Police Claverack station, contacted Investigator John Ryan at SP Dover Plains.  S/I Mazzacano requested Inv John Ryan patrol to the Burger King located on State Route 22 in the Town of Pawling, to obtain information regarding the location of the Burger King, and surrounding landmarks near the Burger King. S/I  Mazzacano advised FBI Special Agents Gary Hoover (C-1), Kevin Hennessy and himself, are currently working information regarding the victim of a homicide, who could possibly be located in SP Dover Plains Patrol area.  S/I Mazzacano advised Inv. Ryan, that two subjects responsible for the homicide are currently in custody in the state of Arkansas.

2.  On 12/01/00 Inv. Ryan patrolled to the Burger King on State Route 22 in the Town of Pawling, and sketched the area on paper, with surrounding landmarks.  Sketch attached as enclosure, (E-1).  Inv Ryan returned to SP Dover Plains and advised S/I Arthur Wilson of the case status.

3.  On 12/01/00 at approximately 8:45pm, S/I Mazzacano advised Inv. Ryan that FBI Special Agents Hennessy and Hoover and himself, with Dover Plains Uniform patrols, located a body on private property, the location being: east side of State Route 22, approx. 1 mile south of County Route 6, in the Town of Dover. S/I Mazzancano advised scene is secured.  Inv Ryan contacted S/I Arthur Wilson and advised same of case status.  Inv Ryan responded to scene from SP Dover Plains.

On 12/01/00 the following State Police supervisory personnel responded: Captain Frank Koehler BCI, Captain Frank Christensen Uniform, Lieutenant William Baker BCI, S/Inv Arthur Wilson BCI  SP Dover Plains, S/Inv Thomas Martin Troop K Identification Unit, Station Commander Sgt Denis Murphy

0001148

FELL-00002177

GENL-84b REV 11/97E

## NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                      PAGE 2

COMPLAINANT - LAST, FIRST, MIDDLE                          CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |

SP Dover Plains. FBI agents at scene: SA Kevin Hennessy, SA Gary Hoover, SSA Dan Matthews, SA David Fallon,SA Darren Semprebon.

5.   On 12/01/00, Senior Investigator Gary Mazzacano advised Senior Investigator Arthur Wilson (writer) the following regarding the circumstances surrounding this investigation: On 11/30/00, T-1 (Robert Lee) and T-2 (Donald Fell), were being detained by the Clarksville Police Department in Arkansas on traffic violations and drug charges. T-1 and T-2 were in the possession of a vehicle, (V-1), which belonged to S-1 (TERESCA KING), who was an active NYSPIN entry as a Missing Person Endangered, from the Vermont State Police. Further investigation led to information being provided to the authorities by T-1 (Robert Lee) and T-2 (Donald Fell), that they were responsible for the kidnaping of S-1 (Teresca R. King) in the State of Vermont, and subsequently killed her in the State of New York. S/I Mazzacano advised the information provided did not give an exact location, only that T-1 and T-2 mentioned a pull off with some type of shooting range set up. After they disposed of T-1 (Teresca King), they stopped at a Burger King restaurant, which was on the left hand side of the highway they traveled in New York. S/I Mazzancano being familiar with the SP Dover Plains patrol area, located an area off ST 22, in the Town of Dover, that is an open area and is a make shift shooting range. S/I Mazzacano along with Troopers Bialeck and Larkin of the Dover Plains State Police Station, along with FBI agents Hennessy and Hoover, began a physical search of the pull off area, approximately one mile south of County Route 6, in the Town of Dover. During the search of the area, a deceased female subject was located near the woodline, east of ST 22, fitting the description of being S-1 (Teresca R. King). S/I Mazzacano advised the scene was secured.

7.   On 12/01/00 S/I Martin Troop K Identification Unit secured the scene for the evening under State Police and F.B.I. guard.

8.   On 12/01/00 further information was received by S/I Wilson that on 11/27/00, T-1 (Lee) and T-2 (Fell), made an attempt to purchase drugs from a drive through window employee at the Burger King on ST 22 Pawling New York. Writer assigned Investigator John Ryan of the Dover Plains station, to patrol to the Burger King in Pawling and identify the employee working the drive through window.

9.   On 12/01/00 Inv. John Ryan advised writer the employee working the drive through window is a subject named (Michael Leight) WT-1 of # 9 Wesley Rd Brewster. Inv. Ryan along with FBI agent Hennesey, attempted to locate WT-1, but met with negative results.

10.   On 12/02/00 at approximately 7:20am, S/I Martin - Troop K Identification Unit, along with the FBI Identification Unit, began the crime scene processing. All case evidence was turned over to the Federal Bureau of Investigation at the crime scene.

11.   On 12/02/00 at approximately 7:24am Dr. Michael Del Monicco of the Dutchess County Medical Examiners Office, arrived at the crime scene and pronounced S-1 (Teresca R. King) deceased. Dr Del Monico authorized removal of S-1 to St. Frances Hospital for autopsy.

FELL-00002178

0001149

FELL-00002179

GENL-84b REV 11/97E

## NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                                PAGE 3

COMPLAINANT - LAST, FIRST, MIDDLE                              CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |

12.    On 12/02/00 S/I Wilson along with Inv Ryan contacted Shepard Spunt 617-277-7265, who is the executor for the estate of Malcolm Fooshee, who is the land owner where S-1 was located. At approximately 8:20am, Shepard Spunt granted verbal consent to the State Police and FBI to enter the property. On 12/02/00 a consent to search was faxed to Shepard Spunt for his signature. On 12/07/00 Inv Ryan received consent to search from Shepard Spunt via US mail. Consent to search attached as enclosure, E-2.

13.    On 12/02/00 a physical search of State Route 22, south of the crime scene, was conducted by State Police members and FBI agents. Approximately 3.7 miles south of the crime scene, along the west shoulder of the southbound lanes of State Route 22, in the Town of Dover, a wallet with identification belonging to S-1 (Teresca King) was located. Wallet secured by F.B.I. SA Mark Promupico and retained as evidence by the F.B.I.

14.    On 12/02/00 Inv John Ryan interviewed ( Michael Leight) WT-1, who advised that he was employed at the Burger King in Pawling on 11/27/00, and at approximately 8:00am, two male customers approached the drive through window in a Saturn type vehicle. The subjects,while waiting for their food, asked him if the store sold alcohol, or he had any pot. WT-1 advised the subjects he could get some,and the cost would be $20.00. The driver advised WT-1 he would be back in five minutes. WT-1 advised he called a friend of his who advised he could get whatever they need. WT-1 advised the subjects returned and he advised them to wait by the speaker of the drive through. WT-1 went outside, and only the driver of the vehicle was present. WT-1 advised the driver it would be $20 a gram or $60 an 1/8 ounce, at which time the driver advised him to disregard. WT-1 further advised, the driver stated he was from Vermont, and heading to New York City, so WT-1 gave him directions and went back to work. WT-1 advised he didn't see the passenger again, but was advised by the driver of the vehicle, that the passenger went to use the bathroom. Genl.4 (deposition) obtained an attached as an enclosure, E-3.

15.    On 12/02/00 Inv. Thomas Fort interviewed (Laura Place) WT-2, who stated that at approximately 8:00pm on 11/30/00, an employee of Burger King restaurant, Keith Cancel. showed her a blue purse that he found in the grease bin outside of the restaurant, and that there was no ID in it. WT-2 could offer no further information. Genl. 4 (deposition) obtained and attached as enclosure, E-4..

16.    On 12/02/00 Inv. Darren Forbes interviewed (Tracy Fisher) WT-3, who stated that she is the manger at the Burger King Restaurant, on ST 22 Town of Pawling. WT-3 advised an employee named Keith Cancel had brought a pocket book into the store, which he found outside. WT-3 advised, Keith Cancel looked through the pocketbook and located nothing important in it, at which time Keith Cancel took the pocketbook outside and threw it in the garbage compactor. WT-3 advised she thinks the date of this occurrence was Thursday,11/30/00. WT-3 could offer no further information. Genl. 4 (deposition) obtained and attached as an enclosure, E-5.

17.    On 12/02/00 Inv. Ethan Fergus interviewed (Keith Cancel) WT-4, who stated that on 11/30/00 he was working the 5pm-9pm shift at the Burger King restaurant in Pawling.. WT-4 advised he went to dump the restaurant grease into the grease dumpster, located outside the store, at which time he located a blue purse, along with a box of crushed up donuts on the grease dumpster.. WT-4 moved the pocketbook and dumped the grease. WT-4 then brought the pocketbook inside the restaurant and looked

0001150

FELL-00002181

GENL-84b REV 11/97E

## NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K   Dover Plains                                                           PAGE 4

COMPLAINANT - LAST, FIRST, MIDDLE                                    CASE NUMBER

| Hoover, Gary F.B.I. | 00-833, 841-845 |

inside the pocketbook, observing a comb and empty pepsi bottle. WT-4 could not recall what he then did with the pocketbook. WT-4 could offer no further information. Genl. 4 (deposition) obtained and attached as an enclosure, E-6.

18. On 12/02/00 Inv. Ethan Fergus interviewed (Ronald Guerro) WT-5, employee of Burger King. WT-5 could offer no information. Genl. 4 (deposition) obtained and attached as an enclosure, E-7.

19. On 12/02/00 Inv Thomas Fort interviewed (Darlene Smalley) WT-6, an employee of Burger King who stated that she is the manager of the store. She stated an employee (Michael Leight) WT-1, brought it to her attention that a purse was found with no identification in it. WT-6 could offer no further information. Gen 4 (deposition) obtained and attached as an enclosure, E-8.

20. On 12/02/00 writer instructed Trooper Breen to secure the surveillance tape dated 11/27/00 from the Cumberland Farms store on ST 22 Town of Dover. Trooper Breen secured video tape from James Dunnaway, manager of store, Genl 15 (receipt) obtained and attached as enclosure E-9. Video tape secured as evidence and listed as P-1. Video tape was secured due to the surveillance camera records the traffic along ST route 22, in the Town of Dover.

21. On 12/02/00 writer instructed Inv. Darren Forbes to view P-1 (video tape). At approximatley 7:00am listed on video tape (P-1), it appears S-1's vehicle is photographed passing the Cumberland farms store in a southern direction on ST 22, in the Town of Dover.

22. On 12/02/00 writer instructed Inv. Forbes,Ryan, Fort and Fergus to patrol to the Burger King Restaurant, ST 22, Town of Pawling, in an effort to locate evidence in this case. During search of a field in the rear of the restaurant, Inv Forbes located two pieces of newspaper from the Rutland Shopper, 1- clear nail polish bottle, and 1 AMEX credit card receipt, items secured as evidence and turned over to FBI agent MAHER. Genl 15 (receipt obtained) and attached as enclosure E-10. A physical search was conducted on the contents of a garbage dumpster at the Burger King, which resulted in S-1's pocketbook being located by FBI Agent Mark Promupico, who retained custody of S-1's pocketbook as evidence. Burger King property photographed by the Troop K ID Unit.

23. On 12/02/00 at approximately 1:00pm, the body of (Teresca King) S-1, was removed from the crime scene and transported to St Frances Hospital for autopsy. Hufcut Funeral Home personnel (Frank Kelly & Larry House) transported S-1, followed by S/Martin and FBI S/A Woods.

24. On 12/02/00 the autopsy was preformed on (Teresca King) S-1, at St Francis Hospital in Poughkeepsie NY, by Dr. Michael Baden. Troop K Identification Unit, along with FBI identification unit personnel attended autopsy. All evidence retained by FBI personnel at autopsy. Dr. Michael Baden determined cause of death to be strangulation, and blunt force trauma to head. S/I Thomas Martin advised writer on the completion of the autopsy report by Dr.Baden, same will be sent to him directly and will be turned over to the FBI. S/I Martin advised upon his receipt of the autopsy report he will transmit a copy to writer for case file.

FELL-00002182

0001151

FELL-00002183

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

TROOP K    Dover Plains                                                                 PAGE 5

COMPLAINANT - LAST, FIRST, MIDDLE                          CASE NUMBER

| Hoover,Gary F.B.I. | 00-833, 841-845 |
|---|---|

25. On 12/02/00 writer advised Sr. ADA Edward Whitesell, of the Dutchess County District Attorneys office the status of this investigation, who responded to SP Dover Plains.

26. On 12/04/00 SP Dover Plains BCI and Uniform personnel conducted a road check on State Route 22 in the Town of Dover, from 6:00am thru 8:00am, at the area where the pull off is located, in an effort to generate leads in this investigation. Trooper Trojanek advised writer the following people were interviewed by him as a result of this road check, RICK BOYNTON of Lakeville Connecticut # 805-435-1232 who advised at approx 8:15/20 am while northbound in his vehicle he saw a vehicle pulled off the roadway with two people out of the vehicle possibly pouring something on the ground. Subject could offer no further information. DAVID FELLER of Chatham NY 518-392-5439 advised he observed a vehicle at approx. 7:30am pointed southbound, but on the northbound shoulder of ST 22, subject described the vehicle as a 2dr possibly older/rusty dark color, subject could offer no further information.

27. On 12/04/00 Captain Frank Koehler, Troop K BCI advised writer that this homicide investigation will be prosecuted on a federal level, per Dutchess County District Attorney William Grady.

28. On 12/11/00 writer received S-1's (Teresca King) dental x-ray and dental records from Detective Kevin Stevens of the City of Rutland Police Department. Dental records TOT S/I Martin Troop K ID 12/11/00.

29. On 12/12/00 writer interviewed (Francis Bellantoni) WT-7, who stopped at SP Dover Plains. He advised writer he recalled traveling south on ST 22, and observed a vehicle facing north at the pull off on ST 22. He advised he saw two male subjects outside of a car, coming from the wooded area, and that the vehicle had Vermont plates. He stated inside the vehicle, he observed a female on passenger side. WT-7 stated he had to turn around due to forgetting his cell phone at his residence, and was now heading northbound, and upon approaching the pull off he observed a female walking towards the woods, with two males behind her. WT- 7 continued to his residence, retrieved his cell phone, then returned southbound on ST 22, passing the pull off area, at which time the vehicle and subjects were now gone. WT-7 advised the amount of time it took him from his second pass of the location and retrieving his cell phone at his residence and returning, was approximately ten minutes. WT-7 was unable to recall what time of day it was, only that the vehicle had Vermont plates, and the women wasn't being taken by force. WT-7 stated he was traveling 55MPH when he observed the above. WT-7 could offer no further information. Genl 4 (deposition) obtained and attached as enclosure, E-11.

30. On 12/13/00 S/I Thomas Martin of Troop K Identification Unit turned over P-1 (Video Tape) and S-1's dental records to FBI agent Elizabeth Maher. Genl 15 (receipt) obtained and attached as enclosure, E-12.

FELL-00002184

0001152

FELL-00002185

GENL-84b REV 11/97E

# NEW YORK STATE POLICE
## CONTINUATION SHEET

**TROOP K    Dover Plains**

COMPLAINANT - LAST, FIRST, MIDDLE

**PAGE 6**

CASE NUMBER

| Hoover, Gary F.B.I. | 00-833, 841-845 |
|---|---|

31. On 12/21/00 writer completed VICAP Crime Analysis Report and forwarded same to S/I Ayling NYSP Forensic Center Albany NY. Copy of same retained in case folder.

32. On 12/26/00 writer received a copy of the death certificate for (Teresca R. King) S-1, which is on file with the Town of Dover Town Clerks Office. Death certificate attached as an enclosure, E-13.

32. As a result of this investigation SP Dover Plains BCI adopts the following cases which are closed EXCEPTIONAL CLEARANCE

> 00-833 - MURDER 1 - - - - - - - -    CLOSED
> 00-841 - KIDNAPING 1st - - - -    CLOSED
> 00-842 - ROBBERY 1st - - - - - -    CLOSED
> 00-843 - C.P. STOLEN PROP 3rd -    CLOSED
> 00-844 - C.P. WEAPON 4th -  - - -    CLOSED
> 00-845 - TRESPASS - - - - - - - - - - -    CLOSED

****************NO PROPERTY OR EVIDENCE RETAINED FINAL REPORT ****************

FELL-00002186

0001153

FELL-00002187

# EXHIBIT 214



# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET

Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 1 of 9

## CASE INFORMATION

Judge Assigned: Thomson, Harold Jr.          Date Filed: 01/16/2002          Initiation Date: 01/16/2002

OTN: H0995212                                Lower Court Docket No: CR-0000121-01

Initial Issuing Authority:                   Final Issuing Authority: William N Sanquilly

Arresting Agency: PSP - Blooming Grove        Arresting Officer: Affiant

Case Local Number Type(s)                    Case Local Number(s)

    Legacy Docket Number                      2002-10

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Complaint Date: | 11/15/2001 |
|---|---|---|---|---|---|
| | | 10/08/2002 | Migrated Final Disposition | | |
| | | 01/16/2002 | Migrated Case | | |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|
| 10/20/2009 | DOC Confined | SCI Huntingdon | | Yes |

## DEFENDANT INFORMATION

Date Of Birth:          03/30/1983          City/State/Zip: Lake Ariel, PA  18436

Alias Name

Eike, Christopher

Eike, Christopher A.

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Eike, Christopher Allen |

AOPC 2220 - Rev 05/02/2010                                        Printed: 05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002188

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



**Docket Number: CP-52-CR-0000010-2002**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 2 of 9

## BAIL INFORMATION

**Eike, Christopher Allen**

**Nebbia Status:  None**

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 01/15/2002 | ROR | | $0.00 | | |
| | | | | | Posted | 01/15/2002 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Date | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | M1 | **18 § 3126 §§A7** | Ind Asslt Person Less 13 Yrs Age | 07/06/2001 | H0995212 |
| 2 | 2 | M1 | **18 § 3126 §§A7** | Ind Asslt Person Less 13 Yrs Age | 07/06/2001 | H0995212 |
| 3 | 3 | M1 | **18 § 6301 §§A1** | Corruption Of Minors | 07/06/2001 | H0995212 |

AOPC 2220 - Rev 05/02/2010

Printed:  05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 3 of 9

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |
| Linked Offense - Sentence | Link Type | Linked Docket Number |

**Migrated Disposition**

| Migrated Dispositional Event | 06/20/2002 | Not Final |
|---|---|---|
| 3 / Corruption Of Minors | Guilty Plea | 18§6301§§A1 |
| Thomson, Harold Jr. | 06/20/2002 | |
| Confinement | Min of 6.00 Months | 09/03/2002 |
| | Max of 1.00 Years 11.00 Months | |
| Financial Assessments | Min of 6.00 Months | 09/03/2002 |
| | Max of 1.00 Years 11.00 Months | |

**Migrated Disposition**

| Migrated Dispositional Event | 10/08/2002 | Final Disposition |
|---|---|---|
| 1 / Ind Asslt Person Less 13 Yrs Age | Nolle Prossed | 18§3126§§A7 |
| 2 / Ind Asslt Person Less 13 Yrs Age | Nolle Prossed | 18§3126§§A7 |

## COMMONWEALTH INFORMATION

**Name:**   Raymond Jay Tonkin, Esq.
District Attorney

**Supreme Court No:**   083972
**Phone Number(s):**
    (570) 296-3482   (Phone)
    (570) 296-3559   (Fax)
**Address:**
Pike County District Attorney's Office
506 Broad Street
Milford PA  18337

## ATTORNEY INFORMATION

**Name:**   Andrew W. Hood, Esq.
Private

**Supreme Court No:**   034640
**Rep. Status:**   Active
**Phone Number(s):**
    (570) 296-8844   (Phone)
    (570) 296-3914   (Fax)
**Address:**
    Levy, Stieh and Gaughan, P.C.
    542 U.S. Rtes 6 & 209
    Milford PA  18337

Representing: Eike, Christopher Allen

AOPC 2220 - Rev 05/02/2010

Printed:  05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002190

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



**Docket Number: CP-52-CR-0000010-2002**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 4 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date |
|---|---|---|

**2**  01/16/2002
Original Papers Received from Lower Court

Unknown Filer

---

**3**  01/16/2002
TRANSCRIPT FILED FROM DOCKET OF DIS

TRANSCRIPT FILED FROM DOCKET OF DISTRICT JUSTICE WILLIAM SANQUILLY. EXIT COPIES OF TRANSCRIPT TO DISTRICT ATTORNEY

Migrated, Filer

---

**1**  03/25/2002
INFORMATION FILED BY DISTRICT ATTOR

INFORMATION FILED BY DISTRICT ATTORNEY

Migrated, Filer

---

**1**  03/28/2002
WAIVER OF ARRAIGNMENT FILED SCHEDUL

WAIVER OF ARRAIGNMENT FILED SCHEDULING CASE TO THE MAY 2002 TERM OF COURT.

Migrated, Filer

---

**1**  05/06/2002
APPLICATION FOR TRIAL CONTINUANCE I

APPLICATION FOR TRIAL CONTINUANCE IS FILED TOGETHER WITH ORDER CONTINUING TRIAL TO THE NEXT TERM OF COURT

Migrated, Filer

---

**1**  05/17/2002
GUILTY PLEA SCHEDULED FOR JUNE 12,

GUILTY PLEA SCHEDULED FOR JUNE 12, 2002 AT 9:00 AM

Migrated, Filer

---

**1**  06/10/2002
GUILTY PLEA RE-SCHEDULED FOR JUNE 2

GUILTY PLEA RE-SCHEDULED FOR JUNE 20, 2002 AT 9:00 A.M.

Migrated, Filer

---

AOPC 2220 - Rev 05/02/2010

Printed: 05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002191

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



Docket Number: CP-52-CR-0000010-2002

## CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 5 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date |
|---|---|---|
| 1 | 06/20/2002 | |

GUILTY PLEA COLLOQUY PRESENTED TO T

GUILTY PLEA COLLOQUY PRESENTED TO THE COURT AND ACCEPTED BY THE COURT

Migrated, Filer

| 1 | 06/20/2002 | |
|---|---|---|

Migrated Automatic Registry Entry (

Migrated Automatic Registry Entry (Disposition) Text

Migrated, Filer

| 2 | 06/20/2002 | |
|---|---|---|

Migrated Sentence

Migrated Sentence

Migrated, Filer

| 1 | 06/21/2002 | |
|---|---|---|

EXIT NOTICES SETTING SENTENCE DATE

EXIT NOTICES SETTING SENTENCE DATE FOR AUG 22, 2002 AT 9 AM

Migrated, Filer

| 1 | 08/14/2002 | |
|---|---|---|

MEMORANDUM FROM COURT ADMINISTRATOR

MEMORANDUM FROM COURT ADMINISTRATOR IS FILED SCHEDULING SENTENCING HEARING TO SEPTEMBER 3, 2002 AT 1:30 P.M.

Migrated, Filer

| 1 | 09/03/2002 | |
|---|---|---|

SENTENCING PROCEEDING COLLOQUY PRES

SENTENCING PROCEEDING COLLOQUY PRESENTED TO THE COURT AND ACCEPTED BY THE COURT

Migrated, Filer

| 1 | 09/04/2002 | |
|---|---|---|

GUIDELINE SENTENCE FORM IS FILED BY

GUIDELINE SENTENCE FORM IS FILED BY PROBATION OFFICE

Migrated, Filer

AOPC 2220 - Rev 05/02/2010

Printed: 05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002192

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET

Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania
v.
Christopher Allen Eike

Page 6 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date |
|---|---|---|

1    09/06/2002

ORDER OF COURT IS FILED SENTENCING

ORDER OF COURT IS FILED SENTENCING DEFENDANT ON CORRUPTION OF MINORS, M1, TO PAY COSTS, FINE OF $800 AND PAY A SUPERVISION FEE EACH MONTH. HE IS TO BE INCARCERATED IN THE PIKE COUNTY JAIL FOR 6 MONTHS TO 23 MONTHS. HE IS TO ATTEND THE PIKE COUNTY DRUG & ALCOHOL OFFICE. HE IS TO REFRAIN FROM CONTACT WITH VICTIM ALLYSSA SHAFFER OR ANY OTHER CHILDREN UNDER THE AGE OF 18.

Migrated, Filer

---

1    09/11/2002

CERTIFICATE OF COSTS IS FILED.

CERTIFICATE OF COSTS IS FILED.

Migrated, Filer

---

1    10/07/2002

PETITION FOR NOLLE PROSEQUI IS FILE

PETITION FOR NOLLE PROSEQUI IS FILED AND TRANSMITTED TO THE COURT

Migrated, Filer

---

1    10/08/2002

ORDER OF COURT IS FILED ENTERING NO

ORDER OF COURT IS FILED ENTERING NOLLE PROSEQUI TO COUNT I-INDECENT ASSAULT AND COUNT II-INDECENT ASSAULT.

Migrated, Filer

---

1    10/08/2002

Migrated Automatic Registry Entry (

Migrated Automatic Registry Entry (Disposition) Text

Migrated, Filer

---

2    10/08/2002

EXIT COPIES TO ALL PARTIES BY REGUL

EXIT COPIES TO ALL PARTIES BY REGULAR MAIL OR OFFICE MAILBOXES

Migrated, Filer

---

1    11/14/2002

APPLICATION FOR WORK RELEASE IS FIL

APPLICATION FOR WORK RELEASE IS FILED AND TRANSMITTED TO THE COURT.

AOPC 2220 - Rev 05/02/2010                                                      Printed:  05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002193

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 7 of 9

## ENTRIES

| Sequence Number | CP Filed Date | Document Date |
| --- | --- | --- |

Migrated, Filer

---

1    11/26/2002

ORDER OF COURT IS FILED DENYING DEF

ORDER OF COURT IS FILED DENYING DEFENDANT APPLICATION FOR WORK RELEASE.

Migrated, Filer

---

2    11/26/2002

EXIT COPIES TO ALL PARTIES BY REGUL

EXIT COPIES TO ALL PARTIES BY REGULAR MAIL OR OFFICE MAILBOXES

Migrated, Filer

---

1    01/31/2003

PETITION FOR PAROLE IS FILED AND TR

PETITION FOR PAROLE IS FILED AND TRANSMITTED TO THE COURT.

Migrated, Filer

---

1    02/04/2003

ORDER OF COURT IS FILED SETTING PAR

ORDER OF COURT IS FILED SETTING PAROLE HEARING FOR MARCH 4, 2003 AT 1:30 P.M.

Migrated, Filer

---

2    02/04/2003

EXIT COPIES TO ALL PARTIES BY REGUL

EXIT COPIES TO ALL PARTIES BY REGULAR MAIL OR OFFICE MAILBOXES

Migrated, Filer

---

1    03/13/2003

COPY OF CORRESPONDENCE FROM COMMONW

COPY OF CORRESPONDENCE FROM COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION AND PAROLE IS FILED.

Migrated, Filer

---

AOPC 2220 - Rev 05/02/2010

Printed: 05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002194

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 8 of 9

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 52-2005-P721 | Monthly | 10/01/2005 | True | $2,471.48 |
| Eike, Christopher Allen | | | False | $123.67 |

| | Payment Plan History: | Payment Date | Payor Name | Participant Role | Amount |
|---|---|---|---|---|---|
| | | 09/20/2005 Payment | | | $16.33 |

AOPC 2220 - Rev 05/02/2010

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002195

# COURT OF COMMON PLEAS OF PIKE COUNTY

## DOCKET



Docket Number: CP-52-CR-0000010-2002

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Christopher Allen Eike

Page 9 of 9

## CASE FINANCIAL INFORMATION

Last Payment Date: 09/20/2005                    Total of Last Payment: -$16.33

| Eike, Christopher Allen<br>Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Plea F & M (Pike) | $75.00 | $0.00 | $0.00 | $0.00 | $75.00 |
| Nolle Pros (Pike) | $100.00 | $0.00 | $0.00 | $0.00 | $100.00 |
| Clerk Fee (Pike) | $30.00 | $0.00 | $0.00 | $0.00 | $30.00 |
| County Court Cost (Act 204 of 1976) | $24.01 | $0.00 | $0.00 | $0.00 | $24.01 |
| State Court Costs (Act 204 of 1976) | $8.61 | $0.00 | $0.00 | $0.00 | $8.61 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $7.38 | $0.00 | $0.00 | $0.00 | $7.38 |
| Crime Victims Compensation (Act 96 of 1984) | $15.00 | -$1.31 | -$13.69 | $0.00 | $0.00 |
| Crimes Commission Cost (Act 96 of 1984) | $15.00 | -$15.00 | $0.00 | $0.00 | $0.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Firearm Education and Training Fund (158 of 1994) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Judicial Computer Project | $1.50 | -$0.02 | $0.00 | $0.00 | $1.48 |
| Inmate Fees (Pike) | $1,410.00 | $0.00 | $0.00 | $0.00 | $1,410.00 |
| Costs/Fees Totals: | $1,701.50 | -$16.33 | -$13.69 | $0.00 | $1,671.48 |
| **Fines** | | | | | |
| County Fines (Pike) | $800.00 | $0.00 | $0.00 | $0.00 | $800.00 |
| Fines Totals: | $800.00 | $0.00 | $0.00 | $0.00 | $800.00 |
| Grand Totals: | $2,501.50 | -$16.33 | -$13.69 | $0.00 | $2,471.48 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

FELL-00002196

# EXHIBIT 215

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

JUL 10   4 29 PM '02

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:01-CR-12 |
| | ) | |
| DONALD R. FELL | ) | |

<u>OPPOSITION OF THE UNITED STATES TO THE MOTION TO SUPPRESS</u>

The United States of America, by and through its attorney, Peter W. Hall, United States

Attorney for the District of Vermont, opposes the "Motion to Suppress Evidence and

Statements" filed by defendant Donald Fell.

## I. INTRODUCTION

Fell is charged by indictment with, among other offenses, car-jacking resulting in death,

and kidnapping with death resulting. His instant motion seeks suppression of "all physical,

documentary, testimonial, and other evidence seized in connection with [his] arrest and a

subsequent search of the vehicle from which he was seized." As grounds for suppression, Fell

argues that "the arrest and search were without warrant, without probable cause, and without

valid consent."

## II. THE FACTS

The government expects to introduce evidence of the following facts. In mid-2000, Fell

came to Vermont from his home town of Wilkes-Barre, Pennsylvania. He stayed with his

mother, Debra Fell, in her apartment at 135 Robbins Street in Rutland. Fell invited his friend

Robert Lee, also from Wilkes-Barre, to join him. By November, 2000, Fell and Lee were

living in the Robbins Street apartment. During the early morning hours of November 27, the

FELL-00002197

Monday after Thanksgiving, Fell and Lee were in the apartment with Debra Fell and her friend Charles Conway. At around 2 or 3 AM Fell and Lee decided to kill Conway and Debra Fell. Taking two knives from the kitchen, Fell and Lee attacked the two victims in the living room. Fell cut Conway's throat and stabbed him repeatedly; Lee did the same to Debra Fell.

After the murders Fell and Lee decided to steal a car and flee Vermont. They went out into the night with Fell's shotgun (which he had brought from Wilkes-Barre) to find a car. A plan to buy ammunition for the shotgun was foiled when they found stores closed. Concealing themselves behind the side of the Rutland Price Chopper supermarket, Fell and Lee waited for someone in a car. At about 3:30 AM, Teresca King arrived for her shift at the Price Chopper deli, driving her greenish blue 1996 Plymouth Neon. Fell and Lee waited until she got out of her car (so she could not drive away), then ran out and confronted her with the shotgun. Seizing her car keys, the men forced the reluctant and hysterical King into the back seat of the Neon. Fell drove back to Robbins Street and collected their belongings while Lee, in the passenger seat, held the shotgun on King.

Driving out of Rutland in the dark, Fell followed signs indicating routes south. After leaving the State of Vermont, they wound up southbound on Route 22 in New York State. King tried to jump out of the car at one point, but the men pulled her back in. At around dawn, in the township of Dover Plains, New York (east of Hartford, Connecticut), Fell stopped the car on the side of Route 22, opened the back door, and ordered King out of the Neon. The two men then pursued King into the woods. After Fell knocked King to the ground, the two men killed her by kicking her and hitting her with rocks.

Fell and Lee got back into the Neon and drove on to Pennsylvania, arriving in Wilkes-

2

FELL-00002198

Barre on the afternoon of November 27. The two visited friends in Wilkes-Barre that evening and the following day, November 28. Around midnight on the 28th they continued their flight west. Shortly before leaving Wilkes-Barre, they stole a pair of Pennsylvania plates off another Neon, discarding King's Vermont plates. About 24 hours later, around midnight on November 30, the owner of the stolen Pennsylvania plates, Tara Richards, reported the missing plates to the local police. The police promptly entered the plates in the NCIC national computer database.

By mid-day on Thursday, November 30, Fell and Lee were halfway across Arkansas, traveling west on Interstate 40. They got off at Exit 58, in the town of Clarkesville, Arkansas, about 60 miles from the Oklahoma border. At 1:30 PM Central Time, Fell and Lee, with King's Neon bearing the stolen Pennsylvania plates, were at a Phillips 66 gas station just off the highway. About 50 yards away, on the other side of the street, Officer Jeff Ross of the Clarksville Police Department was refueling his patrol car at a Texaco station.

Interstate 40 crosses over Rogers Street at a right angle. Exit 58 places cars coming off of I-40 onto Rogers Street, which runs north into downtown Clarksville (about a mile away). The Phillips 66 and Texaco stations are on opposite sides of Rogers street, on the north side of I-40. The Texaco is on the east side of Rogers Street, about 50 yards south of the Phillips 66.

The Neon pulled out of the Phillips 66 station heading north on Rogers Street, with Lee driving and Fell beside him in the passenger seat. At the same time, Officer Ross left the Texaco in his cruiser, heading in the same direction. With the Neon in front and Ross behind, the two cars drove up Rogers Street. The street climbs straight up a hill for a quarter of a mile before leveling off. Driving behind the Neon up the two-way street, Officer Ross saw the sole

3

FELL-00002199

passenger (Fell) repeatedly turn to look at the police car. Ross found this odd, but was disinclined to respond.

When the two cars were about eight-tenths of a mile from the service stations, the Neon's right turn signal went on and the car turned right off Rogers onto Poplar Street, a side street into a residential area. Ross, intending to stay on the main road into Clarkesville, began to drive straight through the intersection. However, as the Neon turned in front of him, Ross saw Fell again turn to look at the marked cruiser. Ross decided to call in the Neon's plates; he abruptly turned and followed the Neon. As the two cars drove down Poplar Street, Ross radioed the Clarksville Police Department ("CPD") dispatch to run a computer check on the Pennsylvania plates. As CPD dispatch ran the check, the Neon continued down Poplar for half a mile before turning left on Meadow Place, a small street through a quiet residential neighborhood.

At about 1:38 PM, as the two cars drove down Meadow Place, CPD dispatch radioed back to Ross that the Pennsylvania plates were stolen. Ross informed dispatch that he was going to stop the Neon, and turned on his cruiser's lightbar. After driving on a short distance, the Neon turned right into the parking lot of the small City Park Church of Christ and stopped.

Parking behind the Neon, Ross stood behind his cruiser's open driver's door with handgun drawn, and instructed the Neon's driver to get out of the car. Once Lee was out, Ross told him to walk backwards to the cruiser with his hands in the air. Ross handcuffed Lee, patted him down, and placed him in the backseat of his cruiser. Ross then crossed to the other side of his cruiser, stood behind the open front passenger door, and ordered Fell out, directing him to walk backwards with his hands up to where Ross could handcuff him.

4

FELL-00002200

As Fell and Lee emerged from the Neon, they displayed remarkable similarities in appearance: both were 20 year-old white males; both weighed 135 pounds; both had long brown hair and brown eyes; both were about the same height (Fell was 5' 9", Lee was 5' 8"); both wore black t-shirts (Fell's inscribed "Slayer") with dark pants and laced black boots; and both were unshaven and disheveled from their days on the road.

Within moments of Ross's having secured Fell, CPD Chief Kyn Wilson and Det. Billy Joe Felkins arrived, followed by Officer Greg Phillips. Lee and Fell were asked for identification. Lee produced a Florida driver's license. Fell had no identification papers, but gave Officer Ross his name and date of birth, adding that he had identification in Pennsylvania. Ross radioed Fell's information to dispatch, which ran a computer check and at about 1:45 confirmed that Fell had Pennsylvania identification.

During the next few minutes, Ross checked the Neon's glove box and discovered the car's Vermont registration card, listing the owner as Teresca King (and her husband) and their Vermont address. The vehicle identification number on the Vermont registration matched the number visible under the windshield of the car. Ross also found Fell's shotgun. The shotgun was a police weapon; it had a short barrel, extra magazine capacity, fixed sites, ringed fore-end, and a black synthetic stock.[1] The gun was in the Neon's trunk but was visible (and accessible) from the passenger compartment through a partially folded down split rear seat back which opened into the trunk. Ross also found two hash/crack pipes in the center console between the two front seats, and women's clothing (King's).

---

[1] The officers referred to it as an "assault shotgun." It was stolen from the Wilkes-Barre Police Department.

5

Believing that Fell and Lee were in possession of stolen plates, a stolen car, and illegal drug paraphernalia,[2] and troubled by the police shotgun and women's clothing, the CPD officers kept the two men detained and separated. At about 2:18 PM, 30 minutes after the Neon was stopped, Officer Phillips drove Fell to the nearby Johnson County Detention Center ("JCDC") in Clarkesville.[3] When asked to empty his pockets at the JCDC, Fell produced two license plate screws.

Ross remained at the scene, filling out a CPD "Vehicle Impoundment Record" form for the Neon, with Lee in the back of his cruiser. At about 2:25 PM, Lee became very agitated and kicked out a window. Ross alerted CPD dispatch and Chief Wilson and Det. Felkins, who had left, returned and brought Lee to the JCDC. Ross waited with the Neon until a tow truck arrived.[4]

At about 3:00 PM Chief Wilson returned to his office with King's Vermont registration card, hoping to find the Neon's owner. Wilson reached the Rutland Police Department by telephone and reported that King's car, occupied by Fell and Lee, had turned up in Clarkesville, Arkansas. Rutland police immediately put him in touch with Det. Sgt. James Cruise of the Vermont State Police, who was investigating the missing person report on Teresca King (filed by her family on November 27). Cruise informed Wilson that King, and her car, had been

---

[2] The pipes were "instruments of a crime" under Arkansas Code § 5-73-101; their possession was a Class A misdemeanor under § 5-73-102.

[3] CPD has no holding cell or lock-up facility.

[4] At 2:20 CPD made contact with Pennsylvania officials and confirmed that the report on the plates was "active" – they had been reported "lost or stolen" the prior night.

6

FELL-00002202

missing for three days, ever since King driven to work in Rutland early on November 27. Fell was familiar to Rutland police, and officers promptly went to the Robbins Street apartment to ask Debra Fell about her son. Those officers made the grisly discovery of Fell's and Conway's bodies. Cruise immediately reported the murders to Wilson. By 4:00 that afternoon (Central Time) the case had developed into a double homicide, with a stolen car and a third and probably related missing person. The FBI took over the investigation.

The FBI office closest to Clarkesville is in Fort Smith, Arkansas, about 60 miles west of Clarkesville on Interstate 40, bordering on Oklahoma. The FBI's Fort Smith Resident Agency has three agents and a supervisor. After Vermont FBI agents contacted Fort Smith's Supervisory Resident Agent Dan Sturgill, Agent Sturgill telephoned Agent James Caudle, training in Little Rock, and asked Caudle to meet him in Clarkesville. In the early evening of November 30, the two Agents met in Clarkesville and began several hours of meetings and conference calls with CPD officers and State and FBI investigators in Vermont. The group reviewed the known facts. The urgent question concerned King's whereabouts – investigators hoped that she was alive. The discussion turned to how to interview Fell and Lee and find out what had happened. The consensus was that Fell was tougher and would be difficult, while Lee was more likely to talk. The investigators concluded that Agents Sturgill and Caudel should begin by trying to get a confession from Lee, and then turn to Fell.

Before beginning the critical interviews, Sturgill and Caudle decided to consult Agent Carl Malloy, of the FBI's Texarkana, Arkansas office, whose experience and knowledge they respected. Agent Malloy reached a different conclusion: he recommended staged interviews beginning with Fell, limited to discovering personal information about himself and Lee. In this

7

preliminary interview, they would neither confront Fell with the evidence nor seek a confession. Next, in an interview of Lee, the agents would try to impress him with their evidence, both personal (obtained from Fell) and criminal, and seek a confession and information about King. Finally, in the second interview of Fell, the agents would confront him with the evidence (including the confession of Lee), and seek a full statement.

Agents Caudle and Sturgill decided to follow Malloy's advice. Just before 11:30 PM the two agents met with Fell in an interview room at the JCDC. Fell was advised of his Miranda rights and signed a Miranda waiver form. The agents talked to him for about 45 minutes without bringing up the Rutland murders or King's disappearance. Fell provided numerous details about himself and Lee. He stated that he had stolen the Neon from a man who had picked him and Lee up hitchhiking. When the man stopped and went into a store, Fell and Lee drove off with the car.

At 12:17 AM the agents concluded the preliminary Fell interview and Lee was brought into the interview room. After Lee signed a Miranda waiver form, Sturgill and Caudle began an interview in which they impressed upon Lee their familiarity with both him and Fell, and with the murders and car theft in Rutland. Lee then admitted the murders of Debra Fell and Charles Conway in Rutland, and the abduction and murder of King. He stated, however, that it was Fell who had done the actual killing.

The agents then returned to Fell, who signed a second Miranda waiver form at 2:53 AM. As Agent Sturgill confronted Fell with the murders and Lee's confession, Fell stared straight at him without moving a muscle. Fell then declared, "I wouldn't kill my fucking mother. I don't know any fucking Teri [King], and I'm sticking with my first statement." The

8

FELL-00002204

agents concluded the interview. Agent Sturgill drove back to Fort Smith, and Agent Caudle checked into the Best Western motel in Clarksville.

At about 4 AM, Fell banged on his cell door. When JCDC custodian Kenneth Cochran responded, asking Fell what he wanted, Fell said that he wanted to talk to the FBI again. Cochran reported this to Johnson County Sheriff Wesley Kendrick, who, knowing that Caudle had retired after 3 AM, decided to let him sleep for a few hours. At around 9AM (still on Friday, December 1), the Sheriff knocked on Agent Caudle's motel door and reported that Fell wanted to talk.

Agent Caudle returned to the JCDC accompanied by Det. Felkins of the CPD. Fell signed another Miranda waiver (his third) at 9:41 AM. After Agent Caudle asked Fell what he wanted to say, Fell proceeded to give a detailed narrative of the three murders. Fell could not remember, however, where they killed King and left her body, other than that he thought it was somewhere in New York State.

In order to locate King's body, New York State Police investigator Tom Aiken conducted a fourth Fell interview at 12:55 PM (when Fell signed another Miranda waiver). By telephone Aiken interviewed Fell (accompanied by Agent Caudle) about the route Fell and Lee had driven through New York, and where the body might be. This interview lasted until 2:06 PM. Lee was also interviewed about the location of King's body.

During the course of the Aiken interview with Fell, at about 2:30 PM Eastern Time on December 1 (1:30 in Arkansas), United States Magistrate Judge Jerome J. Niedermier signed a Criminal Complaint and arrest warrant, charging Fell (and Lee) with kidnapping King and

9

FELL-00002205

carjacking the Neon.[5]

On the afternoon of November 30, CPD officers Felkins and Ross, inventorying the contents of the Neon, stopped when they came upon what appeared to be blood stains on a jacket in the car. Felkins began preparing a warrant application to search the car. On December 2, Johnson County Circuit Judge John Patterson issued a warrant. Subsequently an FBI forensics team searched the car.

Also on December 2, 2000, Vermont State Police Det. Cruise, accompanied by two Rutland Police Department officers investigating the deaths of Debra Fell and Conway, arrived in Clarkesville and that afternoon conducted tape recorded interviews of Fell and Lee. Both men signed written Miranda waivers and gave detailed confessions.

On December 6, 2000, United States Magistrate Judge Beverly S. Jones issued search warrants authorizing the search of Fell and Lee's clothing and footwear, maintained until then by the JCDC. The subsequent examination of Fell's boots yielded blood which has been matched to King by DNA analysis. DNA analysis also confirmed that Lee's boots had King's blood on them, as well as the blood of a second female. The second sample is pending a comparison to Debra Fell's DNA. The FBI and the New York State Police succeeded in finding King's body in the woods near Route 22 in Dover Plains. The FBI in Wilkes-Barre recovered King's discarded license plates.

---

[5] The federal warrants were faxed to Clarksville that afternoon. On the next business day, Monday, December 4, 2002, Agent Caudle picked up the two defendants at the JCDC and drove them to Fayetteville, Arkansas for an appearance before the closest federal court (about 90 miles away). United States Magistrate Judge Beverly S. Jones of the United States District Court for the Western District of Oklahoma conducted the Rule 40 hearing that afternoon.

10

FELL-00002206

### III. DISCUSSION

**A. OFFICER ROSS HAD PROBABLE CAUSE TO ARREST BOTH LEE AND FELL AT THE OUTSET.**

Officer Ross was justified in stopping the Neon upon being informed that it's Pennsylvania license plates were stolen.[6] Based upon his experience and training, Ross suspected that the Neon itself was stolen.[7] He reasonably assumed that, as between the car's two occupants, one or the other, or both, were involved in the offense.

Ross stopped the Neon after (1) receiving a report that it bore stolen licence plates from a distant state; (2) inferring that there was a reasonable likelihood that the car was stolen; (3) seeing repeated furtive looks at his marked cruiser from the Neon's nervous passenger; and (4)

---

[6]    The possession of stolen property is a criminal violation of Arkansas law. Arkansas Code § 5-26-106 ("Theft by Receiving") provides in subpart (a) that "[a] person commits the offense of theft by receiving if he receives, retains, or disposes of stolen property of another person, knowing that is was stolen or having good reason to believe it was stolen." Subpart (b) defines "receiving" to include "acquiring possession." Subpart (c) adds that [t]he unexplained possession or control by a person of recently stolen property . . . shall give rise to a presumption that he knows or believes that the property was stolen."

Fell and Lee had no reasonable expectation of privacy in the stolen plates. Because of states' extensive regulation of highways and thoroughfares, "[e]very operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy." New York v. Class, 475 U.S. 106, 113 (1986). "It is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of [an] automobile . . . . The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.' " New York v. Class, 475 U.S. 106, 114 (1986); see also Katz v. United States, 389 U.S. 347, 351, (1967) (stating that Fourth Amendment does not protect what "a person knowingly exposes to the public"). Although the Class Court considered the expectation of privacy in a vehicle identification number, the same analysis applies to a license plate.

[7] The experience of the CPD coincides with the common sense conclusion that stolen license plates frequently are used to conceal stolen cars.

11

observing the Neon, which initially appeared to be a Pennsylvania car refueling just off the highway, proceed to make several turns onto smaller and then smaller side roads into residential areas, as if seeking to get out from in front of the cruiser. Upon stopping the Neon, Ross had probable cause to believe that its operator (Lee) was involved in a stolen property offense.[8] Ross also had probable cause to believe that the passenger (Fell) was jointly involved, based upon the latter's agitation about police proximity. In fact, it was Fell's obvious concern that caused Ross to call in the Neon's plates. The Supreme Court has observed that "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." Wyoming v. Houghton, 526 U.S. 295, 304-05 (1999).

Even if Ross did not have probable cause to arrest Fell immediately, it developed as soon as Fell stepped out of the Neon. Fell's very close similarity to Lee supported Ross's inference that they were fellow travelers, "engaged in a common enterprise."

The constitutionality of a warrantless arrest turns upon whether, "at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).

---

[8] Under Arkansas law "[a] law enforcement officer may arrest a person without a warrant if . . . the officer has reasonable cause to believe that such person has committed any violation of law in the officer's presence." Arkansas Rule of Criminal Procedure 4.1(a)(iii). See also Atwater v. City of Lago Vista, 532 U.S. 318 (2001)(Constitution permits warrantless misdemeanor arrests).

12

FELL-00002208

In addressing the probable cause standard the Supreme Court has observed that, "[l]ong before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same and so are law enforcement officers . . . . [E]vidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, 462 U.S. 213, 231-32 (1983).

The government recognizes that mere presence at the scene of a crime, or "mere propinquity to others independently suspected of criminal activity," frequently does not provide probable cause to search a person. Ybarra v. Illinois, 444 U.S. 85, 91 (1979). In Ybarra, police with information that a bartender was dealing heroin out of a bar, and a search warrant to search the bartender and the bar, searched all bar patrons, including Ybarra, on whom they found heroin. The heroin was suppressed.

The Supreme Court later distinguished Ybarra in Wyoming v. Houghton, 526 U.S. 295, supra, an automobile search case. In Houghton, the Court held that officers with probable cause to search a car may inspect passengers' belongings in the car capable of concealing the object of the search. The Court found that car passengers (like drivers) had reduced expectations of privacy in the car. The Court also observed that:

> a car passenger – unlike the unwitting tavern patron in Ybarra – will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.

526 U.S. at 304-05.

Ybarra also was distinguished in United States v. Buckner, 179 F.3d 834 (9th Cir. 1999), cert. denied, 528 U.S. 1094 (2000), holding that police had probable cause to arrest the sole

13

FELL-00002209

passenger in a car containing 37 pounds of marijuana hidden in the dashboard and rear panels.

In refusing to apply the "mere presence" rule, the court reasoned as follows:

> As Ybarra . . . demonstrate[s], the mere presence doctrine has logical application where the facts and circumstances do not support an inference that the individual is connected to the proximate criminal activity. In Ybarra, police unlawfully searched Ybarra based on criminal activity in a public establishment, where there were numerous other patrons, and where the police had specific information regarding one person's criminal activities. Nothing could be inferred from Ybarra's mere presence in the bar. . . .
>
> . . . .
>
> In contrast, here the attendant facts and circumstances support a fair probability that Murry was linked to the crime of drug trafficking. Murry was the passenger in a car loaded with a commercial quantity of marijuana, the car belonged to neither occupant, and the car was procured under suspicious circumstances. Given these facts, a prudent and experienced police officer might reasonably suspect that the passenger is involved in drug smuggling.
>
> . . . .
>
> As we have previously noted, it may be the case that the facts supporting an arrest in a drug smuggling case will not be enough to convict a passenger, but that does not mean that police lack probable cause to arrest a passenger "as a probable party to the importation."

179 F.3d at 839 (citations omitted).

The circumstances confronting Ross as he handcuffed Fell included the following: (1) Fell was the sole passenger in a car bearing stolen Pennsylvania plates; (2) Fell's high degree of nervousness about the proximity of a police car had caused Ross to call in the plates; (3) Clarkesville was a long way from Pennsylvania, such that the Neon's two occupants were not likely to be simply "joyriding"; (4) the Neon appeared to belong to neither occupant, and probably was stolen; (5) given Fell's nervous behavior prior to the stop, and the Neon's turns off the main route into Clarkesville onto a side street, and then onto a quieter, smaller side street, it appeared that the occupants were interested in getting out of the way of, or eluding, the police car behind them. Fell's last look back at Ross, as if to see if Ross would follow at the

14

FELL-00002210

first turn, in the wake of the prior furtive looks, indicated a guilty mind; (6) Fell, the sole passenger, very closely resembled Lee, the operator, in every way – the two men appeared to be close members of the same tribe or subculture; and (7), as the Supreme Court observed in Houghton, a car passenger is "often . . . engaged in a common enterprise with the driver."

These circumstances may not have been enough to convict Fell, but they provided Ross with probable cause to arrest him.

### B. EVEN IF PROBABLE CAUSE DID NOT EXIST TO ARREST FELL AT THE OUTSET, REASONABLE SUSPICION COMBINED WITH SAFETY CONCERNS JUSTIFIED FELL'S INITIAL INVESTIGATORY DETENTION, AND PROBABLE CAUSE TO ARREST DEVELOPED RAPIDLY.

In the event the Court finds a lack of probable cause to arrest Fell as he got out of the Neon, the above circumstances justified an initial "Terry" detention, and additional facts rapidly came to light justifying his arrest. Ross' precautionary use of his sidearm and handcuffs did not convert that investigative detention into an arrest.

(1) Ross Had Reasonable Suspicion to Detain Fell Temporarily.

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989), citing Terry v. Ohio, 392 U.S. 1 (1968). The Sokolow Court explained that:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.' " Id., at 27. The Fourth Amendment requires "some minimal level of objective justification" for making the stop. INS v. Delgado, 466 U.S. 210, 217 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates, 462 U.S. 213, 238 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause, see United States v. Montoya

15

FELL-00002211

de Hernandez, 473 U.S. 531, 541, 544 (1985).

The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a neat set of legal rules." Gates, supra, 462 U.S. at 232 . . . . In evaluating the validity of a stop such as this, we must consider "the totality of the circumstances – the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981). As we said in Cortez:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same--and so are law enforcement officers." Id. at 418.

490 U.S. at 7-8.

Ross acted as a reasonable police officer by immediately seeking to determine the identities of the two men and thus their connection with each other and the stolen property. Moments after handcuffing Fell, Ross asked him for identification. Fell replied that he did not have any papers, but gave his name and date of birth, and said that he had identification in Pennsylvania. Ross radioed that information to CPD dispatch, which promptly confirmed Fell's Pennsylvania identification and informed Ross.

Fell's Pennsylvania identification was significant in view of the stolen Pennsylvania plates: both Fell and the plates came from the same distant state. Moreover, Lee's Florida license further enhanced the significance of Fell's Pennsylvania identification: as between the two men, Fell's likely connection to the stolen Pennsylvania plates seemed the stronger.

According to the CPD dispatch log, the fact that Fell had Pennsylvania identification was confirmed at 1:45 – about seven minutes after the stop. Of course, Fell told Ross that he had Pennsylvania identification some time before then, allowing time for Ross to call the information into CPD dispatch, and for dispatch to confirm it with Pennsylvania DMV and

16

FELL-00002212

radio back to Ross. In addition, it took several minutes for Ross to get Lee out of the car, handcuffed and in the back of his cruiser, and then to get Fell out of the car, handcuffed and queried. Thus the elapsed time between Fell's getting out of the Neon and his statement that he was from Pennsylvania was brief.

Fell's detention during the few minutes until his Pennsylvania identification was disclosed was justified under Terry. Once Fell's information that he – and only he – was from the same state as the stolen plates, there was probable cause to arrest him.

Even if the Court deems the information available to the officers at the scene within those first five minutes insufficient to establish probable cause to arrest Fell, within the following minutes Ross continued the brief investigative work consistent with Terry by making a quick check on the Neon. He discovered additional evidence of criminal activity: the car's Vermont registration in a Vermont woman's name, women's clothing in the car, a police shotgun, and the two hash/crack pipes. These additional circumstances significantly escalated the probable cause to believe that Fell and Lee were jointly involved in criminal activity. In particular, the two pipes, in the console between the two front seats in which the two closely similar men recently had been seated, was further evidence of joint involvement.

(2) Ross's Use of his Sidearm and Handcuffs Were Not Unduly Intrusive So as to Convert the Initial Investigative Detention into an Arrest

The fact that Ross used his weapon and handcuffs during the initial investigatory detention of Fell did not transform that detention into an arrest. Ross was the sole officer confronting the two men in the Neon – he took appropriate action to ensure his own safety and the status quo pending further prompt investigation.

17

FELL-00002213

The Supreme Court has recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." Michigan v. Long, 463 U.S. 1032 (1883).[9] In Maryland v. Wilson, the Court held that in view of the "legitimate and weighty" factor of officer safety, an officer making a traffic stop may order both drivers and passengers out of a stopped car. The Court observed that "traffic stops may be dangerous encounters," citing a study finding that "[i]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops." 519 U.S. at 413. The Court observed that:

> the possibility of a violent encounter stems . . . from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

Id. at 414. The Court also held that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." Id.

In United States v. Sharpe, 470 U.S. at 678, the Supreme Court examined the propriety of an investigatory stop that began with a police officer stopping a pickup truck. "After stopping the truck, [the officer] had approached it with his revolver drawn, ordered the driver, Savage, to get out and assume a 'spread eagled' position against the side of the truck, and patted

---

[9] The Terry Court made clear that officers conducting an investigatory stop may ensure their own safety during the encounter:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly, it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

392 U.S. at 23.

18

FELL-00002214

him down." The Court found that this was a proper investigatory stop and not a de facto arrest.

"We certainly agree that law enforcement officials 'have a right to take reasonable steps to protect themselves . . . regardless of whether probable cause to arrest exists.'" United States v. Esieke, 940 F.2d 29, 35 (2d Cir.)(expressing concern over, but approving, use of handcuffs and leg irons on suspected alimentary canal drug smuggler), cert. denied, 502 U.S. 992 (1991). Accord United States v. Alexander, 907 F.2d 269, 273 (2d Cir. 1990), cert. denied, 498 U.S. 1095 (1991)(fact that officers approached stopped car with weapons unholstered did not convert stop to an arrest; "A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself . . . regardless of whether probable cause to arrest exists"); United States v. Sanders, 994 F.2d 200, 206, (5th Cir.)("Clearly, using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect – whether singly or in combination – do not automatically convert an investigatory detention into an arrest requiring probable cause")(citation omitted), cert. denied, 510 U.S. 955 (1993).[10]

---

[10] See also United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(approving use of drawn weapons and an order to get down on the ground during a Terry car stop; "This holding is consistent with the recent trend allowing police to use handcuffs or place suspects on the ground during a Terry stop. Nine courts of appeals, including the Tenth Circuit, have determined that such intrusive precautionary measures do not necessarily turn a lawful Terry stop into an arrest under the Fourth Amendment")(citations omitted); United States v. Smith, 3 F.3d 1088, 1094 (approving handcuffs during automotive Terry stop, citing cases), cert. denied, 510 U.S. 1061 (1994). Other circuits have held that a suspect may be detained in a police car, e.g., Rogala v. District of Columbia, 161 F.3d 44 (D.C. Cir. 1999)(detention of passenger during field sobriety test of driver); United States v. Lego, 855 F.2d 542, 545 (8th Cir.1988) (suspect held at gunpoint and then placed in police patrol car during warrant check); Pliska v. City of Stevens Point, 823 F.2d 1168, 1176-78 (7th Cir.1987) (suspect placed in police squad car during investigation); Thomas v. Newsome, 821 F.2d 1550. 1554 (11th Cir.), cert. denied, 484 U.S. 967 (1987); United States v. Manbeck, 744 F.2d 360, 377-78 (4th Cir.1984) (suspect

19

FELL-00002215

"The purpose of the Terry frisk is 'to allow the officer to pursue his investigation without fear of violence.' " United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982)(quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). In Bautista, 684 F.2d at 1289, the Ninth Circuit examined the act of a police officer who handcuffed two robbery suspects after they had been frisked for weapons and found to possess none. The officer testified that he handcuffed the suspects because he had to leave his partner alone with both suspects while he (the testifying officer) investigated the suspects' alibi. The level of concern for his partner's safety was elevated by the presence of needle marks on both suspects' arms and the suspects' behavior, which suggested that they might attempt to flee. In approving of the use of handcuffs, the court held that even a total restriction of liberty, if brief and not excessive under the circumstances, is permissible during a Terry stop and does not automatically convert it into an arrest.

Ross's use of his sidearm and handcuffs during the initial detention of Fell were precautions to ensure his own safety and the status quo. He should not be required to risk his personal safety, and Fell's flight, during such a stop. Ross was alone at the scene, deciding how safely to handle two occupants of what was likely a stolen car. When ordering the passenger out of the Neon, Ross had in mind that it was the passenger who had displayed

---

stopped at gunpoint and then placed in back of police car during investigation), cert. denied, 469 U.S. 1217 (1985); United States v. Moore, 638 F.2d 1171, 1174-75 (9th Cir.1980), cert. denied, 449 U.S. 1113 (1981) (suspects stopped at gunpoint and then detained in a caged police car during investigation), or ordered to lie prone on the ground, United States v. Jacobs, 715 F.2d 1343, 1346 (9th Cir.1983), United States v. Hemphill, 767 F.2d 922 (6th Cir.)(unpublished table opinion available on Westlaw), cert. denied, 474 U.S. 982 (1985)(reasonable for officers to require suspects to lie on the ground and to handcuff the suspects during an investigatory detention).

20

obvious agitation about the proximity of police. It would have been foolhardy for him not to have taken precautions to ensure his own safety and try to prevent flight. Fell and Lee, triple murderers fleeing across the country in a stolen car with a shotgun, present a paradigmatic example of why detentions of "suspects in vehicles are especially fraught with danger to police officers." Michigan v. Long, supra. Ross's precautions in treating Fell carefully certainly did not run afoul of the Fourth Amendment.

### C. THE SEARCH OF THE NEON DID NOT VIOLATE FELL'S RIGHTS.

As the passenger in a car he had stolen (and whose owner he had murdered), Fell has no legal basis to protest the car's search. The Second Circuit Court of Appeals has stated that "[w]e think it obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car." United States v. Tropiano, 50 F.3d 157, 161 (2d Cir. 1995).

"Capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). In Rakas the Court held that passengers in a car had no reasonable expectation of privacy as to a firearm found in the car, when they owned neither the car nor the firearm. Holding that Fourth Amendment rights are "personal rights which . . . may not be vicariously asserted," 439 U.S. at 133, the Court concluded that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. at 134. In a footnote, the Court disapproved of two Ninth and Tenth Circuit decisions which "inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the

21

FELL-00002217

search of the automobile." Id. at 141, note 9.[11]

Having stolen the Neon, murdered its owner, and sought to conceal the car's identity by attaching a second set of stolen license plates while fleeing across the country, the Constitution affords Fell no ground upon which to claim a reasonable expectation of privacy in the car.

Even if Fell did have a reasonable expectation of privacy in the Neon, officers were justified in performing the initial warrantless search for multiple reasons. First, the search was permissible under the so-called "automobile exception" to the warrant requirement established by the Supreme Court over 75 years ago in Carroll v. United States, 267 U.S. 132 (1925). This exception is based upon (1) the fact that an automobile is readily mobile and can be quickly moved, such that the opportunity to search is fleeting; and (2) the diminished expectation of privacy individuals have in automobiles (in contrast to their homes, for example), based in part upon pervasive regulation and control of automobiles by the state (such as laws requiring registration, inspection, and licensing, and well as traffic laws).[12] California v. Carney, 471 U.S. 386, 390-93 (1984). Based upon these circumstances, "the overriding societal interests in effective law enforcement justify an immediate search before the vehicle . . . become[s] unavailable." Carney, 471 U.S. at 393. Under the automobile exception, however, only prior

---

[11] Even if the Neon were not stolen, Fell's privacy expectations were diminished by the fact that he was a passenger at the time of the stop. United States v. Paulino, 850 F.2d 93 (2d Cir. 1988), cert. denied, 490 U.S. 1052 (1989).

[12] "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." Cardwell v. Lewis, 417 U.S. 583, 590 (1974).

22

judicial approval of a search is waived; there must still be probable cause to search the vehicle for evidence of a crime. 471 U.S. at 394-95. Officers at the scene of the Neon's stop had probable cause to believe that it contained evidence of stolen property and drug offenses justifying its search. Consequently, their search was justified under the automobile exception.

A second well-defined exception to the warrant requirement justifying the search of the Neon is the inventory search exception, permissible when police impound a vehicle. The Supreme Court has found that:

> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures were developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger.

South Dakota v. Opperman, 428 U.S. 364, 369 (1976)(citations omitted). Such inventory searches are "reasonable" under the Fourth Amendment. Opperman, supra; accord Colorado v. Bertine, 479 U.S. 367, 371 (1986).

King's Neon remained in the City Park Church of Christ parking lot after Fell and Lee were transported to the JCDC. Having found the Vermont registration and the stolen Pennsylvania plates, officers rightly concluded that it was stolen. It was therefore impounded and towed.[13] In accordance with written CPD regulations and well-defined Constitutional law, the CPD was justified in searching the car.

---

[13] Arkansas law required the CPD to impound the car. "When property alleged to have been stolen comes into the possession of any sheriff, constable, or other person authorized to perform the duties of the officer, he shall hold the property subject to the order of the officer authorized pursuant to this section to direct the disposition thereof." Arkansas Code § 16-80-103(c).

23

A third applicable exception to the warrant requirement concerns searches of a vehicle "incident to the arrest" of recent occupants. A warrant is not required for a search incident to an arrest because the search prevents the arrestee from reaching weapons or destructible evidence. Illinois v. Rodriguez, 497 U.S. 177, 185 (1990). The scope of the warrantless search under this exception is restricted to the person of the arrestee and to any area into which the arrestee could have reached prior to the arrest. For automobiles this means that if the arrestee is the occupant or recent occupant of an automobile, an officer may, as a contemporaneous incident to the arrest, search the passenger compartment. New York v. Belton, 453 U.S. 454 (1981). The automobile search is generally reasonable even if the arrestee is already secured and away from the vehicle. United States v. Cotton, 751 F.2d 1146, 1149 (10th Cir.1985); United States v. White, 871 F.2d 41, 44 (6th Cir.1989); see also Belton, 453 U.S. at 456 (search of automobile passenger compartment was reasonable after arrestee was removed from automobile and secured). See generally United States v. Mazzochi, 424 F.2d 49 (2d Cir. 1970)(vehicle search three and one-half to four hours after arrest was incidental to arrest).

After Fell and Lee got out of the Neon, a search of areas that had been within their reach was permissible. This included the glovebox, where King's Vermont registration was found, the passenger compartment, where the two pipes were found, and the trunk of the compact car (accessible through the folding rear seat back) where the police shotgun was found. Once King's Vermont registration was discovered, officials' suspicion that the car was stolen was significantly bolstered.[14]

---

[14] In view of the circumstances, the Neon's search also was inevitable under Nix v. Williams, 467 U.S. 431 (1984).

24

FELL-00002220

In addition to the foregoing, prior to a full search of the Neon officials took the precaution of obtaining a search warrant from County Circuit Judge John Patterson. Fell has not challenged that warrant.

For all of the above reasons, Fell has no grounds upon which to protest the Neon's search.

## D. FELL'S CONFESSION AND THE REMAINING EVIDENCE DO NOT REQUIRE SUPPRESSION.

### (1) Even If Fell's Detention was Improper, His Confession Should not be Suppressed.

Fell was advised of his Miranda rights, and signed a written Miranda waiver, prior to each of his statements. Those written waivers reflect the careful and appropriate measures taken by investigating officers to protect Fell's Fifth Amendment rights.[15] However, if the Court deems Fell's detention improper, the vitality of his subsequent statements might be in question. The issue in that instance is whether the statements must be excluded as the fruit of an illegal arrest.

Whether a Fourth Amendment violation requires suppression of subsequent statements made after a Miranda waiver was addressed by the Supreme Court in Brown v. Illinois, 422 U.S. 590 (1975). In Brown v. Illinois, Chicago police officers flagrantly and deliberately violated an accused's Fourth Amendment rights by breaking into his apartment and then arresting him without probable cause. Id. at 592. They then detained the suspect illegally until advising him of his Miranda rights and obtaining a confession to complicity in a murder.

---

[15] "The voluntariness of a confession need be established only by a preponderance of the evidence . . . ." Colorado v. Connelly, 479 U.S. 157, 169 (1986).

25

The Brown Court explicitly refused to apply a "but for" rule, which would require the suppression of any statement which would not have been given "but for" a prior Fourth Amendment violation. Instead, the Court adopted a "totality of the circumstances" test to be decided on the facts of each case.

> It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will be break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. [Citation omitted.]

> While we therefore reject the per se rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative per se or 'but for' rule. The petitioner himself professes not to demand so much. . . . The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, 406 U.S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See Wong Sun v. United States, 371 U.S. at 491. The voluntariness of the statement is a threshold requirement. Cf. 18 U.S.C. § 3501. And the burden of showing admissibility rests, of course, on the prosecution.

411 U.S. at 603-04. Accord, Rawlings v. Kentucky, 448 U.S. 98, 106-10 (1980).

In United States v. Ibarra-Sanchez, 199 F.3d 753 (9th Cir. 1999), the court ruled that any illegality associated with a possibly warrantless arrest was too attenuated from evidence seized, and from defendants' statements, to require suppression. In Ibarra-Sanchez the defendants sought suppression of drugs found in a van they occupied, as well as later statements. Officials stopped the van on suspicion that it was involved in drug trafficking. A SWAT team surrounded the van with shotguns and pistols, ordering all occupants to get out and get on their

26

FELL-00002222

knees. Smelling marijuana, the officials then searched the van and recovered 344 pounds of pot.

After discussing the vitality of the detention, and whether it was a Terry stop or an arrest, the court found no Constitutional violation, reasoning as follows:

> We do not resolve this issue, for even if the show of force by the officers constituted an illegal arrest, it would not affect our ultimate disposition because neither the drugs nor the statements were products of the alleged post-stop arrest. To warrant suppression, the challenged evidence must have been obtained "by exploitation of [the alleged] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471 (1963). This Court has recognized that the exclusionary rule's bar to admitting evidence "only extends from the 'tree' to the 'fruit' if the fruit is sufficiently connected to the illegal tree." Passman v. Blackburn, 652 F.2d 559, 564 (5th Cir.1981) (holding that evidence was admissible because it was not derived from illegal police action); see also United States v. Sheppard, 901 F.2d 1230, 1234 (5th Cir.1990) (finding evidence admissible if causal connection between alleged police illegality and evidence introduced a trial is broken); United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir.1971) (same).
>
> . . . .
>
> After the appellants were ordered out of the van, it made no difference to the ultimate result whether they stood by the side of the road or sat handcuffed in police cars: in either situation, the officers would have discovered the marihuana and arrested them. In short, there is no causal link between the alleged "arrest" of the appellants and the evidence later introduced at trial; the drugs and statements were not fruits of that particular tree. Therefore there is no reason to suppress the marihuana or the statements.

199 F.3d at 761.

The factors addressed by the Court in Brown, in conjunction with other pertinent circumstances, support the conclusion that Fell's confession should not be suppressed even if his arrest lacked probable cause. First, the agents in this case carefully provided Fell with his Miranda rights, and reviewed with him a written Miranda waiver form, prior to each interview. Thus, Fell was told – over and over – that he did not have to make a statement, could remain silent, and was entitled to counsel. Miranda warnings are "important, although not dispositive,

27

FELL-00002223

in determining whether the statements at issue were obtained by exploitation of an illegal detention." Rawlings, 448 U.S. at 107. Fell repeatedly and explicitly waived his Miranda rights in writing. Second, although Fell's murder confession came after hours of detention, it was his own request to talk to the FBI that precipitated that confession. Only after Fell told JCDC custodian Cochran that he wanted to talk to the FBI again did Agent Caudle return and receive Fell's description of how Conway, Debra Fell, and King were killed. Third, this case involves no "purposeful and flagrant" official misconduct. Unlike the officers in Brown, who broke into the accused's apartment without a warrant before arresting him without probable cause, investigators in Clarkesville committed no intentional misconduct. As set forth above, the government submits that the officials here are not to be faulted. If the Court views the circumstances differently, certainly any errors were not deliberate. See Rawlings (officers detain house occupants pending warrant application, later searching occupants): "the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements." 448 U.S. at 98.

Within minutes after Officer Ross detained Fell, officials discovered a plethora of evidence. Immediately upon Fell's arrival at the JCDC the license plate screws were found in his pocket. By about 3:15 PM that same afternoon – approximately an hour and 20 minutes after the stop – Chief Wilson learned from Vermont police that Fell had been living in Rutland and that the Neon's owner had disappeared from Rutland with her car. Within another half hour, Wilson learned that Rutland Police had found the decomposing bodies of Debra Fell and Conway in the Fell apartment. Thus, within two hours, there was probable cause to believe Fell had committed multiple murders.

28

FELL-00002224

As in Ibarra-Sanchez, even if Ross was overly intrusive in detaining Fell, such that the initial detention is deemed a de facto arrest, it "made no difference to the ultimate result whether [Fell] stood by the side of the road or sat handcuffed in [a] police car." Id. at 761. In either situation, the officers would have looked in the Neon and discovered the King's Vermont registration, the police shotgun, the two drug pipes, and the woman's clothing, and arrested Fell. Moreover, under all the circumstances, when police discovered the above items, they would have been justified in detaining Fell long enough to check with Vermont officials about the Neon and King. Lee's break-out of Ross's cruiser window, and the necessity of phone calls to Vermont, delayed contact with Vermont officials for another hour, but by that time the license plate screws from Fell's pocket were discovered.

Under all of the circumstances, any Fourth Amendment defects in the detention of Fell do not render his subsequent confession unconstitutional.

(2) Fell has no Constitutional Basis to Suppress the Remaining Evidence

Fell has no reasonable expectation of privacy in Lee's belongings, including Lee's clothes and boots (which were, in any event, searched pursuant to a federal warrant). Fell's own clothes and boots were searched pursuant to a federal search warrant, after a federal court issued a warrant authorizing his arrest. Fell also has no grounds upon which to seek suppression of the discovery of any of his victims' bodies, or King's license plates, recovered in Wilkes-Barre.

29

## IV.  CONCLUSION

For the above reasons, Fell's motion to suppress should be denied after a hearing.

Dated at Burlington, in the District of Vermont, this ⟨10th⟩day of July, 2002.

Respectfully submitted,

UNITED STATES OF AMERICA

PETER W. HALL
United States Attorney

By:    WILLIAM B. DARROW
GREGORY L. WAPLES
Assistant U.S. Attorneys
P.O. Box 570
Burlington VT 05402-0570
(802) 951-6725

30

FELL-00002226

# EXHIBIT 216

588R05

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   04/25/2005

[redacted] white female, Date of Birth [redacted]
Social Security Number [redacted] home telephone number
[redacted] was interviewed by Special Agent [redacted]
Scranton Resident Agency, FEDERAL BUREAU OF INVESTIGATION, and by
[redacted] Forensic Psychiatrist, [redacted] residence, [redacted]
[redacted] After being advised of the
official identities of the interviewing personnel and nature of the
interview, [redacted] provided the following information:

b6
b7C
b7D

[redacted] advised that [redacted] DONALD FELL, was close
friends to MICHAEL ROMONDI, who was killed as a pedestrian on Route
309, Wilkes-Barre, Pennsylvania.  FELL was also friends with [redacted]
[redacted] who joined the UNITED STATES ARMY.  [redacted] described [redacted]
[redacted] in downtown Wilkes-Barre.  To her knowledge, FELL's friend,
[redacted] still resides in the area [redacted] further indicated
that [redacted] were friends of
DONALD FELL. [redacted] recalled that FELL's friend, [redacted]
resided on [redacted]
[redacted] stated that FELL [redacted] however,
[redacted]

b6
b7C
b7D

b6
b7C
b7D

[redacted] stated that DONALD FELL [redacted]
[redacted] however she did not know
her last name.

b6
b7C
b7D

[redacted] indicated at one point in time, DONALD FELL was

b6
b7C
b7D

7A-AL-44453-302  -73

Investigation on   04/07/2005   at [redacted] PA .   b7D

File #  7A-PH-44453 (SRA) ~      b6
                                 b7C        Date dictated   04/11/2005

by   SA [redacted]

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.   Southerton CR

CWON

FELL-00002227

FD-302a (Rev. 10-6-95)

7A-PH-44453 (SRA)

Continuation of FD-302 of _____ b6 b7C b7D , On 04/07/2005 , Page _____ 7

[                                                    ] b7D

    At the conclusion of the interview, Doctor [      ] provided a business card to [      ] in the event that she had any additional information subsequent to the interview, she could call him directly. [      ] encouraged [      ] to call him. b6 b7C b7D

    [      ] was asked by Doctor [      ] if she felt he was objective in his line of questioning. [      ] responded that he was neither pro defense nor pro prosecution. b6 b7C b7D

    [      ] advised [      ] at present, he could not disclose any information concerning the details of this investigation, however, at a point in the proceeding he would be allowed to do so and would provide her with any information she so desired. b6 b7C b7D

    [      ] encouraged [                              ] to speak with him and he would change his schedule to accommodate them and had already done so to speak with her this evening. [      ] stated that he spoke briefly to [      ] and hoped to speak with her in more depth at a later date. b6 b7C

FELL-00002228

# EXHIBIT 217

4/30/05

| | Caption | Date | Time | Description | Icon |
|---|---|---|---|---|---|
| ☑ | DONALD T. FELL BORN, (DONNY'S PATERNAL GRANDFATHER) M53 | REDACTED 1909 | 12:00:00PM | | |
| ☑ | FRANCES KOWERSKI BORN NO.M49-M50 | 1914 | 12:00:00PM | | |
| ☑ | MARILYN JOAN FELL BORN, (DONNY'S PATERNAL AUNT) FATHER DONALD J. FELL , MOTHER MYRTLE FRITZ, NO.M50-51 | 1928 | 12:00:00PM | | |
| ☑ | GERALDINE ANN FELL, BORN (DONNY'S PATERMAL AUNT) NO.M54 | 1931 | 12:00:00PM | | |
| ☑ | MARILYN JOAN FELL, DIED, (DONNY'S PATERNAL AUNT) 5 YEARS OLD, M52 | 05/05/1934 | 12:00:00PM | | |
| ☑ | THERESA KOZERSKI-SHARPE BORN. (DONNYS MATERNAL GRANDMOTHER) NO. M47 | REDACT 1935 | 12:00:00PM | | |
| ☑ | FRANCES KOWERSKI DIED, 23 YEARS OLD, | 03/01/1938 | 12:00:00PM | | |
| ☑ | DONALD ROBERT FELL BORN, (FATHER) NO.M54 | REDACTE 1939 | 12:00:00PM | | |
| ☑ | TERESCA RUTH KING BORN, 53 YEARS OLD 5'3', 115LBS. NO.1168 | 1947 | 12:00:00PM | | |
| ☑ | MARRIAGE, RAYMOND KOTZER (25 YRS AND THERESA BANAS (18 YRS) NO.M71 | 08/29/1953 | 12:00:00PM | | |
| ☑ | DEBORAH ANN FELL, (MOTHER) BORN, 48 YEARS OLD AT TIME OF DEATH. NO 1209 | REDACTED 1954 | 12:00:00PM | | |
| ☑ | CHARLES THOMAS CONWAY, BORN, 44 YEARS OLD AT TIME OF DEATH. NO 1226 | 1956 | 12:00:00PM | | |
| ☑ | SANDRA JEAN KOTZER BORN, (DONNY'S MATERNAL AUNT) PARENTS RAYMOND KOTZER AND THERESA FRANCIS BANAS NO. M56 | 1956 | 12:00:00PM | | |
| ☑ | DONNA MARIE KOTZER BORN, (DONNY'S MATERNAL AUNT) PARENTS RAYMOND KOTZER AND THERESCA KOTZER THERESCA FRANCIS BANAS. NO.M57 | 1959 | 12:00:00PM | | |
| ☑ | MARRIAGE, DONALD R FELL (20YRS) AND BEATRICE L. GELSLEICHTER(18YRS) (DONNY'S FATHER'S FIRST MARRAGE) NO.72 | 10/09/1959 | 12:00:00PM | | |
| ☑ | DONNA LOUISE FELL BORN, (DONNY'S HALF SISTER BY FATHER) PARENTS DONALD ROBERT FELL AND BEATRICE LOUISE | REDACTED 1960 | 12:00:00PM | | |
| ☑ | SUSAN JEAN FELL BORN, (DONNY'S HALF SISTER BY FATHER) PARENTS DONALD ROBERT FELL AND BEATRICE LOUISE | 964 | 12:00:00PM | | |

FELL - (Events)

1

| Caption | Date | Time | Description | Icon |
|---|---|---|---|---|
| ☑ ROBERT DONALD FELL BORN, (DONNY'S HALF BROTHER WITH FATHER) PARENTS DONALD ROBERT FELL AND BEATRICE LOUISE GELSEICHTER NO.M60 | REDACTED 1965 | 12:00:00PM | | |
| ☑ JACAQUELINE SHARPE BORN, (AUNT TO DONNY, MOTHERS SISTER) PARENTS JOHN JOSEPH SHARPE JR AND THERESA FRANCES | FELL 1973 | 12:00:00PM | | |
| ☑ DIVORCE, BEATRICE L FELL AND DONALD FELL.(DONNY'S FATHER AND FIRST WIFE) NO.75 | 04/23/1976 | 12:00:00PM | | |
| ☑ MARRIED JOHN SHARPE AND THERESA KOTZER (DONNY'S MATERNAL | 04/26/1976 | 12:00:00PM | | |
| ☑ DIVORCE RAYMOND KOTZER AND THERESA KOTZERdONNY'S GRAND MATERNAL GRANDMOTHER) NO.76 | 04/26/1976 | 12:00:00PM | | |
| ☑ DONALD T. FELL DIED, (DONNY'S PATERNAL GRANDFATHER)73 YEARS OLD, NO.M53 | 02/18/1979 | 12:00:00PM | | |
| ☑ ROBERT J. LEE BORN, NY STATE POLICE REPORT NO. 1170 | REDACTED 1979 | 12:00:00PM | | |
| ☑ MARRIAGE, DONALD FELL (40 YRS) AND DEBORAH A. MCDONALD (25 YRS) NO.M70 | 11/10/1979 | 12:00:00PM | | |
| ☑ DONALD ROBERT FELL II BORN, PARENTS DONALD ROBERT FELL AND DEBORAH ANN | 04/30/1980 | 12:00:00PM | | |
| ☑ DONALD FELL MEDICAL RECORDS,  TWO WEEKS TO 5 YEARS OLD. M90-M95 | 05/10/1980 | 12:00:00PM | | |
| ☑ SUSAN FELL(DONNY'S HALF SISTER BY FATHER) MOVES IN WITH FELLS | 06/01/1980 | 12:00:00PM | SUSAN FELL, 16 YEAR OLD DAUGHTER OF DONALD SR.,  WITNESSES ABUSES AND CLEANS UP AFTER 1985 MUTUAL STABBING DONALD SR. AND DEBBIE FELL.  SHE STAYS WITH FAMILY FOR SEVERAL MORE MONTHS THEN RETURNS TO LIVE WITH HER MOTHER NEVER TO SEE | |
| ☑ CHILD ABUSE OF DONNY AND TERI BY FELL SR.OFFENSE REPORT, Officers J. Keiper and Sgt. Joseph E. Olblen Kingston PD. NO. M16-M21 | 12/12/1982 | 09:22:00AM | | |
| ☑ LUZERNE COUNTY CHILDRENS & YOUTH SERVICE RECORDS. FIRST REPORT OF SEXUAL ABUSE BY FRANK AND CLAUDIA BUBLO. NO. | 03/11/1985 | 12:00:00PM | NO.158-M279, FRANK KREMSKI - CASE WORKER, JACQULYN MADDON SUPERVISIOR, NO.M167 | |
| ☑ STABBING INCIDENT. NO. M9-M15, CHILDREN AND YOUTH SERVICES, NO. M161 | 04/21/1985 | 01:25:00AM | DEBBIE FELL CLAIMS THAT DISCUSSING SEXUAL ABUSE OF CHILDREN BY BABY SITTERS  WITH DONALD SR.,  LEADS TO STABBING INCIDENT. DONNY AND TERI PLACED WITH GRANDMOTHER, TERESA SHARPE. CHILDREN AND YOUTH SERVICES RECORDS AND POLICE REPORTS. | |
| ☑ SEXUAL ABUSE BY THE BUBLOS, CHILDREN YOUTH SERVICES. M22-M24 | 05/02/1985 | 12:00:00PM | INVESTIGATION BEGINS OF FRANK AND CLAUDIA (COOKIE) BUBLO FOR POSSIBLE SEXUAL ABUSE OF DONNY AND TERI. NO. M22-M24 | |

FELL - (Events)

FELL-00002230