# EXHIBIT 242

## DECLARATION OF SALLY FELL FRANCIS

Sally Francis hereby declares as follows:

1. I, Sally (Fell) Francis, live at REDACTED - FELL Pasadena, California 91105. I was born on REDACTED - FELL 1941. I have lived in Pasadena for the past **35** years.

2. I have worked as a nurse for **25** years. I currently work at **FLINTRIDGE ShARED HEART ACADEMY**. My husband and I have two grown sons.

3. I attend church regularly and I sing in the choir. In my free time, I like to paint water colors.

4. I am the younger sister of Donald Fell, Sr. Donald Fell, Sr. is the father of Donald Fell and Teri Fell. My brother Donald recently passed away on Christmas Eve. He was an alcoholic and as far as I know a very unhappy person throughout his life.

5. I grew up in Wilkes-Barre, Pennsylvania with my parents, Donald Townsend Fell and Myrtle Jeanette Fell, and older siblings, Donald Fell Sr. and Geraldine Fell.

6. I graduated from high school in Wilkes-Barre, Pennsylvania in 1958 and then went into a three-year nursing program at Einstein Medical Center in Philadelphia. I left Pennsylvania for good after I graduated from the nursing program. I have visited my family in Pennsylvania on very few occasions since then and have had little contact with my siblings ever since. My family was very dysfunctional. I could not wait to get away from home for this reason.

7. My parents' first child was a daughter named Marilyn, who died before I was born. She died after a brief illness, a simple infection, something that would be easily curable now. She was not a sickly child, so her death was a shock to my parents, especially my mother.

The funeral was held at home. My mother suffered from depression and was never the same after Marilyn's death.

8. My sister Geraldine has told me that my mother was hysterical when she found out that she was pregnant with me because she did not want to have any more children. My mother and I were not close. My brother Donald never felt any love at home either. I did not have close relationships with my sister Geraldine nor my brother Donald. Geraldine favored my brother and they would gang up on me. I was the baby. I was not appreciated, not wanted.

9. My mother was the second of seven children, six girls and then the youngest, a boy named Harry, who was an alcoholic. ~~She was ignored by her parents~~ SLF. She never learned to swim, ride a bike or drive a car. She quit school in 11th grade to help support her family.

10. My parents were secretly married. My mother kept her wedding band under her mattress, but her sister found it and told their mother. My grandmother then kicked my mother out of the house for marrying my father.

11. Around the time of my parents' marriage, my father's parents, Elvina Townsend Fell and John Fell, split up and my grandmother Elvina moved in with my parents. Elvina lived with us for the next 17 years.

12. Elvina did not like children very much and spent most of her time alone in the attic. She never at any meals with us. I remember her brushing my hair with a metal brush and that I screamed out in pain because it really hurt.

13. When Elvina got sick with cancer, my mother had to take her to the doctor on the city bus. Elvina was weak after her cancer treatment and my mother basically had to carry

2

her onto the bus. My father did not take her to the doctor in our car because he was always at work.

14. My father resented his father, John Fell, for divorcing his mother Elvina. My father did not want us to see John Fell very often because he felt that he had abandoned the family. He eventually died in an institution.

15. My mother was subservient to my father. He had a way of speaking to her that made her feel inferior. She tried to work hard to keep the house clean. She cooked every night and worked her fingers to the bone. But still, my father would be very critical when he came home from work. If he saw a speck of dirt, he would say something.

16. My mother would take a nap every afternoon and I would often come home from school to find her sitting in the living room, staring out the window. She would ask me to walk to the store every day to get groceries, because she did not feel like going. I used to stop over at a friends house most days, until it got dark, so that it would be too late to go to the store. I didn't like going.

17. My mother was a severe alcoholic and suffered from chronic depression. My sister, Geraldine, had to put my mother to bed every night until she left Pennsylvania for college. She had to do this because my mother was drunk and passed out. My sister Geraldine is 10 years older than me. She gets upset when I talk about my mother's alcoholism. She is ashamed and doesn't want anyone to know. She minimizes it. It wasn't until Geraldine left the state that I realized she was putting my mother to bed every night. Geraldine didn't want me to know, and no one talked about it. When Geraldine left home to go to school in New Orleans, she told me I had to put my mother to bed every night, so I did.

3

FELL-00002383

18. My father worked long hours. My mother would save pennies from the ~~lunch~~ money my father gave her to buy herself port at the liquor store. She would put the alcohol in different bottles, drink beer in one room and then go to another room and drink port. When I was little, she would take me on walks with her to the liquor store.

19. My mother was also addicted to pills. She was friendly with a pharmacist who made bottles of pills available to her without a prescription. She constantly sent me to the drugstore to refill her bottles with pills.

20. When I was a young child, my sister, my brother and I stayed with my mother's sister Clara for a while, because my mother was institutionalized for depression and mental illness. Another time, we stayed with a friend of the family while she was institutionalized. At the hospital, she was treated with electro-shock therapy, beginning before I was born, and continuing during my childhood. She suffered brain damage from the treatment. It was very barbaric. They would hold her down and then zap her without measuring the electricity.

21. My mother tried to kill herself at least two times. She tried to overdose on prescription drugs one time, and cut her wrists the other time. On both occasions my father did not want to call the doctor. He tried to sweep my mother's suicide attempts under the carpet.

22. My mother would usually get up early in the morning to prepare breakfast for the family and help us kids get off to school. One morning, when I was about 10 years old, she did not get up from bed because she overdosed on pills. I called my father at work and told him that my mother hadn't gotten out of bed. He told me not to worry about it. I tried again and again to wake her up. I called my father again and insisted he call the family doctor. When the family doctor finally arrived, he found my mother unconscious. She

4

FELL-00002384

had consumed prescription pills together with alcohol. She had taken a full bottle of pills. She was rushed to the hospital in an ambulance. I was in the ambulance with her. My father did not come home from work while all this was happening. The hospital discovered that her stomach was filled with pills. My father came to the hospital after he got off work and then left. I spent the night alone with my mother at the hospital. I was just a child, 10 years old. It was a devastating experience for me. I can see her laying in the bed. I can still see the scene. I was scared that my mother was dying.

23. My older sister Geraldine was about 20 years old at the time, and she was going to school in New Orleans. She came up from Louisiana to take care of my mother.

24. Another time, when I was older, my mother called my father at work saying "Goodbye, Don" and then tried to kill herself by cutting her wrists. When my father arrived at home, he found her with her wrists cut, bleeding. She was just standing there, her wrists hanging over the kitchen sink. She didn't want to make a mess by bleeding all over the house. He taped up her wrists and refused to take her to the doctor. He didn't want anyone to know.

25. ~~My mother suffered from seizures. They may have been related to alcohol withdrawal and withdrawal from pills.~~ *SLF*

26. While my mother was in the hospital after the wrist-cutting suicide attempt, I realized that she was not taking her medication. She hoarded her pills in a bedside drawer. When I found her medications, I realized the hospital staff was not watching her closely, and I took a leave of absence from nursing school to take care of her for a few weeks.

27. After her suicide attempts, my mother saw a psychiatrist in Scranton, Pennsylvania. I was in nursing school at the time. ~~I would~~ I TOOK A 2 WEEK leave school to drive her from Wilkes-Barre to *from*   *SLF*

5

Scranton two or three times a week. My father wouldn't drive her to her appointments because he had to work.

28. My mother's psychiatrist prescribed Thorazine, which turned her into a zombie. She could not talk, had a flat affect, and was totally useless while on this medication. One night, she got up to use the restroom and fell down the stairs. She fractured her skull and lost sight in one of her eyes. From that time, onwards, we had a baby gate that we would fasten to the top of the stairs, so that she wouldn't fall down in a stupor from her drinking or her Thorazine, or both.

29. My mother's depression intensified after her failed suicide attempts. She was mentally unstable for a very long time, spent a lot of time in bed and continued to abuse alcohol and pills throughout her life.

30. My mother was jealous of my relationship with my father. Growing up, he gave me more attention than anyone else in the family. We would go for walks on Sunday, and he would drive me to Philadelphia for ball games.

31. My mother remained depressed her entire life. As an adult, I lived in Texas, California and in England and my parents would come to visit me. My mother refused to go sightseeing and insisted on staying behind, by herself, in the hotel. She would hardly talk to me and did not care to be there.

32. When I was living in London, my parents came to visit once. I was waiting at the airport for them. They were coming out of customs. There was a huge flight of steps. My father was walking way ahead of my mother. He was carrying his attaché case but she had the suitcase. She was tipsy and she fell down the steps, with the suitcase. It was very embarrassing and caused quite a stir. Everyone looked and was concerned for her. My

6

FELL-00002386

father just turned around and said, "Oh, come on Myrtle." He was excited to be there. I feel bad for my mother. She was neglected in some way.

33. She continued drinking until the day she died. Another time when my parents came to visit, my husband and I hid the few bottles of alcohol we had, to prevent my mother from drinking. We put it up on top of a cupboard. It was raining during much of their visit and we stayed home mainly. The one time my father and I went out of the house for a while, my mother found the alcohol. When we got home, she was inebriated.

34. As an adult, I talked to my mother about Alcoholics Anonymous and rehab, but she didn't recognize that she had a problem. One time, my mother's tooth was bothering her. Instead of going to the doctor, she just kept bothering it until it broke clear off.

35. My parents had very little interaction with my children. Many women, when they are about to have a baby, they ask their mother or their parents to come and help out. I didn't ask them to come and watch my children, or help me out with raising my children. A lot of people have that kind of relationship with their parents, but I did not.

36. My brother Don and I were only 19 months apart and competed for our parents' love. The sibling rivalry between us started very early. My mother stopped breastfeeding him when I was born. Later, he was always picking on me. When I was a baby, Don pushed me down the steps when I was in a baby carriage. Thankfully the carriage had bumpers on the back and the front, otherwise I would have fallen out.

37. I do not think Don ever felt loved by my parents, and he had lots of problems growing up. He was very disrespectful to my mother and frequently yelled foul words at her. My mother was not a disciplinarian; she would just groan and turn around and walk away.

FELL-00002387

My father, ~~on the other hand, would~~ pull down Don's pants and spank him, ~~which was~~ *once only*

*SLF* ~~humiliating.~~ *in his life. I was never spanked.*

38. My father was not the kind of guy who would go out and play ball, and he and Don did not have a good relationship. Don did not participate in the family very much. He had his own room and a radio, and he went to a different *elementary* school than ~~my sister and~~ I did. *SLR*

39. Don was an alcoholic all his life who started drinking and smoking at a very young age. He was younger and smaller built than his classmates, and I think he was trying to be a tough guy. When Don was a senior in high school, he was caught stealing cars, which was very embarrassing for our family. One of my teachers even pointed it out in front of my whole class. Don was sent away to a juvenile facility. My mother was very upset and depressed when my brother Don was sent away. My father talked to the teachers and tried to get him into a program, but Don did not want to go to college. All he wanted to do was get married to his high school girlfriend, Beatrice. They were young when they got married.

40. While Don was married to Beatrice, he would stop for a drink after work and come home inebriated. Beatrice's mother was married to an alcoholic and did not want Beatrice to go through the same thing she did. Don and Beatrice got divorced because his mother-in-law got involved.

41. I did not have much contact with Don after I left Pennsylvania. At one point, he wanted me to make an investment in a trailer on his behalf, but I turned him down because I knew I would never see that money again if I gave it to him. I would hear stories about Don from my sister Geraldine. Geraldine told me about violence between Don and his

8

FELL-00002388

wives and children, including a fight where Debra stabbed Don in the arm, causing a very serious injury.

42. My father used to drink. My sister Geraldine used to drink too. She may have been developing into an alcoholic. She stopped drinking in the late sixties after she had a serious bout of tuberculosis. She didn't take care of herself, and that's why she developed tuberculosis.

43. The Wilkes-Barre flood was hard on my parents. They lost everything and had to move into an apartment.

44. I was never contacted by the lawyers for Donald Fell, Jr., who is my nephew.

I have had the opportunity to review and correct the foregoing pages, and I find it true and accurate to the best of my knowledge.

Date: 1/10/2011

Sally Fell Francis

Witness

9

FELL-00002389

# EXHIBIT 243

My name is Ronald Cupano. For about six years, I lived in the Quiet Cove trailer park in Pittston, Pennsylvania, with my wife at the time, Rose, and our children. The Fells lived nearby in Inkerman. My son Brian played with Donny Fell, and my daughter Chrissy played with Donny's sister Teri. Donny and Teri came around our house to play with our kids.

Around this time, crank was very popular in the Inkerman Trailer Park. Crank is a higher grade speed, that you snort, ~~like crystal meth.~~ Several of the residents were hooked on it. It was cheap and readily available back in those days.

*Crank is another name for crystal meth. RAC*

Donny's mother Debbie was sloppily dressed and very heavyset. Debbie and her husband were always partying and drinking. They had a lot of problems. They just did not live right. They were fighting and going at it all the time. Their trailer was run down and the porch was falling off.

One night, Debra and her husband got into a very serious fight, and Children and Youth Services placed Donny and Teri with us for the night. Chris Purcell and Marianne Czanker were the police officers who handled the Inkerman area.

One night, a neighbor of ours in the trailer park got drunk and shot his wife to death in their trailer. He shot her right in the liver with a 357. I went into the trailer, which was filthy, to look for his 3 year old son. The wife was lying in a pool of blood and the little boy was hiding under the bed. We found him hiding and

1

*RAC.*

FELL-00002390

shaking, and we had temporary legal custody of him for maybe a week. The guy's family members came to the house and tried to take the child, but we did not give the baby to any family until they had approval from Children and Youth Services.

I was not contacted by Donny's lawyers or anyone connected to his case until recently. I would have been willing to share what I know about when I knew him.

I have had the opportunity to review and correct the foregoing pages, and I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: 2-20-11

Ronald Cupano

Melissa Thomas
Witness

2

FELL-00002391

# EXHIBIT 244

O'Hop

My name is Rose, O'Hop. I used to be married to Ronald Cupano, and my name was Rose Cupano. I have remarried. I have two children, Brian and Chrissy Cupano.

In the late 1980s and early 1990s, I lived in the Quiet Cove trailer park in Pittston, Pennsylvania, with my husband at the time and our children. My husband used to take off for days at a time, and I would not see or hear from him. I left him in 1992, and I married my current husband in 1998.

During the time I lived in Quiet Cove, the Fells lived nearby in Inkerman. My son Brian played with Donny Fell, and my daughter Chrissy played with Donny's sister. My son Brian was a handful, so I used to threaten him that I would send him to St. Michael's if he was bad. I would even take him up there and drive past, but Brian would just laugh.

Teri was not just shy, she was backward. She was timid and kept to herself. She was in my house a lot because I did not let Chrissy play outside then. Chrissy and I used to do Teri's hair. We would have fun fixing it in ponytails or pigtails. Chrissy and Teri used to play dress up.

Donny and Teri did not want to go home. They often asked to stay, but I could not call the mom every night, night after night, to ask, not that the mother would have cared. I used to feed them.



1

FELL-00002392

The Fell home was dirty, and the children did not look clean. They wore ratty, run-me-down clothes and had straggly hair. At first, I did not want my kids to play with them. It is sad to have your child look like that because it reflects poorly on you.

Donny and Teri had lice numerous times. I called the school nurse about Teri's lice, because her mother was not doing what she needed to do to get rid of the lice. It was ridiculous. I did the lice treatments for Teri and my daughter Chrissy, but it was not long before Teri was itching again. This was very frustrating because I spent a month dealing with it, cleaning my house each time, and the treatments were expensive. I was on Welfare at the time, so that was a lot of money for me. I had to clean out the bedrooms and all of Chrissy's clothes. You were not supposed to send your child to school when they had lice, but Teri was not removed from the school. Her mother kept sending her back to school, with the lice infestation.

Donny and Teri were placed in our custody for one night by the police because the father threatened the mother. I gave the kids a bath that night, and I gave them clothes too. The kids were totally out of it and scared that night. They were eventually placed with the grandmother.

We had problems with one set of neighbors in Quiet Cove. Our neighbor Diane thought her husband Joe had a crush on me, and she did not like me as a result. Diane scratched up my cars and threw nails down to flatten the tires. Diane



used to feed her baby beer to get her child to sleep. She called Children and Youth Services on me one time.

There was one family that lived on the same row as us in Quiet Cove. The child was still in diapers when his father killed his mother. Their house was disgusting. There was blood all over the kitchen, and the baby was hiding. After the shooting, we watched the child for a week.

No one from Donny's lawyers got in touch with me before his trial. The first time I have heard from anyone involved with Donny's case was this past year. I have been living in Luzerne County all my life. I was available prior to trial and would have been willing to talk with people who represented Donny.

I have had the opportunity to review and correct the foregoing pages, and I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: 2-20-11

Rose Cupano Ohop   O' Hop

Witness

3

FELL-00002394

# EXHIBIT 245

My name is Claudia Bublo. ~~My friends and family call me "Cookie."~~

*I used to have the nickname Cookie, but no one calls me that anymore. CB*

When I was 18-19 years old, I babysat Donny and Teri Fell at their house on

East Bennett Street in Kingston. When I first went to the house to meet them, the

mother said she needed someone that Donny liked, and he jumped right on me and

grabbed my neck.

When I babysat for the Fells, I had just gotten married to Frank Bublo. He

was 24-25 years old. We are no longer married. *C.B.*

Most days, I rode my bike to work, but *when the weather was bad, occasionally* ~~sometimes~~ Frank dropped me off in

the morning. I worked for the Fells for over a year, Monday through Friday. Since

we were newlyweds, ~~sometimes~~ *one time  C.B.* Frank came over to spend time with me while I was

babysitting.

The Fell's house was very dirty. Debbie did not do any housecleaning. There

were clothes on the floor and a path of things you had to walk through. When I

showed up, I had to clean the house. The toys were all over the floor. I had to clean

the toy box every day. I complained to Debbie about the toys being everywhere and

warned her that she might trip on them. Debbie showed me how she kicked the toys

out of the way with her foot, rather than picking them up and putting them away in

the toy box. I got really sick of going over there and cleaning all the time.

There was not enough food in the house for Donny and Teri. One time, I

*C.B*

1

FELL-00002395

accidentally dropped a large container of soup on the floor and it spilled all over. I thought that I was going to get in trouble, but the father did not seem to care. The floor hadn't been washed in so long that he was glad that I had washed it.

There was a fridge downstairs with a barrel of beer in it. The barrel did not last long before they needed to get a new one. Debbie made it clear that it was not for me to drink. Debbie was more worried about the beer than she was about the children.

Debbie and Don had a mangy dog, ~~tied up~~ running loose C.B. in the basement. The dog was not walked regularly. The dog was depositing fecal matter + urine C.B. ~~There was dog mess and dog urine~~ all through the basement. The floor down there was brown and thick and sticky.

The phone rang off the hook while I was babysitting. Bill collectors were calling left and right, and there was a pile of late notices in the mail. Debbie told me that they had previously been burned out by a fire, and they made charges on credit cards for furniture and clothes. They had a lot of money problems due to the fire.

When I arrived in the mornings at 7am, Teri was jumping in the crib in a dirty diaper. Donny was locked in his room.

Debbie did not change Teri's diaper in the mornings. When I arrived, Teri's diaper was just dripping with urine. Teri was jumping up and down, wanting to get

C.B.

2

FELL-00002396

up out of the crib, but Debbie just left her there until I arrived. Teri's saturated diaper stunk up the crib. It was disgusting and happened over and over again. I didn't want to hold Teri because the diaper was so wet. I leaned her against me once, and my shirt got wet from her diaper. She was left in the same diaper from the time I left in the afternoon until I came back in the morning.

Teri was always irritated in her genital area. Her skin and bottom area stunk like pee. She was all red towards the front and the back. She had an infection and rash. Debbie did not take her to the doctor to treat her infection. I did not understand why Debbie did not take Teri out of her crib and change her diaper in the morning. Debbie just left Teri in the crib for me to deal with. I complained about it more than once and asked Debbie to change Teri before I got there, but she said she was too busy when she got up in the morning and had to go to work.

There was a metal hook-and-eye lock on the outside of Donny's bedroom door. The parents locked him inside his room at night, and he was still locked inside when I arrived in the morning. He was not allowed to come out until a certain time. Many times, when I arrived, I heard him banging on the door, saying, "Let me out! Let me out!" They put a bucket in his room for him to use the bathroom.

The parents told me that Donny had mental problems. He was bold, but he did not threw temper tantrums around me. When I let him out of his room, he ran back and forth, and back and forth in the house, and he yelled and carried on. He *He was not violent.* C.B.

3

was definitely hyper.

Donny spent a lot of time locked in his room. He did not have a lot of furniture in his room, and what he did have was busted. He had a mattress on the floor, but there were no toys in there. The toybox was downstairs.

I started working for the Fells in 1984. When I first started working there, it was the summer time, but when pre-school started, I used to walk Donny to pre-school. It was a half-day program. The teacher told me that he was having problems. She told me that Donny was disruptive in school. She told me she wanted Debbie to call her. Donny was hyper and seemed like he had ADHD.

One time, I saw Debbie grabbing Donny by the arm and pulling him upstairs because he did not want to sit and eat. I heard him banging on the door because he wanted to come out. Donny did not leave the house to go outside and play. He did not go out for a bike ride or have friends to come over and play.

Donny took his shirt off a lot. Teri ran around naked without anything on. She couldn't really talk then. She was only 2. Her hair was never brushed and was always a bird's nest, but she was a good girl.

I saw a few bruises and a black and blue mark on Teri's arm. I saw a black and blue mark on Donny's legs. The parents hit the children with a paddle with

C.B.

4

FELL-00002398

holes drilled in it.

I saw a ~~knot~~ puncture wound C.B. on Debbie's head one time that looked like she had been in a

fight and maybe got caught by a screw or something. Debbie told me that she was

drunk and fell in the bathroom. I asked her if she hit her head on the screw on the

toilet because it looked like she got caught by a screw.

Don came on to me once. Normally, Debbie and Don left for work together in

their junky car, but he stayed and tried to put the moves on me. He was trying to

touch my behind. He made several sexual comments to me.

I called Children and Youth Services on Debbie about the way she treated her

children and the conditions in the house. Children and Youth Services did not want

to hear my story.

Before this year, I was not contacted by anyone involving Donny Fell's

murder case. I had not heard from anyone about Donny in many years. I have lived

in Luzerne County ~~all my life and~~ and Lackawanna County ~~for the past~~ since 1999 when I came back from North C.B. was available to talk with the lawyers. Carolina.

Since 1999, I was here in Pennsylvania C.B. and

I have had the opportunity to review and correct the foregoing pages, and I

declare under penalty of perjury that the foregoing is true and accurate to the best

of my knowledge.

2-21-11
Date

Claudia Buhlo C.B.
Claudia Buhlo

Witness

5

FELL-00002399

Date: 2-21-11

Claudia Bublo
Witness

6

FELL-00002400

# EXHIBIT 246

parole, but I think that if you did all those pieces, and I had to make that decision, that I would be able to make that decision, yes.

MR. KELLY: May I have a moment, your Honor?

THE COURT: Yes.

(Brief pause.)

MR. KELLY: Nothing further, Judge.

THE COURT: Okay? All right?

MR. PRIMOMO: Thank you.

Good afternoon.

JUROR NO. 64: Good afternoon.

MR. PRIMOMO: My name is Gene Primomo. I represent Donald Fell. He is sitting right here. This is Alex Bunin. He is one of the attorneys in the case. Paul Volk, he is another attorney on the case. And this is Beth Bochnak and she is helping us with this portion of the case.

MR. PRIMOMO: You in your own words, mentioned something that I would like to touch upon. You said "follow the laws of government," and I assume -- what do you mean by that? You feel obligated to follow the laws of government?

JUROR NO. 64: Well, the way our laws presently, in this type of case, allow for the death sentence. I'm not a supporter of that, but that is what

FELL-00002401

is allowed presently.

MR. PRIMOMO: That's, that's -- that's correct. And you understand that the law's part is going to be expressed to you by Judge Sessions. And as part of those laws, you will be asked to swear to an oath to follow those laws.

JUROR NO. 64: Yes.

MR. PRIMOMO: And it's pretty clear to me, and correct me if I am wrong, that you are willing to follow those laws as Judge Sessions expresses them to you?

JUROR NO. 64: Um hum.

MR. PRIMOMO: And even if those laws include your consideration, your honest consideration of imposing the death penalty; is that right?

JUROR NO. 64: Yes.

MR. PRIMOMO: That's all I have, Judge.

THE COURT: Well, I just gotta ask you some follow-up questions --

JUROR NO. 64: Sure.

THE COURT: -- just to make sure that I understand completely your views.

And I will just give you some, obviously some background information.

If the government proves guilt beyond a reasonable doubt of an intentional killing, and we get into the

FELL-00002402

# EXHIBIT 247

My name is Robert Fell, and I am Donald Fell's half-brother. Donny and I share the same father, Donald Fell, Sr. My mother, Beatrice Gelschleichter, was married to Don Sr. but they divorced when I was young. I was born on REDACTED - FELL 1965. I have two full sisters, Susan and Donna Fell, who are both older than me. I have two half-siblings, Donny and Teri Fell, who were born after my father married his second wife, Debbie Fell.

My parents divorced when I was about 11 years old. Prior to that, my father was drunk most of the time and there was always beer around, mostly cans of Gibbons. All through my adolescent years too, he was constantly drinking. He is a nasty drunk and has a mean streak – it went his way or no way. He was okay if he wasn't drunk, but that was rare. He didn't have much of a relationship with any of his kids.

After our parents divorced, my father would come and pick us up and take us to the bar. We would play pinball while he was getting hammered. Even then, I knew that the situation was not good.

When my father was working, he drank at lunch, and then came back to work. He worked at an auto parts store called Northeastern Auto Parts at one point. Once, he drove right through the wall of the store when he was trying to park the car. He was drunk, coming back from lunch.    *RDF*

1

There were alcohol problems on my father's side of the family. His mother was an alcoholic, and she had some problems in her head too. My father argued with his parents, and there was an uncomfortable feeling at their house. I felt like we were to sit on the couch and don't move, don't do anything.

My dad was a violent man, too. That's one of the reasons my mother divorced him. Mostly he yelled at my mother, but she is a soft-spoken person and generally did not respond. She let him yell so he could get it out of his system. I saw him hit her in the face with his hand once. Then, one day he threw something in my direction. We left after that.

My mother rarely drank. It was rare that my father was sober, and he was nasty when he was drunk. I went to my mother when I needed anything, rather than deal with my father. She has been there for me when times have been rough in my life.

My father's second wife, Debbie Fell, was the complete opposite of my mother. She and my father liked to booze, and they fought a lot. Debbie was outspoken, and had quite a mouth on her. Whatever my father gave her in terms of arguing and fighting, she gave it right back to him. Some people are happy drunks and some are mean drunks. My father is a mean drunk. Debbie was a mean drunk too, and they clashed. My father would say a lot of nasty things, any four-letter word. He talked like that around kids – it didn't matter who was around. He talked

2

FELL-00002404

like that around me when I was growing up too.

I saw Debbie drink and smoke throughout her pregnancy with Donny, and also her pregnancy with Teri. I said something to her about it, but she said barley was good for the baby. She first said that when she was pregnant with Donny. Then she said it again when she was pregnant with Teri. — D.F

My sister Susan lived with my father and Debbie for a short time. They let her get away with a lot more than my mother would let her get away with. Donny was a baby then and Susan took care of him most of the time while Debbie went boozing. When my father and Debbie fought, which was often, Susan had to hide Donny to get him out of the way, so he wouldn't get hurt. It was a violent home.

Debbie had a lot of partying in her family. Mouths would start flying and people take things wrong when they are drunk. It turns into a whole disaster. People get beer muscles and want to fight. That's one of the reasons I stopped drinking.

I have seen my father and Debbie smoke marijuana when they were living in Kingston. I was in high school at the time but they still smoked in front of me. RDF

Debbie wasn't a stable enough person to have kids. The first priority was alcohol, same with my father. It was a terrible environment for kids. My father went downhill when he was with Debbie. He couldn't hold a job and was homeless for quite a while.

My father and Debbie came to my first wedding in 1990. My father got drunk and belligerent, and started getting on Debbie. He was just being a complete idiot. We asked him to leave.

The Wilkes Barre area is known for alcoholism. I used to drink a lot myself,

3    RDF

but I am on so much medication for epilepsy now that I can't drink anymore. I am on SSI disability for seizures. When I was drunk, I used to fight and use drugs, but I've straightened myself out. I could have gone down my dad's road and been like him, but I couldn't do that. My mother made the difference for me.

I haven't seen my father since I was 27. He used to hang out at a bar called the Amber Lantern on Market Street. I stopped by to say hello one day. The bartender told me he had moved to Florida. He never said goodbye to me or anything. At one point, I moved down to Florida and I spoke to him by phone. That was several years ago. That was the last time I spoke to him. He died recently, but I hadn't been in touch with him for many years.

I see my half-sister Teri every now and then. She says the same thing about my father. She went down to Florida to see him but he was nasty and arrogant to her while she was there. He worked down there, cleaning up a bar for drinks.

I am very concerned about my half-brother, Donny. I think about him a lot and I really don't want to see him killed. I haven't seen him for a long time, but he is still a part of me. People make bad choices and people get pushed over the edge sometimes. I have a temper. My dad had a temper. Part of my genes I got from my father I guess.

I was not contacted by Donny's trial lawyers. The first time I had any contact

4    *RDF*

FELL-00002406

with people who represented Donny was long after he was put on death row. I

would have been willing to testify at his trial if I had been asked. I have lived in
*except one year in Florida, during the 90's.* RDF
Luzerne County all my life, ~~and~~ would have been available if anyone wanted to talk
*I*
to me. I am listed in the phone book, and have been for the last several years. My mother still lives in the house I grew up in, in Kingston, PA. She always knows where to find me RDF

I have had the opportunity to review and correct the foregoing 4½ pages. I
RDF
have been given the opportunity to make any corrections, additions, and deletions

that I see fit. I declare under penalty of perjury that the above statement is true and

accurate to the best of my knowledge.


Date: 2-22-11


_Robert Fell_

Robert Fell


_Mel Carr_

Witness Melanie Carr

FELL-00002407

# EXHIBIT 248

My name is Dorothy Grivner, but everyone calls me Dottie. I am _73_ years old. I am retired and I live with my husband Ray. My husband Ray is also retired. He worked 30 years for the state of Pennsylvania, first as a toll booth collector and then with the Department of Agriculture, in the Dog Law Enforcement division in Tunkhannock.

I met Donny Fell when he was a kid, through his grandmother Theresa Sharpe. I met Theresa because we were both foster parents. Theresa and I met at the foster parent meetings. We went to the meetings every two weeks. At the meetings, we sat around and discussed everything for about two hours, then had coffee and donuts afterwards. After a while, we became friends and started hanging around. She came up to my house and I came down her house. Even when I moved down to Nanticoke, Theresa came down here a lot to see me, and I went to see her. We went to go to bazaars and fairs together. I knew Theresa for about eight years, up until she got sick and later passed away. I went to her funeral.

I met all four of Theresa's daughters. I got to know Debbie, Donna, and Jackie best, because the other one lived down south. At one point, Theresa's daughter Debbie moved into the other half of Theresa's house, with her two children, Donny and his little sister. When Debbie lived next door, she came over sometimes when I was visiting.

Theresa had a foster child named Nicole at one point. Nicole was about 13 or so when she was placed with Theresa. She was up at Theresa's for a while and then

_D. H._
1

FELL-00002408

she came down here to my house. She liked it down here so she asked to be transferred to my house. She liked it at my house better than at Theresa's. Nicole begged and pleaded with her caseworker to get the transfer and ended up getting placed here permanently.

Theresa had a lot of problems with her daughters, all four of them. Theresa and her daughter Jackie fought a lot. They screamed at each other often. Jackie went to the Children's Service Center when she was a teenager because she needed help. Theresa had even more problems with Debbie. Theresa got frustrated with Debbie often and complained to me about it. Theresa often called her, "Oh, that God-damned Debbie!" and that kind of thing. Theresa didn't get along with her grandson Donny either. She felt like he wouldn't listen. Theresa's daughter Donna had a lot of problems with her boyfriends. Theresa seemed like she had a lot of problems in her house, lots of bad situations.

Theresa's boyfriend Jack Rhodes lived in the house with her and Jackie and whatever foster kids she had at the time. Jack lived there the whole time I knew Theresa. Their relationship seemed off and on. They argued a lot. Jack was a drinker. He drank all the time. Theresa and Jack argued over his drinking. She wanted him to cut back.

Theresa drank too. She liked beer. She drank at home. She didn't go to bars when I knew her. She seemed to stay at home a lot. She didn't have any other friends. I was her closest friend.

2

FELL-00002409

I met Stella, Theresa's aunt, several times. Stella was tough. She said what she meant and she meant what she said. Stella and Theresa didn't get along. Stella came to see Theresa from time to time, out of obligation. Stella didn't seem to have any affection for Theresa. Stella got on Theresa to throw her boyfriend Jack Rhodes out of the house, because he drank too much. Theresa didn't listen to Stella, and that made Stella mad. Theresa didn't talk back to Stella.

At one point, Theresa had a lot of problems with her family, and one of the Children and Youth caseworkers told her she should take a break from fostering, so that she could try to fix things in her own family. I agreed. I told her she should take a break, for her sanity. There was so much fighting going on with her daughters and their boyfriends and husbands. The police were called several times and Theresa was caught up in it. Debbie was fighting with her boyfriend Al, who lived on that side of the house with her. When I advised Theresa to take a break, she said she'd think about it, but she didn't take a break.

Theresa came to me with her problems. When things got real bad for her, she called me at night and talked on and on and on about her problems with her daughters and their families. I said the same thing each time. I told her she should not have all these problems. I told her to take a break. Fostering was too much for her because she had too much stress in her house already. I told her over and over again, for years, but she did not want to listen. I told her that she wasn't paying

3

FELL-00002410

attention to what I'm saying to her. I told her that everyone needs a break sometimes. She really needed a break, to try and straighten things out for herself, but she didn't take a break. When a foster child was taken out of her home, she just got another one, without taking a break.

She needed the money. She had trouble making ends meet. Some months she really struggled. When Debbie moved into the other side of Theresa's house, there was no furnace in the apartment, on Debbie's side. Theresa had a furnace on her side, but there wasn't one for Debbie's apartment. When it started getting cold, Debbie and her boyfriend Al and her kids started complaining. Theresa told Debbie she would get them a working furnace, but she did not. She couldn't afford to get Debbie a furnace, so they just went without heat.

We were not paid very much per foster child. I took in up to five foster children at a time, all ages. Whenever they had an opening, I was on the emergency list. I got calls at 2 or 3 o'clock in the morning and I accepted them at my home. Over 21 years I had around 85 children altogether. I took girls or boys at first, but then I decided to only take girls. Girls are easier. Theresa didn't have 5 at a time, but she took girls and boys. Back when I took in boys, they created problems for us. These two brothers we had once set the woods on fire near our house. Another time, some boys we had got into my husband's paint cans and painted a neighbor's house. I think Children and Youth had to pay for the damages.

*D. M.*

4

I didn't feel that the Children's Service Center did much for the foster children that I had. My girls had a lot of problems. They went to the Children's Service Center for help with their problems, but the Children's Service Center didn't do anything for them. The people at the Children's Service Center said that they would do something, but then they didn't do anything. When one of my girls had a problem with their Children and Youth caseworker, the people at the Children's Service Center promised to get her a new caseworker, but then that did not happen.

I have only heard about this case recently. Before 2011 I was not contacted about the case. I have been living in the same house for 25 years and would have been willing to talk about the case if anyone had asked me.

D.S.

I have had the opportunity to read over and have read to me the above 4 pages and make any changes I see fit. I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: _1/2-3/2011_

_Dorothy Grivner_
Dorothy Grivner

_Raymond Grivner_
Witness

5

FELL-00002412

# EXHIBIT 249

My name is John Timek. I used to know Debbie Fell. I drank with her and crashed at her house in Wilkes-Barre for a while years ago.

I met Debbie at Tony's Bar in Pittston. It is now called Stephanie's Bar. I'm not allowed to go there anymore. That place was the bottom of the barrel, a place where downright alcoholics go to drink. People don't go there to have just one or two drinks. The people who went to Tony's at that time had a lot of problems. Back then, a lot of things went on. People got very messed up on drugs, were in and out of jail, and got very violent with each other. Debbie and I were hanging out with a group of people who are mostly dead now, or else they are homeless, in jail, or strung out on drugs.

I met Debbie when I was drinking a lot. I was into drinking and she was into me. I don't drink like that anymore. I was into cocaine real heavy, before I met Debbie. Debbie asked me to go drinking in Wilkes-Barre so I went with her. I needed a place to drink, and all we did was drink. I stayed at her house for a while. I barely knew her, we had just met. We both drank until we passed out. Then as soon as we woke up, whatever time it was, we started drinking again. Our drinking was really bad.

Debbie had been fighting with her ex-boyfriend at the time I knew her. He was an older guy who walked with a cane. Debbie had been letting her son drive her car. Her son was about 13 years old and he didn't go to school very much. Debbie

1

didn't seem to care what he did. Her drinking was more important than the kids, to her. That's what we did, drank morning til night.

Debbie's house looked like she never cleaned it. It looked like it should be condemned. They had a coal furnace, but it was ancient, and it was impossible to get it running. It was way, way out of date. There was no heat in the place. The pipes froze, and there was no running water. I let the Sheriff's Department in at the house one day. They were there to inspect to see if the place needed to be condemned. It was condemned later on, after Debbie went to jail. When Debbie went to jail, that was the last time I saw her.

I was not contacted by anyone involved with this case until a couple months ago. I was available and living in northeast Pennsylvania for the past several years. I would have been willing to talk to people about the case and what I know.

I have had the opportunity to review and correct the foregoing ___ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 02-24-11

_____
John Timek

_____
Witness

2

FELL-00002414

# EXHIBIT 250

My name is Florence Wallace. I am the sister of Lawrence Gilbert, who we call Louie. Debbie Fell was Louie's girlfriend, off and on, for a few years in the late 90s. I have tried to take care of my brother throughout his life, because he is mentally ill and has problems. He has bipolar disorder. He has been on social security disability because of his mental problems.

Louie is also an alcoholic and a drug addict. He has been homeless at times over the past couple of decades. He can't hold a job and has problems with a bad temper. I have tried to help him out many times. I have taken him into my home at times, but I have children at home, and when he acts up and starts to get violent, I have to kick him out. I can't have that around my children. I try to help him find a place to stay so that he isn't always living on the streets. I worry about him. He is so involved with the drinking and the drugs, he won't get help for it. I don't know if he is using drugs now, but he has in the past. F.W

Louie met Debbie at the railroad tracks in Wilkes-Barre. They were both homeless and drinking too much at the time. They got together but they fought constantly. Debbie acted a lot like my brother. My daughter has been diagnosed with bipolar disorder also. I know what people act like when they have bipolar disorder, and Debbie acted a lot like my daughter and my brother. One minute, Debbie was calm, but the next minute, she was snapping at my brother. She started screaming at him and throwing things at him.

I tried to help Louie and Debbie when they were together. I brought them

F.W

shopping one time, to the grocery store. They didn't have a lot of money so Louie was trying to prioritize what they would get. She just wanted to do it her own way. She started screaming at him in the car. She didn't listen to reason. My brother flips out like that too. He loses control. Even when Debbie was sober, she acted like that. Any little thing made her fly into a rage. F.W

At one point, Debbie was homeless and I tried to help her out. She was staying in a shelter for a few days. I tried to help her find some emergency assistance and housing assistance. I gave her a ride to the different agencies that could help link her up with assistance.

Both Louie and Debbie drank too much. When she was drinking, they fought. They had fistfights that got serious, and they hurt each other. Debbie threatened to kill Louie. Several different times, she threatened to stab him. She had a thing about stabbing people. Over and over again, when she and my brother had fights, she threatened to stab Louie. One time, she got into an argument in Wilkes-Barre. She thought someone stole something from her. She was furious and threatened to go stab them.

I told Louie he should drop Debbie off wherever it was that he found her. I got sick of hearing about their fights. She was dangerous when she was angry. I believed that she would kill my brother one day. At one point, she did stab him really bad. He had to get surgery on his arm after that. She sliced him up real bad.

F.W 2

FELL-00002416

At that time, Louie and Debbie were living in an apartment in Edwardsville. My brother got Debbie arrested for the stabbing, but then he later decided he didn't want her to go to jail. He dropped the charges. Later I went by to see my brother because I hadn't heard from him in a while. When I got to the apartment, the door was wide open and the place was totally trashed. No one was there. The place looked like a crime scene. There were dishes and glasses smashed on the floor. I found my brother's wallet there and some paperwork of his. I thought she killed him and he was lying dead somewhere. I didn't know where he was. I called the Edwardsville Police. They found Louie and Debbie up in Vermont. They had taken off to go up there, leaving their apartment like that.

When they were in Vermont, they fought and the police were involved many times. At one point, my brother went to jail and Debbie said she was going to stab the hell out of him when he got out. Eventually my brother came back down to Pennsylvania and he lived with me for a time. When he got back from Vermont, he was doing drugs. He had been an alcoholic for years but it wasn't until he got back from Vermont that I knew he was using drugs ~~like~~ cocaine, *including* crack, uppers, Percocets, Vicadins, and ecstasy. f.w

I didn't know that Debbie had died until someone came to see me about her son's case recently. I have lived in Luzerne County for ~~over~~ *over 30* f.w years now. I would have been available and willing to be interviewed about Debbie.

I have had the opportunity to review and make changes to the foregoing _3_ f.w

f.w 3

pages. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/25/11

Florence Wallace

Witness

4

FELL-00002418

# EXHIBIT 251

JAG 2-25-11

Tunkhannock

My name is John Gacek. I was born in ~~Wilkes-Barre~~, PA and have lived in
Luzerne County ~~all~~ most of my life. I work for Lowe's ~~a tree-trimming company.~~ I have worked
there for the past ~~1 years.~~ few months. I am married and my wife and I have two children.

In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre,
Pennsylvania, with my mother, Adele Gacek, and stepfather, Ernie Schuldaski. My
friend, Donny Fell, lived across the street with his sister Teri, mother, and her
boyfriend, Al Wilcox.

I met Donny when I was around 7 years old. Donny was older, but he was
really small and skinny. When kids at school gave me a hard time, Donny looked out
for me and took me under his wing. I remember a kid at school was yelling at me,
and Donny told him to lay off. He was my first friend at this new school, and Donny
treated me like I was his little brother. We were not in the same grade, but we
walked to school together most days and played after school.

Donny showed me the hideout spots in the neighborhood. We played by the
dike or the train tracks, under the trestle. We went to the park by Dan Flood
Elementary School and to the Turkey Hill convenience store to buy baseball cards.
We traded cards with each other and at the hobby store.

We played baseball a lot and collected baseball cards. Donny had a really
good arm and was a really good pitcher. We did not play in a league, but we played

J.A.G
2-25-11

1

FELL-00002419

at the baseball fields on Chestnut or by Flood Elementary.

My mom took Donny and me to Frances Slocum Park and to the arcade. Donny loved that. He didn't want to go home.

My stepdad Ernie gave us batteries for a tape deck, and we liked to listen to music at the train tracks. We listened to Ernie's tapes. Donny liked Pink Floyd, REM, and Led Zeppelin.

Donny loved being at my house. We played Nintendo. I tried to make up excuses so Donny could come over. I invited him without even asking my mother. Donny and I tried be really good so that my mom did not send him home. If I ever talked back to my mom, he stopped me and said that I was lucky to have a good mom.

Donny's mom was a drinker, and when she wasn't drunk, she was passed out, sleeping. I did not see her without a beer can in her hand. She was not a happy person. She nitpicked at Donny. She was not a normal mom. She was not the type to be nice to neighborhood kids.

Donny had freckles, and his parents used to call him, "You freckle-faced piece of s---" or "you stupid a--hole." They did not calmly say, "Please come over here, Donny." Instead, it was: "Get the f--- over here you little a--hole, before I kick you're

J.AG
2-25-11

2

FELL-00002420

a--."

Donny did not want to be at his house, and he did not want for me to be there either. He did not want me to go inside his house. I stayed on the porch. In there, the music was really loud and there were beer cans all over. The house was very disorderly, and there was always stuff strewn about. His mother did not clean the house.

When we went to his house to pick up his baseball card folders, Donny told me to wait on the porch. When Donny needed to go upstairs to his room, it was like going through a firing squad. His parents sat on the couch drinking, and they just started screaming at him.

I remember the bigger, heavyset guy, Al, that he lived with. He was dirty and never took care of himself. I saw Al backhand Donny across the face. He slapped him and threw stuff at him and threw him around. Donny seemed to get the worst of what went on in that house. It all came down on Donny. I cannot imagine a peaceful moment in his house. I can only imagine what he went through behind closed doors. I was just a little boy, but I could see that what was happening was wrong.

I told my parents that Donny's parents were mean. You could tell he wanted to get away from what was going on at his house. I tried to go to bat for Donny. I

JAG
2-25-11

3

FELL-00002421

invited him over all the time.

Donny's parents called him names. He got upset with his parents. He got mad and threw things. He often left his house with his little sister Teri in tow. Donny was only 11 or 12 years old, but he was trying to be the adult in the situation. Donny was Teri's protector. When his parents got into an argument, he jumped in the middle, taking the blame and the beating. He stepped in so Teri did not get a beating. When Teri or Donny came over, one or both of them were crying. Teri was really quiet.

*JAG 2-25-11*

*Teri was scared a lot because of the screaming + the beatings. She used to run off + hide. Donny used to go try to find her to make sure she was okay. A couple times he asked me to come help him find Teri. One time we found her in a vacant lot with a bunch of old cars parked in it. She was sitting on the ground with her back up against the tire. She was crying. Donny comforted her and tried to reassure her that everything would be okay.*

One day in the spring, we were at a family get-together at my father's house. My mother and my stepfather Ernie were up at my sister's house, which was behind my father's house. Donny and I snuck down to my dad's house, because I wanted to show Donny my dad's gun. My father, Ken Gacek, was a police officer in Exeter Township, and he showed me how to shoot guns. My dad did not really know Donny personally. Donny spent more time with my mom, Ernie, and me. My dad had rules about guns, and I knew I was not supposed to use guns unsupervised. I broke that rule, and it was more my fault than it was Donny's. I tossed the magazine to Donny, and when he shoved it in the gun, the gun just went off. I forgot about the round in the chamber. It was a stupid mistake, and I still feel that it was my fault. My family didn't blame Donny for what happened. I hope Donny never went to bed one night thinking that I was mad at him for what happened, because I wasn't.

4

FELL-00002422

After the accident, I went to the hospital. My mother and father rode with me to the hospital. My brother was working at a restaurant in Wilkes-Barre, and he got to the hospital just before we did. I was standing very close to Donny when the gun went off, and the bullet went right through me. I was only in the hospital overnight.

When I got home from the hospital, Donny came to my house in tears. He told me over and over that he was sorry. He gave me a hug, and we cried together. I thought Donny was going to get in trouble, and I was crying because it was not his fault. It was my fault. My arm was in a sling. Donny felt so bad and he wanted to help me whatever way he could. He offered to help me get into the bathtub, but I was too embarrassed to let him help me.

My family teased Donny about the shooting accident. They tried to make light of it so he would not feel so bad about it. My brother was kidding around and pretended to frisk him.

Not long after the accident, Donny disappeared. At the time, I did not know where Donny was. One day, he just was not around anymore. I now understand that he was locked up in the psychiatric unit.

I knew Tony Tonte, Bobby Lee's brother. Bobby was a weird character. Donny and Bobby were two different people.

JAG
2-25-11

5

FELL-00002423

Donny's lawyers did not contact me prior to his trial in Vermont. I did not hear from anyone involved with Donny's case until 2009. I was available and would have been willing to testify at Donny's trial.

I have had the opportunity to read and have read to me the foregoing _5½_  JAG 2-25-11 pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _2-25-11_

JOHN AARON GACEK

John Gacek

Witness

Jamie Kluk

6

FELL-00002424

# EXHIBIT 252

My name is Adele Gacek. I have lived in Kingston with my boyfriend Ernie

Schuldaski for the past *20* years. I was married to a police officer named Kenneth

Gacek for *25* years. We had five children. My oldest daughter died in a car accident

several years ago. Kenneth Gacek and I divorced and I have been with my boyfriend

Ernie for the past *20* years.

In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre,

Pennsylvania, with my boyfriend Ernie Schuldaski and my son John Gacek. My older

children had grown up and were out of the house by then. My son John became very

close friends with the boy across the street, Donny Fell. Donny lived across the

street with his sister Teri, his mother and her boyfriend Al. We only lived across the

street from the Fells for a year or so.

Donny came over to our house often to play with my son John. We all ate

pizza and popcorn together. John and Donny made blanket forts and watched TV

and sports. Ernie and the boys danced around to music and play-wrestled together.

They were silly together.

Donny was older than my son John, but Donny looked younger than his age

because he was small and skinny. Donny was shy, but when you gave him a hug, he

just buried himself in it. He was affectionate at our home, and he hugged us goodbye

when it was time for him to go home.

1

FELL-00002425

Ernie and I both worked, but on Saturday or Sunday we went on outings to do something fun, like taking a drive or going fishing. We often brought Donny with us. We had dogs and cats in our house, and Donny played with them. He was good with them and seemed to love animals.

When it became clear to me that Donny and John were going to be good friends, Ernie and I went over to meet Donny's parents and to introduce ourselves. I then realized that Donny came from a very dysfunctional family. The parents were constantly drinking and screaming at each other, and it was just complete chaos over there. I could not stand to be at their house because it was so tense. I was very surprised to see where Donny came from. I don't know how any kid could ever thrive or even halfway grow up in that environment.

I was absolutely horrified by the way Donny and Teri were treated by Debbie and Al. They screamed at the kids and called them terrible names. Debbie was foulmouthed and treated the kids in a way I would never treat them. Al called Teri, who was small for her age and generally very quiet, a "b----," which I just could not believe. They threatened Donny, screaming at him that they would kick his a--. There was often some kind of commotion. The parents cursed at Donny and Teri. It was chaos.

We had a stable household. Donny used to eat up the family atmosphere. He was at our house four or five times per week, and he did not want to go home.

2

FELL-00002426

Donny told me more than once that he wished he could live with us. I wished he could too.

When anything happened at his house, Donny ran over to our house. There were many times when he was really upset. His mother treated him a lot worse than his sister. His parents locked him in his room for punishment.

Donny appreciated being around me because I was a more typical mother than he was used to. Whenever John tried to talk back to me, Donny stuck up for me. Donny told John not to talk to me that way, saying that I was a good mother, and John should appreciate that.

Donny was from a violent home. His parents were such heavy drinkers, he did not know what to expect from them at any moment.

My son John did not want to play at Donny's house. The boys played outside or at our house. I did not want John spending time at Donny's house.

Donny was close to his sister Teri. Donny brought Teri over to our house several times. Teri was nice, shy and very withdrawn, but she was less withdrawn at our home.

My ex-husband, Kenneth Gacek, was a police officer, and he lived in a house

3

in Exeter Township.  He had an unsecured 9mm handgun in his home.  My daughter and her husband lived in a house behind his.  Ernie and I took John and Donny to visit my daughter in the country one day.  The boys were off playing for a while, then John came running over saying he was shot.  John and Donny had been playing together, and John showed him my ex-husband's gun.  The gun went off accidentally.  My family and I did not blame Donny for what happened.  It was a fluke accident, and I blamed my ex-husband for leaving the gun unsecured.  To this day, when we talk about the accident, we don't ever say, "When Donny shot John," we say, "when Johnny got shot."

Immediately after the accident, Donny was upset and scared.  John spent the night in the hospital, and Donny came to see him at our house the next day.  Donny ran over to John and put his arms around him, and they both started to cry.  They held on to each other for a long time.  To see two boys that age crying like that just broke my heart since most boys don't act like that.

A few days after the shooting, Donny just disappeared.  I didn't know where he went.  Later I found out that he was in a psychiatric unit.

I was not contacted by Donny's lawyers who represented him at his trial in Vermont.  I was available to speak to the lawyers and I would have been willing to come to Vermont to testify.

4

FELL-00002428

I have had the opportunity to read and have read to me the foregoing 4 pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/28/11

*Adele Gacek*

Adele Gacek

*[signature]*

Witness

5

FELL-00002429

# EXHIBIT 253

My name is Ernie Schuldaski.  I have lived in Kingston *Kingston/Edwardsville* with my girlfriend, Adele Gacek, for the past 20 years.  Adele and I have been together for 20 years.

In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre, Pennsylvania, with Adele Gacek and her youngest son John Gacek, who I call my stepson.  Adele has other children who were grown and out of the house by that time.  For several months, Debbie Fell lived across the street with her two children, Donny and Teri, and her boyfriend, Al.  Donny was about 11 years old at this time.

John and Donny became good friends and often played together.  Donny spent a lot of time at our home.  Donny loved having meals with us.  We ate at the table and sat down together for a home-cooked meal.  He was well-behaved and treated everyone at our house with respect.  He had sleepovers at our house at times.

One Sunday morning, Phil Collins was on the radio, and John, Donny and I danced around the house to the music.  All three of us lined up and danced into the room, like a caterpillar, in step to the music.  Adele laughed at us.

Adele and I took Donny with us when we were going on little day trips.  We took John and Donny on fishing trips to Slocum Park.  We gave the boys a rod, and we all fished.  Sometimes we went to the creek and made a picnic.  Back then, you were allowed to swim in the creek, and we brought the dog with us.  Sometimes we

1

FELL-00002430

went out for a ride on a Sunday afternoon.

Donny really gravitated toward Adele, and he seemed to really appreciate having a loving mother figure around. If John got mouthy, Donny spoke up and told him he shouldn't talk to his mother like that because she's a good mom.

Adele's ex-husband Ken Gacek was a cop. One day, we took John and Donny to Adele's old house in Exeter, where Adele's older daughter lived. John and Donny were playing together, and John showed Donny his father's gun. John knew they weren't supposed to be playing with the gun, and when they heard someone coming, they thought they were going to get into trouble. Donny went to slam the clip back in and the gun accidentally discharged. The gun going off was an accident. John was lucky because it missed his aorta and went clean through. We were all worried about John. Donny was scared and worried about John, who was his best friend. Donny felt terrible about what happened.

After John got home from the hospital, Donny came over to see him. Donny was very upset and remorseful. John and Donny were hanging on each other like two little girls, both crying. They kept saying, "You're still my friend. You're still my friend." We knew that Donny felt bad about what happened, and we thought joking about the accident would help him understand that it was going to be okay. Adele's oldest son joked around, putting Donny up against the wall and frisking him, saying "You got a gun?" And we all laughed about it.

2 *EM*

FELL-00002431

The accident with the gun really was not Donny's fault. It easily could have been the other way around.

When John and Donny got to be friends, Adele and I went over to Donny's house to meet his parents. We thought it was important to get to know anyone who our son was going to spend time with. Donny's mother Debbie was a full blown alcoholic. So was Al. I was horrified by the way Debbie treated Donny and Teri. I remember her boyfriend Al calling Teri a "little bitch." We did not let John spend time at Donny's house, but Donny was always welcome at our house.

Around that time, I was fixing TVs, and when I went to Debbie and Al's house to fix their TV, there was plenty of beer in the house. Al and Debbie stayed in the house and seemed to drink a lot of the time. Whenever I saw them, they always had a beer in their hand.

Debbie did not cook dinner for the kids. Donny had to fend for himself. He always got the blame for anything that happened in that house.

Al died of a heroin overdose. They found him frozen to death in his truck in Kingston.

Donny's grandmother was hard on him too. The grandmother's boyfriend,

3 *EH*

FELL-00002432

Jack Rhodes, spent a lot of time at a neighborhood bar called Spernoga's, which was next to the grandmother's house.

I was not contacted by anyone representing Donny before his trial. I have been living in Kingston Edwardsville for the past 20 years. I would have been available and willing to talk with anyone regarding Donny's case. I would have been available and willing to come up to Vermont and testify. The first time I had contact with anyone from Fell's defense team was during his appeal.

I have had the opportunity to read and have read to me the foregoing 4 pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/28/2011

_Ernie Schuldaski_

Ernie Schuldaski

_Adele Hacek_

Witness

4

FELL-00002433

# EXHIBIT 254

JM

My name is Jon Migatulski, Sr. I was born in Wilkes-Barre, PA. I have lived in Luzerne County for most of my life. I work as a painter.

I met Donny Fell at Flood Elementary School when I was 5 or 6 years old. We were in the same grade until Donny was held back, and then I was one year ahead of him. We played football and baseball together and rode bikes. We played in the woods and chased squirrels.

When Donny and his family moved to Inkerman, I did not see him for a few years, but when he moved back to Wilkes-Barre, we became close friends again when were teenagers.

When we were teenagers, Donny and I hung out with a group of friends. Donny ate meals at my house often because there was rarely food at his home. He seemed ashamed to ask for food, but my mother was glad to feed him. My mother was close with many of my friends, but she seemed to have a special relationship with Donny.

We did not spend time at Donny's house. Donny said his parents were mean, and he did not talk about his family very often. Donny's aunt Jackie beat him regularly and was mean. His aunt Jackie tortured him and beat the crap out of him. He had black eyes and other injuries, including bruises on his arms and face, and that was just what was visible to me. Donny was ashamed of his bruises, so he

1 JM

FELL-00002434

pretended as if he had gotten into a fistfight with Gary or one of our other friends. Donny told me that his grandmother, Theresa, raised her hand to him too, when he was little.

Donny stayed at my mother's house for a while after he had dropped out of school. My mother passed away from cancer a few years ago. Donny acted like her nurse and helped her while she was sick. After her surgery and chemotherapy, Donny slept on the floor next to her bed in case she needed anything. He fixed dinner for her. He watched my little brother and my nieces and nephews. My mom trusted Donny around the kids. When my mother was sick, she became very disoriented and acted strangely. She seemed to be having a nervous breakdown, and I didn't know how to deal with her. Donny was patient with her. He didn't seem to mind that she acted out of her head a lot of the time. He tried to help her calm down.

A few of my other friends had troubled family situations, and my mom took them in sometimes as well. Donny, two of my other friends, and I all slept in my bedroom at REDACTED - FELL On Thursday nights, Donny and I sat in front of the television with our friends, watching wrestling.

Bobby Lee hung out with our crowd, but we were not close. I was friends with Bobby's brother Shane. I saw Bobby punch his father, who was a really large man, in the face in a convenience store parking lot over four dollars. We came to

2 JM

Bobby's aid and jumped his dad. A lot of my friends got beat up by their parents, so they weren't going to stand by and watch it happen to Bobby.

When we were teenagers, about half of our friends used heroin, and several died of heroin overdoses. Donny did not use cocaine, crack, or heroin in my presence. We drank and smoked weed. I saw him drop acid from time to time, and he popped pills, including Vicadin or Valium. One of our friends was an acid dealer, and he would give it to us. We did whatever pills that we could get our hands on.

Donny's lawyers did not contact me prior to his trial. I did not hear from anyone involved in Donny's case until after he was on death row. I was available and would have been willing to testify at Donny's trial.

I have had the opportunity to read and have read to me the foregoing ___ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/1/11

Jon Migatulski

Witness

3

# EXHIBIT 255

My name is Steve Ratte. I have been a Deacon with the Catholic church for 28 years. I live in Fairfax, Vermont with my wife. We have six children.

I ministered to prisoners at St. Albans prison from about 1980 to 2006. During this time, I performed services for inmates and also met with individual inmates one on one. Initially, I only performed services for state inmates, but I learned through the guards that a federal prisoner, Donny Fell, was requesting that services also be performed for the federal inmates in what was known as Echo Unit. When I learned of this request, I began performing weekly services for the federal inmates. I also began meeting with Donny on a weekly basis for one-on-one meetings, and I baptized him. I met with Donny regularly for several years before his trial began, and I still keep in touch with him often.

Donny took his involvement with religious services very seriously. I gave him the job of setting up for the services, and he seemed to enjoy fulfilling that responsibility each week. Donny also enjoyed performing readings during these services, and he encouraged other prisoners to attend. Several of the inmates did not speak English well, and Donny tried to explain the church services to them. It was obvious that the other inmates appreciated Donny's assistance.

When I first met Donny, he was in his early 20s, just a few years younger than my own children, so I viewed him as a kid. In our one on one conversations, Donny asked me about my family and took an interest in the events in my life. We also

1

FELL-00002437

discussed the scriptures. Donny cared for other inmates, and how they were being treated.

Donny and I mostly talked about "the now" and the events in his life as they were occurring. I like to let the inmates I visit talk to me about whatever they choose, so I never pushed Donny to talk about the crimes with me . Donny also did not spend a lot of time talking about his childhood. One thing that struck me was that Donny never made any excuses about his crimes. He never blamed drugs or alcohol or other problems in his past, as some prisoners do. He did not want pity. He just wanted someone to care about him. It took a while for Donny to trust me, and for him to learn that I was not going to abandon him because of his crime, but eventually, he started to trust me and opened up.

Shortly before Donny's trial, he told me that he did want me to attend the trial but cautioned me that I would hear some bad things that he had done in his past. I told Donny that nothing I would hear about the past would change how I saw him now. I attended as much of the trial as I could.

Donny seemed sincere about exploring his faith during services and in his meetings with me. Donny told me about his interest in learning about other religions during our meetings. I did not see anything inconsistent between his interest in other religions and our meetings together. Donny is a very intellectually curious person, who wanted to be involved in a lot of the limited activities the

2

FELL-00002438

prison offered, including exploring other religions and thinking critically about them.

On the night Donny was sentenced to death, I went to visit him. We were in a holding cell together, and I became very emotional about the sentence. Donny was more composed, and he tried to console me. He was very concerned about maintaining control and not letting his emotions show. This is something that he developed over time to protect himself.

Although I attended Donny's trial, his attorneys never met with me to learn what I knew about Donny, and they never asked me to testify. It would have been very difficult emotionally for me to testify at the trial because I had grown very fond of Donny, but I would have testified for him if they had asked me.

3

FELL-00002439

I have had the opportunity to read and have read to me the foregoing ___ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2 - 2 4 - 2011

_____
Stephen Ratte

_____
Witness

4

FELL-00002440

# EXHIBIT 256

*My name is Marc Pelkey, and I am* ___32___ *years old. I started working as a correctional officer at Northwest State Correctional Facility in St. Albans, Vermont when I was 20. I am currently working as a Community Correction Officer at FSU in St. Albans.*

*I worked at the Northwest State Correctional Facility from 2001 to* ___2006___, *so I was there nearly the entire time Donald Fell was incarcerated there.*

*For most of that time Fell was housed in Echo Unit which is where all of the federal detainees were housed. A lot of the federal detainees had gang ties from New York City. A lot of the guys were running drugs from New York City, Massachusetts and Connecticut. They had connections with the Latin Kings and other gangs, so we tried to keep them separated from the rest of the population. It seemed like Fell's attitude changed when he was moved to Echo unit, like he might be trying to impress the new crowd.*

*I was working at the facility at the time Bobby Lee died, but I was not on shift. I think Fell was going through a lot after his friend died.*

*Fell was pretty quiet when he first got here. It seemed that he started to act out more when his case started evolving and when he started having court proceedings. Some inmates tend to freak out at trial time.*

1

FELL-00002441

When the crime occurred, from my understanding, they were deep into drugs and alcohol, and a lot of those drugs can make or let you do a lot of things, and not even realize it.

Fell was involved in two incidents during the years that I worked at St. Albans. One incident started outside in the bullpen after he refused to put down a coffee cup and we took him to Delta unit. In the cell we crossed his legs over each other on the ground and I kneeled on them so we could get leg shackles on him. There was some yelling and Fell spit at me. At that point the other correctional officers pulled me out of the cell.

I was investigated for excessive force after that incident that started in the bullpen. The state talked to all of the staff and reviewed the videotape of the incident. I was not in the wrong in that incident. One time an inmate spit on me and I punched him in the face and another time I threw an inmate to the floor. I had to go to anger management classes after these events. I was also suspended once for using too much force with my shield against an inmate's face during an extraction. I've been questioned by Prisoners' Rights over a bunch of stuff, but everyone gets questioned at some point or another. I wasn't formally disciplined for the incident with Fell, but I was ordered by the Chief of Security not to have any more contact with him.

2

FELL-00002442

*The other incident was during a cell extraction. We practice cell extractions, but they can be very chaotic and people often get hurt. Fell kicked Adam Barcomb during the cell extraction, but I do not think that Fell had anything personal against Adam.*

*Other than the incidents with the coffee cup and the cell extraction I am not aware of other things like this involving Fell.*

*Working there can be a pretty brutal environment. I was drinking way too much. I know a lot of them that do who work there. I know I drank way too much when I'd get off work, just to get it out of my mind.*

*I was called by the prosecution to Fell's trial, but I never testified. I went to court four or five times and sat in the hallway.*



3

FELL-00002443

I have had the opportunity to read and have read to me the foregoing _3 (M)_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _3/9/11_

_____    Marc Pelkey

_____    Witness

FELL-00002444

# EXHIBIT 257

and whether you do so fairly and impartially, and I guess, I am going to ask you for a very thoughtful, reflective response.

In light of your views, in light of your willingness to except the directives of the Court, more than that, just not following the Court's instructions, just the fundamental question about whether you can be fair to both sides, that's what I need to know. And so, do you think that, based upon your views, you might lean unfairly in one favor toward one side or the other? Or do you feel that you could put aside any views or you don't have any views which would prejudice you in any way and that you could be very impartial in your decision about whether the death penalty is appropriate or whether life imprisonment is appropriate?

And that's -- I am asking for quite an honest, reflective response.

JUROR NO. 64: I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes.

THE COURT: Okay. Any follow-up questions? Do you want to ask any follow-ups questions?

MR. KELLY: No, Judge.

MR. PRIMOMO: No, your Honor.

FELL-00002445

# EXHIBIT 258

**DELAWARE HEALTH
AND SOCIAL SERVICES**

OFFICE OF CHIEF MEDICAL EXAMINER
FORENSIC SCIENCES CENTER

RICHARD T. CALLERY, M.D., F.C.A.P.
CHIEF MEDICAL EXAMINER
DIRECTOR, FORENSIC SCIENCES LABORATORY

Richard T. Callery, M.D., F.C.A.P. declares the following to be true to the best of my knowledge:

1. Since 1994 I have been the Chief Medical Examiner for the State of Delaware and the Director of the Delaware's Forensic Sciences Laboratory.
2. I keep records of all cases on which I consult and my records date back to include 2003. My records reflect no consultation on Donald Fell's case. I have no record that I was ever asked to, and did not review any materials relating to the death of Teresca King, Debra Fell or Charles Conway.
3. Dr. Michael Sikirica and I are colleagues and I have consulted with him on cases. Occasionally, he refers cases to me. I do not remember receiving a referral from Dr. Sikirca about the Fell case, or otherwise discussing the case with Dr. Sikirica.
4. I also know Dr. Michael Baden. He is a colleague and we have taught together at conferences. I do not recall discussing the Fell case with him or reviewing any reports from him relating to the case.

I have had the opportunity to read the foregoing page. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the foregoing is true and correct the best of my knowledge.

Date: 3-7-11

Richard T. Callery, M.D., F.C.A.P.

FELL-00002446

# EXHIBIT 259

# INTENTIONALLY LEFT BLANK

FELL-00002447 - FELL-00002448

# EXHIBIT 260

## DECLARATION OF MARK J. MILLS, J.D., M.D.

Pursuant to 28 U.S.C. § 1746, Mark J. Mills hereby declares as follows:

1.      I am a licensed physician, with board certifications in psychiatry and forensic psychiatry, and am a Professor of Clinical Psychiatry at Columbia University's College of Physicians and Surgeons.

2.      I have served as the Commissioner of the Department of Mental Health for the Commonwealth of Massachusetts, as the Director of the Program in Psychiatry and Law at UCLA, and as Chief of Psychiatric Evaluation Unit at the Palo Alto Veterans Administration Center. I have performed over 5,000 clinical examinations, and have been qualified as a psychiatric expert in over one hundred federal proceedings. My curriculum vitae, attached hereto as Exhibit A, lists among other things, numerous academic and hospital appointments, Board Certifications, professional society memberships, publications, and presentations. My practice is primarily forensic as opposed to treating patients clinically. I am not currently treating patients on a regular basis, and I have not done so since 1987.

3.      I was retained in February 2001 by Alex Bunin, Esq. to conduct a forensic psychiatric evaluation of the defendant in the above-captioned action, Donald Fell. Mr. Fell's counsel provided me with certain records it had obtained as of the Spring 2001, which are listed in footnote 1 of my report. Generally, they included medical, social service, police and school records for Mr. Fell and draft observations regarding Mr. Fell's father and a few other family members prepared by the mitigation specialist on Mr. Fell's defense team. At the time I was asked to perform my evaluation, Mr. Fell's counsel had not completed a full social history of Mr. Fell and did not provide me a complete social history of Mr. Fell.

FELL-00002449

4.      I completed my evaluation on March 26 and 27, 2001 and documented my findings in a report dated May 7, 2001.

5.      As I said in my report, "It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated."

6.      I was not asked to reexamine Mr. Fell after submitting my report in May 2001 or to revise or update my report in light of additional evidence collected by the trial team after that date. Nor was I asked whether the additional information could lead to different or other opinions. Aside from being sent the Government's expert reports, I was not shown additional documents or given additional information after May 2001. My work after May 2001 was limited to trial preparation.

7.      Generally speaking, I had less communication with Mr. Fell's defense counsel than with counsel that I have worked with on other cases. It was often difficult to get in touch with Mr. Fell's counsel, and they often failed to return my phone calls. I had very limited contact with defense counsel after submitting my report.

8.      I traveled to Vermont to testify on Friday, July 1, 2005. Counsel and I planned to meet on the morning I was scheduled to testify to prepare, but my flight was delayed and I did not arrive in Vermont as scheduled. Before we had a chance to prepare, counsel decided to pull my testimony for that day. My understanding is that due to scheduling difficulties, trial counsel considered putting me on for surrebuttal, if at all, the day after I returned from Paris. Had I been prepared to testify at trial, I would have offered the opinions set forth in my report of May 2001.

9.      I now understand that during the trial, the defense stipulated that: "(1) [Mr. Fell] had no cognitive or neurological defects; (2) his intellect and cognitive functions were intact; (3)

2

FELL-00002450

and he did not suffer from any mental disease or defect." I do not agree with this statement, and it is not supported by the expert report I submitted in this case, which concluded that Mr. Fell is an alcoholic with incipient psychosis or pre-psychotic breakdown. Defense counsel did not seek my advice on whether to stipulate to these facts.

I declare under penalty of perjury that the foregoing 3 page declaration is true and correct.

Date: _Mun·h 15, 2011_

_Mark J. Mills_

Mark J. Mills, J.D., M.D.

3

FELL-00002451

# EXHIBIT 261

# INTENTIONALLY LEFT BLANK

FELL-00002452 - FELL-00002454

# EXHIBIT 262

## DECLARATION OF ANDREW BARTNICK

Pursuant to 28 U.S.C. § 1746, Andrew Bartnick hereby declares as follows:

1. I am an investigator and have worked in the Office of the Federal Public Defender in Burlington, Vermont since September 1999. At the time of Donald Fell's trial, I had worked as an investigator for 13 years, 4 of which were spent working on his capital defense.

2. From the time Donny was arrested through his trial, the District of Vermont and the Northern District of New York were part of the same Federal Defender Office. I therefore reported to Alex Bunin, who was the Federal Defender for the office, although he was located in Albany and I was located in Burlington.

3. My primary responsibility on Donny's case was maintaining client contact, and I visited Donny frequently. My visits with Donny were very informal.

4. I did not do any forensic investigation into the crime scenes in Vermont or New York and to my knowledge no members of the team did.

5. We did not have regular team conference calls or team meetings. Since Alex and Gene were in Albany, and I was in Vermont, I often learned about things that were happening with Donny's case after the fact.

6. I was the member of the team who knew Donny best, but trial counsel did not ask me to have contact with any of the witnesses from Donny's hometown of Wilkes-Barre, Pennsylvania. Aside from the interviews I conducted to develop evidence of Donny's good adjustment to life in prison and investigation of the prison incidents, I was not involved in interviewing or preparing lay mitigation witnesses to testify or reviewing documents in connection with the mitigation investigation. I was not involved in the

1

FELL-00002455

decisions regarding which of the available lay witnesses would testify at trial. Trial counsel also did not give me any input into which mental health experts would evaluate Donny or would testify. I was not informed about the decision to pull the mental health case until after it was made.

7.      I was very frustrated that Alex and Gene did not visit Donny very often. At one point, over a year went by when they had no contact with Donny. In 2004, over three years into Donny's case, Donny even asked me which one was Alex and which one was Gene.

8.      I was the one on the team who delivered the government's notice of intent to seek the death penalty against Donny. In March 2004, I was the one who told him when the Second Circuit reversed the decision to declare the death penalty unconstitutional and he would have to proceed to trial and face a potential death sentence. Donny was more upset than I had ever seen him when the Second Circuit reversed the court's decision after a year and half, and I told him he would be facing a death penalty trial.

9.      I understand that, not long after I told Donny about the Second Circuit decision, he was involved in an incident where he used foul language against one of the guards. This incident was videotaped and presented at trial.

10.      I worked with Paul Volk to interview prison guards to try to establish that Donny had adjusted well to prison. We interviewed guards who I came to know had favorable things to say about Donny through my interactions with them during my prison visits. I was not asked to look into the disciplinary history of any of the officers as part of

2

FELL-00002456

the investigation, and as a result, I did not do so. I was not aware, and no one told me, that at least one of the guards had a disciplinary history.

11.    I was at the prison when the government's mental health expert, Dr. Wetzel, examined Donny in June 2005. I waited outside with Bill Darrow, the prosecutor on Donny's case, during the interview. At the end of the interview, Darrow took the videotapes of the interview and left with them.

I declare under penalty of perjury that the foregoing 3 page declaration is true and correct.

Dated: 3·16·11

Andrew Bartnick

3

FELL-00002457

# EXHIBIT 263

Pursuant to 28 U.S.C. § 1746, Gene Primomo hereby declares as follows:

1. I joined the Federal Defenders Office in Albany in August 1999, and have been working there for almost 12 years. Prior to that, I was an Assistant U.S. Attorney in the Eastern District of Oklahoma and was in private practice until 1999. My previous capital experience was in the Ray Molina case in 1993. I was appointed to represent Ray Molina by the federal district court in the Eastern District of Oklahoma. Mr. Molina was facing a potential death sentence, and was one of the first cases filed under the Federal Death Penalty Act. Four defendants went to trial, three facing death, including Molina. Molina got a life sentence.

2. Mr. Bunin served as lead counsel on Mr. Fell's case, and I was his co-counsel. Mr. Bunin was responsible for the guilt phase, for all of the briefing in the case, and for choosing and communicating with most of our experts. I informally assumed responsibility for the mitigation investigation. Paul Volk was given a role on the case with regard to the development of positive prisoner evidence with witnesses in Vermont and voir dire. He also helped prepare trial witnesses. No one on the case was specifically focused on what the Government would present in aggravation.

3. I was the primary contact with our mitigation specialist, Cynthia Ayres. I considered Ayres self-directed. To my knowledge, Cynthia Ayres was not assigned to help identify whether Mr. Fell had any mental health disorders.

4. The early investigation in the case, up through when the government rejected the plea agreement in January 2002, was done with the expectation that it was likely that the case would resolve with a plea to life without parole.

5. I did not prepare for trial from September 2002, when the death penalty was declared unconstitutional, until November 2004, after the Supreme Court denied Mr. Fell's petition for a writ of certiorari to the Second Circuit with respect to the Second Circuit's reversal of Judge Sessions' order ruling the federal death penalty unconstitutional. Nor to my knowledge did anyone else on the defense team.

6. Mr. Bunin was generally the first contact with all expert witnesses. To my knowledge, he did not consult with Cynthia Ayres about choosing who the mental health experts would be in our case.

7. Andy Bartnick was our fact investigator. He was located in the Burlington office. He was the person on the team who had the most responsibility for client contact with Mr. Fell. Except for when he helped Mr. Volk interview positive prisoner adjustment witnesses, he was not involved in helping to build our mitigation presentation for trial.

8. To my knowledge, we did not interview the family of the boy who Donald Fell accidentally shot when he was a child.

9. To my knowledge, we did not do any investigation into the Woodstock, New York incident where Donald Fell got into a fight with Chris Eike.

FELL-00002458

10. To my knowledge, we did not interview Sean Campbell or the Cupano family.

11. To my knowledge, we never specifically requested discovery about Mr. Fell's co-defendant, Robert Lee.

12. I was responsible for preparing for Dr. Mark Cunningham's testimony. Our first meeting with Dr. Cunningham was in January 2005. He interviewed Mr. Fell and was going to testify about historical factors in Mr. Fell's upbringing and how they impacted his decision-making. He came to Vermont for trial and I was prepared to present his testimony. But for our concern that Dr. Welner would testify, we would have called Dr. Cunningham as an expert for Mr. Fell.

13. After we received Dr. Welner's report on July 5, we made a motion to exclude his testimony on a number of grounds including that the government had engaged in misconduct, that the Court's order had been violated, and that Dr. Welner's testimony would be unreliable. I believed, and still believe, that the motion was meritorious. We made the decision to withdraw our mental health case and the testimony of our experts because we assumed that, notwithstanding the legal merit of our motion, the Court would reject it and would not permit us to have it heard before we had to decide whether to put on a mental health case. We did not make that assessment based on any actual ruling from the Court on our motion. We did not consider asking the Court for a continuance or to advance the date for the hearing on the motion.

14. I would have wanted to know if a juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly. I also would have wanted to know if jurors had been exposed to pretrial publicity about Bobby Lee's death, since this was prejudicial information I wanted excluded from the trial. I would have challenged any jurors with these experiences for cause.

I declare under penalty of perjury that the foregoing two page declaration is true and correct.

Date: _5/16/2011_

_____
Gene Primomo

2

FELL-00002459

# EXHIBIT 264

Pursuant to 28 U.S.C. § 1746, Alexander Bunin hereby declares as follows:

1. I am currently the Public Defender for Harris County, Texas. I began my career as a criminal defense lawyer in Texas, where I was in private practice and then became an Assistant Federal Defender. I established the Federal Defender office in the Southern District of Alabama, and I was appointed in 1999 to establish the Northern District of New York and Vermont. The District of Vermont opened its own Federal Defender Office in 2006, but I remained the Federal Defender for the Northern District of New York. I left the Federal Defender office in 2010, to become the Public Defender for Harris County.

2. I was the Federal Public Defender for the District of Vermont when Donald Fell and Robert Lee were arrested. Bobby Lee's family retained a private lawyer for him. As the Federal Defender, I recommended that my office be appointed to represent Donald Fell.

3. In December 2000, I recommended that John Pacht and Brad Stetler be appointed to represent Bobby Lee and replace Bobby's private lawyer.

4. Although I had some capital appellate and habeas experience during the early 1990s in Texas, this was my first capital trial.

5. I served as lead counsel, and my colleague Gene Primomo was co-counsel. Gene and I divided most of the responsibilities between us. Gene was primarily responsible for preparing the mitigation case. I was primarily responsible for the guilt phase preparations and for all of the briefing associated with the case, but I oversaw all aspects of the case. Paul Volk, whom Judge Sessions appointed as co-counsel in 2002, assisted with the voir dire, the investigation into positive prisoner evidence, the preparation of witness examinations during trial, and certain direct and cross examinations.

6. I retained Cynthia Ayres as a mitigation specialist in January 2001, shortly after Mr. Fell's arrest in 2000. I tasked Ms. Ayres to perform a preliminary mitigation investigation into Mr. Fell's life. Ms. Ayres was not involved in choosing mental health experts, but we discussed their reports.

7. The remaining members of our trial team were Andy Bartnik, who was my investigator in Burlington, and Wanda Rivera, who was an investigator in the Albany office. Andy was tasked with client management, and conducted some of the investigation of the positive prisoner evidence. Wanda was responsible for the administrative component of the mitigation investigation, i.e., retrieving records and following up with various agencies about documents.

8. Our initial strategy was to try to obtain a plea agreement to a sentence of life imprisonment without possibility of release. Based on Mr. Fell's statements at the time of his arrest and those of his co-defendant Robert Lee, I determined that it would be difficult for Mr. Fell to successfully contest guilt. I also determined that, given the potential for the death penalty in the case, a plea to life imprisonment was a reasonable resolution and an appropriate one. Mr. Fell was willing to agree to plead guilty in

FELL-00002460

exchange for a sentence to life imprisonment without possibility of release and I indicated that to the United States Attorneys Office.

9. From shortly after Mr. Fell's arrest, I believed that the U.S. Attorney's Office would be receptive to a plea to life imprisonment without parole instead of the death penalty. That understanding was based upon my belief that Mr. Fell's mitigation case was strong and upon the actions and statements of the United States Attorneys Office, which suggested to me that their Office would be receptive to a guilty plea to life imprisonment. I did not have any formal assurances that their Office would agree to a plea until October 2001.

10. Based upon my belief that a guilty plea to life imprisonment was an appropriate resolution and one that would be accepted by the United States Attorneys Office, I focused my attention on preparing a plea package for the U.S. Attorneys Office that I believed it would find helpful in justifying a decision not to seek the death sentence.

11. For this reason, in the time period from December 2000 to February 2001, I hired three mental health experts to prepare reports on Mr. Fell. I made the initial contacts and worked with these experts in developing their reports. At the time we retained these three experts, I believed that the United States Attorneys Office would accept a guilty plea to life imprisonment without possibility of release and I did not believe that the United States Attorneys Office would seek the death penalty or that the case would go to trial. At the time these experts were hired and by the time they rendered their reports, we had not completed a social history of Mr. Fell. I did not believe that we had the time to complete such a social history before Mr. Fell's guilty plea was accepted nor (based on my conversations with the U.S. Attorneys Office) did I believe it was necessary to complete such a history for Mr. Fell's guilty plea to be accepted.

12. I retained Dr. Jonathan Lipman, a neuropharmacologist, in December 2000. Among other things, Dr. Lipman took a hair sample from Mr. Fell to determine his historic drug use. I do not recall ever receiving results from the testing of his hair. We did not ask Dr. Lipman to analyze the historic drug use of Debra Fell and Charles Conway. We also did not ask Dr. Lipman to consider whether there was a diminished capacity defense for the guilt phase.

13. I also hired Dr. Mark J. Mills and Dr. Wilfred Van Gorp to evaluate Mr. Fell and issue reports. Dr. Mills evaluated Mr. Fell on March 26-27, 2001, and Dr. Van Gorp evaluated Mr. Fell on April 6, 2001. I made the decision to hire Dr. Van Gorp based upon the recommendation by Dr. Mills.

14. On May 18, 2001, I submitted a letter to the United States Attorney's Office advocating that that Office should accept a plea to a sentence of life imprisonment without possibility of release. The letter enclosed mental health reports from Drs. Lipman, Mills and Van Gorp and a summary of the mitigation evidence we had developed in the case because we continued to believe based on our conversations with the prosecutors that we would be successful in negotiating the plea agreement and that no trial would be necessary. We did not put any restrictions on the use of the information by the Government, except for the limitations under Federal Rule of Criminal Procedure 11(e) (6) and Federal Rule of

2

FELL-00002461

Evidence 410.   I would not have submitted the letter if I had not believed that the United States Attorneys Office would accept a plea to a sentence of life imprisonment without possibility of release.

15. On May 25, 2001, I met with David Kirby, Esq., Greg Waples, Esq. and John Tavana, Esq. and discussed the possibility of a plea agreement.  Messrs. Kirby, Waples and Tavana were Assistant United States Attorneys in the Office of the United States Attorney and David Kirby was acting U.S. Attorney for the District of Vermont. Although I do not recall now exactly what was said at the meeting, I left the meeting with the understanding that the United States Attorneys Office would be receptive to a guilty plea to life imprisonment without possibility of release.  When we left the meeting, I got the impression that Mr. Kirby, Mr. Waples and Mr. Tavana were all in agreement that a plea agreement to life without parole was appropriate, and they only needed to get approval from the incoming U.S. Attorney Peter Hall in order to finalize the agreement.

16. After the May 25, 2001 meeting, the plea negotiation process was stalled because Mr. Fell's co-defendant, Robert Lee, was resisting entering into a plea agreement.  It was not until after Bobby Lee's death in September 2001 that we were able to reach a plea agreement.  It was my understanding that the U.S. Attorney's Office would not enter into a plea agreement unless both Mr. Fell and Mr. Lee agreed to plead guilty.

17. In October 2001, we reached an agreement with the United States Attorneys Office for Mr. Fell to plead guilty in exchange for a sentence of life imprisonment without possibility of release.  Although the agreement was dependent upon approval by the Department of Justice based upon changes in the death penalty protocol on June 1, 2001, I believed that the Justice Department would support the decision of the United States Attorney.  Specifically, I recall the United States Attorney Peter Hall assuring me that he would argue forcefully that the Justice Department should accept his Office's decision to accept the guilty plea to life imprisonment without possibility of release, that he believed that he would convince the Department of Justice to accept the guilty plea, and that I therefore did not need to meet in person with the Justice Department to plead Mr. Fell's case.

18. As a result, when the Justice Department officials involved in making the decision as to whether to accept the plea invited us to meet with them, we attended by teleconference. The teleconference was in November 2001.  Even after the teleconference, I believed that the Justice Department would accept the guilty plea, that the United States Attorneys Office would not seek the death penalty and that Mr. Fell would not be proceeding to trial.  I acted accordingly.

19. In January 2002, the Department of Justice under Attorney General John Aschroft rejected the plea agreement.  The Government issued a Notice of Intent to Seek the Death Penalty on January 30, 2002.  I was surprised by the decision and believe that everyone representing Mr. Fell was surprised by the decision.

3

FELL-00002462

20. While the plea agreement was pending, I believed and understood that the United States Attorneys Office fully supported the plea agreement, that the plea agreement would be accepted by the Department of Justice, and that the case would never go to trial.

21. In early 2002, within weeks after I received the Notice of Intent to Seek the Death Penalty, Greg Waples approached me and suggested that we reach an agreement whereby Mr. Fell would plead guilty pursuant to an understanding that the penalty phase would be tried before the Court by Judge Sessions. I agreed to the proposal on behalf of Mr. Fell because I believed, based on the investigation that had been done in early 2001, that the mitigation case was strong and that Judge Sessions would follow the facts and the law and impose a sentence of life imprisonment without possibility of release. I did not believe that the case would go to trial before a jury.

22. In March 2002, I was informed by the United States Attorneys Office that Attorney General Ashcroft himself would be making the decision whether to allow us to enter into an arrangement whereby the penalty phase would be tried before the Court rather than in front of the Jury. I continued to believe that the Department of Justice would accept the arrangement until it was rejected on May 9, 2002. During this time period, I did not prepare for a trial because I did not believe that the case would be going to trial in front of a jury.

23. On May 14, 2002, after the agreement was rejected, I filed a motion to dismiss the Notice of Intent to Seek the Death Penalty based upon the fact that the government admitted in the October 24, 2001 plea agreement that Mr. Fell did not deserve the death penalty because of the mitigating factors in our case. On May 28, 2002, I also filed a motion seeking to declare the death penalty unconstitutional. On June 11, 2002, the Court held a hearing on our motion to dismiss the Notice of Intent to Seek the Death Penalty. Based on the hearing, my understanding was that the Court was very interested in issues surrounding the constitutionality of the death penalty in light of legal developments in the federal courts, including Judge Rakoff's preliminary decision declaring the death penalty unconstitutional and that the Court wanted to spend the summer researching and considering the constitutional issues. I was therefore under the impression that no trial would be imminent.

24. After June 2002, I devoted all of my attention to preparing the briefs and the arguments for why the federal death penalty statute was unconstitutional. On September 24, 2002, the Court declared the federal death penalty statute to be unconstitutional.

25. I understood that even if this Court declared the federal death penalty statute to be unconstitutional, the United States Attorneys Office might appeal that decision. Accordingly, during the briefing on the motion to declare the federal death penalty statute unconstitutional, Mr. Waples and I continued to have discussions about the possibility of a potential plea agreement. The Department of Justice protocol provided that "if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances." Mr. Waples proposed that we make a submission to the Justice Department arguing that there were changed circumstances in the case and suggested

4

FELL-00002463

that, if we made Mr. Fell available to government experts for examination and those government experts believed that there were mitigating factors in Mr. Fell's life and background, that would strengthen Mr. Fell's argument that a guilty plea to life imprisonment without possibility of release should be accepted. Mr. Waples led me to believe that the United States Attorneys Office would be supportive of our proposal to have Mr. Fell agree to a guilty plea to life imprisonment without possibility of release, just as the United States Attorneys Office was supportive of that guilty plea agreement in 2001.

26. I agreed to that proposal based on those assurances and my own independent research into the Government's proposed experts, Dr. Richard Wetzel and Dr. John Rabun, which indicated that those doctors were fair-minded individuals who would take an open-minded view of the evidence. I believed that the combination of a decision striking down the federal death penalty with reports finding mitigating factors would lead the Justice Department to reconsider its decision and to accept a guilty plea to life imprisonment.

27. Dr. Richard Wetzel examined Mr. Fell on September 18-19, 2002. Dr. John Rabun examined Donald Fell on December 12, 2002. We restricted the Government mental health experts from discussing the crimes with Mr. Fell, but we did not otherwise place limitations on the testing because we thought we might be able to get a plea agreement and there would be no trial. We did not see any downside to allowing the evaluations since we trusted the prosecutors. If we had known that Greg Waples would not be the prosecutor on the case, we would not have allowed the evaluations.

28. Dr. Wetzel delivered his report on October 11, 2002. Dr. Rabun delivered his report on December 31, 2002. Both Drs. Wetzel and Rabun confirmed the existence of significant mitigation in Mr. Fell's background. We submitted these reports to the Attorney General in conjunction with our request for reconsideration in February 2005.

29. After the Court declared the federal death penalty statute unconstitutional, I worked on the Government's appeal to the Second Circuit. The Second Circuit reversed this Court's decision on March 2, 2004. On March 15, 2004, on behalf of Mr. Fell, I moved for reconsideration or rehearing en banc. That motion was rejected. On October 18, 2004, the Supreme Court denied Mr. Fell's petition for a writ of certiorari. On November 5, 2004, the case was remanded to the District of Vermont for trial.

30. I did not prepare for trial during this time period because I was hopeful that this Court's decision would be sustained. Furthermore, I did not believe that the Government would argue aggressively for the death penalty. Mr. Greg Waples was the Assistant United States Attorney in charge of the case and I did not think he would aggressively pursue the death penalty. Furthermore, based upon my previous communications with Greg Waples and the favorable mental health evaluation we received from the government's mental health experts, Dr. Wetzel and Dr. Rabun, I also had a false sense of assurance that Mr. Fell's mental health would not be a heavily contested issue at trial.

5

FELL-00002464

31. After the case was remanded to the District of Vermont in November 2004, Mr. Greg Waples withdrew as the lead prosecutor in the case, and I learned that Stephen Kelly and William Darrow would be trying the case.

32. Even after Stephen Kelly replaced Greg Waples, I pursued potential plea negotiations with David Kirby. On February 22, 2005, after John Ashcroft left the Bush administration and Alberto Gonzalez became Attorney General, I sent a letter to Mr. Kirby asking him to reconsider the decision to seek the death penalty based upon changed circumstances, including: 1) the fact that the Government's mental health experts found substantial mitigating evidence; 2) Donald Fell's positive adjustment to life in prison; and 3) changes in the law that would prevent the use of Bobby Lee's statements against Donald Fell. The government did not inform us until just before jury selection that they would not reconsider a plea agreement based upon changed circumstances. Mr. Kirby informed me that he spoke personally with Attorney General Gonzalez, who would not reconsider.

33. On December 1, 2004, on behalf of Mr. Fell, we filed a Rule 12.2 notice that we would be presenting mental health evidence. In 2002, I had initially contacted Dr. Mark Cunningham. Dr. Cunningham did not begin work in 2002 because Judge Sessions declared the death penalty unconstitutional. Prior to filing the motion, I did not talk to Dr. Cunningham, Dr. Mills or to any of the other doctors who had done examinations of Mr. Fell in the winter and spring of 2001. I did not consider whether we should hire additional or different experts. I did not ask any of our experts to update the reports they had prepared in the spring of 2001.

34. When we began to prepare for trial, I asked Dr. Mills, who performed the examination in preparation for the plea agreement, to be our mental health expert at trial. I did not ask Dr. Mills to update his report or to conduct an additional examination of Mr. Fell based upon new information we had received since May 2001. I also never provided him with a complete social history. We had only limited discussions regarding his potential testimony before trial.

35. Dr. Cunningham did not begin work on Mr. Fell's case again until June 2005, a few weeks before trial. He was planning to testify about historical factors in Mr. Fell's upbringing and how they impacted his decision-making.

36. The only other expert that we retained was James Aiken. In April 2005 we sent him information pertaining to the case including Mr. Fell's prison records from his period of incarceration. Mr. Aiken also interviewed Mr. Fell and delivered a report dated June 15, 2005 opining that Mr. Fell could be housed, managed and secured in a maximum security facility for the remainder of his life without causing an unusual risk of harm to staff, other inmates, or the community.

37. Our mitigation specialist Cynthia Ayers did most of the on-the-ground investigation for our mitigation case, though she was not given any assignments from mid-2002 to 2005. Her work was self-directed. She decided what records to collect and what witnesses to interview, and she told us which witnesses we should meet.

6

FELL-00002465

38. We never requested, and we did not receive, discovery related to the Government's investigation into Bobby Lee's criminal history, personal history, or mental health from the Government. We also never requested records relating to the investigation into Bobby Lee's death, and we never asked our mental health experts to examine the relationship between Mr. Fell and Mr. Lee.

39. I understood from Mr. Fell's post-arrest statements that, as a child, he had shot an individual named John Gacek and that the Government might seek to offer evidence regarding that shooting. I did not investigate that shooting. I did not speak to Mr. Gacek or to his parents.

40. I also understood from Mr. Fell's post-arrest statements that, in the summer before his arrest in this case, Mr. Fell had gotten into a fight with an individual named Chris Eike and I believed, based on those statements and information I received from the Government, that Mr. Fell had beaten Mr. Eike into a coma. I never sought to find Mr. Eike or speak to him or caused anyone else to find him or to speak to him. I never sought the hospital records for Mr. Eike. Based on the statements elicited by the Government at trial and its arguments, I believed and assumed that Mr. Eike was in a coma and had suffered serious injury. I did not do any investigation to determine whether that claim was true.

41. I did not meet Mr. Fell's sister, Teri, until she came up to Vermont for trial.

42. We kept all discovery and 302s that we received from the Government and maintained them in the files of the Federal Defender in Albany.

43. We never interviewed Frances Bellantoni, the man who reported to the New York State Police that he witnessed an argument on the side of the road near the Dover crime scene. To the best of my recollection, while we did receive reports of statements taken by the New York State Police in December 2000, I did not receive a 302 of an interview of Mr. Bellantoni.

44. I was involved in selecting jurors for the case. We asked the jurors questions on the juror questionnaire and in follow up questioning about their receptivity to mental health evidence.

45. I would have wanted to know if a juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly. I also would have wanted to know if jurors had been exposed to pretrial publicity about Bobby Lee's death, since this was prejudicial information I wanted excluded from the trial. I would have challenged any jurors with these experiences for cause.

46. I knew that the mental health evidence was important to our case, but we withdrew the mitigating factor that Mr. Fell was under mental and emotional disturbance when the crimes were committed to avoid the testimony of Dr. Welner.

7

FELL-00002466

47. We did not put on Dr. Mills' testimony because we believed that there was a risk that, if we called Dr. Mills, the Government would call Dr. Welner and we believed that the Court had already indicated that it would receive the testimony of Dr. Welner.

48. We did not get the Welner report until the evening of July 5, midway through the penalty phase and right before Dr. Cunningham was scheduled to testify on July 7.

49. We knew prior to trial that Dr. Welner was visiting witnesses with an FBI agent because Mr. Fell's family members informed Cynthia Ayres that they had spoken with him. However, we had not received all of the 302s from Dr. Welner's investigation before receiving his report, and I do not believe we ever received all of the 302s.

50. When we received the Welner report, we knew that Dr. Welner provided Dr. Wetzel questions to ask during his examination of Mr. Fell, and we knew this violated the Court's order preventing Dr. Welner from examining Mr. Fell. We also knew that Dr. Welner performed psychological testing on Mr. Fell in violation of the Court's order. We knew that it was important for us to challenge his proposed testimony, so on July 6, we filed a motion in limine seeking to exclude Dr. Welner's testimony based upon (1) Dr. Welner's use of Dr. Wetzel as a proxy during the 12.2 examination; (2) Dr. Welner's unnoticed testing; (3) statements in the report taken by Dr. Welner with the assistance of law enforcement from individuals who would not be called as witnesses in violation of the Confrontation Clause; (4) allegations of unnoticed misconduct irrelevant to any aggravating factor; (5) the bad science on which the report was based; and (6) the unduly prejudicial nature of the report. The Court scheduled a hearing to consider our motion on July 11, 2005.

51. I thought there were many good reasons why Dr. Welner should have been prevented from testifying on Daubert grounds, but rather than waiting for a ruling from the Court on whether Dr. Welner's testimony would be excluded, I decided to pull the testimony of Dr. Cunningham. It was my belief that the Court required us to decide to put on the testimony of Dr. Cunningham before the Court would decide whether to allow testimony from Dr. Welner. In retrospect, I now realize that I never asked the Court for a ruling about Dr. Welner's testimony before making a decision about whether Dr. Cunningham would testify. At the time, I was also under the impression that the Court would not do anything to sanction the Government for violating the Court's order and that in order to prevent Dr. Welner from testifying we had no choice but to withdraw our 12.2 notice and pull the testimony of our mental health experts. The decision was a difficult one. We had promised the jury that it would hear from Drs. Cunningham and Mills.

52. I never sought a promise from the Government that they would not put on any testimony from Dr. Welner, and I never asked the Court whether it would prevent Dr. Welner from testifying if we pulled the mental health testimony and withdrew our Rule 12.2 Notice. I was surprised when the Government argued that it would still seek to present Dr. Welner as a rebuttal witness to our lay mitigation case. I never made a motion seeking to exclude Dr. Welner thereafter. The decision not to pursue a motion to exclude Dr. Welner was not a result of any research in the law.

8

53. The Court suggested that if the defense stipulated that it was not asserting a diminished capacity defense, the Government might decide not to ask Dr. Welner to testify. I suggested that stipulation to the Government but it refused. I agreed to the stipulation that the Government suggested only because the Government demanded it and I believed that we had no alternative if we were going to keep Dr. Welner off the stand.

54. I would not have agreed to withdraw Dr. Mills and Dr. Cunningham's testimony, nor would I have agreed to the stipulation but for the threat by the Government to call Dr. Welner.

I declare under penalty of perjury that the foregoing nine page declaration is true and correct.

Date: March 17, 2011

Alexander Bunin

9

FELL-00002468

# EXHIBIT 265

## DECLARATION OF CYNTHIA AYRES

Pursuant to 28 U.S.C. § 1746, Cynthia Carter Ayres hereby declares as follows:

1.      I am a mitigation specialist working for the Capital Defense Unit of the Office of the Chief Public Defender in Hartford, CT. I have been at my current job since the fall of 2005. Prior to that, I was in private practice as a mitigation specialist and clinical social worker. I began working as a social worker and mitigation specialist in 1994.

2.      I was retained by counsel for Donald Fell in January of 2001. I was living in Williamsburg, VA at the time. On or about late 2001, I moved to Richmond, VA. Mr. Fell's case was difficult for me because of all the travel involved. None of the investigation was within easy driving distance from my home. In addition, the defense team members and the client were geographically distant from me. The original attorneys, Alex Bunin and Gene Primomo, were based in Albany, NY. Later, in 2002, Paul Volk was added to the defense team. He was based in Burlington, VT. I did not meet Mr. Volk until trial began in 2005.

3.      In some instances, I base the dates and events set forth in this declaration upon my review of my time sheets and records.

4.      My work on the case progressed in three distinct periods of time: in the first half of 2001, two months in 2002, and the first half of 2005. From January to June 2001, I did some preliminary investigation for use in the process of trying to avoid the death penalty. During this time period, I did not complete the social history investigation, because I did not think the case was going to trial. I took a few overnight trips to Mr. Fell's hometown, and another trip to see 3 of his other relatives in South Carolina and Florida. During this period in 2001, I met with his sister, Teri Fell, once. According to my records, I billed a total of 85 hours during that time, plus 41 hours of travel.

FELL-00002469

5.     I did not work on the case between June 28, 2001 and April 30, 2002, at which time, trial counsel told me that they had a trial date coming up. I spent four hours catching up on the case and meeting with the attorneys on April 30, 2002. I informed counsel that I had a trial in Virginia that was starting up in early May, but said I would be available after that to prepare for trial in Mr. Fell's case. In early June 2002, I worked on Mr. Fell's case for a week. I was later informed by counsel that trial in Mr. Fell's case was postponed indefinitely, and that I did not need to do any work to prepare the case for trial. I booked a total of 17 hours during June 2002, plus 25 hours of travel time. I did not become active in the case again until January 10, 2005, when we had a team meeting to plan for the upcoming trial. I did not actually resume my work on the case until March 29, 2005.

6.     In late 2004 as well as January and February of 2005, I was working primarily on Daryl Atkins's case. On February 7, 2005, the *Atkins* case was scheduled for a hearing where a jury would determine whether or not Mr. Atkins was mentally retarded. My role as mitigation specialist in Mr. Atkins' case was critical to the preparation required for this mental retardation hearing. The *Atkins* attorneys expected a lot of work from me in 2004 and 2005, leading up to the hearing date.

7.     I told Mr. Fell's counsel that I would be unavailable while preparing for the *Atkins* hearing in January and February, 2005. I told them that I could not travel to do investigation in Wilkes-Barre or elsewhere on Mr. Fell's case during that time period. The Atkins mental retardation hearing date of February 7, 2005 was postponed at the last minute, during a hearing only three days prior, on February 4, 2005. On February 17, 2005, the new hearing date of July 25, 2005 was scheduled for Mr. Atkins' mental retardation hearing.

8.     I continued working on Mr. Atkins' case through February and much of March,

2

FELL-00002470

then returned to working on Mr. Fell's case on March 29, 2005. Between March and July 2005, I was scrambling to prepare for both Mr. Fell's trial and Mr. Atkins' mental retardation hearing.

9.      In 2005, during the five weeks leading up to jury selection, I billed for 55 hours of work on Mr. Fell's case (not including travel time). This was not enough time to conduct a complete social history investigation in order to prepare a comprehensive mitigation presentation. Even counting from the time of my original hire, I did not spend a lot of time with any one witness, even those who were very important. For example, Teri Fell, who is Mr. Fell's sister and his closest witness, was interviewed for a total of seven hours, over three visits in four years.

10.     Nor did I spend much time with Mr. Fell himself. I traveled to see him three times during my five years working on the case prior to trial. Due to my lack of contact with Mr. Fell, I was unable to screen him for signs and symptoms of mental illness. I did not ask him about many areas of his life, particularly sensitive areas like his sexual history. My conversations with Mr. Fell on critical areas of the case—such as his relationship with his co-defendant and Mr. Fell's actions during crime itself—were superficial at best, due to the limited time I spent meeting with him.

11.     Although I often am in charge of records collection, I was told that Wanda Rivera from the Federal Defender's Office would do that here and I assumed she was collecting the relevant documents. I was not supervising Ms. Rivera's work; I understood that Mr. Bunin and Mr. Primomo were, and I did not generally follow up on her work. In 2005, I learned for the first time that we were missing many readily available documents that would be relevant to a mitigation case. Ms. Rivera's involvement in the case had dropped off sometime earlier. As a result, we had not completed our collection of school records and social services records. It was

3

FELL-00002471

very late by this point, but I spent some time trying to chase records down in Wilkes-Barre.

12.    On April 21, 2005, which was less than two weeks prior to jury selection, I visited the Victim's Resource Center in Wilkes-Barre for the first time. I could have visited earlier but did not because I understood that Ms. Rivera was collecting relevant records, and that the case would not go to trial. Prior to my visit, no one on the team had visited the Victim's Resource Center, even though it was obviously important to Mr. Fell's life and his case because he had been treated there after sexual assaults which happened when he was very young. I just showed up at the Victim's Resource Center, and the people there were helpful. During my visit, I learned that the Victim's Resource Center had therapy notes and other records regarding Mr. Fell that trial counsel should have sought to obtain earlier but did not. I was able to get the records released to trial counsel within two weeks but – because we had not requested the documents earlier – they were mailed out to trial counsel on May 4, 2005. Copies were not faxed to me until June 13, 2005. I read the documents, but by then I did not have time to do any follow-up investigation related to them, and no one asked me to. For example, I would have interviewed some of the witnesses named in the files had we obtained the records earlier.

13.    During trial, we received a large number of additional documents from Luzerne County Children and Youth Services (CYS). During the preliminary investigation in 2001, Ms. Rivera had received some CYS records. On March 31, 2005, I met with a CYS caseworker named Deanna German. No one on the defense team had previously spoken to her. She told me that her notes, referred to as "Contact Sheets," would have a lot of relevant information regarding Mr. Fell's case. No one had asked for them. She told me that trial counsel would have to get in touch with the legal department at CYS to get access to these materials as well as confidential referral reports and investigation reports.

4

FELL-00002472

14.     On July 3-4, 2005, in the middle of trial, after the defense mitigation presentation had begun already, I reviewed the CYS contact sheets for the first time. Had I gotten them earlier, I would have talked through the records with Mr. Fell, his sister Teri Fell, and his aunts Donna Williams, Jackie Sharpe, and Sandy Bowles to refresh their memories and get additional details on several different events that the records noted. I would have used the records to locate and interview a number of witnesses named in the records to get additional information. I would have collected mitigating records based on the information in the contact sheets. I would have wanted to hand the records over to mental health experts for a review. As trial had already started, I was unable to do these things.

15.     In April, 2005, I learned that Dr. Welner had been interviewing witnesses in Wilkes-Barre. I discussed this with trial counsel and we agreed that I should ask the witnesses about their interactions with Dr. Welner and report back, which I did.

16.     I was not involved in the process of identifying appropriate mental health experts for the case. No one asked me to review the records to determine whether Mr. Fell had any mental health issues or whether we should hire any particular kind of mental health experts, and I did not do so.

17.     In 2005, when Mr. Bunin chose to retain Dr. Mark Cunningham, again I was not involved or included in discussions regarding this decision, and was simply informed after the fact.

18.     Trial was already underway by the time I read the Victim's Resource Center records and CYS contact sheets and referral reports. No one on the team gave these materials to mental health experts to determine whether Mr. Fell suffered from mental impairments. No one asked me to read through the records in order to identify Mr. Fell's signs and symptoms of

5

FELL-00002473

mental illness.

19.    At no point during the investigation or trial of this case did we have regular defense team meetings or even regular phone calls regarding the case. In fact, we had very little communication.

20.    I was out on my own for most of the time I worked on the case. I was hardly given any direction on what they expected me to do. The attorneys expected me to figure out the direction of the mitigation investigation on my own, and did not give me ideas or input on which witnesses to interview, or how to prioritize tasks in the case. We did not have a master task list that was circulated to everyone for comments and edits. For the most part, I was not kept informed about what other team members were doing. Unlike in my other capital cases, the team did not coalesce and function as a unit.

21.    There were no team discussions on developing theories of the case for the guilt phase and the penalty phase. Decisions appeared to be made primarily by Alex Bunin. Leading up to trial, we did not have team discussions on how trial would be conducted, which witnesses would be put on, which documents would be admitted as exhibits, etc.

22.    I was not involved in any plans to create a Mitigation Binder in preparation for trial. I was not involved in making decisions about what documents would be included in the Mitigation Binder, which I understand was admitted into evidence. I was not asked for my input regarding documents to be entered into evidence.

23.    I was not asked to investigate aggravating factors in this case. Leading up to trial, there were no team discussions or strategies developed to deal with aggravating material or bad acts that the government had informed us about via discovery. I was not directed to interview witnesses with aggravating information nor was I asked to investigate prior bad acts in other

6

FELL-00002474

ways, e.g. collecting records or doing courthouse research.

24.     The defense team in Mr. Fell's case did not discuss the integration of culpability and mitigation theories.  There were no team brainstorming sessions or meetings to discuss the way things would be handled at trial.  In my other cases, attorneys and the mitigation specialists would get together and discuss how to integrate the two phases, because it's otherwise very easy for the phases to end up conflicting with one another.

I declare under penalty of perjury that the foregoing is true and correct.

Date: ___3/18/11___

Cynthia Carter Ayres

7

FELL-00002475

# EXHIBIT 266

My name is Sandra Shum, and I am _54_ [_55._] years old. I currently live in Clarendon, Vermont, but in the late 1990s, I lived in Rutland at the Royal Motel for a little over a year. For many years, I worked as a machinist at a tool company.

Debbie Fell was my neighbor at the Royal Motel, and we were friends. Even when we had not known each other very long, she said I was her best friend because she did not have anyone else. The Royal Motel was a scary place to live because of the many drug deals and crime in the area. I saw that many of my neighbors were struggling financially, ~~but we partied together~~. *I got to know some of my neighbors, and while socializing I got to know their hard life stories, some of their vices and how they coped. SS.* Debbie lived with her boyfriend, Louie Gilbert. They lived in the room across the parking lot from me at the Royal Motel. Debbie and Louie had come to Rutland from Wilkes-Barre, Pennsylvania in their camper. When they first arrived in Rutland, they slept in their camper in the parking lot by the Bowl-A-Rama. Debbie and Louie worked at the Hawk Mountain Resort at the Killington Mountain. Debbie worked as a housekeeper, and I think Louie did security work around the motel.

I ~~saw~~ *heard* Debbie and Louie fight often. *I could hear them hollering from across the parking lot.* They drank heavily and then fought like cats and dogs. They *usually* drank every night and even more on ~~the weekends~~ *their days off. SS.* They usually drank Budweiser, and I saw large stacks of beer cans in their room at the Royal Motel.

1 SS.

FELL-00002476

Debbie and Louie were verbally abusive with one another. Even with my windows closed, I could hear them yelling at each other from across the parking lot. The police were called several times as a result. Louie tried to control Debbie, and at times, he would not let her leave the hotel room. If they were hanging out with a large group of people, it seemed like he tried to get her to leave before she got out of control. Louie messed with Debbie's car by taking the spark plugs wires or ~~battery out~~ wire to the distributor SS. so she would not be able to get to work in the morning.

After she had been drinking, Debbie was often loud and aggressive, and she could be very mean. At times, she made a very big deal out of something small. She got in people's faces and made sure they listened to her. There were times when she would say very cruel things while intoxicated and then not remember what she had said the next day. Her speech was slurred after drinking. When Debbie was drunk, she often seemed depressed to me and cried. about her children, and her life in Pennsylvania. SS.

Debbie told me that her mother was a mean, abusive drunk. Debbie was angry that her mother got custody of her children. Debbie said her mother wanted the kids so that she would get extra money from the state. Debbie said her mother spent the money on alcohol rather than the children. Debbie believed her mother had turned her kids against her.

Louie left town at some point. Debbie moved in with a guy named Tim Reynolds at an apartment on Library Avenue. I visited her once at the new apartment, and it looked similar to her room at the Royal Motel with beer cans

2 SS.

stacked up high. After I moved out of the Royal Motel, Debbie and Tim came by my trailer with a group of scruffy looking guys in a car with the windows smashed out. After that, I told Debbie not to bring people like that to my house in the future because I did not want them to know where I lived.

I was interviewed by police officers and federal agents. I was not contacted by anyone representing Donald Fell before his trial. The first time I had contact with anyone from Donald Fell's defense team was in 2010 during his appeal. I have lived in Rutland County my whole life. I was available and would have been willing to talk to the defense lawyers before trial.

I have had the opportunity to read and have read to me the foregoing _2_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Between 2000 - 2005, I was living in North Clarendon, Vermont, just outside of Rutland. I was living at REDACTED - FELL No one ever attempted to contact me during that time, for trial.
SS

3
SS.

Date: _March 3, 2011_

_Sandra F. Shum_

Sandra Shum

Witness

4

FELL-00002479

# EXHIBIT 267

My name is Deborah Wisell, and I am _55_ years old. I currently live in Hinesburg, Vermont. Alan Reynolds is my younger brother, but most people call him Tim.

Tim is an alcoholic who drinks very regularly. I am familiar with most of the women that my brother has dated, and almost all of his relationships have been ~~violent~~ full of drama towards the end. I met Tim's girlfriend Debbie. She seemed to drink as often as Tim did.

Tim and I knew Charlie Conway and his sister Tina since we were young. Charlie was often drunk. At times he would joke, but I also saw him act violently when drunk. When my son was 7 or 8 years old, Charlie had been drinking at my house and verbally threatened my son. I kicked Charlie out of my house as a result.

My husband, Rich, and I lived in an apartment above the Stoplite bar for around 2 years. I saw and heard lots of fights while I was living there. There was always drama at the Stoplite. Tina Conway spent a lot of time at the Stoplite then. She was drunk at 2:00 in the afternoon and I saw them cut her off. Tina made sexual advances to my husband. Once, I looked out the window at the Stoplite and Tina made sure that I saw them kissing.

Marsha Thompson was the bartender at the Stoplite. She could be mean and aggressive. While my husband and I were on and off again, he was with

1

FELL-00002480

Marsha. I was accused of scratching her car, and she would not serve me at the

bar. She was abusive to my husband, and she threw beer cans at him. Once, she

cursed me out and threatened my life.

A few months before Debbie was killed, my brother ended up in jail.

Debbie and Tim had been drinking and fighting, then the cops got involved.

I was not contacted by anyone representing Donny before his trial. The

first time I had contact with anyone from Donald Fell's defense team was in 2010

during his appeal.

I have had the opportunity to read and have read to me the foregoing

_____/_____ pages. I have been given the opportunity to make any corrections,

D.W.

additions, and deletions that I see fit. I declare under penalty of perjury that the

above statement is true and accurate to the best of my knowledge.

I have lived in Vermont for my whole life.
Between the years, 2000 - 2005, I lived
in Middlebury and Whiting, Vermont. No one
ever attempted to contact me.

D.W

D.W.

FELL-00002481

Date: 3-6-11

_Deborah L. Wisell_

Deborah Wisell

_[signature]_

Witness

3

FELL-00002482

# EXHIBIT 268

My name is Anthony Mistretta. I live in Castleton, VT. I moved here from New York in 1995. I worked at Walmart in Rutland from about 1999 to 2004.

I saw the two boys who committed the murders on that night, sometime in the early morning hours. They came into the Walmart and they weren't supposed to be there because the store was closed. They both looked wet like they had just taken showers and thrown their clothes on. I told them that they had to leave. They looked high and had a blank look like a wide-eyed blank stare. They looked like they were wired like they had just been electrocuted but were still alive. They seemed like they were high on crack that night. I've seen it enough to know what people look like on crack.

Charlie Conway had actually worked at Walmart for a month or so in the dog food aisle. Debbie also worked at Walmart for a little bit. My wife knew her. My wife smelled alcohol on Debbie's breath when she came into work. I did not know Charlie very well, but we talked sometimes. He told me that he was going out with Debbie. They had been dating for a little while. Charlie was known around town as "Charlie the Painter." He was a heavy drinker, always red-faced and buzzed. I can't remember him not smelling like alcohol.

Sometime after he died, I dated Charlie's sister Tina, who I met through my brother Steven. She lived with me for a little while, but we were on and off. Tina had her problems. Drinking was her main thing, but she would do anything she could get her hands on after that, including pot and crack. She was a mess and was really crazy. She



1

FELL-00002483

would leave and you never knew if Dr. Jeckyll or Mr. Hyde would come home. She was violent and tried to stab me multiple times with knives and scissors. Once, she chased me around the house with scissors and then stabbed me in the side. I had to knock them out of her hand and throw her to the ground.

I recognized Teresa King from the Price Chopper. I used to go there to pick up lunch and go back to Walmart to eat.

I was interviewed by someone from the government a couple of times before the trial. I testified at the trial. The trial was a rough time for me. I was getting a divorce, and the day that I testified, I was in the hospital for chest pains and the FBI actually took me out of the hospital to go to court.

I was not contacted by anyone representing Donny Fell until 2011 in connection with his appeal. I have been living on the same street in Castleton since before the murders happened. I was not hard to find and would have been willing to speak with the lawyers if they wanted to talk to me.

I have reviewed the foregoing ____1____ pages and have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.



2

FELL-00002484

I have lived in Castleton since 1999, and did not move out of the state of Vermont.

Date: March 8, 2011

Anthony Mistretta

Witness

Anthony Mistretta

3

FELL-00002485

# EXHIBIT 269

My name is Dora Carter. I live in Rutland, VT and have lived here for ___30___ years. I knew Debbie Fell when she lived in Rutland. We were friends for a few years.

Debbie worked when she worked, but her life really wasn't good. She drank every day. I saw her get tremors when she didn't drink. She drank a lot of beer. She was a real mess. Her lifestyle was not good, not at all. She did not go to rehab or try to stop drinking. Her boyfriend Tim Reynolds drank as much as she did. Most of the people she hung out with in Rutland drank as much as she did. She was a chronic alcoholic, and then she got into other drugs.

Debbie didn't really know her kids. When her son moved up to Rutland, it was obvious that she really didn't know him. She was worried about their relationship, because she didn't really know who he was. And then they all got into the drugs, Debbie, her son, and his friend. They were drinking, smoking weed, and doing crack really bad. I saw Debbie smoking crack at her place on Robbins Street. I stopped hanging out with her when all that started. I saw her using and decided that was it. She was killed shortly after that.

I saw Debbie smoke crack more than once. She was living at REDACTED - FELL at the time. She was smoking crack a lot of the time. Her son and his friend who came up, and Charles Conway, all of them were smoking crack really bad. I saw it one time with all of them there, and then I never went back there once that started going on.

1

Between 2000 and 2005, I was living on <sup>REDACTED - FELL</sup> in Rutland, that whole time. I have lived in Rutland since _1980_. The FBI came to see me at one point. No one from Donny's defense came to see me or tried to contact me, as far as I know. I would have been willing and available to talk with them.

     I have had the opportunity to read and have read to me the foregoing _1_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 3-08-11

_____
Dora Carter

_____
Witness

FELL-00002487

# EXHIBIT 270

My name is Jeff Van Buren. I live in Rutland, VT with my girlfriend, Mary Bell. For many years, I worked hard labor jobs, but I am currently on disability due to a serious back injury. Although I formerly had a drug and alcohol addiction, I have been sober for the past 6 years.

In the late 1990s, I met Debbie Fell through Jerry Whitford, a friend of her boyfriend, Tim Reynolds. When we first met, we drank at a bar on the corner of State Street called Shucker's. It is now closed. At that time, Jerry, Tim, Debbie and I would work during the day and then drink all night. We all had financial trouble, so on Sunday afternoons, we would go to the bar to watch NASCAR races, eat free food, and drink beer.

Debbie and I were drinking partners. It was like a drink-a-thon with us two. Debbie lived a few doors down from where I lived at the time. Debbie was a blackout drinker, and so was I at the time. Debbie drank until the point when she would pass out and could not handle another drop. We would both pass out, and then we'd wake up in the morning and start drinking again. Debbie and I used to like to do the crossword puzzle in the Rutland Herald in the mornings. We would pop a beer and sit down and do the crossword.

Although Debbie lived with Tim, they broke up a lot. They argued and fought a lot. It seemed that Tim had trouble holding a job, and he rarely had money. At one point, Debbie left Tim and moved in with Kevin Bodette for a while. One time, when

FELL-00002488

Debbie had left Tim to go live with Kevin, I saw Debbie walking down the street pushing a grocery cart with a washing machine from Tim's apartment on top of it. She was taking it to Kevin's house. She said it was hers, not Tim's. Later, she and Tim got back together, and she moved back in with him. One time, I walked Debbie home from the bar, and she had lost her keys somehow. Tim had been drinking and was passed out in bed. We banged and banged on the door but he wouldn't wake up. I ended up helping her pry open a window with a screwdriver so she could break into her own apartment.

I was in a car accident with Debbie one day. After a night of drinking, we woke up and started drinking again, as usual. Debbie was driving and we were both wasted. The car had no business being on the road. The windows were busted out and there were no headlights. She was driving on the left-hand side of the road, and I saw a car coming. I yelled to her and tried to yank the wheel. She yanked it over to the other side, the car flipped, and we ended up in the ditch on the side of the road. I was on probation and did not want to get arrested so I disappeared into the crowd before the police arrived. Debbie got a DUI for that.

Debbie and I smoked crack together. A friend of Debbie's bought it and shared with us. Debbie liked to snort amphetamines, like Adderol or Ritalin. We called those ADHD drugs, "the poor man's coke," because they are cheap and available in Rutland. People steal them out of other people's medicine cabinets, or they get prescriptions for their kids and sell the pills. Those drugs make you stay up all night, filled with adrenaline. They make you quick to lose your temper, get aggressive, and smash

FELL-00002489

someone. You feel like you are invincible, like you can break through concrete walls. Your heart is pounding, you're sweating, and the adrenaline is just maxed. We also used other types of pills. I was using pain medication recreationally at the time. I had prescriptions from different doctors. I used to crush Percocets and snort them. I had a lot of pills and I shared them with Debbie. Later on, after Debbie's death, I ended up getting a severe addiction to pain medication.

Debbie's apartment was very dirty with garbage, clothes, dirty dishes and beer cans all over the apartment. There was a path through the middle of the mess, and Debbie had ashtrays overflowing on to the floor. The only times the beer cans would be picked up was when Debbie and Tim were so broke that they needed to trade in the beer cans for money to buy cigarettes. One night after Debbie had been drinking, she attempted to cook dinner and started a fire by turning the stove on high when something was on the burner. She could not stay sober long enough to finish cooking a meal.

When she heard Donny was coming to Vermont, Debbie tried to clean up her apartment and cut down on her drinking. Her apartment had been a disaster before that. She tried to clean it up before Donny came, so she could represent well to her son. She was even trying to do some home cooking again. She had not stopped drinking, but she tried to limit it to a few beers after work. That was a huge change from her regular drinking habits. Debbie said many times that she wanted to get sober. She only managed to stay sober for about a week before Donny got here. Donny was respectful to Debby until his friend, Bobby Lee, showed up. Then he was disrespectful to her in front of his friend.

FELL-00002490

It didn't last long. After Donny was up in Rutland just a couple of days, Debbie was hard partying again. She couldn't go without drinking for long. She went back to her blackout drunk ways, and she was using drugs again too. Her apartment was a wreck again pretty soon. It just went back to normal, which was filthy. There were beer cans all over the place, ashtrays overflowing again, garbage strewn around, and dirty dishes all over. There were clothes strewn around the apartment. The house smelled like a bar, not an apartment. It reeked of alcohol and cigarettes. She had a cat but she didn't change the kitty litter, so it was overflowing and smelled like cat urine. In Rutland, among our friends, there were a lot of gross apartments. Debbie's place was usually pretty gross. Occasionally, when Debbie was broke, she put all the beer cans in a bag and brought them down to cash them in. Usually though, there were beer cans all over the place.

Shortly after Donny arrived, I drove down to Fair Haven with Donny, Debbie, and Kevin Bodette. Kevin Bodette was a convicted pedophile. He talked about sex all the time and had a lot of porn. He was not shy when he talked about his conviction for molesting a child. We went to Fair Haven that day because Kevin wanted to show us his workplace and some of the equipment he used. During the trip, we were all drinking and snorting Percocets, which I crushed with a pill crusher. I brought the Percocets and I shared them with the other three. Donny seemed happy that day. We were all in a good mood, partying.

Kevin planned to steal a compressor from his worksite. It was a weekend day, so his workplace was closed, but he had the keys. He showed us around his workplace, then

4

FELL-00002491

we helped him load up the compressor in the trunk, but it did not fit. The trunk would not close, so we rode back to Rutland with the trunk open. Kevin had a buyer lined up to buy the compressor. We were going to party with the cash. We ran into Kevin's boss on the way back to Rutland, and since we were caught, we had to turn around and bring the compressor back to Fair Haven.

When Donny first arrived, the situation between Donny and Debbie appeared to be ok. But after Donny's friend Bobby showed up, things changed for the worse. Bobby was a whackjob. He was quiet and he looked and acted crazy. Donny acted differently around Bobby. Donny and Bobby acted like they had something to prove to each other. I stopped going over to Debbie's house as much after Bobby moved in because Bobby made me uncomfortable.

I spoke to Debbie on a daily basis, so I was surprised when I did not hear from her during the week after Thanksgiving. I went by her apartment to see her, but no one answered the door. I knew how Debbie liked to open a beer and do the crossword puzzle in the mornings, so when I saw the newspapers piled up at the door, I assumed she had taken off to Pennsylvania with Donny and Bobby. By then, she was already way behind on the rent.

Charlie Conway was an alcoholic. When he drank, he became loud and obnoxious, and I did not like to be around him when he was drinking. He drank so much. A lot of times, he was so drunk he could barely walk or stand up. In the middle of the

FELL-00002492

night, he stumbled around the neighborhood trying to find someone who would give him a beer. He went to people's houses that he knew and started banging on the doors and the windows, hollering until they opened up and gave him a beer. He didn't care if their lights were on, whether they were awake or asleep. He had a smart mouth when he was drunk. He was full of big talk. He got into arguments and threatened people, telling people he was going to kick their a--.

I have been sober now for more than five years. It was very hard to get sober. I went to rehab 6 different times. When I was drinking and on drugs, I couldn't dream of living without alcohol or drugs. I had to hit rock bottom first. My life is very different now.

I was interviewed by the FBI prior to Donny's trial, but Donny's lawyers from the trial did not contact me. I was subpoenaed by the government to testify, and I sat at the courthouse for a day but they did not call me to testify. The defense lawyers could have talked to me while I was sitting at the courthouse all day. No one representing Donny got in touch with me until 2010. I have lived in Rutland for the past __12__ $^{JJ.}$ years and I know a lot of people in this town. I was available and it would not have been difficult to find me if the lawyers just asked around.

I have reviewed the foregoing __5__ $^{JJ.}$ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

$\frac{6}{S}$ J.

FELL-00002493

J.V.

Debbie would often talk about her guilt and shame for leaving her children behind in Pennsylvania. She would say that she was not the mother she wanted to be. She had a lot of regret.

Date: MARCH 8 2011

*Jeff Van Buren*

Jeff Van Buren

*Mary Bell    3-8-91*

Witness

J.V.

FELL-00002494

# EXHIBIT 271

My name is Pat Johnson, and I am _73_ years old. I currently live in Pittsford, Vermont, but I lived in Rutland for _40_ years up until _2009_, when I moved.

P.J.

Tim Reynolds lived directly above me at REDACTED - FELL and his girlfriend Debbie Fell lived there too. Tim ended up in jail. I did not speak to Debbie often, but I could hear things that happened in her apartment. Tim and Debbie fought frequently. I heard doors slam and the two of them screaming at each other. There was often yelling or loud music coming from their apartment. Neighbors often called the police about the noise, but I usually kept to myself. Most nights, I just waited for the noise to end. Eventually, they both passed out drunk.

Debbie drank often and there were frequently people coming and going from her apartment. Many of Debbie's visitors arrived at night, and they often appeared to be bombed, very drunk. Sometimes Debbie left the apartment for 2 or 3 days at a time. I knew she was gone during those times because no one was coming or going from the apartment for a few days.

I knew Charlie Conway for years. He was a very bad drunk. He was a house painter, and I watched him paint the house across the street from me on REDACTED - FELL He drank beer all day long while he was painting. I saw him wobbling on the ladder and the roof because he was drunk. He drank beer all day long til he would pass out.

1

When Debbie's son was coming to visit, Debbie tried to change how much she drank. She seemed to be trying to cut down. She did not stop drinking, but things seemed more calm, for a short time. It wasn't long til things went back to normal for Debbie though, with her drinking heavily, people coming and going from her apartment, a lot of loud noise, arguing, fighting, doors slamming, and loud music and partying going on. My neighbors called the police several times.

On the night Debbie and Charlie died, it was very loud. I heard a lot of fighting and arguing. I heard both female and male voices get loud and angry with the yelling. There was a lot of thumping and it sounded like someone was playing the drums. It sounded like they were throwing things around. The slamming and banging noises and the yelling went on for hours. It sounded like someone was going to come through the ceiling. When it finally got quiet, I assumed that Debbie had gone to bed and the boys had either left or passed out.

I was interviewed by someone from law enforcement and signed a statement, About a year after Debbie's death, two men came to around the time the bodies were found. I was not contacted by anyone representing interview me, I believe one was a Donald Fell before his trial. The first time I had contact with anyone from Donald Fell's U.S. Marshall, defense team was in 2010 during his appeal. I would have been willing to talk to them I'm not sure. about the case before trial. I still lived in Rutland in the same apartment up until around 2007 - 2008.

I have had the opportunity to read and have read to me the foregoing ____2____

pages. I have been given the opportunity to make any corrections, additions, and

deletions that I see fit. I declare under penalty of perjury that the above statement is true

and accurate to the best of my knowledge.

Date: ___3 - 8 - 11___

_Patricia Johnson_

Pat Johnson

_Jim Randall_

Witness

3

FELL-00002497

# EXHIBIT 272