## II. PREVIOUS ORDERS

On April 7, 2005, the Court issued an Opinion and Order stating, "The examination may be conducted by either Dr. Rabun or Wetzel, or both." This was in response to the government's request that Dr. Welner be allowed to interview and test Fell. In describing his testing of Fell for the PCL-R, Welner wrote in his report, "For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which *I provided questions to be posed to Mr. Fell*." (emphasis added).

The Court's Order, limiting access to Rabun and Wetzel, addressed the fact that the government had already been allowed two experts.[1] Using Wetzel as a mere courier for Welner's questions violated the spirit and substance of the Court's order.

> In a second Order issued the same day, the Court stated:
> Prior to any mental health testing being conducted by any mental health testing being conducted by any expert for the government, the government shall provide to counsel a list of any tests its expert wishes to perform. The government's expert shall not identify more than one test for the purpose of measuring the same mental function(s).
> * * *
> No mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert.

In his report, Dr. Welner identifies three tests, two apparently performed this week, that have never been discussed with Fell's counsel. The PCL-R is an assessment of psychopathy, which Welner uses as a risk assessment. VRAG is a risk assessment. The HCR-20 is a risk assessment. The Court has never ruled on the permissibility of these additional tests.

## III. CONFRONTATION

In its Opinion and Order of June 30, 2005, the Court found that Sixth Amendment

confrontation protections apply to the proof of elements at a capital sentencing hearing, and that

proof of mental culpability factors and statutory aggravating factors were elements of capital

murder. The Court stated:

> For example, the government may wish to introduce hearsay evidence to rebut the defendant's claim that his capacity to appreciate his conduct was significantly impaired. Some of this evidence may also be highly relevant to a gateway factor such as intent to kill. If the jury were to consider the hearsay when deciding a gateway factor it would raise a Confrontation Clause concern.

The statements in Dr. Welner's report, not only raise a Confrontation Clause concern, but

are clearly "testimonial" within the meaning of Crawford v. Washington, 541 U.S 36 (2004). All

of the statements were taken by Dr. Welner with the assistance of law enforcement officers who

were acting in furtherance of this investigation. Most of the statements were formalized in FBI

302s, although it is now clear many of those statements were never provided to the defense.

Welner's report cites to interviews of over 20 persons who do not appear on the government

witness list. Practically, every paragraph of the report has a quote or summarized statement

disparaging the defendant.

## IV. UNCHARGED MISCONDUCT

It is impossible to summarize all of the alleged acts of misconduct that Welner attributes

to Fell. Many were omitted from any previous discovery, and were identified in no government

pleading. The report was received less that 12 hours ago, late at night. However, typical of the

endless claims are, "Even from his early teens, when he reportedly chased police officers with a

hot poker, Donald Fell has displayed a propensity for risk-taking behavior." No authority for the

claim is provided.

## V. PSYCHOPATHY

FELL-00002673

The report has only one purpose - to get the word "psychopath" before the jury. It is a term of limited diagnostic value, but of very pejorative connotations. Leaving aside for a moment the quality of Welner's assessment, approximately 75% of all prisoners meet the DSM-IV definition of Anti-Social Personality Disorder (ASPD). Psychopathy is merely a more severe form of ASPD. About 25% of all prisoners will meet the PCL-R test for psychopathy. Most persons who met this definition are not violent.[2]

It is clearly recognized throughout the mental health field that there is no test that predicts violence in prison. The PCL-R was designed to test persons who are not incarcerated, and does not take into account the structure and rules of a prison. Welner will testify that his diagnosis of Donald Fell confirms he is a risk for future violence in prison. Dr. Welner should not be allowed to make predictions in an area where there is no scientific basis.

Since psychopathy is not a predictor of future dangerousness, in prison or in society, the diagnosis of psychopathy has no relevance as rebuttal evidence. It rebuts nothing that the defendant has presented or will present. Omitting that conclusion, the report is merely a collection of hearsay and uncharged misconduct, neither of which would be otherwise admissible.

Last, there is the matter of methodology. It is impossible to respond in kind with such short notice. At this point, it can only be said that Welner's testing results defy any rational review. The only way such scores could occur is if the examiner had a predetermined result in mind and justified all variables toward reaching that end.

Last, there is the issue of timing. Dr. Welner apparently completed two complicated diagnostic tests on July 4, 2005. This means he only started this testing half-way through the

FELL-00002674

defense mitigation case. Dr. Mills will arrive back from Paris on Sunday to face a 72-page report

he will neither be able to read nor respond to in time for his proposed Monday testimony. Welner

also says his report will later be supplemented.

## V. CONCLUSION

For the reasons above the testimony and report of Dr. Welner should be excluded.

By: _____

Alexander Bunin
Federal Public Defender

Gene V. Primomo
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

Paul Volk
Blodgett, Watts & Volk, P.C.
72 Hungerford Terrace
Burlington, VT 05401
(802) 862-8919

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United
States Attorney William Darrow and Stephen Kelly on the 6th day of July, 2005.

_____

[1] "However, Rule 12.2 gives the government the ability to select one expert, not three."
(Opinion and Order, May 26, 2005).

[2] In a letter to William Darrow, dated June 30, 2005, Dr. Richard Wetzel stated, "Both
ASPD and psychopathy are quite common in prison populations. Common characteristics in a

FELL-00002675

population seldom, if ever, become useful in predicting rare events, like homicide or suicide."

FELL-00002676

# EXHIBIT 311

6/6/2005  9:00:00 AM

JV-15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

------------------------------

UNITED STATES OF AMERICA

    VS.        Criminal File No. 01-12

DONALD FELL

-----------------------------

INDIVIDUAL VOIR DIRE OF PROSPECTIVE JURORS

197, 212, 215, 216, 242, 260, 282, 289, 201,

205, 206, 210, 250, 266, 278, 287

Monday, June 6, 2005

Burlington, Vermont

BEFORE:

THE HONORABLE WILLIAM K. SESSIONS, III

Chief District Judge

APPEARANCES:

WILLIAM B. DARROW, ESQ. and STEPHEN D. KELLY, ESQ.,

Assistant United States Attorneys, Federal

Building, Burlington, Vermont; Attorneys for the

United States

ALEXANDER BUNIN, ESQ. and GENE PRIMOMO, ESQ.,

Office of the Federal Public Defender, 39 North

Pearl Street, Albany, New York; Attorneys for

the Defendant

PAUL S. VOLK, ESQ., Blodgett, Watts & Volk, P.C.,

72 Hungerford Terrace, Burlington, Vermont;

Attorney for the Defendant

NORMA J. MILLER, RPR

COURT REPORTERS ASSOCIATES

117 BANK STREET

BURLINGTON, VT 05401

Page -

FELL-00002677

24

MR. DARROW: Did that surprise you, the testimony that he gave?

JUROR NO. 215: It did a little bit.

MR. DARROW: It comes up, for our purposes, in connection with one of the questions on the questionnaire, which was, it says, "Do you hold any beliefs or opinions that would prevent you from evaluating the testimony of a law enforcement officer fairly and impartially," and you checked yes based on that, and wrote, "I have a problem with police officers not telling the truth."

JUROR NO. 215: Mm-hm.

MR. DARROW: Is that your feeling?

JUROR NO. 215: I mean I suppose most of them do tell the truth and I suppose that the general public sitting behind the witness stand can sometimes not tell the truth, as well, and you would never know. I just don't think that I would weigh their testimony any greater than anybody else. I mean I certainly don't put them on a pedestal.

MR. DARROW: Well, would you give it less weight than others?

JUROR NO. 215: Honestly, I'm not sure.

MR. DARROW: You might?

JUROR NO. 215: I might.

25

MR. DARROW: Okay. Let's talk a little bit about the death penalty. You know, your reaction was not unusual. Most people don't think about the death penalty a whole lot, and then they come in and they see the videotape and they're called in as jurors in a death penalty case and they fill out the questionnaire, and then a couple weeks go by and they have a chance to think about things a little bit. Was that your experience?

JUROR NO. 215: Yes.

MR. DARROW: You're in the health care industry, to begin with?

JUROR NO. 215: Yes.

MR. DARROW: Working with trying to make people better?

JUROR NO. 215: Mm-hm.

MR. DARROW: Tell us about how you've thought about this since you've filled out the questionnaire.

JUROR NO. 215: I mean I haven't given it a huge amount of thought, because I really was hoping I wouldn't have to come back here, but I guess I think I had put that I thought more towards the death penalty when I filled out the questionnaire.

MR. DARROW: Right.

26

JUROR NO. 215: And I guess it really would just depend upon the situation and what had happened. I mean I don't really have -- I'm probably not on either extreme. I mean I'm now leaning a little more towards against the death penalty, just because I think they need to pay for what they've done.

MR. DARROW: All right. One of the questions that you answered in the death penalty section of the questionnaire was whether a defendant should live or die is a decision each juror must make herself. The defendant in this case is Mr. Fell, in the sort of gray-and-white-checked shirt over there. The question here is -- and the rest of the question in the questionnaire was -- do you feel you could make such a decision, and you didn't answer yes or no, but you wrote in, "I'm not sure. That would be a difficult decision to make." Any other feelings about that?

JUROR NO. 215: I still think it would be a difficult decision to make. I mean I'm -- I can't say yes, I could absolutely make a decision and/or that it would be an easy decision to make.

MR. DARROW: Well, I would hope it wouldn't be an easy decision to make, but nevertheless, we

27

are looking for jurors who would be capable of making that decision.

JUROR NO. 215: Right.

MR. DARROW: In other words, if the government proved its case consistent with the court's instructions such that, you know, the case indicated that the death penalty was the appropriate choice, jurors need to be capable of doing that, and the question is, could you?

JUROR NO. 215: Honestly, I don't know.

MR. DARROW: You're not sure?

JUROR NO. 215: I'm really not sure.

MR. DARROW: Let me ask you another question. The questionnaire asks, "In what kinds of murder cases do you feel that the penalty of life imprisonment without the possibility of parole is appropriate?" And you wrote in, "I guess if a person's mental status was in question."

Let me ask you a little bit about what you meant by that. If you had evidence that a defendant, a capital defendant's mental status was in some regard impaired, would you therefore go for life imprisonment, as opposed to the death penalty?

JUROR NO. 215: Probably not automatically. I think it would depend upon the circumstances, but,

Page 24 - 27

FELL-00002678

28

you know, a mental illness is an illness and it needs to be treated, and if something happens because somebody's mentally ill, you know, they may not necessarily -- I mean they weren't in their right mind when they did it, so they need some treatment.

MR. DARROW: Since you're in health care, when you use the term mentally ill, I'm wondering what that means to you.

JUROR NO. 215: They're on medication for like maybe schizophrenia or a bipolar disorder, or I mean some severe mental illness that they're receiving medication as well as treatment from.

MR. DARROW: What if someone's diagnosed with, say, a personality disorder; would that qualify as a mental illness?

JUROR NO. 215: I would -- yeah.

MR. DARROW: All right. And is it your feeling that someone suffering from these sorts of disorders or illnesses should not suffer the death penalty for the results of something that they did?

JUROR NO. 215: Potentially. I'm not really -- I mean not that they shouldn't be responsible for what they have done, but they also, I think, need the opportunity to be treated for the

29

illness that they have, to see if that can be taken care of.

MR. DARROW: All right. Let's talk a little bit about some of the circumstances you might learn if you were chosen as a juror in the case and if the case went to the penalty phase.

You might learn that the defendant and a buddy of his killed a couple people in Rutland, and then getting out of town, carjacked or kidnapped a woman, and commandeered her car, took her with them, drove about four hours, and while they're headed southwest, and while they're in New York State, they decide that they don't want her around anymore and they take her up in the woods and beat her to death and then drive on and are arrested out in Arkansas.

You might also hear that the defendant in this case, Mr. Fell, had a toxic childhood, a thoroughly dysfunctional childhood, with both parents alcoholics, violent, both of them had left him by the time he was 13, and that he suffered from various other kinds of childhood abuse, including sexual abuse; that he began abusing alcohol and drugs at a very early age and continued abusing them.

These are the sorts of things that you might

30

hear about the defendant's background. I'm wondering, if you heard those sorts of things about the defendant in addition to psychiatric testimony, that he was impaired in some regard along the lines that we've been talking about, whether that would make it very difficult for you to impose the death penalty on him.

JUROR NO. 215: I certainly think it would be a consideration. I don't think it would be something that I would focus on, necessarily. There are plenty of people who have been through circumstances like that that are, you know, very -- I don't know --

MR. DARROW: Who don't go out and murder people?

JUROR NO. 215: Right.

MR. DARROW: Right. Well, let's return, then, to the question of whether you feel now, having thought about this for a couple of weeks, whether, if the circumstances warranted, you could impose a death penalty on such a person -- or I don't mean -- whether you could vote for an imposition of a death penalty.

JUROR NO. 215: Right. I mean I think I could, but I'm not really sure. I mean I've never

31

really been in a situation before, and that's a huge decision. It's somebody's life, so I, you know, I'm not positive that I could, but, you know, I think I could hear things as impartially as --

MR. DARROW: Right.

JUROR NO. 215: -- anybody could.

MR. DARROW: Do you understand that in addition to hearing things and listening to both sides, ultimately each individual juror has to make that decision?

JUROR NO. 215: Right.

MR. DARROW: And the law is not going to tell you how to make that -- I mean it will give you some guidelines, but at the end of the day, you're going to have to decide which penalty is appropriate. The government will be arguing for one side, the defense will be arguing for the other. I mean you're going to have to make that call.

JUROR NO. 215: Right, but it's not my decision alone. I have other people that are --

MR. DARROW: You do. You'll have 11 other jurors, but after talking to those other jurors, you're going to have to have look inside yourself and decide what you think is right and, you know, no one can tell you how to do that.

FELL-00002679

# EXHIBIT 312





FELL-00002681



FELL-00002682



DEFENDANT'S
EXHIBIT

FELL-00002683



FELL-00002684