UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| DONALD FELL | ) | |
| | ) | |
| v. | ) | No. 2:01-CR-12 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

OPPOSITION OF THE UNITED STATES TO FELL'S DISCOVERY MOTION

The United States of America, by and through its attorney, Tristram J. Coffin, United States Attorney for the District of Vermont, submits this response to Donald Fell's "Motion for Leave to Conduct Discovery," filed May 5, 2011.

A.  BACKGROUND

Fell's discovery motion seeks information to support his 28 U.S.C. § 2255 collateral attack on the jury's capital verdict at his 2005 triple-homicide/kidnapping trial.  The jury verdict is now final, having survived both Fell's Rule 29 challenge, *see* this Court's "Opinion and Order," filed April 4, 2006, and direct appeal, *see United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), *rehearing en banc denied*, 571 F.3d 264 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 1880 (2010).  The discovery motion seeks leave to serve subpoenas and document requests on various government entities.

(1)  The Offense

On November 27, 2000, at about 2:30 in the morning, Donald Fell and Robert Lee brutally murdered Fell's mother, Debra Fell, and her friend, Charles Conway, in Fell's Rutland, Vermont apartment.  Looking for a car to flee Vermont, at about 3:45 that morning the two killers accosted Terry King, a 53-year-old woman, arriving for her early shift at the Rutland Price Chopper.  Threatening her with Fell's shotgun, the two men forced the woman into the backseat

of her car.  Fell drove King's car out of Vermont while Lee, in the front passenger seat, held the

shotgun on the terrified King.  After driving southwest for about four hours, Fell stopped the car

in rural New York and ordered King out.  Chasing the woman into the woods, Fell pushed her to

the ground.  As she lay on her back, Fell and Lee stomped and battered their third victim to death

by kicking her head, stepping on her neck, and smashing her face with a rock.  Several days later,

the two men were arrested in Arkansas driving King's car.

(2)  Pretrial Proceedings

On December 1, 2000, a Criminal Complaint against Fell and Lee was filed in this

District.  On December 12, 2000, the Court appointed the Federal Public Defender ("FPD") to

represent Fell.  Attorney Alexander Bunin, the Federal Public Defender for the Northern District

of New York (an Office which at that time covered Vermont), filed his appearance on behalf of

Fell, along with Gene Primomo, also from the Albany FPD Office.[1]  On February 1, 2001, a

federal grand jury in Vermont charged Fell and Lee with four crimes: carjacking with death

resulting (Count 1); kidnapping with death resulting (Count 2); use of a firearm during a crime of

violence (Count 3); and being fugitives in possession of a firearm (Count 4).  Counts 1 and 2

were capital offenses.

On January 30, 2002, the government filed a "Notice of Intent To Seek Death Penalty," in

compliance with the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et seq*.  The notice

---

[1]  Both Bunin and Primomo had experience handling capital cases, Bunin in Texas State
court, and Primomo in federal court.  Transcript, June 11, 2002 hearing, p. 10.  Bunin was
appointed FPD by the Court of Appeals for the Second Circuit in 1999.  He has been an Adjunct
Professor at Albany Law School, teaching Trial Practice I and II.  He is a life-long member of the
National Association of Criminal Defense Lawyers.  He began the practice of law in Texas, and
recently was appointed the first Chief Public Defender of Harris County, Texas.

declared the government's intent to prove various "narrowing" elements for purposes of a capital prosecution, including threshold culpability factors under § 3591(a)(2), statutory aggravating factors under § 3592(c), and non-statutory aggravating factors under § 3593(a).[2]

In June, 2002, the Court decided to appoint a third attorney to join Bunin and Primomo, stating that, "as a matter of personal concern, I want to bend over backwards to make sure that [Fell] gets the best possible representation that he can." June 11, 2002 Hearing, Transcript p. 10 (adding, "I am going to appoint . . . a Vermont attorney . . . that will assist defense counsel in ensuring that they are familiar with the culture of this Court [and] what Vermonters are like. . . . Above all I want to make sure that he gets a fair trial," pp. 11-12). The Court then added Paul S. Volk, of Burlington, Vermont, to join Bunin and Primomo. As trial approached, the defense team retained a mitigation specialist and a jury consultant.

Fell's many pretrial motions included a challenge to the constitutionality of the FDPA. On September 24, 2002, the Court granted the latter motion, holding that § 3593(c), the FDPA's relaxed evidentiary standard for the penalty phase of a capital trial, was unconstitutional. *United States v. Fell*, 217 F. Supp. 2d 469 (D. Vt. 2002). In November, 2004, the Court of Appeals for the Second Circuit reversed and remanded the case for trial. *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004).

---

[2] On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same four offenses as the first indictment. The Superseding Indictment was sought in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), and alleged the threshold culpability factors and statutory aggravating factors set forth in the original notice. On the same date, the United States filed a "Supplemental Notice of Intent to Seek Death Penalty," alleging the same non-statutory aggravating factors as the original notice.

(3)  <u>The Trial</u>

Jury *voir dire* began on May 4 and continued, intermittently, until June 6, 2005.  At the June 20 - 24, 2005 guilt phase of trial, the government called witnesses to describe (1) the disappearance of Terry King after she left home for work in Rutland early on November 27, 2000; (2) the arrest of Fell and Lee in Arkansas on November 30, 2000, in King's car; (3) the discovery of the bodies of Debra Fell and Charles Conway in Rutland on the evening of November 30, 2000; (4) Fell's post-arrest description of the three murders;[3] (5) the discovery of King's body in New York on December 1, 2000; and (6) forensic evidence, including King's blood and DNA on one of Fell's steel-toed boots.  On June 24, 2005, the government rested.  The defense introduced no evidence.  That same afternoon, the jury returned guilty verdicts on all counts.

In the penalty phase, which opened on June 28, 2005, the government called seven witnesses.  Crime scene investigators and medical examiners described the brutality of the two Vermont murders.  Conway and Debra Fell had been stabbed about 50 and 40 times, respectively, sustained defensive wounds on their hands, and had their throats cut.  In New York, King had been kicked and beaten to death, in what New York Medical Examiner Michael Baden, M.D., described as "a kind of overkill."  An acquaintance of Debra Fell described Fell's public

---

[3]  In describing the killing of King, Fell recalled that after entering the woods, she tried to run to the road.  But the two men caught her and "hustled her . . . up the hill . . .  And, ah, I found a little, a little spot where you couldn't see from the highway, and ah, well we started kicking her in her head. . . .  I pushed her down first, she was on her back. . . . [S]he started to pray.  And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about, yah big, and ah, slammed it right down on her head. . . .  [King] "wasn't struggling at all throughout the whole thing, she didn't even try to struggle, she just took it."  Asked how he knew she was praying, Fell said that King had held her hands together in front of her.

assault on his mother shortly before her murder.  King's two daughters, and her siblings, gave victim-impact testimony describing the loss of their mother and sister.

Fell's penalty phase evidence included testimony from 14 witnesses, including family members, school teachers, and social service providers, who described Fell's troubled childhood, and corrections officials who described his positive adjustment to pretrial custody.  The defense also introduced a "Mitigation Binder," containing hundreds of documents generated by schools, social services agencies, and health-care providers, as well as photographs of himself as a child and of the homes in which he grew up.  The  defense also called a corrections expert, former prison warden James Aiken, who opined that if Fell received a life sentence, he could be safely managed in prison.

In rebuttal the government called five witnesses.  Two corrections officers described two violent altercations with Fell while in pretrial custody, both videotaped.  The videos showed Fell fighting with and threatening officials, yelling obscenities and taunts, kicking, and spitting.

In response to defense expert Aiken, David Duncan, a 20-year Bureau of Prisons employee at four United States Penitentiaries, and Associate Warden at FCI Manchester, addressed Fell's disciplinary record during pretrial detention.  Duncan told the jury that usually pretrial inmates are better behaved than those convicted and sentenced, because "their life is hinging on the outcome of the trial still at that point, so they don't want to do anything negative to be used against them."  Duncan found Fell's various disciplinary violations on pre-trial detention "extremely excessive," indicating Fell was an inmate "who has a real problem following instructions, following orders from anybody, and seems to be aggressive back at them."  The two videotaped prison altercations seemed to depict Fell actually seeking

confrontation, Duncan opined.  The fact that Fell's disciplinary infractions increased in number and severity over time, suggested to Duncan that he "seems to be getting worse on his path rather than better."

Matt Cunningham was a friend of Fell's in the late 1990s.  They hung out together nearly every day with Lee and another male.  Fell was more "outgoing" than the others, and "more of a leader."  In contrast, Bobby Lee was the quietest and least violent; his nickname was "Twiggy."  Cunningham testified that Fell talked about killing his mother ("I could kill her"), and once said that, "if you killed one person, why stop there?  Because you are going to get the same punishment anyway."

John Kozierski, one of Fell's high school teachers, described him as "very intelligent," but famously "confrontational, disruptive, uncooperative, discourteous, ill-tempered, [and] hot-headed."  Kozierski recalled a day in the classroom when got "right in my face . . . and says, 'get the fuck out of my way or I will fucking stab you.'"  Fell was "legendary" at the school.

The government's remaining rebuttal consisted of two stipulations.  One concerned Lee's accidental death.  The second provided, in relevant part, that mental health experts had examined Fell, and that "(1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; and (3) he did not suffer from any mental disease or defect."  Exhibit 14.[4]

By way of surrebuttal, the defense introduced documents relating to Fell's August 2000 New York arrest for assault.  That episode had been described by defense witness Teri Fell, the

---

[4] The parties consulted with seven psychiatrists and psychologists regarding Fell.  Drs. Mark J. Mills, M.D., J.D.;  Jonathan J. Lipman, Ph.D; Wilfred van Gorp, Ph.D; and Mark Cunningham, Ph.D, consulted for the defense.  Drs. Richard Wetzel, Ph.D, Michael Welner, M.D., and John Rabun, Ph.D, consulted for the government.

defendant's sister, and also was referenced by Fell in his post-arrest statement. Summations and jury instructions were delivered the following afternoon, July 13.

The parties conceded the essential components of their adversary's case: Fell conceded the three brutal murders and the bulk of the aggravators, but urged that his troubled background with alcoholic, violent parents who abandoned him made the death penalty inappropriate. The government conceded Fell's troubled childhood, but urged that the aggravating circumstances associated with three brutal murders outweighed the background mitigation. In opening the penalty phase, defense counsel had focused on the violence and chaos in Fell's childhood. In closing the penalty phase, the defense argued that Fell's tragic childhood mitigated full moral culpability. Mr. Primomo urged:

> [W]e are going to talk a little bit now about generally the mitigating factors in, in Donnie's life. What – what shaped it. What shapes all of us. What makes all of us who we are and what guides our decisions day in and day out. We decided, your common sense and its life experiences, don't need to be – don't need to be redefined, or told to you by an expert psychologist. We trust you. We trust you to make that correlation, your life experiences on your own because we all have 'em.

The jury weighed the aggravators against the mitigators and returned its 20-page "Special Verdict Form" on July 14, 2005. The jury unanimously found in favor of every eligibility and aggravating factor alleged by the government. The jury also agreed unanimously that Fell had proven eight of his 19 mitigating factors, including four relating to his difficult childhood. The jurors were unanimous in finding that:

> – Donald Fell was sexually and physically abused as a child.

> – As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions.

> – Donald Fell's parents were violent alcoholics who abandoned him as a child.

7

– Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.

The jurors also found unanimously that:

– Donald Fell and Robert Lee acted in concert in committing the crimes.

– Robert Lee, equally culpable for the crimes, would not face execution.

In addition, 10 of the 12 jurors found an additional mitigating circumstance relating to Fell's background, handwritten on the form as follows:

– Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*Id*.

The jury decided unanimously that the aggravating factors sufficiently outweighed the mitigating factors such that, as to both Count 1 and Count 2, "a sentence of death shall be imposed." *Id*.

In affirming the jury's verdict, the Second Circuit Court of Appeals concluded that this Court "presided over this complicated and difficult trial with care, fairness, and an exemplary concern for the protection of Fell's rights." 531 F.3d at 240.

(4) Post-Trial Proceedings

Fell's post-trial Rule 29 motion urged the Court to overturn the jury's verdict. The motion did not contest his guilt, the sufficiency of the evidence, or the court's legal instructions. Instead, the motion claimed prosecutorial misconduct. One such claim was that the government made improper assertions in the penalty phase closing argument. Another was that the government violated a Court order relating to its mental health examination of Fell. In the wake

of Fell's Fed. R. Crim. P. 12.2 notice of planned mental health expert testimony, the Court permitted a government expert to examine Fell for purposes of rebuttal. However, the Court refused to let government mental health expert Dr. Micheal Welner, examine Fell, instead requiring Dr. Richard Wetzel or Dr. John Rabun to conduct the examination. The post-trial motion asserted that the government improperly circumvented the order by having Dr. Wetzel ask questions on Dr. Welner's behalf. The motion urged that Welner then used Fell's answers to score several psychological tests in further violation of the Court order, which precluded testing absent agreement of the parties.

Fell raised the mental health misconduct claim at trial on July 6, 2002, in a motion to exclude Welner's testimony. In response the Court scheduled a July 11, 2002, hearing to explore the matter. Before the hearing, however, on July 7, 2002 the defense team announced that it had decided not to present mental health evidence, after which the government also decided not call a mental health expert. In his Rule 29 motion Fell revisited the claim. Denying the motion, the Court held that "[w]hen Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct . . . ." April 7 Order, *supra* at 31-32 (adding that Fell, "waived his prosecutorial misconduct claim by failing to pursue it at sentencing when the essential facts of his claim were known by him"). In short, the Court ruled, Fell had "abandon[ed]" and "waiv[ed]" the mental health misconduct claim.

On June 16, 2006, the Court complied with the FDPA's mandate that "the court shall sentence the defendant" in accordance with the jury's verdict, § 3594, and sentenced Fell to death on Counts 1 and 2 of the Superseding Indictment.

Fell appealed the verdict to the Second Circuit Court of Appeals. His appeal was briefed and argued by a new legal team, Professors John Blume, Christopher Seeds, and Sheri Lynn Johnson of the Cornell Law School. Trial counsel Alex Bunin was also on the brief. Fell's 193-page brief – and 738 page appendix – raised a plethora of claims, one of which revisited the mental health misconduct claim. The Second Circuit rejected all grounds for appeal and affirmed the sentence of death on both Counts 1 and 2. 531 F.3d 197. The Second Circuit also denied Fell's petition for rehearing *en banc*. 571 F.3d 264. Fell then petitioned the United States Supreme Court for a writ of ceriorari. The Supreme Court denied the petition in March, 2011. 130 S.Ct. 1880.

(5) The § 2255 Motion

Fell's § 2255 motion reflects the efforts of a third team of lawyers, replacing the three trial lawyers and the three appellate lawyers. The new team includes Lewis Liman and Avram Luft, of Cleary Gottlieb Steen & Hamiliton LLP, a large New York law firm, along with Cathleen Price in New York City, and Richard Rubin in Vermont. The 365-page motion – accompanied by six volumes of exhibits – again challenges the jury's 2005 verdict.

Fell's § 2255 motion does not contest the triple homicide or the kidnapping/carjacking. Instead, it claims that the penalty phase of the trial was unfair, because Fell's trial lawyers were constitutionally ineffective, and the prosecutors committed misconduct. The new lawyers claim principally that the trial lawyers: (1) failed to adequately investigate and present additional mitigating evidence of Fell's background, which was even worse than was described at trial by Fell's family members, school teachers, and social service providers; (2) failed to adequately investigate and present mitigating mental health evidence, including (a) evidence of a family

10

predisposition for controlled substances and violence, (b) evidence of Fell's personality disorders, and (c) testimony from an expert to explain the link between Fell's childhood and the murders; (3) failed to adequately investigate two prior violent episodes, in which Fell shot a boy with a pistol in 1992, and kicked a man into unconsciousness in year 2000; (4) failed to adequately investigate a possible reason for Fell's two violent episodes in prison – a Vermont Corrections Officer whom counsel faults for the altercations; and (5) failed to call as a penalty phase witness Steve Ratte, a Catholic Deacon who worked with inmates at Vermont's Northwest Correctional Center, and could have portrayed Fell in a positive light.

Fell's § 2255 motion also asserts various prosecutorial misconduct claims, including failures to disclose exculpatory information, misrepresenting evidence regarding the Summer, 2000 assault in New York, and misstating law and facts in penalty phase closing arguments.

(6)  Section 2255

28 U.S.C. § 2255 provides a means for a federal prisoner to collaterally attack his sentence.[5]  *United States v. Haymen*, 342 U.S. 205 (1952).  In order for relief to lie under § 2255, the claimed error must be jurisdictional, constitutional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary

_____

[5]  Section 2255 states in relevant part as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

demands of fair procedure." *United States v. Addonozio,* 442 U.S. 178, 185 (1979); *Hill v. United States*, 368 U.S. 424, 428 (1962). Simply put, "[p]ostconviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." *Singleton v. United States*, 26 F.3d 233, 236 (1ˢᵗ Cir. 1994) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993)).

The law is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 165-66 (1982)("we have long and consistently affirmed that a collateral challenge may not do service for an appeal"). "Direct review is the principle avenue for challenging a conviction . . . [and when this process] 'comes to an end, a presumption of finality and legality attaches to the conviction and sentence.'" *Brecht*, 507 U.S. at 633, quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994)(quoting *Brecht*; emphasizing "*presumption of finality and legality*"); *Wall v. United States*, 619 F.3d 152, 154 (2d Cir. 2010)("'we have previously held that 'a motion under § 2255 is not a substitute for direct appeal'").

As a general matter, a federal prisoner cannot employ § 2255 to litigate issues that could have been, but were not, raised on direct appeal. *Douglas v. United States*, 13 F.3d 43, 46 (2d Cir. 1993). Failure to raise a claim on direct appeal ordinarily results in procedural default precluding appellate review of the issue. *United States v. Helmsley*, 985 F.2d 1202, 1205 (2d Cir.1993). "[F]ailure to raise a claim on direct appeal is itself a default of normal appellate procedure, which a defendant can overcome only by showing cause and prejudice." *Campino v. United States*, 968 F.2d 187, 190 (2d Cir. 1992). "In other words, the failure to raise a particular

ground on direct appeal will bar consideration of that claim in a § 2255 motion unless the movant can show that there was cause for failing to raise the issue, and prejudice resulting therefrom." *Douglas*, 13 F.3d at 46; *see also Frady*, 456 U.S. at 167-68 (establishing cause and prejudice test for collateral relief based on trial errors to which no contemporaneous objection was made).

"[T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *Frady*, 456 U.S. at 167-68; *see also United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1993)("A motion to vacate a sentence under 28 U.S.C. § 2255 (1988) must be supported by cause for the defendant's failure to raise his claim earlier").

"It is clear that '[s]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.'" *Riascos-Prado v. United States*, 66 F.3d 30, 33 (2d Cir. 1995), quoting *Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir.1992) (quoting *Barton v. United States*, 791 F.2d 265, 267 (2d Cir.1986) (per curiam)); *see also United States v. Natelli* 553 F.2d 5, 7 (2d Cir. 1977)("once a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack under section 2255")(and cases cited).

Upon the filing of a § 2255 motion, a court submits it to a preliminary review.  Rule 4 of the Rules Governing Section 2254 Cases in United States District Courts (titled "Preliminary Review; Serving the Petition and Order"), provides that upon preliminary consideration by the district court, "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief . . . , the judge must dismiss the petition . . . ."  Rule 1(b) of those Rules gives the habeas court authority to apply the rules to other habeas corpus cases.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Perez v. United States*, 378 F. Supp.2d 150, 157 (E.D.N.Y. 2005)("Perez has provided not one iota of proof that any corruption took place during his case. Where, as here, the request for discovery is a mere fishing expedition, the Court will not grant it").[6] Discovery is only warranted "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09.

> Rule 6 of the habeas rules provides in pertinent part that:
>
> (a) Leave of Court Required. A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law. If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A.
>
> (b) Requesting Discovery. A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

*Id*. As the Supreme Court stated in *Harris v. Nelson*, 394 U.S. 286 (1969), which established the basis for Rule 6: "in appropriate circumstances, a district court, confronted by a petition for habeas corpus which establishes a prima facie case for relief, may use or authorize the use of

---

[6] In *Bracy v. Gramley*, *supra*, the Court allowed discovery in a state habeas case under a similar rule, while emphasizing the showing that the movant made in his papers. The case involved a Chicago state judge convicted of taking bribes in murder cases. The movant claimed that the judge, who handled his murder case at the same time that the judge was taking bribes, was biased in handling the case. The Court noted that the movant was not relying only on the bare claim that he was tried in a murder case by a judge who was taking bribes in murder cases at the time, but that he offered other evidence that "len[t] support to his claim that [the judge] was actually biased *in petitioner's own case*." *Id*. at 910 (emphasis in original).

suitable discovery procedures . . . ." *Id*. at 290.  *See also Mayberry v. Petsock*, 821 F.2d 179, 185

(3d Cir. 1987) (citation omitted) ("Unless the petition itself passes scrutiny, there would be no

basis to require the state to respond to discovery requests").

"[C]ourts should not allow prisoners to use federal discovery for fishing expeditions to

investigate mere speculation."  *Calderon v. U.S. Dist. Court for the Northern Dist. of California*,

98 F.3d 1102, 1106 (9th Cir. 1996), *citing Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir.1994)

(footnotes omitted) ("federal habeas court must allow discovery and an evidentiary hearing only

where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief . . . .

Conclusory allegations are not enough to warrant discovery under Rule 6 . . . ; the petitioner must

set forth specific allegations of fact.  Rule 6 . . . does not authorize fishing expeditions"); *Aubut

v. State of Maine*, 431 F.2d 688, 689 (1st Cir.1970) ("Habeas corpus is not a general form of

relief for those who seek to explore their case in search of its existence").

    (7)  Ineffective Assistance of Counsel Claims

The Second Circuit created a limited exception to the § 2255 default rule for ineffective

assistance of counsel claims.  *Billy-Eko v. United States*, 8 F.3d 111 (2d Cir.1993).  When one

attorney serves as both trial and appellate counsel, it is unlikely that that attorney would raise an

ineffective assistance claim.  Hence such claims are not procedurally barred.

To establish a claim of ineffective assistance a petitioner must show that his attorney's

performance was objectively deficient and such deficient performance prejudiced his defense.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The Supreme Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to require
> reversal of a conviction or . . . sentence has two components.  First, the defendant must
> show that counsel's performance was deficient.  This requires showing that counsel made

15

errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*.

The defendant bears the burden of proof as to both the "deficient performance" and the "prejudice" prongs of the *Strickland* standard. First, the defendant must show that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id*. at 688. *Strickland* requires that "scrutiny of counsel's performance be highly deferential," and that "every effort be made to eliminate the distorting effects of hindsight." *Id* at 689. A court should adopt "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (adding, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way")(citation and internal quotation marks omitted). Second, the defendant must demonstrate that counsel's inadequate performance prejudiced him. *Id*. at 687. Thus, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Courts may bypass the performance prong and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice. *Strickland*, 466 U .S. at 697.

16

(8) <u>The Discovery Motion</u>

Fell's discovery motion seeks leave to serve sweeping subpoenas and document requests on various government entities, including counsel for the government, the United States Attorney's Office ("USAO"), as well as the Federal Bureau of Investigation ("FBI"); the Office of the Attorney General of the United States; the United States Marshal's Service; the Vermont Department of Corrections; and Vermont's Northwest State Correctional Facility. He advances his request prior to the Court's Rule 4 review and in disregard of, in various instances, the trial record and the limitations of § 2255 review.

Fell proposes to request documents from the USAO for evidence supporting his § 2255 prosecutorial misconduct claims. Specifically, Fell broadly seeks "any and all records" the USAO has relating to: (1) his year 2000 assault in Woodstock; (2) his 1992 shooting of John Gacek; (3) his two violent altercations during pretrial custody; (4) "disciplinary histories or grievances of any of the officers involved in those incidents"; (5) witness (uncalled) Francis Bellantoni; (6) Dr. Welner's work in the case; (7) Lee; (8) the New York homicide scene; (9) the death of King; (10) Dr. Baden's work on the case; (11) the Rutland crime scene; (12) the autopsies of Fell and Conway; (13) the background investigations of Fell and Lee; (14) items found in King's car upon Fell and Lee's arrests in Arkansas, and any related testing; (15) the decision by the United States to seek the death penalty; and (16) Fell and Social Security Administration.

Fell also proposes a separate subpoena to the FBI, demanding "any and all records" relating to: (1) Christopher Eike, the victim of Fell's mid-2000 New York assault; (2) Francis Bellantoni, the uncalled witness from the Dover, New York, area; (3) reports referenced in Dr.

Welner's evaluation; (4) the background investigation of Fell and Lee; (5) Lee, including records relating to his violence, his aggression, his criminal history, and his mental health; (6) the New York crime scene; (7) the death of King; (8) the Rutland crime scene; (9) the autopsies of Fell and Conway; (10) items seized from King's car in Arkansas, and related testing; (11) all documents redacted or withheld in response to Fell's FOIA request previously served on the FBI.

In a subpoena to the U.S. Attorney General, Fell wishes to obtain "any and all records" relating to the rejection of his 2001 plea offer, the decision to seek the death penalty, the decision to reject a bench trial, and Fell's "Death Penalty Evaluation Form."

In a subpoena to the U.S. Marshal's Service, Fell would demand "any and all records" relating to (1) his two altercations introduced as rebuttal evidence during the penalty phase, and (2) Lee.

In a subpoena to the Vermont Department of Corrections and the Northwest State Correctional Facility, Fell would demand "any and all records" relating to (1) his two altercations introduced as rebuttal evidence during the penalty phase; (2) any other disciplinary incidents involving Fell; (3) the disciplinary history of Officer Marc Pelkey; (4) incidents in which Pelkey "used force" with inmates; (5) inmate complaints or grievances against Pelkey; (6) "voluntary or mandated programming" as to Pelkey; (7) disciplinary histories and grievances filed against any other officers involved in the two altercations, of subjects of Fell's grievances, and any evaluations, programming, or classes.

B.  DISCUSSION

Generally, Fell's motion is flawed procedurally and substantively.  Procedurally, the motion is premature.  The 365-page § 2255 motion should be subjected to Rule 4 preliminary

18

review prior to discovery on its multitude of allegations.  In addition, the requested subpoenas

and document requests are inappropriate means of obtaining discovery.  This case began as a

criminal proceeding in which the United States was one of the parties, represented by the United

States Attorney's Office with the assistance of the FBI.  As an initial matter, the Court should

handle discovery issues consistently with the way it handles matters in criminal cases.  Fell seeks

to make various requests of the prosecution team – the USAO and the FBI.  To the extent that the

government provides the requested information, there is no cause resorting to civil discovery.

Indeed, in light of the fact that most of Fell's requests are directed to the prosecution team, the

most efficient discovery process would be for Fell to file motions to compel particular materials

from the government if they have not been provided.  The government can then respond to the

motion to compel and the Court can rule.  Adding the quite complex civil discovery processes

into this case should be avoided until the common mode of discovery between the parties in a

criminal case are deemed ineffective.  Fell has not been able to demonstrate a need for civil

discovery with regard to the United States Attorney's Office and the FBI.[7]

Further, discovery requests to federal government components involved in the case – such

as the FBI – should go through the attorney for the federal government: the USAO.  Thus, if Fell

seeks something from the FBI, or the U.S. Marshal's Service, he should present the request to the

USAO, as counsel for the government.

Substantively, much of Fell's proposed discovery lacks "good cause" under Rule 6 at this

---

[7] Rule 6 does not direct the Court to turn to the civil rules as the only method of discovery.  Rather Rule 6 directs discovery "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  Rule 6 gives this Court broad discretion to deal with the flow of information.

time.  Some of the proposed discovery seeks information as to claims that are not properly raised in the § 2255 motion.  For example, the mental health misconduct claim, and the matters  relating to the 2001 plea offer, have already been litigated, before this Court and on direct appeal.  Other proposed discovery reflects no more than a "fishing expedition" for *Brady* information, absent any evidence that the government has the materials.  If permitted, such requests would allow § 2255 movants leave to examine "any and all" records in the files of government lawyers to try and find some basis to collaterally attack their conviction and sentence.[8]  That is not the proper function of a § 2255 action.  Other  components of the proposed discovery seek information as to claims on which preliminary review will show that Fell "is not entitled to relief" under Rule 4.  Such discovery should await the Court's Rule 4 review.

With regard to several of Fell's requests, the United States agrees to provide the information absent Court intervention.  In light of this discovery, the Court should at the very least delay additional discovery until Fell can assess the production and the parties can discuss any disputes about the material.

Fell's requested discovery breaks into several subject matters, as discussed below.

(1)  Forensic Evidence

Fell seeks access to evidence from the New York crime scene, the Rutland crime scene, and the Arkansas arrest scene.  The government believes that it made this evidence available to the defense prior to the trial.  In any event, the government will arrange to make the evidence

---

[8]  Fell's request, for example, for production of all USAO records relating to "the death of King," would require production of virtually every case-related USAO document.

available to Fell's § 2255 counsel now.[9]  The government will also provide all law enforcement

reports about the acquisition of that evidence.  There is no need for the Court to issue orders

relating to the information at this time.

(2)  Background Information about Fell

Fell asserts that his trial counsel did not receive documents reviewed by the FBI during its

2001 background investigation into his life.  The government would have made whatever

documents referenced in the report available at trial, and the government will produce any

underlying documents now.  There is no need for the Court to issue orders relating to this

information at this time.

(3)  Department of Corrections and United States Marshal Service Records on Fell

With regard to several of Fell's requests for discovery, the government seeks to stay

discovery until the Court's preliminary review of the § 2255 motion.  As the government noted at

the status conference several weeks ago, it is common for such preliminary review to result in

summary dismissal of some claims, narrowing the scope of litigation.  One of the claims as to

which the government will seek summary dismissal relates to Corrections Officer Pelkey's

disciplinary record.  In the government's view, the Court and the parties should not spend time

and resources dealing with discovery from different agencies, including State agencies, when

those discovery issues could be mooted by summary dismissal.  The government anticipates

filing the motion before the end of Summer.  Any delay on this limited issue will not delay the

---

[9]  Prior to the filing of the § 2255 motion, at the request of counsel the government arranged for counsel to review trial exhibits and the evidence obtained at the New York crime scene.  Counsel also requested and received copies of email correspondence between the USAO and trial counsel retained by the USAO.

21

overall discovery plan, which Fell's counsel anticipates could take at least eighteen months.[10]

(4)  The U.S. Department of Justice Decision to Seek the Death Penalty

Fell makes the bold claim that the U.S. Attorney General decided to seek the death penalty because of his race.  The government will seek summary dismissal of this claim.  Courts addressing similar motions for discovery have uniformly rejected them as seeking privileged information.  *See  United States v. Ferandez*, 231 F.3d 1240 (9th Cir. 2000)(reversing court's decision to allow capital defendant discovery of information as to government's decision to seek death penalty; information protected by  deliberative process and work product privileges); *United States v. Frank*, 8 F.Supp. 2d. 253, 283-84 ( S.D.N.Y. 1998)(denying federal capital defendant's request for discovery of government materials generated in connection with death penalty decision; "Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty"); *United States v. Taylor*, 608 F.2d 1263 (D. N.M. 2009)(denying federal capital defendant's request for death penalty decision materials); *United States v. Perez*, 222 F.Supp. 2d 164 (D. Conn. 2002)(same); *see also* Fed. R. Crim. P. 16(a)(2)("this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government . . . in connection with investigating or prosecuting the case").

The Court should stay the discovery motion as to materials generated within the U.S. Department of Justice – including the Attorney General's Office and the USAO – relating to the

---

[10]  Further, Fell has already served a Freedom of Information Act request on the State of Vermont for such records.

decision to seek the death penalty against Fell and other privileged deliberations.

(5)  Information about Robert Lee

Fell seeks three different categories of information from the USAO and the FBI regarding Lee: (1) materials from the 2001 background investigation of Lee, (2) materials about Lee's conduct in jail after his arrest, and (3) reports of interview of Francis Bellantoni.

With regard to the latter, the government provided the defense prior to trial with an interview report on Mr. Bellantoni.  Fell now contends, correctly, that an FBI agent spoke with Bellantoni again as trial approached.  Consistent with common practice in this District, however, the agent did not prepare a report of the second, trial preparation interview.  The government later decided that Bellantoni's testimony was not useful.  There is no additional report to produce.

Fell's current counsel intimates that the government failed to provide to trial counsel the 2001 background investigation materials as to Lee.  Yet government records show that such material was in fact produced to Fell's trial counsel.  In any event, the government will produce to Fell's current counsel the materials provided previously to trial counsel.   There is no need for the Court to intervene in this component of discovery at this time.

Turning to the Lee's post-arrest conduct in custody, the government will seek summary dismissal as to this claim.  Among other things, Lee's conduct in custody, separated from Fell and prior to his 2001 death, would not have been relevant at trial.  The Court should delay the discovery motion on this issue for now.[11]

---

[11]  The government notes that at trial it was barred from introducing into evidence significant Lee information: Lee's detailed, recorded post-arrest statement, and correspondence Lee sent to his father from custody in Vermont (both of which describing Fell as more culpable).

(6)  <u>Eike Information</u>

Fell asserts that the government hid information about Christopher Eike, the victim of his

Summer, 2000 assault in New York.  This claim, like many in the § 2255 motion, misconstrues

the record.  Trial evidence of the assault on Eike came from Fell, not the government (which did

not allege the assault as an aggravating factor).  It was Teri Fell, a defense witness present during

the assault, who described it without objection on cross-examination.  She testified that Fell first

punched Eike, who fell to the ground.  Fell and Lee then kicked him with their "combat boots"

until Eike was "unconscious" and hurt "very badly."  As Eike lay on the ground trembling and

unconscious, Fell urinated on him.  Trial Transcript, July 1, 2005, Vol. VII-1, pp. 158-159.  In

response to the above testimony from their own witness, the defense introduced related records

of the event on surrebuttal.

Fell now protests that Eike "was not seriously injured and the fight was provoked by Mr.

Eike's attempted rape of Teri Fell – and the defense failed to discover that readily available

evidence." Memorandum in Support of Motion for Leave to Conduct Discovery" at 7.  Yet these

matters were familiar at trial.  Teri Fell testified that what led to the fight was Eike "hanging on

me, and he kept trying to kiss me" and  "grabbing" her body.  Teri "kept asking him to leave me

alone," but he persisted.  Fell witnessed these events and also asked Eike to stop.  Teri told Eike

to stop or she would have "Donnie beat him up."  Eike then hit Fell first, according to Teri, to

begin the altercation.  In short, Eike's sexual interest in Teri Fell, as a causal factor in the assault,

was addressed at trial.

Fell also protests the government's use of the word "coma" in closing argument to

describe Eike's unconscious state.  Yet the word "coma" was introduced by Fell himself,

describing the incident to investigators in a post-arrest interview. In the December 1, 2000, recorded interview by Tom Aiken of the New York State Police, introduced at trial, Fell was asked if he and Lee had been in trouble before. In response Fell described the Eike assault: "Ah, what happened was ah . . . this dude tried to rape my sister and ah, I caught him and ah, I put him in a coma for a day." *Id.* As to the seriousness of Eike's injuries and the duration of his unconsciousness, the government disclosed prior to trial an Eike interview report in which Eike recalled regaining consciousness on the way to the hospital. And again, defense witness Teri Fell testified that Fell and Lee hurt Eike "very badly."

The Eike interview report also stated that he did not file charges against Fell because he was concerned that the police might charge him in connection with misconduct with Teri. Further, the FBI report documented that Eike was in jail at the time of the interview, such that he had a criminal record. Because Eike was not a witness, there was no *Giglio* obligation on the part of the government.

Fell seeks several different kinds of information with regard to Eike. He seeks any information the government has about Eike from the Catskills Regional Medical Center and the Sullivan County Sheriff's Department, as well as an unredacted version of an FBI request arranging the interview discussed above. The government will provide Fell with the unredacted FBI report.

The Court should not grant discovery with regard to the other Eike information. Fell has no basis for asserting that the government had any contact with the Catskills Regional Medical Center. Under *Bracy* and Rule 6, a § 2255 movant should have "good cause" for seeking discovery. Fell has offered none. This claim, like some discussed below, is no more than a

unjustified fishing exhibition for information which would be of dubious probative value. Finally, Fell has made no showing that the government's possession of any hospital records would be relevant to an ineffectiveness of counsel claim.

The government obtained several document from the Sullivan County Sheriff's Department, which were disclosed to the defense during the trial. Fell now claims that additional records might cast more light on the Sheriff Department's thinking about charging Eike in connection with his possible assault on Teri Fell. But Fell now cannot make out a claim for relief with regard to this claim. Teri Fell's testimony and the Eike report clearly raised the issue of Eike's possible misconduct with Teri prior to Fell's assault on Eike. There was no dispute at the trial that Fell was motivated by Eike's conduct towards Teri. The Sheriff's decision-making about a possible charge against Eike would have no bearing on the issue. Fell has not shown good cause for discovery about the government's contacts with the Sheriff's Office.

(7)  John Gacek

As with the Eike assault, Fell's 1992 shooting of John Gacek was introduced at trial by the defense, and was not alleged by the government as an aggravating circumstance. The shooting and its aftermath is described in Wilkes-Barre General Hospital records in the "Donald Fell Mitigation Binder" (at Tab 25), submitted into evidence by Fell. The records describe one of Fell's several childhood psychiatric commitments for "violent behavior towards others." The report at Tab 25 states that the bullet fired by Fell nearly killed Gacek ("a few inches, and the other boy would have been dead with a bullet in his heart"). The report notes that Fell "shows no remorse and even threatens to shoot his mother." The government did not err in pointing out that information to the jury. Had there been trial error, the remedy would have been objection, and

26

then appeal – not a § 2255 collateral argument six years later.

Fell's current counsel, having interviewed Gacek and others, announce that in fact Fell *was* remorseful, and that Gacek forgave him. Yet that too was in the record at trial: the same hospital report discussed above states that, after two weeks in the hospital, "when confronted with the shooting of his friend, [Fell] cries and seems to show genuine remorse." "Donald says he will never play with guns again. His friend forgives him for shooting him. Donald seems to greatly regret the incident whereas at first he bragged about shooting the other boy." *Id*.

The Gacek claim lacks merit, and the related discovery request is not supported by good cause. Further, Fell has no evidence or reason to believe that the government has more information about the Gacek shooting (which would be cumulative in any event). The Court should deny the motion for discovery as to Gacek.

(8) Social Security Disability

Fell's § 2255 counsel evidently believe that Fell was at one time diagnosed with a disability for purposes of the Social Security Administration. Fell speculates that perhaps the government knew of the diagnosis and obtained related information which it did not disclose. Again, Fell advances no reason or "good cause" for this speculation.

(9) Mental Health Misconduct

The mental health prosecutorial misconduct claim requires factual context. By the time of trial, the government was relying upon two mental health experts as rebuttal witnesses: Drs. Wetzel and Welner. Both experts provided evaluations of Fell after the guilt phase verdict. Dr. Wetzel's supplemental evaluation was provided on June 27, and Dr. Welner's on July 5, 2005. Both evaluations contained devastating information for the defense. Although in his § 2255

motion Fell overlooks Dr. Wetzel's evaluation, it undoubtedly played a significant role in related developments.

The Court made very clear during trial that it would consider fully Fell's challenge to the Welner report at the scheduled July 11 *Daubert* hearing. The Court directed the government to have Dr. Welner present for the hearing, and requested briefing.[12] The fact is, even if the defense had successfully excluded Welner, the June 27, 2005 report of Dr. Wetzel and his videotaped June, 2005 interview of Fell were would have been highly damaging if introduced.

Based upon the June, 2005 interview, Dr. Wetzel concluded that Fell:

– "Exaggerated the amount of alcohol used" on the night of the killings and "was not significantly impaired."

– "was generally the leader in his relationship with Bobby Lee."

– "was not under the influence of a severe mental or emotional disturbance at the time of the crimes."

– was the victim of sexual abuse as a young child, but did not report any causal connection between the abuse and the murders, and "I agree – I also do not see a causal connection."

– was the victim of "repeated physical abuse as a young child," but "I do not believe there was a causal relationship between physical abuse and the murders of his mother and Mr. Conway," and "I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship."

– "meets the criteria for antisocial personality disorder fully. I have no doubt of this diagnosis."

Dr. Wetzel also concluded that:

---

[12] "This is a brand-new area for me, and so we'll start . . . looking into it, but what I'm suggesting is that he [Dr. Welner] be here on Monday [July 11] . . . the jury will be coming back on Tuesday, and at that point we'll proceed, but I would like to address all of these issues." Trial Transcript, Vol VIII, July 6, 2005, p. 72.

– during childhood Fell's "mother made multiple ineffective attempts to control [his] behavior and guide him.  He refused and she accepted this defeat perhaps too easily."

– "in my opinion with reasonable professional certainty, neither crack nor marijuana had any effects on the events of the day [of the murders]."

– there is "no sign of psychosis" and "no cognitive deficits detectable on neuropsychological testing."

*Id.*

Had the defense introduced mental health evidence at trial, it would have opened the door to Dr. Wetzel's testimony.  In addition, Dr. Wetzel would have introduced his videotaped interview of Fell, in which Fell made highly damaging statements, not the least of which concerned King's murder.  Fell claimed that he had only kicked Mrs. King two or three times in the torso, then averted his eyes as Lee inflicted the fatal injuries to her head.  He contended that, given his lack of involvement in the killing, King's blood or DNA could not be on his boots.  The presence of blood or DNA on his boots, Fell suggested, could be because he had "stepped in something weird" in another state.   Fell's false denial and explanation was refuted by the DNA expert, and Dr. Baden (who testified that all of King's injuries were inflicted on her head and neck).  Fell made many other very damaging statements during his interview, including descriptions of the two episodes of prison violence proved false by the prison videotapes.  All government mental health experts (Drs. Wetzel, Rabun, and Welner) were impressed with Fell's lack of affect and detachment during his description of the three killings.  *See* Wetzel Report, page 16 ("Mr. Fell showed little emotion and little remorse").

The facts strongly indicated that Fell's trial lawyers elected to forego mental health testimony because, even if they persuaded the Court to exclude Dr. Welner, Dr. Wetzel's opinion

and the videotape would have come in.  Dr. Wetzel would have undermined several defense mitigators, and also opined that Fell had Antisocial Personality Disorder.  The latter diagnosis alone would have been devastating.[13]

In any event, Fell may not raise the mental health misconduct argument again in his § 2255 motion, after raising it at trial, in his Rule 29 motion, and on appeal.  It is settled law that "[s]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal." *Riascos-Prado*, *supra*, 66 F.3d at 33.   In denying the Rule 29 motion this Court held that "[w]hen Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct . . . ."  April 7 Order, *supra* at 31-32 (adding that Fell had "abandon[ed]" and "waiv[ed]" the claim).  Fell's fanciful theory that the government conspired with Welner to manipulate Wetzel in his interview of Fell, all to subvert the Court's limiting order and obtain Welner testimony that Fell was a psychopath, was forclosed years ago.

What does remain a proper subject of the § 2255 motion is the *Strickland* claim that trial counsel were ineffective in not presenting penalty phase mental health evidence.  That is a matter to be explored with trial counsel, and the government has provided to § 2255 counsel its email

---

[13]  Fell's appellate counsel, capital litigation expert Professor John Blume, has written several articles on how antisocial personality disorder is a diagnosis to be avoided.  *See* John H. Blume & David P. Voisin, "Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder," 24 Champion 69 (Apr. 2000) (antisocial personality disorder diagnosis "can be the kiss of death, because to many people, and most judges, this means that the defendant is little more than a remorseless sociopath.").

correspondence with trial counsel.  Fell's request for discovery from the USAO seeks information as to a misconduct claim that is not properly the subject of § 2255 review, and is not supported by a "good cause" explanation of how the material is needed for his ineffectiveness claim.

C.  CONCLUSION

For the reasons set forth above, the Court should deny Fell's motion for leave to serve the requested subpoenas and document requests.  The government will voluntarily produce the bulk of the information for which good cause exists.  The remaining information does not meet the "good cause" test at this time.

Dated at Burlington, in the District of Vermont, this 27th day of June, 2011.

Respectfully submitted,

UNITED STATES OF AMERICA

TRISTRAM J. COFFIN
United States Attorney

By:    /s/ *William B. Darrow*
WILLIAM B. DARROW
PAUL J. VAN DE GRAAF
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov