IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

DONALD FELL                              )
                                         )
        v.                               )          No. 11-CV-075
                                         )
UNITED STATES OF AMERICA                 )


**OPPOSITION OF THE UNITED STATES TO FELL'S § 2255 MOTION**

The United States of America, by and through its attorney, Tristram J. Coffin, United

States Attorney for the District of Vermont, opposes Donald Fell's 28 U.S.C. § 2255 motion to

vacate his sentence.

Fell filed his motion requesting § 2255 relief in March, 2011, along with a 365-page brief

and hundreds of exhibits.  The brief raises 23 sets of claims, most of which contain a multitude

of sub-issues.  The bulk of the claims assert ineffective assistance of trial counsel.  Fell later

moved for extensive discovery, indicating that his claims would be supplemented and refined in

future.  After a thorough review of Fell's petition, the government submits that his claims,

considered against the record, are all insufficient on their face.  Therefore, prior to embarking on

extensive discovery and repetitive cycles of filings, the government submits that the Court should

schedule a hearing for argument on the post-conviction claims for sufficiency.  This Court is

fully familiar with the record, having presided over the trial.  That record is now supplemented

by the multitude of exhibits submitted with Fell's petition, and has now been scrutinized by both

parties in nearly 700 pages of briefing.  In the wake of the hearing, the government respectfully

submits that Fell's claims should be summarily dismissed or, alternatively, dramatically reduced.

### I.    Procedural History

On December 1, 2000, a Criminal Complaint against Fell and Robert Lee was filed in this District.  On December 12, 2000, the Court appointed the Federal Public Defender ("FPD") to represent Fell.  Attorney Alexander Bunin, the Federal Public Defender for the Northern District of New York (an Office which at that time covered Vermont), filed his appearance on behalf of Fell, along with Gene Primomo, also from the Albany FPD Office.[1]

On February 1, 2001, a federal grand jury sitting in the District of Vermont returned a four count Indictment charging Fell and Lee in Count One with carjacking resulting in death in violation of 18 U.S.C. § 2119(3); in Count Two with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a); in Count Three with use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c); and in Count Four with being fugitives in possession of a firearm in violation of 18 U.S.C. 922(g)(2).  (Dkt. No. 21)  Counts 1 and 2 were capital offenses.  Fell was arraigned on February 7, 2001.[2]

On January 30, 2002, the government filed a "Notice of Intent To Seek Death Penalty" (the "Notice of Intent"), pursuant to the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et seq.*  (Dkt. No. 32).  It listed four intent factors, alleging the requisite scienter under 18 U.S.C. § 3591(b)(2), and three statutory aggravating factors under 18 U.S.C. § 3592(c).  The three

---

[1]  Both Bunin and Primomo had experience handling capital cases, Bunin in Texas State court, and Primomo in federal court.  Transcript, June 11, 2002 hearing, p. 10.  The Court of Appeals for the Second Circuit appointed Bunin FPD in 1999.  Bunin has been an Adjunct Professor at Albany Law School, teaching Trial Practice I and II.  He is a life-long member of the National Association of Criminal Defense Lawyers.  Presently he is the Chief Public Defender of Harris County, Texas.

[2]  Lee died in prison in 2001.

statutory aggravating factors alleged that: (1) the death of Terry King occurred during the commission of a kidnapping; (2) Fell killed Terry King in an especially heinous, cruel or depraved manner in that it involved serious physical abuse; and (3) Fell intentionally killed more than one person in a single criminal episode.

The Notice of Intent also listed four non-statutory aggravating factors. They were that: (1) Fell participated in the abduction of Terry King to facilitate his escape from the area in which he and Lee had committed a prior double murder; (2) Fell participated in the murder of Terry King to silence a witness, by preventing her from reporting the kidnapping and carjacking to authorities; (3) Fell participated in the murder of Terry King after substantial premeditation to commit the crime of carjacking; and (4) the killing of Terry King caused her family extreme emotional suffering and severe and irreparable harm.

In June, 2002, the Court appointed a third attorney to join Bunin and Primomo, stating that, "as a matter of personal concern, I want to bend over backwards to make sure that [Fell] gets the best possible representation that he can." June 11, 2002 Hearing, Transcript p. 10 (adding, "I am going to appoint . . . a Vermont attorney . . . that will assist defense counsel in ensuring that they are familiar with the culture of this Court [and] what Vermonters are like. . . . Above all I want to make sure that he gets a fair trial," pp. 11-12). The Court then added Paul S. Volk, of Burlington, Vermont, to the defense team. The three lawyers were joined by a mitigation specialist and, at trial, a jury consultant.

On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same four offenses as the Indictment. (Dkt. No. 57) The Superseding Indictment was sought in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), and included a Notice of Special Findings,

alleging the threshold intent factors and statutory aggravating factors set forth in the Notice of

Intent.  On the same date, the United States filed a Supplemental Notice of Intent to Seek Death

Penalty, alleging the same non-statutory aggravating factors as on the original Notice of Intent.

(Dkt. No. 58)

In mid-2002, Fell filed various pretrial motions, including motions to have the FDPA

declared unconstitutional.  (Dkt. No. 44)[3]  On September 24, 2002, the Court granted one of tthe

latter motions, holding that 18 U.S.C. § 3593(c), the FDPA's relaxed evidentiary standard for the

penalty phase of a capital trial, rendered unconstitutional any jury findings as to the aggravating

factors necessary to impose a sentence of death.  (Dkt. No. 70)  The Court struck the aggravating

factors from the Superseding Indictment, as well as the Supplemental Notice of Intent.  *United

States v. Fell*, 217 F. Supp.2d 469 (D.Vt. 2002).

On October 22, 2002, the government filed an interlocutory appeal.  (Dkt. No. 71)  On

November 5, 2004, the Second Circuit reversed.  *United States v. Fell*, 360 F.3d 135 (2d Cir.),

*cert. denied,* 543 U.S. 946 (2004) (Dkt. No. 73).  The unanimous panel held that § 3593(c)'s

evidentiary standard was consistent with the requirement of heightened reliability in capital trials.

"[I]n order to achieve such heightened reliability, *more* evidence, not less, should be admitted on

the presence or absence of aggravating and mitigating factors . . . ." *Id.* at 143 (original

emphasis).

Jury selection began on May 4, 2005, with individual *voir dire.*  Prior to *voir dire*,

prospective jurors filled out a lengthy questionnaire.  Individual *voir dire* continued,

---

[3] Fell supplemented his motion to declare the death penalty unconstitutional on July 23,
2002 (Dkt. No. 65), and August 27, 2002.  (Dkt. No. 69)

intermittently, through June 6.  The jury was selected on June 9, 2005.  (Dkt. No. 140)

The guilt phase of trial began on June 20, 2005 and ended on June 24, 2005, when the jury returned guilty verdicts on all counts.  The penalty phase began on June 28, 2005.  After nine days of evidence, on July 14, 2005, the jury returned capital verdicts on the kidnapping and carjacking counts.  (Dkt. Nos. 199 and 200).  Fell filed a motion for judgment of acquittal and new trial on August 26, 2005.  The Court denied the motion on April 24, 2006 (Dkt. No. 236).  At a hearing on June 16, 2006, Fell was sentenced to death on both capital counts (Dkt. No. 243), and judgment was entered.  (Dkt. No. 244)

Fell filed a timely notice of appeal from the judgment.  On June 28, 2008, the Second Circuit affirmed the convictions and death sentences.  *United States v. Fell*, 531 F.2d 197 (2d Cir. 2008).  Fell's request for rehearing *en banc* was denied.  *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009).  The judgment became final on March 22, 2010, when the Supreme Court denied Fell's certiorari petition.  *Fell v. United States*, 130 S.Ct. 1880 (2010).  On March 21, 2011, Fell timely filed a petition for relief from his sentence of death pursuant to 28 U.S.C. § 2255.

## II.    Statement of Facts

### A.    Evidence Introduced During the Guilt Phase

At the guilt phase of trial, the government called witnesses who described (1) the disappearance of Terry King during the early morning hours of November 27, 2000; (2) the arrest of Fell and Lee in Arkansas on the afternoon of November 30, 2000; (3) the discovery of the bodies of Debra Fell and Charles Conway in Rutland, Vermont on the evening of November 30, 2000; (4) the interviews of Fell in Arkansas; (5) the discovery of King's body in New York on December 1, 2000; and (6) the forensic evidence, including King's blood and DNA on one of

Fell's steel-toed boots.  The defense introduced no evidence.

1.    The Disappearance of Terry King on November 27, 2000

Norman King testified that he had been married to Terry King for 37 years.[4]  Tr. I-1 at 66.

They lived together in a trailer home in North Clarendon, Vermont, a village several miles south

of Rutland.  *Id*. at 65.  Norman worked full-time at Omya, a mineral processing company north

of Rutland, and Terry worked approximately 15 hours a week at Price Chopper, a Rutland

grocery store.  *Id*. at 65, 68, 74.

On Monday, November 27, 2000, Terry's shift began at 4:00 a.m.  She awoke at around

2:00 a.m. and showered, dressed, and ate breakfast while Norman stayed in bed.  *Id*. at 73.  After

a brief conversation about dinner that evening, Terry drove off to work at around 3:30 a.m., in

her green Plymouth Neon.  Later that day, when Norman returned from work, Terry unexpectedly

was not home.  He called their older daughter, who checked with their younger daughter and then

called Price Chopper employees.  No one had seen Terry since she left home early that morning.

Anthony Mistretta testified that he worked the night-shift maintenance crew at the

Rutland Wal-Mart, located in the same shopping mall as Price Chopper.  The Wal-Mart was

open from 7 a.m. to 9 p.m.  Mistretta and his maintenance crew worked through the night to

clean the store before it opened.  While the crew worked, store lights were on and the front doors

were occasionally opened for the crew to take breaks.  According to Mistretta, during the early

morning hours of November 27, two males with wet hair and dry clothes came in the front door

and asked to buy shotgun shells.  Mistretta told them that the store was closed and asked them to

---

[4]  References to pages of the trial transcripts will be cited as "Tr. _-_ at __."
The first numeral refers to the day of trial and the following number 1 or 2 refers
to the morning or afternoon session, respectively.

leave. Tr. IV-1 at 29. The men needed to be told twice to leave and swore at Mistretta as they departed.

William Liphardt was Terry King's co-worker at the Price Chopper for over ten years. On November 27, he arrived at the store at about 3:30 a.m. Terry usually brought in two cups of coffee, one for him and one for her, along with a bag of Dunkin Donuts for co-workers. She usually parked her car next to his, in the employee parking area on the east side of the building, around the corner from the main entrance. Liphardt was surprised when Terry did not arrive for the start of the 4:00 a.m. shift on November 27. At 4:15 a.m., he went outside to look for her car, and checked again several minutes later, but did not see it. He discussed King's unusual absence with his manager and they decided that she must be sick. Tr. I-1 at 95.

Peter Wink worked the midnight shift at the Dunkin Donuts on U.S. Route 7, between North Clarendon and Rutland. Terry King was one of his regular morning customers. On November 27 between 3:30 and 4:00 a.m. Terry stopped for her usual order of coffee and doughnuts. *Id.* at 101. Wink was the last person, besides Fell and Lee, to see Terry King alive.

### 2. The Arrests of Fell and Lee in Arkansas

Clarkesville, Arkansas is about an hour-and-a-half west of Little Rock on Interstate 40, an East/West highway. At about 1:30 p.m. on November 30, 2000, Clarkesville Police Officer Jeff Ross refueled his marked cruiser at a service station near I-40. As Ross drove out of the station, a green Plymouth Neon pulled in front of him from a gas station across the street. Ross noticed that the male passenger repeatedly turned to look at him. After about a mile, the Neon turned right into a residential area. As it did so, the passenger turned again and looked at Ross. Ross decided to call his dispatcher to run a check on the Neon's Pennsylvania license plate. Tr. I-1 at

127.  Dispatch reported that the plate had been stolen in Pennsylvania the night before.  Ross stopped the Neon and secured its two male occupants, Fell and Lee.

Inside the Neon Ross saw a 12-gauge pump-action shotgun.  It was a police model, with extended magazine capacity, black synthetic stocks, and a shorter than usual length.  Ross also found two pot pipes and a knife in the front passenger door compartment.  In the glove box was the Neon's Vermont registration, mated to the car's vehicle identification number, indicating that the car belonged to Norman and Theresa King of North Clarenden, Vermont.  Ross detained Lee, the driver, and Fell, the passenger, on suspicion of possessing stolen property and drug paraphernalia.

Shortly after the vehicle stop, Clarkesville police called the Vermont State Police and learned that the Neon, and Terry King, had been missing from Vermont since November 27, 2000.  Officers transported Fell and Lee to the nearby Johnson County Detention Center.  During booking, two license plate screws were found in Fell's pants pocket.

### 3.    The Discovery of the Bodies of Debra Fell and Charles Conway

Early in the evening of November 30, after Vermont authorities learned that Fell and Lee had been apprehended driving the car of the still-missing Terry King, Rutland Police Detective Curtis Moore went to Debra Fell's apartment at 135 Robbins Street in Rutland to inquire about her son Donald Fell.  Moore found two dead bodies in the apartment, and summoned forensics specialists.

Investigators found Charlie Conway's body in an easy chair and Debra Fell's body lying on the floor.  Conway's neck had been "literally sawn, um, with his tendons and his insides . . . exposed."  Tr. I-2 at 39.  There was "blood spattered across the wall" behind him.  *Id*. at 39.

Debra Fell laid on her stomach on the floor, with blood on her legs and the bottoms of her feet. *Id*. at 39. Officers photographed the scene and collected evidence. Blood samples were recovered from floors and walls in multiple rooms. *Id*. at 51. Among the items seized were two knives, found wrapped in a towel on the kitchen table. *Id*. at 47. The only drug evidence in the apartment was a film container with marijuana seeds and cigarette rolling papers. The apartment was littered with beer cans. *Id*. at 53-54.

### 4. The Interviews of Fell in Arkansas

On the evening of November 30, 2000, Jimmie Caudle, a Special Agent with the Federal Bureau of Investigation ("FBI") in Arkansas, received instructions to report to Clarkesville to assist with a developing double-murder/missing person investigation. Upon arrival, Agent Caudle and fellow FBI Agent Daniel Sturgill met with other investigators and spoke by phone with Rutland officers and the Vermont State Police. At 11:30 p.m., the agents met with Fell at the detention center. Fell was advised of his rights and signed a written *Miranda* waiver. He then described falsely how he had come into possession of the Neon vehicle in Arkansas. Fell stated that he was hitch-hiking across the country with Lee when a man named "John" picked them up in the Neon. According to Fell, when John stopped and went into a convenience store, Fell and Lee stole the car. Fell admitted that the shotgun, the pipes, and some of the clothing in the car belonged to him. When asked whether he had any prior legal trouble, Fell mentioned "putting a guy in a coma" at the recent "Woodstock Festival." Tr. II- 1 at 6. Fell said he had been visiting his mother in Rutland until the prior week. He claimed he left because she was a crack addict. He was intending to call her when he had access to a phone. *Id*. at 8.

The two agents then talked with Lee for several hours.  Returning to Fell, the agents told him that the bodies of his mother and Conway had been found in Rutland, and that Terry King, the owner of the Neon, also had been murdered.  They asked Fell for his explanation.  Fell stared at the agents without a blink and replied, "I wouldn't kill my fucking mother.  I don't know any fucking Terry.  I'm sticking with my first statement."  Tr. II-1 at 13.

The next morning, Agent Caudle returned to the jail after learning that Fell wanted to talk again.  *Id*. at 16.  After signing another *Miranda* waiver, Fell admitted that he and Lee had killed Conway and Debra Fell.  *Id*. at 15-16.  He said that after the four had been playing cards, he got a knife from the kitchen and attacked Conway.  *Id*. at 16-17.  He slashed Conway's throat and "kept stabbing him and stabbing him."  *Id*. at 17.  At the same time, Lee was slashing and stabbing Debra Fell.  *Id*.  After the two murders, Fell and Lee showered, packed, and walked to the Price Chopper in downtown Rutland.  They waited there for about 15 minutes, looking for a car to steal.  *Id*.  When Terry King drove in, they accosted her with the shotgun, forced her into the Neon's back seat, and fled Vermont.  *Id*. at 18.  King tried to jump out of the car, but Fell restrained her.  *Id*. at 18-19.  At some point after entering New York State, Fell stopped the car and told King she could leave.  *Id*. at 18.  Lee then told Fell that they had to kill her because she could identify them.  *Id*. at 21.  Fell agreed and the two men took King up into the woods.  Fell hit King and knocked her down.  *Id*.  The two men then started kicking her.  *Id*.  Fell said that Lee picked up a rock and slammed it down on her head and face.  *Id*.  When she was dead, Fell wiped his boots off on her clothing and the two men returned to her car.  *Id*. at 22.

Fell and Lee stopped for breakfast at a Burger King restaurant 12 miles south of the third murder.  The killers paid for breakfast with money from King's purse, then discarded the purse in

the restaurant's dumpster. *Id*. at 23, 25. The two men continued on to their hometown of Wilkes-Barre, Pennsylvania, where they visited friends and stole a Pennsylvania license plate off another Plymouth Neon, putting it on King's car. *Id.* at 22. They threw the Vermont license plates into a stream, and also tossed away a baby seat that Terry King had used to transport her grandchild.

After completing this oral statement, Fell agreed to provide a written statement. Caudle invited Fell to "say anything he wanted," including whether he was sorry for what he had done. In its entirety, Fell's written statement reads:

> We were playing cards and smoking crack and drinking Budweiser. Then I don't even know what happened except that for some reason I grabbed a knife and I cut Charlie's throat. Then continued to stab him until I was sure he was dead. When I saw what I did I wanted to turn myself in, but I turned around and saw Bobby killing my mom, Debbie. I tried to stop it, but she was already too far gone. We then took showers and grabbed my shotgun and left. We went to Price Chopper and grabbed a girl named Terry and took her car. That happened when she pulled up and Bobby ran up to her with the shotgun and told her to get in the back seat. He jumped in the passenger side and I drove. We went south. Somewhere along the way we stopped and let Terry out. I believe it was in New York. I told her to walk through the woods and we would leave and let her live. At which point Bobby said we could not let her live because she had our names and descriptions, that we had to kill her. So we followed her into the woods. And she was running towards the road. Bobby got her at the bottom of a hill. I came down from the top and told her to go back up. We found a spot where the traffic could not see. I proceeded to kick her. And Bobby found a rock and threw it on her face at which point we thought she was dead and left. We left Vermont at about 2:30 a.m. When we dropped her off it was light outside. We went to Burger King, got breakfast. And I threw her purse into the dumpster. And we left. We continued. I'm not sure which way we went, but we got into Wilkes-Barre, PA about 6:00 p.m. We spent the day in Wilkes-Barre and left the next night. We switched license plates, threw her plates into the creek and headed to 81 south.

*Id.* at 24-25. The interview concluded at 11:10 a.m. Caudle described Fell's manner as "neutral" and "matter of fact." Tr. II-1 at 29.

-11-

As of mid-day on December 1, King's body had not been found.  Early that afternoon, a New York State Police investigator interviewed Fell and Lee by telephone about where they left King's body.  Vermont law enforcement officers then interviewed Fell.  Rutland Detective Sergeant Rod Pulsifer was one of three Vermont officers who flew to Arkansas to interview Fell and Lee.  By the morning of December 2, the Vermont officers learned that the New York State Police had found King's battered body.

After discussing the New York crime scene with New York officers on the telephone, the Vermont officers tape-recorded interviews with Lee and then Fell.  Pulsifer *Mirandized* Fell and at trial provided the evidentiary foundation for introducing the recording of Fell's interview.  Fell stated that he went to Rutland, Vermont from Wilkes-Barre on September 23, 2000, to visit his mother.  Before that, he had been traveling with a carnival and staying with his aunt and his great grandmother in Pennsylvania.  Fell described his mother as "a good person," who "cook[ed] us dinner" and "bought me cigarettes when I needed them and stuff like that."  Exhibit J at 7.  But she "liked to smoke crack and drink a lot."  *Id.*  He described an altercation with her at the Stop Lite bar in Rutland.  Fell said that his mother had:

> called me up and asked me to come down and get her, so I went to get her and, ah, I went into the bar and I am talking to my mom, some old guy and some black dude named Reggie.  And ah, next thing I know Tina Conway comes up behind me and starts kicking me.  And ah, so I turned around and I spit on her, cause you know I don't feel right hitting a woman you know?  And ah, so my mom grabs hold of me, and the whole way as she is pushing me out of the bar she is smacking me and punching me, and she is yelling at me for spitting on her friend.  And I am like, "she was kicking me," and when we got outside the bar she wouldn't stop, so I kind of shoved her off me.  You know what I mean, instead of hitting her or anything I just kind of pushed her off me, I said "get away from me."  I guess she was real drunk and she fell like a dump, and ah, I tried helping her up, she wouldn't let me help her up or nothing.  They called the cops, and I waited there for them, and they ah, took me to the drunk tank.

*Id*. at 9.

Fell described the brutal murders of Debra Fell and Conway as follows:

> Ah, well, what happened was, is, ah, we were all kind of wasted, you know, pretty, pretty fucked-up. My mom was, we were all smoking crack, and, you know, drinking lots of alcohol and shit. Ah, to tell you the truth I don't really, ah, know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah, I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

*Id*. at 11.

When Sgt. Pulsifer asked, "Well, why did Bobby cut your mom's throat?"  Fell replied:

> I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it . . . .

*Id.*

Fell said that he had met Conway twice before, and that Conway and his mother "were just friends."  He could offer no reason for the Rutland killings.  When asked for a motive and a more detailed narrative, Fell said:

> I guess, I ran, ah, I don't remember, I'm telling you.  I really don't, I ran in and I suppose, I started cutting Charlie apart man, but that's, that's all I can tell you. Like I said, I told him [Agent Caudle] plenty of times already.  You, ah, I don't see how you figure that I am holding out information on it or nothing.

*Id*. at 19-20.  After the Rutland killings, Fell "hopped right in the shower."  *Id*. at 26.

Officers questioned Fell about the murder of Terry King.  Fell recalled that when he and Lee grabbed King, she pleaded, "please, please, leave me alone, don't hurt me."  *Id.* at 34. During the drive, she offered them doughnuts from a Dunkin Donuts bag.  Fell and Lee took

turns driving and holding the shotgun on King.  Fell recalled that:

> at one point in time, driving down the road, she tried to jump out of the moving
> vehicle and ah, I pulled her back in by her arm.  I was gentle with her, I didn't hit
> her or nothing you know, and ah, I pulled her back in and I told her not to try it
> again.  Well, Bobby continued driving he was pretty, he was pretty rotten towards
> her, he was screaming and yelling . . . .

*Id*. at 4-35.

According to Fell, after driving for around four-and-a-half hours, he found "a nice little

spot" on the side of the road and pulled the car over.  He repeated that he intended to let King go,

but Lee insisted that they had to kill her.  The two men then brought her into the woods:

> we both hustled her back up the hill, not, not harsh or nothing hard you know
> what I mean, just go ahead walk up the hill, you know.  And, ah, I found a little, a
> little spot where you couldn't see from the highway, and ah, well we started
> kicking her in her head.

*Id*. at 38.

When the officers asked how King wound up on the ground, Fell responded:

> I pushed her down first, she was on her back. . . . [S]he started to pray.  And ah,
> we started kicking her and ah, Bobby went and ah, he found a rock and it was
> about, yah big, and ah, slammed it right down on her head.

*Id*. Fell said that King "wasn't struggling at all throughout the whole thing, she didn't even try to

struggle, she just took it." *Id*. at 39.  Asked how he knew she was praying, he recalled that she

had held her hands together in front of her. *Id*.  Fell stated that after "I was pretty sure she was

dead . . . I wiped my boot off with her shirt, um, and we left." SA at 48.

The two men returned to the car and continued south.  Fell stated:

> About a half hour later we, we pulled up to a Burger King, ah, and we, we got
> breakfast.  Um, I threw her purse and the doughnuts into the dumpster, ah, like we
> found like $220 on her, in, in bank envelopes and stuff like that.  That's how we
> got gas and ate breakfast and stuff, for a while, and we just continued driving.

*Id*. at 40.

Before leaving Wilkes-Barre, the two men "saw another Neon parked right by where

[King's] car was.  So I thought we would take the tags off that Neon, the Pennsylvania one."  *Id*.

at 42.

The officers asked Fell why he had come to Vermont. Fell said that he wanted to visit his

mother, whom he had not seen for several years:

> I got locked up when I was 14 for not going to school, I skipped two complete
> years of school.  So they threw me in a boy's home.  And I, I was in the boy's
> home for two years, and they threw my mom in jail for it.  Ah, after she got out of
> jail, ah, she split, she just left the State.  Ah, she had warrants and fines, and she
> didn't want to deal with it, and, ah there were a couple points in time when she
> tried coming back into the state, and ah, my aunt would call the cops on her or
> something and have her arrested.  So, she just decided to stay in Vermont.

*Id.* at 46.  Fell added that:

> every time she would call, my aunt, ah, was pretty rotten and she hated my mom's
> guts.  Ah, she would never put me on the phone with her.  Ah, she would always
> tell my mom that I wasn't around, um, so I never got a chance to talk to her.

*Id.*

Fell gave the Vermont officers a block-by-block description of his walk from his

mother's Rutland apartment to the Price Chopper.  His demeanor during the interview was

"matter-of-fact," "cooperative, [and] calm."  Tr. II-1 at 34.  The one exception was when the

officers asked him about his mother's dying words ("I love you"), when he became emotional for

30-60 seconds.[5]  *Id.* at 51-52.  Fell also gave a detailed description of the murder weapons: Lee

used a "black-handled steak knife" with a serrated blade; Fell used a "pretty thick knife" with the

---

[5] The officers learned of Debra Fell's last utterance from Lee's interview.  Lee's post-arrest statement was far more detailed than Fell's.  The Court excluded it under *Crawford v. Washington*, 541 U.S. 36 (2004).

word "Hawk" inscribed on the blade.  Exhibit J at 28.

### 5.    The Discovery of King's Body in New York

A day after the arrests and statements of Fell and Lee in Arkansas, investigators in New York were still trying to find Terry King's body.  They had only very vague information: Fell remembered breakfast at Burger King shortly after the killing, and Lee described the location where King got out of the car as a gravel pull-off on a two lane road, next to a field with a back-board used for target practice.

Investigators focused upon several north/south roads in New York State between Rutland and the Tappan Zee Bridge.  Early on the evening of December 1, officials consulted with Gary Mazzacano, a Senior Investigator with the New York State Police who once had been assigned to the Dover Plains, New York, Police Barracks.  Mazzacano recalled a gravel pull-off in Dover Plains on Route 22, a north/south highway by a field with a target practice back-board.  He also knew that there was a Burger King in Pawling, a town 13 miles south of Dover Plains on Route 22.  Tr. III-1 at 15-16.  After picking up two New York State Troopers, Mazzacano drove to the area, arriving after dark.  Trooper Darren Bialek found King's body.  In the bitterly cold December night, officials secured the area for a forensics team scheduled to arrive in the morning.

Senior Investigator Thomas Martin of the New York State Police supervised the processing of the New York crime scene on the morning of December 2.  *Id.* at 48.  King's body lay face-up in a wooded area about 400 feet east of Route 22.  The brutality of her death was readily apparent –  there were "extensive injuries to [her] face, head and neck . . . large bruising and markings and trauma-type wounds."  *Id*. at 29.  Forensics investigators photographed the

scene, took plaster footwear impressions, collected fiber samples, and retrieved a rock and other items from near the body.

FBI Special Agent Mark Promutico, searching for evidence along Route 22 found King's wallet, two to three miles south of King's body on the west (right-hand) side of the road. It contained her identification documents, but no cash. *Id*. at 75-82. From a dumpster at the Burger King in Pawling, another 10 miles south, the agent recovered King's purse with a Dunkin Donuts bag inside it. *Id*. at 76-83.

Michael Leight worked the 7:30 a.m. shift at Burger King on November 27. Tr. At III-1 at 94. Early in his shift, two males in a small, greenish car ordered breakfast at the drive-through window. After the driver asked if they could buy some marijuana, Leight met the men in the parking lot behind the restaurant. There was a discussion about drug prices, but no sale. The driver (Lee) was wearing a jean jacket with "heavy metal band patches" on it and glasses. *Id*. at 96. The men said they were en route to New York City from Vermont. Leight gave them directions. Both men seemed "normal."

Matt Kolojeski, lived in Wilkes-Barre, across the street from Fell's house. Tr. III-1 at 112-13. Late on November 27, 2000, Fell arrived at Kolojeski's residence in a green car with Bobby Lee. Fell and Lee both seemed normal and calm. That night they "started drinking and smoking a little weed with [Kolojeski's] brother." *Id*. at 115. According to Kolojeski, Fell had done that before, and had a high tolerance for alcohol. *Id*. at 117-18. Fell and Lee stayed the night of November 27 and most of the following day. They talked about going to California. Before they left, they borrowed a screwdriver to do something with their car.

FBI Agent James Glenn recovered King's Vermont license plates from Mill Creek, a stream near Kolojeski's house. The plates had been folded in half, with Vermont's distinctive green coloring concealed on the inside of the fold.

### 6. Physical and Forensic Evidence

In Arkansas, FBI Agent Jerry Spurgers searched King's car. He recovered clothing; a map of Vermont and New York; Lee's wallet (containing an October 22, 2000 bus ticket from Wilkes-Barre to Rutland); receipts from fast food restaurants on highways between Wilkes-Barre and Clarkesville; and a card-board sign, reading: "Stranded travelers in need of food. Please help. God bless." *Id*. at 149.

Brendan Shea, a forensic examiner in the FBI Laboratory, testified as an expert DNA analyst. Tr. III-2 at 4. Shea compared samples of King's and Debra Fell's blood with stains found on the boots worn by Fell and Lee when arrested. Both men had blood on both of their boots. Lee's boots were stained with blood from both Debra Fell and King. Fell's right boot tested positive for blood, but Shea was unable to type the small amount of DNA found. *Id*. at 21. Fell's left boot had mixed bloodstains on it, with King being the major contributor. The rock found near King's body was also stained with her blood.

The government introduced stipulations that: (1) photographs, clothing and footwear (introduced as Exhibits 2(a) - (f) and 3(a) - (e)) were taken from Fell and Lee at the Johnson County Detention Center in Arkansas on November 30, 2000; (2) footwear impressions found at the New York crime scene, between King's body and Route 22, corresponded in design and size to the boots worn by Fell and Lee when arrested; (3) cotton fibers recovered at the New York crime scene, in close proximity to King's body, shared the same microscopic characteristics and

optical properties as the fibers comprising the T-shirt worn by Fell and the jeans worn by Lee when arrested; (4) if called as a witness, Tara Richards would have testified that she lived in Wilkes-Barre near Matt Kolojeski's residence; that she owned a Plymouth Neon registered in Pennsylvania; and that on the evening of November 29, 2000, she noticed that her rear license plate (found on Terry King's car in Arkansas) was missing and reported it to police immediately; (5) King's Plymouth Neon was manufactured in Mexico and had been shipped in interstate commerce; (6) the Mossberg 12-gauge shotgun found in the Neon on November 30 was a "firearm" under federal law; (7) blood samples from the bodies of Debra Fell and Terry King were forwarded to the FBI laboratory and maintained there in accordance with accepted forensic best practices; and (8) toxicology tests conducted on blood samples taken from the bodies of Debra Fell and Charles Conway found a high alcohol content (.39 for Conway and .32 for Debra Fell), but no trace of illegal drugs.

On June 24, 2005, after five days of trial, the government rested its guilt phase case. The defense introduced no evidence. That same afternoon, the jury returned guilty verdicts on all four counts.

B. Evidence Introduced During the Penalty Phase

The penalty phase of trial began on June 27, 2005, with preliminary jury instructions, in which the court gave the jury an overview of the law.

1. The Government's Direct Penalty Phase Evidence

The government's case in chief during the penalty phase supplemented the guilt phase evidence with graphic proof of the heinous, cruel and depraved manner in which Fell and Lee killed their three victims; victim-impact evidence showing the devastating effect of Terry King's

murder on her close-knit family; and witness testimony about Fell's interactions with his mother in Vermont shortly before her murder.

FBI Agent T. Kevin Talley assisted in the search for evidence at the New York crime scene. After King's body was removed by the medical examiner, Talley recovered two teeth, an earring and an earring post from the area near the body. Tr. V-1 at 64.

Dr. Michael Baden, an expert forensic pathologist, responded to the New York crime scene on the morning of December 2, 2000, and later performed an autopsy on King's body. At the crime scene, Dr. Baden observed that King laid "on her back, fully clothed, with extensive evidence of injury to the head and neck area." *Id*. at 79. During the autopsy, Dr. Baden first noticed that there was "no evidence of any droplets of blood falling downward," which is "something we look for to see if the person was standing or lying down when bleeding occurred." *Id*. at 82. There were no injuries below the neck; "[a]ll the injuries were confined to the face, the head, the neck area." *Id*. at 82. The extensive injuries to King's head and neck included blunt force trauma on both sides of the head, extensive damage to the windpipe and the Adam's apple, and extensive fractures to the skull, many "emanating from . . . a severe blow to the . . . bridge of the nose." *Id*. at 83. There had been "severe compression to the neck by a powerful force," which had not broken the skin. That "crushing injury" was consistent with a forceful "stomp" by the boots worn by Fell and Lee when arrested. *Id*. at 87. Dr. Baden opined that the neck injury required "more than 150 pounds of pressure." *Id*. at 89. There were also separate impact injuries to the mouth area, because there were fractures of the upper and . . . lower jaw." *Id*. at 88. The teeth recovered from the area around the body weren't broken: "these were teeth that popped out of their sockets . . . after the bone was cracked," indicative of "another stomping type injury." *Id*.

The blow to King's nose was consistent with the blood-stained rock found near her body. As to the cause of death, Dr. Baden testified that "there was a kind of overkill." King died from blunt force injuries to the face, head and brain and traumatic compression of the neck with asphyxia. *Id*. at 90-91. According to Dr. Baden, "there were many more injuries than necessary to cause death." *Id*. at 95.

Dr. Paul Morrow, then Chief Medical Examiner for Vermont, performed autopsies on Debra Fell and Charles Conway. Tr. V-1 at 104-05. Conway died of multiple stab wounds – "there were approximately 50 stab wounds on the body." *Id*. Dr. Morrow found a complex of deep stab wounds of the left side of Conway's neck – one of which severed his carotid artery – as well as serial stab wounds to the back of the neck, the front of the neck (including a long, gaping six to seven inch wound), the face, the back, the chest and the upper abdomen. Conway also had slicing wounds on his hands. The wounds were consistent with the two knives found in the apartment. Conway bled to death as a result of his wounds. *Id*. at 120.

Dr. Morrow concluded that Debra Fell also died from "multiple sharp force injuries," or "approximately 40" stab wounds. Tr. V-2 at 3. Debra Fell had a 21 centimeter long cut across the front of her neck, made by several wounds, some of which were deep enough to reach her vertebrae. That complex of wounds severed her carotid artery. *Id*. at 5-6. There were also stab wounds on both sides of Debra's head, on her face, on her back, on her side, and on her hands. She had blood on the bottoms of her legs and feet, indicting that she had walked through blood before collapsing. Dr. Morrow testified that Debra bled to death.

Marsha Thompson worked at the Stop Lite Bar in Rutland. *Id*. at 40. Debra Fell was a regular customer during the last months of her life. In the summer of 2000, Debra let

it be known that her son was coming to live with her. When he arrived, Debra brought him into the bar and introduced him as "my son Donny." *Id*. at 43-44. One day in mid-November 2000, when Debra Fell was at the Stop Lite, Fell entered the premises. After drinking from Debra's beer, he tried to take the change she had left on the bar. Debra tried to stop him, but Fell "grabbed her hair and punched her in the head." *Id*. at 45. When Thompson ordered Fell out, he spat and kicked at her. Debra said, "he'll leave if I leave," and walked towards the door. After Fell followed her out, Thompson saw Donald push Debra down on the sidewalk. Thompson called the police, who arrived and took Fell away. Afterward, Debra came back into the bar crying. She told Thompson that she was afraid of her son and did not want to go back to her apartment. Thompson advised Debra to kick Fell out. Debra replied: "I can't. He's my son, and I love him." *Id*. at 49.

Vertith Oberle was a friend of Debra Fell's, and visited her a number of times in her apartment. *Id*. at 58-59. She never saw Debra use drugs or get angry. After Fell and Lee arrived in Vermont, Oberle saw them several times at Debra's apartment. Fell was "mean" to his mother. He was more "outgoing" than Lee, who was the "more quiet" of the two. *Id*. at 62. On the evening of November 26, 2000, Oberle visited Debra's apartment between 9:30 and 10 p.m. Debra, Conway, Fell and Lee were all sitting in the kitchen, playing cards and drinking beer. They seemed to be having a good time. No one appeared drunk or angry. No one was using drugs, and no drug paraphernalia was visible. *Id*. at 65.

The government's remaining penalty phase witnesses were members of King's family: her two daughters and three siblings. The government also introduced a letter from King's oldest grandson. Her children and siblings described Terry King's personal characteristics and the

impact of her murder on their lives.  The government then rested. Tr. VI-1 at 59.

> 2.    The Defendant's Direct Penalty Phase Evidence

Fell introduced testimony from 14 penalty phase witnesses, including family members, teachers, social service providers and law enforcement officers, all of whom testified about Fell's childhood and upbringing.  In addition, Fell presented the testimony of correctional officers and a prison consultant, who testified about his adaptation to prison.  The defense also introduced a "Mitigation Binder" containing hundreds of historical documents generated during Fell's childhood and adolescence, by schools, social services agencies and health-care providers.

> a.  Family Members

The first defense witness was Susan Benczkowski, Fell's older step-sister and the daughter of his father and his father's first wife.  Benczkowski's parents divorced when she was 10.  She testified that her father, Donald Fell, Sr., drank alcohol on a daily basis.  Her mother later told her that he was abusive.  As a young teen, Benczkowski visited her father and his new wife, Debra Fell.  Benczkowski once confronted Debra about drinking beer when pregnant with Donald Jr.; Debra rebuffed her with the remark, "[b]arley is good for the baby."  Tr. VII-1 at 58.

When Benczkowski was 15 and Fell an infant, she lived with her father and Debra Fell for the summer.  She was often responsible for feeding, changing and caring for the baby.  According to Benczkowski, Debra Fell and her father argued and drank constantly.  Benczkowski once saw Debra Fell become enraged and attack her father with a knife.  There was "blood everywhere," and her father locked himself in the bathroom.  Benczkowski called the police, who took her father away.  She cleaned up the blood and found a piece of her father's scalp.

Teri Fell, Fell's 22 year-old younger sister, took the stand after Benczkowski.  She

testified that when she and Fell were children, their parents were always drunk and "yelling at each other." *Id*. at 81. She recalled one night, when she was very young, Donald Sr. and Debra got in a big fight and there was "lots of blood everywhere." Their grandmother came to take her and Fell out of the house. At a later time, her father kept a beer keg in the basement. Teri and her brother would sneak downstairs and "drink beer out of the keg without him [the father] knowing it." *Id*. at 84. The police sometimes came to the house when the parents fought. In addition, her brother and her mother fought . *Id*. at 87. Teri Fell saw Fell hit her mother, and her mother hit him. Fell protected Teri when they were growing up. After Teri had a fight with her mother in January 1994, Debra moved out of the home and Teri did not see her again.

On cross-examination, Teri testified that Debra regularly worked during her childhood. Her brother frequently refused to go to school and stayed out late at night. She witnessed Fell engage in serial acts of violence. These included stabbing a childhood friend with a fork; taking the crutch of Al Wilcox, an injured friend of her mother's and striking him on his bad leg; throwing a door at the same man; and, in a joint assault with Bobby Lee in the Summer of 2000, beating another man "very badly." Fell kicked the latter victim violently and repeatedly when he was on the ground, until he went into shock and a "coma." *Id*. at 144. Fell then urinated on him. *Id*. at 151. When arrested for the assault, Fell gave a false name to authorities. Teri Fell testified that, after her brother went to Vermont in the Fall of 2000, her mother confided to her in a phone conversation that "she was afraid of him." *Id*.

b.  Law Enforcement Officers

The defense called two police officers from Jenkins Township, Pennsylvania, where the Fell family lived in 1989-90. In 1989, Officer Marianne Czanker-Chiumento twice arrested

Donald Fell, Sr. for driving while intoxicated and without a license.  In one instance, Fell, Sr. struck a child on a bicycle with his car.  The other arrest occurred when he had children in the car.  Czanker-Chiumento also responded to several domestic disputes at the Fell residence during which she found both parents intoxicated and arguing.  Tr. VII-2 at 10-15.  According to Czanker-Chiumento, Donald, Sr. was usually the aggressor in the domestic disputes.  The officer never saw Debra Fell physically or verbally abuse a child.  In October 1990, Debra "finally threw [Donald, Sr.] out."  Tr. VII-2 at 25.  After that, officers had no reason to respond to the residence.

Officer Christopher Purcell also responded to alcohol-related domestic altercations at the Fell residence in 1989-90.  He perceived Mr. Fell to be the main assailant, and Mrs. Fell to be essentially a battered spouse.  Prior to late October 1990, Debra had been afraid to take legal action against her husband.  On October 29, 1990, however, Officer Purcell responded after Debra Fell reported that her husband had slapped Donald, then age 10, for refusing to take a shower.  Observing that the boy had "a bloody lip," the officer arrested Fell, Sr.  That incident finally led Debra Fell to obtain a court order requiring her husband to stay away from the house.

### c.  Social Services Personnel

Ellis Carle was a former supervisor of Luzerne County, Pennsylvania Children and Youth Services ("CYS") and a medic.  Tr. VII-2 at 48.  Late one night in April 1985, Carle was dispatched to the Fell house in response to a domestic altercation.  Inside he found Debra Fell with a knife wound in her leg, intoxicated and holding a beer she did not want to put down.  Both children were sleeping upstairs.  A "blood trail" led to the kids' bedroom and the bathroom; "she obviously had gone up to check the kids or something."  *Id*. at 52.  Carle arranged for the children to spend the night with their maternal grandmother, Theresa Sharpe.  Sharpe was a

trained foster parent with whom Carle had worked in past. *Id*. 57. Carle and another social worker collected the children. "[T]he boy [Donald] was kind of groggy" and "didn't want to wake up." *Id*. at 52. The girl (Teri) was "sound asleep" and "wasn't waking up for nothing." *Id*. at 52, 58. Carle recalled that when the boy noticed the blood on the floor, they told him it was spilled paint. *Id*. at 58. Donald, Sr. was found on a nearby street, also with a knife wound.

Carle further testified that in the wake of the Fell family's 1984-85 problems, which included a report of sexual abuse of the two children by a baby sitter, CYS and the Victim Resource Center began providing services to the family. This included counseling, home visits, office visits and phone conferences, as well as an evaluation of the family's housing, medical, emotional and physical needs. *Id*. at 81, 84.

In 1994-96, Donald Fell again came to Carle's attention when chronic truancy landed him in juvenile court. Tr. VII-2 at 86. Initially, the court penalized Debra Fell for her son's truancy (including jailing her a few times), but she convinced the court that "she had done everything she could to get him to school," after which the court focused on Fell. *Id*. at 87. Eventually, a juvenile court ordered Fell to St. Michael's, a residential facility for problem boys. *Id*. at 66.

At St. Michael's, Fell received anger management and drug and alcohol counseling. *Id*. at 90. Carle recalled that Fell initially had "a rough time" at St. Michael's but, after discharge a year or so later, did "pretty good." Carle's office continued to supervise the family for about six months after Fell's mid-1995 discharge then closed the case. *Id*. at 69-70. The last notation in Carle's file indicated that in 1996, Debra Fell sought to regain custody of her children but was told that custody had been transferred to Jackie Sharpe. *Id*. at 70.

Deanna German Habib, a CYS case worker, worked with the Fell family in 1990-92,

when Fell was 10-12 years old. She testified about Fell's youth, based upon her own memory and CYS documents in the defense "Mitigation Binder." She touched again on incidents already related to the jury by Carle. German Habib identified as "risk factors" the fact that both parents abused alcohol and engaged in domestic violence while Fell was young, and that, according to her, "there was not a lot of extended family." Tr. IX at 20-26. She read into the record the 1985 allegation that Fell had been sexually abused by a baby sitter. *Id.* at 30-31. German Habib said that at age 10-12, Fell "seemed like a normal kid." *Id*. at 64. He was on a Little League baseball team and in the Boy Scouts. *Id*. He was also "an A-B student in school," where he had no behavioral problems. German Habib conceded that when CYS closed its initial supervision of the Fell family in late 1985, the file indicated the children were "receiving appropriate care and love," that "discipline has also been appropriate," and that "there [were] no issues of abuse or neglect that would warrant further involvement." *Id*. at 75.

Subsequently, when CYS reopened the case in 1990 and German Habib became involved, CYS documents noted that "there appear to be no behavioral or other attendance problems at school," "the children were dressed neatly and in clean clothes," and the "physical hygiene and appearance of Mr. and Mrs. Fell are not an area of concern." *Id*. at 79. German Habib confirmed that the father left in late 1990, after Debra Fell had him "kicked out" for slapping young Donald. *Id.* at 80-81. German Habib's contemporaneous notes concluded that the mother had "acted appropriately" at the time. *Id.* at 81. Subsequent reports from the Spring of 1991 indicated that, after the father's departure, domestic violence abated and there was no more evidence of Debra Fell drinking excessively. *Id*. at 87.

However, in 1991 Fell's behavior began to deteriorate and he became aggressive with his

mother and his sister. *Id*. at 85, 89. By September 1991, Fell's violence had become "quite severe," and resulted in him being hospitalized. *Id*. at 89. By sixth grade, Fell was "aggressive and oppositional" at school, and had hit and thrown darts at his mother, who was afraid of him. *Id*. at 95. In May 1992, Fell was hospitalized again for violence. He had shot a young friend with a 9 mm pistol; punched his sister; chased his mother with a curtain rod; and kept knives in his room. *Id*. at 103. Debra Fell was afraid that he would use the knives on her. *Id*. at 104. When German Habib closed her file on the Fell family in mid-1992, there were no concerns about excessive drinking or abuse by Debra Fell; on the contrary, she was "providing a safe and stable environment" for her children. *Id*. at 106. The agency's concern was with Fell's behavior. *Id.* at 107.

### d. Teachers

Sharon Hinchey was Fell's Kindergarten teacher in 1985-86. She described Fell at the time as "a wonderful little boy" with whom she never had a problem. After he went on to first grade the following year, he used to "pop in and say hi." Tr. VIII-1 at 14.

Mary Grance Loncoski was Fell's fifth grade teacher in 1990-91. He was a "normal, likeable" boy. *Id*. at 37. He "was a very good reader," who assisted first graders learning to read. Academically he was "average and slightly above average." *Id*. at 33. Late in the year his attendance and work declined.

William Kane taught at St. Michael's when Fell was there in 1994-95. Kane testified that Fell "adjusted pretty well." He was "always respectful" to Kane. He "wasn't a communicator," and was "mostly flat and depressed." But "there were very few incidents that I can recall that were problematic." Tr. IX-2 at 15.

Mary Jo Scott was a teacher at the Northwest Correctional Facility in Vermont, where Fell was detained pending trial. After meeting Fell in mid-2001, Scott helped him prepare for a GED high school equivalency test. She described Fell as "well-read," "curious," "eager," "prepared," and "focused." *Id*. at 73-75. Based upon scores and testing, he was "in the upper percentile" in comparison with other inmates. *Id*. at 74. Scott opined that, "given the opportunity," Fell "would attend further educational opportunities." *Id*. at 76. When asked what impact Fell's execution would have upon her, Scott replied that she valued her ongoing accomplishments with him and "would hate to see . . . an end to that." *Id*. at 82.

### e. Correctional Officers

Ronald Barclay, a Correctional Officer from Northwest, never had difficulties with Fell. However, Barclay admitted that he was not aware of Fell's prison disciplinary record.

James Bailey, another Correctional Officer, testified that during the time he worked in "Echo Unit," where Fell was housed, Fell "followed policies [and] procedures" and was a "quiet" inmate. Tr. VIII-1 at 133. On direct, Bailey testified that Fell took part in "educational and religious opportunities" offered at the facility. *Id*. at 134. Cross-examination revealed that Bailey's only exposure to Fell was as an occasional "float" officer temporarily assigned to Echo Unit. Fulltime officers in that Unit had a lot more interaction with him. *Id*. at 137.

Correctional Officer Jason Rushlow was also assigned to Echo Unit. On direct, he described Fell as a "quiet" inmate who "fit in well." Tr. VIII-2 at 27. He participated in "religious and Bible studies." Tr. VIII-2 at 11-12. On cross-examination, Rushlow reviewed a list of Fell's disciplinary violations. Rushlow then recalled that Fell had an "anger management problem." *Id.* at 48-49 ("[h]e can be explosively angry, and you don't know when it's coming").

During one serious incident shortly before trial, Fell fought with and injured correctional guards. *Id.* Fell also sued the prison for infringing upon his right to practice Native American religion, *id*. at 54-55, and sought to participate in Ramadan as a Muslim. *Id*. at 55-56. He had an "anarchy" tattoo on one arm, and an "upside down cross with 6, 6, 6" tattooed on the other. *Id*. at 60. Fell also filed a multitude of grievances and said derogatory things about officers (calling them "lazy," "stupid," and "things of that nature"). *Id.* at 58.

### f.  Prison Consultant

The last defense witness was James Aiken, a consultant and former prison warden and correctional commissioner in South Carolina, Indiana and the U.S. Virgin Islands. Aiken was retained by the defense to "make an assessment of Mr. Fell in relationship to his adjustment to a prison environment for a long period of time." In Aiken's opinion, Fell's history of prison disciplinary infractions was "fairly minor," and "fairly insignificant." *Id.* at 63-64. If Fell were sentenced to life imprisonment, he would be designated to a United States penitentiary, a "very, very high-security facility," which keeps close control over inmates. *Id*. at 66. Aiken had met with Fell and concluded that he had begun to "mature" and "chill out." *Id.* at 70-71. Fell was a man who could "be adequately managed within the Federal Bureau of Prisons for the remainder of his life," *id*. at 71, "without causing an undue risk of harm to staff, inmates, and the public." *Id*. at 72.

### 3.  The Government's Rebuttal Penalty Phase Evidence

The government's rebuttal witnesses in the penalty phase included two prison officials who related specific incidents of conduct by Fell while incarcerated, a prison expert, and two witnesses from Fell's past: a teacher, and a former friend. In addition, the government submitted

two stipulations regarding Fell's mental health and Lee's accidental death in prison.

### a.  Correctional Officers

Gregory Machia, a Correctional Officer from Northwest, described an incident on March 17, 2004, when a fight broke out among inmates in Echo Unit's outdoor "bull-pen."  Tr. X-1 at 109.  Responding officers secured the area by ordering all inmates to put both hands on the perimeter fence.  When Fell refused to put his hands on the fence or put down his cup of coffee, he was handcuffed and removed.  The ensuing scene was captured on videotape, introduced by Machia.  The tape depicted Fell angrily taunting and yelling obscenities at officers tasked with taking him into the facility.  Tr. X-1 at 112-13.

Correctional Officer Michael Gordon testified about another violent encounter with Fell that occured only a month before jury selection.  After Fell refused to come out of his cell, an "extraction team" of four officers was sent to remove him.  The incident was videotaped.  Gordon, a member of the team, introduced the tape and described what happened.  As soon as the team opened the cell door, Fell charged them aggressively.  He held the top of a "property box" in one hand, and had wrapped his head with a towel to mitigate the effects of pepper spray (which was not used).  *Id.* at 137, 141-42.  As the officers pushed back, Fell fought, kicked, and tried to bite them.  One officer, Jason Rushlow, was kicked in the knee and injured, and was still out of work at the time of Fell's trial.  *Id.* at 138-39.  Once shackled and removed from the cell, Fell lay down on the floor and had to be carried.  *Id.* at 139.  Upon reaching another cell, he threatened an officer.  *Id.* at 140.

### b.  Prison Expert

David Duncan was a 20-year employee with the U.S. Bureau of Prisons and Associate

Warden at FCI Manchester in Kentucky. Duncan had worked at four United States

Penitentiaries. Tr. X-2 at 4. He was qualified as an expert in classification and security matters

in federal prisons. Duncan told the jury that, ordinarily, inmates in pretrial detention are better

behaved than those who have been convicted and sentenced. "Basically their life is hinging on

the outcome of the trial still at that point, so they don't want to do anything negative to be used

against them." *Id*. at 17. Duncan found Fell's disciplinary violations on pre-trial detention

"extremely excessive," and indicated Fell was an inmate "who has a real problem following

instructions, following orders from anybody, and seems to be aggressive back at them." *Id*. at

18-19. Also, in light of the fact that Fell's disciplinary infractions increased in number and

severity over time, Duncan believed that he "seems to be getting worse on his path rather than

better." *Id*. at 43 ("he's not adjusting").

The two videotaped prison incidents alarmed Duncan. As to the cell extraction, he

observed that Fell "seemed to have planned it out. He wanted the confrontation." *Id*. at 23.

Similarly, with respect to the bull-pen incident, Duncan noted that Fell was trying to "goad" the

officers into a confrontation. "He didn't want to avoid the conflict. He wanted to accelerate the

conflict." *Id*. at 24. Duncan stated that, based upon his review of Fell's record, it appeared he

would have "major conflicts or ongoing conflicts with staff" at a future prison facility. *Id*.

at 34. He also testified that prisons were dangerous places: during his two-year tour of duty at

the penitentiary in Florence, there had been "seven homicides and roughly 41 major assaults or

stabbings." *Id.* at 30-31.

### c. Friend

Matt Cunningham was a friend of Fell's during 1997–99. Since that time, Cunningham

had married, had a child, and was employed as a concrete worker. Tr. XI-1 at 39-40. He and

Fell used to "hang out" together nearly every day. There were four other members of their group,

one of whom was Bobby Lee. *Id*. at 43. The group drank, smoked pot, and committed low-level

crimes. Cunningham never saw Fell take harder drugs, like heroin or crack. *Id*. at 48. They all

carried knives. *Id*. at 48. Fell was more "outgoing" than other members of the group and "more

of a leader than some of the rest of us." *Id*. at 46. In contrast, Bobby Lee was the quietest and

least violent of the group; his nickname was "Twiggy." *Id*. at 47.

Cunningham testified that Fell "made it very clear that he didn't . . . like his mother at

all," and said things like, "I could kill her." *Id*. at 51. Cunningham also recalled a conversation

in which Fell said that, "if you killed one person, why stop there? Because you are going to get

the same punishment anyway." *Id*. at 52.

### d. Teacher

John Kozierski was one of Fell's teachers at the Wilkes-Barre Vocational Technical

School in 1995-96. Kozierski taught in the school's Head Start Program. Program students were

mostly from dysfunctional families and the program was designed to help them get a "head start"

and choose a vocation. *Id*. at 59. Kozierski loved his job because students really needed him:

"these students don't really have anybody they can rely on outside of the school . . . they only

have us to count on. . . . [W]ith these students, you can really foster something beyond that

[traditional teacher-student relationship]. It makes it – it really fulfills me, and that's why I love

it." *Id*. at 63-65.

Fell left an indelible impression on Kozierski. He was "[c]onfrontational, disruptive,

uncooperative, discourteous, ill-tempered, [and] hot headed." *Id*. at 65. Yet, testing indicated

that Fell was "an intelligent person," *id*. at 70 ("very intelligent"), and "there was no reason why he couldn't excel." *Id*. at 71.  Kozierski recalled a day in class when Fell refused to sit down as requested.  Fell became irate and began to curse the instructor.  When Fell tried to leave, Kozierski stood in the doorway and said, "whoa, where are you going?"  In response, Fell got "right in my face . . . and says, 'get the fuck out of my way or I will fucking stab you.'"  *Id*. at 67. Kozierski testified that the threat "totally caught me off guard, to say the least."  *Id*.  The incident propelled Fell back into juvenile court, where he denied that it ever happened.  *Id*. at 68.  Upon returning to school, "there was no apology" or any "sign of remorse whatsoever."  Instead, Fell "smirk[ed]" at Kozierski, "like I got the best of you."  *Id*. at 69.

According to Kozierski, Fell was "legendary" at the school.  Of the "between 700 and 800" students he had worked with in the Head Start program, Fell was one of the most unforgettable.  *Id*. at 79.  He was "confrontational" and "hot-headed" with all teachers, and generated a multitude of disciplinary reports and referrals.  *Id.* at 73.

The government's remaining rebuttal evidence consisted of two stipulations.  One concerned the accidental pretrial death of Robert Lee.  The second, Exhibit 14, concerned Fell's mental health. It provided as follows:

> It is stipulated and agreed by and between the . . . parties that after his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations.  Those examinations determined that: (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; and (3) he did not suffer from any mental disease or defect. The examinations also found that Fell was competent to stand trial, and knew the difference between right and wrong at the time of the offenses on November 27th, 2000.

*Id.*

By way of brief surrebuttal, the defense introduced documents relating to Fell's August

2000 arrest in New York for assault.  Summations and jury instructions were delivered the following afternoon, July 13, 2005.

### 4.  The Jury Verdict

On July 14, 2005, the jury returned a special verdict form wherein it recorded its findings with regard to the aggravating and mitigating factors presented during the penalty phase.  The jury unanimously found each of the threshold intent factors, as well as, each of the statutory and non-statutory aggravating factors presented by the government.  (Dkt. No. 200, pp. 3-9)  The jury made findings of the proffered mitigating factors as follows:

| | Mitigating Factor | Number of Jurors Who So Find |
|---|---|---|
| 1. | Impaired Capacity | 0 |
| 2. | Did not plan to kill King when he kidnapped her | 1 |
| 3. | Truthfully admitted responsibility for King murder after arrest | 6 |
| 4. | Assisted Officers in Finding King's body | 6 |
| 5. | Fell is not a risk to others in prison | 0 |
| 6. | Fell has made a positive contribution in prison | 1 |
| 7. | Execution Impact | 3 |
| 8. | Fell is remorseful for King's murder | 0 |
| 9. | Lee, who is equally culpable, will not face death | 12 |
| 10. | Fell and Lee acted in concert in committing crimes | 12 |
| 11. | Fell offered to plea to life imprisonment | 12 |
| 12. | Fell was sexually and physically abused as a child | 12 |
| 13. | Fell witnessed family violence as a child | 8 |
| 14. | Fell was raised without positive role models | 10 |
| 15. | Fell was institutionalized for mental health conditions | 12 |
| 16. | Fell was 20 years old at the time of the offense | 12 |
| 17. | Fell's parents were violent alcoholics who abandoned him as a child | 12 |
| 18. | Fell regularly abused alcohol and drugs from childhood until his arrest | 12 |

Written in by Jury

19.   Total life experience                                                       10
20.   Failure of state social and mental health services to effectively    10
       intervene in his childhood abuse and to treat or address his early
       antisocial behavior

(Dkt. No. 200, pp. 12-17)

## FEDERAL COLLATERAL REVIEW
## OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief

under § 2255 are narrower than those for relief on direct appeal. As discussed below, with very

limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or

constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and

rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or

(5) an error that did not have a substantial and injurious effect or influence in determining the

jury's verdict.  Section 2255 relief may be based upon (6) ineffective assistance of counsel, if a

petitioner demonstrates sufficiently deficient performance and resulting prejudice.

    A.    Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed

errors in conviction and sentencing.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979);

*Davis v. United States*, 417 U.S. 333, 346 (1974).  Once a defendant has appealed his conviction,

the court is "entitled to presume he stands fairly and finally convicted. . . .  Our trial and appellate

procedures are not so unreliable that we may not afford their completed operation any binding

effect beyond the next in a series of endless postconviction collateral attacks." *United States v.*

*Frady*, 456 U.S. 152, 164-65 (1982); *see also Lucas v. United States*, 963 F.2d 8, 14 (2d cir.

1992). Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962); *United States v. Bokun*, 73 F.3d 8, 12 (2nd Cir. 1995).

### B.     Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. § 2255(f); *Moshier v. United States,* 402 F.3d 116, 118 (2d Cir. 2005). The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing. *United States v. Willis*, 202 F.3d 1279, 1280-81 (10th Cir. 2000). The period of limitations also bars untimely amendments that add new claims to a defendant's initial § 2255 motion, unless they "relate-back." *Veal v. United States*, 334 Fed.Appx. 402, 403 (2d Cir. 2009). While § 2255 petitioners may file untimely amendments that amplify the facts in their timely-filed motions, they may not use such pleadings to add new claims. *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 815 (2d Cir. 2000). Section 2255 petitioners may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control. *Baldayaque v. United States,* 338 F.3d 145, 150 (2d Cir. 2003).

### C.     Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the petitioner omitted to raise on appeal. *Frady*, 456 U.S. at 165 (1982); *Campino v. United States*, 968 F.2d 187, 189-90 (2d Cir. 1982); *United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008); *United States v. Dunham*, 767 F.2d 1395 (9th

Cir.1985); *Bumgarner v. United States,* 758 F.2d 1292 (8th Cir.1985); *United States v. Griffin,* 765 F.2d 677 (7th Cir.1985); *United States v. Hanyard,* 762 F.2d 1226 (5th Cir.1985). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *See Billy-Eko v. United States,* 8 F.3d 111, 114 (2d Cir. 1993) (*superceded by statute on other grounds* as noted in *Triestman v. United States*, 124 F.3d 361, 369 n. 8 (2d Cir. 1997)).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances. First, they may consider defaulted claims when a petitioner demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *Campino*, 968 F.2d at 190. "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can show cause by demonstrating that a claim was "so novel that its legal basis [was] not reasonably available to counsel." *Bousley*, 523 U.S. at 622. A petitioner can also establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (holding that ineffective assistance of counsel claim asserted as cause for procedural default of another federal claim could itself be procedurally defaulted); *see also Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001). To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional

-38-

dimension." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003).

        D.        Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *Cabrera v. United States,* 972 F.2d 23, 25 (2d Cir. 1992). Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in the law of a circuit." *Davis v. United States*, 417 U.S. 333, 342 (1974).

        E.        New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. at 310. When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do. *Id.* at 351-52. A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id.* Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *Id*. at 156-57.

F.    Harmless Error

Even assuming that a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 578-79 (1986). Thus, absent a showing that the case involves one of a rare group of structural errors that affect the framework of the trial and require reversal without a showing of prejudice, a § 2255 petitioner cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases). Indeed, the Second Circuit recognized the extensive mitigation case presented by Fell in finding no prejudice from the admission of evidence regarding Fell's satanic beliefs. *U.S. v. Fell*, 531 F.3d 197, 230-31 (2d Cir. 2008).

G.    Ineffective Assistance of Counsel

As the Supreme Court has made clear since *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant making a Sixth Amendment ineffectiveness claim must show both that counsel's performance was so deficient as to fall "below an objective standard of reasonableness," and that, as a result of counsel's unprofessional errors, "there is a reasonable probability that . . . the results of the proceeding would have been different." 466 U.S. at 688. Petitioner bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009); *United States v. Payton*, 159 F.3d 49, 59-60 (2d Cir. 1998).

The reasonableness of counsel's performance must be evaluated "from counsel's

perspective at the time of the alleged error and in light of all the circumstances" (*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)), and without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Because it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all to easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful," "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Hence, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. *See also Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Thus, in order to establish that his lawyer's performance was constitutionally deficient, a defendant "must overcome the 'presumption that, under the circumstances, the challenged action "might be considered sound trial strategy'"" by a reasonable attorney. *Id*. *United States v. Chandler*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (defendant "must establish that no competent counsel would have taken the action that his counsel did take").

The strong presumption of reasonableness and judicial deference apply to counsel's investigative decisions. As the Supreme Court reiterated in *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), defense counsel has a constitutional duty to conduct a pretrial investigation that is "reasonable[] under prevailing professional norms," which "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

"[S]trategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Further, "strategic choices made after less than complete investigation" are reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Id.*; *see also Wiggins*, 539 U.S. at 521; *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("reasonably diligent counsel may draw a line where they have good reason to think further investigation would be a waste").

The choice between alternative, conflicting defenses is one instance where reasonable professional judgments support the limitations on investigation. *See Williams v. Woodford*, 384 F.3d 567, 611-12 (9th Cir. 2004) ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental status defense"). Because an ineffectiveness inquiry properly focuses "on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement," what the lawyer "did not miss" is "just as (or more) important as what the lawyer missed." *See Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998).

## SUMMARY OF ARGUMENT

Fell claims that his trial attorneys were ineffective in investigating and presenting readily available mitigation evidence – yet nothing could be further from the truth. Trial counsel called a total of 14 mitigation witnesses in the penalty phase, encompassing six distinct areas of testimony: two family members; two social workers; two law enforcement officers; four teachers; three correctional officers; and one prison consultant. These witnesses painted a graphic and compelling picture of Fell's dreadful upbringing, plagued by chronic alcoholism, physical and emotional abuse, sexual abuse, neglect, and ultimately abandonment. In addition, trial counsel introduced a mitigation binder containing over 300 pages of documents

memorializing events during Fell's childhood and adolescence, including his interactions with social services departments, schools, and the mental health system.  One of the teachers and the three correctional officers testified about Fell's conduct in a residential home and in prison.  The jury thus had a comprehensive picture of Fell's background.

Fell cites several cases where the Supreme Court reversed a death sentence based on trial counsel's failure to investigate and present mitigation evidence.  *See* P 20-21.  Yet Fell's trial counsel adequately investigate his background, and presented a compelling case in mitigation, introducing evidence of a childhood and adolescence characterized by parental chronic alcoholism, neglect and abuse.  Trial counsel's success in conveying a graphic picture of Fell's horrendous upbringing is memorialized in the fact that the jury, in addition to unanimously finding each of the mitigating factors related to Fell's background, added the following two mitigating factors:

1.    Total life experience.

2.    Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*See* Special Verdict Form, Penalty, Dkt. 200 at 14.  Hence, trial counsel effectively investigated and presented mitigation evidence.  While the government does not dispute the fact that other witnesses were available, the record indicates that trial counsel's decision not to call more witnesses was a reasonable strategic decision.  The testimony of additional witnesses now proffered by Fell would have been cumulative.

Fell also claims that trial counsel was ineffective in failing to investigate and present mental health evidence.  He seems to start from the erroneous premise that every capital case trial

should include defense mental health evidence.  In this case, Fell's attorneys investigated Fell's

mental health from the outset, in 2001.  They consulted with three mental health experts:

psychiatrist Dr. Mark J. Mills, neuropsychologist Dr. Wilfred G. van Gorp and

neuropharmacologist Dr. Jonathan J. Lipman.  All three experts examined Fell, and none found

him to be psychotic or to have any cognitive functioning deficits.  In addition, none found Fell to

be suffering from a mood disorder, other than mild depression, and none indicated that Fell

suffered from fetal alcohol syndrome – despite being aware that his mother was a chronic

alcoholic.  Trial counsel also obtained Fell's medical records arising from four psychiatric

hospitalizations between the ages of 11 and 13.  All four hospitalizations involved conduct

disorder, and while Fell was treated with anti-psychotic drugs, he was never diagnosed as

psychotic.

Further, as trial approached counsel retained the services of a fourth mental health expert,

psychologist Dr. Mark Cunningham, who prepared a social history of Fell and analyzed "risk

factors" for violence and aggressive behavior present in his background.  Both Dr. Cunningham

and Dr. Mills were prepared to testify in the penalty phase.  However, trial counsel made a

strategic decision in midst of the penalty phase not to call them.  Counsel's decision was

reasonable in light of likely damaging rebuttal testimony from government mental health experts.

Trial counsel had been successful in presenting a grim picture of Fell's childhood.  That evidence

had been received essentially uncontested by the government.  Introducing mental health expert

testimony not only would have afforded the government an opportunity to rebut such evidence

with their own experts, but it would have detracted from the weight of Fell's background

mitigation case by turning the penalty phase into a battle of experts.  Given the findings of the

respective experts, it was not unreasonable for counsel to elect not to risk rebuttal mental health testimony.

Fell further asserts that trial counsel was ineffective in failing to pursue a motion to exclude the proposed, but never presented, rebuttal testimony of a government psychiatrist, Michael Welner, M.D. However, the trial team's strategic decision not to present mental health evidence did prevent Dr. Welner's testimony. Fell assumes first, that counsel would have succeeded in excluding Dr. Welner's testimony; and second, that had trial counsel been successful in excluding Dr. Welner's testimony entirely, his mental health case would have gone unrebutted. This is simply unrealistic. Successfully excluding any testimony by Dr. Welner was highly unlikely. While the trial court might have entertained excluding part of Dr. Welner's testimony, the Court made clear that it was going to allow both parties to present their mental health experts. In any event, even if Dr. Welner had been excluded, the government had another powerful mental health expert, Dr. Richard D. Wetzel, who had examined Fell in depth and on video shortly before trial and was available to testify. Even excluding Dr. Welner would not have done away with the government's mental health case. Fell would still have been exposed to very damaging rebuttal testimony.

Fell also presumes that a mental health strategy would have been successful. This presumption is also erroneous. Government and defense experts would have both testified that Fell was not psychotic and had no cognitive functioning deficits. While defense experts concluded that Fell was impaired at the time of the murders due to alcohol consumption, both government experts would have rebutted that claim. Drs. Wetzel and Welner both concluded that Fell was not impaired, because, among other things, he remembered exactly what happened,

was able to retell his actions step by step immediately after the murder, including the carjacking and kidnapping of Terry King, and was able to make organized, rational decisions. Moreover, evidence indicated that Fell showed no signs of being intoxicated more than four hours after the murders of his mother and Charles Conway, when he and Lee killed Terry King. Nothing that any mental health expert could have said would have detracted from the fact that Fell knew what he was doing and could appreciate the consequences of his actions at the time of the murders.

In any event, hypothesizing about whether or not a different defense mental health strategy would have been successful is not determinative of Fell's ineffectiveness claims. The critical fact is that defense counsel adequately investigated Fell's mental health and made a strategic decision not to present a mental health case. With the benefit of hindsight, Fell now speculates that trial counsel should have presented mental health evidence. Yet the contrary decision during trial was a strategic one, and Fell is not entitled to relief simply because his trial strategy did not succeed. Fell is not entitled to a successful penalty strategy, he is entitled to a reasonable one. *See, e.g., Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009) ("the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices") *(quoting Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)).

Fell's remaining claims can be classified into claims alleging either trial counsel's failure to conduct additional investigation of certain matters, and government misconduct. None of the additional claims have merit.

For example, Fell faults his counsel for failing to present additional witnesses regarding his accidental shooting of his childhood friend, John Gacek, but the evidence proffered by Fell would have been cumulative and would have added nothing to the evidence presented in the

penalty phase.  Similarly, any additional investigation of Fell's assault on Christopher Eike, three months before the capital offenses would not have yielded material evidence.  Moreover, the presentation of the testimony of Deacon Steve Ratte would not have added little of significance to Fell's sentencing profile and could have opened the door to damaging evidence.

Fell's claim that the government failed to disclose favorable evidence about Robert Lee is not only patently false, but also disingenuous in light of their sensible trial strategy to exclude any statements by Lee.  Fell's claim that the government failed to disclose Officer Marc Pelkey's disciplinary record is also false, and in any event, caused Fell no prejudice as Fell was unaware of such a record, Officer Pelkey did not testify at trial, and his intervention with Fell was recorded on video and submitted to the jury.

Fell's claim faulting his counsel for failing to conduct a forensic investigation of the Terry King murder that would have rendered him ineligible for the death penalty also lacks merit.  Fell claims that King was killed only as a result of a blow to her head by a rock, and therefore, only Lee intentionally caused her death.  However, Dr. Baden's testimony and King's autopsy report indicate that King suffered multiple skull fractures and contusions of her brain, as well as extensive neck injuries, which according to the evidence, were caused not only by a rock, but by repeated kicks to King's head and a heavy stomp to her neck.  In light of the fact that King's DNA was found on Fell's boot, and he admitted kicking King in the head, the jury was free to find that Fell intentionally killed King or intentionally inflicted serious bodily injury that resulted in her death.  The jury found both.  In any event, the last two intent factors also applied to Fell rendering him death eligible.  Therefore, Fell cannot show prejudice.

Similarly, the evidence proffered by Fell against the heinous, cruel and depraved statutory

aggravating factor is not only unreliable, but nonconsequential.  Such evidence would not have established that King did not suffer more injuries than necessary to cause her death, nor would it have negated the fact that Fell inflicted those injuries.  Likewise, the evidence proffered by Fell about the Rutland murders or about Debra Fell's life in Vermont would have added absolutely nothing to the sentencing profile presented at trial.

Trial counsel adequately investigated Fell's potential diminished capacity, and counsel's decision not to rely on a diminished capacity defense in the guilt phase was informed and reasonable.  As was counsel's decision not to rely on expert mental health testimony in support of the diminished capacity mitigating factor presented in the penalty phase.

Trial counsel was not ineffective in failing to present additional witnesses in support of execution impact as any additional witnesses would have either not offered relevant testimony, or opened the door to damaging testimony on cross-examination.  Similarly, trial counsel was not ineffective in failing to object to relevant and probative evidence such as the t-shirt Fell was wearing upon arrest.  Nor was counsel ineffective for failing to object to properly formulated arguments by the government in final summation, which the Second Circuit has already determined were not error.

Fell's claim of misconduct in connection with drug evidence in Arkansas and Rutland is pure speculation and has no basis whatsoever.  His claims of prosecutorial misconduct during arguments to the jury were variously defaulted or adjudged in the criminal case, and are not proper subjects for § 2255 review.  In any event, they are meritless.  Similarly, Fell's *Brady* claims are based upon erroneous allegations and have no weight.

Further, Fell's half-hearted and undeveloped claim alleging that his trial counsel was

ineffective for failing to object to leading questions, as well as to the testimonies of Police

Officer Christopher Purcell regarding battered women; William Kane regarding freedom of

choice; Terry Fell regarding an assault by Fell; Matt Cunningham about Fell's expressions

regarding multiple murders; and Matthew Kolojeski regarding Fell's tolerance of alcohol lacks

merit. All of the above listed testimonies were supported by adequate foundation based on

personal experience and observation and were; therefore, admissible.

Fell's claims of ineffective assistance of counsel warrant no relief individually, or when

considered jointly, as they had no effect on the outcome of the trial.

Fell makes a multi-pronged attack on his trial team, raising 13 enumerated claims

about the alleged failings of his three attorneys. All of his claims arise in the context of the

penalty phase of trial. As detailed below, none of Fell's allegations has merit under the

prevailing standards for constitutional competency of counsel. Fell's § 2255 claims are

discussed below, under the same argument numbers used in his petition.

### III.    TRIAL COUNSEL ADEQUATELY INVESTIGATED AND PRESENTED MITIGATION EVIDENCE

While trial counsel in a capital case has an obligation to investigate and present relevant

mitigation evidence, he/she has no obligation to uncover and present every detail of a defendant's

life, particularly when such details would not change the sentencing profile. See *Van Hook*, 130

S.Ct. at 19 ("there comes a point at which evidence from more distant relatives can reasonably be

expected to be only cumulative, and the search for it distractive from more important duties").

Fell claims that his trial attorneys were ineffective in investigating and presenting more

mitigating information about his social history than was presented by the 14 witnesses at trial. It

is significant that his claim is not failure to advance a particular defense, or failure to investigate and present social history evidence.  At trial Fell's attorneys advanced precisely the defense now urged by his § 2255 attorneys: to rely upon mitigating social history in the penalty phase.  The trial attorneys presented an extensive and compelling mitigating social history case in the penalty phase.  Yet Fell now protests that his trial lawyers failed to investigate and present "more evidence" of his social history.

In an effort to substantiate Fell's claim, his new attorneys summarize certain information in bullet format in the § 2255 petition, (P 28-30)[6] – information that he claims the jury would have learned had his attorneys done an adequate job investigating and presenting his social history.  However, a review of the record reveals that the jury in fact learned most of the information now proffered  To illustrate this point, most of Fell's bullets are reproduced below with corresponding citations to the record where such facts were established or addressed.

> \*      Donald ("Donny") Fell was born on April 30, 1980, in Wilkes-Barre, Pennsylvania, (Tr. II-1 at 3; Exhibit 11g), into a family plagued with long histories of mental illness (Tr. 8-1 107; MB Tab 28),[7] suicide, alcoholism (Tr. VII-1 at 47, 59-60, 79, 82-83; Tr. VII-2 at 13, 29, 37; Tr. 8-1 at 18, 47-48, 51), and substance abuse on both sides.

> \*      From the beginning, Donny's life has been surrounded and shaped by alcoholism, [substance abuse, mental illness], childhood neglect, and family violence, set against the backdrop of Luzerne County, Pennsylvania. (Tr. VII-1 at 57, 59-60, 76-77, 79, 86; Tr. VII-2 at 14, 15, 37, 44; Tr. 8-1 at 31-33.  Luzerne County is an old coal mining and industrial area that has been in economic decline for decades, and is overwhelmed with deep-seated poverty, unemployment, government corruption, alcoholism, drug addiction and extreme violence.

---

[6]  Citation references to pages of Fell's 2255 petition are in the form, "P __."

[7]  Citation references to tabs in the "Mitigation Binder" introduced by Fell at the penalty phase of trial are in the form "MB Tab __."

\*      Mr. Fell's parents, Donald Fell Sr. ("Don Sr.") and Debra Kotzer Fell ("Debra"), were chronic alcoholics who fought violently with each other and neglected their children – Donny and his younger sister Teri Fell. (Tr. VII-1 at 47, 57-60, 79; Tr. VII-2 at 8, 13, 16-17, 29, 37, 44; Tr. 8-1 at 47, 51; *See also* Special Verdict Form, Dkt. 200, p. 14, Factor 17).

\*      Debra drank heavily during her pregnancy with Donny (Tr. VII-1 at 57), as she did with his sister Teri.

\*      Because of the severity of the abuse and neglect in Donny's home, the local law enforcement agencies became involved in their lives (Tr. VII-2 at 8, 15, 27-28, 29), when Donny was only two years-old. MB, Tab 14.

\*      In 1985, when Donny was four and his sister two, the children revealed to authorities that they had been repeatedly sexually assaulted and physically abused by their babysitters. (Tr. VII-2 at 69, 70; Tr. 8-1 at 22, 25, 32).  Even at this young age, Donny displayed signs and symptoms of chronic exposure to trauma.

\*      Soon after the sexual assaults came to light, Donny's mother Debra stabbed her husband Don Sr. in the back in a drunken rage, and Don Sr. retaliated by stabbing her in the leg. (Tr. VII-2 at 43-44, 47, 68-70, 73; Tr. 8-1 at 22, 25, 26, 30). Concerns were raised about Don Sr. and Debra's alcoholism and family violence in front of Donny, but the local Children and Youth Services agency ("CYS") failed to meaningfully intervene in the family, and the traumas continued to mount.  (Tr. VII-2 at 51-52; *see also* Special Verdict Form, Dkt. 200, p. 14, Factors 19 and 20 written in by jury).

\*      At age 7, Don Sr. and Debra moved Donny and his sister to the rough north Wilkes-Barre neighborhood where Donny spent most of the rest of his life.  His parents' alcoholism and violence increase, and police were called regularly to break up their fights.  (Tr. VII-2 at 13-17, 27-29).  Among other violent acts, Debra again stabbed her husband in front of their children, this time deep into his arm, traumatizing them again.  (*Id.* at 44-47; Tr. 8-1 at 33).

\*      Whereas the violence between the parents was well documented, the parents' violence against their children was largely overlooked by the authorities.  (Tr. VII-1 at 79, 86; Tr. VII-2 at 29-31, Tr. 8-1 at 76).  Donny tried to protect himself and his sister from their parents' abuse by finding places to hide.  (Tr. VII-1 at 88). CYS reopened their case on the family, bringing dependency proceedings in hopes of ameliorating the situation, but again failed.  (Tr. 8-1 at 23, 33-34).

\*      Contrary to what was presented at trial, Donny's life did not improve after Don Sr. left the household.  (Tr. VII-1 at 105-06; Tr. 8-1 at 44).  Donny's life worsened in

the quality and range of his abuse and neglect at the hands of his mother, her boyfriend, and all of his subsequent guardians. (Tr. 8-1 at 76-77). Donny's mother was a violent, aggressive, and disturbed woman, (Tr. VII-1 at 59-60, 64; Tr. VII-2 at 13-14; 27-28, 44-47); who physically, emotionally (Tr. VII-1 at 76-77, 86; Tr. 8-1 at 47, 51), and sexually abused her children (Tr. 8-1 at 66); and harbored a lifelong addiction to drugs and alcohol that lasted well after Don Sr.'s departure. (Tr. 8-1 at 47, 51; Tr. VII-1 at 106, 109, 112).

* Contrary to what was presented at trial, Debra Fell's live-in boyfriend following her husband's departure, Ellery "Al" Wilcox, was not a role model for Donny. (Tr. 8-1 at 48). Mr. Wilcox was a hard-drinking member of a motorcycle gang. Al Wilcox set about beating respect into Donny on multiple occasions (age 11), but he had a special affection for Teri (age 9). (Tr. VII-1 at 105-06). Al had Debra molest Teri as he watched. (Tr. 8-1 at 66). When Donny tried to object, he was beaten. (Tr. 8-1 at 76). Debra and Al continued to drink heavily and fight, requiring police and CYS intervention on several occasions. (Tr. VII-1 at 107; Tr. 8-1 at 52).

* Debra and Al regularly abused and neglected Donny, and things got so bad that he began displaying undeniable signs of a mental illness. (Tr. 8-1 at 74-78, 86, 90). He was institutionalized four times within a span of two years between the ages 11 and 13, each time for about a month. (Tr. 8-1 at 78, 90; MB, Tabs 22-32). However, each time he returned he was helplessly exposed to the same violent and chaotic home life. (Tr. 8-1 at 47-48, 51. *See also* Special Verdict Form, Dkt. 200, p. 14, Factors 19 and 20).

* When Donny was age 13 (and his sister age 11), his mother lost custody of them. Donny and his sister were to be placed with their maternal grandmother, Theresa Sharpe, but Theresa, who had always favored Teri, refused to take Donny. (Tr. VII-1 at 127-28, 143, 157; Tr. VII-2 at 54-56; 57, 59; Tr. 8-1 at 50-52). Theresa, built up by the government as a loving foster parent, was a drinker herself and wanted little to do with Donny. (Tr. VII-1 at 143, 157; Tr. 8-1 at 33). Donny was thus placed in a juvenile residential facility called St. Michael's School for over a year, when he was 13. (Tr. VII-2 at 59, 60, 76; Tr. 8-1 at 51; MB Tabs 39-41).

* Just as Mr. Fell's father had done three years earlier, Debra succumbed to her alcoholism, (Tr. VII-1 at 106, 109, 111-13); and illness and was homeless for a while, sleeping under a bridge in Wilkes-Barre. She eventually ended up in Rutland, Vermont. (*Id*. at 146).

* After Theresa passed away from cancer, Donny and his sister were placed with their mother's sister, Jackie Sharpe, who was 21 years old. (Tr. 8-1 at 52, 54-55; Tr. VII-1 at 129).

\*      Mr. Fell was left to fend for himself because Jackie Sharpe was a mentally ill, violent and volatile young woman who was arguably more physically and emotionally abusive than Donny and Teri's parents had ever been. (Tr. VII-1 at 129-30; 142). Although not presented at trial, it would have been undisputed that Jackie had been behaving strangely and having violent rages since she was a child. The violence and abuse Donny suffered at the hands of Jackie broke young Donny to the point where he contemplated suicide.

\*      When Donny was 17, Jackie Sharpe threatened to stab him with a pair of scissors and ultimately kicked him out – leaving him homeless. *See* VII-1 at 130, 142. Donny was forced to stay intermittently with friends and relatives, working on a traveling carnival up until the end of the summer of 2000 (Exhibit J at 5-7), when he decided to try to renew his relationship with his mother. *Id*. He moved to Vermont in September of that year, about two months before the crimes. *Id*.

\*      In addition to the above, had counsel conducted a reasonable investigation, the evidence would have further showed – contrary to what was stipulated at trial – that Mr. Fell was and is profound mentally impaired. But see P. Exhibits 2,3,4 and 5.

As demonstrated above, the record reveals that the overwhelming majority of the mitigating background information now proffered was presented to the jury. Trial counsel diligently sought and obtained social history evidence, and presented to the jury a powerful and compelling mitigation case. Counsel's decision not to seek and present even more mitigating evidence fell "well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699.

There is no doubt that Fell encountered abuse and neglect during his childhood and adolescence. However, there is also no doubt that the jury was well aware of those circumstances and considered them in mitigation during the penalty phase. Fell starts from the erroneous premise that a "dreadful infancy, childhood, and youth" leaves an individual so impaired that it necessarily mitigates a sentence of death. This is simply not correct. While Fell is entitled to have a jury consider his "dreadful infancy, childhood, and youth," he is not entitled

to have the jury conclude that those circumstances outweigh aggravating circumstances. That balancing was precisely the issue presented to the jury in the penalty phase: did Fell's "dreadful infancy, childhood and youth" outweigh the aggravating circumstances associated with his crimes? The jury unanimously concluded they did not. What is relevant, thus, is whether the jury had the necessary information before them to make this decision – it clearly did. That trial counsel could have presented more witnesses is of no consequence if such evidence would have merely expanded on information and issues already before the jury. *See, e.g., Van Hook*, 130 S.Ct. at 19.

Fell relies heavily on *Wiggins v. Smith*, 539 U.S. 510 (2003), in support of his claim that his trial counsel's investigation fell short of the prevailing professional standard. His reliance is misplaced. *Wiggins* involved a trial counsel who purposely failed to investigate the defendant's life history, *id*. at 516-17, electing instead to retry the facts in penalty in an effort to convince the jury that the defendant was not directly responsible for the murder. The Supreme Court assigned no fault to trial counsel's decision not to present a mitigation case, but found their failure to conduct an adequate mitigation investigation prior to making such a decision unreasonable. *Id*. at 522-24. Trial counsel in *Wiggins* limited their investigation into their client's background to securing a copy of his PSR and examining some department of social services records. The Court indicated that under *Strickland*, more information than that is needed before a trial counsel can make a tactical decision not to rely on a mitigation case at all. *Id*. at 527, 533.

The facts of the instant case could not be further from the facts underlying *Wiggins*. Not only did Fell's trial counsel conduct an extensive mitigation investigation, but at trial, counsel provided the jury with a comprehensive picture of Fell's unfortunate background.

Nor do the facts of this case even remotely resemble the facts underlying *Sears v. Upton*, 130 S.Ct. 3259 (2010), where trial counsel painted a deceptive and incomplete picture of the defendant's upbringing. During the penalty phase in *Sears* trial counsel presented evidence describing the defendant's childhood as stable, loving, and essentially without incident. *Id*. at 3261. During the post-conviction evidentiary hearing, however, the defendant presented evidence of physical abuse between the parents, sexual abuse of the defendant at the hands of a male cousin, and verbal abuse of the defendant by both parents. *Id*. at 3262. Sears was also severely learning disabled, severely behaviorally handicapped and had frontal lobe pathology. *Id*. at 3263. Because of their inadequate mitigation investigation, none of this evidence was known to Sears's trial counsel. *Id*. at 3264. Therefore, whether the strategy counsel devised for the penalty phase was reasonable or not, it was not informed. Having determined that trial counsel's investigation was not reasonable, the Court remanded for the district court to determine whether the defendant was prejudiced by his counsel's performance. *Id*. at 3267.

Fell's reliance on *Porter v. McCollum*, 130 S.Ct. 447 (2009), is similarly unavailing. In *Porter*, trial counsel was wholly unaware of a wealth of mitigation evidence he had failed to uncover. Counsel in *Porter* called a single witness in penalty, who failed to convey to the jury the defendant's abusive childhood, heroic military service and the trauma he suffered because of it, and a history of substance abuse and impaired mental health and capacity. *Id*. at 449. The record in this case is readily distinguishable. Fell's trial counsel investigated his thoroughly disfunctional childhood and adolescence, and decided to concentrate the defense on presenting that compelling time period in Fell's life in the penalty phase. The investigation of Fell's background was adequate and the strategy pursued in penalty was informed and reasonable.

Fell's § 2255 petition seems driven by the notion that his upbringing was so horrific that only counsel's ineffectiveness can explain the capital verdict. That notion ignores the rightful function of the jury in weighing competing mitigating and aggravating factors. It also overlooks the aggravating factors that the jury also had to consider: circumstances associated with a brutal and gratuitous triple homicide and carjacking/kidnapping. *See, e.g., Van Hook*, 130 S.Ct. at 20 ("On the other side of the scales, moreover, was the evidence of the aggravating circumstance . . ."). Even among the few homicides that give rise to capital prosecutions, the murders in this case stand out as particularly horrific. In a span of about four hours, Fell was involved in murdering three people in an incredibly heinous, cruel and depraved manner, stabbing and slashing Charles Conway – as he sat helpless and intoxicated – approximately 50 times; then carjacking, kidnapping and murdering a second victim – a grandmother – as she lay on the ground praying, by kicking her in the head and stomping on her neck. Fell showed no remorse for these killings. Immediately after wiping his bloodied boots on the third victim's body, he stripped the cash from her purse to buy breakfast at a nearby fast food restaurant.

There is no doubt whatsoever about Fell's guilt, which was decisively established by written and recorded confessions and forensic evidence. The jury's verdict clearly shows that Fell's social history was carefully considered – the jury actually wrote-in two additional mitigating factors relating to his background. That jury, however, after being properly instructed by the Court, ultimately concluded that the aggravating factors outweighed the mitigating factors sufficiently to justify a sentence of death. That others disagree with the jury's conclusion does not render trial counsel's assistance ineffective.

A.     Fell's Trial Counsel Effectively Investigated and Presented His Social History.

Urging that his trial counsel failed to adequately investigate his background, Fell relies heavily on the amount of time that his mitigation specialist – retained by trial counsel – spent on the case; the number of communications between trial counsel and the mitigation specialist; and the number of communications between trial counsel and certain witnesses. It is significant in and of itself that shortly after being appointed to represent Fell, in January 2001 counsel hired Cynthia Ayres, a trained mitigation specialist who has been involved in many capital cases. P 33. Ms. Ayres traveled to Fell's hometown of Wilkes-Barre, located and interviewed mitigation witnesses, and scheduled several visits by trial counsel with these witnesses. P 32. In her declaration of March 18, 2011, Ayres states that she conducted a mitigation investigation from January to June 2001. *See* P Exhibit 265 at p. 1, Fell-00002469. During that time she made several overnight trips to Fell's hometown and at least one trip to South Carolina and Florida to interview three relatives in those states, including Fell's father. *Id*.; *see also* P Exhibit 87 at 1.

Fell now claims that trial counsel was ineffective for failing to direct Ms. Ayres to work, while the case was on interlocutory appeal to the Second Circuit. According to Ayres's declaration, she met with defense attorneys on April 30, 2002, and spent a week working on the case in June 2002. P Exhibit 365 at 2. Thereafter she was informed that the trial had been postponed indefinitely and that she did not need to prepare for trial. This decision by trial counsel was not unreasonable. The case remained on appeal to the Circuit for over two years.[8] After the case returned to the District at the end of 2004, Ms. Ayres resumed work on March 29,

_____

[8] This Court struck the government's death notice in September 2002. The Second Circuit reversed in November, 2004.

2005, five weeks before the start of jury selection on May 4, 2005, and nearly three months before trial began on June 20, 2005. *Id*. Hence, about three months before the guilt phase of trial began, Ayres was again actively working on the case. Among the things she accomplished was re-interviewing mitigation witnesses about their interaction with Dr. Welner, one of the government's mental health experts. *Id*. at 5. The time spent on the case by the mitigation specialist – including the first half of 2001, and, after the appeal, the three months leading up to trial – was sufficient. *See, e.g.*, *Van Hook*, 130 S.Ct. at 18 (noting with approval the enlistment of a mitigation specialist five weeks before trial).

In any event, the number of hours spent by Fell's mitigation specialist researching his background is of little consequence if trial counsel was able to present adequate background evidence to the jury – which they were in fact able to do. Ms. Ayres tracked down Fell's father, whom he had not seen since he was 10-years-old, and managed to interview him in Florida for two hours despite his initial refusal to speak with her. *See* Exhibit 87, Memorandum from Cynthia Carter Ayres to Dr. Mark Mills, dated April 23, 2001, Fell-00001260. Exhibit 87 alone demonstrates that Ms. Ayres spoke to multiple Fell family members, including Jackie Sharpe, Fell's aunt and custodian from age 15 to age 17; Stella Banas, Fell's great-great aunt; her daughter Jeanette; Donna Williams, Fell's maternal aunt; Jessie Williams, Fell's first cousin; and Sandy Bowles, Fell's maternal aunt. It is baseless for Fell to claim that this multitude of family interviews, in addition to the interviews of trial witnesses, was constitutionally ineffective.

Ayres states that had the defense team obtained mitigation records earlier, she would have interviewed additional witnesses, mentioned in those records. *See* P. Exhibit 365 at 4. She fails, however, to identify the particular witnesses she would have interviewed, and more importantly,

fails to state how their testimony would have altered Fell's mitigation case. In a collateral attack on a criminal judgment, the defendant must allege a factual basis for relief. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187; *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citations omitted)). As demonstrated below, the mitigation specialist's time spent in pre-trial preparation, even if deemed inadequate, resulted in no prejudice to Fell.

B.   Fell Fails to Demonstrate Prejudice as a Result of Counsel's Performance.

Based upon the foregoing and the record, Fell fails to establish error by counsel in developing a background mitigation case. In any event, however, Fell has the additional burden of showing that, but for such deficiency, there is a reasonable probability that the result of the penalty phase would be different. To assess that probability, the court must consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence" now proffered by petitioner – "and reweig[h] it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). Fell simply cannot make this showing. The defense adopted by counsel at trial was to advance penalty phase evidence of Fell's unfortunate background, and urge that it mitigated his capital responsibility. That same defense is now proposed by § 2255 counsel. With the benefit of hindsight, however, the latter now urge that trial counsel's 14 witnesses and hundreds of exhibits reflected constitutionally ineffective assistance, and that additional background evidence was necessary. Yet the evidence at trial more than adequately established Fell's tragic background. The new evidence would but marginally alter the sentencing profile presented to the jury, and falls short of the required threshold. *Strickland*, 466

U.S. at 700.  Nothing about the new evidence would materially change the sentencing profile at trial or lead one to lose confidence in jury's verdict.

    1.  <u>Trial Counsel Properly Investigated and Presented Mitigation Testimony from Lay Witnesses</u>.

     a.  <u>Factual Background</u>

Fell claims that his three trial lawyers presented an incomplete version of his life prior to the age of 10, and no evidence of his life after the age of 15.  He misrepresents the record on both counts

Trial counsel introduced testimony from Fell's half-sister Susan Benczkowski, and from his sister Teri Fell.  Together they painted a graphic and consistent picture of Fell's childhood, plagued with alcoholism, physical and emotional abuse, neglect, and abandonment.  Counsel also called to the stand two Pennsylvania police officers, Christopher Purcell and Marianne Czanker-Chiumento, as well as two Pennsylvania social workers, Ellis Carle and Deanna German Habib, who described in detail serial interventions by police and social services at the Fell home, mostly as a result of altercations between the volatile and intoxicated parents.  Last, counsel introduced testimony from two of Fell's teachers, Sharon Hinchey (Kindergarten) and Mary Grance Loncoski (Fifth Grade), who portrayed Fell as a likeable child in his youth.

Fell's first penalty phase witness was his older half sister – Susan Benczkowski. Susan moved in with her father when Fell was a baby and took care of him.  Tr-VII-1 at p. 47.  She testified that she did not have a memory of her father *not* drinking.  *Id.*  She testified that Debbie, Fell's mother, drank everyday while pregnant with Fell.  *Id.* at 57.  When Susan asked Debbie about it, because she knew that alcohol was not good prenatal care, Debbie replied that "barley

was good for the baby." *Id*.  Susan took care of the baby in the evenings, when the parents went drinking.  *Id*. at 58-59.  The father and mother were "constantly" intoxicated, constantly arguing and always abusive toward each other.  *Id*. at 59-60.  Susan described one altercation when Debbie attacked her father with a knife, cutting off a piece of his scalp.  *Id*. at 60.  There was blood all over the apartment.  *Id*.

Susan described other violent incidents between Debbie and her father; the two fought constantly and were always violent.  *Id*. at 64.  Susan lived at her father's house for six months. *Id*.  After she left, she did not see her father for the next 10 years.  *Id*. at 66.  She did not see Fell again until trial.  *Id*.

Against that stark view into Fell's deeply troubled home and parents when he was a baby, the second penalty phase defense witness was Teri Fell, the only sibling with whom Fell grew up. Teri testified that the parental failures described by Susan Benczkowski continued when she and Fell grew up.  She began her testimony by describing an incident when police responded to their childhood home after their parents stabbed each other.  That night their grandmother took her and her brother.  Tr-VII-1 at 76.  "I just saw lots of blood everywhere."  *Id*. at 77.  Teri told the jury that she did not have *any* nice memories from her childhood.  *Id*. at 78-79.

Like Susan Benczkowski, Teri Fell testified that her parents were always drunk and yelling.  Her father yelled at her and hit her a lot.  *Id*. at 79.  Teri also recalled how her father would let her and her brother drink the foam off the top of his beer.  *Id*. at 82-83.  From an early age, she and Fell would sneak down to the basement and drink beer from a keg their father kept there.  *Id*.  Teri recalled that Fell drank more that she did: "he was always down there drinking it."  *Id*. at 83.

Teri told the jury about an incident when she was seven years-old and a young neighbor molested her while playing in the woods behind her house. *Id*. at 131. She testified that she did not tell her mother, because she thought her drunken mother would not care. *Id*. at 132.

Teri testified that her mother physically abused Fell: Debra fought with him and he fought back. *Id*. at 86. According to Teri, Fell played the slide trombone in elementary school, *id*. at 101; he played baseball, *id*. at p. 103; he liked to read books, *id*. at 140; he liked to play the guitar, *id*.; and he liked to build model cars. *Id*. at 103. But Fell's home life was anything but normal. The police came to their home many times, usually because her parents were fighting. *Id*. at 85. Teri also described how Fell began to use drugs before he was in sixth grade. *Id*. at 87.

Fell was protective of Teri as the two grew up. *Id*. at p. 88. Fell once attacked their father with a baseball bat and broke his nose after her father hit her. The father left after that incident, and Teri never saw him again. *Id*. at pp. 104-05. With the father gone, Teri and Fell, and their mother, moved into a house next to their grandmother. Al Wilcox, Fell's mother's boyfriend moved in with them. *Id*. at 106. At first, her mom was still drunk a lot, but after a while, Teri testified that her mother sobered up and stayed sober for a while. *Id*. Also, "she went to work, and worked very hard." *Id*. For the first time in her childhood Teri came home to a clean house and a home-cooked meal. *Id*. According to Teri, Al encouraged her mother to stay sober – "[t]hey drank on the weekends usually." *Id*. at 106-07.

Notwithstanding, Debra Fell and Al Wilcox had their fights. *Id*. at 107. Teri described one incident when Debra hit Al and the police responded. Debra Fell had to be taken to the hospital because she was struck by a police officer after she jumped on his back. *Id*. The comparative normalcy in the home with Debra sober, however, was short-lived. Al was hit by a

-62-

bus and injured. *Id*. at 107. Eventually, Al and Debra Fell broke up, and Debra started drinking again. *Id*. at 106. Teri recalled visiting Fell at the hospital around Thanksgiving. Teri remembered her mother being drunk and making a scene at the hospital and yelling at Fell. *Id*. at 109. Teri told the jury how she did not have friends over to her house because she was too embarrassed of her mother's drunkenness. *Id*.

At Christmas time in 1994-96, the year Teri was in 6th grade, their mother abandoned them. Teri related how she and Fell spent that Christmas eve alone at home. By midnight they decided to wrap each other's presents so they would have presents to open in the morning. *Id*. at 111-12. When they woke up the next morning, their mother was passed out on the couch. *Id*. at 112. They opened their presents and then woke her up. She told them she was going out to get some ham and did not come back. *Id*. When Teri saw her mother again in January, the two had another fight and her mother left for good. *Id*. at 113. Defense counsel introduced photographs of the Fell home through the testimony of Teri Fell, depicting the deplorable condition of the home – beer cans, clothes, food and dirty dishes everywhere. *Id*. at 123-27.

When Debra Fell did not return, a grandmother was awarded custody of Teri and Fell. *Id*. at 127. Teri described how excited she was when she went to court because she expected her mother to show up, but she never did. *Id*. By that time, Fell had been committed to St. Michaels, a home for boys. *Id*. at 128. For approximately a year, things were "pretty good" for Teri Fell. *Id*. at 157. Her grandmother provided a good home and she was good to Teri. *Id*. at 143. A year later, however, the grandmother died. *Id*. at 128.

Teri and Fell were placed in the custody of their aunt, Jackie. According to Teri, their aunt was abusive and negligent – "She made me do all the cleaning, and it – it was horrible." *Id*.

at 130.  Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her horrendous childhood and the abuse inflicted by her aunt.  *Id*. at 132.  Although Teri did not indicate as much, Fell had moved back home by this time.  *See* Exit Report from St. Michael's, MB Tab 41 at 3.

Teri stopped cutting herself at 15, around the time she started to take care of her aunt's child, Haley.  *Id*. at 132-33.  She then began using drugs because, "I needed something to help me forget about everything else."  *Id*. at 134.

During cross-examination Teri recalled a series of violent altercations with Fell, including episodes in which stabbed a friend of her's with a fork; *id*. at 136-37; hit Al with his crutch on his bad leg following his accident, *id*. at 137-38; and fought with aunt Jackie and fractured her hand.  *Id*. at 142.  Teri also testified that Fell missed a lot of school, and eventually stopped going.  *Id*. at 138.  Finally, Teri described an incident when Fell beat and kicked another kid so violently that the victim went into shock and a coma.  *Id*. at 144.  Fell then urinated on his victim.  *Id*. at 151; 158-59.  Teri testified that her mother told her that she was afraid of Fell.  *Id*. at 146.

Through the testimony of Fell's two sisters alone, trial counsel established that Fell was raised by chronic alcoholics and was the victim of emotional and physical abuse and neglect growing up.  Fell and his sister Teri were also constantly exposed to violence between their parents, which often required police intervention.  Counsel also established that Fell began to abuse alcohol and drugs since before he was in sixth grade.  All but one of these mitigating factors were unanimously found to have been established by the jury.  *See* Special Verdict Form, Dkt. 200, pp. 13-14, Factors 12, 17 and 18.  A majority of the jurors also found that Fell was exposed to violence between his parents as a child.  *Id*. At 13, Factor 13.  It should be noted that

securing the testimony of Teri Fell was an accomplishment in and of itself by trial counsel, in light of the fact that Fell was implicated in the brutal murder of her mother.

Police officers Marianne Czanker-Chiumento and Christopher Purcell also testified about their interventions with the Fell household. Both officers described responding to the Fell home on a weekly basis after reports of domestic disputes. Tr, VII-2 at 15, 29. Whenever they responded, they would find the parties arguing and intoxicated. *Id*. at 8, 13, 29. The officers recalled verbal and physical abuse, mostly on the part of Donald Fell, Sr. *Id*. at 14, 21, 27-28.

Trial counsel further strengthened and developed the background evidence summarized above with the testimony of two social workers from the Luzerne County, Pennsylvania Children Youth Services ("CYS"): Ellis Carle and Deanna German. Carle began his testimony by relating a first dramatic intervention at the Fell home – a domestic dispute where Mr. and Mrs. Fell, both intoxicated, stabbed each other. Tr. VII-2 at 43-44. When he entered the house he found the living room in shambles. *Id*. at 45. Carle followed a trail of blood upstairs and to the children's room. *Id*. at 46. The children were taken into protective custody and placed with their grandmother, Theresa Sharpe, a trained foster parent. *Id*. at 48-49. Carle identified photos of the Fell home taken by Theresa Sharpe in an effort to show him the deplorable conditions of the home. *Id*. at 54-55.

Carle testified that he did not interact with the Fell family again until Fell was in juvenile court for truancy. *Id*. at 52. As a teenager, Fell was sent to St. Michael's, a home for children with chronic school problems. *Id*. at 57-58. Carle explained that in Pennsylvania, in the first instance of truancy, parents are arrested and jailed, until they can prove that they have done all they can to get the child to school. According to Carle, Fell's truancy had led to Debra Fell

spending time in jail. *Id.* at 59, 76. When Fell was released from St. Michael's at the age of 15, his grandmother had passed away and Fell was placed in the custody of his 21 year-old aunt, Jackie Sharpe. *Id.* at 60. Carle closed his case six months later in January of 1996. *Id.* at 61.

German brought the CYS file on the Fell family and testified both from her own recollection and based on documents in the file that she reviewed. Tr. 8-1 at 10-12. She testified that both Fell and his sister Teri were sexually abused when Fell was five years-old. *Id.* at 22, 25, 26, 32. Fell was referred to counseling. After attending three sessions, however, his mother failed to make another appointment. *Id.* at 26-28, 30.

A CYS case was again opened on the Fell family in April 21, 1990, after an incident where Fell's parents were fighting and the father threatened to kill the mother in front of the children. The children ran to a neighbor's house for help. The children spent that night at the neighbor's house and the next day went home with their grandmother. *Id.* at 33. German was assigned the case after this incident. *Id.* at 34. German was the case worker for the Fell family from October of 1990 to May of 1992, during which time she conducted "somewhere around 30 home visits." Tr. 8-1 at 17. She testified that the risk factors identified in the Fell home at the time were drug and alcohol problems by both parents, and domestic violence. *Id.* at 18.

German further testified that the Fell home environment improved after the father left. But not long afterward, Fell's aggressive behavior caused her to keep the case open. *Id.* at 44. Fell was hospitalized for aggressive behavior four times between the ages of 11 and 13. German closed her case in May of 1992. *Id.* at 46. It was reopened again in January of 1994, when Debra Fell was referred to CYS for hitting Teri while intoxicated. *Id.* at 47. There had been a previous referral, however, on November 27, 1993, *see* Defense Trial Exhibit T, which indicates that

Fell's mother showed up at the hospital drunk, refusing to take him home.

> The friend with the mother confirms she has been drinking heavily. Stepfather is
> outside in car. Allegations that stepfather and child do not get along and
> stepfather does not want him home. Dr. Shin or Sheen states there is no reason
> for him to remain but mother wants him admitted again.

*Id*. at 48.

While German admitted that Fell had behavioral problems, in hindsight, she believed that

his mother used Fell as an scapegoat to mask her own problems. Tr. 8-1 at 107-08.

Through the testimony of CYS caseworkers Carle and German, Fell's trial attorneys

further developed a graphic and horrific picture of Fell's childhood and early adolescence. The

background evidence established that Fell's formative years were marked by alcoholism,

domestic violence, sexual abuse, physical abuse, neglect, lack of nurturing and ultimately,

parental abandonment. The medical records introduced by trial counsel showed that Fell had an

early need for counseling to control his aggressive and violent behavior, and while he received

some treatment through his hospitalizations, that treatment was not continued upon his release.

*See* MB, Tabs 22-32; Tr. 8-1 at 44-45.

The testimony of Fell's two teachers established that he was an intelligent student, with

an interest in learning, but was burdened by chronic problems at home. Far from failing to

present a complete picture of his life, Fell's trial attorneys presented a compelling graphic

account of Fell's life story from infancy through adolescence.

Trial counsel listed both Donna Williams and Jackie Sharpe as penalty phase defense

witnesses, but opted not to call them. Tr. VIII-1 at 57. Dr. John Rabin was also a potential

witness on the defense list, but was also not called. *Id*. at 58. James Hate was also on the

original witness list of the defense, but failed to make it to the stand.  *Id*.  These circumstances

reveal not a lack of investigation and preparation, but informed judgements made after the

benefit of strong testimony by 14 other defense witnesses, supplemented by the hundreds of

documents in the Mitigation Binder.

>   b.   Trial Counsel's Decision Not to Present Additional Witnesses Was Reasonable.

Notwithstanding the compelling and extensive mitigation evidence summarized above,

*see* III(B)(1)(a), *supra*, Fell claims that there were "a number of readily available witnesses who

had important mitigation evidence about Mr. Fell's life that was undeveloped and unpresented at

trial."  P. at p. 38.  This argument mirrors the claim brought by petitioner in *Van Hook*, which the

Supreme Court squarely rejected, as follows:

> Despite all the mitigating evidence the defense did present, Van Hook and the
> Court of Appeals fault his counsel for failing to find more.  What his counsel did
> discover, the argument goes, gave them "reason to suspect that much worse
> details existed," and that suspicion should have prompted them to interview other
> family members – his stepsister, two uncles, and two aunts – as well as a
> psychiatrist who once treated his mother, all of whom "could have helped his
> counsel narrate the true story of Van Hook's childhood experiences."  560 F.3d at
> 528.  But there comes a point at which evidence from more distant relatives can
> reasonably be expected to be only cumulative, and the search for it distractive
> from more important duties. . . .  And given all the evidence they unearthed from
> those closest to Van Hook's upbringing and the experts who reviewed his history,
> it was not unreasonable for his counsel not to identify and interview every other
> living family member or every therapist who once treated his parents.

130 S.Ct. at 19.

The government does not dispute the existence or availability of additional background

witnesses, but submits that they would have offered essentially cumulative evidence of Fell's

unfortunate background.  Therefore, the decision by trial counsel not to call then was reasonable.

Moreover, because these witnesses were unlikely to alter the existing mitigation profile at the penalty phase, Fell fails to show how he was prejudiced by his counsel's failure to call them.

i. The Alleged Continued Deterioration of Mr. Fell's Home Life After his Father's Departure.

Fell claims that his life really did not get better after his father moved out, contrary to arguments made by the government in the penalty phase. He submits his trial counsel was ineffective in failing to clarify or rebut this fact on the record through additional evidence. However, the testimony of Teri Fell clearly indicates that their home life did improve after their father left their home. Teri testified that her mother, under the influence of her new boyfriend, Al Wilcox, actually became sober for a period of time. Tr-VII-1 at 106-07. During that period of time Debra Fell worked hard regularly, cooked dinner for her children, and kept her home clean. *Id*.

Teri's testimony in this regard is corroborated by the testimony of social worker Deanna German, who testified that after Fell's father left the home, Debra Fell was providing a stable environment for the children and there was no evidence of violence or excessive drinking in the home. Tr. 8-1 at 77. In addition, both children were participating in the Children of Alcoholics Group. *Id*. Records generated by German at the time, and submitted into evidence, further indicate that the conditions of the Fell home improved significantly after Fell's father left the home. *See* Service Plan Report dated May 1991, MB Tab 4. In fact, German testified that her agency considered closing the case after Fell's father left, but it remained opened because Fell's mother reported some incidents with Fell – his behavior was deteriorating at home and at school; he had been violent towards Teri and his mother; and he was subsequently psychiatrically

5:01-cr-00012-gwc   Document 337   Filed 12/02/11   Page 70 of 75

hospitalized.  *Id*. at 44; Family Service Plan dated 11/91, MB Tab 5.

In addition, Officer Czanker-Chiumento testified that, after Debra Fell threw the father out of the house in late 1990, the officer did not have reason to respond back to the house again. Tr. 7-2, 22.  Similarly, Officer Purcell could not recall responding to the Fell house after the father left, other than one occasion in 1991 when Fell, Sr violated a court order and returned, leading to his arrest.  Tr. 7-2, 38.

The record clearly shows that the Fell home did improve significantly after Fell's father left.  The fact that subsequently Fell's behavior deteriorated does not alter the fact that his home environment improved.

Despite the record, Fell contends that his life worsened after his father left.  Specifically, Fell quarrels with the government's argument that Al Wilcox, his mother's boyfriend after Fell Sr was gone, was the disciplinarian Fell needed.  According to the § 2255 petition, "[h]ad trial counsel investigated Al's role in Donny's childhood and adolescence, the jury would have learned that Al was a psychologically and physically abusive, violent alcoholic."  In support of his claim, petitioner submits in the first instance the declarations of Ernie Schuldaski, Stanley Kowalski, and Adele and John Gacek.

A careful review of Schuldaski's declaration, however, reveals that while he perceived Fell's mother to be an alcoholic and was horrified at how she treated her children, he never saw Al Wilcox hit either Fell or his sister or witnessed any violence at the Fell home.  P Exhibit 253, Fell-00002430-33.  Similarly, Kowalski's declaration does not support the statement that Al Wilcox was "a psychologically and physically abusive, violent alcoholic."  Kowalski knew Debra Fell in the mid-1990s, after she had abandoned her children and no longer lived with Wilcox.  P

-70-

Exhibit 277, Fell-00002534. Moreover, Kowalski's knowledge of Wilcox is quite limited, and nowhere in his declaration does Kowalski state that he ever saw Wilcox engage in abuse or violence. *Id*.

Adele Gacek and her son John lived across the street from Debra Fell and Al Wilcox for approximately a year. P Exhibit 252, Fell-00002425. While Adele Gacek states that Debra and Al were constantly drinking and screaming at each other, and cursed at the children, she makes no mention of Al being violent or physically abusive. *Id*.

John Gacek, who was seven years-old when he met Fell, describes Fell as a regular kid who liked to play baseball and video games. P Exhibit 251, 00002419. John Gacek remembers his friend Donnie coming over to his house crying because he had been hit at home. John Gacek states that he never saw Debra Fell without a beer in her hand and remembers that she and her boyfriend Al used to call Fell names and curse at him regularly. But the evidence presented in penalty left no doubt that Debra Fell was an alcoholic who regularly consumed beer. The CYS records, and the testimony of the two social workers and the two police officers, offered the jury an accurate picture of the conditions of the Fell home and the risks to which Fell was exposed growing up. The Gaceks' testimony simply would have added a different perspective on the same picture already presented to the jury. Moreover, John Gacek was the victim of a shooting by Fell at the age of eight. Calling him to the stand to give arguably cumulative testimony about Fell's childhood risked focusing the jury on the shooting, and on Fell's expressed lack of remorse when admitted to the hospital immediately afterwards. *See* MB, Tab 25.

Next, Fell attaches a declaration by Teri Fell. P Exhibit 278, Fell-00002541. *See* section III(B)(1)(a), *supra.* Teri Fell testified during the penalty phase and painted a horrific picture of

her and Fell's upbringing, characterized by chronic alcoholism, ongoing domestic violence, and abuse and neglect. She described a series of violent incidents between her parents, and violent incidents between her brother and mother. However, Teri Fell's testimony was that Wilcox encouraged Debra Fell to remain sober and establish a good home. Tr. VII-1 at 106. Who better to tell the jury about the environment in the Fell home than Fell's own sister, who actually lived in that home everyday?

In her post-conviction declaration, Teri Fell expands on some of those experiences, but does not change the sentencing profile that she and trial counsel presented in the penalty phase. For example, at trial Teri started her testimony by relating an incident where her mother and father stabbed each other and she remembered seeing blood. *Id*. at 76. In her post-conviction declaration Teri states:

> My parents fought an awful lot. They stabbed each other and threw things at each other. It was pretty scary. Police came to the house because of the fighting and violence all the time. My parents held knives over each other.

Declaration of Teri Fell, p. 1, Fell-00002541. During her trial testimony, Teri Fell stated that her aunt Jackie was "mean. She was abusive. Negligent. She made me do all the cleaning, and it was horrible." Tr. VII-1 at 130. Teri explained that she resorted to cutting herself to deal with the emotional pain of living with her aunt. *Id*. at 132-33. She testified that she stopped cutting herself after Haley, her aunt's daughter, was born because she was responsible for her care. *Id*. at 134. She then turned to drugs. *Id*. In her post-conviction declaration Teri relates additional incidents with her aunt that further strengthen her trial testimony, but again, do not change the sentencing profile presented at the penalty phase.

With regard to Al Wilcox, Teri testified at trial that sometime after he moved in her

mother "sobered up. Her mother remained sober for a while, cooked dinner every night, went to work and worked very hard. The house was clean. But after her mother and Al broke-up, she started drinking again." In her post-conviction declaration, Teri states that Al Wilcox would not simply discipline Donny, but screamed, yelled and called him names. Declaration of Teri Fell, Fell-00002541-2572, p. 13. Yet at trial Teri described an altercation between her brother and Al Wilcox in which the former hit the latter with Al's crutch on his bad leg following his accident, *id*. at 137-38. Again, Teri expands on her trial testimony, but does not significantly change the sentencing profile presented in the mitigation phase.[9]

Fell's own statements, made during the course of a psychiatric hospitalization, also contradicts the evidence he now proffers with regard to Al Wilcox. "The patient reported that his mother's boyfriend is not mean but the boy [is] sometimes oppositional defiant to this man nonetheless and he would frequently threaten to run away from school and home." MB, Tab 22 at 2. During the course of four psychiatric hospitalizations between the ages of 11 and 13, Fell never reported violence or physical abuse by Wilcox.

Last, Fell submits the declaration of Christina Cumpano, who was Teri Fell's best friend when she was seven years-old. Declaration of Christina Cumpano, Fell-00002573, p. 1. Christina Cumpano describes a Fell home environment much like that described by witnesses who took the stand at trial. She also adds that Teri Fell once told her that "her mom would sexually molest her while her boyfriend watched." *Id*. at 2. This allegation is not found in Teri

---

[9] Although the government submits that it is not necessary for the Court to consider additional evidence to dispose of this issue, we note that the evidence proffered by Fell in support of his argument is in stark contrast to his own statements to a mental health expert who examined him prior to trial. *See* P. Exhibit 7 at 108, Fell-00000576.

Fell's declaration and is inconsistent with the testimony of German, who testified that the CYS file contained no allegations of sexual abuse by Fell's parents. Tr. 8-1 at 66. In any event, this information would not have changed the sentencing profile presented by trial counsel, which included testimony by Teri Fell that she had been sexually abused when she was six or seven years old by a neighbor and did not tell her mother because she was drunk and Teri did not think her mother would care. Tr. VII-1 at 133-35. In addition, CYS caseworker German testified that both Fell and his sister Teri were sexually abused when Fell was five years-old.

None of the cited declarations – Ernie Schuldaski, Adele Gacek, John Gacek, Stanley Kowalski, Teri Fell, and Christina Cumpano – add information that would have changed the sentencing profile presented by trial counsel.[10]

Having established that the testimony of these witnesses would not have added information much different than what was already before the jury, the government submits that there is no reasonable likelihood that the outcome of the penalty phase would have been different. The jury heard through the largely uncontested testimony of Teri Fell, Officer

---

[10] Fell also attaches a declaration by Alan Reynolds, Debra Fell's boyfriend just before she was killed. Fell-00002522. Reynolds describes Debra Fell's life and habits before her murder and relates a number of incidents. Reynolds admits that he never met Fell. Declaration of Alan Reynolds, at 7. Reynolds described an incident Debra Fell told him about where Debra Fell's husband, Don Fell Sr., forced her to give him oral sex and then had intercourse with her on the couch, in front of the children. *Id*. Reynolds does not state how old the kids were when this incident took place. Neither child told CYS of this incident, therefore, it appears neither remembered the incident. Nor did Debra Fell tell CYS of this alleged incident, even after her husband left her home. Fell also submits a declaration by Janice Stoss, a foster child placed with Theresa Sharpe when Fell was a boy. Stoss returned to live with Theresa Sharpe when she became pregnant at the age of 18 in 1993. Stoss's testimony adds nothing of significance. She states that "Donny's mother treated him real bad," and that she saw Debra "smack him around numerous times." Declaration of Janice Stoss, 00002515, p. 3. This testimony is similar to Teri Fell's testimony at trial when she stated that her mother physically abused Fell. Tr. VII-1 at 86. The declaration of Jamie Dominick, P Exhibit 276, was not attached.

Czanker-Chiumento, Officer Purcell, Social Worker Carle and Social Workers Carle and German the deplorable conditions in which Fell was raised. The testimony of the additional witnesses now proffered would not have changed that profile. The new witnesses would simply have offered yet more instances of drinking, violence and domestic disfunction in addition to the many instances described at trial. The jury was well-aware of what Fell's background, as indicated in its verdict findings.

ii.  Trial Counsel Presented Evidence of Fell's life After Age 15

Fell claims that trial counsel was ineffective in failing to investigate and present evidence of his life after the age of 15. This claim ignores many records in the penalty phase Mitigation Binder, as well as the testimony of Teri Fell.

The Mitigation Binder includes records from St. Michael's, where Fell resided when he turned 15. *See* MB Tab 41, "Exit Report from St. Michael's," 003092. During his last year at St. Michael's, Fell completed the 8th grade successfully and was promoted to the 9th grade. While enrolled in the St. Michael's educational program, Fell earned grades of C or better. It was recommended that Fell return to public school, which he did by enrolling in the Wilkes-Barre Area Headstart Vocational Tech. MB, Tab 11. Fell completed the 9th grade and withdrew from school in April, 1997 (when he turned 17). MB, Tab 42. The Mitigation Binder includes dozens of school records generated after Fell left St. Michael's. *Id*. at Tabs 42 and 43.

Teri Fell testified that after her grandmother died, she and her brother were placed in the custody of their aunt Jackie. When Fell was released from St. Michael's at age 15, he returned to

-75-