Wilkes Barre and lived with Teri and his aunt Jackie. Teri described their tumultuous homelife with aunt Jackie. According to Teri, their aunt, who was nine years older than Teri and six and half years older than Fell, was abusive and negligent. Tr. VII-1, 130. Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her dreadful home life and the abuse inflicted by her aunt. *Id*. at 132. According to Teri – and confirmed by records in the Mitigation Binder – Fell often missed school, and eventually stopped going to school. Mitigation Binder records state that Fell quit school when he turned 17. *Id*., Tab 42.

Additional evidence of Fell's conduct after the age of 15 was introduced through Teri Fell's cross-examination. Generally, it was not favorable. Teri Fell related two violent incidents by Fell after the age of 15. The first involved a fight Fell had with aunt Jackie, in which he broke her hand. *Id*. at 142. The second involved Fell's assault on Chris Eike at the Woodstock Festival in New York. *Id*. at 152. Chris was harassing Teri, who asked him to stop. *Id*. at 153. Fell then asked Eike to leave his sister alone. *Id*. at 154. As told by Teri, Chris then punched Fell, after which Fell and Robert Lee beat Chris badly. *Id*. at 155. Fell punched him and kicked him so seriously that Chris went into shock and a coma. *Id*. at 144, 151. Fell then urinated on him. *Id*. at 151.

Teri Fell also testified that when her mother lived in Vermont they spoke together on the phone. After Fell went to Vermont to live with their mother, in a phone call Debra Fell told Teri that she was afraid of him. *Id*. at 146, 150. Fell was 20 years-old when that conversations took place. Also, it was after the age of 15 or 16 that Fell obtained his tatoos: one of an anarchy sign

and one of an upside down cross with 666 on it, which Teri Fell testified represented Satan.  Tr. VII-1 at 141.

Evidence of Fell's life after the age of 15 reflected a downward trajectory; it was not as mitigating as the evidence of his early childhood and adolescence.  *See* Tr. X-1 at 55, 61-64. Hence, while counsel presented some evidence as to what happened to Fell after the age of 15, it was not unreasonable for counsel not to have focused further on that time period.  Indeed, the record indicates that trial counsel purposely stayed away from Fell's life between the ages of 15 and 20.

> Mr. Bunin:    I don't know what rebuttal is completely going to be, but I'm trying to clarify the scope of rebuttal.  Basically our case in chief in punishment was Donald Fell till age 15 and then Donald Fell in the correctional institution. . . .
>
>  . . . we weren't introducing evidence that necessarily showed good character during his teenage years.   We simply stopped at age 15.

Tr. 10-1 at 55.  Counsel adopted this approach when trying to limit additional aggravating background information that the government sought to admit.

After Fell's attorneys completed their case in mitigation, the Court excused the jury and conducted a hearing regarding mental health evidence and two of the government's proposed rebuttal witnesses: Matt Cunningham and Bethany Brashears.  Cunningham had been Fell's friend in Pennsylvania during the period 1997-99, with whom Fell had discussed murders. Brashears, a teenager, was kidnapped and threatened with death by Fell in early 2000.  The defense initially objected to those witnesses as not properly rebutting its direct evidence, in the

-77-

above-quoted argument by Mr. Bunin. The government provided the court with FBI reports of interviews of Cunningham and Brashears, as well as transcripts of 2001 grand jury testimony by Brashears (and Lynn Roberts, a witness to the Brashears kidnapping). On July 11, 2005 the government filed a memorandum setting forth the proposed testimony to be given by Brashears and Cunningham, and explaining its evidentiary basis. Docket No. 195. That same day, the defense filed the "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing," arguing for exclusion of the testimony. Docket No. 193. After further discussion with the Court and between the parties, only the testimony by Cunningham was admitted. The entire Brashears incident was not presented to the jury. In short, trial counsel successfully excluded the serious and aggravating Brashears incident, in part by urging that Fell's late teens were not proper rebuttal, since the defense evidence had focused on his childhood and adolescence.

It was not unreasonable for the defense to decide, as a matter of trial strategy, not to focus on Fell's life in his late teens. Not only was that time period less formative (in that Fell was no longer a child and was beginning to make his own decisions about the direction of his life – such as leaving school), but the government was poised to present additional evidence of Fell's violence during that time. Focusing on Fell's childhood and adolescence enabled trial counsel to exclude such damaging evidence. Hence, this was an effective trial strategy. "[S]trategic choices made after through investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins*, 539 U.S. at 521.

iii.    Trial Counsel Presented Evidence of Debra Fell's Conduct

Fell also asserts that trial counsel was ineffective in failing to present evidence of Debra Fell's illegal drug use. Such evidence, he submits, would have prevented the government from arguing that he lied in post-arrest statements about his and his mother's drug use the night of the crimes. This argument is simply illogical. The government contended that Fell made false post-arrest statements about his and his mother's drug use because (1) the toxicology report on Debra Fell's body showed that alcohol was the only controlled substance in her system when she died, and (2) a thorough search of her apartment revealed no evidence of illegal drugs other than a small quantity of marihuana seeds. These factors indicated that Fell's claim that his mother was a "crack addict" who had been smoking crack cocaine the night she was killed was minimizing and false. Whether or not Debra Fell used illegal drugs prior to the night she was killed would have been irrelevant; it would not have changed the foregoing evidence.

Fell further claims that trial counsel was ineffective in failing to investigate Debra Fell's conduct after she left her children, as that evidence would have "shed important light on Mr. Fell's relationship with her." But trial evidence firmly established – and the government did not deny – that Debra Fell was a violent, chronic alcoholic when she lived with her children. And the evidence indicated that she remained an alcoholic after moving to Vermont – testimony described her frequenting a local bar (the StopLite lounge in Rutland), and her high blood alcohol content the night she bled to death during Fell's rampage with Lee. While Fell mentions a number of witnesses who trial counsel could have spoken to about Debra Fell's conduct after she

-79-

abandoned her children, he fails to establish why it was important to offer additional evidence as to such conduct.

In any event, regardless of what Debra Fell's behavior was like in the years after she fled Wilkes Barre, Fell was no longer living with her. More importantly, Debra Fell's conduct in Vermont, after leaving Wilkes Barre and before Fell and Lee came north and killed her, had nothing to do with her murder in her apartment on November 27, 2000. The overwhelming evidence presented during the guilt phase of the trial established that Debra Fell did nothing to cause the violent, brutal attacks that ended her life and that of Charles Conway. Therefore, Fell cannot show that his counsel erred in this regard, or that any such error prejudiced him.

<blockquote>
iv.    <u>Trial Counsel Presented Compelling Mitigation Evidence Through Teri Fell</u>
</blockquote>

Notwithstanding the fact that trial counsel called Teri Fell to the stand during the penalty phase, and she testified at length and in detail (over 85 pages of transcript), Fell claims that trial counsel failed to adequately exploit Teri Fell as a witness, reciting a string of facts to which she could also have testified. A review of the proffered facts, however, reveals that either they were indeed presented to the jury – even if not to the extent urged in the § 2255 motion – or they would not have changed the sentencing profile presented at trial.

Fell claims that if counsel had spent more time with Teri Fell, she would have been able to tell the jury that during his early childhood "[Debra] screamed at Donny for little things and smacked him around a lot. She called him names, said mean things about him, and threatened to kill him. She picked up knives and chased Donny around with them multiple times." P 49. But

during her trial testimony, Teri Fell testified about ongoing physical abuse that Fell suffered at the hands of his mother. Tr. VII-1 at 86. She told the jury that Debra "would start fighting with him. She would nag at him about things, and start hitting him." *Id*. Debra hit her brother with various things in addition to her hands, "[u]sually whatever was heavy and [near]by her, she would hit him with." *Id*. at 87. Teri told the jury how her parents were drunk all the time and always yelling. *Id*. at 79. She told the jury about the serious domestic violence, *id*. at 76, including incidents during which her parents stabbed each other. Officer Christopher Purcell related an incident where Fell's father slapped both his wife and Fell, causing Fell to bleed from his lip. Tr. VII-2 at 30-31. Officer Purcell added that there was always arguing and physical abuse back and forth when the police responded to the Fell home. *Id*. at 27-28. It is simply incorrect that trial counsel failed to cover these subjects.

Fell also claims that additional trial preparation would have led to Teri Fell telling the jury about how he would try to put himself between Teri and beatings by Debra, her boyfriends, or others. While Teri Fell might not have used the exact words used in Fell's instant motion, the fact is that she told the jury that her brother was protective of her growing up. *Id*. at 88 (Q: "Did he protect you? A: "All the time." Q: "how would he do that?" A: "He would fight my father off of me when my father was hitting me"). Similarly, Fell attacked his father with a baseball bat, breaking his nose, when Fell Sr hit Teri. *Id*. at 104-05. And again, Teri explained the Chris Eike assault as motivated by Fell's protecting her. Teri's trial testimony adequately established that Fell protected her. The additional testimony would have been cumulative.

-81-

Similarly, Fell submits that trial counsel failed to introduce evidence of yet one more

stabbing incident between Debra Fell and her husband.  If there was one thing the jury heard

about over and over in the defense penalty phase evidence, it was bloody knife altercations

between Fell's parents.  They were described by Susan Benczkowski, by Teri Fell, by Ellis Carle,

and by Deanna German.  Tr. VII-1 at 60, 64, 76; Tr. VII-2 at 44; Tr. 8-1 at 31.  This evidence

gave the jury a very graphic view of domestic violence in the Fell home.  Indeed, it lent the

foundation for defense counsel, in the guilt phase opening statement, to dramatically channel

police responding to one of these altercations:

> They see what they have seen before.  The see blood.  They see blood on the floor.  They
> see blood on the tables.  They follow the blood.  It leads to . . . the living room couch.
> There they find Debbie Fell, alive, with a knife protruding from her thigh, the wound
> bleeding profusely. . . .  They find a trail of blood.  The blood leads outside.  They follow
> the trail of blood.  The blood leads to a nearby bar which they find Donald Fell Senior
> drinking with . . . a broken knife blade in his shoulder.  They find another trail of blood.
> The blood goes upstairs . . .

Tr. V-1, 45-46.  Yet another such incident would do little to add to the uncontested evidence.

The information Fell proffers about Al Wilcox similarly adds nothing of great

significance to the trial testimony of Teri Fell and would not have changed the sentencing profile

presented by trial counsel.  *See* section III(B)(1)(a), *supra*.  Likewise, the testimony proffered

regarding Debra Fell's use of illegal drugs, or her neglect of Teri adds little to a record replete

with evidence of her chronic alcoholism, violence, abuse and abandonment.

Fell proffers additional evidence regarding his treatment by his grandmother.  Evidence

presented at trial established that Fell's grandmother, Theresa Sharpe, came to the aid of the

children when social services took them into protective custody, Tr. VII-2 at 48-49, or they were left alone by their mother. Tr. VII-1 at 114. When their mother finally abandoned them, Theresa Sharpe, a trained foster parent, took custody of them for a year until she died – Teri went to live with her and Fell was sent to a home for problem boys. At trial Teri Fell had no criticism of Theresa Sharpe. *Id*. at 127-28. Yet Fell now proffers that Sharpe abused him physically and drank.

In support of this recent allegation, petitioner submits a declaration of Dorothy Grivner, which is unremarkable, and one from J. Migatulski, who states that Fell told him about beatings he received from Theresa as a child. Even if true – a fact not conceded and unsupported by the record – such information would not in no way have changed the sentencing profile presented to the jury, much less cause one to loose confidence in the outcome of the trial.

The most prominent evidence proffered in support of Fell's argument that Teri Fell's mitigation evidence was not fully explored relates to the treatment of Fell and his sister by their aunt, Jackie Sharpe. Fell now submits that Teri could have elaborated about the abuse she and her brother suffered at the hands of Sharpe. He proffers that Jackie Sharpe held "wild alcohol parties" and allowed both Teri and Fell to drink alcohol. In addition, Fell proffers that Jackie Sharpe engaged in sexual behavior in front of Teri. In addition, he claims that Jackie Sharpe, in a rage, kicked him out at the age of 17, leaving him homeless.[11] Fell claims that this information

---

[11] During his interview with Dr. Lipman, Fell indicated that his aunt let him smoke cigarette and watch tv, but that living with her "was kinda like being in jail ... she'd let me out twice a week, but when she was asleep I could no anything I wanted." P. Exhibit 4 at 4, Fell-

"would have provided jurors with an image of Mr. Fell's later life that was fundamentally different from anything heard at trial."

But this information is not fundamentally different than the testimony presented at trial. According to Teri's trial testimony, their aunt was abusive and negligent.  Tr. VII-1 at 130. Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her horrendous homelife and the abuse inflicted by her aunt.  Id. at 132. Although Teri does not indicate as much, Fell had moved back home by this time.  See Exit Report from St. Michael's, MB Tab 41.

Teri stopped cutting herself at 15, around the time she started to take care of her aunt's child, Haley.  Id. at 132-33.  She then began using illegal drugs because:  "I needed something to help me forget about everything else."  Id. at 134.

While Teri did not offer the graphic examples of her aunt's abuse now proffered in her declaration, her testimony at trial left no doubt that the home life of Teri Fell and her brother under the supervision of their aunt Jackie was dreadful.  Indeed, it led Teri to self-mutilation and drug abuse.  Trial counsel did not need to go into the additional details now proffered by Fell to convey this fact to the jury.  Therefore, it cannot be said that but for counsel's failure to present such evidence to the jury, the outcome would have been different.

Moreover, as discussed above, exploring Fell's later teens was ultimately not to his

---

00000426.  According to Fell, ultimately he was ejected from his aunt Jackie's house at 17 as a result of his drug abuse, drinking and misbehavior.  Id.

advantage; it could have led to the admission of additional aggravating evidence of his kidnapping and assault of another female: Bethany Brashears. Trial counsel fought hard and successfully to exclude that evidence. The record indicates that counsel purposely avoided presenting evidence of Fell's later teens because it was not as mitigating as evidence of his childhood and adolescence.

In sum, Teri Fell's testimony at trial was compelling and convincing. This is again evidenced by the fact that the jury unanimously found all the mitigating factors that related to Fell's upbringing, and wrote in another two factors regarding his background and life experience. Therefore, trial counsel's performance in penalty was effective. Therefore, Fell has not shown that, absent his attorney's error, if any, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 694. Indeed, nothing about the information trial counsel allegedly failed to present would lead one to lose confidence in the outcome of the trial. *Id*.

2.   <u>Trial Counsel Adequately Investigated and Presented Mitigating Records and Photographs</u>

Trial counsel introduced into evidence at the penalty phase a Mitigation Binder containing hundreds of pages organized behind over 40 tabs, consisting of records from Fell's background, including medical records documenting his four psychiatric hospitalizations between the ages of 11 and 13; CYS records documenting the interventions of social workers from the CYS with the Fell family; records generated by his various schools; and police reports documenting domestic violence incidents in the Fell residence.

-85-

Trial counsel called two CYS social workers to testify about the Fell family.  Deanna German explained to the jury CYS documents in the Mitigation Binder, including referral forms describing family demographics, *i.e.*, names, ages, birth dates, addresses, telephone numbers, and reasons for referrals, Tr. 8-1 at 12; contact sheets, which are forms generated by a CYS worker that document any contact with the family or service providers or neighbors, including visits and telephone calls, or any contact that has to do with the family or the case, *id*. at 13; intake assessments, which include adult interactions, sibling interaction, education, financial situation, housing, income, the basis of what the problem is and the worker's opinion, *id*. at 15; family service plans, which are contracts between the family and the agency stating what goals and objectives need to be completed for the case to be closed, *id*. at 16; risk assessments, which are documents that identify the risks in the family, that is, the severity of the abuse, the mental health status of the parents, whether there is domestic violence in the home, the condition of the home, *id*. at 17; dependency petitions, which are sometimes prepared to obtain a court order for the parents to cooperate with the agency recommendations, *id*. at 23; and progress notes and reports. *Id*. at 24.

Notwithstanding trial counsel's efforts, Fell now claims that his lawyers were ineffective in failing to introduce even more background documents, that would have "depicted Mr. Fell's life in an entirely different manner – one that was mitigating to Mr. Fell."  P 52.

a.  Trial Counsel Used Sufficient Documents from CYS

Fell takes objection to the government's use of the "Family Service Plan" generated by

German in May 1991. MB, Tab 4 at 1. In this Family Service Plan German states:

> Mrs. Fell has provided a safe and stable home environment. Mr. Fell no longer resides in the home. Mr. Fell is not living in the home. Therefore, there is no problems with physical violence.

German further noted that there was no evidence of excessive drinking by Debra Fell. *Id*. at 3. German's comments refer to the period of time after October 1990 up to May 1991. The government used this document with German in an effort to show that Fell's home environment had improved after his father left. This line of argument was also supported by Teri Fell's testimony. According to Teri Fell, her mother actually became sober sometime after her father left the home. Tr. VII-1 at 105-06.

Fell claims that this statement is false and misleading because after his father left Fell was psychiatrically hospitalized four times. He argues that trial counsel should have refuted the testimony of German with other documents. First, the fact that Fell was hospitalized does not mean that his father's absence was not a net improvement in the home. Second, in any event, trial counsel placed before the jury, not only German's testimony, but also the medical records detailing the four psychiatric hospitalizations. Therefore, the jury had an opportunity to examine the medical records themselves which tracked Fell's development. Third, no other document would have erased German's words recorded in the Family Service Plan she generated in 1991. In May of 1991, when German was visiting the Fell home on a regular basis, her assessment was that Fell's mother was providing a safe and stable environment. German had mostly helpful things to contribute to Fell's mitigation case in the penalty phase. The fact that there was some

-87-

limited exception that was not helpful does not mean that counsel was ineffective. Counsel

reasonably took the bit of bad with the mostly good – not an unusual situation with a trial

witness. Fourth, trial counsel astutely led German through her testimony and then solicited her

opinion as to the conduct of Fell's mother in 1990 and 1991 – German testified that in retrospect,

in her opinion, Fell's mother used him as an scapegoat to mask her own conduct. Tr. 8-1 at 124.

This was very compelling testimony from a person who was familiar with the Fell home.

> A.  Because if he got better then there would be no focus. And from my records, as you
> could see, I started changing the focus myself. I fell into that with her, that he was the
> focus, he was the behavioral problem, and her drinking and that kind of was minimized
> which is also what Debbie did was minimize her own problems. So when you have a
> scapegoat in the family no matter what else is going on that person, Debbie, would look
> at the identified child or scapegoat and say, see it's all him, see everything else is fine,
> Teri's doing fine, I'm doing fine. But let's keep – she wanted all the focus to be on him
> so no one really paid attention to what she was doing. And when, well, I was going to say
> when he finally –
>
> Q.  You can finish your answer.
>
> A.  I was going to say when Donny finally went to St. Mike's where he was going
> to get very intensive treatment Debbie left. So there was never a point where
> somebody could say see, you still have a problem. I mean she left the state.

*Id*. at 124-25. Trial counsel's performance in this regard was more than adequate.

Notwithstanding, Fell argues that trial counsel was ineffective in failing to introduce a

number of contact sheets which would have placed additional information before the jury. P 53-

54. Some of these contact sheets would have established that Fell's father was at the home

several times between January and March of 1991. But they also would have established that it

was Debra Fell who was reporting his presence to CYS and to the police, and it was Debra Fell

-88-

who ultimately had him arrested for trespassing. *See* P note 14. Other contact sheets would have established that Debra Fell was evicted from her home and continued to drink after her husband left. But these facts were well established by other evidence presented by trial counsel, including the testimony of Teri Fell, police reports and documents related to Fell's hospitalizations. *See* Tr. VII-1 at 103-04, 107-109; Defense Trial Exhibit T. Tab 21 of the Mitigation Binder contains a police report regarding a traffic stop of Debra Fell on July 17, 1991, pursuant to which she was found to have been driving drunk. Tab 20 of the Mitigation Binder contains a police report indicating that Debra Fell was arrested for public drunkenness and assault on January 29, 1994. The affidavit filed by the arresting officer indicates that Debra Fell attacked her boyfriend Al Wilcox, dragging him out of his vehicle by the hair, striking him on the face and breaking his glasses. Fell, age 13, corroborated Wilcox's statements to the police. Defense Trial Exhibit T is a CYS Referral dated November 27, 1993, which indicates that Fell's mother showed up at the hospital drunk, refusing to take Fell home.

> The friend with the mother confirms she has been drinking heavily. Stepfather is outside in car. Allegations that stepfather and child do not get along and stepfather does not want him home. Dr. Shin or Sheen states there is no reason for him to remain but mother wants him admitted again.

Tr. 8-1 at 48. The evidence presented at trial made it clear that Debra Fell never stopped drinking completely. Trial counsel was not required to present every existing piece of evidence, so long as the evidence they chose to present adequately conveyed the relevant mitigation evidence to the jury. It is significant that German testified that she had FEDEXed approximately two inches worth of documents to counsel in response to a subpoena. Tr. 8-1 at 36. Several of

these contact sheets were included in the Mitigation Binder introduced into evidence.  The fact

that counsel did not choose to introduce the contact sheets now highlighted by Fell in his motion

at pp. 54-56 does not render counsel's assistance constitutionally ineffective.  None of the

additional information contained in those contact sheets would have changed the sentencing

profile presented by trial counsel.

In conclusion, Fell argues that the information contained in the additional contact sheets

not submitted to the jury would have clearly established that he was not living in a "safe

environment" under his mother's care.  But the evidence presented by trial counsel established

that fact.  The jury unanimously found that:

> 12.  Fell was sexually and physically abused as a child
> 17.  Fell's parents were violent alcoholics who abandoned him as a child
> 18.  Fell regularly abused alcohol and drugs from childhood until his arrest

In addition, 10 jurors on their own found the following two mitigating factors:

> 19.  Total life experience
> 20.  Failure of state social and mental health services to effectively
>       intervene in his childhood abuse and to treat or address his early
>       antisocial behavior

Clearly trial counsel's presentation of mitigation evidence and his use of the available mitigation

records was adequate.  Even if Fell were able to establish that trial counsel should have

introduced more documents, in light of the jury's findings, he cannot establish prejudice

sufficiently to undermine confidence in the outcome.  *Strickland*, 466 U.S. at 694.

b.      Trial Counsel Obtained and Presented Other Documentary
        Evidence of Mitigation

Fell further claims that his trial counsel was ineffective in failing to present more documents pertaining to his hospitalizations which would have established the hostility and neglect of his home life. Specifically, he submits that trial counsel should have made better use of nurses' notes. However, among the documents trial counsel submitted to the jury was a referral from a hospital to CYS dated November 27, 1993, which indicates that Fell's mother showed up at the hospital drunk, refusing to take Fell home.

> The friend with the mother confirms she has been drinking heavily. Stepfather is outside in car. Allegations that stepfather and child do not get along and stepfather does not want him home. Dr. Shin or Sheen states there is no reason for him to remain but mother wants him admitted again.

Defense Trial Exhibit T; Tr. 8-1 at 48. It is hard to imagine a more effective manner in which to convey to the jury the "hostility and neglect" that Fell was exposed to at home than providing them with this referral.

Moreover, the remaining information that Fell claims would have been provided to the jury through the proffered nurses' notes was presented through other testimony. *See* Testimony of Teri Fell, Tr. VII-1 at 86 (mother physically abused Fell); MB, Tab 30, Discharge Summary dated June 30, 1993, at 1 ("I'm here because my mother just doesn't want me around"); at 2 ("upon admission to the Adolescent Unit he had head lice."); at 3-4 ("His grandmother came in and reported to the staff that there were problems in the home, that it is 'not all Donald's fault'"); MB, Tab 25, Discharge Summary dated May 2, 1992 ("He also exhibited head lice and had to be

-91-

treated with Knell shampoo several times").

While trial counsel did not submit the associated nurses' notes into evidence at the penalty phase, the relevant mitigation information therein was presented to the jury through the Mitigation Binder's hospitalization records and witness testimony. Trial counsel's performance was thus adequate and effective.

Fell further claims that his trial counsel was ineffective in using records from St. Michael's school to establish that he had an alcohol problem. But a review of the record again indicates that trial counsel introduced a drug and alcohol evaluation conducted of Fell on September 16, 1996. MB, Tab 13 at 1. This evaluation documented Fell's chronic substance abuse problem, beginning with his first experimentation with alcohol at the age of eight, and his ongoing abuse beginning at age 13.

> Donald stated he consumed one twelve pack of beer daily and one-fifth of rum on weekends for one and one-half years. Donald reported he also drank unknown amounts of alcohol on a binge basis during this time period.

*Id*. This same document noted that Fell's "[s]cores on the WPI correlate with those who are prone to abuse alcohol." *Id*. at 2. The evaluator also concluded that Fell had a marihuana abuse problem and was minimizing his abuse of alcohol. *Id*. Thus, again, while trial counsel might not have utilized the documents now cited, counsel clearly conveyed the relevant mitigation information to the jury.[12]

---

[12] Fell further claims that trial counsel should have presented evidence to the jury regarding the fact that Fell and Robert Lee reconnected at St. Michael's. He deems it relevant that at St. Michael's, Lee was treated for aggressiveness and destructiveness. However, the

Last, Fell claims that his three trial lawyers were ineffective in failing to submit documents from St. Michael's that would have "revealed allegations that Don Sr. had been 'sexually abusive' to Mr. Fell and his sister." He cites a Psycho Social Summary completed at St. Michael's School. However, a review of this document shows that the allegation of sexual abuse was made by the Theresa Sharpe, the maternal grandmother. *See* Fell - 00002024. Other than Sharpe's statement, the record in this case, including CYS files and mental health evaluations, are devoid of allegations of Fell's sexual abuse by either parent. Particularly in view of evidence of Sharpe's volatility and immaturity – introduced both at trial and in connection with the instant motion – it was reasonable for trial counsel not to have relied on her isolated and unsubstantiated allegation.

3.    Trial Counsel Effectively Obtained and Presented Evidence of Familial Substance Abuse and Mental Health Issues

Fell claims that his trial counsel failed to present evidence of familial substance abuse and mental health issues. Again, the record does not support his contention.

a.    Trial Counsel Presented Evidence of Abuse of Alcohol and Illegal Substances by Fell and His Parents

The record in this case is replete with evidence of chronic alcoholism by Fell's father and mother, as well its side effects. From the moment the first defense witness took the stand at the penalty phase (consistent with counsel's opening statement), the jury heard one horrific story

---

record reveals that trial counsel purposely and as a matter of strategy chose to exclude evidence regarding Lee's relationship with Fell. We expand on this argument below. "We expland on this argument in section VIII, *infra*."

after another relating to the chronic abuse of alcohol by Donald and Debra Fell and resulting

drunken altercations. Susan Benczkowski, Fell's half-sister, began her testimony by telling the

jury that she did not have a single memory of her father not drinking. Tr. VII-1 at 47. Susan

testified that Debra drank everyday, even when she was pregnant. *Id*. at 57. Teri Fell testified

that her parents were always drunk and always yelling at each other. *Id*. at 79. She also told the

jury how her father would let her and her brother drink the foam off the top of a beer. *Id*. at 82-

83; and how she and her brother first started drinking when he was about eight years old from a

keg their father kept in the basement. *Id*. Both Susan and Teri related violent incidents where

Donald and Debra Fell stabbed each other while intoxicated. *Id*. at 60, 76. Officer Czanker told

the jury that there was a period of time when the police would respond to the Fell home on a

weekly basis, usually to find both parties intoxicated and yelling at each other. Tr. VII-2 at 13-

14. Officer Purcell similarly testified that the police responded to the Fell home at least weekly,

*Id*. at 29, and that the main problem in the Fell household was alcohol. *Id*. at 37. Social worker

Ellis Carle began his testimony by telling the jury about a shocking incident at the Fell home

where Donald Fell was found walking down a sidewalk with a knife in his back and Debra Fell

was found at her home with a knife wound on her leg - both parties were intoxicated. *Id*. at 44-

47.

Trial counsel not only presented extensive evidence of the Fell family's chronic

alcoholism, but he also provided the jury with evidence of Fell's predisposition to abuse alcohol.

*See* MB, Tab 13, Drug and Alcohol Evaluation of Fell dated 9/16/96, which indicates that Fell's

-94-

"[s]cores on the WPI correlate with those who are prone to abuse alcohol." According to this evaluation, Fell abused alcohol as well as marihuana. This evaluation was reviewed before the jury through the testimony of social worker Deanna German. Tr. 8-1 at 11.

Notwithstanding the above summarized evidence, Fell claims trial counsel were ineffective in failing to present evidence of familial alcoholism and substance abuse. He submits that his trial attorneys should have also presented evidence of alcohol and illegal substance abuse by his extended family members. However, given the chronic alcoholism of his parents, and his own early exposure to alcohol and alcohol abuse, additional evidence of familial alcoholism would not have altered the sentencing profile presented. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. In this case, in light of the evidence presented, it was highly unlikely that additional evidence of familial alcoholism and substance abuse would have materially altered the mitigation profile.

      b.      Trial Counsel Elected Not to Present Evidence of Mental Illness

In the penalty phase counsel introduced evidence of four psychiatric hospitalizations of Fell between the ages of 11 and 13. *See* MB, Tabs 22-31. Through the medical records, the jury learned that Fell's father was a diagnosed schizophrenic and his grandmother was diagnosed with chronic psychosis and took psychotropic medications. MB, Tab 28 at 2. Fell submits that trial counsel was ineffective in failing to present additional evidence of familial mental illness. However, the record demonstrates that counsel made a strategic decision not to present a mental

-95-

health case. Evidence of familial mental illness would have opened the door to the government's

expert testimony in rebuttal, something that trial counsel sought to circumvent. Introducing

additional evidence of familial mental illness would have been inconsistent with trial strategy,

and it was not unreasonable for counsel to forego it.[13]

Moreover, although there was a history of mental illness in Fell's family, the fact remains

that Fell himself exhibited no mental illness. Multiple experts, for both the defense and the

government, reached that conclusion (and other evidence established that Fell's conduct on

November 27, 2000, was purposeful, goal oriented, rational, and organized). Therefore, there is

no reasonable probability that evidence of familial mental illness would have led to a favorable

verdict.

4.    Trial Counsel's Investigation and Presentation of Mitigation Evidence
Was Adequate, Therefore, Fell Can Not Show Prejudice

As stated above, trial counsel presented a total of 10 lay witnesses in mitigation who

painted a horrific picture of Fell's childhood and upbringing. Together, these witnesses

described an intelligent child who appeared to have succumbed the hazards of his home

environment, which included chronic alcoholism, physical and emotional abuse, sexual abuse,

neglect and ultimately, abandonment. The testimony of most of these witnesses was supported

by hundreds of documents in the Mitigation Binder. Included in that binder were Fell's

---

[13]  From the beginning of the case counsel was aware of the risks created by familial
mental illness as they had been noted by Dr. Mark J. Mills in his report dated May 7, 2001. *See*
P. Exhibit 2 at 4, Fell-00000395.

psychiatric hospitalization records describing Fell's four hospitalizations. In each instance, he responded positively to treatment, only to abandon treatment when released to his mother's custody. The mitigation profile presented by trial counsel was compelling, as demonstrated by the jury's unanimously finding of every mitigating factor submitted relating to childhood and upbringing. Indeed, 10 jurors also found as mitigators Fell's "total life experience" and the "[f]ailure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior." Therefore, trial counsel's investigation and presentation of mitigation evidence was more than adequate and his legal representation was effective.

Fell's claims, addressed above, that trial counsel failed to present "important mitigation evidence" (P 62), are not supported by the record. He further argues that "[d]efense counsel should have been prepared to offer available witness testimony and supporting documentary evidence to *provide real weight* to the mitigating factors presented regarding his background." P 63 (emphasis added). Yet the Special Verdict Form indicates that the jury unanimously found all but two of the mitigating factors related to Fell's background, and the remaining two factors were found to have been established by 8 and 10 jurors.

| 12. | Fell was sexually and physically abused as a child | 12 |
| 13. | Fell witnessed family violence as a child | 8 |
| 14. | Fell was raised without positive role models | 10 |
| 15. | Fell was institutionalized for mental health conditions | 12 |
| 16. | Fell was 20 years old at the time of the offense | 12 |
| 17. | Fell's parents were violent alcoholics who abandoned him as a child | 12 |
| 18. | Fell regularly abused alcohol and drugs from childhood until his arrest | 12 |

In addition, the jury wrote in an another two mitigating factors, both of which relate to Fell's background.

        Written in by Jury

| | | |
|---|---|---|
| 19. | Total life experience | 10 |
| 20. | Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior | 10 |

Dkt. No. 200, pp. 12-17. Fell's allegation that additional evidence of these factors would have led at least one juror to strike a different balance is pure speculation. Nor is the fact that the jury deemed aggravating evidence more compelling than mitigating evidence indicative of ineffective counsel. Fell must show that, based on an error by his counsel, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. Given the extensive and compelling background mitigation evidence in the penalty phase, the professionalism of the lawyers, and the care exercised by the Court at trial, Fell is unable to make the requisite showing.

#### IV.    Trial Counsel Adequately Investigated Fell's Mental Health and Their Strategic Decision Not to Present a Mental Health Case Was Reasonable

Fell next claims that his trial counsel failed to conduct an adequate investigation of his mental health – the record completely defies this allegation. Immediately upon being assigned to represent Fell, trial counsel retained the services of three mental health experts, each of whom rendered a report on Fell's mental health. In addition, as trial approached, defense counsel

-98-

retained the services of a fourth psychologist to evaluate Fell's social history and the risk factors associated with it. Nonetheless, during the penalty phase, after introducing important mitigation evidence and reviewed reports from two government rebuttal experts, trial counsel made an informed strategic decision not to present a mental health case. By the beginning of the penalty phase, seven mental health experts had examined Fell – four for the defense and three for the government. None had found any neurological deficits, organic brain damage, or significant mental illness. Moreover, the government mental health experts were poised to testify in rebuttal – if Fell introduced mental health testimony – that he fully met the criteria for Anti-Social Personality Disorder, and psychopathy, that he was not significantly impaired at the time of the murders, and that he showed no remorse. Further, Fell made highly damaging, false exculpatory and minimizing statements in his video-taped interview by Dr. Wetzel, which likely would have been shown to the jury. Therefore, trial counsel's decision not to present a mental health case did not reflect constitutional ineffectiveness. Further, because presentation of mental health expert testimony would have triggered strong and unfavorable expert testimony in rebuttal, Fell cannot demonstrate prejudice.

> A.    Trial Counsel Conducted an Adequate Mental Health Investigation Which Conformed to Existing Standards of Professional Conduct

One of the first steps taken by Fell's trial attorneys upon being appointed was to retain and consult with three mental health experts. Defense expert Dr. Mark J. Mills evaluated Fell on March 26 and 27, 2001, just two months after indictment. In his report Dr. Mills indicates that Fell is "neither floridly psychotic nor significantly cognitively impaired, at present." P. Exhibit 3

at 4, Fell-00000395.  Dr. Mills based his opinion that Fell may be considered "pre-psychotic" on

the fact that Fell appeared to respondeto anti-psychotic medication during his childhood

hospitalizations.  But Dr. Mills could not state that Fell was psychotic at the time of his

evaluation nearly a decade later.  Indeed, medical records indicate that Fell has never been

diagnosed as psychotic.

On April 6, 2001, a week after Dr. Mills's evaluation, defense expert Dr. Wilfred G. van

Gorp, with the assistance of Dr. Kimberly Walton, conducted an independent neuropsychological

evaluation of Fell.  P. Exhibit 2, Fell-00000377.  Dr. van Gorp's evaluation indicated only

moderate depression, *id*. at 4, Fell-00000380; and no evidence of psychosis or cognitive deficits.

*Id*. at 5, Fell-00000381.  Fell demonstrated an IQ of 101, placing him in the average range of

overall intellectual ability.  *Id*.  He demonstrated no abnormalities in the domains of attention,

concentration, language functioning, learning, memory, executive functioning and motor

functioning.  *Id*. at 6-7, Fell-00000383.  In other words, Fell had no learning disabilities or other

cognitive impairments.  Among Dr. van Gorp's notable remarks is his finding that Fell tends to

be "somewhat egocentric and frankly manipulative of others."  *Id*. at 8, Fell-00000384.

Next, Fell was evaluated by defense expert Dr. Jonathan J. Lipman, a

neuropharmacologist, who documented Fell's abuse of alcohol and illegal drugs from childhood.

*See* P. Exhibit 4, Fell-00000423.  It is worth noting that the primary source of information for Dr.

Lipman's evaluation was Fell himself.  Dr. Lipman opined that Fell suffered from a

predisposition to drug abuse and that his early drug abuse co-existed with developing mental

illness characterized by depression with psychotic and borderline aspects. However, Dr. Lipman recognized that Fell had a "relatively normal current neuropsychological test performance." According to Dr. Lipman, Fell also suffered from a "neuropsychological vulnerability to psychotic decompensation under extreme conditions of emotional stress." In other words, Dr. Lipman could not say that Fell was psychotic, only that he was vulnerable to becoming psychotic when under "extreme stress." This vulnerability would be expected to increase when intoxicated, and increase more when chronically intoxicated, as Dr. Lipman concludes was the case at the time of the capital offenses.

In addition to the three defense mental health consultations, counsel obtained Fell's medical records from all four of his psychiatric hospitalizations. During each, Fell was diagnosed with only a conduct disorder. *See* MB, Tab 22 at 1; Tab 25 at 1; Tab 29 at 2; Tab 30 at 1. His summary discharge from the first hospitalization on October 30, 1991, stated that one of Fell's problems was behavioral: he was "assaultive, combative, destructive, oppositional, defiant, impulsive, and running away." *Id*. at 4. Fell was hospitalized a second time after shooting a friend with a handgun. MB, Tab 25 at 1. Upon his admission it was noted that "[t]he patient shows no remorse and even threatens to shoot his mother." *Id*. Later Fell demonstrated appropriate remorse. *Id*. During his third hospitalization, Fell was found to be "impulsive, demanding, manipulative, and . . . cried profusely when he d[id] not get his own way. He is defiant and oppositional toward authority . . . ." MB, Tab 29 at 1. Fell was psychiatrically hospitalized a fourth time for increasing violent behavior and depression. MB, Tab 30 at 1. He

admitted "throwing" a fork at a friend, though he claimed not to have intended to hit anyone. MB, Tab 32 at 1-2. Trial counsel also obtained records from social services agencies such as the Victim Resource Center ("VCR"), and Luzerne County Youth Services ("CYS").

Notwithstanding the above summarized evidence, Fell claims that his trial counsel's mental health investigation fell below the prevailing professional norms as set forth in the American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel In Death Penalty Cases ("ABA guidelines"). P. at 70-72. First, the ABA guidelines do not define reasonableness under the Federal Constitution. *See Van Hook*, 130 S.Ct at 17. In *Strickland*, the Supreme Court held that the Sixth Amendment entitles criminal defendants to the "'effective assistance of counsel'" – that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." 466 U.S. at 686. That standard, the Supreme Court has held, is "necessarily a general one." *Van Hook*, 130 S.Ct. at 16.

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 688-89. Indeed, in *Van Hook* the Supreme Court criticized the Sixth Circuit for treating the ABA's 2003 Guidelines (cited by petitioner here), "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel " 'must fully comply.' " 130 S.Ct at 17. In so doing the Court reiterated that standards such as the ABA guidelines are only "guides" to what reasonableness means, not its definition. *Id.*

-102-

> [W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.

*Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

Second, whether trial counsel's performance is judged under the constitutional standard, or the ABA Guidelines, counsel provided adequate and effective representation. Trial counsel conducted an extensive independent investigation of Fell's mental health, including consultations with neurological, psychological and psychiatric experts. In addition, Fell's trial counsel diligently obtained medical records pertaining to four psychiatric hospitalizations of Fell as an adolescent. Counsel (and Fell's mitigation specialist) also spoke to a multitude family members, teachers, police officers, social workers, correctional officers, and others to obtain a full social history. Counsel obtained school records, correctional records, and family department records, all yielding important mitigation information that was ultimately presented to the jury. In preparation for trial, defense counsel retained a fourth mental health expert, Dr. Mark Cunningham, to conduct an analysis of Fell's social history, the risk factors associated with his upbringing, the lack of associated protective factors, and how these factors affected his life trajectory. Therefore, trial counsel's performance was objectively reasonable and complied with both the Constitution and the ABA guidelines.

### B.  Trial Counsel Had No Obligation to Further Investigate Mental Health

Fell claims that trial counsel was ineffective in failing to investigate his mental health beyond the neuropsychological, psychiatric and neuropharmacological evaluations. Yet none of

-103-

the three experts who evaluated Fell recommended any further testing.  In any event, in preparation for trial counsel retained a fourth mental health expert, clinical and forensic psychologist Dr. Mark Cunningham, to conduct an analysis of Fell's social history, and how it these affected Fell's life trajectory.  P. Exhibit 5.  Therefore, trial counsel clearly reevaluated his mental health evidence and sought to supplement the mental health record in preparation for trial.

Fell further claims that his mental health experts did not have his complete social history when they conducted their evaluations; and therefore, the diagnoses were merely "preliminary." However, none of the experts who evaluated Fell prior to trial indicated that they lacked sufficient background information to provide a professional opinion.  Similarly, none qualified the opinions rendered as "preliminary" or otherwise.  *See* P. Exhibit 2, Neuropsychological Evaluation by Dr. Wilfred G. van Gorp; Exhibit 3, Psychiatric Evaluation by Dr. Mark J. Mills; and Exhibit 4, Neuropharmacological Evaluation by Dr. Jonathan J. Lipman.  Fell submits a declaration by Dr. Mills in support of his argument, stating that trial counsel did not provide him with a complete social history.  But Dr. Mills does not state, either in his report or his declaration that this affected his opinion.  *See* P. Exhibits 2, Fell-00000392, and 206, Fell-00002449.

Similarly, Fell claims that Dr. Lipman indicated to counsel that he typically interviews people close to the defendant, but trial counsel failed to arrange for him to conduct such interviews.  However, in his report, Dr. Lipman makes no mention of this alleged failure by trial counsel having affected his ability to render an opinion.  And Fell adds no evidence that would support such a contention.

-104-

Fell further claims that trial counsel failed to follow up on the suggestions of his mental health experts. For example, he states that Dr. Lipman recommended "neuropsychological testing, including an evaluation of Mr. Fell's dissociative tendencies and an administration of the Dissociative Experiences Scale." No such recommendation is found in Dr. Lipman's report. *See* P. Exhibit 4. In any event, that is what Dr. van Gorp conducted – a complete neuropsychological evaluation. Unswayed, Fell argues that trial counsel failed to direct Dr. van Gorp to complete the recommended testing, that is, for dissociation, "which could have confirmed impairment of the right parietal lobe." Presumably if Dr. van Gorp, who conducted a thorough neuropsychological evaluation, believed that such testing was warranted, he would have recommended it – yet he did not. Moreover, even if the Court were to determine that trial counsel's failure to request that such testing be done was unreasonable, Fell fails to state how a diagnosis of "impairment of the right parietal lobe" would have altered his sentencing profile.[14] Hence, he has not demonstrated prejudice.

Fell further faults his trial counsel for failing to direct his mitigation specialist, Ms. Ayres, to spend more time with him. According to Fell, Ms. Ayres met with him only three times in the years leading up to the trial. As a result, he submits that Ms. Ayres did not explore highly sensitive topics with him, such as his sexual history and his relationship with Lee. However, Fell fails to state what facts Ms. Ayres would have uncovered had she spent more time with him, and

---

[14] As discussed below, trial counsel ultimately made a strategic decision not to present mental health evidence, therefore, even if evidence of "impairment of the right parietal lobe" had been developed, it would not have been presented.

more important, how counsel's failure to learn of such evidence prejudiced him at trial.

Fell also claims that many relevant records, such as CYS contact sheets and Victim's Resource Center records, were obtained late, just prior to the start of trial. However, he fails to specify, in the first instance, which records his argument applies to, and in the second instance, how, if in any way, he was prejudiced by counsel obtaining the records late. Similarly, Fell criticizes the fact that his trial counsel did not obtain his prison records from the Northwest Correctional Facility until the Spring of 2005. Again, however, he fails to specify what records his argument pertains to, and how his case was affected by counsel obtaining these documents two to three months before trial.

Last, Fell claims that trial counsel was ineffective in failing to request that his mental health experts update their reports in light of the additional evidence that had been gathered. But a review of the reports rendered by Fell's mental health experts reveals that they were aware of Fell's background and upbringing. Trial counsel did not develop evidence different from that which was taken into consideration by the experts when they examined Fell. Moreover, Fell fails to identify what newly developed evidence trial counsel should have transmitted to his experts, or how, if in any way, it would have altered their opinions.

> C.     <u>None of Fell's Multiple Mental Health Examinations Revealed Serious Mental Health Impairments</u>

Fell claims that his trial counsel missed clear warning signs that he suffered from Fetal Alcohol Spectrum Disorder ("FASD"), a mood disorder and impairment due to chronic trauma during childhood through adolescence. He claims that "there is evidence" that he suffers from

FASD and mood disorder. Yet the hundreds of exhibits submitted with his lengthy § 2255

motion include no such diagnosis. Moreover, the record indicates that trial counsel had no

indication from Fell's mental health evaluations or previous medical records that Fell suffered

from FASD. While Fell had been diagnosed with depression as a young adolescent, not one of

his multiple mental health evaluations after arrest indicate that he was significantly depressed or

had any other type of mood disorder. Moreover, while Fell's social history clearly indicates that

he was the victim of trauma during his childhood years, none of his multiple mental health

evaluations after arrest indicate that said trauma caused any cognitive impairments.

Despite the foregoing, trial counsel retained the services of Dr. Mark Cunningham, a

psychologist who prepared to present to the jury in the penalty phase a social history of Fell, and

the resulting risks and ramifications for adult behavior. However, as was the case with the other

three defense experts, trial counsel made a strategic decision not to present the testimony of Dr.

Cunningham. Therefore, even if trial counsel had ascertained that Fell suffered from preciously

unknown mental health conditions, it would have been nonconsequential as trial counsel made a

strategic decision not to present mental health evidence. Therefore, Fell can show no prejudice.

    1.    The Record is Devoid of Any Indication That Fell Suffered From
          Fetal Alcohol Spectrum Disorder

.

FASD, as Fell states, is an umbrella term describing the continuum of permanent birth

defects caused by maternal consumption of alcohol during pregnancy, P 81. It includes, but is

not limited to, Fetal Alcohol Syndrome (FAS), Partial Fetal Alcohol Syndrome (PFAS), Alcohol-

Related Neurodevelopmental Disorder (ARND), Alcohol-Related Birth Defects (ARBD), and

Fetal Alcohol Effect (FAE). FASD is not itself a diagnosis, but rather a term embracing a range of disabilities that may result from fetal alcohol exposure. Fell claims that his trial counsel was ineffective in failing to have him tested for fetal alcohol related disabilities.

Significantly, Fell does not claim that he in fact suffers from a fetal alcohol related disability. His extensive § 2255 motion, and its hundreds of exhibits, contains no diagnosis for a fetal alcohol related condition, disability or impairment. Rather, Fell states that he has manifested symptoms, and engaged in past conduct, that would be consistent with a fetal alcohol related condition or disability. Trial counsel cannot be deemed ineffective for failing to have Fell diagnosed with something he does not have, and that seven mental health experts failed to find. Counsel investigated pre-natal consumption of alcohol by Fell's mother and presented evidence of it to the jury. Tr. VII-1 at 57. Given the record, counsel was obligated to do no more.

Even if the court were to consider Fell's argument on its merits, the record does not support his claim. While it is true that trial counsel had evidence that Fell's mother drank alcohol while she was pregnant with Fell, it is also true that Fell was never diagnosed with a fetal alcohol related disability. In fact, he was never diagnosed with any disability at all. Fell fails to note that not every child exposed to alcohol during pregnancy develops an alcohol related disorder or disability. Overall, the available literature points to a prevalence rate of FAS of 0.5 to 2 cases per 1,000 births in the United States during the 1980s and 1990s. Estimating the Prevalence of Fetal Alcohol Syndrome: A Summary, Philip A. May, Ph. D., and J. Phillip Gossage, Ph. D. Dr. Michael Welner, the only mental health expert to address the possibility of

-108-

the presence of fetal alcohol syndrome found no evidence of it.

> Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education.

P. Exh. 10 at 21, Fell-00000642.

In his petition, Fell states that "[i]t is common for persons with FASD to display abnormal behaviors during childhood, such as hyperactivity, poor impulse control, poor judgment and anxiety." But in fact, Fell did not display, nor was he diagnosed with, hyperactivity or anxiety prior to his second psychiatric hospitalization. His school records are devoid of any indication that Fell was either hyperactive or suffered from FASD. Rather than demonstrating poor judgment throughout elementary school, the record in this case indicates that Fell was actually a good student, who maintained good grades and good discipline through 5th grade. Tr. VIII-1 at 29-33.[15] After conducting a mental health evaluation of Fell, Dr. Richard D. Wetzel indicated:

> Based on the history that he gave to me and the limited documentation in his medical records, I am unable to state with reasonable professional certainty that Mr. Fell ever had hyperactivity or attention deficit disorder. He certainly shows none of the characteristics of these disorders at present. I would concede that most persons with these disorders outgrow them by his current age.

P. Exh. 9 at 8, Fell-00000618. *See also* Report of Dr. Michael Welner, P. Exh. 10 at 19-20, Fell-00000640-41 (Fell does not meet the criteria for Attention Deficit Hyperactivity Disorder).

---

[15] It is worth noting that Fell's mental health evaluations did not indicate that he suffered from hyperactivity as an adult.

Fell's academic performance began to decline in the 6th grade because, as per his own account, "he fell in with the wrong crowd," and started "doing what he pleased," including getting drunk and high. *See* P. Exhibit 7 at 37, Fell-00000503. The Mitigation Binder also includes many school reports of truancy. Fell's psychiatric hospitalization records reveal that when he was admitted for the first time on September 30, 1991, he was refusing to accept rules at home, he was smoking, he was refusing to do his homework and he was getting into trouble at school. MB, Tab 22 at 1. Upon admission to the hospital, it was noted that "[h]e had been also increasingly aggressive toward his mother and readily admitted that he hit his mother." *Id*. Fell was diagnosed with conduct disorder, MB, Tab 23 at 2, in other words, bad behavior. He was psychologically and psychiatrically evaluated during his stay in the hospital, *id*. at Tabs 23-24, and was found to have average intellectual functioning. After 30 days of observation, psychiatric treatment and counseling, doctors made no mention of a potential fetal alcohol related disability. While the treating psychiatrist noted "indications of some degree of depression and anxiety," he found them to be mild and transient. *Id*. at Tab 24.

Fell was hospitalized a second time on April 14, 1992, after shooting a boy with a handgun. Upon admission it was noted that he, "shows no remorse and even threatens to shoot his mother." MB, Tab 25 at 1. "By the end of his first week in the hospital, he was still oppositional, defiant, and manipulative." *Id*. at 2. A clinical evaluation found that Fell had behavioral problems with weapons such as guns and knives; he physically abused his mother and sister; he threw things when angry; he cursed at authority figures; and he refused to follow rules

at home.  He was diagnosed with atypical depression and hyperkinetic Conduct Disorder.  After another two weeks of observation, doctors made no mention of a potential fetal alcohol related disorder or disability.

About nine months later, on January 26, 1993, Fell was admitted to a psychiatric unit for a third time, for increasingly aggressive behavior.  MB, Tab 28.  He kept knives in his room, and had recently thrown a butcher knife at his mother; punched his mother's boyfriend on his broken leg; he had not attended school in over three months and was staying out late at night.  *Id*.  Debra Fell reported that she was afraid to go to sleep with Fell in the house for fear that he would stab her in her sleep.  *Id*. at 3.  At least by this third hospitalization, doctors were aware of his mother's alcohol abuse and familial mental illness.  Fell was preliminarily diagnosed with atypical depression, hyperkinetic conduct disorder and borderline personality traits.  Upon discharge he was diagnosed with major depression with psychotic features, hyperkinetic conduct disorder and borderline personality traits.  Again, after 30 days of observation and treatment, doctors made no mention of a potential fetal alcohol related disability.

Three months later, on June 6, 1993,  Fell was admitted to a psychiatric unit for the fourth time, again for increasingly violent behavior and depression.  MB, Tab 30.  He had "thrown" a fork at a friend and stabbed him, though he claimed unintentionally.  His preliminary diagnosis was depressive disorder, attention deficit activity disorder and borderline personality traits.  *Id*.  Fell, however, claimed that he was there just because his mother did not want him around.  *Id*.  After 24 days of observation and treatment, doctors made no mention of a potential

-111-

fetal alcohol related disability.

Approximately six months after his last psychiatric hospitalization, Fell's truancy led him to be committed to St. Michael's school for boys, where he remained for nearly two years. At St. Michael's, Fell attended academic classes and completed the 7th and 8th grades. He also received mental health counseling. Tr. IX at 12, 16. There is no mention of fetal alcohol related disability or disorder in records from St. Michael's.

The three defense mental health experts who examined Fell did not indicate that he displayed symptoms of fetal alcohol related disability or disorder. Dr. Mills, who examined Fell for seven hours, made no mention of Fell potentially suffering from FASD in his report. *See* P. Exhibit 3.. Despite being aware of alcohol abuse by his parents, neuropsychologist Dr. van Gorp made no mention of Fell possibly having a fetal alcohol related disability or disorder. *See* P. Exhibit 2. Dr. Lipman documented an extensive history of substance abuse by Fell, but his report is similarly devoid of any reference to FASD. *See* P. Exhibit 4.

Given that counsel received no indication from records or experts that Fell potentially suffered from FASD, they should not be faulted for not having pursued further evaluations in that regard. Counsel does not have a duty to investigate when they have good reason to think further investigation would be a waste. *Rompilla*, 545 U.S. at 382-83; *see also Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"). Moreover, even if counsel had ascertained that

-112-

Fell displayed symptoms of FASD, counsel made a strategic decision not to present mental health evidence.  Therefore, Fell can show no resulting prejudice.

2.      The Record Does Not Indicate That Fell Suffers From a Mood Disorder

Fell further claims that his trial counsel was ineffective in failing to investigate and present expert testimony regarding a mood disorder.  Yet again, the massive § 2255 filing includes no diagnosis of mood disorder.  As with FASD, Fell does not claim that he in fact suffers from a mood disorder or suffered from a mood disorder when the crimes were committed. Rather, he refers to medical and social records indicating varying degrees of depression between the ages of 12 and 13.[16]  But Fell offers no diagnosis after his last psychiatric hospitalization at age 13 in support of his claim that "there is evidence" that he suffers from a mood disorder.  He also claims that his records from the Northwest Correctional Facility contained red flags suggesting mood disorder.

Fell's three trial lawyers acted on the considerable mental health evidence before them. They retained three mental health experts, none of whom indicated that Fell displayed significant symptoms of mood disorder.  At the time of his neuropsychological evaluation on April 6, 2001, by neuropsychologist Dr. Wilfred G. van Gorp, Fell reported his mood to be "ok" and added that he was bored in the confines of his cell.  P. Exhibit 2 at 3, Fell-00000379.  Fell stated that he passed the time reading books and magazines.  *Id*.  Dr. van Gorp noted that on the Beck

---

[16]  The Report of Dr. Richard D. Wetzel, P. Exhibit 7 at 5, finds no evidence that Fell had depressive syndrome.

-113-

Depression Inventory Fell scored 20, which placed him in the lower end of the Moderate range of clinical depression – not particularly unusual for someone who is incarcerated and facing the possibility of life imprisonment or death. *Id*. at 4. Otherwise, Dr. van Gorp noted no symptoms of a mood disorder.

Dr. Mills, a psychiatrist who examined Fell for seven hours on March 26 and 27, 2001, made no mention of mood disorder in his report. *See* P. Exhibit 3. It is worth noting that prior to his psychiatric evaluation, Dr. Mills had reviewed Fell's psychiatric hospitalization records. P. Exhibit 3, n. 1. Dr. Lipman's report is similarly devoid of reference to mood disorder. P. Exhibit 4.

Trial counsel did what they were supposed to do – they retained mental health experts to evaluate Fell's mental health. In light of the fact that none of the experts found that Fell suffered from any significant mood disorder – and neither did the three government mental health experts – counsel was not obligated to seek yet another evaluation.

Moreover, even if counsel would have ascertained that Fell displayed symptoms of a significant mood disorder, it would have been unlikely to alter the mitigation phase strategy of not presenting mental health evidence. There is no reason to believe that the jury would have found that a mood disorder, contested by government experts, would have constituted a sufficiently weighty factor balanced against rebuttal ASP testimony. Therefore, if the court were to conclude that trial counsel's failure to pursue additional testing for a mood disorder constituted error, Fell cannot show that it resulted in prejudice.

3.    Trial Counsel Adequately Investigated the Effects of Chronic Exposure to Trauma from Early Childhood to Adolescence

Fell claims that this trial counsel was ineffective in failing to investigate the clinical meaning of his chronic childhood trauma, and therefore, no evidence was presented in penalty as to the implications of that trauma and the impact it had on his childhood development and adverse life trajectory. Yet this is essentially what Dr. Mark Cunningham was prepared to address: the linkage between a horrific childhood and criminal acts in adulthood. Dr. Cunningham, a clinical and forensic psychologist was poised to present to the jury the thesis that Fell's adverse childhood experiences mitigated his adult responsibility. His opinion was that Fell's social history, including many traumatic "risk" factors, were associated with later substance abuse and violence. *See* P. Exhibit 5. Dr. Cunningham would have further explained to the jury how neglect and traumatic experiences impact a person's developmental trajectory. *Id*. As Dr. Cunningham explained in his report:

> The above research provides an explanation for the developmental trajectory observable from adolescence and early adulthood which culminated in the charged capital offenses. I anticipate that in my testimony at capital sentencing I will particularize these factors to Mr. Fell and the resulting trajectory of his life. These and other adverse factors including those listed below impacted not only on Mr. Fell's life trajectory, but also on his underlying value system, moral development, perception of life options and nature of choices.

> Additionally, I anticipate describing in more extensive detail a number of damaging developmental factors present in Mr. Fell's history that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. Again, these will be supplemented by research findings demonstrating a nexus between such factors and disrupted developmental trajectory and adverse developmental outcomes including substance abuse, criminal activity, and criminal violence.

-115-

P. Exhibit 5 at 5. However, for strategic reasons, specifically to avoid confronting government expert mental health evidence in rebuttal, trial counsel decided not to present mental health evidence in penalty. Therefore, rather than failing to investigate the effects of Fell's childhood trauma on his later life, trial counsel made an informed and strategic decision not to present such evidence (and instead argue the thesis in closing). Such an informed and strategic decision cannot constitute ineffective assistance of counsel. *Wiggins*, 539 U.S. at 521.

Fell further claims that "there was evidence" that he suffered from disassociation and that his history of disassociation, coupled with a low score in the Rey-Osterrieth Complex Figure Test ("Rey-O"), should have been a red flag to counsel as to potential defects in his right parietal lobe. Since trial counsel is not a neuropsychologist, he relied on experts. Counsel retained the services of neuropsychologist Dr. Wilfred van Gorp, who conducted a neuropsychological evaluation of Fell. Dr. van Gorp, who administered the Rey-O test to Fell, concluded as follows:

> He achieved a Low Average range score in his copy of a complex figure (Rey Osterrieth Complex Figure) and he had a number of difficulties in recognition of various details of this figure. In contrast, on a measure of judgement of line orientation (another non-motor visual spatial test), Mr. Fell performed within the Average range (40th percentile). Thus, *there is no convincing evidence that Mr. Fell has significant problems in tasks of visual spatial ability*.

P. Exhibit 7 at 7 (emphasis added). If Dr. van Gorp, a neuropsychologist, did not believe that there was reason to investigate further into this area of Fell's neurological functioning, then clearly, it was not unreasonable for trial counsel rely upon that conclusion. Trial counsel cannot be deemed ineffective for following expert advice.

D.    Trial Counsel's Performance Complied With Applicable Standards of Professional Conduct

Fell claims that trial counsel's failure to follow up on the warning signs which he claims pointed to FASD, mood disorder and impairment based on childhood trauma; his decision to hire mental health experts before completing a social history that yielded signs of these disorders; and his failure to reconsider his mental health experts for trial, constitute ineffective assistance of counsel.

Fell begins with the erroneous premise that counsel were ineffective in failing to investigate his social history. As set forth in Part III, *supra*, they were not. Next, he claims that counsel were ineffective in failing to provide his mental health experts with a "complete" social history. However, the record demonstrates that defense mental health experts in fact had a great deal of background evidence on Fell when they evaluated him, including his psychiatric hospitalization records, CYS records, Children's Service Center records, and some school records. *See* P. Exhibit 2 at 9, Fell-00000385; P. Exhibit 3 at 1 n. 1, Fell-00000392; Exhibit 4 at 2, Fell-00000424. In addition, the mitigation specialist had begun work in January 2001, before the mental health evaluations of Fell were conducted, and she provided the mental health experts with a summary of interviews conducted containing background information on Fell. *See* Exhibit 87, 00001260-1264. Moreover, each expert had the opportunity to interview Fell extensively about his background during the course of their evaluations. Therefore, while trial counsel might not have had a complete social history of Fell prior to his mental health evaluations, the experts had sufficient social history to conduct evaluations. In fact, none of the

-117-

mental health experts indicated that there was insufficient background information to render an

opinion. Nor does Fell point to specific evidence obtained after the mental health expert reports

were rendered, which any of the mental health experts indicates would alter the resulting

opinions. *See Van Hook*, 130 S.Ct. at 19 n. 3 ("Van Hook alleges that his lawyers failed to

provide the expert witnesses with a "complete psycho-social history. . . . But he offers no

support for that assertion"). Hence, Fell cannot establish that his counsel erred to his prejudice.

Fell next claims that trial counsel were ineffective in failing to reconsider what mental

health experts should be presented at trial, but he offers no reason as to why counsel needed to

reconsider the choice of experts. Fell contends that trial counsel needed to have completed a

"sweeping life history investigation," and then have an "expert make a comprehensive mental

health assessment." But he fails to state what a "comprehensive mental health assessment"

would have accomplished that was not accomplished by the four assessments completed by

experts retained by counsel.[17] Fell cannot change what was clearly established in 2005 – that he

was a man of average intelligence with no cognitive deficits, no psychosis, no major depression

or other mood disorder, no neurological deficits, and no other significant mental impairment.

---

[17] Fell dedicates a great deal of effort to criticizing defense counsel for not obtaining
CYS records until March 2005 and VCR records until May 2005. First, each of the mental health
reports rendered in 2001 indicate that each expert reviewed CYS and VCR records. Therefore,
clearly at least some of the records from each of these two agencies were obtained in 2001.
Second, the relevant inquiry is whether there was any information in the records obtained in
March and May 2005 that defense counsel failed to present to the jury and, which, if presented,
would have likely altered the outcome of the case. Fell fails to make that showing.

What he did have was a horrific background.  Trial counsel's decision to focus on Fell's background in mitigation was clearly appropriate – it is essentially the same strategy advocated in his instant collateral attack.  *See Williams*, 529 U.S. at 396 (finding ineffective assistance of counsel where failure of trial counsel to introduce evidence was not justified by a tactical decision).  The fact that his trial strategy was not successful does not entitle Fell to another bite at the apple.

Last, the decision of what expert witnesses to present, or whether to present expert testimony at all, is left to the discretion of trial counsel.  So long as trial counsel made an informed decision, that decision cannot constitute ineffective assistance of counsel merely because trial strategy did not work.  Courts have long recognized that "the decision of which witnesses to call is quintessentially a matter of strategy."  *Boylev. McKune*, 544 F.3d at 1139.  Because such decisions are matters of strategy, counsel's choices are accorded a strong presumption of reasonableness.  *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (adequately informed strategic choices are "virtually unchallengeable").

Fell suggests that in capital litigation a defense attorney is obligated to present evidence of mental health – that is incorrect.  There is absolutely no authority for the proposition that the failure to present expert mental health evidence is, *per se*, unreasonable, and thus ineffective assistance of counsel.  Quite the contrary, if, as was the case here, evidence of mental health would likely invite very damaging cross examination and evidence in rebuttal, trial counsel

certainly has the discretion not to present mental health evidence at all and rely on other more compelling mitigation evidence. In fact, on this record, had counsel introduced mental health evidence, and after rebuttal testimony a capital verdict followed, a § 2255 motion could fault counsel for the ineffective and prejudicial decision to introduce the evidence.

          E.     Fell Suffered No Prejudice As A Result of His Counsel's Decision Not To Present Mental Health Expert Testimony

Fell claims that he suffered prejudice as a result of his trial attorneys' failure to present mental health expert testimony. However, the record is clear that counsel investigated his mental health, and prepared to present mental health expert testimony on Fell's behalf. Tr. VII-1 at pp. 4-5 (Trial counsel advised the court that Dr. Mills was on his way from Burlington and might take the stand that day).[18] However, late in the trial, after receiving and reviewing the June 27, 2005 supplemental evaluation by Dr. Wetzel, and the July 5, 2005, evaluation by Dr. Welner, both containing devastating information, and after introducing compelling and extensive background mitigation evidence, trial counsel made a strategic decision not to present mental health evidence. It is reasonable to infer that counsel concluded that the likely benefit of Fell's mental health case would be outweighed by the likely risks of damaging rebuttal testimony. Trial counsel's determination was a strategic decision, and cannot be said to have been *Strickland* error.

"[S]trategic choices made after thorough investigation of law and facts relevant to

---

[18] *See also* Declaration of Alexander Bunin, P. Ex 264 at 6, Fell-00002465; P. at 105 n. 29.

plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. This was precisely

the nature of the decision made by Fell's trial counsel – after consideration of the defense mental

health case and the strength of the government's rebuttal case, a strategic decision was made that

the benefits were unlikely to outweigh the damage on rebuttal. The Supreme Court held in

*Strickland* that:

> [a] fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's
> perspective at the time. Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that counsel's conduct fall
> within the wide range of reasonable professional assistance; that is, the defendant
> must overcome the presumption that, under the circumstances, the challenged
> action might be considered sound trial strategy.

466 U.S. at 689.

The Second Circuit has made clear that a failure to call a witness for tactical reasons of

trial strategy does not satisfy the standard for ineffective assistance of counsel. *United States v.*

*Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (*per curiam*) (*citing United States v. Luciano*, 158 F.3d

655, 660 (2d Cir. 1998); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)); *see also*

*United States v. Nersesian*, 824 F.2d 1294,1321 (2d. Cir. 1987) (decision whether to call a

witness on behalf of defendant, and which witnesses to call, characterized as a tactical decision

which will not constitute the basis for a claim of ineffective assistance of counsel). Even if a

witness might offer exculpatory evidence, counsel's decision as to whether to call that witness is

ordinarily not viewed as a lapse in professional representation for purposes of an ineffective

assistance of counsel claim. *United States v. Best*, 219 F.3d 192, 201 (2d. Cir. 2000). In *Best*, the

-121-

Second Circuit found that counsel's decision not to call witnesses to testify about Best's reputation for truthfulness was reasonable because such evidence would have opened the door for the government to attack Best's character. *Id*. at 202. *See also United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir. 1997). Similarly, a strategic decision not to call an expert witness does not constitute ineffective assistance of counsel. *Eyman*, 313 F.3d at 743 (counsel not ineffective in choosing not to use expert was strategic choice, not oversight).

That counsel's strategy was not successful is of no consequence to the ineffectiveness analysis. A review of an attorney's "advocacy is deferential to the lawyer's perspective at the time and is not made through the 20/20 lens of hindsight." *Schmidt*, 105 F.3d at 90. To establish that a strategic decision constituted ineffectiveness, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Fell cannot make this showing. The decision of his lawyers not to present mental health evidence in the penalty phase of trial, according to counsel Alex Bunin, was made to avoid having to confront the testimony of Dr. Michael Welner on rebuttal, a reasonable strategic decision. Declaration of Alexander Bunin, P. Exh. 264 at 7-8, Fell-00002466-2467; Declaration of Gene Primono, P. Exh. at 2, Fell-00002459. Counsel omits mention of rebuttal testimony by Dr. Wetzel, consistent with his June 27 report (and in the wake of Fell's videotaped interview) which would also have been formidable.

While defense experts could have referred to Fell's childhood trauma, and abuse of alcohol and drugs, as factors leading to the conclusion that he was "pre-psychotic" and

-122-

"vulnerable to becoming psychotic under extreme stress," none would have testified that Fell was in fact psychotic or mentally ill, either when he committed the crimes, or after arrest. Likewise, no mental health expert would have testified that Fell did not know right from wrong, or did not know what he was doing on November 26, 2000, or lacked the ability to appreciate the consequences of his actions, or was acting under duress. In fact, his actions immediately following the killings of his mother and Conway indicate that Fell was well aware of the consequences of his actions – that is why he immediately fled the State of Vermont. Killing the witness to the departure, Terry King, was part of his flight plan. None of the many psychological tests indicated that Fell's cognitive functioning was impaired. Moreover, none of the tests indicated that he had any organic brain damage or any mental defect or disorder that impaired his judgment at the time of the three murders.

Both Dr. Wetzel and Dr. Welner were poised to take the stand on rebuttal and testify that Fell had Anti-Social Personality Disorder ("ASP"). *Id*. at 26. Thus, trial counsel was faced with a difficult factual scenario – a client who participated in the brutal killing of his own mother and another man without motive or provocation, and then carjacked and kidnapped a 54 year-old grandmother, battering her to death and abandoning her body in another state - and credible government experts prepared to testified that he was not impaired, had ASP, lacked remorse, and falsely denied proven facts in a forensic interview. Deciding against presentation of a mental health case, in order to avert such evidence, reflected a strategic choice by the trial lawyers, not "oversight." *Eyman*, 313 F.3d at 743

-123-

Fell again cites *Wiggins*, but by his own admission, the facts underlying *Wiggins* are wholly inapposite. In *Wiggins*, trial counsel elected not to present evidence of Wiggins's life history. The Supreme Court found counsel's mitigation investigation unreasonable, and their decision not to present mitigation evidence insufficiently informed. Wiggins's trial counsel limited their mitigation investigation to obtaining a copy of a Pre-Sentence Investigation Report and social service records – the Court concluded that such an "investigation" did not reflect reasonable professional judgment. 539 U.S. at 534. According to the Court, the mitigating evidence that Wiggins's counsel failed to discover and present was powerful:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augmented his mitigation case.

*Id*. at 535. By contrast, Fell's trial counsel hired a mitigation specialist and interviewed many family members, teachers, friends, police officers and social workers about his background. Counsel obtained and reviewed school records, hospital records, social service records, police records, etc., to build Fell's social history. Moreover, counsel presented a strong background mitigation case to the jury. Fell admits that counsel's presentation of mitigation evidence at trial was effective. *See* P. at 103-04. In his petition, Fell recognizes that the jury found:

> by resounding margins (often unanimous) that he had an abusive childhood. He was sexually and physically abused, he witnessed family violence, his parents were violent alcoholics who abandoned him, he had no positive role models, he abused drugs and alcohol as a child, and he was institutionalized for mental health conditions.

*Id.* (*citing* Special Verdict Form, P. Ex. 209, Fell-00002135-2137). Fell further recognizes that "[t]he jury felt strongly enough about Mr. Fell's mistreatment it wrote in a separate, independent, mitigator found by a total of ten jurors: 'Total life experience, failure of state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.'" P. at 104. Therefore, wholly contrary to what transpired in *Wiggins*, the jury here heard about Fell's excruciating life history and placed it on the mitigating side of the scale.

Fell also cites *Rompilla*, but misrepresents the Court's reasoning. He claims that in *Rompilla* the Court noted "that evidence of the defendant's fetal alcohol syndrome meant the defendant's 'capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense.'" P 103. The Supreme Court never reached such a conclusion. The section that Fell purports to quote is a summary by the Court of what post-conviction mental health experts concluded:

> When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.". . . The also said that "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."

545 U.S. at 392. *Rompilla* lends no support to Fell's claims. Like *Wiggins*, *Rompilla* deals with a woefully inadequate mitigation investigation by trial counsel. Trial counsel failed to review school records, though they were aware that Romilla did not make it pass the 9th grade; failed to review correctional records, though they were aware that Romilla had a criminal record; and

failed to investigate his abuse of alcohol, though one of the mental health experts who evaluated

Rompilla stated that his trouble with alcohol merited further investigation. Even so, the Court

noted that "there is room for debate about trial counsel's obligation to follow at least some of

those potential lines of enquiry." *Id*. at 383.

The Court in *Rompilla* also found that trial counsel's failure to review the case file

pertaining to a conviction that the government would rely on as an aggravating factor was

unreasonable. Concluding that a review of this file would have led trial counsel to mitigating

evidence that he otherwise failed to uncover and present, the Court held that Rompilla was

prejudiced. Rompilla's mitigation evidence was limited to the testimony of five family members

who argued for residual doubt and prayed for mercy since they believed that Rompilla was

innocent and a good man. *Id*. at 377. The Court found that Rompilla's mitigation case would

have been drastically different had counsel reviewed the court file pertaining to his prior

conviction, which contained his prison records.

> The prison files pictured Rompilla's childhood and mental health very differently from
> anything defense counsel had seen or heard. An evaluation by a corrections counselor
> state that Rompilla was "reared in the slum environment of Allentown, Pa. vicinity. He
> early came to [the] attention of juvenile authorities, quit school at 16, [and] started a
> series of incarcerations in and out Penna. often of assaultive nature and commonly related
> to over-indulgence in alcoholic beverages." Lodging 40. The file discloses test results
> that the defense's mental health experts would have viewed as pointing to schizophrenia
> and other disorders, and test scores showing a third grade level of cognition after nine
> years of schooling.

*Id*. at 390-91. Again, pivotal to the Court's holding in *Rompilla* was the fact that trial counsel

failed to conduct an objectively reasonable investigation prior to making the strategic decision

not present mitigation evidence.

As stated above, unlike the attorneys in *Rompilla*, Fell's trial counsel sought, obtained and reviewed school records, hospital records, social service records, police records, counseling and treatment records by independent agencies such as the Victim Resource Center, records from juvenile detention facilities such as St. Michaels and prison records. Trial counsel hired a mitigation specialist and interviewed family members, teachers, social workers, police officers and correctional officers. They retained three mental health experts, one of whom was a neuropharmacologist to follow-up on Fell's reported abuse of alcohol and illegal substances. Counsel also retained a fourth mental health expert, Dr. Cunningham, to testify about Fell's social history and its resulting life trajectory. In addition, trial counsel retained the services of a prison consultant to testify about Fell's subsequent adjustment to prison. Counsel's mitigation investigation here was far different from, and more thorough than, that in *Rompilla*, such that subsequent strategic decisions were adequately informed.

Assuming, arguendo, that Fell can meet the onerous burden of establishing error by his trial attorney, he must still establish prejudice by demonstrating a reasonable probability that the forgone testimony would have resulted in a different outcome. *See Boyle v. McKune*, 544 F.3d at 1138; *see also Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998); *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir.1985). Fell cannot make this showing either. Even if he can establish that his attorneys had a Sixth Amendment duty to present a mental health case – which the government does not concede – he cannot show a reasonable probability that it would

have led to a different verdict. Nothing about the mental health evidence that trial counsel would have presented, when weighed against the government's rebuttal testimony, would lead a reasonable person to loose confidence in the jury's verdict.

When considering whether there is a reasonable probability that the mental health evidence that trial counsel could have presented would have led to a different outcome, such that the verdict is unreliable, the court must consider such evidence in context, that is, the court must also consider the evidence the government would have presented in rebuttal. The government was prepared to call Dr. Welner and/or Dr. Wetzel in rebuttal. Dr. Wetzel had twice evaluated Fell and interviewed him at length during jury selection. P. Exh. 9 at 1-2, Fell-00000611-12. Dr. Wetzel determined that Fell showed "no sign of psychosis" or depression, *id*. at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive deficits." *Id*. at 8, Fell-00000618. Dr. Wetzel concluded that Fell met fully the criteria for ASP. *Id*. at 7, Fell-00000617. Dr. Wetzel also concluded that Fell had exaggerated his intake of alcohol the night of the murders and "was not significantly impaired." *Id*. at 4, Fell-00000614.

> A.    In my opinion, he has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.
>
> B.    He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.
>
> C.    He denied that he has ever had withdrawal symptoms. He claimed that he has unusual tolerance for alcohol.

-128-

*Id*. Dr. Wetzel further concluded that Fell "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id*. Moreover, according to Dr. Wetzel, Fell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was also not significantly impaired. *Id*. While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes. *Id*. at 5, Fell-00000615.

Dr. Welner would have also testified that Fell suffered from ASP disorder, a diagnosis which entailed findings of, *inter alia*, conduct disorder prior to the age of 15; a demonstrated failure to conform to societal norms by engaging in unlawful conduct; deceitfulness; impulsivity and failure to plan ahead; irritability and aggressiveness; a reckless disregard for the safety of others; and lack of remorse. P. Exh. 10 at 8-9, Fell-00000629-30. Dr. Welner also agreed with Dr. Wetzel's finding that Fell showed no sign of psychosis or depression. *Id*. at 18, Fell-00000639; 20-21, Fell-00000641-42. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors common to ASP, as well as manipulative conduct, shallow affect and lack of empathy. *Id*. at 26-32, Fell-00000647-53. Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he committed the murders. *Id*. at 32-34. On the contrary, Dr. Welner found that Fell's behavior at the time of the murders "primarily reflected organization, and not signs of a mental illness or intoxication." *Id*. at 35-40. This evidence would have almost certainly neutralized, if not completely overcome, Fell's mental health evidence. Therefore, Fell cannot establish that trial

-129-

counsel's failure to present mental health evidence prejudiced him.

> 1.   Expert Mental Health Testimony Was Not Required or Warranted.

As stated above, Fell concedes that his trial counsel effectively presented the available

mitigation evidence from his childhood and early adolescence.  *See* P. at 103-04.  He recognizes

that the jury found:

> by resounding margins (often unanimous) that he had an abusive childhood.  He
> was sexually and physically abused, he witnessed family violence, his parents
> were violent alcoholics who abandoned him, he had no positive role models, he
> abused drugs and alcohol as a child, and he was institutionalized for mental health
> conditions.

*Id*. (*citing* Special Verdict Form, P. Ex. 209, Fell-00002135-2137).  Petitioner further recognizes

that "[t]he jury felt strongly enough about Mr. Fell's mistreatment it wrote in a separate,

independent, mitigator found by a total of ten jurors:

> Total life experience, failure of state of Pennsylvania social and mental health
> services to effectively intervene in his childhood abuse and to treat or address his
> early antisocial behavior.

P. at 104.

Nonetheless, Fell claims that while the jury could understand the facts of his childhood,

"the defense failed to give them the expert testimony necessary to understand the lasting

consequences and implications of that childhood."  As a result, he claims that the jury

"misunderstood [his] behavior as 'anti-social' and not a collection of symptoms related to co-

existing mental impairments."  Fell's argument is faulty is several respects.

At the outset, Dr. Cunningham was prepared to offer the testimony that Fell now laments.

Yet counsel made a strategic decision not to call that expert. That point is discussed above. There are addition reasons why Fell's argument here lacks weight.

First, trial counsel is not obligated to present mental health evidence if he understands that it would be detrimental to the trial strategy. While Supreme Court jurisprudence mandates that trial counsel conduct a reasonable mitigation investigation prior to selecting trial strategies, it grants great deference to informed strategic decisions. *Strickland*, 466 U.S. at 689. *See also Eyman*, 313 F.3d at 743 (Failure to call expert witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.); *Nersesian*, 824 F.2d at 1321 (The decision whether to call a witness on behalf of defendant, and which witnesses to call, is characterized as a tactical decision which will not constitute the basis for a claim of ineffective assistance of counsel.); *Best*, 219 F.3d at 201 (same).

Second, the Court must accept the jury's special verdict as accurately reflecting their own factual findings, and those findings do not support the inference counsel urges the court to make. The jury's findings do not relate to Fell's behavior as much as it relates to the State of Pennsylvania's failure to address Fell's early behavior. In other words, the jury, in the mitigation factor it wrote on the verdict, focused on lack of action by the State of Pennsylvania, not Fell's conduct. Therefore, it cannot be inferred that the jury reached any conclusions with regard to Fell's mental health. The only conclusion that can be drawn is that the jury found that the State of Pennsylvania failed to provide the help Fell needed.

Third, while the evidence regarding Fell's background was for the most part uncontested

(the government conceded that his upbringing was horrific, Tr. XII at 52), expert testimony regarding the effects, if any, of Fell's childhood trauma on his actions the night of the crimes would have been vigorously contested – in trial counsel's professional opinion, to Fell's detriment. While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he explicitly found no causal connection between those factors and Fell's conduct on November 27, 2000. *Id*. at 5, Fell-00000615. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy. *Id*. at 26-32, Fell-00000647-53. Therefore, it cannot be assumed that if Fell had presented expert mental health testimony, the jury would have necessarily reached the conclusions, or drawn the inferences, wished for. Argument in that regard is but speculation.

Moreover, none of the multiple defense mental health experts would have testified that Fell suffered from fetal alcohol related disability or mood disorder. Even if trial counsel had elected to present mental health evidence, it is unlikely that they would have been able to establish that Fell's brutal murders, and behavior generally, was really "a collection of symptoms related to co-existing mental impairments." Therefore, it cannot be said that but for trial counsel's failure to present mental health evidence, there is a reasonable likelihood that the outcome of the trial would have been different.

          a.     Fell Was Not Impaired When He Committed the Capital Crime That Led To His Death Sentence

Fell claims that at trial his lawyers told the jury that his "capacity to appreciate his conduct was significantly impaired," but then failed to put forward expert testimony to explain the impairment. P 105. He submits that if counsel had investigated a scientific explanation for

-132-

his poor judgment and behavior, the jury would have been moved by: (1) "Mr. Fell's prenatally created brain disorder as a result of his mother's alcohol consumption;" (2) his "genetically inherited mood disorder;" and (3) the "harmful exposure to chronic, interpersonal trauma."

Fell first contends that an expert – whom he does not identify and whose report he does not attach to his motion – would have testified that his "prenatal exposure to alcohol impaired his brain development and made him vulnerable to other environmental and genetic factors at play in his life." P 106. An expert would have explained that "exposure to fetal alcohol impacts neurological functioning, processing and behavior for the rest of one's life." *Id*. But as stated previously in section III(C)(1), *supra*, Fell has not established that he suffers from fetal alcohol related disability. On the contrary, his own neuropsychological expert, Dr. van Gorp, found no cognitive deficits. That mental health expert found Fell to be of average intelligence with an IQ of 101. P. Exhibit 2. Fell performed in the "Average" range on overall measures of verbal comprehension and perceptual organization. He performed in the "Superior" range on a measure of attention and concentration (working memory), and he performed in the "Very Superior" range on an index of speed of information processing. Dr. van Gorp makes no mention of Fell even possibly having a fetal alcohol related disability. While Fell argues that FASD "had a direct bearing on his actions during the crime," Dr. van Gorp's report is devoid of any statement in that regard. Similarly, Dr. Mills, who conducted a psychiatric evaluation of Fell, concluded that he is not "significantly cognitively impaired, at present," and also makes not mention of Fell even possibly having a fetal alcohol related disability. Likewise, Dr. Lipman, who conducted a

-133-

neuropharmacological evaluation of Fell concluded that Fell suffers from a "constitutional and historic predisposition for the abuse of drugs," but makes no mention of possible FASD.

Dr. Michael Welner, the only mental health expert to address explicitly the possibility of fetal alcohol syndrome found no evidence of it.

> Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education.

P. Ex. 10 at 21, Fell-00000642. Therefore, counsel were not ineffective for failing to find another mental health expert, in addition to the four with whom they consulted and the three with whom the government consulted, to opine that Fell suffered from a "prenatally created brain disorder as a result of his mother's alcohol consumption."

Next, Fell claims that another unnamed expert in mood disorder would have testified that Fell's "acting out" and aggressive behavior, coupled with his poor impulse control and judgment further impaired his ability to respond to stressful situations. P. at 107. But again, Fell has not established that he suffers from a mood disorder. *See* section III(C((2), *supra*.

Dr. Mills did conclude that Fell while was not psychotic, he was "pre-psychotic" or "potentially psychotic." P. Exhibit 3 at 4, Fell-00000395. And he adds that Fell's highly deprived childhood resulted in "early" and recurrent inappropriate behavior and intoxication. However, when he discusses the capital crimes Fell committed, Dr. Mills states:

> It seems highly unlikely that her murder [Fell's mother] and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication. Further, without those murders, Mr. Fell's guilt (particularly over the killing of his mother) and his fear of being apprehended, the abduction and subsequent killing

-134-

of Mrs. King would not have occurred.

*Id*. at 5, Fell-00000396.  Thus, the principal impairment Dr. Mills credits for Fell's killing of his

mother and her boyfriend is his alleged state of intoxication.  Significantly, an impairment he

does not refer to in relation to the abduction and subsequent killing of Terry King (and

impairment denied by both Drs. Wetzel and Welner).  In any event, intoxication is certainly a

condition about which expert testimony was not required.[19]

Third, Fell claims that an expert in trauma "would have explained that it is common for

individuals who have experienced ongoing trauma to react with either aggressive or avoidance

behaviors."  But again, such testimony would have triggered rebuttal mental health expert

testimony.  Specifically, Dr. Welner was prepared to testify that while Fell had a traumatic

childhood, he exhibited no signs of post-traumatic stress disorder, P. Exh. 10 at 47-48, but did

meet the criteria for anti-social personality disorder and psychopathy.  *Id*. at 8-9, 26.  Similarly,

Dr. Wetzel conceded that Fell had a traumatic childhood, but found no causal connection

between it and the murders.  *Id*. at 5, Fell-00000615.  Given the strong evidence against Fell's

---

[19]  It is significant that both Dr. Wetzel and Dr. Welner concluded that Fell exaggerated his abuse of alcohol and was not impaired.  "Donald Fell did not demonstrate a withdrawal syndrome; there is no history of seizures, no morning shakes, and he did not require medical attention after incarceration removed him from the opportunity to ingest alcohol. Notwithstanding claims of prodigious amount of alcohol, Mr. Fell has cumulatively consumed for years, his neuropsychological testing does not show evidence for damage from the chronic effects of alcohol abuse.  There is, likewise, no evidence for any physical damage to Mr. Fell from alcohol use – be it gastritis, impotency, or hepatitis.  His provided history is therefore not an accurate representation of what his body tells us."  P. Exh. 10 at 16, Fell-00000637.  *See also* P. Exh. 9 at 4, Fell-00000614.

belated proposition, he cannot establish a reasonable probability that had trial counsel presented expert testimony the outcome would have been different, nor does this evidence render the jury's verdict unreliable.

Fell further claims that trial counsel was ineffective for entering into the mental health stipulation, which provided that he did not have cognitive and neurological deficits; his intellect and cognitive functions were intact; and he did not suffer from any mental disease or defect. The parties also stipulated that Fell was competent to stand trial and knew the difference between right and wrong on November 27, 2005. The record, however, shows that the stipulation was consistent with the experts' findings, and that trial counsel's decision to enter into it reflected an informed tactical decision.

After Fell withdrew his Rule 12.2 notice, the government advised the court that it was still considering offering expert mental health evidence in rebuttal, in order to respond to two proposed mitigating factors that related to Fell's mental health. Specifically, mitigating factor number one stated that Fell's capacity to appreciate his conduct was significantly impaired, and mitigating factor number 15 stated that as a child and teenager, Fell was treated and institutionalized several times for mental health conditions. In support of mitigating factor 15, the defense had introduced dozens of documents in the Mitigation Binder referencing repeated psychiatric hospitalizations, mental health diagnoses, and psychotropic drugs. Fell also introduced the testimony of Kane, a counselor at St. Michael's, who testified that while at St Michael's Fell was considered a mental health client. Therefore, the government submitted that it

-136-

should be allowed to rebut the inevitable inference the jury would draw from said evidence – that

Fell suffered from some sort of mental disease or defect at the time of the murders.

> MR. DARROW: Judge, let me back up for a second. I'm glad we've got some consensus as to the second mitigating factor, which is that defendant was under mental and emotional disturbance when the crimes were committed. I note that we're not quibbling over factor 17 which is also somewhat problematic. It says, as a child and teenager Donald Fell was treated and institutionalized several times for mental health conditions. Your Honor, I think it's fair to say that since the outset of this case, due to the nature of the crimes involving, among other things, a murder of Mr. Fell's mother, the parties saw this as a psychological homicide case. And that's why I think it's no fewer than seven mental health experts, four for the defense, and now three for the Government, have examined Mr. Fell. I think it's also fair to say that all seven of those mental health experts failed to find any neurological deficit, any organic brain problem, or any significant mental health problem which would have mitigated Mr. Fell's responsibility or ability to understand what he was doing at the time of the crimes. I don't think that's in dispute. And that's I think one reason why we're where we are today. In the stipulation we're proposing we're not proposing to put in an anti-social diagnosis or anything else. We would just like to have something so that the jury knew that his current mental condition was not really at issue. And even though there are these, the defense documents indicate that he was four or five times psychiatrically hospitalized as a child, psychiatrically hospitalized, and even though just yesterday Mr. Cane, the defense witness, testified that he was considered at the age of, I think, 15 when he was at St. Mike's, as a mental health student and therefore was put in the special dormitory. We are concerned that this jury know that as of November of 2000 he was not mentally ill. And, therefore, we simply would like a stipulation in order to avoid having to call a government expert that, you know, he was not mentally ill, he did not have neurological problems, he was of average intelligence. And just as of the time of the murders he was not suffering from any significant mental disorder. We're not recommending a diagnosis or anything like that.

> MR. BUNIN: Here's the problem with that. Those are all historical facts. And as I recall they were all brought out on cross. We never asked Mr. Cane [sic] about all those hospitalizations. They were brought out in cross. We did not seek to go there. But they are just historical facts that he was hospitalized. We're not offering those diagnoses as part, as, as anything more than that's what happened, that's what those reports say.

-137-

THE COURT:  Well, let me propose an alternative.  You've not raised the diminished capacity defense in any way.  Then a viable stipulation would be that the defendant did not suffer from mental illness, to the extent that it diminished his capacity to commit the offense, etcetera.  That's inartfully put, but off the top of my head it's an attempt as best that I can –

MR. BUNIN:  I don't know that we've done anything that requires a stipulation.  I mean there's this whole other issue of whether or not, you know, whether or not a mental health expert can testify for the Government anyways because it hasn't been triggered by us putting on expert evidence.  I mean I think the rule's pretty clear.

THE COURT:  Well, it, it is and it is not.  It might be clear that the Government could not rely upon statements that were made by the defendant during examination under 12.2 because as I read the notes introduction of those statements may have to be triggered only with the introduction of expert testimony.  It does not necessarily mean that experts could not testify to other factors which are introduced during the course of the trial.  And I'm not suggesting in any way that I prejudge that issue or even know the answer.  But, you know, there may be other issues that he could testify to.

MR. BUNIN:  I understand.

THE COURT:  I don't know.  They are not necessarily mental health related and fall within 12.2.  Regardless, it becomes an extraordinarily complex issue.  And obviously in light of the nature of this particular offense it would be an issue that would be or could be extraordinarily controversial and could last into multiple years of litigation.

MR. BUNIN:  Let me, I need to talk to co-counsel and my client before I can stand here and enter into any stipulation.  But um, we certainly are not, we're not urging that factor.  And it will not be part of closing.  That a mental defect had existed at that time that affected the defendant during –

THE COURT:  His capacity to commit the offense.  You are not raising a diminished capacity defense.  That's stating nothing other than what is the status of the case at this particular point.  It's not suggesting in any way that you are throwing out all the testimony about his background because the Supreme Court has said repeatedly that that kind of evidence is admissible in regard to mitigating evidence.  And I understand that you would not want to impact that particular kind

-138-

of testimony. But as far as a diminished capacity defense you've essentially waived that. And that would be the logical, in my view, way to proceed by way of stipulation.

Tr. 10-1 at 49-52. *See also* Tr. IX-2 at 65. The above discussion clearly reflects the circumstances leading up to the stipulation. The government was concerned about the state of the evidence absent any expert mental health evidence. The defense sought to close the evidence without expert mental health evidence. And the Court was exploring and considering the parties' respective positions, suggesting that a simple stipulation would be the common ground to resolve the matter. Absent some final mental health evidence, in the way of testimony or a stipulation, there was a risk the jury would be misled into inferring that Fell had a mental health disease or defect. The Court suggested a stipulation if defense counsel wanted to prevent the government mental health experts from taking the stand.

While Fell argues post-conviction that government mental health testimony would have been excluded under Rule 12.2, the Court indicated that the issue was not so clear-cut. Rule 12.2 provides, in pertinent part:

> **(4) Inadmissibility of a Defendant's Statements.** No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
>
> (A) has introduced evidence of incompetency or evidence requiring notice under Rule 12.2(a) or (b)(1), or
>
> (B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

-139-

Rule 12.2 thus governs to the admissibility of a defendant's statements made during the course of a Rule 12.2 evaluation. However, it places no limits on the admissibility of expert testimony, not based on the defendant's Rule 12.2 statements. In this case, for example, Dr. Welner had conducted an extensive forensic investigation of Fell, aside from Rule 12.2 statements. The total exclusion of his testimony – and that of Dr. Wetzel – was anything but certain. Indeed, Fell's post-conviction petition cite not a single court opinion in support of his argument. In view of the above-quoted exchange on the record, and absent a reasonable probability under the applicable jurisprudence that trial counsel's objection would have been sustained, their decision cannot be deemed to have been error.

The only way for trial counsel to definitely prevent the government from presenting expert mental health evidence in rebuttal was to enter into a mental health stipulation, consistent with the expert reports. Had the defense refused to enter into a stipulation, and their objection been overruled, they would have triggered government expert mental health evidence establishing the very facts contained in the stipulation – that Fell had no cognitive or neurological deficits; that his intellect and cognitive functions were intact; that he did not suffer from any mental disease or defect; that he was competent to stand trial, and knew the difference between right and wrong at the time of the murders. Electing to forgo mental health expert testimony was consistent with trial counsel's key strategy in the penalty phase: focus the jury on the tragic facts of Fell's childhood and background and argue that they mitigated his sentence. The government referenced the mental health stipulation only twice during closing summations. Entering into a

-140-

stipulation was an informed strategic decision by trial counsel.

Fell attempts to support his argument that counsel was ineffective in agreeing to the stipulation with a declaration from a juror. He proffers that juror 203 speculated that, "maybe if there had been some sort of intelligent psychiatrist to present evidence of the defendant's mental state it would have made a difference, but there was not overwhelming amount of that presented." Yet speculation at to testimony by an imagined psychiatrist who was on no witness list, about a non-existent mental state, carries no weight.

In any event, testimony of jurors is not admissible to show the effect of evidence upon a jury's thought process. Federal Rule of Evidence 606 clearly provides:

> **(b) Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict* or indictment or concerning the juror's mental process in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

*Id*. (emphasis added). The juror statement proffered by Fell falls squarely within the Rule 606(b) preclusion, and should not be considered by the Court.[20]

---

[20] The Second Circuit has refused to allow a defendant to investigate "jurors merely to conduct a fishing expedition." *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978) (citing cases). Fell obtained the Court's permission to interview his jurors after trial on an ex parte basis, such that the filing was sealed and the government was not even unaware of the motion or the interviews. Yet the government doubts that Fell submitted evidence of juror misconduct or

In *Tanner v. United States*, 483 U.S. 107 (1987), the defendant alleged that jurors had consumed alcohol during their lunch break and this caused them to fall asleep in the afternoon during trial. 483 U.S. at 113. The Court denied inquiry into the allegations, observing that:

> full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Id*. at 120-21. *See also United States v. Sampson*, 332 F.Supp.2d 325 (D.Ma. 2004) (denying inquiry into allegations of juror misconduct based on juror statements to the press).

<blockquote>

b.      The Evidence, Including Fell's Flat Affect, Established That Fell Felt No Remorse for his Crimes

</blockquote>

Fell submitted as a mitigating factor that he "has shown remorse for killing Teresca King." Special Verdict Form, Dkt. 202. The limited evidence submitted to support that factor was Fell's confession, his willingness to be interviewed about where he left Mrs. King's body, and his offer to plead guilty in exchange for a life sentence.

Extensive evidence indicated Fell's lack of remorse, including flight in the wake of the murders (fleeing Rutland in a carjacked car with a kidnapped victim, murder of the third victim, promptly eating breakfast and resuming flight); his initial two false exculpatory statements; his failure to express remorse in his eventual written confession (even when prompted to do so by an FBI agent); his matter-of-fact tone and persistent minimizing in the recorded audio statements about the murders; and his demeanor during his statements. Fell claims that trial counsel failed

---

of extraneous juror information.

-142-

to introduce expert mental health testimony to explain that his flat affect was a result of childhood trauma and not lack of remorse.

Fell's argument falls short for several reasons. First, such evidence would inevitably have resulted in government expert rebuttal, which would not have gone well for Fell. Both Drs. Wetzel and Welner were struck by Fell's flat affect and lack of remorse. Dr. Wetzel noted that Fell's statements to the police indicated a "remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims." P. Ex. 7 at 2, Fell-00000464. Dr. Welner noted: "Mr. Fell's response to what he had done was strikingly remorseless in behavior and expression." P. Exh. 10 at 13, Fell-00000634. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors that indicate anti-social personality disorder, as well as shallow affect and lack of empathy. *Id*. at 26-32, Fell-00000647-53. Doubtless based in part on such prospective testimony, counsel made a wire tactical decision to rely upon Fell's compelling and tragic background, not his mental state.

Second, even if the Court were to determine that it was error for trial counsel not to present expert testimony to explain Fell's flat affect, there is no showing of prejudice. Evidence of Fell's demeanor was not the only evidence upon which the government relied to prove that Fell lacked remorse. The government also relied on Fell's truly extraordinary statements and associated actions on November 27. For example, Fell stated that after "using his feet" during the killing of Terry King, he "wiped [his] boots on her sweater." That was after he found a "nice little spot" to get King out of her car in New York. Next on his mind after wiping off his boots

-143-

was breakfast - "a couple of those sausage and egg thingies" at Burger King, 12 miles down the road. The Burger King employee who took his order testified that Fell did not appear to be upset. Tr. III-1 at 100. He confided to FBI agents that "got a chuckle" out of the fact that his sister and his third victim shared the same first name. Arriving in Wilkes Barre hours after the murder of King, a witness testified that Fell began to drink and play cards, giving no indication that he had just brutally killed three people. The evidence of Fell's lack of remorse was varied and extensive, obvious and subtle, overwhelming in the aggregate. The instant claim that trial counsel should have presented expert testimony on the subject reflects an utter lack of familiarity with the record.

c.     Fell's Aggressiveness Was Evidence of of Anti-Social Disorder and Psychopathy

Fell next claims that he was prejudiced by trial counsel's failure to present a scientific explanation for his "agitated depression and acting out behaviors throughout childhood." According to the § 2255 motion, Fell's "seemingly aggravating adolescent aggression was attributable to his comorbid mental impairments: poor judgment and impulse control as a result of exposure to alcohol in utero; mood lability, irritability, and agitated depression as a result of his budding mood disorder; and avoidance, learned helplessness, agitation, and dissociation as a result of being physically, emotionally and sexually victimized by his parents and guardians." P 114. Fell urges that a hypothetical expert could have explained to the jury the ways in which his impairments could have been controlled with consistent treatment. *Id*. Fell claims that the jury never heard that many of the symptoms of these disorders are treatable.

-144-

This claim, like the foregoing argument about expert remorse testimony, demonstrates lack of familiarity with the record and a shallow disregard for tactical decisions that trial counsel were required to make during the penalty phase. The testimony now urged would have thrown wide open the door to expert rebuttal testimony, including very damaging opinions by Drs. Wetzel and Welner.

Trial counsel's decision not to present expert mental health evidence encompassed the type of expert testimony at issue. Expert mental health evidence purporting to explain that Fell's adolescent aggression was attributable to mental impairments would have invited rebuttal expert mental health evidence about ASP disorder and possibly psychopathy. Both include adolescent aggression. Further, one of the defining attributes of both is that they are chronic and resistent to treatment. Dr. Wetzel would have testified that Fell's adolescent aggression was evidence of his ASP, a disorder unlikely to change. Dr. Welner would have further testified that Fell's diagnosis of conduct disorder supported his psychopathy diagnosis. Trial counsel made an informed strategic decision to avert such testimony.

Further, trial counsel introduced into evidence the Mitigation Binder, containing medical records of four psychiatric hospitalizations of Fell between the ages of 11 and 13. MB, Tabs 24-32. While those records do not reflect a diagnosis of the impairments alleged post-conviction, they do reflect findings for many of the symptoms described by Fell: poor judgment and impulse control; irritability, depression and agitation. Fell was diagnosed with conduct disorder and treated, showing improvement after each hospitalization. *Id*. The records also reflect that Fell's

treatment was not continued after release from the hospital. Therefore, while the jury did not hear expert mental health testimony on this subject, it did hear that many of the symptoms which Fell displayed as an adolescent were treatable. In fact, one of the mitigating factors written in the verdict form by 10 jurors indicate that they concluded that Fell's symptoms as an adolescent could have been treated.

> 20.     Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

Special Verdict Form, Dkt. 202. Expert testimony was not necessary for the jury to understand that many of the symptoms Fell displayed as an adolescent could have been treated or controlled through treatment.

### d.      Fell is Not Mentally Impaired

Fell now claims that mental illness diminished his responsibility for his crimes, and expert testimony would have made this clear to the jury. At the outset, he has failed to establish that he was mentally ill or even impaired. He submits that he had poor judgment and impulse control problems, urging that they were caused by fetal alcohol exposure, but provides no evidence. Similarly, his claim that untreated mood disorder led to an increase in agitation and acting out finds no support in the expert reports he obtained. Dr. Mills does not state that Fell was mentally ill, but rather that he was vulnerable to becoming mentally ill under extreme stress. Moreover, Dr. Mills makes no mention of fetal alcohol exposure having a causal relation to Fell's poor judgment and impulse control.

-146-

Second, while a mental health expert could have testified about any mental health conditions Fell might have had, if any, an expert could not have testified as to Fell's moral culpability. Whether any mental health condition or illness diminishes the moral culpability of a defendant would have been for the jury and the jury alone to determine.

Fell further claims that a mental health expert would have explained that environmental factors in Vermont echoed the traumatic household in which he was raised. But this is hardly the type of evidence that requires expert testimony. The jury heard extensive evidence about Fell's upbringing and was well aware of the factors that affected his childhood home from the testimony of his sister, police officers and social workers, as well as numerous social service records. Through Fell's post-arrest statements the jury also heard what the environment was like in Debra Fell's Vermont home. The jury hardly needed a mental health expert to draw the necessary inferences. Trial counsel so argued to the jury in closing. Tr. XII at 83.

Fell speculates that in committing multiple brutal, senseless murders he imitated his parents' behavior – resorting to knife violence as a means of problem solving. This theory lacks scientific support and is implausible. Nor is there evidence that either of his parents ever kicked a helpless praying older women to death before breakfast while not impaired; owned and brandished a police shotgun; kidnapped or carjacked anyone; murdered a houseguest by stabbing him 50 times and severing his jugular; contributed to the murder of their mothers; or kicked yet another victim into unconsciousness before urinating on him. The motion argues that had trial counsel presented expert testimony "to explain the competing forces at work on Mr. Fell's

-147-

psyche, they would not have sentenced him to death." P. at 117.  But this argument again is rendered moot by trial counsel's strategic decision not to present expert mental health evidence. Moreover, there is nothing about this hypothetical evidence that renders the jury's verdict unreliable.

e.    Trial Counsel Presented Evidence that Fell Would Function Well in the Structured Environment of a Prison

Fell further claims that trial counsel was ineffective in failing to present expert mental health testimony to establish that the environmental factors that triggered his violence are absent in prison.  "A mental health expert would have explained that people with FASD and mood disorder respond positively to structure, and as evidence by his hospitalizations, institutionalization at St. Michael's, and his many years in prison with limited infractions, Mr. Fell does well in a structured environment."  P 117.

Yet trial counsel did introduce evidence as to Fell's adjustment to prison life, and the likelihood that, if given a life sentence, he would fare well in the structured prison environment. The jury heard testimony from Vermont corrections employees as well as expert testimony by prison consultant James Aiken, who was asked to make an assessment of Fell's adjustment to a prison environment.  Tr. IX-2 at 49.  Aiken testified that Fell could be expected to be a good inmate if incarcerated for life.  According to Aiken, with a life sentence, Fell would be designated to a United States Penitentiary, which is a high security facility well-equipped to handle his confinement.  *Id*. at 58.  Aiken stated that he had talked to Fell, and Fell had impressed him as a person who had done a lot of growing up over the previous five years and

-148-

understood the regimen of the correctional environment. *Id*. at 61. He opined that Fell's

disciplinary record during the four years or so of pretrial detention indicated that Fell was "at the

lower range of even being disruptive and nowhere near the range of being a predator." *Id*. at 51.

Aiken admitted having reviewed the incidents on April 9, 2005, and March 17, 2004, and

indicated that neither incident was serious. *Id*. at 52-54. Accordingly, Aiken stated that Fell

could be confined in the Federal Bureau of Prisons "for the remainder of his life without causing

an undue risk of harm to staff, inmates, and the public." *Id*. at 63.

While trial counsel did not present testimony from a mental health expert on Fell's

adjustment to the structured environment of a prison, he did present expert testimony from an

arguably more experienced and credible source: a career corrections official and prison warden.

Aiken concluded that Fell could be housed safely in prison without causing a risk to staff or other

inmates. Moreover, he also presented evidence of Fell's past conduct when placed within a

structured environment. This evidence conveyed the same message to the jury - that Fell would

function well in the structured environment of a prison.

Trial counsel also was prepared to present mental health expert testimony bearing on

Fell's conduct in prison. Dr. Cunningham was prepared to testify that there were a number of

factors that pointed to Fell being likely to have a positive adjustment to prison, including the

absence of serious violence during pre-trial confinement and his participation in constructive

activities during that time. P. Exh. 5 at 6, Fell-00000444. However, when trial counsel made a

strategic decision not to present mental health evidence, Dr. Cunningham was withdrawn.

-149-

Again, that development reflected an informed strategic decision not to present expert mental health evidence.

Further, while Dr. Cunningham did not testify, the jury did hear evidence related to Fell's hospitalizations and his institutionalization at St. Michael's and his positive adjustment to both of those structured environments. Trial counsel presented evidence of Fell's four psychiatric hospitalizations as an adolescent, and the favorable progress he made under treatment. MB, Tabs 22-32. The jury also heard evidence and testimony about Fell's social and academic progress during confinement at St. Michael's, including his positive adjustment to its structured environment. Tr. IX-2 at 13, 17, 20; Educational and Discharge Summaries from St. Michael's, MB, Tabs 39-41.

In sum, Fell cannot establish that trial counsel's decision not to present mental expert testimony regarding his conduct in the structured environment of a prison was *Strickland* error. Even if this Court were to determine that trial counsel's decision in this regard was error, Fell has not established that he was prejudiced. In rebuttal, the government introduced two videos from the Northwest Correctional Facility vividly showing Fell's poor adjustment to prison life. Both depicted Fell in dramatic altercations with correctional officers. Penalty Phase Exhibits 18 and 19. In these videos Fell violently and profanely antagonizes correctional officers, assaulting them verbally and physically, spitting, swearing, and refusing to obey orders. In light of that evidence, Fell cannot establish that had trial counsel introduced expert mental health testimony about his adjustment to the structured environment of a prison, the outcome of the case would

-150-