entered into the associated stipulation.  Fell also claims that counsel inexplicably abandoned a motion *in limine* to exclude Welner's testimony before the Court ruled on it.  As a result Fell claims prejudice because the jury never heard evidence about his impaired mental health and the stipulation allowed the government to undermine the balance of his evidence in mitigation during summation.  However, Fell's very argument, to wit, that his "trial counsel made several ultimately fatal decisions," clearly indicates that his trial counsel were not constitutionally ineffective, but rather were making strategic decisions that should not be second-guessed only because they were not ultimately successful.

As set forth above in part IV, *supra*, trial counsel conducted an extensive investigation of Fell's mental health before making an informed strategic decision not to present mental health evidence in the penalty phase.  The fact that counsel's determination was "fatal" does not render it ineffective under *Strickland*.  To prove ineffective assistance of counsel Fell must show that trial counsel's decision was objectively unreasonable.  And even if Fell is able to overcome that high hurdle, he must then show that he was prejudiced by counsel's failure.  Fell cannot make this showing.

Trial counsel clearly perceived that, if they called a mental health expert in the penalty phase, rebuttal testimony by Drs. Wetzel and Welner was likely and would damage their mitigation case.  Therefore, after considering the robust mental health and background mitigation evidence, counsel made the strategic decision to avert such rebuttal testimony and not to present mental health evidence.  *See* Declaration of Alexander Bunin, P. Exhibit 264 at 8-9, Fell-

-151-

00002467-68; Declaration of Gene Primono, P. Exhibit 263 at 2, Fell-00002459. This is the type

of strategic decision that trial attorneys routinely make. Such decisions are often made after

several other witnesses have testified, and the success or failure of such prior witnesses informs

the decision about other prospective witnesses. Generally, the many mitigation witnesses called

by the defense had done very well. Moreover, the record indicates that the Court was disinclined

to bar *all* testimony by Dr. Welner, and, in any event, Dr. Wetzel's opinions were also a major

threat to the defense case. Further, the stipulation, an alternative discussed with the Court, was

also reasonable as it achieved trial counsel's ultimate goal – keeping the government rebuttal

mental health witnesses off the witness stand. Therefore, Fell cannot prove ineffective

assistance of counsel.

        A.     Background

        1.     Early Mental Health Investigation and Discovery

Shortly after his indictment, Fell submitted to three mental health examinations by three

different mental health experts retained by his trial counsel. Dr. Mark J. Mills evaluated Fell on

March 26 and 27, 2001. A week later, on April 6, 2001, Dr. Wilfred G. van Gorp, with the

assistance of Dr. Kimberly Walton, conducted an independent neuropsychological evaluation of

Fell to determine his level of neuropsychological functioning. Next, Fell was evaluated by Dr.

Jonathan J. Lipman, a neuropharmacologist, who documented his abuse of alcohol and illegal

drugs from early childhood to adulthood. The findings of these three experts are in the record

and summarized above. Trial counsel also obtained Fell's medical records from four psychiatric

-152-

hospitalizations, detailing contemporaneous circumstances and findings.

Fell submitted to two initial government examinations, one by Dr. Wetzel and a second by Dr. John Rabun. *See* P. Exhibits 7 and 8. Both were limited in significant respects: (1) one of Fell's lawyers was present during the interview and unduly restricted its scope; (2) neither doctor was allowed to ask Fell about the charged capital offenses, the murders of Debra Fell and Charles Conway, or his state of mind during the three murders; (3) neither doctor was allowed to ask Fell about his use of knives; and (4) neither doctor was allowed to ask Fell about the dynamics of his relationship with Lee. As a result, after these first two restricted mental health examinations, neither expert could offer any opinion as to Fell's state of mind during the murders.

In Dr. Wetzel's first report, dated October 11, 2002, he indicated that in his opinion, the circumstances of Fell's childhood could not be rebutted. P. Exhibit 7 at 2, Fell-00000464. Dr. Wetzel found no evidence that Fell ever had hyperactivity or attention deficit disorder. "The neuropsychological testing does not show any likely correlates of it today. He certainly shows none of the characteristics of these disorders at present." *Id.* at 3, Fell-00000465. Dr. Wetzel also concluded that Fell had no cognitive deficits, notwithstanding his extended use of alcohol and other drugs. *Id.* In addition, Dr. Wetzel noted that Fell met "some or all of the criteria for a number of Cluster B personality disorders, displaying antisocial, borderline and narcissistic traits." *Id.* at 4, Fell-00000466. Dr. Wetzel indicated that Fell showed no signs of psychosis on testing or in his clinical examinations. *Id.* at 4-5, Fell-00000466-67. Nor did Dr. Wetzel find

-153-

any indication that Fell suffered from an affective disorder such as depression. *Id.* at 5, Fell-00000467. Dr. Wetzel strongly disagreed with the conclusion that Fell was submissive, *id.*, or pre-psychotic. *Id.* at 7, Fell-00000469.

Dr. Rabun reported his evaluation of Fell on December 31, 2002. He also concluded that Fell did not suffer from any psychotic or major depressive disorder. P. Exhibit 8 at 14, Fell-00000609. According to Dr. Rabun, Fell's cognitive functions were intact. "Mr. Fell does not show evidence of a limited intellectual capacity or a cognitive disorder." *Id.* Dr. Rabun also found that Fell's memory and executive functions were also intact. *Id.* Dr. Rabun did indicate that Fell was sexually and physically abused as a child and noted that male children who are victims of sexual and physical abuse are known in certain situations to become aggressive as adults. *Id.* He also found that Fell qualified for a diagnosis of alcohol dependence. *Id.*

2.    <u>Second Mental Health Examination and Discovery</u>

In 2004 the government retained forensic psychiatrist Dr. Michael Welner, and the defense filed a Fed. R. Crim. P. Notice of intent to rely upon expert mental health evidence. The government moved the court to allow an unrestricted examination of Fell by Dr. Welner, since the prior interviews had been restricted by defense counsel. Dkt. No. 77. Fell's trial counsel opposed the government's request to have Dr. Welner interview Fell, but did not oppose a further interview by either Dr. Rabun or Dr. Wetzel. *See* Dkt. No. 78. The Court allowed the government to examine Fell again, but ordered that only Drs. Wetzel or Rabun could conduct the

-154-

examination.  *See* Court Order of April 7, 2005, Dkt. No. 99-1.[21]  The Court ordered that the

"examiner shall be permitted to conduct a complete psychiatric examination, including inquiry

into defendant's state of mind before, during and after November 27, 2000."  *See* Dkt. No. 101 at

1.  The Court's Order further provided that the government was to provide the defense with a list

of any tests to be performed.  *Id* at 2.

Barred from using Dr. Welner for the interview, the government selected Dr. Wetzel to

interview Fell, and worked to familiarize him, as well as Dr. Rabun, with the advances in the

investigation since 2002.  The government shipped to both doctors hundreds of documents not

reviewed by them in 2002.  The documents included a multitude of reports of witness interviews

conducted since 2002; crime scene photographs and investigative reports not reviewed in 2002;

prison documents related to Fell generated since 2002; prison correspondence from Lee not

possessed in 2002; and autopsy and toxicology reports not reviewed in 2002.  In addition to

reviewing these materials, Dr. Wetzel's preparation for the interview included consulting with

Drs. Welner and Rabun.

Dr. Wetzel conducted Fell's 12.2 interview on June 13, 2005.  On June 27, 2005, Dr.

Wetzel rendered a supplemental report.  He reaffirmed that Fell's evaluation yielded  "no sign of

---

[21]  On April 14, 2005, the government moved for reconsideration of the Court's April 7, 2005 Order.  *See* Dkt. No. 105.  On April 22, 2005, petitioner moved to exclude the testimony of Dr. Welner.  *See* Dkt. No. 107.  The government opposed petitioner's motion on April 29, 2005. *See* Dkt. No. 113.  On May 25, 2005, the Court denied the government's motion for reconsideration of its April 7, 2005 Order and denied as premature petitioner's motion to exclude Dr. Welner's testimony.  *See* Court Order of May 25, 2005, Dkt. No. 129.

psychosis" or depression, *id.* at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive deficits." *Id.* at 8, Fell-00000618. Dr. Wetzel concluded that Fell met fully the criteria for anti-social personality disorder. *Id.* at 7, Fell-00000617. Dr. Wetzel also concluded that Fell exaggerated his intake of alcohol the night of the murders and "was not significantly impaired." *Id.* at 4, Fell-00000614.

    A.      In my opinion, he has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.

    B.      He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.

    C.      He denied that he has ever had withdrawal symptoms. He claimed that he has unusual tolerance for alcohol.

*Id.* Dr. Wetzel concluded that Fell "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id.* Moreover, Fell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was not significantly impaired. *Id.* While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes. *Id.* at 5, Fell-00000615.[22]

    The penalty phase began on June 27, 2005. In opening statement the defense announced

---

[22] On June 30, 2005, petitioner moved to exclude portions of Dr. Wetzel's report, including the portion where he states that in his opinion Fell exaggerated his consumption of alcohol the night of the murders, but this motion was never ruled on. *See* Dkt. No. 177.

that it would call mental health expert Dr. Mills.

> Dr. Mark Mills is a psychiatrist. A medical doctor. That he has done testing and will give conclusions and essentially provide that Donnie was -- grew up in a deprived childhood with inappropriate social behavior, of truancy and fighting and constant intoxication. He is substancely (sic) addicted. From those hospitalization records, and other records he has reviewed, when Donnie was in the structured environment, with rules, away from intoxicating substances, he does well. He adjusts. He needs the structure.

Tr. V-1 at 54. Significantly, trial counsel proffered no mental health opinions by Dr. Mills in his

opening statement. Rather he indicated that Dr. Mills would testify about Fell's upbringing and

demonstrate through records he had reviewed how Fell does well in a structured environments.

Trial counsel also announced the testimony of Dr. Mark Cunningham.

> Dr. Mark Cunningham is a psychologist. He will summarize research developments and events that involve adverse outcomes. It will take some time to hear his testimony, maybe half a day. And what Dr. Cunningham can do and will do is explain studies conducted by the Department of Justice that talk about the reasons, what are the causes of bad outcomes, and they are broken down into essentially two things. There are risks factors, many of them mitigating factors that we are talking about, are those risk factors. And there're protective factors. Protective factors are those things like a role model, like maybe a coach or something that gives someone guidance and teaches them. The comparison of those risk factors and protective factors, you will hear those risk factors were plentiful in Donnie's life. The protective factors were few or nonexistent.

Tr. V-1 at 54-55. Again, trial counsel proffered no mental health opinions by Dr. Cunningham

in his opening statement. Rather he indicated that Dr. Cunningham would testify about risk

factors, many of them the same mitigating factors being submitted by the defense, and how they

led to bad outcomes.

Also on June 27, 2005, the government moved to exclude the testimony of Dr.

Cunningham, and for a *Daubert* hearing, arguing that Dr. Cunningham did not propose to testify with regard to any recognized area of science or medicine, and his testimony regarding Fell's moral culpability would invade the province of the jury. *See* Dkt. No. 164 at 16-17.

On July 1, 2005, *prior to the disclosure of Dr. Welner's report*, and on the day Dr. Mills was expected to testify, Fell's trial counsel announced that the defense would not call Dr. Mills, instead reserving him for possible surrebuttal.

> THE COURT:  You have three other witnesses?
>
> MR. BUNIN:  Yes.
>
> THE COURT:  And you have an expert?
>
> MR. BUNIN:  Well, as I'm saying, the expert will be withheld.
>
> THE COURT:  Oh, you're not going to put him on at all?
>
> MR. BUNIN:  No.  I'm going to save him for surrebuttal if we need him.  There's still Dr. Cunningham who's an expert who will testify next week.  If they believe that somehow raises rebuttal questions, I'm sure they'll try to present such an expert.

Tr. VII-2 at 4.

Dr. Welner issued his report on July 5, 2005.  Dr. Welner's report was a comprehensive analysis of all mental health issues raised in the case since 2001.  He reviewed all prior testing, and analyzed each defense expert opinion and each mitigation factor relating to mental health. Dr. Welner concluded that Fell suffered from anti-social personality disorder, a diagnosis which entailed findings of, among others, conduct disorder prior to the age of 15; a demonstrated failure

-158-

to conform to societal norms by engaging in unlawful conduct; deceitfulness; impulsivity and failure to plan ahead; irritability and aggressiveness; a reckless disregard for the safety of others and lack of remorse. P. Exh. 10 at 8-9, Fell-00000629-30. Dr. Welner also agreed with Dr. Wetzel in finding that Fell showed no sign of psychosis or depression. *Id.* at 18, Fell-00000639; 20-21, Fell-00000641-42. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors common to anti-social personality disorder, as well as grandiose, manipulative conduct, shallow affect and lack of empathy. *Id.* at 26-32, Fell-00000647-53. Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he committed the murders. *Id.* at 32-34, Fell-00000653-55. On the contrary, Dr. Welner found that Fell's behavior at the time of the murders "primarily reflected organization, and not signs of a mental illness or intoxication." *Id.* at 35-40, Fell-00000656-61.

Dr. Welner's report was provided to Fell's trial counsel immediately upon receipt the night of July 5, 2005, with another copy delivered on the morning of July 6, 2005.[23] On that same date, trial counsel filed a Motion in Limine to Exclude the Report and Testimony of Michael Welner. *See* Dkt. No. 182. Trial counsel alleged that Dr. Welner violated the Court's Order of April 7, 2005 ("April 7 Order"), requiring that the new forensic examination of Fell be conducted by Dr. Wetzel or Dr. Rabun, when he provided questions to Dr. Wetzel to pose to Fell and performed tests not previously notified to trial counsel. Trial counsel also objected to the

---

[23] Also on July 5, 2005, trial counsel finally disclosed Dr. Cunningham's notes to the government. *See* July 5, 2005 Letter of Alexander Bunin to Judge Sessions, attached as Government Exhibit A.

fact that Dr. Welner made reference to numerous interviews of persons who would not be called as witnesses in the case and to acts of misconduct by Fell not previously disclosed by the government. Last, trial counsel claimed that Dr. Welner's report was simply "bad science" because psychopathy had not been shown to be an indicator of violence in prison.

Pursuant to trial counsel's motion, the Court scheduled a *Daubert* hearing for Monday, July 11, 2005. *See* Dkt. No. 184. A *Daubert* hearing pertaining to Dr. Cunningham's testimony was to be held prior to Dr. Cunningham taking the stand, which was expected to happen on July 7, 2005. *Id.* On July 7, 2005, the government filed a Memorandum of Law re the upcoming *Daubert* hearing pertaining to Dr. Cunningham's testimony, *see* Dkt. No. 187. On that same day trial counsel announced that it was not going to call Dr. Cunningham, and on July 8, 2005, counsel withdrew the Rule 12.2 notice. *See* Dkt. No. 191.

As discussed above, the government announced that it was still considering whether to call a mental health expert, in light of mitigating factors alleged by the defense referring to Fell's mental health. In the ensuing discussion between the Court and counsel – quoted above – the Court noted that absent a stipulation, "there may be other issues that [a government rebuttal expert] could testify to." Tr. 10-1 at 50-52. Thus, it was not clear that the Court would not permit the government to offer some mental health evidence in rebuttal. In fact, Dr. Welner's extensive forensic investigation contained many opinions independent of statements made by Fell during his forensic interview by Dr. Wetzel. As a result, and to avoid such testimony, the parties entered into the mental health stipulation. As a result of the stipulation, the government

called no mental health expert and introduced no further mental health evidence.  The

presentation of penalty phase evidence was concluded on that same day.

### 3.  The Summations

Fell claims that the government used the mental health stipulation to undermine the

balance of his mitigation evidence during summation.  The record indicates that the prosecutor

referenced the stipulation *once* during closing argument.  Tr. XII at 40.  The prosecutor began by

talking about the third victim, Terry King, and the impact of her death on her loved ones because

of the type of person she was and how she lived her life.  *Id*. at 12-13.  He then drew some

parallels between Terry King's life and Fell's life.  *Id*. at 14.

> So as we discuss the case this morning, and over the next perhaps several hours,
> you will hear counsel for both sides talking about the ongoing life of Donald Fell,
> about how Donald Fell grew up, about how Donald Fell, just like Terry King,
> faced the challenges of being raised in an abusive and alcoholic family, about
> how Donald Fell made decisions very different from Terry King, and about how
> Donald Fell became the man that he is today, the man who participated in three
> brutal murders of defenseless victims on November 27th, 2000.

*Id*. at 14-15.  The prosecutor then outlined the process for arriving at the decision the jury would

have to make, *id*. at 16-20, and then discussed each aggravating and mitigating factor in order.

*Id*. at 20.

The first mitigating factor that the prosecutor addressed was mitigating factor number

one which claimed that "Donald Fell's capacity to appreciate his conduct was significantly

impaired."  *Id*. at 38.  The prosecutor challenged this mitigating factor first by outlining the

evidence presented with regard to Fell's actions immediately after the murder of Charles

-161-

Conway and his mother.

> You know he made a number of calculated and clear decisions that night on
> November 27th. You remember the planning, the showers, the packing. You
> know that they stopped at the Wal-Mart to get shotgun shells. You know how
> they sized-up Mr. Trapasso. You know how they waited for Terry King. All that
> evidence, ladies and gentlemen, decision after decision after decision, shows you
> that they were not, and that the defendant was not significantly impaired that
> night. . . . They drove for four hours without being stopped by anyone. They
> could drive for four hours. That shows you that they weren't significantly
> impaired. Next, you also know the defendant remembered these events clearly
> four days later. Think about it, ladies and gentlemen. If he was significantly
> impaired at the time, would he remember that the knife he was using said the
> word Hawk on it? Would he be able to describe the difference between the two
> knives as he did, one with Hawk on it, and the other as a black-handled knife.
> There are many other instances of his memory that day: His exact description of
> the route that he took. . . . . He remembered each turn that he took on his way
> down to the Price Chopper. No question he was not significantly impaired.

*Id*. at 38-39. In addition, the prosecutor referred the jury to the testimony of Cindy Oberle and

Michael Leight, who saw Fell before and after the murders, and testified that Fell acted

normally. *Id*. at 40. Then in conclusion, the prosecutor briefly reminded the jury of the

stipulation that provided that Fell suffered from no mental disease or defect and knew the

difference between right and wrong when he committed the crimes.

> Not only that, ladies and gentlemen, you have heard in this phase of the case
> about the mental health stipulation. There is no question there's no mental
> disease, no mental defect; no question the defendant knew the difference from
> right from wrong when these crimes occurred.

*Id*. This is the only reference by the prosecutor in summation to the mental health stipulation.

The brief reference rebutted a single mitigating factor: that Fell's capacity to appreciate his

conduct was significantly impaired. After summarizing the evidence that showed that Fell was

-162-

not impaired by a controlled substance, the prosecutor used the stipulation to argue that he also

was not impaired by a mental illness or defect.  The prosecutor did not use the stipulation to

rebut any other mitigating factor.  Therefore, Fell's claim that the prosecutor used the mental

health stipulation to undermine the balance of his evidence in mitigation during summation is

completely unfounded.

Defense counsel then addressed the jury and conceded, as stated in the stipulation

regarding Fell's mental health, that Fell knew right from wrong in arguing to the jury that Fell

was under the influence when he committed the murders and that is a mitigating factor.

> Under the influence at the time of the offense is a significant mitigating factor.
> Again, Donnie knew right from wrong; that's not the point.  The point is, he was
> unable to make correct, moral judgments, aside from his candor on the tape,
> which we have no reason to believe that him and Bobby Lee and Debra Fell and
> Charles Conway were not drinking incredible amounts of alcohol.

*Id*. at 79.  Otherwise, the defense focused their summation on Fell's childhood and how his

childhood impeded him from making correct moral decisions.

The government then delivered a brief, 14-page rebuttal argument, again making a single

reference to the stipulation.  Specifically, in rebutting the defense's argument that because of his

childhood Fell was incapable of making morally correct choices, the prosecutor referenced Fell's

medical records and the stipulation.

> You were also told about his medical history.  Folks, there is no evidence of any
> genetic predisposition to alcohol or drug dependence.  There's no evidence of
> fetal alcohol syndrome.  There's no evidence of closed-head injuries with any
> aftereffect.  And there's no evidence of any psychological disorder.  The only
> evidence as to Mr. Fell's state of mind and his health is in Government's Exhibit
> 14, which is a stipulation by both parties, and as you know, it indicates that

-163-

psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate. I am not even going to read it to you again. He is completely intact.

*Id*. at 117. The prosecutor then moved on to other aspects of the evidence. He did not focus on the mental health stipulation alone, but urged the jury to consider it in conjunction with other relevant evidence. Again, Fell cannot prove that the prosecutor used the stipulation to undermine the balance of his evidence in mitigation during summation.

### 4.    Post-Trial Motions

Following the jury's death verdict, Fell filed a motion for judgement of acquittal and a new trial. Dkt. No. 209. He did not challenge his conviction, but claimed that prosecutorial misconduct at the penalty phase required that the jury's verdict be changed to life imprisonment, or that he be granted a second, new sentencing hearing. Specifically, Fell claimed that the government made false representations to the Court when asked whether it had told Dr. Wetzel to ask the questions Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel conducted to support his opinion. The government denied doing so. Fell claimed that the Court's reliance on those misrepresentations and the subsequent response by the Court harmed him by causing him to withdraw all expert mental health evidence. Fell further claimed that the government performed tests in violation of the April 7 Order.[24]

---

[24] Fell also claimed that the government took inconsistent positions with regard to Fell's mitigation evidence during plea negotiations and at trial and he was not allowed to explain those discrepancies to the jury. And last, Fell claimed that the government improperly argued that there must be a nexus between his mitigation evidence and King's murder. These two arguments are not the subject of Fell's post-conviction petition.

The record indicates that on July 6, 2005, the Court questioned the government about Fell's allegations of misconduct:

> THE COURT:  Did you tell him to tell Dr. Wetzel to ask the questions that Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel had to support his opinion?  Is that what you did?
>
> MR. DARROW:  No.  Those two were in consultation with each other prior to the interview.  We told Dr. Wetzel to conduct the interview as -- as he saw fit, but we also told him that -- you know, to be in touch with Dr. Welner about it, and we know that Dr. Welner prepared some of the questions, not all of them, for him to ask.  I didn't – we were not involved in a lot of this stuff.

Tr. VIII-2 at 64.  The Court reserved ruling on the issue of precluding Dr. Welner's testimony and scheduled a hearing for Monday, July 11, 2005.  *Id*.  The Court also requested further briefing on the relevant issues.  *Id*. at 69, 74-75.  However, the next day Fell withdrew his Rule 12.2 notice and then entered into the mental health stipulation, mooting his motion *in limine* to exclude the testimony of Dr. Welner.

The government responded to Fell's allegations with a detailed Affidavit by Dr. Richard Wetzel, submitted with its "Opposition to Defendant's Post-Trial Motion."  Dkt. No. 212.  In his affidavit, Dr. Wetzel undercut the allegations, and firmly established his independence from Dr. Welner.  He stated that the government contacted him to be a rebuttal witness, in case Welner was not permitted to examine Fell or to testify as a rebuttal witness.  He received a substantial amount of information pertaining to the case that had been produced by Welner working with FBI investigators.  Aff. At 7.  According to Dr. Wetzel, counsel for the government "made it clear that Dr. Welner would be willing to discuss material with me.  He encouraged me to

-165-

contact Dr. Welner and to do anything else I felt was necessary to become prepared." *Id.* Dr.

Wetzel explicitly invited Dr. Welner to give him whatever advice or help he wished, as a

collegial gesture. *Id.* at 8. Dr. Welner responded with a lengthy list of questions. *Id.* at 9.

Wetzel was insulted; he stated that he had not intended to do anyone else's examination but his

own, that he was doing the evaluation he thought appropriate, although he had no objection to

being helpful to any of the other experts in the case. *Id.* at 9-10. He also noted that there was a

considerable overlap between the questions offered by Dr. Welner and those he would have

asked in any event, based on the new information provided by Dr. Welner and the FBI. *Id.* at 10-

11. Moreover, Dr. Wetzel clearly stated that counsel for the government did not instruct him to

do anything and did not ask him to ask any of Dr. Welner's proposed questions. In addition, Dr.

Wetzel stated that counsel for the government advised that he saw no legal reason why Dr.

Wetzel should not use Dr. Welner's questions if he wished to do so. Further, Dr. Wetzel

emphatically denied that Dr. Welner had directed his re-interview of Fell. *Id.* at 11-12. He

denied administering any additional tests to Fell. *Id.* at 14.

 With regard to Fell's allegation that the government had performed tests, without

providing prior notice to trial counsel as mandated by the April 7 Order, the government stated

that it did not understand Dr. Welner's evaluations, conducted after the forensic interview and

outside the presence of Fell, to constitute "tests" within the meaning of the Order.

> MR. DARROW: Moreover, my understanding from speaking to him today is that
> the – the name of the psychopathy test, which I can't remember, is not a test
> which was administered. It's a historical scale that was done after the fact. We
> had understood your court order saying, you know, any – any further

-166-

psychological testing, bring it up with counsel, to refer to psychological testing during the interview; in other words, with the defendant at the facility, and there wasn't any. You know, what Welner did was after he had gotten all this information together, including the DVD of the interview and all these collateral interviews that he's been doing, is he plugged in that – whatever the name of that scale is and – and reached results. Not dissimilar, Your Honor, to an antisocial personality disorder diagnosis, which is the primary diagnosis that Dr. Welner reaches. You know, it's not a piece of paper like the MMPI that you put in front of the defendant and have him fill things in. Instead, it's a review of his history. You know, what was he doing before the age of 15, for example. That's one of the primary factors for antisocial personality disorder diagnosis. And a lot of that stuff's just historical.

Tr. VIII-2 at 65.

After consideration of the transcript and Dr. Wetzel's affidavit, the Court determined that there was no basis to conclude that the government lied to the Court. *See* Court's Opinion and Order of April 24, 2006, Dkt. No. 236 at 20. The Court further concluded that there was no basis to believe that government counsel misrepresented his belief that the April 7 Order did not preclude additional testing or evaluation outside the interview of Fell. *Id.* Notwithstanding, the Court found that the spirit of its Order was not followed. *Id.* at 21. The Court credited Dr. Wetzel's affidavit and absolved Dr. Wetzel of any complicity in circumventing the April 7 Order. *Id.* But it found that the evaluations conducted by Dr. Welner constituted testing in contravention of the April 7 Order. *Id.* at 22.

The Court, however, did not go on to evaluate the question of misconduct, prejudice, or remedies. The Court stated that ordinarily an evidentiary hearing would be necessary before making such findings. *Id*

In assessing whether an instance of prosecutorial misconduct caused substantial

-167-

prejudice, ordinarily a court would proceed to consider the severity of the misconduct, any measures to cure the misconduct, and the certainty of conviction absent the misconduct. *See Elias*, 285 F.3d at 190. Ordinarily, an evidentiary hearing would be necessary; the submissions of the parties alone do not enable this Court to judge the severity of the conduct, for example, whether the government deliberately set out to circumvent the Court's order, or whether its expert was simply a zealot who pursued his own agenda despite the restrictions imposed by the Court.

*Id.*

But the Court determined that it did not have to examine the government's conduct further because "Fell cannot demonstrate a causal link between the conduct complained of (lying to the Court and violating its order) and his withdrawal of all expert mental health evidence." *Id.* at 23. The Court never had an opportunity to rule on Fell's motion *in limine* to exclude the testimony of Dr. Welner because the defense withdrew its Rule 12.2 notice before the Court's scheduled hearing on Fell's motion. *Id.* at 24. "Regardless of the reasons for Fell's decision to withdraw his expert evidence, he waived his prosecutorial misconduct claim by failing to pursue it at sentencing when the essential facts of his claim were known to him." *Id.* at 25-26.[25]

Rather than await an evidentiary hearing, Fell opted to withdraw its mental health case entirely in order to keep damaging rebuttal testimony from the jury. *Id.* This, again, was an informed strategic decision by Fell's counsel.

---

[25] The Second Circuit affirmed the district court's holding in *United States v. Fell*, 531 F. 3d 197, 226-227 (2d Cir. 2008) ("Before the hearing took place, however, Fell changed course and elected not to call a mental health expert. ... '[w]hen Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct by the government in obtaining its rebuttal evidence.' . . . We agree").

B.    Argument

1.    Trial Counsel's Decision Not to Pursue the Motion to Exclude Dr. Welner's Testimony Was Not Error

Fell claims post-conviction that his trial counsel was ineffective in failing to pursue the motion *in limine* to exclude testimony by Dr. Welner prior to withdrawing his mental health case. Fell contends that there were ample grounds to challenge Dr. Welner's report and testimony.

First, Fell's argument is disingenuous. The record is clear that Fell decided to withdraw its mental health case *before* the disclosure of Dr. Welner's report. On July 1st, 2005, Fell informed the Court that it would not call Dr. Mills, its principal mental health expert, reserving him for possible surrebuttal. Tr. VII-2 at 4. Therefore, by July 1st, *several days prior to the issuance of Dr. Welner's report*, Fell had already decided not to present a mental health case. That strategic decision was therefore not forced by Dr. Welner's report. Instead, it reflected the strength of the defense mitigation evidence up to that point, and the report of Dr. Wetzel, which issued on June 27. Prior to the latter report, the defense had listed Dr. Wetzel on its witness list. That was no longer an option after his new, post forensic interview, supplemental report. While in hindsight, Fell can purport to second-guess his trial counsel's strategy, the record shows sound reasons for such decisions, and speculation does not render counsel's performance ineffective.

Second, even assuming grounds to pursue the challenge to Dr. Welner's testimony, trial counsel was not compelled to do so. The decision of what motions to file are strategic decisions to be made by counsel. See *United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir.1987)

-169-

(counsel has adequately represented his client if counsel exercised "professional discretion" when deciding whether to file a motion); *United States v. Aulet,* 618 F.2d 182, 187-88 (2d Cir.1980) (counsel not always required to file suppression motion in cases involving evidence or statements obtained after a search); *see also Maxwell v. Mabry*, 672 F.2d 683, 685 (8th Cir. 1982) (counsel's failure to pursue motion for change of venue was within area of trial tactics and judgment which attorneys have to make and did not constitute ineffective assistance of counsel). Absent a showing that a motion would certainly have been granted, and that not pursuing it caused prejudice, Fell cannot show that his counsel's failure to pursue a particular motion fell below the prevailing professional norm. *See United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990) (*citing Kimmelman v. Morrison,* 477 U.S. 365, 375-76 (1986)) (to show ineffective assistance for the failure to make a suppression motion, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed"). Here, a decision to exclude Dr. Welner's report and testimony was within the Court's discretion. Given the tenor of Dr. Wetzel's post-trial affidavit, there is no basis to conclude that Fell would have been able to establish intentional government misconduct, or that based on such misconduct the Court would have excluded any and all testimony by Dr. Welner. In light of the fact that the Court found that the government did not lie to the Court, it was more likely that the Court would not have excluded Dr. Welner's testimony and instead grant the defense additional time to prepare to confront it. Or the Court may have opted to limit Dr. Welner's testimony only in certain respects, for example, by barring

-170-

testimony relying on the improper psychopathy "tests."

Third, even if the Court were to determine that trial counsel's failure to pursue the motion *in limine* to exclude Dr. Welner was error, Fell cannot demonstrate prejudice.  Even if counsel had pursued his motion *in limine*, and been successful in having Dr. Welner's testimony excluded in its entirety, the government still had the similar testimony of Dr. Wetzel at its disposal.  Dr. Wetzel's testimony would have been just as devastating.  Therefore, Fell cannot show a reasonable likelihood that the result of his sentencing hearing would have been different even if counsel had pursued his motion *in limine* to exclude Dr. Welner's testimony.

a.　It Was Unlikely That the Court Would Have Excluded Dr. Welner's Testimony for Failing to Comply With the April 7 Order

Fell contends that Dr. Welner's report was excludable for failing to comply with the April 7 Order.  It is clear from the record that the Court concluded that, although the government had not lied to the Court, nor misrepresented its belief that the April 7 Order did not preclude additional testing or evaluation outside the interview of Fell, the spirit of its April 7 Order was not followed because the evaluations conducted by Dr. Welner constituted "testing" and the April 7 Order specifically required advance notice to the defense before testing.  *See* Opinion and Order of April 24, 2006, Dkt. No. 236 at 21-22.  However, it is far from clear that the Court's findings would have resulted in the exclusion of Dr. Welner's testimony.  Indeed, analysis of the record favors a contrary conclusion.

As the penalty phase began, the record indicates that trial counsel was envisioning the

-171-

presentation of mental health testimony. In its June 28, 2005 list of penalty phase witnesses, the defense listed both Dr. Mills and Dr. Cunningham. On July 1, 2005, counsel responded to the government's request for the notes of Dr. Mills, and advised the Court that Dr. Mills was on his way to Burlington and may take the stand that same day. Tr-VII-1 at pp. 4-5. Clearly the manner in which the lay witness testimony came in, as well as Dr. Wetzel's June 27, 2005 supplemental report, informed trial counsel's decisions in the midst of the penalty phase. Dr. Wetzel's all day forensic examination of Fell, conducted that same month, had been closely litigated and monitored by counsel for both sides. It was the only examination to be videotaped, and both sides received copies of the video. Both sides had, based upon Dr. Wetzel's initial, 2002 evaluation, listed him as a penalty phase witness. There can be no doubt that his new, more extensive report was immediately reviewed and considered. This is not uncommon in litigation, when ongoing evidentiary developments affect how and whether additional evidence is presented. The possibility of damaging expert rebuttal testimony is of necessity a serious consideration for trial counsel in deciding whether to present expert testimony. Such are the strategic decisions that a trial counsel must routinely and necessarily make.

Also on July 1st, the Court inquired as to whether Dr. Welner would take the stand in rebuttal. *Id*. at 13. Clearly the Court was expecting Dr. Welner to testify, although the scope of his testimony was undetermined. The record makes clear that it was unlikely the court would exclude Dr. Welner's testimony entirely. The Court repeatedly expressed an inclusionary approach to expert witnesses. When discussing the potential testimony of Dr. Mills following a

government objection because they had yet to receive his notes, the Court stated:

> I don't want to exclude his testimony. I don't want to unnecessarily restrict his testimony. It seems to me that the defense has a wide-open opportunity here, should have a wide opportunity to provide mitigating evidence. On the other hand, I want to make sure that the government is adequately prepared before he testifies, so, we will take a break. . . . and then I can address that as to whether there's a postponement or not.

*Id.* at 12. Rather than bar expert testimony, the Court favored postponement if a party needed

more time to prepare. Later on in that same exchange, the Court makes clear its intention to

allow both sides to present their experts:

> *My intention is to provide both sides with the opportunity to present their experts openly and on everything that those experts want to testify to.* So, the logical solution would be, if you want to follow the order, is the experts for the defense testify, the government's experts testify, and then they in rebuttal testify.

*Id.* at 17 (emphasis added). When the defense announced that they were withdrawing Dr. Mills

and would reserve him for surrebuttal, the court asks counsel, "So you're going to reserve him

for surrebuttal after Mr. Welner testifies, assuming it's Dr. Welner or . . . ." Tr-VII-2 at 4. At

the end of that day, the court again addresses the testimony of the mental health experts:

> The other reason to – in which surrebuttal is appropriate in this case is in light of the fact that this letter is – the report is late, and as a result, *I'm not going to exclude Dr. Welner from testifying. There's a request that I exclude him. I'm not going to exclude him from testifying*, but in light of the late delivery of the letter, it seems to me that surrebuttal responds to that, so you'll have an opportunity to rebut as well as cross-examine.

*Id.* at 84 (emphasis added).

Therefore, it is clear from the record that the Court was not inclined to exclude expert

testimony from the penalty phase, including the testimony of Dr. Welner. The Court addressed

the matter again in a discussion of scheduling:

> Well, you've got at a minimum Dr. Welner testifying on Tuesday, obviously if he chooses to testify – or you choose to call him, and then the defense has one or two other experts to come in surrebuttal. That's assuming that you've gone through all of your eight witnesses whom you intend to call tomorrow. And I don't know if you're going to short-cut those witnesses, as well.
>
> So – I don't even know who those witnesses are. So I think it would be realistic to assume that we would go into Wednesday at a minimum for the evidence, which means, the way it's going, realistically summations and charge on Thursday.

Tr. IX-2 at (towards the end).

Even after the disclosure of Dr. Welner's report, and Fell's motion *in limine* to exclude

his testimony based on prosecutorial misconduct, the Court was still not predisposed to

excluding expert testimony and appears to clearly favor granting the parties additional time to

prepare to meet the testimony in court if necessary.

> THE COURT: Well, you've had a chance to read, obviously, the report. What are you proffering by way of a surrebuttal? There's adequate case law. A case called United States versus Barnette is just an example, Fourth Circuit, which says, of course, if you bring up things like psychopathology or antisocial personality in the rebuttal case, then the defense in a capital punishment case should be afforded a fair opportunity at surrebuttal.
>
> MR. BUNIN: And we would do that if it came up. Again, we're going to attack the underlying basis that it shouldn't even mentioned, but if you allow them to do that, then, yes, we should have surrebuttal. . . . .
>
> THE COURT: I'd ask for the defense to come up with a memorandum describing their specific objections to what Dr. Welner would testify to. I mean, I from the beginning, from day one, have suggested to both sides that they be afforded an opportunity, a fair opportunity, to put on expert witnesses, *and I'm hard-pressed to try to stop an expert witness from testifying*. On the other hand, there are a lot of things in Dr. Welner's report, I am told of new facts which would be

prejudicial -- highly prejudicial and would need the defense to be given an opportunity to look into them. . . .

THE COURT: Okay. All right. Well, we've got to take it step by step. So tomorrow you'll have Dr. Cunningham. Before he testifies, we'll have a hearing. The government can elicit the objections that they have to his testimony. We'll try to go through all of those witnesses tomorrow. Friday the government's lay witness rebuttal and then Tuesday there will be expert witnesses, first from the government, second from the defense, and perhaps other surrebuttal from the defense.

Tr. VIII-2 at 71-74 (emphasis added). In view of the circumstances, and the above statements by the Court, it was not unreasonable for Fell's trial counsel to conclude that it was unlikely that all testimony by Dr. Welner would be barred, even if they pursued the motion *in limine*. *See* Declaration of Alexander Bunin, P. Exhibit 264 at 8, Fell-00002467. In this regard, it is significant that Dr. Welner's testimony was not limited to the three tests completed on July 4, 2005, which the Court found to have been conducted contrary to its April 7 Order. Based on his own forensic investigation and testing conducted by other experts, Dr. Welner concluded, among other things, that Fell had ASP; that he was not significantly impaired when he killed King; and that there was no causal connection between his childhood trauma and the crimes he committed. *See* P. Exhibit 10.[26] None of these opinions relied on the three contested tests. Therefore, Fell's argument that "[t]here would have been nothing for defense counsel to fear because there would have been no basis for diagnosis without testing" is incorrect. P 140-141. It is uncertain at best whether the Court would have excluded those portions of Dr. Welner's testimony that relied

---

[26] Dr. Wetzel reached exactly the same conclusions in his June 27, 2005 report.

upon the three tests he conducted himself, but it is unlikely that the Court would have excluded

Dr. Welner's testimony with regard to the remaining portions of his report.

b.      It Was Unlikely That the Court Would Have Found Dr. Welner's Testimony Completely Unreliable and Lacking in Probative Value

Fell next claims that Dr. Welner's testimony was also excludable because it was

unreliable.  He argues that trial counsel was ineffective by failing to insist in his motion to

exclude Dr. Welner's testimony pursuant to 18 U.S.C. 3593(c), which provides that evidence

may be excluded if its probative value is outweighed by the danger of creating unfair prejudice,

confusing the issues, or misleading the jury.

Yet again Fell ignores his counsel's strategic decision not to present expert mental health

testimony.  Most of the arguments now raised in sections V(B)(2)-(7) of the § 2255 motion were

originally raised by trial counsel in his motion *in limine* to exclude Dr. Welner's testimony.  *See*

P. at 157.  This shows that trial counsel weighed those arguments before making the strategic

decision to withdraw the mental health case rather than litigate his motion.

Moreover, as demonstrated below, trial counsel's appreciation that the Court was

unlikely to exclude Dr. Welner's testimony in its entirety was reasonable as none of the

arguments advanced by Fell in his petition were likely to accomplish total exclusion.  Therefore,

in the midst of the penalty phase, trial counsel was faced with the decision to pursue his motion

*in limine*, a process that would have taken several days in briefing and hearings and delay the

presentation of his case in mitigation, knowing he was unlikely to succeed, or withdraw his

-176-

mental health case to insure that he would not confront the testimony of Dr. Welner or Dr. Wetzel, and complete his mitigation case in an orderly manner. Trial counsel's decision to forego the motion *in limine* does not reflect *Strickland* error.

Even if the Court were to determine that trial counsel's decision to forego the motion *in limine* was error, Fell cannot show prejudice. Specifically, Fell cannot show that his motion *in limine* would have been granted. On the contrary, it appears unlikely that the Court would have excluded Dr. Welner's entire testimony as unreliable. Dr. Welner conducted a thorough forensic investigation into Fell's background, personally interviewing dozens of primary sources, and reviewing all of the prior mental health evaluations. In addition, he reviewed the hundreds of documents generated in the case, and all of the multiple recorded confessions. Dr. Welner lists 159 sources of information in his report. P. Exhibit 10 at 3-8, Fell-00000624-29.

In *United States v. Mitchell*, 2009 WL 3837222 (D.Utah, November 16, 2009), the federal capital case involving the kidnapping of young Elizabeth Smart, the court denied a defense mitigation phase motion *in limine* and found that Dr. Welner conducted a thorough forensic investigation.

> The court concludes that Welner's testimony meets the standards for admissibility under Rule 702. First, there is no basis for concluding that his testimony is not based on sufficient facts or data. In reaching his opinion, Welner reviewed and considered all of the materials available to the prior examiners. But, unlike the prior examiners, Welner considered a substantial amount of additional information including over 60 interviews with witnesses who had observed and interacted with Defendant, including the victim, hospital staff, family members, former coworkers, church leaders, and other friends and acquaintances. Welner's report lists 161 sources of information.

-177-

2009 WL 3837222 at 7. The *Mitchell* court went on to commend the work conducted by Dr.

Welner:

> Welner then prepared a report presenting relevant history, examination findings,
> diagnostic assessment, and explanation of the reasoning process used to formulate
> his opinion. *This represents the best practices in forensic psychiatry and
> psychology*.

*Id*., (emphasis added). Dr. Welner did not deviate from those "best practices" in this case. There

is no basis to conclude that the findings of the Court here would have caused it to bar Dr. Welner

from testifying.

Dr. Welner rendered a number of mental health opinions in his 72-page report, including

anti-social personality disorder, alcohol dependence, psychopathy, lack of impairment from

alcohol during the commission of the murders, no mental illness, no cognitive impairments, no

post-traumatic stress disorder as a result of sexual abuse; and genetic predisposition to

alcoholism. It is highly unlikely that the Court would have found each of these opinions, many

of which were shared by other experts in the case both for the defense and the government,

unreliable. Therefore, counsel's decision not to pursue his motion *in limine* on this basis, even if

deemed to have been an error, was not prejudicial.

> 2.    Dr. Welner's Diagnosis of Psycopathy Was Not Per Se Excludable
>       For Its Underlying Methodology or As an Unreliable Predictor of
>       Prison Violence

Fell claims that Dr. Welner's diagnosis of psychopathy was inadmissible based on both

the unreliable methodology he used to reach it and the fact that it has been proven to be an

unreliable predictor of prison violence. Fell argues that his counsel was ineffective in failing to

persist on his motion to exclude Dr. Welner's testimony on this basis.  Fell admits that his trial counsel set forth both of these arguments in his motion *in limine* to exclude the testimony of Dr. Welner, indicating that counsel considered this line of argument.  However, he then made a strategic decision to withdraw his mental health case and not pursue the motion.

At the outset, given the settled ASP diagnoses by Drs. Wetzel and Welner, and their other adverse findings, psychopathy testimony would not have added much to the weight of expert rebuttal testimony.  In any event, Fell argues that Dr. Welner's administration of the PCL-R, the VRAG and HCR0-20 outside the presence of Fell, and "without acknowledgment of the concomitant reduction in the tests' reliability," was contrary to accepted psychiatric principles and ethically impermissible.  P 144.  However, Fell cites no authority for the proposition that these tests cannot be administered outside the presence of the subject.  In fact, according to the American Academy of Psychiatry and the Law, Ethics Guidelines for the Practice of Forensic Psychiatry at 3, cited by Fell in his petition, P. at 144, a mental health expert can administer these tests in absence of a personal examination, so long as they so indicate and note any resulting limitations to their opinions.  *Id*.  Dr. Welner complied with this directive, noting on his report that he had not been able to interview Fell.  *See* P. Exhibit 10 at 27.  Dr. Wetzel also states in his affidavit of September 12, 2005, that "[t]here is research in the literature that indicates that the [sic] *these three tests can be validly used without any interview at all*, if sufficient records are available."  P. Exhibit 139 at 17, Fell-000001464 (emphasis added).  The challenge to Dr.

Welner's testimony in this regard would have been unlikely to lead to exclusion.[27] Rather, such arguments would have been proper subjects for cross examination.

Similarly, Fell's claim that Dr. Wetzel's statement that the questions he posed during his interview of June 13, 2005 could not have formed a sufficient basis for the administration of these tests, and therefore, Dr. Welner could not have administered them in a reliable manner, is misleading. In his affidavit, Dr. Wetzel indicated that he did not probe during his interview the subjects relevant to the Hare Psychopathy Checklist. However, that did not foreclose the possibility that Dr. Welner obtained sufficient information on those subjects from other sources to allow him to reach an opinion. For example, while Dr. Wetzel did not inquire about Fell's sexual promiscuity, Dr. Lipman did and Dr. Welner reviewed Dr. Lipman's report. Dr. Welner also interviewed multiple family and friends of Fell. A challenge to Dr. Welner's testimony in this regard was unlikely to lead to exclusion.

Fell also contends that a diagnosis of psychopathy is not a reliable predictor of an inmate's likelihood of committing violent acts in prison. But in his report, Dr. Welner indicated that his diagnosis of psychopathy was but one factor considered. Dr. Welner cited other studies, independent of the VRAG.

> One prison study independent of the VRAG and PCL-R found that violent
> prisoners were more likely to have a juvenile arrest history and a history of
> psychiatric hospitalization. They were less likely to be married. The violent
> prisoners were also more likely to have a history of violence by arrest or self-

---

[27] A contrary finding would constitute a new rule under *Teague v. Lane*, 489 U.S. 288 (1989).

report, during the previous five years.

P. Exhibit 10 at 70.  In light of the fact that one of the Fell's proposed mitigating factors was that

he did not pose a danger to others in prison, it is unlikely that Dr. Welner's opinion in this

regard, supported by relevant authority, would have been excluded.  Moreover, Dr. Welner

frankly acknowledged that more progress needs to be made in the area of predicting future prison

violence:

> Ultimately, there is substantial risk that Mr. Fell will become violent in custody,
> based upon actuarial approaches.  The newness of establishing a methodology for
> ascertaining risk of violence in maximum-security institutions is relatively new,
> however.  Therefore, while Mr. Fell is a psychopath whose VRAG score is quite
> high, interpretations in this setting must allow for more progress to come in this
> area.

Challenges to Dr. Welner's testimony in this regard would have been appropriate subjects for

cross-examination, not a bar to testimony; such arguments would have been relevant to the

weight of Dr. Welner's opinion, not its admissibility.

Fell further argues that his trial counsel should also have moved to exclude the PCL-R

test based on the his age.  However, at the time of Dr. Welner's evaluation, Fell was a 25 year-

old male with no cognitive deficits.  Therefore, the general concerns with administering the

PCL-R to individuals at the lower end of the acceptable age range, that is, 18, were non-existent.

While it is true that the Court expressed concern about the prejudicial nature of a

psychopathy diagnosis, it does not follow that the Court would have excluded such evidence.  As

the Court noted at the time, citing *United States v. Barnette* in the Fourth Circuit, courts have

permitted testimony regarding psychopathy.  In *United States v. Lee*, 274 F.3d 485 (8th Cir.

-181-

2001), for example, the Eighth Circuit noted that a defendant's potential psychopathy was probative of future dangerousness. 274 F.3d at 495. In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the court noted no error in the government's introduction of evidence that the defendant was a psychopath, but only in the court's denial of defense rebuttal evidence. 211 F.3d at 820-21. In *United States v. Dretke*, 99 Fed.App. 538 (6th Cir. 2004) (unpublished), the court noted no error in the admission of psychopathy testimony. 99 Fed.App at 541. In Fell's case, a diagnosis of psychopathy was not only relevant as to mitigating factor number five, which claimed that Fell was not a risk to others in prison, but also as to mitigating factor number eight, which claimed that he was remorseful for the murder of Terry King. It was also likely to be responsive if the defense called an expert mental health witness. There is little basis to conclude to any degree of certainty that this Court would have excluded psychopathy testimony.

Fell further argues that "Dr. Welner's testimony had been excluded in a number of cases." P. at 146. This statement is misleading, and continues the series of baseless attacks on Dr. Welner advanced by defense counsel during the trial. Fell cites a single case in support of his allegation, and a review of this case, *United States v. Sampson, supra*, reveals that Dr. Welner's testimony was not excluded, but only limited in certain respects. In *Sampson*, another triple homicide involving brutal, gratuitous killings, Dr. Welner testified that the defendant did not have a mental illness which significantly impaired him. 332 F.Supp.2d at 330. The *Sampson* jury credited Dr. Welner's testimony – not a single juror found mental illness. *Id*. The Court in *Sampson* did limit Dr. Welner's testimony, by not allowing him to use the term "psychopath."

-182-

The Court explained that it took this measure in part because it believed the term would imply

that the defendant was a future danger. Since Dr. Welner's conclusion was derived from his

Rule 12.2 examination, the court reasonsed that the government could not use Dr. Welner's

testimony in support of its aggravating factor of future dangerousness. 335 F.Supp.2d 166, 222

n. 27 (D.Ma. 2004). We have located no other case that has similarly excluded Dr. Welner's or

any other expert's testimony of psychopathy on that basis.

Fell's reliance on *New Jersey v. Vandewaghe*, 177 N.J. 229 (N.J. 2003), is similarly

misleading. *Vandewaghe* involved a defendant accused of murder who alleged that he was

intoxicated the night of the murder and did not remember kicking his victim. A defense mental

health expert testified at trial that defendant "was so overwhelmed by his alcohol intoxication

that he was . . . not able to form the intent to kill . . . or to cause serious bodily injury." 177 N.J.

at 234. The defense expert also testified that the defendant's intoxication did not permit a

diagnosis of anti-social personality disorder. *Id*. Dr. Welner testified for the state. *Id*. With

regard to the claim of severe intoxication, Dr. Welner concluded that because the defendant was

an alcoholic, his drinking that night did not impair him – his system was accustomed to alcohol.

*Id*. Dr. Welner also based that conclusion on the absence of random or disorganized behavior

consistent with severe intoxication. *Id*. at 234-35. Further, Dr. Welner questioned defendant's

claimed ability to recall only a select portion of the events on the night of the offense, indicating

that an alcohol-induced blackout usually lasts for a few hours and involves "a lack of recall of

everything." *Id*. at 235. Because he believed the defendant was not severely intoxicated by

alcohol, Dr. Welner concluded that he acted purposefully when repeatedly kicking the victim. *Id.* Dr. Welner also testified that the defendant suffered from anti-social personality disorder. It was this latter part of Dr. Welner's testimony that the court concluded should have been excluded, not because Dr. Welner's opinion was unreliable, but because it was not relevant to a determination of *mens rea. Id.* at 240.

Fell cites one case, *United States v. Stitt*, 369 F.Supp.2d at 698, where the court found that the PCL-R was not a reliable predictor of violence in prison. Yet numerous authorities approve of and rely upon that instrument for various purposes. A sampling includes the following: *United States v. Mitchell,* 706 F.Supp.2d 1148, 1217-1220 (D. Utah 2010)(relying on PCL-R; "Psychopathy is a construct within Antisocial Personality Disorder that is noted in the DSM-IV, but is developed much more extensively in the scientific literature"); *United States v. Doe #3*, 113 F. Supp.2d 604, 608 (S.D.N.Y. 2000)(expert offers the PCL-R as "the single best predictor of person's future criminal recidivism"); "The Role and Relevance of the Psychopathy Checklist-Revised in Court – A Case Law Survey of U.S. Courts (1991-2004)," 12 Psychology, Public Policy, and Law 214 (2006) (first sentence: "The Psychopathy Checklist--Revised (PCL--R) (Hare, 1991, 2003) is considered to be the most valid and reliable instrument for measuring the construct of psychopathy in correctional and forensic psychiatric populations"); "'I'm Sorry I did it . . . But he Started it': A Comparison of the Official and Self-Reported Homicide Descriptions of Psychopaths and Non-Psychopaths," 31 Law and Human Behavior 91 (2007) (first sentence: "Psychopathy has become a major focus of research in psychology and

law in recent years.  As defined by the well-validated Psychopathy Checklist-Revised (PCL-R; Hare, 1991, 2003) . . . ."); "The Construct of Psychopathy," 28 Crime and Justice 197 (2001) (Abstract: "psychopathy . . . can be reliably and validly measured . . . . Hare's Psychopathy Checklist-Revised is the best available assessment"); "Psychopathy and Responsibility," 90 V. Law Review 1423, 1429 (2004) ("There is currently a very reliable tool for identifying the presence of psychopathic personality – the Hare Psychopathy Checklist").

Notwithstanding Fell's protestations, psychopathy is a well-established construct, and there is little basis to attack Dr. Welner for considering it, or for concluding that trial counsel's failure to pursue its motion *in limine* to exclude Dr. Welner's testimony was error.[28]  In any event, Fell cannot show prejudice.  There is no reasonable likelihood that Fell would have prevailed in his motion.

> 3.    Dr. Welner Conducted An Objective Inquiry Into Fell's Background

Fell also claims that Dr. Welner's testimony was excludable because it was not objective. Fell alleges that Dr. Welner approached his interviews with an agenda, seeking to confirm his pre-determined hypothesis that Fell was psychopath.  P. at 150.  This argument is pure over-reaching and has no basis.  From the dozens of interviews conducted by Dr. Welner, Fell references two: the interview of Fell's sister Teri, and Sean Campbell, Jackie Sharpe's boyfriend. With regard to these two interviews, Fell points to a single question posed to each subject.  The

---

[28]  A contrary finding would constitute a new rule under *Teague*, *supra*, 489 U.S. 288.

record demonstrates that Dr. Welner spoke to both Teri Fell and Sean Campbell extensively.

The question referenced was not the only question posed to either subject. Neither instance –

nor any other evidence – demonstrates any bias or agenda on Dr. Welner's part.

4.        The Word "Pychopath" is Not Inherently Prejudicial.

Although not very clearly, Fell appears to argue that the word "psychopath" is inherently

prejudicial, and had trial counsel pursued his motion in limine to exclude Dr. Welner's testimony

about psychopathy, it would have been excluded under 18 U.S.C. 3593(c) because it was more

prejudicial than probative. Significantly enough, Fell cites no case in which testimony of

psychopathy was found to be inherently prejudicial and was excluded only on that basis. As set

forth above, psychopathy is a well-researched construct relied upon by courts and psychologists

for various purposes. Fell's only support stems from an affidavit submitted in another case.

Again, absent clear jurisprudence that this particular challenge would have been successful, there

is no basis to conclude that trial counsel was unreasonable in not pursuing his motion in limine

to exclude the testimony of Dr. Welner. As set forth above, testimony about psychopathy has

been admitted in numerous criminal trials. *See, e.g.*, *Lee*, 274 F.3d at 495; *Barnette*, 211 F.3d at

821-22 (reversed on other grounds); *Dretke*, 99 Fed.App. at 541; *Mitchell,* 706 F.Supp.2d 1148.

5.        Dr. Welner's Report is Based on His Review of Historical
          Documents, Interviews of Fell and Personally Conducted
          Interviews of Reliable Sources of Information

Fell next claims that Dr. Welner's report and testimony was unreliable because he based

many of his conclusions on interviews of unreliable sources. But Dr. Welner's report and the

-186-

conclusions he reached were not based on interviews alone. As reflected by his list of sources, Dr. Welner relied on social service documents, hospital records, police reports, FBI interviews, interviews conducted by Dr. Welner himself, mental health examinations conducted by other experts, and recorded interviews of Fell and Lee. *See Mitchell*, 2009 WL 3837222 at 7 (Finding that Dr. Welner conducted a thorough forensic investigation.).

Second, among the individuals that Dr. Welner interviewed himself were Fell's sister Teri; his employers; his aunt Donna Williams; his girlfriend Lynn Roberts; his great-grandmother Jeanette Banas, with whom Fell lived for a while; his cousin Jesse Williams; and others. *See* P. Exhibit 10 at 3-8, Fell-00000624-29. Each one of these sources knew Fell well were appropriate and reliable sources. Indeed, it is hard to fathom how Teri Fell was reliable enough to testify on behalf of Fell at trial, and provide a sworn declaration in support of the motion for post-conviction relief, but not reliable enough to be considered by Dr. Welner. Fell's argument in this regard is disingenuous. Fell also claims that Dr. Welner's interview of Stanley Kowalski was unreliable because it was conducted at 11:00 pm. This argument is similarly meritless on its face. Fell's arguments against the conclusions reached by Dr. Welner based on the interviews he conducted are simply different interpretations of data, which do not support exclusion, but may have provided avenues for cross-examination.

Third, it is significant that Fell argues when urging that trial counsel failed to provide sufficient information to their experts that it is vital for mental health experts to have as complete a social history as possible prior to rendering an opinion, yet attacks Dr. Welner for the broad

-187-

scope of his inquiry into Fell's social history. Without a doubt the mental health expert in this

case who actually conducted the most complete forensic investigation of Fell's social history

was Dr. Welner. Hence, from that stand point, his opinions would be arguably the most

reliable.[29] Nothing about the interviews conducted by Dr. Welner would have caused the

exclusion of his testimony to any degree of certainty.

Last, Fell claims that the government did not produce many of the FBI 302 reports

corresponding to the interviews conducted by Dr. Welner. However, it is clear from the record

that the government was in the process of providing discovery pursuant to Dr. Welner's report.

> MR. BUNIN: Is the -- when you're reviewing all this stuff, Judge, I want to bring
> to the Court's attention that -- and I may be wrong about a few of these, but he
> lists 159 sources of information, and I count 28 interviews that he refers to as
> discussions that we've never seen nor heard about underlying data for his basis.
> We never – there are people on here I've never heard of before. And then there
> are 22 persons who have been previously listed on the government's witness list
> before but they haven't called to date or they've taken them off the witness list,
> and it's not clear whether they're going to testify or not......

> MR. DARROW: Your Honor, we're -- I mean, it's interesting that counsels interested in
> the underlying notes of experts. I mean, as you know, we had a little difficulty getting
> them from Dr. Mills, and it wasn't until yesterday that we got the notes from Dr.
> Cunningham, which are extensive and refer to his interviews of multiple witnesses, some
> of whom we haven't heard of before. I mean, that's what shrinks, forensic psychologists
> in their case, psychiatrist in our case, is they go out and interview people, and we'll turn
> over all that stuff.

---

[29] Fell's additional argument that Dr. Welner conducted some of his interviews in the
presence of law enforcement agents, thereby intimidating his subjects has not merit. His sole
support for this argument is that one witness perceived Dr. Welner to have been "very CSI"
because he handed him a business card.

Tr. VIII-2 at 66-67. Thus, it is clear that the government intended to provide complete discovery. However, the next day, the defense withdrew their Rule 12.2 notice and entered into the mental health stipulation. Therefore, further discovery as to Dr. Welner's sources was unnecessary.[30]

6.    Trial Counsel Was Not Ineffective In Failing To Move To Exclude Dr. Welner's Testimony Pursuant to *Estelle v. Smith*

Fell further claims that, in addition to the bases for exclusion delineated in sections V(B)(2)-(5) above, which were raised by trial counsel in his motion *in limine*, Dr. Welner's testimony was excludable pursuant to the principles announced by the Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 470-71 (1981), which provides that a defendant's Sixth Amendment rights were infringed by the government's secret forensic interview of a capital defendant, without the presence or knowledge of defense counsel, by a mental health expert who then testified at trial. Fell argues that if defense counsel is given notice of the government's experts and the tests they intend to conduct, a defendant could decide to withdraw his Rule 12.2 notice. Since Fell was not given notice that Dr. Welner would conduct the PCL-R, the VRAG and the HCR-20 evaluations, he was not provided an opportunity to consult with counsel about these tests. Hence, Fell argues that any testimony regarding any of these evaluations should have been excluded and his trial

---

[30] Fell further claims that much of the testimony of Dr. Welner was based on statements by third persons who were not witnesses at trial and admission of such statements would have violated the Confrontation Clause. But Dr. Welner's testimony would have been elicited in rebuttal, to respond to proposed mitigating factors; therefore, the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004), would not have been implicated.

counsel was ineffective in failing to argue this basis for the exclusion of Dr. Welner's testimony.[31]

*Estelle v. Smith* has no bearing on this case. The defense is *Estelle* did not even know about the interview. Here the interview was litigated. The forensic interviewer in *Estelle* gave surprise testimony and was not even on the government witness list. Here he was well known and did not testify. In *Estelle* the defense had not noticed psychiatric evidence; here Fell filed a Rule 12.2 notice. The Court in *Estelle* ruled that surprise introduction, during the penalty phase, of statements by the defendant to the government psychiatrist, violated the Fifth and Sixth Amendments because the defendant was without counsel, and was not warned, prior to the examination, that he had the right to remain silent and that any statements could be used against him at sentencing. Fell, on the other hand, was well aware that his statements would be disclosed to counsel for the government and could be used against him. In fact, he had been so warned prior to each of his mental health evaluations and had the opportunity to consult with counsel prior to the evaluations themselves. The Supreme Court has limited *Estelle*'s Fifth Amendment holding to the "distinct circumstances" of that capital case and has "never extended [that] holding

---

[31] Fell further claims that the government violated the April 7 Order by maintaining custody of Dr. Wetzel's interview of Fell because the "possibility" exists that they could have viewed Fell's interview prior to the end of the guilt phase. We note that the defense team was represented, with the government, outside the room in which Fell was interviewed. The defense raised no objection to the government maintaining custody of the single set of resulting videocassette tapes so as to have DVD copies made for counsel and the experts. In any event, there is absolutely no evidence that the government viewed Fell's recorded interview until after the guilty verdict was rendered and Fell's speculation to the contrary is nothing short of irresponsible. It is significant that he makes no attempt whatsoever to show how if in any way, assuming the government viewed the tape prior to a guilty verdict, any use of Fell's statements could have been made during the guilt trial.

beyond its particular facts." *Penry v. Johnson*, 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (internal quotation marks omitted). Therefore, it is highly unlikely that Dr. Welner's statements would have been excluded pursuant to *Estelle*. Hence, counsel's failure to seek exclusion under *Estelle* was not error.

Fell further claims that his counsel was ineffective in failing to move to exclude Dr. Welner's testimony regarding his ASP diagnosis to support the claim that Fell would be violent in prison. According to Fell, a diagnosis of ASP is not indicative of prison violence. But neither Dr. Wetzel nor Dr. Welner stated in their report that such a diagnosis indicated that Fell would be violent in prison. In addition, it was evident that ASP was relevant to other proposed mitigating factors. For example, a diagnosis of ASP would have been relevant to Fell's claim that he was remorseful of his crimes or that his aggressive behavior was a result of his childhood trauma. It was also likely to be responsive to defense expert testimony.

Last, Fell claims that his trial counsel was ineffective in failing to review the reports of interviews conducted by Dr. Welner, prior to deciding to withdraw his mental health case. Fell makes no attempt to show what information might have been in those reports that would have so impacted his trial counsel's strategy and caused him to change course. Moreover, it is clear from the record that Fell's trial counsel had sufficient information to make an informed decision whether to pursue its original trial strategy or not. When faced with two very damaging reports by two credible mental health experts, trial counsel made a reasonable strategic decision to withdraw the mental health case.

a.    Trial Counsel Was Not Ineffective In Agreeing to a Mental Health Stipulation

The government addressed this argument in Part IV(E)(1)(a), *supra*.

7.    Fell Cannot Demonstrate That He Suffered Prejudice As a Result of His Trial Counsel's Decision Not to Pursue His Motion *in Limine* to Exclude Dr. Welner's Testimony or To Withdraw His Mental Health Case

Fell argues that from the onset of the trial, counsel prepared the jury to hear expert mental health evidence and specifically promised the jury that it would hear the testimony of Drs. Mills and Cunningham. He contends that trial counsel was ineffective in failing to follow through with his motion in limine to exclude Dr. Welner and his promise to present a mental health case.

First, the record shows that counsel actually presented the underlying evidence at issue in his reference to Drs. Mills and Cunningham. Second, failing to call a witness announced to the jury is not in and of itself unreasonable. In determining whether or not trial counsel's decision was reasonable, the Court must consider trial counsel's decision in the context of the trial. Even if trial counsel had been successful in excluding Dr. Welner's testimony, which was unlikely, and presented mental health evidence, Fell would have confronted the testimony of Dr. Wetzel in rebuttal, who would have been just as damaging as Dr. Welner. It is no coincidence that trial counsel withdrew Dr. Mills before receiving Dr. Welner's report but after receiving Dr. Wetzel's report.

a. Dr. Mills's Testimony

Fell's trial counsel proved all that he told the jury he would prove through

-192-

Dr. Mill's testimony.  In his opening statement, Fell's trial counsel stated:

> We have indicated that there is going to be expert testimony, and there will be.  Dr. Mark Mills is a psychiatrist.  A medical doctor.  That he has done testing and will give conclusions and essentially provide that Donnie was -- grew up in a deprived childhood with inappropriate social behavior, of truancy and fighting and constant intoxication.  He is substancely (sic) addicted.  From those hospitalization records, and other records he has reviewed, when Donnie was in the structured environment, with rules, away from intoxicating substances, he does well.  He adjusts.  He needs the structure.

Tr. V-I at 54.  Trial counsel certainly proved that Fell grew up in a deprived childhood with inappropriate social behavior, truancy, fighting and constant intoxication.  In fact, the government conceded in its closing summation that Fell had a terrible childhood.  Tr. XII  at 52.  Moreover, the jury's Special Verdict indicates that counsel proved that Fell was institutionalized for mental health conditions; that his parents were violent alcoholics who abandoned him as a child; and that Fell regularly abused alcohol and drugs from childhood until his arrest.  The jury also found that Fell's total life experience and the failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior were also mitigating factors.  See Special Verdict Form, Dkt. 200 at 12-17.  Trial counsel further proved through Fell's hospitalization records, records from St. Michael's and the testimony of William Kane, that Fell functioned well in a structured environment, with rules and away from intoxicating substances.  Tr. IX-2 at 13.

Fell now claims post-conviction that had trial counsel called Dr. Mills as a witness, he would have testified that Fell's highly deprived childhood resulted in early and recurrent inappropriate social behavior and intoxication, that his history and testing results indicated

incipient psychosis or pre-psychotic breakdown, and that both his substance abuse and potential

psychotic illness had strong familial and genetic components.  In addition, Dr. Mills would have

provided the jury with some psychological explanation for the behaviors demonstrated in Fell's

hospitalizations records.

The government does not dispute that Dr. Mills would have testified consistent with his

report and as stated above.  However, as discussed above, trial counsel made an informed

strategic decision not to present mental health evidence.  Fell has not shown that if the jury had

heard Dr. Mills's testimony, there is a reasonable likelihood that the outcome of the trial would

have been different.  Dr. Mills's testimony would have triggered the testimony of Dr. Welner or

Dr. Wetzel, or both.  Both would have testified that Fell had ASP, was not remorseful, and was

not significantly impaired when he committed the capital crimes.  They both would have testified

that while Fell suffered trauma during childhood, there was no causal connection between that

trauma and the crimes he committed.  And both Dr. Wetzel and Dr. Welner would have testified

that Fell knew the difference between right and wrong.  In light of the government's likely

rebuttal, Fell cannot establish prejudice.

### b.      Dr. Cunningham's Testimony

Fell's trial counsel addressed the essence of what he told the jury would be proven

through Dr. Cunningham's testimony.  In his opening statement, Fell's trial counsel stated:

> Dr. Mark Cunningham is a psychologist.  He will summarize research
> developments and events that involve adverse outcomes.  It will take some time to
> hear his testimony, maybe half a day.  And what Dr. Cunningham can do and will
> do is explain studies conducted by the Department of Justice that talk about the

-194-

reasons, what are the causes of bad outcomes, and they are broken down into essentially two things. There are risks factors, many of them mitigating factors that we are talking about, are those risk factors. And there're protective factors. Protective factors are those things like a role model, like maybe a coach or something that gives someone guidance and teaches them. The comparison of those risk factors and protective factors, you will hear those risk factors were plentiful in Donnie's life. The protective factors were few or nonexistent.

While trial counsel never introduced the promised statistics from the U.S. Department of Justice, counsel did introduce evidence of risk factors present in Fell's life, as well as evidence of the absence of protective factors. Counsel then argued that mitigation in closing. As evidenced by the jury's finding in its Special Verdict, the risk factors present in Fell's life were not lost on the jury. Expert testimony was not required for the jury to appreciate the effect of different risk factors such as physical and sexual abuse and alcoholism on Fell's life trajectory as evidenced by their findings on the Special Verdict Form. *See* Dkt. No. 100.

Fell's primary mitigation evidence was his unfortunate childhood and his history of abusing controlled substances. The defense introduced and argued from evidence relating to both those mitigators. In so doing the defense pursued the same theory that Dr. Cunningham would have advanced, without risking rebuttal testimony.

The value of Dr. Cunningham's opinion was dubious at best. He was slated to testify as to the common sense thesis that a man is formed by his childhood. As stated by Dr. Cunningham, his thesis considers "the nexus between adverse developmental factors and criminally violent outcome." Cunningham Declaration, P. Exhibit 6 at 5, Fell-00000449. Dr. Cunningham's June 14, 2005 letter to defense counsel was similarly generic, although it at least contained a list of

-195-

general "risk factors" present in Fell's childhood, such as "[e]arly and persistent antisocial

behavior" and "favorable attitudes towards delinquent and violent behaviors." P. Exhibit 5 at 2,

Fell-00000440. Ultimately, Dr. Cunningham's proposed testimony was that Fell's poor

childhood impaired his ability as an adult to make sound moral choices and significantly

increased the likelihood of violent criminal conduct. That fact presumably diminished his

culpability for the murders, because he had no control over his childhood. That is the essence of

Dr. Cunningham's testimony in dozens of capital cases and his two written opinions in this case.[32]

Defense counsel at trial made a reasonable and strategic decision to rely heavily during

the penalty phase upon Fell's wretched childhood and adolescence. The majority of defense

witnesses testified in detail about that matter. After jettisoning all mental health experts except

Dr. Cunningham, and successfully eliciting extensive testimony about Fell's background, the

question was whether to call Dr. Cunningham to opine that Fell had been formed by that

childhood (and was therefore less responsible for his adult crimes), or simply argue that point in

summation. The latter course traded off significant risks for marginal gain (a psychologist

explaining a common sense conclusion). The risks included damaging cross-examination of Dr.

Cunningham about Fell's immutable and aggravating adult nature, and also whatever rebuttal

---

[32] As summarized by defense counsel at the July 27 preliminary hearing, as the childhood "damaging factors go up, the moral culpability goes down." Transcript, "Hearing on Outstanding Issues - Monday, July 27, 2005," page 48. Counsel withdrew Dr. Cunningham before the *Daubert* hearing, so his ultimate testimony is unknown. However, that is the essence of his opinion in this and other capital cases. *See*, *e.g., United States v. Lee*, 274 F.3d 485, 490 (8th Cir. 2001).

expert testimony the Court deemed permissible, along with the damaging statements from Fell's

June 13 interview. *See Lee, supra*, 274 F.3d at 495 (introduction of mental health expert in

defense opened the door to testimony concerning psychological diagnosis, including defendant's

potential psychopathy.).

Fell's ASP diagnosis was likely to be exposed to the jury if Dr. Cunningham testified,

either through his cross-examination or through rebuttal expert testimony (Dr. Welner or Dr.

Wetzel). He undoubtedly did not want the jury to hear about that disorder.[33] Yet the ASP

diagnosis was consistent with Dr. Cunningham's thesis. In fact, many childhood "risk factors"

identified by Dr. Cunningham (such as "[e]arly and persistent antisocial behavior") are integral to

---

[33] According to the "Diagnostic and Statistical Manual of Mental Disorders," § 301.7 (4th ed. 1994), "[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. This pattern has also been referred to as psychopathy, sociopathy, or dyssocial personality disorder. Because deceit and manipulation are central features [of ASPD], it may be especially helpful to integrate information acquired from systematic clinical assessment with information collected from collateral sources." TThe DSM-IV's "Diagnostic Criteria" for ASPD looks for at least three of the following: (1) failure to conform to societal norms as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure, (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness, as indicated by repeated fights or assaults; (5) reckless disregard for the safety of self or others; (6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations; and (7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another." *Id*. Either government expert would opine (and Dr. Cunningham may have conceded) that there is no successful medical or psychological treatment for ASPD. The latter fact also would have further undermined Fell's claim that he had "matured" in prison.

ASP.  Dr. Cunningham's proposed testimony would have invited a discussion of that diagnosis, both on cross-examination and rebuttal.

Precisely that prospect is illustrated in *Lee*, *supra*, where Dr. Cunningham testified on direct during a capital penalty phase consistent with his proposed testimony in this case: that circumstances during the defendant's childhood, including abandonment by his father, abuse by his stepfather, and neglect by his mother, as well as early use of alcohol and drugs, predisposed him toward criminal behavior.  274 F.3d at 490.  On cross-examination, Dr. Cunningham was confronted with a variety of aggravating factors relating to risk assessment, a psychological diagnosis, and episodes of uncharged violence.  That cross-examination was permitted by the district court and approved on appeal.  *Id*. at 494-95.

> Even if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice.  By introducing a mental health expert in defense, Lee opened the door to testimony concerning psychological diagnosis.  Moreover, the FDPA provides for a broad scope of evidence at the penalty phase in a capital case.  The district court did not commit error in admitting testimony concerning psychopathy on cross examination.

*Id*. at 495.  *See also Barnette*, 211 F.3d 803, *supra* (permitting rebuttal evidence of psychopathy in response to mental health expert testimony by defense).

Counsel's strategic decision to argue Dr. Cunningham's thesis, instead of calling him as a witness, was apparent in the defense summation.  Introducing a detailed review of Fell's poor childhood, defense counsel told the jury:

> Now, we are going to talk a little bit now about generally the mitigating factors in, in Donnie's life.  What – what shaped it.  What shapes all of us.  What makes all of us who

-198-

we are and what guides our decisions day in and day out.

We decided, your common sense and its life experiences, don't need to be – don't need to be redefined, or told to you by an expert psychologist. We trust you. We trust you to make that correlation, your life experiences on your own because we all have them.

Tr. XII at 83.

Counsel also argued Dr. Cunningham's thesis in asserting:

But what damaging factors are present in Donnie's case? We know what they are. And we are going to talk about them and how they affect his choice, and what happens if his moral culpability falls, and that's why, that's why he's entitled to a life sentence, because his, his basis, his being, how he was created, how he was at the time of these murders, was so damaged.

*Id*. at 69.

During summation counsel displayed to the jury slides (or visual aides) prepared by Dr. Cunningham (and reviewed by the Court during preliminary hearings regarding Dr. Cunningham). After counsel reviewed the testimony of multiple defense witnesses who described Fell's childhood, counsel argued that it was that childhood that formed Fell and resulted in the murders. "This is a story of lost chances. [Y]ou could just imagine if Susan [Benczkowski] could have taken her little baby brother home and raised him in her house with her mother. . . . We wouldn't be here today. He would have been loved, cared for, nurtured, not abused."

In sum, Fell's decision to forego Dr. Cunningham's testimony certainly was based upon consideration of the nominal benefits, and substantial risks, of opening the door to potential cross-examination and rebuttal expert testimony. By withdrawing his Rule 12.2 notice Fell precluded the jury from hearing government mental health evidence that was predominantly aggravating in

nature. That was a reasonable strategic decision, even if it did not result in the verdict Fell

sought. The post-conviction claim that Fell was prejudiced as a result of his counsel's decision to

forgo mental health evidence simply cannot be sustained.

c.        Other Available Expert Testimony

Fell further claims that his trial counsel could have called Dr. Rabun, one of the original

government mental health experts. Both of the original government mental health experts were

on the witness list produced by Fell prior to jury selection. Therefore, Fell's trial counsel

considered this option, but again, made a reasonable strategic decision not to call Dr. Rabun, and

not to introduce mental health evidence. As discussed more fully in part V(7)(e), *infra*, any

benefit Fell could have derived from Dr. Rabun's testimony, or indeed from the testimony of any

of its mental health experts, would have been heavily outweighed by the government's mental

health evidence.

d.        The Stipulation

The government addressed this argument in Part IV(E)(1)(a).

e.        Even if Dr. Welner's testimony Had Been Excluded, Fell
          Would Have Withdrawn his 12.2 Notice

Fell's retrospective claim that he would have fared better at trial had counsel pursued his

motion to exclude Dr. Welner's testimony and not withdrawn his mental health case requires

evidence of resulting prejudice. *United States v. Miller*, 907 F.2d 994, 1000 (10th Cir. 1990);

*United States v. Rivera*, 900 F.2d 1462, 1472-74. (10th Cir. 1990) (en banc). Fell cannot make

such a showing.

-200-

In the penalty phase, the government was relying upon two mental health experts as possible rebuttal witnesses: Drs. Wetzel and Welner.  Both experts provided evaluations of Fell after the guilt phase verdicts.  Dr. Wetzel's supplemental evaluation was provided on June 27, and Dr. Welner's on July 5, 2005.  Both evaluations contained devastating information for the defense.  Although in his post-conviction petition Fell overlooks Dr. Wetzel's evaluation, it undoubtedly played a significant role in his decision to withdraw his Rule 12.2 notice.

The Court made very clear during trial that it would consider fully Fell's challenge to Dr. Welner's report at the scheduled July 11 *Daubert* hearing.  The Court directed the government to have Dr. Welner present for the hearing, and requested briefing.[34]  But the fact is, even if the defense had been successful at that hearing in excluding Dr. Welner's testimony in its entirety, which was unlikely, the June 27, 2005 report of Dr. Wetzel and his videotaped June 13, 2005 interview of Fell would have constituted highly damaging evidence if introduced in penalty.

> Based upon the June 13, 2005 interview of Fell, Dr. Wetzel concluded that Fell:
> – "Exaggerated the amount of alcohol used" on the night of the killings and "was not significantly impaired."
>
> – "was generally the leader in his relationship with Bobby Lee."
>
> – "was not under the influence of a severe mental or emotional disturbance at the time of the crimes."
>
> – was the victim of sexual abuse as a young child, but did not report any causal connection

---

[34]  "This is a brand-new area for me, and so we'll start . . . looking into it, but what I'm suggesting is that he [Dr. Welner] be here on Monday [July 11] . . . the jury will be coming back on Tuesday, and at that point we'll proceed, but I would like to address all of these issues."  Trial Transcript, Vol VIII, July 6, 2005, p. 72.

between the abuse and the murders, and "I agree – I also do not see a causal connection."

– was the victim of "repeated physical abuse as a young child," but "I do not believe there was a causal relationship between physical abuse and the murders of his mother and Mr. Conway," and "I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship."

– "meets the criteria for antisocial personality disorder fully. I have no doubt of this diagnosis."

Dr. Wetzel also concluded that:

– during childhood Fell's "mother made multiple ineffective attempts to control [his] behavior and guide him. He refused and she accepted this defeat perhaps too easily."

– "in my opinion with reasonable professional certainty, neither crack nor marijuana had any effects on the events of the day [of the murders]."

– there is "no sign of psychosis" and "no cognitive deficits detectable on neuropsychological testing."

*Id*.

In addition, through Dr. Wetzel, the government would have introduced his videotaped interview of Fell on June 13, 2005 supporting his conclusions, including Fell's portions of highly damaging statements, not the least of which concerned King's murder. Specifically, Fell claimed that he had only kicked Mrs. King two or three times in the torso, then averted his eyes as Lee inflicted the fatal injuries to her head. He contended that, given his lack of involvement in the killing, King's blood or DNA could not be on his boots. The presence of blood or DNA on his boots, Fell suggested, could be because he had "stepped in something weird" in another state. Fell's false denial and explanation was refuted by the DNA expert's testimony, and Dr. Baden's

-202-

testimony (who testified that all of King's injuries were inflicted on her head and neck). Fell

made many other very damaging statements during his interview, including descriptions of the

two episodes of prison violence proved false by the prison videotapes. Both government mental

health experts, Drs. Wetzel and Welner, were impressed with Fell's lack of affect and detachment

during his description of the three killings. *See* Report of Dr. Richard Wetzel, P. Exhibit 7 at 2

("His statements to the police do indicate a remarkable lack of empathy for the emotions and

thoughts of other people, both investigators and victims."); Report of Dr. Michael Welner, P.

Exhibit 10 at 67 (Fell has demonstrated no more than superficial remorse for his actions).

Therefore, the record indicates that Fell's trial lawyers elected to forego mental health

testimony, not just to avoid the testimony of Dr. Welner, but also to avoid the testimony of Dr.

Wetzel. Indeed, as discussed above, Fell withdrew the testimony of Dr. Mills, before receiving

Dr. Welner's report. Dr. Wetzel would have undermined several defense mitigators, and also

opined that Fell had ASP. The latter diagnosis alone would have been devastating.[35] *See Darden*

*v. Wainwright*, 477 U.S. 168, 186-87 (1986) (counsel's decision not to present character or

mental-state evidence in mitigation was sound trial strategy because the mitigating evidence

---

[35] Fell's appellate counsel, capital litigation expert Professor John Blume, has written several articles on how ASP is a diagnosis to be avoided in capital trials. *See* John H. Blume & David P. Voisin, "Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder," 24 Champion 69 (Apr. 2000) (antisocial personality disorder diagnosis "can be the kiss of death, because to many people, and most judges, this means that the defendant is little more than a remorseless sociopath").

would have opened the door to damaging rebuttal evidence, which included a psychiatric opinion that the defendant had a sociopathic personality.); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (ASP diagnosis may be "potentially more harmful to [a] petitioner than [helpful]"). Trial counsel's strategic decision cannot be deemed to have been unreasonable.

Even if the Court were to determine that trial counsel's decisions to withdraw his mental health case and not to pursue his motion *in limine* to exclude Dr. Welner's testimony were unreasonable, Fell cannot show that there is a reasonable likelihood, in the absence of said errors, that the outcome of the trial would have been different.

**VI.    The Government Did Not Commit Misconduct and Trial Counsel Was Not Ineffective In Failing To Investigate Further Two Prior Acts of Violence by Fell**

Fell asserts that the government introduced evidence of two prior acts of violence in the penalty phase prior to the Rutland killings: an accidental shooting of his friend, John Gacek, when Fell was 11 years-old ("the Gacek shooting"), and his beating of a young man, Christopher Eike, in Woodstock, N.Y., three months prior to the capital murder ("the Eike assault"). However, it was Fell who introduced evidence of the Gacek shooting through his hospitalization records, which were included in his Mitigation Binder. *See* MB, Tab 25 at 1. In addition, the Eike assault was first mentioned by Fell himself in his post-arrest interview, and was inquired into by the government during the cross-examination of Teri Fell, a defense witness. Neither of these two incidents formed part of the government's case-in-chief in penalty and neither supported an aggravating factor alleged by the government.

Fell contends that the government's arguments and factual assertions during final summation with regard to these two incidents were false and that trial counsel was ineffective in failing to investigate these two incidents further and to correct the record. Fell further claims that he was prejudiced as a result because the jury failed to find "a number of critical mitigating factors, and gave fatal weight to aggravating factors." Neither claim has any merit.

A.    Trial Counsel Conducted a Reasonable Investigation of the Gacek Shooting

Fell's hospitalization records indicate that he was admitted to Wilkes-Barre General Hospital on April 14, 1992, two weeks shy of his 12th birthday and three days after shooting a friend, John Gacek, with a handgun. The summary of the events contained in the hospital records makes clear that the shooting was accidental.

> Three days ago, Donald and his friend were playing with a 9mm. police handgun which belonged to the other boy's father. The gun went off while Donald was holding it and the other boy was hit in the shoulder. Fortunately, he suffered no major injury; a few inches; and the other boy would have been dead with a bullet in his heart. The patient shows no remorse and even threatens to shoot his mother.

MB, Tab 25 at 1. The hospital records also reference other instances of violence by Fell, including punching his sister's 11 year-old girlfriend and chasing his mother with a curtain rod. In addition, according to his mother, Fell kept knives in his room, and she was fearful that he would use them on her. Fell received a preliminary diagnosis of atypical depression and disturbance of conduct and remained in the hospital until May 2, 1992. While hospital records indicate that Fell remained defiant and oppositional during his first week at the hospital, they also indicate that Fell later apologized to his mother for his behavior and expressed sincere remorse

-205-

for shooting his friend.

> During his family sessions, his mother confronts him with his behavior problems. At first he was oppositional and defiant but later on he became very cooperative and apologized profusely to his mother for his prior disrespectful behavior. When confronted with the shooting of his friend, he cries and seems to show genuine remorse.

*Id*. at 2. By the end of his hospital stay Fell was doing significantly better. The hospital records again note:

> He seems genuinely sincere about listening to his mother who seems able to set firm limits. Donald says he will never play with guns again. His friend forgives him for shooting him. *Donald seems to greatly regret the incident* whereas as at first he bragged about shooting the other boy. . . . At the time of discharge, *patient showed genuine remorse* for shooting his friend.

*Id*. (emphasis added). Therefore, the hospital records made clear that Fell was remorseful for shooting Gacek.

Hence, contrary to Fell's claim in his petition, trial counsel placed before the jury evidence that established the circumstances of the shooting – that it took place while Fell was playing with a handgun and that the discharge was accidental. Nothing in the information presented to the jury indicated that Fell "deliberately" shot his playmate. The only evidence of deliberateness that could have been surmised by the jury actually came from Fell himself, who, during his post-arrest statements, described the Gacek shooting as an accident, but admitted that he had intentionally pulled the trigger, though not intending to hit his friend.

> What happened was we were little kids and he said you want to see my dad's gun, and I said yeah? So we looked at his dad's gun and I mean his dad kept the gun in the kids' bedroom door, loaded with two little clips, and it wasn't even on safety. I took the clip out and pointed at the wall and I didn't know nothing about guns or

-206-

anything about one being in the chamber or anything like that you know what I mean. I pulled the trigger and he jumped in the way and it went through his shoulder.

P. Exhibit 62 at 44. Trial counsel also placed evidence before the jury that established that after treatment and counseling Fell expressed sincere remorse for the shooting.

### 1. Trial Counsel Was Not Ineffective In Failing to Investigate Further the Gacek Shooting

Notwithstanding the evidence presented at trial, Fell claims that his trial counsel was ineffective in failing to investigate further the Gacek shooting. According to Fell, John Gacek, his mother, Adele Gacek, her boyfriend, Ernie Schudalski, and Gacek's father, Kenneth Gacek, all would have spoken to trial counsel if he had called upon them. But a review of the declarations provided by each of these individuals reveals nothing more about the Gacek shooting than what trial counsel already knew from Fell's statements and hospital records. *See* Declaration of John Gacek, P. Exhibit 251, at 4-5; Declaration of Adele Gacek, P. Exhibit 252 at 4; Declaration of Ernie Schudalski, P. Exhibit 252 at 2.[36] These witnesses would have simply provided the same information that was presented to the jury, but from a different point of view. *See* section III(B)(1)(b)(I).

Fell tries to bring this incident within the purview of *Rompilla*, *supra*, where the Court held that trial counsel's failure to review the case file pertaining to a conviction that the government would rely on as an aggravating factor was unreasonable. 545 U.S. at 390-91.

---

[36] No declaration for Kenneth Gacek was submitted by Fell.

However, Fell's case can be distinguished in two very significant ways. First, the Gacek shooting was not being used by the prosecution as an aggravating factor in the penalty phase. The government relied on three statutory aggravating factors in penalty: that the death of Teresca King occurred during the commission of a kidnapping; that Fell committed the offense in an especially heinous, cruel or depraved manner in that it involved physical abuse to Teresca King; and that Fell attempted to kill more than one person in a single criminal episode. *See* Special Verdict, Dkt. No. 200. Clearly the Gacek shooting by Fell at age 11 would not have been even arguably admissible to prove any of the three statutory aggravating factors, and indeed, the government did not submit evidence of the Gacek shooting in its case in chief in penalty. The government also relied on four non-statutory aggravating factors: that Fell committed the abduction of Teresca King to facilitate his escape from an area where he and his accomplice had committed a double murder; that Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities; that Fell participated in the murder of Teresca King after substantial planning and premeditation to commit the crime of carjacking; and that Fell caused loss, injury and harm to the family of Teresca King. Again, the Gacek shooting by Fell at age 11 would not have been admissible to prove any of the four non-statutory aggravating factors and the government did not rely on it. Therefore, trial counsel would have only had to deal with evidence of the Gacek shooting if he presented evidence of it in penalty, which he did.

Second, trial counsel here was aware of the relevant facts surrounding the Gacek shooting

-208-

both from hospital records and from the statements of Fell himself. These two sources of information provided trial counsel with the circumstances of the offense and Fell's actions immediately thereafter. There was simply no need to investigate further.

2.   Trial Counsel's Performance Was Not Deficient and Fell Suffered No Prejudice

Fell claims that he was prejudiced by his counsel's failure to investigate the Gacek shooting further. But as demonstrated above, further investigation by trial counsel would not have revealed additional evidence or changed the profile presented to the jury at sentencing. Fell further claims that he was prejudiced by his counsel's failure to correct the record with regard to the fact that the Gacek shooting was accidental and that Fell was remorseful. But again, as demonstrated above, the record is clear on both of these factors. That counsel could have submitted additional (cumulative) evidence, but did not, is insufficient to establish prejudice.

Fell also argues that the government used the Gacek shooting to impress upon the jury that he was a violent and not a remorseful person. In the wake of the three 2000 murders, that argument was fully supported by the evidence. Moreover, Fell's increasing violence was established by numerous other examples in the hospitalization records. His summary discharge from his first hospitalization on October 30, 1991, stated that one of Fell's problems was behavioral. He was reportedly "assaultive, combative, destructive, oppositional, defiant, impulsive, and running away." MB, tab 22 at 4. Fell was hospitalized a second time after the Gacek shooting. MB, Tab 25 at 1. Upon his admission it was noted that "[t]he patient shows no remorse and even threatens to shoot his mother." *Id*. The records also referenced other instances

-209-

of violence by Fell, including punching his sister's 11 year-old girlfriend and chasing his mother with a curtain rod.  In addition, according to his mother, Fell was keeping knives in his room and his mother was fearful of him.  *Id.*  During his third hospitalization, Fell was found to be "impulsive, demanding [and] manipulative. . . .  He is defiant and oppositional toward authority . . ."  MB, Tab 29 at 1.  Fell was psychiatrically hospitalized a fourth time for increasing violent behavior and depression.  MB, Tab 30 at 1.  Fell admitted throwing a fork at a friend, though he claimed not to have intended to hit anyone and was staying out beyond his curfew contrary to his mother's directions.  MB, Tab 32 at 1-2.  Therefore, the government's argument that Fell was becoming increasingly violent was fully supported by Fell's own evidence.

Nothing in the evidence proposed by Fell post-conviction would have detracted from the government's argument or contradicted it beyond the hospitalization records or Fell's own statements.  Moreover, calling additional witnesses to testify about the Gacek shooting would have shifted the focus of the jury away from Fell's detrimental childhood and onto his increasingly violent conduct.  This would have been wholly inconsistent with Fell's trial strategy.  Therefore, even if the court were to determine that trial counsel's failure to investigate the Gacek shooting further was unreasonable, Fell cannot establish prejudice.  Nothing about the newly proffered evidence leads to the conclusion that, but for trial counsel's error, a reasonable probability exists that Fell would have received a more favorable verdict.

B.    The Government Did Not Misrepresent Eike's Condition or
Withhold Evidence and Trial Counsel Was Not Ineffective in
Failing To Investigate Further the Eike Assault

During the testimony of FBI Special Agent Jimmie Caudle, on the second day of trial, the

government asked Agent Caudle to tell the jury about the statements Fell made during his first

post-arrest interview with law enforcement.  Among the things that Fell mentioned was the Eike

assault:

> Fell also advised that, that he had gotten into some legal trouble at the most recent
> Woodstock Festival.  Lee had accompanied Fell to the, to the Woodstock Festival.
> And there was an incident where, as Fell described it, he quote beat the shit
> unquote or end quote out of an individual who he said was trying to rape his sister.
> Lee advised that he put the guy in a coma for about a day and that charges were
> eventually dropped against Mr. Fell.

Tr. II-1 at 3.  No further mention of this incident was made during the guilt phase of the trial.  In

addition, as with the Gacek shooting, the Eike assault did not form part of the government's case-

in-chief in penalty, nor did the government rely on this incident to prove any of its aggravating

factors.

In the penalty phase, the defense called Fell's sister, Teri Fell, to the stand.  Consistent

with their trial strategy, the defense solicited testimony from Teri Fell about her and Fell's

horrific childhood, providing examples of alcoholism, physical abuse, neglect and abandonment.

In cross-examination the government inquired about Fell's violence, including the Eike assault.

Q    Was there a time when you also saw your brother be very angry and use his feet?
A    What -- I'm not sure what you are referring to?
Q    Did you ever see him kick someone violently?
A    Yes.
Q    What did you see him do?

-211-

A       He beat a kid up and he was kicking him.
Q       How serious was it?
A       It was pretty serious.
Q       Did the kid go into shock and into a coma?
A       Yes, he did.

Tr. VII-1 at 144.

Q       And in terms of what your brother did to this person, did he do anything other than stomp on the person?
A       He punched him.
Q       Did he urinate on him?
A       Yes.

*Id*. at 151.

On redirect, the defense established that Fell, his sister, Bobby Lee, Eike and a few more people had driven up to Woodstock for the yearly festival and were doing drugs. Teri Fell stated that they were doing acid and mushrooms and that Eike was not reacting well to the drugs. *Id*. at 153.

A       He was freaking out a lot, and he was hanging on me, and he kept trying to kiss me and he kept hanging on me and I kept asking him to leave me alone.
Q       Was he grabbing your body with his hands?
A       Yes.

*Id*. According to Teri Fell, she told Eike that if he did not stop, she would have Donnie beat him up. *Id*. a154. Eike did not stop, and then Fell asked him to stop and, according to Teri Fell, Eike punched Fell in the face and the fight started. *Id*. at 154-55. Teri Fell testified that Eike was hurt very badly. *Id*. at 155. Trial counsel then focused his inquiry on Fell's conduct after the assault.

Q       When the police asked who did it, did Donnie deny it?
A       No, he didn't.
Q       Did he resist the police?

-212-

> Q       No.
> Q       Did he run away from the police?
> A       No.
> Q       Did he tell them what he had done?
> A       Yes.
> Q       Did he get -- did he go into custody?
> A       Yes.
> Q       And do you remember what day of the week that was?
> A       No, I don't.
> Q       Do you remember whether or not he went to jail for that?
> A       Yes, he did.

*Id*. at 155-56. The government did not cross-examine Teri Fell with regard to the alleged motive

for the assault on Eike, but asked again about the manner in which Fell had committed the assault.

> Q       Was it clear that the person was defenseless?
> A       Yes.
> Q       And he kept kicking him?
> A       Yes.
> Q       Now, he began to shake, right, on the ground because of the shock?
> A       Yes.
> Q       And so at that point, he was unconscious and trembling on the ground?
> A       Um hum.
> Q       And your brother urinated on him?
> A       Yes.

*Id*. at 159.

The prosecution used the Eike assault to argue against giving weight to the mitigating

factor that claimed that Fell was 20 years-old when he committed the capital crimes.

> Yes, he was 20, ladies and gentlemen.  He was an adult.  If you want to know what kind
> of an adult he was, want to know what kind of person he is?  Look at those videos from
> prison.  That's Donald Fell.  That's the man that he was.  And if you have any questions
> about whether he was a man when he committed those crimes, think back about the
> testimony from Teri Fell.  You remember when I cross examined her about an incident
> that occurred in August of 2000?  August of, just a few months before the crimes in this
> case.  What did she tell you?  Donald Fell committed a horrible, violent assault on a

-213-

person the same way he then later killed Terry King. He did it intentionally. He did it violently. And he did it with the utter depravity that you have heard about in this case. He did it in that case. Remember what he did after he beat that man with his feet into a coma. Those are the acts of a man.

Tr. XII at 60. No other mention of the Eike assault was made in closing summation. And it is significant that the emphasis of the government's argument was not on the resulting injuries, but on the manner in which the assault was committed – "*[a]nd he did it with the utter depravity* that *you have heard in this case*" – bringing the jury's attention to what Fell did after he assaulted the young man. Of course, the evidence had shown that Fell urinated on his victim after the assault.

In rebuttal, the government again made reference to the Eike assault in support of its argument that Fell was an extremely violent person who showed little if any remorse:

> There's another thing that distinguishes Donald Fell from other murderers. And that is his over-the-top violence, and his disdain for his victims after he subjected them to that violence. It wasn't enough for Fell to kill one person. Three had to die. And they all died hard. It wasn't enough for him, in New York, in August 2000, to knock that guy down and to stomp him into a coma. Then he urinated on him as the guy lay convulsed. It wasn't enough for him to chill -- kill Charlie Conway; had to stab him 50 times and cut his throat. It wasn't enough for him to see his mother murdered, right next to him in the same room, right next to Charlie Conway. She was stabbed 40 times. And then she said, "I love you, Binker," with her dying breath, before her throat was cut back to her vertebrae. And it wasn't enough for Fell to kill Terry King. He had to stomp her, he had to kick her, he had to watch his friend Bobby Lee beat her head with a rock. And when they were done with her, wiped his boots on her. Again, it is amazing.

*Id*. at 124.

Fell claims that the government's characterization of how he left Eike, in a "coma," was false. Yet it was Fell who first that word to characterize the condition of his victim, and his sister Teri used it as well in her testimony. The Merriam-Webster Dictionary defines "coma" as a state

-214-

of profound unconsciousness caused by, among others, injury. The record shows that Fell and

Lee kicked Eike until he lost consciousness and was unresponsive. Teri, an eye witness to the

assault, so testified. Similarly, the first officer responding to the scene described Eike's condition

as follows:

> The victim was incoherent, shaking, and had contusions and deformities on his
> face. I requested an ambulance respond to the scene. I asked the victim his name
> and got no response from him and bystanders told me his name was Chris. I began
> to treat the victim for shock. Applied 15 LPM O2 via nonrebreather. Covered
> patient with emergency blanket. Victim began to make noise. I asked him where
> he hurt and he said he couldn't feel his body.

P. Exhitit 56; Fell-00000928 (emphasis added). Hence, the government's characterization of

Eike's state as a coma, consistent with Teri Fell's and Fell's characterizations, was not false.

That Eike later regained consciousness does not negate his unconscious state immediately

following Fell's assault.

Moreover, Fell's trial counsel was not ineffective in failing to investigate further the Eike

assault. Fell's and Teri Fell's statements provided counsel with the information he needed to

confront this evidence. In addition, any attempt to argue that Eike's injuries were not as serious

as they appeared would have been wholly inconsistent with Fell's defense strategy to portray Fell

as a remorseful individual, who had accepted responsibilities for his actions.

### 1. Background

#### a. Pre-Trial

The government does not dispute that trial counsel was aware of the Eike assault from the

beginning of the case as Fell described the assault during his post-arrests statements, including the

-215-

claim that Eike had tried to rape Teri. *See* P. Exhibit 57. The government also disclosed to the defense a copy of the New York State Incident Report, as well as statements given by Fell and Lee to the Sullivan County Sheriff's Department. P. Exhibits 84 and 86. Trial counsel also interviewed Teri about the incident. Moreover, the defense investigator obtained a copy of the Certificate of Disposition for Fell. P 184-85. In addition, the government provided copies of statements given by Teri Fell, Lee's brother Anthony Tonte, and Lance Rowland following the incident and copies of the charge sheet and the Certificate of Disposition for Lee. P 184 note 57. The government also provide trial counsel with a report of interview of Christopher Eike. Eike confirmed that he was beaten unconscious and came to in the ambulance on the way to the hospital. *See* P. Exhibit 129. Therefore, trial counsel had sufficient information about the Eike assault to prepare to confront evidence of it at trial.

b.    Trial

As stated above, the only mention of the Eike assault during the guilt phase of the trial was by FBI Special Agent Caudle who summarized Fell's first post-arrest statement to the jury. Fell also described the Eike assault during later post-arrest interviews. During the penalty phase, the government cross-examined Teri Fell about this incident. On cross-examination, Teri admitted that Fell punched and kicked Eike violently and that he went into a shock and coma, Tr. VII-1 at 146, and that Fell urinated on Eike as he lay unconscious on the ground. *Id.* at 151. Fell's trial counsel clearly established on re-direct that Fell's assault on Eike was provoked by Eike's unwanted sexual advances towards Fell's sister Teri. *Id.* at 153-54. Trial counsel also

-216-

established that Fell accepted responsibility for his actions. *Id*. at 155.

c.    Post-Conviction

Fell argues post-conviction that there was more documentary evidence – notes and reports from the Sullivan County Sheriff's Department, Eike's medical records and Eike's criminal records – regarding the Eike assault that was neither produced by the government nor obtained by trial counsel. Fell claims that these documents would have demonstrated that Eike's injuries were not serious and would have corroborated Teri Fell's claim that the assault by Fell was provoked by Eike's unwelcomed sexual advances towards Teri. The government does not dispute the existence of such documents. However, Fell fails to demonstrate that these additional documents were in the hands of the government – they were not. The FBI ran an NCIC criminal record check on Eike, which revealed that in July 2001 Eike was arrested by the Pennsylvania State Police for indecent assault and corruption of minors. *See* Exhibit __ attached hereto. The NCIC did not list a disposition, but it appeared that Eike had been sentenced to a term of probation. *Id*. The government, however, did not have any documents pertaining to Eike's criminal record, such as affidavits, certificate of disposition, etc. In any event, the additional information contained in these documents would not have changed the character of the evidence submitted at trial.

2.    The Government Did Not Fail To Disclose Favorable Evidence and<br>Trial Counsel's Decision Not To Investigate Further Was<br>Reasonable

Fell claims that the government failed to disclose Eike's criminal record, which he claims was favorable evidence, and trial counsel failed to investigate the Eike assault further in violation

-217-

of his constitutional rights.

        a.  The Government Did Not Fail To Disclose Evidence and Trial Counsel Did Not Fail To Investigate

           i.  The Government Did Not Fail to Disclose Brady Evidence

The record completely belies the allegation that the government failed to disclose favorable evidence in violation of *Brady*. There is no evidence whatsoever that the government was in possession of any of the documents obtained by Fell post-conviction, to wit, notes from the Sullivan County Sheriff's Department, Eike's medical records and documents pertaining to Eike's criminal record.

In *Brady v. Maryland*, the Court held that the government has an obligation to disclose evidence that is favorable to the accused and material to guilt or punishment. 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To establish a *Brady* violation, petitioner must establish three elements: 1) that the evidence at issue was favorable, either because it was exculpatory, or because it was impeaching; 2) the evidence must have been suppressed by the government; and 3) prejudice must have resulted. *See Stickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Without addressing the first element of the *Brady* inquiry, which we do not concede, it is clear from the record that the government was not in possession of the documents obtained by Fell post-conviction. Indeed, Fell makes not attempt to demonstrate otherwise. It is well-

-218-

established that the government has no obligation to disclose evidence not in its possession. Therefore, Fell has failed to demonstrate a *Brady* violation.

Fell also argues that because "the Government argued the supposed gravity of that offense as a reason for which Mr. Fell should be sentenced to death, any evidence to the contrary was favorable to Mr. Fell's sentencing." P 192. This is simply not true. The Eike assault was not an aggravating factor that the government relied on to request a sentence of death. During the cross-examination of Teri Fell the government inquired about the Eike assault in order to demonstrate that, not withstanding the mitigating background evidence, Fell was an extraordinarily violent man long after his mother abandoned him. In its closing summation the government made a single reference to the Eike assault when arguing against the weight of mitigating factor number 16, which claimed that Fell was 20 years old at the time of the offense. The emphasis of the government's argument was not on the resulting injuries, but on the manner in which the assault was committed – "[a]nd he did it with the utter depravity that you have heard in this case" – bringing the jury's attention to what Fell did after he assaulted the young man, that is, urinating on him.

Last, in rebuttal the government again made reference to the Eike assault in support of its argument that Fell was an extremely violent person who showed no remorse. Again, this argument was consistent with the government's trial strategy to portray Fell as violent and remorseless. The Eike assault was thus evidence that weighed against a mitigating factor and rebutted mitigation evidence.

-219-

ii.    Trial Counsel's Investigation of the Eike Assault
Was Reasonable

The additional information proffered by Fell post-conviction would not have changed

Fell's trial strategy; therefore, trial counsel's decision not to investigate the Eike assault further

was reasonable.  *See* Section VI(B)(1)(a), *supra*.

b.    The Additional Information Proffered by Fell Post-
Conviction Is Not Material and Fell Suffered no Prejudice

First, Fell makes much about the fact that the government characterized Eike's condition

after he was assaulted by Fell as a "coma," and claims that this statement by the prosecutor was

false.  But as stated above, a "coma" is defined as a state of profound unconsciousness, which can

be caused by injury.  The record indicates that Fell definitely beat Eike to the point where he lost

consciousness and was unresponsive.  Hence, the government's adoption of Fell's own

characterization of Eike's state as a "coma" was not false.

More importantly, examining Terry Fell further about whether or not Eike was actually

beaten into a coma, or calling other witnesses to the stand to establish whether Eike was beaten

into a coma or not, or for how long he remained unconscious, would have been wholly

inconsistent with Fell's defense in penalty, not to mention strategically self-destructive.  From the

beginning of the trial, a key component of Fell's theory was that he was remorseful and had

accepted responsibility for his actions immediately upon arrest, and continued to accept

responsibility at trial.  Whatever trial counsel could have accomplished with regard to

establishing that Eike was not left in a coma, he could not have established that Fell did not punch

-220-

Eike; he could not have established that Fell did not kick Eike with combat boots, continuing to kick Eike even after he was on the ground defenseless; he could not have established that Eike did not go into shock and lost consciousness as a result of Fell's assault; and he could not have established that he did not urinate on Eike. Therefore, the only issue trial counsel could have contested was for how long Eike lost consciousness and whether it had been long enough to be called a "coma." Extending the testimony and discussion of this incident merely to establish this last point was simply not in the best interest of Fell during the penalty phase. While trial counsel might have perhaps won a small battle, he could have never won the war. The fact is that, just three months before the brutal murder of Terry King, Fell had beaten another individual, in the same manner as he beat Terry King to death, to the point where that individual lost consciousness and had to be taken to a hospital. Contesting the use of the word "coma" would have prolonged the discussion of the incident and opened the door for the government to bring in the description of the victim's injuries. To illustrate our point, the first officer who responded to the scene described the victim's injuries as follows:

> The victim was incoherent, shaking, and had contusions and deformities on his face. I requested an ambulance respond to the scene. I asked the victim his name and got no response from him and bystanders told me his name was Chris. I began to treat the victim for shock. Applied 15 LPM O2 via nonrebreather. Covered patient with emergency blanket. Victim began to make noise. I asked him where he hurt and he said he couldn't feel his body.

P. Exhitit 56; Fell-00000928.

Indeed, trial counsel strategy was clearly to shift the jury's focus from the assault to Fell's acceptance of responsibility. On re-direct, he asked Teri Fell,

-221-

Q       When the police asked who did it, did Donnie deny it?
A       No, he didn't.
Q       Did he resist the police?
A       No.
Q       Did he run away from the police?
A       No.
Q       Did he tell them what he had done?
A       Yes.
Q       Did he get -- did he go into custody?
A       Yes.
Q       And do you remember what day of the week that was?
A       No, I don't.
Q       Do you remember whether or not he went to jail for that?
A       Yes, he did.

Tr. VII-1 at 155-56.  There was nothing unreasonable about trial counsel's strategy.  Moreover,

there is no reason to conclude that the outcome of the trial would have been different had counsel

challenged the use of the word "coma," or introduced medical evidence of Eike's injuries.  Fell

clearly suffered no prejudice.

### 3.       The Government Did Not Engage in Prosecutorial Misconduct

Fell also claims that the government's characterization of Eike's condition as a "coma" in

final summation and rebuttal was false and constituted prosecutorial misconduct.  First, for the

reasons set forth above, the government submits that its characterization was not false.  Second,

any such claim is procedurally barred as Fell could have, but failed to raise this claim on direct

appeal.  He cannot show any cause for having failed to raise this claim on direct appeal, much less

make a showing of resulting prejudice.

4.    The Government Did Not Withhold Evidence That Eike Was A <u>Sex</u> <u>Offender and Trial Counsel's Failure to Investigate Further In That</u> <u>Regard Was Not Unreasonable</u>

a.    <u>Allegation of Non-Disclosure and Failure to Investigate</u>

i.    <u>The Government Did Not Fail to Disclose Evidence</u> <u>that Eike Was a Sex Offender</u>

Fell further argues that the government withheld evidence pertaining to Eike's criminal history indicating that he was a convicted sex offender. The government did conduct an NCIC check that indicated that Eike had been arrested for indecent assault and corruption of minors. *See* Exhibit F. The NCIC did not provide a disposition, but it appeared Eike was sentenced to probation. That information, however, was not included in the report of interview of Eike provided to the prosecutors, and as result, not conveyed to the defendant. *See* P. Exhibit 128.

First, the government submits that this claim is procedurally barred as Fell could have, but failed to assert this claim on direct appeal. The government disclosed an interview report dated June 15, 2005, prior to trial. That interview report indicated that Eike was in prison at the State Correctional Institute in Pennsylvania. Clearly then Eike had been arrested and convicted of a crime. That was sufficient information for Fell to be placed on notice that Eike had a criminal record. If not at trial, certainly on direct appeal Fell was in a position to raise this claim.

Second, even if the court were to consider Fell's claim of non-disclosure on the merits, Fell cannot establish a *Brady* violation. Eike's prior conviction for a sex offense was not favorable evidence. Eike was not called as a witness at trial; therefore, the information had no impeachment value. Moreover, Fell was not aware that Eike had a prior conviction for a sex

-223-

offense when he viciously attacked him in August 2000; therefore, the information had no exculpatory value. Since the information was inadmissible, Fell was not prejudiced by its non-disclosure.

Even if Fell's trial counsel would have learned of Eike's criminal record prior to trial, there is no basis to conclude that such information would have significantly impacted trial strategy. As demonstrated above, Fell's strategy was to demonstrate remorse and acceptance of responsibility to the jury. Therefore, any attempt to justify his criminal conduct towards Eike by introducing evidence of Eike's prior conviction for a sex offense – of which Fell was ignorant at the time of the assault – would have been inconsistent with that strategy. In addition, the depravity of Fell's actions – beating a defenseless individual, kicking him while on the ground until he was unconscious and then urinating on him – would not have been reduced by any criminal history Eike might have had. Simply because a victim is a sex offender does not mean that others are free to beat him to unconsciousness and urinate on him. There is no reason whatsoever to think that if the jury had known that Eike was a sex offender the outcome of the case would have been different.

ii.    Trial Counsel Did Not Fail to Investigate the Eike Assault

Fell's instant argument that further investigation by trial counsel would have revealed that Eike was a sex offender, and that this evidence would have corroborated Teri Fell's testimony as to the motive for the assault, is similarly without merit. Teri Fell's testimony with regard to the motive for the Eike assault was uncontested. In addition, as stated above, justifying Fell's actions

-224-

by introducing evidence of Eike's criminal record would have been inconsistent with Fell's trial strategy.  Moreover, regardless of Eike's record, it was clearly irrelevant to Fell's actions since Fell was unaware of it.  That is, Fell did not attack Eike because he was a sex offender, hence that fact was irrelevant.

Trial counsel wisely recognized that extended discussion of the Eike assault was not in his Fell's best interest.  Accordingly, counsel highlighted the only positive inferences to be drawn from the event: Fell's motive to defend his sister and his acceptance of responsibility.  This strategy was reasonable.  There is no reason to think that learning of Eike's criminal history would have altered this strategy.  There is also no basis to conclude that the evidence of Eike's criminal conviction would have in any way affected the outcome of the case.

### VII.    The Government Did Not Fail To Disclose Evidence of Fell's Conduct in Prison and Trial Counsel Did Not Fail To Investigate

Mitigating factor number five claimed that Fell "does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release."  Mitigating factor number six claimed that Fell had made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances. In response to Fell's evidence in support of those mitigating factors, the government submitted in rebuttal the testimony of David Duncan, a prison expert, Fell's disciplinary record (Government Exhibit 15), a lawsuit filed by Fell while in custody (Government Exhibit 16), and two videotapes of altercations between Fell and correctional officers.  *See* Government Exhibits 18 and 19.

In its closing summation the government used this evidence to argue that Fell's conduct in

-225-