prison was not getting better as urged by defense expert Aiken, it was getting worse.[37]  Indeed,

Fell's disciplinary record in prison revealed that Fell's violations had significantly increased over

the previous year.  *See* Government Exhibit 15.  The prosecutor referenced the testimony of Fell's

prison consultant, James Aiken, who testified that Fell was maturing in prison.  Tr. IX-2 at 61.  In

an effort to discredit Aiken's testimony, the government referenced Fell's conduct as depicted in

the prison videos.

> And could you believe when Mr. Aiken told you that Donald Fell was maturing in
> prison?  Maturing in prison?  You saw him on those videotapes.  Those are the
> same videotapes that Mr. Aiken saw.  He is maturing?

Tr. XII at 46.  The government further argued that Fell had made no significant contribution to

the Northwest Correctional Facility, but had instead tried to disrupt and manipulate the system.

> Let's move on to the next factor, ladies and gentlemen.  This one's good:  Donald
> Fell has made positive contributions to the Northwest Correctional Facility by
> working, gaining an education, and helping to resolve inmate grievances.  Let's get
> real.  You saw those videotapes.  What positive contributions has this man made to
> the Northwest Correctional Facility?  Yes, you heard from Mary Jo Scott.  He
> studied for a G.E.D., and he's read some novels while he is in prison.  That's it.
> You heard from Jason Rushlow he worked in the laundry.  Okay, okay.  They want
> to claim that he is a positive contribution in resolving grievances?  You heard from
> Jason Rushlow.  The man generated grievances.  Are you kidding me?  You saw
> the lawsuit.  You can read it for     yourself when you go back there.  This man
> signs up for bible study, and then files a lawsuit claiming to be American -- a
> Native American.  He files a lawsuit so that he can practice his Native American
> religion on the yard.  It's bogus, ladies and gentlemen.  You know it's even more
> bogus because, believe it or not, he observes Ramadan as a Muslim.  Ladies and

---

[37]  Fell again asserts that the government argued that because he represented a risk to
others in prison he should be put to death.  P. at 206.  This is not correct.  The evidence of his
conduct in prison was submitted in opposition to mitigating factor number five.  What the
government argued was that the jury should not accord weight to mitigating factor number five.

gentlemen, what do you see from this? He's still manipulating even from prison. That's who he is. He hasn't changed. He won't change. Gotten more violent in prison. Ladies and gentlemen, that's not proven.

*Id*. at 47-48.[38]

Fell now claims post-conviction first that Officer Marc Pelkey, an officer assaulted by Fell on March 17, 2004, had "a reputation for and history of violent behavior at the prison and in fact attempted to assault Mr. Fell during this incident." P. at 206. Fell alleges that the government's failure to disclose Officer Pelkey's history of misconduct was a violation of *Brady*.   As stated above, under *Brady*, the government has an obligation to disclose evidence that is both favorable to the accused and material to guilt or punishment. 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Therefore, to establish a *Brady* violation, petitioner must establish three elements: 1) that the evidence at issue was favorable him, either because it was exculpatory, or because it was impeaching; 2) the evidence was suppressed by the government; and 3) prejudice resulted. *See Greene*, 527 U.S. at 281-82.

Fell cannot establish any of these three elements. First, the evidence at issue was not favorable to Fell because it was not exculpatory. Fell argues that if the jury had heard this evidence, it would have explained Fell's aggressive reaction towards Officer Pelkey and refuted

---

[38] Again, the government clearly argued that mitigating factor number six had not been proven and warranted no weight.

the government's argument that Fell was uncontrollable. At the outset, the videotaped altercations clearly show Fell instigating confrontations with multiple corrections officials, not just Pelkey. In any event, Fell makes no effort to demonstrate to what extent, if any, he was aware of Officer Pelkey's history of alleged misconduct or reputation. On the contrary, he asserts that he was not aware of it because the government failed to disclose it and his counsel failed to investigate. Pelkey's prior conduct or reputation would have been relevant to explain Fell's aggressive reaction only to the extent that Fell was aware of it. Given that Fell was unaware of it, it could not have contributed to his reaction. The evidence also offered no impeachment value since Officer Pelkey was not a witness at trial. Hence, Fell fails to show how the evidence at issue was favorable, much less material.

Second, Fell cannot show that the government suppressed the information, because he cannot show possession. The government was not aware of Pelkey's history of misconduct as it was never in possession of his personnel file – a file maintained by the State of Vermont's Department of Corrections. Significantly, in his sworn declaration, Officer Pelkey does not assert having informed the government of his disciplinary history. *See* P. Exhibit 256.

Third, Fell suffered no prejudice. The entire videotape depicting the confrontation between Fell and multiple correctional officers on March 17, 2004, was submitted into evidence. *See* Government Exhibit 18. Therefore, the jury had an opportunity to observe first hand the actions of Fell, Officer Pelkey and all the other officers involved in that incident. Even assuming, arguendo, that Officer Pelkey did in fact have a reputation for violent conduct of which Fell was

aware, the jury was able to see and judge both the actions of Fell and Officer Pelkey. It is clear from the videotape, and the testimony of Officer Greg Machia, who identified the videotape for the jury, that Officer Pelkey did absolutely nothing on March 17, 2004, to provoke Fell's actions. To the contrary, as observed by David Duncan, it was Fell seeking confrontation, not prison officials. There is no reason to believe that information regarding Officer Pelkey's past misconduct would have led to a different outcome.

Fell further claims that his counsel was ineffective in failing to investigate Officer Pelkey's background and he suffered prejudice as a result. However, the record indicates that trial counsel had obtained the file pertaining to the March 17, 2004, incident, had in fact investigated Officer Pelkey's background to some extent, and was aware that there was a history of dislike between Fell and Officer Pelkey. Tr. VIII-2 at 37. But again, counsel's strategy to depict Fell as someone who had accepted responsibility for his actions and had adjusted well to prison would have been inconsistent with him trying to somehow blame Officer Pelkey for his actions on March 17, 2004. Trial counsel's strategy was reasonable.

Fell also contends that his trial counsel was ineffective in failing to interview Deacon Steve Ratte of the Catholic Church, who had been meeting with him for several years and would have testified that Fell was participating seriously in weekly religious services and had a sincere interest in his faith and other religions. Deacon Ratte would have also testified to the deep impact that Fell's execution would have on him. While the government does not contest the testimony that Deacon Ratte would have provided, it is clear from the record that the decision not to

-229-

introduce evidence of Fell's alleged Christian faith, including the testimony of Deacon Ratte, was reasonable. The testimony of a deacon of the Catholic Church to the effect that Fell was sincerely interested in pursuing his alleged Christian faith would have opened the door to further evidence of Fell's other, inconsistent religious interests. Further, counsel introduced death penalty impact testimony from another witness, Mary Jo Scott. Even if trial counsel's failure to introduce such evidence is deemed to have been error, Fell cannot show prejudice.

    A.    <u>The Government Did Not Fail To Disclose Favorable Evidence Regarding Officer Pelkey's Disciplinary History and Trial Counsel Did Not Fail to Investigate</u>

        1.    <u>Evidence Presented to the Jury</u>

In support of mitigating factors five and six, Fell introduced the testimony of three correctional officers. Officer Ronald Barclay testified that he never had any problems or issues with Fell, with the exception of one incident when Fell lost recreation privileges and was locked in his cell. *Id*. at 93. Fell told Barclay that he grew up with Lee and that alcohol and drugs were a part of their lives. *Id*. at 96. Fell also told Barclay that he was under the influence of drugs when he committed his crimes. *Id*. at 97. According to Barclay, in his experience, Fell had no difficulties adjusting to prison. *Id*. at 99.

Officer James Bailey testified that he had several interactions with Fell as a float officer. *Id*. at 114. Bailey recalled Fell as being very quiet and young when he first met him. *Id*. at 114-15. Although, Bailey recalled an instance when Fell failed room inspection because his room was untidy, he described Fell as an inmate who generally followed policies and procedures. *Id*. at

115-16.  Bailey also testified that Fell signed up for religious, educational and job opportunities. *Id*. at 117-18.  Bailey added that in his opinion, Fell had adapted well to being institutionalized, *id*. at 119, though he admitted on cross-examination that reports of misconduct towards other officers would cause him to change his opinion.  *Id*. at 122.

Officer Jason Rushlow testified that Fell was first in the Delta unit, a controlled unit, and was then transferred to the Echo unit for positive behavior.  Tr. VIII-2 at 4.  Rushlow remembered Fell being quiet most of the time, he never took a point from Fell.  *Id*. at 5.  According to Rushlow, Fell read a lot of sci-fi material.  *Id*. at 6.  Rushlow remembered one incident when Fell became boisterous because the lights were turned on when they were watching a movie.  *Id*. at 7. Aside from this incident, however, Rushlow had no incident with Fell.  *Id*. at 8.  Rushlow was promoted to case worker in May of 2004, and continued interacting with Fell in that capacity.  *Id*. at 9.  Rushlow testified that Fell participated in activities offered at the institution regularly, and was elected unit representative.  *Id*. at 11-12.  As case worker, he met with Fell weekly to discuss unit issues.  *Id*. at 13.  Rushlow never observed Fell  have any difficulties in the unit.  *Id*. at 16-17. He did not consider Fell to have too many disciplinary violations as compared to other inmates. *Id*. at 18.  Rushlow described two major violations involving Fell – the March 17, 2004, incident and the April 9, 2005, incident – but stated that, in his opinion, Fell has fit in well in prison.  *Id*. at 24.

In addition, Fell introduced the testimony of Mary Jo Scott, a teacher at the Northwest Correctional Institution, who had worked with Fell for several years and helped prepare Fell to

take the GED. Tr. 8-1. at 61. Scott described Fell as curious, eager and focused on his work. *Id*. at 64. When asked whether she would be impacted if Fell was executed, she stated that she valued what she had accomplished with Fell and what he had accomplish for himself, and added that she would hate to see that end. *Id*. at 72.

Fell also introduced the testimony of James Aiken, a prison consultant, who testified that Fell was at the lower range of being disruptive and nowhere near the range of being a predator. Tr. IX-2 at 51. Aiken reviewed the two videotapes submitted into evidence depicting two confrontations between correctional officers and Fell, and he stated that he did not consider either incident to be serious. *Id*. at 52-54. Aiken stated that Fell impressed him as a person who had done a lot of growing up over the previous five years and was understanding the regimen of correctional environment. *Id*. at 61. Accordingly, Aiken stated that Fell could be confined in the Federal Bureau of Prisons "for the remainder of his life without causing an undue risk of harm to staff, inmates, and the public." *Id*. at 63.

In rebuttal, the government called Officer Greg Machia. Tr. 10-1 at 94. Officer Machia testified that he was on duty on March 17, 2004, when an emergency was reported in the bullpen of Echo unit and he and other officers responded. *Id*. at 95. One of those officers brought a video camera. *Id*. at 95-96. When Officer Machia arrived, he was told that a fight had taken place, but the inmates involved were being dealt with by other officers. *Id*. at 96-97. Therefore, Officer Machia proceeded to secure the other inmates by asking them to put their hands against the fence. *Id*. at 97. When Officer Machia went up to Fell, he had a cup of coffee in his hand. *Id*. Officer

Machia asked Fell to put the cup down and put his hands on the fence like the other inmates, but he refused. *Id.* Fell was secured with handcuffs. *Id.* Officer Machia's supervisor instructed him to take Fell back to the Delta unit and Officer Machia, Officer Pelkey and others walked Fell to that unit. *Id.* at 97, 109. Fell engaged in highly provocative verbal abuse towards the officers all the way to the cell, yelling obscenities and urging them to hit him. *Id.* at 98, 102-03. He specifically directed comments at Officer Machia, who he believed was responsible for his being sent to the Delta Unit. *Id.* at 103.

After Fell was placed in the cell he was still being combative. *Id.* at 99. Because Fell had made threats against the officers, when getting Fell into his cell, the officers asked him to kneel down and cross his legs so they would have easier control of him. *Id.* Fell refused to do it; therefore, Officer Pelkey crossed Fell's leg and Fell alleged that Officer Pelkey was hurting him. *Id.* at 99, 104. According to Officer Machia, Fell turned and told Officer Pelkey: "I'm going to get you." *Id.* Fell then spat on Officer Pelkey's face. *Id.* Fell was immediately pinned against the mattress by other officers and Officer Pelkey promptly left the cell. *Id.* at 105. The entire incident was captured on a video, which was introduced into evidence as Exhibit 18.

The government also called Officer Michael Gordon who testified that he participated in the cell extraction of Fell on April 9, 2005. *Id.* at 119. Again, Fell refused to obey orders and provoked an altercation before being moved to a disciplinary unit. *Id.* at 120. Officers entered Fell's cell with Gordon in front, behind a shield. *Id.* Fell charged at Officer Gordon with the top of a property box in his hands, struck and kicked some of the officers and tried to bite others. *Id.*

at 120-21.  Officers were able to control Fell and put shackles on him.  *Id*.  The Fell cell

extraction was also recorded on videotape, submitted into evidence as Exhibit 19.  *Id*. at 122.

### 2.    Alleged Brady Violation

Fell alleges post-conviction that the government failed to disclose that Officer Pelkey had

a history of violence and aggression towards inmates.  P. at 210.  In support of his claim, Fell

submits a sworn declaration by Officer Pelkey.  In his declaration, Officer Pelkey states:

> I was investigated for excessive force after that [March 17, 2004] incident that
> started in the bullpen.  The state talked to all of the staff and reviewed the
> videotape of the incident.  I was not in the wrong in that incident.  One time an
> inmate spit on me and I punched him in the face and another time I threw an
> inmate to the floor.  I had to go to anger management classes after these events.  I
> was also suspended once for using too much force with my shield against an
> inmate's face during extraction.

P. Exhibit 256 at 2.  Fell claims that this information was mitigating and would have impeached

Officer Pelkey's account.  But Officer Pelkey admits no wrongdoing in his declaration in relation

to the March 17, 2004, incident.  Nowhere in that declaration does Officer Pelkey state that he

"attempted to assault" Fell, as Fell alleges.  On the contrary, Officer Pelkey indicates that he was

cleared of any wrongdoing following an investigation.  Moreover, Officer Pelkey did not testify at

trial, nor was his report admitted into evidence.  Therefore, it is difficult to envision how this

information could have been used to impeach Officer Pelkey.[39]

---

[39]  Fell also argues that Pelkey admitted drinking heavily around the time period of the
March 17, 2004, incident.  But nowhere in his declaration does Officer Pelkey indicate that his
after work drinking ever affected his work performance and Fell proffers no evidence to that
effect.

Similarly, the evidence at issue was not exculpatory. Fell is seen on the videotape of the incident on March 17, 2004, repeatedly using foul language towards the correctional officers escorting him to his cell, challenging and threatening them. When placed in his cell and is asked to kneel down and cross his legs, he refuses; therefore, the correctional officers are forced to do it for him. When Officer Pelkey crosses his legs and holds them so that Fell can be shackled, Fell spits on Officer's Pelkey's face. Nothing about Pelkey's prior misconduct, even if it had been admitted into evidence, would have changed the jury's appreciation of Fell's actions. Fell was not aware of Pelkey's history of misconduct, hence, the information at issue would not have been relevant to explain Fell's actions. Thus, Fell has not shown how this information was favorable or material.

Fell also fails to show that the government suppressed the information. Officer Pelkey does not indicate in his sworn declaration that he told the government about his prior use of excessive force against other inmates. Moreover, Fell provides no evidence that the government knew about Officer Pelkey's prior conduct. Clearly, the Northwest Correctional Facility was not a federal agency and information in their files cannot be imputed to the United States Government. Therefore, Fell has not met the second element of a *Brady* violation.

Nor, assuming Fell can overcome the first two hurdles to establishing a *Brady* violation, has he shown how he was prejudiced by the government's alleged nondisclosure. As stated above, the videotape depicting the confrontation between Fell and correctional officers on March 17, 2004 was submitted into evidence. Therefore, the jury had an opportunity to observe first

-235-

hand the actions of Fell, Officer Pelkey and all six other officers involved in that incident. It is clear from the videotape, and the testimony of Officer Machia, that Officer Pelkey did absolutely nothing on March 17, 2004, to provoke Fell's actions as seen on the videotape. There is no reason to believe that information regarding Officer Pelkey's alleged past misconduct would have led to a different outcome in penalty.

### 3.    Trial Counsel Did Not Fail To Investigate Officer Pelkey

Fell also argues that if the government did not violate its *Brady* or *Giglio* obligations, then trial counsel was ineffective in failing to investigate Officer Pelkey. But the record belies this claim. During the cross-examination of Rushlow, the government attempted to introduce a report prepared by Officer Pelkey, but trial counsel objected based on the inflammatory nature of the report. Tr. VIII-2 at 34-35.

| | |
|---|---|
| THE COURT: | Going back. So what you're saying is there are other reports out there which contradict – |
| MR. VOLK: | They don't particularly contradict. They don't – |
| THE COURT: | Soften. |
| MR. VOLK: | Right. They don't put it in as inflammatory a term as this potential witness does. Secondarily, by way of a proffer, we would also suggest that this particular officer who wrote this report is someone who has expressed a significant personal dislike for Mr. Fell, and we certainly cannot engage in any kind of meaningful cross-examination through this witness about that. |
| THE COURT: | Well, I'd like to see the other reports, then. Do you have the other reports? |
| MR. KELLY: | We do, Judge. |

-236-

MR. VOLK:          We have the whole file.  It's large.

*Id*. at 37.  It is clear from trial counsel's proffer that they had subpoenaed the "whole file"

pertaining to the March 17, 2004, incident.  Moreover, trial counsel clearly was aware of who

Officer Pelkey was and had investigated him to some extent as evidenced by his statement: "this

particular officer who wrote this report is someone who has expressed a significant personal

dislike for Mr. Fell."  None of the reports pertaining to the March 17, 2004, incident contain any

remarks of dislike by Officer Pelkey towards Fell; therefore, trial counsel must have been

referencing their own additional investigation.  While it is not apparent whether trial counsel's

further investigation revealed Officer Pelkey's prior history of misconduct, it is clear that Fell

suffered no prejudice.  The information at issue was not exculpatory in any way. Therefore, there

is no reason to conclude that the information pertaining to Officer Pelkey's history of misconduct

would have changed the sentencing profile. Again, trial counsel's strategy to depict Fell as

someone who had accepted responsibility for his actions and had adjusted well to prison would

have been inconsistent with Fell trying to somehow blame Officer Pelkey for his actions on

March 17, 2004.  Trial counsel's strategy was reasonable.

> B.     Trial Counsel's Decision Not To Present Evidence of Fell's Alleged
>        Religious Believes Was Reasonable

> 1.     Evidence Presented

Through the testimony of Correctional Officer James Bailey, Fell sought to establish that

he was an inmate who followed policies and procedures.  Tr. 8-1 at 116.  Bailey also testified that

Fell signed up for religious, educational and job opportunities.  *Id*. at 117-18.  Correctional

-237-

Officer Jason Rushlow testified that the majority of the time he remembered Fell being quiet,

Rushlow never took a "point" from him. Tr. VIII-2 at 5. Rushlow also testified that Fell read a

lot, mostly sci-fi. *Id*. at 6. According to Rushlow, Fell participated in activities offered at the

institution regularly and was elected unit representative. Id. at 12.

On cross-examination, Rushlow admitted that he recommended Fell for unit

representative because Fell filed alot of grievances. Rushlow also indicated that Fell participated

in Ramadan, a Muslim practice. In rebuttal, in an effort to counter the testimony of the

correctional officers, the government also introduced copy of a lawsuit filed by Fell demanding

that he be allowed to practice his "Native American" faith. The government argued that Fell had

made no significant contribution to the Northwest Correctional Facility, but had instead tried to

disrupt and manipulate the system.

### 2.    Trial Counsel Was Not Ineffective

Fell claims that trial counsel was ineffective in failing to present the testimony of Deacon

Steve Ratte. In support of his argument, Fell submits a declaration by Deacon Ratte wherein he

essentially states that Fell took his involvement with weekly religious services very seriously and

seemed sincere about exploring his faith. P. Exhibit at 1-2, Fell-00002437-38. Deacon Ratte

gave Fell the responsibility of setting up for the services. *Id*. According to Deacon Ratte, Fell

also assisted other inmates who did not speak English understand the service. *Id*. Fell told

Deacon Ratte about his interest in learning about other religions, which Deacon Ratte did not find

inconsistent with their meetings. *Id*. Deacon Ratte attended Fell's trial, but was not interviewed

-238-

by trial counsel.  *Id.*

Fell claims that Deacon Ratte's testimony would have refuted the government's claim that Fell's interest in religion was manipulative.  P 218.  Deacon Ratte's testimony would have also helped to establish that Fell could conform his conduct to a prison environment.  Fell ignores the fact that trial counsel did in fact present the testimony of three correctional officers and a prison consultant, all of whom testified that Fell was capable of adjusting his conduct to a prison environment.  The correctional officers also testified that Fell demonstrated an interest in religious activities.  Therefore, Deacon Ratte's testimony would not have been new, it would have simply been similar testimony from a different point of view.  In that sense, this testimony cannot be said to have been vital to Fell's mitigation case.

On the other hand, Deacon Ratte would have triggered cross examination and possible rebuttal.  Testimony regarding Fell's alleged Christian faith invited further inquiry into Fell's other professed religious beliefs, such his prison lawsuit asserting his American Indian faith, and his request to observe Muslim traditions, as well as his considerable interest in Satan.  Fell had a tatoo of an upside down cross bearing the inscription "666."  Dr. Welner's report discussed Fell's interest in Satan, which also noted by Teri Fell.  P. Exhibit 10 at 22.  Teri Fell testified about Fell's religious interests as follows:

> Q    Did he have any interests against religion?
> A    He wasn't a religious person at all.
> Q    Can you explain that to the jurors?
> A    He didn't believe in God.
> Q    What did he believe in?
> A    Well, when we were first living in Wilkes-Barre, he didn't believe in anything, and

-239-

> then towards – by the time I moved out of Aunt Jackie's house when I was 16, he talked about Satan, but I don't know if he worshipped Satan. I don't believe that he worshipped Satan. He didn't have a Satanic bible or anything like that.
>
> Q    What did he say, if anything, about Satan?
> A    He would just make jokes about Satan being the kindest beast, and that was it, and that he normally talked to me about National Geographic.
> Q    And, I'm sorry, you said Satan is the kindest beast?
> A    Yes.
> Q    I'm sorry, what does that mean?
> A    I don't know.
> Q    Do you know, if as a result of that, he has any tattoos?
> A    Yes, he does.
> Q    And what are those tattoos?
> A    On his left arm, I do believe he has got an upside down cross with 666  And on his right arm he has got an anarchy sign.
> Q    Do you know what the upside down cross with 666 means?
> A    It represents Satan.
> Q    Do you know when he got that?
> A    I don't know that.  Probably -- I think he was 15 or 16 when he got it.

Tr. VII-1 at 144. In addition, Jeanette Banas, Debra Fell's cousin, reported that only weeks before he went to Vermont in year 2000, Fell availed himself of gory pictures and video from the internet. "Everything was about Satanism and how to kill animals," she stated. "He showed me gory things, dead people, people blown up, bodies blown apart. He went into all these websites about Satan. Heads missing, eyes missing, people blown up." When Fell showed her where he was browsing, she recalled saying, "this is sick shit."

While the Second Circuit found that the government did not demonstrate a sufficient connection between Fell's Satanic beliefs and his motive for the capital murder, 531 F.3d at 230, evidence of Fell's various non-Christian beliefs, including his interest in Satan, may have been admissible to rebut any claim that Fell was a deeply Christian person. Trial counsel's decision

-240-

not to present further evidence of Fell's alleged Christianity was not unreasonable.  Moreover,

even trial counsel's failure to introduce such evidence is deemed to have been error, Fell cannot

show prejudice.  There is no basis to conclude that additional evidence of Fell's religious

practices would have in any way affected the outcome of the case.

### VIII.    The Government Did Not Fail To Disclose Evidence Regarding Co-defendant Robert Lee and Trial Counsel's Decision Not to Present Evidence of That Relationship Was Reasonable

Fell's trial counsel made a strategic decision early on not to introduce evidence of Fell's

relationship with his co-defendant, Robert Lee.  In fact, counsel at the 2002 government mental

health expert forensic interviews barred questioning of Fell about his relationship with Lee.  At

trial, counsel argued strenuously and successfully for exclusion of Lee's detailed post-arrest

statements from the penalty and guilt phases.   *See* Dkt No. 91; Tr. 3-2 at 25.   Trial counsel also

sought successfully to exclude from evidence a number of letters written by Lee from prison

which contained many details about his relationship with Fell and the murders.  Lee's post-arrest

statements, as well as his prison letters, clearly indicate that Fell was the leader and instigator of

their killing spree.  The obvious conclusion reached by trial counsel was that evidence of Fell's

relationship with Lee would be detrimental to Fell's case in penalty.  Therefore, trial counsel's

decision not to present evidence of the Fell-Lee relationship was both informed and reasonable.

Introduction of Lee's violent conduct in prison not only would have been wholly inconsistent

with trial counsel's strategy, but it would have opened the door to very damaging evidence in

rebuttal.  Therefore, even if this court were to determine that the government failed to disclose

Lee's prison records in violation of *Brady*, which we deny, Lee suffered no prejudice.

Further, it is clear from the reports of interviews of Francis Bellantoni that his testimony

would not have supported the theory advanced by Fell post-conviction that Fell was a reluctant

participant in the murder of Terry King. Therefore, counsel's decision not to interview Bellantoni

further was reasonable.

> A.    Background

Prior to the first mental health evaluation conducted by a government expert, during which

trial counsel was present counsel advised the government expert that the issue of dominance and

submissiveness vis-a-vis Fell's relationship with Lee would not be raised at trial and that Fell

would not answer questions regarding Fell's relationship with Lee.

> Prior to beginning the examination, his attorney, Paul Volk, informed me that Mr.
> Fell would not discuss the events involved in the murders or his mental state at the
> time of the crimes. He also indicated that no inquiry should be made about the use
> of knives. *His counsel also indicated that the issue of dominance and
> submissiveness would not be raised at trial and that Donny, on advice of counsel,
> would not discuss these relationships.*

Report of Dr. Richard D. Wetzel, P. Exhibit 7 at 2, Fell-00000464 (emphasis added). It is

significant that Dr. Wetzel interviewed Fell on September 18 and 19, 2002. Prior to that date, on

May 25, 2001, the government disclosed to Fell a complete copy of a background investigation

conducted of Fell and Lee by the FBI. The FBI's 183 page report contained educational records,

medical records, juvenile court records, police records and other documents pertaining to Fell's

and Lee's background from childhood to the date of their arrest. *See* Exhibit B, 028540-722. The

FBI report also included summaries of numerous interviews conducted by FBI agents. The

overwhelming majority of the witnesses interviewed by the FBI were of the opinion that Fell was more intelligent than Lee, and was also the clear leader of the two.

For example,  John Kozerski, a social studies teacher at the Wilkes-Barre Area Vocational-Technical School ("W-BAVTS"), described Lee as a "somewhat quiet student who never did a lick of work." *Id*. at 028546.  According to Kozerski, Fell was intelligent, but Lee was as "dumb as a stump." *Id*.  Kozerski added that when seen together, Fell would be the leader and Lee the follower. *Id*.  Patrick Tosh, another teacher at W-BAVTS, also described Lee as a follower who was never confrontational with him. *Id*. at 028545.  Tosh further indicated that he did not believe Lee went to school as often as Fell did. *Id*.  Carmen LoBrutto, a science teacher at W-BAVTS, described Lee as a very quiet and unmotivated student. *Id*. at 028546. According to LoBrutto, Lee was more of a loner than Fell and never acted out in LoBruto's class. *Id*..  Thomas Zelinka, an English teacher at W-BAVTS, agreed that Lee was definitely a loner, and added that other students found him a bit strange. *Id*. at 028553.  Zelinka observed Lee and Fell together on several occasions at the school and stated that they were two of a kind. *Id*.

Lisa Lucke, the Director of Admissions of St. Michael's School, also described Lee as a follower more than a leader. *Id*. at 028542.  This sentiment was shared by Lee's father, Robert Lee, Sr., who expressed concerns to medical professionals that Lee had always been a child that was "easily led by others." *Id*. at 028659.  Even Fell's sister, Teri Fell, stated that Fell was more of a leader than Lee. *Id*. at 028717.  According to Teri Fell, it was not uncommon for Fell to physically strike and hit Lee. *Id*.  Similarly, witness Cunningham described Lee as a follower and

Fell as a leader.

In his post-arrest statements, Lee clearly depicted Fell as the leader in their killing spree. According to Lee, it was Fell who handed him a knife and told him to kill his mother, it was Fell who told him to pack the bags, it was Fell who wrapped the murder weapons in a towel intending on taking them and it was Fell who pulled over where they killed Terry King. *See* Hand Written Statement of Robert Lee attached hereto as Exhibit C at 014594, 014600, 014596.

Moreover, in a number of letters written by Lee from prison he talks extensively about his relationship with Fell and makes clear that Fell was the dominating personality in that relationship.

> and that is like my friendship with donnie he always has to have his own way and if you do not live up to his expectation he'd flip throw a thing or tantrum till he get his own way and me having to do what he expects me to do puts me into . . . he [Fell] was person that wanted me around and I did not want to lose that once we started something I would really have no choice but to finish it with him him because he wanted me around he was my friend a person that I can relate to to a certain point I have never reached before with anybody else and I did not want to lose my friendship with him because I said no and he flipped out another reason is I am scared of him to a point I see a little or more of myself in him and I know that what I do see in him is a force not to be reconed (sic) with there is also something about him that he has . . . that can control people . . . that is what I see in donnie . . . his sister will tell you he is very controlling.

*See* Government Exhibit D.  In another letter Lee clearly states that it was Fell who urged him to kill Debra Fell.

> He started saying after he did charlie he kept saying kill her come on you have to I killed him fucker stab her cut her fucker though she was on the floor moving hack her make her stop stab her cut through some more start hacking make me here it keep cutting now . . . I am going to take a shower I want you to start packing the clothes and bring me some pants.

-244-

*See* Government Exhibit E.

          B.      <u>Argument</u>

                1.      <u>Trial Counsel's Decision Not to Present Evidence of the Fell-Lee Relationship Was Reasonable</u>

Fell now claims post-conviction that the government withheld "a wealth of mitigating evidence about Mr. Lee" that countered the government's argument that Fell dominated Lee, including prison records, social service records, medical records, educational records and law enforcement records.  This testimony, Fell argues, would have made clear Lee's greater culpability for the capital crimes and would have led to a different outcome in penalty.

While Fell alleges that the government failed to disclose "prison records, social service records, medical records, educational records and law enforcement records," in support of his argument Fell only specifically proffers two different acts of violence committed by Fell while in prison, both of which are documented in his prison records.  The government submits that the information proffered by Fell post-conviction, even if it had been obtained by trial counsel prior to trial, would not have altered Fell's trial strategy.  Fell's trial counsel clearly made an informed strategic decision not to introduce evidence about the Fell-Lee relationship.  Indeed, when it appeared that Fell intended to introduce evidence of prior criminal acts by Lee at trial, and the government objected, trial counsel made clear that they had no such intent, and purposely made as little mention of Lee as possible.

MR. PRIMOMO:    We don't intend to ask or get into any statements of Bobby Lee made to Teri Fell.  We are not doing that.  But, I just want to make it clear that there is witnesses going to be talking about hearsay in

connection to how they grew up, and just general, general facts that relate to the situation in the home. And so I'm – I don't think hearsay objection is sound, but I am just telling the Court that we are not going to get into Bobby Lee's statements at all.

THE COURT:    All right.

MR. PRIMOMO:    Or about Bobby Lee killing somebody or Bobby Lee anything.

THE COURT:    All right. It is fundamental, in my view, that statements made by Mr. Lee should not be introduced, and if they are introduced, then of course you understand that that raises a potential of a very big door being opened. So, if what you say is correct, that no one's going to testify to what Mr. Lee has said by way of hearsay or in any other form, I just want to make sure that you have instructed your witnesses never to say anything in regard to things that Mr. Lee may have said, because that doesnt afford the government an opportunity to cross examine that, and I think that that would be a clear violation of the law.

MR. PRIMOMO:    Judge, we are not -- that's fine. We are not getting into -- we are not getting into Bobby Lee's statement in connection with these crimes at all, I mean, but there's going to be discussions about hearsay with regard to things that happened in the home, life in the home, that type of hearsay, which I think is with regard to our specific mitigators. But nothing to do with Bobby Lee's statements, what Bobby Lee said.

THE COURT:    Well, okay. So, well, we may be walking a very fine line here.

MR. BUNIN:    Judge, I --

THE COURT:    I am not just talking about Bobby Lee's statements about what happened here. Apparently, and I have not read the letters yet because they just came in, but apparently Mr. Lee would make a number of statements about the relationship between he and Mr. Fell, and I think that you are saying, no Lee statements are coming in by way of hearsay or any other form. But I just want to make sure that that's exactly accurate, not just the offense.

-246-

MR. PRIMOMO:    This is not about Bobby Lee.  *Our mitigation case isn't about
                Bobby Lee with regard to any statements at all.*

MR. BUNIN:      Anything.

MR. PRIMOMO:    Anything.

Tr. VII-1 at 26-28 (emphasis added).  Trial counsel had clearly decided to avoid triggering in

rebuttal any evidence about the Fell-Lee relationship.

When the government attempted to introduce evidence of Lee's character in penalty, trial

counsel objected and argued that such evidence was irrelevant to the issues that needed to be

decided at trial.

THE COURT:      Now you have a broader objection.  You have an objection to the
                whole discussion of the relationship between Mr. Lee and Mr. Fell?
                Is that correct?

MR. BUNIN:      I do, because I don't think the way it's discussed in this context is
                relevant to deciding any matter in this case.  I mean, it just – they
                had a relationship.  But to talk about their characteristics, attributing
                various characteristics to Mr. Lee to inform the jury about what to
                do about Mr. Fell I think is inappropriate.

Tr. XI at 15.  Trial counsel was well aware that introducing evidence of the Fell-Lee relationship

to attempt to portray Fell as someone who was dominated by Lee would have triggered an

avalanche of damaging testimony to the contrary in rebuttal.  Fell's post-conviction argument that

the government failed to disclose Lee's prison record and that Fell would have introduced

evidence of Lee's violent acts in prison to demonstrate that he was the aggressor in the Teri King

-247-

murder is disingenuous at best.[40]  Trial counsel purposely elected not to present evidence about

Lee or his relationship with Fell and objected strenuously when the government attempted to do

so.  The court ruled partially in Fell's favor at trial, permitting the government to present evidence

of the Fell-Lee relationship only in as far as it demonstrated Fell's personal characteristics.

> THE COURT:    But what they did offer is character and background evidence about Mr. Fell.  And the fact is, you have got testimony to suggest that Mr. Fell was in a leadership role, and, over the objection of the defense, I think you are permitted to offer that.  I just don't – I don't think that the door's been opened to have somebody come in and describe psychologically or their observations of Mr. Lee separate and apart from Mr. Fell.

*Id*. at 17.  Fell reaped the benefits of his trial counsel's strategy and the court's ruling in his favor.

Indeed, the jury unanimously found both mitigating factors that related to Fell and Lee.

> 9.    Lee, who is equally culpable, will not face death         12
>
> 10.    Fell and Lee acted in concert in committing crimes         12

*See* Special Verdict Form, Dkt. No. 200.  Both of these mitigating factors were weighed by the

jury in Fell's favor.  The fact that the ultimate outcome of the penalty phase was not what Fell

wanted it to be, does not render his trial counsel's performance ineffective.[41]  In light of the

---

[40]  In view of the fact that Lee died four years prior to trial, and Fell's trial strategy was to avoid evidence of the Fell-Lee relationship, there was no reason for the government to think that Lee's prison records constituted favorable evidence for Fell.  Indeed, if Fell's trial counsel had wanted to make use of Lee's prison records, they could have easily obtained them through a subpoena to the Northwest Correctional Institution, a state facility.  Trial counsel did not obtain the evidence because it was irrelevant to their trial strategy.  Therefore, Fell cannot establish a *Brady* violation as he can show no prejudice.

[41]  Fell asserts incorrectly that the government failed to disclose social service records, educational records, medical records and law enforcement records obtained through its lay

damaging evidence that the government could have introduced in rebuttal, trial counsel's decision

not introduce evidence of the Fell-Lee relationship was reasonable. The newly proffered

evidence would not have altered trial counsel's strategic decision. Moreover, nothing about the

newly proffered evidence would not cause a reasonable person to loose confidence in the outcome

of the case.

### 2.    Trial Counsel's Decision Not To Pursue Francis Bellantoni As A Witness Was Reasonable

Fell further claims that trial counsel was ineffective in failing to interview Francis

Bellantoni, a "near eye-witness" to the capital crime.[42] Fell argues that Bellantoni's testimony

would have "supported the theory that Lee was the aggressor in Mrs. King's death."

During an interview on December 12, 2000, Bellantoni reported that on an unknown date,

he remembered seeing two males coming from a wooded area along Route 22, and it appeared

that one of the males was agitated with the other. P. Exhibit 68. Bellantoni noticed a car, and as

he passed by the car at 55 mph, he noticed that it had Vermont plates. *Id*. Bellantoni also noticed

a female seating in the back passenger side of the car. *Id*. Bellantoni went further down the road

and noticed he had forgotten his cell phone. *Id*. He turned around and returned home. *Id*. When

---

investigation of Lee. However, as evidenced by Exhibit B attached hereto, the government in fact disclosed its entire lay investigation of Lee.

[42] Fell also claims that the government failed to disclose the FBI's report of Bellantoni's interview. However, as Fell admits, he was provided with a report of Bellantoni's interview with the New York State Police. *See* P. Exhibit 68. The FBI report did not contain any more information than the New York State Police Report. Therefore, no failure to disclose can be established. Fell is entitled to the information, not the format it is provided in.

-249-

he passed by the car with the Vermont plates again, he saw the female walking towards the woods, and the two males following approximately eight to ten feet behind her. *Id*. When Bellantoni passed by the area again, the car and the people were gone. *Id*. Bellantoni was not able to describe the car or state what time it was when he made his observations. *Id*.

Assuming that the individuals that Bellantoni observed were Fell, Lee and Terry King (which is not clear because Bellantoni could not state when he made his observations), it is clear that Bellantoni observed the two males only for a few seconds, as he was travelling at 55 mph. Moreover, Bellantoni merely reported that one of the males appeared to be agitated. But he could not possibly identify Lee or Fell, much less state which of the two was agitated. In addition, it is clear that Bellantoni did not hear what if anything the two males he observed said to each other. In that regard, it is significant that Bellantoni used the word "agitated," not "arguing" in the statement he provided on December 12, 2000. Therefore, Bellantoni's testimony simply could not have "supported the theory that Lee was the aggressor in Mrs. King's death."

Based upon the Bellantoni interview report, Fell's counsel stated in opening the guilt phase that "a passing motorist saw [Fell and Lee] arguing by the side of the road." Tr. I at 55. Fell now submits a new declaration by Bellantoni, provided on February 24, 2011, over 10 years later, wherein Bellantoni states that the two men he observed on the side of the road sometime prior to December 12, 2000, were "arguing." Bellantoni still asserts that he would not recognize either man and could not tell the difference between them. This evidence would not have informed trial counsel's strategy at trial, therefore, it is not material.

-250-

Moreover, the admission of such testimony, and Fell's argument that what Bellentoni observed was consistent with Fell's later self-serving statements that it was Lee's idea to kill Teri King, may have triggered damaging rebuttal evidence establishing Fell's history of dominance over Lee. Nothing about the testimony that Bellantoni might have provided would cause a reasonable person to lose confidence in the verdict.

### IX.     Trial Counsel Was Not Ineffective in Failing to Conduct A Further Forensic Investigation of the Murder of Terry King[43]

Fell claims that trial counsel was ineffective in failing to conduct a further forensic investigation of the murders. Such an investigation, he alleges, would have revealed that Terry King was killed by a rock, which caused injury to her brain, and not from injuries to her neck. In support of his argument, Fell submits the declaration of Dr. Charles Wetli, who, after reviewing the autopsy photographs taken and report rendered by Dr. Baden, as well as the trial testimony of the forensic investigators, concluded that King's neck injuries were not fatal; therefore, she would not have died from asphyxia. *See* P. Exhibit 306. Dr. Wetli also stated that "the autopsy revealed that the stomping and kicking did not inflict any lethal injuries to Ms. King." However, Dr. Wetli makes no attempt to explain his conclusion that a rock alone, and not any kicks or stomping, caused the multiple fractures on King's skull. In any event, Fell claims that this evidence would

---

[43] To the extent that Fell reasserts in Section IX trial counsel's alleged failure to investigate Lee, or present evidence of Lee's aggressiveness and/or dominance over Fell, we rely on our argument in response thereto set forth in Section IX, *supra*. Any reliance on a mitigating factor that claimed that Fell would not have committed the killing of Teri King without the influence of Lee would have triggered in rebuttal the presentation of the damaging evidence summarized by the government in Section IX above.

have allowed him to challenge his eligibility for the death penalty. Fell's argument has no merit.

The Federal Death Penalty acts lists four intent factors, of which the government need only prove one.

    (A)    intentionally killed the victim;

    (B)    intentionally inflicted serious bodily injury that resulted in the death of the victim;

    (C)    intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act;

    (D)    intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

Even if Fell had been successful in establishing that he did not intentionally cause King's fatal injuries, which the government disputes, his actions would still have come within the purview of the last two intent factors. Therefore, Fell would still have been death eligible. Indeed, the jury unanimously found all four intent factors to have been proven. *See* Special Verdict, Dkt. No. 200 at 3-4.

## A.    <u>Background</u>

Fell confessed to the killing of Charlie Conway and Terry King on three different occasions. On December 1, 2000, Fell spoke with Agent Tom Aiken of the New York State Police about the possible whereabouts of Terry King's body. Aiken took advantage of the opportunity to ask Fell about the killings of Conway and his mother.

    DF:    I really don't know. I got up and all of the sudden I, had cut Charlie's throat, and ah, I started stabbin' him and, and I was, I was gonna turn myself in right then, and then I turned around, he, Bobby had already cut my mom's throat, and . . .

-252-

TA:    Oh, he was involved in it too?

DF:    Yeah. So I figured that, at that point in time, ya know? I looked and it was already too late for my mom, ya know? And ...

*See* Penalty Phase Exhibit 11g at 53.  Regarding Terry King's murder, Fell told Aiken:

TA:    I know its been a few days, but is there any chance she could still be alive?

DF:    I don't see that as a possibility. You know what, I, I, could only hope she is, ya know?

TA:    But based on, what, what'd you hit her with? A rock?

DF:    Ah, yes, it, it was a rock.

TA:    And, who, and, did he do that too or just you?

DF:    No, that, that was him with the rock. I was using my feet.

*Id*. at t 32-33.  On December 2, 2000, Detective Rodney Pulsifer interviewed Fell again with

regards to the crimes he had committed.  Fell again described how he killed Conway and Lee

killed his mother:

OF:    Ah, well what happened was, is ah we were all kind of wasted, you know, pretty, pretty fucked up. My mom was we were all smoking crack and you know drinking lots of alcohol and shit. Ah, to tell you the truth I don't really ah know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

RP:    Well, why did Bobby cut your mom's throat?

OF:    I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of

-253-

followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it, but...

*See* Government Exhibit 11j at 11.

RP:   Okay, hold, hold that thought a minute, let's back up, ah going back to where you were standing over.  Charlie. Um, you had the knife in your hand, yes?

DF:   Yes.

RP:   Do you remember how many times ah you, you stabbed him?

DF:   No, no, I am thinking maybe somewhere around 25.

*Id*. at 14.

DF:   This is the part I'm not sure about, but ah I might, cause when I, when I realized what I was doing, my hand was on his shoulder, on his left shoulder.

RP:   On his left shoulder?

DF:   On his left shoulder, I had the knife in my right hand, so what I am thinking is I must have grabbed him by his left shoulder, and just, like across you know?

RP:   Okay.

DF:   But I'm not sure and I don't know how many times I did it, but then I, I moved the knife a different way and I started stabbing him in the side of the throat here.

*Id*. at 15.  And Fell again described the murder of King:

DF:   And ah, at which point I got out of the car, and I opened her back door, she was on the driver's side. And I said "walk up through the woods, just keep on walking and we'll go." And she said, "I'll be safe right?" and I said "yeah." So I let her go, and I get back in the car, and, Bobby says to me, "we can't let her go, he says she's knows our descriptions, she knows our names," he said "we have to kill her." So, I said okay, so we walked.

JC:   You agreed with him at that point?

-254-

DF:     Yeah, I walked up, I walked up to the top of the hill, and Bobby went down to the bottom of the hill, and she was already running down towards the road.  Bobby intercepted her, and I went down the hill and we both hustled her back up the hill, not, not harsh or nothing hard you know what I mean, just go ahead walk up the hill, you know. And, ah, I found a little, a little spot where you couldn't see from the highway and ah, well we started kicking her in her head. And um, Bobby.

JC:     Was she standing up when you were kicking her?

DF:     No I pushed her down first, she was on her back.

JC:     Was she saying anything?

DF:     No, she, she started to pray. And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about yay big and ah slammed it right down on her head.

*Id*. at 37-38.

DF:     Yeah, yeah. So, after Bobby slammed the rock down ah I was pretty sure she was dead and I wiped my boot off with her shirt, urn, and we left. We went back into the car.

JC:      Did you slam the rock down on her head at all?

DF:     Ah, no.

JC:     You sure about that it?

DF:     Uh huh, I used my feet.

JC:     You used your feet, you were pretty sure she was dead when you left her?

DF:     Yeah. Yeah. There was, ah, blood all pouring out of her mouth, um, her nose, her eyes were bleeding, ah she was, she didn't look like she was breathing, so we left.

*Id*. at 39-40.  Thus, Fell described each killing in detail, recalling accurately the knives used in the

killings of Conway and Debra Fell, the route he and Lee took to the Price Chopper where he and

-255-

Lee kidnapped Terry King, the route they took out of Vermont, readily agreeing to kill King and how he and Lee killed her.  His description of the murders were entirely consistent with all the forensic evidence gathered.

In penalty the government presented the testimony of Dr. Michael Baden, the medical examiner who conducted the autopsy of King.  Dr. Baden indicated that King suffered an obvious blunt force injury at the base of the nose, where there was protrusion of nasal bone fractures.  Tr. V-1 at 78.  In addition to that fracture, there was a laceration and fracture beneath the left part of the skull bone.  *Id*.  As a result King suffered severe contusions of the brain.  *Id*. at 80.  King also had palpable fractures of the jaw bone, both upper and lower, and the mouth.  *Id*. at 78.  According to Dr. Baden, teeth near the body had been knocked out of their sockets by blunt force trauma.  *Id*. at 79.  Dr. Baden also testified that there were no blood droplets below the neck area, and no evidence of droplets of blood falling downward, which was indicative of the fact that King was on the ground during the brutal attack.  *Id*. at79-80.

King also had a blunt force fracture of the right collar bone and extensive damage to the windpipe and the front and back of the Adam's apple in the neck, with a lot of hemorrhage around it.  *Id*. at 80.  According to Dr. Baden, the injuries to the neck of King were caused by a powerful crushing force, which could have been generated by someone stomping on the victim with the type of boot Fell was wearing upon arrest.  *Id*. at 81-82, 84.  In Dr. Baden's professional opinion, there was "over kill":  both the blows to King's head and the injuries to her brain, as well as the crushing injury to her neck, were fatal.  *Id*. at 87.

In addition, the government introduced the testimony of forensic investigator Tom Martin who testified that he conducted a forensic investigation of the New York murder scene, recovering fibers and footprints that were later determined to be consistent with Fell's clothing and boots seized from him upon arrest.

### B.    Trial Counsel's Decision Not to Challenge the Forensic Evidence Was Reasonable

Fell argues that the newly proffered evidence would have allowed him to challenge his death eligibility because it demonstrates that he did not inflict the fatal blows to King.  Fell does not dispute that he intentionally participated in the brutal attack of King with the intent to kill her.  Indeed, Fell admitted knocking King to the ground and "using his feet" to repeatedly kick her head until he thought she was dead.  Instead, Fell argues that he did not happen to strike the fatal blow.

First, Dr. Wetli ignores the fact that, according to the autopsy report, there were multiple fractures to King's skull, caused by separate blows.  *See* P. Exhibit 65 at 6.  Dr. Michael Baden, who conducted the autopsy, when asked how many times King was struck, testified:

> I think she was struck, again, blunt force, at least five times.  Many – could be many times more because many strikes don't leave, as in the boxing analogy, many blows don't leave a mark.  But she had at least five different hard impacts to her neck, chin, mouth, left side of head, both sides of the scalp of the head.

Tr. V-1 at 92-93. Dr. Wetli also ignores that Fell admitted kicking King repeatedly on the head – not just her neck – while she was on the ground.  Therefore, the evidence conclusively established that the blow to the face by the rock was not the only injury that caused skull fractures and injury

to the brain of King. For example, King had a separate skull fracture on the left side of her head. Given that Fell admitted kicking King repeatedly on the head, the jury could have certainly concluded that he caused the injury to the left side of King's head and brain, as well as the crushing neck injury. Dr. Wetli agrees that King's brain injuries were fatal. Hence, Dr. Wetli's opinion does not establish that Fell did not cause any fatal injury to King.

Even if the Court were to determine that Dr. Wetli's testimony would have supported a challenge to the first two intent factors in penalty, factors (A) and (B) above, Fell's conduct still came within the purview of the last two intent factors, factors (C) and (D). Each of these factors is applicable if Fell participated in act, either contemplating that the life of a person would be taken or intending that lethal force would be used against a person, or knowing that the act created a grave risk of death, and the victim died as a result of the act. Fell misinterprets intent factors (C) and (D). The act to which these factors refer is not the killing itself, but the underlying criminal offense. That is, Fell clearly participated in the kidnapping of King, contemplating that her life would be taken or intending that lethal force would be used against King, and she died as a result of the kidnapping. Nothing in the language of the Death Penalty Act requires the government to prove that Fell killed King himself to become death eligible. Indeed, Fell offers no legal support for his argument.

Moreover, the evidence of guilt was overwhelming. Fell was arrested in King's vehicle. He confessed on three different occasions to killing Conway and King. Fell's statements about how the murder of King was committed are entirely consistent with the forensic evidence.

-258-

Footprints lifted at the murder scene were consistent with Fell's boots. Fibers recovered at the murder scene were consistent with the t-shirt Fell was wearing upon arrest. Other evidence closely corroborated Fell's statements. The FBI recovered King's license plates in a Wilkes Barre creek, King's wallet alongside Route 22 in New York, and King's purse at the nearby Burger King. Blood with King's DNA was found on one of Fell's boots. And the autopsy revealed that King indeed died of blunt force trauma as Fell described. In view of the incredible strength of the evidence of guilt against Fell, a strategy of acceptance of responsibility, rather than denial, was not only reasonable but necessary. Counsel's performance also resulted in no prejudice, for all of the foregoing reasons.

This is not a case such as *Soffar v. Dretke*, 368 F.3d 441, 471-79 (5th Cir. 2004), where the defendant's confession was inconsistent with the forensic evidence recovered from the crime scene; or *Harris v. ex.rel. Ramseyer v. Blodgett*, 853 F.Supp. 1239, 1255-58 (W.D. Wash. 1994), where there were inconsistencies between the defendant's story and police reports; or even *Draughoun v. Dretke*, 427 F.3d 286, 294-96 (5th Cir. 2005), where trial counsel failed to seek forensic expert testimony that could have supported defendant's claim that he did not intentionally shoot the victim. Fell clearly intentionally knocked King to the ground and then kicked her in the head, while she was laying praying and defenseless, and continued to kick her until he believed she was dead. Thus, he "used his feet" during the joint attack with Lee. Given that the physical evidence revealed multiple fractures of King's skull and a crushed neck, it cannot be said that only the blow with the rock killed King.

-259-

**X.      Trial Counsel Was Not Ineffective In Failing To Investigate the Evidence Underlying the Especially Heinous, Cruel, and Deprived Factor**

Fell claims that trial counsel was ineffective in failing to conduct a forensic investigation to counter the heinous, cruel and depraved manner of committing the offense aggravating factor. He claims that trial counsel should have sought expert testimony to challenge the government's argument that Fell kicked King so hard that her earring landed four feet away from her body and her teeth were dislodged from her jaw. Similarly, Fell claims that counsel should have sought expert testimony to disprove the claim that Fell stomped on King with 150 pounds of pressure. He claims, notwithstanding the testimony of qualified Medical Examiner Dr. Michael Baden, that there is no scientific basis for this assertion. Last, Fell claims that there is no scientific basis for claiming that King was killed twice.

A.      Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony Challenging the Government's Argument Regarding the Location of the Victim's Earring.

The evidence presented at trial established that one of King's earrings, and the post for that earring, were found around her mid-thigh area, on the right side of her body, approximately three to four feet from her head. Tr. V-1 at 62-63. In its opening statement, the government urged the jury to infer from this evidence that Teri King had been kicked with great force:

> At this stage of the trial, you will learn that as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body. . . . One of her earrings was found several feet away. You will hear that her throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure. Her skull was fractured in several places.

Tr. V-1 at 35. In closing argument, the government stated:

-260-

> You also heard from Special Agent Talley that an earring and a post from her was recovered even further from the body. The earring and post were found even further from her body. What does that mean? That means either that the assault on Terry King began when she was standing up several feet from where she was found, and they were hitting her so hard that it literally was torn off, or that this was part of the further stomping in this case by the defendant, where again, she was hit so hard that that earring was literally driven off the side of her head.

Tr. XII at 23.

Fell offers the post-conviction declaration of Dr. Wetli, who, after examining part of the evidence, concludes that animal activity was responsible for the victim's earring being found three to four feet away from her head. Dr. Wetli thus rejects the inference that Fell's kicks to King's head dislodged the earring and teeth. He offers no scientific basis for his opinion.

Dr. Wetli's opinion does nothing to change the sentencing profile in this case. First, the government urged the jury to make a reasonable inference based on the evidence presented at trial. No scientific evidence was need for the government to argue that when Fell savagely kicked Terry King in the head as she lay face up, it was very likely that her earring flew off her ear. The fact that an animal subsequently caused damage to King's right ear does not negate this argument.

Second, even if trial counsel would have been able to establish, to any degree of scientific certainty, that animal activity was responsible for King's earring being found three to four feet down the right side of her body, that evidence would not have influenced the outcome of the trial. Fell confessed to kicking King repeatedly in the head. Whether her earring dislodged as a result of Fell's multiple kicks to her head, or it was removed by an animal and deposited three to four

feet down the right side of her body, the evidence conclusively established that Fell repeatedly

kicked her in the head causing blunt force trauma.  The newly proffered evidence by Fell post-

conviction would not have altered the jury's verdict.  The verdict reflected Fell's depraved

conduct.  Under these circumstances, counsel's performance was neither deficient nor prejudicial.

> B.  Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony Challenging the Government's Argument Regarding the Location of the Victim's Teeth

The evidence presented at trial established that one of King's teeth was found to the left of

her body, by her forearm.  Tr. V-1 at 62.  A second tooth was found on the right side of the body,

above her head.  *Id*.  Dr. Baden testified that King's teeth had been knocked out of their sockets

by blunt force trauma.  *Id*. at 79.  In its closing argument, the government used this evidence to

impress upon the jury that Fell kicked Terry King more than once, and with great force:

> These, ladies and gentlemen, are what were found once her body was removed. Whole teeth that had been kicked from her head.  You remember that Special Agent Talley actually told you where those teeth were found.  One tooth was found on one side of her body, the other tooth on the other side of her body.  What does that mean?  That means that there were separate blows one way, and then another below the other way.  They were so powerful that her teeth came out of her mouth whole.

Tr. XII at 22-23.  The government also used the evidence to comment on Fell's depravity.

> Finally, whether the killing showed indifference to the suffering of the victim. You may consider that.  Is there any question, ladies and gentlemen, that the defendant acted with indifference?  Did he have to knock her teeth out?  She was praying for her life.  Is there anything that's more indifferent to human life?  Based on the evidence, ladies and gentlemen, this second statutory aggravating factor is also proven by overwhelming evidence.

*Id*. at 25.

Fell now claims post-conviction that had trial counsel conducted an adequate forensic investigation they would have been able to prove that the distance of the teeth from Terry King's body had no probative value. They again rely on the declaration of Dr. Wetli, who essentially states that if teeth are knocked out through stomping, they would fall into the mouth, rather than be propelled away from the body.

First, Dr. Wetli ignores the fact that Fell did not just stomp on King, he kicked her head repeatedly. Certainly forceful kicks to King's head as she lay face up would have not only caused fractures to her facial bones, but could have knocked her teeth out of their sockets and propelled them outward. Second, the government's argument focused on the fact that King's teeth were knocked out of their sockets whole, not on the distance at which they landed. Even if we were to accept Dr. Wetli's conclusion as correct, it does not negate the fact testified to by Dr. Baden, that Terry King was kicked and/or stomped on with such force that her facial bones were fractured and her teeth were knocked out. Therefore, the newly proffered evidence post-conviction is non-consequential. Trial counsel's failure to pursue such an expert opinion was reasonable and, in any event, caused no prejudice.

C.    Trial Counsel Was Not Ineffective in Failing to Challenge Dr. Baden's Opinion That Terry King Was Stomped On With 150 Pounds of Force

During the testimony of Dr. Baden, the government drew his attention to the crushing of King's neck, and asked: "about how many pounds of pressure were required to do that?" Tr. V-1 at 86.

You need more – more than – more than 150 pounds of pressure; from various

-263-

informations we have from examining dead bodies, that just leaning on the neck wouldn't be enough. There would have to be a forceful application of at least 150 pounds of pressure, because normally, for example, normally we see people hang themselves, and when people hang themselves, there's no fractures. Even though the person may weigh 200 pounds, and the head weighs about 12 pounds, so there's 190 pounds of pressure, it doesn't cause a fracture, but if that same amount of force were brought down with – that's why I use the term stomp – with a force, then that would cause a fracture. But not just the pressure itself. It's the focal, sudden application of that pressure.

*Id*.

Fell claims post-conviction that there is no scientific basis for Dr. Baden's opinion and argues that his trial counsel was ineffective in failing to challenge that evidence. He relies again on the opinion of Dr. Wetli, who claims that Dr. Baden's opinion is specious because there are no studies that conclusively support it. Fell's argument, again, is far-fetched and nonconsequential.[44]

First, Dr. Baden's point was that 150 pounds of pressure suddenly applied, such as would be the case if someone stomped on the victim, would be needed to cause the kind of damage caused to King's neck. Dr. Baden explained his opinion, and relied on his knowledge and experience, having conducted more than 20,000 autopsies. Nothing about the statements of Dr. Wetli render Dr. Baden's opinion inadmissible, much less unscientific. Second, the government properly used Dr. Baden's opinion to argue to the jury that Fell stomped on Terry King. This was a reasonable inference based on the injuries suffered by King and Fell's own post-arrest statements.

---

[44] It seems unlikely that "studies" are needed (or might even exist) to address whether a man with boots, stomping on the neck of a 53 year-old woman, could crush her windpipe.

D.    Trial Counsel Was Not Ineffective in Failing to Challenge Cause of Death

Dr. Baden testified that Terry King had multiple causes of death. Her skull had multiple fractures and he found bruising or contusions of the brain. Dr. Baden also found that King's wind pipe had been crushed, causing asphyxia. In addition, he found multiple non-fatal injuries to her facial bones. Dr. Baden testified that:

> my opinion as to the cause of death, is that she died both of the blows to the face, the injuries to the brain, and the injuries to the neck, because I think she was alive when most of those injuries were – were incurred. Not necessarily all of them. But she would have died just from the head injuries alone, from the brain injuries, but that usually takes a little time. People with head injuries and bruising of the brain can live for a few hours in a coma before they die, and the heart's still functioning. The compression of the neck can cause death within a few minutes. And I think in the combination of both, I think most of the injuries, she was still alive, alive from the point of view of the heart's still beating. Unconscious most probably from the first blows to the face, but that there was kind of an overkill. There were many more injuries that were produced, caused, than would have been necessary for her to die.

Tr. V-1 at 90.

The government used this testimony in support of the heinous, cruel and depraved manner of committing the offense statutory aggravating factor, arguing that Fell inflicted more injury than was necessary to cause death. The government also argued that King suffered physical abuse not meant to cause death.

> Of course, you also heard the testimony of Dr. Michael Baden. He described a multitude of injuries to her head, to her neck, to her clavicle, to her jaw, the areas and fractures around her head. Multiple blows. He described the horrible, blunt-force trauma to her head. He also told you about the injuries to her neck which were consistent with the boots that he observed that were worn by Donald Fell. He told you how, in his opinion, that injury to the neck was actually consistent with a stomping type of injury. He also told you that the injuries to her

-265-

> mouth and the teeth coming out of her mouth, those were also consistent with the stomping type injury. Perhaps most importantly, what he told you was that there were actually two causes of death for Terry King. There was obviously the blunt trauma to her head, but then there was also the crushing of her windpipe and neck causing asphyxia. Asphyxia is that she couldn't breathe. She was actually killed twice. In Dr. Baden's opinion, this was overkill because it was far more injury than was necessary for them to kill her.

Tr. XII at 23.

Fell claims post-conviction that trial counsel was ineffective in failing to investigate the government's evidence with regard to the cause of death. In support of his argument Fell relies again on the opinion of Dr. Wetli who asserts that King's neck injuries were not fatal. It is significant that Dr. Wetli does not contest Dr. Baden's findings with regard to the nature of the injuries suffered by Terry King, only his conclusion as to whether or not the neck injuries were fatal. Essentially, new counsel is belatedly suggesting alternative cross examination for Dr. Baden. Even if Fell had been able to establish that the injuries to the neck of King were not fatal, however, she still endured those injuries. The injuries would still constitute evidence of extreme physical abuse. Therefore, the jury would still have been able to consider this evidence in support of the heinous, cruel or depraved manner of committing the offense.

The government alleged that "Fell committed the offense in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to Terry King." Tr. XII at 143. With regard to this factor, the Court instructed the jury as follows:

> To establish this aggravating factor, the government must prove that the offense involved serious physical abuse to Theresa King. However, just because an offense involves serious physical abuse does not necessarily mean that it was committed in an especially heinous, cruel or depraved manner. Rather, you must

-266-

decide whether any proven serious physical abuse rendered the offense especially heinous, especially cruel, or especially depraved.

Serious physical abuse means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended serious physical abuse apart from the killing.

Heinous means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of serious physical abuse of the victim as to set it apart from other killings.

Cruel means that the defendant intended to inflict a high degree of pain by serious physical abuse of the victim over and above that involved in killing her.

Depraved means that the defendant relished – relished the killing, or showed indifference to the suffering of the victim as evidenced by the infliction of serious physical abuse.

Tr. XII at 143-44.

The evidence presented at trial clearly established by overwhelming evidence that Terry King suffered serious physical abuse.[45] Fell does not contest post-conviction Dr. Baden's conclusions with regard to the injuries suffered by Terry King. Moreover, Fell's post-conviction statements, as well as the forensic evidence introduced at trial also clearly established that Fell inflicted much of the physical injuries suffered by King. Fell admitted kicking her in the head repeatedly. Moreover, King's DNA was found on Fell's boot. By his own admission, after

---

[45] Counsel challenged the sufficiency of the evidence on this aggravating factor at trial. The Court excluded from evidence several photographs of King proffered by the government, but found the evidence nonetheless sufficient to go to the jury.

killing King, Fell wiped his boots on her shirt.  Therefore, the government had a sufficient factual

basis to argue that Fell committed the offense in an especially heinous, cruel and depraved

manner in that it involved serious physical abuse to Terry King.  Evidence that King's neck

injuries were not fatal – contrary to the testimony of Dr. Baden – would not have affected the

jury's conclusions in this regard because it would not negate that Fell inflicted those injuries.  For

all these reasons, defense counsel's performance was neither deficient nor prejudicial.

## XI.    Trial Counsel Was Not Ineffective in Failing To Further Investigate the Deaths of Debra Fell and Charles Conway

Fell claims that trial counsel had a duty to investigate "how and why the deaths of Ms.

Fell and Mr. Conway occurred."  Given the physical and forensic evidence, and the multiple

confessions, this claim is perplexing.  Fell argues that trial counsel was ineffective in failing to

conduct a further forensic investigation of the Debra Fell and Charles Conway murders and a

background investigation into the life of Debra Fell in Vermont.  But there was no indication that

any further investigation of the Debra Fell and Conway murders would have unearthed any

evidence favorable to Fell.  Since neither one of these efforts would have changed the sentencing

profile presented by trial counsel in penalty, counsel's performance was neither deficient nor

prejudicial.

First, Fell (and Lee) gave a detailed account of how the deaths of Debra Fell and Charles

Conway occurred.  Fell stated:

> DF:    Ah, well what happened was, is ah we were all kind of wasted, you know, pretty, pretty fucked up.  My mom was we were all smoking crack and you know drinking lots of alcohol and shit.  Ah, to tell you the truth I don't really ah know what

-268-

happened to, to lead up to what happened, you know what I mean?  All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah I turned around, and I was thinking I was going turn myself in.  And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

RP:    Well, why did Bobby cut your mom's throat?

DF:    I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know?  But I don't know why, I don't even know why I did it, but...

*See* Government Penalty Exhibit 11j at 11.

RP:    Okay, hold, hold that thought a minute, let's back up, ah going back to where you were standing over ... Charlie.  Um, you had the knife in your hand, yes?

DF:    Yes.

RP:    Do you remember how many times ah you, you stabbed him?

DF:    No, no, I am thinking maybe somewhere around 25.

*Id*. at 14.

DF:    This is the part I'm not sure about, but ah I might, cause when I, when I realized what I was doing, my hand was on his shoulder, on his left shoulder.

RP:    On his left shoulder?

DF:    On his left shoulder, I had the knife in my right hand, so what I am thinking is I must have grabbed him by his left shoulder, and just, like across you know?

RP:    Okay.

DF:    But I'm not sure and I don't know how many times I did it, but then I, I moved the knife a different way and I started stabbing him in the side of the throat here.

-269-

*Id*. at 15.  The autopsy of Debra Fell and Charles Conway revealed that they were each stabbed multiple times.  Conway was stabbed approximately 50 times.  Tr. V-I at 101.  A complex of those wounds severed Conway's carotid artery, killing him.  *Id*. at 104.  These findings were completely consistent with Fell's post-arrest statements.  Moreover, the forensic evidence found at the crime scene was also wholly consistent with Fell's post-arrest statements.  Crime scene investigators found two knives wrapped in a towel on the kitchen table – each matched the description provided by Fell.  *See* Government Penalty Exhibit 11j at 28-29; 48.  There was no indication whatsoever that a further forensic investigation into the deaths of Debra Fell and Charles Conway would have revealed anything of use to Fell's defense.

Similarly, there was no indication that an extensive investigation of Debra Fell's life in Vermont would have assisted Fell's trial strategy.  By Fell's own account of the Rutland murders, his mother posed no threat to either him or Lee when she was brutally attacked by Lee.

RP:    Okay.  Did you see your mom struggling with ah.

DF:    She didn't struggle.

RP:    Okay, did Charlie struggle with you?

DF:    No.

*Id*. at 48.  Notwithstanding, Fell claims that an investigation into Debra Fell's life in Vermont would have revealed evidence of her chronic substance abuse and violent tendencies.  However, the record clearly establishes that any such investigation would not have added anything of significance to the sentencing profiled presented in penalty.

A.    Trial Counsel Was Not Ineffective in Failing To Conduct a Further
Forensic Investigation of the Debra Fell and Conway Murders

Fell faults trial counsel for not hiring a forensic pathologist to look at the autopsy reports,

autopsy photos, toxicology reports and other forensic evidence pertaining to the murders of Debra

Fell and Charles Conway. Fell further faults his counsel for not hiring a forensic expert to

analyze all the evidence recovered at the Rutland crime scene. Fell argues that he was prejudiced

by trial counsel's performance, but fails to state how. Fell speculates that such experts would

have uncovered mitigating and/or exculpatory evidence, but fails to proffer a shred of evidence to

that effect. Fell states that he intends to conduct discovery in this regard and subsequently amend

his petition to add additional claims based on any new evidence discovered.

Nothing in 28 U.S.C. § 2255 grants Fell the right to either demand discovery post-

conviction or file a claim after the one year limitations period. Indeed, the Supreme Court has

clearly established that a criminal defendant has no constitutional right to post-conviction

discovery. *See District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 129

S.Ct. 2308, 2320 (2009) (criminal defendant had no constitutional right to demand DNA testing

after conviction). And Fell cannot toll the limitations period of section 2255 by asserting an

unidentified claim. This claim should be stricken for failing to set forth a basis upon which relief

can be granted.

B.    Trial Counsel Was Not Ineffective in Failing to Conduct a Factual
Investigation of the Debra Fell and Charles Conway murders

Fell further claims that trial counsel was ineffective in failing to locate and interview

-271-

potential witnesses to the events that transpired at 135 Robbins Street on the night of November 27, 2000. Fell proffers the sworn declaration of a single witness, Pat Johnson, the upstairs neighbor of Debra Fell, in support of his argument. Johnson claims that on the night of November 26, 2000, she overheard loud noises and arguments coming from upstairs at 135 Robbins St. *See* P. Exhibit 271 at 2 . According to Johnson, she heard slamming, banging noises and yelling that went on for hours. Johnson does not provide a time frame for what she overheard. Nor does she relate any specific statements that she overheard. In any event, Johnson's testimony was not material to any of the issues decided at trial. Fell argues that Johnson's account "strongly suggests that the Rutland crimes were triggered by a fight that lasted 'for hours.'" But neither the autopsy of Debra Fell or Conway revealed any blunt force trauma consistent with having suffered any injuries during a fight. Nor did Fell or Lee have any bruises, scratches or marks on their bodies upon arrest consistent with having been involved in a fight a few days earlier. Nor did either of the two killer's statements indicate a fight – or for that matter a struggle.

In the declaration proffered by Fell, Johnson does not provide a time frame for what she overheard. Nor does she relate any specific statements that she overheard. But Johnson provided a written statement to the police immediately after the Rutland murders wherein she stated that she heard loud noises coming from Debbie Fell's apartment from 11:00 p.m. on Sunday, November 26, 2000 to 6:00 a.m. on Monday, November 27, 2000. *See* attached Exhibit J. Her written statement was produced to Fell in discovery. In fact, according to an e-mail from

-272-

Alexander Bunin, Pat Johnson was originally on the witness list for Fell. *See* Exhibit K.

Johnson's testimony was not only inconsistent with the remaining evidence in the case, it was not material to any of the issues decided at trial. Fell argues that Johnson's account "strongly suggests that the Rutland crimes were triggered by a fight that lasted 'for hours.'" Given the obvious inconsistencies with other evidence in this case, Johnson's testimony in that regard is not reliable. Moreover, neither the autopsy of Debra Fell or Conway revealed any blunt force trauma consistent with having suffered any injuries during a fight.

The forensic evidence, and Fell's own post-arrest statements, were inconsistent with any theory that the murders were preceded by an altercation. By Fell's own account, Conway was simply sitting on a chair when he attacked him.

RP: Where was Charlie? Where was Charlie and your mom?

DF: Charlie and my mom were in the living room.

RP: Okay.

DF: Charlie was on the chair. I don't know where my mom was.

*See* Government Penalty Phase Exhibit 11j at 19. Moreover, the autopsy report for Conway revealed that Conway had .39 level content in his blood, indicating that he was highly intoxicated, if not unconscious, when Fell attacked him. The testimony of Dr. Paul Morrow left this quite clear.

Q.    Is that blood alcohol content for Mr. Conway very high?

A.    Yes, it is.

-273-

Q.    Is there a certain range of behavior that would be consistent with that blood alcohol content?

A.    Yes.

Q.    Could you describe that to the jurors briefly?

A.    Yes. This blood alcohol was actually quite high. And of course it, a person's reaction to alcohol depends, to some extent on what their experience is with the drug. In other words, people who drink a lot have more tolerance and then tend not to show the effects of the drug quite as much. Nevertheless, even in a very experienced drinker, in this case with this blood alcohol, one would expect at the very least the person to appear very drunk, perhaps and perhaps passing out or even comatose.

Tr. V-2 at 13. Fell, on the other hand, immediately after the murders was able to make reasoned decisions, taking a shower and packing his clothes, grabbing his shotgun, seeking ammunition, then committing a carjacking and kidnapping and driving long distance to escape apprehension.

Trial counsel's decision not to pursue any further factual investigation of the Rutland's murder was reasonable. Fell suffered no prejudice as a result.

C.    Trial Counsel Was Not Ineffective in Failing to Investigate the Lifestyles of Debra Fell and Charles Conway in Vermont

Fell argues that his trial counsel failed to conduct an adequate investigation into the lifestyles of Debra Fell and Conway in Vermont. Fell admits that his trial counsel was aware that Debra Fell had numerous encounters with the Rutland City Police Department and was in possession of some of the corresponding police reports. P. at 259. Notwithstanding, Fell claims that trial counsel should have obtained all such police reports. He argues that the remaining police reports would have revealed a pattern of violent encounters, domestic disruptions and noise

-274-

complaints.[46]  Fell further claims that trial counsel was ineffective in failing to interview

witnesses who would have testified that Debra Fell was often violent when drinking and abusing

drugs.

First, introduction of evidence pertaining to Debra Fell's encounters with the police or any

other violent incidents would have implied that her behavior somehow led to Fell's actions the

night of the murders   This is an implication that is simply not supported by the evidence in the

case.  Such an implication would have also been inconsistent with trial counsel's trial strategy of

acceptance of responsibility.

Second, the jury already knew that Debra Fell was a chronic alcoholic with violent

tendencies.  Through the testimony of Fell's sisters, Teri Fell and Susan Benczkowski, they heard

evidence of several violent stabbing incidents involving Debra Fell while intoxicated.  *See*

sections III(B)(1)(a) and (b)(iv), *supra*.  The government never argued that Debra Fell's conduct

changed after moving to Vermont.  In addition, Teri Fell also provided testimony indicating that

her mother had not stopped drinking after moving to Vermont.  Tr. VII-1 at 146.  Thus, the jury

had a fairly accurate picture of the lifestyle of Debra Fell.  Moreover, the photographs of the

crime scene in Rutland also left no doubt that Debra Fell had not stopped drinking as evidenced

by the dozens of beer cans in her apartment.  Indeed, her blood alcohol content at the time of her

---

[46]  Fell further claims that to the extent that the government failed to disclose these reports to trial counsel, that failure constitutes a *Brady* violation.  Without conceding that we were in possession of any such reports, the government submits that Fell has failed to show that these reports constituted favorable evidence, and has further failed to show how if in any way he was prejudiced by the alleged non-disclosure.

death was .32.  Tr. V-2 at 13.

Fell argues that information of his mother's life in Vermont was essential for the jury to understand the context that led to her and Conway's murder.  But as demonstrated above, Fell has not established that Conway's and Debra Fell's murder were the result of any violent altercation, or any act that night, by Debra Fell or Conway.  And to the extent that Fell argues that his mother's continued drinking led him commit the crimes, the evidence admitted at trial clearly established that Debra Fell was drinking on the night of November 26, 2000.  Thus, the evidence proffered by Fell post-conviction would not have changed the sentencing profile presented to the jury in penalty.  There is simply no reason to believe that there is a reasonable probability that this evidence would have led to a different outcome.  Accordingly, counsel's performance was neither deficient nor prejudicial.

### XII.    Trial Counsel Was Not Ineffective in Failing To Investigate and Present a Diminished Capacity Defense

Fell claims that his trial attorney was ineffective in failing to investigate and present a diminished capacity defense in both the guilt and penalty phases of trial.  Fell argues that if trial counsel had presented evidence of his mental illness and intoxication on the night of the crimes the outcome of the trial would have been different.

First, trial counsel investigated Fell's diminished capacity on the night of the murders. Three different mental health experts interviewed Fell, considered both Fell's mental health and alcohol consumption on the night of the murders and rendered opinions.  None offered any opinion that would have enabled Fell to challenge intent in the guilt phase.  Indeed, Fell does not

cite a single expert opinion in support of his argument.[47]

Second, trial counsel's strategy in the guilt phase was one of acceptance of responsibility. Given that the evidence of guilt against Fell was overwhelming, trial counsel's decision to follow a strategy of acceptance of responsibility in guilt was unreasonable. This strategy provided trial counsel with the opportunity to set forth several arguments that would assist him in penalty. For example, trial counsel argued that Fell's actions were not planned and that he was remorseful for what he had done. Therefore, trial counsel in fact began to lay the foundation in the guilt phase for some of the mitigating factors to be introduced in the penalty phase.

Third, trial counsel alleged diminished capacity in penalty. Mitigating Factor number one alleged that Fell's capacity to appreciate his conduct was significantly impaired. *See* Special Verdict Form, Dkt. No. 200. However, as set forth in section IV and V, *supra*, trial counsel made a strategic decision not to rely on expert mental health evidence to establish Fell's diminished capacity or any other mitigating factor.

Trial counsel's strategic decision not to present expert mental health testimony regarding Fell's alleged diminished capacity in penalty was reasonable. The government had two different experts poised to testify that Fell's ability to appreciate his actions was not significantly impaired. Moreover, the same two experts agreed that Fell was not mentally ill, and had ASP. In addition, one of the government experts classified Fell as a psychopath. Any expert mental health

---

[47] It is significant that Fell attaches a sworn declaration from Dr. Mills. *See* P. Exhibit 260. However, Dr. Mills's declaration is devoid of any support for Fell's argument.

testimony by Fell in penalty would have triggered very damaging rebuttal evidence. *See* section V, *supra*. Therefore, Fell's claim has no merit.

A.      Trial Counsel Was Not Ineffective In Failing to Present A Diminished Capacity Defense in the Guilt Phase of the Trial And Presented A Diminished Capacity Defense in Penalty

Fell claims that trial counsel failed to investigate his alleged diminished capacity as a result of his intoxication and mental illness. But as discussed above, immediately upon being assigned to represent Fell, trial counsel retained the services of three mental health experts and requested a psychiatric, neuropsychological and neuropharmacological evaluations. Trial counsel also obtained social service records providing information on Fell's familial history of alcohol abuse. In addition, Teri Fell provided information regarding Fell's alcohol and drug abuse. Hence, Fell's allegation that trial counsel failed to investigate Fell's potential diminished capacity as a result of his intoxication has no merit.

None of the defense mental health experts found any neurological deficits, any organic brain damage, or any significant mental disorder that would have mitigated Fell's criminal responsibility or ability to appreciate the consequences of his actions at the time of the murders. Moreover, none found that Fell's alleged intoxication and mental disorders rendered him incapable of forming the necessary mens rea to commit carjacking or kidnapping.

Dr. Mills stated in his report:

It seems highly unlikely that her murder and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication. Further, without those murders, Mr. Fell's guilt (particularly over the killing of his mother) and his fear of being apprehended, the abduction and subsequent killing of Mrs. King

-278-

would not have occurred.

P. Exhibit 3 at 4-5. Dr. Mills at no time provides any indication that Fell did not have the ability to appreciate his actions or form intent when he carjacked and kidnapped Terry King, much less hours later when she was killed. On the contrary, according to Dr. Mills, Fell was motivated by his fear of apprehension for the murders of his mother and her boyfriend, clearly indicating that Fell knew exactly what he was doing and acted intentionally. Dr. Mills never opined that Fell lacked the necessary intent to commit the capital offenses.

Dr. Lipman, who assessed Fell's history of alcohol and drug abuse, concluded that Fell suffered from a pathological drug appetite and a "related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress." P. Exhibit 4 at 2. In other words, Fell, along with perhaps half the world population, was not mentally ill, but was vulnerable to becoming mentally ill if under severe stress. According to Dr. Lipman, this vulnerability would be expected to increase if chronically intoxicated, as Fell alleged he was the night of the murders. *Id*. But Dr. Lipman does not indicate that Fell lacked the ability to appreciate the consequences of his actions, nor does he indicate that Fell lacked the ability to act intentionally when he carjacked, kidnapped and subsequently killed Terry King.

Furthermore, the evidence submitted at trial simply did not support a diminished capacity defense as to guilt. Fell murdered his mother and her friend, and immediately devised a plan to escape apprehension. He showered, packed his clothes and other belongings, armed himself with a shotgun and set out to carjack a vehicle that he and Lee could use to leave town. After

-279-

attempting to buy ammunition for his shotgun, Fell conducted surveillance at the Price Shopper until the right victim came along. 54 year-old Terry King, who barely stood five feet tall, turned out to be the perfect victim for Fell and Lee. They pointed their weapon at her, overpowered her and forced her back into her vehicle. Fell and Lee then drove for approximately four hours, taking turns at the wheel, before Fell found a "nice little spot" in New York State, where they brutally murdered King. Upon arrest, Fell confessed to affirmatively deciding to carjack, kidnap and kill King and intentionally killing her. These were hardly the actions of a significantly alcohol impaired individual.

Therefore, trial counsel made a strategic decision not to rely on a diminished capacity defense in guilt, and to rely instead on a defense of acceptance of responsibility and remorse.

> And if you listen to the first statement and then you listen to the second statement you, you hear someone who is coming to terms with the enormity of what had happened and coming to terms with his own personal responsibility. And he accepted responsibility five years ago and he was sorry. And he's sorry today. And so we're just asking you to listen to everything and do what's just.

*See* Tr. IV-1 at 68. Trial counsel's decision was reasonable. The evidence of guilt was overwhelming. Not only did Fell confess to committing both the carjacking and kidnapping of Terry King, describing the crimes in detail in all three of his confessions, but he was found riding Terry King's vehicle in another state. Terry King's DNA was found on Fell's boots and fibers consistent with the t-shirt Fell was wearing when arrested were found at the crime scene. Moreover, the FBI located the license plate for Terry King's vehicle in a creek in Wilkes-Barre, PA, consistent with his post-arrest statements. King's purse was located in the dumpster of a

-280-

Burger King where Fell and Lee had stopped for breakfast after her murder. Thus, in light of the

strength of the evidence against Fell in guilt, trial counsel's decision to pursue a strategy of

acceptance of responsibility and remorse was reasonable.

While it is correct that trial counsel did not request a diminished capacity instruction as

such an instruction was not supported by the evidence, they did raise the issue with the jury,

arguing that Fell's capacity was impaired due to his alcohol and drug consumption.

> Look at the night of November 26, 2000. And listen -- what you heard about what
> is a chaotic scene in the apartment on Robbins Street. You saw pictures of cans
> and cans of beer, empty cases of beer. And you heard that Charles Conway was
> found with a blood alcohol content of point 39 percent and that Deborah Fell was
> found with a blood alcohol content of point percent. There was some serious
> drinking going on that night. Now, people that are alcoholics can often mask the
> symptoms of alcohol. They can do things. They learn how to do things. They
> learn how to drive a car. But there's one thing that alcohol does to everybody
> whether they are a tea toddler or whether they are an Alcoholic or serious drinker,
> it affects their ability to make decisions. It does that in any case. Now, there was
> more going on besides just the use of alcohol. Donald Fell and Robert Lee used
> crack cocaine that night. Donald Fell did not say that his mother used crack
> cocaine. If you listen to the recording you will hear that he says we and then it
> stops mid sentence and he goes on to another subject and he talks about his
> mother. He never says his mother uses crack cocaine. He uses the term we. He's
> Talking about Bobby Lee and himself.

Tr. IV-1 at 64. Fell's alcohol consumption would not have supported a defense in guilt, but by

arguing the issue to the jury, trial counsel began to lay the foundation for the diminished capacity

mitigating factor the jury would consider in penalty.

Fell argues that "there were red flags indicating other evidence relevant to Mr. Fell's

diminished capacity that trial counsel failed to investigate." P 266. In support of his argument

Fell submits the declaration of a single witness who alleges that both Debra Fell and Fell were

-281-

using crack cocaine in the month before the crimes. Fell also proffers Lee's statements to prison

officials that he used crack cocaine around the time of the offense.[48] But this evidence would

have simply been cumulative of Fell's post-arrest statements. Fell also submits that trial counsel

should have submitted evidence of Fell's Fetal Alcohol Syndrome and mood disorder. But as

argued in section IV(C), *supra*, Fell has failed to establish that he suffered from either of these

two conditions.

Fell also alleges that only portions of his confession on December 2, 2000, were submitted

into evidence. *Id*. at 267. This is untrue. The entire recording of Fell's confession on December

2, 2000, was submitted into evidence and marked as Exhibit 11i, Tr. II at 28, together with its

transcript, which was marked Exhibit j. The passages quoted by petitioner at p. 267, appear on p.

78 of Exhibit 11j. Therefore, the jury considered those statements.

Trial counsel presented a diminished capacity defense in penalty. Mitigating Factor

number one alleged that Fell's capacity to appreciate his conduct was significantly impaired. *See*

Special Verdict Form, Dkt. No. 200. However, as set forth in section IV and V, *supra*, trial

counsel made a strategic decision not to rely on expert mental health evidence to establish Fell's

diminished capacity. Instead, trial counsel relied on testimonial and forensic evidence introduced

at trial in support of Fell's diminished capacity mitigating factor.

> Under the influence at the time of the offense is a significant mitigating factor.
> Again, Donnie knew right from wrong; that's not the point. The point is, he was

---

[48] Trial counsel successfully sought to exclude Lee's post-arrest statements from trial. Introduction of any statements by Lee would have triggered damaging evidence in rebuttal.

unable to make correct, moral judgments, aside from his candor on the tape, which we have no reason to believe that him and Bobby Lee and Debra Fell and Charles Conway were not drinking incredible amounts of alcohol. First of all, we know that Donnie Fell had been doing it his entire life. We know that Debbie Fell had been doing it his entire life. And if you want the specific evidence of what was going on that night, look at the photographs in the Rutland, 135 Rutland – Robbins Street address. There are dozens of empty Budweiser beer cans.    . . .

Now, further, through the government's own expert, Dr. Morrow, he extrapolated out blood alcohol levels. And what blood alcohol levels are, simply amount of alcohol that's in the body. And he talked about how those levels of blood alcohol affect motor skills and judgments. And he has testified, as a trained medical examiner, that a .10 begins to cause errors in judgment.
That a .15 to .20 causes one to be emotionally unstable and intoxicated. And at a .2 to .3 begins to experience amnesia and blackouts. Charles Conway's autopsy at the time of his death, and Debra Fell's, which is approximately at one a.m., were those levels. 392 and 325. I am going to ask you to use your common sense and decide whether or not you believe that Donnie Fell had consumed alcohol, based on his statements, based on what you saw, based on your history, based on everything that you have heard in this case, that Donald Fell was intoxicated at levels close to this. Whatever level you think he was, because you can extrapolate out, as Dr. Morrow did, what the elimination rate would be, and what level of intoxication rate he would have been up and to at the time of Mrs. King's murder at approximately seven a.m.

Tr. XII at 79-81. Although trial counsel did not introduce expert testimony to support the

diminished capacity mitigating factor, they made effective use of expert testimony solicited from

a government expert witness.

Trial counsel's strategic decision not to present mental health expert testimony regarding

Fell's alleged diminished capacity in penalty was reasonable. The government had two different

expert opinions that indicated that Fell's ability to appreciate his actions was not significantly

impaired. When considering whether there is a reasonable probability that the expert mental

health evidence that trial counsel would have presented would have led to a different outcome,

-283-

such that the verdict is unreliable, the court must consider such evidence in context, that is, the

court must also consider the evidence the government would have presented in rebuttal.

The government was prepared to call Dr. Welner and Dr. Wetzel in rebuttal. Dr. Wetzel

had twice evaluated Fell and interviewed him over the course of three days. P. Exh. 9 at 1-2,

Fell-00000611-12. Dr. Wetzel determined that Fell's evaluation yielded "no sign of psychosis"

or depression, *id*. at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive

deficits." *Id*. at 8, Fell-00000618. On the other hand, Dr. Wetzel concluded that Fell met fully

the criteria for anti-social personality disorder. *Id*. at 7, Fell-00000617. Dr. Wetzel also

concluded that Fell exaggerated his intake of alcohol the night of the murders and "was not

significantly impaired." *Id*. at 4, Fell-00000614. Dr. Wetzel opined that:

> A.      In my opinion, [Fell] has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.
>
> B.      He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.
>
> C.      He denied that he has ever had withdrawal symptoms. He claimed that he has unusual tolerance for alcohol.

*Id*. Dr. Wetzel further concluded that Fell "was not under the influence of a severe mental or

emotional disturbance at the time of the crimes." *Id*. Moreover, according to Dr. Wetzel, Fell's

capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was

also not significantly impaired. *Id*. While Dr. Wetzel agreed that Fell had been the victim of

-284-

abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes.  *Id*. at 5, Fell-00000615.

Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he committed the murders.  P. Exhibit 10 at 32-34, Fell-00000653-55.  On the contrary, Dr. Welner found that Fell's behavior at the time of the murders "primarily reflected organization, and not signs of a mental illness or intoxication."  *Id*. at 35-40, Fell-00000656-61.  This evidence would have completely overcome Fell's allegation of diminished capacity.  Therefore, Fell cannot establish that trial counsel's failure to present expert mental health evidence in penalty regarding diminished capacity prejudiced him, rendering the jury's verdict unreliable.  There is no reason to believe that expert testimony regarding Fell's alcohol consumption on the night of the murders would have led to a different outcome.  Fell can show no prejudice.

> B.   Trial Counsel Was Not Ineffective in Failing to Present Evidence of Intoxication and Mental Illness During the Guilt Phase to Lay a Foundation for the Penalty Phase Mitigation Case

Fell claims that his trial counsel should have presented evidence of intoxication and mental illness in the guilt phase to lay a foundation for the penalty phase.  But as established above, none of the defense mental health experts concluded that Fell's mental disorders or consumption of alcohol impaired his ability to act intentionally on the night of the offenses.  Moreover, as we established above, trial counsel's decision not to present mental health evidence in penalty was reasonable in light of the government's rebuttal case.  *See* sections IV and V,

-285-

*supra*. The same factors that informed trial counsel's decision not to introduce expert mental health evidence in penalty would have informed trial counsel's decision not to present mental health evidence in guilt. Introduction of mental health evidence in guilt would have triggered the same damaging evidence in rebuttal. It necessarily follows that trial counsel's decision not to present mental health evidence in guilt was reasonable as well, and resulted in no prejudice.

### XIII.    Trial Counsel Were Not Ineffective in Failing to Interview and Present Additional Execution Impact Witnesses

Mitigating factor number seven claimed that Fell's execution would detrimentally affect persons who care about him. In support of this factor, trial counsel submitted the testimony of Mary Jo Scott, who testified that she valued what she had accomplished with Fell, and what Fell had accomplished for himself, and would hate to see that end. Tr. 8-1 at 72. Fell claims that his trial counsel was ineffective in failing to present additional witnesses in support of his execution impact mitigating factor.

Even post-conviction, Fell does not offer much evidence of execution impact. In support of his post-conviction claim Fell submits the testimony of Teri Fell, his sister, who testified at trial and was at the time admittedly upset at her mother's death. Tr. VII-1 at 144. Nonetheless, Teri conveyed to the jury a sincere sense that her brother cared about her and she about him. They shared a horrific childhood, an experienced that left them with no one but each other to rely on, and which undeniably bonded them for life. While Teri Fell did not actually say, "I will be affected by my brother's execution," there was no doubt, in light of her testimony, that she would be. Rather than being ineffective, trial counsel should be commended for securing the testimony

-286-

of Teri Fell on behalf of her brother, after he brutally murdered their mother.

Fell also offers the statement of one of his half brothers, Robert Fell, in support of his argument. *See* P. Exhibit 247. But Robert Fell would have been as vulnerable as his sister, Susan Benzkowski, if not more so, on cross examination on the subject of execution impact. Robert Fell has not seen his brother for so long, he cannot remember. *Id.* Robert Fell has not visited Fell in prison since his arrest. *Id.* The testimony of Robert Fell certainly would not have shed any additional light on Fell's background or character. *Id.* Robert Fell simply had no significant relationship to his half brother. Therefore, presenting the testimony of Robert Fell in support of execution impact would have been more detrimental than beneficial. Indeed, his testimony would have been subject to exclusion for the same reasons the Court did not allow Sharon Hinchey to testify as to execution impact – she was too distant to have a connection with Fell that would rise to the level of execution impact. *See* Tr. XIII-1 at 16.

Similarly, Janice Stoss maintained no significant relationship to Fell. *See* P. Exhibit 274. Tim Reynolds, Debra Fell's boyfriend, was in prison when Fell visited his mother in Vermont and had no relationship with Fell ("Debbie had two children. I never met them."). The fact that he would not want to see Donny executed because he believes that Debra Fell would not have wanted her son executed, does not constitute execution impact evidence. While Deacon Ratte may have offered testimony in support of execution impact, his testimony may have also opened the door to other damaging evidence about Fell. *See* section VII(A)(2), *supra*. Thus, not only was there a dearth of evidence to support execution impact in Fell's case, but many of the

-287-

witnesses who could offer testimony in support of this factor were not close to Fell and had extra

baggage that would have been detrimental to his case. Therefore, it cannot be said that trial

counsel was ineffective in failing to present additional witnesses in support of the execution

impact mitigating factor.

Even if this court were to determine that trial counsel's failure to present additional

witnesses in support of execution impact was error, there is no reasonable probability that such

evidence would have led to a different outcome. Fell cannot show prejudice.

### XIV.    Trial Counsel Was Not Ineffective in Failing to Object to the Admission of Relevant, Probative and Admissible Evidence

Fell faults his trial counsel for failing to object to evidence that was clearly relevant,

probative and admissible.

#### A.    Trial Counsel Was Not Ineffective in Stipulating to the Admission of Fell's "Slayer" T-Shirt

When arrested in Arkansas, Fell was wearing a black t-shirt, depicting a demon with the

word "Slayer" – a reference to the hard metal rock band by the same name. Fibers consistent

with the Slayer t-shirt were found at the scene of Terry King's murder, and Fell admitted that he

had been wearing the Slayer t-shirt when he killed Terry King. Clearly then the Slayer t-shirt was

relevant and probative evidence of Fell's participation in King's murder.

Fell claims that his trial counsel was ineffective in failing to move to exclude the Slayer t-

shirt under Rule 403 because it was more prejudicial than probative. He argues that the t-shirt's

demon image conveyed a prejudicial image of Fell to the jury. Fell submits that since he did not

-288-

contest his presence at the New York murder scene, the Slayer t-shirt, and any evidence related thereto, was irrelevant.

While Fell did not contest his presence at the murder scene, he pleaded not guilty to the charges. As a result, all allegations in the indictment were at issue and the government was forced to prove its case beyond a reasonable doubt. The Slayer t-shirt was a significant part of the government's case because it was probative of Fell's presence at the murder scene of Terry King.

The admission or exclusion of evidence is a discretionary decision to be made by the trial court. Nothing in the record indicates that a Rule 403 motion to exclude the Slayer t-shirt would have been successful even if pursued, particularly in light of its relevance and probative value.

Fell now contends that he was actually wearing a blue hooded pull-over sweatshirt over the Slayer t-shirt during the crimes; therefore, the Slayer t-shirt would not have been exposed at the crime scene. He adds that the fibers of concert t-shirts are fairly common, and thus, any probative value was minimal. However, this argument goes to the weight the jury might have accorded the fiber evidence, not to its admissibility.

The Slayer t-shirt was published to the jury only briefly at the guilt phase, and not at all during the penalty phase. Any significance it may have had was likely dwarfed by the extraordinary amount of aggravating evidence, and the fact that the contested issues concerned the penalty phase, not the guilt phase. Therefore, Fell has failed to establish that there is a reasonable probability that had counsel been successful in excluding the Slayer t-shirt at the

-289-

guilty phase, the outcome of the case would have been different. Counsel's performance was

neither deficient nor prejudicial.

> B.    Trial Counsel Was Not Ineffective in failing to Object to Testimony about
> Satanism

During the cross-examination of Teri Fell, the government inquired whether Fell had any

interests in religion:

Q    Did he have any interests against religion?
A    He wasn't a religious person at all.
Q    Can you explain that to the jurors?
A    He didn't believe in God.
Q    What did he believe in?
A    Well, when we were first living in Wilkes-Barre, he didn't believe in anything, and
     then towards – by the time I moved out of Aunt Jackie's house when I was 16, he
     talked about Satan, but I don't know if he worshipped Satan.  I don't believe that
     he worshipped Satan.  He didn't have a Satanic bible or anything like that.
Q    What did he say, if anything, about Satan?
A    He would just make jokes about Satan being the kindest beast, and that was it, and
     that he normally talked to me about National Geographic.
Q    And, I'm sorry, you said Satan is the kindest beast?
A    Yes.
Q    I'm sorry, what does that mean?
A    I don't know.
Q    Do you know, if as a result of that, he has any tattoos?
A    Yes, he does.
Q    And what are those tattoos?
A    On his left arm, I do believe he has got an upside down cross with 666  And on his
     right arm he has got an anarchy sign.
Q    Do you know what the upside down cross with 666 means?
A    It represents Satan.
Q    Do you know when he got that?
A    I don't know that.  Probably -- I think he was 15 or 16 when he got it.

Tr. VII-1 at 144.  The government asked defense prison consultant James Aiken whether any of

Fell's tattoos had any significance to him.  Aiken replied mildly that the 666 tattoo could denote a

relationship with an organization, but did not elaborate further.  Tr. X-1 at 30.  Fell claims that his

trial counsel was ineffective in failing to object to this testimony or request a limiting instruction.

Fell submitted two mitigating factors relating to his pretrial confinement at the Northwest

Correctional Facility.  Mitigating factor number five alleged that Fell "does not present a risk to

prison officials or other inmates if he is sentenced to life in prison without possibility of release."

Mitigating factor number six alleged that Fell "has made positive contributions to the Northwest

Correctional Facility by working, gaining an education, and helping to resolve prison grievances."

In support of his argument that he had adjusted well to prison, Fell offered evidence of his

participation in extracurricular activities, including religious studies.  The government sought to

rebut the evidence of Fell's rehabilitative potential with evidence that he was a significant

disciplinary problem at Northwest.  The government also showed that Fell had manipulated the

prison grievance process by filing a prison grievance and then a lawsuit alleging he had been

denied the right to practice a Native American faith, and that he participated in the Muslim feast

of Ramadan.  To further show that Fell's interest in those religions was not sincere, the

government sought to establish that he had exhibited no interest in any religion before

incarceration.  The government elicited evidence of Fell's tattoos.

The "[C]onstitution does not erect a *per se* barrier to the admission of evidence concerning

one's beliefs and associations at sentencing simply because those beliefs and associations are

protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 486 (1993), *quoting*

*Dawson*, 503 U.S. at 165; *United States v. Kane*, 452 F.3d 140, 142 (2d Cir. 2006) (collecting

cases); *Kapadia v. Tally*, 229 F.3d 641 (7th Cir. 2000).  Evidence of a defendant's beliefs may be relevant to show his motive for committing a crime, *Mitchell*, 508 U.S. at 485-86; *Barclay v. Florida*, 463 U.S. 939 (1983) (plurality opinion); *United States v. Salameh*, 152 F.3d at 111-12, or to rebut the defendant's evidence. *Kane*, 452 F.3d at 143-44.

The testimony regarding Satan was not obviously objectionable.  Moreover, trial counsel could have determined that an objection to such a brief mention of Satan may have actually served to bring more attention to the issue, while not objecting and allowing the government to move on would appear as though the issue was insignificant to Fell.  Simply because trial counsel may have valid grounds to formulate an objection does not mean that he is compelled to do so in every instance.  In this case, an objection may have indeed brought more attention to the matter.  Similarly, requesting a limiting instruction would have focused the jury's attention on the issue of Satan in ways that the brief testimony may not have.

Fell's trial counsel elected to forgo an objection and clarify the issue in a manner that limited any prejudice that could be derived from such testimony.  During the cross-examination of Matt Cunningham, a government rebuttal witness, trial counsel inquired as to how Fell had acquired his tattoos.  Cunningham testified that he, Fell, Lee and others were friends who smoked marijuana during the middle and late 1990s.  Trial counsel established that Fell and his friends were very interested in forming a band devoted to heavy metal music.  Cunningham agreed that the "dress and the getting of tattoos . . . was . . . consistent with what [we] were trying to do."  Tr. XI at 53.  Trial counsel's strategy was reasonable.

Fell argues that he suffered prejudice because the evidence led the jury "to believe that Mr. Fell had an interest in Satan and this motivated his crimes and defined his character." But such an argument was never advanced by the government at trial. It cannot be said that the brief mention of Fell's possible Satanic beliefs during the testimony of his sister was so significant that had it been excluded the outcome of the trial would have been different. The testimony occupied less than half a page in the entire transcript of the penalty phase and was not used by the government in summation. Moreover, the trial court instructed the jury that it could not consider Fell's religious beliefs in reaching its decision. Therefore, even if the court determines that it was error for counsel to fail to object to this testimony, Fell cannot show prejudice. Indeed, the Second Circuit, readily found no prejudice:

> Nevertheless, to the extent that any unjustified reference to Fell's satanic beliefs occurring in the testimony constituted constitutional error, it was not challenged at trial and did not constitute plain error. It neither prejudiced Fell nor did it "seriously affect the fairness, integrity, or public reputation of judicial proceedings."

*Fell*, 531 F.3d at 230.

C.   Trial Counsel Was Not Ineffective in Failing to Limit the Use of Matt Cunningham's Testimony

When the government sought to introduce the rebuttal testimony of Matt Cunningham, trial counsel objected, Tr. XI at 6-13, but was overruled by the Court. *See* "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing." Docket No. 193; Tr. XI at 56-57, 78. *Id*. at 13. Fell claims post-conviction that the government impermissibly used

-293-

Cunningham's testimony to argue premeditation and motive in closing argument. Fell faults his

counsel for failing to object to the government's argument.

Fell's premise for his claim of ineffective assistance of counsel is false. He takes the

prosecutor's words out of context in an effort to establish a claim where there is none. The

prosecutor used Cunningham's testimony, as well as the testimony of Larry Turner, the victim's

brother, to establish that people with bad childhoods can grow up and make moral decisions as

adults. When read in context, the prosecutor's argument is shown to be completely proper.

> "Question: Can you please tell the jury a little bit about those early years growing up with Terry." This is a man of not many words, pretty short sentences, and this is what he said: "They were pretty tough years. You know, when I hear people talk about child abuse and tough lives, I don't know if anyone had it much tougher than we did. My father was an alcoholic, and he was a mean alcoholic. He liked to drink, and he liked to drink hard stuff. And when he did, you didn't want to be around him. We went without a lot of things because he drank mostly every cent he had. Friday nights he would be in the bar drinking, and you'd be lucky to have anything left for anything else when he was done. I have seen him and my mother fight over that, money and drinking, and I have seen him beat her so bad she couldn't walk. Both of us did. It was a rough time of life.
>
> "Question: Did your father treat you differently than Terry? "He treated us a little differently because I was the oldest and I was a boy. He didn't really do too much to her, you know. Smacked her around once in a while. But he could get on me if he wanted to." A little later, Larry Turner was asked the question: "What lessons did Terry and you take from that background?" He said: "I guess I used it as a learning curve. I knew I didn't want to live that type of life, so when we moved on, none of the four of us ever lived like that." Because you don't have to live like that. You can grow up and make your own decisions. And Matthew Cunningham made decisions. So did these other people. And so will the vast majority of those kids down at the Head Start Program. You know as a matter of common sense that people have free will, and particularly when they grow up, they have free will to do the right thing and to decide what's right and what's wrong. And you know that for years, Donald Fell thought about killing. He thought about killing John Kozierski, his teacher, back when he was starting out in high school.

-294-

> A couple more years went by, and in conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one. And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too. People are responsible for what they do, particularly when they do severe, heinous crimes like this. The killing of Terry King was completely unnecessary. Those guys could have driven her up a dirt road, several miles up some dirt road, off of Route 22, or it could have been in Vermont, and they could have dropped her off, and they could have said, "Give us your shoes and give us your clothes. You're staying here." And they would have had hours to get out of there. They could have tied her to a tree, or in Dover they could have knocked her out. They could have punched her hard, and that woman, she would have been knocked out cold and they could have driven away. But again, that wasn't the choice that he made.

Tr. XII at 124-26. Far from arguing substantial premeditation or motive, the prosecutor argued that Fell had the ability to make free choices. He used the testimony of Larry Turner and Matt Cunningham as examples to demonstrate a person's ability to change as an adult, even after a troubled childhood, and make good moral choices. The prosecutor then contrasted the life trajectory of the two witnesses with Fell's. He reminded the jury of Fell's experiences and thoughts as an adolescent and then argued that as an adult, rather than choosing to make moral decisions, Fell chose to kill. There was nothing erroneous about the prosecutor's argument and no valid reason for trial counsel to have objected.

Fell claims that had trial counsel objected to the use of Cunningham's testimony, "the jurors would have given less weight to the government's proffered statutory aggravator about 'substantial premeditation,' and at least one juror would have struck a different balance in favor of life." P. at 291. But the government did not rely on the statutory aggravating factor of

-295-

substantial planning and premeditation as to the Rutland killings. *See* Special Verdict Form, Dkt. No. 200. The only aggravating factor relating to the Rutland murders was multiple killings. Cunningham's testimony did not relate to that aggravating factor in any way. The government alleged as a non-statutory aggravating factor that Fell participated in the murder of *Terry King* after substantial premeditation to commit the crime of carjacking. Cunningham's testimony did not relate to this aggravating factor either. Cunningham's testimony related to the background and character of Fell, and the government used that testimony to discuss Fell's background and character.

Fell further faults his trial counsel for failing to request a limiting instruction. But a limiting instruction is not necessarily the best strategy as it may draw more attention to an issue and possibly suggest inferences which the jury may not have drawn on its own. In any event, since the government properly argued the testimony of Cunningham, a limiting instruction was not warranted.

D.    Trial Counsel Was Not Ineffective in Failing to Counter the Government's Assertion that Fell's Memory of the Word "Hawk" on the Murder Weapon Was Evidence that Fell Was Not Intoxicated

Shortly after arrest, Fell gave three detailed statements admitting his participation in the carjacking and kidnapping of Terry King, and in the murder of his mother and her friend Charles Conway. Fell described in detail how he personally killed Conway, where Conway was sitting when he attacked him, approximately how many times he stabbed him, how and where he stabbed Conway, and the weapon he used, a knife with the word "Hawk" on it. *See* Exhibit J at 14-15, 19,

-296-

28.  The government argued that Fell could not have been significantly impaired by alcohol on the night of the murders if, among other things, he remembered so many details, including that the knife he used to kill Conway had the word "Hawk" on it.

> Next, you also know the defendant remembered these events clearly four days later.  Think about it, ladies and gentlemen.  *If he was significantly impaired at the time, would he remember that the knife he was using said the words Hawk on it?*  Would he be able to describe the difference between the two knives as he did, one with Hawk on it, and the other as a black-handled knife.  There are many other instances of his memory that day:  His exact description of the route that he took.  You remember Mr. Darrow showed that to you.  It's on one of the charts you can consider.  He remembered each turn that he took on his way down to the Price Chopper.  No question he was not significantly impaired.

Tr. XII at 39 (emphasis added).

This was a perfectly logical argument.  Notwithstanding, Fell claims that trial counsel was ineffective in failing to object to the government's argument.  According to Fell, it was objectively unreasonable for counsel to allow the jury to draw this inference against Fell.  P. at 292.  Fell's claim has no merit.  The government's argument was not error.  Trial counsel is not required to raise futile objections.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).  *See also Scott v. Romero*, 153 Fed. Appx. 495, 497-98 (10th Cir. 2005) ("Counsel is not ineffective for failing to advance a futile argument").

### XV.    Trial Counsel Was Not Ineffective in Failing to Preserve the Record

Fell claims that his trial counsel failed to object at trial to the following government arguments during final summation:

-297-

1.    Fell's decision not to plead guilty;
2.    the jury's consideration of mitigating factors unrelated to the capital offenses; and
3.    Fell's interest in Satanism, Islam and Native American religions.

P 293. Fell contends that trial counsel's failure to object to each of these arguments by the government in final summation resulted in these claims of error being reviewed on direct appeal under the plain error standard and thus constituted ineffective assistance of counsel. Fell's claim has no merit.

Under *Strickland*, a petitioner demonstrates ineffective assistance of counsel by showing first that his trial counsel's performance fell below an objective standard of reasonableness; and second, that the deficient performance was prejudicial. 466 U.S. at 687. To establish prejudice Fell must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 694. Therefore, Fell cannot demonstrate ineffective assistance of counsel by showing that trial counsel's error resulted in an unfavorable standard of review on appeal. *See United States v. Busch*, 411 Fed.Appx. 872, 877 n. 4 (6th Cir. 2011) ("Under *Strickland*, we determine prejudice by asking whether trial counsel's error undermined confidence in the outcome of the trial, not by asking whether trial counsel's error resulted in an unfavorable standard of review on appeal."); *United States v. Hemsley*, 287 Fed.Appx. 649, 650-51 (10th Cir. 2008) (holding that appellant had not made out a claim of ineffective assistance of counsel based solely on the argument that his lawyer's failure to object subjected appellant to the more deferential "plain error" standard of review on appeal). Fell must

-298-

show that trial counsel's error was of such magnitude that it undermined confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. Fell cannot make this showing.

A.    <u>Trial Counsel Was Not Ineffective in Failing to Object to the Prosecutor's<br/>Argument in the Final Summation of the Penalty Phase</u>

As established above, trial counsel is not required to make futile objections. At trial the parties stipulated that Fell offered to plead guilty in exchange for a life sentence without release and government refused that offer. Fell argued that Fell had accepted responsibility for his actions through his offer to plea guilty. The government responded in rebuttal that Fell could have pled guilty unconditionally, but elected to go to trial forcing the government to prove its case. On direct appeal, the Second Circuit found that the prosecutor's argument regarding Fell's offer to plead guilty was a proper response to Fell's argument in closing. *Fell*, 531 F.3d at 221. Fell cannot establish that his counsel's performance fell below an objective standard of reasonableness for failing to object to an argument that was not error. Such an objection would have been futile. Given that Fell has failed to show that his trial counsel's failure to object to the government's argument regarding his offer to plead guilty was professionally deficient and prejudicial, he is not entitled to relief.

The same analysis applies to Fell's claim that his trial counsel was ineffective in failing to object to the introduction of evidence and government argument regarding Fell's alleged interest in the Native American and Muslim religions. The Second Circuit found on direct appeal that the testimony regarding Fell's interest in the Native American and Muslim religions was relevant. *Id*. at 229. "We see no error and certainly no plain error in its admission." *Id*. at 230. Certainly

-299-

then, the government's use of this evidence in final summation was not error either.[49]  Again, trial counsel was not compelled to lodge a futile objection to argument that was not error.  Fell is not entitled to relief.  Counsel's performance was neither deficient nor prejudicial.

Similarly, the Second Circuit found on direct appeal that the prosecutor's argument that some of the mitigating factors warranted little or no weight because they lacked a connection to the capital offenses did not lead the jurors to believe that they were precluded from considering Fell's mitigating evidence.  *Fell*, 531 F.3d at 222-23.  Significantly, two of the panel members agreed that the prosecutor's arguments were entirely proper.  *Id.* at 222 n. 14.  The Court went on to find that in light of the evidence presented, the instructions provided and the findings of the jury, "[n]o juror could have [believed] that to qualify as a mitigating factor, that factor needs to have a nexus to the crime."  *Id.* at 224.  Thus, not only was the prosecutor's argument not error, but Fell cannot show deficient performance or prejudice as a result of his counsel's failure to object to the government's argument regarding the lack of nexus between some of the mitigating factors and the capital offenses.

        B.      <u>Appellate Counsel Was Not Ineffective in Failing to Raise Evidentiary</u> <u>Issues on Direct Appeal</u>

Fell claims that his appellate counsel was ineffective in failing to raise a number of issues on direct appeal.

---

[49]  The government addressed Fell's claim of ineffective assistance of his trial counsel in failing to object to evidence of Satanism in section XIV(B), *supra*.

1.    Leading Questions by the Government During the Guilt Phase

Fell contends that his trial counsel failed to object, and his appellate counsel failed to raise on direct appeal the government's use of leading questions during the guilt phase.  However, Fell makes no attempt to identify the alleged leading questions that he claims were improperly posed, nor does he state how, if in any way, he was prejudiced by his attorneys' failure.  This claim should be denied for failure to state sufficient facts upon which relief can be granted.

2.    The Eike Assault

As stated above in section VI(B), *supra*, in the penalty phase, the defense called Fell's sister, Teri Fell, to the stand.  Consistent with their trial strategy, the defense solicited testimony from Teri Fell about her and Fell's childhood, providing examples of alcoholism, physical abuse, neglect and abandonment.  *See* section III(B)(1)(a), *supra*.  In cross-examination the government sought to develop their trial strategy of portraying Fell as an individual who became increasingly violent and aggressive as he approached adulthood.  Pursuant to that trial strategy the government inquired about the Eike assault.

> Q    Was there a time when you also saw your brother be very angry and use his feet?
> A    What -- I'm not sure what you are referring to?
> Q    Did you ever see him kick someone violently?
> A    Yes.
> Q    What did you see him do?
> A    He beat a kid up and he was kicking him.
> Q    How serious was it?
> A    It was pretty serious.
> Q    Did the kid go into shock and into a coma?
> A    Yes, he did.

Tr. VII-1 at 144.

-301-

Q    And in terms of what your brother did to this person, did he do anything other than stomp on the person?
A    He punched him.
Q    Did he urinate on him?
A    Yes.

*Id*. at 151. Fell contends that his trial counsel was ineffective in failing to object to this testimony and appellate counsel was ineffective in failing to raise this issue on direct appeal. But this testimony was clearly admissible as it was probative of Fell's character and background. On direct Teri Fell testified broadly about Fell's back ground and experiences over many years. It was not objectionable for the government on cross to inquire about Fell's acts of violence. As stated above, neither trial nor appellate counsel had an obligation to raise a futile objection, and their performance in this regard was neither deficient nor prejudicial.

3.    Testimony of Police Officer About the Features of "Battered Woman Syndrome"

On the second day of the Fell's mitigation case, during the cross-examination of Officer Christopher Purcell, the government asked whether he considered Debra Fell a battered woman.

Q    Did you have a fair amount of experience dealing with domestics in houses around town over the years?
A    Absolutely.
Q    All right. Generally, in your view, what was the main problem in that household?
A    Alcohol.
Q    Alcohol?
A    Yes.
Q    And in the altercations that you witnessed, were you able to distinguish who the main aggressor was or the main assailant?
A    Basically it was Mr. Fell.
Q    All right. Do you know whether or not you came to regard Mrs. Fell as essentially a battered woman or a battered spouse?

-302-

A     I would -- that's fair to say that, yes.

Q     All right. I understand that the time period we're talking about is about the end of October '89 to – about for one year, late October 1990?

A     Somewhere in there, yes.

Q     And during that time period she was afraid to take the necessary steps against him?

A     We – we offered her many times shelter. We offered her shelter for her and her kids. We offered her domestic violence help. She refused every effort that we -- we tried to give her.

Q     Okay. What was the date of this incident when Mr. – young Donald Fell wouldn't take a shower and the father gave him –

A     October 29th, 1990.

Q     Okay. Do you know if that's around the same time that Debra Fell finally took some action against her husband?

A     Well, that's – this basically, I think, predicated that action, because this was the first time that we would – we finally were able to make an arrest. She was going to follow through. She did follow through at the magistrate level, which was a slight period of time. He was court ordered away from the house. Part of his bail was he was not to return to the house or have any contact.

Tr. VII-2 at 36-38. Fell asserts that Officer Purcell was not qualified to offer such testimony, and

that his trial counsel was ineffective for failing to object to this testimony, and his appellate

counsel was ineffective for failing to raise this issue on direct appeal. Generally, the rules of

evidence applicable at trial do not apply at sentencing. In any event, the record shows that prior

to asking Officer Purcell whether he considered Debra Fell a battered woman, the prosecutor

asked Officer Purcell whether he had much experience responding to domestic situations. Officer

Purcell indicated that he did. Moreover, Officer Purcell had first hand knowledge of the

relationship between Debra Fell and her husband as he had responded to their home on numerous

occasions. *Id*. at 28-29. Therefore, he was certainly qualified to state, based on his experience

and personal observations, whether or not he considered Debra Fell a battered woman.  Trial

counsel's failure to object to this testimony and appellate counsel's failure to raise this issue on

appeal was not constitutionally deficient.

Even if the Court were to determine that trial and appellate counsel's failures were error,

Fell has not shown how, if in any way, he was prejudiced.

### 4.    Testimony of William Kane

On the second day of his mitigation case, Fell introduced the testimony of William Kane,

a counselor at St. Michael's School.  Tr. IX-2 at 4.  Mr. Kane testified, among other things, that

Fell was housed in an intensive treatment unit at St. Michael's and was considered a mental

health client.  *Id*. at 24.  On cross-examination the government sought to establish that Mr. Kane

had not seen Fell since he left St. Michael's and that Fell, like any other individual, was able to

make free choices.

> Q    So at that point when you last saw him – which would have been
> 1994?
> A    That would have been – when I discharged him, it would have been
> the spring –  actually, it's probably on here.  It  would have been the
> spring of '95, I think.
> Q    Okay.
> A    Actually, I can't find a date, but I just – I remember he participated
> in the summer for the day treatment, so it would have been --
> toward the end of the school year was the typical time to discharge
> kids, as well.
> Q    But you haven't seen him since then?
> A    I – as I said, I saw him here and there during the day treatment
> program, but our contact would have been, Hi, how you doing, you
> know.  But I haven't seen him since, no.
> Q    And since then you don't really know anything about what he's
> been up to or the choices he's made since being there?

A    No, I don't.
Q    Do you believe that each individual does have to make choices in life?
A    Yes, I do.
Q    And they should be held accountable for their choices?
A    Yes, I do.

*Id*. at 29-30.  Fell claims that his trial counsel was ineffective in failing to object to this testimony and his appellate counsel was ineffective in failing to raise this issue on direct appeal.  According to Fell, Kane's testimony constituted an impermissible comment on Fell's moral culpability.  Nothing could be further from fact.  The government's cross examination inquired into an individual's ability to make choices and his responsibility for those choices – not his moral culpability.  Trial counsel's failure to object to this testimony and appellate counsel's failure to raise this issue on appeal was not deficient representation.

Even if this court were to determine that trial and appellate counsel's representation was deficient, Fell has not shown how, if in any way, he was prejudiced by this brief testimony.

###        5.        Testimony of Matt Cunningham

In its rebuttal case, the government introduced the testimony of Matt Cunningham over Fell's objection.  Cunningham was a friend of Fell's growing up and he was asked about his interactions with Fell in an effort to inform the jury about Fell's character.  During one of the conversations that Cunningham had with Fell, they talked about what they would do if they committed murder.

Q    Now, at times did you also talk about what it might be like if one of you committed murder and whether or not you would commit more than one murder?

-305-

A      Yeah.  I recall a conversation like that.
Q      And what did Donald Fell say?
A      Well, he wasn't the only one involved in the conversation, but it went along the lines of, well, if you killed one person, why stop there?  Because you are going to get the same punishment anyway, so –

Tr. XI at 51.  Fell claims that his trial counsel was ineffective in failing to object to this testimony and his appellate counsel was ineffective in failing to raise this issue on direct appeal.  But trial counsel had already objected, unsuccessfully, to the testimony of Cunningham.  *See* "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing," Dkt. No. 193; Tr. XI at 56-57, 78.  Obviously, therefore, there was no need for another objection during the testimony.  Even, if the court were to determine that trial counsel's failure to object again to Cunningham's testimony was deficient representation, Fell has failed to set forth how, if in any way, he was prejudiced.

6.      Testimony of Matthew Kolojeski

During the guilt phase of the trial the government presented the testimony of Matthew Kolojeski, a friend of Fell's.  After Fell and Lee brutally killed Terry King, they drove to their home town of Wilkes-Barre and stayed with Kolokeski for a couple of days.  During that time Fell, Lee, Kolojeski and Kolojeski's brother did drugs, drank and played cards.  The government specifically asked Kolojeski about Fell's drinking:

Q      Okay, thank you.  Now, you said that they [Fell and Lee] came to the apartment.  Did they end up staying?
A      Yes.
Q      And what were you all doing at the apartment?

A    Like I said, just pretty much drinking a little bit, smoking some weed, hanging out.

Q    What if anything were people drinking?

A    Beer, and pretty sure they had a couple 40s.

Q    When you say a 40, what is a 40?

A    A 40-ounce of beer, bottle.

Q    So that's a big, full, 40-ounce bottle?

A    Yeah.

Q    Now, had you drank with Donald Fell in the past?

A    Yeah.

Q    What did he like to drink?

A    Mostly beer, pretty much.

Q    And had you seen him drink beer in the past?

A    Yes.

Q    And he drank beer that day as well?

A    Yeah.

Q    Did he have a tolerance for alcohol?

A    Yeah.  He – he seemed, you know, he was somebody that could drink a little bit more than most people without actually being impaired too easy

Q    And how did you notice that?

A    Me just being an addict before, you know, when you see a guy that could drink, you know, more than a six-pack or something and not, you know, act any different, is usually a guy that has a tolerance.

Q    And you noticed that about Donald Fell?

A    Yeah.

Q    And, was his tolerance greater than yours?

A    Yeah, I don't drink alcohol.  I was more into drugs, so –

Q    But you had been around other people that had drank?

A    Yes.

Q    And his tolerance was higher than a normal person?

A    Yeah, pretty much.

Tr. III-1 at 119.  Fell claims that his trial counsel was ineffective in failing to object to this testimony for lack of foundation and his appellate counsel was ineffective in failing to raise this issue on direct appeal.  But the prosecutor established that Kolojeski had drank with Fell on several occasions and had an opportunity to observe Fell after consuming a significant amount of

-307-

alcohol.  Therefore, Kolojeski testified based on personal experience and observations.  Further,

Fell's tolerance of alcohol was clearly probative.  Trial counsel had no grounds to object to this

testimony; therefore, his failure to object was not deficient representation.  Even if the court were

to determine that trial counsel's failure to object to was error, Fell has failed to set forth how, if in

any way, he was prejudiced by this testimony.

### XVI.    Fell's Claims of Ineffective Assistance of Counsel Have No Merit Individually or Jointly as They Had No Effect on the Outcome of the Trial

Fell's claims of ineffective assistance of counsel warrant no relief either individually or

cumulative.  As demonstrated above, Fell has failed to show that his trial counsel's performance

was professionally deficient or prejudicial.

Fell's trial counsel began a mitigation investigation immediately upon being appointed to

represent Fell, hiring a mitigation expert, as well as retaining the services of three mental health

experts to evaluate Fell and inform of potential mitigating information.  Trial counsel also

gathered documents, spoke to family members and devised an organized identifiable strategy in

anticipation of trial.  Fell's trial counsel called a total of 14 mitigation witnesses in the penalty

phase, encompassing six distinct areas of testimony, including family members; social workers;

law enforcement officers; teachers; correctional officers; and a prison consultant.  As established

above, these witnesses painted a very graphic picture of Fell's dreadful upbringing, plagued by

chronic alcoholism, physical and emotional abuse, sexual abuse, neglect and ultimately,

abandonment.  In addition, trial counsel introduced a mitigation binder containing dozens of

documents which related Fell's interactions during his childhood and adolescence with the social

-308-

service department and the mental health system of his residential county. Indeed, the Second

Circuit, in denying Fell relief, recognized the "extensive mitigation evidence" presented by Fell at

trial. *Fell*, 531 F.3d at 230-31. Trial counsel's decision not to introduce additional evidence were

informed and strategic decisions which are not opened to challenge post-conviction.

The jury thus had a comprehensive picture of Fell's background. The fact that the

ultimate outcome of the trial was not life does not entitle Fell to relief. As established earlier, the

reasonableness of counsel's performance must be evaluated "from counsel's perspective at the

time of the alleged error and in light of all the circumstances" (*Kimmelman v. Morrison*, 477 U.S.

365, 381 (1986)), and without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

An analysis of Fell's claims from this perspective leads to the inevitable conclusion that Fell has

not overcome that strong presumption that his trial attorney's conduct falls within the wide range

of reasonable professional assistance. *Id*. *See also Jackson*, 162 F.3d at 85. Fell is not entitled to

relief.

## XVII. The Government's Failure to Disclose Every Report of Interview Conducted by the FBI and Dr. Welner and Failure to Disclose Information from Social Service Agencies Did Not Violate Fell's Fifth and Eighth Amendment Rights

Fell argues that the government violated its *Brady* obligations in failing to disclose certain

FBI reports, Form 302s, during trial. None involved witnesses called by the government. The

Court should reject this claim because Fell is mistaken on the facts and the law. The government

turned over all FBI 302s Dr. Welner listed in his report with two limited exceptions. First, the

government interviewed a number of people after the defense gave notice that it intended to call

-309-

them as defense witnesses at the trial. Fell ignores the principle that *Brady* does not apply to information to which the defense already has access. The government does not have an obligation to provide FBI reports of interviews of defense witnesses. Second, the government failed to disclose one report for a non-defense witness, but as described below, it contained no material *Brady* information.

Fell also asserts that the government violated the Constitution by failing to disclose certain social service records and information once in the possession of the Social Security Administration. Again, Fell cannot show that the government failed to disclose material exculpatory information in its possession.

1.     The Welner FBI 302s

Fell's petition fails to define precisely the scope of his factual claims with regard to the interviews considered by Dr. Welner. Dr. Welner listed 159 different pieces of information he considered in his report. These sources include everything from medical records to FBI reports to conversations Welner had personally. Fell's motion makes various allegations about non-disclosure. For example, Fell first mentions that Dr. Welner's report notes that he considered the statements of "77 lay witnesses" and that the government "failed to disclose all but a few reports of investigations reflecting interviews of these individuals." This statement both misleading and incorrect. On the one hand, Dr. Welner spoke to a number of people himself without the FBI and there is no FBI report documenting the conversations. On the other hand, the government disclosed all of the FBI reports Welner listed except for the reports of 18 defense witnesses and

-310-

one non-defense witness.  Fell claims that counsel obtained 38 FBI 302s through a FOIA request

that were not produced, but some of these appear unconnected to the Welner report.

Fell begins his argument by claiming that some of the reports he received under a FOIA

request appear to contain "favorable information."  First, he cites an interview report for Erika

Balestra, Ex. 219.  Yet Ms. Balestra was listed a defense witness prior to her interview.   Second,

he mentions the interview of "pen pal" of Fell's,[50] Carol Larochelle, but it does not appear among

the reports Welner reviewed.[51]  Third, he cites two other reports of "witnesses who appear to have

known Donny earlier in his life."  One of them, the interview of May 9, Ex. 119, was of a defense

witness, Mr. Settas, and the other, the interview of June 1,[52] Ex. 221, was of Ms. Larochelle,

discussed above, was not reviewed by Dr. Welner, and involves someone who did not know Fell

before the murders.  Finally, Fell mentions a report of interview of a correctional officer, Ex. 225.

This officer, Adam Barcomb, was interviewed by the defense and provided a sworn statement to

---

[50]  Fell's petition, at 300, lists this report as Ex. 127, but it appears to be Ex. 221, since Ex. 127 was left blank and Ex. 221 refers to a "pen pal."

[51] While Fell does not make the argument in any clear fashion in his motion, he has failed to make any preliminary showing that the government violated its *Brady* obligations with respect to FBI reports not reviewed by Dr. Welner.  For example, the "pen pal" report details an interview with Carol Larochelle.  The report shows that Ms. Larochelle's sole source for information was what Fell told her in his letters.  Fell knew what he told her. The government could not have suppressed that information.  Any such information is merely what Fell himself knows.  Moreover, Fell obviously could have identified Ms. Larochelle (he can identify his pen pals) and had every opportunity to explain precisely what exculpatory information was, supposedly suppressed.

[52] Fell's petition, at 300, lists Exhibit 221 was report dated May 11, but in fact it is dated June 1.

the defense prior to trial.  Thus, his information was known to the defense.  The FBI interviewed

him after he provided a detailed statement to the defense.

Even assuming that listed defense witnesses provided the FBI with favorable information,

Fell cannot state a *Brady* claim based on the fact that the government failed to disclose its reports

of interviews of listed defense witnesses.  In a footnote, M 300 n. 107, Fell lists the people who

were the subjects of FBI 302s listed in Dr. Welner's report.  He lists 20 people, though he in fact

received the reports for one of those people.[53]  Fell neglects to mention that 18 of those people

were listed as his defense witnesses prior to trial.  *See* Exhibit H (defense witness lists).[54]

Fell fails to consider in any regard well-established *Brady* case law addressing the failure

to disclose information the defense already knows.  As noted above, one of the elements of a

*Brady* violation the petitoner must establish is that the government suppressed favorable

information.  he Second Circuit has held that "evidence is not considered to have been suppressed

within the meanig of the *Brady* doctrine if the defendant or his attorney "'either knew, or should

have known, of the essential facts permitting him to take advantage of [that] evidence.'" *United*

*States v. Payne*, 67 F.3d 1200, 1208 (2d Cir. 1995) (quoting *United States v. Zackson*, 6 F.3d 911,

---

[53] One of the 20 people, Robert Lee, Sr., was the subject of two FBI 302s, dated May 10,
2005 and May 24, 2005.  The May 24 302, which addressed substantial matters, was produced to
the defense on July 6, 2005.  *See* Exhibit L (government discovery letter with attachments).  The
May 10 302 dealt with Mr. Lee's questions about his son's death in jail and contains no
favorable material evidence.  *See* Exhibit G.

[54] Ericka Balestra, Mark Balestra, Tim Brooks, Theodore Settas, Ellis Carle, Geraldine
Fell, Deanne German, Sharon Hinchey, Donna Williams, Justine Taylor, Jason Rushlow, Ronald
Barclay, Mary Jo Scott, Diane Sergi, James Bailey, Mariann Chiumento, Donna Williams, and
Chris Purcell.

918 (2d Cir. 1993), and *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)); *accord United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990); *United States v. Exposito*, 834 F.2d 272, 275 (2d Cir. 1987).  Obviously, with regard to defense witnesses, Fell's counsel knew that they had potential favorable information.  There is no evidence that the defense did not contact and interview all of its own defense witnesses.  After they were listed, the government attempted to speak with them in an effort to understand their role in the case.  This happens in virtually every criminal case.  A defendant should not be heard to complain that he did not receive government reports of interview as to his own witnesses.

There is only one person, Sanda Bowles, not listed as a defense witness but listed by Dr. Welner.  The government has attached an unredacted copy of this FBI 302.  *See* Exhibit I.  It is apparent from the report that the failure to disclose it cannot state a *Brady* violation.   Sandra Bowles is Fell's maternal aunt.  She was interviewed on May 18, 2005 in South Carolina.  Ms. Bowles described Fell's history generally.  Fell knew both that he had an aunt and that she was aware of his general history.  Ms. Bowles recalled some incidents from Fell's past, including the knife fight incident involving Fell's parents, but this information was presented to the jury by other witnesses and was not contested.

Fell also argues that the FBI reports suggest medical misconduct by Dr. Welner, in particular violations of the Health Information Portability and Accountibility Act and other privacy laws.  This argument is also flawed.  This claim might have relevance if Dr. Welner testified, but he did not.  Even if Fell could make this point from the evidence – and the

-313-

government does not concede that he can – the information is at best *Giglio* information that could be used to cross examine Dr. Welner.  Since he did not testify, the only plausible *Brady* claim is that had the defense known of this potential impeachment that knowledge would have affected its decision with regard to its mental health case.  That claim is simply too farfetched.  Fell has failed to proffer any argument that this minor impeachment information would have affected his trail strategy.

Further, Fell complains about Dr. Welner's failure to mention that he was present during the interview of Stella Banas, Fell's step-grandmother.  This fact does not make out a constitutional claim.  On April 6,2005, Dr. Welner and FBI Agent Glenn interviewed both Stella and her daughter, Jeanette Banas.  Agent Glenn prepared an eight-page report about Jeanette's interview, which was disclosed to the defense on April 28, 2005.  Dr. Welner cited Jeanette's report as providing information he relied on.  It is clear from both reports that Jeanette had more detailed recollections than her mother, who was 82 in 2005.  Stella's report is two pages and contains few details.  Perhaps Dr. Welner never received the Stella Banas report, or he decided to rely on Jeanette's more detailed recollections.  Fell is also wrong on the facts.  He claims that he did not receive a copy of Stella's report.  Fell's counsel received a copy of the report with a discovery letter on April 20, 2005.[55]  Thus, defense counsel knew that Dr. Welner was present for

---

[55] As noted above, Fell also complains in passing about FBI reports unrelated to Dr. Welner's analysis that were supposedly not disclosed.  In order to state a colorable *Brady* claim with regard to such reports, Fell must make a greater showing than he does.  Fell notes that Agent Heilner interviewed a St. Michael's worker on July 5, 2005, Ex. 32.  In fact, Agent Heilner spoke that day with William Kane, former St. Michael's employee and defense witness, whose

Stella's interview.  Jeanette Banas and Stella Banas were also on the defense witness list.

2.    Social Service Records and Social Security Records

Fell also makes several claims with regard to information in the social service and Social Security records.  All should be summarily rejected.

First, Fell argues that the government committed a *Brady* violation by its allegedly selective incorporation of a portion of a report by Mark Innocenzi in the background investigation of Fell done by the FBI in 2001.  Innocenzi apparently worked as a social worker for St. Michael's.  In 2001, FBI Agent Glenn copied part of the St. Michael's records into the Fell background report.  Fell now claims that the FBI Agent failed to excerpt critical *Brady* information.  This claim misses the mark.  On the one hand, Fell now claims that the "full report" contains additional information, but the government cannot find this "full report" in the motion or its exhibits.  On the other hand, the only additional information is a claim that Fell's grandmother "believed" that Fell had been molested by his father.  Fell's grandmother, Theresa Sharpe, died in 1994, and was unavailable as a witness.  Fell's counsel obviously spoke with many other family members and clearly investigated the claim that Fell had been abused.  There has been no showing that Agent Glenn failed to include important information.[56]

---

contact information the defense provided to the government on July 4, 2005.  Fell called Mr. Kane as a defense witness on July 7, 2005.  In short, the FBI report concerned a defense witness who was actually called to testify.

[56] Agent Glenn was only allowed to review the Innocenzi information at St. Michael's. He hand copied the information for his 2001 background report.  The government never received the complete records from St. Michael's.

-315-

Second, Fell makes the argument that the government suppressed material information about Fell's Social Security Supplemental Security Income. Fell fails, however, to make any showing that the government possessed additional Social Security information. The Social Security Administration was not part of the prosecution team and the prosecution had no obligation to disclose its Social Security Records. In any event, Fell now has failed to make any showing that additional Social Security records existed in 2005 or that they would have been material to the defense. The defense presented various mental health records as part of its mitigation case. The jury learned that Fell received mental health treatment on multiple occasions. The defense consulted with various mental health experts. Fell and various family members knew that Fell received some sort of Social Security payments. Indeed, the Jeanette Banas FBI 302, disclosed to the defense in April, 2005, notes that Ms. Banas understood that Fell received some sort of SSI support. There is no evidence that Social Security records would have added anything to the defense case.

### XVIII. No Government Failure to Disclose Physical Evidence, or Failure by Counsel to Investigate Same, Warrants § 2255 Relief

Fell contends that the government suppressed physical evidence that would have supported his claimed impairment by controlled substances, and that counsel ineffectively failed to investigate such evidence. There is no basis for the argument. In any event, at least as to misconduct by the government, it could have been raised during the criminal case, both at trial and on appeal, and cannot now be raised collaterally, a decade later.

When arrested, Fell's various minimizing statements included his claim that his mother was a "crack addict," and that "we . . . were smoking crack and drinking Budweiser" shortly before the Rutland killings.  Guilt phase trial evidence established that there were many empty beer cans at the Rutland crime scene, but no drug evidence other than a small film canister containing some marijuana seeds.  Consistent with that fact, toxicology on the bodies of Debra Fell and Charles Conway showed no controlled substances except (a significant amount of) alcohol.  Trial counsel reviewed the Rutland crime scene evidence prior to trial, and photographs of the apartment were introduced at the guilt phase.  In any event, the killing of King in Dover Plains, New York, took place about four hours after the Rutland killings.

Fell now claims that critical physical evidence found in King's car in Arkansas was withheld by the government and not investigated by counsel.  M 308.  He bases this argument on an FBI form listing seized items, including a small bottle labeled "Patchoili Tunisian,"containing brown liquid, and a cigarette box containing small plastic bags.  Prior to trial defense counsel reviewed that evidence, in the custody of the FBI's Albany Division office.  What they found, consistent with what the government found, was no evidence of drugs.  Patchoili Tunisian is a "perfume oil," as an internet google search quickly indicates, and bottle's scent confirms.  The several small baggies in the Marlboro cigarette box were empty.  There is no basis for § 2255 counsel's claim that those items were tested (they were not), and no basis for the claim of unconstitutional conduct by the government and Fell's trial lawyers.

-317-

Counsel also purports to find significant the fact that the two pipes found in King's Neon were not tested for crack.  Again, in the absence of any evidence that Fell was high on crack when he and Lee killed King in New York, and in view of overwhelming guilt evidence of her purposeful, willful murder, the lack of testing was of no moment.  Even if Fell did smoke crack in Rutland hours before killing King in New York, that fact would have been of dubious mitigating value.[57]  Certainly the decision to eliminate that witness to the flight from Vermont was calculated and not reflective of a tranquilized mind.

The facts as to the two pipes are as follows.  Officer Jeff Ross, who arrested Fell and Lee in Arkansas traveling in King's car, described evidence found in that car, as did Jerry Spurgers, the FBI agent who searched it pursuant to a warrant.  Prior to trial, Ross testified at the March 16, 2005 suppression hearing that there were two "smoking devices, pipes, or in that nature that were used for smoking marijuana" in the car.  Transcript at 30-31.  He testified that he thought they were used for marijuana based on their smell and design, and his experience.  *Id*.  At trial counsel cross-examined Ross about whether the pipes were used for marijuana or crack.  Tr. I at 140. Ross testified that they did not go to the laboratory, but his "training and experience" led him to believe that they were pot pipes, not crack pipes.  When pressed, Ross conceded that he was not "a hundred percent," but went into some detail about respective pipe design, concluding that

_____

[57] Lee's statement, which the defense successfully excluded from trial, was that about six hours before the Rutland killings, Fell obtained a pipe that reportedly had crack residue on the screen, and he and Fell smoked the screen.

crack pipes were usually glass, and had small, "single hitter" bowls, unlike the pipes found in King's car. *Id*. at 142.

Fell fails to demonstrate unconstitutional conduct by either the government – which he fails to show suppressed drug evidence – or trial counsel, who decided to cross-examine Ross on the pipes rather than seek testing with at best nominal possible benefit. Of course, if a test had come back with negative results for crack, Fell's claim, and counsel's theory (or suggestion) that he had been smoking crack the night of the killings would have been completely undercut.

Fell also claims, over ten years after trial, that "a complete evidence log" for the Rutland crime scene was not found in trial counsel's files. Yet the necessary premise of his argument, that drug evidence was suppressed or overlooked, is pure speculation. Trial counsel reviewed the Rutland evidence prior to trial. Photographs of the crime scene were made available to counsel and introduced at trial. The evidence was described in testimony during trial. The record is devoid of any reason to suspect impropriety as to this issue.

## XIX.   The Government Did Not Violate *Brady*

Fell sets forth a number of claims alleging that the government failed to disclose favorable evidence. None of Fell's claims in that regard have any merit whatsoever; the bulk of them are pure speculation. As demonstrated herein, the government was forthcoming throughout the discovery process in this case. The documents that Fell alleges the government failed to disclose were not in the government's possession, or did not constitute favorable evidence that required disclosure.

The government was not in possession Eike's medical records or any records pertaining to his criminal history. While the government did conduct an NCIC check, the information obtained was not favorable to Fell. *See* section VI(B)(1)(c), *supra*. Nor was the government in possession of Officer Marc Pelkey's Vermont Department of Corrections disciplinary record. Notwithstanding Fell's assertions to the contrary, the government did disclose its investigation of Lee, including all documents obtained pursuant to that investigation. While the government did not disclose Lee's prison records, that information was not favorable to Fell in light of Fell's trial strategy. *See* section VIII, *supra*. Moreover, the government disclosed the existence of witness Francis Bellantoni and a corresponding statement containing the substance of his testimony. *See* section VIII(B)(2), *supra*.

## XX. No Prosecutorial Misconduct During Closing Argument Warrants § 2255 Relief

Fell contends that the government committed prosecutorial misconduct during closing arguments, depriving him of a fair trial. If there had been such misconduct, Fell should have raised it at trial, or, after obtaining a new set of lawyers, on direct appeal. In fact, he did raise several of these claims in a post-trial motion, and on appeal. At this time, all of the arguments are foreclosed for purposes of § 2255 collateral attack.

Fell's claim that the prosecutor misstated the law regarding the evaluation of mitigation evidence was explored by this Court post-trial, and reviewed and rejected by the Second Circuit on the direct appeal. *Fell*, 531 F.3d 221-225.

Fell also protests that, during the guilt phase summation, the prosecutor stated that there was "no evidence of [Fell] drinking" on the night of the Rutland murders "other than Mr. Bunin's speculation." M 313. Again, this claim was procedurally defaulted during the criminal case. Counsel urges that this was a prejudicial and "gross mischaracterization," despite the fact that it drew no objection, and was evidently overlooked both by the three trial lawyers and the three (new) appellate lawyers. If, as Fell now asserts, the record was "rife" with evidence of Fell's drinking, then presumably the jury followed the Court's instruction that attorneys' arguments "are not evidence" and that only "the evidence" can be considered in reaching a verdict. Tr. IV-2 at 11. Yet the evidence of Fell's drinking was, in fact, thin. More importantly, evidence of his intoxication was non-existent. It was uncontested that there were many beer cans in the apartment, but that arguably explained why both murder victims had high BAC that night. Only Fell's post-arrest statement claimed that he had also been drinking, and his post-arrest statements were false and minimizing in multiple regards. In any event, the evidence was uncontested that Fell had a life-long controlled substance problem, and that beer was a substance of choice. Whether guilt phase evidence showed that he was drinking beer the night of the Rutland murders, before driving interstate to New York and killing King hours later, was of nominal significance. The statement of the prosecutor in guilt phase rebuttal, even if inconsistent with the record, could not have prejudiced Fell. There was simply no evidence that Fell was intoxicated when he killed King, and there was ample evidence that he was not. Thus, not a single juror found that Fell's "capacity to appreciate his conduct was significantly impaired." Special Verdict Form, p. 15.

Fell also protests "numerous inflammatory remarks" by the government during penalty phase closing regarding his "religious practices." The government made the observations in response to Fell's contention, set forth in both mitigating factors and trial testimony, that he had adjusted well to prison and was a good inmate. The prison evidence showed that Fell was a font of grievances at the facility, and attended Bible studies, filed suit to protect his purported interest in Native American religious practices, and sought to participate in Muslim traditions as well. The government's contention – again, in rebuttal – was that his prison conduct reflected manipulation. Further, the most significant prison evidence – the videotaped altercations – indicated Fell's aggressive resistance to authority and his willful seeking of violent confrontation with corrections officers.

The bulk of the remarks Fell protests were in response to his own contentions and evidence. Government counsel would have been remiss in ignoring the prison evidence, including the religious practices evidence. Further, the remarks were brief, and but one part of a lengthy closing argument over 50 pages of transcript. And the Court instructed the jury to consider only evidence, not arguments, in reaching its verdict. Finally, any claim of government impropriety as to the remarks was foreclosed during the criminal case, and is not a proper subject for § 2255 review.

Fell also protests the government's penalty phase argument that, based upon his extraordinary crimes and the respective weight of aggravating and mitigating factors, he did not deserve a lifetime in prison. Prison, the government submitted, while a diminished life, was

-322-

nonetheless a life with undeserved comforts and pleasures.[58] The issue of whether Fell deserved a

life sentence, or a death sentence, was *the* issue at the trial, and the government was obligated to

argue it. The Court will recall that the government's final argument was brief, and was delivered

calmly and quietly. Certainly a capital verdict should be based on reason, not emotion or even

sympathy. The prosecutors here, both in the extended closing argument, and in the short rebuttal,

were not emotional and did not incite the jury's emotions. Inevitably, in a trial involving three

brutal murders, including the murder of a grandmother (with testifying family members),

emotions run high. Yet emotions at trial were not improperly inflamed by the prosecutors, and

the detailed Special Verdict Form reflects reasonable, deliberate findings by the jury. Finally, any

impropriety regarding the prosecutors' arguments should have been raised during the criminal

case. They are not a proper subject for collateral review.

---

[58] Fell cites *Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002), and *Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002), yet both cases affirmed capital verdicts. Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case. *See United States v. Higgs*, 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate). As in *Higgs*, in which the defense argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was a response to the defense mitigation phase contention that Fell, if given a life sentence, would spend his life, as described by defense expert Aiken, "under a gun at a U.S. Penitentiary." *See* Tr IX-2, p. 62 ("Fell can be adequately managed within the Federal Bureau of Prisons for the remainder of his life . . . and if lethal force has to be applied, it would be"). Moreover, even if a comment offends Oklahoma's "three cots" doctrine, which defines as misconduct arguments that compare the relative comforts of prison with the fate of the dead victim, the prosecutor in this case did not make the comment in an inflammatory appeal, and certainly made no statement that infected the trial with unfairness.

**XXI.  No Cumulative Impact from Prosecutorial Misconduct During Arguments Warrants § 2255 Relief**

Fell urges that the cumulative impact of prosecutorial misconduct warrants collateral relief.  In rejecting Fell's cumulative impact argument on direct appeal, the Second Circuit made the following observation:

> not every error – whether alone or in combination with others – warrants a new trial.  *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.").  As we have discussed, the trial conduct challenged by Fell either was not improper, was not prejudicial, or fails plain error review.  The district court's evidentiary rulings were thoughtful and meticulous; none approached an abuse of its broad discretion.  Because considered singly, none of the errors claimed by Fell undermine our confidence in the fairness of the proceeding, we similarly conclude that, given the care and soundness with which this trial was conducted, "the cumulative error doctrine finds no foothold in this appeal."

531 F.3d at 233 (citation omitted).  The same considerations and outcome apply here**.**

Further, arguments about the nature of the prosecutors' arguments at trial should have been raised during the criminal proceedings.  Some were, and were adjudicated adversely to his interests; some were not.  Either way, they are not properly the subject of this collateral litigation, years later.  None of the alleged errors, taken either single or cumulatively, warrant § 2255 relief.[59]

### Conclusion

In affirming the jury's verdict on direct appeal, the Second Circuit Court of Appeals concluded that this Court "presided over this complicated and difficult trial with care, fairness,

---

[59] Fell's arguments XXII and XXIII will be addressed in a separate filing.

and an exemplary concern for the protection of Fell's rights." 531 F.3d at 240. Judge Reena

Raggi echoed that characterization of this Court's performance in her opinion concurring in the

Circuit's denial of Fell's petition for rehearing *en banc*:

> At the outset, I note my agreement with the dissent's characterization of the trial court's conduct in this difficult case as "nothing short of exemplary."

*United States v. Fell*, 571 F.3d 264, 265 (2d Cir. 2009). The record in this case fully supports

these statements. Nothing in the record suggests that Fell received anything but a fair trial. The

Court stated in June, 2002, that, "as a matter of personal concern, I want to bend over backwards

to make sure that [Fell] gets the best possible representation that he can." June 11, 2002 Hearing,

Transcript p. 10. The Court's intent and efforts in that regard.

For the reasons set forth above, the Court should deny Fell's motion for collateral relief.

Dated at Burlington, in the District of Vermont, this 2d day of December, 2011.

Respectfully submitted,

UNITED STATES OF AMERICA

TRISTRAM J. COFFIN
United States Attorney

By:

/s/ *Jacabed Rodriguez-Coss*
JACABED RODRIGUEZ-COSS
Trial Attorney
U.S. Department of Justice
1000 Lafayette Boulevard
Bridgeport, CT 06604
(203) 696-3027
jacabed.rodriguez-coss@usdoj.gov

/s/ *William B. Darrow*
WILLIAM B. DARROW
PAUL J. VAN DE GRAAF
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov

-326-