IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

DONALD FELL                    )
                               )
     v.                        )          No. 2:01-cr-12
                               )
UNITED STATES OF AMERICA       )


**AMENDED OPPOSITION OF THE UNITED STATES TO FELL'S § 2255 MOTION**

The United States of America, by and through its attorney, Tristram J. Coffin, United States Attorney for the District of Vermont, opposes Donald Fell's 28 U.S.C. § 2255 motion to vacate his sentence.

Fell filed his motion requesting § 2255 relief in March, 2011, along with a 365-page brief and hundreds of exhibits. The brief raises 23 sets of claims, most of which contain a multitude of sub-issues. The bulk of the claims assert ineffective assistance of trial counsel. Fell later moved for extensive discovery, indicating that his claims would be supplemented and refined in future. After a thorough review of Fell's petition, the government submits that his claims, considered against the record, are all insufficient on their face. Therefore, prior to embarking on extensive discovery and repetitive cycles of filings, the government submits that the Court should schedule a hearing for argument on the post-conviction claims for sufficiency. This Court is fully familiar with the record, having presided over the trial. That record is now supplemented by the multitude of exhibits submitted with Fell's petition, and has now been scrutinized by both parties in nearly 700 pages of briefing. In the wake of the hearing, the government respectfully submits that Fell's claims should be summarily dismissed or, alternatively, dramatically reduced.

i

TABLE OF CONTENTS

I.  PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS AND APPLICABLE JURISPRUDENCE.. . . . . . . . . . . . . . 4
  A.  Evidence Introduced During the Guilt Phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.  The Disappearance of Terry King on November 27, 2000.. . . . . . . . . . . . . . 5
    2.  The Arrests of Fell and Lee in Arkansas.. . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.  The Discovery of the Bodies of Debra Fell and Charles Conway.  . . . . . . . . . 7
    4.  The Interviews of Fell in Arkansas.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    5.  The Discovery of King's Body in New York. . . . . . . . . . . . . . . . . . . . . . . . . 15
    6.  Physical and Forensic Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  B.  Evidence Introduced During the Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . 18
    1.  The Government's Direct Penalty Phase Evidence . . . . . . . . . . . . . . . . . . . . 19
    2.  The Defendant's Direct Penalty Phase Evidence. . . . . . . . . . . . . . . . . . . . . . 22
        a.  Family Members.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        b.  Law Enforcement Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        c.  Social Services Personnel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        d.  Teachers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        e.  Correctional Officers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        f.  Prison Consultant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    3.  The Government's Rebuttal Penalty Phase Evidence.. . . . . . . . . . . . . . . . . . 30
        a.  Correctional Officers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        b.  Prison Expert.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        c.  Friend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        d.  Teacher. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    4.  The Jury Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
  C.  Federal Collateral Review of Presumptively Final Criminal Judgments. . . . . . . . . 36
    1.  Cognizable Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    2.  Time Barred Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    3.  Procedurally Defaulted Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    4.  Claims Previously Adjudicated on Direct Appeal. . . . . . . . . . . . . . . . . . . . . 38
    5.  New Rule of Criminal Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    6.  Harmless Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    7.  Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
  D.  Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.  TRIAL COUNSEL ADEQUATELY INVESTIGATED AND PRESENTED
      MITIGATION EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
  A.  Fell's Trial Counsel Effectively Investigated and Presented His Social History.. . . . 58
  B.  Fell Fails to Demonstrate Prejudice as a Result of Counsel's Performance.. . . . . . . 60
    1.  Trial Counsel Properly Investigated and Presented Mitigation Testimony from
        Lay Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    a. Factual Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    b. Trial Counsel's Decision Not to Present Additional Witnesses Was
      Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
      i. The Alleged Continued Deterioration of Mr. Fell's Home Life
        After his Father's Departure.. . . . . . . . . . . . . . . . . . . . . . . 70
      ii. Trial Counsel Presented Evidence of Fell's life After Age 15
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      iii. Trial Counsel Presented Evidence of Debra Fell's Conduct
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      iv. Trial Counsel Presented Compelling Mitigation Evidence
        Through Teri Fell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
   2. Trial Counsel Adequately Investigated and Presented Mitigating Records and
    Photographs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
    a. Trial Counsel Used Sufficient Documents from CYS. . . . . . . . . . . . 87
    b. Trial Counsel Obtained and Presented Other Documentary Evidence of
      Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
   3. Trial Counsel Effectively Obtained and Presented Evidence of Familial
    Substance Abuse and Mental Health Issues.. . . . . . . . . . . . . . . . . . . . . . 93
    a. Trial Counsel Presented Evidence of Abuse of Alcohol and Illegal
      Substances by Fell and His Parents. . . . . . . . . . . . . . . . . . . . . . 94
    b. Trial Counsel Elected Not to Present Evidence of Mental Illness. . . . 95
   4. Trial Counsel's Investigation and Presentation of Mitigation Evidence Was
    Adequate; Therefore, Fell Can Not Show Prejudice. . . . . . . . . . . . . . . . . 96

IV. TRIAL COUNSEL ADEQUATELY INVESTIGATED FELL'S MENTAL HEALTH
  AND THEIR STRATEGIC DECISION NOT TO PRESENT A MENTAL HEALTH
  CASE WAS REASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
  A. Trial Counsel Conducted an Adequate Mental Health Investigation Which Conformed
    to Existing Standards of Professional Conduct. . . . . . . . . . . . . . . . . . . . . . 99
  B. Trial Counsel Had No Obligation to Further Investigate Mental Health. . . . . . . . . 103
  C. None of Fell's Multiple Mental Health Examinations Revealed Serious Mental Health
    Impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
   1. The Record is Devoid of Any Indication That Fell Suffered From Fetal
    Alcohol Spectrum Disorder.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
   2. The Record Does Not Indicate That Fell Suffers From a Mood Disorder. . . 112
   3. Trial Counsel Adequately Investigated the Effects of Chronic Exposure to
    Trauma from Early Childhood to Adolescence. . . . . . . . . . . . . . . . . . . . 114
  D. Trial Counsel's Performance Complied With Applicable Standards of Professional
    Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
  E. Fell Suffered No Prejudice As A Result of His Counsel's Decision Not To Present
    Mental Health Expert Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
   1. Expert Mental Health Testimony Was Not Required or Warranted. . . . . . . 128
    a. Fell Was Not Impaired When He Committed the Capital Crime That

Led To His Death Sentence
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

b. The Evidence, Including Fell's Flat Affect, Established That Fell Felt No Remorse for his Crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

c. Fell's Aggressiveness Was Evidence of of Anti-Social Disorder and Psychopathy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

d. Fell is Not Mentally Impaired. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

e. Trial Counsel Presented Evidence that Fell Would Function Well in the Structured Environment of a Prison. . . . . . . . . . . . . . . . . . . . . . . 145

V.    FELL'S COUNSEL WAS NOT INEFFECTIVE IN DECIDING NOT TO PRESENT MENTAL HEALTH EVIDENCE, NOT TO PURSUE A MOTION TO EXCLUDE DR. WELNER'S TESTIMONY AND IN STIPULATING THAT FELL HAD NO COGNITIVE DEFICITS AND DID NOT SUFFER FROM A MENTAL DISEASE OR DEFECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

A. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

1. Early Mental Health Investigation and Discovery. . . . . . . . . . . . . . . . . . . . 149

2. Second Mental Health Examination and Discovery. . . . . . . . . . . . . . . . . . . 151

3. The Summations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

4. Post-Trial Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

B. Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

1. Trial Counsel's Decision Not to Pursue the Motion to Exclude Dr. Welner's Testimony Was Not Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

a. It Was Unlikely That the Court Would Have Excluded Dr. Welner's Testimony for Failing to Comply With the April 7 Order. . . . . . 166

b. It Was Unlikely That the Court Would Have Found Dr. Welner's Testimony Completely Unreliable and Lacking in Probative Value
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

2. Dr. Welner's Diagnosis of Psychopathy Was Not Per Se Excludable For Its Underlying Methodology or As an Unreliable Predictor of Prison Violence
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

3. Dr. Welner Conducted An Objective Inquiry Into Fell's Background. . . . . . 180

4. The Word "Psychopath" is Not Inherently Prejudicial. . . . . . . . . . . . . . . . . 180

5. Dr. Welner's Report is Based on His Review of Historical Documents, Interviews of Fell and Personally Conducted Interviews of Reliable Sources of Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

6. Trial Counsel Was Not Ineffective In Failing To Move To Exclude Dr. Welner's Testimony Pursuant to *Estelle v. Smith*. . . . . . . . . . . . . . . . . . 184

a. Trial Counsel Was Not Ineffective In Agreeing to a Mental Health Stipulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

7. Fell Cannot Demonstrate That He Suffered Prejudice As a Result of His Trial Counsel's Decision Not to Pursue His Motion *in Limine* to Exclude Dr. Welner's Testimony or To Withdraw His Mental Health Case. . . . . . . . 186

a. Dr. Mills's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
b. Dr. Cunningham's Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189
c. Other Available Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 194
d. The Stipulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
e. Even if Dr. Welner's testimony Had Been Excluded, Fell Would Have
   Withdrawn his 12.2 Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

VI.   THE GOVERNMENT DID NOT COMMIT MISCONDUCT AND TRIAL COUNSEL
      WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE FURTHER TWO PRIOR
      ACTS OF VIOLENCE BY FELL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
      A. Trial Counsel Conducted a Reasonable Investigation of the Gacek Shooting.. . . . . 199
      B. The Government Did Not Misrepresent Eike's Condition or Withhold Evidence and
         Trial Counsel Was Not Ineffective in Failing To Investigate Further the Eike
         Assault. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
         1. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
            a. Pre-Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
            b. Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
            c. Post-Conviction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210
         2. The Government Did Not Fail To Disclose Favorable Evidence and Trial
            Counsel's Decision Not To Investigate Further Was Reasonable.. . . . . . 211
            a. The Government Did Not Fail To Disclose Evidence and Trial Counsel
               Did Not Fail To Investigate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
               i. The Government Did Not Fail to Disclose Brady Evidence
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
         3. The Government Did Not Engage in Prosecutorial Misconduct. . . . . . . . . 215
         4. The Government Did Not Withhold Evidence That Eike Was A Sex Offender
            and Trial Counsel's Failure to Investigate Further In That Regard Was Not
            Unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
            a. Allegation of Non-Disclosure and Failure to Investigate. . . . . . . . . 216
               i. The Government Did Not Fail to Disclose Evidence that Eike
                  Was a Sex Offender.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
               ii. Trial Counsel Did Not Fail to Investigate the Eike Assault. . 217

VII.  THE GOVERNMENT DID NOT FAIL TO DISCLOSE EVIDENCE OF FELL'S
      CONDUCT IN PRISON AND TRIAL COUNSEL DID NOT FAIL TO INVESTIGATE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218
      A. The Government Did Not Fail To Disclose Favorable Evidence Regarding Officer
         Pelkey's Disciplinary History and Trial Counsel Did Not Fail to Investigate.. . 223
         1. Evidence Presented to the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223
         2. Alleged Brady Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226
         3. Trial Counsel Did Not Fail To Investigate Officer Pelkey. . . . . . . . . . . . . 228
      B. Trial Counsel's Decision Not To Present Evidence of Fell's Alleged Religious
         Believes Was Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

    1. Evidence Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230
    2. Trial Counsel Was Not Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

VIII.  THE GOVERNMENT DID NOT FAIL TO DISCLOSE EVIDENCE REGARDING CO-
       DEFENDANT ROBERT LEE AND TRIAL COUNSEL'S DECISION NOT TO
       PRESENT EVIDENCE OF THAT RELATIONSHIP WAS REASONABLE. . . . . . . . 233
       A.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
       B.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
           1. Trial Counsel's Decision Not to Present Evidence of the Fell-Lee Relationship
              Was Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
           2. Trial Counsel's Decision Not To Pursue Francis Bellantoni As A Witness Was
              Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

IX.    TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO CONDUCT A
       FURTHER FORENSIC INVESTIGATION OF THE MURDER OF TERRY KING. . 243
       A.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
       B.  Trial Counsel's Decision Not to Challenge the Forensic Evidence Was Reasonable
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

X.     TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE THE
       EVIDENCE UNDERLYING THE ESPECIALLY HEINOUS, CRUEL, AND
       DEPRIVED FACTOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251
       A.  Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony
           Challenging the Government's Argument Regarding the Location of the Victim's
           Earring. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251
       B.  Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony
           Challenging the Government's Argument Regarding the Location of the Victim's
           Teeth  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253
       C.  Trial Counsel Was Not Ineffective in Failing to Challenge Dr. Baden's Opinion That
           Terry King Was Stomped On With 150 Pounds of Force. . . . . . . . . . . . . . . . . 255
       D.  Trial Counsel Was Not Ineffective in Failing to Challenge Cause of Death. . . . . . 256

XI.    TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO FURTHER
       INVESTIGATE THE DEATHS OF DEBRA FELL AND CHARLES CONWAY. . . . 259
       A.  Trial Counsel Was Not Ineffective in Failing To Conduct a Further Forensic
           Investigation of the Debra Fell and Conway Murders. . . . . . . . . . . . . . . . . . . . 261
       B.  Trial Counsel Was Not Ineffective in Failing to Conduct a Factual Investigation of the
           Debra Fell and Charles Conway Murders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262
       C.  Trial Counsel Was Not Ineffective in Failing to Investigate the Lifestyles of Debra
           Fell and Charles Conway in Vermont. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

XII.   TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE AND
       PRESENT A DIMINISHED CAPACITY DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . 267

    A. Trial Counsel Was Not Ineffective In Failing to Present A Diminished Capacity Defense in the Guilt Phase of the Trial And Presented A Diminished Capacity Defense in Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

    B. Trial Counsel Was Not Ineffective in Failing to Present Evidence of Intoxication and Mental Illness During the Guilt Phase to Lay a Foundation for the Penalty Phase Mitigation Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

XIII. TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INTERVIEW AND PRESENT ADDITIONAL EXECUTION IMPACT WITNESSES. . . . . . . . . . . . . . . . 276

XIV. TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE ADMISSION OF RELEVANT, PROBATIVE AND ADMISSIBLE EVIDENCE. . . . 278

    A. Trial Counsel Was Not Ineffective in Stipulating to the Admission of Fell's "Slayer" T-Shirt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

    B. Trial Counsel Was Not Ineffective in failing to Object to Testimony about Satanism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

    C. Trial Counsel Was Not Ineffective in Failing to Limit the Use of Matt Cunningham's Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283

    D. Trial Counsel Was Not Ineffective in Failing to Counter the Government's Assertion that Fell's Memory of the Word "Hawk" on the Murder Weapon Was Evidence that Fell Was Not Intoxicated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

XV. TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO PRESERVE THE RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

    A. Trial Counsel Was Not Ineffective in Failing to Object to the Prosecutor's Argument in the Final Summation of the Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . 288

    B. Appellate Counsel Was Not Ineffective in Failing to Raise Evidentiary Issues on Direct Appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

        1. Leading Questions by the Government During the Guilt Phase. . . . . . . . . . . 289

        2. The Eike Assault. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

        3. Testimony of Police Officer About the Features of "Battered Woman Syndrome". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

        4. Testimony of William Kane. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

        5. Testimony of Matt Cunningham. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

        6. Testimony of Matthew Kolojeski. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295

XVI. FELL'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL HAVE NO MERIT INDIVIDUALLY OR JOINTLY AS THEY HAD NO EFFECT ON THE OUTCOME OF THE TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

XVII. THE GOVERNMENT'S FAILURE TO DISCLOSE EVERY REPORT OF INTERVIEW CONDUCTED BY THE FBI AND DR. WELNER AND FAILURE TO DISCLOSE INFORMATION FROM SOCIAL SERVICE AGENCIES DID NOT

VIOLATE FELL'S FIFTH AND EIGHTH AMENDMENT RIGHTS.. . . . . . . . . . . . 298
    1. The Welner FBI 302s. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298
    2. Social Service Records and Social Security Records. . . . . . . . . . . . . . . . . . 303

XVIII.     NO GOVERNMENT FAILURE TO DISCLOSE PHYSICAL EVIDENCE, OR
         FAILURE BY COUNSEL TO INVESTIGATE SAME, WARRANTS § 2255 RELIEF
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

XIX.   THE GOVERNMENT DID NOT VIOLATE *BRADY*. . . . . . . . . . . . . . . . . . . . . . . . . 307

XX.   NO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT
     WARRANTS § 2255 RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

XXI.   NO CUMULATIVE IMPACT FROM PROSECUTORIAL MISCONDUCT DURING
     ARGUMENTS WARRANTS § 2255 RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

XXII.  FELL FAILS TO ESTABLISH JUROR MISCONDUCT WARRANTING POST-
     CONVICTION RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312
    A. Fell Cannot Establish Deliberate Juror Deceit During Voir Dire. . . . . . . . . . . . . 313
       1. Juror 162. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318
       2. Juror 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
    B. The Jury's Exposure to Extraneous Evidence Was Not Prejudicial. . . . . . . . . . . . 328
       1. Juror 143. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329
       2. Juror 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331
    C. The Court Can Not Consider the Testimony of a Juror to Impeach The Death Verdict
       Rendered Against Fell, and In Any Event, No Juror Was Subjected to Coercion
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332
    D. There Is No Evidence of Any Additional Instances of Alleged Misconduct by Any
       Juror. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

XXIII. OTHER CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333
    A. The Government Sought The Death Penalty Against Fell On Race – Neutral Grounds
       and Without Regard to Geography or The Race and Gender of the Victim and
       Trial Counsel Provided Constitutionally Adequate Representation. . . . . . . . . . 333
       1. The Government Sought The Death Penalty Against Fell Without Regard to
         Race .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
       2. The Government Sought The Death Penalty Against Fell Without Regard to
         the Geographical Location of his Trial. . . . . . . . . . . . . . . . . . . . . . . . 337
       3. The Government Sought The Death Penalty Against Fell Without Regard to
         the Race and Gender of His Victim. . . . . . . . . . . . . . . . . . . . . . . . . . 338
       4. Trial and Appellate Counsel Were Not Ineffective.. . . . . . . . . . . . . . . . . . 338
       5. Fell Is Not Entitled to Discovery or a Hearing. . . . . . . . . . . . . . . . . . . . . 339
       6. The Information Sought by Fell is Protected. . . . . . . . . . . . . . . . . . . . . . . 339

B. Trial Counsel Conducted Constitutionally Adequate Voir Dire of the Jury. . . . . . . 340
C. Trial Counsel Adequately Questioned Prospective Jurors Who Initially Suggested that They Could Not Vote for the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . 342
D. Fell Was Not A Juvenile When He Committed The Capital Offenses and His Execution Would Not Violate The Eighth Amendment. . . . . . . . . . . . . . . . . . . 343
E. This Court Lacks Jurisdiction to Determine Whether Fell's Execution Will Constitute Cruel and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345
  1. Justiciability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346
  2. Improper Venue and Procedural Vehicle. . . . . . . . . . . . . . . . . . . . . . . . . . 347
  3. Fell's Eighth Amendment Claim Fails. . . . . . . . . . . . . . . . . . . . . . . . . . . . 349

XXIV. FELL HAS FAILED TO STATE A CLAIM UPON WHICH THIS COURT SHOULD GRANT DISCOVERY OR AN EVIDENTIARY HEARING. . . . . . . . . . . . . . . . . . . . 351

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

## I.    PROCEDURAL HISTORY

On December 1, 2000, a Criminal Complaint against Fell and Robert Lee was filed in this District.  On December 12, 2000, the Court appointed the Federal Public Defender ("FPD") to represent Fell.  Attorney Alexander Bunin, the Federal Public Defender for the Northern District of New York (an Office which at that time covered Vermont), filed his appearance on behalf of Fell, along with Gene Primomo, also from the Albany FPD Office.[1]

On February 1, 2001, a federal grand jury sitting in the District of Vermont returned a four count Indictment charging Fell and Lee in Count One with carjacking resulting in death in violation of 18 U.S.C. § 2119(3); in Count Two with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a); in Count Three with use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c); and in Count Four with being fugitives in possession of a firearm in violation of 18 U.S.C. 922(g)(2).  (Dkt. No. 21)  Counts 1 and 2 were capital offenses.  Fell was arraigned on February 7, 2001.[2]

On January 30, 2002, the government filed a "Notice of Intent To Seek Death Penalty" (the "Notice of Intent"), pursuant to the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et seq.*  (Dkt. No. 32).  It listed four intent factors, alleging the requisite scienter under 18 U.S.C. § 3591(b)(2), and three statutory aggravating factors under 18 U.S.C. § 3592(c).  The three

---

[1]  Both Bunin and Primomo had experience handling capital cases, Bunin in Texas State court, and Primomo in federal court.  Transcript, June 11, 2002 hearing, p. 10.  The Court of Appeals for the Second Circuit appointed Bunin FPD in 1999.  Bunin has been an Adjunct Professor at Albany Law School, teaching Trial Practice I and II.  He is a life-long member of the National Association of Criminal Defense Lawyers.  Presently he is the Chief Public Defender of Harris County, Texas.

[2]  Lee died in prison in 2001.

statutory aggravating factors alleged that: (1) the death of Terry King occurred during the commission of a kidnapping; (2) Fell killed Terry King in an especially heinous, cruel or depraved manner in that it involved serious physical abuse; and (3) Fell intentionally killed more than one person in a single criminal episode.

The Notice of Intent also listed four non-statutory aggravating factors. They were that: (1) Fell participated in the abduction of Terry King to facilitate his escape from the area in which he and Lee had committed a prior double murder; (2) Fell participated in the murder of Terry King to silence a witness, by preventing her from reporting the kidnapping and carjacking to authorities; (3) Fell participated in the murder of Terry King after substantial premeditation to commit the crime of carjacking; and (4) the killing of Terry King caused her family extreme emotional suffering and severe and irreparable harm.

In June, 2002, the Court appointed a third attorney to join Bunin and Primomo, stating that, "as a matter of personal concern, I want to bend over backwards to make sure that [Fell] gets the best possible representation that he can." June 11, 2002 Hearing, Transcript p. 10 (adding, "I am going to appoint . . . a Vermont attorney . . . that will assist defense counsel in ensuring that they are familiar with the culture of this Court [and] what Vermonters are like. . . . Above all I want to make sure that he gets a fair trial," pp. 11-12). The Court then added Paul S. Volk, of Burlington, Vermont, to the defense team. The three lawyers were joined by a mitigation specialist and, at trial, a jury consultant.

On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same four offenses as the Indictment. (Dkt. No. 57) The Superseding Indictment was sought in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), and included a Notice of Special Findings,

2

alleging the threshold intent factors and statutory aggravating factors set forth in the Notice of

Intent.  On the same date, the United States filed a Supplemental Notice of Intent to Seek Death

Penalty, alleging the same non-statutory aggravating factors as on the original Notice of Intent.

(Dkt. No. 58)

In mid-2002, Fell filed various pretrial motions, including motions to have the FDPA

declared unconstitutional.  (Dkt. No. 44)[3]  On September 24, 2002, the Court granted one of tthe

latter motions, holding that 18 U.S.C. § 3593(c), the FDPA's relaxed evidentiary standard for the

penalty phase of a capital trial, rendered unconstitutional any jury findings as to the aggravating

factors necessary to impose a sentence of death.  (Dkt. No. 70)  The Court struck the aggravating

.factors from the Superseding Indictment, as well as the Supplemental Notice of Intent.  *United

States v. Fell*, 217 F. Supp.2d 469 (D.Vt. 2002).

On October 22, 2002, the government filed an interlocutory appeal.  (Dkt. No. 71)  On

November 5, 2004, the Second Circuit reversed.  *United States v. Fell*, 360 F.3d 135 (2d Cir.),

*cert. denied,* 543 U.S. 946 (2004).  (Dkt. No. 73).  The unanimous panel held that § 3593(c)'s

evidentiary standard was consistent with the requirement of heightened reliability in capital trials.

"[I]n order to achieve such heightened reliability, *more* evidence, not less, should be admitted on

the presence or absence of aggravating and mitigating factors . . . ."  *Id.* at 143 (original

emphasis).

---

[3]  Fell supplemented his motion to declare the death penalty unconstitutional on July 23, 2002 (Dkt. No. 65), and August 27, 2002.  (Dkt. No. 69)

Jury selection began on May 4, 2005, with individual *voir dire.* Prior to *voir dire*, prospective jurors filled out a lengthy questionnaire. Individual *voir dire* continued, intermittently, through June 6. The jury was selected on June 9, 2005. (Dkt. No. 140)

The guilt phase of trial began on June 20, 2005 and ended on June 24, 2005, when the jury returned guilty verdicts on all counts. The penalty phase began on June 28, 2005. After nine days of evidence, on July 14, 2005, the jury returned capital verdicts on the kidnapping and carjacking counts. (Dkt. Nos. 199 and 200). Fell filed a motion for judgment of acquittal and new trial on August 26, 2005. The Court denied the motion on April 24, 2006. (Dkt. No. 236) At a hearing on June 16, 2006, Fell was sentenced to death on both capital counts (Dkt. No. 243), and judgment was entered. (Dkt. No. 244)

Fell filed a timely notice of appeal from the judgment. On June 28, 2008, the Second Circuit affirmed the convictions and death sentences. *United States v. Fell*, 531 F.2d 197 (2d Cir. 2008). Fell's request for rehearing *en banc* was denied. *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009). The judgment became final on March 22, 2010, when the Supreme Court denied Fell's certiorari petition. *Fell v. United States*, 130 S. Ct. 1880 (2010). On March 21, 2011, Fell timely filed a petition for relief from his sentence of death pursuant to 28 U.S.C. § 2255.

## II.   STATEMENT OF FACTS AND APPLICABLE JURISPRUDENCE

A.   Evidence Introduced During the Guilt Phase

At the guilt phase of trial, the government called witnesses who described (1) the disappearance of Terry King during the early morning hours of November 27, 2000; (2) the arrest of Fell and Lee in Arkansas on the afternoon of November 30, 2000; (3) the discovery of the bodies of Debra Fell and Charles Conway in Rutland, Vermont on the evening of November 30,

2000; (4) the interviews of Fell in Arkansas; (5) the discovery of King's body in New York on December 1, 2000; and (6) the forensic evidence, including King's blood and DNA on one of Fell's steel-toed boots. The defense introduced no evidence.

### 1. The Disappearance of Terry King on November 27, 2000

Norman King testified that he had been married to Terry King for 37 years.[4] Tr. I-1 at 66. They lived together in a trailer home in North Clarendon, Vermont, a village several miles south of Rutland. *Id*. at 65. Norman worked full-time at Omya, a mineral processing company north of Rutland, and Terry worked approximately 15 hours a week at Price Chopper, a Rutland grocery store. *Id*. at 65, 68, 74.

On Monday, November 27, 2000, Terry's shift began at 4:00 a.m. She awoke at around 2:00 a.m. and showered, dressed, and ate breakfast while Norman stayed in bed. *Id*. at 73. After a brief conversation about dinner that evening, Terry drove off to work at around 3:30 a.m., in her green Plymouth Neon. Later that day, when Norman returned from work, Terry unexpectedly was not home. He called their older daughter, who checked with their younger daughter and then called Price Chopper employees. No one had seen Terry since she left home early that morning.

Anthony Mistretta testified that he worked the night-shift maintenance crew at the Rutland Wal-Mart, located in the same shopping mall as Price Chopper. The Wal-Mart was open from 7 a.m. to 9 p.m. Mistretta and his maintenance crew worked through the night to clean the store before it opened. While the crew worked, store lights were on and the front doors were occasionally opened for the crew to take breaks. According to Mistretta, during the early

---

[4] References to pages of the trial transcripts will be cited as "Tr. _-_ at __."
The first numeral refers to the day of trial and the following number 1 or 2 refers
to the morning or afternoon session, respectively.

morning hours of November 27, two males with wet hair and dry clothes came in the front door

and asked to buy shotgun shells.  Mistretta told them that the store was closed and asked them to

leave.  Tr. IV-1 at 29.  The men needed to be told twice to leave and swore at Mistretta as they

departed.

William Liphardt was Terry King's co-worker at the Price Chopper for over ten years.

On November 27, he arrived at the store at about 3:30 a.m.  Terry usually brought in two cups of

coffee, one for him and one for her, along with a bag of Dunkin Donuts for co-workers.  She

usually parked her car next to his, in the employee parking area on the east side of the building,

around the corner from the main entrance.  Liphardt was surprised when Terry did not arrive for

the start of the 4:00 a.m. shift on November 27.  At 4:15 a.m., he went outside to look for her car,

and checked again several minutes later, but did not see it.  He discussed King's unusual absence

with his manager and they decided that she must be sick.  Tr. I-1 at 95.

Peter Wink worked the midnight shift at the Dunkin Donuts on U.S. Route 7, between

North Clarendon and Rutland.  Terry King was one of his regular morning customers. On

November 27 between 3:30 and 4:00 a.m. Terry stopped for her usual order of coffee and

doughnuts. *Id.* at 101. Wink was the last person, besides Fell and Lee, to see Terry King alive.

2.  The Arrests of Fell and Lee in Arkansas

Clarkesville, Arkansas is about an hour-and-a-half west of Little Rock on Interstate 40, an

East/West highway.  At about 1:30 p.m. on November 30, 2000, Clarkesville Police Officer Jeff

Ross refueled his marked cruiser at a service station near I-40.  As Ross drove out of the station,

a green Plymouth Neon pulled in front of him from a gas station across the street.  Ross noticed

that the male passenger repeatedly turned to look at him.  After about a mile, the Neon turned

6

right into a residential area.  As it did so, the passenger turned again and looked at Ross.  Ross decided to call his dispatcher to run a check on the Neon's Pennsylvania license plate.  Tr. I-1 at 127.  Dispatch reported that the plate had been stolen in Pennsylvania the night before.  Ross stopped the Neon and secured its two male occupants, Fell and Lee.

Inside the Neon Ross saw a 12-gauge pump-action shotgun.  It was a police model, with extended magazine capacity, black synthetic stocks, and a shorter than usual length.  Ross also found two pot pipes and a knife in the front passenger door compartment.  In the glove box was the Neon's Vermont registration, mated to the car's vehicle identification number, indicating that the car belonged to Norman and Theresa King of North Clarenden, Vermont.  Ross detained Lee, the driver, and Fell, the passenger, on suspicion of possessing stolen property and drug paraphernalia.

Shortly after the vehicle stop, Clarkesville police called the Vermont State Police and learned that the Neon, and Terry King, had been missing from Vermont since November 27, 2000.  Officers transported Fell and Lee to the nearby Johnson County Detention Center.  During booking, two license plate screws were found in Fell's pants pocket.

### 3.  The Discovery of the Bodies of Debra Fell and Charles Conway

Early in the evening of November 30, after Vermont authorities learned that Fell and Lee had been apprehended driving the car of the still-missing Terry King, Rutland Police Detective Curtis Moore went to Debra Fell's apartment at 135 Robbins Street in Rutland to inquire about her son Donald Fell.  Moore found two dead bodies in the apartment, and summoned forensics specialists.

Investigators found Charlie Conway's body in an easy chair and Debra Fell's body lying on the floor. Conway's neck had been "literally sawn, um, with his tendons and his insides . . . exposed." Tr. I-2 at 39. There was "blood spattered across the wall" behind him. *Id*. at 39. Debra Fell laid on her stomach on the floor, with blood on her legs and the bottoms of her feet. *Id*. at 39. Officers photographed the scene and collected evidence. Blood samples were recovered from floors and walls in multiple rooms. *Id*. at 51. Among the items seized were two knives, found wrapped in a towel on the kitchen table. *Id*. at 47. The only drug evidence in the apartment was a film container with marijuana seeds and cigarette rolling papers. The apartment was littered with beer cans. *Id*. at 53-54.

### 4.   The Interviews of Fell in Arkansas

On the evening of November 30, 2000, Jimmie Caudle, a Special Agent with the Federal Bureau of Investigation ("FBI") in Arkansas, received instructions to report to Clarkesville to assist with a developing double-murder/missing person investigation. Upon arrival, Agent Caudle and fellow FBI Agent Daniel Sturgill met with other investigators and spoke by phone with Rutland officers and the Vermont State Police. At 11:30 p.m., the agents met with Fell at the detention center. Fell was advised of his rights and signed a written *Miranda* waiver. He then described falsely how he had come into possession of the Neon vehicle in Arkansas. Fell stated that he was hitch-hiking across the country with Lee when a man named "John" picked them up in the Neon. According to Fell, when John stopped and went into a convenience store, Fell and Lee stole the car. Fell admitted that the shotgun, the pipes, and some of the clothing in the car belonged to him. When asked whether he had any prior legal trouble, Fell mentioned "putting a guy in a coma" at the recent "Woodstock Festival." Tr. II- 1 at 6. Fell said he had

been visiting his mother in Rutland until the prior week. He claimed he left because she was a crack addict. He was intending to call her when he had access to a phone. *Id*. at 8.

The two agents then talked with Lee for several hours. Returning to Fell, the agents told him that the bodies of his mother and Conway had been found in Rutland, and that Terry King, the owner of the Neon, also had been murdered. They asked Fell for his explanation. Fell stared at the agents without a blink and replied, "I wouldn't kill my fucking mother. I don't know any fucking Terry. I'm sticking with my first statement." Tr. II-1 at 13.

The next morning, Agent Caudle returned to the jail after learning that Fell wanted to talk again. *Id*. at 16. After signing another *Miranda* waiver, Fell admitted that he and Lee had killed Conway and Debra Fell. *Id*. at 15-16. He said that after the four had been playing cards, he got a knife from the kitchen and attacked Conway. *Id*. at 16-17. He slashed Conway's throat and "kept stabbing him and stabbing him." *Id*. at 17. At the same time, Lee was slashing and stabbing Debra Fell. *Id*. After the two murders, Fell and Lee showered, packed, and walked to the Price Chopper in downtown Rutland. They waited there for about 15 minutes, looking for a car to steal. *Id*. When Terry King drove in, they accosted her with the shotgun, forced her into the Neon's back seat, and fled Vermont. *Id*. at 18. King tried to jump out of the car, but Fell restrained her. *Id*. at 18-19. At some point after entering New York State, Fell stopped the car and told King she could leave. *Id*. at 18. Lee then told Fell that they had to kill her because she could identify them. *Id*. at 21. Fell agreed and the two men took King up into the woods. Fell hit King and knocked her down. *Id*. The two men then started kicking her. *Id*. Fell said that Lee picked up a rock and slammed it down on her head and face. *Id*. When she was dead, Fell wiped his boots off on her clothing and the two men returned to her car. *Id*. at 22.

9

Fell and Lee stopped for breakfast at a Burger King restaurant 12 miles south of the third murder. The killers paid for breakfast with money from King's purse, then discarded the purse in the restaurant's dumpster. *Id*. at 23, 25. The two men continued on to their hometown of Wilkes-Barre, Pennsylvania, where they visited friends and stole a Pennsylvania license plate off another Plymouth Neon, putting it on King's car. *Id.* at 22. They threw the Vermont license plates into a stream, and also tossed away a baby seat that Terry King had used to transport her grandchild.

After completing this oral statement, Fell agreed to provide a written statement. Caudle invited Fell to "say anything he wanted," including whether he was sorry for what he had done. In its entirety, Fell's written statement reads:

> We were playing cards and smoking crack and drinking Budweiser. Then I don't even know what happened except that for some reason I grabbed a knife and I cut Charlie's throat. Then continued to stab him until I was sure he was dead. When I saw what I did I wanted to turn myself in, but I turned around and saw Bobby killing my mom, Debbie. I tried to stop it, but she was already too far gone. We then took showers and grabbed my shotgun and left. We went to Price Chopper and grabbed a girl named Terry and took her car. That happened when she pulled up and Bobby ran up to her with the shotgun and told her to get in the back seat. He jumped in the passenger side and I drove. We went south. Somewhere along the way we stopped and let Terry out. I believe it was in New York. I told her to walk through the woods and we would leave and let her live. At which point Bobby said we could not let her live because she had our names and descriptions, that we had to kill her. So we followed her into the woods. And she was running towards the road. Bobby got her at the bottom of a hill. I came down from the top and told her to go back up. We found a spot where the traffic could not see. I proceeded to kick her. And Bobby found a rock and threw it on her face at which point we thought she was dead and left. We left Vermont at about 2:30 a.m. When we dropped her off it was light outside. We went to Burger King, got breakfast. And I threw her purse into the dumpster. And we left. We continued. I'm not sure which way we went, but we got into Wilkes-Barre, PA about 6:00 p.m. We spent the day in Wilkes-Barre and left the next night. We switched license plates, threw her plates into the creek and headed to 81 south.

*Id.* at 24-25.  The interview concluded at 11:10 a.m.  Caudle described Fell's manner as "neutral" and "matter of fact."  Tr. II-1 at 29.

As of mid-day on December 1, King's body had not been found.  Early that afternoon, a New York State Police investigator interviewed Fell and Lee by telephone about where they left King's body.  Vermont law enforcement officers then interviewed Fell.  Rutland Detective Sergeant Rod Pulsifer was one of three Vermont officers who flew to Arkansas to interview Fell and Lee.  By the morning of December 2, the Vermont officers learned that the New York State Police had found King's battered body.

After discussing the New York crime scene with New York officers on the telephone, the Vermont officers tape-recorded interviews with Lee and then Fell.  Pulsifer *Mirandized* Fell and at trial provided the evidentiary foundation for introducing the recording of Fell's interview.  Fell stated that he went to Rutland, Vermont from Wilkes-Barre on September 23, 2000, to visit his mother.  Before that, he had been traveling with a carnival and staying with his aunt and his great grandmother in Pennsylvania.  Fell described his mother as "a good person," who "cook[ed] us dinner" and "bought me cigarettes when I needed them and stuff like that."  Exhibit J at 7.  But she "liked to smoke crack and drink a lot."  *Id.*  He described an altercation with her at the Stop Lite bar in Rutland.  Fell said that his mother had:

> called me up and asked me to come down and get her, so I went to get her and, ah,
> I went into the bar and I am talking to my mom, some old guy and some black
> dude named Reggie.  And ah, next thing I know Tina Conway comes up behind
> me and starts kicking me.  And ah, so I turned around and I spit on her, cause you
> know I don't feel right hitting a woman you know?  And ah, so my mom grabs
> hold of me, and the whole way as she is pushing me out of the bar she is smacking
> me and punching me, and she is yelling at me for spitting on her friend.  And I am
> like, "she was kicking me," and when we got outside the bar she wouldn't stop, so
> I kind of shoved her off me.  You know what I mean, instead of hitting her or

11

anything I just kind of pushed her off me, I said "get away from me."  I guess she was real drunk and she fell like a dump, and ah, I tried helping her up, she wouldn't let me help her up or nothing.  They called the cops, and I waited there for them, and they ah, took me to the drunk tank.

*Id*. at 9.

Fell described the brutal murders of Debra Fell and Conway as follows:

Ah, well, what happened was, is, ah, we were all kind of wasted, you know, pretty, pretty fucked-up. My mom was, we were all smoking crack, and, you know, drinking lots of alcohol and shit. Ah, to tell you the truth I don't really, ah, know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah, I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

*Id*. at 11.

When Sgt. Pulsifer asked, "Well, why did Bobby cut your mom's throat?"  Fell replied:

I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it . . . .

*Id.*

Fell said that he had met Conway twice before, and that Conway and his mother "were just friends."  He could offer no reason for the Rutland killings.  When asked for a motive and a more detailed narrative, Fell said:

I guess, I ran, ah, I don't remember, I'm telling you.  I really don't, I ran in and I suppose, I started cutting Charlie apart man, but that's, that's all I can tell you. Like I said, I told him [Agent Caudle] plenty of times already.  You, ah, I don't see how you figure that I am holding out information on it or nothing.

*Id*. at 19-20.  After the Rutland killings, Fell "hopped right in the shower."  *Id*. at 26.

12

Officers questioned Fell about the murder of Terry King.  Fell recalled that when he and Lee grabbed King, she pleaded, "please, please, leave me alone, don't hurt me."  *Id.* at 34.  During the drive, she offered them doughnuts from a Dunkin Donuts bag.  Fell and Lee took turns driving and holding the shotgun on King.  Fell recalled that:

> at one point in time, driving down the road, she tried to jump out of the moving vehicle and ah, I pulled her back in by her arm.  I was gentle with her, I didn't hit her or nothing you know, and ah, I pulled her back in and I told her not to try it again.  Well, Bobby continued driving he was pretty, he was pretty rotten towards her, he was screaming and yelling . . . .

*Id*. at 4-35.

According to Fell, after driving for around four-and-a-half hours, he found "a nice little spot" on the side of the road and pulled the car over.  He repeated that he intended to let King go, but Lee insisted that they had to kill her.  The two men then brought her into the woods:

> we both hustled her back up the hill, not, not harsh or nothing hard you know what I mean, just go ahead walk up the hill, you know.  And, ah, I found a little, a little spot where you couldn't see from the highway, and ah, well we started kicking her in her head.

*Id*. at 38.

When the officers asked how King wound up on the ground, Fell responded:

> I pushed her down first, she was on her back. . . . [S]he started to pray.  And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about, yah big, and ah, slammed it right down on her head.

*Id*. Fell said that King "wasn't struggling at all throughout the whole thing, she didn't even try to struggle, she just took it."  *Id*. at 39.  Asked how he knew she was praying, he recalled that she had held her hands together in front of her.  *Id*.  Fell stated that after "I was pretty sure she was dead . . . I wiped my boot off with her shirt, um, and we left."  SA at 48.

13

The two men returned to the car and continued south.  Fell stated:

> About a half hour later we, we pulled up to a Burger King, ah, and we, we got
> breakfast.  Um, I threw her purse and the doughnuts into the dumpster, ah, like we
> found like $220 on her, in, in bank envelopes and stuff like that.  That's how we
> got gas and ate breakfast and stuff, for a while, and we just continued driving.

*Id*. at 40.

Before leaving Wilkes-Barre, the two men "saw another Neon parked right by where

[King's] car was.  So I thought we would take the tags off that Neon, the Pennsylvania one."  *Id*.

at 42.

The officers asked Fell why he had come to Vermont. Fell said that he wanted to visit his

mother, whom he had not seen for several years:

> I got locked up when I was 14 for not going to school, I skipped two complete
> years of school.  So they threw me in a boy's home.  And I, I was in the boy's
> home for two years, and they threw my mom in jail for it.  Ah, after she got out of
> jail, ah, she split, she just left the State.  Ah, she had warrants and fines, and she
> didn't want to deal with it, and, ah there were a couple points in time when she
> tried coming back into the state, and ah, my aunt would call the cops on her or
> something and have her arrested.  So, she just decided to stay in Vermont.

*Id.* at 46.  Fell added that:

> every time she would call, my aunt, ah, was pretty rotten and she hated my mom's
> guts.  Ah, she would never put me on the phone with her.  Ah, she would always
> tell my mom that I wasn't around, um, so I never got a chance to talk to her.

*Id.*

Fell gave the Vermont officers a block-by-block description of his walk from his

mother's Rutland apartment to the Price Chopper.  His demeanor during the interview was

"matter-of-fact," "cooperative, [and] calm."  Tr. II-1 at 34.  The one exception was when the

officers asked him about his mother's dying words ("I love you"), when he became emotional for

14

30-60 seconds.[5] *Id.* at 51-52.  Fell also gave a detailed description of the murder weapons: Lee used a "black-handled steak knife" with a serrated blade; Fell used a "pretty thick knife" with the word "Hawk" inscribed on the blade.  Exhibit J at 28.

### 5. The Discovery of King's Body in New York

A day after the arrests and statements of Fell and Lee in Arkansas, investigators in New York were still trying to find Terry King's body.  They had only very vague information: Fell remembered breakfast at Burger King shortly after the killing, and Lee described the location where King got out of the car as a gravel pull-off on a two lane road, next to a field with a backboard used for target practice.

Investigators focused upon several north/south roads in New York State between Rutland and the Tappan Zee Bridge.  Early on the evening of December 1, officials consulted with Gary Mazzacano, a Senior Investigator with the New York State Police who once had been assigned to the Dover Plains, New York, Police Barracks.  Mazzacano recalled a gravel pull-off in Dover Plains on Route 22, a north/south highway by a field with a target practice back-board.  He also knew that there was a Burger King in Pawling, a town 13 miles south of Dover Plains on Route 22.  Tr. III-1 at 15-16.  After picking up two New York State Troopers, Mazzacano drove to the area, arriving after dark.  Trooper Darren Bialek found King's body.  In the bitterly cold December night, officials secured the area for a forensics team scheduled to arrive in the morning.

---

[5]  The officers learned of Debra Fell's last utterance from Lee's interview.  Lee's post-arrest statement was far more detailed than Fell's, but the Court excluded it under *Crawford v. Washington*, 541 U.S. 36 (2004).

15

Senior Investigator Thomas Martin of the New York State Police supervised the processing of the New York crime scene on the morning of December 2. *Id.* at 48. King's body lay face-up in a wooded area about 400 feet east of Route 22. The brutality of her death was readily apparent – there were "extensive injuries to [her] face, head and neck . . . large bruising and markings and trauma-type wounds." *Id*. at 29. Forensics investigators photographed the scene, took plaster footwear impressions, collected fiber samples, and retrieved a rock and other items from near the body.

FBI Special Agent Mark Promutico, searching for evidence along Route 22 found King's wallet, two to three miles south of King's body on the west (right-hand) side of the road. It contained her identification documents, but no cash. *Id*. at 75-82. From a dumpster at the Burger King in Pawling, another 10 miles south, the agent recovered King's purse with a Dunkin Donuts bag inside it. *Id*. at 76-83.

Michael Leight worked the 7:30 a.m. shift at Burger King on November 27. Tr. At III-1 at 94. Early in his shift, two males in a small, greenish car ordered breakfast at the drive-through window. After the driver asked if they could buy some marijuana, Leight met the men in the parking lot behind the restaurant. There was a discussion about drug prices, but no sale. The driver (Lee) was wearing a jean jacket with "heavy metal band patches" on it and glasses. *Id*. at 96. The men said they were en route to New York City from Vermont. Leight gave them directions. Both men seemed "normal."

Matt Kolojeski, lived in Wilkes-Barre, across the street from Fell's house. Tr. III-1 at 112-13. Late on November 27, 2000, Fell arrived at Kolojeski's residence in a green car with Bobby Lee. Fell and Lee both seemed normal and calm. That night they "started drinking and

16

smoking a little weed with [Kolojeski's] brother." *Id*. at 115. According to Kolojeski, Fell had

done that before, and had a high tolerance for alcohol. *Id*. at 117-18. Fell and Lee stayed the

night of November 27 and most of the following day. They talked about going to California.

Before they left, they borrowed a screwdriver to do something with their car.

FBI Agent James Glenn recovered King's Vermont license plates from Mill Creek, a

stream near Kolojeski's house. The plates had been folded in half, with Vermont's distinctive

green coloring concealed on the inside of the fold.

      6.  Physical and Forensic Evidence

In Arkansas, FBI Agent Jerry Spurgers searched King's car. He recovered clothing; a

map of Vermont and New York; Lee's wallet (containing an October 22, 2000 bus ticket from

Wilkes-Barre to Rutland); receipts from fast food restaurants on highways between Wilkes-Barre

and Clarkesville; and a card-board sign, reading: "Stranded travelers in need of food. Please

help. God bless." *Id*. at 149.

Brendan Shea, a forensic examiner in the FBI Laboratory, testified as an expert DNA

analyst. Tr. III-2 at 4. Shea compared samples of King's and Debra Fell's blood with stains

found on the boots worn by Fell and Lee when arrested. Both men had blood on both of their

boots. Lee's boots were stained with blood from both Debra Fell and King. Fell's right boot

tested positive for blood, but Shea was unable to type the small amount of DNA found. *Id*. at 21.

Fell's left boot had mixed bloodstains on it, with King being the major contributor. The rock

found near King's body was also stained with her blood.

The government introduced stipulations that: (1) photographs, clothing and footwear

(introduced as Exhibits 2(a) - (f) and 3(a) - (e)) were taken from Fell and Lee at the Johnson

County Detention Center in Arkansas on November 30, 2000; (2) footwear impressions found at the New York crime scene, between King's body and Route 22, corresponded in design and size to the boots worn by Fell and Lee when arrested; (3) cotton fibers recovered at the New York crime scene, in close proximity to King's body, shared the same microscopic characteristics and optical properties as the fibers comprising the T-shirt worn by Fell and the jeans worn by Lee when arrested; (4) if called as a witness, Tara Richards would have testified that she lived in Wilkes-Barre near Matt Kolojeski's residence; that she owned a Plymouth Neon registered in Pennsylvania; and that on the evening of November 29, 2000, she noticed that her rear license plate (found on Terry King's car in Arkansas) was missing and reported it to police immediately; (5) King's Plymouth Neon was manufactured in Mexico and had been shipped in interstate commerce; (6) the Mossberg 12-gauge shotgun found in the Neon on November 30 was a "firearm" under federal law; (7) blood samples from the bodies of Debra Fell and Terry King were forwarded to the FBI laboratory and maintained there in accordance with accepted forensic best practices; and (8) toxicology tests conducted on blood samples taken from the bodies of Debra Fell and Charles Conway found a high alcohol content (.39 for Conway and .32 for Debra Fell), but no trace of illegal drugs.

On June 24, 2005, after five days of trial, the government rested its guilt phase case. The defense introduced no evidence. That same afternoon, the jury returned guilty verdicts on all four counts.

B. Evidence Introduced During the Penalty Phase

The penalty phase of trial began on June 27, 2005, with preliminary jury instructions, in which the court gave the jury an overview of the law.

1.   The Government's Direct Penalty Phase Evidence

The government's case in chief during the penalty phase supplemented the guilt phase evidence with graphic proof of the heinous, cruel and depraved manner in which Fell and Lee killed their three victims; victim-impact evidence showing the devastating effect of Terry King's murder on her close-knit family; and witness testimony about Fell's interactions with his mother in Vermont shortly before her murder.

FBI Agent T. Kevin Talley assisted in the search for evidence at the New York crime scene. After King's body was removed by the medical examiner, Talley recovered two teeth, an earring and an earring post from the area near the body. Tr. V-1 at 64.

Dr. Michael Baden, an expert forensic pathologist, responded to the New York crime scene on the morning of December 2, 2000, and later performed an autopsy on King's body. At the crime scene, Dr. Baden observed that King laid "on her back, fully clothed, with extensive evidence of injury to the head and neck area." *Id*. at 79. During the autopsy, Dr. Baden first noticed that there was "no evidence of any droplets of blood falling downward," which is "something we look for to see if the person was standing or lying down when bleeding occurred." *Id*. at 82. There were no injuries below the neck; "[a]ll the injuries were confined to the face, the head, the neck area." *Id*. at 82. The extensive injuries to King's head and neck included blunt force trauma on both sides of the head, extensive damage to the windpipe and the Adam's apple, and extensive fractures to the skull, many "emanating from . . . a severe blow to the . . . bridge of the nose." *Id*. at 83. There had been "severe compression to the neck by a powerful force," which had not broken the skin. That "crushing injury" was consistent with a forceful "stomp" by the boots worn by Fell and Lee when arrested. *Id*. at 87. Dr. Baden opined that the neck injury

19

required "more than 150 pounds of pressure." *Id*. at 89. There were also separate impact injuries to the mouth area, because there were fractures of the upper and . . . lower jaw." *Id*. at 88. The teeth recovered from the area around the body weren't broken: "these were teeth that popped out of their sockets . . . after the bone was cracked," indicative of "another stomping type injury." *Id*. The blow to King's nose was consistent with the blood-stained rock found near her body. As to the cause of death, Dr. Baden testified that "there was a kind of overkill." King died from blunt force injuries to the face, head and brain and traumatic compression of the neck with asphyxia. *Id*. at 90-91. According to Dr. Baden, "there were many more injuries than necessary to cause death." *Id*. at 95.

Dr. Paul Morrow, then Chief Medical Examiner for Vermont, performed autopsies on Debra Fell and Charles Conway. Tr. V-1 at 104-05. Conway died of multiple stab wounds – "there were approximately 50 stab wounds on the body." *Id*. Dr. Morrow found a complex of deep stab wounds of the left side of Conway's neck – one of which severed his carotid artery – as well as serial stab wounds to the back of the neck, the front of the neck (including a long, gaping six to seven inch wound), the face, the back, the chest and the upper abdomen. Conway also had slicing wounds on his hands. The wounds were consistent with the two knives found in the apartment. Conway bled to death as a result of his wounds. *Id*. at 120.

Dr. Morrow concluded that Debra Fell also died from "multiple sharp force injuries," or "approximately 40" stab wounds. Tr. V-2 at 3. Debra Fell had a 21 centimeter long cut across the front of her neck, made by several wounds, some of which were deep enough to reach her vertebrae. That complex of wounds severed her carotid artery. *Id*. at 5-6. There were also stab wounds on both sides of Debra's head, on her face, on her back, on her side, and on her hands.

20

She had blood on the bottoms of her legs and feet, indicting that she had walked through blood before collapsing. Dr. Morrow testified that Debra bled to death.

Marsha Thompson worked at the Stop Lite Bar in Rutland. *Id*. at 40. Debra Fell was a regular customer during the last months of her life. In the summer of 2000, Debra let it be known that her son was coming to live with her. When he arrived, Debra brought him into the bar and introduced him as "my son Donny." *Id*. at 43-44. One day in mid-November 2000, when Debra Fell was at the Stop Lite, Fell entered the premises. After drinking from Debra's beer, he tried to take the change she had left on the bar. Debra tried to stop him, but Fell "grabbed her hair and punched her in the head." *Id*. at 45. When Thompson ordered Fell out, he spat and kicked at her. Debra said, "he'll leave if I leave," and walked towards the door. After Fell followed her out, Thompson saw Donald push Debra down on the sidewalk. Thompson called the police, who arrived and took Fell away. Afterward, Debra came back into the bar crying. She told Thompson that she was afraid of her son and did not want to go back to her apartment. Thompson advised Debra to kick Fell out. Debra replied: "I can't. He's my son, and I love him." *Id*. at 49.

Vertith Oberle was a friend of Debra Fell's, and visited her a number of times in her apartment. *Id*. at 58-59. She never saw Debra use drugs or get angry. After Fell and Lee arrived in Vermont, Oberle saw them several times at Debra's apartment. Fell was "mean" to his mother. He was more "outgoing" than Lee, who was the "more quiet" of the two. *Id*. at 62. On the evening of November 26, 2000, Oberle visited Debra's apartment between 9:30 and 10 p.m. Debra, Conway, Fell and Lee were all sitting in the kitchen, playing cards and drinking beer.

21

They seemed to be having a good time. No one appeared drunk or angry. No one was using drugs, and no drug paraphernalia was visible. *Id.* at 65.

The government's remaining penalty phase witnesses were members of King's family: her two daughters and three siblings. The government also introduced a letter from King's oldest grandson. Her children and siblings described Terry King's personal characteristics and the impact of her murder on their lives. The government then rested. Tr. VI-1 at 59.

### 2. The Defendant's Direct Penalty Phase Evidence

Fell introduced testimony from 14 penalty phase witnesses, including family members, teachers, social service providers and law enforcement officers, all of whom testified about Fell's childhood and upbringing. In addition, Fell presented the testimony of correctional officers and a prison consultant, who testified about his adaptation to prison. The defense also introduced a "Mitigation Binder" containing hundreds of historical documents generated during Fell's childhood and adolescence, by schools, social services agencies and health-care providers.

### a. Family Members

The first defense witness was Susan Benczkowski, Fell's older step-sister and the daughter of his father and his father's first wife. Benczkowski's parents divorced when she was 10. She testified that her father, Donald Fell, Sr., drank alcohol on a daily basis. Her mother later told her that he was abusive. As a young teen, Benczkowski visited her father and his new wife, Debra Fell. Benczkowski once confronted Debra about drinking beer when pregnant with Donald Jr.; Debra rebuffed her with the remark, "[b]arley is good for the baby." Tr. VII-1 at 58.

When Benczkowski was 15 and Fell an infant, she lived with her father and Debra Fell for the summer. She was often responsible for feeding, changing and caring for the baby.

22

According to Benczkowski, Debra Fell and her father argued and drank constantly. Benczkowski once saw Debra Fell become enraged and attack her father with a knife. There was "blood everywhere," and her father locked himself in the bathroom. Benczkowski called the police, who took her father away. She cleaned up the blood and found a piece of her father's scalp.

Teri Fell, Fell's 22 year-old younger sister, took the stand after Benczkowski. She testified that when she and Fell were children, their parents were always drunk and "yelling at each other." *Id*. at 81. She recalled one night, when she was very young, Donald Sr. and Debra got in a big fight and there was "lots of blood everywhere." Their grandmother came to take her and Fell out of the house. At a later time, her father kept a beer keg in the basement. Teri and her brother would sneak downstairs and "drink beer out of the keg without him [the father] knowing it." *Id*. at 84. The police sometimes came to the house when the parents fought. In addition, her brother and her mother fought. *Id*. at 87. Teri Fell saw Fell hit her mother, and her mother hit him. Fell protected Teri when they were growing up. After Teri had a fight with her mother in January 1994, Debra moved out of the home and Teri did not see her again.

On cross-examination, Teri testified that Debra regularly worked during her childhood. Her brother frequently refused to go to school and stayed out late at night. She witnessed Fell engage in serial acts of violence. These included stabbing a childhood friend with a fork; taking the crutch of Al Wilcox, an injured friend of her mother's and striking him on his bad leg; throwing a door at the same man; and, in a joint assault with Bobby Lee in the Summer of 2000, beating another man "very badly." Fell kicked the latter victim violently and repeatedly when he was on the ground, until he went into shock and a "coma." *Id*. at 144. Fell then urinated on him. *Id*. at 151. When arrested for the assault, Fell gave a false name to authorities. Teri Fell testified

23

that, after her brother went to Vermont in the Fall of 2000, her mother confided to her in a phone conversation that "she was afraid of him." *Id*.

### b. Law Enforcement Officers

The defense called two police officers from Jenkins Township, Pennsylvania, where the Fell family lived in 1989-90. In 1989, Officer Marianne Czanker-Chiumento twice arrested Donald Fell, Sr. for driving while intoxicated and without a license. In one instance, Fell, Sr. struck a child on a bicycle with his car. The other arrest occurred when he had children in the car. Czanker-Chiumento also responded to several domestic disputes at the Fell residence during which she found both parents intoxicated and arguing. Tr. VII-2 at 10-15. According to Czanker-Chiumento, Donald, Sr. was usually the aggressor in the domestic disputes. The officer never saw Debra Fell physically or verbally abuse a child. In October 1990, Debra "finally threw [Donald, Sr.] out." Tr. VII-2 at 25. After that, officers had no reason to respond to the residence.

Officer Christopher Purcell also responded to alcohol-related domestic altercations at the Fell residence in 1989-90. He perceived Mr. Fell to be the main assailant, and Mrs. Fell to be essentially a battered spouse. Prior to late October 1990, Debra had been afraid to take legal action against her husband. On October 29, 1990, however, Officer Purcell responded after Debra Fell reported that her husband had slapped Donald, then age 10, for refusing to take a shower. Observing that the boy had "a bloody lip," the officer arrested Fell, Sr. That incident finally led Debra Fell to obtain a court order requiring her husband to stay away from the house.

### c. Social Services Personnel

Ellis Carle was a former supervisor of Luzerne County, Pennsylvania Children and Youth Services ("CYS") and a medic. Tr. VII-2 at 48. Late one night in April 1985, Carle was

24

dispatched to the Fell house in response to a domestic altercation. Inside he found Debra Fell with a knife wound in her leg, intoxicated and holding a beer she did not want to put down. Both children were sleeping upstairs. A "blood trail" led to the kids' bedroom and the bathroom; "she obviously had gone up to check the kids or something." *Id*. at 52. Carle arranged for the children to spend the night with their maternal grandmother, Theresa Sharpe. Sharpe was a trained foster parent with whom Carle had worked in past. *Id*. 57. Carle and another social worker collected the children. "[T]he boy [Donald] was kind of groggy" and "didn't want to wake up." *Id*. at 52. The girl (Teri) was "sound asleep" and "wasn't waking up for nothing." *Id*. at 52, 58. Carle recalled that when the boy noticed the blood on the floor, they told him it was spilled paint. *Id*. at 58. Donald, Sr. was found on a nearby street, also with a knife wound.

Carle further testified that in the wake of the Fell family's 1984-85 problems, which included a report of sexual abuse of the two children by a baby sitter, CYS and the Victim Resource Center began providing services to the family. This included counseling, home visits, office visits and phone conferences, as well as an evaluation of the family's housing, medical, emotional and physical needs. *Id*. at 81, 84.

In 1994-96, Donald Fell again came to Carle's attention when chronic truancy landed him in juvenile court. Tr. VII-2 at 86. Initially, the court penalized Debra Fell for her son's truancy (including jailing her a few times), but she convinced the court that "she had done everything she could to get him to school," after which the court focused on Fell. *Id*. at 87. Eventually, a juvenile court ordered Fell to St. Michael's, a residential facility for problem boys. *Id*. at 66.

At St. Michael's, Fell received anger management and drug and alcohol counseling. *Id*. at 90. Carle recalled that Fell initially had "a rough time" at St. Michael's but, after discharge a

25

year or so later, did "pretty good." Carle's office continued to supervise the family for about six months after Fell's mid-1995 discharge then closed the case. *Id*. at 69-70. The last notation in Carle's file indicated that in 1996, Debra Fell sought to regain custody of her children but was told that custody had been transferred to Jackie Sharpe. *Id*. at 70.

Deanna German Habib, a CYS case worker, worked with the Fell family in 1990-92, when Fell was 10-12 years old. She testified about Fell's youth, based upon her own memory and CYS documents in the defense "Mitigation Binder." She touched again on incidents already related to the jury by Carle. German Habib identified as "risk factors" the fact that both parents abused alcohol and engaged in domestic violence while Fell was young, and that, according to her, "there was not a lot of extended family." Tr. IX at 20-26. She read into the record the 1985 allegation that Fell had been sexually abused by a baby sitter. *Id.* at 30-31. German Habib said that at age 10-12, Fell "seemed like a normal kid." *Id*. at 64. He was on a Little League baseball team and in the Boy Scouts. *Id*. He was also "an A-B student in school," where he had no behavioral problems. German Habib conceded that when CYS closed its initial supervision of the Fell family in late 1985, the file indicated the children were "receiving appropriate care and love," that "discipline has also been appropriate," and that "there [were] no issues of abuse or neglect that would warrant further involvement." *Id*. at 75.

Subsequently, when CYS reopened the case in 1990 and German Habib became involved, CYS documents noted that "there appear to be no behavioral or other attendance problems at school," "the children were dressed neatly and in clean clothes," and the "physical hygiene and appearance of Mr. and Mrs. Fell are not an area of concern." *Id*. at 79. German Habib confirmed that the father left in late 1990, after Debra Fell had him "kicked out" for slapping young Donald.

26

*Id.* at 80-81. German Habib's contemporaneous notes concluded that the mother had "acted appropriately" at the time. *Id.* at 81. Subsequent reports from the Spring of 1991 indicated that, after the father's departure, domestic violence abated and there was no more evidence of Debra Fell drinking excessively. *Id.* at 87.

However, in 1991 Fell's behavior began to deteriorate and he became aggressive with his mother and his sister. *Id.* at 85, 89. By September 1991, Fell's violence had become "quite severe," and resulted in him being hospitalized. *Id.* at 89. By sixth grade, Fell was "aggressive and oppositional" at school, and had hit and thrown darts at his mother, who was afraid of him. *Id.* at 95. In May 1992, Fell was hospitalized again for violence. He had shot a young friend with a 9 mm pistol; punched his sister; chased his mother with a curtain rod; and kept knives in his room. *Id.* at 103. Debra Fell was afraid that he would use the knives on her. *Id.* at 104. When German Habib closed her file on the Fell family in mid-1992, there were no concerns about excessive drinking or abuse by Debra Fell; on the contrary, she was "providing a safe and stable environment" for her children. *Id.* at 106. The agency's concern was with Fell's behavior. *Id.* at 107.

### d. Teachers

Sharon Hinchey was Fell's Kindergarten teacher in 1985-86. She described Fell at the time as "a wonderful little boy" with whom she never had a problem. After he went on to first grade the following year, he used to "pop in and say hi." Tr. VIII-1 at 14.

Mary Grance Loncoski was Fell's fifth grade teacher in 1990-91. He was a "normal, likeable" boy. *Id.* at 37. He "was a very good reader," who assisted first graders learning to read.

Academically he was "average and slightly above average." *Id*. at 33. Late in the year his attendance and work declined.

William Kane taught at St. Michael's when Fell was there in 1994-95. Kane testified that Fell "adjusted pretty well." He was "always respectful" to Kane. He "wasn't a communicator," and was "mostly flat and depressed." But "there were very few incidents that I can recall that were problematic." Tr. IX-2 at 15.

Mary Jo Scott was a teacher at the Northwest Correctional Facility in Vermont, where Fell was detained pending trial. After meeting Fell in mid-2001, Scott helped him prepare for a GED high school equivalency test. She described Fell as "well-read," "curious," "eager," "prepared," and "focused." *Id*. at 73-75. Based upon scores and testing, he was "in the upper percentile" in comparison with other inmates. *Id*. at 74. Scott opined that, "given the opportunity," Fell "would attend further educational opportunities." *Id*. at 76. When asked what impact Fell's execution would have upon her, Scott replied that she valued her ongoing accomplishments with him and "would hate to see . . . an end to that." *Id*. at 82.

e. Correctional Officers

Ronald Barclay, a Correctional Officer from Northwest, never had difficulties with Fell. However, Barclay admitted that he was not aware of Fell's prison disciplinary record.

James Bailey, another Correctional Officer, testified that during the time he worked in "Echo Unit," where Fell was housed, Fell "followed policies [and] procedures" and was a "quiet" inmate. Tr. VIII-1 at 133. On direct, Bailey testified that Fell took part in "educational and religious opportunities" offered at the facility. *Id*. at 134. Cross-examination revealed that Bailey's only exposure to Fell was as an occasional "float" officer temporarily assigned to Echo Unit. Fulltime officers in that Unit had a lot more interaction with him. *Id*. at 137.

Correctional Officer Jason Rushlow was also assigned to Echo Unit. On direct, he described Fell as a "quiet" inmate who "fit in well." Tr. VIII-2 at 27. He participated in "religious and Bible studies." Tr. VIII-2 at 11-12. On cross-examination, Rushlow reviewed a list of Fell's disciplinary violations. Rushlow then recalled that Fell had an "anger management problem." *Id.* at 48-49 ("[h]e can be explosively angry, and you don't know when it's coming").

During one serious incident shortly before trial, Fell fought with and injured correctional guards. *Id.* Fell also sued the prison for infringing upon his right to practice Native American religion, *id*. at 54-55, and sought to participate in Ramadan as a Muslim. *Id*. at 55-56. He had an "anarchy" tattoo on one arm, and an "upside down cross with 6, 6, 6" tattooed on the other. *Id*. at 60. Fell also filed a multitude of grievances and said derogatory things about officers (calling them "lazy," "stupid," and "things of that nature"). *Id.* at 58.

29

f. Prison Consultant

The last defense witness was James Aiken, a consultant and former prison warden and correctional commissioner in South Carolina, Indiana and the U.S. Virgin Islands. Aiken was retained by the defense to "make an assessment of Mr. Fell in relationship to his adjustment to a prison environment for a long period of time." In Aiken's opinion, Fell's history of prison disciplinary infractions was "fairly minor," and "fairly insignificant." *Id.* at 63-64. If Fell were sentenced to life imprisonment, he would be designated to a United States penitentiary, a "very, very high-security facility," which keeps close control over inmates. *Id*. at 66. Aiken had met with Fell and concluded that he had begun to "mature" and "chill out." *Id.* at 70-71. Fell was a man who could "be adequately managed within the Federal Bureau of Prisons for the remainder of his life," *id*. at 71, "without causing an undue risk of harm to staff, inmates, and the public." *Id*. at 72.

### 3. The Government's Rebuttal Penalty Phase Evidence

The government's rebuttal witnesses in the penalty phase included two prison officials who related specific incidents of conduct by Fell while incarcerated, a prison expert, and two witnesses from Fell's past: a teacher, and a former friend. In addition, the government submitted two stipulations regarding Fell's mental health and Lee's accidental death in prison.

### a. Correctional Officers

Gregory Machia, a Correctional Officer from Northwest, described an incident on March 17, 2004, when a fight broke out among inmates in Echo Unit's outdoor "bull-pen." Tr. X-1 at 109. Responding officers secured the area by ordering all inmates to put both hands on the perimeter fence. When Fell refused to put his hands on the fence or put down his cup of coffee,

30

he was handcuffed and removed. The ensuing scene was captured on videotape, introduced by Machia. The tape depicted Fell angrily taunting and yelling obscenities at officers tasked with taking him into the facility. Tr. X-1 at 112-13.

Correctional Officer Michael Gordon testified about another violent encounter with Fell that occured only a month before jury selection. After Fell refused to come out of his cell, an "extraction team" of four officers was sent to remove him. The incident was videotaped. Gordon, a member of the team, introduced the tape and described what happened. As soon as the team opened the cell door, Fell charged them aggressively. He held the top of a "property box" in one hand, and had wrapped his head with a towel to mitigate the effects of pepper spray (which was not used). *Id.* at 137, 141-42. As the officers pushed back, Fell fought, kicked, and tried to bite them. One officer, Jason Rushlow, was kicked in the knee and injured, and was still out of work at the time of Fell's trial. *Id.* at 138-39. Once shackled and removed from the cell, Fell lay down on the floor and had to be carried. *Id.* at 139. Upon reaching another cell, he threatened an officer. *Id.* at 140.

### b. Prison Expert

David Duncan was a 20-year employee with the U.S. Bureau of Prisons and Associate Warden at FCI Manchester in Kentucky. Duncan had worked at four United States Penitentiaries. Tr. X-2 at 4. He was qualified as an expert in classification and security matters in federal prisons. Duncan told the jury that, ordinarily, inmates in pretrial detention are better behaved than those who have been convicted and sentenced. "Basically their life is hinging on the outcome of the trial still at that point, so they don't want to do anything negative to be used against them." *Id.* at 17. Duncan found Fell's disciplinary violations on pre-trial detention

31

"extremely excessive," and indicated Fell was an inmate "who has a real problem following instructions, following orders from anybody, and seems to be aggressive back at them." *Id*. at 18-19. Also, in light of the fact that Fell's disciplinary infractions increased in number and severity over time, Duncan believed that he "seems to be getting worse on his path rather than better." *Id*. at 43 ("he's not adjusting").

The two videotaped prison incidents alarmed Duncan. As to the cell extraction, he observed that Fell "seemed to have planned it out. He wanted the confrontation." *Id*. at 23. Similarly, with respect to the bull-pen incident, Duncan noted that Fell was trying to "goad" the officers into a confrontation. "He didn't want to avoid the conflict. He wanted to accelerate the conflict." *Id*. at 24. Duncan stated that, based upon his review of Fell's record, it appeared he would have "major conflicts or ongoing conflicts with staff" at a future prison facility. *Id.* at 34. He also testified that prisons were dangerous places: during his two-year tour of duty at the penitentiary in Florence, there had been "seven homicides and roughly 41 major assaults or stabbings." *Id.* at 30-31.

### c. Friend

Matt Cunningham was a friend of Fell's during 1997–99. Since that time, Cunningham had married, had a child, and was employed as a concrete worker. Tr. XI-1 at 39-40. He and Fell used to "hang out" together nearly every day. There were four other members of their group, one of whom was Bobby Lee. *Id*. at 43. The group drank, smoked pot, and committed low-level crimes. Cunningham never saw Fell take harder drugs, like heroin or crack. *Id*. at 48. They all carried knives. *Id*. at 48. Fell was more "outgoing" than other members of the group and "more

32

of a leader than some of the rest of us." *Id*. at 46.  In contrast, Bobby Lee was the quietest and least violent of the group; his nickname was "Twiggy." *Id*. at 47.

Cunningham testified that Fell "made it very clear that he didn't . . . like his mother at all," and said things like, "I could kill her."  *Id*. at 51.  Cunningham also recalled a conversation in which Fell said that, "if you killed one person, why stop there?  Because you are going to get the same punishment anyway."  *Id*. at 52.

### d.  Teacher

John Kozierski was one of Fell's teachers at the Wilkes-Barre Vocational Technical School in 1995-96.  Kozierski taught in the school's Head Start Program.  Program students were mostly from dysfunctional families and the program was designed to help them get a "head start" and choose a vocation.  *Id*. at 59.  Kozierski loved his job because students really needed him: "these students don't really have anybody they can rely on outside of the school . . . they only have us to count on. . . . [W]ith these students, you can really foster something beyond that [traditional teacher-student relationship].  It makes it – it really fulfills me, and that's why I love it."  *Id*. at 63-65.

Fell left an indelible impression on Kozierski.  He was "[c]onfrontational, disruptive, uncooperative, discourteous, ill-tempered, [and] hot headed."  *Id*. at 65.  Yet, testing indicated that Fell was "an intelligent person," *id*. at 70 ("very intelligent"), and "there was no reason why he couldn't excel."  *Id*. at 71.  Kozierski recalled a day in class when Fell refused to sit down as requested.  Fell became irate and began to curse the instructor.  When Fell tried to leave, Kozierski stood in the doorway and said, "whoa, where are you going?"  In response, Fell got

"right in my face . . . and says, 'get the fuck out of my way or I will fucking stab you.'" *Id*. at 67.

Kozierski testified that the threat "totally caught me off guard, to say the least." *Id*. The incident

propelled Fell back into juvenile court, where he denied that it ever happened. *Id*. at 68. Upon

returning to school, "there was no apology" or any "sign of remorse whatsoever." Instead, Fell

"smirk[ed]" at Kozierski, "like I got the best of you." *Id*. at 69.

According to Kozierski, Fell was "legendary" at the school. Of the "between 700 and

800" students he had worked with in the Head Start program, Fell was one of the most

unforgettable. *Id*. at 79. He was "confrontational" and "hot-headed" with all teachers, and

generated a multitude of disciplinary reports and referrals. *Id.* at 73.

The government's remaining rebuttal evidence consisted of two stipulations. One

concerned the accidental pretrial death of Robert Lee. The second, Exhibit 14, concerned Fell's

mental health. It provided as follows:

> It is stipulated and agreed by and between the . . . parties that after his arrest in late 2000,
> Donald Fell was subjected to full psychological and psychiatric examinations. Those
> examinations determined that: (1) he had no cognitive or neurological deficits; (2) his
> intellect and cognitive functions were intact; and (3) he did not suffer from any mental
> disease or defect. The examinations also found that Fell was competent to stand trial, and
> knew the difference between right and wrong at the time of the offenses on November
> 27th, 2000.

*Id.*

By way of brief surrebuttal, the defense introduced documents relating to Fell's August

2000 arrest in New York for assault. Summations and jury instructions were delivered the

following afternoon, July 13, 2005.

34

4.  The Jury Verdict

On July 14, 2005, the jury returned a special verdict form wherein it recorded its findings with regard to the aggravating and mitigating factors presented during the penalty phase.  The jury unanimously found each of the threshold intent factors, as well as, each of the statutory and non-statutory aggravating factors presented by the government.  (Dkt. No. 200, pp. 3-9)  The jury made findings of the proffered mitigating factors as follows:

| | Mitigating Factor | Number of Jurors Who So Find |
|---|---|---|
| 1. | Impaired Capacity | 0 |
| 2. | Did not plan to kill King when he kidnapped her | 1 |
| 3. | Truthfully admitted responsibility for King murder after arrest | 6 |
| 4. | Assisted Officers in Finding King's body | 6 |
| 5. | Fell is not a risk to others in prison | 0 |
| 6. | Fell has made a positive contribution in prison | 1 |
| 7. | Execution Impact | 3 |
| 8. | Fell is remorseful for King's murder | 0 |
| 9. | Lee, who is equally culpable, will not face death | 12 |
| 10. | Fell and Lee acted in concert in committing crimes | 12 |
| 11. | Fell offered to plea to life imprisonment | 12 |
| 12. | Fell was sexually and physically abused as a child | 12 |
| 13. | Fell witnessed family violence as a child | 8 |
| 14. | Fell was raised without positive role models | 10 |
| 15. | Fell was institutionalized for mental health conditions | 12 |
| 16. | Fell was 20 years old at the time of the offense | 12 |
| 17. | Fell's parents were violent alcoholics who abandoned him as a child | 12 |
| 18. | Fell regularly abused alcohol and drugs from childhood until his arrest | 12 |

Written in by Jury

| | | |
|---|---|---|
| 19. | Total life experience | 10 |
| 20. | Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior | 10 |

(Dkt. No. 200, pp. 12-17)

35

C.   Federal Collateral Review of Presumptively Final Criminal Judgments

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief

under § 2255 are narrower than those for relief on direct appeal. As discussed below, with very

limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or

constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and

rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or

(5) an error that did not have a substantial and injurious effect or influence in determining the

jury's verdict.  Section 2255 relief may be based upon (6) ineffective assistance of counsel, if a

petitioner demonstrates sufficiently deficient performance and resulting prejudice.

1.   Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed

errors in conviction and sentencing.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979);

*Davis v. United States*, 417 U.S. 333, 346 (1974).  Once a defendant has appealed his conviction,

the court is "entitled to presume he stands fairly and finally convicted. . . .  Our trial and appellate

procedures are not so unreliable that we may not afford their completed operation any binding

effect beyond the next in a series of endless postconviction collateral attacks." *United States v.*

*Frady*, 456 U.S. 152, 164-65 (1982); *see also Lucas v. United States*, 963 F.2d 8, 14 (2d cir.

1992).  Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a

fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United*

*States*, 368 U.S. 424, 428 (1962); *United States v. Bokun*, 73 F.3d 8, 12 (2nd Cir. 1995).

2.   Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file

motions to vacate, set aside or correct his sentence.  28 U.S.C. § 2255(f); *Moshier v. United States,* 402 F.3d 116, 118 (2d Cir. 2005).  The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing.  *United States v. Willis*, 202 F.3d 1279, 1280-81 (10th Cir. 2000). The period of limitations also bars untimely amendments that add new claims to a defendant's initial § 2255 motion, unless they "relate-back."  *Veal v. United States*, 334 Fed. Appx. 402, 403 (2d Cir. 2009).  While § 2255 petitioners may file untimely amendments that amplify the facts in their timely-filed motions, they may not use such pleadings to add new claims.  *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 815 (2d Cir. 2000).  Section 2255 petitioners may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control.  *Baldayaque v. United States,* 338 F.3d 145, 150 (2d Cir. 2003).

### 3.  Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the petitioner omitted to raise on appeal.  *Frady*, 456 U.S. at 165 (1982); *Campino v. United States*, 968 F.2d 187, 189-90 (2d Cir. 1982); *United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008); *United States v. Dunham*, 767 F.2d 1395 (9th Cir.1985); *Bumgarner v. United States,* 758 F.2d 1292 (8th Cir.1985); *United States v. Griffin,* 765 F.2d 677 (7th Cir.1985); *United States v. Hanyard,* 762 F.2d 1226 (5th Cir.1985).  This doctrine applies even in death penalty cases.  *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005).  An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal.  *See Billy-Eko v. United States,* 8 F.3d

111, 114 (2d Cir. 1993) (*superceded by statute on other grounds* as noted in *Triestman v. United States*, 124 F.3d 361, 369 n. 8 (2d Cir. 1997)).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances. First, they may consider defaulted claims when a petitioner demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *Campino*, 968 F.2d at 190. "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can show cause by demonstrating that a claim was "so novel that its legal basis [was] not reasonably available to counsel." *Bousley*, 523 U.S. at 622. A petitioner can also establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (holding that ineffective assistance of counsel claim asserted as cause for procedural default of another federal claim could itself be procedurally defaulted); *see also Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001). To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003).

### 4. Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *Cabrera v. United States,* 972 F.2d 23, 25 (2d Cir. 1992). Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in

the law of a circuit." *Davis v. United States*, 417 U.S. 333, 342 (1974).

### 5.  New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law.  *Teague v. Lane*, 489 U.S. at 310.  When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review.  As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted).  Generally, new procedural rules do not apply retroactively, while new substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do. *Id.* at 351-52.  A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies.  *Beard v. Banks*, 542 U.S. 406, 411 (2004).  First, it determines when the judgment became final.  *Id.*  Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted).  Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*.  *Id*. at 156-57.

### 6.  Harmless Error

Even assuming that a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 578-79 (1986).  Thus, absent a showing that the case involves one of a rare group of structural errors that affect the framework of the trial and require reversal without a

showing of prejudice, a § 2255 petitioner cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases). Indeed, the Second Circuit recognized the extensive mitigation case presented by Fell in finding no prejudice from the admission of evidence regarding Fell's satanic beliefs. *U.S. v. Fell*, 531 F.3d 197, 230-31 (2d Cir. 2008).

### 7. Ineffective Assistance of Counsel

As the Supreme Court has made clear since *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant making a Sixth Amendment ineffectiveness claim must show both that counsel's performance was so deficient as to fall "below an objective standard of reasonableness," and that, as a result of counsel's unprofessional errors, "there is a reasonable probability that . . . the results of the proceeding would have been different." 466 U.S. at 688. Petitioner bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009); *United States v. Payton*, 159 F.3d 49, 59-60 (2d Cir. 1998).

The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances" (*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)), and without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Because it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all to easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful," "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Hence, courts "must indulge a 'strong

presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. *See also Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Thus, in order to establish that his lawyer's performance was constitutionally deficient, a defendant "must overcome the 'presumption that, under the circumstances, the challenged action "might be considered sound trial strategy'"" by a reasonable attorney. *Id*. *United States v. Chandler*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (defendant "must establish that no competent counsel would have taken the action that his counsel did take").

The strong presumption of reasonableness and judicial deference apply to counsel's investigative decisions. As the Supreme Court reiterated in *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), defense counsel has a constitutional duty to conduct a pretrial investigation that is "reasonable[] under prevailing professional norms," which "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Further, "strategic choices made after less than complete investigation" are reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Id*.; *see also Wiggins*, 539 U.S. at 521; *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("reasonably diligent counsel may draw a line where they have good reason to think further investigation would be a waste").

41

The choice between alternative, conflicting defenses is one instance where reasonable professional judgments support the limitations on investigation. *See Williams v. Woodford*, 384 F.3d 567, 611-12 (9th Cir. 2004) ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental status defense"). Because an ineffectiveness inquiry properly focuses "on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement," what the lawyer "did not miss" is "just as (or more) important as what the lawyer missed." *See Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998).

D.  Summary of Argument

Fell claims that his trial attorneys were ineffective in investigating and presenting readily available mitigation evidence – yet nothing could be further from the truth. Trial counsel called a total of 14 mitigation witnesses in the penalty phase, encompassing six distinct areas of testimony: two family members; two social workers; two law enforcement officers; four teachers; three correctional officers; and one prison consultant. These witnesses painted a graphic and compelling picture of Fell's dreadful upbringing, plagued by chronic alcoholism, physical and emotional abuse, sexual abuse, neglect, and ultimately abandonment. In addition, trial counsel introduced a mitigation binder containing over 300 pages of documents memorializing events during Fell's childhood and adolescence, including his interactions with social services departments, schools, and the mental health system. One of the teachers and the three correctional officers testified about Fell's conduct in a residential home and in prison. The jury thus had a comprehensive picture of Fell's background.

Fell cites several cases where the Supreme Court reversed a death sentence based on trial counsel's failure to investigate and present mitigation evidence. *See* P. 20-21. Yet Fell's trial counsel adequately investigate his background, and presented a compelling case in mitigation, introducing evidence of a childhood and adolescence characterized by parental chronic alcoholism, neglect and abuse. Trial counsel's success in conveying a graphic picture of Fell's horrendous upbringing is memorialized in the fact that the jury, in addition to unanimously finding each of the mitigating factors related to Fell's background, added the following two mitigating factors:

1.  Total life experience.

2.  Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*See* Special Verdict Form, Penalty, Dkt. 200 at 14. Hence, trial counsel effectively investigated and presented mitigation evidence. While the government does not dispute the fact that other witnesses were available, the record indicates that trial counsel's decision not to call more witnesses was a reasonable strategic decision. The testimony of additional witnesses now proffered by Fell would have been cumulative.

Fell also claims that trial counsel was ineffective in failing to investigate and present mental health evidence. He seems to start from the erroneous premise that every capital case trial should include defense mental health evidence. In this case, Fell's attorneys investigated Fell's mental health from the outset, in 2001. They consulted with three mental health experts: psychiatrist Dr. Mark J. Mills, neuropsychologist Dr. Wilfred G. van Gorp and neuropharmacologist Dr. Jonathan J. Lipman. All three experts examined Fell, and none found

him to be psychotic or to have any cognitive functioning deficits.  In addition, none found Fell to be suffering from a mood disorder, other than mild depression, and none indicated that Fell suffered from fetal alcohol syndrome – despite being aware that his mother was a chronic alcoholic.  Trial counsel also obtained Fell's medical records arising from four psychiatric hospitalizations between the ages of 11 and 13.  All four hospitalizations involved conduct disorder, and while Fell was treated with anti-psychotic drugs, he was never diagnosed as psychotic.

Further, as trial approached counsel retained the services of a fourth mental health expert, psychologist Dr. Mark Cunningham, who prepared a social history of Fell and analyzed "risk factors" for violence and aggressive behavior present in his background.  Both Dr. Cunningham and Dr. Mills were prepared to testify in the penalty phase.  However, trial counsel made a strategic decision in midst of the penalty phase not to call them.  Counsel's decision was reasonable in light of likely damaging rebuttal testimony from government mental health experts. Trial counsel had been successful in presenting a grim picture of Fell's childhood.  That evidence had been received essentially uncontested by the government.  Introducing mental health expert testimony not only would have afforded the government an opportunity to rebut such evidence with their own experts, but it would have detracted from the weight of Fell's background mitigation case by turning the penalty phase into a battle of experts.  Given the findings of the respective experts, it was not unreasonable for counsel to elect not to risk rebuttal mental health testimony.

Fell further asserts that trial counsel was ineffective in failing to pursue a motion to exclude the proposed, but never presented, rebuttal testimony of a government psychiatrist,

Michael Welner, M.D.  However, the trial team's strategic decision not to present mental health evidence prevented Dr. Welner's testimony.  Fell assumes first, that counsel would have succeeded in excluding Dr. Welner's testimony; and second, that had trial counsel been successful in excluding Dr. Welner's testimony entirely, his mental health case would have gone unrebutted.  This is simply unrealistic.  Successfully excluding any testimony by Dr. Welner was highly unlikely.  While the trial court might have entertained excluding part of Dr. Welner's testimony, the Court made clear that it was going to allow both parties to present their mental health experts.  In any event, even if Dr. Welner had been excluded, the government had another powerful mental health expert, Dr. Richard D. Wetzel, who had examined Fell in depth and on video shortly before trial and was available to testify.  Even excluding Dr. Welner would not have done away with the government's mental health case.  Fell would still have been exposed to very damaging rebuttal testimony.

Fell also presumes that a mental health strategy would have been successful.  This presumption is also erroneous.  Government and defense experts would have both testified that Fell was not psychotic and had no cognitive functioning deficits.  While defense experts concluded that Fell was impaired at the time of the murders due to alcohol consumption, both government experts would have rebutted that claim.  Drs. Wetzel and Welner both concluded that Fell was not impaired, because, among other things, he remembered exactly what happened, was able to retell his actions step by step immediately after the murder, including the carjacking and kidnapping of Terry King, and was able to make organized, rational decisions.  Moreover, evidence indicated that Fell showed no signs of being intoxicated more than four hours after the murders of his mother and Charles Conway, when he and Lee killed Terry King.  Nothing that

any mental health expert could have said would have detracted from the fact that Fell knew what he was doing and could appreciate the consequences of his actions at the time of the murders.

In any event, hypothesizing about whether or not a different defense mental health strategy would have been successful is not determinative of Fell's ineffectiveness claims. The critical fact is that defense counsel adequately investigated Fell's mental health and made a strategic decision not to present a mental health case. With the benefit of hindsight, Fell now speculates that trial counsel should have presented mental health evidence. Yet the contrary decision during trial was a strategic one, and Fell is not entitled to relief simply because his trial strategy did not succeed. Fell is not entitled to a successful penalty strategy, he is entitled to a reasonable one. *See, e.g., Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) ("the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices") *(quoting Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)).

Fell's remaining claims can be classified into claims alleging either trial counsel's failure to conduct additional investigation of certain matters, and government misconduct. None of the additional claims have merit.

For example, Fell faults his counsel for failing to present additional witnesses regarding his accidental shooting of his childhood friend, John Gacek, but the evidence proffered by Fell would have been cumulative and would have added nothing to the evidence presented in the penalty phase. Similarly, any additional investigation of Fell's assault on Christopher Eike, three months before the capital offenses would not have yielded material evidence. Moreover, the presentation of the testimony of Deacon Steve Ratte would not have added little of significance to Fell's sentencing profile and could have opened the door to damaging evidence.

46

Fell's claim that the government failed to disclose favorable evidence about Robert Lee is not only patently false, but also disingenuous in light of their sensible trial strategy to exclude any statements by Lee. Fell's claim that the government failed to disclose Officer Marc Pelkey's disciplinary record is also false, and in any event, caused Fell no prejudice as Fell was unaware of such a record, Officer Pelkey did not testify at trial, and his intervention with Fell was recorded on video and submitted to the jury.

Fell's claim faulting his counsel for failing to conduct a forensic investigation of the Terry King murder that would have rendered him ineligible for the death penalty also lacks merit. Fell claims that King was killed only as a result of a blow to her head by a rock, and therefore, only Lee intentionally caused her death. However, Dr. Baden's testimony and King's autopsy report indicate that King suffered multiple skull fractures and contusions of her brain, as well as extensive neck injuries, which according to the evidence, were caused not only by a rock, but by repeated kicks to King's head and a heavy stomp to her neck. In light of the fact that King's DNA was found on Fell's boot, and he admitted kicking King in the head, the jury was free to find that Fell intentionally killed King or intentionally inflicted serious bodily injury that resulted in her death. The jury found both. In any event, the last two intent factors also applied to Fell rendering him death eligible. Therefore, Fell cannot show prejudice.

Similarly, the evidence proffered by Fell against the heinous, cruel and depraved statutory aggravating factor is not only unreliable, but nonconsequential. Such evidence would not have established that King did not suffer more injuries than necessary to cause her death, nor would it have negated the fact that Fell inflicted those injuries. Likewise, the evidence proffered by Fell

47

about the Rutland murders or about Debra Fell's life in Vermont would have added absolutely nothing to the sentencing profile presented at trial.

Trial counsel adequately investigated Fell's potential diminished capacity, and counsel's decision not to rely on a diminished capacity defense in the guilt phase was informed and reasonable. As was counsel's decision not to rely on expert mental health testimony in support of the diminished capacity mitigating factor presented in the penalty phase.

Trial counsel was not ineffective in failing to present additional witnesses in support of execution impact as any additional witnesses would have either not offered relevant testimony, or opened the door to damaging testimony on cross-examination. Similarly, trial counsel was not ineffective in failing to object to relevant and probative evidence such as the t-shirt Fell was wearing upon arrest. Nor was counsel ineffective for failing to object to properly formulated arguments by the government in final summation, which the Second Circuit has already determined were not error.

Fell's claim of misconduct in connection with drug evidence in Arkansas and Rutland is pure speculation and has no basis whatsoever. His claims of prosecutorial misconduct during arguments to the jury were variously defaulted or adjudged in the criminal case, and are not proper subjects for § 2255 review. In any event, they are meritless. Similarly, Fell's *Brady* claims are based upon erroneous allegations and have no weight.

Further, Fell's half-hearted and undeveloped claim alleging that his trial counsel was ineffective for failing to object to leading questions, as well as to the testimonies of Police Officer Christopher Purcell regarding battered women; William Kane regarding freedom of choice; Terry Fell regarding an assault by Fell; Matt Cunningham about Fell's expressions

48

regarding multiple murders; and Matthew Kolojeski regarding Fell's tolerance of alcohol lacks merit. All of the above listed testimonies were supported by adequate foundation based on personal experience and observation and were; therefore, admissible.

Fell also claims that juror misconduct warrants vacating his death sentence. He argues that jurors 162 and 26 failed to disclose information that would have subjected them to a challenge for cause, and that jurors 143 and 26 were exposed to extrinsic matters that were considered during jury deliberations, which caused him prejudice. Fell offers no reason why any of these claims are not procedurally barred. Moreover, in support of his arguments, Fell offers juror testimony that is inadmissible under Rule 606(b) of the Federal Rule of Evidence. In any event, Fell fails to establish that any juror was intentionally dishonest, and even if so, that he/she would have been stricken for cause had they provided accurate information. Last, any extrinsic information that might have been brought to the attention of the jury was cumulative of evidence introduced during the trial and clearly harmless.

In his last argument Fell contends that the government pursued capital punishment against him in a racially discriminatory manner. Fell also claims that the government considered his geographical location, as well as the race and gender of his victim in determining whether or not to seek the death penalty. Fell's claims in this regard are procedurally defaulted. Moreover, regardless of the procedural propriety of the claims, their essential premise – that statistical evidence suffices to show discrimination – is not supported by the law.

Similarly, Fell's claim that his trial counsel was ineffective in failing to question jurors about particular forms of mitigation evidence, aside from being procedurally barred, is not supported by the record in this case. Trial counsel, through the juror questionnaire and individual

49

questioning, conducted constitutionally adequate *voir dire*.  Trial counsel also properly attempted to rehabilitate jurors who originally stated that they could not vote for death.

Fell's claim that he was "functionally" a juvenile when he committed the capital offenses is also procedurally barred, and in any event, not supported under applicable case law. Last, Fell's claim that the government's potential use of "imported sodium thiopental" would violate the Eighth Amendment is premature, raised in the wrong forum and without merit in any event.

Fell's claims of ineffective assistance of counsel warrant no relief individually, or when considered jointly, as they had no effect on the outcome of the trial.

Fell makes a multi-pronged attack on his trial team, raising 13 enumerated claims about the alleged failings of his three attorneys.  All of his claims arise in the context of the penalty phase of trial.  As detailed below, none of Fell's allegations has merit under the prevailing standards for constitutional competency of counsel.  Fell's § 2255 claims are discussed below, under the same argument numbers used in his petition.

## III.    TRIAL COUNSEL ADEQUATELY INVESTIGATED AND PRESENTED MITIGATION EVIDENCE

While trial counsel in a capital case has an obligation to investigate and present relevant mitigation evidence, he/she has no obligation to uncover and present every detail of a defendant's life, particularly when such details would not change the sentencing profile.  S*ee Van Hook*, 130 S. Ct. at 19 ("there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties").

Fell claims that his trial attorneys were ineffective in investigating and presenting more mitigating information about his social history than was presented by the 14 witnesses at trial.  It

is significant that his claim is not that his trial counsel failed to advance a particular defense, or

failed to investigate and present social history evidence.  At trial Fell's attorneys advanced

precisely the defense now urged by his § 2255 attorneys: to rely upon mitigating social history in

the penalty phase.  The trial attorneys presented an extensive and compelling mitigating social

history case in the penalty phase.  Indeed, the Second Circuit recognized the extensive mitigation

case presented by Fell in finding no prejudice from the admission of evidence regarding Fell's

satanic beliefs. *United States  v. Fell*, 531 F.3d 197, 230-31 (2d Cir. 2008).  Yet Fell now protests

that his trial lawyers failed to investigate and present "more evidence" of his social history.

In an effort to substantiate Fell's claim, his new attorneys summarize certain information

in bullet format in the § 2255 petition, (P. 28-30)[6] – information that he claims the jury would

have learned had his attorneys done an adequate job investigating and presenting his social

history.  However, a review of the record reveals that the jury in fact learned most of the

information now proffered.  To illustrate this point, Fell's bullets are reproduced below with

corresponding citations to the record where such facts were established or addressed.

> \*  Donald ("Donny") Fell was born on April 30, 1980, in Wilkes-Barre, Pennsylvania, (Tr. II-1 at 3; Exhibit 11g), into a family plagued with long histories of mental illness (Tr. 8-1 107; MB Tab 28),[7] suicide, alcoholism (Tr. VII-1 at 47, 59-60, 79, 82-83; Tr. VII-2 at 13, 29, 37; Tr. 8-1 at 18, 47-48, 51), and substance abuse on both sides.

> \*  From the beginning, Donny's life has been surrounded and shaped by alcoholism, [substance abuse, mental illness], childhood neglect, and family violence, set against the backdrop of Luzerne County, Pennsylvania.  (Tr. VII-1 at 57, 59-60, 76-77, 79, 86; Tr. VII-2 at 14, 15, 37, 44; Tr. 8-1 at 31-33.  Luzerne County is an

---

[6]  Citation references to pages of Fell's 2255 petition are in the form, "P. __."

[7]  Citation references to tabs in the "Mitigation Binder" introduced by Fell at the penalty phase of trial are in the form "MB Tab __."

51

old coal mining and industrial area that has been in economic decline for decades, and is overwhelmed with deep-seated poverty, unemployment, government corruption, alcoholism, drug addiction and extreme violence.

\*     Mr. Fell's parents, Donald Fell Sr. ("Don Sr.") and Debra Kotzer Fell ("Debra"), were chronic alcoholics who fought violently with each other and neglected their children – Donny and his younger sister Teri Fell. (Tr. VII-1 at 47, 57-60, 79; Tr. VII-2 at 8, 13, 16-17, 29, 37, 44; Tr. 8-1 at 47, 51; *See also* Special Verdict Form, Dkt. 200, p. 14, Factor 17).

\*     Debra drank heavily during her pregnancy with Donny (Tr. VII-1 at 57), as she did with his sister Teri.

\*     Because of the severity of the abuse and neglect in Donny's home, the local law enforcement agencies became involved in their lives (Tr. VII-2 at 8, 15, 27-28, 29), when Donny was only two years-old. MB Tab 14.

\*     In 1985, when Donny was four and his sister two, the children revealed to authorities that they had been repeatedly sexually assaulted and physically abused by their babysitters. (Tr. VII-2 at 69, 70; Tr. 8-1 at 22, 25, 32). Even at this young age, Donny displayed signs and symptoms of chronic exposure to trauma.

\*     Soon after the sexual assaults came to light, Donny's mother Debra stabbed her husband Don Sr. in the back in a drunken rage, and Don Sr. retaliated by stabbing her in the leg. (Tr. VII-2 at 43-44, 47, 68-70, 73; Tr. 8-1 at 22, 25, 26, 30). Concerns were raised about Don Sr. and Debra's alcoholism and family violence in front of Donny, but the local Children and Youth Services agency ("CYS") failed to meaningfully intervene in the family, and the traumas continued to mount. (Tr. VII-2 at 51-52; *see also* Special Verdict Form, Dkt. 200, p. 14, Factors 19 and 20 written in by jury).

\*     At age 7, Don Sr. and Debra moved Donny and his sister to the rough north Wilkes-Barre neighborhood where Donny spent most of the rest of his life. His parents' alcoholism and violence increase, and police were called regularly to break up their fights. (Tr. VII-2 at 13-17, 27-29). Among other violent acts, Debra again stabbed her husband in front of their children, this time deep into his arm, traumatizing them again. (*Id*. at 44-47; Tr. 8-1 at 33).

\*     Whereas the violence between the parents was well documented, the parents' violence against their children was largely overlooked by the authorities. (Tr. VII-1 at 79, 86; Tr. VII-2 at 29-31, Tr. 8-1 at 76). Donny tried to protect himself and his sister from their parents' abuse by finding places to hide. (Tr. VII-1 at 88).

CYS reopened their case on the family, bringing dependency proceedings in hopes of ameliorating the situation, but again failed. (Tr. 8-1 at 23, 33-34).

* Contrary to what was presented at trial, Donny's life did not improve after Don Sr. left the household. (Tr. VII-1 at 105-06; Tr. 8-1 at 44). Donny's life worsened in the quality and range of his abuse and neglect at the hands of his mother, her boyfriend, and all of his subsequent guardians. (Tr. 8-1 at 76-77). Donny's mother was a violent, aggressive, and disturbed woman, (Tr. VII-1 at 59-60, 64; Tr. VII-2 at 13-14; 27-28, 44-47); who physically, emotionally (Tr. VII-1 at 76-77, 86; Tr. 8-1 at 47, 51), and sexually abused her children (Tr. 8-1 at 66); and harbored a lifelong addiction to drugs and alcohol that lasted well after Don Sr.'s departure. (Tr. 8-1 at 47, 51; Tr. VII-1 at 106, 109, 112).

* Contrary to what was presented at trial, Debra Fell's live-in boyfriend following her husband's departure, Ellery "Al" Wilcox, was not a role model for Donny. (Tr. 8-1 at 48). Mr. Wilcox was a hard-drinking member of a motorcycle gang. Al Wilcox set about beating respect into Donny on multiple occasions (age 11), but he had a special affection for Teri (age 9). (Tr. VII-1 at 105-06). Al had Debra molest Teri as he watched. (Tr. 8-1 at 66). When Donny tried to object, he was beaten. (Tr. 8-1 at 76). Debra and Al continued to drink heavily and fight, requiring police and CYS intervention on several occasions. (Tr. VII-1 at 107; Tr. 8-1 at 52).

* Debra and Al regularly abused and neglected Donny, and things got so bad that he began displaying undeniable signs of a mental illness. (Tr. 8-1 at 74-78, 86, 90). He was institutionalized four times within a span of two years between the ages 11 and 13, each time for about a month. (Tr. 8-1 at 78, 90; MB Tabs 22-32). However, each time he returned he was helplessly exposed to the same violent and chaotic home life. (Tr. 8-1 at 47-48, 51. *See also* Special Verdict Form, Dkt. 200, p. 14, Factors 19 and 20).

* When Donny was age 13 (and his sister age 11), his mother lost custody of them. Donny and his sister were to be placed with their maternal grandmother, Theresa Sharpe, but Theresa, who had always favored Teri, refused to take Donny. (Tr. VII-1 at 127-28, 143, 157; Tr. VII-2 at 54-56; 57, 59; Tr. 8-1 at 50-52). Theresa, built up by the government as a loving foster parent, was a drinker herself and wanted little to do with Donny. (Tr. VII-1 at 143, 157; Tr. 8-1 at 33). Donny was thus placed in a juvenile residential facility called St. Michael's School for over a year, when he was 13. (Tr. VII-2 at 59, 60, 76; Tr. 8-1 at 51; MB Tabs 39-41).

* Just as Mr. Fell's father had done three years earlier, Debra succumbed to her alcoholism, (Tr. VII-1 at 106, 109, 111-13); and illness and was homeless for a

while, sleeping under a bridge in Wilkes-Barre.  She eventually ended up in Rutland, Vermont.  (*Id*. at 146).

\*    After Theresa passed away from cancer, Donny and his sister were placed with their mother's sister, Jackie Sharpe, who was 21 years old.  (Tr. 8-1 at 52, 54-55; Tr. VII-1 at 129).

\*    Mr. Fell was left to fend for himself because Jackie Sharpe was a mentally ill, violent and volatile young woman who was arguably more physically and emotionally abusive than Donny and Teri's parents had ever been.  (Tr. VII-1 at 129-30; 142).  Although not presented at trial, it would have been undisputed that Jackie had been behaving strangely and having violent rages since she was a child.  The violence and abuse Donny suffered at the hands of Jackie broke young Donny to the point where he contemplated suicide.

\*    When Donny was 17, Jackie Sharpe threatened to stab him with a pair of scissors and ultimately kicked him out – leaving him homeless. *See* VII-1 at 130, 142. Donny was forced to stay intermittently with friends and relatives, working on a traveling carnival up until the end of the summer of 2000 (Exhibit J at 5-7), when he decided to try to renew his relationship with his mother. *Id*. He moved to Vermont in September of that year, about two months before the crimes. *Id*.

\*    In addition to the above, had counsel conducted a reasonable investigation, the evidence would have further showed – contrary to what was stipulated at trial – that Mr. Fell was and is profound mentally impaired. But see P. Exhibits 2,3,4 and 5.

As demonstrated above, the record reveals that the overwhelming majority of the mitigating background information now proffered was presented to the jury.  Trial counsel diligently sought and obtained social history evidence, and presented to the jury a powerful and compelling mitigation case.  *See United States v. Fell*, 531 F.3d 197, 230-31 (2d Cir. 2008) (recognizing extensive mitigation evidence presented by Fell).  Counsel's decision not to seek and present even more mitigating evidence fell "well within the range of professionally reasonable judgments."  *Strickland*, 466 U.S. at 699.

There is no doubt that Fell encountered abuse and neglect during his childhood and adolescence. However, there is also no doubt that the jury was well aware of those circumstances and considered them in mitigation during the penalty phase. Fell starts from the erroneous premise that a "dreadful infancy, childhood, and youth" leaves an individual so impaired that it necessarily mitigates a sentence of death. This is simply not correct. While Fell is entitled to have a jury consider his "dreadful infancy, childhood, and youth," he is not entitled to have the jury conclude that those circumstances outweigh aggravating circumstances. That balancing was precisely the issue presented to the jury in the penalty phase: did Fell's "dreadful infancy, childhood and youth" outweigh the aggravating circumstances associated with his crimes? The jury unanimously concluded they did not. What is relevant, thus, is whether the jury had the necessary information before them to make this decision – it clearly did. That trial counsel could have presented more witnesses is of no consequence if such evidence would have merely expanded on information and issues already before the jury. *See, e.g., Van Hook*, 130 S. Ct. at 19.

Fell relies heavily on *Wiggins v. Smith*, 539 U.S. 510 (2003), in support of his claim that his trial counsel's investigation fell short of the prevailing professional standard. His reliance is misplaced. *Wiggins* involved a trial counsel who purposely failed to investigate the defendant's life history, *id*. at 516-17, electing instead to retry the facts in penalty in an effort to convince the jury that the defendant was not directly responsible for the murder. The Supreme Court assigned no fault to trial counsel's decision not to present a mitigation case, but found their failure to conduct an adequate mitigation investigation prior to making such a decision unreasonable. *Id*. at 522-24. Trial counsel in *Wiggins* limited their investigation into their client's background to

securing a copy of his PSR and examining some department of social services records.  The Court indicated that under *Strickland*, more information than that is needed before a trial counsel can make a tactical decision not to rely on a mitigation case at all.  *Id*. at  527, 533.

The facts of the instant case could not be further from the facts underlying *Wiggins*.  Not only did Fell's trial counsel conduct an extensive mitigation investigation, but at trial, counsel provided the jury with a comprehensive picture of Fell's unfortunate background.

Nor do the facts of this case even remotely resemble the facts underlying *Sears v. Upton*, 130 S. Ct. 3259 (2010), where trial counsel painted a deceptive and incomplete picture of the defendant's upbringing.  During the penalty phase in *Sears* trial counsel presented evidence describing the defendant's childhood as stable, loving, and essentially without incident.  *Id*. at 3261.  During the post-conviction evidentiary hearing, however, the defendant presented evidence of physical abuse between the parents, sexual abuse of the defendant at the hands of a male cousin, and verbal abuse of the defendant by both parents.  *Id*. at 3262.  Sears was also severely learning disabled, severely behaviorally handicapped and had frontal lobe pathology.  *Id*. at 3263.  Because of their inadequate mitigation investigation, none of this evidence was known to Sears's trial counsel.  *Id*. at 3264.  Therefore, whether the strategy counsel devised for the penalty phase was reasonable or not, it was not informed.  Having determined that trial counsel's investigation was not reasonable, the Court remanded for the district court to determine whether the defendant was prejudiced by his counsel's performance.  *Id*. at 3267.

Fell's reliance on *Porter v. McCollum*, 130 S. Ct. 447 (2009), is similarly unavailing.  In *Porter*, trial counsel was wholly unaware of a wealth of mitigation evidence he had failed to uncover.  Counsel in *Porter* called a single witness in penalty, who failed to convey to the jury

the defendant's abusive childhood, heroic military service and the trauma he suffered because of it, and a history of substance abuse and impaired mental health and capacity.  *Id*. at 449.  The record in this case is readily distinguishable.  Fell's trial counsel investigated his thoroughly disfunctional childhood and adolescence, and decided to concentrate the defense on presenting that compelling time period in Fell's life in the penalty phase.  The investigation of Fell's background was adequate and the strategy pursued in penalty was informed and reasonable.

Fell's § 2255 petition seems driven by the notion that his upbringing was so horrific that only counsel's ineffectiveness can explain the capital verdict.  That notion ignores the rightful function of the jury in weighing competing mitigating and aggravating factors.  It also overlooks the aggravating factors that the jury also had to consider: circumstances associated with a brutal and gratuitous triple homicide and carjacking/kidnapping.  *See, e.g., Van Hook*, 130 S. Ct. at 20 ("On the other side of the scales, moreover, was the evidence of the aggravating circumstance . . .").  Even among the few homicides that give rise to capital prosecutions, the murders in this case stand out as particularly horrific.  In a span of about four hours, Fell was involved in murdering three people in an incredibly heinous, cruel and depraved manner, stabbing and slashing Charles Conway – as he sat helpless and intoxicated – approximately 50 times; then carjacking, kidnapping and murdering a second victim – a grandmother – as she lay on the ground praying, by kicking her in the head and stomping on her neck.  Fell showed no remorse for these killings.  Immediately after wiping his bloodied boots on the third victim's body, he stripped the cash from her purse to buy breakfast at a nearby fast food restaurant.

There is no doubt whatsoever about Fell's guilt, which was decisively established by written and recorded confessions and forensic evidence.  The jury's verdict clearly shows that

Fell's social history was carefully considered – the jury actually wrote-in two additional mitigating factors relating to his background. That jury, however, after being properly instructed by the Court, ultimately concluded that the aggravating factors outweighed the mitigating factors sufficiently to justify a sentence of death. That others disagree with the jury's conclusion does not render trial counsel's assistance ineffective.

A.  Fell's Trial Counsel Effectively Investigated and Presented His Social History

Urging that his trial counsel failed to adequately investigate his background, Fell relies heavily on the amount of time that his mitigation specialist – retained by trial counsel – spent on the case; the number of communications between trial counsel and the mitigation specialist; and the number of communications between trial counsel and certain witnesses. It is significant in and of itself that shortly after being appointed to represent Fell, in January 2001 counsel hired Cynthia Ayres, a trained mitigation specialist who has been involved in many capital cases. P. 33. Ms. Ayres traveled to Fell's hometown of Wilkes-Barre, located and interviewed mitigation witnesses, and scheduled several visits by trial counsel with these witnesses. P. 32. In her declaration of March 18, 2011, Ayres states that she conducted a mitigation investigation from January to June 2001. *See* P. Exh. 265 at p. 1, Fell-00002469. During that time she made several overnight trips to Fell's hometown and at least one trip to South Carolina and Florida to interview three relatives in those states, including Fell's father. *Id*.; *see also* P. Exh. 87 at 1.

Fell now claims that trial counsel was ineffective for failing to direct Ms. Ayres to work, while the case was on interlocutory appeal to the Second Circuit. According to Ayres's declaration, she met with defense attorneys on April 30, 2002, and spent a week working on the case in June 2002. P. Exh. 365 at 2. Thereafter she was informed that the trial had been

postponed indefinitely and that she did not need to prepare for trial. This decision by trial counsel was not unreasonable. The case remained on appeal to the Circuit for over two years.[8] After the case returned to the District at the end of 2004, Ms. Ayres resumed work on March 29, 2005, five weeks before the start of jury selection on May 4, 2005, and nearly three months before trial began on June 20, 2005. *Id*. Hence, about three months before the guilt phase of trial began, Ayres was again actively working on the case. Among the things she accomplished was re-interviewing mitigation witnesses about their interaction with Dr. Welner, one of the government's mental health experts. *Id*. at 5. The time spent on the case by the mitigation specialist – including the first half of 2001, and, after the appeal, the three months leading up to trial – was sufficient. *See, e.g.*, *Van Hook*, 130 S. Ct. at 18 (noting with approval the enlistment of a mitigation specialist five weeks before trial).

In any event, the number of hours spent by Fell's mitigation specialist researching his background is of little consequence if trial counsel was able to present adequate background evidence to the jury – which they were in fact able to do. Ms. Ayres tracked down Fell's father, whom he had not seen since he was 10-years-old, and managed to interview him in Florida for two hours despite his initial refusal to speak with her. *See* Exhibit 87, Memorandum from Cynthia Carter Ayres to Dr. Mark Mills, dated April 23, 2001, Fell-00001260. Exhibit 87 alone demonstrates that Ms. Ayres spoke to multiple Fell family members, including Jackie Sharpe, Fell's aunt and custodian from age 15 to age 17; Stella Banas, Fell's great-great aunt; her daughter Jeanette; Donna Williams, Fell's maternal aunt; Jessie Williams, Fell's first cousin; and

---

[8] This Court struck the government's death notice in September 2002. The Second Circuit reversed in November, 2004.

Sandy Bowles, Fell's maternal aunt. It is baseless for Fell to claim that this multitude of family interviews, in addition to the interviews of trial witnesses, was constitutionally ineffective.

Ayres states that had the defense team obtained mitigation records earlier, she would have interviewed additional witnesses, mentioned in those records. *See* P. Exh. 365 at 4. She fails, however, to identify the particular witnesses she would have interviewed, and more importantly, fails to state how their testimony would have altered Fell's mitigation case. In a collateral attack on a criminal judgment, the defendant must allege a factual basis for relief. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187; *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citations omitted)). As demonstrated below, the mitigation specialist's time spent in pre-trial preparation, even if deemed inadequate, resulted in no prejudice to Fell.

B. Fell Fails to Demonstrate Prejudice as a Result of Counsel's Performance

Based upon the foregoing and the record, Fell fails to establish error by counsel in developing a background mitigation case. In any event, however, Fell has the additional burden of showing that, but for such deficiency, there is a reasonable probability that the result of the penalty phase would be different. To assess that probability, the court must consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence" now proffered by petitioner – "and reweig[h] it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). Fell simply cannot make this showing. The defense adopted by counsel at trial was to advance penalty phase evidence of Fell's unfortunate background, and urge that it mitigated his capital responsibility. That same defense is now proposed by § 2255

counsel.  With the benefit of hindsight, however, the latter now urge that trial counsel's 14

witnesses and hundreds of exhibits reflected constitutionally ineffective assistance, and that

additional background evidence was necessary.  Yet the evidence at trial more than adequately

established Fell's tragic background.  The new evidence would but marginally alter the

sentencing profile presented to the jury, and falls short of the required threshold.  *Strickland*, 466

U.S. at 700.  Nothing about the new evidence would materially change the sentencing profile at

trial or lead one to lose confidence in jury's verdict.

### 1.  Trial Counsel Properly Investigated and Presented Mitigation Testimony from Lay Witnesses

#### a.  Factual Background

Fell claims that his three trial lawyers presented an incomplete version of his life prior to

the age of 10, and no evidence of his life after the age of 15.  He misrepresents the record on both

counts

Trial counsel introduced testimony from Fell's half-sister Susan Benczkowski, and from

his sister Teri Fell.  Together they painted a graphic and consistent picture of Fell's childhood,

plagued with alcoholism, physical and emotional abuse, neglect, and abandonment.  Counsel also

called to the stand two Pennsylvania police officers, Christopher Purcell and Marianne Czanker-

Chiumento, as well as two Pennsylvania social workers, Ellis Carle and Deanna German Habib,

who described in detail serial interventions by police and social services at the Fell home, mostly

as a result of altercations between the volatile and intoxicated parents.  Last, counsel introduced

testimony from two of Fell's teachers, Sharon Hinchey (Kindergarten) and Mary Grance

Loncoski (Fifth Grade), who portrayed Fell as a likeable child in his youth.

Fell's first penalty phase witness was his older half sister – Susan Benczkowski. Susan moved in with her father when Fell was a baby and took care of him. Tr-VII-1 at p. 47. She testified that she did not have a memory of her father *not* drinking. *Id*. She testified that Debbie, Fell's mother, drank everyday while pregnant with Fell. *Id*. at 57. When Susan asked Debbie about it, because she knew that alcohol was not good prenatal care, Debbie replied that "barley was good for the baby." *Id*. Susan took care of the baby in the evenings, when the parents went drinking. *Id*. at 58-59. The father and mother were "constantly" intoxicated, constantly arguing and always abusive toward each other. *Id*. at 59-60. Susan described one altercation when Debbie attacked her father with a knife, cutting off a piece of his scalp. *Id*. at 60. There was blood all over the apartment. *Id*.

Susan described other violent incidents between Debbie and her father; the two fought constantly and were always violent. *Id*. at 64. Susan lived at her father's house for six months. *Id*. After she left, she did not see her father for the next 10 years. *Id*. at 66. She did not see Fell again until trial. *Id*.

Against that stark view into Fell's deeply troubled home and parents when he was a baby, the second penalty phase defense witness was Teri Fell, the only sibling with whom Fell grew up. Teri testified that the parental failures described by Susan Benczkowski continued when she and Fell grew up. She began her testimony by describing an incident when police responded to their childhood home after their parents stabbed each other. That night their grandmother took her and her brother. Tr-VII-1 at 76. "I just saw lots of blood everywhere." *Id*. at 77. Teri told the jury that she did not have *any* nice memories from her childhood. *Id*. at 78-79.

Like Susan Benczkowski, Teri Fell testified that her parents were always drunk and yelling. Her father yelled at her and hit her a lot. *Id*. at 79. Teri also recalled how her father would let her and her brother drink the foam off the top of his beer. *Id*. at 82-83. From an early age, she and Fell would sneak down to the basement and drink beer from a keg their father kept there. *Id*. Teri recalled that Fell drank more that she did: "he was always down there drinking it." *Id*. at 83.

Teri told the jury about an incident when she was seven years-old and a young neighbor molested her while playing in the woods behind her house. *Id*. at 131. She testified that she did not tell her mother, because she thought her drunken mother would not care. *Id*. at 132.

Teri testified that her mother physically abused Fell: Debra fought with him and he fought back. *Id*. at 86. According to Teri, Fell played the slide trombone in elementary school, *id*. at 101; he played baseball, *id*. at p. 103; he liked to read books, *id*. at 140; he liked to play the guitar, *id*.; and he liked to build model cars. *Id*. at 103. But Fell's home life was anything but normal. The police came to their home many times, usually because her parents were fighting. *Id*. at 85. Teri also described how Fell began to use drugs before he was in sixth grade. *Id*. at 87.

Fell was protective of Teri as the two grew up. *Id*. at p. 88. Fell once attacked their father with a baseball bat and broke his nose after her father hit her. The father left after that incident, and Teri never saw him again. *Id*. at pp. 104-05. With the father gone, Teri and Fell, and their mother, moved into a house next to their grandmother. Al Wilcox, Fell's mother's boyfriend moved in with them. *Id*. at 106. At first, her mom was still drunk a lot, but after a while, Teri testified that her mother sobered up and stayed sober for a while. *Id*. Also, "she went to work, and worked very hard." *Id*. For the first time in her childhood Teri came home to a

clean house and a home-cooked meal. *Id*. According to Teri, Al encouraged her mother to stay sober – "[t]hey drank on the weekends usually." *Id*. at 106-07.

Notwithstanding, Debra Fell and Al Wilcox had their fights. *Id*. at 107. Teri described one incident when Debra hit Al and the police responded. Debra Fell had to be taken to the hospital because she was struck by a police officer after she jumped on his back. *Id*. The comparative normalcy in the home with Debra sober, however, was short-lived. Al was hit by a bus and injured. *Id*. at 107. Eventually, Al and Debra Fell broke up, and Debra started drinking again. *Id*. at 106. Teri recalled visiting Fell at the hospital around Thanksgiving. Teri remembered her mother being drunk and making a scene at the hospital and yelling at Fell. *Id*. at 109. Teri told the jury how she did not have friends over to her house because she was too embarrassed of her mother's drunkenness. *Id*.

At Christmas time in 1994-96, the year Teri was in 6ᵗʰ grade, their mother abandoned them. Teri related how she and Fell spent that Christmas eve alone at home. By midnight they decided to wrap each other's presents so they would have presents to open in the morning. *Id*. at 111-12. When they woke up the next morning, their mother was passed out on the couch. *Id*. at 112. They opened their presents and then woke her up. She told them she was going out to get some ham and did not come back. *Id*. When Teri saw her mother again in January, the two had another fight and her mother left for good. *Id*. at 113. Defense counsel introduced photographs of the Fell home through the testimony of Teri Fell, depicting the deplorable condition of the home – beer cans, clothes, food and dirty dishes everywhere. *Id*. at 123-27.

When Debra Fell did not return, a grandmother was awarded custody of Teri and Fell. *Id*. at 127. Teri described how excited she was when she went to court because she expected her

mother to show up, but she never did. *Id*. By that time, Fell had been committed to St. Michaels, a home for boys. *Id*. at 128. For approximately a year, things were "pretty good" for Teri Fell. *Id*. at 157. Her grandmother provided a good home and she was good to Teri. *Id*. at 143. A year later, however, the grandmother died. *Id*. at 128.

Teri and Fell were placed in the custody of their aunt, Jackie. According to Teri, their aunt was abusive and negligent – "She made me do all the cleaning, and it – it was horrible." *Id*. at 130. Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her horrendous childhood and the abuse inflicted by her aunt. *Id*. at 132. Although Teri did not indicate as much, Fell had moved back home by this time. *See* Exit Report from St. Michael's, MB Tab 41 at 3.

Teri stopped cutting herself at 15, around the time she started to take care of her aunt's child, Haley. *Id*. at 132-33. She then began using drugs because, "I needed something to help me forget about everything else." *Id*. at 134.

During cross-examination Teri recalled a series of violent altercations with Fell, including episodes in which stabbed a friend of her's with a fork; *id*. at 136-37; hit Al with his crutch on his bad leg following his accident, *id*. at 137-38; and fought with aunt Jackie and fractured her hand. *Id*. at 142. Teri also testified that Fell missed a lot of school, and eventually stopped going. *Id*. at 138. Finally, Teri described an incident when Fell beat and kicked another kid so violently that the victim went into shock and a coma. *Id*. at 144. Fell then urinated on his victim. *Id*. at 151; 158-59. Teri testified that her mother told her that she was afraid of Fell. *Id*. at 146.

Through the testimony of Fell's two sisters alone, trial counsel established that Fell was raised by chronic alcoholics and was the victim of emotional and physical abuse and neglect

65

growing up. Fell and his sister Teri were also constantly exposed to violence between their parents, which often required police intervention. Counsel also established that Fell began to abuse alcohol and drugs since before he was in sixth grade. All but one of these mitigating factors were unanimously found to have been established by the jury. *See* Special Verdict Form, Dkt. 200, pp. 13-14, Factors 12, 17 and 18. A majority of the jurors also found that Fell was exposed to violence between his parents as a child. *Id*. at 13, Factor 13. It should be noted that securing the testimony of Teri Fell was an accomplishment in and of itself by trial counsel, in light of the fact that Fell was implicated in the brutal murder of her mother.

Police officers Marianne Czanker-Chiumento and Christopher Purcell also testified about their interventions with the Fell household. Both officers described responding to the Fell home on a weekly basis after reports of domestic disputes. Tr, VII-2 at 15, 29. Whenever they responded, they would find the parties arguing and intoxicated. *Id*. at 8, 13, 29. The officers recalled verbal and physical abuse, mostly on the part of Donald Fell, Sr. *Id*. at 14, 21, 27-28.

Trial counsel further strengthened and developed the background evidence summarized above with the testimony of two social workers from the Luzerne County, Pennsylvania Children Youth Services ("CYS"): Ellis Carle and Deanna German. Carle began his testimony by relating a first dramatic intervention at the Fell home – a domestic dispute where Mr. and Mrs. Fell, both intoxicated, stabbed each other. Tr. VII-2 at 43-44. When he entered the house he found the living room in shambles. *Id*. at 45. Carle followed a trail of blood upstairs and to the children's room. *Id*. at 46. The children were taken into protective custody and placed with their grandmother, Theresa Sharpe, a trained foster parent. *Id*. at 48-49. Carle identified photos of the

Fell home taken by Theresa Sharpe in an effort to show him the deplorable conditions of the home. *Id*. at 54-55.

Carle testified that he did not interact with the Fell family again until Fell was in juvenile court for truancy. *Id*. at 52. As a teenager, Fell was sent to St. Michael's, a home for children with chronic school problems. *Id*. at 57-58. Carle explained that in Pennsylvania, in the first instance of truancy, parents are arrested and jailed, until they can prove that they have done all they can to get the child to school. According to Carle, Fell's truancy had led to Debra Fell spending time in jail. *Id*. at 59, 76. When Fell was released from St. Michael's at the age of 15, his grandmother had passed away and Fell was placed in the custody of his 21 year-old aunt, Jackie Sharpe. *Id*. at 60. Carle closed his case six months later in January of 1996. *Id*. at 61.

German brought the CYS file on the Fell family and testified both from her own recollection and based on documents in the file that she reviewed. Tr. 8-1 at 10-12. She testified that both Fell and his sister Teri were sexually abused when Fell was five years-old. *Id*. at 22, 25, 26, 32. Fell was referred to counseling. After attending three sessions, however, his mother failed to make another appointment. *Id*. at 26-28, 30.

A CYS case was again opened on the Fell family in April 21, 1990, after an incident where Fell's parents were fighting and the father threatened to kill the mother in front of the children. The children ran to a neighbor's house for help. The children spent that night at the neighbor's house and the next day went home with their grandmother. *Id*. at 33. German was assigned the case after this incident. *Id*. at 34. German was the case worker for the Fell family from October of 1990 to May of 1992, during which time she conducted "somewhere around 30

home visits." Tr. 8-1 at 17.   She testified that the risk factors identified in the Fell home at the time were drug and alcohol problems by both parents, and domestic violence.  *Id*. at 18.

German further testified that the Fell home environment improved after the father left. But not long afterward, Fell's aggressive behavior caused her to keep the case open.  *Id*. at 44. Fell was hospitalized for aggressive behavior four times between the ages of 11 and 13.  German closed her case in May of 1992.  *Id*. at 46.  It was reopened again in January of 1994, when Debra Fell was referred to CYS for hitting Teri while intoxicated.  *Id*. at 47.  There had been a previous referral, however, on November 27, 1993, *see* Defense Trial Exhibit T, which indicates that Fell's mother showed up at the hospital drunk, refusing to take him home.

> The friend with the mother confirms she has been drinking heavily.  Stepfather is outside in car.  Allegations that stepfather and child do not get along and stepfather does not want him home.  Dr. Shin or Sheen states there is no reason for him to remain but mother wants him admitted again.

*Id*. at 48.

While German admitted that Fell had behavioral problems, in hindsight, she believed that his mother used Fell as an scapegoat to mask her own problems.  Tr. 8-1 at 107-08.

Through the testimony of CYS caseworkers Carle and German, Fell's trial attorneys further developed a graphic and horrific picture of Fell's childhood and early adolescence.  The background evidence established that Fell's formative years were marked by alcoholism, domestic violence, sexual abuse, physical abuse, neglect, lack of nurturing and ultimately, parental abandonment.  The medical records introduced by trial counsel showed that Fell had an early need for counseling to control his aggressive and violent behavior, and while he received

68

some treatment through his hospitalizations, that treatment was not continued upon his release. *See* MB Tabs 22-32; Tr. 8-1 at 44-45.

The testimony of Fell's two teachers established that he was an intelligent student, with an interest in learning, but was burdened by chronic problems at home.  Far from failing to present a complete picture of his life, Fell's trial attorneys presented a compelling graphic account of Fell's life story from infancy through adolescence.

Trial counsel listed both Donna Williams and Jackie Sharpe as penalty phase defense witnesses, but opted not to call them.  Tr. VIII-1 at 57.  Dr. John Rabin was also a potential witness on the defense list, but was also not called.  *Id*. at 58.  James Hate was also on the original witness list of the defense, but failed to make it to the stand.  *Id*.  These circumstances reveal not a lack of investigation and preparation, but informed judgements made after the benefit of strong testimony by 14 other defense witnesses, supplemented by the hundreds of documents in the Mitigation Binder.

> b.  <u>Trial Counsel's Decision Not to Present Additional Witnesses Was Reasonable</u>

Notwithstanding the compelling and extensive mitigation evidence summarized above, *see* III(B)(1)(a), *supra*, Fell claims that there were "a number of readily available witnesses who had important mitigation evidence about Mr. Fell's life that was undeveloped and unpresented at trial."  P. at p. 38.  This argument mirrors the claim brought by petitioner in *Van Hook*, which the Supreme Court squarely rejected, as follows:

> Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more.  What his counsel did discover, the argument goes, gave them "reason to suspect that much worse details existed," and that suspicion should have prompted them to interview other

family members – his stepsister, two uncles, and two aunts – as well as a psychiatrist who once treated his mother, all of whom "could have helped his counsel narrate the true story of Van Hook's childhood experiences." 560 F.3d at 528. But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. . . . And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents.

130 S. Ct. at 19.

The government does not dispute the existence or availability of additional background witnesses, but submits that they would have offered essentially cumulative evidence of Fell's unfortunate background. Therefore, the decision by trial counsel not to call then was reasonable. Moreover, because these witnesses were unlikely to alter the existing mitigation profile at the penalty phase, Fell fails to show how he was prejudiced by his counsel's failure to call them.

> i. The Alleged Continued Deterioration of Mr. Fell's Home Life After his Father's Departure

Fell claims that his life really did not get better after his father moved out, contrary to arguments made by the government in the penalty phase. He submits his trial counsel was ineffective in failing to clarify or rebut this fact on the record through additional evidence. However, the testimony of Teri Fell clearly indicates that their home life did improve after their father left their home. Teri testified that her mother, under the influence of her new boyfriend, Al Wilcox, actually became sober for a period of time. Tr-VII-1 at 106-07. During that period of time Debra Fell worked hard regularly, cooked dinner for her children, and kept her home clean. *Id*.

Teri's testimony in this regard is corroborated by the testimony of social worker Deanna German, who testified that after Fell's father left the home, Debra Fell was providing a stable environment for the children and there was no evidence of violence or excessive drinking in the home. Tr. 8-1 at 77. In addition, both children were participating in the Children of Alcoholics Group. *Id*. Records generated by German at the time, and submitted into evidence, further indicate that the conditions of the Fell home improved significantly after Fell's father left the home. *See* Service Plan Report dated May 1991, MB Tab 4. In fact, German testified that her agency considered closing the case after Fell's father left, but it remained opened because Fell's mother reported some incidents with Fell – his behavior was deteriorating at home and at school; he had been violent towards Teri and his mother; and he was subsequently psychiatrically hospitalized. *Id*. at 44; Family Service Plan dated 11/91, MB Tab 5.

In addition, Officer Czanker-Chiumento testified that, after Debra Fell threw the father out of the house in late 1990, the officer did not have reason to respond back to the house again. Tr. 7-2, 22. Similarly, Officer Purcell could not recall responding to the Fell house after the father left, other than one occasion in 1991 when Fell, Sr violated a court order and returned, leading to his arrest. Tr. 7-2, 38.

The record clearly shows that the Fell home did improve significantly after Fell's father left. The fact that subsequently Fell's behavior deteriorated does not alter the fact that his home environment improved.

Despite the record, Fell contends that his life worsened after his father left. Specifically, Fell quarrels with the government's argument that Al Wilcox, his mother's boyfriend after Fell Sr was gone, was the disciplinarian Fell needed. According to the § 2255 petition, "[h]ad trial

counsel investigated Al's role in Donny's childhood and adolescence, the jury would have learned that Al was a psychologically and physically abusive, violent alcoholic." In support of his claim, petitioner submits in the first instance the declarations of Ernie Schuldaski, Stanley Kowalski, and Adele and John Gacek.

A careful review of Schuldaski's declaration, however, reveals that while he perceived Fell's mother to be an alcoholic and was horrified at how she treated her children, he never saw Al Wilcox hit either Fell or his sister or witnessed any violence at the Fell home. P. Exh. 253, Fell-00002430-33. Similarly, Kowalski's declaration does not support the statement that Al Wilcox was "a psychologically and physically abusive, violent alcoholic." Kowalski knew Debra Fell in the mid-1990s, after she had abandoned her children and no longer lived with Wilcox. P. Exh. 277, Fell-00002534. Moreover, Kowalski's knowledge of Wilcox is quite limited, and nowhere in his declaration does Kowalski state that he ever saw Wilcox engage in abuse or violence. *Id*.

Adele Gacek and her son John lived across the street from Debra Fell and Al Wilcox for approximately a year. P. Exh. 252, Fell-00002425. While Adele Gacek states that Debra and Al were constantly drinking and screaming at each other, and cursed at the children, she makes no mention of Al being violent or physically abusive. *Id*.

John Gacek, who was seven years-old when he met Fell, describes Fell as a regular kid who liked to play baseball and video games. P. Exh. 251, 00002419. John Gacek remembers his friend Donnie coming over to his house crying because he had been hit at home. John Gacek states that he never saw Debra Fell without a beer in her hand and remembers that she and her boyfriend Al used to call Fell names and curse at him regularly. But the evidence presented in

penalty left no doubt that Debra Fell was an alcoholic who regularly consumed beer. The CYS records, and the testimony of the two social workers and the two police officers, offered the jury an accurate picture of the conditions of the Fell home and the risks to which Fell was exposed growing up. The Gaceks' testimony simply would have added a different perspective on the same picture already presented to the jury. Moreover, John Gacek was the victim of a shooting by Fell at the age of eight. Calling him to the stand to give arguably cumulative testimony about Fell's childhood risked focusing the jury on the shooting, and on Fell's expressed lack of remorse when admitted to the hospital immediately afterwards. *See* MB Tab 25.

Next, Fell attaches a declaration by Teri Fell. P. Exh. 278, Fell-00002541. Teri Fell testified during the penalty phase and painted a horrific picture of her and Fell's upbringing, characterized by chronic alcoholism, ongoing domestic violence, and abuse and neglect. *See* section III(B)(1)(a), *supra*. She described a series of violent incidents between her parents, and violent incidents between her brother and mother. However, Teri Fell's testimony was that Wilcox encouraged Debra Fell to remain sober and establish a good home. Tr. VII-1 at 106. Who better to tell the jury about the environment in the Fell home than Fell's own sister, who actually lived in that home everyday?

In her post-conviction declaration, Teri Fell expands on some of those experiences, but does not change the sentencing profile that she and trial counsel presented in the penalty phase. For example, at trial Teri started her testimony by relating an incident where her mother and father stabbed each other and she remembered seeing blood. *Id*. at 76. In her post-conviction declaration Teri states:

73

> My parents fought an awful lot.  They stabbed each other and threw things at each
> other.  It was pretty scary.  Police came to the house because of the fighting and
> violence all the time.  My parents held knives over each other.

Declaration of Teri Fell, p. 1, Fell-00002541.  During her trial testimony, Teri Fell stated that her

aunt Jackie was "mean.  She was abusive.  Negligent.  She made me do all the cleaning, and it

was horrible."  Tr. VII-1 at 130.  Teri explained that she resorted to cutting herself to deal with

the emotional pain of living with her aunt.  *Id*. at 132-33.  She testified that she stopped cutting

herself after Haley, her aunt's daughter, was born because she was responsible for her care.  *Id*. at

134.  She then turned to drugs.  *Id*.  In her post-conviction declaration Teri relates additional

incidents with her aunt that further strengthen her trial testimony, but again, do not change the

sentencing profile presented at the penalty phase.

  With regard to Al Wilcox, Teri testified at trial that sometime after he moved in her

mother "sobered up.  Her mother remained sober for a while, cooked dinner every night, went to

work and worked very hard.  The house was clean.  But after her mother and Al broke-up, she

started drinking again."  In her post-conviction declaration, Teri states that Al Wilcox would not

simply discipline Donny, but screamed, yelled and called him names.  Declaration of Teri Fell,

Fell-00002541-2572, p. 13.  Yet at trial Teri described an altercation between her brother and Al

Wilcox in which the former hit the latter with Al's crutch on his bad leg following his accident,

*id*. at 137-38.  Again, Teri expands on her trial testimony, but does not significantly change the

sentencing profile presented in the mitigation phase.[9]

---

[9] Although the government submits that it is not necessary for the Court to consider additional evidence to dispose of this issue, we note that the evidence proffered by Fell in support of his argument is in stark contrast to his own statements to a mental health expert who examined him prior to trial.  *See* P. Exh. 7 at 108, Fell-00000576.

Fell's own statements, made during the course of a psychiatric hospitalization, also contradicts the evidence he now proffers with regard to Al Wilcox. "The patient reported that his mother's boyfriend is not mean but the boy [is] sometimes oppositional defiant to this man nonetheless and he would frequently threaten to run away from school and home." MB Tab 22 at 2. During the course of four psychiatric hospitalizations between the ages of 11 and 13, Fell never reported violence or physical abuse by Wilcox.

Last, Fell submits the declaration of Christina Cumpano, who was Teri Fell's best friend when she was seven years-old. Declaration of Christina Cumpano, Fell-00002573, p. 1. Christina Cumpano describes a Fell home environment much like that described by witnesses who took the stand at trial. She also adds that Teri Fell once told her that "her mom would sexually molest her while her boyfriend watched." *Id*. at 2. This allegation is not found in Teri Fell's declaration and is inconsistent with the testimony of German, who testified that the CYS file contained no allegations of sexual abuse by Fell's parents. Tr. 8-1 at 66. In any event, this information would not have changed the sentencing profile presented by trial counsel, which included testimony by Teri Fell that she had been sexually abused when she was six or seven years old by a neighbor and did not tell her mother because she was drunk and Teri did not think her mother would care. Tr. VII-1 at 133-35. In addition, CYS caseworker German testified that both Fell and his sister Teri were sexually abused when Fell was five years-old.

75

None of the cited declarations – Ernie Schuldaski, Adele Gacek, John Gacek, Stanley Kowalski, Teri Fell, and Christina Cumpano – add information that would have changed the sentencing profile presented by trial counsel.[10]

Having established that the testimony of these witnesses would not have added information much different than what was already before the jury, the government submits that there is no reasonable likelihood that the outcome of the penalty phase would have been different. The jury heard through the largely uncontested testimony of Teri Fell, Officer Czanker-Chiumento, Officer Purcell, Social Worker Carle and Social Workers Carle and German the deplorable conditions in which Fell was raised. The testimony of the additional witnesses now proffered would not have changed that profile. The new witnesses would simply have offered yet more instances of drinking, violence and domestic disfunction in addition to the many instances described at trial. The jury was well-aware of what Fell's background, as indicated in its verdict findings.

---

[10] Fell also attaches a declaration by Alan Reynolds, Debra Fell's boyfriend just before she was killed. Fell-00002522. Reynolds describes Debra Fell's life and habits before her murder and relates a number of incidents. Reynolds admits that he never met Fell. Declaration of Alan Reynolds, at 7. Reynolds described an incident Debra Fell told him about where Debra Fell's husband, Don Fell Sr., forced her to give him oral sex and then had intercourse with her on the couch, in front of the children. *Id*. Reynolds does not state how old the kids were when this incident took place. Neither child told CYS of this incident, therefore, it appears neither remembered the incident. Nor did Debra Fell tell CYS of this alleged incident, even after her husband left her home. Fell also submits a declaration by Janice Stoss, a foster child placed with Theresa Sharpe, Fell's grandmother, when Fell was a boy. Stoss returned to live with Theresa Sharpe when she became pregnant at the age of 18 in 1993. Stoss's testimony adds nothing of significance. She states that "Donny's mother treated him real bad," and that she saw Debra "smack him around numerous times." Declaration of Janice Stoss, Fell-00002515, p. 3. This testimony is similar to Teri Fell's testimony at trial when she stated that her mother physically abused Fell. Tr. VII-1 at 86. The declaration of Jamie Dominick, P. Exh. 276, was not attached.

76

ii. Trial Counsel Presented Evidence of Fell's life After Age 15

Fell claims that trial counsel was ineffective in failing to investigate and present evidence of his life after the age of 15. This claim ignores many records in the penalty phase Mitigation Binder, as well as the testimony of Teri Fell.

The Mitigation Binder includes records from St. Michael's, where Fell resided when he turned 15. *See* MB Tab 41, "Exit Report from St. Michael's," 003092. During his last year at St. Michael's, Fell completed the 8th grade successfully and was promoted to the 9th grade. While enrolled in the St. Michael's educational program, Fell earned grades of C or better. It was recommended that Fell return to public school, which he did by enrolling in the Wilkes-Barre Area Headstart Vocational Tech. MB Tab 11. Fell completed the 9th grade and withdrew from school in April, 1997 (when he turned 17). MB Tab 42. The Mitigation Binder includes dozens of school records generated after Fell left St. Michael's. *Id.* at Tabs 42 and 43.

Teri Fell testified that after her grandmother died, she and her brother were placed in the custody of their aunt Jackie. When Fell was released from St. Michael's at age 15, he returned to Wilkes Barre and lived with Teri and his aunt Jackie. Teri described their tumultuous homelife with aunt Jackie. According to Teri, their aunt, who was nine years older than Teri and six and half years older than Fell, was abusive and negligent. Tr. VII-1, 130. Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her dreadful home life and the abuse inflicted by her aunt. *Id.* at 132. According to Teri – and confirmed by records in the Mitigation Binder – Fell often missed school, and eventually stopped going to school. Mitigation Binder records state that Fell quit school when he turned 17. *Id.*, Tab 42.

77

Additional evidence of Fell's conduct after the age of 15 was introduced through Teri Fell's cross-examination. Generally, it was not favorable. Teri Fell related two violent incidents by Fell after the age of 15. The first involved a fight Fell had with aunt Jackie, in which he broke her hand. *Id*. at 142. The second involved Fell's assault on Chris Eike at the Woodstock Festival in New York. *Id*. at 152. Chris was harassing Teri, who asked him to stop. *Id*. at 153. Fell then asked Eike to leave his sister alone. *Id*. at 154. As told by Teri, Chris then punched Fell, after which Fell and Robert Lee beat Chris badly. *Id*. at 155. Fell punched him and kicked him so seriously that Chris went into shock and a coma. *Id*. at 144, 151. Fell then urinated on him. *Id*. at 151.

Teri Fell also testified that when her mother lived in Vermont they spoke together on the phone. After Fell went to Vermont to live with their mother, in a phone call Debra Fell told Teri that she was afraid of him. *Id*. at 146, 150. Fell was 20 years-old when that conversations took place. Also, it was after the age of 15 or 16 that Fell obtained his tatoos: one of an anarchy sign and one of an upside down cross with 666 on it, which Teri Fell testified represented Satan. Tr. VII-1 at 141.

Evidence of Fell's life after the age of 15 reflected a downward trajectory; it was not as mitigating as the evidence of his early childhood and adolescence. *See* Tr. X-1 at 55, 61-64. Hence, while counsel presented some evidence as to what happened to Fell after the age of 15, it was not unreasonable for counsel not to have focused further on that time period. Indeed, the record indicates that trial counsel purposely stayed away from Fell's life between the ages of 15 and 20.

Mr. Bunin:    I don't know what rebuttal is completely going to be, but I'm trying to clarify the scope of rebuttal.  Basically our case in chief in punishment was Donald Fell till age 15 and then Donald Fell in the correctional institution. . . .

. . . we weren't introducing evidence that necessarily showed good character during his teenage years.  We simply stopped at age 15.

Tr. 10-1 at 55.  Counsel adopted this approach when trying to limit additional aggravating background information that the government sought to admit.

After Fell's attorneys completed their case in mitigation, the Court excused the jury and conducted a hearing regarding mental health evidence and two of the government's proposed rebuttal witnesses: Matt Cunningham and Bethany Brashears.  Cunningham had been Fell's friend in Pennsylvania during the period 1997-99, with whom Fell had discussed murders. Brashears, a teenager, was kidnapped and threatened with death by Fell in early 2000.  The defense initially objected to those witnesses as not properly rebutting its direct evidence, in the above-quoted argument by Mr. Bunin. The government provided the court with FBI reports of interviews of Cunningham and Brashears, as well as transcripts of 2001 grand jury testimony by Brashears (and Lynn Roberts, a witness to the Brashears kidnapping).  On July 11, 2005 the government filed a memorandum setting forth the proposed testimony to be given by Brashears and Cunningham, and explaining its evidentiary basis.  Docket No. 195.  That same day, the defense filed the "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing," arguing for exclusion of the testimony.  Docket No. 193.  After further discussion with the Court and between the parties, only the testimony by Cunningham was admitted.  The entire Brashears incident was not presented to the jury.  In short, trial counsel successfully excluded the

serious and aggravating Brashears incident, in part by urging that Fell's late teens were not proper rebuttal, since the defense evidence had focused on his childhood and adolescence.

It was not unreasonable for the defense to decide, as a matter of trial strategy, not to focus on Fell's life in his late teens. Not only was that time period less formative (in that Fell was no longer a child and was beginning to make his own decisions about the direction of his life – such as leaving school), but the government was poised to present additional evidence of Fell's violence during that time. Focusing on Fell's childhood and adolescence enabled trial counsel to exclude such damaging evidence. Hence, this was an effective trial strategy. "[S]trategic choices made after through investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins*, 539 U.S. at 521.

### iii. Trial Counsel Presented Evidence of Debra Fell's Conduct

Fell also asserts that trial counsel was ineffective in failing to present evidence of Debra Fell's illegal drug use. Such evidence, he submits, would have prevented the government from arguing that he lied in post-arrest statements about his and his mother's drug use the night of the crimes. This argument is simply illogical. The government contended that Fell made false post-arrest statements about his and his mother's drug use because (1) the toxicology report on Debra Fell's body showed that alcohol was the only controlled substance in her system when she died, and (2) a thorough search of her apartment revealed no evidence of illegal drugs other than a small quantity of marihuana seeds. These factors indicated that Fell's claim that his mother was a "crack addict" who had been smoking crack cocaine the night she was killed was minimizing and false. Whether or not Debra Fell used illegal drugs prior to the night she was killed would have been irrelevant; it would not have changed the foregoing evidence.

Fell further claims that trial counsel was ineffective in failing to investigate Debra Fell's conduct after she left her children, as that evidence would have "shed important light on Mr. Fell's relationship with her." But trial evidence firmly established – and the government did not deny – that Debra Fell was a violent, chronic alcoholic when she lived with her children. And the evidence indicated that she remained an alcoholic after moving to Vermont – testimony described her frequenting a local bar (the StopLite lounge in Rutland), and her high blood alcohol content the night she bled to death during Fell's rampage with Lee. While Fell mentions a number of witnesses who trial counsel could have spoken to about Debra Fell's conduct after she abandoned her children, he fails to establish why it was important to offer additional evidence as to such conduct.

In any event, regardless of what Debra Fell's behavior was like in the years after she fled Wilkes Barre, Fell was no longer living with her. More importantly, Debra Fell's conduct in Vermont, after leaving Wilkes Barre and before Fell and Lee came north and killed her, had nothing to do with her murder in her apartment on November 27, 2000. The overwhelming evidence presented during the guilt phase of the trial established that Debra Fell did nothing to cause the violent, brutal attacks that ended her life and that of Charles Conway. Therefore, Fell cannot show that his counsel erred in this regard, or that any such error prejudiced him.

iv.    Trial Counsel Presented Compelling Mitigation Evidence Through Teri Fell

Notwithstanding the fact that trial counsel called Teri Fell to the stand during the penalty phase, and she testified at length and in detail (over 85 pages of transcript), Fell claims that trial counsel failed to adequately exploit Teri Fell as a witness, reciting a string of facts to which she

could also have testified.  A review of the proffered facts, however, reveals that either they were indeed presented to the jury – even if not to the extent urged in the § 2255 motion – or they would not have changed the sentencing profile presented at trial.

Fell claims that if counsel had spent more time with Teri Fell, she would have been able to tell the jury that during his early childhood "[Debra] screamed at Donny for little things and smacked him around a lot.  She called him names, said mean things about him, and threatened to kill him.  She picked up knives and chased Donny around with them multiple times."  P. 49.  But during her trial testimony, Teri Fell testified about ongoing physical abuse that Fell suffered at the hands of his mother.  Tr. VII-1 at 86.  She told the jury that Debra "would start fighting with him.  She would nag at him about things, and start hitting him."  *Id*.  Debra hit her brother with various things in addition to her hands, "[u]sually whatever was heavy and [near]by her, she would hit him with."  *Id*. at 87.  Teri told the jury how her parents were drunk all the time and always yelling.  *Id*. at 79.  She told the jury about the serious domestic violence, *id*. at 76, including incidents during which her parents stabbed each other.  Officer Christopher Purcell related an incident where Fell's father slapped both his wife and Fell, causing Fell to bleed from his lip.  Tr. VII-2 at 30-31.  Officer Purcell added that there was always arguing and physical abuse back and forth when the police responded to the Fell home.  *Id*. at 27-28.  It is simply incorrect that trial counsel failed to cover these subjects.

Fell also claims that additional trial preparation would have led to Teri Fell telling the jury about how he would try to put himself between Teri and beatings by Debra, her boyfriends, or others.  While Teri Fell might not have used the exact words used in Fell's instant motion, the fact is that she told the jury that her brother was protective of her growing up.  *Id*. at 88 (Q: "Did

82

he protect you?  A: "All the time."  Q: "how would he do that?"  A: "He would fight my father off of me when my father was hitting me").  Similarly, Fell attacked his father with a baseball bat, breaking his nose, when Fell Sr hit Teri.  *Id*. at 104-05.  And again, Teri explained the Chris Eike assault as motivated by Fell's protecting her.  Teri's trial testimony adequately established that Fell protected her.  The additional testimony would have been cumulative.

Similarly, Fell submits that trial counsel failed to introduce evidence of yet one more stabbing incident between Debra Fell and her husband.  If there was one thing the jury heard about over and over in the defense penalty phase evidence, it was bloody knife altercations between Fell's parents.  They were described by Susan Benczkowski, by Teri Fell, by Ellis Carle, and by Deanna German.  Tr. VII-1 at 60, 64, 76; Tr. VII-2 at 44; Tr. 8-1 at 31.  This evidence gave the jury a very graphic view of domestic violence in the Fell home.  Indeed, it lent the foundation for defense counsel, in the guilt phase opening statement, to dramatically channel police responding to one of these altercations:

> They see what they have seen before.  The see blood.  They see blood on the floor.  They see blood on the tables.  They follow the blood.  It leads to . . . the living room couch.  There they find Debbie Fell, alive, with a knife protruding from her thigh, the wound bleeding profusely. . . .  They find a trail of blood.  The blood leads outside.  They follow the trail of blood.  The blood leads to a nearby bar which they find Donald Fell Senior drinking with . . . a broken knife blade in his shoulder.  They find another trail of blood.  The blood goes upstairs . . .

Tr. V-1, 45-46.  Yet another such incident would do little to add to the uncontested evidence.

The information Fell proffers about Al Wilcox similarly adds nothing of great significance to the trial testimony of Teri Fell and would not have changed the sentencing profile presented by trial counsel.  *See* section III(B)(1)(a), *supra*.  Likewise, the testimony proffered

83

regarding Debra Fell's use of illegal drugs, or her neglect of Teri adds little to a record replete with evidence of her chronic alcoholism, violence, abuse and abandonment.

Fell proffers additional evidence regarding his treatment by his grandmother. Evidence presented at trial established that Fell's grandmother, Theresa Sharpe, came to the aid of the children when social services took them into protective custody, Tr. VII-2 at 48-49, or they were left alone by their mother. Tr. VII-1 at 114. When their mother finally abandoned them, Theresa Sharpe, a trained foster parent, took custody of them for a year until she died – Teri went to live with her and Fell was sent to a home for problem boys. At trial Teri Fell had no criticism of Theresa Sharpe. *Id*. at 127-28. Yet Fell now proffers that Sharpe abused him physically and drank.

In support of this recent allegation, petitioner submits a declaration of Dorothy Grivner, which is unremarkable, and one from  J. Migatulski, who states that Fell told him about beatings he received from Theresa as a child. Even if true – a fact not conceded and unsupported by the record – such information would not in no way have changed the sentencing profile presented to the jury, much less cause one to loose confidence in the outcome of the trial.

The most prominent evidence proffered in support of Fell's argument that Teri Fell's mitigation evidence was not fully explored relates to the treatment of Fell and his sister by their aunt, Jackie Sharpe. Fell now submits that Teri could have elaborated about the abuse she and her brother suffered at the hands of Sharpe. He proffers that Jackie Sharpe held "wild alcohol parties" and allowed both Teri and Fell to drink alcohol. In addition, Fell proffers that Jackie Sharpe engaged in sexual behavior in front of Teri. In addition, he claims that Jackie Sharpe, in a

rage, kicked him out at the age of 17, leaving him homeless.[11]  Fell claims that this information "would have provided jurors with an image of Mr. Fell's later life that was fundamentally different from anything heard at trial."

But this information is not fundamentally different than the testimony presented at trial. According to Teri's trial testimony, their aunt was abusive and negligent.  Tr. VII-1 at 130. Eventually, around the age of 14, Teri started cutting herself to deal with the emotional pain brought upon by her horrendous homelife and the abuse inflicted by her aunt.  Id. at 132. Although Teri does not indicate as much, Fell had moved back home by this time.  See Exit Report from St. Michael's, MB Tab 41.  Teri stopped cutting herself at 15, around the time she started to take care of her aunt's child, Haley.  Id. at 132-33.  She then began using illegal drugs because:  "I needed something to help me forget about everything else."  Id. at 134.

While Teri did not offer the graphic examples of her aunt's abuse now proffered in her declaration, her testimony at trial left no doubt that the home life of Teri Fell and her brother under the supervision of their aunt Jackie was dreadful.  Indeed, it led Teri to self-mutilation and drug abuse.  Trial counsel did not need to go into the additional details now proffered by Fell to convey this fact to the jury.  Therefore, it cannot be said that but for counsel's failure to present such evidence to the jury, the outcome would have been different.

Moreover, as discussed above, exploring Fell's later teens was ultimately not to his advantage; it could have led to the admission of additional aggravating evidence of his

---

[11]  During his interview with Dr. Lipman, Fell indicated that his aunt let him smoke cigarettes and watch tv, but that living with her "was kinda like being in jail ... she'd let me out twice a week, but when she was asleep I could no anything I wanted."  P. Exh. 4 at 4, Fell-00000426.  According to Fell, ultimately he was ejected from his aunt Jackie's house at 17 as a result of his drug abuse, drinking and misbehavior.  Id.

kidnapping and assault of another female: Bethany Brashears.  Trial counsel fought hard and successfully to exclude that evidence.  The record indicates that counsel purposely avoided presenting evidence of Fell's later teens because it was not as mitigating as evidence of his childhood and adolescence.

In sum, Teri Fell's testimony at trial was compelling and convincing.  This is again evidenced by the fact that the jury unanimously found all the mitigating factors that related to Fell's upbringing, and wrote in another two factors regarding his background and life experience.  Therefore, trial counsel's performance in penalty was effective.  Therefore, Fell has not shown that, absent his attorney's error, if any, a reasonable probability exists that he would have received a more favorable verdict.  *Strickland*, 466 U.S. at 694.  Indeed, nothing about the information trial counsel allegedly failed to present would lead one to lose confidence in the outcome of the trial.  *Id*.

### 2.  Trial Counsel Adequately Investigated and Presented Mitigating Records and Photographs

Trial counsel introduced into evidence at the penalty phase a Mitigation Binder containing hundreds of pages organized behind over 40 tabs, consisting of records from Fell's background, including medical records documenting his four psychiatric hospitalizations between the ages of 11 and 13; CYS records documenting the interventions of social workers from the CYS with the Fell family; records generated by his various schools; and police reports documenting domestic violence incidents in the Fell residence.

Trial counsel called two CYS social workers to testify about the Fell family.  Deanna German explained to the jury CYS documents in the Mitigation Binder, including referral forms

describing family demographics, *i.e.*, names, ages, birth dates, addresses, telephone numbers, and reasons for referrals, Tr. 8-1 at 12; contact sheets, which are forms generated by a CYS worker that document any contact with the family or service providers or neighbors, including visits and telephone calls, or any contact that has to do with the family or the case*, id*. at 13; intake assessments, which include adult interactions, sibling interaction, education, financial situation, housing, income, the basis of what the problem is and the worker's opinion, *id*. at 15; family service plans, which are contracts between the family and the agency stating what goals and objectives need to be completed for the case to be closed, *id*. at 16; risk assessments, which are documents that identify the risks in the family, that is, the severity of the abuse, the mental health status of the parents, whether there is domestic violence in the home, the condition of the home, *id*. at 17; dependency petitions, which are sometimes prepared to obtain a court order for the parents to cooperate with the agency recommendations, *id*. at 23; and progress notes and reports. *Id*. at 24.

Notwithstanding trial counsel's efforts, Fell now claims that his lawyers were ineffective in failing to introduce even more background documents, that would have "depicted Mr. Fell's life in an entirely different manner – one that was mitigating to Mr. Fell." P. 52.

### a. Trial Counsel Used Sufficient Documents from CYS

Fell takes objection to the government's use of the "Family Service Plan" generated by German in May 1991. MB Tab 4 at 1. In this Family Service Plan German states:

> Mrs. Fell has provided a safe and stable home environment. Mr. Fell no longer resides in the home. Mr. Fell is not living in the home. Therefore, there is no problems with physical violence.

87

German further noted that there was no evidence of excessive drinking by Debra Fell. *Id*. at 3. German's comments refer to the period of time after October 1990 up to May 1991. The government used this document with German in an effort to show that Fell's home environment had improved after his father left. This line of argument was also supported by Teri Fell's testimony. According to Teri Fell, her mother actually became sober sometime after her father left the home. Tr. VII-1 at 105-06.

Fell claims that this statement is false and misleading because after his father left Fell was psychiatrically hospitalized four times. He argues that trial counsel should have refuted the testimony of German with other documents. First, the fact that Fell was hospitalized does not mean that his father's absence was not a net improvement in the home. Second, in any event, trial counsel placed before the jury, not only German's testimony, but also the medical records detailing the four psychiatric hospitalizations. Therefore, the jury had an opportunity to examine the medical records themselves which tracked Fell's development. Third, no other document would have erased German's words recorded in the Family Service Plan she generated in 1991. In May of 1991, when German was visiting the Fell home on a regular basis, her assessment was that Fell's mother was providing a safe and stable environment. German had mostly helpful things to contribute to Fell's mitigation case in the penalty phase. The fact that there was some limited exception that was not helpful does not mean that counsel was ineffective. Counsel reasonably took the bit of bad with the mostly good – not an unusual situation with a trial witness. Fourth, trial counsel astutely led German through her testimony and then solicited her opinion as to the conduct of Fell's mother in 1990 and 1991 – German testified that in retrospect,

in her opinion, Fell's mother used him as an scapegoat to mask her own conduct. Tr. 8-1 at 124.

This was very compelling testimony from a person who was familiar with the Fell home.

> A. Because if he got better then there would be no focus. And from my records, as you could see, I started changing the focus myself. I fell into that with her, that he was the focus, he was the behavioral problem, and her drinking and that kind of was minimized which is also what Debbie did was minimize her own problems. So when you have a scapegoat in the family no matter what else is going on that person, Debbie, would look at the identified child or scapegoat and say, see it's all him, see everything else is fine, Teri's doing fine, I'm doing fine. But let's keep – she wanted all the focus to be on him so no one really paid attention to what she was doing. And when, well, I was going to say when he finally –
>
> Q. You can finish your answer.
>
> A. I was going to say when Donny finally went to St. Mike's where he was going to get very intensive treatment Debbie left. So there was never a point where somebody could say see, you still have a problem. I mean she left the state.

*Id*. at 124-25. Trial counsel's performance in this regard was more than adequate.

Notwithstanding, Fell argues that trial counsel was ineffective in failing to introduce a number of contact sheets which would have placed additional information before the jury. P. 53-54. Some of these contact sheets would have established that Fell's father was at the home several times between January and March of 1991. But they also would have established that it was Debra Fell who was reporting his presence to CYS and to the police, and it was Debra Fell who ultimately had him arrested for trespassing. *See* P. note 14. Other contact sheets would have established that Debra Fell was evicted from her home and continued to drink after her husband left. But these facts were well established by other evidence presented by trial counsel, including the testimony of Teri Fell, police reports and documents related to Fell's hospitalizations. *See* Tr. VII-1 at 103-04, 107-109; Defense Trial Exhibit T. Tab 21 of the Mitigation Binder contains a police report regarding a traffic stop of Debra Fell on July 17, 1991,

pursuant to which she was found to have been driving drunk. Tab 20 of the Mitigation Binder contains a police report indicating that Debra Fell was arrested for public drunkenness and assault on January 29, 1994. The affidavit filed by the arresting officer indicates that Debra Fell attacked her boyfriend Al Wilcox, dragging him out of his vehicle by the hair, striking him on the face and breaking his glasses. Fell, age 13, corroborated Wilcox's statements to the police. Defense Trial Exhibit T is a CYS Referral dated November 27, 1993, which indicates that Fell's mother showed up at the hospital drunk, refusing to take Fell home.

> The friend with the mother confirms she has been drinking heavily. Stepfather is outside in car. Allegations that stepfather and child do not get along and stepfather does not want him home. Dr. Shin or Sheen states there is no reason for him to remain but mother wants him admitted again.

Tr. 8-1 at 48. The evidence presented at trial made it clear that Debra Fell never stopped drinking completely. Trial counsel was not required to present every existing piece of evidence, so long as the evidence they chose to present adequately conveyed the relevant mitigation evidence to the jury. It is significant that German testified that she had FEDEXed approximately two inches worth of documents to counsel in response to a subpoena. Tr. 8-1 at 36. Several of these contact sheets were included in the Mitigation Binder introduced into evidence. The fact that counsel did not choose to introduce the contact sheets now highlighted by Fell in his motion at pp. 54-56 does not render counsel's assistance constitutionally ineffective. None of the additional information contained in those contact sheets would have changed the sentencing profile presented by trial counsel.

In conclusion, Fell argues that the information contained in the additional contact sheets not submitted to the jury would have clearly established that he was not living in a "safe

90

environment" under his mother's care. But the evidence presented by trial counsel established

that fact. The jury unanimously found that:

> 12.     Fell was sexually and physically abused as a child
> 17.     Fell's parents were violent alcoholics who abandoned him as a child
> 18.     Fell regularly abused alcohol and drugs from childhood until his arrest

In addition, 10 jurors on their own found the following two mitigating factors:

> 19.     Total life experience
> 20.     Failure of state social and mental health services to effectively
>        intervene in his childhood abuse and to treat or address his early
>        antisocial behavior

Clearly trial counsel's presentation of mitigation evidence and his use of the available mitigation

records was adequate. Even if Fell were able to establish that trial counsel should have

introduced more documents, in light of the jury's findings, he cannot establish prejudice

sufficiently to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

> b.   Trial Counsel Obtained and Presented Other Documentary Evidence of Mitigation

Fell further claims that his trial counsel was ineffective in failing to present more

documents pertaining to his hospitalizations which would have established the hostility and

neglect of his home life. Specifically, he submits that trial counsel should have made better use

of nurses' notes. However, among the documents trial counsel submitted to the jury was a

referral from a hospital to CYS dated November 27, 1993, which indicates that Fell's mother

showed up at the hospital drunk, refusing to take Fell home.

> The friend with the mother confirms she has been drinking heavily. Stepfather is
> outside in car. Allegations that stepfather and child do not get along and
> stepfather does not want him home. Dr. Shin or Sheen states there is no reason
> for him to remain but mother wants him admitted again.

Defense Trial Exhibit T; Tr. 8-1 at 48.  It is hard to imagine a more effective manner in which to convey to the jury the "hostility and neglect" that Fell was exposed to at home than providing them with this referral.

Moreover, the remaining information that Fell claims would have been provided to the jury through the proffered nurses' notes was presented through other testimony.  *See* Testimony of Teri Fell, Tr. VII-1 at 86 (mother physically abused Fell); MB Tab 30, Discharge Summary dated June 30, 1993, at 1 ("I'm here because my mother just doesn't want me around"); at 2 ("upon admission to the Adolescent Unit he had head lice."); at 3-4 ("His grandmother came in and reported to the staff that there were problems in the home, that it is 'not all Donald's fault'"); MB Tab 25, Discharge Summary dated May 2, 1992 ("He also exhibited head lice and had to be treated with Knell shampoo several times").

While trial counsel did not submit the associated nurses' notes into evidence at the penalty phase, the relevant mitigation information therein was presented to the jury through the Mitigation Binder's hospitalization records and witness testimony.  Trial counsel's performance was thus adequate and effective.

Fell further claims that his trial counsel was ineffective in using records from St. Michael's school to establish that he had an alcohol problem.  But a review of the record again indicates that trial counsel introduced a drug and alcohol evaluation conducted of Fell on September 16, 1996.  MB Tab 13 at 1.  This evaluation documented Fell's chronic substance abuse problem, beginning with his first experimentation with alcohol at the age of eight, and his ongoing abuse beginning at age 13.

92

> Donald stated he consumed one twelve pack of beer daily and one-fifth of rum on weekends for one and one-half years. Donald reported he also drank unknown amounts of alcohol on a binge basis during this time period.

*Id.* This same document noted that Fell's "[s]cores on the WPI correlate with those who are prone to abuse alcohol." *Id.* at 2. The evaluator also concluded that Fell had a marihuana abuse problem and was minimizing his abuse of alcohol. *Id.* Thus, again, while trial counsel might not have utilized the documents now cited, counsel clearly conveyed the relevant mitigation information to the jury.[12]

Last, Fell claims that his three trial lawyers were ineffective in failing to submit documents from St. Michael's that would have "revealed allegations that Don Sr. had been 'sexually abusive' to Mr. Fell and his sister." He cites a Psycho Social Summary completed at St. Michael's School. However, a review of this document shows that the allegation of sexual abuse was made by the Theresa Sharpe, the maternal grandmother. *See* Fell - 00002024. Other than Sharpe's statement, the record in this case, including CYS files and mental health evaluations, are devoid of allegations of Fell's sexual abuse by either parent. Particularly in view of evidence of Sharpe's volatility and immaturity – introduced both at trial and in connection with the instant motion – it was reasonable for trial counsel not to have relied on her isolated and unsubstantiated allegation.

### 3. Trial Counsel Effectively Obtained and Presented Evidence of Familial Substance Abuse and Mental Health Issues

---

[12] Fell further claims that trial counsel should have presented evidence to the jury regarding the fact that Fell and Robert Lee reconnected at St. Michael's. He deems it relevant that at St. Michael's, Lee was treated for aggressiveness and destructiveness. However, the record reveals that trial counsel purposely and as a matter of strategy chose to exclude evidence regarding Lee's relationship with Fell. We expand on this argument below.

Fell claims that his trial counsel failed to present evidence of familial substance abuse and mental health issues. Again, the record does not support his contention.

### a. Trial Counsel Presented Evidence of Abuse of Alcohol and Illegal Substances by Fell and His Parents

The record in this case is replete with evidence of chronic alcoholism by Fell's father and mother, as well its side effects. From the moment the first defense witness took the stand at the penalty phase (consistent with counsel's opening statement), the jury heard one horrific story after another relating to the chronic abuse of alcohol by Donald and Debra Fell and resulting drunken altercations. Susan Benczkowski, Fell's half-sister, began her testimony by telling the jury that she did not have a single memory of her father not drinking. Tr. VII-1 at 47. Susan testified that Debra drank everyday, even when she was pregnant. *Id*. at 57. Teri Fell testified that her parents were always drunk and always yelling at each other. *Id*. at 79. She also told the jury how her father would let her and her brother drink the foam off the top of a beer. *Id*. at 82-83; and how she and her brother first started drinking when he was about eight years old from a keg their father kept in the basement. *Id*. Both Susan and Teri related violent incidents where Donald and Debra Fell stabbed each other while intoxicated. *Id*. at 60, 76. Officer Czanker told the jury that there was a period of time when the police would respond to the Fell home on a weekly basis, usually to find both parties intoxicated and yelling at each other. Tr. VII-2 at 13-14. Officer Purcell similarly testified that the police responded to the Fell home at least weekly, *Id*. at 29, and that the main problem in the Fell household was alcohol. *Id*. at 37. Social worker Ellis Carle began his testimony by telling the jury about a shocking incident at the Fell home where Donald Fell was found walking down a sidewalk with a knife in his back and Debra Fell

94

was found at her home with a knife wound on her leg – both parties were intoxicated. *Id*. at 44-47.

Trial counsel not only presented extensive evidence of the Fell family's chronic alcoholism, but he also provided the jury with evidence of Fell's predisposition to abuse alcohol. *See* MB Tab 13, Drug and Alcohol Evaluation of Fell dated 9/16/96, which indicates that Fell's "[s]cores on the WPI correlate with those who are prone to abuse alcohol." According to this evaluation, Fell abused alcohol as well as marihuana. This evaluation was reviewed before the jury through the testimony of social worker Deanna German. Tr. 8-1 at 11.

Notwithstanding the above summarized evidence, Fell claims trial counsel were ineffective in failing to present evidence of familial alcoholism and substance abuse. He submits that his trial attorneys should have also presented evidence of alcohol and illegal substance abuse by his extended family members. However, given the chronic alcoholism of his parents, and his own early exposure to alcohol and alcohol abuse, additional evidence of familial alcoholism would not have altered the sentencing profile presented. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. In this case, in light of the evidence presented, it was highly unlikely that additional evidence of familial alcoholism and substance abuse would have materially altered the mitigation profile.

b. Trial Counsel Elected Not to Present Evidence of Mental Illness

In the penalty phase counsel introduced evidence of four psychiatric hospitalizations of Fell between the ages of 11 and 13. *See* MB Tabs 22-31. Through the medical records, the jury learned that Fell's father was a diagnosed schizophrenic and his grandmother was diagnosed with

95

chronic psychosis and took psychotropic medications.  MB Tab 28 at 2.  Fell submits that trial counsel was ineffective in failing to present additional evidence of familial mental illness.  However, the record demonstrates that counsel made a strategic decision not to present a mental health case.  Evidence of familial mental illness would have opened the door to the government's expert testimony in rebuttal, something that trial counsel sought to circumvent.  Introducing additional evidence of familial mental illness would have been inconsistent with trial strategy, and it was not unreasonable for counsel to forego it.[13]

Moreover, although there was a history of mental illness in Fell's family, the fact remains that Fell himself exhibited no mental illness.  Multiple experts, for both the defense and the government, reached that conclusion (and other evidence established that Fell's conduct on November 27, 2000, was purposeful, goal oriented, rational, and organized).  Therefore, there is no reasonable probability that evidence of familial mental illness would have led to a favorable verdict.

4. Trial Counsel's Investigation and Presentation of Mitigation Evidence Was Adequate; Therefore, Fell Can Not Show Prejudice

As stated above, trial counsel presented a total of 10 lay witnesses in mitigation who painted a horrific picture of Fell's childhood and upbringing.  Together, these witnesses described an intelligent child who appeared to have succumbed the hazards of his home environment, which included chronic alcoholism, physical and emotional abuse, sexual abuse, neglect and ultimately, abandonment.  The testimony of most of these witnesses was supported

---

[13]  From the beginning of the case counsel was aware of the risks created by familial mental illness as they had been noted by Dr. Mark J. Mills in his report dated May 7, 2001.  *See* P. Exh. 2 at 4, Fell-00000395.

by hundreds of documents in the Mitigation Binder.  Included in that binder were Fell's

psychiatric hospitalization records describing Fell's four hospitalizations.  In each instance, he

responded positively to treatment, only to abandon treatment when released to his mother's

custody.  The mitigation profile presented by trial counsel was compelling, as demonstrated by

the jury's unanimously finding of every mitigating factor submitted relating to childhood and

upbringing.  Indeed, 10 jurors also found as mitigators Fell's "total life experience" and the

"[f]ailure of state social and mental health services to effectively intervene in his childhood abuse

and to treat or address his early antisocial behavior."  Therefore, trial counsel's investigation and

presentation of mitigation evidence was more than adequate and his legal representation was

effective.

Fell's claims, addressed above, that trial counsel failed to present "important mitigation

evidence" (P. 62), are not supported by the record.  He further argues that "[d]efense counsel

should have been prepared to offer available witness testimony and supporting documentary

evidence to *provide real weight* to the mitigating factors presented regarding his background."  P.

63 (emphasis added).  Yet the Special Verdict Form indicates that the jury unanimously found all

but two of the mitigating factors related to Fell's background, and the remaining two factors were

found to have been established by 8 and 10 jurors.

| 12. | Fell was sexually and physically abused as a child | 12 |
| 13. | Fell witnessed family violence as a child | 8 |
| 14. | Fell was raised without positive role models | 10 |
| 15. | Fell was institutionalized for mental health conditions | 12 |
| 16. | Fell was 20 years old at the time of the offense | 12 |
| 17. | Fell's parents were violent alcoholics who abandoned him as a child | 12 |
| 18. | Fell regularly abused alcohol and drugs from childhood until his arrest | 12 |

In addition, the jury wrote in an another two mitigating factors, both of which relate to Fell's background.

Written in by Jury

| 19. | Total life experience | 10 |
| 20. | Failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior | 10 |

Dkt. No. 200, pp. 12-17. Fell's allegation that additional evidence of these factors would have led at least one juror to strike a different balance is pure speculation. Nor is the fact that the jury deemed aggravating evidence more compelling than mitigating evidence indicative of ineffective counsel. Fell must show that, based on an error by his counsel, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. Given the extensive and compelling background mitigation evidence in the penalty phase, the professionalism of the lawyers, and the care exercised by the Court at trial, Fell is unable to make the requisite showing.

**IV.    TRIAL COUNSEL ADEQUATELY INVESTIGATED FELL'S MENTAL HEALTH AND THEIR STRATEGIC DECISION NOT TO PRESENT A MENTAL HEALTH CASE WAS REASONABLE**

Fell next claims that his trial counsel failed to conduct an adequate investigation of his mental health – the record completely defies this allegation. Immediately upon being assigned to represent Fell, trial counsel retained the services of three mental health experts, each of whom rendered a report on Fell's mental health. In addition, as trial approached, defense counsel retained the services of a fourth psychologist to evaluate Fell's social history and the risk factors

associated with it.  Nonetheless, during the penalty phase, after introducing important mitigation evidence and reviewed reports from two government rebuttal experts, trial counsel made an informed strategic decision not to present a mental health case.  By the beginning of the penalty phase, seven mental health experts had examined Fell – four for the defense and three for the government.  None had found any neurological deficits, organic brain damage, or significant mental illness.  Moreover, the government mental health experts were poised to testify in rebuttal – if Fell introduced mental health testimony – that he fully met the criteria for Anti-Social Personality Disorder, and psychopathy, that he was not significantly impaired at the time of the murders, and that he showed no remorse.  Further, Fell made highly damaging, false exculpatory and minimizing statements in his video-taped interview by Dr. Wetzel, which likely would have been shown to the jury.  Therefore, trial counsel's decision not to present a mental health case did not reflect constitutional ineffectiveness.  Further, because presentation of mental health expert testimony would have triggered strong and unfavorable expert testimony in rebuttal, Fell cannot demonstrate prejudice.

> A.  Trial Counsel Conducted an Adequate Mental Health Investigation Which Conformed to Existing Standards of Professional Conduct

One of the first steps taken by Fell's trial attorneys upon being appointed was to retain and consult with three mental health experts.  Defense expert Dr. Mark J. Mills evaluated Fell on March 26 and 27, 2001, just two months after indictment.  In his report Dr. Mills indicates that Fell is "neither floridly psychotic nor significantly cognitively impaired, at present."  P. Exh. 3 at 4, Fell-00000395.  Dr. Mills based his opinion that Fell may be considered "pre-psychotic" on the fact that Fell appeared to respond to anti-psychotic medication during his childhood

hospitalizations. But Dr. Mills could not state that Fell was psychotic at the time of his evaluation nearly a decade later. Indeed, medical records indicate that Fell has never been diagnosed as psychotic.

On April 6, 2001, a week after Dr. Mills's evaluation, defense expert Dr. Wilfred G. van Gorp, with the assistance of Dr. Kimberly Walton, conducted an independent neuropsychological evaluation of Fell. P. Exh. 2, Fell-00000377. Dr. van Gorp's evaluation indicated only moderate depression, *id*. at 4, Fell-00000380; and no evidence of psychosis or cognitive deficits. *Id*. at 5, Fell-00000381. Fell demonstrated an IQ of 101, placing him in the average range of overall intellectual ability. *Id*. He demonstrated no abnormalities in the domains of attention, concentration, language functioning, learning, memory, executive functioning and motor functioning. *Id*. at 6-7, Fell-00000383. In other words, Fell had no learning disabilities or other cognitive impairments. Among Dr. van Gorp's notable remarks is his finding that Fell tends to be "somewhat egocentric and frankly manipulative of others." *Id*. at 8, Fell-00000384.

Next, Fell was evaluated by defense expert Dr. Jonathan J. Lipman, a neuropharmacologist, who documented Fell's abuse of alcohol and illegal drugs from childhood. *See* P. Exh. 4, Fell-00000423. It is worth noting that the primary source of information for Dr. Lipman's evaluation was Fell himself. Dr. Lipman opined that Fell suffered from a predisposition to drug abuse and that his early drug abuse co-existed with developing mental illness characterized by depression with psychotic and borderline aspects. However, Dr. Lipman recognized that Fell had a "relatively normal current neuropsychological test performance." According to Dr. Lipman, Fell also suffered from a "neuropsychological vulnerability to psychotic decompensation under extreme conditions of emotional stress." In other words, Dr.

Lipman could not say that Fell was psychotic, only that he was vulnerable to becoming psychotic when under "extreme stress." This vulnerability would be expected to increase when intoxicated, and increase more when chronically intoxicated, as Dr. Lipman concludes was the case at the time of the capital offenses.

In addition to the three defense mental health consultations, counsel obtained Fell's medical records from all four of his psychiatric hospitalizations. During each, Fell was diagnosed with only a conduct disorder. *See* MB Tab 22 at 1; Tab 25 at 1; Tab 29 at 2; Tab 30 at 1. His summary discharge from the first hospitalization on October 30, 1991, stated that one of Fell's problems was behavioral: he was "assaultive, combative, destructive, oppositional, defiant, impulsive, and running away." *Id*. at 4. Fell was hospitalized a second time after shooting a friend with a handgun. MB Tab 25 at 1. Upon his admission it was noted that "[t]he patient shows no remorse and even threatens to shoot his mother." *Id*. Later Fell demonstrated appropriate remorse. *Id*. During his third hospitalization, Fell was found to be "impulsive, demanding, manipulative, and . . . cried profusely when he d[id] not get his own way. He is defiant and oppositional toward authority . . . ." MB Tab 29 at 1. Fell was psychiatrically hospitalized a fourth time for increasing violent behavior and depression. MB Tab 30 at 1. He admitted "throwing" a fork at a friend, though he claimed not to have intended to hit anyone. MB Tab 32 at 1-2. Trial counsel also obtained records from social services agencies such as the Victim Resource Center ("VCR"), and Luzerne County Youth Services ("CYS").

Notwithstanding the above summarized evidence, Fell claims that his trial counsel's mental health investigation fell below the prevailing professional norms as set forth in the American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel

In Death Penalty Cases ("ABA guidelines").  P. at 70-72.  First, the ABA guidelines do not

define reasonableness under the Federal Constitution.  *See Van Hook*, 130 S. Ct at 17.  In

*Strickland*, the Supreme Court held that the Sixth Amendment entitles criminal defendants to the

"'effective assistance of counsel'" – that is, representation that does not fall "below an objective

standard of reasonableness" in light of "prevailing professional norms."  466 U.S. at 686.  That

standard, the Supreme Court has held, is "necessarily a general one."  *Van Hook*, 130 S.  Ct. at

16.

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of
> the variety of circumstances faced by defense counsel or the range of legitimate decisions
> regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 688-89.  Indeed, in *Van Hook* the Supreme Court criticized the Sixth

Circuit for treating the ABA's 2003 Guidelines (cited by petitioner here), "not merely as

evidence of what reasonably diligent attorneys would do, but as inexorable commands with

which all capital defense counsel " 'must fully comply.' " 130 S. Ct at 17.  In so doing the Court

reiterated that standards such as the ABA guidelines are only "guides" to what reasonableness

means, not its definition.  *Id*.

> [W]hile States are free to impose whatever specific rules they see fit to ensure that
> criminal defendants are well represented, we have held that the Federal
> Constitution imposes one general requirement: that counsel make objectively
> reasonable choices.

*Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

Second, whether trial counsel's performance is judged under the constitutional standard,

or the ABA Guidelines, counsel provided adequate and effective representation.  Trial counsel

conducted an extensive independent investigation of Fell's mental health, including consultations

with neurological, psychological and psychiatric experts.  In addition, Fell's trial counsel

diligently obtained medical records pertaining to four psychiatric hospitalizations of Fell as an

adolescent.  Counsel (and Fell's mitigation specialist) also spoke to a multitude family members,

teachers, police officers, social workers, correctional officers, and others to obtain a full social

history.  Counsel obtained school records, correctional records, and family department records,

all yielding important mitigation information that was ultimately presented to the jury.  In

preparation for trial, defense counsel retained a fourth mental health expert, Dr. Mark

Cunningham, to conduct an analysis of Fell's social history, the risk factors associated with his

upbringing, the lack of associated protective factors, and how these factors affected his life

trajectory.  Therefore, trial counsel's performance was objectively reasonable and complied with

both the Constitution and the ABA guidelines.

B.  Trial Counsel Had No Obligation to Further Investigate Mental Health

Fell claims that trial counsel was ineffective in failing to investigate his mental health

beyond the neuropsychological, psychiatric and neuropharmacological evaluations.  Yet none of

the three experts who evaluated Fell recommended any further testing.  In any event, in

preparation for trial counsel retained a fourth mental health expert, clinical and forensic

psychologist Dr. Mark Cunningham, to conduct an analysis of Fell's social history, and how it

these affected Fell's life trajectory.  P. Exh. 5.  Therefore, trial counsel clearly reevaluated his

mental health evidence and sought to supplement the mental health record in preparation for trial.

Fell further claims that his mental health experts did not have his complete social history

when they conducted their evaluations; and therefore, the diagnoses were merely "preliminary."

However, none of the experts who evaluated Fell prior to trial indicated that they lacked

103

sufficient background information to provide a professional opinion. Similarly, none qualified the opinions rendered as "preliminary" or otherwise incomplete. *See* P. Exh. 2, Neuropsychological Evaluation by Dr. Wilfred G. van Gorp; Exhibit 3, Psychiatric Evaluation by Dr. Mark J. Mills; and Exhibit 4, Neuropharmacological Evaluation by Dr. Jonathan J. Lipman. Fell submits a declaration by Dr. Mills in support of his argument, stating that trial counsel did not provide him with a complete social history. But Dr. Mills does not state, either in his report or his declaration that this affected his opinion. *See* P. Exhs. 2, Fell-00000392, and 206, Fell-00002449.

Similarly, Fell claims that Dr. Lipman indicated to counsel that he typically interviews people close to the defendant, but trial counsel failed to arrange for him to conduct such interviews. However, in his report, Dr. Lipman makes no mention of this alleged failure by trial counsel having affected his ability to render an opinion. And Fell adds no evidence that would support such a contention.

Fell further claims that trial counsel failed to follow up on the suggestions of his mental health experts. For example, he states that Dr. Lipman recommended "neuropsychological testing, including an evaluation of Mr. Fell's dissociative tendencies and an administration of the Dissociative Experiences Scale." No such recommendation is found in Dr. Lipman's report. *See* P. Exh. 4. In any event, that is what Dr. van Gorp conducted – a complete neuropsychological evaluation. Unswayed, Fell argues that trial counsel failed to direct Dr. van Gorp to complete the recommended testing, that is, for dissociation, "which could have confirmed impairment of the right parietal lobe." Presumably if Dr. van Gorp, who conducted a thorough neuropsychological evaluation, believed that such testing was warranted, he would have recommended it – yet he did

not.  Moreover, even if the Court were to determine that trial counsel's failure to request that such testing be done was unreasonable, Fell fails to state how a diagnosis of "impairment of the right parietal lobe" would have altered his sentencing profile.[14]  Hence, he has not demonstrated prejudice.

Fell further faults his trial counsel for failing to direct his mitigation specialist, Ms. Ayres, to spend more time with him.  According to Fell, Ms. Ayres met with him only three times in the years leading up to the trial.  As a result, he submits that Ms. Ayres did not explore highly sensitive topics with him, such as his sexual history and his relationship with Lee.  However, Fell fails to state what facts Ms. Ayres would have uncovered had she spent more time with him, and more important, how counsel's failure to learn of such evidence prejudiced him at trial.

Fell also claims that many relevant records, such as CYS contact sheets and Victim's Resource Center records, were obtained late, just prior to the start of trial.  However, he fails to specify, in the first instance, which records his argument applies to, and in the second instance, how, if in any way, he was prejudiced by counsel obtaining the records late.  Similarly, Fell criticizes the fact that his trial counsel did not obtain his prison records from the Northwest Correctional Facility until the Spring of 2005.  Again, however, he fails to specify what records his argument pertains to, and how his case was affected by counsel obtaining these documents two to three months before trial.

Last, Fell claims that trial counsel was ineffective in failing to request that his mental health experts update their reports in light of the additional evidence that had been gathered.  But

---

[14]  As discussed below, trial counsel ultimately made a strategic decision not to present mental health evidence; therefore, even if evidence of "impairment of the right parietal lobe" had been developed, it reasonably would not have been presented.

a review of the reports rendered by Fell's mental health experts reveals that they were aware of Fell's background and upbringing.  Trial counsel did not develop evidence different from that which was taken into consideration by the experts when they examined Fell.  Moreover, Fell fails to identify what newly developed evidence trial counsel should have transmitted to his experts, or how, if in any way, it would have altered their opinions.

C.  None of Fell's Multiple Mental Health Examinations Revealed Serious Mental Health Impairments

Fell claims that his trial counsel missed clear warning signs that he suffered from Fetal Alcohol Spectrum Disorder ("FASD"), a mood disorder and impairment due to chronic trauma during childhood through adolescence.  He claims that "there is evidence" that he suffers from FASD and mood disorder.  Yet the hundreds of exhibits submitted with his lengthy § 2255 motion include no such diagnosis.  Moreover, the record indicates that trial counsel had no indication from Fell's mental health evaluations or previous medical records that Fell suffered from FASD.  While Fell had been diagnosed with depression as a young adolescent, not one of his multiple mental health evaluations after arrest indicate that he was significantly depressed or had any other type of mood disorder.  Moreover, while Fell's social history clearly indicates that he was the victim of trauma during his childhood years, none of his multiple mental health evaluations after arrest indicate that said trauma caused any cognitive impairments.

Despite the foregoing, trial counsel retained the services of Dr. Mark Cunningham, a psychologist who prepared to present to the jury in the penalty phase a social history of Fell, and the resulting risks and ramifications for adult behavior.  However, as was the case with the other three defense experts, trial counsel made a reasonable strategic decision not to present the

testimony of Dr. Cunningham. Therefore, even if trial counsel had ascertained that Fell suffered from previously unknown mental health conditions, it would have been nonconsequential as trial counsel made a reasonable strategic decision not to present mental health evidence. Therefore, Fell can show no prejudice.

> 1. The Record is Devoid of Any Indication That Fell Suffered From Fetal Alcohol Spectrum Disorder

.

FASD, as Fell states, is an umbrella term describing the continuum of permanent birth defects caused by maternal consumption of alcohol during pregnancy, P. 81. It includes, but is not limited to, Fetal Alcohol Syndrome (FAS), Partial Fetal Alcohol Syndrome (PFAS), Alcohol-Related Neurodevelopmental Disorder (ARND), Alcohol-Related Birth Defects (ARBD), and Fetal Alcohol Effect (FAE). FASD is not itself a diagnosis, but rather a term embracing a range of disabilities that may result from fetal alcohol exposure. Fell claims that his trial counsel was ineffective in failing to have him tested for fetal alcohol related disabilities.

Significantly, Fell does not claim that he in fact suffers from a fetal alcohol related disability. His extensive § 2255 motion, and its hundreds of exhibits, contains no diagnosis for a fetal alcohol related condition, disability or impairment. Rather, Fell states that he has manifested symptoms, and engaged in past conduct, that would be consistent with a fetal alcohol related condition or disability. Trial counsel cannot be deemed ineffective for failing to have Fell tested for a condition he has not been shown to have, and that seven mental health experts failed to find. Counsel investigated pre-natal consumption of alcohol by Fell's mother and presented evidence of it to the jury. Tr. VII-1 at 57. Given the record, counsel was obligated to do no more.

107

Even if the court were to consider Fell's argument on its merits, the record does not support his claim. While it is true that trial counsel had evidence that Fell's mother drank alcohol while she was pregnant with Fell, it is also true that Fell was never diagnosed with a fetal alcohol related disability. In fact, he was never diagnosed with any disability at all. Fell fails to note that not every child exposed to alcohol during pregnancy develops an alcohol related disorder or disability. Overall, the available literature points to a prevalence rate of FAS of 0.5 to 2 cases per 1,000 births in the United States during the 1980s and 1990s. Estimating the Prevalence of Fetal Alcohol Syndrome: A Summary, Philip A. May, Ph. D., and J. Phillip Gossage, Ph. D. Dr. Michael Welner, the only mental health expert to address the possibility of the presence of fetal alcohol syndrome, found no evidence of it.

> Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education.

P. Exh. 10 at 21, Fell-00000642.

In his petition, Fell states that "[i]t is common for persons with FASD to display abnormal behaviors during childhood, such as hyperactivity, poor impulse control, poor judgment and anxiety." But in fact, Fell did not display, nor was he diagnosed with, hyperactivity or anxiety prior to his second psychiatric hospitalization. His school records are devoid of any indication that Fell was either hyperactive or suffered from FASD. Rather than demonstrating poor judgment throughout elementary school, the record in this case indicates that Fell was actually a good student, who maintained good grades and good discipline through 5th

grade. Tr. VIII-1 at 29-33.[15]  After conducting a mental health evaluation of Fell, Dr. Richard D.

Wetzel indicated:

> Based on the history that he gave to me and the limited documentation in his
> medical records, I am unable to state with reasonable professional certainty that
> Mr. Fell ever had hyperactivity or attention deficit disorder.  He certainly shows
> none of the characteristics of these disorders at present. I would concede that most
> persons with these disorders outgrow them by his current age.

P. Exh. 9 at 8, Fell-00000618.  *See also* Report of Dr. Michael Welner, P. Exh. 10 at 19-20, Fell-

00000640-41 (Fell does not meet the criteria for Attention Deficit Hyperactivity Disorder).

Fell's academic performance began to decline in the 6th grade because, as per his own

account, "he fell in with the wrong crowd," and started "doing what he pleased," including

getting drunk and high.  *See* P. Exh. 7 at 37, Fell-00000503.  The Mitigation Binder also includes

many school reports of truancy.  Fell's psychiatric hospitalization records reveal that when he

was admitted for the first time on September 30, 1991, he was refusing to accept rules at home,

he was smoking, he was refusing to do his homework and he was getting into trouble at school.

MB Tab 22 at 1.  Upon admission to the hospital, it was noted that "[h]e had been also

increasingly aggressive toward his mother and readily admitted that he hit his mother." *Id*.  Fell

was diagnosed with conduct disorder, MB Tab 23 at 2, in other words, bad behavior.  He was

psychologically and psychiatrically evaluated during his stay in the hospital, *id*. at Tabs 23-24,

and was found to have average intellectual functioning.  After 30 days of observation, psychiatric

treatment and counseling, doctors made no mention of a potential fetal alcohol related disability.

---

[15]  It is worth noting that Fell's mental health evaluations did not indicate that he suffered
from hyperactivity as an adult.

While the treating psychiatrist noted "indications of some degree of depression and anxiety," he found them to be mild and transient. *Id*. at Tab 24.

Fell was hospitalized a second time on April 14, 1992, after shooting a boy with a handgun. Upon admission it was noted that he, "shows no remorse and even threatens to shoot his mother." MB Tab 25 at 1. "By the end of his first week in the hospital, he was still oppositional, defiant, and manipulative." *Id*. at 2. A clinical evaluation found that Fell had behavioral problems with weapons such as guns and knives; he physically abused his mother and sister; he threw things when angry; he cursed at authority figures; and he refused to follow rules at home. He was diagnosed with atypical depression and hyperkinetic Conduct Disorder. After another two weeks of observation, doctors made no mention of a potential fetal alcohol related disorder or disability.

About nine months later, on January 26, 1993, Fell was admitted to a psychiatric unit for a third time, for increasingly aggressive behavior. MB Tab 28. He kept knives in his room, and had recently thrown a butcher knife at his mother; punched his mother's boyfriend on his broken leg; he had not attended school in over three months and was staying out late at night. *Id*. Debra Fell reported that she was afraid to go to sleep with Fell in the house for fear that he would stab her in her sleep. *Id*. at 3. At least by this third hospitalization, doctors were aware of his mother's alcohol abuse and familial mental illness. Fell was preliminarily diagnosed with atypical depression, hyperkinetic conduct disorder and borderline personality traits. Upon discharge he was diagnosed with major depression with psychotic features, hyperkinetic conduct disorder and borderline personality traits. Again, after 30 days of observation and treatment, doctors made no mention of a potential fetal alcohol related disability.

110

Three months later, on June 6, 1993, Fell was admitted to a psychiatric unit for the fourth time, again for increasingly violent behavior and depression. MB Tab 30. He had "thrown" a fork at a friend and stabbed him, though he claimed unintentionally. His preliminary diagnosis was depressive disorder, attention deficit activity disorder and borderline personality traits. *Id*. Fell, however, claimed that he was there just because his mother did not want him around. *Id*. After 24 days of observation and treatment, doctors made no mention of a potential fetal alcohol related disability.

Approximately six months after his last psychiatric hospitalization, Fell's truancy led him to be committed to St. Michael's school for boys, where he remained for nearly two years. At St. Michael's, Fell attended academic classes and completed the 7th and 8th grades. He also received mental health counseling. Tr. IX at 12, 16. There is no mention of fetal alcohol related disability or disorder in records from St. Michael's.

The three defense mental health experts who examined Fell did not indicate that he displayed symptoms of fetal alcohol related disability or disorder. Dr. Mills, who examined Fell for seven hours, made no mention of Fell potentially suffering from FASD in his report. *See* P. Exh. 3.. Despite being aware of alcohol abuse by his parents, neuropsychologist Dr. van Gorp made no mention of Fell possibly having a fetal alcohol related disability or disorder. *See* P. Exh. 2. Dr. Lipman documented an extensive history of substance abuse by Fell, but his report is similarly devoid of any reference to FASD. *See* P. Exh. 4.

Given that counsel received no indication from records or experts that Fell potentially suffered from FASD, they should not be faulted for not having pursued further evaluations in that regard. Counsel does not have a duty to investigate when they have good reason to think further

111

investigation would be a waste. *Rompilla*, 545 U.S. at 382-83; *see also Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"). Moreover, even if counsel had ascertained that Fell displayed symptoms of FASD, counsel made a strategic decision not to present mental health evidence. Therefore, Fell can show no resulting prejudice.

### 2.   The Record Does Not Indicate That Fell Suffers From a Mood Disorder

Fell further claims that his trial counsel was ineffective in failing to investigate and present expert testimony regarding a mood disorder. Yet again, the massive § 2255 filing includes no diagnosis of mood disorder. As with FASD, Fell does not claim that he in fact suffers from a mood disorder or suffered from a mood disorder when the crimes were committed. Rather, he refers to medical and social records indicating varying degrees of depression between the ages of 12 and 13.[16] But Fell offers no diagnosis after his last psychiatric hospitalization at age 13 in support of his claim that "there is evidence" that he suffers from a mood disorder. He also claims that his records from the Northwest Correctional Facility contained red flags suggesting mood disorder.

Fell's three trial lawyers acted on the considerable mental health evidence before them. They retained three mental health experts, none of whom indicated that Fell displayed significant symptoms of mood disorder. At the time of his neuropsychological evaluation on April 6, 2001, by neuropsychologist Dr. Wilfred G. van Gorp, Fell reported his mood to be "ok" and added that

---

[16] The Report of Dr. Richard D. Wetzel, P. Exh. 7 at 5, finds no evidence that Fell had depressive syndrome.

he was bored in the confines of his cell.  P. Exh. 2 at 3, Fell-00000379.  Fell stated that he passed

the time reading books and magazines.  *Id*.  Dr. van Gorp noted that on the Beck Depression

Inventory Fell scored 20, which placed him in the lower end of the Moderate range of clinical

depression – not particularly unusual for someone who is incarcerated and facing the possibility

of life imprisonment or death.  *Id*. at 4.  Otherwise, Dr. van Gorp noted no symptoms of a mood

disorder.

Dr. Mills, a psychiatrist who examined Fell for seven hours on March 26 and 27, 2001,

made no mention of mood disorder in his report.  *See* P. Exh. 3.  It is worth noting that prior to

his psychiatric evaluation, Dr. Mills had reviewed Fell's psychiatric hospitalization records.  P.

Exh. 3, n. 1.  Dr. Lipman's report is similarly devoid of reference to mood disorder.  P. Exh. 4.

Trial counsel did what they were supposed to do – they retained mental health experts to

evaluate Fell's mental health.  In light of the fact that none of the experts found that Fell suffered

from any significant mood disorder – and neither did the three government mental health experts

– counsel was not obligated to seek yet another evaluation.

Moreover, even if counsel would have ascertained that Fell displayed symptoms of a

significant mood disorder, it would have been unlikely to alter the mitigation phase strategy of

not presenting mental health evidence.  There is no reason to believe that the jury would have

found that a mood disorder, contested by government experts, would have constituted a

sufficiently weighty factor balanced against rebuttal ASP testimony.  Therefore, if the court were

to conclude that trial counsel's failure to pursue additional testing for a mood disorder constituted

error, Fell cannot show that it resulted in prejudice.

### 3. Trial Counsel Adequately Investigated the Effects of Chronic Exposure to Trauma from Early Childhood to Adolescence

Fell claims that this trial counsel was ineffective in failing to investigate the clinical meaning of his chronic childhood trauma, and therefore, no evidence was presented in penalty as to the implications of that trauma and the impact it had on his childhood development and adverse life trajectory. Yet this is essentially what Dr. Mark Cunningham was prepared to address: the linkage between a horrific childhood and criminal acts in adulthood. Dr. Cunningham, a clinical and forensic psychologist was poised to present to the jury the thesis that Fell's adverse childhood experiences mitigated his adult responsibility. His opinion was that Fell's social history, including many traumatic "risk" factors, were associated with later substance abuse and violence. *See* P. Exh. 5. Dr. Cunningham would have further explained to the jury how neglect and traumatic experiences impact a person's developmental trajectory. *Id*. As Dr. Cunningham explained in his report:

> The above research provides an explanation for the developmental trajectory observable from adolescence and early adulthood which culminated in the charged capital offenses. I anticipate that in my testimony at capital sentencing I will particularize these factors to Mr. Fell and the resulting trajectory of his life. These and other adverse factors including those listed below impacted not only on Mr. Fell's life trajectory, but also on his underlying value system, moral development, perception of life options and nature of choices.

> Additionally, I anticipate describing in more extensive detail a number of damaging developmental factors present in Mr. Fell's history that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. Again, these will be supplemented by research findings demonstrating a nexus between such factors and disrupted developmental trajectory and adverse developmental outcomes including substance abuse, criminal activity, and criminal violence.

P. Exh. 5 at 5.  However, for strategic reasons, specifically to avoid confronting government expert mental health evidence in rebuttal, trial counsel decided not to present mental health evidence in the penalty phase.  Therefore, rather than failing to investigate the effects of Fell's childhood trauma on his later life, trial counsel made an informed and strategic decision not to present such evidence (and instead argue the thesis in closing).  Such an informed and strategic decision cannot constitute ineffective assistance of counsel.  *Wiggins*, 539 U.S. at 521.

Fell further claims that "there was evidence" that he suffered from disassociation and that his history of disassociation, coupled with a low score in the Rey-Osterrieth Complex Figure Test ("Rey-O"), should have been a red flag to counsel as to potential defects in his right parietal lobe.  Since trial counsel is not a neuropsychologist, he relied on experts.  Counsel retained the services of neuropsychologist Dr. Wilfred van Gorp, who conducted a neuropsychological evaluation of Fell.  Dr. van Gorp, who administered the Rey-O test to Fell, concluded as follows:

> He achieved a Low Average range score in his copy of a complex figure (Rey Osterrieth Complex Figure) and he had a number of difficulties in recognition of various details of this figure.  In contrast, on a measure of judgement of line orientation (another non-motor visual spatial test), Mr. Fell performed within the Average range (40th percentile).  Thus, *there is no convincing evidence that Mr. Fell has significant problems in tasks of visual spatial ability*.

P. Exh. 7 at 7 (emphasis added).  If Dr. van Gorp, a neuropsychologist, did not believe that there was reason to investigate further into this area of Fell's neurological functioning, then clearly, it was not unreasonable for trial counsel rely upon that conclusion.  Trial counsel cannot be deemed ineffective for following expert advice.

D.   Trial Counsel's Performance Complied With Applicable Standards of Professional
Conduct

Fell claims that trial counsel's failure to follow up on the warning signs which he claims

pointed to FASD, mood disorder and impairment based on childhood trauma; his decision to hire

mental health experts before completing a social history that yielded signs of these disorders; and

his failure to reconsider his mental health experts for trial, constitute ineffective assistance of

counsel.

Fell begins with the erroneous premise that counsel were ineffective in failing to

investigate his social history.  As set forth in Part III, *supra*, they were not.  Next, he claims that

counsel were ineffective in failing to provide his mental health experts with a "complete" social

history.  However, the record demonstrates that defense mental health experts in fact had a great

deal of background evidence on Fell when they evaluated him, including his psychiatric

hospitalization records, CYS records, Children's Service Center records, and some school

records.  *See* P. Exh. 2 at 9, Fell-00000385; P. Exh. 3 at 1 n. 1, Fell-00000392; Exhibit 4 at 2,

Fell-00000424.  In addition, the mitigation specialist had begun work in January 2001, before the

mental health evaluations of Fell were conducted, and she provided the mental health experts

with a summary of interviews conducted containing background information on Fell.  *See*

Exhibit 87, 00001260-1264.  Moreover, each expert had the opportunity to interview Fell

extensively about his background during the course of their evaluations.  Therefore, the experts

had a sufficient social history to conduct evaluations.  In fact, none of the mental health experts

indicated that there was insufficient background information to render an opinion.  Nor does Fell

point to specific evidence obtained after the mental health expert reports were rendered, which

any of the mental health experts indicates would alter the resulting opinions. *See Van Hook*, 130 S. Ct. at 19 n. 3 ("Van Hook alleges that his lawyers failed to provide the expert witnesses with a "complete psycho-social history. . . . But he offers no support for that assertion"). Hence, Fell cannot establish that his counsel erred to his prejudice.

Fell next claims that trial counsel were ineffective in failing to reconsider what mental health experts should be presented at trial, but he offers no reason as to why counsel needed to reconsider the choice of experts. Fell contends that trial counsel needed to have completed a "sweeping life history investigation," and then have an "expert make a comprehensive mental health assessment." But he fails to state what a "comprehensive mental health assessment" would have accomplished that was not accomplished by the four assessments completed by experts retained by counsel.[17] Fell cannot change what was clearly established in 2005 – that he was a man of average intelligence with no cognitive deficits, no psychosis, no major depression or other mood disorder, no neurological deficits, and no other significant mental impairment. Trial counsel's decision to focus on Fell's background in mitigation was clearly appropriate – it is essentially the same strategy advocated in his instant collateral attack. *See Williams*, 529 U.S. at 396 (finding ineffective assistance of counsel where failure of trial counsel to introduce

---

[17] Fell dedicates a great deal of effort to criticizing defense counsel for not obtaining CYS records until March 2005 and VCR records until May 2005. First, each of the mental health reports rendered in 2001 indicate that each expert reviewed CYS and VCR records. Therefore, clearly at least some of the records from each of these two agencies were obtained in 2001. Second, the relevant inquiry is whether there was any information in the records obtained in March and May 2005 that defense counsel failed to present to the jury and, which, if presented, would have likely altered the outcome of the case. Fell fails to make that showing.

117

evidence was not justified by a tactical decision).  The fact that his trial strategy was not successful does not entitle Fell to another bite at the apple.

Last, the decision of what expert witnesses to present, or whether to present expert testimony at all, is left to the discretion of trial counsel.  So long as trial counsel made an informed decision, that decision cannot constitute ineffective assistance of counsel merely because trial strategy did not work.  Courts have long recognized that "the decision of which witnesses to call is quintessentially a matter of strategy." *Boyle v. McKune*, 544 F.3d at 1139. Because such decisions are matters of strategy, counsel's choices are accorded a strong presumption of reasonableness. *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (adequately informed strategic choices are "virtually unchallengeable").

Fell suggests that in capital litigation a defense attorney is obligated to present evidence of mental health – that is incorrect.  There is absolutely no authority for the proposition that the failure to present expert mental health evidence is, *per se*, unreasonable, and thus ineffective assistance of counsel.  Quite the contrary, as was the case here, evidence of mental health would likely invite very damaging cross examination and evidence in rebuttal, trial counsel certainly has the discretion not to present mental health evidence at all and rely on other, more compelling mitigation evidence.  In fact, on this record, had counsel introduced mental health evidence, and after rebuttal testimony a capital verdict followed, a § 2255 motion could fault counsel for the ineffective and prejudicial decision to introduce such evidence.

E.  Fell Suffered No Prejudice As A Result of His Counsel's Decision Not To Present Mental Health Expert Testimony

Fell claims that he suffered prejudice as a result of his trial attorneys' failure to present mental health expert testimony.  However, the record is clear that counsel investigated his mental health, and prepared to present mental health expert testimony on Fell's behalf.  Tr. VII-1 at pp. 4-5 (Trial counsel advised the court that Dr. Mills was on his way from Burlington and might take the stand that day).[18]  However, late in the trial, after receiving and reviewing the June 27, 2005 supplemental evaluation by Dr. Wetzel, and the July 5, 2005, evaluation by Dr. Welner, both containing devastating information, and after introducing compelling and extensive background mitigation evidence, trial counsel made a strategic decision not to present mental health evidence.  It is reasonable to infer that counsel concluded that the likely benefit of Fell's mental health case would be outweighed by the likely risks of damaging rebuttal testimony.  Trial counsel's determination was a strategic decision, and cannot be said to have been *Strickland* error.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.  This was precisely the nature of the decision made by Fell's trial counsel – after consideration of the defense mental health case and the strength of the government's rebuttal case, a strategic decision was made that the benefits were unlikely to outweigh the damage on rebuttal. The Supreme Court held in *Strickland* that:

---

[18]  *See also* Declaration of Alexander Bunin, P. Ex 264 at 6, Fell-00002465; P. at 105 n. 29.

119

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct fall within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689.

The Second Circuit has made clear that a failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel. *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (*per curiam*) (*citing United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)); *see also United States v. Nersesian*, 824 F.2d 1294,1321 (2d. Cir. 1987) (decision whether to call a witness on behalf of defendant, and which witnesses to call, characterized as a tactical decision which will not constitute the basis for a claim of ineffective assistance of counsel). Even if a witness might offer exculpatory evidence, counsel's decision as to whether to call that witness is ordinarily not viewed as a lapse in professional representation for purposes of an ineffective assistance of counsel claim. *United States v. Best*, 219 F.3d 192, 201 (2d. Cir. 2000). In *Best*, the Second Circuit found that counsel's decision not to call witnesses to testify about Best's reputation for truthfulness was reasonable because such evidence would have opened the door for the government to attack Best's character. *Id*. at 202. *See also United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir. 1997). Similarly, a strategic decision not to call an expert witness does not constitute ineffective assistance of counsel. *Eyman*, 313 F.3d at 743 (counsel not ineffective in choosing not to use expert was strategic choice, not oversight).

That counsel's strategy was not successful is of no consequence to the ineffectiveness analysis. A review of an attorney's "advocacy is deferential to the lawyer's perspective at the time and is not made through the 20/20 lens of hindsight." *Schmidt*, 105 F.3d at 90. To establish that a strategic decision constituted ineffectiveness, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Fell cannot make this showing. The decision of his lawyers not to present mental health evidence in the penalty phase of trial, according to counsel Alex Bunin, was made to avoid having to confront the testimony of Dr. Michael Welner on rebuttal, a reasonable strategic decision. Declaration of Alexander Bunin, P. Exh. 264 at 7-8, Fell-00002466-2467; Declaration of Gene Primono, P. Exh. at 2, Fell-00002459. Counsel omits mention of rebuttal testimony by Dr. Wetzel, consistent with his June 27 report (and in the wake of Fell's videotaped interview) which would also have been formidable.

While defense experts could have referred to Fell's childhood trauma, and abuse of alcohol and drugs, as factors leading to the conclusion that he was "pre-psychotic" and "vulnerable to becoming psychotic under extreme stress," none would have testified that Fell was in fact psychotic or mentally ill, either when he committed the crimes, or after arrest. Likewise, no mental health expert would have testified that Fell did not know right from wrong, or did not know what he was doing on November 26, 2000, or lacked the ability to appreciate the consequences of his actions, or was acting under duress. In fact, his actions immediately following the killings of his mother and Conway indicate that Fell was well aware of the consequences of his actions – that is why he immediately fled the State of Vermont. Killing the witness to the departure, Terry King, was part of his flight plan. None of the many psychological

tests indicated that Fell's cognitive functioning was impaired. Moreover, none of the tests indicated that he had any organic brain damage or any mental defect or disorder that impaired his judgment at the time of the three murders.

Both Dr. Wetzel and Dr. Welner were poised to take the stand on rebuttal and testify that Fell had Anti-Social Personality Disorder ("ASP"). *Id*. at 26. Thus, trial counsel was faced with a difficult factual scenario – a client who participated in the brutal killing of his own mother and another man without motive or provocation, and then carjacked and kidnapped a 54 year-old grandmother, battering her to death and abandoning her body in another state – and credible government experts prepared to testified that he was not impaired, had ASP, lacked remorse, and falsely denied proven facts in a forensic interview. Deciding against presentation of a mental health case, in order to avert such evidence, reflected a strategic choice by the trial lawyers, not "oversight." *Eyman*, 313 F.3d at 743

Fell again cites *Wiggins*, but by his own admission, the facts underlying *Wiggins* are wholly inapposite. In *Wiggins*, trial counsel elected not to present evidence of Wiggins's life history. The Supreme Court found counsel's mitigation investigation unreasonable, and their decision not to present mitigation evidence insufficiently informed. Wiggins's trial counsel limited their mitigation investigation to obtaining a copy of a Pre-Sentence Investigation Report and social service records; the Court concluded that such an "investigation" did not reflect reasonable professional judgment. 539 U.S. at 534. According to the Court, the mitigating evidence that Wiggins's counsel failed to discover and present was powerful:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in

122

foster care.  The time Wiggins spent homeless, along with his diminished mental capacities, further augmented his mitigation case.

*Id*. at 535.  By contrast, Fell's trial counsel hired a mitigation specialist and interviewed many family members, teachers, friends, police officers and social workers about his background. Counsel obtained and reviewed school records, hospital records, social service records, police records, etc., to build Fell's social history.  Moreover, counsel presented a strong background mitigation case to the jury.  Fell admits that counsel's presentation of mitigation evidence at trial was effective.  *See* P. at 103-04.  In his petition, Fell recognizes that the jury found:

> by resounding margins (often unanimous) that he had an abusive childhood.  He was sexually and physically abused, he witnessed family violence, his parents were violent alcoholics who abandoned him, he had no positive role models, he abused drugs and alcohol as a child, and he was institutionalized for mental health conditions.

*Id*. (*citing* Special Verdict Form, P. Ex. 209, Fell-00002135-2137).  Fell further recognizes that "[t]he jury felt strongly enough about Mr. Fell's mistreatment it wrote in a separate, independent, mitigator found by a total of ten jurors: 'Total life experience, failure of state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.'"  P. at 104.  Therefore, wholly contrary to what transpired in *Wiggins*, the jury here heard about Fell's excruciating life history and placed it on the mitigating side of the scale.

Fell also cites *Rompilla*, but misrepresents the Court's reasoning.  He claims that in *Rompilla* the Court noted "that evidence of the defendant's fetal alcohol syndrome meant the defendant's 'capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense.'"  P. 103.  The Supreme Court never

123

reached such a conclusion. The section that Fell purports to quote is a summary by the Court of what post-conviction mental health experts concluded:

> When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.". . . The also said that "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."

545 U.S. at 392. *Rompilla* lends no support to Fell's claims. Like *Wiggins*, *Rompilla* deals with a woefully inadequate mitigation investigation by trial counsel. Trial counsel failed to review school records, though they were aware that Romilla did not make it pass the 9th grade; failed to review correctional records, though they were aware that Romilla had a criminal record; and failed to investigate his abuse of alcohol, though one of the mental health experts who evaluated Rompilla stated that his trouble with alcohol merited further investigation. Even so, the Court noted that "there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry." *Id*. at 383.

The Court in *Rompilla* also found that trial counsel's failure to review the case file pertaining to a conviction that the government would rely on as an aggravating factor was unreasonable. Concluding that a review of this file would have led trial counsel to mitigating evidence that he otherwise failed to uncover and present, the Court held that Rompilla was prejudiced. Rompilla's mitigation evidence was limited to the testimony of five family members who argued for residual doubt and prayed for mercy since they believed that Rompilla was innocent and a good man. *Id*. at 377. The Court found that Rompilla's mitigation case would

have been drastically different had counsel reviewed the court file pertaining to his prior

conviction, which contained his prison records.

> The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard.  An evaluation by a corrections counselor state that Rompilla was "reared in the slum environment of Allentown, Pa. vicinity.  He early came to [the] attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages."  Lodging 40.  The file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling.

*Id*. at 390-91.  Again, pivotal to the Court's holding in *Rompilla* was the fact that trial counsel

failed to conduct an objectively reasonable investigation prior to making the strategic decision

not present mitigation evidence.

As stated above, unlike the attorneys in *Rompilla*, Fell's trial counsel sought, obtained

and reviewed school records, hospital records, social service records, police records, counseling

and treatment records by independent agencies such as the Victim Resource Center, records from

juvenile detention facilities such as St. Michaels and prison records.  Trial counsel hired a

mitigation specialist and interviewed family members, teachers, social workers, police officers

and correctional officers.  They retained three mental health experts, one of whom was a

neuropharmacologist to follow-up on Fell's reported abuse of alcohol and illegal substances.

Counsel also retained a fourth mental health expert, Dr. Cunningham, to testify about Fell's

social history and its resulting life trajectory.  In addition, trial counsel retained the services of a

prison consultant to testify about Fell's subsequent adjustment to prison.  Counsel's mitigation

investigation here was far different from, and more thorough than, that in *Rompilla*, such that

subsequent strategic decisions were adequately informed.

125

Assuming, *arguendo*, that Fell can meet the onerous burden of establishing error by his trial attorney, he must still establish prejudice by demonstrating a reasonable probability that the forgone testimony would have resulted in a different outcome. *See Boyle v. McKune*, 544 F.3d at 1138; *see also Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998); *United States v. Murray,* 751 F.2d 1528, 1535 (9th Cir.1985). Fell cannot make this showing either. Even if he can establish that his attorneys had a Sixth Amendment duty to present a mental health case – which the government does not concede – he cannot show a reasonable probability that it would have led to a different verdict. Nothing about the mental health evidence that trial counsel would have presented, when weighed against the government's rebuttal testimony, would lead a reasonable person to loose confidence in the jury's verdict.

When considering whether there is a reasonable probability that the mental health evidence that trial counsel could have presented would have led to a different outcome, such that the verdict is unreliable, the court must consider such evidence in context, that is, the court must also consider the evidence the government would have presented in rebuttal. The government was prepared to call Dr. Welner and/or Dr. Wetzel in rebuttal. Dr. Wetzel had twice evaluated Fell and interviewed him at length during jury selection. P. Exh. 9 at 1-2, Fell-00000611-12. Dr. Wetzel determined that Fell showed "no sign of psychosis" or depression, *id*. at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive deficits." *Id*. at 8, Fell-00000618. Dr. Wetzel concluded that Fell met fully the criteria for ASP. *Id*. at 7, Fell-00000617. Dr. Wetzel also concluded that Fell had exaggerated his intake of alcohol the night of the murders and "was not significantly impaired." *Id*. at 4, Fell-00000614.

126

A.    In my opinion, he has exaggerated the amount of alcohol used.  While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.

B.    He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.

C.    He denied that he has ever had withdrawal symptoms.  He claimed that he has unusual tolerance for alcohol.

*Id*.  Dr. Wetzel further concluded that Fell "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id*.  Moreover, according to Dr. Wetzel, Fell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was also not significantly impaired.  *Id*.  While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes.  *Id*. at 5, Fell-00000615.

Dr. Welner would have also testified that Fell suffered from ASP disorder, a diagnosis which entailed findings of, *inter alia*, conduct disorder prior to the age of 15; a demonstrated failure to conform to societal norms by engaging in unlawful conduct; deceitfulness; impulsivity and failure to plan ahead; irritability and aggressiveness; a reckless disregard for the safety of others; and lack of remorse.  P. Exh. 10 at 8-9, Fell-00000629-30.  Dr. Welner also agreed with Dr. Wetzel's finding that Fell showed no sign of psychosis or depression.  *Id*. at 18, Fell-00000639; 20-21, Fell-00000641-42.  In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors common to ASP, as well as manipulative conduct, shallow affect and lack of empathy.  *Id*. at 26-32, Fell-00000647-53.  Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he

committed the murders. *Id*. at 32-34. On the contrary, Dr. Welner found that Fell's behavior at

the time of the murders "primarily reflected organization, and not signs of a mental illness or

intoxication." *Id*. at 35-40. This evidence would have almost certainly neutralized, if not

completely overcome, Fell's mental health evidence. Therefore, Fell cannot establish that trial

counsel's failure to present mental health evidence prejudiced him.

1. Expert Mental Health Testimony Was Not Required or Warranted

As stated above, Fell concedes that his trial counsel effectively presented the available

mitigation evidence from his childhood and early adolescence. *See* P. at 103-04. He recognizes

that the jury found:

> by resounding margins (often unanimous) that he had an abusive childhood. He
> was sexually and physically abused, he witnessed family violence, his parents
> were violent alcoholics who abandoned him, he had no positive role models, he
> abused drugs and alcohol as a child, and he was institutionalized for mental health
> conditions.

*Id*. (*citing* Special Verdict Form, P. Ex. 209, Fell-00002135-2137). Petitioner further recognizes

that "[t]he jury felt strongly enough about Mr. Fell's mistreatment it wrote in a separate,

independent, mitigator found by a total of ten jurors:

> Total life experience, failure of state of Pennsylvania social and mental health
> services to effectively intervene in his childhood abuse and to treat or address his
> early antisocial behavior.

P. at 104.

Nonetheless, Fell claims that while the jury could understand the facts of his childhood,

"the defense failed to give them the expert testimony necessary to understand the lasting

consequences and implications of that childhood." As a result, he claims that the jury

128

"misunderstood [his] behavior as 'anti-social' and not a collection of symptoms related to co-existing mental impairments." Fell's argument is faulty is several respects.

At the outset, Dr. Cunningham was prepared to offer the testimony that Fell now laments. Yet counsel made a strategic decision not to call that expert. That point is discussed above. There are addition reasons why Fell's argument here lacks weight.

First, trial counsel is not obligated to present mental health evidence if he understands that it would be detrimental to the trial strategy. While Supreme Court jurisprudence mandates that trial counsel conduct a reasonable mitigation investigation prior to selecting trial strategies, it grants great deference to informed strategic decisions. *Strickland*, 466 U.S. at 689. *See also Eyman*, 313 F.3d at 743 (Failure to call expert witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel); *Nersesian*, 824 F.2d at 1321 (The decision whether to call a witness on behalf of defendant, and which witnesses to call, is characterized as a tactical decision, which will not constitute the basis for a claim of ineffective assistance of counsel); *Best*, 219 F.3d at 201 (same).

Second, the jury's written findings do not support the inference counsel urges the court to make. The jury's findings do not relate to Fell's behavior as much as it relates to the Commonwealth of Pennsylvania's failure to address Fell's early behavior. In other words, the jury, in the mitigation factor it wrote on the verdict, focused on lack of action by the Commonwealth of Pennsylvania, not Fell's conduct. Therefore, it cannot be inferred that the jury reached any conclusions with regard to Fell's mental health. The only conclusion that can be drawn is that the jury found that the Commonwealth of Pennsylvania failed to provide the help Fell needed.

Third, while the evidence regarding Fell's background was for the most part uncontested (the government conceded that his upbringing was horrific, Tr. XII at 52), expert testimony regarding the effects, if any, of Fell's childhood trauma on his actions the night of the crimes would have been vigorously contested – in trial counsel's professional opinion, to Fell's detriment. While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he explicitly found no causal connection between those factors and Fell's conduct on November 27, 2000. *Id*. at 5, Fell-00000615. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy. *Id*. at 26-32, Fell-00000647-53. Therefore, it cannot be assumed that if Fell had presented expert mental health testimony, the jury would have necessarily reached the conclusions, or drawn the inferences, wished for. Argument in that regard is but speculation.

Moreover, none of the multiple defense mental health experts would have testified that Fell suffered from fetal alcohol related disability or mood disorder. Even if trial counsel had elected to present mental health evidence, it is unlikely that they would have been able to establish that Fell's brutal murders, and behavior generally, was really "a collection of symptoms related to co-existing mental impairments." Therefore, it cannot be said that but for trial counsel's failure to present mental health evidence, there is a reasonable likelihood that the outcome of the trial would have been different.

### a. Fell Was Not Impaired When He Committed the Capital Crime That Led To His Death Sentence

Fell claims that at trial his lawyers told the jury that his "capacity to appreciate his conduct was significantly impaired," but then failed to put forward expert testimony to explain the impairment. P. 105. He submits that if counsel had investigated a scientific explanation for

his poor judgment and behavior, the jury would have been moved by: (1) "Mr. Fell's prenatally created brain disorder as a result of his mother's alcohol consumption;" (2) his "genetically inherited mood disorder;" and (3) the "harmful exposure to chronic, interpersonal trauma."

Fell first contends that an expert – whom he does not identify and whose report he does not attach to his motion – would have testified that his "prenatal exposure to alcohol impaired his brain development and made him vulnerable to other environmental and genetic factors at play in his life." P. 106. An expert would have explained that "exposure to fetal alcohol impacts neurological functioning, processing and behavior for the rest of one's life." *Id*. But as stated previously in section III(C)(1), *supra*, Fell has not established that he suffers from fetal alcohol related disability. On the contrary, his own neuropsychological expert, Dr. van Gorp, found no cognitive deficits. That mental health expert found Fell to be of average intelligence with an IQ of 101. P. Exh. 2. Fell performed in the "Average" range on overall measures of verbal comprehension and perceptual organization. He performed in the "Superior" range on a measure of attention and concentration (working memory), and he performed in the "Very Superior" range on an index of speed of information processing. Dr. van Gorp makes no mention of Fell even possibly having a fetal alcohol related disability. While Fell argues that FASD "had a direct bearing on his actions during the crime," Dr. van Gorp's report is devoid of any statement in that regard. Similarly, Dr. Mills, who conducted a psychiatric evaluation of Fell, concluded that he is not "significantly cognitively impaired, at present," and also makes not mention of Fell even possibly having a fetal alcohol related disability. Likewise, Dr. Lipman, who conducted a neuropharmacological evaluation of Fell concluded that Fell suffers from a "constitutional and historic predisposition for the abuse of drugs," but makes no mention of possible FASD.

131

Dr. Michael Welner, the only mental health expert to address explicitly the possibility of fetal alcohol syndrome found no evidence of it.

> Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education.

P. Ex. 10 at 21, Fell-00000642. Therefore, counsel were not ineffective for failing to find another mental health expert, in addition to the four with whom they consulted and the three with whom the government consulted, to opine that Fell suffered from a "prenatally created brain disorder as a result of his mother's alcohol consumption."

Next, Fell claims that another unnamed expert in mood disorder would have testified that Fell's "acting out" and aggressive behavior, coupled with his poor impulse control and judgment further impaired his ability to respond to stressful situations. P. at 107. But again, Fell has not established that he suffers from a mood disorder. *See* section III(C((2), *supra*.

Dr. Mills did conclude that Fell while was not psychotic, he was "pre-psychotic" or "potentially psychotic." P. Exh. 3 at 4, Fell-00000395. And he adds that Fell's highly deprived childhood resulted in "early" and recurrent inappropriate behavior and intoxication. However, when he discusses the capital crimes Fell committed, Dr. Mills states:

> It seems highly unlikely that her murder [Fell's mother] and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication. Further, without those murders, Mr. Fell's guilt (particularly over the killing of his mother) and his fear of being apprehended, the abduction and subsequent killing of Mrs. King would not have occurred.

*Id*. at 5, Fell-00000396. Thus, the principal impairment Dr. Mills credits for Fell's killing of his mother and her boyfriend is his alleged state of intoxication – an impairment he does not refer to in relation to the abduction and subsequent killing of Terry King (and impairment denied by both

132

Drs. Wetzel and Welner).  In any event, intoxication is certainly a condition about which expert testimony was not required.[19]

Third, Fell claims that an expert in trauma "would have explained that it is common for individuals who have experienced ongoing trauma to react with either aggressive or avoidance behaviors."  But again, such testimony would have triggered rebuttal mental health expert testimony.  Specifically, Dr. Welner was prepared to testify that while Fell had a traumatic childhood, he exhibited no signs of post-traumatic stress disorder, P. Exh. 10 at 47-48, but did meet the criteria for anti-social personality disorder and psychopathy.  *Id*. at 8-9, 26.  Similarly, Dr. Wetzel conceded that Fell had a traumatic childhood, but found no causal connection between it and the murders.  *Id*. at 5, Fell-00000615.  Given the strong evidence against Fell's belated proposition, he cannot establish a reasonable probability that had trial counsel presented expert testimony the outcome would have been different, nor does this evidence render the jury's verdict unreliable.

Fell further claims that trial counsel was ineffective for entering into the mental health stipulation, which provided that he did not have cognitive and neurological deficits; his intellect and cognitive functions were intact; and he did not suffer from any mental disease or defect.  The

---

[19]  It is significant that both Dr. Wetzel and Dr. Welner concluded that Fell exaggerated his abuse of alcohol and was not impaired.  "Donald Fell did not demonstrate a withdrawal syndrome; there is no history of seizures, no morning shakes, and he did not require medical attention after incarceration removed him from the opportunity to ingest alcohol. Notwithstanding claims of prodigious amount of alcohol, Mr. Fell has cumulatively consumed for years, his neuropsychological testing does not show evidence for damage from the chronic effects of alcohol abuse.  There is, likewise, no evidence for any physical damage to Mr. Fell from alcohol use – be it gastritis, impotency, or hepatitis.  His provided history is therefore not an accurate representation of what his body tells us."  P. Exh. 10 at 16, Fell-00000637.  *See also* P. Exh. 9 at 4, Fell-00000614.

parties also stipulated that Fell was competent to stand trial and knew the difference between

right and wrong on November 27, 2005. The record, however, shows that the stipulation was

consistent with the experts' findings, and that trial counsel's decision to enter into it reflected an

informed tactical decision.

After Fell withdrew his Rule 12.2 notice, the government advised the court that it was

still considering offering expert mental health evidence in rebuttal, in order to respond to two

proposed mitigating factors that related to Fell's mental health. Specifically, mitigating factor

number one stated that Fell's capacity to appreciate his conduct was significantly impaired, and

mitigating factor number 15 stated that as a child and teenager, Fell was treated and

institutionalized several times for mental health conditions. In support of mitigating factor 15,

the defense had introduced dozens of documents in the Mitigation Binder referencing repeated

psychiatric hospitalizations, mental health diagnoses, and psychotropic drugs. Fell also

introduced the testimony of Kane, a counselor at St. Michael's, who testified that while at St

Michael's Fell was considered a mental health client. Therefore, the government submitted that it

should be allowed to rebut the inevitable inference the jury would draw from said evidence – that

Fell suffered from some sort of mental disease or defect at the time of the murders.

> MR. DARROW: Judge, let me back up for a second. I'm glad we've got some
> consensus as to the second mitigating factor, which is that defendant was under
> mental and emotional disturbance when the crimes were committed. I note that
> we're not quibbling over factor 17 which is also somewhat problematic. It says,
> as a child and teenager Donald Fell was treated and institutionalized several times
> for mental health conditions. Your Honor, I think it's fair to say that since the
> outset of this case, due to the nature of the crimes involving, among other things, a
> murder of Mr. Fell's mother, the parties saw this as a psychological homicide
> case. And that's why I think it's no fewer than seven mental health experts, four
> for the defense, and now three for the Government, have examined Mr. Fell. I
> think it's also fair to say that all seven of those mental health experts failed to find

any neurological deficit, any organic brain problem, or any significant mental health problem which would have mitigated Mr. Fell's responsibility or ability to understand what he was doing at the time of the crimes. I don't think that's in dispute. And that's I think one reason why we're where we are today. In the stipulation we're proposing we're not proposing to put in an anti-social diagnosis or anything else. We would just like to have something so that the jury knew that his current mental condition was not really at issue. And even though there are these, the defense documents indicate that he was four or five times psychiatrically hospitalized as a child, psychiatrically hospitalized, and even though just yesterday Mr. Cane, the defense witness, testified that he was considered at the age of, I think, 15 when he was at St. Mike's, as a mental health student and therefore was put in the special dormitory. We are concerned that this jury know that as of November of 2000 he was not mentally ill. And, therefore, we simply would like a stipulation in order to avoid having to call a government expert that, you know, he was not mentally ill, he did not have neurological problems, he was of average intelligence. And just as of the time of the murders he was not suffering from any significant mental disorder. We're not recommending a diagnosis or anything like that.

MR. BUNIN: Here's the problem with that. Those are all historical facts. And as I recall they were all brought out on cross. We never asked Mr. Cane [sic] about all those hospitalizations. They were brought out in cross. We did not seek to go there. But they are just historical facts that he was hospitalized. We're not offering those diagnoses as part, as, as anything more than that's what happened, that's what those reports say.
THE COURT: Well, let me propose an alternative. You've not raised the diminished capacity defense in any way. Then a viable stipulation would be that the defendant did not suffer from mental illness, to the extent that it diminished his capacity to commit the offense, etcetera. That's inartfully put, but off the top of my head it's an attempt as best that I can –

MR. BUNIN: I don't know that we've done anything that requires a stipulation. I mean there's this whole other issue of whether or not, you know, whether or not a mental health expert can testify for the Government anyways because it hasn't been triggered by us putting on expert evidence. I mean I think the rule's pretty clear.

THE COURT: Well, it, it is and it is not. It might be clear that the Government could not rely upon statements that were made by the defendant during examination under 12.2 because as I read the notes introduction of those statements may have to be triggered only with the introduction of expert testimony. It does not necessarily mean that experts could not testify to other factors which are introduced during the course of the trial. And I'm not

135

suggesting in any way that I prejudge that issue or even know the answer.  But, you know, there may be other issues that he could testify to.

MR. BUNIN:  I understand.

THE COURT:  I don't know.  They are not necessarily mental health related and fall within 12.2.  Regardless, it becomes an extraordinarily complex issue. And obviously in light of the nature of this particular offense it would be an issue that would be or could be extraordinarily controversial and could last into multiple years of litigation.

MR. BUNIN:  Let me, I need to talk to co-counsel and my client before I can stand here and enter into any stipulation.  But um, we certainly are not, we're not urging that factor.  And it will not be part of closing.  That a mental defect had existed at that time that affected the defendant during –

THE COURT:  His capacity to commit the offense.  You are not raising a diminished capacity defense.  That's stating nothing other than what is the status of the case at this particular point.  It's not suggesting in any way that you are throwing out all the testimony about his background because the Supreme Court has said repeatedly that that kind of evidence is admissible in regard to mitigating evidence.  And I understand that you would not want to impact that particular kind of testimony.  But as far as a diminished capacity defense you've essentially waived that.  And that would be the logical, in my view, way to proceed by way of stipulation.

Tr. 10-1 at 49-52.  *See also* Tr. IX-2 at 65.  The above discussion clearly reflects the

circumstances leading up to the stipulation.  The government was concerned about the state of

the evidence absent any expert mental health evidence.  The defense sought to close the evidence

without expert mental health evidence.  And the Court was exploring and considering the parties'

respective positions, suggesting that a simple stipulation would be the common ground to resolve

the matter.  Absent some final mental health evidence, in the way of testimony or a stipulation,

there was a risk the jury would be misled into inferring that Fell had a mental health disease or

defect.  The Court suggested a stipulation if defense counsel wanted to prevent the government

mental health experts from taking the stand.

While Fell argues post-conviction that government mental health testimony would have been excluded under Rule 12.2, the Court indicated that the issue was not so clear-cut. Rule 12.2 provides, in pertinent part:

> **(4) Inadmissibility of a Defendant's Statements.** No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
>
> (A) has introduced evidence of incompetency or evidence requiring notice under Rule 12.2(a) or (b)(1), or
>
> (B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

Rule 12.2 thus governs to the admissibility of a defendant's statements made during the course of a Rule 12.2 evaluation. However, it places no limits on the admissibility of expert testimony, not based on the defendant's Rule 12.2 statements. In this case, for example, Dr. Welner had conducted an extensive forensic investigation of Fell, aside from Rule 12.2 statements. The total exclusion of his testimony – and that of Dr. Wetzel – was anything but certain. Indeed, Fell's post-conviction petition cite not a single court opinion in support of his argument. In view of the above-quoted exchange on the record, and absent a reasonable probability under the applicable jurisprudence that trial counsel's objection would have been sustained, their decision cannot be deemed to have been error.

The only way for trial counsel to definitely prevent the government from presenting expert mental health evidence in rebuttal was to enter into a mental health stipulation, consistent with the expert reports. Had the defense refused to enter into a stipulation, and their objection

been overruled, they would have triggered government expert mental health evidence establishing the very facts contained in the stipulation – that Fell had no cognitive or neurological deficits; that his intellect and cognitive functions were intact; that he did not suffer from any mental disease or defect; that he was competent to stand trial, and knew the difference between right and wrong at the time of the murders. Electing to forgo mental health expert testimony was consistent with trial counsel's key strategy in the penalty phase: focus the jury on the tragic facts of Fell's childhood and background and argue that they mitigated his sentence. The government referenced the mental health stipulation only twice during closing summations. Entering into a stipulation was an informed strategic decision by trial counsel.

Fell attempts to support his argument that counsel was ineffective in agreeing to the stipulation with a declaration from a juror. He proffers that juror 203 speculated that, "maybe if there had been some sort of intelligent psychiatrist to present evidence of the defendant's mental state it would have made a difference, but there was not overwhelming amount of that presented." Yet speculation at to testimony by an imagined psychiatrist who was on no witness list, about a non-existent mental state, carries no weight.

In any event, testimony of jurors is not admissible to show the effect of evidence upon a jury's thought process. Federal Rule of Evidence 606(b) clearly provides:

> **(b) Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict* or indictment or concerning the juror's mental process in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A

> juror's affidavit or evidence of any statement by the juror may not be received on
> a matter about which the juror would be precluded from testifying.

*Id*. (emphasis added).  The juror statement proffered by Fell falls squarely within the Rule 606(b)

preclusion, and should not be considered by the Court.[20]

In *Tanner v. United States*, 483 U.S. 107 (1987), the defendant alleged that jurors had

consumed alcohol during their lunch break and this caused them to fall asleep in the afternoon

during trial.  483 U.S. at 113.  The Court denied inquiry into the allegations, observing that:

> full and frank discussion in the jury room, jurors' willingness to return an
> unpopular verdict, and the community's trust in a system that relies on the
> decisions of lay people would all be undermined by a barrage of postverdict
> scrutiny of juror conduct.

*Id*. at 120-21.  *See also United States v. Sampson*, 332 F.Supp.2d 325 (D. Mass. 2004) (denying

inquiry into allegations of juror misconduct based on juror statements to the press).

### b.  The Evidence, Including Fell's Flat Affect, Established That Fell Felt No Remorse for his Crimes

Fell submitted as a mitigating factor that he "has shown remorse for killing Teresca

King."  Special Verdict Form, Dkt. 202.  The limited evidence submitted to support that factor

was Fell's confession, his willingness to be interviewed about where he left Mrs. King's body,

and his offer to plead guilty in exchange for a life sentence.

Extensive evidence indicated Fell's lack of remorse, including flight in the wake of the

murders (fleeing Rutland in a carjacked car with a kidnapped victim, murder of the third victim,

---

[20]  The Second Circuit has refused to allow a defendant to investigate "jurors merely to conduct a fishing expedition."  *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978) (citing cases).  Fell obtained the Court's permission to interview his jurors after trial on an ex parte basis, such that the filing was sealed and the government was not even unaware of the motion or the interviews.  Yet the government doubts that Fell submitted evidence of juror misconduct or of extraneous juror information.

promptly eating breakfast and resuming flight); his initial two false exculpatory statements; his failure to express remorse in his eventual written confession (even when prompted to do so by an FBI agent); his matter-of-fact tone and persistent minimizing in the recorded audio statements about the murders; and his demeanor during his statements. Fell claims that trial counsel failed to introduce expert mental health testimony to explain that his flat affect was a result of childhood trauma and not lack of remorse.

Fell's argument falls short for several reasons. First, such evidence would inevitably have resulted in government expert rebuttal, which would not have gone well for Fell. Both Drs. Wetzel and Welner were struck by Fell's flat affect and lack of remorse. Dr. Wetzel noted that Fell's statements to the police indicated a "remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims." P. Ex. 7 at 2, Fell-00000464. Dr. Welner noted: "Mr. Fell's response to what he had done was strikingly remorseless in behavior and expression." P. Exh. 10 at 13, Fell-00000634. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors that indicate anti-social personality disorder, as well as shallow affect and lack of empathy. *Id*. at 26-32, Fell-00000647-53. Doubtless based in part on such prospective testimony, counsel made a wire tactical decision to rely upon Fell's compelling and tragic background, not his mental state.

Second, even if the Court were to determine that it was error for trial counsel not to present expert testimony to explain Fell's flat affect, there is no showing of prejudice. Evidence of Fell's demeanor was not the only evidence upon which the government relied to prove that Fell lacked remorse. The government also relied on Fell's truly extraordinary statements and associated actions on November 27. For example, Fell stated that after "using his feet" during

140

the killing of Terry King, he "wiped [his] boots on her sweater." That was after he found a "nice little spot" to get King out of her car in New York. Next on his mind after wiping off his boots was breakfast - "a couple of those sausage and egg thingies" at Burger King, 12 miles down the road. The Burger King employee who took his order testified that Fell did not appear to be upset. Tr. III-1 at 100. He confided to FBI agents that "got a chuckle" out of the fact that his sister and his third victim shared the same first name. Arriving in Wilkes Barre hours after the murder of King, a witness testified that Fell began to drink and play cards, giving no indication that he had just brutally killed three people. The evidence of Fell's lack of remorse was varied and extensive, obvious and subtle, overwhelming in the aggregate. The instant claim that trial counsel should have presented expert testimony on the subject reflects an utter lack of familiarity with the record.

c. Fell's Aggressiveness Was Evidence of of Anti-Social Disorder and Psychopathy

Fell next claims that he was prejudiced by trial counsel's failure to present a scientific explanation for his "agitated depression and acting out behaviors throughout childhood." According to the § 2255 motion, Fell's "seemingly aggravating adolescent aggression was attributable to his comorbid mental impairments: poor judgment and impulse control as a result of exposure to alcohol in utero; mood lability, irritability, and agitated depression as a result of his budding mood disorder; and avoidance, learned helplessness, agitation, and dissociation as a result of being physically, emotionally and sexually victimized by his parents and guardians." P. 114. Fell urges that a hypothetical expert could have explained to the jury the ways in which his

141

impairments could have been controlled with consistent treatment. *Id*. Fell claims that the jury never heard that many of the symptoms of these disorders are treatable.

This claim, like the foregoing argument about expert remorse testimony, demonstrates lack of familiarity with the record and a shallow disregard for tactical decisions that trial counsel were required to make during the penalty phase. The testimony now urged would have thrown wide open the door to expert rebuttal testimony, including very damaging opinions by Drs. Wetzel and Welner.

Trial counsel's decision not to present expert mental health evidence encompassed the type of expert testimony at issue. Expert mental health evidence purporting to explain that Fell's adolescent aggression was attributable to mental impairments would have invited rebuttal expert mental health evidence about ASP disorder and possibly psychopathy. Both include adolescent aggression. Further, one of the defining attributes of both is that they are chronic and resistent to treatment. Dr. Wetzel would have testified that Fell's adolescent aggression was evidence of his ASP, a disorder unlikely to change. Dr. Welner would have further testified that Fell's diagnosis of conduct disorder supported his psychopathy diagnosis. Trial counsel made an informed strategic decision to avert such testimony.

Further, trial counsel introduced into evidence the Mitigation Binder, containing medical records of four psychiatric hospitalizations of Fell between the ages of 11 and 13. MB Tabs 24-32. While those records do not reflect a diagnosis of the impairments alleged post-conviction, they do reflect findings for many of the symptoms described by Fell: poor judgment and impulse control; irritability, depression and agitation. Fell was diagnosed with conduct disorder and treated, showing improvement after each hospitalization. *Id*. The records also reflect that Fell's

142

treatment was not continued after release from the hospital. Therefore, while the jury did not

hear expert mental health testimony on this subject, it did hear that many of the symptoms which

Fell displayed as an adolescent were treatable. In fact, one of the mitigating factors written in the

verdict form by 10 jurors indicate that they concluded that Fell's symptoms as an adolescent

could have been treated.

>20.    Failure of state social and mental health services to effectively
>        intervene in his childhood abuse and to treat or address his early
>        antisocial behavior.

Special Verdict Form, Dkt. 202. Expert testimony was not necessary for the jury to understand

that many of the symptoms Fell displayed as an adolescent could have been treated or controlled

through treatment.

### d. Fell is Not Mentally Impaired

Fell now claims that mental illness diminished his responsibility for his crimes, and

expert testimony would have made this clear to the jury. At the outset, he has failed to establish

that he was mentally ill or even impaired. He submits that he had poor judgment and impulse

control problems, urging that they were caused by fetal alcohol exposure, but provides no

evidence. Similarly, his claim that untreated mood disorder led to an increase in agitation and

acting out finds no support in the expert reports he obtained. Dr. Mills does not state that Fell

was mentally ill, but rather that he was vulnerable to becoming mentally ill under extreme stress.

Moreover, Dr. Mills makes no mention of fetal alcohol exposure having a causal relation to

Fell's poor judgment and impulse control.

Second, while a mental health expert could have testified about any mental health

conditions Fell might have had, if any, an expert could not have testified as to Fell's moral

culpability.  Whether any mental health condition or illness diminishes the moral culpability of a defendant would have been for the jury alone to determine.

Fell further claims that a mental health expert would have explained that environmental factors in Vermont echoed the traumatic household in which he was raised.  But this is hardly the type of evidence that requires expert testimony.  The jury heard extensive evidence about Fell's upbringing and was well aware of the factors that affected his childhood home from the testimony of his sister, police officers and social workers, as well as numerous social service records.  Through Fell's post-arrest statements the jury also heard what the environment was like in Debra Fell's Vermont home.  The jury hardly needed a mental health expert to draw the necessary inferences.  Trial counsel so argued to the jury in closing.  Tr. XII at 83.

Fell speculates that in committing multiple brutal, senseless murders he imitated his parents' behavior – resorting to knife violence as a means of problem solving.  This theory lacks scientific support and is implausible.  Nor is there evidence that either of his parents ever kicked a helpless praying older women to death before breakfast while not impaired; owned and brandished a police shotgun; kidnapped or carjacked anyone; murdered a houseguest by stabbing him 50 times and severing his jugular; contributed to the murder of their mothers; or kicked yet another victim into unconsciousness before urinating on him.  The motion argues that had trial counsel presented expert testimony "to explain the competing forces at work on Mr. Fell's psyche, they would not have sentenced him to death."  P. at 117.  But this argument again is rendered moot by trial counsel's strategic decision not to present expert mental health evidence.  Moreover, there is nothing about this hypothetical evidence that renders the jury's verdict unreliable.

144

e.  Trial Counsel Presented Evidence that Fell Would Function Well in the Structured Environment of a Prison

Fell further claims that trial counsel was ineffective in failing to present expert mental health testimony to establish that the environmental factors that triggered his violence are absent in prison.  "A mental health expert would have explained that people with FASD and mood disorder respond positively to structure, and as evidence by his hospitalizations, institutionalization at St. Michael's, and his many years in prison with limited infractions, Mr. Fell does well in a structured environment."  P. 117.

Yet trial counsel did introduce evidence as to Fell's adjustment to prison life, and the likelihood that, if given a life sentence, he would fare well in the structured prison environment. The jury heard testimony from Vermont corrections employees as well as expert testimony by prison consultant James Aiken, who was asked to make an assessment of Fell's adjustment to a prison environment.  Tr. IX-2 at 49.  Aiken testified that Fell could be expected to be a good inmate if incarcerated for life.  According to Aiken, with a life sentence, Fell would be designated to a United States Penitentiary, which is a high security facility well-equipped to handle his confinement.  *Id.* at 58.  Aiken stated that he had talked to Fell, and Fell had impressed him as a person who had done a lot of growing up over the previous five years and understood the regimen of the correctional environment.  *Id.* at 61.  He opined that Fell's disciplinary record during the four years or so of pretrial detention indicated that Fell was "at the lower range of even being disruptive and nowhere near the range of being a predator."  *Id.* at 51. Aiken admitted having reviewed the incidents on April 9, 2005, and March 17, 2004, and indicated that neither incident was serious.  *Id.* at 52-54.  Accordingly, Aiken stated that Fell

145

could be confined in the Federal Bureau of Prisons "for the remainder of his life without causing an undue risk of harm to staff, inmates, and the public." *Id*. at 63.

While trial counsel did not present testimony from a mental health expert on Fell's adjustment to the structured environment of a prison, he did present expert testimony from an arguably more experienced and credible source: a career corrections official and prison warden. Aiken concluded that Fell could be housed safely in prison without causing a risk to staff or other inmates. Moreover, he also presented evidence of Fell's past conduct when placed within a structured environment. This evidence conveyed the same message to the jury – that Fell would function well in the structured environment of a prison.

Trial counsel also was prepared to present mental health expert testimony bearing on Fell's conduct in prison. Dr. Cunningham was prepared to testify that there were a number of factors that pointed to Fell being likely to have a positive adjustment to prison, including the absence of serious violence during pre-trial confinement and his participation in constructive activities during that time. P. Exh. 5 at 6, Fell-00000444. However, when trial counsel made a strategic decision not to present mental health evidence, Dr. Cunningham was withdrawn. Again, that development reflected an informed strategic decision not to present expert mental health evidence.

Further, while Dr. Cunningham did not testify, the jury did hear evidence related to Fell's hospitalizations and his institutionalization at St. Michael's and his positive adjustment to both of those structured environments. Trial counsel presented evidence of Fell's four psychiatric hospitalizations as an adolescent, and the favorable progress he made under treatment. MB Tabs 22-32. The jury also heard evidence and testimony about Fell's social and academic progress

146

during confinement at St. Michael's, including his positive adjustment to its structured environment.  Tr. IX-2 at 13, 17, 20; Educational and Discharge Summaries from St. Michael's, MB Tabs 39-41.

In sum, Fell cannot establish that trial counsel's decision not to present mental expert testimony regarding his conduct in the structured environment of a prison was *Strickland* error. Even if this Court were to determine that trial counsel's decision in this regard was error, Fell has not established that he was prejudiced.  In rebuttal, the government introduced two videos from the Northwest Correctional Facility vividly showing Fell's poor adjustment to prison life.  Both depicted Fell in dramatic altercations with correctional officers.  Penalty Phase Exhibits 18 and 19.  In these videos Fell violently and profanely antagonizes correctional officers, assaulting them verbally and physically, spitting, swearing, and refusing to obey orders.  In light of that evidence, Fell cannot establish that had trial counsel introduced expert mental health testimony about his adjustment to the structured environment of a prison, the outcome of the case would have been different.

## V.   FELL'S COUNSEL WAS NOT INEFFECTIVE IN DECIDING NOT TO PRESENT MENTAL HEALTH EVIDENCE, NOT TO PURSUE A MOTION TO EXCLUDE DR. WELNER'S TESTIMONY AND IN STIPULATING THAT FELL HAD NO COGNITIVE DEFICITS AND DID NOT SUFFER FROM A MENTAL DISEASE OR DEFECT

Fell claims that after trial counsel received the report of Dr. Michael Welner, they made several fatal decisions.  First counsel withdrew their expert mental health case, and then they entered into the associated stipulation.  Fell also claims that counsel inexplicably abandoned a motion *in limine* to exclude Welner's testimony before the Court ruled on it.  As a result Fell claims prejudice because the jury never heard evidence about his impaired mental health and the

147

stipulation allowed the government to undermine the balance of his evidence in mitigation during summation. However, Fell's very argument, to wit, that his "trial counsel made several ultimately fatal decisions," clearly indicates that his trial counsel were not constitutionally ineffective, but rather were making strategic decisions that should not be second-guessed only because they were not ultimately successful.

As set forth above in part IV, *supra*, trial counsel conducted an extensive investigation of Fell's mental health before making an informed strategic decision not to present mental health evidence in the penalty phase. The fact that counsel's determination was "fatal" does not render it ineffective under *Strickland*. To prove ineffective assistance of counsel Fell must show that trial counsel's decision was objectively unreasonable. And even if Fell is able to overcome that high hurdle, he must then show that he was prejudiced by counsel's failure. Fell cannot make this showing.

Trial counsel clearly perceived that, if they called a mental health expert in the penalty phase, rebuttal testimony by Drs. Wetzel and Welner was likely and would damage their mitigation case. Therefore, after considering the robust mental health and background mitigation evidence, counsel made the strategic decision to avert such rebuttal testimony and not to present mental health evidence. *See* Declaration of Alexander Bunin, P. Exh. 264 at 8-9, Fell-00002467-68; Declaration of Gene Primono, P. Exh. 263 at 2, Fell-00002459. This is the type of strategic decision that trial attorneys routinely make. Such decisions are often made after several other witnesses have testified, and the success or failure of such prior witnesses informs the decision about other prospective witnesses. Generally, the many mitigation witnesses called by the defense had done very well. Moreover, the record indicates that the Court was disinclined to bar

*all* testimony by Dr. Welner, and, in any event, Dr. Wetzel's opinions were also a major threat to the defense case. Further, the stipulation, an alternative discussed with the Court, was also reasonable as it achieved trial counsel's ultimate goal – keeping the government rebuttal mental health witnesses off the witness stand. Therefore, Fell cannot prove ineffective assistance of counsel.

A. Background

1. Early Mental Health Investigation and Discovery

Shortly after his indictment, Fell submitted to three mental health examinations by three different mental health experts retained by his trial counsel. Dr. Mark J. Mills evaluated Fell on March 26 and 27, 2001. A week later, on April 6, 2001, Dr. Wilfred G. van Gorp, with the assistance of Dr. Kimberly Walton, conducted an independent neuropsychological evaluation of Fell to determine his level of neuropsychological functioning. Next, Fell was evaluated by Dr. Jonathan J. Lipman, a neuropharmacologist, who documented his abuse of alcohol and illegal drugs from early childhood to adulthood. The findings of these three experts are in the record and summarized above. Trial counsel also obtained Fell's medical records from four psychiatric hospitalizations, detailing contemporaneous circumstances and findings.

Fell submitted to two initial government examinations, one by Dr. Wetzel and a second by Dr. John Rabun. *See* P. Exhs. 7 and 8. Both were limited in significant respects: (1) one of Fell's lawyers was present during the interview and unduly restricted its scope; (2) neither doctor was allowed to ask Fell about the charged capital offenses, the murders of Debra Fell and Charles Conway, or his state of mind during the three murders; (3) neither doctor was allowed to ask Fell about his use of knives; and (4) neither doctor was allowed to ask Fell about the dynamics of his

149

relationship with Lee. As a result, after these first two restricted mental health examinations, neither expert could offer any opinion as to Fell's state of mind during the murders.

In Dr. Wetzel's first report, dated October 11, 2002, he indicated that in his opinion, the circumstances of Fell's childhood could not be rebutted. P. Exh. 7 at 2, Fell-00000464. Dr. Wetzel found no evidence that Fell ever had hyperactivity or attention deficit disorder. "The neuropsychological testing does not show any likely correlates of it today. He certainly shows none of the characteristics of these disorders at present." *Id*. at 3, Fell-00000465. Dr. Wetzel also concluded that Fell had no cognitive deficits, notwithstanding his extended use of alcohol and other drugs. *Id*. In addition, Dr. Wetzel noted that Fell met "some or all of the criteria for a number of Cluster B personality disorders, displaying antisocial, borderline and narcissistic traits." *Id*. at 4, Fell-00000466. Dr. Wetzel indicated that Fell showed no signs of psychosis on testing or in his clinical examinations. *Id*. at 4-5, Fell-00000466-67. Nor did Dr. Wetzel find any indication that Fell suffered from an affective disorder such as depression. *Id*. at 5, Fell-00000467. Dr. Wetzel strongly disagreed with the conclusion that Fell was submissive, *id*., or pre-psychotic. *Id*. at 7, Fell-00000469.

Dr. Rabun reported his evaluation of Fell on December 31, 2002. He also concluded that Fell did not suffer from any psychotic or major depressive disorder. P. Exh. 8 at 14, Fell-00000609. According to Dr. Rabun, Fell's cognitive functions were intact. "Mr. Fell does not show evidence of a limited intellectual capacity or a cognitive disorder." *Id*. Dr. Rabun also found that Fell's memory and executive functions were also intact. *Id*. Dr. Rabun did indicate that Fell was sexually and physically abused as a child and noted that male children who are

victims of sexual and physical abuse are known in certain situations to become aggressive as adults. *Id*. He also found that Fell qualified for a diagnosis of alcohol dependence. *Id*.

2. Second Mental Health Examination and Discovery

In 2004 the government retained forensic psychiatrist Dr. Michael Welner, and the defense filed a Rule 12.2 Notice of Intent to rely upon expert mental health evidence. The government moved the court to allow an unrestricted examination of Fell by Dr. Welner, since the prior interviews had been restricted by defense counsel. Dkt. No. 77. Fell's trial counsel opposed the government's request to have Dr. Welner interview Fell, but did not oppose a further interview by either Dr. Rabun or Dr. Wetzel. *See* Dkt. No. 78. The Court allowed the government to examine Fell again, but ordered that only Drs. Wetzel or Rabun could conduct the examination. *See* Court Order of April 7, 2005, Dkt. No. 99-1.[21] The Court ordered that the "examiner shall be permitted to conduct a complete psychiatric examination, including inquiry into defendant's state of mind before, during and after November 27, 2000." *See* Dkt. No. 101 at 1. The Court's Order further provided that the government was to provide the defense with a list of any tests to be performed. *Id* at 2.

Barred from using Dr. Welner for the interview, the government selected Dr. Wetzel to interview Fell, and worked to familiarize him, as well as Dr. Rabun, with the advances in the investigation since 2002. The government shipped to both doctors hundreds of documents not

---

[21] On April 14, 2005, the government moved for reconsideration of the Court's April 7, 2005 Order. *See* Dkt. No. 105. On April 22, 2005, petitioner moved to exclude the testimony of Dr. Welner. *See* Dkt. No. 107. The government opposed petitioner's motion on April 29, 2005. *See* Dkt. No. 113. On May 25, 2005, the Court denied the government's motion for reconsideration of its April 7, 2005 Order and denied as premature petitioner's motion to exclude Dr. Welner's testimony. *See* Court Order of May 25, 2005, Dkt. No. 129.

reviewed by them in 2002. The documents included a multitude of reports of witness interviews conducted since 2002; crime scene photographs and investigative reports not reviewed in 2002; prison documents related to Fell generated since 2002; prison correspondence from Lee not possessed in 2002; and autopsy and toxicology reports not reviewed in 2002. In addition to reviewing these materials, Dr. Wetzel's preparation for the interview included consulting with Drs. Welner and Rabun.

Dr. Wetzel conducted Fell's 12.2 interview on June 13, 2005. On June 27, 2005, Dr. Wetzel rendered a supplemental report. He reaffirmed that Fell's evaluation yielded "no sign of psychosis" or depression, *id*. at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive deficits." *Id*. at 8, Fell-00000618. Dr. Wetzel concluded that Fell met fully the criteria for anti-social personality disorder. *Id*. at 7, Fell-00000617. Dr. Wetzel also concluded that Fell exaggerated his intake of alcohol the night of the murders and "was not significantly impaired." *Id*. at 4, Fell-00000614.

> A.    In my opinion, he has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.
>
> B.    He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.
>
> C.    He denied that he has ever had withdrawal symptoms. He claimed that he has unusual tolerance for alcohol.

*Id*. Dr. Wetzel concluded that Fell "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id*. Moreover, Fell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was not significantly impaired.

*Id*. While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes. *Id*. at 5, Fell-00000615.[22]

The penalty phase began on June 27, 2005. In opening statement the defense announced that it would call mental health expert Dr. Mills.

> Dr. Mark Mills is a psychiatrist. A medical doctor. That he has done testing and will give conclusions and essentially provide that Donnie was -- grew up in a deprived childhood with inappropriate social behavior, of truancy and fighting and constant intoxication. He is substancely (sic) addicted. From those hospitalization records, and other records he has reviewed, when Donnie was in the structured environment, with rules, away from intoxicating substances, he does well. He adjusts. He needs the structure.

Tr. V-1 at 54. Significantly, trial counsel proffered no mental health opinions by Dr. Mills in his opening statement. Rather he indicated that Dr. Mills would testify about Fell's upbringing and demonstrate through records he had reviewed how Fell does well in a structured environments. Trial counsel also announced the testimony of Dr. Mark Cunningham.

> Dr. Mark Cunningham is a psychologist. He will summarize research developments and events that involve adverse outcomes. It will take some time to hear his testimony, maybe half a day. And what Dr. Cunningham can do and will do is explain studies conducted by the Department of Justice that talk about the reasons, what are the causes of bad outcomes, and they are broken down into essentially two things. There are risks factors, many of them mitigating factors that we are talking about, are those risk factors. And there're protective factors. Protective factors are those things like a role model, like maybe a coach or something that gives someone guidance and teaches them. The comparison of those risk factors and protective factors, you will hear those risk factors were plentiful in Donnie's life. The protective factors were few or nonexistent.

---

[22] On June 30, 2005, petitioner moved to exclude portions of Dr. Wetzel's report, including the portion where he states that in his opinion Fell exaggerated his consumption of alcohol the night of the murders, but this motion was never ruled on. *See* Dkt. No. 177.

Tr. V-1 at 54-55. Again, trial counsel proffered no mental health opinions by Dr. Cunningham in his opening statement. Rather he indicated that Dr. Cunningham would testify about risk factors, many of them the same mitigating factors being submitted by the defense, and how they led to bad outcomes.

Also on June 27, 2005, the government moved to exclude the testimony of Dr. Cunningham, and for a *Daubert* hearing, arguing that Dr. Cunningham did not propose to testify with regard to any recognized area of science or medicine, and his testimony regarding Fell's moral culpability would invade the province of the jury. *See* Dkt. No. 164 at 16-17.

On July 1, 2005, *prior to the disclosure of Dr. Welner's report*, and on the day Dr. Mills was expected to testify, Fell's trial counsel announced that the defense would not call Dr. Mills, instead reserving him for possible surrebuttal.

THE COURT: You have three other witnesses?

MR. BUNIN: Yes.

THE COURT: And you have an expert?

MR. BUNIN: Well, as I'm saying, the expert will be withheld.

THE COURT: Oh, you're not going to put him on at all?

MR. BUNIN: No. I'm going to save him for surrebuttal if we need him. There's still Dr. Cunningham who's an expert who will testify next week. If they believe that somehow raises rebuttal questions, I'm sure they'll try to present such an expert.

Tr. VII-2 at 4.

Dr. Welner issued his report on July 5, 2005. Dr. Welner's report was a comprehensive analysis of all mental health issues raised in the case since 2001. He reviewed all prior testing,

154

and analyzed each defense expert opinion and each mitigation factor relating to mental health. Dr. Welner concluded that Fell suffered from anti-social personality disorder, a diagnosis which entailed findings of, among others, conduct disorder prior to the age of 15; a demonstrated failure to conform to societal norms by engaging in unlawful conduct; deceitfulness; impulsivity and failure to plan ahead; irritability and aggressiveness; a reckless disregard for the safety of others and lack of remorse. P. Exh. 10 at 8-9, Fell-00000629-30. Dr. Welner also agreed with Dr. Wetzel in finding that Fell showed no sign of psychosis or depression. *Id*. at 18, Fell-00000639; 20-21, Fell-00000641-42. In addition, Dr. Welner concluded that Fell met the criteria for psychopathy, which includes many of the factors common to anti-social personality disorder, as well as grandiose, manipulative conduct, shallow affect and lack of empathy. *Id*. at 26-32, Fell-00000647-53. Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he committed the murders. *Id*. at 32-34, Fell-00000653-55. On the contrary, Dr. Welner found that Fell's behavior at the time of the murders "primarily reflected organization, and not signs of a mental illness or intoxication." *Id*. at 35-40, Fell-00000656-61.

Dr. Welner's report was provided to Fell's trial counsel immediately upon receipt the night of July 5, 2005, with another copy delivered on the morning of July 6, 2005.[23] On that same date, trial counsel filed a Motion in Limine to Exclude the Report and Testimony of Michael Welner. *See* Dkt. No. 182. Trial counsel alleged that Dr. Welner violated the Court's Order of April 7, 2005 ("April 7 Order"), requiring that the new forensic examination of Fell be conducted by Dr. Wetzel or Dr. Rabun, when he provided questions to Dr. Wetzel to pose to Fell

---

[23] Also on July 5, 2005, trial counsel finally disclosed Dr. Cunningham's notes to the government. *See* July 5, 2005 Letter of Alexander Bunin to Judge Sessions, attached as Government Exhibit A.

and performed tests not previously notified to trial counsel.  Trial counsel also objected to the

fact that Dr. Welner made reference to numerous interviews of persons who would not be called

as witnesses in the case and to acts of misconduct by Fell not previously disclosed by the

government.  Last, trial counsel claimed that Dr. Welner's report was simply "bad science"

because psychopathy had not been shown to be an indicator of violence in prison.

Pursuant to trial counsel's motion, the Court scheduled a *Daubert* hearing for Monday,

July 11, 2005.  *See* Dkt. No. 184.  A *Daubert* hearing pertaining to Dr. Cunningham's testimony

was to be held prior to Dr. Cunningham taking the stand, which was expected to happen on July

7, 2005.  *Id*.  On July 7, 2005, the government filed a Memorandum of Law re the upcoming

*Daubert* hearing pertaining to Dr. Cunningham's testimony, *see* Dkt. No. 187.  On that same day

trial counsel announced that it was not going to call Dr. Cunningham, and on July 8, 2005,

counsel withdrew the Rule 12.2 notice.  *See* Dkt. No. 191.

As discussed above, the government announced that it was still considering whether to

call a mental health expert, in light of mitigating factors alleged by the defense referring to Fell's

mental health.  In the ensuing discussion between the Court and counsel – quoted above – the

Court noted that absent a stipulation, "there may be other issues that [a government rebuttal

expert] could testify to." Tr. 10-1 at 50-52.  Thus, it was not clear that the Court would not

permit the government to offer some mental health evidence in rebuttal.  In fact, Dr. Welner's

extensive forensic investigation contained many opinions independent of statements made by

Fell during his forensic interview by Dr. Wetzel.  As a result, and to avoid such testimony, the

parties entered into the mental health stipulation.  As a result of the stipulation, the government

156

called no mental health expert and introduced no further mental health evidence.  The

presentation of penalty phase evidence was concluded on that same day.

### 3.  The Summations

Fell claims that the government used the mental health stipulation to undermine the

balance of his mitigation evidence during summation.  The record indicates that the prosecutor

referenced the stipulation *once* during closing argument.  Tr. XII at 40.  The prosecutor began by

talking about the third victim, Terry King, and the impact of her death on her loved ones because

of the type of person she was and how she lived her life.  *Id*. at 12-13.  He then drew some

parallels between Terry King's life and Fell's life.  *Id*. at 14.

> So as we discuss the case this morning, and over the next perhaps several hours,
> you will hear counsel for both sides talking about the ongoing life of Donald Fell,
> about how Donald Fell grew up, about how Donald Fell, just like Terry King,
> faced the challenges of being raised in an abusive and alcoholic family, about how
> Donald Fell made decisions very different from Terry King, and about how
> Donald Fell became the man that he is today, the man who participated in three
> brutal murders of defenseless victims on November 27th, 2000.

*Id*. at 14-15.  The prosecutor then outlined the process for arriving at the decision the jury would

have to make, *id*. at 16-20, and then discussed each aggravating and mitigating factor in order.

*Id*. at 20.

The first mitigating factor that the prosecutor addressed was mitigating factor number one

which claimed that "Donald Fell's capacity to appreciate his conduct was significantly impaired."

*Id*. at 38.  The prosecutor challenged this mitigating factor first by outlining the evidence

presented with regard to Fell's actions immediately after the murder of Charles Conway and his

mother.

> You know he made a number of calculated and clear decisions that night on November 27th. You remember the planning, the showers, the packing. You know that they stopped at the Wal-Mart to get shotgun shells. You know how they sized-up Mr. Trapasso. You know how they waited for Terry King. All that evidence, ladies and gentlemen, decision after decision after decision, shows you that they were not, and that the defendant was not significantly impaired that night. . . . They drove for four hours without being stopped by anyone. They could drive for four hours. That shows you that they weren't significantly impaired. Next, you also know the defendant remembered these events clearly four days later. Think about it, ladies and gentlemen. If he was significantly impaired at the time, would he remember that the knife he was using said the word Hawk on it? Would he be able to describe the difference between the two knives as he did, one with Hawk on it, and the other as a black-handled knife. There are many other instances of his memory that day: His exact description of the route that he took. . . . . He remembered each turn that he took on his way down to the Price Chopper. No question he was not significantly impaired.

*Id*. at 38-39. In addition, the prosecutor referred the jury to the testimony of Cindy Oberle and Michael Leight, who saw Fell before and after the murders, and testified that Fell acted normally. *Id*. at 40. Then in conclusion, the prosecutor briefly reminded the jury of the stipulation that provided that Fell suffered from no mental disease or defect and knew the difference between right and wrong when he committed the crimes.

> Not only that, ladies and gentlemen, you have heard in this phase of the case about the mental health stipulation. There is no question there's no mental disease, no mental defect; no question the defendant knew the difference from right from wrong when these crimes occurred.

*Id*. This is the only reference by the prosecutor in summation to the mental health stipulation. The brief reference rebutted a single mitigating factor: that Fell's capacity to appreciate his conduct was significantly impaired. After summarizing the evidence that showed that Fell was not impaired by a controlled substance, the prosecutor used the stipulation to argue that he also was not impaired by a mental illness or defect. The prosecutor did not use the stipulation to rebut any other mitigating factor. Therefore, Fell's claim that the prosecutor used the mental

158

health stipulation to undermine the balance of his evidence in mitigation during summation is completely unfounded.

Defense counsel then addressed the jury and conceded, as stated in the stipulation regarding Fell's mental health, that Fell knew right from wrong in arguing to the jury that Fell was under the influence when he committed the murders and that is a mitigating factor.

> Under the influence at the time of the offense is a significant mitigating factor. Again, Donnie knew right from wrong; that's not the point. The point is, he was unable to make correct, moral judgments, aside from his candor on the tape, which we have no reason to believe that him and Bobby Lee and Debra Fell and Charles Conway were not drinking incredible amounts of alcohol.

*Id*. at 79. Otherwise, the defense focused their summation on Fell's childhood and how his childhood impeded him from making correct moral decisions.

The government then delivered a brief, 14-page rebuttal argument, again making a single reference to the stipulation. Specifically, in rebutting the defense's argument that because of his childhood Fell was incapable of making morally correct choices, the prosecutor referenced Fell's medical records and the stipulation.

> You were also told about his medical history. Folks, there is no evidence of any genetic predisposition to alcohol or drug dependence. There's no evidence of fetal alcohol syndrome. There's no evidence of closed-head injuries with any aftereffect. And there's no evidence of any psychological disorder. The only evidence as to Mr. Fell's state of mind and his health is in Government's Exhibit 14, which is a stipulation by both parties, and as you know, it indicates that psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate. I am not even going to read it to you again. He is completely intact.

*Id*. at 117. The prosecutor then moved on to other aspects of the evidence. He did not focus on the mental health stipulation alone, but urged the jury to consider it in conjunction with other

159

relevant evidence.  Again, Fell cannot prove that  the prosecutor used the stipulation to undermine the balance of his evidence in mitigation during summation.

### 4.  Post-Trial Motions

Following the jury's death verdict, Fell filed a motion for judgement of acquittal and a new trial.  Dkt. No. 209.  He did not challenge his conviction, but claimed that prosecutorial misconduct at the penalty phase required that the jury's verdict be changed to life imprisonment, or that he be granted a second, new sentencing hearing.  Specifically, Fell claimed that the government made false representations to the Court when asked whether it had told Dr. Wetzel to ask the questions Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel conducted to support his opinion.  The government denied doing so.  Fell claimed that the Court's reliance on those misrepresentations and the subsequent response by the Court harmed him by causing him to withdraw all expert mental health evidence.  Fell further claimed that the government performed tests in violation of the April 7 Order.[24]

The record indicates that on July 6, 2005, the Court questioned the government about Fell's allegations of misconduct:

> THE COURT:  Did you tell him to tell Dr. Wetzel to ask the questions that Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel had to support his opinion?  Is that what you did?
>
> MR. DARROW:  No.  Those two were in consultation with each other prior to the interview.  We told Dr. Wetzel to conduct the interview as -- as he saw fit, but we also told him that -- you know, to be in touch with Dr. Welner about it, and we

---

[24]  Fell also claimed that the government took inconsistent positions with regard to Fell's mitigation evidence during plea negotiations and at trial and he was not allowed to explain those discrepancies to the jury.  And last, Fell claimed that the government improperly argued that there must be a nexus between his mitigation evidence and King's murder.  These two arguments are not the subject of Fell's post-conviction petition.

know that Dr. Welner prepared some of the questions, not all of them, for him to ask. I didn't – we were not involved in a lot of this stuff.

Tr. VIII-2 at 64. The Court reserved ruling on the issue of precluding Dr. Welner's testimony and scheduled a hearing for Monday, July 11, 2005. *Id*. The Court also requested further briefing on the relevant issues. *Id*. at 69, 74-75. However, the next day Fell withdrew his Rule 12.2 notice and then entered into the mental health stipulation, mooting his motion *in limine* to exclude the testimony of Dr. Welner.

The government responded to Fell's allegations with a detailed Affidavit by Dr. Richard Wetzel, submitted with its "Opposition to Defendant's Post-Trial Motion." Dkt. No. 212. In his affidavit, Dr. Wetzel undercut the allegations, and firmly established his independence from Dr. Welner. He stated that the government contacted him to be a rebuttal witness, in case Welner was not permitted to examine Fell or to testify as a rebuttal witness. He received a substantial amount of information pertaining to the case that had been produced by Welner working with FBI investigators. Aff. At 7. According to Dr. Wetzel, counsel for the government "made it clear that Dr. Welner would be willing to discuss material with me. He encouraged me to contact Dr. Welner and to do anything else I felt was necessary to become prepared." *Id*. Dr. Wetzel explicitly invited Dr. Welner to give him whatever advice or help he wished, as a collegial gesture. *Id*. at 8. Dr. Welner responded with a lengthy list of questions. *Id*. at 9. Wetzel was insulted; he stated that he had not intended to do anyone else's examination but his own, that he was doing the evaluation he thought appropriate, although he had no objection to being helpful to any of the other experts in the case. *Id*. at 9-10. He also noted that there was a considerable overlap between the questions offered by Dr. Welner and those he would have asked in any

161

event, based on the new information provided by Dr. Welner and the FBI. *Id*. at 10-11.

Moreover, Dr. Wetzel clearly stated that counsel for the government did not instruct him to do

anything and did not ask him to ask any of Dr. Welner's proposed questions. In addition, Dr.

Wetzel stated that counsel for the government advised that he saw no legal reason why Dr.

Wetzel should not use Dr. Welner's questions if he wished to do so. Further, Dr. Wetzel

emphatically denied that Dr. Welner had directed his re-interview of Fell. *Id*. at 11-12. He

denied administering any additional tests to Fell. *Id*. at 14.

With regard to Fell's allegation that the government had performed tests, without

providing prior notice to trial counsel as mandated by the April 7 Order, the government stated

that it did not understand Dr. Welner's evaluations, conducted after the forensic interview and

outside the presence of Fell, to constitute "tests" within the meaning of the Order.

> MR. DARROW: Moreover, my understanding from speaking to him today is that the – the name of the psychopathy test, which I can't remember, is not a test which was administered. It's a historical scale that was done after the fact. We had understood your court order saying, you know, any – any further psychological testing, bring it up with counsel, to refer to psychological testing during the interview; in other words, with the defendant at the facility, and there wasn't any. You know, what Welner did was after he had gotten all this information together, including the DVD of the interview and all these collateral interviews that he's been doing, is he plugged in that – whatever the name of that scale is and – and reached results. Not dissimilar, Your Honor, to an antisocial personality disorder diagnosis, which is the primary diagnosis that Dr. Welner reaches. You know, it's not a piece of paper like the MMPI that you put in front of the defendant and have him fill things in. Instead, it's a review of his history. You know, what was he doing before the age of 15, for example. That's one of the primary factors for antisocial personality disorder diagnosis. And a lot of that stuff's just historical.

Tr. VIII-2 at 65.

162

After consideration of the transcript and Dr. Wetzel's affidavit, the Court determined that there was no basis to conclude that the government lied to the Court. *See* Court's Opinion and Order of April 24, 2006, Dkt. No. 236 at 20. The Court further concluded that there was no basis to believe that government counsel misrepresented his belief that the April 7 Order did not preclude additional testing or evaluation outside the interview of Fell. *Id*. Notwithstanding, the Court found that the spirit of its Order was not followed. *Id*. at 21. The Court credited Dr. Wetzel's affidavit and absolved Dr. Wetzel of any complicity in circumventing the April 7 Order. *Id*. But it found that the evaluations conducted by Dr. Welner constituted testing in contravention of the April 7 Order. *Id*. at 22.

The Court, however, did not go on to evaluate the question of misconduct, prejudice, or remedies. The Court stated that ordinarily an evidentiary hearing would be necessary before making such findings. *Id*

> In assessing whether an instance of prosecutorial misconduct caused substantial prejudice, ordinarily a court would proceed to consider the severity of the misconduct, any measures to cure the misconduct, and the certainty of conviction absent the misconduct. *See Elias*, 285 F.3d at 190. Ordinarily, an evidentiary hearing would be necessary; the submissions of the parties alone do not enable this Court to judge the severity of the conduct, for example, whether the government deliberately set out to circumvent the Court's order, or whether its expert was simply a zealot who pursued his own agenda despite the restrictions imposed by the Court.

*Id*.

But the Court determined that it did not have to examine the government's conduct further because "Fell cannot demonstrate a causal link between the conduct complained of (lying to the Court and violating its order) and his withdrawal of all expert mental health evidence." *Id*. at 23. The Court never had an opportunity to rule on Fell's motion *in limine* to exclude the

163

testimony of Dr. Welner because the defense withdrew its Rule 12.2 notice before the Court's

scheduled hearing on Fell's motion.  *Id*. at 24.  "Regardless of the reasons for Fell's decision to

withdraw his expert evidence, he waived his prosecutorial misconduct claim by failing to pursue

it at sentencing when the essential facts of his claim were known to him."  *Id*. at 25-26.[25]

Rather than await an evidentiary hearing, Fell opted to withdraw its mental health case

entirely in order to keep damaging rebuttal testimony from the jury.  *Id*.  This, again, was an

informed strategic decision by Fell's counsel.

B.  Argument

1.  Trial Counsel's Decision Not to Pursue the Motion to Exclude Dr. Welner's Testimony Was Not Error

Fell claims post-conviction that his trial counsel was ineffective in failing to pursue the

motion *in limine* to exclude testimony by Dr. Welner prior to withdrawing his mental health case.

Fell contends that there were ample grounds to challenge Dr. Welner's report and testimony.

First, Fell's argument is disingenuous.  The record is clear that Fell decided to withdraw

its mental health case *before* the disclosure of Dr. Welner's report.  On July 1st, 2005, Fell

informed the Court that it would not call Dr. Mills, its principal mental health expert, reserving

him for possible surrebuttal.  Tr. VII-2 at 4.  Therefore, by July 1st, *several days prior to the*

*issuance of Dr. Welner's report*, Fell had already decided not to present a mental health case.

That strategic decision was therefore not forced by Dr. Welner's report.  Instead, it reflected the

---

[25]  The Second Circuit affirmed the district court's holding in *United States v. Fell*, 531 F. 3d 197, 226-227 (2d Cir. 2008) ("Before the hearing took place, however, Fell changed course and elected not to call a mental health expert. ... '[w]hen Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct by the government in obtaining its rebuttal evidence.' . . .  We agree").

strength of the defense mitigation evidence up to that point, and the report of Dr. Wetzel, which issued on June 27. Prior to the latter report, the defense had listed Dr. Wetzel on its witness list. That was no longer an option after his new, post forensic interview, supplemental report. While in hindsight, Fell can purport to second-guess his trial counsel's strategy, the record shows sound reasons for such decisions, and speculation does not render counsel's performance ineffective.

Second, even assuming grounds to pursue the challenge to Dr. Welner's testimony, trial counsel was not compelled to do so. The decision of what motions to file are strategic decisions to be made by counsel. See *United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir.1987) (counsel has adequately represented his client if counsel exercised "professional discretion" when deciding whether to file a motion); *United States v. Aulet,* 618 F.2d 182, 187-88 (2d Cir.1980) (counsel not always required to file suppression motion in cases involving evidence or statements obtained after a search); *see also Maxwell v. Mabry*, 672 F.2d 683, 685 (8th Cir. 1982) (counsel's failure to pursue motion for change of venue was within area of trial tactics and judgment which attorneys have to make and did not constitute ineffective assistance of counsel). Absent a showing that a motion would certainly have been granted, and that not pursuing it caused prejudice, Fell cannot show that his counsel's failure to pursue a particular motion fell below the prevailing professional norm. *See United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990) (*citing Kimmelman v. Morrison,* 477 U.S. 365, 375-76 (1986)) (to show ineffective assistance for the failure to make a suppression motion, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed"). Here, a decision to exclude Dr. Welner's report and testimony was within the Court's discretion. Given the tenor of Dr. Wetzel's post-trial

165

affidavit, there is no basis to conclude that Fell would have been able to establish intentional

government misconduct, or that based on such misconduct the Court would have excluded any

and all testimony by Dr. Welner.  In light of the fact that the Court found that the government did

not lie to the Court, it was more likely that the Court would not have excluded Dr. Welner's

testimony and instead grant the defense additional time to prepare to confront it.  Or the Court

may have opted to limit Dr. Welner's testimony only in certain respects, for example, by barring

testimony relying on the improper psychopathy "tests."

Third, even if the Court were to determine that trial counsel's failure to pursue the motion

*in limine* to exclude Dr. Welner was error, Fell cannot demonstrate prejudice.  Even if counsel

had pursued his motion *in limine*, and been successful in having Dr. Welner's testimony

excluded in its entirety, the government still had the similar testimony of Dr. Wetzel at its

disposal.  Dr. Wetzel's testimony would have been just as devastating.  Therefore, Fell cannot

show a reasonable likelihood that the result of his sentencing hearing would have been different

even if counsel had pursued his motion *in limine* to exclude Dr. Welner's testimony.

### a.  It Was Unlikely That the Court Would Have Excluded Dr. Welner's Testimony for Failing to Comply With the April 7 Order

Fell contends that Dr. Welner's report was excludable for failing to comply with the April

7 Order.  It is clear from the record that the Court concluded that, although the government had

not lied to the Court, nor misrepresented its belief that the April 7 Order did not preclude

additional testing or evaluation outside the interview of Fell, the spirit of its April 7 Order was

not followed because the evaluations conducted by Dr. Welner constituted "testing" and the

April 7 Order specifically required advance notice to the defense before testing.  *See* Opinion and

166

Order of April 24, 2006, Dkt. No. 236 at 21-22. However, it is far from clear that the Court's findings would have resulted in the exclusion of Dr. Welner's testimony. Indeed, analysis of the record favors a contrary conclusion.

As the penalty phase began, the record indicates that trial counsel was envisioning the presentation of mental health testimony. In its June 28, 2005 list of penalty phase witnesses, the defense listed both Dr. Mills and Dr. Cunningham. On July 1, 2005, counsel responded to the government's request for the notes of Dr. Mills, and advised the Court that Dr. Mills was on his way to Burlington and may take the stand that same day. Tr-VII-1 at pp. 4-5. Clearly the manner in which the lay witness testimony came in, as well as Dr. Wetzel's June 27, 2005 supplemental report, informed trial counsel's decisions in the midst of the penalty phase. Dr. Wetzel's all day forensic examination of Fell, conducted that same month, had been closely litigated and monitored by counsel for both sides. It was the only examination to be videotaped, and both sides received copies of the video. Both sides had, based upon Dr. Wetzel's initial, 2002 evaluation, listed him as a penalty phase witness. There can be no doubt that his new, more extensive report was immediately reviewed and considered. This is not uncommon in litigation, when ongoing evidentiary developments affect how and whether additional evidence is presented. The possibility of damaging expert rebuttal testimony is of necessity a serious consideration for trial counsel in deciding whether to present expert testimony. Such are the strategic decisions that a trial counsel must routinely and necessarily make.

Also on July 1st, the Court inquired as to whether Dr. Welner would take the stand in rebuttal. *Id*. at 13. Clearly the Court was expecting Dr. Welner to testify, although the scope of his testimony was undetermined. The record makes clear that it was unlikely the court would

167

exclude Dr. Welner's testimony entirely. The Court repeatedly expressed an inclusionary

approach to expert witnesses. When discussing the potential testimony of Dr. Mills following a

government objection because they had yet to receive his notes, the Court stated:

> I don't want to exclude his testimony. I don't want to unnecessarily restrict his
> testimony. It seems to me that the defense has a wide-open opportunity here,
> should have a wide opportunity to provide mitigating evidence. On the other
> hand, I want to make sure that the government is adequately prepared before he
> testifies, so, we will take a break. . . . and then I can address that as to whether
> there's a postponement or not.

*Id*. at 12. Rather than bar expert testimony, the Court favored postponement if a party needed

more time to prepare. Later on in that same exchange, the Court made clear its intention to allow

both sides to present their experts:

> *My intention is to provide both sides with the opportunity to present their experts
> openly and on everything that those experts want to testify to.* So, the logical
> solution would be, if you want to follow the order, is the experts for the defense
> testify, the government's experts testify, and then they in rebuttal testify.

*Id*. at 17 (emphasis added). When the defense announced that they were withdrawing Dr. Mills

from their case in chief, and would reserve him for surrebuttal, the court asked counsel, "So

you're going to reserve him for surrebuttal after Mr. Welner testifies, assuming it's Dr. Welner or

. . . ." Tr-VII-2 at 4. At the end of that day, the court again addressed the testimony of the

mental health experts:

> The other reason to – in which surrebuttal is appropriate in this case is in light of
> the fact that this letter is – the report is late, and as a result, *I'm not going to
> exclude Dr. Welner from testifying. There's a request that I exclude him. I'm not
> going to exclude him from testifying*, but in light of the late delivery of the letter, it
> seems to me that surrebuttal responds to that, so you'll have an opportunity to
> rebut as well as cross-examine.

*Id*. at 84 (emphasis added).

Therefore, it is clear from the record that the Court was not inclined to exclude expert

testimony from the penalty phase, including the testimony of Dr. Welner.  The Court addressed

the matter again in a discussion of scheduling:

> Well, you've got at a minimum Dr. Welner testifying on Tuesday, obviously if he
> chooses to testify – or you choose to call him, and then the defense has one or two
> other experts to come in surrebuttal.  That's assuming that you've gone through
> all of your eight witnesses whom you intend to call tomorrow.  And I don't know
> if you're going to short-cut those witnesses, as well.
>
> So – I don't even know who those witnesses are.  So I think it would be realistic
> to assume that we would go into Wednesday at a minimum for the evidence,
> which means, the way it's going, realistically summations and charge on
> Thursday.

Tr. IX-2 at (towards the end).

Even after the disclosure of Dr. Welner's report, and Fell's motion *in limine* to exclude

his testimony based on prosecutorial misconduct, the Court was still not predisposed to

excluding expert testimony and appears to clearly favor granting the parties additional time to

prepare to meet the testimony in court if necessary.

> THE COURT:  Well, you've had a chance to read, obviously, the report.  What
> are you proffering by way of a surrebuttal?  There's adequate case law.  A case
> called United States versus Barnette is just an example, Fourth Circuit, which
> says, of course, if you bring up things like psychopathology or antisocial
> personality in the rebuttal case, then the defense in a capital punishment case
> should be afforded a fair opportunity at surrebuttal.
>
> MR. BUNIN:  And we would do that if it came up.  Again, we're going to attack the
> underlying basis that it shouldn't even mentioned, but if you allow them to do that, then,
> yes, we should have surrebuttal. . . . .
>
> THE COURT:  I'd ask for the defense to come up with a memorandum describing
> their specific objections to what Dr. Welner would testify to.  I mean, I from the
> beginning, from day one, have suggested to both sides that they be afforded an
> opportunity, a fair opportunity, to put on expert witnesses, *and I'm hard-pressed
> to try to stop an expert witness from testifying*.  On the other hand, there are a lot

of things in Dr. Welner's report, I am told of new facts which would be prejudicial -- highly prejudicial and would need the defense to be given an opportunity to look into them. . . .

THE COURT: Okay. All right. Well, we've got to take it step by step. So tomorrow you'll have Dr. Cunningham. Before he testifies, we'll have a hearing. The government can elicit the objections that they have to his testimony. We'll try to go through all of those witnesses tomorrow. Friday the government's lay witness rebuttal and then Tuesday there will be expert witnesses, first from the government, second from the defense, and perhaps other surrebuttal from the defense.

Tr. VIII-2 at 71-74 (emphasis added). In view of the circumstances, and the above statements by the Court, it was not unreasonable for Fell's trial counsel to conclude that it was unlikely that all testimony by Dr. Welner would be barred, even if they pursued the motion *in limine*. *See* Declaration of Alexander Bunin, P. Exh. 264 at 8, Fell-00002467. In this regard, it is significant that Dr. Welner's testimony was not limited to the three tests completed on July 4, 2005, which the Court found to have been conducted contrary to its April 7 Order. Based on his own forensic investigation and testing conducted by other experts, Dr. Welner concluded, among other things, that Fell had ASP; that he was not significantly impaired when he killed King; and that there was no causal connection between his childhood trauma and the crimes he committed. *See* P. Exh. 10.[26] None of these opinions relied on the three contested tests. Therefore, Fell's argument that "[t]here would have been nothing for defense counsel to fear because there would have been no basis for diagnosis without testing" is incorrect. P. 140-141. It is uncertain at best whether the Court would have excluded those portions of Dr. Welner's testimony that relied upon the three tests he conducted himself, but it is unlikely that the Court would have excluded Dr. Welner's testimony with regard to the remaining portions of his report.

---

[26] Dr. Wetzel reached exactly the same conclusions in his June 27, 2005 report.

### b. It Was Unlikely That the Court Would Have Found Dr. Welner's Testimony Completely Unreliable and Lacking in Probative Value

Fell next claims that Dr. Welner's testimony was also excludable because it was unreliable. He argues that trial counsel was ineffective by failing to insist in his motion to exclude Dr. Welner's testimony pursuant to 18 U.S.C. 3593(c), which provides that evidence may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Yet again Fell ignores his counsel's strategic decision not to present expert mental health testimony. Most of the arguments now raised in sections V(B)(2)-(7) of the § 2255 motion were originally raised by trial counsel in his motion *in limine* to exclude Dr. Welner's testimony. *See* P. at 157. This shows that trial counsel weighed those arguments before making the strategic decision to withdraw the mental health case rather than litigate his motion.

Moreover, as demonstrated below, trial counsel's appreciation that the Court was unlikely to exclude Dr. Welner's testimony in its entirety was reasonable as none of the arguments advanced by Fell in his petition were likely to accomplish total exclusion. Therefore, in the midst of the penalty phase, trial counsel was faced with the decision to pursue his motion *in limine*, a process that would have taken several days in briefing and hearings and delay the presentation of his case in mitigation, knowing he was unlikely to succeed, or withdraw his mental health case to insure that he would not confront the testimony of Dr. Welner or Dr. Wetzel, and complete his mitigation case in an orderly manner. Trial counsel's decision to forego the motion *in limine* does not reflect *Strickland* error.

171

Even if the Court were to determine that trial counsel's decision to forego the motion *in limine* was error, Fell cannot show prejudice. Specifically, Fell cannot show that his motion *in limine* would have been granted. On the contrary, it appears unlikely that the Court would have excluded Dr. Welner's entire testimony as unreliable. Dr. Welner conducted a thorough forensic investigation into Fell's background, personally interviewing dozens of primary sources, and reviewing all of the prior mental health evaluations. In addition, he reviewed the hundreds of documents generated in the case, and all of the multiple recorded confessions. Dr. Welner lists 159 sources of information in his report. P. Exh. 10 at 3-8, Fell-00000624-29.

In *United States v. Mitchell*, 2009 WL 3837222 (D.Utah 2009), the federal capital case involving the kidnapping of young Elizabeth Smart, the court denied a defense mitigation phase motion *in limine* and found that Dr. Welner conducted a thorough forensic investigation.

> The court concludes that Welner's testimony meets the standards for admissibility under Rule 702. First, there is no basis for concluding that his testimony is not based on sufficient facts or data. In reaching his opinion, Welner reviewed and considered all of the materials available to the prior examiners. But, unlike the prior examiners, Welner considered a substantial amount of additional information including over 60 interviews with witnesses who had observed and interacted with Defendant, including the victim, hospital staff, family members, former coworkers, church leaders, and other friends and acquaintances. Welner's report lists 161 sources of information.

2009 WL 3837222 at 7.[27] The *Mitchell* court went on to commend the work conducted by Dr. Welner:

> Welner then prepared a report presenting relevant history, examination findings, diagnostic assessment, and explanation of the reasoning process used to formulate

---

[27] The government does not concede that Rule 702 applies to penalty phase proceedings. *See United States v. Fields*, 483 F.3d 313, 344-45 (5th Cir. 2007) (Rule 702 does not apply to the penalty phase).

his opinion. *This represents the best practices in forensic psychiatry and psychology.*

*Id*., (emphasis added). Dr. Welner did not deviate from those "best practices" in this case. There is no basis to conclude that the findings of the Court here would have caused it to bar Dr. Welner from testifying.

Dr. Welner rendered a number of mental health opinions in his 72-page report, including anti-social personality disorder, alcohol dependence, psychopathy, lack of impairment from alcohol during the commission of the murders, no mental illness, no cognitive impairments, no post-traumatic stress disorder as a result of sexual abuse; and genetic predisposition to alcoholism. It is highly unlikely that the Court would have found each of these opinions, many of which were shared by other experts in the case both for the defense and the government, unreliable. Therefore, counsel's decision not to pursue his motion *in limine* on this basis, even if deemed to have been an error, was not prejudicial.

### 2. Dr. Welner's Diagnosis of Psychopathy Was Not Per Se Excludable For Its Underlying Methodology or As an Unreliable Predictor of Prison Violence

Fell claims that Dr. Welner's diagnosis of psychopathy was inadmissible based on both the unreliable methodology he used to reach it and the fact that it has been proven to be an unreliable predictor of prison violence. Fell argues that his counsel was ineffective in failing to persist on his motion to exclude Dr. Welner's testimony on this basis. Fell admits that his trial counsel set forth both of these arguments in his motion *in limine* to exclude the testimony of Dr. Welner, indicating that counsel considered this line of argument. However, he then made a strategic decision to withdraw his mental health case and not pursue the motion.

173

At the outset, given the settled ASP diagnoses by Drs. Wetzel and Welner, and their other adverse findings, psychopathy testimony would not have added much to the weight of expert rebuttal testimony. In any event, Fell argues that Dr. Welner's administration of the PCL-R, the VRAG and HCR0-20 outside the presence of Fell, and "without acknowledgment of the concomitant reduction in the tests' reliability," was contrary to accepted psychiatric principles and ethically impermissible. P. 144. However, Fell cites no authority for the proposition that these tests cannot be administered outside the presence of the subject. In fact, according to the American Academy of Psychiatry and the Law, Ethics Guidelines for the Practice of Forensic Psychiatry at 3, cited by Fell in his petition, P. at 144, a mental health expert can administer these tests in absence of a personal examination, so long as they so indicate and note any resulting limitations to their opinions. *Id.* Dr. Welner complied with this directive, noting on his report that he had not been able to interview Fell. *See* P. Exh. 10 at 27.

Dr. Wetzel also states in his affidavit of September 12, 2005, that "[t]here is research in the literature that indicates that the [sic] *these three tests can be validly used without any interview at all*, if sufficient records are available." P. Exh. 139 at 17, Fell-000001464 (emphasis added). In *Fields*, *supra*, the Fifth Circuit upheld the admission of expert testimony notwithstanding the fact that the expert had not interviewed the defendant. 483 F.3d at 344 (*citing Barefoot v. Estelle*, 463 U.S. 880, 903 (1983) (expert can provide an opinion on future dangerousness although he did not examine defendant). The challenge to Dr. Welner's testimony

in this regard would have unlikely led to exclusion.[28]  Rather, such arguments would have been proper subjects for cross examination.

Similarly, Fell's claim that Dr. Wetzel's statement that the questions he posed during his interview of June 13, 2005 could not have formed a sufficient basis for the administration of these tests, and therefore, Dr. Welner could not have administered them in a reliable manner, is misleading.  In his affidavit, Dr. Wetzel indicated that he did not probe during his interview the subjects relevant to the Hare Psychopathy Checklist.  However, that did not foreclose the possibility that Dr. Welner obtained sufficient information on those subjects from other sources to allow him to reach an opinion.  For example, while Dr. Wetzel did not inquire about Fell's sexual promiscuity, Dr. Lipman did and Dr. Welner reviewed Dr. Lipman's report.  Dr. Welner also interviewed multiple family and friends of Fell.  A challenge to Dr. Welner's testimony in this regard was unlikely to lead to exclusion.

Fell also contends that a diagnosis of psychopathy is not a reliable predictor of an inmate's likelihood of committing violent acts in prison.  But in his report, Dr. Welner indicated that his diagnosis of psychopathy was but one factor considered.  Dr. Welner cited other studies, independent of the VRAG.

> One prison study independent of the VRAG and PCL-R found that violent prisoners were more likely to have a juvenile arrest history and a history of psychiatric hospitalization. They were less likely to be married. The violent prisoners were also more likely to have a history of violence by arrest or self-report, during the previous five years.

---

[28]  A contrary finding would constitute a new rule under *Teague v. Lane*, 489 U.S. 288 (1989).

P. Exh. 10 at 70.  In light of the fact that one of the Fell's proposed mitigating factors was that he

did not pose a danger to others in prison, it is unlikely that Dr. Welner's opinion in this regard,

supported by relevant authority, would have been excluded.  Moreover, Dr. Welner frankly

acknowledged that more progress needs to be made in the area of predicting future prison

violence:

> Ultimately, there is substantial risk that Mr. Fell will become violent in custody,
> based upon actuarial approaches.  The newness of establishing a methodology for
> ascertaining risk of violence in maximum-security institutions is relatively new,
> however.  Therefore, while Mr. Fell is a psychopath whose VRAG score is quite
> high, interpretations in this setting must allow for more progress to come in this
> area.

Challenges to Dr. Welner's testimony in this regard would have been appropriate subjects for

cross-examination, not a bar to testimony; such arguments would have been relevant to the

weight of Dr. Welner's opinion, not its admissibility.

Fell further argues that his trial counsel should also have moved to exclude the PCL-R

test based on the his age.  However, at the time of Dr. Welner's evaluation, Fell was a 25 year-

old male with no cognitive deficits.  Therefore, the general concerns with administering the PCL-

R to individuals at the lower end of the acceptable age range, that is, 18, were non-existent.

While it is true that the Court expressed concern about the prejudicial nature of a

psychopathy diagnosis, it does not follow that the Court would have excluded such evidence.  As

the Court noted at the time, citing *United States v. Barnette* in the Fourth Circuit, courts have

permitted testimony regarding psychopathy.  In *United States v. Lee*, 274 F.3d 485 (8th Cir.

2001), for example, the Eighth Circuit noted that a defendant's potential psychopathy was

probative of future dangerousness.  274 F.3d at 495.  In *United States v. Barnette*, 211 F.3d 803

(4th Cir. 2000), the court noted no error in the government's introduction of evidence that the defendant was a psychopath, but only in the court's denial of defense rebuttal evidence. 211 F.3d at 820-21. In *United States v. Dretke*, 99 Fed. App. 538 (6th Cir. 2004) (unpublished), the court noted no error in the admission of psychopathy testimony. 99 Fed. App at 541. In Fell's case, a diagnosis of psychopathy was not only relevant as to mitigating factor number five, which claimed that Fell was not a risk to others in prison, but also as to mitigating factor number eight, which claimed that he was remorseful for the murder of Terry King. It was also likely to be responsive if the defense called an expert mental health witness. There is little basis to conclude to any degree of certainty that this Court would have excluded psychopathy testimony.

Fell further argues that "Dr. Welner's testimony had been excluded in a number of cases." P. at 146. This statement is misleading, and continues the series of baseless attacks on Dr. Welner advanced by defense counsel during the trial. Fell cites a single case in support of his allegation, and a review of this case, *United States v. Sampson, supra*, reveals that Dr. Welner's testimony was not excluded, but only limited in certain respects. In *Sampson*, another triple homicide involving brutal, gratuitous killings, Dr. Welner testified that the defendant did not have a mental illness which significantly impaired him. 332 F. Supp.2d at 330. The *Sampson* jury credited Dr. Welner's testimony – not a single juror found mental illness. *Id*. The Court in *Sampson* did limit Dr. Welner's testimony, by not allowing him to use the term "psychopath." The Court explained that it took this measure in part because it believed the term would imply that the defendant was a future danger. Since Dr. Welner's conclusion was derived from his Rule 12.2 examination, the court reasonsed that the government could not use Dr. Welner's testimony in support of its aggravating factor of future dangerousness. 335 F. Supp.2d 166, 222

n. 27 (D. Ma. 2004). We have located no other case that has similarly excluded Dr. Welner's or any other expert's testimony of psychopathy on that basis.

Fell's reliance on *New Jersey v. Vandewaghe*, 177 N.J. 229 (N.J. 2003), is similarly misleading. *Vandewaghe* involved a defendant accused of murder who alleged that he was intoxicated the night of the murder and did not remember kicking his victim. A defense mental health expert testified at trial that defendant "was so overwhelmed by his alcohol intoxication that he was . . . not able to form the intent to kill . . . or to cause serious bodily injury." 177 N.J. at 234. The defense expert also testified that the defendant's intoxication did not permit a diagnosis of anti-social personality disorder. *Id*. Dr. Welner testified for the state. *Id*. With regard to the claim of severe intoxication, Dr. Welner concluded that because the defendant was an alcoholic, his drinking that night did not impair him – his system was accustomed to alcohol. *Id*. Dr. Welner also based that conclusion on the absence of random or disorganized behavior consistent with severe intoxication. *Id*. at 234-35. Further, Dr. Welner questioned defendant's claimed ability to recall only a select portion of the events on the night of the offense, indicating that an alcohol-induced blackout usually lasts for a few hours and involves "a lack of recall of everything." *Id*. at 235. Because he believed the defendant was not severely intoxicated by alcohol, Dr. Welner concluded that he acted purposefully when repeatedly kicking the victim. *Id*. Dr. Welner also testified that the defendant suffered from anti-social personality disorder. It was this latter part of Dr. Welner's testimony that the court concluded should have been excluded, not because Dr. Welner's opinion was unreliable, but because it was not relevant to a determination of *mens rea*. *Id*. at 240.

Fell cites one case, *United States v. Stitt*, 369 F. Supp.2d 679, 698 (E.D.VA. 2005), where the court found that the PCL-R was not a reliable predictor of violence in prison.  Yet numerous authorities approve of and rely upon that instrument for various purposes.  A sampling includes the following: *United States v. Mitchell,* 706 F. Supp.2d 1148, 1217-1220 (D. Utah 2010) (relying on PCL-R; "Psychopathy is a construct within Antisocial Personality Disorder that is noted in the DSM-IV, but is developed much more extensively in the scientific literature"); *United States v. Doe #3*, 113 F. Supp.2d 604, 608 (S.D.N.Y. 2000) (expert offers the PCL-R as "the single best predictor of person's future criminal recidivism"); "The Role and Relevance of the Psychopathy Checklist-Revised in Court – A Case Law Survey of U.S. Courts (1991-2004)," 12 Psychology, Public Policy, and Law 214 (2006) (first sentence: "The Psychopathy Checklist--Revised (PCL--R) (Hare, 1991, 2003) is considered to be the most valid and reliable instrument for measuring the construct of psychopathy in correctional and forensic psychiatric populations"); "'I'm Sorry I did it . . . But he Started it': A Comparison of the Official and Self-Reported Homicide Descriptions of Psychopaths and Non-Psychopaths," 31 Law and Human Behavior 91 (2007) (first sentence: "Psychopathy has become a major focus of research in psychology and law in recent years.  As defined by the well-validated Psychopathy Checklist-Revised (PCL-R; Hare, 1991, 2003) . . . ."); "The Construct of Psychopathy," 28 Crime and Justice 197 (2001) (Abstract: "psychopathy . . . can be reliably and validly measured . . . . Hare's Psychopathy Checklist-Revised is the best available assessment"); "Psychopathy and Responsibility," 90 V. Law Review 1423, 1429 (2004) ("There is currently a very reliable tool for identifying the presence of psychopathic personality – the Hare Psychopathy Checklist").

Notwithstanding Fell's protestations, psychopathy is a well-established construct, and there is little basis to attack Dr. Welner for considering it, or for concluding that trial counsel's failure to pursue its motion *in limine* to exclude Dr. Welner's testimony was error.[29] In any event, Fell cannot show prejudice. There is no reasonable likelihood that Fell would have prevailed in his motion.

### 3.  Dr. Welner Conducted An Objective Inquiry Into Fell's Background

Fell also claims that Dr. Welner's testimony was excludable because it was not objective. Fell alleges that Dr. Welner approached his interviews with an agenda, seeking to confirm his pre-determined hypothesis that Fell was psychopath. P. at 150. This argument is pure over-reaching and has no basis. From the dozens of interviews conducted by Dr. Welner, Fell references two: the interview of Fell's sister Teri, and Sean Campbell, Jackie Sharpe's boyfriend. With regard to these two interviews, Fell points to a single question posed to each subject. The record demonstrates that Dr. Welner spoke to both Teri Fell and Sean Campbell extensively. The question referenced was not the only question posed to either subject. Neither instance – nor any other evidence – demonstrates any bias or agenda on Dr. Welner's part.

### 4.  The Word "Psychopath" is Not Inherently Prejudicial.

Although not very clearly, Fell appears to argue that the word "psychopath" is inherently prejudicial, and had trial counsel pursued his motion *in limine* to exclude Dr. Welner's testimony about psychopathy, it would have been excluded under 18 U.S.C. 3593(c) because it was more prejudicial than probative. Significantly enough, Fell cites no case in which testimony of

---

[29]  A post-conviction ruling barring testimony of a diagnosis based on the PCL-R test would constitute a new rule under *Teague*, *supra*, 489 U.S. 288.

180

psychopathy was found to be inherently prejudicial and was excluded only on that basis. As set forth above, psychopathy is a well-researched construct relied upon by courts and psychologists for various purposes. Fell's only support stems from an affidavit submitted in another case. Again, absent clear jurisprudence that this particular challenge would have been successful, there is no basis to conclude that trial counsel was unreasonable in not pursuing his motion *in limine* to exclude the testimony of Dr. Welner. As set forth above, testimony about psychopathy has been admitted in numerous criminal trials. *See, e.g.*, *Lee*, 274 F.3d at 495; *Barnette*, 211 F.3d at 821-22 (reversed on other grounds); *Dretke*, 99 Fed.App. at 541; *Mitchell,* 706 F.Supp.2d 1148.[30]

### 5.  Dr. Welner's Report is Based on His Review of Historical Documents, Interviews of Fell and Personally Conducted Interviews of Reliable Sources of Information

Fell next claims that Dr. Welner's report and testimony was unreliable because he based many of his conclusions on interviews of unreliable sources. But Dr. Welner's report and the conclusions he reached were not based on interviews alone. As reflected by his list of sources, Dr. Welner relied on social service documents, hospital records, police reports, FBI interviews, interviews conducted by Dr. Welner himself, mental health examinations conducted by other experts, and recorded interviews of Fell and Lee. *See Mitchell*, 2009 WL 3837222 at 7 (Finding that Dr. Welner conducted a thorough forensic investigation.).

Second, among the individuals that Dr. Welner interviewed himself were Fell's sister Teri; his employers; his aunt Donna Williams; his girlfriend Lynn Roberts; his great-grandmother Jeanette Banas, with whom Fell lived for a while; his cousin Jesse Williams; and others. *See* P.

---

[30]  A contrary ruling post-conviction would constitute a new rule under *Teague*, which would foreclose any claim for relief by Fell.

181

Exh. 10 at 3-8, Fell-00000624-29.  Each one of these sources knew Fell well were appropriate

and reliable sources.  Indeed, it is hard to fathom how Teri Fell was reliable enough to testify on

behalf of Fell at trial, and provide a sworn declaration in support of the motion for post-

conviction relief, but not reliable enough to be considered by Dr. Welner.  Fell's argument in this

regard is disingenuous.  Fell also claims that Dr. Welner's interview of Stanley Kowalski was

unreliable because it was conducted at 11:00 pm.  This argument is similarly meritless on its

face.  Fell's arguments against the conclusions reached by Dr. Welner based on the interviews he

conducted are simply different interpretations of data, which do not support exclusion, but may

have provided avenues for cross-examination.

Third, it is significant that Fell argues when urging that trial counsel failed to provide

sufficient information to their experts that it is vital for mental health experts to have as complete

a social history as possible prior to rendering an opinion, yet attacks Dr. Welner for the broad

scope of his inquiry into Fell's social history.  Without a doubt the mental health expert in this

case who actually conducted the most complete forensic investigation of Fell's social history was

Dr. Welner.  Hence, from that stand point, his opinions would be arguably the most reliable.[31]

Nothing about the interviews conducted by Dr. Welner would have caused the exclusion of his

testimony to any degree of certainty.

---

[31] Fell's additional argument that Dr. Welner conducted some of his interviews in the presence of law enforcement agents, thereby intimidating his subjects has not merit.  His sole support for this argument is that one witness perceived Dr. Welner to have been "very CSI" because he handed him a business card.

Last, Fell claims that the government did not produce many of the FBI 302 reports corresponding to the interviews conducted by Dr. Welner. However, it is clear from the record that the government was in the process of providing discovery pursuant to Dr. Welner's report.

> MR. BUNIN: Is the -- when you're reviewing all this stuff, Judge, I want to bring to the Court's attention that -- and I may be wrong about a few of these, but he lists 159 sources of information, and I count 28 interviews that he refers to as discussions that we've never seen nor heard about underlying data for his basis. We never – there are people on here I've never heard of before. And then there are 22 persons who have been previously listed on the government's witness list before but they haven't called to date or they've taken them off the witness list, and it's not clear whether they're going to testify or not......

> MR. DARROW: Your Honor, we're -- I mean, it's interesting that counsels interested in the underlying notes of experts. I mean, as you know, we had a little difficulty getting them from Dr. Mills, and it wasn't until yesterday that we got the notes from Dr. Cunningham, which are extensive and refer to his interviews of multiple witnesses, some of whom we haven't heard of before. I mean, that's what shrinks, forensic psychologists in their case, psychiatrist in our case, is they go out and interview people, and we'll turn over all that stuff.

Tr. VIII-2 at 66-67. Thus, it is clear that the government intended to provide complete discovery. However, the next day, the defense withdrew their Rule 12.2 notice and entered into the mental health stipulation. Therefore, further discovery as to Dr. Welner's sources was unnecessary.[32]

---

[32] Fell further claims that much of the testimony of Dr. Welner was based on statements by third persons who were not witnesses at trial and admission of such statements would have violated the Confrontation Clause. But Dr. Welner's testimony would have been elicited in rebuttal, to respond to proposed mitigating factors; therefore, the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004), would not have been implicated. In any event, a contrary ruling post-conviction would constitute a new rule under *Teague*, which would foreclose any claim for relief by Fell.

### 6. Trial Counsel Was Not Ineffective In Failing To Move To Exclude Dr. Welner's Testimony Pursuant to *Estelle v. Smith*

Fell further claims that, in addition to the bases for exclusion delineated in sections V(B)(2)-(5) above, which were raised by trial counsel in his motion *in limine*, Dr. Welner's testimony was excludable pursuant to the principles announced by the Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 470-71 (1981), which provides that a defendant's Sixth Amendment rights were infringed by the government's secret forensic interview of a capital defendant, without the presence or knowledge of defense counsel, by a mental health expert who then testified at trial. Fell argues that if defense counsel is given notice of the government's experts and the tests they intend to conduct, a defendant could decide to withdraw his Rule 12.2 notice. Since Fell was not given notice that Dr. Welner would conduct the PCL-R, the VRAG and the HCR-20 evaluations, he was not provided an opportunity to consult with counsel about these tests. Hence, Fell argues that any testimony regarding any of these evaluations should have been excluded and his trial counsel was ineffective in failing to argue this basis for the exclusion of Dr. Welner's testimony.[33]

---

[33] Fell further claims that the government violated the April 7 Order by maintaining custody of Dr. Wetzel's interview of Fell because the "possibility" exists that they could have viewed Fell's interview prior to the end of the guilt phase. We note that the defense team was represented, with the government, outside the room in which Fell was interviewed. The defense raised no objection to the government maintaining custody of the single set of resulting videocassette tapes so as to have DVD copies made for counsel and the experts. In any event, there is absolutely no evidence that the government viewed Fell's recorded interview until after the guilty verdict was rendered and Fell's speculation to the contrary is nothing short of irresponsible. It is significant that he makes no attempt whatsoever to show how if in any way, assuming the government viewed the tape prior to a guilty verdict, any use of Fell's statements could have been made during the guilt trial.

*Estelle v. Smith* has no bearing on this case. The defense is *Estelle* did not even know about the interview. Here the interview was litigated. The forensic interviewer in *Estelle* gave surprise testimony and was not even on the government witness list. Here he was well known and did not testify. In *Estelle* the defense had not noticed psychiatric evidence; here Fell filed a Rule 12.2 notice. The Court in *Estelle* ruled that surprise introduction, during the penalty phase, of statements by the defendant to the government psychiatrist, violated the Fifth and Sixth Amendments because the defendant was without counsel, and was not warned, prior to the examination, that he had the right to remain silent and that any statements could be used against him at sentencing. Fell, on the other hand, was well aware that his statements would be disclosed to counsel for the government and could be used against him. In fact, he had been so warned prior to each of his mental health evaluations and had the opportunity to consult with counsel prior to the evaluations themselves. The Supreme Court has limited *Estelle*'s Fifth Amendment holding to the "distinct circumstances" of that capital case and has "never extended [that] holding beyond its particular facts." *Penry v. Johnson*, 532 U.S. 782, 795 (2001)(internal quotation marks omitted). Therefore, it is highly unlikely that Dr. Welner's statements would have been excluded pursuant to *Estelle*. Hence, counsel's failure to seek exclusion under *Estelle* was not error.[34]

Fell further claims that his counsel was ineffective in failing to move to exclude Dr. Welner's testimony regarding his ASP diagnosis to support the claim that Fell would be violent in prison. According to Fell, a diagnosis of ASP is not indicative of prison violence. But neither Dr. Wetzel nor Dr. Welner stated in their report that such a diagnosis indicated that Fell would be

---

[34] In any event, a contrary ruling post-conviction would constitute a new rule under *Teague*, which would foreclose any claim for relief by Fell.

185

violent in prison.  In addition, it was evident that ASP was relevant to other proposed mitigating

factors.  For example, a diagnosis of ASP would have been relevant to Fell's claim that he was

remorseful of his crimes or that his aggressive behavior was a result of his childhood trauma.  It

was also likely to be responsive to defense expert testimony.

Last, Fell claims that his trial counsel was ineffective in failing to review the reports of

interviews conducted by Dr. Welner, prior to deciding to withdraw his mental health case.  Fell

makes no attempt to show what information might have been in those reports that would have so

impacted his trial counsel's strategy and caused him to change course.  Moreover, it is clear from

the record that Fell's trial counsel had sufficient information to make an informed decision

whether to pursue its original trial strategy or not.  When faced with two very damaging reports

by two credible mental health experts, trial counsel made a reasonable strategic decision to

withdraw the mental health case.

> a.  Trial Counsel Was Not Ineffective In Agreeing to a Mental Health
> Stipulation

The government addressed this argument in Part IV(E)(1)(a), *supra*.

> 7.  Fell Cannot Demonstrate That He Suffered Prejudice As a Result of His Trial
> Counsel's Decision Not to Pursue His Motion *in Limine* to Exclude Dr. Welner's
> Testimony or To Withdraw His Mental Health Case

Fell argues that from the onset of the trial, counsel prepared the jury to hear expert mental

health evidence and specifically promised the jury that it would hear the testimony of Drs. Mills

and Cunningham.  He contends that trial counsel was ineffective in failing to follow through with

his motion in limine to exclude Dr. Welner and his promise to present a mental health case.

186

First, the record shows that counsel actually presented the underlying evidence at issue in his reference to Drs. Mills and Cunningham. Second, failing to call a witness announced to the jury is not in and of itself unreasonable. In determining whether or not trial counsel's decision was reasonable, the Court must consider trial counsel's decision in the context of the trial. Even if trial counsel had been successful in excluding Dr. Welner's testimony, which was unlikely, and presented mental health evidence, Fell would have confronted the testimony of Dr. Wetzel in rebuttal, who would have been just as damaging as Dr. Welner. It is no coincidence that trial counsel withdrew Dr. Mills before receiving Dr. Welner's report, but after receiving Dr. Wetzel's report.

### a. Dr. Mills's Testimony

Fell's trial counsel proved all that he told the jury he would prove through Dr. Mill's testimony. In his opening statement, Fell's trial counsel stated:

> We have indicated that there is going to be expert testimony, and there will be. Dr. Mark Mills is a psychiatrist. A medical doctor. That he has done testing and will give conclusions and essentially provide that Donnie was -- grew up in a deprived childhood with inappropriate social behavior, of truancy and fighting and constant intoxication. He is substancely (sic) addicted. From those hospitalization records, and other records he has reviewed, when Donnie was in the structured environment, with rules, away from intoxicating substances, he does well. He adjusts. He needs the structure.

Tr. V-I at 54. Trial counsel certainly proved that Fell grew up in a deprived childhood with inappropriate social behavior, truancy, fighting and constant intoxication. In fact, the government conceded in its closing summation that Fell had a terrible childhood. Tr. XII at 52. Moreover, the jury's Special Verdict indicates that counsel proved that Fell was institutionalized for mental health conditions; that his parents were violent alcoholics who abandoned him as a

187

child; and that Fell regularly abused alcohol and drugs from childhood until his arrest. The jury also found that Fell's total life experience and the failure of state social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior were also mitigating factors. See Special Verdict Form, Dkt. 200 at 12-17. Trial counsel further proved through Fell's hospitalization records, records from St. Michael's and the testimony of William Kane, that Fell functioned well in a structured environment, with rules and away from intoxicating substances. Tr. IX-2 at 13.

Fell now claims post-conviction that had trial counsel called Dr. Mills as a witness, he would have testified that Fell's highly deprived childhood resulted in early and recurrent inappropriate social behavior and intoxication, that his history and testing results indicated incipient psychosis or pre-psychotic breakdown, and that both his substance abuse and potential psychotic illness had strong familial and genetic components. In addition, Dr. Mills would have provided the jury with some psychological explanation for the behaviors demonstrated in Fell's hospitalizations records.

The government does not dispute that Dr. Mills would have testified consistent with his report and as stated above. However, as discussed above, trial counsel made an informed strategic decision not to present mental health evidence. Fell has not shown that if the jury had heard Dr. Mills's testimony, there is a reasonable likelihood that the outcome of the trial would have been different. Dr. Mills's testimony would have triggered the testimony of Dr. Welner or Dr. Wetzel, or both. Both would have testified that Fell had ASP, was not remorseful, and was not significantly impaired when he committed the capital crimes. They both would have testified that while Fell suffered trauma during childhood, there was no causal connection between that

188

trauma and the crimes he committed.  And both Dr. Wetzel and Dr. Welner would have testified that Fell knew the difference between right and wrong.  In light of the government's likely rebuttal, Fell cannot establish prejudice.

### b.  Dr. Cunningham's Testimony

Fell's trial counsel addressed the essence of what he told the jury would be proven through Dr. Cunningham's testimony.  In his opening statement, Fell's trial counsel stated:

> Dr. Mark Cunningham is a psychologist.  He will summarize research developments and events that involve adverse outcomes.  It will take some time to hear his testimony, maybe half a day.  And what Dr. Cunningham can do and will do is explain studies conducted by the Department of Justice that talk about the reasons, what are the causes of bad outcomes, and they are broken down into essentially two things.  There are risks factors, many of them mitigating factors that we are talking about, are those risk factors.  And there're protective factors. Protective factors are those things like a role model, like maybe a coach or something that gives someone guidance and teaches them.  The comparison of those risk factors and protective factors, you will hear those risk factors were plentiful in Donnie's life.  The protective factors were few or nonexistent.

While trial counsel never introduced the promised statistics from the U.S. Department of Justice, counsel did introduce evidence of risk factors present in Fell's life, as well as evidence of the absence of protective factors.  Counsel then argued that mitigation in closing.  As evidenced by the jury's finding in its Special Verdict, the risk factors present in Fell's life were not lost on the jury.  Expert testimony was not required for the jury to appreciate the effect of different risk factors such as physical and sexual abuse and alcoholism on Fell's life trajectory as evidenced by their findings on the Special Verdict Form.  *See* Dkt. No. 100.

Fell's primary mitigation evidence was his unfortunate childhood and his history of abusing controlled substances.  The defense introduced and argued from evidence relating to both

those mitigators.  In so doing the defense pursued the same theory that Dr. Cunningham would have advanced, without risking rebuttal testimony.

The value of Dr. Cunningham's opinion was dubious at best.  He was slated to testify as to the common sense thesis that a man is formed by his childhood.  As stated by Dr. Cunningham, his thesis considers "the nexus between adverse developmental factors and criminally violent outcome."  Cunningham Declaration, P. Exh. 6 at 5, Fell-00000449.  Dr. Cunningham's June 14, 2005 letter to defense counsel was similarly generic, although it at least contained a list of general "risk factors" present in Fell's childhood, such as "[e]arly and persistent antisocial behavior" and "favorable attitudes towards delinquent and violent behaviors." P. Exh. 5 at 2, Fell-00000440.  Ultimately, Dr. Cunningham's proposed testimony was that Fell's poor childhood impaired his ability as an adult to make sound moral choices and significantly increased the likelihood of violent criminal conduct.  That fact presumably diminished his culpability for the murders, because he had no control over his childhood.  That is the essence of Dr. Cunningham's testimony in dozens of capital cases and his two written opinions in this case.[35]

Defense counsel at trial made a reasonable and strategic decision to rely heavily during the penalty phase upon Fell's wretched childhood and adolescence.  The majority of defense witnesses testified in detail about that matter.  After jettisoning all mental health experts except

---

[35] As summarized by defense counsel at the July 27 preliminary hearing, as the childhood "damaging factors go up, the moral culpability goes down."  Transcript, "Hearing on Outstanding Issues - Monday, July 27, 2005," page 48.  Counsel withdrew Dr. Cunningham before the *Daubert* hearing, so his ultimate testimony is unknown.  However, that is the essence of his opinion in this and other capital cases.  *See*, *e.g., United States v. Lee*, 274 F.3d 485, 490 (8th Cir. 2001).

Dr. Cunningham, and successfully eliciting extensive testimony about Fell's background, the

question was whether to call Dr. Cunningham to opine that Fell had been formed by that

childhood (and was therefore less responsible for his adult crimes), or simply argue that point in

summation.  The latter course traded off significant risks for marginal gain (a psychologist

explaining a common sense conclusion).  The risks included damaging cross-examination of Dr.

Cunningham about Fell's immutable and aggravating adult nature, and also whatever rebuttal

expert testimony the Court deemed permissible, along with the damaging statements from Fell's

June 13 interview.  *See Lee, supra*, 274 F.3d at 495 (introduction of mental health expert in

defense opened the door to testimony concerning psychological diagnosis, including defendant's

potential psychopathy.).

Fell's ASP diagnosis was likely to be exposed to the jury if Dr. Cunningham testified,

either through his cross-examination or through rebuttal expert testimony (Dr. Welner or Dr.

Wetzel).  He undoubtedly did not want the jury to hear about that disorder.[36]  Yet the ASP

---

[36] According to the "Diagnostic and Statistical Manual of Mental Disorders," § 301.7 (4th ed. 1994), "[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood.  This pattern has also been referred to as psychopathy, sociopathy, or dyssocial personality disorder.  Because deceit and manipulation are central features [of ASPD], it may be especially helpful to integrate information acquired from systematic clinical assessment with information collected from collateral sources."  The DSM-IV's "Diagnostic Criteria" for ASPD looks for at least three of the following: (1) failure to conform to societal norms as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure, (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness, as indicated by repeated fights or assaults; (5) reckless disregard for the safety of self or others; (6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations; and (7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another."  *Id*.  Either government expert would opine (and Dr. Cunningham may have conceded) that there is no successful medical or psychological treatment for ASPD.  The latter fact also would have further undermined Fell's claim that he had

diagnosis was consistent with Dr. Cunningham's thesis. In fact, many childhood "risk factors" identified by Dr. Cunningham (such as "[e]arly and persistent antisocial behavior") are integral to ASP. Dr. Cunningham's proposed testimony would have invited a discussion of that diagnosis, both on cross-examination and rebuttal.

Precisely that prospect is illustrated in *Lee*, *supra*, where Dr. Cunningham testified on direct during a capital penalty phase consistent with his proposed testimony in this case: that circumstances during the defendant's childhood, including abandonment by his father, abuse by his stepfather, and neglect by his mother, as well as early use of alcohol and drugs, predisposed him toward criminal behavior. 274 F.3d at 490. On cross-examination, Dr. Cunningham was confronted with a variety of aggravating factors relating to risk assessment, a psychological diagnosis, and episodes of uncharged violence. That cross-examination was permitted by the district court and approved on appeal. *Id*. at 494-95.

> Even if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice. By introducing a mental health expert in defense, Lee opened the door to testimony concerning psychological diagnosis. Moreover, the FDPA provides for a broad scope of evidence at the penalty phase in a capital case. The district court did not commit error in admitting testimony concerning psychopathy on cross examination.

*Id*. at 495. *See also Barnette*, 211 F.3d 803, *supra* (permitting rebuttal evidence of psychopathy in response to mental health expert testimony by defense).

---

"matured" in prison.

192

Counsel's strategic decision to argue Dr. Cunningham's thesis, instead of calling him as a witness, was apparent in the defense summation. Introducing a detailed review of Fell's poor childhood, defense counsel told the jury:

> Now, we are going to talk a little bit now about generally the mitigating factors in, in Donnie's life. What – what shaped it. What shapes all of us. What makes all of us who we are and what guides our decisions day in and day out.
>
> We decided, your common sense and its life experiences, don't need to be – don't need to be redefined, or told to you by an expert psychologist. We trust you. We trust you to make that correlation, your life experiences on your own because we all have them.

Tr. XII at 83.

> Counsel also argued Dr. Cunningham's thesis in asserting:
>
> But what damaging factors are present in Donnie's case? We know what they are. And we are going to talk about them and how they affect his choice, and what happens if his moral culpability falls, and that's why, that's why he's entitled to a life sentence, because his, his basis, his being, how he was created, how he was at the time of these murders, was so damaged.

*Id*. at 69.

During summation counsel displayed to the jury slides (or visual aides) prepared by Dr. Cunningham (and reviewed by the Court during preliminary hearings regarding Dr. Cunningham). After counsel reviewed the testimony of multiple defense witnesses who described Fell's childhood, counsel argued that it was that childhood that formed Fell and resulted in the murders. "This is a story of lost chances. [Y]ou could just imagine if Susan [Benczkowski] could have taken her little baby brother home and raised him in her house with her mother. . . . We wouldn't be here today. He would have been loved, cared for, nurtured, not abused."

In sum, Fell's decision to forego Dr. Cunningham's testimony certainly was based upon consideration of the nominal benefits, and substantial risks, of opening the door to potential cross-examination and rebuttal expert testimony. By withdrawing his Rule 12.2 notice Fell precluded the jury from hearing government mental health evidence that was predominantly aggravating in nature. That was a reasonable strategic decision, even if it did not result in the verdict Fell sought. The post-conviction claim that Fell was prejudiced as a result of his counsel's decision to forgo mental health evidence simply cannot be sustained.

### c. Other Available Expert Testimony

Fell further claims that his trial counsel could have called Dr. Rabun, one of the original government mental health experts. Both of the original government mental health experts were on the witness list produced by Fell prior to jury selection. Therefore, Fell's trial counsel considered this option, but again, made a reasonable strategic decision not to call Dr. Rabun, and not to introduce mental health evidence. As discussed more fully in part V(7)(e), *infra*, any benefit Fell could have derived from Dr. Rabun's testimony, or indeed from the testimony of any of its mental health experts, would have been heavily outweighed by the government's mental health evidence.

### d. The Stipulation

The government addressed this argument in Part IV(E)(1)(a).

### e. Even if Dr. Welner's testimony Had Been Excluded, Fell Would Have Withdrawn his 12.2 Notice

Fell's retrospective claim, that he would have fared better at trial had counsel pursued his motion to exclude Dr. Welner's testimony and not withdrawn his mental health case, requires

194

evidence of resulting prejudice. *United States v. Miller*, 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera*, 900 F.2d 1462, 1472-74 (10th Cir. 1990) (en banc).  Fell cannot make such a showing.

In the penalty phase, the government was relying upon two mental health experts as possible rebuttal witnesses: Drs. Wetzel and Welner.  Both experts provided evaluations of Fell after the guilt phase verdicts.  Dr. Wetzel's supplemental evaluation was provided on June 27, and Dr. Welner's on July 5, 2005.  Both evaluations contained devastating information for the defense.  Although in his post-conviction petition Fell overlooks Dr. Wetzel's evaluation, it undoubtedly played a significant role in his decision to withdraw his Rule 12.2 notice.

The Court made very clear during trial that it would consider fully Fell's challenge to Dr. Welner's report at the scheduled July 11 *Daubert* hearing.  The Court directed the government to have Dr. Welner present for the hearing, and requested briefing.[37]  But the fact is, even if the defense had been successful at that hearing in excluding Dr. Welner's testimony in its entirety, which was unlikely, the June 27, 2005 report of Dr. Wetzel and his videotaped June 13, 2005 interview of Fell would have constituted highly damaging evidence if introduced in penalty.

Based upon the June 13, 2005 interview of Fell, Dr. Wetzel concluded that Fell:

– "Exaggerated the amount of alcohol used" on the night of the killings and "was not significantly impaired."

– "was generally the leader in his relationship with Bobby Lee."

---

[37]  "This is a brand-new area for me, and so we'll start . . . looking into it, but what I'm suggesting is that he [Dr. Welner] be here on Monday [July 11] . . . the jury will be coming back on Tuesday, and at that point we'll proceed, but I would like to address all of these issues."  Trial Transcript, Vol VIII, July 6, 2005, p. 72.

– "was not under the influence of a severe mental or emotional disturbance at the time of the crimes."

– was the victim of sexual abuse as a young child, but did not report any causal connection between the abuse and the murders, and "I agree – I also do not see a causal connection."

– was the victim of "repeated physical abuse as a young child," but "I do not believe there was a causal relationship between physical abuse and the murders of his mother and Mr. Conway," and "I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship."

– "meets the criteria for antisocial personality disorder fully. I have no doubt of this diagnosis."

Dr. Wetzel also concluded that:

– during childhood Fell's "mother made multiple ineffective attempts to control [his] behavior and guide him. He refused and she accepted this defeat perhaps too easily."

– "in my opinion with reasonable professional certainty, neither crack nor marijuana had any effects on the events of the day [of the murders]."

– there is "no sign of psychosis" and "no cognitive deficits detectable on neuropsychological testing."

*Id*.

In addition, through Dr. Wetzel, the government would have introduced portions of his videotaped interview of Fell on June 13, 2005 supporting his conclusions, including Fell's highly damaging statements, not the least of which concerned King's murder. Specifically, Fell claimed that he had only kicked Mrs. King two or three times in the torso, then averted his eyes as Lee inflicted the fatal injuries to her head. He contended that, given his lack of involvement in the killing, King's blood or DNA could not be on his boots. The presence of blood or DNA on his boots, Fell suggested, could be because he had "stepped in something weird" in another state.

196

Fell's false denial and explanation was refuted by the DNA expert's testimony, and Dr. Baden's testimony (who testified that all of King's injuries were inflicted on her head and neck). Fell made many other very damaging statements during his interview, including descriptions of the two episodes of prison violence proved false by the prison videotapes. Both government mental health experts, Drs. Wetzel and Welner, were impressed with Fell's lack of affect and detachment during his description of the three killings. *See* Report of Dr. Richard Wetzel, P. Exh. 7 at 2 ("His statements to the police do indicate a remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims."); Report of Dr. Michael Welner, P. Exh. 10 at 67 (Fell has demonstrated no more than superficial remorse for his actions).

Therefore, the record indicates that Fell's trial lawyers elected to forego mental health testimony, not just to avoid the testimony of Dr. Welner, but also to avoid the testimony of Dr. Wetzel. Indeed, as discussed above, Fell withdrew the testimony of Dr. Mills, before receiving Dr. Welner's report. Dr. Wetzel would have undermined several defense mitigators, and also opined that Fell had ASP. The latter diagnosis alone would have been devastating.[38] *See Darden v. Wainwright*, 477 U.S. 168, 186-87 (1986) (counsel's decision not to present character or

---

[38] Fell's appellate counsel, capital litigation expert Professor John Blume, has written several articles on how ASP is a diagnosis to be avoided in capital trials. *See* John H. Blume & David P. Voisin, "Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder," 24 Champion 69 (Apr. 2000) (antisocial personality disorder diagnosis "can be the kiss of death, because to many people, and most judges, this means that the defendant is little more than a remorseless sociopath").

mental-state evidence in mitigation was sound trial strategy because the mitigating evidence would have opened the door to damaging rebuttal evidence, which included a psychiatric opinion that the defendant had a sociopathic personality.); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (ASP diagnosis may be "potentially more harmful to [a] petitioner than [helpful]"). Trial counsel's strategic decision cannot be deemed to have been unreasonable.

Even if the Court were to determine that trial counsel's decisions to withdraw his mental health case and not to pursue his motion *in limine* to exclude Dr. Welner's testimony were unreasonable, Fell cannot show that there is a reasonable likelihood, in the absence of said errors, that the outcome of the trial would have been different.

## VI. THE GOVERNMENT DID NOT COMMIT MISCONDUCT AND TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE FURTHER TWO PRIOR ACTS OF VIOLENCE BY FELL

Fell asserts that the government introduced evidence of two prior acts of violence in the penalty phase prior to the Rutland killings: an accidental shooting of his friend, John Gacek, when Fell was 11 years-old ("the Gacek shooting"), and his beating of a young man, Christopher Eike, in Woodstock, N.Y., three months prior to the capital murder ("the Eike assault"). However, it was Fell who introduced evidence of the Gacek shooting through his hospitalization records, which were included in his Mitigation Binder. *See* MB Tab 25 at 1. In addition, the Eike assault was first mentioned by Fell himself in his post-arrest interview, and was inquired into by the government during the cross-examination of Teri Fell, a defense witness. Neither of these two incidents formed part of the government's case-in-chief in penalty and neither supported an aggravating factor alleged by the government.

198

Fell contends that the government's arguments and factual assertions during final summation with regard to these two incidents were false and that trial counsel was ineffective in failing to investigate these two incidents further and to correct the record. Fell further claims that he was prejudiced as a result because the jury failed to find "a number of critical mitigating factors, and gave fatal weight to aggravating factors." Neither claim has any merit.

A.  Trial Counsel Conducted a Reasonable Investigation of the Gacek Shooting

Fell's hospitalization records indicate that he was admitted to Wilkes-Barre General Hospital on April 14, 1992, two weeks shy of his 12th birthday and three days after shooting a friend, John Gacek, with a handgun. The summary of the events contained in the hospital records makes clear that the shooting was accidental.

> Three days ago, Donald and his friend were playing with a 9mm. police handgun which belonged to the other boy's father. The gun went off while Donald was holding it and the other boy was hit in the shoulder. Fortunately, he suffered no major injury; a few inches; and the other boy would have been dead with a bullet in his heart. The patient shows no remorse and even threatens to shoot his mother.

MB Tab 25 at 1. The hospital records also reference other instances of violence by Fell, including punching his sister's 11 year-old girlfriend and chasing his mother with a curtain rod. In addition, according to his mother, Fell kept knives in his room, and she was fearful that he would use them on her. Fell received a preliminary diagnosis of atypical depression and disturbance of conduct and remained in the hospital until May 2, 1992. While hospital records indicate that Fell remained defiant and oppositional during his first week at the hospital, they also indicate that Fell later apologized to his mother for his behavior and expressed sincere remorse for shooting his friend.

199

> During his family sessions, his mother confronts him with his behavior problems. At first he was oppositional and defiant but later on he became very cooperative and apologized profusely to his mother for his prior disrespectful behavior. When confronted with the shooting of his friend, he cries and seems to show genuine remorse.

*Id*. at 2.  By the end of his hospital stay Fell was doing significantly better.  The hospital records again note:

> He seems genuinely sincere about listening to his mother who seems able to set firm limits.  Donald says he will never play with guns again.  His friend forgives him for shooting him.  *Donald seems to greatly regret the incident* whereas as at first he bragged about shooting the other boy. . . .  At the time of discharge, *patient showed genuine remorse* for shooting his friend.

*Id*.  (emphasis added).  Therefore, the hospital records made clear that Fell was remorseful for shooting Gacek.

Hence, contrary to Fell's claim in his petition, trial counsel placed before the jury evidence that established the circumstances of the shooting – that it took place while Fell was playing with a handgun and that the discharge was accidental.  Nothing in the information presented to the jury indicated that Fell "deliberately" shot his playmate.  The only evidence of deliberateness that could have been surmised by the jury actually came from Fell himself, who, during his post-arrest statements, described the Gacek shooting as an accident, but admitted that he had intentionally pulled the trigger, though not intending to hit his friend.

> What happened was we were little kids and he said you want to see my dad's gun, and I said yeah?  So we looked at his dad's gun and I mean his dad kept the gun in the kids' bedroom door, loaded with two little clips, and it wasn't even on safety. I took the clip out and pointed at the wall and I didn't know nothing about guns or anything about one being in the chamber or anything like that you know what I mean.  I pulled the trigger and he jumped in the way and it went through his shoulder.

P. Exh. 62 at 44. Trial counsel also placed evidence before the jury that established that after treatment and counseling Fell expressed sincere remorse for the shooting.

>        1.  Trial Counsel Was Not Ineffective In Failing to Investigate Further the Gacek Shooting

Notwithstanding the evidence presented at trial, Fell claims that his trial counsel was ineffective in failing to investigate further the Gacek shooting. According to Fell, John Gacek, his mother, Adele Gacek, her boyfriend, Ernie Schudalski, and Gacek's father, Kenneth Gacek, all would have spoken to trial counsel if he had called upon them. But a review of the declarations provided by each of these individuals reveals nothing more about the Gacek shooting than what trial counsel already knew from Fell's statements and hospital records. *See* Declaration of John Gacek, P. Exh. 251, at 4-5; Declaration of Adele Gacek, P. Exh. 252 at 4; Declaration of Ernie Schudalski, P. Exh. 252 at 2.[39] These witnesses would have simply provided the same information that was presented to the jury, but from a different point of view. *See* section III(B)(1)(b)(I).

Fell tries to bring this incident within the purview of *Rompilla*, *supra*, where the Court held that trial counsel's failure to review the case file pertaining to a conviction that the government would rely on as an aggravating factor was unreasonable. 545 U.S. at 390-91. However, Fell's case can be distinguished in two very significant ways. First, the Gacek shooting was not being used by the prosecution as an aggravating factor in the penalty phase. The government relied on three statutory aggravating factors in penalty: that the death of Teresca King occurred during the commission of a kidnapping; that Fell committed the offense in an

---

[39] No declaration for Kenneth Gacek was submitted by Fell.

especially heinous, cruel or depraved manner in that it involved physical abuse to Teresca King; and that Fell attempted to kill more than one person in a single criminal episode. *See* Special Verdict, Dkt. No. 200. Clearly the Gacek shooting by Fell at age 11 would not have been even arguably admissible to prove any of the three statutory aggravating factors, and indeed, the government did not submit evidence of the Gacek shooting in its case in chief in penalty. The government also relied on four non-statutory aggravating factors: that Fell committed the abduction of Teresca King to facilitate his escape from an area where he and his accomplice had committed a double murder; that Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities; that Fell participated in the murder of Teresca King after substantial planning and premeditation to commit the crime of carjacking; and that Fell caused loss, injury and harm to the family of Teresca King. Again, the Gacek shooting by Fell at age 11 would not have been admissible to prove any of the four non-statutory aggravating factors and the government did not rely on it. Therefore, trial counsel would have only had to deal with evidence of the Gacek shooting if he presented evidence of it in penalty, which he did.

Second, trial counsel here was aware of the relevant facts surrounding the Gacek shooting both from hospital records and from the statements of Fell himself. These two sources of information provided trial counsel with the circumstances of the offense and Fell's actions immediately thereafter. There was simply no need to investigate further.

2. Trial Counsel's Performance Was Not Deficient and Fell Suffered No Prejudice

Fell claims that he was prejudiced by his counsel's failure to investigate the Gacek shooting further. But as demonstrated above, further investigation by trial counsel would not have revealed additional evidence or changed the profile presented to the jury at sentencing. Fell further claims that he was prejudiced by his counsel's failure to correct the record with regard to the fact that the Gacek shooting was accidental and that Fell was remorseful. But again, as demonstrated above, the record is clear on both of these factors. That counsel could have submitted additional (cumulative) evidence, but did not, is insufficient to establish prejudice.

Fell also argues that the government used the Gacek shooting to impress upon the jury that he was a violent and not a remorseful person. In the wake of the three 2000 murders, that argument was fully supported by the evidence. Moreover, Fell's increasing violence was established by numerous other examples in the hospitalization records. His summary discharge from his first hospitalization on October 30, 1991, stated that one of Fell's problems was behavioral. He was reportedly "assaultive, combative, destructive, oppositional, defiant, impulsive, and running away." MB tab 22 at 4. Fell was hospitalized a second time after the Gacek shooting. MB Tab 25 at 1. Upon his admission it was noted that "[t]he patient shows no remorse and even threatens to shoot his mother." *Id*. The records also referenced other instances of violence by Fell, including punching his sister's 11 year-old girlfriend and chasing his mother with a curtain rod. In addition, according to his mother, Fell was keeping knives in his room and his mother was fearful of him. *Id*. During his third hospitalization, Fell was found to be "impulsive, demanding [and] manipulative. . . . He is defiant and oppositional toward authority .

203

. ." MB Tab 29 at 1. Fell was psychiatrically hospitalized a fourth time for increasing violent behavior and depression. MB Tab 30 at 1. Fell admitted throwing a fork at a friend, though he claimed not to have intended to hit anyone and was staying out beyond his curfew contrary to his mother's directions. MB Tab 32 at 1-2. Therefore, the government's argument that Fell was becoming increasingly violent was fully supported by Fell's own evidence.

Nothing in the evidence proposed by Fell post-conviction would have detracted from the government's argument or contradicted it beyond the hospitalization records or Fell's own statements. Moreover, calling additional witnesses to testify about the Gacek shooting would have shifted the focus of the jury away from Fell's detrimental childhood and toward his increasingly violent conduct. This would have been wholly inconsistent with Fell's trial strategy. Therefore, even if the court were to determine that trial counsel's failure to investigate the Gacek shooting further was unreasonable, Fell cannot establish prejudice. Nothing about the newly proffered evidence leads to the conclusion that, but for trial counsel's error, a reasonable probability exists that Fell would have received a more favorable verdict.

B. The Government Did Not Misrepresent Eike's Condition or Withhold Evidence and Trial Counsel Was Not Ineffective in Failing To Investigate Further the Eike Assault

During the testimony of FBI Special Agent Jimmie Caudle, on the second day of trial, the government asked Agent Caudle to tell the jury about the statements Fell made during his first post-arrest interview with law enforcement. Among the things that Fell mentioned was the Eike assault:

> Fell also advised that, that he had gotten into some legal trouble at the most recent Woodstock Festival. Lee had accompanied Fell to the, to the Woodstock Festival. And there was an incident where, as Fell described it, he quote beat the shit unquote or end quote out of an individual who he said was trying to rape his

204

sister.  Lee advised that he put the guy in a coma for about a day and that charges were eventually dropped against Mr. Fell.

Tr. II-1 at 3.  No further mention of this incident was made during the guilt phase of the trial.  In addition, as with the Gacek shooting, the Eike assault did not form part of the government's case-in-chief in penalty, nor did the government rely on this incident to prove any of its aggravating factors.

In the penalty phase, the defense called Fell's sister, Teri Fell, to the stand.  Consistent with their trial strategy, the defense solicited testimony from Teri Fell about her and Fell's horrific childhood, providing examples of alcoholism, physical abuse, neglect and abandonment.  In cross-examination the government inquired about Fell's violence, including the Eike assault.

Q    Was there a time when you also saw your brother be very angry and use his feet?
A    What -- I'm not sure what you are referring to?
Q    Did you ever see him kick someone violently?
A    Yes.
Q    What did you see him do?
A    He beat a kid up and he was kicking him.
Q    How serious was it?
A    It was pretty serious.
Q    Did the kid go into shock and into a coma?
A    Yes, he did.

Tr. VII-1 at 144.

Q    And in terms of what your brother did to this person, did he do anything other than stomp on the person?
A    He punched him.
Q    Did he urinate on him?
A    Yes.

*Id*. at 151.

On redirect, the defense established that Fell, his sister, Bobby Lee, Eike and a few more people had driven up to Woodstock for the yearly festival and were doing drugs.  Teri Fell stated

that they were doing acid and mushrooms and that Eike was not reacting well to the drugs. *Id*. at

153.

> A    He was freaking out a lot, and he was hanging on me, and he kept trying to kiss me and he kept hanging on me and I kept asking him to leave me alone.
> Q    Was he grabbing your body with his hands?
> A    Yes.

*Id*. According to Teri Fell, she told Eike that if he did not stop, she would have Donnie beat him

up. *Id*. a154. Eike did not stop, and then Fell asked him to stop and, according to Teri Fell, Eike

punched Fell in the face and the fight started. *Id*. at 154-55. Teri Fell testified that Eike was hurt

very badly. *Id*. at 155. Trial counsel then focused his inquiry on Fell's conduct after the assault.

> Q    When the police asked who did it, did Donnie deny it?
> A    No, he didn't.
> Q    Did he resist the police?
> A    No.
> Q    Did he run away from the police?
> A    No.
> Q    Did he tell them what he had done?
> A    Yes.
> Q    Did he get -- did he go into custody?
> A    Yes.
> Q    And do you remember what day of the week that was?
> A    No, I don't.
> Q    Do you remember whether or not he went to jail for that?
> A    Yes, he did.

*Id*. at 155-56. The government did not re-cross-examine Teri Fell with regard to the alleged

motive for the assault on Eike, but asked again about the manner in which Fell had committed

the assault.

> Q    Was it clear that the person was defenseless?
> A    Yes.
> Q    And he kept kicking him?
> A    Yes.
> Q    Now, he began to shake, right, on the ground because of the shock?

206

A    Yes.

Q    And so at that point, he was unconscious and trembling on the ground?

A    Um hum.

Q    And your brother urinated on him?

A    Yes.

*Id*. at 159.

The prosecution used the Eike assault to argue against giving weight to the mitigating factor that claimed that Fell was 20 years-old when he committed the capital crimes.

> Yes, he was 20, ladies and gentlemen.  He was an adult.  If you want to know what kind of an adult he was, want to know what kind of person he is?  Look at those videos from prison.  That's Donald Fell.  That's the man that he was.  And if you have any questions about whether he was a man when he committed those crimes, think back about the testimony from Teri Fell.  You remember when I cross examined her about an incident that occurred in August of 2000?  August of, just a few months before the crimes in this case.  What did she tell you?  Donald Fell committed a horrible, violent assault on a person the same way he then later killed Terry King.  He did it intentionally.  He did it violently.  And he did it with the utter depravity that you have heard about in this case.  He did it in that case.  Remember what he did after he beat that man with his feet  into a coma.  Those are the acts of a man.

Tr. XII at 60.  No other mention of the Eike assault was made in closing summation.  And it is significant that the emphasis of the government's argument was not on the resulting injuries, but on the manner in which the assault was committed – "*[a]nd he did it with the utter depravity* that *you have heard in this case*" – bringing the jury's attention to what Fell did after he assaulted the young man.  Of course, the evidence had shown that Fell urinated on his victim after the assault.

In rebuttal, the government again made reference to the Eike assault in support of its argument that Fell was an extremely violent person who showed little if any remorse:

> There's another thing that distinguishes Donald Fell from other murderers.  And that is his over-the-top violence, and his disdain for his victims after he subjected them to that violence.  It wasn't enough for Fell to kill one person.  Three had to die.  And they all died hard. It wasn't enough for him, in New York, in August 2000, to knock that guy down and to stomp him into a coma.  Then he urinated on

207

him as the guy lay convulsed. It wasn't enough for him to chill -- kill Charlie Conway; had to stab him 50 times and cut his throat. It wasn't enough for him to see his mother murdered, right next to him in the same room, right next to Charlie Conway. She was stabbed 40 times. And then she said, "I love you, Binker," with her dying breath, before her throat was cut back to her vertebrae. And it wasn't enough for Fell to kill Terry King. He had to stomp her, he had to kick her, he had to watch his friend Bobby Lee beat her head with a rock. And when they were done with her, wiped his boots on her. Again, it is amazing.

*Id*. at 124.

Fell claims that the government's characterization of how he left Eike, in a "coma," was false. Yet it was Fell who first that word to characterize the condition of his victim, and his sister Teri used it as well in her testimony. The Merriam-Webster Dictionary defines "coma" as a state of profound unconsciousness caused by, among others, injury. The record shows that Fell and Lee kicked Eike until he lost consciousness and was unresponsive. Teri, an eye witness to the assault, so testified. Similarly, the first officer responding to the scene described Eike's condition as follows:

> The victim was incoherent, shaking, and had contusions and deformities on his face. I requested an ambulance respond to the scene. I asked the victim his name and got no response from him and bystanders told me his name was Chris. I began to treat the victim for shock. Applied 15 LPM O2 via nonrebreather. Covered patient with emergency blanket. Victim began to make noise. I asked him where he hurt and he said he couldn't feel his body.

P. Exh. 56; Fell-00000928 (emphasis added). Hence, the government's characterization of Eike's state as a coma, consistent with Teri Fell's and Fell's characterizations, was not false. That Eike later regained consciousness does not negate his unconscious state immediately following Fell's assault.

Moreover, Fell's trial counsel was not ineffective in failing to investigate further the Eike assault. Fell's and Teri Fell's statements provided counsel with the information he needed to

confront this evidence. In addition, any attempt to argue that Eike's injuries were not as serious as they appeared would have been wholly inconsistent with Fell's defense strategy to portray Fell as a remorseful individual, who had accepted responsibilities for his actions.

1. Background

a. Pre-Trial

The government does not dispute that trial counsel was aware of the Eike assault from the beginning of the case as Fell described the assault during his post-arrests statements, including the claim that Eike had tried to rape Teri. *See* P. Exh. 57. The government also disclosed to the defense a copy of the New York State Incident Report, as well as statements given by Fell and Lee to the Sullivan County Sheriff's Department. P. Exhs. 84 and 86. Trial counsel also interviewed Teri about the incident. Moreover, the defense investigator obtained a copy of the Certificate of Disposition for Fell. P. 184-85. In addition, the government provided copies of statements given by Teri Fell, Lee's brother Anthony Tonte, and Lance Rowland following the incident and copies of the charge sheet and the Certificate of Disposition for Lee. P. 184 note 57. The government also provide trial counsel with a report of interview of Christopher Eike. Eike confirmed that he was beaten unconscious and came to in the ambulance on the way to the hospital. *See* P. Exh. 129. Therefore, trial counsel had sufficient information about the Eike assault to prepare to confront evidence of it at trial.

b. Trial

As stated above, the only mention of the Eike assault during the guilt phase of the trial was by FBI Special Agent Caudle who summarized Fell's first post-arrest statement to the jury. Fell also described the Eike assault during later post-arrest interviews. During the penalty phase,

209

the government cross-examined Teri Fell about this incident.  On cross-examination, Teri admitted that Fell punched and kicked Eike violently and that he went into a shock and coma, Tr. VII-1 at 146, and that Fell urinated on Eike as he lay unconscious on the ground.  *Id*. at 151. Fell's trial counsel clearly established on re-direct that Fell's assault on Eike was provoked by Eike's unwanted sexual advances towards Fell's sister Teri.  *Id*. at 153-54.  Trial counsel also established that Fell accepted responsibility for his actions.  *Id*. at 155.

### c. Post-Conviction

Fell argues post-conviction that there was more documentary evidence – notes and reports from the Sullivan County Sheriff's Department, Eike's medical records and Eike's criminal records – regarding the Eike assault that was neither produced by the government nor obtained by trial counsel.  Fell claims that these documents would have demonstrated that Eike's injuries were not serious and would have corroborated Teri Fell's claim that the assault by Fell was provoked by Eike's unwelcomed sexual advances towards Teri.  The government does not dispute the existence of such documents.  However, Fell fails to demonstrate that these additional documents were in the hands of the government – they were not.  The FBI ran an NCIC criminal record check on Eike, which revealed that in July 2001 Eike was arrested by the Pennsylvania State Police for indecent assault and corruption of minors.  *See* Exhibit F attached hereto.  The NCIC did not list a disposition, but it appeared that Eike had been sentenced to a term of probation.  *Id*.  The government, however, did not have any additional documents pertaining to Eike's criminal record, such as affidavits, certificate of disposition, etc.  In any event, the additional information contained in these documents would not have changed the character of the evidence submitted at trial.

2.  The Government Did Not Fail To Disclose Favorable Evidence and Trial Counsel's Decision Not To Investigate Further Was Reasonable

Fell claims that the government failed to disclose Eike's criminal record, which he claims was favorable evidence, and trial counsel failed to investigate the Eike assault further in violation of his constitutional rights.

a.  The Government Did Not Fail To Disclose Evidence and Trial Counsel Did Not Fail To Investigate

i.  The Government Did Not Fail to Disclose Brady Evidence

The record completely belies the allegation that the government failed to disclose favorable evidence in violation of *Brady*.  There is no evidence whatsoever that the government was in possession of any of the documents obtained by Fell post-conviction, to wit, notes from the Sullivan County Sheriff's Department, Eike's medical records and documents pertaining to Eike's criminal record.

In *Brady v. Maryland*, the Court held that the government has an obligation to disclose evidence that is favorable to the accused and material to guilt or punishment.  373 U.S. 83, 87 (1963).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  To establish a *Brady* violation, petitioner must establish three elements: 1) that the evidence at issue was favorable, either because it was exculpatory, or because it was impeaching; 2) the evidence must have been suppressed by the government; and 3) prejudice must have resulted. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Nothing in the information obtained by Fell post-conviction was favorable.  Further, it is clear from the record that the government was not in possession of the documents obtained by

211

Fell post-conviction. Indeed, Fell makes not attempt to demonstrate otherwise. It is well-established that the government has no obligation to disclose evidence not in its possession. Therefore, Fell has failed to demonstrate a *Brady* violation.

Fell also argues that because "the Government argued the supposed gravity of that offense as a reason for which Mr. Fell should be sentenced to death, any evidence to the contrary was favorable to Mr. Fell's sentencing." P. 192. This is simply not true. The Eike assault was not an aggravating factor that the government relied on to request a sentence of death. During the cross-examination of Teri Fell the government inquired about the Eike assault in order to demonstrate that, not withstanding the mitigating background evidence, Fell was an extraordinarily violent man long after his mother abandoned him. In its closing summation the government made a single reference to the Eike assault when arguing against the weight of mitigating factor number 16, which claimed that Fell was 20 years old at the time of the offense. The emphasis of the government's argument was not on the resulting injuries, but on the manner in which the assault was committed – "[a]nd he did it with the utter depravity that you have heard in this case" – bringing the jury's attention to what Fell did after he assaulted the young man, that is, urinating on him.

Last, in rebuttal the government again made reference to the Eike assault in support of its argument that Fell was an extremely violent person who showed no remorse. Again, this argument was consistent with the government's trial strategy to portray Fell as violent and remorseless. The Eike assault was thus evidence that weighed against a mitigating factor and rebutted mitigation evidence.

212

ii.  Trial Counsel's Investigation of the Eike Assault Was Reasonable

The additional information proffered by Fell post-conviction would not have changed Fell's trial strategy; therefore, trial counsel's decision not to investigate the Eike assault further was reasonable.  *See* Section VI(B)(1)(a), *supra*.

b.  The Additional Information Proffered by Fell Post-Conviction Is Not Material and Fell Suffered no Prejudice

First, Fell makes much about the fact that the government characterized Eike's condition after he was assaulted by Fell as a "coma," and claims that this statement by the prosecutor was false.  We note in the first instance that both Fell in his post-arrest statements and Teri Fell in her trial testimony characterized Eike's condition as a "coma."  Moreover, as stated above, a "coma" is defined as a state of profound unconsciousness, which can be caused by injury.  The record indicates that Fell definitely beat Eike to the point where he lost consciousness and was unresponsive.  Hence, the government's adoption of Fell's own characterization of Eike's state as a "coma" was not false.

More importantly, examining Terry Fell further about whether or not Eike was actually beaten into a coma, or calling other witnesses to the stand to establish whether Eike was beaten into a coma or not, or for how long he remained unconscious, would have been wholly inconsistent with Fell's defense in penalty, not to mention strategically self-destructive.  From the beginning of the trial, a key component of Fell's theory was that he was remorseful and had accepted responsibility for his actions immediately upon arrest, and continued to accept responsibility at trial.  Whatever trial counsel could have accomplished with regard to establishing that Eike was not left in a coma, he could not have established that Fell did not

213

punch Eike; he could not have established that Fell did not kick Eike with combat boots, continuing to kick Eike even after he was on the ground defenseless; he could not have established that Eike did not go into shock and lost consciousness as a result of Fell's assault; and he could not have established that he did not urinate on Eike. Therefore, the only issue trial counsel could have contested was for how long Eike lost consciousness and whether it had been long enough to be called a "coma."[40] Extending the testimony and discussion of this incident merely to establish this last point was simply not in the best interest of Fell during the penalty phase. Even assuming, without conceding, trial counsel could have won a small battle, he could have never won the war and likely would have impaired his overall war strategy. The fact is that, just three months before the brutal murder of Terry King, Fell had beaten another individual, in the same manner as he beat Terry King to death, to the point where that individual lost consciousness and had to be taken to a hospital. Contesting the use of the word "coma" would have prolonged the discussion of the incident and opened the door for the government to bring in the description of the victim's injuries. To illustrate our point, the first officer who responded to the scene described the victim's injuries as follows:

> The victim was incoherent, shaking, and had contusions and deformities on his face. I requested an ambulance respond to the scene. I asked the victim his name and got no response from him and bystanders told me his name was Chris. I began to treat the victim for shock. Applied 15 LPM O2 via nonrebreather. Covered patient with emergency blanket. Victim began to make noise. I asked him where he hurt and he said he couldn't feel his body.

P. Exh. 56; Fell-00000928.

---

[40] The government notes that Fell submits no evidence that a victim needs to have lost consciousness for a long or specified period of time before he/she can be said to be in a coma.

214

Indeed, trial counsel strategy was clearly to shift the jury's focus from the assault to Fell's acceptance of responsibility. On re-direct, he asked Teri Fell,

Q    When the police asked who did it, did Donnie deny it?
A    No, he didn't.
Q    Did he resist the police?
A    No.
Q    Did he run away from the police?
A    No.
Q    Did he tell them what he had done?
A    Yes.
Q    Did he get -- did he go into custody?
A    Yes.
Q    And do you remember what day of the week that was?
A    No, I don't.
Q    Do you remember whether or not he went to jail for that?
A    Yes, he did.

Tr. VII-1 at 155-56. There was nothing unreasonable about trial counsel's strategy. Moreover, there is no reason to conclude that the outcome of the trial would have been different had counsel challenged the use of the word "coma," or introduced medical evidence of Eike's injuries. Fell clearly suffered no prejudice.

### 3. The Government Did Not Engage in Prosecutorial Misconduct

Fell also claims that the government's characterization of Eike's condition as a "coma" in final summation and rebuttal was false and constituted prosecutorial misconduct. First, any such claim is procedurally barred as Fell could have, but failed to raise this claim on direct appeal. *See* Section II(B)(3), *supra*. He cannot show any cause for having failed to raise this claim on direct appeal, much less make a showing of resulting prejudice. Second, for the reasons set forth above, the government submits that its characterization was not false.

    4. <u>The Government Did Not Withhold Evidence That Eike Was A Sex Offender and Trial Counsel's Failure to Investigate Further In That Regard Was Not Unreasonable</u>

        a. <u>Allegation of Non-Disclosure and Failure to Investigate</u>

            i. <u>The Government Did Not Fail to Disclose Evidence that Eike Was a Sex Offender</u>

Fell further argues that the government withheld evidence pertaining to Eike's criminal history indicating that he was a convicted sex offender. The government did conduct an NCIC check that indicated that Eike had been arrested for indecent assault and corruption of minors. *See* Exhibit F hereto attached. The NCIC did not provide a disposition, but it appeared Eike was sentenced to probation. That information, however, was not included in the report of interview of Eike provided to the prosecutors, and as result, not conveyed to the defendant. *See* P. Exh. 128.

First, the government submits that this claim is procedurally barred as Fell could have, but failed to assert this claim prior to trial and on direct appeal. *See* Section II(B)(3), *supra*. The government disclosed an interview report dated June 15, 2005, prior to trial. That interview report indicated that Eike was in prison at the State Correctional Institute in Pennsylvania. Clearly then Eike had been arrested and convicted of a crime. That was sufficient information for Fell to be placed on notice that Eike had a criminal record.

Second, even if the court were to consider Fell's claim of non-disclosure on the merits, Fell cannot establish a *Brady* violation. Eike's prior conviction for a sex offense was not favorable evidence. Eike was not called as a witness at trial; therefore, the information had no impeachment value. Moreover, Fell was not aware that Eike had a prior conviction for a sex

offense when he viciously attacked him in August 2000; therefore, the information had no

exculpatory value. Since the information was inadmissible, Fell was not prejudiced by its non-

disclosure.

Even if Fell's trial counsel would have learned of Eike's criminal record prior to trial,

there is no basis to conclude that such information would have significantly impacted trial

strategy. As demonstrated above, Fell's strategy was to demonstrate remorse and acceptance of

responsibility to the jury. Therefore, any attempt to justify his criminal conduct towards Eike by

introducing evidence of Eike's prior conviction for a sex offense – of which Fell was ignorant at

the time of the assault – would have been inconsistent with that strategy. In addition, the

depravity of Fell's actions – beating a defenseless individual, kicking him while on the ground

until he was unconscious and then urinating on him – would not have been reduced by any

criminal history Eike might have had. Simply because a victim is a sex offender does not mean

that others are free to beat him to unconsciousness and urinate on him. There is no reason

whatsoever to think that if the jury had known that Eike was a sex offender the outcome of the

case would have been different.

ii.  Trial Counsel Did Not Fail to Investigate the Eike Assault

Fell's instant argument that further investigation by trial counsel would have revealed that

Eike was a sex offender, and that this evidence would have corroborated Teri Fell's testimony as

to the motive for the assault, is similarly without merit. Teri Fell's testimony with regard to the

motive for the Eike assault was uncontested. In addition, as stated above, justifying Fell's

actions by introducing evidence of Eike's criminal record would have been inconsistent with

Fell's trial strategy. Moreover, regardless of Eike's record, it was clearly irrelevant to Fell's

217

actions since Fell was unaware of it.  That is, Fell did not attack Eike because he was a sex offender, hence that fact was irrelevant.

Trial counsel wisely recognized that extended discussion of the Eike assault was not in his Fell's best interest.  Accordingly, counsel highlighted the only positive inferences to be drawn from the event: Fell's motive to defend his sister and his acceptance of responsibility.  This strategy was reasonable.  There is no reason to think that learning of Eike's criminal history would have altered this strategy.  There is also no basis to conclude that the evidence of Eike's criminal conviction would have in any way affected the outcome of the case.

## VII.   THE GOVERNMENT DID NOT FAIL TO DISCLOSE EVIDENCE OF FELL'S CONDUCT IN PRISON AND TRIAL COUNSEL DID NOT FAIL TO INVESTIGATE

Mitigating factor number five claimed that Fell "does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release."  Mitigating factor number six claimed that Fell had made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances. In response to Fell's evidence in support of those mitigating factors, the government submitted in rebuttal the testimony of David Duncan, a prison expert, Fell's disciplinary record (Government Exhibit 15), a lawsuit filed by Fell while in custody (Government Exhibit 16), and two videotapes of altercations between Fell and correctional officers.  *See* Government Exhibits 18 and 19.

In its closing summation the government used this evidence to argue that Fell's conduct

in prison was not getting better as urged by defense expert Aiken, it was getting worse.[41]  Indeed,

Fell's disciplinary record in prison revealed that Fell's violations had significantly increased over

the previous year.  *See* Government Exhibit 15.  The prosecutor referenced the testimony of

Fell's prison consultant, James Aiken, who testified that Fell was maturing in prison.  Tr. IX-2 at

61.  In an effort to discredit Aiken's testimony, the government referenced Fell's conduct as

depicted in the prison videos.

> And could you believe when Mr. Aiken told you that Donald Fell was maturing in
> prison?  Maturing in prison?  You saw him on those videotapes.  Those are the
> same videotapes that Mr. Aiken saw.  He is maturing?

Tr. XII at 46.  The government further argued that Fell had made no significant contribution to

the Northwest Correctional Facility, but had instead tried to disrupt and manipulate the system.

> Let's move on to the next factor, ladies and gentlemen.  This one's good:  Donald
> Fell has made positive contributions to the Northwest Correctional Facility by
> working, gaining an education, and helping to resolve inmate grievances.  Let's
> get real.  You saw those videotapes.  What positive contributions has this man
> made to the Northwest Correctional Facility?  Yes, you heard from Mary Jo Scott.
> He studied for a G.E.D., and he's read some novels while he is in prison.  That's
> it.  You heard from Jason Rushlow he worked in the laundry.  Okay, okay.  They
> want to claim that he is a positive contribution in resolving grievances?  You
> heard from Jason Rushlow.  The man generated grievances.  Are you kidding me?
> You saw the lawsuit.  You can read it for    yourself when you go back there.
> This man signs up for bible study, and then files a lawsuit claiming to be
> American -- a Native American.  He files a lawsuit so that he can practice his
> Native American religion on the yard.  It's bogus, ladies and gentlemen.  You
> know it's even more bogus because, believe it or not, he observes Ramadan as a
> Muslim.  Ladies and gentlemen, what do you see from this?  He's still

---

[41]  Fell again asserts that the government argued that because he represented a risk to
others in prison he should be put to death.  P. at 206.  This is not correct.  The evidence of his
conduct in prison was submitted in opposition to mitigating factor number five.  What the
government argued was that the jury should not accord weight to mitigating factor number five.

manipulating even from prison. That's who he is. He hasn't changed. He won't change. Gotten more violent in prison. Ladies and gentlemen, that's not proven.

*Id*. at 47-48.[42]

Fell now claims post-conviction first that Officer Marc Pelkey, an officer assaulted by Fell on March 17, 2004, had "a reputation for and history of violent behavior at the prison and in fact attempted to assault Mr. Fell during this incident." P. at 206. Fell alleges that the government's failure to disclose Officer Pelkey's history of misconduct was a violation of *Brady*.

As stated above, under *Brady*, the government has an obligation to disclose evidence that is both favorable to the accused and material to guilt or punishment. 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Therefore, to establish a *Brady* violation, petitioner must establish three elements: 1) that the evidence at issue was favorable him, either because it was exculpatory, or because it was impeaching; 2) the evidence was suppressed by the government; and 3) prejudice resulted. *See Greene*, 527 U.S. at 281-82.

Fell cannot establish any of these three elements. First, the evidence at issue was not favorable to Fell because it was not exculpatory or otherwise favorable to the defense. Fell argues that if the jury had heard this evidence, it would have explained Fell's aggressive reaction towards Officer Pelkey and refuted the government's argument that Fell was uncontrollable. At the outset, the videotaped altercations clearly show Fell instigating confrontations with multiple corrections officials, not just Pelkey. In any event, Fell makes no effort to demonstrate to what

---

[42] Again, the government clearly argued that mitigating factor number six had not been proven and warranted no weight.

extent, if any, he was aware of Officer Pelkey's history of alleged misconduct or reputation. On the contrary, he asserts that he was not aware of it because the government failed to disclose it and his counsel failed to investigate. Pelkey's prior conduct or reputation would have been relevant to explain Fell's aggressive reaction only to the extent that Fell was aware of it. Given that Fell was unaware of it, it could not have contributed to his reaction. The evidence also offered no impeachment value since Officer Pelkey was not a witness at trial. Hence, Fell fails to show how the evidence at issue was favorable, much less material.

Second, Fell cannot show that the government suppressed the information, because he cannot show possession. The government was not aware of Pelkey's history of misconduct as it was never in possession of his personnel file – a file maintained by the State of Vermont's Department of Corrections. Significantly, in his sworn declaration, Officer Pelkey does not assert having informed the government of his disciplinary history. *See* P. Exh. 256.

Third, Fell suffered no prejudice. The entire videotape depicting the confrontation between Fell and multiple correctional officers on March 17, 2004, was submitted into evidence. *See* Government Exhibit 18. Therefore, the jury had an opportunity to observe first hand the actions of Fell, Officer Pelkey and all the other officers involved in that incident. Even assuming, *arguendo*, that Officer Pelkey did in fact have a reputation for violent conduct of which Fell was aware, the jury was able to see and judge both the actions of Fell and Officer Pelkey. It is clear from the videotape, and the testimony of Officer Greg Machia, who identified the videotape for the jury, that Officer Pelkey did absolutely nothing on March 17, 2004, to provoke Fell's actions. To the contrary, as observed by David Duncan, it was Fell seeking

confrontation, not prison officials.  There is no reason to believe that information regarding Officer Pelkey's past misconduct would have led to a different outcome.

Fell further claims that his counsel was ineffective in failing to investigate Officer Pelkey's background and he suffered prejudice as a result.  However, the record indicates that trial counsel had obtained the file pertaining to the March 17, 2004, incident, had in fact investigated Officer Pelkey's background to some extent, and was aware that there was a history of dislike between Fell and Officer Pelkey.  Tr. VIII-2 at 37.  But again, counsel's strategy to depict Fell as someone who had accepted responsibility for his actions and had adjusted well to prison would have been inconsistent with him trying to somehow blame Officer Pelkey for his actions on March 17, 2004.  Trial counsel's strategy was reasonable.

Fell also contends that his trial counsel was ineffective in failing to interview Deacon Steve Ratte of the Catholic Church, who had been meeting with him for several years and would have testified that Fell was participating seriously in weekly religious services and had a sincere interest in his faith and other religions.  Deacon Ratte would have also testified to the deep impact that Fell's execution would have on him.  While the government does not contest the testimony that Deacon Ratte would have provided, it is clear from the record that the decision not to introduce evidence of Fell's alleged Christian faith, including the testimony of Deacon Ratte, was reasonable.  The testimony of a deacon of the Catholic Church to the effect that Fell was sincerely interested in pursuing his alleged Christian faith would have opened the door to further evidence of Fell's other, inconsistent religious interests.  Further, counsel introduced death penalty impact testimony from another witness, Mary Jo Scott.  Even if trial counsel's failure to introduce such evidence is deemed to have been error, Fell cannot show prejudice.

222

A.   The Government Did Not Fail To Disclose Favorable Evidence Regarding Officer Pelkey's Disciplinary History and Trial Counsel Did Not Fail to Investigate

1.   Evidence Presented to the Jury

In support of mitigating factors five and six, Fell introduced the testimony of three correctional officers.  Officer Ronald Barclay testified that he never had any problems or issues with Fell, with the exception of one incident when Fell lost recreation privileges and was locked in his cell.  *Id*. at 93.  Fell told Barclay that he grew up with Lee and that alcohol and drugs were a part of their lives.  *Id*. at 96.  Fell also told Barclay that he was under the influence of drugs when he committed his crimes.  *Id*. at 97.  According to Barclay, in his experience, Fell had no difficulties adjusting to prison.  *Id*. at 99.

Officer James Bailey testified that he had several interactions with Fell as a float officer.  *Id*. at 114.  Bailey recalled Fell as being very quiet and young when he first met him.  *Id*. at 114-15.  Although, Bailey recalled an instance when Fell failed room inspection because his room was untidy, he described Fell as an inmate who generally followed policies and procedures.  *Id*. at 115-16.  Bailey also testified that Fell signed up for religious, educational and job opportunities.  *Id*. at 117-18.  Bailey added that in his opinion, Fell had adapted well to being institutionalized, *id*. at 119, though he admitted on cross-examination that reports of misconduct towards other officers would cause him to change his opinion.  *Id*. at 122.

Officer Jason Rushlow testified that Fell was first in the Delta unit, a controlled unit, and was then transferred to the Echo unit for positive behavior.  Tr. VIII-2 at 4.  Rushlow remembered Fell being quiet most of the time, he never took a point from Fell.  *Id*. at 5.  According to Rushlow, Fell read a lot of sci-fi material.  *Id*. at 6.  Rushlow remembered one

incident when Fell became boisterous because the lights were turned on when they were watching a movie. *Id*. at 7. Aside from this incident, however, Rushlow had no incident with Fell. *Id*. at 8. Rushlow was promoted to case worker in May of 2004, and continued interacting with Fell in that capacity. *Id*. at 9. Rushlow testified that Fell participated in activities offered at the institution regularly, and was elected unit representative. *Id*. at 11-12. As case worker, he met with Fell weekly to discuss unit issues. *Id*. at 13. Rushlow never observed Fell have any difficulties in the unit. *Id*. at 16-17. He did not consider Fell to have too many disciplinary violations as compared to other inmates. *Id*. at 18. Rushlow described two major violations involving Fell – the March 17, 2004, incident and the April 9, 2005, incident – but stated that, in his opinion, Fell has fit in well in prison. *Id*. at 24.

In addition, Fell introduced the testimony of Mary Jo Scott, a teacher at the Northwest Correctional Institution, who had worked with Fell for several years and helped prepare Fell to take the GED. Tr. 8-1. at 61. Scott described Fell as curious, eager and focused on his work. *Id*. at 64. When asked whether she would be impacted if Fell was executed, she stated that she valued what she had accomplished with Fell and what he had accomplish for himself, and added that she would hate to see that end. *Id*. at 72.

Fell also introduced the testimony of James Aiken, a prison consultant, who testified that Fell was at the lower range of being disruptive and nowhere near the range of being a predator. Tr. IX-2 at 51. Aiken reviewed the two videotapes submitted into evidence depicting two confrontations between correctional officers and Fell, and he stated that he did not consider either incident to be serious. *Id*. at 52-54. Aiken stated that Fell impressed him as a person who had done a lot of growing up over the previous five years and was understanding the regimen of

correctional environment. *Id*. at 61. Accordingly, Aiken stated that Fell could be confined in the Federal Bureau of Prisons "for the remainder of his life without causing an undue risk of harm to staff, inmates, and the public." *Id*. at 63.

In rebuttal, the government called Officer Greg Machia. Tr. 10-1 at 94. Officer Machia testified that he was on duty on March 17, 2004, when an emergency was reported in the bullpen of Echo unit and he and other officers responded. *Id*. at 95. One of those officers brought a video camera. *Id*. at 95-96. When Officer Machia arrived, he was told that a fight had taken place, but the inmates involved were being dealt with by other officers. *Id*. at 96-97. Therefore, Officer Machia proceeded to secure the other inmates by asking them to put their hands against the fence. *Id*. at 97. When Officer Machia went up to Fell, he had a cup of coffee in his hand. *Id*. Officer Machia asked Fell to put the cup down and put his hands on the fence like the other inmates, but he refused. *Id*. Fell was secured with handcuffs. *Id*. Officer Machia's supervisor instructed him to take Fell back to the Delta unit and Officer Machia, Officer Pelkey and others walked Fell to that unit. *Id*. at 97, 109. Fell engaged in highly provocative verbal abuse towards the officers all the way to the cell, yelling obscenities and urging them to hit him. *Id*. at 98, 102-03. He specifically directed comments at Officer Machia, who he believed was responsible for his being sent to the Delta Unit. *Id*. at 103.

After Fell was placed in the cell he was still being combative. *Id*. at 99. Because Fell had made threats against the officers, when getting Fell into his cell, the officers asked him to kneel down and cross his legs so they would have easier control of him. *Id*. Fell refused to do it; therefore, Officer Pelkey crossed Fell's leg and Fell alleged that Officer Pelkey was hurting him. *Id*. at 99, 104. According to Officer Machia, Fell turned and told Officer Pelkey: "I'm going to

225

get you." *Id.* Fell then spat on Officer Pelkey's face. *Id.* Fell was immediately pinned against the mattress by other officers and Officer Pelkey promptly left the cell. *Id.* at 105. The entire incident was captured on a video, which was introduced into evidence as Exhibit 18.

The government also called Officer Michael Gordon who testified that he participated in the cell extraction of Fell on April 9, 2005. *Id.* at 119. Again, Fell refused to obey orders and provoked an altercation before being moved to a disciplinary unit. *Id.* at 120. Officers entered Fell's cell with Gordon in front, behind a shield. *Id.* Fell charged at Officer Gordon with the top of a property box in his hands, struck and kicked some of the officers and tried to bite others. *Id.* at 120-21. Officers were able to control Fell and put shackles on him. *Id.* The Fell cell extraction was also recorded on videotape, submitted into evidence as Exhibit 19. *Id.* at 122.

## 2. Alleged Brady Violation

Fell alleges post-conviction that the government failed to disclose that Officer Pelkey had a history of violence and aggression towards inmates. P. at 210. In support of his claim, Fell submits a sworn declaration by Officer Pelkey. In his declaration, Officer Pelkey states:

> I was investigated for excessive force after that [March 17, 2004] incident that started in the bullpen. The state talked to all of the staff and reviewed the videotape of the incident. I was not in the wrong in that incident. One time an inmate spit on me and I punched him in the face and another time I threw an inmate to the floor. I had to go to anger management classes after these events. I was also suspended once for using too much force with my shield against an inmate's face during extraction.

P. Exh. 256 at 2. Fell claims that this information was mitigating and would have impeached Officer Pelkey's account. But Officer Pelkey admits no wrongdoing in his declaration in relation to the March 17, 2004, incident. Nowhere in that declaration does Officer Pelkey state that he "attempted to assault" Fell, as Fell alleges. On the contrary, Officer Pelkey indicates that he was

226

cleared of any wrongdoing following an investigation.  Moreover, Officer Pelkey did not testify at trial, nor was his report admitted into evidence.  Therefore, it is difficult to envision how this information could have been used to impeach Officer Pelkey.[43]

Similarly, the evidence at issue was not exculpatory.  Fell is seen on the videotape of the incident on March 17, 2004, repeatedly using foul language towards the correctional officers escorting him to his cell, challenging and threatening them.  When placed in his cell and asked to kneel down and cross his legs, he refused; therefore, the correctional officers were forced to do it for him.  When Officer Pelkey crossed Fell's legs and held them so that Fell could be shackled, Fell spat on Officer's Pelkey's face.  Nothing about Pelkey's prior misconduct, even if it had been admitted into evidence, would have changed the jury's appreciation of Fell's actions.  Fell was not aware of Pelkey's history of misconduct, hence, the information at issue would not have been relevant to explain Fell's actions.  Thus, Fell has not shown how this information was favorable or material.

Fell also fails to show that the government suppressed the information.  Officer Pelkey does not indicate in his sworn declaration that he told the government about his prior use of excessive force against other inmates.  Moreover, Fell provides no evidence that the government knew about Officer Pelkey's prior conduct.  Clearly, the Northwest Correctional Facility was not a federal agency and information in their files cannot be imputed to the United States Government.  Therefore, Fell has not met the second element of a *Brady* violation.

---

[43]  Fell also argues that Pelkey admitted drinking heavily around the time period of the March 17, 2004, incident.  But nowhere in his declaration does Officer Pelkey indicate that his after work drinking ever affected his work performance and Fell proffers no evidence to that effect.

Nor, assuming Fell can overcome the first two hurdles to establishing a *Brady* violation, has he shown how he was prejudiced by the government's alleged nondisclosure.  As stated above, the videotape depicting the confrontation between Fell and correctional officers on March 17, 2004 was submitted into evidence.  Therefore, the jury had an opportunity to observe first hand the actions of Fell, Officer Pelkey and all six other officers involved in that incident.  It is clear from the videotape, and the testimony of Officer Machia, that Officer Pelkey did absolutely nothing on March 17, 2004, to provoke Fell's actions as seen on the videotape.  There is no reason to believe that information regarding Officer Pelkey's alleged past misconduct would have led to a different outcome in penalty.

### 3.  Trial Counsel Did Not Fail To Investigate Officer Pelkey

Fell also argues that if the government did not violate its *Brady* or *Giglio* obligations, then trial counsel was ineffective in failing to investigate Officer Pelkey.  But the record belies this claim.  During the cross-examination of Rushlow, the government attempted to introduce a report prepared by Officer Pelkey, but trial counsel objected based on the inflammatory nature of the report.  Tr. VIII-2 at 34-35.

> THE COURT:    Going back.  So what you're saying is there are other reports out there which contradict –
>
> MR. VOLK:     They don't particularly contradict.  They don't –
>
> THE COURT:    Soften.
>
> MR. VOLK:     Right.  They don't put it in as inflammatory a term as this potential witness does.  Secondarily, by way of a proffer, we would also suggest that this particular officer who wrote this report is someone who has expressed a significant personal dislike for Mr. Fell, and we certainly cannot engage in any kind of meaningful cross-examination through this witness about that.

THE COURT:      Well, I'd like to see the other reports, then.  Do you have the other reports?

MR. KELLY:      We do, Judge.

MR. VOLK:       We have the whole file.  It's large.

*Id*. at 37.  It is clear from trial counsel's proffer that they had subpoenaed the "whole file" pertaining to the March 17, 2004, incident.  Moreover, trial counsel clearly was aware of who Officer Pelkey was and had investigated him to some extent as evidenced by his statement: "this particular officer who wrote this report is someone who has expressed a significant personal dislike for Mr. Fell."  None of the reports pertaining to the March 17, 2004, incident contain any remarks of dislike by Officer Pelkey towards Fell; therefore, trial counsel must have been referencing their own additional investigation.  While it is not apparent whether trial counsel's further investigation revealed Officer Pelkey's prior history of misconduct, it is clear that Fell suffered no prejudice.  The information at issue was not exculpatory in any way. Therefore, there is no reason to conclude that the information pertaining to Officer Pelkey's history of misconduct would have changed the sentencing profile. Again, trial counsel's strategy to depict Fell as someone who had accepted responsibility for his actions and had adjusted well to prison would have been inconsistent with Fell trying to somehow blame Officer Pelkey for his actions on March 17, 2004.  Trial counsel's strategy was reasonable.

B.  Trial Counsel's Decision Not To Present Evidence of Fell's Alleged Religious Believes Was Reasonable

1.  Evidence Presented

Through the testimony of Correctional Officer James Bailey, Fell sought to establish that he was an inmate who followed policies and procedures.  Tr. 8-1 at 116.  Bailey also testified that Fell signed up for religious, educational and job opportunities.  *Id*. at 117-18.  Correctional Officer Jason Rushlow testified that the majority of the time he remembered Fell being quiet, Rushlow never took a "point" from him.  Tr. VIII-2 at 5.  Rushlow also testified that Fell read a lot, mostly sci-fi.  *Id*. at 6.  According to Rushlow, Fell participated in activities offered at the institution regularly and was elected unit representative.  Id. at 12.

On cross-examination, Rushlow admitted that he recommended Fell for unit representative because Fell filed alot of grievances.  Rushlow also indicated that Fell participated in Ramadan, a Muslim practice.  In rebuttal, in an effort to counter the testimony of the correctional officers, the government also introduced copy of a lawsuit filed by Fell demanding that he be allowed to practice his "Native American" faith.  The government argued that Fell had made no significant contribution to the Northwest Correctional Facility, but had instead tried to disrupt and manipulate the system.

2.  Trial Counsel Was Not Ineffective

Fell claims that trial counsel was ineffective in failing to present the testimony of Deacon Steve Ratte.  In support of his argument, Fell submits a declaration by Deacon Ratte wherein he essentially states that Fell took his involvement with weekly religious services very seriously and seemed sincere about exploring his faith.  P. Exh. at 1-2, Fell-00002437-38.  Deacon Ratte gave

Fell the responsibility of setting up for the services. *Id*. According to Deacon Ratte, Fell also assisted other inmates who did not speak English understand the service. *Id*. Fell told Deacon Ratte about his interest in learning about other religions, which Deacon Ratte did not find inconsistent with their meetings. *Id*. Deacon Ratte attended Fell's trial, but was not interviewed by trial counsel. *Id*.

Fell claims that Deacon Ratte's testimony would have refuted the government's claim that Fell's interest in religion was manipulative. P. 218. Deacon Ratte's testimony would have also helped to establish that Fell could conform his conduct to a prison environment. Fell ignores the fact that trial counsel did in fact present the testimony of three correctional officers and a prison consultant, all of whom testified that Fell was capable of adjusting his conduct to a prison environment. The correctional officers also testified that Fell demonstrated an interest in religious activities. Therefore, Deacon Ratte's testimony would not have been new, it would have simply been similar testimony from a different point of view. In that sense, this testimony cannot be said to have been vital to Fell's mitigation case.

On the other hand, Deacon Ratte would have triggered cross examination and possible rebuttal. Testimony regarding Fell's alleged Christian faith invited further inquiry into Fell's other professed religious beliefs, such his prison lawsuit asserting his American Indian faith, and his request to observe Muslim traditions, as well as his considerable interest in Satan. Fell had a tatoo of an upside down cross bearing the inscription "666." Dr. Welner's report discussed Fell's interest in Satan, which also noted by Teri Fell. P. Exh. 10 at 22. Teri Fell testified about Fell's religious interests as follows:

Q       Did he have any interests against religion?

231

A      He wasn't a religious person at all.
Q      Can you explain that to the jurors?
A      He didn't believe in God.
Q      What did he believe in?
A      Well, when we were first living in Wilkes-Barre, he didn't believe in anything, and then towards – by the time I moved out of Aunt Jackie's house when I was 16, he talked about Satan, but I don't know if he worshipped Satan. I don't believe that he worshipped Satan. He didn't have a Satanic bible or anything like that.
Q      What did he say, if anything, about Satan?
A      He would just make jokes about Satan being the kindest beast, and that was it, and that he normally talked to me about National Geographic.
Q      And, I'm sorry, you said Satan is the kindest beast?
A      Yes.
Q      I'm sorry, what does that mean?
A      I don't know.
Q      Do you know, if as a result of that, he has any tattoos?
A      Yes, he does.
Q      And what are those tattoos?
A      On his left arm, I do believe he has got an upside down cross with 666 And on his right arm he has got an anarchy sign.
Q      Do you know what the upside down cross with 666 means?
A      It represents Satan.
Q      Do you know when he got that?
A      I don't know that. Probably -- I think he was 15 or 16 when he got it.

Tr. VII-1 at 144. In addition, Jeanette Banas, Debra Fell's cousin, reported that only weeks before he went to Vermont in year 2000, Fell availed himself of gory pictures and video from the internet. "Everything was about Satanism and how to kill animals," she stated. "He showed me gory things, dead people, people blown up, bodies blown apart. He went into all these websites about Satan. Heads missing, eyes missing, people blown up." When Fell showed her where he was browsing, she recalled saying, "this is sick shit."

While the Second Circuit found that the government did not demonstrate a sufficient connection between Fell's Satanic beliefs and his motive for the capital murder, 531 F.3d at 230, evidence of Fell's various non-Christian beliefs, including his interest in Satan, may have been

232

admissible to rebut any claim that Fell was a deeply Christian person. Trial counsel's decision

not to present further evidence of Fell's alleged Christianity was not unreasonable. Moreover,

even trial counsel's failure to introduce such evidence is deemed to have been error, Fell cannot

show prejudice. There is no basis to conclude that additional evidence of Fell's religious

practices would have in any way affected the outcome of the case.

## VIII.   THE GOVERNMENT DID NOT FAIL TO DISCLOSE EVIDENCE REGARDING CO-DEFENDANT ROBERT LEE AND TRIAL COUNSEL'S DECISION NOT TO PRESENT EVIDENCE OF THAT RELATIONSHIP WAS REASONABLE

Fell's trial counsel made a strategic decision early on not to introduce evidence of Fell's

relationship with his co-defendant, Robert Lee. In fact, counsel at the 2002 government mental

health expert forensic interviews barred questioning of Fell about his relationship with Lee. At

trial, counsel argued strenuously and successfully for exclusion of Lee's detailed post-arrest

statements from the penalty and guilt phases. *See* Dkt No. 91; Tr. 3-2 at 25. Trial counsel also

sought successfully to exclude from evidence a number of letters written by Lee from prison

which contained many details about his relationship with Fell and the murders. Lee's post-arrest

statements, as well as his prison letters, clearly indicate that Fell was the leader and instigator of

their killing spree. The obvious conclusion reached by trial counsel was that evidence of Fell's

relationship with Lee would be detrimental to Fell's case in penalty. Therefore, trial counsel's

decision not to present evidence of the Fell-Lee relationship was both informed and reasonable.

Introduction of Lee's violent conduct in prison not only would have been wholly inconsistent

with trial counsel's strategy, but it would have opened the door to very damaging evidence in

rebuttal. Therefore, even if this court were to determine that the government failed to disclose

Lee's prison records in violation of *Brady*, which we deny, Lee suffered no prejudice.

Further, it is clear from the reports of interviews of Francis Bellantoni that his testimony would not have supported the theory advanced by Fell post-conviction that Fell was a reluctant participant in the murder of Terry King.  Therefore, counsel's decision not to interview Bellantoni further was reasonable.

A.  Background

Prior to the first mental health evaluation conducted by a government expert, during which trial counsel was present counsel advised the government expert that the issue of dominance and submissiveness vis-a-vis Fell's relationship with Lee would not be raised at trial and that Fell would not answer questions regarding Fell's relationship with Lee.

> Prior to beginning the examination, his attorney, Paul Volk, informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes.  He also indicated that no inquiry should be made about the use of knives.  *His counsel also indicated that the issue of dominance and submissiveness would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.*

Report of Dr. Richard D. Wetzel, P. Exh. 7 at 2, Fell-00000464 (emphasis added).  It is significant that Dr. Wetzel interviewed Fell on September 18 and 19, 2002.  Prior to that date, on May 25, 2001, the government disclosed to Fell a complete copy of a background investigation conducted of Fell and Lee by the FBI.  The FBI's 183 page report contained educational records, medical records, juvenile court records, police records and other documents pertaining to Fell's and Lee's background from childhood to the date of their arrest.  *See* Exhibit B, 028540-722. The FBI report also included summaries of numerous interviews conducted by FBI agents.  The overwhelming majority of the witnesses interviewed by the FBI were of the opinion that Fell was more intelligent than Lee, and was also the clear leader of the two.

234

For example,  John Kozerski, a social studies teacher at the Wilkes-Barre Area Vocational-Technical School ("W-BAVTS"), described Lee as a "somewhat quiet student who never did a lick of work." *Id*. at 028546.  According to Kozerski, Fell was intelligent, but Lee was as "dumb as a stump." *Id*.  Kozerski added that when seen together, Fell would be the leader and Lee the follower. *Id*.  Patrick Tosh, another teacher at W-BAVTS, also described Lee as a follower who was never confrontational with him. *Id*. at 028545.  Tosh further indicated that he did not believe Lee went to school as often as Fell did. *Id*.  Carmen LoBrutto, a science teacher at W-BAVTS, described Lee as a very quiet and unmotivated student. *Id*. at 028546. According to LoBrutto, Lee was more of a loner than Fell and never acted out in LoBruto's class. *Id.*. Thomas Zelinka, an English teacher at W-BAVTS, agreed that Lee was definitely a loner, and added that other students found him a bit strange. *Id*. at 028553.  Zelinka observed Lee and Fell together on several occasions at the school and stated that they were two of a kind. *Id*.

Lisa Lucke, the Director of Admissions of St. Michael's School, also described Lee as a follower more than a leader. *Id*. at 028542.  This sentiment was shared by Lee's father, Robert Lee, Sr., who expressed concerns to medical professionals that Lee had always been a child that was "easily led by others." *Id*. at 028659.  Even Fell's sister, Teri Fell, stated that Fell was more of a leader than Lee. *Id*. at 028717.  According to Teri Fell, it was not uncommon for Fell to physically strike and hit Lee. *Id*.  Similarly, witness Cunningham described Lee as a follower and Fell as a leader.

In his post-arrest statements, Lee clearly depicted Fell as the leader in their killing spree. According to Lee, it was Fell who handed him a knife and told him to kill his mother, it was Fell who told him to pack the bags, it was Fell who wrapped the murder weapons in a towel intending

235

on taking them and it was Fell who pulled over where they killed Terry King.  *See* Hand Written

Statement of Robert Lee attached hereto as Exhibit C at 014594, 014600, 014596.

Moreover, in a number of letters written by Lee from prison he talks extensively about his

relationship with Fell and makes clear that Fell was the dominating personality in that

relationship.

> and that is like my friendship with donnie he always has to have his own way and
> if you do not live up to his expectation he'd flip throw a thing or tantrum till he
> get his own way and me having to do what he expects me to do puts me into . . .
> he [Fell] was person that wanted me around and I did not want to lose that once
> we started something I would really have no choice but to finish it with him him
> because he wanted me around he was my friend a person that I can relate to to a
> certain point I have never reached before with anybody else and I did not want to
> lose my friendship with him because I said no and he flipped out another reason is
> I am scared of him to a point I see a little or more of myself in him and I know
> that what I do see in him is a force not to be reconed (sic) with there is also
> something about him that he has . . . that can control people . . . that is what I see
> in donnie . . . his sister will tell you he is very controlling.

*See* Government Exhibit D.  In another letter Lee clearly states that it was Fell who urged him to

kill Debra Fell.

> He started saying after he did charlie he kept saying kill her come on you have to I
> killed him fucker stab her cut her fucker though she was on the floor moving hack
> her make her stop stab her cut through some more start hacking make me here it
> keep cutting now . . . I am going to take a shower I want you to start packing the
> clothes and bring me some pants.

*See* Government Exhibit E.

B. Argument

    1.  Trial Counsel's Decision Not to Present Evidence of the Fell-Lee Relationship
       Was Reasonable

Fell now claims post-conviction that the government withheld  "a wealth of mitigating

evidence about Mr. Lee" that countered the government's argument that Fell dominated Lee,

236

including prison records, social service records, medical records, educational records and law enforcement records. This testimony, Fell argues, would have made clear Lee's greater culpability for the capital crimes and would have led to a different outcome in penalty.

While Fell alleges that the government failed to disclose "prison records, social service records, medical records, educational records and law enforcement records," in support of his argument Fell only specifically proffers two different acts of violence committed by Fell while in prison, both of which are documented in his prison records. The government submits that the information proffered by Fell post-conviction, even if it had been obtained by trial counsel prior to trial, would not have altered Fell's trial strategy. Fell's trial counsel clearly made an informed strategic decision not to introduce evidence about the Fell-Lee relationship. Indeed, when it appeared that Fell intended to introduce evidence of prior criminal acts by Lee at trial, and the government objected, trial counsel made clear that they had no such intent, and purposely made as little mention of Lee as possible.

MR. PRIMOMO:    We don't intend to ask or get into any statements of Bobby Lee made to Teri Fell. We are not doing that. But, I just want to make it clear that there is witnesses going to be talking about hearsay in connection to how they grew up, and just general, general facts that relate to the situation in the home. And so I'm – I don't think hearsay objection is sound, but I am just telling the Court that we are not going to get into Bobby Lee's statements at all.

THE COURT:    All right.

MR. PRIMOMO:    Or about Bobby Lee killing somebody or Bobby Lee anything.

THE COURT:    All right. It is fundamental, in my view, that statements made by Mr. Lee should not be introduced, and if they are introduced, then of course you understand that that raises a potential of a very big door being opened. So, if what you say is correct, that no one's going to testify to what Mr. Lee has said by way of hearsay or in

237

any other form, I just want to make sure that you have instructed your witnesses never to say anything in regard to things that Mr. Lee may have said, because that doesnt afford the government an opportunity to cross examine that, and I think that that would be a clear violation of the law.

MR. PRIMOMO:    Judge, we are not -- that's fine. We are not getting into -- we are not getting into Bobby Lee's statement in connection with these crimes at all, I mean, but there's going to be discussions about hearsay with regard to things that happened in the home, life in the home, that type of hearsay, which I think is with regard to our specific mitigators. But nothing to do with Bobby Lee's statements, what Bobby Lee said.

THE COURT:    Well, okay. So, well, we may be walking a very fine line here.

MR. BUNIN:    Judge, I --

THE COURT:    I am not just talking about Bobby Lee's statements about what happened here. Apparently, and I have not read the letters yet because they just came in, but apparently Mr. Lee would make a number of statements about the relationship between he and Mr. Fell, and I think that you are saying, no Lee statements are coming in by way of hearsay or any other form. But I just want to make sure that that's exactly accurate, not just the offense.

MR. PRIMOMO:    This is not about Bobby Lee. *Our mitigation case isn't about Bobby Lee with regard to any statements at all.*

MR. BUNIN:    Anything.

MR. PRIMOMO:    Anything.

Tr. VII-1 at 26-28 (emphasis added). Trial counsel had clearly decided to avoid triggering in rebuttal any evidence about the Fell-Lee relationship.

When the government attempted to introduce evidence of Lee's character in penalty, trial counsel objected and argued that such evidence was irrelevant to the issues that needed to be decided at trial.

238

THE COURT:         Now you have a broader objection.  You have an objection to the whole discussion of the relationship between Mr. Lee and Mr. Fell?  Is that correct?

MR. BUNIN:         I do, because I don't think the way it's discussed in this context is relevant to deciding any matter in this case.  I mean, it just – they had a relationship.  But to talk about their characteristics, attributing various characteristics to Mr. Lee to inform the jury about what to do about Mr. Fell I think is inappropriate.

Tr. XI at 15.  Trial counsel was well aware that introducing evidence of the Fell-Lee relationship to attempt to portray Fell as someone who was dominated by Lee would have triggered an avalanche of damaging testimony to the contrary in rebuttal.  Fell's post-conviction argument that the government failed to disclose Lee's prison record and that Fell would have introduced evidence of Lee's violent acts in prison to demonstrate that he was the aggressor in the Teri King murder is disingenuous at best.[44]  Trial counsel purposely elected not to present evidence about Lee or his relationship with Fell and objected strenuously when the government attempted to do so.  The court ruled partially in Fell's favor at trial, permitting the government to present evidence of the Fell-Lee relationship only in as far as it demonstrated Fell's personal characteristics.

THE COURT:         But what they did offer is character and background evidence about Mr. Fell.  And the fact is, you have got testimony to suggest that Mr. Fell was in a leadership role, and, over the objection of the defense, I think you are permitted to offer that.  I just don't – I don't think that the door's been opened to have somebody come in

_____

[44] In view of the fact that Lee died four years prior to trial, and Fell's trial strategy was to avoid evidence of the Fell-Lee relationship, there was no reason to think that Lee's prison records constituted favorable evidence for Fell.  Indeed, if Fell's trial counsel had wanted to make use of Lee's prison records, they could have easily obtained them through a subpoena to the Northwest Correctional Institution, a state facility.  Trial counsel did not obtain the evidence because it was irrelevant to their trial strategy.  Therefore, Fell cannot establish a *Brady* violation as he can show no prejudice.

239

and describe psychologically or their observations of Mr. Lee separate and apart from Mr. Fell.

*Id*. at 17. Fell reaped the benefits of his trial counsel's strategy and the court's ruling in his favor.

Indeed, the jury unanimously found both mitigating factors that related to Fell and Lee.

9.  Lee, who is equally culpable, will not face death          12

10. Fell and Lee acted in concert in committing crimes          12

*See* Special Verdict Form, Dkt. No. 200. Both of these mitigating factors were weighed by the

jury in Fell's favor. The fact that the ultimate outcome of the penalty phase was not what Fell

wanted it to be, does not render his trial counsel's performance ineffective.[45] In light of the

damaging evidence that the government could have introduced in rebuttal, trial counsel's

decision not introduce evidence of the Fell-Lee relationship was reasonable. The newly

proffered evidence would not have altered trial counsel's strategic decision. Moreover, nothing

about the newly proffered evidence would not cause a reasonable person to loose confidence in

the outcome of the case.

---

[45] Fell asserts incorrectly that the government failed to disclose social service records, educational records, medical records and law enforcement records obtained through its lay investigation of Lee. However, as evidenced by Exhibit B attached hereto, the government in fact disclosed its entire lay investigation of Lee.

240

2.  Trial Counsel's Decision Not To Pursue Francis Bellantoni As A Witness Was Reasonable

Fell further claims that trial counsel was ineffective in failing to interview Francis Bellantoni, a "near eye-witness" to the capital crime.[46]  Fell argues that Bellantoni's testimony would have "supported the theory that Lee was the aggressor in Mrs. King's death."

During an interview on December 12, 2000, Bellantoni reported that on an unknown date, he remembered seeing two males coming from a wooded area along Route 22, and it appeared that one of the males was agitated with the other.  P. Exh. 68.  Bellantoni noticed a car, and as he passed by the car at 55 mph, he noticed that it had Vermont plates.  *Id*.  Bellantoni also noticed a female seating in the back passenger side of the car.  *Id*.  Bellantoni went further down the road and noticed he had forgotten his cell phone.  *Id*.  He turned around and returned home.  *Id*.  When he passed by the car with the Vermont plates again, he saw the female walking towards the woods, and the two males following approximately eight to ten feet behind her.  *Id*.  When Bellantoni passed by the area again, the car and the people were gone.  *Id*.  Bellantoni was not able to describe the car or state what time it was when he made his observations.  *Id*.

Assuming that the individuals that Bellantoni observed were Fell, Lee and Terry King (which is not clear because Bellantoni could not state when he made his observations), it is clear that Bellantoni observed the two males only for a few seconds, as he was travelling at 55 mph.  Moreover, Bellantoni merely reported that one of the males appeared to be agitated.  But he

---

[46]  Fell also claims that the government failed to disclose the FBI's report of Bellantoni's interview.  However, as Fell admits, he was provided with a report of Bellantoni's interview with the New York State Police.  *See* P. Exh. 68.  The FBI report did not contain any more information than the New York State Police Report.  Therefore, no failure to disclose can be established.  Fell is entitled to the information, not the format it is provided in.

could not possibly identify Lee or Fell, much less state which of the two was agitated. In addition, it is clear that Bellantoni did not hear what if anything the two males he observed said to each other. In that regard, it is significant that Bellantoni used the word "agitated," not "arguing" in the statement he provided on December 12, 2000. Therefore, Bellantoni's testimony simply could not have "supported the theory that Lee was the aggressor in Mrs. King's death."

Based upon the Bellantoni interview report, Fell's counsel stated in opening the guilt phase that "a passing motorist saw [Fell and Lee] arguing by the side of the road." Tr. I at 55. Fell now submits a new declaration by Bellantoni, provided on February 24, 2011, over 10 years later, wherein Bellantoni states that the two men he observed on the side of the road sometime prior to December 12, 2000, were "arguing." Bellantoni still asserts that he would not recognize either man and could not tell the difference between them. This evidence would not have informed trial counsel's strategy at trial, therefore, it is not material.

Moreover, the admission of such testimony, and Fell's argument that what Bellentoni observed was consistent with Fell's later self-serving statements that it was Lee's idea to kill Teri King, may have triggered damaging rebuttal evidence establishing Fell's history of dominance over Lee. Nothing about the testimony that Bellantoni might have provided would cause a reasonable person to lose confidence in the verdict.

242

IX.   **TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO CONDUCT A FURTHER FORENSIC INVESTIGATION OF THE MURDER OF TERRY KING**[47]

Fell claims that trial counsel was ineffective in failing to conduct a further forensic investigation of the murders.  Such an investigation, he alleges, would have revealed that Terry King was killed by a rock, which caused injury to her brain, and not from injuries to her neck.  In support of his argument, Fell submits the declaration of Dr. Charles Wetli, who, after reviewing the autopsy photographs taken and report rendered by Dr. Baden, as well as the trial testimony of the forensic investigators, concluded that King's neck injuries were not fatal; therefore, she would not have died from asphyxia.  *See* P. Exh. 306.  Dr. Wetli also stated that "the autopsy revealed that the stomping and kicking did not inflict any lethal injuries to Ms. King."  However, Dr. Wetli makes no attempt to explain his conclusion that a rock alone, and not any kicks or stomping, caused the multiple fractures on King's skull.  In any event, Fell claims that this evidence would have allowed him to challenge his eligibility for the death penalty.  Fell's argument has no merit.

The Federal Death Penalty acts lists four intent factors, of which the government need only prove one.

    (A)    intentionally killed the victim;
    (B)    intentionally inflicted serious bodily injury that resulted in the death of the victim;
    (C)    intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person,

---

[47]  To the extent that Fell reasserts in Section IX trial counsel's alleged failure to investigate Lee, or present evidence of Lee's aggressiveness and/or dominance over Fell, we rely on our argument in response thereto set forth in Section VIII, *supra*.  Any reliance on a mitigating factor that claimed that Fell would not have committed the killing of Teri King without the influence of Lee would have triggered in rebuttal the presentation of the damaging evidence summarized by the government in Section VIII(B), above.

other than one of the participants in the offense, and the victim died as a direct result of the act;

(D)    intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

Even if Fell had been successful in establishing that he did not intentionally cause King's fatal injuries, which the government disputes, his actions would still have come within the purview of the last two intent factors. Therefore, Fell would still have been death eligible. Indeed, the jury unanimously found all four intent factors to have been proven. *See* Special Verdict, Dkt. No. 200 at 3-4.

A. Background

Fell confessed to the killing of Charlie Conway and Terry King on three different occasions. On December 1, 2000, Fell spoke with Agent Tom Aiken of the New York State Police about the possible whereabouts of Terry King's body. Aiken took advantage of the opportunity to ask Fell about the killings of Conway and his mother.

DF:    I really don't know. I got up and all of the sudden I, had cut Charlie's throat, and ah, I started stabbin' him and, and I was, I was gonna turn myself in right then, and then I turned around, he, Bobby had already cut my mom's throat, and . . .

TA:    Oh, he was involved in it too?

DF:    Yeah. So I figured that, at that point in time, ya know? I looked and it was already too late for my mom, ya know? And ...

*See* Penalty Phase Exhibit 11g at 53. Regarding Terry King's murder, Fell told Aiken:

TA:    I know its been a few days, but is there any chance she could still be alive?

DF:    I don't see that as a possibility. You know what, I, I, could only hope she is, ya know?

TA:     But based on, what, what'd you hit her with? A rock?

DF:     Ah, yes, it, it was a rock.

TA:     And, who, and, did he do that too or just you?

DF:     No, that, that was him with the rock. I was using my feet.

*Id*. at 32-33.  On December 2, 2000, Detective Rodney Pulsifer interviewed Fell again with regards to the crimes he had committed.  Fell again described how he killed Conway and Lee killed his mother:

DF:     Ah, well what happened was, is ah we were all kind of wasted, you know, pretty, pretty fucked up. My mom was we were all smoking crack and you know drinking lots of alcohol and shit. Ah, to tell you the truth I don't really ah know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

RP:     Well, why did Bobby cut your mom's throat?

DF:     I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it, but...

*See* Government Exhibit 11j at 11.

RP:     Okay, hold, hold that thought a minute, let's back up, ah going back to where you were standing over.  Charlie. Um, you had the knife in your hand, yes?

DF:     Yes.

RP:     Do you remember how many times ah you, you stabbed him?

DF:     No, no, I am thinking maybe somewhere around 25.

*Id*. at 14.

DF:  This is the part I'm not sure about, but ah I might, cause when I, when I realized what I was doing, my hand was on his shoulder, on his left shoulder.

RP:  On his left shoulder?

DF:  On his left shoulder, I had the knife in my right hand, so what I am thinking is I must have grabbed him by his left shoulder, and just, like across you know?

RP:  Okay.

DF:  But I'm not sure and I don't know how many times I did it, but then I, I moved the knife a different way and I started stabbing him in the side of the throat here.

*Id*. at 15.  And Fell again described the murder of King to Detective Cruise:

DF:  And ah, at which point I got out of the car, and I opened her back door, she was on the driver's side. And I said "walk up through the woods, just keep on walking and we'll go." And she said, "I'll be safe right?" and I said "yeah." So I let her go, and I get back in the car, and, Bobby says to me, "we can't let her go, he says she's knows our descriptions, she knows our names," he said "we have to kill her." So, I said okay, so we walked.

JC:  You agreed with him at that point?

DF:  Yeah, I walked up, I walked up to the top of the hill, and Bobby went down to the bottom of the hill, and she was already running down towards the road.  Bobby intercepted her, and I went down the hill and we both hustled her back up the hill, not, not harsh or nothing hard you know what I mean, just go ahead walk up the hill, you know. And, ah, I found a little, a little spot where you couldn't see from the highway and ah, well we started kicking her in her head. And um, Bobby.

JC:  Was she standing up when you were kicking her?

DF:  No I pushed her down first, she was on her back.

JC:  Was she saying anything?

DF:  No, she, she started to pray. And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about yay big and ah slammed it right down on her head.

*Id*. at 37-38.

DF:     Yeah, yeah. So, after Bobby slammed the rock down ah I was pretty sure she was dead and I wiped my boot off with her shirt, urn, and we left. We went back into the car.

JC:      Did you slam the rock down on her head at all?

DF:     Ah, no.

JC:     You sure about that it?

DF:     Uh huh, I used my feet.

JC:     You used your feet, you were pretty sure she was dead when you left her?

DF:     Yeah. Yeah. There was, ah, blood all pouring out of her mouth, um, her nose, her eyes were bleeding, ah she was, she didn't look like she was breathing, so we left.

*Id*. at 39-40.  Thus, Fell described each killing in detail, recalling accurately the knives used in the killings of Conway and Debra Fell, the route he and Lee took to the Price Chopper where he and Lee kidnapped Terry King, the route they took out of Vermont, readily agreeing to kill King and how he and Lee killed her.  His description of the murders were entirely consistent with all the forensic evidence gathered.

In penalty the government presented the testimony of Dr. Michael Baden, the medical examiner who conducted the autopsy of King.  Dr. Baden indicated that King suffered an obvious blunt force injury at the base of the nose, where there was protrusion of nasal bone fractures.  Tr. V-1 at 78.  In addition to that fracture, there was a laceration and fracture beneath the left part of the skull bone.  *Id*.  As a result King suffered severe contusions of the brain.  *Id*. at 80.  King also had palpable fractures of the jaw bone, both upper and lower, and the mouth.  *Id*. at 78.  According to Dr. Baden, teeth near the body had been knocked out of their sockets by blunt force trauma.  *Id*. at 79.  Dr. Baden also testified that there were no blood droplets below

247

the neck area, and no evidence of droplets of blood falling downward, which was indicative of the fact that King was on the ground during the brutal attack. *Id*. at79-80.

King also had a blunt force fracture of the right collar bone and extensive damage to the windpipe and the front and back of the Adam's apple in the neck, with a lot of hemorrhage around it. *Id*. at 80. According to Dr. Baden, the injuries to the neck of King were caused by a powerful crushing force, which could have been generated by someone stomping on the victim with the type of boot Fell was wearing upon arrest. *Id*. at 81-82, 84. In Dr. Baden's professional opinion, there was "over kill": both the blows to King's head and the injuries to her brain, as well as the crushing injury to her neck, were fatal. *Id*. at 87.

In addition, the government introduced the testimony of forensic investigator Tom Martin who testified that he conducted a forensic investigation of the New York murder scene, recovering fibers and footprints that were later determined to be consistent with Fell's clothing and boots seized from him upon arrest.

B. Trial Counsel's Decision Not to Challenge the Forensic Evidence Was Reasonable

Fell argues that the newly proffered evidence would have allowed him to challenge his death eligibility because it demonstrates that he did not inflict the fatal blows to King. Fell does not dispute that he intentionally participated in the brutal attack of King with the intent to kill her. Indeed, Fell admitted knocking King to the ground and "using his feet" to repeatedly kick her head until he thought she was dead. Instead, Fell argues that he did not happen to strike the fatal blow.

248

First, Dr. Wetli ignores the fact that, according to the autopsy report, there were multiple fractures to King's skull, caused by separate blows. *See* P. Exh. 65 at 6. Dr. Michael Baden, who conducted the autopsy, when asked how many times King was struck, testified:

> I think she was struck, again, blunt force, at least five times. Many – could be
> many times more because many strikes don't leave, as in the boxing analogy,
> many blows don't leave a mark. But she had at least five different hard impacts to
> her neck, chin, mouth, left side of head, both sides of the scalp of the head.

Tr. V-1 at 92-93. Dr. Wetli also ignores that Fell admitted kicking King repeatedly on the head – not just her neck – while she was on the ground. Therefore, the evidence conclusively established that the blow to the face by the rock was not the only injury that caused skull fractures and injury to the brain of King. For example, King had a separate skull fracture on the left side of her head. Given that Fell admitted kicking King repeatedly on the head, the jury could have certainly concluded that he caused the injury to the left side of King's head and brain, as well as the crushing neck injury. Dr. Wetli agrees that King's brain injuries were fatal. Hence, Dr. Wetli's opinion does not establish that Fell did not cause any fatal injury to King.

Even if the Court were to determine that Dr. Wetli's testimony would have supported a challenge to the first two intent factors in penalty, factors (A) and (B) above, Fell's conduct still came within the purview of the last two intent factors, factors (C) and (D). Each of these factors is applicable if Fell participated in act, either contemplating that the life of a person would be taken or intending that lethal force would be used against a person, or knowing that the act created a grave risk of death, and the victim died as a result of the act. Fell misinterprets intent factors (C) and (D). The act to which these factors refer is not the killing itself, but the underlying criminal offense. That is, Fell clearly participated in the kidnapping of King,

249

contemplating that her life would be taken or intending that lethal force would be used against King, and she died as a result of the kidnapping. Nothing in the language of the Death Penalty Act requires the government to prove that Fell killed King himself to become death eligible. Indeed, Fell offers no legal support for his argument.

Moreover, the evidence of guilt was overwhelming. Fell was arrested in King's vehicle. He confessed on three different occasions to killing Conway and King. Fell's statements about how the murder of King was committed are entirely consistent with the forensic evidence. Footprints lifted at the murder scene were consistent with Fell's boots. Fibers recovered at the murder scene were consistent with the t-shirt Fell was wearing upon arrest. Other evidence closely corroborated Fell's statements. The FBI recovered King's license plates in a Wilkes Barre creek, King's wallet alongside Route 22 in New York, and King's purse at the nearby Burger King. Blood with King's DNA was found on one of Fell's boots. And the autopsy revealed that King indeed died of blunt force trauma as Fell described. In view of the incredible strength of the evidence of guilt against Fell, a strategy of acceptance of responsibility, rather than denial, was not only reasonable but necessary. Counsel's performance also resulted in no prejudice, for all of the foregoing reasons.

This is not a case such as *Soffar v. Dretke*, 368 F.3d 441, 471-79 (5th Cir. 2004), where the defendant's confession was inconsistent with the forensic evidence recovered from the crime scene; or *Harris v. ex.rel. Ramseyer v. Blodgett*, 853 F.Supp. 1239, 1255-58 (W.D. Wash. 1994), where there were inconsistencies between the defendant's story and police reports; or even *Draughoun v. Dretke*, 427 F.3d 286, 294-96 (5th Cir. 2005), where trial counsel failed to seek forensic expert testimony that could have supported defendant's claim that he did not

250

intentionally shoot the victim.  Fell clearly intentionally knocked King to the ground and then kicked her in the head, while she was laying praying and defenseless, and continued to kick her until he believed she was dead.  Thus, he "used his feet" during the joint attack with Lee.  Given that the physical evidence revealed multiple fractures of King's skull and a crushed neck, it cannot be said that only the blow with the rock killed King.

## X.   TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE THE EVIDENCE UNDERLYING THE ESPECIALLY HEINOUS, CRUEL, AND DEPRIVED FACTOR

Fell claims that trial counsel was ineffective in failing to conduct a forensic investigation to counter the heinous, cruel and depraved manner of committing the offense aggravating factor. He claims that trial counsel should have sought expert testimony to challenge the government's argument that Fell kicked King so hard that her earring landed four feet away from her body and her teeth were dislodged from her jaw.  Similarly, Fell claims that counsel should have sought expert testimony to disprove the claim that Fell stomped on King with 150 pounds of pressure. He claims, notwithstanding the testimony of qualified Medical Examiner Dr. Michael Baden, that there is no scientific basis for this assertion.  Last, Fell claims that there is no scientific basis for claiming that King was killed twice.

A.  Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony
Challenging the Government's Argument Regarding the Location of the Victim's Earring

The evidence presented at trial established that one of King's earrings, and the post for that earring, were found around her mid-thigh area, on the right side of her body, approximately three to four feet from her head.  Tr. V-1 at 62-63.  In its opening statement, the government urged the jury to infer from this evidence that Teri King had been kicked with great force:

251

> At this stage of the trial, you will learn that as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body. . . .  One of her earrings was found several feet away.  You will hear that her throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure.  Her skull was fractured in several places.

Tr. V-1 at 35.  In closing argument, the government stated:

> You also heard from Special Agent Talley that an earring and a post from her was recovered even further from the body.  The earring and post were found even further from her body.  What does that mean?  That means either that the assault on Terry King began when she was standing up several feet from where she was found, and they were hitting her so hard that it literally was torn off, or that this was part of the further stomping in this case by the defendant, where again, she was hit so hard that that earring was literally driven off the side of her head.

Tr. XII at 23.

Fell offers the post-conviction declaration of Dr. Wetli, who, after examining part of the evidence, concludes that animal activity was responsible for the victim's earring being found three to four feet away from her head.  Dr. Wetli thus rejects the inference that Fell's kicks to King's head dislodged the earring and teeth.  He offers no scientific basis for his opinion.

Dr. Wetli's opinion does nothing to change the sentencing profile in this case.  First, the government urged the jury to make a reasonable inference based on the evidence presented at trial.  No scientific evidence was need for the government to argue that when Fell savagely kicked Terry King in the head as she lay face up, it was very likely that her earring flew off her ear.  The fact that an animal subsequently caused damage to King's right ear does not negate this argument.

Second, even if trial counsel would have been able to establish, to any degree of scientific certainty, that animal activity was responsible for King's earring being found three to four feet down the right side of her body, that evidence would not have influenced the outcome of the trial.

252

Fell confessed to kicking King repeatedly in the head. Whether her earring dislodged as a result of Fell's multiple kicks to her head, or it was removed by an animal and deposited three to four feet down the right side of her body, the evidence conclusively established that Fell repeatedly kicked her in the head causing blunt force trauma. The newly proffered evidence by Fell post-conviction would not have altered the jury's verdict. The verdict reflected Fell's depraved conduct. Under these circumstances, counsel's performance was neither deficient nor prejudicial.

> B. Trial Counsel Was Not Ineffective in Failing to Present Expert Testimony Challenging the Government's Argument Regarding the Location of the Victim's Teeth

The evidence presented at trial established that one of King's teeth was found to the left of her body, by her forearm. Tr. V-1 at 62. A second tooth was found on the right side of the body, above her head. *Id*. Dr. Baden testified that King's teeth had been knocked out of their sockets by blunt force trauma. *Id*. at 79. In its closing argument, the government used this evidence to impress upon the jury that Fell kicked Terry King more than once, and with great force:

> These, ladies and gentlemen, are what were found once her body was removed. Whole teeth that had been kicked from her head. You remember that Special Agent Talley actually told you where those teeth were found. One tooth was found on one side of her body, the other tooth on the other side of her body. What does that mean? That means that there were separate blows one way, and then another below the other way. They were so powerful that her teeth came out of her mouth whole.

Tr. XII at 22-23. The government also used the evidence to comment on Fell's depravity.

> Finally, whether the killing showed indifference to the suffering of the victim. You may consider that. Is there any question, ladies and gentlemen, that the defendant acted with indifference? Did he have to knock her teeth out? She was praying for her life. Is there anything that's more indifferent to human life?

253

Based on the evidence, ladies and gentlemen, this second statutory aggravating factor is also proven by overwhelming evidence.

*Id*. at 25.

Fell now claims post-conviction that had trial counsel conducted an adequate forensic investigation they would have been able to prove that the distance of the teeth from Terry King's body had no probative value. They again rely on the declaration of Dr. Wetli, who essentially states that if teeth are knocked out through stomping, they would fall into the mouth, rather than be propelled away from the body.

First, Dr. Wetli ignores the fact that Fell did not just stomp on King, he kicked her head repeatedly. Certainly forceful kicks to King's head as she lay face up would have not only caused fractures to her facial bones, but could have knocked her teeth out of their sockets and propelled them outward. Second, the government's argument focused on the fact that King's teeth were knocked out of their sockets whole, not on the distance at which they landed. Even if we were to accept Dr. Wetli's conclusion as correct, it does not negate the fact testified to by Dr. Baden, that Terry King was kicked and/or stomped on with such force that her facial bones were fractured and her teeth were knocked out. Therefore, the newly proffered evidence post-conviction is non-consequential. Trial counsel's failure to pursue such an expert opinion was reasonable and, in any event, caused no prejudice.

C. Trial Counsel Was Not Ineffective in Failing to Challenge Dr. Baden's Opinion That Terry King Was Stomped On With 150 Pounds of Force

During the testimony of Dr. Baden, the government drew his attention to the crushing of King's neck, and asked: "about how many pounds of pressure were required to do that?" Tr. V-1 at 86.

> You need more – more than – more than 150 pounds of pressure; from various informations we have from examining dead bodies, that just leaning on the neck wouldn't be enough. There would have to be a forceful application of at least 150 pounds of pressure, because normally, for example, normally we see people hang themselves, and when people hang themselves, there's no fractures. Even though the person may weigh 200 pounds, and the head weighs about 12 pounds, so there's 190 pounds of pressure, it doesn't cause a fracture, but if that same amount of force were brought down with – that's why I use the term stomp – with a force, then that would cause a fracture. But not just the pressure itself. It's the focal, sudden application of that pressure.

*Id.*

Fell claims post-conviction that there is no scientific basis for Dr. Baden's opinion and argues that his trial counsel was ineffective in failing to challenge that evidence. He relies again on the opinion of Dr. Wetli, who claims that Dr. Baden's opinion is specious because there are no studies that conclusively support it. Fell's argument, again, is far-fetched and nonconsequential.[48]

First, Dr. Baden's point was that 150 pounds of pressure suddenly applied, such as would be the case if someone stomped on the victim, would be needed to cause the kind of damage caused to King's neck. Dr. Baden explained his opinion, and relied on his knowledge and experience, having conducted more than 20,000 autopsies. Nothing about the statements of Dr.

---

[48] It seems unlikely that "studies" are needed (or might even exist) to address whether a man with boots, stomping on the neck of a 53 year-old woman, could crush her windpipe.

255

Wetli render Dr. Baden's opinion inadmissible, much less unscientific.  Second, the government

properly used Dr. Baden's opinion to argue to the jury that Fell stomped on Terry King.  This

was a reasonable inference based on the injuries suffered by King and Fell's own post-arrest

statements.  Defense counsel's performance was, therefore, neither deficient nor prejudicial.

> D.  Trial Counsel Was Not Ineffective in Failing to Challenge Cause of Death

Dr. Baden testified that Terry King had multiple causes of death.  Her skull had multiple

fractures and he found bruising or contusions of the brain.  Dr. Baden also found that King's

wind pipe had been crushed, causing asphyxia.  In addition, he found multiple non-fatal injuries

to her facial bones.  Dr. Baden testified that:

> my opinion as to the cause of death, is that she died both of the blows to the face, the injuries to the brain, and the injuries to the neck, because I think she was alive when most of those injuries were – were incurred.  Not necessarily all of them. But she would have died just from the head injuries alone, from the brain injuries, but that usually takes a little time.  People with head injuries and bruising of the brain can live for a few hours in a coma before they die, and the heart's still functioning.  The compression of the neck can cause death within a few minutes. And I think in the combination of both, I think most of the injuries, she was still alive, alive from the point of view of the heart's still beating.  Unconscious most probably from the first blows to the face, but that there was kind of an overkill. There were many more injuries that were produced, caused, than would have been necessary for her to die.

Tr. V-1 at 90.

The government used this testimony in support of the heinous, cruel and depraved

manner of committing the offense statutory aggravating factor, arguing that Fell inflicted more

injury than was necessary to cause death.  The government also argued that King suffered

physical abuse not meant to cause death.

> Of course, you also heard the testimony of Dr. Michael Baden.  He described a multitude of injuries to her head, to her neck, to her clavicle, to her jaw, the areas

256

and fractures around her head. Multiple blows. He described the horrible, blunt-force trauma to her head. He also told you about the injuries to her neck which were consistent with the boots that he observed that were worn by Donald Fell. He told you how, in his opinion, that injury to the neck was actually consistent with a stomping type of injury. He also told you that the injuries to her mouth and the teeth coming out of her mouth, those were also consistent with the stomping type injury. Perhaps most importantly, what he told you was that there were actually two causes of death for Terry King. There was obviously the blunt trauma to her head, but then there was also the crushing of her windpipe and neck causing asphyxia. Asphyxia is that she couldn't breathe. She was actually killed twice. In Dr. Baden's opinion, this was overkill because it was far more injury than was necessary for them to kill her.

Tr. XII at 23.

Fell claims post-conviction that trial counsel was ineffective in failing to investigate the government's evidence with regard to the cause of death. In support of his argument Fell relies again on the opinion of Dr. Wetli who asserts that King's neck injuries were not fatal. It is significant that Dr. Wetli does not contest Dr. Baden's findings with regard to the nature of the injuries suffered by Terry King, only his conclusion as to whether or not the neck injuries were fatal. Essentially, new counsel is belatedly suggesting alternative cross examination for Dr. Baden. Even if Fell had been able to establish that the injuries to the neck of King were not fatal, however, she still endured those injuries. The injuries would still constitute evidence of extreme physical abuse. Therefore, the jury would still have been able to consider this evidence in support of the heinous, cruel or depraved manner of committing the offense.

The government alleged that "Fell committed the offense in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to Terry King." Tr. XII at 143. With regard to this factor, the Court instructed the jury as follows:

> To establish this aggravating factor, the government must prove that the offense involved serious physical abuse to Theresa King. However, just because an

257

offense involves serious physical abuse does not necessarily mean that it was committed in an especially heinous, cruel or depraved manner. Rather, you must decide whether any proven serious physical abuse rendered the offense especially heinous, especially cruel, or especially depraved.

Serious physical abuse means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended serious physical abuse apart from the killing.

Heinous means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of serious physical abuse of the victim as to set it apart from other killings.

Cruel means that the defendant intended to inflict a high degree of pain by serious physical abuse of the victim over and above that involved in killing her.

Depraved means that the defendant relished – relished the killing, or showed indifference to the suffering of the victim as evidenced by the infliction of serious physical abuse.

Tr. XII at 143-44.

The evidence presented at trial clearly established by overwhelming evidence that Terry King suffered serious physical abuse.[49] Fell does not contest post-conviction Dr. Baden's conclusions with regard to the injuries suffered by Terry King. Moreover, Fell's post-conviction statements, as well as the forensic evidence introduced at trial also clearly established that Fell inflicted much of the physical injuries suffered by King. Fell admitted kicking her in the head repeatedly. Moreover, King's DNA was found on Fell's boot. By his own admission, after killing King, Fell wiped his boots on her shirt. Therefore, the government had a sufficient factual

---

[49] Counsel challenged the sufficiency of the evidence on this aggravating factor at trial. The Court excluded from evidence several photographs of King proffered by the government, but found the evidence nonetheless sufficient to go to the jury.

basis to argue that Fell committed the offense in an especially heinous, cruel and depraved manner in that it involved serious physical abuse to Terry King. Evidence that King's neck injuries were not fatal – contrary to the testimony of Dr. Baden – would not have affected the jury's conclusions in this regard because it would not negate that Fell inflicted those injuries. For all these reasons, defense counsel's performance was neither deficient nor prejudicial.

## XI.   TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO FURTHER INVESTIGATE THE DEATHS OF DEBRA FELL AND CHARLES CONWAY

Fell claims that trial counsel had a duty to investigate "how and why the deaths of Ms. Fell and Mr. Conway occurred." Given the physical and forensic evidence, and the multiple confessions, this claim is perplexing. Fell argues that trial counsel was ineffective in failing to conduct a further forensic investigation of the Debra Fell and Charles Conway murders and a background investigation into the life of Debra Fell in Vermont. But there was no indication that any further investigation of the Debra Fell and Conway murders would have unearthed any evidence favorable to Fell. Since neither one of these efforts would have changed the sentencing profile presented by trial counsel in penalty, counsel's performance was neither deficient nor prejudicial.

First, Fell (and Lee) gave a detailed account of how the deaths of Debra Fell and Charles Conway occurred. Fell stated:

> DF:   Ah, well what happened was, is ah we were all kind of wasted, you know, pretty, pretty fucked up. My mom was we were all smoking crack and you know drinking lots of alcohol and shit. Ah, to tell you the truth I don't really ah know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he

> was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

RP:   Well, why did Bobby cut your mom's throat?

DF:   I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know?  But I don't know why, I don't even know why I did it, but...

*See* P. Exh. 11j at 11.

RP:   Okay, hold, hold that thought a minute, let's back up, ah going back to where you were standing over ... Charlie.  Um, you had the knife in your hand, yes?

DF:   Yes.

RP:   Do you remember how many times ah you, you stabbed him?

DF:   No, no, I am thinking maybe somewhere around 25.

*Id*. at 14.

DF:   This is the part I'm not sure about, but ah I might, cause when I, when I realized what I was doing, my hand was on his shoulder, on his left shoulder.

RP:   On his left shoulder?

DF:   On his left shoulder, I had the knife in my right hand, so what I am thinking is I must have grabbed him by his left shoulder, and just, like across you know?

RP:   Okay.

DF:   But I'm not sure and I don't know how many times I did it, but then I, I moved the knife a different way and I started stabbing him in the side of the throat here.

*Id*. at 15.  The autopsy of Debra Fell and Charles Conway revealed that they were each stabbed multiple times.  Conway was stabbed approximately 50 times.  Tr. V-I at 101.  A complex of those wounds severed Conway's carotid artery, killing him.  *Id*. at 104.  These findings were completely consistent with Fell's post-arrest statements.  Moreover, the forensic evidence found

at the crime scene was also wholly consistent with Fell's post-arrest statements. Crime scene investigators found two knives wrapped in a towel on the kitchen table – each matched the description provided by Fell. *See* Government Penalty Exhibit 11j at 28-29; 48. There was no indication whatsoever that a further forensic investigation into the deaths of Debra Fell and Charles Conway would have revealed anything of use to Fell's defense.

Similarly, there was no indication that an extensive investigation of Debra Fell's life in Vermont would have assisted Fell's trial strategy. By Fell's own account of the Rutland murders, his mother posed no threat to either him or Lee when she was brutally attacked by Lee.

RP:     Okay. Did you see your mom struggling with ah.

DF:     She didn't struggle.

RP:     Okay, did Charlie struggle with you?

DF:     No.

*Id*. at 48. Notwithstanding, Fell claims that an investigation into Debra Fell's life in Vermont would have revealed evidence of her chronic substance abuse and violent tendencies. However, the record clearly establishes that any such investigation would not have added anything of significance to the sentencing profiled presented in penalty.

A.  Trial Counsel Was Not Ineffective in Failing To Conduct a Further Forensic Investigation of the Debra Fell and Conway Murders

Fell faults trial counsel for not hiring a forensic pathologist to look at the autopsy reports, autopsy photos, toxicology reports and other forensic evidence pertaining to the murders of Debra Fell and Charles Conway. Fell further faults his counsel for not hiring a forensic expert to analyze all the evidence recovered at the Rutland crime scene. Fell argues that he was prejudiced

by trial counsel's performance, but fails to state how.  Fell speculates that such experts would have uncovered mitigating and/or exculpatory evidence, but fails to proffer a shred of evidence to that effect.  Fell states that he intends to conduct discovery in this regard and subsequently amend his petition to add additional claims based on any new evidence discovered.

Nothing in 28 U.S.C. § 2255 grants Fell the right to either demand discovery post-conviction or file a claim after the one year limitations period.  Indeed, the Supreme Court has clearly established that a criminal defendant has no constitutional right to post-conviction discovery.  *See District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009) (criminal defendant had no constitutional right to demand DNA testing after conviction).  And Fell cannot toll the limitations period of section 2255 by asserting an unidentified claim.  This claim should be stricken for failing to set forth a basis upon which relief can be granted.

B.  Trial Counsel Was Not Ineffective in Failing to Conduct a Factual Investigation of the Debra Fell and Charles Conway Murders

Fell further claims that trial counsel was ineffective in failing to locate and interview potential witnesses to the events that transpired at 135 Robbins Street on the night of November 27, 2000.  Fell proffers the sworn declaration of a single witness, Pat Johnson, the upstairs neighbor of Debra Fell, in support of his argument.  Johnson claims that on the night of November 26, 2000, she overheard loud noises and arguments coming from upstairs at 135 Robbins St.  *See* P. Exh. 271 at 2 .  According to Johnson, she heard slamming, banging noises and yelling that went on for hours.  Johnson does not provide a time frame for what she overheard.  Nor does she relate any specific statements that she overheard.  In any event, Johnson's testimony was not material to any of the issues decided at trial.  Fell argues that

262

Johnson's account "strongly suggests that the Rutland crimes were triggered by a fight that lasted 'for hours.'"  But neither the autopsy of Debra Fell or Conway revealed any blunt force trauma consistent with either victim having suffered any injuries during a fight.  Nor did Fell or Lee have any bruises, scratches or marks on their bodies upon arrest consistent with having been involved in a fight a few days earlier.  Nor did either of the two killer's statements indicate a fight – or for that matter a struggle.

In the declaration proffered by Fell, Johnson does not provide a time frame for what she overheard.  Nor does she relate any specific statements that she overheard.  But Johnson provided a written statement to the police immediately after the Rutland murders wherein she stated that she heard loud noises coming from Debbie Fell's apartment from 11:00 p.m. on Sunday, November 26, 2000 to 6:00 a.m. on Monday, November 27, 2000.  *See* attached Exhibit J.  Her written statement was produced to Fell in discovery.  In fact, according to an e-mail from Alexander Bunin, Pat Johnson was originally on the witness list for Fell.  *See* Exhibit K.

Johnson's testimony was not only inconsistent with the remaining evidence in the case, it was not material to any of the issues decided at trial.  Fell argues that Johnson's account "strongly suggests that the Rutland crimes were triggered by a fight that lasted 'for hours.'"  Given the obvious inconsistencies with other evidence in this case, Johnson's testimony in that regard is not reliable.  Moreover, neither the autopsy of Debra Fell or Conway revealed any blunt force trauma consistent with having suffered any injuries during a fight.

The forensic evidence, and Fell's own post-arrest statements, were inconsistent with any theory that the murders were preceded by an altercation.  By Fell's own account, Conway was simply sitting on a chair when he attacked him.

RP: Where was Charlie? Where was Charlie and your mom?

DF: Charlie and my mom were in the living room.

RP: Okay.

DF: Charlie was on the chair. I don't know where my mom was.

*See* Government Penalty Phase Exhibit 11j at 19.  Moreover, the autopsy report for Conway revealed that Conway had .39 level content in his blood, indicating that he was highly intoxicated, if not unconscious, when Fell attacked him.  The testimony of Dr. Paul Morrow left this quite clear.

Q.     Is that blood alcohol content for Mr. Conway very high?

A.     Yes, it is.

Q.     Is there a certain range of behavior that would be consistent with that blood alcohol content?

A.     Yes.

Q.     Could you describe that to the jurors briefly?

A.     Yes.  This blood alcohol was actually quite high.  And of course it, a person's reaction to alcohol depends, to some extent on what their experience is with the drug.  In other words, people who drink a lot have more tolerance and then tend not to show the effects of the drug quite as much.  Nevertheless, even in a very experienced drinker, in this case with this blood alcohol, one would expect at the very least the person to appear very drunk, perhaps and perhaps passing out or even comatose.

Tr. V-2 at 13.  Fell, on the other hand, immediately after the murders was able to make reasoned decisions, taking a shower and packing his clothes, grabbing his shotgun, seeking ammunition, then committing a carjacking and kidnapping and driving long distance to escape apprehension.

Trial counsel's decision not to pursue any further factual investigation of the Rutland's

murder was reasonable.  Fell suffered no prejudice as a result.

C.  Trial Counsel Was Not Ineffective in Failing to Investigate the Lifestyles of Debra
Fell and Charles Conway in Vermont

Fell argues that his trial counsel failed to conduct an adequate investigation into the

lifestyles of Debra Fell and Conway in Vermont.  Fell admits that his trial counsel was aware that

Debra Fell had numerous encounters with the Rutland City Police Department and was in

possession of some of the corresponding police reports.  P. at 259.  Notwithstanding, Fell claims

that trial counsel should have obtained all such police reports.  He argues that the remaining

police reports would have revealed a pattern of violent encounters, domestic disruptions and

noise complaints.[50]  Fell further claims that trial counsel was ineffective in failing to interview

witnesses who would have testified that Debra Fell was often violent when drinking and abusing

drugs.

First, introduction of evidence pertaining to Debra Fell's encounters with the police or

any other violent incidents would have implied that her behavior somehow led to Fell's actions

the night of the murders   This is an implication that is simply not supported by the evidence in

the case.  Such an implication would have also been inconsistent with trial counsel's trial strategy

of acceptance of responsibility.

---

[50]  Fell further claims that to the extent that the government failed to disclose these reports
to trial counsel, that failure constitutes a *Brady* violation.  Without conceding that we were in
possession of any such reports, the government submits that Fell has failed to show that these
reports constituted favorable evidence, and has further failed to show how if in any way he was
prejudiced by the alleged non-disclosure.

265

Second, the jury already knew that Debra Fell was a chronic alcoholic with violent tendencies. Through the testimony of Fell's sisters, Teri Fell and Susan Benczkowski, they heard evidence of several violent stabbing incidents involving Debra Fell while intoxicated. *See* sections III(B)(1)(a) and (b)(iv), *supra*. The government never argued that Debra Fell's conduct changed after moving to Vermont. In addition, Teri Fell also provided testimony indicating that her mother had not stopped drinking after moving to Vermont. Tr. VII-1 at 146. Thus, the jury had a fairly accurate picture of the lifestyle of Debra Fell. Moreover, the photographs of the crime scene in Rutland also left no doubt that Debra Fell had not stopped drinking as evidenced by the dozens of beer cans in her apartment. Indeed, her blood alcohol content at the time of her death was .32. Tr. V-2 at 13.

Fell argues that information of his mother's life in Vermont was essential for the jury to understand the context that led to her and Conway's murder. But as demonstrated above, Fell has not established that Conway's and Debra Fell's murder were the result of any violent altercation, or any act that night, by Debra Fell or Conway. And to the extent that Fell argues that his mother's continued drinking led him commit the crimes, the evidence admitted at trial clearly established that Debra Fell was drinking on the night of November 26, 2000. Thus, the evidence proffered by Fell post-conviction would not have changed the sentencing profile presented to the jury in penalty. There is simply no reason to believe that there is a reasonable probability that this evidence would have led to a different outcome. Accordingly, counsel's performance was neither deficient nor prejudicial.

266

## XII.    TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT A DIMINISHED CAPACITY DEFENSE

Fell claims that his trial attorney was ineffective in failing to investigate and present a diminished capacity defense in both the guilt and penalty phases of trial.  Fell argues that if trial counsel had presented evidence of his mental illness and intoxication on the night of the crimes the outcome of the trial would have been different.

First, trial counsel investigated Fell's diminished capacity on the night of the murders. Three different mental health experts interviewed Fell, considered both Fell's mental health and alcohol consumption on the night of the murders and rendered opinions.  None offered any opinion that would have enabled Fell to challenge intent in the guilt phase.  Indeed, Fell does not cite a single expert opinion in support of his argument.[51]

Second, trial counsel's strategy in the guilt phase was one of acceptance of responsibility. Given that the evidence of guilt against Fell was overwhelming, trial counsel's decision to follow a strategy of acceptance of responsibility in guilt was unreasonable.  This strategy provided trial counsel with the opportunity to set forth several arguments that would assist him in penalty.  For example, trial counsel argued that Fell's actions were not planned and that he was remorseful for what he had done.  Therefore, trial counsel in fact began to lay the foundation in the guilt phase for some of the mitigating factors to be introduced in the penalty phase.

Third, trial counsel alleged diminished capacity in penalty.  Mitigating Factor number one alleged that Fell's capacity to appreciate his conduct was significantly impaired.  *See* Special Verdict Form, Dkt. No. 200.  However, as set forth in section IV and V, *supra*, trial counsel

---

[51] It is significant that Fell attaches a sworn declaration from Dr. Mills.  *See* P. Exh. 260. However, Dr. Mills's declaration is devoid of any support for Fell's argument.

made a strategic decision not to rely on expert mental health evidence to establish Fell's diminished capacity or any other mitigating factor.

Trial counsel's strategic decision not to present expert mental health testimony regarding Fell's alleged diminished capacity in penalty was reasonable. The government had two different experts poised to testify that Fell's ability to appreciate his actions was not significantly impaired. Moreover, the same two experts agreed that Fell was not mentally ill, and had ASP. In addition, one of the government experts classified Fell as a psychopath. Any expert mental health testimony by Fell in penalty would have triggered very damaging rebuttal evidence. *See* section V, *supra*. Therefore, Fell's claim has no merit.

A.  Trial Counsel Was Not Ineffective In Failing to Present A Diminished Capacity Defense in the Guilt Phase of the Trial And Presented A Diminished Capacity Defense in Penalty

Fell claims that trial counsel failed to investigate his alleged diminished capacity as a result of his intoxication and mental illness. But as discussed above, immediately upon being assigned to represent Fell, trial counsel retained the services of three mental health experts and requested a psychiatric, neuropsychological and neuropharmacological evaluations. Trial counsel also obtained social service records providing information on Fell's familial history of alcohol abuse. In addition, Teri Fell provided information regarding Fell's alcohol and drug abuse. Hence, Fell's allegation that trial counsel failed to investigate Fell's potential diminished capacity as a result of his intoxication has no merit.

None of the defense mental health experts found any neurological deficits, any organic brain damage, or any significant mental disorder that would have mitigated Fell's criminal responsibility or ability to appreciate the consequences of his actions at the time of the murders.

268

Moreover, none found that Fell's alleged intoxication and mental disorders rendered him incapable of forming the necessary *mens rea* to commit carjacking or kidnapping.

Dr. Mills stated in his report:

> It seems highly unlikely that her murder and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication. Further, without those murders, Mr. Fell's guilt (particularly over the killing of his mother) and his fear of being apprehended, the abduction and subsequent killing of Mrs. King would not have occurred.

P. Exh. 3 at 4-5. Dr. Mills at no time provides any indication that Fell did not have the ability to appreciate his actions or form intent when he carjacked and kidnapped Terry King, much less hours later when she was killed. On the contrary, according to Dr. Mills, Fell was motivated by his fear of apprehension for the murders of his mother and her boyfriend, clearly indicating that Fell knew exactly what he was doing and acted intentionally. Dr. Mills never opined that Fell lacked the necessary intent to commit the capital offenses.

Dr. Lipman, who assessed Fell's history of alcohol and drug abuse, concluded that Fell suffered from a pathological drug appetite and a "related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress." P. Exh. 4 at 2. In other words, Fell, along with perhaps half the world population, was not mentally ill, but was vulnerable to becoming mentally ill if under severe stress. According to Dr. Lipman, this vulnerability would be expected to increase if chronically intoxicated, as Fell alleged he was the night of the murders. *Id.* But Dr. Lipman does not indicate that Fell lacked the ability to appreciate the consequences of his actions, nor does he indicate that Fell lacked the ability to act intentionally when he carjacked, kidnapped and subsequently killed Terry King.

269

Furthermore, the evidence submitted at trial simply did not support a diminished capacity defense as to guilt. Fell murdered his mother and her friend, and immediately devised a plan to escape apprehension. He showered, packed his clothes and other belongings, armed himself with a shotgun and set out to carjack a vehicle that he and Lee could use to leave town. After attempting to buy ammunition for his shotgun, Fell conducted surveillance at the Price Shopper until the right victim came along. 54 year-old Terry King, who barely stood five feet tall, turned out to be the perfect victim for Fell and Lee. They pointed their weapon at her, overpowered her and forced her back into her vehicle. Fell and Lee then drove for approximately four hours, taking turns at the wheel, before Fell found a "nice little spot" in New York State, where they brutally murdered King. Upon arrest, Fell confessed to affirmatively deciding to carjack, kidnap and kill King and intentionally killing her. These were hardly the actions of a significantly alcohol impaired individual.

Therefore, trial counsel made a strategic decision not to rely on a diminished capacity defense in guilt, and to rely instead on a defense of acceptance of responsibility and remorse.

> And if you listen to the first statement and then you listen to the second statement you, you hear someone who is coming to terms with the enormity of what had happened and coming to terms with his own personal responsibility. And he accepted responsibility five years ago and he was sorry. And he's sorry today. And so we're just asking you to listen to everything and do what's just.

*See* Tr. IV-1 at 68. Trial counsel's decision was reasonable. The evidence of guilt was overwhelming. Not only did Fell confess to committing both the carjacking and kidnapping of Terry King, describing the crimes in detail in all three of his confessions, but he was found riding Terry King's vehicle in another state. Terry King's DNA was found on Fell's boots and fibers consistent with the t-shirt Fell was wearing when arrested were found at the crime scene.

270

Moreover, the FBI located the license plate for Terry King's vehicle in a creek in Wilkes-Barre, PA, consistent with his post-arrest statements. King's purse was located in the dumpster of a Burger King where Fell and Lee had stopped for breakfast after her murder. Thus, in light of the strength of the evidence against Fell in guilt, trial counsel's decision to pursue a strategy of acceptance of responsibility and remorse was reasonable.

While it is correct that trial counsel did not request a diminished capacity instruction as such an instruction was not supported by the evidence, they did raise the issue with the jury, arguing that Fell's capacity was impaired due to his alcohol and drug consumption.

> Look at the night of November 26, 2000. And listen -- what you heard about what is a chaotic scene in the apartment on Robbins Street. You saw pictures of cans and cans of beer, empty cases of beer. And you heard that Charles Conway was found with a blood alcohol content of point 39 percent and that Deborah Fell was found with a blood alcohol content of point percent. There was some serious drinking going on that night. Now, people that are alcoholics can often mask the symptoms of alcohol. They can do things. They learn how to do things. They learn how to drive a car. But there's one thing that alcohol does to everybody whether they are a tea toddler or whether they are an Alcoholic or serious drinker, it affects their ability to make decisions. It does that in any case. Now, there was more going on besides just the use of alcohol. Donald Fell and Robert Lee used crack cocaine that night. Donald Fell did not say that his mother used crack cocaine. If you listen to the recording you will hear that he says we and then it stops mid sentence and he goes on to another subject and he talks about his mother. He never says his mother uses crack cocaine. He uses the term we. He's Talking about Bobby Lee and himself.

Tr. IV-1 at 64. Fell's alcohol consumption would not have supported a defense in guilt, but by arguing the issue to the jury, trial counsel began to lay the foundation for the diminished capacity mitigating factor the jury would consider in penalty.

Fell argues that "there were red flags indicating other evidence relevant to Mr. Fell's diminished capacity that trial counsel failed to investigate." P. 266. In support of his argument

271

Fell submits the declaration of a single witness who alleges that both Debra Fell and Fell were using crack cocaine in the month before the crimes. Fell also proffers Lee's statements to prison officials that he used crack cocaine around the time of the offense.[52] But this evidence would have simply been cumulative of Fell's post-arrest statements. Fell also submits that trial counsel should have submitted evidence of Fell's Fetal Alcohol Syndrome and mood disorder. But as argued in section IV(C), *supra*, Fell has failed to establish that he suffered from either of these two conditions.

Fell also alleges that only portions of his confession on December 2, 2000, were submitted into evidence. *Id*. at 267. This is untrue. The entire recording of Fell's confession on December 2, 2000, was submitted into evidence and marked as Exhibit 11i, Tr. II at 28, together with its transcript, which was marked Exhibit j. The passages quoted by petitioner at p. 267, appear on p. 78 of Exhibit 11j. Therefore, the jury considered those statements.

Trial counsel presented a diminished capacity defense in penalty. Mitigating Factor number one alleged that Fell's capacity to appreciate his conduct was significantly impaired. *See* Special Verdict Form, Dkt. No. 200. However, as set forth in section IV and V, *supra*, trial counsel made a strategic decision not to rely on expert mental health evidence to establish Fell's diminished capacity. Instead, trial counsel relied on testimonial and forensic evidence introduced at trial in support of Fell's diminished capacity mitigating factor.

> Under the influence at the time of the offense is a significant mitigating factor. Again, Donnie knew right from wrong; that's not the point. The point is, he was unable to make correct, moral judgments, aside from his candor on the tape, which we have no reason to believe that him and Bobby Lee and Debra Fell and

---

[52] Trial counsel successfully sought to exclude Lee's post-arrest statements from trial. Introduction of any statements by Lee would have triggered damaging evidence in rebuttal.

Charles Conway were not drinking incredible amounts of alcohol.  First of all, we know that Donnie Fell had been doing it his entire life.  We know that Debbie Fell had been doing it his entire life.  And if you want the specific evidence of what was going on that night, look at the photographs in the Rutland, 135 Rutland – Robbins Street address.  There are dozens of empty Budweiser beer cans. . . .

Now, further, through the government's own expert, Dr. Morrow, he extrapolated out blood alcohol levels.  And what blood alcohol levels are, simply amount of alcohol that's in the body.  And he talked about how those levels of blood alcohol affect motor skills and judgments.  And he has testified, as a trained medical examiner, that a .10 begins to cause errors in judgment.
That a .15 to .20 causes one to be emotionally unstable and intoxicated.  And at a .2 to .3 begins to experience amnesia and blackouts.  Charles Conway's autopsy at the time of his death, and Debra Fell's, which is approximately at one a.m., were those levels.  392 and 325.  I am going to ask you to use your common sense and decide whether or not you believe that Donnie Fell had consumed alcohol, based on his statements, based on what you saw, based on your history, based on everything that you have heard in this case, that Donald Fell was intoxicated at levels close to this.  Whatever level you think he was, because you can extrapolate out, as Dr. Morrow did, what the elimination rate would be, and what level of intoxication rate he would have been up and to at the time of Mrs. King's murder at approximately seven a.m.

Tr. XII at 79-81.  Although trial counsel did not introduce expert testimony to support the diminished capacity mitigating factor, they made effective use of expert testimony solicited from a government expert witness.

Trial counsel's strategic decision not to present mental health expert testimony regarding Fell's alleged diminished capacity in penalty was reasonable.  The government had two different expert opinions that indicated that Fell's ability to appreciate his actions was not significantly impaired.  When considering whether there is a reasonable probability that the expert mental health evidence that trial counsel would have presented would have led to a different outcome, such that the verdict is unreliable, the court must consider such evidence in context, that is, the court must also consider the evidence the government would have presented in rebuttal.

The government was prepared to call Dr. Welner and Dr. Wetzel in rebuttal. Dr. Wetzel had twice evaluated Fell and interviewed him over the course of three days. P. Exh. 9 at 1-2, Fell-00000611-12. Dr. Wetzel determined that Fell's evaluation yielded "no sign of psychosis" or depression, *id*. at 9, Fell-00000619, and his neuropsychological testing revealed "no cognitive deficits." *Id*. at 8, Fell-00000618. On the other hand, Dr. Wetzel concluded that Fell met fully the criteria for anti-social personality disorder. *Id*. at 7, Fell-00000617. Dr. Wetzel also concluded that Fell exaggerated his intake of alcohol the night of the murders and "was not significantly impaired." *Id*. at 4, Fell-00000614. Dr. Wetzel opined that:

A.   In my opinion, [Fell] has exaggerated the amount of alcohol used. While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.

B.   He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.

C.   He denied that he has ever had withdrawal symptoms. He claimed that he has unusual tolerance for alcohol.

*Id*. Dr. Wetzel further concluded that Fell "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id*. Moreover, according to Dr. Wetzel, Fell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was also not significantly impaired. *Id*. While Dr. Wetzel agreed that Fell had been the victim of abuse and neglect as a child, he found no causal connection between those factors and his conduct the night of the capital crimes. *Id*. at 5, Fell-00000615.

Like Dr. Wetzel, Dr. Welner concluded that Fell was not significantly impaired by the use of alcohol when he committed the murders. P. Exh. 10 at 32-34, Fell-00000653-55. On the

274

contrary, Dr. Welner found that Fell's behavior at the time of the murders "primarily reflected organization, and not signs of a mental illness or intoxication." *Id*. at 35-40, Fell-00000656-61. This evidence would have completely overcome Fell's allegation of diminished capacity. Therefore, Fell cannot establish that trial counsel's failure to present expert mental health evidence in penalty regarding diminished capacity prejudiced him, rendering the jury's verdict unreliable. There is no reason to believe that expert testimony regarding Fell's alcohol consumption on the night of the murders would have led to a different outcome. Fell can show no prejudice.

### B. Trial Counsel Was Not Ineffective in Failing to Present Evidence of Intoxication and Mental Illness During the Guilt Phase to Lay a Foundation for the Penalty Phase Mitigation Case

Fell claims that his trial counsel should have presented evidence of intoxication and mental illness in the guilt phase to lay a foundation for the penalty phase. But as established above, none of the defense mental health experts concluded that Fell's mental disorders or consumption of alcohol impaired his ability to act intentionally on the night of the offenses. Moreover, as we established above, trial counsel's decision not to present mental health evidence in penalty was reasonable in light of the government's rebuttal case. *See* sections IV and V, *supra*. The same factors that informed trial counsel's decision not to introduce expert mental health evidence in penalty would have informed trial counsel's decision not to present mental health evidence in guilt. Introduction of mental health evidence in guilt would have triggered the same damaging evidence in rebuttal. It necessarily follows that trial counsel's decision not to present mental health evidence in guilt was reasonable as well, and resulted in no prejudice.

### XIII.    TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO INTERVIEW AND PRESENT ADDITIONAL EXECUTION IMPACT WITNESSES

Mitigating factor number seven claimed that Fell's execution would detrimentally affect persons who care about him.  In support of this factor, trial counsel submitted the testimony of Mary Jo Scott, who testified that she valued what she had accomplished with Fell, and what Fell had accomplished for himself, and would hate to see that end.  Tr. 8-1 at 72.  Fell claims that his trial counsel was ineffective in failing to present additional witnesses in support of his execution impact mitigating factor.

Even post-conviction, Fell does not offer much evidence of execution impact.  In support of his post-conviction claim Fell submits the testimony of Teri Fell, his sister, who testified at trial and was at the time admittedly upset at her mother's death.  Tr. VII-1 at 144.  Nonetheless, Teri conveyed to the jury a sincere sense that her brother cared about her and she about him. They shared a horrific childhood, an experienced that left them with no one but each other to rely on, and which undeniably bonded them for life.  While Teri Fell did not actually say, "I will be affected by my brother's execution," there was no doubt, in light of her testimony, that she would be.  Rather than being ineffective, trial counsel should be commended for securing the testimony of Teri Fell on behalf of her brother, after he brutally murdered their mother.

Fell also offers the statement of one of his half brothers, Robert Fell, in support of his argument.  *See* P. Exh. 247.  But Robert Fell would have been as vulnerable as his sister, Susan Benzkowski, if not more so, on cross examination on the subject of execution impact.  Robert Fell has not seen his brother for so long, he cannot remember.  *Id*.  Robert Fell has  not visited Fell in prison since his arrest.  *Id*.  The testimony of Robert Fell certainly would not have shed

276

any additional light on Fell's background or character.  *Id*.  Robert Fell simply had no significant relationship to his half brother.  Therefore, presenting the testimony of Robert Fell in support of execution impact would have been more detrimental than beneficial.  Indeed, his testimony would have been subject to exclusion for the same reasons the Court did not allow Sharon Hinchey to testify as to execution impact – she was too distant to have a connection with Fell that would rise to the level of execution impact.  *See* Tr. XIII-1 at 16.

Similarly, Janice Stoss maintained no significant relationship to Fell.  *See* P. Exh. 274.  Tim Reynolds, Debra Fell's boyfriend, was in prison when Fell visited his mother in Vermont and had no relationship with Fell ("Debbie had two children.  I never met them.").  The fact that he would not want to see Donny executed because he believes that Debra Fell would not have wanted her son executed, does not constitute execution impact evidence.  While Deacon Ratte may have offered testimony in support of execution impact, his testimony may have also opened the door to other damaging evidence about Fell.  *See* section VII(A)(2), *supra*.  Thus, not only was there a dearth of evidence to support execution impact in Fell's case, but many of the witnesses who could offer testimony in support of this factor were not close to Fell and had extra baggage that would have been detrimental to his case.  Therefore, it cannot be said that trial counsel was ineffective in failing to present additional witnesses in support of the  execution impact mitigating factor.

Even if this court were to determine that trial counsel's failure to present additional witnesses in support of execution impact was error, there is no reasonable probability that such evidence would have led to a different outcome.  Fell cannot show prejudice.

## XIV.    TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE ADMISSION OF RELEVANT, PROBATIVE AND ADMISSIBLE EVIDENCE

Fell faults his trial counsel for failing to object to evidence that was clearly relevant, probative and admissible.

### A.    Trial Counsel Was Not Ineffective in Stipulating to the Admission of Fell's "Slayer" T-Shirt

When arrested in Arkansas, Fell was wearing a black t-shirt, depicting a demon with the word "Slayer" – a reference to the hard metal rock band by the same name.  Fibers consistent with the Slayer t-shirt were found at the scene of Terry King's murder, and Fell admitted that he had been wearing the Slayer t-shirt when he killed Terry King.  Clearly then the Slayer t-shirt was relevant and probative evidence of Fell's participation in King's murder.

Fell claims that his trial counsel was ineffective in failing to move to exclude the Slayer t-shirt under Rule 403 because it was more prejudicial than probative.  He argues that the t-shirt's demon image conveyed a prejudicial image of Fell to the jury.  Fell submits that since he did not contest his presence at the New York murder scene, the Slayer t-shirt, and any evidence related thereto, was irrelevant.

While Fell did not contest his presence at the murder scene, he pleaded not guilty to the charges.  As a result, all allegations in the indictment were at issue and the government was forced to prove its case beyond a reasonable doubt.  The Slayer t-shirt was a significant part of the government's case because it was probative of Fell's presence at the murder scene of Terry King.  The admission or exclusion of evidence is a discretionary decision to be made by the trial court.  Nothing in the record indicates that a Rule 403 motion to exclude the Slayer t-shirt would

278

have been successful even if pursued, particularly in light of its relevance and probative value.

Fell now contends that he was actually wearing a blue hooded pull-over sweatshirt over the Slayer t-shirt during the crimes; therefore, the Slayer t-shirt would not have been exposed at the crime scene. He adds that the fibers of concert t-shirts are fairly common, and thus, any probative value was minimal. However, this argument goes to the weight the jury might have accorded the fiber evidence, not to its admissibility.

The Slayer t-shirt was published to the jury only briefly at the guilt phase, and not at all during the penalty phase. Any significance it may have had was likely dwarfed by the extraordinary amount of aggravating evidence, and the fact that the contested issues concerned the penalty phase, not the guilt phase. Therefore, Fell has failed to establish that there is a reasonable probability that had counsel been successful in excluding the Slayer t-shirt at the guilty phase, the outcome of the case would have been different. Counsel's performance was neither deficient nor prejudicial.

B. Trial Counsel Was Not Ineffective in failing to Object to Testimony about Satanism

During the cross-examination of Teri Fell, the government inquired whether Fell had any interests in religion:

Q      Did he have any interests against religion?
A      He wasn't a religious person at all.
Q      Can you explain that to the jurors?
A      He didn't believe in God.
Q      What did he believe in?
A      Well, when we were first living in Wilkes-Barre, he didn't believe in anything, and then towards – by the time I moved out of Aunt Jackie's house when I was 16, he talked about Satan, but I don't know if he worshipped Satan. I don't believe that he worshipped Satan. He didn't have a Satanic bible or anything like that.
Q      What did he say, if anything, about Satan?

279

A       He would just make jokes about Satan being the kindest beast, and that was it, and that he normally talked to me about National Geographic.

Q       And, I'm sorry, you said Satan is the kindest beast?

A       Yes.

Q       I'm sorry, what does that mean?

A       I don't know.

Q       Do you know, if as a result of that, he has any tattoos?

A       Yes, he does.

Q       And what are those tattoos?

A       On his left arm, I do believe he has got an upside down cross with 666  And on his right arm he has got an anarchy sign.

Q       Do you know what the upside down cross with 666 means?

A       It represents Satan.

Q       Do you know when he got that?

A       I don't know that.  Probably -- I think he was 15 or 16 when he got it.

Tr. VII-1 at 144.  The government asked defense prison consultant James Aiken whether any of Fell's tattoos had any significance to him.  Aiken replied mildly that the 666 tattoo could denote a relationship with an organization, but did not elaborate further.  Tr. X-1 at 30.  Fell claims that his trial counsel was ineffective in failing to object to this testimony or request a limiting instruction.

Fell submitted two mitigating factors relating to his pretrial confinement at the Northwest Correctional Facility.  Mitigating factor number five alleged that Fell "does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release."  Mitigating factor number six alleged that Fell "has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve prison grievances."  In support of his argument that he had adjusted well to prison, Fell offered evidence of his participation in extracurricular activities, including religious studies.  The government sought to rebut the evidence of Fell's rehabilitative potential with evidence that he was a significant disciplinary problem at Northwest.  The government also showed that Fell had

manipulated the prison grievance process by filing a prison grievance and then a lawsuit alleging he had been denied the right to practice a Native American faith, and that he participated in the Muslim feast of Ramadan. To further show that Fell's interest in those religions was not sincere, the government sought to establish that he had exhibited no interest in any religion before incarceration. The government elicited evidence of Fell's tattoos.

The "[C]onstitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 486 (1993), *quoting Dawson*, 503 U.S. at 165; *United States v. Kane*, 452 F.3d 140, 142 (2d Cir. 2006) (collecting cases); *Kapadia v. Tally*, 229 F.3d 641 (7th Cir. 2000). Evidence of a defendant's beliefs may be relevant to show his motive for committing a crime, *Mitchell*, 508 U.S. at 485-86; *Barclay v. Florida*, 463 U.S. 939 (1983) (plurality opinion); *United States v. Salameh*, 152 F.3d at 111-12, or to rebut the defendant's evidence. *Kane*, 452 F.3d at 143-44.

The testimony regarding Satan was not obviously objectionable. Moreover, trial counsel could have determined that an objection to such a brief mention of Satan may have actually served to bring more attention to the issue, while not objecting and allowing the government to move on would appear as though the issue was insignificant to Fell. Simply because trial counsel may have valid grounds to formulate an objection does not mean that he is compelled to do so in every instance. In this case, an objection may have indeed brought more attention to the matter. Similarly, requesting a limiting instruction would have focused the jury's attention on the issue of Satan in ways that the brief testimony may not have.

Fell's trial counsel elected to forgo an objection and clarify the issue in a manner that limited any prejudice that could be derived from such testimony. During the cross-examination of Matt Cunningham, a government rebuttal witness, trial counsel inquired as to how Fell had acquired his tattoos. Cunningham testified that he, Fell, Lee and others were friends who smoked marijuana during the middle and late 1990s. Trial counsel established that Fell and his friends were very interested in forming a band devoted to heavy metal music. Cunningham agreed that the "dress and the getting of tattoos . . . was . . . consistent with what [we] were trying to do." Tr. XI at 53. Trial counsel's strategy was reasonable.

Fell argues that he suffered prejudice because the evidence led the jury "to believe that Mr. Fell had an interest in Satan and this motivated his crimes and defined his character." But such an argument was never advanced by the government at trial. It cannot be said that the brief mention of Fell's possible Satanic beliefs during the testimony of his sister was so significant that had it been excluded the outcome of the trial would have been different. The testimony occupied less than half a page in the entire transcript of the penalty phase and was not used by the government in summation. Moreover, the trial court instructed the jury that it could not consider Fell's religious beliefs in reaching its decision. Therefore, even if the court determines that it was error for counsel to fail to object to this testimony, Fell cannot show prejudice. Indeed, the Second Circuit, readily found no prejudice:

> Nevertheless, to the extent that any unjustified reference to Fell's satanic beliefs occurring in the testimony constituted constitutional error, it was not challenged at trial and did not constitute plain error. It neither prejudiced Fell nor did it "seriously affect the fairness, integrity, or public reputation of judicial proceedings."

*Fell*, 531 F.3d at 230.

C.  Trial Counsel Was Not Ineffective in Failing to Limit the Use of Matt Cunningham's Testimony

When the government sought to introduce the rebuttal testimony of Matt Cunningham, trial counsel objected, Tr. XI at 6-13, but was overruled by the Court.  *See* "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing."  Docket No. 193; Tr. XI at 56-57, 78.  *Id*. at 13.  Fell claims post-conviction that the government impermissibly used Cunningham's testimony to argue premeditation and motive in closing argument.  Fell faults his counsel for failing to object to the government's argument.

Fell's premise for his claim of ineffective assistance of counsel is false.  He takes the prosecutor's words out of context in an effort to establish a claim where there is none.  The prosecutor used Cunningham's testimony, as well as the testimony of Larry Turner, the victim's brother, to establish that people with bad childhoods can grow up and make moral decisions as adults.  When read in context, the prosecutor's argument is shown to be completely proper.

> "Question:  Can you please tell the jury a little bit about those early years growing up with Terry."  This is a man of not many words, pretty short sentences, and this is what he said:  "They were pretty tough years.  You know, when I hear people talk about child abuse and tough lives, I don't know if anyone had it much tougher than we did.  My father was an alcoholic, and he was a mean alcoholic.  He liked to drink, and he liked to drink hard stuff.  And when he did, you didn't want to be around him.  We went without a lot of things because he drank mostly every cent he had.  Friday nights he would be in the bar drinking, and you'd be lucky to have anything left for anything else when he was done.  I have seen him and my mother fight over that, money and drinking, and I have seen him beat her so bad she couldn't walk.  Both of us did.  It was a rough time of life.
>
> "Question:  Did your father treat you differently than Terry?  "He treated us a little differently because I was the oldest and I was a boy.  He didn't really do too much to her, you know.  Smacked her around once in a while.  But he could get on me if he wanted to."  A little later, Larry Turner was asked the question:  "What lessons did Terry and you take from that background?"  He said: "I guess I used it as a learning curve.  I knew I didn't want to live that type of life, so when we moved

on, none of the four of us ever lived like that." Because you don't have to live like that. You can grow up and make your own decisions. And Matthew Cunningham made decisions. So did these other people. And so will the vast majority of those kids down at the Head Start Program. You know as a matter of common sense that people have free will, and particularly when they grow up, they have free will to do the right thing and to decide what's right and what's wrong. And you know that for years, Donald Fell thought about killing. He thought about killing John Kozierski, his teacher, back when he was starting out in high school. A couple more years went by, and in conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one. And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too. People are responsible for what they do, particularly when they do severe, heinous crimes like this. The killing of Terry King was completely unnecessary. Those guys could have driven her up a dirt road, several miles up some dirt road, off of Route 22, or it could have been in Vermont, and they could have dropped her off, and they could have said, "Give us your shoes and give us your clothes. You're staying here." And they would have had hours to get out of there. They could have tied her to a tree, or in Dover they could have knocked her out. They could have punched her hard, and that woman, she would have been knocked out cold and they could have driven away. But again, that wasn't the choice that he made.

Tr. XII at 124-26. Far from arguing substantial premeditation or motive, the prosecutor argued that Fell had the ability to make free choices. He used the testimony of Larry Turner and Matt Cunningham as examples to demonstrate a person's ability to change as an adult, even after a troubled childhood, and make good moral choices. The prosecutor then contrasted the life trajectory of the two witnesses with Fell's. He reminded the jury of Fell's experiences and thoughts as an adolescent and then argued that as an adult, rather than choosing to make moral decisions, Fell chose to kill. There was nothing erroneous about the prosecutor's argument and no valid reason for trial counsel to have objected.

Fell claims that had trial counsel objected to the use of Cunningham's testimony, "the jurors would have given less weight to the government's proffered statutory aggravator about 'substantial premeditation,' and at least one juror would have struck a different balance in favor of life." P. at 291. But the government did not rely on the statutory aggravating factor of substantial planning and premeditation as to the Rutland killings. *See* Special Verdict Form, Dkt. No. 200. The only aggravating factor relating to the Rutland murders was multiple killings. Cunningham's testimony did not relate to that aggravating factor in any way. The government alleged as a non-statutory aggravating factor that Fell participated in the murder of *Terry King* after substantial premeditation to commit the crime of carjacking. Cunningham's testimony did not relate to this aggravating factor either. Cunningham's testimony related to the background and character of Fell, and the government used that testimony to discuss Fell's background and character.

Fell further faults his trial counsel for failing to request a limiting instruction. But a limiting instruction is not necessarily the best strategy as it may draw more attention to an issue and possibly suggest inferences which the jury may not have drawn on its own. In any event, since the government properly argued the testimony of Cunningham, a limiting instruction was not warranted. Counsel's performance was neither deficient nor prejudicial.

D. Trial Counsel Was Not Ineffective in Failing to Counter the Government's Assertion that Fell's Memory of the Word "Hawk" on the Murder Weapon Was Evidence that Fell Was Not Intoxicated

Shortly after arrest, Fell gave three detailed statements admitting his participation in the carjacking and kidnapping of Terry King, and in the murder of his mother and her friend Charles Conway. Fell described in detail how he personally killed Conway, where Conway was sitting

285

when he attacked him, approximately how many times he stabbed him, how and where he

stabbed Conway, and the weapon he used, a knife with the word "Hawk" on it. *See* Exhibit J at

14-15, 19, 28. The government argued that Fell could not have been significantly impaired by

alcohol on the night of the murders if, among other things, he remembered so many details,

including that the knife he used to kill Conway had the word "Hawk" on it.

> Next, you also know the defendant remembered these events clearly four days
> later. Think about it, ladies and gentlemen**.** *If he was significantly impaired at
> the time, would he remember that the knife he was using said the words Hawk on
> it?* Would he be able to describe the difference between the two knives as he did,
> one with Hawk on it, and the other as a black-handled knife. There are many
> other instances of his memory that day: His exact description of the route that he
> took. You remember Mr. Darrow showed that to you. It's on one of the charts
> you can consider. He remembered each turn that he took on his way down to the
> Price Chopper. No question he was not significantly impaired.

Tr. XII at 39 (emphasis added).

This was a perfectly logical argument. Notwithstanding, Fell claims that trial counsel

was ineffective in failing to object to the government's argument. According to Fell, it was

objectively unreasonable for counsel to allow the jury to draw this inference against Fell. P. at

292. Fell's claim has no merit. The government's argument was not error. Trial counsel is not

required to raise futile objections. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005);

*Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). *See also Scott v. Romero*, 153 Fed. Appx.

495, 497-98 (10th Cir. 2005) ("Counsel is not ineffective for failing to advance a futile

argument"). For these reasons, counsel's performance was neither deficient nor prejudicial.

## XV.    TRIAL COUNSEL WAS NOT INEFFECTIVE IN FAILING TO PRESERVE THE RECORD

Fell claims that his trial counsel failed to object at trial to the following government arguments during final summation:

1.    Fell's decision not to plead guilty;
2.    the jury's consideration of mitigating factors unrelated to the capital offenses; and
3.    Fell's interest in Satanism, Islam and Native American religions.

P 293.  Fell contends that trial counsel's failure to object to each of these arguments by the government in final summation resulted in these claims of error being reviewed on direct appeal under the plain error standard and thus constituted ineffective assistance of counsel.  Fell's claim has no merit.

Under *Strickland*, a petitioner demonstrates ineffective assistance of counsel by showing first that his trial counsel's performance fell below an objective standard of  reasonableness; and second, that the deficient performance was prejudicial.  466 U.S. at 687.  To establish prejudice Fell must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict.  *Strickland*, 466 U.S. at 694.  Therefore, Fell cannot demonstrate ineffective assistance of counsel by showing that trial counsel's error resulted in an unfavorable standard of review on appeal.  *See United States v. Busch*, 411 Fed.Appx. 872, 877 n. 4 (6th Cir. 2011) ("Under *Strickland*, we determine prejudice by asking whether trial counsel's error undermined confidence in the outcome of the trial, not by asking whether trial counsel's error resulted in an unfavorable standard of review on appeal."); *United States v. Hemsley*, 287 Fed. Appx. 649, 650-51 (10th Cir. 2008) (holding that appellant had not made out a claim of ineffective assistance of counsel based solely on the argument that his lawyer's failure to object

287

subjected appellant to the more deferential "plain error" standard of review on appeal).  Fell must show that trial counsel's error was of such magnitude that it undermined confidence in the outcome of the trial.  *Strickland*, 466 U.S. at 694.  Fell cannot make this showing.

A.   Trial Counsel Was Not Ineffective in Failing to Object to the Prosecutor's Argument in the Final Summation of the Penalty Phase

As established above, trial counsel is not required to make futile objections.  At trial the parties stipulated that Fell offered to plead guilty in exchange for a life sentence without release and government refused that offer.  Fell argued that Fell had accepted responsibility for his actions through his offer to plea guilty.  The government responded in rebuttal that Fell could have pled guilty unconditionally, but elected to go to trial forcing the government to prove its case.  On direct appeal, the Second Circuit found that the prosecutor's argument regarding Fell's offer to plead guilty was a proper response to Fell's argument in closing.  *Fell*, 531 F.3d at 221. Fell cannot establish that his counsel's performance fell below an objective standard of reasonableness for failing to object to an argument that was not error.  Such an objection would have been futile.  Given that Fell has failed to show that his trial counsel's failure to object to the government's argument regarding his offer to plead guilty was professionally deficient and prejudicial, he is not entitled to relief.

The same analysis applies to Fell's claim that his trial counsel was ineffective in failing to object to the introduction of evidence and government argument regarding Fell's alleged interest in the Native American and Muslim religions.  The Second Circuit found on direct appeal that the testimony regarding Fell's interest in the Native American and Muslim religions was relevant.  *Id*. at 229.  "We see no error and certainly no plain error in its admission."  *Id*. at 230.

288

Certainly then, the government's use of this evidence in final summation was not error either.[53]

Again, trial counsel was not compelled to lodge a futile objection to argument that was not error.

Fell is not entitled to relief.  Counsel's performance was neither deficient nor prejudicial.

Similarly, the Second Circuit found on direct appeal that the prosecutor's argument that some of the mitigating factors warranted little or no weight because they lacked a connection to the capital offenses did not lead the jurors to believe that they were precluded from considering Fell's mitigating evidence.  *Fell*, 531 F.3d at 222-23.  Significantly, two of the panel members agreed that the prosecutor's arguments were entirely proper.  *Id*. at 222 n. 14.  The Court went on to find that in light of the evidence presented, the instructions provided and the findings of the jury, "[n]o juror could have [believed] that to qualify as a mitigating factor, that factor needs to have a nexus to the crime."  *Id*. at 224.  Thus, not only was the prosecutor's argument not error, but Fell cannot show deficient performance or prejudice as a result of his counsel's failure to object to the government's argument regarding the lack of nexus between some of the mitigating factors and the capital offenses.

B.  Appellate Counsel Was Not Ineffective in Failing to Raise Evidentiary Issues on Direct Appeal

Fell claims that his appellate counsel was ineffective in failing to raise a number of issues on direct appeal.

1.  Leading Questions by the Government During the Guilt Phase

Fell contends that his trial counsel failed to object, and his appellate counsel failed to raise on direct appeal the government's use of leading questions during the guilt phase.

---

[53]  The government addressed Fell's claim of ineffective assistance of his trial counsel in failing to object to evidence of Satanism in section XIV(B), *supra*.

However, Fell makes no attempt to identify the alleged leading questions that he claims were improperly posed, nor does he state how, if in any way, he was prejudiced by his attorneys' failure. This claim should be denied for failure to state sufficient facts upon which relief can be granted.

### 2. The Eike Assault

As stated above in section VI(B), *supra*, in the penalty phase, the defense called Fell's sister, Teri Fell, to the stand. Consistent with their trial strategy, the defense solicited testimony from Teri Fell about her and Fell's childhood, providing examples of alcoholism, physical abuse, neglect and abandonment. *See* section III(B)(1)(a), *supra*. In cross-examination the government sought to develop their trial strategy of portraying Fell as an individual who became increasingly violent and aggressive as he approached adulthood. Pursuant to that trial strategy the government inquired about the Eike assault.

> Q    Was there a time when you also saw your brother be very angry and use his feet?
> A    What -- I'm not sure what you are referring to?
> Q    Did you ever see him kick someone violently?
> A    Yes.
> Q    What did you see him do?
> A    He beat a kid up and he was kicking him.
> Q    How serious was it?
> A    It was pretty serious.
> Q    Did the kid go into shock and into a coma?
> A    Yes, he did.

Tr. VII-1 at 144.

> Q    And in terms of what your brother did to this person, did he do anything other than stomp on the person?
> A    He punched him.
> Q    Did he urinate on him?
> A    Yes.

*Id.* at 151.  Fell contends that his trial counsel was ineffective in failing to object to this testimony and appellate counsel was ineffective in failing to raise this issue on direct appeal.  But this testimony was clearly admissible as it was probative of  Fell's character and background.  On direct Teri Fell testified broadly about Fell's back ground and experiences over many years.  It was not objectionable for the government on cross to inquire about Fell's acts of violence.  As stated above, neither trial nor appellate counsel had an obligation to raise a futile objection, and their performance in this regard was neither deficient nor prejudicial.

        3.  Testimony of Police Officer About the Features of "Battered Woman Syndrome"

On the second day of the Fell's mitigation case, during the cross-examination of Officer Christopher Purcell, the government asked whether he considered Debra Fell a battered woman.

> Q      Did you have a fair amount of experience dealing with domestics in houses around town over the years?
> A      Absolutely.
> Q      All right.  Generally, in your view, what was the main problem in that household?
> A      Alcohol.
> Q      Alcohol?
> A      Yes.
> Q      And in the altercations that you witnessed, were you able to distinguish who the main aggressor was or the main assailant?
> A      Basically it was Mr. Fell.
> Q      All right.  Do you know whether or not you came to regard Mrs. Fell as essentially a battered woman or a battered spouse?
> A      I would -- that's fair to say that, yes.
> Q      All right.  I understand that the time period we're talking about is about the end of October '89 to – about for one year, late October 1990?
> A      Somewhere in there, yes.
> Q      And during that time period she was afraid to take the necessary steps against him?

A        We – we offered her many times shelter.  We offered her shelter for her and her kids.  We offered her domestic violence help.  She refused every effort that we -- we tried to give her.

Q        Okay.  What was the date of this incident when Mr. – young Donald Fell wouldn't take a shower and the father gave him –

A        October 29th, 1990.

Q        Okay.  Do you know if that's around the same time that Debra Fell finally took some action against her husband?

A        Well, that's – this basically, I think, predicated that action, because this was the first time that we would – we finally were able to make an arrest.  She was going to follow through.  She did follow through at the magistrate level, which was a slight period of time.  He was court ordered away from the house.  Part of his bail was he was not to return to the house or have any contact.

Tr. VII-2 at 36-38.  Fell asserts that Officer Purcell was not qualified to offer such testimony, and that his trial counsel was ineffective for failing to object to this testimony, and his appellate counsel was ineffective for failing to raise this issue on direct appeal.  Generally, the rules of evidence applicable at trial do not apply at sentencing.  In any event, the record shows that prior to asking Officer Purcell whether he considered Debra Fell a battered woman, the prosecutor asked Officer Purcell whether he had much experience responding to domestic situations.  Officer Purcell indicated that he did.  Moreover, Officer Purcell had first hand knowledge of the relationship between Debra Fell and her husband as he had responded to their home on numerous occasions.  *Id*. at 28-29.  Therefore, he was certainly qualified to state, based on his experience and personal observations, whether or not he considered Debra Fell a battered woman.  Trial counsel's failure to object to this testimony and appellate counsel's failure to raise this issue on appeal was not constitutionally deficient.

Even if the Court were to determine that trial and appellate counsel's failures were error, Fell has not shown how, if in any way, he was prejudiced.

292

4. Testimony of William Kane

On the second day of his mitigation case, Fell introduced the testimony of William Kane, a counselor at St. Michael's School. Tr. IX-2 at 4. Mr. Kane testified, among other things, that Fell was housed in an intensive treatment unit at St. Michael's and was considered a mental health client. *Id.* at 24. On cross-examination the government sought to establish that Mr. Kane had not seen Fell since he left St. Michael's and that Fell, like any other individual, was able to make free choices.

> Q    So at that point when you last saw him – which would have been 1994?
> A    That would have been – when I discharged him, it would have been the spring – actually, it's probably on here. It would have been the spring of '95, I think.
> Q    Okay.
> A    Actually, I can't find a date, but I just – I remember he participated in the summer for the day treatment, so it would have been -- toward the end of the school year was the typical time to discharge kids, as well.
> Q    But you haven't seen him since then?
> A    I – as I said, I saw him here and there during the day treatment program, but our contact would have been, Hi, how you doing, you know. But I haven't seen him since, no.
> Q    And since then you don't really know anything about what he's been up to or the choices he's made since being there?
> A    No, I don't.
> Q    Do you believe that each individual does have to make choices in life?
> A    Yes, I do.
> Q    And they should be held accountable for their choices?
> A    Yes, I do.

*Id.* at 29-30. Fell claims that his trial counsel was ineffective in failing to object to this testimony and his appellate counsel was ineffective in failing to raise this issue on direct appeal. According to Fell, Kane's testimony constituted an impermissible comment on Fell's moral culpability.

293

Nothing could be further from fact.  The government's cross examination inquired into an individual's ability to make choices and his responsibility for those choices – not his moral culpability.  Trial counsel's failure to object to this testimony and appellate counsel's failure to raise this issue on appeal was not deficient representation.

Even if this court were to determine that trial and appellate counsel's representation was deficient, Fell has not shown how, if in any way, he was prejudiced by this brief testimony.

### 5.  Testimony of Matt Cunningham

In its rebuttal case, the government introduced the testimony of Matt Cunningham over Fell's objection.  Cunningham was a friend of Fell's growing up and he was asked about his interactions with Fell in an effort to inform the jury about Fell's character.  During one of the conversations that Cunningham had with Fell, they talked about what they would do if they committed murder.

> Q  Now, at times did you also talk about what it might be like if one of you committed murder and whether or not you would commit more than one murder?
> A  Yeah.  I recall a conversation like that.
> Q  And what did Donald Fell say?
> A  Well, he wasn't the only one involved in the conversation, but it went along the lines of, well, if  you killed one person, why stop there?  Because you are going to get the same punishment anyway, so –

Tr. XI at 51.  Fell claims that his trial counsel was ineffective in failing to object to this testimony and his appellate counsel was ineffective in failing to raise this issue on direct appeal.  But trial counsel had already objected, unsuccessfully, to the testimony of Cunningham.  *See* "Defendant Donald Fell's Memorandum on Extraneous Acts at the Punishment Hearing," Dkt. No. 193; Tr. XI at 56-57, 78.  Obviously, therefore, there was no need for another objection during the

294

testimony.  Even, if the court were to determine that trial counsel's failure to object again to

Cunningham's testimony was deficient representation, Fell has failed to set forth how, if in any

way, he was prejudiced.

> 6. Testimony of Matthew Kolojeski

During the guilt phase of the trial the government presented the testimony of Matthew

Kolojeski, a friend of Fell's.  After Fell and Lee brutally killed Terry King, they drove to their

home town of Wilkes-Barre and stayed with Kolokeski for a couple of days.  During that time

Fell, Lee, Kolojeski and Kolojeski's brother did drugs, drank and played cards.  The government

specifically asked Kolojeski about Fell's drinking:

> Q       Okay, thank you.  Now, you said that they [Fell and Lee] came to
>          the apartment.  Did they end up staying?
> A       Yes.
> Q       And what were you all doing at the apartment?
> A       Like I said, just pretty much drinking a little bit, smoking some
>          weed, hanging out.
> Q       What if anything were people drinking?
> A       Beer, and pretty sure they had a couple 40s.
> Q       When you say a 40, what is a 40?
> A       A 40-ounce of beer, bottle.
> Q       So that's a big, full, 40-ounce bottle?
> A       Yeah.
> Q       Now, had you drank with Donald Fell in the past?
> A       Yeah.
> Q       What did he like to drink?
> A       Mostly beer, pretty much.
> Q       And had you seen him drink beer in the past?
> A       Yes.
> Q       And he drank beer that day as well?
> A       Yeah.
> Q       Did he have a tolerance for alcohol?
> A       Yeah.  He – he seemed, you know, he was somebody that could
>          drink a little bit more than most people without actually being
>          impaired too easy
> Q       And how did you notice that?

A     Me just being an addict before, you know, when you see a guy that could drink, you know, more than a six-pack or something and not, you know, act any different, is usually a guy that has a tolerance.

Q     And you noticed that about Donald Fell?

A     Yeah.

Q     And, was his tolerance greater than yours?

A     Yeah, I don't drink alcohol.  I was more into drugs, so –

Q     But you had been around other people that had drank?

A     Yes.

Q     And his tolerance was higher than a normal person?

A     Yeah, pretty much.

Tr. III-1 at 119.  Fell claims that his trial counsel was ineffective in failing to object to this testimony for lack of foundation and his appellate counsel was ineffective in failing to raise this issue on direct appeal.  But the prosecutor established that Kolojeski had drank with Fell on several occasions and had an opportunity to observe Fell after consuming a significant amount of alcohol.  Therefore, Kolojeski testified based on personal experience and observations.  Further, Fell's tolerance of alcohol was clearly probative.  Trial counsel had no grounds to object to this testimony; therefore, his failure to object was not deficient representation.  Even if the court were to determine that trial counsel's failure to object to Kolojeski's testimony was error, Fell has failed to set forth how, if in any way, he was prejudiced by this testimony.

## XVI.    FELL'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL HAVE NO MERIT INDIVIDUALLY OR JOINTLY AS THEY HAD NO EFFECT ON THE OUTCOME OF THE TRIAL

Fell's claims of ineffective assistance of counsel warrant no relief either individually or cumulative.  As demonstrated above, Fell has failed to show that his trial counsel's performance was professionally deficient or prejudicial.

Fell's trial counsel began a mitigation investigation immediately upon being appointed to represent Fell, hiring a mitigation expert, as well as retaining the services of three mental health

296

experts to evaluate Fell and inform of potential mitigating information. Trial counsel also gathered documents, spoke to family members and devised an organized identifiable strategy in anticipation of trial. Fell's trial counsel called a total of 14 mitigation witnesses in the penalty phase, encompassing six distinct areas of testimony, including family members; social workers; law enforcement officers; teachers; correctional officers; and a prison consultant. As established above, these witnesses painted a very graphic picture of Fell's dreadful upbringing, plagued by chronic alcoholism, physical and emotional abuse, sexual abuse, neglect and ultimately, abandonment. In addition, trial counsel introduced a mitigation binder containing dozens of documents which related Fell's interactions during his childhood and adolescence with the social service department and the mental health system of his residential county. Indeed, the Second Circuit, in denying Fell relief, recognized the "extensive mitigation evidence" presented by Fell at trial. *Fell*, 531 F.3d at 230-31. Trial counsel's decision not to introduce additional evidence were informed and strategic decisions which are not opened to challenge post-conviction.

The jury thus had a comprehensive picture of Fell's background. The fact that the ultimate outcome of the trial was not life does not entitle Fell to relief. As established earlier, the reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances" (*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)), and without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. An analysis of Fell's claims from this perspective leads to the inevitable conclusion that Fell has not overcome that strong presumption that his trial attorney's conduct falls within the wide range of reasonable professional assistance. *Id*. *See also Jackson*, 162 F.3d at 85. Fell is not entitled to relief.

**XVII. THE GOVERNMENT'S FAILURE TO DISCLOSE EVERY REPORT OF INTERVIEW CONDUCTED BY THE FBI AND DR. WELNER AND FAILURE TO DISCLOSE INFORMATION FROM SOCIAL SERVICE AGENCIES DID NOT VIOLATE FELL'S FIFTH AND EIGHTH AMENDMENT RIGHTS**

Fell argues that the government violated its *Brady* obligations in failing to disclose certain FBI reports, Form 302s, during trial. None involved witnesses called by the government. The Court should reject this claim because Fell is mistaken on the facts and the law. The government turned over all FBI 302s Dr. Welner listed in his report with two limited exceptions. First, the government interviewed a number of people after the defense gave notice that it intended to call them as defense witnesses at the trial. Fell ignores the principle that *Brady* does not apply to information to which the defense already has access. The government does not have an obligation to provide FBI reports of interviews of defense witnesses. Second, the government failed to disclose one report for a non-defense witness, but as described below, it contained no material *Brady* information.

Fell also asserts that the government violated the Constitution by failing to disclose certain social service records and information once in the possession of the Social Security Administration. Again, Fell cannot show that the government failed to disclose material exculpatory information in its possession.

      1.  The Welner FBI 302s

Fell's petition fails to define precisely the scope of his factual claims with regard to the interviews considered by Dr. Welner. Dr. Welner listed 159 different pieces of information he considered in his report. These sources include everything from medical records to FBI reports to conversations Welner had personally. Fell's motion makes various allegations about non-

298

disclosure. For example, Fell first mentions that Dr. Welner's report notes that he considered the statements of "77 lay witnesses" and that the government "failed to disclose all but a few reports of investigations reflecting interviews of these individuals." This statement both misleading and incorrect. On the one hand, Dr. Welner spoke to a number of people himself without the FBI and there is no FBI report documenting the conversations. On the other hand, the government disclosed all of the FBI reports Welner listed except for the reports of 18 defense witnesses and one non-defense witness. Fell claims that counsel obtained 38 FBI 302s through a FOIA request that were not produced, but some of these appear unconnected to the Welner report.

Fell begins his argument by claiming that some of the reports he received under a FOIA request appear to contain "favorable information." First, he cites an interview report for Erika Balestra, Ex. 219. Yet Ms. Balestra was listed a defense witness prior to her interview. Second, he mentions the interview of "pen pal" of Fell's,[54] Carol Larochelle, but it does not appear among the reports Welner reviewed.[55] Third, he cites two other reports of "witnesses who appear to have known Donny earlier in his life." One of them, the interview of May 9, Ex. 119, was of a

---

[54] Fell's petition, at 300, lists this report as Ex. 127, but it appears to be Ex. 221, since Ex. 127 was left blank and Ex. 221 refers to a "pen pal."

[55] While Fell does not make the argument in any clear fashion in his motion, he has failed to make any preliminary showing that the government violated its *Brady* obligations with respect to FBI reports not reviewed by Dr. Welner. For example, the "pen pal" report details an interview with Carol Larochelle. The report shows that Ms. Larochelle's sole source for information was what Fell told her in his letters. Fell knew what he told her. The government could not have suppressed that information. Any such information is merely what Fell himself knows. Moreover, Fell obviously could have identified Ms. Larochelle (he can identify his pen pals) and had every opportunity to explain precisely what exculpatory information was, supposedly suppressed.

299

defense witness, Mr. Settas, and the other, the interview of June 1,[56] Ex. 221, was of Ms.

Larochelle, discussed above, was not reviewed by Dr. Welner, and involves someone who did

not know Fell before the murders.  Finally, Fell mentions a report of interview of a correctional

officer, Ex. 225.  This officer, Adam Barcomb, was interviewed by the defense and provided a

sworn statement to the defense prior to trial.  Thus, his information was known to the defense.

The FBI interviewed him after he provided a detailed statement to the defense.

Even assuming that listed defense witnesses provided the FBI with favorable information,

Fell cannot state a *Brady* claim based on the fact that the government failed to disclose its reports

of interviews of listed defense witnesses.  In a footnote, M 300 n. 107, Fell lists the people who

were the subjects of FBI 302s listed in Dr. Welner's report.  He lists 20 people, though he in fact

received the reports for one of those people.[57]  Fell neglects to mention that 18 of those people

were listed as his defense witnesses prior to trial.  *See* Exhibit H (defense witness lists).[58]

Fell fails to consider in any regard well-established *Brady* case law addressing the failure

to disclose information the defense already knows.  As noted above, one of the elements of a

*Brady* violation the petitioner must establish is that the government suppressed favorable

---

[56] Fell's petition, at 300, lists Exhibit 221 was report dated May 11, but in fact it is dated June 1.

[57] One of the 20 people, Robert Lee, Sr., was the subject of two FBI 302s, dated May 10, 2005 and May 24, 2005.  The May 24 302, which addressed substantial matters, was produced to the defense on July 6, 2005.  *See* Exhibit L (government discovery letter with attachments).  The May 10 302 dealt with Mr. Lee's questions about his son's death in jail and contains no favorable material evidence.  *See* Exhibit G.

[58] Ericka Balestra, Mark Balestra, Tim Brooks, Theodore Settas, Ellis Carle, Geraldine Fell, Deanne German, Sharon Hinchey, Donna Williams, Justine Taylor, Jason Rushlow, Ronald Barclay, Mary Jo Scott, Diane Sergi, James Bailey, Mariann Chiumento, Donna Williams, and Chris Purcell.

information.  he Second Circuit has held that "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney "'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" *United States v. Payne*, 67 F.3d 1200, 1208 (2d Cir. 1995) (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993), and *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)); *accord United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990); *United States v. Exposito*, 834 F.2d 272, 275 (2d Cir. 1987).  Obviously, with regard to defense witnesses, Fell's counsel knew that they had potential favorable information.  There is no evidence that the defense did not contact and interview all of its own defense witnesses.  After they were listed, the government attempted to speak with them in an effort to understand their role in the case.  This happens in virtually every criminal case.  A defendant should not be heard to complain that he did not receive government reports of interview as to his own witnesses.

There is only one person, Sanda Bowles, not listed as a defense witness but listed by Dr. Welner.  The government has attached an unredacted copy of this FBI 302.  *See* Exhibit I.  It is apparent from the report that the failure to disclose it cannot state a *Brady* violation.  Sandra Bowles is Fell's maternal aunt.  She was interviewed on May 18, 2005 in South Carolina.  Ms. Bowles described Fell's history generally.  Fell knew both that he had an aunt and that she was aware of his general history.  Ms. Bowles recalled some incidents from Fell's past, including the knife fight incident involving Fell's parents, but this information was presented to the jury by other witnesses and was not contested.

Fell also argues that the FBI reports suggest medical misconduct by Dr. Welner, in particular violations of the Health Information Portability and Accountability Act and other

301

privacy laws. This argument is also flawed. This claim might have relevance if Dr. Welner testified, but he did not. Even if Fell could make this point from the evidence – and the government does not concede that he can – the information is at best *Giglio* information that could be used to cross examine Dr. Welner. Since he did not testify, the only plausible *Brady* claim is that had the defense known of this potential impeachment that knowledge would have affected its decision with regard to its mental health case. That claim is simply too farfetched. Fell has failed to proffer any argument that this minor impeachment information would have affected his trail strategy.

Further, Fell complains about Dr. Welner's failure to mention that he was present during the interview of Stella Banas, Fell's step-grandmother. This fact does not make out a constitutional claim. On April 6,2005, Dr. Welner and FBI Agent Glenn interviewed both Stella and her daughter, Jeanette Banas. Agent Glenn prepared an eight-page report about Jeanette's interview, which was disclosed to the defense on April 28, 2005. Dr. Welner cited Jeanette's report as providing information he relied on. It is clear from both reports that Jeanette had more detailed recollections than her mother, who was 82 in 2005. Stella's report is two pages and contains few details. Perhaps Dr. Welner never received the Stella Banas report, or he decided to rely on Jeanette's more detailed recollections. Fell is also wrong on the facts. He claims that he did not receive a copy of Stella's report. Fell's counsel received a copy of the report with a discovery letter on April 20, 2005.[59] Thus, defense counsel knew that Dr. Welner was present for

_____

[59] As noted above, Fell also complains in passing about FBI reports unrelated to Dr. Welner's analysis that were supposedly not disclosed. In order to state a colorable *Brady* claim with regard to such reports, Fell must make a greater showing than he does. Fell notes that Agent Heilner interviewed a St. Michael's worker on July 5, 2005, Ex. 32. In fact, Agent Heilner spoke that day with William Kane, former St. Michael's employee and defense witness, whose contact

Stella's interview.  Jeanette Banas and Stella Banas were also on the defense witness list.

### 2.  Social Service Records and Social Security Records

Fell also makes several claims with regard to information in the social service and Social Security records.  All should be summarily rejected.

First, Fell argues that the government committed a *Brady* violation by its allegedly selective incorporation of a portion of a report by Mark Innocenzi in the background investigation of Fell done by the FBI in 2001.  Innocenzi apparently worked as a social worker for St. Michael's.  In 2001, FBI Agent Glenn copied part of the St. Michael's records into the Fell background report.  Fell now claims that the FBI Agent failed to excerpt critical *Brady* information.  This claim misses the mark.  On the one hand, Fell now claims that the "full report" contains additional information, but the government cannot find this "full report" in the motion or its exhibits.  On the other hand, the only additional information is a claim that Fell's grandmother "believed" that Fell had been molested by his father.  Fell's grandmother, Theresa Sharpe, died in 1994, and was unavailable as a witness.  Fell's counsel obviously spoke with many other family members and clearly investigated the claim that Fell had been abused.  There has been no showing that Agent Glenn failed to include important information.[60]

Second, Fell makes the argument that the government suppressed material information about Fell's Social Security Supplemental Security Income.  Fell fails, however, to make any

---

information the defense provided to the government on July 4, 2005.  Fell called Mr. Kane as a defense witness on July 7, 2005.  In short, the FBI report concerned a defense witness who was actually called to testify.

[60] Agent Glenn was only allowed to review the Innocenzi information at St. Michael's. He hand copied the information for his 2001 background report.  The government never received the complete records from St. Michael's.

showing that the government possessed additional Social Security information.  The Social

Security Administration was not part of the prosecution team and the prosecution had no

obligation to disclose its Social Security Records.  In any event, Fell now has failed to make any

showing that additional Social Security records existed in 2005 or that they would have been

material to the defense.  The defense presented various mental health records as part of its

mitigation case.  The jury learned that Fell received mental health treatment on multiple

occasions.  The defense consulted with various mental health experts.  Fell and various family

members knew that Fell  received some sort of Social Security payments.  Indeed, the Jeanette

Banas FBI 302, disclosed to the defense in April, 2005, notes that Ms. Banas understood that Fell

received some sort of SSI support.  There is no evidence that Social Security records would have

added anything to the defense case.

## XVIII.  NO GOVERNMENT FAILURE TO DISCLOSE PHYSICAL EVIDENCE, OR FAILURE BY COUNSEL TO INVESTIGATE SAME, WARRANTS § 2255 RELIEF

Fell contends that the government suppressed physical evidence that would have

supported his claimed impairment by controlled substances, and that counsel ineffectively failed

to investigate such evidence.  There is no basis for the argument.  In any event, at least as to

misconduct by the government, it could have been raised during the criminal case, both at trial

and on appeal, and cannot now be raised collaterally, a decade later.

When arrested, Fell's various minimizing statements included his claim that his mother

was a "crack addict," and that "we . . . were smoking crack and drinking Budweiser" shortly

before the Rutland killings.  Guilt phase trial evidence established that there were many empty

beer cans at the Rutland crime scene, but no drug evidence other than a small film canister

containing some marijuana seeds.  Consistent with that fact, toxicology on the bodies of Debra Fell and Charles Conway showed no controlled substances except (a significant amount of) alcohol.  Trial counsel reviewed the Rutland crime scene evidence prior to trial, and photographs of the apartment were introduced at the guilt phase.  In any event, the killing of King in Dover Plains, New York, took place about four hours after the Rutland killings.

Fell now claims that critical physical evidence found in King's car in Arkansas was withheld by the government and not investigated by counsel.  M 308.  He bases this argument on an FBI form listing seized items, including a small bottle labeled "Patchoili Tunisian,"containing brown liquid, and a cigarette box containing small plastic bags.  Prior to trial defense counsel reviewed that evidence, in the custody of the FBI's Albany Division office.  What they found, consistent with what the government found, was no evidence of drugs.  Patchoili Tunisian is a "perfume oil," as an internet google search quickly indicates, and bottle's scent confirms.  The several small baggies in the Marlboro cigarette box were empty.  There is no basis for § 2255 counsel's claim that those items were tested (they were not), and no basis for the claim of unconstitutional conduct by the government and Fell's trial lawyers.

Counsel also purports to find significant the fact that the two pipes found in King's Neon were not tested for crack.  Again, in the absence of any evidence that Fell was high on crack when he and Lee killed King in New York, and in view of overwhelming guilt evidence of her purposeful, willful murder, the lack of testing was of no moment.  Even if Fell did smoke crack in Rutland hours before killing King in New York, that fact would have been of dubious

305

mitigating value.[61]  Certainly the decision to eliminate that witness to the flight from Vermont was calculated and not reflective of a tranquilized mind.

The facts as to the two pipes are as follows.  Officer Jeff Ross, who arrested Fell and Lee in Arkansas traveling in King's car, described evidence found in that car, as did Jerry Spurgers, the FBI agent who searched it pursuant to a warrant.  Prior to trial, Ross testified at the March 16, 2005 suppression hearing that there were two "smoking devices, pipes, or in that nature that were used for smoking marijuana" in the car.  Transcript at 30-31.  He testified that he thought they were used for marijuana based on their smell and design, and his experience.  *Id*.  At trial counsel cross-examined Ross about whether the pipes were used for marijuana or crack.  Tr. I at 140.  Ross testified that they did not go to the laboratory, but his "training and experience" led him to believe that they were pot pipes, not crack pipes.  When pressed, Ross conceded that he was not "a hundred percent," but went into some detail about respective pipe design, concluding that crack pipes were usually glass, and had small, "single hitter" bowls, unlike the pipes found in King's car.  *Id*. at 142.

Fell fails to demonstrate unconstitutional conduct by either the government – which he fails to show suppressed drug evidence – or trial counsel, who decided to cross-examine Ross on the pipes rather than seek testing with at best nominal possible benefit.  Of course, if a test had come back with negative results for crack, Fell's claim, and counsel's theory (or suggestion) that he had been smoking crack the night of the killings would have been completely undercut.

---

[61]  Lee's statement, which the defense successfully excluded from trial, was that about six hours before the Rutland killings, Fell obtained a pipe that reportedly had crack residue on the screen, and he and Fell smoked the screen.

306

Fell also claims, over ten years after trial, that "a complete evidence log" for the Rutland crime scene was not found in trial counsel's files. Yet the necessary premise of his argument, that drug evidence was suppressed or overlooked, is pure speculation. Trial counsel reviewed the Rutland evidence prior to trial. Photographs of the crime scene were made available to counsel and introduced at trial. The evidence was described in testimony during trial. The record is devoid of any reason to suspect impropriety as to this issue.

## XIX. THE GOVERNMENT DID NOT VIOLATE *BRADY*

Fell sets forth a number of claims alleging that the government failed to disclose favorable evidence. None of Fell's claims in that regard have any merit whatsoever; the bulk of them are pure speculation. As demonstrated herein, the government was forthcoming throughout the discovery process in this case. The documents that Fell alleges the government failed to disclose were not in the government's possession, or did not constitute favorable evidence that required disclosure.

The government was not in possession Eike's medical records or any records pertaining to his criminal history. While the government did conduct an NCIC check, the information obtained was not favorable to Fell. *See* section VI(B)(1)(c), *supra*. Nor was the government in possession of Officer Marc Pelkey's Vermont Department of Corrections disciplinary record. Notwithstanding Fell's assertions to the contrary, the government did disclose its investigation of Lee, including all documents obtained pursuant to that investigation. While the government did not disclose Lee's prison records, that information was not favorable to Fell in light of Fell's trial strategy. *See* section VIII, *supra*. Moreover, the government disclosed the existence of witness

307

Francis Bellantoni and a corresponding statement containing the substance of his testimony. *See* section VIII(B)(2), *supra*.

## XX.    NO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT WARRANTS § 2255 RELIEF

Fell contends that the government committed prosecutorial misconduct during closing arguments, depriving him of a fair trial. If there had been such misconduct, Fell should have raised it at trial, or, after obtaining a new set of lawyers, on direct appeal. In fact, he did raise several of these claims in a post-trial motion, and on appeal. At this time, all of the arguments are foreclosed for purposes of § 2255 collateral attack.

Fell's claim that the prosecutor misstated the law regarding the evaluation of mitigation evidence was explored by this Court post-trial, and reviewed and rejected by the Second Circuit on the direct appeal. *Fell*, 531 F.3d 221-225.

Fell also protests that, during the guilt phase summation, the prosecutor stated that there was "no evidence of [Fell] drinking" on the night of the Rutland murders "other than Mr. Bunin's speculation." M 313. Again, this claim was procedurally defaulted during the criminal case. Counsel urges that this was a prejudicial and "gross mischaracterization," despite the fact that it drew no objection, and was evidently overlooked both by the three trial lawyers and the three (new) appellate lawyers. If, as Fell now asserts, the record was "rife" with evidence of Fell's drinking, then presumably the jury followed the Court's instruction that attorneys' arguments "are not evidence" and that only "the evidence" can be considered in reaching a verdict. Tr. IV-2 at 11. Yet the evidence of Fell's drinking was, in fact, thin. More importantly, evidence of his intoxication was non-existent. It was uncontested that there were many beer cans

308

in the apartment, but that arguably explained why both murder victims had high BAC that night. Only Fell's post-arrest statement claimed that he had also been drinking, and his post-arrest statements were false and minimizing in multiple regards. In any event, the evidence was uncontested that Fell had a life-long controlled substance problem, and that beer was a substance of choice. Whether guilt phase evidence showed that he was drinking beer the night of the Rutland murders, before driving interstate to New York and killing King hours later, was of nominal significance. The statement of the prosecutor in guilt phase rebuttal, even if inconsistent with the record, could not have prejudiced Fell. There was simply no evidence that Fell was intoxicated when he killed King, and there was ample evidence that he was not. Thus, not a single juror found that Fell's "capacity to appreciate his conduct was significantly impaired." Special Verdict Form, p. 15.

Fell also protests "numerous inflammatory remarks" by the government during penalty phase closing regarding his "religious practices." The government made the observations in response to Fell's contention, set forth in both mitigating factors and trial testimony, that he had adjusted well to prison and was a good inmate. The prison evidence showed that Fell was a font of grievances at the facility, and attended Bible studies, filed suit to protect his purported interest in Native American religious practices, and sought to participate in Muslim traditions as well. The government's contention – again, in rebuttal – was that his prison conduct reflected manipulation. Further, the most significant prison evidence – the videotaped altercations – indicated Fell's aggressive resistance to authority and his willful seeking of violent confrontation with corrections officers.

309

The bulk of the remarks Fell protests were in response to his own contentions and evidence.  Government counsel would have been remiss in ignoring the prison evidence, including the religious practices evidence.  Further, the remarks were brief, and but one part of a lengthy closing argument over 50 pages of transcript.  And the Court instructed the jury to consider only evidence, not arguments, in reaching its verdict.  Finally, any claim of government impropriety as to the remarks was foreclosed during the criminal case, and is not a proper subject for § 2255 review.

Fell also protests the government's penalty phase argument that, based upon his extraordinary crimes and the respective weight of aggravating and mitigating factors, he did not deserve a lifetime in prison.  Prison, the government submitted, while a diminished life, was nonetheless a life with undeserved comforts and pleasures.[62]  The issue of whether Fell deserved a life sentence, or a death sentence, was *the* issue at the trial, and the government was obligated to argue it.  The Court will recall that the government's final argument was brief, and was

---

[62]  Fell cites *Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002), and *Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002), yet both cases affirmed capital verdicts.  Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case.  *See United States v. Higgs*, 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate).  As in *Higgs*, in which the defense argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was a response to the defense mitigation phase contention that Fell, if given a life sentence, would spend his life, as described by defense expert Aiken, "under a gun at a U.S. Penitentiary."  *See* Tr IX-2, p. 62 ("Fell can be adequately managed within the Federal Bureau of Prisons for the remainder of his life . . . and if lethal force has to be applied, it would be").  Moreover, even if a comment offends Oklahoma's "three cots" doctrine, which defines as misconduct arguments that compare the relative comforts of prison with the fate of the dead victim, the prosecutor in this case did not make the comment in an inflammatory appeal, and certainly made no statement that infected the trial with unfairness.

delivered calmly and quietly.  Certainly a capital verdict should be based on reason, not emotion

or even sympathy.  The prosecutors here, both in the extended closing argument, and in the short

rebuttal, were not emotional and did not incite the jury's emotions.  Inevitably, in a trial

involving three brutal murders, including the murder of a grandmother (with testifying family

members), emotions run high.  Yet emotions at trial were not improperly inflamed by the

prosecutors, and the detailed Special Verdict Form reflects reasonable, deliberate findings by the

jury.  Finally, any impropriety regarding the prosecutors' arguments should have been raised

during the criminal case.  They are not a proper subject for collateral review.

## XXI.   NO CUMULATIVE IMPACT FROM PROSECUTORIAL MISCONDUCT DURING ARGUMENTS WARRANTS § 2255 RELIEF

Fell urges that the cumulative impact of prosecutorial misconduct warrants collateral

relief.  In rejecting Fell's cumulative impact argument on direct appeal, the Second Circuit made

the following observation:

> not every error – whether alone or in combination with others – warrants a new trial.  *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.").  As we have discussed, the trial conduct challenged by Fell either was not improper, was not prejudicial, or fails plain error review.  The district court's evidentiary rulings were thoughtful and meticulous; none approached an abuse of its broad discretion.  Because considered singly, none of the errors claimed by Fell undermine our confidence in the fairness of the proceeding, we similarly conclude that, given the care and soundness with which this trial was conducted, "the cumulative error doctrine finds no foothold in this appeal."

531 F.3d at 233 (citation omitted).  The same considerations and outcome apply here**.**

Further, arguments about the nature of the prosecutors' arguments at trial should have

been raised during the criminal proceedings.  Some were, and were adjudicated adversely to his

interests; some were not.  Either way, they are not properly the subject of this collateral litigation,

311

years later.  None of the alleged errors, taken either single or cumulatively, warrant § 2255 relief.[63]

## XXII. FELL FAILS TO ESTABLISH JUROR MISCONDUCT WARRANTING POST-CONVICTION RELIEF

Fell claims that juror misconduct requires the vacating of his death sentence under § 2255.  He argues that during jury selection jurors 162 and 26 failed to disclose information that would have subjected them to challenge for cause, and that jurors 143 and 26 were exposed to extrinsic matters considered during jury deliberations, causing him prejudice.

Initially, Fell fails to explain why his juror claims, raised for the first time on § 2255 collateral review, are not procedurally defaulted.  As stated above, *see* section II(C)(3), *supra*, the procedural default doctrine generally bars from consideration on collateral review claims which could have been raised during the criminal litigation.  Fell does not say how and when he learned of the alleged juror misconduct.  Presumably he found the information when interviewing jurors during the preparation of his § 2255 filing.[64]

The bulk of juror misconduct cases arise in motions for new trial, typically under Fed. R. Crim. P. Rule 29 or Rule 33, litigated prior to direct appeal.  Each of Fell's § 2255 juror claims is based upon facts existing prior to verdict.  Fell has not explained why he could not have discovered those facts in a timely manner, so as to litigate them during the criminal case.  Nor

---

[63]  Fell's arguments XXII and XXIII will be addressed in a separate filing.

[64]  The government has been informed that Fell filed an *ex parte*, sealed motion for leave to interview jurors.  The government was, and remains, without knowledge of the contents of the motion and the resulting order.  Absent such knowledge, and absent any explanation by Fell for his failure to timely raise juror issues, the government is at a disadvantage.  However, there is no apparent reason why Fell could not have learned of the juror issues during the criminal case, instead of waiting until that litigation was concluded.

does Fell establish that his claims fall within an exception to the procedural default doctrine.  He has not shown his innocence, nor has he demonstrated cause and prejudice for his omission of this contention from earlier proceedings.  *See Schlup*, 513 U.S. at 321; *Wainwright*, 433 U.S. at 84.  Fell points to no factor external to the defense that prevented trial counsel from raising his present constitutional claim.  Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty."  *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).  Having failed to raise the juror misconduct issues during the criminal case, and failed to explain why he may raise them years later on collateral review, his claims should be barred.

In any event, as set forth below, none of the juror misconduct claims have merit.

A.  Fell Cannot Establish Deliberate Juror Deceit During Voir Dire

"It is, of course, the rule that a motion for a new trial must be granted if the trial was not fair to the moving party."  *Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996).  "One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *see also United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006); *United States v. Nelson,* 277 F.3d 164, 201 (2d Cir. 2002).

"A strong presumption exists against setting aside jury verdicts based on charges of juror misconduct."  *United States v. Greer*, 998 F. Supp. 399, 405 (D. Vt.,1998), citing *Tanner v. United States*, 483 U.S. 107, 120 (1987), *affirmed*, 285 F.3d 158 (2d Cir. 2002).  "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process."  *Tanner*, 483 U.S. at 120.

313

"[I]f such allegations were frequently pursued, jurors would be less able to communicate freely in deliberations, less willing to render unpopular verdicts, and the public would lose its trust in the jury system." *Greer*, 998 F. Supp. at 405, citing *Tanner*, 483 U.S. at 120-21; *see also United States v. Radonjich*, 1 F.3d 117, 120 (2d Cir.1993) (public has interest in full and free discussion inside the jury room; jurors have interest in returning to private life after verdict without fear of being questioned or harassed).

The Court in *McDonough Power* observed that:

This Court has long held that "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231-32 (1973), quoting *Bruton v. United States*, 391 U.S. 123, 135 (1968), and *Lutwak v. United States*, 344 U.S. 604, 619 (1953). Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing case load. Even this straightforward products liability suit extended over a three-week period.

464 U.S. at 553.

In *McDonough,* a products liability case involving a boy injured by a lawnmower, the court asked the venire whether they or any member of their families ever suffered an injury "that resulted in any disability or prolonged pain and suffering." *Id.* at 555. The juror at issue did not respond, but after trial the respondent discovered that the juror's son had been injured (and his leg broken) by an exploding tire. *Id.* The respondent requested a new trial. *Id*. at 549.

The Supreme Court reversed the 10th Circuit and held that a new trial was not required. Where the juror had not considered his son's broken leg to have involved "disability or prolonged pain and suffering," the matter involved mistake, not dishonesty. The Court reasoned:

[J]urors are not necessarily experts in English usage. Called as they are from all walks of

314

life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges. Moreover, the statutory qualifications for jurors require only a minimal competency in the English language

. . .

To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination. Whatever the merits of the Court of Appeals' standard in a world which would redo and reconstruct what had gone before upon any evidence of abstract imperfection, we think it is contrary to the practical necessities of judicial management . . . .

464 U.S. at 555-56.

The *McDonough* Court articulated the following two-pronged rule applicable to juror false statement claims: "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." 464 U.S. at 556. The Court added, that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id*.

The *McDonough* rule applies to criminal trials. *See United States v. Greer,* 285 F.3d 158, 170 (2d Cir.2002). The Second Circuit has never found reason to overturn a verdict on the basis of juror nondisclosure under *McDonough*, and only once, in *United States v. Colombo,* 869 F.2d 149 (2d Cir.1989), has remanded for an evidentiary hearing. *See Stewart*, 433 F.3d at 303.[65]

---

[65] In *Colombo,* a district court's decision to refuse Rule 33 relief on the basis of alleged false *voir dire* responses was vacated and the case was remanded for an evidentiary hearing. *Colombo,* 869 F.2d at 150. The alleged false responses asserted by Fell differ significantly from the ones at issue in *Colombo.* There, the defendant's Rule 33 motion was supported by an alternate juror's affidavit, which stated that one of the jurors (i) confided that she failed to disclose that her brother was a government attorney because she feared the relationship would

315

This Court in *Greer, supra*, relied upon *McDonough* in denying a Rule 29 motion for new trial, when a convicted drug defendant learned after trial that one of the jurors was the brother of a man identified at trial as purchasing 10 pounds of hashish from the defendant years before. 998 F. Supp. 403-04. Further, the juror knew that his brother had been in jail on other charges some 27 years before trial. In addition, on the eve of trial, juror received a phone call from an acquaintance of the defendants who "encouraged" him to lend "a sympathetic ear" to the defendant. *Id*. Despite these circumstances, the juror inaccurately responded "no" to questions as to (1) whether any "relative" had been a witness to a crime or accused of a crime, and (2) whether he had spoken to any "outsiders" about the case.

Applying the *McDonough* rule, the Court found that the juror had not intentionally lied. Reviewing the *voir dire*, the Court observed that the juror had been honest in response to other questions, such as exposure to media about the case. Given the lapse of nearly 30 years since his brother's jailing, the fact that he did not know if this brother had actually been convicted, along with the distance between himself and his brother, the Court found that the mistakes reflected an "honest oversight," *id.* at 406, and that the defendant had not satisfied the first *McDonough* prong. Also, the Court found that the juror "felt that his judgement was unaffected by the third party contact." *See McDonough,* 464 U.S. at 556 ("[t]he motives for concealing information may

_____

make her ineligible to serve on the jury, and (ii) asserted familiarity with one of the conspirators' meeting places as a "hang out for gangsters." *Id.* In *Colombo,* "it was not simply that the lies in question were deliberate, but that *the deliberateness of the particular lies evidenced partiality.*" *Greer,* 285 F.3d at 172-73 (discussing *Colombo*). Thus, where the *Colombo* affiant specifically asserted that the juror admitted not only concealment, but concealment of facts from which specific bias could be inferred, the alleged lies, if established, would demonstrate both dishonesty and partiality and would satisfy both prongs of the *McDonough* test. *Id.* That is not the case here.

vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial").  In sum, "[t]he Court will not attribute a malicious design to a juror where the evidence does not indicate one."  998 F. Supp. at 407.

As to the second *McDonough* prong, the Court in *Greer* found that there was no evidence of bias on the part of the juror, and that "there is no basis for a challenge for cause."  *Id*. at 409 (observing that the brother's "role in the trial was inconsequential").

Challenges for cause are generally based on actual bias, implied bias, or inferable bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997).  Actual bias is bias in fact.  *Id*. Implied bias is bias presumed as a matter of law.  *Id*. at 45.  "In contrast to the inquiry for actual bias, which focuses on whether the record at *voir dire* supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced."  *Id*.  The Second Circuit has cautioned that "automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself."  *Id*.  "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias."  *Id*. at 47.  As with actual bias, "the judge's determination [of inferred bias] must be grounded in facts developed at *voir dire*."  *Id*.

This Court conducted an extensive and thorough *voir dire* process.  Prior to the beginning of *voir dire*, prospective jurors filled out a 34-page questionnaire containing 75 questions divided into six parts. The questionnaire inquired as to each prospective juror's: (1) background; (2) experiences and beliefs; (3) grasp of basic legal principles; (4) views concerning the death

317

penalty; (5) exposure to media treatment of the case or the death penalty; and (6) schedule during the anticipated three weeks of trial. The parties had the opportunity to review completed questionnaires in advance of *voir dire*. The Court then conducted a group *voir dire* to determine hardship. Each prospective juror was then individually questioned first by the court and then by attorneys for the parties. Over the government's objection, the Court permitted case specific questions during individual *voir dire*. *See United States v. Fell*, 372 F. Supp.2d 766, 770-71 (D. Vt. 2005). The improprieties cited by Fell are far less significant than those treated in Greer, and do not even warrant a hearing, much less the vacating of a verdict resulting from a lengthy trial.

### 1. Juror 162

Fell claims that juror 162 purposely failed to disclose during *voir dire* that she was sexually abused as a child. According to Fell, juror 162 should have provided this information in response to question number 38 of the juror questionnaire: "Have you or has a family member or close friend ever been a witness to or the victim of a crime?" Juror 162 marked "No" in response. During a post-conviction interview apparently conducted by counsel, juror 162 was asked about her deliberative process and her reasons for voting for death. She responded as follows:

> At trial we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.

P. Exh. 280 at 2-3, Fell-00002580-2581.

318

As established above in section IV(E)(1)(a), *supra*, Fed. R. Evid. 606(b) prohibits the use of juror testimony to attack the verdict.  It provides in pertinent part:

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict* or indictment or concerning the juror's mental process in connection therewith.

Fed. R. Evid. P. 606(b) (emphasis added).  The statement of juror 162 falls squarely within the parameters established by Rule 606(b) and cannot be considered by this Court.  Fell should not have inquired about juror deliberations, and (apparently) having done so, cannot rely upon a juror's declaration regarding her deliberative process to establish and support  his claim.  Rather, Fell must produce evidence not barred by Rule 606(b).  *See Lopez v. Aramark Uniform & Career Apparel, Inc.*, 417 F. Supp.2d 1062, 1071 (N.D. Iowa 2006).  He has failed to produce any such evidence; therefore, his claim must be denied.

Even if the court were to consider juror 162's statement, under the *McDonough*/*Greer* rule there is no reason to suspect that it was deliberately false.  Juror 162 was 62-years-old when she completed her questionnaire.  Her sexual abuse, therefore, was approximately *50 years* before trial.  *See* Questionnaire of Juror 162 at 5, attached hereto as Exhibit M.  When juror 162 completed her lengthy questionnaire before trial, it is reasonable to infer that she did not readily think of events a half century earlier, particularly if, as is evident from her other answers, no charges were brought.  *See* Exhibit M at 18.  Similarly, in *Greer* this Court found the lapse of about 27 years significant in explaining a juror's failure to disclose that his brother had been jailed.  This Court should "not attribute a malicious design to a juror" absent any basis for so doing.  *Greer*, 998 F. Supp. at 407.

319

Further evidence that juror 162 did not purposely conceal abuse as a child is the fact that she readily disclosed the fact that her son had been charged with a crime 16 years prior to trial. Specifically, juror 162 reported that her son had been placed under house arrest for Driving Under the Influence and Domestic Violence. *See* Exhibit M at 19. *See also* Court Questionnaire, p. 2, attached hereto as Exhibit M2. She also readily disclosed the childhood abuse when interviewed by Fell's § 2255 team.

The conduct of juror 162 resembles the conduct of a juror in *United States v. Adeniyi*, 277 Fed. Appx. 22, 24 (2d Cir. 2008). In *Adeniyi* a juror disclosed, on the second day of trial, that he had personal experience of fraud, in the form of bounced checks submitted to his business, but that it had not occurred to him during *voir dire* that this might make him a crime victim. The district court found that the juror did not fail to answer honestly a material question on *voir dire* because "the information he provided was not directly responsive to any of the questions asked of him by the Court," and that nothing in the juror's disclosure, or in his responses to further questioning, permitted an inference of bias or provided the basis for a challenge for cause.

Juror 162 stands in sharp contrast with "juror C" in *United States v. Sampson*, --- F. Supp.2d ----, 2011 WL 5022335 (Oct. 20, 2011). In *Sampson*, during both individual *voir dire* and a post-conviction hearing, juror C purposely and repeatedly concealed information in response to seven different juror selection questions. 2011 WL 5022335, * 26. She "intentionally gave false answers to many important questions in her questionnaire, during individual voir dire, and in these § 2255 proceedings . . . ." *Id*. *24. The hidden information, which the juror continued to experience as a "humiliating" "nightmare," *id*. at *30, involved criminal activities by juror C's second husband, as well as by her daughter. Her second husband

was a violent man, who only three years before jury selection had stalked juror C, threatening to kill her by shooting her with a gun. The daughter was a drug addict, jailed for drug offenses. When those matters finally came out, the juror was intensely emotional.

In addition to finding that juror C had intentionally and deliberately given false answers to selection questions, the court in *Sampson* found bias, because the juror's "reasons for lying during *voir dire* reflect her deep emotional distress about events similar to those presented in the trail and are, therefore, 'reasons that affect her impartiality.'" *36, quoting *McDonough*. The concealed, deeply emotional experiences could have led the juror to relate to Sampson's victims. "Like Sampson's victims, C had experienced the fear of being murdered. Like the bank tellers Sampson robbed, she had been threatened with being shot. Like Sampson's former wife, C had a marriage that was destroyed by her husband's abuse. And like Sampson's parents, C was deeply ashamed of her child and refused to be associated publicly with her problems." 2011 WL 5022335 at *36.

Juror 162's alleged dishonesty concerned one written *voir dire* question, not seven, and related to events decades before trial, not three years. Further, juror 162 readily disclosed her prior experience in Fell's Exhibit 280, instead of desperately concealing it, like juror C in *Sampson*. And juror 162's experience would not cause her to sympathize with Fell's victims, in contrast to juror C in *Sampson*.

Like the juror in *McDonough*, it is likely that juror 162 – even if she had events of 50 years prior in mind – did not understand question 38 to require disclosure of an event that she did not think was responsive. She may no longer view herself as a victim, or more likely, no longer thinks about her childhood abuse at all. Moreover, while child sexual abuse today is a readily

321

recognized crime to those familiar with the criminal justice system, the unfortunate reality is that 50 years ago many persons did not readily recognize it as such. Fell fails to establish deliberate deceit on the part of juror 162, so as to satisfy the first element of the *McDonough* inquiry. *See, e.g., Greer*, *supra*, 223 F.3d at 48-49.

In any event, even if juror 162 had disclosed sexual abuse as child, this information, taken together with her answers to her questionnaire and during individual *voir dire*, does not permit an inference, much less a factual finding, of bias that would have supported a challenge for cause.[66] As established above, *McDonough*'s second prong requires that a party moving for a new trial show, in addition to deliberate dishonesty, that a correct answer to a question at *voir dire* would have provided a valid basis for a challenge for cause. *Greer*, 285 F.3d at 171. "The district court then must determine if it would have granted the hypothetical challenge." *Id.* *See also United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) (noting that under the second prong of *McDonough*, a defendant must have a basis for arguing that the district court is required to sustain his challenge for cause). Fell cannot make this showing. Even if juror 162 had disclosed that she had been the victim of sexual abuse as a child, that alone would not have subjected her to challenge for cause. Fell was not charged with sexually abusing others, but rather claimed that he was a victim of sexual abuse, as one component of a tragic childhood.

The Supreme Court has acknowledged that jurors bring information, knowledge, and experience into deliberations with them. *Peters v. Kiff*, 407 U.S. 493, 503 (1972) ("Individual jurors bring to their deliberations 'qualities of human nature and varieties of human experience,

---

[66] Juror 162's statement in Fell's Exhibit 280 also reflects a conscientious, impartial juror.

the range of which is unknown and perhaps unknowable'"). In *McCleskey*, the Court found a capital sentencing jury's ability to draw upon jurors' individual experiences during deliberations helped build "discretion, equity, and flexibility into" the legal system. *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987). In *Beck*, the Court discussed a juror's ability to draw on his experiences and acknowledged that "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." *Beck v. Alabama*, 447 U.S. 625 (1980) (quoting *Jacobs v. State*, 361 So.2d 640, 652 (Ala. 1978).

Past sexual abuse does not establish *per se* grounds for a challenge for cause. In *Lopez*, the district court concluded that two female jurors' failure to disclose past sexual abuse was not grounds for re-trial. *Lopez*, 417 F. Supp.2d at 1071. In that case, the defendant was accused of sexual harassment by past employees. *Id*. at 1065. During *voir dire*, the court asked the venire if any member or someone in their families were victims of sexual harassment or discrimination. *Id*. at 1068. The court also asked whether there was any aspect of the case that would make any member question their impartiality and whether they, if a party in the case, would want a juror with a similar frame of mind as themselves to decide the case. *Id*. Following the jury's significant damages award to the plaintiffs, the defendant learned the jury was heavily influenced by two jurors who discussed their alleged past sexual abuse during deliberations. *Id*. at 1065. The defendant moved for an evidentiary hearing to investigate the jurors' failure to disclose that abuse at *voir dire*. *Id*.

The court noted that the first prong of its inquiry required consideration of whether the jurors could have "honestly believed" no response was required to the *voir dire* questions and, in turn, whether their answers were reasonable. *Id*. The court rejected the defendants' arguments

by first finding that he never directly asked any of the venire members if they were victims of sexual abuse. *Id*. at 1068-69. The court concluded the jurors' negative responses to the *voir dire* questions were honest and accurate because sexual abuse and harassment were different things. *Id*. The court also pointed out that the defendant had an opportunity to ask questions during *voir dire* and failed to ask about sexual abuse. The court stated "[i]f the defendant was interested in this topic, it had an obligation to ask more probing questions during voir dire in order to ferret out this type of sensitive and specific information." *Id*. at 1070.

Similarly here, Fell's post-conviction claim that he would have moved to strike juror 162 for cause because she was sexually abused as a child is disingenuous. If this was so important an issue for Fell he would have asked about it on *voir dire*. While Fell asked juror 162 about a number of specific mitigating factors, including the use of drugs and alcohol, remorse, lack of criminal history, defendant's age and the lack of authority figures in his life, he never asked her about childhood sexual abuse. *See* Tr. May 23, 2005 at 132-35.

If the court determined that juror 162 could consider Fell's mitigation evidence fairly and impartially, she would not have been subject to removal for cause. When conducting its analysis, the government submits that the Court must consider any allegation of potential bias against the entire record. Juror 162's answers, in response to a multitude of searching questions, both in her questionnaire and during individual *voir dire,* indicate that she was anything but partial.

Juror 162's responses in her questionnaire indicated that she was an impartial juror. In responding to question 39, she indicated that she could evaluate the case based upon the evidence presented at trial and in accordance with the court's instructions. *See* Exhibit M at 17. She further indicated that she harbored no bias towards either the defendant or the government. *Id*. at

324

23-25. With regard to the death penalty, juror 162 indicated that she used to be opposed to it, but would consider it based on the facts of the case. *Id*. at 28-29. *See also* Tr. May 23, 2005, at 122. Nothing in her responses to her questionnaire gave rise to even an inference of partiality.

Juror 162's responses during individual *voir dire* further indicated that she would be a fair and impartial juror. *Id*. at 116-17. In fact, throughout her examination juror 162 indicated that she would want to hear all mitigating evidence prior to making a decision, including evidence of the defendant's childhood, his mental state, the circumstances surrounding the offense, evidence of remorse and the defendant's potential for rehabilitation. *Id*. at 117-18, 123, 126, 131. No grounds for a successful challenge for cause existed here.

Fell must establish both elements of the *McDonough* test to be entitled to relief – that is, he must show that juror 162 was deliberately dishonest during jury selection, and that truthful answers would have subjected her to challenge for cause. On the weak facts here, there is no basis to establish either element. Therefore, the claim for post-conviction relief based on alleged misconduct by juror 162 must be denied.

### 2. Juror 26

Fell claims that juror 26 failed to disclose his criminal history during *voir dire*. According to Fell, juror 26 should have provided this information in response to question number 43(b) of the juror questionnaire. Question 43(b) asked: "Have you or has a family member or close friend ever been ever been charged with a crime?" Juror 26 marked "No." According to a criminal record check, on April 2, 1996, juror 26 was convicted of misdemeanor unlawful mischief, carrying a maximum penalty of a fine of $250 or less. He was fined $100. Juror 26

325

was not fingerprinted as a result of that incident, indicating that he was not arrested, but merely provided with a citation.[67]

A juror's non-disclosure of two misdemeanor offenses, committed nearly a decade prior to trial, provides no basis to overturn Fell's 11-week trial. It is difficult to imagine that the non-disclosure was a deliberate lie that reflects a challengeable bias by juror 26. It entirely possible that juror 26 simply did not remember having paid a $100 fine nine years prior to trial on a citation for unlawful mischief, or his license being suspended for driving under the influence nearly a decade before trial. It is also entirely plausible that juror 26 simply did not consider these matters to come within the purview of question 43(b). It cannot be inferred that juror 26 deliberately failed to disclose the information. In any event, had juror 26 disclosed this information, it would not have subjected him to a challenge for cause. Juror 26's answers during *voir dire* indicated that he was very much a middle of the road juror that would want to hear all of the evidence, including all mitigating evidence, before making a decision. Tr. 5/13/05 at 90. He repeatedly stated that he could be fair and impartial. *Id*. at 90, 95, 98, 99. Nothing in the record indicates that the information now being proffered by Fell would have led the Court to strike juror 26 for cause.

Without submitting any supporting evidence, Fell further claims that juror 26 admitted being exposed to a television news report that described the supposed suicide of Lee, four years

---

[67] As stated above, Fell's claim is barred by the procedural default doctrine. Fell could have requested a criminal record check of juror 26 prior to the conclusion of the criminal case. Further investigation by the government reveals that juror 26 has a January, 1995, New Hampshire conviction for a driving under the influence in December, 1994. As a result, the Vermont Department of Motor Vehicles suspended his license for 90 days.

prior to the Fell trial.  Fell does not state exactly what juror 26 learned through that news report, but faults juror 26 for failing to disclose this information during *voir dire*.

The court routinely asked the jurors whether they had been exposed to any publicity "on this case."  It is not clear that a typical juror would have understood the question to apply to a news report about the death of co-defendant Lee, who was not on trial, and therefore, not a part of "this case."  In fact, when asked during individual *voir dire* whether he knew anything about the case, juror 26 responded as follows:

| | |
|---|---|
| THE COURT: | . . . Have you heard anything about this case? |
| JUROR NO. 26: | No, not really.  No. |
| THE COURT: | Do you know any of the facts at all? |
| JUROR NO. 26: | No.  I think at one point, a long time ago, I heard something in passing, but other than that, no. |
| THE COURT: | Do you remember what you heard? |
| JUROR NO. 26: | That just that a woman had been kidnapped, and that was the only thing that I, I can recall. |

Tr. 5-13-05, p. 88.  No intent to deceive can be inferred from juror 26's responses.  Juror 26 heard the alleged news report four years before the trial.  It is also entirely plausible that he simply did not recall this information during *voir dire* or he did not immediately relate the report about Lee's death to the Fell trial.  The evidence submitted is simply insufficient for the court to find that juror 26 deliberately withheld information from the court.  And even if the court were to determine that juror 26 deliberately withheld information during *voir dire*, there is no evidence that he did so for an "illegitimate purpose" or with a "malicious design.*"*

327

In any event, even if juror 26 had disclosed the alleged information, he would not have been eligible for a challenge for cause. As stated above, juror 26's remaining answers during *voir dire* reflect complete impartiality. He would not have been stricken for cause.

B. The Jury's Exposure to Extraneous Evidence Was Not Prejudicial

Fell also claims that juror 143 brought prejudicial extrinsic evidence to bear on jury deliberations. It is well-settled that "any extra-record information of which a juror becomes aware is presumed prejudicial." *Greer*, 285 F.3d at 173 (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)). However, "[a] government showing that the information is harmless will overcome this presumption." *Id*. "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.) (per curiam) (internal quotation marks omitted), *cert. denied*, 513 U.S. 901 (1994). The court's inquiry must focus on the information's probable effect on a "hypothetical average juror." *Id. See also United States v. Calbas*, 821 F.2d 887, 896 n. 9 (2d Cir.), *cert. denied*, 485 U.S. 937 (1988). "The touchstone of decision . . . is thus not the mere fact of infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann*, 435 F.2d 813, 817-18 (2d Cir.), *cert. denied*, 402 U.S. 906 (1971). The court may not inquire into "the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Calbas*, 821 F.2d at 897 (citing Rule 606(b)). *See also Greer*, 285 F.3d at 173 (same); *Bibbins*, 21 F.3d at 17 (juror's affidavit as to how extrinsic information affected the thinking and voting of the jurors or the deliberations of the jury as a whole was inadmissible).

1.  Juror 143

According to Fell, during an interview of juror 143 conducted post-conviction, juror 143 revealed that he visited the location of Debra Fell's residence and of Terry King's abduction during the course of the trial.  Specifically, juror 143 stated:

> There was not a lot of disagreement about the guilt, there was no doubt that he did it.  We discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper.  The mother's neighborhood wasn't great, but it was okay.  The house was decent.  She was just trying to live her life.  I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife into.  The dumpster in the parking lot.  After trial I drove to New York on my motorcycle.  I recognized the spot from the photos and I felt a really negative energy while I was there.  The lighting at the Price Chopper in Rutland was weak.  At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit. It isn't expensive to get better lighting. They should do that.

P. Exh. 241 at 2-3, Fell-00002377-2378.  The extraneous information introduced by juror 143 was his visual observation of the outside of Debra Fell's house, and the parking lot of Price Chopper.  Yet multiple photographs of both locations were introduced into evidence during trial. The government introduced eight photographs of the outside of Debra Fell's house, taken from different angles.  *See* Government Exhibits  5(a)(1), (2), (3), (4), (5), (6), (7) and (8); Tr. I-2 at 16- 17.  Similarly, the government introduced three photographs of the Price Chopper and its parking lot.  *See* Government Exhibits 12(a)(1), (2) and (3); Tr. I-1 at 84-85.  The government also introduced several aerial photographs indicating the location of Debra Fell's residence and the Price Chopper.  *See* Government Exhibits 12C, Tr I-1 at 86; 12D, Tr. I-2 at 18.

The extrinsic information obtained by juror 143 added nothing to the evidence already presented at trial through testimony and photographs.  The nature of the neighborhood in which Debra Fell lived was apparent from such photographs.  So was the appearance of the Price

Chopper parking lot.  The extra-record information was cumulative.  Such information is insufficient to establish prejudice.

In *Bibbins*, *supra*, a few minutes after a street sale of cocaine to an undercover agent, police spotted Bibbins across the street and arrested him because he fit the description of the seller.  21 F.3d at 14.  One juror told the others that she was a resident of the area in which the transaction and arrest took place and that there were no open places of business there.  *Id*.  The Second Circuit found the extra-record information provided by the juror cumulative as the State had introduced into evidence a photograph showing that the shops in the vicinity were boarded up.  *Id*. at 17.  Accordingly, the Second Circuit concluded that the information was insufficient to establish prejudice.  *Id*.

Fell argues that the lighting of the Price Chopper parking lot was a "critical" issue and that therefore, this information would have affected the findings of a typical juror.  The government rejects that characterization.  The timing of Terry King's abduction by Fell and Lee was uncontested and well-established: it happened as she arrived for her 4:00 a.m. shift at the Price Chopper.  The quality of the lighting in the pre-dawn hours in the parking area alongside the supermarket was of dubious significance.  There is no question at all that Fell and Lee kidnapped her when she arrived (in good light or bad).  In any event, witness Joseph Trapasso, present not long before that hour, described the scene.  Tr. I-1 at 106 ("there was a couple individuals in the roadway to the back of the store.  It was fairly dark out there.  But you could make them out").

Moreover, it is not clear that juror 143's observations regarding the lighting of the Price Chopper parking lot were made before trial.  Juror 143 stated:

330

> *After trial* I drove to New York on my motorcycle.  I recognized the spot from the photos and I felt a really negative energy while I was there.  The lighting at the Price Chopper in Rutland was weak.

P. Exh. 241, at 3, Fell-00002378 (emphasis added).  Nor is it clear that he conveyed any information regarding the lighting of the Price Chopper parking lot to the other jurors.[68]  But even if he did, a typical juror would not have been affected by this information.  The evidence against Fell was overwhelming.  Juror 143 himself stated that there was no doubt that he was guilty.  Therefore, Fell cannot show prejudice.

### 2.  Juror 26

Fell again raises the fact that juror 26 was allegedly exposed to a television news report about the death of Lee.  Fell now claims that juror 26's exposure to this extrinsic evidence affected him.  But the parties stipulated that Lee died in prison.  *See* Stipulation marked as Exhibit 17.  That stipulation read:

> On February 1, Robert Lee and Donald Fell were charged by grand jury with the same capital crimes.  On September 20, 2001, Lee died in his cell at the Northwest Correctional Facility in St. Albans, Vermont. His death was determined to be accidental.  At the time of his death, Lee faced the same charges as Fell.

Clearly then the jurors were informed not only that Lee had died in prison while confined in his cell, but also that his death was accidental.  Therefore, the only extrinsic evidence that juror 26 appears to have heard is that Lee had hung himself.  Fell asserts that juror 26 saw the alleged news report four years before the trial.  A typical juror would not consider such evidence and disregard a stipulation introduced into evidence by both parties at trial.  This is especially

---

[68]  Fell also argues that the extrinsic evidence was relevant at to the route that Fell took from his mother's house to the Price Chopper.  But there is no evidence whatsoever that juror 143 walked that route.

true given the court's admonition to the jury that they were to render a decision based solely on the evidence heard at trial. There is no reason to think that juror 26 did not follow the court's instruction. There is no reasonable probability that Fell was prejudice from juror 26's exposure to this information.

> C. The Court Can Not Consider the Testimony of a Juror to Impeach The Death Verdict Rendered Against Fell, and In Any Event, No Juror Was Subjected to Coercion

Fell proffers that a female juror proposed the fact that Fell's shotgun was not loaded as a mitigating factor. *See* P. Exh. 241. In an effort to demonstrate the weakness of her argument, juror 143, after showing the jury that the weapon was unloaded, pointed the unloaded shotgun at the juror and cocked it. The female juror squirmed. Juror 143 told her, "[t]hat's what they did, you were scared even though you knew it wasn't loaded." *Id.* Fell urges that juror 143 pointed the gun at the female juror "to intimidate her into changing her vote by instilling fear." Fell's speculation is unsupported by juror 143's statement and unsustainable under Rule 606(b).

As stated above, juror testimony is not admissible to show the effect of evidence upon a jury's thought process. Rule 606(b) clearly provides that "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict*." Fed. R. Evid. 606(b) (emphasis added). The statement of Juror 143 proffered by Fell falls squarely within the categories of statements by jurors precluded by Rule 606(b), and therefore, cannot be considered by the Court. The Court cannot vacate the verdict based on a statement by a juror about what was said during jury deliberations.

D.  There Is No Evidence of Any Additional Instances of Alleged Misconduct by Any Juror

Fell further asserts, without pointing to a single specific instance, that the jurors in this case engaged in all manner of constitutionally cognizable misconduct.  His conclusory assertion does not merit relief or warrant further discovery.  A § 2255 movant must state specific facts that describe each ground for relief.  *Taylor v. United States*, 287 F.3d at 661 (7th Cir. 2002).  A § 2255 petition must set forth sufficiently detailed factual claims to point the court to a demonstrable possibility of error.  *See Oliver v. United States*, 961 F.2d at 1343, n.5 (7th Cir. 1992).  Fell's factually unsupported claims of juror misconduct provides an insufficient basis to grant relief or discovery.  *See United States v. Zuno-Arce*, 25 F. Supp. 2d at 1118.  Of course, even if Fell had properly stated a claim, he could not raise an issue that he omitted to properly raise at trial or on appeal.  Having failed to raise the issues at trial or on appeal, Fell cannot obtain collateral relief based on the jury's supposed misconduct.

## XXIII.    OTHER CLAIMS

A.  The Government Sought The Death Penalty Against Fell On Race – Neutral Grounds and Without Regard to Geography or The Race and Gender of the Victim and Trial Counsel Provided Constitutionally Adequate Representation

Fell, relying on several newspaper articles and a statistical survey performed by the U.S. Department of Justice, claims that the government pursued capital punishment against him in a racially discriminatory manner.  He also claims that the government considered his geographical location as well as the race and gender of his victim in determining whether or not to seek the death penalty.  Fell does not identify a basis for relief.  He has procedurally defaulted his claims that charging decisions stemmed from racial animus or any other improper basis.  Moreover,

regardless of the procedural propriety of the claim, its essential premise – that statistical evidence suffices to show racial discrimination – finds no favor in the law.  Accordingly, Fell cannot obtain relief.

As established above, a collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the petitioner omitted to appropriately raise at an earlier stage of the litigation.  *See* section II, *supra*, pp. 37-38.  This doctrine applies even in death penalty cases.  *See Battle*, *supra*, 419 F.3d at 1298.  As Fell readily admits, he has never before claimed that the government's decision to seek the death penalty stemmed from racial bias or any other prohibited basis.  Furthermore, he does not establish that his claim falls within an exception to the procedural default doctrine.  Fell has not shown his innocence, nor has he demonstrated cause and prejudice for his omission of this contention from earlier proceedings.  He points to no factor external to the defense that prevented trial counsel from raising his present constitutional claim.  Further, Fell cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336); *Wainwright*, 433 U.S. at 84.  Having failed to raise the issue earlier in the proceedings, Fell cannot obtain collateral relief based on the contention that the decision to seek the death penalty was the product of racial or gender bias or geographical considerations.

Fell's claim is also barred by the non-retroactivity doctrine established in *Teague*, *supra*, and its progeny.  *See* section II, supra, at p. 39.

1.  The Government Sought The Death Penalty Against Fell Without Regard to Race

Assuming, *arguendo*, that Fell has not defaulted his biased prosecution claim, he still could not obtain relief on the argument, having premised it on bare statistical data.  If a prosecutor has probable cause to believe a defendant has committed a crime, "the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *In re U.S.*, 397 F.3d 274, 284 (5th Cir. 2005).  That discretion is, though, guided by the Equal Protection Clause.  *In re U.S.*, at 284.  The law presumes that prosecutors exercise their discretion in good faith and constitutional compliance.  *See United States v. Armstrong*, 517 U.S. 456, 465-66 (1996).  Only proof of discriminatory effect and purpose will overcome this presumption of regularity.  *Id.* at 465 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  To establish a discriminatory effect, the claimant must show that similarly situated individuals of a different race were not prosecuted."  *United States v. Armstrong*, 517 U.S. at 465 (internal quotations and citations omitted).

In support of his claim, Fell relies on statistics generated by the U.S. Department of Justice.  He has not provided any foundation for, or demonstrated the validity of, these calculations.  *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 262 (4th Cir. 2005); *cf. Cooper v. Southern Co.*, 390 F.3d 695, 717 (11th Cir. 2004) ("[s]tatistics without a proper analytic foundation are virtually meaningless").  Assuming he had done so, numbers still would not carry the day.  Statistics reflecting the application of the death penalty within a given scheme to different races cannot, without more, support a finding of discriminatory intent

335

sufficient to strike down that death penalty scheme on equal protection grounds. *See McCleskey v. Kemp*, 481 U.S. 279 (1987); *see also Bin Laden*, 126 F.Supp.2d 256, 261 (2000) ("At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant"). *McCleskey* controls here and requires denial of Fell's claim, as he has not offered any evidence of discriminatory effect or intent specific to his case. *McCleskey*, at 292-93. Moreover, Fell has made no effort to show that similarly situated defendants of different races received different treatment. *See Armstrong*, 517 U.S. at 465. Instead, he merely alludes to a report that addresses the administration of the federal death penalty generally. Under *McCleskey*, Fell's data does not demonstrate that the government pursued the death penalty for racially discriminatory reasons.

In an effort to salvage his claim and demonstrate some sort of connection between the statistics cited and himself, Fell cites several newspaper articles criticizing the DOJ based on the statistical survey released. He also cites a Washington Post article wherein Attorney General Ashcroft was allegedly quoted as saying that DOJ's "analysis has confirmed that black and Hispanic defendants were less likely at each stage of the department's review process to be subjected to the death penalty than white defendants. There is no evidence of racial bias in the administration of the federal death penalty." Based on this statement and Attorney General Ashcroft's rejection of a plea agreement allowing Fell to plea guilty to life imprisonment, Fell claims that Attorney General Ashcroft based his decision to seek the death penalty against Fell on his race. Fell argues: "[c]learly, it was in the interest of the DOJ and Attorney General Ashcroft to find a white defendant against whom to authorize the imposition of the death penalty." P. at

336

345. Such irresponsible speculation cannot support even a colorable claim of discriminatory purpose by the Attorney General.

The Supreme Court clearly established that a defendant claiming racial discrimination had to demonstrate that "the decisionmakers in *his* case acted with a discriminatory purpose" and that the purposeful discrimination had "'a discriminatory effect on him." *McCleskey*, 481 U.S. at 292 (citations omitted; emphasis in original). The *McCleskey* Court defined "discriminatory purpose" as entailing:

> more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group.

*Id*. at 298 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). "Because discretion is essential to the criminal justice process," the Court stressed that it would "demand exceptionally clear proof before [it] would infer that the discretion has been abused." *Id*. at 297. Based on this standard, Fell's purely speculatory arguments are insufficient to support an inference of discriminatory purpose. Certainly the Attorney General's reaction to the question of a newspaper reporter, even if coupled with his decision not to accept a plea agreement to life from Fell, would not constitute, even remotely, "exceptionally clear proof" of intent to discriminate on the basis of race.

### 2. The Government Sought The Death Penalty Against Fell Without Regard to the Geographical Location of his Trial

Fell similarly claims that the Attorney General sought the death penalty against him based in part on the geographical area in which Fell would be tried. Fell claims, without a shred of evidence, that the Attorney General was "on a campaign to nationalize the death penalty."

According to Fell, DOJ statistics showed a lack of uniformity in the decision to seek the death penalty, with 42% of capital cases submitted to the Attorney General coming from five of the 94 federal districts. Fell argues that this evidence provides a reasonable basis to conclude that the decision to seek the death penalty against him was made, in part, based on the fact that he would be tried in Vermont. For the same reasons set forth above in section XXIII(A)(1), Fell's claim has not merit and should be denied.

### 3. The Government Sought The Death Penalty Against Fell Without Regard to the Race and Gender of His Victim

Fell also claims that the DOJ survey demonstrates that DOJ seeks the death penalty in a disproportionately larger share of cases in which the victim is white and female. Based solely on the statistical survey Fell claims that the Attorney General determined to seek the death penalty against him based on the race and gender of his victim. For the same reasons set forth above in section XXIII(A)(1), Fell's claim has no merit and should be denied.

### 4. Trial and Appellate Counsel Were Not Ineffective

Moreover, to the extent that Fell claims that his trial and appellate counsel were ineffective in failing to assert this claim in a timely manner, the government submits that Fell has failed to establish a *Strickland* violation. To show ineffective assistance of counsel for the failure to make a motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the motion had been granted. *See Matos, supra*, 905 F.2d at 32 (*citing Kimmelman v. Morrison,* 477 U.S. 365, 375-76 (1986)). That is, Fell must show that his trial counsel's performance was not only professionally deficient, but also that he suffered prejudice. Not filing a claim that had no support in law was reasonable.

338

Fell cannot show that his counsel's failure to challenge the Notice of Intent to Seek the Death Penalty on the basis on race, gender and geographical location fell below the prevailing professional norm. Therefore, Fell's claim also fails to meet the *Strickland* standard.

### 5. Fell Is Not Entitled to Discovery or a Hearing

Fell admits that statistics alone may be insufficient to demonstrate purposeful discrimination, but claims that "this trend warrants discovery." P. at 348. In order to obtain discovery on a claim of unconstitutional selective prosecution, a defendant must present "some evidence" of the elements required for relief on the merits of such claims: "[t]he claimant must show that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 608). *See also In Re United States*, 397 F.3d 274, 284 (5th Cir. 2005); *Webster*, 162 F.3d at 333-34. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. Absent such a showing, a district court lacks the authority to grant discovery on the selective prosecution claim. *Id*. at 468-71. The foregoing standards also apply to defense motions for evidentiary hearings on selective prosecution claims. *See Wade v. United States*, 504 U.S. 181, 186 (1992); *Webster*, 162 F.3d at 333-34. Fell misunderstands his burden – he must establish a *prima facie* case of discrimination first and then seek discovery. *See In Re United States*, 397 F.3d at 284. He fails to make that preliminary showing.

### 6. The Information Sought by Fell is Protected

Fell states that he should be permitted to conduct discovery concerning "the government's authorization and plea bargaining decisions." P. at 348. However, even if Fell establishes a right

to discovery or a hearing, the deliberative process privilege, the work product privilege and the attorney-client privilege bar access to the information he seeks. *See In re United States*, 397 F.3d at 285-86; *United States v. Fernandez*, 231 F.3d 1240, 1246-47 (9th Cir. 2000).

B. Trial Counsel Conducted Constitutionally Adequate Voir Dire of the Jury

Fell claims that his trial counsel was ineffective in failing to question jurors about whether they could fairly consider particular forms of mitigation evidence that were relevant to his case. He argues that despite their ability to ask case specific questions, trial counsel failed to consistently ask the jurors whether they could fairly consider critical aspects of Fell's mitigation case, to wit, familial alcohol and drug abuse and domestic violence. The record simply does not support his contention.

Fell overlooks the fact that the juror questionnaire utilized in this case included questions specifically tailored to solicit information relevant to both the familial alcohol and drug use and the domestic violence mitigating factors that he proposed. Specifically, questions 20(a) and 44 asked for information regarding the juror's knowledge, experience or familiarity with substance abuse. *See* Exhibit Q at 8, 20. Question 20(a) asked whether the juror had taken courses or worked in the field of drug abuse. Question 44 asked whether the juror, a close relative or a close friend had been treated for substance abuse. These two questions taken together would have certainly revealed any relevant information the juror had to offer with regard to familial substance abuse. Questions 38, 41, 42 and 43 all inquired into the juror's interaction with the legal system, including the criminal justice system. Question 38 asked if the juror, a close relative or close friend had been a witness or victim of a crime, while questions 41, 42 and 43 asked whether the juror, a close relative or close friend had either been involved in a criminal

340

investigation or been the target or witness thereof. *Id*. at 17-18. Question 43 also asked whether the juror had ever been charged with a crime. Certainly if a juror had any experience with domestic violence, these questions would have yielded that information. Fell further ignores the fact that trial counsel did in fact ask potential jurors who ultimately sat on the jury case specific questions related to mitigation. For example, trial counsel asked juror 162 about her ability to consider mitigating evidence regarding the use of drugs and alcohol, remorse, lack of criminal history, defendant's age and the lack of authority figures in Fell's life. *See* Tr. May 23, 2005 at 132-35. In addition, in some instances, the prosecutor asked potential jurors whether they would be able to consider specific mitigating factors. For example, the prosecutor told juror 26 that he may hear evidence of a chaotic background, parent abandonment, abuse and the use of drugs and alcohol and asked whether he could consider such evidence in mitigation. Tr. May 13, 2005, at 97. Juror 26 said he could. *Id*.

But more importantly, aside from citing only a brief excerpt from the *voir dire* examination of juror 203, wherein trial counsel in fact asked juror 203 whether he could consider evidence of child abuse, parent abandonment and drugs and alcohol, Fell fails to provide any factual support for his claim. Trial counsel did more than an adequate job in *voir dire*, both to discover any potential bias and to learn jurors' attitudes towards his future mitigation case. Counsel did not have to ask about every specific potential mitigating factor to determine whether a juror would be fair and impartial. In any event, Fell was entitled to a jury that was impartial, not a jury that would have viewed all of his mitigation evidence favorably. Counsel's performance was neither deficient nor prejudicial. Fell's claim has no merit and should be denied.

341

C.   Trial Counsel Adequately Questioned Prospective Jurors Who Initially Suggested that They Could Not Vote for the Death Penalty

Fell attempts to revive an issue considered and denied by the Second Circuit – the removal for cause of Juror 64 – by now alleging that his removal was the result of the ineffective assistance of trial counsel.  Fell claimed on appeal that this Court abused its discretion by excusing juror 64 for cause.  Juror 64 expressed strong opposition to the death penalty and indicated that she would have difficulty voting for it regardless of the facts or the law.  Although later juror 64 stated that she could follow the Court's instructions and apply the law despite her strong reservations, the Court excused her.  After reviewing the record, the Second Circuit found no abuse of discretion and affirmed the Court's decision.  *Fell*, 531 F.3d 212-13.  Generally, a claim raised and rejected on direct appeal cannot be re-litigated in a § 2255 motion.  *Cabrera, supra*, 972 F.2d at 25.

In a hopeless attempt to revisit this issue post-conviction, Fell now claims that trial counsel was ineffective in failing to rehabilitate juror 64, and numerous other unnamed jurors, during *voir dire*.  Fell's claim again warrants no relief.

The record establishes that juror 64 had clearly indicated both in her questionnaire and during *voir dire* that she was opposed to the death penalty.  *See* Questionnaire of Juror 64 hereto attached as Exhibit R at 28; Tr. May 13, 2005, at 228.  Therefore, trial counsel attempted to rehabilitate juror 64 by having her focus on her willingness to follow the law and the court's instructions, regardless of her personal views.  In fact, in response to trial counsel's questions, juror 64 asserted that she could consider the death penalty and could follow the instructions of the court and apply the law.  Tr. May 13, 2005, at 240-41.  The Court recognized the fact that

342

juror 64 claimed that she could be fair and impartial, but based on the entire record, including juror 64's answers in her questionnaire, found that she was impaired. *Id*. at 246-47. Counsel's performance was neither deficient nor prejudicial.

Fell makes no specific reference to any other juror who he claims trial counsel could have rehabilitated. Therefore, with regard to any other juror, aside from juror 64, Fell fails to set forth sufficient facts upon which relief can be granted.

### D. Fell Was Not A Juvenile When He Committed The Capital Offenses and His Execution Would Not Violate The Eighth Amendment

Fell further claims that although he was 20-years-old when he committed the capital offenses, functionally he was still a juvenile. Therefore, it would be cruel and unusual punishment in violation of the Eighth Amendment to execute him. Fell's claim is barred by the procedural default and non-retroactivity doctrines, and in any event lacks merit.

As stated above, *see* section II, *supra*, pp. 37-38, the procedural default doctrine generally bars consideration of any claim that the petitioner omitted to appropriately raise at an earlier stage of the litigation. Furthermore, Fell does not establish that his claim falls within an exception to the procedural default doctrine. He has not shown his innocence, nor has he demonstrated cause and prejudice for his omission of this contention from earlier proceedings. *See Schlup*, 513 U.S. at 321; *Wainwright*, 433 U.S. at 84. Fell points to no factor external to the defense that prevented trial counsel from raising his present constitutional claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336). Having failed to raise the issue before, Fell cannot

obtain collateral relief based on the contention that he was functionally a juvenile and his execution would violate the Eighth Amendment.

Fell's claim is also barred by the non-retroactivity doctrine established in *Teague*, *supra*, and its progeny. *See* section II, supra, at p. 39. The constitutional rule Fell proposes, allowing defendants older than 18 years old at the time of the commission of the offense to establish that they were nonetheless "functionally" a juvenile, and thus, that their execution would violate the Eighth Amendment, is clearly not one dictated by precedent existing as of March 10, 2010,[69] and indeed is without any support in existing precedent. Further, the class of offenders covered by Fell's proposed rule is too vague and ill-defined to fall within any exception to *Teague* retroactivity. Accordingly, Fell's claim is barred for this additional reason.

In any event, current Supreme Court precedent forecloses Fell's argument on its merits. The Supreme Court clearly held in *Roper v. Simmons* that it would be cruel and unusual punishment to impose the death penalty on an individual who was a juvenile under the age of 18 when he committed the offense. 543 U.S. 551, 578 (2005).

> The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest. . . . The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.

*Id*. at 574, 578. Fell was 20-years-old when he participated in three brutal murders and related kidnaping and car-jacking offenses. Therefore, *Roper* affords him no relief. Fell does not cite a

---

[69] A new rule under *Teague* is one that was not "dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301. Where, as here, a defendant files a petition for certiorari, the conviction becomes final when certiorari is denied. *See Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6 (1987). In this case that date was March 10, 2011.

single decision extending *Roper* to individuals over the age of 18 who are able to show that they are "functionally" juveniles.  His claim had no merit and should be denied.

Moreover, to the extent that Fell claims that his trial counsel were ineffective in failing to assert this claim in a timely manner, the government submits that trial counsel is not obligated to file meritless claims.  Not filing a claim that had no support in law was reasonable.  As we have stated above, absent a showing that a motion would have certainly been granted, and that failure to file prejudiced him, Fell cannot show that his counsel's failure fell below the prevailing professional norm.  *See Matos, supra*, 905 F.2d at 32 (*citing Kimmelman v. Morrison,* 477 U.S. 365, 375-76 (1986)) (to show ineffective assistance for the failure to make a suppression motion, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed").  Therefore, Fell's claim also fails to meet the *Strickland* standard.

E.  This Court Lacks Jurisdiction to Determine Whether Fell's Execution Will Constitute Cruel and Unusual Punishment

Fell anticipates that the government will use the predominant method of execution by lethal injection to execute him.  He further claims that the government may use "imported sodium thiopental" in Fell's execution, which will likely cause him "serious injury and needless suffering" in violation of the Eighth Amendment.  The government submits that Fell fails properly to present this claim or bring it in the appropriate forum.  Accordingly, this Court should dismiss the contention, outright.

1. Justiciability

Fell cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies. U.S. Const. art. III, § 1; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir. 1986). Thus, federal courts cannot give advisory opinions in hypothetical cases. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806). Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir.1995). Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship – the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993). The plaintiff bears the burden of alleging facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Fell has made no effort to demonstrate ripeness of his complaints about the federal lethal injection protocol. Quite the opposite, he has premised the balance of this § 2255 motion on claims designed to avoid execution of his death sentence. Furthermore, he has not and cannot argue that the execution protocol about which he complains is not subject to amendment prior to his actual execution.

346

Not only does Fell fail to allege facts sufficient to demonstrate ripeness, he affirmatively recognizes that this Court may decline to consider the case on ripeness grounds.  P. at 360. Because Fell has failed to undertake any effort to demonstrate the justiciability of this Eighth Amendment claim, this Court should disregard the issue.

### 2.  Improper Venue and Procedural Vehicle

Through this claim, Fell does not attack the validity of his conviction and sentence; he attacks only the method by which the Government will carry out his sentence.  "Challenges to the execution of a federal sentence are properly brought under 28 U.S.C.A. § 2241."  *United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004).  Challenging the execution of a sentence on the basis of an alleged constitutional violation does not remove it from the ambit of § 2241.  *Id.*  As an alternative to a properly filed § 2241 petition, it appears that Fell could also file a *Bivens* action challenging the specifics of his execution.  *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 415 (1971); *see also Hill v. McDonough*, 547 U.S. 573, 582 (2006) (permitting a suit under 42 U.S.C. § 1983 to challenge method of execution).

District courts can grant § 2241 habeas relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a).  That statute requires "nothing more than that the court issuing the writ have jurisdiction over the custodian."  *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 495 (1973).  Thus, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."  *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).

Fell is domiciled in the United States Penitentiary at Terre Haute, Indiana.  Accordingly, this Court is not the proper venue for a § 2241 petition filed by Fell; the Southern District of

347

Indiana appears to have jurisdiction over this question.  Moreover, Fell has made no attempt to name his custodian, though the denomination of his pleading invokes both § 2241 and § 2255.  In light of these two flaws, this Court should dismiss that aspect of the Petition that seeks the granting of habeas relief – specifically, Fell's challenge to the method of execution.  *See United States v. Little*, 392 F.3d at 680; *see also Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994) (holding that the failure to name the custodian as a respondent deprived the federal court of personal jurisdiction).

Furthermore, to the extent that Fell's Petition attacks the promulgation of the federal execution protocols, his claim appears to have fallen far afield of the limitations on § 2255 litigation.  The statute provides jurisdiction to consider flaws in a criminal judgment, not in the legality of rules for implementing that judgment.  *See United States v. Addonizio*, 442 U.S. 178, 185 (1979) (limiting the scope of § 2255 motions and holding that they do not encompass all claimed errors in conviction and sentencing); *see also Brown v. United States*, 610 F.2d 672 (9th Cir. 1980) (holding the motion can test only the sentence imposed and not the sentence as it is being executed).

In all, Fell's § 2255 Petition represents an inappropriate mechanism for considering potential problems with an execution that is not slated to occur in this District and might not occur for years to come.  This Court should therefore disregard the contention.[70]

---

[70]  The government interprets Fell's claim as a narrowly focused challenge to the federal method of execution.  To the extent that Fell claims a broader challenge to the categorical use of a lethal injection as a method of execution, such a challenge would be based on a new rule that is *Teague* barred.

348

### 3. Fell's Eighth Amendment Claim Fails

Even if Fell had a ripe claim, had named the correct respondent, and filed his suit in the appropriate venue, he could not obtain relief. To demonstrate an Eighth Amendment violation, a prisoner must address "(1) whether a method of execution comports with the contemporary norms and standards of society; (2) whether a method of execution offends the dignity of the prisoner and society; (3) whether a method of execution inflicts unnecessary physical pain; and (4) whether a method of execution inflicts unnecessary psychological suffering." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 306 (Tenn. 2005) (citing *Weems v. United States*, 217 U.S. 349 (1910)). Under these factors, punishment may not include torture, lingering death, wanton infliction of pain, or like methods. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *In re Kemmler*, 136 U.S. 436, 447 (1890). Beyond showing a harm "sufficiently serious" so as to deny "the minimal civilized measure of life's necessities," the condemned must also show that the official accused of causing the harm has a "sufficiently culpable state of mind" because, "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Fell cannot hope to show that lethal injection, as a means of execution, does not comport with contemporary societal norms. "[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002). Legislative acts in virtually every state that imposes the death penalty demonstrate the broad acceptance of lethal injection as a means of execution: "Of the thirty-eight states that presently have capital punishment, approximately thirty-seven have legislation adopting lethal injection as the primary means of execution." *Abdur'Rahman*, 181

349

S.W.3d at 307; *State v. Webb*, 750 A.2d 448, 457 (2000)).  Furthermore, Fell cannot point to a single judicial decision that finds lethal injection cruel and unusual.  *Abdur'Rahman*, 181 S.W.3d at 306 (citing *Cooper*, 358 F.3d at 659;  *Wheeler v. Commonwealth*, 121 S.W.3d 173, 186 (Ky. 2003); *Webb*, 750 A.2d at 457-58); *see also Evans v. Saar*, 412 F. Supp. 2d 519, 522 (D. Md. 2006) ("Circuit after Circuit (including the Fourth) has ruled that the protocol does not run afoul of the Eighth Amendment").

Fell also fails to demonstrate that the method of execution will offend his dignity or cause him undue pain.  He cannot avoid the fact that his sentence calls for his execution, an event that will cause him some pain.  *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). The pain of death cannot be totally averted by any method of execution, and this Court lacks jurisdiction to dictate that method unless the chosen procedure will subject Fell to objectively cruel or unusual punishment.  *Walker v. Johnson*, 448 F. Supp.2d 719, 722 (E.D.Va. 2006).  Fell, moreover, has not identified an excessive risk of pain: he has only made note of speculative dangers – the possibility that the drugs in the injection will not work as planned.  But Fell "cannot rely on the possibility of something going wrong during an execution as the grounds for substantial risk of harm."  *Walker*, 448 F. Supp.2d at 723 (E.D.Va. 2006) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947)).  *See also Beardslee v. Woodford*, 395 F.3d 1064, 1075 (9th Cir. 2005); *Reid v. Johnson*, 333 F. Supp.2d 543, 551 (E.D. Va. 2004).

Fell's claim also founders on the intent prong of the Eighth Amendment test.  A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," and officials who act reasonably are not liable under Eighth Amendment.  *Farmer*, 511 U.S. at 844-45.  Thus, an official could only violate the Eighth Amendment if he/she knew of and disregarded an excessive

risk to inmate health or safety. *Id.* at 837. The federal method of execution is a multi-step procedure apparently designed to protect the health and safety of all involved. Indeed, the protocol compares favorably with one that recently survived Eighth Amendment scrutiny, because the district court in that case noted that it involved "the placing of two working IV lines, the high dosage of lethal drugs to ensure that the drugs cause death quickly, the manner in which the drugs are prepared and handled, the qualifications of the execution team members, and the repetitive training required of them." *Walker v. Johnson*, at *5. In fact, the Supreme Court of Tennessee noted that most lethal injection protocols are essentially identical: "Tennessee's lethal injection protocol is consistent with the overwhelming majority of lethal injection protocols used by other states and the federal government." *Abdur'Rahman*, 181 S.W.3d at 307.

## XXIV.   FELL HAS FAILED TO STATE A CLAIM UPON WHICH THIS COURT SHOULD GRANT DISCOVERY OR AN EVIDENTIARY HEARING

Fell claims generally that this Court should grant an evidentiary hearing in this case. The government disagrees and submits that he has failed to make either credible allegations or allegations that, if accepted as true, would entitle him to relief. Accordingly, no hearing is necessary.

A § 2255 movant is entitled to an evidentiary hearing unless the motion, files, and record conclusively show that he is not entitled to relief. 28 U.S.C. § 2255(b). *See also Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011); *Engelen v. United States*, 68 F.3d 238, 240-41 (8th Cir. 1995). Thus, a hearing is not required if (1) the movant's allegations, accepted as true, would not entitle him to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.

351

*Id.* at 240 (*citing United States v. Rodriguez Rodriguez*, 929 F.2d 747, 749-50 (1st Cir. 1991)).

*See also United States v. White*, 366 F.3d 291, 296 (4th Cir. 2004) (permitting the denial of a

hearing when the movant presents incredible allegations); *cf. United States v. Magini*, 973 F.2d

261, 264 (4th Cir.1992) (stating that a federal court "must hold an evidentiary hearing when the

petitioner alleges facts which, if true, would entitle [him] to relief").

In this case, as fully discussed in this brief, Fell has presented a multitude of claims, many

of which suffer from some procedural flaw that should prove fatal, either in whole or in part.  To

the extent Fell has presented claims that survive procedural challenges, he has not alleged any

facts that are either potentially credible or, if taken as true, would merit relief.  The specific flaws

in his arguments are fully discussed in these papers, and the government will not belabor its

points here.  Fell has failed to make any allegations that could possibly require relief, much less

that would require this Court to grant an evidentiary hearing.

## CONCLUSION

In affirming the jury's verdict on direct appeal, the Second Circuit Court of Appeals

concluded that this Court "presided over this complicated and difficult trial with care, fairness,

and an exemplary concern for the protection of Fell's rights."  531 F.3d at 240.  Judge Reena

Raggi echoed that characterization of this Court's performance in her opinion concurring in the

Circuit's denial of Fell's petition for rehearing *en banc*:

> At the outset, I note my agreement with the dissent's characterization of the trial court's conduct in this difficult case as "nothing short of exemplary."

*United States v. Fell*, 571 F.3d 264, 265 (2d Cir. 2009).  The record in this case fully supports these statements.  Nothing in the record suggests that Fell received anything but a fair trial.  The Court stated in June, 2002, that, "as a matter of personal concern, I want to bend over backwards to make sure that [Fell] gets the best possible representation that he can."  June 11, 2002 Hearing, Transcript p. 10.  The Court's intent and efforts in that regard are reflected in the record, and in the foregoing appraisals of the Court of Appeals.

For the reasons set forth above, the Court should deny Fell's motion for collateral relief.

Dated at Burlington, in the District of Vermont, this 21st day of December, 2011.

Respectfully submitted,

UNITED STATES OF AMERICA

TRISTRAM J. COFFIN
United States Attorney

By:

/s/ *Jacabed Rodriguez-Coss*
JACABED RODRIGUEZ-COSS
Trial Attorney
U.S. Department of Justice
1000 Lafayette Boulevard
Bridgeport, CT 06604
(203) 696-3027
jacabed.rodriguez-coss@usdoj.gov

/s/ *William B. Darrow*
WILLIAM B. DARROW
PAUL J. VAN DE GRAAF
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov