**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| DONALD FELL, | ) |
| Movant, | ) |
| v. | ) 2:01-CR-12-01 |
| UNITED STATES OF AMERICA, | ) |
| Respondent. | ) |

## REPLY TO THE GOVERNMENT'S AMENDED OPPOSITION TO MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255

LEWIS J. LIMAN
Cleary Gottlieb Steen &
Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

CATHLEEN PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193

RICHARD RUBIN
Rubin, Kidney, Myer & DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514

Date:   August 20, 2012

*Attorneys for Donald Robert Fell, Jr.*

## TABLE OF CONTENTS

**Page**

Table of Authorities .......................................................................................... ix

I.    Preliminary Statement.................................................................................. 1

II.   Legal Standards............................................................................................ 7

III.  Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For
      Failing To Investigate And Present Mitigating Evidence...................................... 14

      A.    Mr. Fell Has Adequately Alleged That Trial Counsel's Performance Fell
            Below An Objective Standard Of Reasonableness........................................ 14

      B.    Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient
            Performance Prejudiced His Case............................................................ 19

            1.    The Government Applies The Wrong Legal Framework..................... 20

            2.    Mr. Fell's Post-Conviction Evidence, Which Presents His True Life
                  History, Would Have Nullified Nearly All Of The Government's
                  Arguments Against Him At Trial ........................................................ 23

                  a.    The Jury Was Led To Believe That The Relentless Abuse In
                        Mr. Fell's Life Was Isolated And Limited To His Early
                        Childhood.................................................................................. 26

                  b.    The Jury Was Led To Believe That Mr. Fell's Ever-Worsening
                        Circumstances Actually Improved When His Father Left The
                        Household ................................................................................. 29

                  c.    The Jury Was Led To Believe That The Trauma Was Long
                        Over, When In Fact, Mr. Fell Continued To Suffer Relentless
                        Trauma After The Age Of Fifteen ............................................... 34

                  d.    The Jury Was Led To Believe That Mr. Fell Did Not Inherit A
                        Predisposition To Substance Abuse Or Mental Illness, When
                        There Was Readily Available Evidence That He Did ................. 38

IV.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For
      Failing To Conduct An Adequate Mental Health Investigation ........................... 40

      A.    Mr. Fell Has Adequately Alleged That He Suffered From Serious Mental
            Impairments ........................................................................................... 41

      B.    Mr. Fell Has Adequately Alleged That Trial Counsel's Mental Health
            Investigation Fell Below Prevailing Professional Standards ....................... 43

**Page**

1.  Trial Counsel's Mental Health Investigation Was Not
    Constitutionally Adequate As A Matter of Law .................................. 43

2.  Mr. Fell Has Adequately Alleged That Trial Counsel Failed To
    Provide The Appropriate Experts, With The Appropriate
    Information, At The Appropriate Time ................................................ 46

3.  Mr. Fell Has Adequately Alleged That Trial Counsel Failed To
    Follow Up On Red Flags That Mr. Fell Suffered From Serious
    Mental Impairments ............................................................................. 51

C.  The Government's Argument That Trial Counsel's Failure To Present
    Expert Mental Health Testimony Was Strategic Presents A Substantial
    Question Of Fact ........................................................................................... 55

D.  Mr. Fell Has Adequately Alleged That He Suffered Prejudice From Trial
    Counsel's Performance .................................................................................. 57

    1.  Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due
        To Trial Counsel's Failure To Present Expert Testimony Of His
        Mental Condition ................................................................................. 57

    2.  Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due
        To Trial Counsel's Failure To Present Expert Testimony To Explain
        That His Flat Affect Was A Function Of His Mental Impairments
        And Not A Lack Of Remorse ............................................................... 61

    3.  Mr. Fell Has Adequately Alleged That He Suffered Prejudice From
        Trial Counsel's Failure To Investigate And Present Expert
        Testimony To Explain That There Were Alternative Mental Health
        Explanations For His Early Childhood Behaviors Besides ASPD Or
        Psychopathy ......................................................................................... 64

    4.  Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due
        To Trial Counsel's Failure To Present Mental Health Testimony To
        Explain That Mr. Fell Would Function Well In The Structured
        Environment Of A Prison ..................................................................... 66

V.  Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For
    Withdrawing Their Mental Health Case ................................................................ 68

A.  The Decision To Withdraw The Mental Health Case And To Agree To A
    Manifestly False Stipulation Was Deficient Performance ............................. 68

    1.  Mr. Fell Has Adequately Alleged That Trial Counsel Needlessly
        Abandoned A Crucial And Meritorious Motion To Exclude
        Dr. Welner ............................................................................................ 70

ii

**Page**

a.  Exclusion Was Available And Warranted As A Sanction For Prosecutorial Misconduct.................................................. 71

b.  Exclusion Was Warranted Under The Sixth Amendment ........... 75

c.  Exclusion Was Warranted Due To The Total Lack Of Probative Value And Extreme Prejudice Of Dr. Welner's Proffered Testimony ..................................................... 76

    i.  Dr. Welner's Methodology Was Unreliable In Several Ways ..................................................... 77

    ii.  Exclusion Was Warranted Due To The Excessive Prejudice Of Dr. Welner's Opinion On Psychopathy ......... 82

    iii.  The Prejudice From Dr. Welner's Opinion Starkly Outweighs Its Near-Zero Probative Value......................... 84

d.  Other Bases For Exclusion Would Have Also Been Successful ..................................................... 84

e.  Conclusion ..................................................... 86

2.  Trial Counsel's Withdrawal Of Drs. Mills And Cunningham Was Not The Product Of An Informed Strategic Judgment ........................ 87

3.  Trial Counsel's Agreement To The Mental Health Stipulation Also Constituted Deficient Performance........................................ 90

B.  Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient Performance Prejudiced Him........................................ 93

1.  The Record Plainly Shows That Trial Counsel Would Have Called Drs. Mills And Cunningham.................................................. 93

2.  Expert Testimony Would Have Provided Important Evidence That Did Not Come In Through Lay Testimony........................................ 94

3.  Other Potential Testimony Cannot Be Summarily Held To Be "Just As Damaging" As The Excluded Testimony From Dr. Welner ........... 97

a.  ASPD And Other Aspects Of Dr. Welner's Report Either Would Have Been Excluded Or Subject To Effective Challenge On Cross-Examination................................ 98

b.  Dr. Wetzel's Proffered Testimony Was Demonstrably Different From That Of Dr. Welner........................... 100

4.    Introduction Of The Mental Health Stipulation Caused Mr. Fell Additional Prejudice ................................................................. 102

VI.    Mr. Fell Has Adequately Alleged Ineffective Assistance of Counsel And Government Misconduct Relating To Mr. Fell's Alleged Prior Acts Of Violence ...................................................................................................... 104

A.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Gacek Shooting ................................................... 104

1.    Mr. Fell Has Adequately Alleged That Trial Counsel's Conduct Fell Below Prevailing Professional Standards ...................................... 105

2.    Mr. Fell Has Adequately Alleged Prejudice ........................................ 112

B.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To The Woodstock Incident ................... 114

1.    Mr. Fell Has Adequately Alleged Government Misconduct ................ 115

a.    Mr. Fell Has Adequately Alleged A Napue Violation ................. 115

b.    Mr. Fell Has Adequately Alleged A Brady Violation ................. 122

2.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel . 132

VII.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To Mr. Fell's Prison Conduct .......................... 135

A.    Mr. Fell Has Adequately Alleged That The Government Withheld Material Evidence In Violation of Brady ........................................................ 137

1.    Mr. Fell Has Adequately Alleged That The Improperly Withheld Evidence Was Favorable To Mr. Fell ................................................... 138

2.    Mr. Fell Has Adequately Alleged That The Government Suppressed Evidence In Violation Of Brady ........................................................... 141

3.    Mr. Fell Has Adequately Alleged That Mr. Fell Was Prejudiced By The Government's Failure To Disclose ................................................. 145

B.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate Mr. Fell's Prison Conduct ......................................... 148

C.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Interview And Present Testimony Of Deacon Steve Ratte .......... 150

VIII.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To Mr. Fell's Co-Defendant Robert Lee ........ 153

**Page**

A.   Mr. Fell Has Adequately Alleged That Trial Counsel Unreasonably Failed To Investigate Mr. Lee ................................................................................ 155

B.   Mr. Fell Has Adequately Alleged That The Government Violated Its Brady Obligations By Failing to Turn Over Favorable Evidence Regarding Mr. Lee .................................................................................................... 161

C.   Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient Performance And The Government's Misconduct Prejudiced Mr. Fell ........ 166

IX.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Forensic Investigation Into Teresca King's Death ............. 169

A.   Mr. Fell Has Adequately Alleged That Mrs. King Was Killed Only Once By A Rock Wielded By Robert Lee .............................................................. 170

B.   Mr. Fell Has Adequately Alleged That Trial Counsel Had A Duty To Investigate The Cause Of Mrs. King's Death; Their Failure To Do So Was Not Strategic .......................................................................................... 171

C.   Mr. Fell Has Adequately Alleged That He Was Prejudiced By Trial Counsel's Deficient Performance .................................................................. 173

X.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Government's Claim That Mrs. King Was Killed In An "Especially Heinous, Cruel Or Depraved Manner" .......................................... 176

XI.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Deaths Of Debra Fell And Charles Conway ............... 183

A.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Forensic Investigation Of The Rutland Crimes ......... 187

B.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Factual Investigation Of The Rutland Crimes ........... 188

C.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Vermont Lifestyles Of Debra Fell And Charles Conway ....................................................................................... 190

XII.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate And Present A Diminished Capacity Defense ................... 193

XIII.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Present Readily Available Additional Execution Impact Witnesses .... 200

XIV.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Stipulating To And Failing To Object To The Admission of Highly Inflammatory And Prejudicial Evidence Offered By The Government ................. 204

    A.    Trial Counsel Were Ineffective In Stipulating To The Admission Of The Inflammatory And Minimally Probative "Slayer" T-Shirt ............................ 205

    B.    Trial Counsel Were Ineffective For Failing To Object To The Introduction Of Testimony About Mr. Fell's Purported Past Interest In Satanism And His 666 Tattoo.............................................................................................. 208

    C.    Trial Counsel Were Ineffective For Failing To Object To The Highly Prejudicial Testimony Of Matthew Cunningham ........................................... 210

    D.    Trial Counsel Were Ineffective For Failing To Object To The Government's Unsubstantiated Claim That Mr. Fell's Memory Of The Word "Hawk" On The Knives Meant That He Was Not Intoxicated On The Night Of The Crimes ................................................................................ 211

XV.     Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Preserve The Record For Appeal, And Appellate Counsel Were Ineffective For Failing To Raise Additional Errors That Trial Counsel Missed .... 212

XVI.    Mr. Fell Has Adequately Alleged That The Aggregate Prejudice Stemming From Trial Counsel's Many Instances Of Ineffective Assistance Warrants Relief 214

XVII.   Mr. Fell Has Adequately Alleged That The Government Improperly Failed To Disclose Reports Of Interviews Conducted By The FBI And Dr. Welner, And Social Service Records ......................................................................................... 215

    A.    The Government Improperly Failed To Disclose Welner Interview Notes And FBI 302s.............................................................................................. 216

    B.    The Government Improperly Failed To Disclose Social Service Records And Social Security Information .................................................................... 219

XVIII.  Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Regarding Physical Evidence Relating To Investigation Of The Crimes...................................................................................... 220

XIX.    Mr. Fell Has Adequately Alleged That The Aggregated Prejudice Stemming From The Government's Brady Violations Warrants Independent Relief ............. 223

XX.     Mr. Fell Has Adequately Alleged Prosecutorial Misconduct In Closing Arguments............................................................................................................. 224

XXI.    Mr. Fell Has Adequately Alleged That The Aggregate Prejudice Stemming From The Government's Prosecutorial Misconduct Warrants Relief ................... 226

XXII.   Mr. Fell Has Adequately Alleged That Juror Misconduct Deprived Him
Of A Fair Trial ...................................................................................................   227

   A.   Mr. Fell's Juror Misconduct Claims Are Not Procedurally Defaulted ..........   227

   B.   Mr. Fell Has Adequately Alleged That Two Jurors Failed To Truthfully
Disclose Important Information In Response To Direct Questioning On
Voir Dire ......................................................................................................   229

       1.   Juror 162 ...........................................................................................   230

       2.   Juror 26 .............................................................................................   238

   C.   Mr. Fell Has Adequately Alleged That His Trial Was Infected With
Prejudicial Extraneous Evidence ..................................................................   242

       1.   Extraneous Evidence Of The Co-Defendant's Suicide.........................   243

       2.   Extraneous Evidence Of The Rutland Crime Scene ............................   244

   D.   Mr. Fell Has Adequately Alleged Improper Experiments And Coercion
Within The Jury Room...................................................................................   249

       1.   Rule 606(b) Does Not Block This Court From Reviewing The
Merits Of These Serious Improprieties..............................................   250

       2.   Mr. Fell Has Adequately Alleged That One Juror's Use Of A Gun
Was An Improper Experiment And Introduced Extraneous
Prejudicial Evidence Into The Jury's Deliberations ...........................   251

   E.   Mr. Fell Has Adequately Alleged Additional Claims of Juror Misconduct ..   252

   F.   Conclusion .....................................................................................................   253

XXIII. Other Claims ........................................................................................................   254

   A.   Mr. Fell Has Adequately Alleged That The Attorney General Engaged
In Selective Prosecution.................................................................................   254

   B.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For
Failing To Conduct A Sufficient Voir Dire ....................................................   258

   C.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For
Failing To Rehabilitate Prospective Jurors.....................................................   260

   D.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective
When They Failed To Explain Why His Youth Was Mitigating, And That
Executing Him For Crimes He Committed When He Was Functionally A
Juvenile Would Violate The Eighth Amendment.........................................   261

**Page**

E.    Mr. Fell Has Adequately Alleged That His Execution By Lethal Injection Will Be Cruel And Unusual Punishment; In The Event This Court Determines That This Claim Should Be Dismissed, Mr. Fell Seeks Dismissal Of His Claim Without Prejudice ................................................... 265

XXIV. Conclusion ....................................................................................... 265

**Page(s)**

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

18 U.S.C. § 3591(a)(2)(C)-(D) ................................................................................. 174-175

18 U.S.C. § 3593.................................................................................................76-77, 80

28 U.S.C. § 1865(b)(5) ................................................................................................ 241

28 U.S.C. § 2255 ................................................................................................... passim

Fed. R. Civ. P. 12(b)(6)................................................................................................ 12

Fed. R. Civ. P. 56(a) ................................................................................................... 12

Fed. R. Crim. P. 16(a)(1)(G) ...................................................................................... 218

Fed. R. Evid. 403 ......................................................................................................... 77

Fed R. Evid. 606(b)..................................................................................................... 232

McKinney's Penal Law § 130.55 (2010)..................................................................... 125

Rule 4(b), Rules Governing § 2255 Proceedings................................................... 7, 12

Rule 6(a), Rules Governing § 2255 Proceedings..........................................7, 9-10, 184

Rule 7(a), Rules Governing § 2255 Proceedings.......................................................... 7

Rule 8, Rules Governing § 2255 Proceedings ............................................................ 74

Weinstein's Federal Evidence § 404.20[1]................................................................ 134

**Cases**

Anderson v. Miller,
206 F. Supp. 2d 352 (E.D.N.Y. 2002), aff'd, 346 F.3d 315 (2d Cir. 2003)......................... 250, 251

Anderson v. Miller,
346 F.3d 315 (2d Cir. 2003).............................................................................. 250

Anderson v. Miller,
No. 99 Civ. 01187 (FB), 2001 WL 1182832 (E.D.N.Y. Oct. 2, 2001)............................... 250-251

Armienti v. United States,
234 F.3d 820 (2d Cir. 2000)............................................................................. 8, 9

**Page(s)**

Barefoot v. Estelle,
463 U.S. 880 (1983)..................................................................................... 8

Baumann v. United States,
692 F.2d 565 (9th Cir. 1982) ......................................................132, 215, 223-224

Ben-Sholom v. Ayers,
566 F. Supp. 2d 1053 (9th Cir. 2008) ................................................... passim

Berger v. United States,
295 U.S. 78 (1935).................................................................154, 224, 227

Bibbins v. Dalsheim,
21 F.3d 13 (2d Cir. 1994) ..................................................................... 245, 246

Blackledge v. Allison,
431 U.S. 63 (1977)..................................................................................... 7, 8

Blankenship v. Hall,
542 F.3d 1253 (11th Cir. 2008) ........................................................... 111

Bloomer v. United States,
162 F.3d 187 (2d Cir. 1998).................................................. 126, 220, 225-226, 227

Blystone v. Horn,
664 F.3d 397 (3d Cir. 2011)............................................................... 61

Bobby v. Van Hook,
130 S. Ct. 13 (2009)................................................................... passim

Bobo v. State,
327 S.E.2d 208 (Ga. 1985)................................................................ 246

Bond v. Beard,
539 F.3d 256 (3d Cir. 2008)........................................................ 21-22, 106

Boss v. Pierce,
263 F.3d 734 (7th Cir. 2001) ............................................................. 217

Boyde v. California,
494 U.S. 370 (1990)............................................................................. 60

Bracy v. Gramley,
520 U.S. 899 (1997).................................................................. passim

Brumfield v. Cain,
No. 04-787-JJB-LN, 2008 WL 2600140 (M.D. La. June 30, 2008)................................. 42

**Page(s)**

Buchanan v. Kentucky,
483 U.S. 402 (1987)................................................................................ 76

Burch v. Millas,
663 F. Supp. 2d 151 (W.D.N.Y. 2009) ................................................... 70

Burkette v. H.R. III, L.L.C.,
410 F. Supp. 2d 1117 (W.D. Ala. 2006) ................................................. 254

Burton v. Johnson,
948 F.2d 1150 (6th Cir. 1991) ................................................................ 237

California v. Ramos,
463 U.S. 992 (1983)................................................................................ 12

Calley v. Callaway,
519 F.2d 184 (5th Cir.1975) (en banc) ................................................... 128

Campbell v. Hankins,
2009 Ark. App. 479 (2009)...................................................................... 246

Cargle v. Mullin,
317 F.3d 1196 (10th Cir. 2003) .............................................................. 11-12

Caro v. Woodford,
280 F.3d 1247 (9th Cir. 2002) ................................................................ 60, 66

Carriger v. Stewart,
132 F.3d 463 (9th Cir. 1997) .................................................................. 144

Chang v. United States,
250 F.3d 79 (2d Cir. 2001)...................................................................... 8

Ching v. United States,
298 F.3d 174 (2d Cir. 2002).................................................................... 11

Citizens Against Casino Gambling in Erie County v. Stevens,
No. 09-CV-0291S (WMS), 2012 WL 2405195 (W.D.N.Y. June 23, 2012) ...................... 257

Coastal States Gas Corp. v. Dep't of Energy,
617 F.2d 854 (D.C. Cir. 1980).......................................................... 256-257

Coble v. Quarterman,
496 F.3d 430 (5th Cir. 2007) .................................................................. 111

Collier v. Turpin,
177 F.3d 1184 (11th Cir. 1999) .............................................................. 15

**Page(s)**

Commonwealth v. Cuffie,
609 N.E.2d 437 (Mass. 1993) .............................................................................. 246

Cone v. Bell,
556 U.S. 449 (2009) ....................................................................................126, 162, 192

Crisp v. Duckworth,
743 F.2d 580 (7th Cir. 1984) ......................................................................... 135, 147

Cuadra v. Sullivan,
837 F.2d 56 (2d Cir. 1988) .................................................................................. 207

Dawson v. Delaware,
503 U.S. 159 (1992) .............................................................................................. 208

Douglas v. Woodford,
316 F.3d 1079 (9th Cir. 2003) ............................................................................... 43

Drake v. Portuondo,
321 F.3d 338 (2d Cir. 2003) ..................................................................................... 9

Drake v. Portuondo,
553 F.3d 230 (2d Cir. 2009) ......................................................................... 117, 119

Draughon v. Dretke,
427 F.3d 286 (5th Cir. 2005) ................................................................................ 171

Dretke v. Haley,
541 U.S. 386 (2004) .............................................................................................. 263

Edwards v. Marin Park, Inc.,
356 F.3d 1058 (9th Cir. 2004) ............................................................................. 256

Elmore v. Ozmint,
661 F.3d 783 (4th Cir. 2011) ..................................................................171-172, 184

English v Romanowski,
602 F.3d 714 (6th Cir. 2010) ............................................................................... 158

Enmund v. Florida,
458 U.S. 782 (1982) .............................................................................................. 175

Estelle v. Smith,
451 U.S. 454 (1981) ................................................................................................ 75

Ex Parte Potter,
661 So.2d 260 (Ala. 1994) .................................................................................... 246

**Page(s)**

Eze v. Senkowski,
321 F.3d 110 (2d Cir. 2003)......................................................................... 98, 158

Ferrell v. Hall,
640 F.3d 1199 (11th Cir. 2011) ................................................................... 15, 186

Flanagan v. State,
846 P.2d 1053 (Nev. 1993).................................................................................. 208

Floyd v. Meachum,
907 F.2d 347 (2d Cir. 1990).................................................................................. 11

Foust v. Houk,
655 F.3d 524 (6th Cir. 2011) ........................................................................ 20, 22

Furman v. Georgia,
408 U.S. 238 (1972).............................................................................................. 263

Gawne v. United States,
409 F.2d 1399, 1403 (9th Cir. 1969) .................................................................. 196

Giglio v. United States,
405 U.S. 150 (1972).............................................................................................. 154

Goodwin v. Johnson,
632 F.3d 301 (6th Cir. 2011) ................................................................................ 22

Graham v. Florida,
130 S. Ct. 2011 (2010)......................................................................................... 264

Haliym v. Mitchell,
492 F.3d 680 (6th Cir. 2007) .............................................................................. 108

Harris ex rel Ramseyer v. Blodgett,
853 F. Supp. 1239 (W.D. Wash. 1994)........................................................ 171, 172

Henry v. Poole,
409 F.3d 48 (2d Cir. 2005)..................................................................................... 15

Henyard v. McDonough,
459 F.3d 1217 (11th Cir. 2006) .......................................................................... 263

Hildebrandt v. W.R. Grace & Co. –Conn.,
492 F. Supp. 2d 516 (D. Md. 2007).................................................................... 256

Hill v. United States,
622 A.2d 680 (D.C. App. 1993)........................................................................... 246

**Page(s)**

Holloway v. United States,
526 U.S. 1 (1999)............................................................................................ 196

Hovey v. Ayers,
458 F.3d 892 (9th Cir. 2006) .......................................................................... 21, 47

Ida v. United States,
191 F. Supp. 2d 422 (S.D.N.Y. 2002)............................................................ 228, 233

Jackson v. Brown,
513 F.3d 1057 (9th Cir. 2008) ........................................................................ 121

Johnson v. Bagley,
544 F.3d 592 (6th Cir. 2008) ...........................................................31, 34, 57, 65, 108

Johnson v. United States,
No. C 09-3064-MWB, 2012 WL 1836282 (N.D. Iowa Mar. 22, 2012) ............................ passim

Jurek v. Texas,
428 U.S. 262 (1976)......................................................................................... 129

Keith v. Mitchell,
455 F.3d 662 (6th Cir. 2006) .......................................................................... 111

Kimmelman v. Morrison,
477 U.S. 365 (1986).........................................................................................11, 52, 86

Kyles v. Whitley,
514 U.S. 419 (1995)......................................................................................... passim

Lava Trading Inc. v. Hartford Fire Ins. Co.,
No. 03 Civ. 7037, 2005 U.S. Dist. LEXIS 44802 (S.D.N.Y. Apr.11, 2005)...................... 85

Leka v. Portuondo,
257 F.3d 89 (2d Cir. 2001)...........................................................................129, 140-141, 165

Lindstadt v. Keane,
239 F.3d 191 (2d Cir. 2001).............................................................................. passim

Little v. Dretke,
407 F. Supp. 2d 819 (W.D. Tex. 2005)............................................................ 262-263

Littlejohn v. Artuz,
271 F.3d 360 (2d Cir. 2001).............................................................................. 11

Lockett v. Ohio,
438 U.S. 586 (1978).......................................................................................... 175

**Page(s)**

Lopez v. Aramark Uniform & Career Apparel, Inc.,
417 F. Supp. 2d 1062 (N.D. Iowa 2006)............................................................... 232

Lowenfield v. Phelps,
484 U.S. 231 (1988)......................................................................................... 251

Lunbery v. Hornbeak,
605 F.3d 754 (9th Cir. 2010) ...................................................................... 107, 134

Machibroda v. United States,
368 U.S. 487 (1962) ................................................................................. 8, 29, 98

Mak v. Blodgett,
970 F.2d 614 (9th Cir. 1992) .......................................................................... 201

Marshall v. Cathell,
428 F.3d 452 (3d Cir. 2005)...................................................................... 201, 202

Masotto v. United States,
No. 97-2894 (JLO), 2000 U.S. App. LEXIS 298 (2d Cir. Jan. 5, 2000) ........................... 11

Matthews v. United States,
682 F.3d 180 (2d Cir. 2012)............................................................................. 9, 261

Matthews v. United States,
No. 10-0611-PR, 2012 WL 2146320 (2d Cir. June 14, 2012)............................................ 17

Mayle v. Felix,
545 U.S. 644 (2005)....................................................................................... 188

McAleese v. Mazurkiewicz,
1 F.3d 159 (3d Cir. 1993) ................................................................................ 97

McDonough Power Equip. Inc. v. Greenwood,
464 U.S. 548 (1984)...........................................................................229, 233, 236

Miller v. Alabama,
132 S. Ct. 2455 (2012).................................................................................... 264

Miller v. Fenton,
474 U.S. 104 (1985)......................................................................................... 16

Napue v. Illinois,
360 U.S. 264 (1959)................................................................................. 116, 154

Old Chief v. United States,
519 U.S. 172 (1997)........................................................................................ 205

**Page(s)**

Oliver v. United States,
961 F. 2d 1339 (7th Cir. 1992) ...................................................................... 253

Oregon v. Stevens,
879 P.2d 162 (Or. 1994) ................................................................................ 201

Outten v. Kearney,
464 F.3d 401 (3d Cir. 2006)........................................................................... 39

Pavel v. Hollins,
261 F.3d 210 (2d Cir. 2001)..................................................................... 16, 113

Pham v. United States,
317 F.3d 178 (2d Cir. 2003)................................................................... 145, 149

Porter v. McCollum,
130 S. Ct. 447 (2009).................................................................. 15, 22, 25, 214

Powell v. Texas,
492 U.S. 680 (1989)....................................................................................... 76

Prou v. United States,
199 F.3d 37 (2d Cir. 1999)............................................................................ 263

Puglisi v. United States,
586 F.3d 209 (2d Cir. 2009)..................................................................... passim

Resolution Trust Corp. v. Diamond,
137 F.R.D. 634 (S.D.N.Y. 1991) ................................................................. 257

Rimbert v. Eli Lilly & Co.,
No. 06 Civ. 0879 (JCH), 2009 WL 2208570 (D. N.M. July 21, 2009) ............ 99

Robinson v. NYC Health Dep't,
No. 00 Civ. 8969 (NRB), 2001 WL 863418 (S.D.N.Y. July 30, 2001)........... 256

Rompilla v. Beard,
545 U.S. 374 (2005).................................................................................. passim

Roper v. Simmons,
543 U.S. 551 (2005)............................................................................... 262, 263

Sanders v. Sullivan,
701 F. Supp. 1008 (S.D.N.Y. 1988).......................................................... 11-12

Sanders v. United States,
373 U.S. 1 (1963)........................................................................................... 10

**Page(s)**

Satterwhite v. Texas,
486 U.S. 249 (1988)......................................................................................... 76

Sears v. Upton,
130 S. Ct. 3259 (2010)................................................................................. 21, 64

Showers v. Beard,
635 F.3d 625 (3d Cir. 2011).............................................................................. 172

Siehl v. Grace,
561 F.3d 189 (3d Cir. 2009)............................................................................... 92

Silva v. Woodford,
279 F.3d 825 (9th Cir. 2002) ............................................................................. 61

Simmons v. Luebbers,
299 F.3d 929 (8th Cir. 2002) ............................................................................ 186

Simon v. Kuhlman,
549 F. Supp. 1202 (S.D.N.Y. 1982)................................................................... 252

Smith v. Groose,
205 F.3d 1045 (8th Cir. 2000) .......................................................................... 257

Smith v. Mullen,
379 F.3d 919 (10th Cir. 2004) ............................................................................ 60

Soffar v. Dretke,
368 F.3d 441 (5th Cir. 2004) .................................................................... 171, 172

Sowell v. Collins,
557 F. Supp. 2d 843 (S.D. Ohio 2008) ......................................................... 22, 28

Stitt v. United States,
369 F. Supp. 2d 679 (E.D. Va. 2005) ................................................................. 80

Strickland v. Washington,
446 U.S. 668 (1984)................................................................................... passim

Teague v. Lane,
489 U.S. 288, 310 (1989)................................................................................. 262

Travis v. Stone,
66 S.W.3d 1 (Mo. 2002) .................................................................................. 246

Turner v. Louisiana,
379 U.S. 466 (1965).......................................................................................... 243

xvii

**Page(s)**

United States v. Adeniyi,
277 F. App'x. 22 (2d Cir. 2008) ................................................................... 234

United States v. Aiello,
814 F.2d 109 (2d Cir. 1987)...................................................................... 8, 9, 74

United States v. Al Jibori,
90 F.3d 22 (2d Cir. 1996) ........................................................................... 256

United States v. Alameh,
341 F.3d 167 (2d Cir. 2003)........................................................................ 255

United States v. Alfonso-Perez,
535 F.2d 1362 (2d Cir. 1976)...................................................................... 11-12

United States v. Arboleda,
20 F.3d 58 (2d Cir. 1994) ........................................................................... 103

United States v. Armstrong,
517 U.S. 456 (1996)................................................................................... 254

United States v. Atchison,
524 F.2d 367 (7th Cir. 1975) ...................................................................... 196

United States v. Auten,
632 F.2d 478 (5th Cir. 1980) ................................................................. 123, 126

United States v. Beckford,
962 F. Supp. 804 (E.D. Va. 1997) ...................................................128, 162, 216

United States v. Bilzerian,
926 F.2d 1285 (2d Cir. 1991)...................................................................... 140

United States v. Bin Laden,
397 F. Supp. 2d 465 (S.D.N.Y. 2005)........................................................... 142

United States v. Boney,
68 F.3d 497 (D.C. Cir. 1995)....................................................................... 232

United States v. Boone,
959 F.2d 1550 (11th Cir. 1992). .................................................................. 196

United States v. Cronic,
466 U.S. 648 (1984)............................................................................11, 64-65

United States v. Daugerdas,
No. S3 09 Cr. 581 (WHP), 2012 U.S. Dist. LEXIS 82597 (S.D.N.Y. June 4, 2012)......... 233

**Page(s)**

United States v. Defreitas,
No. 07-CR-543 (DLI)(SMG), 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011)....................... 218

United States v. Doe #3,
113 F. Supp. 2d 604 (S.D.N.Y. 2000)................................................................ 82

United States v. Dretke,
99 F. App'x 538 (5th Cir. 2004) ...................................................................... 82

United States v. Dupre,
462 F.3d 131 (2d Cir. 2006)........................................................................ 197-198

United States v. Feliciano,
998 F. Supp. 166 (D. Conn. 1998)........................................................128, 162, 216

United States v. Fell,
531 F.3d 197 (2d Cir. 2008).......................................................................... passim

United States v. Fell,
360 F.3d 135 (2d Cir. 2004)............................................................................ 77

United States v. Fell,
372 F. Supp. 2d 766 (D. Vt. 2005).................................................................... 260

United States v. Fell,
372 F. Supp. 2d 773 (D. Vt. 2005)..............................................................68, 242, 243

United States v. Fell,
No. 01 Cr. 12-01, 2006 U.S. Dist. LEXIS 24707 (D. Vt. Apr. 24, 2006) ......................... passim

United States v. Frank,
11 F. Supp. 2d 322 (S.D.N.Y. 1998).............................................................. 128, 216

United States v. Giardino,
797 F.2d 30 (1st Cir. 1986)............................................................................ 9

United States v. Gil,
297 F.3d 93 (2d Cir. 2002)......................................................................126, 129, 162

United States v. Grace,
401 F. Supp. 2d 1069 (D. Mont. 2005)............................................................... 218

United States v. Greer,
285 F.3d 158 (2d Cir. 2000)........................................................................... passim

United States v. Greer,
998 F. Supp. 339 (D. Vt. 1998), aff'd, 285 F.3d 158 (2d Cir. 2002)................................ 234

**Page(s)**

United States v. Grieco,
261 F.2d 414 (2d Cir. 1958)................................................................... 251

United States v. Hall,
152 F.3d 381 (5th Cir. 1998), abrogated on other grounds by
United States v. Martinez-Salazar, 528 U.S. 304 (2000)...........................................156, 175, 177

United States v. Harris,
420 F.3d 467, 478 (5th Cir. 2005) ........................................................ 196

United States v. Hayman,
342 U.S. 205 (1952)............................................................................. 16

United States v. Hedaithy,
392 F.3d 580 (3d Cir. 2004).................................................................. 254

United States v. Hernandez-Montoyo,
39 F. App'x 38 (4th Cir. 2002) ............................................................ 196

United States v. Ianiello,
866 F.2d 540 (2d Cir. 1989).................................................................. 232

United States v. Jackson,
345 F.3d 59 (2d Cir. 2003)................................................................... passim

United States v. James,
No. 02 CV 0778(SJ), 2007 WL 914242 (E.D.N.Y. Mar. 21, 2007).................................. 218

United States v. Johnson,
362 F. Supp. 2d 1043 (N.D. Iowa 2005)................................................... 75

United States v. Langford,
990 F.2d 65 (2d Cir. 1993)................................................................... 229, 233

United States v. Lee,
274 F.3d 485 (8th Cir. 2001) ............................................................... 82

United States v. Mannino,
212 F.3d 835 (3d Cir. 2000)...............................................................126-127, 220, 226, 227

United States v. Marx,
485 F.2d 1179 (10th Cir. 1973) ............................................................ 196

United States v. McCabe,
812 F.2d 1060 (8th Cir. 1987) ............................................................. 196

United States v. McGrew,
397 F. App'x 87 (5th Cir. 2010) ........................................................... 9, 55-56

**Page(s)**

United States v. McInnis,
601 F.2d 1319 (5th Cir. 1979) .................................................................. 196

United States v. Mejia,
545 F.3d 179 (2d Cir. 2008)..................................................................... 85

United States v. Mejia,
655 F.3d 126 (2d Cir. 2011)..................................................................... 256

United States v. Mitchell,
706 F. Supp. 2d 1148 (D. Utah 2010)................................................... 82

United States v. Nabor,
256 F. App'x 669 (5th Cir. 2007) ............................................................ 11

United States v. Nelson,
277 F.3d 164 (2d Cir. 2002)..................................................................... 254

United States v. Owens,
933 F. Supp. 76 (D. Mass. 1996) ............................................................ 144

United States v. Paul,
217 F.3d 989 (8th Cir. 2000) ................................................................... 175

United States v. Pelullo,
105 F.3d 117 (3d Cir. 1997)..................................................................... 126

United States v. Perdomo,
929 F.2d 967 (3d Cir.1991)...................................................................... 143

United States v. Perez,
222 F. Supp. 2d 164 (D. Conn. 2002).........................................128, 162, 216

United States v. Pitre,
960 F.2d 1112 (2d Cir. 1992)................................................................... 130

United States v. Roane,
378 F.3d 382 (4th Cir. 2004) ................................................................... 10

United States v. Robinson,
530 F.2d 1076 (D.C. Cir. 1976)............................................................... 255

United States v. Rodriguez,
496 F.3d 221 (2d Cir. 2007)..................................................................... 129, 162

United States v. Sablan,
No. 00-cr-00531-WYD, 2007 WL 4116117 (D. Colo. Nov. 16, 2007)............................. 156, 177

**Page(s)**

United States v. Sampson,
335 F. Supp. 2d 166 (D. Mass. 2004) ...............................................................75, 80, 89

United States v. Sampson,
820 F. Supp. 2d 151 (D. Mass. 2011) ...............................................................  passim

United States v. Sampson,
820 F. Supp. 2d 202 (D. Mass. 2011) ...............................................................  passim

United States v. Sampson,
No. 01-10384 (MLW), 2012 WL 1633296 (D. Mass. May 10, 2012) ...............................   228

United States v. Santiago,
46 F.3d 885 (9th Cir. 1995) ...........................................................................   144

United States v. Snowden,
770 F.2d 393 (4th Cir. 1985) ..........................................................................   135

United States v. Stewart,
433 F.3d 273 (2006)......................................................................................   233

United States v. Taylor,
320 F. Supp. 2d 790 (N.D. Ind. 2004) ................................................................   82

United States v. Thomas,
221 F.3d 430 (3d Cir. 2000)........................................................................10-11, 188

United States v. Thorpe,
471 F.3d 652 (6th Cir. 2006) ..........................................................................   256

United States v. Torres,
128 F.3d 28 (2d Cir. 1997)..............................................................................   236

United States v. Tuitt,
68 F. Supp. 2d 4 (D. Mass. 1999) .....................................................................   256

United States v. Wallach,
935 F.2d 445 (2d Cir. 1991)..................................................................... 116, 119, 121

United States v. Wiley,
846 F.2d 150 (2d Cir. 1988)............................................................................   134

United States v. Wilson,
237 F.3d 827 (7th Cir. 2001) ..........................................................................   143

United States v. Wilson,
No. 04-CR-1016 (NGG), 2007 U.S. Dist. LEXIS 1834 (E.D.N.Y. Jan. 10, 2007) ...........   91

**Page(s)**

United States v. Wong,
78 F.3d 73 (2d Cir. 1996) ........................................................................ 121, 154

United States v. Young,
213 F.3d 627 (2d Cir. 2000) (Table),
No. 99-1718, 2000 WL 687750 (2d Cir. May 25, 2000) ...................................   196

Walbey v. Quarterman,
No. 08-7007, 2009 WL 113778 (5th Cir. Jan. 19, 2009) ...................................    21

Waley v. Johnston,
316 U.S. 101 (1942) ...............................................................126, 220, 227, 228

Wheatley v. United States,
159 F.2d 599 (4th Cir. 1946) ............................................................   196

Wiggins v. Smith,
539 U.S. 510 (2003) ...........................................................................  passim

Williams v. Taylor,
529 U.S. 362 (2000) ...........................................................................    22

Williams v. Taylor
529 U.S. 420 (2000) ...........................................................................   233

Williams v. Whitley,
940 F.2d 132 (5th Cir. 1991) ............................................................   144

Wilson v. Mazzuca,
No. 01 Civ 2246 (DGT), 2007 U.S. Dist. LEXIS 22492 (E.D.N.Y. Mar. 28, 2007),
rev'd on other grounds, 570 F.3d 490 (2d Cir. 2009) .........................................  70-71

Wilson v. Sirmons,
536 F.3d 1064 (10th Cir. 2008) ............................................................43, 60-61

Ybarra v. McDaniel,
656 F.3d 984 (9th Cir. 2011) ............................................................   258

## Other Authorities

Alix Spiegel, Can a Test Really Tell Who's A Psychopath, NPR (May 26, 2011),
www.npr.org/2011/05/26/136619689/can-a-test-really-tell-whos-a-psychopath?sc=emaf     81

American Bar Association, Guidelines for the Appointment and Performance of
 Defense Counsel in Death Penalty Cases (rev. ed. 2003),
(printed in 31 Hofstra L. Rev. 913 (2002-2003)) ..............................................  passim

Coma, Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Coma. ...............   120

**Page(s)**

David DeMatteo and John F. Edens, <u>The Role and Relevance of the Psychopathy Checklist – Revised in Court</u>, 12 Psychol. Pub. Pol'y & L 214 (2006)...............81, 82, 83

David W. Ogden, <u>Memorandum for Prosecutors Regarding Criminal Discovery</u> (January 4, 2010), http://www.justice.gov/dag/discovery-guidance.html .........................    142

Dorland's Pocket Medical Dictionary (24th ed. 1989).......................................................    120

Douglas S. Liebert and David V. Foster, <u>The Mental Health Evaluation in Capital Cases: Standards of Practice</u>, 15 Am. J. Forensic Psychiatry 43 (1994)................    44

Gary Goodpaster, <u>The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases</u>, 58 N.Y.U. L. Rev. 299 (1983)......................................................................    44

Harold Kaplan and Benjamin Sadock (eds.), <u>Comprehensive Textbook of Psychiatry</u>, 837 (Lippincott Williams & Wilkins, 4th ed. 1985).............................................................    44

<u>Jackson Not Guilty: Jurors acquit pop star of all molestation charges</u>, CNN Law Center (June 14, 2005), http://www.cnn.com/2005/LAW/06/13/jackson.trial/..................    235

Jay N. Giedd, <u>Structural Magnetic Resonance Imaging of the Adolescent Brain</u>, 1021 Annals N.Y. Acad. Sci. 77 (2004) ............................................................................    264

John H. Blume, <u>Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination</u>, The Advocate, Aug. 1995 .............    44

Kathleen Wayland, <u>The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations</u>, 36 Hofstra L. Rev. 923 (2008)....................    99

Laurence Steinberg et al., <u>Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model</u>, 44 Dev. Psychol. 1764 (2008) ............................................................................. 264-265

3 Leonard B. Sand et al., <u>Modern Federal Jury Instructions</u> 8-3 (1993) ............................ 197, 244

Linnea Vaurio, Edward Riley, and Sarah Mattson, <u>Differences in Executive Functioning in Children with Heavy Prenatal Alcohol Exposure or Attention-Deficit/Hyperactivity Disorder</u>, 14 J. Int'l Neuropsychological Soc'y 119 (2008)............    52

Mark D. Cunningham and Thomas J. Reidy, <u>Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing</u>, 26 Crim. Just. & Behav. 20 (1999) .....................................................................................    83

Nat'l Research Council of the Nat'l Acads., <u>Strengthening Forensic Science in the United States: A Path Forward</u> 122 (2009).......................................................................    206

Phyllis L. Crocker, <u>Childhood Abuse and Adult Murder: Implications for the Death Penalty</u>, 77 N.C.L. Rev. 1143 (1999) .............................................................................    44

**Page(s)**

Robert D. Hare and Craig S. Neumann, Psychopathy: Assessment and Forensic
Implications, 54 Can. J. Psychiatry 791 (2009) ....................................................... 83

Robert D. Hare, The Hare PCL-R: Some Issues Concerning its Use and Misuse,
3 Legal and Criminological Psychol. 99 (1998) ..................................................... 83

Stedman's Medical Dictionary (25th ed. 1990) ...................................................... 120

Without Conscience, Psychopathy Scales PCL-R,
http://www.hare.org/scales/pclr.html (last visited Aug. 11, 2012) ..................................... 79

U.S. Dep't of Justice, United States Attorneys' Manual 9.5001(B)(2) (2008),
http://www.justice.gov. ...................................................................... 143

## I.     Preliminary Statement

On March 21, 2011, Donald Fell filed a Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255 (the "2255 Motion") raising in great detail claims of ineffective assistance of counsel, prosecutorial misconduct, juror misconduct and other constitutional violations that pervaded his trial.  He attached 313 exhibits to his 2255 Motion, including declarations from members of the trial team; experts they consulted who did not testify; lay mitigation witnesses they never interviewed, some of whom gave statements that the Government never turned over; a forensic expert; and several jurors.  These assertions, when combined with other extra-record facts in the 2255 Motion, cast grave doubt over the process that resulted in Mr. Fell's conviction and death sentence.

The Government nevertheless seeks to have Mr. Fell's 2255 Motion summarily dismissed without filing an answer or even producing the relevant documents in its possession. In so doing, the Government asks the wrong questions and comes to the wrong conclusions.  The question at this stage is not whether Mr. Fell's allegations are probable or believable – although they are – but whether they are "so palpably incredible" or  "so patently frivolous or false" in light of the record as to warrant dismissal without any further process.  Nor is the question whether each of Mr. Fell's allegations would – if asserted in isolation – entitle him to relief (although they do), but whether as a whole they cast sufficient doubt on the sentence.  Finally, Mr. Fell is a federal prisoner, and these proceedings are his first and only opportunity for post-conviction review.  Thus, the question is not whether further process is necessary in the face of adverse state court findings, but whether Mr. Fell should have *any* opportunity for discovery or a hearing in any forum on any of the issues raised in the 2255 Motion.  There have been no post-

conviction findings on any of these claims against Mr. Fell, and the federalism concerns that loom large in traditional habeas review of state court proceedings are entirely absent here.

Mr. Fell's 2255 Motion is plainly not incredible, frivolous, or false. Taken together, his allegations document the breakdown in the adversarial process that resulted in his death sentence. The Government's call for summary dismissal of these claims without further factual development or any merits consideration whatsoever simply misunderstands the standard of review at this stage of the proceedings. At this stage, it suffices that Mr. Fell's claims depend on the credibility and weight of extra-record evidence. Nonetheless, most of the Government's arguments urge this Court to reach the merits of the claims in order to grant its request for summary dismissal. Although Mr. Fell addresses these arguments for this Court's reference, he submits that this Court need not and should not consider them now.

Mr. Fell's trial lawyers conducted a preliminary mitigation investigation for the purposes of plea negotiations. But after those failed, no further preparation was done in the manner suitable for facing a jury at a vigorously contested capital trial. For instance, even though it should have been obvious that mental health would be a central issue, counsel stopped meeting with their preliminary mental health experts until the eve of trial. In addition, they failed to explore the full range of their young client's mental illnesses. Notably, their mitigation specialist visited Mr. Fell all of three times. As a result, the jury never learned that – as the extra-record evidence will establish – Mr. Fell was a severely mentally impaired person, which diminished his capacity to form the specific intent to commit these crimes and mitigated them. Instead, trial counsel entered into a devastating stipulation which allowed the Government to argue that Mr. Fell was "completely intact."

2

Mr. Fell has further alleged that after the plea agreement fell through, trial counsel relied primarily on the same mitigating facts that had failed to dissuade the Attorney General from seeking death, without either bolstering these facts or following up on any red flags pointing to additional mitigating evidence during the ensuing three years prior to trial. For example, the defense team ignored wide swaths of Mr. Fell's life, including the years immediately preceding the crimes. They also failed to look for evidence to support their proffered mitigating factors. For example, the Government devastated their anemic mitigation case by arguing, falsely, for example, that the mitigating facts about Mr. Fell's life were contained to his earliest years, and that as the abuse in his life became more and more remote, Mr. Fell became more and more violent. In fact, as was readily ascertainable, the abuse in Mr. Fell's life was relentless.

Further, by their own admission, trial counsel did not investigate any evidence that they anticipated, or reasonably should have anticipated, the Government would use to support the aggravating factors. Nor did they investigate the evidence they anticipated, or reasonably should have anticipated, the Government would use to rebut the mitigating factors. Mr. Fell's attorneys had an obligation to fully investigate the mitigating evidence available, and to marshal it in a way that permitted the jury to accord it its full mitigating weight. Moreover, in no death case is counsel permitted to just accept as true the facts and arguments that the Government alleges; rather, counsel must investigate them to independently assess their truth and investigate any correlative context.

Here, trial counsel knew of the "bad facts" the Government would offer, and should have known of the impact those facts would have on the Government's case and the defense case if not put in context. But, after having done some work to put on a mitigation case,

3

counsel did not use reasonable efforts either to counteract the Government's case or to support their own. Although they knew from his post-arrest statements that Mr. Fell had shot a playmate as a child, they did not attempt to talk to the friend or to any other witnesses who would have confirmed that it was an accident for which Mr. Fell felt deep remorse. Trial counsel also failed to investigate the claim that Mr. Fell had put someone into "a coma" a few months prior to his move to Vermont – even though records were available that demonstrated that was not true and even though the Government drew an analogy between that incident and the crimes for which Mr. Fell was on trial. Nor did counsel speak to the corrections officer with a long disciplinary history who was involved in two incidents that the Government used to show that Mr. Fell would be a danger in prison. Counsel also abandoned their entire forensic investigation after an expert spent two hours on the matter and referred them elsewhere, leaving them without a way to challenge Mr. Fell's death eligibility or the heinous, cruel or depraved aggravator.

These issues are not susceptible to summary dismissal. Individualized consideration of the defendant and his conduct is essential to the fairness and constitutionality of the death penalty. Mr. Fell could only be sentenced to death following the jurors' careful weighing of aggravating and mitigating circumstances. If just one juror found that the evidence did not support an aggravator, the jury would not have been able to find that aggravator, and if just one juror found that the aggravating factors did not outweigh the mitigators, the jury would have been required to return a sentence of life.[1] And, if there is a reasonable probability that just one juror would have returned a different verdict if counsel had presented the evidence that was reasonably available but that they failed to investigate or present, he is entitled to a new penalty hearing. This determination cannot be answered by addressing whether each claim in isolation

---

[1] Under the Federal Death Penalty Act, Mr. Fell could be executed only if the jury unanimously found that the aggravating factors (that it found unanimously and beyond a reasonable doubt) outweighed the mitigating factors.

4

would have made a difference and then arguing – as the Government implicitly does – that because no single attorney error would have made a difference, then all of the errors viewed collectively must be considered harmless. Even if the Government were right (and it is not), the Court must review the record as a whole.

Here, counsel's deficient performance prejudiced Mr. Fell by upsetting the entire weighing process. As a result, the jurors gave undue weight to the aggravating factors, which counsel failed to challenge. The jurors also could not give appropriate weight to the mitigating factors, which counsel failed to support, develop and explain. The implications of these failures are far-reaching and interconnected. Notwithstanding the Government's attempt to attack it piece-by-piece, the 2255 Motion as a whole sets forth a facially valid claim that Mr. Fell's ineffective lawyers compromised the integrity of his trial.

Mr. Fell has also alleged facts showing that in its zeal to secure a death sentence, the Government repeatedly violated the Constitution. The Government's violation of this Court's order with respect to psychiatric testing, which also deprived Mr. Fell of his Sixth Amendment right to counsel in that context, is symptomatic of its approach in this case. The 2255 Motion also asserts that the Government knowingly or recklessly put on false evidence, including evidence about the Woodstock incident and the prison video shown to the jury. It further alleges that the Government withheld favorable information about Mr. Fell's co-defendant, Robert Lee, and other mitigating materials. These tactics unjustly tipped the scale in favor of death. They undermined the fundamental fairness of the trial, and the reliability of its result. Because Mr. Fell's claims and supporting allegations are sufficient and not conclusively refuted by the record, the Government should be required to answer them.

5

In addition to the broad ineffective assistance of counsel and substantial prosecutorial misconduct, post-conviction investigation has also uncovered serious juror misconduct. Two jurors responded untruthfully to questions designed to ascertain whether they could fairly assess evidence of family violence, sexual abuse, and substance abuse. One juror failed to disclose that she was repeatedly sexually molested by her stepfather. The other declined to reveal that he had been criminally charged three times, including once for driving while intoxicated. The 2255 Motion further states that the same juror did not disclose his knowledge of facts about Mr. Lee that had been the subject of a motion in limine. Both jurors would have been excluded for cause had they been forthright in their voir dire responses.

That was not the only misconduct by the jurors who decided whether Mr. Fell deserved to be put to death. Another juror took a trip to the Rutland crime scene during the trial to assess for himself Mr. Fell's living circumstances, the lighting at the Price Chopper, and the distance between the store and his home. This juror then shared his findings with the other jurors. By his own account, this juror also asked to have the gun used during the abduction brought into the jury room, then pointed it at a female juror who had been unwilling to vote for death so she could experience what he believed Mrs. King had felt. He reports that she then changed her vote from life to death.

Section 2255 provides the lone forum for federally death-sentenced prisoners to raise precisely these claims: allegations of fundamental improprieties that undermined the fairness and reliability of the trial where the relevant evidence is outside of the trial record. And this is Mr. Fell's first Section 2255 motion. It would be inappropriate to foreclose Mr. Fell's opportunity to develop and present this evidence now, without the benefit of discovery, an answer by the Government, a hearing, or any briefing on the merits.

6

## II.    Legal Standards

The Government's argument rests on a misunderstanding of the standards that the Court must apply to Mr. Fell's 2255 Motion at this early stage of the proceedings. Throughout its submission, the Government asks this Court to make findings of fact that Mr. Fell has a right to challenge and would be appropriate, only, if at all, at a later stage in the proceedings. But Rule 4 of the Rules Governing Section 2255 Proceedings (the "2255 Rules") requires the Court only to conduct a "Preliminary Review" and to make an "Initial Consideration." The Court may dismiss a Section 2255 motion only "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Rule 4(b), Rules Governing § 2255 Proceedings. This "Initial Consideration" is only the first step of a three-step process for evaluating 2255 motions. If the Court does not or cannot determine from the specified materials that the moving party is "plainly" not entitled to relief, the 2255 Rules require the Court to "order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." Id. The movant may then submit a reply to the United States attorney's answer. Rule 5(d), Rules Governing § 2255 Proceedings. The Court may permit discovery and "[i]f the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion." Rule 7(a), Rules Governing § 2255 Proceedings. If the motion survives the initial Rule 4(b) review, the Court must still determine whether an evidentiary hearing is necessary. See Rules 6, 7, and 8(a), Rules Governing § 2255 Proceedings.[2] Finally, if warranted, the Court may

---

[2] This process is essentially the equivalent of summary judgment in the civil context. See Blackledge v. Allison, 431 U.S. 63, 80 (1977); Puglisi v. United States, 586 F.3d 209, 213-15 (2d Cir. 2009).

7

hold an evidentiary hearing pursuant to Rule 8(c), after which it will decide whether Mr. Fell is entitled to relief on his claims.[3]

In keeping with the preliminary nature of the Court's review at this initial stage, the Courts have held that "[t]he critical question is whether these allegations, when viewed against the record…were 'so palpably incredible,' so 'patently frivolous or false,' as to warrant summary dismissal." Blackledge, 431 U.S. at 76 (citation omitted). Mr. Fell's 2255 Motion plainly clears this threshold. Put otherwise, summary dismissal is not appropriate where "the motion and the files and records of the case do *not* conclusively show that [movant] is entitled to no relief." Armienti v. United States, 234 F.3d 820, 823-25 (2d Cir. 2000) (citations and internal quotation marks omitted); 28 U.S.C. § 2255(b). Further, at this stage, the Court must accept all of Mr. Fell's allegations as true unless conclusively refuted by the record. See 28 U.S.C. § 2255(b); Puglisi, 586 F.3d at 213. "The Government's contention that [Mr. Fell's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence." Machibroda v. United States, 368 U.S. 487, 495 (1962); see Chang v. United States, 250 F.3d 79 (2d Cir. 2001) (summary dismissal inappropriate where claim, while improbable, was not so clearly bereft of merit as to be subject to dismissal on its face); Barefoot v. Estelle, 463 U.S. 880, 888 (1983) (court "need not, and should not…fail to give nonfrivolous claims of constitutional error the careful attention that they deserve"). The need to allow full evidentiary development of any claims that if true would entitle the movant to relief is particularly crucial in

---

[3] Notably, a determination that a claim survives Initial Consideration is not equivalent to a decision that resolution of that claim requires a full-blown hearing, with witness testimony. The Rules provide the Court with discretion regarding how to resolve claims that survive Initial Consideration; they do not, however, permit dismissal of a claim that is facially sufficient based on the Government's argument that it will ultimately not be meritorious. See Blackledge, 431 U.S. at 81-82 ("[T]he district judge…may employ a variety of measures in an effort to avoid the need for an evidentiary hearing [and]…it may turn out upon remand that a full evidentiary hearing is not required. But Allison is entitled to careful consideration and plenary processing of (his claim,) including full opportunity for presentation of the relevant facts."); United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987) (finding summary dismissal inappropriate but noting that on remand court could "utilize any of the habeas rules designed to supplement the record without the necessity of conducting a full-blown evidentiary hearing").

a capital proceeding, where this Court's findings of fact will likely determine whether Mr. Fell's conviction or death sentence was marred by constitutional error.

These rules are especially applicable to claims – such as Mr. Fell's – of ineffective assistance of counsel and governmental misconduct. Because such claims are based on facts outside the record, the Court cannot conclusively determine that Mr. Fell is not entitled to relief without affording him additional process. As Judge Wolf recognized in the Sampson case: "Potentially meritorious claims that allege specific facts, that are based on information outside the presiding judge's knowledge and the records of the case…may not be summarily dismissed, even if the ultimate likelihood of success on the merits appears relatively low to those familiar with the trial." United States v. Sampson, 820 F. Supp. 2d 202, 212-13 (D. Mass. 2011).[4]

The expectation that 2255 motions, like Mr. Fell's, that are adequately pled and supported by facts will survive summary dismissal is highlighted by the structure of the Rules Governing Section 2255 Proceedings themselves. After setting forth the standards for a Preliminary Review in Rule 4, the Rules go on to provide in Rule 6(a) that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal

---

[4] See also e.g., Armienti, 234 F.3d at 823-25 (finding district court erred by not allowing an evidentiary hearing where "these issues implicate actions taken by counsel outside the presence of the trial judge and could not ordinarily be resolved by him without such a hearing"); Aiello, 814 F.2d at 114 (finding summary dismissal inappropriate where factual basis for the claim was outside the record); Matthews v. United States, 682 F.3d 180, 188 (2d Cir. 2012) (holding "[court] could [not] properly summarily resolve against [defendant] the matter of whether [defendant's] off-the-record communications with [trial counsel] had made [trial counsel] aware of the potential bias of [trial counsel's investigator]" and that defendant "should have an opportunity to show what an unbiased investigator could have unearthed in order to create a reasonable probability that the result of the trial would have been different"); United States v. Giardino, 797 F.2d 30, 32-33 (1st Cir. 1986) (reversing summary dismissal where "[t]he factual allegations…relate…primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light" and directing the court to "take further steps to determine the truth and significance of what is alleged") (internal citations and quotations omitted); United States v. McGrew, 397 F. App'x. 87, 93- 94 (5th Cir. 2010) (remanding for evidentiary hearing on petitioner's claim that trial counsel failed to file a motion to suppress and "[g]iven the devastating impact of that statement, it is impossible to conclude without further factual development that McGrew's trial counsel's decision not to file a motion to suppress was 'strategic, continuous, and informed'") (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)).

Procedure or Civil Procedure, or in accordance with the practices and principles of law."  Rule 6(a), Rules Governing § 2255 Proceedings.  The Supreme Court has held that this language permits a movant to obtain discovery when "he has made specific allegations before the court [that] show *reason to believe* that [he] may, if the facts are fully developed, be able to demonstrate that he is…*entitled to relief*."  See Bracy v. Gramley, 520 U.S. 899, 908-09  (1997) (emphasis added) (further stating that where such good cause is shown, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry");[5] Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003); Puglisi, at 213-14 (noting that because there is no pre-motion discovery in a Section 2255 case, the petitioner "may need only to identify available sources of relevant evidence rather than obtain it as in civil cases or seek a discovery order from the court under Rule 6 of the Rules Governing Section 2255 Proceedings").  It thus follows that Mr. Fell need not allege *all* of the facts that will ultimately entitle him to relief, but only sufficient facts offering reason to believe that he will be entitled to relief if he gets discovery.  That Rule only makes sense: at this stage, Mr. Fell has not had the benefit of discovery and has had to rely on document requests which do not carry the force of law to obtain records from government agencies.  The 2255 Motion more than establishes good cause to believe that, if he is given discovery, his Motion will prevail.[6]

---

[5] Though Bracy involved discovery in habeas corpus proceedings pursuant to the Rules Governing 2254 Cases, its discussion of the "good cause" standard is fully applicable to 2255 proceedings.  See United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004).

[6] Mr. Fell, like all 2255 movants, had only one year in which to develop and plead all his available 2255 claims, 28 U.S.C.§ 2255(f), and has indicated his intent to amend his 2255 Motion to include additional facts in support of his claims made possible by additional investigation, and discovery if the Court permits. Mot. 364. If the Court determines that Mr. Fell's allegations are insufficient with respect to any one claim in isolation, he should be given the opportunity to correct any pleading deficiencies through amendment. See e.g., Memorandum and Order at 3-4, Sampson, No. 01-10384-MLW (D. Mass. Mar. 1, 2010) (allowing petitioner to amend before ruling on summary dismissal); Sanders v. United States, 373 U.S. 1, 19 (1963) (noting that although district court had the power to dismiss section 2255 motion "because it stated only bald legal conclusions with no supporting factual allegations,… the better course might have been to direct petitioner to amend his motion"); United States v. Thomas, 221 F.3d 430, 437-38 (3d Cir. 2000) (vacating dismissal of 2255 motion and remanding for consideration of whether movant's

10

Indeed, this Court acknowledged those very principles in language that the Government ignores. See Discovery Hearing Tr. at 3:24-25, Dkt. No. 324 (June 1, 2011); id. at 19:1-7 (Court: "You know, I am particularly sensitive to the issue of a need for discovery, generally speaking, especially when you are talking about ineffective assistance of counsel for failure to investigate, or the withholding of evidence from the government, because a lot of that information has to be disclosed before you can adequately address the issue.").

Moreover, although the Government attacks Mr. Fell's motion piecemeal and suggests that the Court do so as well, both the substantive law and the plain language of Rule 4(b) discourage a process by which the Court reviews at this stage each and every claim independently and determines whether that claim standing alone would support a claim for relief. For example, although the Court may determine that one error alone is sufficient to entitle Mr. Fell to relief, Kimmelman v. Morrison, 477 U.S. 365, 383 (1986); United States v. Cronic, 466 U.S. 648, 657 n.20, the Fifth and Sixth Amendments also require that the allegations of ineffective assistance and prosecutorial misconduct be considered together and that the Court consider whether the "cumulative effect" of those errors rendered the trial unfair or denied Mr. Fell his constitutional rights.[7]

---

motion to amend corrected pleading deficiency concerning factual details of claims). See also, e.g., Ching v. United States, 298 F.3d 174, 180 (2d Cir. 2002) ("We have previously decided that the application of Fed. R. Civ. P. 15 to habeas petitions and § 2255 motions would not frustrate the [Antiterrorism and Effective Death Penalty Act]'s goals, even if the motion to amend is brought late in the proceedings."); Littlejohn v. Artuz, 271 F.3d 360, 364 (2d Cir. 2001) ("[W]e see nothing in AEDPA inconsistent with the application of Rule 15, which promotes consideration of all of a party's claims on the merits."); Masotto v. United States, No. 97-2894 (JLO), 2000 U.S. App. LEXIS 298, at *6 (2d Cir. Jan. 5, 2000) (remanding to the district court because it "gave no explanation for why it denied the motion to amend, or that it even considered the applicability of the liberal provisions of Rule 15(a) to the motion to amend"); United States v. Nabor, 256 F. App'x. 669, 670 (5th Cir. 2007) (finding the district court abused its discretion in refusing to allow defendant to amend his section 2255 petition).

[7] See e.g., Lindstadt v. Keane, 239 F.3d 191, 198-206 (2d Cir. 2001) (considering trial counsel's errors in the aggregate in determining both that counsel's services fell "outside the wide range of professionally competent assistance" and that "there [wa]s a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (quoting Strickland, 466 U.S. at 690, 694); see also Floyd v. Meachum, 907 F.2d 347, 353, 357 (2d Cir. 1990) (granting habeas relief where "the cumulative effect of the prosecutor's

11

Moreover, the plain language of Rule 4(b) directs the Court to look at Mr. Fell's 2255 Motion as a whole and determine whether to dismiss "the motion" based on whether "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief."  Rule 4(b), Rules Governing § 2255 Proceedings. Thus, unless it "plainly appear[s]" that Mr. Fell is entitled to no relief on any of his claims, Rule 4(b) does not contemplate dismissal at this preliminary stage.  The language of Rule 4(b) thus is markedly different from the language the rulemakers used elsewhere in the Federal Rules where they provided that motions could be directed to, and orders of dismissal entered on, individual claims.  Compare e.g., Fed. R. Civ. P. 56(a) (directing party to identify "*each claim* or defense – or the part of each claim or defense – *on which summary judgment is sought*") (emphasis added); and Fed. R. Civ. P. 12(b)(6) (noting party may submit a motion to dismiss for "*failure to state a claim* upon which relief can be granted") (emphasis added).  Rule 4(b) concerns Preliminary Review, and not a motion to dismiss or summary judgment, and it does not permit dismissal of individual claims or allegations unless the motion as a whole is plainly without merit and must be dismissed as a whole.[8]

---

persistent and clearly improper remarks amounted to such egregious misconduct as to render Floyd's trial fundamentally unfair" and noting "[w]hile each instance of prosecutorial misconduct, standing alone might not justify reversal, the effect of all of them requires it"); Kyles v. Whitley, 514 U.S. 419, 441-54 (1995) (applying "the cumulative evaluation required by Bagley" and determining that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable"); Aug. 30 Tr. at 63:13-65:21, Sampson, No. 01-cr-10384-MLW (D. Mass. Aug. 30, 2010) (reserving ruling on individual claims until an amended petition was filed and a hearing could be held on all claims noting "the rulings, to some extent, depend on cumulative evidence of prejudice"); Cargle v. Mullin, 317 F.3d 1196, 1201 (10th Cir. 2003) (holding prejudice could be cumulated among different types of constitutional error and that petitioner was entitled to relief from his capital convictions and sentence based on the cumulative impact of his ineffective assistance of counsel, prosecutorial misconduct, and admission of improper victim impact evidence claims); United States v. Alfonso-Perez, 535 F.2d 1362 (2d Cir. 1976) (reversing a conviction on direct review based on the cumulative effect of trial errors); Sanders v. Sullivan, 701 F. Supp. 1008, 1012 (S.D.N.Y. 1988) (noting that the "cumulative error" doctrine also applies in the habeas context).

[8] The Court will have the opportunity at a later stage – after it is informed by discovery and the Government's answer – to determine whether particular claims are sufficiently supported to require a hearing or can be disposed of without a hearing.  And, if the Court determines after considering discovery motions and the Government's response to those motions that there is not "good cause" for any request for discovery, it may limit discovery at that point.  It

Finally, it bears note that this is a death case.  Courts are required by statute, the Rules Governing Section 2255 Proceedings, and precedent to give careful consideration to habeas claims in capital cases.  See California v. Ramos, 463 U.S. 992, 998-99 (1983) ("The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."); Kyles v. Whitley, 514 U.S. 419, 421-22 (1995) ("Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.") (citation omitted); United States v. Sampson, 820 F. Supp. 2d 202, 214 (D. Mass. 2011) (As "[a] remand at any stage of the proceeding can cause significant delay in resolving a capital case, where finality is both important and often elusive… it is essential that the court make decisions that are properly informed, legally correct, and do not require reversal and remand on appeal.").

In his 2255 Motion, Mr. Fell has set forth facially adequate allegations that are not conclusively contradicted by the record.  He has alleged multiple claims, including ineffective assistance of counsel, prosecutorial misconduct, juror misconduct, and other constitutional violations, and he has alleged specific, extra-record facts in support of his allegations.  That is sufficient to meet his burden at this stage and to survive summary dismissal.  Mr. Fell has also begun building his 2255 record as best he can before the Court grants discovery and an evidentiary hearing.

Furthermore, Mr. Fell has supported his allegations with records that trial counsel never reviewed, either because they failed to investigate those records, or because the Government failed to turn them over.  These claims cannot be dismissed as the record in these

---

would be contrary to the Rules and a waste of judicial resources at this point for the Court, before discovery and amendment, to wade into the merits of individual claims and dismiss them seriatim when it is evident that the 2255 Motion as a whole clearly states numerous grounds on which Mr. Fell is in a position to prevail and the Court will have the opportunity later to assess the Motion as a whole.

13

proceedings currently stands.  Accordingly, Mr. Fell should be permitted to proceed to the next stage of 2255 litigation.  He should be granted the ability to take discovery, given the opportunity to amend, and, after he has amended, the Government should be directed to provide an answer.

### III.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate And Present Mitigating Evidence

The Government urges summary dismissal of Mr. Fell's entire claim that his lawyers rendered ineffective assistance in failing to investigate and present mitigating evidence. It argues from the trial record that counsel adequately presented Mr. Fell's background and made strategic decisions to withhold additional mitigating information.  Moreover, in the Government's view, Mr. Fell's extra-record evidence is cumulative, insignificant, or untrue.  The Government asks this Court to resolve all of these inherently factual disputes against Mr. Fell now, summarily, and without any further process.

The Government's arguments misapprehend the law and misrepresent the facts. Mr. Fell has alleged on the basis of extra-record evidence that his trial lawyers conducted an unreasonably limited investigation that handicapped their mitigation presentation.  He has further alleged that as a result, the jury heard only a superficial, incomplete, and in places inaccurate narrative of his life that the Government devastated on rebuttal.  Mr. Fell has introduced dozens of declarations from witnesses trial counsel never interviewed, and even more records that counsel never reviewed, documenting a life story that the jury never heard.  It would be premature to rule on the merits that Mr. Fell's new facts are merely cumulative or untrue, or that they could not have persuaded one juror to strike a different balance and vote for life.

### A.    Mr. Fell Has Adequately Alleged That Trial Counsel's Performance Fell Below An Objective Standard Of Reasonableness

The Government claims that Mr. Fell's lawyers spent "sufficient" time investigating mitigation and presented "adequate background evidence to the jury."  Opp. 59.

14

Specifically, it argues that regardless of what trial counsel failed to do, they acted reasonably because their mitigation specialist spoke with some family members and because they presented fourteen witnesses at trial. Opp. 59-60. The Government relies on Bobby v. Van Hook, 130 S. Ct. 13 (2009), and a sentence from United States v. Fell ("Fell III"), 531 F.3d 197, 230-31 (2d Cir. 2008), to support this claim. Opp. 59, 51. The Government also suggests that any failure to educe additional evidence was reasonable in light of counsel's overall trial strategy. Opp. 70. None of these arguments supports summary dismissal.

The Government argues, in essence, that an investigation involving interviews with multiple family members that produces trial testimony about relevant subjects cannot be found deficient. Opp. 60 ("It is baseless for Fell to claim that this multitude of family interviews in addition to the interviews of trial witnesses, was constitutionally ineffective."). This is not the law. Deficient performance often arises from counsel's omissions and failures, not what *was* investigated and presented. Henry v. Poole, 409 F.3d 48, 71-72 (2d Cir. 2005) (finding ineffectiveness based on single error and explaining that "reliance on 'counsel's competency in other respects'…fail[s] to apply the Strickland standard at all"). See, e.g., Porter v. McCollum, 130 S. Ct. 447 (2009) (analyzing counsel's failure to present three kinds of mitigating evidence in vacating death sentence).

Contrary to the Government's suggestion, there is no magic formula for "effective assistance" based on the number of witnesses interviewed or presented at trial. Cf. Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999) (finding ineffective assistance where counsel called ten witnesses to the stand but mostly elicited testimony about defendant's reputation for truth); Ferrell v. Hall, 640 F.3d 1199, 1216 (11th Cir. 2011) (finding ineffective assistance where investigator interviewed 40-50 witnesses but "only asked statutory character evidence

15

questions…and only followed up with them if they said anything positive" about the petitioner).

Indeed, the Supreme Court has repeatedly rejected a one-size-fits-all approach to ineffective

assistance, holding instead that the reasonableness of defense counsel's actions depends on the

facts of each case.  See, e.g., Strickland v. Washington, 446 U.S. 668, 688-89 (1984) ("No

particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety

of circumstances faced by defense counsel…."); Wiggins v. Smith, 539 U.S. 510, 523 (2003)

(court must undertake "a context-dependent consideration of the challenged conduct as seen

from counsel's perspective at the time") (internal quotations omitted).

The Government nevertheless insists that Mr. Fell's trial lawyers rendered

objectively reasonable performance based on conduct upheld in Van Hook.  See, e.g., Opp. 59

("The time spent on this case by the mitigation specialist…was sufficient.") (citing Van Hook,

130 S. Ct. at 18).  But Van Hook addresses the reasonableness of trial counsel's conduct in 1985,

two decades before Mr. Fell's trial.[9]  130 S. Ct. at 17. The Supreme Court criticized the Sixth

Circuit for determining that trial counsel was effective in 1985 on the basis of ABA Guidelines

published eighteen years later.  Id. ("Judging counsel's conduct in the 1980's on the basis of

these 2003 Guidelines – without even pausing to consider whether they reflected the prevailing

professional practice at the time of the trial – was error.").  In asking this Court to summarily

dismiss Mr. Fell's claim that his lawyers were ineffective in 2005 because the lawyers in Van

---

[9] Van Hook was also a state prisoner seeking federal relief under 28 U.S.C. § 2254 after the Ohio courts had already considered and rejected his ineffectiveness claim.  Van Hook, 130 S. Ct. at 15-16, 19.  Federal courts respected the considered determinations of the state courts long before the AEDPA imposed an "added layer of deference" to those decisions.  Id. at 16.  See Miller v. Fenton, 474 U.S. 104, 112 (1985) ("[T]he federal habeas court should, of course, give great weight to the considered conclusions of a coequal state judiciary.").  There is simply no state court determination entitled to "great weight" in the 2255 context.  Cf. Pavel v. Hollins, 261 F.3d 210, 215 (2d Cir. 2001) ("In this case, there are no relevant state court factual findings.  Accordingly, there is no basis under 'pre-AEDPA law' for deferring to the state courts' denial of Pavel's Sixth Amendment claim.").  Mr. Fell's first and only opportunity to seek review of his constitutional ineffectiveness claim is the federal habeas proceeding.  It is also his only forum in which to develop the factual record as necessary.  See, e.g., United States v. Hayman, 342 U.S. 205, 219 (1952) (2255 requires a hearing to be held to review claims not "determined by the files and records in the trial court") (internal quotation marks and citations omitted).

16

Hook were not found ineffective in 1983, the Government advocates the very mistake the Supreme Court identified in that case.

Determining the parameters of the professional standards which prevailed at the time of Mr. Fell's trial requires a critical factual inquiry that must be conducted by this Court in assessing the merits of this claim. At best, the Government's argument here (and reliance on Van Hook) highlights a factual disagreement about the standard of care. The facts in Van Hook also differ materially from the facts that Mr. Fell has alleged, which the Government cannot and does not refute.[10]

The Government also states that Mr. Fell's ineffectiveness claims lack merit because the Second Circuit, in rejecting his challenge to the admission of inflammatory evidence, held that Mr. Fell suffered no prejudice in that context because of the "extensive mitigation case." Opp. 51 (citing Fell III, 531 F.3d at 230-31). However, the Government acknowledges that this fleeting reference to "extensive mitigation evidence" was not part of any Strickland analysis and was made on direct appeal, without the benefit of extra-record evidence. Opp. 40; Fell III, 531 F.3d at 230-31. It is thus irrelevant to this Court's instant analysis. See Matthews v. United States, No. 10-0611-PR, 2012 WL 2146320 (2d Cir. June 14, 2012) (reversing summary dismissal and rejecting Government's argument that the defendant could not prove Strickland prejudice because the district court had already found in a different context that the behavior supporting defendant's complaints about his counsel would have no impact on the

---

[10] The lawyers in Van Hook had less than three months between indictment and trial in which to prepare to litigate both the guilt and penalty phases, yet contacted their lay witnesses "early and often" and met regularly with their expert witnesses. 130 S. Ct. at 6, 18. For example, trial counsel met nine times with Van Hook's mother beginning the week after his indictment. Id. at 18. By contrast, Mr. Fell's lawyers had nearly *five years* between their client's arrest and trial but instructed their mitigation specialist to do nothing for over two years and had only "limited discussions" with their mental health expert witnesses. Declaration of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 6). Nothing in Van Hook requires this Court to conclude, let alone summarily conclude, that trial counsel's performance under these circumstances was "reasonable."

outcome of the trial). This habeas proceeding is the first opportunity for any court to assess the impact of counsel's *omissions*.

Finally, the Government argues that trial counsel's failure to discover and present the evidence in Mr. Fell's 2255 Motion was not unreasonable because trial counsel's overall strategy was reasonable. See, e.g., Opp. 70; id. at 93 ("[I]t was reasonable for trial counsel not to have relied on [Theresa Sharpe's] isolated and unsubstantiated allegation."); id. at 96. But purported "strategy" based upon an incomplete investigation is not entitled to deference. See Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Moreover, the factual question of the contours of trial counsel's trial strategy cannot be resolved on summary dismissal.

The extra-record facts alleged in Mr. Fell's 2255 Motion amply support his claim that trial counsel's investigation was deficient. Not only has Mr. Fell noted the many witnesses with whom counsel never spoke, and the records with which they were manifestly unfamiliar, but he has also included declarations from trial counsel and their mitigation specialist recounting the limitations of their investigation, including its haste, narrow scope, and lack of direction. See Decl. of Gene Primomo, Mar. 16, 2011 (Fell Ex. 263 at 1-2) (describing mitigation specialist Cynthia Ayres as "self-directed" and noting that team never interviewed Gacek family, Cupano family, or Sean Campbell); Decl. of A. Bunin (Fell Ex. 264 at 6) (explaining that defense team did not prepare social history in plea bargaining stage because time was short, then never gave experts updated information; describing Ms. Ayres as "self-directed" and noting that "she was not given any assignments from mid-2002 to 2005"); see generally Decl. of Cynthia Ayres, Mar. 18, 2011(Fell Ex. 265).

18

Ms. Ayres provides a detailed account of the defense team's haphazard and largely perfunctory mitigation investigation. She admits that the time she spent on the case was not enough "to conduct a complete social history investigation in order to prepare a comprehensive mitigation presentation." Fell Ex. 265 at 3. For example, Ms. Ayres "did not spend a lot of time with any one witness, even those who were very important." Id. She spent only seven hours with Teri Fell over three visits in four years, and met just three times with Mr. Fell. Id.

Whether this investigation was adequate to support trial counsel's purported "strategy" of withholding additional mitigating evidence depends on the quantity, quality, type, and impact of the materials first discovered and developed after trial. As these facts are outside the record, summary dismissal is not appropriate. See supra Rep. Section II.

**B.      Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient Performance Prejudiced His Case**

Mr. Fell has presented specific facts in support of his claim that an adequate mitigation investigation would have revealed that he suffered extraordinary abuse from before birth through his teen years. Mot. 64. Each of his "homes" was a violent hell. Id. Neighbors and friends vividly recall the lice, the lack of food, the beer cans on the floor, and the cuts and bruises visible on Mr. Fell and his sister. Id. Things worsened for Mr. Fell as he grew older, when the constant physical and verbal abuse from his mother, her boyfriend, his aunt, and even his grandmother relented only when he was institutionalized. Id. His close friends remember that Mr. Fell's name at home was "you freckle-faced piece of s---," and friends and relatives saw both his mother and his aunt chase Mr. Fell with knives. See Decl. of John Gacek, Feb. 25, 2011 (Fell Ex. 251 at 2-3); Decl. of Sean Campbell, Feb. 25, 2011 (Fell Ex. 273); Decl. of Teri Fell, Mar. 15, 2011 (Fell Ex. 278). Witnesses and records further document that each of these

19

"caretakers" abandoned Mr. Fell in turn, leaving him traumatized, alcohol and drug-dependent, and homeless at age seventeen.  See Mot. 65.

After telling the jurors that they had heard nothing to distinguish Mr. Fell's background from any other "poor childhood" at trial, the Government now tells this Court that the jurors heard everything that a reasonable investigation would have uncovered.

### 1.    The Government Applies The Wrong Legal Framework

The Government argues that each allegation in Mr. Fell's 2255 Motion is cumulative evidence of his "poor childhood" and therefore would not have changed the "sentencing profile" at trial.  Opp. 61.  This analysis is flawed in several ways.

First, Mr. Fell's new evidence of chronic physical, sexual, and emotional abuse is not cumulative simply because it relates in a general sense to his "poor childhood."  See, e.g. Foust v. Houk, 655 F.3d 524, 539 (6th Cir. 2011) (rejecting claim that new evidence of parental abuse and neglect and sexual abuse was cumulative of evidence of the defendant's "dismal home life" presented at trial because "[f]ar from being cumulative, the new evidence paints an altogether different picture of Foust's childhood").  Rather, evidence is cumulative where it "would have added nothing of value."  Van Hook, 130 S. Ct. at 19.  Mr. Fell has alleged that critical holes in counsel's mitigation presentation enabled the Government to mislead the jury about his youth in ways that demolished the mitigating import of what little was presented about him.  See infra Rep. Section III(B)(2)(b).  Any assertion that Mr. Fell's new evidence "would have added nothing of value" is contrary to these facts and requires merits resolution.[11]

---

[11] For example, as discussed below in Section III(B)(2)(b), Mr. Fell claims that the jury wrongly believed that Al Wilcox was a well-meaning disciplinarian because trial counsel failed to present evidence of his physical and psychological abuse.  The Government alleges that this fact is cumulative because the jury already knew the "deplorable conditions" in which Mr. Fell was raised.  This is clearly non-responsive.

The Government's related claim that Mr. Fell's new facts do not "change the sentencing profile" contorts a sentence from <u>Strickland</u> into a requirement that post-conviction evidence address topics wholly ignored by trial counsel.  <u>See, e.g.</u>, Opp. 50, 74, 76, 83, 84, 90, 95.  In <u>Strickland</u>, the Supreme Court found that extra-record evidence "would barely have altered the sentencing profile" presented to the jury.  466 U.S. at 700.  The Government reasons that because Mr. Fell's trial lawyers argued that his background was mitigating, new evidence about Mr. Fell's background cannot change the "sentencing profile" in his case.  Opp. 50-51 ("It is significant that his claim is not that his trial counsel failed to advance a particular defense, or failed to investigate and present social history evidence.  At trial Fell's attorneys advanced precisely the defense now urged by his 2255 attorneys: to rely upon mitigating social history at the penalty phase.").   In other words, no matter how cursory their mitigation investigation and presentation, trial counsel cannot be held ineffective if they broached the right topics.

This is simply not the law.  Courts regularly find ineffectiveness where the post-conviction investigation adds substantial depth and breadth to the mitigation presentation at trial.  <u>See, e.g.</u>, <u>Sears v. Upton</u>, 130 S. Ct. 3259, 3266 (2010) ("We have never limited the prejudice inquiry under <u>Strickland</u> to cases in which there was only little or no mitigation evidence presented.") (citation and internal quotation marks omitted); <u>Walbey v. Quarterman</u>, No. 08-7007, 2009 WL 113778, at *7 (5th Cir. Jan. 19, 2009) (stating that "counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented").  It suffices that the new materials are of a different quality or quantity than anything the jury heard on similar topics.[12]  <u>See</u> <u>Bond v. Beard</u>, 539 F.3d 256, 291 (3d Cir. 2008) ("<u>Strickland</u> permits relief where,

_____

[12] Indeed, a different source may alter the jury's perception of identical information.  <u>See</u> <u>Hovey v. Ayers</u>, 458 F.3d 892 (9th Cir. 2006) (finding ineffective assistance in failure to provide testifying psychiatrist with records of previous hospitalization where doctors lacked incentive to invent a diagnosis); <u>Sampson</u>, 820 F. Supp. 2d at 245

21

as here, trial counsel presented some mitigation evidence but could have introduced evidence that was upgraded dramatically in quality and quantity."); Goodwin v. Johnson, 632 F.3d 301, 328, 331 (6th Cir. 2011) (finding prejudice where new mitigating evidence was "different from and much stronger than the evidence presented on direct appeal," "much more extensive, powerful, and corroborated," and "sufficiently different and weighty"); Sowell v. Collins, 557 F. Supp. 2d 843, 870 (S.D. Ohio 2008) (finding ineffective assistance where counsel failed to present available evidence that was "qualitatively different than the information that was presented during the mitigation hearing"). Thus, contrary to the Government's argument, Mr. Fell has raised factual issues about the depth and breadth of the mitigation presentation that warrant further process.

The Government further errs in analyzing Mr. Fell's new evidence piecemeal. See Porter, 130 S. Ct. at 453-54 ("[W]e consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweigh it against the evidence in aggravation.'"); Williams v. Taylor, 529 U.S. 362, 416 (2000) ("The Virginia Supreme Court's decision reveals an obvious failure to consider the totality of the omitted mitigation evidence."). The standard is whether Mr. Fell's new evidence, taken as a whole, paints a different picture than the one before the jury. See Foust, 655 F.3d at 539 ("[T]he new evidence paints an altogether different picture of Foust's childhood"); Bond, 539 F.3d at 280 (finding ineffectiveness where post-conviction testimony "painted a very different picture than that presented at the penalty hearing").

Mr. Fell has alleged that the complete and accurate account of his background in his post-conviction evidence differs meaningfully from the incomplete and misleading narrative

---

(summary dismissal inappropriate where post-conviction motion presented evidence of abuse from third parties, in contrast to presentation of abuse at trial by expert based on interviews with defendant with motive to lie).

before the jury. The Government's serial analysis of Mr. Fell's extra-record materials for consistency with evidence of his "poor childhood," and therefore the "sentencing profile" at trial, does not respond to this claim. Nor does it negate the facts Mr. Fell has presented. These disputes must be resolved on the merits in a forum that will allow the Court to assess the credibility and weight of the evidence.

> **2.    Mr. Fell's Post-Conviction Evidence, Which Presents His True Life History, Would Have Nullified Nearly All Of The Government's Arguments Against Him At Trial**

The Government's main arguments in the penalty phase would not have been possible had trial counsel investigated and presented the available mitigation case. For instance, because trial counsel described only one sexual assault and two knife fights between his parents during Mr. Fell's early childhood, the Government told the jury that sexual abuse and violence were isolated events that Mr. Fell probably did not remember. See, e.g., Tr. Vol. XII at 55:12-23 (July 13, 2005). Because trial counsel failed to investigate the reality of Mr. Fell's home life after his father left, the Government argued that Mr. Fell's circumstances improved while his behavior worsened to the point that he had to be institutionalized. See id. at 56:6-16, 58:17-59:23. And because trial counsel cut off their mitigation presentation at Mr. Fell's fifteenth birthday, the Government claimed that in the years leading up to the crime, Mr. Fell engaged in increasingly violent attacks unrelated to his "poor childhood." In essence, the Government turned mitigation into aggravation, arguing that Mr. Fell's horrific background was nothing out of the ordinary and in any event long pre-dated the crimes.[13] Id. at 62:9 (describing Mr. Fell's childhood as indistinguishable from those of witnesses who led productive lives).

---

[13] The Government also implied that Mr. Fell's explanation of his family history showed that he did not accept responsibility for his crimes. Tr. Vol. V-I at 41:20-21 (June 28, 2005) ("The evidence will continue to show that Donald Fell faults others for his failures and for his crimes.").

Witnesses and records were available to refute the Government's aggravating narrative, had trial counsel only looked. As Mr. Fell recounts in his 2255 Motion and again briefly below, trial counsel could have informed the jury that the knife violence and sexual assault they heard about were merely samples of the chronic, relentless physical abuse Mr. Fell experienced throughout his childhood. Mot. 63. They could have rebutted the Government's claim that Mr. Fell's life after age ten improved significantly, and could specifically have undermined the Government's portrayals of Theresa Sharpe as a loving, qualified caretaker and Al Wilcox as a well-meaning disciplinarian with evidence of their rampant alcoholism and abusive personalities. Mot. 39-43. And counsel could and should have extended the mitigation story into Mr. Fell's late teens, when his environment reached new lows under the roof of his severely mentally ill Aunt Jackie. Mot. 44-46. These extra-record facts preclude summary dismissal.

After capitalizing on counsel's superficial, incomplete, and in places inaccurate mitigation presentation at trial, the Government now argues that Mr. Fell's abundant new mitigation evidence could not have made a difference to a single juror. See, e.g., Opp. 55, 61, 76. It claims that all the facts in his 2255 Motion are cumulative of evidence presented at trial, are not true or not credible, and/or would not have changed the "sentencing profile."[14][15] See, e.g., Opp. 51, 84.

---

[14] The Government attacks Mr. Fell's pleading because Ms. Ayres's declaration does not identify the witnesses she would have interviewed on the basis of these records and because she fails to state how their testimony would have made a difference. Opp. 60. The Government's argument is mystifying: Ms. Ayres cannot know whom she would have interviewed based on records she has never seen or never reviewed. Her lack of personal knowledge of such key mitigation witnesses as John Gacek, Adele Gecek, Ernie Schuldaski, and Sean Campbell is precisely Mr. Fell's point. Nor can Ms. Ayres possibly know how their testimony would have altered Mr. Fell's mitigation presentation because trial counsel did not discuss their plans with her. See Fell Ex. 265 at 6.

[15] The Government's engagement with Mr. Fell's claim on the merits belies its own argument that his claim can be summarily dismissed. In making merits arguments while simultaneously asserting that the issues are so frivolous as

24

First, it is premature to make any of these determinations. Courts routinely decide whether the petitioner has merely offered more of the same evidence presented at trial on the merits, after additional fact development through discovery, amendment, and hearings. See, e.g., Johnson v. United States, No. C 09-3064-MBW, 2012 WL 1836282, at \*10 (N.D. Iowa Mar. 22, 2012) (hearing on 2255 motion required 18 days of evidence, 58 witnesses, thousands of pages of documentary submissions, and six hours of oral argument on the merits). When, at the appropriate time, this Court reaches the merits of Mr. Fell's claims, it must determine not only whether Mr. Fell's new evidence could have established additional mitigators or undermined any aggravators, but whether it might have caused the jury to *weigh* these factors differently. See, e.g., Porter, 130 S. Ct. at 454 ("Had the judge and jury been able to place [the defendant's] life history on the mitigating side of the scale, and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury – and the sentencing judge – would have struck a different balance, and it is unreasonable to conclude otherwise.").

Where, as in the Second Circuit, prejudice is assessed cumulatively, it is especially important to wait until all the facts are known. See supra Rep. Section II. To the extent that the Government disputes the accuracy or credibility of Mr. Fell's new allegations, it concedes the existence of a factual dispute that renders summary dismissal inappropriate.

Second, Mr. Fell's new evidence is not cumulative, incredible, or insignificant. The remainder of this section describes the ways in which Mr. Fell's extra-record evidence changes the picture painted at trial to further mitigate his culpability. The Government's attempt to impugn Mr. Fell's new evidence on the grounds that trial counsel failed to elicit similar

to warrant summary dismissal, the Government seeks to have it both ways. This it cannot do; summary dismissal is not appropriate precisely because the arguments warrant merits engagement.

25

testimony at trial only underscores the need for Court to resolve these factual disputes. See, e.g., Opp. 75 (allegation that Debra Fell molested Teri Fell "is not found in Teri Fell's declaration and is inconsistent with the testimony of German"); id. at 84 ("At trial Teri Fell had no criticism of Theresa Sharpe. Yet Fell now proffers that Sharpe abused him physically and drank."). The Government offers no reason to disbelieve sworn post-conviction testimony, and if anything further illustrates that trial counsel did not present a complete and accurate picture of Mr. Fell's life at trial.

### a. The Jury Was Led To Believe That The Relentless Abuse In Mr. Fell's Life Was Isolated And Limited To His Early Childhood

Mr. Fell's trial lawyers presented evidence that their client was molested by his babysitters at age four and that he saw his parents attack each other with knives twice. See Tr. Vol. XII at 54:10-13, 55:12-23 (July 13, 2005). The Government now claims that "[i]f there was one thing the jury heard about over and over in the defense penalty phase evidence, it was bloody knife altercations between Fell's parents." Opp. 83. It submits that "[y]et another such incident would do little to add to the uncontested evidence." Id. The Government also claims that additional evidence of sexual abuse "would not have changed the sentencing profile presented by trial counsel," which included testimony that Teri Fell and her brother were sexually abused when Mr. Fell was five years old. Opp. 75.

At trial, the Government persuaded four jurors that Mr. Fell had not "[as] a child witness[ed] family violence." Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 13). The Government argued specifically that Mr. Fell's experience of sexual violence at age four was not significant because social services intervened and the family "did better." Tr. Vol. XII at 54:10-24 (July 13, 2005). It also emphasized that there were "no allegations in this case at all or in any of these files of sexual abuse by the parents of Mr. Fell." Tr. Vol. IX-I at 76:11-14 (July 7,

26

2005).  In addition, the Government claimed that the two episodes of violence between his parents described at trial did not impact Mr. Fell because he likely "has no recollection of that at all," he did not actually observe them, and they did not reoccur.  Tr. Vol. XII at 55:12-23 (July 13, 2005).  Thus, according to the Government, Mr. Fell's youth was really comparable to any "poor" childhood, including the victim's.  Id. at 62:9, 63:8-16; see also id. at 62:12-16 (other witnesses and victims had indistinguishable childhoods and led productive and stable lives).

These arguments exploited trial counsel's failure to investigate and present available evidence of sexual abuse and domestic violence.  Contrary to what the jury heard at trial, Mr. Fell's rape by his babysitters at age four was merely one episode in a childhood punctuated with sexual victimization.  Mr. Fell has alleged that he and his sister were sexually abused by their father, Mot. 58 (reporting that Donald Fell, Sr. was "sexually abusive" to his children (citing Psycho Social Summary, Apr. 8, 1994 (Fell Ex. 187)), who also forced his wife sexually in front of them.  Mot. 42 (citing Decl. of Alan "Tim" Reynolds, Mar. 1, 2011 (Fell Ex. 275 at 7)).  Mr. Fell was later beaten for intervening when his mother sexually abused his sister while Al Wilcox watched.  See Mot. 41-42 (citing Decl. of Christina Cupano, Feb. 2, 2011 (Fell Ex. 279 at 2-3)).  And Aunt Jackie humiliated Mr. Fell as a teenager by engaging in grossly inappropriate sexual behavior with his sister's friends.  Decl. of T. Fell (Fell Ex. 278 at 23).

The two incidents of assault presented at trial were likewise mere samples of the extreme violence that dominated Mr. Fell's home life with his parents, Mr. Wilcox, and Aunt Jackie.  New testimony and records describe specific violent outbursts, see, e.g., Decl. of T. Fell (Fell Ex. 278 at 1-2) (Mr. Fell and his sister watched Debra Fell stab Donald Fell, Sr. in the arm); Medical Records (Fell Exs. 281-285) (corroborating this incident); and the perpetually violent atmosphere in the home.  See, e.g., Decl. of J. Gacek (Ex. 251 at 3) (Debra Fell and Mr. Wilcox

27

were violent and abusive when drunk); Decl. of S. Campbell (Fell Ex. 273 at 5) (Jackie Sharpe chased Mr. Campbell with knives and threw objects at him and Mr. Fell). Mr. Fell has also unearthed new evidence of Debra Fell's violence toward him. See Decl. of T. Fell (Ex. 278 at 2) ("[Debra Fell] screamed at Donny for little things and smacked him around a lot. She called him names, said mean things about him, and threatened to kill him. She picked up knives and chased Donny around with them."); CYS Contact Sheet, Feb. 14, 1993 (Fell Ex. 181) (reporting that Debra Fell stabbed her son in the arm with a screwdriver).

In short, Mr. Fell has alleged that the brutality he experienced was far more intense and prolonged than anything the jury heard.[16] See, e.g., Sowell, 557 F. Supp. 2d at 873 (finding ineffectiveness where "the panel did not hear any evidence of how violence was so very prevalent during the formative years of petitioner's life – evidence which may have explained why petitioner grew into the kind of adult who found himself frequently reacting in a violent manner"). At trial, the Government capitalized on the anemic presentation it now characterizes as robust.

The Government's additional claim that Mr. Fell's allegations are not credible because trial counsel did not present them to the jury only condemns Mr. Fell's trial lawyers, highlighting the differences between what they told the jury and what a reasonable investigation would have revealed. Opp. 75 (allegation that Teri Fell was molested by her mother "is not found in Teri Fell's declaration and is inconsistent with the testimony of German"); id. at 93 (asserting, falsely, that apart from the Psycho Social Summary from St. Michael's "the record in

_____

[16] Nor was anything presented whatsoever about the impact of this brutality on Mr. Fell's mental health. See infra Rep. Section IV.

28

this case… are [sic] devoid of allegations of Fell's sexual abuse by either parent").[17]   Again, the Government urges this Court to adopt its version of the facts as true and to rule against Mr. Fell without independently assessing the credibility and weight of his new evidence.  This is contrary to the law.  See Machibroda v. United States, 368 U.S. 487, 496 (1962) ("The Government's contention that [the petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.").

> **b.   The Jury Was Led To Believe That Mr. Fell's Ever-Worsening Circumstances Actually Improved When His Father Left The Household**

Mr. Fell's trial lawyers elicited testimony that after Mr. Fell's father left the home, his mother drank less and cooked dinner regularly under the influence of her new boyfriend Al Wilcox.  Tr. Vol. VII-I at 108:6-20 (July 1, 2005).  The Government urges summary dismissal on the grounds that Mr. Fell's lawyers accurately portrayed his home life without his father: "[t]he record clearly shows that the Fell home did improve significantly after Fell's father left."  Opp. 71.  The Government dismisses much of Mr. Fell's extra-record evidence documenting the ongoing horrors in the Fell home as insignificant or incredible.  See, e.g., Opp. 72, 84, 89.  At the same time, the Government insists that new evidence of the persistent abuse and neglect at home is cumulative of what the jurors heard.  See, e.g., Opp. 72-73, 74, 84, 90.

---

[17] These facts are in dispute.  A hospital record in the Mitigation Binder states that "the patient talked about his sexual abuse in the group therapy program.  He was abused at the hands of his biological father."  Mitigation Binder (Fell Ex.1, Tab 28 at 4).  Reasonable trial counsel would not have failed to investigate this allegation further, nor would they have buried it in Tab 28 of a binder containing hundreds of pages of records, many of them handwritten. See infra Rep. 31 n.20. Most likely, neither trial counsel nor the Government realized that there were allegations of parental sexual abuse in the Mitigation Binder.  The Government also asserts that "it was reasonable for trial counsel not to have relied on [Theresa Sharpe's] isolated and unsubstantiated allegation" in light of "evidence of Sharpe's volatility and immaturity."  Opp. 93.  Yet within a few pages, the Government reiterates its description of Theresa Sharpe as "a trained foster parent" who took care of Mr. Fell and his sister when their mother abandoned them. Opp. 84.

At trial, the Government eviscerated Mr. Fell's mitigation case by arguing that Mr. Fell's behavior worsened as his home life improved. See, e.g., Tr. Vol. XII at 53:22-24 (July 13, 2005) ("[T]he abuse that [Mr. Fell] suffered got more and more removed, and as it did, he got more and more violent."). Specifically, the Government told the jury that Mr. Fell's circumstances improved at age ten, when his mother kicked his father out. Id. at 53:6-9. The Government elicited testimony from caseworker Deanna German that CYS documents described the household as "a safe and stable home environment" with "no problems of physical violence" and no "drinking excessively" because Donald Fell, Sr. no longer lived in the home. Tr. Vol. IX-I at 20:14-26:11, 87:12-17 (July 7, 2005). The Government also claimed that throughout this period, Mr. Fell had access to positive role models in Al Wilcox, a well-meaning disciplinarian, see Tr. Vol. VII-I at 139:14-140:3 (July 1, 2005), and Theresa Sharpe, a "trained foster parent" who cared for him when social services intervened. Tr. Vol. VII-II at 56:4-57:16 (July 1, 2005). It even convinced two jurors that Mr. Fell was not "raised without positive role models." See Special Verdict Form (Fell Ex. 209 at 13).

According to the Government, Mr. Fell nevertheless chose to behave badly. Tr. Vol. XII at 56:6-16 (July 13, 2005); id. at 56:10-15 (describing Mr. Fell's choices to keep knives, throw things, stab, and shoot his friend).[18] He was unjustifiably aggressive toward Mr. Wilcox, see Tr. Vol. VII-I at 139:14-140:3 (July 1, 2005) (eliciting testimony of Teri Fell that Mr. Wilcox tried to discipline Mr. Fell and that Mr. Fell once hit Mr. Wilcox in his bad leg); id. at 141:10-14 (eliciting testimony that Mr. Fell threw a door at Mr. Wilcox), and needed to be psychiatrically hospitalized four times because of his escalating violence. Tr. Vol. XII at 58:21-22 (July 13,

---

[18] The Government's claim that Mr. Fell "chose" to shoot his friend John Gacek is outrageous in light of new, uncontroverted evidence that the incident was an accident. See infra Rep. Section VI(A).

2005); id. at 53:8-14 (arguing that Mr. Fell's "proclivity for violence" began very young and "got worse and worse").

The Government again seized the opportunity created by trial counsel's failures to misrepresent the trajectory of Mr. Fell's life. Dozens of records reviewed by post-conviction counsel shatter the image of the "safe and stable home environment" conjured by the Government at trial, revealing instead an unsafe and unstable home rife with physical violence and alcoholism. For example, CYS contact sheets and police reports show that Donald Fell, Sr. repeatedly tried to reenter the home, see, e.g., Police Report, Mar. 4, 1991 (Fell Ex.147) (arrest for trespassing); CYS Contact Sheet, May 1, 1991 (Fell Ex. 159) (break-in to trailer); that the family was evicted and forced to move into Mr. Wilcox's cramped apartment, see, e.g., CYS Contact Sheets, June 1991 (Fell Exs. 161-62); that Debra Fell drank daily, used speed, and "partied" with a succession of male visitors, see, e.g., CYS Contact Sheets (Fell Exs. 14, 167); and that she and her companions regularly left the children alone.[19] See, e.g., CYS Contact Sheets (Fell Exs. 171, 172, 178, 179, 180); Referral Notes (Fell Exs. 158, 177). Nursing notes from Mr. Fell's hospitalizations and records from St. Michael's School further document his abuse and neglect at the hands of his mother and other purported caretakers.[20] See, e.g., Nursing

---

[19] Again, the Government at most highlights a factual dispute between the parties. The Government attacks Mr. Fell's claim that these records would have undermined its portrayal of Mr. Fell's home after his father left as "safe and stable." It argues that Deanna German's 1991 Family Service Plan was neither false nor misleading simply "because after his father left Fell was psychiatrically hospitalized four times." Opp. 88. Mr. Fell does not contend that the Family Service Plan is misleading because Mr. Fell was later hospitalized, but rather that it led the jury to believe, wrongly, that once Donald Fell, Sr. was out of the picture, that there was no violence in the home, and that Debra Fell drank little during this time. While CYS contact sheets and police reports would not have "erased" Ms. German's words on the stands, they certainly cast doubt on her credibility as a witness. Opp. 88.

[20] The Government further claims that the information in the nursing notes was already before the jury in the Mitigation Binder. Opp. 92. The Government's reliance on medical records included in the Mitigation Binder that were not even mentioned at trial assumes a practical impossibility: that the jury carefully combed through a stack of jargon-filled and often illegible records of no apparent relevance to their task. See, e.g., Johnson v. Bagley, 544 F.3d 592, 602 (6th Cir. 2008) (finding counsel constitutionally ineffective for "dump[ing]" social services records in front of the jury without "explaining to the jury how or why they are relevant"). In fact, even the Government is unfamiliar with the contents of the Mitigation Binder after years of litigation: it fails to notice other allegations of

31

Notes, June 8, 1993 (Fell Ex. 24 at FELL-00000821) ("mother and stepfather are drinking a lot

and [] they get mean and call him names); id. ("nits noted throughout hair"); Psycho Social

Summary, Apr. 8, 1994 (Fell Ex. 187 at FELL-00002026) (Mr. Fell forced to act as own

"caretaker").

The declarations of Christina Cupano, Janice Stoss, and the Gacek family, among

other witnesses trial counsel never interviewed, collaborate the dismal picture of Mr. Fell's

adolescent home life painted in the records that the jury never saw.  See, e.g., Decl. of C. Cupano

(Fell Ex. 279 at 2) (Debra Fell failed to feed her children); id. at 5 (neighbor washed Teri Fell's

hair with lice shampoo); Decl. of Janice Stoss, Feb. 20, 2011 (Fell Ex. 274 at 3) (Debra Fell

"treated [Mr. Fell] real bad" and "smack[ed] him around numerous times…[s]he hit him hard,

then would hit him again"); Decl. of J. Gacek (Fell Ex. 251 at 3) (Mr. Fell, screamed at by Debra

Fell and Mr. Wilcox as soon as he entered the door, insisted friends wait on porch to avoid

"firing squad" within); Decl. of A. Gacek (Fell Ex. 252 at 2) (Gacek home as refuge from abuse

and dysfunction in Fell home); Decl. of Ernie Schuldaski, Feb. 28, 2011 (Fell Ex. 253 at 3)

(Gaceks did not allow son John to spend time in Fell home).

Furthermore, the Government convinced two jurors that Mr. Fell was not "raised

without positive role models" in part because he had access to Al Wilcox and Theresa Sharpe.

See Fell Ex. 209 at 13.  Eight post-conviction declarations describe Mr. Wilcox as a

psychologically and physically abusive alcoholic whose idea of "discipline" was to berate and

---

sexual abuse buried in Tab 28.  See Opp. 93 (asserting, falsely, that apart from the Psycho Social Summary from St. Michael's "the record in this case…are [sic] devoid of allegations of Fell's sexual abuse by either parent").  A hospital record in the Mitigation Binder states that "the patient talked about his sexual abuse in the group therapy program.  He was abused at the hands of his biological father."  Fell Ex. 1, Tab 28 at 4.  The Government's own unfamiliarity with the records in the Mitigation Binder further undercuts its argument that trial counsel effectively "presented" this information to the jury.

32

beat Mr. Fell.[21]  Mot. 39-43 (citing declarations of Adele Gacek, John Gacek, Ernie Schuldaski, Teri Fell, Christina Cupano, John Migatulski, Stanley Kowalski, and Jamie Dominick); see also Decl. of J. Gacek (Fell Ex. 251 at 4).  During the period the Government described as free of "physical violence" and "excessive drinking," police routinely broke up drunken fights between Mr. Wilcox and Debra Fell.  Cf. Mot. 55.  Mr. Fell has further alleged that Theresa Sharpe was yet another unstable alcoholic who abused, neglected, and eventually abandoned him.  See Mot. 43 n.7; id. at 50 (citing Decl. of J. Migatulski (Fell Ex. 254 at 2); Decl. of T. Fell (Fell Ex. 278 at 15)).  The "trained foster parent" punished her foster children by forcing them to kneel on grains of rice and institutionalized Mr. Fell instead of caring for him after his mother lost custody.  Mot. 43 n.7.

New testimony and records also indicate that the much-emphasized deterioration in Mr. Fell's behavior was not a product of his "choices," as the Government insisted, but rather a byproduct of his brutal conditions and nascent mental illness.  John Gacek saw his friend throw things only when he was overwhelmed by abuse from his mother and Mr. Wilcox.  See Decl. of J. Gacek (Ex. 251 at 4).  Nurses also noted that Mr. Fell's aggression was not the root of the problem.  See, e.g., Nursing Notes, June 7, 1993 (Fell Ex. 145 at FELL-00001791) ("problems at home are not all Donald's fault"); id. ("I'm here because [mother] don't want me around").  Rather, the instability and insecurity in his home environment was taking a psychological toll.  See, e.g., Hospital Discharge/Referral Form, Oct. 31, 1991 (Fell Ex. 18 at FELL-00000717) (reporting distress from mother allowing father back into home); Psycho Social Summary, Apr. 8, 1994 (Fell Ex. 187) (Mr. Fell overwhelmed by family situation); Psychological Consultation,

---

[21] The Government's attempt to dismiss this evidence of Mr. Wilcox's alcoholism and violence on the grounds that three of the witnesses did not actually see Mr. Wilcox strike Mr. Fell is frivolous.

33

Apr. 12, 1994 (Fell Ex. 26 at FELL-00000851) (Mr. Fell lacked any "emotional support system and guidance"). See generally Mot. Section IV.

Because trial counsel never interviewed the witnesses or mined the records that tell this story,[22] the Government's instant argument is not surprising: "[t]he record clearly shows that the Fell home did improve significantly after Fell's father left." Opp. 71, 92. The point is what was *not* in the record. See, e.g., Bagley, 544 F.3d at 606 (finding ineffective assistance where some relevant information was in stack of social services records submitted to the jury because "this jury was given no basis for construing and digesting this information"). In any event, whether the extra-record evidence that is inconsistent with the trial presentation is sufficiently credible and weighty to have altered the outcome is a merits determination that is premature at the Rule 4 stage.

### c. The Jury Was Led To Believe That The Trauma Was Long Over, When In Fact, Mr. Fell Continued To Suffer Relentless Trauma After The Age Of Fifteen

The Government claims that trial counsel were not ineffective in failing to investigate and present evidence of Mr. Fell's life after age fifteen because they included several

---

[22] In their post-conviction declarations, many mitigation witnesses noted the failure of anyone from Mr. Fell's trial team to contact them. See, e.g., Decl. of A. Gacek (Fell Ex. 252 at 4) ("I was available to speak to the lawyers and I would have been willing to come to Vermont to testify."); Decl. of C. Cupano (Fell Ex. 279 at 6) ("No one involved in Donny's case came to talk to me about it until this past year. I would have been willing to be interviewed and even go up to Vermont to testify."); Decl. of E. Schuldaski (Fell Ex. 253 at 4) ("I was not contacted by anyone representing Donny before his trial. I have been living in Kingston/Edwardsville for the past twenty years. I would have been available and willing to talk with anyone regarding Donny's case. I would have been available and willing to come up to Vermont and testify. The first time I had contact with anyone from Fell's defense team was during his appeal."); Decl. of J. Stoss (Fell Ex. 274 at 6) ("I was not contacted by anyone regarding Donny's case until 2010. I have lived in Luzerne County my whole life. I have been living in the same house for the past 8 years. If Donny's lawyers at trial wanted to talk to me, they could have gotten my phone number or address from Jackie. I would have been willing and available to talk to them."); Decl. of J. Gacek (Fell Ex. 251 at 6) ("Donny's lawyers did not contact me prior to his trial in Vermont. I did not hear from anyone involved with Donny's case until 2009. I was available and would have been willing to testify at Donny's trial."); Decl. of J. Migatulski (Fell Ex. 254 at 3) ("Donny's lawyers did not contact me prior to his trial. I did not hear from anyone involved in Donny's case until after he was on death row. I was available and would have been willing to testify at Donny's trial."); Decl. of S. Campbell (Fell Ex. 273 at 13) ("I was never contacted by the lawyers for Donald Fell, but I would have been willing to testify at his trial if I had been asked. If Dr. Welner could get in touch with me, I don't see why the defense lawyers didn't.").

34

school records in the Mitigation Binder and because Teri Fell mentioned that her aunt was abusive and negligent. Opp. 77. In the Government's view, summary dismissal is proper because trial counsel were wise to avoid introducing additional evidence of Mr. Fell's life after age fifteen, which "reflected a downward trajectory," as the jury learned through the cross-examination of Teri Fell. Opp. 78 (describing Teri Fell's testimony about Mr. Fell's assault on Christopher Eike and Debra Fell's fear of her brother). The Government also asserts that mitigating evidence about these years would have opened the door to rebuttal testimony from Bethany Brashears, a disturbed teenager who claimed to have been kidnapped by Mr. Fell. Opp. 79-80.

Without obtaining a ruling in advance, trial counsel assumed that if it presented mitigating evidence from only Mr. Fell's earlier years they could exclude rebuttal evidence from Mr. Fell's later teens, so they explicitly cut off their mitigation presentation at Mr. Fell's fifteenth birthday. See Tr. Vol. X-I at 64:9-10 (July 8, 2005) (arguing at the end of the mitigation presentation that rebuttal relating to these later years was inappropriate because "[w]e simply stopped at age 15"). The Court rejected this artificial restriction, and allowed the Government to present rebuttal evidence about Mr. Fell's life after the age of fifteen. Id. at 65:3-11 (the Court noting that "to make artificial barriers into behaviors that occur after fifteen is really unfair"). The Government took advantage, eliciting graphic (but, it turns out, incorrect) testimony that Mr. Fell seriously injured Christopher Eike in an assault a few months before the crime, that Debra Fell feared him, and that he had a physical fight with Jackie Sharpe, while arguing that little of what the jurors heard from the defense was mitigating because the events were so remote from the crimes. Opp. 78; Tr. Vol. XII at 118:22 (July 13, 2005). The Government claimed that Mr. Fell was on a steep downward trajectory marked by increasingly

35

violent outbursts unrelated to his "poor childhood" years earlier. See Tr. Vol. XII at 60:3-20 (July 13, 2005) (the Government arguing that Mr. Fell at age twenty was an intact adult who made his own bad choices).

Mr. Fell has alleged extra-record facts that counter this characterization and show that the abuse never stopped.[23] At age fifteen, Mr. Fell moved in with his deranged Aunt Jackie; two years later, he became homeless. See 2001 FBI Report (Fell Ex. 76) (Mr. Fell's teachers described Jackie Sharpe as "emotionally disturbed"). Witnesses trial counsel never interviewed would have vividly described Mr. Fell's harrowing years living with his Aunt Jackie. See, e.g., Decl. of S. Campbell (Fell Ex. 273 at 3) (Jackie Sharpe pinned Mr. Fell to the floor and threatened to stab him with scissors); id. at 5, 6, 9 (Jackie Sharpe chased Mr. Campbell with knives, beat Teri Fell, and put knife to her pregnant stomach threatening to cut out baby); Decl. of J. Migatulski (Fell Ex. 254 at 1) (Jackie Sharpe "tortured [Mr. Fell] and beat the crap out of him. He had black eyes and other injuries, including bruises on his arms and face, and that was just what was visible to me."); Decl. of J. Stoss (Fell Ex. 274 at 4) (Jackie Sharpe was extremely aggressive toward Mr. Fell). Sean Campbell and Teri Fell saw how Jackie Sharpe's "care" affected Mr. Fell: he became suicidal, see Decl. of S. Campbell (Fell Ex. 273 at 4), and experienced dissociative blackouts. Decl. of T. Fell (Fell Ex. 278 at 19). And Jon Migatulski could have told the jury that after Jackie Sharpe kicked Mr. Fell out in a rage, leaving him homeless at age seventeen, Mr. Fell cared for Mr. Migatulski's cancer-ridden mother Nancy. Fell Ex. 254.

Seeking summary dismissal, the Government now claims that the jury already knew all of the above because Teri Fell testified that her aunt was "mean" and "made [her] do all

---

[23] The Government's claims regarding the later violent outbursts were also false. See infra Rep. Section VI.

36

the cleaning, and it was horrible."[24]  Opp. 74, 77.  The idea that Teri Fell's uncorroborated

testimony about her "mean" aunt who made her do chores informed the jury about the horrors of

Jackie Sharpe's home for her brother, who was beaten black and blue, chased with knives, and

driven to contemplate suicide, is preposterous.  See, e.g., Sampson, 820 F. Supp. 2d at 244

(summary dismissal inappropriate where post-conviction motion presented evidence of abuse

from third parties).

        The Government also tries the opposite tack: that counsel's strategy to

"purposefully stay[] away from Fell's life between the ages of 15 and 20" was reasonable

because that period "reflected a downward trajectory."  Opp. 78, 79.  Mr. Fell does not dispute

that the evidence before the jury "reflected a downward trajectory," but rather claims that the

extra-record evidence reflects a far more mitigating picture of the unrelenting trauma Mr. Fell

continued to experience during these years.  See, e.g., Bagley, 544 F.3d at 607 (trial counsel

could not reasonably argue that grandmother was a positive influence where extra-record

evidence showed that she was abusive).  The trial record belies the Government's alternative

claim that it was prepared to rebut evidence of trauma and abuse in Mr. Fell's later teens with the

testimony of Bethany Brashears.  Opp. 80.  In fact, the Government agreed not to call Ms.

Brashears in exchange for trial counsel's withdrawal of the unrelated mitigating factor that Mr.

Fell lacked a significant criminal history.  See Tr. Vol. XI at 3:21-4:9 (July 12, 2005) ("Mr.

Bunin: Okay, my understanding, having just spoken to Mr. Darrow, that in exchange for us not

---

[24] The Government also emphasizes that trial counsel included school records in the Mitigation Binder showing that
Mr. Fell earned Cs or better until he dropped out.  Opp. 77.  It is unclear how these unexplicated records shed light
on Mr. Fell's horrific home environment or otherwise mitigate the case against him.

37

going forward with the – withdrawing the mitigator that spoke about lack of significant criminal history, they're not going to put Miss Brashears on to talk about the kidnapping…."). [25]

Having failed to seek evidence to explain this period, Mr. Fell's trial lawyers could only avoid it altogether.  See, e.g., Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053 (9th Cir. 2008) (finding ineffectiveness where counsel did not investigate and present mitigating mental health evidence to avoid diagnosis of antisocial personality disorder).  It is not appropriate for this Court to conclude now, on the merits, that Mr. Fell's new witnesses and records are not credible, or would not have been at trial.  Nor can it now decide that their testimony would not have persuaded a single juror to weigh the evidence differently.  See supra Rep. Section II.

### d. The Jury Was Led To Believe That Mr. Fell Did Not Inherit A Predisposition To Substance Abuse Or Mental Illness, When There Was Readily Available Evidence That He Did

Lastly, the Government claims that "[t]he record in this case is replete with evidence of chronic alcoholism by Fell's father and mother, as well its [sic] side effects." [26]  Opp. 94.  The Government submits that the jury also knew from hospitalization records in the Mitigation Binder "that Fell's father was a diagnosed schizophrenic and that his grandmother was diagnosed with chronic psychosis and took psychotropic medications."  Opp. 95-96.  In light of the Government's readiness to present expert rebuttal, and "the fact [] that Fell himself exhibited no mental illness," trial counsel reasonably chose not to present additional intergenerational mental health evidence.  Opp. 96.

---

[25] Defense counsel agreed to this stipulation before the Court had an opportunity to rule on whether or not the incident involving Ms. Brashears as an uncharged crime could be part of Mr. Fell's criminal history.  See Tr. Vol. X-I at 70:13-92:25 (July 8, 2005).  Even assuming that Ms. Brashears could have testified in rebuttal to this mitigating factor, trial counsel could have excluded or impeached her testimony as unreliable.  The Court had already expressed reservations about allowing Ms. Brashears to testify because of the "enormous prejudicial impact" it would have and her "tendency toward exaggeration or dishonesty."  See id. at 70:13-158:25.

[26] It notes that a record in the Mitigation Binder "provided the jury with evidence of Fell's predisposition to abuse alcohol" because it indicates that Mr. Fell's scores "on the WPI correlate with those who are prone to abuse alcohol."  Opp. 95.

38

Yet at trial, the Government harped on the lack of any evidence of addiction or mental illness that would impair his judgment. It reminded the jurors in summation that they had heard nothing to suggest that Mr. Fell had any genetic predisposition to alcohol or drug dependence. Tr. Vol. XII at 119:2-7 (July 13, 2005) ("Folks, there is no evidence of any genetic predisposition to alcohol or drug dependence."). As the Government put it, he just liked to "drink beer, pop some pills, and [] smoke pot." Id. at 61:10-17. Of his mental health history, the jury learned only that his own lawyers agreed that Mr. Fell was "completely intact." Id. at 119:14.

Post-conviction investigation has revealed that alcohol abuse was "rampant" in Mr. Fell's mother's family, affecting at least his mother, sister, aunt, grandmother, grandfather, great-aunt, great-niece, great-grandfather, and great-great grandmother. Mot. 60. His mother, sister, grandmother, aunts, and niece also displayed symptoms of bipolar disorder, depression, anxiety, suicidal ideation, and developmental disorders. Id. at 61. Mr. Fell's father, paternal grandmother, and half-brother Robert Fell were also alcoholics, and grandmother Myrtle was twice institutionalized for depression and psychosis and at least twice attempted suicide. Id. at 60-61.

In short, this Court must resolve the factual question whether Mr. Fell made his own choice to "pop some pills," as the Government told the jury, or inherited a vulnerability to substance abuse and mental illness from both parents, as Mr. Fell's post-conviction evidence shows, by assessing the value of that evidence. Cf. Tr. Vol. XII at 61:14 (July 13, 2005). In light of the Government's emphasis on Mr. Fell's "choices" at trial, it is premature to rule on the merits that no juror could have been swayed by evidence of nearly pre-ordained addiction and mental disease. See, e.g., id. at 63:17-23 (arguing that Mr. Fell "made choices as he [became] a

39

man," "made [choices] on November 27th of 2000," "made choices leading up to that day," and "made choices after his childhood, choices to be the man he is today"); see also Outten v. Kearney, 464 F.3d 401, 411-12, 420 (3d Cir. 2006) (finding ineffectiveness where counsel failed to investigate and present evidence that children of defendant's alcoholic father all suffered from alcoholism and drug addiction and that defendant began abusing alcohol at age ten).

## IV.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct An Adequate Mental Health Investigation

Mr. Fell's 2255 Motion contains specific allegations that he suffers from serious mental health impairments, "including but not limited to, organic brain impairment due to exposure to fetal alcohol, untreated mood disorder, and the effects of exposure to chronic abuse and trauma during early childhood and continuing into adolescence." Mot. 69. It also contains specific allegations that trial counsel failed to conduct an adequate mental health investigation because, having chosen their mental health experts after conducting only a preliminary social history investigation in preparation for an early plea agreement, trial counsel did nothing to explore fully Mr. Fell's mental health when the plea agreement was rejected and after it was clear the case was headed for a contested trial. Despite red flags in Mr. Fell's social history and these preliminary mental health reports that Mr. Fell suffered from serious mental impairments, trial counsel failed to follow up and develop a mental health case that could withstand a contested trial.

Mr. Fell's motion also alleges prejudice. Had an adequate investigation been conducted, the jury would have learned that Mr. Fell had genetically inherited mental illnesses and impairments that were exacerbated by the chronic trauma he suffered from the womb through the date of the crimes. This would have helped to explain Mr. Fell's seemingly aggravating prior conduct and to mitigate his crimes. Absent that investigation, the jury was left

with the misleading impression that Mr. Fell: "had no cognitive or neurological deficits"; "his intellect and cognitive functions were intact"; "he did not suffer from any mental disease or defect," Tr. Vol. XI at 93:22-94:12 (July 12, 2005); psychiatrists had evaluated him and given him a "clean slate"; and he was "completely intact." Tr. Vol. XII at 110:12-14 (July 13, 2005). The jury found that Mr. Fell had proven facts regarding certain events in his life, including suffering sexual abuse as a young child, parental substance abuse and witnessing family violence, but was deprived of the information necessary to understand why those facts were mitigating because it received no explanation from a mental health expert about how these facts influenced the person Mr. Fell became and the crimes he committed. Had trial counsel conducted the minimum constitutionally appropriate investigation and presented evidence of Mr. Fell's mental impairments to the jury, the vote of at least one of the jurors would have been different.

Notwithstanding these detailed allegations, the Government argues that Mr. Fell's claims must be summarily dismissed without the opportunity for discovery or a hearing and that – trial counsel having failed to present this evidence to a jury – post-conviction counsel may not now present it for a hearing before this Court. But those arguments should be rejected. The Government's arguments largely turn on facts that are outside the record. Because Mr. Fell's claims, if proven, would entitle him to relief, and they cannot be conclusively resolved based on the record, summary dismissal is improper, and Mr. Fell must be given the opportunity for further factual development.

A.      **Mr. Fell Has Adequately Alleged That He Suffered From Serious Mental Impairments**

The Government's contention that Mr. Fell's claims are not well pled because he did not submit expert affidavits containing diagnoses of his mental impairments is unsupported

by the law.  The Rules Governing Section 2255 Proceedings do not require Mr. Fell, within the one-year limitations period, to submit with his Motion the expert reports and declarations he will provide should the Court proceed with a determination of his claims on the merits.  Mr. Fell has alleged specific facts in support of his claim that he suffers from "a number of brain impairments, including but not limited to, organic brain impairment due to exposure to fetal alcohol, untreated mood disorder, and the effects of exposure to chronic abuse and trauma during early childhood and continuing into adolescence," Mot. 69, and these claims were made in good faith.  Moreover, Mr. Fell has noted that he will amplify his allegations regarding his mental health impairments through expert affidavits and amendment at the appropriate time, and he will move for an evidentiary hearing to present expert mental health testimony.  Mot. 70.  No more is required at this stage.  See e.g., Order at 3-4, United States v. Sampson, No. 01-10384-MLW (D. Mass. Mar. 1, 2010) (allowing defendant to amend motion to amplify claims with, among other things, clinical findings reached by experts regarding Mr. Sampson's brain injury); Johnson v. United States, No. 09-3064-MWB, 2012 WL 1836282, at *34 (N.D. Iowa Mar. 22, 2012) (allowing defendant to amend motion to further detail trial counsel's failures related to mental health expert, including the addition of allegations of failure to order additional medical testing, as well as failure to hire an alternative expert); Brumfield v. Cain, No. 04-787-JJB-LN, 2008 WL 2600140, at *16 (M.D. La. June 30, 2008) (allowing defendant to amend an Atkins claim to include supporting declarations from medical experts); see also Puglisi v. United States, 586 F.3d 209, 213-14 (2d Cir. 2009) (petitioner "may need only to identify available sources of relevant evidence rather than obtain it as in civil cases").

42

**B.      Mr. Fell Has Adequately Alleged That Trial Counsel's Mental Health Investigation Fell Below Prevailing Professional Standards**

The Government argues that Mr. Fell has not adequately alleged that his trial counsel conducted a constitutionally inadequate investigation as a matter of law because they hired three mental health experts in the months shortly after Mr. Fell was arrested; hired Dr. Cunningham shortly thereafter; obtained some records, including records of Mr. Fell's psychiatric hospitalizations as a child; and spoke to some witnesses.  The Government's arguments are not sufficient to require summary dismissal.

**1.      Trial Counsel's Mental Health Investigation Was Not Constitutionally Adequate As A Matter of Law**

The Government's claim that trial counsel's investigation was constitutionally adequate as a matter of law is without merit.  It is well established that hiring mental health experts, obtaining some records and speaking to some witnesses, in and of itself does not satisfy the constitutional standard for effective assistance of counsel.  See, e.g., Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003) (finding ineffective assistance where defense counsel hired a psychiatrist and psychologist (who found no major mental defects) but failed to perform follow-up testing or discover an earlier psychological report concluding that the defendant suffered from "serious and outstanding mental illness and possible organic impairment"); Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053 (E.D. Ca. 2008) (finding ineffective assistance where defense counsel hired five mental health experts, interviewed numerous witnesses, and collected numerous documents, but failed to conduct a constitutionally sufficient investigation and to provide the experts with complete and accurate information about defendant's background); Johnson, 2012 WL 1836282, at *180 (finding ineffective assistance where defense counsel hired four mental health experts and presented testimony regarding defendant's dysfunctional family

43

life, history of abuse, drug use, and various mental impairments, but failed to investigate or

present evidence of her mental state at the time of the offenses).  More is required.

Because of the "crucial mitigating role that…mental health problems can have in

the sentencing phase, defense counsel must pursue this avenue of investigation with due

diligence."  Wilson v. Sirmons, 536 F.3d 1064, 1085 (10th Cir. 2008).  A decision to refrain

from further investigation and presentation of mental health mitigation evidence must be

objectively reasonable "under prevailing professional norms."  Rompilla v. Beard, 545 U.S. 374,

380 (2005) (citing Strickland v. Washington, 466 U.S. 688 (1984); Wiggins v. Smith, 539 U.S.

510, 521 (2003)).  Prevailing professional norms at the time of Mr. Fell's trial required trial

counsel to conduct a thorough social history investigation and to provide the proper experts with

the information necessary for them to render competent and reliable evaluations.[27]  This required

trial counsel "to investigate the client's life history, and emotional and psychological make-up,"

and to "inquir[e] into the client's childhood, upbringing, education, relationships, friendships,

formative and traumatic experiences, personal psychology and present feelings."  Gary

Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58

N.Y.U. L. Rev. 299, 323-24 (1983) ("The importance of this investigation, and the care with

---

[27] See Ben-Sholom, 566 F. Supp. 2d at 1124 (counsel's failure to investigate fully and to provide mental health experts with complete and accurate social history "disabled the experts from giving the assistance for which they had been retained"); Douglas S. Liebert & David V. Foster, The Mental Health Evaluation in Capital Cases: Standards of Practice, 15 Am. J. Forensic Psychiatry 43, 46-48 (1994) (the "collection of an accurate medical, developmental, psychological and social history, gathered from multiple sources" is the crucial first step in a capital mental health evaluation); Harold Kaplan & Benjamin Sadock (eds.), Comprehensive Textbook of Psychiatry, 837 (Lippincott Williams & Wilkins, 4th ed. 1985) (noting an accurate and complete medical and social history has been called the "single most valuable element to help the clinician reach an accurate diagnosis"); John H. Blume, Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination, The Advocate, Aug. 1995 (noting the required elements of a complete, competent and reliable mental health evaluation, the first being the collection of an accurate medical and social history.); Phyllis L. Crocker, Childhood Abuse and Adult Murder: Implications for the Death Penalty, 77 N.C. L. Rev. 1143, 1192 (1999) ("First and foremost, the defense attorney must comprehensively investigate every aspect of the defendant's life to know what information will help the jury understand the defendant and his commission of the crime.  The attorney must then consult with mental health professionals who will use their expertise to evaluate, test, and interpret the factual information about the defendant's life and its relationship to the crime.").

which it is conducted, cannot be overemphasized."). Likewise, the 2003 ABA Guidelines, which were in place well before Mr. Fell's 2005 trial, provided that counsel and mitigation specialists should "compile[] a comprehensive and well-documented *psycho-social history* of the client based on an *exhaustive investigation*," including an "extensive and generally unparalleled investigation into personal and family history," which should be corroborated through multiple sources, and an investigation into "the adequacy of institutional responses to childhood trauma, mental illness, or disability to determine whether the client's problems were ever accurately identified or properly addressed" in a case such as Mr. Fell's where "the client was incarcerated, institutionalized or placed outside of the home."[28] American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 4.1, 10.7, Commentary at 959, 1022, 1025, 1026 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) (emphasis added).

Again, whether trial counsel's performance met prevailing standards of care is an inherently factual inquiry. The answer turns on both the norms for mental health investigation in capital cases between 2000 and 2005 and whether the superficial investigation in this case conformed to those norms. Neither question can be resolved against Mr. Fell now. The record does not conclusively refute his well-pled allegations, so the Court must accept them as true. After further factual development, the Court will be able to determine: 1) what appropriate mental health experts, armed with an adequate social and medical history, would have

---

[28] The Government argues that the Court should not rely on the 2003 ABA Guidelines based on the Supreme Court's decision in Bobby v. Van Hook, 130 S. Ct. 13 (2009). In Van Hook, the Supreme Court noted that "[r]estatements of professional standards…can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." Id. at 16. In particular, the Supreme Court criticized the Sixth Circuit for determining that trial counsel was ineffective based on standards set forth in the 2003 ABA Guidelines, when the capital trial took place in 1985, ruling that "[j]udging counsel's conduct in the 1980's on the basis of these 2003 Guidelines – without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial – was error." Id. at 17. By contrast, here, Mr. Fell relies on the ABA Guidelines in effect at the time of his trial – and to which counsel had access – as well as other indicia of professional standards at the time. He does not rely on hindsight.

concluded; 2) whether it was reasonable for counsel not to present a mental health case; and 3) whether there is a reasonable probability that at least one juror would have voted for life if Mr. Fell's new evidence had been presented at trial.

### 2. Mr. Fell Has Adequately Alleged That Trial Counsel Failed To Provide The Appropriate Experts, With The Appropriate Information, At The Appropriate Time

Mr. Fell has also adequately alleged that trial counsel failed to conduct the "more" investigation that was required.  Mr. Fell has alleged that the mental health case trial counsel prepared was conducted and prepared at the very outset of the case for the purposes of plea negotiations and before a complete social history was conducted, much less provided to the experts.  Mot. 98.  He has also alleged that following the Attorney General's rejection of the plea agreed to by Mr. Fell and the United States Attorney's Office, trial counsel never completed their social history investigation, supplemented their mental health evaluations or reconsidered whether they had selected the appropriate experts for a contested proceeding.

This claim is supported by specific factual allegations.[29]  Mr. Fell has specifically alleged that trial counsel did not give the initial experts that they hired, Dr. Lipman, Dr. Van Gorp and Dr. Mills, a thorough social history before they evaluated Mr. Fell's mental health in 2001.  Mot. 73-80.  Mitigation specialist Cynthia Ayres has declared under oath: "From January to June 2001, I did some *preliminary investigation* for use in the process of trying to avoid the death penalty.  During this time period, I did not complete the social history investigation, because I did not think the case was going to trial."  Declaration of Cynthia Ayres, Mar. 18, 2011 (Fell Ex. 265 at 1) (emphasis added).  Mr. Fell's trial counsel has also declared under oath: "I

---

[29] Unlike in Van Hook, where the Court found that the defendant offered no support for the assertion that trial counsel failed to provide experts with a complete psycho-social history, 130 S. Ct. at 19 n.3, here, Mr. Fell has presented ample evidence to support his claim.

46

retained Cynthia Ayres as a mitigation specialist in January 2001, shortly after Mr. Fell's arrest

in 2000. I tasked Ms. Ayres to perform a *preliminary* mitigation investigation into Mr. Fell's

life." Decl. of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 1) (emphasis added). Further,

Dr. Mills has stated that "[a]t the time I was asked to perform my evaluation, Mr. Fell's counsel

had not completed a full social history of Mr. Fell and did not provide me a complete social

history of Mr. Fell" and that "I was not asked to reexamine Mr. Fell after submitting my report in

May 2001 or to revise or update my report in light of additional evidence collected by the trial

team after that date.… My work after May 2001 was limited to trial preparation." Decl. of Mark

J. Mills, Mar. 15, 2011 (Fell Ex. 260 at 1-2). Thus, Mr. Fell has adequately alleged that the

initial mental health evaluations by Drs. Lipman, Mills and Van Gorp were necessarily

incomplete because they were based upon incomplete information about Mr. Fell's social

history.[30] To the extent that the Government disputes that these reports were complete, this only

creates a factual dispute that precludes summary dismissal.

Moreover, Ms. Ayres has acknowledged that she never completed her social

history investigation, even after the failed plea negotiations. Ms. Ayres was the only member of

Mr. Fell's trial team with expertise in mental health issues. See ABA Guideline 10.4(C)(2)(b)

(requiring a capital defense team to have "at least one member qualified by training and

experience to screen individuals for the presence of mental or psychological disorders or

---

[30] The Government quibbles that the reports of Drs. Van Gorp, Mills and Lipman did not expressly use the word "preliminary," so their reports must have been complete. But the information upon which these experts relied was preliminary, so their reports were necessarily preliminary. In any event, it was trial counsel's duty to provide their experts with the information necessary to complete their evaluations, so whether these experts considered their reports to be complete is immaterial. See e.g., Hovey v. Ayers, 458 F.3d 892, 925 (9th Cir. 2006) ("A defense attorney in the sentencing phase of a capital trial has a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client facts that the experts do not request. Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's duty to seek out such evidence and bring it to the attention of the experts.") (citations and internal quotation marks omitted).

47

impairments"). Yet, Ms. Ayres has acknowledged that she did not spend enough time with Mr. Fell to screen him for signs of mental illness, nor was she tasked by trial counsel with doing so. Fell Ex. 265 at 3 ("Due to my lack of contact with Mr. Fell, I was unable to screen him for signs and symptoms of mental illness."); see also Decl. of Gene Primomo, Mar. 16, 2011 (Fell Ex. 263 at 1) ("I was the primary contact with our mitigation specialist, Cynthia Ayres. I considered Ayres self-directed. To my knowledge, Cynthia Ayres was not assigned to help identify whether Mr. Fell had any mental health disorders."). Ms. Ayres was also excluded from the process of selecting the appropriate experts. See Decl. of A. Bunin (Fell Ex. 164 at 1) ("Ms. Ayres was not involved in choosing mental health experts…."); Decl. of C. Ayres (Fell Ex. 265 at 5) ("No one asked me…whether we should hire any particular kind of mental health experts…."). This hindered trial counsel from choosing the appropriate experts for their case. ABA Guideline 10.11, Commentary at 1061 (noting need for experts "tailored specifically to the needs of the case").

Due to trial counsel's failure to include her in the document collection process,[31] Ms. Ayres also did not obtain critical documents until immediately before trial, when it was too late to follow up on the red flags contained within them indicating that she should speak to additional witnesses and retrieve additional documents. Ms. Ayres noted that she did not receive records from the Victim's Resource Center and contact sheets from Children and Youth Services until shortly before trial, and if she had received the documents, she would have "talked through the records with Mr. Fell, his sister Teri Fell, and his aunts," "used the records to locate and

---

[31] Fell Ex. 265 at 3 ("Although I often am in charge of records collection, I was told that Wanda Rivera from the Federal Defender's Office would do that here and I assumed she was collecting the relevant documents. I was not supervising Ms. Rivera's work; I understood that Mr. Bunin and Mr. Primomo were, and I did not generally follow up on her work. In 2005, I learned for the first time that we were missing many readily available documents that would be relevant to a mitigation case.").

48

interview a number of witnesses named in the record[]" and "collected mitigating records based on the information in the contact sheets." See Fell Ex. 265 at 5. She also noted that she "would have wanted to hand the records over to mental health experts for a review. As trial had already started, I was unable to do these things." Id.

Further, Mr. Fell has specifically alleged that trial counsel failed to conduct a thorough investigation of the multigenerational mental illness in Mr. Fell's family, which would have enabled experts to reach a more accurate assessment of Mr. Fell's mental health. Mot 99. See ABA Guideline 10.7, Commentary at 1025 (noting that "[a] multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.").

Contrary to the Government's argument, the retention of Dr. Mark Cunningham to testify at trial did not cure the deficiencies in the preliminary investigation and did not constitute an informed reassessment of trial counsel's mental health case before trial.[32] Dr. Cunningham was hired in May 2002, without any input from Ms. Ayres, and when her social history investigation was still in the preliminary stages. See Decl. of A. Bunin (Fell Ex. 264 at 6) (noting initial contact with Dr. Cunningham in 2002); Decl. of C. Ayres (Fell Ex. 265 at 2) (noting that after the preliminary social history investigation, Ms. Ayres met with attorneys for only four hours in April 2002 to catch up on the case, worked on the case for seventeen hours in June 2002, and then did not work on the case again until March 29, 2005.). Therefore, trial counsel's decision to hire Dr. Cunningham was no more informed than their decision to hire Drs.

---

[32] The Government's argument contradicts its position at trial that Dr. Cunningham was not a qualified expert. See United States' Sentencing Memorandum and In Limine Motions for Penalty Phase, Dkt. No. 161, at 17 (June 27, 2005) ("Cunningham is not an expert in any recognized area of science or medicine…[He] does not conduct a psychological evaluation of a defendant consistent with medical or other professional practices. Cunningham does not provide a diagnosis of the defendant.")

Lipman, Van Gorp and Mills. Further, Dr. Cunningham was never asked to conduct a diagnostic assessment of Mr. Fell's mental health, and never did so. He simply was not a diagnostician of Mr. Fell's mental health. See Decl. of Dr. Mark Cunningham, June 27, 2005 (Fell Ex. 6 at FELL-0000047) (describing his ability to discuss nexus between deleterious developmental events and adverse outcomes); see also Decl. of A. Bunin (Fell Ex. 264 at 6) ("[Dr. Cunningham] was planning to testify about historical factors in Mr. Fell's upbringing and how they impacted his decision-making."); Decl. of G. Primomo (Fell Ex. 263 at 2). In addition, since Ms. Ayres never completed a thorough social history, Dr. Cunningham also did not have the benefit of this critical information before trial. To the extent that questions about the sufficiency of Dr. Cunningham's evaluation remain, they are merely factual disputes that cannot be resolved against Mr. Fell at this preliminary stage.

Moreover, after Dr. Cunningham was hired in May 2002, the tenor of the Government's case changed markedly. By December 2004, trial counsel were on notice that the Government intended to contest Mr. Fell's mental health case vigorously, and had hired Dr. Michael Welner as their primary expert. Supplemental Memorandum in Support of Government's Motion for Discovery of Mental Health Evidence, Dkt. No. 77, at 3 (Dec. 17, 2004). Trial counsel were also on notice that Dr. Welner's standard diagnoses were psychopathy and Anti-Social Personality Disorder ("ASPD"). Defendant Donald Fell's Trial Memorandum, Dkt. No. 142, at 7 (June 14, 2005) (noting Dr. Welner's diagnoses of psychopathy and ASPD in previous cases, which "allowed him to describe a laundry list of bad characteristics that he then attributed to the defendant"). Additionally, trial counsel were well aware of Dr. Welner's "extensive research…investigating Fell's background, psychiatric history, antecedents to the offenses charged, relevant psychosocial information and substance abuse questions." Motion to

50

Reconsider Rule 12.2 Order, Dkt. No. 105, at 4-5 (Apr. 14, 2005) (discussing Dr. Welner's "extensive evaluation," to date, including the review of "thousands of documents relating to Fell" and three days of interviews of "over a dozen persons knowledgeable about Fell and Robert Lee, such as friends, school teachers, and family members"). Therefore, trial counsel were on notice that they would need to select mental health experts who could counter the Government's aggressive mental health rebuttal case. Yet, trial counsel failed to reassess whether they had the appropriate experts to do so, or even to ask the experts they had to reevaluate Mr. Fell with an eye toward a contested proceeding.

Thus, Mr. Fell has adequately alleged that trial counsel rendered deficient performance by failing to conduct a thorough social history investigation, failing to ask the experts they had the appropriate questions or to provide them with the appropriate documents in order to accurately diagnose Mr. Fell, and failing to retain and prepare the appropriate experts for a heavily contested trial.

### 3.     Mr. Fell Has Adequately Alleged That Trial Counsel Failed To Follow Up On Red Flags That Mr. Fell Suffered From Serious Mental Impairments

The Government's contention that Mr. Fell's childhood records and the preliminary mental health expert reports did not raise any red flags that Mr. Fell suffered from mental impairments or suggest that any further investigation into Mr. Fell's mental health was required raises factual disputes that cannot be resolved on summary dismissal, and in any event, cannot be reconciled with the records and reports themselves. Mr. Fell has adequately alleged and pled supporting facts showing that his childhood psychiatric records and the preliminary mental health reports were replete with red flags that showed that further investigation into Mr.

51

Fell's mental health was necessary and that specialized experts needed to be consulted.[33]  To cite

just a few of the notable examples:

- Trial counsel were on notice that Debra Fell drank daily while pregnant with Mr. Fell. Further, Mr. Fell's records from his childhood psychiatric institutionalizations and St. Michaels showed that Mr. Fell suffered from hyperactivity, poor impulse control, poor judgment and anxiety, which are classic symptoms of FASD.[34]  Mot. 82-86. These factors should have put trial counsel on notice that Mr. Fell might suffer from FASD, and that consultation with an expert in FASD was necessary.[35]

- Mr. Fell's childhood records showed that Mr. Fell suffered from depression.  See Van Gorp Report (Fell Ex. 2 at 2) (noting that childhood psychological testing revealed that Mr. Fell suffered from "mild depression and anxiety"); Mills Report (Fell Ex. 3 at 3) (noting that a childhood psychiatrist diagnosed Mr. Fell with "a major depression with psychotic features"); Lipman Report (Fell Ex. 4 at 10) (noting that in

---

[33] Trial counsel were also on notice that Mr. Fell's childhood psychiatric records were incomplete and misleading, and it was incumbent upon them to consult objective sources to verify the accuracy of those records.  See Lipman Report, May 14, 2001 (Fell Ex. 4 at 9) (noting that "[r]eview of Fell's early institutional records reveals his comorbidity and most particularly reveals a stunning lack of appreciation by his therapists of the existence and relevance of his drug and alcohol abuse"); Wetzel Report, Oct. 11, 2002 (Fell Ex. 7 at 6) ("It is obvious that Donny has had behavioral and substance abuse problems for many years.  His parents misrepresented to the case workers, to the mental health professionals and others about the nature and extent of the substance abuse problems, violence and other forms of abuse in his parents' home.  Their behavior was not simply a lack of insight.  This deception interfered with early, prompt and thorough interventions which might have affected the course of his development."); See ABA Guideline 10.7, Commentary at 1025 (noting the need to collect "corroborating information from multiple sources").

[34] The Government argues that trial counsel had no reason to believe that Mr. Fell suffered from FASD because he was not diagnosed with FASD in childhood.  However, when Mr. Fell was institutionalized as a child, his mother was the primary reporter of his symptoms, and she would have no incentive to disclose alcohol ingestion during pregnancy.  Further, studies have emphasized the difficulty in diagnosing FASD without information regarding maternal ingestion of alcohol during pregnancy and due to the fact that symptoms associated with fetal overexposure to alcohol are often mistaken for ADD/ADHD, with which Mr. Fell was diagnosed.  See e.g., Linnea Vaurio, Edward Riley & Sarah Mattson, Differences in Executive Functioning in Children with Heavy Prenatal Alcohol Exposure or Attention-Deficit/Hyperactivity Disorder, 14 J. Int'l Neuropsychological Soc'y 119, 120 (2008).  The Government also argues that none of the defense mental health experts indicated that Mr. Fell suffered from FASD, but that evidence on its face demonstrates that the experts did not consider the information readily available to counsel of maternal alcohol ingestion during pregnancy.  See Van Gorp Report, Apr. 6, 2001 (Fell Ex. 2 at 1) ("No complications with the birth or pregnancy were reported"); Lipman Report (Fell Ex. 4).

[35] The Government's argument that its own experts, Drs. Welner and Wetzel, did not conclude that Mr. Fell had FASD, is of no moment.  It was the duty of Mr. Fell's own attorneys to investigate Mr. Fell's mental health and to subject the Government's expert opinions to scrutiny through the adversary process.  Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (duty to investigate derives from counsel's function, which is "to make the adversarial testing process work in the particular case") (quoting Strickland, 466 U.S. at 690-91).  Moreover, while the Government selectively quotes from Dr. Wetzel's second report, stating that he was "unable to state with reasonable professional certainty that Mr. Fell ever had hyperactivity or attention deficit disorder," Dr. Wetzel clearly stated in his first report that there were several defense opinions that could not, in his opinion be rebutted, *including the fact that competent professionals thought he had ADHD as a child.*  Wetzel Report (Fell Ex. 7 at 3).

52

childhood Mr. Fell was diagnosed with "an atypical depression NOS"). The preliminary mental health evaluations also showed that Mr. Fell suffered from clinical depression post-arrest. Van Gorp Report (Fell Ex. 2 at 4) ("[O]n the Beck Depression Inventory, Mr. Fell achieved a score of 20 placing him the Moderate [sic] range of clinical depression.").[36] These documents should have put trial counsel on notice that Mr. Fell suffered from a mood disorder.

- Even the limited social history trial counsel conducted showed that Mr. Fell suffered multiple traumas during childhood, and a thorough social history would have shown that Mr. Fell suffered relentless trauma from birth through the crimes. See supra Rep. Section III. These factors should have put trial counsel on notice that consultation with a trauma expert was necessary.[37]

The preliminary expert reports also revealed that an investigation into Mr. Fell's mental state on the night of the crimes was necessary. Dr. Van Gorp stated that Mr. Fell "harbors a good deal of atypical thinking, depression, *propensity to a breakdown in his thought process if under sufficient stress, and a decidedly acquiescent style when directed by others*." Fell Ex. 2 at 8 (emphasis added). This report should have caused trial counsel to investigate the stressors that might have existed on the night of the crimes that could have exacerbated Mr. Fell's mental illness. It also should have caused trial counsel to investigate the role that Mr. Fell's co-defendant Robert Lee might have played in influencing Mr. Fell's behavior on the night of the crimes. In addition, Dr. Lipman's report was full of red flags regarding Mr. Fell's tendency to black out or disassociate – a common symptom experienced by victims of chronic trauma. See, e.g., Fell Ex. 4 at 4-7 ("Other blackout incidents had previously occurred, he

---

[36] The Government's effort to minimize Dr. Van Gorp's conclusion that Mr. Fell suffered from *clinical* depression by arguing that this is typical of an inmate facing incarceration fails because it is wholly unsupported by law or science. It also raises a factual dispute about the existence and severity of Mr. Fell's mood disorder that cannot be resolved at the summary dismissal stage.

[37] The Government's argument that Dr. Cunningham would have served the same function as a trauma expert is unpersuasive. Dr. Cunningham was tasked with determining the presence or absence of adverse developmental factors in Mr. Fell's life through a checklist and based on Department of Justice statistics. He then drew conclusions about how the presence or absence of those factors tend to impact people with adverse developmental factors comparable to Mr. Fell's as a statistical matter. Dr. Cunningham was never asked to conduct a clinical evaluation of how Mr. Fell internalized the trauma he suffered. The individualized assessment a trauma expert would have provided would have been far more comprehensive and personalized and therefore more mitigating. Since the differences between the testimony a trauma expert and Dr. Cunningham could provide are inherently factual, Mr. Fell should be permitted to prove his claim that a trauma expert would have been a more appropriate expert.

mentioned: on one of these his friends had told him he had been complaining of 'demons.'  He had no memory of this.").  These red flags, as well as Mr. Fell's own statements regarding his lack of memory the night of the crimes, should have prompted trial counsel to investigate his mental health, intoxication on the night of the crimes and any emotional triggers that could have led to psychosis or disassociation during the crimes.  But as Mr. Fell has amply alleged, trial counsel failed to investigate any of these factors.  See infra Rep. Sections VII, XI and XII.

Mr. Fell has also specifically alleged that Dr. Lipman was not given an opportunity to conduct interviews, which he usually does, and that trial counsel failed to follow up on additional neuropsychological testing that Dr. Lipman recommended, including an evaluation of Mr. Fell's "dissociative tendencies and an administration of the Dissociative Experiences Scale."  Mot. 76; Opp. 104.  The Government simply raises factual disputes that cannot be resolved at the summary dismissal stage when it argues that Dr. Lipman's report does not show a request for additional neuropsychological testing and that Dr. Van Gorp's neuropsychological testing was complete.  See Johnson, 2012 WL 1836282, at *179-83 (finding deficient performance, after an evidentiary hearing, where trial counsel ignored experts' suggestions for further testing).  Moreover, it was clear from the reports of Drs. Van Gorp, Lipman and Mills that their evaluations of Mr. Fell reflected a snapshot of Mr. Fell's mental health at the moments when he was being evaluated, after he was arrested and was no longer under the influence of drugs and alcohol, and when he had some distance from the extreme emotional stress of his chaotic life prior to prison.  See Lipman Report (Fell Ex. 4 at 16) ("Although he *currently* tests – in his drug-free state – within the normal range on various neuropsychological measures of brain function (per Drs. Mills and Van Gorp), a considerable body of work supports the conclusion that chronic heavy use deranges various tests of cognitive

54

performance in a way that persists for weeks and sometimes months after the drug is withdrawn.") (emphasis added). Since Mr. Fell was on trial for his life for his past behavior, trial counsel should have investigated his mental health not just at a moment in time post-arrest, but during the critical moments in his life that the Government would try to paint as aggravating.

In short, trial counsel were on notice that Mr. Fell suffered serious mental impairments that were documented during his adolescent years and continued after his arrest. Indeed, Dr. Van Gorp expressly noted that Mr. Fell's "atypical thought process and depression… [we]re fully consistent with his history of many years of psychiatric hospitalizations and treatment," and concluded that "Mr. Fell is clearly a troubled young man in need of continued structured psychiatric intervention." Fell Ex. 2 at 8. Mr. Fell has thus alleged a number of specific failures on the part of trial counsel to follow up on clear red flags that Mr. Fell suffered from serious mental impairments.[38] He was not "completely intact," as the Government once again tries to argue. Mr. Fell's claims have been adequately pled, and the substantial factual questions raised cannot be resolved on summary dismissal.

C.      **The Government's Argument That Trial Counsel's Failure To Present Expert Mental Health Testimony Was Strategic Presents A Substantial Question Of Fact**

Mr. Fell's well-pled claims should not be dismissed based upon the Government's repeated contention that trial counsel made a reasonable strategic decision to withdraw their mental health case in its entirety and to rely only upon lay testimony. The contours of trial counsel's strategy and its foundation are factual issues that cannot be resolved at this stage. See, e.g., United States v. McGrew, 397 F. App'x 87, 93-94 (5th Cir. 2010) (remanding for

---

[38] Mr. Fell is not, as the Government argues, making the "unsupportable argument that every capital defense attorney is obligated to present evidence of mental health." Opp. 118. Mr. Fell is alleging that a thorough mental health investigation and presentation of mental health experts was required *in this case* because there was abundant evidence that he in fact suffered from mental impairments.

55

evidentiary hearing on petitioner's ineffective assistance claim and noting it was "impossible to conclude without further factual development that McGrew's trial counsel's decision not to file a motion to suppress was 'strategic, continuous, and informed'") (quoting Strickland, 466 U.S. at 689).  As Mr. Fell has specifically alleged, trial counsel's decision to withdraw all mental health evidence in Mr. Fell's case because of the potentially damaging rebuttal testimony of Drs. Welner and Wetzel constituted ineffective assistance in and of itself.  See infra Rep. Section V. The decision was not informed, is not entitled to strategic deference, and should not prevent Mr. Fell from presenting to this Court the mental health case that trial counsel failed to develop. Wiggins, 539 U.S. at 521, 536 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") (quoting Strickland, 466 U.S. at 690); Armstrong v. Kemna, 534 F.3d 857, 864 (8th Cir. 2008) ("[S]trategic choices resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.") (citations and internal quotation marks omitted).

In addition, trial counsel's entire strategic calculus of whether to put on a mental health case would have been altered if they had reached an accurate understanding of Mr. Fell's mental health after a constitutionally adequate mental health investigation.  Equipped with the knowledge that Mr. Fell suffered from FASD, a mood disorder and chronic trauma, among other impairments, reasonable trial counsel would have had a much more robust mental health case to counter the conclusions of Dr. Wetzel and Dr. Welner and would have made a different decision about whether to proceed with a presentation of Mr. Fell's mental health case.

**D.**    **Mr. Fell Has Adequately Alleged That He Suffered Prejudice From Trial Counsel's Performance**

Mr. Fell's 2255 Motion also adequately alleges prejudice as a result of his trial counsel's failure to investigate his mental health sufficiently.  Had trial counsel conducted an adequate investigation and had they learned that Mr. Fell suffered from numerous mental health impairments, "including but not limited to, organic brain impairment due to exposure to fetal alcohol, untreated mood disorder, and the effects of exposure to chronic abuse and trauma during early childhood and continuing into adolescence," Mot. 69, the result would have been dramatically different.  The Government's responses either are deficient on their face or raise factual issues that cannot be resolved summarily at this stage.

**1.**    **Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due To Trial Counsel's Failure To Present Expert Testimony Of His Mental Condition**

The Government argues that expert testimony was not necessary and that Mr. Fell was not prejudiced by its absence because the jury found that Mr. Fell witnessed violence and abuse, had no positive role models, abused drugs and alcohol, and was institutionalized for mental health problems.  Opp. 128.  It contends in essence that, because the jury heard lay testimony regarding Mr. Fell's childhood abuse and institutionalizations, it was irrelevant whether they heard any expert testimony regarding the lasting impacts of these traumatic events on the person Mr. Fell became and the crimes he committed.[39]  That argument is meritless.

---

[39] As discussed in Section V below, even if the analysis were confined – which it should not be – to the mental health evidence that trial counsel were prepared to offer, Mr. Fell has adequately alleged that he was prejudiced by trial counsel's failure to call Drs. Mills and Cunningham to provide a scientific link between Mr. Fell's traumatic childhood and his conduct.  See e.g., Ben-Sholom, 566 F. Supp. 2d at 1135 (lay testimony of mother's abuse was not enough without expert testimony to put that abuse in context); Johnson, 2012 WL 1836282, at *117 (lay testimony regarding defendant's battered woman's syndrome was not enough where there was "no attempt to tie together the evidence, the syndrome, and the extent to which the syndrome explained the evidence, Johnson's mental state, and her conduct").

As Mr. Fell is prepared to show, the jury's findings of fact concerning certain aspects of the trial mitigation presentation only highlight the significance of the mental health evidence and the difference it would have made to the jury.  Mr. Fell's argument was never that his social history alone mitigated the gravity of the offenses and supported a sentence of life without parole.  That would have been the "abuse excuse" that the Government so effectively derided.  See e.g., Tr. Vol. XII at 118:21-125:7 (July 13, 2005).  Rather, his argument was that Mr. Fell's "deprived childhood," full of horrific abuse and lack of "protective factors," produced a developmentally and psychologically damaged individual, mitigating his culpability for the crimes.  Tr. Vol. V-I at 56:4-57:9 (June 18, 2005).  As trial counsel described its case for reduced moral culpability in summation, "[w]e are talking about what formed Donnie's decisions.  What made Donnie – what clouded his ability and shaped his choices….And those are reasons, those are reasons for you to consider the life sentence that we are going to ask for."  Tr. Vol. XII at 69:10-15 (July 13, 2005).

Mr. Fell will demonstrate why trial counsel's argument required expert testimony. As defense counsel explained to the jury before they withdrew even the weaker mental health case that they gathered without adequate investigation, "We have indicated that there is going to be expert testimony, and there will be."  Tr. Vol. V-I at 56:4-5 (June 28, 2005).  Trial counsel promised to call Dr. Mills, "a medical doctor" who "has done testing and will give conclusions," and Dr. Cunningham, who would "explain studies conducted by the Department of Justice that talk about the reasons, what are the causes of bad outcomes."  Id. at 56:4-24.

The failure to present expert testimony that could have tied together the evidence presented regarding Mr. Fell's social history (on which the jury made favorable findings of fact) and his character and the circumstances of the crimes thus had a devastating effect on Mr. Fell's

58

defense.  It left him with nothing to explain how the social history was *mitigating* and indeed left him with a defense that essentially was one of blaming Debra Fell, the victim.  Indeed, as a result of trial counsel's failure to present expert evidence, counsel unreasonably believed that they had to agree to the stipulation that Mr. Fell "had no cognitive or neurological deficits"; that "his intellect and cognitive functions were intact"; and that "he did not suffer from any mental disease or defect."  Tr. Vol. XI at 93:22-94:12 (July 12, 2005).  The Government fully exploited this gap in its closing statements:

- "[Y]ou have heard in this phase of the case about the mental health stipulation.  There is no question there's no mental disease, no mental defect; no question the defendant knew the difference from right from wrong when these crimes occurred.  In fact, ladies and gentlemen, there's no evidence of significantly impaired [sic] at the time of the crimes.  This factor is not proven."  Tr. Vol. XII at 41:7-14 (July 13, 2005).

- "Folks, there is no evidence of any genetic predisposition to alcohol or drug dependence.  There's no evidence of fetal alcohol syndrome.  There's no evidence of closed-head injuries with any after effect.  And there's no evidence of any psychological disorder."  Id. at 119:3-7.

- "The only evidence as to Mr. Fell's state of mind and his health is in Government's Exhibit 14, which is a stipulation by both parties, and as you know, it indicates that psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate.  I am not even going to read it to you again.  He is completely intact."  Id. at 119:8-14.

- "There are some murders, as bad as they are, where you know that there was – there's something wrong with the guy upstairs, the guy that did it.  He has some kind of organic neurological brain deficit.  He is mentally ill.  Can't tell the difference between right and wrong.  That's not this case."  Id. at 130:17-22.

The result, ultimately, was that the jury was left to credit the Government's unrebutted arguments and to conclude that the mitigating factors that were proven were insufficient to outweigh the aggravating factors because they had no relevance or bearing at all on Mr. Fell's mental health or as factors explaining his character or conduct.  In other words, the proffered mitigating factors were just biographical facts about Mr. Fell that otherwise served no mitigating purpose with respect to explaining the trajectory of Mr. Fell's life, how he came to be the person

he was, or how he could have participated in the offense for which he was being capitally prosecuted.

As Mr. Fell has pled, had trial counsel adequately investigated, they would have been able to answer these points. Mr. Fell did not have a "clean slate," he was not "completely intact," and there was something wrong "upstairs." He in fact suffered from a "genetic predisposition to alcohol and drug dependence," he had all the symptoms "of fetal alcohol syndrome," and he suffered from serious mental impairments including a mood disorder and the lasting effects of chronic trauma. Mot. 56-62. The Government highlighted the absence of each of these factors and stressed their significance. The fact that evidence was readily available to establish these factors but was not presented thus demonstrates the prejudice. See e.g., Johnson, 2012 WL 1836282, at *183 ("[T]he decision to forego presentation of what would have been copious mental health mitigation evidence [was not] offset by the presentation of a meaningful mitigation case that focused, instead, on family dysfunction, abuse, and a history of drug use.").

Indeed, because of the powerfully mitigating impact of testimony regarding a defendant's severe mental impairments, courts have repeatedly found prejudice where trial counsel failed to adequately investigate and present such evidence to the jury. See, e.g., Boyde v. California, 494 U.S. 370, 382 (1990) (recognizing the "belief, long held by this society, that defendants who commit criminal acts that are attributable to…emotional and mental problems, may be less culpable than defendants who have no such excuse") (citation and internal quotation marks omitted); Smith v. Mullen, 379 F.3d 919, 942 (10th Cir. 2004) (failure to present evidence of borderline mental retardation, brain damage, and troubled childhood was "patently unreasonable" as it is "exactly the sort of evidence that garners the most sympathy from jurors"); Wilson v. Sirmons, 536 F.3d 1064, 1085-94 (10th Cir. 2008) (trial counsel was ineffective when

60

he failed to present expert testimony regarding the psychological impact of defendant's history of abuse and mental illness); Silva v. Woodford, 279 F.3d 825, 846-847 (9th Cir. 2002) (trial counsel was ineffective when he failed to present evidence of defendant's childhood abuse, organic brain disorder, substance abuse, and mental illness (including PTSD, fetal alcohol syndrome, and attention deficit disorder)); Caro v. Woodford, 280 F.3d 1247, 1255, 1258 (9th Cir. 2002) (counsel was ineffective for failing to investigate and present expert testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child" and noting that "[m]ore than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system"); Blystone v. Horn, 664 F.3d 397, 427 (3d Cir. 2011) ("Had counsel's investigation not been deficient, the jury could have heard expert testimony as to Blystone's organic brain damage, bipolar disorder, and borderline personality disorder."); Johnson , 2012 WL 1836282, at *180-81 (trial counsel was ineffective where he failed to present expert testimony regarding defendant's mental state at the time of the offense); Ben-Sholom, 566 F. Supp. 2d at 1118-19 (trial counsel was ineffective for failing to adequately investigate and present evidence of defendant's mental illness, including PTSD, borderline personality disorder, and major depression).

> **2.      Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due To Trial Counsel's Failure To Present Expert Testimony To Explain That His Flat Affect Was A Function of His Mental Impairments And Not A Lack Of Remorse**

Mr. Fell suffered prejudice in a second way: because of their inadequate investigation, trial counsel were unable to explain to the jury that Mr. Fell's flat affect was "not a function of the absence of remorse but of his mental impairments, including his exposure to chronic, ongoing trauma, mood disorder, and exposure to alcohol in utero."  Mot. 113.

This failure manifestly caused prejudice to Mr. Fell.  At trial, Mr. Fell offered substantial evidence – aside from his demeanor – that he felt remorse for the killing of Mrs. King, including the fact that he decided to confess within fifteen hours of being arrested, assisted the police in finding Mrs. King's body, accepted responsibility for his crime, and offered to plead guilty.  Tr. Vol. XII at 68:1-4 (July 13, 2005).

The Government's response was to repeatedly stress Mr. Fell's flat affect and demeanor.  Mot. 110.  In describing Mr. Fell's first interview with the FBI, the Government stated in its opening argument, "Donald Fell stared intently at the agents.  He showed no emotion.  He denied everything."  Tr. Vol. I-I at 34:4-5 (June 20, 2005).  In its examination of Agent Jimmie Caudle and Sergeant Rodney Pulsifer, the Government focused on Mr. Fell's purported flat affect.  Mot. 110.  Asking Agent Caudle what Mr. Fell's response was after being told that the FBI was aware that his mother, Charles Conway, and Teresca King were all dead, the Government elicited the following testimony:

> My job during this interview at this time was to pay close attention to what Fell's reactions were.  Fell was roughly in the position right here staring intently at Agent Sturgill while he was giving a run down of a synopsis of what we knew… To, during the course of this if he blinked I missed it because *I did not see him blink.*  I did not see him move a muscle.  *I saw absolutely no emotion* other than the *intense stare* directly at Mr. Sturgill, at Agent Sturgill.

Tr. Vol. II-I at 15:3-12 (June 21, 2005) (emphasis added).

The Government also focused on Mr. Fell's purported flat affect in its questioning of Michael Leight, the Burger King employee who served the defendants following the crime.  It asked whether Mr. Fell "appear[ed] to be upset at all" and elicited testimony that the passenger of the car "didn't appear to be upset, no."  Tr. Vol. III-I at 100:19-22 (June 23, 2005).

The Government continued to emphasize Mr. Fell's perceived lack of emotion and unaffected tone of voice in its closing, emphasizing that Mr. Fell was "stone cold" and that

the jury could hear his lack of remorse in the sound of his voice. Tr. Vol. XII at 42:24-25, 44:20-45:3 (July 13, 2005). The Government further bolstered its argument by pointing to a childhood shooting incident where the Government contended he also showed no remorse:

> In April 1992 he was institutionalized after shooting a boy with a nine millimeter pistol, barely missing his heart. This was the episode you heard him describe in one of his taped admissions when he said that the boy jumped in front of the bullet. Hospital records from the time state that Fell, quote, shows no remorse, and threatens to shoot his mother, close quote.

Tr. Vol. V-I at 39:25-40:6 (June 28, 2005). See also Tr. Vol. XII at 123:14-23 (July 13, 2005) ("I mean, you heard the casual tone that he talked about what he did to Terry King. He even jokes about it. He gets a chuckle out of it. He said on the tape that he got a chuckle out of the name – of the fact that her name was Terry because he had a sister named Teri….It almost leaves you speechless. I mean, that attitude is – it is amazing.").

An expert would have explained that mood disorder and exposure to chronic trauma directly impact affect regulation and prevent people with these disorders from experiencing and demonstrating the full range of emotions. An expert would have also explained that people with FASD often have difficulty interpreting environmental factors and providing the appropriate response or expression, thus giving the appearance of flat or inappropriate affect. Mot. 113. Without this expert testimony, trial counsel were left to argue that the jury should use its own experiences and "common sense" to judge Mr. Fell's level of remorse. See Tr. Vol. XII at 80:12-14, 82:3-8, 84:18-22 (July 13, 2005).

The impact of this evidence – and trial counsel's failure to provide an expert explanation for it – was devastating. Notwithstanding the ample evidence of remorse offered by Mr. Fell, the jury unanimously found against him on the mitigating factor that "Mr. Fell has shown remorse for killing Teresca King." Special Verdict Form, July 14, 2005 (Fell Ex. 209 at

63

13, 15).  The mental health evidence that would have been available to reasonably competent

counsel but was not investigated or used by this trial counsel would have made a difference in

this factor, and in the jury's penalty phase determination.[40]

> **3.      Mr. Fell Has Adequately Alleged That He Suffered Prejudice From Trial Counsel's Failure To Investigate And Present Expert Testimony To Explain That There Were Alternative Mental Health Explanations For His Early Childhood Behaviors Besides ASPD Or Psychopathy**

In addition to failing to explain Mr. Fell's flat affect, trial counsel failed to present

a scientific explanation for Mr. Fell's "agitated depression and acting out behaviors throughout

childhood."  Mot. 114.  Because of their deficient investigation, trial counsel were unable to

explain that Mr. Fell's "seemingly aggravating adolescent aggression was attributable to his

comorbid mental impairments," which could have been controlled with consistent treatment, and

not, as the Government argued, the behaviors of an individual "with an innately violent core who

needed to be put to death in order to prevent his future violence."[41]  Mot. 114-15.

---

[40] The Government oddly argues that Mr. Fell was not prejudiced by this failure because its experts, Dr. Wetzel and Dr. Welner, would have testified about Mr. Fell's lack of remorse and lack of empathy as part of a psychopathy and antisocial personality disorder diagnosis.  But, as explained in Claim V below, Dr. Welner and Dr. Wetzel did not testify, and the testimony of Dr. Welner and Dr. Wetzel could have been excluded even if Mr. Fell offered a mental health case.  Id.  Moreover, contrary to the Government's suggestion, Rule 4 does not permit the Court (much less require it) to engage in such a hypothetical enterprise: comparing the unoffered testimony on behalf of Mr. Fell to the unoffered testimony that the Government now says it has.  Mr. Fell has demonstrated that he suffered prejudice based on the face of his Motion.  If the Government believes that it could have overcome Mr. Fell's demonstration of the reason for his flat affect with contrary expert testimony that is the subject at most for a hearing.  It is not a basis for summarily denying his motion.  See Sears v. Upton, 130 S. Ct. 3259, 3264 (2010) ("[T]he fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, given that counsel's initial mitigation investigation was constitutionally inadequate.  Competent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory.  In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, were features, in another well-credentialed expert's view, of a 'profound personality disorder.'  This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts – especially in light of his purportedly stable upbringing.") (internal citations omitted).

[41] The Government argues that such testimony would have opened the door to damaging rebuttal testimony from Dr. Welner and Dr. Wetzel that Mr. Fell suffered from ASPD and psychopathy and that these conditions were resistant to treatment.  But this argument is not fit for determination on the papers or cause for summary dismissal.  In essence, the Government urges that trial counsel should have abdicated their responsibility to develop relevant evidence to explain Mr. Fell's behaviors for fear of how Government experts might respond.  That is not the law.  See United States v. Cronic, 466 U.S. 648, 656-67 (1984) ("The right to the effective assistance of counsel is…the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.  When

Because trial counsel failed to provide a mental health explanation for Mr. Fell's behavior, the Government was able to exploit even Mr. Fell's childhood psychiatric hospitalizations, which should have been mitigating, and to present them as aggravating. The Government argued in closing:[42]

> Why is he being sent to the hospital? He is being sent to the hospital because he's violent. And the violence is extreme. The violence is him keeping knives. The violence is anger towards his mother. Threats towards his mother. Throwing things at his mother. Throwing knives at his mother. Danger to his sister. Picking up a weapon. He claims, accidentally, shooting another child. Throwing a door at his mother's boyfriend. You can look through those records and go on and on and you can see it again and again, it's actually verified, if you look at the records carefully, by the observations of those at the hospital. There are incidents where he gets angry and explosive in the hospital….[Debra] was scared because her son was becoming a violent man…*because Donald Fell had grown and made choices to become the man that he is.*

Tr. Vol. XII at 58:20-59:23 (July 13, 2005) (emphasis added). The jury's findings themselves also suggest that it misunderstood Mr. Fell's behavior as antisocial and not as a product of his co-existing mental impairments. See Fell Ex. 209 at 14, 17 (finding "failure of the state of

---

a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."). Accepting the Government's argument would eviscerate the advocacy role defense lawyers are expected to play in the adversarial process to ensure the fairness of convictions and sentences.

[42] The Government also argues that documents in the Mitigation Binder stated that Mr. Fell's mental impairments were treatable, so Mr. Fell was not prejudiced by the absence of expert testimony on this factor. Opp. 142. However, it is inconceivable that, without the assistance of counsel, the jury carefully combed through a stack of jargon-filled and often illegible records. And even if they did, it was trial counsel's duty to explain what the documents meant and why they were legally significant; the jury cannot be expected to synthesize complicated medical records without assistance. See, e.g., Johnson v. Bagley, 544 F.3d 592, 602 (6th Cir. 2008) (finding counsel constitutionally ineffective for "dump[ing]" social services records in front of the jury without "explaining to the jury how or why they are relevant"). Further, according to the Government's own argument, the full extent of Mr. Fell's mental impairments were not evident in the Mitigation Binder. Opp. 142 ("While those records *do not reflect a diagnosis of the impairments alleged post-conviction*, they do reflect findings for many of the symptoms described by Fell: poor judgment and impulse control; irritability, depression and agitation.") (emphasis added). Additionally, the absence of mental health testimony allowed the Government to fully exploit the Mitigation Binder to argue that Mr. Fell was incorrigible.

Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his *early antisocial behavior*") (emphasis added).

Had trial counsel conducted an adequate mental health investigation, a mental health expert could have explained Mr. Fell's comorbid mental impairments as a child, including his depression and FASD, and the traumatic experiences he was living through that contributed to these behaviors. If the jurors understood that Mr. Fell's "violent" and "antisocial" behaviors were actually the product of trauma and mental illness, there is a reasonable probability that at least one juror would have determined that his background provided a basis for reduced moral culpability and mercy. See Caro, 280 F.3d at 1258 (finding prejudice where "jury was not afforded the benefit of expert testimony explaining the effects that Caro's physiological defects would have on his behavior….By explaining that his behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced."); Ben-Sholom, 566 F. Supp. 2d at 1135 (finding defendant suffered prejudice where counsel failed to present expert testimony on his mental health impairments at his penalty phase, and that "[t]he combined import of the unstable and tormented upbringing and expert testimony explaining the psychological impact would have made for a compelling mitigating case.").

> **4.** **Mr. Fell Has Adequately Alleged That He Suffered Prejudice Due To Trial Counsel's Failure To Present Mental Health Testimony To Explain That Mr. Fell Would Function Well In The Structured Environment Of A Prison**

Finally, Mr. Fell also adequately alleged that he was prejudiced by trial counsel's failure to explain to the jury that many of the environmental factors that exacerbated Mr. Fell's mental impairments, including alcohol and drug abuse and continuing trauma, were absent in prison, and Mr. Fell would respond well to a structured environment in the absence of these factors.

Because of trial counsel's failure to put on this important mitigating testimony and to rebut the Government's argument that Mr. Fell was an inherently violent individual whose behavior would not improve and who could not be safely confined in prison, zero jurors found that Mr. Fell did not present a risk to others if sentenced to life in prison, demonstrating the prejudice Mr. Fell suffered.  Fell Ex. 209 at 12, 15.

The Government contends that testimony from prison expert James Aiken was in fact presented to address positive prisoner adjustment, so a mental health expert would have been merely duplicative.  The thrust of Mr. Aiken's testimony was that Mr. Fell could be contained in a prison environment no matter how violent he became because Mr. Fell was not a predator, his behavior was not that bad compared to other inmates, and he would always be "under the gun" so the prison could control him, even with violence if necessary.  See, e.g., Tr. Vol. IX at 65:2-13 (July 7, 2005) ("As I just stated to you, no matter how good he is or how bad he is, he will always be under the gun….If we have to cover his mouth to prevent him spitting on someone, we'll do that.  If we have to tie his hands to the bed, we'll do that.  If we have to tie his legs to the bed, we'll do that.  If we have to kill him, we'll do that.").  Mr. Aiken's testimony was therefore far different from testimony a mental health expert could have provided about the relentless trauma in Mr. Fell's life and about how his chronic abuse of alcohol and drugs dulled his mental health symptoms while aggravating his behaviors.[43]  A mental health explanation that Mr. Fell himself would change in prison when removed from the chaos of his background would

---

[43] The Government also argues that Mr. Fell did not suffer prejudice from the absence of mental health expert testimony regarding his positive prison adjustment because the Government introduced videos demonstrating Mr. Fell's poor adjustment to prison, which would have outweighed any testimony from mental health experts.  Mr. Fell has also alleged that the Government did not produce, and trial counsel failed to investigate, evidence that would have presented the prison videos in a far less aggravating light.  See infra Rep. Section VII.  These claims must be considered together on the merits.  In any event, at the pleading stage, Mr. Fell has adequately alleged that he suffered prejudice from trial counsel's failure to present mental health evidence on this factor, and he is entitled to present further evidence to demonstrate the countervailing mitigating weight it would have offered.

have been far more mitigating that Mr. Aiken's testimony that Mr. Fell could be contained by a gun.

V.      **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Withdrawing Their Mental Health Case**

A.      **The Decision To Withdraw The Mental Health Case And To Agree To A Manifestly False Stipulation Was Deficient Performance**

As has been independently well-pled, trial counsel were ineffective in their investigation of the critical question of Mr. Fell's mental illness from the very outset of their involvement in this case. One consequence of this ineffectively incomplete work was that they were unprepared to confront the Government's expert rebuttal. Moreover, although they had scheduled two experts to address some aspects of Mr. Fell's mental health, when faced with what they understood to be the full testimony of the Government's expert, Dr. Michael Welner, trial counsel surrendered their entire expert-assisted case. Not only did they withdraw the anticipated testimony of Drs. Cunningham and Mills, but they also agreed to a stipulation that allowed the Government to present inaccurately as fact the notion that Mr. Fell was "completely intact." Tr. Vol. XII at 118:21-119:14 (July 13, 2005). This was a grave error that independently and severely damaged Mr. Fell's case for a sentence of less than death.

A key moment in this set of decisions was trial counsel's decision to waive a meritorious motion to exclude the testimony of Dr. Welner, which had been developed in violation of the Court's April 7 Order,[44] was otherwise unsuitably unreliable, and would have caused unfair prejudice to Mr. Fell. Mr. Fell's lawyers have attested to the fact that they did so

---

[44] The April 7 Order set the parameters under which the Government was entitled to a compelled mental health evaluation following the defense's notice under Federal Rule of Criminal Procedure 12.2 that it intended to offer expert mental health evidence in the penalty phase. The Order made clear that, among other requirements, the examination was to be performed by either Dr. Rabun or Dr. Wetzel, or both, and that the defense was entitled to advance notice of any testing to be performed, including that "[n]o mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert" in the event of a dispute. Order, Dkt. No. 101, at 3 (Apr. 7, 2005); see also United States v. Fell, 372 F. Supp. 2d 773, 758-62 (D. Vt. 2005).

because they assumed, incorrectly, that the Court had already ruled against them, and would admit Dr. Welner's testimony in full.  Declaration of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 8); Decl. of Gene Primomo, Mar. 16, 2011 (Fell Ex. 263 at 2).  This Court has already found that trial counsel's "thought processes were infected by certain misapprehensions of the facts" in this regard and that the Government violated the April 7 Order.  United States v. Fell, No. 01 Cr. 12-01, 2006 U.S. Dist. LEXIS 24707, at *29 (D. Vt. Apr. 24, 2006).  However, because trial counsel had abandoned Mr. Fell's rights to restrict the use of Dr. Welner during trial, no relief could be ordered from the consequence of the error through a post-trial motion. Id. at *31-32.

Despite its length, the Government's Opposition does not address the legal standards that preclude summary dismissal where – as here – the movant has alleged a facially meritorious claim.  Instead, the Government argues, in essence, that the in limine motion was of no consequence, because it was not meritorious and that the decision to abandon it was the result of a "strategic" decision and not based on Dr. Welner.  As set out below, the record supports Mr. Fell's claim that trial counsel could have successfully excluded Dr. Welner's testimony and presented their own experts.  Their failure to do so was a product of a mistaken belief that Dr. Welner's testimony would be admitted and lack of preparation – not any "strategy" within the legally defensible meaning of that term.  The Government's disagreements with the well-pled claims of Mr. Fell's 2255 Motion serve only to highlight the need for further factual development, and the inappropriateness of summary dismissal at this stage.

The Government further argues that the abandonment of the motion caused no prejudice to Mr. Fell because 1) the stipulation provided to the jurors in lieu of Dr. Welner was uncontroverted; and 2) even if Dr. Welner had been precluded from testifying, Mr. Fell's case

69

would have been equally damaged by the Government's other expert, Dr. Richard Wetzel, and

testimony regarding Anti-Social Personality Disorder ("ASPD").  These arguments, however,

which are discussed more fully in Section V(B) below, are also contradicted by the allegations

pled in the 2255 Motion and – to the extent it has been developed – the record, and simply

cannot be decided on the pleadings alone.

>    **1.    Mr. Fell Has Adequately Alleged That Trial Counsel Needlessly Abandoned A Crucial And Meritorious Motion To Exclude Dr. Welner**

The Government argues for summary dismissal on the ground that trial counsel

cannot be found ineffective in abandoning their in limine motion because they would not have

prevailed.  Opp. 164-86.  However, the record corroborates Mr. Fell's well-pled claims and he

has pled enough to survive summary dismissal.  Moreover, to the extent the record is incomplete,

this argument requires consideration of extensive evidence that is outside of the record, and is

thus not a suitable ground for summary dismissal.  Trial counsel have stated on the record that

they believed that the Court had already ruled on their motion – a mistaken belief as the Court

has recognized.  As the 2255 Motion asserts, had counsel pursued the challenge to Dr. Welner,

Mr. Fell could have succeeded in excluding – or at the very least meaningfully limiting – Dr.

Welner's testimony on any of the independent grounds discussed below.  The failure to pursue

that challenge based on their mistaken belief as to the state of the proceedings constituted

deficient performance under Strickland.  See Burch v. Millas, 663 F. Supp. 2d 151, 187-88

(W.D.N.Y. 2009) (counsel ineffective when he operated under mistaken belief that doctor's

testimony would not be admissible and, when ruled admissible, counsel failed to confront doctor

despite awareness of available challenges); Wilson v. Mazzuca, No. 01 Civ. 2246 (DGT), 2007

U.S. Dist. LEXIS 22492, at *46 n.36, 50, 53 (E.D.N.Y. Mar. 28, 2007), rev'd on other grounds,

570 F.3d 490 (2d Cir. 2009) (counsel's decision would not have been strategic if based on a misunderstanding of the court's prior rulings).

### a. Exclusion Was Available And Warranted As A Sanction For Prosecutorial Misconduct

Trial counsel could have excluded Dr. Welner's testimony because his analysis, report and potential testimony were developed in flagrant violation of the April 7 Order, which prohibited any unauthorized testing of Mr. Fell. This Court has already found the fact of this misconduct. Fell, 2006 U.S. Dist. LEXIS 24707, at *26. In the hundreds of pages in the Opposition, the Government devotes less than five pages to addressing this violation, and does not dispute that it occurred, Opp. 166-170, instead arguing only that it was "unlikely" that the Court would have excluded Dr. Welner's testimony as a result, given the tenor of the Court's comments at trial. See, e.g., Opp. 170. The Court, however, made clear at the time that the allegations of prosecutorial misconduct were a "big deal" that would require careful and thorough analysis. Tr. Vol. VIII-II at 85:6-7 (July 6, 2005). Regardless of what the Court's commentary at the time revealed about any "inclination," the Court has also made clear that additional factual development is necessary to resolve the prosecutorial misconduct at issue. See, e.g., id. at 71:13-16. Thus, Mr. Fell's instant ineffectiveness claim requires extensive review of facts not already in the record about the Government's conduct.

It was clear on the face of the Welner Report that the Government subverted the Court's April 7 Order by advancing Dr. Wetzel to conduct the interview of Mr. Fell that was desired by Dr. Welner. Trial counsel thus promptly moved to exclude Dr. Welner's testimony on a number of grounds, including the illicit testing and the use of Dr. Wetzel as a "mere courier." Second Motion in Limine to Exclude Report and Testimony of Michael Welner, M.D., Dkt. No. 182, (July 9, 2005). In preliminary discussions of that motion, the Court repeatedly noted the

71

significance of the issues raised by the Report and asked for more briefing on "what happened here" including, for example, the interactions of the Government with Dr. Wetzel, what information had been provided as discovery, how psychopathology has been assessed by other courts and "what this test is all about." Tr. Vol. VIII-II at 85:6-12 (July 6, 2005); see also id. at 69:20-21, 71:13-16, 75:3-4, 78:23-79:8, 83:13-15. Despite this, and mistakenly believing that this motion was lost,[45] the next day trial counsel withdrew their 12.2 Notice, surrendering all anticipated expert testimony in order to avoid Dr. Welner. Tr. Vol. IX-II at 3:14-15 (July 7, 2005).

Summary dismissal is simply not appropriate under Rule 4 because the only remaining question as to whether Mr. Fell is entitled to relief on the instant claim of ineffective assistance of counsel – whether Mr. Fell has pled credible contentions that the abandoned motion would have been won – has already been held to require the adjudication of facts that are outside the current record. Fell, 2006 U.S. Dist. LEXIS 24707, at *27-28. Specifically, after trial this Court explained that that there was a need for additional factual development in order to resolve the crucial issue of whether the prosecutorial misconduct wrought prejudice substantial enough to warrant the remedy of exclusion:

> Ordinarily, an evidentiary hearing would be necessary; the submissions of the parties alone do not enable this Court to judge the severity of the conduct, for example, whether the government deliberately set out to circumvent the Court's order, or whether its expert was simply a zealot who pursued his own agenda despite the restrictions imposed by the Court.

---

[45] See Fell, 2006 U.S. Dist. LEXIS 24707, at *29 (belief that motion had been decided was a "misapprehension[] of the facts").

Id. at *28.  Mr. Fell has now pled adequate facts in support of the allegation that this Court

would have granted the motion, in whole or in part.[46]  In addition to the Court's post-trial ruling

as described above, Mr. Fell has pled that the Government used Dr. Wetzel as the medium for

Dr. Welner, that Dr. Wetzel ceased to be an independent expert, and that the Government knew

of this violation:

- Dr. Welner provided Dr. Wetzel instructions and a long list of questions for Dr. Wetzel to use in conducting the examination.  Mot. 138, 140.

- Although Dr. Wetzel left that question list in St. Louis when he came to Vermont to conduct the interview, when he arrived in Vermont, the prosecutor (Mr. Darrow) gave him another copy of the questions and sent the unmistakable message that he was expected to serve as Dr. Welner's mouthpiece in the examination room, including explicitly stating that Dr. Wetzel could legally ask the questions that the Government provided.  Affidavit of Richard Wetzel, Ph.D., Sept. 12, 2005 (Fell Ex. 139 at 9-13); Mot. 140; see also Memorandum to Alexander Bunin from Paul Volk, July 20, 2005 (Fell Ex. 137 at FELL-00001416).

- In a carefully worded affidavit submitted by the Government in post-trial briefing, Dr. Wetzel stated that he had been given the impression by the Government that asking the questions drafted by Welner would be a benefit to the Government.  Mot. 138, 140; Fell Ex. 139 at 9-14.

It is also clear that Dr. Welner relied directly on Dr. Wetzel's labors in purporting

to administer testing in violation of the April 7 Order, and that the Government understood and

were depending on him to do so in preparing his testimony:

- Dr. Welner's report plainly states that he "administered" the testing based on Dr. Wetzel's interview and that he scored the test on which he based the psychopathy diagnosis, the PCL-R, on "behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Mr. Fell."  Mot. 138 (citing Welner Report, July 5, 2012 (Fell Ex. 10 at 27)).

- Dr. Wetzel's post-trial affidavit and the post-trial briefing established that 1) Mr. Fell's responses were provided to Dr. Welner; 2) Dr. Welner did in fact use the responses to administer the tests in violation of the Order; and 3) the Government submitted Dr. Welner's report to the Court, as it had intended to rely on his testimony at trial as early as December 2004.  See Mot. 140; see also Tr. Vol. VIII-II at 73:15-

---

[46] Mr. Fell has also alleged good cause for discovery in this regard and will plead any further relevant facts once he is provided with necessary discovery, resultant further factual development and an amendment.

19 (July 6, 2005) ("We, as we indicated in the papers [in December 2004 and April 2005], have all along regarded him as our – as our first choice and our primary mental health rebuttal expert for those reasons, and we didn't give up on him when – when the Court decided that he shouldn't be the one doing the interview.").

After asking the Government point-blank about what had occurred between Drs. Welner and Wetzel, the Court noted that the Government's conduct "raised a lot of issues." Tr. Vol. VIII-II at 75:3-4 (July 6, 2005). These issues now warrant full merits review and an evidentiary hearing. See Rule 8, Rules Governing § 2255 Proceedings.

Nothing in the Government's Opposition conclusively refutes these facts and allegations. As has been noted, the Government actually makes no response at all to these allegations beyond its suggestion that the motion to exclude Dr. Welner was likely to have been denied. Because this motion cannot be finally addressed without discovery and evidentiary development, summary dismissal of this claim is not appropriate. As Mr. Fell pled in his 2255 Motion, it is clear that a new penalty phase and/or exclusion of Dr. Welner's testimony in its entirety were available and appropriate sanctions for the prosecutorial misconduct. Mot. 139; see Fell, 2006 U.S. Dist. LEXIS 24707, at *21 (discussing standard for determining whether a new trial is warranted based on prosecutorial misconduct, including analysis of curative measures for the misconduct) (citations omitted). Short of a grant of relief, all that is compelled at this stage on the question is that Mr. Fell be permitted to proceed, with a grant of his requested discovery.[47] See United States v. Aiello, 814 F.2d 109, 114 (2d Cir. 1987) (summary dismissal inappropriate where there was a genuine issue of material fact, no evidentiary hearing had been held and factual basis for the claim was outside the record).

---

[47] As Mr. Fell has alleged in his 2255 Motion, in addition to the prosecutorial misconduct raised by trial counsel post-trial, the Government had access to the tapes of Mr. Fell's compelled examination in advance of the date that it was entitled to access information gleaned from that examination under Federal Rule of Criminal Procedure 12.2. Mot. 158-59. Mr. Fell has demonstrated good cause for discovery in connection with alleged prosecutorial misconduct and should be granted the opportunity to conduct discovery to determine the extent to which the tapes were viewed and utilized in violation of the Rule and Mr. Fell's rights. See Motion for Leave to Conduct Discovery, Dkt. No. 309 (May 5, 2011).

### b.   Exclusion Was Warranted Under The Sixth Amendment

Mr. Fell has additionally pled that trial counsel could have prevailed on Sixth Amendment grounds had they raised the issue: Dr. Welner's testimony violated Mr. Fell's Sixth Amendment right to counsel in connection with the compelled examination.  This independent right was explicitly protected by the terms of the April 7 Order, which required the Government to provide the constitutional notice of the content of the examination.  See United States v. Johnson, 362 F. Supp. 2d 1043, 1086-87,1090-91 (N.D. Iowa 2005) (ruling defendant's Sixth Amendment rights still at issue after initial notice under Rule 12.2 provided and would be adequately protected "by advance notice of testing and the recording of [the defendant's] examinations and interviews"); Sampson, 335 F. Supp. 2d at 245-46 (advance notice to the defense of the tests to be administered by the Government necessary to protect the defendant's Sixth Amendment rights prior to the administration of any testing on the defendant).

It is undisputed that, notwithstanding the Order, the Government had Dr. Wetzel perform a compelled examination of Mr. Fell on June 13, 2005 at Dr. Welner's behest, from which three psychological tests were administered.  No notice of that testing was provided, and thus any use of the results of this clandestine testing would have been excluded.  See, e.g., Order, United States v. Richardson, No. 08 Cr. 00139 (CC) (N.D. Ga. Apr. 10, 2012), Dkt. No. 903 (excluding testimony by experts from The Forensic Panel, Dr. Welner's practice, due to failure to notify defendant about procedures to be used in forming government expert opinion).

The Government does not engage with the case law or facts discussed above in its Opposition, however, and instead opposes Mr. Fell's claim by arguing that Estelle v. Smith, 451 U.S. 454, 470-71 (1981), a foundational case holding that the Sixth Amendment requires that a defendant be allowed to consult with counsel before being subjected to a compelled pretrial mental examination, is not applicable to the facts of Mr. Fell's case because in Estelle the

75

defendant had no notice of the examination at all.[48]  However, the Government neglects to address any of the subsequent case law and appears to have missed the point.  See Opp. 184-85.  The Supreme Court has clearly held that in the context of a compelled mental health examination, "the effectiveness of the consultation [between defendant and counsel]…would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put."  Buchanan v. Kentucky, 483 U.S. 402, 424-25 (1987); see also Satterwhite v. Texas, 486 U.S. 249, 255-56 (1988) (Sixth Amendment right violated where defense not provided with sufficient notice that compelled examination would address defendant's future dangerousness).  The prosecution is required to provide the defense with notice of the issues that a compelled examination will cover, regardless of whether the defendant has put mental status at issue.  Powell v. Texas, 492 U.S. 680, 685 (1989) (per curiam).  Thus the Government's argument does little to address Mr. Fell's well-pled allegations that any testimony on the unnoticed testing would have been excluded in order to prevent the violation of his Sixth Amendment rights.

Trial counsel were entitled to rely on the April 7 Order prohibiting any testing of their client without prior notice.  They were unconstitutionally deficient, however, in abandoning Mr. Fell's meritorious challenge when they discovered that such notice had not been provided.

### c.   Exclusion Was Warranted Due To The Total Lack Of Probative Value And Extreme Prejudice Of Dr. Welner's Proffered Testimony

Though the Federal Rules of Evidence ("FRE") do not apply in the penalty phase under the Federal Death Penalty Act ("FDPA"), the FDPA imposes its own evidentiary

---

[48] The Government's additional argument that the Supreme Court has limited Estelle's Fifth Amendment holding to its facts is inapposite, as it is the Sixth Amendment holding that Mr. Fell cites in making his claim.  The Supreme Court has made clear that the two analyses are distinct, and that the Sixth Amendment holding has not been so limited.  Powell v. Texas, 492 U.S. 680, 685 (1989) (citing Buchanan v. Kentucky, 483 U.S. 402, 421-24 (1987)).

76

requirement, namely that evidence "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."[49]  18 U.S.C. § 3593(c).  Under this standard, the Second Circuit emphasized that "'judges continue their role as evidentiary gatekeepers and … retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair.'"  United States v. Fell, 360 F.3d 135, 145 (2d Cir. 2004) (quoting United States v. Battle, 264 F. Supp. 2d 1088, 1106 (N.D. Ga. 2003)).

Mr. Fell has alleged clearly and thoroughly both that Dr. Welner's opinion was fundamentally unsound based on the methodology he employed, and that his opinions were rendered in a manner designed to prejudice Mr. Fell.  The Government disagrees with Mr. Fell's well-pled allegations, arguing again that exclusion was "unlikely" on these grounds.  See, e.g., Opp. 166.  Arguments as to the likelihood of success, where Mr. Fell has thoroughly pled that the motion would have succeeded, are improper grounds for summary dismissal given that Mr. Fell's allegations are credible and supported by the record to the extent it has been developed. Thus, Mr. Fell's claims in this regard cannot be summarily dismissed.

### i. Dr. Welner's Methodology Was Unreliable In Several Ways

Mr. Fell has thoroughly pled a number of additional facts which condemn the reliability of Dr. Welner's methodology and would have compelled exclusion of his testimony in whole or in part.  First, the record indisputably reflects that Dr. Welner's PCL-R testing was done based on an observation of another examiner's interview – indeed he said as much on the face of his report.  Fell Ex. 10 at 27 (stating that "[f]or the scoring [of the PCL-R] of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr.

---

[49] This standard presents a higher evidentiary bar than the parallel rule under the FRE, which requires that prejudice "substantially" outweigh probative value for exclusion.  See Fed. R. Evid. 403.

Richard Wetzel, for which I provided questions to be posed to Mr. Fell"). However, Dr. Wetzel has stated on the record that he did not ask the questions necessary to administer the test performed by Dr. Welner.[50] Fell Ex. 139 at 14. Dr. Welner's report in no way addressed this issue – or any other limitations posed by his lack of direct testing – as is required in such circumstances under accepted psychiatric principles and ethical guidelines, including those issued by the American Academy of Psychiatry and the Law. See Mot. 144-45. Thus, the Government's argument that Dr. Welner's testing methodology could be acceptable under the APA Guidelines (which permit doctors some discretion to rely on other testing) misses the point; the record does not reflect any indicia of reliability in this unorthodox format of testing. The same is true for the Government's argument that Dr. Welner's opinion could have been reached based on his use of other sources outside of the improper interview – that argument is belied by Dr. Welner's report, which clearly states that he relied on the interview (without naming any other sources) in administering the testing.

Dr. Wetzel has also directly confirmed that Dr. Welner's testing was unreliable, affirmatively stating in his post-trial affidavit that he does not believe that such testing, administered based on the questions he wrote, would produce reliable results based on standard practices in the scientific community. Fell Ex. 139 at 17 ("[I]f I were thought to have administered these tests during my evaluation… it was poorly done and the scores derived at a later time by Dr. Welner would be less valid than usual or invalid and would not assist a trier-of-fact to understand Mr. Fell or his behavior.").

Dr. Wetzel's opinion is supported by the scientific literature, including that written by the creator of the PCL-R, Dr. Robert Hare, who has emphasized his concern as to the

---

[50] Specifically, the PCL-R requires that the examiner ask questions or observe conduct during an interview for at least 16 of the items that must be scored. Mot. 136 (citing Memorandum in Support of a Hearing for a New Trial at 6, Dkt. No. 213 (Oct. 28, 2005)).

"potential for harm," which he views as "considerable if the PCL-R is used incorrectly, or if the user is not familiar with the clinical and empirical literature pertaining to psychopathy." Without Conscience, Psychopathy Scales PCL-R, http://www.hare.org/scales/pclr.html (last visited Aug. 11, 2012).

Dr. Wetzel has also explained that the second factor measured by the PCL-R is an estimate of a defendant's recurring subjective reactions, and that this factor is "less reliably measured" than the other factor (behavioral patterns), which aligns more closely with the DSM-IV-TR. Fell Ex. 139 at 15-16. Dr. Wetzel has further explained that "Dr. Welner specifically used Mr. Fell's interview with me to gauge this [second factor], according to his report." Id. According to Dr. Wetzel, reliance on his interview for these subjective feelings or reactions was even less reliable given the context of the interview with Mr. Fell, which occurred during Mr. Fell's capital trial.

> I would suggest that Mr. Fell was in a cruel, markedly stressful and atypical situation when I saw him. His death penalty trial was in progress. Remorse with full disclosure increased his risk of death. Lack of disclosure could be used against him. He had to make a choice. I would agree with his statements to me that he did not appreciate the legal nuances [fn: My word; he used "dumb"] of his situation. I would not say this was a typical day in his life or a reasonable sample of his lifelong emotional reactions.

Id. at 16. Dr. Wetzel then emphasized that, even "[i]f this were a typical example of [Mr. Fell's] emotional reactions, I would not agree with Dr. Welner's scoring." Id.

The Government nonetheless argues that it was "unlikely" that Dr. Welner's opinion based on the PCL-R would have been excluded because it would have constituted reliable evidence of the likelihood of Mr. Fell's future violence in prison.[51] Opp. 176. This is

_____

[51] Instead of providing support for the assertion that Dr. Welner's psychopathy diagnosis was a reliable predictor of Mr. Fell's likelihood of committing violent acts in prison, the Government argues that Dr. Welner indicated his diagnosis of psychopathy "was but one factor considered" and that "other studies" that are independent of these tests

simply not a viable argument for summary dismissal, given Mr. Fell's well-pled allegations and

the record set out above. In addition, and as was pled in the 2255 Motion, at the time of trial,

similar testimony, including by Dr. Welner, had been limited in a number of other cases

precisely because of its lack of reliability. See e.g., Sampson, 335 F. Supp. 2d at 219, 222 n.27

(noting exclusion of Dr. Welner's use of word "psychopathy" because of its potential for

prejudice and lack of reliability in predicting future violence); Mot. 146-50, 149-50 n.44

(collecting cases). In one case, a Government expert even recanted his testimony upon

presentation of affidavits from respected practitioners to this effect. Mot. 148 (citing affidavit

submitted in Stitt v. United States, 369 F. Supp. 2d 679 (E.D. Va. 2005) and attached as Fell Ex.

206 in which expert explained withdrawal of report and refusal to testify on psychopathy); see

also Stitt, 369 F. Supp. 2d at 699 (ruling that testimony of the Government's expert witness,

including as to the reliability of the PCL-R, "was erroneous and has been recanted").

At trial, this Court directly noted its concern with the reliability of Dr. Welner's

analysis, a fact the Government declines to mention as it contends that exclusion was

"unlikely."[52]

> As I understand his – the psychopathology test that [Dr. Welner]
> has administered, it's been reviewed by other cases. Some District
> Courts have found that it's an unreliable case. I don't know
> whether the defense has had an opportunity to review that or not.
> If I'm mistaken, you will correct me, but I thought this issue came
> up in Sampson, at least as to whether or not Dr. Welner could

---

also informed his opinion on future violence. Opp. 175-76 (citing Fell Ex. 10 at 70). The "studies" referenced by the Government are in actuality one study described in three sentences in the Welner Report. Fell Ex. 10 at 70. Given the multiple studies which find pronounced flaws in the reliability of the PCL-R and VRAG instruments which form most of the basis for his opinion on the likelihood of future violence, Mot. 147-48; Fell Ex. 199 at 3, the lone study that is argued to affirm Dr. Welner's opinion raises at best a dispute about its fundamental reliability. See Opp. 176.

[52] The Government also argues that the evidence would have been admitted because it was relevant to rebut mitigating factors related to remorse or other defense evidence. Opp. 176-77. This argument is unavailing, however, because relevance is not the issue. Rather, reliability is the issue. See 18 U.S.C. § 3593.

> testify about psychopathology, and I don't know in what context
> that was brought up, whether it was coming in by way of a motion
> in limine or not.  Obviously Dr. Welner's report raises, you know,
> many significant issues.

Tr. Vol. VIII-II at 69:11-21 (July 6, 2005).

The Court's concern was anchored in widely observed problems with the PCL-R. As set out in the 2255 Motion, there is a large body of scientific literature discussing the lack of reliability in connection with the use of the PCL-R in the case of defendants like Mr. Fell.  Mot. 147-48 (discussing and attaching as an exhibit declarations submitted in United States v. Haynes outlining the literature) (citing Fell Ex. 199); see also, e.g., David DeMatteo & John F. Edens, The Role and Relevance of the Psychopathy Checklist – Revised in Court, 12 Psychol. Pub. Pol'y & L. 214, 227 (2006) ("Role and Relevance of PCL-R in Court") (finding "essentially no empirical support for the assertion that PCL-R scores were predictive of serious institutional violence, particularly in high-security federal prisons in the United States that would house life-sentenced offenders").  Again, even Dr. Robert Hare has voiced his concern with respect to the misuse of the instrument he created in the context of the criminal justice system.  See Alix Spiegel, Can a Test Really Tell Who's A Psychopath, NPR (May 26, 2011), www.npr.org/2011/05/26/136619689/can-a-test-really-tell-whos-a-psychopath?sc=emaf (describing Dr. Hare's reluctance to allow the test to be administered for purposes of predicting violence in a criminal justice setting and noting the potential for distortion when administered by an expert retained by an adversarial party).

The Government states that it has "located no other case [than Sampson] that has similarly excluded Dr. Welner's or any other expert's testimony of psychopathy" on the basis of concerns of reliability in connection with predictions of future violence.  Opp. 178.  If so, it has not looked.  Mr. Fell has provided the Court with examples in addition to Sampson.  See Mot.

81

149 n.44 (collecting cases with negative treatment of the reliability of PCL-R).  In United States

v. Taylor, for example, the court ruled that "due to the uncertainty of the validity and reliability

of the PCL-R as it is used in capital sentencing hearings, the Government and any of its experts

is prohibited from utilizing this test in evaluating [the defendant]."  320 F. Supp. 2d 790, 794

(N.D. Ind. 2004) (also citing academic literature).[53]

Contrary to the Government's argument, there were multiple problems with the

Welner Report's reliability, rendering its probative value near zero.  Mr. Fell thus has adequately

pled that exclusion of the evidence would have been the result had counsel pursued the

challenge.  The Government has certainly failed to conclusively show that Mr. Fell is not entitled

to relief, as would be required for summary dismissal.

### ii.   Exclusion Was Warranted Due To The Excessive Prejudice Of Dr. Welner's Opinion On Psychopathy

Mr. Fell has also thoroughly pled that Dr. Welner's testimony about psychopathy

would have been more prejudicial than could be permitted in a death penalty proceeding.  In its

Opposition, the Government acknowledges that "the Court expressed concern about the

prejudicial nature of a psychopathy diagnosis," but argues that it "does not follow that the Court

---

[53] Moreover, the examples cited by the Government as supporting the reliability of the PCL-R have either been discredited in the scientific literature or are readily distinguishable.  For example, one of the articles cited by the Government concludes that, based on an examiner's ethical obligation only to administer the PCL-R where it is relevant to the sentencing determination, the examiners in the two capital cases discussed in the article – including the Barnette case relied upon by the Government – "should not have even administered the [PCL-R]" given the lack of support in the scientific literature for its reliability in predicting future violence in the context of a capital case and the potential for prejudicial impact on the jury.  Role and Relevance of PCL-R in Court at 227, 233.  This article even discusses the Fell case briefly after noting that, because of the known impact of a psychopathy label on laypeople, "[i]t appears that some prosecutors are well aware of this in relation to future dangerousness issues, and it now seems that psychopathy may be used in an attempt to supersede other forms of mental health evidence, in that the attribution made for the person's behavior is that he or she is 'bad' rather than 'mad' (with little or no consideration that one may in fact be both)."  Id. at 232.  None of the cases or articles cited by the Government includes circumstances similar to this case, where the testing was administered in such a removed, secretive and unreliable way, and none of them supports extension of the approval of use in a different context to the circumstances of Mr. Fell's case.  See, e.g. United States v. Dretke, 99 F. App'x 538 (5th Cir. 2004); United States v. Lee, 274 F.3d 485 (8th Cir. 2001); United States v. Mitchell, 706 F. Supp. 2d 1148, 1218-19 (D. Utah 2010); United States v. Doe #3, 113 F. Supp. 2d 604, 608 (S.D.N.Y. 2000).

would have excluded such evidence" given that there were other examples of courts that had permitted testimony regarding psychopathy.[54]  Opp. 176.

As set out in the 2255 Motion, well-known practitioners in the field have demonstrated through scientific studies the dramatic prejudicial impact of psychopathy testimony on laypeople, as well as the risk of undue influence by experts testifying regarding psychopathy. Mot. 153 (citing affidavit of John F. Edens, Ph.D., Nov. 24, 2003 (Fell Ex. 309)).  An article cited by the Government in its Opposition supports the same conclusion.  See Role and Relevance of PCL-R in Court at 232 ("[l]abeling a criminal defendant as a psychopath can have a pronounced effect on how that person is viewed by laypersons"; "[i]n conjunction with the questionable inferences offered about PCL-R scores in the two capital cases…the potential for prejudicial effects would seem to be very profound"); see also Robert D. Hare, The Hare PCL-R: Some Issues Concerning its Use and Misuse, 3 Legal and Criminological Psychol. 99, 115 (1998) (article by PCL-R creator calling psychopathy a "sticky label" and suggesting other ways to present data to avoid prejudice associated with terminology).[55]

---

[54] Contrary to the Government's suggestion, Mr. Fell does not seek to establish a per se rule that psychopathy testimony is uniformly inadmissible.  Rather, Mr. Fell argues that, in this case – which includes a number of unique factors including the entirely unprecedented approach taken in the administration of the tests by Dr. Welner – the balance of probative value and prejudice leans strongly in favor of exclusion of the proffered testimony.

[55] The Government also argues that the psychopathy label "would not have added much to the weight of expert rebuttal testimony" given a second diagnosis, anti-social personality disorder ("ASPD").  Opp. 174.  ASPD, however, would not have blinded the jurors from the added aggravation of the term "psychopath."  In fact, ASPD is not even rare: the "prevalence of ASPD in civil and forensic populations…is at least 3 times the prevalence of psychopathy (based on the [accepted] PCL-R…cut-off score [of 30]…)."  Robert D. Hare and Craig S. Neumann, Psychopathy: Assessment and Forensic Implications, 54 Can. J. Psychiatry 791, 796 (2009).  Thus, "[i]dentifying someone as 'having' [ASPD] is about as nonspecific and scientifically unhelpful as diagnosing a sick patient as having a fever or an infectious or a neurological disorder."  Id. (internal quotation omitted).  Dr. Cunningham could have readily testified to this effect.  See Mark D. Cunningham and Thomas J. Reidy, Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing, 26 Crim. Just. & Behav. 20 (1999) (explaining that 75% of the prison population can be diagnosed with ASPD).  In any event, as discussed below, the ASPD diagnosis also would have been excluded or at the very least subject to dramatic challenge on cross-examination.

### iii.   The Prejudice From Dr. Welner's Opinion Starkly Outweighs Its Near-Zero Probative Value

Ultimately, the lack of reliability of Dr. Welner's methodology and the nonexistent probative value in Dr. Welner's psychopathy testimony render any analysis of the prejudice nearly superfluous.  Mr. Fell has far surpassed his pleading burden under Rule 4 with respect to his claim that the psychopathy evidence would have been excluded as more prejudicial than probative – Dr. Welner's methodology was unreliable and unsupported in the professional community and the prejudice from such a label is established.  This Court recognized as much after even the initial discussions during the penalty phase, when, after asking for more briefing on the admissibility of Dr. Welner's opinion, the Court told the Government, "You use an expression about psychopathy.  It has a connotation which is fairly extraordinary, and, I mean, it's nowhere in the DSM."  Tr. Vol. VIII-II at 82:23-25 (July 6, 2005).  These meritorious allegations, waived at trial, may not now be summarily dismissed because the record supports Mr. Fell's claim and any issues of fact highlighted by the Government turn on facts outside the current record.

### d.   Other Bases For Exclusion Would Also Have Been Successful

Finally, there were meritorious challenges to Welner's Report in other respects that trial counsel would have won had they not abandoned the motion.  As Mr. Fell pled in his 2255 Motion, Dr. Welner would have been barred from relating the prejudicial hearsay recounted throughout his report, Mot. 156-57, Mr. Fell's well-pled claims in this regard cannot be summarily dismissed they turn on facts outside the record, including information that the Government was obligated to provide during trial but never produced.[56]

---

[56] Not only has the Government acknowledged that discovery to which Mr. Fell was entitled during his original trial has not yet been provided, Opp. 183, but Mr. Fell has also established good cause for discovery on a number of issues in the Motion for Leave to Conduct Discovery, Dkt. No. 309 (May 11, 2005).  Perversely, the Government

Dr. Welner's testimony also would also have been successfully challenged under the FDPA's evidentiary standard where it relies on the selected snippets of hearsay, apparently derived from interviews (regarding which there has been no discovery) that appear to have been presented misleadingly and out of context in a way that was unnecessarily prejudicial.  Mot. 156-57; see also United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008) (expert may not "simply transmit" hearsay but must instead "form his own opinions by 'applying his extensive experience and a reliable methodology'"); Lava Trading Inc. v. Hartford Fire Ins. Co., No. 03 Civ. 7037, 2005 U.S. Dist. LEXIS 44802, at *8 (S.D.N.Y. Apr.11, 2005) (precluding expert damages testimony where expert relied on selective portions of available data and took assumptions provided by plaintiff "and bolstered them with his own opinion without an adequate basis to support that opinion").

As has been pled in his 2255 Motion, post-conviction investigation has also demonstrated that:

- Dr. Welner's portrayal of Sean Campbell, Al Wilcox and other members of Mr. Fell's family including his grandmother Theresa Sharpe as positive influences in his life was inaccurate.  See Mot. 155; Decl. of Sean Campbell, Feb. 15, 2011 (Fell Ex. 273 at 9-10); Decl. of Teri Fell (Fell Ex. 278 at 6-7, 12-13).

- Dr. Welner may have violated ethical and other guidelines, further negating the reliability of his conclusions, while interviewing individuals about Mr. Fell's background.[57]  Mot. 155 n.47 (citing American Academy of Psychiatry and the Law, Ethics Guidelines for the Practice of Forensic Psychiatry 3 (adopted May 2005) available at http://www.aapl.org/pdf/ETHICSGDLNS.pdf).

- Dr. Welner omitted information gathered in his interviews that would have been mitigating and contrary to his opinions.[58]

---

now argues that because his trial counsel gave up the rights to discovery of the underlying statements in Dr. Welner's report during trial, he should forever be denied knowledge of the contents of those statements.  The law does not require such an odd result.  The Government should not be permitted to argue for dismissal while simultaneously withholding the evidence which supports Mr. Fell's claims.

[57] See also Mot. 300-01 (discussing FBI 302s indicating coercive questioning in interviews).

[58] The Welner Report lists twenty FBI interviews for which no 302 was disclosed and twenty-three individuals whom Dr. Welner himself interviewed and for whom no corresponding interview was turned over to the defense.

Although Mr. Fell contends that these facts assert an adequate basis to support the claim, the record reveals that there is plainly more information hidden behind Dr. Welner's report and opinions, and Mr. Fell should receive discovery as to that information. At trial, the Government was prepared to provide trial counsel with at least some background material noted in Dr. Welner's report, but trial counsel abandoned their request for it when they withdrew their challenge to the testimony.[59] Mot. 161. Given the utility of those materials in understanding the potential to cross-examine or otherwise challenge Dr. Welner, this was further ineffective assistance of counsel. See, e.g. Kimmelman v. Morrison, 477 U.S. 365, 367 (1986) (failure to make suppression motion could not be considered strategic because failure to conduct discovery meant decision was not informed).

### e.  Conclusion

Mr. Fell has clearly pled that his trial counsel were deficient in failing to pursue their meritorious motion to exclude Dr. Welner's testimony, which would have proven successful on any of the grounds listed above including prosecutorial misconduct, violation of the Sixth Amendment or under the FDPA's evidentiary standard. These allegations are not "patently frivolous or false" and it is not the case that the record "conclusively show[s]" that Mr. Fell is not entitled to relief. See supra Rep. Section II. To the contrary, the record supports Mr. Fell's claims as set out above and summary dismissal is inappropriate.

---

Mot. 302. As argued in greater detail in Section XVII, based on heavily-redacted 302s obtained through a Freedom of Information Act ("FOIA") request, there are at least five additional interview reports by FBI agents which were never disclosed or noted in Dr. Welner's report. At least three of these 302s included Brady information that conflicted with Dr. Welner's conclusions. Id. at 303.

[59] The Government's assertion that the prosecution team was going to provide discovery in connection with Dr. Welner's report, Opp. 183, does nothing to change the fact that no discovery has in fact been provided. Further, the Government's later point that Mr. Fell "makes no attempt to show what information might have been in those reports [of interviews conducted] that would have so impacted his trial counsel's strategy," Opp. 186, cannot be credited here; it is plainly impossible for Mr. Fell to use reports to which he has yet to be granted access.

**2.    Trial Counsel's Withdrawal Of Drs. Mills And Cunningham Was Not The Product Of An Informed Strategic Judgment**

The Government argues first that the decision to forego challenge of Dr. Welner and instead to withdraw their mental health case was strategic (and thus not subject to this Court's review for its competence), and second that it cannot be attributed to anything about Dr. Welner's report because one expert witness, Dr. Mills, was reserved for surrebuttal *prior* to trial counsel's access to the Welner Report.  Opp. 164-65.  These arguments are belied by the well-pled facts and neglect to address trial counsel's declarations, which are attached to the 2255 Motion.

First, the reservation of Dr. Mills for surrebuttal was a separate decision from the decision to withdraw the mental health case that is at issue in this claim.  The mental health case at trial consisted of Dr. Mills *and* Dr. Cunningham, and trial counsel plainly intended to present Dr. Cunningham when they reserved Dr. Mills for surrebuttal.  Tr. Vol. VII-II at 4:20-22 (July 1, 2005) ("I'm going to save [Dr. Mills] for surrebuttal if we need him.  There's still Dr. Cunningham who's an expert who will testify next week.").  The record is clear that defense counsel's 12.2 Notice was not withdrawn until after trial counsel received the Welner Report the evening of July 5, and after trial counsel had concluded – mistakenly (or incorrectly) – that the Court had denied their motion to exclude some or all of his testimony.  Tr. Vol. IX-II at 3-4 (July 7, 2005) (withdrawing Dr. Cunningham and 12.2 Notice).  The Government is simply wrong when it argues that trial counsel had withdrawn their mental health case before receiving the Welner Report.

Mr. Fell has thoroughly pled the claim that trial counsel's decision to withdraw the 12.2 Notice was unconstitutionally deficient because it was made not on any reasoned analysis of the evidence, but instead on the basis of a crucial mistake: the belief that the Court

87

had "already stated that Welner would be allowed to testify." Motions for Judgment of Acquittal and New Trial, Dkt. No. 209, at 20 (Aug. 26, 2005). In fact, the Court had made no such ruling, but had only instructed the parties that it would not exclude Dr. Welner *on the basis of the lateness of his report*. Tr. Vol. VII-II at 96:12-15 (July 1, 2005). The fact supporting this allegation of deficient performance has already been found by this Court: trial counsel's "thought processes were infected by certain *misapprehensions of the facts*." Fell, 2006 U.S. Dist LEXIS 24707, at *29 (emphasis added). Nothing in the Government's Opposition contravenes this operative fact.

Mr. Fell has also presented undisputed sworn evidence that reiterates the basis of the Court's finding, and further demonstrates the reason that trial counsel withdrew the mental health case. Decl. of G. Primomo (Fell Ex. 263 at 2) ("*But for* our concern that Dr. Welner would testify, we would have called Dr. Cunningham as an expert for Mr. Fell.") (emphasis added); id. (counsel withdrew case without pursuing motion because assumed Court would reject it); Decl. of A. Bunin (Fell Ex. 264 at 9) ("I would not have agreed to withdraw Dr. Mills and Dr. Cunningham's testimony, nor would I have agreed to the stipulation *but for* the threat by the Government to call Dr. Welner.") (emphasis added); id. at 8 (stating impression that the Court would not sanction the Government for violation of the April 7 Order).[60]

Moreover, Mr. Fell has pled that trial counsel knew what Dr. Welner would likely say without even seeing his report. Indeed, Dr. Welner's reputation for diagnosing defendants as psychopaths was well-established in the death penalty community, and he had just done so in

---

[60] The Government's citation to these declarations for the statement that, "after considering the robust mental health and background mitigation evidence, counsel made the strategic decision to avert such rebuttal testimony and not to present mental health evidence," Opp. 148 (citing Decl. of A. Bunin (Fell Ex. 264 at 8-9); Decl. of G. Primomo (Fell Ex. 263 at 2)), is not only contradicted by the very paragraphs cited by the Government, it is also refuted by the later, much more directly on point paragraphs of these declarations cited here.

88

Sampson.  See Sampson, 335 F. Supp. 2d at 218-19.  As a result of this well-founded

expectation, the defense had opposed the Government's efforts to use Welner as a witness as far

back as December 2004 – when the Government sought to have him interview Mr. Fell.[61]  Trial

counsel revisited these arguments in briefing in April and again in June.  See Motion in Limine

Regarding Testimony of Michael Welner, M.D., Dkt. No. 107 (Apr. 22, 2005); Defense Trial

Memorandum, Dkt. No. 142 (June 14, 2005).  It is thus abundantly clear that even if the Court

finds that Dr. Mills was withdrawn prior to the disclosure of the Welner Report, the record ably

supports trial counsel's statements that their doing so *even then* would have been due to their

unreasonable belief regarding the admissibility of Dr. Welner's testimony.

        The Government has also argued that this claim is due to be summarily denied

because the decision to withdraw their mental health case was strategic, and thus not deficient

performance.  This question cannot be resolved without considering facts outside of the record,

and thus is not ripe for summary dismissal.  That said, the Government's argument is

additionally unpersuasive because it fails to address the legal reality: no decision is defensibly

strategic if it is uninformed.[62]  Here, it is plainly the case that trial counsel's decision to withdraw

the mental health case was not rooted in good information: trial counsel inadvertently abandoned

their motion to limit Dr. Welner's testimony before it could be ruled upon; they declined an

opportunity to discover the bases of his opinions in order to determine his vulnerabilities on

cross examination; and they had already failed to develop the available mental health defense in

the first place that would have been robust enough to confront Dr. Welner, whom they had

---

[61] See Reply to Government's Supplemental Memo Regarding Discovery of Mental Health Evidence, Dkt. No. 78 (Dec. 23, 2004) (raising, among other arguments, that Dr. Welner's anticipated testimony on "psychopathy" had previously been excluded).

[62] See supra Rep. Section IV(C) (discussing standard for considering a decision to be "strategic" under Strickland).

known was coming for eight months prior to trial. The Government concedes that trial counsel failed to secure the documents on Dr. Welner's opinion that it had been willing to produce at trial; it thus necessarily concedes the fact that trial counsel could not have been informed as to the bases for challenging Dr. Welner. Nor then, could they have been sufficiently informed about the possibilities of their case when they decided to withdraw the mental health case.[63]

### 3.    Trial Counsel's Agreement To The Mental Health Stipulation Also Constituted Deficient Performance

The agreement to the mental health stipulation, while the cumulative result of all of the deficiencies leading up to that point, was a final and stark example of deficient performance. After withdrawing the 12.2 Notice and thus Mr. Fell's capacity to offer an expert mental health framework to contextualize and explain the impact of the rest of the evidence, trial counsel still faced the Government's threat to use Dr. Welner to rebut the life history testimony that had been provided by lay witnesses. Surprised at this, trial counsel raised their concern that such testimony would implicate Rule 12.2's restriction of Government use of the compelled examination to instances where the defense had offered its own mental health expert evidence. The Court acknowledged the issue, noting that the resolution of whether Dr. Welner would be permitted to testify "could last into multiple years of litigation." Tr. Vol. X-I at 59:18-19 (July 8, 2005). To avoid this, the Court suggested the possibility of a narrow stipulation:

> Court: Well, let me propose an alternative. You've not raised the diminished capacity defense in any way. Then a viable stipulation would be that the defendant did not suffer from mental illness, to the extent that it diminished his capacity to commit the offense, etcetera.

---

[63] Of course, trial counsel's underlying failure to pursue an adequate investigation of Mr. Fell's background and mental health, as well as its failure to work effectively with the experts retained and to investigate aggravating evidence all combine to render any later decision in connection with Mr. Fell's mental health uninformed, as set out more fully above in Sections III and IV. As a result, even apart from the failure to pursue this discovery, no decision in connection with Mr. Fell's mental health case can be considered "strategic."

Id. at 58:11-16.  The Court did not require the parties to stipulate and did not rule on the litigable issue – indeed it expressly stated that it was "not suggesting in any way that I prejudge that issue or even know the answer."  Id. at 59:8-10.

As has been pled in the 2255 Motion, instead of agreeing to that limited stipulation – which in and of itself would have been inaccurate – trial counsel conceded to a stipulation that went much further, stating that: 1) Mr. Fell "had no cognitive or neurological deficits"; 2) "his intellect and cognitive functions were intact"; 3) he "did not suffer from any mental disease or defect"; 4) he was "competent to stand trial"; and 5) he "knew the difference between right and wrong at the time of offenses."  Tr. Vol. XI at 94:2-8 (July 12, 2005).

Trial counsel's agreement to this stipulation was deficient performance that violated prevailing professional norms.  The only reason that trial counsel agreed to the stipulation was that they unreasonably perceived it to be the only means of keeping Dr. Welner off the stand.  Like the text of the stipulation, this was flatly not true.  Trial counsel had other, better options, including a motion to block Dr. Welner under Rule 12.2.  Had they pursued it, the Government would have been prohibited from presenting testimony based on any observations of Mr. Fell in connection with the compelled examination.  See, e.g., United States v. Wilson, No. 04-CR-1016 (NGG), 2007 U.S. Dist. LEXIS 1834, at *3 (E.D.N.Y. Jan. 10, 2007) (no testimony by Dr. Welner, nor fruits from his interview, would be admitted "except on an issue regarding his mental condition on which Wilson has introduced expert evidence requiring notice under Fed. R. Crim. P. 12.2(b)(2)").

Contrary to the Government's argument, the decision to enter into the stipulation can in no way be considered strategic.  Opp. 133-38.  As with the decision to withdraw the whole case, it was uninformed, and additionally so because trial counsel failed to even consult their

91

experts to determine whether it was an accurate statement of Mr. Fell's mental health.  Dr. Cunningham was in Vermont and prepared to testify, yet counsel did not seek to inform themselves by consulting him.  See Mot. 126.  No one contacted Dr. Mills, though if they had he would have told trial counsel that the stipulation was inaccurate.  Decl. of Dr. Mark Mills, Mar. 13, 2011 (Fell Ex. 260 at 2-3).  This further failure to investigate, including by consulting these readily available experts, is in no way consistent with a reasonable strategy under prevailing professional standards.  See American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 10.11(A), Commentary at 104 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) (explaining that counsel have a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation"); Siehl v. Grace, 561 F.3d 189, 196 (3d Cir. 2009) (remanding for an evidentiary hearing on allegations that counsel was ineffective where counsel failed to consult with appropriate experts when determining whether to stipulate regarding fingerprint evidence).

In addition, the only evidence in the record as to trial counsel's thought processes in agreeing to the stipulation is that they were "surprised" that the Government still sought to "present Dr. Welner as a rebuttal witness to our lay mitigation case" after they withdrew their expert case.  Decl. of A. Bunin (Fell Ex. 264 at 8).  There is no basis for equating this "surprise" with a reasonable "strategy" under the law or prevailing professional norms.

The decisions made by trial counsel in connection with Mr. Fell's mental health thus cannot be considered strategic.  Beyond that, and as Mr. Fell has pled and set out in greater detail above, the withdrawal of the mental health case and agreement to a materially false mental health stipulation – without pursuing necessary investigation, obtaining discovery to which all

92

parties agree they were entitled, pursuing even the arguments they knew to be available at the time of their motion to exclude Dr. Welner's testimony, or even asking for a continuance[64] – can in no way be considered reasonable.

### B. Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient Performance Prejudiced Him

In the Opposition, the Government rejects the well-pled allegations in Mr. Fell's 2255 Motion, which show that trial counsel's deficient performance in their handling of the Government's experts was prejudicial. However, any consideration of the Government's arguments will require careful examination of nuanced factual disputes and a weighing of the impact of testimony and other evidence not already in the record. As a result, none of its arguments can support summary dismissal of this claim.

Had trial counsel been reasonably prepared to challenge Dr. Welner and pursued that challenge, Mr. Fell's jurors would have had the benefit of expert assistance on the critical question of his mental health. This evidence was the necessary link between the evidence of Mr. Fell's atrocious childhood and the question of how it was mitigating. It would have shifted the balance of mitigating and aggravating evidence in favor of life for at least one juror, and so entitles Mr. Fell to relief on his 2255 Motion. See, e.g., Wiggins v. Smith, 539 U.S. at 510, 537 (2003).

### 1. The Record Plainly Shows That Trial Counsel Would Have Called Drs. Mills And Cunningham

At the outset of their appointment, trial counsel intended to defend Mr. Fell against the death penalty with evidence of his psychological and psychiatric vulnerabilities. By

---

[64] The failure to obtain a ruling on the scope of testimony that would have been admissible should they have refused the stipulation further renders the decision to enter into the stipulation uninformed and thus incapable of being strategic. Counsel had already withdrawn their mental health experts but even so failed to pursue the challenge to the Government's continued attempts to have Dr. Welner testify. Though trial counsel put in a letter initially raising these very arguments, the challenge was once again unpursued. See Letter to Judge Sessions from A. Bunin, July 8, 2005 (Fell Ex. 134).

the time of trial, they had secured the expert assistance of Drs. Mills and Cunningham, whose

testimony they intended to present to the jurors.  See Tr. Vol. V-I at 56:4-57:9 (June 28, 2005);

Decl. of A. Bunin (Fell Ex. 264 at 2); Decl. of G. Primomo (Fell Ex. 263 at 1).  They told the

jury to expect these experts' testimony.  As stated above, it is also clear that the reservation of

Dr. Mills' testimony for surrebuttal was not a withdrawal of the mental health case; rather it was

an effort to deploy his testimony in a fashion that was responsive to that of Dr. Welner.[65]  See Tr.

VII-II at 96:17-19 (July 1, 2005) (Court noting that "in light of the late delivery of the [report], it

seems to me that surrebuttal responds to that, so you'll have an opportunity to rebut as well as

cross-examine").  Clearly, everyone in the courtroom was anticipating a mental health case, and

one that may well have included a surrebuttal.  As discussed above, counsel withdrew that

testimony based on an unreasonable fear of Dr. Welner's testimony.

### 2.  Expert Testimony Would Have Provided Important Evidence That Did Not Come In Through Lay Testimony

The Government argues that Mr. Fell suffered no prejudice from the failure to

offer the testimony of Drs. Mills and Cunningham and the introduction of the stipulation because

he had already offered the evidence of his deprived childhood through lay witnesses and records.

In essence, it claims that by "conced[ing] in its closing summation that Fell had a terrible

childhood," Opp. 187, the Government can wave a wand and erase the prejudice caused by trial

counsel's failure to put on expert testimony to frame and explain the impact of that terrible

childhood.  That argument is wrong.

---

[65] The reservation of Dr. Mills was in no way an irreversible decision to withdraw his testimony, as the Government would seem to argue, but instead an attempt to address the Government's failure to produce Dr. Welner's report in a timely fashion (so as to allow the defense to make an informed decision as to the nature of their own penalty phase presentation) and Dr. Mills' own scheduling issues.  See Hearing on Outstanding Issues at 63:25-64:6 (June 27, 2005) (Mills traveling to Paris shortly after scheduled to testify).  The defense thus elected to proceed with the understanding that Dr. Cunningham was still slated for their direct case and, if Dr. Welner was permitted to testify, it would have reserved Dr. Mills for surrebuttal after having the opportunity to view Dr. Welner's report.

The need for expert testimony is "particularly acute" in death penalty cases, where an accurate and thorough picture of the defendant's mental health is vital. ABA Guideline 4.1, Commentary at 28. The ABA Guidelines note that experts are crucial to explaining the significance of the social history facts that are otherwise presented. Id.; ABA Guideline 10.11, Commentary at 104. Many death penalty cases are won or lost based on a defendant's mental health mitigation presentation, and counsel's duty to investigate and present it is paramount. See, e.g., Johnson v. United States, No. 09-3064-MWB, 2012 WL 1836282 (N.D. Iowa Mar. 22, 2012) (counsel's failure to use experts to present mitigating mental health evidence was ineffective because expert opinion would have connected mental state and defendant's conduct); see also Rompilla v. Beard , 545 U.S. 379, 393 (2005); Wiggins, 539 U.S. at 534-35.

Here, trial counsel had done some investigation into Mr. Fell's mental health, and had developed testimony to provide the jury with a way to understand and give scientifically informed weight to the lay mitigation testimony presented at trial and other aspects of Mr. Fell's history by applying this evidence to the United States Department of Justice's ("DOJ") risk and protective factors, as well as those specified in other research, that demonstrate a nexus between adverse developmental factors and criminally violent outcomes. Decl. of M. Cunningham (Fell Ex. 6). Dr. Cunningham thus would have linked the risk factors at each stage of Mr. Fell's development from early childhood through early adulthood to his later behavior, and he would have described the protective nature of several factors that are scientifically understood to be crucial to healthy development. This testimony would have educated the jurors on the impact of the absence of those protective factors from Mr. Fell's life. This scientific context goes directly to the framing and weight that jurors placed on the other material that they were given. Mot.

167-70.  Without that testimony, Mr. Fell was left with – as the Government emphasized to the jury on summation – just an "abuse excuse."[66]  Tr. Vol. XII at 118:21-22 (July 13, 2005).

Finally, though trial counsel had alleged as a mitigating factor that Mr. Fell was only twenty years old at the time of the offense, Dr. Cunningham alone was positioned to explain why that fact is a mitigating factor: he would have explained that maturity is generally delayed in an individual who has been exposed to an upbringing such as Mr. Fell's.  Mot. 170.

Dr. Mills would have additionally provided testimony about Mr. Fell's early and recurrent inappropriate social behavior and intoxication.  Id. at 166.  He also would have provided the testimony necessary to demonstrate that Mr. Fell's background was mitigating because of the impact it had on his mental health – that Mr. Fell's history and testing results indicated incipient psychosis or pre-psychotic breakdown, and that both his substance abuse and potential psychotic illness had strong familial and genetic components.  Id.  He also would have been able to provide a psychological explanation for the behaviors cited in Mr. Fell's hospitalization records and presented to the jury through lay testimony.  Id.  The Government does not dispute that this testimony was available.  Opp. 188.

Indeed, trial counsel promised just this information to the jury, telling it that Dr. Mills is "a medical doctor" who "has done testing and will give conclusions" and that Dr. Cunningham is "a psychologist" whose testimony would last "half a day" and would "explain studies conducted by the Department of Justice that talk about the reasons, what are the causes of bad outcomes."  Tr. Vol. V-I at 56:4-57:9 (June 28, 2005).  The impact of the failure to produce such evidence – in view of that argument – was to leave the jury with the unmistakable impression that there was no evidence linking Mr. Fell's background to mitigating factors

---

[66] The Government characterizes the value of Dr. Cunningham's opinion as "dubious," Opp. 190, but that is wrong and given that Dr. Cunningham never testified and the hearing on the scope of his testimony never occurred, the record is insufficiently developed for summary dismissal based on that characterization.

96

regarding the person he is today, his culpability for the crime, and whether he should be put to death. See, e.g., McAleese v. Mazurkiewicz, 1 F.3d 159, 166-67 (3d Cir. 1993) ("The rationale for holding such a failure to produce promised evidence ineffective is that when counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the testimony he promised.").

### 3.   Other Potential Testimony Cannot Be Summarily Held To Be "Just As Damaging" As The Excluded Testimony From Dr. Welner

The Government also argues for summary dismissal on the theory that an exclusion of Dr. Welner's psychopathy analysis would have been insignificant – and thus no prejudice resulted from trial counsel's failure to secure the exclusion – since the defense still would have been facing testimony on ASPD. Opp. 188, 191-92. The Government further argues that their backup expert, Dr. Wetzel, would have been "just as damaging as Dr. Welner." Opp. 187. Neither argument is meritorious, nor does either assert a basis for summary dismissal on the record that is currently before the Court.

In essence, the Government's argument for summary dismissal asks this Court to conclude on the current record that the potential Government testimony against Mr. Fell would prevail regardless of what trial counsel were prepared to present affirmatively as part of their mitigation presentation. Summary dismissal based on untested and unpresented opinions is inappropriate, however, because the hearings and testimony of these witnesses were not pursued at trial and cannot be accurately assessed based on the current record. It was not settled during the penalty phase what scope of expert testimony would be offered, as the Court recognized when it repeatedly asked the Government which aspects of the 72-page Welner Report it would be relying on. See, e.g., Tr. Vol. VIII-II at 72:6-12 (July 6, 2005).

97

Mr. Fell has pled that he has suffered prejudice due to the lack of expert evidence presented based on the reports on file and the clear need to explain the lay mitigation testimony to the jury with appropriate context. Even if the Court were to find these arguments "unlikely," as the Government argues, Mr. Fell would still be entitled to further factual development and a hearing on his well-pled claims. See United States v. Sampson, 820 F. Supp. 2d 202, 213 (D. Mass. 2011) (no summary dismissal where expansion of the record in relation to prejudice section and other claims necessary); see also Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003) (remanding for evidentiary hearing where scope of available testimony insufficient to resolve claim); Machibroda v. United States, 368 U.S. 487, 496 (1962) (summary dismissal inappropriate where claim, while improbable, not clearly bereft of merit). Mr. Fell is entitled to a full and fair hearing of his claims, and the record has not yet been developed sufficiently to allow for adjudication on the merits.

In any event, the Government's arguments at this stage are unpersuasive, as set out below.

### a. ASPD And Other Aspects Of Dr. Welner's Report Either Would Have Been Excluded Or Subject To Effective Challenge On Cross-Examination

The purported basis for the Government's position that its expert testimony would have carried the day at trial, regardless of whether the Welner Report, or portions thereof, was excluded, is its untested opinion that Mr. Fell: 1) had ASPD; 2) displayed no sign of psychosis or depression; 3) was not significantly impaired by the use of alcohol when he committed the murders; 4) demonstrated behaviors at the time of the murders which reflected organization, and not signs of mental illness or intoxication; 5) had no cognitive impairments; and 6) did not suffer from post-traumatic stress disorder as a result of sexual abuse. Opp. 159, 176-78. The

98

Government focuses on the ASPD diagnosis and argues that these opinions would have come in through either Dr. Welner or Dr. Wetzel.

Whoever provided the testimony, all of these contentions were and remain subject to formidable attack.[67] First, as has been pled in the 2255 Motion, any testimony about ASPD would have been subject to exclusion to the same extent as the psychopathy testimony in connection with the prosecutorial misconduct, Sixth Amendment concerns and reliability problems discussed above. Second, Dr. Welner's methodology in reaching his diagnosis of ASPD was not sufficiently reliable in that Dr. Welner did not rule out or effectively consider other potential explanations for the behaviors he characterizes as ASPD (e.g., trauma and depression). See, e.g., Rimbert v. Eli Lilly & Co., No. 06 Civ. 0879 (JCH), 2009 WL 2208570, at *58 (D.N.M. July 21, 2009) (methodology unreliable under Daubert where expert failed to address alternatives and relies only on selective evidence); Kathleen Wayland, The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations, 36 Hofstra L. Rev. 923, 947 (2008) (ASPD frequently misdiagnosed based on behaviors attributable to the impacts of trauma).

Even if testimony on ASPD were ruled admissible, it would have been vulnerable in many respects to cross-examination on these and other grounds such that any adverse impact

---

[67] It is not even established whether the ASPD diagnosis would have been relevant testimony. The Government does not dispute that the diagnosis was not relevant as a predictor of future violence, and instead argues that it could have been relevant to the remorse mitigator or responsive to (as yet undetermined) defense testimony. Opp. 185-86. However, the remorse mitigator was limited to remorse in connection with the crimes, and Dr. Welner spends only one line of the lengthy opinion diagnosing Mr. Fell with ASPD addressing factual evidence associated with the crime and subsequent flight (evidence which had already been recounted to the jury by the Government during trial). Aside from this reference, the discussion of remorse in Dr. Welner's diagnosis of ASPD cites other information unrelated to the crime, and thus unrelated to the mitigating factor alleged. Welner Report (Fell Ex. 10 at 13).

of the testimony would have been negated.[68]  The untested nature of this purported diagnosis prevents the Court at this stage from summarily crediting these opinions.

The remaining opinions listed by the Government were either duplicative of unchallenged testimony elicited by the Government from lay witnesses, contradicted by the record or contradicted by other Government expert opinions and thus readily challengeable on cross.  At any rate these remaining opinions would not have prevented Mr. Fell from offering his own testimony and in no way justify a summary finding that Mr. Fell is not entitled to relief.

Of course, when trial counsel withdrew their mental health case, they withdrew their opportunity to provide the jury with an alternate explanation for the "antisocial" behaviors that were already in the record, as found by the jury even without Government expert testimony. See supra Rep. Section IV; Special Verdict Form, July 14, 2005 (Fell Ex. 209).  Had trial counsel pursued their challenge to Dr. Welner's testimony, it would have been successful and, even if at a minimum only portions of the testimony were excluded, Mr. Fell could have easily challenged the remainder and would have had the benefit of his own mental health case.

### b.  Dr. Wetzel's Proffered Testimony Was Demonstrably Different From That Of Dr. Welner

Moreover, it is clear from the record that Dr. Wetzel was not the ready substitute that the Government presents him to be in the Opposition.  Indeed, the Government fought hard to have Dr. Welner testify precisely because the testimony Dr. Wetzel would have given was of a categorically different tone and type than that proffered by Dr. Welner, and trial counsel

---

[68] The Government's assertion that ASPD is just as damaging as psychopathy is inaccurate.  The prejudicial impact of psychopathy is established and that diagnosis is also much more specific – ASPD can be diagnosed in at least three times as large a portion of the civil and forensic populations as can psychopathy.  See supra Rep. Section V(A)(1)(c)(ii).  Because at least three-quarters of the prison population could be diagnosed with ASPD, it is not even a probative distinguishing factor in the jury's consideration of the sentencing determination in a capital trial.

100

understood this to be the case as well.[69]  Dr. Wetzel was prepared to deliver favorable testimony

to Mr. Fell not present in – and in some cases directly contradicting – Dr. Welner's opinion:

- While Dr. Wetzel did not find a direct "causal connection" between the abuse Mr. Fell suffered and the crimes, he explicitly stated that both the sex abuse and physical abuse suffered "did occur and would affect his personality."  Second Wetzel Report, June 27, 2005 (Fell Ex. 9 at 5).  He further concluded that the "failure to seize control" by the supervisory adults in Mr. Fell's life "has had long term effects on his personality."  Id. at 6.

- While Dr. Wetzel found that Mr. Fell met some or all of the criteria for ASPD, he also concluded that "[t]his disorder, as well as his alcohol dependence, do have a genetic and a familial basis."  Id. at 7.

- Dr. Wetzel found that "[t]he history of his psychiatric care suggests that his parents consistently misrepresented the real problems in the family that needed to be dealt with if therapy were to have a reasonable chance to help him when he was a child or early teenager… [his childhood psychiatrist and] [m]ultiple other professionals failed to understand the problem that is now quite clear in retrospect."  Id. at 7-8.

- Dr. Wetzel also recognized that Mr. Fell's genetic predisposition to ASPD, the undisciplined environment of his childhood, his exposure to sexual and physical abuse, the failure of his family to gain effective control of his behavior and the failure of psychiatric treatment were some of the factors that "set Mr. Fell on his life path."  Id. at 10.

- Dr. Wetzel's post-trial affidavit made clear that he did not view Mr. Fell's behaviors during the compelled interview to be typical or necessarily reflective of his ability to show remorse: "I would suggest that Mr. Fell was in a cruel, markedly stressful and atypical situation when I saw him.  His death penalty trial was in progress.  Remorse with full disclosure increased his risk of death.  Lack of disclosure could be used against him.  He had to make a choice.  I would agree with his statements to me that he did not appreciate the legal nuances [fn: My word; he used "dumb"] of his situation.  I would not say this was a typical day in his life or a reasonable sample of his lifelong emotional reactions."  Affidavit of R. Wetzel (Fell Ex. 139 at 16).

The Welner Report is markedly more negative on virtually every count.  To the

extent the Government believes Dr. Wetzel would disown his opinions as to the mitigating

nature of Mr. Fell's mental health status or otherwise change his testimony, that argument only

---

[69] Dr. Wetzel's testimony would have been limited by many of the same admissibility concerns discussed above in relation to Dr. Welner and any Government expert would have been testifying as a rebuttal witness, so would have been limited to testimony responsive to defense evidence.  Though the Government again makes much of Dr. Wetzel's alleged willingness to diagnose Mr. Fell with ASPD, as discussed above such a diagnosis was readily challengeable on cross-examination (to the extent it was even admissible).

further clarifies the need for additional factual development as to the scope of available expert

testimony, precluding summary dismissal.

**4.      Introduction Of The Mental Health Stipulation Caused Mr. Fell
          Additional Prejudice**

The decision to agree to the mental health stipulation, while an independently

ineffective decision, was also clearly the product of the failure to exclude Dr. Welner.  As

discussed above, when faced with the unexpected continued prospect of Dr. Welner's testimony,

trial counsel unreasonably remained blind to the meritorious challenges available to Mr. Fell

based on the unnecessary desire to keep Dr. Welner off of the stand.  Decl. of A. Bunin (Fell Ex.

264 at 9).  No reasonable attorney would have agreed to the stipulation, which was inaccurate

and unnecessary given the available legal challenges.[70]  The stipulation had a dramatic

prejudicial impact in that it specifically told the jurors that there was no consequence to his

background – that he stood before them intact.  It eliminated any credibility for defense counsel,

who had promised the jury that it would hear expert mental health testimony yet failed to deliver

it, and it left the Government with wide leeway to exploit that failure.

Despite the Government's efforts at downplaying the impact of the stipulation,

Opp. 164, it is irrefutable that the stipulation was the last piece of evidence that the jury heard,

and that the Government relied on it prominently in its closing argument to the jury.  Tr. Vol. XI

at 93:22-94:12 (July 12, 2005).  In the Government's initial summation, it reinforced for the jury

the evidence that they had heard just prior to the close of testimony, telling the jury that, based

on the stipulation, "[t]here is no question there's no mental disease, no mental defect."  Tr. Vol.

XII at 41:7-14 (July 13, 2005).  Then, after characterizing defense counsel's summation as the

"abuse excuse," the Government went on in rebuttal to tell the jury:

---

[70] As discussed above in Section V(A)(3), this decision was unreasonable and is not entitled to any strategic
deference under the law.

> The only evidence as to Mr. Fell's state of mind and his health is in Government's Exhibit 14, which is a stipulation by both parties, and as you know, it indicates that psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate. I am not even going to read it to you again. He is completely intact.

Tr. Vol. XII at 118:21-119:14 (July 13, 2005).

In addition to being catastrophically destructive to the defense, the stipulation was totally counter-factual. The first statement – that Mr. Fell had been given a "clean slate" – is contradicted by the Government's own expert report, and could have been refuted had there been evidence presented. See generally Second Wetzel Report (Fell Ex. 9). The remainder of the statement is similarly inaccurate, and Dr. Mills would have informed trial counsel of that had he been consulted, even based on the inadequate mental health investigation pursued prior to trial. Decl. of M. Mills (Fell Ex. 260 at 2).

There can thus be no doubt that this final piece of evidence, as well as its repetition on summation, caused Mr. Fell prejudice. Cf. United States v. Arboleda, 20 F.3d 58, 62 (2d Cir. 1994) (noting that "[t]he last word so often is the decisive word" and finding repetition of prosecution's summation to have resulted in prejudice) (citing Bollenbach v. United States, 326 U.S. 607, 612 (1946)). Had the jurors not been told point blank just before they began deliberations that the defense agreed that Mr. Fell was "completely intact" and instead heard Mr. Fell's affirmative mental health expert testimony, at least one of them would have adjusted the balance between aggravating and mitigating factors such that they would have voted for life.

In summary, had trial counsel pursued their meritorious challenge to Dr. Welner's testimony, the jury would have been provided with probative expert testimony that tied together Mr. Fell's horrific upbringing and the behaviors and crimes they had before them. Instead, they heard that a fully-formed adult, who was "completely intact" in the judgment of multiple

103

psychologists, was attempting to escape just punishment based on the "abuse excuse," and the defense offered nothing except a plea to the juror's own life experience in response. Nothing in the Government's Opposition refutes the evidence in support of Mr. Fell's allegations; its disagreement with the import of those facts cannot serve as the basis for summary dismissal. Because Mr. Fell's allegations will, once proven, entitle him to relief, the Government's request for summary dismissal must be denied.

## VI.   Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To Mr. Fell's Alleged Prior Acts Of Violence

Mr. Fell has pled extra-record facts sufficient to allow him to proceed with his claims of ineffective assistance of counsel and government misconduct in connection with Mr. Fell's alleged prior acts of violence because these claims, if proven, create a reasonable probability that the outcome of the sentencing phase would have been different.

### A.   Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Gacek Shooting

In support of the death penalty during the penalty phase, the Government repeatedly argued to the jury that Mr. Fell had a pattern of "uncontrollable behavior" that included purposefully shooting another child when Mr. Fell was eleven years old. Tr. Vol. V-I at 39:7-11 (June 28, 2005). The Government claimed that Mr. Fell was unrepentant and incorrigible. In its closing argument, the Government argued to the jury that Mr. Fell was violent as a child, using as an example: "Picking up a weapon. *He claims*, *accidentally*, shooting another child." Tr. Vol. XII at 59:1-3 (July 13, 2005) (emphasis added). It stated that at age 11 Mr. Fell "began to *make choices*…almost tragically shooting one of his friends." Id. at 56:9-16 (emphasis added). See also Tr. Vol. IX-I at 134:10-11 (July 7, 2005) (cross-examining social worker Deanna German and emphasizing hospital records that stated, "Last year he *quote accidentally* shot a boy in the chest with a handgun.") (emphasis added). Thus, the Government

104

clearly led the jury to believe first that the shooting was not accidental and second that Mr. Fell's claim to the contrary was disingenuous.

As Mr. Fell alleged in the 2255 Motion, trial counsel could have presented readily available evidence that the incident was an accident and that Mr. Fell was immediately apologetic.  John Gacek, the alleged victim, with whom trial counsel never spoke, would have testified that the event was "a stupid mistake, and I still feel that it was my fault."  Declaration of John Gacek, Feb. 25, 2011 (Fell Ex. 251 at 4).  Additionally, Mr. Gacek recalled that when he got home from the hospital he "was crying because it was not [Donny's] fault.  It was my fault." Id. at 5.  Other witnesses would have testified to similar effect.  Decl. of Adele Gacek, Feb. 28, 2011 (Fell Ex. 252 at 4); Decl. of Ernie Schuldalski, Feb. 28, 2011 (Fell Ex. 253 at 3).

Having secured the death penalty, however, the Government now does an about-face: it argues that Mr. Fell's statement that the shooting was accidental, which it claimed at trial was self-serving, was, in fact, backed by independent evidence.  It claims that Mr. Fell is not entitled even to pursue this claim because lurking within some records in a binder offered into evidence were "hospital records [that] make clear that the shooting was accidental" and that "[a]t the time of discharge, patient showed genuine remorse for shooting his friend" and – contradicting its own arguments – "[n]othing in the information presented to the jury indicated that Mr. Fell 'deliberately' shot his playmate."  Opp. 199-200.  Those arguments are without merit.

**1.      Mr. Fell Has Adequately Alleged That Trial Counsel's Conduct Fell Below Prevailing Professional Standards**

Professional standards at the time of Mr. Fell's trial provided that "[i]f uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly *must thoroughly investigate* it as an integral part of

preparing for the penalty phase." American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 1.1, Commentary at 7 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) (emphasis added); see also Rompilla v. Beard, 545 U.S. 374, 388 (2005) (defense counsel has duty to investigate that which "he knows the prosecution will cull for aggravating evidence" at sentencing). Those standards indisputably applied to the Gacek incident and required defense counsel to investigate it thoroughly. As alleged in the 2255 Motion, trial counsel were aware of the incident as early as December of 2000 because Mr. Fell referred to the shooting in his post-arrest statement. Mot. 175.

In addition, trial counsel were obligated to investigate because they had affirmatively alleged as a mitigator that Mr. Fell was remorseful for Teresca King's death and were on notice that the Government intended to dispute that claim, in part by showing that Mr. Fell had ASPD, one of whose features is that "individuals…show little remorse for the consequences of their acts." Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 4th ed., text rev. 2000). See Special Verdict Form, July 14, 2005 (Fell Ex. 209). Evidence that Mr. Fell lacked remorse for the Gacek incident would have supported the Government's claim, as counsel reasonably could have anticipated, and evidence that he was remorseful would have powerfully contradicted the Government's argument and supported Mr. Fell's claim that his remorse was mitigating. See Bond v. Beard, 539 F.3d 256 (3d Cir. 2008) (finding ineffective assistance of counsel for failing to investigate evidence that would have supported potential mitigating factors).

Mr. Fell has specifically alleged that, despite knowing the potentially aggravating nature of this evidence and that the Government would use it at trial, trial counsel did not explore

106

any of the reasonably available evidence regarding this incident. Strikingly, they did not attempt to talk to Mr. Gacek. They did not attempt to talk to any of Mr. Gacek's family members. They did not attempt to talk to anyone else about the incident. This was not because such witnesses were unavailable – post-conviction counsel were able to find them and secure their statements. It was simply because trial counsel unreasonably chose not to investigate.

None of the arguments the Government makes to defend this conduct and to prevent Mr. Fell from pursuing this claim is meritorious. The Government suggests that trial counsel were relieved of a duty to investigate the Gacek shooting because Mr. Fell confessed to it in his post-arrest statement. But the issue for trial was not whether Mr. Fell discharged the weapon that hit Mr. Gacek. The issues were whether he did so purposefully or accidentally and whether he showed genuine remorse. Notably, the Government does not cite any support for the proposition that the defense need not investigate claims made by a defendant in a post-arrest statement. That proposition has no support. See Rompilla, 545 U.S. at 387 ("duty to investigate exists regardless of the accused's admissions").[71]

The Government also argues that trial counsel's conduct should be excused because information regarding the shooting was reflected in Mr. Fell's post-arrest statements and in the hospital records in the Mitigation Binder. Opp. 201-202. But that argument too fails.[72]

---

[71] See also Lunbery v. Hornbeak, 605 F.3d 754, 760 (9th Cir. 2010) (recognizing defense counsel's failure to investigate validity of defendant's confession would constitute an error requiring grant of petition for habeas relief); Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053, 1119 (E.D. Cal. 2008) (finding ineffective assistance where "no one knew whether [defendant] was telling the truth or exaggerating" and counsel did not "investigate whether potential aggravating evidence was corroborated and learn where [defendant's] exaggeration gave way to reality"); ABA Guideline 1.1, Commentary at 6-7 ("To assume the accuracy of whatever information the client may initially offer …is to render ineffective assistance of counsel.").

[72] Five of the eleven hospital records in the Mitigation Binder mention the Gacek shooting. Three of these relate to Mr. Fell's hospitalization in April 1992 following the Gacek incident and two relate to his subsequent hospitalization in January 1993. Donald Fell Hospital Records, Apr. 16, 1992 – Mar. 26, 1993, Mitigation Binder (Fell Ex. 1, Tabs 25-29). The two January 1993 records note that "[l]ast year he *'accidentally'* shot a boy in the chest with a hand gun. He joked about the shooting and *showed no remorse*." Mitigation Binder (Fell Ex. 1, Tabs 28-29) (emphasis added).

107

Only one hospital record contemporaneous with Mr. Fell's hospitalization for the Gacek incident addresses his remorse, and that record contains the hearsay statement that Mr. Fell only appeared remorseful at the time of discharge and not at the time of his admission. Wilkes-Barre Gen. Hosp. Final Narrative Summary, May 2, 1992, Mitigation Binder (Fell Ex. 1, Tab 25 at 1, 2) ("patient *shows no remorse* and even threatens to shoot his mother" and "Donald seems to greatly regret the incident whereas *at first he bragged about shooting the other boy*") (emphasis added). But trial counsel knew that Mr. Fell himself claimed the incident was accidental. Thus, far from relieving counsel of the duty to inquire and investigate, the production of that record should have triggered such investigation – to determine whether the statement had any basis, whether the comments attributed to Mr. Fell reflected a true lack of remorse or an immature reaction to questions from a stranger, and how Mr. Fell truly acted at the time and in front of those who were involved in the incident. See Haliym v. Mitchell, 492 F.3d 680, 710-713 (6th Cir. 2007) (finding ineffective assistance, in part, for failing to investigate client's history of abuse where Mitigation Report submitted by defense counsel, which specifically denied abuse, "would have put competent counsel on notice that further investigation was required").[73]

The Government also argues that it was Mr. Fell, and not the Government, who affirmatively introduced evidence about the Gacek incident through the Mitigation Binder, and somehow this relieved trial counsel of its duty to investigate this incident. The Government's argument is sophistry. The Government itself introduced evidence about the Gacek incident through Mr. Fell's post-arrest statements during the guilt phase. See Audio Recording of Post-

---

[73] See also Johnson v. Bagley, 544 F.3d 592, 600 (6th Cir. 2008) (finding ineffective assistance, in part, for counsel's failure to investigate defendant's abuse by his grandmother where social service records introduced by defense counsel "would have prompted reasonable mitigation counsel to investigate [his grandmother's] past further").

Arrest Interview of Donald Fell, Dec. 2, 2000 (Gov. Tr. Ex. 11I); Transcript of Post-Arrest

Interview of Donald Fell, Dec. 2, 2000 (Gov. Tr. Ex. 11J).[74] The jury was permitted to consider

the post-arrest statements in the penalty phase. See Tr. Vol. XII at 136:17-20 (July 13, 2005)

(Court instructing jury that "[i]n deciding whether aggravating or mitigating factors have been

proven, you may consider any evidence that was presented during either the guilt or the

sentencing phases of the trial."). Indeed, there could have been no purpose to the Government

introducing portions of Mr. Fell's post-arrest statement relating to the Gacek incident during the

guilt phase other than predisposing the jury toward death at the penalty phase – the shooting had

no relevance to the question of guilt or innocence.

Further, the Government referenced the shooting in its opening statement in the

penalty phase before trial counsel made any arguments or submitted any hospital records or other

evidence to the jury relating to the Gacek incident. The Government explained that "[t]he

evidence will show…that Donald Fell's pattern of uncontrollable behavior began when he was

about 11 years old" and used the Gacek incident and Mr. Fell's subsequent hospitalization as an

example of such behavior. Tr. Vol. I-I at 39:7-24 (June 28, 2005). The Government further

stated in its opening argument that "[i]n April 1992 he was institutionalized after shooting a boy

with a nine millimeter pistol, barely missing his heart…" and noted that "Fell, quote, shows no

remorse, and threatens to shoot his mother, close quote." Id. at 39:25-40:9.

Lastly, the Government asserts that there was no harm because the Gacek incident

was not alleged as an affirmative aggravator. The Government suggests the evidence was

irrelevant. But the evidence of the Gacek incident impacted a number of proposed mitigating

---

[74] In its opening statement during the penalty phase, the Government mentioned the April 1992 hospitalization and noted the reference to it in the post-arrest statement played for the jury. Tr. Vol. V-I at 39:25-40:4 (June 28, 2005) ("This was the episode you heard him describe in one of his taped admissions when he said that the boy jumped in front of the bullet.").

109

factors, and there is a reasonable probability that it influenced the weight the jury accorded to those factors and the ultimate sentence. See Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 13). The Government used the Gacek incident to argue that, from the time Mr. Fell was eleven years old, he was remorseless and made choices to be violent even though his home life was improving. The implication the jury would have drawn from this was unmistakable – as the Government intended. Even though Mr. Fell was only twenty years old at the time of the crimes, which should have been mitigating, under the Government's narrative he had over nine years of experience with gratuitous violent crime and thus should be put to death. Moreover, even though Mr. Fell felt remorse for Mrs. King's death and even told the police where they could find her body, under the Government's account, he was remorseless and if he lacked remorse when his friend John Gacek was shot, there was no reason to believe he felt remorse when Mrs. King was killed. It also detracted from mitigating factors regarding the violence, sexual abuse and neglect in Mr. Fell's early life; according to the Government's account, from age eleven, he chose violent crime independent of those factors. And it undermined the mitigating factor that Mr. Fell was hospitalized as a child for his mental health condition; according to the Government's account – which could have been rebutted but was not – he was institutionalized because he was violent, and he had shot Gacek without remorse. Mr. Fell clearly has pled enough facts to entitle him to proceed on this claim. This was graphic and troubling evidence as presented by the Government. Mr. Fell is prepared to show after discovery and in a hearing that if the jury had heard the full facts, rather than the incomplete and untrue version presented by the Government, there is a reasonable probability its sentence would have been different.

110

Moreover, as a legal matter, the Government's suggestion that Rompilla and its progeny only reflect a duty to investigate when the Government has alleged an incident as an affirmative aggravator has no support in Rompilla, cases interpreting it, or the ABA Guidelines. Courts interpreting Rompilla have explained that it is *knowledge* of the unfavorable evidence and the prosecution's plan to use it that triggers the duty to investigate. See, e.g., Coble v. Quarterman, 496 F.3d 430, 436 (5th Cir. 2007) (counsel in Rompilla was ineffective for failing to examine the conviction file "despite knowing the state's strategy was to emphasize defendant's violent character"); Blankenship v. Hall, 542 F.3d 1253, 1277 n.7 (11th Cir. 2008) ("[Counsel's] obligation to review the prior felony case stemmed from their knowledge the prosecutor would use petitioner's history of felony convictions and violence to seek the death penalty."); Keith v. Mitchell, 455 F.3d 662, 671 (6th Cir. 2006) ("[Rompilla held] that counsel must investigate evidence it knows the state will use against defendant."). That proposition only makes sense. The defense counsel's failure properly to investigate a defense properly may be just as consequential to the defendant as counsel's failure to investigate the Government's case-in-chief. Indeed, the ABA Guidelines reject the notion that trial counsel's duty to investigate is limited to affirmative aggravators. The 2003 version of the ABA Guidelines, in effect during Mr. Fell's trial, explicitly advise counsel to investigate any potentially damaging evidence that could reach the jury, and not simply evidence that the prosecution introduces as an affirmative aggravator in its penalty case-in-chief. See, e.g., ABA Guideline 10.7, Commentary at 85 (duty to investigate offenses that could "otherwise come into evidence"); ABA Guideline 1.1, Commentary at 7 ("If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly *must thoroughly investigate* it as an integral part of preparing for the penalty phase.") (emphasis added). See also

111

ABA Guideline 10.11, Commentary at 110 (duty to seek discovery of rebuttal evidence); id. (duty to consider "intangible factors" that could influence the jury).  Indeed, counsel is unambiguously directed to "[u]se available discovery mechanisms to ascertain the aggravating *and rebuttal evidence* the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut."  ABA Guideline 10.11, Commentary at 111 (emphasis added).

### 2.    Mr. Fell Has Adequately Alleged Prejudice

The Government also cannot cut short Mr. Fell's claim by contending he suffered no prejudice.

During opening argument in the penalty phase, the Government referred to one of the hospital reports and emphasized, "Fell, quote, *shows no remorse*, and threatens to shoot his mother, close quote."  Tr. Vol. V-I at 40:4-6 (June 28, 2005) (emphasis added).  Additionally, the Government argued that following counseling, "Fell was released after he expressed remorse and apologized to his mother."  Id. at 40:7-9.  The Government similarly elicited evidence of Mr. Fell's purported lack of remorse in its cross-examination of Deanna German, asking with respect to one hospital record included in the Mitigation Binder whether it reflected, "*The patient shows no remorse and even threatens to shoot his mother*; is that right?"  Tr. Vol. XI at 102:18-103:16 (July 7, 2005) (emphasis added).  Ms. German responded, "That's what it says, yes."  The Government went on to categorize the incident as "very serious…extremely serious."  Id. at 103:21-24.  The Government's repeated references to notations in the hospital reports of Mr. Fell's lack of remorse were intended to convince the jury that Mr. Fell was not initially remorseful following the shooting.

As Mr. Fell has alleged, and as argued above, however, had trial counsel adequately investigated the incident, the jury would have seen an entirely different picture. The unheard testimony clearly demonstrated Mr. Fell's remorse immediately after the shooting and even prior to his hospitalization. Specifically, John Gacek would have testified, "Donny felt so bad and he wanted to help me whatever way he could." Fell Ex. 251 at 5. Adele Gacek, John Gacek's mother, would have similarly testified as to Mr. Fell's tearful display of remorse and that "immediately after the accident, Donny was upset and scared." Fell Ex. 252 at 4. Further, Mr. Schuldalski explained Mr. Fell's behavior the day after the shooting, before the hospitalization, as "very upset and remorseful." Fell Ex. 253 at 2. This claim cannot be summarily rejected.[75]

Finally, the Government argues that there is no prejudice because emphasis on the Gacek shooting would have shifted the focus of the jury away from Mr. Fell's detrimental childhood and would have further highlighted Mr. Fell's increasingly violent conduct. Opp. 204. This argument fails for multiple reasons. First, trial counsel never even bothered to speak to the Gaceks, so their decision not to present the Gaceks' testimony was uninformed and not the result of reasonable trial strategy.[76] Second, had trial counsel spoken to the Gaceks, trial counsel would have known that testimony from the Gaceks would have rebutted the argument the Government once again advances that this incident was indicative of violent tendencies of Mr.

---

[75] The Government also alleges that Mr. Fell was not prejudiced because the hospital records showed other violent acts by Mr. Fell, in addition to the Gacek incident, so it was fair to argue that Mr. Fell's behavior was becoming increasingly violent. But this contention does not dispense with the requirement that Mr. Fell be given the opportunity to pursue his claim. Trial counsel's failure to explain these other acts does not mitigate the prejudice Mr. Fell suffered from trial counsel's failure to investigate the Gacek incident. Instead, the Government's argument highlights the interrelatedness of Mr. Fell's ineffective assistance of counsel claims and demonstrates why it is incorrect to consider Mr. Fell's claims in a piecemeal fashion at this stage of the proceedings.

[76] See Pavel v. Hollins, 261 F.3d 210, 218-20 (2d Cir. 2001) (decision not to present witness "was flawed because it was not based on either a plausible strategic calculus or an adequate pre-trial investigation").

113

Fell as a child.  The newly-discovered evidence shows that the incident was an accident about which Mr. Fell was deeply remorseful.  Further, nothing about the Gaceks' testimony would have detracted from trial counsel's strategy to emphasize Mr. Fell's detrimental childhood.  The Gaceks would have provided powerful testimony about Mr. Fell's troubled childhood based on their first-hand observations of Mr. Fell's life during the time they lived across the street.  See, e.g., Fell Ex. 252 at 3 (Ms. Gacek stating that "Donny was from a violent home," Debbie and Al threatened young Donny, and "his parents were such heavy drinkers, [Donny] did not know what to expect from them at any moment."); id. at 2 ("Donny came from a very dysfunctional family" and Ms. Gacek did not "know how any kid could ever thrive or even halfway grow up in that environment."); Fell Ex. 251 at 3 (John Gacek noting that he observed "Al backhand Donny across the face" and even though he was just a young boy at the time, he "could see that what was happening was wrong.").  Finally, the Government presented evidence regarding the Gacek incident; in these circumstances, Mr. Fell's lawyers had a duty to see whether they could reasonably rebut that evidence.

**B.     Mr. Fell Has Adequately Alleged Ineffective Assistance of Counsel And Government Misconduct Relating To The Woodstock Incident**

The Government seeks summary dismissal of Mr. Fell's claim that the Government engaged in misconduct when it led the jury to believe that Mr. Fell kicked Christopher Eike into a "coma for a day" in August of 2000 in Woodstock, New York (the "Woodstock incident"), and repeatedly harped on the "coma" to argue that Mr. Fell had committed previous violent acts in "the same way he then later killed Terry King."  See Tr. Vol. VII-I at 146:24-25 (July 1, 2005); Tr. Vol. XII at 60:14-15, 124:5-7 (July 13, 2005).  Mr. Fell's 2255 Motion presents specific facts, based on post-conviction investigation, establishing that Mr. Eike was never in a coma and instead suffered only minor injuries.  Further, the Government was

114

well aware of these facts.  The Motion also alleges, based on post-conviction evidence, that the Government knew that Mr. Eike was a convicted sex offender who had corrupted a minor but failed to turn over that evidence.  Together and alone, these allegations are sufficient at this stage to suggest that the Government violated <u>Napue</u> and <u>Brady</u> and that trial counsel were ineffective, and to permit Mr. Fell's claims to go forward.  The allegations should not be summarily dismissed.

### 1.    Mr. Fell Has Adequately Alleged Government Misconduct

### a.  Mr. Fell Has Adequately Alleged A <u>Napue</u> Violation

During trial, the Government intentionally elicited testimony from Mr. Fell's sister, Teri Fell, that Mr. Fell had assaulted another individual only a few months before the King murder and had put that individual, Mr. Eike, into a coma.  <u>See</u> Tr. Vol. VII-I at 146:15-25 (July 1, 2005).  The testimony it elicited was lurid.  <u>Id.</u> at 146:24-25 (Q. "Did the kid go into shock and *into a coma*?" A. "Yes, he did.") (emphasis added).  The Government then repeatedly emphasized Mr. Eike's "coma" to the jury in its closing arguments, focusing on its similarity to the death of Mrs. King: "[i]t wasn't enough for him, in New York, in August 2000, to knock that guy down *and stomp him into a coma*…And it wasn't enough for Fell to kill Terry King.  He had to stomp her, he had to kick her, he had to watch his friend Bobby Lee beat her head with a rock."  Tr. Vol. XII at 124:5-19 (July 13, 2005) (emphasis added).  It even used the coma to suggest that Mr. Fell was depraved: "Donald Fell committed a horrible, violent assault on a person *the same way he later killed Terry King*.  He did it intentionally.  He did it violently.  And he did it with the utter depravity that you have heard about in this case…Remember what he did after *he beat that man with his feet into a coma*."  <u>Id.</u> at 60:13-19 (emphasis added).

Those statements were false.  Mr. Fell attached to the 2255 Motion newly-discovered documents from the Sullivan County Sheriff's Department (the "SCSD Records")

115

and the Catskills Regional Medical Center (the "Medical Records") that conclusively show that

Mr. Eike was never in a coma following his altercation with Mr. Fell. The SCSD Records also

establish that Mr. Eike was verbally responsive at the scene, that he was sent to the hospital

where he spoke with a detective, and that he was released from the hospital and reported to the

SCSD office that same day.[77] Mot. 188. The Medical Records unequivocally establish that Mr.

Eike did not suffer any serious injury, was awake and alert upon arrival to the hospital, and

admitted to taking acid and having a mental disorder.[78] Mot. 188-89.

Other evidence uncovered post-conviction challenges the Government's entire

account of the event. The SCSD Records demonstrate that the Sheriff's Department considered

charging *Mr. Eike* with sexually abusing Teri Fell. Fell Ex. 55. Other new records corroborate

the nature of the attack by Mr. Eike on Teri Fell and show that Mr. Eike was a convicted sex

offender.

Under these facts, Mr. Fell has clearly set forth sufficient facts to proceed with his

Napue claim. Napue v. Illinois, 360 U.S. 264, 272 (1959) (holding constitutional error where

"the false testimony used by the [Government] in securing the conviction of petitioner may have

had an effect on the outcome of the trial"). See also United States v. Wallach, 935 F.2d 445,

447, 458 (2d Cir. 1991) (government must proceed with caution upon soliciting testimony from

witness where government on notice that witness was perjuring himself given inconsistencies in

---

[77] See SCSD Handwritten Notes of Deputy Hall (Fell Ex. 56) (noting that after arriving on the scene, Hall "began to treat the victim for shock…the victim began to make noise" and then began to answer his questions.); id. (typed report indicating that "Detective Rojas responded to CGH [Community General Hospital]…I was able to talk to Chris after a short time," that "at 4:30pm received a call from CGH advised that Chris Eike was going to be released," and that Mr. Eike subsequently responded to the SCSD office with his mother.); see also SCSD Handwritten Notes of Unknown Authorship, Aug. 12, 2000 (Fell Ex. 53); SCSD Handwritten Notes of Unknown Authorship, Aug. 12, 2000 (Fell Ex. 55).

[78] See Cmty. Gen. Hosp. Emergency Room Record, Aug. 12, 2000 (Fell Ex. 286); Cmty. Gen. Hosp. Dep't of Emergency Medicine Record, Aug. 12, 2000 (Fell Ex. 287); Cmty. Gen. Hosp. ED Nurse Assessment, Aug. 12, 2000 (Fell Ex. 288); Prehospital Care Report, Aug. 12, 2000 (Fell Ex. 289); Cmty. Gen. Hosp. Radiology Reports, Aug. 12, 2000 (Fell Exs. 290-292); Cmty. Gen. Hosp. Lab. Results, Aug. 12, 2000 (Fell Exs. 293-294); Cmty. Gen. Hosp. Patient Instructions, Aug. 12, 2000 (Fell Ex. 295).

his statements); <u>Drake v. Portuondo</u>, 553 F.3d 230, 242 (2d Cir. 2009) (noting that in <u>Napue</u>, court found constitutional error "where prosecutor knew of false evidence" and whether a witness's testimony constituted perjury is irrelevant "where the issue is a conviction on tainted testimony").

The Government only has a few responses – none of which is sufficient at this stage to preclude Mr. Fell from going forward.  It claims as a factual matter that it did not know it was lying to the jury.  But Mr. Fell has alleged specific facts otherwise.  Those facts fall into at least three categories.  First, as the 2255 Motion sets forth, the Government was in possession of the SCSD Records and the Medical Records, or at least the information contained within.  Indeed, it turned over some records it received from the SCSD, but not the newly-discovered records.  Mr. Fell was able to readily obtain the newly-discovered records from the SCSD through a public records request and they were part of the same file as the previously produced documents.  The inference is plain that the Government also had these documents.  Certainly, the inference is strong enough for Mr. Fell to take discovery on the issue.

Second, the 2255 Motion also sets forth a redacted FBI report, dated June 14, 2005, obtained as a result of a FOIA request to the FBI (the "Redacted June 14 FBI Report"), that reveals for the first time that prior to its interview with Mr. Eike, the FBI conducted a criminal record check on him.  Redacted June 14 FBI Report, June 14, 2005 (Fell Ex. 128).  In the Government's Opposition, the Government has included an unredacted copy of this report (the "Unredacted June 14 FBI Report").  The Unredacted June 14 FBI Report shows that the FBI obtained "reports…from the SCSO [Sullivan County Sheriff's Office] regarding the assault."  Gov. Ex. F at 3-4.[79]  This report also states that, "[a]lthough no statement was taken from the

---

[79] The Unredacted June 14 FBI Report also notes that "[c]opies of all reports obtained from the SCSO were previously provided to SA C. Patrick Austin, via facsimile, on 06/14/2005."  Gov. Ex. F at 4.

victim, *a detective from SCSO went to the hospital where Eike told the detective the following about the incident.*" Id. at 3 (emphasis added). But the only documents in the SCSD file that show that an officer visited Mr. Eike in the hospital are the same documents that reveal Mr. Eike was not in a coma. Thus, the report itself constitutes an admission that the FBI knew of the limited nature of Mr. Eike's injuries. Fell Exs. 53, 55, 56. Mr. Fell also has good cause to believe that the Government was aware, at minimum, of the information contained within the Medical Records because the SCSD Records show that a detective went to the Catskills Regional Medical Center and learned that Mr. Eike was decidedly not in a coma because he interviewed Mr. Eike. Accordingly, Mr. Fell is entitled to discovery to determine for certain that the Government was aware of this information.

Finally, Mr. Eike himself has averred under oath that "I definitely did not tell the FBI or anyone else that I had ever been in a coma or had serious injuries due to the fight that night. I told them I just had a black eye and that was it." Declaration of Christopher Eike, Mar. 24, 2011 (Fell Ex. 314 at 2).

Unable really to dispute that the 2255 Motion alleges it knew Mr. Fell was not in a coma, the Government next argues that it was justified in telling the jury that Mr. Fell was in a coma because Mr. Fell used that word in a post-arrest statement[80] and the testimony it elicited regarding that false fact came from Mr. Fell's sister, Teri Fell. Opp. 208. But the Government did not argue or elicit testimony that Mr. Fell *claimed* to have put Mr. Eike into a coma.[81] It relied on the objective nature of the injuries and asserted that Mr. Eike *was* in a coma. The fact

---

[80] During a post-arrest interview at the Johnson County Sheriff's Department, Mr. Fell mentioned the Woodstock incident and stated, "[T]his dude tried to rape my sister and…I put him in a coma for a day." Transcript of Post-Arrest Interview of Donald Fell, Dec. 1, 2000 (Fell Ex. 60 at 36).

[81] The Government does not dispute that it was the Government itself – and not Mr. Fell – who elicited the damaging testimony and relied on it to seek death.

118

that Mr. Fell claimed in his statement that Mr. Eike was in a coma does not permit the

Government to assert that claim as the truth when it knew or was reckless in not knowing

otherwise.[82]  It is not disputed that, at the time of the incident, Mr. Fell was extremely

intoxicated due to his consumption of hallucinogenic drugs and alcohol.[83]  As the Government

knew, he was in no position to know whether Mr. Eike was injured or the extent of those

injuries.  The Government's argument – that it can elicit false evidence because it comes from

the mouth of a defendant – is tantamount to the claim that it can offer a confession it knows to be

false simply because it is a confession.  That is not the law.

As for Teri Fell, there was no excuse to elicit the testimony from her other than to

improperly poison and taint the jury.  She too was impaired.  Indeed, as the Government knew,

she had just been sexually assaulted by Mr. Eike.  She too was in no position to know the extent

of Mr. Eike's injuries or their cause.  Moreover, Teri Fell was led to believe that Mr. Eike was in

a coma when the police suggested it to her following the Woodstock incident.  Decl. of Teri Fell,

Mar. 5, 2011 (Fell Ex. 278 at 28) ("After Bobby and Donny beat him up, the police told us that

Chris was in a coma.").  The fact that Teri Fell was forced to give the false testimony does not

relieve the Government of its duties to elicit only the truth; it aggravates the nature of the

Government's violation.

The Government resorts to the argument that it did not focus on Mr. Eike's

"coma," but instead focused on the fact that Mr. Fell urinated on Mr. Eike, and that Mr. Eike's

condition was tantamount to a coma.  But, try as it might, the Government cannot convert a black

---

[82] See Wallach, 935 F.2d at 447, 458; Drake, 553 F.3d at 242.

[83] See Tr. Vol. VII-I at 154:11-2, 155:21-22 (July 1, 2005) (Teri testified that "we consumed a large amount of acid and mushrooms" and "we were all drinking and smoking hash, and eating acid and mushrooms"); see also Fell Ex. 314 (Eike noting that "[w]e all did acid, mushrooms, weed and drank beer that night" and "we were all really intoxicated that night").

119

eye into a coma. The Government recites the Miriam-Webster Dictionary's definition of coma as "a state of profound unconsciousness caused by injury," and then argues that since there are reports that Mr. Eike was briefly unresponsive at the scene before he started answering questions, it had license to say that he was in a "coma." Opp. 208. The Government's argument runs counter to both the medical definition of the term and a lay understanding of the term. Medical dictionaries note that a coma patient "cannot be roused" from a state of unconsciousness.[84] Yet the very record upon which the Government relies to argue that Mr. Eike was unconscious and therefore could have been in a coma notes that Mr. Eike was almost immediately roused, belying the Government's contention that Mr. Eike's condition could fairly be described as a coma. Opp. 208; Fell Ex. 56 (responding officer noting, "I asked the victim his name and got no response…I began to treat the victim for shock. Applied 15 LPM O2 via nonrebreather. Covered patient with emergency blanket. Victim began to make noise. I asked him where he hurt and he said he couldn't feel his body."). Similarly, Wikipedia, which fairly reflects a lay person's interpretation of the word "coma," defines a coma as "a state of unconsciousness, lasting more than six hours." Coma, Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Coma. Six hours is a far cry from, at most, a few minutes. Indeed, any lay juror using common knowledge and experience would understand the radical difference between momentarily blacking out (the most that the newly-proffered evidence might support here) and being put into a coma.[85] And, as the Government made unmistakably clear, the significance of the urination was not that Mr. Fell relieved himself publicly, but that he showed a

---

[84] See, e.g., Stedman's Medical Dictionary (25th ed. 1990) (defines coma as "a state of profound unconsciousness from which one cannot be roused…"); Dorland's Pocket Medical Dictionary (24th ed. 1989) (same).

[85] The Court instructed the jury that it "may also make references and reach conclusions that reason and common sense lead you to draw from facts which have been established from testimony and other evidence in the case." Tr. Vol. XII at 136:20-24 (July 13, 2005).

120

disregard for human life by beating Mr. Eike into a coma and then – when, on the Government's account, Mr. Eike was in a condition similar to Mrs. King's – urinating on him.  In short, the argument regarding urination cannot be separated from the extraordinarily serious injury the Government claimed Mr. Eike had to which the Government connected it.  Indeed, the Government repeatedly told the jury that Mr. Eike was in a "coma" and used the aggravated nature of that injury and the comparison of it to the assault on Mrs. King to justify the imposition of death.

Finally, given the prejudicial impact of the false testimony, the 2255 Motion easily satisfies the standard of pleading a "reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Wong, 78 F.3d 73, 81 (2d Cir. 1996).  This standard is far easier to satisfy than that for ineffective assistance or a Brady claim.[86]  The Government did not just argue that Mr. Fell beat up Mr. Eike.  Instead, it argued that Mr. Fell kicked Mr. Eike into a coma and then urinated on him.  That argument left the unmistakable impression that Mr. Fell delighted in the act.  The Government then juxtaposed Mr. Fell's actions during the Eike incident and the supposed delight he experienced with Mr. Fell's conduct in connection with the murder of Mrs. King, suggesting that just as Mr. Fell desecrated Mr. Eike's body by urinating on him when he was in a coma and defenseless, so too Mr. Fell desecrated Mrs. King's body after she had already been killed by killing her twice.  The Government explicitly drew the parallels.  See Tr. Vol. XII at 124:5-19 (July 13, 2005) ("Donald Fell committed a horrible, violent assault on a person *the same way he later killed Terry King*.  He did it intentionally.  He did it violently.  And he did it with the utter depravity that you have

---

[86] See Wallach, 935 F.2d at 456 (movant entitled to relief for Napue violation if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal citations omitted); Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008) (materiality standard of Napue that conviction be set aside whenever there is "any reasonable likelihood that false testimony could have affected the judgment of the jury" differs from Brady standard requiring that "the result of the proceeding would have been different") (internal citations omitted).

heard about in this case…Remember what he did after *he beat that man with his feet into a coma*.") (emphasis added).  And, the significance was apparent – and did not need to be explicitly vocalized.  The jury was instructed that it could find Mr. Fell acted in a depraved manner if it found he "relished the killing, or showed indifference to the suffering of the victim as evidenced by the infliction of serious physical abuse."  Tr. Vol. XII at 146:21-23 (July 13, 2005).  If Mr. Fell "relished" the violent – and, according to the Government, gratuitous – assault by not just attacking Mr. Eike but also putting him into a coma and then urinating on him, then it was all the more credible that he "relished" the killing of Mrs. King, only three months later.  It was not just that he did the minimum necessary to ensure that Mrs. King would die (which would not have supported application of the aggravator) but that – as he did with Mr. Eike – he took an extra act showing he relished what he was doing.  Moreover, the prejudicial impact was not just limited to the heinous, cruel or depraved factor.  It also extended to the mitigating factors that Mr. Fell was twenty years old and that he was remorseful for Mrs. King's death, as well as to all other factors relating to Mr. Fell's troubled childhood – the jury's view of which would have been impacted by this false evidence.  Mr. Fell thus would be prepared to prove at a hearing not only that the testimony was false and that the Government knew it was false, but that there is a reasonable likelihood that the false testimony could have affected the jury.

### b.  Mr. Fell Has Adequately Alleged A <u>Brady</u> Violation

Mr. Fell also properly alleged a <u>Brady</u> violation.  The Government was aware that Mr. Eike's injuries were not serious and that Mr. Eike was a convicted sexual offender whom the Sheriff considered charging with sexual assault in connection with the very incident the Government was relying upon, yet failed to disclose any of those mitigating or exculpatory facts.

The Government seeks to summarily dismiss Mr. Fell's claim, arguing that "there is no evidence whatsoever that the government was in possession of any of the documents

122

obtained by Fell post-conviction." Opp. 211. That contention cannot be resolved summarily on the papers. As noted, Mr. Eike himself has averred under oath that "I definitely did not tell the FBI or anyone else that I had ever been in a coma or had serious injuries due to the fight that night" and that he just "told them I just had a black eye and that was it." Fell Ex. 314 at 2. Thus, even if the Government was not in possession of the documents, the Government was required to disclose this information, which it learned directly from Mr. Eike. See United States v. Auten, 632 F.2d 478, 481 (5th Cir. 1980) (holding that Government suppressed witness's criminal record because it had knowledge of information even though it chose not to run criminal background check and did not have tangible documentation). Mr. Fell has also made specific allegations that the Government was in possession of the documents demonstrating that Mr. Eike did not suffer serious injury.

Mr. Fell has also adequately alleged that the Government was aware that Mr. Eike had been convicted of sexual assault involving a minor and that the Sheriff's Department considered charging Mr. Eike with the sexual assault of Teri Fell.[87] Mr. Fell specifically alleged that he obtained a heavily redacted report from the FBI through a FOIA request, suggesting that

---

[87] See Pennsylvania State Police Criminal Complaint of Christopher Eike, Nov. 7, 2001 (Fell Ex. 108) (Mr. Eike, then 18 years old, had engaged in open mouth kissing with 11-year old female victim and had felt between her breasts and her legs.); Court of Common Pleas of Pike Country Criminal Docket of Christopher Eike, Oct. 8, 2002 (Fell Ex. 214) (shows Mr. Eike charged with two counts of Indecent Assault on a Person Less than 13 Years of Age and Corruption of Minors; pled guilty to one count of Corruption of Minors; sentenced to minimum of 6 months with a maximum of 23 months in jail, fined $800 plus a monthly supervision fee, and ordered to attend counseling and to refrain from contact with victim and any children under 18); Pennsylvania State Police Criminal History Record of Christopher Eike, Nov. 16, 2010 (Fell Ex. 94) (2001 conviction for Corruption of Minors, among other convictions); Fell Ex. 55 (SCSD detective's notes from interview with Mr. Eike includes note stating "Sexual Abuse 3rd Section 130.55").

123

the FBI had in fact conducted a criminal record check on Mr. Eike:



An NCIC III and CCH conducted for ☐ on 06/14/2005,
revealed the following criminal history for ☐

Fell Ex. 128 at 5.  In its Opposition, the Government attached an unredacted version of the

report, unambiguously confirming Mr. Fell's allegation that such a criminal record check had

been conducted:

> An NCIC III and CCH conducted for Eike, on 06/14/2005,
> revealed the following criminal history for Eike:  On 07/06/2001,
> Eike was arrested by the Pennsylvania State Police (PSP), in
> Blooming Grove, for Indecent Assault and Corruption of Minors.
> Although no disposition was reported, it appears Eike received
> probation for the charge. On 03/05/2003, Eike was arrested by the
> PSP in Honesdale, Pennsylvania, for Forgery,  2 counts of Theft
> by Unlawful Taking or Disposition, Receiving Stolen Property and
> Criminal Conspiracy/Forgery. It appears that Eike pleaded guilty
> to one count of Theft by Unlawful Taking or Disposition and that
> the other counts were dismissed and/or withdrawn. Eike was
> sentenced to 4 months to 2 years and ordered to pay an unknown
> amount of restitution.

Unredacted June 14 FBI Report, June 14, 2005 (Gov. Ex. F at 4).  The Government argues that it

was not in possession of evidence of Mr. Eike's conviction because it "did not have any

*additional documents* pertaining to Eike's criminal record, such as affidavits, certificate of

disposition, etc.," Opp. 210 (emphasis added), but the Unredacted June 14 FBI Report

unmistakably shows that the Government was in possession of the most material information –

124

that Mr. Eike had been sentenced to probation for assault and corruption of minors.[88]  The

Unredacted June 14 FBI Report also highlights Mr. Fell's need for discovery of critical

documents in the possession of the FBI that have thus far either been withheld from Mr. Fell in

their entirety or only provided in such heavily redacted form that pivotal information is missing.

The Unredacted June 14 FBI Report highlights Mr. Fell's need for discovery at this stage and

that the Government cannot be taken at its word that it did not possess material documents.

Likewise, the Government's own submission unambiguously demonstrates that

the Government obtained the SCSD records regarding the Woodstock incident, and Mr. Fell has

alleged facts showing that the SCSD notes documenting the potential sexual abuse charge were

in the file related to this incident.  The SCSD readily provided the newly-proffered documents to

post-conviction counsel pursuant to a public records request.  The Government offers no reason

to believe that the SCSD would have withheld the same information from the Government when

it was providing its file.  Mot. 188; Fell Ex. 55.[89]  It is thus simply implausible to assume that the

Government did not know that the Sheriff was considering charges against Mr. Eike, which

provides good cause to believe that it had both this document and other relevant material

---

[88] Indeed, tellingly the Government considered charging the Woodstock incident as a statutory aggravator, and calling Mr. Eike as a witness at trial, but then decided not to do so.  See FBI 302 Report of Interview with Christopher Eike, June 15, 2005 (Fell Ex. 129 at 2) (FBI 302 notes that "Eike stated he is willing to testify about this assault"); Gov. Ex. F at 5 (Unredacted June 14 FBI Report notes that "[t]he assault of Eike, by Fell and Lee, may be used by the prosecution as an aggravating factor in support of the death penalty during the penalty phase after fell is convicted.").  The inference is powerful that it knew that the true facts regarding the incident would not support an aggravator.

[89] The handwritten notes from the SCSD's interview with Mr. Eike include a note stating "Sexual Abuse 3rd – Section 130.55," which suggests that the SCSD considered bringing charges against Mr. Eike for sexual abuse in the third degree.  Fell Ex. 55; McKinney's Penal Law § 130.55 (2010).

125

documents that require discovery.[90]  At best, the Government has raised a factual dispute about

whether it had this record, which precludes summary dismissal of Mr. Fell's claim.

The Government also argues that the criminal record check "was not included in

the report of interview of Eike provided [by the FBI] to the prosecutors, and as result, not

conveyed to the defendant."  Opp. 216.  However, that does not excuse the Government's <u>Brady</u>

violation.  It is well-settled that knowledge of information possessed by law enforcement

agencies that participate in the investigation, such as the FBI in this case, is properly imputed to

the prosecution.[91]  Thus, it is irrelevant that the NCIC results were not listed in the FBI's "report

of the interview."[92]  The information should have been turned over under <u>Brady</u> regardless of

whether it was in the 302.  <u>See</u> <u>United States v. Pelullo</u>, 105 F.3d 117 (3d Cir. 1997) (failure to

disclose FBI agent's rough notes, which had favorable information not included in FBI 302,

violated <u>Brady</u> disclosure obligation).[93]

---

[90] <u>See</u> Gov. Ex. F at 3 ("According to reports obtained from the SCSO regarding the assault…"); <u>id.</u> at 4 ("Copies of all the reports obtained from the SCSO were previously provided to SA C. Patrick Austin, via facsimile, on 6/14/2005.").

[91] <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) ("[an] individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").  <u>See also</u> <u>United States v. Gil</u>, 297 F.3d 93, 106 (2d Cir. 2002) (finding constructive possession where document was possessed by an OTB investigator because "[t]he government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team'") (citation omitted).

[92] <u>See</u> <u>Auten</u>, 632 F.2d at 481 (finding constructive possession and suppression of witness's criminal history even where prosecution chose not to run FBI or NCIC check of witness).

[93] The Government argues that Mr. Fell's <u>Brady</u> claim relating to Mr. Eike's criminal history is procedurally barred because the Eike 302 turned over to trial counsel immediately before trial provided "sufficient information for Fell to be placed on notice that Eike had a criminal record," and the claim could have been raised on direct appeal.  Opp. 216.  The Government's argument fails because it turns on facts outside the record on appeal.  <u>See</u> <u>Waley v. Johnston</u>, 316 U.S. 101, 104 (1942) (finding claim cognizable in habeas where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal").  In any event, Mr. Fell has alleged that his trial counsel, one of whom also served as his appellate counsel, rendered deficient performance in failing to pursue the evidence of Mr. Eike's criminal history.  Thus, Mr. Fell has adequately established cause for failing to bring this claim earlier, which would excuse any procedural default of his <u>Brady</u> claim.  <u>See</u> <u>Bloomer v. United States</u>, 162 F.3d 187, 191 n.1 (2d Cir. 1998) (noting petitioner may bring claim in 2255 proceeding because "ineffective assistance of counsel will constitute cause when it rises to a constitutional violation of a petitioner's Sixth Amendment right" to excuse a procedural default); <u>see also</u> <u>United States v. Mannino</u>, 212 F.3d 835, 845 (3d Cir. 2000) (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)) (defendants

126

The Government also argues that, even if it knew that Mr. Eike was not in a coma, this information was not exculpatory and the Government did not have to disclose it because the Government did not rely on the incident to prove any of its affirmative aggravators and instead only used the evidence to rebut the mitigating factor offered by Mr. Fell that he was twenty years old at the time of the offense of conviction. In essence, the Government claims that it elicited evidence that Mr. Fell kicked Mr. Eike into a "coma" and then urinated on him for no reason. But that is not what it conveyed to the jury. To the jury, it conveyed that this was important information relating to Mr. Fell's character and to the offense. This false evidence unmistakably influenced the jury's perceptions of Mr. Fell, and because the Government drew a direct comparison between the Woodstock incident and Mrs. King's death, it bore directly upon the statutory aggravator that Mrs. King was killed in a heinous, cruel or depraved manner, and upon other mitigating factors including whether Mr. Fell was remorseful for Mrs. King's death and whether mitigating events in Mr. Fell's early life could outweigh the gravity of his crimes. The Government's argument also fails because Brady applies equally to evidence related to proposed mitigating and aggravating factors. See Cone v. Bell, 556 U.S. 449, 475-76 (2009) (holding that suppression of evidence by Government at trial may constitute a Brady violation even where evidence at issue serves to undercut Government's rebuttal to a mitigating factor).

Finally, the Government argues that Mr. Fell did not suffer any prejudice from the Government's disclosure violation because the jury found unanimously in Mr. Fell's favor on the mitigating factor that Mr. Fell was twenty years old. Opp. 212. That argument is specious. As is also true with respect to its response to the mitigating factors regarding Mr. Fell's social background, the Government confuses proof of existence of the underlying fact alleged to be

established ineffective assistance of counsel under Strickland and "therefore demonstrated the cause and prejudice that will excuse the procedural default from counsel's failure to [raise other claim] on direct appeal").

mitigating with proof that such fact is mitigating and evidence regarding the weight of that

mitigator. It never was in dispute that Mr. Fell was twenty years old at the time of the offense –

that was a matter of objective fact. What remained in dispute was the weight to be accorded to

that mitigating factor.[94] The Government argued that that fact was entitled to no weight (or

should be given negative weight).[95] It is thus no answer to say that the jury found that Mr. Fell

was twenty years old; the Government's <u>Brady</u> obligations may not be so narrowly cabined. Mr.

Fell has alleged that concealment of the Eike evidence caused him prejudice in the weighing of

that mitigating fact and other aggravating and mitigating facts, and ultimately in the jury's

sentence, and that claim cannot now be resolved summarily on the pleadings. <u>See</u> <u>Calley v.</u>

<u>Callaway</u>, 519 F.2d 184, 221 (5th Cir. 1975) (en banc) ("<u>Brady</u> requires the disclosure of

material evidence *favorable in the sense of mitigation* or exculpation…") (emphasis added).[96]

Indeed, the Government's argument otherwise would undermine the entire balancing process that

---

[94] Tr. Vol. XII at 38:7-18 (July 13, 2005) (During its closing argument, the Government stated, "[E]ven if you find evidence of some of these mitigating factors, we submit to you that the weight of these factors is not that heavy, and you need not give them much, if any, weight…And that decision about what weight to give these factors is up to you, for you to deliberate on, and for you to make a decision on.").

[95] <u>See</u> Tr. Vol. XII at 60:1-20 (July 13, 2005) ("The next alleged mitigating factor is: The defendant was twenty years old at the time of the offense…*And if you have any questions about whether he was a man when he committed those crimes, think back about the testimony from Teri Fell*. You remember when I cross examined her about an incident that occurred in August of 2000…just a few months before the crimes in this case…Donald Fell committed a horrible, violent assault on a person the same way he then later killed Terry King. He did it intentionally. He did it violently. And he did it with the utter depravity that you have heard about in this case. He did it in that case. Remember what he did after he beat that man with his feet into a coma. *Those are the acts of a man*.") (emphasis added).

[96] <u>See also</u> <u>United States v. Frank</u>, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998) (noting <u>Brady</u> obligated prosecutor in death penalty case to disclose information "that would be material to the defendant's presentation of factors mitigating against a sentence of death"); <u>United States v. Feliciano</u>, 998 F. Supp. 166, 170 (D. Conn. 1998) ("Defendants are clearly entitled to discovery of mitigating evidence under <u>Brady</u>…"); <u>United States v. Beckford</u>, 962 F. Supp. 804, 811 (E.D. Va. 1997) ("Evidence relevant to a statutory mitigating factor would certainly be, for the defendant, 'favorable' evidence pertaining to punishment in that it may justify a sentence of life imprisonment as opposed to death.") (citation omitted); <u>United States v. Perez</u>, 222 F. Supp. 2d 164, 166 (D. Conn. 2002) ("[M]aterials relating to aggravating and mitigating circumstances are within the scope of the Government's obligations under <u>Brady</u>.").

is a critical component of the federal death penalty statute and has been a critical component of

Eighth Amendment jurisprudence since the Woodson trilogy.[97]

Next, the Government argues that because it did not call Mr. Eike as a witness at

trial, Mr. Eike's criminal history had no impeachment value and thus was not favorable.  Opp.

216.  The Government, however, is required to disclose exculpatory or impeachment evidence,

even if the materials concern a non-testifying witness.  See United States v. Jackson, 345 F.3d

59, 70-71 (2d Cir. 2003) (noting Brady requires disclosure of exculpatory and impeachment

evidence pertaining to non-testifying witnesses to prevent prosecution from avoiding its

disclosure obligations by simply not calling witness to testify); Leka v. Portuondo, 257 F.3d 89

(2d Cir. 2001) (habeas granted for Brady violation where prosecution failed to disclose material

concerning a non-testifying police officer).[98]  The Government's ultimate decision not to call Mr.

Eike to testify did not its obligation to disclose this favorable evidence to trial counsel prior to

trial.  Jackson, 345 F.3d at 71.

Furthermore, Mr. Eike's conviction for sexually assaulting a minor was mitigating

information in and of itself and was not simply impeachment material.  This evidence would

have corroborated the accounts of Mr. Fell and Teri Fell, who were arguably interested

witnesses, that Mr. Fell was provoked to attack Mr. Eike because he was trying to sexually

---

[97] Jurek v. Texas, 428 U.S. 262, 271 (1976) (stating that "a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in [Woodson] to be required by the Eighth and Fourteenth Amendments…. A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, *but also why it should not be imposed.*  Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances.") (emphasis added).

[98] See United States v. Rodriguez, 496 F.3d 221, 226 n.4 (2d Cir. 2007) ("[T]he Government's obligations under Brady to disclose…does [sic] not depend on whether the information to be disclosed is admissible as evidence in its present form."); United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002) (finding undisclosed memo was material even though it contained hearsay and it was potentially inadmissible).

assault Mr. Fell's intoxicated, seventeen-year-old sister.[99]  Additionally, this evidence would be admissible under Federal Rule of Evidence 404(b) because it shows that Mr. Eike was not an innocent victim, as the Government's arguments suggested, but, consistent with his prior actions, Mr. Eike had intended to sexually assault Teri Fell.  See United States v. Pitre, 960 F.2d 1112, 1118-19 (2d Cir. 1992) (acknowledging the Second Circuit's inclusionary approach to Rule 404(b) evidence which allows such evidence if it is offered "for any purpose other than to show a defendant's criminal propensity").

Finally, Mr. Fell has alleged facts showing prejudice.  As noted, the Government told the jury that Mr. Fell "stomp[ed] [Mr. Eike] into a coma."  Tr. Vol. XII at 124:5-7 (July 13, 2005).[100]  The Government also unmistakably equated the Woodstock incident to the death of Mrs. King.  The Government argued, "Donald Fell committed a horrible, violent assault on a person *the same way he then later killed Terry King*."  Id. at 60:13-15 (emphasis added).[101]  This comparison was drawn after the Government painted a highly graphic, and as Mr. Fell has alleged, inaccurate picture of the nature of Mrs. King's injuries.  See infra Section X.  The Government argued that Mrs. King's death involved such forceful blows "that her teeth came out of her mouth whole"; her earring "was literally was torn off"; and Mrs. King was actually "killed twice."  Tr. Vol. XII at 23:8-10, 23:19-24, 24:16-23 (July 13, 2005).  Thus, there can be no reading of the summation to support the Government's argument that its sole focus on the Woodstock incident was on urination.  The thrust of the Government's claim was that Mr. Fell

---

[99] The Government's argument that Mr. Eike's criminal history was not favorable because Mr. Fell was unaware of it during the Woodstock incident ignores the value of the evidence to corroborate the Fells' claims, regardless of whether Mr. Fell was aware of it.  Opp. 216-17.

[100] See also Tr. Vol. XII at 60:13-19 (July 13, 2005) ("Remember what he did after *he beat that man with his feet into a coma*.") (emphasis added).

[101] The Government went on to say, "He did it intentionally.  He did it violently.  And he did it with the utter depravity that you have heard about in this case."  Id. at 60:15-18.

130

put Mr. Eike into a coma. If the Government did also note that Mr. Fell urinated on the victim, the jury's perception of the degree of callousness of the act was undoubtedly impacted by its impression that Mr. Eike was actually in a coma at the time.

The Government's familiar canard that use of this evidence "would have been wholly inconsistent with Fell's defense strategy" is not true. Opp. 214. There was no defense strategy to have Mr. Fell admit to causing injuries far more serious than those that were suffered.[102] Thus, had the Government produced the newly-discovered evidence, trial counsel could have used it to support a motion to exclude all evidence regarding the Eike incident because it was irrelevant and, as well, far more prejudicial than probative.

It is also no answer at this stage for the Government to claim now that Mr. Eike's criminal history was inadmissible. Opp. 210, 217. Mr. Fell has alleged that the evidence, and leads developed from it, could have been used in that form or in other ways. The Government argued to the jury that Mr. Fell inflicted a coma on Mr. Eike, much like he and Mr. Lee gratuitously killed Mrs. King. It certainly would have been relevant to the Court's assessment of the admissibility of any evidence relating to the Eike incident, and to trial counsel's response, that Mr. Eike had been convicted of sexually assaulting an 11-year old girl. This evidence would also have been relevant to explain Mr. Fell's reaction to Mr. Eike's attempt to rape his sister, especially when viewed in conjunction with information pertaining to Mr. Fell and Teri Fell's past.[103]

---

[102] Indeed, trial counsel belatedly tried to minimize the harm from Teri Fell's testimony that Mr. Fell kicked Mr. Eike into a coma by trying to introduce evidence that Mr. Fell was merely charged with a misdemeanor and issued a fine in connection with the incident. Trial counsel noted that "the jury should [not] be left with an incomplete picture of an event that the government obviously saw the need to accentuate." Tr. Vol. XI at 97:25-98:2 (July 12, 2005).

[103] As a child, Mr. Fell was repeatedly forced to stand by and watch his sister being molested. See Wilkes-Barre Gen. Hosp. Final Narrative Summary, May 2, 1992, Mitigation Binder (Fell Ex. 1, Tab 25) ("At age four years, [Donald Fell] and his sister were sexually and physically abused by a babysitter."); Decl. of Teri Fell, Mar. 15, 2011

131

Far from the false and misleading portrait painted by the Government, Mr. Fell did not have a history of intentionally inflicting serious harm on other individuals prior to the offense of conviction.  The suppressed evidence would have shown the jury that Mr. Fell was not on a clear and irreversible path of violence as he grew older, but rather the Woodstock incident was a fight in which a convicted sex offender sexually assaulted Teri Fell; Mr. Fell was high on hallucinogens and other substances, defended his sister; and the assailant suffered at most temporary injuries.

Under these facts, Mr. Fell's claims cannot be summarily dismissed.  As the Ninth Circuit has stated in a similar context, Mr. Fell's claim clearly "is not so patently frivolous or incredible as to justify summary dismissal.  He has not made a conclusory allegation, but rather has specifically identified the exculpatory evidence which he claims the government knew of and failed to disclose.  There is nothing in the record which conclusively demonstrates that this claim was without merit."  Baumann v. United States, 692 F.2d 565, 573 (9th Cir. 1982) (citation omitted) (reversing summary dismissal of petitioner's Brady claim and remanding for an evidentiary hearing).

### 2.  Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel

The Government does not dispute that trial counsel were aware of the Woodstock incident as early as December of 2000.  It was in that time period – at the very outset of the case – that trial counsel were provided Mr. Fell's post-arrest statement.  Fell Ex. 60 at 36.  The Government also does not dispute that trial counsel were on notice that the Government might seek to use this evidence to support the death penalty.  The incident was the sole prior criminal

---

(Fell Ex. 278 at 3) ("Those sick people made my brother watch while they molested me.  I understand that they also molested my brother.").  See also Decl. of Christina Cupano, Feb. 2, 2011 (Fell Ex. 279 at 2) ("Teri told me that her mom would sexually molest her while her boyfriend watched.  Donny saw what his mom was doing and tried to stop it, but he would get a beat down by the mother and the guy.").  Naturally, he would have a strong reaction upon seeing Mr. Eike victimizing his sister once again.

132

conviction on Mr. Fell's record.  The Government also does not dispute that over the four plus

years leading up to trial, the defense did not do a single bit of investigation into the Woodstock

incident and did not know Mr. Eike was never in a coma.  See Decl. of Gene Primomo, Mar. 16,

2011 (Fell Ex. 263 at 1) ("To my knowledge, we did not do any investigation into the

Woodstock, New York incident where Donald Fell got into a fight with Chris Eike.");[104] Decl. of

Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 7) (because trial counsel failed to investigate

the incident and simply relied on Mr. Fell's post-arrest "statements and information…received

from the Government, [trial counsel believed] that Mr. Fell had beaten Mr. Eike into a coma").

Finally, the Government does not dispute that the evidence would have been readily available to

trial counsel had trial counsel simply spoken to Mr. Eike or obtained the SCSD documents and

Mr. Eike's hospital records by simply requesting the records from the requisite agencies.

        The Government nonetheless seeks to summarily dismiss Mr. Fell's claim that

trial counsel's failure to investigate Mr. Eike and the Woodstock incident constituted ineffective

assistance of counsel.  Its arguments are meritless.

        It is not sufficient to say, as the Government does, that trial counsel had in its

possession documents that briefly describe the Woodstock incident and the subsequent

disposition of charges against Mr. Lee and Mr. Fell.  These documents do not explain Mr. Eike's

medical diagnosis or treatment and do not reveal that Mr. Eike suffered no serious injury, much

less a coma.  Nor is it the law that because Mr. Fell first used the word "coma" to characterize

Mr. Eike's condition, trial counsel need not have investigated the Woodstock incident.  Opp.

---

[104] Trial counsel did not interview the witnesses to the incident, with the exception of Teri Fell, and even failed to thoroughly question her about the Woodstock incident or why she believed Mr. Eike had been in a coma.  Trial counsel failed to obtain any records that would have conclusively established that Mr. Eike was never in a coma, including the SCSD records and Mr. Eike's Medical Records.  Trial counsel simply made no effort prior to trial to explore the extent of Mr. Eike's injuries and only obtained the records from the Bethel Justice Court that documented the incident, Mr. Fell's charges, and the resulting disposition at the last minute.  Mot. 186.

133

208. Counsel's duty to investigate is not relieved because the inculpatory words are alleged to have come from the defendant's own mouth. If that were the case, the legion of defendants who are claimed to have made false confessions would be without any enforceable right to effective assistance of counsel. See Rompilla v. Beard, 545 U.S. 374, 387 (2005) ("duty to investigate exists regardless of the accused's admissions or statements") (quoting ABA Standard § 4-4.1 (2d ed. 1980)).[105] Not only is trial counsel's duty to investigate preserved when the defendant makes inculpatory statements, trial counsel is obligated to investigate the validity of a confession made by the defendant. See Lunbery v. Hornbeak, 605 F.3d 754, 760 (9th Cir. 2010) (recognizing defense counsel's failure to investigate validity of defendant's confession would constitute an error requiring grant of petition for habeas relief).

Finally, as noted above, there is a reasonable probability that investigation of the Woodstock incident would have made a difference at trial. Mr. Fell is prepared to prove that the evidence that the incident was provoked by the sexual assault on Teri Fell and that Mr. Eike did not suffer any serious injuries would have eliminated any link between the Woodstock incident and the King murder and would have made clear that Mr. Fell's statement was unreliable, thus eliminating any basis for admission of the portion of Mr. Fell's statement relating to the Woodstock incident under Rules 401, 403 and 404(b). See Weinstein's Federal Evidence, §404.20[1]; see also United States v. Wiley, 846 F.2d 150, 156 (2d Cir. 1988) (holding even where evidence is probative of exception to 404(b), such evidence inadmissible if so prejudicial that it would tend to make jury believe defendant had propensity to commit such crimes). It

---

[105] See also Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053, 1119 (E.D. Cal. 2008) (finding ineffective assistance where "no one knew whether [defendant] was telling the truth or exaggerating" and counsel did not "investigate whether potential aggravating evidence was corroborated and learn where [defendant's] exaggeration gave way to reality"); ABA Guideline 1.1, Commentary at 6-7 ("To assume the accuracy of whatever information the client may initially offer… is to render ineffective assistance of counsel.").

134

would further have eliminated any basis for the Government's questioning of Teri Fell regarding the "coma," thus removing the basis for admission of the Woodstock incident evidence at all. And, even if those motions did not succeed (which they should have), the image that the newly-proffered evidence would have presented – of Mr. Fell protecting his sister rather than of Mr. Fell stomping someone into a coma – would have been dramatically different from what the Government told the jury.[106]  Mr. Eike himself believed the reason he "passed out was due to the drugs [he] took that night," and not a result of Mr. Fell's actions.  Fell Ex. 314 at 2.  Indeed, had trial counsel properly investigated and uncovered the information that proved Mr. Eike was never in a coma, they would have been able to prevent the jury from hearing any reference to the word "coma."[107]

## VII.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To Mr. Fell's Prison Conduct

Trial counsel presented two mitigating factors related to Mr. Fell's post-arrest conduct at trial.  The first was: "Mr. Fell did not present a risk to prison officials or other inmates if he was sentenced to life in prison without possibility of release."  Mot. Section VII, 205-06; Special Verdict Form, July 14, 2005 (Fell Ex. 209).  The second was the mitigating factor: "Mr. Fell had made positive contributions to the Northwest State Correctional Facility (the "NWSCF") by working, gaining an education, and helping to resolve inmate grievances."  Id. at

---

[106] See United States v. Snowden, 770 F.2d 393, 397 (4th Cir. 1985) (holding materially different circumstances between two acts can make evidence of first act inadmissible).

[107] The Government's argument that trial counsel did not need to investigate Mr. Eike's criminal history because Teri Fell's testimony concerning Mr. Eike's sexual assault went uncontested is without merit.  Opp. 217-218.  The Government did contest Teri Fell's testimony; it argued that Mr. Fell's conduct during the Woodstock incident was similar to his unprovoked murder of Mrs. King, both of which it contended were marked by "utter depravity."  Tr. Vol. XII at 60:13-19 (July 13, 2005).  Given that the only account of Mr. Eike's sexual assault of Teri Fell came from Teri herself, she was an arguably interested witness who could have been trying to paint her brother in a more positive light.  Mr. Eike's sexual assault conviction would have corroborated the Fells' claims that Mr. Eike was in fact trying to assault Teri Fell on this occasion, making her testimony more credible.  Cf. Lindstadt v. Keane, 239 F.3d 191, 203 (2d Cir. 2001) (describing the "exceeding importan[ce]" in a "credibility contest" of "the testimony of neutral, disinterested witnesses") (internal quotation marks omitted); Crisp v. Duckworth, 743 F.2d 580, 585 (7th Cir. 1984) (noting the importance of "[h]aving independent witnesses corroborate a defendant's story").

135

2.  No jurors found in favor of Mr. Fell on the first mitigating factor.  Id.  Only one juror found in favor of Mr. Fell on the second mitigating factor.  Id.

The 2255 Motion presents specific facts demonstrating that the Government violated its Brady obligations and that Mr. Fell received ineffective assistance of counsel with respect to both mitigators and that, had the Government satisfied its obligations or counsel followed prevailing professional standards, there is a reasonable probability the outcome of the penalty phase would have been different.  As trial counsel reasonably should have anticipated, in rebuttal to the mitigator that Mr. Fell did not present a risk to prison officials, the Government relied heavily upon videos of two disciplinary incidents involving Mr. Fell, including one from March 17, 2004 (the "March 17, 2004 incident"), that appeared to show Mr. Fell being verbally aggressive and allegedly spitting at correctional officer Marc Pelkey.  The Government used these videos to argue in summation that Mr. Fell was "fighting, swearing, kicking, spitting, yelling, doing all he could to get in the way of those correctional officials *who behaved themselves impeccably throughout*."  Tr. Vol. XII at 122:9-12 (July 13, 2005) (emphasis added).  As a result of post-conviction investigation, Mr. Fell presented specific evidence in the 2255 Motion that the Government's argument was false.  Far from behaving "impeccably," one of the officers, Officer Pelkey, was in fact investigated for using excessive force during the March 17, 2004 incident, and while he "wasn't formally disciplined for the incident with Fell, [he] was ordered by the Chief of Security not to have any more contact with [Fell]."  Declaration of Marc Pelkey, Mar. 9, 2011 (Fell Ex. 256 at 2).  Additionally, Mr. Fell presented evidence in the 2255 Motion that Officer Pelkey had a pattern of engaging in excessive force with prisoners, corroborating Mr. Fell's claim that Officer Pelkey did not behave himself "impeccably" during the March 17, 2004 incident.  This Court and the jury never heard this evidence because it was

136

suppressed by the Government and trial counsel never bothered to investigate Officer Pelkey's

disciplinary history or even to attempt to talk with him or other witnesses to the incident.

With respect to the mitigator regarding positive contributions, as trial counsel

reasonably also should have anticipated, the Government introduced a lawsuit filed by Mr. Fell

against the prison regarding Native American religious practices, his participation in numerous

religious faiths, and his utilization of the prison's administrative grievance process.  The

Government used this evidence to argue that Mr. Fell's professed religious beliefs were insincere

and manipulative, and his tendency to generate grievances made him disruptive.  Mot. 207.

These arguments too were false – as counsel could have demonstrated.  Deacon Steven Ratte,

who was present in court nearly every day during Mr. Fell's trial, would have testified about Mr.

Fell's religious curiosity and his positive contributions to the NWSCF.  Deacon Ratte was

intimately familiar with these factors through his work as a spiritual advisor to Mr. Fell for years

leading up to trial, and as Mr. Fell's friend.  Yet, trial counsel failed also to talk to Deacon Ratte.

Whether viewed individually or collectively, these allegations are sufficient to satisfy Mr. Fell's

pleading obligations and to permit his claims to go forward.

### A.    Mr. Fell Has Adequately Alleged That The Government Withheld Material Evidence In Violation Of <u>Brady</u>

In the 2255 Motion, Mr. Fell alleged that the Government, in violation of its

<u>Brady</u> obligations, failed to disclose evidence that Officer Pelkey attempted to assault Mr. Fell,

was investigated for using excessive force during the March 17, 2004 incident, and had a

reputation for and history of violent behavior against inmates.  Mot. Section VII, 206.  The

Government seeks to summarily dismiss Mr. Fell's claim, arguing that Mr. Fell has failed to

adequately allege a <u>Brady</u> violation because evidence of Officer Pelkey's misconduct was not

favorable, was not in the Government's possession, and its suppression did not prejudice Mr.

Fell because it was not material to Mr. Fell's case for life.  The Government's arguments fail.

**1.      Mr. Fell Has Adequately Alleged That The Improperly Withheld Evidence Was Favorable To Mr. Fell**

The Government argues that evidence of Officer Pelkey's disciplinary history in

general was not favorable to Mr. Fell, but in doing so, the Government wholly ignores the

newly-discovered evidence Mr. Fell submitted with the 2255 Motion showing that the

Government was aware that Officer Pelkey used excessive force against Mr. Fell *during the*

*March 17, 2004 incident*.  Specifically, Mr. Fell proffered an Incident Report he received in

heavily redacted form through a document request to the USMS (the "Incident Report"), which

nonetheless reveals that a fellow officer believed that Officer Pelkey inappropriately bent Mr.

Fell's wrist on March 17, 2004, and repeatedly advanced towards Mr. Fell before he was ushered

out of the cell.  USMS Incident Report, Mar. 17, 2004 (Fell Ex. 112).  Mr. Fell's post-conviction

counsel also readily obtained a declaration from Officer Pelkey, admitting that he was

investigated for excessive force relating to the March 17, 2004 incident, and as a result of the

investigation, he was ordered by a superior officer, the Chief of Security at the NWSCF, to stay

away from Mr. Fell.[108]  Fell Ex. 256.  This evidence that Officer Pelkey engaged in excessive

force during the March 17, 2004 incident is clearly favorable to Mr. Fell because it counters the

narrative the Government advanced at trial that Mr. Fell's aggression toward Officer Pelkey was

unprovoked and therefore Mr. Fell's reaction was simply a reflection of his increasingly violent

prison behavior.

---

[108] The Government's argument that, according to Officer Pelkey's declaration, he was cleared of any wrongdoing ignores this telling informal sanction from a superior officer, which Officer Pelkey readily acknowledged.  Mr. Fell has been unable to obtain access to Officer Pelkey's disciplinary file in connection with the March 17, 2004 incident or Officer Pelkey's disciplinary history in general through public document requests, but will seek such documents through the discovery process if the Court permits.  The newly-proffered evidence also justifies Mr. Fell's request for further discovery.

Against this backdrop, evidence of Officer Pelkey's disciplinary history overall is also clearly favorable to Mr. Fell because it reflects a pattern in Officer Pelkey's behavior that corroborates the notion that Officer Pelkey was indeed an aggressor in the encounter with Mr. Fell. Officer Pelkey's history would have provided important context to help the jury understand Mr. Fell's reaction during the March 17, 2004 incident.

The Government next argues that evidence relating to Officer Pelkey's excessive use of force is not material because the March 17, 2004 video shows Mr. Fell initiating a confrontation with multiple officers besides Officer Pelkey. But this argument cannot and should not be disposed of summarily. Mr. Fell has alleged, and is prepared to prove, that, contrary to the Government's argument at trial that Mr. Fell "wanted the officers to attack so that he could have a fight with them" (Tr. Vol. X-I at 23:19-25 (July 8, 2005)), the newly-discovered evidence would show that Mr. Fell was initially cooperating with prison guards calmly when officers first began escorting him from the yard and that it was only when Officer Pelkey provoked a confrontation that Mr. Fell responded. Videotape of March 17, 2004 incident (Gov. Tr. Ex. 18). Specifically, Mr. Fell would be prepared to prove and show at a hearing that the significance of the withheld evidence and Officer Pelkey's statement is what it says about what is concealed by virtue of the camera angle – that Mr. Fell's change in behavior was triggered by Officer Pelkey's overly-aggressive behavior in twisting Mr. Fell's wrist in a painful manner. Thus, the Incident Report and Officer Pelkey's statement explain Mr. Fell's conduct – Officer Pelkey was using excessive force on Mr. Fell, causing him pain – and contradict the Government's argument at trial. This information is material and mitigating. In terms of the mitigating factor of future risk, there is a world of difference between an unprovoked verbal

139

assault on officers and a temporary reaction to the use of excessive force, as the Government

itself appeared to recognize by arguing that the verbal assault was unprovoked.[109]

The Government misses the point by arguing that Mr. Fell has not established that

he was aware of Officer Pelkey's reputation.  The relevance of the hidden evidence does not lie

in what it says about Mr. Fell's state of mind.  Rather, the evidence establishes that, far from the

story presented to the jury by the Government, Officer Pelkey was an aggressor and Mr. Fell's

conduct was a response to that aggression.  See United States v. Bilzerian, 926 F.2d 1285, 1296

(2d Cir. 1991) ("The weighing of relevance under Rule 403 may be altered when a false

impression is created by earlier testimony… evidence whose probative value might not

ordinarily outweigh its prejudicial effect if offered on direct examination is admissible to rebut

testimony elicited on cross examination that created a false impression.") (citation omitted).

The Government also argues that because Officer Pelkey was not a witness, the

newly-uncovered evidence is not favorable because it lacks impeachment value.  But, the law is

clear that the Government is required to disclose exculpatory or impeachment evidence to the

defense, even if the materials at issue concern a non-testifying witness.  See United States v.

Jackson, 345 F.3d 59, 70-71 (2d Cir. 2003) (noting Brady requires disclosure of exculpatory and

impeachment evidence pertaining to non-testifying witnesses); Leka v. Portuondo, 257 F.3d 89

---

[109] Mr. Fell would also be prepared to show that the newly-discovered evidence also sheds light on what transpired after Mr. Fell reached his cell.  While much of what occurred is not visible from the video, the Incident Report shows that Officer Pelkey actually advanced at Mr. Fell multiple times and had to be escorted from the cell so that he would not advance at Mr. Fell again.  See Unredacted Incident Report of Officer Cross, Mar. 17, 2004 (Fell Ex. 315) ("Pelkey *started to advance* toward him at which point CO/2 Machia got in between inmate Fell and Pelkey. Co/1 Pelkey *again started to advance* toward Fell at which time CO/1 Sousa put Pelkey against the wall.  CO/1 Pelkey *appeared to be returning* at which time I grabbed him and push him out of the cell…"); Memorandum of Officer Williams, Mar. 18, 2004 (Fell Ex. 316) ("officer *Pelkey lunged at inmate Fell* while he was still in hand cuffs").  At trial, the Government questioned Officer Machia about what transpired after Mr. Fell allegedly spit at Officer Pelkey, asking "[a]nd then that officer was immediately taken away so the scene wouldn't get escalated; is that right?" to which Officer Machia responded "[t]rue."  Tr. Vol. X-I at 113:6-21 (July 8, 2005).  This testimony and the videotape itself obscured the fact that Officer Pelkey continued to act aggressively toward Mr. Fell when Mr. Fell was handcuffed in his cell and could not have caused Officer Pelkey harm.  Thus, the newly-discovered information is material and favorable because it would have shown Officer Pelkey's continued aggression and the reasons Mr. Fell had such a strong reaction to him.

140

(2d Cir. 2001) (habeas granted for Brady violation where prosecution failed to disclose material concerning a non-testifying police officer).

Without knowledge of the investigation into Officer Pelkey's conduct in the March 17, 2004 incident and the reports of another officer documenting that Officer Pelkey's use of force was inappropriate, trial counsel lacked sufficient grounds to succeed on its motion in limine to exclude the videotape. The newly discovered evidence is favorable because it could have resulted in the exclusion of the video, or at the very least, provided adequate information to cross-examine Officer Machia.

### 2. Mr. Fell Has Adequately Alleged That The Government Suppressed Evidence In Violation Of Brady

Next, the Government argues that it did not suppress evidence of Officer Pelkey's disciplinary history because the evidence was in the possession of the NWSCF and not in the possession of a federal agency.[110] Opp. 227. This argument again misses the mark. The Incident Report cited by Mr. Fell in his 2255 Motion showing that a fellow officer observed Officer Pelkey engaging in excessive force (Fell Ex. 112) was obtained by Mr. Fell through a FOIA request to the USMS, a federal agency.

Moreover, Officer Pelkey appeared in court for five days at the Government's request, and was prepared to testify.[111] When post-conviction counsel spoke with Officer Pelkey, he readily admitted his disciplinary history. It is implausible that, at the time it was considering him as a witness, the Government also did not talk to him or that Officer Pelkey did

---

[110] By arguing that because the NWSCF was not a federal agency, "information in their files cannot be imputed to the United States Government," the Government implicitly acknowledges well-settled law that favorable information maintained in the files of a federal agency are imputable to the Government. Opp. 227.

[111] Decl. of M. Pelkey (Fell Ex. 256 at 3).

not admit to his disciplinary history then.[112]  Indeed, the Department of Justice instructs prosecutors to "have candid conversations" with law enforcement officers who might serve as potential witnesses regarding any potential Giglio material that might be relevant to their testimony.  David W. Ogden, Memorandum for Prosecutors Regarding Criminal Discovery (January 4, 2010), http://www.justice.gov/dag/discovery-guidance.html.  Notably, after the Court ruled that the Government could only offer Officer Pelkey's report of the March 17, 2004 incident if Officer Pelkey testified (Tr. Vol. VIII-II at 39:12-40:1, 42:13-16, 46:3-47:5 (July 6, 2005)), the Government suddenly elected not to call him as a witness.[113]  The inference thus is unmistakable that the Government knew of Officer Pelkey's disciplinary history, including the investigation into his conduct in connection with this incident and chose not to call him precisely because of those facts.

The Government does not dispute that it has an affirmative obligation to "learn of any favorable evidence known to others acting on the government's behalf" and possession of such evidence will be imputed to the prosecution.  Kyles v. Whitley, 514 U.S. 419, 437 (1995). See also United States v. Bin Laden, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) ("A prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him – those variously referred to as an 'arm of the prosecutor' or 'part of the prosecution team.'") (citing Second Circuit cases).  The USMS was clearly "acting on the Government's behalf" and "part of the prosecution team" throughout Mr. Fell's pre-trial

---

[112] The Government does not deny that Officer Pelkey mentioned his disciplinary history in the five days he sat in the courthouse waiting to be called as a witness by the Government.  Resolution of this issue thus turns on extra-record evidence.

[113] Decl. of M. Pelkey (Fell Ex. 256 at 3) ("I was called by the prosecution to Fell's trial, but I never testified.  I went to court for four or five times and sat in the hallway.").

detention and during trial.  The USMS retained custody of Mr. Fell – a federal prisoner,[114] and

Mr. Fell was housed in the NWSCF's Echo Unit, a unit that was used solely to detain federal

prisoners.[115]  As custodian, the USMS continually monitored Mr. Fell and received regular,

nearly contemporaneous updates regarding any disciplinary incidents involving Mr. Fell.[116]

Additionally, it was the USMS, and not the NWSCF, that transported Mr. Fell to and from the

courthouse each day of trial.  Under these facts, the USMS was unquestionably part of the

prosecution team for Brady purposes.  See United States v. Wilson, 237 F.3d 827, 832 (7th Cir.

2001) ("[I]t is impossible to say in good conscience that the U.S. Marshal's Service was not 'part

of the team' that was participating in the prosecution, even if the role of the Marshal's service

was to keep the defendants in custody rather than to go out on the streets and collect

evidence.").[117]

Documents within the possession of the USMS were also readily available to the

Government, and the Government therefore had a duty to seek Brady material within the

possession of the USMS.  See e.g., United States v. Perdomo, 929 F.2d 967, 971 (3d Cir. 1991)

(court held non-disclosure was inexcusable where the prosecution had not sought out information

---

[114] Documents obtained from the USMS via a public records request explicitly identify the USMS as custodian of Mr. Fell.  See USMS Prisoner Medical Records Release Form, Dec. 14, 2000 (Fell Ex. 317) (release signed by Mr. Fell authorizing USMS with access to his medical records for care provided while "I am in the custody of that agency").

[115] Tr. Vol. VIII-I at 63:13-64:18 (July 6, 2005) (prison teacher notes Echo Unit serves as a "detention center for the federal prisoners" and federal prisoners all detailed in that one unit at time Mr. Fell was housed there); Tr. Vol. VIII-II at 28:6-8 (July 6, 2005) (correctional officer confirmed Echo Unit is a "federal detention unit").

[116] The USMS received computer-generated incident reports for several other incidents that resemble the Incident Report, which demonstrates the NWSCF maintained this type of report for all disciplinary incidents and provided such reports to the USMS shortly after the incident occurred.  See e.g., NWSCF Fax Cover Sheet with Incident Report, Apr. 26, 2005 (Fell Ex. 318) (NWSCF fax to USMS with computer-generated report of April 9, 2005 incident).

[117] Furthermore, the Department of Justice requires United States Attorneys "to seek all exculpatory and impeachment information from all members of the prosecution team."  U.S. Dep't of Justice, United States Attorneys' Manual 9.5001(B)(2) (2008), http://www.justice.gov.

readily available to it); Williams v. Whitley, 940 F.2d 132, 133 (5th Cir. 1991) ("[T]he

prosecution is deemed to have knowledge of information readily available to it."); Carriger v.

Stewart, 132 F.3d 463, 480 (9th Cir. 1997) ("Because the prosecution is in a unique position to

obtain information known to other agents of the government, it may not be excused from

disclosing what it does not know but could have learned.") (citing Kyles v. Whitley, 514 U.S.

419, 438-40 (1995)).  See also United States v. Santiago, 46 F.3d 885, 894 (9th Cir. 1995)

("[T]he fact that the Bureau of Prisons and the United States Attorney's Offices are both

branches of the Department of Justice would facilitate access by federal prosecutors to prison

files."); United States v. Owens, 933 F. Supp. 76, 86 (D. Mass. 1996) (noting a federal

prosecutor's duty to search for evidence under Brady may "include the United States Marshal's

office, as they are a bridge between the Justice Department and the courts").  The Incident

Report would have been readily available to the Government through the USMS, even if it was

not available through the NWSCF.  Thus, Mr. Fell's claim that the Government failed to disclose

the Incident Report cannot be summarily dismissed because the Government did not have

possession of the document.

Additionally, the Government's argument ignores the fact that the NWSCF was a

state agency that was closely related to the federal government.  Mr. Fell was housed in the

NWSCF's Echo Unit, which had an arrangement with the federal government to house federal

prisoners.[118]  In this respect, the Echo Unit was more akin to a federal Bureau of Prisons facility

than a state prison.  Accordingly, files related to Mr. Fell's detention should have been readily

available to the Government and should be imputed to the Government for Brady purposes.  See

Santiago, 46 F.3d at 894 ("Bureau of Prison files are within the possession and control of the

---

[118] See infra Rep. 142 n.115.

144

United States Attorney.").  At minimum, the Government's argument presents a factual dispute as to whether it was in possession of Officer Pelkey's disciplinary history that turns on extra-record facts and cannot be resolved at the summary dismissal stage.

### 3.    Mr. Fell Has Adequately Alleged That Mr. Fell Was Prejudiced By The Government's Failure to Disclose

Finally, the Government also argues that the newly-discovered evidence would not have been material because the jury had an opportunity to view the videotape, and thus, observed the actions of Mr. Fell and Officer Pelkey.  But the Government's argument proves Mr. Fell's point.  The Government states that "it is clear from the videotape…that Officer Pelkey did absolutely nothing on March 17, 2004 to provoke Fell's actions."  Opp. 228.  That is precisely the point.  Officer Pelkey's provocation cannot be seen clearly from the tape.  The tape shows Mr. Fell voluntarily complying with the commands of all of the officers until he reached the Delta 5 door and something provoked him to verbally lash out at Officer Pelkey, but does not show the source of the provocation.  Mr. Fell has alleged and would be prepared to prove that the significance of the newly-discovered evidence is precisely that it shows what the video does not: that Officer Pelkey's unjustified use of force was the catalyst.[119]

The evidence showing that Mr. Fell was calm until he was provoked by an overly-aggressive officer during the March 17, 2004 incident – had it been heard by the jury – would have dampened the aggravating effect of the video, and allowed the jury to more heavily weigh the mitigation evidence presented.  This includes evidence that Mr. Fell got along with other

---

[119] Additionally, to the extent that the Government seeks to argue that it is in fact true that Officer Pelkey did nothing wrong despite Mr. Fell's specific, supported allegations that Officer Pelkey used excessive force during the incident, the Government merely creates a factual dispute that cannot be resolved at the summary dismissal stage. See Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003).

145

inmates[120] and staff,[121] contributed to the NWSCF as a janitor and laundry man,[122] and that Mr.

Fell was elected as unit representative and helped resolve other inmates' grievances.[123]  Mr. Fell

has therefore sufficiently established that there is a reasonable probability that this evidence

would have caused at least one juror to change his vote to life.

Further, it would be premature to deny Mr. Fell's claim that the Government

withheld evidence in violation of Brady without further discovery.  Since Mr. Fell filed the 2255

Motion, the Vermont Department of Corrections has released additional documents to Mr. Fell,

including an unredacted version of the Incident Report Mr. Fell attached as an exhibit to the

Motion.  Fell Ex. 315.  This unredacted report identifies the writer of the Incident Report as

Officer Charles Cross and confirms that at least one fellow officer observed Officer Pelkey using

excessive force in bending Mr. Fell's wrist[124] and inappropriately advancing toward Mr. Fell

three separate times during the March 17, 2004 incident.[125]  This document shows that the

---

[120] See Tr. Vol. VIII-I at 111:7-8 (July 6, 2005) (Officer Barclay testified  that "Donald could get along with other inmates."); Tr. Vol. VIII-II at 18:9-25 (July 6, 2005) (Officer Rushlow testified that Mr. Fell got along with a diverse group of other inmates and had no racial problems.).

[121] See Tr. Vol. VIII-I at 126:23-25, 133:1-3 (July 6, 2005) (Officer Barclay testified to Mr. Fell's "pro social" behavior and interactions with prison staff, and noting  that "[d]uring the time [he] was in Echo [Mr. Fell] followed policies, procedures, routine movement."); Tr. Vol. VIII-II at 3:23-6:4, 19:5-15, 27:15-21 (July 6, 2005) (Officer Rushlow testifying that Mr. Fell "was quiet," "fit in well" and he and other officers did not have a problem with Mr. Fell.).

[122] See Tr. Vol. VIII-I at 134:19-135:25 (July 6, 2005) (Officer Bailey testified that Mr. Fell was selected by the CO2 of the Echo Unit to serve as a laundry man and a janitor and performed those jobs thoroughly.).

[123] Mr. Fell was elected by other inmates as unit representative and approved by the unit management team.  Tr. Vol. VIII-II at 12:24-15:9 (July 6, 2005).  As unit representative, Mr. Fell helped the other inmates raise grievances through the formal administrative grievance process and Mr. Fell would meet regularly with Officer Rushlow to discuss these issues.  Id. at 15:10-16:20.

[124] Officer Cross describes Pelkey's excessive use of force on Mr. Fell's wrist, which prompted Officer Cross to take over for Officer Pelkey and escort Mr. Fell with Officer Machia.  See Fell Ex. 315 (noting Fell started "complaining about his wrist being hurt at this time I observed that…CO/1 Pelkey had his wrist which he had bend up.  I informed CO/1 Pelkey that I would take his place.").

[125] Officer Cross writes that after Mr. Fell spit in Officer Pelkey's direction, Pelkey attempted to assault Mr. Fell several times, until Officer Cross eventually hustled Pelkey out of the cell.  See Fell Ex. 315 ("Pelkey *started to advance* toward him at which point CO/2 Machia got in between inmate Fell and Pelkey.  Co/1 Pelkey *again started*

146

USMS, and thus the Government, did have evidence in their possession – and from a neutral, disinterested witness – that was not disclosed that contradicts the argument the Government advanced at trial and continues to make that Officer Pelkey behaved "impeccably," Tr. Vol. XII at 122:8-12 (July 13, 2005),  and "did absolutely nothing on March 17, 2004 to provoke Fell's actions."  Opp. 221.[126]  See generally Lindstadt v. Keane, 239 F.3d 191, 203 (2d Cir. 2001) (describing the "exceeding important[ce]" in a "credibility contest" of "the testimony of neutral, disinterested witnesses") (internal quotation marks omitted); Crisp v. Duckworth, 743 F.2d 580, 585 (7th Cir. 1984) (noting the importance of "[h]aving independent witnesses corroborate a defendant's story").

Moreover, the prejudice stemming from Mr. Fell's Brady claims must be "considered collectively, not item by item."  Kyles, 514 U.S. at 436; see also Jackson, 345 F.3d at 74 (noting that courts "look at the cumulative effect of suppression in light of the evidence as a whole" and conduct their own investigation of the record in determining whether the suppressed evidence is material).  It would be premature to summarily dismiss Mr. Fell's Brady claim relating to Officer Pelkey's disciplinary history without providing Mr. Fell an opportunity to obtain the discovery necessary to fully develop the valid Brady claims he has asserted.  See Rep. Sections VI(B), VII, VIII, XI, XVII, and XVIII.

---

*to advance* toward Fell at which time CO/1 Sousa put Pelkey against the wall.  CO/1 Pelkey *appeared to be returning* at which time I grabbed him and push him out of the cell…") (emphasis added).

[126] The Vermont Department of Corrections also produced two additional documents that shed further light on the March 17, 2004 incident.  See Memorandum of Officer Williams, Mar. 18, 2004 (Fell Ex 316) ("officer *Pelkey lunged at inmate Fell* while he was still in hand cuffs") (emphasis added); Informational Report of Officer Cross, Mar. 24, 2004 (Fell Ex. 319) (noting Fell "said that his wrist was being hurt.  At this time I checked and noticed *that officer Pelkey had inmate Fell's wrist bend up in a wrist lock*.") (emphasis added).  This newly-discovered evidence shows that there are remaining issues that must be explored before Mr. Fell could fairly be precluded from pursuing his well-pled Brady claims.

B.      **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate Mr. Fell's Prison Conduct**

In the 2255 Motion, Mr. Fell alleged that trial counsel were ineffective in investigating Mr. Fell's prison conduct in part because trial counsel "never requested the disciplinary or grievance records of Pelkey or any of the other officers" in connection with the March 17, 2004 incident. Mot. 215. The Government seeks summary dismissal of this claim, arguing that the record shows that trial counsel in fact investigated Officer Pelkey because, during an exchange in which trial counsel sought to exclude Officer Pelkey's report about the March 17, 2004 incident, trial counsel stated that "the particular officer who wrote this report is someone who has expressed a significant dislike for Mr. Fell." Tr. Vol. VIII-II at 42:9-10 (July 6, 2005). Further, trial counsel informed the Court: "We have the whole file." Id. at 42:24. The Government's argument is without merit.

Mr. Fell has alleged and the facts would show that trial counsel did not have the whole file, whatever they might have believed at the time. They only had Mr. Fell's core file, which they obtained through letter from the Government. See Cover Letter From AUSA With Mr. Fell's Prison File, May 18, 2005 (Fell Ex. 122). As Mr. Fell has alleged, this core file did not contain the Incident Report or other documents showing that Officer Pelkey used excessive force. In fact, trial counsel did not subpoena disciplinary records relating to the March 17, 2004 incident or any other records relating to Officer Pelkey's disciplinary history. As for trial counsel's statement that Officer Pelkey had a "significant dislike" for Mr. Fell, that information – provided by Mr. Fell – demonstrates that trial counsel had red flags that there was something in the Fell-Pelkey relationship that should have been investigated but was not. This vague knowledge does not substitute for the hard objective evidence of Officer Pelkey's disciplinary history and the Incident Report regarding exactly what happened on March 17, 2004. Therefore,

148

at best, the Government's argument presents a factual dispute that cannot be resolved at the summary dismissal stage. See Pham, 317 F.3d at 184 (summary dismissal inappropriate where factual issues exist).

The Government further argues that introduction of evidence that Officer Pelkey used excessive force would have somehow been inconsistent with trial counsel's strategy of acceptance of responsibility. This argument again is nonsensical. Evidence that Mr. Fell responded negatively to Officer Pelkey because Officer Pelkey used excessive force on him would have had no bearing on whether Mr. Fell had accepted responsibility for the death of Mrs. King. Moreover, demonstrating that Officer Pelkey used excessive force on Mr. Fell, and Mr. Fell reacted accordingly, would explain Mr. Fell's actions in the video, not excuse them. From the statements the Government itself quotes, it is evident that it was trial counsel's strategy to seek to exclude evidence of the March 17, 2004 incident from the jury altogether because it was more prejudicial than probative. If trial counsel had investigated Officer Pelkey's disciplinary history, trial counsel would have had a much more powerful argument for exclusion of the videotape.

Finally, the Government completely ignores additional aspects of Mr. Fell's claim that trial counsel were ineffective for failing to conduct a sufficient investigation to explain Mr. Fell's conduct during the March 17, 2004 incident. Specifically, Mr. Fell alleged that the March 17, 2004 incident took place just a week after the Second Circuit reversed this Court's decision declaring the death penalty unconstitutional and held that Mr. Fell once again could be facing a death sentence. Mot. 215. The evidence would have established that Mr. Fell naturally was extraordinarily upset at this development precisely at the time of the incident. Decl. of Andrew Bartnick, Mar. 16, 2011 (Fell Ex. 262 at 2). His emotional state was hardly what it would have

149

been had this Court's decision been sustained. Yet the jury was never presented this evidence

because trial counsel never investigated it or any other exculpatory or mitigating factors with

respect to the March 17, 2004 incident. Trial counsel's total abdication of its responsibility to

investigate an incident it knew would play a powerful part at trial thus caused Mr. Fell prejudice.

Lindstadt, 239 F.3d at 202 (In evaluating the prejudice suffered by a petitioner as a result of

counsel's deficient performance, the court looks to the "cumulative weight of error" in order to

determine whether the prejudice "reache[s] the constitutional threshold.").

C.    **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Interview And Present Testimony Of Deacon Steve Ratte**

Mr. Fell has also sufficiently alleged that, whether viewed individually or

collectively along with the other failures of counsel, trial counsel's failure to interview and

present the testimony of Deacon Ratte constituted ineffective assistance of counsel. Deacon

Ratte was a friend and spiritual advisor to Mr. Fell for several years before trial. No one talked

to him, even though Deacon Ratte was present in the courtroom nearly every day during trial and

would have willingly testified. The Government's arguments do not support summary dismissal.

First, the Government argues that Deacon Ratte's testimony would have been

cumulative to that of the three correctional officers presented by the defense, Ronald Barclay,

James Bailey, and Jason Rushlow, and to prison consultant James Aiken, because these

witnesses all testified that Mr. Fell was capable of adjusting his conduct to a prison environment

and "the correctional officers also testified that Fell demonstrated an interest in religious

activities." Opp. 231. Yet the only correctional officer at trial to offer any substantive testimony

regarding Mr. Fell's religious activities was Officer Rushlow. Officer Rushlow answered "yes"

when asked by trial counsel if Mr. Fell participated in religious activities and whether he had

expressed an interest in Christianity, Ramadan and Native American talking circles. Tr. Vol.

150

VIII-II at 12:9-18 (July 6, 2005). However, he was unable to provide any insight into why Mr. Fell had expressed interest in other religions. Id. at 64:25-65:1 ("Q: Did he tell you at all why he was interested in [Ramadan]? A: No"). On cross-examination, the Government elicited testimony from Officer Rushlow that Mr. Fell had filed a lawsuit in order to participate in Native American talking circles and had filed grievances to participate in Ramadan. Id. at 52:24-57:6. The clear import of this cross-examination was that Mr. Fell's religious beliefs were insincere and manipulative, and indeed the Government urged the jury to conclude from Officer Rushlow's testimony that Mr. Fell's religious interests were "bogus." Tr. Vol. XII at 48:20-49:4 (July 13, 2005). The testimony of Deacon Ratte would not have been cumulative to Officer Rushlow's. It offered substantially more information about the intellectual nature of Mr. Fell's religious interests, and the sincere manner in which he explored Christianity and other faiths. Deacon Ratte would have testified:

> Donny took his involvement with religious services very seriously. I gave him the job of setting up for the services, and he seemed to enjoy fulfilling that responsibility each week. Donny also enjoyed performing readings during these services, and he encouraged other prisoners to attend. Several of the inmates did not speak English well, and Donny tried to explain the church services to them. It was obvious that the other inmates appreciated Donny's assistance….
>
> Donny seemed sincere about exploring his faith during services and in his meetings with me. Donny told me about his interest in learning about other religions during our meetings. I did not see anything inconsistent between his interest in other religions and our meetings together. Donny is a very intellectually curious person, who wanted to be involved in a lot of the limited activities the prison offered, including exploring other religions and thinking critically about them.

Decl. of Steven Ratte, Feb. 24, 2011 (Fell Ex. 255 at 1-3).

151

Next, the Government argues that trial counsel's decision not to call Deacon Ratte was reasonable because his testimony would have triggered cross-examination and possible rebuttal about Mr. Fell's other religious activities, such as the prison lawsuit he filed regarding his Native American faith, his request to observe Muslim tradition and his purported interest in Satan. Opp. 231. Leaving aside that trial counsel never interviewed Deacon Ratte, so their decision not to call him as a witness could not have been "strategic," the jury did learn about all of these issues through cross-examination of Officer Rushlow and Teri Fell. See Tr. Vol. VIII-II at 52:6-56:9 (July 6, 2005); Tr. Vol. VII-I at 142:18-144:1 (July 1, 2005). Without objection from trial counsel, the Government also admitted into evidence a chart of Mr. Fell's tattoos, which included an upside down cross bearing the inscription "666." Tr. Vol. VIII-II at 59:10-60:11 (July 6, 2005). What the jury never learned was the counter-narrative Deacon Ratte was uniquely poised to provide – that Mr. Fell's religious interests were intellectual and sincere.[127]

Further, Deacon Ratte offered unique insight into Mr. Fell's interpersonal relationships with himself and other inmates that did not come from any other source. For instance, he would have testified:

> When I first met Donny, he was in his early 20s, just a few years younger than my own children, so I viewed him as a kid. In our one on one conversations, Donny asked me about my family and took an interest in the events in my life. We also discussed the scriptures. Donny cared for other inmates, and how they were being treated…

---

[127] The Government argues that if Deacon Ratte would have testified, it would have called still more witnesses about Mr. Fell's adolescent interest in Satanism. The Government ignores that reasonable trial counsel would have objected to the introduction of further, cumulative evidence on a topic that the Second Circuit has acknowledged did not have a sufficient link to the capital murder case. United States v. Fell, 531 F.3d 197, 230 (2d Cir. 2008) ("We are more troubled by the testimony that the government elicited regarding Fell's satanic beliefs and tattoos…While evidence of the defendant's abstract moral beliefs may in some cases be constitutionally admissible to show motive, there must be stronger evidence of the connection than occurred here and it was a *mistake for the prosecutor to offer the evidence*.") (emphasis added).

> On the night Donny was sentenced to death, I went to visit him.
> We were in a holding cell together, and I became very emotional
> about the sentence. Donny was more composed, and he tried to
> console me.

Fell Ex. 255 at 1-3.

Trial counsel presented Mr. Fell's positive contributions to the NWSCF through working, gaining an education, and helping to resolve inmate grievances as a mitigator, and therefore, affirmatively put Mr. Fell's prison conduct at issue. Fell Ex. 209. Trial counsel should have anticipated that the Government would seek to introduce into evidence the lawsuit Mr. Fell filed professing his right to participate in Native American talking circles and other grievances he filed pertaining to Ramadan fasting. It is unreasonable that trial counsel failed to investigate and uncover evidence to address the grievances filed by Mr. Fell dealing with his religious interests. Trial counsel failed to investigate and interview Deacon Ratte, and as a result, prevented the jury from hearing favorable information that would have lessened the aggravating nature of the Government's depiction of Mr. Fell as disruptive and manipulative. This deficient performance undermines confidence in the outcome of Mr. Fell's sentencing trial.

## VIII.   Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Relating To Mr. Fell's Co-Defendant Robert Lee

The Government seeks summary dismissal of Mr. Fell's claim that his trial counsel were ineffective for failing to investigate the relationship between Mr. Fell and his co-defendant Robert Lee. Mr. Lee was Mr. Fell's closest friend during his critical adolescent years and a participant in the crimes for which Mr. Fell was facing a potential death sentence. An investigation into Mr. Fell's relationship with Mr. Lee was essential in order to understand Mr. Fell's upbringing, his mental health, and his relative culpability for the crimes. The Government claims that trial counsel made a reasonable strategic decision "early on" to avoid all discussion of Mr. Lee, and therefore to cease investigating anything about the relationship, but this

153

argument fails because trial counsel were on notice that an investigation into the relationship between Mr. Fell and Mr. Lee was essential in order to understand who Mr. Fell was and what role Mr. Fell played in the crimes, and also to counter any damaging evidence the Government might offer about their relationship.

The Government also seeks summary dismissal of Mr. Fell's claim that the Government violated its Brady obligations when it failed to disclose favorable evidence regarding Mr. Lee. 2255 counsel has learned that the Government failed to disclose Mr. Lee's prison records showing that after Mr. Lee was arrested, and separated from Mr. Fell, he verbally and physically assaulted other inmates, threatened to rape another inmate's mother, expressed homicidal thoughts in personal writings, displayed suicidal tendencies and otherwise misbehaved in prison. These prison records counter evidence in the Welner report and arguments and evidence presented at trial that Mr. Lee was a docile follower, who was dominated by Mr. Fell. 2255 counsel has also learned that the Government failed to disclose an FBI 302 from an hour-long interview the FBI conducted with Francis Bellantoni, a critical witness who observed Mr. Fell and Mr. Lee arguing on the side of the road and could have corroborated Mr. Fell's statements that it was Mr. Lee's idea to kill Teresca King and that Mr. Fell wanted to let Mrs. King go.[128] Tellingly, the Government relegates its discussion of why Mr. Fell's Brady claims should be dismissed to footnotes, none of which supply sufficient basis to summarily dismiss Mr. Fell's claims.

---

[128] Mr. Fell has also adequately alleged that the Government's misrepresentation of Mr. Lee's purportedly docile nature in the face of Mr. Fell's dominance, given the undisclosed evidence in its possession of Mr. Lee's violent and aggressive behavior, constitutes prosecutorial misconduct in violation of Napue v. Illinois, 360 U.S. 264 (1959), Giglio v. United States, 405 U.S. 150 (1972) and Berger v. United States, 295 U.S. 78 (1935). There is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Wong, 78 F.3d 73, 81 (2d Cir. 1996).

154

A.      **Mr. Fell Has Adequately Alleged That Trial Counsel Unreasonably Failed To Investigate Mr. Lee**

The Government argues that trial counsel made a strategic decision "early on" not to make any mention of the relationship between Mr. Fell and Mr. Lee because there was a wealth of damaging evidence about Mr. Lee. Yet, there were a number of red flags showing that investigation into Mr. Lee would not only be fruitful but necessary.

First, trial counsel were on notice that relative culpability was a critical issue that needed to be investigated based on their client's statements, red flags in their experts' preliminary mental health reports, and their knowledge that the Government intended to pursue the statutory aggravator that Mrs. King was killed in a heinous, cruel or depraved way.

In post-arrest statements, Mr. Fell stated that he wanted to let Mrs. King go, but Mr. Lee convinced him that they had to kill her because she was a witness. See Transcript of Post-Arrest Interview of Donald Fell, Dec. 1, 2000 (Fell Ex. 60 at 9) ("I told her to walk up in the woods and ah, she'd be free to go…[M]y friend [said] she has our names and our descriptions and that, we have to kill her. I [said] I really don't want to… "); id. at 29 ("I wanted to set her free, ya know"); id. ("Bobby had a different idea"); Transcript of Post-Arrest Interview of Donald Fell, Dec. 2, 2000 (Fell Ex. 62 at 21) ("And I said walk up through the woods just keep on walking and we'll go. And she said I'll be safe right and I said yeah."). Further, preliminary mental health evaluations of Mr. Fell concluded that Mr. Fell was easily dominated by others, which corroborated Mr. Fell's statement that he was influenced by Mr. Lee to kill Mrs. King. According to Dr. Mills, Mr. Fell's score on the MMPI-2 Dominance Scale "tend[ed] to confirm Mr. Fell's statements that he had not intended to hurt Mrs. King, that he had intended to release her, but that he acceded to the demand of Mr. Lee." Mills Report, May 7, 2001 (Fell Ex. 3 at 5) (noting his score on the MMPI-2 Dominance Scale "means that Mr. Fell is incapable of

155

standing up for his beliefs and *that others can easily dominate him*") (emphasis added).  See also

Van Gorp Report, May 7, 2001 (Fell Ex. 2 at 4) (noting Fell has "a personality style of being

*quite submissive and responsive to the direction of others*") (emphasis added).

Trial counsel were also aware as early as January 2002 that the Government

intended to pursue the statutory aggravator that Mrs. King was killed in a heinous, cruel or

depraved way.  This statutory aggravator required the Government to prove, beyond a reasonable

doubt, that Mr. Fell's own actions, as opposed to Mr. Lee's, were so "extremely wicked or

shockingly evil," demonstrated intent to "inflict a high degree of pain," or showed that he

"relished the killing, or showed indifference to the suffering of the victim."  Tr. Vol. XII at

146:3-147:1 (July 13, 2005).  Thus, Mr. Fell's own intent with respect to the death of Mrs. King,

as opposed to Mr. Lee's, was unquestionably going to be a central issue at trial.  See United

States v. Hall, 152 F.3d 381, 415 (5th Cir. 1998), abrogated on other grounds by United States v.

Martinez-Salazar, 528 U.S. 304 (2000) (rejecting defendant's claim that jury instructions

"invited the jury to consider the conduct of [defendant]'s coconspirators throughout the course of

the kidnapping in concluding that the killing was 'especially heinous, cruel, or depraved,'"

because "[t]he instructions accompanying the aggravating factor removed any doubt that the jury

was required to focus on Hall's actions in determining whether this aggravating factor existed");

United States v. Sablan, No. 00-cr-00531-WYD, 2007 WL 4116117, *3 (D. Colo. Nov. 16,

2007) ("I agree with Defendant that this aggravating factor must focus on his actions, as

compared to [co-defendant]'s actions.").  Investigation into Mr. Fell's relationship with Mr. Lee

was therefore necessary.

In addition, an investigation into the relationship between Mr. Fell and Mr. Lee

was essential in order to understand Mr. Fell's upbringing and his mental health.  Mr. Lee was

156

Mr. Fell's best friend, and they spent their critical teenage years together.  As Mr. Fell has alleged, this was a time period in Mr. Fell's life which was woefully underexplored.  See supra Section IV.  There were also multiple red flags that Mr. Lee was deeply disturbed, including Mr. Lee's suicide.  These red flags should have put trial counsel on notice that an investigation into Mr. Lee was essential in order to understand Mr. Fell's own social history and his mental health. Indeed, trial counsel were well aware that the relationship between Mr. Fell and Mr. Lee was important, as evidenced by the two mitigating factors they proposed about their relationship:  1) that "Robert Lee, equally culpable for the crimes, will not face execution," and 2) that "Donald Fell would not have committed the crimes without the influence of Robert Lee."  Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 13); Tr. Vol. XI at 18:1-19:4 (July 12, 2005).[129]

Yet despite these red flags, trial counsel did nothing to investigate readily available mitigating evidence regarding Mr. Lee and the dynamics of his relationship with Mr. Fell.  See Declaration of Cynthia Ayres, Mar. 18, 2011 (Fell Ex. 265 at 3) ("My conversations with Mr. Fell on critical areas of the case – such as his relationship with his codefendant… [was] superficial at best, due to the limited time I spent meeting with him."); Decl. Of Gene Primomo, Mar. 16, 2011 (Fell Ex. 263 at 2) ("To my knowledge, we never specifically requested discovery about Mr. Fell's co-defendant, Robert Lee"); Decl. of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 7) ("We never requested, and we did not receive, discovery related to the Government's investigation into Bobby Lee's criminal history, personal history, or mental health from the Government. We also never requested records relating to the investigation into Bobby Lee's death, and we never asked our mental health experts to examine the relationship between Mr. Fell and Mr. Lee.").

---

[129] Due to trial counsel's failure to investigate mitigating evidence in support of this second proposed mitigator, they were forced to retreat to the far less mitigating factor that "Donald Fell and Robert Lee acted in concert in committing the crimes."  Tr. Vol. XI at 18:1-19:4 (July 12, 2005).

157

For instance, trial counsel never interviewed Francis Bellantoni.  Trial counsel were on notice from a New York State police report that on his way to work Mr. Bellantoni "saw two males outside of [a] car" with Vermont plates; that it "appeared that one of the males was agitated with the other"; and that he later saw the female "walking towards the woods with two males behind her."  New York State Police Supporting Deposition of Francis R. Bellantoni, Dec. 12, 2000 (Fell Ex. 68).  If contacted, Mr. Bellantoni would have further testified that when he saw the two men outside of the car, they "looked like they were arguing with each other… I could tell because one of the men was flapping his arms up and down like he was getting frustrated with the other man.  They were arguing."  Decl. of Francis Bellantoni, Feb. 24, 2011 (Fell Ex. 301 at 1).  He would have also testified that when he observed the two men following the female towards the woods, "[o]ne of the men trailed behind the other.  He was the man who was getting yelled at previously."  Id.  This evidence could have powerfully supported Mr. Fell's claim that he did not intend to kill Mrs. King, but succumbed to Mr. Lee's entreaties.  Thus, it would have been directly relevant to Mr. Fell's claim that he did not act with the requisite intent to qualify for the heinous, cruel or depraved aggravator and would have supported the mitigating factor, which trial counsel initially proposed, that Mr. Fell would not have killed Mrs. King without the influence of Mr. Lee.  This failure to investigate a potentially important witness is unreasonable under Strickland.  See English v. Romanowski, 602 F.3d 714 (6th Cir. 2010) (habeas granted due to unreasonable failure to investigate potential witness even though ultimate decision not to call witness was reasonable trial strategy).[130]  Trial counsel also failed to obtain

---

[130] To the extent that the Government argues that trial counsel's failure to investigate Mr. Bellantoni was strategic, it merely raises a factual dispute that cannot be resolved on summary dismissal.  See, e.g., Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003) (remanding for evidentiary hearing on ineffectiveness claims to allow trial counsel to explain the strategy, if any, behind nine specific omissions).  During opening argument, trial counsel emphasized Mr. Fell's hesitation to kill Mrs. King and the fact that Mr. Fell and Mr. Lee disagreed about whether to do so.  Tr. Vol. I-I at 57:9-20 (June 20, 2005).  Trial counsel also noted that "a passing motorist saw them arguing by the side of the road."  Id. at 57:12-14.  The fact that trial counsel mentioned Mr. Bellantoni in their opening statement demonstrates

158

Mr. Lee's prison records through subpoena or records request, and did not interview other

critical witnesses, such as Mr. Lee's family members, who could have shed light on Mr. Lee's

mental health and aggression, as well as his relationship with Mr. Fell.

The Government relies heavily on statements of Mr. Lee and witness interviews

to argue that trial counsel's failure to investigate was reasonable because there was a wealth of

damaging evidence showing that Mr. Fell dominated Mr. Lee, so there was no reason for trial

counsel to further explore the relationship.  Opp. 234.

First, the Government relies upon a series of 302s turned over to trial counsel,

claiming that the overwhelming majority of witnesses interviewed by the FBI were of the

opinion that "Mr. Fell was the clear leader of the two."  This is not the case.

- The Government points to Lisa Lucke's statement that Mr. Lee was a "follower more than a leader."  FBI Report (Gov. Ex. B at 028542).  However, Ms. Lucke stated in the report that she did not recall and had never worked with Mr. Fell.  Id.

- Although Mr. Tosh described Mr. Lee "as a follower who was never confrontational with him," he said nothing about the dynamic between the two.  His only comparison of the two was that he "did not believe that Lee came to school as often as Donald Fell."  Id. at 028545.

- Likewise, Mr. LeBrutto's and Mr. Zelinka's statements about Mr. Lee being a loner do nothing to support the Government's argument, and Mr. Zelinka's comment that in observing the two together "they were two of a kind" undermines the Government's claim.  Id. at 28553.

- The Government also points to Robert Lee, Sr.'s statements to medical professionals that Lee had always been a child that was "easily led by others."  Yet, this was a statement by the co-defendant's father years before the crimes and does not support the Government's contention that "Mr. Fell was the clear leader of the two."  Id. at 028659.

- The Government also conveniently fails to acknowledge its interview with Walter Opshinski, who described "Fell as a relatively quiet youngster," and noted that

---

that it would not have been inconsistent with trial strategy to develop evidence to support Mr. Bellantoni's observations.  Nonetheless, trial counsel failed to interview Mr. Bellantoni or to request full documentation of the Government's interviews with Mr. Bellantoni.

"Lee…was more problematic than Fell and often acted out against other students and staff members."  Id. at 028542.[131]

Second, the Government points to Mr. Lee's post-arrest statements and prison letters painting Mr. Fell as the dominating personality and leader in the crimes as further damaging evidence that could have been entered in rebuttal.  But it was highly likely that the admission of these self-serving, unreliable, hearsay statements by Mr. Lee could be limited,[132] and thus they should not have barred further investigation into whether there were any aspects of the relationship between Mr. Fell and Mr. Lee that would have been favorable and admissible for Mr. Fell.  To the contrary, this evidence should have prompted trial counsel to further investigate the relationship between Mr. Fell and Mr. Lee because trial counsel should have been on notice that the Government might seek to present Mr. Fell as the dominating leader and more culpable party, as the Government in fact ultimately did.  Rompilla v. Beard, 545 U.S. 374, 388 (2005) (trial counsel has the duty to investigate that which "he knows the prosecution will cull for aggravating evidence" at sentencing).

At a minimum, trial counsel should have developed this evidence to present to their mental health experts, who could have offered insight into the relationship between Mr. Fell and Mr. Lee without implicating these evidentiary concerns.  Trial counsel were on notice that a

---

[131] As Mr. Fell alleged, the Government violated its Brady obligations by failing to turn over a later interview with Mr. Opshinski, which 2255 counsel has discovered, where the Government attempted to coerce Mr. Opshinski to change his story to corroborate its theory of Mr. Fell's dominance over Mr. Lee.  Mot. 301.  After summarizing Mr. Opshinski's prior interview, the Government asked "if it was possible that he could have gotten Fell and Lee confused" because "other individuals interviewed mentioned things that were consistent that Fell was more of how Opshinski described Lee, and Lee was more how Opshinski described Fell."  FBI 302, June 9, 2005 (Fell Ex. 220 at 1).  Opshinski stated affirmatively that "*he did not have Fell and Lee confused, and that he remembered them well*."  Id. at 2 (emphasis added).

[132] See e.g., Tr. Vol. VII-I at 27:7-9 (July 1, 2005) (the Court noting, "It's fundamental, in my view, that statements made by Mr. Lee should not be introduced…").  While the issue of whether Mr. Lee's statements could be introduced into evidence during the penalty phase was a heavily-contested issue, and turned upon an analysis of whether Crawford applies under the FDPA and the court's discretion to balance the prejudicial versus probative value of evidence at sentencing, it would have been premature for trial counsel to pre-judge the outcome of any rulings on these issues, and to cease investigating all evidence relating to Mr. Lee based upon the assumption that a wealth of unreliable statements from Mr. Lee would be introduced into evidence.

mental health assessment of the relationship between Mr. Fell and Mr. Lee would have been fruitful. See Van Gorp Report (Fell Ex. 2 at 4); Mills Report (Fell Ex. 3 at 5). Yet, trial counsel never developed critical evidence relating to Mr. Lee's background and character that could have informed an accurate mental health assessment of their relationship. See e.g., Decl. of A. Bunin (Fell Ex. 264 at 6) (noting "we never asked our mental health experts to examine the relationship between Mr. Fell and Mr. Lee"). Indeed, the Government tasked Dr. Welner with evaluating the relationship between Mr. Fell and Mr. Lee, and Dr. Welner stated in his report that Mr. Fell clearly dominated Mr. Lee. Welner Report, July 5, 2005 (Fell Ex. 10 at 65). Trial counsel should have conducted an investigation into Mr. Lee so that they would be equipped to confront this assessment.

**B.      Mr. Fell Has Adequately Alleged That The Government Violated Its Brady Obligations By Failing To Turn Over Favorable Evidence Regarding Mr. Lee**

The Government offers only a minimal defense, in footnotes, of its failure to turn over documents related to Mr. Lee's prison behavior and its interview of Mr. Bellantoni. The Government's arguments lack merit and at best raise factual disputes that preclude summary dismissal.

The Government does not dispute that it was in possession of documents showing that after Mr. Lee was arrested, and separated from Mr. Fell, he verbally and physically assaulted other inmates, threatened to rape another inmate's mother, expressed homicidal thoughts in personal writings, displayed suicidal tendencies and otherwise misbehaved in prison. Yet the Government argues that it was relieved of its Brady obligations because it had no reason to think that Mr. Lee's prison records were favorable to Mr. Fell because trial counsel adopted a strategy of avoiding discussion of the relationship between Mr. Lee and Mr. Fell. Opp. 239 n.44. This

161

argument is legally unsupportable.  The Government has a duty under Brady to turn over

mitigating evidence, which does not turn on what the Government believes is defense strategy, or

what defense contends their strategy is at a particular moment in time.  See Cone v. Bell, 556

U.S. 449 (2009); see also United States v. Feliciano, 998 F. Supp. 166, 170 (D. Conn. 1998)

("Defendants are clearly entitled to discovery of mitigating evidence under Brady."); United

States v. Beckford, 962 F. Supp. 804, 811 (E.D. Va. 1997) ("Evidence relevant to a statutory

mitigating factor would certainly be, for the defendant, 'favorable' evidence pertaining to

punishment in that it may justify a sentence of life imprisonment as opposed to death…The fact

that it is not certain whether the requested evidence will ultimately establish a mitigating factor is

of no import.") (citing Brady v. Maryland, 373 U.S. 83, 87 (1976)); United States v. Perez, 222

F. Supp. 2d 164, 166 (D. Conn. 2002) ("materials relating to aggravating and mitigating

circumstances are within the scope of the Government's obligations under Brady.").[133]  Evidence

relating to Mr. Lee's prison behavior and his background was directly relevant to the two

mitigating factors that trial counsel proposed relating to Mr. Lee, and the Government was

therefore required to turn over any mitigating evidence relating to these factors.

Moreover, the Government was well aware that its own strategy was to emphasize

Mr. Fell's aggression and dominance relative to Mr. Lee.  See United States' Trial

Memorandum, June 17, 2005 (Fell Ex. 130 at 11-12) (noting Jeff Van Buren will testify "how

Fell dominated Debra Fell" and how "he observed Fell to be animated and outgoing, while Lee

_____

[133] See also United States v. Rodriguez, 496 F.3d 221, 226 n.4 (2d Cir. 2007) ("the Government's obligations under Brady to disclose…does not depend on whether the information to be disclosed is admissible as evidence in its present form"); United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002) (finding undisclosed memo was material even though it contained hearsay and it was potentially inadmissible).  As the prejudice stemming from all of Mr. Fell's Brady claims must be "considered collectively, not item by item," Kyles v. Whitley, 514 U.S. 419, 436 (1995), and Mr. Fell has made "specific allegations before the court [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief," it would be premature to dismiss Mr. Fell's claims before he has the opportunity for discovery.  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (noting, where good cause is shown, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry") (citation omitted).

was quiet and reserved"); id. at 19-21 (discussing intent to enter Mr. Lee's letters at penalty phase to rebut Mr. Fell's mitigator and noting that the letters make clear that "*Fell was the dominant personality in their relationship*" and that "his letters are consistent with the independent observations of witnesses who knew them. *In all these circumstances, the evidence shows that Fell, not Lee, was the aggressor and Lee was the follower*.") (emphasis added). See also Memorandum of the United States in Support of Penalty Phase Rebuttal Witnesses, Dkt. No. 195, at 5 (July 11, 2005) (noting that John Kozierski will testify that Mr. Fell was "disruptive, oppositional, and defiant," that Fell threatened to kill him and another teacher, and that he would describe Lee as "nearly the opposite of Fell: a quiet 'wall-flower'"); id. at 19 (noting that Mathew Cunningham will testify that "*Fell was one of the leaders of the group…Bobby Lee, a member of the group, was nick-named 'Twiggy,'* and was the only member who was not a 'bad ass' and never started trouble…Fell was the 'tough guy' in the group and loved to fight. He had a short fuse and carried a knife."). The Government was in possession of evidence that ran directly counter to the narrative it fully intended to introduce at trial, and Mr. Fell has adequately alleged that the Government was under an obligation to turn over this mitigating evidence.

The Government also argues that it did not commit a Brady violation by failing to disclose Mr. Lee's prison records because trial counsel could have easily obtained the records through a subpoena. Opp. 239 n.44. Yet Mr. Lee's prison files were not open to the public for inspection. While, as Mr. Fell has alleged, trial counsel could have sought these records through a subpoena, and they were ineffective for failing to do so, there is no question that the Government had these highly material records in their possession. In post-conviction, Mr. Fell obtained these records, in heavily redacted form, directly from the FBI. The FBI closely monitored Mr. Lee and conducted an investigation into Mr. Lee's death, so they clearly had

163

knowledge about Mr. Lee's prison behavior that was far superior to trial counsel. Under these facts, it was incumbent upon the Government to disclose this information, particularly since the Government was well aware that it intended to introduce evidence at trial that was in direct conflict with this evidence.

The Government also does not dispute that it has in its possession a 302 memorializing its one-hour interview with Mr. Bellantoni. It argues instead in a footnote that it did not commit a Brady violation because the report contains the same information as a NYS police report that was turned over to trial counsel, so "no failure to disclose can be established [as] Fell is entitled to the information, not the format it is provided in." Opp. 241 n.46. Whether the 302 contains any additional information is a factual issue based on information outside the record, and as Mr. Fell's claim cannot be conclusively resolved against him based on the record, summary dismissal is improper.

Moreover, it is clear from Mr. Bellantoni's declaration that the 302 in fact contains substantially more information than the initial report. Mr. Bellantoni declared that he "took some photos of the area and timed the drive between where I saw the car and my home" and turned these photos over to the FBI. Fell Ex. 301 at 2. He also identified for the FBI through other photos where he saw the car, and recounted details of his observations. This information was not present in the NYS police report.

As discussed above, Mr. Bellantoni's testimony could have corroborated Mr. Fell's favorable statement regarding Mrs. King's killing, supported trial counsel's proposed mitigating factor that "Mr. Fell would not have committed the crimes without the influence of Robert Lee," and countered the Government's statutory aggravator – that Mr. Fell committed the crime in an especially heinous, cruel or depraved manner. Mr. Fell has therefore adequately

164

alleged that the Government was obligated under Brady to turn over this critical mitigating evidence. See e.g., Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) (finding a Brady violation and granting habeas based on prosecution's failure to disclose a non-testifying witness's observations of the crime scene that were favorable to the defense).

Finally, the Government contends that it disclosed "its entire lay investigation of Lee," pointing to the FBI report it disclosed to Mr. Fell on May 25, 2001. Opp. 240 n.4; Gov. Ex. B. However, it is clear from Dr. Welner's report that the Government further investigated Mr. Lee after May 25, 2001. See e.g., Welner Report (Fell Ex. 10 at 6-7) (noting that Welner relied upon interviews conducted in 2005 of Robert Lee Sr., June Kondraski, Shane Lee and Mr. Lee's attorney, Leo Diamond, along with friends of both Mr. Lee and Mr. Fell). Thus, the 2001 disclosure clearly did not entail the Government's "entire lay investigation of Mr. Lee." In any event, whether or not the Government turned over all mitigating evidence relating to Mr. Lee is an issue that cannot be resolved against Mr. Fell at this stage. Mr. Fell has specifically alleged that the Government withheld favorable evidence regarding Mr. Lee and has "identif[ied] available sources of relevant evidence." Puglisi, 586 F.3d at 213-14. His allegations are not conclusively refuted by the record and give "reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief." Bracy, 520 U.S. at 908-09.[134] Thus, summary dismissal is improper.

---

[134] As indicated in Mr. Fell's Motion for Leave to Conduct Discovery, Mr. Fell seeks discovery of "[a]ny and all records regarding Mr. Lee, including, but not limited to any and all records regarding Mr. Lee's prison record at the Northwest State Correctional Facility"; "[a]ny and all records describing incidents in which Mr. Lee exhibited violent or aggressive tendencies"; "[a]ny and all records pertaining to Mr. Lee's criminal history, including but not limited to records that show any history of arrests, charges, convictions and incarcerations in county, state or federal prison"; "[a]ll records regarding Mr. Lee's medical, mental health and substance abuse history, including but not limited to medical and mental health records, psychotherapy notes, diagnosis and treatment records"; "[a]ny and all investigatory documents, including any and all records, notes, communications and other documents collected during the FBI's investigation of Mr. Fell's and Mr. Lee's history and background, including but not limited to any documentation underlying the FBI's initial report on Mr. Fell and Mr. Lee compiled in early 2001"; "[a]ny and all records relating to Francis Bellantoni, including, but not limited to the 302 or other interview documentation of any

C.    **Mr. Fell Has Adequately Alleged That Trial Counsel's Deficient Performance And The Government's Misconduct Prejudiced Mr. Fell**

Mr. Fell has adequately alleged that trial counsel's failure to investigate, and the Government's failure to disclose, evidence relating to Mr. Lee prejudiced Mr. Fell.  Because of trial counsel's deficient performance and the Government's misconduct, trial counsel had nothing to corroborate Mr. Fell's statement regarding Mr. Lee's influence over him the night of the crimes.  They were also disabled from countering the Government's contention that Mr. Fell had the requisite intent to satisfy the heinous, cruel or depraved aggravator.  See Tr. Vol. XII at 137:15-138:6 (July 13, 2005) (directing the jurors to consider "any motives that witness may have for testifying a certain way…and the extent to which the testimony is consistent with other evidence that you believe" in determining how much weight to give the evidence).  And trial counsel were forced to withdraw the mitigating factor they proposed that "Donald Fell would not have committed the crimes without the influence of Robert Lee."  Although trial counsel did present the mitigating factor that "Donald Fell and Robert Lee acted in concert in committing the crimes," the jury heard no evidence as to why this mitigating factor was in fact mitigating.[135] Trial counsel's failure to investigate evidence to support this factor was evident during trial. Before withdrawing the "influence" mitigator, the Court pressed trial counsel on what evidence they intended to introduce to support it and asked whether they would be focusing on Mr. Fell's

interview with Mr. Bellantoni conducted by the FBI, U.S. Attorney, or any other law enforcement agency"; and "[u]nredacted versions of any and all records referencing or relating to Robert Lee."  Dkt. No. 309 at Appendix A, B, D.

[135] In support of the mitigation factor, "Robert Lee, equally culpable for the crimes, will not face execution," the jury heard only the stipulation that Mr. Lee died in his cell; that the death was accidental; and at the time of his death, Lee faced the same charges as Fell. Tr. Vol. XI at 93:15-19 (July 12, 2005).  The only explanation regarding this mitigator came from the Government, who argued persuasively that this was in no way mitigating. Tr. Vol. XII at 51:8-17 (July 13, 2005) ("He faced the very same capital charges as the defendant…There's no judgment made that he was not going to face execution… He accidentally died in prison.  And now Donald Fell wants to take advantage of that.  It's not a mitigating factor.").  The Court even pointed out that it did not understand why the factor was actually mitigating.  Hearing on Outstanding Issues at 59:12-14 (June 27, 2005) ("I am not – you know, I am not sure I understand. If in fact it's an accidental death, I don't know what that factor means.").  And trial counsel conceded that the jury would "may put very little weight on that but it's still -- it's offered as a mitigating factor." Id. at 59:5-7.

statement that he would not have killed Mrs. King but for Mr. Lee's influence.  Tr. Vol. VI at 95:20-97:4 (June 29, 2005).  Trial counsel responded "that would be a rejection of responsibility."  Id. at 97:6-7.  Disagreeing with trial counsel, the Court pointed out "I'm not sure it's a rejection of responsibility" and pressed trial counsel further on what they intended to present.  Id. at 97:8-9.  Trial counsel responded that they would focus on the general relationship, telling the Court, "[i]t was not one person through this series of events.  There were two people.  So it is an inference."  Id. at 97:20-21.  Trial counsel then proceeded to change the "influence" mitigator to the "in concert" mitigator, offer no evidence in support of the "in concert" mitigator, and tell the jury to rely on their common sense based on all they had heard regarding the Lee-Fell relationship.

The only explanation trial counsel gave the jury regarding why the "in concert" mitigator was mitigating was that "these two men, from their time when they were kids, up until they are twenty years old, were just fed off each other" and "but for this child – this childhood influence, it wouldn't have happened…Something snapped with both of them which resulted in two killings.  Donald Fell probably, or is much less likely to have been able to do both and/or would have never killed his mother…I think it's common sense, based on all you heard, that this thing would have never happened without being, acting in concert with Bobby Lee."  Tr. Vol. XII at 79:12-80:15 (July 13, 2005).  Because of trial counsel's deficient performance, the Government was able to argue in summations that the "in concert" mitigator was in no way mitigating.  Id. at 51:20-52:4 ("How is this mitigating?...The fact that Robert Lee was an accomplice in no way lessens this man's responsibility and culpability for these crimes.").  If trial counsel had conducted an adequate investigation, they would have been able to support the

167

"influence" mitigator by explaining Mr. Lee's behavior and character and his influence over Mr. Fell.[136]

Furthermore, trial counsel were deprived of evidence that would have enabled them to counter the Government's aggravating portrayal of Mr. Fell as the dominating leader and Mr. Lee as the docile follower in the Welner Report[137] and at trial. Mot. 232-33. The Government argued in its guilt-phase summation there was no question about the dominance of Donald Fell in the Fell-Lee relationship. Tr. Vol. IV-I at 69:4-10, 71:15-71:22 (June 24, 2005) ("On the subject of Bobby Lee, Donald Fell's shotgun, the Fell apartment where Donny Fell was living, Donny Fell's mother, Donny Fell driving the car from the Price Chopper back to the house, Donald Fell getting the luggage, Donald Fell driving south out of Rutland, Donald Fell pulling over the car in Dover when he didn't want her in the car any more, and Donald Fell choosing the place to kill her."). The Government's emphasis on Mr. Fell's dominance was the last thing the jury heard in the Government's closing in the guilt phase. Playing Mr. Fell's recorded statement for the jury, the Government argued, "*if there was any more doubt about the dominance of Donald Fell* in the Lee-Fell relationship…*The man who said that was the boss. He was bragging about his dominance over Bobby Lee.*" Id. at 71:22-72:5 (emphasis added). The Government attempted to further hammer home their dominant-submissive theory during the penalty phase, eliciting testimony from a childhood friend that Mr. Fell was "a leader" and the

---

[136] The Government argues that Mr. Fell "reaped the benefits of his trial counsel's strategy" of not entering evidence regarding the Fell-Lee relationship, as the jurors found unanimously that 1) "Lee, who is equally culpable, will not face death" and 2) that "Fell and Lee acted in concert in committing crimes." Opp. 240. While the jurors may have found these mitigators to be true as a factual matter, as evidenced by the lack of any mitigating explanation discussed above, it is hard to see how the jury could have placed any weight at all on these mitigators.

[137] As Mr. Fell alleged, had trial counsel obtained this evidence, they would have had an effective challenge to the Welner report, which the Government used to coerce a stipulation that Mr. Fell suffered from no mental health condition, and contained inflammatory hearsay statements from Mr. Lee and others supposedly attesting to Mr. Fell's dominance over Mr. Lee generally and on the night of the crimes. Welner Report (Fell Ex. 10 at 67); Mot. 232-33.

"more active and outgoing" of the members of their group and Mr. Lee was "the quietest" and "least violent" and that Mr. Lee's nickname was "Twiggy." Tr. Vol. XI at 46:8-47:6 (July 12, 2005). The evidence discussed above reveals that Mr. Lee was deeply disturbed and extremely violent away from Mr. Fell, and that he had influence over Mr. Fell on the night of the crimes. This evidence should have been accounted for by trial counsel, whether following its own investigation or Government disclosure, when determining how to develop its own mitigation case and how to confront the Government's aggravating portrayal of the co-defendants' relationship.

### IX.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Forensic Investigation Into Teresca King's Death

The Government seeks summary dismissal of Mr. Fell's claim that his trial counsel were constitutionally ineffective for failing to investigate the cause of Mrs. King's death even though the relative culpability of Mr. Fell and his co-defendant Mr. Lee was relevant to multiple contested issues. At trial, the Government presented uncontroverted evidence not only that Mr. Fell killed Mrs. King, but that he and his co-defendant Robert Lee killed her "twice." See, e.g., Tr. Vol. XII at 24:21 (July 13, 2005). Without investigation, trial counsel accepted this evidence as true, admitting that Mr. Fell "was directly responsible for…*at least one* of the causes of death of Mrs. King." Tr. Vol. XII at 79:22-24 (July 13, 2005) (emphasis added). Mr. Fell has alleged that a reasonable forensic investigation would have revealed that there was only one cause of death: the rock thrown by Mr. Lee, and not any kicking or stomping by Mr. Fell. Mot. 236-37. He has amply supported this allegation with the declaration of Dr. Charles Wetli, the first defense expert to opine on the cause of Mrs. King's death. Dr. Wetli concluded that "[t]he autopsy revealed that the stomping and kicking [by Mr. Fell] did not inflict any lethal injuries to

169

Ms. King, and therefore the cause of death is blunt craniocerebral trauma" from the rock wielded by Mr. Lee.  Decl. of Dr. Charles Wetli, Mar. 18, 2011 (Fell Ex. 306 at 2-3).

The Government seeks summary dismissal of Mr. Fell's claim that trial counsel were ineffective for failing to learn that Mr. Lee's actions killed Mrs. King, arguing that: 1) Dr. Wetli's declaration does not actually establish that Mrs. King was killed only once by the rock; 2) a forensic investigation was unnecessary and would have been inconsistent with trial counsel's strategy of acceptance of responsibility; and 3) Mr. Fell was not prejudiced by trial counsel's failure to investigate.  None of these arguments supports summary dismissal.

### A.      Mr. Fell Has Adequately Alleged That Mrs. King Was Killed Only Once By A Rock Wielded By Robert Lee

The Government argues, in essence, that even if Dr. Wetli was correct that Mr. Fell did not cause Mrs. King's death by injuring her neck, as the Government contended at trial, the jury could have reasonably concluded that Mr. Fell killed her by kicking her in the head. Opp. 249.  This argument ignores Dr. Wetli's conclusion that "the stomping and kicking [by Mr. Fell] *did not inflict any lethal injuries to Ms. King*."  Fell Ex. 306 at 2-3 (emphasis added).  At bottom, the Government's argument is an attack on Dr. Wetli's conclusions on the merits, which is premature at the summary dismissal stage.

Mr. Fell has adequately alleged on the basis of the declaration of an expert forensic pathologist that Mrs. King was killed only once, by the rock wielded by Mr. Lee.  These allegations are not conclusively refuted by the record, and in fact the Government offers no support for its contention that Dr. Wetli is wrong.  Mr. Fell's claim cannot be summarily dismissed based on the Government's disagreement with Dr. Wetli's conclusions.

170

**B.    Mr. Fell Has Adequately Alleged That Trial Counsel Had A Duty To Investigate The Cause Of Mrs. King's Death; Their Failure To Do So Was Not Strategic**

The Government claims that trial counsel had no duty to investigate the forensic evidence relating to Mrs. King's death because Mr. Fell's post-arrest statements were consistent with the forensic evidence as interpreted by the Government's experts.  Opp. 250.  This argument too fails.  Mr. Fell's post-arrest statements did not relieve his lawyers of their duty to investigate: "[t]he duty to investigate is not eliminated by the client's own conclusions or admissions of guilt, because the client's beliefs may not coincide with the necessary elements of proof to establish guilt in law."  Harris ex rel Ramseyer v. Blodgett, 853 F. Supp. 1239, 1256 (W.D. Wash. 1994).  See also Rompilla v. Beard, 545 U.S. 374, 381 (2005) (finding counsel's mitigation investigation deficient where client indicated that his childhood "had been normal" and was "actively obstructive by sending counsel off on false leads").  That is particularly true of forensic evidence in a capital murder case, which professional standards require counsel to investigate even where the circumstances of the offense "appear overwhelmingly indicative of guilt."  American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 10.7, Commentary at n.201 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.");  Harris, 853 F. Supp. at 1255 ("The duty to investigate is part of a defendant's right to counsel. 'The principle is so fundamental that the failure to conduct a pretrial investigation may in itself amount to ineffective assistance of counsel.'") (quoting United States v. Tucker, 716 F.2d 576, 583 n.16 (9th Cir. 1983)); Soffar v. Dretke, 368 F.3d 441, 471-79 (5th Cir. 2004); Draughon v. Dretke, 427 F.3d 286, 294-96 (5th Cir. 2005); see also Elmore v. Ozmint, 661 F.3d 783, 859 (4th

171

Cir. 2011) ("A healthy skepticism of authority, while generally advisable, is an absolute necessity for a lawyer representing a client charged with capital murder.").[138]

Even if trial counsel did not have a duty to investigate in every case, trial counsel were on notice that a forensic investigation was necessary in this case. Mr. Fell's post-arrest statements made clear that he and his co-defendant engaged in distinct acts: Robert Lee wielded a rock, and Mr. Fell used his feet. See Transcript of Post-Arrest Interview of Donald Fell, Dec. 1, 2000 (Fell Ex. 60 at 22). Mr. Fell also indicated several times that he believed the rock injury was fatal. Id. at 27 ("TA: Is there any chance she could still be alive? DF: I doubt it highly. Ah, there was a pretty big rock."); Transcript of Post-Arrest Interview of Donald Fell, Dec. 2, 2000 (Fell Ex. 62 at 22) ("DF: So after Bobby slammed the rock down I was pretty sure she was dead…. JC: Did you slam the rock down on her head at all? DF: No.").

Trial counsel's failure to investigate was not based upon a "strategy" of acceptance of responsibility, as the Government now urges. Mr. Fell could have accepted responsibility for his acts without conceding (incorrectly) that those acts caused death. Indeed, as Mr. Fell has alleged, trial counsel did recognize a need to consult a forensic pathologist, Dr. Michael Sikirica. See Decl. of Dr. Michael Sikirica, Mar. 10, 2011 (Fell Ex. 300). However, when Dr. Sikirica informed trial counsel that he lacked the time required to conduct an adequate investigation, and referred them to another pathologist, Dr. Callery, trial counsel simply dropped the topic. Decl. of Dr. Richard Callery, Mar. 7, 2011 (Fell Ex. 258). See, e.g., Showers v. Beard, 635 F.3d 625, 633 (3d Cir. 2011) (counsel's reliance on lay testimony that victim

---

[138] Indeed, the lawyers in Soffar and Harris were held ineffective for failing to conduct a forensic investigation that would have proven their clients' confessions false. Soffar, 368 F.3d at 471-79 (ballistics expert would have established that crime scene inconsistent with likely false confession); Harris, 853 F. Supp. at 1256 (ballistics or forensic expert could have challenged most inculpatory version of defendant's confession). Because courts clearly expect counsel to investigate all relevant circumstances, the Government's attempt to distinguish Draughon, Soffar, and Harris on their facts is unavailing.

172

voluntarily consumed fatal quantity of morphine was objectively unreasonable where counsel failed to contact any of three scientific experts suggested by expert psychiatrist).[139]

Finally, trial counsel could not make a strategic decision to fail to investigate evidence that they knew the Government would introduce in both the guilt and penalty phases of trial.  Rompilla, 545 U.S. at 380.  As trial counsel should have anticipated, the Government emphasized Mr. Fell's purported dominance over Robert Lee throughout the trial.  See, e.g., Tr. Vol. IV-I at 71:15-72:5 (June 24, 2005) (arguing that there was no "doubt about the dominance of Donald Fell in the Lee-Fell relationship"); Tr. Vol. XI at 46:8-47:7 (July 12, 2005) (testimony of Matt Cunningham that Mr. Fell was "a leader" and "more active and outgoing" while Mr. Lee was "the quietest" and "least violent" of their friends).  Regardless of their own strategy to convince the jurors to vote for life, Mr. Fell's lawyers were obliged to rebut the Government's case for death.

In any event, whether trial counsel adopted a reasonable strategy to fail to pursue a forensic investigation into the death of Mrs. King is an inherently factual inquiry that turns on facts outside the record and cannot be resolved at the summary dismissal stage.

### C.    Mr. Fell Has Adequately Alleged That He Was Prejudiced By Trial Counsel's Deficient Performance

Mr. Fell has alleged that he was prejudiced by trial counsel's failure to investigate for multiple reasons: 1) trial counsel failed to raise a viable argument that Mr. Fell was not eligible for the death penalty based upon his own actions as opposed to Mr. Lee's; 2) trial counsel failed to challenge the inflammatory allegation that Mrs. King was killed twice, which

---

[139] Moreover, trial counsel initially advanced as a mitigating factor at trial that Mr. Fell would not have committed the crime without the influence of Robert Lee.  Tr. Vol. XI at 67:23 (July 12, 2005).  Thus, if it was consistent with trial strategy to propose this mitigating factor, it would have been consistent with trial counsel's strategy to develop evidence that could have supported it.  Because trial counsel failed to develop such evidence, trial counsel had to retreat to a far less mitigating version of the factor: that Mr. Lee and Mr. Fell committed the crime "in concert."  Tr. Vol. XII-I at 154:15-16 (July 13, 2005).

the Government advanced in support of the heinous, cruel or depraved statutory aggravator; 3) trial counsel failed to counter the Government's argument that Mr. Lee was a docile follower and Mr. Fell was the leader; and 4) trial counsel were forced to argue that Mr. Fell acted "in concert" with Mr. Lee rather than the more powerful mitigating factor they initially proposed, that Mr. Fell would not have committed the crimes without the influence of Mr. Lee. The Government contends that Mr. Fell would have still been eligible for the death penalty even if the jury learned that Mrs. King was only killed once, by the rock wielded by Mr. Lee, so Mr. Fell could not have been prejudiced by trial counsel's deficient performance. The Government fails to address Mr. Fell's remaining prejudice arguments.

Mr. Fell has adequately alleged that trial counsel's failure to investigate deprived him of the claim that he was not eligible for the death penalty. The Government does not dispute that under statutory intent factors (A) and (B), it was required to prove beyond a reasonable doubt that Mr. Fell directly caused Mrs. King's death before Mr. Fell would be eligible for a death sentence under the Federal Death Penalty Act. Mot. 238-39.[140] It follows that if the rock wielded by Mr. Lee was the sole cause of death, Mr. Fell was ineligible for the death penalty under those two factors. The jury unanimously found in favor of both factors because, due to trial counsel's deficient performance, they believed that Mrs. King was "killed twice," and at least once by Mr. Fell. Trial counsel's deficient performance thus prejudiced Mr. Fell by depriving him of a viable defense for these two eligibility factors. Mot. 240.

The Government argues that Mr. Fell would still be eligible for the death penalty under the last two intent factors, so he was not prejudiced overall by trial counsel's deficient performance. 18 U.S.C. § 3591(a)(2)(C)-(D) state that a defendant is eligible for the death

---

[140] Under 18 U.S.C. § 3591(a)(2)(A), the Government would have to show that Mr. Fell "intentionally killed the victim." Under 18 U.S.C. § 3591(a)(2)(B), it would have to show that Mr. Fell "intentionally inflicted serious physical injury that resulted in the death of the victim."

174

penalty if he "participated/engaged in an act…and the victim *died as a direct result of the act*." 18 U.S.C. § 3591(a)(2)(C)-(D) (emphasis added). The Government offers no support for its argument that the act to which these factors refer is not the killing itself, but the underlying criminal offense, see Opp. 249, which is inconsistent with the text of the statute requiring that the victim die as a "direct result" of the act. See United States v. Paul, 217 F.3d 989, 1006 (8th Cir. 2000) (Heaney, C.J., dissenting) (the "died as a direct result" language of § 3591(a)(2)(C) is "critical…because it requires a close causal nexus between the defendant's act and the victim's death.").

The Government also fails to acknowledge that regardless of the meaning of "act," Mr. Fell suffered prejudice because the jury never grappled with his actual conduct in deciding his fate. The Supreme Court has long recognized that "individualized consideration [is] a constitutional requirement in imposing the death sentence." Lockett v. Ohio, 438 U.S. 586, 605 (1978). Only the defendant's "own conduct" is relevant to whether he should live or die. Enmund v. Florida, 458 U.S. 782, 798 (1982) ("The question before us is…the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims….") (emphasis in original). The same is true under the plain language of the FDPA. See Paul, 217 F.3d at 1006 (Heaney, C.J., dissenting)  (arguing that defendant who did not himself kill not death-eligible under FDPA); United States v. Hall, 152 F.3d 381, 415 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000) (indicating that jury must focus on acts of defendant in assessing heinous, cruel or depraved conduct). Consistent with this precedent, this Court instructed the jury that "[a]ny finding that a threshold eligibility factor has been proven…

175

must be based on *Donald Fell's personal actions and intent*." Tr. Vol. XII at 141:23-25 (July 13, 2005) (emphasis added).

Because the jury never learned of any distinction between the actions of Mr. Fell and Mr. Lee, it never had an opportunity to consider whether Mr. Fell should live or die based on his conduct alone. Trial counsel admitted, wrongly, that Mr. Fell "was directly responsible for… *at least one* of the causes of death of Mrs. King," where in fact only Mr. Lee "was directly responsible" for the one actual cause of death. Tr. Vol. XII at 79:22-24 (July 13, 2005) (emphasis added). The jury thus determined that Mr. Fell was eligible for the death penalty, and should be sentenced to death, based on Mr. Lee's actions, depriving Mr. Fell of his constitutional and statutory right to individualized sentencing.

For the reasons stated in the 2255 Motion and in Sections VIII and X of this Reply, Mr. Fell has also adequately alleged that he was prejudiced by trial counsel's failure to investigate because trial counsel failed to challenge the argument the Government made in support of the heinous, cruel or depraved aggravator that Mrs. King was killed twice, to develop evidence to counter the Government's contention that Mr. Lee was just a docile follower of Mr. Fell, and to support their own proposed mitigation factor that Mr. Fell would not have committed the crimes without the influence of Bobby Lee.

## X.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Government's Claim That Mrs. King Was Killed In An "Especially Heinous, Cruel Or Depraved Manner"

Mr. Fell's 2255 Motion presented specific facts demonstrating ineffective assistance with respect to the statutory aggravator that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to Teresca King." Fell Ex. 209 at 6. The aggravator was extremely important as it was one of the

176

few not redundant with the elements of the crime itself.[141]  It was also self-evidently open to

attack.  It required the Government to prove "acts of serious physical abuse *over and above that*

*necessary to end Mrs. King's life*, acts that would enable a jury to conclude that her murder was

committed in an especially heinous, cruel or depraved manner."  Memorandum and Order, Dkt.

No. 173 at 1-2 (June 30, 2005) (emphasis added).  As the Court instructed the jury, this means

proof beyond a reasonable doubt that "the killing was accompanied by such additional acts of

serious physical abuse of the victim *as to set it apart from other killings*," and either that it

demonstrated an "inten[t] to inflict a high degree of pain by serious physical abuse of the victim"

or "that the defendant relished…the killing, or showed indifference to the suffering of the

victim."  Tr. Vol. XII at 146:3-147:1 (July 13, 2005) (emphasis added).  That standard must be

satisfied by the conduct and intent of the defendant himself, and not his co-defendant.[142]  It also

could not be satisfied based on the deaths of Charles Conway and Debra Fell.

Here, apart from the fact of the murder itself, the evidence was weak that Mr. Fell

acted in a heinous, cruel or depraved manner with respect to the death of Mrs. King.  There were

no eyewitnesses to testify about torture or physical mutilation, or that Mr. Fell enjoyed

participating in her murder; Mr. Fell's confession did not contain any statements that would

---

[141] The first statutory aggravator stated only that "the death of Teresca King occurred during the commission of a kidnapping."  Tr. Vol. XII at 145:7-9 (July 13, 2005).  And the third aggravator read, "Donald Fell intentionally killed or attempted to kill more than one person in a criminal episode."  Tr. Vol. XII at 147:8-11 (July 13, 2005).  The alleged non-statutory aggravators were that Mr. Fell abducted Mrs. King to escape the area of a double murder; that he murdered Mrs. King to prevent her from reporting the crime to authorities, and, separately, after premeditating the carjacking; and that "the defendant caused loss, injury and harm to the victim and the victim's family."  See Tr. Vol. XII at 149:10-150:12 (July 13, 2005).

[142] See United States v. Hall, 152 F.3d 381, 415 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000) (rejecting defendant's claim that jury instructions "invited the jury to consider the conduct of [defendant]'s coconspirators throughout the course of the kidnapping in concluding that the killing was 'especially heinous, cruel, or depraved,'" because "[t]he instructions accompanying the aggravating factor removed any doubt that the jury was required to focus on [defendant]'s actions in determining whether this aggravating factor existed"); United States v. Sablan, No. 00-cr-00531-WYD, 2007 WL 4116117, *3 (D. Colo. Nov. 16, 2007) ("I agree with Defendant that this aggravating factor must focus on his actions, as compared to [co-defendant]'s actions").

177

support such an inference, and in fact Mr. Fell stated that he did not intend to kill Mrs. King, but participated in her murder under the influence of Mr. Lee; and the confession and physical evidence with regard to the murder itself suggested that Mr. Fell, along with Mr. Lee, did just what appeared to be necessary to accomplish the murder of Mrs. King with the tools he had available and did not commit "acts of serious physical abuse *over and above that necessary to end Mrs. King's life*." Dkt. 173 at 1-2 (emphasis added).

Trial counsel were on notice as early as January 30, 2002, three and a half years before trial, that the Government would seek to prove that Mr. Fell acted in a heinous, cruel and depraved manner. They knew that the aggravator was important.[143] They also knew that the Government had collected extensive evidence from the crime scene and intended to call a forensic expert, Dr. Michael Baden. And they knew that the Government would rely on physical evidence of the condition of Mrs. King's body, found in the woods four days after her death,[144] to support the aggravator, as it did in closing arguments. See Tr. Vol. XII at 21:21-25:7 (July 13, 2005) (emphasizing that two teeth and an earring were recovered a distance from her body). Trial counsel should have known that there were weaknesses in that physical evidence. Yet they did nothing to investigate facts that would support a defense to this aggravator. They did not retain a forensic pathologist of their own to examine the crime scene and the autopsy report, nor did they seek any witnesses to the crime.

The facts pled establish trial counsel's deficient performance under Rompilla v. Beard, 545 U.S. 374 (2005) (sustaining ineffective assistance claim where trial counsel failed to investigate a previous conviction that they *knew* the Government would rely upon to support an

---

[143] They accordingly moved twice for this Court to strike it. See Fell's Motion in Limine to Exclude Mention of Aggravating Factors, Dkt. No. 95 (Mar. 29, 2005); Punishment Phase Memorandum, Dkt. No. 160 (June 27, 2005).

[144] See Tr. Vol. III-I at 12:24-18:19 (June 23, 2005) (testimony of New York State Police Officer Mazzacano detailing search efforts and discovery of Mrs. King's body at around 8:45 p.m. on December 1, 2000).

178

aggravating factor).  There was ample reason to believe the physical evidence could be

challenged.  The autopsy report indicated that there was "post-mortem animal activity" that

could have been responsible for some of the damage to Mrs. King's body and also indicated that

there were two possible causes of death: blunt force trauma and asphyxiation.  Michael M.

Baden, Autopsy Report of Teresca Ruth King, Dec. 2, 2000 (Fell Ex. 65 at 2, 3, 7).  Trial counsel

were also on notice from the photographic evidence turned over to trial counsel that an earring

and teeth had been recovered in debris from the crime scene, and they were measured by officers

at the scene.  In addition, Mr. Fell's post-arrest statements indicated that he and Mr. Lee attacked

Mrs. King in different ways, raising the question of how their separate actions contributed to

Mrs. King's injuries.  Trial counsel should have followed these leads.  See also supra Rep.

Sections VIII and IX.

The pled facts also establish prejudice.  The Government argues that the facts it

presented were sufficient to sustain the statutory aggravator, but that is irrelevant.  Opp. 258-59.

The question on an ineffective assistance claim is not whether the evidence is sufficient – if it

were not sufficient that might support a different claim.  The question is whether had counsel

conducted a reasonable investigation, there is a "reasonable probability" that the vote of one

juror might have been different.  See Wiggins v. Smith, 539 U.S. 510, 537 (2003).

That point is amply pled.  This Court itself noted that it was a close question

whether the facts in this case supported the heinous, cruel or depraved aggravator.  In permitting

the heinous, cruel or depraved factor to go to the jury, the Court emphasized that the injury to

Mrs. King "required more than 150 pounds of force to produce, and was consistent with being

stomped with a boot."  Dkt. 173 at 2.  The Court also highlighted that "[t]here were also separate

impact injuries to [Mrs. King's] mouth and jaw, sufficient to dislodge two of her teeth" and that

179

"[o]ne tooth was recovered near the left side of her body; one tooth was recovered to the right of her head." Id. at 2-3.[145]

The Government itself emphasized those same facts in front of the jury, belying its new-found suggestion that the evidence Mr. Fell could have challenged was surplusage. It took Special Agent Talley through an extensive set of questions – spanning 11 pages of trial transcript – regarding his recovery of the two teeth. It walked him through multiple blown up photographs showing where the teeth were recovered, having him place stickers on the photographs of where the earring and teeth were recovered relative to the location of the body. See Tr. Vol. V-I at 64:9-72:18 (June 28, 2005). The Government also introduced the earring and post into evidence through his testimony. Id. at 74:3-20.

The Government further supported the factor with lurid testimony from Dr. Baden. Dr. Baden testified that "teeth…were present nearby from blunt force trauma to the mouth area" and that "more than 150 pounds of pressure" were "required" to cause the injuries to Mrs. King's neck. Tr. Vol. V-I at 81:13-14, 88:23-89:16 (June 28, 2005). Dr. Baden was also asked the formal finding as to the cause of Mrs. King's death, to which he answered: "Blunt force injuries to the face, head and brain and traumatic compression of the neck. Traumatic compression of the neck with asphyxia, inability to breathe. Homicidal assault." Id. at 90:17-22. From this testimony, the Government argued that Mrs. King was "killed twice." Tr. Vol. XII at 24:21 (July 13, 2005).

In closing arguments, the Government showed the jury again the pictures of where the teeth were retrieved and further emphasized their location:

_____

[145] Taking into account this evidence, the Court concluded that the Government had introduced sufficient evidence from which a jury could reasonably conclude that Mrs. King suffered a significant or considerable amount of injury or damage which involved a substantial risk of death, unconsciousness, or protracted and obvious disfigurement," although it ruled that "this conclusion is by no means the only inference that may be drawn from the evidence." Dkt. 173 at 5.

> [Y]ou also heard . . . evidence in this case, and *I apologize about being graphic, but this is the government's burden to prove this*. You heard the testimony of FBI Special Agent Kevin Talley, and if we could show photographs which are Government's Exhibit 7A49 and 52.
>
> (Government's Exhibits 7A49 and 52 were displayed in open court.)
>
> These, ladies and gentlemen, are what were found once her body was removed. Whole teeth that had been kicked from her head….You remember that Special Agent Talley actually told you *where those teeth were found. One tooth was found on one side of her body, the other tooth on the other side of her body*. What does that mean? That means that there were separate blows one way, and then another blow the other way. They were so powerful that her teeth came out of her mouth whole.

Tr. Vol. XII at 22:17-23:10 (July 13, 2005) (emphasis added).

With respect to Mrs. King's teeth and earring, the Government told the jury that Mrs. King "was kicked so savagely that…[o]ne of her earrings was found several feet away," and "as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body." Tr. Vol. V-I at 36:13-16 (June 28, 2005). The Government asserted that the location of the earring meant "either the assault on Terry King began when she was standing up several feet from where she was found, and they were hitting her so hard that it literally was torn off, or that this was part of the further stomping in this case by the defendant, where again, she was hit so hard that that earring was literally driven off the side of her head." Tr. Vol. XII at 23:21-24:2 (July 13, 2005).

The 150 pounds of force allegedly required to cause Mrs. King's injuries and her "two causes of death" also dominated the Government's arguments. The Government promised the jury in its opening statement, "You will hear that [Mrs. King's] throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure." Tr. Vol. V-I at 36:16-18 (June 28, 2005). The Government reinforced the significance of this testimony by arguing in

summation that Mrs. King's injuries were consistent with "a stomping type of injury." Tr. Vol.

VIII-I at 24:11-12 (July 13, 2005). In arguing that it had proven that Mrs. King was killed in an

especially heinous, cruel and depraved manner, the Government proclaimed:

> Perhaps *most importantly*, what [Dr. Baden] told you was that
> there were actually *two causes of death for Terry King*. There was
> obviously the blunt trauma to her head, but then there was also the
> crushing of her windpipe and neck causing asphyxia. Asphyxia is
> that she couldn't breathe. *She was actually killed twice*.

Tr. Vol. XII at 24:16-21 (July 13, 2005) (emphasis added).

While the Government now contends that, "[i]t seems unlikely that 'studies' are

needed (or might even exist) to address whether a man with boots, stomping on the neck of a 53-

year-old woman, could crush her windpipe," Opp. 255 n.48, the point it emphasized in front of

the jury was that Mr. Fell's conduct went beyond that necessary to cause death. It thus elicited

testimony from Dr. Baden to explain the 150-pound estimation, creating the impression for the

jury that his estimate was based upon science. Tr. Vol. V-I at 88:23-89:16 (June 28, 2005).

Had the defense conducted a constitutionally adequate investigation, the

Government's arguments would have been eviscerated. Dr. Wetli would have explained that the

likely cause of the location of the teeth and earrings was not the attack on Mrs. King, but animal

activity, and that there is no scientific support (and can be none) that 150 pounds of force caused

the injuries to Mrs. King. See, e.g., Lindstadt v. Keane, 239 F.3d 191, 202 (2d Cir. 2001) (cross-

examination of prosecution's medical expert "was hamstrung [] by counsel's lack of familiarity

with the studies upon which Dr. Gordon was presumably relying"). An eyewitness would have

also corroborated that Mr. Fell did not intend to kill Mrs. King, but was influenced to do so by

Mr. Lee. See Declaration of Francis Bellantoni, Feb. 24, 2011 (Fell Ex. 301) (describing an

argument that he witnessed between Mr. Fell and Mr. Lee just before Mrs. King's death).

But for counsel's unprofessional errors, there is at least a "reasonable probability" that evidence of the location of the teeth and the earring would have been excluded (or explained), the 150 pounds of force testimony challenged, and the jury told that Mr. Fell's actions did not cause Mrs. King's death. Mr. Fell certainly has pled as much, permitting this claim to survive summary dismissal. And without the aggravator, there is a reasonable probability that one juror's vote would have been different. These consequences suffice to permit this claim to proceed.

## XI.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Deaths Of Debra Fell And Charles Conway

The Government seeks summary dismissal of Mr. Fell's claim that his trial counsel were ineffective for failing to investigate the circumstances of the deaths of Debra Fell and Charles Conway and their lifestyles in Vermont. The Government argues that trial counsel did not have a duty to investigate the Rutland crimes because Mr. Fell and Mr. Lee gave a "detailed account" of the events that matched the Government's forensic evidence, so there was no indication that a forensic investigation would yield any information useful to Fell. Opp. 259-60. Additionally, in the Government's view, Mr. Fell did not suffer prejudice because an investigation would not have uncovered anything useful to the defense. Opp. 262. The Government's argument misrepresents the evidence and misstates the relevant legal standards.

First, prevailing professional standards required trial counsel to conduct a forensic investigation of the Rutland crimes, and not just accept the Government's proof. See American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 10.7, Commentary at n.201 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) (capital defense counsel must thoroughly examine forensic evidence even when "circumstances appear overwhelmingly indicative of guilt"). Forensic investigation is the

standard of care because capital defense counsel cannot "reasonably trust[] in not only the integrity, but the infallibility" of the Government's forensic investigators. Elmore v. Ozmint, 661 F.3d 783, 859, 786 (4th Cir. 2011) (finding ineffective assistance based on defense lawyers' "blind acceptance of the State's forensic evidence"). Furthermore, the deaths of Debra Fell and Charles Conway were the subject of graphic evidence presented during the guilt phase of Mr. Fell's trial, and they were also related to a statutory and non-statutory aggravator.[146] Mr. Fell's intent on the night of the Rutland crimes was a critical element of these aggravators, so it was trial counsel's duty to understand what precipitated these crimes. As the Court in Rompilla v. Beard explained, it "flouts prudence" to deny that trial counsel should examine evidence that "the prosecution says it will use." 545 U.S. 374, 389 (2005).

More importantly, in Mr. Fell's case, there were red flags that an investigation of the Rutland crimes was necessary. The excerpts from Mr. Fell's post-arrest statements cited by the Government clearly show that Mr. Fell did not give a "detailed account of how the deaths of Debra Fell and Charles Conway occurred," as the Government now claims. Opp. 259. Instead, Mr. Fell repeatedly stated that he did not remember what transpired on the night of the Rutland crimes. Mr. Fell told the FBI, "Ah, to tell you the truth I don't really ah know what happened to, to lead up to what happened, you know what I mean?" Opp. 259 (quoting Gov. Tr. Ex. 11J at 11). Mr. Fell also acknowledged that he had "no idea" why Bobby Lee killed Debra Fell. Opp. 260 (quoting Gov. Tr. Ex. 11J at 11); id. ("I don't know why, I don't even know why I did it…."). Furthermore, trial counsel were on notice that Mr. Fell was impaired on the night of the crimes, so his recollections might not have been reliable. Opp. 259 (quoting Gov. Tr. Ex. 11J at

---

[146] These factors were, respectively: "Mr. Fell intentionally killed or attempted to kill more than one person in a single criminal episode" and "Mr. Fell participated in the abduction of Mrs. King to facilitate his escape from the area in which he and an accomplice had committed a double murder." Tr. Vol. V-I at 23:1-3, 25:8-11 (June 28, 2005).

184

11) (Mr. Fell remembered that "we were all smoking crack and you know drinking lots of alcohol and shit."); see also Tr. Vol. XII at 81:3-8 (July 13, 2005) (describing photographs of "dozens of empty Budweiser cans" and a gin bottle). Mr. Fell's limited recollection of the events of that evening should have prompted further investigation, not foreclosed it.

The Government argues that there was no evidence that Debra Fell instigated a physical altercation on the night of the Rutland crimes, so trial counsel had no reason to investigate what role Debra Fell or Charles Conway might have played in escalating the tension on the night of the crimes. The Government itself argued at trial, "it's fair to say that since the outset of this case, due to the nature of the crimes involving, among other things, the murder of Mr. Fell's mother, the parties saw this as a psychological homicide case." Tr. Vol. X-I at 56:14-18 (July 8, 2005). Trial counsel thus had a duty to examine any psychological factors that might have precipitated the Rutland crimes, even if they fell short of a physical attack on Donald Fell or Robert Lee by Debra Fell or Charles Conway. Indeed, there was evidence of a prolonged altercation leading up to the crimes that should have prompted investigation. Opp. 263 (noting that the Government produced in discovery Pat Johnson's written statement to the police "immediately after the Rutland murders wherein she stated that she heard loud noises coming from Debbie Fell's apartment from 11:00 p.m. on Sunday, November 26, 2000 to 6:00 a.m. on Monday, November 27, 2000"). Thus, even if trial counsel did not have a duty to investigate without an "indication that any further investigation of the Debra Fell and Conway murders would have unearthed any evidence favorable to Fell," there was ample reason to believe that further investigation would have been fruitful in Mr. Fell's case. Opp. 259.

Without investigation in the Rutland crimes, the jury was left with only the following explanation by trial counsel for what happened on the night of the Rutland crimes:

185

> Something, something occurred at about one in the morning in that house at 35 Robins Street in Rutland. Something occurred that caused Donnie Fell and Bobby Lee to snap, to pick up two knives and begin stabbing Debbie Fell and Charles Conway. *We may never know what that was.* We know about a complicated relationship with his mother. We know that he had been up there for several weeks trying to unite, and at times things were going well and at times things weren't going well, *but there is no other evidence whatsoever that explains what that event or catalyst was.* We just know what happened. We just know what happened.

Tr. Vol. XII at 74:16-75:2 (July 13, 2005) (emphasis added). The Government was also able to argue that there was "no question about Donald Fell's intent" with respect to Charles Conway's murder because Mr. Fell stabbed him 50 times. Id. at 27:16-18 (July 13, 2005). Yet due to trial counsel's ineffectiveness, there were far more questions than there were answers about Mr. Fell's state of mind on the night of the crimes. See Simmons v. Luebbers, 299 F.3d 929, 938-39 (8th Cir. 2002) ("Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons's attorneys' representation was ineffective."); Ferrell v. Hall, 640 F.3d 1199, 1232 (11th Cir. 2011) (finding ineffectiveness where "counsel's argument expressly raised for the jury the question hovering over the entire trial, *why* [the defendant] did it – the very question that could have been answered by the powerful mitigating mental health evidence easily developed later….[C]ounsel never conducted an investigation that would have begun to answer this question, and never offered the jury the slightest reason."); ABA Guideline 10.11, Commentary at 107-08 ("[A] mitigation presentation may be offered not to justify or excuse the crime but to help explain it.") (internal quotations omitted).

186

A.      **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Forensic Investigation Of The Rutland Crimes**

The Government argues that Mr. Fell cannot yet point to the specific mitigating or exculpatory evidence that a reasonable investigation would have unearthed.  Opp. 261-62.  At the time of filing of the Motion, post-conviction counsel could not access the critical forensic evidence necessary to fully investigate the Rutland crimes.[147]  The Government actively resisted Mr. Fell's efforts to use the tools of civil procedure to obtain this evidence, and as of the filing of this Reply has still refused to turn over the autopsy photos from the Rutland crimes, and any other laboratory testing in connection with the crime scene.  As Mr. Fell has alleged through a declaration of Dr. Wetli, a forensic pathologist he has retained to evaluate this information as soon as it becomes available, "[f]urther conclusions cannot be drawn without examining the autopsy photographs."  Decl. of Charles Wetli, Mar. 18, 2011 (Fell Ex. 306 at 2).

Mr. Fell, however, has made "specific allegations before the court [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief."  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997); see also Rule 6(a), Rules Governing § 2255 Proceedings ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.").  Mr. Fell has alleged that the outcome of the penalty phase would have been different if trial counsel could have explained the events that precipitated the Rutland crimes, including the relative actions of Debra Fell, Charles Conway, Robert Lee and Mr. Fell.  Mot. Section X.  If he obtains this evidence, he will be in a position to do so.

---

[147] As Mr. Fell has alleged, the Rutland City Police Department repeatedly denied post-conviction counsel's requests to produce the relevant documents.  Mot. 258.  The Government also refused to schedule a time for post-conviction counsel to access the forensic evidence before the Motion was due.

Moreover, Mr. Fell has not engaged in any dilatory tactics seeking to delay these proceedings – it is the Government, the Rutland City Police Department and the Vermont Medical Examiner's Office that have prevented Mr. Fell from gaining access to the information he needs to fully investigate his claim.[148]

### B. Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Factual Investigation Of The Rutland Crimes

In response to Mr. Fell's claim that trial counsel were ineffective for failing to interview fact witnesses to the Rutland crimes who could have testified that a prolonged altercation preceded the Rutland crimes, the Government argues, in essence, that post-arrest statements and the forensic evidence were inconsistent with any evidence of a physical fight having preceded the murders. The Government also argues that the declaration of Pat Johnson, which was submitted as an exhibit to the 2255 Motion and states that Ms. Johnson heard loud noises "for hours" on the night of the crimes, is not reliable. See Decl. of Pat Johnson, Mar. 8, 2011 (Fell Ex. 271 at 2). These arguments do not support summary dismissal. Opp. 262-65.

First, the Government's contention that there was no evidence of a prior physical altercation preceding the murders in the autopsy photos or post-arrest statements or on the bodies of Mr. Fell and Mr. Lee when they were arrested is irrelevant. As Mr. Fell has alleged, he was subjected to severe trauma and emotional abuse from his mother and her male companions for his entire life. See generally Mot. Section III. A drawn-out and hurtful verbal altercation is as powerful an explanation as a physical fight for the actions of a deeply traumatized, mentally ill

---

[148] Mr. Fell has thus alleged sufficient facts to enable him to obtain discovery of the forensic evidence at the Rutland crime scene, and to amend his claims to amplify his allegations. See United States v. Thomas, 221 F.3d 430, 434, 436 (3d Cir. 2000) (citing 28 U.S.C. § 2255) (holding that an amendment "to provide factual clarification or amplification after the expiration of the one-year period of limitations" is permissible "as long as the petition itself was timely filed and the petitioner does not seek to add an entirely new claim or new theory of relief"); Mayle v. Felix, 545 U.S. 644, 664 n.7 (2005) (noting that "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts," amendment to a timely-filed petition is appropriate even after the one-year period of limitations has expired).

and intoxicated twenty-year-old. No forensic evidence would reflect a verbal altercation and, as noted above, the post-arrest statements were unreliable.

Additionally, the Government's argument that a physical altercation is inconsistent with the forensic evidence depends upon evidence that has never been provided to Mr. Fell and has therefore never been subjected to adversarial scrutiny. This includes the autopsy photos of Debra Fell and Charles Conway.[149]

Second, the Government's contention that Ms. Johnson's post-conviction declaration is unreliable, in its view, demonstrates precisely why summary dismissal is not appropriate. The declaration was executed under penalty of perjury and is consistent with her previous recollection. Opp. 263. Compare Statement of Pat Johnson, Nov. 30, 2000 (Gov. Ex. J) (Johnson heard loud noises from 11:00 p.m. to 6:00 a.m.) and Decl. of P. Johnson (Fell Ex. 271 at 2) (Ms. Johnson heard loud noises "for hours" that night). The Government's factual disagreement with her sworn testimony cannot be resolved on the face of the evidence, thus precluding summary dismissal.

The Government also contends that Pat Johnson's testimony "was not material to any of the issues decided at trial." But as noted above, the Rutland crimes were the subject of extensive, graphic testimony during the guilt phase and they were the subject of two aggravators. The only reason that evidence of a prolonged altercation leading up to the Rutland crimes was not introduced at trial and not "at issue," was because of trial counsel's ineffectiveness. The Government's circular argument thus does not support summary dismissal of Mr. Fell's claims.

---

[149] The Government's argument that neither Mr. Fell nor Mr. Lee had marks on their body when they were arrested also ignores the nearly four days between the Rutland crimes and their arrest, during which defensive marks might have healed. Opp. 263; Tr. Vol. I-I at 20:11-18 (June 20, 2005) (Charles Conway and Debra Fell died early in the morning on November 27, 2000); Id. at 28:16-29:8 (Mr. Fell and Mr. Lee were arrested on November 30, 2000 at about 2:30 p.m.). And, as noted above, Mr. Fell's post-arrest statements are inherently unreliable. Mr. Fell did not even recall what happened during the Rutland murders and he was mentally ill, heavily intoxicated and under the influence of drugs that night, so his statements do not foreclose the possibility of a physical struggle. Mot. 270.

**C.      Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate The Vermont Lifestyles Of Debra Fell And Charles Conway**

The Government's argument that the Court should summarily dismiss Mr. Fell's claim that trial counsel were ineffective for failing to obtain police reports and conduct interviews that would have shown Debra Fell's violence, drinking and drug abuse is also without merit. Contrary to the Government's claims, properly conducting an investigation would not have been inconsistent with trial counsel's strategy of acceptance of responsibility. Nor would it have been cumulative. There is a reasonably probability it could have changed the outcome.

First, as explained above, the Government is wrong that evidence that Debra Fell's behavior contributed to the toxic atmosphere on Robbins Street on the night of the crimes would have been inconsistent with the evidence. In any event, newly-discovered evidence showing that the evidence presented at trial was misleading would only support the inference that trial counsel's failures were prejudicial – it would not foreclose Mr. Fell from introducing such extra-record evidence.

Additionally, the Government's argument that trial counsel made a strategic decision not to focus on Debra Fell's behavior and to instead adopt a strategy of acceptance of responsibility is untenable because it is well settled that trial counsel could not have made such a "strategic decision" without first investigating what mitigating evidence about Debra Fell's lifestyle in Vermont was available. See, e.g., Strickland v. Washington, 466 U.S. 668, 690-91 (1984) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation."); Wiggins v. Smith, 539 U.S. 510, 523 (2003) ("[W]e focus on whether the

190

investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins'

background *was itself reasonable*.") (emphasis in original).[150]

Second, the Government's argument that the jury had all of the information it

needed about Debra Fell's alcoholism and violent tendencies from the testimony of Mr. Fell's

sisters at trial is false. The jury learned from Mr. Fell's sisters that Debra Fell was an alcoholic

who engaged in knife violence with her husband when Mr. Fell was a small child, but the jury

never learned that Debra Fell had a consistent pattern of being both verbally and physically

aggressive when she was drunk or high, which frequently escalated into violence with knives,

and this pattern persisted long after her relationship with Donald Fell, Sr. ended. For instance, if

trial counsel had investigated Debra Fell's behavior beyond these earliest years, they could have

presented the testimony of witnesses such as Florence Wallace, who noted that Debra "had a

thing about stabbing people," Decl. of Florence Wallace, Feb. 25, 2011 (Fell Ex. 250 at 2), or

Sandra Shum, who remembered that Debra "was often loud and aggressive, and she could be

very mean" when she was drunk. Decl. of Sandra Shum, Mar. 3, 2011 (Fell Ex. 266 at 2); see

also Mot. 259 (police reports that trial counsel did not obtain documented a pattern of violent

encounters, domestic disruptions, and noise complaints). While the jury was aware that Debra

Fell continued to drink in Vermont, it did not know how Debra Fell's drinking dramatically

---

[150] Moreover, the Government's argument that trial counsel made a strategic decision not to attribute any blame to Debra Fell is contradicted by the record. Trial counsel introduced evidence from Mr. Fell's childhood showing that Debra Fell was an alcoholic, and an abusive and neglectful parent. See, e.g., Tr. Vol. XII at 96:3-8 (July 13, 2005) ("Let's move up and talk a little bit about Debbie. I don't know how or why the government is trying to prop her up to be anything other than what we all know her to be: A woman who shows up to pick up her husband – her son from the hospital, too drunk to get him. Doesn't want him."); id. at 100:20-23 ("And the corruptive influence of the mother is something that's so significant because it's not only a question of letting these things happen, but she's encouraging it."); id. at 89:12-23 ("They get so drunk that they stab each other."). Counsel also accused Debra Fell of lying and blaming her son for her own failings. See, e.g., id. at 101:7-10 ("[E]ven Deanna German, who was responsible for this case during those period of times [sic], candidly admitted to her – admitted to you that Debbie pulled one over on her."); id. at 95:20-23 ("Debbie goes in and says it started because [Donny] wouldn't take a shower, because he had license here. Again, diverting the problem away from herself to Donnie."). What trial counsel failed to do was to investigate readily available evidence to show that Debra Fell's same character traits that were mitigating in Mr. Fell's childhood persisted through her years in Vermont, and contributed to the Rutland crimes.

191

impacted her behavior.  As Mr. Fell has alleged, Debra Fell became violent, emotionally abusive, and sexually promiscuous when she was drunk.  The link between Debra Fell's substance abuse and her behavior is the critical mitigating information that the jury never learned.

Additionally, the jury never learned of Charles Conway's drunken aggression, his abuse of drugs, and the possibility of a sexual relationship between him and Debra Fell, which also contributed to the Rutland crimes.  Mot. 261-64.

Finally, contrary to the Government's arguments, Mr. Fell has adequately alleged that he was prejudiced by trial counsel's failure to investigate evidence of Debra Fell and Charles Conway's lifestyles in Vermont.  Due to trial counsel's failure to investigate, the jury was left with no explanation whatsoever of what led to the Rutland crimes.  See Tr. Vol. XII at 74:16-21 (July 13, 2005) ("Something, something occurred at about one in the morning in that house at 135 Robbins Street in Rutland….We may never know what that was.").  If trial counsel had conducted an adequate investigation, the jury would have had an explanation for how a prolonged fight, which was exacerbated by Debra Fell and Charles Conway's aggression and intoxication, could have led to the Rutland crimes.  The evidence also would have rebutted the Government's misleading representation of Debra Fell and Charles Conway as defenseless victims of an unprovoked attack.  Tr. Vol. V-I at 20:19-21:2 (June 28, 2005).  Thus, Mr. Fell has adequately alleged that if trial counsel had explained the Rutland crimes, there is a reasonable probability that at least one juror would have struck a different balance and voted for life.[151]

---

[151] The Government defends in a footnote its failure to disclose many police reports documenting Debra Fell's encounters with the Rutland City Police Department.  Opp. 265 n.50.  The Government's position is that Mr. Fell "has failed to show that these reports constituted favorable evidence."  Id.  Mr. Fell has clearly shown above how evidence relating to Debra Fell's violence and alcoholism was relevant and material to an understanding of what transpired between Donald Fell and his mother in Vermont, including on the night of the crimes.  Thus, these reports would have been favorable to Donald Fell and they should have been disclosed under Brady.  See Cone v. Bell, 556 U.S. 449, 476 (2009) (finding evidence regarding mental impairment and drug use "may well have been material" to the jury's weighing of mitigation evidence and ordering full review of the suppressed evidence).  Mr. Fell has also

**XII.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Investigate And Present A Diminished Capacity Defense**

Mr. Fell has properly alleged that trial counsel were ineffective for failing to investigate and present evidence of Mr. Fell's diminished capacity in both the guilt and penalty phases of Mr. Fell's trial.

First, while the Government argues that Mr. Fell's experts concluded that Mr. Fell's capacity was not diminished on the night of the crimes, the Government at most raises a factual dispute as to whether reasonable trial counsel would have conducted additional investigation into Mr. Fell's diminished capacity that cannot be resolved at the summary dismissal stage.  Moreover, the Government's argument is not supported by the record.  The preliminary mental health investigation trial counsel conducted, in fact, raised a number of red flags that should have alerted trial counsel to the need to fully investigate and present a diminished capacity defense.  See Johnson v. United States, No. C 09-3064-MWB, 2012 WL 1836282, at *179-83 (N.D. Iowa Mar. 22, 2012) (finding that trial counsel's performance was deficient for failing to pursue a diminished capacity defense based on several red flags identified by experts).  Dr. Lipman noted that Mr. Fell was heavily drinking and was high on drugs, including a drug of unknown origin, on the night of the crimes.  Lipman Report, May 14, 2001 (Fell Ex. 4 at 13, 15).  He also concluded that the effects of Mr. Fell's drug and alcohol abuse on the night of the crimes were exacerbated by his earlier, chronic drug abuse: "At the time of the offense, the intoxication from which Mr. Fell suffered was thus a combination of both the acute effects due to his recent consumption and the chronic and enduring effects caused by his past two years abuse."  Id. at 15.  Dr. Lipman also emphasized the comorbidity of Mr. Fell's alcohol and

adequately alleged prejudice since disclosure of the withheld documents would have helped supply an explanation for the Rutland crimes, when none was offered at trial.

drug abuse and his mental health.  He noted that in addition to Mr. Fell's "pathological drug appetite" he "suffers from a related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress….*This vulnerability would be expected to increase when intoxicated and to increase further when chronically intoxicated, as was the case at the time of the offenses*."  Id. at 2 (emphasis added).[152]

Dr. Van Gorp noted that Mr. Fell "harbors a good deal of atypical thinking, depression, propensity to a breakdown in his thought process if under sufficient stress."  Van Gorp Report, Apr. 6, 2001 (Fell Ex. 2 at 8).  Dr. Mills concluded that, "[i]t seems highly unlikely that [Debra Fell's] murder and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication."  Mills Report, May 7, 2001 (Fell Ex. 3 at 4).  Based upon these reports, Mr. Fell's trial counsel were on notice that Mr. Fell suffered from mental impairments that made him particularly vulnerable to a breakdown under conditions of sufficient stress and when intoxicated, such as on the night of the murders, and investigating a diminished capacity defense would be fruitful.

Mr. Fell has adequately alleged that trial counsel should have investigated readily available evidence to corroborate Mr. Fell's level of intoxication on the night of the offenses; further investigated Mr. Fell's mental illness; and investigated what emotional stressors might have exacerbated Mr. Fell's intoxication and mental illness on the night of the offenses.  Mot. Section XII.[153]  This includes: evidence of witnesses to Mr. Fell and Mr. Lee's alcoholism and

---

[152] The Government's attempt to minimize the import of Dr. Lipman's report by arguing that Dr. Lipman's conclusion that Mr. Fell has a "pathological drug appetite" and a "related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress" makes Mr. Fell just like "half of the world population" is wholly unsupported by science or the record.  At most, the Government raises a factual dispute about the severity of Mr. Fell's vulnerability to psychotic decompensation when intoxicated and under conditions of stress, an issue that cannot be resolved at the summary dismissal stage.

[153] As set forth above in Sections III, IV and XI, Mr. Fell has also sufficiently alleged that trial counsel failed to adequately investigate Mr. Fell's social history, his mental health and the circumstances of the offenses.

drug abuse before, during and after the crimes; evidence of Mr. Fell's mental impairments, including FASD, mood disorder, and impairments from the effects of chronic trauma; and the testimony of a witness that there was a prolonged, loud altercation at 135 Robbins Street on the night of the crimes. Id. Without thoroughly investigating these factors, it was impossible for trial counsel to make a strategic decision about the viability of a diminished capacity defense. See Strickland v. Washington, 466 U.S. 668, 690-91 (1984); Wiggins v. Smith, 539 U.S. 510, 523 (2003).

The Government also notes that trial counsel relied upon a strategy of acceptance of responsibility and remorse, instead of a diminished capacity defense, and this strategic decision was reasonable given the overwhelming evidence of guilt. Opp. 270. Trial strategy is an inherently factual question, and the Government's argument that a diminished capacity defense would have been inconsistent with trial strategy cannot be resolved at the summary dismissal stage. Furthermore, there would be nothing inconsistent with acknowledging that Mr. Fell committed the crimes and was remorseful, while at the same time asserting his capacity was diminished. Indeed, trial counsel did argue that Mr. Fell was intoxicated on the night of the crimes during the guilt phase, at the same time that they urged the jurors to find that he accepted responsibility and was remorseful. They just did not do so effectively. Since, as Mr. Fell alleged, trial counsel failed to develop evidence to corroborate Mr. Fell's level of intoxication on the night of the crimes, the Government was able to successfully argue that there was no evidence of Mr. Fell's intoxication or drug abuse on the night of the crimes. See Tr. Vol. IV-I at 80:8-11 (June 24, 2005) ("But there's no evidence in this trial of crack use by the defendant that night. In fact, there's actually no evidence of him drinking that night other than Mr. Bunin's speculation."); id. at 79:18-22 ("[T]here is no question that they could make decisions that night.

195

There is no defense here ladies and gentlemen that they couldn't make decisions that night, that they couldn't act intentionally. There is no defense about that. None.").

Furthermore, evidence of Mr. Fell's mental illness and how it was exacerbated by alcohol and drug abuse and emotional stressors would have been substantially more persuasive to a jury assessing Mr. Fell's intent in the guilt phase and mitigating factors in the penalty phase than evidence of alcohol and drug abuse alone.[154] Mr. Fell has adequately alleged that such evidence was readily available. This includes an allegation that if trial counsel had investigated, they would have learned from neighbor Pat Johnson that: "On the night Debbie and Charlie died, it was very loud. I heard a lot of fighting and arguing. I heard both female and male voices get loud and angry with the yelling. There was a lot of thumping and it sounded like someone was playing the drums. It sounded like they were throwing things around. The slamming and banging noises and the yelling went on for hours." Decl. of Pat Johnson, Mar. 8, 2011 (Fell Ex. 271 at 2). This evidence that an altercation took place on the night of the crimes was significant to show the emotional stress Donald Fell was under that night, yet trial counsel never investigated it.

---

[154] At the guilt phase, the jury would have been asked to consider whether Mr. Fell had the requisite intent to carjack and kidnap. Diminished capacity would have been a defense to carjacking if Mr. Fell was unable to form the intent to kill or seriously harm Mrs. King "*at the precise moment* [he] demanded or took over the car…." United States v. Harris, 420 F.3d 467, 478 (5th Cir. 2005); see also Holloway v. United States, 526 U.S. 1, 8 (1999) ("The statute's *mens rea* component thus modifies the act of 'tak[ing]' the motor vehicle….If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied."). Similarly, diminished capacity would have been a defense to kidnapping if Mr. Fell was unable to act "knowingly and willfully" when he "seized, kidnapped, abducted or carried away Theresa King." See Tr. Vol. IV-II at 28:14-16, 30:4-6 (June 24, 2005). The Second Circuit has indicated that the defendant must act intentionally with respect to the initial abduction. See United States v. Young, 213 F.3d 627 (2d Cir. 2000) (Table), No. 99-1718, 2000 WL 687750, at *3 (2d Cir. May 25, 2000). Accord United States v. McCabe, 812 F.2d 1060, 1062 (8th Cir. 1987); Wheatley v. United States, 159 F.2d 599, 602-03 (4th Cir. 1946). It is well-established that the defendant must form the intent to kidnap before he transports the hostage across state lines. United States v. Boone, 959 F.2d 1550, 1555 (11th Cir. 1992). See also United States v. Hernandez-Montoyo, 39 F. App'x. 38, 38 (4th Cir. 2002); United States v. McInnis, 601 F.2d 1319, 1326 (5th Cir. 1979); United States v. Atchison, 524 F.2d 367, 370 n.4 (7th Cir. 1975); United States v. Marx, 485 F.2d 1179, 1186 (10th Cir. 1973); Gawne v. United States, 409 F.2d 1399, 1403 (9th Cir. 1969). Had trial counsel presented a diminished capacity defense in the guilt phase, the jury would have considered these questions before deliberating in the penalty phase whether "Donald Fell's capacity to appreciate his conduct was significantly impaired." Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 12).

196

There was also evidence that Donald Fell blacked out or dissociated on the night of the crimes.[155] As Mr. Fell explained in above in Section IV, dissociation is a symptom of chronic trauma, and trial counsel should have been on notice that a traumatic emotional event could have preceded the Rutland crimes, causing Mr. Fell to dissociate. Further, contrary to the Government's argument, Mr. Fell was under conditions of extreme emotional distress when he and Robert Lee encountered Mrs. King. In his post-arrest statements, Mr. Fell noted that he awoke from a dissociative state or a blackout to find himself stabbing Mr. Conway, and he witnessed his best friend murder his mother. Consistent with the reports of Drs. Lipman and Van Gorp, these are precisely the types of extreme emotional triggers that could be expected to exacerbate Mr. Fell's mental impairments. All of this evidence would have been admissible in both the guilt and the penalty phases if Mr. Fell had asserted a diminished capacity defense.

Trial counsel tried to introduce mitigation evidence in the guilt phase, so introduction of mitigation evidence in the guilt phase would not have been inconsistent with trial strategy as the Government now argues. See Tr. Vol. I-I at 45:20-46:1 (June 20, 2005). However, having failed to request a diminished capacity instruction, trial counsel did not have the legal framework through which to introduce further evidence in support of the diminished capacity defense.[156] And having failed to conduct an adequate investigation into what happened

---

[155] Mr. Fell told the FBI, "Ah, to tell you the truth I don't really ah know what happened to, to lead up to what happened, you know what I mean?" Opp. 259 (quoting Gov. Tr. Ex. 11J at 11). Mr. Fell also acknowledged that he had "no idea" why Mr. Lee killed Debra Fell. Opp. 260 (quoting Gov. Tr. Ex. 11J at 11); see also id. ("I don't know why, I don't even know why I did it….").

[156] For standard jury instructions on diminished capacity as a result of intoxication, see, e.g., 3 Leonard B. Sand et al., Modern Federal Jury Instructions 8-3, Voluntary Intoxication ¶ 803 (1993) ("There has been evidence that the defendant may have been intoxicated at the time of the offense with which he is charged. Intoxication or drunkenness in itself is not a legal defense to a criminal charge. However, intoxication or drunkenness may negate the existence of the defendant's intent to commit the crime that the government must prove in order to convict. On the evidence before you, if you find that the defendant was intoxicated, you may conclude that the defendant did not have the required intent I described earlier. On the other hand, even if you believe that the defendant was intoxicated to some degree, you still may conclude that he was capable of having the required intent. After considering all of the evidence, if you find that the government has established each of the elements beyond a reasonable doubt, then

on the night of the crimes, Mr. Fell's mental illness and corroborating evidence of substance abuse, trial counsel did not have the readily available evidence it could have offered to support the diminished capacity defense.  There is no conceivable strategic reason for trial counsel to argue only a weak semblance of an intoxication defense, without requesting a diminished capacity instruction and introducing readily-available evidence in support of the defense.  See Johnson, 2012 WL 1836282, at *180 ("If Learned Counsel's decisions to reject a [diminished capacity] mitigation defense was in some sense strategic, it was the worst strategic decision by any defense counsel that I have ever seen in my entire career: It effectively doomed Johnson's mitigation case from the start.").  Thus, the Government's argument that trial counsel reasonably failed to present a diminished capacity defense during the guilt phase has no merit.

The Government also states that trial counsel presented a diminished capacity defense in the penalty phase when they alleged that Mr. Fell's capacity to appreciate his conduct was significantly impaired, but then decided only to rely upon testimonial evidence of Mr. Fell's intoxication and the Government's expert's statements about the elimination rates of alcohol in the bloodstream.  Opp. 272-73.  First, it could not be strategic to decide not to put on mental health evidence regarding a diminished capacity defense without fully investigating what evidence was available to support such a defense.  As Mr. Fell alleged, trial counsel failed to conduct such an investigation.  Moreover, as Mr. Fell has alleged above in Section V, there were ample bases to challenge the opinions of Drs. Welner and Wetzel as unreliable, so reasonable

---

you may find the defendant guilty.  On the other hand, if you find the government has failed to meet this burden beyond a reasonable doubt, you must find the defendant not guilty.").  A jury may also consider "mental health evidence for the purpose of rebutting the prosecution's proof of the mens rea element of a specific intent crime." United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006).

trial counsel would not have abandoned an otherwise viable legal defense out of sheer fear of Drs. Welner and Wetzel.[157]

The Government's argument that trial counsel were able to argue effectively – based solely upon the circumstantial evidence of beer cans in the house, the intoxication levels of Debra Fell and Charles Conway, and mathematical formulations from the Government's expert – that Mr. Fell's capacity was diminished, is belied by the record. Not a single juror found that that Mr. Fell's capacity to appreciate his conduct was significantly impaired. Fell Ex. 209 at 12, 15. The obvious explanation for trial counsel's failure to convince even a single juror of Mr. Fell's diminished capacity is the damaging stipulation, which in and of itself was objectively unreasonable. Mental Health Stipulation, July 8, 2005 (Fell Ex. 135) (stipulating, regarding Mr. Fell, that "(1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; (3) and he did not suffer from any mental disease or defect. The examination also found that Fell…knew the difference between right and wrong at the time of the offenses…"); see also Tr. Vol. XII at 41:7-12 (July 13, 2005) (arguing in the penalty phase closing that the jury had "heard in this phase of the case about the mental health stipulation. There is no question there's no mental disease, no mental defect, no question the defendant knew the difference from right from wrong when these crimes occurred."); see also supra Rep. Section V. But it was also due to the fact that trial counsel failed to investigate and present the readily available evidence that Mr. Fell's capacity to appreciate his conduct was in fact diminished due to the combination of his alcohol use, drug use and mental health. See Tr. Vol. XII at 39:8-13(July 13, 2005); id. at 41:12-15.

---

[157] Contrary to the Government's argument, a failure to investigate and present a diminished capacity defense in the guilt phase because of fear of Drs. Welner and Wetzel would have been just as unreasonable as a failure to investigate and present a diminished capacity in the penalty phase because of a fear of Drs. Welner and Wetzel.

199

Mr. Fell has adequately alleged that if trial counsel had presented a diminished capacity defense in the guilt phase, the jury would have understood Mr. Fell's background, and the combination of drugs, alcohol and mental illness that led to the commission of the crimes, and there is a reasonable probability that at least one juror would have found Mr. Fell's intoxication and mental illness to have negated his intent in the guilt phase and to be more mitigating in the penalty phase, changing the outcome of the trial. The Government's arguments to the contrary do not support summary dismissal.

## XIII.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Present Readily Available Additional Execution Impact Witnesses

Trial counsel presented only one witness who barely knew Mr. Fell in support of the mitigating factor: "Donald Fell's execution would detrimentally affect persons who care about him." Fell Ex. 209 at 12, 15. Mr. Fell's § 2255 Motion includes relevant declarations from several witnesses who were much more deeply connected to Mr. Fell who could have testified about the devastating impact that Mr. Fell's execution would have on their lives. These witnesses include Teri Fell, Mr. Fell's sister; Robert Fell, Mr. Fell's half-brother; Janice Stoss, a foster child who was intimately familiar with Mr. Fell's family during his formative years; Tim Reynolds, Debra Fell's boyfriend at the time of her death; and Deacon Ratte, who became a friend and spiritual advisor to Mr. Fell in the years after he was arrested. Mr. Fell has also alleged that trial counsel could have called multiple additional witnesses to testify about their personal relationships with Mr. Fell. The Government nonetheless argues that trial counsel were not ineffective for failing to present this evidence because the newly-presented evidence is not that mitigating, and regardless Mr. Fell was not prejudiced by trial counsel's failure to present this evidence. That argument is insufficient to permit summary dismissal.

The Government does not – and cannot – dispute that relevant professional standards applicable at the time of trial required counsel to interview witnesses who could humanize the defendant and shed light on his character.[158] So did the relevant case law.[159]

Here, the Court expressly ruled that evidence relating to execution impact would be relevant and admissible because it could "shed light on Fell's background and character by providing testimony about any positive qualities, his capacity to be of emotional value to others and the nature of his interpersonal relationships." Amended Memorandum and Order, Dkt. No. 181 at 4-5 (July 5, 2005). Indeed, this Court recognized that "the mitigating factor at issue here [was] the *only one* alleged by Fell that [could] provide any insight into his relationships with third parties." Id. at 3 (emphasis added). Nonetheless, trial counsel failed to contact the many readily available witnesses who could have testified in support of this factor.

Mr. Fell has also adequately alleged that he was prejudiced by trial counsel's failure. During trial, the Government forcefully emphasized the dearth of evidence supporting this mitigating factor in its own closing arguments:

> Let's go to the next one: Donald Fell's execution would
> detrimentally affect persons who care about him. There's no real

---

[158] See American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), Guideline 10.11 (printed in 31 Hofstra L. Rev. 913 (2002-2003)) (providing in part that "[i]n deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:…4. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones."); ABA Guidelines, Guideline 10.1, Commentary (providing in part that family and friends "humanize the client by allowing the jury to see him in the context of his family, showing that they care about him, and providing examples of his capacity to behave in a caring, positive way, such as attempting to protect other family members from domestic violence or trying to be a good parent and provider").

[159] See, e.g., Marshall v. Cathell, 428 F.3d 452, 470 (3d Cir. 2005) (describing counsel's failure to interview defendant's sons with respect to penalty phase as "[p]erhaps the most glaring of [counsel's] omissions, and what strongly contributes to our rendering the state court's application of Strickland to this case 'unreasonable'" where sons "would have willingly taken the stand and pleaded for the jury to spare his father's life"); Oregon v. Stevens, 879 P.2d 162, 167-68 (Or. 1994) (trial court erred in excluding defendant's wife's testimony about impact execution would have on his daughter because the effect showed that the defendant had "the capacity to be of emotional value to others"); Mak v. Blodgett, 970 F.2d 614, 616-18 & n.5 (9th Cir. 1992) (holding counsel ineffective for failing to present mitigation witnesses where positive testimony from defendant's family would have humanized client and could have resulted in a life sentence for defendant convicted of thirteen murders).

evidence about this factor. His own sister testified. His half sister testified. There were no other family members. No other people close to him who came and testified about this factor. None. Ah, there was one person who testified about this, the educator at Northwest Correctional Facility. She spent an hour a week with him for a year and a half to two years helping him get his G.E.D. and in her own words, she walled herself off from everything else that he had ever done. That's the only testimony on this, ladies and gentlemen, respectfully. This is demonstrably clearly not proven.

Tr. Vol. XII at 49:10-23 (July 13, 2005). The absence of execution impact evidence thus clearly left the jury with the false and negative impression that Mr. Fell had no friends or family members in his life who would care if he was executed. Cf. Marshall, 428 F.3d at 471 (finding ineffective assistance in failure to investigate and present the testimony of the defendant's sons, who would have pled for his life, in part because "the jury was left wondering why the sons would not have pled for their father's life and could have reasonably drawn a negative inference from their absence from the courtroom during the penalty phase…."). As a result, a clear majority (nine of the jurors) found that this factor was not proven. Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 12, 15).

The Government cannot seriously argue that had Mr. Fell's lawyers offered the execution impact testimony that was reasonably available to them there was not a reasonable probability that this vote – and the jury's death sentence – would have been different for at least one juror. Although the Government now argues that, after Teri Fell testified, "there was no doubt" in light of her testimony that she would be affected by her brother's execution, Opp. 276, in its penalty phase summation, it used the fact that "[h]is own sister testified" and did not state that she would be affected by her brother's execution to support the opposite inference – that neither she, nor anybody else, cared whether Mr. Fell lived or died. Tr. Vol. XII at 49:10-23 (July 13, 2005). It also argues that "trial counsel should be commended for securing the

202

testimony of Teri Fell on behalf of her brother, after he brutally murdered their mother," Opp. 276, but that is precisely the point. Teri Fell was herself a victim of the Rutland crimes – she lost her mother. If the jury had heard her testimony that she feared the loss of her brother, her only remaining family member, that would have left an indelible mark.

Likewise, while the Government tries to minimize the declaration of Robert Fell, Mr. Fell's half-brother, by arguing that they had not seen each other in a long time and that he was too distant a relative to testify about execution impact. Robert Fell would have testified, "I am very concerned about my half-brother, Donny. I think about him a lot and I really don't want to see him killed. I haven't seen him for a long time, but he is still a part of me." Decl. of Robert Fell, Feb. 22, 2012 (Fell Ex. 247 at 4). He thus would have powerfully rebutted the Government's argument that "[there] were no other family members" who would be impacted by Mr. Fell's execution and provided the jury a reason not to vote for Mr. Fell's execution.[160]

That testimony would not have been limited to family members. Deacon Ratte, who got to know Mr. Fell after he was incarcerated, could have talked about how Mr. Fell "cared for the other inmates" and "just wanted someone to care about him" and how Mr. Fell's death

---

[160] In addition to the declarations Mr. Fell cited in support of his claim that trial counsel were ineffective for failing to present additional mitigation impact testimony, Mr. Fell submitted a number of declarations from witnesses who were also close to Mr. Fell at various times throughout his life and could have testified about their interpersonal relationships with Mr. Fell and his positive qualities. See, e.g., Decl. of John Gacek, Feb. 25, 2011 (Fell Ex. 251 at 1) ("He was my first friend at this new school, and Donny treated me like I was his little brother."); Decl. of Adele Gacek, Feb. 25, 2011 (Fell Ex. 252 at 3) ("Donny told me more than once that he wished he could live with us. I wished he could too."); ("Donny was shy, but when you gave him a hug, he just buried himself in it. He was affectionate at our home, and he hugged us goodbye when it was time for him to go home."); Decl. of Sean Campbell, Feb. 25, 2011 (Fell Ex. 273 at 5) ("The best way to get Jackie to stop going after Teri was for Donny to make Jackie mad at him so Jackie would go after Donny. Donny did that a lot."; "Donny was careful and affectionate towards [Jackie's daughter] Haley."; "I couldn't believe it when I heard that Donny was on trial for murder. I couldn't see Donny doing that."); Decl. of Jamie Dominick, Mar. 2, 2011 (Fell Ex. 313 at 3) ("We joked with each other, and it felt to me like I had another brother."); Decl. of Paul Stoss, Feb. 28, 2011 (Fell Ex. 304 at 1) ("He was like family to me, so I did not mind if he stayed at my house for a while."); Decl. of Ernie Schuldaski, Feb. 28, 2011 (Fell Ex. 253 at 2) (Mr. Fell "really gravitated toward Adele, and he seemed to really appreciate having a loving mother around."); Decl. of John Migatulski, Mar. 1, 2011 (Fell Ex. 254 at 2) ("My mother was close with many of my friends, but she seemed to have a special relationship with Donny.").

sentence would impact him.[161]  Ms. Stoss, who herself was a victim of abuse from Mr. Fell's

grandmother, her foster parent Theresa Sharpe,[162] and bonded with Mr. Fell over the horrors in

their home environments, would have testified that "[i]f Donny were to be executed, I would be

very upset, and very sad.  It would affect me for the rest of my life."  Decl. of Janice Stoss, Feb.

28, 2011 (Fell Ex. 274 at 6).  Even Tim Reynolds, who was extremely close with Debra Fell and

Charlie Conway, would have said he did not want Mr. Fell to be executed because Debra Fell

"would not have wanted her son put to death because of this."  Decl. of Alan Reynolds, Mar. 1,

2011 (Fell Ex. 275 at 9).  Mr. Fell's claim should not be summarily dismissed.

## XIV.    Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Stipulating To And Failing To Object To The Admission Of Highly Inflammatory And Prejudicial Evidence Offered By The Government

As further demonstration of trial counsel's ineffectiveness in failing to confront

the Government's case, Mr. Fell has alleged that trial counsel repeatedly failed to object to

evidence and arguments offered by the Government that were highly prejudicial and minimally

probative, and even stipulated to their admission.  Even if trial counsel's failure to object to any

of this evidence or these arguments standing alone did not change the outcome of the trial,

together they further demonstrate that trial counsel failed to subject the Government's case to

meaningful testing through the adversarial process, and they should be considered along with

---

[161] While the Government argues that presenting testimony from Deacon Ratte would have opened the door to other damaging evidence about Mr. Fell, much of that evidence was introduced anyway.  Deacon Ratte could have explained, "Donny seemed sincere about exploring his faith during service and in his meetings with me.  I did not see anything inconsistent between his interest in other religions and our meetings together."  Decl. of Steve Ratte, Feb. 24, 2011 (Fell Ex. 255 at 2-3).

[162] Janice Stoss would have offered the jury a unique perspective into Theresa's abusive caretaking.  Indeed, absent her testimony, the jury was left with the mistaken impression that Theresa was a responsible "licensed foster parent" and a role model for her grandchildren.  Tr. Vol. VII-II at 56:4-57:16 (July 1, 2005).  Trial counsel's failure to correct this misimpression about Theresa is the subject of a related claim of ineffective assistance of counsel.  Mot. Section III.

204

trial counsel's other errors in determining whether Mr. Fell received ineffective assistance of counsel.

A.    **That Trial Counsel Were Ineffective In Stipulating To The Admission Of The Inflammatory And Minimally Probative "Slayer" T-Shirt**

The Government seeks summary dismissal of Mr. Fell's claim that trial counsel were ineffective for stipulating to the unrestricted admission of the graphic "Slayer" concert t-shirt featuring a horned demon that Mr. Fell was wearing during the crimes and when he was arrested. According to the Government, Mr. Fell's trial lawyers could not have excluded the t-shirt under Rule 403 because it was "significant" probative evidence of Mr. Fell's presence at the crime scene. Opp. 278. The Government further argues that Mr. Fell suffered no prejudice from the t-shirt's admission because the Government only published the t-shirt during the guilt phase and the prejudicial impact was outweighed by other aggravating evidence in the case. Opp. 279.

The Slayer t-shirt, however, was simply not a "significant part" of the forensic case against Mr. Fell, as the Government now claims. See Opp. 278. The Government concedes that Mr. Fell never contested his presence at the Dover crime scene. Indeed, Mr. Fell even never contested that he and Mr. Lee were involved in killing Mrs. King. Opp. 278; see Old Chief v. United States, 519 U.S. 172, 184 (1997) ("[A] party's concession is pertinent to the court's discretion to exclude evidence on the point conceded. Such a concession…will sometimes call for the exclusion of evidence offered to prove [the] point conceded by the opponent.") (citations and internal quotation marks omitted). Nevertheless, at trial, the Government introduced extensive forensic evidence placing Mr. Fell at the scene. See generally Tr. Vol. III-I at 43:23-44:8 (June 23, 2005) (testimony comparing footprints at scene with boots worn by Mr. Fell and Mr. Lee); Tr. Vol. III-II at 3:25-24:1 (June 23, 2005) (testimony about DNA found on boots). The Government also acknowledged during trial that the t-shirt was less probative than other

205

evidence. After describing the t-shirt to the jury in its opening statement, the Government

continued: "*And more importantly*, you will learn in this case that there is DNA evidence"

linking Mr. Fell's boots to the crime. Tr. Vol. I-I at 43:8-10 (June 20, 2005) (emphasis added).

The Government's post-conviction efforts to magnify the importance of the t-shirt to its guilt

phase case against Mr. Fell thus fail.

        Tellingly, the Government does not dispute Mr. Fell's allegations that there was a

tenuous forensic link between the Slayer t-shirt and the fibers recovered at the crime scene. The

Government does not contest the limited forensic significance of fibers from a ubiquitous black

concert t-shirt found at a public shooting range. See Mot. 285-86; Opp. 279; see also Nat'l

Research Council of the Nat'l Acads., Strengthening Forensic Science in the United States: A

Path Forward 122 (2009) (explaining "little probative value" of matching fibers where fibers are

extremely common). Nor does the Government challenge Mr. Fell's claim that he wore a

hooded sweatshirt over his t-shirt the cold November day of the crime, making it further unlikely

that the fibers found at the scene were from his shirt. See Mot. 285 (citing Supporting

Deposition of Michael S. Leight, Dec. 2, 2005 (Fell Ex. 303)). The Government simply argues

that these factors go "to the weight the jury might have accorded the fiber evidence, not to its

admissibility." Opp. 279. Yet these circumstances clearly undercut the scientific foundation

upon which the fiber evidence purportedly rested, and diminish its probative value. Thus, these

factors would have supported exclusion of the fiber evidence on Daubert grounds, as Mr. Fell

alleged, and also would have supported exclusion or limitation under Rule 403 because the

prejudicial impact of the t-shirt substantially outweighed its probative value.

        The Government candidly acknowledged during Mr. Fell's direct appeal that the

t-shirt had the prejudicial effect of painting Mr. Fell as a Satanist. See Brief of the United States

206

on Appeal from the United States District Court for the District of Vermont, May 25, 2007 (Fell

Ex. 140 at 148); id. at 169 n.45 ("Fell's obsessive interest in Satanism was vividly displayed on

his body and his clothes during the crime.").  And while Slayer is a rock band, the term "slayer"

also means "one who slays."  Introduction of the t-shirt thus deeply prejudiced Mr. Fell in a

capital murder trial involving two stabbings where Mr. Fell's religious beliefs were at issue.[163]

For these reasons, Mr. Fell has adequately alleged that a Rule 403 Motion to exclude or limit the

Slayer t-shirt would have succeeded, and trial counsel rendered deficient performance when they

failed to seek its exclusion.  See Cuadra v. Sullivan, 837 F.2d 56, 59 (2d Cir. 1988) (likely that

trial counsel's failure to object to prejudicial evidence "fell below an objective standard of

reasonableness").

       The Government argues that even if trial counsel rendered deficient performance

in failing to seek to exclude the t-shirt, the prejudice Mr. Fell suffered did not impact the

outcome of the penalty phase because the t-shirt was only published to the jury during the guilt

phase, and the other aggravating evidence in the case was overwhelming.  See Opp. 279.  Neither

argument is persuasive.  As Mr. Fell alleged, the t-shirt was introduced into evidence at the

outset of trial, as the jurors were formulating their initial impressions of Mr. Fell and the case.

The graphic Slayer t-shirt thus inevitably created an indelible impression in the minds of the

jurors that transcended the guilt phase.  Moreover, the jury was expressly invited to consider any

evidence introduced in the guilt phase in its penalty phase deliberations, so the prejudice Mr. Fell

suffered extended through the guilt phase. Tr. Vol. XII at 136:17-20 (July 13, 2005) ("In

deciding whether aggravating or mitigating factors have been proven, you may consider any

---

[163] The Government does not even address Mr. Fell's claim that the introduction of the Slayer t-shirt for the purpose of proving that Mr. Fell was a Satanist violated his First Amendment rights.  See Mot. 287 (citing Dawson v. Delaware, 503 U.S. 159 (1992)).  Mr. Fell should therefore be permitted to pursue this claim.

207

evidence that was presented during either the guilt or the sentencing phases of the trial."). The unrestricted admission of the t-shirt also allowed the Government to develop a prejudicial theme that Mr. Fell was a Satanist. See, e.g., Tr. Vol. VII-I at 143:19-21 (July 1, 2005) (Teri Fell describing one of her brother's tattoos as "an upside down cross with 666"); id. at 143:7-9 (Teri Fell remembering that Mr. Fell had joked at age sixteen about Satan being "the kindest beast" (a Slayer lyric); Tr. Vol. X-I at 30:25-31:6 (July 8, 2005) (James Aiken stating that "the 666 [tattoo] denotes possible involvement in some type of relationship with an organization").

> **B.      Trial Counsel Were Ineffective For Failing To Object To The Introduction Of Testimony About Mr. Fell's Purported Past Interest In Satanism And His 666 Tattoo**

The Government seeks summary dismissal of Mr. Fell's claim that trial counsel failed to object to testimony relating to Mr. Fell's teenage interest in Satanism and his tattoos of an upside down 666 and an anarchy symbol because: 1) the testimony was not "obviously objectionable"; 2) trial counsel could have made the reasonable determination that objecting to the evidence would draw more attention to it; and 3) it did not prejudice Mr. Fell. Opp. 281-82

First, settled law at the time of trial made it unconstitutional to elicit testimony related to Mr. Fell's abstract beliefs when they bore no relationship to the crimes he committed. See Dawson v. Delaware, 503 U.S. 159, 168 (1992) (holding that the First Amendment "prevents [the government] from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried"); Flanagan v. State, 846 P.2d 1053 (Nev. 1993) (vacating death sentence and finding that inflammatory references to non-mainstream religious practices during the prosecution's penalty phase closing arguments violated the appellants' First Amendment rights). Thus, the testimony the Government elicited was indeed "obviously objectionable."

208

Second, trial counsel were on notice from as early as Mr. Fell's arrest that he was arrested in a t-shirt that depicted a horned demon, and he had tattoos of an upside down 666 and an anarchy symbol. This should have alerted trial counsel that the Government might seek to introduce evidence relating to Mr. Fell's abstract religious beliefs to inflame the jury, and they could have prevented this information from ever reaching the jury through a motion in limine. Additionally, in its opposition, the Government cites an excerpt from Teri Fell's trial testimony showing that the Government pursued a line of questioning relating to Mr. Fell's purported interest in Satan when he was a teenager with the question: "Did [Mr. Fell] have any interests against religion?" Opp. 279 (citing Tr. Vol. VII-I at 142:20 (July 1, 2005)). Trial counsel could have objected, and their objection would have been sustained under Dawson while drawing minimal attention to the issue. Even if trial counsel had not objected to Teri Fell's testimony, which was indeed "obviously objectionable," trial counsel could have objected to any further mentions of Mr. Fell's abstract beliefs, including his tattoos, from additional witnesses. Thus trial counsel could have prevented Officer Rushlow and James Aiken from testifying about Mr. Fell's tattoos. In short, reasonable trial counsel could have and would have utilized any number of tools to keep this information from the jury without drawing undue attention to it. Mr. Fell has adequately alleged that trial counsel's performance was deficient because they failed to do so.

Third, Mr. Fell suffered prejudice. The Second Circuit reviewed the introduction of this evidence on appeal under a plain error standard because trial counsel failed to object. See United States v. Fell, 531 F.3d 197, 230 (2d Cir. 2008). It acknowledged that it was "a mistake for the prosecutor to offer the evidence" because there was not sufficiently "strong[] evidence of the connection [to the crime]," but concluded that the introduction of the evidence, standing

209

alone, did not require reversal under the plain error standard because it was not sufficiently prejudicial. Id. However, the Second Circuit never considered the prejudicial impact of this error under the Strickland standard, and in combination with all of the other errors trial counsel made at trial that have been raised in post-conviction and turn on facts outside the record on direct appeal. The Second Circuit decision confirms trial counsel's error, and Mr. Fell has pled sufficient facts to allow him to demonstrate the prejudice this and other errors caused him.

**C.     Trial Counsel Were Ineffective For Failing To Object To The Highly Prejudicial Testimony Of Matthew Cunningham**

This Court expressly ruled that the Government could only use testimony from Matthew Cunningham to the effect that Mr. Fell had spoken about killing his mother a year or two before the crime and stated that, if he committed a murder, he would not stop there, in order to establish Mr. Fell's background and character and for no other purpose. Tr. Vol. XI at 33:13-22 (July 12, 2005) ("I am particularly cautious about those particular statements and the purpose for which they are used, and it is, although this is extraordinary, it is the kind of situation which I would be willing to give a cautionary instruction to the jury that those statements do not in any way relate or constitute an independent aggravating factor, but they are offered to describe general background and character of the defendant at that particular time, if the defense requests that.")

Nonetheless, the Government unambiguously used this evidence to establish premeditation for both the Rutland crimes and Teresca King's murder:

> [I]n conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one. And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too.

210

Tr. Vol. XII at 128:1-10 (July 13, 2005).  The import of the Government's argument is clear, and

the Government's effort to argue now that it relied upon this testimony solely as a reflection of

Mr. Fell's background and character, and not to establish premeditation for both the Rutland

crimes and Mrs. King's death, is simply untenable.  Mr. Fell has adequately alleged that trial

counsel unreasonably failed to object to this evidence, which was used for an improper purpose,

and he suffered prejudice from this and other failures by trial counsel to object to the

Government's inappropriate arguments and evidence.

> **D.**    **Trial Counsel Were Ineffective For Failing To Object To The Government's Unsubstantiated Claim That Mr. Fell's Memory Of The Word "Hawk" On The Knives Meant That He Was Not Intoxicated On The Night Of The Crimes**

During its penalty phase closing statement, the Government argued that Mr. Fell

could not have been substantially intoxicated during the Rutland crimes because he later recalled

that one of the knives used to commit the crimes had the word "Hawk" on the handle.  See Tr.

Vol. XII at 40:5-7 (July 13, 2005).  Yet there was abundant evidence in the photographs of the

Rutland crime scene to show that the word "Hawk" was emblazoned upon numerous items in the

Fell household because Debra Fell had worked at the Hawk Mountain House, and the

Government's argument that this reflected upon Mr. Fell's level of intoxication was specious.

Mr. Fell has adequately alleged that trial counsel unreasonably failed to object or explain why

this evidence did not mean that he was not substantially impaired.  He has also adequately

alleged that he was prejudiced by this failure because Mr. Fell's level of intoxication was a

critical, contested issue at trial.  Mr. Fell has thus pled sufficient facts to allow the Court to

assess the prejudice Mr. Fell suffered from trial counsel's deficient performance along with all of

trial counsel's other errors.

**XV.** **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Preserve The Record For Appeal, And Appellate Counsel Were Ineffective For Failing To Raise Additional Errors That Trial Counsel Missed**

The Government seeks summary dismissal of Mr. Fell's claim that trial counsel were ineffective for failing to preserve the record for appeal, and appellate counsel were ineffective for failing to raise additional errors that trial counsel also missed. Because Mr. Fell's claims turn on a cumulative assessment of trial counsel's performance, they cannot be summarily dismissed.

Mr. Fell has alleged that trial counsel were ineffective for failing to preserve the record on appeal, which is further evidence of trial counsel's pervasive failure to effectively advocate on Mr. Fell's behalf. The Second Circuit noted that "[n]early all the evidentiary issues Fell raise[d] were not preserved at trial and were presented for the first time either in his motion for a new trial or on appeal." United States v. Fell, 531 F.3d 197, 209 (2d Cir. 2008). Specifically, the errors that trial counsel failed to preserve that were pursued on direct appeal were: 1) improper commentary on Mr. Fell's decision to plead not guilty; 2) improper comments by the Government relating to the lack of a nexus between the mitigation presented and the crimes; and 3) improper commentary on Mr. Fell's religious interests, including a teenage interest in Satanism. Mot. 296. Because there had been no timely objection to these instances of misconduct, the Second Circuit was forced to review these problems under the onerous plain error standard. Fell, 531 F.3d at 210. Trial counsel's failure to preserve the record was a failure in their duty to defend Mr. Fell.[164]

---

[164] Under the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." ABA Guidelines 10.8, Commentary at 86.

Because it is not "palpably incredible" that trial counsel's deficient performance in failing to preserve the record prejudiced Mr. Fell, these claims cannot be summarily dismissed. For instance, with respect to the claim arising out of the improper comments about Mr. Fell's purported "Satanism," the Second Circuit found the pertinent testimony not only troubling, but erroneous. Id. at 230. However, the court could not grant relief because the matter "was not challenged at trial and did not constitute plain error." Id. Thus, Mr. Fell has adequately alleged that trial counsel's failure to challenge the Government's case and preserve the record impacted his chances of prevailing on appeal because it impacted both the standard of review and the record from which the Second Circuit measured prejudice.

Further, trial counsel failed to object to multiple other improper questions and arguments by the Government, including: 1) graphic leading questions by the Government during the guilt phase; 2) testimony the Government elicited from Teri Fell that Christopher Eike was in a coma when there was no foundation for that testimony; 3) testimony from a witness that Debra Fell suffered from "battered woman syndrome" when his qualifications to make such an assessment were not established; 4) questions from a lay witness about Mr. Fell's moral culpability; 5) testimony from one of Mr. Fell's friends about his hypothetical intent to kill his mother and others when he was a teenager; and 6) testimony from Mr. Fell's friend about his "tolerance" for alcohol, when he was not qualified to make such an assessment and Mr. Fell's level of intoxication on the night of the crimes was a critical, contested issue. Trial counsel failed to object to this erroneous testimony, and appellate counsel failed to raise the errors on appeal. Since the Second Circuit would have considered these issues as part of its assessment of whether the errors at Mr. Fell's trial, considered cumulatively, prejudiced Mr. Fell, Mr. Fell has sufficiently alleged that trial and appellate counsel were ineffective for failing to raise these

213

issues to allow him to demonstrate the prejudice he suffered on the merits, and when combined with trial counsel's other failures.

**XVI.    Mr. Fell Has Adequately Alleged That The Aggregate Prejudice Stemming From Trial Counsel's Many Instances Of Ineffective Assistance Warrants Relief**

It is well-established in the Second Circuit that courts must look to the cumulative effect of trial counsel's errors in determining prejudice under Strickland. Lindstadt v. Keane, 239 F.3d 191, 198-206 (2d Cir. 2001) ("Strickland directs us to look at the totality of the evidence before the judge or jury, keeping in mind that some errors have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. We therefore consider these errors in the aggregate.") (citations and internal quotation marks omitted). Although this is the legal standard for evaluating multiple instances of ineffective assistance of counsel, such as what has been raised here, for clarity Mr. Fell has additionally pled an independent claim asserting the cumulative error. Mot. 296. The Government urges summary dismissal of Mr. Fell's ineffective assistance of counsel claims, singly and cumulatively, arguing that Mr. Fell has failed to establish prejudice given what was introduced at trial in the form of mitigation witnesses and a binder of documents. Opp. 297.

This argument cannot support summary dismissal. As Mr. Fell has argued repeatedly, this Court's analysis of the prejudice of trial counsel's omissions requires it to evaluate what was presented against the weight of what was not. Prejudice cannot be assessed based solely on an assessment of the evidence that was presented at trial. Porter v. McCollum, 130 S. Ct. 447, 453-54 (2009) ("[W]e consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweigh it against the evidence in aggravation.'") (citation omitted). Mr. Fell has alleged substantial facts and evidence in support of his claims that reflect information that is not presently in the record:

214

declarations from witnesses trial counsel never interviewed; experts whose insights were never presented; and records that counsel never reviewed or discovered. All of this evidence reflects the facial sufficiency of the claims that Mr. Fell's trial counsel were unconstitutionally deficient in their investigation and presentation of his defense. The particular errors have been enumerated in a variety of claims and subclaims, and include trial counsel's failure to adequately investigate Mr. Fell's background, mental health, the circumstances of the crimes, and the aggravating circumstances. The ways in which Mr. Fell suffered prejudice are also sufficiently pled. Trial counsel's failure to investigate and present powerful available mitigating evidence and their failure to pursue available challenges to the Government's evidence and arguments in aggravation and rebuttal left the jury with no way to accord appropriate weight to the mitigating factors that were presented or to limit the weight of the aggravators and rebuttal arguments. Because Mr. Fell has presented facially adequate claims, and the Court cannot conclusively determine, based on the record, that the cumulative effect of trial counsel's errors did not prejudice Mr. Fell, summary dismissal is not appropriate.

**XVII.    Mr. Fell Has Adequately Alleged That The Government Improperly Failed To Disclose Reports Of Interviews Conducted By The FBI And Dr. Welner, And Social Service Records**

Mr. Fell's claims that the Government failed to disclose reports of interviews conducted by both the FBI and Dr. Welner in violation of its Brady obligations and that the Government failed to disclose mitigating information in social service records both raise factual disputes that turn on evidence outside of the record, and thus cannot be summarily dismissed. See Baumann v. United States, 692 F.2d 565, 573 (9th Cir. 1982) (noting Brady claim "is not the type of claim that can ordinarily be decided on a section 2255 petition without an evidentiary hearing").

215

**A.     The Government Improperly Failed To Disclose Welner Interview Notes And FBI 302s**

First, the Government has admitted that it had intended to turn over interview notes and FBI reports of the 77 lay witnesses interviewed by Dr. Welner and relied upon in his report but failed to do so after trial counsel withdrew their mental health case.  Opp. 183.  These notes and reports are important evidence that could show that Dr. Welner was biased in selectively relying only upon interviews where unfavorable evidence about Mr. Fell was revealed and thus could corroborate Mr. Fell's claims that Dr. Welner's methodology was unreliable and subject to challenge.  There is no reason that the Government should not now be required to turn over these documents, as it stated it intended to do.  As set forth above in Section V, Mr. Fell has established good cause for the discovery of these documents.

Additionally, Mr. Fell has established good cause to believe that these notes and reports should have been disclosed for the separate and sufficient reason that they contain mitigating information that the Government was required to disclose pursuant to its Brady obligations.  See United States v. Frank, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998) (noting Brady obligated prosecutor in death penalty case to disclose information "that would be material to the defendant's presentation of factors mitigating against a sentence of death").[165]  The Government does not even address Mr. Fell's claim that notes from interviews Dr. Welner conducted outside of the presence of the FBI, to the extent that they contain Brady material and Dr. Welner was acting as an arm of the prosecution, should have been disclosed.  Thus, Mr. Fell should be permitted to proceed with that claim.

---

[165] See also United States v. Feliciano, 998 F. Supp. 166, 170 (D. Conn. 1998) ("Defendants are clearly entitled to discovery of mitigating evidence under Brady."); United States v. Beckford, 962 F. Supp. 804, 811 (E.D. Va. 1997) ("Evidence relevant to a statutory mitigating factor would certainly be, for the defendant, 'favorable' evidence pertaining to punishment in that it may justify a sentence of life imprisonment as opposed to death."); United States v. Perez, 222 F. Supp. 2d 164, 166 (D. Conn. 2002) ("materials relating to aggravating and mitigating circumstances are within the scope of the Government's obligations under Brady").

Mr. Fell has also proffered sufficient facts to entitle him to discovery of the FBI 302s from interviews the FBI conducted with Dr. Welner. Through a FOIA request, the FBI turned over thirty-eight 302s (the "FOIA 302s") to post-conviction counsel that were never turned over to trial counsel. The FOIA 302s were heavily redacted, and in some cases the identity of the interviewee is not discernible. However, based upon the text that could be read, Mr. Fell alleged that the FOIA 302s contained Brady material that should have been disclosed. Mot. Section XVII. For instance, one 302 contains information from a witness who appeared to know Mr. Fell during his early life and provides details of Mr. Fell's good natured disposition as a child, which would have been mitigating.

The Government's arguments against Mr. Fell's claim turn on extra-record evidence. It now asserts for the first time that the unidentified witness was Theodore Settas and then argues that, because Mr. Settas was on the defense list, the Government was not required to turn over this 302 under Brady. But there is no record evidence – only the Government's say-so – to support that claim. And, in any event, the fact that a witness is on the defense list does not automatically relieve the Government from disclosing favorable material evidence. See Boss v. Pierce, 263 F.3d 734, 743 (7th Cir. 2001) ("Allowing the government to withhold favorable material evidence that it receives from defense witnesses upsets the balance Brady and its progeny strike.").

Finally, the Government's disclosure of the unredacted 302 of the FBI's interview with Sandra Bowles, Mr. Fell's maternal aunt, reveals that the Government has adopted an exceedingly narrow view of what constitutes mitigating evidence that is subject to disclosure under Brady. The Government states that it did not disclose the Bowles 302 even though it was included as a source upon which Dr. Welner relied in the Welner Report, and Ms. Bowles was

217

not listed as a defense witness. Opp. 301. Yet, the Government asserts its failure to disclose the Bowles 302 did not constitute a <u>Brady</u> violation in part because the report contains no material information. <u>Id.</u> at 298. Contrary to the Government's argument, the Bowles 302 contains powerful mitigating information, including the facts that: Donald Fell was subjected to physical and emotional abuse as a child from his parents, including being beaten with a belt by his father when he was five years old just for asking his father to help him put on the belt; Donald Fell reported to his aunt that the only happy time in his childhood was a two-week visit with his aunt when he was thirteen years old; and knife fights between Mr. Fell's parents occurred multiple times, and Mr. Fell personally witnessed them, a fact that was contested at trial. FBI 302 of Sandra Bowles, May 19, 2005 (Gov. Ex. I). The Government's effort to dismiss this as irrelevant mitigation evidence demonstrates that there are material factual disputes about what constitutes <u>Brady</u> material in the penalty phase of a capital trial, and in particular this trial, and these claims cannot be resolved at the summary dismissal stage, particularly when the Government has still not disclosed the vast majority of the 302s that it alleges do not contain mitigating information.[166] <u>See</u> Mot. 299 n.100.

---

[166] The FOIA 302s also contained some FBI 302s from interviews where Dr. Welner was present but he did not list the interview in his report. The Government argues that it was not required to disclose these reports because Dr. Welner did not rely upon them, and he did not testify. The Government appears to be confusing its duty under <u>Brady</u> with its Rule 16 obligations. <u>See</u> Fed. R. Crim. P. 16(a)(1)(G) (requiring the Government to turn over an expert "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications"). However, Rule 16 does not limit the Government's obligations under <u>Brady</u> to disclose favorable information to the defense. <u>See</u> <u>United States v. James</u>, No. 02 CV 0778(SJ), 2007 WL 914242 (E.D.N.Y. Mar. 21, 2007) (considering separately in a capital case the Government's obligations to turn over expert report material under Rule 16(a)(1)(G) versus its obligations under <u>Brady</u>, <u>Giglio</u>, and/or <u>Jencks</u>); <u>United States v. Defreitas</u>, No. 07-CR-543 (DLI)(SMG), 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) (considering separately the Government's obligations under Rule 16 and <u>Brady</u>); <u>United States v. Grace</u>, 401 F. Supp. 2d 1069, 1074 (D. Mont. 2005) ("government's discovery obligations under Rule 16 and its constitutional obligations under <u>Brady</u> are separate and distinct").

**B.**     **The Government Improperly Failed To Disclose Social Service Records And Social Security Information**

Mr. Fell is also entitled to an answer and discovery on his claim that the Government failed to disclose a Children and Youth Services document authored by social worker Mark Innocenzi that the FBI cited as a source in a 2001 report. See FBI Report (Fell Ex. 76 at 46). While the FBI report excerpts and paraphrases some information from Mr. Innocenzi's analysis, it completely omits information favorable to Mr. Fell. For example, Mr. Innocenzi reported that Theresa Sharpe believed Donny was sexually molested by his father, a critical mitigating fact that was known to the FBI but which the FBI report failed to mention due to the FBI's selective paraphrasing. Psycho Social Summary by Mark Innocenzi, Apr. 9, 1994 (Fell Ex. 320 at 3). The Government makes no persuasive argument that this was not relevant and material evidence, only making the extra-record claim that Theresa Sharpe was an unavailable witness at trial, and trial counsel likely spoke to other family members about Mr. Fell's abuse. Further, the Government argues that Agent Glenn was only allowed to review the Innocenzi Report at St. Michael's, and had to copy it by hand, so the report itself was never in the Government's possession. Opp. 303. These arguments turns on facts outside of the record, and in any event do not relieve the Government of its duty to turn over powerful mitigating evidence that was undisputedly in the Government's possession that there had been allegations that Mr. Fell was sexually abused by his father.

Mr. Fell has also adequately alleged that the Government failed to disclose evidence related to Mr. Fell's receipt of Supplemental Security Income ("SSI") in recognition of his mental health disorders and the Government does not dispute that Mr. Fell received SSI payments. However, Mr. Fell lacks subpoena power at this stage and has been unable to obtain

additional documents related to the nature of the disorder for which Mr. Fell was recovering.[167]

Evidence that the Government had recognized that Mr. Fell suffered from a mental health

disorder, and the nature of the recognized disorder, would have been critical mitigating

information that should have been disclosed to trial counsel. In its brief, the Government makes

the assertion that it did not have these records and that they should not be considered to be in its

possession. But that assertion simply raises a factual dispute for which Mr. Fell is entitled to an

answer and entitled to test through a properly framed discovery request. It thus should not be

summarily dismissed before Mr. Fell has an opportunity to test the assertion.

## XVIII.    Mr. Fell Has Adequately Alleged Ineffective Assistance Of Counsel And Government Misconduct Regarding Physical Evidence Relating To Investigation Of The Crimes

The Government seeks summary dismissal of Mr. Fell's claim that the

Government failed to disclose, and trial counsel failed to request, evidence related to Mr. Fell's

drug abuse during and after the Rutland crimes.[168] Specifically, Mr. Fell has alleged that the

Government did not disclose or produce for inspection: the results of drug testing of a bottle

containing brown liquid and a Marlboro cigarette box containing small plastic bags; two "crack"

---

[167] Mr. Fell has also adequately alleged that trial counsel failed to investigate these records even though they were on notice that Mr. Fell had received SSI payments. See Fell Ex. 76 at 56 (FBI interview with Jackie Sharpe revealing that "whenever Donald got really mad, he would often black out and have no memory of the incident" and that he "actually received Supplemental Security Income for [this] problem").

[168] The Government argues that Mr. Fell's claims should have been raised at trial, but Mr. Fell has alleged that trial counsel were ineffective for failing to request this evidence and to insist that the Government comply with its disclosure obligations. This excuses any procedural default on Mr. Fell's part. See Bloomer v. United States, 162 F.3d 187, 191 n.1 (2d Cir. 1998) (noting petitioner may bring claim in 2255 proceeding because "ineffective assistance [of counsel] will constitute cause when it rises to a constitutional violation of a petitioner's Sixth Amendment right" to excuse a procedural default); see also United States v. Mannino, 212 F.3d 835, 845 (3d Cir. 2000) (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)) (defendants established ineffective assistance of counsel under Strickland and "therefore demonstrated the cause and prejudice that will excuse the procedural default that resulted from counsel's failure to [raise other claim] on direct appeal"). In any event, the claim turns on facts outside of the record, so it could not have been raised on direct appeal. See Waley v. Johnston, 316 U.S. 101, 104 (1942) (finding claim cognizable in habeas where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal").

220

pipes that could have contained crack residue; and an evidence log from the Rutland crime scene that could have shown the presence of drug use at 135 Robbins Street on the night of the crimes. Nor did trial counsel request this evidence. The Government's efforts to summarily dismiss Mr. Fell's claims fail because the question of whether Mr. Fell and Mr. Lee used drugs on the night of the crimes was a critical contested issue at trial,[169] and Mr. Fell has alleged facts establishing good cause to believe that the Government withheld material evidence bearing upon Mr. Fell's drug use, and that trial counsel unreasonably failed to seek this evidence.

The Government argues, with no supporting documentation, that trial counsel were permitted to inspect the bottle containing brown liquid pre-trial, and it only contained perfumed oil. Opp. 305. It further claims that the small baggies in the Marlboro box were empty. Id. The Government also asserts, again without support, that these items were not tested for drugs. Id. However, Mr. Fell attached as Exhibit 81 to the 2255 Motion a document from the FBI in Albany that establishes that the "drug weight" for the bottle and Marlboro box was 69.20 grams. This gives Mr. Fell good cause to believe that these items were in fact tested for drugs, and the Government's response does not conclusively refute Mr. Fell's claim. Thus, Mr. Fell should be permitted to pursue discovery to ascertain whether testing was in fact done. Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (petitioner entitled to discovery where he has made "specific allegations before the court [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief") (citation omitted). The

---

[169] The Government argued: "Mr. Bunin keeps raising this question about intoxication and crack use…But there's no evidence in this trial of crack use by the defendant that night." Tr. Vol. IV-I at 80:6-9 (June 24, 2005). See also Tr. Vol. I-I at 39:8-10 (June 20, 2005) (the Government claiming in guilt phase arguments "there's no evidence from the apartment at 135 Robbins Street of any crack use at all"); Tr. Vol. IV-I at 70:6-12 (June 24, 2005) (the Government arguing in guilt phase arguments that "there was nothing to do with crack cocaine there; no paraphernalia, no glass pipes, no nothing."); Tr. Vol. XII at 39:9-40:21 (July 13, 2005) (the Government arguing in penalty phase summation that "there really was no evidence in this case that the defendant was substantially impaired…at the time of these crimes…No one was doing drugs. [Witness] saw no drug paraphernalia.").

221

Government's argument that the testing was not done simply raises a factual dispute that cannot be resolved on summary dismissal.

The Government's efforts to minimize the significance of the crack pipes also fails. The Government elicited testimony from Officer Jeff Ross of the Clarksville Police Department that he believed that two pipes recovered from Mrs. King's car when Mr. Fell and Mr. Lee were arrested in Clarksville were marijuana pipes. Tr. Vol. I-I at 144:14-147:6 (June 20, 2005). Officer Ross based his characterization of the pipes as marijuana pipes on his own observations of the pipes, but, as Mr. Fell alleged, these pipes were not turned over to trial counsel for inspection or tested for crack residue. Exhibit 78 to the 2255 Motion, a newly-discovered document Mr. Fell obtained through a FOIA request, contradicts Officer Ross's characterization of the pipes as marijuana pipes, because the FBI in Albany itself characterized these pipes as "crack pipes." FBI Report Regarding Transfer of Evidence Collected From Vehicle, Jan. 4, 2001 (Fell Ex. 78 at 2). The disparity between Officer Ross's description of the pipes as marijuana pipes and the FBI in Albany's description of the pipes as "crack pipes" gives Mr. Fell good cause to believe that the Government may have withheld material evidence of Mr. Fell's crack use on the night of the crimes, and he is entitled to discovery to observe the pipes and test them in order to support these claims. Bracy, 520 U.S. at 908-09 (further stating that where such good cause is shown, "it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry").[170]

Mr. Fell has also adequately alleged that trial counsel were ineffective for failing to investigate Mr. Fell's diminished capacity on the night of the crimes. See supra Rep. Section

---

[170] Evidence that the Government may have withheld drug testing of the bottle and baggies in the Marlboro box and evidence of crack use also establishes good cause for discovery into whether there was any other evidence recovered from the Rutland crime scene to corroborate Mr. Fell's drug use on the night of the crimes.

222

XII.  While trial counsel argued that Mr. Fell was drunk and under the influence of drugs on the night of the crimes, it did not seek any evidence to corroborate Mr. Fell's drug abuse.  Id.  Since the evidence recovered in Clarksville could have corroborated Mr. Fell's claims that he was abusing drugs that night, Mr. Fell has adequately alleged that trial counsel were ineffective for failing to pursue this evidence, and he is entitled to discovery of this evidence to further demonstrate the prejudice he suffered.  The Government's argument that trial counsel did not pursue this evidence for strategic reasons turns on facts outside the record, and does not foreclose Mr. Fell's claims for relief.

### XIX.  Mr. Fell Has Adequately Alleged That The Aggregated Prejudice Stemming From The Government's <u>Brady</u> Violations Warrants Independent Relief

In his 2255 Motion, Mr. Fell adequately alleged the prejudice he suffered, both singly and cumulatively, as a result of the Government's failure to turn over favorable material. Mot. 310.  Despite Mr. Fell's specific allegations of the Government's improper withholdings in violation of <u>Brady</u> in the context of many of his claims,[171] the Government seeks to summarily dismiss Mr. Fell's claim by arguing it has not violated <u>Brady</u> because the documents that are the subject of Mr. Fell's claims were either not in its possession or did not constitute favorable evidence.  Opp. 307.  However, Mr. Fell "has not made a conclusory allegation, but rather has specifically identified the exculpatory evidence which he claims the government knew of and failed to disclose."  <u>Baumann v. United States</u>, 692 F.2d 565, 573 (9th Cir. 1982) (reversing

---

[171] Mr. Fell alleged the cumulative effect of the information withheld by the Government relating to Mr. Lee's influence over Mr. Fell, Francis Bellantoni's eyewitness information about the argument between Mr. Fell and Mr. Lee, Mr. Eike's medical records, Mr. Fell's disciplinary incidents in prison, physical evidence that supported Mr. Fell's account of drug use the night of the crimes, Debra Fell's criminal history, and documentation of interviews by the FBI and Dr. Welner, and other documentation from social service agencies.  Mot. 311-312.

223

summary dismissal of petitioner's <u>Brady</u> claim and remanding for evidentiary hearing).[172]  As the Ninth Circuit has explained, a <u>Brady</u> claim cannot ordinarily be decided without an evidentiary hearing where, as here, the claim "is not so patently frivolous or incredible as to justify summary dismissal."  <u>Id.</u>

If Mr. Fell does not have all of the evidence regarding exactly what documents the Government has in its possession and what specific information those withheld documents contain, it is because the Government has suppressed that information.  This is the very reason that Mr. Fell should be provided an opportunity to obtain the discovery necessary to fully develop the valid <u>Brady</u> claims he has asserted.  The prejudice stemming from all of Mr. Fell's <u>Brady</u> claims, including the information that the Government continues to suppress, must be "considered collectively, not item by item."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995); <u>see also</u> <u>United States v. Jackson</u>, 345 F.3d 59, 74 (2d Cir. 2003) (noting that courts "look at the cumulative effect of suppression in light of the evidence as a whole" and conduct their "own independent examination of the record in determining whether the suppressed evidence is material").  The Government's attempt to dismiss Mr. Fell's well-pled <u>Brady</u> claims fails.

## XX.    Mr. Fell Has Adequately Alleged Prosecutorial Misconduct In Closing Arguments

The Government has a duty to ensure that the convictions it obtains are secured in good faith, particularly when someone's life is at stake.  <u>See</u> <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935) ("[A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").  Mr. Fell has alleged that, in its zeal to obtain a death

---

[172] The <u>Baumann</u> court concluded that a <u>Brady</u> claim cannot ordinarily be decided without an evidentiary hearing. <u>Id.</u>  The court found that "[w]hile the government correctly insists that Baumann has not shown that any <u>Brady</u> material was in fact suppressed," his <u>Brady</u> claim survived summary dismissal. <u>Id.</u>

sentence for Mr. Fell, the Government engaged in aggressively inappropriate arguments during its closing, including: 1) arguing to the jury that there was no evidence of Mr. Fell drinking on the night of the crimes, despite ample evidence that there was extensive drinking that night and reports from the Government's own experts that Mr. Fell had a long history of excessive drinking;[173] 2) arguing to the jury that it should not consider mitigation evidence in Mr. Fell's background because it was unrelated to the crimes, despite well-settled law that mitigation evidence need not relate to the crimes; 3) improperly commenting on Mr. Fell's religious practices; and 4) impermissibly commenting on the "perks" Mr. Fell would receive if he were to be sentenced to life in prison without the possibility of parole, including "[a] cup of coffee, a good book, some exercise, a sunny day in the yard, shooting hoop with your buddies."  Tr. Vol. XII at 130:6-8 (July 13, 2005); Mot 319-20.  The Government contends that none of these errors caused prejudice to Mr. Fell, and thus has argued for summary dismissal.  The Government's arguments that these statements did not prejudice Mr. Fell must be considered together with Mr. Fell's additional claims that the Government's conduct deprived Mr. Fell of the fair trial to which he is constitutionally entitled.

The Government also argues that because Mr. Fell failed to raise these claims either in a post-trial motion or on appeal, he is foreclosed from doing so now.  However, Mr. Fell has alleged that trial counsel were ineffective for failing to challenge these arguments and to make multiple other meritorious objections.  Mot. Sections XIV, XV.  This ineffectiveness would excuse any procedural default.  See Bloomer v. United States, 162 F.3d 187, 191 n.1 (2d Cir. 1998) (noting petitioner may bring claim in 2255 proceeding because "ineffective assistance of counsel will constitute cause when it rises to a constitutional violation of a petitioner's Sixth

---

[173] In its Opposition, the Government argues that "evidence of [Mr. Fell's] intoxication was non-existent" and that he had not been drinking at all during the day in question.  Opp. 308-09.  This raises a factual dispute that cannot be resolved at the summary dismissal stage.

Amendment right" to excuse a procedural default); <u>see also</u> <u>United States v. Mannino</u>, 212 F.3d 835, 845 (3d Cir. 2000) (defendants established ineffective assistance of counsel under <u>Strickland</u> and "therefore demonstrated the cause and prejudice that will excuse the procedural default from counsel's failure to [raise other claim] on direct appeal") (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)) .  Accordingly, Mr. Fell should be permitted to proceed with this claim as part and parcel of his claim that the Government's actions as a whole deprived Mr. Fell of a fair trial.

## XXI.    Mr. Fell Has Adequately Alleged That The Aggregate Prejudice Stemming From The Government's Prosecutorial Misconduct Warrants Relief

In the 2255 Motion, Mr. Fell set forth allegations of prosecutorial misconduct during both the guilt and penalty phases that resulted in cumulative prejudice which rendered his trial fundamentally unfair.  Mot. 322.  The Government improperly relies on the Second Circuit's rejection of the cumulative impact argument as to errors raised by Mr. Fell on direct appeal.  Opp. 311.  The Government's suggestion that "the same considerations and outcome apply here" entirely ignores the fact that the Second Circuit's opinion did not consider the newly-uncovered evidence set forth in the 2255 Motion that demonstrates the Government presented false testimony.[174]  When viewed cumulatively, the Government's improper withholding of critical documents, elicitation of false or misleading testimony, violation of this Court's April 7, 2005 order and performance of unauthorized mental health testing upon Mr. Fell

---

[174] The Second Circuit opinion denying Mr. Fell's direct appeal was issued on June 27, 2008, long before post-conviction counsel undertook its investigation and uncovered the withheld information upon which Mr. Fell's claims are based.  <u>United States v. Fell</u>, 531 F.3d 197 (2d Cir. 2008).  For example, post-conviction counsel obtained documentation that conclusively proves the Government knew that Mr. Eike was never in a coma yet repeatedly argued to the jury that Mr. Fell had beaten Mr. Eike into a coma.  Mot. Section VI.  The Second Circuit opinion rejecting the cumulative impact argument is not controlling in this situation because the court did not consider the newly-discovered evidence that is the subject of the claims in Mr. Fell's 2255 Motion.

226

were sufficiently egregious as to warrant a reversal of Mr. Fell's death sentence.[175]  See Berger

v. United States, 295 U.S. 78, 89 (1935) ("where such [prosecutorial] misconduct was

pronounced and persistent, with the probable cumulative effect upon the jury which cannot be

disregarded as inconsequential…[a] new trial must be awarded").

**XXII.    Mr. Fell Has Adequately Alleged That Juror Misconduct Deprived Him Of A Fair Trial**

Mr. Fell has raised several very serious claims of juror misconduct in his 2255

Motion, involving jurors' failure to provide truthful answers on voir dire, extraneous evidence,

and inappropriate experiments.  The Government argues that these claims are procedurally

defaulted, defeated by the Federal Rules of Evidence, or otherwise unmeritorious.  As discussed

below, Mr. Fell's juror misconduct claims have not been procedurally defaulted, and have been

sufficiently pled in his 2255 Motion.  He is entitled to proceed and to have these constitutional

improprieties reviewed on the merits, with further discovery and an evidentiary hearing.

**A.    Mr. Fell's Juror Misconduct Claims Are Not Procedurally Defaulted**

Mr. Fell has not procedurally defaulted his juror misconduct claims because the

facts in support of these claims do not arise from the record made at trial.  The Supreme Court

---

[175] The Government's argument that Mr. Fell's prosecutorial misconduct claims should have been raised during the criminal proceedings ignores the crucial fact that, due to trial counsel's ineffectiveness and the Government's withholdings, the evidence necessary to assert many of these claims did not come to light until post-conviction counsel's investigation.  Mr. Fell cannot have been expected to raise arguments with respect to the Government's misconduct relating to evidence that remained outside the record on direct appeal.  See Waley v. Johnston, 316 U.S. 101, 104 (1942) (finding claim cognizable in habeas where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal").  Furthermore, Mr. Fell alleged that his trial counsel, one of whom also served as his appellate counsel, rendered deficient performance in failing to uncover the evidence that would have revealed the existence of Mr. Fell's claims of prosecutorial misconduct.  Thus, Mr. Fell has adequately established cause for failing to bring these claims earlier, which would excuse any procedural default of his prosecutorial misconduct claims.  See Bloomer v. United States, 162 F.3d 187, 191 n.1 (2d Cir. 1998) (noting petitioner may bring claim in 2255 proceeding because "ineffective assistance [of counsel] will constitute cause when it rises to a constitutional violation of a petitioner's Sixth Amendment right" to excuse a procedural default); see also United States v. Mannino, 212 F.3d 835, 845 (3d Cir. 2000) (defendants established ineffective assistance of counsel under Strickland and "therefore demonstrated the cause and prejudice that will excuse the procedural default that resulted from counsel's failure to [raise other claim] on direct appeal") (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  Therefore, the claim is not therefore procedurally barred.

227

has held that a habeas petition is the proper device through which to raise claims which turn on facts outside of the trial record. See Waley v. Johnston, 316 U.S. 101, 104 (1942) (finding claim cognizable in habeas where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal"). See also Ida v. United States, 191 F. Supp. 2d 422, 436 (S.D.N.Y. 2002) (no procedural default of juror misconduct claims where defendant had "failed to raise the question at trial, on direct appeal, or on his Rule 33 motion," because none of the evidence supporting those claims "appeared in the trial record"). As in both Waley and Ida, the facts underlying Mr. Fell's juror misconduct claims are not found in the record, and thus have been appropriately raised in his 2255 Motion, his first opportunity. See also United States v. Sampson, No. 01-10384 (MLW), 2012 WL 1633296 (D. Mass. May 10, 2012) (addressing merits of juror misconduct claims raised in 2255 motion).

The Government wrongly argues in its Opposition that trial counsel should have investigated these matters and developed the record at trial. While trial counsel did conduct voir dire at trial, as is customary in federal capital prosecutions, Mr. Fell cannot be rationally faulted because his trial counsel did not know that veniremembers were providing inaccurate and untruthful answers to the questions posed about their personal experiences. It is equally irrational, if not more so, to suggest that trial counsel could have uncovered the fact of the jurors' exposure to extraneous evidence, threats, and inappropriate experiments during their deliberations. These types of juror misconduct claims are typically reviewed for their merits in post-conviction precisely *because* nothing in the record from the trial alerts anyone to the existence of the issue. Ida, 191 F. Supp. 2d at 436. See also United States v. Sampson, 820 F. Supp. 2d 151 (D. Mass. 2011), appeal docketed, No. 12-1643 (1st Cir. May 23, 2012).[176] Any

---

[176] Indeed, the juror-related issues that did arise on the record were timely litigated during Mr. Fell's direct appeal.

228

application of procedural default to Mr. Fell's juror misconduct claims would be a radical departure from the procedural requirements in effect at the time of his trial.

> **B.      Mr. Fell Has Adequately Alleged That Two Jurors Failed To Truthfully Disclose Important Information In Response To Direct Questioning On Voir Dire**

Notwithstanding the Court's clear instructions to the veniremembers at trial about the importance of answering voir dire questions completely and truthfully, two of the jurors in Mr. Fell's case did not comply, and gave untruthful answers to significant questions.  As has been raised in Mr. Fell's 2255 Motion, these failures to honestly answer voir dire questions compromised Mr. Fell's right to a fair trial.  Mot. 325-30.

In McDonough Power Equip. Inc. v. Greenwood, 464 U.S. 548 (1984), the Supreme Court held that in order to succeed on a juror dishonesty claim, a defendant must show 1) a deliberately dishonest statement during voir dire; and 2) bias on the part of the juror that would have given rise to a challenge for cause.  McDonough, 464 U.S. at 556.  The Second Circuit follows the McDonough test.  See, e.g., United States v. Greer, 285 F.3d 158, 170-71 (2d Cir. 2002) (evaluating juror dishonesty claim under McDonough test); United States v. Langford, 990 F.2d 65, 68-71(2d Cir. 1993) (court applied McDonough to evaluate juror dishonesty claim, holding that petitioner could not meet McDonough's second prong).

In his 2255 Motion, Mr. Fell has alleged facts in support of both prongs of the McDonough test.  The Government's responses misapply the law, and otherwise introduce factual disputes that cannot be resolved against Mr. Fell at the summary dismissal stage. Because the allegations, when proven, will entitle him to relief, the Government's arguments for summary dismissal must fail.  See 28 USC § 2255(b); Puglisi v. United States, 586 F.3d 209, 213

---

United States v. Fell, 531 F.3d 197 (2d Cir. 2008) (Mr. Fell alleged that the district court improperly struck for cause three jurors who expressed reservations about applying the death penalty.).

(2d Cir. 2009) (court must accept all allegations as true unless conclusively refuted by the record).

Recently, the district court for the District of Massachusetts granted a writ of habeas corpus in a death case that featured juror misconduct arising out of a juror's failure to disclose pertinent information during voir dire. In <u>Sampson</u>, the district court conducted an evidentiary hearing on a claim that a juror had failed to disclose that she was the victim of domestic abuse when asked.[177] 820 F. Supp. 2d 151. After hearing from the juror in question, the court found that since the juror's dishonesty related to material issues presented at trial, the juror could not have impartially evaluated the evidence. <u>Id.</u> at 192-95. The court inferred bias on the part of the juror in question, and also found that had she provided an honest answer during voir dire, she would have been excused or struck for cause. <u>Id.</u> at 195. As a result, the court vacated Mr. Sampson's death sentence. <u>Id.</u> at 202.

Here the facts of the juror misconduct, when proven, will entitle Mr. Fell to vacatur of his conviction and death sentence. Because the claims are facially well-pled, as in <u>Sampson</u>, Mr. Fell is entitled to have this Court reach the merits of these claims.

### 1.    Juror 162

Mr. Fell has supplied a sworn declaration which reveals that Juror 162 provided an untrue answer to a material question during voir dire. Although Juror 162 had been the victim of repeated sexual molestation by her stepfather, she responded "No" to the question, "Have you or has a family member or close friend ever been a witness to or the victim of a crime?" Juror No. 162 Questionnaire, May 23, 2005 (Gov. Ex. M at 16). As she noted in her declaration:

---

[177] Notably, in <u>Sampson</u>, 2255 counsel had identified only one instance of dishonesty on the part of Juror C in its initial motion: failure to disclose that she had filed an abuse prevention order. <u>Id.</u> at 158. This disclosure led to three evidentiary hearings where the evidence was developed of the extensive breadth of Juror C's dishonesty, and potential for bias.

> At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.[178]

Statement of Juror 162, Jan. 5, 2011 (Fell Ex. 280 at FELL-00002580). This was highly relevant information that any defense counsel would need to know about a potential juror in a case such as this one. Among the mitigating factors that Mr. Fell and his counsel presented during the sentencing phase was evidence that Mr. Fell had been sexually abused as a child.[179] If Juror 162 had disclosed information that she had been sexually abused as child, trial counsel would have challenged her for cause. Mot. 326; see also Memorandum Opinion and Order, Dkt. No. 139, at 1,4,7 (June 9, 2005) (granting Mr. Fell's motion to challenge Juror 184, who among other things, answered that he could not consider mitigating factors such as upbringing and sexual abuse because he believed that people are personally responsible for how they develop).

Like Mr. Fell and his sister, Juror 162 was a victim of memorable sexual abuse as a child. However, when prompted, she chose not to disclose this information. As a result, Mr. Fell was denied of his constitutional right to a fairly selected jury that had been composed pursuant to a voir dire process in which prospective jurors answered questions truthfully.

The Government makes two arguments for summary dismissal of this claim as regards Juror 162: first, that Federal Rule of Evidence 606(b) prohibits the court from considering her statement; and second, that there was no error because "there is no reason to

---

[178] Juror 162's history as a crime victim was revealed during Mr. Fell's post-conviction investigation, at which point the declaration was prepared.

[179] The Special Verdict Form included the following relevant mitigating factor: "Donald Fell was sexually and physically abused as a child." Special Verdict Form, July 14, 2005 (Fell Ex. 209 at 13, 16).

231

suspect that the juror's voir dire statements were deliberately false." Opp. 319. Neither argument is persuasive.

First, claims arising out of a juror's failure to honestly answer voir dire questions are not foreclosed by Rule 606(b), and Juror 162's testimony about her experience of having been sexually abused, and the resultant implied or inferred bias, is plainly outside the scope of the rule. See, e.g., Sampson, 820 F. Supp. 2d at 189 (court allowed petitioner's counsel to question juror about matters that did not occur during jury deliberations); United States v. Boney, 68 F.3d 497 (D.C. Cir. 1995) (Rule 606(b) does not bar questioning a juror who failed to disclose on voir dire that he was a convicted felon); United States v. Ianiello, 866 F.2d 540, 544 (2d Cir. 1989) (Rule 606(b) does not prohibit the court from questioning jurors about ex-parte communications made to them during deliberations). By the plain text of the rule, 606(b) prevents a juror from testifying about "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other's juror's mind or emotions…" Fed R. Evid. P. 606(b). Because Juror 162's late-disclosed history of sexual abuse and resultant biases does not impeach or even describe the juror's deliberations, Rule 606(b) is inapposite.[180]

Next, the Government contends that this claim should be summarily dismissed because Juror 162 probably did not intend to fail to disclose her relevant history of having been a

---

[180] Equally misplaced is the government's reliance on Lopez v. Aramark Uniform & Career Apparel, Inc., 417 F. Supp. 2d 1062, 1071 (N.D. Iowa 2006). Lopez is a civil sexual harassment case in which two jurors failed to reveal on voir dire that they had some prior experience with sexual abuse. According to a third juror, they revealed this during deliberations, which the third juror experienced as causing so much pressure that the damage awards were elevated. Id. at 1065. The court declined to hold an evidentiary hearing, finding that the jurors with the experience of sexual abuse could not be found to have failed to honestly answer any direct questions on that point during voir dire, nor found to have concealed any bias. There, the jurors' answers to all of the even arguably pertinent voir dire questions were honest. Id. at 1068-70. The facts in Mr. Fell's case are exactly the opposite. The Lopez court did not rule under 606(b), and inasmuch as it addressed the application of the rule in dicta, it noted only that 606(b) would bar its inquiry into the operation of subjective biases of jurors in the course of their deliberations. Id. at 1071-72.

232

victim of sexual abuse.  As noted, under McDonough when the failure to disclose is motivated in

ways that affect a juror's impartiality, reversal is required.  McDonough, 464 U.S. at 556; see

also Greer, 285 F.3d at 170-71; Langford, 990 F.2d at 68-71.  In support of its position, the

Government supplies no evidence, but instead speculates that Juror 162 forgot about the events

because they happened when she was a child.  Opp. 319.  Having posed an alternative set of

facts, the Government, in actuality, only confirms the necessity of denial of its motion for

summary dismissal, and the need for further factual development.[181]

At the moment, however, the only evidence presently before the Court augurs

decidedly against the Government's speculation: the juror's own declaration, which indicates the

plain fact that she recalled the events over five years later during her interview with post-

conviction counsel.  In any event, at this stage, the Court must accept all of Mr. Fell's allegations

as true unless conclusively refuted by the record.  See 28 U.S.C. § 2255(b); Puglisi v. United

States, 586 F.3d 209, 213 (2d Cir. 2009).   Viewed in that lens, summary dismissal of this claim

is not appropriate, given that Mr. Fell can satisfy McDonough upon full presentation of the

evidence.[182]

---

[181] Moreover, because of the seriousness of the constitutional harm that arises when jurors are not truthful during voir dire, the Second Circuit has made clear that evidentiary hearings on juror dishonesty are favored: "we… caution district courts that, if any significant doubts as to a juror's impartiality remains in the wake of objective evidence of false voir dire responses, an evidentiary hearing generally should be held."  United States v. Stewart, 433 F.3d 273, 306 (2d Cir. 2006).  Because Mr. Fell has put forth "objective evidence of false voir dire responses" to create a strong inference of bias on the part of Juror 162, he is entitled to close merits review of this claim, as well as an evidentiary hearing.  Review here is especially warranted because unlike in McDonough, this is a death penalty case where Mr. Fell is subject to execution.  See, e.g., Williams v. Taylor, 529 U.S. 420, 423 (2000) (remanding for evidentiary hearing on juror's omissions during voir dire on basis of juror's affidavits submitted with habeas petition); Sampson, 820 F. Supp. 2d at 156-57, 161 (noting uniquely critical importance of each individual juror in federal death cases and reversing death sentence after conducting three evidentiary hearings at which jurors testified about their failures to disclose the truth on voir dire).

[182] District courts have granted evidentiary hearings on claims such as these where the defendant has put forth comparable evidence.  See, e.g., United States v. Daugerdas, No. S3 09 Cr. 581 (WHP), 2012 U.S. Dist. LEXIS 82597 (S.D.N.Y. June 4, 2012) (post-trial evidentiary hearing conducted after trial counsel learned that the juror failed to disclose during voir dire that she was an attorney with a suspended law license); Ida, 191 F. Supp. 2d at 439 (evidentiary hearing conducted after post-trial affidavit asserting that the juror had not been truthful on voir dire about the presumption of innocence); Langford, 990 F.2d at 66-67 (reviewing evidence educed at hearing below on

This point is only emphasized by the procedural posture of the authority cited in the Government's Opposition. The Government cites United States v. Greer, 998 F. Supp. 399, 407 (D. Vt. 1998), aff'd, 285 F.3d 158 (2d Cir. 2002), in support of its position that a malicious design should not be attributed to a juror without additional evidence. Opp. 319. Greer, however, is inapposite here on the question of *summary dismissal* without additional evidence. In Greer, the court carefully considered the facts surrounding a juror's failure to mention until deliberations that an estranged family member was involved in drug transactions with the defendant. Greer, 998 F. Supp. at 410-411. The court held an evidentiary hearing to ascertain from all of the seated jurors what impact the juror's belated disclosures might have had on the proceedings. Id. at 404. The court's determination that the failure to disclose did not warrant reversal was only made after hearing the juror's post-trial testimony. Id. at 406. Greer does not hold that this Court can – or should – summarily dismiss a claim where the evidence strongly suggests that a juror declined to reveal a very important aspect of her background during voir dire.[183]

The Government also suggests that even if Juror 162 did remember her abuse, she may not have understood that she should answer "yes" when asked if she had been the victim of a crime. Opp. 321-22. The Government argues that because sexual abuse of children was not recognized and prosecuted during Juror 162's childhood in the same manner that it is today,

---

juror's failure to mention three criminal arrests); Greer, 998 F. Supp. at 403-04 (evidentiary hearing held where juror failed to disclose on voir dire that his brother had been incarcerated and other pertinent information about his history with crime).

[183] The Government also urges this Court to liken this case to United States v. Adeniyi, where a juror disclosed during trial that he had been the victim of fraud in the form of bounced checks from his customers because it had not occurred to him during voir dire that he had been the victim of a crime. 277 F. App'x 22, 24 (2d Cir. 2008). However, this case is easily distinguishable from Adeniyi. In Adeniyi, the court knew why the juror had answered during voir dire that he had not been the victim of a crime, because he explained that reason to the court. Id. Adeniyi does not compel this Court to summarily dismiss this claim in the absence of similar evidence.

234

Juror 162 may not have identified as a victim.[184]   Again, this argument requires this Court to assume facts not in evidence that contravene the logical import of Juror 162's declaration.

In his 2255 Motion, Mr. Fell sufficiently pled that Juror 162 provided a dishonest answer during voir dire by citing to the inconsistency between her juror questionnaire and her post-conviction declaration.  Mot. 325-26.  In addition to these claims, Mr. Fell puts forth additional record evidence – answers that Juror 162 provided in her voir dire questionnaire – that give rise to a strong inference that she would have known that sexual abuse of children is in fact a crime.  For example, Juror 162 noted that she followed the highly-publicized Michael Jackson trial, a criminal prosecution involving seven counts of child molestation that took place at the same time as the pre-trial proceedings in Mr. Fell's case.[185]   Gov. Ex. M at 14.  She also noted having recently read "John Walsh's latest book" which at the time was "Public Enemies: The Host of America's Most Wanted Targets the Nation's Most Notorious Criminals."  Id. at 15. This book included a chapter on Kyle Bell, a lifelong sexual predator who targeted children.

Juror 162 also reported watching "CNN-every day, Larry King Live every night, Nancy Grace – every night, Court T.V. (sometimes)."  Id.  All of these television shows include coverage of news stories involving the sexual abuse of children.  It is implausible that an individual who followed the Michael Jackson trial, read John Walsh books, and regularly watched Nancy Grace, would not have known that sexual molestation of a child was a crime.  At a minimum, this Court should undertake full evidentiary development and merits review.

In addition to the facts which were not disclosed, Mr. Fell has also pled facts sufficient to create a presumption of implied or inferred bias on the part of Juror 162, which

---

[184] In her juror questionnaire, Juror 162 listed her age as 62.  Gov. Ex. M at 5.

[185] Jackson Not Guilty: Jurors acquit pop star of all molestation charges, CNN Law Center (June 14, 2005), http://www.cnn.com/2005/LAW/06/13/jackson.trial/ (On June 14, 2005, a jury acquitted Michael Jackson on all counts of child molestation).

235

would have supported a challenge for cause.  See McDonough, 464 U.S. at 556 ("[A] correct response would have provided a valid basis for a challenge for cause."); United States v. Torres, 128 F.3d 28 (2d Cir. 1997) (challenges for cause are based on actual bias, implied bias, or inferred bias). The implied bias arises in the fact that Juror 162, like Mr. Fell, was also the victim of sexual abuse.  However, since, by her own admission, she responded differently to the abuse than Mr. Fell, Juror 162 may have been unable to impartially consider this mitigation evidence. Similarly, the Court could easily find an inferred bias on the part of Juror 162 when considering her history with sexual abuse combined with her serious interest in true crime media coverage and novels.

Nevertheless, at this stage in the litigation, the Court need not determine the exact contours of Juror 162's bias, but rather need only conclude that Mr. Fell has pled sufficient facts which, when later proven, could result in a successful challenge for cause.  See, e.g., Sampson, 820 F. Supp. 2d 151 (granting evidentiary hearing based upon one documented instance of dishonesty on voir dire, and concluding after full evidentiary development that juror in question made multiple dishonest assertions on voir dire that showed inferred bias).

The Government argues that Juror 162's childhood abuse would not have been grounds for a challenge for cause because Mr. Fell was not charged with abuse, but instead was himself the victim of abuse.  Opp. 322.  This argument is specious.  In the first place, any criminal defendant facing judgment needs to learn during voir dire who among his jurors have themselves been victims of personal crimes.  Furthermore, Mr. Fell's experience of sexual abuse was an important part of his mitigation case, and his defense to the Government's position that he deserved to be put to death for his crimes.  Juror 162 admitted in her declaration that she was unsympathetic to Mr. Fell's experience in this regard, because she had been a victim as well, and

236

"it didn't turn [her] into a murderer." Fell Ex. 280 at FELL-00002580. This admission would have supported a challenge for cause. See Burton v. Johnson, 948 F.2d 1150 (6th Cir. 1991) (holding that a juror would have been struck for cause for implied bias in a death case where both the defendant and the juror were victims of abuse, but the juror failed to disclose the abuse when asked on voir dire). This Court excused many veniremembers who revealed experience with sexual abuse.[186] Thus, if Juror 162 had disclosed her experience with sexual abuse, she too would have been removed from the jury.

The Government does not contest that Juror 162's experience with sexual abuse could constitute grounds for a challenge for cause on the basis of implied or inferred bias. However, the Government attempts to distinguish Mr. Fell's case from Sampson, where the court found inferred bias, by arguing that "Juror 162's experience would not cause her to sympathize with Fell's victims, in contrast to Juror C in Sampson." Opp. 321. This distinction is unavailing. By her own report, Juror 162's experience led her to disdain the impact of a key component of Mr. Fell's mitigation case.

The record at trial makes clear that Mr. Fell's trial counsel were concerned about their prospective jurors' capacity to understand the mitigation material that they expected to present.[187] Decl. of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 7) ("I would have wanted

---

[186] The Court removed the following jurors: Juror 117 (Tr. Individual Voir Dire of Prospective Juror No. 117 at 14:9-17:3 (May 17, 2005)) (the father of her daughters had raped their children), Juror 51 (Tr. Individual Voir Dire of Prospective Juror No. 51 at 156:15-157:22 (May 12, 2005)) (she had an ex-boyfriend who committed a lewd and lascivious act on their child), Juror 194 (Tr. Individual Voir Dire of Prospective Juror No. 194 at 57:19-67:17 (May 31, 2005)) (the prospective juror had adopted four children and some of her children had been sexually abused).

[187] In addressing the abuse in its closing statement, trial counsel argued, "Can you imagine having to deal with the sexual torture of your two young children in a normal, loving house? How do you deal with that?" Tr. Vol. XII at 89:7-9 (July 13, 2005). Trial Counsel then quoted from a social services report on the Fell children's response to the abuse, "'of the two children, it has affected Donald Junior the most. Since the incident, Donald has become extremely aggressive and active. The parents have related that at times Donald become uncontrollable and is very difficult to deal with.' Is that Donnie's fault at five? The beginning of this damage, this foundation is cracking." Tr. Vol. XII at 90:12-18 (July 13, 2005).

237

to know if a juror was the victim of sexual abuse… because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly."); Decl. of Paul Volk (Fell Ex. 305 at 1) ("I also would have challenged for cause any jurors who said they could not consider mitigation evidence about… childhood sexual abuse."). In light of the importance of this mitigation evidence, if Juror 162 had reported her history as a victim of sexual abuse and her bias that "it didn't make me a murderer," trial counsel would have challenged her for cause. Mr. Fell has pled sufficient facts in support of this claim to proceed to have the opportunity to prove it and have it adjudicated on its merits.

### 2.    Juror 26

Like Juror 162, Juror 26 also failed to disclose relevant information during voir dire, including his criminal history and his prior knowledge of Mr. Fell's case. The Government has argued that this claim should be summarily dismissed by again speculating as to Juror 26's intent in providing dishonest answers. Mr. Fell has pled sufficient facts with respect to Juror 26 to meet the McDonough standard, and thus this claim should not be summarily dismissed.

As pled in his 2255 Motion, Mr. Fell has made the following showing as to Juror 26's dishonesty: 1) the juror questionnaire in this case asked: "Have you or has a family member or close friend ever been charged with a crime?" and Juror 26 checked "no" for his answer (Gov. Ex. M at 16); and 2) the truth is that Juror 26 has been charged with three separate crimes over a five-year period: driving under the influence, unlawful criminal mischief, and unlawful insurance payment and failure to keep record.[188] In addition, Juror 26 failed to disclose that he had seen a television news report that described the suicide of Mr. Fell's co-defendant, although when asked

---

[188] In his 2255 Motion, Mr. Fell cited only Juror 26's April 1996 conviction for unlawful criminal mischief. Mot. 329. In its Opposition, the Government then identified Juror 26's January 1995 conviction for DUI in New Hampshire. Opp. 326. Since the filing of the 2255 Motion, 2255 Counsel has learned of a third set of charges of unlawful insurance payment and failure to report payment. This last incident took place in 1991 and was followed by a hearing in Essex County, Vermont.

238

on voir dire what he knew about the case, he did mention knowing about the kidnapping of Mrs. King. See Tr. Individual Voir Dire of Prospective Juror No. 26 at 90:11-17 (May 13, 2005).

In response, the Government argues, simply, that Juror 26 did not intend to withhold his criminal history because "[i]t is difficult to imagine that the non-disclosure was a deliberate lie." Opp. 326. The Government then argues that the Court should not "infer[] that juror 26 deliberately failed to disclose the information." Id. As with Juror 162, this Court, without evidence to the contrary, should not presume the omission to have been anything other than deliberate. With regard to the undisclosed charges, the fact of the matter is that *there were three of them*; it seems highly unlikely that Juror 26 would have forgotten all three of his criminal charges. Mr. Fell has put forth sufficient evidence that in response to specific questions, Juror 26 failed to disclose his criminal history during voir dire.

The Government also urges this Court to dismiss Mr. Fell's claim on the basis of its suggested speculation that Juror 26 may not have remembered the charges, or perhaps did not consider them to fall within the scope of the voir dire question. Id. In an attempt to demonstrate that Juror 26 may have forgotten of his arrests, the Government minimizes Juror 26's criminal history by arguing that he was not fingerprinted for his crimes and therefore, he was not formally arrested. Id. at 325-26.[189] Conceding that he was fined, the Government does not dispute the fact that the charges faced by Juror 26 were in fact criminal charges. Summary dismissal is not appropriate here, where the Government's effort to refute the facts presented in support of the claim entails pure speculation.

In addition, with respect to Juror 26's failure to disclose his knowledge of the co-defendant's suicide, several years after the voir dire Juror 26 had ready recall of having seen the

---

[189] The Government neglects to mention that Juror 26 was in fact fingerprinted for his DUI conviction. Thus, by the Government's own logic, Juror 26 should have at least remembered this arrest and disclosed it to the Court during voir dire.

239

news report that aired prior to the voir dire, which at a minimum creates an inference that he recalled the report during voir dire, where he deliberately failed to disclose it. The Government suggests that Juror 26 may not have known that the Court's preliminary questions about his knowledge of the case also applied to knowledge of Mr. Lee's involvement. Id. at 327. Again, this is rank speculation, and the Court should not resolve the issue by way of summary dismissal. In all, Juror 26 not only failed to disclose his knowledge of Mr. Lee's suicide, but also the fact that he had been charged with three separate crimes. When viewed individually or as a whole, these repeated instances of dishonesty create a further inference that Juror 26 deliberately withheld important information during voir dire. As such, Mr. Fell has pled sufficient facts for this Court to conduct an evidentiary hearing where it can question Juror 26 as to his responses during voir dire.

The Government also argues that none of these hidden facts would have led to a challenge for cause had they been revealed. Id. at 326. This is simply not true. Juror 26 provided misrepresentations about his criminal history that related to mitigating factors, and would almost certainly have led effective trial counsel to pursue a challenge for cause. Indeed, trial counsel were especially interested in potential jurors' experiences with domestic violence as well as substance and alcohol abuse. See Decl. of A. Bunin (Fell Ex. 264 at 7) ("I would have wanted to know if a juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly."); Decl. of G. Primomo (Fell Ex. 263 at 2) (same).

However, because Juror 26 failed to reveal his criminal history, Mr. Fell was prevented from inquiring into these relevant experiences. Doing so would have been fruitful: as

240

it turns out, Juror 26's conviction for unlawful mischief arose out of a domestic dispute.

Additionally, his conviction for driving under the influence involved alcohol. Finally, his third

criminal charge involved an unlawful insurance payment. Any or all of these criminal charges

could reflect experiences that imply a bias in his capacity to fairly assess the mitigating factors

relating to Mr. Fell's family life and upbringing, which were characterized by alcohol, substance

abuse, and domestic violence, as well as Mr. Fell's intent and premeditation on the night of the

crime, since he was under the influence of both drugs and alcohol.[190] Without question, this

Court could have granted a challenge for cause based on an implied or inferred bias if Juror 26's

prior experience and criminal conviction resulted in a bias that prevented him from weighing

these mitigating factors.

Moreover, Juror 26's DUI conviction may have warranted his disqualification by

statute. See 28 U.S.C § 1865(b)(5) (disqualifying from jury service those with convictions

entailing possible sentences of over a year). During voir dire in this case, the Court frequently

encountered jurors who, like Juror 26, had been convicted of DUI. Tr. Individual Voir Dire of

Prospective Juror No. 69 at 231:23-24 (May 5, 2005); Tr. Individual Voir Dire of Prospective

Juror No. 1 at 12:15-13:24 (May 13, 2005); Tr. Individual Voir Dire of Prospective Juror No.

181 at 176:21-25 (May 23, 2005). The Court carefully considered the nature of each DUI

conviction that was disclosed, and noted that a seated juror who had failed to disclose having a

DUI could give rise to error. Tr. Individual Voir Dire at 280:14-24 (May 13, 2005). That is

exactly what has happened here. As a consequence, Mr. Fell has been denied his constitutional

right to a fair jury selection process. This Court should at a minimum conduct an evidentiary

hearing where it can determine whether Juror 26 was qualified to sit as one of Mr. Fell's jurors.

---

[190] The mitigating factors included: "Donald Fell did not plan to kill Teresca King at the time she was kidnapped"; "[a]s a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other"; and "Donald Fell's parents were violent alcoholics who abandoned him as child." Fell Ex. 209 at 12, 14.

241

Similarly, had trial counsel known that Juror 26 was familiar with the suicide of Mr. Lee, they would have challenged him for cause on the basis of an inferred bias.[191]  Trial counsel worked to keep information about Mr. Lee's suicide away from the jury out of fear that it would affect the jury's evaluation of Mr. Fell's culpability, and ultimately were granted an in limine order to this effect.   United States v. Fell, 372 F. Supp. 2d 773, 778 (D. Vt. 2005); see also Decl. of A. Bunin (Fell Ex. 264 at 7) ("I would have wanted to know if jurors had been exposed to pretrial publicity about Bobby Lee's death, since this was prejudicial information I wanted excluded from the trial.  I would have challenged any jurors with these experiences for cause."); Decl. of G. Primomo (Fell Ex. 263 at 2) (same).

In fact, another prospective juror was excused in part for revealing knowledge of Bobby Lee's suicide:

> Second, he has got some information about this case which no one else has, and that is that Mr. Lee committed suicide.  And if he is allowed to sit on a jury, that means the entire jury gets to know that Mr. Lee committed suicide.  And that is of grave concern to me, in terms of fairness to this defendant, as well as the government, for that matter, because you know that this evidence is going to become – well, that fact is going to become known to anybody.

Tr. Individual Voir Dire at 177 of Prospective Juror No. 42 at 177:12-20 (May 4, 2005).

### C.   Mr. Fell Has Adequately Alleged That His Trial Was Infected With Prejudicial Extraneous Evidence

Mr. Fell has raised serious constitutional error arising out of two separate instances of extraneous evidence that was provided to the jurors for their consideration.  In a criminal case, "any extra-record information of which a juror becomes aware is presumed prejudicial."  Greer, 285 F.3d at 173 (citing Remmer v. United States, 347 U.S. 227, 229 (1954));

---

[191] The inferred bias arises in his capacity to consider Mr. Fell's relative culpability.  The following mitigating factors are relevant in this analysis: "Donald Fell did not plan to kill Teresca King at the time she was kidnapped"; "Robert Lee, equally culpable for the crimes, will not face execution"; and "Donald Fell and Robert Lee acted in concert in committing the crimes."  Fell Ex. 209 at 12, 16.

242

see also Turner v. Louisiana, 379 U.S. 466, 472-73 (1965) (trial by jury in a criminal case necessarily means the evidence developed against a defendant shall come from the witness stand with full judicial protection of rights of confrontation and counsel).  The court may find prejudice here with respect to only the penalty phase of the conviction.  See, e.g., Sampson, 820 F. Supp. 2d at 188 (court found that since he satisfied the McDonough test, Sampson was entitled to a new sentencing trial).

### 1.    Extraneous Evidence Of The Co-Defendant's Suicide

The first claim involves Juror 26's knowledge of the co-defendant's suicide.  Mot. 337-38.  As has been addressed above, Juror 26 failed to disclose that he was aware of the suicide of Mr. Lee, Mr. Fell's co-defendant.  In addition to the error that arises in his failure to disclose this material on voir dire, Juror 26's awareness of this fact constituted improper extraneous evidence that is presumed prejudicial.  This Court had granted a motion in limine to prevent the jurors from learning of Mr. Lee's suicide and ruled that such evidence would be inadmissible, pending a specific Government proffer.  Fell, 372 F. Supp. 2d at 778.  As discussed above, this extraneous evidence related directly to the mitigation evidence regarding Mr. Fell's relative culpability.  Clearly, Juror 26's awareness of the suicide was extraneous because the Court deliberately attempted to exclude it from the body of evidence that the jury would consider.

In response, the Government also urges this Court to summarily conclude that Mr. Fell could not have been prejudiced by this information because "a typical juror" would not consider such evidence.  Opp. 331.  The Government suggests that a typical juror would have disregarded this extraneous information because the Court issued a standard instruction that in their deliberations, members of the jury should only consider the evidence presented at trial.  Id.

243

at 331-32.  This standard instruction is customary in every criminal case,[192] and if the Government's argument were correct, extraneous evidence could never give rise to reversible error.  For the purposes of its summary dismissal analysis, the presumption is what is operative; although the merits resolution will require the court to assess whether the extraneous evidence would have impacted "a typical juror," see Greer, 285 F.3d at 173, that is the core of the merits analysis and not the inquiry here, at summary dismissal.[193]

Mr. Fell has pled sufficient facts in his 2255 Motion to meet the presumption that extraneous information, which related directly to mitigation evidence presented at trial, prejudiced the jury.  Mot. 330-38.  Once again, the Government offers only speculation in response, urging summary dismissal on the suggestion that "[t]here is no reasonable probability that [Mr.] Fell was prejudice [sic] from juror 26's exposure to this information."  Opp. 332.  At this stage, however, given the facts taken to be true, the Court must presume prejudice.  See Greer, 285 F.3d at 173 (citing Remmer, 347 U.S. at 229).  Thus, this Court should not summarily dismiss these claims without further process and review these claims on the merits.

> **2.  Extraneous Evidence Of The Rutland Crime Scene**

As was fully pled in Mr. Fell's 2255 Motion, Mr. Fell's trial was additionally corrupted with extraneous evidence when Juror 143 traveled to Rutland during the trial to learn information about Mr. Fell and the crimes.  According to his declaration, Juror 143 traveled to Rutland to better understand the evidence at trial by supplementing the litigants' presentations

---

[192] The Modern Federal Jury Instructions provide the following guideline instruction on considering extraneous evidence: "The evidence in this case consists of the sworn testimony of the witnesses, the exhibits received in evidence, stipulations and judicially noticed facts… Anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded." 5 Modern Federal Jury Instructions § 5.05 (2012).

[193] Although Greer affirmed the district court's conclusion that the extraneous material there would not have impacted "a typical juror," it did so because the extra-record material had "presented no information that could have been improperly used in deliberations," was not detailed or specific, and was minimal. Id. This cannot be said of the extraneous evidence in issue here, the matter of the co-defendant's suicide.

with his own evaluations of relevant issues and locations.  Statement of Juror 143, Dec. 19, 2010

(Fell Ex. 241at FELL-00002377).  After visiting Rutland, Juror 143 introduced three elements of

extraneous evidence into the jury's deliberations: 1) his observations of the lighting at the Price

Chopper; 2) his observations of the Fell residence at 135 Robbins Street and the neighborhood at

large; and 3) his observations of the trip from the Fell residence on Robbins Street to the Price

Chopper where Mrs. King was abducted.  Id.  Juror 143 reported that during the deliberations, he

shared his observations with his fellow jurors.  Id.  As has been noted, jurors' consideration of

extraneous evidence is presumptively prejudicial.  Greer, 285 F.3d at 173.[194]

        Although the Government acknowledges the presumption of prejudice on facts

such as these, and does not contest their veracity, it argues in response that Mr. Fell was not

prejudiced by the extraneous evidence because it was cumulative.  Opp. 328-32.   The

Government's argument that there was no prejudice notwithstanding the presumption of

prejudice cannot support summary dismissal of this claim.  The Court must accept all of Mr.

Fell's allegations as true unless conclusively refuted by the record; any factual disputes and all

credibility determinations must be resolved on the merits, after full evidentiary development.

See 28 U.S.C. § 2255(b); Puglisi, 586 F.3d at 213.

        The Government's contention that the extraneous evidence here is cumulative is

unpersuasive.  The Government asserts that Juror 143's observations were cumulative because it

introduced photographic evidence at trial that captured Juror 143's observations.  Opp. 329-30.

Additionally, the Government cites Bibbins v. Dalsheim, 21 F.3d 13 (2d Cir. 1994), for the

proposition that given the photographs introduced at trial, any impressions resulting from Juror

---

[194] Mr. Fell has also raised a separate claim that this conduct by Juror 143, specifically his visiting the Price Chopper and Fell residence in Rutland and recreating the trip between these two locations, was an improper out-of-court experiment that introduced extraneous, prejudicial information into his deliberations of the questions in issue at trial. The Government has offered no opposition to this claim, and thus it should proceed.

143's extraneous observations were cumulative.  However, Bibbins is inapposite.  At the outset, the circuit court was reviewing the habeas claim under 28 U.S.C. § 2254, and thus was bound by the state court supported finding of fact on the point that the juror's extraneous knowledge was cumulative of the trial testimony and correlative admitted photographs.  Bibbins, 21 F.3d at 17.

Bibbins is also factually distinguishable, in that the alleged extraneous material that was relied upon by the juror there was her pre-existing personal knowledge about the scene of the crime, which she of course brought with her to her jury service.  Id. at 17-18.  Moreover, at trial the Government had proved the fact in question – that the scene of the crime did not have any open businesses – by introducing photographs that demonstrated the vacant area.  Courts expect jurors, such as the relevant juror in Bibbins, to bring their personal knowledge with them to their jury service, and courts allow jurors to rely on these experiences while deliberating. Bibbins, 21 F.2d at 17.  When there has not been any dishonesty on voir dire, personal knowledge of aspects of a particular case do not give rise to misconduct.  In any case, in Bibbins, the trial evidence *mirrored* the juror's report of her personal knowledge and thus, rendered the juror's experience superfluous, or cumulative.

Here, in contrast, Juror 143 independently visited the crime scene *during* the trial, and relied on what he learned during the trip.[195]  As a result of his trip, Juror 143 introduced extrinsic evidence that was not cumulative because it did not replicate the evidence submitted at

---

[195] See, e.g., Campbell v. Hankins, 2009 Ark. App. 479 (2009) (affirming new trial in personal injury action where juror visited auto accident scene to make independent investigation, then reported results to other jurors); Ex Parte Potter, 661 So.2d 260 (Ala. 1994) (jurors' unauthorized viewing of accident scene during prosecution for criminally negligent homicide warranted reversal of conviction); Hill v. United States, 622 A.2d 680 (D.C. App. 1993) (conviction reversed and case remanded for new trial where juror conducted independent view of scene of defendant's alleged drug sale, examining lighting conditions where defense was misidentification);  Bobo v. State, 327 S.E.2d 208 (Ga. 1985) (murder, burglary, and assault conviction reversed where two jurors made trip to scene of crime which was critical in determining credibility of sole eyewitness); Commonwealth v. Cuffie, 609 N.E.2d 437 (Mass. 1993) (reversal required where one juror reported that second juror made independent visit to crime scene); Travis v. Stone, 66 S.W.3d 1 (Mo. 2002) (presumption of prejudice not overcome in wrongful death action where juror, during break in reconstruction expert's testimony, went to examine scene of accident).

246

trial. As an initial matter, the Court can infer from Juror 143's affirmative decision to seek out additional evidence that he was not satisfied with the evidence presented at trial, and wanted to observe the relevant areas.

While three photos of the Rutland areas were admitted at trial, they do not reflect the breadth of Juror 143's observations. For example, Juror 143 was concerned with the lighting at the Price Chopper, and noted in his declaration, "lighting at the Price Chopper in Rutland was weak." Fell Ex. 241 at FELL-00002377. He added that "[i]t isn't expensive to get better lighting. They should do that." Id. The lighting in the parking lot was potentially significant because it related to the evidence regarding Mr. Fell's precise intentionality and the credibility of the observations about his impairment, which were both mitigating factors.[196] In fact, the Government argued explicitly at trial: "And they went to a parking lot that was lit." Tr. Vol. IV-I at 75:9-10 (June 24, 2005). The photographs that were admitted at trial, however, depicted Rutland during the daytime. Thus, they were entirely unhelpful on any assessment of the lighting at night. Only the observations of Juror 143, who has stated that he took note of the lighting conditions, bore on that.

Nor were Juror 143's reflections on the Fell residence and surrounding neighborhood mirrored by the photographs of these settings that were introduced at trial. After visiting the area, Juror 143 shared the following insights with the jurors: "[t]he mother's neighborhood wasn't great, but it was okay. The house was decent. She was just trying to live her life." Fell Ex. 241 at FELL-00002377. As Mr. Fell pled in his 2255 Motion, this was prejudicial because it related to the jurors' assessment of Mr. Fell's circumstances – specifically

---

[196] The Government argues that "it is not clear that Juror 143's observations regarding the lighting of the Price Chopper parking lot were made before trial." Opp. 330. This argument raises an issue of fact that should not be decided on summary dismissal. Puglisi, 586 F.3d at 213 ("If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made.").

247

that, contrary to the defense at trial, they were not all that bad. Mot. 336-37. Juror 143's

contextual observation of the neighborhood was not established by any other evidence submitted

by the Government and served to minimize the impact of Debra Fell's neglect and abuse of her

son. This observation was particularly prejudicial to Mr. Fell because any outward appearance

of normalcy at 135 Robbins Street masked the deep dysfunction of the inhabitants.

Finally, Juror 143's Rutland observations also introduced extraneous information

to the jury when he shared his experience of having traveled from the Fell home in Rutland to the

Price Chopper. The Government puts forth a curious response to this argument in a footnote:

"there is no evidence whatsoever that Juror 143 walked that route." Opp. 331 n.68. The

Government misunderstands Mr. Fell's argument. Whether he walked it or not, by undertaking

to experience for himself the route from the Fell residence to the Price Chopper, Juror 143

established for himself matters such as the distances between locations, how simple the route

was, where different buildings were located, how easy they would be to remember, how easy the

route would be to navigate, and the like. Although the jury was presented an aerial photograph

that showed in a general, abstract way certain locations in the downtown Rutland area, no

witness described the path between 135 Robbins Street and the Price Chopper, or described

where both 135 Robbins Street and the Price Chopper were. Indeed, a police officer who pointed

the jury to the location of 135 Robbins Street on the map only noted that the house was "a few

blocks from downtown Rutland." Tr. Vol. I-II at 21:13-18 (June 20, 2005). Many of the

individual buildings described by Mr. Fell were not visible from the aerial photographs, making

them inadequate substitutes for a drive through the area, such as the one Juror 143 took. And no

witness described what it actually was like to walk that route, how simple it was, how exposed

Mr. Fell and Mr. Lee might have been to public view during their walk, or how memorable the

248

sites and locations would be.  This extraneous information bore on an important defense

argument – that the Government had not proven that Mr. Fell was fully sober and acting without

an impaired capacity.  Thus, Juror 143 alone was able to observe those lighting conditions and

gain information with which to assess (consciously or subconsciously) the veracity of the

Government's witness and thus whether Mr. Fell was acting in a premeditated fashion and

deserved to die or not.  His reliance on this is extraneous, prejudicial evidence.  Greer, 285 F.3d

at 173 (citing Remmer, 347 U.S. at 229).[197]

> **D.      Mr. Fell Has Adequately Alleged Improper Experiments And Coercion Within The Jury Room**

Mr. Fell has also raised well-pled claims in his 2255 Motion that his conviction

and death sentence are due to be reversed because the jurors conducted improper experiments

and improperly coerced a holdout juror.  In addition to the experiment-aspect of Juror 143's trip

to Rutland, he also engaged in disturbing, improper conduct in the jury deliberation room.  Juror

143 has stated as follows:

> A female juror pointed out that the shotgun was not loaded.  The
> marshal then brought in the gun.  We showed the jury that it was
> unloaded.  I also made sure that the gun was unloaded…I cocked
> and pointed it at her and she squirmed.  I said, '[t]hat's what they
> did, you were scared even though you knew it wasn't loaded.'

Fell Ex. 241 at FELL-00002379.  The juror at whom the gun was pointed had been resistant to

vote to sentence Mr. Fell to death; after this experience, she changed her vote to give him the

death penalty.  Mr. Fell has pled that this event resulted in two errors: 1) Juror 143 improperly

---

[197] The Government also argues that since there was so much evidence as to Mr. Fell's guilt, the extraneous evidence simply could not have been prejudicial.  Opp. 331.  However, the Government confuses the prejudice analysis.  Mr. Fell could have been prejudiced with respect to the penalty phase by extrinsic evidence that may be harmless as to the guilt phase determination.  The extrinsic evidence at issue here was directly and indirectly relevant to the juror's evaluation of mitigating factors such as whether Mr. Fell's capacity to appreciate his conduct was impaired at the time of the crime, whether Mr. Fell intended to kill Mrs. King, and whether Mr. Fell's difficult and abusive childhood affected his development.

coerced another juror into changing her vote; and 2) Juror 143 conducted an improper jury experiment that was prejudicial.  Mot. 338-40.

In its Opposition, the Government argues only that this Court should not review this claim on the theory that to do so would violate Federal Rule of Evidence Rule 606(b).  Opp. 332.  With respect to Mr. Fell's claim that this conduct constituted an improper experiment, the Government argues that there was no prejudice resulting from the introduction of extraneous evidence.  Id.  Neither of these arguments compels or even supports summary dismissal of these claims, which have been well-pled with facts that, when proven, will entitle Mr. Fell to relief. Mr. Fell will address each of the Government's arguments in turn.

### 1. Rule 606(b) Does Not Block This Court From Reviewing The Merits Of These Serious Improprieties

Contrary to the Government's position, Rule 606(b) does not bar this Court from reviewing this claim.  While 606(b) does generally prohibit jurors from testifying about events concerning their verdict, the Second Circuit allows for inquiry and evidentiary hearings when there have been threats or coercion in the jury room.  In Anderson v. Miller, the Second Circuit noted that Rule 606(b) does not prevent a party from investigating and presenting evidence of intra-jury threats.  346 F.3d 315, 327 (2d Cir. 2003).  The district court in that case had conducted an evidentiary hearing to consider whether there had been coercion within the jury room when two jurors submitted post-trial affidavits stating that as a result of threats and verbal abuse from other jurors, they changed their votes from "not guilty" to "guilty."  Anderson v. Miller, 206 F. Supp. 2d 352, 360 (E.D.N.Y. 2002), aff'd, 346 F.3d 315, 357-58 (2d Cir. 2003). The district court had conducted an evidentiary hearing, explaining, "[g]iven the unique circumstances of this case, a hearing should be held to flush out precisely what transpired in the jury room so that the Court may ascertain whether the petitioner's constitutional rights have been

250

violated." Anderson v. Miller, No. 99-CV01187 (FB), 2001 WL 1182832, at *2 (E.D.N.Y. Oct. 2, 2001). In addressing the application of Rule 606(b), the district court noted that "if Rule 606(b) precluded hearing juror testimony when there are credible allegations that a juror's safety was threatened by fellow jurors, it would raise serious constitutional concerns with respect to a defendant's right to a fair trial." Anderson v. Miller, 206 F. Supp. 2d at 360; see also United States v. Grieco, 261 F.2d 414, 415 (2d Cir. 1958) (affirming judgment that followed a post-trial evidentiary hearing where juror testified about threats).

It cannot be rationally disputed that any reasonable person feels threatened when facing the barrel of a rifle, even an unloaded one. Here, a juror changed her vote as a result of having a rifle pointed at her by another juror, resulting in Mr. Fell's death sentence. Mr. Fell has pled uncontested facts of the potential for juror coercion sufficient for this Court to order an evidentiary hearing and additional discovery. As in Anderson and Grieco, a juror in this case threatened another juror. As has been fully pled in the 2255 Motion, a death sentence that follows such juror irregularities would violate Mr. Fell's Fifth, Sixth and Eighth Amendment rights not to be subjected to a death sentence that was obtained with coercion. Lowenfield v. Phelps, 484 U.S. 231, 241 (1988) ("Any criminal defendant…being tried by a jury is entitled to the uncoerced verdict of that body."); see also Anderson, 206 F. Supp. 2d 352.

### 2. Mr. Fell Has Adequately Alleged That One Juror's Use Of A Gun Was An Improper Experiment And Introduced Extraneous Prejudicial Evidence Into The Jury's Deliberations

In addition to unconstitutional coercion, Juror 143's conduct with the shotgun was an unlawful experiment that warrants this Court's review. By his own admission, Juror 143 was attempting to simulate the fear that Mrs. King might have felt on the night of the crime, and to dissuade the targeted juror of her belief that Mr. Fell's pointing an unloaded gun at Mrs. King

251

was something different than if he had pointed a gun at her that was actually loaded.  Here again the Government makes no substantive response to the disturbing allegations, but instead argues a categorical bar pursuant to Rule 606(b).  In fact, Mr. Fell has pled sufficient, uncontested facts to demonstrate that extra-record facts were considered in the jurors' deliberations, which resulted in a death sentence.  The constitutional implications of this claim should be addressed by this Court.

Where improper experiments result in extra-record facts, the probability of prejudice can condemn a verdict.  See Simon v. Kuhlman, 549 F. Supp. 1202, 1205-08 (S.D.N.Y. 1982) (noting that "whether the experiment introduced extra-record facts which give rise to such a probability of prejudice that the jury verdict must be set aside as inherently lacking in due process").  Mr. Fell has pled sufficient facts to meet the threshold showing of prejudice required to warrant an evidentiary hearing.  Nothing about the experiment with the shotgun was approximated by the evidence at trial.  Thus, in attempting to recreate the experience of Mrs. King, Juror 143 introduced extraneous information into the jury's deliberations that was prejudicial.  Given these uncontested facts, this Court should at a minimum conduct an evidentiary hearing.

E.    **Mr. Fell Has Adequately Alleged Additional Claims of Juror Misconduct**

In light of the serious juror misconduct that has been uncovered to date, which at a minimum indicates jury-wide exposure to extraneous evidence, Mr. Fell has presented in his 2255 Motion an additional claim that more jurors were involved in improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, false or misleading responses of jurors on voir dire, and improper biases which infected the jury's deliberations.  Mot. 340.  The Government urges this Court to summarily dismiss this claim,

arguing that it is insufficiently factually specific, or is procedurally barred. Opp. 333. For the reasons already explained above in Section XXII(A), no aspect of this claim could be properly procedurally barred because the facts in its support could not have been uncovered at trial or on direct appeal.

Mr. Fell has presented all the evidence in support of this claim that is presently available without an evidentiary hearing, or any of the tools of discovery or subpoena. Although any pleading deficiencies can be resolved with amendment, as pled the claim is not unreasonably vague, given the circumstances.[198] At minimum, Mr. Fell has presented a competent affidavit in which Juror 143 admits that he shared his extraneous information about the Rutland crime scene with his fellow jurors. Fell Ex. 241. As has been noted, jurors' consideration of extraneous evidence is presumptively prejudicial. Greer 285 F.3d at 173. Given what has been uncovered about the presence and reliance on extraneous evidence, and dishonesty on voir dire about matters at issue at trial, combined with the news reports about Mr. Fell and the crime that saturated Vermont after his arrest, post-conviction counsel have good cause to believe that there have been other such instances of misconduct that will emerge at an evidentiary hearing. Order, United States v. Sampson, No. 01-10384-MLW (D. Mass. Oct. 20, 2011), Dkt. No. 1218.

**F.     Conclusion**

The facts alleged about Mr. Fell's jurors raise serious concerns that warrant this Court's consideration. This is a death penalty case, the first in Vermont and one of few in the

---

[198] In its Opposition, the Government cites Oliver v. United States, 961 F. 2d 1339, 1343 n.5 (7th Cir. 1992). However, Oliver is inapposite. The focus of the decision is the application of the doctrine of laches and procedural default to a 2255 motion that had had been filed *seventeen years* after Mr. Oliver had pled guilty to bank robbery charges. Id. at 1343. The footnote cited by the Government considers the separate question of whether the district court should have held an evidentiary hearing. Id. at 1343 n.5. After concluding that none was necessary there, given the futility of the claims, the court also noted that evidentiary hearings are not warranted where there is "no cognizable claim, if the allegations in the motion are unreasonably vague, conclusory, or incredible, or if the factual matters raised by the motion may be resolved on the record before the district court." Id. Because Mr. Fell's allegations are not "unreasonably vague," or conclusory, his claims are unlike Mr. Oliver's and are entitled to proceed on merits review.

entire nation in which a federal jury has imposed a death sentence.  Mr. Fell's pleadings before the Court now sufficiently allege that two jurors in Mr. Fell's case were empanelled after failing to disclose pertinent aspects of their history and familiarity with the case.  Perhaps even more troubling was what happened during deliberations:  the introduction of extraneous influences, and an ultimate vote that Mr. Fell be put to death after one juror pointed a rifle at another.  To ensure fundamental fairness and heightened reliability, this Court should deny the Government's request for summary dismissal, and proceed to review the merits of this claim.

## XXIII.   Other Claims

### A.   Mr. Fell Has Adequately Alleged That The Attorney General Engaged In Selective Prosecution

Mr. Fell has pled facts that he was deprived of his Fifth, Sixth and Eighth Amendment rights when the Department of Justice ("DOJ"), through United States Attorney General John Ashcroft, rejected the plea agreement reached between the United States Attorney's Office for the District of Vermont and trial counsel based in part on Mr. Fell's race, geographic location, and the race and gender of his victims.  The Government does not dispute that the decision to seek the death penalty "may not be based on an *unjustifiable* standard such as race," United States v. Armstrong, 517 U.S. 456, 464 (1996) (emphasis added) (citation omitted), and that, whatever the motive, "a prosecutorial decision made on the basis of race is *per se* unjustifiable."  United States v. Hedaithy, 392 F.3d 580, 606 (3d Cir. 2004) (emphasis added).[199]

---

[199] Cf. United States v. Nelson, 277 F.3d 164, 207 (2d Cir. 2002) (reversing conviction where court, on agreement of parties, seated and excused jurors on the basis of race and religion; "although the motives behind the district court's race- and religion-based jury selection procedures were undoubtedly meant to be tolerant and inclusive rather than bigoted and exclusionary, that fact cannot justify the district court's race-conscious actions" ); Burkette v. H.R. III, L.L.C., 410 F. Supp. 2d 1117, 1120 (W.D. Ala. 2006) (holding that it would violate equal protection to excuse a white juror from selected jury in order to maintain racial balance because a black juror had to be excused for personal reasons).

In his 2255 Motion, Mr. Fell alleged "evidence of discriminatory effect and intent." United

States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003) (quoting Armstrong, 517 U.S. at 465).

Specifically, Mr. Fell alleged that – after careful deliberation – the United States

Attorney's Office in the District of Vermont reached an agreement with Mr. Fell on October 24,

2001.  The written agreement, which was drafted in its entirety by the Government, provided for

Mr. Fell to plead guilty in exchange for a life sentence.  In January 2002, the DOJ, through

Attorney General Ashcroft, rejected the plea agreement and the judgment that death was not an

appropriate sentence, and insisted that the United States Attorney's Office seek the death penalty

against Mr. Fell.  Mr. Fell alleges that the decision by the DOJ and Attorney General Ashcroft

was not the result of any change of circumstances or changes in facts – the facts had not changed

between October, when the United States Attorney's Office determined that death was not

appropriate, and January 2002, when the DOJ determined that the United States Attorney's

Office had to seek death.  Nor was it the result of any other legitimate factor.  Rather, the

decision was made on the heel of the DOJ "September 2000 Study," which had found substantial

racial and geographic disparities in use of the federal death penalty,[200] and at a time when the

DOJ had an interest in imposing the death sentence against a defendant because he was white

and/or from an "underrepresented" geographic location.  To that point, the DOJ had never

overruled the decision of a local prosecutor, familiar with the facts.  In short, Mr. Fell alleged

strong circumstantial evidence that the decision to seek the death penalty against him was based

on his race, the race of the victim, and his geographic location, and not on the circumstances of

his offense or his character.  Such evidence would support a claim of employment discrimination

---

[200] Bizarrely, the Government argues that Mr. Fell "has not provided any foundation for, or demonstrated the validity of," the DOJ's reported statistics.  Opp. 335.  The Government cannot contest its own statistics.  See United States v. Robinson, 530 F.2d 1076, 1083 n.13 (D.C. Cir. 1976) ("[A] foundation is not required for use of a party's admissions whether or not he is a witness.").

255

or housing discrimination; it can also support a claim of race-conscious or geography-conscious prosecution.  See generally Hildebrandt v. W.R. Grace & Co. –Conn., 492 F. Supp. 2d 516 (D. Md. 2007); Robinson v. NYC Health Dep't, No. 00 Civ. 8969 (NRB), 2001 WL 863418, at *6 (S.D.N.Y. July 30, 2001) (plaintiff established prima facie case of age discrimination where, "[s]hortly after discovering plaintiff's age, [defendant] rescinded its offer of employment").[201]

The thrust of the Government's argument is that Mr. Fell's claim should be summarily dismissed because he cannot show direct evidence of discriminatory intent.[202]  It contends that the direct evidence that would support such a claim is shielded from production as a result of various governmental privileges and that as a result – regardless of the potential merit of Mr. Fell's claim – it should be summarily dismissed.  In essence, the Government seeks to use the vehicle of summary dismissal to deprive Mr. Fell on a blanket basis of his ability to serve discovery requests to establish his claim and to relieve it of the responsibility of responding appropriately to those requests.  Opp. 33-39.  This it may not do.  The Government may not wave a magic wand and assert that all of its information is privileged.  It bears the burden of establishing that the material at issue is protected from discovery by privilege.  See United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).  That burden is appropriately satisfied only by review of each requested document to determine whether it meets the standards to be protected by a privilege.  "[C]onclusory assertions of privilege will not suffice to carry the Government's burden of proof."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 861 (D.C. Cir.

---

[201] See United States v. Al Jibori, 90 F.3d 22 (2d Cir. 1996) (discovery ordered based on evidence of discriminatory intent despite absence of credible evidence of discriminatory effect); United States v. Thorpe, 471 F.3d 652, 661 (6th Cir. 2006) ("To be sure, the government exaggerates by implying that statistical evidence of discriminatory effect, without more, can never raise an inference of discriminatory intent."); United States v. Tuitt, 68 F. Supp. 2d 4, 10 (D. Mass. 1999) ("A discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose.").

[202] No inference can be drawn from Mr. Fell's failure to adduce direct evidence of discriminatory intent.  See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061 (9th Cir. 2004) (noting that discovery is "often necessary to uncover a trail of evidence regarding the defendants' intent in undertaking allegedly discriminatory action").

256

1980).  Moreover, the deliberative process privilege (which the Government now invokes) can only be asserted by the Attorney General or a subordinate with "high authority" acting pursuant to guidelines established by the Attorney General (which has not happened here), see Resolution Trust Corp. v. Diamond, 137 F.R.D. 634, 641 (S.D.N.Y. 1991), and only then with an explanation of "what deliberative process is involved, and the role played by the documents in issue in the course of that process," Coastal States Gas Corp., 617 F.2d at 868.  "Even where the parameters are met, the deliberative process privilege can 'evaporate' where a 'party's cause of action is directed at the government's intent in rendering its policy decision and closely tied to the underlying litigation.'"  Citizens Against Casino Gambling in Erie County v. Stevens, No. 09-CV-0291S (WMS), 2012 WL 2405195, at *3 (W.D.N.Y. June 23, 2012) (citation omitted).

It may be that, after Mr. Fell makes his discovery requests and after the Government reviews its documents, some of those documents will be protected by privilege.  It would be inappropriate now, and contrary to the Rules Governing Section 2255 Proceedings, to dismiss Mr. Fell's claim on the hypothesis that all of the Government's documents will be protected or that none of them will support his well-pled allegations.

To the extent that trial and appellate counsel should have raised these issues regarding race, gender, and geography, prior counsel's failure to do so constitutes ineffective assistance of counsel, and Mr. Fell was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.[203]

---

[203] The Government's contention that the selective prosecution claim is barred by the non-retroactivity doctrine established in Teague, Opp. at 334, is without merit.  Mr. Fell is not here advancing a "new" rule of constitutional law, and thus there is no issue of retroactivity.  Smith v. Groose, 205 F.3d 1045, 1053-54 (8th Cir. 2000).

257

**B.      Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective For Failing To Conduct A Sufficient Voir Dire**

In his 2255 Motion, Mr. Fell sufficiently pled that trial counsel performed deficiently in failing to adequately question prospective jurors about their ability to consider mitigation evidence that they specifically expected to present, including their experiences with substance abuse, other factors arising out of Mr. Fell's childhood, and other potential mitigating circumstances.  Mot. 349-52.

Courts have evaluated claims of ineffective assistance of counsel during voir dire under Strickland v. Washington, 466 U.S. 668 (1984).  See e.g., Johnson v. United States, No. C 09-3064-MWB, 2012 WL 1836282 (N. D. Iowa Mar. 22, 2012) (addressing allegations of ineffective assistance during voir dire in capital case under Strickland); Ybarra v. McDaniel, 656 F.3d 984 (9th Cir. 2011) (denying certificate of appealability where claim of ineffective assistance of counsel on voir dire failed to establish prejudice under Strickland).  Mr. Fell has pled sufficient facts to meet this standard.

In its Opposition, the Government argues that the questionnaire sufficiently covered these topics, and further argues that Mr. Fell failed to provide factual support for this claim.  Opp. 340-41.  Neither argument compels summary dismissal.  Although trial counsel's voir dire questions (including those posed via the juror questionnaire) did aim to reach some aspect of the veniremember's experiences with substance abuse, Mr. Fell's ineffectiveness claims arise in what was not asked.  Thus, while trial counsel asked prospective jurors about their familiarity with friends or relatives who had undergone substance abuse treatment, they inexplicably failed to ask the veniremembers whether any had experienced substance abuse issues that had not been subjected to formal treatment.  Nor did they ask about their attitudes about alcohol or drugs, or any impact of those issues in their homes or communities.  Mot. 350-

258

51 (citing transcript). Any experience with substance abuse, whether it was treated or not, would have been important to know about given the critical fact that Mr. Fell struggled with untreated alcohol and drug abuse, and in fact was thoroughly intoxicated on the night of the crime. See Tr. Vol. I-I at 55:4-8 (June 20, 2005) ("[O]n…November 26th of 2000, Donald Fell…w[as] doing again what [he] often did, drinking a lot. Drinking as much as three cases of beer. And using a crack pipe they found with some crack in it."). The terrain of jurors' experiences with this would have been extremely pertinent information to understand on voir dire. Indeed, in post-conviction, trial counsel expressly stated that they wanted to know about alcoholism in a juror's background, but they did not ask a sufficiently broad question to elicit this critical information. See Decl. of Alexander Bunin, Mar. 17, 2011 (Fell Ex. 264 at 7); Decl. of Paul Volk, Mar. 18, 2011 (Fell Ex. 305 at FELL-00002628).

Contrary to the Government's suggestion, neither of the two questions from the juror questionnaire that are cited in the Opposition address the matter of their experience of substance abuse. Question 20(a) asks whether the prospective juror has taken courses or worked in the field of drug abuse, and Question 44 asks jurors about their experience with substance abuse treatment. The Government's argument that these two questions would have "certainly revealed any relevant information the juror had to offer with regard to familial substance abuse" is simply contrary to the facts.[204] Those questions are quite specific in what they seek, and their honest answer would plainly avoid a juror's having to report her own ongoing struggles with substance abuse, or those of anyone close to them.

In addition to trial counsel's failure to query the venire about their experience with untreated substance abuse problems, trial counsel were additionally unreasonable for failing to adequately question jurors as to their ability to fairly consider mitigating factors. In his 2255

---

[204] Opp. 340 (citing Juror Questionnaire (Fell Ex. 123 at 20)).

259

Motion, Mr. Fell provided the example of Juror 203, who was permitted to be seated on the jury although he had stated that he could not consider mitigation evidence without mental health testimony. In response, the Government argues that trial counsel did ask several jurors specific questions about mitigating circumstances, and tersely states that "Fell fails to provide any factual support for his claim." Opp. 341. The Government flatly ignores the factual support in the example of Juror 203. Because Mr. Fell has pled facts in support of the claim the veracity of which has not been refuted, summary dismissal of this claim is not appropriate.

If trial counsel had drafted an adequate juror questionnaire and conducted sufficient questioning during voir dire, these biases would have been confronted and dealt with by way of successful challenges for cause. See United States v. Fell, 372 F. Supp. 2d 766, 773 (D. Vt. 2005) ("The Court will excuse a juror for cause whenever it finds that juror cannot fairly weigh aggravating and mitigating factors as required by the Federal Death Penalty Act."). Mr. Fell has sufficiently pled facts in support of the claim that trial counsel provided constitutionally ineffective assistance under Strickland. This Court should deny the Government's request for summary dismissal, and proceed to address the merits of the claim, which warrant reversal of his conviction and death sentence.

### C.  Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective In Failing To Rehabilitate Prospective Jurors

In his 2255 Motion, Mr. Fell pled sufficient facts to demonstrate that trial counsel unreasonably failed to adequately question or attempt to rehabilitate prospective jurors who initially suggested that they could not vote for the death penalty. Mot. 353-56. Mr. Fell highlighted this claim by demonstrating trial counsel's failure to adequately question and rehabilitate Juror 64. Mot. 354-55. In its Opposition, the Government argues that 1) this claim has already been rejected by the Second Circuit Court of Appeals on Mr. Fell's direct appeal;

and 2) apart from Juror 64, Mr. Fell cannot point to any additional instances of trial counsel's failure to adequately question or attempt to rehabilitate jurors who initially suggested that they could not vote for the death penalty.  Opp. 342-43.  Neither of these arguments supports summary dismissal.

The Government's lone argument regarding Juror 64 is wrong as a matter of fact: while a related claim about this juror was raised on direct appeal, the instant claim of ineffective assistance of counsel was not.   United States v. Fell, 531 F.3d 197, 210-11 (2d Cir. 2008) (addressing whether court abused its discretion in excusing Juror 64).  Since the Court did not consider whether trial counsel were ineffective for failing to ask Juror 64 any additional questions for rehabilitation purposes, and Mr. Fell has pled specific facts in support of this claim in his timely 2255 Motion, summary dismissal is not appropriate.  See, e.g., Matthews v. United States, 682 F.3d 180 (2d Cir. 2012) (reversing summary dismissal where Government's opposition to 2255 was inadequate to refute allegation of Strickland prejudice notwithstanding finding on direct appeal in a different context that evidence of defendant's guilt was overwhelming).  The Government's Opposition is due to be denied, and Mr. Fell's claim should proceed to be assessed on the merits.

D. **Mr. Fell Has Adequately Alleged That Trial Counsel Were Ineffective When They Failed To Explain Why His Youth Was Mitigating, And That Executing Him For Crimes He Committed When He Was Functionally A Juvenile Would Violate The Eighth Amendment**

Mr. Fell has asserted two independent claims with respect to the mitigating aspect of his youth: first, that trial counsel were ineffective for failing to present the jurors with any evidence or argument about how and why his youth was mitigating; and second, that Mr. Fell is categorically ineligible for the death penalty pursuant to the reasoning of the Supreme Court in

261

Roper v. Simmons, given that he is functionally a juvenile if not chronologically one.[205]  Mot. Section XXIII(D).  The Government makes no response to the claim of ineffective assistance of counsel, but argues for summary dismissal of the eligibility claim on the grounds that it is procedurally barred and without substantive merit, since Roper has not yet been applied to individuals who are older than 18.  Opp. 343-44.  At a minimum, because Mr. Fell has asserted a wholly unrebutted, facially sufficient claim of ineffective assistance of counsel, this Court should proceed to consider it on its merits.  Indeed, trial counsel not only offered no evidence whatsoever to establish why Mr. Fell's age of twenty was mitigating, but it wholly failed to anticipate – and offer the readily available evidence to rebut – the Government's arguments that Mr. Fell's age was not mitigating because of, inter alia, Mr. Fell's alleged prior acts of violence and "utter depravity."  See supra Rep. Section VI; Tr. Vol. XII at 60:16-17 (July 13, 2005).

Nor is Mr. Fell's claim about his ineligibility dismissible.  In its Opposition, the Government argues that the claim is both procedurally barred and substantively baseless because "current Supreme Court precedent forecloses Fell's argument on its merits."  Opp. 344.  In support of its procedural claim, the Government invokes Teague v. Lane, which generally bars federal courts from applying new constitutional rules of criminal procedure on collateral review. 489 U.S. 288, 310 (1989).  But Teague does not foreclose the retroactive application of new substantive law, of which a rule rendering the petitioner ineligible for the death penalty is a classic example.  See Little v. Dretke, 407 F. Supp. 2d 819, 824 (W.D. Tex. 2005) ("Teague does not foreclose application of the holding in Roper to petitioner's case because the new

---

[205] See generally Roper v. Simmons, 543 U.S. 551 (2005) (holding death penalty unconstitutional for juveniles).

262

constitutional right recognized in <u>Roper</u> is clearly substantive, rather than procedural, in nature.").[206]

        In support of the latter substantive argument, the Government cites <u>Roper</u> alone. <u>Roper</u>, however, does absolutely nothing to "foreclose" Mr. Fell's argument. Quite the contrary: Mr. Fell's argument is a natural and logical extension of <u>Roper</u>. <u>See</u> 543 U.S. at 574 ("The qualities that distinguish juveniles from adults do not disappear when an individual turns 18."). If it is cruel and unusual to execute a juvenile under eighteen, and a defendant aged twenty shares the developmental traits of juveniles under eighteen, it is surely cruel and unusual to execute that "functionally juvenile" defendant merely because of his chronological age. To hold otherwise would be to elevate form over substance, at the cost of a life. <u>See</u> <u>Henyard v. McDonough</u>, 459 F.3d 1217, 1248-49 (11th Cir. 2006) (Barkett, J., concurring) ("The characteristics identified by the [<u>Roper</u>] Court as those which diminish culpability and thus militate against the imposition of the death penalty for children under the chronological age of eighteen…appear equally present in those with a mental age of less than eighteen years….The mere fact of a defendant's chronological age should not qualify a defendant for death where the measures of capacity render him lacking in culpability."). Culpability cannot, as a constitutional matter, turn on such an arbitrary factor. <u>See</u> <u>Furman v. Georgia</u>, 408 U.S. 238 (1972) (invalidating death penalty as arbitrarily applied).

---

[206] Moreover, even if this exception to <u>Teague</u> did not apply, ineffectiveness of counsel would excuse any failure to timely raise this issue here. Procedural default does not bar later merits review where the petitioner can show cause and prejudice. <u>Dretke v. Haley</u>, 541 U.S. 386, 388 (2004). "Constitutionally ineffective assistance of counsel constitutes cause sufficient to excuse a procedural default." <u>Prou v. United States</u>, 199 F.3d 37, 47 (2d Cir. 1999). In this case, trial counsel knew in 2001 that their twenty-year-old client was severely neurologically underdeveloped in ways that would manifest in "immature" and "impulsive[]" behavior. Lipman Report, May 14, 2001 (Fell Ex. 4 at 11). Shortly before trial, the Supreme Court abolished the death penalty for defendants under the age of 18 at the time of their crimes, explaining that their immaturity, impetuosity, and suggestibility "render suspect any conclusion that a [defendant] falls among the worst offenders." <u>Roper</u>, 543 U.S. at 570. Under these circumstances, any reasonable lawyer would have argued that Mr. Fell was ineligible for the death penalty under the logic of <u>Roper</u>. Trial counsel's failure to do so deprived Mr. Fell of a valid Eighth Amendment claim.

Moreover, courts consider "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual. Miller v. Alabama, 132 S. Ct. 2455, 2463 (2012). Since Roper, the Supreme Court has explored the biological differences between juveniles and adults in two additional cases, Graham v. Florida, 130 S. Ct. 2011 (2010) (prohibiting life without parole for juvenile non-homicide offenders), and Miller, 132 S. Ct. at 2464 (prohibiting mandatory life without parole for juvenile homicides). The Court in Graham noted that "developments in psychology and brain science [following Roper] continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." 130 S. Ct. at 2026. In Miller, the Court again commented, "The evidence presented to us in these cases indicates that the science and social science supporting Roper's and Graham's conclusions have become even stronger." 132 S. Ct. at 2465.[207]

In sum, the Supreme Court has repeatedly invoked a growing body of scientific evidence that shows that neurological maturation continues well into early adulthood. It is far from clear that the Court's arbitrary cut-off at age 18 will – or should – persist in light of increasing evidence that impulse control and other characteristics of "adulthood" are not fully developed until much later. See, e.g., Jay N. Giedd, Structural Magnetic Resonance Imaging of the Adolescent Brain, 1021 Annals N.Y. Acad. Sci. 77, 83 (2004) (describing the "relatively late development of the [dorsolateral prefrontal cortex], not reaching adult levels until the 20s," as "intriguing" because it "is linked to the ability to inhibit impulses, weigh the consequences of decisions, prioritize, and strategize"); Laurence Steinberg et al., Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems

---

[207] The Miller Court also cited the amicus brief of the American Psychological Association for the proposition that "[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." Id.

Model, 44 Dev. Psychol. 1764 (2008) (finding linear decrease in impulsivity from age ten through age 30).  Mr. Fell should be given an opportunity to demonstrate how the law and science have evolved to create a new "standard of decency" that renders the execution of a functionally juvenile twenty-year-old "cruel and unusual."

    **E.      Mr. Fell Has Adequately Alleged That His Execution By Lethal Injection Will Be Cruel And Unusual Punishment; In The Event This Court Determines That This Claim Should Be Dismissed, Mr. Fell Seeks Dismissal Of His Claim Without Prejudice**

In an abundance of caution, Mr. Fell raised an Eighth Amendment challenge to the proposed method of execution in the 2255 Motion to preserve the issue in the event that the Government one day were to challenge the timeliness of such a claim.  However, as Mr. Fell alleged, Mr. Fell does not believe that this claim is ripe.  See Mot. 360 ("Although Mr. Fell does not believe this claim is ripe, to the extent the court finds that this claim should have been presented earlier and all prior counsel who failed to present the claim rendered ineffective assistance in not asserting it sooner, the Court should consider the claim on the merits.").

Should this Court agree that this claim is not ripe, Mr. Fell requests that the Court dismiss the claim without prejudice to renew the claim if and when the issue becomes ripe.  Should the Court disagree, and deem this claim ripe, Mr. Fell seeks the opportunity to challenge the Government's flawed contention that execution by lethal injection is consistent with the Eighth Amendment after a full investigation, discovery, access to the Court's subpoena power, and an evidentiary hearing.

## XXIV.    Conclusion

For the reasons set forth in the 2255 Motion and those set forth in this Reply, the request for summary dismissal should be denied.  In addition, for the reasons set forth herein and those set forth in the Motion for Leave to Conduct Discovery, the Court should permit Mr. Fell

265

to take discovery pursuant to the Federal Rules of Civil and Criminal Procedure.  Thereafter, he should be given the opportunity to amend, and, after he has amended, the Government should be directed to provide an answer.  Mr. Fell may then seek an evidentiary hearing at which all remaining factual disputes can be resolved.

Dated:  August 20, 2012                                        RESPECTFULLY SUBMITTED,
Barre, Vermont


                                                               /s/ Richard Rubin
                                                               RICHARD RUBIN
                                                               Rubin, Kidney, Myer & DeWolfe
                                                               237 N. Main Street
                                                               Barre, Vermont, 05641-4125
                                                               (802) 479-2514
                                                               Fax: (802) 479-2516


Dated:  August 20, 2012
New York, New York


                                                               /s/ Lewis J. Liman
                                                               LEWIS J. LIMAN
                                                               Cleary Gottlieb Steen & Hamilton LLP
                                                               One Liberty Plaza
                                                               New York, New York 10006
                                                               (212) 225-2550
                                                               Fax: (212) 225-3999


Dated:  August 20, 2012
New York, New York


                                                               /s/ Cathleen Price
                                                               CATHLEEN PRICE
                                                               P.O. Box 321762
                                                               New York, New York 10032
                                                               (212) 998-6193


                                                               *Attorneys for Donald Robert Fell, Jr.*


266

**CERTIFICATE OF SERVICE**

I, Lewis Liman, an attorney admitted to practice in the State of New York and a partner of the firm Cleary Gottlieb Steen & Hamilton LLP, hereby certify that on August 20, 2012, I electronically filed with the Clerk of the Court a Reply to the Government's Amended Opposition to Donald Fell's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255 on behalf of Donald Fell. The CM/ECF system will provide service of such filings via Notice of Electronic Filing ("NEF") to all parties with an e-mail address of record who appeared and consented to electronic service in this action.

Dated: New York, New York
August 20, 2012

/s/ Lewis J. Liman
Lewis J. Liman
Cleary Gottlieb Steen & Hamilton LLP
1 Liberty Plaza
New York, New York 10006
(212) 225-2550
Fax: (212) 225-3999