UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA       *
                               *
            V                  *
                               *
DONALD FELL                    * CRIMINAL FILE NO. 01-12


MOTIONS HEARING
Tuesday, March 5, 2013
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge


APPEARANCES:

    WILLIAM B. DARROW, ESQ. and PAUL J. VAN DE GRAAF,
        ESQ., Assistant United States Attorneys, Federal
        Building, Burlington, Vermont; Attorneys for the
        United States

    JACABED RODRIGUEZ-COSS, ESQ., United States
        Department of Justice - Criminal Division, 1331
        F Street, N.W., Washington, D.C.; Attorney for
        the United States

    LEWIS J. LIMAN, ESQ., KRISTIN M. SANTILLO, ESQ. and
        DANA BERKOWITZ, ESQ., Cleary Gottlieb Steen &
        Hamilton LLP, One Liberty Plaza, New York, New
        York; Attorneys for the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
        New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
        DeWolfe, 237 North Main Street, Barre, Vermont;
        Attorney for the Defendant

ANNE E. NICHOLS
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

TUESDAY, MARCH 5, 3013

(The following was held in open court at 9:30 a.m.)

COURTROOM DEPUTY:  This is case number 1-12, United States of America versus Donald Fell.  The government is present through Assistant United States Attorneys William Darrow, Paul Van de Graaf, and Jacabed Rodriguez-Coss.  Also present in the courtroom on behalf of the defendant are attorneys Lewis Liman, Cathleen Price, Richard Rubin, Kristin Santillo, and Dana Berkowitz.

The matter before the Court is a hearing on the pending motions.

THE COURT:  All right.  A number of motions have been filed.  I sent out an e-mail to the parties to outline how I thought we should address the issues, and any response to that?  Any objection, I essentially ask, to that particular outline?

MR. LIMAN:  No, your Honor, not from the defendant.

MS. RODRIGUEZ-COSS:  Not from the government, your Honor.

THE COURT:  Okay.  All right.  So let's begin, then.  The government has filed a motion for summary -- it's not a motion for summary dismissal.  Essentially a request for summary dismissal of many of the claims, if

not all of the claims, and so I will hear the government first on that request.

MS. RODRIGUEZ-COSS:  Jacabed Rodriguez-Coss on behalf of the United States.  Good morning.  How are you?

THE COURT:  Good morning.  Just back from Puerto Rico or --

MS. RODRIGUEZ-COSS:  Originally from Puerto Rico, yes, sir.

THE COURT:  Well, weren't you -- aren't you involved in a case in Puerto Rico at this point?

MS. RODRIGUEZ-COSS:  I am, peripherally.  I am with the Capital Case Unit in Washington, D.C., and as a member of the Capital Case Unit I did travel to Puerto Rico recently to assist in the selection of a jury in a capital case there, yes, sir.

THE COURT:  All right.  I just -- the other case that I have at this point, it was mentioned that you were actually down in Puerto Rico helping with that prosecution.

MS. RODRIGUEZ-COSS:  Oh, that's right, because Mr. Ruhnke is the defense counsel --

THE COURT:  Correct.

MS. RODRIGUEZ-COSS:  -- in that case.  That's correct.

4

THE COURT:  All right.

MS. RODRIGUEZ-COSS:  We were busy at work.  I can vouch for him.  He was down there.

THE COURT:  Right.  Well, welcome to Vermont.

MS. RODRIGUEZ-COSS:  Thank you.

Your Honor, the United States stands by its opposition which states that the petition filed by Donald Fell in this case can be summarily dismissed based on the record that is existing at this time.  We have thoroughly reviewed the claims that have been submitted by Donald Fell in this case, and they can pretty much be categorized into five different categories.

Those are claims alleging juror misconduct, claims alleging discrimination by the Department of Justice in seeking the death penalty against him, claims for prosecutorial misconduct as it relates to arguments in summation, claims of prosecutorial misconduct as it relates to Brady violations, and ineffective-assistance-of-counsel claims.

The ineffective-assistance-of-counsel claims are primarily a claim of an unreasonable investigation and presentation of mental health evidence and unreasonable investigation and presentation of mitigation evidence.  And then aside from that, the defendant --

THE COURT:  And also a failure to investigate and to present evidence to counter the aggravating factors that the government produced.

MS. RODRIGUEZ-COSS:  Right.  And in addition, he actually has a myriad of peripheral ineffective-assistance-of-counsel claims for counsels' alleged failure to pursue evidence, be it physical or testimonial; that is correct.

So, we would like to start by addressing the ineffective-assistance-of-counsel claims, if -- if the Court --

THE COURT:  Yes.

MS. RODRIGUEZ-COSS:  Initially, your Honor, none of the defendant's claims, individually or jointly, come close to the standard set for a reasonable performance by an attorney under Strickland.  Since Strickland, the Supreme Court has considered a number of capital cases that have come to set forth standards of performance by an attorney in capital cases.

In United States --

THE COURT:  Well, do you have any case law to suggest that at this preliminary stage, when ineffective assistance of counsel has been raised on a post-conviction relief petition, that the court granted the request in a capital case without having permitted

counsel to go through discovery?

MS. RODRIGUEZ-COSS:  Yes, sir.  Recently in United States versus Barrett, a case from the Tenth Circuit, the district court resolved the 2255 petition without additional discovery or evidentiary hearing. Prior to that, in United States versus Jackson -- and I apologize for not having the cite for the Court but I can certainly provide the Court with the cite -- a case out of the Eighth Circuit, similar ruling from the -- from the court.

And in an older case, United States versus Lee comes to find where the court initially permitted defense counsel to supplement its petition.  After receiving a petition much like the petition in this case where -- where the defendant is basically alleging that simply his good-faith allegation of certain claims are sufficient to trigger discovery and an evidentiary hearing, the court permitted the defendant to supplement its petition with additional information and then resolved it without permitting discovery or an evidentiary hearing.

So, yes, in all those three -- all three of those cases were capital cases, your Honor.

With --

THE COURT:  Lee is out of the Eastern District

of Virginia?

MS. RODRIGUEZ-COSS:  Um, not one I am sure of at this time whether it's out of the Eastern District of Virginia, your Honor, but I can definitely provide the Court with those cites.

THE COURT:  All right.

MS. RODRIGUEZ-COSS:  So what we are -- our position is not unprecedented in that sense, if that responds to the Court's questions.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  All right.  In United States versus -- in Williams versus Taylor, your Honor, from the Supreme Court, for example, the court faulted counsel for beginning to prepare for the penalty phase just one week prior to the beginning of the penalty phase.  And then found ineffective assistance in that trial counsel failed to present evidence regarding the defendant's conduct in prison, evidence regarding the defendant's mental retardation, and evidence of the defendant's horrific childhood.

In United States versus Wiggins, the court again found fault in trial counsels' performance in that they failed to present the defendant's personal history, relying -- their investigation relying solely on a one page out of a presentence investigation report.

Subsequently in United States -- in Rompilla versus Beard, the Supreme Court found trial counsel's performance ineffective in failing to investigate an incident, a prior conviction of the defendant, where they knew that the government would rely on that prior conviction as an aggravating factor.

So, our submission is that this case stands in stark contrast to those cases where the Supreme Court has found ineffective assistance of counsel.  And in this case your Honor appointed three defense attorneys to defend Donald Fell at trial, and those defense attorneys collectively presented a wealth of information to the jury in penalty, a wealth of information that was very effective.

If the Court goes back to the special verdict form and reviews the findings of this jury, it will determine that the defense counsel were very effective in communicating the information of Donald Fell's background to the jury as they overwhelmingly voted almost unanimously with regards to most all of his mitigating factors having to do with his background, his childhood, his life experiences.  In fact, so effective were they that the jury found two additional factors on their own.

So with that, with that background in mind,

your Honor, we would like to address defense counsels' claim that trial counsel was ineffective in investigating his mental health.

Trial counsel here hired a forensic psychiatrist, Dr. Mills, to examine and render a report on the defendant's mental health.  They hired a forensic psychologist to then conduct a thorough psychological examination of the defendant.  He again examined the defendant thoroughly and rendered a report.

Then they hired a pharmacologist specifically to focus on the defendant's history of addiction with regards to drugs and alcohol.  He thoroughly examined the defendant and rendered a report.

In addition to that, trial counsel obtained Donald Fell's hospital records, his psychiatric treatment as a juvenile.  He had four different hospitalizations.  All of those records were obtained by trial counsel.

In addition to that, they obtained social service records from two different organizations:  The Victim Resource Center and the Luzerne County Youth Services.

They interviewed family members.  They interviewed social workers with regards to his family situation. They interviewed police officers.  They interviewed teachers.  And then they hired a fourth mental health expert, Mr. Mark Cunningham, a forensic psychologist, to

explore how Mr. Fell's childhood trauma affected his conduct as an adult. So -- and each one of these mental health experts had an opportunity to also interview the defendant during the course of their --

THE COURT: Well, there's no question that they hired Dr. Mills. They hired Dr. Cunningham. They spoke with a therapist. They conducted a preliminary examination early on. In fact, that examination was primarily related to the mitigation claim that they were bringing before the Department of Justice. Obviously the defense is arguing that there was a whole period of time in which nothing was done. But I would refocus your argument.

I have read all of the 1,000 pages of the pleading, and it seems to me that what the defense is focusing in on primarily in the ineffective-assistance-of-counsel claim is the ultimate decision that was made during the course of the trial at the time Dr. Welner was potentially a witness and the Court was exploring a Daubert hearing, a decision that was made by defense counsel to waive their argument.

I mean, essentially the defense, in the jury selection, in the opening statements, in the opening statements at the penalty phase, argued strenuously that -- that the defendant was under the influence of a

mental condition that was caused and directly related to his childhood; that, in fact, even in the summation, I can recall Mr. Primomo suggesting that Mr. Fell was, I think, warped, as I recall, some language like that. But essentially a real connection between his childhood and his upbringing and the mental condition that he suffered under, which then related in some direct way to the act, the crimes that he committed, so that there's a flow directly from childhood through mental illness to the offense.

And then, what the defense has done as a cumulative approach to the ineffective-assistance-of-counsel claim is to say these are all the areas in which counsel was ineffective which contributed to its mistaken decision at that poignant moment in the trial when they waived this disease and defect and stipulated that in fact the defendant was not suffering from any disease or defect.

You go back through the lack of the social history given to Dr. Mills, in fact you go back to Dr. Mills' testimony which related the offense conduct to his childhood and mental condition, all of that gets waived.

And then what they -- what they're arguing is all of these failures, the failure to investigate, et cetera, related to that ultimate decision in which the defense stood up and said, Everything that we said about

the connection between the offense and his childhood and mental condition, forget that.  We stipulate he doesn't have a disease or defect, and that suggests to me that what they're basically wrapping up is not independent issues in regard to ineffective assistance of counsel but the cumulative impact of that.

And to that extent, it may differ a little bit from what Judge Wolf did in the Sampson case, which resulted in him going through the individual ineffective-assistance-of-counsel arguments and granting some and not granting others.

This seems to be a cumulative approach so that they want to explore the conduct of the lawyers up to that ultimate decision essentially waiving their disease and defect argument.  And at this particular point, isn't it extraordinary -- wouldn't it be extraordinary to say that they should not be able to explore that?

I -- I appreciate the fact that -- I'm not suggesting that I agree or disagree with the argument that they're making, but at this preliminary stage, when you are looking into what did the lawyers do, isn't -- doesn't this at least create the threshold which allows discovery to go forward?

MS. RODRIGUEZ-COSS:  A couple of --

THE COURT:  That's a long question --

MS. RODRIGUEZ-COSS:  It is a long --

THE COURT:  -- but I am trying to focus in exactly what in their 350 pages, and then their 300 pages, they're saying.

MS. RODRIGUEZ-COSS:  And I'm going to try and break it down for the Court, and I want to add to the equation, your Honor, what they're not saying, because I think it's very important to take into consideration what they're saying and also what they're not saying.

Dr. Mills examined the defendant in this case, and while he found that he had a horrific childhood, his ultimate conclusion was that he was not psychotic.  His ultimate conclusion was that Donald Fell knew what he was doing.

THE COURT:  Actually, that's not precisely correct.

MS. RODRIGUEZ-COSS:  He said he wasn't floridly psychotic.

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  He was not floridly --

THE COURT:  He's not totally psychotic. Right.  He said that there may very well have been a split from reality, but then when also you start looking into the claims that the defense is making, what they are suggesting is the defense counsel was even

ineffective in their hiring of Dr. Mills because, number one, never gave him a social history; two, never -- never pursued extensive psychiatric analysis, including the potential of organic brain damage, et cetera. That's -- that's what they're basically saying.

MS. RODRIGUEZ-COSS: Let's -- let's try and break it down, your Honor.

With regards to their perhaps being ineffective in hiring Dr. Mills, they hired Dr. Mills. He conducted a thorough forensic psychiatric evaluation. He rendered an opinion. There was nothing on the face of that report that would have led any trial counsel to determine that that opinion was deficient in any way.

In fact, Dr. Mills says, Hey, you should hire Dr. van Gorp because you should have this individual psychologically evaluated. So they do that. They go and they hire a neuropsychologist, Dr. van Gorp, who thoroughly examines Donald Fell and finds that he has no cognitive deficits. He -- he doesn't exhibit any psychosis. He finds -- neither one of -- neither Dr. Mills nor Dr. van Gorp say that there was anything to challenge the intent of Donald Fell in the killing of Terry King.

So, they have -- notwithstanding that, they hire a pharmacologist, and nothing on his report to indicate to

trial counsel that that was not a valid opinion.

So now trial counsel is sitting there looking at these three opinions. None of them mentioned fetal alcohol syndrome. None. So I don't believe that we can assign trial counsel a responsibility to go out and research fetal alcohol syndrome when they have three professional expert opinions, and while they may not have had a complete social history, none of them qualify their opinion in that sense, your Honor.

They did have their psychiatric records of Donald Fell. They had interviews that had been conducted up to date by the mitigation specialist. They had information -- they had the ability to interview Donald Fell thoroughly. They had some records from the Victim Resource Center for treatment that Donald Fell had received. They were aware of his sexual abuse as a child.

So while they didn't have what petitioner's current counsel would call a complete social history, they certainly had sufficient information to render a professional opinion, because I reviewed those three reports, and nowhere do any of them say, Hey, by the way, this is a preliminary opinion based on the information that I have to date. None of 'em say that, and what is --

THE COURT:  Do you know if defense counsel asked those particular experts to look into organic brain damage or fetal alcohol syndrome?

MS. RODRIGUEZ-COSS:  I don't -- we don't have anything on the record that would indicate at this time that trial counsel asked any of them to look into that. But, your Honor --

THE COURT:  But isn't that --

MS. RODRIGUEZ-COSS:  -- trial counsel is not the expert.

THE COURT:  But isn't that -- isn't that just an indicator of the fact that these arguments have to be explored to -- to make an *in toto* analysis of the effective assistance of counsel?

MS. RODRIGUEZ-COSS:  That -- that perhaps may very well be the ultimate conclusion of the Court, your Honor.  But our position is that if you have three expert -- mental health experts, three mental health experts who know their field, who are aware of the defendant's alcoholic history, who are aware of his upbringing, who are aware that his mother was an alcoholic, who are aware of the details of the crime scene in Rutland where there were beer cans all over, and examined the defendant and yet found no cognitive deficits, none, nothing to indicate that he had a fetal

alcohol disorder -- related disorder, and did not say to trial counsel, let's follow this up, then how can we fault trial counsel for not following that up?

Trial counsel is not the mental health expert.  The experts are.  And he is entitled to rely on the experts' opinion that he's receiving unless they're facially deficient, and there is nothing on this record to indicate that those expert opinions were facially deficient.  In fact, the only mental health expert in this case to have even mentioned fetal alcohol syndrome and then dismissed it as not having found any evidence of it is Dr. Welner because, based on the social history of the defendant, he felt compelled to address it and, yet, stated there's no evidence that he had any sort of fetal-alcohol-syndrome-related disability.  So, that would be our position on that, your Honor.

None of them qualified their opinions as preliminary.  What is even more significant is they now stand here on post conviction, they submit a declaration by Dr. Mills in support of their petition, and in that declaration, Dr. Mills says, Yes, when I examined Donald Fell, I didn't have a complete social history.  But he doesn't state that that affected his opinion.  Even now, post conviction, in support of a petition to stand aside the verdict of the jury, Dr. Mills doesn't say that

whatever social history or whatever other information the defense could have brought to his attention would have affected his opinion.

So here is trial counsel, faced with these -- these opinions from his mental health experts. Let's add Dr. Cunningham to that mix. Right? And now we are in the penalty phase, and they're trying to decide whether or not they're going to proceed with their mental health case. And I am going to now focus on the Court's question --

THE COURT: Sure.

MS. RODRIGUEZ-COSS: -- and their strategic decision not to proceed with that case.

And now they have the reports of Dr. Welner and Dr. Wetzel, and let's first go to the reasonableness of not wanting to confront the government's experts in penalty.

Dr. Welner and Dr. Wetzel both say that Donald Fell has antisocial personality disorder. The expert on capital cases that handle Fell's appeal, the Professor Bloom, has written several articles on this and has stated that antisocial personality disorder diagnosis can be the kiss of death because to many people and most judges means the defendant is little more than a remorseless sociopath.

So trial counsel now has to weigh what are the

benefits of my proceeding with a mental health -- with my mental health expert evidence, and how -- how is that going to outweigh the expert evidence on the other side.

And the defense, on post conviction, concentrates on Dr. Welner's, but again, let's consider what they don't address.  Dr. Wetzel reached the same conclusion after interviewing the defendant for a period of -- I think it was eight hours, and conducting the examinations that they agreed that he could conduct, reached the same conclusion.

So it wasn't just a matter of not confronting Dr. Welner.  They had the problem of not confronting Dr. Wetzel, who is also going to take the stand and say that Donald Fell had antisocial personality disorder.  But not just that, your Honor.

In the videotape interview of Dr. Wetzel, completely ignored by counsel post conviction, Donald Fell denies responsibility.  He denies participating in the murder of Terry King.  He says he turns his face when Lee was killing her.

So now trial counsel has built an entire case based on a strategy of acceptance of responsibility from day one.  They have argued to this jury that Donald Fell has accepted responsibility for what he has done:  that he confessed, that he assisted law enforcement in trying to

find Terry King's body, that he is a troubled, troubled young man who has had a horrific childhood but who committed a mistake, faced up to it, accepted responsibility, tried to assist, was willing to plead guilty and accept a life sentence, and the government is still seeking the death penalty against him.

That was their strategy in guilt and that was their strategy in penalty.

THE COURT: But the difficulty with your argument, you know, frankly, is that it may very well be true that they thought of all of these ramifications of introducing the testimony, but then Mr. Bunin submits an affidavit which basically says that the reason they chose to enter into that stipulation and not put on any mental disease or defect testimony was because they thought the Court had already ruled or was clearly going to rule that Dr. Welner could testify.

And that appears, at least factually at this particular point, in light of his statement, his affidavit, to be what they were thinking. And then you have the affidavit of one of the co-counsel, the third co-counsel, Mr. Volk, who said this was done without his knowledge, and he clearly was upset about that ultimate decision. Seems to be a conflict among the lawyers as to why this decision was made or even whether they

consulted or didn't consult.

I guess the question is what are they thinking when this ultimate decision is being made?  I appreciate the fact that one could look back and say, well, they could have thought about this or they could have thought about that.  The question is what were they thinking when they entered into this agreement by which they would remove one of the arguments that they raised in jury selection and in opening statement?

MS. RODRIGUEZ-COSS:  Two things.  I am not so sure -- and I don't have it in -- directly in front of me.  I certainly reviewed it in anticipation of this argument.  I don't think that trial counsel says in his post-conviction declaration that he thought that the Court had ruled on the motion.  I think what he says is that he believed that the Court was not going to exclude Dr. Welner's testimony.  In any event, I think that's what motivated his actions.  And a review of the record would certainly support that decision.

When we look at the Court's statements throughout the penalty phase, during conferences with counsel, it certainly seemed that the Court was not inclined to excluding Dr. Welner's testimony in its entirety.

I think there's a -- an instance where the Court states, I'm going to let the parties litigate this case.

And I think post conviction, in considering the motion for a new trial, and the Court's opinion and order, I think it becomes evident that while the Court had certainly not ruled on the motion *in limine* filed by trial counsel, it's also apparent that you would not have excluded Dr. Welner's testimony entirely.

The Court found that the government had not engaged in prosecutorial misconduct. The Court found that the spirit of the Court's order with regards to the examinations to be conducted by Donald Fell were not followed by the government. And -- and I believe that the Court is basing that, and obviously the Court knows best, on the fact that Dr. Welner submitted questions to Dr. Wetzel and, as a result of that information that he obtained, was able to reach a psychopathy conclusion or diagnosis with regard --

THE COURT: Is it psycho-pathy or psychopathy?

MS. RODRIGUEZ-COSS: I'm not a a native speaker, your Honor. I will defer to the Court on that one.

THE COURT: Well, anyway. I guess -- I mean, I found interesting in reading the briefs the assessment that's trying to make of what I was thinking, and I never thought I was that obvious. But apparently I become quite obvious.

MS. RODRIGUEZ-COSS:  Well, your Honor --

THE COURT:  Essentially there was no ruling. We are setting up a Daubert hearing.  The Daubert hearing was going to be extensive.  It was going to relate obviously to the opinion that Dr. Welner had, and in particular the psycho-pathy, or the psychopathy, whatever it is, whether he could ever testify to that, but also to the procedures.  It was going to be a wide-open Daubert hearing, no question about that.  I thought it was left at that particular point, but regardless.

MS. RODRIGUEZ-COSS:  And -- and so they had to consider whether or not the Court would exclude it entirely or would simply exclude that portion of his opinion that related to the questions the Court thought should not have been --

THE COURT:  But you know -- you know that's a fundamental decision.  I mean, they -- they had argued throughout the case that there was a linkage between the childhood and the abuse and mental illness to ultimately the crime.  And when they stipulated, they removed that. They removed the linkage.

I appreciate the fact that ultimately the jury comes back, mostly unanimous, a couple of times with 10 votes, to various factors of childhood which are

mitigating in nature.  But as to the relationship between the underlying offense -- or to the underlying mental illness and the offense, that was severed by that stipulation.  Major, major decision.

Now, that, it seems to me, suggests that the causes of the reasons for that particular decision should be explored in detail when you address a question of ineffective assistance of counsel.

MS. RODRIGUEZ-COSS:  Major decision, your Honor, but a strategic decision, a strategic decision made by defense counsel based on -- on a well-established record, and I would differ from the Court just a tiny bit in the sense that while they removed their mental health expert testimony, they didn't remove the linkage.  They still argued it to the jury.

They still argued to the jury that his childhood experiences had a lot to do with what happened in Rutland and the murder of Terry King.  They simply said to the jury, We think you can understand it.  You don't need an expert to explain it to you.  We understand that, you know, you are capable of considering this evidence and reaching your own conclusions.

So it wasn't complete abandonment of their theory. What they abandoned was the use of expert testimony.

And so the question is whether that tactical decision -- and in -- trial counsel in its reply pretty much concedes it was a tactical decision. The question now becomes, Was that an informed decision? Did they have sufficient evidence before them --

THE COURT: Right.

MS. RODRIGUEZ-COSS: -- to make that tactical decision?

THE COURT: And then, then you address the -- the way the defense raised this post-conviction relief petition here. So did they -- were they informed? Did they have sufficient information? And what the argument in counsels' petition -- although obviously this is my assessment of what they're arguing -- is that it was not informed, not just because of Dr. Welner or Dr. Wetzel, or in fact the testimony of Dr. Cunningham, et cetera, or Mills, but also because of the failure to have a social history, the failure to investigate fully the defendant's background, the failure to investigate that -- his mental and -- mental condition, the failure to explore fetal alcohol syndrome, the failure -- all of those contributing factors suggested to the defense in the argument at this point that they were not informed enough because of the failure to investigate and also because of the failures of information that were given

to them to be able to make an informed decision.  That is the heart of the ineffective-assistance-of-counsel claim.

MS. RODRIGUEZ-COSS:  Right.  Very well.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  And in regards to that, your Honor, and I think the Court has to at some point consider each individually to then -- to then see which should be weighed towards that cumulative argument that the Court is -- has identified.  But let me just say very honestly, your Honor, when I first -- I was obviously not involved in the trial, and this is the first time I have appeared before this Court.  And when I was first tasked with assisting the U.S. Attorney's Office in responding to the extremely long petition filed by Donald Fell post conviction, and as I began to read through that, through that petition, I myself was quite concerned.

They lead off with two or three pages of bullets of information that they claim, you know, defense counsel failed to uncover.  And -- and as I read through these bullets, my concern increased incrementally, and I completed my examination of their -- of their petition, and then I began to review the record in this case.  And as I reviewed the record in this case, I continuously

and consistently found all the information that they were asserting had not been presented to the jury, to the point where, in our opposition to their -- to their petition, I was able to find record references to each one, and we set them forth intact, as petitioner sets them forth in their motion, with now citations to the record where that information was before the jury.

So, you know, the idea that the trial counsel in this case failed to present a reasonable social history to this jury, honestly, is baffling because this jury was aware of the entire childhood experience of Donald Fell to the point where they themselves added mitigation factors, which included his total life experience and included the Commonwealth of Pennsylvania's failure to address that -- his needs.  So I --

THE COURT:  Except you get -- I appreciate the fact that a lot of that was presented and accepted by the jury.  But then as the defense counsel have said in their submissions, at age 15 they stopped.  And then you come back and say, Well, of course they stopped because if you -- they got into the age 15 and above, then you had a potential kidnapping or sexual assault, and so that there was a balance there.

What they are suggesting there is that that needed to be explored, and in fact they have witnesses to say

that various people who were described by your experts as -- Dr. Welner in particular -- supportive as parents, in fact, were abusive.  So there seems to be a massive factual dispute between the sides.

MS. RODRIGUEZ-COSS:  I wouldn't call it massive.

THE COURT:  Well, all right.

MS. RODRIGUEZ-COSS:  I wouldn't characterize it as massive.

THE COURT:  So, how about big?

MS. RODRIGUEZ-COSS:  Well, identifiable, certainly.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  But with regards to the post-age 15 strategy, that's not the government saying that.  Mr. Bunin's on the record arguing to the Court quite clearly, We have made it a point not to open the door to Donald Fell's life after life 15.

THE COURT:  Okay.  And that's a decision that he made as counsel.

MS. RODRIGUEZ-COSS:  That's right.

THE COURT:  No question about that.  And what they're saying is that that's an ineffective decision because he had not investigated sufficiently to his -- to Donald Fell's mental condition, and also treatment by

others during that period of time which would have been very helpful for the ultimate defense.  And that's where the ineffective-assistance-of-counsel claim seems to be pervasive on each of the relevant issues.

MS. RODRIGUEZ-COSS:  Well, but -- perhaps, your Honor.  But it would have opened the door to a strategy, which the Court agreed with, to keep Lee out of this trial.  They worked very hard to exclude his statements.  They worked very hard to exclude his letters.  They worked very hard to exclude that relationship.  And, quite frankly, reasonably so.

THE COURT:  All right.  So that -- that actually brings up another issue that I didn't find to be fully fleshed out, and that's the interview with Francis Bellantoni by the FBI.  It would have been just before the trial.

Standard rule here of practice in this jurisdiction is that the FBI, in advance of trial, may interview witnesses in preparation of trial and not write a 302. So they're -- and you responded there's no 302 of this particular interview.

This is the person who apparently saw Mrs. King and the two defendants at that point right before the murder.  And obviously the relationship between Mr. Lee and Mr. Fell is important, and apparently he saw them

arguing.  The defense seems to suggest in their pleading that, from their interview with Mr. Bellantoni, he clearly could identify the fact that Mr. Lee was the aggressor and Mr. Fell was not the aggressor.

And then I got from your response there's no 302. A decision was made not to call him as a witness because, in quote, he was not helpful.

They're saying that there's the potential of exculpatory information there; that in fact this witness would have said that Mr. Lee was the aggressor based upon his observations of the argument that was going on at the car, and also watching them go into the woods.

And I wonder, what is -- what -- what was said there, and is that something that needs to be explored?

MS. RODRIGUEZ-COSS:  So Mr. Bellantoni drives by the area where Fell and Lee allegedly walked Terry King up -- up the hill.  He's driving at 55 miles an hour, glances to the side and sees a vehicle.  I don't believe he correctly identified the type of vehicle. Sees a female sitting in the back seat, and two males. He is not able to identify either one of the defendants. So he can't say -- he is not able to identify Donald Fell.  He is not able to identify Lee.

He turns around and comes back because he left something at home, and then at that point sees the two

males and the female walking up -- up a hill.  And from apparently a hand gesture that he observed, he concludes that the two males were arguing.  But again, your Honor, he is unable to identify who's Donald Fell and who's Lee.

So, he is speculating, first of all, that they are the people involved in this case because he cannot identify them and does not identify the vehicle save for the fact that he apparently remembered a Vermont license plate.  He is speculating from the hand gesture that they were arguing.  And we're speculating that that would have been relevant and admissible information, your Honor.  I -- so basic --

THE COURT:  Well, but the defense's claim here is that there may very well have been exculpatory information given to the FBI agent by Mr. Bellantoni at that interview; even though it's not a 302, no question about that, that there may have been exculpatory evidence introduced.  And does that need to be explored?

MS. RODRIGUEZ-COSS:  Well, your Honor, the government did not produce a 302 but they did produce the police report regarding Mr. Bellantoni's interview by the New York State Police.  Right?

THE COURT:  Right.  They did.

MS. RODRIGUEZ-COSS:  New York State Police.

THE COURT: They did.

MS. RODRIGUEZ-COSS: Right.

THE COURT: And that's another basis of the claim of ineffective assistance of counsel because that's the last person who theoretically saw them, and they were never interviewed by the defense.

MS. RODRIGUEZ-COSS: Well, your Honor, we have to again, you know, question what would that have brought to the penalty phase profile of Donald Fell? What would that have added to the profile?

They're theory and their strategy was to maintain Donald Fell's and Robert Lee's relationship out of the case. Would that not have opened the door wide open to that relationship? Particularly since they're now questioning that Donald Fell seemed to be arguing with Lee. Would his post-arrest statement not have walked in at that point? The letters that he wrote from prison would not have walked in?

THE COURT: You mean the Lee statements.

MS. RODRIGUEZ-COSS: The Lee statements, absolutely, that the Court kept out.

THE COURT: Yes.

MS. RODRIGUEZ-COSS: The Lee letters that the Court kept out. And -- you know, so convinced was trial counsel that that evidence would be detrimental, that in

the original evaluation of Dr. Wetzel of Donald Fell, they did not allow him to question Donald Fell on the Lee relationship. And I think -- you know, again, obviously we can't read the Court, but I think the Court agreed that it would be detrimental to Donald Fell's case in penalty. So --

THE COURT: Well, at that particular point, but the counter argument, of course -- and, you know, what I am doing is obviously forecasting.

MS. RODRIGUEZ-COSS: Obviously.

THE COURT: I am not making a determination one way or another, but --

MS. RODRIGUEZ-COSS: Of course.

THE COURT: But he makes a statement, Donald Fell makes a statement that at the time of the arrest to the Clarksville police, which is essentially consistent -- actually, I guess it wasn't with Clarksville police, but anyway, he makes a statement which is, he's essentially arguing that Mr. Lee was the aggressor, that he was not, and that he was opposed to it, fighting it.

And then the question is whether Mr. Bellantoni in fact told the FBI agent something that was consistent with that particular statement, and could that have swung the balance for them deciding to explore.

Well, then, of course, then they never looked into Mr. Lee's background, theoretically, at least according to the defense at this point; say they don't really know whether Mr. Lee was the aggressor or not, even though you have got witnesses to suggest that obviously Mr. Lee was known as much more passive and Mr. Fell was the much more aggressive in their friendships.  Right?

MS. RODRIGUEZ-COSS:  And as a trial attorney, when you weigh the benefit that a witness, who can't identify your client and can't identify the other person, and, you know, the benefit that that witness is going to be able to bring versus all the other damaging evidence that he would open the door to --

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  -- you can't --

THE COURT:  But to weigh that particular issue as a trial lawyer, you have to have -- know the facts. You have to have conducted a full investigation, know the facts.  And then you can make an informed decision. And their argument is, they didn't know the facts.  The defense lawyers didn't know the facts.

MS. RODRIGUEZ-COSS:  Well, they didn't speak to Mr. Bellantoni is what they're alleging, but they knew the summary of what Mr. Bellantoni would say.  You know, if they --

THE COURT: Well, right.

MS. RODRIGUEZ-COSS: If they interviewed Mr. Bellantoni, he wasn't suddenly going to be able to identify Donald Fell or Robert Lee.

THE COURT: Well, of course they don't know that. They don't -- they don't know what he said to the FBI agent other than what Mr. Bellantoni said to them. That's -- that's an issue.

MR. VAN DE GRAAF: Your Honor, just for the record, Mr. Bellantonio's aff- -- declaration that the 2255 counsel says -- says that he still could never do that. You know, he describes his interview with the FBI; doesn't suggest that he could ever identify these people. So couldn't identify them before in the report, and in 2255 counsels' declaration, he says, I could not identify which man was which.

So he has always said the same thing. Now, we don't have a record of exactly what happened in his pretrial prep interview, but there's no -- they did talk to Mr. Bellantonio presumably asked him, Did you identify 'em when you talked to the FBI? And then they had a chance to talk to him, and he didn't say anything different than what he said.

THE COURT: Is it Bellantonio or is it Bellantoni?

MR. VAN DE GRAAF:  Bellantoni.

THE COURT:  Bellantoni, right.

MR. VAN DE GRAAF:  Bellantoni.  I apologize if I misspoke, your Honor.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  In concluding, your Honor, it occurs to me that there's a force driving the post-conviction petition by Donald Fell and the information or the petition filed.  As you read the papers on the side of the defense, there is -- there's palpable sense that, you know, God, this defendant had such a horrific childhood, he had -- he had such horrible life experiences -- and he did.  He did.  The -- the government didn't contest that.  We couldn't contest that in penalty.  He had a horrific childhood.  No child should be raised the way he was.  And so -- but there's this -- this palpable sense from the defense that if he had such a horrific childhood, and the jury saw it and found it and determined it, and he is still sentenced to death, trial counsel must have done something wrong.  There must be a mistake here somewhere.

And what I want to point out to the Court is that analysis is leading out the other side.  And so that analysis has to consider the other side.  It has to

consider, your Honor, the horrific acts that Donald Fell committed.  Even among capital cases, this case stands out as particularly heinous.  Donald Fell didn't just kill Charlie Conway.  He slaughtered him.  He slaughtered him.  And he watched Lee slaughter his own mother.  And he stepped over her, took a shower, got dressed, picked up his CDs, packed up his bag, packed up the two knives, wrapped them in a towel, grabbed the shotgun, and went out looking for a car so they could get away.  And it was very organized, very intentional, very calculated actions.

And then they waited for the right victim.  They sat there.  They waited for the right victim to come along.  And Terry King was it.  They pointed a shotgun at her, threw her in the back of her car, drove back to the apartment, picked up the bag, forgot the knives but picked up that bag with his CDs, and got on the road and drove for four hours, kept that woman in the back of that seat for four hours before he found a nice little spot where he could kill her.  Walked her up the hill, and then they didn't just shoot her, your Honor.  They beat her to death.  He stomped on her with his boots until she was dead.  And then he wiped his boot on her, and with her money went down the road and had breakfast as if nothing had happened.  And then drove to

Wilkes-Barre and played cards and drank with his buddies as if nothing had happened, and continued on his way.

The evidence has to be weighed against that horrific picture, your Honor. Even among capital cases this stands out.

THE COURT: It does have to be weighed, because essentially if you are talking ineffective assistance of counsel, then the question is prejudice. It's not just the ineffective assistance of counsel. It's the prejudice.

MS. RODRIGUEZ-COSS: Right.

THE COURT: And so as a part of the balancing that -- that the Court would actually employ would be whether in fact, in light of all of the facts and circumstances, this would be likely to result in a different verdict.

MS. RODRIGUEZ-COSS: Right. And the point that I wanted to finish with is, your Honor, is that when they are faced with the tactical decision to withdraw their mental health case, they have so far submitted into the record an incredible mitigation case that has gone completely unopposed. Completely unopposed. We have nothing to rebut his horrific childhood, his horrific life experiences, his horrific upbringing. Up to that point it's gone completely

unopposed, and so they are weighing the benefit of presenting mental health expert testimony that, contrary to all the other evidence that had been submitted into the record thus far, was going to be vigorously, vigorously challenged by the government, successfully so, probably.

THE COURT:  So let's just briefly talk about the other issues, in particular, the exploring DOJ's decision to pursue the death penalty.  Are you aware -- you have cited a number of cases in which courts have said that it's inappropriate to explore the prosecutorial decision-making process for death penalty decisions in light of that report on racial discrimination, et cetera.

MS. RODRIGUEZ-COSS:  Racial impact.

THE COURT:  Racial impact, right.  So are there any cases out there which have in fact permitted the discovery of internal documents in the decision-making process?

MS. RODRIGUEZ-COSS:  None, your Honor.  None.

THE COURT:  You have never seen that?

MS. RODRIGUEZ-COSS:  I have never seen that.

THE COURT:  And --

MS. RODRIGUEZ-COSS:  Every court that has considered the argument that -- the statistical evidence

generated by that report, and the statistical evidence that's generated by the resource center for defense counsel in capital cases is not enough to trigger that process.

THE COURT:  All right.  And the other thing I'd ask whether you are aware of any documentation -- without getting into the contents of the documentation, but whether you are aware of any documentation which would indicate that race, gender or geography, which are the issues raised by the defense in this particular case, if there were any documents which included those particular representations as relevant in the decision to pursue the death penalty in this case?

MS. RODRIGUEZ-COSS:  I'm sorry, the last part of that, your Honor, what I am aware of any --

THE COURT:  Well, are you aware --

MS. RODRIGUEZ-COSS:  -- documentation pertaining to the review of this case?

THE COURT:  Well, no courts have permitted a wide-open --

MS. RODRIGUEZ-COSS:  Discovery.

THE COURT:  -- disclosure --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- of this material.  But if you are in fact aware of any documentation, you yourself

having prepared this particular argument, if you are aware of any documentation out there which suggests that race, gender or geography played a part in this decision.

MS. RODRIGUEZ-COSS:  Your Honor, I cannot respond to that question because I have not engaged in that inquiry.

THE COURT:  Oh, all right.

MS. RODRIGUEZ-COSS:  What I can tell the Court is that the policy of the Department of Justice is not to consider those factors in this decision-making process, but we have not engaged in that -- in that inquiry.  I have not engaged in that inquiry.

THE COURT:  Okay.  And then the final thing that I would raise at this particular point is the juror issue.  Do you want to address that?

MS. RODRIGUEZ-COSS:  I do.

Your Honor, first of all, we were quite surprised at -- at that argument and surprised that the government was not involved in -- in that process.  We are not privy to the motion filed by trial -- post-conviction counsel requesting to interview those -- those jurors. We are not privy to the order of the Court, so we are at a disadvantage at this point.  But from the information proffered in the petition by -- by Donald Fell, on

information and belief, your Honor, we would submit that there was no previous showing of alleged misconduct prior to the interviews of these jurors.

In any event, our position is, with regards to the allegations of juror misconduct, the only evidence being submitted by defense counsel in support of those claims are statements of the jurors themselves with regards to their deliberative process, which, pursuant to Rule 606(b), your Honor, cannot be considered by the Court. The claims cannot be substantiated by bringing in a juror and questioning them on their deliberative process.

Juror 162, for instance, who disclosed to defense counsel that she had been the victim of sexual abuse early on in her childhood -- this is a 62-year-old woman -- provides that information in what appears to be a response to a question that asked her why she voted for death or what was important to her in reaching her verdict.  That is just a prohibited area, really, and has traditionally, consistently been viewed by the courts as -- as a sacred area that we do not inquire into.

In United States versus Sampson, for example, where a similar issue was entertained by the court --

THE COURT:  Right.

MS. RODRIGUEZ-COSS: -- the information or the alleged conduct came to the attention of trial counsel because they learned that the juror in that case had obtained a protective order, and that caused the subsequent investigation into that juror's potential misrepresentations with regards to her --

THE COURT: Let me ask you about the other juror. The other juror went down to Rutland, apparently, at least the argument is, went down to Rutland, conducted his own investigation.

MS. RODRIGUEZ-COSS: Again, your Honor, how do we obtain that information? By asking him about his deliberative process which the Court cannot consider. I don't see anything else on the record that supports that information other than the statements of Juror 143 when he's asked what factors he considered in reaching his verdict.

THE COURT: His description of going down to Rutland and what he did there you -- you don't think is relevant?

MS. RODRIGUEZ-COSS: In terms of what, your Honor?

THE COURT: In terms of his own deliberative process. I mean, I --

MS. RODRIGUEZ-COSS: I don't think --

THE COURT:  Well --

MS. RODRIGUEZ-COSS:  Well --

THE COURT:  I guess my ultimate question is, in the Sampson case, which I have read, what Judge Wolf did in that particular case, when raised -- when some issues have been raised about impartial jurors, is to conduct the -- the court conduct a questioning or lawyers as well conduct a questioning of individual jurors in camera to review what exactly happened.  And then make an assessment as to whether that was prejudicial.

I mean, it is fair to say that every day I ask the same question:  Has anybody ever learned anything about this case from outside of the courtroom?  Have you done anything to research this case or whatever?  And obviously the significance of that is that you have to decide the case based upon what you hear.  Every, every day that was said.  S --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- if there's some evidence to suggest that that was not followed, doesn't -- isn't that --

MS. RODRIGUEZ-COSS:  But the evidence --

THE COURT:  Doesn't that need to be pursued?

MS. RODRIGUEZ-COSS:  The evidence cannot stand

from inquiring into a juror's deliberative process, your Honor.  That is so well established.  We can only imagine, we can only imagine what would happen if, in every criminal case after a conviction that the defense was not happy with, they were granted leave to interview each juror with regards to anything, without having some sort of *prima facie* showing of potential misconduct, to see if there is anything at all that that juror did that could possibly support a challenge to the verdict.  We can only imagine what -- what would happen.

The Supreme Court has consistently upheld the interest of the government and the interest of the community in having finality to criminal prosecutions.  The Second Circuit has consistently advised against venturing into the prohibitive realm of jury deliberations.  They are entitled to go on with their lives.  They are entitled to go on free of harassment, and absent some sort of independent showing that there was perhaps some misconduct, to allow the defense to go into a fishing expedition by interviewing each juror with regards to their deliberative process, honestly, your Honor, I think it's a very dangerous proposition.

THE COURT:  Okay.  So your argument is that it's almost like a fruit of the poisonous tree under the Fourth Amendment, that is that you can't go ask the

question about the deliberative process, and if, during that particular question, you learn about something which may have been improper that they did, that essentially becomes irrelevant or suppressed because you shouldn't have asked the question in the first place.

MS. RODRIGUEZ-COSS:  It's only -- I think it's more than becoming irrelevant or suppressed.  It cannot be considered by the Court.

THE COURT:  So, in other words, if in that particular process some juror, just hypothetically, says they did something outrageous, or they learned something from some source which was totally inappropriate, and the Court becomes aware of that, then you think that there's a constitutional principle about the inability to explore deliberations that would require the Court to just ignore that information?

MS. RODRIGUEZ-COSS:  I think the rules are clear that you cannot substantiate your argument or your claim based on inquiring of the jury about their deliberations, your Honor.  That's correct.  And -- and further, to respond to the Court's earlier question, I do believe in the ultimate instance, in Juror 143's case -- and I don't want to waive that argument -- it would be harmless.

There were photographs of the scenes presented in

evidence.  While he did, apparently, because we don't know this, apparently drive by the outside of Debra Fell's house and drove by the ShopRite [sic] parking lot, those were both places that were shown or depicted in many photographs admitted into evidence, and so I think, ultimately, it would be harmless anyway

THE COURT:  Okay.  All right.  Okay.  Thank you.  And let's take a 15-minute break at this point and then we will hear from the other side.

(Court was in recess at 10:36 a.m.)

(The following was held in open court at 10:50 a.m.)

THE COURT:  Okay.  Good morning again.

MR. LIMAN:  Good morning, your Honor.  It's good to be back in Vermont again.

THE COURT:  You think that that's a step up from New York; is that --

MR. LIMAN:  I don't want to be quoted back to my --

THE COURT:  Yeah, right.  Plead the Fifth Amendment.

MR. LIMAN:  I am prepared to address the ineffective-assistance claim and the claim with respect to prosecutorial decision making.  My colleague, Miss Price, is prepared to address the juror claim.

THE COURT:  Okay.

MR. LIMAN:  And I'd like to start with the ineffective-assistance claim.

I think your Honor understands and expressed our arguments and our claims quite well.

THE COURT:  Well, did I express it correctly?

MR. LIMAN:  You did.  One point I would like to make is that it is our contention that the claims not only infected the penalty phase but infected the guilt phase as well and undermines confidence with respect to the --

THE COURT:  Well, all right.  Well, so, let me address that.  One of the claims that you made was a failure to investigate and/or present a diminished capacity defense.

MR. LIMAN:  That's correct.

THE COURT:  Right?  Is that what you are suggesting as infecting the guilt phase?

MR. LIMAN:  Your Honor, it is that -- it's primarily that and the -- the whole mental health evidence affecting the ability to inform an intent with respect to the guilt phase.  So that is our primary contention with respect to the guilt phase.

THE COURT:  Okay.  So it's, first of all, diminished capacity due to intoxication or drug use, but it's also diminished capacity in terms of mental disease

or defect, or, assuming it's not -- well, it's diminished capacity because you are talking about the inability to form the necessary intent to commit the crime.

MR. LIMAN:  That's correct, your Honor.

THE COURT:  Well, I mean, that just goes right back to the government's argument that during a trial of this sort, you make decisions about tactical positions that you are going to take.  And if you don't have a whole lot of evidence about diminished capacity, and I assume that they did not have much evidence about diminished capacity, then they make a tactical decision to go through the guilt phase and basically acknowledge guilt, and that's a tactical decision to, I assume, create a relationship with the jury of trust, that they're being honest and forthright, the fact he acknowledges responsibility for these crimes, so that -- that creates a much more healthy relationship with the jury, one of trust.

So why isn't that particular decision, the decision not to go forward with the diminished capacity defense, a tactical decision which does not form the basis of ineffective assistance of counsel?

MR. LIMAN:  Your Honor, because the teaching of the case law since at least Strickland, and

continuing forward, is that a strategic judgment is entitled to deference only to the extent that the issue has been investigated and explored and a reasonable investigation conducted.

It's a curious argument that the government is making.  Essentially the government's argument is, You didn't have any evidence so therefore it was reasonable not to put on evidence.  It doesn't meet our contention at all, which is our contention is that from early on in this case there were clear avenues of -- areas as to which reasonable counsel would investigate, as to which the prevailing norms of the profession require counsel to investigate, but that were ignored because counsel, from very early on, without conducting that investigation, formed a fixed view as to where the case would end up, with a guilty.

THE COURT:  So your argument is counsel decided earlier on that they were going to try to negotiate this.  Mitigating circumstances, they were looking for mitigating circumstances.  They don't ask for a psychiatric evaluation, a full psychiatric evaluation.  Is that the point?

MR. LIMAN:  In essence, that's the point, your Honor.

THE COURT:  Because you -- you do have defense

counsel in this particular case immediately hiring Dr. Mills, Cunningham -- is it van -- von --

MR. LIMAN:  Von Gorp, I think is --

THE COURT:  Von Gorp.  Okay.  Making some real effort at getting psychiatric background information, and helpful information, mitigating information, obviously, which had some persuasive authority with -- with the U.S. Attorney's Office.  Immediately going out and getting a full analysis from these particular specialists, and also the hiring of a mitigation specialist who conducts a number of interviews, 14 separate interviews, as I remember, of family members, et cetera, all of which contribute to an ultimate decision.  And why is that -- why is that ineffective?

MR. LIMAN:  Because -- there are several answers to give to that, your Honor.  The first is that the prevailing norm, cases, and the ABA guidelines, suggest that before the decision is made as to what kind of mental health expert to engage, you need to do a full social history investigation.  That's also obvious in a capital case, or should have been obvious to trial counsel here.

THE COURT:  What is the difference between a full social history and what was done here, which included a number of interviews of family members,

including Teri Fell, so that the picture of a person abused over significant periods of time was established?

MR. LIMAN:  Let me address that, your Honor.

The record here, and the record through the declarations that we put forward, is that the decision as to which mental health experts to retain, and the work with respect to those mental health experts, were done -- was done early in the handling of this case and with respect to a guilty plea.

That's -- if you look at the -- at the Bunin declaration, you will see that.  If you look at the Ayres declaration, you will see that.

With respect to the information that counsel did not have, and did not give to the mental health experts, that is an area that should be explored at a hearing. It's a factual issue.  We believe we put forward sufficient evidence that that is something as to which the Court should hear.

The evidence that I would proffer right now would include, number one, you have got in the record before you the -- and with respect to Teri Fell, the fact that she was interviewed by the mitigation specialist only three times over a five-year time period and each time for approximately two hours.  She's probably the most important mitigation witness to spend time with.  She is

the person who spent the most time with our client.  She was basically ignored, again, because they thought there was going to be a guilty plea.

You see it in the declarations, trial counsel basically ignored, just ignored, made assumptions about and ignored Mr. Fell's life from the age of 11 on.  They assumed that there was nothing that they needed to investigate there, and so they didn't investigate --

THE COURT:  Was it 11 or 15?  I thought it was 15, but -- is it 11?

MR. LIMAN:  11 is really around the time that they stopped investigating.

THE COURT:  Okay.

MR. LIMAN:  There was evidence with respect to some of his hospitalizations that was introduced.  But -- but there, I want to point out something for the record.  The government has put papers before you and argued, Oh, there's no ineffective assistance here because the records of Mr. Fell's hospitalization were put in front of the jury.

Well, who put them in front of jury?  The government put them in front of the jury.  They were in the mitigation binder.  It was the government, if you will recall, through the cross examination of Ms. German, who took the witness through those

hospitalization records even though she -- she was not a percipient witness with respect to --

THE COURT:  Well, that's not consistent with my memory.  I thought -- I thought the defense had put them in; then the government -- the defense put them in. Your argument was the defense puts this binder of --

MR. LIMAN:  Correct, the mitigation binder.

THE COURT:  -- a lot of documents in, with a whole lot of writing that nobody could read, and then doesn't use it at all, and then the government uses what's already been introduced by the defense to cross examine witnesses and would take out portions of them -- of the records to be consistent with their position.

MR. LIMAN:  Your Honor, my recollection is that the record is a little bit unclear whether the mitigation binder as a whole was admitted all at once. It may have been.  That's certainly what trial counsel agreed to when the government first had the witness --

THE COURT:  All right.  Okay.

MR. LIMAN:  -- read from the hospitalization records.  But otherwise, you are exactly -- you are exactly right.

And so none of that evidence with respect to Mr. Fell's later years was really developed by -- by trial counsel.  They made assumptions with -- with

respect to it.

We put evidence before your Honor that there were contact sheets and other documents that the mitigation specialist got only at the very -- in the very eve of trial.  None of that was given to -- to the mental health experts.  And while the mitigation specialist proffer did conduct some interviews early on, conducted a number of interviews early on, she didn't reduce those to memoranda that were shared within the defense team so that they could be given in a fulsome form to the mental health experts.

But even beyond that, your Honor, what the case law requires and what trial practice requires is you collect the evidence.  You then consult with somebody who can tell you what kind of mental health experts you need. It may be mitigation experts.  That's what the ABA guidelines say.  It could be a general consultant who can read the records and say, we need this expert or we need that expert.

You don't ordinarily -- and case law doesn't require you to, you don't ordinarily go to your testifying expert and say to your testifying expert, Well, I know that I have only asked you -- you are only an expert with respect to this, but be a consulting expert with respect to me.  Tell me what other doctors I

should go and see.

Now the government also made a point of saying, well, Dr. Mills didn't -- we didn't put in an affidavit from Dr. Mills saying his opinion would have been different had he seen all of this other evidence.

We didn't put in a supplemental affidavit from Dr. Mills at all.  Our point is that had the right experts been hired, had an investigation been conducted with the notion that this case might go to trial, and counsel been prepared for trial, it would have collected the documents, they would have analyzed the documents, they would have hired the right expert, and, number one, would have been able to put on a mental health case that tied together the evidence with respect to Mr. Fell's early childhood, would have tied together the evidence with respect to Mr. Fell's later years, and would have tied together the evidence with respect to the crime, making a cohesive whole that showed the jury that there was mitigation.

Instead, what ended up happening here is that the -- we put on -- trial counsel put on evidence with respect to an incident when Mr. Fell was a baby.  They put on evidence with respect to a -- two incidents when Mr. Fell was four years old.  You heard Ms. Rodriguez say we didn't contest those, and -- and that's what my

reading of the record reflects, is that they didn't contest those.

Instead, what they did was to say those incidents stopped when he was four.  As those incidents faded in time, the -- Mr. Fell got worse, and they said to the jury, Even if you find some evidence with respect to those incidents, you have to determine what weight to give them.  And they said to the jury, in their penalty summation, You should not give those incidents much, if any, weight.

That's where one of the many areas where trial counsel was -- trial counsels' deficient performance showed prejudice.  There was nothing that trial counsel gave on the other end of the scale that would have said, Here's the reason why this evidence is mitigating. Here's the reason why what happened early on, what happened in the middle of Mr. Fell's life, ties to the crime and mitigates the crime.

The law says that in a penalty phase, you have to investigate that if you -- particularly if you have got reasonable leads.  We've put in declarations that make it clear that trial counsel just cut short their -- their investigation.

The government's made a number of arguments about why there's not prejudice.  That is pragmatically the

stuff of a factual evidentiary hearing.  You should hear what our witnesses have to say.  You should hear what the government's witnesses have to say, and in that way, you can make a decision with respect to the Strickland prejudice prong.

THE COURT:  Well, some of the concerns I had about your pleading is that you actually argue that a lot of the individual factors that you claim to be ineffective justify unto themselves a determination of sufficient prejudice under Strickland to warrant a retrial on -- at least on the penalty phase and maybe -- with diminished capacity, maybe on the guilt phase.

And then when you -- but when you compare these individual circumstances -- for instance, they choose to consult with Dr. Mills.  Well, perhaps the best way of approaching a case in this particular situation would be to speak with a consulting expert who will tell you these are the experts who should explore fetal alcohol syndrome or these are the experts who should explore organic brain dysfunction.  But then you compare that particular failing with Supreme Court case law in which they have reversed some death penalty cases, there's a dramatic difference in scale between that kind of mistake, theoretically, or not exploring the way you really should do it as an expert, and the kinds of cases

which result in reversal.

And that's why I -- I thought your main focus was less individual instances of ineffective as opposed to the cumulative impact which may impact major decisions, like the mental disease and defect. And do you focus -- for you focusing on each of these individual themes as warranting, you know, retrial, does not seem to be consistent with the case law.

MR. LIMAN: Your Honor, our main claim is the cumulative prejudice, and that's supported by the case law in the Second Circuit. There's the Lindstadt case. Your Honor's also familiar with the way in which Sampson -- Sampson -- Sampson's treated it, which was as cumulative prejudice.

THE COURT: Right. But what's interesting about Sampson is actually -- Judge Wolf actually went through various claims, and in fact the government is suggesting that I do just that, go through various individual claims and, at least prior to issuing an order in regard to discovery, exclude that particular claim: That's not ineffective or that is not sufficiently prejudicial. That's what essentially Judge Wolf did at this hearing, although his hearing was three days long.

You don't want to stay here for three -- Vermont is

nice, but three days is --

I mean, he took three days --

MR. LIMAN:  Maybe on the fourth day.

THE COURT:  -- to go through this and then said, Well, all right, so ineffective-assistance-of-counsel claim in regard to this particular factual scenario, inappropriate, and excluded it.  If you are taking this position of each individually warranted -- each circumstance warranting reversal, then you are forcing the Court into a situation of doing just that, as opposed to, at this particular point, addressing the cumulative nature.

MR. LIMAN:  And that -- that's one of the many reasons why our focus is on the cumulative nature.  I would just highlight that as to -- it's not so easy, as I think your Honor's perceived, to break apart the individual claims.  For example, as your Honor knows, we have a claim with respect to the incident where there was a gun discharged when my client was 11 years old, shot a boy when he was 11 years old.

THE COURT:  Yeah, and Mr. Darrow's comment that it came within inches of his heart, and Eike's testimony as well, in a coma.

MR. LIMAN:  Right.  And if you -- if you put together -- one reason why I focused on the Gacek

evidence is that that evidence and that witness is a witness both with respect to Mr. Fell's remorse, which is a big part of the government's argument with respect to remorse, he is a witness with respect to another part of the government's argument in the failure to meet an aggravator when the government went in front of the jury and said, you know, Here's when it began.  It began with the shooting of Mr. -- Mr. Gacek, and here's when his -- the uncontrollable behavior began.

And it's also -- he and the other witnesses are witnesses with respect to the social conditions and the abuse that Mr. Fell suffered.  So you can't really break apart those pieces.

Same thing with respect to -- to Mr. Eike and the claim with respect to the beating.  There is tied up with that a claim, as you know, of prosecutorial misconduct.  There's a claim with respect to meeting the government's aggravating --

THE COURT:  I appreciate that, but you have got -- in Mr. Eike's case, just as an example, you have got Mr. Fell saying he put him in a coma.  You have got Teri Fell saying that he was put in a coma.  That's the evidence at that particular point.

You are suggesting that because the government actually got a hold of his records or spoke with

Mr. Eike -- obviously he spoke with Mr. Eike -- that they must have known that he was not in a coma and that they misrepresented the coma?

MR. LIMAN:  I have Mr. Eike saying to the government, "I did not tell them I was in a coma.  I told them I had a black eye."  I mean that's -- that's -- that's the evidence.  That's the declaration sworn under oath.

They then stood in front of the jury and they said he kicked him into a coma just like he went after Mrs. King three months later.  And it's just -- they said that not once, they said it twice, I think they said it three -- three times.  They were the ones who introduced it.

And trial counsel never -- trial counsel knew that Mr. Fell had made the statement about kicking Eike into a coma at least as early as December 2000.  They did not do the first thing to investigate whether that was true. They didn't attempt to talk to Mr. Eike.  They didn't attempt to get the hospital records.  They just essentially assumed that because their client said something, then they don't have any duty to investigate it.

That -- that's the deficient performance.  The prevailing norms say -- and this case should have been

obvious -- you've got a major incident that happens a couple of months before the crime and the government is clearly going to use it.  You should find out the facts and circumstances with respect to that event and figure out whether in fact it was an incident where the -- Mr. Eike had suffered serious harm or not.  They didn't do that.

Then the prejudice part is something that -- as to which the Court also should hear the evidence and have a hearing, and you can evaluate, you know, what would it have been like.  Could we have excluded the evidence?  Had we not been able to exclude the evidence, what would the jury have heard if in fact the evidence is that he had a fight when he was on drugs when -- when Mr. Eike was going after his -- his sister?  He knocked the guy down to the ground.  He may have passed out momentarily.  Not clear with respect to that.  Clear that he was responsive as soon as the -- the police arrived and the ambulance arrived, and clear that he walked out of the hospital that very same day.

THE COURT:  Well, all right.  I understand that representation of fact but I did not, I will tell you, did not read Mr. Eike's statement.  He told whom?  And this would have been just in advance of trial so there wouldn't be a 302.  He must have told an FBI

agent?  Is that what happened?

MR. LIMAN:  You will give me a moment, your Honor.  Let me grab it.  It was -- it was not actually in our motion because we didn't have the -- that evidence at the time we filed our motion.  It was submitted, I believe, in connection with our reply.

And what he says is, "The FBI were the only people who talked to me about Don's case before his trial.  I definitely did not tell the FBI or anybody that I had ever been in a coma or had any serious injuries due to the fight that night.  The FBI asked me about my injuries and I told them I just had a black eye and that was it."

Then he goes on to say, "During the fight, Don punched me and the other guy kicked me.  I told the -- the FBI how the fight went down and that Don had punched" -- give me a moment.

"Not kicked me."  So that's the Eike declaration.

THE COURT:  And in context is, this was in advance of trial.  The FBI agent was talking to him with the possibility that he may come over and testify; is that -- well, you wouldn't know that.

MR. LIMAN:  I don't know that.

THE COURT:  But at least this was right -- right before trial; is that right?

MR. LIMAN:  I think that that is an inference you could draw from the other records.  It's not in the Eike declaration itself.

THE COURT:  So there would not be a 302.  Okay.

MR. LIMAN:  I believe that's right, but I don't know.

THE COURT:  Well, speaking about 302s then, the interview with Mr. Bellantoni.  You made a representation in your pleading that you could pretty clearly show that his testimony was exculpatory in nature; that in fact he should be able to identify in some particular way who the aggressor was, who was not the aggressor.

The government has obviously made a factual argument here that there's no way to be able -- that Mr. Bellantoni could have said who the aggressor was, and so therefore there's nothing exculpatory about that, so that your claim about Mr. Bellantoni's interview with the FBI agent does not reveal exculpatory information because they can't tell who was who in the interview.

MR. LIMAN:  Your Honor, the government's argument essentially misses our point.  Our point is that had the defense had Mr. Bellantoni's statement, and had they talked to him, it would have been able to

corroborate Mr. Fell's statement, put together Mr. Fell's statement that there was an argument and that he was making the argument that they should let Mrs. King just go, and Mr. Lee was the one who said, No, she knows our names, she knows what we look like, we have to kill her.  Had the jury -- the jury heard that evidence from Mr. Fell, put in by the government, had they also heard the testimony with respect to -- by Mr. Bellantoni, it would have corroborated that that statement was true and that in fact it was Mr. Lee who was the aggressor here.

THE COURT:  So Mr. Bellantoni would be able to say that there was an argument, right?

MR. LIMAN:  Correct.

THE COURT:  Okay.  That's consistent with what Mr. Fell said.  But how would Mr. Bellantoni be able to say who was the aggressor?

MR. LIMAN:  Your Honor, I don't know that he would be able to do that.  I don't think he would -- he would be able to do that.  That would be an inference that the jury would draw if you put together what Mr. Bellantoni said --

THE COURT:  Oh, okay.

MR. LIMAN:  -- and what Mr. Fell --

THE COURT:  So it's corroborative only by

substantiating Mr. Fell's testimony that there was in fact an argument, but there's nothing else that could come out of his testimony which could place the onus on the -- being the aggressive one on Mr. Lee.

MR. LIMAN:  Well, that we know of so far out of Mr. Bellantoni's testimony.  Now, I don't want to say or be heard to suggest that that is the only evidence that would have come in that would have corroborated Mr. Fell's testimony that it was Mr. Lee who was the aggressor and Mr. Fell was the one who was more passive, because that -- I don't believe that that is the case, which is the reason why you need to look at this not piece by piece as the government suggests, but in a more holistic way.

THE COURT:  So by looking at it in a holistic way, I asked the government initially to focus in on cumulative nature of that ultimate -- of the evidence to support that ultimate decision made by defense counsel to waive the mental disease and defect -- not defense, but evidence, and to enter into the stipulation.

So why is that not, as the government suggests, a tactical decision, faced not only with the testimony of Dr. Welner, which could or could not have come in, but Dr. Wetzel as well, who could very well introduce the testimony about antisocial personality?

MR. LIMAN:  Two reasons, your Honor.  First, let me read to you and refer you to the relevant portions of the declarations before your Honor, sworn to under oath.

Number one, Miss Rodriguez did not know what Mr. Bunin had said.  She paraphrased it incorrectly, we believe.  If you refer to paragraph 51 of the Bunin declaration, what Mr. Bunin says is, "It was my belief that the Court required us to decide to put on the testimony of Dr. Cunningham before the Court would decide whether to allow testimony from Dr. Welner.  In retrospect, I now realize that I never asked the Court for a ruling about Dr. Welner's testimony before making a decision about whether Dr. Cunningham would testify.

"At the time I was also under the impression that the Court would not do anything to sanction the government for violating the Court's order, and that in order to prevent Dr. Welner from testifying, we had no choice but to withdraw our 12.2 notice and pull the testimony of our mental health experts.  The decision was a difficult one."

Mr. Volk -- your Honor remembered what Mr. Volk had said.  He was the third lawyer, I believe, that your Honor referred to.

Paragraph eight of his declaration, he says, "Until

the morning of July 7th, I expected that we would go forward with the Daubert hearing about the Welner report. I would have happily cross examined Dr. Welner, and I believe that we would have had very strong arguments for excluding Dr. Welner's testimony and his report.

"On the morning of July 7th, though, I learned from Gene Primomo that he and Alex Bunin had decided to pull the mental health evidence in the case instead of going forward with the Daubert challenge. I was not consulted about this decision and I strongly disagreed with it." If that doesn't raise a factual issue, I'm not sure what does.

With respect to the government's other argument that evidence with respect to antisocial personality disorder would have come in any way, and therefore it had to be a strategic decision, there are just two points I would make.

Number one, you can't have a strategic decision unless you have actually investigated. Number two, with respect to antisocial personality disorder specifically, I believe the statistics are something like 75 percent of the people in federal prison -- I may have it a little bit wrong. It may be the number's not 75 percent. It may be a little bit lower. It may also

include state prison, I'm not so sure. I can get that right for your Honor. But have antisocial personality disorder.

If a decision to -- if the fact that somebody had antisocial personality disorder was a basis for *per se*, without a hearing, excluding any evidence of ineffective assistance with respect to mental health, then you would never have a mental-health-ineffective-assistance claim in any event. And the Supreme Court might never have written its opinion in Ake against Oklahoma saying you have a right to get a mental health expert. Their argument simply at this stage reaches too far.

THE COURT: All right.

MR. LIMAN: Let me address, if I might, the issue with respect to selective prosecution.

You asked the government whether there were any cases in which discovery had been ordered against the government with respect to prosecutorial decision making when there's a claim like this of essentially making the decision on the basis of race or geography.

I believe that the government said no, it wasn't aware of any cases. There are three cases I want to cite to your Honor where district court judges did order discovery.

The first is U.S. versus Glover, G-L-O-V-E-R, 43 F.

Supp. Second, 1217. The second is U.S. against Llera Plaza, L-L-E-R-A P-L-A-Z-A, 181 F. Supp. Second, 414. And the third, which is a case of -- where I think the issue was the discriminatory bringing of claims with respect to drug charges, is U.S. against Tuitt, T-U-I-T-T, 68 F. Supp. Second, 4, from 1999.

The government said, in answer to one of your questions, that it had not asked the questions as to whether there would be evidence that would be relevant to the prosecutorial decision making here that would not be covered by the attorney/client privilege. Or put more positively, that it could not stand in front of your Honor and say that every piece of evidence that we had requested was covered by a privilege.

I think that should be sufficient in and of itself to follow the process that's ordinarily followed in a case where somebody has stated a claim, which is that we will serve a discovery request on --

THE COURT: But you have a requirement to meet a threshold. It's the nonfishing threshold.

MR. LIMAN: We do have that.

THE COURT: I appreciate the fact that there is a report at that particular point addressing the racial factor in decisions pursuing the death penalty. But aside from this particular report, what evidence do

you have out there to suggest that the Attorney General, who made this ultimate decision, used factors which were inappropriate:  race, gender, geography?

MR. LIMAN:  Your Honor, we believe we clearly have enough to permit there to be discovery in this case.  Among other things, we have the evidence which you don't see in most of the cases that -- where the court has considered issues with respect to discovery, that the question of whether the government should seek the death penalty in this case was something that was fully vetted by the U.S. Attorney's Office in this district.  The U.S. Attorney -- U.S. Attorney Parker made the decision not to seek the death penalty.  He would have been charged with consideration of all of the factors that the courts say go into prosecutorial --

THE COURT:  It's actually U.S. Attorney Hall who --

MR. LIMAN:  I'm sorry, U.S. Attorney Hall.

THE COURT:  -- who then took Federal Judge Parker's place on the Court of Appeals, so just to get your Hall and Parker straight.

MR. LIMAN:  I knew I was stumbling a little bit.

THE COURT:  Well, keep me posted, all right, when you are stumbling.  But anyway, just for purposes

of the record.

MR. LIMAN:  I think you have got the point. And we would proffer that at the same time -- this is not in our pleading, but that there were decisions made where there were multiple murders and an African-American defendant where the U.S. Attorney -- the Attorney General decided not to seek the death penalty.  And this was a highly unusual decision.

THE COURT:  Well, I appreciate it may have been unusual, but what you are suggesting then is discovery not only into this particular case but discovery into the deliberations -- the deliberative process of all other cases at that point because you want to be able to show, well, look, this is -- this is a case involving multiple murders by an African-American defendant.  They decide not to pursue the death penalty here.  Here, here we have a Caucasian man.  They pursue the death penalty here.

I mean, where -- where does the discovery end?  You go through all of the cases that they are deliberating about at that point?

I mean, what I was looking for was some factual information which goes beyond just the status of the record at this point -- that's the report itself -- to suggest that somebody said something which suggested

that they were going to pursue Caucasians as opposed to African-Americans during this particular juncture. That's all.

MR. LIMAN: Your Honor -- and that's -- that's exactly what, at this stage, we can't get through FOIA requests is, you know, what -- a statement by somebody saying that they wanted to have a Caucasian to even the balance and to be able to show Congress that the balance was even.

But, you know, what we are talking about here is decision to impose the death penalty. Decision to sentence somebody and to execute somebody. And where there is evidence that is put forward that that decision may have been made not because of the nature of the crime or because of the circumstances of the offense, but because of a desire to have balance, that's -- that's what I hear the government say, the desire to have balance, that's not the constitutionally valid reason to put somebody to death, and I think that's what we have pleaded here.

Now, with respect to the privilege, I also would highlight that we're talking about now decisions that were made 12 years ago, a long time ago, under different administration, where there's no continuing law enforcement interest. And to essentially assume that

the current Justice Department and the current Attorney General would assert a privilege, we submit it would be wrong.

There's deliberative process privilege.  There are processes the Justice Department has to go through in terms of the authorization coming from a high level. Counsel here does -- not the counsel that have that authority to make that decision.  They have not even asserted a privilege.  What they have said is it would be subject to a privilege.

We should be permitted to serve our discovery, have them -- have the Justice Department consider whether it wants to assert a privilege, have the Justice Department look into the documents.  If they decide that they want to assert a privilege, and if we're not able to work it out through a meet and confer, that would be the appropriate time, you know, with full briefing and considering particular documents to determine whether that privilege should be upheld.

THE COURT:  The three cases that you cite for exploring the motivation or the information the prosecutors had in making the decision, those -- were those death penalty cases or were those not?

MR. LIMAN:  Ah --

THE COURT:  In other words, was that an

investigation into the committee in the Justice Department, or in fact into the Main Justice, as opposed to decisions of individual prosecutors who, for some reason or another, were subject to criticism for being racially biased or using improper factors for some reason?

MR. LIMAN:  Your Honor --

THE COURT:  In other words --

MR. LIMAN:  -- two of the cases are death penalty cases.  I don't know, as I stand here, whether they were challenges to the decision at Main Justice or within the local U.S. Attorney's Office.  I could confer, if you want.

THE COURT:  You can look at those.  That's fine.

Okay.  And Miss Price want to --

Good morning.

MS. PRICE:  Good morning, your Honor.  I'm Cathleen Price.  I am addressing the juror claims.

I think it may be helpful to go through the claims.  They're different in ways that I think are -- respond to the government's asserted concerns in both their pleadings and today about whether or not 606(b) bars the Court's review of them.

We conducted a bunch of juror interviews -- none of

them have any all- -- there are no allegations in this record of improprieties around them -- and located several instances of actual juror misconduct:  Two instances of jurors failing to obviously report -- respond to questions on voir dire, two instances of extrinsic evidence, an additional incidence of some behavior with Juror 143 that we -- we raised two separate claims around, and they're different.

So as a threshold matter, 606(b) doesn't bar the Court's review of the two instances of failure to respond to voir dire questions.

Juror 162, we have submitted a signed declaration from her that she was -- she told us that she had been a victim of sexual abuse as a child.  This is not something she reported during voir dire.  It was responsive to a question that was put to her.

THE COURT:  But the actual question that was asked in voir dire was not so specific as to say were you subjected to abuse, sexual abuse, as a child.  The question was, Were you ever the victim of any criminal act --

MS. PRICE:  Right.

THE COURT:  -- or criminal conduct?  Right? The government responds in its pleadings, well, somebody could be confused.  I mean, you are a child, you are

being subjected to sexual abuse.  Does that necessarily translate to "I am a victim of a crime," and if it doesn't, if she is actually confused about that, that doesn't show that she is misrepresenting anything, does it?

MS. PRICE:  Well, that was further inquiry. The record suggests that she may have -- that she did understand that what happened to her was a crime because of a separate place on her jury questionnaire she notes having watched the Michael Jackson trial, which was a trial about sexual molestation.  He was being prosecuted for seven counts of molestation.

It's -- the Court -- the government has asserted that she may have been confused, but they -- that's not -- at this stage of Rule 4, we don't know that she was confused.  The evidence suggests that -- that it was responsive and that she didn't respond.

The Michael Jackson trial -- we don't know the details of her sexual abuse but we do know that sexual abuse is a crime.

THE COURT:  Okay.  So let's say that -- that obviously she was not being accurate in responding to her being a victim of sexual abuse, a victim of a criminal crime.  Then the question is whether there's some sort of prejudicial impact on that.  And then to

find out if there's some prejudicial impact, you actually have to get into her deliberative process.  You actually have to try to say, well, did the fact that there was evidence of sexual abuse in this particular case -- and I think what she said in the -- in her affidavit is, Well, you know, I was abused for years and, you know, I am not a murderer.  Does that impact her deliberative process?

At that point do you have the right to ask the question, How did this impact your deliberative process?

MS. PRICE:  I actually think that the -- the question of whether it would have biased -- it would have caused bias is not assessed by whether it actually impacted her deliberative process.  This is a question that would have been asked at voir dire.  So you would be assessing whether her responses at voir dire would give rise to an inference of bias or actual bias.

So she -- the statement that we -- the statement that "I was sexually abused and didn't turn me into a murderer" suggests that she may not have been able to consider the evidence that was going to be presented in mitigation.

We are not asserting that that was a function of her deliberative process.  She actually says in her declaration that she wasn't -- she -- she did not go

into her deliberative process during --

THE COURT: Okay, so what you are basically saying is that her -- I mean, the role of this information, the impact of this information on the deliberative process is irrelevant. What you are suggesting is that, based upon the answer, one can conclude that reasonably it could very well have impacted her judgment so that you don't have to deliberate -- you don't have to get into the deliberations of the jury to basically substantiate prejudice; is that right?

MS. PRICE: Exactly. 606(b) does not apply to -- to these types of juror misconduct claims. It's not provoked. The bias question is not resolved by the actual deliberative process. And Sampson is actually a good case of that respect. Another one is Williams V Taylor, which is a Supreme Court case on juror misconduct. The juror failed to report having a relationship with some -- I think it was a prosecutor, actually. And the bias question isn't about the deliberative process; it's about whether the bias would have given rise to a challenge for cause.

THE COURT: All right. So basically you don't have to actually ask how this impacted your deliberation or your verdict. You just merely have to get the impact

of what a reasonable person would believe given that particular circumstance.

MS. PRICE:  Yes.

THE COURT:  Is that right?

MS. PRICE:  Yes.  And that's also true for our other allegation -- allegations about failure to respond correctly on voir dire with respect to Juror 26, who failed to report prior convictions and failed to report that he had been exposed to news reports about the co-defendant's suicide.

So we don't -- our position is 606(b) does not -- is just not apposite for the Court's review of those claims.

The next category is extrinsic evidence, and that -- that category of juror misconduct claim is expressly excluded from 606(b)'s bar in 606(b)(2), which says that a juror can testify to -- I don't have the rule in front of me, but can testify to outside or improper influence.

Extrinsic evidence claims are classic juror misconduct claims.  When jurors -- they get exposed to media.  They get exposed to other things.  Here, the juror went and traveled to the crime scene.  It's not an uncommon juror misconduct claim.  Um --

THE COURT:  That is not uncommon?

MS. PRICE:  Well, juror misconduct claims are uncommon, but it's the sort of thing that jurors do. The claims are not -- they're not -- it's not a frequent kind of post-conviction claim, but --

THE COURT:  Can you tell me the timing of when this trip occurred?

MS. PRICE:  According to his declaration, he went to the -- he just said during the trial.  That's what he said, he went to Rutland during the trial, and that's --

THE COURT:  And then what did he do there?

MS. PRICE:  He said he -- I'll get the declaration.  He, um, was inter- -- he looked at --

THE COURT:  Didn't he walk the --

MS. PRICE:  Well, he didn't say he walked.  He said he traveled -- he went to the home at one -- at the home where the Fells were living.  He went from the home to the Price Chopper, where Mrs. King was abducted.  And he inspected the lighting and he checked out the neighborhood.  That's what he said he did there.

THE COURT:  And what about the throwing of the knife?  I couldn't understand what the point of the --

MS. PRICE:  He said he -- there was a dumpster --

THE COURT:  I mean, the two knives are

obviously found in the house, were they not?

MS. PRICE:  Yes.

THE COURT:  And then he makes some comment about knives and dumpsters, and I didn't quite understand that.

MS. PRICE:  Yeah, he says in his declaration that he thought the knives might have been thrown away into the dumpster.  I don't -- the knives were obviously not thrown into the dumpster, so I -- there -- he -- I don't think he wit- -- he didn't say anything about getting into the dumpster.  But that's -- we don't -- we don't make any allegation of juror misconduct claim arising out of that statement.

THE COURT:  All right.  And to what extent do you have evidence to suggest that he shared this with -- shared his investigation with others?

MS. PRICE:  He said he did.  And that's in the declaration as well.

THE COURT:  And do you know when?

MS. PRICE:  No.  We don't know when.  I don't know that that changes the claim, but -- but we don't know when he did.

THE COURT:  Why doesn't that change the claim?

MS. PRICE:  Um, because exposure to extraneous evidence doesn't -- the prejudice of that doesn't turn

on whether it happened before the jurors went into deliberations or after.  Extraneous evidence can compromise the -- the validity of a verdict which is supposed to be returned only on the evidence that comes from the courtroom and from the documents admitted and the witness testimony.

THE COURT:  Well, true.  Well, just -- just following up on that.  I mean, every morning, as you know, I said, Have learned anything about this case from outside the courtroom, conducted your own investigation, talked about this with anyone?  And every day people said no.  So, if in fact he had told other jurors about this particular evidence, then what you are suggesting is that the jurors were talking about the case in the first place, and the second, they were communicating among themselves about evidence found outside of the courtroom.

MS. PRICE:  (Nods head.)

THE COURT:  Right.  That changes the nature of the claim --

MS. PRICE:  Well, that --

THE COURT:  -- I would think.  Wouldn't it?

MS. PRICE:  That might be an additional juror misconduct claim.  Premature deliberations is a different kind of misconduct claim, but what it would do

here is bear on the question of whether the extrinsic evidence was prejudicial.  The Court's inquiry into that would be to determine whether a typical juror would be affected by the extrinsic evidence, whether it would bear on a matter that was actually the subject -- should have been the subject of deliberations so that -- it was a matter in issue in trial, um, those sorts of inquiries.  Had there been discussion of the -- sort of an extensive discussion of the extrinsic evidence, it would bear on that part of the analysis.

THE COURT:  Okay.  I thought there was also some indication that this juror went out to the scene in New York.

MS. PRICE:  Yes.  According to the declaration, he went to the scene in New York after the trial.

THE COURT:  Oh, all right.  Okay.

MS. PRICE:  So, that -- I mean, he may have still be curious, but it was never mentioned.

THE COURT:  All right.  Okay.  All right?

MS. PRICE:  Okay.  So 606(b) doesn't bar either of those claims.

We have another juror misconduct claim with respect to that same juror, 143, that does involve behavior within the deliberation room and the shotgun that was

admitted into evidence.  And we have alleged two separate juror misconduct claims there.  One, that the verdict may have resulted from intimidation, and a second, that the -- that the behavior may have given rise to the type of improper experiment that generates extrinsic evidence.  So the extrinsic evidence claim would not -- would be excluded from the 606(b) bar.

The intimidation claim is a little bit different. 60 -- the question of whether a verdict -- well, the question of whether -- whether a verdict was reached at the -- at the -- as -- because of intimidation would require a consideration of whether a juror's deliberations would be impacted.

In the Second Circuit, we have Anderson versus Miller, which we cite in our motion and in our reply, which suggests that certain kinds of very grave corruption of the deliberation process would -- would not be immunized by 606(b), including intimidation and threat and coercion.  So our position is that 606(b) doesn't block the Court's inquiry into that either.

THE COURT:  So what does that -- what does that practically speaking mean?  Does that mean you get the whole jury in to be questioned about whether this incident happened?  And if so, did it have any impact on the deliberative process?  Is that -- is that what you

are suggesting?

MS. PRICE:  Well, I don't think that's -- we don't think that's necessary, your Honor.  We think if you could establish -- well, if you -- we think this juror would need to be examined and perhaps you could establish what happened from that examination.

In Anderson, the question of whether -- it's sort of an objective question.  It's an objective question of whether a reasonable juror would feel threatened in the wake of the behavior, if someone's standing in the -- the target shoes would feel -- would feel threatened.

So you may not have to call in the whole jury for that, and at this time we wouldn't -- we don't necessarily see the need to summon each juror.

THE COURT:  Well, that's interesting because to be able to analyze whether in fact a reasonable juror would be impacted, you would have to actually get into the deliberative process.  You would actually have to know what the person who theoretically was holding the gun was saying, what was the circumstances surrounding this particular incident.  That gets you right into the middle of the deliberative process.

But then you say that there essentially is a waiver when you have this kind of coercive deliberative process.  Is that right?

MS. PRICE:  Well, the client's Sixth Amendment right, the defendant's Sixth Amendment rights are not -- they're not blocked by 606(b) because of the gravity of the potential -- the potential corruption of the verdict.  But that's -- can I back up a second?

THE COURT:  Sure.

MS. PRICE:  I don't -- I -- we don't necessarily think that you would have to get into the deliberative process.  What -- you'd first have to establish what happened.  The question of whether a person would feel threatened when that happened to them does not require you to ask an individual juror, Were you threatened?  It's whether a reasonable person would be threatened if one of their -- one of -- another juror held a gun at their head.  And I do think you would have to ask what exactly happened, what were the circumstances, what was said.  But that's not the deliberative process.  That's -- those are just the facts of what happened.

THE COURT:  Okay.  It's a fuzzy line.

MS. PRICE:  It's a fuzzy line.

THE COURT:  Right.  Okay.

MS. PRICE:  The government didn't speak to this today but their papers asserted a procedural defense that I wanted to respond to and address any

questions the Court had.

None of these claims are defaulted. The facts that give rise to these claims were not known to trial counsel at the time of trial, they weren't known before the conviction was final and, therefore, they're totally cognizable in post conviction.

THE COURT: Okay. All right? Thank you.

MS. PRICE: Thank you.

THE COURT: Any just brief response to -- till noon, and we'll take a break?

MS. RODRIGUEZ-COSS: Yes, sir.

To take up the very last issue first, there's no fuzzy line about it. They asked the jurors about their deliberative process. That's -- that's clear. The incident about the shotgun revolved specifically around one juror proposing a mitigating factor. And she proposed that the fact that the shotgun that Fell used to kidnap and carjack Terry King was not loaded perhaps should be a mitigating factor.

And in response to her proposed argument on behalf of that additional mitigating factor, a juror picked up the shotgun that was in evidence, had been admitted, was an exhibit, and was in the jury room, and said -- and pointed it at her, and she squirmed, according to the papers that the defense has submitted. And he said,

"See?  You knew this shotgun wasn't loaded and you still squirmed.  And so can you imagine how Terry King would have felt?"

If that is not the deliberative process of the jurors, your Honor, I don't know what is.

THE COURT:  But what -- what do you say to the argument that if in the deliberative process there becomes outrageous coercion; does -- is a court powerless to explore that?

MS. RODRIGUEZ-COSS:  I don't think the Court is completely powerless to explore.  What I think should not happen is the type of fishing expedition that clearly happened in this case.

If -- if a -- this is a jury that served.  This is a jury that rendered a verdict in writing, that signed that verdict, and that was polled.  This Court polled this jury and said, Is that your verdict?  Yes, that's my verdict.

And so after that, there is no allegation, no allegation by the defense that any of these 12 jurors came forward and said, You know what?  I -- I was coerced into rendering my verdict.  Someone pointed a gun at me and I was coerced, and that's not really my verdict.

That didn't happen in this case.  Nothing close to

that happened in this case.  They simply elected to interview this juror, *ex parte*, off the record, and she revealed her deliberative process, and in -- in revealing to them her consideration of a potential mitigating factor, revealed conduct by another juror that doesn't come close to intimidation or coercion or threat.

THE COURT:  But what about -- what about the juror who said he went to Rutland, conducted his own investigation, went to the house, made observations of the house, made observations of the lighting at the Price Chopper and also the distance between the house and the Price Chopper, et cetera?  You are saying that because they started the interview with invading the deliberative process, that any misconduct by any juror becomes irrelevant, becomes something that they cannot -- the Court cannot explore or --

MS. RODRIGUEZ-COSS:  I think what the -- I think what the cases clearly say is if to establish your claim -- this is what Rule 606(b) says:  If to establish your claim you have to solicit juror testimony regarding the deliberative process, that's barred.  You can -- you cannot use -- a juror cannot testify as to his or her deliberative process.

THE COURT:  But going to Rutland and

conducting an investigation is not the deliberative process. Now they have information that this apparently may or may not have happened, but they think it's happened. That's not a deliberative process.

What you are saying is because they learned that by first asking about the deliberative process and then this person says, Oh, by the way, I went down to Rutland and I conducted this own investigation, that is excluded for some particular reason. And I --

MS. RODRIGUEZ-COSS: That's our initial argument. And in the second instance, your Honor, if the Court is going to consider that information, our argument is that it's harmless anyway because it was covered by the evidence presented in the case.

THE COURT: Okay. So it's harmless because it's covered. Photographs. Obviously he has impressions. So then what you are saying is it's harmless also because you can't ask him the question about did the -- did the -- your evaluation of the lighting at the -- at the Price Chopper, or your assessment that the house seemed to be of normal middle-class quality, et cetera, you can't ask that because that's part of the deliberative process?

MS. RODRIGUEZ-COSS: I think that's correct, your Honor. But I -- but I think the Juror 143 actually

answers that in his response when he states -- he or she, I'm not sure if it's he or she, states, There was not -- quote, There was not a lot of disagreement about guilt. There was no doubt that he did it.

So -- so if the Court is wondering whether he -- this -- this additional information that he observed affected his verdict, I think he has already answered that.

THE COURT: Well, but that's on guilt phase. That's not on the penalty phase. And whether the way this crime was committed impacts the penalty phase is pretty clear. I mean, that's highly relevant.

MS. RODRIGUEZ-COSS: Well, I would be hard-pressed to -- to conclude that observing a building from the outside and observing a parking lot was somehow central to a juror's decision whether to sentence Donald Fell to death or not on this record, your Honor.

THE COURT: Can I ask you a broader question?

MS. RODRIGUEZ-COSS: You can ask any question you want.

THE COURT: Oh, thanks. Appreciate that. Yeah.

You know, I have been a judge for 17 years, 18 years, going on 18 years, and we're looking for precedent of death penalty related cases in the First or

Second Circuit over the past 20 years or so that have actually obviously resulted in a death verdict, affirmed by the Court of Appeals, and are back on 2250 -- 55 petitions, and I can't find any.

MS. RODRIGUEZ-COSS:  I believe in the First Circuit, Sampson is the first.

THE COURT:  Well, that's on -- that's now been theoretically vacated by Judge Wolf.  And is this the only death penalty case that has gone through verdict and affirmed by the circuit in all of the First or Second Circuit?

I mean, just thinking about discovery and trying to figure out how you organize discovery and how you go forward in this whole process.  I haven't been able to find any other death verdicts in the First or Second Circuit in 20 years.  And is that right?

MS. RODRIGUEZ-COSS:  In the Second Circuit, your Honor, I believe Fell is the only one to have been confirmed on appeal.

THE COURT:  Judge Garaufis had one reversed I know.

MS. RODRIGUEZ-COSS:  There was -- there is a recent district court verdict for death in Connecticut.

THE COURT:  In Connecticut, right.

MS. RODRIGUEZ-COSS:  But that has not yet

gone --

THE COURT:  Judge Arterton.  But that obviously hasn't gone up.  Is there any others?  Or the First Circuit?

MS. RODRIGUEZ-COSS:  Not that I am aware of, your Honor.

But can we just address very quickly, before lunch, very quickly, one argument by -- by counsel.

The information with regards to Juror 26 and his prior conviction, we do stand by our objection that they have not shown cause as to why that was not learned earlier in these proceedings.

With regards to the discrimination allegation against the Department of Justice, it's barred several times.  It was never raised before the district court.  It was never raised on appeal.  It's being raised for the first time --

THE COURT:  Well, do you know those three cases that Mr. Liman just referred to?

MS. RODRIGUEZ-COSS:  Well, I know -- I am familiar with the Llera Plaza case, but I --

THE COURT:  And did that --

MS. RODRIGUEZ-COSS:  But I know that it was denied.  I'd have to go back and look at the record and see whether there was any discovery prior to the court's

decision.

THE COURT: I am interested to know if there's any discovery into the deliberative process. I mean, I, earlier on -- I mean, I thought I dealt with this and denied it, but if there's any discovery, and if so, what is the scope of the discovery? Does that mean that you can explore every decision made by the Ashcroft Attorney General's Office at that point to try to put this in context to show that, you know, they all of a sudden were making sure that there were plenty of white defendants who were facing the death penalty? What are the limits on discovery?

MS. RODRIGUEZ-COSS: I'll look closely at those cases, your Honor, but I don't believe that the defendant here, were he to get over the incredible obstacle of not having raised this claim before, which we are not waiving by addressing his arguments here in oral argument, I think he has not met the threshold for -- for discovery. He has to assert specific information indicating that the decision to seek the death penalty against Donald Fell was based on race, gender or some other prohibited basis. I think --

THE COURT: That's --

MS. RODRIGUEZ-COSS: -- the Court perhaps may be thinking of United States versus Jacques where the

Court recently entertained a similar argument --

THE COURT: Oh.

MS. RODRIGUEZ-COSS: -- and denied it in United States versus Jacques.

THE COURT: Okay. Right.

MS. RODRIGUEZ-COSS: That might be --

So, very briefly, your Honor, if we could go back to some of the points raised by Mr. -- by Mr. Liman that there is an FBI 302 which, to the best of my knowledge, the defense has, on the interview of Christopher Eike, and --

THE COURT: Is this right before trial?

MS. RODRIGUEZ-COSS: June --

THE COURT: He was going to testify.

MS. RODRIGUEZ-COSS: Investigation on June 15th, 2005. I don't know that he was going to testify, your Honor. I think an important point for the Court to consider here is that we did not rely on this evidence in aggravation. Mr. Liman alludes to that here. I don't know how. We did not introduce this evidence in aggravation. Neither the Gacek assault or the Eike assault were part of the United States' case-in-chief in aggravation.

The jury first learns of the Gacek assault through the mitigation binder and the hospital records submitted

by the defense, and they first learn of the Eike assault through the cross examination of Teri Fell.

THE COURT:  Right.  So the -- what happened was Teri Fell was testifying.  To impeach her testimony, the cross examination by the government asked specifically about this assault:  And didn't it happen -- wasn't he placed in a coma?  And she said, Yes, he was in a coma be- -- and --

MS. RODRIGUEZ-COSS:  Well --

THE COURT:  Et cetera.

MS. RODRIGUEZ-COSS:  Well, we -- I don't know that it was necessarily to impeach her testimony as it was to show that in his later years, Fell had become increasingly violent.  And the question posed by Mr. Darrow on cross examination was, Have you seen your brother violently kick someone?  And she eventually says, Yes.  And she describes the assault.  The first characterization of having placed Mr. Eike in a coma came first from -- from Fell himself during his confessions which were already in evidence.

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  And subsequently, Teri Fell says, Yes, he kicked him until he was in -- in a coma.  The point being, your Honor, he kicked him repeatedly until he was in a deep state of conscious --

of unconsciousness, and according to the dictionary, when I looked up the word "coma," that's what it is. It's a deep state of unconsciousness.

And in his interview with -- with the FBI, he says that he passed out around this time, and when he regained conscious, he was in an ambulance and recalls somebody treating him say that he had brought him back. And so Eike was under the belief that he had died and was resuscitated.

If you go back to the report of the first person to respond to the scene, that person finds him unconscious and unresponsive. How long had he been unconscious and unresponsive before that medical responder got there, we don't know and it's not established by the record, but what is clear is that he was unconscious and unresponsive, and he starts with the oxygen mask and with all the other first aid tools that he has at his disposal. And once they have him inside the ambulance, they are able to bring him back to be able to at least say something.

So, was he in a deep state of unconsciousness? I think so. So, in -- Teri Fell corroborates that. And Donald Fell himself in his confession says he kicked him repeatedly.

THE COURT: The representation is -- made by

the defense is that there clearly -- there's testimony about the coma, and what they're essentially saying is that there's somebody that must have interviewed Mr. Eike who said, oh, no -- well, Mr. Eike said he only had a black eye, in which case they are trying to say that in the summation that Mr. Darrow made -- I think it was part of Mr. Darrow's summation -- put him in a coma. And that, they're saying, is a knowing misrepresentation.

If there is no other reports out there, no other information to Mr. Darrow, then you have responded to that, that is, he has got -- he has got a report which you actually gave to them, in particular, which says that he was knocked unconscious. So --

MS. RODRIGUEZ-COSS: He was knocked unconscious.

THE COURT: Right. Assuming there's no other information to suggest that Mr. -- Mr. Darrow knew that he was only -- he only had a black eye. So --

MS. RODRIGUEZ-COSS: Right. So the other point that we wanted to make before closing prior to lunch, your Honor, is that -- and we were stricken by some of the arguments by Mr. Liman, is, their burden is not just to come forward and say, Oh, you know, he only spent two hours with Teri Fell. He only met three times

with Teri Fell.  Mitigation specialist only spent five hours.  And I am using times in the abstract.  I am not using accurate times.

I am trying to make a point.  And the point is, you know, that's fine, but they bear the burden of coming forward and saying what other information they would have placed before the jury, what else.

You know, assuming he did spend only three hours preparing her for trial, the question is, did he effectively, through her testimony, convey Donald -- paint a picture for the jury of Donald Fell's childhood?  And that's an objective evaluation by the Court.  It's nothing to do with what trial counsel was thinking or how the witness felt that she was perhaps neglected throughout the procedures.  It's an objective evaluation of her testimony presented before the jury.

THE COURT:  Well, I appreciate that.  I think you are correct, if you were actually picking apart the various bases of what I -- appear -- of what seems to me to be a cumulative argument here in regard to ineffective assistance of counsel, in which case they don't need to meet an evidentiary burden as to each one of them, they all become -- they all become relevant, right?

MS. RODRIGUEZ-COSS:  Right.  And with regards

to that point, and I have heard the Court say that repeatedly throughout -- throughout this morning, and our point would be --

THE COURT:  I have been dupli- -- dupli -- duplicitous?

MS. RODRIGUEZ-COSS:  Duplicitous.

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  I think our point is that the Court necessarily has to undergo an individual analysis first, because if the Court is later on going to determine what errors it's going to place on that balance, to then decide whether the effective -- the cumulative effect of those errors caused prejudice, then -- then which errors go on that balance?  Certainly not claims that were not error.

And so I think the Court has to engage in an individual analysis of each claim --

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  -- and decide, well, you know what?  This was completely reasonable.  This doesn't go on the balance.  This one doesn't appear to me to be unreasonable.  This goes on the balance.

To then say, okay, here I have these X number of -- of actions by the trial counsel which I deem to have been unreasonable, individually they don't appear to

have caused the defendant prejudice, I am now going to consider whether, cumulative, they result in prejudice.

THE COURT:  Oh, well, with that --

MS. RODRIGUEZ-COSS:  It would be unfair to place --

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  Not establish errors on that balance.

THE COURT:  Well, I -- with that, I may agree. To be able to actually make a determination of the cumulative, you need -- in fact, you need to -- actually, even to make a determination in the individual allegations of misconduct, you need to be able to see the whole thing in context.  I mean, this is not like taking things separate and apart and just looking at them outside the context of the trial and saying this is ineffective or this is not.

The way you do that is you look at the entire conduct of a trial and then you, in that context, can be able to assess how this particular act fits into the conduct of the lawyer.  You know, I -- so I agree with you to some extent that you have to actually say, well, this is -- this unto itself is not ineffective, but that does not mean that you don't make that assessment in the context of the entire trial.  That's what I meant --

MS. RODRIGUEZ-COSS:  Okay.

THE COURT:  -- duplicitously --

MS. RODRIGUEZ-COSS:  Throughout the morning.

THE COURT:  Yeah, throughout the morning.
Right.

MS. RODRIGUEZ-COSS:  All right.  I guess the last thing that I would say then in regards to that, your Honor, is that we do -- and perhaps this is what the Court is going to address after lunch, is that with regards to some of those individual claims, we certainly understand that no further discovery is warranted before the Court can properly consider them in the context of the --

THE COURT:  Well, I wasn't actually going to address that.  That's going to come out in an opinion. I am going to draft an opinion based upon the arguments today.

What I wanted to do in the afternoon was then address discovery:  How do you conduct discovery in a case like this?  And the reason that I asked you the question about whether there's other cases in this circuit, as well as the First Circuit, is whether there are any examples, prototypes, about how you do this, and apparently there isn't.  So, I -- I mean there is to some extent, and we will talk about Judge Wolf and the

juror misconduct approach that he took, but this seems to be casting on -- well, I will forget the analogy. So.  All right.

MR. LIMAN:  Your Honor, I just wanted to give the Court a citation.

THE COURT:  Okay.

MR. LIMAN:  We referred to the Eike declaration.  That is Exhibit 314, and it was submitted with our reply.  It was not submitted with the motion.

THE COURT:  Okay.  And I will take the matter under advisement, and really appreciate the argument.

And let's -- this afternoon, we will start at 1:15, and we will go through discovery, and assuming that the defense can go forward with, in particular, the ineffective-assistance-of-counsel claim, how discovery is to be organized, et cetera.

So, okay.  Thank you.

(Court was in recess at 12:13 p.m.)

(The following was held in open court at 1:21 p.m.)

THE COURT:  Okay, good afternoon.

MR. DARROW:  Good afternoon, your Honor.

THE COURT:  All right, this is a continuation of the motions hearing.  There's been a request filed by petitioner for discovery and, in particular, various items of discovery have been requested.  All of these

relate, I believe -- well, actually they relate to a number of issues but primarily to the ineffective-assistance-of-counsel claim, although there is a request for discovery of materials held by the Department of Justice regarding the decision to pursue the death penalty.

The government has responded by suggesting that a lot of this material has already been given to the defense.  So I wonder if we could start the discovery discussion with what remains outstanding.

Okay, Mr. Liman, are you going to do that?

MR. LIMAN:  I can, your Honor, if you give me a moment just to get my notes.

THE COURT:  And just to set the stage for this discussion, of course the Court has taken under advisement the request for dismissal of various claims raised by the defense, the motion being raised by the government, but this is subject to continuation of the case in regard to prosecutorial misconduct, in particular, and in ineffective assistance of counsel.

I have just been told that people in the audience, and in the courtroom, are having difficulty hearing, so I guess I'd ask that counsel speak right into the microphone.

MR. LIMAN:  Your Honor, what -- I think this

is responsive to -- I think is responsive to your question, but what I am prepared to do is to take you through what the government represented in its papers it either was -- had done or was prepared to do and where we stand with respect to it.

THE COURT:  Okay.

MR. LIMAN:  So the -- the government indicated that it had provided forensic evidence in connection with the Vermont, New York and Alabama scenes, documents referenced in the 2001 FBI report on Mr. Fell and Mr. Lee, and background investigation materials with respect to Mr. Lee.

Some of these documents have been received from the U.S. Attorney's Office, and we have had the opportunity to -- to view the physical evidence.  We have one particular item that we don't have.  It has to do with Mr. Bellantoni.

In the opposition to the 2255 motion, the government stated that their -- stated that the separate FBI report did not contain any more information than the New York State Police report.  And seemed to indicate this is at the opposition --

THE COURT:  I actually thought their position was that the FBI agent spoke with Mr. Bellantoni in advance of trial, that no report was made so that they

really have no report to disclose to you, and I thought that's what they said in their responsive pleading, but that's not correct?

MR. LIMAN:  Your Honor, they did say that in their discovery opposition.  They said there is no additional report to produce.

THE COURT:  Right.

MR. LIMAN:  Then in their opposition to the 2255 motion and their suggestion that that be dismissed, they made a different statement that there was a report but it did not contain any more information than the New York State Police report.  That's at page 241, note 46. We don't know which is true.

THE COURT:  Okay.

MR. LIMAN:  And we have not been given -- to the extent that there are notes or a separate report or jottings or anything like that, we have not been given that.

We have -- we have seen some of the physical evidence available, including the trial exhibits and evidence recovered by the Rutland police, but we have not seen evidence from the New York crime scene or from Clarksville.  And we are still missing some lab reports and analysis from the Vermont medical examiner's office.

THE COURT:  All right.  So essentially what

the government has done is given you a number of items. You have some debate as to whether or not they have given you everything.  Maybe the best thing to do would be to sit down with the government and find out where these other things are.

MR. LIMAN:  Your Honor, I think that's right. The only other thing that we would -- we would ask is that when the government make a -- makes a representation to us, it make it in a form that is understood to be governed by the Federal Rules of Civil Procedure, and the reason why I ask that is twofold.

First of all, what -- we would want to make sure that it is accompanied by the requirements of the rule that diligent search be done and that there be a standard against which it's raised.

And second, in the event that the Court ultimately determines to deny Mr. Fell's motion, and in the event -- in that event, if evidence turns up that the government knew that it had but failed to turn over, we would want to be able to use Rule 60 in order to -- for there to be a consequence for the failure to turn over evidence.  Not hoping that there's -- hoping that there's nothing like that in this case, but just that there's an orderly set of  --

THE COURT:  So how about the 302s of

interviews conducted by the FBI in the presence of Dr. Welner?  I thought that was already being given to you -- well, actually being given to previous trial counsel, but do you have those?

MR. LIMAN:  I don't -- we do not have those.

THE COURT:  Okay.

MR. LIMAN:  Those have not been -- those have not been produced to us.  If there is -- we have received some -- on the prison records, we have received some information and some documents from the marshals and the Vermont Department of Corrections and the Bureau of Prisons, but much of it is redacted, so we have not received unredacted copies of prison records.

THE COURT:  Well, as far as the Department of Corrections records, I think the government has indicated that they never were in possession of those, in particular, in relationship to Officer Pelkey, and as a result, you have subpoenaed those records from the department.

MR. LIMAN:  We are seeking leave to serve a subpoena, your Honor.  We are not --

THE COURT:  You have not subpoenaed them yet?

MR. LIMAN:  We don't have the right to serve a subpoena until --

THE COURT:  Okay.

MR. LIMAN:  -- you give us the authority.

THE COURT:  Okay.

MR. LIMAN:  And that's -- that's what that appendix in our motion is directed to.

THE COURT:  Oh, all right.

MR. LIMAN:  So --

THE COURT:  Okay.

MR. LIMAN:  So it will give us the authority.

I think those are the main categories of documents, leaving aside the evidence with respect to how the prosecutorial decision was made, which I am prepared to address.

THE COURT:  Okay.  So let me just go through a couple of areas that you had raised before.

Documents in relationship to the Eike assault. Documents related to the Gacek shooting.  Obviously Officer Pelkey we have already talked about.  I have raised the Welner statements and you don't have those yet.  You have everything in regard to the preliminary investigation with Mr. Lee; is that right?

MR. LIMAN:  We have what the government claims is everything with respect to it.

THE COURT:  Okay.

MR. LIMAN:  And we don't know if there are additional documents.

THE COURT:  And you do have the forensic exam- -- forensic reports regarding the New York crime scene; is that right?

MR. LIMAN:  We do not have forensics for the New York crime scene or for Clarksville.

THE COURT:  Okay.  But you do then have the Rutland crime scene?

MR. LIMAN:  Do you mind if I have my colleague, who --

THE COURT:  No.  That's fine.

MS. SANTILLO:  My name is Kristin Santillo --

THE COURT:  Okay.

MS. SANTILLO:  -- on behalf of Mr. Fell.

We have seen the evidence that it was in the Rutland police dep- -- or in the possession of the Rutland Police Department.  There have been some items that were turned over to the FBI from the Rutland police, and it's not clear that we have seen everything in those documents.  But for the most part, we have seen all of the evidence that is still housed at the Rutland Police Department

THE COURT:  Oh, all right.  So -- but you still haven't gotten the Clarksville information?

MS. SANTILLO:  No.  There are some items that we specifically know that we haven't seen, including

crack pipes that were found in the car that we'd like to examine.

THE COURT: Right. And how about the forensic examinations of the mother, Debra Fell, and Mr. Conroy?

MS. SANTILLO: We have the autopsy report from the Vermont medical examiner's office, but we don't have a whole lot of the documentation that is underlying the autopsy reports, including toxicology reports and other information about the -- sort of the backup to the autopsy reports.

THE COURT: Okay. All right? And putting aside the Department of Justice materials, the Social Security filings, you don't have anything in regard to Social Security. The government said they didn't have anything.

MS. SANTILLO: We have made inquiries into whether or not there are documents available regarding disability with which Mr. Fell was diagnosed when he was a child. We have discov- -- we have evidence in our files that shows that Mr. Darrow did request those Social Security records. The government has made a representation that they don't have any in their possession but we don't have any confirmation that that's the case.

THE COURT: Okay. All right. So then the

concern, as I understand it, that you have relates to, number one, whether in fact there is a Bellantoni report of an interview just prior to trial; not the New York State Police report, but the FBI report.  Second, the 302 examinations by Dr. Welner in the presence of an FBI agent.  You are seeking prison -- you are seeking the request to get the prison records directly from the Department of Corrections.

MS. SANTILLO:  Yes, and there were documents that were in the U.S. Marshal Service's possession which we believed could be imputed to the government.  They have said that they were only in the possession of the Department of Corrections but the parallel documents were also within the U.S. Marshal records.

THE COURT:  Okay.  All right.  Is there -- aside from the dentist that's upstairs, is there anything --

MS. SANTILLO:  I just wanted to address the Lee documents as well.

THE COURT:  Yes.

MS. SANTILLO:  The government has represented that they turned over a full back- -- their full background investigation into Mr. Lee in 2001, but we have evidence, including on the face of the Welner report, that they conducted additional interviews into

Mr. Lee's background, including speaking with his parents, that have never been turned over.

THE COURT: Okay. All right? Anything else that's of concern?

MS. SANTILLO: Also, documents in connection with the decision to withdraw the mental health case. So correspondence with Wel- -- Dr. Welner, in terms of the decision to -- or in terms of the testing.

THE COURT: You mean documentation between counsel and their witness about the interview by Dr. Wetzel of Mr. Fell? Is that what you are asking for?

MS. SANTILLO: Your Honor, as you mentioned earlier, at trial there was going to be a evidentiary hearing about the propriety of the government's passage of -- or the -- Dr. Welner's passage of test questions to Dr. Wetzel. We believe that's an area of inquiry we would like to see discovery.

THE COURT: Okay. All right. Does the government want to respond?

MR. VAN DE GRAAF: Your Honor, I will respond to some of it if I could.

THE COURT: Sure.

MR. VAN DE GRAAF: And then Miss Rodriguez may respond to part of it as well.

THE COURT: Okay.

MR. VAN DE GRAAF:  We tried to do this informally, and I think we should continue to try to resolve these things informally without resorting to the civil rules for every aspect of this.  We have tried to answer their questions for -- and maybe we haven't had as good a meeting of the minds as we can, of course, because the Court hasn't assessed -- made its preliminary judgment on what's going forward, but I assume once the Court gives us some signal about what we are going forward on, we will be able to reach some accommodations.

For example, the Welner 302s, this package of material that Mr. Welner had that was going to be produced on the eve of his hearing that didn't go forward, we'd -- of course if the Court's going to let the Welner matter go forward, we will produce all those materials to the defense.

We produced, prior to our submission, the one FBI 302 that Mr. Welner had that was not a defense witness. And we produced that to them already.  But anyway, be that as it may, we will turn over all of the Welner materials that --

THE COURT:  Okay.

MR. VAN DE GRAAF:  -- he says he refers to, that we have in -- if we go forward on the Welner

matter.

THE COURT:  Okay.

MR. VAN DE GRAAF:  Mr. Bellantoni's -- I have communicated with Miss Heilner.  She was the FBI agent that was there.  She has double checked her materials.  There is no 302 that was done.  It was a pretrial prep interview, and she didn't take notes, and she didn't write a 302 about that.

Our footnote doesn't actually say there is a report, but whatever we were writing at that time, it may have been before we got confirmation that there is no report.

THE COURT:  Okay.

MR. VAN DE GRAAF:  To the extent the Court needs more than that, I am sure that the Court could ask Agent Heilner to make a representation, or whatever, but it seems we don't need to resort to Rule 60 here.

THE COURT:  Right.  Yes.

MR. VAN DE GRAAF:  In terms of the marshals system, obviously if the Court thinks that the marshals' records should be produced to them, that's a simple -- a simple matter for us to ask the marshals to produce those.

The government has never perceived, in at least my 20 years in this district, that the marshals' records

about a defendant's incarceration were part of the prosecution team's matter for discovery. That is, we don't regularly go up and look at what the marshals have on people that are incarcerated, especially defendants. I would think the defense bar would be relatively unhappy if we regularly could access that information. That's never been thought of at least by our office as part of the materials we need to review before trial. But obviously if the Court wants the marshals to produce some stuff, that's easily accomplished.

As to third parties, it does seem that the right way to proceed is for them to propose a -- a subpoena. It could be under Rule 17 under the criminal rules. It could be under the civil rules. I don't think it really matters because in substance they would be the same. I think the government should have a chance to oppose the subpoena. Whoever's getting subpoenaed should have a chance to quash it if they think it's inappropriate or immaterial, have the Court review it, but obviously third-party material can be addressed by subpoenas.

THE COURT: You are talking subpoenas for depositions here?

MR. VAN DE GRAAF: For documents.

THE COURT: For documents.

MR. VAN DE GRAAF: For documents.

THE COURT: Okay. Isn't the first step to actually meet with the other side and see if all of these things can be worked out?

MR. VAN DE GRAAF: And we'd be glad to do that. We'd be glad to do that. There's some stuff we think we could get. Then there's things we don't have any access to. And the DOC records, you know, we can't get the DOC records.

THE COURT: All right. I know that in the Sampson case, there is essentially a plan, a discovery plan, which was developed and submitted by both sides to the court. Do you have any objection to doing that?

MR. VAN DE GRAAF: No. It makes total sense if we could try to see where we have common ground, and where we don't have common ground, we can come back to the Court and say here's a place where we need your Honor to resolve the issue.

THE COURT: Okay.

MR. VAN DE GRAAF: That seems like a totally reasonable way to go forward.

I mean, there are some issues that we don't think there's any -- necessary for discovery because we think may find that they don't -- they shouldn't go forward. So, you know, one of the things the Court should give us some guidance on at some point in time is when we should

think about what is still open and what is not still open.

THE COURT:  I think you will be getting a -- an opinion quickly.

MR. VAN DE GRAAF:  Okay.  So obviously after that, we will be in a position to sort of try to work out whatever way forward we can.

THE COURT:  Okay.

MR. VAN DE GRAAF:  And unless the Court has any questions?

THE COURT:  No.

Mr. Liman, do you want to respond or --

MR. LIMAN:  No, we are prepared to meet and confer with the government and to --

THE COURT:  Okay.  Let me just ask the broader question of both sides:  Rule 6 suggests that the criminal rules apply, the civil rules apply, the -- basically the Court has wide-open discretion about how discovery is to be conducted in a 2255 collateral proceeding.  Is that fair to say?

MS. RODRIGUEZ-COSS:  That's fair.

MR. VAN DE GRAAF:  We agree, your Honor.

THE COURT:  Okay.  There's a Hayden decision -- I remember the name because my grandson is named Hayden -- and which basically says that

depositions are appropriate in given situations under the court's direction in 2255 petitions. That's -- and that goes both ways, to the extent that the government would certainly have the right to depose defense counsel and the defendant would have the right to -- the defendant, the petitioner, would have the right to depose particularly important witnesses, subject to the Court's control. Is that what's anticipated here or not?

MS. RODRIGUEZ-COSS: Yes, your Honor. And very much dependent on the discovery. I think -- I think it would be prudent to first receive some discovery, if the Court leaves any issues open, evaluate that information, and from the review of that information, and the evidence that's already on the record, then determine whether it's appropriate to proceed to depose any particular witness.

THE COURT: Okay. And then from the petitioner's perspective?

MR. LIMAN: I'm not sure I caught every bit of what government counsel said, but we think that it is appropriate to turn over documents first, as far as subpoenaed documents, and then there may be some limited depositions that are appropriate, and that's what we would --

THE COURT:  Okay.  So at least you are going to go through two steps here.  This is irrespective of the jury, because the Court takes a direct involvement in any potential questioning of jurors.

So you'd go through a period of time in which there would be the exchange of documentary evidence, right?  And then at that point you make a proposal as to who is to be deposed, under what circumstances, and if there's a dispute, you come to the Court and suggest -- well, argue your case; is that -- is that the way this works?

I mean, this -- this is new ground here.  I mean, if this in fact is the only case, this is new ground.

MR. LIMAN:  That would be our proposal.  There may be some third-party depositions, in which case there either would be an agreement with the third party with respect to the deposition or that third party would have the rights that the federal rules give a third -- third party in any situation to object.

And one reason why we proposed the Federal Rules of Civil Procedure is that it just provides an orderly set of rules that lawyers can look at to understand their rights and procedure they're expected to follow.

THE COURT:  Well, it also gives you the right to depositions.

MR. LIMAN:  It does.  It does.

THE COURT: Right. I think that that's -- I -- right.

MR. LIMAN: But, your Honor, it really is not just the right to depositions here. It also is the notion that there is a body of law out there that we can consult and know what we're supposed to do, and the concern that I have about not having a set of rules as to which there's a body of law developed is that mistakes can be made and there can be misunderstandings. And I -- whatever the rules are, I would like to have a body -- have something that I can reference that says here's what the rules are.

THE COURT: All right. Well, you know, as a practical matter, in this jurisdiction -- this is not related to 2255 petitions -- it's important to get responses to particular discovery requests in writing because then you know the other side is on record as having said such and such a piece of evidence exists or doesn't exist. We have never gone to the requirement of formalizing that in any particular way. And maybe that's inappropriate, but, you know, Vermont is a small place, people know each other, and I have never actually, you know, gone to the extent of making sure that everything is formally acknowledged, and that when somebody writes a document, a letter, suggesting that

this is what they have got and it's not true, or it's not accurate, then the Court has inherent power to enforce that.

So I am less concerned about the enforceability of a lawyer's representation in a document as to the existence or nonexistence of some discovery in this jurisdiction, but --

MR. LIMAN:  Your Honor, my -- my only concern is that in these cases, the district court is not always the -- is always the first court to look at something. It's not always the last court to look at something, and I would ask that we have some kind of process in place --

THE COURT:  All right.  Well, that's interesting.

MR. LIMAN:  -- in order to protect the defendant's rights.

THE COURT:  You mean to suggest there could be an appeal?

MR. LIMAN:  I would hope not once we prevail.

THE COURT:  Oh, really.  Okay.  I'm sorry to put you on the spot, but, anyway.

So what I hear you saying is that Court rules -- issues a ruling, assuming there is something left in regard to the complaint or the petition, in particular,

in regard to ineffective assistance of counsel, cumulatively as well as individually in regard to each of those claims, that the parties would get together, see if all of the discovery has been satisfied, and develop a plan, submit the plan to the Court within, let's say, 30 days of the Court's order, and within that, set out a plan for general depositions, assuming that we're going to adopt the civil rules at least in part, and I don't know whether you want to start listing people at that particular point, but -- I don't think it's necessary, but at least set out a whole plan here with the idea -- I think the defense at one particular point, or petitioner, suggested that this all be done -- if there's to be an evidentiary hearing, it would be in approximately a year from this point forward.  Is that right?

MR. LIMAN:  Yes, your Honor.

THE COURT:  That's the goal?

MR. LIMAN:  That's the goal.

THE COURT:  That was your goal.

MR. LIMAN:  Correct.

THE COURT:  Okay.  Without saying whether or not -- without waiving any argument that there should not be an evidentiary hearing, the question is whether we set as a goal one year.

MS. RODRIGUEZ-COSS:  We were hoping sooner than that, your Honor, quite frankly, since the position of the government is that we have sufficient information on the record to rule on these matters, but we -- I think we should be as diligent as possible to complete this process.

THE COURT:  Right.  Well, as a practical matter, since between the months of September and who knows when, December, January, I'm in trial. Realistically, a year is fine.  So I wonder if we'd set, you know, the rough idea of a year for the conduct of discovery, and then I assume, in light of the fact that the civil rules are being applied, that rather than go to an evidentiary hearing, there may be dispositive motions filed.  Is that correct?

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  Is that -- is that correct?

MR. LIMAN:  Your Honor, we -- if we followed the federal rules, I have to take the good with the bad. We would hope that, you know, we could proceed quickly to trial on all of the issues, but -- but if we're following the federal rules, they would have the right to motion for summary judgment.

THE COURT:  Okay.

MR. VAN DE GRAAF:  Your Honor, if we could

counsel about this ourselves.  I'm not sure we -- it may be, after discovery, we may just want to have the evidentiary hearing and get this on the record.  So let us think about whether we think that's a good idea from our perspective.

THE COURT:  That's fine.

MR. VAN DE GRAAF:  Maybe the petitioners think about whether it's a good idea.  But another year of sort of summary judgment motions -- you have already seen a thousand pages.  I don't know if you want another thousand pages with summary judgment motions.  So, maybe we just go to the hearing.  But let us -- maybe that will be part of what we address in the --

THE COURT:  Any difficulty with that?

MR. LIMAN:  From the movant's perspective, we would think that we just move to a hearing, have the hearing, maybe have some post-hearing briefs with respect to what the evidence shows, and get a ruling.

THE COURT:  Okay.  And you try to keep the post-ruling briefs to within a thousand pages?

MR. LIMAN:  Per side?

THE COURT:  Per side.

MR. LIMAN:  Yes, your Honor.

THE COURT:  Single-spaced.  Oh, I see.  Check the font down to about five just to make sure you can

get it under a thousand?  Okay.

MS. RODRIGUEZ-COSS:  Your Honor, we cited some opinions for the Court, we brought copies for the Court, and the Court asked whether we were aware of cases where the court had resolved 2255 petitions just on the record without discovery or evidentiary hearings.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  And we cited, just to put it on the record now, United States -- Barrett versus United States, and that was recently issued in August of 2012.  And it is at 2012 Westlaw 3542, 609, from the Eastern District of Oklahoma.  Jackson versus United States was issued on June 19th, 2009.  That is codified at 638 F. Supp. Second 514, and that's from the Western District of North Carolina.  And United States versus Lee, which was issued on August of 2008, in the Eastern District of Arkansas.  That's at 2008 Westlaw 4079, 315.  We have provided defense counsel with copies of these opinions as well, your Honor, so if I may --

THE COURT:  Okay.  All right.  And were those issues ineffective assistance of counsel?

MS. RODRIGUEZ-COSS:  Yes, sir, among others.  Yes, sir.

THE COURT:  Among others?  Okay.  Be glad to take a look at those.

Okay?  All right, I have nothing else to discuss at this point.  I will issue a ruling fairly quickly.  Then if there is to be discovery, then discovery would -- you'd meet within a few days and develop a discovery plan, and with the idea that in a year from now would be an evidentiary hearing, I would assume.

MR. LIMAN:  Your Honor, could I just put -- give your Honor one more set of authorities.  We had asked with respect to the prosecutorial discretion to take some discovery.  I think if you look at our brief on discovery, it was tailored just to this case and not to -- to other cases, but just to this particular case.

THE COURT:  Um hum.

MR. LIMAN:  The -- I cited U.S. against Llera Plaza, which was a death penalty case, to your Honor. We would also cite a case called U.S. against Ortiz-Torres.  It's an unreported case from the District of Puerto Rico.  In that case, the court ordered review of the death penalty memorandum submitted by the U.S. Attorney to the Attorney General to ascertain whether the U.S. complied with its duties under Brady.  So it's not directly applicable to selective prosecution.  It is related to the issues with respect to turning over that particular --

THE COURT:  Actually, I'm not so sure it is,

right?  What you have basically have represented is that the local U.S. Attorney's Office recommended that it not be a death penalty case.  It was rejected by Attorney General Ashcroft.  Your objection is to the process by which Attorney Ash- -- Attorney General Ashcroft made that decision.  So whatever is represented to him by the local U.S. Attorneys would not be particularly significant, would it be?

MR. LIMAN:  It's -- it -- it is significant in the sense that the U.S. Attorney Emmanuel says that one of -- as the bases for overturning the decision of a local U.S. Attorney, change in facts or circumstances. That's the -- those are the bases on which --

THE COURT:  Oh, all right.

MR. LIMAN:  And so for that reason -- but I also cite it for the proposition that -- that there are circumstances under which a court will review the U.S. Attorney memo to the Attorney General.

THE COURT:  Okay.

MR. LIMAN:  Thank you.

THE COURT:  All right.  Is there anything else that either side wishes to present at this point?

MR. LIMAN:  Not for Mr. Fell.

THE COURT:  All set?  Mr. Rubin, you don't have anything to say?

MR. RUBIN:  It's nice to see you, your Honor.

THE COURT:  Nice to see you.

Anything from the government?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  All right.  Thank you very much.

MR. LIMAN:  Thank you.

(Court was in recess at 1:55 p.m.)

*** ** ***

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

March 14, 2013                    _____
Date                              Anne Nichols Pierce