*SEALED BY ORDER OF THE COURT*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA      *
                              *
              V               *
                              *
DONALD FELL                   * CRIMINAL FILE NO. 01-12


EXAMINATION OF JURORS 143 & 162
Thursday, August 15, 2013
Burlington, Vermont


BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge


APPEARANCES:

    JACABED RODRIGUEZ-COSS, ESQ., United States
        Department of Justice - Criminal Division, 1331
        F Street, N.W., Washington, D.C.; Attorney for
        the United States

    WILLIAM B. DARROW, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    LEWIS J. LIMAN, ESQ. and KRISTIN M. SANTILLO, ESQ.,
        Cleary Gottlieb Steen & Hamilton LLP, One
        Liberty Plaza, New York, New York; Attorneys for
        the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
        New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
        DeWolfe, 237 North Main Street, Barre, Vermont;
        Attorney for the Defendant

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227


*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                    2

## I N D E X

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **JUROR NO. 143** | | |
| By the Court | 25 | 5 |
| By Mr. Liman | 31 | 1 |
| By Ms. Rodriguez-Coss | 61 | 2 |
| **JUROR NO. 162** | | |
| By the Court | 96 | 19 |
| By Mr. Rubin | 102 | 15 |
| | 199 | 22 |
| By Ms. Rodriguez-Coss | 182 | 5 |

### E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 1 | Photograph of motorcycle | 74 |
| 2 | Photograph of motorcycle - side view | 74 |
| 3 | Bill of sale - 8/17/2010 | 77 |
| 4 | Photograph of dirt bike | 83 |
| 5 | Bill of sale - 10/4/2007 | 83 |

*SEALED BY ORDER OF THE COURT*

*SEALED  BY  ORDER  OF  THE  COURT*    3

# I N D E X

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 1 | Juror No. 143 written statement dated 12/19/2010 | 37 |
| 2 | Juror No. 162 questionnaire | 109 |
| 3 | Juror No. 162 questionnaire | 116 |
| 5 | Juror No. 162 voir dire transcript | 125 |
| 6 | Statement of Juror No. 162 | 103 |
| 7 | Ryan VCIC record | 137 |
| 8 | Summary chart of Ryan convictions | 141 |

*SEALED  BY  ORDER  OF  THE  COURT*

*SEALED BY ORDER OF THE COURT*                4

THURSDAY, AUGUST 15, 2013

(The following was held in open court at 10:30 a.m.)

COURTROOM DEPUTY:  This is case number 1-12, United States of America versus Donald Fell.  The government is present through Assistant United States Attorney William Darrow and Jacabed Rodriguez-Coss.  The defendant is not present in the courtroom.  Present on behalf of the defendant are attorneys Richard Rubin, Lewis Liman, Cathleen Price and Kristen Santillo.

The matter before the Court is a juror examination.

THE COURT:  All right.  First, Mr. Fell has waived his presence; is that correct, Mr. Liman?

MR. LIMAN:  Your Honor, it's Lewis Liman.  That is correct, your Honor.

THE COURT:  Okay.  This is a preliminary investigation of some of the allegations that were made by Mr. Fell in his post-conviction relief petition.  I ordered that three jurors be questioned preliminarily to see if a further evidentiary hearing would be required.

The third -- or first juror contacted the court, and this juror is now disabled, lives in the far reaches of Vermont, although I shouldn't -- I shouldn't probably say that.  Lives in Vermont, in the very rural section of Vermont, and is unable to drive, unable essentially to walk, was unable to be here.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                    5

I sent an e-mail to the various lawyers indicating that I gave him permission not to be here.  The only alternative would be to have the marshals drive him, and I didn't think that would be appropriate.  So I thought I'd raise that issue first.

One suggestion is that he be deposed by the parties.  The second suggestion is that we travel to the Northeast Kingdom and question him in a state courthouse in that area.  I would be willing to travel to the Northeast Kingdom.  I haven't been there in quite some time.

So, anyway, my thought is those are two alternatives.  I certainly think that he needs to be questioned.  And let me ask counsel as to whether you have a preference for either of those alternatives or whether you have some thought on your own as to how to proceed with this additional juror.

Mr. -- Ms. Rodriguez-Coss?

MS. RODRIGUEZ-COSS:  Your Honor, given the alternatives presented by the Court, we certainly do not think that a deposition by the parties would be appropriate.  I think that an inquiry by the Court would be preferable, and we certainly would be willing to travel.

After hearing from defense counsel on that

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                           6

particular issue, the government also wanted permission to address the Court very briefly before we begin today's proceedings, your Honor.

THE COURT:  Okay.  All right.  Mr. Liman or Mr. Rubin?

MR. LIMAN:  Your Honor, we would be comfortable with the deposition.  If the Court is comfortable going up to the Northeast Kingdom and deems that appropriate, we'd also be appropriate.

THE COURT:  All right.  So I will go up to the Northeast Kingdom.  I will try to arrange for a courtroom to be used either in St. Johnsbury or Guildhall, and will set -- set this up.  We will arrange a hearing date with lawyers.  At this point his testimony is in the public, so we will notify the public as well about the timing of that particular hearing.

So, you wanted to raise an issue?

MS. RODRIGUEZ-COSS:  Well, your Honor, if the Court would just grant the government a couple minutes --

THE COURT:  Sure.

MS. RODRIGUEZ-COSS:  -- we wanted to -- we'd like to place on the record our continuing objection to the hearing itself.

The government's position has been consistently

*SEALED BY ORDER OF THE COURT*

that the inquiry of the jurors that the defense has conducted in this case has been done in blatant violation of Rule 606 and the applicable jurisprudence that governs the contact by the parties with jurors.

We wanted to note, your Honor, that Second Circuit has specifically noted that the planned, systematic, broad-scale and post-trial inquisition of the jurors by a private investigator is reprehensible, and I am quoting from United States versus Brasco, 516 F.2nd at 816. In fact, the Second Circuit has stated that inquiring into the deliberative process is so reprehensible that it is within the Court's discretion to decide whether such conduct will affect the defendant's right to any trial.

And the Supreme Court, in United States versus Tanner, 483 U.S. 107, has held that the district court would have acted within its discretion in disregarding an affidavit obtained in violation of a court order and the rules against interviewing jurors.

Now, we are not asserting, of course, that the defense here has acted in violation of a court order; that the Court has made clear. But we are asserting that they clearly violated Rule 606 and the applicable jurisprudence which prohibits counsel from inquiring into the jury deliberative process.

The sworn declaration of Juror 143 serves as a perfect example.  In that declaration, Juror 143 relates the deliberative processes of the jury in this case with regards to the penalty, disclosing where the jury stood with regard to the death penalty at various intervals during the jury deliberative process, what evidence was discussed by the jury, and what factors were significant in arriving at the verdict.  This is precisely the type of inquiry into jury deliberations which courts have characterized as reprehensible.

Asking jurors about what factors they considered important in voting for death and what evidence was considered during the deliberative process, the government submits that while the Court was aware that the defense would speak to jurors, the Court could not have known that the defense would have inquired into the jury deliberative process.  Such conduct by members of this court, your Honor, should not be tolerated, and it is the government's position that no further inquiry into the matters raised during such improper interviews should be conducted.

Specifically, it is hard for the government to fathom how the Court will inquire, for example, of Juror 143 with regards to his conduct without inquiring into the deliberative process.  The jurors -- what the juror

*SEALED BY ORDER OF THE COURT*        9

did or what he said took place precisely within the jury deliberations, and that domain should not be invaded.

In Tanner, for example, the court refused to consider an affidavit by one juror alleging that there had been drinking by jury members during the deliberative process because jurors were not allowed to testify about juror conduct during deliberations.

And so similarly here, the conduct that is alleged by Juror 143 -- and I am specifically referring to the conduct involving the use of a shotgun -- was an integral part of the deliberative process in this case, and we submit that it should not be inquired into.

In this -- even if this Court decides to go forward, your Honor, with the examination of Juror 143, the government would like the opportunity to speak to court personnel about one of the allegations raised by counsel, specifically the allegation concerning the shotgun.

Upon information and belief, the court personnel has certain policies that would bear directly upon what evidence is permitted or not into the jury deliberative room.  In addition, at times the court handled the evidence and was tasked with providing evidence to the jury.  Therefore, they would have knowledge bearing directly on the claim raised by the defense.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          10

We were a bit baffled yesterday, your Honor, when we contacted court personnel precisely to ascertain some of these matters and were advised that the Court had instructed the personnel not to speak with the government.

THE COURT:  Well, actually, the clerk and the Court spoke.  The fact is, the clerk of the Vermont -- the U.S. District Court, and all of the court personnel, including the probation, and the clerk's office, et cetera, all work for the Court.

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  They work for me.  Essentially if you -- if you want to speak with them as potential witnesses, there are complex legal issues that come into play.

So, if you want to speak with one of my employees, it seems to me that you should make a showing this is what you want to ask, this is why it's particularly relevant.  It can be done *ex parte* because it's part of the investigative process.  It could be done by either side.  I would then review it and then make a determination as to whether essentially the Court waives the -- "immunity" is the wrong word, but waives the protection that's afforded the personnel of the court from being interviewed as potential witnesses.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     11

MS. RODRIGUEZ-COSS:  Very well, your Honor.  We --

THE COURT:  So that was -- that was, frankly, the concern.  So all you needed to do is make an *ex parte* request, ask for what exactly you want to know and why this is particularly relevant, and then I'd review it.

MS. RODRIGUEZ-COSS:  Very well, your Honor.  And to be clear, we had no intent in going into any communications between the personnel and the Court.  Our only intent was to --

THE COURT:  Well, then --

MS. RODRIGUEZ-COSS:  -- inquire into the policy of the -- of the court, which may or may not be written.

THE COURT:  See, that's why --

MS. RODRIGUEZ-COSS:  And --

THE COURT:  -- it's important that you go to the Court first.  I mean, essentially any communication that I may have had with the employees during the course of a trial is beyond limits.

MS. RODRIGUEZ-COSS:  And --

THE COURT:  So I don't know exactly what you are asking employees to reveal.  If in fact you are asking them for material which may be limited to what

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          12

went into the jury room, that may be of much less concern than asking what they have talked about with their -- with their boss or the Court itself.

MS. RODRIGUEZ-COSS:  And that is precisely what we were after:  What is the policy of the court with regards to evidence that goes into the jury deliberations room?

THE COURT:  Right.  But let me just address the broader question that you are raising.

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  You have an objection to disclosure of the deliberations of the jury, and I have, from the beginning, suggested that the deliberations are irrelevant.  That is not material.  You are asking for a broader sanction because maybe there were questions about that.  At this particular point, the deliberative process is off limits.

Now, that doesn't mean that there may be things in the jury process which were inaccurate or incorrect, and that is what the scope of this investigatory hearing is to cover, just what is appropriate.

Now, as to the conduct of a juror as to whether or not he pointed a firearm at someone, I certainly would keep under advisement whether in fact that should be excluded ultimately, but before I do that, I really

*SEALED BY ORDER OF THE COURT*        13

would like to know what happened, and this is the whole purpose of this hearing. It's investigative. It's just what happened.

MS. RODRIGUEZ-COSS: I understand that, your Honor. And the government understands that there is a much broader issue at stake here in -- implicated in these proceedings. And that is that in this case, contrary to any other case that I have managed to find or read, the defense went out and interviewed every single juror who sat in the trial of Donald Fell without so much as a hint of misconduct by any member of that jury. So -- so that there was nothing that they legitimately were trying to investigate, save perhaps the nondisclosure of Juror 126 of a minor misdemeanor offense that took place 10 years prior to him being selected by the jury, which I think the jurisprudence will reveal will have absolutely no effect on the jury selection process of this case.

But save -- save perhaps that, and it has been our -- the result of our investigation on our talks with Juror 126, that the defense didn't even inquire into that when they talked to him. And so they, without so much as a hint of misconduct -- normally in cases you have the defense receiving information from a neighbor of a juror or a family member of a juror or a juror

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                14

expressed themselves in public and spoke to the press and that alerted them to the possibility of juror misconduct.  Or, for example, in United States versus Sampson, which was recently heard by the First Circuit, the defense was able to uncover the fact that Juror C had a protective order in place, and that obviously led to further investigation:  Why was a protective order needed?  And it turned out that she had been the victim of domestic violence and whole host of other conduct that was not disclosed, intentionally not disclosed by that juror.

But here, we stand in stark contrast to any of those -- any of those cases because there was nothing. This really was a fishing expedition conducted by the defense to try and discover something that they could hang a hat on in order to formulate allegations of juror misconduct.

And when asking these jurors about what did you think about the prosecutors, what was your opinion of the Court, what was your opinion of the defense counsel, how did you feel about the whole process, they then dove into -- directly into juror deliberations.  You know, because when you read the declarations of these jurors, when you talk to them about the things that they discussed with defense counsel, they discussed what

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                    15

evidence they talked about, how they discussed that evidence, in what order that evidence was discussed, how did -- where did the jury stand in -- with regards to the death penalty, what factors were important to that jury in reaching a vote of death, and I think that --

THE COURT:  You are raising -- you are raising factual issues that I am not aware of.  I have no idea what was said to the various jurors.  The only information that I have is in the reports that were submitted regarding those three individual jurors, and it is -- it is true that in the statement that was made by Juror 143, there were obviously discussions about jury deliberations.  So I think your argument is preliminary at this point.

MS. RODRIGUEZ-COSS:  Very well.

THE COURT:  Certainly you have the ability and should have the opportunity to file a motion to exclude this argument.  And what I would remind you as to the instruction I gave the jury panel when they were excused, and that is they have the ability to speak with the press.  Obviously somebody said they spoke with just about every member of the press in the state of Vermont. They have the ability to speak with the press.  They have the ability to speak with anyone at that point. Their names were disclosed at the close of the trial,

*SEALED BY ORDER OF THE COURT*

and that the Court really didn't have the ability at that point to say you're not allowed to speak with anyone.  In fact, there wasn't a local rule, and so therefore there was no order that was violated when in fact the defense went to speak with them.

What you are saying is that there should be a sanction against the defense from raising any issues of misconduct because the defense went too far in the interviews into the deliberative process.  It is fair to say that the jury, when they were excused by me after the deliberation, were told -- or was told that I discouraged discussion of the deliberative process.  I didn't prevent it, but I said I really would prefer that you not talk about the deliberative process.  That is confidential.

MS. RODRIGUEZ-COSS:  I think --

THE COURT:  Regardless.  I appreciate your argument.  I have no idea what was said to other jurors and --

MS. RODRIGUEZ-COSS:  And --

THE COURT:  -- that should be in the pleading.

MS. RODRIGUEZ-COSS:  And I understand the Court's holding on the ruling, and we will abide by it, but in closing, I would just say that as officers of the court we are held to a higher standard.  We are presumed

*SEALED BY ORDER OF THE COURT*

to know the law and know the bounds of the law when engaging in such matters.

So we'd also like to safeguard our objection to these proceedings based on the fact that we understand that the defendant has defaulted his claim by failing to raise it, your Honor, during the pendency of the trial proceedings in this case. We set forth our objection in our written papers but we want to make sure that we are --

THE COURT: And that's preserved.

MS. RODRIGUEZ-COSS: -- where we stand.

And last, your Honor, we received the Court's opinion and order late yet afternoon with regard to its intent to close the courtroom when examining Juror 162. We want to ask the Court if it would consider, while it -- while we understand it has decided to close the courtroom for the public and for the press during the examination of Juror 162, whether it would consider, your Honor, permitting the family members to remain in the courtroom.

THE COURT: But --

MS. RODRIGUEZ-COSS: The family members have been present throughout these proceedings from the very beginning. They have attended the entire trial. They have attended every hearing and every proceeding. And I

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    18

cannot think of -- of individuals who are more vested in this procedure than -- than the family members of the victim in this case.

Their interests, your Honor, stands apart from the interests of the public and the interests of the press, and we would like the Court to entertain the possibility of allowing them to remain in the courtroom. Perhaps we can inquire of Juror 162 if she would have any objection to them remaining in the courtroom.

THE COURT:  I would be glad to speak with Juror 162 as to whether she has an objection.  The reason that I closed the courtroom is because she was to speak about extraordinarily personal experiences, and as in any jury selection, when a juror wants to speak -- needs to speak about those kinds of experiences, childhood sexual abuse, that that's done in confidence. It's not done in front of anyone other than the judge and the lawyers.

I really believe that the press had a right to be here.  I have been through this process once before in United States versus Greer many years ago.  Jurors were brought back into the courtroom, testified in front of the press.  I agree that the press should be here unless there is something so private that it would have a devastating impact upon a juror.  And I tend to think

*SEALED BY ORDER OF THE COURT*

speaking in open court, in front of others, would have that kind of emotional impact. So as a result, that's why I decided the way I decided it.

I would be glad to speak with her to see if she has any objections to the family. Generally speaking, when you close the courtroom, it's closed. I would consider other alternatives, and that is immediate transcripts to be furnished to the family as well. If there's a process that we will follow for the transcripts to be released to the press, that's another alternative, but I would be glad to address that.

MS. RODRIGUEZ-COSS: All right. The other alternative that we would suggest, if after speaking with Juror 162 the Court does not feel comfortable with allowing the family members to remain, was to deal with the particular issue that is of concern in private, and once we have obtained the necessary information, then -- then opening the record with regards to the second inquiry really, which does not pertain to the details of the childhood experiences but rather with the voir dire process itself.

THE COURT: I -- we are not getting into the merits of the case in this particular hearing. What I am trying to find out is what happened. Was her -- was she accurate in her response in the jury questionnaire

*SEALED BY ORDER OF THE COURT*

form and during the voir dire process.

MS. RODRIGUEZ-COSS: Right. That's --

THE COURT: That's all wrapped up in the question of exposure to childhood sexual abuse. I don't see them as separate and distinct issues.

MS. RODRIGUEZ-COSS: Well, really, when asking her why did she not disclose it, there's no need to refer to details of the incident. Just referring to the incident itself would be sufficient.

THE COURT: I really disagree.

MS. RODRIGUEZ-COSS: All right.

THE COURT: Why did she not -- why did she not disclose it? It could very well be that she thought this was not a criminal act, as you said in your pleadings.

MS. RODRIGUEZ-COSS: Right.

THE COURT: It could very well be that she was extraordinarily embarrassed. It could very well be that that was linked to her childhood sexual abuse history. It's all intertwined. So -- but I would be willing to speak with her. Let me get the defense's response --

MS. RODRIGUEZ-COSS: Yes, sir.

THE COURT: -- to your various issues.

Mr. Liman?

MR. LIMAN: Your Honor, there are a number of

*SEALED BY ORDER OF THE COURT*          21

issues.  I would just be brief unless your Honor has further questions.

THE COURT:  All right.

MR. LIMAN:  First, we have put before the Court what we believe are serious issues of juror misconduct.  The Court has appropriately ordered the hearing with respect to that.  The law in the Second Circuit, the law in other circuits, says that it is both appropriate and encouraged when there are allegations of serious juror misconduct.  For the Court to ask the questions to understand what happened, that's what we are asking for.  There are no questions in terms of the juror interviews of 606(b).  That's a rule of evidence.

With respect to what happened during the jury interviews, nothing in that is particularly relevant, but we are also quite comfortable with the process of the interviews.  It's not what Ms. Cross-Rodriguez *[sic]* had suggested.

With respect to the issue of the closure of the courtroom, the issue that we put before your Honor that we understand the juror has raised is that her identity, her -- who she is, is, as she put it, the one fact that has not been revealed to the public, and by having her present in public for a portion of the hearing, that would undermine that one element of juror privacy that

*SEALED BY ORDER OF THE COURT*

she and we are trying to protect.

In terms of the members of the family, we obviously understand that this process is one that must involve some -- some pain, but in order to ensure that we get an accurate account of what happened to the juror, we believe that the proceedings should be done in -- in private.

We don't -- I don't know personally of any law that says that you can selectively exclude members of the media, and there obviously would be no law that your Honor could impose that would prohibit members of the family from talking to members of the media and revealing the juror's identity.  So those are our concerns with respect to the -- to the members of the family.

Finally, in terms of the transcript, I think after we have the hearing we can see how the transcript reads, work with the government to see if we can agree upon a redacted transcript that could be released extremely quickly.  May be able to reach agreement with the government; we might not, but I think we can address that issue fairly --

THE COURT:  Well, the process is that we have the witness testify.  A transcript is made.  Both sides will look at the transcript, excise those portions which

*SEALED BY ORDER OF THE COURT*                23

may reveal her identity, and if the parties can't agree to a redacted transcript which protects her identity, then I would do that.  And then it's released to the public.

Mr. Liman raises an interesting point as to whether or not, if there's any -- anyone in a sealed hearing, they can be restricted from speaking with others about what they heard about identity or about anything else, it becomes a little bit more complicated actually.  I'd like to think about that before we proceed.

MS. RODRIGUEZ-COSS:  The only thing we would say about that, your Honor, is that even if -- I am assuming that although the Court had intent of closing the courtroom, that the juror would still, for purposes of the record, be referred to as Juror 162.  So her name would not be revealed.

And speaking to some extent with her counsel yesterday, we understand that her concern is her -- her identity because her name, as the Court very well said, has already been released to the press.  They just don't know which -- which juror is number 162, and so I don't think that that would be as much of a concern.

THE COURT:  Well, I think it's a little bit more complicated.  When somebody talks about their history, are there facts which are revealed which may

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

have some side effect, side impact of disclosing their identity?  Regardless.

I think we are ready to proceed with the first juror, number 143.  Is that right?  We're all set?

Okay?  Yeah, and the process is I will ask just general questions, what happened.  Again, by stipulation of the parties, the defense has an opportunity to ask questions, and the government has an opportunity to ask questions.

Again, I am going to instruct the juror that I am not asking questions about the deliberative process other than in Juror No. 143's case whether in fact the gun came into the jury room and whether it was pointed at a juror.

MR. LIMAN:  Your Honor, I believe there were two issues with respect to this juror.  One is the issue of the gun and the other is the issue of the trip to Rutland during the trial.

THE COURT:  Oh, no.  I understand that.  I was just talking about the deliberative process, and -- well, to the extent of revelation of that to the jury, I suppose that that's relevant.  I will be asking that, but --

Would you come forward, sir.

COURTROOM DEPUTY:  Please come forward to be

*SEALED BY ORDER OF THE COURT*    25

sworn.  And would you raise your right hand.

JUROR NO. 143,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q    Good morning.

A    Good morning.

Q    I'd ask you to take the stand.  Again, I am not going to ask you your name.  To all of us you are Juror No. 143.

And let me just describe to you the process that we are going to follow.  I am going to ask you some just general questions about statements that you made to -- during -- during interviews later on and things that may have happened during the course of the trial that you disclosed during those interviews.

I am not interested in the deliberative process or how votes were taken or what people were thinking or saying.  It's just limited to what happened.  And I really appreciate you coming today.  I know that this is really a stressful situation for you, as the trial was extraordinarily stressful.  So I really appreciate you coming, and I also ask that you try to be as candid as possible.

I know, also, it was a long time ago, and if you don't remember anything, then -- then you don't remember.  If you don't remember specific things or remember some other things, that's also fine.  But I just ask that you try to be as thorough as possible, and, again, if you don't quite recall, that's fine.  All right?

You were interviewed by investigators for Mr. Fell just a little while -- well, 2011, right?  2010 to 2011.  Do you remember that?

A    I remember a couple people showing up, yes.

Q    Okay.  All right.  And there's a statement that you made, and it raised a couple of questions that I had.  The first is, you indicated that at some point during the trial you went to Rutland, and did you do that?

A    No, that was a misunderstanding.

Q    Okay.  So tell me what that misunderstanding was.

A    I am very familiar with Rutland, and during the trial, when you showed aerial photos and that kind of stuff, in my head I was in that spot.  I'm very familiar with that whole downtown area because I work and I cover the whole state.  I eat at The Sandwich Shop right there on, what is it, Merchants Row, so it's right in that area.

But, no, I went to -- when I did, I guess you'd

*SEALED BY ORDER OF THE COURT*   27

call it the trial tour, I did it on my motorcycle in the fall of 2010, I believe.  It wasn't during the trial.

Q    Okay.  Well, there's -- in the statement that you made to an investigator, my memory is that you made a statement that it was during the trial and that you shared your observations of the house and the trip to the Price Chopper and passing a dumpster.

A    Right.  No, I did not go -- during the trial I did not go anywhere

Q    Okay.  Well, did you -- did you share your observations with jurors?  Not again what their responses are, but did you say things about that scene?

A    The only -- the only thing that I mentioned was I didn't recall ever hearing about the knife being found, and through the testimony he had mentioned Stewart's, and every -- and I am thinking to myself that every dumpster -- every convenience store has a dumpster.  That's where I figured they had found it.

Q    Okay.

A    I can't recall --

Q    Right.

A    -- them saying --

Q    What did you tell these individuals that came to interview you?

A    I believe that's what I told 'em.  And that

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   28

statement wasn't my writing.  It was their interpretation of it.  And I believe they grossly simplified, contorted, and actually left out a lot of what we actually discussed.  I actually thought they were Jehovah Witnesses when they showed up, but when they show- -- when they told me their name and they mentioned Donald Fell and court, I was like, "errr?"  And I had, you know, a few beers in me, and --

Q   You thought they were Jehovah's Witnesses?

A   Yeah, when they showed up.  I knew they didn't know me because they came to my front door, and nobody comes to my front door.

Q   Okay.  So you told them that the trip that you took to Rutland occurred after the trial?

A   Yes.

Q   Okay.  The other issue that was raised in the report was a firearm, a shotgun, a rifle that was in the jury room.  Can you tell me about that?

A   There was no gun pointed at anybody.  During the deliberations, we didn't have any firearm in there.  When there was a discussion over things, somebody had mentioned that it wasn't even loaded, and I simulated, simulated pointing a gun at somebody.

Q   Okay.  By "simulated," you mean you didn't have a gun in your possession?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   29

A    No.

Q    You were just --

A    Like this.

Q    Like -- and by "like this," it is --

A    Like holding a --

Q    -- holding your arms up --

A    Like holding a firearm at the person who asked a question or made a statement that the gun wasn't even loaded.

Q    But then according to the statement that you gave to these individuals, you said that "That makes you nervous. See, that makes you nervous." That was not in response to having a firearm? That was just in response to having your arms put in such a way that the firearm --

A    Right.

Q    -- was pretended to be there?

A    Right. Right. There was no firearm in the jury room, so there was another misunderstanding of this whole --

Q    Okay. And what exactly did you tell these investigators in regard to the firearm in the -- in the room?

A    You know, we were in this -- the whole discussion was pretty lengthy with these two folks. It was a man

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

and a woman. She did most of the talking, and -- or questioning, I should say, and they asked me all kinds of questions from how we were treated in court to the details of the case, and --

Q   Okay. But at least in regard to this particular firearm in the jury room, what did you say to them?

A   That, you know, I -- at one point this woman stated that the gun wasn't even loaded, and here it was -- it was late. It was -- we were into this thing for hours at that point, and we'd taken a vote earlier, and here we are still talking and hashing out and going through the little boxes. And I remember, you know, when it was my turn, I was like, you know, you don't ask whether or not a gun is loaded. If somebody's aiming at you, you assume it is. And I made the --

Q   All right, no, but is this what you told the investigators?

A   Yes.

Q   So you told the investigators there was no gun, this was just you pretending a gun?

A   Right.

Q   And -- and then the other juror seemed nervous?

A   That's right.

Q   Okay.

        THE COURT: Okay? All right? Mr. Liman?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                31

EXAMINATION

BY MR. LIMAN:

Q    Good morning, Mr. Lapore, my name is --

        THE COURT:  You should strike that from the record.  Yeah.  He is Juror No. 143.

BY MR. LIMAN:

Q    Good morning, Juror No. 143.  My name is Lewis Liman.  I am a lawyer for Mr. Fell.  We have not met before, correct?

A    Right.

Q    And the other day two of my colleagues came to talk to you, and you refused to talk to them; is that correct?

A    Unannounced visits are always refused, yes.

Q    And those are the -- my colleagues right there who came to talk to you, and you said no; correct?

A    No.

Q    What do you say you said to them?

A    I told 'em, "Get the hell out."

Q    Followed by "capeesh"?

A    Yeah.

Q    Now, the two people who came to talk to you back in 2010 --

A    Um hum.

Q    -- you don't see them in the courtroom here today;

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        32

is that correct?  Or do you?

A    No.

Q    Their names were Brian and Deena.  They were from my firm.  They didn't -- they didn't require you to talk to them, correct?

A    No.

Q    You talked to them voluntarily?

A    That's correct.

Q    And you understood that they were lawyers for Mr. Fell, correct?

A    No.  I thought they were from the court.

Q    You saying to me that they didn't tell you that they were lawyers for Mr. Fell?

A    Like I said, I thought they were -- at first they were Jehovah Witnesses.  They mentioned my name, that I was involved in this court, and that they wanted to ask me some questions.

Q    So you thought they were lawyers for the court; is that what you are saying?

A    Somebody from the court.  I didn't know if they were lawyers or not.

Q    And you -- you ended up speaking to them for a couple of hours, correct?

A    It was much longer than I ever expected or wanted, yes.

*SEALED BY ORDER OF THE COURT*

Q    Told them the truth?

A    I tried to.

Q    At the end of the discussion with them, they -- they asked you to sign a statement; is that correct?

A    Yes.  And she was scribbling stuff out, and when I read it, it looks like something like a fourth grader wrote it.  It's not my words.  It's not my handwriting.

Q    In fact, the day that they spoke to you, you didn't sign the state- -- a statement; is that right?

A    Right.

Q    You told them that they should come back the next day, correct?

A    That's when they came back.  Yes, they came back.

Q    Well, no, but in fact you told them that they should come back the next day?

A    I don't recall that.

Q    And if --

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, is this not the defense witness?  And we would object to cross examination being conducted.  I thought that he is -- this is his witness, right?  So this should be a direct examination, nonleading, so we would object to leading questions by the defense.

THE COURT:  Objection overruled.  You can ask the question.

*SEALED BY ORDER OF THE COURT*

34

BY MR. LIMAN:

Q    And, in fact, you left them a message the following day saying that they should come by your house a little bit earlier to sign the declaration, correct?

A    Maybe.

Q    And they showed up at your house at about three o'clock on -- on December 19th, correct?

A    I take your word for that.

Q    It was a Sunday afternoon?

A    (No verbal response.)

Q    You sat down with them?

A    We were sitting.

Q    They showed you the declaration?

A    Um-hum.

Q    You read through every paragraph of it?

A    Hastily kind of, yeah.

Q    Anybody tell you to read it quickly?

A    No.

Q    You spent as much time with it as you wanted to spend, correct?

A    I spent way more than I ever wanted to spend on it.

Q    And after reviewing it, you signed it saying that you had the opportunity to review it and correct it, and that it was true and accurate to the best of your knowledge, correct?

A    I'm not the sharpest tack in the box.

Q    Is the answer to my question yes?

A    No.  I signed it kind of like you would and anybody else in here when they're buying a car.  They're flashing papers in front of you, you're initialing stuff, you're initialing stuff, and they're sitting there over you staring at you.  I'm not the best writer in the world.  I'm not the best reader.  If you did your homework, I had a C plus average in high school.  That was tops.  I was 260 out of a class of 390.  I had an English teacher that told me my boat was sinking, that I didn't have a life jacket.  I was not exactly an English major, and I don't read super well, especially when people are staring over me.

Q    Now, at the time you signed this statement, you didn't understand how it would be used; is that a fair statement?

A    That's true.

Q    And in fact, it's a fair statement that you believe that Donnie Fell was appropriately sentenced to death, correct?

A    Based on the conditions that were outlined in the procedure, yes.

Q    And now, today, sir, you understand how we're trying to use your statement, correct?

A     You're trying to use me and contort -- yes.

Q     And I take it you're not happy with that, correct?

A     No.

Q     You think it would be wrong if your statement could be used to undermine the sentence in this case.

A     At this point, yes.

Q     Okay.  And, sir, when you reviewed your statement, you made changes to it, didn't you, when you saw that there were things that were inaccurate?

A     Yes.

Q     And you asked for things to be added where you thought that there were important things that were omitted?

A     Right.

Q     And you didn't change the statements about the fact -- that your visit to Rutland during the -- during the trial, correct?

A     Like I said, I read over it quickly.

Q     And you didn't --

A     I just did a reclassification at work where I had to do a writeup of a job that I do every day, and I did that writeup with my partner where we have to describe in detail, much like this, what we do every day.  I have done this job for 28 years.  It took us about eight drafts of this.  Even after eight drafts, my boss looks

at it, he adds some more stuff, add more questions.  We submitted this.  We still had to go in front of a panel because there were still questions because they didn't understand.  It's not always easy to put your thoughts on paper.

Q    You asked for things to be added where you thought the statement was incomplete, correct?

A    Sure.

MR. LIMAN:  Your Honor, I'd ask for the witness's statement to be marked as Defendant's Exhibit 1.

THE COURT:  Okay.  With the redaction to the name, is there any objection to that?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  So admitted.

MR. LIMAN:  I have a courtesy copy for your Honor.

THE COURT:  I have got it here.

MS. RODRIGUEZ-COSS:  For the government?

(Defendant's Exhibit 1 was received in evidence.)

BY MR. LIMAN:

Q    Sir, I am handing you what I have had marked as Defendant's Exhibit 1.  Do you recognize that as the statement that you signed back in December of 2010?

*SEALED BY ORDER OF THE COURT*    38

A    Yes.

Q    And at the time you signed it, you believed it was correct, right, sir?

A    Based on a quick review, yes.

Q    And when you -- the -- if you look at it, there are initials off to the left side?  You see that?

A    Um-hum.

Q    And those are your initials; is that correct?

A    Should be.

Q    And you put your initials on -- on each of those paragraphs; is that right?

A    That's right.

Q    And you put it on there -- well, why did you put your initials next to each paragraph?

A    Because they told me to.

Q    You are saying they told you to put your initials by each paragraph?

A    Yeah.

Q    That wasn't your idea?

A    No.

Q    And did you understand that by putting your initials by each paragraph, you were indicating you agreed with the statement that was in that paragraph?

A    Those are your words.

Q    What did you think your initials --

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   39

A    My initials were put there because I read it.

Q    And you agreed with the statements, correct?

A    I don't agree with it.

Q    You are saying you did not agree with it at the
time you signed it, sir?

A    Probably not.  I didn't read it well enough,
obviously.

Q    Let's go through it.  Paragraph number two.  Do you
have that in front of you?  Can you read that to
yourself?

A    (Witness reading.)

Q    Tell me when you're done.

A    Okay.

Q    Are the statements in that paragraph true?

A    Minus a couple omissions.

Q    The omissions things that make it incorrect?

A    No, there was other stuff that we had talked about.
There's a lot of stuff that we talked about that isn't
in this.  We talked for quite a while, and this looks
like, you know, we were 15 minutes.

Q    And, sir, in fact, paragraph two, where it says,
"This trial has changed me and I am now more
compassionate and involved" --

A    And untrusting.

Q    And that was a truthful statement; is that correct?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          40

A     Minus the word "untrusting."  You left that out.

Q     Okay.  And then you go on to say, "I watch the news a lot now and keep a watch on the kids in my neighborhood"?  That was true?

A     I still do that.

Q     And you said, "My responses to the questionnaire were honest and I took my time answering them"?

A     That was during the voir dire.  That was the questionnaire.

Q     Was that a truthful answer or false answer, sir?

A     That is true based on the voir dire, that 35-, 40-page SAT-version questionnaire that took me two something hours to fill out.

Q     Were your answers truthful in that questionnaire?

A     Yes.

Q     Would you read paragraph three, sir, and tell us whether the statements in that paragraph are accurate.

A     (Witness reading.)

      True minus a couple other things you left out. There's no way I would mention any food without mentioning the Leonardo's.  Good pizza.  And I know -- I talked about the 15 pounds that I ate because I was stressed out eating Dunkin' Munchkins out in the jury room.

Q     You go on to say -- but the paragraph is true, the

*SEALED BY ORDER OF THE COURT*                    41

statements that you made in that paragraph, correct?

A    When you take out stuff, yeah.

Q    And you say in that paragraph, "I told my then live-in girlfriend that I wasn't allowed to hear about coverage of the case," and you didn't talk to her about it during the trial.  Was that statement true or false, sir?

A    No, that's true.

Q    And, sir, in fact, what you have talked about, that you don't understand things all that well, isn't it correct that you graduated from the University of Connecticut?

A    I did.

Q    You are a biologist?

A    Yeah.

Q    You were a biologist with the Agency of Transportation, correct?

A    Yes.

Q    They tell you that you don't understand things all that well, the Agency of Transportation?

A    I have co-workers correct my work daily.

Q    Sir, would you look at paragraph four.  You initialed that also, correct?

A    Um-hum.

Q    And that was because that paragraph was true as

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    42

well?

MS. RODRIGUEZ-COSS:  We object to that.  It's one of the paragraphs that the Court specifically said would go into the jury deliberations.  We don't see why it has to be the subject of questioning here.

MR. LIMAN:  Your Honor, the witness has disavowed his declaration.  I think I am permitted to show that his disavowal is selective.

THE COURT:  Well, objection overruled.  You can do that.  Again, I would be sensitive about getting into any issues in regard to the deliberations, but in paragraph four, I don't see much about deliberations.

MS. RODRIGUEZ-COSS:  He is talking --

THE COURT:  Regardless, you can ask that general question as to whether in fact his representation was true in that report.

A    It's false, representation.  I think the statement that "I think the defense made a mistake by not having Fell testify -- made a mistake by not having Fell testify," that's not my words.

BY MR. LIMAN:

Q    Sir, was that your belief when you signed the declaration?

A    No.  Those weren't my words.

Q    Was that your belief?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        43

A   They made a mistake, but that's not how I phrased it.

Q   How did you phrase it, sir?

A   I said they fucked up.

Q   Okay.

A   That they should have put him on the stand and said "I'm sorry." That's what we had discussed with your people.

Q   And then --

THE COURT:   That -- that was discussion with them, with the lawyers, not with the other jurors. Right? So go ahead.

JUROR NO. 143:   Well, I had said that with the jurors --

THE COURT:   Without getting into discussion about the deliberations. So, go ahead.

MR. LIMAN:   Okay.

BY MR. LIMAN:

Q   And, sir, I am not asking about the deliberations but about your views, sir, at the time you signed this declaration.

The time you signed this declaration, you believed that Mr. Fell showed no remorse; is that right?

A   I still believe that.

Q   Okay. And, in fact, sir, if you look at this

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        44

declaration, that's not how the sentence was originally written, correct?

A    I don't know what was there.  It's crossed out.

Q    Right.  What was originally written said, "He barely showed any remorse," and you struck the word "barely" and you -- it was you who substituted the word "no" for "any" so that it would read, instead of "he barely showed any remorse," "he showed no remorse," correct?  You made that change.

A    Yes.

Q    And that's because you thought that the sentence as originally drafted was not accurate.  You made that --

A    You want to Wordsmyth it, yes, I made the change.

Q    And you were Wordsmything it, correct?

A    I'm not a very good one, am I?

Q    Now, in paragraph number five, that's the paragraph that you said is inaccurate, correct?  One of the paragraphs?

        (Brief pause.)

A    What was your question?

Q    Is that paragraph -- the statements in that paragraph true or not true?

A    I did not go to Rutland or any place of concern for this case during the trial.  So that would make talking to the jurors about that false.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

And as for Price Chopper, I only know it was dark because of the testimony of the guy with the bread truck or whatever it was, he was a delivery guy, that saw two dark shadows come out from the side, and I had worked at Price Chopper in the Barre-Montpelier Road, and I had already -- not even -- no one of this case had complained because the employee parking lot, which is off to the side, was really dark and wasn't very smart for people to be parking there.

Q    When did you come to the realization, sir, that the statements in this paragraph you didn't think were true?

A    Oh, two weeks ago, when I saw the peeper -- paper.

Q    And did you -- did the government visit you, sir?

A    They did.

Q    And you talked to them?

A    I did.

Q    You talked to my colleagues, correct?

A    No.  They had the decency to call ahead and ask.

Q    I take it that --

A    Like I said, I don't accept unannounced visitors.

Q    And they showed you the declaration, correct?

A    They did.

Q    And it was at that point the first time that you came and -- came to the realization that you said that these statements are not true, correct?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                46

A    That's right.

Q    Okay.  Now, sir, if you look at paragraph six -- I am going to get back to paragraph five in a moment.

A    I'm sure you will.

Q    Paragraph six, statements in that paragraph true?

(Brief pause.)

A    Looks to be.  We took it serious.  Still do.

Q    And paragraph seven, did you believe the statements in paragraph seven were true when you affixed your initials to it?

A    Abbreviated version of what took place.  It's true. Very abbreviated.

Q    And you believe those statements are as true today, correct?

A    I wouldn't put the quotes in there.  I remember holding up two pictures in the jury room.  One picture was Theresa King before and the other was the one that gave me the nightmares.

Q    Paragraph nine, the statements in that you believe to be true when you affixed your initials to it?

A    Yep, all two sentences.

Q    And you believe those statements are true today, correct?

A    I do.

Q    Paragraph 10, you believe that statement was true

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*            47

when you affixed your initials to it?

A    You forgot eight here, if you -- you can't count, but --

Q    Don't worry.  I will come back to it.

A    Okay.

Q    Paragraph 10?

A    Just checking your math.

Q    The statements there -- did you believe the statements there were true when you affixed your initials to it?

A    Again, a gross understatement.  It's still sticking with me.  I went to counseling for about two years.  So the sentence, "the photographs stuck with me a very long time," is a very, very gross understatement.

Q    I take it the trial was a fairly traumatic experience for you?

A    I bet it was for everybody.

Q    And those statements in paragraph 10, you believed them to be true today, correct?

A    All one sentence.

Q    Paragraph 11, the statements were true when you made them?

A    I didn't look at any of the newspapers or any of that.  Basically I had people asking me questions, so I -- I didn't look at publicity, I guess is how it's

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          48

phrased.  I had people asking me what took place.

Q    And you had people tell you what was in the news?

A    Right.

Q    Okay.

A    And it seemed like they skipped over a lot of the nitty-gritty stuff.

Q    And that statement also is substantially true today, correct?

A    I didn't look at any publicity, so that is wrong.

Q    But you were aware of the publicity.  Substantially true, correct?

A    I was aware there was publicity of the case.

Q    In paragraph 13, the language says, "It bothered me that there were two more murders that never went to trial and that the victims were forgotten."  You see that?

A    Um-hum.

Q    And you see that's written in somewhat different pen than the rest of the statement?

A    Um-hum.  Because that's the only part I wrote. That's right.

Q    Correct.  That's what you wrote.  That's the part that you wrote.  And you believed that when you added that, correct?

A    Right.

*SEALED BY ORDER OF THE COURT*

Q    And the murders that you were talking about there were the murders that took place in Vermont, correct?

A    Right.

Q    Of Rutlanders, correct?

A    Right.

Q    People -- this was a Vermont crime in your mind, correct?

A    No.  It was a federal crime.  It crossed state lines.

Q    And you believed that you were concerned that the victims were forgotten, correct?

A    I still think they were.

Q    And that was a view that you had coming out of the trial, right?

A    Um-hum.

Q    Yes?

A    Yes.

Q    Okay.  And it was a view that you had that there was not enough attention paid to what happened in Rutland.

        MS. RODRIGUEZ-COSS:  Objection, your Honor. That's beyond the scope of this hearing.

        THE COURT:  Objection sustained.  You can move on at this point.

        MR. LIMAN:  Okay.

BY MR. LIMAN:

Q   And, sir, let me now ask you about paragraph number five.  See the sentence there that says, "We discussed the evidence like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper"?  You see that?

A   I see the sentence.

Q   Okay.  Sir, and now --

A   I did not go to Robbins Street during the trial, so you can save your question.

Q   Okay.  Sir, my question to you is, before the trial took place, you said you had been to Rutland; is that correct?

A   I'm familiar with Rutland.  Not Robbins Street.  Never been to Robbins Street before.

Q   Okay.  That was my -- going to be my question, sir.  You anticipated it.  And you did in fact discuss the evidence, correct?

A   We had discussed it -- all kinds of stuff.

Q   The rock, the shotgun, correct?

A   Um-hum.

Q   The photos of Mrs. King?

A   Um-hum.

Q   Now, you go on to say that "the mother's

*SEALED BY ORDER OF THE COURT*    51

neighborhood wasn't great but it was okay."  You see that?

A    Um-hum.

Q    Was that your view at the time of the trial?

A    I didn't know her neighborhood at the time of the trial.  This was based on my visit back in 2010, probably September-ish.  I was on my motorcycle.

Q    You say, "The house was decent.  She was just trying to live her life."  Is that your view at the time of the trial?

A    I didn't know what her house was at the time of the trial.

Q    Sir, isn't it correct that Deena and Brian, the two people came to talk to you, asked you, Did you go to Rutland during the trial?

A    I did not go to Rutland during the trial.  They must have misunderstood something.

Q    Sir, did they ask you the question whether you went to Rutland --

A    I don't recall, but I know I did not go to Rutland during the trial.

Q    And, sir, you told them that you did go to Rutland during the trial; isn't that right?

A    No.

Q    Ah --

*SEALED BY ORDER OF THE COURT*

A    I did not go to Rutland during the trial.  I don't remember them asking me if I specifically went there, but I know I did not.

Q    Now, you went on to say, "The lighting at the Price Chopper in Rutland was weak."  Do you see that?

A    Um-hum.

Q    And was -- the answer's yes to that?

A    That's correct.

Q    Okay.  For the court reporter's purpose, you need to say yes or no, give a verbal answer.  Is that okay?

A    Gotcha.

Q    Okay.  And was that an observation you reached during the trial or --

A    During the trial, if you recall, I don't know if you were in the room, but there was a bread truck delivery guy, I believe it was a bread truck delivery guy, who went and he saw two shadows, two guys come out of the shadows of Price Chopper.  He was the guy who wound up going into the Price Chopper, getting the manager, and when they came out, the two people were gone.

Q    Sir, was that --

A    Because of his testimony, it is fair to say it was dark because that's what shadows are.

Q    And you then say at the time you worked at the --

*SEALED BY ORDER OF THE COURT*         53

well, did you make that observation about the lighting at the Price Chopper in Rutland during the trip that you said you made after the trial?

A    I have never been to Rutland in the night.

Q    Okay.  When is it that you said you made this trip to Rutland?

A    I guess it was probably September 2010.

Q    And what prompted you to make the trip then?

A    I had my motorcycle, wanted to ride, you know, based on the fact that I could ride on that thing and save gas.  I wasn't going to go do it in my own truck at 19 miles to the gallon.

Q    You said you made the trip in September of 2010?

A    That's right.

Q    So your testimony, sir, is that you made that trip just months before you signed this declaration?

A    Yeah.

Q    And did you tell the investigators that?

A    Which investigators?  Your people?  The --

Q    Yes, from my office.

A    I believe I did.  Yeah, if you recall, I was drinking back then.  I was in the middle of a breakup.

Q    Were you drinking when you signed the declaration the following day?

A    Probably.  I was on pretty good bender here.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        54

Q    Did you tell people that you were not able to sign the declaration?

A    I wasn't that drunk.

Q    Did you tell anybody you couldn't read the declaration?

A    (No verbal response.)

Q    Now, in fact, let's turn to paragraph eight  You initialed your names next to the sentence that says, "A female juror pointed out the shotgun was not loaded." Correct?

A    That's correct.

Q    And then it goes on to say, "The marshal then brought in the gun."  You see that?

A    I see that.

Q    Okay.  It says, "We showed the jury that it was unloaded."  Correct?

A    I see that.

Q    Sir, when you said --

A    I don't believe this state -- this whole paragraph.

Q    What did you think that it was saying when you signed it?

A    I don't know what I was thinking at the time, but I know I think it's wrong right now.

Q    And then --

A    I don't think it's wrong.  I know it's wrong.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                55

Q    And then you go on to say, "I cocked and pointed it at her and she squirmed."  That was a --

A    False.

Q    -- truthful statement, sir, wasn't it?

A    No.

Q    That's what --

A    I have never aimed a firearm at anybody, not in this court, not out of this court.  I simulated pointing a firearm.  There was no firearm left in the jury room.

Q    You picked up the gun and you pointed it at the juror.

A    No.

Q    You saying you didn't do that?

A    That's what I'm saying.  There was no firearm in the jury room pointed at anybody.

Q    You just happen to be mistaken.

A    That's right.

Q    Sir, I want to go back to the trip to -- to Rutland.  I understand you said you made that in September of 2010.  Put aside the date.  Tell me what -- what you did when you went to Rutland.

A    Rode my motorcycle.

Q    Where did you go?

A    Went around Rut- -- Rutland.  Then I rode down through Whitehall and hopped onto Route 22, tooled down

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    56

there.  Have friends down that area.

Q    You visited the Robbins Street residence, correct?

A    I didn't go at the house.  I went by it, looked at it.

Q    Observed the neighborhood, correct?

A    Yeah.

Q    Looked at the other houses nearby, correct?

A    Yeah, looks like my neighborhood, minus the flood.

Q    How does it compare to your neighborhood?  It's better than your neighborhood, right?

A    Yeah, it didn't get flooded, to my knowledge.

Q    And you -- you drove your -- your car from the Robbins Street residence --

A    Motorcycle.

Q    Your -- you saying you drove a motorcycle, not a car?  Didn't you tell our people you drove a car?

A    No.  Motorcycle.

Q    And didn't you take -- go from the Robbins Street residence to the Price Chopper?

A    I did a little loop, all, what, half mile.

Q    Tried to retrace the steps that you understood Mr. Fell had taken?

A    On the motorcycle.  He wasn't on a motorcycle, but --

Q    You got a sense of what the distances looked like?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    57

A    I already knew the sense.

Q    How did you know the sense?

A    I'm familiar with Rutland.

Q    And Robbins Street, you said?

A    No.

Q    So how did you --

A    I never had any projects on Robbins Street.

Q    So how did you have a sense of the distances if you had never been to Robbins Street?

A    Because they showed aerial photos during the case. I use aerial photos every day in my job. I'm a map nerd.

Q    You got a sense what the lighting was like?

A    No.

Q    You got a sense --

A    The sense of the lighting was based on the testimony of some delivery truck driver during the case. I was never in Rutland in the evening hours.

Q    Got a sense of what the -- how much activity there was on the streets, correct? Between the Robbins Street and the shopping mall?

A    That was daylight hours that I was there. It wasn't at the wee hours of the morning that this would have taken place.

Q    And even in the daylight hours, you had a sense

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    58

there's not all that much activity on those streets, correct?

A    There was activity.

Q    Now, you also got a sense of what the distances looked like within the shopping center, correct?

A    I already knew that, but whatever.

Q    Got a sense of how long it took to walk from the entrance of the shopping center to the -- to the Price Chopper?

A    I already knew that, but --

Q    Somebody, if they wanted to go to the edge of the Price Chopper, would have had to make an affirmative decision to go there?  You got that sense?

A    What's that question?

Q    The question is, you got the sense that if somebody wanted to go to the edge of the Price Chopper, they -- withdrawn.

Somebody -- got the sense if somebody ended up on the side of the Price Chopper, having entered at the entrance to the parking lot, that would have had to be a deliberate decision?

A    I don't really understand your question.

Q    You don't have --

A    The store's only, what, 300 feet wide.

Q    You don't end up in that alleyway by the Price

Chopper by accident.

A   I didn't go into the alleyway.

Q   You knew where it was.

A   Right.

Q   And you don't end up there just by accident.  You go -- end up there because you choose to be there.

A   I drove by the Price Chopper, yes.  On the bike.

Q   You wanted to check it out?

A   Just wanted to go by the whole journey.

Q   Okay.  See where --

A   It was a moot point.  I mean, this is -- it was five years after the trial.

Q   See -- get a sense of the things that were missing from the trial, right?

A   There wasn't anything missing.  The only thing missing is a lot of details in here:  the fact that two people got murdered, that your client tried to allude police, that they carjacked some people, that they beat some woman senseless with a rock while she pleaded, she feared for her life, she tried to dive out of a moving car.  I didn't forget.

Q   Thank you.

A   But they didn't put that in there, did they?  They left out a lot of details.  They left out the details and I know, I know.

MS. RODRIGUEZ-COSS: I'm sorry, your Honor, we hate to interrupt but we are going way beyond the scope of the questioning of counsel.

THE COURT: Right. Objection sustained. I think we can go on to the next question.

(Brief pause.)

BY MR. LIMAN:

Q   Sir, just a couple more. When the investigators first met with you, you were coming back from deer camp, right?

A   I -- not sure what I was doing.

Q   You don't remember that. Okay. And when they left --

A   I know I was drinking.

Q   When they left, you gave them each a bottle of jam; isn't that right?

A   Probably.

Q   And a map of Vermont?

A   Probably.

Q   And you didn't think at that point that anybody was putting words into your mouth, right, sir?

A   No, not until recently.

(Brief pause.)

MR. LIMAN: Your Honor, I have no further questions.

*SEALED BY ORDER OF THE COURT*    61

THE COURT:  Okay.  Ms. Rodriguez-Coss?

EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    Good morning.  How are you?

A    Ah, I have been better.

Q    My name is Jacabed Rodriguez-Coss.  You and I have never met.  I was not involved in the trial of Donald Fell.

A    Okay.

Q    I work at the Department of Justice and I have been assisting Mr. Darrow here in the local U.S. Attorney's Office with these post-trial proceedings.  So I just like to follow up with you a couple things.

When two people show up at your house unannounced, they didn't make sure that you understood who they were; is that correct?

A    I wasn't really in the condition really to understand.

Q    All right.  So you -- let's talk about that a little bit.  You said that you -- I think defense counsel just asked you that you came back from deer camp?

A    Um-hum.

Q    And I am not from Vermont, so can you tell us what -- what that is and what were you doing?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    62

A    Deer camp and beer camp are one and the same sometimes, and there's a little drinking going on.

Q    Okay.

A    And I was in the middle of a big breakup with the gal I had been seeing.  My birthday was a few days prior, and I was still on a pretty good bender, and -- and so all a sudden these people show up.  There's a man and a woman in a suit, and like I said, I thought they were Jehovah Witnesses.  Then they mentioned my name, and I heard Donald Fell and court, and I'm like, "errr?"  And then they said, "We'd like to ask you a few questions."

Q    So you assumed that they were representatives from the court, and they did not correct you.

A    Right.

Q    And did you tell 'em you just come back from deer camp and you had been drinking?

A    Well, they probably should have smelt it on me, yeah.

Q    And they went ahead and interviewed you at that point anyway?

A    Right.

Q    For several hours?  How long would you think that the interview lasted?

A    It was a long time because I know the gal I was

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    63

seeing, we were supposed to talk again, and I never called her back for quite a while.  She was even more irritated than ever and that kind of accelerated the breakup even more.

Q    Sorry.

A    No, it's -- it was for the better, that part.

Q    Sorry to hear that.

All right.  And so be fair to say -- you have defense Exhibit A I believe right there in front of you, right?  It be fair to say that this does not summarize the entire conversation that you had with these two representatives from the defense team on that day.

A    Correct.

Q    And is that one of the things that is somewhat bothersome to you, that you spent hours talking to them, you gave them a lot of details, and they have reduced it to just what is contained in Exhibit A?

A    Reduced, simplified and contorted, I would say.

Q    All right.  Now, you met with -- is that -- now, you said you understood them to be from the court, so when defense counsel tried to go back -- well, let me ask you this.  Let me ask you this.

You received a summons from the court; is that correct?

A    That's right.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     64

Q    And what did you do when you received that summons?

A    Well, that was kind of an entertainment too because they had -- the marshals had my wrong address, so all of a sudden the neighbor comes over to me and she's like, "Dude, what the -- did you do?"  And I go, "What do you mean?"  She goes, "There were U.S. Marshals crawling up and down the street looking for you," because they had my wrong address so they are knocking on doors looking for me.

So all of a sudden I'm like, "errr?"  So I assumed it had something to do with this.

Q    So the entire neighborhood knew --

A    Oh, yeah, yeah.

Q    -- that you had been summoned to court?

A    Oh, yeah.  It was entertaining.

Q    All right.  Did you call the court at that point?

A    I did.  Well, actually I waited a couple days, because that was -- that was another one.  You know, that was another unannounced visit at July 3rd, you know.  And that kind of ruined my whole 4th of July weekend this year.

Q    All right.  But then so a couple days later you called the court?

A    That's right.

Q    And what did you say to them?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                65

A    Said that, you know -- well, there was a business card.

Q    Okay.

A    And --

Q    Did you ask them why they wanted to talk to you again?

A    Right.

Q    And --

A    And they said, "You're getting a subpoena."

Q    And was it the court personnel at that point that informed you that court personnel had never spoken to you?

A    No.  It was a -- no, the card was from a -- a marshal.

Q    Okay.

A    And I talked to him.

Q    Oh, you talked to the marshal.

A    And he set up the time to get it to me.  He met me at work, and --

Q    To bring you the summons?

A    That's right.

Q    Okay.  But I am saying, after -- after you received the summons and it's asking you to come into court, did you actually call the court and try to find out what this was all about?

*SEALED BY ORDER OF THE COURT*

A    I called the -- the court clerk, I guess it was.

Q    Okay.

A    Yeah.

Q    And what did they tell you?

A    And just asked 'em, you know, what I need to do and all that.

Q    And was it she that clarified that you had spoken to --

A    He.

Q    He that clarified that you had spoken to representatives from the defense and not from -- to representatives from the court?

A    No.  At that time I didn't know.  It was three weeks -- three weeks, four weeks and a day, it was a Wednesday, they showed up the day I told 'em take a hike.  But in that brief discussion, which was real brief, the guy right there, behind you, not the one I was talking to, the other guy -- yeah, that guy.

Q    Mr. Rubin?

A    He said, "You had already spoken to a couple members of our team."

Q    I see.

A    And that's when all of a sudden the light started flashing.  I started realizing who I had spoken with.

Q    I see.  So that whole time you thought you were

*SEALED BY ORDER OF THE COURT*                67

speaking to representatives of the court?

A    That's right.

Q    All right.  Now -- and so is it -- is that why you refused to speak to them a second time, because you were upset, you felt they had not been forthcoming with you when they first visited you?

A    Well, it was more -- it was more an unannounced visit --

Q    Okay.

A    -- and I was pretty irritated.  I get pretty irritated when people do unannounced stuff.  I am not a surprise fan.  And the -- I guess they're defendant -- plaintiff group had the decency to call and arrange a time.

Q    All right.

A    Show -- they showed more respect.

Q    Okay.  And when you are talking about the government, you are talking about the FBI agent Michelle Delpha, who is present in court?

A    That's right.

Q    And when she first -- the first time that she -- is it correct to say that you spoke to her several times?

A    Yes.

Q    Personally and then on the phone; is that correct?

A    Yes, once in person.

*SEALED BY ORDER OF THE COURT*    68

Q    And then you had a few follow-up conversations with her over the phone, right?

A    As I remembered.

Q    And the first follow-up conversation, wasn't that because when Miss Delpha first spoke to you, she did not have your statement with her?

A    That's right.

Q    Okay.  So she didn't show you defense Exhibit A during that first meeting.

A    Right.

Q    And she asked you if you had taken a trip to Rutland during the trial, and you said no.

A    Right.

Q    Right?  But she didn't have your statement with her so she couldn't confront you with your statement at that time; is that correct?

A    Correct.

Q    All right.  She did ask you about the fact that you provided a statement to the defense?  Did you ask Miss Delpha to send you that statement?

A    Yes.

Q    All right.

A    Well, she said she had gotten it, yeah, and -- yeah.  And she Fed-Ex'd it.

Q    And she did send it to you, in fact?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        69

A    That's right.

Q    Okay.  And when you received it, and you had an opportunity to review it again, you called her back?

A    Um-hum.

Q    And advised her that there were some misunderstandings in the statement?

A    Right.

Q    Right.  And the first misunderstanding is that you are certain that you never went to the crime scene during the trial.

A    That's right.

Q    All right.  Let's talk about that for a little bit. You said before that you are very familiar with Rutland.

A    Um-hum.

Q    Can you just give the Court an indication or -- you know, of how familiar you are with that area and how you have come to be familiar with that area?

A    I have projects all over the state.  I know of -- at the time of the trial, I didn't have Rutland in my territory anymore, but I started working with VTrans in '92.  At that point I had the whole state, was my territory, and so any transportation project was mine to get the permits for.  So I had numerous projects in and around the Rutland area, and of course Rutland, you have to go through Rutland just to get there, and because the

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

70

food generally stinks in a lot of Vermont, I tend to plan my trip for lunch in Rutland, and The Sandwich Shop and Ramunto's are two of my prime spots. I tend to travel on my stomach.

Q   All right. Well, I am not from Vermont so I am not taking any offense to it.

A   It's good pizza. Ramunto's.

Q   My experience has been very positive, so --

A   You gotta go, Ramunto's.

Q   All right. So when you talk about transportation projects, can you just give us an idea what you mean?

A   Every road, bridge, paving project, bridge maintenance projects, aviation project, rail project, I have to look -- review for the environmental impacts and determine what level of permitting is required, state and federal permitting.

Q   And you can't do that from behind a desk?

A   You do some, you do some. I mean, you can -- you have to do some background information, but then you have to actually go to the site.

Q   So you have to actually visit the sites in order to complete your work?

A   Right.

Q   Right. And some of these transportation projects that you have conducted in the past were in the vicinity

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

of Rutland?

A   Um-hum.

Q   So it's fair to say that you were very familiar with Rutland, and wasn't it --

A   In Rutland, some of 'em.

Q   And some of the locations in Rutland?

A   Right.

Q   You have driven by the Price Chopper before?

A   Um-hum.  Actually we -- we're kind of cheap.  We don't like to pay for the meters in Rutland, so we actually park in Walmart parking lot.

Q   So you are familiar with the Walmart that was mentioned in court during the trial?

A   Right.

Q   You were familiar with the Price Chopper?  Were you familiar with the Dunkin' Donuts that was mentioned?

A   Actually I had been there a pile of times before, and I don't go there ever again.

Q   All right.

A   Just brings it all up.

Q   And there were photographs of these places introduced at trial, is that not --

A   Um-hum.

Q   Did you find those photographs to be accurate depictions of the places that you -- that they were

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        72

trying to show to the jury?

A    The aerial photo was very telling for me.  It puts it all into perspective --

Q    Okay.

A    -- because that is how I do 98 percent of my work, is through aerial photos, and there's this thing called ArcMap which is very similar to --

Q    And during the trial, when you heard these places mentioned, you remembered these places?

A    Um-hum.

Q    They were clear in your mind?

A    Right.

Q    All right.  Now, when you said that there was a possibility that there was a misunderstanding by the defense investigators, you are referring to the fact that they must have misunderstood the timing of when you visited these places.  In other words, you are not denying that you took a trip and went to Rutland to see these places.  Your only argument with the defense is that it didn't happen during the trial.  It happened after the trial.  Is that correct?

A    Correct.

Q    Okay.  Now, you mentioned a motorcycle and you mentioned you were very specific about the fact that when you visited these places, you were on your

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                    73

motorcycle?

A      Um-hum.

Q      When you first go to Agent Delpha from the FBI, did you remember that or did you remember that after you reviewed your statement?

A      I remembered it after reading.

Q      And when you received your statement, did you call Agent Delpha?

A      I did.

Q      And what did you tell her about that?

A      Yeah.  When you read something, it triggers memories and you have to go through it a hundred times, and I remembered taking my motorcycle, and I had a motorcycle before the one that I took this trip on, but that was a dirt bike, and it wasn't something that anybody in his right mind would have driven from Northfield down to Rutland because that's, well, 70 miles.  The round trip would've killed you.

Q      On a dirt bike.

A      Right.

Q      Right.  And when you first spoke to Agent Delpha, did you remember when you had purchased that motorcycle?

A      I did.

Q      When was that?

A      It was in August of 2010.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    74

Q    Okay.  And did she ask you whether you had any documents or records regarding that motorcycle?

A    She did.

Q    And what did you tell her?

A    I used to have 'em but they -- I didn't have 'em anymore because Irene flooded my garage and sunk the motorcycle.

Q    All right.

A    It was totaled.

Q    Were you able to dig up some photographs for Agent Delpha of that motorcycle?

A    I did.

Q    And did you provide those to her?

A    I did.

          MS. RODRIGUEZ-COSS:  Your Honor, we would like to have a couple photographs marked Government's Exhibits 1 and 2.

          THE COURT:  All right.  Any objection to 1 and 2?

          MR. LIMAN:  No, your Honor.

          THE COURT:  So admitted.

          (Government's Exhibits 1 and 2 were received in evidence.)

          MS. RODRIGUEZ-COSS:  May we approach the witness, your Honor?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                75

THE COURT:  Yes.

BY MS. RODRIGUEZ-COSS:

Q    I am going to bring your attention first to what has been marked Government Exhibit 1.  Can you -- the identification sticker is on the back.  So if you could refer to Exhibit 1 and tell us what that is.

A    That was my motorcycle as I found it on August 29th, 2011.

Q    What's the significance of that date?

A    It's the day after Irene.

Q    All right.  And can you see the license tag --

A    Um-hum.

Q    -- on that photograph?  Can you tell us what that license tag is?

A    It's KC424.

Q    Okay.  And you had -- you had lost the documentation pertaining to that motorcycle; is that correct?

A    Nah, I had thrown it out.

Q    All right.

A    I mean, I didn't have the bike anymore, so -- was no need for hanging onto that.

Q    Okay.  And let me bring your attention, before I move on, to Government Exhibit 2.  Can you tell us what that is?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        76

A    That's -- that's a side view of the motorcycle because the number 1 is just a back view and it's all covered with mud.  But the 2 is a side view of my beaster.

Q    Okay.  So I want to --

MS. RODRIGUEZ-COSS:  Your Honor, I want to have the next document marked Government Exhibit 3.

BY MS. RODRIGUEZ-COSS:

Q    Let me bring your attention to Government Exhibit No. 3 and ask you to review that document.  Do you recognize what that is?

A    It looks like the bill of sale for the motorcycle.

Q    For your motorcycle?

A    That's right.

Q    And does it reflect the day that you purchased it?

A    Ah-da-da-da-da-da-da-da.  Looks like 8/17/2010.

MS. RODRIGUEZ-COSS:  Your Honor, we would like to submit Exhibits 1, 2 and 3 into evidence.

THE COURT:  Any objection?

MR. LIMAN:  No objection, your Honor.

THE COURT:  So admitted.

MS. RODRIGUEZ-COSS:  All right.

THE COURT:  1 and 2 have already been admitted.

(Government's Exhibit 3 was received in

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                  77

evidence.)

MS. RODRIGUEZ-COSS: We would like to have two more marked, your Honor, 4 and 5.

BY MS. RODRIGUEZ-COSS:

Q   I bring your attention to -- well, let me get back to the microphone.

Let me bring your attention to what's been marked Government Exhibit 4. Do you recognize what's depicted in that photograph?

A   Yeah.

Q   What is that?

A   That was a picture of me on my 2005 Yamaha 450 dirt bike. That was taken during the toy run that summer.

Q   All right.

A   That summer -- the summer 2008, I think it was.

Q   Okay. And is that the dirt bike that you were referring to --

A   It is.

Q   -- that you also owned but would have never driven long distances?

A   Right. I traded this in for the beaster.

Q   All right. And do you remember when you acquired this dirt bike?

A   I got a cheat sheet here.

Q   All right. So you -- so you are referring to

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   78

Government Exhibit 5, right?

A    Yeah.  It was a 2005 dirt bike.

Q    All right.  And let me bring your attention to Government 5.  Do you recognize that document?

A    That's the bill of sales as well.

Q    All right.  And does that indicate to you when you acquired the motorcycle that's depicted in Government Exhibit 4?

A    October 4, 2007.

Q    All right.  And you are certain that when you visited Rutland after the trial, you did so on -- on your motorcycle?

A    That's right.

Q    And we're talking about the one depicted in the government exhibit, right?  I don't know much about motorcycles --

A    Right.

Q    -- but what is that called, the bigger bike?

A    It was a -- it was a Yamaha 1300 --

Q    A Yahama --

A    -- V Star Touring.

Q    All right.  That's --

A    Nice comfy bike versus --

Q    Okay.  And it was, according to the paragraph four or paragraph five of your -- of your statement, that's

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    79

the bike that you also used to drive by the crime scene in New York; is that correct?

A    That's right.

Q    All right.  So you couldn't have taken that trip before you acquired your motorcycle.

A    Right.

Q    That's basically your testimony.

A    Right.

Q    All right.  Now --

A    I could have taken it in a car but it would have cost me a fortune.  And it wouldn't have been fun.  Not that it was fun anyways, but, you know.

Q    All right.

MS. RODRIGUEZ-COSS:  With the Court's indulgence, your Honor?

(Brief pause.)

BY MS. RODRIGUEZ-COSS:

Q    Now, very briefly -- I keep wanting to say "mister" but I know I can't say "mister."  It's --

THE COURT:  Mr. 143.

MS. RODRIGUEZ-COSS:  Mr. 143.

JUROR NO. 143:  Woohoo.  I'm a number.

BY MS. RODRIGUEZ-COSS:

Q    The defense also asked you about an incident that you described to their investigators when they met with

you a couple of years ago involving a shotgun.  Do you recall that?

The defense asked you about it today in court.

A    Okay.

Q    All right.  And you -- you have testified very -- very clearly that there was no shotgun in the jury room.

A    That's right.

Q    You never pointed a shotgun at another juror.

A    Or anybody else even outside of court.

Q    Or anyone else even -- even outside of -- anybody outside of court.

A    Before, during or after this trial.

Q    Right.  Now, obviously when we read statement -- the statement that you signed for the defense, which has been marked Government Exhibit A *[sic]*, it appears to indicate that you were actually holding a shotgun when you were discussing the case with the other jurors.  And I don't want to go into the jury deliberations but I do want to ask you, is it possible that the defense simply misunderstood what you were saying because you were so dramatic in your description as to what you did?

MR. LIMAN:  Objection.

A    Right.

THE COURT:  "Is it possible," it's calling for speculation.  You want to rephrase the question?

*SEALED BY ORDER OF THE COURT*

BY MS. RODRIGUEZ-COSS:

Q    Did you tell them that were you holding an actual shotgun?

A    No.

Q    Was there a shotgun in the jury room?

A    No.

Q    All right.  Now, in reviewing your statement -- and they gave you an opportunity to review the statement.  Let me ask you this.  They came to your house.  They interviewed you for an extended period of time, but -- but the statement was prepared after that and they came back to your house the next day.  Do I have that right?

A    Right.

Q    Okay.  And when they come back to you the next day, you reviewed your statement, but it's your testimony that you probably did not do it as accurately as you could have done.

A    Right.

Q    Is that because you believed these people were from the court and you had no reason to think that they would misunderstand or misrepresent your words?

        MR. LIMAN:  Objection.

A    I don't -- I don't know if it was --

        THE COURT:  Objection overruled.  You can answer that question.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     82

A     I don't know if it was because of that or because I -- you know, when you have two people -- you know, we were in the living room, and my -- I didn't have a couch, and we are sitting on these uncomfortable little wooden chairs that I had -- you know, bachelor pad -- and, you know, you have people on either side of you trying to read this, and even if I sit there and I pay attention to stuff, I'm likely to make errors.

THE COURT:  So --

A     I make errors in my own writing every day.

THE COURT:  Was this statement drafted the first day, later on, and then you wanted to think about it, or was it drafted the second day when they came back?

JUROR NO. 143:  They -- they came back with it.

THE COURT:  All right.  So you never saw it the first day?

JUROR NO. 143:  Right.

THE COURT:  All right.

JUROR NO. 143:  We had talked at great lengths and then they came back with that paper.

BY MS. RODRIGUEZ-COSS:

Q     And they wrote it?

A     Right.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

83

Q    They didn't ask you to write the statement.

A    Right.

Q    They told --

A    It was her -- it was her writing.

Q    And brought it back to you.  And then they didn't read it to you.  They asked you to read it.

A    Right.

Q    And then just stood over you and waited for you to read it?

A    Right.

Q    So you felt a little pressure when you reviewed it.

A    Quite a pressure.

Q    All right.

MS. RODRIGUEZ-COSS:  I don't have anything further, your Honor.

THE COURT:  Okay.  Mr. Liman, any follow-up questions?

MR. LIMAN:  Very quickly.

MS. RODRIGUEZ-COSS:  I'm sorry, did we submit 4 and 5 into evidence?  We would do that at this point.

THE COURT:  No.  Any objection to 4 and 5?

MR. LIMAN:  No objection.

THE COURT:  All right.  So admitted.

(Government's Exhibits 4 and 5 were received in evidence.)

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   84

BY MR. LIMAN:

Q   Just a couple of questions, sir.  Can you describe for us how you simulate cocking a gun?

A   (Witness demonstrating.)

Just like that.

Q   That's what you said you did in the jury room?

A   I -- I just did it in the living room.  I simulated what I simulated in the jury room.

Q   Now --

A   Basically pointed right at the woman who made the comment of the firearm not being loaded because --

Q   Now, sir --

A   -- I said that's really kind of a dumb statement because you don't ask the question when somebody's aiming the business end of a firearm, you don't ask whether or not it's loaded.  It's very smart to just assume it is, because number one rule of firearms is keep it -- trust every gun is loaded and act accordingly.

Q   Pretty scary things.  Would you agree?

A   Firearms?

Q   Yes.

A   Scary?  Depends on if you handle 'em right, they're not.  If you handle 'em wrong, they are.

Q   Some things -- if a firearm is pointed at you, it's

*SEALED BY ORDER OF THE COURT*

a pretty scary thing; is that correct?

A    It should be.  I would imagine.

Q    And, sir, now, how did you get to court every day during the trial?  Did you drive?

A    Yeah.

Q    You are not disputing that you had a car back in 2005, correct?

A    I had a truck.

Q    Okay.  You had a means of transportation, correct?

A    I did.

Q    And you, in 2005, went to Rutland, correct?

A    To investigate the trial?  No.

Q    I asked you whether you went to Rutland in 2005.

A    2000 -- 2005, I went probably through Rutland for the job.  I didn't go investigating anything.

Q    Now, would you take a look at defense Exhibit 1.

A    I don't have it anymore.  The paper shuffle.

Q    Isn't it correct, sir, that you took the -- your motorcycle to New York during this road -- this post -- this road trip?

A    Correct.

Q    And it was on that same road trip that you went to Rutland; is that right?

A    Correct.

Q    Okay.  And if you take a look at paragraph five of

defense Exhibit 1?

A   Which is about two pages long.

Q   Okay.  Take a look at the third page of the exhibit, towards the back of paragraph five.  You see it says there, "After the trial, I drove to New York on a motor -- on my motorcycle"?  You see that?

Tell me when you're there.

A   Oh, I do.

And you don't drive a motorcycle.  You ride.

Q   Okay.  And then you said --

A   Again, those aren't my words.

Q   And then -- but that was -- that was true after the trial, you went to New York on your motorcycle, correct?

A   Um-hum.

Q   Yes?

A   Yes.

Q   And you recognized the spot from the photos?

A   I believe so.

Q   Was that correct?

A   I believe I -- I believe I saw the spot.

Q   And you felt a real -- really negative energy while you were there; is that correct?

A   I did, as I have all the time.  That's why, like I said, I don't go to the Dunkin' Dunuts either anymore.

Q   And I take it you felt that really negative energy

when you were on Robbins Street?

A    I didn't really feel it there.

Q    Okay.  Isn't it -- and that's a trip in which you went to Rutland also, correct?  When you took the motorcycle to New York?

A    Trying to find some closure.

Q    Okay.  And if you look --

A    Didn't get it.

Q    If you look further back in the declaration, when you say that "We discussed the evidence, like the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper," isn't it correct, sir, that you made two trips to Rutland?

A    No.  I didn't go to Rutland during the trial.  And we didn't discuss any trips.  Not me, nobody else went to Rutland, to my knowledge; not me, no other juror went to Rutland.

Q    Now, sir, you testified in response to questions from the government that you thought my colleagues were from the court.  Isn't it correct that my colleague left you our business card?

A    Could have.

Q    And the business card said Cleary Gottlieb, New York, New York?

*SEALED BY ORDER OF THE COURT*

A    I don't even know what I ever did with it, be honest.

Q    And when you called her to say come at three o'clock on the Sunday, you called the 212 number.

A    I don't know.

Q    And you knew a 212 number was not a number for the courthouse in Burlington, Vermont, correct?

A    This is a federal case so there's people all over the place involved in this.

Q    So you knew, sir, isn't it correct, that -- well, sir, when you testified a moment ago that you thought that the lawyers were representatives of the court, that wasn't true.

A    No.  I thought they were from the court.

Q    You thought that they were representatives of Judge Sessions?

A    Yeah.

          MR. LIMAN:  No further questions.

          THE COURT:  Anything further?

          MS. RODRIGUEZ-COSS:  (Shakes head.)

          THE COURT:  All right.  Thank you.  We will take a recess at this point.  We will reconvene at 1:15. And at least at this particular point, the expectation is we would reconvene in a sequestered *in camera* session, and it would be in the jury room, but the Court

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     89

will consider the application of the victim's family to be present.  And it would be helpful if the government had some research to say that when you seal a court hearing, that doesn't cover everyone, because, frankly, I have never been in a situation where you have a sealed hearing and yet some people are allowed in, although I am sensitive to --

MS. RODRIGUEZ-COSS:  Well, there are a lot of --

THE COURT:  -- the victims.

MS. RODRIGUEZ-COSS:  -- in this case, your Honor, but I'm certain the Court --

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  I'm certain the Court can -- if the Court permits these additional people to be present during that part of the hearing, I am certain the Court can order them not to disclose what transpires inside the sealed proceedings, and I see no reason why that would or would not be obeyed.

THE COURT:  So what you'd be suggesting is that if they were permitted to be present while she was being interviewed, that I would order them not to make any disclosure?

MS. RODRIGUEZ-COSS:  That they be under the rules of the Court not to disclose what transpires in

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*       90

those proceedings, your Honor, publicly.

THE COURT:  Okay.  All right.  Well, we'll reconvene at 1:15.  Thank you.

(Court was in recess at 12:25 p.m.)

*THE FOLLOWING PROCEEDINGS ARE SEALED*

*BY ORDER OF THE COURT*

(The following was held in chambers at 1:20 p.m. with all counsel of record present along with Attorney Lisa Shelkrot.)

THE COURT:  Okay, we are in chambers.  I have asked Miss Shelkrot to come here.  She has volunteered to represent the next juror, and I understand that you have spoken with the lawyers in the back of the room who told you that maybe -- there may be an issue as to whether or not the victims' family could be in the room if you consent -- if she consented.  And so I wondered what her reaction is.

ATTORNEY LISA SHELKROT:  I have spoken to her and she is not concerned about the victim's family being there.  I told her it may be quite a number of people.  And that was fine with her.  And I also told her that I thought it was likely that if the victim's family were going to be there, that the proceeding would be in court as opposed to back in the jury room, which I think had originally been contemplated.  She was fine with that.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    91

She wanted to make sure that the press would be excluded and the rest of the public would be excluded even if the proceeding were in court.

THE COURT:  Okay.  And she understands that it's functionally difficult to restrict the family from speaking with other people?

ATTORNEY LISA SHELKROT:  She does.

THE COURT:  She understands that?

ATTORNEY LISA SHELKROT:  She has been advised.

THE COURT:  Okay.  We have looked generally into the issue as to whether in fact you can have a partial sealing, and in light of the reason for the sealing here, that is to protect the juror from embarrassment, if she in fact has no objection to the family sitting there, then I have no objection as well, assuming that she understands that they're bound by an order not to disclose this, but if they disclose this, then -- then this is a very difficult thing to do, and that is hold a member of the family in contempt.  That is not an easy thing to do.

ATTORNEY LISA SHELKROT:  I have explained that any kind of order involving the family would be very difficult to enforce.

THE COURT:  Okay.  Do you want to put your objections on the record?  Or you already have.

*SEALED BY ORDER OF THE COURT*   92

MR. LIMAN:  I think I have, your Honor.

THE COURT:  Okay.

MR. RUBIN:  I will be doing the examination of the witness, and I have a question about how you define "family" and whether the -- because there's -- seems to be a group of about 15 people there.  I don't know how many, but -- and I don't know who's family and who's not and what that means and whether you are going to identify the individuals who are in the courtroom and what their relationship is, an issue to the ordered identified people.

THE COURT:  First of all, are they all family members?

MS. RODRIGUEZ-COSS:  They're all family.

THE COURT:  You know that?

MS. RODRIGUEZ-COSS:  Siblings --

MR. DARROW:  Unless you want everybody to come and identify themselves, my understanding is they're siblings, children, maybe grandchildren, and it's a tight-knit little family down there.

THE COURT:  Okay.

MR. DARROW:  Maybe you could --

THE COURT:  I will ask to make sure they are all family members, but I am not going to ask each of them to identify themselves.

*SEALED BY ORDER OF THE COURT*

Okay.  I think this one will be shorter than -- unless you want to ask a lot of questions.

MR. RUBIN:  It depends what she says.

THE COURT:  Oh, yeah, right.

ATTORNEY LISA SHELKROT:  Are we ready to begin with her at this point?

MS. RODRIGUEZ-COSS:  Yes.

ATTORNEY LISA SHELKROT:  Oh, good.

MR. RUBIN:  So we are going to do this in open court?

ATTORNEY LISA SHELKROT:  Or closed court?

MR. RUBIN:  Closed court in the courtroom?

THE COURT:  Yes.

(Chambers conference concluded at 1:22 p.m.)

*THE FOLLOWING PROCEEDINGS ARE UNSEALED*

*BY ORDER OF THE COURT*

(The following was held in open court at 1:25 p.m.)

THE COURT:  All right.  Before we proceed, let me put on the record the Court's determination based upon the witness's request.

The Court ruled that this testimony, because it is so private and so personal, and because public disclosure of such private, personal matters could result in, really, irreparable harm, the Court felt that the privacy interests of this particular juror

*SEALED BY ORDER OF THE COURT*                94

outweighed the public's First Amendment rights because I am going to also disclose the full contents of what she had to say in a redacted form -- "redacted," meaning her identification disclosure should be removed -- so that the press is going to have an opportunity to see exactly what she said.  But it is her fervent request that this matter be confidential.

Now, there is a way in which the Court could actually permit some persons to be in the courtroom so there's a partial sealing of the courtroom, and the victim's family has been throughout this ordeal in court and respectful for their entire time here and have requested to be available for her testimony.  She has disclosed that she has no objection to the family members being present.

Again, this is a sealed hearing so that the family members would need to affirm that what happens here is confidential and not to be disclosed to other people. It's a very, very unique circumstance in which somebody is permitted to be in a sealed hearing.  In fact, in my 18 years on the bench, this is the first time this has ever happened.  But based upon her request, or lack of objection, and the Court's feeling that that would be just, the Court will permit members of the victim's family to be present during the examination provided

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                95

that, first of all, they are members of the family, and -- extended family, and second, that they understand what a sealed hearing means, and that, theoretically, they could be disciplined for violating the Court's rule.

So, Ms. Rodriguez-Coss, are you representing that all of the persons here are members of Ms. King's family; is that correct?

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  Okay.  And can I just ask you, are all of you members of the family?

(All members indicated in the affirmative.)

THE COURT:  And do all of you agree that if you are to sit in a confidential hearing like this, that you would abide by the Court's order, that this is not to be disclosed to others?

Of course there's going to be a transcript given to the press within a short period of time, but that's the rule in a sealed hearing.  Any objection to that?

(All members indicate in the negative.)

THE COURT:  Okay.  All right.  With that, I am going to seal the courtroom and permit the family to stay, and that means that the witness will be brought forward and sit and be examined.  Okay.

*THE FOLLOWING PROCEEDINGS ARE SEALED*

*SEALED BY ORDER OF THE COURT*   96

*BY ORDER OF THE COURT*

(The following was held in court at 1:30 p.m.)

(Besides the Court, counsel and court personnel, the following people are present:  Nine family members, Amy Sterns, Julie Chappell, FBI Agent Michelle Delpha and Attorney Lisa Shelkrot.)

THE COURT:  Okay?

Okay.  Good afternoon.

JUROR NO. 162:  Good afternoon.

THE COURT:  I'd ask that you sit right here --

JUROR NO. 162:  Okay.

THE COURT:  -- and raise your right hand and be sworn.

COURTROOM DEPUTY:  Would you stand, please. Raise your right hand.

JUROR NO. 162,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q   Good afternoon and thank you very much for coming. You are known as Juror 162.  Your name has not been disclosed during the course of these proceedings.

A   Okay.

Q   And this is a sealed hearing.  I have excluded

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          97

members of the press and the general public, although I understand, with your consent, members of the victim's family could be present; is that --

A    That's fine.

Q    That's correct?

A    Um-hum.

Q    Okay.  So again, I really appreciate your service and I know that this is really painful and hard, but it's really necessary.  So, I am going to ask you just some brief questions at the beginning, and then the lawyers have an opportunity to ask you some questions as well.  And the questions relate to the statement that you made to investigators for Mr. Fell in late 2010 and early 2011, in particular, and your jury questionnaire.

I'm not interested in the jury deliberations.  I am not interested in knowing anything about how votes were taken or what the vote results were or any of the discussions during the course of the jury deliberations. This is just merely to the question about whether you have ever been a victim of a crime and, if so, some further questions in regard to that.

A    Sure.

Q    All right?

A    That's fine.

Q    Okay.  You understand?

*SEALED BY ORDER OF THE COURT*

A    I do understand that, yes.

Q    Now, you did fill out the form indicating that you had not been a victim of any crime.  And then you indicated to investigators for Mr. Fell that you had been subjected to sexual abuse from a stepfather over a number of years?

A    Um-hum.

Q    Is that -- is that correct?

A    That is true, yes.

Q    Okay.  So can you tell me, without getting into the details of the sexual abuse, just the nature of that relationship that you had with the stepfather and how long it lasted, et cetera?

A    Well, it didn't last very long.  I was very, very young, and just so you know, I am 71 years old.  So this happened to me when I was --

Q    Well, you have me beaten by a few years.

A    Yeah.

Q    Not many, but --

A    So this happened to me when I was a very young child.  I was adopted.  And, you know, there was no actual intercourse, but there was touching that was inappropriate, and of course back in those days they didn't speak about sexual abuse, and I was very, very young and really didn't even understand what was going

on until I got older and then realized what had happened. But --

Q    How old were you when you realized this?

A    How old was I? I was like eight or nine when this happened to me, but it wasn't an ongoing thing. It was just once in a while, and -- but as I said, it didn't -- it wasn't a continuous thing.

Q    Okay. Have you received treatment for --

A    No. No.

Q    -- anything related to that relationship?

A    No.

Q    Okay. You answered the question that you were not a victim of any crime. Why did you do that?

A    Because I didn't connect it. You know, this is something that I have never even thought about. I mean, I went on and lived my life, never considered it. I never thought about it. And so when that question came up in -- you know, I would attribute crime as having somebody hold a gun to my head or somebody stealing my purse or something of that nature. It's just something that I never thought about. You know, I mean, I had a lot of other things happen to me.

I think what happened to me about my husband being burned to death and having a three-month-old child affected me much more than what -- you know, what this

*SEALED BY ORDER OF THE COURT*    100

ever did.

Q    Well, I guess -- that's another question that I would have.

A    Yes.

Q    To what extent did this experience, being abused, sexually abused by a stepfather, impact your life?

A    I don't think it did.  I think I forgot about it. I never considered myself a victim.  It's just I was so young.  I mean, I went on and lived my life.  There's so many different things that have happened to me in my life since then -- I'm 71 years old -- I never gave that -- you know, I just -- it's something you just don't think about.

Q    All right.  Well, the statement that you made to the investigator, according to the written statement I guess that you signed, linked your experience as being sexually abused to Mr. Fell in some way, and is there a linkage?

A    They had mentioned that he was sexually abused, and what I said was, "Well, I was sexually abused as a child but I didn't grow up -- I didn't turn out to kill anybody."  That is exactly what I said.

Q    Okay.

A    And that's --

Q    But is there -- is there some linkage in your mind,

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     101

at least during the course of the trial, that your experience had some relevance?

A    No.  You mean the decision that I made?  No.

Q    Well, not necessarily the decision, but as you are going through the trial --

A    No.

Q    -- did it bring back memories?

A    No, no.  This is something I never think about. This is why -- I mean, you know, if I had intentionally kept that, or withheld that information, why would I have said that to the investigator?  I mean, I was using that to say, well, you know, I grew up -- I think I lived a normal -- you know, pretty normal life other than my husband -- my first husband being killed the way he was and me having to raise a child.  This didn't have anything to do with my thoughts one way or the other about --

Q    So as you filled out that form indicating that you --

A    I didn't connect it.  I just did not connect it.

Q    Okay.

A    And that's -- you know, I just didn't have -- it just didn't -- I just didn't think about that.

Q    Okay.  All right.  Thank you.

A    Do you understand what I mean by that?

*SEALED BY ORDER OF THE COURT*    102

Q    Um-hum.  I understand.

A    Okay.

Q    I understand.  You didn't connect it.

A    I just didn't connect it to a crime.  To me, it's like somebody putting a gun to your head or stealing your pocketbook or -- and it's like I said, I just never thought about that during my life, this thing that happened to me way back when I was a little kid, you know, so --

THE COURT:  Okay.  Well, let me let the lawyers ask some questions.

JUROR NO. 143:  Sure.

THE COURT:  Mr. Rubin, you want to start?

MR. RUBIN:  Yes.

EXAMINATION

BY MR. RUBIN:

Q    Nice to see you again.

A    Hello.

Q    How are you?

A    Fine.

Q    Remember me?

A    Oh, yeah.  I sure do.  Yes.

Q    And --

A    Yes.

Q    We talked a couple weeks ago at your home.  I thank

*SEALED BY ORDER OF THE COURT*

you for welcoming us in and talking to us.

A    No problem.

Q    Defendant's 6 is a copy of your statement, and I'd offer that.

THE COURT:  Any objection to 6?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  So admitted.

(Defendant's Exhibit 6 was received in evidence.)

MR. RUBIN:  You have it in front of you, your Honor?

THE COURT:  Yes.

BY MR. RUBIN:

Q    So what we've marked there as Defendant's 6 is a copy of your statement, right?  Yes?

A    This here?  This that you gave me is a copy of my statement?

Q    Yes.

A    I guess so.

Q    Well, take a look at it.  The back page is signed by you, right?

A    This is the statement that I gave to them when they came to my house, you mean?  The --

Q    Right.  A couple of years ago.

A    The defense.  Yeah.  I guess so, without reading

the whole thing.  Yes, that's my signature.

Q    All right.  And take a look at page -- well, second page, paragraph seven.  Read that to yourself there.

A    (Witness reading.)

Well, I do have something to say about --

Q    Let me just ask a question.

A    Yeah, okay.  Go ahead.

Q    Okay.  And you said, "At the trial we learned that Donald Fell was abused as a child and that his parents were alcoholics," right?

A    Um-hum.

Q    And then you said, "I was sexually abused by my stepfather for years and it didn't turn me into a murderer."  Right?

A    Well, I don't think those were my exact words.

Q    But that's essentially --

A    I said -- because they had mentioned that he had been sexually abused, and I said, well, I was by my adopted father, not my stepfather, but my adopted father, but that did not -- you know, that I didn't turn out to kill anyone.  I think that's what I said.  And it couldn't have been for years because it didn't go on for years, so --

Q    Well, I think you just told the Court that it was during --

*SEALED BY ORDER OF THE COURT*      105

A    It was intermittent.

Q    But for several years?

A    Intermittently.

Q    For several years, right?  You said --

A    I don't remember it being several years, no.

Q    Well, I think -- didn't you just tell the judge that it was when you were age eight and nine?

A    But, you know, I was so young, I can't -- you know, I can't -- I was just a young child.

Q    Okay.  In fact, looking over on the next page --

A    Can I just interject a minute?  I would say that it happened several times but it didn't go on for years, because I married when I was, like, almost 18 years old, so -- to my first husband.

Q    Well, in fact, when you were an adolescent, perhaps in the 16, 17, before you married and left home, you told a neighbor that your adoptive father had --

A    Um hum, that's true.

Q    Right.

A    Because when you are young like that, you really don't understand what's going on, and I had mentioned it to my neighbor, yes.

Q    So at least at the age -- when did you marry and leave home?

A    I was 18.

*SEALED BY ORDER OF THE COURT*

Q    So sometime a year or so before that, you mentioned it to the neighbor, told the neighbor?

A    When I was -- yes, I did.

Q    Right.  And so at that point you knew that it was wrong that --

A    No, I did not know it was wrong.  I didn't know what was going on.

Q    Well, do you remember --

A    Told her what -- what -- I told the neighbor what my father was doing.  You gotta remember back in those days, people didn't talk about this type of thing.  People didn't, you know --

Q    I don't mean to interrupt you --

A    That's all right.  Go ahead.

Q    -- but it would be perhaps more efficient if you could let me ask the questions.

A    Go ahead.

Q    And if you want to answer a full question --

A    That's fine.

Q    -- take your time.

Q    Sometime when you were in your 20s, I think you told us recently, that when your mother was ill and perhaps dying, she wrote you a letter condemning you or criticizing you or damning you for having accused your father or stepfather --

*SEALED BY ORDER OF THE COURT*    107

A    That's true.

Q    Adoptive father.  Right?  And in fact you carried that, so to speak, condemnation from the grave with you ever since?

A    I wouldn't say it's -- because I don't think about these things.  I don't -- I haven't given this any thought until this came up.  You know, I have had a lot of life to live, Mr. Rubin, in between this.  It's something I don't consider myself a victim.  I mean, you have that choice whether you go through your life being a victim or if you just go on with your life, and it's just something that I don't think about.  But yes, she did.  She did this several years after my father died, right.

Q    And --

A    Because the neighbor had told her after my father died.

Q    Right.  So you actually volunteered this to Cathleen Price and me when we were talking to you.  You told us, in an unsolicited way, that you told your neighbor that your mother had written you this letter?

A    Um-hum.  She wrote me a letter saying that she had -- they adopted me and they gave -- they wanted me when nobody else did, and how could I say those things about my father.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

Q    I just wanted to go over the process by which you filled out your jury questionnaires.  Do you remember initially you were asked to fill out a two-page questionnaire?

A    No, I don't remember that.  It was too many years ago.

Q    Okay.

MR. RUBIN:  Defendant's 2, your Honor, is the district court two-page questionnaire that was filled out as kind of a preliminary questionnaire, and I would offer that.

THE COURT:  All right.  It can't be 2 because 2 has already been admitted, I believe; is that -- you want to do an 8?

MR. RUBIN:  No, the Government's 2 --

THE COURT:  Oh, 2 is the government.  They're both using numbers.

MR. RUBIN:  Well, I got mine already numbered, your Honor.

THE COURT:  You have to be flexible here, so --

MR. RUBIN:  So I can renumber --

THE COURT:  But 2 is fine.  Is there any objection to Defendant's 2 and we can renumber it at the close of the hearing?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    109

MS. RODRIGUEZ-COSS:  I think it already forms part of the record, right?  The questionnaire --

MR. RUBIN:  Well, just for purposes of this hearing, I think we wanted to mark these.

THE COURT:  Okay.  It is admitted.

(Defendant's Exhibit 2 was received in evidence.)

BY MR. RUBIN:

Q    I am going to take this away so it doesn't distract you.

Okay.  What you are looking at is the -- if you look at the second page, you can see that you signed it, and this would be the two-page questionnaire you filled out and returned to the court when you were -- first received notice of your being a prospective juror.

A    Um-hum.

Q    And that's your handwriting on the form?

A    Yes, it is.

Q    And I think you understood when you filled this out that the purpose of this was to see whether you could be a fair and impartial juror and whether you had any kind of disqualifying factors, right?

A    I would assume so, yes.

Q    If you look at the first sentence, it says, "Dear Juror:  To give the court more information about you as

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

110

a juror and to assist the court in expediting the process," et cetera.  So it was a screening device, right?

A    Right.

Q    And consistent with your -- what you were supposed to do, you answered this form honestly?

A    I did answer it honestly, yes.

Q    And completely?

A    Um-hum.

Q    And I think it says somewhere here that if you -- if you look at the fourth sentence down at the top, it says, "If there's information that -- you would prefer to keep confidential, you could ask to speak to the judge privately."  Right?  You see that?

A    No, I don't think I do.  Where is it?

Q    First page.  I got you confused.

A    Okay.  That's fine.

Okay, so your point is?

Q    My point is that you knew that if there was private or sensitive information, you could ask that you could write "private" next to the question and apparently you could talk to the judge privately about it.  Right?

A    I assume that's right.

Q    So you attempted and were honest and truthful and forthright on that form, right?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    111

A    Yes.

Q    And, in fact, you listed your employment history. You were complete and accurate about that?

A    Um-hum.

Q    And on the second page it asked you to list newspapers you read, your hobbies, and you listed those, right?

A    Right.

Q    And the form asked you if you or any person close to you had ever been accused of a crime, right?

A    That's correct.

Q    And you in fact disclosed that your son -- you can see that on page two?

A    Um-hum.

Q    You said that your son was under house arrest for D -- DUI, DWI and domestic violence 16 years ago, and he now is the assistant manager at Shaw's, et cetera, right?

A    That's correct.

Q    And that was personal information?

A    Um-hum.

Q    You love your son?

A    I sure do.

Q    And you have been close to your son and still are?

A    Um-hum.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   112

Q    And so you were willing to disclose that -- that information?

A    Um-hum.

Q    If you could say "yes," I think the court --

A    Yes.

Q    Okay.  So that was honest and truthful and open and candid about your family?

A    That's correct.

Q    And I believe, I think -- is it true that this incident with your son took place during the breakup of his marriage and when his life was in turmoil?

A    That's correct.

Q    And you were willing to say that he was a better person for having gone through that 16 years before.  I think you said that?

A    Well, I think he has learned a lot from it, yes.

Q    Okay.  So like the sexual molestation of you, which happened many years before, you were willing to disclose your son's history of criminal offenses which -- or criminal involvement which took place a long time ago.  Right?

A    That's correct.

Q    But you did not disclose that you yourself were a victim of a --

A    Well, that should prove to you that I don't think

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                113

about that anymore.  I didn't connect that question --

Q    Okay.

A    -- to my problem when I was a little kid or little child as a crime.

Q    So what you are saying --

A    And, I mean, I'm going to sit here and say the same thing no matter how many times you ask me that.  I did not connect it.  Give me a polygraph test; I will tell you the same thing under a polygraph test.  That's exactly -- and that's all that I can say about it.

Q    Okay.

A    I just did not connect what happened to me as being a crime.  And because I disclosed my son, that should prove to you that -- I didn't say it about myself and I did about my son, that it was not an intentional -- I wasn't intentionally lying or intentionally trying to withhold the information.

Q    All right.

A    And that's it in a nutshell.

Q    So what you are telling us is that you were -- you knew you had to be open and honest on the form, right?  And you were?

A    Yes.

Q    And because it didn't click, as you said to the judge --

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                114

A    Exactly.  You have to understand the psychological, you know, part of it.  It's just -- at my age, it's just something that I just did not connect to that question as being a crime.  My son, yes, he went to jail.  You know, he was accused of domestic abuse and convicted of it and went to jail.  My father was not convicted of any crime, and I -- I have not considered myself a victim in all these years, and I did not connect that question.

Q    In fact, you actually said your son was on house arrest, right?

A    He was for a while when he got out of jail, yes.

Q    In fact, the form doesn't mention jail, does it?

A    No, but he was in jail.

Q    Okay.  So then --

A    It says he was convicted of that, yes.

Q    Does it say "convicted"?

A    You have to be convicted before you go under house arrest.

Q    So the form doesn't --

A    He was in jail first and then under house arrest, yes.

Q    The form doesn't say he was convicted, though.

A    From the Department of Corrections.

Q    I am just asking --

A    Yeah, it was the Department of Corrections.

*SEALED BY ORDER OF THE COURT*

MR. RUBIN:  Does the Court have a copy of this?

THE COURT:  I don't have a copy of that --

MR. RUBIN:  I'm sorry.

THE COURT:  -- document, no.

MR. RUBIN:  Referring to the second page, your Honor.

BY MR. RUBIN:

Q     On --

MR. RUBIN:  Give me a second, your Honor.

THE COURT:  No, go ahead.

BY MR. RUBIN:

Q     On May 2nd, 2005, you came to court and filled out a long, 33-page questionnaire.  You remember -- not the questions, but do you remember going through that process of having to fill out the questionnaire?

A     Yes.

Q     And Defendant's 3 is a copy of your questionnaire.

MR. RUBIN:  And I'd offer that.

THE COURT:  Okay.  Any objection to Defendant's 3?

MS. RODRIGUEZ-COSS:  No, your Honor.

MR. RUBIN:  Do you need a copy of it?

MS. RODRIGUEZ-COSS:  No, I have it.

THE COURT:  All right.  So admitted.

*SEALED BY ORDER OF THE COURT*    116

(Defendant's Exhibit 3 was received in evidence.)

BY MR. RUBIN:

Q    Now, the judge prepared a video that he showed to all of the jurors, and we have a transcript of it, but do you recall that the video said, among other things, that your answers on the questionnaire had to be truthful?

A    Do I recall that?

Q    Um-hum.

A    Unfortunately, no.  It was too many years ago.  I don't remember that.

Q    But your understanding is that your answers were to be truthful?

A    Well, yes, of course.

Q    And you also understood that the questionnaire would be confidential?  I mean, it would be kept away from the press.

A    Are you asking me that, Mr. Rubin?

Q    Yes.  When you filled it out, did you have an understanding that it would be confidential?

A    I would assume so, right.  Yes.

Q    Take a look at page two of the questionnaire. Right at the bottom sentence or two, it says, "Remember, there are no right or wrong answers.  Just be completely

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        117

candid and truthful.  All the information you will provide -- you provide will be kept confidential and only viewed by the Court and the party and the clerk's office"?

A    Um-hum.

Q    And you read that?

A    I imagine that I probably did.  I mean, I don't recall it now, but I assume that I did, yes.

Q    You approached this process with -- you wanted to do the right job here and do it right, correct?

A    That's correct.

Q    Okay.  In fact, prior to filling out this questionnaire, from judge's description on the videotape, you knew that it was a murder charge that you were potentially going to be a juror for, murder/kidnapping charge?

A    You know, I can't remember way back, it happened so many years ago, but I would assume so.

Q    If the videotape transcript had statements from the judge that -- explaining to you what the charges were, and what the processes were, you wouldn't dispute that?

A    No.

Q    And you also knew, when you filled this out, that in fact there could be a death sentence if he was convicted and the facts justified it, right?

*SEALED BY ORDER OF THE COURT*

A    I would assume that I did at the time.  I can't sit here and tell you that I recall everything back then.

Q    In fact, if the transcript indicated that you would be asked to consider aggravating factors in connection with Mr. Fell's behavior --

MS. RODRIGUEZ-COSS:  Your Honor, I'm sorry, at this point we have no idea where counsel is, going and I think he is way beyond the scope of the hearing.  I don't -- why're we going into death qualification questions?

THE COURT:  You are linking this up to what?

MR. RUBIN:  To the --

THE COURT:  The fact that she knew she was supposed to tell the truth?

MR. RUBIN:  Well, because -- that and also because the issue of sexual abuse of Donnie Fell was discussed in the voir dire, that he was a victim of physical and other abuse, and that was presented to her in the voir dire questioning itself.  So I wanted to just ascertain that she knew what the case was about when she was questioned.

MS. RODRIGUEZ-COSS:  Well, then we would ask counsel to refer to the section of the voir dire that he is referring to.  Can he provide us with the page?

THE COURT:  Well, he --

*SEALED BY ORDER OF THE COURT*

MR. RUBIN:  I will when I get there.

THE COURT:  He is getting into that at this point, but at this point, objection overruled.  Go ahead.  You can proceed.

MS. RODRIGUEZ-COSS:  I just don't remember sexual abuse being asked of this --

MR. RUBIN:  "Physical and other abuse" was the quote.

THE COURT:  Right.  So let's take it step by step.  Go ahead.

MR. RUBIN:  Okay.

BY MR. RUBIN:

Q    So you also -- I think your testimony has been that you answered all these questions truthfully and honestly as they were presented to you all along the process, right?  The short questionnaire, the long questionnaire?

A    That's correct.

Q    All right.  So take a look at question 29, and you said in question 29 -- question 29C:  "What authors and types of books do you read?"  And you said you read true crime, and mentioned Ann Rule.  Ann Rule writes books about -- true-crime books.

A    Um hum.

Q    Right?

A    Yes.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

120

Q    And this is an interest of yours?

A    It is, yes.

Q    And it still is an interest of yours, right?

A    It still is, yes.

Q    It's okay.  And you also mentioned that you had just read one of -- her recent book at the time you filled this out, or latest book?  Ann Rule's latest book, you said that in number D, 29D?  Right?

A    That's correct.

Q    And you also said that you read John Walsh's latest book, and John Walsh is also a crime -- true-crime writer?

A    Right, but those aren't the only kind of books I read.

Q    I know.  I know.  You actually said --

        THE COURT:  Where are you going with this?

        MR. RUBIN:  Where I am getting is that she was -- and you will see throughout this process, she had an interest in true crime and violent crime and sexual crimes and that these issues were as -- as she fills this out, there were numerous opportunities for her to be reminded, flagged of her own experience.

        THE COURT:  Oh, all right.  Okay.

        JUROR NO. 143:  Can -- can I answer that?

        MR. RUBIN:  No.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    121

THE COURT: You will have an opportunity to answer that at some future time, but go ahead with the next question.

BY MR. RUBIN:

Q   On question 30, you said that you watched the Nancy Grace show every night. Right?

A   Back then I did, yes.

Q   Yes.

A   But she is getting kind of nasty so I don't watch her that much now.

Q   I had to watch her to find out what she was like. I agree with you. But back then she was -- she focused on notorious crimes of natural -- of national interest, right?

A   Not always just crime, no.

Q   But often crime?

A   Often.

Q   And crimes of violence, crimes against children, right?

A   I would assume so.

Q   Yeah. On question 37, the form asked what recent criminal trials have you followed, and you mentioned -- do you see that?

A   Yes.

Q   Michael Jackson?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    122

A    Um-hum.

Q    Now, Michael Jackson was charged with molesting children.

A    Um-hum.

Q    Yes?

A    That's correct.

Q    And the Michael Jackson trial was actually going on when you filled out this questionnaire.  Right?

A    Right.  But my interest isn't just in the crime. My -- my interest are the trials, and the psychology behind it, not in the -- in the gore and the crime.  I like the trials.

Q    I just want to --

A    So.

Q    -- make sure I understand.

A    I just want to make sure that you understand that I am not somebody that just sits there and wants to read about gore.  I like the trial, the actual trials --

Q    Okay.

A    -- in these books, too.  And these aren't the only kind of books I read.  I read a lot of biography and a lot of history.

Q    I am not implying --

A    It's just an interest.

Q    -- as you sit there, you're fascinated with gore,

SEALED BY ORDER OF THE COURT

123

and --

A    Yeah, well, I think that's the point I am trying to get is that I'm fascinated with -- with blood and gore and people killing each other, and it's not that.  It's mainly the trials and the psychology in it.

Q    Okay.  But my question is, in fact it's true that the Michael Jackson trial went on from roughly early 2005 until the end of the trial, which was I think in June or July of 2005, and was going on while you were filling out these questionnaires; is that fair?

A    But I didn't see all of the trial.  I saw -- I was working full time, so I -- I wasn't -- I couldn't watch things like that all day long.

Q    And question 43, like the short form, it asked again if a family member had been charged with a crime, right?  And you again honestly reported that your son was charged with DUI, domestic abuse, he received counseling, and he was a better person for it.

A    That's right.

Q    And you said, in answer to the question, "What was the result of the prosecution," you said, "House arrest," right?

A    Evidently that's what I wrote.

Q    But you didn't say jail, right?  Right?  I don't see it.

SEALED BY ORDER OF THE COURT

*SEALED BY ORDER OF THE COURT*                    124

A    Well, there might have been --

Q    Just a question if you see the word "jail"?

A    You have to go to jail before you're -- you are let out and put under house arrest.  That's the thing.  I probably just inadvertently didn't put that in there.  It wasn't a lie.

Q    The judge -- the form also asked you about the feelings about the death penalty, and this again has to do with sex crimes, and you were -- there were a lot of questions about your feelings about the death penalty, and again you were honest and open and candid about your feelings, correct?

A    That's correct.

Q    And I believe it's on question 65 you mentioned, when the question says, "What kinds of murder cases do you feel the death penalty is appropriate" -- I can read my own writing -- you mentioned murders, like premeditated murders and like sex crimes, right?

A    Well --

Q    I am just asking you if that's what you wrote.

A    This would be like a pedophile sexually molesting a child and then murdering the child, yes.

Q    Okay.  So that's just another instance on your form where the question of sex crimes, sexual molestation --

A    I don't know what you are getting at when you say a

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   125

sex crime.

Q    Well, those were your words.

A    You know, I think a pedophile murdering a child, that would be something I would consider the death penalty, yes.

Q    So despite acknowledging your interest in true-crime stories including sex-crime stories against children --

A    No, that's -- I do not read crimes -- sex crimes against children.  I don't know where you are going with this, but, you know --

Q    Okay.  Your next -- briefly, I want to go over some of the questions that the lawyers asked you.  Do you remember you were also questioned individually, right?

A    The voir dire?  Yes.

Q    The individual voir dire.

          MR. RUBIN:  Defendant's Exhibit 5 is the voir dire -- transcript of the voir dire testimony of the witness.

          THE COURT:  Any objection to the admission of 5?

          MS. RODRIGUEZ-COSS:  No, your Honor.

          THE COURT:  Okay.  So admitted.

          (Defendant's Exhibit 5 was received in evidence.)

*SEALED BY ORDER OF THE COURT*        126

BY MR. RUBIN:

Q    You doing all right?

A    I'm doing fine.

Q    Okay.

May I ask you whether you remember Mr. Kelly, the prosecutor, one of them?  Mr. Darrow -- and Mr. Kelly -- was the other prosecutor.

A    I believe so, yes.

Q    He was the lawyer who asked you questions, one of the two lawyers who asked you questions individually.

A    Um-hum.

Q    And do you recall he told you that you might hear -- you know what the concept of mitigating evidence was in this case?  I mean, what it means, mitigating evidence?

A    I believe so.

Q    That's evidence that tended towards leniency as opposed to more serious result?

A    Um-hum.

Q    Okay.  And he told you that you might hear mitigating evidence.  For instance, he told you that you might hear that Fell grew up in a chaotic home, that he was abandoned by his parents as a child, and that he was the subject of physical and other abuse, right?  Do you recall that?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    127

A    Um --

Q    I can represent --

A    Probably.

Q    The record will --

A    This happened so many years ago; I can't remember each and every thing.

Q    I understand.  And do you recall that he wanted to know if you could be fair and impartial when considering this kind of evidence, and you said that you could.

A    That's correct, and I was.

Q    Right.  And you did not disclose, when he mentioned physical or other abuse, your own experience.

A    I never gave that a thought.  I never gave anything about myself in this trial a thought.  I listened to the evidence and based my judgment on that.

Q    Shortly after that, Mr. Primomo, who is one of the defense attorneys in the individual voir dire, told you there would be a lot of evidence about Fell and his abuse of alcohol and drugs at a very early age, and he said he was curious as to your own personal experience with your son and whether that could affect your ability to consider the mitigating factors.  And, again, you disclosed the information about your son's history 16 years before, right?

A    I guess so, yeah.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    128

Q    And you told him that your son did not commit any crimes.  That wasn't true, was it?

MS. RODRIGUEZ-COSS:  Your Honor, can we get the page of the question and the response that counsel is referring to?

A    What --

THE COURT:  Can you identify exactly where that is?

MR. RUBIN:  Yes.  I think it's 137 -- well, it starts at 136, line eight, where Mr. Primomo is saying that -- referring to Fell's abuse of alcohol and drugs at a very young age, and then down below, she says, "It took corrections coming to the house, took his losing his driver's license, he hit bottom before he went to the top."

BY MR. RUBIN:

Q    Do you see that?

A    That's true.

Q    You also said that he didn't commit any crimes, but that was not true.  Is that because you didn't consider the DUI the kind of crime that they would be interested in?

A    I think it says did he commit any criminal acts?

Q    Right.  And you said no.

A    Well, why would anyone ask someone that if I had

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                  129

already told them --

Q    I don't know why --

A    -- that he hit his wife and was under DWI.

Q    Well, I don't know why they asked you, but I'm -- you apparently said no.  Right?

A    It is what it is.  My son was convicted of DWI and domestic abuse.

Q    16 years earlier, right?

A    Yeah.  He is 50 some odd now.  This happened when he was a -- in his twenties, I believe.

Q    Okay.  So now I want to go back over some of this with you.  You told us that your husband was also a victim of sexual abuse as a child, right?

A    That's what my husband told me, um-hum.

Q    And the questionnaire asked you not only whether you were a victim of a crime but also whether a family member or relative or someone close to you was a victim.  Right?

A    My husband told me that.  I don't know that for a fact.

Q    Yes, but you didn't list him as a victim of a crime either.  Right?

A    I guess, if that's what you say.  But that's -- that's what my husband told me.  I wasn't there.  I don't know.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

Q    In fact, your son was convicted of multiple serious crimes.

A    Serious crimes?

Q    Yes.  Five felonies?

A    I don't know that.

Q    Many misdemeanors?

A    I don't know that.  I know he had domestic abuse and DWI.  That's what I know.

Q    Beginning at age 18, his criminal history starts; isn't that right?  Not -- how old was he in 1982?

MS. RODRIGUEZ-COSS:  Your Honor, we raise an objection at this point.  This was not raised previously.  We received no discovery whatsoever on this.  It's not part of the defendant's allegation in the petition.  It's certainly not included in the statement they prepared for this witness, and we have the benefit at least having a --

THE COURT:  Okay, are you raising a new objection to her voir dire or answering the questionnaire?

MR. RUBIN:  No, I am not.

THE COURT:  So how are you linking this to the issue that's before the Court, and that's whether she honestly responded to the victim of a crime?

MR. RUBIN:  The claim is broader than

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        131

merely -- the claims stated that she was dishonest --

JUROR NO. 162:  Ah.

MR. RUBIN:  -- in answering to questions on voir dire and the forms.  One aspect of this was the failure to disclose her victim -- being a victim of sexual abuse.

She has sat here today at least three times and said that when she disclosed her son's criminal experience, it was limited to one set of events 16 years before the voir dire.  So I want to show the Court that not only is she lying on the witness stand -- and I use the word advisedly -- that we have the right to impeach her because you have to decide whether she is telling the truth about the reasons that she explained why she didn't list this information.

And I can show through cross examination -- examination of this witness that her son has a criminal history that goes back from 1982 right through the trial.  We can show that he was on parole when she answered the question relating to his criminal history.  She -- he was on parole.  He lived next door to her.  That in -- a couple of years before the trial, he was convicted of DUI fourth, charged with possession of cocaine, possession of marijuana, that she knew about this.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    132

Then in 1982, he committed a major felony, and he served a year in jail, five months in jail at different times.  She has bailed him out.  She has taken custody of him.  And she has known of his -- and these crimes are violent, they are assaultive, burglaries involving breaking into people -- his girlfriend's houses, climbing on the roof, breaking into the window, assaulting women and their friends, boyfriends, man friends.  And if you give me some leeway here, I can -- I can impeach her that she has -- repetitive statement that she was honest on these forms because --

THE COURT:  All right.  The nature of the allegation, I thought, in regard to her testimony, was that she did not disclose the fact that she was a victim of sexual abuse, and that becomes relevant because of course there was information introduced during the course of the trial about the defendant being sexually abused.

Now you are suggesting that it's a little broader than that.  You are basically suggesting that the problem with her response to the questions in voir dire and to the form shows a general lack of honesty.  I guess that's what you are -- you are suggesting at this point.  I don't think that claim has been raised in advance.

*SEALED BY ORDER OF THE COURT*

On the other hand, as to the other relevance, and that is to impeach testimony, theoretically, you have the right to pursue this line of examination. So -- I did not read your pleadings as suggesting in any way that the -- the argument related to general responses. I thought it was all sexual abuse.

Now perhaps it should be broader than that, if that's what you are asking about, but at least in regard to impeachment, bias, you certainly have the right to explore that. So you can go ahead.

MS. RODRIGUEZ-COSS: What we are asking, your Honor, is a good-faith basis for his questioning. We have no information on this. I think we would be entitled to at least a good-faith showing --

THE COURT: Okay.

MS. RODRIGUEZ-COSS: -- the factual basis for his questioning.

THE COURT: All right. So, Mr. Rubin, do you have her son's criminal record?

MR. RUBIN: Yes.

THE COURT: You want to give a copy of that to the government?

MR. RUBIN: Yes. I have not only his criminal record, we have certified copies of all of his convictions as well as the VCIC printout of his record

*SEALED BY ORDER OF THE COURT*    134

and a summary of it as well for the Court.

THE COURT: And do you have a copy of that for the government?

MR. RUBIN: Yes, I do.

THE COURT: Okay.

MR. RUBIN: The Court would like, I can present these as a trial -- as a hearing exhibit for the Court as I go through them?

THE COURT: Right. Well, you need them at this point?

MR. RUBIN: Hmm?

THE COURT: You need them at this point or can you surrender those to the Court?

MR. RUBIN: I have copies.

THE COURT: Oh. Why don't you submit a copy.

MR. RUBIN: Perhaps, for purposes of the hearing, I would offer these exhibits and then I can go over them with the witness?

THE COURT: Okay. Any objection to the exhibits? Are you marking them as 4 and 5?

MS. RODRIGUEZ-COSS: I don't know what he is marking them.

MR. RUBIN: Defendant's 7 is the VCIC.

MS. RODRIGUEZ-COSS: What you just handed me, can I see?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*      135

MR. RUBIN:  Yes, it's --

MS. RODRIGUEZ-COSS:  Can I just see?

THE COURT:  Actually, you can't communicate between --

MS. RODRIGUEZ-COSS:  Counsel.

THE COURT:  -- counsel because the court reporter doesn't know if she should take it down or not.

MS. RODRIGUEZ-COSS:  Oh, okay.

THE COURT:  So you are offering 7 and 8?

MR. RUBIN:  Well, I will do them one at a time, your Honor.  7 is the VCIC record.

MS. RODRIGUEZ-COSS:  Your Honor, first of all, we -- there's an objection to her being questioned of the first three, all of which took place, if they took place, took place after the trial was over.  So we don't see the relevance of questioning on those.

THE COURT:  Your response is that she had answered some questions suggesting that he only was convicted 16 years ago and he has been doing just fine since, and --

MR. RUBIN:  Exactly.

THE COURT:  -- that's what she testified to.  And what you are suggesting is that those later convictions may be relevant to impeach the testimony today as opposed to her form.  Is that correct?

*SEALED BY ORDER OF THE COURT*

MR. RUBIN: Couldn't say it better.

THE COURT: I'm sure you would have, but -- right.

MS. RODRIGUEZ-COSS: But the first three took place after the trial, so --

THE COURT: Well, no, I appreciate that, but she has testified that she has been doing -- that her son has been doing extraordinarily well for the last 16 years.

MS. RODRIGUEZ-COSS: Right.

THE COURT: That's what she testified to.

MS. RODRIGUEZ-COSS: Okay.

THE COURT: And Mr. Rubin is using those convictions  to suggest that that is not an accurate statement.

MS. RODRIGUEZ-COSS: Can we start by verifying that this is in fact her son's record.

THE COURT: I'm sorry?

MS. RODRIGUEZ-COSS: We haven't yet authenticated the document by relating it to the witness, right?  We don't know that this is his -- in fact his record.  Could we start there?

THE COURT: All right.  So --

BY MR. RUBIN:

Q    What is your --

*SEALED BY ORDER OF THE COURT*    137

THE COURT:  Do you want to ask her --

BY MR. RUBIN:

Q    What is your son's date of birth?

A    June 7th, '61.

Q    And his name is Patrick Michael Ryan?

A    That's him.

THE COURT:  All right.  So you can go ahead.

BY MR. RUBIN:

Q    Defendant's Exhibit 8 --

THE COURT:  7 is admitted.

(Defendant's Exhibit 7 was received in evidence.)

THE COURT:  And any objection to 8?

MS. RODRIGUEZ-COSS:  I don't know what 8 is.

THE COURT:  8 appears to be your --

MR. RUBIN:  I will make a representation.

THE COURT:  -- description of his criminal record?

MR. RUBIN:  Yes.  8 is a summary of Patrick -- and I guess I can mention his name -- Patrick Ryan's criminal history.  It's based on certified copies of all of these convictions.  It's extracted by our investigator from the information and affidavit and DDRs for the state court, and it's a summary of his entire record.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          138

THE COURT:  All right.

MR. RUBIN:  It's in somewhat more detail than the --

THE COURT:  All right.  So this is -- this is -- this is to be introduced as a summary, a chart essentially, of all his previous convictions.  So do you have the underlying documentation, that's the certified copies of his convictions dating back to 1997 -- or '77?

MR. RUBIN:  Yes.  Um, all of the criminal convictions.  We also have the moving violations as well?

MS. SANTILLO:  Within the criminal --

MR. RUBIN:  Yes.

THE COURT:  Okay.

MR. RUBIN:  And what we can do, since the Court has considered this to be a preliminary hearing, and I anticipate some briefing at a further time --

THE COURT:  Yes.

MR. RUBIN:  -- we can submit as an exhibit the certified copies of all of these exhibits -- all of these -- the proof of this chart.

THE COURT:  Okay.  But your representation is that this is an accurate, quick synopsis of each of the convictions dating back to 1977?

MR. RUBIN:  Yes.  And the sentence and some of

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     139

the underlying facts surrounding, drawn from the affidavit.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  Your Honor, I don't see how we can not object, you know, because we are receiving a summary of materials that we have never been provided.  We have never been afforded the opportunity to review.  We moved for disclosure of this type of materials.  Our motion was denied.  So how can we now acquiesce to the admission of a summary of information that we have not had the opportunity to review?

THE COURT:  Well, you know, I agree, and it may be that this document may be removed if the defense cannot substantiate these particular convictions.  But at this point it's a preliminary investigative hearing.  All it is is cross examination.  It's cross examination based upon a good-faith basis to believe that he was convicted of these offenses because the defense is saying they have got a good-faith basis to believe he was convicted of these things, so that they would have the right, or Mr. Rubin would have the right, to cross examine her on this, it seems to me.

I appreciate the fact that there may be some objection to the admission of this document later on if they cannot substantiate these convictions, but you have

*SEALED BY ORDER OF THE COURT*    140

now got a representation from them as members of the bar that they have got the underlying documentation.

MS. RODRIGUEZ-COSS:  It's been marked, but is their intent to show it to the witness, because we would object to this being shown to the witness.  It's just a summary of information prepared by the defense, selective summary of information that's not complete.

So why -- if they have the original records that were used to prepare this, we would not object to the witness being shown original court records, but for the witness to simply be shown a summary of selective information that's been prepared by the defense, we would object.

THE COURT:  Yeah, frankly, I wasn't sure that she'd be shown that at all.  I thought --

MS. RODRIGUEZ-COSS:  I don't know why they marked it then.

THE COURT:  -- he would be using that -- it's a summary chart, basically.  He would be using the contents of that to cross examine her on did you know that on such and such a date he was convicted of such and such a thing.

MS. RODRIGUEZ-COSS:  Right.  Okay.

THE COURT:  In which case, I think that resolves the difficulty.  I mean, I assume that you are

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    141

not going to have her read this document.  You are going to be asking questions about the individual convictions from the document; is that correct?

MR. RUBIN:  Yes.

THE COURT:  Okay.  So go ahead.

MR. RUBIN:  8 is admitted?

THE COURT:  8 is admitted.  It is admitted provisionally.  It needs to be supported by the underlying documentation of the certified copies of the convictions, but assuming that it is so substantiated, it is an exhibit.

(Defendant's Exhibit 8 was received in evidence.)

BY MR. RUBIN:

Q    I am going to ask you a number of questions about your son's involvement in the criminal justice system. You have been listening here for the last 10 minutes, right?  And you understand that, like what you said on the voir dire, you have an obligation to be honest about this, right?

A    I have been honest.

Q    All right.  So let's -- in 2001 and 2, you were living in Colchester, right?

A    I believe so.

Q    And where were you living?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

142

A    Bay Road.

Q    And your son was living at some point next door to you?

A    He was living next door, um-hum.

Q    And you recall him being arrested for DWI fourth?

A    You know, this is the thing, I don't know every little thing that my son did.  I know he -- and I told you when you were sitting on the couch beside me that he was picked up for several DWIs, but, you know, I can't remember each and every thing that he did.  And when I put this down here, I put down what I remembered about his conviction of his domestic violence, and I also told you I thought you represented him at one time for a DWI charge as a public defender.  I told you that in my house.

Q    Your son was living next door?

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, can we approach on that last one?

THE COURT:  Can we approach on that last one?

MS. RODRIGUEZ-COSS:  Yes.

THE COURT:  You don't have to approach.  This is a sealed hearing, so --

MS. RODRIGUEZ-COSS:  Well, is that correct?  Is -- did Mr. Rubin represent the juror's son?

JUROR NO. 162:  I believe so.  He was a public

*SEALED BY ORDER OF THE COURT*    143

defender, and remember I told you when you were sitting on my couch, I said, "Oh, I think that you -- you were a public -- you defended my son at one time," because he had been picked up on several DWI charges.

THE COURT:  Okay.  You want to respond?

JUROR NO. 162:  I told you that.

MR. RUBIN:  No, unless the Court wants me to respond.

THE COURT:  Well, obviously --

MR. RUBIN:  I mean, I don't understand what the issue is.  What is her issue?

JUROR NO. 162:  That you -- that you were his public defender.  Richard Rubin, right?

MR. RUBIN:  That's --

MS. RODRIGUEZ-COSS:  I'm sorry, that's information obtained from a client to cross examine this witness?  You don't understand how that may be relevant to this proceeding?  I --

MR. RUBIN:  Are you representing that there's an ethical issue here?

MS. RODRIGUEZ-COSS:  Yes, I do.  Yes, I am.

THE COURT:  Well, that's what she is raising.

MR. RUBIN:  My answer is to that, your Honor, if that's the concern, her concern, I never represented him.  He was represented by the office of the public

*SEALED BY ORDER OF THE COURT*

defender in Washington County, not me personally. All of the information that is obtained here we carefully ensured came only from public documents, nothing from my files, which have been sealed and buried in the archives over the years. I have no memory of his -- of Mr. Ryan. And all of the information concerning his criminal record arose from public documents.

And I have been aware of the possibility of a concern and made sure that there was no ethical violation either by myself or any member of my firm who has any memory or that we have no files in the office regarding this Mr. Ryan and no information concerning him was used to present this case.

JUROR NO. 162: Can I say something? As a matter of fact, I mentioned it to him the other day, and he said --

THE COURT: Just a minute.

JUROR NO. 162: -- Richard Rubin --

THE COURT: Just a second.

JUROR NO. 162: -- defended --

THE COURT: There's no question pending, so -- do you want to respond to that?

MS. RODRIGUEZ-COSS: Well, your Honor, I'm sorry, counsel is saying that all the information that is now being presented here came from -- came from

public records.  Is that also how counsel knew where her son lived, the fact that he lived next door to the juror, the fact that he knew her home address?

MR. RUBIN:  The short answer to that question, and I -- you know, if she has an ethical complaint, she can file it.  But the short answer, to meet any concerns the Court may have, is yes, all information came from public records.

Melanie Carr did our investigation.  We have been doing this for a long time because we understood that she was not to be believed, that she was not truthful on her forms, and that's how we proceeded, so --

THE COURT:  We are going to proceed to the hearing.  If you have got a question about conflicts of interest, ethical issues, then, you know, certainly the government can raise it at this point.  But I am going to proceed to the cross examination based upon the representation that there was no information obtained from the records.

If in fact there's some information inconsistent with that developed during the government's investigation, then the Court would address it at that point.

MR. RUBIN:  And also --

MS. RODRIGUEZ-COSS:  Those are very

*SEALED BY ORDER OF THE COURT*    146

difficult -- very difficult issues and complex, but the fact that we have here is a flag went up in counsel's mind, and -- and when a flag went up in counsel's mind, he knew that a flag would go up in the government's mind, he knew a flag would go up in the Court's mind, and I think he had an obligation to come forward and disclose his potential conflict of interest in this case prior to this hearing so this issue could have been addressed prior to this hearing.

THE COURT:  At this point I want to go forward with the hearing.  I don't think she should be called back to testify some later time once this whole issue has been fleshed out.  And so continue with your cross examination.  Let's complete the testimony of the witness, and then any subsequent issues can be addressed later on.  Go ahead.

MR. RUBIN:  Can I say one further thing?

THE COURT:  Sure.

MR. RUBIN:  She made representations about criminal conduct 16 years ago.  Those are the records we went to.  Those records reveal a record check going back, and then we went forward.  It's as simple as that. It's all there.

The government -- we don't know what the government knew and hasn't been disclosed.  But I will move ahead.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*       147

THE COURT:  But you appreciate the fact that in your pleadings up to date, this particular series of what you describe as inaccuracies in her testimony were not discussed.  This is somewhat of a new issue.

I appreciate the fact that you want to use the general rubric of "she was not being accurate," completely, but this was not specifically identified.  So that's why we end up getting into this whole complex area because nothing was known.

MR. RUBIN:  I think -- right.  What happened here, just procedurally, is the claim was stated broadly about juror dishonesty.  Factually, it was focused on the failure to disclose her sexual abuse.  In the process of preparing for this hearing, we uncovered all of this evidence which we are now using for impeachment, because in the Sampson case, it was of great significance that the juror was not truthful on the witness stand.  So we felt that this was very significant impeachment relevant to what the Court has to decide.

We probably will expand the claim to be more specific about this dishonesty as differentiated from the impeachment which we are dealing with now.

THE COURT:  Okay.  Ms. Rodriguez-Coss?

MS. RODRIGUEZ-COSS:  Your Honor, I think the

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    148

claim was, and still is, that Juror 162 failed to answer a question on her questionnaire honestly by failing to disclose childhood sexual abuse when asked, "Have you ever been the victim of a crime," that is the claim. There is no broader unstated claim.

The defendant has one year to set forth his claim, and that is the claim that he set forth, and the inquiry this Court now has to undertake is, one, was Juror 162 honest? Two, would a truthful answer to that question have caused her to be stricken for cause? There's no other broader claim to be thought of here.

Now, I understand that Mr. Rubin is being allowed to proceed with this line of questioning in order to demonstrate to the Court whether or not Juror 162 was in fact honest and is being honest before the Court now during this hearing, but I don't believe that it is the basis to permit the defense to broaden that claim, because we would have a myriad of objections to that.

THE COURT: Well, as I had said before, my understanding was that the claim really related to the answer to the victim of a crime and the sexual abuse. Mr. Rubin says the language was broader than that. I don't know that. And my guess is that he may very well try to expand the claim or modify the claim, in which case he would do that by writing and then you would

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     149

respond.

I don't think we need to answer the question today because I admitted this line of cross examination in regard to impeachment.  So therefore, all of this can come in.  Issues about whether there's a separate claim in regard to dishonesty can be addressed once it's raised.

So, with that, you want to continue your examination?

MR. RUBIN:  Yes.

BY MR. RUBIN:

Q    When your son was arrested for DWI fourth, and you said he was living -- which is a felony, you were living next door to him?

A    You have to understand, you know, I don't remember all of these things.  You are sitting here and accusing me of lying, which I don't lie.  I am not a liar.  I detest lying.  I don't remember all of the things that my son was charged with.  And when I filled out this questionnaire, I wrote on this questionnaire what I remembered at the time.  And I resent you sitting here and telling me that I am a liar.  And I have about 40 references at home from past employers and people that have known me all my life that will tell you that is one thing I do not do is lie.  And you are sitting here and

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

150

putting me through this about my son --

THE COURT:  All right, let me -- let me just -- let me -- let me --

JUROR NO. 162:  Yeah, well, I am getting very upset about this whole thing.

THE COURT:  No, I -- I --

JUROR NO. 162:  What does my son have to do with this?

THE COURT:  I appreciate that.  Would you just -- just hold on for a second?  Would you like to take a brief recess?

JUROR NO. 162:  No, but I am really beginning to get upset.

THE COURT:  I just think it's important to calm down, and the questions will be asked, you can answer the questions.

JUROR NO. 162:  All I am saying is when I filled out this questionnaire, I filled it out --

THE COURT:  I think it's really --

JUROR NO. 162:  -- honestly.

THE COURT:  I think it's really important that you listen to me at this point.  What I think it's important is just to calm down and just answer the questions --

JUROR NO. 162:  But what does this have to do

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                151

with this -- with this trial and with my judgment on this trial?

THE COURT:  I'm sorry, but -- but you are just going to have to listen and calm down.  They have the right to ask the question.

JUROR NO. 162:  I know what he is doing.  I know that.

THE COURT:  Okay.  I am going to take a brief recess at this point, and so we will be back at three o'clock.

(Court was in recess at 2:40 p.m.)

(The following was held in court at 3:00 p.m.)

THE COURT:  Okay.  We ready to proceed?

BY MR. RUBIN:

Q    I believe you told me that you recalled that your husband was charged with DWI when he was living next door to you in Colchester?

THE COURT:  Her son, you mean?

MS. RODRIGUEZ-COSS:  Son.

A    Not my husband.

MR. RUBIN:  Sorry.

THE COURT:  Yeah.

MR. RUBIN:  Her son.

THE COURT:  Yes.

BY MR. RUBIN:

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*      152

Q    Your son.  Is that correct?

A    I don't recall the year but he was living next door to me.

Q    And you were living in Colchester, as you said, in 2001 and 2002, right?

A    I believe so.

Q    And he lived in an adjoining apartment?

A    At one time he did, yes.

Q    In fact, he lived in an adjoining apartment when he was arrested.

A    I don't recall that.

Q    The car that he was driving when he was arrested for DUI fourth was registered to both you and him; isn't that correct?

A    I don't recall that.

Q    You do recall that you had a car registered to both of you at some point, correct?

A    I have a car that's registered to us both now, but I don't recall that, no.

Q    Do you recall that when he was released -- that he was also charged on the night of that DUI, or DWI, with possession of cocaine and possession of marijuana, the same incident?

A    I don't know anything about that.

Q    That he was required to report daily to the

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*   153

Colchester Police Department?

A    I don't recall that.

Q    Did you drive him there?

A    I don't recall that.  That may be.  I am not saying that it's not so.  I'm just saying that I don't recall that.

Q    Do you recall that in connection with that 2002 conviction for DUI, that he got a two-to-five-year sentence and was referred again to the ISAP program?

A    I don't recall that.

Q    You know what the ISAP program is, though, don't you?  Intensive substance abuse program?

A    Abuse program?

Q    Yes.

A    Vaguely I remember.

Q    Your son was in that program at least twice and perhaps a third time, correct?

A    I don't recall.

Q    And, in fact, you knew that he was on parole, right?

A    I do recall him being on parole at one time when he was under house arrest, I believe.

Q    I am talking about on parole in connection with the DUI fourth in Colchester.

A    I don't honestly recall that.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    154

Q    And you don't recall -- do you recall that he was on parole in May and June and July of 2005 while he was -- while you were filling out these questionnaires and answering questions?

A    I don't recall that.

Q    The incident that you did talk about, which you said was 16 years before the voir dire, I think you said involved his wife.

A    That is correct.  At the time he was married, yes.

Q    And he was living in Middlebury or nearby to Middlebury?

A    That's correct.

Q    That was in fact in 1992, which was 13 years before.

A    I don't -- I don't recall.

Q    And do you recall that he was released to your custody and had to come over and live in Barre with you when he was released on that charge?

A    I recall that I went and took him from St. Johnsbury, but I don't recall that he lived with me, no.

Q    And you are aware the charge involved climbing onto your wife's roof, breaking into her attic, threatening her and her friend while wreaking of beer, and that a charge was burglary?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    155

A    I was not there.  I don't know what happened.  My son was not living with me so I don't know.

Q    And do you recall -- you went to court with him, didn't you?

A    I don't believe so.

Q    You never drove him over to court to support him during the court hearings on this case?

A    I don't think so.

Q    You were never at the sentencing on that case?

A    I don't believe so.

Q    You recall that he was required to -- he got a zero-to-three-year suspended sentence and was required, among other things, to undertake mental health counseling, anger management, including anger management and domestic violence?

A    He may have, but I don't recall that.

Q    And that --

A    But I am not saying that didn't happen.  I am just -- I just don't recall that.

Q    And a few months after that 1992 incident in Middlebury, and after he was sentenced, do you recall that he was busted in -- for DUI third in Barre?

A    All I know is he was picked up several times on DWI charge.  I was not there so I -- I really can't.

Q    Well, did you ever visit him in jail?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    156

A    Yes, I did.

Q    And, in fact, he did five months in jail from January 1st, 19 -- six months, from January 1st, '93, to June of '93, right?

A    I remember he was in jail but I couldn't tell you the year, no.

Q    And that was the second time he was in jail, right? Didn't he go to jail for -- back when he was 21, for -- you know Charlie Parton, his old friend Charlie Parton?

A    The name sounds familiar but I don't know him personally, no.

Q    Do you recall when he was 21 and living in Barre, he and Charlie Parton kicked in the back door of a residence, stole six guns and a stereo system, and other things, and then broke into another home on the same night, stole more stuff, and that he received a -- pled out to a felony and received 12 months in jail?

A    I don't know anything about that.

Q    Didn't you visit him in jail when he was in jail?

A    I know there was a time when he was in jail and I visited him, but I don't know anything about that ever happening.

Q    You would have visited him in jail whenever he was in jail, right? If he was in jail, you would have gone to see him? I assume?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

157

A    Probably.

Q    Yeah.  We talked about the Middlebury incident, but do you recall that in 1997, when he was 35 years old -- and this would be five years before the voir dire -- that he was arrested for unlawful mischief, simple assault, unlawful trespass after seeing -- after seeing his girlfriend at a bar with her boyfriend, becoming angry, harassing them, he came to their home, banged on the door, kicked in the door, broke the window, crawled in, assaulted them?  Do you recall that?

A    If what you are telling me is true, this is the first time that I have heard about it.

Q    Well, it happened in Washington County when you were living there.  You don't recall that?

A    No, I do not.

     Can I interject something?  My son hasn't lived with me since he was like 18 years old.  So a lot of what you are telling me I don't -- I don't know anything about it.

Q    Well, did you ever pay his bail?

A    I did pay his bail at one time.  I believe that was on the domestic abuse, when he was in St. Johnsbury.  One time I did.

Q    Well, one time there was a $5,000 bail.  Did you get a bail bondsman and arrange for that?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

A    I don't recall.

Q    You knew that your son had a long history of alcohol and substance abuse, right?

A    I do know that.

Q    And the substance abuse included marijuana, occasionally cocaine, sometimes pills?

A    I do not know anything about pills.  I do know about the cocaine because when he was 17 years old he was given an ultimatum:  He either go and get help or he would have to leave my house.  He chose to leave my house.

Q    On your questionnaire -- that would be -- I am going to show you -- I don't know what exhibit number this is, but the questionnaire --

MR. RUBIN:  Does anyone know what number it is?

THE COURT:  3.

BY MR. RUBIN:

Q    I am going to show you question 44 on the long form questionnaire, which asks, "Have you or any close friend or relative ever been treated for substance abuse," and you answered, "Yes," and then you explained, did you not, "My son, alcohol," right?

A    Yes, I believe he went to an alcohol counselor, yes, at one time.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          159

Q    Well, that's not true, is it, because he went to the ISAP program and you knew that because you reported that on the form as well.  Right?

A    I don't recall that.

Q    And you know that the ISAP program involves going to -- it's an intensive substance abuse program where you go three to four times a week, right?  You knew that?

A    I don't remember that.

Q    And you never disclosed that he had a cocaine problem or a marijuana problem, did you?

MS. RODRIGUEZ-COSS:  I'm sorry, can counsel cite the question that asks, did your -- whether her son had an alcohol -- drug problem?

THE COURT:  Well, objection overruled.  There is a particular answer to 44.  There's some question as to whether he had used cocaine before.  The question is following through with 44 beyond alcohol.  So to that extent, he has the ability to ask the question.

MS. RODRIGUEZ-COSS:  Well, if his question is whether she was asked that, then he has to provide us with the reference of when and where the question was asked.

MR. RUBIN:  I don't have to do anything --

THE COURT:  Well --

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    160

MR. RUBIN: -- unless the judge tells me I have to do it.

THE COURT:  Right.  44 is interpreted as a substance abuse issue.

MS. RODRIGUEZ-COSS:  Treatment, your Honor. Treatment.

THE COURT:  Well, I --

MS. RODRIGUEZ-COSS:  Not use.

THE COURT:  -- appreciate that, but it got all into abuse and treatment.  Alcohol was mentioned.  She had mentioned cocaine before.

You can ask the question.  Go ahead.

MR. RUBIN:  She answered it.

BY MR. RUBIN:

Q    But you didn't tell anybody that he had a cocaine problem at any point during the -- answering the questions or when you were -- on the forms, or when you were questioned in court by the lawyers, right?

A    I don't recall that.

Q    In fact, I read you before, earlier today, Mr. Primomo's question that he was concerned about -- he told you that Donnie Fell personally abused alcohol and drugs from a very early age, and he was curious as to your own personal experience with your son, whether that in any way could affect your ability to consider that as

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    161

one of the mitigating circumstances, "that" being abuse of alcohol and drugs.  And you said, essentially your son had an alcohol problem and he was rehabilitated.

MS. RODRIGUEZ-COSS:  But that's not correct.  That's not correct.  That's not her answer.

MR. RUBIN:  The question.

MS. RODRIGUEZ-COSS:  That's not her answer.

THE COURT:  So where's the -- what is the transcript?  Do you have that?  Would you --

MR. RUBIN:  I think the Court has it.

THE COURT:  Okay.  Tell me where it is in the transcript.

MR. RUBIN:  It's at page 136, line -- starts out at line 11.

THE COURT:  "Mr. Primomo:  Let me just back up a little bit," et cetera.  "Well, first of all, regarding Donnie Fell personally, was -- was abused alcohol and drugs from a very, very young age, as young as eight years old, and so I am curious as to your own personal experience with your son, whether that in any way could affect your ability to consider that as one of the mitigating circumstances."

And your answer:  "You asked me a hard question.  Drugs and alcohol can do a lot to you, yes, from my own personal experience with my son."

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    162

"All right.  So my question is --"

And then your answer:  "But he -- I mean, my son, you know, was rehabilitated through the correctional -- through corrections, which was the best thing that ever happened to him, so that's a hard question."

That's the paragraph that you wish?

MR. RUBIN:  Yes.  The transcript speaks for itself.

THE COURT:  Okay.  All right?

BY MR. RUBIN:

Q    It is true that your form doesn't mention jail, any of your questionnaires don't mention his jail time, right?

A    I don't -- I don't know.

Q    Now, the question asked you whether you had been -- one of the questions was, "Were you ever a victim of a crime?"  And you said, "No."  And you talked about your sexual involvement with your adoptive father.  But there was another very serious event, a criminal event, that you were a victim of that you did not disclose, and that would be when you were ripped off by attorney Don Milne, right?

A    That's correct.

Q    And you never mentioned that?

A    No, because I didn't think of it.

*SEALED BY ORDER OF THE COURT*

THE COURT:  I'm sorry, by attorney who?

MR. RUBIN:  Donald Milne.

JUROR NO. 162:  Donald Milne.

MR. RUBIN:  I will make a representation to the Court?

THE COURT:  Yes.  I don't -- I don't --

MR. RUBIN:  Don Milne was a lawyer in Barre in the '60s, who was disbarred for stealing from his clients, and he was the juror's guardian when she was at the state hospital.

MS. RODRIGUEZ-COSS:  When she was a child, is what you are saying?

MR. RUBIN:  No.

MS. RODRIGUEZ-COSS:  She's what?

MR. RUBIN:  I don't have to explain it to you.

MS. RODRIGUEZ-COSS:  I thought you were making a proffer to the Court.  I just want -- I didn't hear what he said.

THE COURT:  I'm sorry, you can't be talking to each other.

MS. RODRIGUEZ-COSS:  I apologize, your Honor.  Can counsel repeat his last statement?  I failed to hear his last statement.  That's all.  I'm sorry.

THE COURT:  That's the statement to the Court?  It's the one that --

*SEALED BY ORDER OF THE COURT*    164

MS. RODRIGUEZ-COSS:  Yes, he said he represented her when she was -- and I didn't hear.

MR. RUBIN:  Okay.

THE COURT:  Okay.  You want to repeat that proffer?

MR. RUBIN:  Yes.  The juror was under guardianship in the probate court in Washington County for many years, first as a child, until her 21st birthday, and then as an adult, as an incompetent adult. Her guardian, appointed by Judge Olich in the probate court, was attorney Don Milne.  He ripped her off.  And we have the certified records from the probate court to indicate -- to prove that, and she has just acknowledged --

THE COURT:  Yes.

MR. RUBIN:  I would like to explore that.

BY MR. RUBIN:

Q    You told us this when we met with you, correct?

A    Um-hum.

Q    And, in fact, you -- your husband, I think you mentioned earlier, was tragically killed in a work-related accident when you were 19?

A    That's correct.

Q    And you had a three-month-old son at the time?

A    That's the son that you are referring to, yes.  My

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        165

son, Pat.

Q    And you received -- you had some property, some real estate, the house that you had as a result of the death, or somehow you had a -- you had a home?

A    Yes.

Q    And that was in Montpelier or Barre?

A    That was in Barre.

Q    And first José Monte was your guardian?

A    I don't recall that.

Q    But you do recall that Don Milne was your guardian?

A    I recall that.

Q    And you were in the Waterbury State Hospital?

A    Yes, because I suffered from severe depression after my husband's death.  At that time they didn't understand depression and so, yes, I went there.  And it was during that time that Donald Milne stole --

Q    Everything you had?

A    -- everything I had, yes.

Q    And he left you impoverished.  You were not then impoverished but you were totally relying on your Social Security widow's benefits; is that correct?

A    That's correct.

Q    And you did not disclose that either?

A    Because I didn't associate it with that question.

Q    I thought earlier this afternoon you said when you

*SEALED BY ORDER OF THE COURT*

SEALED BY ORDER OF THE COURT

thought of criminal conduct, you thought of violence and people stealing things and thefts.  Didn't you say that?

A    Yeah, but you have to understand, I went through a psychological trauma.  I haven't thought about these things for years and years and years.  I answered the question -- the questionnaire truthfully at the time.  To me, you know, a crime -- I didn't take the crime -- the word "crime" as what was done to me.

Q    How long --

A    Now -- now I know that I was a victim.

Q    How old were you when you went into the state hospital?

A    It was right after my husband's death.  Probably 18.

Q    And you were there for --

A    About -- about six months maybe.  I can't -- I can't remember that.

Q    Weren't you there --

A    My son was only a baby at the time.

Q    Weren't you there for -- in and out for two or three years?

A    I don't recall.

Q    You saying that I'm wrong or you just don't --

A    No, I don't recall.

Q    Because Mr. -- you were in the state hospital when

SEALED BY ORDER OF THE COURT

Mr. Milne stole your property, right?

A    That is correct.

Q    And he was appointed to be your guardian when you were 21 because --

A    You had to be -- you had to have a guardian until you were 21, because when my husband was killed, I was not 21 years old.  I think I was only 8 -- 19.  I was only married a year before he was killed.  And you couldn't inherent.  You couldn't inherent anything --

Q    Right.

A    -- until you were 21, so that's why they appointed a guardian.

Q    Right.  And that guardian was José Monte.

A    I don't recall that.

Q    Then the probate court, isn't this correct, after you became 21 and Monte dropped off, and -- Mr. Milne was appointed your guardian because you were both 21 and declared incompetent to manage your own affairs?

A    No.  It was because I wasn't 21 years of age to inherent --

Q    After --

A    -- anything.

Q    After you were 21.

A    I don't recall that.

        MR. RUBIN:  We have the probate records

*SEALED BY ORDER OF THE COURT*    168

certified.

JUROR NO. 612:  Well.

MR. RUBIN:  We will provide them at some point to the Court.

THE COURT:  I think it's -- you covered this topic.  You ready to move on?

BY MR. RUBIN:

Q    You were asked by Mr. Kelly -- you were told by Mr. Kelly that you might hear mitigating evidence about Donnie Fell's chaotic home life, abandonment and physical and other abuse.  Now, your son also was a victim of a crime, fairly serious crime, when he was 16 and living in your home.  Isn't that correct?

A    I don't recall.

Q    You don't -- you were -- at the time, when he was 16, you were living with a woman in -- in Barre who punched him and pushed him down a flight of stairs?  Do you remember that?

A    No, I don't.

Q    Don't remember this -- what was the name of the woman you were living with back then?

MS. RODRIGUEZ-COSS:  How is this relevant, your Honor?  And where are we going?

THE COURT:  It's relevant -- relevant to the question about knowledge of victims of criminal conduct,

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     169

so objection overruled.  Go ahead.

A    Yes, I lived with a woman --

BY MR. RUBIN --

Q    And what was her name?

A    -- when I got out of the hospital.  Lucille Tatro.

Q    Did it strike you as untrue that your son reported to a probation officer that this woman locked him out in the cold and threw him down a flight of stairs?

A    I don't know anything about that.  Never heard of that.

Q    Now, when Mr. Kelly asked you about issues of abandonment and whether you could hear those about Fell being abandoned and whether that would raise any -- to paraphrase, whether you could hear issues about that with an open mind, you didn't disclose that you had abandoned your own son, Patrick, by being in the hospital --

        MS. RODRIGUEZ-COSS:  Objection, your Honor.

Q    -- for several years.

        MS. RODRIGUEZ-COSS:  This is a conclusion. Objection to the question --

        THE COURT:  Yeah, I --

        MS. RODRIGUEZ-COSS: -- to the conclusion he is trying to draw.

        THE COURT:  Objection sustained.  She is

*SEALED BY ORDER OF THE COURT*

hospitalized.  That's not abandonment under the general understanding of the term, so objection sustained.

MR. RUBIN:  I'll try and rephrase it because in the criminal trial, there was evidence that because of the chaotic history that Mr. Fell underwent as a child, he was placed in foster care, and in a sense he suffered separation and abandonment in kind of a structural sense, not in a malicious or intentional sense by his family, and that affected his development.  So my saying -- and she was the issue of -- that kind of issue was flagged by Mr. Kelly, but she mentioned nothing about her own son's being separated from her for many years when he was but a child.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  The question Mr. Kelly posed, your Honor --

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  The question Mr. Kelly posed was, "These are -- this is the type of evidence you are going to hear.  Can you consider this evidence fairly?"  And the juror said, "Yes."  How can he attempt to impeach her by demonstrating that she failed to reveal something that had nothing to do with the question that was posed to her?

That is unbelievably unfair to stand here and

*SEALED BY ORDER OF THE COURT*    171

attempt to impeach this witness by indicating or insinuating that she failed to disclose information about which she was never asked.

THE COURT:  Well, if the question was related to disclosing information, then he has the right to get into that.

MS. RODRIGUEZ-COSS:  But it was not.

THE COURT:  But if he's not then asking about disclosing information, but "is that an accurate answer to the question of your response to 'are you able to consider this as a mitigating factor,'" he can ask that. It's not, though, proper for him to ask or insinuate that she did not disclose this abandonment or separation.

So, at least to the impact of that particular experience in her life, as whether that would impact her ability to consider mitigating factors, you can ask the question.  But to use that as a ground to insinuate that she did not disclose particularly conflicting evidence, that would be improper.

MR. RUBIN:  She represented here today and on her forms that, you know, everything was fine except until the breakup of his marriage when he had this incident 16 years ago that led to these legal problems, and that life is, you know, and he has been --

*SEALED BY ORDER OF THE COURT*

172

everything is fine.

The implication that she both testified to on the voir dire and here today is that her son is not the kind of person, you know, who has suffered from the same things that Mr. Fell suffered from.

THE COURT: Well --

MS. RODRIGUEZ-COSS: The --

THE COURT: You certainly have had access to that particular area of examination, there's no question about that.

MR. RUBIN: Okay.

THE COURT: This is something totally different. You are going back to when the child is an infant, or close to an infant, and a separation for a relatively brief period of time, and what you are suggesting, I think, which is probably improper, is that that was an abandonment which should have been disclosed by the witness.

There's no question it was asked of her which related to that disclosure or lack of disclosure. I thought you then were going to ask the question about, well, there was this period of separation that she experienced. Would that necessarily impact her ability to be fair in that context. It's not --

MR. RUBIN: Let me put it --

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     173

THE COURT: -- not failing to disclose. It is ability to be fair.

BY MR. RUBIN:

Q    It is true that your son was placed in foster care, right?

A    When I went into the hospital, yeah.

Q    And he was in foster care for some significant period of time, like a year or so?

A    I can't remember. That was -- happened so many years ago. That was 50 years ago.

Q    And after he was placed in foster care for two years, he was placed with your aunt in Montpelier?

A    He was placed with my sister-in-law.

Q    In Montpelier?

A    In Barre, I believe.

Q    Still under state custody but placed with a relative of yours?

A    Right, until I recovered, and then I went to court and got custody of my son back.

Q    So this was not a brief period of time that you were -- had lost custody of your son or given up custody of your son?

A    I did not give up custody of my son. I was sick. I had just gone through a traumatic event and I suffered from severe depression. There's been a lot learned

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    174

about that since then, though.  I would never give up my son.

Q    It was several years that you were separated from your son; isn't that true?

A    I don't recall that, no.

MS. RODRIGUEZ-COSS:  I am going to object. There's no claim --

A    It was not several years.

THE COURT:  Objection -- objection overruled. You can ask the question.  Go ahead.

BY MR. RUBIN:

Q    Do you recall that it was several years, not a brief period of time, that you were separated from your son?

A    I don't recall how long it was.  It was a brief period.  I had just undergone my husband being burned to death.  I was young, and my son was an infant.  It was all -- I couldn't deal with it.  That wouldn't happen today.  They would give you antidepressants today, which they didn't have back in those days, and that's why I went there.

Q    So when Mr. Kelly told you that Donnie Fell was abandoned, or you might hear testimony that Don Fell was abandoned by his parents and the effect that had on his development, it had no impact on you?

*SEALED BY ORDER OF THE COURT*        175

A    No, because I -- I didn't abandon my son.

Q    And your son -- no question.

When Mr. Kelly asked you or told you that your -- that Fell had grown up in a chaotic household, it did not occur to you that your son's early years were difficult and chaotic and you ought to disclose that?

MS. RODRIGUEZ-COSS:  Objection.  She wasn't asked to disclose that.  Mr. Kelly --

MR. RUBIN:  I did not -- I did not --

MS. RODRIGUEZ-COSS:  -- did not ask her that question.

THE COURT:  He did not ask for disclosure. The question is whether she felt she should have.  You can ask the question.  Objection overruled.  Go ahead.

JUROR NO. 162:  Can you repeat the question.

MR. RUBIN:  Yes.

BY MR. RUBIN:

Q    When Mr. Kelly told you that the issue of Don Fell's abandonment as a child might be presented as a mitigator and whether you could consider that fairly and impartially, you felt no obligation to disclose your own son's difficulties and chaotic upbringing?

A    No.

Q    Did you have a second child?

A    What has that --

*SEALED BY ORDER OF THE COURT*

Q    You told us you did have a second child.

A    I do have a second child.

Q    And that child was given up for adoption by you?

A    That's correct.

Q    And when was that?

MS. RODRIGUEZ-COSS:  Objection, your Honor. What is the relevance of this questioning?

THE COURT:  You have to stand up when you're --

JUROR NO. 162:  That's okay.

MS. RODRIGUEZ-COSS:  I apologize.  I apologize.  I object on the basis of the relevance.  Why is that --

THE COURT:  What is the relevance of the second child and putting a child up for adoption?

MR. RUBIN:  Because she was flagged about the chaotic upbringing, questions of abandonment, and she never --

THE COURT:  That wouldn't be something that she would respond to.  That would be something that you'd get from somebody else, if that's what you're --

MR. RUBIN:  No, because she has to judge Mr. Fell's situation and what people did to him.

The claim at trial was that because of the way he was treated by his parents, and his -- the adults in his

*SEALED BY ORDER OF THE COURT*    177

life, he grew up to be what -- who he was and what he did.  That was the mitigating -- mitigating theory, one of 'em.

So if you have a situation where a prospective juror has not identical but the same kinds of events in her life, and she's just basically presenting a totally different picture and she comes here today and says she has been totally candid, open and truthful, I have -- it's difficult.  I have no -- I am not getting any pleasure out of this.  But it's -- she -- she's misrepresented her life situation both in court and in the voir dire.

THE COURT:  But see, the difficulty is you have to pinpoint exactly where she was being inaccurate or incomplete.  Are there some particular questions that were asked during voir dire or questions on the jury questionnaire form that were not accurately represented?

MR. RUBIN:  Yes.

THE COURT:  Because certainly you can't put a duty on a juror to come forward with candid information which may be helpful to one side or another.  So, in that particular respect, where -- where do you pinpoint her obligation to talk about putting a child up for adoption and why that was done?  Where do you point to -- what questions do you point to to say that that

*SEALED BY ORDER OF THE COURT*

failure to disclose was inaccurate?

MR. RUBIN:  The failure to disclose her being a victim of Don Milne, which she has here today described as horrendous, he took everything she had as a young woman in the context of her being institutionalized, and if she had disclosed that as she was obligated to do -- this wasn't someone stole her purse when she was 20; this was a life-altering event -- it would have -- other questions regarding what that was about would have been developed, or probably would have been developed in voir dire and she wouldn't be sitting there.

THE COURT:  All right.  So the inaccuracy is the failure to disclose that she was a victim of this particular fraud.  You have already covered that.  So why is the subsequent putting a child up for adoption relevant?

MR. RUBIN:  It's relevant because she was asked by -- not asked, but Mr. Kelly raised the issue of abandonment, those were his words, and asked her if she could be fair and impartial, and she had this -- two traumatic events which could loosely be characterized -- not malicious abandonment, but as kind of a structural abandonment of her children, and she didn't mention them, so that when she says that she was honest, I think

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    179

I can explore that there was not only her separation from her son, Patrick, but there was another separation, which I am sure -- I don't know, I assume had a traumatic effect on her as well. This was raised in the voir dire.

THE COURT: I don't see how it was raised in the voir dire, frankly. I mean, I don't see how her failure to disclose the adoption was inconsistent with the truth unto itself. And it certainly didn't put her on an obligation to disclose -- you know, that question from Mr. Kelly did not put her under the duty of disclosing.

MR. RUBIN: If he had asked her, was there any experiences in your family relating to separation of children and abandonment of children and -- she would have had an obligation to answer that one.

THE COURT: But he never asked that.

MR. RUBIN: No, but I think by implication she was not truthful when she -- when she --

THE COURT: I'd ask, in light of the fact that this is an issue which was not really addressed to her at voir dire, that you go on to the next topic.

MR. RUBIN: What we propose to do, your Honor, is to submit the documentation that supports the representations about Mr. Milne while she has admitted

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     180

Mr. Milne -- the victimization by Mr. Milne, but we will submit other documentation to support the questions I asked.

THE COURT:  Well, there's an agreement between the parties that you would submit follow-up memoranda 45 days after the hearing.  Of course the hearing is going to be extended because we have another juror to speak with.  Are you also going to make an effort at amending your petition to cover issues which you may have raised today?  Is that what is expected?

MR. RUBIN:  Yeah, I think -- I don't know whether the Court actually formulated a date.  Maybe there was a date for amendment, but --

THE COURT:  Your stipulation was, I thought, 45 days after the hearing, but the hearing has to be stretched because we have to go to Guildhall.

MR. RUBIN:  The answer to your question is yes, we intend to amend the petition, the ultimate petition, and consistent with the rules, there would be a date set for the amendment of the petition prior to the final hearing, which is tentatively set for June. So yes, the answer to your question is yes, we will expand the allegations consistent with the claim of dishonesty.

THE COURT:  I would ask that you do that

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*          181

relatively quickly because the government's going to respond objecting to that particular change. And it seems to me that that should be addressed before we ultimately deal with the memoranda 45 days down the road.

MR. RUBIN: Okay, one of the questions we had procedurally was, this has been -- you call this a preliminary hearing, a screening hearing, and we are not sure what degree of evidence you would want to determine whether this claim can go forward. So we will -- I mean, there's other evidence to support our claim of dishonesty.

THE COURT: That's what I wanted to hear. What -- I mean, this is a preliminary issue as to whether we -- or whether you are permitted to explore this jury misconduct claim. Assuming you meet a threshold balance, and that you have got other evidence, then I assume there would be a full evidentiary hearing. If not, then I would dismiss it. So you should actually represent, I would think, in your pleadings, "We have other evidence to suggest that our claims are viable which would warrant a full evidentiary hearing."

MR. RUBIN: Okay. Primarily it's the documentation that we have talked about today, but we will do that.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    182

THE COURT:  All right.  Okay?  Anything else?

MR. RUBIN:  No.

THE COURT:  Okay.  All right.  Ms. Rodriguez-Coss?

EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    Hi.

A    Hi.

Q    Good afternoon.  I don't have much, so I don't expect to keep you here much longer, okay?

Going back to the incident in your -- in your childhood of --

MR. RUBIN:  I'm sorry, I am having trouble hearing.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  I don't know that I can -- I don't know if it carries any further.

THE COURT:  That's as far as it goes.

MS. RODRIGUEZ-COSS:  Can you hear me now? Okay.

BY MS. RODRIGUEZ-COSS:

Q    Going back to the incident of sexual abuse that you told us about in your childhood, I just want to make sure that I got this correct.  Your stepfather was never charged?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    183

A    He was my adoptive father, and no, he was -- wasn't charged.

Q    Okay.  So he wasn't your stepfather.  He was your adopted father?

A    That's correct.

Q    So you had been in foster care and this family had adopted you?

A    That's correct.

Q    And it was your adopted father that incurred in the sexual misconduct?

A    That's right.

Q    All right.  And he was never charged?

A    No.

Q    He was never arrested?

A    No.

Q    Never prosecuted for that?

A    No.

Q    Did you report him to someone at the time?  Do you remember when --

A    The only thing I did, when I was a child, I went to a neighbor, because I was little and I didn't know what was going on, and I told the neighbor.  But nothing ever came of it.

Q    All right.

A    The neighbor never said anything to -- until after

*SEALED BY ORDER OF THE COURT*    184

I was gone from home.

Q    Right.

A    Then she told my mother.

Q    Okay.  So --

A    My adopted mother.

Q    So it went unreported, no one was charged, no one was prosecuted, and you never appeared in court.  You never had to undergo any hearings or testimony or give any statements about it.

A    No.

Q    All right.  And the only person you ever talked to about that was that neighbor that one time.

A    That neighbor, yes.

Q    Right.  And we're talking about something that happened over 60 years ago, given --

A    Well, I was probably eight years old and I'm 71 now, so.

Q    Right.  So more than 60 --

A    It was a long time ago.

Q    So more than 60 years ago.  And you said that -- let me ask you this.  And you have answered a lot of questions today.  When you read the question which asked, "Have you ever been the victim of a crime," you explained that you did not connect that to the experience you had had as a child.  Had -- had the

SEALED BY ORDER OF THE COURT    185

questionnaire asked you whether you had ever been sexually abused, how would you have answered that question?

A    I would have answered yes.

Q    So there was no intent on your part when responding to the questionnaire to hide that information?

A    No.

Q    All right.  And did you otherwise, during the course of the trial, follow the Court's instructions?

A    Yes.

Q    Did you understand the proceedings and you understood the Court's instructions throughout the trial?

A    Oh, yes.

Q    And did you adhere to -- to those instructions?

A    Yes.

Q    Now, counsel has raised some questions -- well, before we move on, you said that -- I think a couple times during your testimony today you explained that not only did you not connect your childhood abuse with the question as to whether you had been the victim of a crime, but you said it never entered your mind throughout the trial.  Did I understand you correctly?  Is that true?

A    About myself?  No.

SEALED BY ORDER OF THE COURT

*SEALED BY ORDER OF THE COURT*

Q    About yourself?

A    No, never.

Q    So as you sat here -- I don't know if it was held in this courtroom.  As you sat through the trial of Donald Fell and you listened to the evidence and you listened to the argument of counsel, those experiences that you had undergone when you were a child never came to your mind.

A    About him, you mean, and my --

Q    Your experiences.  Your experiences.

A    No, my experiences didn't, no.

Q    Never came to your mind.

A    No.

Q    All right.  So you don't -- you understand that despite those experiences, you were able to listen to the evidence in the case fairly and impartially?

A    That's correct.

Q    All right.  Now, you were also asked a myriad of questions today with regards to your son and his past conduct or criminal acts and so forth.  You -- you indicated in your -- in response to your questionnaire that he had been arrested and prosecuted for DWI and for domestic violence; is that correct?

A    That's right.

Q    Okay.  You also told defense counsel, in fact, in

*SEALED BY ORDER OF THE COURT*   187

response to his questions, he asked you whether your personal experience with your son, whether in any way could affect your ability to consider that as one of the -- as one of the mitigating circumstances.  And you said, "You asked me a hard question.  Drugs and alcohol can do a lot to you, yes, from my own personal experience with my son."

So in your response, you referred to both drugs and alcohol, not just alcohol; is that correct?

A    That's right.

Q    All right.  And you were not asked any follow-up questions with regards to your response in terms of drugs; is that correct?

A    Not that I recall.

Q    Defense counsel didn't say, well, what drugs did your son use or when did he use those drugs?  Those questions were not asked --

A    No.

Q    -- during the voir dire process?

A    I don't recall that.

Q    Okay.  Nor were you asked how many times your son was arrested.

A    I don't recall that.

Q    All right.  Or when was the last time that your son was arrested.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                188

A    I don't recall that.

Q    Mr. Rubin, here in court today, asked you whether you visited your son in prison, but during the voir dire process of the trial, you were never asked whether you ever visited your son in prison.

A    No.

Q    All right.  And I am curious, you seem to have spoken to Mr. Rubin for a long time.  Is that correct?

A    Today, you mean?

Q    No, no.

A    Or in my house?

Q    No.

A    In my home?

Q    Prior to today.  Prior to today Mr. Rubin visited you; is that right?

A    That's right.

Q    And for how long did you guys speak?  How long a visit was that?

A    An hour maybe.

Q    All right.

A    45 minutes.

Q    And -- and during that visit, you told him -- you talked to him about your son?

A    Yes, I told him that I thought that he had represented my son as a public defender during a DWI

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    189

charge in Barre.

Q    And what did he say?

A    I believe he said, "Oh, I don't recall."

MR. RUBIN:  Objection.

A    He said, "Did I?  I don't recall."

BY MS. RODRIGUEZ-COSS:

Q    All right.  And did you tell him about your son's prior DWI arrests?

A    Yes.

Q    And how many times did you tell him your son had previously been arrested for DWI?

A    Three or four times.

Q    All right.  So you didn't have any problem disclosing that information to the defense.

A    No.

Q    It's just that they never asked you before.

A    That's correct.

Q    And I am going to ask you the same question.  You have these experiences with -- with your son.  He had obviously some legal problems, and you saw yourself involved in some of those problems, and you saw him go through a process of rehabilitation.  Did those experiences affect your ability to be fair and impartial during the course of the trial of Donald Fell?

MR. RUBIN:  Objection.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*        190

THE COURT:  Objection overruled.  I think she has said something related to that, so go ahead.

A    I'm sorry, can you --

BY MS. RODRIGUEZ-COSS:

Q    Your experiences with your son -- during voir dire, counsel asked you, "Notwithstanding the experiences your son had, can you consider mitigating evidence fairly?" and you said, "Sure, I can do that."  And what I am asking you now is, were you able to do that?  Were you able to consider all the evidence fairly and impartially during the course of the trial of Donald Fell, despite the experiences that you had -- you had with your son?

MR. RUBIN:  Objection.  The objection -- it's a 606 objection.  It's really -- she is really asking about what went on in her deliberative process, you know, whether she could be fair and was fair.  Has to do with the whole deliberations.  And I don't have any problem with asking her when she answered the question during voir dire what her state of mind was, but what her state of mind was in the jury room, I think it violates -- it, first of all, is not relevant.  It violates the rule.

MS. RODRIGUEZ-COSS:  We will move on.

THE COURT:  It's not necessarily limited to deliberations.  Also during the course of the trial.

And it's essentially not asking her for describing her emotional reaction to evidence nor engaging in any discussion during deliberation. It's essentially asking about the ability to consider mitigating evidence, which is essentially related to the questions that were asked earlier on. It seems to me that she should be able to answer that question.

MR. RUBIN: How can I cross examine her on whether she was fair and impartial in the jury room without violating 606? If she was to ask a question, Were you fair and impartial when you heard the evidence? it leaves no room for kind of cross examination in that sense.

THE COURT: Re- -- let me re-hear the question again. Are you asking her as to whether in fact she could be fair -- she was fair and impartial in this particular case?

MS. RODRIGUEZ-COSS: Right, right.

THE COURT: In the deliberations. In the room.

MS. RODRIGUEZ-COSS: We could change it to "could." We can transport ourselves to the voir dire process and --

THE COURT: Well, I'd ask you to do that because I think Mr. Rubin's got a good point that in

*SEALED BY ORDER OF THE COURT*     192

fact he can't go into the deliberations.

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  But you certainly can go to the ability to be fair and impartial in the voir dire process.

MS. RODRIGUEZ-COSS:  Very well, your Honor.

BY MS. RODRIGUEZ-COSS:

Q    Had defense counsel asked you during the voir dire process whether you could be fair and impartial, notwithstanding the experiences that you have had with your son, what would have been your answer?

MR. RUBIN:  Objection.  Speculative.

THE COURT:  Objection overruled.  This is in the voir dire process.  Objection overruled.  Go ahead.

A    Can you -- I guess -- can you rephrase it or just ask -- yes, I could.  I was fair and impartial.  I didn't think about myself or my son or anything else but what I was hearing in the courtroom.

MR. RUBIN:  Move to strike.

THE COURT:  Right.  The motion is granted.

As to your -- as to your ability to be fair and impartial, if somebody asked you during the voir dire process, Do you think, based upon your own personal experiences, you could be fair and impartial in regard to consideration of the mitigating circumstances --

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

JUROR NO. 162:  Yes.

THE COURT:  -- that we are talking about --

JUROR NO. 162:  Yes.

THE COURT:  -- your answer would have been what?

JUROR NO. 162:  Would have been yes.

THE COURT:  Okay.

JUROR NO. 162:  Um-hum.

BY MS. RODRIGUEZ-COSS:

Q    And you had no doubts about that?

A    No, no doubt at all.

Q    All right.  Counsel marked a statement that you signed.  I am forgetting what number that statement is.  Here we go.

MR. RUBIN:  2.

MS. RODRIGUEZ-COSS:  6.

MR. RUBIN:  Okay.

MS. RODRIGUEZ-COSS:  All right.

BY MS. RODRIGUEZ-COSS:

Q    So this is Defendant's Exhibit 6, and it's a statement that I am going to ask you, is that your handwriting?

A    No, it isn't.

Q    So you did not write that statement?

A    I did not.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

194

Q    All right.  So someone else wrote this statement
and then presented it to you and asked you to sign it?

A    Um, I don't think I actually saw this statement
when I signed it.  I think it was just the back of this
where it said all of the above is a matter of public
record and should be -- and that's what I signed.  But I
don't recall them writing this statement in front of me.
This is the first time I have seen this.

Q    So when you signed this statement, you don't
remember actually reading it?

A    I did not read this.

Q    It was not read to you?

A    No.  All I did was sign a little piece -- a little
piece of paper.

Q    The last page.

A    The very last page, and there was nothing written.
This was written after.

Q    And bringing --

A    I have never seen it before.

Q    And bringing your attention to that last page where
it says at paragraph 11, "All of the above is a matter
of public record and should not be misconstrued as
anything being discussed during deliberations," is that
your handwriting?

A    That is my handwriting, but --

SEALED BY ORDER OF THE COURT

Q    And why did you add that to that statement?  Were you asked to write that down?

A    That's not my writing.

Q    Oh, is that not -- okay, I'm sorry.

A    None of this is my writing.

Q    I misunderstood you.  So paragraph 11 is also not your handwriting?

A    No.  But that's the only thing that I saw --

Q    Oh, I see.

A    -- was just a couple of sentences that I signed. This, I have only seen today.  This statement was not given to me at any time.  This is the first time I have seen this statement -- all of this all written out.

Q    Did you have an opportunity to read this today?

A    I did.

Q    All right.  And so is that why you pointed out a couple of misstatements in there?

A    That's correct.

Q    I see.  You did not have an opportunity before to do that?

A    No.

Q    Let me ask you something completely -- well, let me -- defense counsel also raised the fact that your husband apparently at some point in time disclosed that -- to you that he had been sexually abused as a

*SEALED BY ORDER OF THE COURT*    196

child?

A    Yes.

Q    How long ago did you have this conversation with him?

A    I have been married to him 31 years and so it was like 31 years ago.

Q    And when you answered the question in the questionnaire, "Have you or anyone close to you ever been the victim of a crime," why did you not disclose that information?

A    Because I never gave it a thought.

Q    Is it --

A    People -- you have to understand what's going on psychologically.  I just never gave it a thought.  It wasn't intentionally lying.

Q    So that was not a conversation you had had with your husband recently?

A    No.

Q    It was a conversation you had with your husband over 30 years ago.

A    No, no.  That's correct.

Q    And it didn't come to mind?

A    No, it did not.

Q    All right.  And going back to Defendant's Exhibit 6, does that summarize the entire information you

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

provided to the defense when you met with them?

A   All of this, you mean?

Q   Um-hum.

A   I believe so.

Q   You met with Mr. Rubin recently, correct?

A   I did.

Q   Did you meet with representatives from the defense before that?  Did you meet with them back in 2010?

A   Yeah, back in -- when I lived -- was living in Colchester, yes.

Q   Okay.  And I guess the statement is signed January 1st, 2011.  Was it close to when --

A   That must have been.  Yes.

Q   Okay.  And how long did you meet with defense representatives at that time?

A   They were there maybe an hour and then they came back a second time.

Q   Is that when they presented the statement to you to sign?

A   I don't remember seeing this statement.

Q   Okay.

A   I just remember signing a little piece of paper. She just showed -- she just gave me a paper and I signed it.  But I don't recall seeing this statement until today.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     198

Q    All right.  I have another question for you, different, I guess, from what we have been discussing. Do you remember seeing a firearm in the jury room?

A    I never saw a firearm in the jury room, no.

Q    Do you remember a shotgun being introduced into evidence during the trial?

A    I don't recall that.

Q    All right.  And you don't recall having seen a shotgun in the jury room?

A    I don't recall that.

Q    All right.  Now, you said that you -- your son is rehabilitated; is that correct?  You consider that your son is rehabilitated now?

A    Well, he still drinks --

Q    Okay.

A    -- but he doesn't like he used to, no.  He's in his middle fifties, and he is doing quite well.

Q    Is he employed?

A    He has worked 15 years at Shaw's right here in Williston, in the meat room, yeah.

Q    So for the last 15 years he has been gainfully employed?

A    That's correct.

Q    Okay.  But he has had some problems during those 15 years?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

199

A    He has had an ongoing problem with alcohol, right. I think it was last year he went to AA, was five months sober, was drinking again but not to the extent of what he used to, no.

Q    All right.  So when you responded to the question in the questionnaire and you indicated that your son had had a DWI conviction and a domestic violence conviction, did you intend for that to be a complete summary of your son's life problems with drugs and alcohol?

A    No.

Q    All right.  So that was just what you recalled at the time?

A    This is what I recalled at the time of any serious offense that he had.

         MS. RODRIGUEZ-COSS:  With the Court's indulgence, your Honor?

         (Brief pause.)

         MS. RODRIGUEZ-COSS:  I don't have anything further, your Honor.

         THE COURT:  Okay.  Any response?

         MR. RUBIN:  A little follow-up?

                    EXAMINATION

BY MR. RUBIN:

Q    Do you have your statement in front of you?

A    Um-hum.  I do.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*    200

Q    That would be, I think, Exhibit 6; is that correct?

MS. RODRIGUEZ-COSS:  Yes.  Did I take it?

THE COURT:  I have it.

BY MR. RUBIN:

Q    So your testimony is that this is the first time today -- in court was the first time you have seen this statement?

A    This is what I recall.  I don't recall seeing this.

Q    Your lawyer didn't show it to you?

A    I believe she did, yes, today.

Q    Oh, so it wasn't --

A    No, I said was the first time I have seen it.

Q    I think what you said on the witness stand was the first time you saw it --

A    No, I saw today.

THE COURT:  No, she said today.

MR. RUBIN:  Okay.

BY MR. RUBIN:

Q    Now, take a look at paragraph 10.  It says, "I have had the opportunity to review and correct the foregoing and it is true, accurate to the best of my knowledge"?

A    Um-hum.

Q    And that is your signature below that?

A    Right.

Q    On the same page?

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*                201

A    Right.

Q    And you said just a minute ago that you just recall someone sticking something in front of you, a little piece of paper, and you signed it?

A    That's what I recall.

Q    All right.  Take a look at paragraph three. There's a change there, correct?

A    There appears to be, yes.

Q    And that is your initials next to the change?

A    Yep.

Q    Take a look at paragraph six.

A    Um-hum.

Q    There's a change?

A    Right.

Q    And your initials again appear next to the change?

A    Right.  What I am saying is I don't --

Q    I am not --

A    -- recall seeing this.

Q    I'm not -- no, that's not what -- well, the Court will determine what you said.

But take a look at paragraph nine.  The word "ocular" is changed to "macular"?

A    Um-hum.

Q    And that again is your initials?

A    Right.

*SEALED BY ORDER OF THE COURT*                  202

Q    So on each one of the four pages of this statement, there is a change which you initialed, and then on the last page you signed at the bottom.

A    Yes.

Q    So it's not true --

A    I said I didn't recall seeing it.  This -- how many years ago was this?  I don't remember this.

MR. RUBIN:  I have no further questions.

JUROR NO. 162:  Okay.

THE COURT:  Any further questions?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  All right.  Thank you.  And you are --

JUROR NO. 162:  Excused.

THE COURT:  You are excused.

JUROR NO. 162:  Thank you.

THE COURT:  Yes.  Okay.

(Juror No. 162 excused.)

THE COURT:  All right.  We will arrange for the continued testimony of the third witness.  Is there any preference for Guildhall or St. Johnsbury?  One or the other.  But we will coordinate this with counsel. Should do that relatively quickly.

MR. RUBIN:  You asked if we had a preference? Guildhall, your Honor.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*     203

THE COURT: Guildhall, right.

MR. LIMAN: Your Honor, I assume the transcript will be released to the parties and then we'll confer --

THE COURT: Right.

MR. LIMAN: -- with Ms. Cross-Rodriguez regarding appropriate redactions?

THE COURT: Correct. And then submit it to the Court and I will review it as well. If there's any dispute, I will review that, and it should be released quickly.

MR. LIMAN: Thank you, your Honor.

THE COURT: All right?

MS. RODRIGUEZ-COSS: Your Honor, we are assuming that these documents have been marked will remain sealed?

THE COURT: Yes, absolutely.

MS. RODRIGUEZ-COSS: And with regards to the statement of Juror 143, it was marked into evidence this morning. It had been previously sealed. It does contain his name and it contains actually a great deal about jury deliberative process in this case, and we would ask that it remain under seal.

THE COURT: Right.

MR. LIMAN: Your Honor, may I suggest that

*SEALED BY ORDER OF THE COURT*

with respect to the exhibits, I confer with Miss Cross-Rodriguez and --

THE COURT:  He refers to votes, he refers to a lot of jury deliberations, totally improper.  Obviously anything has to be redacted which includes names.  If the two of you can work it out, that would be helpful.  If not, let me know.  Right now it's sealed.  It will remain sealed until both parties agree.

MR. LIMAN:  Thank you.

MS. RODRIGUEZ-COSS:  And we still have -- does the Court still wish to receive a written request for the government to speak with court personnel with regards to the procedures for handling evidence during a trial?

THE COURT:  Well, you tell me whether you want to do that.  Tell me who you want to speak with, why you would think it's important.  It should be in -- it should be in writing.

Again, I mean, obviously it's public.

MS. RODRIGUEZ-COSS:  Well --

THE COURT:  You are doing anything in regard to investigations on either side, it can be done *ex parte*, but yeah.  I mean, the problem is, you are talking to employees of the court, and so I want to know what you are going to be asking about, why it's

*SEALED BY ORDER OF THE COURT*

205

particularly important, and then I will review it.

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  I just think that that's important.  And actually, you -- you recognized the problem.

MS. RODRIGUEZ-COSS:  Well --

THE COURT:  It's an employee of the court.

MS. RODRIGUEZ-COSS:  Sure.

THE COURT:  And I talk to employees all the time, and -- so obviously you can't get into communication.

MS. RODRIGUEZ-COSS:  And we have no intent on doing that.

THE COURT:  Right.  So that's what I need to know.  Obviously if you want to know about policies and procedures in regard to whether guns go into the jury room or not, that's not an issue that is -- that is so sensitive in terms of how the court functions that it would not be disclosed.

So, just let me know exactly what you want, who you want to talk to, and -- it goes for either side.  Okay?  All right?  Anything else?

Okay.  Thank you.

MR. LIMAN:  Thank you.

MS. RODRIGUEZ-COSS:  Thank you.

*SEALED BY ORDER OF THE COURT*

*SEALED BY ORDER OF THE COURT*

MR. RUBIN:  Thank you.

(Court was in recess at 4:06 p.m.)

*** ** ***

C E R T I F I C A T I O N

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

August 28, 2013
Date                          Anne Nichols Pierce

*SEALED BY ORDER OF THE COURT*