UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA   *
                         *
        V           *
                         *
DONALD FELL             * CRIMINAL FILE NO. 01-12

EXAMINATION OF JUROR 26
Friday, September 27, 2013
Essex County Courthouse
Guildhall, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge

APPEARANCES:

    JACABED RODRIGUEZ-COSS, ESQ., United States
       Department of Justice - Criminal Division, 1331
       F Street, N.W., Washington, D.C.; Attorney for
       the United States

    WILLIAM B. DARROW, ESQ., Assistant United States
       Attorney, Federal Building, Burlington, Vermont;
       Attorney for the United States

    LEWIS J. LIMAN, ESQ., SCOTT BUELL, ESQ. and
       MICHAEL J. KAHN, ESQ., Cleary Gottlieb Steen &
       Hamilton LLP, One Liberty Plaza, New York,
       New York; Attorneys for the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
       New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
       DeWolfe, 237 North Main Street, Barre, Vermont;
       Attorney for the Defendant

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# I N D E X

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| JUROR NO. 26 | | |
| By The Court | 4 | 9 |
| By Mr. Liman | 28 | 21 |
| | 64 | 8 |
| By Ms. Rodriguez-Coss | 60 | 8 |

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| A | Rap sheet | 40 |
| B | Criminal record | 40 |
| C | Waiver of arraignment and request to enter plea | 54 |
| D | Notice of plea agreement | 54 |

FRIDAY, SEPTEMBER 27, 2013

(The following was held in open court at 10:41 a.m.)

THE COURT:  Good morning.

COURTROOM DEPUTY:  This is case number 1-12, United States of America versus Donald Fell.  Mr. Fell is not present in the courtroom.  Present on behalf of Mr. Fell is Richard Rubin, Lewis Liman, Cathleen Price, Scott Buell, and Michael Kahn.  Also present in the courtroom on behalf of the government is William Darrow and Jacabed Rodriguez-Coss.

The matter before the Court is a juror examination.

THE COURT:  Okay.  Well, welcome to Guildhall. In all of my years of practice, this is the only courthouse I never went to.  Anyway.  We had an opportunity, thanks to the request of the juror, to come.  I apologize for being late.  This took some -- from my neck of the woods, this takes a lot longer than I anticipated.  So sorry for starting a little bit late.

We are ready to proceed on the questioning of Juror No. 26.

We are not using your name at all, and you are identified as Juror 26 --

JUROR NO. 26:  Okay.

THE COURT:  -- from this point forward, all right?  And I appreciate you coming today.

So, would we begin with the oath being administered.

COURTROOM DEPUTY:  Your Honor, he does not need to stand, correct?

THE COURT:  No, he does not need to stand.

JUROR NO. 26,

having been duly sworn by the courtroom deputy, was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q    Again, welcome to the court.  I have just a couple of questions to ask.

You were interviewed, I think, by various individuals after the trial, and some questions have been raised about some of your responses, so I have just a couple of questions.  Then I will ask the lawyers to ask you whatever questions they wish at that point.

A    Okay.

Q    But first, when you were interviewed to be a juror, you were asked the question as to whether or not you had any criminal convictions on your record?

A    Um-hum.

Q    And you indicated no.  Is that correct?

A    I think it -- it was a long time ago, but I think you're right, yes.  I didn't.

Q   Okay.

A   I -- I didn't think that I had -- well, I didn't think they were serious enough to be like -- I didn't think of it as any more than a speeding ticket or, you know --

Q   What have you been convicted of?

A   I have had DWI, and I had a misdemeanor which said that I cut a phone line.

Q   I'm sorry, that you cut a phone line?

A   Yes.

Q   Can you tell me -- tell me about when that was and what that case involved?

A   That had to be -- it was a long time ago.

Q   And where was it?  Is it in Essex County or some other place?

A   Right here in Essex, yes.

Q   Okay.  And so what was the nature of that charge?

A   Well, my wife and I weren't getting along very well at the time.  I was laid off from work because it was wintertime and I was doing construction.  Well, when I built my house, I put in -- I had put my own electrical line in, and that cost me $20,000.  Up here everything's a long ways.  So when it came --

Q   Except from New Hampshire, right?  Fairly close to New Hampshire?

A    Right.  I coulda brought it over from there and probably --

Q    Right.

A    But anyway, I had decided to move up there.  It was -- started out as a camp, but I had a lot of things that I didn't have done yet, like electricity, and actually I was using an outhouse because it was just a camp.

So after I got the electricity, I called up the telephone people and they said, Well, we'll be there tomorrow if you got another 5,000.  So I thought, you know, I've done a lot of telephone work.  I'm going to wire my own house, and I did wire it for telephone, and I said, what do I want to bother hiring them to do it.

So I -- I needed a service that was close to the telephone -- I mean close to the regular telephone line.  And I actually didn't own the land at the time.  My father owned it all because we hadn't made any arrangements yet.  So I thought, well, if I put something down in this pasture right next to the -- to the power line, and the phone line, I'll be able to just get it for nothing.  They'll just hook it up to the outhouse.

So this sounds funny, but I didn't know what I was going to put out there in the pasture because the cows

were running all over the place.  So I didn't need the outhouse anymore, so I put the outhouse down to the line and had 'em put a service on it.

So that's -- that was my actual address, was on that outhouse out in the pasture down by my father's. And it was still pretty near half a mile away.  But if you -- with the service on the outhouse, all I had to do was -- 'cuz I wired my own house, was take a phone line, and I bought my own, and I ran it up through the woods. I carried the wire over my shoulder and I went along -- and it weighed about a hundred pounds -- and tacked 'em to trees till they got to the house, and I hooked it up to the phone in the house.

And so actually the -- the line in the outhouse through the woods to the house was just like it was a long extension line to another room; you know what I mean?

So -- well, my wife and I were having bad time, and I got thrown out, so I -- my bills were getting kind of high, and I wasn't working at the time, and I was a little worried about the phone line -- well, the telephone bill, because, you know, she had plenty of time on her hands, and so I thought, well, I'll spare myself that because this phone line is mine and I paid for it and I put it in.  So I went down and cut it off.

Well, then I -- I came -- I was cited, and they brought me in here, and --

Q    So you were cited for unlawful trespass or unlawful mischief -- unlawful mischief; is that right?

A    I think so.

Q    All right.  And that is for actually cutting the phone lines into the house in which your wife was living at that point --

A    Yes.

Q    -- based upon the fact that you had put the phone line in yourself?

A    No.  Because I cut the line.  But I didn't think it mattered because it was my own.  I bought and paid for it.

Q    So what happened in the criminal case?

A    Well, they brought me into court and they charged me, and I -- I thought what -- you know, this doesn't make any sense.  So I took my Kodak up and took a lot of pictures of the outhouse and the cut and everything, and I brought it out here to court, and the judge threw it out.  Threw out the case.  He says, you know, this doesn't make any sense.  So -- but he did say, when I was about to leave -- you know, he told her that he was going to have to -- and said something to her about if she -- she wanted to rewrite it, she could try something

else.

Q    Rewrite the affidavit that was used to support your charges?

A    No.  She found somebody else who would accuse me of something bad, and it was my brother-in-law, because he was the phone specialist.  He worked for -- for the phone company.  And 'cuz I called a head of New England Telephone, and he didn't know anything about it, and he couldn't find out anything about it.  They just accused me of -- of doing something evil.

Q    So did you have to come back to court at some later time?

A    Yeah, they re-cited me.  They re --

Q    And what did they charge you with the second time?

A    Well, it was a misdemeanor anyway.  She didn't take it well because they were all laughing about the pictures, and one of the public defenders I'd had when I came the first time, and -- he had made fun of her, the prosecutor, when he took 'em and showed her the pictures.  And then when they threw it out of court, she was really not happy.

So they -- she wrote it out, and she had it so I couldn't have a public defender, and -- but he went in and he talked to her and he came back and he said, you know, he says, you can -- you can fight this as long as

you want, and every time you get it thrown out she is going to come back at you again with something else.  He says, the best thing you could do is just give in, plead guilty and pay a hundred dollar fine, and chalk it up to a bad idea.  So that's what I did.

Q    All right.  And so why did you answer the question you had no criminal record?

A    I don't know.  I just thought that it was kind of a joke and -- so I paid the fine.

Q    Okay.  In addition, apparently you have been convicted of a DWI or DUI, a drunk driving in New Hampshire?

A    Um-hum.

Q    Is that correct?

A    Yes, I had.

Q    When did that happen?

A    I actually can't remember.  It's -- it's been a long time.  It was back in the '90s, I guess.

Q    Okay.  And what actually happened in that case?

A    Well, I was going to -- over to Littleton and I was supposed to spend some time over there with a friend of mine.  We were -- I was going to their apartment, and we were going to spend the night there, and I decided to start partying a little early, and I didn't have a lot but I had enough so that I got caught before I got to

the apartment.

Q    So you got charged in court in New Hampshire?

A    Right.

Q    And what happened to that case?

A    I was found guilty.

Q    And what was your penalty?

A    I got a fine, and I think it was 90 days or something.  No, it was 180.

Q    180 days of what?

A    Because I pleaded not guilty to start with.  I -- I was -- I had wanted to have a lawyer because I thought, you know, this -- you know, I asked for some things, and they wouldn't give in at all.  They were gonna have everything their way.  And I wasn't arguing with them or trying to be unreasonable, but -- but like I said, I should have thought better before I started early.

Q    Well, all right.  So 180 days, I don't quite understand what that means.  180 days of probationary supervision?  180 days of imprisonment?  What exactly --

A    Just 180 days of -- of -- there was no supervision or anything.  It was just -- that's how long I lost it.

Q    Oh, that's --

A    It could have been -- it could have been 90 days except for I -- I actually started by saying not guilty.

Q    I see.  So your suspension was 180 days --

suspension of your operating license?

A     Yes.

Q     In Vermont?

A     Well, both, because New Hampshire and Vermont coincide.

Q     I see.  And that would have been different if you pled guilty at the very beginning?

A     Right.  I had forgotten about that.

Q     All right.  So when you answered the question about whether or not you had a previous conviction, you didn't respond on the DUI or DWI, and why is that?

A     I didn't?  I --

Q     Well, I don't know.  Did you tell people that you had been convicted of that?

A     No, I really didn't think about it at the time.  I actually never thought that they would ever pick me, way over here, almost in New Hampshire, to go to court, and I guess I kind of filled it out in a hurry, you know, not expecting to get picked.  It was -- I was -- I couldn't believe it when --

Q     All right.  Also, you were asked some questions about whether you knew anything about the case --

A     Right.

Q     -- in advance?

A     Right.

Q    Can you tell me if you -- this is way back, obviously, but can you tell me what you had heard about the case against Mr. Fell?

A    Well, not much.  I just -- I did hear about it.

Q    Okay.  What --

A    But I heard --

Q    -- had you heard?

A    But it didn't mean anything to me, you know, because I didn't know who it was and never -- you know, I never had subscribed to a newspaper or I never watched the news.  Actually, I was never home, well, to sit around and watch TV or watch the news or something like that.

Q    All right.  So you did hear something about it but you are not sure where you heard about it?

A    Well, I might have been home at some point.  They tell me now that -- you know, because I did -- I happened to hear something about the other guy who -- who -- who committed suicide in jail, but it didn't mean anything to me, and I never put two and two together.  You know what I mean?  I didn't know anything about it other than I knew it happened.

Q    You knew what happened about the other guy?

A    Well, that I heard one night on the news, when I was actually home, that he had committed suicide, and I

don't even remember his name now.  But he was apparently with Don -- Mr. Fell at the time, but I didn't know that until later when I got picked for jury.

Q    All right.  So you were in your house.  You must have been listening to either the radio or watching TV?

A    Yeah, probably.

Q    Okay.  You are not sure which one?

A    No.

Q    And can you, as best you can, remember when that conversation took place when you heard about this other person committing suicide?

A    After -- after they had started the case.  I just never had any reason to -- to acknowledge anything.  I didn't know him.

Q    Sure.  No, I appreciate that.  But in relationship to the trial, right?

A    Um-hum.

Q    Was it before or after the trial that you heard about this person committing suicide?

A    It was before.

Q    Okay.  Was it sometime about the time of the offense, about the time of the crime, or was it pretty close to -- or closer to the time of the trial itself?

A    It was quite a while before it, I think.

Q    Okay.  But you remember -- do you remember that

fairly clearly that you had heard this?

A    I don't know.  The reason that I remember today is that -- is because I have been asked about it a lot.  Other than that, I wouldn't have -- I don't remember his name.

Q    Well, when you were -- when you were being questioned to become a juror, you were asked about what you heard about the case, right?

A    Um-hum.

Q    Right?  Do you remember being asked?

A    Yes.

Q    I think that was actually by me.

A    Probably.

Q    And do you remember what you said?

A    Nothing.  I didn't.  But at the time, until the case started, I didn't -- I didn't know that I did know something that -- but I didn't know that I knew it.  It's just that I had heard that.  Then later, when they said this guy had been involved, and I said, well, I did -- I actually did hear that this man had committed suicide, but I didn't know anything -- didn't know that the two things corresponded.

Q    All right.  So at the time you were answering the questions about what you remember hearing about the case, at that point you had not remembered this fact

that the other person committed suicide?  Is that correct?

A    Right.  I didn't know -- I knew he had committed suicide, but I didn't know that it had anything to do with this case until later on when I -- when I started hearing the -- the evidence that they had against -- against him.

Q    Okay.  And so at some point during the trial you recognized that this was important, that you had known this piece of information, or --

A    Yes, later on.

Q    What do you mean later on?

A    You know, after I found out from testimony on -- on the stand from different people.

Q    Do you remember what the testimony was that made you think that this was a relevant piece of information?

A    Well, I guess I never thought it was that relevant other than -- because he wasn't on trial, and he was actually passed away.

Q    Okay.

THE COURT:  All right.  I am just going to take a brief recess and would like to speak with the lawyers in chambers.  This is just going to be a second.  The chambers are quite small.  We will get to know each other.  But I would like to discuss an issue.

(Court was in recess at 11:04 a.m.)

(The following was held in chambers at 11:05 a.m.)

THE COURT:  Okay.  All the lawyers are in chambers.  The -- the obvious next question is, and I think this is probably improper, but did you talk with any other jurors about the fact that this person had committed suicide?  And I'm not about ready to ask that question at this point.  That's why I am bringing you in here to discuss that.

A long way from New York City?

MR. LIMAN:  But it's a welcome visit. Mr. Rubin took a picture of me in front of the courthouse, and I am looking forward to posting it up and sharing with my colleagues.  It's a beautiful courthouse, actually.

THE COURT:  This is off the record.

(An off-the-record discussion was held.)

THE COURT:  Okay.  I throw that out.

MS. RODRIGUEZ-COSS:  Your Honor, the government doesn't feel like that would be necessary. In fact, we -- we thought perhaps you brought us in here to entertain the idea that no further questioning of this juror is actually necessary.

I think he has made it clear with regards to the issue of Lee that he never put two and two together.  It

wasn't until way later that he realized that he had heard something over the radio that this person had died in prison.

The manner of -- of death, if he remembered, we don't believe is so significant because the jury was told that Lee died in prison and that it was an accidental death. We have no reason to believe that he would have disregarded the stipulation introduced into evidence and instructed to follow by the Court.

So it's clear that when he completed the questionnaire, he had no intention of not disclosing relevant information. It simply didn't come to his mind because he didn't relate what he had heard on the radio quite some time before trial to the trial that he had been summoned to serve on.

In fact, when the Court asked him -- and I don't think he remembered when you asked him now on the stand, but when the Court asked him during voir dire whether he had heard anything about the case, he did volunteer information. He said he had heard something about a woman being kidnapped, and that's all he -- he remembered.

So that also shows that there was no intent on the part of this juror to hide any information or not disclose any information or not be completely candid

with the Court.  He put two and two together at some other point in time and, as he stated quite honestly on the stand today, he didn't consider it to be relevant. So this isn't a case where the juror lied.  And I think -- I think the inquiry on that issue shouldn't go any further.

THE COURT:  Well, you may have -- you may have heard different versions of what he said.  I think he said that he clearly heard about the fact that Mr. Lee had committed suicide.  Didn't call him Mr. Lee, but committed suicide, in advance, and that during the course of the trial he had a better sense of the relevance of that.

MS. RODRIGUEZ-COSS:  I think --

THE COURT:  I thought that's what he said.  It wasn't some later time after the trial.  It was during the course of the trial.  And so then the logical next question is, Well, did you talk to other jurors about that?  And --

MS. RODRIGUEZ-COSS:  Your Honor, I --

THE COURT:  I just hadn't -- I haven't -- that's what I am particularly sensitive about.

MS. RODRIGUEZ-COSS:  I would beg to differ, your Honor.  I think he said that at some point during the trial he put two and two together and realized that

the Lee he had heard about on the radio or the news, he doesn't remember which, is the Lee who was Fell's partner in crime or the Lee involved with Fell in the crime subject of the trial that he was sitting on, but he didn't consider it relevant.

So, you know, when the Court asked him, Was it -- was it then that you realized that it was relevant? and he said, Well, I didn't actually consider it relevant, so I don't know that there's any need to inquire further, particularly into whether or not he shared the information with other jurors.

THE COURT:  Well, I really don't want to get involved in discussions among jurors.  Very sensitive area.

MS. RODRIGUEZ-COSS:  Let's also take into consideration, your Honor, that the defense has questioned all the jurors in this case and has set forth no allegation that any other juror had any extrinsic information.

THE COURT:  Yes.  Okay, Mr. Liman?

MR. LIMAN:  I'm not going to argue what the juror said or didn't say but just address your question.

We would request that you ask that question.  We are sensitive to questions with respect to deliberations and not going into things that are barred by Rule 606,

but what we're talking about here is evident -- is information, not evidence, that was not evidence at trial. There was no evidence at trial about Mr. Lee hanging himself or about suicide. So we are not talking about discussions about the evidence. That's the first point I would make.

And, your Honor, the second point that I would make is that we would ask that you phrase the question whether you had any discussions where you reported what you had seen on the -- on the news to the other jurors, so that it's quite clear that what you are talking about is not the evidence at the trial but what he had seen outside of trial. I think that is a perfectly proper and in fact a common question when the question is have jurors been exposed to extrinsic information.

THE COURT: I guess my question is, first of all, one of relevance. There's some evidence to suggest that he may have been aware of this fact, and that needs to be explored, and I assume that you are going to explore that. Whether in fact he shared that with somebody else ultimately becomes not particularly significant because he is a juror, he was on the jury pool, and for whatever relevance, what he may have said to others becomes less important.

MR. LIMAN: I agree with that, your Honor. I

think that the test is whether a juror was exposed to extrinsic information, and it's -- and that for purposes of our case, we don't need to prove that he shared it with any -- anybody else.  I would say that if he did share it with other people, that would tend to establish that he believed that this information was important, recognized that it was important during the trial, and I think it goes to that question, the significance that he put on the information.

I think we have made out our case without that, and so I want to be clear about that, but I think it is relevant evidence if he -- if he shared it with a lot of other people, that he believed that this was information that was important he shared it with other jurors, he didn't share it with the Court.  That's the relevance of that.

THE COURT:  So it becomes a little less important as to whether or not he actually shared that with other jurors, and to that extent I agree with you completely.  So at this point, in light of the sensitivity of getting involved in any discussions among jurors, I am not going to permit that examination.  I am going to ask some further questions about what he was thinking, why he didn't disclose this information, and open it up for questions.

I do think that he has raised enough questions that both sides should have an opportunity to speak with him.

MR. LIMAN:  Your Honor, for the -- just for the purpose of the record, can -- I would ask the question of him whether he has -- he shared that information with the other jurors.  I understand that your Honor is not going to ask that question yourself, and rather than --

THE COURT:  Yeah.

MR. LIMAN:  -- ask the question, draw an objection, have it sustained, for the purposes of the record, it would be helpful if you actually --

THE COURT:  All right.  For the purpose of the record, your objection is preserved.

MR. LIMAN:  Thank you.

THE COURT:  I just think that that's the next step into jury deliberations and that is forbidden at this particular point.  You know, if there's some major change of heart, I will let you know, but --

MR. LIMAN:  Thank you.

THE COURT:  -- I just -- I just -- I just don't think getting into jury deliberations is helpful, and I think it's of marginal significance, frankly, in light of the law.  But, with that, I will just ask a couple of questions and then I will open it up.  Who

wants to go first?

MR. LIMAN:  Your Honor, I would like to.

MS. RODRIGUEZ-COSS:  Your Honor, as the government said, I really don't think any further questioning is necessary.  I think the Court has been quite thorough in obtaining the information that the Court felt it needed in order to rule on this particular claim.

THE COURT:  Yeah, except I -- I appreciate the fact that I looked at the record.  I don't know this juror at all.  I don't know this juror's background.  Both sides know that -- a whole lot more than I know, and, you know, what he may have said to others -- apparently he has talked to a whole bunch of people -- is something that I just have no clue about.

MS. RODRIGUEZ-COSS:  The people he has talked to about the case is the defense.  That's -- that's who he has talked to.  The people who questioned him continuously for about -- a couple of hours was the defense.  It's no one else that he was referring to.

THE COURT:  The government has had an opportunity to speak with him.  I don't know if you have or not.

MS. RODRIGUEZ-COSS:  We did, and that's what he -- that's what he said.  They never asked him about

his misdemeanor convictions.  All they asked him was about Lee, and so that's why the issue comes about.

THE COURT:  Well, that's a little different than he testified to.  Nobody asked about whether they asked him about his misdemeanor convictions.  So you may have information that I am just not privy to.  So -- and I also think that both sides should have an opportunity to examine him.

MS. RODRIGUEZ-COSS:  Very well, your Honor. We also put on the record that this is an objective analysis to be made by the Court.  I don't know how relevant the juror felt whatever information he had before him was -- is relevant to this analysis.  Jurors are exposed to extrinsic evidence all the time.  Not all allegations of possible extrinsic evidence result in an evidentiary hearing, much lesson a ruling of the Court.

THE COURT:  I agree with you that his subjective analysis of relevance is not particularly significant other than the fact you could take Mr. Liman's response in saying, well, if he really felt it was relevant, he was much more likely to think about it and impact his judgment.  But I think this is not a subjective question.  You have got him saying that he was exposed to this kind of information in advance of the trial.  Okay, so what does that mean?  And to figure

out what that means, there needs to be further questions about exactly what he knew, how he knew it, and --

MS. RODRIGUEZ-COSS:  But the first part of the test, I believe, we can't even cross.  I think it's been clear from his responses so far that it was not his intent to lie to the Court, or not disclose any information to the Court.  He -- he didn't put two and two together.

THE COURT:  There's no question there --

MS. RODRIGUEZ-COSS:  We don't need to get past --

THE COURT:  There's no intention he intentionally lied.

MS. RODRIGUEZ-COSS:  We don't get past the first step under McDonough.

MR. LIMAN:  Your Honor, obviously we disagree with that.  We will address it at the appropriate time.

THE COURT:  This is just to find out what happened here.  So I am going to let both sides ask questions.

MR. LIMAN:  If I could have three minutes to confer with my colleagues, that would streamline it.

THE COURT:  And you are going first?

MR. LIMAN:  Yes.

THE COURT:  All right.

MR. LIMAN:   Thank you.

(Chambers conference concluded at 11:18 a.m.)

(The following was held in open court at 11:25 a.m.)

EXAMINATION

BY THE COURT:

Q    Okay.  So I just have a few more questions.  You --
you heard this thing about the person dying, the other
person dying?

A    Um-hum.

Q    You think that was either by radio or TV, and was
your memory of that quite clear?

A    Yes, it's just that I didn't put the two together
until we went to court.

Q    Yes.  So what do you mean put the two together?

A    Well, I just heard the name, and I remember -- I'd
remembered that I had heard it before, but as far as his
name was the only one that I heard, so I didn't --

Q    His name, meaning this other person who died?

A    Yeah, the person who had committed suicide.

Q    Okay.

A    But I didn't -- I wasn't paying enough attention.
It's just, you know, sometimes you hear things and then
later on you'll say --

Q    Okay.  So you heard something during the course of
the trial which brought back this memory, or had you

always remembered --

A    Yeah, when he brought up his name, I remembered I had heard that name before, and then I realized, you know, that that was -- I had heard it before because I had heard it on the news that he had committed suicide.

Q    Okay.  So you heard that some time during the trial?

A    Yes.

Q    Okay.  And why -- why did you think that was important?

A    Why --

Q    If you did.

A    No, I didn't at the time think it was important to anything.

Q    Okay.

THE COURT:  All right.  So, Mr. Liman, are you going to go first?

MR. LIMAN:  Yes.  I just have a few questions.

THE COURT:  Sure.

THE WITNESS:  Um-hum.

EXAMINATION

BY MR. LIMAN:

Q    Good morning, *{Juror 26}*.  Good morning, Juror 26.

MR. LIMAN:  I ask that that be stricken from the record.

THE COURT: Okay. Yeah, I think you asked the last time --

MR. LIMAN: I did as well.

THE court: -- that it be stricken as well. And --

MR. LIMAN: I am going to volunteer to be admonished in a moment.

BY MR. LIMAN:

Q    I just have a few questions for you.

MR. LIMAN: I take it I can ask from here?

THE COURT: Yes, fine.

BY MR. LIMAN:

Q    You told the Court a little while ago about two crimes which you had been charged and that you failed to mention during the voir dire in this case that, correct?

A    Um-hum.

Q    When -- you have to answer the question yes or no or verbally.

A    Oh. Yes, I --

Q    One was the unlawful mischief, correct? That was one of the crimes --

A    Yes.

Q    -- that you failed to -- that you did not mention to the Court during the voir dire?

A    Right.

Q    The other was the DUI in New Hampshire; is that correct?

A    Right.

Q    Sir, is it correct that there was another crime that you were charged with back in the 1990s?

A    Ah, I don't -- I don't remember.

Q    Weren't you brought into this courtroom for a crime having to do with failing to pay wages?

A    Oh, yes.

Q    You want to tell us and the Court about that?

A    Well, it lasted for years.  I was working for the NCA Program, and they only --

THE COURT:  By NCA Program, that's the Northeast Community --

THE WITNESS:  Yes.

THE COURT:  -- Action Program?

THE WITNESS:  Right.

A    Because I was a contractor, and I had about 20 different jobs going, and I made it clear to the people that I had to hire to work with me that they don't get paid until everything is done, and for me to be able to afford to do 'em, we had to work together, you know, get the jobs done, and we're all working.

And this guy, he liked to drink a lot, and he -- he decided all of a sudden he wanted his money, and he

wanted a lot more than he earned, and I refused to pay. I said, I'll pay you a reasonable -- and you can go on your way. But I'm not going to pay when you did like $500 worth of work.

And he goes down to the -- to the unemployment office and tells them he's earned over $4,000. I said no, no. And so they took me to court.

BY MR. LIMAN:

Q    And you were charged with a crime?

A    Right.

Q    And the crime had to do with not paying this person money; is that right? Wages that he claimed that he was due?

A    Yes.

Q    And how much were the wages that you were accused of not paying him?

A    Well, it was -- he wanted over $4,000. This is so long ago that I can't remember.

Q    And you remembered that this was a crime that you were charged with, correct?

A    Well, it was another -- like a misdemeanor for -- I end up, we sat down and agreed that I would pay him $1200.

Q    You pled guilty to that crime, correct?

A    Well, in order to -- no, they just found me guilty.

Q    I'm sorry?

A    They found me guilty.

Q    So you were -- and you -- do you recall that you received a deferred sentence in connection with that? Well, what do you recall the outcome being?

A    All they wanted me to do was pay him a hundred dollar a month for 12 months, and I had already -- when we started, I had already paid him some of -- like $400, because they wanted me to.  That was the court -- what the court wanted.  And so that's what I did.

And then when we settled, we sat down and agreed on a hundred dollars a month.  I still owed him $800, and over eight months, I paid him the $800.  And they said after it was paid, that was it.  Nothing, no charge -- you know, nothing on my record to speak of, something like that.

Q    You recognized that this was a crime that you had been charged with, correct?

A    Well, yes, but they said that it wasn't -- it wasn't going to be on the -- on any records.

Q    So from -- as far as you knew, nobody else knew about this crime?

A    Right, right.

Q    And you said that the prosecution of this lasted several years; is that right?

A    This is true, because --

Q    Okay.

A    -- of a -- the sheriff that they had, he told me later that, you now, she -- the prosecutor kept offering me pleas, and he -- she asked him, Why -- why do you -- why is it that no matter what I offer him, he won't take it?  And the sheriff said to her, Maybe because he doesn't think he is guilty.

So I just kept fighting it.  I wouldn't give in because I didn't feel I had done anything wrong.

Q    At the end of the day you had been -- you were found guilty?

A    Yes.

Q    And you recalled that this lasted several years?

A    Yes.

Q    And you didn't mention this to the Court either during voir dire, correct?

A    Right, but like I said, they said this won't even be on any record, so --

Q    So did you not mention it because you didn't think you would be picked for jury in this case?

A    No, I didn't.

Q    You didn't mention it because you didn't think it was going to be on any records?

A    I didn't think it was important.

Q    You didn't think it was -- can you explain that to me?

A    Well, like I said, they said it wasn't even going to be on any records of any kind, and -- just as -- just as long as I paid him what they decided was fair that he would have been compensated, then, you know, they were happy.

Q    Who told you that the crime that you were convicted of wasn't going to be publicly known?

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor.  I don't believe it's been established that this was a crime.  This seems to be a dispute over unpaid services.

THE COURT:  Well, I assume that someone must have reference to a criminal record check which indicates --

MR. LIMAN:  We do.  I can offer those now.

THE COURT:  Okay.  Do you have a criminal record check --

MR. LIMAN:  Yes.

THE COURT:  -- which indicates this is a crime?

MR. LIMAN:  Yes.

THE COURT:  I mean, the other question is whether he was given a deferred sentence.

MR. LIMAN:  And he -- he was, your Honor.

That's --

THE COURT:  He was given a deferred sentence?

MR. LIMAN:  That's what the rap sheet reflects.  I will go through the exhibits and we can go through them.

THE COURT:  Well, if he was given a deferred sentence, then he was probably placed on probation for a period of time, and upon completion of probation, his deferred sentence gets eliminated.  Do you know if that's what happened?

MR. LIMAN:  It ends up that that's what happened.  I can establish the relevance of the whole line of questioning.  You want the proffer now or would you like me to ask a couple of questions?

THE COURT:  Go ahead and ask further questions, but if that is true, then technically he does not have a criminal conviction on his record.

MS. RODRIGUEZ-COSS:  That's clear on -- that he doesn't.  Not --

THE COURT:  You have to stand up.

MS. RODRIGUEZ-COSS:  Sorry.

MR. LIMAN:  The --

THE COURT:  It is a small, informal courtroom, but you still have to stand up.

BY MR. LIMAN:

Q    The question -- well, do you recall, sir, that you were asked the question during voir dire -- as part -- in the jury questionnaire, whether you or family member had ever been charged with a crime?

A    Probably.  There were a lot of questions on there.

Q    And do you recall that you answered that question no?

A    Well, at the time -- I can -- like I said, I didn't even consider that because they said that it was -- at the end of paying off the $1200, that it was not going to be anything.  That's what I was told.

Q    My question, sir, is just when you were asked the question whether you had ever been charged with a crime, do you recall what your answer was?

A    No, not right now.

            MR. LIMAN:  Your Honor, I'd like to --

            THE WITNESS:  Well, if --

            THE COURT:  I think you can move on.  That's been established.

            THE WITNESS:  I --

            THE COURT:  His response to that question was no, and now there's an issue in regard to the deferred sentence.

            MR. LIMAN:  Just ask to have marked both the rap sheet and records of the criminal conviction.

THE COURT:  Okay.

MR. LIMAN:  We will mark these as, Judge, one?

COURTROOM DEPUTY:  Yes, we can.

THE COURT:  Yes.  Is this the FBI --

MR. LIMAN:  This is the rap sheet plus the criminal record, public records, with respect to the prosecution.

THE COURT:  Okay.  Does the government have copies of those?

MS. RODRIGUEZ-COSS:  He just gave those -- yes.

THE COURT:  Okay.

MR. LIMAN:  The Court like courtesy copies?

THE COURT:  Yes.

BY MR. LIMAN:

Q    {Juror 26}, I am handing you what --

THE COURT:  Just strike the reference to --

MR. LIMAN:  Sorry.

BY MR. LIMAN:

Q    Juror 26, I am handing you what's been marked as Defendant's Exhibit A and Defendant's Exhibit B.

If you look at the second page of Defendant's Exhibit B, do you see that there's a listing of name, and your name is listed there?  Is that right?  On Defendant's Exhibit B?  I'm sorry.  Defendant's

Exhibit -- I'm sorry.  Defendant's Exhibit A.

Take a look at Defendant's Exhibit A.  It's the other exhibit, sir.

A     Oh, this one here?

Q     Yes, the shorter one.

A     Okay.

Q     And if you take a look at the second page.  Do you see that there's a list of charges and dispositions in the body of the document?  You see that, sir?

Why don't you let me know when you are done reviewing the document.

THE COURT:  It's a little dark in here.  Do you have any difficulty reading that?

THE WITNESS:  I did forget my glasses.

THE COURT:  Oh, okay.  So let me just read that to you.  There's three counts, one, two and three.

THE WITNESS:  Yes.

THE COURT:  The first is unlawful insurance payment, the second is nonpayment of wages, the third is failure to keep records.  First and third were dismissed.  The second says misdemeanor conviction, sentence deferred.

THE WITNESS:  Um-hum.

THE COURT:  Right?  Can you read those?

THE WITNESS:  Yes.

THE COURT:  All right.  Okay.  I think he is having trouble reading them.

MR. LIMAN:  Thank you.

BY MR. LIMAN:

Q    Does that accurately reflect the disposition of the charges, the results of the charges with respect to the nonpayment of wages?

A    I'm just -- oh, is this all about one thing?

Q    This is -- you recognize this as being all about the nonpayment of wages?

A    Oh, it says on the one here that I not keeping good records and --

I guess so.  I guess this is about right.

MR. LIMAN:  Your Honor, we would offer A and B.

THE COURT:  All right.  Any objection?

THE WITNESS:  It was --

MS. RODRIGUEZ-COSS:  We would object to the extent we just don't see the relevance of -- of this. He didn't deny that the incident took place.  He didn't deny what the outcome was.  There's also testimony in the record about it.  I don't know why we need to introduce the document with his --

THE COURT:  To the extent that that was not literally the way he responded to the questionnaire, it

is admitted.

(Defendant's Exhibits A and B were received in evidence.)

BY MR. LIMAN:

Q    Sir, would you look at Defendant's Exhibit B?

A    The big one?

Q    That's the stack of pages.

MS. RODRIGUEZ-COSS:  He is not going to be able to read a stack of pages, your Honor.

THE COURT:  Right.  So are you going to ask him literally what the --

MR. LIMAN:  No, I am not.

THE COURT:  -- questions --

MR. LIMAN:  I am just going to point to a couple of things.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  Select the page that's going to ask the witness about?  It's 30 pages.

MR. LIMAN:  Just let me do the examination.

THE COURT:  Just go to your next -- identify the page.  Are you actually going to bring up the informations that were filed against him?

MR. LIMAN:  (Nods head.)

THE COURT:  Okay.  So you can do that relatively quickly.

BY MR. LIMAN:

Q    Sir, if you look at the -- at the second page, you see it has a "two" in the corner?

MS. RODRIGUEZ-COSS:  It has a what?

MR. LIMAN:  A "two" in the corner.

BY MR. LIMAN:

Q    Take a look at the second page of the document.

THE COURT:  I am concerned about his inability to read that in light of the lack of glasses and the light.

Can you actually read that information?

THE WITNESS:  Depends on how I hold it.  All right, you get it just the right distance --

THE COURT:  The right distance, you can read it?

THE WITNESS:  Well, pretty much.

BY MR. LIMAN:

Q    Let me -- do you see that it has your name in the top left corner in -- in all caps letters?

A    Yes.

Q    And then it's a -- it says "information by state's attorney"?  Do you see that?

MR. LIMAN:  Your Honor, would you let me approach and point it out to him?

THE COURT:  That's fine.

(Court Reporter offered reading glasses to the witness.)

THE WITNESS:  That's a lot better.

MR. LIMAN:  I'll stay back here.

THE COURT:  Let the record reflect that the court reporter has loaned him the glasses.

THE WITNESS:  Right.

THE COURT:  Do you see that information?  And can you read that?

BY MR. LIMAN:

Q    And those are -- if you look at pages two, three and four, those are the informations that were filed by the state against you?

A    I just don't understand because I was asked to pay a hundred dollars.  There was no fine, that I know of.

Q    You remembered that you were charged with a crime, correct?

A    Well, the -- yes.  Because --

Q    And for the purpose of time, I will represent to you that it says April of '92 in the bottom left corner in terms of when the information was filed.

A    All I know is they kept dropping everything, you know, until it got down to just paying the hundred dollars a month, you know, because I wouldn't give in, so she tried to do something more to -- to get me to

give in, and I wouldn't.  They finally found me guilty.

Q    And do you recall, sir, that you actually had to appear in front of the court and that bail was set for you?

A    No.

Q    Would you turn to page seven of --

A    Oh, may -- that's what the hundred dollars was for, that I paid a month, and I went to see the -- the guy down in St. Johnsbury.

Q    Would you turn to page seven.

A    Might I add this, that we -- we were doing quite well on the case.  I had done a little investigation myself, and the guy quit.  He was drinking real bad that day.  He left me high and dry.  He insulated a roof, and then because he was pretty drunk, just left.  And it was going to rain that afternoon, so I went over and took over and got the job done, and -- but it's true, they had this, but they dropped that.

Q    Sir, if you --

A    And what we found out was -- and we -- we -- the lawyer I had asked him about it, and all of a sudden he didn't know anything either.  You know, he was being pushed, and he was practically bawling, and he said that he was so confused.  You see, somebody offered to sell him -- and he didn't really have a home, so somebody

offered him an opportunity to buy a secondhand trailer for the exact same price that he wanted in wages.

Q   Sir, if you listen to the question that I ask and just try to answer that question, it may move quicker. If you don't understand the question, let me know and I will try to rephrase it.

My question to you is, did you appear in this courthouse on that case?

A   Probably, yes.

Q   And do you recall that bail was set for you in this case?

A   Oh.  Ah, I think it was the -- no, I don't remember any bail.

Q   Do you have page seven in front of you?

A   No.  I got three, but -- I honestly don't remember any bail --

Q   Why don't you turn to --

A   -- other than I missed the court date and I had to pay -- I had to bail myself out for missing the court date.

Q   Sir, if you look in the upper right corner there, there are page numbers.  I am just going to refer to those just to move this along.

MS. RODRIGUEZ-COSS:  Does the Court have the document?

THE COURT:  Yes.

MS. RODRIGUEZ-COSS:  There's no bail.

THE COURT:  I am looking for the bail.  But then he just said he didn't show up in court one day.

THE WITNESS:  I had to come bail --

THE COURT:  You had to bail yourself out?

THE WITNESS:  Yeah, somebody called me up and said -- because I was home for dinner that day. Somebody said, I see you made the papers today.  I said, What do you mean?  He says, Well, he got a bench warrant out on you.

So I immediately came up to the courthouse and it cost me $200 to get me out of that so that they wouldn't chase me around.

BY MR. LIMAN:

Q    Bottom of page seven, that's your signature, correct?

A    Yes, it is.

Q    And if you -- the top of it, I will represent to you, says that the defendant will be released upon the following conditions, and then it lists a series of conditions.

A    Um-hum.

Q    One of those conditions is that you would have to let your attorney or the court clerk know where you are

at all times.  You recall that that was part of the court process?

A    Yeah, I went and met with the -- a guy in St. Johnsbury.  He was a parole thing.

Q    Thank you.  Sir, you met with the parole officer, right?

A    Yes, I did.  Once or twice.

Q    And in connection with the case, you actually went out and hired a criminal defense lawyer, correct?

A    No, I had a public defender.

Q    But before you had a public defender, do you remember you hired a very prominent criminal defense lawyer within this state?

A    That case had nothing to do with this.

Q    Did you hire a criminal defense lawyer in connection with another case?

A    Yes.

Q    Which case?

A    Yes.  I had been -- I built a house up on the mountain, and the guy owed me like 6-, $7,000, and we had to get a lawyer, and -- the plumber and I both did, and we had to go to court for that.

Q    Let me ask you -- take a look at page eight, the next page.  Just flip --

A    Page three?

Q     Page eight.  If you just --

A     Eight.

Q     -- flip the page.

MS. RODRIGUEZ-COSS:  Your Honor, I'm sorry. Once again the government is going to object on the basis of relevance.  We don't really see where this examination is going.  We don't see what other examination the counsel needs to get on the record.

THE COURT:  Objection overruled.  It relates to one potential criminal charge.  There's some confusion about whether he had a lawyer or not or whether there was some other offense, although my guess is that the other offense is in fact a civil matter.

But the reference to the document says that your lawyer was Richard Davis?

THE WITNESS:  Yes.

THE COURT:  From -- he was your lawyer?

THE WITNESS:  Yeah.  He actually --

THE COURT:  Was he the lawyer in this failure-to-pay-wages case or was he your lawyer in regard to anything else?

THE WITNESS:  Ah, I -- I don't remember that he worked on this, on -- maybe he did.

THE COURT:  Well, you know, perhaps we could move on.

MR. LIMAN:  Yes.

BY MR. LIMAN:

Q   If you turn to page 10, sir, maybe that would refresh his recollection.

THE WITNESS:  But he died.

THE COURT:  Richard E. Davis has died, right. He is not local.

THE WITNESS:  He died.  He was an excellent guy.

THE COURT:  Um-hum.  But anyway.

So if you look at page eight -- or page 10, do you see that?  And that's a reference to a witness list in your criminal case.  Eight -- 10 and 11.  I think we can probably move on here.

THE WITNESS:  Oh, that's --

THE COURT:  That -- the document -- the documents itself are -- fairly establish that fact, so go ahead.

BY MR. LIMAN:

Q   Let me actually just ask you one more question about this stack of documents.  Can you turn to page 18?

A   I'm always forgetting my glasses.  How much is the rent on these?

THE COURT:  Do you see page 18 there?

THE WITNESS:  Yes.

THE COURT:  You got page 18?

THE WITNESS:  I have got page 18.

THE COURT:  Okay.

BY MR. LIMAN:

Q    And, again, if you look at the middle of the document -- approach the -- that's your signature?

A    Yes.

Q    Right in the middle of the document?

A    Right.

Q    And then if you look at the bottom of the document where there's an X -- I am not going to make you read that.  I will read that to you if it's okay.  It says, "The Court finds that the applicant is financially needy and has been charged with a serious offense.  An attorney is assigned to represent the applicant as soon as any co-payment is paid to the court clerk."

Do you recall that that's -- you filled out a form that had a finding that you were charged with a serious offense?

A    But they -- I was -- I assumed that they dropped all of this.

Q    Now, sir, at the time that you pled guilty to -- well, do you recall that you continued to be on some form of supervision in connection with this case?

A    Yeah.  I had to come to court once every month.

Q    And at the time -- and Mr. Davis, I think -- he was not a cheap attorney to hire, correct?

MS. RODRIGUEZ-COSS:  Your Honor, we would object to this line of questioning.  The question is --

THE COURT:  Where are you going with this?

MR. LIMAN:  It's relevant that he was charged with a crime and failed to answer the question that -- whether he was charged with a crime, and he knew that he was charged with what was a serious crime.

THE COURT:  Right.  Haven't you established the fact that he was charged with a crime?  Whether or not Richard E. Davis -- I think it's E, right? -- the senior --

THE WITNESS:  Yes.

THE COURT:  -- was -- you know, charged a lot of money, maybe I should take judicial of that.

THE WITNESS:  Yeah.

THE COURT:  He did.

THE WITNESS:  Well, I don't -- I don't think --

THE COURT:  Regardless, I think you have got it established that -- move on.

MR. LIMAN:  Let me just offer two more documents in connection with the unlawful mischief.

BY MR. LIMAN:

Q    You recall, sir, at the time that you pled guilty to the unlawful mischief, you still had in effect a deferred sentence agreement?

A    Deferred sentence on what?

Q    On your wages charge.

A    Well, like I said, I just had to pay it off.  It was -- it was dismissed after that.  As I said, the -- I can't remember her name, but she would change the -- change it every month, and it kept getting lower and lower, you know.

THE COURT:  So as you paid restitution, as you paid the $1200, she would reduce that amount?

THE WITNESS:  Yes.

THE COURT:  I think Mr. Liman is asking the question, you were placed on probationary supervision while your deferred sentence continued?

THE WITNESS:  Yes.

THE COURT:  And in that period of time, while you were under supervision, were you convicted of this unlawful mischief charge?

That's the question you were asking?

MR. LIMAN:  That is the question.

THE COURT:  Right.

THE WITNESS:  I don't know.  I don't remember. I'm -- I honestly don't.  I just -- I know I paid him --

I paid the court a hundred dollars and went home and --

MR. LIMAN:  May I have marked as Defendant's Exhibit C a waiver of arraignment and request to answer plea and notice of plea agreement?

THE WITNESS:  Actually, it was quite -- I -- while I was seeing the -- the -- the guy that -- parole guy, she -- he asked me what was happening, and I told him what was -- what I was accused of doing, and he said -- he said, I don't think you did anything wrong. He says, The kid grew up right beside my house and he was in more trouble than you.

THE COURT:  Well, according to these documents, you were charged in '92 -- 1992; you were convicted of this charge in '94, I believe.  And then it's unclear as to when the unlawful mischief was.  Is that '95?

MR. LIMAN:  Your Honor, the plea to that was in '96.

THE COURT:  '96, okay.

BY MR. LIMAN:

Q    I just, sir, have two questions with respect to Defendant's Exhibit C.  Is that your signature on the first page of Defendant's Exhibit C, right there?

A    Yes.

Q    Okay.  And is that your signature on the second

page?  It's now been marked as Defendant's Exhibit D.

A    Yes.

Q    Okay.  And Defendant's Exhibit C is the waiver of arraignment and a request to enter plea in connection with the unlawful mischief, correct?

A    Um-hum.

Q    Yes?

A    Yes.

Q    And the D is your notice of plea agreement in connection with the unlawful mischief, do you see that?

A    Um-hum.

Q    Yes?

A    Well, I'd have to read it, but --

Q    Does it say C?

A    Oh, yes.

Q    Notice of plea agreement?

A    For the unlawful mischief.

          MR. LIMAN:  Okay.  Your Honor, I would offer C and D.

          THE COURT:  Okay.  Any objection other than issues raised before?

          MS. RODRIGUEZ-COSS:  No, none other than those.

          THE COURT:  So admitted.

          (Defendant's Exhibits C and D were received in

evidence.)

BY MR. LIMAN:

Q    Finally, sir, you testified about your DUI conviction.  The question I have for you, sir, has that been an issue, drinking and alcoholism, in your family?

A    Well, I don't know as you call it alcoholism, but I had -- I went through all the standard -- I went to -- to Berlin, New Hampshire, and I paid all my fines that day, and I went over to New Hampshire and spent -- spent two nights in a hotel hell, and then after that, I was -- I was given an A plus and sent me to Vermont to a -- like a -- well, I keep thinking of a psychiatrist, but someone similar to that, and I was there for half an hour, and he gave me an A plus, and I went home.

Q    Okay.  So you didn't, in connection with that, get any substance abuse counseling or be subject to some substance abuse?

A    No, he said I didn't need it.

Q    Do you recall, sir, that's been an issue with respect to certain members of your family?

        MS. RODRIGUEZ-COSS:  Objection, your Honor.  Where --

        THE COURT:  Yeah, objection sustained as to relevance.

        MR. LIMAN:  Your Honor, there is a statement

with respect to the -- in the jury questionnaire about substance abuse. We have learned about some recent incidences of substance abuse. It's just a couple of questions.

THE COURT: Well, recent instances would not be particularly relevant. Are you talking about instances that he may have been aware of at the time he answered that particular question?

MR. LIMAN: I am.

MS. RODRIGUEZ-COSS: Your Honor, the government was provided no notice of this. There's absolutely no mention in the 350-page petition that the petitioner filed with regards to that allegation. There was absolutely no heads up about this, and I suggest to the Court, very respectfully, that if there is any such identification, it's been waived because they had a year to file their petition. They filed it and they did not file that claim.

THE COURT: But you are inviting the potential of coming back again over what would seem to be not an extraordinarily significant argument. So perhaps permitting questions to be asked now would alleviate that possibility.

MS. RODRIGUEZ-COSS: I'm sorry, I didn't quite hear the first part of the Court's reasoning.

THE COURT:  What I am suggesting is that there was a question that was asked about your knowledge of -- to jurors of your knowledge of abuse of alcohol and drugs.  Obviously it was relevant to this particular case.  If in fact there's some indication that they have that that was inaccurately represented, then it seems to me the questions can be asked because otherwise we could be finding ourselves coming back here again, lovely place as it is, in the future.

MS. RODRIGUEZ-COSS:  Well, your Honor, may counsel point me to which question he is now claiming the juror might not have answered honestly?

THE COURT:  There is a question in the questionnaire about the history of alcohol or drug abuse within families or knowledge of that.  I mean, I can't pinpoint specifically what number it is, but that is asked in all of those questions.  So I am going to let him ask that particular question.

MS. RODRIGUEZ-COSS:  Could we have a proffer?

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  Could we have a proffer?

THE COURT:  You don't want to make a proffer?

MR. LIMAN:  I suggest I ask the questions.  It will be quicker.

THE COURT:  That's fine.  Go ahead.

BY MR. LIMAN:

Q   Sir, we understand that your first wife has had significant problems with alcoholism.  Is that correct?

A   Ah, not that I know of.

Q   And she was arrested for alcoholism; is that correct?

MS. RODRIGUEZ-COSS:  When?

A   When?  I have had three wives.

THE COURT:  If you are raising an objection, it's an objection --

MS. RODRIGUEZ-COSS:  Objection.

THE COURT:  Okay.  So you want --

MS. RODRIGUEZ-COSS:  Objection.  Lack of foundation.

BY MR. LIMAN:

Q   Do you recall your first wife was arrested for alcohol --

A   My first wife --

MS. RODRIGUEZ-COSS:  Objection.  Lack of foundation.

THE COURT:  Okay.  Objection overruled.  You can ask the question.  Go ahead.

Was she --

A   What did they arrest her for?

BY MR. LIMAN:

Q    Do you recall that she was arrested for alcohol-related offenses?  I am just asking if you recall that, sir.

A    No.

Q    Okay.  And was substance abuse a factor in your first divorce?

A    I can't remember that it was.  I got custody of my son, but my wife was -- well, she didn't like me as much as she liked other guys, so whether she ever got arrested for -- I know she had a few too many once in a while, like most people -- you know, most young people. We were like -- I don't know, she was 20 years old when we got divorced, so I -- but I don't know.  I don't know if she was ever arrested for it.

Q    Was she treated for substance abuse?

A    Oh.  Well, she went into the Army.  She thought, you know -- she had a boyfriend, and she thought, Well, I'll go and be in the Army with him.  And we had gotten divorced.  Well, we were getting divorced.  But I do know that -- but I don't know if that has anything to do with around here, but she was kicked out of the Army because she OD'd on something, but she told me she did it on purpose because she got sick of being in the Army.

Q    And your second wife, your second wife, was your second wife arrested for a DUI after the two of you had

gotten divorced?

A    After I was divorced?

        MS. RODRIGUEZ-COSS:  Your Honor, we would object at this point.

A    I don't really --

        THE COURT:  Just one second.  Yeah, go ahead.

        MS. RODRIGUEZ-COSS:  How is this relevant, information that took place after the juror was divorced?  Even if we go by the questionnaire, even if we go by the question, it asked about close family and family members.  I don't understand that an ex-wife is a family member.

        THE COURT:  Well, are you suggesting that this was a DUI during the course of their relationship?

        MR. LIMAN:  Yes.  It was -- DUI was after, but the alcoholism was during, so --

        THE COURT:  Well, as to the DUI afterwards, it is totally irrelevant because it is not directly related to the question.  I mean, again, I just -- I think we should be moving on.

BY MR. LIMAN:

Q    Sir, is your -- was your second wife -- did your second wife also have -- have a substance abuse problem?

A    Ah, well, it depends on what you call a problem. You know, if she'd have a couple beers once in a while

while we were sitting around watching TV, but I didn't -- I wouldn't call that a substance abuse problem.

Q   Was she treated for substance abuse?

A   I don't know.  I have no idea.

MR. LIMAN:  I have got nothing further.

THE COURT:  Okay.  Questions?

EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q   So just to get the facts straight, you have three misdemeanor -- no, two misdemeanor convictions, correct?

A   Yes.

Q   One for a DWI that took place in December of 1994, so we are talking more than 10 years before you were called to be a juror in the case of Donald Fell?

A   Right.

Q   All right.  And one that took place even before that.  I believe the original charge for the lack of payment of wages was May of 1992, correct?

A   I'm not exactly sure of the exact time, but I did, yes.

Q   It was -- it was before the DWI?

A   Yes.

Q   All right.  And the unlawful mischief that resulted from you cutting the telephone line was also in the

mid-1990s?

A    Yes.

Q    All right.  So would it be fair to say that when you sat down in June of 2005 to complete the questionnaire, the juror questionnaire in the case of Donald Fell --

A    Right.

Q    -- that these incidents that had taken place 10 years prior didn't flow back into your mind?

A    Not really.  It just -- I didn't really think too much about it.  It --

Q    So the question was, "Have you ever been charged with a crime?"  Did you consider yourself to be a criminal?

A    No, I haven't.

Q    So you didn't consider what you had -- what had transpired?

A    Oh, excuse me.  Yes, I was, but I didn't think I was a criminal.

Q    Okay.  So you didn't -- you didn't think that what had transpired between your ex-employee and yourself 10 years earlier was relevant to the questionnaire that you were completing?

A    No, I didn't.

Q    Did you mean not to disclose information to the

Court?

A    No.

Q    All right.  When the Court asked you whether you had heard anything about the Donald Fell case, you told them that you had heard something about a woman being kidnapped; isn't that correct?

A    More or less about the time I got -- I came over here.  When they sent me the thing is when I realized, you know, the -- the questionnaire and the summons to go over to the -- to be questioned, to see if I was worthy of being on a jury.  But there were hundreds of people there, and I -- I was thinking, you know, why would they want me from way over on the border of New Hampshire.

Q    Right.  Did you travel back and forth to the courthouse during the trial?

A    No.  I had to stay.  I just -- I couldn't do it.

Q    Okay.  But going back to -- the Court asked you questions before you were selected as a juror, right?  Do you recall that?

A    Ah --

Q    You completed the questionnaire?

A    Yeah, they sent me a questionnaire.

Q    They sent you the questionnaire and then they brought you into court, correct?

A    Right, I think so, yes.

Q    And the Court and the attorneys asked you some more questions about the case.  Do you recall that?

A    Yes.

Q    And the Court asked you this morning, did he actually ask you whether you knew anything about the case?  Do you recall that?

A    Well, yes, they did.

Q    All right.

A    Yes.

Q    And you remember telling the Court that you remember hearing something about the case, and the Court said, Well, what exactly did you hear?  And you said that just -- "that a woman had been kidnapped, that's the only thing that I can recall."  Do you remember that?

A    Well, I was a little curious when I got the -- I was wondering what this was all about, you know.

Q    Right.  Okay.  But my point is, you answered to the best of your abilities the questions from the Court --

A    Right.

Q    -- according to your memory at the time; is that correct?

A    Right.

Q    All right.

          MS. RODRIGUEZ-COSS:  We have nothing, further,

your Honor.

THE COURT:  Okay.

MR. LIMAN:  Just one question, sir.

EXAMINATION

BY MR. LIMAN:

Q    You mentioned that you didn't spend very much time answering the questionnaire.  Do you recall how much time you spent with the questionnaire?

A    Considering that I was positive that I wasn't going to be going over, and actually hoping that I wouldn't be picked, because it was like -- it's two hours from my house, not very long.

MR. LIMAN:  I have got nothing further.  Thank you very much, {Juror 26}.

THE COURT:  Anything further from the government?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  All right.  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Okay, you are excused.

THE WITNESS:  Oh, good.  I don't need these anymore, do I?

THE COURT:  No.  No, you don't need these anymore.

THE WITNESS:  And your glasses, thank you very

much.

MR. LIMAN:  Mr. Rubin points to my attention they haven't been admitted, but I think the Court has ordered them --

THE COURT:  I haven't ordered them admitted but they are admitted.

Juror No. 26, thank you for coming.

THE WITNESS:  Well, it's been interesting.

THE COURT:  And you are free to leave.

THE WITNESS:  And I had forgotten all this stuff.  Okay.  Thank you.

THE COURT:  I am going to stay and talk with the lawyers at this point, so you are free to leave at this point.

(Witness excused.)

THE COURT:  All right, I have read the motion that's been filed by the government.  I have not got a response from the defense.  The defense is correct, they have not -- or the petitioner is correct, they have not responded, and I am concerned about a number of things.

The first is the tenor of the communications, and second, the inability to resolve some very fundamental discovery issues.  Those issues include deadlines; who is to be deposed; if there are to be depositions, et cetera, who objects to certain depositions.  All of

those, seems to me, not to have been advanced in any particular way.

And so what I am going to suggest at this point is to arrive at some deadlines and have both sides just disclose in detail what they want by way of discovery and the responses that they have to the other side, and then give the other side 15 days to respond to the petition that is requested for discovery on both sides, and then I would sit down and, within 15 days, decide all of the issues.  So, that's my suggestion at this point.

MR. LIMAN:  Your Honor, let me inform the Court of where we are before you do that.

The main thing that the government asked for in terms of documents or discovery in its motion is the trial counsel records.  We had agreed to provide that information to the government and are in the process of putting that information together.  The government asked for the nonprivileged information with a privilege log to follow.  We are going to provide everything that's been put at issue.  And that information will be provided in less than three weeks on the schedule that the government in its proposed order suggested that your Honor impose on the defendant -- on the petitioner.

So we were somewhat, well, both mystified and

surprised when the first item in the motion had to do with document discovery.  I have had lawyers working on getting that information ready to be produced to the government on the timetable that the government suggested.

THE COURT:  But it's not just the document exchange that's at issue.  There's some fairly significant disputes, or maybe I anticipate disputes, in regard to depositions.  For instance, are you going to agree that Mr. Fell should be deposed?

MR. LIMAN:  Your Honor, we will not, and that's what I would ask for the opportunity to brief.

THE COURT:  Okay.

MR. LIMAN:  We could do that in short order.

THE COURT:  They are objecting to the prosecutors in the case being deposed.  I would assume that in light of the nature of the allegations you have made, that you would want depositions of them.

MR. LIMAN:  Absolutely, your Honor.

THE COURT:  All right.  So there seems to be, reading between the lines, significant difference of opinion about the scope of discovery.  So do you have an objection to me saying, all right, let's get both sides to submit a document with the Court saying this is what they want, and then give the other side 15 days to

respond to that, and then getting this resolved so that there are no more continuing disputes?

MR. LIMAN:  No, I don't, your Honor.

MS. RODRIGUEZ-COSS:  With all due respect, your Honor, we have done that.  We did that when the Court first asked us for a discovery schedule.  If you recall, the defense did not actually file a discovery schedule, but we did, and we conferred with counsel prior to filing that discovery schedule.  And the Court -- we came back to the Court and said, Your Honor, we are not getting anywhere with discovery.  And the Court ordered us to confer again, and we did.  And if the Court looks at the e-mail, the electronic communication from Scott Buell that we attached to our letter yesterday, it can see that we did confer on each one of the requests that we are -- were setting forth, and we didn't get anywhere with respect to some significant information.

THE COURT:  Well, you know, that's fine, and that may very well be the case, but the question that I am asking is, do you have any objection to those areas in which the parties dispute discovery for a court intervention at this point to definitively resolve the issue of who's to be deposed, rough schedule for deposition, document distribution?  Is there any reason

why that cannot be resolved relatively quickly so that you don't run into the problem which you cited in your memorandum suggesting that if you wait till 90 days before trial, or disclosure of expert witnesses, you are behind the eight ball?

So what I am --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- suggesting that everybody just submit everything that's in dispute, and the Court will make a quick order, this is the way you are going to go forward, and then so be it.

MS. RODRIGUEZ-COSS:  Right.  So we -- we have done that.  We just -- we wouldn't like to see this other period of time extend itself before the call -- the Court finally rules.  We welcome the Court's ruling. That's exactly what we moved for in our motion to compel is the Court ruling on these issues that we have been --

THE COURT:  All right.  You have raised some objections to discovery, in particular, obviously the deposition of the prosecution team, that I would anticipate they oppose, so that has to be briefed and resolved.  That's just one of the issues.  You have requested a deposition of Mr. Fell.

MS. RODRIGUEZ-COSS:  Yes.

THE COURT:  Well, they object to that.  And

then I guess the preliminary question is, can you get a deposition of Mr. Fell?  Second, are there any reasonable limits in the scope of the deposition?  For instance, is it limited to communications with lawyers and decisions that are made by him as a result of communications with lawyers, as opposed to the underlying facts in the case?  Just a fundamental distinction.  And so that needs to be fleshed out, to what extent can there be a deposition and what is the limit of the deposition.

There are countless issues which you have raised.  I mean, for instance, the -- the expert witnesses that are being disclosed by the defense, you want an opportunity to depose them relatively quickly.  I agree that you should have the opportunity to depose them relatively quickly.  So let's get -- tell me exactly what you want, the Court makes a decision, and then you go forward.

MS. RODRIGUEZ-COSS:  Well, with respect to the expert issue, your Honor -- I appreciate the Court bringing it up.  With respect to the expert issue, there actually is no dispute.  They agree we should have discovery on their unannounced experts, and what we want is we want that now.  We want that as soon as possible.  They asserted no reason why we should not have that at

the same time that they're turning over discovery on October 8th with respect to the trial counsels' files. I think that issue is ripe.

THE COURT:  I appreciate it's a matter of timing according to your submission.  I haven't heard them yet as to when they have agreed to turn that over, if in fact they're going to turn over all of this material.  That's -- all I am trying to do is advance the ball so that --

MS. RODRIGUEZ-COSS:  Their --

THE COURT:  -- you are ready for June --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- or in the summer to get this tried.

MS. RODRIGUEZ-COSS:  Right.  Their position on the experts is actually addressed by Mr. Buell's e-mail, your Honor.  And it, quite frankly, says, "We are just not going to give you that until April."  There's no other reason on the record.

THE COURT:  Okay?

MR. LIMAN:  Your Honor, can I just confer with Ms. Rodriguez-Cross *[sic]* on a procedural matter for just one second?

MS. RODRIGUEZ-COSS:  Coss.  Coss.

MR. LIMAN:  Coss.

THE COURT:  Sure.

(Brief pause.)

MR. LIMAN:  Your Honor, in terms of process, we served a discovery request to conform with the local rules and the federal rules on the government.  That -- the response is overdue, which we're not saying any consequences should fall from that, but we haven't got any response, and in order to frame the issues in front of you, we need to know which, by request, which specific request is objected to and the basis on which there's an objection.

THE COURT:  All right.  Let me then throw the ball back in your court.  What I am looking for is a submission from both sides as to what needs to be resolved by the Court, and it has to be done relatively quickly.  My suggestion is within 30 days, I want to know what's in dispute and what your relative positions are.  So then I would make a decision relatively quickly.

Now if the two of you could actually get into a room and figure out all those things you agree upon, that's fine.  Just tell me what you agree upon, that's all resolved, what you disagree upon, then I need to resolve those with some written argument on behalf of both sides, and then ultimately the resolution by the

Court, so that, you know, within 60 days, everybody knows where you're headed.

MR. LIMAN:   What I --

THE COURT:   That's the point.

MR. LIMAN:   What I would suggest, your Honor --

MS. RODRIGUEZ-COSS:   And that's --

MR. LIMAN:   -- each side serve on the other whatever discovery request they have, and within seven days we can respond, and within seven days after that, if there are issues that are in dispute, we bring them to -- to your attention.

And we could start the seven days, you know -- I mean, I guess we need, I think, you know, some time to serve it, so maybe seven days to serve the discovery, seven days to respond, seven days to brief things.  I don't think that would delay things, and it would permit the issues to be --

MS. RODRIGUEZ-COSS:   Your Honor?

THE COURT:   Probably take you seven days to get back to New York.

MS. RODRIGUEZ-COSS:   Your Honor, we wholeheartedly oppose that.  We have engaged in conferences with the defense.  We have had extensive discovery conferences.  They have committed to producing

certain discovery by certain dates.  We have relied in good faith in that, and we have advised them on what we don't agree on, we will proceed to file a motion to compel; and they said, Fine, file your motion to compel.

We filed our motion to compel.  So what we do not agree on, we have already reduced to writing, and we would object to beginning this process over because all it would do would be to extend this whole process further down the line.  We insist on them producing on October 8th what they already committed to produce on October 8th.

As we summarized for the Court, all of the discovery that the government has already turned over post-2255, prior to 2255 petition and post the filing of the 2255 petition, your Honor, we have at all times been acting in good faith.

The last discovery conference, with regards to the discovery request from the defense, was held with Miss Price.  We -- we agreed that we would produce most of the documents in that list.  We agreed that we would review the files of the FBI to make sure that we can verify that everything that should be in their hands is in their hands.

I spent the last two days in Burlington, Vermont going through the files of the U.S. Attorney's Office,

going through all of the discovery binders, in order to ascertain whether there is any document in those files that was not turned over in discovery to the defense, and I have made incredible progress. I advised Miss Price of that this morning.

So most of the documents -- and I would be willing to say that 99.9 percent of the documents in the possession of the government has already been turned over to the defense. Their interest at this juncture is to ensure that there isn't something in the working files of the U.S. Attorney's Office or the FBI that was not turned over in discovery, and that is the goal of the process that I have initiated over the last two days.

So we have been working earnestly and diligently to comply. They may stand here and say, We haven't received anything in response to our last discovery request. That's because we have already given it to you. That's because we said, We have already provided everything we have on Eike, we have already provided everything we have on Gacek, we've already -- most of the documents in support of Dr. Welner's, you know, report, just to rattle off some examples. We are now looking for things that could have possibly been in possession of the government but was not turned over.

That's a far more meticulous process, but we are undertaking it because we do understand that it is important.

Miss Price suggested perhaps coming over and inspecting our files, and, you know, quite honestly, after having undertaken the process for the last two days, there may come a point when we may be -- should be able to do that.  Obviously our discovery letters are all in binders.  They are free to look at them.  But we have not received a single piece of paper from the defense, nothing since May 10th when the Court issued its order.  We have gotten nothing.  And it's unbelievably frustrating to watch time go by, and for us, for our preparation, for the evidentiary hearing to have been completely halted by this just lapse of time, and so now we are finally getting close to a deadline.  We don't want to do away with that deadline.

I think the Court should leave in place the timetable for some discovery that the parties have already agreed to, and let's then address the matters in dispute.

THE COURT:  I mean, I appreciate your expression of your frustration about not getting the discovery.  I am not trying to slow up the process.  What I am basically suggesting is the process should be

sped up.

Now, you may have an agreement with Mr. Liman, or the defense, or the petitioner, in general, that something on October 8th is going to be submitted to you. I have no clue about that, frankly. But if that's the case, then it should be complied with.

What I am suggesting is that there are areas of dispute that I can obviously see, by the tenor of the communications between both sides, that are going to have to be resolved by the Court. And so what I am trying to do, frankly, is not impede the discovery that you have engaged in already. It's to make sure that the issues in dispute are briefed quickly and resolved.

You now have, obviously, a motion that you filed. They have got a period of time in which to respond. I just don't see how what I am suggesting here delays the process. Quite frankly, it improves the process because it gets you to focus in upon what you agreed upon and what not -- what you don't agree upon.

I am, frankly, hoping -- this isn't much of a courthouse, but -- that both sides, now that you feel a little bit of the thrust of the pressure from the judge, you sit down and say these are all the things we will give you right now so we don't have to deal with this whole issue. These are the matters in dispute. And

that needs to be briefed, and that needs to be resolved. And then move on. That's what I am trying to do, frankly.

And I appreciate that, you know, fingers can be pointed at each other's side, but I am just trying to push this thing along.

So my question is, first of all, Mr. Liman, on the 8th of October, you have agreed to turn over a lot of stuff?

MR. LIMAN: It's actually the 18th, your Honor, that we had reached the agreement with the government, and the answer is yes, we are going to turn over a lot of stuff.

THE COURT: Okay. So what -- what is in dispute, from your perspective? You have got depositions of various individuals in dispute. Right?

MR. LIMAN: With respect to our requests on the government -- which has not yet been briefed to your Honor -- there are a number of document requests that we have made, that the Court has approved. We made in the form of a document request. We have not -- we have got in verbal assurances that the government's searching for some things. I don't know, and my co- -- what is in dispute because the government hasn't responded to that discovery request.

There may be particular items that are in dispute, and maybe the government is agreeing to give us one --

THE COURT:  So what would both sides say if I was to suggest a date by which you are to submit to the Court any issues in dispute in regard to discovery --

MR. LIMAN:  I think that would --

THE COURT:  -- by the end of October, so that you have plenty of time to get this all resolved, and then the depositions are all clear, you know exactly what's in dispute, and you can submit this, and then I can rule?

MR. LIMAN:  Your Honor, I think that would be a very good idea because we do need discovery also.  And I -- just so the record is clear, we are not talking about delaying anything as to which we have already reached agreement.  The bulk of what the prosecutor is asking for are the documents.  No depositions would be taking place in any event without the documents, if we are talking about the documents by October 18th.  I think that will give the government a lot to work with.

THE COURT:  Okay.  So if all of the documents are to be turned over by both sides by the 18th, and that the -- both parties are to submit a petition to the Court by the 25th highlighting the areas of dispute in regard to discovery, both documentary discovery as well

as depositions, and -- and then give the other side 10 days to respond, then by the middle of November, I have got everything in front of me, everything can get resolved. You know exactly what depositions you are going to be conducting. You know exactly what documentary evidence is to be released and what's being withheld, et cetera. That seems to me to push this matter quickly forward. So where am I wrong?

MS. RODRIGUEZ-COSS: No, sir. I was just waiting for the Court to finish. Can we --

THE COURT: Oh, right. Right. No, I am just asking both sides what is the problem with that particular thought process.

MS. RODRIGUEZ-COSS: We can proceed, your Honor, but we would -- can we get expert discovery now? Can we -- they -- they are not saying, We don't have it. It's not ready.

They're -- you know, they just don't want to turn it over until April. That is such an important piece of evidence for the government.

THE COURT: Okay.

MS. RODRIGUEZ-COSS: They --

THE COURT: Do you know that you have got experts whom you are pretty assured you are going to call, and you have got expert disclosures, and under

Rule 26(a)(2), ordinarily those would be disclosed --

MR. LIMAN:  We --

THE COURT:  -- at this point?

MR. LIMAN:  The answer is no.  We don't have the expert reports and we have not reached a determination as to which particular experts we are going to rely upon.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  Your Honor, that is not what counsel represented to the government during the discovery process.  Absolutely not what counsel represented to the government.  They made clear they will not rely at the evidentiary hearing on any of the old experts whom the government is aware of.  They have new experts who will be the experts that they will rely on at the evidentiary hearing, and they simply said, We don't think we should give that to you until 90 days before the conference.

THE COURT:  Well, that's what you said in your memorandum.  So -- and you also highlighted some names that I had never heard before.

So I guess my question is, when can you make that determination as to whether or not those witnesses are to be called, in which case expert reports can be disclosed to the other side?

MR. LIMAN:  Your Honor, I have to confer with my colleagues and I have to confer with the experts before I can answer.

THE COURT:  Let's set the 18th.  That would be obviously a very important aspect of the trial because they're going to have to come up with experts as well.  In fact, they have already asked for a full evaluation of Mr. Fell.

MS. RODRIGUEZ-COSS:  Your Honor, can we consider the dis- --

MR. LIMAN:  The 18th --

THE COURT:  Excuse me.  Let me just get his response to that.

What's --

MR. LIMAN:  I am just trying to understand what the 18th is the deadline for.

THE COURT:  At that particular point you disclose if you wish to call experts during the course of the trial and submit reports to them as to what those experts say.

MR. LIMAN:  Your Honor, frankly, I don't think we will be prepared by the 18th to do that.  We can indicate by the 18th the soonest we can do it, but I don't believe that by October 18th we are going to be able to provide to the defense -- to the government the

names of the experts we are going to be relying upon or the expert reports.

We are collecting discovery. We are doing investigation. And I can indicate what the soonest timetable would be. We heard the Court with respect to the Court's preliminary views about timetable, but I don't believe that the 18th --

THE COURT: Well, Ms. Rodriguez-Coss just indicated that someone represented in the defense team --

MS. RODRIGUEZ-COSS: Mr. Liman.

MR. LIMAN: Okay.

THE COURT: -- that in fact experts were going to be called, and you have essentially identified them. And is that not the case or is that the case?

MR. LIMAN: That's not the case. And since the government has identified me as being the person making the representations, very easy for me to respond.

What I did tell the government is that we would not be relying upon as experts the -- the trial experts, the doctors who were called or considered to be called by the trial lawyers.

Our claim is one of ineffective assistance. We would expect those individuals to be witnesses at trial. We agreed with the government that their depositions

could be taken, but they are not Rule 26 experts for the purpose of --

THE COURT:  All right.  I am not going to set a deadline of 18th for disclosure of that material. What I need to know is exactly what you wish -- how you wish to proceed at that point on the 18th, and then set realistic goals so that the government is on notice as to who is to be called.  And it should be done relatively quickly after October because they have got the opportunity, they should have the opportunity to call whatever witnesses they want, which means you are going to be screaming about getting a report from their experts as well.

So we need to be moving along.  I am not at this stage going to say that you have to make all of your Rule 26 disclosures by the 18th because I don't know the status at this point other than the fact that there is a conflict over what you may have said or what the government may have heard in regard to whom you are going to call.

I take your word that at this point you haven't made the selection, and this is relatively early on in discovery so it's not fair to order you by the 18th of October to disclose who the experts are.  On the other hand, everybody's on notice that this is going to be

moving along swiftly, and I am going to want to know what is a reasonable deadline for disclosure of the identities of the experts, both ways, back and forth, by the 18th of October.

MR. LIMAN:  Thank you.

THE COURT:  Okay?

MS. RODRIGUEZ-COSS:  I would just defer, respectfully, from the Court on that this is early on in discovery.  We have been providing discovery since 2010.  We have provided discovery prior to the filing of the petition.  We have provided discovery after the filing of the petition.

They have had two and a half years since they began work on this to consult the experts, to talk to them, to file claims based on their testimony.

THE COURT:  Yes, but --

MS. RODRIGUEZ-COSS:  So --

THE COURT:  -- moving -- moving the ball forward here.

MS. RODRIGUEZ-COSS:  We just --

THE COURT:  What I am trying to do is move the ball forward.

MS. RODRIGUEZ-COSS:  The --

THE COURT:  I think the process -- I appreciate -- I appreciate your comments.  I think it's

just important to move the process along, and I think probably you both being experienced or all being experienced trial lawyers understand that the Court is taking a fairly active role here and making sure this moves along.

MS. RODRIGUEZ-COSS:  I understand.  I understand, your Honor, but, you know, if counsel is not going to be forthcoming and honest during conferences with co-counsel, I don't see how this process can go forward.

THE COURT:  I just don't think we are advancing the ball by accusing each other --

MR. LIMAN:  Do I need to respond to that?

THE COURT:  You don't need to respond to that.

MR. LIMAN:  Thank you.

THE COURT:  So, with that, as of the 18th, I will get submissions as to what you have agreed to, what you anticipate you are going to need, where the disputes are, briefs on the questions about whether certain depositions should be conducted, and we will move forward.

MR. LIMAN:  I think you said the 25th, your Honor.

THE COURT:  I'm sorry, the 25th.  The 18th is when you make the initial disclosure to them.  The 25th

is when you submit it to the Court.

MR. LIMAN:  Thank you, your Honor.

THE COURT:  Right.  All right.  Again, thank you for coming.

(Court was in recess at 12:43 p.m.)

*** ** ***

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matte

October 3, 2013                    _____
Date                               Anne Nichols Pierce