**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| DONALD FELL,<br><br>                    Movant,<br><br>          v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | )<br>)<br>)<br>)<br>)<br>) 2:01-CR-12-01<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# AMENDED MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255

LEWIS J. LIMAN
Cleary Gottlieb Steen &
Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

CATHLEEN PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193

RICHARD RUBIN
Rubin, Kidney, Myer & DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514

Date:  ~~March 21, 2011~~October 22, 2013          *Attorneys for Donald Robert Fell, Jr.*

TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

I.    Relevant Procedural History ...................................................................... 9

A.    Prior To Trial ............................................................................................. 9

B.    Trial........................................................................................................... 14

C.    Post-Trial................................................................................................... 18

 II.    Legal Standards for Ineffective Assistance of Counsel and Prosecutorial
       Misconduct................................................................................................. 19

A.    Ineffective Assistance of Counsel............................................................. 20

B.    The Government's Brady Obligation.......................................................... 22

C.    The Government's Prohibition from Securing a Conviction with False
      Evidence.................................................................................................... 25

   III.    Trial Counsel's Failure to Investigate and Present Readily Available
           Mitigation Evidence was Ineffective Assistance of Counsel in Violation of
           Mr. Fell's Sixth and Eighth Amendment Rights ................................... 26

A.    Counsel's Lay Mitigation Investigation Was Deficient In Violation of the
      Constitution............................................................................................... 30

B.    Mr. Fell Suffered Prejudice As a Result of His Counsel's Deficient
      Performance .............................................................................................. 35

      1.    Trial Counsel Were Ineffective For Failing to Investigate and
            Present Relevant and Material Mitigation Testimony From Lay
            Witnesses ......................................................................................... 35

            a.    Background ................................................................................. 35

            b.    Trial Counsel's Failure to Investigate and Present Readily
                  Accessible Witnesses About Relevant and Material
                  Mitigation Violated Prevailing Professional Norms .................... 37

      2.    Trial Counsel Provided Ineffective Assistance in Failing to
            Investigate and Present Critical Mitigating Records .............................. 51

            a.    Counsel Were Ineffective In Not Using Readily Accessible
                  Documents from CYS .................................................................. 51

            b.    Counsel Were Ineffective In Not Presenting Or Obtaining
                  Other Readily Accessible Documentary Evidence of
                  Mitigation.................................................................................... 55

      3.    Counsel was Ineffective in Failing to Investigate and Present
            Evidence of Familial Substance Abuse and Mental Health Issues .......... 58

a. Trial Counsel Were Ineffective For Failing To Investigate and Present Evidence of Mr. Fell's Family History of Alcoholism and Substance Abuse.................................................. 58

b. Trial Counsel Were Ineffective For Failing To Investigate and Present Evidence of Mr. Fell's Family History of Mental Illness.................................................. 60

c. Conclusion .................................................. 60

4. As a Result of Trial Counsel's Deficient Investigation and Presentation, Donald Fell Suffered Severe Prejudice .............................. 61

IV. Trial Counsel's Failure to Investigate and Present Mr. Fell's Array of Mental Health Impairments and Vulnerabilities was Ineffective Assistance of Counsel that Deprived the Jurors of a Critical Component of his Mitigation Case in Violation of the Fifth, Sixth, and Eighth Amendments to the Constitution.................................................. 67

A. Trial Counsel's Mental Health Investigation Violated the Prevailing Professional Norms as Set Forth in the ABA Guidelines .................................. 69

B. Trial Counsel Stopped Investigating Their Client's Mental Infirmities Less than Six Months After his Arrest .......................................... 72

C. Evidence in Trial Counsel's Possession or that Trial Counsel Acquired Only After the Mental Health Reports Were Completed Provided Evidence of Mr. Fell's Serious Mental Impairments. .......................................... 79

1. Missed Red Flags that Mr. Fell Suffers from a Fetal Alcohol Spectrum Disorder .................................................. 80

2. Missed Red Flags that Mr. Fell has a Mood Disorder ............................ 85

3. Missed Red Flags that Mr. Fell Suffers from the Effects of Chronic Exposure to Trauma from Early Childhood Through Adolescence ........ 90

D. Trial Counsel's Performance Fell Below Prevailing Norms of Professional Conduct .................................................. 94

E. Mr. Fell Suffered Prejudice as a Result of Counsel's Deficient Performance .................................................. 102

1. The Missing Mental Health Evidence's Impact on Culpability............. 102

a. Mr. Fell was Substantially Impaired by the Combination and Interaction of his Mental Impairments, and Understanding Their Cumulative Impact Was Impossible Without Expert Testimony.................................... 104

b. Mr. Fell's Perceived Lack of Remorse Due to his Flat or Inappropriate Affect was Prejudicial ......................................... 109

c. Mr. Fell's Mental Impairments Caused him to Act Out ............ 113

ii

d.     Mr. Fell's Mental Impairments Diminish his Culpability for the Crimes ................................................... 115

e.     Mr. Fell's Confinement will Control his Symptoms ................. 116

V.    Mr. Fell's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated in Connection with the Mental Health Evidence at Trial, The Failure to Pursue an Available Motion to Exclude Testimony from The Government's Mental Health Expert, and the Decision to Withdraw All Mental Health Evidence and Stipulate that Mr. Fell had No Cognitive Deficits and Did Not Suffer from Any Mental Disease or Defect. .................... 117

A.    Background ................................................................................................ 118

1.    Pretrial Disclosure of the Government's Intent To Use Welner and the Court's Restrictions on Welner's Ability To Examine Mr. Fell ...... 118

2.    The Government's Late Production of the Welner Report .................... 123

3.    Summations .................................................................................................. 131

4.    Post-Trial Motions ................................................................................... 133

B.    Argument ................................................................................................... 136

1.    Trial Counsel Violated Prevailing Professional Norms in Failing to Pursue the Motion to Exclude Welner .................................................. 136

a.     The Welner Report was Excludable for Failure to Comply With the April 7 Order ............................................................. 137

b.     Welner's Testimony was Excludable Because It was Unreliable and Thus Lacked Any Probative Value ................... 141

2.    Reasonable Counsel Would Have Pursued Exclusion of Dr. Welner's Testimony Because the Testing He "Administered" and the Diagnosis that He Reached Do Not Constitute a Reliable Basis for an Expert Opinion Regarding the Likelihood of an Inmate's Future Violence in Prison ....................................................................... 142

3.    Reasonable Counsel Would Have Further Pursued Exclusion of Dr. Welner's Testimony Because He was Not Engaged In an Objective Inquiry Into Mr. Fell's Background .................................... 149

4.    Reasonable Trial Counsel Would Have Utilized These Reliability Arguments to Pursue Exclusion of Dr. Welner's Testimony Under the FDPA Exclusionary Rule .................................................................. 151

5.    Dr. Welner's Opinions Were in Large Part Based on Interviews Conducted With a Wide Variety of Individuals Who Were to Varying Degrees Associated with Mr. Fell's Life. These Sources Were Not Reliable Bases on Which to Reach a Mental Health Diagnosis, and a Reasonable Attorney Would Have Pursued Exclusion of His Opinion As a Result .................................................. 152

iii

6.  In Addition To the Above Arguments Raised by Counsel in Their Motion in Limine on July 6, Reasonable Counsel Would Have Pursued Exclusion of Dr. Welner's Opinion on Additional Grounds ................................................................................. 156

    a.  Counsel Was Ineffective in Agreeing to The Stipulation .......... 160

7.  Mr. Fell Suffered Prejudice As a Result of His Trial Counsel's Errors ...................................................................................... 162

    a.  Dr. Mills' Testimony ................................................... 165

    b.  Dr. Cunningham's Testimony ........................................ 166

    c.  Other Available Expert Testimony ............................... 169

    d.  The Stipulation ............................................................ 170

VI.  Government Misconduct and Trial Counsel's Failures in Connection with Mr. Fell's Alleged Prior Acts of Violence on Others Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights .................................................................................. 173

A.  Trial Counsel Failed to Conduct a Constitutionally Reasonable Investigation of a Shooting Accident in Mr. Fell's Childhood .......................... 174

1.  Trial Counsels' Failure to Investigate this Accident Constituted Deficient Performance ............................................................... 174

2.  Trial Counsel's Deficiency was Severely Prejudicial ........................... 176

B.  The Government Misrepresented Mr. Eike's "Coma" and Withheld Critical Evidence Regarding his History of Sexual Assault, All of Which Trial Counsel Failed to Investigate or Rebut .................................................... 180

1.  Background .................................................................................. 182

    a.  Pre-trial ..................................................................... 182

    b.  Trial .......................................................................... 185

    c.  Post-Conviction .......................................................... 186

2.  The Government's Failure to Disclose Favorable Evidence about Mr. Eike's "Coma" and Trial counsel's Failure to Investigate Same Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of his Death Sentence ........................... 190

    a.  Government's Withholdings and Trial counsel's Deficient Performance .............................................................. 190

        i.  Government's Withholding of Favorable Evidence in Violation of Brady Obligations ............................... 190

        ii.  Trial counsel's Failure to Investigate in Violation of Mr. Fell's Sixth Amendment Rights ........................... 191

b.      Materiality and Prejudice: Brady Violations and Ineffective Assistance of Counsel .............................................. 194

3.      The Government's Prosecutorial Misconduct in Soliciting False Testimony Regarding Mr. Eike's "Coma" Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of His Death Sentence ........................................... 196

4.      The Government's Failure to Disclose and Trial Counsel's Failure to Discover Evidence of Mr. Eike's Prior Conviction for Sexual Assault and The Possibility of Mr. Eike being Charged with Sexual Abuse of Teri Fell Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of his Death Sentence .............................................................................. 198

a.      Government Suppression and Trial counsel Failures ............... 198

i.      Government Brady Violation ....................................... 198

ii.      Trial Counsel's Failure to Investigate ........................... 202

b.      Mr. Fell Suffered Constitutional Prejudice As a Result of The Brady Violations and Counsel's Ineffective Assistance ..... 203

VII.      The Government's Failure to Disclose Favorable Evidence Regarding Mr. Fell's Conduct in Prison and Trial Counsel's Failure to Investigate Same Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights ................................................................ 204

A.      The Government's Failure to Disclose Favorable Evidence Regarding Officer Pelkey's Disciplinary History and His Attempted Assault of Mr. Fell Was a Violation of its Brady Obligations and Mr. Fell's Fifth and Eighth Amendment Rights; Trial Counsel's Failure to Investigate Same Was a Violation of Mr. Fell's, Fifth, Sixth and Eighth Amendment Rights ..... 207

1.      Evidence Presented to the Jury .............................................. 207

2.      Brady Violation ..................................................................... 209

3.      Trial Counsel's Ineffectiveness .............................................. 213

B.      Trial Counsel's Failure to Investigate and Present a Key Witness, Deacon Steve Ratte, to Support its Case Regarding Acclimation to Prison, Positive Contributions in Prison, and Execution Impact was Ineffective in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights ................. 215

1.      Evidence Presented ................................................................ 215

2.      Trial Counsel's Ineffectiveness .............................................. 216

VIII.      The Government's Failure to Disclose Favorable Evidence Regarding Mr. Fell's Co-Defendant Bobby Lee or Trial Counsel's Failure to Investigate Same Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights ..................................................... 219

v

A.    Background ................................................................................ 220

    1.    Evidence Presented at Trial.................................................. 220

    2.    Evidence in the Government's Possession ............................ 222

            a.    Prison Records ...................................................... 223

                    i.    Violence Against Other Inmates.................... 223

                    ii.    Violence Towards Mothers............................. 224

                    iii.    Homicidal Ideations ....................................... 225

                    iv.    Drug Use At The Time Of The Crime ............ 225

                    v.    Suicidal Tendencies After Arrest................... 226

                    vi.    Misbehavior ................................................... 227

                    vii.    Further Discovery .......................................... 227

            b.    Social Service, Educational, Medical and Law Enforcement
                    Records And Lay Witness Investigation Pertaining to Lee ....... 228

            c.    Francis Bellantoni ................................................. 228

B.    The Government's Brady Violations and Counsel's Ineffective Assistance ..... 230

    1.    The Government's Failure to Disclose Evidence and Trial
            Counsel's Failure to Investigate Same................................... 230

            a.    Government's Failure to Disclose Evidence............... 230

            b.    Trial Counsel's Failure to Investigate ...................... 230

    2.    Materiality and Prejudice:  Brady Violation and Ineffectiveness of
            Counsel................................................................................ 231

IX.    Trial Counsel Was Ineffective for Failing to Conduct an Adequate
        Forensic Investigation, thereby Depriving Mr. Fell of Rights Guaranteed
        him by the Fifth, Sixth, and Eighth Amendments. ........................... 232

A.    Trial Counsel's Performance was Deficient. ...................................... 235

B.    Trial Counsel's Deficient Performance Prejudiced Mr. Fell ............... 237

X.    Trial Counsel Were Ineffective for Failing to Investigate the Facts
        Underlying the Government's Claim that Mrs. King was Killed In an
        "Especially Heinous, Cruel or Depraved Manner."........................... 241

A.    The Government Presented Graphic Evidence in Support of the "Heinous,
        Cruel and Depraved Aggravator" that Could Have and Should Have Been
        Challenged by Trial Counsel................................................................ 243

    1.    Trial counsel should have challenged arguments regarding the
            earring. ................................................................................ 243

B.    Trial Counsel Should Have Challenged Evidence Regarding the Teeth ........... 245

C.      There is No Scientific Basis For the Government's Argument that 150 Pounds of Force Were Used to Kill Mrs. King....................................................248

D.      There is No Scientific Basis For the Government's Argument that Mrs. King was "Killed Twice"..........................................................................................249

    1.      Trial Counsel's Failure to Investigate and Meet the Government's Proof on the "Heinous, Cruel or Depraved" Aggravator Was Objectively Unreasonable. ..................................................................251

    2.      Donald Fell was prejudiced by trial counsel's deficient performance ...................................................................................................252

XI.     Trial Counsel Were Ineffective for Failing to Investigate the Deaths of Debra Fell and Charles Conway, thereby Depriving Mr. Fell of Rights Guaranteed Him by the Fifth, Sixth and Eighth Amendments .........................254

A.      Trial Counsel Were Ineffective for Failing to Conduct a Reasonable Investigation of the Forensic Evidence of the Deaths of Debra Fell and Charles Conway ...................................................................................................256

B.      Trial Counsel were Ineffective for Failing to Investigate Critical Witnesses who Heard or Observed the Events at 135 Robbins Street on November 26, 2000..................................................................................................................257

C.      Trial Counsel Were Ineffective for Failing to Investigate the Lifestyles of Debra Fell and Charles Conway in Vermont.....................................................258

XII.    Trial Counsel Were Ineffective for Failing to Investigate and Present a Diminished Capacity Defense, Thereby Depriving Mr. Fell of Rights Guaranteed Him by the Fifth, Sixth, and Eighth Amendments ........................263

A.      Trial counsel were ineffective for failing to present a diminished capacity defense based on available evidence.................................................................265

B.      Trial Counsel Were Ineffective for Failing to Present Evidence of Intoxication and Mental Illness During the Guilt Phase to Lay the Foundation For the Penalty Phase Mitigation Case ..........................................271

    1.      The Failure To Present A Diminished Capacity Defense Was Prejudicial ........................................................................................273

XIII.   Trial Counsel Were Ineffective for Failing to Interview and Present Numerous Readily Available Witnesses Who Could Support the Mitigation Factor That "Donald Fell's Execution Would Detrimentally Affect Persons Who Care About Him".................................................................276

XIV.    Trial Counsel Were Ineffective for Stipulating To and Failing to Object To the Admission of Highly Inflammatory and Prejudicial Evidence Offered By the Government, in Violation of Mr. Fell's Fifth, Sixth, and Eighth Amendment Rights ..........................................................................................282

A.   Trial Counsel Were Objectively Unreasonable for Stipulating To the Admission of a Slayer T-shirt, Which was Highly Inflammatory and Minimally Probative ........................................................................ 282

B.   Trial Counsel Were Ineffective for Failing to Object to the Introduction of Testimony about Satanism and a 666 Tattoo, in violation of Mr. Fell's Fifth, Sixth, and Eighth Amendment rights. ....................................... 287

C.   Trial Counsel Were Ineffective for Failing to Limit the Use of Matt Cunningham's Highly Prejudicial Testimony. ................................... 289

D.   Trial Counsel Were Ineffective for Failing to Counter the Government's False Assertion that Mr. Fell's Memory of the Word "Hawk" Meant that He Was Not Intoxicated on the Night of the Crimes. ........................................ 291

XV.   Trial Counsel Were Ineffective for Failing to Adequately Preserve the Record, Resulting in Numerous Meritorious Claims on Direct Appeal Being Evaluated Under the Onerous Plain Error Standard. ............................. 292

A.   Trial Counsel Were Ineffective for Failing to Object to Numerous Instances of Prosecutorial Misconduct in the Closing Arguments During the Sentencing Phase. ......................................................................... 294

B.   Appellate Counsel Were Ineffective for Failing to Raise Evidentiary Issues on Direct Appeal, Resulting in the Waiver of Numerous Meritorious Claims. ....................................................................... 295

XVI.   The Cumulative Impact of Trial Counsel's Objectively Unreasonable Performance Resulted in Cumulative Prejudice that Demonstrates a Reasonable Probability that At Least One Juror Would Have Struck A Different Balance and Voted in Favor of Life .................................................. 296

XVII.   The Government's Failure to Disclose Reports of Interviews Conducted By The FBI and Dr. Welner and Failure to Disclose Information from Social Service Agencies Violated Mr. Fells Fifth and Eighth Amendment Rights ................................................................................................... 298

   1.   302s and Underlying Interview Documentation ................................ 298

      a.   FOIA 302s ............................................................................... 298

         i.   Favorable Information in FOIA 302s ........................... 298

         ii.   Misconduct Evident in FOIA 302s ............................... 299

      b.   Welner Report 302s and Interview Documentation ................... 301

   2.   The Government Failure to Disclose Information from Social Service Agencies and Trial Counsel's Failure to Investigate Same Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights ........... 304

      a.   Social Service Records Collected in FBI Investigation ............. 304

      b.   Supplemental Social Security Income ....................................... 305

XVIII.  The Government's Failure to Disclose Physical Evidence Relating to the Investigation of the Crimes and Trial Counsel's Failure to Investigate Same Entitles Mr. Fell to Relief From His Death Sentence ............................ 306

    1.    Withheld Clarksville Evidence ........................................................... 307

    2.    Withheld Documentation of 135 Robbins Street Evidence ................... 308

    3.    Materiality.......................................................................................... 308

XIX.  The Government's Brady Violations, Both Singly and Cumulatively, Violated Mr. Fell's Fifth, Sixth, and Eighth Amendment Rights and Entitle Mr. Fell to a New Trial or at the Minimum a Reversal of his Death Sentence ......................................................................................................... 309

XX.  Mr. Fell was deprived of his rights under the Fifth, Sixth, and Eighth Amendments when the government engaged in additional prosecutorial misconduct during closing arguments ............................................................. 312

A.  The Government engaged in misconduct when it misstated the evidence regarding Mr. Fell's intoxication during the crimes during the guilt phase closing statements ...................................................................................... 312

B.  The Government engaged in misconduct when it misstated the law regarding the evaluation of mitigation evidence................................................. 314

C.  The Government engaged in misconduct when it made inflammatory remarks about Mr. Fell's religious practices...................................................... 316

D.  The Government engaged in misconduct when it impermissibly commented upon Mr. Fell's lifestyle in prison................................................. 318

XXI.  The Cumulative Impact of The Government's Prosecutorial Misconduct During Both the Guilt and Penalty Phases Resulted in Cumulative Prejudice Which Rendered The Trial Fundamentally Unfair ........................... 321

XXII.  Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment ~~Right~~Rights to an Impartial Jury............................................................... ~~322~~323

    A.    ~~Jurors who would have been Stricken for Cause if they had been Truthful were Empanelled after Making Material Misstatements or Omissions During Jury Selection.......................................322~~Juror #162. 324

    ~~1.~~    ███████████████████████████████████

    ~~2.    Juror #26. ................................................................................. 328~~

~~B.    Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to a Fair and Unbiased Trial when Jurors Were Exposed to Extraneous Influences. ................................................................................. 329~~

    1.    Juror #███████████████████

        a.    ███████████████████████

b. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

B.   Juror #26 .................................................................................... 349

C.   ~~Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to an Impartial Jury and an Uncoerced Jury Verdict when One Juror Coerced Another into Changing her Vote from a Life Sentence to a Death Sentence by Aiming a 12-Gauge Shotgun at her when she Resisted Voting for Death. .............................. 337~~Juror #143 354

D.   Juror #27 .................................................................................... 358

E.   Additional Jurors in Mr. Fell's Case Engaged in Misconduct in Violation of Mr. Fell's Rights under the Fifth, Sixth, and Eighth Amendments .................................................................... ~~339~~359

XXIII. Other Claims ...................................................................... ~~340~~360

A.   Mr. Fell was Deprived of his Rights under the Fifth, Sixth, and Eighth Amendments when the United States Attorney General Decided to Seek the Death Penalty Against him on the Basis of Race, Gender and Geography, Three Constitutionally Impermissible Sentencing Factors. ..... ~~340~~360

   1.   The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Race Violates His Constitutional Rights .................... ~~342~~362

   2.   The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Geographic Location Violates His Constitutional Rights ........................................................................ ~~345~~365

   3.   The Attorney General's Decision to Seek the Death Penalty Based on the Race and Gender of the Victim Was Arbitrary and Capricious and Violated Mr. Fell's Constitutional Rights............... ~~346~~366

B.   Trial Counsel were Ineffective for Failing to Adequately Voir Dire the Jury in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights~~348~~368

C.    Trial Counsel Failed to Adequately Question or Attempt to Rehabilitate Prospective Jurors who Initially Suggested that they Could Not Vote for the Death Penalty ................................................................ 352372

D.    The Execution of a Man who was Developmentally a Juvenile at the Time of His Crimes is Cruel and Unusual under the Eighth Amendment ............ 355375

E.    The Manner in Which the Government Would Execute Mr. Fell Violates the Eighth Amendment ................................................................ 358378

CONCLUSION AND PRAYER FOR RELIEF ................................................ 360380

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

18 U.S.C. § 1201(a) 2119 ................................................................ 9-10

18 U.S.C. § 2119................................................................ 9-10

18 U.S.C. § 2243 (2011) ................................................................ 327

18 U.S.C. § 3005................................................................ 9

18 U.S.C. § 3591(a)(2)................................................................ 237

18 U.S.C. § 3591(a)(2)................................................................234, 237, 239

18 U.S.C. § 3591(a)(2)(C) ................................................................ 238

18 U.S.C. § 3591(a)(2)(D) ................................................................ 239

18 U.S.C. § 3592(a)(1)................................................................ 104

18 U.S.C. § 3592(a)(2)................................................................ 272

18 U.S.C. §3593(c) ................................................................141, 151, 156

18 U.S.C. § 3593(f) ................................................................ 317

18 U.S.C. § 3596(a) ................................................................ 358378

42 U.S.C. § 1983................................................................ 358378

FED. R. CRIM. P. 12.2 ................................................................ passim

Fed. R. Crim. P. 12.2(c) ................................................................ 156

Fed. R. Evid. 404(a)(2) ................................................................ 198

**Cases**

xi

Ainsworth v. Woodford,
268 F.3d 868 (9th Cir. 2001) ........................................................................ 95

Amorgianos v. Nat'l RR Passenger Corat,
303 F. 3d 256 (2d Cir. 2002) ........................................................................ 284

Astoria Fed. Sav. & Loan Ass'n v. Solimino,
501 U.S. 104 (1991) ........................................................................ 239

Banks v. Dretke,
540 U.S. 668 (2004) ........................................................................ 23-24

Barefoot v. Estelle,
463 U.S. 880 (1983) ........................................................................ 20

Baze v. Rees,
553 U.S. 35 (2008) ........................................................................ 358-359378, 379

Bazemore v. Friday,
478 U.S. 385 (1986) ........................................................................ 344365

Berger v. United States,
295 U.S. 78 (1935) ........................................................................ passim

Brady v. Maryland,
373 U.S. 83 (1963) ........................................................................ passim

Brecht v. Abrahamson,
507 U.S. 619 (1993) ........................................................................ 294

Brown v. Fisher,
06 Civ. 2771 (RJS), 2010 U.S. Dist. LEXIS 89566 (S.D.N.Y. Apr. 29, 2010) ................... 327

Burton v. Johnson,
948 F.2d 1150 (10th Cir. 1991) ........................................................................ 326

Caldwell v. Mississippi,
472 U.S. 320 (1985) ........................................................................ 22

California v. Ramos,
463 U.S. 992 (1983) ........................................................................ 20

Cone v. Bell,
129 S. Ct. 1769 (2009) ........................................................................ 24

Crawford v. Washington,
541 U.S. 36 (2004 ........................................................................ 13, 155

Cuadra v. Sullivan,
837 F. 2d 56 (2d Cir. 1988)......................................................................285, 287, 290, 294

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993) .................................................................................. 284

Dawson v. Delaware,
503 U.S. 159 (1992)..................................................................................286-288, 317

Dickerson v. Bagley,
453 F.3d 690 (6th Cir. 2006) ..................................................................... 96

DiSimone v. Phillips,
461 F.3d 181 (2d Cir. 2006)....................................................................... 250

Drake v. Portuondo,
321 F.3d 338 (2d Cir. 2003)....................................................................... 25

Drake v. Portuondo,
553 F.3d 230 (2d Cir. 2009)....................................................................... 197

Draughon v. Dretke,
427 F.3d 286 (5th Cir. 2005) .....................................................................232, 239, 263

Duckett v. Mullin,
306 F.3d 982 (10th Cir. 2002) ................................................................... 319

Eddings v. Oklahoma,
455 U.S. 104 (1983)..................................................................................~~355~~375-376

Estelle v. Smith,
451 U.S. 454 (1981)................................................................................... 21, 156

Evitts v. Lucey,
469 U.S. 387 (1985)..................................................................................~~320~~ 320, 321

Flanagan v. State,
846 P.2d 1053 (Nev. 1993) ....................................................................... 317

Furman v. Georgia,
408 U.S. 238 (1972) (Douglas, J.) .............................................................~~343, 345~~364, 365

Giglio v. United States,
405 U.S. 150 (1972)................................................................................... passim

Graham v. Florida,
130 S. Ct. 2011 (2010)............................................................................... ~~355~~375

Graham v. Florida,
No. 08-7412 (U.S. July 2009) ................................................................ ~~356~~376

Gray v. Mississippi,
481 U.S. 648 (1987) ............................................................................ ~~352~~372

Gregg v. Georgia,
428 U.S. 153 (1976) .................................................................~~345 346~~365, 366

Harris ex rel. Ramseyer v. Blodgett,
853 F. Supp. 1239 (W.D. Wash. 1994) ............................................... 233, 263

Hodge v. Hurley,
426 F.3d 368 (6th Cir. 2005) .................................................................... 294

In re Stanford,
537 U.S. 472 (2003) ............................................................................ ~~356~~376

Irvin v. Dowd,
366 U.S. 717 (1961) ............................................................................ ~~328~~353

Jermyn v. Horn,
266 F.3d 257 (3d Cir. 2001) ....................................................................... 95

Keene Corp. v. United States,
508 U.S. 200 (1993) ................................................................................ 239

Kyles v. Whitley,
514 U.S. 419 (1995) ............................................................................ passim

Le v. Mullin,
311 F.3d 1002 (10th Cir. 2002) ................................................................ 319

Leka v. Portuondo,
257 F.3d 89 (2d Cir. 2001) ...........................................................24, 191, 202

Lindstadt v. Keane,
239 F.3d 191 (2d Cir. 2001) ..................................................................... 296

Lockett v. Ohio,
438 U.S. 586 (1978) ............................................................................ ~~348~~369

~~Loliscio v. Goord,~~
~~263 F.3d 178 (2d Cir. 2001) ................................................................... 332~~

~~Lowenfield v. Phelps,~~
~~484 U.S. 231 (1988) ............................................................................ 338~~

McCleskey v. Kemp,
481 U.S. 279 (1987)................................................................ ~~343 344, 347~~363, 364, 3

McKoy v. North Carolina,
494 U.S. 433 (1990)................................................................ 314

Mitchell v. Gibson,
262 F.3d 1036 (10th Cir. 2001) ............................................. 308

Morgan v. Illinois,
504 U.S. 719 (1992)................................................................ ~~348, 355~~368, 375

Napue v. Illinois,
360 U.S. 264 (1959)................................................................ passim

New Jersey v. Vandewaghe,
351 N.J. Super. 467, 799 A.2d 1 (2002), aff'd 177 N.J. 229, 827 A.2d 1028 (N.J. 2003) . 146

Outten v. Kearney,
464 F.3d 401 (3d Cir. 2006)................................................... 95

Penry v. Lynaugh,
492 U.S. 302 (1989)................................................................ 314-316

Porter v. McCollum,
130 S. Ct. 447 (2009)............................................................. 20, 22

Ramos v. Town of Vernon,
353 F.3d 171 (2d Cir. 2003).................................................. 293

Ratzlaf v. United States,
510 U.S. 135 (1994)................................................................ 239

Rompilla v. Beard,
545 U.S. 374 (2005)................................................................ passim

Roper v. Simmons,
543 U.S. 551 (2005)................................................................ ~~355 356~~375, 376

Rosales-Lopez v. United States,
451 U.S. 183 (1981) (plurality opinion) ................................ ~~348~~368

Sears v. Upton,
130 S. Ct. 3259 (2010)............................................................ 20-22, 31

Skipper v. South Carolina,
476 U.S. 1 (1986)................................................................... 207, 218

Soffar v. Dretke,
368 F.3d 441 (5th Cir. 2004) .................................................................. 233, 263

State of New York v. Shore Realty Corp.,
759 F.2d 1032 (2d Cir.1985).................................................................. 239

Stier v. United States,
871 F. Supp. 127 (N.D.N.Y. 1994)........................................................ 264

Stitt v. United States,
369 F. Supp. 2d 679 (E.D. Va. 2005) .................................................... 147, 152

Strickland v. Washington,
466 U.S. 668 (1984)................................................................................ passim

Strickler v. Green,
527 U.S. 263 (1999)................................................................................ 23

Thomas v. Kuhlman,
255 F. Supp. 2d 99 (E.D.N.Y. 2003) .................................................... 297

Tug Raven v. Trexler,
419 F.2d 536 (4th Cir. 1969) ................................................................ 226

Turner v. Fouche,
396 U.S. 346 (1970).............................................................. 344364-365

Turner v. Louisiana,
379 U.S. 466 (1965)............................................................. 330, 337-338

United States v. Cronic,
466 U.S. 648 (1984)................................................................................ 297

United States v. Hall,
152 F. 3d 381 (5th Cir. 1998) ................................................................ 239, 252

United States v. Hammer,
121 F. Supp. 2d 794 (M.D. Pa. 2000) ................................................... 358378

United States v. Martinez-Salazar,
528 U.S. 304 (2000)................................................................................ 240, 253

United States v. Sablan,
No. 00-cr-00531-WYD, 2007 WL 4116117 (D. Colo. Nov. 16, 2007)............................. 240, 254

United States v. Tierney,
947 F.2d 854 (8th Cir. 1991) ................................................................ 26, 196-197

United States v. Albanese,
195 F.3d 389 (8th Cir. 1999) ........................................................................ 25, 197

United States v. Amiel,
95 F.3d 135 (2d Cir. 1996)............................................................................. 25

United States v. Armstrong,
517 U.S. 456 (1996)........................................................................ 342, 346363, 366

United States v. Avellino,
136 F.3d 249 (2d Cir. 1998)........................................................................... 23

United States v. Bagley,
473 U.S. 667 (1985) ........................................................................................ passim

United States v. Balistrieri,
779 F.2d 1191 (7th Cir. 1985) ...................................................................... 228

United States v. Biasucci,
786 F.2d 504 (2d Cir. 1986)......................................................................... 315, 319

United States v. Bin Laden,
126 F. Supp. 2d 256 (S.D.N.Y. 2000)......................................................... 345365

United States v. Colombo,
869 F.2d 149 (2d Cir. 1989).......................................................................... 326

United States v. Crowley,
236 F. 3d 104 (2d Cir. 2000)......................................................................... 263, 265

United States v. Diaz,
176 F. 3d 52 (2d Cir. 1999)........................................................................... 264

United States v. Dupre,
339 F. Supp. 2d 534 (S.D.N.Y. 2004)......................................................... 264

United States v. Elias,
285 F.3d 183 (2d. Cir. 2002)........................................................................ 315, 319

United States v. Fell,
372 F. Supp. 2d 753 (Apr. 7, 2005) ............................................................ 18, 121

United States v. Fell,
372 F. Supp. 2d 766 (D. Vt. 2005)............................................................... passim

United States v. Fell,
531 F.3d 197 (2d Cir. 2008)........................................................................... passim

United States v. Fell,
No. 2:01-CR-12, 2006 U.S. Dist. LEXIS 24707 (D. Vt. Apr. 24, 2006)............................ passim

United States v. Grieco,
261 F.2d 414 (2d Cir. 1958) (per curiam), cert. denied, 359 U.S. 907 (1959) ................... 323

United States v. Harris,
498 F.2d 1164 (3d Cir. 1974)........................................................................................ 26, 198

United States v. Johnson,
362 F. Supp. 2d 1043 (N.D. Iowa 2005).............................................................................. 158

United States v. Modica,
663 F.2d 1173 (2d Cir. 1981)............................................................................................... 313

United States v. Pleva,
66 F.2d 529 (2d Cir. 1933)................................................................................................... 338

United States v. Quinones,
511 F.3d 289 (2d Cir. 2007)........................................................................................... 352372

United States v. Rodriguez,
496 F.3d 221 (2d Cir. 2007)................................................................................................... 23

United States v. Roman,
931 F. Supp. 960 (D.R.I. 1996)...................................................................................... 343363

United States v. Sampson,
335 F. Supp. 2d. 166 (2004) ......................................................................................... passim

United States v. Simmons,
923 F.2d 934 (2d Cir. 1991).................................................................................330, 337, 338

United States v. Spinelli,
551 F.3d 159 (2d Cir. 2008).................................................................................................. 26

United States v. Tavares,
585 F. Supp. 2d 327 (E.D.N.Y. 2008) .................................................................................. 146

United States v. Taylor,
No. 1:04-CR-160, 2008 U.S. Dist. LEXIS 12710 (E.D. Tenn. Feb. 15, 2008) ................. 159

United States v. Whitten,
610 F.3d 168 (2d Cir. 2010)......................................................................................... 313, 319

United States v. Williams,
No. 06-000079, 2004 WL 2980027 (S.D.N.Y. Dec. 22, 2004) ......................................159, 344364

United States v. Wong,
78 F.3d 73 (2d Cir. 1996)......................................................................................25-26, 196, 253

United States v. Yousef,
327 F.3d 56 (2d Cir. 2003)..................................................................................    293

Vasques v. Hillery,
474 U.S. 254 (1986) ..........................................................................................    ~~343~~363

Walbey v. Quarterman,
No. 08-7007, 2009 WL 113778 (5th Cir. May 18, 2009) ...................................    22, 31

Wiggins v. Smith,
539 U.S. 510 (2003) ..........................................................................................    passim

Williams v. Taylor,
529 U.S. 362 (2000) ..........................................................................................    20

Wood v. Bartholomew,
516 U.S. 1 (1995) ..............................................................................................    23

Woodson v. North Carolina,
428 U.S. 280 (1976) ..........................................................................................    141, 314

Zant v. Stephens,
462 U.S. 862 (1983) ..........................................................................................    317

## Other Authorities

American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) Guidelines 1.1, 4.1, 10.11(A) (printed in 31 HOFSTRA L. REV. 913) (2002-2003) ............................................................    passim

Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963 (2008) ............................................................................................    passim

Bessel van der Kolk, TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY AND SOCIETY (1996) ................................................................    93

Mark D. Cunningham, Thomas J. Reidy, Don't Confuse Me with the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing, 26-1 CRIM. JUST. AND BEHAV. (March 1999) ....................................................................................................    158

Dan Eggen, Ashcroft Aggressively Pursues Death Penalty, WASH. POST, July 1, 2002 ....~~340, 346~~361, 366

Dan Eggen, U.S. Death Penalty System Not Biased, Ashcroft Declares, WASH. POST, June 7, 2001 ........................................................................................................~~342~~362-363

David Stout, <u>Attorney General Says Report Shows No Racial and Ethnic Bias in Federal Death Sentences</u>, N.Y. TIMES, (June 7, 2001) ...................................................... ~~341~~361

Disease Control and Prevention, <u>Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis</u> (July 2004) ..................................................................................... 80, 81

Douglas W. Deedrick, *Hairs, Fibers, Crime, and Evidence, Part 2: Fiber Evidence*, FORENSIC SCIENCE COMMUNICATIONS (July 2000) ............................................. 284

Eitan D. Schwartz & Bruce D. Perry, <u>The Post-Traumatic Response in Children and Adolescents</u>, PSYCHIATRIC CLINICS OF NORTH AMERICA (Vol. 17, No. 2) (June 1994) .... 93-94

Gary Goodpaster, <u>The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases</u>, 58 N.Y.U.L. REV. 299 (1983) ................................................................. 70

Karen Gullo, <u>Justice Study Finds No Racial Bias</u>, WASH. POST, June 6, 2001 .................. ~~342~~363

American Academy of Psychiatry and the Law, ETHICS GUIDELINES FOR THE PRACTICE OF FORENSIC PSYCHIATRY (adopted May 2005) ................................................... 143, 150

Raymond Bonner & Marc Lacey, <u>Pervasive Disparities Found in the Federal Death Penalty</u>, N.Y. TIMES, Sept. 12, 2000 ........................................................... ~~341~~361

Scott E. Sundby, <u>The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony</u>, 83 VA. L. REV. 1109, 1144 (1997) ......................... 69-70

American Bar Association, <u>Standards for Criminal Justice: Prosecution Function and Defense Function</u> (3d ed. 1993) ............................................................. 176

Susan J. Astley & Sterling K. Clarren, <u>Diagnosing the Full Spectrum of Fetal Alcohol Exposed Individuals: Introducing the 4-Digit Diagnostic Code</u>, Alcohol & Alcoholism (Vol. 35, No. 4) (2000) ................................................................... 80

U.S. DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000).................................................................................. ~~345~~361, 366

~~VT. STAT. ANN. CRIMES & CRIM. PRO. § 3253a~~.................................................. ~~327~~

McKinney's Penal Law § 130.55 (2010) .......................................................... 187, 201

Donald R. Fell, Jr., through undersigned counsel, respectfully moves this Court pursuant to 28 U.S.C. Section 2255 and the Constitution and laws of the United States of America, to vacate, set aside, or correct the judgment and sentence of death imposed upon him by this Court on June 16, 2006. In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this motion sets forth only the facts and claims entitling Mr. Fell to relief. It does not contain legal argument or citation. Mr. Fell will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Motion.

## PRELIMINARY STATEMENT

Donald R. Fell, Jr. was sentenced to death by this Court following a trial plagued by the ineffective assistance of his counsel and marred by prosecutorial misconduct. As a result of those twin errors and other errors set forth in this motion, the man whom the jury intended to be sent to the death chamber is not the person whom Mr. Fell is. The jury learned that Mr. Fell had experienced a few isolated traumatic incidents in his early life, but was told his life generally improved after his father left the family when Donny was ten. The jury did not hear any mitigating evidence about Mr. Fell's life between the age of 15 and the crimes at issue, and was led to believe that Mr. Fell had numerous chances and positive role models in life, and he simply chose evil. The truly unrelenting horror in Mr. Fell's life was never exposed:

- Mr. Fell is the child of parents with long histories of mental illness, substance abuse and alcoholism on both sides of the family. Prenatally exposed to alcohol as a result of his mother's heavy drinking, he and his younger sister were then the victims of extraordinary degradations and deprivations – child sexual abuse, extreme violence, drinking and drugs, neglect, deplorable living conditions and hunger – all before the age of ten.

- The extraordinary abuse to which Mr. Fell was subject did not end at age ten, or at age fifteen. Mr. Fell's mother was a violent, aggressive, and disturbed woman who continued to physically, emotionally, and sexually abuse her children long after Mr. Fell's father left. She harbored a lifelong addiction to

drugs and alcohol that lasted well after Mr. Fell's father's departure. One of the men she took up with was a hard-drinking and violent member of the Hell's Angel's motorcycle gang who molested Mr. Fell's sister in front of Mr. Fell's own eyes and regularly beat him. The woman to whose care the young Mr. Fell was relegated after his mother suddenly abandoned Donny when he was 13 and with whom he stayed until he was 17 was arguably more physically and emotionally abusive than even Mr. Fell's parents.

- The person who committed these crimes at age 20 was not on a downward trajectory as his home life improved. Experts – who were never called to testify at trial – would have testified that his impulse control and aggression were manifestations of underlying mental illness and impairment, which were triggered by the abuse and trauma he suffered throughout his short life. They also would have testified that Mr. Fell had a genetic predisposition to these impairments as a result of his multigenerational history of mental illness. As a clinical matter, those impairments left him with an inappropriately flat affect – one that could easily be confused with lack of remorse and that was so argued by the Government.

- Nor does Mr. Fell have a long history of inflicting serious harm on others, as the Government argued. Mr. Fell did not beat anyone into a coma as the Government claimed, and the only other previous incident alleged at trial of serious harm was caused by the accidental discharge of a fire arm when Mr. Fell was a child.

- And the person who committed these crimes at age 20 is not a person who is incapable of effective treatment or successful confinement for life. Mr. Fell's impairments are such that – as an expert would testify – he would respond positively in the future.

The jury that sentenced Donny Fell to be executed, however, did not hear much of this, and heard nothing at all about the impact of his lifetime of relentless neglect, abuse, and chronic intoxication.

The judgment in this case was a function of ineffective assistance of counsel and, separately, of prosecutorial misconduct. Until his incarceration in connection with this case, Mr. Fell is a man who, ironically, was never given a chance in life. His life had extraordinary mitigating circumstances that were not presented to the jury, his capacity was substantially impaired at the time of the offense, he had no significant prior criminal record, and he has posed

2

no risk to anyone while incarcerated. Certain of the errors that prevented the jury and this Court from hearing Mr. Fell's case for life were caused by the ineffective assistance of his counsel, and certain others by prosecutorial misconduct and disclosure violations, as summarized below and set forth in this motion.

**Mr. Fell's Trial Counsel Failed to Adequately Investigate and
as a Result Gave a Deficient Performance at Trial**

The defense lawyers in this case failed adequately to prepare for trial. This was a case that no one – certainly not the defense – expected to go to trial. When Mr. Fell was first arrested, the Government indicated it would be prepared to accept a plea to a sentence of life imprisonment without possibility of release and the defense proceeded accordingly. But, in January 2002, the Justice Department served a Notice of Intent to Seek the Death Penalty. Even then, until the eve of trial, Mr. Fell's lawyers did not believe they would have to go to trial before a jury where the death penalty would be at stake. They acted accordingly. For over four years, their approach and view and practice never changed. Inexplicably, even after the Government made clear at the beginning of January 2002 that it would go to trial and pursue the death penalty, the defense did not prepare for trial. They never investigated basic facts and, as a result, they fundamentally misunderstood their client and his case. Among their more serious errors:

- Trial counsel conducted a deficient investigation into Mr. Fell's upbringing. Although they hired a mitigation specialist, Cynthia Ayres, Mr. Fell's lawyers abdicated their responsibilities as counsel by failing to supervise her work with feedback or instruction on whom to interview or what issues to pursue. By her own account, Ms. Ayres did very little. Meanwhile, no work was done between June 2002 and the eve of trial. The short time that Ms. Ayres spent in Mr. Fell's hometown, Wilkes-Barre, Pennsylvania, did not permit a sufficient effort to elicit the necessary mitigation support from Mr. Fell's sister, Teri Fell, his family members, or any of the of the other witnesses to Mr. Fell's horrific life, who were available and willing to testify on Mr. Fell's behalf at sentencing. Instead of exploring the extensive mitigation evidence available to them, trial counsel rested on a far weaker and more anemic case

3

for life (one that had already been rejected by the Justice Department) and simply assumed – without preparing for trial – that the Government would not challenge it and that what the Justice Department found lacking a jury would find compelling.

- Trial counsel did not investigate the numerous family members, friends and neighbors of Mr. Fell who could have testified how every adult in Mr. Fell's life – his mother, his father, the men with whom his mother took up, his grandmother, and his abusive 21 year old guardian – failed to support him in all the ways necessary for successful development. As a result, they left the door open for the Government to argue – as it did, falsely – that his life "improved" over time, though his behavior worsened. Trial counsel selected and retained mental health experts when they had hardly begun their mitigation investigation. And they did not bother, until the eve of trial, to obtain all records necessary to assess Mr. Fell's mental health, nor did they review these records when they obtained them to see what they revealed about Mr. Fell's mental health or to update their experts with the newly-discovered information. Had they examined the documents or shown them to an appropriate expert, they would have learned that Mr. Fell had, among other things, all the symptoms of fetal alcohol spectrum disorder, a mood disorder, and mental impairment from exposure to chronic trauma. The jury never heard evidence from experts of Mr. Fell's serious mental impairments or how the trauma he experienced related to the questions the jury was being asked to consider.

- Trial counsel failed entirely to investigate the single incident in Mr. Fell's youth when the Government alleged he caused serious harm to another person – an incident in which Mr. Fell accidentally discharged a gun, hurting a friend. The defense knew about the issue from its first engagement in the case in 2000. The witnesses – the young boy who was involved in the accident and his family – were readily available. But counsel never spoke to them. Furthermore, the Government contended, with no objection from Mr. Fell's lawyers, that Mr. Fell was remorseless after this accident. Tr. Vol. IX-I, 135:9-13 (July 7, 2005). The assertion was untrue. If counsel had conducted a minimal investigation, they would have learned and the jury would have heard – without contradiction – that the incident was an accident and that, far from lacking remorse, Mr. Fell was devastated by it. Records in the defense's possession show that rather than comforting her traumatized son, Mr. Fell's mother, Debra Fell, compounded the trauma of the accident by institutionalizing him.

- Trial counsel also failed to investigate the only other previous incident admitted at trial in which Mr. Fell caused serious harm. The jury was told by the Government that during the summer before the crime Mr. Fell started a fight with a young man named Chris Eike in Woodstock, New York, and that

4

Mr. Fell "stomp[ed] him into a coma" and "committed a horrible, violent assault on a person the same way he then later killed Terry King." Tr. Vol. XII at 61:13-15 (July 13, 2005). Mr. Eike was *never* in a coma and was treated only for minor surface injuries. Again, the defense knew about the issue and its obvious relevance to the penalty phase from their first engagement on the case. But, once again, the defense inexplicably failed to ask any questions or obtain the readily accessible medical records that would have completely undermined the Government's false account.

- Trial counsel's failure to investigate Mr. Fell's conduct in prison prevented them from challenging misleading evidence presented by the Government. The Government showed to the jury videos of two disciplinary incidents over the course of years of Mr. Fell's imprisonment. Limited as that evidence was, it had dramatic effect: The jury found against Mr. Fell on the mitigating factor "Donald Fell does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release." Trial counsel failed to obtain the grievance records for Officer Pelkey, the officer involved in the prison fight with Mr. Fell, or ask him about his prior grievances. Had they done so, they would have discovered that Officer Pelkey attempted to attack Mr. Fell and was ordered not to be in contact with Mr. Fell after the incident. Furthermore, Officer Pelkey had a long history of grievances being filed against him because he was abusive to prisoners on his watch. This information was readily available to the defense – aside from being reflected in the prison records, Officer Pelkey sat in the courtroom for five days during trial. Nevertheless, Mr. Fell's lawyers unreasonably failed to discover this information.

- Had they investigated, trial counsel would have readily learned that the flat or inappropriate affect which Mr. Fell demonstrated during his post-arrest statements and at trial was not due to a lack of remorse but was a symptom of his impairments. Trial counsel did not investigate and thus they allowed the Government to argue – over and over, at trial and in the jury addresses – that Mr. Fell's affect reflected a lack of remorse for which he deserved death.

Despite trial counsel's intention to rely on social services records, they did not read or analyze the records or notes in their files to uncover the powerfully mitigating information contained within them. Mr. Fell's defense was compromised not only by trial counsel's failures to prepare but also by their woefully deficient performance at trial:

- In spite of the red flags that Mr. Fell had serious mental impairments, Mr. Fell's lawyers withdrew all of the mental health expert testimony which they

5

had promised the jury and, in a 180-degree turnaround, made an extraordinary stipulation:

> After his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that, one, he had no cognitive or neurological deficits; two, his intellect and cognitive functions were intact; three, <u>he did not suffer from any mental disease or defect</u>. The examination also found that Fell was competent to stand trial, and knew the difference between right and wrong at the time of offenses on November 27th, 2000.

Tr. Vol. XI at 94:24-95:8 (July 12, 2005) (emphasis added). This devastating and inaccurate stipulation was the last evidence the jury heard. The effect was to leave the jury with the misimpression that the mitigation evidence they heard about Mr. Fell's childhood had no impact on him whatsoever, that Mr. Fell was not remorseful, and that he was offering no more than an "abuse excuse." Not surprisingly, the Government seized upon this stipulation. It argued that Mr. Fell had been given a "clean slate" and was "completely intact." Tr. Vol. XI at 120:8-14 (July 13, 2005). This argument made a huge difference. The jury found in Mr. Fell's favor with respect to all of the factors having to do with his traumatic upbringing – but it rejected every mitigating circumstance that dealt with the way in which that upbringing scarred him and affected his actions. Trial counsel were only able to enter into a stipulation that was not true because they failed to educate themselves about Mr. Fell's mental impairments and illnesses. Trial counsel's actions – as well as the prosecutor's misconduct described below—deprived the jury of the essential evidence it needed to find that Mr. Fell's experiences left him a substantially impaired individual, and to return a sentence of life.

- Trial counsel made, but then failed inexplicably and inexcusably to pursue, a challenge to the report prepared by prosecution expert Dr. Michael Welner mid-way through the penalty phase on July 5, 2005. Viable and meritorious

6

challenges to Dr. Welner's report and testimony were available to counsel, including on the basis of prosecutorial misconduct and <u>Daubert</u>. Indeed, this Court later found that its order preventing the Government from engaging in unauthorized testing of Mr. Fell by Dr. Welner had been violated. Instead, although the motion could have resulted in the abbreviation or complete exclusion of the Welner report, trial counsel inexplicably failed to pursue their arguments. Inexcusably, counsel unilaterally withdrew their own expert testimony – evidence that they had promised the jury and that was essential to linking Mr. Fell's background to his character, behavior and the circumstances of the offense.

- Mr. Fell's defense counsel failed to object to long stretches of inadmissible, prejudicial, and inaccurate testimony, including illogical testimony regarding fibers supposedly from Mr. Fell's "Slayer" t-shirt – the Government's successful gambit to introduce the highly prejudicial images and word on the shirt – as well as misleading and prejudicial testimony regarding the state of Mrs. King's body and the role that Mr. Fell's actions played in her death.

- The defense also failed to object to inadmissible evidence and improper statements throughout the trial. The Second Circuit, on direct appeal, noted, "Nearly all the evidentiary issues Fell raises were not preserved at trial and were presented for the first time either in his motion for a new trial or on appeal." <u>United States v. Fell</u>, 531 F.3d 197 (2d Cir. 2008). For example, defense counsel failed to object to the Government's argument during summation that the jury could not consider mitigating evidence unrelated to the crimes for which Mr. Fell was found guilty. Counsel also failed to object to the Government's improper statements with respect to Mr. Fell's supposed interests in Satanism, Islam and Native American religions.

**Prosecutorial Misconduct**

The sentence here was also obtained through prosecutorial misconduct. The United States Supreme Court has long held that while the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935). Unfortunately, here, in their zeal to win, the Government lost the lodestar of fairness that the Constitution commands of all public officials – particularly of prosecutors and particularly in death cases. Among other things:

- The Government purposely elicited testimony which it knew to be false, specifically that Mr. Fell put Mr. Eike into a coma during the altercation in

7

Woodstock, NY. Mr. Eike was never in a coma. As the Government knew, he was alert when he arrived at the hospital on the morning of the fight and walked out of the hospital that same day without a report of any serious injury. Mr. Eike was treated only for minor surface injuries. The Government also suppressed the evidence of Mr. Eike's prior conviction for sexual assault and police reports regarding Mr. Eike's assault of Teri Fell that would have established that the fight began when Mr. Eike attacked Mr. Fell's sister.

- The Government withheld evidence showing that Officer Pelkey, a prison guard on the videos played during the trial, had a lengthy history of violence against inmates and had in fact attempted to assault Mr. Fell during that incident.

- The Government interviewed a witness who would have testified that he saw Mr. Fell and his co-defendant, Robert Lee, arguing at the side of the road shortly before Mrs. King's death. That witness would have offered evidence that Mr. Fell and Mr. Lee disagreed about whether to kill Mrs. King, and would have corroborated Mr. Fell's reluctance to do so. Although the FBI interviewed this witness for over an hour, the Government never provided counsel with a FBI 302.

- The Government also suppressed and failed to produce numerous documents that would have undercut their argument that Mr. Fell's co-defendant Bobby Lee was a docile follower who would never have committed a violent act without Mr. Fell's influence. The documents would have shown that Mr. Lee was a violent prisoner who repeatedly threatened other prisoners, including a threat to rape a fellow prisoner's mother. His violent tendencies were not attributable to Mr. Fell, since Mr. Lee was segregated from Mr. Fell in prison. The documents were inconsistent with the Government's story and they were not produced.

Finally, and unfortunately, despite the care that this Court exercised with respect to jury selection, Mr. Fell's jury trial rights were compromised by conduct and statements of which the Court and trial counsel were not aware. Two jurors made material misrepresentations on their jury questionnaires about critical issues. Another juror drove more than two hours out of his way to Rutland during the trial to conduct his own independent investigation of Debra Fell's home and neighborhood and the Price Chopper where Mrs. King worked. That same juror, by his own admission, "cocked and pointed" a shotgun that had been introduced into evidence at a

8

female juror who had argued that mitigating factors in Mr. Fell's life warranted the imposition of a life sentence, and not a death sentence, and she changed her vote to death shortly thereafter.

These are just some of the constitutional errors that pervaded this prosecution and infected the judgment against Donald Fell. Numerous others are set forth in the body of this motion. The combined effect of these errors was to omit valuable mitigating evidence, allow unwarranted aggravating evidence, and ultimately present a false picture of Mr. Fell to the jury and the Court. These errors, each standing alone, but especially when combined, undermine confidence in the verdict and require a new trial and sentencing proceeding for Mr. Fell.

## I.    Relevant Procedural History

### A.    Prior To Trial

Donald Fell and his best friend, Robert Lee, were arrested in Clarksville, Arkansas, on November 30, 2000, and charged with interstate kidnapping and car-jacking, in violation of 18 U.S.C. §§ 1201(a) and 2119. Mr. Fell was 20 years old. Mr. Fell was transferred to Vermont in connection with the deaths of Mr. Fell's mother, Debra Fell, and her friend, Charles Conway, as well as the kidnapping and death of Teresca King. Mr. Fell was presented in the District of Vermont on December 14, 2000 on these charges.

Under 18 U.S.C. § 3005, a capital defendant has the right to the appointment of two attorneys, "at least 1 [of which] shall be learned in the law applicable to capital cases," and the Federal Defender may make a recommendation as to the appointment of such counsel for the Court's consideration. The Federal Defender for the Northern District of New York and for the District of Vermont was Alex Bunin. Mr. Bunin recommended himself. At that time, and to this date (with the exception of the trial of Mr. Fell), he had never tried a capital case. See Declaration of Alex Bunin, Mar. 17, 2011 ("Decl. of A. Bunin") (Ex. 264). On December 5,

9

2000, Mr. Bunin sent a letter to Magistrate Judge Niedermeier and United States Attorney Charles Tetzlaff announcing that he "will personally seek appointment" on Fell's case if it "is prosecuted in the District of Vermont." Letter to Magistrate Judge Niedermeier from Alexander Bunin (Ex. 200); Letter to United States Attorney Charles Tetzlaff from Alexander Bunin (Ex. 201). On December 11, 2000, Mr. Bunin wrote to District Judge Murtha suggesting that he and his colleague from the Federal Public Defender Office in Albany, Gene Primomo, be appointed as counsel for Mr. Fell. Letter to District Judge Garvan Murtha from Alexander Bunin (Ex. 202). At that time Mr. Primomo had tried one federal capital case a decade earlier in Oklahoma.

On December 14, 2000, Mr. Bunin entered a Notice of Appearance to represent movant Donald R. Fell, Jr., who was facing potentially capital charges in this Court. On February 1, 2001, Mr. Fell and his codefendant were indicted on four counts, two of which were capital: carjacking with death resulting, and kidnapping with death resulting. See 18 U.S.C. §§ 1201(a), 2119.

From the outset, Mr. Bunin and Mr. Primomo focused their efforts on obtaining a guilty plea to life imprisonment without possibility of release, a resolution they had reason to believe the United States Attorney's Office would accept. Vermont does not have a death penalty, and the United States Attorney's Office had suggested they would be receptive to a resolution that did not involve that penalty. As a consequence, defense counsel devoted their entire effort to persuading the United States Attorney's Office's to accept a plea for less than death and to giving that Office the information counsel thought it needed to justify that decision. Accordingly, counsel undertook a preliminary investigation of Mr. Fell social history, hired mental health experts and prepared mental health reports. All of this was presented to the U.S. Attorney's Office in May 2001.

10

Long before trial counsel presented any mental health evidence, the conversations with the Government appeared to go well. The Government indicated it would be prepared to accept a package deal from Mr. Fell and his co-defendant Mr. Lee to plead guilty in exchange for life imprisonment. Mr. Lee hesitated, and was not prepared to accept that plea. However, in September 2001, after Mr. Fell's lawyers had submitted their expert reports to the Government, Mr. Lee died while incarcerated. On October 24, 2001, Mr. Fell signed an agreement to plead to life imprisonment, which was accepted by the United States Attorney's Office.

By the time Mr. Fell and the United States Attorney entered into the plea agreement, however, protocols had changed. The Department of Justice now had to affirm local decisions by the regional United States Attorney's Offices not to seek the death penalty in death-eligible cases. In January 2002, after a presentation by the Vermont United States Attorney's Office, Attorney General John Ashcroft rejected the plea agreement. Soon thereafter the Government filed a Notice of Intent to Seek the Death Penalty.

After the Government filed its Notice of Intent, the defense remained intent on seeking a guilty plea and avoiding trial before a jury. It negotiated with the United States Attorney's Office for an agreement that the penalty phase be tried before the bench following a guilty plea. On May 9, 2002, however, defense counsel were notified that the Attorney General had declined to authorize a bench trial on penalty, and that their case was on the path to a jury trial.

Shortly after the Attorney General vetoed the bench trial Mr. Bunin leaked an as-yet-unfiled motion to dismiss the notice to seek the death penalty. The motion contended that Mr. Fell had been prejudiced by the government's two reversals on a plea agreement. The motion included details of the Court's statements that it would accept a stipulation to waive a

11

jury trial – which had been placed under seal – as well as the details of the factual allegations Mr. Fell had been willing to admit. The leaked motion was reported in two prominent Vermont newspapers, the Burlington Free Press and the Rutland Herald. See Emily Stone, Government Should not Seek Death Penalty in Fell Case, Bunin Argues, BURLINGTON FREE PRESS (May 15, 2002) (Ex. 204); Alan J. Keays, Fell Makes Move to Avoid Receiving Death Sentence, RUTLAND HERALD (May 13, 2002) (Ex. 203).

After expressing concerns on the record about the leak of the motion and the tactics of the defense, this Court sua sponte appointed a third attorney, Paul Volk, to assist Mr. Fell. Mr. Volk had extensive trial experience in Vermont, and also had some post-conviction capital experience in southern state courts. However, he had never tried a death penalty case or been involved in any way in a federal capital trial.

In mid-2002, at the suggestion of the United States Attorney's Office, the defense made one more effort to secure a plea to life without parole or possibility of release. See Decl. of A. Bunin (Ex. 264 at 4). To that end, defense counsel consented to examinations of their client by two government mental health experts, Dr. Richard Wetzel, and Dr. John Rabun. The only conditions placed on the examinations were that defense counsel was to be present and that no questions were to be asked regarding the crimes themselves. Dr. Wetzel administered the first of the government's examinations on September 18-19, 2002, and Dr. Rabun then administered the second on December 12, 2002. Both experts concluded that there were mitigating facts in Donny's background and stated as much in their reports.

Trial counsel filed a motion to declare the federal death penalty unconstitutional on several grounds on May 28, 2002. The motion was granted in part on September 24, 2002 in a ruling that was promptly appealed by the Government. On March 2, 2004, a panel of the

12

Second Circuit reversed this Court's decision. On May 21, 2004, Mr. Fell's motion for reconsideration and rehearing en banc was rejected. On October 18, 2004, the Supreme Court denied Mr. Fell's petition for a writ of certiorari. On November 5, 2004, the case was remanded to this Court. United States v. Fell, No. 2:01-CR-12 (WKS), Docket No. 73 (Nov. 5, 2004) (Mandate docketed in the D. Vt., vacating and remanding for further proceedings).

During the entire period from July 2002 to October 2004 no work was done by Mr. Fell's lawyers or his mitigation specialist to prepare the case for trial.

On December 16, 2004, the parties appeared before this Court for a status conference. The Court suggested that the trial commence on April 18, 2005. Counsel represented that there was still significant investigative work to be done in preparation for trial but that it could be ready just a few weeks later in May 2005. Transcript of Status Conference at 3-4, Fell, No. 2:01-CR-12 (WKS) (Dec. 16, 2004) (requesting delayed trial date based on additional investigation to be done in preparation for trial). Although they had not spoken with their mental health experts since 2002, on December 1, 2004, the defense filed their notice of intent to offer expert mental health evidence in the penalty phase under FED. R. CRIM. P. 12.2.

Even at this juncture, five months prior to trial, the defense focused on resolving the case at the expense of trial preparation. In February 2005, after a new Attorney General, Alberto Gonzales, took office, trial counsel asked United States Attorney David Kirby to again request reconsideration of the earlier plea agreement. Letter to United States Attorney David Kirby from Alexander Bunin, Feb. 23, 2005 (Ex. 207 at FELL-00002118-2119). Trial counsel argued that three new circumstances warranted Attorney General Gonzales's acceptance of the plea: the results of the examinations by two government mental health experts that had taken place over a year earlier; Mr. Fell's good record in jail for the duration of his pre-trial detention;

13

and the Supreme Court's decision in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), which in Mr. Bunin's view would prohibit the government from introducing some of its intended evidence at any forthcoming penalty phase. Notably, trial counsel cited no new mitigation information that it had uncovered about Mr. Fell's life history or background, or the circumstances of the offense. None had been investigated. Between June 2002 and March 2005 trial counsel's mitigation expert did not conduct any interviews, a hiatus of almost three years. Declaration of Cynthia Ayres, Mar. 18, 2011 ("Decl. of C. Ayres") (Ex. 265). Trial counsel then hired an expert – psychologist Dr. Mark Cunningham – but he was not asked to develop a diagnosis of Mr. Fell's mental impairments, and he did not begin work on the case until June 10, 2005. Declaration of Dr. Mark Cunningham, Mar. 10, 2011 ("Decl. of M. Cunningham") (Ex.6). Trial counsel did not meet with Dr. Mills, the psychologist who had prepared a report years earlier in the case, until the day he was scheduled to testify. Declaration of Dr. Mark Mills, March 13, 2001 ("Decl. of M. Mills") (Ex. 260).

On May 4, 2005, with their mitigation investigation incomplete, and without knowing what their experts would testify to, defense counsel began individual voir dire of prospective jurors.

### B. Trial

Opening statements began on June 20, 2005.[1] Although Mr. Fell pled not guilty, Mr. Bunin began his case by admitting all of the elements of the charged offense, as well as to his client's culpability in the uncharged deaths of Debra Fell and Charlie Conway. Tr. Vol. I-I at 55:23-57:20 (June 20, 2005). Without presenting any guilt phase defenses, Mr. Bunin focused

his introduction on Mr. Fell's background and family life – themes about which no evidence would be presented at this time. This beginning prompted two interruptions by the Government, which objected to the mitigation evidence as irrelevant at the guilt phase. Id. at 45:20-54:9. In sustaining the objections, this Court expressed confusion at the defense strategy and wondered openly to counsel why it was necessary to have a guilt phase. In a subsequent sidebar, the Court questioned whether the opening was a "judicial admission." Id. at 60:15-17.

The Government's case proceeded smoothly, with defense counsel generally declining to cross-examine government witnesses. The jurors were not presented with any affirmative defense or even rebuttal, and on June 24, 2005, they returned a verdict of guilt.

The penalty phase began on June 28. After an initial charge in which each of the mitigating factors alleged by the defense were carefully enumerated, the defense opened its case with a statement that promised a number of elements, including lay testimony about Donny's devastating family life and extensive substance abuse, and evidence of his positive adjustment to the structured life of imprisonment and resultant lack of any future danger. Counsel also promised the expert testimony of Dr. Mark Mills, a psychiatrist, and Dr. Mark Cunningham, a forensic psychologist. The government proceeded to present several witnesses in support of the eligibility factors and several aggravating circumstances. Trial counsel did little to challenge any of the evidence the prosecution presented in aggravation, or to minimize its prejudicial impact.

On July 1, 2005, defense counsel began to present their case for a sentence of less than death. Counsel restricted their presentation to evidence about Mr. Fell prior to the age of 15. They called two members of Mr. Fell's family who described his parents' alcohol problems;

---

[1]    Voir dire began on May 4, 2005 and continued through June 6, 2005. Trial counsel were expressly permitted to ask case-specific questions of the prospective jurors. Fell v. United States, 372 F. Supp. 2d

15

two police officers who had been involved in domestic incidents in Donny's early childhood home; two social services agents who discussed the family's involvement with child protective services as well as an early sexual assault; a kindergarten teacher, a fifth grade teacher, and a teacher from the institution where Donny was sent as an adolescent when his mother abandoned him; three correctional officers from the local jail; and an expert witness who opined about Mr. Fell's capacity to do well in prison. Trial counsel also provided the jurors with a binder of collected materials from Mr. Fell's life, many of which were quite dense or practically illegible, and several of which were not contextualized by any of the testimony. The case for Mr. Fell's life consumed about three trial days, and resulted in the withdrawal by the defense of two of the mitigating circumstances presented to the jurors in the initial charge. A third mitigating circumstance was substantially reframed.

An enormous amount of relevant, compelling mitigating evidence about Mr. Fell was not presented. Although counsel knew that Mr. Fell's mother had a very severe alcohol problem and drank while pregnant with Mr. Fell, they inexplicably failed to present any evidence whatsoever about his Fetal Alcohol Spectrum Disorder ("FASD"). This evidence would have accounted for the inappropriately flat affect that was misunderstood by nearly everyone as a sign that Mr. Fell lacked remorse. The jury learned nothing about Mr. Fell's mood disorder, the symptoms of which were amply documented in records in trial counsel's possession. If developed and presented, this evidence would have provided an explanation for Mr. Fell's history of impulsivity, impaired judgment, and acting-out behavior.

Donny's traumatic experiences were not limited to the single episode of sexual assault mentioned at trial. Not only were there additional and even more horrific sexual assaults

766 (D. Vt. 2005).                    16

that went undiscovered and not presented by trial counsel, but a truly staggering array of other instances of trauma were unexplored, including terrifying neglect and psychological cruelty. More critically, the jury learned nothing about the impact of this trauma history on Mr. Fell and his life, including the fact that his experiences of chronic trauma caused Mr. Fell to suffer from impairments which affected his behavior.

Because trial counsel confined its presentation to evidence about who Mr. Fell was prior to the age of fifteen, they omitted critical evidence of his horrific adolescent home and worsening mental illness leading up to his decision to move to Vermont. No information was presented on the history of the relationship between Mr. Fell and his co-defendant, with whom he'd been close since they were little children, and whom the government portrayed as the lesser actor in the offense.

Although it was explicitly promised in the defense opening statement, no expert testimony was presented about Donny's mental or emotional vulnerabilities. Indeed, the treatment of mental health evidence and experts was a particularly important and contentious issue during the penalty phase. Defense counsel did not have timely access to crucial mental health reports prepared by the government's expert witnesses. First, the report prepared by Dr. Wetzel concerning his June 13, 2005 interview with Mr. Fell was not delivered to the defense until June 29, after the penalty phase of the trial had already begun. Tr. Vol. VI at 104:8-105:11 (June 29, 2005). Second, the report of Dr. Welner, the expert the government retained to testify in rebuttal to the defense case, was not disclosed until 9:30 p.m. on the night of July 5, 2005 – four days after the date by which the Court ordered the report to be disclosed, and four days after the defense had begun their penalty phase presentation. Tr. Vol. VIII-2 at 69:7-9 (July 6, 2005).

17

On July 6, this Court raised concerns regarding the communication between Drs. Welner and Wetzel prior to Dr. Wetzel's interview of Mr. Fell, plus an additional concern that DR. Welner's potential testimony had been partially stricken as inadmissible in the recent Sampson case. Tr. Vol. VIII-2, at 69:7-85:19 (July 6, 2005). Noting the insufficiency of the scant briefing then before it, this Court scheduled a Daubert hearing for the Welner testimony for July 11, 2005. That hearing was also meant to encompass arguments on other improprieties in the Government's use of Dr. Welner. Before that hearing could be held, however, during the lunch break on July 7, defense counsel suddenly withdrew its Rule 12.2 Notice after reversing course and deciding that they would provide no expert mental health testimony to the jury after all. The Government continued to press its desire to present some version of Dr. Welner's testimony, and before this Court could rule on whether any part of Dr. Welner's testimony would be admitted, defense counsel stipulated that Mr. Fell suffered from no mental impairments – even though they possessed evidence to the contrary. That stipulation was the last item read to the jurors, and plainly stated that Mr. Fell "had no cognitive or neurological deficits," "his intellect and cognitive functions were intact," and "he did not suffer from any mental disease or defect." Tr. Vol. XI at 93:22-94:12 (July 12, 2005). This directly contradicted counsel's opening statement.

On July 14, 2005, the jurors returned a verdict of death.

### C.    Post-Trial

On August 25, 2005, defense counsel filed a Motion for a Judgment of Acquittal and a New Trial. The motion contended that the government had disobeyed a court order that only Dr. Rabun or Dr. Wetzel could perform Mr. Fell's mental health examination, United States v. Fell, 372 F. Supp. 2d 753, 761-62 (Apr. 7, 2005), and lied about its compliance with 12.2

18

when it arranged for Dr. Wetzel to ask Mr. Fell questions on behalf of Dr. Welner. Counsel further argued that the government advanced inconsistent positions during plea bargaining and the sentencing phase when it refused to acknowledge mitigating factors that it described in the plea agreement it drafted. Finally, the motion argued that the government improperly told the jury to disregard mitigating factors that were not directly related to Mrs. King's death in its closing argument during the sentencing phase.

On April 26, 2006, the Court found serious error but nevertheless denied the motion. Fell, No. 2:01-CR-12, 2006 U.S. Dist. LEXIS 24707 (D. Vt. Apr. 26, 2006). It found that the Government had in fact violated the Court's order in its use of Dr. Welner, id. at *26, but faulted defense counsel for abandoning its opposition to Dr. Welner's testimony with the withdrawal of the Rule 12.2 notice and thus found these arguments waived. Id. at **31-32. The Court sentenced Mr. Fell to death on June 16, 2006.

Mr. Bunin remained on the case for appeal and was joined by longtime capital expert and Cornell Law Professor John Blume, who was assisted by Cornell Law Professors Christopher Seeds and Sheri Johnson. Noting that the majority of the claims raised on appeal had not been preserved at trial and thus were subject to plain error review, the Second Circuit affirmed the conviction and death sentence on June 27, 2008. Fell v. United States, 531 F.3d 197, 209 (2d Cir. 2008). Regarding mental health evidence, the Second Circuit agreed with the Court's conclusion that the defense had waived its claim of misconduct when it decided to withdraw any expert evidence on Mr. Fell's mental condition. En banc rehearing was denied on June 17, 2009, with one dissent arguing the important federalism concerns presented in this prosecution, given that the State of Vermont has no death penalty. Mr. Fell's petition for writ of certiorari was denied on March 22, 2010.

## II.    Legal Standards for Ineffective Assistance of Counsel and Prosecutorial Misconduct

The law applicable to this motion is, for the most part, well established. The proceedings in this case were marred by the twin errors of ineffective assistance of counsel and prosecutorial misconduct. Each of these principles shares certain similarities: each is addressed to those constitutional errors by defense counsel and the prosecution, respectively, that undermine confidence in the jury's judgment; and each requires vacatur of the judgment when there is a reasonable probability that, but for the constitutional error, the result of the proceeding would have been different – a standard that is met in a capital case when the court is able to find that just one juror's vote would have been different. In the case of prosecutorial misconduct, other than Brady violations, the movant need only show that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury.

In this case, as set forth in this motion, there is powerful evidence of ineffective assistance and prosecutorial misconduct. Any one of the three types of conduct identified below would require that the death sentence be vacated. All three together certainly do.

### A.    Ineffective Assistance of Counsel

It should be obvious "that the need for procedural safeguards is particularly great where life is at stake. . . . Time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case." Barefoot v. Estelle, 463 U.S. 880, 913-914 (1983) (Marshall, J., dissenting). Indeed, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U.S. 992, 998-999 (1983). Thus, the Supreme Court has not hesitated to vacate death sentences where counsel's assistance was deficient. See, e.g.,

20

Sears v. Upton, 130 S. Ct. 3259 (2010) (finding ineffective assistance where counsel failed to present mitigating evidence); Porter v. McCollum, 130 S. Ct. 447 (2009) (vacating death sentence for counsel's failure to uncover and present mitigating evidence, despite presentation of some mitigating evidence); Rompilla v. Beard, 545 U.S. 374 (2005) (finding prejudicial ineffective assistance where counsel failed to investigate or examine court files of prior conviction on which prosecution relied as aggravating factors warranting death sentence); Wiggins v. Smith, 539 U.S. 510 (2003) (vacating death sentence for ineffective assistance where counsel failed to investigate and present mitigating evidence of dysfunctional background); Williams v. Taylor, 529 U.S. 362 (2000) (vacating death sentence where defendant was denied effective assistance of counsel when his trial lawyers failed to investigate and present mitigating evidence); Estelle v. Smith, 451 U.S. 454 (1981) (affirming vacatur of death sentence where, inter alia, defendant was denied effective assistance of counsel).

When counsel's deficient performance results in prejudice, the defendant's Sixth Amendment right to effective assistance of counsel is violated, mandating vacatur. Strickland v. Washington, 466 U.S. 668, 687 (1984). Whether counsel's performance is deficient is "measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla, 545 U.S. at 380 (citing Strickland, 466 U.S. at 688; Wiggins, 539 U.S. at 521 (2003)). "Prevailing norms of practice as reflected in American Bar Association standards and the like … are guides to determining what is reasonable." Strickland, 466 U.S. at 688-89. The existence of prejudice derived from such deficient performance turns on "whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Rompilla, 545 U.S. at 390 (citing Strickland, 466 U.S. at 694). In a capital case, deficient performance results in prejudice where "there is a reasonable probability

21

that at least one juror would have struck a different balance" between the aggravating and mitigating evidence in the absence of the deficiency. Wiggins, 539 U.S. at 537.

In a capital case, a lawyer is obligated, among other things, to investigate both aggravating and mitigating evidence. Rompilla, 545 U.S. at 374, 377. Moreover, it is well established that in a capital case, counsel does not discharge his or her duties to provide constitutionally effective representation merely by the presentation of some mitigation evidence. "[T]he prejudice inquiry under Strickland [is not limited] to cases in which there was only 'little or no mitigation evidence' presented." Sears, 130 S. Ct. at 3266 (citations omitted). The Supreme Court has also "found deficiency and prejudice in . . . cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." Id.; see also Walbey v. Quarterman, No. 08-7007, 2009 WL 113778, at *7 (5th Cir. 2009) (stating that "counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented" and "prejudice is still possible if that evidence is substantially incomplete") (internal citations omitted) (citing Williams, 529 U.S. 362); Porter, 130 S. Ct. at 453-54 (ruling that trial counsel was ineffective for attempting to blame his client's bad acts on his drunkenness, and had failed to discover significant mitigation evidence relating to his client's heroic military service and substantial mental health difficulties that came to light only during post-conviction relief).

Thus, constitutionally ineffective assistance can arise not only when counsel fails to present a mitigation case, but when counsel fails to conduct an "investigation supporting their decision not to introduce mitigating evidence . . . [that] was itself reasonable." Wiggins at 511 (emphasis in original). The question is "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate

22

further." Id. at 539. Where the failure to investigate "result[s] from inattention, not reasoned strategic judgment," a claim of ineffective assistance of counsel may lie. Id. at 526.

### B.    The Government's Brady Obligation

The Supreme Court has been equally steadfast in addressing claims of prosecutorial misconduct in capital cases. It would be, and has been, intolerable for a sentence of death to be executed when the prosecutor has failed to abide by the high standards set forth in our Constitution. See Caldwell v. Mississippi, 472 U.S. 320 (1985) (vacating death sentence procured in part by prosecutorial misconduct).

Those standards include several components. The Government is obligated to turn over evidence that is favorable to the defendant and material to guilt or punishment, regardless of the good faith or bad faith of the prosecution, and whether or not the material was requested by the defense. Brady v. Maryland, 373 U.S. 83 (1963). This obligation includes the affirmative duty to learn about evidence favorable to the defense in the possession of law enforcement agencies, whether as to liability or punishment, including impeachment material, and disclose that evidence to defense counsel. Banks v. Dretke, 540 U.S. 668, 696 (2004); Strickler v. Green, 527 U.S. 263 (1999); Kyles v. Whitley, 514 U.S. 419, 437 (1995); Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) ("An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police'") (quoting Kyles v. Whitley, 514 U.S. 419 (1995)).

Moreover, it is not sufficient under Brady and Giglio that the Government turn over exculpatory material at any time before the jury is discharged or before it is seated. Brady

23

is a rule that is intended to ensure that trials are fair and find the truth. "Thus, the Government must make disclosures in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007). The failure to turn over exculpatory or mitigating evidence on a timely basis sufficient for defense counsel reasonably to be able to use such information violates Brady. Nor is it sufficient that the Government turn over general information. As the Second Circuit has again made clear, "disclosures must be sufficiently specific and complete to be useful." Id. at 226.

Furthermore, evidence required to be disclosed is not limited to that which would be admissible. Id. at 226 n.4. Brady and its progeny require disclosure of exculpatory and/or impeachment materials of witnesses, regardless of whether the witnesses testify at trial or whether the evidence would have been admissible. Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (per curiam) (finding that inadmissible evidence that would have led to admissible evidence is material for Brady purposes); Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) (finding a Brady violation and granting habeas based on prosecution's failure to disclose a non-testifying witness's observations of the crime scene that were favorable to the defense and contradicted two eyewitnesses who testified for the prosecution).[2]

---

[2]   Notwithstanding the materiality requirements of Brady, the Government is required to turn over all favorable evidence under prevailing ethical and statutory obligations. See Cone v. Bell, 129 S. Ct. 1769, 1783 n.15 (2009) (although Brady and progeny only mandate the disclosure of material evidence, "the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations"(citing Kyles, 514 U.S. at 437 ("[T]he rule in Bagley(and, hence, in Brady requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)")).  ABA Model Rules provide that "[t]he prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal"). Id. (citing ABA Model Rule of Professional Conduct 3.8(d) (2008)(emphasis added).

24

Finally, in a capital case, the Government's obligations are not limited to turning over that evidence which is mitigating as to the issue of guilt or innocence. The Government is also obligated to turn over any evidence in its possession or in the possession of those acting on its behalf that would be mitigating as to the issue of sentence. Cone v. Bell, 129 S. Ct. 1769 (2009); Banks, 540 U.S. at 691 (applying Brady to failure to disclose witness's paid police informant status for purposes of penalty phase of capital case); Brady, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment.").

Accordingly, to establish a Brady violation, a movant need only show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant as to guilt or punishment; and (3) that the evidence was material. The good or bad faith of the prosecution is irrelevant. Indeed, the materiality requirement is met when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Amiel, 95 F.3d 135 (2d Cir. 1996) (citing United States v. Bagley, 473 U.S. 667, 682 (1985)). Further, the case law holds that a movant can demonstrate a "reasonable probability" of a different result when it is shown that the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 434 (1995) (citing Bagley, 473 U.S. at 678). The movant need not show that it is "more probable than not" that had the evidence been disclosed the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, Kyles, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Id. at 441. If so, the sentence and/or conviction must be vacated.

25

### C.    The Government's Prohibition from Securing a Conviction with False Evidence

In addition to its <u>Brady</u> obligations, the Government is prohibited from soliciting or failing to correct evidence from witnesses that it knows or should know to be false, failing to disclose impeachment evidence, and using any other improper methods to produce a conviction. <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Berger v. United States</u>, 295 U.S. 78 (1935). The test is not whether the witness was lying or even knows that his testimony is false, but whether the Government is putting before the jury information it knows or should know to be false. As the Second Circuit has held, "[w]here the prosecution knew or should have known of the perjury, a new trial is warranted if 'there was any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>United States v. Wong</u>, 78 F.3d 73, 81 (2d Cir. 1996) (internal quotations omitted); <u>Drake v. Portuondo</u>, 321 F.3d 338, 346 (2d Cir. 2003); <u>see also</u> <u>United States v. Albanese</u>, 195 F.3d 389, 393 (8th Cir. 1999) (noting that "a prosecutor may not knowingly, recklessly, or negligently introduce perjured testimony"); <u>United States v. Tierney</u>, 947 F.2d 854, 860-61 (8th Cir. 1991) (holding that where "the government knowingly, recklessly or negligently used…false testimony," vacatur is required if defendant shows "any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal citations and quotation omitted); <u>United States v. Harris</u>, 498 F.2d 1164, 1169 (3d Cir. 1974) ("Regardless of the lack of intent to lie on the part of the witness, <u>Giglio</u> and <u>Napue</u> require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . [W]hen it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the

26

Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury.").

Moreover, in keeping with the nature of the error, the standard of materiality for a Napue claim is more relaxed than that for a Strickland claim. Whereas the movant must prove that there is a reasonable probability that the juror's decision would have been different to establish a Strickland or Brady claim, to establish a Napue claim the movant need only show that there is any "reasonable likelihood that the false testimony could have affected the judgment of the jury." Wong, 78 F.3d at 81. The Second Circuit has explicitly recognized that "[t]his standard of materiality . . . is less exacting than in the case of a prosecutor's failure to perform Brady or Giglio obligations." United States v. Spinelli, 551 F.3d 159, 166 (2d Cir. 2008).

## III.   Trial Counsel's Failure to Investigate and Present Readily Available Mitigation Evidence was Ineffective Assistance of Counsel in Violation of Mr. Fell's Sixth and Eighth Amendment Rights[3]

In a capital case, reasonable defense counsel have a duty to conduct extensive life-history investigations to mine whatever information is available to them for deployment in their case for life, as well as a constitutional obligation to investigate the available aggravating and mitigating evidence. See Rompilla, 545 U.S. 374; Wiggins, 539 U.S. at 524. As explicated below, for a confluence of reasons that did not happen here. Although trial counsel had prepared a case that they had hoped would satisfy the Vermont U.S. Attorney's office for purposes of plea negotiations, trial counsel did not prepare a penalty phase case that was appropriate for the adversarial nature of a capital trial. Indeed, knowing that their presentation had failed to successfully produce a negotiated sentence of less than death, and having the luxury of several

27

years in which to build the better case that was readily available, trial counsel presented at trial

nearly exactly the same information that it had provided in support of a plea in 2001, minus the

expert mental health evidence. Trial counsel's failures to investigate their case – and their

decision instead to present a case which they knew had failed – constituted ineffective assistance

of counsel.

Because of this ineffective assistance of counsel, the jurors and this Court were

prevented from learning critical mitigating truths about the person who has now been sentenced

to death, and were left with damaging distortions. Had counsel conducted the objectively

reasonable investigation required by the Constitution, the jury would have learned all of the

following:

- Donald ("Donny") Fell was born on April 30, 1980, in Wilkes-Barre, Pennsylvania, into a family plagued with long histories of mental illness, suicide, alcoholism and substance abuse on both sides.

- From the beginning, Donny's life has been surrounded and shaped by alcoholism, substance abuse, mental illness, childhood neglect, and family violence, set against the backdrop of Luzerne County, Pennsylvania. Luzerne County is an old coal mining and industrial area that has been in economic decline for decades, and is overwhelmed with deep-seated poverty, unemployment, government corruption, alcoholism, drug addiction and extreme violence.

- Mr. Fell's parents, Donald Fell Sr. ("Don Sr.") and Debra Kotzer Fell ("Debra"), were chronic alcoholics who fought violently with each other and neglected their children – Donny and his younger sister Teri Fell.

- Debra drank heavily during her pregnancy with Donny, as she did with his sister Teri.

---

[3] Section 2255 counsel's investigation into Mr. Fell's life history remains ongoing, and counsel anticipate supplementing Mr. Fell's request for relief as a result of information learned through discovery, further investigation, or litigation of this motion.

28

- Because of the severity of the abuse and neglect in Donny's home, the local law enforcement agencies became involved in their lives when Donny was only two years old.

- In 1985, when Donny was four and his sister two, the children revealed to authorities that they had been repeatedly sexually assaulted and physically abused by their babysitters. Even at this young age, Donny displayed signs and symptoms of chronic exposure to trauma.

- Soon after the sexual assaults came to light, Donny's mother Debra stabbed her husband Don Sr. in the back in a drunken rage, and Don Sr. retaliated by stabbing her in the leg. Concerns were raised about Don Sr. and Debra's alcoholism and family violence in front of Donny, but the local Children and Youth Services agency ("CYS") failed to meaningfully intervene in the family, and the traumas continued to mount.

- At age 7, Don Sr. and Debra moved Donny and his sister to the rough north Wilkes-Barre neighborhood where Donny spent most of the rest of his life. His parent's alcoholism and violence increased, and police were called regularly to break up their fights. Among other violent acts, Debra again stabbed her husband in front of their children, this time deep into his arm, traumatizing them again.

- Whereas the violence between the parents was well documented, the parents' violence against their children was largely overlooked by the authorities. Donny tried to protect himself and his sister from their parents' abuse by finding places to hide. CYS reopened their case on the family, bringing dependency proceedings in hopes of ameliorating the situation, but again failed.

- Contrary to what was presented at trial, Donny's life did not improve after Don Sr. left the household. Donny's life worsened in the quality and range of his abuse and neglect at the hands of his mother, her boyfriend, and all of his subsequent guardians. Donny's mother was a violent, aggressive, and disturbed woman who physically, emotionally, and sexually abused her children and harbored a lifelong addiction to drugs and alcohol that lasted well after Don Sr.'s departure.

- Contrary to what was presented at trial, Debra Fell's live-in boyfriend following her husband's departure, Ellery "Al" Wilcox, was not a role model for Donny. Mr. Wilcox was a hard-drinking member of a motorcycle gang. Al Wilcox set about beating respect into Donny on multiple occasions (age 11), but he had a special affection for Teri (age 9). Al had Debra molest Teri as he watched. When Donny tried to object, he was beaten. Debra and Al

29

continued to drink heavily and fight, requiring police and CYS intervention on several occasions.

- Debra and Al regularly abused and neglected Donny, and things got so bad that he began displaying undeniable signs of a mental illness. He was institutionalized four times within a span of two years between the ages 11 and 13, each time for about a month. However, each time he returned he was helplessly exposed to the same violent and chaotic home life.

- When Donny was age 13 (and his sister age 11), his mother lost custody of them. Donny and his sister were to be placed with their maternal grandmother, Theresa Sharpe, but Theresa, who had always favored Teri, refused to take Donny. Theresa, built up by the Government as a loving foster parent, was a drinker herself and wanted little to do with Donny. Donny was thus placed in a juvenile residential facility called St. Michael's School for over a year, when he was 13.

- Just as Mr. Fell's father had done three years earlier, Debra succumbed to her alcoholism and illness and was homeless for a while, sleeping under a bridge in Wilkes-Barre. She eventually ended up in Rutland, Vermont.

- After Theresa passed away from cancer, Donny and his sister were placed with their mother's sister, Jackie Sharpe, who was 21 years old.

- Mr. Fell was left to fend for himself because Jackie Sharpe was a mentally ill, violent and volatile young woman who was arguably more physically and emotionally abusive than Donny and Teri's parents had ever been. Although not presented at trial, it would have been undisputed that Jackie had been behaving strangely and having violent rages since she was a child. The violence and abuse Donny suffered at the hands of Jackie broke young Donny to the point where he contemplated suicide.

- When Donny was 17, Jackie Sharpe threatened to stab him with a pair of scissors and ultimately kicked him out – leaving him homeless. Donny was forced to stay intermittently with friends and relatives, working on a traveling carnival up until the end of the summer of 2000, when he decided to try to renew his relationship with his mother. He moved to Vermont in September of that year, about two months before the crimes.

30

- In addition to the above, had counsel conducted a reasonable investigation, the evidence would have further showed – contrary to what was stipulated at trial – that Mr. Fell was and is profoundly mentally impaired. [4]

In short, at the time the crimes were committed Donald Fell was a deeply damaged individual who never had a chance in life. During those few moments when he had a refuge from the family and home, he responded positively. He did not have a criminal record of any substance. But from prior to birth, his life was marked by familial violence, alcoholism and substance abuse, and chaos.

Only a truncated, incomplete and distorted portion of Mr. Fell's life was presented at trial, which permitted the Government to turn mitigation to aggravation and argue that Mr. Fell was presenting an "abuse excuse." His dreadful infancy, childhood, and youth left him an impaired individual and fundamentally mitigated the sentence he should receive in this case. Had trial counsel effectively investigated their case, they would have put on a very different picture of Mr. Fell, in which case there would have been a reasonable probability of a different outcome. Their failure to do so is inexcusable, and the resultant conviction and death sentence are due to be reversed.

### A.   Counsel's Lay Mitigation Investigation Was Deficient In Violation of the Constitution

Trial counsel conducted a preliminary investigation that left the Justice Department believing that the death penalty was appropriate, and then never did anything to further investigate the mitigation case that was available to be presented at trial.

---

[4]   Trial counsel's failure to thoroughly investigate Mr. Fell's social history also contributed to their failure to understand and investigate Mr. Fell's mental health issues. Counsel's separate and additional ineffectiveness in this regard is set out infra

31

In the over four-and-a-half years that trial counsel had from arrest to trial, trial counsel failed to investigate Mr. Fell's social history, and consequently failed to present a reliable and coherent case for life that was supported by the strong testimony that was available. Trial counsel failed to collect important records which were readily available and would have shed valuable mitigating light on various aspects of Mr. Fell's social history. Counsel failed to conduct a reasonable review (or in some cases, any review) of the relevant documents in order to mine them for the mitigating evidence within. Trial counsel also, and as a consequence, failed to follow up on any of the numerous tips and leads that were contained in the records that they did actually collect. They were of course further unable to follow up on the additional leads that were available in documents that they objectively should have obtained but failed to collect. As a result, even many of the mitigating documents counsel had in their possession did not serve to inform the scope of the mitigation investigation and were not presented to the jury.

Trial counsel's limited understanding of Mr. Fell's life led them to present a misleading and inaccurate depiction of it. These deficiencies led to a distorted balance of the aggravating and mitigating factors, and resulted in Mr. Fell's death sentence.

Trial counsel's investigation of Mr. Fell's personal history, which fell far short of the prevailing professional standard,[5] proceeded as follows. In 2001, after Mr. Fell was indicted, trial counsel hired a mitigation specialist, Cynthia Ayres, to undertake the mitigation investigation. The primary work of locating the mitigation evidence was Ms. Ayres' responsibility on the team. Trial counsel traveled to Wilkes-Barre for only a few meetings with

---

[5]    See Wiggins, 539 U.S. 510 (vacating death sentence for ineffective assistance where counsel failed to investigate and present mitigating evidence of dysfunctional background); Sears, 130 S. Ct. 3259 (ineffective assistance where counsel failed to present mitigating evidence); see also Walbey, 309 F. App'x at 802 ("counsel can be prejudicially ineffective even if some of the available mitigation evidence is

32

family members and witnesses that had been set up by Ms. Ayres. After hiring her, however, trial counsel did nothing to guide Ms. Ayres investigation, to direct her to interview those witnesses who would be necessary or useful at trial, to obtain the records that could be used at trial or would contain further leads, or to ensure that she conduct a thorough investigation. Counsel provided no direction or feedback to Ms. Ayres regarding whom to interview or what to investigate. Indeed, trial counsel did not schedule or conduct regular team calls or meetings, or adopt any other protocols to ensure that the team was working together to present the strongest possible mitigation case, as directed by Revised ABA Guideline 10.11. Declaration of Cynthia Ayres, Mar. 18, 2011 ("Decl. of C. Ayres") (Ex. 265 at 6). Instead, Ms. Ayres was left to communicate with trial counsel through sporadic phone calls.

Although the crimes occurred in Vermont and New York, and nearly every day of Mr. Fell's life was lived in Wilkes-Barre, Pennsylvania, Ms. Ayres was based in Williamsburg, Virginia. She is a trained mitigation specialist who has been involved in many capital cases. However, under defense counsel's watch, between 2001 and mid-2005, Ms. Ayres met with Mr. Fell all of three times. Her work in this case developed in three phases:

- During the first half of 2001, Ms. Ayres conducted a preliminary mitigation investigation in support of a request to plead guilty that was ultimately rejected;

- During two months in 2002, Ms. Ayres attended a few meetings; and

- During the first half of 2005, Ms. Ayres assisted on the trial preparation and was effectively unable to follow any new leads. During that same time period, she was also working on another capital case in Virginia.

---

presented" and "prejudice is still possible if that evidence is substantially incomplete.") (internal citations omitted); see also ABA Guideline 10.7.

Counsel never had her conduct a thorough or objectively reasonable mitigation investigation. By the time she was brought back into the case, trial was imminent and there was no time for such a project.

Ms. Ayres did not work on the case from late June 2001 through late April 2002. Thereafter, when a firm trial date was briefly set, counsel had her work on the case for about half of a week. Counsel did not have her do any further work whatsoever on the case until January 2005, when she attended a team meeting. It was during this interim that the case was stayed pending resolution of the constitutionality of the Federal Death Penalty Act. Although she contacted trial counsel during this time to see if there was something that she should be doing, counsel told her that she should not do any work. This interim period between June 2001 and 2005 was a time when the witness relationships and mental health issues could have been explored with painstaking detail and meticulous attention to all possible leads with the time to pursue them. Indeed such a stayed proceeding was an unparalleled luxury in a capital mitigation case. Not only did trial counsel fail to conduct the investigation that would have been possible, it failed to conduct any investigation at all.

When counsel directed Ms. Ayres to work again on the case in 2005, it was five weeks before the start of jury selection and she was working intensively on another capital case. Not including her travel time, Ms. Ayres booked 55 hours of work on Mr. Fell's case during this period. Decl. of C. Ayres (Ex. 265 at 3). That time was devoted to trial preparation. Ms. Ayres did not have the time to conduct a full or reasonable social history, and no one else on the defense team did either. Id.

Indeed, at no point did trial counsel investigate the aggravating factors it expected the Government to present in the case or direct Ms. Ayres to do so either. Id.; Decl. of G.

34

Primomo (Ex. 263 at 1). As a result, counsel did not develop an approach to rebutting the Government's aggravation case, or even ensuring its accuracy.

As late as the spring of 2005, counsel had neglected to obtain relevant and obvious records regarding mitigation. It was not until well after the Court had set a trial date and until after Ms. Ayres became re-engaged in the case – and even then not until the eve of trial – that anyone on the defense noted this plain deficiency. Even then it was only Ms. Ayres who noted it. On March 31, 2005, Ms. Ayres interviewed Mr. Fell's caseworker at CYS for the first time. Decl. of C. Ayres (Ex. 265 at 4). No one had bothered to talk to her previously. It was then apparent for the first time that CYS "Contact Sheets" which include the caseworker's contemporaneous handwritten notes were never retrieved by trial counsel, nor was the documentation of anonymous calls to the child abuse hotline regarding the Fell family. The late collection of these materials, which included hundreds of pages of difficult to read and handwritten material, on the eve of trial made it difficult to properly digest the information, to effectively utilize it during the trial, or to incorporate it into the mitigation narrative presented at trial. The belated collection and review of these documents also prevented trial counsel from following up on the new information they contained. Id. at 5.

Similarly, trial counsel did not obtain documents from the Victims Resource Center ("VRC") for Donny or his sister Teri until the eve of trial even though they should have. Id. at 4. Despite awareness that this agency had relevant documents regarding Donny and Teri's treatment following their childhood sexual abuse, these documents were not requested, received or reviewed until late spring 2005. Id.; Ex. 88 at FELL-00001265.

Due to their deficient investigation, trial counsel was not prepared to put on the available and robust mitigation case that was necessary in the face of a death-qualified jury and

35

thus failed to do so. Counsel was also wholly unprepared to respond to the Government's aggravation case. While they had collected some records, they had not invested the time necessary to review them thoroughly and had simply not performed the follow-up investigation that the content of those records compelled. They had interviewed some witnesses, but had not developed a rapport with them such that trial counsel could get the depth of the information the witnesses could have revealed. A reasonable attorney would have done so. As a result, trial counsel did not construct the case for life that they could have presented with the materials they had and the mitigation case they put on at trial was a distorted, incomplete, and unreliable version of Mr. Fell's social history.

### B. Mr. Fell Suffered Prejudice As a Result of His Counsel's Deficient Performance

#### 1. Trial Counsel Were Ineffective For Failing to Investigate and Present Relevant and Material Mitigation Testimony From Lay Witnesses

##### a. Background

Defense counsel presented at trial a fundamentally incomplete, misleading and truncated version of the horror that was Mr. Fell's life. Although Mr. Fell's lawyers called some witnesses to testify to his life prior to the age of ten when his father was still at home, none of the defense witnesses testified on direct to information about Mr. Fell after the age of fifteen and even the presentation of Mr. Fell's life prior to age ten was substantially incomplete. It left the jury without the readily available information necessary to judge the person whose life was in their hand.

The trial presentation of Mr. Fell's life history was misleadingly incomplete. In summary: Mr. Fell's older half-sister, Susan Benczkowski, who lived with Don Sr. and Debra for about six months when Mr. Fell was first born, described Don Sr. and Debra as violent

36

alcoholics and testified that Debra drank during her pregnancy. Tr. Vol. VII-1 at 57:22-58:6; 65:12-24 (July 1, 2005). Teri Fell, Mr. Fell's younger sister, testified about their childhood with their parents and their mother's boyfriend. Id. at 75:15-104:25 (July 7, 2005).

Deanna German testified that she was the social worker directly involved with the Fell family from when Mr. Fell was ten to twelve years old and read from records that she created during that time, as well as from Mr. Fell's hospitalization records which she had never before seen. Tr. Vol. IX-1 at 27:16-58:13 (July 7, 2005). She described records revealing the fact that Mr. Fell and his little sister had been sexually assaulted when they were four and two. No other testimony about this fact was ever introduced, although the Government used testimony by Mr. Fell's kindergarten teacher to argue that he was unscathed by the molestation. Tr. Vol. XII at 54:25-55:2 (July 13, 2005). Ellis Carle, also a social worker, described how he helped remove the children after the parents stabbed each other during a fight shortly after the rapes, when Mr. Fell was about four years old. Tr. Vol. VII-2 at 49:19-59:12 (July 1, 2005). He also testified that when Debra lost custody of her children, Mr. Fell was first housed in a juvenile facility and then placed with his Aunt Jackie at age fifteen. Id. at 59:13-71:2.

Police Officers Czanker and Purcell testified that they independently responded to reports of domestic abuse at the trailer when Mr. Fell was nine and ten years old, as well as about their involvement in a couple of domestic disputes at the Fell home during that time. Id. at 6:10-26:25 (Czanker; also recounting Don Sr.'s two arrests for DUIs); id. at 34:10-46:17 (Purcell; also recounting arrest of Don Sr. on assault charges in October 1990).

Two grade school teachers, Sharon Hinchey and Mary Grace Loncoski, described Mr. Fell as an engaged schoolboy at ages five and ten. Tr. Vol. VIII-1 at 10:9-14:15, 22:5-24:2 (July 6, 2005); id. at 28:8-39:2. In addition, William Kane, a child care and social worker at St.

37

Michael's, the juvenile residential treatment facility where Mr. Fell was sent after having been abandoned, testified about Mr. Fell's life there as a fourteen to fifteen year old, from April 1994 to August 1995. Tr. Vol. IX-2 at 10:23-15:1 (July 7, 2005).

In addition to these witnesses, the defense counsel submitted into evidence a binder of documents that they called the "Mitigation Binder" which included a variety of social services reports and evaluations, police incident reports, photographs and hospitalization and educational records. See generally Mitigation Binder (Ex. 1). The binder includes 57 tabs, many of which contain multiple records with no explanation or delineation other than a list of the tabs in the Index. Many of the records are also difficult to read or include medical or otherwise dense terminology, yet very few of the records were published to the jury in conjunction with any defense explanatory or contextualizing testimony. In general, the Government found more benefit from the materials in the Mitigation Binder during trial than did the defense.

### b. Trial Counsel's Failure to Investigate and Present Readily Accessible Witnesses About Relevant and Material Mitigation Violated Prevailing Professional Norms

There were a number of readily available witnesses who had important mitigation evidence about Mr. Fell's life that was undeveloped and unpresented at trial. Among the areas of uninvestigated and unpresented mitigation that was readily available and would have made a difference at trial are the following:

### i. The Continued Deterioration of Mr. Fell's Home Life After His Father's Departure

Perhaps the most critical lapse was trial counsel's concession to the Government's argument that the problem in Mr. Fell's young life was his father Don Sr., and that when he departed in 1990, somehow things got better. See, e.g. Tr. Vol. XII at 53:13-13 (July 13, 2005).

38

The Government argued strenuously that Mr. Fell's home life somehow improved after his father departed when he was ten, and that every year after that was a year further away from the abuse of his early life. Id. at 53:21-24. This argument was manifestly not true, and there were numerous readily-available witnesses who would have offered critical proof in rebuttal.

First, as has been noted, Mr. Fell's father Don Sr. left sometime in mid-1991. Contrary to what was presented at trial, this departure was merely a transition into another era of severe abuse, neglect and trauma. While the Government depicted Al Wilcox, Debra's boyfriend after Don Sr. left, as the disciplinarian that Mr. Fell needed in his life, a strong role model and as someone towards whom Mr. Fell was nevertheless unnecessarily violent, there were readily available witnesses who would have thoroughly rebutted this position. Tr. Vol. VII-1 at 139:14-140:3; 141:10-14 (July 1, 2005).

Had trial counsel investigated Al's role in Donny's childhood and adolescence, the jury would have learned that Al was a psychologically and physically abusive, violent alcoholic. Declaration of Ernie Schuldalski, Feb. 28, 2011 ("Decl. of E. Schuldalski") (Ex. 253 at 3); Declaration of Jamie Dominick, Mar. 2, 2011 ("Decl. of J. Dominick") (Ex. 276 at 1-2); Declaration of Adele Gacek, Feb. 28, 2011 ("Decl. of A. Gacek") (Ex. 252 at 3). Al was a big, heavy-set man who did not take care of himself. Declaration of John Gacek, Feb. 25, 2011 ("Decl. of J. Gacek") (Ex. 251 at 3); Declaration of Stanley Kowalski, Feb. 22, 2011 ("Decl. of S. Kowalski") (Ex. 277 at 5). Al would not simply discipline Donny but screamed, yelled and cursed at him for no reason. Declaration of Teri Fell, Mar. 15, 2011 ("Decl. of T. Fell") (Ex. 278 at 12).

39

One available witness would have been a young man named John Gacek, of whom trial counsel was on notice because he was the victim of an accidental shooting which Mr. Fell described in his statement to the police. Ex. 62 at FELL-00001079. Trial counsel's failure to investigate this shooting is more fully presented infra Section VII, but had they spoken with John Gacek they would have learned not only the details of the shooting (strongly confirming it as an accident for which Mr. Fell was remorseful), but also horrific details about Mr. Fell's life after Don Sr. left the household – during the time period when the Government alleged things got better. For example, as set out in his attached declaration, Mr. Gacek could have testified to the physical and emotional abuse of Donny by his mother and Al Wilcox, and to Debra's ongoing extreme alcohol addiction. Decl. of J. Gacek (Ex. 251 at 2-4).

According to John Gacek and his mother Adele Gacek, Donny would try to avoid being at home, and insisted that his friends wait on the porch to protect them from the "firing squad" waiting inside. Id. at 3; Declaration of Jon Migatulski, Mar. 1, 2011 ("Decl. of J. Migatulski) (Ex. 254 at 1 ). With music blasting and alcohol in hand, Al and Debra screamed and yelled at Donny the second he entered the door. Al chastised Donny for his freckles, calling him "You freckle-faced piece of s---" or "you stupid a--hole." He told Donny, "Get the f--- over here you little a--hole, before I kick your a--." Decl. of J. Gacek (Ex. 251 at 2-3); Decl. of A. Gacek (Ex. 252 at 2). When Donny grew upset with the psychological abuse, he threw things at Debra and Al in protest. Decl. of J. Gacek (Ex. 251 at 4).

Witnesses would have testified that Donny seemed to get the worst of it when Debra and Al got drunk, got violent towards each other, drank more, and then became abusive of Donny. Decl. of T. Fell (Ex. 278 at 12); Decl. of J. Gacek. (Ex. 251 at 3). Stuck in the middle when Debra and Al fought, Donny was often blamed and beaten. Decl. of J. Gacek (Ex. 251 at

40

4). John Gacek remembers seeing Al slap Donny, throw things at him and throw him around. Teri was often scared and hiding away until Mr. Fell would find her. Id.

The Gacek family became a place of refuge for Mr. Fell from the abuse and dysfunction in his own home. Decl. of A. Gacek (Ex. 252 at 2). There, he could enjoy the occasional home cooked family dinner, a fishing trip or car ride on a Sunday afternoon. Decl. of E. Schuldaski (Ex. 253 at 3). The Gacek family had cats and dogs that Donny enjoyed playing with. Decl. of A. Gacek (Ex. 252 at 2). Safe and loved, Donny was well behaved in their home. After seeing the conditions in Al and Debra's home, the Gaceks did not allow John to spend time at the Fell home. Id. at 3; Decl. of E. Schuldalski (Ex. 252 at 3). Donny grew especially attached to Adele, and would tell John not to talk poorly to her because she was a good mother. Decl. of A. Gacek (Ex 252 at 3). John, Adele and John's step-father Ernie would have gladly testified at trial to Donny's home life after Don Sr.'s departure, but no one spoke with them or any other member of their family.

Had trial counsel investigated Al and thus uncovered his abuse of Donny, they would have been able to explain Donny's aggression toward him, which came in at trial. See Tr. Vol. VII-1 at 139:21-140:3 (July 1, 2005) (Teri testifying to one time that she saw Donny strike Al). Trial counsel was under an obligation to not only investigate Mr. Fell's life history generally, but also to investigate whether purported bad behaviors reveal mitigating context. See Wiggins, 539 U.S. at 524. Their failure to do this here left the jurors with an inaccurate picture of Al as somehow having been one of the supportive people in Mr. Fell's life, to whom Mr. Fell was unaccountably mean. This was simply not true. Al was one of the principal abusing adults in Mr. Fell's life, and part of why Mr. Fell ended up in the psychiatric institution. Trial counsel's failure to investigate this critical figure in Mr. Fell's life was unreasonable.

41

In addition to the Gaceks, trial counsel should have easily located the Cupano family, who were Mr. Fell and Teri's neighborhood friends at this same time in their life. They would have provided highly relevant mitigating evidence that the jury never heard about Debra's aggressive and damaging behavior and about the time period after Don Sr. left the household. The names of the Cupanos were readily available to trial counsel from both Mr. Fell and his sister. In addition, the Cupano family name is mentioned several times in CYS records and police reports. CYS Contact Sheet (Ex. 150); CYS Contact Sheet (Ex. 148); Police Report (Ex. 149). Nevertheless, trial counsel never spoke with them.

The Cupanos' testimony would have been graphic. Had she been contacted by trial counsel, Christina ("Chrissy") Cupano would have testified that, after Don Sr. left, Teri revealed to her that she had been sexually molested by her mother Debra in the presence of her boyfriend. Declaration of Christina Cupano, Feb. 2, 2011 ("Decl. of C. Cupano") (Ex. 279 at 2). Donny saw what was happening and tried to intervene. However, when he did so, he too was beaten by Debra and Al. Id. Chrissy Cupano would have also been a powerful, non-cumulative, witness with respect to the depravity of Debra Fell after Don Sr. left. She would have testified that Debra "rarely cooked for [her children] or made sure they had something to eat."[6] Id. at 2. She would have also explained that, because of the inhumane condition of the Fell home, other children were not allowed to visit the home and sometimes were not even allowed to have the Fells over to their own houses. Id. at 5 (Teri not allowed to visit until Mrs. Cupano washed her

---

6    Other readily available witnesses could have easily supported the lack of available food in the Fell home. See, e.g. Declaration of Claudia Bublo, Feb. 21, 2011 ("Decl. of C. Bublo") (Ex. 245 at 1) (Debra was more worried about beer than food); Declaration of Robert Fell, Feb. 22, 2011 ("Decl. of R. Fell") (Ex. 247 at 3) (Debra's first priority was alcohol, as was Don Sr.'s); Decl. of T. Fell (Ex. 278 at 8) (Donny would go out to get food, taking money from Debra's purse while she was passed out); Decl. of J. Migatulski (Ex. 254 at 1) (Donny ate meals at his house because there was rarely food at Donny's); Declaration of Rose O'Hop, Feb. 20, 2011 ("Decl. of R. O'Hop") (Ex. 244 at 1) (neighbor who used to feed Donny and Teri).

hair with lice shampoo); see also Decl. of E. Schuldaski (Ex. 253 at 2) (he did not want his step-son John spending time at the Fell home). Chrissy Cupano has lived in Luzerne County all her life and was readily available to defense counsel, but she was never contacted. Decl. of C. Cupano (Ex. 279 at 1).

This potential further witness testimony would have also flatly refuted that "there's no allegations in this case at all or in any files of sexual abuse by the parents of Mr. Fell." Tr. Vol. IX-1 at 76:11-14 (July 7, 2005). In addition to the Cupanos' testimony on that point, had defense counsel spoken to Debra's last boyfriend in Vermont, Tim Reynolds – an individual who was quite close to Debra at the end of her life but never contacted by the defense – they would have learned that Don Sr. forced Debra sexually in front of Donny and Teri. Declaration of Alan "Tim" Reynolds, Mar. 1, 2011 ("Decl. of A. Reynolds") (Ex. 275 at 7). This important information about Mr. Fell's background with his parents set the stage for the rest of his life.

Janice Stoss, a foster child who was placed with Donny's grandmother Theresa while he was a boy, would have also provided important new information that would have refuted the Government's argument that things got better for Mr. Fell after his father left the home. Specifically, Ms. Stoss would have also told the jury that "Donny's mother treated him real bad," that she saw Debra "smack him around numerous times … [s]he hit him hard, then would hit him again," and that she "did not see Donny ever hit his mother back." Declaration of Janice Stoss, Feb. 20, 2011 ("Decl. of J. Stoss") (Ex. 274 at 3-4). She also would have testified that Theresa – who the Government built up as a source of love and support – was unkind to the foster children in her house and forced them to kneel in a corner on grains of rice if they disobeyed. Id. at 1-2. This testimony would have done much to refute the Government's

43

otherwise undisputed portrayal of Theresa as a source of kindness and social-adjustment in Mr. Fell's life.[7]

### ii.   Life for Mr. Fell after Age Fifteen

Another grossly ineffective approach was trial counsel's explicit limitation of their mitigation presentation to events that took place in Mr. Fell's life prior to age fifteen, with the majority of the testimony about his early childhood. Although Mr. Fell's early childhood was harrowing and certainly relevant, the unnatural truncation of his life story at trial left the jurors with a necessarily mystifying presentation, given that the crimes occurred when the defendant was twenty years old. Bizarrely, the years between fifteen and the crime were left entirely obscured for the jurors as well as the Court; this is even more bizarre given the fact of Mr. Fell's four psychiatric hospitalizations between the ages of eleven and thirteen.[8] This was ineffective, because it was a period of enormous importance in Mr. Fell's development: one in which he was subject to unrelenting abuse, abandonment, and disappointment, as well as escalating untreated mental illness. Had trial counsel investigated this era in Mr. Fell's life, there were numerous witnesses available who could have provided mitigating evidence with respect to that time period, which immediately preceded his move to Vermont and the weeks before the

---

[7]   The truth about Donny's grandmother, Theresa, is that she was born an illegitimate child who lost her mother at a very early age due to a botched abortion Ex. 308; Ex. 307 Theresa's life features serious domestic violence, alcoholism and promiscuity. Divorce Proceedings (Ex. 146)Had they investigated, trial counsel would have known that Theresa was actually quite aggressive, and had severely punished her children, neglected their basic needs and institutionalized them whenever she could not deal with them. She was also cruel to her grandchildren, including Donny, and the foster children she took in for money. Decl. of J. Stoss (Ex. 274 at 3); Decl. of T. Fell (Ex. 278 at 6) Theresa openly favored Teri over Donny. Id. Rather than showing Donny any affection or love, she in fact beat him. Decl. of T. Fell (Ex. 278 at 6); Decl. of J. Migatulski (Ex. 254 at 2) While Teri stayed over at her grandmother's house when the chaos at home became too much, Donny was barely invited. After Debra abandoned her children, Theresa agreed to take custody of Teri but refused to do the same for Donny. Ex. 296 at FELL-00002609.

[8]   The Court itself recognized that counsel could not reasonably limit the case to the period before Mr. Fell's 15th birthday or expect to do so without opening the door to the Government presenting evidence of Mr. Fell's life after age fifteen. Tr. Vol. X-1at 86:14-19 (July8, 2005).

crimes. Their decision to present only a sporadic mitigation narrative without any evidence of Mr. Fell's social history after the age of fifteen was well below prevailing professional norms and "resulted from inattention, not reasoned strategic judgment." Wiggins, 539 U.S. at 526.

As has been noted, in 1995, with his mother absconded and his grandmother deceased, Donny was placed in the custody of his young Aunt Jackie, who was twenty-one years old at the time. Although nothing about this time in Mr. Fell's life was introduced at trial, these were the worst years in Donny's life, the years that led to his decision to seek a different life in Vermont, with another chance at a mother. There were numerous witnesses to his experience who were known to Mr. Fell, Teri, and Jackie, and to whom trial counsel should have spoken. No understanding of Donald Fell was possible without understanding his life as a ward of his Aunt Jackie.

Although it was not presented in any form or fashion at trial, Jackie had a history of psychological and emotional disturbances, and she was simply not able to fulfill the responsibility of raising two troubled children when she was twenty-one. Janice Stoss, mentioned above, would have testified to Jackie's emotional manipulation and verbal abuse, as well as her wild, frightening mood swings. Decl. of J. Stoss (Ex. 274 at 4). She was distinctly aggressive toward Mr. Fell and Teri. According to Ms. Stoss, Jackie was as mean to Mr. Fell as Debra had been years earlier. Id. Trial counsel never learned any of this though, because they failed to interview Ms. Stoss despite the fact that she was readily available in Luzerne County and could have been easily contacted.

Ms. Stoss was not the only witness to Mr. Fell's abuse at the hands of Jackie. Had counsel interviewed him, Sean Campbell would also have provided important new information that the jury never heard and that was critical to Mr. Fell's mitigation case. Sean

45

was Jackie's boyfriend between 1995 and 1997, and lived with Jackie, Teri and Donny for two years from when Donny was fifteen to seventeen years old. These were critical years at the trial – they were the years after Mr. Fell left St. Michael's, during which time the prosecutor claimed Mr. Fell was free from abuse and increasingly violent.

Sean Campbell would have testified to the violence and abuse inflicted on Mr. Fell by Jackie. He recalled an instance when Jackie broke down the door of Donny's bedroom, where he was hiding, and pinned him to the floor, holding scissors open over his face as if she would stab him. Declaration of Sean Campbell, Feb. 25, 2011 ("Decl. of S. Campbell") (Ex. 273 at 3). Donny pleaded for her to stop, but she relented only when Sean tried to intervene – at which point Jackie turned to go after Sean with the scissors instead. Id.; see also id. at 5, 6, 9 (Jackie chased Sean with knives, Jackie beat Teri, Jackie put a knife to her pregnant stomach threatening to cut out the baby).

Although the fact that Donny's childhood home was filthy was presented at trial, Ex. 312 (photographs), it was also true that his adolescent home with Jackie was even more filthy. Decl. of T. Fell (Ex. 278 at 18). Jackie kept a large number of neglected pets. Once in 1995, Mr. Fell's guidance counselor stopped by the house to meet with Jackie and to get her signature on a form to allow Mr. Fell to enroll in 9th grade. The guidance counselor recalled years later that the house and yard "were in deplorable condition. There were broken bottles in the front yard, the exterior fence was broken, and the house was in general disarray." 2001 FBI Report (Ex. 76 at FELL-00001187). None of this material was presented.

Unsurprisingly, Jackie's fits of rage and demeaning behavior toward the children in her care had an effect on Donny and Teri's mental health. As noted above, Mr. Fell once threatened to kill himself because of the stress of living with such erratic and explosive anger.

Decl. of S. Campbell (Ex. 273 at 4). When Donny got upset, he began to experience blackouts, episodes of temporary memory loss caused by dissociation. He did not remember what happened after he got upset. Decl. of T. Fell (Ex. 278 at 19). Mr. Fell's sister Teri was also suicidal during this time period, due to Jackie's emotional and physical abuse. Id. at 24. Trial counsel were aware that even Mr. Fell's teachers at school recognized that Jackie was "emotionally disturbed." 2001 FBI Report (Ex. 76 at FELL-00001179). Jon Migatulski, a friend of Donny's during this time period, was available to counsel and would have been willing to testify that "Jackie tortured [Donny] and beat the crap out of him. He had black eyes and other injuries, including bruises on his arms and face, and that was just what was visible to me." Decl. of J. Migatulski (Ex. 254 at 1). Had they investigated further, counsel would have been able to present this critical testimony.

### iii.   The Truth About Debra Fell, Mr. Fell's Mother

Also unexplored by trial counsel, Debra herself was not just an alcoholic but was also a long-time hard drug user. Because trial counsel did not investigate Debra's drug use, it was not developed at trial. Consequently, the Government in its penalty phase summation argued that Mr. Fell lied about his own and his mother's drug use because there was no evidence of drugs in her system the night that she died. Tr. Vol. IV-1 at 69:22-70:5 (June 24, 2005). Had trial counsel interviewed Tim Reynolds or Mr. Fell's half-brother Robert Fell, they would have learned that during Debra's marriage to Donny's father, the two used marijuana, crack, powder cocaine and smoked heroin together. Decl. of R. Fell (Ex. 247 at 3); Decl. of A. Reynolds (Ex. 275 at 7). Debra would drink and get high on drugs like crystal methamphetamine, known as crank, in the trailer where the family lived when Donny was nine to about 11. Decl. of C. Cupano (Ex. 279 at 4), Declaration of Ronald Cupano, Feb. 20, 2011 ("Decl. of R. Cupano")

(Ex. 247 at 1). Witnesses from Debra's time in Vermont would have further confirmed Mr. Fell's reports to the police that she abused drugs, including crack and powder cocaine, crushed Percocet, Ritalin, Adderol and other pills, but they were never interviewed by the defense. Declaration of Dora Carter, Mar. 8, 2011 ("Decl. of D. Carter") (Ex. 269 at 1); Decl. of A. Reynolds (Ex. 275 at 1); Declaration of Jeff Van Buren, Mar. 8, 2011 ("Decl. of J. Van Buren") (Ex. 270 at 2, 3, 4); Declaration of Mary Bell, Mar. 11, 2011 ("Decl. of M. Bell) (Ex. 272 at 1).

Debra was also aggressive in ways that were not presented at trial, but shed important light on Mr. Fell's relationship with her. Although trial counsel failed to investigate Debra's life after she left her children, Debra's aggression, violence, and mental instability continued throughout her life. In addition to the available records discussed in greater detail below, trial counsel could have spoken with Florence Wallace, who got to know Debra in the years immediately after she lost her children. Declaration of Florence Wallace, Feb. 25, 2011 ("Decl. of F. Wallace") (Ex. 250 at 1). Debra was dating her brother at the time, a mentally ill and drug-addicted man named Lawrence "Lou" Gilbert. Id. Florence noted that both Lou and Debra would appear calm at one moment, then fly into a rage over a small thing the next moment. Florence witnessed Debra's aggression toward Louie, even when Debra was sober. Id. Debra and Lou both drank too much and became aggressive, beating each other. Police Reports (Ex. 210). Debra threatened to stab and kill Lou over and over again, and she threw things at him when she was angry at him. Id. at 1-2. Florence was so concerned about Debra's violence that she begged her brother to stop dating her. Id. at 2.[9]

---

[9] Even Tim Reynolds, Debra's boyfriend at the time of the crimes, would have chronicled her hysterical attacks and his own need to react violently in self-defense. Decl. of A. Reynolds (Ex. 275 at 4). Of course, trial counsel never spoke with him either.

### iv.  The Unexplored Mitigation that was Available in Teri Fell

Teri Fell is Mr. Fell's closest sibling, and was perhaps the most important witness to take the stand at trial.  Unfortunately counsel and their investigator effectively neglected her – not spending any real time with her until trial preparation and even then limiting their time with her. Putting in the requisite time and attention for such a crucial witness is part of the standard of care in a capital mitigation investigation, yet it is obvious that such an investigation was not pursued.  Cynthia Ayres met with Teri three times in the five years she worked on the case, and booked a total of seven hours with this critical witness.  Decl. of C. Ayres (Ex. 265 at 3).

Had counsel sought the information, Teri would have been able to tell the jury that in Donny's early childhood "[Debra] screamed at Donny for little things and smacked him around a lot. She called him names, said mean things about him, and threatened to kill him.  She picked up knives and chased Donny around with them multiple times."  Decl. of T. Fell (Ex. 278 at 2). She would have added that Debra verbally abused Donny, cursing at him that he was worthless and that she wished he had not been born. Id. at 12. Further, she would have also talked about how Donny would try to put himself between Teri and beatings by Debra, Debra's boyfriends, and anyone else. Id. at 5.

Had counsel recognized the issue and spoke further to Teri Fell, they – and the jury – would have learned that knife violence was a very important part of the Fell household when Donny was growing up and that the violence and abuse did not stop when Don Sr. left the house.  In addition to the admittedly searing episodes that were presented at trial, Teri could have

testified about an additional incident in which Debra stabbed her husband deep into the bone of his forearm, while her two children watched.[10] Id. at 7.

Teri Fell would also have also supported the refutation of the Government's depiction of Debra's boyfriend Al Wilcox as an ameliorating and positive force in Donny's life from the age of eleven through fourteen – as discussed in greater detail above[11] – testifying that Al would not simply discipline Donny but would scream, yell and curse at him for no reason. Id. at 12. He threatened Teri and Donny with stories about how his Hell's Angels motorcycle gang beat their apprentices, who would in turn beat others to enforce a chain of superiority. Id. Al's method of discipline was to beat respect into Donny, which was Al's way of showing him "how to be a man." Id.

Teri could also have explained to the jury the additional abuse Mr. Fell suffered at the hands of Debra herself rather than just from Don Sr., id. at 2, and told the jury about Debra's drug abuse, id. at 13. Indeed, Debra not only abused prescription drugs including amphetamines,[12] but unlawfully sold medication prescribed to Donny by psychiatrists. Id. Teri would have also testified to the horrible neglect that she and her brother suffered through, as exemplified by their repeated bouts of lice, scabies, and ringworm. Id. at 3, 4. Teri would have provided compelling testimony about the fact that they smelled so badly as little kids that they

---

[10]   The incident is corroborated by medical records in the possession of counsel at trial reflecting that Don Sr. had to undergo vascular surgery to "repair extensive laceration, radial side of right arm [with] nerve, tendon, and muscle repair" Medical Records (Ex. 284; 281; 283; 282; 285)Upon admission nurses noted "alcohol abuse" on his chart.

[11]   See, e.g. Decl. of E. Schuldalski (Ex. 253 at 3); Decl. of J. Dominick (Ex. 276 at 2); Decl. of A. Gacek (Ex. 252 at 3); Decl. of J. Gacek (Ex. 251 at 3); Decl. of S. Kowalski (Ex. 277 at 5).

[12]   The physician who supplied Debra with her speed was later arrested for illegally selling controlled substances, money laundering and unlicensed treatment of drug addiction. CYS Contact Sheet (Ex. 14 at FELL00000705; Newspaper Articles (Ex. 232).Debra abused speed pills during Donny's early childhood up until her death

were made fun of as school. The shame and consequent trauma that would have been revealed in this testimony is mitigating independent of the fact of the neglect.

Further, Teri would have described how Theresa abused her grandchildren, including Donny, and that Theresa herself drank. Decl. of T. Fell (Ex. 278 at 15). As noted above, this would have been supported by numerous other available witnesses, including Dorothy Grivner, who was another foster parent and became friends with Theresa, and would have testified that Theresa liked to drink at home. Declaration of Dorothy Grivner, Feb. 23, 2011 ("Decl. of D. Grivner") (Ex. 248 at 2); see also Decl. of J. Migatulski (Ex. 254 at 2) (Donny had told him about beatings he received from Theresa as a child). These witnesses could have also testified that when Debra, Al, and her children moved into the half of a double-house that Theresa owned, Theresa refused to have the furnace replaced, rendering the house freezing cold in the middle of winter. Decl. of T. Fell (Ex. 278 at 11); Decl. of D. Grivner (Ex. 248 at 4); see also Declaration of John Timek, Feb. 24, 2011 ("Decl. of J. Timek") (Ex. 249 at 2).

Had she been asked, Teri would have also corroborated and elaborated on the information above about the abuse that both she and Donny suffered at the hands of Jackie, including that Donny often tried to protect Teri from their aunt. Decl. of T. Fell (Ex. 278 at 17-18, 5). Teri also would have testified that during this time Jackie had wild alcohol-fueled parties in the house that included sex in the backyard. Id. at 22. Both Donny and Teri were permitted to drink alcohol. Id. Jackie also used to torture Teri by engaging in sexual behavior in front of her and a cousin, and Jackie exhibited other grossly inappropriate sexual behavior that was humiliating, including with Donny and Teri's young teenage friends. Id. Finally, Teri, in addition to many other available witnesses, would have testified that Mr. Fell became homeless after Jackie, in a rage, kicked him out of her house when he was 17. Id. at 24. He spent

51

intermittent periods with friends and relatives, but was without access to a stable home. Jurors should have heard from Jon Migatulski that during this era, Donny would sometimes stay with him. During this time, Donny helped take care of Jon's mother, Nancy Migatulski, as she suffered a nervous breakdown while she was ill with cancer and undergoing several rounds of chemotherapy. Decl. of J. Migatulski (Ex. 254 at 2).

### v. Conclusion

These are just some of the many witnesses to whom trial counsel could have and should have spoken. In summary and as set out in greater detail in the attached declarations, incorporated here by reference, in addition to providing new information regarding Mr. Fell's early life, those witnesses would have provided the jurors with an image of Mr. Fell's later life that was fundamentally different from anything they heard at trial, a life of worsening abuse and increased trauma after the departure of his father, and concomitant internal deterioration.

Had they been asked, these and other witnesses would have explained to counsel and to the jury that following his father's departure, Mr. Fell's mother remained a violent alcoholic and drug user. She took up with a man who was also a violent alcoholic and who abused Mr. Fell. After her eventual abandonment, which was mentioned at trial, he was further abandoned by his grandmother Theresa, which the jury never learned. No mitigating evidence was mentioned at trial about his adolescence, nor was the fact that he was forced to live with an extremely abusive guardian, his Aunt Jackie. Had the facts of his life during this era been presented, it would have been clear that Mr. Fell was not at twenty years old making choices to be unremorsefully violent, but rather was reacting to an overwhelming range and quality of abuse that had been directed at him relentlessly since birth. Because nothing at all was presented about this period in Mr. Fell's life, had the jurors had this evidence before them, there is a

52

reasonable probability that one juror would have reached a different balance of the aggravating and mitigating factors, and the outcome would have been different.

### 2. Trial Counsel Provided Ineffective Assistance in Failing to Investigate and Present Critical Mitigating Records

Trial counsel also failed to adequately present other readily accessible documents that, along with the witnesses, would have depicted Mr. Fell's life in an entirely different manner – one that was mitigating to Mr. Fell. Some of these documents related to CYS, the social services agency that interacted with the Fell family. Other documents and records were readily available from local hospitals and police departments.

### a. Counsel Were Ineffective In Not Using Readily Accessible Documents from CYS

During the penalty phase, the defense called as a witness Deanna German, a caseworker who was assigned to the Fell case from April 1990 to May 1992. Ms. German testified on her direct examination that Mr. Fell's involvement with CYS had a lot of problems. Tr. Vol. IX-1 at 20:14-26:11 (July 7, 2005).

During her cross-examination, the Government had Ms. German read certain damaging snippets taken out of context from the CYS documents that trial counsel had introduced in the Mitigation Binder, including from several of her reports written during this time period. Those snippets generally stated that Mrs. Fell provided a "safe and stable home environment" for Donny with "no problems of physical violence" and no evidence of "excessive drinking," and that she supervised her children but that Mr. Fell had been hospitalized for "behavioral problems" and "aggressive behavior" for which he was remorseless.

That presentation was false and misleading. The home environment was not safe and stable, but rather was so emotionally, physically, and psychologically toxic that it prompted

53

four psychiatric institutionalizations during this time frame. Although trial counsel had many documents in their possession to readily refute the prosecutor's assertions and to present the case for mitigation, trial counsel failed to do so. It presented only limited documentation from CYS in a "Mitigation Binder" – but included many of the documents containing the damaging and misleading quotes recounted by German – without putting before the jury any of the ample other evidence from CYS that would have told a dramatically different and much more reliable story of Mr. Fell's life at and after his father's departure. Even where they included documents in the Mitigation Binder, counsel failed to present them to the jury.

There were documents available to defense counsel, but not presented to this Court or the jury, that told a different and infinitely more reliable story. These included notes from the CYS workers, called "contact sheets" that trial counsel inexplicably only obtained in late June 2005.[13] Decl. of C. Ayres (Ex. 265 at 4-5). Those documents – had they been placed before the jury – would have showed:

- In stark contrast to Ms. German's testimony on the stand, Don Sr. was at the house for an additional six months after the October 1990 incident, a very difficult period that included police involvement because of the fighting between Debra and Don Sr.[14]

- After Don Sr. ostensibly was kicked out by his wife, Debra was going out at night leaving the children at home alone. Referral Note (Ex. 297) (referral note capturing call to child abuse hotline). Don Sr. broke into the trailer to try to reunite with Debra but Debra had gone away with Al Wilcox for a

---

[13] These materials were turned over to the Government within a week of their receipt. Tr. Vol. IX-1 at 42:15-18 (July 7, 2005). The Government's knowing elicitation of testimony from Ms. German that contradicted these documents violated Napue

[14] CYS Contact Sheet (Ex. 152; CYS Contact Sheet (Ex. 153)(noting that in January 1991 Debra reported Don Sr. at the home; CYS Contact Sheet (Ex. 154) (noting in February 1991 that Debra reported she called it quits with Don Sr. during a marriage counseling session); CYS Contact Sheet (Ex. 157)(noting that in March 1991 Debra reported Don Sr. stopped attending drug and alcohol counseling and returned home twice, claiming the first time there was no need to return, and keeping his key the second time); Police Report (Ex. 147) (police arrest Don Sr. for trespassing in when he refuses to leave the home); Certification of Bail (Ex. 223).

weekend.[15] CYS Contact Sheet (Ex. 159); <u>see also</u> CYS Contact Sheet (Ex. 160).

- There was no "safe environment" for Donny and Terry in 1991 or thereafter. Debra was evicted from her trailer in the summer of 1991, forcing the family to leave many of their possessions behind and move into Al Wilcox's cramped apartment. CYS Contact Sheet (Ex. 161); CYS Contact Sheet (Ex. 162); <u>see also</u> Police Report (Ex. 188) (police records not obtained by counsel confirming that Debra was arrested for retail theft during this period).[16]

- Even after Don Sr. left, when Donny was 11 years old, Debra continued to drink excessively every day and use speed, and invited strange men to the home – at least one of whom threatened Donny's sister – and left Donny and Teri alone or ignored them while she "partied" with her male visitors. CYS Contact Sheet (Ex. 14).

- At the end of 1991, an anonymous caller felt compelled to call CYS to report Debra for abuse and neglect when she injured Donny's head and waited several weeks to take him to the hospital. CYS Contact Sheet (Ex. 165); CYS Contact Sheet (Ex. 166).

- In early March 1992, the period when, according to the testimony elicited by the prosecutor, Debra was not drinking excessively, a CYS worker paid an unannounced visit and observed that she had in fact been drinking with a male visitor. CYS Contact Sheet (Ex. 167).

- During that same time period, now well after Don Sr. had left and during the time of the supposed "safe environment," Debra admitted to a therapist that she had been drinking over the weekend and that she failed to come home at night, exposing the children to abuse from her boyfriend Al Wilcox. CYS Contact Sheet (Ex. 224). Al Wilcox by this time was admitting to heavy drinking, depression and problems in his relationship with Debra. CYS Contact Sheet (Ex. 164).

- During his period of hospitalization in 1992, Donny stated that he just "wants his mom to stop yelling at him – says that's all she does." CYS Contact Sheet (Ex. 168).

---

[15] Had trial counsel investigated these six months they would have learned from records of Donny's first psychiatric hospitalization that this situation was extremely psychologically distressing to Donny as he struggled with Debra "allowing his father back into the house on several occasions." Hospital Discharge/Referral Form (Ex. 18).

[16] While Debra apparently told German that their new home was not ready to visit, according to Teri Fell they had actually moved into Al Wilcox's run-down, one bedroom apartment where Teri slept on the couch and Donny slept on the floor. Decl. of T. Fell (Ex. 278 at 11); <u>see also</u> Ex. 162.

- When Donny was 13 years old, Donny and Teri were often left home alone while Debra and Al were out drinking or ignored while Debra had friends over to the house for drinks. CYS Contact Sheet (Ex. 172); Referral Note (Ex. 171); Referral Note (Ex. 158); Contact Sheet (Ex. 180 at FELL00002011); <u>see also</u> Police Report (Ex. 173 at FELL-00001942).

- By January 1994, Debra had invited her friend, a known prostitute, and the friends' children to live in the house. Referral Note (Ex.177); CYS Contact Sheet (Ex. 178); CYS Contact Sheet (Ex. 179); <u>see also</u> Decl. of T. Fell at 14. Mrs. Fell and her friend went out drinking, leaving the children to fend for themselves.[17] <u>Id.</u>

- Also in 1994, Debra's mother Theresa identified her daughter as a binge drinker to CYS and noted that Debra had stabbed Donny in his arm with a screwdriver claiming that he somehow deserved it because he "got nasty after he was sexually abused." CYS Contact Sheet (Ex. 181); <u>see also</u> Ex. 1 at FELL00000062 (report in Mitigation Binder suggesting that Debra stabbed Donny with a fork on or around this time).

- By March 1994, Mrs. Fell was out drinking all week long and once again neglecting her children terribly. CYS Contact Sheet (Ex. 182); Referral Note (Ex. 183). During this time, she brought home men for the night, gave Donny keys to a car with stolen license plates to run errands for her, CYS Contact (Ex. 184), and eventually accrued several bad check charges. Police Reports (Ex. 231).

In short – and contrary to the testimony – Debra's home remained a toxic zone for Mr. Fell and his sister right up until she lost custody in 1994. This would have been shown by the documents available to counsel as well as by the witnesses. As CYS concluded – in another document never presented to the jury – Debra's neglect of her children resulted in "behavioral problems" that psychologically harmed Donny and influenced his emotional and social impairment. CYS Risk/Severity Assessment Form (Ex. 193). Had trial counsel used the material within the records at their disposal, they never would have permitted Ms. German to

---

[17] During this time, as discussed below, Theresa's live in boyfriend, Jack Rhodes, was arrested at the house for public drunkenness (Police Reports (Ex. 191); (Ex. 192) see also(Ex. 194); (Ex. 195); (Ex. 196); (Ex. 189); (Ex. 190)),and so was Debra. (Ex. 1 at FELL-00000117)

testify that Mr. Fell was living in a "safe environment" during these final years in his mother's care.

### b.   Counsel Were Ineffective In Not Presenting Or Obtaining Other Readily Accessible Documentary Evidence of Mitigation

Other documents available to counsel would have further undermined the prosecutor's claim that as things got better for Mr. Fell, he got worse, and would have provided additional evidence in mitigation. Trial counsel never obtained some of these documents, and where trial counsel obtained relevant documents (often at the last minute) it inexplicably – and without strategic reason – failed to use them.

Nursing notes from Mr. Fell's hospitalization would have revealed the relentlessness of the hostility and neglect of his life at home. The notes are testimony of his reports about his parents' drinking and how much it hurt. See, e.g. Nursing Notes (Ex. 24 at FELL-00000821) ("mother and stepfather are drinking a lot and [] they get mean and call him names); (Ex. 23 at FELL-00000784) ("she attacked me when drunk"); (Ex. 170 at FELL-00001905 (mother hit him); (Ex. 145 at FELL-00001791 ("I'm here because [mother] don't want me around"); (Ex. 175 at FELL-00001986) ("pt getting hair all cut off" because of head lice); (Ex. 24 at FELL-00000819-820 ("nits noted throughout hair"); (Ex. 145 at FELL-00001795 ("problems at home are not all Donald's fault").

Documents from St. Michael's should have been used to establish that as early as 1994, when he was admitted to that facility, he was flagged as needing treatment for alcohol abuse and substance abuse. St. Michael's Report of Diagnostic and Evaluation (Ex. 186 at FELL-00002021); Mitigation Binder (Ex. 1 at FELL-0000240). This would have refuted the Government's contention at trial that Mr. Fell had not established his alcohol problem. Tr. Vol.

XII, 61:10-12 (July 13, 2005) (Government emphasizing only "two pages in the mitigation binder about it"). The documents also establish that the attending psychiatrist believed – as should have also been evident from the CYS documents above – that an investigation of Donny's "dysfunctional family" was necessary. Psychiatric Report (Ex. 185). Those documents further establish that by the time Donny arrived at St. Michael's, he had been forced to act as his own "caretaker," Psycho Social Summary (Ex. 187 at FELL-00002026), and was overwhelmed by the combination of his family situation, his "underlying feelings of confusion," id., and by the lack of any "emotional support system and guidance." Psychological Consultation (Ex. 26 at FELL-00000851).

Equally critically, the jury did not hear that Donny was joined in St. Michael's by his childhood friend Robert "Bobby" Lee, the co-defendant in this case. Trial counsel were aware of this but did not mention it to the jury. The two reconnected at St. Michael's, but had met years earlier in elementary school. 2001 FBI Report (Ex. 76 at FELL-00001216). At St. Michael's, administrators remember Donny as quieter and better behaved than Bobby. Id. at FELL-00001178-179; 2005 FBI Report (Ex. 220). Bobby was treated with drugs for aggressiveness and destructiveness. 2001 FBI Report (Ex. 76 at FELL-00001211). This information could have and should have been presented to experts and at trial.

Had they been presented to the jury, St. Michael's records in counsel's possession would have revealed allegations that Don Sr. had been "sexually abusive" to Mr. Fell and his sister, further refuting the statement by the Government that there were no allegations of sexual abuse on the part of Donny's parents. Psycho Social Summary (Ex. 187 at FELL00002024); Tr. Vol. IX-1 at 76:11-14 (July 7, 2005).

58

Additional police department documentation provided corroborating evidence that Debra's penchant for attacking people with knives did not stop when Don Sr. moved out of the house. Records confirm the earlier described potential testimony of the stabbing episode between Debra and her boyfriend Lou Gilbert in the late 1990s, reporting that she grabbed a knife and swung it at him, causing extensive injuries to the muscle of his upper arm that required surgery. Police Report (Ex. 210); see also Decl. of F. Wallace (Ex. 250 at 2-3).[18]

Mr. Fell's early and heavy substance abuse problems could have been corroborated not just by the above-mentioned St. Michael's records, but also through hospitalization reports and law enforcement records.[19] As demonstrated by the records attached as exhibits here and incorporated by reference, and as discussed infra in the section discussing trial counsel's failures with respect to Mr. Fell's affirmative mental health case, in reality Mr. Fell's substance abuse was severe and contributed to his mental health struggles and behavioral problems.

Documentation from the Luzerne County Court System would have also further contradicted the image – conjured by the Government and clearly refutable based on the available witnesses discussed above – of Mr. Fell's grandmother Theresa as a good parent for

---

[18]  As discussed above, Lou's sister Florence was another untapped witness who knew that Lou and Debra drank to excess and often fought while drunk and hurt each other. Decl. of F. Wallace (Ex. 250 at 1-2). Florence knew that Debra often threatened to stab Lou and would have told trial counsel that she went over to Lou's house after this particular instance of Debra's violence and that, because no one was there, the door was wide open and the place was a complete mess, she assumed that Debra had killed him. Id. at 3.

[19]  See, e.g. Ex. 1 at FELL-00000169 ("His mother is very suspicious because she finds beer cans because of odor in the house of alcohol and Marijuana"); Nursing Note (Ex. 170 at FELL-00001904) (older friends pay Donny to drink when he is 13 years old). A social history report from St. Michael's that trial counsel failed to obtain indicates drug and alcohol evaluations when he was 14 years old. Psycho Social Summary (Ex. 187 at FELL-00002026). A CYS contact sheet from when Donny was 15 years old also reveals that Donny and Bobby were "paling around and went to get drinks on their own." CYS Contact Sheet (Ex. 197).

Mr. Fell as he got worse.[20]  Divorce Proceedings (Ex. 146); see also Police Reports (Ex. 191); (Ex. 192) see also (Ex. 194); (Ex. 195); (Ex. 196); (Ex. 189); (Ex. 190).

### 3.  Counsel was Ineffective in Failing to Investigate and Present Evidence of Familial Substance Abuse and Mental Health Issues

The Government argued in its summation that Mr. Fell simply chose to abuse alcohol and drugs because he liked to "drink beer, pop some pills, and [] smoke pot," Tr. Vol. XII at 61:10-17 (July 13, 2005), and that this has nothing to do with his crimes, id. at 61:19-20. With the exception of limited information on the history of maternal alcoholism by a Government witness, Tr. Vol. XI at 82:9-10 (July 12, 2005), the jurors were not presented with the family history of severe alcohol and drug abuse that would have undermined the idea that Mr. Fell was unfettered by his family's history of addictions.

### a.  Trial Counsel Were Ineffective For Failing To Investigate and Present Evidence of Mr. Fell's Family History of Alcoholism and Substance Abuse[21]

Counsel was ineffective in presenting only glimpses of the severe alcohol abuse that ran through Mr. Fell's family.  That history is described in the declarations and evidence attached to this motion, which we incorporate by reference herein.  Severe alcohol abuse in Mr. Fell's maternal history was rampant. Post-conviction investigation has revealed that among the alcoholics in his maternal family are Mr. Fell's mother, his sister, his aunt, his grandmother, his grandfather, his great aunt, his great niece, his great grandfather, and his great-great

---

20   Debra's father Ray beat her mother Theresa frequently during their marriage.  Decl. of T. Fell (Ex. 278 at 6).  She was forced to call the police on him often. Divorce Proceedings (Ex. 146).  The violence was not all directed at Theresa, but in some instances originated with her.  Based on records trial counsel failed to uncover, during their 1967 divorce, Ray showed the court wounds and scars on his hands from knives Theresa had used against him.  Id. Another time, while drunk, she came after Ray with an ax at a bar.  Id. After a different fight at a party, Theresa smashed a big rock against the windshield of Ray's car.

21   For the convenience of the Court we include a genogram illustrating, upon information and belief, Mr. Fell's family history of multigenerational mental illness, alcohol and substance abuse. Infra.

grandmother.[22]  All are reported to have been severe alcoholics and/or drug addicts, as were most of their friends and acquaintances.  See Decl. of T. Fell (Ex. 278 at 1, 6, 9, 13, 20, 22); Decl. of D. Grivner (Ex. 248 at 2); Decl. of J. Dominick (Ex. 276 at 1-2); Decl. of S. Kowalksi (Ex. 277 at 1-2, 4-6); Decl. of M. Bell (Ex. 272); Decl. of C. Bublo (Ex. 245 at 1); Decl. of D. Carter (Ex. 269 at 1); Decl. of C. Cupano (Ex. 279 at 4); Decl. of R. Cupano (Ex. 243 at 1); Decl. of J. Timek (Ex. 249 at 1); Decl. of J. Migatulski (Ex. 254 at 3); Declaration of Sandra Shun, Mar. 3, 2011 ("Decl. of S. Shun") (Ex. 266 at 1-2); Decl. of J. Stoss (Ex. 274 at 2); Decl. of J. Van Buren (Ex. 270 at 1-4); Decl. of F. Wallace (Ex. 250 at 1-3); Decl. of A. Reynolds (Ex. 275 at 1); Divorce Proceedings (Ex. 146); Office of the Sheriff Report (Ex. 176).

Severe alcohol abuse was not limited to Mr. Fell's maternal side.  When his mother married Don Sr., she married a man whose family history was also plagued with alcoholism.  Don Sr. was an alcoholic and drug abuser until his recent death at age seventy-one. Decl. of A. Reynolds (Ex. 275 at 7).  A more complete discussion of the alcoholism that was rampant on Don Sr.'s side of the family is set forth in the declaration of Sally Francis Fell which is incorporated by reference herein.  In summary, Don Sr.'s mother, Myrtle, was a severe alcoholic and also addicted to prescription pills almost all her life.  Declaration of Sally Fell Francis, Jan. 18, 2011 ("Decl. of S. Francis") (Ex. 242 at 2-4); see also Decl. of R. Fell (Ex. 247 at 2). Mr. Fell's half-brother, Robert Fell, has struggled with alcoholism and drug addiction as well.  Decl. of R. Fell (Ex. 247 at 3-4).

---

[22]  All of this information is crucial to understanding Mr. Fell's mental health history, as discussed infra Section V.

**b. Trial Counsel Were Ineffective For Failing To Investigate and Present Evidence of Mr. Fell's Family History of Mental Illness**

Trial counsel further failed to sufficiently present the jurors with evidence of the genetic predisposition to mental illness that affected Mr. Fell over the course of his 20 years before arriving in Vermont. The jurors never learned that multiple generations of Mr. Fell's family displayed symptoms of various significant mental health disorders.

In summary, on his maternal side, Mr. Fell's grandmother, mother, maternal aunts, sister and niece all displayed symptoms of various significant mental health disorders including bipolar mood disorder, depression, anxiety disorders, suicide attempts and developmental disabilities. The declarations and evidence attached hereto are incorporated by reference.

In addition to what was inherited from his mother's side, Mr. Fell inherited an independent set of disadvantages from the mental illness on his father's side. Decl. of S. Fell (Ex. 247 at 2-4). Mr. Fell's grandmother Myrtle was institutionalized for depression and psychosis repeatedly and tried to kill herself at least twice. She was treated with electro-shock therapy as well as anti-psychotic medications such as Thorazine. A more complete discussion of her mental illness and that of Mr. Fell's great-grandmother is set forth in the declaration of Sally Francis, incorporated by reference herein. Id.; see also Decl. of R. Fell (Ex. 278 at 2).

**c. Conclusion**

Inter-generational genetic predisposition to mental illness and substance addiction affected Mr. Fell's development, behavior, perceptions, and experiences over the course of his life. It also made him vulnerable to developing major psychiatric illness. This information should have been investigated, developed, and presented to the jurors, both directly and through

62

experts. The failure to do so was prejudicial. Since almost none of it was presented, it seems especially clear that if it had been, at least one juror would have struck a different balance between life and death.

### 4. As a Result of Trial Counsel's Deficient Investigation and Presentation, Donald Fell Suffered Severe Prejudice

The critical issue at the penalty phase of Mr. Fell's capital trial was the horrific background and family circumstances that formed the backdrop for the crimes for which he was facing death. Although this is a critical issue in all capital cases, here it was especially critical because one of the victims was Mr. Fell's mother. Counsel's omission of important mitigating evidence allowed the Government to seize upon this gaping failure of proof. It turned mitigation into aggravation, arguing in essence that as Mr. Fell's mother improved life for Mr. Fell, Mr. Fell himself got worse.

After acknowledging that Mr. Fell had a "terrible" early childhood when Don Sr. was living with the family, the Government then turned that evidence against him, framing the arguments presented by defense counsel as the "abuse excuse." Tr. Vol. XII at 118:22 (July 13, 2005). It told the jury that after age 10 "Debra Fell threw her husband out [and] [t]hey got help from social services." See, e.g. id. at 55:24-56:3. It also told the jury that Mr. Fell's childhood was indistinguishable from those of other witnesses – and even of the victim herself – who were able to lead stable lives, id. at 62:12-16, and that, as a consequence and from this point of relative stability, Mr. Fell's continued disobedience and worsening tendencies toward violence were the product of his own choices, id. at 53:8-14, 56:10-15, 58:21-22. The Government summed up: "the abuse that [Mr. Fell] suffered got more and more removed, and as it did, he got more and more violent." Id. at 53:22-24.

63

Had trial counsel adequately investigated the evidence above, it would have had the means to effectively prevent and refute the Government's prejudicial arguments with the full and accurate trajectory of Mr. Fell's life.

Defense counsel should have been prepared to offer available witness testimony and supporting documentary evidence to provide real weight to the mitigating factors presented regarding his background:

- Donald Fell was sexually and physically abused as a child;

- As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other;

- Donald Fell was raised without positive role models;

- As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions;

- Donald Fell's parents were violent alcoholics who abandoned him as a child;

- Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest;

- Any other factors that favor imposition of life imprisonment without possibility of release, including factors in Donald Fell's childhood, background and character.

Each juror was also asked to determine whether they were "unanimously persuaded, beyond a reasonable doubt, that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of any mitigating factors that the aggravating factors are themselves sufficient to call for a sentence of death." Tr. Vol. XII at 157:3-8 (July 13, 2005). Because of trial counsel's failures, this project of weighing was lethally handicapped by an incomplete understanding of Mr. Fell that was critically inaccurate. Mr. Fell's childhood and youth were not as the Government was permitted to characterize it. His home did not gain

64

stability after his father was kicked out in October of 1990 and he did not receive counseling and support from his mother and other family members that should have served to ameliorate those negative experiences. Mr. Fell suffered abuse of an extraordinary nature from birth (and before) through the time he was finally forced to leave his Aunt Jackie's house. Each and every house in which he lived was a "hell" of alcoholism and drugs, disorder and violence. In truth, he never had any stability or order in his life. And things did not get better for him after age ten or age fifteen. They got worse.

Defense counsel should have been prepared to offer witness testimony of the continued life of violent beating and stabbing, vicious emotional abuse, and continued verbal attack in which Mr. Fell found himself caught as he entered his teenage years – first in the home of his mother and her boyfriend then later while trapped living with his Aunt Jackie. Numerous neighbors and friends would have testified to the lack of food, the lice and the beer cans littering the floor, as well as the cuts and bruises routinely visible on both Mr. Fell and his sister. In direct contrast to the Government's image of Debra and her boyfriend as supportive of Mr. Fell while institutionalized, Debra and Al's constant attacks on him played a large role in putting him in the institutions where he was repeatedly confined, their continued alcoholism kept them from providing support while Mr. Fell was there, and upon his release his mother would either use or sell his prescribed medications. Despite the total lack of evidence presented about Mr. Fell after the age of 15, trial counsel should have had witnesses available like Mr. Campbell who could testify to the constant barrage of abuse Mr. Fell suffered at the hands of his Aunt Jackie. When Mr. Fell finally left Jackie's house at age 17, living as a transient was a better option than returning to her care.

65

Defense counsel should have also been prepared to demonstrate to the jury through the available documentary evidence that the documents relied on by the Government to make its arguments were summary reports that did not reflect the true day-to-day observations of the case worker assigned to the Fells. Had they utilized the CYS contact sheets in their possession they could have supported the view of Mr. Fell's life as a continued struggle with either the total neglect or overt abuse by his alcoholic mother and her frequent male visitors and multiple boyfriends, with whom she continued to engage in mutual combat. The Fell home was clearly not a "safe environment." Defense counsel should have also been able to show the jury that while at St. Michael's, Mr. Fell managed to prosper, despite the lack of support from his family and the crushing weight of his upbringing. Had the defense sought to show the jury anything about Mr. Fell's later life, the jury would have found support for the witness testimony of Jackie's constant violence, and would have also been able to understand Mr. Fell's parallel increasing reliance on his substance abuse to dull the pain of the life that surrounded him.

Instead, the jurors received only scattered glimpses into the desolation that was Mr. Fell's life prior to the crimes for which he has been convicted – scattered glimpses that were successfully minimized by Government argument.

The jurors clearly were receptive to the categories of limited evidence that were presented on the mitigating factors stated above, and many of them found that the defense had carried their burden of proof. In addition, several jurors found an additional factor: that Mr. Fell's "[t]otal life experience, [and the] failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior." Special Verdict Form (Ex. 209 at FELL-00002137 ). Had the defense presented a case that demonstrated the full weight of the available mitigating evidence, as set out

66

above and more fully in the attached declarations and exhibits, the jurors would have been able to attribute the proper mitigating weight to Mr. Fell's childhood experiences. At least one juror would have struck a different balance.

Had the defense effectively investigated and presented this essential part of the case, without question there is a reasonable probability that at least one juror's vote – and the jury's decision – would have been different. Mr. Fell's death sentence is due to be reversed.



**IV.     Trial Counsel's Failure to Investigate and Present Mr. Fell's Array of Mental Health Impairments and Vulnerabilities was Ineffective Assistance of Counsel that Deprived the Jurors of a Critical Component of his Mitigation Case in Violation of the Fifth, Sixth, and Eighth Amendments to the Constitution[23]**

As further set forth below, trial counsel's development of Mr. Fell's mental health case fell below the prevailing professional standards of care. First, counsel did not conduct a reasonable investigation and effectively truncated its investigation into Mr. Fell's social history and mental impairments for reasons not based on any strategy or professional judgment. In 2001, trial counsel's goal was to obtain a guilty plea for Mr. Fell, and they quickly retained experts without first completing a full social history because they believed presenting a modicum of mitigating evidence would be sufficient to reach a plea. At that stage, speed was more important than depth of investigation, so many relevant documents had yet to be collected and numerous relevant witnesses had yet to be interviewed. However, after the Government flatly rejected the expert reports and brief mitigation narrative as insufficient to mitigate against the death penalty, trial counsel nonetheless stopped its mental health preparation as it stood. Despite the rejection of the plea offer, trial counsel failed for years to ever consider supplementing the mental health investigation it had conducted in connection with the plea, or requesting that new testing be performed in light of new developments in Mr. Fell's mitigation case. Further, trial counsel failed to consider whether new experts should be hired for trial and a contested proceeding. It thus failed to develop and present comprehensive evidence relating to Mr. Fell's mental health, thereby depriving the jury of critical evidence that it was obvious would be necessary for a coherent defense to the charged offenses, the mitigation presentation, and to address the prosecution's aggravation case. Second, trial counsel missed obvious warning signs

---

[23]     Counsel's investigation into Mr. Fell's life history and mental impairments remains ongoing, and counsel anticipate supplementing Mr. Fell's request for relief as a result of information learned through discovery, further investigation, or litigation of this Motion.

in Mr. Fell's history – both those known at the outset and more particularly those it tardily looked for and found only on the eve of trial – which had they been examined would have revealed that Mr. Fell had serious mental impairments. Finally, counsel failed to conduct the further investigation required by those warning signs. As a result, the jury was deprived of essential evidence regarding Mr. Fell's mental health.

Trial counsel's failure caused Mr. Fell prejudice. A more thorough review of Mr. Fell's history and mental condition would have revealed the coexistence of a number of brain impairments, including but not limited to, organic brain impairment due to exposure to fetal alcohol, untreated mood disorder, and the effects of exposure to chronic abuse and trauma during early childhood and continuing into adolescence. Testimony regarding these impairments would have explained much of Mr. Fell's seemingly aggravating conduct, perhaps supporting a diminished capacity defense, (see infra Section XIII), mitigating Mr. Fell's role in the crimes, and providing powerful evidence in favor of a life sentence. This testimony would have met and overcome the Government's aggravation case. It would also have explained Mr. Fell's flat or inappropriate affect and poorly modulated emotional tone both in his confessions and in the courtroom, which the Government strenuously emphasized to argue for a death sentence and to rebut mitigators proposed by Mr. Fell. In short, this testimony would have captured Mr. Fell for who he was, a brain impaired adolescent with multiple cognitive, emotional, and environmental factors limiting his ability to effectively modulate and effectively control his thinking, emotions, and behavior. In failing to investigate and present this evidence, trial counsel violated the prevailing norms of professional conduct as set forth in the ABA Guidelines and a long line of

Supreme Court jurisprudence on ineffective assistance of counsel. <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005) (noting that the ABA Guidelines are "guides to what is reasonable").[24]

### A.    Trial Counsel's Mental Health Investigation Violated the Prevailing Professional Norms as Set Forth in the ABA Guidelines

It is axiomatic that the defense of a capital case requires a thorough investigation of a client's background, character, life experiences and mental health. The principle is reflected in the prevailing professional norms. The ABA Guidelines require capital counsel to conduct an ongoing, exhaustive and independent investigation of defendant's medical history, which includes all aspects of the defendant's mental health including both neurological and psychiatric impairment. American Bar Association, <u>Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases</u> (rev. ed. 2003) Guidelines 1.1, 4.1, 10.11(A) (<u>printed in</u> 31 HOFSTRA L. REV. 913) (2002-2003) (the "ABA Guidelines"). Prevailing professional norms also require counsel, in the preparation of the mental health case, to direct the mitigation specialist to interview available family members, as well as former teachers, neighbors, co-workers, classmates and others who had an opportunity to observe the defendant's development and who may provide information critical to expert evaluations, as well as offering lay testimony and historical documentation to corroborate the testimony of experts. <u>See</u> Scott E. Sundby, <u>The Jury as Critic:  An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony</u>, 83 VA. L. REV. 1109, 1144 (1997). A broad investigation is necessary because "the defendant's psychological and social history and his emotional and mental health are often of vital

---

[24]    Trial counsel's duties and failings are set forth briefly based on the ABA Guidelines. Post-conviction counsel will separately brief the applications of these guidelines and the relevant caselaw to the facts of Mr. Fell's case in a subsequent memorandum of law. Post-conviction counsel will also submit separately declarations from mental health experts supporting each and every one of the conclusions reached herein. Post-conviction counsel will be moving for an evidentiary hearing where it anticipates presenting the mental health expert testimony that trial counsel could and should have presented.

importance to the jury's decision at the punishment phase." Id. at Guideline 4.1, Commentary at 956.

The ABA Guidelines make clear that: "Creating a competent and reliable mental health evaluation consistent with the prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtaining a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary." Id. at Guideline 4.1, Commentary at 956; see also Gary Goodpaster, The Trial for Life:  Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L. REV. 299, 323-324 (1983) (This investigation requires "inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized."). The collection and analysis of this documentary and testimonial evidence is a slow and time-intensive process, which often reveals the existence of collateral information, which, in turn, needs to be pursued.

The ABA Guidelines also require that at least one member of the defense team be "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," thus requiring the intense involvement of the mitigation specialist in developing the mental health portions of the defense. ABA Guidelines, Guideline 4.1(A). Through in-depth contact with the defendant, the mitigation specialist customarily collects information relevant to the ultimate mental health assessment by the

72

defense's experts, including observations of "the defendant's gait, mental state, affect regulation, memory, comprehension of writing and speech, adaptation to incarceration, capacity to form interpersonal relationships, and remorse." Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 969 (2008). Typically, the mitigation specialist "gathers extensive information about the mental health issues at hand, works with the defense team to identify and select a qualified expert, assists counsel in preparing the client and his family for the assessment process, and provides any additional information the mental health expert needs to conduct a reliable mental health assessment." Id. at 966.

The ABA Guidelines and prevailing professional norms further make clear that a thorough, reliable social history narrative must be completed prior to the selection or retention of mental health experts because "an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning." ABA Guidelines, Guideline 10.11, Commentary at 1061. "As a general rule, it is never appropriate to expect a mental health expert to deliver a comprehensive mental health assessment of the client until the life history investigation is complete." Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 975 (2008). Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate for the needs of the case, what role that expert will play, and what referral questions will be asked. The standard of care in capital cases, in particular, requires the selection of experts who are "tailored specifically to the needs of the case" not just "all purpose" experts with an insufficient

understanding of the client's individual history. ABA Guidelines, Guideline 10.11, Commentary at 1061.

**B.    Trial Counsel Stopped Investigating Their Client's Mental Infirmities Less than Six Months After his Arrest**

Within the first few weeks of Mr. Fell's arrest in December 2000, trial counsel communicated with Greg Waples at the United States Attorney's Office regarding the possibility of a plea. Decl. of A. Bunin (Ex. 264 at 2). Those communications gave trial counsel reason to believe a plea agreement could be reached for a sentence of life imprisonment – a plea agreement to which the United States Attorney's Office ultimately agreed. Those conversations also led trial counsel to retain mental health experts quickly, in order to bolster the decision of the United States Attorney's Office to agree to a plea for life imprisonment and to give the United States Attorney's Office the material to defend its decision not to seek the death penalty to the Department of Justice, the press, and the King family. Id.

In January 2001, counsel retained Cynthia Ayres as a mitigation specialist to conduct a preliminary investigation, but trial counsel did not consult with her on the selection or use of its mental health experts in order to focus on needed specific clinical expertise. See ABA Guidelines, Guideline 4.1(A); Decl. of A. Bunin (Ex. 264 at 1); Decl. of C. Ayres (Ex. 265 at 1); Declaration of G. Primomo, Mar. 16, 2011 ("Decl. of G. Primomo") (Ex. 263 at 1). Although the mitigation specialist was the only member of the team with any training in mental health, Ms. Ayres was not directed to review documents for the purpose of working with experts or spotting mental health issues. Decl. of C. Ayres (Ex. 265 at 3). In pursuit of a limited mitigation investigation sufficient to support a guilty plea, Ms. Ayres was not directed to spend time meeting with Mr. Fell, and as a result, she spent very little time with him. Id. Likewise, Ms. Ayres was not directed to spend extensive time with Mr. Fell's family, even important witnesses

74

like his sister Teri Fell.  Id.  At the conclusion of the pre-plea investigation, Ms. Ayres did not have much of the evidence that was later developed or that was readily accessible.  The trial team did not provide any of its experts with a full social history or even with all of the documents in the possession of public agencies.  See Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right:  Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 984 (2008) ("Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him."); see Declaration of Mark Mills, Mar. 13, 2011 ("Decl. of M. Mills") (Ex. 260 at 1).

On December 13, 2000, within days of Mr. Fell's arrest on November 30, 2000 and before retaining Ms. Ayres, trial counsel retained Dr. Jonathan J. Lipman, a board certified psychopharmacologist and neuropharmacologist.  Dr. Lipman reviewed the limited records collected within the first few weeks following the offense and evaluated Mr. Fell in January 2001.  Because he conducted his evaluation so early in the process, he was not presented with a comprehensive social history narrative.  Report of Neuropharmacological Consultation ("Lipman Report") (May 14, 2001) (Ex. 4 at FELL-00000424).  Although Dr. Lipman indicated in his initial communication with trial counsel that he typically interviews people close to the defendant in the weeks leading up to the offense, trial counsel did not arrange for Dr. Lipman to conduct those interviews.  Instead, his report relied heavily on Mr. Fell's self-reported substance abuse and the limited records collected by January 2001.  Lipman Report (Ex. 4 at FELL-00000424 ); Decl. of A. Bunin (Ex. 264 at 2).  Aside from the reports of the other defense experts, Dr. Lipman did not review any additional materials following his evaluation of Mr. Fell in January 2001.  He rendered his report on May 14, 2001, at the time counsel was engaged in

75

plea discussions.  Dr. Lipman was not asked to evaluate Mr. Fell's potential diminished capacity or any defenses to the charged offenses.  ABA Guidelines, Guideline 10.7 ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); Decl. of A. Bunin (Ex. 264 at 2).  He did not do any further work on the case after May 2001 and was not contacted again by trial counsel.

In February 2001, within approximately two months of Mr. Fell's arrest, trial counsel retained Dr. Mark J. Mills.  Dr. Mills is a forensic psychiatrist, not a clinician.  Decl. of M. Mills (Ex. 260 at 1).  Dr. Mills evaluated Mr. Fell on March 26 and 27, 2001.  Id. at 2.  Dr. Mills was given the limited documents collected to date, the notes taken by Dr. Lipman during his evaluation of Mr. Fell, and a 5 page memo from Ms. Ayres summarizing her interviews of a few of Mr. Fell's family members.  Ex. 87; Mills Report (Ex. 3 at FELL-00000392); Decl. of M. Mills (Ex. 260 at 1).  Dr. Mills issued a report on May 7, 2001 at the time of the guilty plea discussions.  Decl. of M. Mills (Ex. 260 at 2).  Thereafter, his activities were limited to trial preparation.  Id. at 2, 6.

On February 2, 2001, trial counsel called Dr. Wilfred G. van Gorp for the purpose of performing a neuropsychological evaluation of Mr. Fell and "to determine his current level of neuropsychological functioning."  Decl. of A. Bunin (Ex. 264 at 2); Van Gorp Report (Ex. 2 at FELL-00000377 ).  Trial counsel did not provide Dr. van Gorp with a detailed social history because one had not yet been developed, and trial counsel did not alert Dr. van Gorp to potential neuropsychological damage as a result of Debra Fell's alcohol consumption during her pregnancy with Mr. Fell.  Dr. van Gorp administered a battery of tests that did not take into consideration particular aspects of Mr. Fell's medical history like his mother's history of drug and alcohol abuse, and interviewed Mr. Fell on April 6, 2001, and subsequently issued a report in

76

May 2001, once again in connection with the guilty plea discussions. He also did not do any work on the case after May 2001, and was not contacted by trial counsel again.

Trial counsel turned over all of its mental health reports to the Government on May 18, 2001, along with a summary of the mitigation evidence to date in connection with the guilty plea discussions. Ex. 90; Decl. of A. Bunin (Ex. 264 at 2). In October 2001, weeks after Mr. Fell's codefendant died in custody, trial counsel agreed to a plea for life with the local United States Attorney. Decl. of A. Bunin (Ex. 264 at 3). The agreement was rejected by the Department of Justice and the Government issued a Notice of Intent to Seek the Death Penalty on January 30, 2002. Id. During the intervening time period until trial, counsel failed to follow up on numerous suggestions by its experts. For example, Dr. Lipman recommended neuropsychological testing, including an evaluation of Mr. Fell's dissociative tendencies and an administration of the Dissociative Experiences Scale. Trial counsel did not direct its neuropsychological expert, Dr. van Gorp, to complete this testing, which could have confirmed impairment of the right parietal lobe. Dissociation is a common symptom experienced by victims of trauma, and this testing could have corroborated Mr. Fell's self-reported history of black outs and/or shed light on other mental impairments due to exposure to chronic trauma. Dr. Lipman also took a hair sample from Mr. Fell, but trial counsel never directed him to submit it for testing.[25] Id. at 2. Testing could have revealed critical information regarding Mr. Fell's drug use.

On December 1, 2004, defense counsel served on the Government a 12.2 notice of intent to introduce expert evidence of a mental disease or defect bearing on the issue of

---

[25] In addition, despite Dr. Lipman's request and an instruction from trial counsel to the Government to preserve the clothing, trial counsel failed to obtain and test the underclothing worn by the defendant at the time of the offense. Ex. 80("We need to submit the clothing, or portions thereof, to an independent expert for examination.").

punishment.  Fed. R. Crim. P. 12.2.  However, prior to serving that notice and in the years leading up to trial, no one from the defense team engaged in the multifaceted social history investigation required under the law or revisited the incomplete picture it had provided for its experts in 2001 in the context of plea negotiations.  Trial counsel did virtually nothing to prepare a mental health case for trial.  Trial counsel did not direct its mitigation expert to continue with the mitigation investigation in these intervening four years.  Decl. of C. Ayres (Ex. 265 at 2).

In the five years leading up to trial, trial counsel did not direct its mitigation specialist to meet with Mr. Fell very often, and Ms. Ayres only met with Mr. Fell on three occasions in the years leading up to trial.  Decl. of C. Ayres (Ex. 265 at 3).  Because Ms. Ayres spent such little time with Mr. Fell during the years leading up to trial, she was not able to develop a close enough relationship with him in order to elicit sensitive mitigation information. See ABA Guidelines, Guideline 4.1, Commentary at 959 (noting the role of the mitigation specialist in "elicit[ing] sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed").  Ms. Ayres did not explore a number of highly sensitive but relevant topics with Mr. Fell, including his personal sexual history, and critical areas of the case including Mr. Fell's relationship with his codefendant were explored superficially at best. Decl. of C. Ayres (Ex. 265 at 3). The hours documenting Ms. Ayres's mitigation investigation tell a compelling story. During the preliminary plea negotiation investigation, Ms. Ayres billed 85 hours. Id. at 1. Then, from July 2001 through January 2005, Ms. Ayres only spent 21 hours working on Mr. Fell's case. Id. at 2. In the five weeks leading up to jury selection, Ms. Ayres resumed her mitigation investigation billing 55 hours, but by that point, it was too late to complete a full social history.  Id. at 3.

Although the ABA Guidelines note trial counsel's "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation," ABA Guideline 10.11(a), very little was done in the period after the plea fell through the trial began. Decl. of G. Primomo (Ex. 262 at 1). Although Ms. Ayres contacted trial counsel during that interim to see if there was something that she should be doing, she was told that she should not do any work, because counsel were expecting to defeat the federal death penalty and thus there was no need to prepare for the exigency of a trial. Decl. of C. Ayres (Ex. 265 at 2); Decl. of A. Bunin (Ex. 264 at 6). Although this interim period between June 2001 and 2005 presented an unparalleled opportunity wherein the witness relationships and mental health issues could have been explored with painstaking detail and meticulous attention to all possible leads, given the stayed proceedings, nothing whatsoever was done.

Ms. Ayres was not directed to keep a log of records that she asked trial counsel to collect, and she did not keep track of which records were requested and what progress was made. Decl. of C. Ayres (Ex. 265 at 3); Decl. of A. Bunin (Ex. 264 at 6). When Ms. Ayres was instructed to resume her mitigation investigation in the weeks leading up to trial, she realized for the first time that many readily available documents had not been collected. Decl. of C. Ayres (Ex. 265 at 3-4). Despite awareness that the Victim's Resource Center ("VRC") had what were obviously critically important records regarding Mr. Fell's childhood sexual abuse, counsel did not take steps to obtain these documents until the eve of trial. Ex. 88; Ex. 1 at FELL-00000006. Further, no one obtained the Children and Youth Services ("CYS") Contact Sheets, the contemporaneous notes taken by CYS caseworkers during family investigations, until immediately before the trial in June 2005, which precluded any follow-up regarding information

79

contained in these materials.   Decl. of C. Ayres (Ex. 265 at 4-5); Order, April 28, 2005 (Ex. 116).

These Contact Sheets further document social services involvement in Mr. Fell's childhood and

correspond to reports issued by CYS involving Mr. Fell.  No one on the trial team sought to

gather Mr. Fell's prison records from the Northwest Correctional Facility until spring 2005.

Though these records were obviously relevant to a mental health examination, they were

obtained in connection with the portion of the proceeding devoted to the fact that Mr. Fell would

not present a danger in prison, and not in connection with mental health.  In the five weeks

leading up to trial, Ms. Ayres was not asked to, and understandably was not able to, perform a

thorough social history investigation.  Decl. of C. Ayres (Ex. 265 at 3).  The late collection and

review of these documents prevented trial counsel from effectively utilizing them during the trial

as Ms. Ayres did not have enough time to follow up on all of the information they contained.

C. Ayres Decl. (Ex. 265 at 5).  Ms. Ayres was not directed to review the potential mental health

issues contained in these documents, and trial counsel did not provide these documents to its

mental health experts for analysis of red flags in these documents.  Id.

Indeed, counsel also did not continue to supply its mental health experts with

whatever materials or mitigation information obtained after these experts issued reports in May

2001.  Decl. of M. Mills (Ex. 260 at 2).  Aside from an occasional call to see if the case was still

active and/or if the case files could be placed in storage, neither Dr. Lipman nor Dr. van Gorp

had any contact with trial counsel.  Dr. Mills was in contact with trial counsel in connection with

his preparation for trial.  Id. Trial counsel did not ask any of its experts to consider updating

their reports in light of newly discovered evidence.[26]  Decl. of A. Bunin (Ex. 264 at 6).  Trial

---

[26]   By contrast, the Government engaged in exactly this exercise.  While defense counsel was doing nothing, Government counsel retained Dr. Welner and had Dr. Welner or other members law enforcement complete over 100 interviews.  The contrast between the government's preparation for trial and the defense's preparation of its mental health case for trial is stark and telling.

counsel also did not re-evaluate its experts and consider whether the experts it hired early in the case – and for purposes of a plea – were the appropriate experts to present in a mitigation or culpability proceeding at trial.  Id.

As further laid out below, trial counsel's inadequate mental health examination at the outset and then its decision to rely on the preliminary mental health investigation as it stood at the end of in the pre-authorization phase – without conducting any further investigation, and without considering any of the evidence that it developed or could have developed regarding Mr. Fell's mental defects – left them flat-footed and ill prepared to put on a guilt case or even an effective mitigation case, or to rebut the government's case for aggravation, which deeply prejudiced Mr. Fell.  This decision was objectively unreasonable under the circumstances.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  Although the jury heard facts elicited through lay witnesses regarding certain aspects of Mr. Fell's background and abuse, trial counsel's failure to develop and prepare its mental health case for trial meant that the jury never learned about the psychological impact of these events on his brain or behavior.

> **C.  Evidence in Trial Counsel's Possession or that Trial Counsel Acquired Only After the Mental Health Reports Were Completed Provided Evidence of Mr. Fell's Serious Mental Impairments.**

There is evidence that Mr. Fell suffers from Fetal Alcohol Spectrum Disorder (FASD), a mood disorder, and impairment due to the overwhelming, chronic emotional trauma he was exposed to during his early childhood, continuing into his adolescence.  The defense had clear warning signs that Mr. Fell suffered all of these impairments.  The jury, however, heard none of that evidence.  The defense failed adequately to investigate it.  The failure to investigate and develop that evidence or to present it to the jury was ineffective assistance that caused Mr. Fell constitutional prejudice.

As set forth further below, trial counsel violated prevailing norms of professional conduct at three stages. First, there was evidence in the early stages of this case through May 2001 that provided red flags as to Mr. Fell's mental impairments but that trial counsel – intent on reaching a plea agreement – failed to recognize. Having conducted a preliminary investigation for the purposes of plea negotiations with local attorneys predisposed to accept such a plea and with the mitigation case that was ultimately rejected by the Department of Justice, trial counsel failed to evaluate that mental health evidence and determine if it was appropriate for trial. Second, even after the plea negotiations fell through, trial counsel failed to conduct an appropriate and timely mitigation investigation or to obtain the relevant documents and then inexcusably missed additional warning signs in documents and information that trial counsel obtained far later than they should have. Third, evidence that has been obtained post-conviction but that was available to trial counsel had it conducted a thorough investigation would have provided compelling and reliable evidence that a mental health expert could have used to explain Mr. Fell's mental impairments.

> **1.    Missed Red Flags that Mr. Fell Suffers from a Fetal Alcohol Spectrum Disorder**

Unbeknownst to the jury and to Mr. Fell's counsel, there is compelling evidence that Mr. Fell has a mental impairment due to his mother's alcohol consumption while pregnant. In particular, Fetal Alcohol Spectrum Disorder ("FASD") is an umbrella term describing the continuum of permanent birth defects caused by maternal consumption of alcohol during pregnancy. Centers for Disease Control and Prevention, Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis (July 2004) at 2-4; Susan J. Astley & Sterling K. Clarren, Diagnosing the Full Spectrum of Fetal Alcohol Exposed Individuals: Introducing the 4-Digit Diagnostic Code, Alcohol & Alcoholism (Vol. 35, No. 4) at 400-410 (2000). FASD is an organic form of

brain damage which arises from circumstances beyond the individual's control. It is common for persons with FASD to display abnormal behaviors during childhood such as hyperactivity, poor impulse control, poor judgment and anxiety. Centers for Disease Control and Prevention, <u>Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis</u> (July 2004) at 15-16. In May 2001, but even more particularly after May 2001, counsel had evidence that Mr. Fell's mother was drinking excessively during his pregnancy, and trial counsel's failure to investigate and present that evidence was the function of ineffective assistance of counsel.

As set forth more fully below, there were a number of red flags that should have alerted trial counsel to the need for an investigation into Mr. Fell's FASD as early as May 2001. First, Mr. Fell's father reported that Donny's mother drank daily during her pregnancy with Donny. Ex. 87 at FELL-00001261. By April 2001, trial counsel were aware that Debra Fell drank daily while pregnant. <u>Id.</u> Second, medical and school records in counsel's possession or available to trial counsel describe him as being "small" or having a "small build." Ex. 1 at FELL-00000149-152 ("patient is a small, 11-year-old"); <u>id.</u> at FELL-00000160-64 ("patient is a small, thin, 12 ½ year old"); (Ex. 26) ("fourteen year old white youth of small build"); <u>see</u> Ex. 143 at FELL-00001756; Ex. 27; Ex. 28; Ex. 45. Those records reflect that Donny's height measured in the 11th percentile when he was in first grade but had decreased to the 7th percentile by high school. Ex. 143 at FELL-00001756; Ex. 28; <u>see</u> <u>also</u> Ex. 76 at FELL-00001177-79.

Third, contemporaneous records of Mr. Fell's childhood development and behavior suggest functional problems that are stunningly consistent with exposure to fetal alcohol, and which should have alerted trial counsel that this was a problem. <u>See</u> Ex. 1 at FELL-00000160-64 (has "difficulty keeping still and concentrating"), (his "insight and judgment are immature and/or impaired by his mood swings and impulsiveness"); <u>id.</u> at FELL-00000170

("fidgety and has difficulty staying still"); Ex. 26 ("potential for impulsive, acting out behavior due to poorly developed inner controls"); Ex. 25 ("severe aggressive out-bursts, school difficulties, severe parent/child conflict, testing limits and poor social skills"); Ex. 1 at FELL-00000139-141 ("[t]hinking disturbances characterized by impaired judgment" and "impulsive" behavior displayed). Neuropsychological testing also revealed a discrepancy between Mr. Fell's verbal and math abilities, suggesting the presence of a nonverbal learning disability potentially consistent with FASD. Van Gorp Report (Ex. 2 at FELL-00000382). Finally, there was reason to believe that analysis of Mr. Fell's childhood photos would reveal the signature facial dysmorphology commonly associated with FASD.

Each of these facts is consistent with exposure to fetal alcohol and a fetal alcohol spectrum disorder and, together or alone, should have prompted trial counsel to retain an expert on fetal alcohol spectrum disorder and to have discovered that there was evidence of fetal alcohol spectrum disorder – particularly once the Government issued its Notice of Intent.

Even if trial counsel could have somehow been excused from missing the signs of fetal alcohol exposure in 2001, when counsel was in the process of negotiating a plea agreement with the Government, however, counsel cannot be excused from failing to investigate those signs after the Notice of Intent was issued. Indeed, by the time of trial in 2005, extensive evidence in trial counsel's files and, separately and independently, in information that was readily available to trial counsel had it conducted a reasonable investigation pointed the way to a fetal alcohol spectrum disorder. That evidence included but was not limited to the following: (1) extensive evidence known to counsel at the time of trial and even more extensive evidence obtained post-conviction but that should have been obtained by the time of trial that Debra Fell was drunk while pregnant with Mr. Fell and that there was a history of drinking both by Debra Fell and by

84

all members of her family, Tr. Vol. VII-1 at 57:13-58:6 (July 1, 2005) (Susan Fell Benczkowski; testimony that Debra Fell drank while pregnant with Mr. Fell, believing that "barley was good for the baby"); Decl. of R. Fell (Ex. 247 at 3); Decl. of T. Fell (Ex. 278 at 23) (noting her own fetal alcohol syndrome); (2) evidence from many witnesses to Mr. Fell's childhood that he was small and skinny as a child, see Decl. of A. Gacek (Ex. 252 at 1) ("Donny looked younger than his age because he was small and skinny"); Decl. of J. Gacek at 1 (Ex. 251 at 1) ("Donny was older, but he was really small and skinny")); and (3) evidence from many witnesses to Mr. Fell's childhood that he exhibited the other clinical criteria of fetal alcohol exposure including that he was impulsive and hyperactive, Decl. of C. Bublo (Ex. 245 at 3-4) (Donny was "definitely hyper").

Further, the CYS Contact Sheets and VRC records obtained on the eve of trial supply further evidence of Donny's hyper activity. Ex. 11 ("hyper, climbing all over this worker"); Ex. 12 ("Donald was very hyper and could not sit still"); Ex. 13 at FELL-00000699 ("Donald is reportedly somewhat hyper in school"); Ex. 1 at FELL-00000014-15 ("Unable to concentrate"). Reports of Mr. Fell's hyperactivity, inability to concentrate, and impulsivity continued throughout his childhood and adolescence, as reflected in his school records and hospital records, both of which trial counsel had in its possession, but had not reviewed properly. Ex. 1 at FELL-00000209, FELL-00000211 ("inattention in class"); id. at FELL-00000731 ("appears hyper and restless"); Ex. 19 at FELL-00000721 ("Silly hyperactive"); Ex. 22 at FELL-00000776 ("Became hyper as afternoon progressed"); Ex. 24 at FELL-00000824 ("Somewhat silly and hyper during free time").

Indeed, some of the reasons Mr. Fell was institutionalized repeatedly at age 11-13 were for hyperactivity, impulsivity, and behavior dysregulation, all of which a mental health

85

expert would have explained are symptoms of fetal alcohol spectrum disorder. See Ex. 23 at FELL-00000783-84 ("[Patient] has hx [history of] hyperactivity"); Ex. 1 at FELL-00000139-141 ("impulsive"); Ex. 1 at FELL-00000160-64 ("His insight and judgment are immature and/or impaired by his mood swings and impulsiveness"); Ex. 1 at FELL-00000149-52 (same). These behaviors were evident in the records from his placement at St. Michael's in 1994 as well. Ex. 26 ("[a]ffect is slightly anxious"), ("difficulty paying attention in school because … he does not sleep well at home"), ("[a]bstract thought process is slightly below average and this is also true of vocabulary as well as judgment for practical situations"), ("[i]nsight into the dynamics of a social situation is slightly below average"), ("[s]ome mild underlying autistic trends"), ("easy victim of negative peer influence"). As a child, Mr. Fell was diagnosed with Hyperkinetic Conduct Disorder. Ex. 1 at FELL-00000160-64; Ex. 21 at FELL-00000761.

Each of those pieces of information – together and separately – is evidence that a reasonable defense attorney would have realized was indicative of fetal alcohol spectrum disorder that required counsel to investigate and test further. And had counsel investigated, it would have received even more evidence that Mr. Fell has a Fetal Alcohol Spectrum Disorder. As early as May 2001, trial counsel was aware that Mr. Fell's mother drank while pregnant with him. Ex. 87 at FELL-00001261. Once again, records and information that were both in trial counsel's possession by the time of trial or were readily accessible, showed that Mr. Fell exhibited these behaviors throughout childhood. See Ex. 1 at FELL-00000166-67 (has "difficulty keeping still and concentrating"); (his "insight and judgment are below age level, and they are impaired by his mood swings and impulsivity"); Ex. 26 ("potential for impulsive, acting out behavior due to poorly developed inner controls"); Ex. 25 ("poor social skills"); Ex. 1 at FELL-00000139-40 ("[t]hinking disturbances characterized by impaired judgment" and

86

"impulsive" behavior displayed); Decl. of C. Bublo (Ex. 245 at 3-4) ("hyper").   Another syndrome of FASD is a slight or small build in childhood.   Mr. Fell once again fit the bill – based on information staring at defense counsel in the face.   And there was reason to believe that analysis of Donny's childhood photos – also accessible to defense counsel – showed facial characteristics commonly associated with FASD.

### 2.    Missed Red Flags that Mr. Fell has a Mood Disorder

Also unbeknownst to the jury and to Mr. Fell's counsel, there is evidence that Mr. Fell has a mood disorder.   Mood or affective disorders are a category of mental health problems including depression and bipolar disorder.   There is a strong genetic component to the onset of mood disorders, and they are generally caused by chemical imbalances in the brain.   Mood lability (a clinical term of art describing mood fluctuations), agitated depression, acting out, anxiety, insomnia, and irritability are all common symptoms of mood disorder.   The failure to discover and present expert testimony regarding this impairment and its impact on Mr. Fell's behavior was also the function of ineffective assistance of counsel.

Once again, trial counsel had some warning signs as to the presence of a mood disorder as early as the spring of 2001 as evidenced by his family history, symptom presentation, and response to medication.   In the preparation for the plea, trial counsel was aware that Donald Fell Sr. had a "long history of alcoholism and seem[ed] to recognize that his drinking has been a way of coping with lifelong depression.   His mother suffered from depression and underwent electroshock treatments when he was a young child.   Mr. Fell's mother was also an alcoholic, as her father may have been." Ex. 87 at FELL-00001260.   Medical and social services records in counsel's possession in spring 2001 demonstrated Mr. Fell's mood swings, anxiety, aggression, and inability to control response to stimuli.   See, e.g., Ex. 1 at FELL-00000149-52 (his "insight and judgment are below age level, and they are impaired by his mood swings and impulsivity");

87

(his "affect is labile and extreme, out of proportion to the stimulus"); Ex. 1 at FELL-00000160-64 ("mood is anxious, angry and depressed"), ("insight and judgment are immature and/or impaired by his mood swings and impulsiveness"); Ex. 1 at FELL-00000139-40 ("[t]hinking disturbances characterized by impaired judgment" and "impulsive" behavior displayed).

Mr. Fell's childhood institutionalizations between 1991 to 1993 demonstrate the progression of his mood disorder. For example, in connection with his first hospitalization in 1991, Dr. Anthony Denaro identified Donny as having "[t]hinking disturbances characterized by impaired judgment," "anxiety," "[m]ood disturbances characterized by hostility, anxiety and lability," acting out behavioral problems including "assaultive, combative, destructive, oppositional, defiant, impulsive and running away behaviors," and an "inability to communicate and relate well." Ex. 1 at FELL-00000139-41; see also Ex. 18 at FELL-00000717 (Donny "displayed underdeveloped social skills" during his testing in 1991 as well). A similar panoply of symptoms were observed in Donny's subsequent hospitalization in 1992. His treating psychiatrist, Dr. James Feussner, noted that Donny's "affect is labile and extreme, out of proportion to the stimulus," that his mood is "angry and depressed," that his "insight and judgment are below age level, and they are impaired by his mood swings and impulsivity." Ex. 1 at FELL-00000149-52. While in treatment, Donny responded well to antipsychotic medications, but within a few months, he was hospitalized again after his mother, against medical advice, stopped administering his medications. Id.; Ex. 1 at FELL-00000166-67; Ex. 1 at FELL-0000070-71. During the hospitalization in 1993, he presented the same symptoms of mood lability, impulsivity, anger, and depression. Ex. 1 at FELL-00000166-67. Similar symptoms were presented and treated with medication and therapy during Donny's fourth and final hospitalization in 1993. Ex. 1 at FELL-00000170-71 ("His mood was depressed and he was

often on the verge of tears, especially when discussing the fact that he feels that his mother does not want him anymore;" "[h]istory indicated that he had very poor control of his aggressive impulses"). At different points during his hospitalizations, Mr. Fell was treated with a variety of medications to varying degrees of effectiveness. Ex. 1 at FELL-0000169-173 ("[h]e does well on his medications"), ("some beneficial effects"). That Donny was treated with antipsychotic medications is also a red flag signifying a mood disorder.

Mr. Fell's family history, behavior, and childhood psychiatric treatment evidence the existence of a mood disorder. Taken together or alone, these factors should have prompted trial counsel to complete a detailed social history and retain an expert in child psychology to explain the manifestation of mood disorders in children and adolescents.

Information in the possession of defense counsel by the time of trial or that was available to defense counsel but defense counsel inexplicably and improperly failed to investigate provided further warning signs of the existence of Mr. Fell's budding mood disorder, as evidenced by his mood swings and agitation. A multigenerational family history documenting mental illness and substance abuse by Mr. Fell's mother and others on both the maternal and paternal sides of Mr. Fell's family show that these genetic vulnerabilities to mental illness run deep on both sides of Mr. Fell's family tree. As discussed above, trial counsel learned for the first time in the weeks before trial that CYS had "Contact Sheets," contemporaneous handwritten notes by social workers which further document the dysfunction, abuse, and trauma at the Fell home. See Decl. of C. Ayres (Ex. 265 at 4-5); Ex. 116; Ex. 17 at FELL-00000712 (Oct. 11, 1991) (Donny "hospitalized because of very aggressive behavior"); id. at FELL-00000714-15 (Nov. 7, 1991) (Donny missing appointments because his mother "forgot"); (Ex. 29) (May 26, 1995) ("Donny "stays in his room and he won't eat" and has "mood swings"). Those records

89

were further red flags of Mr. Fell's mood disorder but as a result of counsel's failure to conduct a reasonable investigation after the plea was rejected the defense never had them and as a result of trial counsel's failure even to think about the need to investigate further no expert ever considered them.

The same is true for nursing records from Wilkes-Barre General Hospital documenting Donny's childhood institutionalizations, which provide essential observational background to Donny's treatment and contain further warning signs. See generally Wilkes-Barre General Hospital ("WBGH") Nursing Records of Donald Fell; see, e.g. WBGH Adolescent Psychiatric Unit – Nursing Record (Ex. 22) (4/15/92; 4/19/92; 4/20/92; 4/16/92) (all noting silliness); (Ex. 23) (1/23/93; 1/29/93; 2/12/93; 2/13/93; 2/14/93; 2/20/93) (same); Notes from Interdisciplinary Progress Records (Ex. 144) (6/8/93; 6/9/93; 6/11/93; 6/14/93; 6/20/93; 6/21/93; 6/22/93; 6/25/93; 6/26/93) (same); Notes from WBGH Adolescent Psychiatric Unit Nursing Record (Ex. 24) (6/8/93; 6/10/93; 6/12/93; 6/14/93; 6/15/93; 6/21/93; 6/22/93; 6/23/93) (same). These documents further highlight Mr. Fell's inappropriate affect, sometimes flat or responding to serious matters with jokes or inappropriate laughter – once again a red flag. (Ex. 22) at FELL-00000762-63 ("affect is flat"), ("wrote of an accidental shooting and him playing with weapons, fighting and arguing with mom and dad and being defiant to authority figures. He is silly"); (Ex. 24) at FELL-00000840-41 ("wise-guy attitude").

Further evidence regarding Mr. Fell's mood disorder resides in the records of Northwest Correctional Facility. Those records – also readily accessible but unreasonably obtained only on the eve of trial – contain evidence regarding Mr. Fell's chemical dependency, mood lability, agitated depression, anxiety, insomnia, and irritability. This evidence would have alerted a reasonable competent defense attorney of Mr. Fell's mental impairment in light of the

mood disorders that run in his family and his childhood symptoms. See Ex. 75 at FELL-00001166 (Dec. 28, 2000) (listing Mr. Fell's problem as "I have trouble breathing followed by chronic severe chest pains. I can't sleep."); Ex: 75 at FELL-00001167 (March 1, 2001) ("I have trouble sleeping."); Ex. 75 at FELL-00001169 (June 8, 2001) ("insomnia and anger problems"). Mr. Fell's conditions during pretrial detention suggest the likelihood that he was experiencing manic phases, and had counsel investigated, an expert could have explained these symptoms and their impact to the jury. Ex. 74 at FELL-00001171 (March 2002) ("panic attacks") at FELL-00001171; Ex. 75 at FELL-00001172 (March 25, 2002) ("panic attacks and irritability"); Ex. 75 at FELL-00001174 (Feb. 25, 2003) ("trouble sleeping"); Ex. 75 at FELL-00001175 (Dec. 31, 2003) ("insomnia" and "lack of sleep").

Based on all of that information, counsel had an obligation to investigate further and to present evidence of the mood disorder for the jury to be able to understand the effect of these symptoms on Mr. Fell's brain development and behavior. But counsel did not. Had they investigated, there would have been further evidence that Mr. Fell has a mood disorder. Children with mood disorders may be depressed or manic, or alternate between the two. Mood lability (a clinical term of art used to describe mood fluctuations), impulsivity, anger, and depression are documented in the clinical literature as core symptoms for childhood mood disorder, particularly in what is known as the prodromal phase, when the child is just beginning to experience deterioration of the mental state. Mr. Fell clearly demonstrated this constellation of symptoms (mood lability, impulsivity, anger and depression) during his childhood hospitalizations. See Ex. 1 at FELL-00000137-141; Ex. 1 at FELL-00000149-52; Ex. 1 at FELL-00000166-167; Ex. 26 (difficulty paying attention due to lack of sleep). Further, mania (a distinct period of abnormally and persistently elevated, expansive or irritable mood) is often marked by insomnia, racing

91

thoughts, and distractibility, and Mr. Fell demonstrated these symptoms while incarcerated pretrial. See Ex. 75. Mood disorders are very common among people with substance abuse disorders as well, and thus, an expert could have explained that Mr. Fell's early and frequent substance abuse is also consistent with this self-medication that often augments the symptoms of mood disorders. This relationship is described clinically as comorbid disorders or dual diagnoses.

### 3. Missed Red Flags that Mr. Fell Suffers from the Effects of Chronic Exposure to Trauma from Early Childhood Through Adolescence

Mr. Fell's counsel never investigated the clinical or medical meaning and sequelae of the trauma Mr. Fell experienced throughout his life, and, as a result of counsel's failure to conduct a reasonable investigation, the jury never learned about the far-reaching implications of his suffering from and being exposed to ongoing, chronic trauma. Evidence that was available to trial counsel would have shown the impact of trauma on Donny's childhood development and adverse trajectory and linked that trauma to the person he became and was at age 20.

Knowledge of the physical and sexual violence that Donny experienced and witnessed at age four were warning signs that there were major problems in Donny's household and life. Ex. 1 at FELL-00000020. There was also evidence that the behavior ascribed to Donny immediately after this abuse and violence plagued him for the rest of his childhood and adolescence and reflects symptoms of severe trauma, including inability to modulate emotions, avoidance, blunted affect, hyperactivity, anger, numbing of emotional responses, and blunted affect. Many of the aforementioned symptoms of mood disorder in Donny's childhood, including impulsivity, flattened affect, chemical dependency, and affective dysregulation (over or under responding to circumstances) are also consistent with impairment due to chronic trauma

exposure and were red flags given the traumas of which counsel was aware as early as the spring of 2001. See, e.g., Ex. 1 at FELL-00000149-52 (has "difficulty keeping still and concentrating"); (his "insight and judgment are below age level, and they are impaired by his mood swings and impulsivity"); Ex. 1 at FELL-00000160-64 (same); Ex. 25 ("poor social skills"); Ex. 1 at FELL-00000139-141 ("[t]hinking disturbances characterized by impaired judgment" and "impulsive" behavior displayed); Ex. 26 ("quick to resort to flight or avoidance behavior mechanisms in dealing with situations which he perceives as anxiety provoking or ego threatening rather than attempting to confront the problem in a positive manner"), ("tendency to rely upon fantasy or other intellectual defenses as a means of coping with reality demands"), ("impulsivity, and a tendency to feel somewhat overwhelmed by his current state of affairs"), ("potential for impulsive, acting out behavior due to poorly developed inner controls").

Trial counsel were also in possession of evidence regarding Mr. Fell's tendency to black out or dissociate. That evidence should have alerted trial counsel to the extent of the trauma suffered by Mr. Fell and its lasting impact on his mental state. Even in connection with trial counsel's preliminary investigation in 2001 at least one family member reported that Donny "would occasionally black out" and this tendency was described to the family by his childhood treating psychiatrist Dr. Feussner. Ex. 87 at FELL-00001263 (April 23, 2001). Mr. Fell's self-reporting during his interview with Dr. Lipman also reflected that he blacks out at times. Dr. Lipman even recommended that trial counsel investigate Mr. Fell's dissociative tendencies – a suggestion that was never pursued. Dissociation, a paramount symptom of chronic trauma, stems from problems in the right parietal lobe and can be evaluated through neurological testing. One of the tests administered by Dr. van Gorp, the Rey-Osterrieth Complex Figure (Rey-O) test, showed that Mr. Fell performed in the below average range which coupled with his history of

93

dissociation should have been a red flag as to potential defects in the right parietal lobe. See Van Gorp Report (Ex. 2 at FELL-00000389). However, after the plea deal fell through, counsel failed to investigate these anomalies.

Even if counsel did not notice these warning signs at the time of the plea negotiations in 2001, they surely would have seen even more red flags had the proper and reasonable investigation been conducted for a case that was going to trial. The CYS Contact Sheets which counsel did not obtain until the spring of 2005, shortly before trial, depict the chronic trauma Mr. Fell experienced throughout his childhood and reveal telling information which is absent from the final CYS reports. Compare Ex. 1 at FELL-00000049-51 with Ex. 14. Also on the eve of trial in May 2005, counsel sought and obtained documents from the Victim's Resource Center. They provided further insight in Mr. Fell's reactions to traumatic childhood events, including red flags regarding Mr. Fell's avoidance – but none of the mental health experts were ever given them. Ex. 1 at FELL-00000010-12, FELL-00000014 (afraid of being "locked in his bedroom" and "anything called a game"). Those documents which could have and should have been obtained earlier – and when obtained should have been investigated – further highlight Donny's symptomatic response to trauma. These documents show that Donny began to associate any yelling or raising of voices with violence. Id. at FELL-00000010-12. These documents depict avoidance of the thoughts and memories associated with the trauma (e.g., an unwillingness to discuss it), hyperarousal symptoms including hyperactivity, and reexperiencing symptoms including reenacting the trauma in his play. Ex. 1 at FELL-00000006-15; Ex. 1 at FELL-00000010, FELL-00000014-15.

The same is true for documents reflecting Mr. Fell's mental condition post-arrest, which counsel failed to review until spring of 2005. While incarcerated, Mr. Fell continued to

94

experience symptoms of trauma exposure including panic attacks, difficulty sleeping, and anger. For example, on July 6, 2001, Mr. Fell was administered an ice pack after punching a wall in his cell. Ex. 93. He reported to staff, that he was "just angry and 'got into a fight with the wall.'" Id. Further, a mental health expert would have explained the staggering comorbidity rates between victims of chronic trauma and substance abuse, and explained that Mr. Fell's early childhood polysubstance abuse was another warning sign of trauma.

Expert testimony would establish that these documents and others like them demonstrate that Mr. Fell has experienced chronic, ongoing trauma throughout childhood and adolescence. Chronic, protracted exposure to interpersonal trauma (such as physical, emotional, or sexual abuse or domestic violence) causes victims to experience a loss of control and feelings of helplessness. Bessel van der Kolk, TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY AND SOCIETY (1996) at 184, 196. The chronic nature of this trauma results in the development of adaptive behaviors to avoid the pain and fear of this abuse. For example, people – like Mr. Fell – who have been physically and sexually molested as children may develop a host of distrustful, fearful, and dissociative responses to a range of stimuli associated with intimacy, aggression, and the negotiation of trust. Id. at 184; see Decl. of T. Fell (Ex. 278 at 19) (Donny "blacked out when he got upset and couldn't remember what happened"). Common symptoms of severe trauma include: (1) reexperiencing symptoms, including intrusive recollections of trauma or dissociation that are triggered by exposure to cues symbolizing the trauma; (2) avoidance symptoms, which involve diminished participation in activities and avoidance of thoughts, people, places and memories associated with the trauma; and (3) hyperarousal symptoms, which include difficulty sleeping, irritability, difficulty concentrating, hypervigilence, and exaggerated startle response. Id.; see also Eitan D. Schwartz

95

& Bruce D. Perry, The Post-Traumatic Response in Children and Adolescents, PSYCHIATRIC CLINICS OF NORTH AMERICA (Vol. 17, No. 2) (June 1994) at 315. In children, these symptoms are often expressed through an inability to modulate one's emotions, hyperactivity, aggression, numbing of emotional responses, and blunted affect. See Eitan D. Schwartz & Bruce D. Perry, The Post-Traumatic Response in Children and Adolescents, PSYCHIATRIC CLINICS OF NORTH AMERICA (Vol. 17, No. 2) (June 1994) at 316.

An expert in trauma would have explained that the evidence of trauma experienced by Mr. Fell during his early childhood and throughout adolescence is overwhelming, and his responses from childhood onward demonstrate the array of chronic trauma symptoms. Following his early childhood sexual abuse, Mr. Fell demonstrated all three categories of symptoms: avoidance, hyperarousal, and reexperiencing. As traumas continued to accumulate, Mr. Fell began to demonstrate increasing irritability, hyperactivity, and eventually aggression as demonstrated by his school and hospitalization records. Symptoms of hyperarousal including irritability and disrupted sleep remain present during his incarceration.

### D.    Trial Counsel's Performance Fell Below Prevailing Norms of Professional Conduct

Trial counsel's failure to investigate and follow up on any of these red flags and counsel's decision to hire its mental experts at the outset before it even had some of these warning signs and then not to reconsider what mental health experts it should retain and present at trial in light of this new evidence (which counsel should have had earlier) all fell below the prevailing norms of professional conduct. Any one of these errors would require that the death sentence be vacated.

Common sense, constitutional standards, and the ABA Guidelines all reflect that expert witnesses are crucial to "assist the jury in understanding the significance of the [lay]

96

observations. Expert testimony is necessary to explain the permanent neurological damage caused by fetal alcohol syndrome or child abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control." ABA Guidelines, Guideline 10.11, Commentary at 1061. A jury cannot figure that out for itself. The commonsense observation that expert testimony is essential is also reflected in the case law. The failure to investigate and present powerful mitigating evidence of mental impairment, including expert testimony regarding lay observations, falls below prevailing professional standards of care. See Wiggins v. Smith, 539 U.S. 510 (2003), Rompilla v. Beard, 545 U.S. 374 (2005); Ainsworth v. Woodford, 268 F.3d 868, 876 (9th Cir. 2001) ("the introduction of expert testimony would also have been important" to explain the effects that "serious physical and psychological abuse and neglect as a child" had on the defendant"); Outten v. Kearney, 464 F.3d 401, 418-19 (3d Cir. 2006) (counsel abandoned its investigation at an unreasonably early stage and failed to uncover evidence of trauma); Jermyn v. Horn, 266 F.3d 257, 307-08 (3d Cir. 2001) (failure to investigate and present evidence of abusive childhood and "psychiatric testimony explaining how [defendant's] development was thwarted by the torture and psychological abuse he suffered as a child.").

Further, it is well settled that "[i]n capital litigation, an accurate and reliable life history investigation is the foundation for developing and presenting pivotal mental health issues." See Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 975 (2008). The ABA Guidelines require capital counsel to "conduct an ongoing, exhaustive and independent investigation of" "anything in the life of the defendant which might militate against the appropriateness of the death penalty." ABA Guidelines, Guideline 10.7;

97

Guideline 10.7 Commentary at 1021 n.207; Guideline 10.11. In particular, investigation into the penalty phase "requires extensive and generally unparalleled investigation into personal and family history." Id. at Guideline 10.7, Commentary at 1021 n.208 (This broad investigation requires locating and interviewing "the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others."). This duty to investigate is on-going. See ABA Guidelines, Guideline 10.7; Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 972 (2008) ("Just as observation, gathering records, and conducting interviews are ongoing activities, organizing and interpreting" life history information is a "continuous process.").

Although circumstances – including those present here – may make it reasonable to conduct a preliminary assessment of the client's mental condition, such as competency, trial counsel still has an ongoing obligation, which it failed to satisfy, to resume the sweeping life history investigation required under prevailing professional standards and then to have an expert make a comprehensive mental health assessment. See Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 975 (2008); See Dickerson v. Bagley, 453 F.3d 690, 693 (6th Cir. 2006) ("a thorough and complete mitigation investigation is absolutely necessary in capital cases"); ABA Guidelines, Guideline 10.7, Commentary at 86 ("require[ing] extensive and generally unparalleled investigation into personal and family history"). "As a general rule, it is never appropriate to expect a mental health expert to deliver a comprehensive

98

mental health assessment of the client until the life history investigation is complete." Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 974-75 (2008).

Here, from the beginning, it was obvious that Mr. Fell's mental health and the relationship between his early childhood experiences (from the womb until his teen years) to the person he became at the time of the crimes would be critical issues both at the guilt stage and at the penalty phase. Counsel knew that in December 2000 when they first began to think about experts, knew it in May 2001 when they submitted the mental health experts to the Government, and knew it on December 1, 2004 when they served their Fed. R. Crim. P. 12.2 notice on the Government. They also knew that Mr. Fell's mental health and the relationship between his health, the person he was at age 20, and the crimes would be hotly contested issues at trial and in the penalty phase. As early as December 2004, the Government gave notice that – notwithstanding the two expert reports it had obtained that reported mitigating factors – it had hired and intended to use a third expert with a history of aggressively arguing for, and presenting the case, for death. And counsel also knew that that expert and the Government were devoting extensive time and attention to this precise issue.[27] It was also obvious. The Government was not just going to roll over.

However, knowing full well that mental health would be *the issue* at trial, counsel failed entirely to conduct the reasonable investigation required by the Constitution. They did not consider whether the preliminary evidence that they had collected prior to the guilty plea falling

---

[27] From early 2004 when Dr. Welner began his work on the case, he was "engaged in an extensive evaluation of the defendant" including reviewing "thousands of documents relating to Fell, including work papers, interview reports and test results generated by the 2001-02 experts, as well as historical records" from Mr. Fell's childhood. Motion for reconsideration of mental health discovery at 4, No. 2:01-CR-12, Dkt. No. 105 (Apr. 14, 2005). Dr. Welner also spent several days in Mr. Fell's hometown of Wilkes-Barre,

apart contained additional evidence of mental health impairments for trial and did not reasonably request or receive further documents until the eve of trial. When they obtained further documents and records, they did not make reasonable efforts to understand or utilize their contents. They did not determine whether the contents supported either the existence of these mental health impairments or even the need to test further. They did not see the red flags contained in the new documents and information, which were not only readily accessible but – in many cases – were right there in their files. As a consequence, they also did not follow up or conduct the further investigation that a reasonable review of the records would have suggested. They did not follow likely avenues they could fruitfully have followed in building the mitigation case. All the while, counsel knew this was a critical issue – and knew that the Government was doing its best to prove that Mr. Fell had no mental impairment.

Although it is well established that conducting a multigenerational investigation "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment," trial counsel failed to conduct such an investigation here. Id. at Guideline 10.7, Commentary at 1025. Moreover, although "[s]pecial care should be taken to identify family members whose mental illness is or was similar to that of the defendant" and such care would have resulted in the discovery of such family members, it was not exercised here. Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting it Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963, 970 (2008). Mr. Bartnick, a team investigator, spent time with and befriended Mr. Fell, but he lacked the specialized training to

Pennsylvania "meeting with and personally interviewing over a dozen persons knowledgeable about Fell and Robert Lee, such as friends, school teachers and family members." Id.

100

identify mental health issues.  Decl. of A. Bartnick (Ex. 262 at 1); Decl. of G. Primomo (Ex. 263 at 1); ABA Guideline 4.1(A)(2).

Trial counsel's defaults were not a function of the exercise of judgment about how to best marshal their time and serve their client.  Time was not an issue here.  Trial counsel certainly had time.  The Notice of Intent to Seek the Death Penalty was served in January 2002 – three and a half years before trial.  Although this Court struck down the federal death penalty on September 24, 2002, trial counsel could not (and should not) have assumed that result would follow when the Government first served its Notice in January or that it would stick, particularly when the Government indicated it would file a notice of appeal on October 22, 2002.  And, by March 2, 2004, it was clear that the Second Circuit had rejected this Court's order and that – absent the extraordinary circumstance that the Second Circuit would take the case en banc or the Supreme Court would grant certiorari and reverse the Second Circuit, this case would go to trial – and would go to trial as a death case.

However, from the moment that the Court granted defense counsel's motion declaring the death penalty unconstitutional on September 24, 2002, trial counsel's trial preparation came to a complete halt.  The Second Circuit remanded the case in an opinion dated March 22, 2004, but trial counsel and their investigators did no investigative work on his case until early 2005. Rather than beginning to prepare for trial in earnest as soon as they knew that the Circuit had reversed the Court's decision, trial counsel focused solely on preparing a petition for rehearing en banc, and a petition for cert to the Supreme Court.  Indeed the mitigation specialist and prime investigator in the case conducted no interviews between June 11, 2002 and March 30, 2005.  Decl. of C. Ayres (Ex. 265 at 2).

It was also not a function of the records or information being inaccessible or so large that examining the information would have diverted their attention from other trial preparation tasks that were more promising. The records and information were not inaccessible. The documents were readily accessible through written request to the various medical, social service and educational agencies that served Mr. Fell, and more importantly, through simple follow-up conversations with representatives of these agencies – all of whom made themselves available. In some cases, post-conviction counsel received information from Mr. Fell himself or friends and family members as to the specific agencies of interest, and in others post-conviction counsel simply made request of all of the local agencies in the area. Trial counsel could and should have done the same.

Indeed, it took just one interview of Deanna German by Ms. Ayres (which unfortunately did not occur until March 31, 2005) for the defense to discover the existence of the notes from Children and Youth Services. Id. at 4. When Mr. Fell's lawyers sought an ex parte order to obtain the notes from Children and Youth Services, the Court granted it within 24 hours and without objection. See Ex. 115 (April 27, 2005); Ex. 116 (April 28. 2005). The same is true for the documents from the Victim's Resource Center ("VRC"). Trial counsel contacted the VRC on April 21, 2005, and the VRC produced its file on May 4, 2005. Ex. 141 (April 21, 2005); Ex. 142 (May 4, 2005). In addition to records reflecting Mr. Fell's impairments, the other witnesses to the symptoms of Mr. Fell's mental impairments and the conditions of his childhood trauma were all readily available.[28]

---

[28]    Decl. of A. Gacek (Ex. 252 at 4 ("I was available to speak to the lawyers and I would have been willing to come to Vermont to testify."); Decl. of C. Cupano Decl. at 6 (Ex. 279("No one involved in Donny's case came to talk to me about it until this past year. I would have been willing to be interviewed and even go up to Vermont to testify."); Decl. of C. Bublo (Ex. 245 at 5("Before this year, I was not contacted by anyone involving Donny Fell's murder case … I have lived in Luzerne County and Lackawanna County since 1999 when I came back from North Carolina. Since 1999, I was here in Pennsylvania and was available to talk

Although the evidence of Mr. Fell's impairments was voluminous, a review of only a select portion of this information would have led reasonable counsel to evidence of Mr. Fell's impairments and there was no other task that was more important. Trial counsel did not challenge guilt. Mental impairment was their most important mitigator. Trial counsel acknowledged as much during the penalty phase opening statement, but even before trial counsel pulled its mental health case, they had not conducted an investigation that reflected their purported plan to present mental health mitigation.

with the lawyers."); Decl. of D. Grivner (Ex. 248 at 5("I have only heard about this case recently. Before 2011 I was not contacted about the case. I have been living in the same house for 25 years and would have been willing to talk about the case if anyone had asked me."); Decl. of E. Schuldaski (Ex. 253 at 4("I was not contacted by anyone representing Donny before his trial. I have been living in Kingston/Edwardsville for the past 20 years. I would have been available and willing to talk with anyone regarding Donny's case. I would have been available and willing to come up to Vermont and testify. The first time I had contact with anyone from Fell's defense team was during his appeal."); Decl. of J. Dominick (Ex. 276 at 3("I was not contacted by the lawyers for Donald Fell or the government prior to his trial. I was available and would have been willing to talk with them."); Decl. of J. Stoss (Ex. 274 at 6("I was not contacted by anyone regarding Donny's case until 2010. I have lived in Luzerne County my whole life. I have been living in the same house for the past 8 years. If Donny's lawyers at trial wanted to talk to me, they could have gotten my phone number or address from Jackie. I would have been willing and available to talk to them."); Decl. of J. Van Buren (Ex. 270 at 6("I was subpoenaed by the government to testify, and I sat in the courthouse for a day but they did not call me to testify. The defense lawyers could have talked to me while I was sitting at the courthouse all day. No one representing Donny got in touch with me until 2010. I have lived in Rutland for the past 12 years and I know a lot of people in this town. I was available and it would not have been difficult to find me if the lawyers just asked around.");Decl. ofJ. Gacek (Ex. 251 at 6("Donny's lawyers did not contact me prior to his trial in Vermont. I did not hear from anyone involved with Donny's case until 2009. I was available and would have been willing to testify at Donny's trial."); Decl. of J. Timek (Ex. 249 at 2("I was not contacted by anyone involved with this case until a couple months ago. I was available and living in northeast Pennsylvania for the past several years. I would have been willing to talk to people about the case and what I know."); Decl. of J. Migatulski (Ex. 254 at 3("Donny's lawyers did not contact me prior to his trial. I did not hear from anyone involved in Donny's case until after he was on death row. I was available and would have been willing to testify at Donny's trial"); Decl. of P. Stoss (Ex. 304 at 2) ("I was available and willing to talk to Donny's lawyers. I have lived in Luzerne and Lackawanna County most of my life. My sister Janice always knows how to reach me so the lawyers could easily have found me before the trial."); Decl. of R. Fell (Ex. 274 at 5) ("I have lived in Luzerne County all my life except one year in Florida during the 90s, and I would have been available if anyone wanted to talk to me. I am listed in the phone book, and have been for the last several years. My mother still lives in the house I grew up in, in Kingston, PA. She always knows where to find me."); Decl. of R. Cupano (Ex. 243 at 2("I was not contacted by Donny's lawyers or anyone connected to his case until recently. I would have been willing to share what I know about when I knew him."); Decl. of R. O'Hop (Ex. 244 at 3("I have been living in Luzerne County all my life. I was available prior to trial and would have been willing to talk with people who represented Donny."); Decl. of S. Campbell (Ex. 273 at 13("I was never contacted by the lawyers for Donald Fell, but I would have been willing to testify at his trial if I had been asked. If Dr. Welner could get in touch with me, I don't see why the defense lawyers didn't.").

Even assuming counsel's failure to grasp the chronic, severe history of trauma experienced by Mr. Fell was excusable during the period leading up to the plea, trial counsel's failure to investigate and develop these mitigating facts in the years leading up to trial is inexcusable. Despite numerous warning signs, trial counsel never asked a mental health expert with expertise in childhood trauma or exposure to chronic, ongoing emotional trauma to explain the significance of these events. Had trial counsel investigated, they would have seen that Donny's agitation, acting out and avoidance began at age 4 just after his rape and his parents' violent stabbing, and a mental health expert would have explained that this behavior was consistent with the way children experience and react to trauma. Counsel could have demonstrated through expert testimony how Donny's behavior matches the reexperiencing, avoidance, and hyperarousal symptoms common for victims of trauma.

The failure to investigate and present evidence of Mr. Fell's mental impairments thus was a pure default – one not animated by any strategic or other proper consideration. Counsel had red flags in front of them and developed further warnings before trial. Others were available based on a thorough investigation.

### E.    Mr. Fell Suffered Prejudice as a Result of Counsel's Deficient Performance

Counsel's deficient performance and the failure to present evidence of Mr. Fell's mental impairments had a lethal and constitutionally prejudicial impact. It is probable that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance" and "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [defendant's] moral culpability." Wiggins, 539 U.S. at 537-538; Rompilla, 545 U.S. at 392 (noting that evidence of the defendant's fetal alcohol syndrome meant

104

the defendant's "capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense").

### 1.    The Missing Mental Health Evidence's Impact on Culpability

The jurors found by resounding margins (often unanimous) that Mr. Fell experienced an abusive childhood. He was sexually and physically abused, he witnessed family violence, his parents were violent alcoholics who abandoned him, he had no positive role models, he abused drugs and alcohol as a child, and he was institutionalized for mental health conditions:

- Donald Fell was sexually and physically abused as a child (12 jurors);

- As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other (8 jurors);

- Donald Fell was raised without positive role models (10 jurors);

- As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions (12 jurors);

- Donald Fell's parents were violent alcoholics who abandoned him as a child (12 jurors); and

- Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest (12 jurors).

Special Verdict Form (Ex. 209 at FELL-00002135-FELL-00002137 ). The jury felt strongly enough about Mr. Fell's mistreatment it wrote in a separate, independent, mitigator found by a total of ten jurors: "Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior." Id. (10 jurors so find).

While the jury could understand the facts of Mr. Fell's childhood, the defense failed to give them the expert testimony necessary to understand the lasting consequences and implications of that childhood. Given the Government's closing argument about Mr. Fell's

105

"abuse excuse" and without the expert mental health evidence – that was readily accessible – the jury had difficulty tying Mr. Fell's deplorable upbringing to the person he became at age 20, to the person who committed the crimes, or to the person whom the jury was being asked to sentence. Even the wording of the jury's additional mitigating circumstance shows that they misunderstood Mr. Fell's behavior as "anti-social" and not as a collection of symptoms related to co-existing mental impairments. Assistance of the appropriate mental health experts would have helped counsel present a full picture of Mr. Fell's impairments and a context in which to understand the resulting behaviors. See ABA Guidelines, ABA Guidelines 10.11, Commentary at 1061 ("Expert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations."). Had the defense presented that evidence, it clearly would have made a difference in the sentence if not the guilt verdict.

### a. Mr. Fell was Substantially Impaired by the Combination and Interaction of his Mental Impairments, and Understanding Their Cumulative Impact Was Impossible Without Expert Testimony

The defense put forth as a mitigating factor "Donald Fell's capacity to appreciate his conduct was significantly impaired" and then failed to put forward any expert testimony to explain the nature or severity of those impairments. Special Verdict Form (Ex. 209 at FELL-00002135); see also 18 U.S.C. § 3592(a)(1) (statutory mitigator of "impaired capacity"). Although the jurors were told that they could use their "common sense" and own experiences to determine what impact Mr. Fell's childhood had on his mental health, common sense does not tell one the impact of childhood and fetal events and genetic composition on an individual and on personality. Expert testimony is required to understand the impact of comorbid mental impairments, such as those with which Mr. Fell is inflicted. In the absence of expert testimony, the jury would have been unable to comprehend how Mr. Fell's judgment and behavior were

106

impacted by his mother's alcoholism while pregnant, his family history of mental illness, or the horrific conditions of his childhood.[29]

Had trial counsel investigated and presented a scientific explanation for Mr. Fell's poor judgment and behavior, the jury would have been moved by the debilitating compounding of Mr. Fell's prenatally created brain disorder as a result of his mother's alcohol consumption, genetically inherited mood disorder, and the harmful exposure to chronic, interpersonal trauma. While any one of these disorders alone would have impaired Mr. Fell's ability to conform his behavior to the requirements of law, the complex interaction between them intensified their symptoms and completely debilitated Mr. Fell.

An expert would have testified Mr. Fell's prenatal exposure to alcohol impaired his brain development and made him vulnerable to the other environmental and genetic factors at play in his life. An expert would have explained that exposure to fetal alcohol impacts neurological functioning, processing and behavior for the rest of one's life. Even for someone with average intelligence, FASD may result in a range of outcomes from an inability to modulate

---

[29] From the outset of the case, trial counsel prepared the jury to hear expert testimony regarding Mr. Fell's mental impairments and their mitigating impact. The defense, Government, and Court took care to explore with juror members whether they would be willing to consider the defendant's mental state and potential mental impairments as mitigating factors and asked potential jurors about their views of psychiatrists and psychologists. See, e.g., Voir Dire Tr. Juror 215 at 26:14-27:25, 28:1-2 (May 6, 2005) (explaining that she would consider psychiatric testimony as well as evidence of mental illnesses, such as schizophrenia, bipolar disorder and personality disorder, because "if something happens because somebody's mentally ill, you know, they may not necessarily – I mean they weren't in their right mind when they did it"); Juror 109 at 22:7-23(explaining that she would consider psychiatric testimony describing crimes that might warrant the death penalty as ones that "are premeditated and calculated and have nothing to do with mental derangement or a true mental deficiency or hardship"); Juror 98 at 97:23-98:14 (May 24, 2005)(expressing his willingness to consider a defendant's mental state when deciding "whether the death penalty or life imprisonment without the possibility of release is appropriate" and noting that he would also consider psychiatric testimony on that point); Juror 123 at 134:14-135:2, 140:13-141:3(same). Suggesting to the jury during voir dire that it would hear this type of evidence and explicitly discussing its mental health experts during opening statements made the defense's decision to pull its mental health evidence even more egregious, abruptly disregarding juror expectations and prejudicing Mr. Fell. See also Decl. of P. Volk (Ex. 305 at 1("I focused a substantial amount of my questioning of the jurors on voir dire on mental health issues. I would have changed the nature of my questions and selected different jurors if I had known that there would be no expert testimony regarding mental health and no attempt to link records from Mr. Fell's childhood and early adolescence to his conduct and behavior at the time of the offense.").

107

one's behavior in response to stimulus to poor judgment, social skills, and impulse control. An expert in FASD would have explained that the inappropriate response to stimulus is significant because it may result in an extreme over-reaction which from a lay perspective appears unwarranted given the circumstances. This disorder impacted Mr. Fell's ability to effectively weigh and deliberate especially in stressful situations and had a direct bearing on his actions during the crime.

Building on Mr. Fell's fetal alcohol impairment, he also inherited a genetic predisposition to mood disorder, which if left untreated, results in mood lability or fluctuations, impulsivity, anger and depression. In children, these symptoms are particularly evident during the prodromal phase, which is the period of time just as the child is beginning to experience the deterioration of the mental state. Mania, a distinct period of abnormally and persistently elevated, expansive or irritable mood, is also common, and a child may act out or behave in an aggressive manner during the manic phase. Periods of mania are also evidenced by insomnia, racing thoughts, and distractibility. An expert in mood disorder would have explained how these symptoms coupled with poor impulse control and judgment further restricted Mr. Fell's ability to respond to stressful situations, and at times throughout his life, his resort to acting out or agitated behavior. Mr. Fell's psychological impairment – over which Mr. Fell has no control – and its negative impact on his behavior would have been transparent to the jury with the help of expert testimony.

Finally, expert testimony would have provided a framework to understand the impact of placing someone with Mr. Fell's aforementioned mental vulnerabilities in an environment plagued by extreme violence, demoralizing emotional abuse, ongoing sexual assault, and other recurring interpersonal trauma. See supra Section III. Given the magnitude of

108

trauma experienced by Mr. Fell, it was not enough for trial counsel to simply mention that Mr. Fell "was exposed to chronic exposure to trauma in childhood" without explaining what that meant and what impact that had on the trajectory of his life and behavior. See Tr. Vol. XII at 100:9-10 (July 13, 2005). Like fetal alcohol exposure and mood disorder, exposure to chronic trauma changes the way that you relate to the world and how you respond to stress. An expert in trauma would have explained that it is common for individuals who have experienced ongoing trauma to react with either aggressive or avoidance behaviors, which are both well documented throughout Mr. Fell's life. Expert testimony was essential to place the facts elicited from lay witnesses into an interpretive context that explains how numerous traumatic life events shaped Mr. Fell's brain and behavior, and how his damaged psychology displayed this trauma throughout his life, and ultimately, how this trauma forever altered how Mr. Fell would behave as a 20 year old upon arriving in Vermont and entering the stressful, violent, alcohol and drug-filled, traumatic environment which so vividly replicated the traumatic conditions of his childhood. Expert testimony was essential to rebut the Government's closing argument that these facts regarding Mr. Fell's childhood were merely an "abuse excuse."

Mr. Fell's mental impairments were also exacerbated by his early and chronic substance abuse, but in the absence of expert testimony, the jury was unaware of the well-documented link between the two. An expert would have testified that the comorbidity rates among persons with mood disorders or victims of chronic trauma who also have alcohol and drug problems is staggering.

Rather than presenting Mr. Fell's overlapping mental impairments and expert testimony regarding their impact on his development, personality, and behavior and their relationship to the circumstances of the crime, the defense agreed to a stipulation that stated that:

109

"After his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; (3) and he did not suffer from any mental disease or defect. The examination also found that Fell was competent to stand trial and knew the difference between right and wrong at the time of the offenses on November 27, 2000." Ex. 135 at FELL-00001413. This stipulation obviously pulled the rug out from under any lay mitigation testimony regarding Mr. Fell's mental health impairments, and impacted the jury's evaluation of most of the mitigating factors. Special Verdict Form (Ex. 209). This stipulation also allowed the Government to argue in closing that the lack of expert testimony regarding Mr. Fell's mental impairments was proof of their absence:

> You were also told about his medical history. Folks, there is no evidence of any genetic predisposition to alcohol or drug dependence. There's no evidence of fetal alcohol syndrome. There's no evidence of closed-head injuries with any aftereffect. And there's no evidence of any psychological disorder. The only evidence as to Mr. Fell's state of mind and his health is in Government's Exhibit 14, which is a stipulation by both parties, and as you know, it indicates that psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate. I am not even going to read it to you again. He is completely intact.

Tr. Vol. XII at 118 (July 13, 2005) (emphasis added).

The failure to present expert testimony and the decision instead to agree to the stipulation that the testimony would have shown to be false caused Mr. Fell devastating prejudice. The impact of any one of these mental vulnerabilities alone on Mr. Fell's life would have been significant, but their collective impact was catastrophic. And, as one juror speculated after the trial, "Maybe if there had been some sort of intelligent psychiatrist to present evidence of the defendant's mental state it would have made a difference, but there was not overwhelming

amount of that presented." Declaration of Juror 203, Jan. 19, 2011 ("Decl. of Juror 203") (Ex. 239 at 2).

### b. Mr. Fell's Perceived Lack of Remorse Due to his Flat or Inappropriate Affect was Prejudicial

One of the critical mitigating factors presented by the defense during trial was that "Donald Fell has shown remorse for killing Teresca King." Special Verdict Form (Ex. 209). That mitigating factor was supported by evidence that, among other things, Mr. Fell decided to confess within 15 hours of being arrested, assisted the police in finding Mrs. Kings' body, accepted responsibility for his crime, and offered to plead guilty. Tr. Vol. XII at 68:1-4 (July 13, 2005) (defense closing).

Throughout both phases of trial, the Government made attempts to meet the evidence of that mitigating factor and to turn it into an aggravating factor. Its primary argument was that Mr. Fell had exhibited a flat, or inappropriate, affect in his confessions. In its opening argument, the Government described Mr. Fell's first interview with the FBI, "Donald Fell stared intently at the agents. He showed no emotion. He denied everything." Tr. Vol. I at 34 (June 20, 2005). Over and over again during trial, the Government also asked and elicited testimony that Mr. Fell had a "flat affect." They asked that question of Agent Jimmie Caudle, Tr. Vol. II-1at 29:20-25 (June 21, 2005); of Sergeant Rodney Pulsifer, Tr. Vol. II at 27, 33-34 (June 21, 2005); and of Michael Leight Tr. Vol. III-1 at 97, 100 (June 23, 2005). In graphic testimony, Agent Jimmie Caudle described Mr. Fell's Miranda waiver as emotionless,

> My job during this interview at this time was to pay close attention
> to what Fell's reactions were. Fell was roughly in the position
> right here staring intently at Agent Sturgill while he was giving a
> run down of a synopsis of what we knew … To, during the course
> of this if he blinked I missed it because <u>I did not see him blink</u>. I
> did not see him move a muscle. <u>I saw absolutely no emotion</u> other
> than the <u>intense stare</u> directly at Mr. Sturgill, at Agent Sturgill.

111

Tr. Vol. II-1 at 15:3-12 (June 21, 2005) (emphasis supplied). The Government asked former Rutland City Police Sergeant and detective, Rodney Pulsifer, "Can you just briefly describe, how was he physically comporting himself when you were interviewing him?" Sergeant Pulsifer said that Mr. Fell "was stating things matter-of-factly. He was somewhat animated, you know with his hands." Tr. Vol. II at 27:8-12 (June 21, 2005). The Government also asked Sergeant Pulsifer about whether Mr. Fell was "emotional," but aside from a "minute to minute and a half" reaction of crying about his mother's death, he was "[c]ooperative, calm" and "[s]poke very matter-of-factly about issues." Tr. Vol. II at 33:22-34:14 (June 21, 2005).

The Government also asked similar questions to other witnesses who saw Mr. Fell on the night of the crimes. It asked Michael Leight, the Burger King employee who served the defendants following the crime, whether the defendant "appear[ed] to be upset at all," and elicited testimony that the passenger of the car "didn't appear to be upset, no." Tr. Vol. III-1 at 100:19-22 (June 23, 2005). The only relevance of this question and answer was to suggest to the jury that Mr. Fell was a remorseless killer – one presumably who had killed before and would kill again.

That point was made explicit in the Government's arguments. The Government made much out of Mr. Fell's perceived lack of emotion and unaffected tone of voice in the sentencing phase closing arguments,

> Go ahead, read that statement when you go back to deliberate. <u>Is there any expression of sorrow</u>? Any expression of remorse in that statement? Absolutely not. And as you consider the other statements that Donald Fell made after his arrest, you <u>remember his tone of voice when he talked about the murder of Terry King. Is there any remorse in his tone of voice</u>? Did he ever say that he was sorry for murdering Terry King? At one point, it's true, he did cry, when they were talking about his mother. Not when they were talking about Terry. There's no evidence of remorse for his murder of Terry.

Tr. Vol. XII at 44:17-45:3 (July 13, 2005) (emphasis supplied). In rebuttal, it stated: "[Y]ou heard the casual tone that he talked about what he did to Terry King. He even joked about it. He gets a chuckle out of it. He said on the tape that he got a chuckle out of the name – of the fact that her name was Terry because he had a sister named Teri." Tr. Vol. XII at 123:14-19 (July 23, 2005) (Mr. Darrow, closing rebuttal).

The Government's penalty phase closing argument emphasized that Mr. Fell was "stone cold" and that the jury could hear his lack of remorse in the sound of his voice. Tr. Vol. XII at 42:24-25, 44:20-45:3 (July 13, 2005) (Mr. Kelly). The Government further bolstered its argument about Mr. Fell's lack of remorse by pointing to a childhood shooting incident where the Government contended he also showed no remorse. Vol. I-1 at 39:25-40:6 (June 28, 2005) (Mr. Darrow, opening statement). It stated: "In April 1992 he was institutionalized after shooting a boy with a nine millimeter pistol, barely missing his heart. This was the episode you heard him describe in one of his taped admissions when he said that the boy jumped in front of the bullet. Hospital records from the time state that Fell, quote, shows no remorse, and threatens to shoot his mother, close quote." Id.[30]

The defense was left to argue that the jury should use its own experiences and "common sense" to judge Mr. Fell's level of remorse. See Tr. Vol. XII, p. 80:12-14, 82:3-8, 84:18-22 (July 13, 2005). In fact, Mr. Fell's mental impairments prevent him from displaying his true emotions and the jury would not understand that barrier to expression in the absence of expert testimony.

The Government's argument had its intended effect. In the end, no jurors found as a mitigating factor that "Donald Fell has shown remorse for killing Teresca King." Special

Verdict Form (Ex. 209); see also Decl. of Juror 143 (Ex. 241 at 2) (juror describing Mr. Fell as appearing remorseless throughout the trial); Decl. of Juror 203 (Ex. 239 at 2) ("It was striking how the defendant seemed so rational during the whole crime").

The readily accessible evidence that the defense inexcusably failed to investigate had a powerful and clinical explanation for that flat, or inappropriate, affect – one that was consistent with remorse but that the jury never heard. An expert would have provided a scientific explanation regarding the way Mr. Fell's mental impairments prevent him from demonstrating his emotions the way most people do. It turns out that Mr. Fell's inappropriate affect is not a function of the absence of remorse but of his mental impairments, including his exposure to chronic, ongoing trauma, mood disorder, and exposure to alcohol in utero. An expert would have explained that mood disorder and exposure to chronic trauma directly impact one's affect regulation and prevent people with these disorders from experiencing and demonstrating the full range of emotions. Similarly, people with FASD often have difficulty interpreting environmental factors and providing the appropriate response or expression, thus giving the appearance of flat or inappropriate affect.

An expert in trauma would have explained that in the face of chronic trauma, it is common for the victim to retreat to a safe place in the brain to avoid reexperiencing the trauma. If avoidance and affective numbing work together, a child exposed to chronic trauma may appear to be unaffected by the trauma or the child's reexperiencing of the trauma may be masked. However, experiencing this trauma may impair behavioral development and render the trauma victim unable to calm down after a strong emotional experience or result in hyper-responsiveness to even small stimuli. The trauma victim both experiences the world and displays a response in a

---

[30]    The Government's argument and evidence with respect to this incident, involving John Gacek, is the subject of additional and separate constitutional claims by Mr. Fell.

114

way that is inappropriate given the circumstances. Similarly, someone with mood disorder or FASD may experience a disconnection between the deeply felt emotion and his or her affective display.

This impairment explains otherwise inexplicable behavioral responses in Mr. Fell's life – events that the Government also used to argue Mr. Fell was remorseless. An individual with an inappropriate affect or blunted emotional expressiveness may speak in a monotonous voice, display diminished facial expressions, or appear extremely apathetic. Mr. Fell has demonstrated inappropriate affect throughout his life, including a lack of responsiveness or responding to events in an unexpected manner such as laughing in response to serious or sad situations, which corroborates his neurological impairments rather than depicts a lack of remorse. See, e.g., Ex. 22 ("affect is flat"); Ex. 23 at FELL-00000801 ("affect is flat"). A lay jury would not have understood Mr. Fell's affective responses without expert testimony.

### c.  Mr. Fell's Mental Impairments Caused him to Act Out

Failure to investigate and present a scientific explanation for Mr. Fell's agitated depression and acting out behaviors throughout childhood was deeply prejudicial. The jury never heard that Mr. Fell's seemingly aggravating adolescent aggression was attributable to his comorbid mental impairments:  poor judgment and impulse control as a result of exposure to alcohol in utero; mood lability, irritability, and agitated depression as a result of his budding mood disorder; and avoidance, learned helplessness, agitation, and dissociation as a result of being physically, emotionally and sexually victimized by his parents and guardians as well as witnessing the victimization of his sister Teri and others at their hands. Although each of these impairments impacted the development of Mr. Fell's brain, personality, and behavior, an expert would have explained to the jury the ways Mr. Fell's impairments could have been controlled with consistent treatment.

115

The absence of expert testimony on this issue allowed the Government to portray Mr. Fell as someone with an innately violent core who needed to be put to death in order to prevent his future violence. The failure to present expert testimony on this issue also meant that the jury never heard that many of the symptoms of these disorders, including Mr. Fell's acting out and agitated behavior, were treatable – as evidenced by his responses to medication and therapy during his childhood hospitalizations. Ex. 1 at FELL-00000171. Unfortunately for Mr. Fell, these periods of treatment were followed by periods of extended parental neglect and abuse where his parents deprived him of the medication and therapy he needed to control his mood and behavior. Failure to accurately present this social history allowed the Government to present the need for repeated hospitalizations as aggravating by obscuring the mitigating reason for the repeat visits: namely, his parents' and guardian's failure to ensure that he was effectively treated for his mental impairments. The cumulative effect of this presentation was that the jury failed to see Mr. Fell for what he truly was: an adolescent with multiple mental impairments in desperate need of treatment.

This missing mental health evidence from a mental health expert would also have refuted the Government's argument that Mr. Fell's agitated behavior on the prison videos was merely a continuation of his history of violence. Tr. Vol. XII at 46:9-47:3 (July 13, 2005). Expert testimony regarding Mr. Fell's mental impairments would have explained the reason Mr. Fell's mood changes so quickly in the videos and why he seems to react so strongly. This testimony would have removed the teeth from the prison videos and reassured the jury that, when treated, Mr. Fell is not a danger to other prisoners, guards, or himself. Without medically explaining the reasons behind Mr. Fell's agitation and the manifestation of that anger, it is unsurprising that the jury overwhelmingly rejected the proposed mitigators that Mr. Fell "does

116

not present a risk to prison officials or other inmates if he is sentenced to life in prison without the possibility of release" (0 jurors so find) and that Mr. Fell "has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances" (1 juror so finds). Special Verdict Form (Ex. 209 at FELL-00002315).

### d.   Mr. Fell's Mental Impairments Diminish his Culpability for the Crimes

Mr. Fell's mental illness diminishes his moral culpability for the crimes, and expert testimony would have made this clear to the jury. Mr. Fell arrived in Vermont in September 2000 with his intense mental vulnerabilities and a hope that he would be able to reunite with his mother, who had abandoned him at age 13. Mr. Fell's mother told him and other family members that she was clean and sober, and he believed her. He hoped not only to build the relationship he had always wanted with his mother, but also to get clean and sober himself. Decl. of T. Fell (Ex. 278 at 28). These hopes were quickly dashed as Mr. Fell found his mother was even more out of control and addicted to drugs and alcohol than when he had last seen her many years before. See Decl. of D. Carter (Ex. 269 at 1); Decl. of A. Reynolds (Ex. 275 at 1-3); Decl. of J. Van Buren (Ex. 270 at 2-4 ); Decl. of M. Bell (Ex. 270 at 1). Someone with Mr. Fell's mental impairments was ill-equipped to deal with such disappointment. His poor judgment and impulse control problems as a result of fetal alcohol exposure rendered him unable to problem solve, and his untreated mood disorder led to an increase in agitation and acting out.

Moreover, an expert would have explained that the environmental factors in Vermont eerily echoed the traumatic household in which Mr. Fell was raised: there were men coming and going constantly; there was open drug use and nightly binge drinking; there were heated arguments and loud yelling; and by the end of the night, violence often broke out. Thus, rather than the peaceful reconciliation that Mr. Fell hoped for with his mother, his visit to

117

Vermont resulted in a re-traumatization and the flooding of the fear, pain, and anger he experienced as a child. Debra Fell's apartment at 135 Robbins Street was a toxic environment, and Mr. Fell was not equipped to deal with these circumstances given his compounding mental impairments. His resort to alcohol and drugs to self-medicate these feelings only made matters worse.

After a lifetime of witnessing his mentally impaired parents in an intoxicated state violently stabbing each other, it is tragic – but not surprising – that Mr. Fell was at risk to repeat the same behavior. With his judgment impaired as both a result of his exposure to fetal alcohol and his own intoxication and his anger elevated due to his untreated mood disorder, Mr. Fell resorted to knife violence as a means of problem solving, just as he had seen his parents do on many occasions. It is probable that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance" and "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [defendant's] moral culpability." United States v. Wiggins, 539 U.S. at 537-538. Had trial counsel presented expert testimony to explain the competing forces at work on Mr. Fell's psyche, they would not have sentenced him to death.

### e.  Mr. Fell's Confinement will Control his Symptoms

Had the jury been presented with a more accurate picture of Mr. Fell, as the mentally impaired young man that he was in November 2000, they would have understood that the environmental factors that triggered his violence are absent in prison. A mental health expert would have explained that people with FASD and mood disorder respond positively to structure, and as evidenced by his hospitalizations, institutionalization at St. Michael's, and his many years

118

in prison with limited infractions, Mr. Fell does well in a structured environment. In fact, incarceration is the most stable environment in which he has ever lived.

Had counsel presented this mental health evidence, they would have been able to argue that many of the environmental factors that triggered Mr. Fell's bad behavior or exacerbated his mental vulnerabilities would be absent in prison. An expert would have explained the positive impact of removing drugs, alcohol, and violence from Mr. Fell's life. This evidence would also have assisted trial counsel in rebutting the Government's contention that Mr. Fell is violent and uncontrollable. In short, Mr. Fell's lifetime confinement will control his symptoms of mental illness, and had a mental health expert provided the jury with a lens to view Mr. Fell's behavior, they would have seen and understood that at trial.

V.      **Mr. Fell's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated in Connection with the Mental Health Evidence at Trial, The Failure to Pursue an Available Motion to Exclude Testimony from The Government's Mental Health Expert, and the Decision to Withdraw All Mental Health Evidence and Stipulate that Mr. Fell had No Cognitive Deficits and Did Not Suffer from Any Mental Disease or Defect.**

Midway through the penalty phase, after receiving the Government's sensationalist 72-page expert mental health report prepared by Dr. Welner, trial counsel made – but then inexplicably failed to pursue – a meritorious motion to exclude Dr. Welner's testimony. Then, faced with the possibility that the Government would offer Dr. Welner's testimony and report, trial counsel made several ultimately fatal decisions. After having promised the jury it would hear expert testimony and having presented a mitigation case dependent on expert testimony, counsel suddenly pulled the entire expert mental health case. Then, based on fear that the withdrawal of that case would not be enough to keep Dr. Welner off the stand, counsel made the extraordinary decision to stipulate – contrary to what the facts would have shown – that "one, [Mr. Fell] had no cognitive or neurological deficits; two, his intellect and cognitive functions

119

were intact; three, he did not suffer from any mental disease or defect" and that Mr. Fell "knew the difference between right and wrong at the time of offenses on November 27th, 2000." Tr. Vol. XI at 93:22-94:8 (July 12, 2005). Trial counsel's dilemma was of their own making. The defense unreasonably waived their objection to Welner's testimony by abandoning their motion before giving the court a chance to conduct the already-scheduled hearing on the motion.

Mr. Fell suffered prejudice. Not only did the jury never hear any of the compelling mitigating evidence about Mr. Fell's impaired mental health, it was affirmatively told, by way of stipulation, that Mr. Fell had no mental health issues. The Government used this stipulation to great effect in its closing, not only to argue that Mr. Fell's conduct was the product of evil choices he freely made, but also to undermine the balance of the mitigating evidence that was presented: if Mr. Fell's mental condition was perfectly normal, the Government was able persuasively to argue, the abuse and neglect in his background was at best irrelevant and, at worst, a function of his own conduct.

### A. Background

#### 1. Pretrial Disclosure of the Government's Intent To Use Welner and the Court's Restrictions on Welner's Ability To Examine Mr. Fell

As early as December 2004, trial counsel was aware that, apparently unhappy with the reports of the first two experts it had hired, Dr. John Rabun and Dr. Richard Wetzel, the Government had chosen to retain a third – Dr. Michael Welner – in February 2004 to provide expert mental health testimony in the penalty phase. The defense was also aware that Dr. Welner was conducting an extensive – though one-sided – investigation into Donald Fell's life.

In particular, on December 17, 2004, the Government moved on notice for a court ordered examination of Mr. Fell by Dr. Welner under Federal Rule of Criminal Procedure 12.2

120

(hereinafter "Rule 12.2").[31] In that application, it was further explained that Dr. Welner had been actively working with the Government since February 2004, had reviewed "voluminous written materials," and had been meeting with government counsel. Government Supplemental Memo regarding discovery of mental health evidence at 3, No. 2:01-CR-12, Dkt. No. 77 (Dec. 17, 2004).[32] In the past, Dr. Welner had issued lurid reports, subject to legal challenge, labeling capital defendants psychopaths. His reports had also previously been successfully challenged on Daubert and other grounds.

When the Government sought an examination by Welner, Mr. Fell had already voluntarily submitted to examinations by Dr. Rabun and Dr. Wetzel. Those examinations were conducted in September and December of 2002 with a single restriction – the examiners were not permitted to ask Mr. Fell about the crimes at issue. The Government's reports had been generally favorable to Mr. Fell. Dr. Rabun opined that Mr. Fell's history of sexual and physical abuse, alcohol dependence, intoxication on the evening of the crimes, and chaotic home environment all constituted mitigating factors in assessing his culpability for the crimes. Report of John S. Rabun, M.D. (Dec. 31, 2002) ("Rabun Report") (Ex. 8). Dr. Wetzel confirmed that there were several defense opinions that could not, in his opinion be rebutted: that (1) Mr. Fell

---

[31] Under the Rule, the defense must provide notice pre-trial of the intention to rely on expert mental health evidence in the penalty phase. Once such notice is given, the Government is entitled to a compelled examination of the defendant. The Rule then provides that the Government's report will remain under seal until confirmation by the defense of its intention to rely on mental health expert evidence following conviction. See generally, Fed. R. Crim. P. 12.2.

[32] As the Government later disclosed:

Dr. Welner has been engaged in an extensive evaluation of the defendant. He has reviewed thousands of documents relating to Fell, including work papers, interview reports and test results generated by the 2001-02 experts, as well as historical records from Pennsylvania schools and family services entities, and documents created during the criminal investigation, such as crime scene evidence, photographs and police reports. He also has spent three days in Fell's hometown of Wilkes-Barre, Pennsylvania, meeting with and personally interviewing over a dozen persons knowledgeable about Fell and Robert Lee, such as friends, school teachers, and family members.

121

was the victim of sexual and physical abuse as a young child; (2) Mr. Fell "grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children," including that he received no parental guidance, had no role models, and was abandoned by both his parents; (3) competent professionals believed Mr. Fell had Attention Deficit Disorder ("ADHD") as a child; (4) Mr. Fell was abusing alcohol and drugs at "a remarkably early age" and qualifies for the diagnoses of abuse and dependence on a number of substances; (5) Mr. Fell's parents lied to authorities, but Children and Youth Services had adequate information to alert them and failed to understand the problems; (6) it is broadly true that Mr. Fell showed no signs of malingering; and (7) signs of conduct disorder were evident at an early age. Report of Richard D. Wetzel, Ph.D. (Oct. 11, 2002) ("2002 Wetzel Report") (Ex. 7). Neither characterized Mr. Fell as a psychopath.

Accordingly, trial counsel appropriately moved the Court to prevent the Government from expert-shopping and to prevent Dr. Welner from examining Mr. Fell because he had already been examined by two government experts. Reply to Government Supplemental Memo regarding discovery of mental health evidence at 2, No. 2:01-CR-12, Dkt. No. 78 (Dec. 23, 2004). Trial counsel made no objection to the further examination of Mr. Fell pursuant to Rule 12.2, but argued that such an examination should be done only by either of the Government's previous experts. Id. Trial counsel also explained that Dr. Welner was the creator of the "Depravity Scale," that his research interests included the legal standardization of evil, and that he "begins with the preconception that mitigation evidence is merely fabrication." Id. Counsel further argued that, should Welner be allowed to examine Mr. Fell, the Court should

---

Motion for reconsideration of mental health discovery at 4-5, No. 2:01-CR-12, Dkt. No. 105 (Apr. 14, 2005). During this time period, the defense was doing nothing to prepare its mental health case.

follow the firewalling procedures implemented in <u>United States v. Sampson</u>, 335 F. Supp. 2d.

166, 243-45, n.45 (2004).  <u>Id.</u> at 3.

The Court ruled on these motions on April 7, 2005.  It permitted the Government

an additional examination under Rule 12.2 for the limited purpose of providing the Government

an opportunity to question Mr. Fell about the circumstances of the offense.  However, the Court

specifically ruled that only Dr. Rabun or Dr. Wetzel could perform the examination, not Dr.

Welner.  <u>United States v. Fell</u>, 372 F. Supp. 2d 753, 761-62 (D. Vt. 2005) ("It was the

government who chose Drs. Wetzel and Rabun, and those experts should be permitted to

complete their evaluation.").  In an accompanying Order, the Court placed clear limits on the

examination, including requiring that no new testing could be administered without the

agreement of defense counsel and that the sealing requirements of Rule 12.2 would apply.

Order, No. 2:01-CR-12, Dkt. No. 101 (Apr. 7, 2005) (Ex. 235).  The Court's language was clear

and unambiguous.  It stated:

> Prior to any mental health testing being conducted by any expert
> for the government, the government shall provide to counsel a list
> of any tests its expert wishes to perform. The government's expert
> shall not identify more than one test for the purpose of measuring
> the same mental function(s). Within one week of receiving the
> government's list, the defendant shall identify any such tests to
> which he objects. The defendant and the government shall attempt
> to come to an agreement as to the designation of specific testing
> measures to be administered by the defense and prosecution
> witnesses and shall consider sharing data between the experts. If a
> dispute exists which the government and the defense cannot
> resolve, the parties shall notify the Court and a hearing will be
> held. No mental health testing may be performed by either party
> until there is a final decision as to which tests are to be conducted
> by the government's expert. In the event of such an unresolved
> conflict, nothing in this paragraph shall create a preference in favor
> of the government or a burden on the defendant at a hearing
> conducted pursuant to this paragraph.

123

Id. at FELL-00002349-FELL00002350.  The Court added: "The examination may be conducted by either Dr. Rabun or Dr. Wetzel, or both."  Id. at FELL-00002349.

The Government was clearly sensitive to, and displeased with, these limitations. It moved for reconsideration and, recognizing the Court's limitation on who could do the testing and examination, nonetheless continued to assert that Dr. Welner should be permitted to perform the examination.  Motion for reconsideration of mental health discovery, No. 2:01-CR-12, Dkt. No. 105 (Apr. 14, 2005).

While the Government's motion for reconsideration was pending, the defense filed a motion in limine seeking to exclude Welner's testimony.  No. 2:01-CR-12, Dkt. No. 107 (Apr. 22, 2005).[33]  In that motion, trial counsel noted that Dr. Welner would likely discount any mitigation evidence, testify about the intentionality of the crimes and testify that Mr. Fell constituted a future danger.  Id. at 4. Trial counsel argued this would be improper testimony, and that Dr. Welner's opinion would be invalid because he had not conducted an examination of Mr. Fell.  Id. at 5-7.

The Court denied the motion in limine as premature in the same opinion that it denied the Government's motion to reconsider.  Order, No. 2:01-CR-12, Dkt. No. 129 (May 25, 2005) (ruling that the Court could "address the admissibility of his testimony only after disclosure of the subject of that testimony").  The Court thus left in place the clear restriction that the Government must agree with defense counsel before administering any mental health testing. Id. at 17.

---

[33]    Despite knowing that Dr. Welner had been visiting Mr. Fell's family members and asking questions, defense counsel made no additional effort to investigate the potential aggravating evidence the Government was collecting or to otherwise alert Mr. Fell's family that Dr. Welner would be visiting.  Decl. of C. Ayres (Ex. 265 at 5; see also Decl. of A. Bunin (Ex. 264 at 8(knew of Dr. Welner's visits to family members).  No affirmative investigation into Dr. Welner's interviews or sources was ever pursued or

124

Trial counsel again raised issues with Dr. Welner's testimony in its Trial Memorandum, predicting his testimony and arguing that such testimony would be improper. No. 2:01-CR-12, Dkt. No. 142 (June 14, 2005). In summary, the defense argued:

> [B]ased on his previous conduct, there is every reason to believe that Dr. Welner will: (1) summarize events for which no government witness has personal knowledge; (2) diagnose the defendant as having an antisocial personality disorder, (3) attribute those qualities to him; and (4) give opinions about the credibility of the defendant and others he interviewed. None of this is appropriate regardless of what mitigation evidence the defendant introduces.

Id. at 8.

### 2.    The Government's Late Production of the Welner Report

On June 13, 2005, Dr. Wetzel examined Mr. Fell. By agreement between counsel and as ordered by the court, a videotape was made of the interview. Both defense counsel and the Government were available for consultation throughout the interview. On June 27, 2005, the Government received Dr. Wetzel's "revised, partial report." Revised Report of Richard D. Wetzel, Ph.D. (June 27, 2005) ("Wetzel 12.2 Report") (Ex. 9). That day, the defense received the DVDs of the eight-hour interview. However, the, defense counsel did not receive a copy of Dr. Wetzel's revised report until June 29th, one day after the penalty phase had begun. Motion for a Judgment of Acquittal and a New Trial, No. 2:01-CR-12, Dkt. No. 209 (Aug. 26, 2005) (Ex. 138). Upon receipt of that report, counsel filed a motion to exclude testimony based on portions of it pertaining to the culpability of the defendant. Motion in Limine Regarding Wetzel Report by Donald Fell, No. 2:01-CR-12, Dkt. No. 177 (June 30, 2005).

---

requested by trial counsel. Decl. of C. Ayres(Ex. 265 at 5; see also Decl. of G. Primomo (Ex. 262 at 1(no one focusing on aggravation investigation). Failure to do so was deficient performance.

The Government did not deliver Welner's report prior to the beginning of the penalty phase. Indeed, it did not deliver the report prior to the beginning of the defense's penalty phase case. On June 29, 2005, just after the Government rested its penalty phase case-in-chief, the Court directed the Government to produce Welner's report by July 1, stating "Well, I mean you can't wait until 24 hours before he testifies." Tr. Vol. VI-2 at 105:1-2. The Government missed this deadline, telling the Court that Dr. Welner would need the holiday weekend to finish the report. Letter of D. Kirby to Judge Sessions (June 29, 2005) (Ex. 131).

While defense counsel was waiting to receive Dr. Welner's report, the trial continued. During jury selection, trial counsel focused a substantial amount of their questioning of potential jurors on their opinions of the fields of psychology and psychiatry, as well as on the ability of individuals in those fields to identify and explain reasons for human behavior, thus signaling to the jurors that the defense would put on expert testimony. Decl. of P. Volk (Ex. 305 at 1); see also Decl. of A. Bunin (Ex. 264 at 7). At that time, several of the jurors had affirmatively indicated willingness to accept psychiatric testimony as helpful, either in their questionnaire or in voir dire,[34] and two indicated their strong belief in the merit of psychiatric evaluation.[35] That point was made more explicit in preliminary instructions to the jury on June 27, 2005, when the jurors were informed that the defense would present evidence in support of a number of mitigating factors, including that "[t]he defendant was under mental and emotional disturbance when the crimes were committed" and based on a variety of factors related to Mr. Fell's abuse-ridden early life and ensuing hospitalization for mental health problems. Tr. Vol. V-I at 27:14-21 (June 27, 2005). The next day, in the penalty phase opening statement, trial

---

[34]    These jurors included Jurors 123, 61, 204, 26, 67, 8, and 211.
[35]    These jurors included Jurors 203 and 162.

126

counsel promised the jurors that they would receive lengthy testimony from Dr. Mills and Dr.

Cunningham:

> We have indicated that there is going to be expert testimony, and
> there will be. Dr. Mark Mills is a psychiatrist. A medical doctor.
> That he has done testing and will give conclusions and essentially
> provide that Donnie [sic] was – grew up in a deprived childhood
> with inappropriate social behavior, of truancy and fighting and
> constant intoxication. He is substancely [sic] addicted. From
> those hospitalization records, and other records he has reviewed,
> when Donnie [sic] was in the structured environment, with rules,
> away from intoxicating substances, he does well. He adjusts. He
> needs the structure. You will also hear from Dr. Mark
> Cunningham. Dr. Mark Cunningham is a psychologist. He will
> summarize research developments and events that involve adverse
> outcomes. It will take some time to hear his testimony, maybe half
> a day. And what Dr. Cunningham can do and will do is explain
> studies conducted by the Department of Justice that talk about the
> reasons, what are the causes of bad outcomes, and they are broken
> down into essentially two things. There are risk factors, many of
> them mitigating factors that we are talking about, are those risk
> factors. And there're protective factors. Protective factors are
> those things like a role model, like maybe a coach or something
> that gives someone guidance and teaches them. The comparison of
> those risk factors and protective factors, you will hear those risk
> factors were plentiful in Donnie's [sic] life. The protective factors
> were few or non-existent.

Tr. Vol. V-1, at 56:4-57:9 (June 28, 2005).

The defense broke those promises based on fear of Dr. Welner. Decl. of A. Bunin

(Ex. 264 at 7-8); Decl. of G. Primomo (Ex. 262 at 2). On July 1, after having been informed that

the Government intended to call Welner, defense counsel stated that it would reserve the

testimony of its mental health expert, Dr. Mark Mills, for surrebuttal. Tr. Vol. VII-2 at 4:20-24

(July 1, 2005). On July 7, 2005, after having received the Welner report – and having filed a

motion to exclude it but without having obtained or pursued any judicial ruling as to its

admissibility – trial counsel abruptly withdrew their Rule 12.2 notice and the planned expert

testimony of their remaining mental health expert, Dr. Cunningham, who was standing by and

127

prepared to testify that day.  Tr. Vol. IX-2 at 3:14-21 (July 7, 2005).  On July 13, 2005, the defense closed its case – without putting on any psychiatric or other mental health-related evidence.

On July 5, 2005 at 9:30 p.m., trial counsel received a copy of the Welner report. It was immediately apparent that, as they had suspected, the defense had grounds to exclude the report and Dr. Welner's testimony.

Specifically the report included, among other prejudicial and sensationalist statements:  "According to Mr. Lee, who admitted to stabbing Mrs. Fell, Mr. Fell joined him in kicking his mother when she was dead, to ensure that she was deceased" and that "according to Mr. Lee, [Mr. Fell] implored Mr. Lee to kill her, because Mr. Fell had killed Mr. Conway… [and] directed him as to how he could more effectively end her life… These actions and communications reflect Donald Fell's focus on the activity at hand."[36]  Report of Dr. Michael Welner, M.D. (July 5, 2005) ("Welner Report") (Ex. 10 at FELL-00000651, FELL-00000656 ).

The Welner report was problematic on its face in numerous respects.  Dr. Welner expressly admitted that he had both used Dr. Wetzel as a proxy by supplying the questions for Mr. Fell's compelled examination and had administered three new psychological tests without trial counsel's consent, including the Hare Psychopathy Checklist – Revised (the "PCL-R"), the Violent Risk Appraisal Guide (the "VRAG"), and the Historical, Clinical, Risk Management-20 (the "HCR-20").  Id. at FELL-00000624.  The tests Dr. Welner relied upon in his report were scored based on questions asked by Dr. Wetzel, and are designed to indicate an individual's

---

[36]   At the time, the Government had not produced relevant Brady or Giglio information for Mr. Lee and others. Nor did the government produce 302s or reports of investigation for the witnesses whose hearsay statements were contained in the Welner report.

likelihood of committing future violence.[37]  Id. at FELL-00000623, FELL-00000625.  Based on the scoring of those reports, Dr. Welner diagnosed Mr. Fell as a "psychopath."  It was also clear from the report that Dr. Welner conducted interviews in the company of FBI agents, and that defense counsel had not received 302s or any reports of investigation for many of these interviews.[38]  Id. at FELL-00000624.  Finally, while counsel had anticipated that the report would rely to some extent on problematic hearsay, the report produced was absolutely permeated with not just hearsay but highly prejudicial and out-of-context hearsay statements by a variety of biased and unreliable sources, including Mr. Fell's deceased co-defendant, estranged family members, and distant acquaintances.  Id.

The morning after receiving the report, Wednesday, July 6, 2005, trial counsel filed a motion in limine to exclude the report and Dr. Welner's testimony.  No. 2:01-CR-12, Dkt. No. 182 (July 6, 2005) ("Penalty Phase Motion to Exclude Dr. Welner's Testimony") (Ex. 310). The motion was six pages long, but raised broad-brush challenges to the violations of the court order, as well as to the statements obtained with the assistance of law enforcement, the unnoticed misconduct not relevant to the noticed aggravating factors, and the bad science contained in the report.  Id.  The defense also challenged the Government's lack of disclosure regarding many of the sources and argued that psychopathy was not an accurate predictor of future violence in prison.  Id. at FELL0000-2674-FELL-00002676.  The defense also complained that its expert, Dr. Mills, would have no time to adequately respond to the Welner report.  Id. at 5.

---

[37]  The PCL-R is a twenty item scale for the assessment of psychopathy in clinical and forensic settings that involves an interview as well as an investigation into an individual's history. Affidavit of Richard D. Wetzel, Ph.D., Appendix to Opposition of the United States to Defendant's Post-Trial Motion, No. 2:01-CR-12, Dkt. No. 212 (Sept. 26, 2005) ("Wetzel Aff.") (Ex.139 at FELL-00001468). The PCL-R represents one portion of the analysis in both the VRAG and the HCR-20, which are also both risk assessment tools. Id. at FELL-00001468, FELL-00001470.

[38]  Section 2255 counsel still have not received all of those 302s – and has reason to believe that at least some of them will contain information that is mitigating for Mr. Fell or inconsistent with the information in Dr. Welner's report.

Notably, although there was no restriction on it doing so, trial counsel did not request a continuance.

In response, the Court indicated a willingness to allow trial counsel sufficient and additional time to investigate the bases for Welner's opinion, and an intention to carefully scrutinize the Welner report:

> [T]here are a lot of things in Dr. Welner's report, I am told of new facts which would be prejudicial – highly prejudicial, and would need the defense to be given an opportunity to look into them. … [W]e've got to take it step by step…. I can't be rushed into deciding a Daubert hearing, which is essentially what you're asking for, you know, on a six-page or five-page memorandum… [T]his is a big deal. I need to find out what happened here; what – what information was provided to the other side; what his opinions are, in fact, how psychopathology has been used by other courts in other districts, as to whether it's admissible or not; and what this test is all about. Or if there are other tests out there. But – it is true. You know, it is true. I had said that the government had two experts. Those were the experts that they were going to call. But I did not exclude Dr. Welner. I – and now, obviously, Dr. Welner used Dr. Wetzel to ask the questions that Dr. Welner wanted, and so here we are.

Tr. Vol. VIII-2 at 83:20-85:18 (July 6, 2005).

The Court scheduled a hearing for the following Monday, July 11, 2005 to consider the issues raised by the Welner report. That hearing would have addressed at least:

> (1) whether the government had violated the April 7 order; (2) whether Welner would be permitted to present hearsay information from numerous witnesses whose statements had not been provided to the defense, and who had not appeared on government witness lists; (3) whether Welner would be permitted to testify about numerous acts of uncharged misconduct for which no notice had been provided to the defense; and (4) whether Welner's diagnosis of "psychopathy" could withstand Daubert scrutiny, due either to the unreliable factual bases for his opinions or insufficient scientific support for his principles and methodology.

130

United States v. Fell, No. 2:01-CR-12, 2006 U.S. Dist. LEXIS 24707, at *24-25 (D. Vt. Apr. 24, 2006).

In the discussion of these issues on the record that day, Judge Sessions asked whether the Government needed more time to prepare for the testimony of the defense's expert. Tr. Vol. XIII-2 at 78:1-3 (July 6, 2005). The Government responded no. The defense made no attempt to seek additional information or more time, or to itself defer the testimony on Dr. Cunningham, instead agreeing that Dr. Cunningham would testify on July 7 and that the motion on Dr. Welner would be heard on July 11.

No hearing was ever held, however, and no ruling was made on the motion during the penalty phase. Rather, as mentioned, on Thursday July 7, 2005, with no relevant intervening court proceedings, trial counsel abruptly withdrew their Rule 12.2 notice and announced that they would close without calling Dr. Cunningham to testify, Tr. Vol. IX-2 at 3:14-21 (July 7, 2005), and a few days later closed its case without providing the jury any psychiatric or other mental health-related evidence.

In withdrawing Dr. Cunningham's testimony, trial counsel had not sought any assurances from the Government that it would no longer seek to offer testimony from Dr. Welner in rebuttal to the defense mitigation case. As defense counsel should have anticipated, just a few hours after trial counsel unceremoniously withdrew their Rule 12.2 notice, the Government indicated that it would likely still seek to call Dr. Welner as a rebuttal witness because "there have been references to the mental health of the defendant, … [t]hey also appear in various documents in the defense binder, and they're one of the mitigating factors alleged." Tr. Vol. IX-2 at 74:14-18 (July 7, 2005). The Court then indicated that – with the defense having withdrawn

131

the motion – it would "permit [the Government] to call Dr. Welner, though I'd be interested in talking about specifics." Id. at 74:23-25.

That evening, trial counsel submitted a letter to the Court arguing that the Government should be precluded from calling an expert witness regarding the defendant's mental health under Rule 12.2 based on the fact that no defense expert mental health testimony had been offered. Letter of A. Bunin to Judge Sessions, No. 2:01-CR-12, Dkt. No. 191 (July 8, 2005) (Ex. 134). Counsel also argued that any Government rebuttal testimony should be limited to what defense counsel termed the "two facets" of the mitigation case: "(1) evidence of the defendant's background until he was discharged from St. Michael's School at age 15, and (2) his acclimation to the Northwest Correctional Facility since December, 2000." Id. at FELL-00001411. In response, the Government submitted a letter arguing that it was permitted to introduce expert mental health evidence that does not include statements made by the defendant in the course of the examination under Rule 12.2, and that the defense had opened the door to rebuttal mental health evidence bearing on his entire life. Letter of W. Darrow to Judge Sessions (June 29, 2005)[39] (Ex. 208). The Government also proposed to resolve the issue without calling a government mental health expert by "(1) withdrawal of the second mitigating factor, and (2) a short stipulation regarding the defendant's mental health at the time of the offense." Id.

In a conference that morning, Judge Sessions discussed the Government's proposal, indicating that the issue could be resolved on the narrow issue of the defendant's capacity at the time of the crimes. Tr. Vol. 10-1 at 60:10-13 (July 8, 2005) ("as far as a diminished capacity defense you've essentially waived that. And that would be the logical, in my view, way to proceed by way of stipulation").

---

[39]     While this letter bears a date of June 29, 2005, upon information and belief it was written in response to Mr. Bunin's letter and submitted to the Court on the morning of July 8, 2005.

No such limited stipulation was entered or read to the jury. Having foregone evidence regarding Mr. Fell's mental health, defense counsel agreed to withdraw the mitigating factor based on Mr. Fell's mental condition. Id. at 54:21-24. Then, without even considering whether to pursue the Welner motion and operating on the objectively unreasonable assumption that the only way to keep out the testimony of Dr. Welner was to agree to any mental health stipulation the Government demanded, defense counsel agreed to a sweeping stipulation that read:

> [I]t is stipulated and agreed by and between the undersigned parties that after his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that, one, he had no cognitive or neurological deficits; two, his intellect and cognitive functions were intact; three, he did not suffer from any mental disease or defect. The examination also found that Fell was competent to stand trial, and knew the difference between right and wrong at the time of offenses on November 27th, 2000.

Tr. Vol. XI at 93:22-94:8 (July 12, 2005).

This stipulation was the last piece of evidence the jury heard before it retired for deliberations. It was read at the close of the Government's rebuttal case, with maximum possible impact. Tr. Vol. XI, at 93:22-94:8 (July 12, 2005). Specifically, the stipulation – and the withdrawal of the mitigation factor - ended any ability of the defense to argue that Mr. Fell deserved individualized consideration based on his long history of mental health struggles, despite evidence in defense counsel's possession, including Mr. Fell's hospitalization records and social services contact sheets, providing evidence of Mr. Fell's mental impairments.

### 3.    Summations

As a direct result of defense concessions with respect to their experts and mental health evidence, the Government boldly told the jury in its penalty phase summation that there

133

was no evidence of a mental condition and no evidence that Mr. Fell was "significantly impaired at the time of the crimes." It stated:

> [L]adies and gentlemen, you have heard in this phase of the case about the mental health stipulation. There is no question there's no mental disease, no mental defect; no question the defendant knew the difference from right from wrong when these crimes occurred. In fact, ladies and gentlemen, there's no evidence of significantly impaired at the time of the crimes. This factor is not proven.

Tr. Vol. XII at 41:7-14 (July 13, 2005) (emphasis added).

The defense was left unable to respond to this argument. In the absence of the promised expert testimony, counsel's only argument was an appeal to the juror's own experience:

> We decided, your common sense and its life experiences, don't need to be – don't need to be redefined, or told to you by an expert psychologist. We trust you. We trust you to make that correlation, your life experiences on your own because we all have 'em.

Tr. Vol. XII at 84:18-22 (July 13, 2005). That argument was worse than ineffective. It essentially told the jury to look at their own experiences and ask whether, if they had been subject to abuse, they would have engaged in multiple murders. It did not give them any lens through which to understand Mr. Fell's abuse and the way in which it impaired his mental health and operations.

The Government seized on this admission in their rebuttal summation, again emphasizing that Mr. Fell was "completely intact":

> [T]here's no evidence of any psychological disorder. The only evidence as to Mr. Fell's state of mind and his health is in Government's Ex. 14, which is a stipulation by both parties, and as you know, it indicates that psychologists and psychologists examined Mr. Fell after he was arrested, gave him a clean slate. I am not even going to read it to you again. He is completely intact.

Id. at 119:7-14 (emphasis added).

134

Not missing a beat, the Government also asked the jury to compare Mr. Fell's life history with the unfortunate upbringings of other witnesses – even of the victim herself – and to understand that "you don't have to live like [Mr. Fell did]." Id. at 127:14.

Among the last words the jurors heard from either party were these:

> [T]here are some murders, as bad as they are, where you know that there was – there's something wrong with the guy upstairs, the guy that did it. He has some kind of organic, neurological brain deficit. He is mentally ill. Can't tell the difference between right and wrong. That's not this case. … Ladies and gentlemen, at the end of the line, way out there beyond where we live our lives, is a boundary. It's the end of the line. It's the boundary that you don't cross, and there's a sign out there, and that sign says, this far and no further. Everyone knows where that line is, and everyone knows what that sign says. Donald Fell crossed that line and he kept on going. And he deserves the strongest penalty that the law provides for doing that, and the strongest penalty is the death penalty.

Id. at 130:17-131:10 (emphasis added).

### 4.    Post-Trial Motions

Trial counsel did not fully pursue any challenges to Dr. Welner or the Government's flagrant misconduct until they filed a Motion for a Judgment of Acquittal and a New Trial after the verdict was returned. No. 2:01-CR-12, Dkt. No. 209 (Aug. 26, 2005) (Ex. 138). At that point, it was too late to obtain any meaningful relief. In relevant part, counsel argued that the Government violated Rule 12.2 and the court's order and misrepresented their conduct to the Court. The motion recounted that after the trial ended, defense counsel contacted Dr. Wetzel, and that Dr. Wetzel informed them – as he would have been able to testify had there been the scheduled hearing during trial – that "on two occasions before his June 13, 2005 interview of Donald Fell he spoke to Assistant United States Attorney William Darrow. At some point in these conversations, Darrow encouraged Wetzel to use questions prepared by Michael

135

Welner, M.D. for the interview." Id. at FELL-00001462-FELL-00001463. In addition, Wetzel had told counsel that it was not his idea to ask Welner's questions. Id. at FELL-00001463. Counsel argued that the Government's circumvention of the Court's order was unfair, and that the Government's representations to the Court, namely that the doctors had exchanged questions on their own, was a misrepresentation made in violation of the due process clause. Id. at FELL-00001463-FELL-00001464. Finally, defense counsel argued that the testing administered by the Government's expert, as well as the ensuing misrepresentations to the Court, resulted in the withdrawal of Mr. Fell's mental health evidence and the preclusion from the jury's consideration of important mitigation evidence. Id. at FELL-00001466-FELL-00001467.

The Government submitted a brief in opposition to the motion along with an affidavit from Dr. Wetzel. Opposition of the United States to Defendant's Post-Trial Motion, No. 2:01-CR-12, Dkt. No. 212 (Sept. 26, 2005). In that affidavit, Dr. Wetzel admitted that the prosecutor, Mr. Darrow, provided him an updated list of questions from Dr. Welner. Affidavit of Richard D. Wetzel, Ph.D., Appendix to Opposition of the United States to Defendant's Post-Trial Motion, No. 2:01-CR-12, Dkt. No. 212 (Sept. 26, 2005) ("Wetzel Aff.") (Ex. 139 at FELL-00001457).[40] Dr. Wetzel also did not deny what would have been obvious in any event when the lead prosecutor hands a hired expert a list of questions – that the Government encouraged him to use Dr. Welner's questions, by action if not by word. He further did not deny that he told Mr. Paul Volk precisely that. Rather, in a carefully-worded affidavit drafted many months after the actual events described took place, Dr. Wetzel stated that he had discussed his forthcoming examination with Dr. Welner and offered to accept any advice that Dr. Welner wished to offer, and carefully stated only that Mr. Darrow had never explicitly asked him to use Dr. Welner's

136

questions. The Government didn't have to, because Dr. Wetzel admitted that, even then, he had the impression that Mr. Darrow would prefer that he use Dr. Welner's questions – an impression he could only have gotten from Mr. Darrow. Id. at FELL-00001459 ("It was my belief, then and now, that Mr. Darrow was internally pleased that I would ask at least some of Welner's questions. I believed he wanted to have as many options as possible in presenting the government's case. To the extent I helped Welner, it offered Mr. Darrow more options.").

With respect to the testing administered by Dr. Welner, Wetzel averred that he did not consciously or unconsciously administer the tests used by Dr. Welner, and indeed that he did not ask the questions necessary to score the tests reliably. Id. at FELL-00001461. He also stated: "Dr. Welner wasn't there; he could not have administered them either." Id. With respect to reliance on his questions for scoring, he stated, "[i]t would be impossible to escape the conclusion that if I were thought to have administered these tests during my evaluation, that it was poorly done and the scores derived at a later time by Dr. Welner would be less valid than usual or invalid and would not assist a trier-of-fact to understand Mr. Fell or his behavior." Id. at FELL-00001464. Thus, even accepting Dr. Wetzel's account, Dr. Welner's reliance on Dr. Wetzel's examination for the scoring of the PCL-R would have rendered the results unreliable.

In response, defense counsel filed a Memorandum in Support of a Hearing for a New Trial on October 28, 2005. No. 2:01-CR-12, Dkt. 213. In that motion, counsel argued that a hearing was necessary to resolve the issue of Darrow's involvement in the facilitation of Dr. Welner's use of Dr. Wetzel as a proxy in violation of the Court's Order. Counsel further argued that Wetzel's affidavit could not be determinative of the issue of misconduct without a hearing given the inconsistency of his affidavit with the information previously provided to defense

---

40    The filed version of Dr. Wetzel's affidavit omitted page 17. See No. 2:01-CR-12, Dkt. No. 212 (Sept. 26, 2005). Attached as Ex.139 please find the full version of the affidavit as it was found in trial counsel's

counsel and the length of time that had passed between the interview and the writing of the affidavit.  Id. at 5. Counsel also pointed out that Welner could not have based his psychopathy opinion on materials outside of the Wetzel examination because the PCL-R test requires that much of the information, including at least 16 of the items scored in the rating booklet, requires the tester to ask questions or observe conduct during an interview.  Id. at 6.

In its ruling on defense counsel's motion on April 26, 2006, the Court ruled that the unnoticed testing and use of Dr. Wetzel as a proxy were contrary to the procedures required by its April 7 Order and that as a result the Government had violated that order. Fell, 2006 U.S. Dist. LEXIS 24707, at *26-27. However, the Court denied trial counsel's motion because trial counsel had failed to pursue the motion in limine regarding Dr. Welner's testimony during trial. Id. at *31-32. The Court noted that it had "reserved ruling on the issue of precluding Welner's testimony" in contemplation of additional discovery and briefing for the July 11, 2005 hearing but that the defense failed to pursue the issue.  Id. at *14-15. The Court ruled that – notwithstanding the strength of Mr. Fell's claim – counsel had waived the issue:

> When Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct by the government in obtaining its rebuttal evidence.  Regardless of the reasons for Fell's decision to withdraw his expert evidence, he waived his prosecutorial misconduct claim by failing to pursue it at sentencing when the essential facts of his claim were known to him.

Id. at *31-32.

files.

138

**B.    Argument**

### 1.    Trial Counsel Violated Prevailing Professional Norms in Failing to Pursue the Motion to Exclude Welner

Trial counsel's decision not to pursue the motion to exclude Welner's testimony on grounds that the Court's order was violated and that his testimony was not proper expert testimony – a motion that counsel made but then inexplicably failed to pursue – violated prevailing professional norms. There were ample grounds to challenge Dr. Welner's report and testimony. First, as the Court itself later stated, the report violated the Court's order and the applicable rules for a 12.2 examination. Accordingly, and because the defense would have been able to establish intentional government misconduct and/or prejudice, the report and Welner's testimony were excludable. Second, defense counsel had a wide range of arguments with respect to the lack of reliability and incredible prejudice inherent in Dr. Welner's methodologies that had proven successful in other cases and regarding which the Court had expressed its clear concern. Counsel thus had a substantial likelihood of successful exclusion based on these arguments as well.

Counsel's failure cannot be blamed on any ignorance of the law – and even if it could that would be a separate basis for ineffective assistance. Defense counsel made the motion and withdrawing it did not reflect any kind of strategic judgment. Rather, counsel made an unreasonable mistake – one that caused Mr. Fell constitutional prejudice. Decl. of A. Bunin (Ex. 264 at 8); Decl. of G. Primomo (Ex. 262 at 2).

#### a.    The Welner Report was Excludable for Failure to Comply With the April 7 Order

In its April 26, 2006 order, the Court explicitly found that Dr. Welner's actions demonstrated a "failure to comply with the April 7 order." Fell, 2006 U.S. Dist. LEXIS 24707, at *27. The court further ruled that "The government has presented no convincing evidence that

Welner did not engage in psychological testing. The April 7 order specifically required advance notice to the defense before conducting such testing." Id.

Those rulings – which should be considered law of the case – were clearly correct and were available to defense counsel at the asking before counsel made the fateful decision to pull all its expert testimony and agree to the stipulation which eviscerated its mitigation case. Welner's report on its face reflected that, by his own admission, Dr. Welner "relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which [Welner] provided questions to be posed to Mr. Fell." Welner Report (Ex. 10 at FELL-00000648). Dr. Welner supplied a list of questions to Dr. Wetzel, and Dr. Wetzel has admitted to incorporating the questions into his examination. Wetzel Aff. at FELL-00001457 (Ex. 139) (noting "considerable overlap" in questions Welner proposed and questions he sought to ask). It is also clear that Dr. Welner's persistence in questioning Mr. Fell through Dr. Wetzel violated the Court's rulings made twice that Dr. Welner was not permitted to examine Mr. Fell.

There would have been every reason for the Court to have excluded Welner's testimony had the defense persisted in its request for that relief. In its post-judgment opinion, after ruling that the April 7 order had been violated, the Court set out the criteria for excluding the evidence. Specifically, the Court stated:

> In assessing whether an instance of prosecutorial misconduct caused substantial prejudice, ordinarily a court would proceed to consider the severity of the misconduct, any measures to cure the misconduct, and the certainty of conviction absent the misconduct. Ordinarily, an evidentiary hearing would be necessary; the submissions of the parties alone do not enable this Court to judge the severity of the conduct, for example, whether the government deliberately set out to circumvent the Court's order, or whether its expert was simply a zealot who pursued his own agenda despite the restrictions imposed by the Court.

140

Fell, 2006 U.S. Dist. LEXIS 24707, at *27-28 (citing United States v. Elias, 285 F.3d 183, 190 (2d. Cir. 2002)).

Here, the misconduct was severe. There was evidence – available to defense counsel and that could have been adduced at a hearing – that the Government intentionally violated the Order. The Government was clearly aware of the Court's Order. It opposed the order before it was entered. Then, after the Order was entered, it felt strongly enough about the order – and the restrictions imposed by the Court – that it asked the Court to reconsider. The Court declined to do so – as the Government knew. There was also evidence in the possession of the defense, or that was available to it, that the Government was aware of the violation of the Court's Order and indeed facilitated that violation. That evidence included (but was not limited to):[41] (1) that Dr. Welner had prepared questions for Dr. Wetzel to ask, (2) those questions were provided to Dr. Wetzel for Dr. Wetzel to ask, (3) it was Mr. Darrow and the Government who gave Dr. Welner's questions to Dr. Wetzel, (4) Dr. Wetzel stated that the Government encouraged Dr. Wetzel to use Dr. Welner's questions and that he believed it would benefit the Government for Dr. Wetzel to use Dr. Welner's questions, and (5) the answers were given to Dr. Welner for Dr. Welner to use. Thus, the evidence would have established that it was Dr. Wetzel who actually said the words, but that Dr. Welner drafted questions and provided direction for the examination.

There would also have been no "measures to cure the misconduct." The unauthorized testing of Mr. Fell through Dr. Wetzel was a critical foundation to Dr. Welner's

---

[41]    To date, the Government has not fully complied with Mr. Fell's post-conviction efforts to obtain further evidence of its misconduct absent a subpoena, which is not available pre-motion under § 2255. Had trial counsel sought that further evidence during the trial, it would have had the power of subpoena. Counsel will be filing a motion for discovery following the submission of this petition and will amend the petition to include further information once it becomes available.

141

diagnosis of Mr. Fell as a "psychopath" who displayed a "substantial risk" of becoming violent in custody." Welner Report (Ex. 10 at FELL-00000692 ) (finding "substantial risk" of violence in custody); see also id. at FELL-00000687 (based on Fell's VRAG score, he has a "likelihood of violent recidivism exceptionally high relative to his peer group"). Welner himself stated that he had relied on the responses he observed through the tape of Wetzel's exam, an exam for which he had provided the questions. Id. at FELL-00000648. The results of the examinations could not have been excised – without elimination of the basis for Welner's opinions and his report as a whole.

Finally, it clearly cannot be said that a "conviction" (or here the "penalty") would have been "certain[] absent the misconduct." Absent the misconduct, Welner's testimony would have been inadmissible. There also would have been nothing for defense counsel to fear because there would have been no basis for a diagnosis without the testing. And as laid out above, the threat of offering the Welner report and Welner's testimony was the linchpin in the Government's effort to force the defense to withdraw its mental health case. On the basis of the threat that it would offer Welner's testimony, the Government procured the defense's withdrawal of its two expert witnesses – Drs. Cunningham and Mills. The defense had promised the jury it would hear testimony from those individuals. It also procured the defense's agreement to withdraw the mitigating factor that Mr. Fell was under mental and emotional disturbance when the crimes were committed. And, finally and extraordinarily, the Government secured from the defense a stipulation that informed the jurors that Mr. Fell had been evaluated and found not only to have known the difference between right and wrong at the time of the crimes, but also that he had "no cognitive or neurological deficits" and "no mental disease or defect." Tr. Vol. XI at 93:10-94:12 (July 12, 2005).

As set out below, the defense evidence and the mitigating factors would have provided powerful evidence in support of Mr. Fell's mitigation case and the failure to offer it clearly had a devastating impact on the defense. Dr. Cunningham would have testified that the atmosphere of chronic abuse and neglect that characterized Mr. Fell's upbringing, in combination with the remarkable prevalence of substance abuse and mental illness in his family history, made him prone to fall victim to his own substance abuse, mental disorders, and eventual criminality. Dr. Mills would have testified that Mr. Fell's highly deprived childhood resulted in early and recurrent inappropriate social behavior and intoxication and would have provided the jury with a psychological explanation for the otherwise-aggravating aggressive behaviors presented to the jury. The jury would have then been asked to apply this information in weighing the mitigating factor that Mr. Fell was under mental and emotional disturbance when the crimes were committed. As it was, the Government was able to offer the stipulation as its last piece of evidence in its case and was able to hammer home in both its opening penalty phase summation and in its rebuttal penalty phase summation that the professionals who evaluated Mr. Fell said he had a "clean slate" and found him to be "completely intact." Tr. Vol. XII at 119:7-14 (July 13, 2005).

### b. Welner's Testimony was Excludable Because It was Unreliable and Thus Lacked Any Probative Value

By waiving the <u>Daubert</u> hearing, trial counsel also forewent a second meritorious argument that would have kept Welner and the stipulation out and kept Cunningham and Mills and the mitigating factor in. While the Federal Rules of Evidence do not apply in the penalty phase of a capital trial, the FDPA includes its own evidentiary standard, which reflects a heightened concern that evidence in capital sentencing proceedings be reliable. <u>United States v. Fell</u>, 531 F.3d 197, 219 (2d Cir. 2008); 18 U.S. §3593(c) ("Information is admissible regardless

143

of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality op.) (citing heightened need for reliability in the sentencing determinations of capital cases); see also Fell, 2006 U.S. Dist. LEXIS 24707, at *26 ("complete preclusion of Welner's testimony, either because of governmental misconduct or because it would not be admissible under Daubert, would again be under consideration at [the July 11] hearing, as well as the possibility that his testimony would be substantially limited and his report considerably redacted.").

The Court was therefore obligated to scrutinize the reliability, probative value, and potential for prejudice of the Welner report at the July 11 hearing, and the evidence at that hearing would have shown that the Welner report was far short of any standard of reliability under the federal rules or otherwise. See also United States v. Sampson, 335 F. Supp. 2d 166, 177 (D. Mass. 2004) (FDPA evidentiary standard permits exclusion if the probative value is at all outweighed by the danger of prejudice or if the evidence would confuse the issues or mislead the jury, allowing for the exclusion of more evidence than under the Federal Rule of Evidence 403 balancing test). Laid out below are just some of the arguments that counsel had available at the Daubert hearing counsel inexcusably waived. Each of the arguments set out below were well known in the capital defense community and available to the defense; the defense was preparing to make almost all of these arguments. The success of any one of these arguments would have resulted in the exclusion of Dr. Welner's testimony, allowing defense counsel to put on its

144

mental health case. That counsel gave up the right to make any of them – for nothing in exchange – constitutes ineffective assistance in violation of the Constitution.[42]

### 2. Reasonable Counsel Would Have Pursued Exclusion of Dr. Welner's Testimony Because the Testing He "Administered" and the Diagnosis that He Reached Do Not Constitute a Reliable Basis for an Expert Opinion Regarding the Likelihood of an Inmate's Future Violence in Prison

As defense counsel knew, Welner's opinion, and hence also the hearsay information included in his report, was inadmissible based on the unreliable methodology he used to reach it, including deriving his opinion from inherently unreliable testing that he administered outside the presence of the defendant based on an examination conducted by another evaluator. Though trial counsel stated that "[i]t is impossible to respond in kind with such short notice[,]" they did raise issues with the methodology utilized in Dr. Welner's report in their motion challenging his testimony. Penalty Phase Motion to Exclude Dr. Welner's Testimony, No. 2:01-CR-12, Dkt. No. 182 (July 6, 2005) (Ex. 310 at FELL-00002674).

There are a number of grounds on which such an argument could have been successful. First, Dr. Welner's conduct of psychological testing, including the administration of the PCL-R, the VRAG, and the HCR-20, outside of the presence of the defendant for purposes of evaluation and testimony in a death penalty case, without acknowledgement of the concomitant reduction in the tests' reliability, is contrary to accepted psychiatric principles and ethically impermissible. An affidavit that stated as much was submitted in conjunction with an earlier

---

42      Even if trial counsel anticipated that the Court would rule against them and require them to present Dr. Cunningham's testimony before a resolution about the scope of Dr. Welner's testimony, trial counsel was under a duty to at least seek a ruling on the issue in order to preserve the issue for appeal. Trial counsel failed to do so, despite that fact that "[o]ne of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guidelines, Commentary, Guideline 10.8 (noting that the failure to preserve an issue may result in the client being executed even though reversible error occurred at trial, resulting in a heightened need to fully preserve all issues).

challenge to similar testimony in another case.[43] Affidavit of Donald N. Bersoff, Ph.D., J.D., May 24, 2005 ("Bersoff Aff."), Affidavits Submitted in Support of Motion in Limine to Exclude Expert Testimony Regarding the PCL-R and HCR-20 Risk Assessment Instruments and the Diagnosis of Psychopathy, in United States v. Willis Haynes, May 24, 2000 (Ex. 199 at FELL-00002059-2067) (finding testimony did not meet Daubert standard and averring that the "failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview," among other failures the expert there shared with Dr. Welner's opinion, rendered the opinion below the professional standards of forensic evaluation); see also American Academy of Psychiatry and the Law, ETHICS GUIDELINES FOR THE PRACTICE OF FORENSIC PSYCHIATRY at 3, adopted May 2005, *available at* www.aapl.org/pdf/ETHICSGDLNS.pdf ("Honesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination… [but when not feasible after "appropriate effort"] it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions and any reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions."). Trial counsel either knew of the availability of this argument, including the established strategy of pursuing it as exemplified by the affidavit cited above, or unreasonably failed to know of it.

Dr. Wetzel himself has acknowledged that he did not consciously administer the tests during his examinations and did not ask a wide variety of questions that would be needed for the reliable scoring of the tests. Wetzel Aff. (Ex. 139 at FELL-00001461) (setting out types

---

43    Ex.199 includes a group of affidavits submitted in support of a motion in limine to exclude expert testimony on the PCL-R and HCR-20 risk assessment instruments and the diagnosis of psychopathy in United States v. Willis Haynes, 451 F. Supp.2d 713 (D. Md. 2006), including affidavits from experts Stephen D. Hart, Ph.D. (May 19, 2000), Kirk Heilbrun, Ph.D. (undated), Norman Poythress, Ph.D. (undated), John F. Edens, Ph.D. (May 22, 2000), and Donald M. Bersoff, Ph.D., J.D. (May 24, 2000). The Haynes case and these affidavits are discussed in greater detail over the next several pages.

of questions "needed to score the tests reliably" that were not posed and stating "I did not advertantly or inadvertently administer any of these tests in a sufficient detail by using either my or Dr. Welner's questions"). The questions posed in the interview could not have formed a sufficient basis for the administration of these tests.

Trial counsel were not aware of Dr. Welner's tactics in this regard until the receipt of his report on July 5, 2005. It is not possible that they could have been fully prepared to pursue an adequate challenge to this methodology without the additional time required for reasonable preparation. Despite this, they did not request a continuance or make any request for additional information on the record. Had they taken time to investigate this testing, they would have had time to speak with Dr. Wetzel while the motion was still pending and uncovered the additional details of the prosecutorial misconduct alleged in the post-conviction motion, thus providing additional grounds for exclusion of Dr. Welner's testimony. Because they did not, the facts they later learned regarding Wetzel's communication with the prosecution and his understanding of what tests could have been administered were not presented until defense counsel's post-trial motion.

Moreover, beyond Dr. Welner's non-standard methodology for administration of the tests in reaching his diagnosis, the PCL-R, the other risk assessment tools and any diagnosis of psychopathy based on the tests are simply not reliable predictors of an inmate's likelihood of committing future violence while in prison. Trial counsel raised this point clearly in their motion. Penalty Phase Motion to Exclude Dr. Welner's Testimony, No. 2:01-CR-12, Dkt. No. 182 (July 6, 2005) (Ex. 310 FELL-00002674). Even Dr. Welner indicated that there was no scientific basis for his conclusion when he stated in his report that "while Mr. Fell is a psychopath whose VRAG score is quite high, interpretations in [the maximum security setting]

147

must allow for more progress to come in this area" because of the "newness of establishing a methodology for ascertaining risk of violence in such settings." Id. As defense counsel knew, the Court itself had expressed a concern about the prejudicial and unscientific nature of the psychopathy diagnosis, as well as a willingness to carefully consider the matter even before trial counsel withdrew their mental health case. Tr. Vol. VIII-2 at 69:10 (July 6, 2005); see also id. at 82:24-25 (noting that psychopathy has a "connotation which is fairly extraordinary, and I mean, it's nowhere in the DSM").

Indeed, by the time this case was tried, it was well known that the PCL-R and psychopathy evidence were not reliable in predicting violence within a prison population and such arguments had been made successfully in other capital cases. Even more specifically, Dr. Welner's testimony had been excluded in a number of cases. See Sampson, 335 F.Supp.2d at 219, 222, n.27 (noting exclusion of Welner's use of word "psychopathy" in his testimony and lack of reliability in prediction of future dangerousness; emphasizing danger of jury applying Dr. Welner's psychopathy diagnosis, admissible only as rebuttal under Rule 12.2, to find in aggravation that defendant posed a risk of future violence). Courts have also discussed the prejudice of Welner's testimony to defendants. New Jersey v. Vandewaghe, 351 N.J. Super. 467, 480, 799 A.2d 1 (2002) (despite a limiting instruction, the admission of hearsay in the form of "details regarding defendant's character provided by Welner, many of which were not proven and depended upon hearsay suggesting the defendant was, in essence, a bad person not worthy of belief" was unduly prejudicial), aff'd 177 N.J. 229, 238-40, 827 A.2d 1028 (N.J. 2003) (Welner's testimony regarding defendant's personality disorder clearly produced an unjust result, particularly given Welner's testimony that the disorder enabled him to "lie and lie successfully" and as such the testimony should have been "excluded on grounds of undue prejudice and

148

inadmissible hearsay" (internal citation and quotation marks omitted)); see also United States v. Tavares, 585 F. Supp. 2d 327, 340 (E.D.N.Y. 2008) (decision reached after the Fell trial, but finding that the "prejudicial effect [of Welner's testimony based on out-of-court statements on the issue of defendant's gang membership] far outweighs the probative force of the hearsay-based conclusions of Dr. Welner").

An example of the demonstrated strategy present at the time in the death penalty community is United States v. Willis Haynes, tried in 2000, where there was a coordinated push to challenge the Government's psychopathy expert, Dr. Thomas Ryan, who had administered the PCL-R and, on that basis, rendered a report that the defendant was a psychopath who posed a substantial risk of future violence in prison. 451 F. Supp.2d 713 (D. Md. 2006). Before that opinion was ever received into evidence, however, a number of declarations were submitted from a range of well-respected authorities on the PCL-R, all opining that there is no scientific evidence that the PCL-R or the HCR-20 are predictive of institutional violence in correctional offenders in the United States, and that neither test are generally accepted within the scientific community of clinical forensic psychologists for the purposes of predicting such violence. See Ex. 199 (Affidavits Submitted in Support of Motion in Limine to Exclude Expert Testimony Regarding the PCL-R and HCR-20 Risk Assessment Instruments and the Diagnosis of Psychopathy, in United States v. Willis Haynes, May 24, 2000).

After defense counsel submitted the declarations in Haynes, Dr. Ryan "re-evaluated the scientific literature and consulted with several other forensic psychologists" and withdrew his report as a result. Affidavit of Thomas V. Ryan, May 12, 2003 ("Ryan Aff."), Stitt v. United States, 369 F. Supp. 2d 679 (E.D. Va. 2005) (Ex. 206 at FELL-00002114) (explaining his withdrawal of the report and ensuing lack of testimony on psychopathy in Haynes case). Dr.

149

Ryan also later submitted an affidavit during the pendency of Mr. Fell's case in conjunction with post-conviction proceedings in <u>Stitt v. United States</u>, recanting his testimony at the trial there based on the PCL-R because "[i]t was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the <u>Stitt</u> trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence." Ryan Aff. at FELL-00002115. On April 1, 2005 – three months before this trial – the Court in <u>Stitt</u>, after receiving that evidence, ruled that the testimony of the Government's expert witness, including as to the reliability of the PCL-R, "was erroneous and has been recanted." <u>Stitt</u>, 369 F. Supp. 2d at 698.

Trial counsel either knew or unreasonably failed to know that these arguments, supported by affidavits such as these, were a part of a clearly established strategy within the death penalty community regarding the unscientific usage of risk assessment testing and psychopathy diagnoses. Any reasonable capital attorney would have pursued such a challenge and found ample supportive material readily available within the death penalty community.

Further, in addition to the reliability of such an exam as a predictor of violence within a prison context, reasonable counsel would have also challenged the application of the test based on the defendant's age. As one of the affidavits in trial counsel's possession written by an established expert on the PCL-R stated:

> [N]ot all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such

150

> an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult "core personality structure" had been formed.

Affidavit of Kirk Heilbrun, Ph.D. (undated) (Ex. 199 at FELL-00002050-FELL-000002051).

It is clear – and should have been clear to defense counsel at the time – that a challenge to this type of evidence was part of the prevailing standard of care in capital defense work even as early as prior to Mr. Fell's trial,[44] and defense counsel's failure to avail themselves of the readily available legal and factual bases for challenging this evidence certainly fell below that standard.

In sum, the risk assessment tests and diagnoses offered by Dr. Welner generally are not scientifically valid means for predicting whether a defendant like Donald Fell, who faces a life sentence as an alternative to the death penalty determination at issue, will adequately adapt to a prison setting. Beyond that, the specific way in which Dr. Welner "administered" the testing was unscientific and thus additionally unreliable. Because of this, reasonable counsel would have pursued these arguments and would have successfully excluded Dr. Welner's testimony on this basis, allowing for defense expert testimony without the prejudicial testimony of Dr. Welner.

---

[44]    See also United States v. Taylor, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004) (noting that "following an extensive review of literature addressing institutional violence and the PCL-R that concentrated on the use of the PCL-R in capital sentencing proceedings, John F. Edens, a psychologist with extensive experience in the area of risk assessment concluded, 'the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerate[d] clearly is untenable'"(citation omitted)); Sampson, 335 F.Supp.2d at 218, 222, n.27 (noting that "[d]evelopments in the law and more recent scientific research suggest that expert testimony on future dangerousness would be inadmissible under the Federal Rules of Evidence and is also too unreliable to be admitted in the penalty phase of a capital case" (internal citation and quotation marks omitted)); Flores v. Johnson, 210 F.3d 456 (5th Cir. 2000) (Garza, J., concurring) (use of psychiatric evidence to predict a murderer's future dangerousness fails all five Daubert factors); see also United States v. Doe #3, 113 F.Supp.2d 604, 610 (S.D.N.Y. 2000) (in a determination as to whether to transfer a juvenile to adult status, the court ruled the expert's psychopathy diagnosis to be "speculative," that its reliability had been undermined by "a lack of objective information about defendant's past" and that the diagnosis "strain[ed] credulity").

151

It was unreasonable not to try and because the effort would have succeeded, Mr. Fell was prejudiced.

**3.    Reasonable Counsel Would Have Further Pursued Exclusion of Dr. Welner's Testimony Because He was Not Engaged In an Objective Inquiry Into Mr. Fell's Background**

There was also evidence that Dr. Welner approached every interview with an agenda, seeking to confirm his pre-determined hypothesis that Mr. Fell was a psychopath. As trial counsel argued in their motion, "[t]he only way such scores [on the testing] could occur is if the examiner had a predetermined result in mind and justified all variables toward reaching that end." Penalty Phase Motion to Exclude Dr. Welner's Testimony, No. 2:01-CR-12, Dkt. No. 182 (July 6, 2005) (Ex. 310 at FELL-00002674). Dr. Welner's interviews suffered from his own tunnel-vision and overwhelming biases. He was acting as an agent of the Government, and saw his own role as helping the Government build its case rather than to deliver an objective psychiatric diagnosis consistent with his obligation as a mental health professional. Such an approach is contrary to the accepted ethical standards of the profession and rendered the opinions he reached unreliable. See e.g. American Academy of Psychiatry and the Law, ETHICS GUIDELINES FOR THE PRACTICE OF FORENSIC PSYCHIATRY at 3, adopted May 2005, *available at* www.aapl.org/pdf/ETHICSGDLNS.pdf ("When psychiatrists function as experts within the legal process, they should adhere to the principle of honesty and should strive for objectivity. Although they may be retained by one party to a civil or criminal matter, psychiatrists should adhere to these principles when conducting evaluations, applying clinical data to legal criteria, and expressing opinions.").

That Welner was not seeking objective information from these witnesses was obvious to the interview subjects, and is clear even to the casual observer, based on the questions he posed. Instead of asking neutral questions in an effort to solicit information for the

152

production of an unbiased, professional report, based on § 2255 counsel's investigation to date it appears that he focused solely upon aggravating facts in Donald Fell's past and attempted to solicit information about alleged instances of prior uncharged misconduct about which the interview subjects themselves were unaware. See, e.g. Decl. of S. Campbell (Ex. 273 at 12) (Campbell had no idea what Welner was talking about when Welner asked him about whether Mr. Fell killed a specific dog). This demonstrates that Welner never sought to reach a scientific opinion of Donald Fell's mental health, but instead sought solely to support his desire to diagnose Mr. Fell as a psychopath. As such, Welner's testimony should have been excluded because his opinions were biased and not informed by sources of the type reasonably relied upon by an expert in the field.

Furthermore, based on section 2255 counsel's investigation of Mr. Fell's claims, it appears that Dr. Welner attempted to obfuscate his role in his discussions with his interview subjects. For example, when he went to interview Mr. Fell's sister, Teri Fell, Dr. Welner showed up at her doorstep unannounced and led her to believe that he was there in a neutral role and not out to hurt her brother. Decl. of T. Fell (Ex. 278 at 29); see also, e.g. Decl. of S. Campbell (Ex. 273 at 12) (Welner did not tell him he was with the prosecution until the end of their call). Because Dr. Welner was not seeking to conduct forthright, unbiased interviews with his sources, their statements cannot be validly relied upon as sources for a scientific opinion.

### 4. Reasonable Trial Counsel Would Have Utilized These Reliability Arguments to Pursue Exclusion of Dr. Welner's Testimony Under the FDPA Exclusionary Rule

Counsel further had available the meritorious argument that the prejudice inherent in Dr. Welner's testimony clearly outweighed any shred of probative value that might have remained after taking into consideration the lack of reliability in his testing and interview subjects. As such, had trial counsel pursued its motion to exclude Dr. Welner's testimony, the

testimony would have warranted exclusion under the FDPA's evidentiary standard. 18 U.S. §3593(c). Trial counsel was clearly aware of the available arguments because the Court had voiced its concern about the potential prejudice of Welner's proffered testimony on the record prior to counsel's decision to withdraw from the pursuit of its motion. Tr. Vol. VIII-2 at 81:21-25 (July 6, 2005).

As defense counsel clearly argued in their motion in limine, the Welner report was designed as a mechanism to put the word "psychopath" before the jury and as a conduit for hearsay[45] statements relating the defendant's prior bad acts, as evidenced by his continued reference to the diagnosis and the nearly 100 brief and often oblique references to stories as told by a variety of hastily explained sources.

Dr. Welner's diagnosis not only lacked probative value, it also had been excluded by past courts as unduly prejudicial. Indeed, as early as 2003, an affidavit had been submitted in conjunction with another challenge to a capital psychopathy diagnosis that demonstrated the prejudicial impact that the diagnosis has on juries through scientific studies. Such studies have found that "laypersons who hear a defendant being described as psychopathic subsequently expect him to be much more violent and dangerous in the future than do laypersons who are exposed to the same case information but hear the defendant described as being non-psychopathic." Affidavit of John F. Edens, Ph.D. ("Edens Aff.") (Nov. 24, 2003), submitted in Stitt v. United States, 369 F. Supp. 2d 679 (E.D. Va. 2005) (Ex. 309) (further noting the effect even when the prosecution expert acknowledged that the defendant was at a low risk for

---

45      While under the federal rules, expert opinion is in some circumstances permitted based on inadmissible information, such is not the case when the information is not of the sort reasonably relied upon within the field, when the report is merely a conduit for hearsay, or when allowing the opinion would violate the defendant's constitutional right to confrontation. See, e.g.United States v. Lawson, 653 F.2d 299, 302 (7th Cir. 1981) ("An expert's testimony that was based entirely on hearsay reports, while it might satisfy Rule 703, would nevertheless violate a defendant's constitutional right to confront adverse witnesses."); United

154

engaging in future acts of violence). Further, a much higher portion of laypeople who hear the diagnosis believe that a death sentence is appropriate. Id.

In addition, as set out more fully below, many of the statements Dr. Welner relied upon were not only unreliable, and thus lacking in probative value, but also unduly prejudicial in their own right.

> **5.**   **Dr. Welner's Opinions Were in Large Part Based on Interviews Conducted With a Wide Variety of Individuals Who Were to Varying Degrees Associated with Mr. Fell's Life. These Sources Were Not Reliable Bases on Which to Reach a Mental Health Diagnosis, and a Reasonable Attorney Would Have Pursued Exclusion of His Opinion As a Result**

From the face of the report, it was evident that Dr. Welner's conclusions relied heavily on unreliable hearsay provided by those who intersected with Mr. Fell's past. Penalty Phase Motion to Exclude Dr. Welner's Testimony, No. 2:01-CR-12, Dkt. No. 182 (July 6, 2005) (Ex. 310 at FELL-00002673). These damaging statements are dotted throughout the report, often with only a cursory explanation of the speaker and the speaker's relationship to the defendant.

Defense counsel could have argued at a Daubert hearing, and would have successfully argued at such a hearing, that many of these statements do not constitute sufficiently reliable data upon which to conduct psychological testing or otherwise arrive at a mental health diagnosis because the individuals themselves – including Mr. Fell's co-defendant and individuals who have their own severe substance abuse and mental health issues or harbored grudges against the defendant – were not reliable sources of information for such an analysis. Further, it is clear that Dr. Welner's report does not account for this lack of reliability. Indeed, Welner appears to have relied entirely on the statements of Bobby Lee in forming an understanding of the crime

---

States v. Mejia, 545 F.3d 179, 197–99 (2d Cir. 2008). As discussed in greater detail below, Dr. Welner's

and many other aspects of Mr. Fell's psyche. See, e.g., Welner Report (Ex. 10 at FELL-00000656).[46]

The defense had additional available arguments that these sources were further unreliable because Dr. Welner conducted many of his interviews in the presence of law enforcement officers, making every attempt to generate intimidation and uncertainty on the part of his interview subjects. For example, Stanley Kowalski remembers that Dr. Welner, in the company of the FBI, knocked on his door one night at 11 pm and asked him a number of questions about his experiences with the Fell family. Decl. of S. Kowalski (Ex. 277 at 7). Dr. Welner then gave Stanley his card, a move which Stanley thought was "very CSI." Id. An interview designed to elicit reliable information is simply not conducted in the middle of the night under circumstances designed to evoke the individual's perception of crime scene investigators as seen on television. Clearly the recipients of this treatment were both intimidated and felt the need to provide the questioners with the information they wanted to hear. See also, e.g. Decl. of T. Fell (Ex. 278 at 29-30).

Moreover, Dr. Welner's recitation of the "facts" of Mr. Fell's life through these statements was often fundamentally incorrect or unreliable.[47] For example, Dr. Welner quoted Sean Campbell a number of times in his report[48] and portrayed Mr. Campbell as a protective figure and a role model who rarely drank and bonded with Mr. Fell over music and video games.

---

opinion was problematic on all of these fronts.

[46] At the same time, the Government violated Brady and Giglio by failing to turn over the reports and information that would have undermined Mr. Lee's statements. The defense also violated the Sixth Amendment by failing to seek these separately.

[47] Dr. Welner's misrepresentations and mischaracterizations of collateral source statements in his report were also unethical. American Academy of Psychiatry and the Law, ETHICS GUIDELINES FOR THE PRACTICE OF FORENSIC PSYCHIATRY at 3, adopted May 2005, available at www.aapl.org/pdf/ETHICSGDLNS.pdf ("[Forensic psychiatrists] communicate the honesty of their work, efforts to attain objectivity, and the soundness of their clinical opinion, by distinguishing, to the extent possible, between verified and unverified information as well as among clinical 'facts,' 'inferences,' and 'impressions.'").

156

See Welner Report (Ex. 10 at FELL-00000645); see also id. at FELL-00000665 (describing Campbell as having "assumed a paternal role"). However, as Mr. Campbell states in his declaration attached as Ex. 273, he was only a few years older than Mr. Fell when they lived together and had his share of "scuffles" with him. Decl. of S. Campbell (Ex. 273 at 9-10) ("I spent some time with Mr. Fell while we were living together, but I certainly wasn't a father figure to him"). Dr. Welner also characterized Debra's boyfriend Al Wilcox, as other members of Mr. Fell's family including his grandmother Theresa Sharpe, as positive influences in Mr. Fell's life, a fact that is also false. Decl. of T. Fell (Ex. 278 at 6-7, 12-13 ). Moreover, although the Welner report referred to a number of interviews conducted by Welner in the company of an FBI Agent, the Government did not produce many 302s or reports of investigation relating to those interviews, thus precluding review of the veracity of the statements. Decl. of A. Bunin (Ex. 264 at 8).

In addition to the lack of reliability inherent in the statements relied upon by Dr. Welner, his report was so permeated with unnecessarily provocative statements and inflammatory pro-government argument that his entire testimony should have been excluded as overly prejudicial and misleading to the jury. Welner's report included statements clearly designed to incite fear amongst the jurors and thus discourage defense counsel from putting on their case, including numerous references to Satanism, racism, and inappropriate argument costumed as expert opinion, including "It is my professional opinion, with a reasonable degree of psychiatric certainty, that Ms. Fell's abandonment of Donald preserved her safety, indeed her life." Welner Report (Ex. 10 at FELL-00000678); see also, e.g. id. at FELL-00000682 ("Donald Fell is a man for whom there were no cracks he had to fall into, but a man who created cracks

---

48    No 302 or other documentation of Dr. Welner's interview of Mr. Campbell was ever disclosed to the defense.

157

faster than others could fill them."); id. at FELL-00000647 ("Donald Fell emerged in his teens as a stimulation-seeking, drug-seeking hedonist who did not take to limit setting."); id. at FELL-00000688 ("Mr. Fell's sadism and blood lust are unusual and rarely studied."). The statements relied upon in forming Dr. Welner's opinion, including those of Mr. Fell's deceased co-defendant Mr. Lee, were designed to highlight characteristics that Dr. Welner classified as aggressive and antisocial in the most sensational and prejudicial means possible. Further, many of these statements were elicited in the course of an investigation into the prosecution of Mr. Fell's crimes, often in the presence of the FBI, and thus constituted testimonial hearsay subject to the Sixth Amendment's Confrontation Clause.[49]

Thus the danger of prejudice posed by the report's frequent reliance on these unreliable statements surely outweighed its extremely limited probative value, and it is almost impossible to conceive how these out-of-context statements could fail to confuse the issues or mislead the jury. Because of this, reasonable counsel would have sought a ruling excluding any reference to the statements or an opinion derived from them, and these meritorious arguments would have warranted exclusion. See 18 U.S.C. §3593(c).

---

[49] Under the Confrontation Clause, criminal defendants have a right to confront witnesses who testify against them. U.S. CONST.amend. VI. Hearsay statements that are "testimonial" are only admissible if the declarant testifies at trial or if both the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant about the testimonial statements. SeeCrawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004). Subsequent cases have elaborated on what type of statements are included in such an analysis, including that statements made during prior testimony at a preliminary hearing, during a grand jury hearing, at a former trial, or during police investigations are all clearly "testimonial." Id.at 68; Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (holding that statements made during a police investigation are testimonial if their purpose is to establish past events in order to ultimately prosecute). Many of the interviews that served as the basis for Dr. Welner's report were conducted by an FBI Agent during the course of the investigation of Mr. Fell with respect to the crimes charged, with Welner accompanying the officer and asking additional questions. See, e.g.Decl. of S. Kowalski (Ex. 277 at 7(calling the experience "very CSI"). Mr. Fell had the right to cross-examine declarants interviewed in the course of the investigation of Mr. Fell's crimes if the Government sought to invoke their testimony at trial.

**6.    In Addition To the Above Arguments Raised by Counsel in Their Motion in Limine on July 6, Reasonable Counsel Would Have Pursued Exclusion of Dr. Welner's Opinion on Additional Grounds**

Dr. Welner's testimony was also subject to exclusion on grounds other than those initially raised by trial counsel in their penalty phase motion in limine. Had Dr. Welner's testimony, derived from a diagnosis that was reached as a direct result of compelled psychological testing for which the defendant had received no notice, been allowed, Mr. Fell would have suffered a violation of his Fifth and Sixth Amendment rights. As counsel should have recognized, it was widely recognized well before Mr. Fell's trial that government examinations under Rule 12.2 implicate a defendant's constitutional rights. See, e.g. Estelle v. Smith, 451 U.S. 454, 470-71, 101 S. Ct. 1866, 68 L.Ed.3d 359 (1981) (holding defendant's Sixth Amendment rights are abridged when the defendant is not given prior opportunity to consult with counsel about his participation in a psychiatric examination); Sampson, 335 F.Supp.2d at 245-46 ("if defense counsel were given notice of the government's experts and the tests they intended to conduct, a defendant could decide to withdraw his [testimony under Rule 12.2] rather than proceed with the possibility of presenting evidence concerning his mental condition"). No notice was provided to Mr. Fell that Dr. Welner would administer the PCL-R, the VRAG, and the HCR-20, and the Court's Order explicitly prohibited any unnoticed testing. Mr. Fell was therefore never given the requisite notice of the testing and never received the advice of counsel in order to inform whether and how he should proceed during the examination. Defense counsel were further ineffective for failing to argue for the exclusion of Dr. Welner's testimony on this basis. Were it to be actually offered, Mr. Fell would have suffered a violation of his constitutional rights.

Further, had counsel pursued its claims with respect to the prosecutorial misconduct underlying these violations, they would have been able to provide additional indicia

159

of misconduct in connection to the Rule 12.2 examination. Defense investigator Andy Bartnick was present at the prison when Dr. Wetzel conducted his examination of Mr. Fell and the prosecutor, Mr. Darrow, was there as well. At the end of the day, Darrow left the prison with the videotapes of the interview. Decl. of A. Bartnick (Ex. 262 at 3). It is thus possible that the Government reviewed and relied upon the tapes in preparation of their penalty phase case, in violation of Rule 12.2 and the defendant's constitutional rights.[50] At the very least, the Government's possession of the tapes is an additional violation of the Court's Order that the "report of the examination shall be released to the government only in the event that the jury reaches a verdict of guilty on a capital charge and only after the defendant confirms his intent to offer mental health or mental condition evidence in mitigation." Order at FELL-00002349, No. 2:01-CR-12, Dkt. No. 101 (D. Vt. Apr. 7, 2005) (Ex. 235); see also Fed. R. Crim. P. 12.2(c).

At the hearing defense counsel thus had additional arguments based on the constitutional protections embodied in Rule 12.2 and additional indications that the prosecution had not complied with the Court's sealing Order. See 2002 Advisory Committee Notes, Fed. R. Crim. P. 12.2 (noting that "[m]ost courts that have addressed the issue have recognized that if the government obtains early access to the accused's statements, it will be required to show that it has not made any derivative use of that evidence."); see also United States v. Johnson, 362 F.Supp.2d 1043, 1080-81 (N.D. Iowa 2005) (Rule 12.2 "as a whole contemplates that the government will not have the 'results and reports' of the defendant's experts until after the government has disclosed the 'results and reports' of its own experts."); id. (including a recording of the examination within the definition of "results and reports" under Rule 12.2).

---

[50] Because no pre-petition discovery is contemplated under Section 2255, post-conviction counsel has not yet had the opportunity to fully develop the underlying facts of this potential violation, but the Government's opportunity for such action is clearly evident.

160

Yet another meritorious argument Mr. Fell's lawyers forewent related to the implication of the more general diagnosis of Antisocial Personality Disorder ("ASPD") as indicative of a risk of future violence, as well as to the use of the diagnosis to distinguish the defendant from the remainder of the prison population in any way. Even beyond any psychopathy diagnosis, the more general diagnosis of Antisocial Personality Disorder ("ASPD"), for which Dr. Welner found Mr. Fell "demonstrated evidence" of certain criteria, is even less valuable as a reliable predictor of an individual's likelihood of future violence in prison because the ASPD diagnosis encompasses a wide array of symptoms with behavioral manifestations on a vast continuum, such that three-quarters of the prison population can be so diagnosed. See Mark D. Cunningham, Thomas J. Reidy, Don't Confuse Me with the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing, 26-1 CRIM. JUST. AND BEHAV. 20, 30 (March 1999) (prevalence of ASPD in a prison population is about 75% and thus is not indicative of which inmates will commit violence; ASPD diagnoses not a predictor of violence because of "shifting diagnostic criteria, innumerable symptom variations," and a number of other issues). Indeed Dr. Welner did not allege that the diagnosis allows for such a finding, but rather used the criteria for the diagnosis as a mechanism for conveying a variety of sensational hearsay statements.   Welner Report (Ex. 10 at FELL-00000629-FELL-00000636).

Further, reasonable counsel would have also argued that because the defense experts had not reached a diagnosis or opined on the defendant's likelihood of future violence as a result of any diagnosis, Dr. Welner's conclusions were not relevant rebuttal testimony and thus should have been excluded.  Given the scope of the expert reports provided by the defense experts, Dr. Welner's testing was also outside the scope of testing permissible as relevant rebuttal under Rule 12.2 because no defense expert had attempted to rely upon parallel testing in

161

support of a mitigating factor. <u>See</u> <u>United States v. Williams</u>, No. 06-00079 DAE-KSC, 2010 WL 320081 (D. Hawaii Aug. 16, 2010) (limiting Government experts to preparing a mental diagnosis as a rebuttal to defendant's evidence, and not allowing them to seek to ascertain another possible motive for defendant's actions); <u>United States v. Taylor</u>, No. 1:04-CR-160, 2008 U.S. Dist. LEXIS 12710, at *10 (E.D. Tenn. Feb. 15, 2008) (allowing government exam, but limiting testing to that which is parallel to defendant's intended mental health testimony as to substance abuse).

As a result of defense counsel's failure to investigate, they were unprepared to pursue potentially meritorious arguments related to the clinical reliability of Dr. Welner's diagnosis. For example, had counsel sufficiently investigated Mr. Fell's mental health background, as discussed <u>supra</u> in the section discussing counsel's failures with respect to their affirmative mental health case, counsel could have argued that the diagnosis was not clinically reliable based on the symptoms Mr. Fell exhibits of mood disorder or another Axis I disorder which would preclude a reliable ASPD diagnosis. Additionally, counsel could have argued that there were other potential causes for the behaviors Mr. Fell exhibited in childhood or as an adult that would foreclose an ASPD diagnosis. <u>See</u> DSM-IV-TR at 688, 705(American Psychiatric Association, 4th ed. 2000).

Finally, when defense counsel discussed the lack of disclosure of the FBI 302s and underlying source material generally on the record, the Court essentially instructed counsel that they would need this information in order to adequately cross-examine Dr. Welner, stating that in order to cross examine an expert "you go to the bases of the opinion," and without the disclosure of the underlying sources for Welner's opinions, "you are going into areas for which you say you have no information." Tr. Vol. VIII-2 at 76:2-10 (July 6, 2005). Despite this, trial

162

counsel inexplicably failed to take even the small step of requesting a continuance to allow for investigation of the bases for the report. Trial counsel failed to make this request despite a direct question to the parties from the Court as to whether additional time to prepare for the hearing was necessary.[51]

### a. Counsel Was Ineffective in Agreeing to The Stipulation

Even after agreeing to withdraw its expert witnesses, the defense entered into a stipulation that broadly stated that Mr. Fell had no mental or other cognitive or neurological defects, and that he knew the difference between right and wrong at the time of the offense. It did so ostensibly based on fear that if it did not stipulate, the Government would offer and the Court would receive the Welner testimony. While the Government's failure to turn over the evidence that would have been necessary to challenge that report provides a separate basis for relief for Mr. Fell, counsel was also ineffective in agreeing to the stipulation.

Trial counsel should never have agreed to the stipulation – and certainly should not have done so for fear that they had no alternative grounds to exclude Welner's testimony. In the first place, as set forth above, counsel had grounds to exclude Welner – they did not need to stipulate. Moreover, once counsel withdrew the expert testimony, Welner's testimony would have been inadmissible in any event. Trial counsel's failure to exploit that ground and their decision to enter into an unnecessary and gratuitously harmful stipulation to prevent testimony

---

51    Further, the Court had previously indicated a willingness to delay the proceedings in order to allow opposing counsel to prepare to challenge an expert. Specifically, in discussing Dr. Mills, the Court was unwilling to allow Mills to testify without enough time for the Government to review his as yet undisclosed notes. Tr. Vol. VII-1 at 7:12-21 (July 1, 2005). Also, just before the defense withdrew the 12.2 notice, Judge Sessions requested argument in response to the Government's challenge to Dr. Cunningham based on the failure of the defense to make certain disclosures. In doing so, he also proposed a potential solution: "One of the simple ways of resolving that issue is the require in a Daubert hearing disclosure of that kind of information and then a sufficient delay in the testimony of Dr. Chamberlin [sic] so that the Government would have an adequate opportunity to review that material." Tr. Vol. IX-1 at 139:12-17 (July 7, 2005). Thus the Court's other rulings demonstrated a willingness on the part of the Court to delay an expert's testimony in order to allow sufficient time for opposing counsel to prepare for cross-examination.

counsel could have excluded on other grounds constitutes an independent constitutional violation.

The applicable rule of criminal procedure, Fed. R. Crim. P. 12.2, provides that "no testimony by the expert based on [defendant's] statement [during the course of an examination under the rule], and no other fruits of the statement," are admissible unless the defendant offered "expert evidence relating to a mental disease or defect or any other mental condition of the defendant." Fed. R. Crim. P. 12.2. Dr. Welner's opinion was based on an examination ordered under Rule 12.2. As such, once the defense made the decision not to offer expert evidence relating to a mental condition of Mr. Fell, the Government would not have been entitled to submit testimony based on the examination of the defendant through Dr. Welner, including the testing he administered and the diagnosis that he reached.

This basis of relief was available but not exploited by trial counsel. Indeed, the Court expressed a willingness to carefully consider whether Dr. Welner's testimony was barred under the sealing requirements of Rule 12.2 as a result of trial counsel's decision not to offer expert mental health testimony, but trial counsel again never pursued its arguments, set out in a letter to the Court dated July 8, 2005, prior to entering into the broad stipulation. Tr. Vol. X-1 at 58:2-59:25 (July 8, 2005) (Court expressing its concern that "it becomes an extraordinarily complex issue. And obviously in light of the nature of this particular offense it would be an issue that would be or could be extraordinarily controversial and could last into multiple years of litigation."); see also Letter of A. Bunin to Judge Sessions, No. 2:01-CR-12, Dkt. No. 191 (July 8, 2005) (Ex. 134) (setting out requirements of Rule 12.2). The failure to make this argument – and then to agree to the stipulation based on the erroneous impression that Welner would still be able to testify – violated prevailing professional norms.

164

### 7.      Mr. Fell Suffered Prejudice  As a Result of His Trial  Counsel's Errors

Mr. Fell suffered enormous prejudice from counsel's failure to challenge Dr. Welner and from the decisions to pull his mental health case and to agree to the stipulation.

From the outset of the case, trial counsel prepared the jury to hear expert testimony that would help it understand the significance of the lay witness testimony and provide mitigating evidence supportive of a life sentence.  Decl. of A. Bunin (Ex. 264 at 7); Decl. of P. Volk (Ex. 305 at 1).  During voir dire, defense counsel acknowledged the importance of expert mental health evidence to their mitigation case in questioning a juror that felt that all psychiatric testimony would be biased.  Transcript, Individual Voir Dire of Prospective Jurors (Nos. 113, 119, 120, 121, 143, 150, 174, 180, 184, 203, 224, 239, 241, 243, 252, 280) at 109:1-4 (June 1, 2005) (stating "psychological evidence and these [mental health] mitigating factors... are very important to our case"); see also Decl. of P. Volk (Ex. 305 at 1 ) ("I would have changed the nature of my questions and selected different jurors if I had known that there would be no expert testimony regarding mental health and no attempt to link records from Mr. Fell's childhood and early adolescence to his conduct and behavior at the time of the offense.").[52]  In its penalty phase opening statement, counsel promised the jurors not only expert testimony from "medical doctor" Mark Mills, but also "half a day" of testimony from Dr. Cunningham, who would show how Department of Justice studies demonstrated how Mr. Fell's background made him predisposed to bad outcomes.  Tr. Vol. V-1 at 56:4-57:9 (June 28, 2005).

---

[52]  In its opinion ruling on the motion to strike that juror for cause, the Court also indicated its understanding of the importance of this evidence in the jury's consideration of relevant mitigation evidence. Memorandum and Order, No. 2:01-CR-12, Dkt. No. 139 (June 9, 2005) (ruling that juror 184's belief that a psychiatrist would be a biased witness warranted exclusion for cause because the juror's "personal beliefs about psychological or psychiatric testimony could interfere with his responsibility to weigh such expert testimony impartially").

The jurors were thus conditioned to hear mental health testimony from the defense and were expecting to hear it. Juror No. 203 even clearly told the defense counsel during voir dire that without mental health testimony, other mitigation evidence "about being abused as a child, not having parents, having no – having your parents leave you at an early age and kind of being on your own, falling into drugs and alcohol" wasn't "going to bear much weight." Tr. Individual Voir Dire of Prospective Jurors (Nos. 113, 119, 120, 121, 143, 150, 174, 180, 184, 203, 224, 239, 241, 243, 252, 280) at 164:25-65:8 (June 1, 2005).[53]

Indeed, virtually the entirety of defense counsel's penalty phase case was designed to establish the foundation for the expert mental health testimony. Defense counsel called as witnesses Ellis Carle, Deanna German, and two police officers to testify about the abuse that Mr. Fell had suffered from the time he was in the womb until the age of 15. As the defense indicated to the jury in its opening, that evidence made sense only in the context of expert testimony which would have tied the experiences that Mr. Fell had had through his teen years to the person he was at the age of 20. In the absence of such expert evidence, the record of Mr. Fell's early years was at best irrelevant and – at worst – aggravating.

Indeed, as a result of the defense's failure to put on a mental health case after having promised it to the jury, the Government was able to make what should have been mitigating evidence sound like it was aggravating evidence. For example, the jurors were read the most damaging portions of the hospitalization records from Donny's adolescence, and as discussed supra in the section discussing counsel's failure to investigate and present the lay

---

[53] Defense counsel were thus clearly on notice of the importance of this evidence to the jury. This is further supported by a statement Juror No. 203, who volunteered after the trial:

> Maybe if there had been some sort of intelligent psychiatrist to present evidence of the defendant's mental state it would have made a difference, but there was not overwhelming amount of that presented.

Decl. of Juror No. 203 (Ex. 239 at 2).

mitigation case, they were given only scattered examples of damaging events in Mr. Fell's life through testimony from his sister and half-sister, as well as from medical, police, and social services workers who intersected with Mr. Fell's family at varying points in his upbringing. Dr. Cunningham would have explained that this evidence was mitigating – that bad behavior and social dysfunction can be a byproduct of the chronic trauma, and that Mr. Fell's family history of substance abuse and mental illness made him predisposed to similar problems. But Dr. Cunningham did not testify. The failure left the jury with no understanding that Mr. Fell's seemingly aggressive or antisocial or other conduct was in reality symptomatic of mitigating mental health or other developmental considerations.

In addition, defense counsel provided the jury with the Mitigation Binder, which included detailed records of Mr. Fell's hospitalizations, including diagnoses and medical terminology inaccessible to the lay juror. These records also described a wide variety of instances of misbehavior and aggression on Mr. Fell's part. In the view of Dr. Cunningham, those records were indicative of the predispositions arising out of Mr. Fell's heredity of psychological disorders, personality disturbance, and behavioral misconduct. Decl. of M. Cunningham (Ex. 6 at 4). The jury, however, was never given that opinion.

As a result, in its jury addresses, the Government urged the jury to carefully review the "so-called mitigation binder" and argued that though Mr. Fell had a terrible background, he made choices to be violent. See Tr. Vol. XII at 52:21-53:24 (July 13, 2005). The Government further argued that "[t]here is no question there's no mental disease, no mental defect; no question the defendant knew the difference from right from wrong when these crimes occurred" and that, based on review by mental health professionals, Mr. Fell had a "clean slate" and was "completely intact." Tr. Vol. XII, at 41:9-14, 119:7-14 (July 13, 2005).

167

The case would have been different had defense counsel proceeded with the mental health experts and without the stipulation, as it had planned.

### a.  Dr. Mills' Testimony

Had Dr. Mills been prepared and testified, he would have presented evidence that he examined Mr. Fell and concluded that he was an alcoholic with incipient psychosis or pre-psychotic breakdown, and one of the most drug-abusing individuals he had ever examined. Report of Dr. Mark Mills (May 7, 2001) ("Mills Report") (Ex. 3 at FELL-00000394 ). He would have testified that Mr. Fell experienced a highly deprived childhood resulting in early and recurrent inappropriate social behavior and intoxication, that his history and testing results indicated incipient psychosis or pre-psychotic breakdown, and that both his substance abuse and potential psychotic illness have strong familial and genetic components. As stated in the attached declaration, Dr. Mills believed that Mr. Fell is "the most drug-abusing and chronically intoxicated individual whom I have evaluated." Decl. of M. Mills (Ex. 260). In addition, Dr. Mills would have provided the jury with some psychological explanation for the behaviors demonstrated in Mr. Fell's hospitalization records and testified to by his sister and other witnesses, and he would have testified that Mr. Fell had a low score on psychological testing measuring dominance, meaning that others can easily dominate him.

### b.  Dr. Cunningham's Testimony

Had Dr. Cunningham been prepared and testified, he would have explained to the jurors exactly how the testimony regarding Mr. Fell's upbringing, including the violence he witnessed and suffered at the hands of his parents, the sexual abuse he was the victim of at an early age, and his own drug and alcohol abuse and hospitalizations, impacted his life path. In addition, Dr. Cunningham would have provided the jury with perspective on Mr. Fell's predisposition to these outcomes based on his family tree and the widespread family history of

168

not only drug and alcohol abuse, but also mental illness.  Finally, Dr. Cunningham would have described the emotional abuse suffered by Mr. Fell and the impact that such abuse and neglect can have on a child's ability to develop and interact with the world.

First, Dr. Cunningham would have chronicled Department of Justice studies setting out certain risk factors for violence and delinquency in the community based on an individual's upbringing and background, as well as countervailing protective factors that buffer an individual against the risk factors and inhibit the development of behavioral problems.  He would have described to the jurors how these factors relate to each stage of development from early childhood through early adulthood, and highlighted the importance of the protective factors to healthy development at each stage.  In stark contrast, he would have described Mr. Fell's upbringing as subject to "pervasive developmental poisoning" based on his generational and biological predispositions, the parenting he received, the community in which he was raised, and his "disturbed trajectory" as a result of the psychological damage and substance abuse he sustained at an early age.  See Decl. of M. Cunningham (Ex. 6).

Dr. Cunningham would have also fully set out for the jurors Mr. Fell's chronic exposure to trauma over the course of his childhood, including the daily drunkenness of his mother and father, the observed mutual combat of his parents, the physical abuse and sexual abuse suffered by both Mr. Fell and his sister, the emotional neglect from both parents, and the Fell's generally chaotic household and lack of hygiene.  Dr. Cunningham would have walked the jurors through these traumatic factors.  In addition, Dr. Cunningham would have discussed the likely impact of Mr. Fell's drug use on his long-term development, chronicling his huffing of gasoline beginning at age 12 for several hours a day over the course of a year.

169

Dr. Cunningham's testimony would have also served to explain the importance of familial relationships in childhood development. As acknowledged by both FBI and DOJ studies, healthy family relationships are central to how a child will develop socially and relate to the world. Dr. Cunningham would have then explained the long list of negative impacts on individuals like Mr. Fell, who are the children of alcoholics and drug users, including modeled substance abuse, psychological injury, and broad social and psychological dysfunction including criminality. With respect to the violence witnessed by Mr. Fell, as testified to by several of the police officers and his sister and half-sister at trial, Dr. Cunningham would have explained to the jurors that the rates of serious youth violence go up considerably when youth are exposed to family violence, regardless of whether the child is the target of the violence. The fact that Mr. Fell was in fact a frequent target of physical abuse rendered him 3.1 times more likely to be arrested for violent crime based on studies available at the time. Not only would Dr. Cunningham have explained all of this to the jury, he also would have described various examples of the violence Mr. Fell experienced that had not yet been clearly set out for the jury in testimony.

In addition, Dr. Cunningham would have explained that with parents such as Mr. Fell's who were unaffectionate, unsupportive, and apathetic towards his development, emotional neglect is often even more psychologically damaging than physical abuse. In addition, such neglect results in a markedly increased risk of psychological disorder and behavior problems in childhood, as well as for violent and criminal behavior in adolescence and adulthood. The fact that Mr. Fell's father left when he was 11 years old doubled the likelihood that Mr. Fell would engage in criminal activity and dramatically increased his risk of drug and alcohol abuse and mental illness. Mr. Fell was also abandoned by his mother at a young age for a period of seven

170

years, and even when he reconnected with her, she continued to be a corruptive influence on his life, modeling violence and irresponsibility.

Dr. Cunningham would have testified that children need order and external structures to develop internal structures and the capacity for self-guidance, and that when guidance is not provided by an adult, as in Mr. Fell's life, children do not develop self-control and often resort to aggression, increasing the likelihood that they will be involved with violence in the community.

With respect to the sexual abuse suffered by Mr. Fell at a young age and testified to by Deanna German, as well as his observation of his sister's sexual abuse, Dr. Cunningham would have explained to the jury that this exposure often results in a perception of self and others as objects, a reduced identification with social ideals and unreasoned loyalty as a result of a betrayal by someone on whom he was vitally dependant, aggressiveness, substance abuse, and deep feelings of shame and defectiveness. In addition, the fact that Mr. Fell's mother repeatedly brought home a series of one-night stands, coupled with Mr. Fell's own premature sexualization, added to the sexual trauma Mr. Fell suffered.

Dr. Cunningham also would have noted that the inadequate community intervention in Mr. Fell's life and his corruptive peer influences increased the risk of criminal involvement.

Finally, Dr. Cunningham would have explained to the jury how Mr. Fell's genetic background, his ADHD, the modeling of his parents' behaviors, and his developmental trauma and instability were all risk factors for his childhood onset alcohol and drug abuse and dependence, and that this dependence can lead to delayed maturity, retarded coping skills, impulsive behavior and poor judgment, as well as an increased likelihood of criminal behavior.

171

Though defense counsel had alleged as a mitigating factor that Mr. Fell was only 20 years of age at the time of the offense, no evidence was presented to the jury as to why this constituted a mitigating factor. Quite to the contrary, the Government argued that, at 20, Mr. Fell was an adult capable of adult decision-making. Dr. Cunningham's testimony would have explained to the jury that other factors present in Mr. Fell's life generally serve to delay maturity, including developmental trauma, peer isolation and rejection, a corruptive community or family, a psychological disorder, and substance abuse.

Dr. Cunningham would have also been available to tell the jurors that, based on the absence of serious violence during Mr. Fell's pretrial confinement, his participation in constructive activities during that confinement, and the appraisal of correctional officials within the prison, Mr. Fell is likely to have a positive adjustment to prison. He could have further provided testimony regarding the invalidity of both ASPD and psychopathy as predictors of future violence in the prison setting.

### c.  Other Available Expert Testimony

In addition, trial counsel could have called one of the original government experts to testify based on their early examination of Mr. Fell. In April 2005, Mr. Volk had had some conversations with Dr. Rabun, a government expert who had examined Mr. Fell on December 12, 2002 and delivered a report to both the prosecution and the defense. Dr. Rabun made it clear to Mr. Volk that he would accept a subpoena to testify for either the prosecution or the defense. Memorandum to File of Paul S. Volk (July 20, 2005) (Ex. 137). Dr. Rabun offered several opinions that explicitly found characteristics of Mr. Fell's life to be mitigating, including that (1) "Mr. Fell's history of sexual and physical abuse would effect [sic] his behavior as an adult;" (2) "Mr. Fell qualifies for a diagnosis of Alcohol Dependence" and his "intoxication did contribute to his commission of the instant offense;" (3) "Mr. Fell's lack of supervision, chaotic home

172

environment, and poor role models, would have negatively contributed to his personality development;" and (4) "Mr. Fell displayed remarkable insight into his inappropriate behavior, especially the differences in his behavior when he is sober and when he is not." Rabun Report (Ex. 8 at FELL-00000609-610). In addition, Dr. Rabun indicated that he would support the opinion that Mr. Fell would adjust positively to prison life, based on "[t]he combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs." Id. at FELL-000006010.

In addition, had defense counsel adequately investigated the information available relevant to Mr. Fell's mental health, counsel could have presented the jury with the more accurate and much more mitigating mental health evidence discussed supra in the discussion of trial counsel's failures with respect to the conduct of the mental health case.

### d. The Stipulation

Most devastating, after the conclusion of this lay testimony, defense counsel agreed to the stipulation. As a result, the jurors were read the stipulation, which instructed them that any mental health concern was not supported by expert analysis and clearly provided the impression that these considerations were not properly counted in mitigation. The Government was able to use the stipulation as both a shield and a sword, using it as a tool to effect the withdrawal of the mental health mitigating factor, but also relying on it to effectively argue that none of the mitigating evidence that the jury heard should be given much weight because it had no consequences on Mr. Fell's mental health and moral development. Based on all that they had already given up, defense counsel were left with no argument in response.

The stipulation caused Mr. Fell so much prejudice because it allowed the Government to make arguments in summation that, without the stipulation, would have been

173

untenable based on the record and otherwise unpersuasive to the jury.[54] Because of the stipulation, the Government was able to boldly tell the jury that there was no evidence of a mental condition and go on to state that there was no question as to whether Mr. Fell had any mental disease or defect. Tr. Vol. XII at 41:7-14 (July 13, 2005). In the absence of an explanation of Mr. Fell's conduct as mitigating based on developmental and metal health conditions, counsel were left defenseless and had no way to explain their failure to deliver the promised mental health testimony, instead merely telling the jury to rely on "your life experiences on your own because we all have 'em." Id. at 84:21-22.

In telling this to the jurors, counsel effectively told them that they had no mental health case, and that there was no need for the jurors to alter the lens that they would apply in assessing their own or anyone else's conduct – an approach that clearly does not provide a basis for mitigating an act that ends the life of another. This argument was worse than feckless. Indeed the entire purpose of offering Mr. Fell's social history evidence was to show how atypical Mr. Fell's background was from most people's common life experiences. The notion that a typical juror would be equipped to understand the impact that all of the abuse, neglect and trauma would have had on Mr. Fell's emotional, psychological and social development solely by reference to "common sense and life experiences" is unreasonable.

Indeed, the Government seized on this admission in their rebuttal summation, again emphasizing that Mr. Fell had received a "clean slate" from the mental health professionals who had examined him, finding that he was "completely intact." Id. at 119:7-14. In addition, the Government also asked the jury to compare Mr. Fell's life history with the unfortunate

---

54    Indeed, had defense counsel consulted with Dr. Mills before agreeing to the stipulation, he would have told them that he did not agree with its content, and that the stipulation was not supported by the expert report he submitted. Decl. of M. Mills (Ex. 260 at 3Defense counsel did not seek his advice. Id.

upbringings of other witnesses – even of the victim herself – and to understand that "you don't have to live like [Mr. Fell did]." Id. at 127:14.

Among the last words the jurors heard from either party were these: 'there are some murders, as bad as they are, where you know that there was – there's something wrong with the guy upstairs, the guy that did it… That's not this case." Id. at 130:17-22.Because the jurors were left only with their own experiences as a benchmark, they faced no other option than to agree, and to find that Mr. Fell's conviction warranted a death sentence.

Though the original mitigating factor bearing on mental health was withdrawn from the jurors' consideration in conjunction with the stipulation in trial counsel's final effort to preclude Dr. Welner from testifying, ten of the jurors nonetheless found an additional factor that favored imposition of life imprisonment without possibility of release, agreeing that Mr. Fell deserved mitigating consideration based on his "total life experience, [as well as the] failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior." Special Verdict Form (Ex. 209). Thus it is clear that jurors placed emphasis on the scattered evidence that was presented regarding Mr. Fell's background and mental health and would have valued the additional explanation that could have been offered through expert testimony. While the jury was presented with the fact of his diagnoses while hospitalized, they were not provided with any explanation of that diagnosis or any connection of that diagnosis to the person he became.

VI.    **Government Misconduct and Trial Counsel's Failures in Connection with Mr. Fell's Alleged Prior Acts of Violence on Others Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

At trial, the Government introduced evidence of just two incidents, prior to the Rutland crime, in which Mr. Fell allegedly inflicted serious harm on another individual: a shooting accident when Mr. Fell was a child and a fight Mr. Fell had during the summer of 2000

175

in Woodstock, New York, shortly before the Rutland crime. Trial counsel knew about both incidents as early as December 2000, because Mr. Fell mentioned both of them in his post-arrest statements. Each of them was—and trial counsel knew or should have known that they would be—highly relevant to Mr. Fell's moral culpability, the extent of his mental impairment, his conduct in the King murder, the remorse he had for these offenses, and his risk of danger if incarcerated for life.

The Government used both incidents to great effect in its summations. It argued, with respect to the shooting, that Mr. Fell was institutionalized in a psychiatric unit after "shooting a boy with a nine millimeter pistol," and that the bullet "barely miss[ed] his heart" – as if Mr. Fell had aimed to kill. Tr. Vol. V-1 at 39:1-40:2 (June 28, 2005). The Government also argued that the incident showed Mr. Fell's fundamental lack of remorse for his activities. It argued with respect to the fight that Mr. Fell had "committed a horrible, violent assault," and "beat [a] man with his feet into a coma," with "the same utter depravity" with which he killed Mrs. King. Tr. Vol. XII at 60:13-20 (July 13, 2005). It used these incidents to bolster its argument that Mr. Fell had always had a "proclivity for violence," and that his life was on a "trajectory" which had only "gotten more and more violent the older he ha[d] gotten." Id. at 53:3-24 (July 13, 2005). The effect was evident and profoundly prejudicial: overwhelmed by the Government's arguments, the jury found that Mr. Fell had failed to prove a number of critical mitigating factors, and gave fatal weight to aggravating factors.

The Government's arguments and factual assertions outlined above proved to be as false as they were impactful. Not only were they utterly false, but evidence of their falsehood was readily accessible to the defense and should have been procured. First, the victim of the shooting and his family – whom the defense never spoke to despite their availability – would

176

have explained that the shooting was accidental and that Mr. Fell was remorseful. Their accounts would have been uncontradicted, and supported by the documentary evidence. Second, the medical and hospital records of the person with whom Mr. Fell fought – Christopher Eike – would have shown that Mr. Eike did not suffer any serious injury, let alone a coma, and was released from the hospital on the very day of the fight. Other records also would have confirmed that Mr. Fell was not on a "trajectory" – the fight was precipitated by Mr. Eike's attempt to assault Mr. Fell's sister. Thus, the Government obtained a death sentence on false pretenses, and Mr. Fell's counsel unreasonably failed to detect or contradict these misrepresentations.

## A. Trial Counsel Failed to Conduct a Constitutionally Reasonable Investigation of a Shooting Accident in Mr. Fell's Childhood

One of the two prior incidents in Mr. Fell's life which the government offered as evidence that he previously caused serious harm to another person was the Gacek incident, in which the young Donny was said to have deliberately shot his best friend John Gacek when both boys were 11 years old. Had trial counsel investigated this incident, it would have uncovered solid evidence that the shooting was in fact an accident and that Donny had been remorseful. Moreover, such investigation would have revealed that Mr. Fell's subsequent hospitalization was due more to his mother's dysfunction than to any alleged violence or remorselessness.

### 1. Trial Counsels' Failure to Investigate this Accident Constituted Deficient Performance

As early as December of 2000, trial counsel were aware of the accidental shooting of Mr. Fell's childhood friend. Mr. Fell relayed information about the accident to officers of the Vermont State Police, the Rutland City Police Department and the FBI on December 2, 2000.[55]

---

[55] As is typical for victims and witnesses of a trauma Mr. Fell's and Mr. Gacek's descriptions of the accident vary. There is no doubt, however, that the incident was an accident and that Mr. Fell showed remorse immediately after the accident, on admission at a psychiatric unit and during his stay. Mr. Gacek takes the blame for the accident stating that "it was more my fault than it was Donny's. I tossed the magazine to

177

In his confession, Mr. Fell described the injury to his friend's shoulder as an accident, and explained that the accident was reported to the police because Mr. Gacek's father was a police officer. Mr. Fell stated in his confession that he himself was "shaken up" by the accident and that he and Mr. Gacek remained friends. Donald Fell Interview, Dec. 2, 2000 (Ex. 62). Mr. Fell also expressed the view that he was placed in a mental institution as result of the accident and that "they didn't believe me, they thought I did it on purpose," "the doctor [told] [me] that there is no such thing as accidents." Id.

It was obvious that the Government would seek to exploit the incident – it was a shooting of another allegedly in the chest while Donny was young. It was also obvious that there were several relevant witnesses to the incident including Mr. Gacek, Mr. Gacek's mother Adele Gacek, her long-time boyfriend Ernie Schuldaski, and Mr. Gacek's father Kenneth Gacek. All of those witnesses were readily discoverable, and all would have spoken to trial counsel. In the more than four years that trial counsel had to prepare for trial from December 2000 to June 2005, however, trial counsel never interviewed Mr. Gacek or any of the others present at the time of the shooting. Amazingly, it appears trial counsel did not investigate the incident at all.

Trial counsel's failure falls well-below prevailing professional norms which mandate that where "[t]he prosecution [i]s going to use the dramatic facts of a similar prior offense … counsel ha[ve] a duty to make all reasonable efforts to learn what they c[an] about the offense." Rompilla v. Beard, 545 U.S. 374, 385 (2005); American Bar Association, Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993) ("ABA Standards

---

Donny, and when he shoved it in the gun, the gun went off. I forgot about the round in the chamber. It was a stupid mistake, and I still feel that it was my fault." Decl. of J. Gacek (Ex. 251); see also Decl. of E. Schuldalski (Ex. 253) ("Donny went to slam the clip back in and the gun accidentally discharged."). Mr. Fell said in his confession that: "I took the clip out and pointed at the wall and I didn't know nothing about guns or anything about one being in the chamber or anything like that you know what I mean. I pulled the trigger and he jumped in the way and it went through his shoulder." Donald Fell Interview, Dec. 2, 2000 (Ex. 62).

for Criminal Justice"), Standard 4-4.1(a) ("[t]he duty to investigate exists regardless of the accused's admissions"); ABA Guidelines, Guideline 1.1 Commentary at 7 ("If uncharged prior misconduct is arguably admissible, trial counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.").

Trial counsel's complete failure to obtain or use readily available information that could have minimized—if not entirely eliminated—the prejudice of the Government's characterization of the shooting was inexcusable, and below the Sixth Amendment's performance in any case, let alone one in which a defendant's life is at stake. See ABA Guideline 10.7 (obligating capital defense to conduct thorough investigations); ABA Guideline 10.11 (obligating capital defense to protect the client against the prosecution's case in aggravation).

### 2.    Trial Counsel's Deficiency was Severely Prejudicial

Counsel's abject failure to conduct even the most rudimentary investigation into the shooting severely prejudiced Mr. Fell, as the Jury relied on the Government's mischaracterizations in reaching its capital decision.

At trial, the Government predictably used the shooting to argue that Mr. Fell was an incorrigible violent criminal and had been from an early age. In its penalty phase opening statement, the Government vigorously argued that Mr. Fell was institutionalized in a psychiatric unit after "shooting a boy with a nine millimeter pistol." Tr. Vol. V-1 at 39:16-40:6 (June 28, 2005). The Government graphically stressed that the bullet "barely miss[ed] his heart" – a transparent attempt to suggest, contrary to all available evidence, that Donny had aimed to kill. Id. The Government also argued that the incident showed Mr. Fell's fundamental lack of remorse for his activities. It noted that in Mr. Fell's December 2000 confession he said that his

179

friend "jumped in front of the bullet," Tr. Vol. V-1 at 40:4 (June 28, 2005), and then argued to the Jury that the "[h]ospital records from the time state that Fell, quote, shows no remorse, and threatens to shoot his mother, close quote," Tr. Vol. V-1 at 40:4-6 (June 28, 2005). Finally, the Government argued that Mr. Fell was released only "after he expressed remorse and apologized to his mother." Tr. Vol. V-1 at 40:7-9 (June 28, 2005). The thrust was plain (and false) – Mr. Fell is not a remorseful person.

The Government returned to the same themes in its penalty-phase summation. It argued that the "shooting of one of his friends" was the "first glimpse" of the "Donald Fell that we now have today, and who he became." Tr. Vol. XII at 56:12-16 (July 13, 2005). According to the Government, Mr. Fell was sent to the hospital as a child because "he's violent. And the violence is extreme. . . Picking up a weapon. He claims, accidentally, shooting another child." Tr. Vol. XII at 58:20-59:3 (July 13, 2005). Again, the point was plain – Mr. Fell was violent and not remorseful then and therefore the jury should conclude he was violent and not remorseful now and would continue to be so.

As trial counsel would have known from speaking to Mr. Fell and doing the most rudimentary investigation, all of the witnesses to this event would have contradicted the Government's inflammatory and inaccurate claims. Had trial counsel conducted a constitutionally sufficient investigation, it would have discovered that these claims were false, and could have correctly informed the jury that Mr. Fell accidentally discharged a gun when he and his friend were playing with it and, after the accident, he was extremely remorseful.

That evidence would have come from any number of witnesses, all of whom were readily available to counsel. Mr. Fell's friend, John Gacek, the putative victim, would have testified that the incident was an accident, caused more by him than by Donny. Decl. of J. Gacek

180

(Ex 251). According to Mr. Gacek, he was showing off his father's gun to Donny and he tossed the magazine to Donny. Id. Donny shoved it in the gun and the gun just went off. Id. Mr. Gacek said he had forgotten that there was a round in the chamber, which he said was a stupid mistake that was entirely his fault. Id. He also would have testified that Mr. Fell exhibited remorse. Gacek was taken to the hospital by his parents after the incident, staying only overnight. Id. Upon his return home, Mr. Fell visited the Gacek home in tears and told John over and over how sorry he was. Id. The two boys hugged and cried together; with John crying because he was worried Donny would get in trouble for something that was not his fault. Id. This accurate picture of youthful absentmindedness, fraternity, regret and sadness should have been discovered and presented to counter the contrary and utterly inaccurate picture painted by the Government.

Mr. Gacek's account would have been corroborated by Adele Gacek, John Gacek's mother, who remembers that day well. Decl. of A. Gacek (Ex. 252). Although she was not a witness to the incident, she was present for its immediate aftermath and would have testified to her recollection that Donny was upset and scared immediately after the accident, that he came to visit John the next day, put his arms John and that they were both crying. Id. Ms. Gacek particularly remembered that the boys held onto each other for a long time. Id. Her long-time boyfriend, Ernie Schuldalski, would have given a similar account. Decl. of E. Schuldaski (Ex. 253).

Indeed, nursing records from Mr. Fell's admission to a psychiatric institution not long after this accident would have further confirmed his account. The nursing notes from Mr. Fell's hospitalization plainly reveal that he was thoroughly tearful and contrite about his behavior, in his very first therapy session, which was hours after his mother dropped him off at

181

the hospital.  Wilkes-Barre Gen. Hosp. Adolescent Psych. Unit Interdisciplinary Progress Report, Apr. 14, 1992, Apr. 16, 1992 (Ex. 20).  Those records thus thoroughly contradict the Government's contention during its penalty-phase opening argument that Donny was only released *after* he decided to express remorse.  Tr. Vol. I at 40:7-9 (June 28, 2005).  Indeed, Dr. Feussner noted that Mr. Fell cried in group several times, but "tried hard to hide it."  Dr. Feussner's Notes at Wilkes-Barre Gen. Hosp. Progress Record Notes, Apr. 15, 1992, Apr. 17, 1992 (Ex. 19 at Fell-00000730).  While some childhood records report that Mr. Fell "shows no remorse," Vol. VII-1 at 103:12-17 (July 7, 2005) (Children and Youth Services caseworker, Deanna German, reviewing documents following the accidental shooting not that Mr. Fell "shows no remorse and even threatens to shoot his mother"), id. at 134:12 ("[h]e joked about the shooting and showed no remorse"), a thorough social history – one which the defense never compiled – would have revealed that the records suggesting a lack of remorse were merely documenting Donny's inappropriate affect and were not indicative of his true feelings.  See supra Section V.  But the jury never heard or understood that Mr. Fell's flat or inappropriate affect was the result of his brain impairments, and not a lack of remorse.  Had it known that information, and had the Government's falsehoods been rebutted, the jury's perception and assessment of Mr. Fell and his level of remorse would have been radically different.  See supra Section V.

**B.    The Government Misrepresented Mr. Eike's "Coma" and Withheld Critical Evidence Regarding his History of Sexual Assault, All of Which Trial Counsel Failed to Investigate or Rebut**

The other incident advanced by the Government in which Mr. Fell allegedly caused serious harm to another involved a dispute between Mr. Fell and a man named Christopher Eike in August of 2000 in Woodstock, New York.  The Government elicited testimony during the guilt phase – without objection – from FBI Special Agent Caudle, who testified that Mr. Fell and Mr. Lee both had admitted to being involved in the Woodstock

182

altercation and that "Lee advised that he put the guy in a coma for about a day and that charges were eventually dropped against Mr. Fell." Tr. Vol. II-1 at 6:24-7:1 (June 21, 2005). In its cross-examination of Teri Fell during the penalty phase, the Government elicited similar testimony. Tr. Vol. VII-1 at 146:24-25 (July 1, 2005). The Government asked "Did the kid go into a shock and coma?" and Ms. Fell replied "Yes, he did." Id.

In summation, the Government used this evidence to convince the jury that Mr. Fell committed an unnecessary and unjustified offense in which he inflicted grave physical harm—putting the victim into a coma—similar to the injury inflicted on Mrs. King: "Donald Fell committed a horrible, violent assault on a person the same way he then later killed Terry King. He did it intentionally. He did it violently. And he did it with the utter depravity that you have heard about in this case. He did it in that case. Remember what he did after he beat that man with his feet into a coma. Those are the acts of a man." Tr. Vol. XII at 60:13-20 (July 13, 2005) (emphasis added). The Government reiterated and extended the argument in its rebuttal, claiming that "[i]t wasn't enough for him, in New York, in August 2000, to knock that guy down and stomp him into a coma. Then he urinated on him as the guy lay and convulsed." Id. at 124:5-7 (emphasis added). The Government also directly drew the parallel for the jury: "[i]t wasn't enough for him, in New York, in August 2000, to knock that guy down and to stomp him into a coma … And it wasn't enough for Fell to kill Terry King. He had to stomp her, he had to kick her, he had to watch his friend Bobby Lee beat her head with a rock." Id. at 124:8-19. This portrayal of Mr. Fell cohered with the Government's theme that Mr. Fell had always had a "proclivity for violence," and that his life was on a "trajectory," which had only "gotten more and more violent the older he ha[d] gotten." Id. at 53:8-21.

183

These extraordinary and damning allegations were false, as the Government knew it. Not only was there no evidence of a coma, but Mr. Eike—who had instigated the dispute by attempting to rape Mr. Fell's sister—sustained injuries trivial enough to permit his release from the hospital that same day. Nonetheless, trial counsel never contradicted these claims or obtained the evidence to do so even though it was readily available and its necessity obvious. The Government's failure to disclose evidence in violation of its Brady obligations and its elicitation of false testimony in violation of Napue with respect to the seriousness of Mr. Eike's injuries violated Mr. Fell's Fifth, Sixth, and Eighth Amendment rights. See Brady v. Maryland, 373 U.S. 83 (1963); Napue v. Illinois, 360 U.S. 264 (1959). Trial counsel's failure to investigate same violated Mr. Fell's Sixth and Eighth Amendment rights. See Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005). Further, the Government's failure to disclose evidence regarding Mr. Eike's criminal history of sexual assault and evidence regarding law enforcement's consideration with respect to charging Mr. Eike with sexual assault on Teri Fell, and trial counsel's failure to investigate same, violated those same constitutional rights and deprived the jury of critical information that strongly corroborated Ms. Fell's testimony on the matter. This evidence explained that Mr. Fell was protecting his sister from a sexual assault by Mr. Eike at the time of the altercation.

Had the jury heard this information, at least one juror would have struck a different balance in the penalty phase determination. Its exclusion therefore necessarily undermines confidence in the outcome of the trial, and demonstrates a reasonable probability that the result would have been different had the evidence been disclosed. See United States v. Bagley, 473 U.S. 667 (1985) (internal quotation marks omitted); Napue v. Illinois, 360 U.S. 264 (1959); Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003).

184

These prejudicial errors individually and collectively violated Mr. Fell's Fifth, Sixth and Eighth Amendment rights and entitle him to a reversal of his death sentence. See id.

### 1.    Background

#### a.    Pre-trial

Counsel knew about the fight in Woodstock and its relevance as early as December of 2000. In his initial phone interview with Tom Aiken of the New York State Police on December 1, 2000, Mr. Fell relayed information about the assault, describing that it occurred in Monticello, and that a man had tried to rape his sister so Donny had caught him and "put him in a coma for a day." Interview of Donald Fell by Tom Aiken, Dec. 1, 2000 (Ex. 60 at FELL-00000971). The tape of this interview was sent to the defense under cover of letter dated December 22, 2000 and the transcript of the interview was sent at some point thereafter. Letter from G. Waples to A. Bunin, E. Primomo, J. Pacht and L. Duval, Dec. 22, 2000 (Ex. 70).

In letters spanning from December 28, 2000 through April, 2001, the Government disclosed FBI 302 reports of Mr. Fell's and Mr. Lee's interviews, transcripts and summaries of their oral statements, and at least basic documentation of the incident in Woodstock. Letters from G. Waples to A. Bunin, E. Primomo, J. Pacht and L. Duval, Dec. 28, 2000 (enclosing summaries of oral statements the defendants made to the FBI), Jan. 8, 2001 (enclosing interview notes), Jan. 24, 2001 (enclosing FBI reports) (Exs. 74, 79, 82). The FBI 302 for Mr. Fell also memorialized the August 12, 2000 Woodstock incident, including the claim that the victim "tried to rape [Mr. Fell's] sister." FBI Form 302 for Donald Fell, Nov. 30 - Dec. 1, 2000 (Ex. 57). Under cover of letters sent on March 26, 2001 and April 5, 2001, the Government also disclosed a copy of the New York State Incident Report as well as the statements given by Mr. Fell and Mr. Lee to the Sullivan County Sheriff's Department. See Letters from G. Waples to A. Bunin, E. Primomo, J. Pacht and L. Duval, Mar. 26, 2001 (enclosing New York police and court records

185

regarding arrest for assault), Apr. 5, 2001 (enclosing documents relating to the Woodstock arrest) (Exs. 84, 86). The New York State Incident Report stated that following the altercation, one of the participants had been transported to the hospital with "head and face injur[ies]," but did not contain any further information about the nature of those injuries. New York State Incident Report, Aug. 12, 2000 (Ex. 47). The Sullivan County Sheriff's Department statements from Mr. Fell and Mr. Lee explain that the altercation began because Mr. Eike was assaulting Teri Fell. Sullivan County Sheriff's Department Statement of "Donny McNeely," Aug. 12, 2000 (Ex. 48).[56,57] Although the Government turned over the documents referenced here, they failed to turn over the documents that are the subject of this Brady claim.

Notwithstanding notice of the Woodstock incident and its obvious pertinence in the capital case, trial counsel did nothing to investigate it. In April 2001, while a plea was still being discussed, the defense's investigator furnished counsel a copy of the Certificate of Disposition for Mr. Fell from Sullivan County. But the dialogue about the issue was apparently limited to the investigator's question regarding what Mr. Fell should do about the fact that a warrant for his arrest had been issued.

The Government did, however, interview the alleged victim, Christopher Eike. According to the FBI 302, which was turned over to the defense prior to trial, on June 15, 2005 the FBI spoke to Mr. Eike at Coal Township Correctional Institute in Pennsylvania where he was

---

[56]  Donald McNeely and Joshua Jones were aliases used by Mr. Fell and Mr. Lee respectively at the time of the arrest.

[57]  At some point prior to trial the Government turned over additional discovery on the incident, including statements from Mr. Fell's sister Teri Fell, confirming that the altercation began as a result of Mr. Eike's sexual assault, the statement of Mr. Lee's brother Anthony Tonte confirming the same, the statement of a witness Lance Rowland, the Sullivan County Information Charge Sheet showing that Mr. Fell and Mr. Lee were originally charged with assault in the second degree, and a Certificate of Disposition for Robert Lee noting that the charges against him were disposed of by a plea to the misdemeanor of assault in the third degree with a fine. See Sullivan County Sheriff's Department Statements of Teri Fell, Aug. 12, 2000 (Ex. 227), Anthony Tonte, Aug. 12, 2000 (Ex. (51) and Lance Rowland, Aug. 12, 2000 (Ex.228); Sullivan

186

incarcerated.  FBI Form FD-302 for Christopher Eike, June 15, 2005 (Ex. 129) (stating that the interview is taking place at the correctional facility).  The 302 reports state that Mr. Eike admitted that he, as well as Mr. Fell, Mr. Lee and Teri Fell were taking acid, mushrooms, and smoking weed throughout the night.  Id.  It also states that Mr. Eike came to in the ambulance on the way to the hospital and that the police told him that it was not wise to file charges because of the allegations of his attempted rape of Teri Fell.  Id.  The 302 concludes by noting that Eike is willing to testify about the assault at trial.  Id.  Nowhere in the 302 is there any mention that Mr. Eike was ever in a coma.

Trial counsel did not attempt to interview Mr. Eike.  Nor did counsel interview any others present during the incident aside from Teri Fell.  The additional bystanders included Mr. Lee's brother Anthony Tonte, witness Lance Rowland, and an additional female who was with the group that night, who appears to have been a woman named Stephanie Reed.  Sullivan County Sheriff's Department Notes, Aug. 12, 2000 (Ex.53) .  Counsel did not interview any of the police officers about the incident, nor does it appear that counsel interviewed Teri Fell very thoroughly about the incident.  Finally, counsel did not subpoena Mr. Eike's hospital records.  No one on the defense attempted to explore the extent of Mr. Eike's injuries, whether the hearsay statement that Mr. Eike was in a coma was true, or whether there was disinterested corroboration for Mr. Fell's statement that the incident was provoked by Mr. Eike's assault on Teri Fell.

### b.  Trial

As mentioned, the Government elicited testimony – without objection – during both the guilt and penalty phases that Mr. Eike has been put into a coma as a result of an attack by Mr. Fell in the summer before Mrs. King's death.  In the guilt phase, the Government elicited

County Information Charge Sheet, Aug. 12, 2000 (Ex. 50); Certificate of Disposition, Mar. 28, 2001 (Ex. 85).  Curiously, the Government discovery did not include the Certificate of Disposition for Mr. Fell.

187

testimony during the direct examination of FBI Special Agent Caudle, who testified that Mr. Fell and Mr. Lee both had admitted to being involved in the Woodstock altercation and that "Lee advised that he put the guy in a coma for about a day and that charges were eventually dropped against Fell." Tr. Vol. II-1 at 6-7:22-25 (June 21, 2005). In its cross-examination of Teri Fell during the penalty phase, the Government elicited similar testimony. Tr. Vol. VII-1 at 146:24-25 (July 1, 2005). On re-direct Teri Fell explained that Mr. Eike was trying to kiss her and was hanging all over her and grabbing her body with his hands. Id. at 156:7-8. She said that despite her attempts to make him stop, he persisted, at which point she sought Donny's help. Id. at 157:1-2. Donny asked Eike to stop, at which point Eike hit Donny and the fight began. Id. at 157:7-8. Defense also elicited testimony that the group has been "drinking and smoking hash, and eating acid and mushrooms," throughout the night. Id. at 155:21-22. Trial counsel never asked about the "coma" or any other information regarding the extent of Mr. Eike's injuries.

It was not until *after* Ms. Fell's testimony that trial counsel requested records from the Town of Bethel Justice Court regarding the incident. See Federal Express Airbill from Town of Bethel Justice Court to A. Bartnick, July 6, 2005 (Ex. 133). On July 12, 2005, at the close of evidence and the day before summations, trial counsel sought to introduce the documents it had received from the court, which included the original information sheet indicating a charge for second degree assault, and a document indicating that the ultimate disposition of the incident was a misdemeanor conviction for assault in the third degree and a fine. See Trial Ex. B-2 (Ex. 46)

In both its opening and rebuttal summations in the penalty phase, the Government used this testimony about the Woodstock incident to great and prejudicial effect, arguing that the incident demonstrated Mr. Fell's increasingly violent behavior as an adult and comparing it

188

directly to the killing of Mrs. King. Tr. Vol. XII at 60:13-20, 124:5-17 (July 13, 2005). It argued that Mr. Fell "beat[ing] that man with his feet into a coma" and "stomp[ing] [Mr. Eike] into a coma," was a "horrible, violent assault" characterized by the same "utter depravity" as the crime against Mrs. King. Id. There were no objections by trial counsel and the Government used this incident to support its claim that Mr. Fell's life was on a violent "trajectory," which had only "gotten more and more violent the older he ha[d] gotten." Id. at 58:8-21.

Trial counsel did nothing to counter the Government's false claim that Mr. Fell stomped Mr. Eike into a coma. Without any further material to challenge the Government's account, the defense at best left the jury with the impression that the case involved a failure of law enforcement. The defense claimed that all parties involved were engaged in heavy drug use the night of the incident, that Donny was responding to the sexual assault, and that the Town of Bethel Court documents "establish and tell you the resolution of the criminal matter," which was that Donny had pled guilty to a misdemeanor of assault in the third degree. Tr. Vol. XII at 83:21-84:4 (July 13, 2005).

### c. Post-Conviction

As it turns out, the claim the jury heard from the Government was false. Mr. Eike was not beaten into a coma. His injuries were not serious. In addition, there was third-party corroboration of Teri Fell's claim that the incident was provoked by Mr. Eike's sexual assault. All of this evidence was necessarily known to the Government but not turned over to the defense or disclosed at trial. An examination of these documents is illuminating and disturbing.

Sullivan County Sheriff's Department Records. The Government produced some – but not all – relevant information from the Sullivan County Sheriff's Department. Documents produced through a public records request to the Sullivan County Sheriff's Department demonstrate that Mr. Eike was not in a coma, that he did not suffer serious harm, and that he was

189

nearly charged with sexual abuse of Teri Fell. Trial counsel did not seek, and the Government

did not furnish, this information. The documents include the following:

- Notes from Deputy Hall who responded to the scene of the Woodstock altercation stating that he "treat[ed] [Eike] for shock," and began asking questions to which Mr. Eike responded, thus demonstrating he was not in a coma. Sullivan County Sheriff's Department Officer Notes, Aug. 12, 2000 (Ex. 56).

- A typed report stating that Mr. Eike was treated and released from the hospital by 4:30pm the same day the incident occurred and that he reported to the Sheriff's Department for questioning. Ex. 56.

- Notes from the Sullivan County Sheriff's Department's interview with Mr. Eike, with a note stating, "Sexual Abuse 3rd Section - 130.55." See Sullivan County Sheriff Department Notes of Interview with Christopher Eike, Aug. 12, 2000 (Ex. 55); McKinney's Penal Law § 130.55 (2010).

Mr. Eike's Medical Records. Documents obtained through a request to Catskills

Regional Medical Center for Mr. Eike's medical records further demonstrate that Mr. Eike was

not beaten into a coma and did not suffer serious injury. Trial counsel did not seek, and the

Government did not furnish, these documents. The documents include:

- Prehospital Care Report indicating that Mr. Eike was treated for shock and that the initial assessment found only bruises and no other abnormalities. Ex. 289.

- Emergency Room Record stating that Mr. Eike was "awake/alert upon arrival," admitted "taking acid" and to having a "mental disorder," and had a "scalp contusion." Ex. 286.

- ED Nurse Assessment at 8:11am indicating that patient was "Alert" and "Oriented x3," meaning oriented to person, place and time. Ex. 288.

- Department of Emergency Medicine form indicating that Mr. Eike presented with an "abrasion R eye" and "knee pain," and was currently prescribed Depakote. Ex. 287.

190

- Results of CT scan indicating scalp hematoma and otherwise unremarkable results.[58]  Ex. 290.

- Test Results indicating no fractures or dislocations of either knee.  Ex. 291, 292.

- Lab Report indicating that Mr. Eike is taking Valproic Acid for seizure and bipolar disorders.  Ex. 293, 294.

- Patient Instructions form of Aug. 12, 2000, the day of the incident, instructing patient to see a doctor in 1-2 days and to refrain from further drug use.  Ex. 295.

Mr. Eike's Criminal Records.  Documents obtained through public records requests to the Pennsylvania State Police, Pike County District Attorney's Office and Pike County Court of Common Pleas demonstrate that Mr. Eike was convicted of sexual assault involving a minor, thus corroborating Ms. Fell's testimony that she was being sexually assaulted.  Trial counsel did not have, and the Government did not provide, these documents.  The documents include:

- Affidavit of Probable Cause from Trooper Murray of the Pennsylvania State Police Blooming Grove Station relaying a statement from 11-year old victim A.S. that Mr. Eike, then 18 years old, had engaged in open mouth kissing with her several times, had felt her breasts and felt between her legs.  Pennsylvania State Police Criminal Complaint, Affidavit of Probable Cause, Nov. 15, 2001 (Ex. 108).

- Docket Sheet showing that Mr. Eike was charged with two counts of Indecent Assault on a Person Less than 13 Years of Age and Corruption of Minors.  Court of Common Pleas of Pike County Criminal Docket No. CP-52-CR-0000010-2002 (Ex. 214)

- Docket Sheet showing that on June 20, 2002 Eike pled guilty to one count of Corruption of Minors, and on September 6, 2002 was sentenced to a minimum of 6 months with a maximum of 23 months in jail, was fined $800 plus a monthly supervision fee and was ordered to attend the Pike County Drug & Alcohol Office for counseling and to refrain from contact with victim A.S. or

---

[58]    Benjamin C. Wedro, MD, FAAEM, Hematoma, medicineNet.com, 2 (Mar. 16, 2011), http://medicinenet.com/hematoma/article.htm ("Scalp hematomas occur on the outside of the skull and often can be felt as a bump on the head.  Because the injury is to the skin and muscle lAyres outside of the skull, the hematoma itself cannot press on the brain.").

any other children under the age of eighteen. Id.Pennsylvania State RAP sheet indicating Mr. Eike's entire criminal history which shows the 2001 conviction for Corruption of Minors, a 2002 conviction for theft for which he was sentenced to imprisonment in a regional correctional facility, 2007 convictions for theft, reckless endangerment of another person, driving with a suspended or revoked license, fleeing or attempting to elude a police officer, damage to attended vehicle property, unauthorized use of automobiles and other vehicles, aggravated assault, and attempted criminal escape from prison, for which he is currently serving a sentence. Pennsylvania State Police Criminal History Record of Christopher Allen Eike, Nov. 16, 2010 (Ex. 94).

Evidence that the Government was in possession of Eike's Criminal Records.

Documents obtained through a public records act request to the FBI demonstrate that the FBI was in possession of Mr. Eike's criminal history as of June 14, 2005. FBI Report from Albany to Philadelphia to Set Lead for Interview of Subject, dated June 14, 2005 (Ex. 128 at FELL-00001376) (non-disclosed FBI report indicating the FBI had obtained Mr. Eike's criminal background as of the date of the report).[59] Yet, neither that report nor the underlying criminal record were turned over to trial counsel. The investigative report requests that the Williamsport, Pennsylvania Resident Agency of the FBI interview the witness at Coal Township Correctional Institute in Pennsylvania to ask him about the incident he was involved in with Mr. Fell. Id. The investigative report states that "[a]n NCIC and CCH conducted for [redacted] on 06/14/2005 revealed the following criminal history for: [redacted]."

---

[59] Although the document is heavily redacted, 2255 counsel have identified the subject of the report to be Mr. Eike based on the fact that Mr. Eike was incarcerated at the referenced State Correctional Institute, Coal Township, Pennsylvania at the time of his interview with the FBI. FBI Report from Albany to Philadelphia to Set Lead for Interview of Subject, June 14, 2005 (Ex. 128; FBI Form FD-302 for Christopher Eike, June 15, 2005 (Ex. 129).

```
An NCIC III and CCH conducted for         on 06/14/2005.
revealed the following criminal history for
```

The report further states that this incident "may be used by the prosecution as an aggravating factor in support of the death penalty during the penalty phased after fell is convicted. It is possible that [redacted] and brought to Vermont to testify during the penalty phase." Id.

> **2.**   **The Government's Failure to Disclose Favorable Evidence about Mr. Eike's "Coma" and Trial counsel's Failure to Investigate Same Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of his Death Sentence**

The Government's failure to disclose favorable evidence regarding Mr. Eike's "coma" and medical condition, and trial counsel's failure to investigate same, violated Mr. Fell's rights under the Fifth, Sixth and Eighth Amendments. See Brady v. Maryland, 373 U.S. 83 (1963); Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

> **a.  Government's Withholdings and Trial counsel's Deficient Performance**

> > **i.  Government's Withholding of Favorable Evidence in Violation of Brady Obligations**

Although the Government turned over discovery on the Woodstock incident, including witness statements from the Sullivan County Sheriff's Department, charge sheet and disposition documentation, the Government conspicuously failed to disclose the relevant exculpatory information: that Mr. Eike *was never in a coma* and that he did not suffer serious

193

harm as a result of the incident. The withheld documentation shows that (1) Mr. Eike was verbally responsive to Deputy Hall immediately after being treated for shock after the fight, and before being transported to the hospital, and (2) he was treated and released from the hospital *that same day* by 4:30pm and was well enough to report straight to the Sullivan County Sheriff's Department for questioning. Sullivan County Sheriff's Department Officer Notes, Aug. 12, 2000, Sullivan County Sheriff's Department Report, Aug. 12, 2000 (Ex. 56). That withheld evidence is unquestionably favorable to Mr. Fell. It demonstrates that Mr. Eike's injuries were not nearly as serious as the Government claimed, and it directly contradicts the Government's claim that Mr. Eike was in a coma. Because the Government argued the supposed gravity of that offense as a reason for which Mr. Fell should be sentenced to death, any evidence to the contrary was favorable to Mr. Fell's sentencing and the Government plainly had a duty to disclose it. See United States v. Bagley, 473 U.S. 667 (1985) (disclosure duty encompasses impeachment evidence as well as exculpatory evidence); Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) (disclosure duties not limited to testifying witnesses).

### ii. Trial counsel's Failure to Investigate in Violation of Mr. Fell's Sixth Amendment Rights

By late December of 2000 trial counsel were aware that the Woodstock assault had occurred and that their client, Mr. Fell, had told police that he had put a man in a coma in that incident. Interview of Donald Fell by Tom Aiken, Dec. 1, 2000 (Ex. 60 at FELL-0000097). Letter from G. Waples to A. Bunin, E. Primomo, J. Pacht and L. Duval, Dec. 22, 2000 (Ex. 70). And by early 2001, counsel had seen a basic police report indicating that the other participant had been sent to the hospital with "face and head injuries" following the altercation. Ex. 47. Despite the fact that this incident was the *sole prior criminal conviction* on Mr. Fell's record and the obvious—indeed certain—risk that the Government would use the incident to support its

194

argument for the death penalty (as it ultimately did), trial counsel did nothing to investigate this incident in the four years leading up to trial.

Immediately preceding trial, trial counsel received Mr. Eike's FBI 302, which clearly stated that Mr. Eike was "willing to testify about the assault at trial." Ex. 129. If trial counsel had not previously been aware of the Government's intent to present this evidence, such intent should have been clear after they saw the 302.

Despite the red flags and its duty to investigate aggravating evidence, counsel failed to question Teri Fell about why she believed Mr. Eike to be in a coma – even though Ms. Fell was interviewed a number of times by the defense; counsel failed to interview Mr. Eike – despite the fact that he was easily locatable in a correctional facility at the time of trial. Counsel also failed to request records from the Sullivan County Sheriff's Department – which records were obtainable through a public records request; counsel failed to subpoena Mr. Eike's medical records from Catskills Regional Medical Center.

Trial counsel's failure falls well below prevailing professional norms which mandate that where "[t]he prosecution [i]s going to use the dramatic facts of a similar prior offense … counsel ha[ve] a duty to make all reasonable efforts to learn what they c[an] about the offense." Rompilla v. Beard, 545 U.S. 374, 385 (2005). It "flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." Id. at 388. Furthermore, counsel is required to investigate all evidence regardless of a client's admissions or statement. ABA Standards for Criminal Justice, Standard 4-4.1(a) ("[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel"); ABA Guideline 1.1 Commentary at 6-7 ("To assume the accuracy of whatever information the

195

client may initially offer … is to render ineffective assistance of counsel"; because "the prosecution can be expected to attempt to offer [any prior criminal history] in support of a death sentence," "[d]efense counsel accordingly must comprehensively investigate … the defendant's behavior and circumstances of the conviction. Only then can counsel protect the accused's [constitutional] right to deny or rebut factual allegations made by the prosecution in support of a death sentence, and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights.").

Here, where Mr. Fell was admittedly high on hallucinogens during the event, where there is no reason he would have actual knowledge of Mr. Eike's medical condition considering he had no contact with Mr. Eike once Mr. Eike left for the hospital, and where this is the sort of event susceptible to exaggeration, trial counsel had every reason to question their client's understanding of the circumstances surrounding the fight. Investigation should have been undertaken to understand the extent of injuries suffered by the victim involved in the single prior conviction on Mr. Fell's record – particularly given the severity of injuries claimed and presented to the jury – regardless of Mr. Fell and Teri Fell's second-hand understanding of what had transpired. Relying solely on an intoxicated witness's obviously uninformed medical assessment or hearsay information told to them by third parties cannot serve to excuse trial counsel's duty to investigate.[60]

This failure to investigate aggravating evidence was in clear violation of counsel's duties under <u>Rompilla</u> and the ABA Guidelines, and falls well below the prevailing professional

---

[60] Trial counsel were also ineffective for failing to object to all testimony regarding the alleged coma. Agent Caudle's testimony about the coma was based upon Bobby Lee's statements, and trial counsel should have objected to its admission on hearsay grounds and under the Confrontation Clause. Additionally, trial counsel were ineffective for failing to object to Teri Fell's testimony regarding Mr. Eike being in a coma, because they knew she was an unreliable witness, who was on drugs during the relevant incident and could not accurately report on the medical condition of Mr. Eike in any event.

norms.[61]  See Rompilla  v. Beard, 545 U.S. 374 (2005) (counsel  ineffective  for failing  to investigate  prosecution's  evidence);  ABA Guideline  10.7 ("[c]ounsel  at every stage shall have an obligation  to conduct thorough  and independent  investigations  relating  to the issues of both guilt and penalty.");  ABA Standards  for Criminal  Justice,  Standard  4-4.1(a) ("Defense  counsel should conduct  a prompt investigation  of the circumstances  of the case and explore  all avenues  leading to facts relevant  to the merits  of the case and the penalty  in the event of conviction.  . . . The duty to investigate  exists regardless  of the accused's  admissions  or statements  to defense counsel of facts constituting  guilt  or the accused's  stated desire to plead guilty.");  Strickland  v. Washington, 466 U.S. 668 (1984).

### b. Materiality and Prejudice:  Brady Violations and Ineffective Assistance of Counsel

The Government's  failure  to turn over exculpatory  evidence  in violation  of its Brady obligations  and trial counsel's  failure  to investigate  the Woodstock  incident  and therefore to discover  the exculpatory  evidence  caused Mr. Fell constitutional  prejudice.  Strickland, 466 U.S. at 698 (noting  that the "test for prejudice  finds  its roots in the test for materiality  of exculpatory  information  not disclosed  to the defense by the prosecution,"  so that the prejudice and materiality  tests under Brady and Strickland  are the same); Brady v. Maryland,  373 U.S. 83 (1963); United  States v. Bagley,  473 U.S. 667 (1985). The Woodstock  incident  involving  Mr. Eike was one of two incidents  presented  at trial  in which Mr. Fell had allegedly  caused serious harm to another,  and the only one close in proximity  to the time of the crimes.  The Government relied heavily  on this incident  to argue that Mr. Fell's  problems  with violence  were only escalating  as he got older and that this fight  in which Mr. Fell "beat that man with his feet into a

---

61    Although the Government  did not present this evidence as an aggravator in its penalty phase case-in-chief, and instead brought it in through its cross-examination of Teri Fell, the evidence was clearly used effectively in argument against Mr. Fell's case for life and therefore trial counsel had a duty to investigate.

197

coma" and "stomp[ed] [Mr. Eike] into a coma," was a "horrible, violent assault" characterized by the same "utter depravity" as the crime against Ms. King. Tr. Vol. XII at 60:13-20, 124:5-17 (July 13, 2005). No juror would disregard such evidence, and the Government's repeated attempts to highlight it further demonstrate its materiality. That the jury was misled as to the severity of this incident was therefore highly prejudicial to Mr. Fell and material to the outcome of his sentencing.

Had the Government disclosed the favorable evidence from the Sheriff's Department under its Brady obligations, and had trial counsel properly investigated the incident pursuant to its Sixth Amendment obligations, the jury would have heard an entirely different account – one that was not severely aggravating, as the government misrepresented to the jury. The jury would have heard important corroborating evidence from third-party law enforcement agents that supported Teri Fell's claim that the incident was not unprovoked or gratuitous, but was prompted by an assault on Ms. Fell committed by a convicted sexual predator. Mr. Fell was not randomly assaulting a passer-by; he was protecting his sister. This would have been particularly important to bolster Teri Fell's credibility as she was an arguably interested witness. And the jury would have learned that Mr. Fell did not inflict any serious harm on Mr. Eike, let alone a coma. In fact, the jury would have learned that Mr. Eike had only been treated for minor injuries and had walked away from the hospital that very day. Thus, it would have learned that Mr. Fell was not in fact on a clear and irreversible path of violence as he grew older, but rather that this incident reflected a fight in which Mr. Fell was high on hallucinogens and other substances, provoked, the other participant walked away with no lasting injury, and Mr. Fell ended up with a misdemeanor and a fine.

Hearing an accurate portrayal of this incident would have affected at least one juror in his or her penalty determination. Far from the false portrait that the Government painted – and upon which the jury based its death sentence, Mr. Fell did not have a history of intentionally inflicting serious harm on other individuals prior to the offense of conviction. He had an accident when he was a young boy, see infra, and at age twenty beat up somebody who was sexually assaulting his sister. The suppression of this evidence, and trial counsel's failure to obtain it, therefore undermines confidence in the outcome of the penalty phase, and demonstrates a reasonable probability that the result would have been different had the evidence been presented to the jury. See United States v. Bagley, 473 U.S. 667, 682 (1985); Napue v. Illinois, 360 U.S. 264 (1959); Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003).

### 3.    The Government's Prosecutorial Misconduct in Soliciting False Testimony Regarding Mr. Eike's "Coma" Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of His Death Sentence

The Government's purposeful elicitation of false evidence from both Special Agent Caudle and from Teri Fell—that Mr. Eike was in a coma—plainly violated Napue and Berger. Napue v. Illinois, 360 U.S. 264 (1959); Berger v. United States, 295 U.S. 78 (1935).

The Government unmistakably knew that Mr. Eike was not in a coma. Its agents interviewed Mr. Eike and Mr. Eike himself knew he was not in a coma. It is inconceivable that it would base its case, as it did, on Mr. Fell having beat Mr. Eike into a coma without having asked that question. And the answer to it was plainly that Mr. Eike suffered no such injury. Even if the Government had not known that Mr. Eike was not in a coma—and it did—its negligence or recklessness in presenting such testimony would still violate Napue and mandate reversal. United States v. Wong, 78 F.3d 73, 81 (2d Cir. 1996) ("Where the prosecution knew or should

199

have known of the perjury, a new trial is warranted if 'there was any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal quotations omitted); United States v. Albanese, 195 F.3d 389, 393 (8th Cir. 1999) (noting that "a prosecutor may not knowingly, recklessly, or negligently introduce perjured testimony"); United States v. Tierney, 947 F.2d 854, 860-61 (8th Cir. 1991) (where "the government knowingly, recklessly or negligently used [ ] false testimony," vacatur is required if defendant shows "any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal citations and quotation omitted).

Despite having that knowledge, the Government elicited false evidence and told the jury the contrary. It asked Teri Fell "Is it true that the kid went into shock and a coma?" and when FBI Agent Caudle testified to as much on the stand it did nothing to correct him. It then argued that false point aggressively before the jury.

It is immaterial that Teri Fell (and Donald Fell himself) believed that Mr. Eike was in a coma. By the Government's own account, the Fells had been taking acid, mushrooms and smoking weed throughout the night, and neither have medical training. They were clearly not in a position to know whether Mr. Eike was in a coma, and the Government knew that. Indeed, they would not have been in a position to know whether Mr. Eike was in a coma even if they had not been high on numerous drugs. Here, the relevant sources with respect to whether Mr. Eike was in a coma were the police, hospital and medical records themselves, not the Fells. The Government would have known from those records and from Mr. Eike himself that Mr. Eike was not in a coma (and had not suffered serious harm), and the intentional elicitation of testimony to the contrary plainly violated the Government's obligations. See Drake v. Portuondo, 553 F.3d 230, 242 (2d Cir. 2009) ("Napue held that there was constitutional error

200

where a prosecutor knew of 'false evidence.'  The question of whether the witness's "untruthfulness...constituted perjury" makes no "material difference" where the issue is a conviction on "tainted testimony."); United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974) ("Regardless of the lack of intent to lie on the part of the witness, Giglio and Napue require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . [W]hen it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury.").

Such misconduct requires that Mr. Fell's sentence be vacated regardless of the merit of any other claim presented in this motion.  United States v. Tierney, 947 F.2d 854, 860-61 (8th Cir. 1991) (where "the government knowingly, recklessly or negligently used . . . false testimony," vacatur is required if defendant shows "any *reasonable likelihood* that the false testimony *could have affected the judgment* of the jury") (internal citations and quotation marks omitted) (emphasis added).

      **4.**      **The Government's Failure to Disclose and Trial Counsel's Failure to Discover Evidence of Mr. Eike's Prior Conviction for Sexual Assault and The Possibility of Mr. Eike being Charged with Sexual Abuse of Teri Fell Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and Entitles Mr. Fell to a Reversal of his Death Sentence**

        **a.  Government Suppression and Trial counsel Failures**

          **i.   Government Brady Violation**

A critical issue during the penalty phase was the circumstances surrounding the altercation between Mr. Fell and Mr. Eike.  In evidence offered at trial, Ms. Fell explained that Eike had been sexually assaulting her. Tr. Vol. VII-1 at 156:3-157:5 (July 1, 2005).  In its cross-examination of Ms. Fell and then again in its summations, the Government cast aspersions on

that account, claiming that Mr. Fell's conduct was characterized by "utter depravity" similar to that shown in the murder of Mrs. King, Tr. Vol. XII at 60:13-20, 124:5-17 (July 13, 2005), rather than the act of a drunk and high young man provoked by a sexual assault on his sister. While trial counsel attempted to make that point in its summation (Tr. Vol. XII at 83:5-13 (July 13, 2005)), the jury was deprived of any evidence but the arguably self-interested and thus easily discounted account of the sister of a man facing the death penalty.

It turns out that while the Government was suggesting that the fight was gratuitous and marked by "utter depravity," it had evidence within its possession that contradicted that claim. Evidence obtained as a result of FOIA and public record requests proves beyond peradventure that Mr. Eike is a convicted sexual offender whose other relevant conduct is similar to, and thus corroborative of, the conduct which – according to the Fells' accounts – he engaged in to provoke Mr. Fell. See e.g., Fed. R. Evid. 404(a)(2) (stating that evidence of the "pertinent trait of character of the alleged victim of the crime" is admissible in a criminal case when offered by the defendant).

In particular, evidence obtained post-conviction shows that just one month before trial, the Government conducted an NCIC and CCH criminal history search for Mr. Eike and that that search showed that Mr. Eike had a criminal history. See FBI Report from Albany to Philadelphia to Set Lead for Interview of Subject, dated June 14, 2005 (Ex. 128). The report itself requests that the Williamsport RA of the FBI interview Mr. Eike at Coal Township Correctional Institute in Pennsylvania (where Mr. Eike was incarcerated) and reflects that "[a]n NCIC and CCH conducted for [redacted] on 06/14/2005 revealed the following: [redacted]." Id. The redacted criminal history is lengthy enough to take up more than a quarter of the page. Moreover, there is no doubt that the interview was conducted in connection with Mr. Fell's case

202

– the request is that Mr. Eike be interviewed about the incident he was involved in with Mr. Fell (id.) and the ensuing Form 302 was provided to the prosecutors here and reflects the belief of the Government that the assault incident "may be used by the prosecution as an aggravating factor in support of the death penalty during the penalty phased after fell is convicted." Id. Indeed, the government contemplated that it was "possible that [Mr. Eike would be] brought to Vermont to testify during the penalty phase." Id.

Although the report is redacted to eliminate the content of Mr. Eike's criminal history, there is no doubt about some of the information it must contain. The actual criminal history, obtained only post-conviction through public record requests, shows that Mr. Eike has a lengthy criminal record.[62] Pennsylvania State Police Criminal History Record of Christopher Allen Eike, Nov. 16, 2010 (Ex. 94). In particular, Mr. Eike had a history of sexual assault. Court of Common Pleas of Pike County Criminal Docket No. CP-52-CR-0000010-2002 (Ex. 214). In 2001, Eike was convicted of assaulting A.S., who was eleven years old. According to the records, she told police that Mr. Eike, who was eighteen years old, had engaged in open mouth kissing with her several times, had felt her breasts and felt between her legs. Pennsylvania State Police Criminal Complaint, Affidavit of Probable Cause, Nov. 15, 2001 (Ex. 108). As a consequence, Mr. Eike was charged with several counts of violation of young minors, and was eligible for a felony conviction. Court of Common Pleas of Pike County Criminal Docket No. CP-52-CR-0000010-2002 (Ex. 214); 18 Pa. C.S.A. §3126(a)(7); 18 Pa. C.S.A. § 6301. On June 20, 2002 Mr. Eike pled guilty to one count of Corruption of Minors, and on

---

[62] In addition to the charges discussed herein, Mr. Eike also has a 2002 conviction for theft for which he was sentenced to imprisonment in a regional correctional facility, 2007 convictions for theft, reckless endangerment of another person, driving with a suspended or revoked license, fleeing or attempting to elude a police officer, damage to attended vehicle property, unauthorized use of automobiles and other vehicles, aggravated assault, and attempted criminal escape from prison, for which he is currently service a sentence. (Ex. 94).

September 6, 2002 was sentenced to a minimum of 6 months with a maximum of 23 months in jail and was fined $800 plus a monthly supervision fee. Court of Common Pleas of Pike County Criminal Docket No. CP-52-CR-0000010-2002 (Ex. 214); Pennsylvania State Police Criminal History Record of Christopher Allen Eike, Nov. 16, 2010 (Ex. 94). He was further ordered to attend the Pike County Drug & Alcohol Office for counseling and to refrain from contact with victim A.S. or any other children under the age of eighteen. Court of Common Pleas of Pike County Criminal Docket No. CP-52-CR-0000010-2002 (Ex. 214).

Moreover, not only was there evidence of Mr. Eike's proclivity to engage in sexual assaults in general, but in particular there was evidence – never turned over to the defense – that Mr. Eike engaged in a sexual assault in this case (precisely as Mr. Fell and Ms. Fell explained). Handwritten notes from the Sullivan County Sheriff's Department's interview with Mr. Eike at the time of the episode, which were not turned over by the Government, contain a note stating, "Sexual Abuse 3rd Section - 130.55," which clearly indicates that the Sullivan County Sheriff's Department considered bringing charges against Mr. Eike for sexual abuse in the third ~~degreeSee~~degree. See Sullivan County Sheriff Department Notes of Interview with Christopher Eike, Aug. 12, 2000 (Ex. 55); McKinney's Penal Law § 130.55 (2010).

The foregoing information about Mr. Eike's sexual assault conviction and the real possibility of Mr. Eike having been charged with sexually assaulting Teri Fell, was extremely relevant to the defense because it was exculpatory and mitigating for Mr. Fell. It corroborated Ms. Fell's claim that her brother had been attempting to protect her from Mr. Eike's assault and to deter similar assaults. It showed that Mr. Fell did not have a history of unprovoked serious attacks on others. And, had it been available to the defense and used, it would have shown that Mr. Fell is an individual who could function in a close protective environment such as a prison

204

without being a risk to others. The government's failure to produce this information violated Brady regardless of whether Eike himself testified. See Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001); Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985).

### ii.    Trial Counsel's Failure to Investigate

Separately and independently, it fell below the prevailing norms of professional conduct for trial counsel to fail to investigate whether Mr. Eike provoked the attack, assaulted Ms. Fell, and had an extensive, relevant criminal history. As set forth above, trial counsel had information from the time of the arrest showing that the Woodstock incident would be highly relevant at trial and in the penalty phase. That information was set forth in Mr. Fell's statements and those of Mr. Lee, which made clear that Mr. Fell believed that Mr. Eike was the initial aggressor. Moreover, had trial counsel spent sufficient time with Teri Fell, trial counsel would have known from Ms. Fell as well the circumstances of Mr. Eike's attack on her. Finally, by at least June 2005, trial counsel would have known from the FBI 302 that Mr. Eike had a criminal record (although inexcusably not the nature of that record). Mr. Eike's 302, which was in trial counsel's possession, clearly indicated that he was *in prison* at the time of the FBI's interview.

As a result, trial counsel knew that Mr. Eike had not just engaged in criminal conduct, but was a convicted criminal. Trial counsel also necessarily knew that the nature of Mr. Eike's criminal conduct would be relevant to Mr. Fell's defense and to the penalty phase case. It obviously makes a difference that an individual has been convicted of criminal sexual conduct, particularly in light of the facts here that such an individual had been involved in an altercation with trial counsel's client that resulted from the individual's sexual assault on trial counsel's client's sister. There is no strategic reason for counsel not to have demanded evidence of Mr. Eike's criminal record. Nor is there any other reason not to have requested that information. The criminal history information was readily available through public record requests to the

205

Pennsylvania State Police, the Pike County Court of Common Pleas and Pike County District Attorney's Office. Likewise, the record of Mr. Eike's near charge of Sexual Abuse was readily available through a public records request to the Sullivan County Sheriff's Department. Although the Government did not formally notice trial counsel that it was considering calling Mr. Eike during the penalty phase, the fact that this episode of alleged violence occurred only three months prior to the crime at issue and was the only criminal conviction on Mr. Fell's record made it highly likely that this conduct would be an issue at trial. As a consequence, the failure even to have sought that information falls egregiously below the prevailing norms of practice in violation of Mr. Fell's Fifth, Sixth and Eighth Amendment rights. Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

### b. Mr. Fell Suffered Constitutional Prejudice As a Result of The Brady Violations and Counsel's Ineffective Assistance

The Government's failure to disclose favorable evidence under Brady about Mr. Eike's criminal conviction for sexual assault on a minor and withholding of information indicating Mr. Eike's near charge with sexual assault of Teri, and trial counsel's failure to investigate the same, caused constitutional prejudice to Mr. Fell under the Fifth, Sixth and Eighth Amendments. See Brady v. Maryland, 373 U.S. 83 (1963); Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

The evidence of the sexual assault conviction and Mr. Eike's near charge with sexual assault of Teri Fell was highly relevant and material and, if known to the defense, would have made a difference at the penalty phase. In particular, during the penalty phase, the only testimony that supported the claim that the fight had been provoked by Mr. Eike was that of an arguably interested witness, Teri Fell. No non-family member or other witness testified that Mr. Eike had provoked the fight.

206

Had the Government disclosed the favorable evidence of Mr. Eike's criminal history and charge notes from the Sheriff's Department pursuant to its Brady obligations, and had trial counsel properly investigated Mr. Eike's history and requested the Sheriff Department documents pursuant to its Sixth Amendment obligations, those records would have made a huge difference. They would have corroborated the testimony that the threat to Teri Fell was very real and that Donny had only been protecting her from Mr. Eike's sexual assault when the fight began. The jury also would have seen that Mr. Fell was not increasingly inclined to paroxysms of random and unchecked violence as he grew older – as the Government incorrectly argued. Instead of it being the senseless act of "utter depravity" the Government claimed, the jury could and would have understood this fight to have been provoked, and to have been the natural continuance of Mr. Fell's protection of his younger sister from abuse. This information would have affected at least one juror in their penalty phase determination. Its exclusion therefore undermines confidence in the outcome of the trial, and demonstrates a reasonable probability that the result would have been different had the evidence been disclosed. See United States v. Bagley, 473 U.S. 667 (1985); Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003). Moreover, the Government's withholding of favorable evidence that was material to Mr. Fell's punishment violated its Brady obligations and Mr. Fell's rights under the Fifth, Sixth and Eighth Amendments.

**VII. The Government's Failure to Disclose Favorable Evidence Regarding Mr. Fell's Conduct in Prison and Trial Counsel's Failure to Investigate Same Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

During the penalty phase, the defense put on evidence to support the mitigating factors that (1) Mr. Fell did not present a risk to prison officials or other inmates if he was sentenced to life in prison without possibility of release, and (2) Mr. Fell had made positive

207

contributions to the NWSCF by working, gaining an education, and helping to resolve inmate grievances. Special Verdict Form (Ex. 209).

In rebuttal to the first factor, the Government presented evidence, including videos, of two disciplinary incidents Mr. Fell had in prison in which Mr. Fell failed to comply with commands and showed aggressive behavior to correctional officers. Tr. Vol. X-1 at 140:12-141:8 (July 8, 2005). One of those videos, of an incident on March 17, 2004, shows Mr. Fell directing verbal aggression towards and eventually spitting at a correctional officer named Marc Pelkey. In summations, the Government used this evidence to argue that Mr. Fell had anger and aggression problems, that his behavior was deteriorating over time, that Mr. Fell was not now and would not become adjusted to life in prison, and that Mr. Fell would likely commit future acts of violence in the prison system, which lacked the ability to safely confine him. Tr. Vol. XII at 45:12-49:9 (July 13, 2005). For this, it argued Mr. Fell should be put to death.

The life trajectory the Government sought to portray was wrong.[63] It has now come to light that the Government withheld information that Officer Pelkey, at whom Mr. Fell's aggression was directed in the March 17 video, had a reputation for and history of violent behavior at the prison, and in fact attempted to assault Mr. Fell during this incident. If the jury had heard this evidence it would have explained Mr. Fell's strong reaction to this guard and belied the Government's contention that Mr. Fell's behavior was unprompted and uncontrollable and that he would present a future risk in prison. Given the weakness of the Government's other evidence regarding his behavior in prison and the strength of Mr. Fell's evidence, this evidence would have made a difference with respect to the sentence. Therefore, this withholding was in violation of the Government's Brady duties and Mr. Fell's Fifth and Eighth Amendment rights.

---

[63]   As set forth supra the evidence the Government presented regarding the Woodstock incident and during German's testimony – which it also used to argue that Mr. Fell behavior was deteriorating – was false.

Brady v. Maryland, 373 U.S. 83, 93 (1963). It was also obvious that the defense should seek this type of information. Thus, counsel's failure to investigate same deprived the jury of this critical information and prejudiced Mr. Fell's constitutional rights under the Sixth and Eighth Amendments. Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

In rebuttal to the second factor regarding Mr. Fell's positive contributions while in prison, the Government put on evidence of a lawsuit Mr. Fell had filed against the prison regarding Native American religious practices, evidence that Mr. Fell had participated in religious activities from more than one faith and evidence showing that he made frequent use of the prison's administrative grievance process. The Government argued that this evidence, rather than reflecting active participation in the programming offered by the prison, demonstrated that Mr. Fell was manipulative and disruptive, and had not made positive contributions or acclimated to the prison environment. Indeed, it went so far as to argue: "This one's good: Donald Fell has made positive contributions to the Northwest State Correctional Facility … Let's get real … He's still manipulating even from prison. That's who he is. He hasn't changed." Tr. Vol. XII at 48:9-49:7 (July 13, 2005). For this, it argued he should be put to death.

Contrary to the Government's argument, however, Mr. Fell had been meeting regularly in prison over the course of several years with a Deacon in the Catholic Church, participating seriously in weekly religious services, and showing a sincere interest both in his faith and in other religions. The defense failed to investigate this issue – and hence failed to discover or interview the key witness, Deacon Steve Ratte, who would have provided strong testimony explaining Mr. Fell's participation in prison activities, as well as testified to the deep impact Mr. Fell's execution would have on him. He was never interviewed by the defense, nor

209

asked to testify. This too deprived the jury of critical information that would have been material to a jury's determination of Mr. Fell's sentencing and would have made a difference in the penalty. Trial counsel's failure to investigate and present this witness violated Mr. Fell's rights under the Fifth, Sixth, and Eighth Amendments and deprived him of his constitutional right to present evidence of good behavior in prison under Skipper v. South Carolina. Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005); Skipper v. South Carolina, 476 U.S. 1 (1986).

These constitutional errors by the Government and trial counsel entitle Mr. Fell to a reversal of his death sentence.

**A.    The Government's Failure to Disclose Favorable Evidence Regarding Officer Pelkey's Disciplinary History and His Attempted Assault of Mr. Fell Was a Violation of its Brady Obligations and Mr. Fell's Fifth and Eighth Amendment Rights; Trial Counsel's Failure to Investigate Same Was a Violation of Mr. Fell's, Fifth, Sixth and Eighth Amendment Rights**

**1.    Evidence Presented to the Jury**

During the penalty phase of trial, the defense put on evidence of Mr. Fell's acclimation in prison in support of its case for life. That evidence included testimony from two correctional officers, a case worker and a teacher at NWSCF, as well as from an expert (James Aiken) who gave his opinion that the Mr. Fell could be adequately managed in the Federal BOP for the remainder of his life without causing an undue risk of harm to staff, inmates or the general public. In its rebuttal, the Government introduced documentation of Mr. Fell's entire disciplinary history at the prison, videos of two disciplinary incidents, evidence of a lawsuit Mr. Fell had filed against the prison, a chart of Mr. Fell's tattoos, testimony from two guards involved in the incidents, and testimony of an expert in security matters in federal prisons.

The Government's testifying officers, Gregory Machia and Michael Gordon, who were involved in Mr. Fell's disciplinary incidents on March 17, 2004 and April 9, 2005, testified

210

about the events and described the videotapes as they were played for the jury. The jury learned that the March 17 incident began when Mr. Fell was out in the yard and an unrelated altercation occurred. The correctional officers ordered all inmates against the fence in the bullpen and Officer Machia ordered Mr. Fell to put down his coffee cup. Mr. Fell refused and the Supervisor ordered Mr. Fell taken to D-unit – the highest security and most restrictive unit at the prison – as punishment. Officer Machia and Officer Pelkey escorted Mr. Fell back to the cell. The video depicted Mr. Fell looking very angry, using verbally aggressive language, and apparently challenging the officers to fight him. Once in the D-unit cell, the correctional officers are shown physically restraining Mr. Fell in order to secure compliance and Mr. Fell could be heard to loudly complain about the treatment. In particular, he also complained that Officer Pelkey was seriously hurting his legs with unnecessary force and appeared to direct aggressive comments and insults towards Officer Pelkey. Tr. Vol. X-1 at 114:4-19; 130:1-24 (July 8, 2005). Although not visible on the tape, testimony indicated that Mr. Fell at that point spit at Officer Pelkey. Vol. X-1 at 119:5 – 17 (July 8, 2005). After Mr. Fell apparently spit at Officer Pelkey, Officer Pelkey is immediately hustled out of the cell by two other correctional officers. Vol. X-1 at 128:13-129:3 (July 8, 2005). The video shows that, after Officer Pelkey exited the cell, Mr. Fell calmed considerably to the point where he no longer had to be restrained, and he notably requested that Officer Pelkey get in trouble for hitting him in the face. See id. at 130:11-131:11.

The Government relied heavily on this and Mr. Fell's other disciplinary incident to argue that Mr. Fell was a violent individual who was growing only increasingly more violent in prison, an individual whose behavior would not improve, and therefore who could not be safely confined in prison. Tr. Vol. XII at 47:4-49:9 (July 13, 2005).

### 2.      Brady Violation

The Government withheld information favorable to the defense regarding Officer Pelkey that was material to the jury's penalty phase determination in violation of its Brady obligations and Mr. Fell's Fifth and Eighth Amendment Rights.  The information was mitigating and would have impeached Officer Pelkey's account.

On May 18, 2005, the Government informed defense counsel of their intent to offer records from Mr. Fell's prison file and to call "witnesses to incidents described in these records as part of our rebuttal case in the sentencing phase of the trial."  Letter from W. Darrow to A. Bunin, G. Primono, P. Volk, May 18, 2005 (Ex. 122).  One of those witnesses identified in the records was Officer Pelkey.  Following through, the Government then brought Officer Pelkey to Court as a potential witness for a total of five days.  The Government, however, never told the defense that there is evidence that Officer Pelkey has a significant history of violence and inappropriate aggression against inmates or that he attempted to assault Mr. Fell during the March 17 incident, factors which would have substantially mitigated Mr. Fell's conduct and that clearly were Brady and Giglio material.  The evidence would also have established that Officer Pelkey was using unnecessary force during the incident and explained Mr. Fell's heightened agitation at being around Officer Pelkey.  Declaration of Marc Pelkey ("Decl. of M. Pelkey"), Mar. 9, 2011 (Ex. 256).

Specifically, the defense was not told and did not know that Officer Pelkey has a history of violence and aggression towards inmates.  Id.  This incident is not isolated.  Officer Pelkey has admitted that his uses of excessive force include punching an inmate in the face causing a lip injury; grabbing an inmate and throwing him on the floor, and applying excessive force in using a shield on an inmate's face during a cell extraction.  Id.  Officer Pelkey was suspended for three days for the incident involving the shield use, was ordered to an anger

212

management program for the others, has been questioned by Prisoners' Rights over many incidents and has had numerous grievances filed against him. Id. Indeed, Officer Pelkey was investigated for excessive use of force for the March 17 incident with Mr. Fell. Pelkey Decl. The state investigation unit investigated the claim of excessive force, interviewed Officer Pelkey and other staff involved, and reviewed the tape of the incident. Id. Although Officer Pelkey was apparently cleared of the charges, he was ordered by the prison's Chief of Security not to have further contact with Mr. Fell. Id. Officer Pelkey was also involved in the second, April 9, 2005, disciplinary incident presented against Mr. Fell at trial. Finally, Officer Pelkey admitted to drinking heavily during the time of these two incidents, conduct the jury could have inferred contributed to his unprofessional and aggressive conduct with Mr. Fell and other inmates. Id.

The defense also was not told of a critical Incident Report documenting the March 17 incident. That document states that Mr. Fell was "starting to resist complaining about his wrist hurting," at which time the writer of the report observed that [redacted officer] "had his wrist which he had bend up." VT DOC Incident Report, Log No. 9158, Site Log No. 2399, Mar. 17, 2004 (Ex. 112). The writer "informed [redacted officer] that [he] would take his place." Another correctional officer ordered Mr. Fell to cross his legs and when he failed to comply [redacted officer] crossed his legs and held them down. Mr. Fell inquired about who was on his legs and "when [Mr. Fell] saw it was [redacted officer] he called him a fag and a fucking punk and then spit in his direction." There are two redacted lines in the report followed by "got between inmate Fell and [redacted officer]," and "[redacted officer] again started to advance toward Fell at which time [redacted officer] [redacted]." Based on the video and other facility reports, it is clear that the redacted officer is Officer Pelkey.

213

This report provides critical information that the jury should have heard. First, the report clearly shows that Officer Pelkey's use of force on Mr. Fell's wrist during the restraint was excessive. In fact, it was excessive to the point that another officer, realizing the misconduct, intervened and took over for Officer Pelkey. Second, the report clearly shows that Officer Pelkey *attempted to assault* Mr. Fell at which point he was hustled out of the cell. This is not apparent from the video and was not presented to the jury. Finally, it shows that Mr. Fell was reacting strongly to Officer Pelkey himself, rather than simply demonstrating abstract aggression. The withheld report therefore clearly contradicts the Government's claim that Mr. Fell engaged in unprovoked and uncontrollable behavior.

Without question, the foregoing evidence was favorable to the defense. It explains Mr. Fell's conduct as a response to provocation, it mitigates that conduct, and it shows that Mr. Fell would not otherwise present a danger in prison. It would have explained Mr. Fell's strong reaction to Officer Pelkey and belied the Government's contention that Mr. Fell's behavior was unprompted and uncontrollable.

The Government failed to disclose this information in violation of <u>Brady</u> and <u>Giglio</u>. It is inconceivable that the Government did not know the information.[64] The Government turned over a number of reports documenting the March 17 incident, but none of the discovery included the above, which was the only report indicating that Officer Pelkey was actively advancing towards Mr. Fell. Further, the Government spoke to Officer Pelkey and apparently thought about whether to call him as a witness, bring him to the courthouse on at least

---

[64]   Post-conviction counsel will be seeking further discovery of records relating to disciplinary hearings, sanctions, suspensions and investigations regarding Officer Pelkey as well as regarding any and all of the other correctional officers and prison staff involved in Mr. Fell's March 17, 2004 and April 9, 2005 disciplinary incidents and communications with the prosecutors regarding those subjects. Counsel have requested these records from the Vermont Department of Corrections but have yet to receive any

214

five separate days during the proceeding. The fact that he had a disciplinary history, had numerous grievances filed against him and was being investigated for the incident involving Mr. Fell was not some deep dark secret kept from the Government. Presumably, it was in the prison records. In any event, Mr. Pelkey readily admitted to his record of prison grievances and undoubtedly would have mentioned the information to the prosecutors during the week he spent with them, particularly if they had asked him about the incident and whether he had any grievances – as any responsible prosecutor no doubt would do.

As it was, it appears the Government curiously attempted to keep Officer Pelkey off the stand. It attempted instead to have his written report admitted through the testimony of another correctional officer. Tr. Vol. VIII-2 at 36:1-40:20 (July 6, 2005). And, when the Court excluded the report, ruling that because of prejudicial statements regarding Mr. Fell's alleged threat to Officer Pelkey contained in the report, the Government would have to call Officer Pelkey to the stand, id. at 47:2-5, it instead introduced testimony about the March 17 incident through the testimony of Officer Machia and the video, as described above. Tr. Vol. X-1 at 108:15 (July 8, 2005).

Officer Pelkey's undisclosed excessive use of force and attempted assault of Mr. Fell and his violent background were material to a key component of Mr. Fell's case for mitigation. As trial counsel themselves noted, the evidence regarding Mr. Fell's acclimation to prison was one of two facets of the defense's entire mitigation case (the first being his early childhood background). Letter from A. Bunin to Sessions, July 8, 2005 (Ex. 134). The video depicting Mr. Fell was the only time the jurors heard Mr. Fell's voice during trial aside from his taped statements and confessions. The invectives (taken out of context and captured

---

responsive documents. Counsel will be filing a separate discovery motion after submission of this petition and will amend its petition once the claim is fully developed pursuant to such discovery.

215

incompletely on tape) that Mr. Fell directed at Officer Pelkey were particularly damaging evidence given his contention that he was generally a well-adjusted prisoner. The suppressed evidence offered a compelling counter narrative – one the jury never had the opportunity to consider – Mr. Fell was not getting more violent in prison. He reacted precipitously (and improperly) to an officer who had a history of provoking fights with inmates and who attempted to assault him in that instant, and was appropriately punished for it; the prison had no difficulty dealing with the incident. In its absence, the Government's damaging and wild accusations that Mr. Fell was a dangerous and violent individual who was growing only increasingly more violent in prison ran unchecked. Tr. Vol. XII at 47:4 – 49:9 (July 13, 2005) ("He's getting worse … Maturing in prison? You saw him on those videotapes … He is maturing? … He hasn't changed. He won't change. Gotten more violent in prison."). If the jury had received the full story of the dynamics at play, and recognized that Mr. Fell's reaction to Officer Pelkey was explained by a number of factors including his attempted assault of Mr. Fell and Pelkey's proven violence and aggression towards inmates, it would have had an effect on at least one juror's weighing of the mitigation evidence on this point. The Government's withholding in violation of its <u>Brady</u> obligations undermines confidence in the outcome of the trial sufficient to demonstrate a reasonable probability that had the jury received this information the outcome of the trial would have been different. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)*;* <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)*;* <u>Wiggins v. Smith</u>, 539 U.S. 510, 537 (2003).

### 3.    Trial Counsel's Ineffectiveness

If the Government did not violate its <u>Brady</u> and <u>Giglio</u> obligations regarding Officer Pelkey, then trial counsel was ineffective for failing to investigate Officer Pelkey and for failing to further place in context Mr. Fell's disciplinary incidents with an explanation of the stressors in Mr. Fell's life at the prison.

216

As mentioned, trial counsel knew that Officer Pelkey would be an issue at trial. As early as February 2005, trial counsel had received a core file from the Department of Corrections with some information about the March 17 incident including Pelkey's name. On May 18, counsel was informed that the Government might call Pelkey as a witness. However, counsel never requested the disciplinary or grievance records of Pelkey or any of the other officers.

Moreover, counsel never elicited further mitigating evidence with respect to the March 17 incident that – in combination with the Officer Pelkey incident – would have placed Mr. Fell's conduct in the appropriate context far different from that portrayed by the Government. In particular, one week before the incident, the Second Circuit reviewed this Court's decision declaring the Federal Death Penalty Act unconstitutional, clearing the way for the Government to seek to put Mr. Fell to death. That decision was issued on March 9, 2004. For most of the prior three and a half years, Mr. Fell had been under the expectation that he would not go to trial but would receive life in prison and be spared the death penalty. The jury would well have inferred that Mr. Fell was unusually upset – and that his conduct was not reflective of his long-term adjustment or prospects in prison. Decl. of A. Bartnick (Ex. 262 at 2).This information was critical to helping the jury understand the causes for Mr. Fell's heightened agitation in Echo unit and during the March 17 incident in particular. Trial counsel's failure to investigate despite the obvious red flags above and to fully contextualize the incidents fell below prevailing standards of professional norms. See Rompilla v. Beard, 545 U.S. 374 (2005); ABA Guideline 10.7 (2003) ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). The deficiency of counsel's performance undermines confidence in the outcome of

the trial sufficient to demonstrate a reasonable probability that had the jury received this information the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

> **B.   Trial Counsel's Failure to Investigate and Present a Key Witness, Deacon Steve Ratte, to Support its Case Regarding Acclimation to Prison, Positive Contributions in Prison, and Execution Impact was Ineffective in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**
>
> **1.   Evidence Presented**

In its cross-examination of Jason Rushlow, Mr. Fell's case worker at the prison, the Government elicited testimony regarding Mr. Fell's involvement in religious activities from a variety of different faiths – including participation in Christian bible studies, Ramadan fasting, and an interest in Native American talking circles – in an attempt to cast Mr. Fell as untruthful and manipulative. Tr. Vol. VIII-2 at 52:21-55:6 (July 6, 2005).[65] It also highlighted the fact that Mr. Fell had filed a lawsuit seeking instatement of Native American services and called into question Mr. Fell's filing of numerous grievances through the administrative system set up for inmate complaints within the prison, in an attempt to paint Mr. Fell as a troublemaker. Id. at 56:7-58:4. Finally, the Government gratuitously entered into evidence, without objection, a chart of Mr. Fell's tattoos, simply to elicit the fact that Mr. Fell had tattoos of an anarchy symbol and an upside down cross with a 6, 6, 6 in it. Id. at 59:10-60:11.

---

[65]   Q: And you said [Mr. Fell] has signed up for Bible studies, is that right? A: Yes. Q: Now, those Bible studies, are those Christian Bible studies? A: Yes. Q: And Mr. Fell is of Polish descent; is that right? A: I don't know his descent. Q: But those are Christian Bible services; fair to say? A: Yes. Q: During your time working with Mr. Fell, has he also claimed to practice Native American rituals? A: He filed a grievance requesting Native American services at Northwest. Q: And in fact, he's gone so far as to file a lawsuit against the prison about being a Native American; isn't that fair to say? A: Yes. Q: And in that time he wanted the right to have sweat lodges at the prison; is that right? A: Yes. Q: And take part in what are called talking circles; is that right? A: Yes … Q: …did he also claim to have other religious interests and practice other religions other than Christianity and being a Native American? A: Yes. He participated in Ramadan, which is Muslim. Tr. Vol. VIII-2 at 52:10-55:23 (July 6, 2005).

218

The Government used this evidence to portray Mr. Fell as a disruptive and dishonest inmate whose service as a grievance officer and interest in exploring religions while in prison were nothing but a malicious manipulation of the prison system. Tr. Vol. XII at 48:9-49:7 (July 13, 2005) ("This one's good: Donald Fell has made positive contributions to the Northwest State Correctional Facility … Let's get real … They want to claim that he is a positive contribution in resolving grievances? You heard from Jason Rushlow. The man generated grievances. Are you kidding me? You saw the lawsuit … This man signs up for bible study, and then files a lawsuit claiming to be … Native American. He files a lawsuit so he can practice his Native American religion on the yard. It's bogus ladies and gentlemen. You know it's even more bogus because, believe it or not, he observes Ramadan as a Muslim … What do you see from this? He's still manipulating even from prison. That's who he is. He hasn't changed."). The defense offered no rejoinder.

### 2.    Trial Counsel's Ineffectiveness

While the Government introduced this manipulative evidence of its own, feet away in the courtroom sat Deacon Steve Ratte, who would have been able to counter this damaging information if he had been called by the defense. The defense neither interviewed, nor called, Deacon Ratte to the stand.

Steve Ratte is a Deacon with the Catholic church who has ministered to inmates at NWSCF for twenty-eight years. Declaration of Steve Ratte at 1 ("Decl. of S. Ratte"), Feb. 24, 2011 (Ex. 255). Deacon Ratte began meeting regularly with Mr. Fell for one-on-one meetings for several years before his trial (and still keeps in touch with him often). Id. Deacon Ratte would have explained that Mr. Fell took his involvement with weekly religious services very seriously and that he seemed sincere about exploring his faith during services. He was aware of Mr. Fell's interest in other religions and said the two of them had discussed this. Id. He would

219

have said that Mr. Fell was a curious person who wanted to be involved in the activities the prison offered, however limited, including exploring other religions and thinking critically about them. Id. He also would have provided additional positive information about Mr. Fell's behavior in prison noting that Mr. Fell cared for other inmates and how they were being treated and that he encouraged other inmates to attend religious services and helping to explain the services to the non-English speakers in the group. Id. at 2.

Further, the Deacon would have described the great emotional toll the death sentence took on him personally. Id. He visited Mr. Fell in prison the night the sentence came down and was very emotional. Id. at 3. In fact, he said Mr. Fell was the more composed and tried to console him. Id. He noted that as usual, Mr. Fell was concerned about maintaining control and not letting his emotions show, which was something he had developed over time to protect himself. Id. One thing that struck the Deacon was that Mr. Fell never made any excuses about his crimes and did not want pity. Id. at 2. Rather, he just wanted someone to care about him. Id.

Although Deacon Ratte attended the trial, defense attorneys never met with him and never asked him to testify. Id. at 3. Although it would have been very emotionally difficult for him to testify at the trial because he had grown fond of Mr. Fell, he would have testified if he had been asked. Id.

Deacon Ratte's testimony would have profoundly impacted the jury's understanding of Mr. Fell as a person. It would have provided a crucial response to the Government's base claims that Mr. Fell's participation in religious activities and service as a grievance officer were nothing but the insincere acts of manipulation, and would have countered the Government's argument that Mr. Fell was on path of behavioral deterioration and unable to

220

conform his conduct to the prison environment.  Trial counsel's failure to investigate and present this testimony acted to great detriment on the jury's understanding of Mr. Fell's positive acclimation to prison in violation of Mr. Fell's Skipper rights.  Skipper v. South Carolina, 476 U.S. 1 (1986) (evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does "not relate specifically to petitioner's culpability for the crime he committed").  Further, his strong and close relationship with Mr. Fell also would have given the jury meaningful testimony as to the mitigating factor regarding the impact the execution would have on others, as discussed more fully infra Section XIV.

Trial counsel's failure to interview or call Deacon Ratte to the stand fell below the standard required of counsel in a capital case, especially given the dearth of positive character witnesses presented by defense counsel.  Rompilla v. Beard, 545 U.S. 374 (2005); Skipper v. South Carolina, 476 U.S. 1 (1986); ABA Guideline 10.7 (2003) ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").  This was especially so given that Deacon Ratte was in close communication with Mr. Fell, easily locatable, and in fact was *at the trial*.  If the jury had heard the positive character evidence presented about Mr. Fell and heard the impact the execution would have on the Deacon it would have had an effect on at least one juror's penalty phase determination.  Counsel's deficient performance therefore prejudiced Mr. Fell's case.  Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003).  Trial counsel's failure to investigate and present Deacon Ratte violated Mr. Fell's Sixth and Eighth Amendment rights and his sentence is due to be reversed.

**VIII.    The Government's Failure to Disclose Favorable Evidence Regarding Mr. Fell's Co-Defendant Bobby Lee or Trial Counsel's Failure to Investigate Same Deprived the Jury of Critical Information in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

The relative roles of Mr. Fell and his co-defendant Mr. Lee were at issue throughout trial. The Government cast aspersions on the suggestion that Mr. Lee was the aggressor in the murder of Mrs. King, equally as culpable with respect to the murders of Debra Fell and Charles Conway, or that Mr. Lee had influenced Mr. Fell in any way. It instead focused on Mr. Fell's supposed dominance over Mr. Lee, who it painted as a comparatively docile follower. See, e.g. Tr. Vol. IV-1 at 71:45-72:5 (June 24, 2005); Tr. Vol. IX at 46:12-47:6 (July 12, 2005). It used this portrayal to argue Mr. Fell's greater relative culpability, to coerce the defense to withdraw the mitigator that the crime would not have happened without the influence of Mr. Fell, and to rebut the remaining mitigating factor that Mr. Fell and Mr. Lee acted in concert in the commission of the crimes. However, this portrayal was thoroughly false, and was only possible because the Government failed to disclose, or the defense failed to request, a wealth of mitigating evidence about Mr. Lee that belies this picture, including prison records, social service records, medical records, educational records and law enforcement records. It also withheld important information from the only near-eye-witness to the crime which corroborated Mr. Lee leadership's role in killing Mrs. King.

Had the jury been presented with accurate information about Mr. Lee's greater and/or equal relative culpability for the crimes, it would have made a difference to at least one juror's determination at the guilt and penalty phase. The Government's withholding therefore undermines confidence in the outcome of the trial sufficient to demonstrate a reasonable probability that had the jury received this information the outcome of the trial would have been different. Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Bagley, 473 U.S. 667,

222

682 (1985); Wiggins v. Smith, 539 U.S. 510, 537 (2003).  Presenting the knowingly false picture of Mr. Lee as relatively less culpable was also misconduct in violation of Napue v. Illinois, 360 U.S. 264 (1959), Giglio v. United States, 405 U.S. 150 (1972) and Berger v. United States, 295 U.S. 78 (1935).

Separately, trial counsel was constitutionally ineffective in failing to adequately investigate Bobby Lee and failing to interview a near eye-witness to the crime, which deprived the jury of information critical to an accurate understanding of Bobby Lee's greater relative culpability for the crimes.  Trial counsel's deficient performance prejudiced Mr. Fell in violation of constitutional rights under the Sixth and Eighth Amendments.  Strickland v. Washington, 466 U.S. 668 (1984); Rompilla v. Beard, 545 U.S. 374 (2005).

The Government's misconduct and trial counsel's prejudicial failures violated Mr. Fell's Fifth, Sixth and Eighth Amendment rights and entitles Mr. Fell to a new trial.

A.    Background

1.    Evidence Presented at Trial

The relative role of the co-defendants was at issue throughout trial, both in front of the jury and with respect to evidentiary issues and decisions made outside of the jury's presence.  During the guilt phase, the Government acknowledged Mrs. King's death was Mr. Lee's idea, but argued that Mr. Lee was not in fact the aggressor.  In its guilt phase summation, the Government argued that – by describing that fact and his own role – Mr. Fell nonetheless failed to accept full responsibility in his account of the crime and his own confession.  See, e.g., Tr. Vol. IV-I at 51:20-52:3 (June 20, 2005).

The Government continued to hammer home its argument as to Fell's greater role in the crime by stating that there was "[no] doubt about the dominance of Donald Fell in the Lee-Fell relationship."  Tr. Vol. IV-I at 71:15-72:5 (June 24, 2005).

223

During penalty phase summations the defense introduced two mitigators having to do with the relative roles of Mr. Fell and Mr. Lee in the commission of the crimes. The mitigators were that "Robert Lee, equally culpable for the crimes, will not face execution" and "Donald Fell and Robert Lee acted in concert in committing the crimes." Tr. Vol. XII at 154:13-16 (July 12, 2005). At the outset of the penalty phase it had introduced the mitigator that "Donald Fell would not have committed the crimes without the influence of Robert Lee," Tr. Vol. XI at 67:23-23 (July 12, 2005), but altered it during the proceedings to read "acted in concert." Tr. Vol. XI, at 7:21 (July 12, 2005). In rebuttal to the mitigators and to further convince the jury that Mr. Fell was deserving of the death penalty due to his supposed dominance over Mr. Lee, and apparent inability to be under any influence of Mr. Lee, the Government presented testimony from Matt Cunningham, a childhood friend of Mr. Fell. Mr. Cunningham testified that Mr. Fell was "a leader" and the "more active and outgoing" of the members of their group of friends. The Government also asked Mr. Cunningham whether Mr. Lee was "the quietest" and "least violent" of the group, to which Cunningham agreed. Tr. Vol. XI at 46:8-47:6 (July 12, 2005).[66]

During penalty phase summations, the defense attempted to explain the acting in concert mitigator by stating: "One of the other mitigating factors that I want to talk about has to do with, that Donnie Fell acted in concert with Bobby Lee. And again, don't, please do not misunderstand or confuse responsibility, criminal responsibility for moral culpability … these

---

[66]    Tr. Vol. XI at 46:8-47:7 (July 12, 2005) (Q: Now, within the group that you were with, did you have a chance to observe Donald Fell and Bobby Lee together? A: Yes, I did. Q: Now, within the group, what was Donald Fell like in terms of - was he a leader? Was he not? What was he like within the group? A: I guess, I mean, yeah, I guess you could say he was more of a leader than some of the rest of us were. Q: And why is that? A: Well, he was just a more vocal type, outgoing person. You know what I mean? Always - I don't really know. Q: Was he more active and outgoing? A: Yeah. Than - like myself, or Bobby, yes. Q: Now, you mentioned Bobby. Did you have a nickname for Bobby? A: Yeah. Q: What was the nickname? A: Twiggy. Q: And within the group, was he the quietest? A: I would say so, yes. Q: Was he the least violent? A: I would say so.").

224

two men, from their time when they were kids, up until they are 20 years old, were just fed off each other. And we're not saying that Donnie was not responsible … What we are saying is that but for this child - this childhood influence, it wouldn't have happened. Bobby went up there, and they started drinking and drugging again. Something snapped with both of them which resulted in two killings. Donald Fell probably, or is much less likely to have been able to do both and/or would have never killed his mother … And that is a mitigating factor for you to consider." Tr. Vol. XII at 79:12-80:15 (July 13, 2005). The Government capitalized on the defense's failure to offer evidence by stating simply that "[t]he fact that Robert Lee was an accomplice in no way lessens [Mr. Fell's] responsibility and culpability for those crimes." Tr. Vol. XII at 52:1-4 (July 13, 2005).

In addition to the foregoing which was presented to the jury, Mr. Lee's background played a role in the case that went unpresented to the jury. The Welner Report, which the Government used to coerce a stipulation that Mr. Fell suffered from no mental health condition, see supra, contained inflammatory hearsay statements from Mr. Lee and others supposedly attesting to Mr. Fell's dominance over Mr. Lee and suggesting that Mr. Lee was only violent under the influence of and in the presence of Mr. Fell. Welner Report (Ex. 10 at FELL00000686) ("Mr. Lee, as an explosive, emotionally unstable person, was exploited on other occasions by Mr. Fell, as an antisocial-by-proxy, extending Mr. Fell's ability to be destructive."). The Government knew information that contradicted that account but failed to disclose it; and the defense could have obtained information that contradicted that account but failed to do so.

### 2.    Evidence in the Government's Possession

In fact, the FBI was in possession of numerous of Mr. Lee's prison records that demonstrate Mr. Lee's violent and aggressive tendencies and show him to be anything but a docile follower. The Government was also in possession of the 302 for Mr. Francis Bellenonti

225

whose statement about Mr. Fell and Lee arguing by the side of the road would have shown that Mr. Lee was the aggressor in Mrs. King's death. Finally, the Government was in possession of numerous social service, medical, law enforcement and educational records of Mr. Lee which may contain information favorable to Mr. Fell. None of these documents were turned over to the defense. The records include the following:

### a. Prison Records

Mr. Lee's prison records cover the time of his arrest up until his death nine months later. They reveal a person who, rather than being docile, was actually extremely violent and aggressive with fellow inmates, and deeply disturbed. None of these records were disclosed by the Government nor did Mr. Fell's counsel seek them.

### i. Violence Against Other Inmates

Bobby Lee was incarcerated in the Northwest State Correctional Facility ("NWSCF") along with Mr. Fell upon their transfer from Arkansas after their arrest. The records of this detention, which were not turned over the defense, are exculpatory for Mr. Fell and, if disclosed, would have resulted in a different sentence.

The records show that shortly after incarceration Mr. Lee instigated conflicts and physical altercations with a number of the other inmates, to the point where correctional officers had to accommodate his inability to conform his behavior.[67] In one particularly violent episode he assaulted an inmate, punching him repeatedly in the head. VT DOC Facility Report Form regarding Incident of June 13, 2001 (Ex. 92) (Lee in the activity room repeatedly punching an

---

[67]    Transcript of Taped Statement NWSCF Correctional Officer, CN# 01A204370, at FELL-00001314-1315 (Ex. 102) (officers kept list on board in office indicating the inmates Lee could not be around) (D-Unit Management Team Meeting Case Reviews, Apr. 30, 2001 (Ex. 89]=(negative attitude); D-Unit Management Team Meeting Case Reviews, May 21, 2001 (Ex. 91) (contraband in cell); Email among NWSCF Staff, July 25, 2001 (Ex. 97) (hostility towards other inmates); Emails among NWSCF Staff, Sept. 19 and 20, 2001 (Ex. 101) (same); NWSCF D-Wing Activity Sheet (Ex. 96) (same).

inmate in the head and shoulder area; Lee did not respond to verbal commands to stop and did not cease his attack until the correctional officer requested the help of a third inmate to try to pull Lee off of the first inmate); Email among NWSCF Staff, June 14, 2001 (Ex. 100) (noting assault by Lee on other inmate in activity room; according to Lee, the other inmate had been putting feces under Lee's door and running his mouth about it so Lee took care of it); Email among NWSCF Staff, July 3, 2001 (Ex. 103) (Lee has said he was real close to going off on the other inmate).

The records show that this behavior continued throughout Mr. Lee's time at the prison and up to the night before his death when Mr. Lee got in another fight with another inmate in the activity room, in which Lee was "pacing … very mad looking … like he wanted to kill [inmate]." Transcript of Taped Statement NWSCF Correctional Officer, CN# 01A204370 (Ex.102 at FELL-00001314-1315). When questioned by the correctional officer about this specific incident, Mr. Lee told that officer that the other inmate was running his mouth, that he was dirty and nasty and had blood on his hands with which Lee believed he was trying to touch him. Id. According to the officer's report he followed-up with the other inmate involved who did not in fact have anything on his hands; the inmate explained that Lee had insulted him, so he called Lee a murderer and asked him why he didn't just kill three more, which set Lee off. Id. These records were not produced.

### ii.    Violence Towards Mothers

The FBI was also in possession of records showing Mr. Lee's hostility toward family members, precisely the type of emotion he might have experienced when he – and not Mr. Fell – killed Debra Fell and when he decided that Mrs. King should be killed. See Transcript of Telephonic Interview of D. Fell, Dec. 1, 2000 (Ex. 61at FELL-00000944); Donald Fell Interview, Dec. 2, 2000 (Ex. 62).

227

In particular, the undisclosed records show that Mr. Lee threatened to rape another inmate's mother. Email among NWSCF Staff, July 28, 2001 (Ex. 98). The records further demonstrate Mr. Lee's estrangement from his own mother and show that the family went so far as to indicate the mother should not be notified of Mr. Lee's death in prison. Email from NWSCF to the United States Marshals Service ("USMS") (Ex. 107) (stating that Lee's aunt, representing the family, confirmed to NWSCF that "Lee's father had been notified [of Lee's death] and [she] instructed that the family did not want Lee's mother notified at all.").

Given the fact that Mr. Lee confessed to killing Mr. Fell's mother, this information was relevant to the relative culpability between Mr. Fell and Mr. Lee for the Fell and Conway murders, the events which set the stage for Mr. Fell and Mr. Lee's interactions with Mrs. King. The records should have been turned over to trial counsel and they were not.

### iii.  Homicidal Ideations

Among the items found in Mr. Lee's cell upon his death were writings containing violent and disturbing imagery that indicated his ongoing homicidal thoughts. Handwritten Notebook Pages Found in Lee's Cell at NWSCF (Ex. 105) ("I don't want to hear your shit, Get out of my face with those lies, The nerve of you coming here looking into my eyes, The visions of me beating you Fill my mind blood red, I just want to kill you and blow away your chest, I love my shot gun puts assholes like you to rest, I'm sick of all the pain I go through to sit here and not kill you."); Handwritten Notebook Pages Found in Lee's Cell at NWSCF (Ex. 104) (stating "why don't they just die, just drop like flies/just drop dead"). These records were not produced.

### iv.  Drug Use At The Time Of The Crime

Significantly, Mr. Lee's medical intake form at NWSCF dated December 13, 2000 indicates that Mr. Lee was using marijuana and crack cocaine *three weeks prior to that*

228

*date*. Correctional Healthcare Solutions, Inc., Receiving Screening Form, Dec. 13, 2000 (Ex. 109). This provides crucial information about Mr. Lee and Mr. Fell's drug use at the time of the crime and belies the Government's overblown contention that there was absolutely no evidence to support such a proposition. Id.; Tr. Vol. IV-1 at 69:22-70:12 (June 24, 2005). Rather than acknowledge that such evidence did in fact exist, the Government argued that Mr. Fell's claim about being high on crack both demonstrated that he was not impaired the night of the crime and that he was a liar. Tr. Vol. IV-1 at 70 (June 24, 2005). (Government's guilt phase summation on crack use: "you also know it's a lie because … there was "nothing to do with crack cocaine [at 135 Robbins Street]; no paraphernalia, no glass pipes, no nothing." "… Mr. Bunin keeps raising this question about intoxication and crack use. Mr. Bunin said that. But there's no evidence in this trial of crack use by the defendant that night."); Id. at 80:6(Government's penalty phase summation on crack: "Mr. Darrow explained to you that there really was no evidence in this case that the defendant was substantially impaired or significantly impaired at the time of these crimes … No one was doing drugs. [Witness] saw no drug paraphernalia."). In addition to the violation caused by its failure to disclose such evidence, the Government's presentation to the jury of information it knew to be false was in plain violation of its duties under Napue and Berger. Napue v. Illinois, 360 U.S. 264 (1959); Berger v. United States, 295 U.S. 78 (1935).

### v.    Suicidal Tendencies After Arrest

Finally, the details about Mr. Lee's suicidal tendencies would have been important for Mr. Fell's defense to know, given the common understanding that a desire to commit suicide is evidence of one's personal sense of culpability. Warrant Information Network Subject Report on R. Lee, Dec. 15, 2000 (Ex. 69) (displays suicidal tendencies; also notes three inch scars, one on each hand); Prisoner Intake Form USMS Western District of Arkansas for R. Lee (Ex. 67) (displays suicidal tendencies; talks about wanting to die); see Tug Raven v. Trexler,

419 F.2d 536, 543 (4th Cir. 1969) ("under generally accepted rules of evidence, flight after the commission of a criminal act constitutes circumstantial evidence of consciousness of guilt, and suicide is a form of flight."). Mr. Fell was told that Mr. Lee's ultimate cause of death was determined to be accidental rather than a suicide. Information that Mr. Lee was suicidal would have reflected on Mr. Lee's culpability.

### vi. Misbehavior

A number of additional records show additional episodes of Mr. Lee's general misbehavior and inability to conform his conduct in prison.[68]

### vii. Further Discovery

Although 2255 counsel has been able to glean the above information from records received through public records requests to the FBI and United States Marshals Service, many of the records are so redacted that counsel cannot discern the full scope of the information they contain.[69,70]

---

[68] Shortly after arriving at the prison, Lee engaged in two major disciplinary violations: he promptly flooded his cell and he obtained alcohol. NWSCF Facility Incident Report, Dec. 27, 2000 (Ex. 73). Following this incident Mr. Lee ran back and forth in his cell hitting himself against the cell window and door to the point that he had to be removed from his cell and placed in booking. Id. Mr. Lee was charged with a Major B#21 disciplinary violation for possession and consumption of the alcohol and a Major B#21 for the cell flooding. VT DOC Inmate Disciplinary Report, Dec. 27, 2000 (Ex.72); He was found guilty of a Major B#21 disciplinary violation for "conduct which disrupts or interferes with inmate safety or security or the orderly running of the facility" for the cell flooding, and sanctioned with a 5-day lock-in. VT DOC Inmate Disciplinary Report, Dec. 27, 2000 (Ex. 71); VT DOC Disciplinary Hearing Report, Jan. 1, 2001 (Ex. 77). In another instance, Mr. Lee was caught advising another inmate on how to ingest an industrial cleaner in order to get transferred to the hospital. Report of NWSCF Correctional Officer, Mar. 16, 2001 (Ex. 83) (Mr. Lee attempted to send a note to another inmate, by taping the note inside a magazine to be delivered to the inmate, instructing the inmate on the dangers of Comet and seeming to indicate that if the inmate indeed wanted to go to the hospital as had been expressed, that the inmate should drink the industrial cleaner, Comet. The report states Lee was the only inmate to have used Comet cleaner that day, and upon searching the other inmate's cell a container of water with a quarter inch of Comet was found.).

[69] The Government withheld a host of additional records, not cited here, but also in violation of Brady, that contain documentation of various other aspects of Mr. Lee's behavior in the prison and medical files, among other things. None of these documents were turned over to the defense. See, e.g. Email among NWSCF Staff, July 14, 2001 (Ex. 99), D-Unit Management Team Meeting Case Reviews, June 11, 2001, July 16, 2001, July 23, 2001 (Exs. 95 and 299) (refusing food, refusing medication, acting out of normal, not coming out of cell, not showering).

230

**b. Social Service, Educational, Medical and Law Enforcement Records And Lay Witness Investigation Pertaining to Lee**

No records or documentation of the Government's lay investigation of Mr. Lee, including social service, educational, medical, and law enforcement records were ever turned over to the defense. Although § 2255 counsel have not been able to obtain these records through independent investigation, it has reason to believe that these records contain crucial information on Mr. Lee's tendency towards aggression and violence, history of mental health and relationship to Mr. Fell and others and will seek discovery of these and other documents in the Government's possession.[71]

**c. Francis Bellantoni**

The FBI interviewed Francis Bellantoni, a witness who observed Mr. Fell and Mr. Lee on the side of the highway in Dover having an argument in close proximity to the time of Mrs. King's death, and was required to memorialize the interview on an FBI Form 302. See United States v. Balistrieri, 779 F.2d 1191, 1218 (7th Cir. 1985) ("[i]f an FBI agent acquires information as to which he may later be called to testify, FBI regulations require that he make a written report of the information on form FD-302. [...] Under normal procedures, a transcribed report is returned to the author, who either initials it as correct or sends back for correction, the process being repeated until he initials it."). Nonetheless, no such 302 was ever produced to defense counsel.

---

[70] Section 2255 counsel respectfully requests full discovery of unredacted files in order to fully develop this claim. Counsel will be filing a separate motion for discovery after the submission of this petition and will amend the petition to include further information as it becomes available.

[71] Although the undersigned has requested all relevant documentation regarding Mr. Fell and Mr. Lee through a FOIA request to the Executive Office of the U.S. Attorney, it has been informed that the request will cost upwards of $60,000, take up to 33 weeks and will likely contain a substantial amount of redaction. These materials will also be the subject of counsel's forthcoming discovery and may provide grounds for an amendment to this petition.

231

Mr. Bellantoni was interviewed by the New York State Police and a report was given to the defense. That report stated that Bellantoni had recalled observing two men arguing on the Dover highway with a woman in the car, and a little while later seeing the woman walking up the hill with both men following behind her. New York State Police Supporting Deposition of Francis R. Bellantoni, Dec. 12, 2000 (Ex. 68). Had counsel spoken with Mr. Bellantoni, he would have relayed additional information that was favorable to Mr. Fell and supported the theory that Lee was the aggressor in Mrs. King's death.

In particular, Mr. Bellantoni would have testified that he was traveling to work when he observed two men standing outside a car arguing with one another. Declaration of Francis Bellantoni, Feb. 24, 2011 ("Decl. of F. Bellantoni") (Ex. 301). Specifically, one man looked like he was getting frustrated with the other man, which he could tell by the fact that one of the men was flapping his arms up and down like he was frustrated with the other man. Id. He also noticed a woman sitting in the backseat of the car. Id. Mr. Ballantoni continued on the road, but had to turn back around because he forgot his cell phone at home. Id. On the way back he observed the same car parked on the side of the road, but the woman was now walking towards the woods with the two men behind her. Id. The man who had previously been getting yelled at was trailing behind. Id.

This information provides critical evidence in support of the fact that Mr. Fell and Mr. Lee were arguing because Mr. Lee was in favor of killing Mrs. King while Mr. Fell wanted to let her free. See Transcript of Telephonic Interview of D. Fell, Dec. 1, 2000 at FELL-00000944 (Ex. 60). Mr. Bellantoni's observations support the fact that there was an argument and that, since Mr. Fell was likely the one "getting yelled" at, it was Mr. Lee, rather than he, who

232

led the way to follow Mrs. King into the woods. This is information critically favorable to Mr. Fell and material to a jury's understanding of Mr. Fell's relative culpability for the crime.

Agent Heilner of the FBI interviewed Mr. Bellantoni for approximately one hour, prior to trial, but a 302 of the interview was never turned over to the defense. Because counsel has good cause to believe that the FBI 302 contained the similar favorable corroborating detail as the foregoing, and because it believes the hour long interview yielded more information than was contained in the New York State Police Deposition, the Government violated its Brady obligations in withholding this 302.

**B.    The Government's Brady Violations and Counsel's Ineffective Assistance**

**1.    The Government's Failure to Disclose Evidence and Trial Counsel's Failure to Investigate Same**

**a.  Government's Failure to Disclose Evidence**

The Government was clearly in possession of all of the foregoing evidence because it was collected by the FBI in its investigation of this case. Because this information was material to Mr. Fell's case and would have demonstrated Mr. Lee's influence over Mr. Fell and greater relative culpability for the crime against Mrs. King, the Government was obligated to turn it over to the defense.

**b.  Trial Counsel's Failure to Investigate**

Trial counsel did not seek to obtain any such records or documentation regarding Mr. Lee's background and history in prison, which would have been available through subpoena or public record requests. Nor is there any other evidence that trial counsel otherwise sought to investigate Mr. Lee through any other means. Defense counsel did not investigate Mr. Bellantoni whose statement was in their possession and supported the theory that Mr. Lee was the aggressor in Mrs. King's death. Mr. Bellantoni has lived at the same address as was listed in

233

the police report in 2000. Decl. of F. Bellantoni at 2 (Ex. 301). Trial counsel's failure to investigate the circumstances surrounding Mrs. King's death and the single other person directly involved in and responsible for the very crimes charged against their client, falls well below prevailing standards of professional norms in violation of Mr. Fell's Sixth Amendment rights. Rompilla v. Beard, 545 U.S. 374 (2005); ABA Guideline 10.7 (2003) ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

### 2.    Materiality and Prejudice: Brady Violation and Ineffectiveness of Counsel

The forgoing prison record and statement of Mr. Bellantoni constitutes evidence favorable to Mr. Fell because it would have combated the inaccurate presentation of Mr. Lee as a docile follower and provided support for the fact that Mr. Lee was the aggressor in Ms. King's death. It also would have provided strong support for the originally-offered mitigator that "Donald Fell would not have committed the crimes without the influence of Robert Lee." Tr. Vol. V-1 at 28:17-18 (June 28, 2005) (penalty phase preliminary instruction). Evidence of Mr. Lee's violent behavior in prison and the corroborating statement of Mr. Bellantoni would have affected at least one juror's determination of Mr. Fell's relative culpability or Mr. Lee's influence and would have made a different outcome reasonably probable. The Government's failure to disclose the aggravating prison evidence about Mr. Lee, and corroborating evidence from Mr. Bellantoni, which in turn was mitigating for Mr. Fell, deprived trial counsel of critical information necessary to develop a defense about the relative culpability of Mr. Lee and Mr. Fell, and of the relative influence of Mr. Lee over Mr. Fell, and to present this theory to the jury in violation of its Brady obligations. Trial counsel in turn failed to investigate same. This evidence on its own, as well as in conjunction with a competent forensics investigation and

234

properly presented mitigating factors, would have been material to at least one juror's guilt and sentencing phase determinations. Its exclusion therefore undermines confidence in the outcome of the trial sufficient to demonstrate a reasonable probability of a different outcome. United States v. Bagley, 473 U.S. 667 (1985); Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003).

In addition, the Government failed to disclose evidence relating to Bobby Lee which would have enabled trial counsel to rebut the Government's presentation of Donny as the leader and Bobby as a hapless follower including as an effective challenge to the Welner Report. Finally, the Government's misrepresentation of Lee's purportedly docile nature in the face of Mr. Fell's dominance, given the undisclosed evidence in its possession of Lee's violent and aggressive behavior, constitutes prosecutorial misconduct in violation of Napue v. Illinois, 360 U.S. 264 (1959), Giglio v. United States, 405 U.S. 150 (1972) and Berger v. United States, 295 U.S. 78 (1935).

The Government's misconduct and trial counsel's failures violated Mr. Fell's Fifth, Sixth and Eighth Amendment rights and entitle Mr. Fell to a new trial, or at a minimum a reversal of his death sentence.

## IX.   Trial Counsel Was Ineffective for Failing to Conduct an Adequate Forensic Investigation, thereby Depriving Mr. Fell of Rights Guaranteed him by the Fifth, Sixth, and Eighth Amendments.

The ABA Guidelines emphasize that capital defense counsel have a duty to thoroughly examine forensic evidence even when "circumstances appear overwhelmingly indicative of guilt." ABA Guidelines, Guideline 10.7, Commentary at n.201 (rev. ed. 2003); see also Draughon v. Dretke, 427 F.3d 286, 294-96 (5th Cir. 2005) (finding counsel deficient for failing to obtain a forensics report to substantiate defendant's testimony about bullet flight path when "failure to investigate the forensics of the fatal bullet deprived Draughon of a substantial

235

argument, and set up an unchallenged factual predicate for the State's main argument that Draughon intended to kill"); Soffar v. Dretke, 368 F.3d 441, 471-79 (5th Cir. 2004) (finding counsel ineffective for failing to retain a ballistics expert who could have established that the crime scene was inconsistent with the defendant's confession, which was probably false); Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1255-58 (W.D. Wash. 1994) (finding counsel ineffective for relying on defendant's admission of guilt rather than adequately investigating and hiring an independent ballistics or forensics expert to investigate inconsistencies between the defendant's story and the police report); see also Strickland v. Washington, 466 U.S. 668, 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

In Mr. Fell's case, trial counsel accepted Mr. Fell's guilt from the outset and pursued a strategy of acceptance of responsibility without conducting any forensic investigation into Mr. Fell's role in the crimes relative to his co-defendant, Mr. Lee. The relative roles of Mr. Fell and Mr. Lee were squarely placed into issue in both the guilt and penalty phases by the Government. The Government argued during the guilt phase that Mr. Fell had "dominance" over Mr. Lee, and elicited testimony during the penalty phase from an acquaintance of both Mr. Lee and Mr. Fell that Mr. Fell was "a leader" and "outgoing" while Mr. Lee was "quiet" and "the least violent." Tr. Vol. XI at 46:8-47:6 (July 12, 2005). Had trial counsel conducted an adequate investigation into the relative roles of Mr. Fell and Mr. Lee they would have been able to challenge the Government's depiction of Mr. Lee as a passive bystander and docile follower.

Additionally, the evidence uncovered by such an investigation would have provided critical support for Mr. Fell's mitigation case. Trial counsel initially proposed as a mitigating factor that "Donald Fell would not have committed the crimes without the influence

236

of Robert Lee." Tr. Vol. XI at 67:23-23 (July 12, 2005). However, counsel modified this factor during the penalty phase to the considerably less powerful "Donald Fell and Robert Lee acted in concert in committing the crimes." Tr. Vol. XII at 154:13-16 (July 13, 2005). Trial counsel offered only an anemic explanation for why "acting in concert" should be seen as mitigating. They explained:

> And again, don't, please do not misunderstand or confuse responsibility, criminal responsibility for moral culpability . . . these two men, from their time when they were kids, up until they are 20 years old, were just fed off each other. And we're not saying that Donnie was not responsible . . . What we are saying is that but for this child - this childhood influence, it wouldn't have happened. Bobby went up there, and they started drinking and drugging again. Something snapped with both of them which resulted in two killings. Donald Fell probably, or is much less likely to have been able to do both and/or would have never killed his mother. . . . And that is a mitigating factor for you to consider.

Tr. Vol. XII at 79:12-80:15 (July 13, 2005).

Had trial counsel conducted an adequate investigation they would have been able to offer and support the original mitigating factor – that Mr. Fell was influenced by Mr. Lee – and thereby provided a much more powerful mitigation narrative than the one ultimately offered.

The evidence—unknown but available to trial counsel—shows that Mrs. King's fatal injuries were inflicted by a rock forcefully wielded by Mr. Lee, and not by Mr. Fell. The Government argued at trial that Mrs. King was actually "killed twice:" once by the rock wielded by Mr. Lee and once by asphyxiation from Mr. Fell's actions. However, § 2255 counsel have conducted a forensic investigation which revealed that in fact a blow from the rock wielded by Mr. Lee – and only that – caused the death of Mrs. King. See Declaration of Dr. Charles Wetli, Mar. 18, 2011 ("Decl. of C. Wetli") (Ex. 306). Because Mr. Fell's own personal actions must be considered to determine whether he is eligible for the death penalty, this forensic evidence shows that Mr. Fell had a viable basis to challenge his eligibility for the death penalty under 18 U.S.C. §

237

3591(a)(2)(A)-(D), which counsel did not pursue. See Tr. Vol. XII at 141:23-25 (July 13, 2005) (requiring the jury to look at "Donald Fell's personal actions" in making the "finding that a threshold eligibility factor has been proven").

Furthermore, this evidence, when combined with the evidence described above and incorporated herein by reference, see supra, Section IX, shows that Mr. Lee was by no means a docile follower in the crimes. Instead, he was an aggressor who played the leading role in Mrs. King's death. This mitigating information – that Bobby Lee was in fact an aggressor who influenced Donald Fell, and played a leading role in killing Mrs. King – should have been developed and presented to the jury.

## A.    Trial Counsel's Performance was Deficient.

At trial, the Government presented evidence from Dr. Michael Baden relating to his autopsy of Teresca King including that he found as the cause of death "[m]ultiple blunt force injuries to head with fractures of facial and skull bones and contusions of brain. Traumatic compression of neck with asphyxia. Homicidal assault." Michael Baden, Autopsy Report of Teresca Ruth King, Dec. 2, 2000 (Ex. 65 at FELL-00001102). Dr. Baden testified that Mrs. King "died both of the blows to the face, the injuries to the brain, and the injuries to the neck." Tr. Vol. V-I at 89:22-23 (June 28, 2005). Trial counsel did not counter – or even adequately investigate – that claim.

Trial counsel did not consult a forensic pathologist until January 2005, after a trial date was set. That forensic pathologist, Dr. Michael Sikirica, informed counsel that he lacked the time to conduct a thorough analysis and, ultimately, spent only 1-2 hours on the case. Declaration of Dr. Michael Sikirica, Mar. 10, 2011 ("Decl. of M. Sikirica") (Ex. 300). Dr. Sikirica then referred counsel to a qualified pathologist, Dr. Richard Callery. Id. However, trial

238

counsel never followed up with Dr. Callery, even though they should have. See Declaration of Dr. Richard Callery, Mar. 7, 2011 ("Decl. of R. Callery") (Ex. 258).

The failure of counsel to investigate the relative roles of Mr. Lee and Mr. Fell cannot be blamed on ignorance that the issue would be relevant. The evidence from the beginning of the case was that Mr. Fell's co-defendant Mr. Lee, and not Mr. Fell, was the person who bludgeoned Mrs. King with the rock. Thus, the damage caused by the rock was clearly flagged as an issue relating to the relative roles of the co-defendants in the death of Mrs. King, and had to be investigated.

The failure to conduct even the most rudimentary investigation was an unreasonable deviation from professional norms and caused Mr. Fell immense prejudice. At the request of § 2255 counsel, Dr. Charles Wetli, a pathologist certified by the American Board of Pathology in anatomical, clinical, and forensic pathology, and the former Chief Medical Examiner of Suffolk County, New York, reviewed a variety of materials, including the autopsy report and autopsy photographs of Mrs. King, and has concluded that Mrs. King's death resulted from trauma to her brain caused by a blow to her head from a rock, not traumatic compression to the neck with asphyxia from stomping or kicking. Dr. Wetli found that:

> The autopsy of Teresca King revealed massive blunt force crushing injury to her head centered at the bridge of the nose and associated with a massive basilar skull fracture of the anterior cranial fossa, linear fractures of the frontal bone, and extensive subarachnoid hemorrhage typical for a global impact to the brain. This injury would result in an immediate loss of consciousness and possibly death. However, certain vegetative functions, such as heart beat and respirations, would continue for some time even if death was instantaneous. Therefore it is not surprising that extensive bleeding was associated with the fracture of the right clavicle, musculature of the neck, and around the fracture margins of the posterior central neck structures (viz. hyoid bone and cornua of the thyroid cartilage). It should be noted that despite the neck injuries there is no evidence for asphyxiation: there was no

239

<u>aspiration of blood into the upper airway or lungs, and no</u>
<u>petechiae of the eyes or eyelids from increased vascular pressure in</u>
<u>the facial region.</u>  Fractures of the hyoid bone and thyroid cartilage
cornua indicate a significant amount of force was applied to the
neck but does not indicate anything more than a transient
respiratory embarrassment. It does not indicate death by
<u>suffocation</u>, and healed fractures of these structures may be seen
on occasion at autopsy as an incidental finding of past non-fatal
neck trauma. . . . <u>The autopsy revealed that the stomping and</u>
<u>kicking did not inflict any lethal injuries to Ms. King, and therefore</u>
<u>the cause of death is blunt craniocerebral trauma.</u>

Decl. of C. Wetli (Ex. 306) (emphasis added).

Given that the evidence showed that Mr. Lee alone beat Mrs. King with a rock,

Dr. Wetli's findings establish that Mr. Lee alone caused Mrs. King's death.

### B.    Trial Counsel's Deficient Performance Prejudiced Mr. Fell

Mr. Fell was prejudiced by trial counsel's deficient performance because he had a

viable basis to challenge his eligibility for the death penalty. As this Court explained, under 18

U.S.C. § 3591(a)(2)(A)-(D), the Government was required to prove beyond a reasonable doubt

that Mr. Fell's personal actions directly caused Mrs. King's death. See Tr. Vol. XII at 141:23-25

(July 13, 2005) (requiring the jury to look at "Donald Fell's personal actions" in making the

"finding that a threshold eligibility factor has been proven").

18 U.S.C. § 3591(a)(2) requires the government to prove, before a jury can

sentence a defendant to death, that the personal act of the defendant (committed with the

requisite mens rea) resulted in the death of the victim.

Specifically, 18 U.S.C. § 3591(a)(2) provides in relevant part:

(a) A defendant who has been found guilty of—

(1) an offense described in section 794 or section 2381; or

(2) any other offense for which a sentence of death is provided, if
the defendant, as determined beyond a reasonable doubt at the
hearing under section 3593—

240

(A) intentionally <u>killed</u> the victim;

(B) intentionally inflicted serious bodily injury that <u>resulted in the death of the victim</u>;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and <u>the victim died as a direct result of the act</u>; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the <u>victim died as a direct result of the act</u>,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified . . . . (emphasis added).

Under subsection (A) the government must prove beyond a reasonable doubt that the defendant "intentionally killed the victim." Under subsection (B) the government must prove beyond a reasonable doubt that the defendant "intentionally inflicted serious bodily injury that resulted in the death of the victim." This language could not be clearer. It is not sufficient to inflict serious bodily injury if that injury did not result in death.

Under the remaining sections Congress tightened the causation requirement. Under subsection (C), the government must prove beyond a reasonable doubt that the defendant "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2)(C) (emphasis added). And under subsection (D), the government must prove beyond a reasonable doubt that the defendant "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the

241

participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2)(D) (emphasis added). Under well-established canons of interpretation, the government here was required to prove that Mr. Fell's "act" (his actions with respect to Mrs. King) directly resulted in her death, and not just that he intended that she be killed and someone else engaged in the acts that resulted in the death. This interpretation gives meaning to all parts of § 3591(a)(2)(A)-(D) and avoids rendering superfluous the causal language contained in the statute. See Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."); State of New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir.1985); Keene Corp. v. United States, 508 U.S. 200, 208 (1993) (stating that when Congress uses a term "in one section of a statute and omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting Russello v. United States, 464 U.S. 16, 23 (1983)); see also Ratzlaf v. United States, 510 U.S. 135, 140-41 (1994) (stating that "Judges should hesitate . . . to treat statutory terms [as surplusage] in any setting, and resistance should be heightened when the words describe an element of a criminal offense").

Here, counsel deprived Mr. Fell of a powerful defense to the threshold eligibility factors for the death penalty by failing to investigate the forensic evidence. This was an unreasonable deviation from the norms of professional conduct. See Draughon v. Dretke, 427 F.3d 286, 294-96 (5th Cir. 2005) (finding counsel deficient for failing to investigate forensic evidence and thereby depriving the defendant of a substantial defense). Without minimizing the gravity of the conduct to which Mr. Fell admitted or seeking to excuse that conduct, counsel

242

could have argued that the actual cause of Mrs King's death—the action that, in the words of the statute, "resulted in" her death—was Mr. Lee's brutal act of bludgeoning her with a rock.

Moreover, the Government used its interpretation of Dr. Baden's testimony to argue that Mrs. King was actually "killed twice," and that this was an aggravating factor in support of a finding that Mr. Fell killed Mrs. King in an especially "heinous, cruel or depraved manner." See infra, Section XI. If trial counsel had conducted an adequate forensics investigation, they would have been able to challenge this argument by the government because Mrs. King was only killed once, not twice, and she was killed by Mr. Lee, not Donald Fell. Again, only Mr. Fell's personal actions, and not Mr. Lee's, could be considered when determining whether Mr. Fell himself committed a crime in an especially heinous, cruel or depraved way, and therefore deserved the death penalty. See United States v. Hall, 152 F. 3d 381, 415 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000) (rejecting defendant's claim that jury instructions "invited the jury to consider the conduct of [defendant]'s coconspirators throughout the course of the kidnapping in concluding that the killing was 'especially heinous, cruel, or depraved,' because [t]he instructions accompanying the aggravating factor removed any doubt that the jury was required to focus on Hall's actions in determining whether this aggravating factor existed"); United States v. Sablan, No. 00-cr-00531-WYD, 2007 WL 4116117, *3 (D. Colo. Nov. 16, 2007) ("I agree with Defendant that this aggravating factor must focus on his actions, as compared to [codefendant]'s actions.").

Furthermore, the forensic evidence of Mr. Lee's forceful act of killing Mrs. King with a rock undermines the Government's argument that Mr. Lee was just a passive follower to Mr. Fell's strong leader in the crimes. It also would have bolstered the original and substantially

more impactful proposed mitigating factor that "Donald Fell would not have committed the crimes without the influence of Robert Lee." Tr. Vol. XI at 67:23-23 (July 12, 2005). There is a reasonable probability that had trial counsel conducted an adequate forensic investigation, this forensic evidence, along with other readily available evidence of Mr. Lee's aggression that counsel could have developed, see supra, Section IX, would have influenced at least one juror to strike a different balance and vote for life. Mr. Fell was thus deprived of his Fifth, Sixth and Eighth Amendment rights.

X.      **Trial Counsel Were Ineffective for Failing to Investigate the Facts Underlying the Government's Claim that Mrs. King was Killed In an "Especially Heinous, Cruel or Depraved Manner."**

The Government alleged as a statutory aggravator that Teresca King's death involved "serious physical abuse [that] rendered the offense especially heinous, or especially cruel, or especially depraved." Tr. Vol. XII at 145:25-146:2 (July 13, 2005); id. at 144:22-24. The Government offered several graphic and disturbing arguments in support of this factor. First, the Government argued that the distance between teeth recovered at the crime scene and Mrs. King's body, and the distance between an earring recovered at the crime scene and Mrs. King's body, demonstrated that Mrs. King was killed with such force that the crimes were especially heinous, cruel or depraved. The Government argued that "as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body. One of her earrings was found several feet away." Tr. Vol. V-I at 36:16-18 (June 27, 2005). Next, the Government argued that Mrs. King's "throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure." Tr. Vol. V-I at 36:12-16 (June 27, 2005). The Government also argued that Mrs. King was "killed twice," by blunt force trauma from a rock and by asphyxia from a stomping injury. Tr. Vol. X-II at 24:22 (July 13, 2005). Finally, the Government argued that the injuries inflicted upon Mrs. King were

244

"overkill," since there were more injuries inflicted than were necessary to kill her. Tr. Vol. X-II at 24:21 (July 13, 2005).

Trial counsel only challenged one aspect of the Government's evidence in support of the statutory aggravator, arguing that the death of Mrs. King was not overkill because Mr. Fell did not necessarily know that he had inflicted more injuries than were necessary to kill Mrs. King, and moving to strike the aggravator on that basis. However, trial counsel failed to retain a forensic pathologist to investigate all of the other arguments and evidence the Government offered in support of the aggravator. Since the "heinous, cruel or depraved" aggravator was a gateway factor to qualify Mr. Fell for the death penalty, and proof of this factor also had the potential to inflame the jury and tip the scales in favor of death, it was objectively unreasonable for trial counsel to fail to investigate the Government's proof underlying this aggravator, and to prepare to challenge it. Rompilla, 545 U.S. at 380.

If trial counsel had conducted an adequate forensics investigation, they could have prevented this highly graphic and inflammatory evidence from reaching the jury because it was entirely unscientific and therefore had no probative value. Trial counsel also could have also successfully moved to strike the heinous, cruel and depraved aggravator because nearly all of the evidence that the Government offered in support of it was without foundation. And, even if the admission was received, they could have successfully countered it. There is a reasonable probability that the outcome of Mr. Fell's trial would have been different if the jurors had not been presented with such misleading and aggravating testimony and images or been presented with the effective response to them.

245

**A.** **The Government Presented Graphic Evidence in Support of the "Heinous, Cruel and Depraved Aggravator" that Could Have and Should Have Been Challenged by Trial Counsel**

      **1.** **Trial counsel should have challenged arguments regarding the earring.**

The Government argued in its opening statement that Mrs. King was "kicked so savagely" that "[o]ne of her earrings was found several feet away." Tr. Vol. V-I at 36:14-16 (June 27, 2005). To prove this argument, Special Agent Tally, who helped process the Dover Plains, New York crime scene, also testified that the "earrings were found on Mrs. King's right side, probably, right down around her mid-thigh area. Between three and four feet from her head." Tr. Vol. V-I at 64:25-65:2 (June 27, 2005). Special Agent Tally also showed the jurors multiple photographs, from multiple angles, of where the earring and post were recovered, and placed stickers on the photographs where the earring and post were found. Tr. Vol. V-I at 36:14-16 (June 27, 2005). Finally, the Government introduced the earring and post into evidence. Tr. Vol. V-I at 74:12-18 (June 27, 2005)

The Government never offered any evidence to support the inference that the distance of the earring from Mrs. King body was related to the force with which she was hit. Nonetheless, the Government's use of this evidence painted a highly disturbing picture for the jury. The Government made graphic use of the earring in closing to establish the heinous, cruel and depraved aggravator:

> You also heard from Special Agent Talley that an earring and a post from her was recovered even further from the body.
>
> If we could put up that photo just briefly.
>
> (Government's Exhibit 7A53 was displayed in open court.)
>
> MR. KELLY: Thank you.

246

> You remember the testimony. The earring and post were found even further from her body. What does that mean? That means either that the assault on Terry King began when she was standing up several feet from where she was found, and they were hitting her so hard that it literally was torn off, or that this was part of the further stomping in this case by the defendant, where again, she was hit so hard that that earring was literally driven off the side of her head.

Tr. Vol. XII at 23:12-24:2 (July 12, 2005).

Trial counsel should have been well aware that the government's proof on this factor was vulnerable to challenge. In Mrs. King's autopsy report, Dr. Baden noted that Mrs. King's "left earlobe shows an old earring perforation[,] but no earring is present," and "[t]he right earlobe is largely absent due to animal activity." Michael M. Baden, Autopsy Report of Teresca Ruth King, Dec. 2, 2000 (Ex. 65 at FELL-00001097). The government also admitted at trial that "[t]here was some soft tissue damage around [Mrs. King's] ears" from animal activity. Tr. Vol. V-I at 7:24 (June 27, 2005).

Despite the clear red flags that there was animal activity that might have disturbed the crime scene, counsel never challenged the Government's arguments regarding the earring as a matter of logic. In addition, they never hired a forensic pathologist to investigate the full extent of the animal activity, and what impact that might have on the Government's arguments regarding the evidence found at the crime scene.

If trial counsel had hired a forensic pathologist they could have shown that no logical inference could be drawn that the distance of the earring from the body had anything to do with the force from the kicking. Dr. Charles Wetli, a pathologist certified by the American Board of Pathology in anatomical, clinical, and forensic pathology, and the former Chief Medical Examiner of Suffolk County, New York, has opined in the declaration at Exhibit 306, that "the

247

displaced earring would also be the result of animal activity and not from any blunt force trauma."

Trial counsel also could have used this evidence in support of its argument to strike the statutory aggravator. The Government also used evidence of the distance of the earring from the body to argue to the Court that the aggravator should not be stricken. Tr. Vol. VI-II at 75:13-17 (June 29, 2005) ("Agent Talley's description of finding parts of the victim's earrings several feet away from her ear on the left side indicates violence or a struggle above and beyond the lethal blows we've already talked about."). Finally, even if the evidence had been received, the defense could have countered it.

### B. Trial Counsel Should Have Challenged Evidence Regarding the Teeth

The Government argued in its opening statement that, "as Terry lay on her back in Dover, her head was kicked so savagely that teeth were knocked out, later found on both sides of her body." Tr. Vol. V-I at 36:14-16 (June 27, 2005). To support this argument, Special Agent Talley testified that "One tooth was found to the left of Mrs. King, down by her, her left forearm. Another tooth was found above and on the right side of Mrs. King's head." Tr. Vol. V-I at 64:22-65:2 (June 27, 2005). To emphasize the distance of the teeth from the body, Special Agent Tally showed the jury multiple pictures, from different distances and angles, showing the distance of the teeth from the body, and placed stickers on photographs of the crime scene where the teeth were recovered for the jury to see. See Tr. Vol. V-I at 64:972:18 (June 27, 2005) (walking the jury through multiple photos depicting the distance of the teeth from the body, and placing stickers on the pictures where the teeth were located.).

Dr. Baden also testified that there were "teeth that were present nearby from blunt force trauma." Tr. Vol. V-I at 81:3 (June 27, 2005). And further:

248

> There were also separate impact injuries to the mouth area, because there were fractures of the upper jaw and the lower jaw, the mandible, with teeth that came out of the fracture sites. The teeth weren't broken as could happen with a punch. The top of the tooth can break. But these were teeth that popped out of their sockets, the tooth sockets after the bone was cracked. So, so that would be another stomping type injury.

Tr. Vol. V-I at 88:1-9 (June 27, 2005).

Had trial counsel conducted an adequate forensics investigate, they would have been able to prove that the distance of the teeth from Mrs. King's body had no probative value, as Special Agent Talley and Dr. Baden's testimony suggested.[72]

> Dr. Wetli has concluded:

> The force vector from stomping on a supine individual is front to back and the dislodged teeth from such an action would be displaced posteriorly into the throat. The fact that teeth were found in the foliage and debris some distance away from Ms. King is due to the animal activity (which was also evident on some of the facial structures such as the right ear and an injury to the left side of her forehead).

Decl. of C. Wetli (Ex. 306 at 3)

There is nothing in the evidence at trial that is inconsistent with or would have contradicted this evidence. Since this highly graphic evidence had no probative value, it would have been excluded before it ever reached the jury had the Court been presented with the facts and evidence readily available to the defense. The defense failed to present any of that information for the Court's consideration, leaving it without the essential information necessary to prevent the jury from receiving this inflammatory, prejudicial, and entirely irrelevant evidence. Armed with speculation that it would never have been able to put before the Jury had

---

[72] Trial counsel objected to the introduction of the teeth themselves as overly prejudicial, but never presented the Court with the information readily available to counsel that the Court should have been given to make that decision, never investigated the potentially aggravating use of the teeth, and never objected when a dramatically inaccurate picture of the teeth was presented. Tr. Vol. IV-I at 69:20-70:22 (June 24, 2005).

249

counsel conducted even a minimal forensic investigation, the Government harped upon this evidence in its closing statements to establish that the crime was heinous, cruel and depraved, and Mr. Fell qualified for the death penalty. The Government argued:

> [Y]ou also heard additional evidence in this case, and I apologize about being graphic, but this is the government's burden to prove this. You heard the testimony of FBI Special Agent Kevin Talley, and if we could show photographs which are Government's Exhibit 7A49 and 52.

> (Government's Exhibits 7A49 and 52 were displayed in open court.)

> These, ladies and gentlemen, are what were found once her body was removed. Whole teeth that had been kicked from her head…. You remember that Special Agent Talley actually told you where those teeth were found. One tooth was found on one side of her body, the other tooth on the other side of her body. What does that mean? That means that there were separate blows one way, and then another below the other way. They were so powerful that her teeth came out of her mouth whole.

Tr. Vol. XII at 22:17-23:10 (July 13, 2005).

In its rebuttal closing argument, the Government further emphasized the teeth, noting "they decided to beat her and stomp her, knocking whole teeth from her mouth." Id. at 14:13-14. The government then again reminded the jury that "the injuries to her mouth and the teeth coming out of her mouth, those were also consistent with the stomping type injury." Id. at 24:13-15. Pages later, the Government again returned to the argument. Finally, the Government asked the jury "[i]s there any question, ladies and gentlemen, that the defendant acted with indifference? Did he have to knock her teeth out?" Id. at 26:3-6.

This evidence was also used in support of the Government's argument to the Court that the statutory aggravator should not be stricken. The Government argued:

> And consistent with Fell's description of kicking the victim's head, and Dr. Bodin's description of a stomping on the victim's mouth, Agent Talley described locating the victim's teeth on both sides of

250

her body, one several feet away on her left side down by her forearm and the other above her head and to the right. The evidence both the teeth and the locations indicate severe blows to the victim's head, blows unrelated to the rock injury on her head and the neck stomping blows. In other words, gratuitous additional injuries.

Tr. Vol. VI-I at 75:1-12 (June 29, 2005)

> ### C. There is No Scientific Basis For the Government's Argument that 150 Pounds of Force Were Used to Kill Mrs. King

The Government noted in its opening, "You will hear that her throat was crushed by a boot pressing down on her neck with about 150 pounds or more of pressure." Tr. Vol. V-I at 36:16-18 (June 27, 2005). Dr. Baden later testified that there were 150 pounds of pressure. Dr. Baden was asked, "[D]rawing your attention to the significant injuries to the victim's neck that you described under the skin, in your view, about how many pounds of pressure were required to do that?" Dr. Baden responded:

> You need more – more than – more than 150 pounds of pressure; from various informations we have from examining dead bodies, that just leaning on the neck wouldn't be enough. There would have to be a forceful application of at least 150 pounds of pressure, because normally, for example, normally we see people hang themselves, and when people hang themselves, there's no fractures. Even though the person may weigh 200 pounds, and the head weighs about 12 pounds, so there's 190 pounds of pressure, it doesn't cause a fracture, but if that same amount of force were brought down with – that's why I use the term stomp – with a force, then that would cause a fracture. But not just the pressure itself. It's the focal, sudden application of that pressure.

Tr. Vol. V-I at 88:23-89:16 (June 27, 2005).

In arguing to the Court that the heinous, cruel and depraved aggravator had been satisfied, the inference the Government wanted the jury to draw from this testimony was clear. The Government argued that the amount of force used established that the stomping of the boot from Donald Fell "must have been the most dramatic injury imposed upon her." Tr. Vol. VI at

251

73:14-15 (June 29, 2005). The Government further argued, "Dr. Bodin [sic] testified that someone's boot stomped on King's neck with over a hundred and 50 degrees of pressure. Fell and Lee only weighed a hundred and 35 pounds. That means that one of them jumped on her." Tr. Vol. VI at 73:19-22 (June29, 2005).

Trial counsel never requested any information regarding the underlying basis for Dr. Baden's opinion, even though he only vaguely explained that he was relying upon "various informations we have from examining dead bodies." Tr. Vol. V-I at 89:3-4 (June 27, 2005). If trial counsel had consulted a pathologist, he could have explained.

> It has been asserted that about 150-190 pounds of pressure would be needed to cause the neck injuries found at the autopsy of Ms. King. This assertion is specious because there are no studies to substantiate this statement (for the obvious reason that one cannot subject humans to this type of trauma experimentally), and because the amount of force will vary depending on the age of the victim (young persons are more cartilaginous and elastic than older individuals where elastic cartilage has turned to bone and bone has become more fragile). The example that persons who hang themselves do not have such injuries despite their weight is absurd since hanging constricts the neck above the hyoid bone and thyroid cartilage cornua.[73]

Decl. of C. Wetli (Ex. 306 at 3).

There was thus no scientific basis for the Government's arguments that Mr. Fell stomped Mrs. King with 150 pounds of force.

## D.    There is No Scientific Basis For the Government's Argument that Mrs. King was "Killed Twice"

Dr. Baden testified that Mrs. King died from two official causes, "Blunt force injuries to the face, head and brain," and "compression of neck with asphyxia, inability to

---

[73]    See alsoDean Hawley, Death by Strangulation, *available at*http://www.markwynn.com/dv/Death%20by%20Strangulation%20-%20Dr.%20Dean%20Hawley.pdf ("Quantitation of the actual forces applied to the neck is not a meaningful argument.").

breathe." Tr. Vol. V-I at 90:20-21 (June 27, 2005). Dr. Baden also testified that "in evaluating the death, I included in the cause of death, my opinion as to the cause of death, is that she died both of the blows to the face, the injuries to the brain, and the injuries to the neck, because I think she was alive when most of those injuries were – were incurred." Tr. Vol. V-I at 89:20-25 (June 27, 2005).

From this testimony, the government argued that Mrs. King "was killed multiple times." Tr. Vol. XII at 25:14 (July 13, 2000).In its closing argument, the Government argued:

> Perhaps most importantly, what [Dr. Baden] told you was that there were actually two causes of death for Terry King. There was obviously the blunt trauma to her head, but then there was also the crushing of her windpipe and neck causing asphyxia. Asphyxia is that she couldn't breathe. She was actually killed twice.

Tr. Vol. XII, p. 224; 16-21 (July 13, 2000).

The government also argued to the Court in support of the aggravating factor:

> Bodin [sic] testified that King's injuries consisted of what he called overkill. He found two separate and independent causes of death. One, multiple blows to the head that fractured her skull and caused contusions to the brain, one of which was the rock blow to the bridge of her nose. And, two, traumatic compression or of stomping of her neck that caused asphyxia. They are independent. Either one of them would have killed her.

Tr. Vol. VI-II at 74:4-11 (June 29, 2005). The government further argued "even limited to the fatal injuries they were redundant. They were at least two fatal injuries."

As a matter of logic, it is impossible to be killed more than once. See DiSimone v. Phillips, 461 F.3d 181 (2d Cir. 2006) (citing People v. Dlugash, 41 N.Y.2d 725, 731 (N.Y. 1977) ("Whatever else it may be, it is not murder to shoot a dead body. Man dies but once.")). Moreover, if trial counsel had retained a forensic pathologist, they could have challenged the government's repeated arguments that Mrs. King was "killed twice" as a scientific matter. Tr.

Vol. X-II at 24:22 (July 13, 2005). Dr. Wetli has concluded that Mrs. King was not asphyxiated.

She died of only one cause, blunt force trauma from the rock:

> It should be noted that despite the neck injuries there is no evidence for asphyxiation: there was no aspiration of blood into the upper airway or lungs, and no petechiae of the eyes or eyelids from increased vascular pressure in the facial region. Fractures of the hyoid bone and thyroid cartilage cornua indicate a significant amount of force was applied to the neck but does not indicate anything more than a transient respiratory embarrassment. It does not indicate death by suffocation, and healed fractures of these structures may be seen on occasion at autopsy as an incidental finding of past non-fatal neck trauma. The autopsy revealed that the stomping and kicking did not inflict any lethal injuries to Ms. King, and therefore the cause of death is blunt craniocerebral trauma."

Decl. of C. Wetli (Ex. 306 at 2-3).

## 1. Trial Counsel's Failure to Investigate and Meet the Government's Proof on the "Heinous, Cruel or Depraved" Aggravator Was Objectively Unreasonable.

Trial counsel's failure to investigate the Government's proof in support of the "heinous, cruel and depraved aggravator" was objectively unreasonable. Trial counsel were well aware from the moment that the Government filed its Notice of Intent to Seek the Death Penalty on January 30, 2002 that the Government would seek to prove as one of the statutory aggravating factors to qualify Mr. Fell for the death penalty that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." Notice of Intent to Seek the Death Penalty, No. 2:01-CR-12, Dkt. No. 32 (D. Vt. Jan. 30, 2002). Trial counsel were thus under a duty to perform an adequate forensics investigation to prepare to meet any potential Government evidence on this factor. Yet, in the three-and-a-half years between when the Notice of Intent to Seek the Death Penalty was filed and trial, trial counsel never hired a forensic pathologist to examine the autopsy photos or crime scene photos or did anything else to anticipate or meet any of the arguments the

254

government might raise on this aggravator.  See Decl. of M. Sikirica (Ex. 300). This was professionally unreasonable.  See Rompilla, 545 U.S. at 380.

### 2.    Donald Fell was prejudiced by trial counsel's deficient performance

Mr. Fell was prejudiced by trial counsel's deficient performance because the jury heard several pieces of highly graphic, yet scientifically baseless evidence, to establish that Mr. Fell committed the crimes against Mrs. King in an especially "heinous, cruel or depraved manner."

> As the Court charged the jury:
>
> Heinous means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of serious physical abuse of the victim as to set it apart from other killings.
>
> Cruel means that the defendant intended to inflict a high degree of pain by serious physical abuse of the victim over and above that involved in killing her.
>
> Depraved means that the defendant relished – relished the killing, or showed indifference to the suffering of the victim as evidenced by the infliction of serious physical abuse.
>
> Especially means highly or unusually great, distinctive, peculiar, particular, or significant, when compared to other killings.

Tr. Vol. XII at 146:13-147:1 (July 13, 2005)

The jury unanimously voted in favor of this statutory aggravator.  Special Verdict Form (Ex. 209 at FELL-00002129).  The jury's vote on this statutory aggravator thus qualified Mr. Fell for the death penalty, even though nearly all of the evidence the Government submitted in favor of this factor was subject to challenge.  This evidence influenced the jury to believe that the Mr. Fell's actions were "extremely wicked or shockingly evil," that he "intended to inflict a high degree of pain… over and above that involved in killing her," or that Mr. Fell "relished the killing."  Tr. Vol. XII at 146:13-21 (July 13, 2005). The evidence presented on this factor was

255

also so disturbing and inflammatory that it inevitably influenced the jury to accord less weight to the mitigating factors presented.

Trial counsel's failure to conduct a forensic investigation was also prejudicial because the Court's decision not to strike the statutory aggravator was based in large part upon this unchallenged evidence. The Court issued an opinion denying Mr. Fell's challenge to the sufficiency of the evidence, and noted:

> Dr. Baden performed the autopsy of Mrs. King. He found that she had sustained a crushing injury to her neck, which produced extensive fractures of neck organs, the hyoid bone, the Adams' apple and the thyroid cartilage, with considerable hemorrhage into the soft tissue and muscles. This injury required more than 150 pounds of force to produce, and was consistent with being stomped by a boot. In addition she had sustained a severe blow to the bridge of her nose that produced extensive skull fractures and bruising of the brain. This injury was consistent with being struck in the face with a rock. There were also separate impact injuries to her mouth and jaw, sufficient to dislodge two of her teeth. One tooth was recovered near the left side of her body; one tooth was recovered to the right of her head.
>
> Dr. Baden's formal finding on cause of death was blunt force injuries to the face, head and brain and traumatic compression of the neck with asphyxia, due to homicidal assault. In his opinion, Mrs. King would have died from either the neck or brain injuries, and that she sustained more injuries than would have been necessary to cause her death.

Memorandum and Order, June 30, 2005, Dkt. No. 173 (emphasis added).

All of this evidence could have been challenged as a factual matter and it was not. Furthermore, the government could not rely on evidence that Mrs. King was hit by a rock to support the "heinous, cruel and depraved aggravator," because Bobby Lee hit Mrs. King with the rock, not Mr. Fell. Only the defendant's own actions can support the heinous, cruel and depraved aggravator. See United States v. Hall, 152 F. 3d 381, 415 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000) (rejecting defendant's

256

claim that jury instructions "invited the jury to consider the conduct of [defendant]'s coconspirators throughout the course of the kidnapping in concluding that the killing was 'especially heinous, cruel, or depraved,' because [t]he instructions accompanying the aggravating factor removed any doubt that the jury was required to focus on Hall's actions in determining whether this aggravating factor existed"); United States v. Sablan, No. 00-cr-00531-WYD, 2007 WL 4116117, *3 (D. Colo. Nov. 16, 2007) ("I agree with Defendant that this aggravating factor must focus on his actions, as compared to [codefendant]'s actions"). A reasonable forensic investigation would have therefore extinguished the majority of the government's proof on this aggravator. If trial counsel had conducted the most basic investigation, they also would have had a viable and successful means to prevent the jury from voting on the heinous, cruel and depraved aggravator in the first instance. Their failure to do so violated the Fifth, Sixth and Eighth Amendments to the Constitution.

To the extent the Government knowingly presented misleading testimony with no scientific foundation, the Government's misconduct also violated Mr. Fell's rights under the Fifth, Sixth and Eighth Amendments. Napue v. Illinois, 360 U.S. 264 (1959). Given the highly inflammatory nature of this evidence, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Wong, 78 F.3d 73, 81 (2d Cir. 1996).

## XI. Trial Counsel Were Ineffective for Failing to Investigate the Deaths of Debra Fell and Charles Conway, thereby Depriving Mr. Fell of Rights Guaranteed Him by the Fifth, Sixth and Eighth Amendments

The deaths of Debra Fell and Charles Conway at 135 Robbins Street on November 26, 2000, triggered the series of events leading to the death of Teresca King. Therefore, to contextualize and explain the death of Mrs. King, it was vital for trial counsel to investigate how and why the deaths of Ms. Fell and Mr. Conway occurred. Additionally, their

257

deaths were the subject of the aggravating factors "Mr. Fell intentionally killed or attempted to kill more than one person in a single criminal episode," Tr. Vol. V-1 at 23:1-3 (June 28, 2005), and "Mr. Fell participated in the abduction of Mrs. King to facilitate his escape from the area in which he and an accomplice had committed a double murder," Tr. Vol. V-1 at 23:8-11 (June 28, 2005). During both the guilt and penalty phases the government presented in graphic detail evidence and arguments relating to the Rutland crimes. The government presented this aggravating evidence to influence the jurors' perceptions of the crimes involving Mrs. King. Trial counsel thus had a duty to investigate the Rutland crimes. See Rompilla v. Beard, 545 U.S. 374, 388-89 (2005) (holding that trial counsel was ineffective for failing to make a reasonable effort to investigate evidence counsel knew the prosecution intended to introduce as aggravating evidence during sentencing).

Yet, trial counsel never did. They wholly failed to conduct a forensic or fact investigation into the events leading up to the deaths of Ms. Fell and Mr. Conway. As a result, they had no explanation for how or why those crimes occurred. Counsel told the jury during the guilt phase that:

> Something, something occurred at about one in the morning in that house at 135 Robbins Street in Rutland. Something occurred that caused Donnie Fell and Bobby Lee to snap, to pick up two knives and begin stabbing Debbie Fell and Charles Conway. We may never know what that was. We know about a complicated relationship with his mother. We know that he had been up there for several weeks trying to unite, and at times things were going well and at times things weren't going well, but there is no other evidence whatsoever that explains what that event or catalyst was. We just know what happened. We just know what happened.

Tr. Vol. XII at 74:16-75:2 (July 13, 2005).

Trial counsel also failed to conduct an adequate investigation into Ms. Fell's life in Vermont. Such an investigation would have uncovered crucial contextual information, such

258

as evidence of Ms. Fell's chronic substance abuse and violent tendencies. Trial counsel's failure to investigate the circumstances surrounding the deaths of Ms. Fell and Mr. Conway constituted deficient performance, and there is a reasonable probability that the outcome of Mr. Fell's trial would have been different if trial counsel had investigated and explained these deaths to the jury rather than leaving them wholly unexplained and allowing the government to create, without challenge, its own highly aggravating and inaccurate narrative.

> **A.   Trial Counsel Were Ineffective for Failing to Conduct a Reasonable Investigation of the Forensic Evidence of the Deaths of Debra Fell and Charles Conway**

Trial counsel never hired a forensic pathologist to look at the autopsy reports, autopsy photos, toxicology reports, or any other laboratory reports, or tissue samples or any other materials to analyze the circumstances surrounding the deaths of Ms. Fell and Mr. Conway. Trial counsel also failed to retain an expert to thoroughly analyze the Rutland crime scene and all forensic evidence collected from the crime scene, including DNA and other physical evidence. This fell below the standard of care in capital cases. The ABA Guidelines emphasize that capital defense counsel have a duty to thoroughly examine forensic evidence even when "circumstances appear overwhelmingly indicative of guilt." ABA Guidelines, Guideline 10.7, Commentary at n.201. Trial counsel's failure to investigate the Rutland crime scene was therefore objectively unreasonable.

Mr. Fell was prejudiced by trial counsel's deficient performance. If counsel had conducted an adequate forensics investigation, they would have discovered mitigating and exculpatory evidence about Mr. Fell's relative culpability in the Rutland murders vis-à-vis his co-defendant Mr. Lee, and also vis-à-vis Ms. Fell and Mr. Conway, who played a role in instigating these crimes.

259

Trial counsel did not have in their files many of the documents necessary to conduct an adequate forensics investigation of the deaths of Ms. Fell and Mr. Conway. Section 2255 counsel have requested access to all of these documents, including, but not limited to, autopsy photos and complete toxicology reports for Ms. Fell and Mr. Conway. However, the Rutland City Police Department ("RCPD") has repeatedly denied these requests. Section 2255 counsel have also asked on multiple occasions to review the physical evidence recovered from the Rutland crime scene and have repeatedly been denied access by the RCPD. Accordingly, § 2255 counsel will seek discovery of this evidence in a separate motion following the submission of this motion. Further, § 2255 counsel will amend this motion to include any additional claims arising out of such discovery, including, but not limited to, any potential claims that the Government has improperly withheld evidence relating to the deaths of Ms. Fell and Mr. Conway in violation of its Brady obligations. Brady v. Maryland, 373 U.S. 83 (1963).

**B. Trial Counsel were Ineffective for Failing to Investigate Critical Witnesses who Heard or Observed the Events at 135 Robbins Street on November 26, 2000**

Trial counsel also failed to conduct a fact investigation to locate critical witnesses who heard or observed the events at 135 Robbins Street on November 26, 2000. Trial counsel's failure to investigate this evidence was objectively unreasonable because it would have uncovered evidence that would have provided much needed context for the Rutland crimes, and thereby allowed counsel to counter the Government's aggravation case. See Strickland v. Washington, 466 U.S. 668, 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Mr. Fell was prejudiced by trial counsel's deficient performance. If trial counsel had conducted an adequate investigation, they would have located witnesses such as Ms. Fell's neighbor, Pat Johnson. Ms. Johnson overheard loud noises and arguments coming from 135

260

Robbins Street on the night of November 26, 2000, suggesting that an altercation triggered the

Rutland crimes. Ms. Johnson would have testified:

> On the night Debbie and Charlie died, it was very loud. I heard a lot of fighting and arguing. I heard both female and male voices get loud and angry with the yelling. There was a lot of thumping and it sounded like someone was playing the drums. It sounded like they were throwing things around. The slamming and banging noises and the yelling went on for hours. It sounded like someone was going to come through the ceiling. When it finally got quiet, I assumed that Debbie had gone to bed and the boys had either left or passed out.

Declaration of Pat Johnson, Mar. 8, 2011 ("Decl. of P. Johnson") (Ex. 271).

Ms. Johnson's account of the arguments and noises coming from 135 Robbins

Street strongly suggests that the Rutland crimes were triggered by a fight that lasted "for hours."

Id. Her account stands in sharp contrast to the picture the government presented at trial of Mr.

Conway and Ms. Fell as defenseless victims of an unprovoked attack. See Tr. Vol. V-I at 20:1

(June 20, 2005) (the government arguing that Mr. Conway and Ms. Fell were "defenseless

victims" who were "sitting nearly passed out in the living room when the attack occurred").

### C. Trial Counsel Were Ineffective for Failing to Investigate the Lifestyles of Debra Fell and Charles Conway in Vermont

Trial counsel also failed to conduct an adequate investigation into the lifestyles of

Ms. Fell and Mr. Conway in Vermont. While trial counsel had some police reports showing Ms.

Fell's encounters with the RCPD, they failed to obtain any of the many more which were readily

accessible. Trial counsel were aware that Ms. Fell had over fifty encounters with the Rutland

City Police Department, see RCPD Main Names Table for Deborah Fell, Nov. 30, 2000 (Ex. 58),

but their records show they possessed only nine of those police reports. The reports that counsel

did not request would have shown a chronic pattern of dysfunction in Ms. Fell's life, including:

violent encounters in which Ms. Fell was frequently the victim but also often the aggressor;[74] domestic disruptions and noise complaints;[75] and allegations of trespassing and attempted theft.[76] Trial counsel were objectively unreasonable for failing to develop this evidence. Ms. Fell was Mr. Fell's mother, and Mr. Fell's counsel could not understand who their client was and the circumstances he found himself in when he moved to Vermont without these records, much less explain those circumstances to the jury. To the extent that the government failed to disclose these reports to trial counsel, that failure also constitutes a Brady violation. See Brady v. Maryland, 373 U.S. 83 (1963).

Moreover, trial counsel failed to speak with readily available witnesses who would have testified that Ms. Fell was often violent when she was drinking and abusing drugs.

Florence Wallace, the sister of one of Ms. Fell's boyfriend, Louie Gilbert, the boyfriend with whom she moved to Vermont, would have testified: "One minute, Debbie was calm, but the next minute, she was snapping at my brother . . . She started screaming at him and throwing things at him." She also would have testified: "Both Louie and Debbie drank too much. When she was drinking, they fought. They had fistfights that got serious, and they hurt each other. Debbie threatened to kill Louie. Several different times, she threatened to stab him.

---

[74] See, e.g., RCPD Law Incident Tables, Nov. 6, 1996, Mar. 4, 1997, July 8, 1997, Sept. 16, 1997, Jan. 14, 1997 (Exs. 33, 34, 35, 36, 37, 38) (describing police involvement with Ms. Fell and her boyfriend for public drunkenness, disorderly conduct, fights, and domestic violence; noting that at times Ms. Fell and her boyfriend were so intoxicated that they were taken into custody because the police felt that they could be a danger to themselves or others; naming Ms. Fell as a person of interest in bar fights; and detaining Ms. Fell for drunk and belligerent behavior towards a police officer).

[75] See, e.g., RCPD Law Incident Table, Feb. 2, 2000 (Ex. 44) (describing an incident in which Ms. Fell started a fire because she forgot about items cooking on the stove); RCPD Law Incident Table, May 19, 1999 (Ex. 41) (noting several calls to the police from neighbors with noise complaints, and confiscation of drug paraphernalia from the apartment by the police); see also Ex. 298 (same)

[76] See, e.g., RCPD Incident Report, Jan. 4, 1996 (Ex. 30) (questioning Ms. Fell regarding a series of attempted automobile break-ins); RCPD Incident Report, Apr. 30, 1999 (Ex. 41) (issuing a notice of trespass to Ms. Fell for engaging in stalking behavior toward the ex-husband of a friend at the residence of a third party); RCPD Incident Report, Oct. 30, 1999 (Ex. 43) (describing how the police tracked down Ms. Fell at her apartment for her failure to pay for gas at the gas station).

262

She had a thing about stabbing people. Over and over again, when she and my brother had fights, she threatened to stab Louie. One time, she got into an argument in Wilkes-Barre. She thought someone stole something from her. She was furious and threatened to go stab them." Wallace would have further testified: "At one point, she did stab him really bad. He had to go get surgery on his arm after that. She sliced him up real bad." Decl. of F. Wallace (Ex. 250).

Sandra Shum, Ms. Fell's neighbor in the late 1990s, would have testified: "After she had been drinking, Debbie was often loud and aggressive, and she could be very mean. At times, she made a very big deal out of something small. She got in people's faces and made sure they listened to her. There were times when she would say very cruel things while intoxicated and then not remember what she had said the next day." Decl. of S. Shum (Ex. 266).

Tim Reynolds, Ms. Fell's boyfriend at the time of her death, would have testified: "Debbie was stubborn and at times got angry when she was drunk. It seemed like the smaller the deal, the madder she got. When she was drunk and angry, she threw things. One night, we had been drinking and she threw a glass object at me and it broke. I tried to leave the apartment, but she blocked the door so I pushed her out of the way and left. She called the police and alleged that I threatened her with a knife, and the police arrested me for domestic assault at a store down the street." Decl. of A. Reynolds (Ex. 275).

Witnesses would have also testified that Mr. Conway could be violent when drunk. Tim Reynolds' sister, Deborah Wisell, would have informed trial counsel: "Tim and I knew Charlie Conway and his sister Tina since we were young. Charlie was often drunk. At times he would joke, but I also saw him act violently when drunk. When my son was 7 or 8 years old, Charlie had been drinking at my house and verbally threatened my son. I kicked Charlie out of my house as a result." Declaration of Deborah Wisell, Mar. 6, 2011 ("Decl. of D.

263

Wisell") (Ex. 267). Tim Reynolds also would have testified about Mr. Conway's propensity for violence: "Sometimes things got out of hand when we were drinking. Once, we watched a karate movie, and Charlie started doing karate moves. We had been drinking and he hit me right in the face above my eye with a karate move. Another time, Charlie kicked a waste basket into Debbie, and it drew blood on her legs. I knocked him to the floor and told him never to do that again." Decl. of A. Reynolds (Ex. 275).

Witnesses could have also testified that Mr. Conway and Ms. Fell might have had a sexual relationship. Ms. Fell's boyfriend Tim Reynolds, who was one of Mr. Conway's lifelong friends, would have testified: "I heard Charlie make sexual comments to Debbie to front of me and his girlfriend Sara. It made me mad. Debbie told me had had done that a bunch of times." Id.

Tim Reynolds would have also testified about Ms. Fell's substance abuse: "Debbie and I bought beer every day, and there was always beer in our house. We also usually had pot. Our friend Jeff Van Buren came over and shared crack and pain killers including Vicodin or Oxycontin. I did powder cocaine with Jeff. When I first met Debbie, she owned a crack pipe and she sometimes smoked crack with Jeff. After Debbie smoked crack, I saw her become hyper. She started cleaning the bathroom and the dishes. Then, she started screaming because she spilled her beer in the bathtub. Jeff had a pill container that he could use to crush his pills into powder before we snorted them. Debbie and I both snorted coke with Jeff." Id. Dora Carter would have also testified: "I saw Debbie smoke crack more than once. She was living at Robbins Street at the time. She was smoking crack a lot of the time." Decl. of D. Carter (Ex. 269). Dora Carter also reported "Her son and his friend who came up, and Mr. Conway, all of them were smoking crack really bad. I saw it one time with all of them there." Id.

264

Trial counsel's failure to investigate the victims of the Rutland crimes, one of whom was Mr. Fell's mother, violated prevailing professional norms. See Rompilla v. Beard, 545 U.S. 374 (2005) (holding trial counsel ineffective for failing to make reasonable efforts to investigate evidence that counsel knew the prosecution intended to introduce during sentencing as aggravating evidence); ABA Guidelines, Guideline 10.7 ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); American Bar Association, Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993), Standard 4-4.1(a) ("Defense counsel should conduct a prompt investigation of the circumstances of the case."). This was especially true in light of the red flags raised by Ms. Fell's frequent contact with law enforcement and the fact that the relevant law enforcement reports were easily obtainable through public records requests. Moreover, police and FBI reports put trial counsel on notice of the existence of these witnesses who knew Ms. Fell and would have testified about her life. Trial counsel should have spoken to them, but failed to do so.

Mr. Fell was prejudiced by trial counsel's deficient performance. The jury never heard that Mr. Conway's aggression and Ms. Fell's substance abuse and her frequent instigation of violent encounters when she was under the influence contributed to what occurred at 135 Robbins Street on November 26, 2000. These records and witnesses help explain how Mr. Conway and Ms. Fell were killed after a violent encounter involving drugs and alcohol. In addition, the extent of Ms. Fell's dysfunction deeply affected her son, both as a child and when he reunited with his mother in Vermont for the first time after she abandoned him at the age of thirteen. There is a reasonable probability that the outcome of Mr. Fell's trial would have been different if the jury had been presented an accurate explanation of the events that led up to the

265

Rutland crimes. It was impossible to provide such an explanation without investigating the lives of the victims of the Rutland crimes, Ms. Fell and Mr. Conway. Mr. Fell was therefore deprived of his rights under the Fifth, Sixth and Eighth Amendments and is entitled to a relief from his sentence.

**XII.     Trial Counsel Were Ineffective for Failing to Investigate and Present a Diminished Capacity Defense, Thereby Depriving Mr. Fell of Rights Guaranteed Him by the Fifth, Sixth, and Eighth Amendments**

Trial counsel's unreasonable failure to investigate, prepare or present evidence of Mr. Fell's diminished capacity at the time of the offenses changed the outcome of the trial and therefore constitutes ineffective assistance of counsel.[77] The Second Circuit has specifically held that evidence of voluntary intoxication may be presented for the purpose of negating the intent element of a specific intent crime, United States v. Crowley, 236 F. 3d 104, 110-11 (2d Cir.

---

[77] SeeJacobs v. Horn, 395 F.3d 92, 105-106 (3d Cir. 2005), cert. denied sub nom.Jacobs v. Beard, 546 U.S. 962 (2005) (holding counsel ineffective for failing to utilize evidence in support of a diminished capacity defense when a psychiatrist consulted prior to trial was not provided with any background or social history information about petitioner (counsel had not investigated any), and was not told that petitioner was facing a capital trial, and upon receiving the expert's oral report that petitioner did not suffer from any mental defects, counsel investigated no further, and explaining that post-conviction investigation and evaluations revealed substantial evidence of childhood abuse and neglect, mild mental retardation, organic brain damage and schizoid personality disorder which combined to diminish petitioners capacity); Jennings v. Woodford, 290 F.3d 1006, 1013 (9th Cir. 2002) (finding ineffective assistance at guilt phase because counsel failed to prepare and present a mental-state defense when defendant had told the police that he was high on the night of the murder and had been "strung out on goddamn crank for over a year"); McCoy v. Hubbard, No. 19-16759, 2000 WL 1023208 at *2 (9th Cir. July 25, 2000) (finding counsel ineffective for failing to investigate or attempt to prepare or present a defense of diminished capacity, and noting that "[e]xpert testimony presented to the district court established that failure to investigate the defense and request a neurological evaluation constituted ineffective assistance and that, if counsel had pursued a diminished capacity defense, the likely outcome would have been more favorable to [petitioner]"); Brubaker v. Dickson, 310 F.2d 30, 38 (9th Cir. 1962); see also Draughon v. Dretke, 427 F.3d 286, 294-96 (5th Cir. 2005) (finding counsel deficient for failing to obtain a forensics report to substantiate defendant's testimony about bullet flight path when "failure to investigate the forensics of the fatal bullet deprived Draughon of a substantial argument, and set up an unchallenged factual predicate for the State's main argument that Draughon intended to kill"); Soffar v. Dretke, 368 F.3d 441, 471-79 (5th Cir. 2004)(finding counsel ineffective for failing to retain a ballistics expert who could have established that the crime scene was inconsistent with the defendant's confession, which was probably false); Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1255-58(W.D. Wash. 1994) (finding counsel ineffective for relying on defendant's admission of guilt rather than adequately investigating and hiring an independent ballistics or forensics expert to investigate inconsistencies between the defendant's story and the police report); Strickland v. Washington, 466 U.S. 668, 691 (1984) ("[Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

2000), and mental disease evidence may be presented for the same purpose, United States v. Dupre, 339 F. Supp. 2d 534 (S.D.N.Y. 2004). The Second Circuit has also recognized that the failure of trial counsel to present a diminished capacity defense can constitute ineffective assistance of counsel. See United States v. Diaz, 176 F. 3d 52, 113 (2d Cir. 1999); Stier v. United States, 871 F. Supp. 127, 130-32 (N.D.N.Y. 1994).

Not only did trial counsel unreasonably fail to present a diminished capacity defense or request a jury instruction on that subject, they unreasonably failed to investigate or present the wealth of available evidence regarding the effects of Mr. Fell's mental illnesses and intoxication on the night of the crimes. Owing to these failures, Mr. Fell was deprived of a powerful defense relevant to both his guilt and punishment. Trial counsel's failures also deprived the jury of powerful mitigating evidence. The jury never saw evidence that on the night of the crimes Mr. Fell suffered from a combination of severe intoxication and mental illness that rendered him unable to form the intent required to commit the crimes, evidence which clearly reduces Mr. Fell's culpability.

Furthermore, the failure to present a diminished capacity defense hindered the defense's effort to "frontload" mitigation evidence. These failures were unreasonable under prevailing professional norms. See ABA Guidelines, Guideline 10.7 ("A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); id. Guideline 10.8 ("A. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should: 1. consider all legal claims potentially available; and 2. thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and . . . B. Counsel who decide to assert a particular legal claim should: present the claim as forcefully as possible, tailoring the

267

presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction.").

But for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. Had counsel presented this evidence, the government would have been unable to prove that Mr. Fell possessed the requisite intent. And even if the diminished capacity defense had failed, with the benefit of the evidence of intoxication and mental illness at least one juror would have struck a different balance between mitigation and aggravation and Mr. Fell would not have been sentenced to death.

**A.    Trial counsel were ineffective for failing to present a diminished capacity defense based on available evidence**

Counsel's failure to present a diminished capacity defense, a defense relevant to the question both of guilt and of punishment, violated prevailing professional norms and therefore constituted inadequate representation. There was ample reasonably available evidence supporting such a defense – and counsel was aware of much of it – but they inexplicably failed to present or argue that evidence. Additionally, there were red flags indicating other evidence relevant to Mr. Fell's diminished capacity that trial counsel failed to investigate. Had counsel investigated, prepared and presented this evidence, the jury would have found that on the night of the crime Mr. Fell was affected by a combination of intoxication and mental illness that rendered him incapable of forming the mens rea for the specific intent crimes charged: carjacking and kidnapping.[78]   See United States v. Crowley, 236 F. 3d 104, 110-11 (2d Cir. 2000).

---

[78]    See SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS, INSTRUCTION 8-3, VOLUNTARY INTOXICATION ¶ 803 (1993) ("There has been evidence that the defendant may have been intoxicated at the time of the offense with which he is charged.

Although there was evidence in the record supporting a diminished capacity defense, counsel unreasonably failed to raise the defense or request an instruction on it. Evidence in the record shows that on the night of the crimes Mr. Fell's ability to form intent was compromised by severe intoxication and the effects of mental illnesses. Some of this evidence was presented to the jury but not argued. It included:

- Mr. Fell's statements on December 2, 2000 – introduced by the Government – that on the night of the crimes the occupants of 135 Robbins Street were "all kind of wasted, you know, pretty fucked up," Donald Fell Interview, Dec. 2, 2000, (Ex. 62 at FELL-00001041), and the remainder of the statement – which the jury did not hear – that he and Mr. Lee were using "[c]rack and a lot of alcohol. I drank quite a bit, and when I drink, I drink quick and I go through, well me and Bobby can only go through 24 beers in an hour, between the two of us. So when we get beer, we like to play a card game, flip a card and flip another card and then if the suits match or the numbers match, you got to drink that many beers and what not. Or that many sips of beer you know, So we would go through about 24 beers in an hour . . . we were pretty hammered you know," id. at FELL-00001077-FELL-00001078, and that he had "no idea" why he attacked Mr. Conway and that he didn't "really know what happened to lead up to what happened . . . . [A]ll I know I was standing over a dude and he had a cut throat," id. at FELL-00001041, and that after "sitting there drinking playing our card game . . . . I don't remember my way through the hallway, I don't really remember the first cut," id. at FELL-00001078;[79]

---

Intoxication or drunkenness in itself is not a legal defense to a criminal charge. However, intoxication or drunkenness may negate the existence of the defendant's intent to commit the crime that the government must prove in order to convict.
On the evidence before you, if you find that the defendant was intoxicated, you may conclude that the defendant did not have the required intent I described earlier. On the other hand, even if you believe that the defendant was intoxicated to some degree, you still may conclude that he was capable of having the required intent. After considering all of the evidence, if you find that the government has established each of the elements beyond a reasonable doubt, then you may find the defendant guilty. On the other hand, if you find the government has failed to meet this burden beyond a reasonable doubt, you must find the defendant not guilty.").

[79] While the government introduced Mr. Fell's statements, these particular passages were not introduced. Counsel could have introduced the remainder of Mr. Fell's statement under the Rule of Completeness. See FED.R.EVID.106; US v. Castro, 813 F. 2d 571, 576-577 (2d. Cir. 1987) ("Under this rule, the omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.") (citing United States v. Marin, 669 F.2d 73, 84 (2d Cir.1982); United States v. Rubin, 609 F.2d 51, 63 (2d Cir.1979), aff'd, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); United States v. Capaldo, 402 F.2d 821, 824 (2d Cir.1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969); FED.R.EVID.106 advisory committee note).

269

- Evidence of massive amounts of beer at the Rutland crime scene, which was littered with beer cans and other kinds of alcohol;[80]

- Statements of Anthony Mistretta, one of the witnesses who saw Mr. Fell and Mr. Lee just before they encountered Mrs. King, and who testified at trial, informed police officers that Mr. Fell and Mr. Lee appeared to be high;[81]

- Evidence that drug paraphernalia—two "hash/crack pipes"—were recovered from the car in which Mr. Fell and Mr. Lee were arrested, corroborating Mr. Fell's claims of heavy drug use;[82]

- Testimony that in the days after the crime Mr. Fell engaged in drug use with friends in Wilkes Barre, further corroborating Mr. Fell's claims of heavy drug use;[83] and

- Mr. Fell had a history of extensive drug and alcohol abuse, which corroborated his claims that he was intoxicated on the night of the offenses.[84]

---

[80]   Tr. Vol. I-II at 45:15-22 (June 20, 2005) ("Q. As you came into the apartment did you see a lot of beer cans? A. There was quite a few. I recall carriers or the 24 pack Budweiser carriers in the kitchen area. I believe there was three of those in the kitchen area. I recall seeing a 24 pack carrier that had beer cans in it in the bathroom. In the living room there was approximately 13 loose beer cans scattered around the living room area.").

[81]   See Tr. Vol. IV-I at 35:11-14 (June 24, 2005).

[82]   See Gov't Opp. Br. to Def. Mot. to Suppress Evidence and Statements, July 16, 2002 (Ex. 215 at FELL-00002201).

[83]   Tr. Vol III-I at 115:6-11 ("Q Just briefly, as they first came, what happened when they first arrived? A Just showed up and just basically we were all talking and stuff, and later in the night, him and Bobby started drinking and smoking a little weed with my brother, which we all pretty much did at the time.").

[84]   Tr. Vol VII-I at 88:20-89:7 (testimony of Teri Fell)("Q Did you ever see Donnie use any drugs? A Yes. Q And what is your first memory about how -- about how old or big Donnie was when that started? A He was very young when it started. Q Well, when you say very young, could you tell us about what grade he might have been or what grade you were in when that happened? A He was -- it was before he was in sixth grade so I would say probably fourth or fifth grade he started using. Q Okay. And what kind of drugs would he use? A Marijuana at that time."); Tr. Vol. VIII-I at 110: 8-15 (testimony of Ronald Barclay) ("A. He just, he um, talked to me about being friends with Robert Lee. Q. Was Mr. Lee also an inmate at the time? A. Yes. Q. Okay. A. And that they had grown up together. And um, alcohol and drugs was part of their life. And that's basically what he elaborated on most of it."); id. at 110: 20-25 ("Q. (By Mr. Volk:) Had he told you at all about the circumstances of the crimes themselves? A. Um, I don't think he went into -- I don't have a timeframe on this. I don't think he went into great detail at the time when he was in the Delta Unit of, other than he was under the influence and drugs."); Tr. Vol IX-I at 13:21-25 (testimony of Deanna German)("Q. And when does the report indicate that Donald Fell began -- how old was he when Donald Fell began abusing and using alcohol? A. He reported his first experience with alcohol occurred at the age of eight."); id. at 68, 19-69, 4 ("Q. And that reflects that the first time Donald Fell used alcohol may have been when he was eight, but he didn't start to regularly use alcohol until he was 13; isn't that what the document reflects? Yes or no? A. Yes, it does. Q. So that was after you were involved with Donald Fell that he began to regularly use alcohol; correct? A. At 13, yeah. That would have been after I was regularly involved. Q. So that reference to eight years old is to when he first tried it; is that right?"); Donald Fell Interview, Dec. 2, 2000 (Ex. 62 at FELL-00001077) (stating that he had

270

Other evidence supporting a diminished capacity defense was available, but defense counsel inexcusably never investigated or obtained it. That evidence includes:

- The statement of Mr. Mistretta that both Mr. Fell and Mr. Lee appeared to be drunk and high on crack just before the time they engaged in the carjacking;[85]

- Statements of Dora Carter that Mr. Conway, Mrs. Fell, and both Mr. Fell and Mr. Lee "were smoking crack really bad" at some point in the month before the night of the crimes; [86]

- Prison records establishing that Mr. Lee was using crack and other drugs around the time of the offense, during the week of November 22, 2000;[87]

- Statements from witnesses in Rutland that, at the time of the murders that immediately preceded the kidnapping and carjacking, there was loud music and the sound of men's and women's voices screaming and yelling for hours from the 135 Robbins Street apartment;[88]

- Other evidence from the crime scene;

- Evidence that Mr. Fell suffered from Fetal Alcohol Spectrum Disorder (FASD):[89] Counsel had at its disposal uncontroverted statements that Debra Fell consumed alcohol daily during her pregnancy, and childhood medical and school records demonstrating that Mr. Fell exhibited behaviors consistent with FASD. Counsel was constitutionally remiss in not putting on the expert testimony to establish FASD;[90]

---

"actually used angel dust, marijuana, mushrooms, . . . p[e]yote once, coke, pills, alcohol," crack, and speed).

[85] Declaration of Anthony Mistretta, Mar. 8, 2011 ("Decl. of A. Mistretta)(Ex. 268).

[86] Decl. of Dora Carter (Ex. 269).

[87] Mr. Lee's prison intake form contains a notation indicating that Mr. Lee was using marijuana and crack cocaine three weeks prior to the intake date– December 13, 2000 Correctional Healthcare Solutions, Inc., Receiving Screening Form, Dec. 13, 2000 (Ex. 109 at FELL-00001332 This provides crucial corroborating information about Mr. Lee's and Mr. Fell's drug use at the time of the crime and shows that while the Government argued at trial that Mr. Fell and Mr. Lee were not high leading up to and during the crimes, they had evidence about Lee's drug use during this period of the crimes. Id.; see Tr. Vol. IV-I at 69-70 (June 24, 2005).

[88] See supra Section XII.B.

[89] FASD is an umbrella term describing the continuum of permanent birth defects caused by organic brain damage resulting from the maternal consumption of alcohol during pregnancy. There were a number of red flags that should have alerted trial counsel to the need for an investigation into Mr. Fell's FASD.

[90] See supra, Section V.C.1

- Evidence that Mr. Fell suffered from mood disorder:[91] Mr. Fell's medical, psychiatric, and social services records, which counsel possessed, abundantly document symptoms indicating the presence of a mood disorder, including mood lability, impulsivity, impaired judgment, and acting out behavior. Counsel was constitutionally remiss in not putting on expert testimony on this issue;[92] and

- Evidence that Mr. Fell suffered from mental impairments due to his history of chronic, ongoing trauma:[93] trial counsel were aware that he suffered many traumatic experiences during his childhood and adolescence and that Mr. Fell exhibited marked symptoms of impairment due to chronic trauma, and they should have been aware that they needed to investigate the extent of Mr. Fell's impairment. Counsel was constitutionally remiss in not putting on expert testimony on this issue.[94]

Counsel failed to investigate or develop evidence of intoxication and mental illness that would have supported a diminished capacity defense. Had counsel conducted a proper pre-trial investigation, they could have gathered evidence verifying Mr. Fell's account that he and Mr. Lee had been drinking heavily and smoking crack the night of the crimes. Additionally, counsel failed to adequately investigate evidence of Mr. Fell's mental health issues. In the rush to cement the plea bargain, counsel failed to compile a full social history of Mr. Fell. Without a complete social history, counsel could not obtain constitutionally adequate expert opinions regarding Mr. Fell's mental health. Subsequently, in the years leading up to trial, counsel failed to pursue red flags raised in expert reports and Mr. Fell's records indicating that he suffered from a variety of mental illnesses. Had counsel conducted an adequate investigation, they could have developed and presented to the jury expert evidence that Mr. Fell suffered from a number of impairments, including FASD, untreated mood disorder, and

---

[91] Mood or affective disorders are a category of mental health problems that include depression and bipolar disorder. They are generally caused by chemical imbalances in the brain, and there is a strong genetic component to their onset.

[92] See supra, Section V.C.2

[93] Impairment from chronic trauma results from chronic, protracted exposure to interpersonal trauma (such as physical, emotional, or sexual abuse or domestic violence), and causes victims to develop uncontrolled adaptive behaviors to avoid the pain and fear of the triggering abuse.

272

impairments resulting from chronic trauma. These conditions, in combination with the drugs, alcohol, and the violent and chaotic scene the night of December 26, 2000, diminished Mr. Fell's ability to form the mens rea necessary to carry out the offenses for which he was convicted.

Trial counsel failed to present evidence of Mr. Fell's mental conditions, and in fact stipulated that Mr. Fell "did not suffer from any mental disease or defect" at the time of the crimes. See Stipulation Regarding Donald Fell's Mental Capacity, July 8, 2005 (Ex. 135 at FELL-00001413). Counsel argued that Mrs. Fell drank while pregnant, but they never told the jury the impact that had on Mr. Fell's brain development or behavior, allowing the Government to state in closing that "there is no evidence of fetal alcohol syndrome." Tr. Vol. XII at 119: 5 (July 13, 2005). Trial counsel also failed to present an expert who would testify that Mr. Fell suffered from mood disorder and suffered from both exposure to chronic trauma. Without an expert to explain how those past traumas impacted Mr. Fell's brain and behavior, the evidence of past trauma was essentially meaningless, especially in light of counsel's stipulation that Mr. Fell suffered from no mental disorders.

Mr. Fell's mental impairments—FASD, hereditary mood disorder, and impairments from chronic trauma—indelibly impacted his brain functioning and behavior on the night of the crimes. The interaction between any of these disorders is magnified by the presence of the other disorders, and alcohol exacerbates the effects of the impairments. See supra, Section V. These symptoms would have explained why Mr. Fell so readily followed Mr. Lee, who initiated the kidnapping and carjacking, see infra, Section IX, and show that he lacked the intent to commit the crimes. Furthermore, Mr. Fell dissociates as a symptom of his impairments due to trauma. See supra, Section V. Mr. Fell has no memory of the first stabbing in the Conway

---

94    See supra, Section V.C.3

murder, which is consistent with dissociation on the night of the crimes. See Donald Fell Interview, Dec. 2, 2000 (Ex. 62 at FELL-00001041); id. at FELL-00001078. All of these symptoms, in combination with Mr. Fell's drug use and consumption of massive amounts of alcohol on that night, rendered him unable to form the specific intent to carjack and kidnap Mrs. King.

This evidence shows that at the time of the crimes Mr. Fell was operating in a fog of alcohol and mental illness that rendered him incapable of forming the specific intent to commit the crimes of carjacking and kidnapping, intent that the Government was required to prove in order to convict Mr. Fell. There is a reasonable probability that if one or more jurors had heard this evidence the trial outcome would have been different.

**B.   Trial Counsel Were Ineffective for Failing to Present Evidence of Intoxication and Mental Illness During the Guilt Phase to Lay the Foundation For the Penalty Phase Mitigation Case**

Trial counsel's failure to provide the jurors with evidence of intoxication and mental illness violated prevailing professional norms because it severely undermined Mr. Fell's mitigation case. Furthermore, raising the diminished capacity defense during the guilt phase would have laid the foundation for the mitigation evidence presented in the penalty phase.

The defense offered as mitigating factors that "Donald Fell's capacity to appreciate his conduct was significantly impaired," Special Verdict Form (Ex. 209); Tr. Vol. V-I at 27:18-19 (June 28, 2005), and that "[a]s a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions," id. at 29:6-8. Nevertheless, counsel failed to utilize evidence of Mr. Fell's mental impairment on the night of the crime to provide support for these factors. Without this evidence, the jury could not engage in a nuanced evaluation of Mr. Fell's culpability on that night. It is all but axiomatic that degrees of guilt are determined by the juries' perception of culpability not just in the technical terms, but in layman's

274

terms. Evidence of intoxication and mental illness concerning Mr. Fell's lack of intent was directly relevant to whether he should have been sentenced to death.

Furthermore, the omitted evidence of Mr. Fell's intoxication and mental illness would have proved statutory mitigating factor 18 U.S.C. § 3592(a)(2). Section 3592(a)(2) provides that it is a mitigating circumstance that "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." Even if the evidence of Mr. Fell's intoxication and mental illness would not have constituted a diminished capacity defense, intoxication and mental illness significantly impaired his ability to "appreciate the wrongfulness of [his] conduct or to conform [his] conduct to the requirements of law." Trial counsel unreasonably failed to investigate and present evidence supporting this statutory mitigating circumstance.

Furthermore, trial counsel failed to use evidence of diminished capacity to lay the foundation for its penalty phase mitigation case. The ABA Guidelines emphasize that "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." ABA Guidelines, Guideline 10.11, Commentary. Because jurors in capital cases may eventually be called upon to assess whether some evidence mitigates the defendant's culpability, the standard of care in capital cases requires trial counsel to prepare the jury in the guilt phase to later consider mitigation evidence during the penalty phase.[95] Under this standard, Mr. Fell's counsel was bound, where possible, to establish mitigating themes during the guilt phase. However, instead of mounting a diminished capacity defense that would allow the defense to

---

[95] See Jesse Cheng, Frontloading Mitigation: The "Legal" and the "Human" in Death Penalty Defense, 35 LAW AND SOC. INQUIRY 39, 53 ("Frontloading is a practice whereby defense advocates conduct wide ranging sentencing investigations in search of information that can be strategically presented during the

275

introduce evidence concerning intoxication and mental illness—issues which were central to Mr. Fell's mitigation case—trial counsel effectively admitted all of the elements of the crimes in the opening statement.

Trial counsel's failures here were devastating to Mr. Fell at both the guilt and penalty phases, and his conviction and death sentence are due to be reversed.

### 1.    The Failure To Present A Diminished Capacity Defense Was Prejudicial

There is a reasonable chance that the outcome of the trial would have been different if trial counsel had raised a diminished capacity defense and presented evidence of Mr. Fell's intoxication and mental illness to the jury. The court explicitly recognized that counsel did not intend to raise a diminished capacity defense, and counsel agreed. See Tr. Vol I-I at 49:20-23 (June 20, 2005) ("if the requisite intent is not a defense, diminished capacity is not a defense, then you are essentially not asserting a defense. MR. BUNIN: Basically."). Without a diminished capacity defense, trial counsel was left to effectively concede all of the elements of the offenses. Had counsel recognized and presented a diminished capacity defense, they would not have made these concessions, which had a devastating impact both during the guilt phase and during the penalty phase.

> Even the Court was perplexed by counsel's approach. The Court noted:
>
> Not only did you acknowledge personal responsibility on behalf of Mr. Fell, … but you also then, as you described the offense, admitted to the essential elements of the offense. You went through the acknowledged killings of the first two individuals, and then you described the kidnapping process and, you know, it's true that the government has to prove its case, they probably will not rely upon your representations, but theoretically, if someone took your opening statement and looked at it point by point, and

---

guilt-innocence phase in a way that validates, and ideally reinforces, arguments presented at the penalty hearing.").

> compared it to the elements of the offense, one could logically conclude that you just made a judicial admission in regard to the elements of kidnapping or carjacking with death resulting. Now, technically I guess— well, I just—I don't see any elements which have not been admitted to.

Tr. Vol. I at 61:11-62:5 (June 20, 2005).

The Court then asked, "Why are we going through a guilt phase? Understand that mitigating evidence is to be introduced during the penalty phase, not the guilt or innocence phase, so that you really can't talk about aggravating and mitigating circumstances in the guilt phase. That's reserved for the penalty phase. Are we just going through an exercise?" Id. at 63:1-63:7. Trial counsel merely answered, "I don't know how to respond." Id. at 63:12. This exchange occurred only because counsel failed to present a diminished capacity defense to which its mitigating evidence could have been connected.

Furthermore, trial counsel's failure to investigate and present evidence of diminished capacity allowed the government to make unchallenged assertions that undermined Mr. Fell's claim that he showed remorse and, ultimately, his entire mitigation case before the jury. In its guilt phase opening, the government stated:

> In his statement, he repeated his story that he had no idea why he and Lee did the Rutland murders, even though they had acted together in that assault. He claimed that he couldn't remember things this time because he, his mother and Charlie had been smoking crack that night, something that the evidence in this case will show is false because as you will learn in this case, the autopsies of Donald Fell's mother, Debra Fell, and Charles Conway, proved that neither one of them was using crack that night, or any other illegal drug, for that matter. In fact, there's no evidence from the apartment at 135 Robbins Street of any crack use at all.

Tr. Vol. I-I at 38:23-39:10 (June 23, 2005).

Trial counsel could have effectively challenged this account if they had investigated and presented evidence of drug and alcohol use on the night of the crimes. Counsel

had, and had ready access to, ample evidence that Mr. Fell consumed large quantities of alcohol on the night of the crime, and it was unreasonable for counsel to fail to object here. Had trial counsel investigated the relevant evidence of intoxication and mental illness and mounted a diminished capacity defense, they would have been able to show that drug use was rampant on the night of the crime, undermining the government's narrative.

By unreasonably failing to present a diminished capacity defense in the guilt phase, counsel was precluded from introducing relevant and probative evidence in the guilt phase that also had mitigating value for purposes of the sentencing proceedings. There was no strategic reason for counsel to have failed to present a diminished capacity defense. Nonetheless, trial counsel attempted to introduce mental health evidence from Donny's life history that was wholly unconnected to any guilt phase defense.[96] In fact, counsel had no witnesses on its guilt phase witness list and no intention of eliciting any evidence to support these statements. Furthermore, the mitigation themes counsel tried to present were also the subject of a motion in limine by the Government seeking to prevent the defense from presenting mitigation evidence during the guilt phase, which was granted by the Court.[97]

Without an evidentiary basis for introducing the mental health evidence, the opening statement was repeatedly interrupted by sustained objections from the Government. The Court explained to trial counsel that "[t]he defense is supposed to be limited to introducing your client. I am going to let you do that, but you can't go through various mitigating facts that you

---

[96]   See Tr. Vol. I-I at 45:20-46:1 ("Donald Fell was born to Debra Fell, and at the age of five, they left him with a man who repeatedly sexually abused him and his two-and-a-half-year-old sister. That same month, after that, Debra and Donald Fell, Senior, got into a fight where they stabbed each other-- MR. KELLY: Objection, your Honor.").

[97]   United States' Trial Memorandum, June 17, 2005 (Ex. 130 at FELL-00001393-94); see Tr. Vol. I-I at 50:4-13 (June 20, 2005) ("MR. KELLY:   Judge, I believe this is directly the subject of our motion in limine pretrial. THE COURT:   It is. I am going to let you just finish up this area in a really brief way. MR. BUNIN:   Okay. THE COURT:   But you can't go through all of the mitigating evidence. MR. BUNIN:   No, I am not. THE COURT:   You have to stop.").

do not intend to introduce during the course of the guilt phase. This is way beyond just introducing the defendant." Tr. Vol. I-I at 51:2-7 (June 20, 2005). Trial counsel therefore had to change course midway through the opening statement, leaving everyone in the courtroom confused—including the jurors—and divesting the statement of a cohesive narrative about Mr. Fell or his defenses.

Furthermore, the record suggests that trial counsel intended to introduce evidence of Mr. Fell's intoxication and mental illness on the night of the crimes as mitigation in the penalty phase, but that never occurred. It is no surprise that no jurors found the mitigating circumstance that Donny's "capacity to appreciate his conduct was significantly impaired." Special Verdict Form (Ex. 209). This is a crucial mitigating circumstance in a case like this, and trial counsel's failure to present any mitigating evidence changed the outcome of the trial. Had the jury been presented with such evidence, there is a reasonable probability that the outcome of the trial would have been different.

## XIII. Trial Counsel Were Ineffective for Failing to Interview and Present Numerous Readily Available Witnesses Who Could Support the Mitigation Factor That "Donald Fell's Execution Would Detrimentally Affect Persons Who Care About Him"

Trial counsel offered as a mitigating factor, "Donald Fell's execution would detrimentally affect persons who care about him." However, counsel failed to investigate and present readily available witnesses who could offer compelling evidence in support of this mitigation factor to humanize Mr. Fell to the jury. It was ineffective assistance to present this mitigating factor to the jury and then ineffective assistance not to use readily available evidence to support it.

The Court ruled that trial counsel could present evidence regarding the impact Mr. Fell's execution might have on third parties because, "[t]hird party impact testimony may shed

279

light on Fell's background and character by providing testimony about any 'positive qualities,' 'his capacity to be of emotional value to others,' and the nature of his interpersonal relationships." Memorandum and Order at 4-5, No. 2:01-CR-12, Dkt. No. 180 (July 7, 2005). On the record the day prior to that ruling, the Court informed counsel that Mr. Fell would have "a wide area in general to introduce testimony later on from family members, from people who knew him, had a relationship with him." Tr. Vol. XIII-1 at 19:23-20:1 (July 6, 2005).

Despite this opportunity, trial counsel only presented one witness to speak to this factor, Donny's teacher at the prison, who gave only a tepid response that she tries "not to develop a fondness for any of [her] students" but that she was "enthused" with Donny's progress, energy and interest. Tr. Vol. XIII-1 at 80:15-24 (July 6, 2005). She then agreed on cross that she "put[s] up a wall or a fence" between her and the individuals that she teaches. Id. at 93:20. The only other witness trial counsel attempted to present to establish this factor was Sharon Hinchey, Donny's kindergarten teacher, but the Court ruled that she was too distant from Donny to have a connection with him that would rise to the level of execution impact evidence. Id. at 19:23-20:5.

Trial counsel did not even ask Mr. Fell's sister, Teri Fell, whether Mr. Fell's execution would impact her. See generally, Tr. Vol. VII-1 at 75:25-162:14 (July 1, 2005). This failure was either inadvertent or the product of a misunderstanding of Teri Fell's ability to convey her close relationship, affection, reliance and emotional dependence on her brother. Tr. Vol. XII at 110:23-25 (July 13, 2005) (In closing, counsel attempted to explain: "Everyone who testified will miss him. And blame – and blame me for not – for not breaking Teri down. Blame me for that. She's dysfunctional."). Trial counsel's failure to support this mitigating factor with

280

readily available, compelling testimony, constituted deficient performance.  See Rompilla v.

Beard, 545 U.S. at 387.

Trial counsel's deficient performance in failing to investigate and present

witnesses to demonstrate the detrimental impact of Mr. Fell's execution on those close to him

clearly prejudiced Mr. Fell.  Due to the dearth of evidence supporting this mitigating factor, the

Government was able to argue in summation:

> Let's go to the next one: Donald Fell's execution would
> detrimentally affect persons who care about him.  There's no real
> evidence about this factor.His own sister testified.  His half sister
> testified.  There were no other family members. No other people
> close to him who came and testified about this factor.None.Ah,
> there was one person who testified about this. The educator at
> Northwest Correctional Facility.  She spent an hour a week with
> him for a year and a half to two years helping him get his G.E.D.,
> and in her own words, she walled herself off from everything else
> that he had ever done. That's the only testimony on this, ladies and
> gentlemen, respectfully.  This is demonstrably clearly not proven.

Tr. Vol. XII at 49:10-23 (July 13, 2005)

Not surprisingly, only three jurors voted that any such impact would be felt.

Special Verdict Form (Ex. 209 at FELL-00002135, FELL-00002138).

Had trial counsel developed a relationship with Teri Fell or even spent adequate

time with her, and asked her about the role her brother played in her life and continued to play

while in prison, she would have been able to show the jury just how much she loves and depends

on Donny.  Unfortunately, according to Teri Fell, trial counsel "didn't seem interested."  Decl. of

T. Fell (Ex. 278 at 30).  If trial counsel had asked, Teri Fell would have testified:

> If my brother were to ever be executed, that would kill me. He is
> all I have left of my family.  I can't even explain how much he
> means to me.  I can't even put it into words. He is the only person
> who knows what I have been through, because he was right there
> with me.  He looked out for me throughout my life, when no one
> else did. Even now, he is a better support to me than anyone else

281

> in my life. We have stayed in contact through letters all these
> years. I have written to him, telling him about my struggles as a
> single mother of two girls. I'm so afraid of being like my mother,
> or even worse, being like my Aunt Jackie, toward my children. I
> try so hard to be totally different than they were. I try to be calm
> and understanding with my girls. I try not to blow up at them and
> raise my voice, because I know what it was like to be screamed at
> and belittled as a child. Donny's letters build me up and make me
> feel better. He tells me that I'm a great mother despite not having
> been parented right as a child. I need my brother even though I
> understand that he will spend the rest of his life in jail. I've been
> through a lot and I can't lose another family member.

Id. at 30-31.

If trial counsel had asked Robert Fell, Donny's half-brother who suffered at the

hands of the same violent, alcoholic father, he also would have testified:

> I am very concerned about my half-brother, Donny. I think about
> him a lot and I really don't want to see him killed. I haven't seen
> him for a long time, but he is still a part of me.

Decl. of R. Fell (Ex. 247 at 4).

Janice Stoss was one of the foster children who lived with Theresa Sharpe for

three to four years as a child and again later as an adult. Decl. of J. Stoss (Ex. 274 at 1, 2). She

got to know Donny during those early years because he and Teri would come to stay with them

when the fighting between Don Sr. and Debra got too bad for them to handle. Id. at 1. Janice

was never interviewed by the defense, but she was available. She would have been able to tell

the jury about the terrible childhood that Donny had, and that she identified with Donny because

her life living with Theresa and Jackie was also very abusive. Id. at 2-3, 6. Later, after Janice

left her placement with Theresa, she stayed in contact with the family and eventually moved

back in when she was 18 because her mother was kidnapped, raped, and murdered. Id. at 2. She

was pregnant at the time, and had nowhere to go, so she returned to live with Theresa and Jackie

for a few months. At the time, Donny and Teri were living on the other side of the house. Janice

282

witnessed first-hand the beatings and emotional abuse doled out by Debra to her children. She also saw this pattern continue when Jackie obtained custody of Donny and Teri. Id. at 3-4.

Janice Stoss would have testified:

I feel bad for Donny. I hate what he did, because my mother was killed, and I still hurt about it. Donny went through something similar to what I went through as a child, maybe worse than what I went through. If Donny were to be executed, I would be very upset, and very sad. It would affect me for the rest of my life.

Id. at 6.

Alan "Tim" Reynolds, Debra's boyfriend in Vermont who was in jail at the time that she was killed, was also available and would have also provided powerful testimony on behalf of Donny – had he been interviewed. As set out in his attached declaration, Tim clearly loved both Mrs. Fell and Mr. Conway and wishes that he had been in the house that evening to prevent their deaths. Despite the fact that these two victims were "two of the closest people [he's] had in his life," Tim would have testified that:

I have thought about their deaths a lot over the years, and I came to the decision that I don't want to see Donny be executed. I think that Donny should remain in prison for the rest of his life. I strongly believe that is what Debbie would have wanted. She would not have wanted her son put to death because of this.

Decl. of A. Reynolds (Ex. 275 at 8-9). Tim was questioned by the Rutland Police and spoke to the FBI after Donny's arrest, but he was not contacted by anyone representing Donny prior to 2010. Id. at 9. He was readily available in Rutland prior to trial, but no one from the defense team thought it important to speak with the man closest to Debra while she lived in Rutland.

A powerful witness to Donny's character was sitting right in the courtroom during the entire trial, but trial counsel never interviewed him to determine why he cared enough about Donny to attend trial nearly every day. As set out supra in the discussion of trial counsel's

283

failure to investigate and present evidence regarding Mr. Fell's time in pre-trial detention, Steve Ratte has been a Deacon with the Catholic Church for 28 years. See also Decl. of S. Ratte (Ex. 255 at 1). After learning of Donny's request that services be conducted for federal inmates, Deacon Ratte began meeting with Donny on a weekly basis for one-on-one sessions. He continued to meet with Donny regularly for several years before the trial began. During this time he baptized Donny, and the two still keep in touch.

Deacon Ratte and Donny developed a friendship over these meetings. Donny was just a few years younger than Deacon Ratte's children, and Donny took an interest in Deacon Ratte's family. Deacon Ratte would have testified that over the course of these conversations he learned that Donny cared for other inmates, and for how they were being treated, and that Donny never sought to deflect blame or make excuses for his crimes. Deacon Ratte would have testified that:

> One thing that struck me was that Donny never made any excuses about his crimes. He never blamed drugs or alcohol or other problems in his past, as some prisoners do. He did not want pity. He just wanted someone to care about him. It took a while for Donny to trust me, and for him to learn that I was not going to abandon him because of his crime, but eventually, he started to trust me and opened up.

Id. at 2.

As Deacon Ratte acknowledges, it would have been emotionally very difficult for him to testify because he had grown very fond of Donny, but he would have offered moving testimony if trial counsel only turned around and asked him. Id. at 3. The jury never learned what an impact Donny's death sentence would have on Deacon Ratte, who explained to post-conviction counsel:

> On the night Donny was sentenced to death, I went to visit him. We were in a holding cell together, and I became very emotional

284

> about the sentence. Donny was more composed, and he tried to console me. He was very concerned about maintaining control and not letting his emotions show. This is something that he developed over time to protect himself.

Id.

Instead of this and other compelling testimony from people who were a part of Donny's life and whom counsel would call at a hearing about how they would be impacted by his execution, the jurors heard from only one witness who barely knew Donny. The declarations quoted here merely scratch the surface of similar testimony available at the time that trial counsel did not pursue. It is clear that had they attempted to interview the broad array of family and friends who care deeply about Donny, the jury would have had a dramatically different picture of Donny's positive qualities and the emotional value he brings to others. With this information, it is highly likely that the jury would have concluded that Donny's life was worth preserving, shifting the balancing of aggravating and mitigating factors to reach a different verdict. Trial counsel's failures to investigate therefore violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights and entitle Mr. Fell to a reversal of his death sentence.

## XIV.    Trial Counsel Were Ineffective for Stipulating To and Failing to Object To the Admission of Highly Inflammatory and Prejudicial Evidence Offered By the Government, in Violation of Mr. Fell's Fifth, Sixth, and Eighth Amendment Rights

Trial counsel repeatedly failed to object to inflammatory evidence that was so minimally probative, or altogether irrelevant, that it could have been excluded or, at the very least, limited in its use by the Government.

### A.    Trial Counsel Were Objectively Unreasonable for Stipulating To the Admission of a Slayer T-shirt, Which was Highly Inflammatory and Minimally Probative

Trial counsel unreasonably stipulated to the unrestricted admission of a t-shirt belonging to Mr. Fell that depicted the logo of and imagery relating to the heavy metal band

285

"Slayer." The t-shirt was published to the jury on the first day of trial, when the jurors were forming their initial impressions of Mr. Fell.[98] The Government again referenced the t-shirt during the guilt phase closing, describing it as "a T. shirt that says Slayer on it and a T. shirt that otherwise speaks for itself." Tr. Vol. IV-I, at 55:16-56:1 (June 24, 2005) (referring to "Donald Fell's T. shirt").

Slayer is a popular rock band, particularly among members of Mr. Fell's demographic.[99] Unfortunately, the term "slayer" also means "one who slays."[100] The Slayer t-shirt was extremely prejudicial given the nature of the Rutland crimes, which involved stabbings, and because the t-shirt depicted a large, horned demon:



---

[98]    Ex.13A stipulates that on November 30, 2000, Mr. Fell and Mr. Lee were transported to an Arkansas detention center where they were processed and detained. While there, the prison authorities "took the clothing and footwear worn by both men," including Ex.2B, the "black T. shirt" "worn by Donald Fell at the time." Their clothing and footwear were entered into evidence and "was later submitted to the FBI laboratory for forensic examination including DNA testing…and other testing." Tr. Vol. II at 6:10-7:11 (June 20, 2005).

[99]    See Slayer, WIKIPEDIA.COM, *available at* http://en.wikipedia.org/wiki/Slayer. Since Slayer was formed in 1981, it has been nominated for five Grammys, winning two. See also K. B. Hanlon, Inside Shock Music Carnival: Spectacle as Contested Terrain, 30 CRITICAL SOCIOLOGY 743, 779 (2004) (explaining that heavy metal appeals most to the demographic comprised of young white lower middle class white males).

Ostensibly, the Government introduced the t-shirt to tie Mr. Fell to the Dover Plains crime scene by asserting that a fiber found on a tree at the crime scene could have come from the black fabric of the t-shirt. However, the t-shirt had minimal if any probative value on this question because Mr. Fell confessed to being at the crime scene, and the defense did not contest his presence there.[101] Considering the prejudicial nature of the t-shirt, which "speaks for itself," trial counsel could have successfully moved to exclude the t-shirt under Federal Rule of Evidence 403, or limited its use. Certainly, it should not have stipulated to its unfettered admission for all purposes and publication to the jury.

Furthermore, the fiber evidence that purportedly tied Mr. Fell's t-shirt to the Dover Plains crime scene could have been challenged because it had questionable relevance and lacked forensic value. Under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), expert scientific and technical testimony is inadmissible unless it is relevant to the case before the court and rests on a reliable foundation. Amorgianos v. National RR Passenger Corat, 303 F. 3d 256, 259 (2d Cir. 2002) (citing Daubert, 509 U.S. at 579). The fiber evidence was irrelevant because the government elicited testimony that Mr. Fell was wearing a blue hooded pull-over sweatshirt over his t-shirt during the crimes, and therefore his t-shirt would not have been exposed at the Dover Plains crime scene, particularly since it was late November. Tr. Vol. III-1 at 95:20-21 (June 23, 2005); Donald Fell Interview, Dec. 1, 2000 (Ex. 61); see also Supporting Deposition of Michael S. Leight, Dec. 2, 2005 (Ex. 303) (testifying regarding interactions with Robert Lee Jr. and Donald Fell Jr. at Burger King in Pawling, New York). There is therefore no basis in logic for the conclusion that

---

[100]    Webster's Third New International Dictionary, 2140.

[101]    Old Chief v. United States, 519 U.S. 172, 184 (1997) ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives.").

this fiber evidence tied Mr. Fell to the crime scene. Moreover, according to an FBI publication, "the matching of common fibers . . . [is] less significant."[102] The fibers in black concerts t-shirts are very common, so the forensic value of the evidence to establish Mr. Fell's presence at the crime scene was minimal. Additionally, the crime scene was a public shooting range,[103] so the common fiber could have originated from any of the people who traversed the scene before or after King's death. Trial counsel therefore should have objected to the admission of the fiber evidence because of its tenuous forensic value, particularly since it was introduced to establish a fact that was not contested at trial, so it was not probative evidence on a disputed issue before the Court.."). Furthermore, the defense's unreasonable failure to challenge this unreliable scientific evidence—one instance in a pattern of unreasonable failures to object to the Government's forensic evidence[104]—effectively bolstered the perceived strength and reliability of the Government's case as a whole, when it was frequently unreliable.

Trial counsel's stipulation to the introduction of this inflammatory evidence was objectively unreasonable. See Cuadra v. Sullivan, 837 F. 2d 56, 59 (2d Cir. 1988) (finding it

---

102    Douglas W. Deedrick, *Hairs, Fibers, Crime, and Evidence, Part 2: Fiber Evidence*, FORENSIC SCIENCE COMMUNICATIONS (July 2000), *available at* http://www2.fbi.gov/hq/lab/fsc/backissu/july2000/deedric3.htm; see also MAX M. HOUCK, TRACE EVIDENCE ANALYSIS: MORE CASES IN MUTE WITNESSES 142 (2004) (stating that common fibers "have limited value for association purposes in most situations").

103    See New York State Police Investigation Report, at FELL-00001086 (Ex. 63)(noting that "[o]n 12/01/00, Senior Investigator Gary Mazzacano advised Senior Investigator Arthur Wilson" that Fell and Lee "mentioned a pull off with some type of shooting range set up" and Mazzacano "located an area off ST 22, in the Town of Dover, that is an open area and is a make shift shooting range" where "a deceased female subject was located").

104    For example, the defense failed to challenge lengthy, unnecessary and unreliable "forensic" testimony comparing the foot prints found at the Dover Plains crime scene to the boots worn by Mr. Fell and Mr. Lee. Tr. Vol. III-I, at 43:23-44:8 (June 23, 2005). A comprehensive study conducted by the National Academy of Science, has cast significant doubt on the validity and authority of boot print matching. NAT'L RESEARCH COUNCIL, COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIENCES CMTY., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 149 (National Academies Press 2009). In addition, trial counsel failed to object to the government's exaggerations about the certainty of the DNA match between the blood found on Mr. Fell's shoes and Mrs. King's blood. Tr. Vol. III-II, at 17:2-14; 19:4-20:2 (June 23, 2005); see also supra the section discussion the heinous, cruel, and depraved aggravator

288

likely that trial counsel's failure to object to prejudicial evidence "fell below an objective standard of reasonableness") (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)). Additionally, the ABA Guidelines provide that "[c]ounsel should object to anything that appears unfair or unjust." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8 Commentary at n. 231 (2003).

Mr. Fell was prejudiced by trial counsel's deficient performance because this inflammatory evidence improperly influenced the jurors' perceptions of Mr. Fell's character and his motives for the crimes on the first day of trial when they were forming their opinions about Mr. Fell. In fact, the Government has admitted that it introduced the t-shirt to establish that Mr. Fell had an "obsessive interest in Satanism." Br. of the United States on Appeal from the United States District Court for the District of Vermont, May 25, 2007 at FELL-00001662-64 (Ex. 140). Appellate Counsel for Mr. Fell did not challenge the introduction of the Slayer t-shirt on appeal because it was the subject of a stipulation, but in appealing similar evidence, discussed below, the Government argued, "Fell's obsessive interest in Satanism was vividly displayed on his body and his clothes during the crime." Id. at 169, n.45. The Government thus recognized that the t-shirt was inflammatory and introduced the t-shirt to communicate to the jury that Mr. Fell was a killer and a Satanist. Had trial counsel excluded or limited the use of this evidence, there is a reasonable probability that at least one juror would have struck a different balance and Mr. Fell would not have been sentenced to death. Trial counsel's deficient performance thus violated Mr. Fell's rights under the Fifth, Sixth and Eighth Amendments. The Government's introduction of this evidence also violated Mr. Fell's First Amendment rights. Dawson v. Delaware, 503 U.S. 159 (1992) (The First Amendment "prevents [the government] from employing evidence of a

289

defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried

**B.    Trial Counsel Were Ineffective for Failing to Object to the Introduction of Testimony about Satanism and a 666 Tattoo, in violation of Mr. Fell's Fifth, Sixth, and Eighth Amendment rights.**

The Government also elicited testimony from Mr. Fell's sister, Teri Fell, that Mr. Fell had a 666 tattoo and had joked about Satan when he was 16. During cross examination of Teri Fell, she described Mr. Fell's tattoos—"an upside down cross with 666[.]And on his right arm he has got an anarchy sign." Tr. Vol. VII-I, at 144:19-21 (July 1, 2005). (She also mentioned that Mr. Fell had joked years before the crimes about Satan being "the kindest beast" (a Slayer lyric).Id. at 144:7-9. Trial counsel did not object and thus the Court never had an opportunity to rule on the issue.

Later, the Government persisted in asking about Mr. Fell's tattoo, and the defense expert James Aiken stated on cross-examination that the 666 tattoo "denotes possible involvement in some type of relationship with an organization. I will leave it at that because I have not dwelled into that from the intelligence reports."[105] Trial counsel did not object to this testimony either.

It was objectively unreasonable for trial counsel to fail to object to this testimony. It is well settled that the First Amendment "prevents [the government] from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." Dawson v. Delaware, 503 U.S. 159 (1992). Mr. Fell's tattoos and his joke to his sister about Satan years before the crimes had no bearing on the issues before the

---

[105]    Tr. Vol X-I, at 30:25-31:6 (July 8, 2005) ("Q.   And do those tattoos have any significance to you? A. Everything has significance. Yes, sir. Q.   What's the significance of the 666 tattoo? A.   Well, the 666 denotes possible involvement in some type of relationship with an organization. I will leave it at that because I have not dwelled into that from the intelligence reports.").

290

Court, and it was therefore objectively unreasonable for trial counsel not to object, ask that the questions be stricken, or ask for a curative instruction. See Cuadra, 837 F. 2d at 59.

Trial counsel's failure object to this evidence prejudiced Mr. Fell. Appellate counsel for Mr. Fell challenged the introduction of this evidence on appeal. The Second Circuit stated that it was "troubled by the testimony that the government elicited regarding Fell's satanic beliefs and tattoos" because "[w]hile evidence of the defendant's abstract moral beliefs may in some cases be constitutionally admissible to show motive . . . there must be stronger evidence of the connection than occurred here and it was a mistake for the prosecutor to offer the evidence." US v. Fell, 531 F. 3d 197, 230 (2d Cir. 2008) (citing US v. Kane, 452 F. 3d 140, 143 (2d Cir. 2006)).Nonetheless, since trial counsel failed to object, this evidence was considered under the onerous plain error standard, and the Second Circuit concluded that the introduction of the evidence did not constitute plain error. This failure to object and failure to preserve the issue for appeal prejudiced Mr. Fell.

Furthermore, particularly when coupled with the introduction of the Slayer t-shirt, this objectionable evidence achieved its intended effect of influencing the jury to believe that Mr. Fell had an interest in Satan and this motivated his crimes and defined his character. There is a reasonable probability that at least one juror would have struck a different balance and Mr. Fell would not have been sentenced to death. Trial counsel's deficient performance thus violated Mr. Fell's rights under the Fifth, Sixth and Eighth Amendments. The Government's introduction of this evidence also violated Mr. Fell's First Amendment Rights. Dawson v. Delaware, 503 U.S. 159 (1992) (The First Amendment "prevents [the government] from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried.")

### C.    Trial Counsel Were Ineffective for Failing to Limit the Use of Matt Cunningham's Highly Prejudicial Testimony.

During the penalty phase rebuttal, the Government offered testimony of Matt Cunningham, one of Mr. Fell's childhood friends from Wilkes-Barre. Mr. Cunningham offered damaging testimony that Mr. Fell had spoken about killing his mother a year or two before Mr. Lee killed her. In addition, Mr. Cunningham testified that when asked if Mr. Fell would commit additional murders after committing one murder, he stated he would not "stop there." Because you are going to get the same punishment anyway" for one murder as for additional subsequent murders. Trial Tr. Vol. XI, 52:10-11 (July 12, 2005). Trial counsel objected to the probative value of Mr. Cunningham's testimony when the government proffered this testimony without the jury present, but the Court overruled the objection, holding that it was relevant to Mr. Fell's general background and character when he made the statements a year or two before the crimes. Trial Tr. Vol. XI, 33:7-12 (July 12, 2005). However, the Court noted that "I am particularly cautious about those particular statements and the purpose for which they are used, and … although this is extraordinary, this is the kind of situation which I would be willing to give a cautionary instruction to the jury that those statements do not in any way relate or constitute an independent aggravating factor, but they are offered to describe general background and character of the defendant at that particular time, if the defense requests that." Id. at 33:13-22. Yet, despite the Court's offer, trial counsel never sought a limiting instruction after the testimony was offered, and the instruction was never given. As soon became apparent, that failing caused prejudice.

Not only did trial counsel fail to seek a limiting instruction, but trial counsel did not object when the government used Mr. Cunningham's statements against Mr. Fell in precisely

292

the manner in which the Court expressed concern – to establish premeditation and motive. The government argued:

> [I]n conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one. And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too.

Id. at 128:1-10. The government's use of Mr. Cunningham's testimony to establish premeditation and motive was highly prejudicial, particularly since one of the non-statutory aggravating factors was that Mr. Fell acted with "substantial premeditation." It was therefore objectively unreasonable for trial counsel to fail to contest to the improper use of this testimony. See Strickland v. Washington, 466 U.S. 668, 668 (1984); Cuadra v. Sullivan, 837 F. 2d 56, 59 (2d Cir. 1988) (finding it likely that trial counsel's failure to object to prejudicial evidence "fell below an objective standard of reasonableness"); ABA Guidelines, Guideline 10.8, Commentary at 1032 (providing that "[c]ounsel should object to anything that appears unfair or unjust"). Trial counsel's performance was deficient for failing to move to preclude the testimony in limine, failing to object during the Government's rebuttal and moving to strike, and failing to ask for a curative instruction specifically with respect to the testimony both after it was offered and after the Government's rebuttal. Mr. Fell was prejudiced by trial counsel's deficient performance because, had trial counsel objected to the use of this testimony, the jurors would have given less weight to the government's proffered statutory aggravator about "substantial premeditation," and at least one juror would have struck a different balance in favor of life. See Strickland, 466 U.S. at 694. As a result, Mr. Fell was denied his Fifth, Sixth, and Eighth Amendment rights by trial counsel's ineffective assistance.

293

**D.    Trial Counsel Were Ineffective for Failing to Counter the Government's False Assertion that Mr. Fell's Memory of the Word "Hawk" Meant that He Was Not Intoxicated on the Night of the Crimes.**

During the guilt phase, one of the police officers who reported to the Rutland crime scene testified that a knife bearing the word "Hawk" on it was left behind at the crime scene, and Mr. Fell stated that he remembered the knife with the word "Hawk" on it in his confession. Trial Tr. Vol. 1-II, 47:18-20 (June 20, 2005). During its penalty phase closing, the Government used this evidence to argue that Mr. Fell could not have been substantially impaired on the late night and early morning of November 26 and 27, 2000, because he later recalled that the knife had the word "Hawk" written on the handle. See Trial Tr. Vol. XII, 40:5-7 (July 13, 2005) ("If he was significantly impaired at the time, would he remember that the knife he was using said the words Hawk on it?"). Trial counsel never developed readily available countervailing evidence that Mr. Fell's recollection of the word "Hawk" had no bearing on his level of intoxication. Even a cursory review of the Rutland crime scene photos shows that there were numerous items with the word "Hawk" emblazoned upon them all over Debra Fell's residence, since she had once worked at the Hawk Mountain House. Since Mr. Fell would have been intimately familiar with the items inscribed with the word "Hawk" on them in Debra Fell's apartment, his memory of this fact had no independent significance and certainly no correlation to his level of intoxication. It was objectively unreasonable for trial counsel to allow the Government to draw this inference against Mr. Fell, since Mr. Fell's "capacity to appreciate his conduct" and his level of intoxication were important mitigating factors for the jury to consider. Special Verdict Form (Ex. 209); see also supra Section XIII. Trial counsel therefore should have objected. Mr. Fell was prejudiced by this failure since the jury necessarily discounted critical mitigating evidence that Mr. Fell was intoxicated on the night of the crimes based in part upon these arguments. There is a reasonable probability that at least one juror would have struck a

294

different balance and Mr. Fell would have not been sentenced to death if the jury had believed that Mr. Fell was highly intoxicated on the night of the crimes. As a result, Mr. Fell was denied his Fifth, Sixth, and Eighth Amendment rights by trial counsel's ineffective assistance.

## XV.    Trial Counsel Were Ineffective for Failing to Adequately Preserve the Record, Resulting in Numerous Meritorious Claims on Direct Appeal Being Evaluated Under the Onerous Plain Error Standard.

Trial counsel were professionally unreasonable for failing to make proper objections necessary to preserve the record for appeal. As a result, Mr. Fell was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As the Second Circuit noted, "Nearly all the evidentiary issues Fell raises were not preserved at trial and were presented for the first time either in his motion for a new trial or on appeal." United States v. Fell, 531 F.3d 197, 209 (2d Cir. 2008). Trial counsel failed to timely preserve complete objections to (1) the government's comments during summation about Mr. Fell's decision not to plead guilty, which discredited Mr. Fell's intentions and which impermissibly burdened his Sixth Amendment right to plead not guilty (id. at 218-20); (2) the government's argument that the jury could not consider mitigating evidence unrelated to the crimes for which Mr. Fell had been found guilty (id. at 222-23); and (3) the government's offer of evidence during the penalty phase and during summation regarding Mr. Fell's interests in Satanism, Islam and Native American religions, which denied him due process and violated his rights under the First Amendment of the U.S. Constitution (id. at 227-29).

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668 (1984). The American Bar Association ("ABA") Guidelines provide a guide in determining what

295

constitutes reasonable performance in capital cases. Wiggins v. Smith, 539 U.S. 510, 524 (2003). Under the ABA Guidelines, trial counsel have a duty to "consider all legal claims potentially available" and to "thoroughly investigate the basis for each potential claim." ABA Guidelines, Commentary on ABA Guidelines 10.8, at 1028. Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." Id. Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." Id. at 1028-29.

Each of the claims discussed above had merit. And the failure to make the objections caused Mr. Fell prejudice. Mr. Fell would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds. Accordingly, trial counsel's failure to preserve Mr. Fell's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

The omitted objections discussed above consist of both evidentiary and legal questions. The objections that related to evidentiary rulings were subject to review for abuse of discretion. United States v. Yousef, 327 F.3d 56, 121 (2d Cir. 2003). Several other objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. Ramos v. Town of Vernon, 353 F.3d 171, 174 (2d Cir. 2003). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims, if at all, for plain error. Had counsel made appropriate objections, Mr. Fell would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate abuse of discretion or de novo standard of review.

296

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  Brecht v. Abrahamson,  507 U.S. 619, 638 n.9 (1993) (citation omitted). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, these violations of Mr. Fell's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

> **A.    Trial Counsel Were Ineffective for Failing to Object to Numerous Instances of Prosecutorial Misconduct in the Closing Arguments During the Sentencing Phase.**

The government's closing arguments included several comments that constitute prosecutorial misconduct, including, (1) the government's comments during summation about Mr. Fell's decision not to plead guilty, which discredited Mr. Fell's intentions and which impermissibly burdened his Sixth Amendment right to plead not guilty (Fell, 531 F.3d at 218-20) and (2) the government's argument that the jury could not consider mitigating evidence unrelated to the crimes for which Mr. Fell had been found guilty (Fell, 531 F.3d at 222-23). Despite these highly inappropriate comments, trial counsel failed altogether to object. This failure was not trial strategy.  Viewed alone, or separately in light of the numerous, serious other errors and instances of ineffectiveness which plagued Mr. Fell's trial, this omission by trial counsel was prejudicial and clearly detrimental to Mr. Fell.  See, e.g., Hodge v. Hurley,  426 F.3d 368, 386-89 (6th Cir. 2005) (finding counsel ineffective for failing to object to misconduct in closing arguments); Cuadra v. Sullivan,  837 F. 2d 56, 59 (2d Cir. 1988) (finding it likely that trial counsel's failure to object to prejudicial evidence "fell below an objective standard of reasonableness") (citing Strickland v. Washington,  466 U.S. 668, 688 (1984)); ABA Guidelines, Guideline 10.8,

297

Commentary at 1032 (providing that "[c]ounsel should object to anything that appears unfair or unjust").

### B. Appellate Counsel Were Ineffective for Failing to Raise Evidentiary Issues on Direct Appeal, Resulting in the Waiver of Numerous Meritorious Claims.

Appellate counsel were ineffective for failing to raise evidentiary arguments that were not raised by trial counsel, resulting in the waiver of numerous meritorious claims. As a result, Mr. Fell was denied his right to effective assistance of counsel under the Sixth Amendment.

Trial counsel failed to object to the following issues, each of which appellate counsel failed to raise: (1) leading questions by the government during the guilt phase; (2) prejudicial and minimally probative testimony regarding an incident between Mr. Fell and another young man in Woodstock, New York (Trial Tr. Vol. VII-1, 160:23-162:13 (July 1, 2005)); (3) testimony by a police officer about the features of "battered woman syndrome" directly after questions by the government regarding Mr. Fell's mother, despite no basis for the witness's qualifications to offer such testimony (Trial Tr. Vol. VII-2, 42:7-14) (July 1, 2005); (4) cross-examination by the government regarding the witness's beliefs about moral culpability, despite a judicial determination disallowing such testimony (Trial Tr. Vol. VI-2, 102:17-24 (June 29, 2005); Trial Tr. Vol. IX-2, 34 (July 7, 2005)); (5) extraordinarily prejudicial and minimally probative testimony about statements made by Mr. Fell years before the events underlying his convictions regarding a hypothetical multiple murders (Trial Tr. Vol. XI, 52:3-11 (July 12, 2005)); and (6) testimony by Matthew Kolojeski regarding Mr. Fell's "tolerance" to alcohol, despite no conceivable foundation for such testimony (Trial Tr. Vol. III-1, 117:14-25 (June 23, 2005)).

298

Trial counsel failed to object to each of these events at trial, and appellate counsel failed to raise any of the issues on appeal. Under the ABA Guidelines, appellate counsel have the obligation to "litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation." ABA Guidelines, Guideline 10.15.1(C), Commentary at 1079. Each of the omitted objections discussed above were meritorious yet were not presented. The Guidelines also instruct that appellate counsel "should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." Id. Appellate counsel failed to preserve these arguments by not presenting them at all. Because each omitted argument was meritorious and the underlying testimony constituted important components of the government's case- indeed, most were referenced in the government's summation following the penalty phase- appellate counsel's failure prejudiced Mr. Fell.

**XVI.    The Cumulative Impact of Trial Counsel's Objectively Unreasonable Performance Resulted in Cumulative Prejudice that Demonstrates a Reasonable Probability that At Least One Juror Would Have Struck A Different Balance and Voted in Favor of Life**

The separate instances of trial counsel's deficient performance, which are described in detail above and are incorporated herein by reference, each warrant reversal of Donald Fell's conviction or sentence standing alone. It is therefore unquestionable that the numerous instances of deficient performance detailed above cumulatively deprived Mr. Fell of a fair trial and entitle him to a new trial. See Lindstadt v. Keane, 239 F.3d 191, 199, 203 (2d Cir. 2001) ("Strickland directs us to look at the 'totality of the evidence before the judge or jury,' keeping in mind that 'some errors [] have… a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture….' We therefore consider these errors in the aggregate"; ruling "[t]aken together, ineffectiveness permeated all the evidence") (citation

299

omitted) (collecting cases). Further "[i]neffective assistance may be demonstrated where counsel performs competently in some respects but not in others." Thomas v. Kuhlman, 255 F. Supp. 2d 99, 107 (E.D.N.Y. 2003) (citing Eze v. Senkowski, 321 F.3d 110, 114 (2d Cir. 2003)). Moreover, post-conviction counsel will file a discovery motion after the filing of this petition seeking access to discovery materials trial counsel has been unable to obtain despite diligent efforts, after which it is anticipated that additional claims of deficient performance will be identified.

Each of trial counsel's failures – e.g. to investigate the forensic evidence, the aggravation case, and the mitigation case; to pursue meritorious motions regarding Dr. Welner; to pursue discovery or even to effectively utilize the information in their possession; or to use the rules of evidence to exclude improper and prejudicial evidence – combined to deprive Mr. Fell of his constitutional rights under the Fifth, Sixth and Eighth Amendments.  If Mr. Fell received the representation to which he is entitled under the Constitution, and trial counsel had adequately presented the powerful mitigation in Mr. Fell's case and challenged the misleading aggravation in the Government's case, there is no question that at least one juror would have struck a different balance and would have voted for life.

Indeed, trial counsel's ineffectiveness was so pervasive that it was as if Mr. Fell was wholly undefended.  As the Supreme Court has explained, "the right to the effective assistance of counsel is... the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 656 (1984). In Mr. Fell's case, "the process los[t] its character as a confrontation between adversaries." Id. at 656-57. Trial counsel failed to investigate the forensics in the case; failed to investigate and present viable defenses; failed to investigate and defend against the Government's aggravation

300

case; failed to pursue meritorious motions; failed to raise meritorious objections; stipulated to the admission of highly inflammatory evidence of questionable reliability and relevance; and failed to even look carefully in their own files for powerful mitigating evidence. Under these facts, since trial counsel "fail[ed] to subject the prosecution's case to meaningful adversarial testing, there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" and no specific prejudice need be shown. Id.

### XVII. The Government's Failure to Disclose Reports of Interviews Conducted By The FBI and Dr. Welner and Failure to Disclose Information from Social Service Agencies Violated Mr. Fells Fifth and Eighth Amendment Rights

By Dr. Welner's account, he and the FBI interviewed approximately 77 lay witnesses regarding Mr. Fell. However, the Government failed to disclose all but a few reports of investigations reflecting interviews of these individuals. The Government's failure to turn over these documents to the defense violated Brady and Giglio.[106] Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).

#### 1. 302s and Underlying Interview Documentation

##### a. FOIA 302s

###### i. Favorable Information in FOIA 302s

Counsel have obtained thirty-eight 302s through a FOIA request (the "FOIA 302s") that were not turned over to the trial defense team. Although nearly all of the FOIA 302s are so heavily redacted as to be almost unreadable, the limited amount that is readable reveals favorable information that should have been disclosed by the government prior to trial. For

---

[106]   Through public records requests, including FOIA requests to DOJ and law enforcement agencies, counsel have received many FBI documents. However, most of them are heavily redacted and over 700 records have been withheld completely. Counsel plans to file a motion for discovery following submission of this motion and will amend this motion to include further information gathered through discovery.

example, a FOIA 302 subject who appears to be Erika Balestra, Mr. Fell's former employer, told that FBI that it appeared Donny liked his mother, and that something about Bobby Lee gave her the impression that he was not a good person. FOIA 302, May 10, 2005, (Ex. 219). This 302 likely included additional Brady information regarding Mr. Fell's positive employment experience with Ms. Balestra (2255 counsel believes this due to the positive information it has collected from Ms. Balestra), but this information was redacted and still has not been disclosed. Further, a pen pal of Donny's while he was in prison told the FBI that she understood that Donny and his mother had been smoking crack the night of the crime, FOIA 302, June 1, 2005, (Ex. 127), and other witnesses who appear to have known Donny earlier in his life provide details about his poor home life and good natured disposition as a child, see e.g. FOIA 302, May 9, 2005, and FOIA 302, May 11, 2005 (Exs. 119 and 221).

Finally, there is good cause to believe that at least one of the FOIA 302s may contain a report of an interview with a correctional officer who may have testified for the Government or been interviewed by the Government but not called to the testify, which could provide important insight as to the extent of the Government's knowledge of Officer Pelkey's background, see supra, and/or any issues the correctional officers had with Mr. Fell or other inmates. FOIA 302, June 22, 2005 (Ex. 225). These and any other 302s with favorable mitigation evidence should have been produced. The Government's failure to produce them was prejudicial.

### ii. Misconduct Evident in FOIA 302s

In addition to favorable mitigating information, one FOIA 302 indicates potential violations of medical ethics and other misconduct on the part of Dr. Welner. See e.g. FOIA 302, Apr. 7, 2005 (Ex. 216) ("[redacted] was asked by Welner if she felt he was objective in his line of questioning. [Redacted] responded that he was neither pro defense nor pro prosecution.").

302

Had this evidence been turned over, counsel would have learned that Dr. Welner was not forthcoming with his motives for speaking with the witnesses he interviewed, that he purported to be objective, and either did not reveal to them that he was working with the prosecution, or did not reveal that until the end of the interview. See, e.g. Decl. of S. Campbell (Ex. 273). This fundamental misrepresentation was indicative of the prosecutorial misconduct which plagued this case and prejudiced the defense.

Other FOIA 302s indicate potential violations of the Health Information Portability and Accountability Act ("HIPAA") and other privacy laws, and coercive questioning by the FBI. The FOIA 302 which appears to document the interview of Walter Opshinksy, the Head of Child Care at St. Michael's School, shows that the FBI attempted to interview Mr. Opshinky despite his objection based on his privacy obligations. FOIA 302, May 27, 2005 (Ex. 220). Mr. Opshinsky "told the interviewing agent that he was not comfortable speaking with the interviewing agent without any signed releases by Donald Fell." Id. The FBI agent then disregards Mr. Opshinsky's objections and persuades him to discuss his prior statements to the FBI in 2001. Id. The FBI agent thus put Mr. Opshinsky in an uncomfortable position where he was asked by a federal law enforcement agent to disclose personal information about Mr. Fell.

Due to this coercion, Mr. Opshinksy confirms what he told the FBI in 2001: that he knew both Donald Fell and Robert Lee. Id. Mr. Opshinsky described Donny as relatively quiet and intelligent and noted that he never had any problems with him. Id. Mr. Opshinsky also confirmed that Bobby was the more boisterous of the two and he remembered him as more problematic and acting out against staff. Id. The FBI agent then asked Mr. Opshinsky if it was possible that he confused the two, because others had described Donny in a more similar fashion to how he had described Bobby, and vice versa. Id. Opshinky confirmed that he remembered

303

correctly.  Id.  This shows that the FBI attempted to strong-arm witnesses to corroborate their theory of Donny's dominance over Bobby's submissiveness and raises the question of how many additional instances of coercion there may have been.  Clearly, the Government should have turned over this document to the defense.

Dr. Welner and the FBI agents interviewed a large number of individuals who had may have had privacy obligations under HIPAA.  Neither Dr. Welner nor the FBI agents offered these individuals an appropriate release or court order that allowed them to disclose the privileged information they were asked to discuss.  In addition to Mr. Opshinsky, these individuals included Mark Innocenzi, Diane Sergi, Erika and Mark Balestra, Ellis Carle, Deanna German, Sharon Hinchey, John Kozerski, and Leo Diamond, among others.

### b.  Welner Report 302s and Interview Documentation

The Welner Report lists twenty FBI interviews for which no 302s were disclosed including Mr. Fell's friends, family, acquaintances, correctional officers, police officers and social service workers.[107]  Welner Report (Ex. 10 at FELL-00000624-631).  The report lists twenty-three people whom Dr. Welner interviewed himself and for whom no corresponding interview report was turned over to the defense.[108]  Id.  The list of interviewees are people who have known Mr. Fell through critical periods of his life and include some who could have offered information favorable to Mr. Fell.  For instance, Erika Balestra, employer for Donny at the time of the crimes, and Tim Brooks, an acquaintance of Debra and Donny's, would have said

---

[107]   The full list of FBI interviews documented in the Welner Report for which no 302 was provided includes: Robert Lee Sr., Sandy Bowles, Erika Balestra, Mark Balestra, Tim Brooks, Theodore Settas, Ellis Carle, Diane Sergi, Deanna German, Sharon Hinchey, Donna Williams, Justine Taylor, Tim Brooks, Geraldine Fell, Jason Rushlow, Ronald Barclay, Mary Jo Scott, James Bailey, Marianne Chiumento, Donna Williams, and Chris Purcell.

[108]   The full list of interviewees documented in the Welner Report for which no interview documentation was provided includes: John Kozerski, Trooper Charlie Prula, Gary Yale, Sean Campbell, Carole Frasier, Cindy Golden, Robert Lee, Sr., Shane Lee, Mark Innocenzi, June Kondraski, Carole Frasier, Tim Brooks,

that Donny was respectful and a good kid. Importantly, both of them said that Donny would not let Bobby come around them and warned them not to hang around him. This information is clearly important background information on Donny's ability to get along with others and Bobby's corresponding inability to comport to social norms.

In addition to the purposes for which Dr. Welner used them, these records doubtlessly contain information that would be useful to the defense in challenging Welner's conclusions as well as in preparing their mitigation case. Mr. Fell has yet to obtain access to all of these interview notes and will request further discovery of this material in order to fully develop his claims. The Government had a continuing obligation to disclose the interview notes because they constituted information favorable to the defense under Brady. Brady v. Maryland, 373 U.S. 83 (1963). The failure to do so was an unconstitutional suppression of critical evidence, which warrants reversal of Mr. Fell's death sentence.

The recently disclosed FOIA 302s also include at least five additional interview reports by FBI agents which were not identified in the Welner 302 list and which were never disclosed to trial counsel. These reports were not noted in Dr. Welner's report as having been used for his evaluation, nor were they turned over to trial counsel in discovery. One of these reports, FOIA 302, Apr. 6, 2005 (Ex. 114), indicates that Dr. Welner was present and likely conducted the majority of the questioning during the interview. But that interview was not reflected in the Welner report. At least three of these 302s included Brady information that conflicted with Dr. Welner's conclusions. Brady v. Maryland, 373 U.S. 83 (1963). It is still unclear what other information, which has been redacted, or has not yet been disclosed to § 2255 counsel, might have been suppressed by the Government.

---

Cindy Golden, Leo Diamond, Liz Jones, Dr. Michael Baden, Don Ketcham, Sara Ketcham, John Ketcham, Matt Cunningham, Teri Fell, Jackie Sharpe, Lt. Dale Rinker.

305

For example, Dr. Welner and an FBI agent, likely Special Agent James Glenn, interviewed someone on April 6, 2005 whose name is redacted, but appears to have been Mr. Fell's great-great-aunt/step-grandmother, Stella Banas. FOIA 302, Apr. 6, 2005 (Ex. 114). Ms. Banas told Dr. Welner and the agent that Mr. Fell was "a nice and sociable kid . . . wasn't a mouthy kid." Id. She told them that Mr. Fell liked to play the guitar along with the radio and that he wanted to start a band with his friends. Id. She told them that Debra Fell had difficulty with her mother Theresa Sharpe, who envied Debra. Ms. Banas told them that "Theresa Sharpe and Debra Fell were always arguing." Id. Ms. Banas noted that Theresa refused to take Mr. Fell in as a child, when his mother abandoned the family, and that as a result Mr. Fell was placed at St. Michael's School. Id. This information was clearly favorable to Mr. Fell and should have been disclosed to trial counsel. Further, Dr. Welner's failure to include Ms. Banas's statements in his report is an obvious display of bias. Moreover, by suppressing this information and not disclosing it to the defense, the Government improperly and unconstitutionally deprived Mr. Fell of the information necessary to make an informed decision whether to further object to the Welner report, thus causing him constitutional prejudice.

An FBI agent, likely Special Agent Heilner, interviewed someone by phone on July 5 whose name is redacted. FOIA 302, July 5, 2005 (Ex. 132). This person had worked at St. Michael's when Mr. Fell was placed there at age fourteen. Id. The 302 gives information about Fell's symptoms of mental illness, including that he was "fairly cooperative, yet despondent and depressed" and noting Mr. Fell's flat affect subsequent to his depression. Id. The 302 discusses Fell's "bad family life" including his mother's abandonment and his grandmother's death "which was very traumatic for Fell." Id. The 302 further noted that Fell's home was in a "'rundown' questionable neighborhood." Id. This report clearly contained

306

favorable information that the defense would have used in mitigation, had the prosecution met their <u>Brady</u> obligations by disclosing it. <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). This witness was apparently unknown to trial counsel and would have helped their case.

Several other 302s are undecipherable due to the heavy redactions, but are believed to also contain exculpatory material that should have been disclosed to trial counsel in discovery.

> **2.    The Government Failure to Disclose Information from Social Service Agencies and Trial Counsel's Failure to Investigate Same Violated Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

> **a.  Social Service Records Collected in FBI Investigation**

In 2001, the FBI compiled a report on Mr. Fell and Mr. Lee based on their preliminary investigation, most of it done in and around Wilkes-Barre, Pennsylvania. <u>See</u> 2001 FBI Report (Ex. 76). The report consisted of interviews with educational, social service, mental health and law enforcement agencies and information obtained from records from these various entities. Counsel have discovered good cause to believe that there was misconduct and <u>Brady</u> violations with respect to investigation leading to this report and to documents referenced in the report that were never turned over to the defense.

Notably, at least one source cited in this FBI report was retrieved from the Luzerne County Children and Youth Services and contains information favorable to Mr. Fell that was not itself disclosed to the defense. The report in question, authored by Mark Innocenzi (the "Innocenzi Report") was strategically excerpted and paraphrased in the FBI report to Mr. Fell's detriment. <u>See</u> 2001 FBI report (Ex. 76 at FELL-00001221-1222).For example, the full Innocenzi Report contains information that Donny's grandmother believed that he'd been molested by his father, a critical mitigation fact which was not included in the FBI's rendition of his history. This report contained uniquely important mitigation evidence related to Donny's

background and upbringing which the Government should have turned this over to the defense. Its failure to do so, combined with the failures to disclose the above evidence, constitutes a violation of the Government's Brady obligations. Brady v. Maryland, 373 U.S. 83 (1963).

Trial counsel also failed to investigate same. Despite the fact that the defense had the 2001 FBI Report since early that year and was aware of the documents referenced therein it did not request many of them including the Innocenzi Report. The failure to investigate evidence that the defense was well-aware was being used by the FBI in its case against Mr. Fell falls well short of prevailing professional norms. See Rompilla v. Beard, 545 U.S. 374 (2005) (counsel ineffective for failing to investigate prosecution's evidence); Guideline 10.7 (2003) ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

Because of the Government's failures to disclose and trial counsel's failures to investigate the jury was deprived of critical information that would have made a different trial outcome reasonably probable. Strickland, 466 U.S. at 698 (noting that the "test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution," so that the prejudice and materiality tests under Brady and Strickland are the same); Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985). These dual constitutional errors violated Mr. Fell's Fifth, Sixth and Eighth Amendment rights and entitle Mr. Fell to relief from his sentence.

### b.  Supplemental Social Security Income

In his adolescence Mr. Fell was receiving Supplemental Security Income ("SSI") for a diagnosed mental health disorder, see supra. The defense did not have this information. But the Government was likely in possession of this information which originated from a federal agency and was favorable to Mr. Fell because it corroborated the fact that he had been diagnosed

308

with mental health disorders in his youth. Because this information would have been critical to defense counsel's presentation of Mr. Fell's mental health issues, the withholding was in violation of the Government's Brady obligations. Brady v. Maryland, 373 U.S. 83 (1963).

Trial counsel in turn failed to investigate these records despite the fact that they were aware that Donny had at one point received SSI payments and they knew Donny's mental health issues would be a critical issue at trial. Moreover the information was readily accessible. Donny's sister and his aunt could have told counsel that Donny was on SSI but counsel did not spend time with them preparing for a trial – until the eve of trial. The Social Security Office in Wilkes-Barre would have been able to furnish records evidencing the history of Donny's payments of social security and able to confirm to counsel that the diagnosis was for 'Code 3000,' which is a "catch all" code for mental health disorders. Trial counsel's failure to investigate this critical information fell well below prevailing professional norms. Rompilla v. Beard, 545 U.S. 374 (2005); Guideline 10.7 (2003) ("[c]ounsel at every stage shall have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

Because of the Government and trial counsel's errors the jury was deprived of critical information that would have made a different trial outcome reasonably probable. Strickland v. Washington, 466 U.S. 668 (1984); Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985). These dual constitutional errors violated Mr. Fell's Fifth, Sixth and Eighth Amendment rights and entitle Mr. Fell to relief from his sentence.

## XVIII. The Government's Failure to Disclose Physical Evidence Relating to the Investigation of the Crimes and Trial Counsel's Failure to Investigate Same Entitles Mr. Fell to Relief From His Death Sentence

Throughout the trial, the Government tried to minimize the impact of the influence of alcohol and drugs on Donny and Bobby during the crimes. At the same time it

309

appears that the Government failed to disclose to the defense information within its possession that would corroborate Mr. Fell and Mr. Lee's accounts of their chronic drug and alcohol abuse, as well as their drug abuse on the night of the crimes.

### 1.    Withheld Clarksville Evidence

Mr. Fell and Mr. Lee were arrested and initially detained by the Clarksville Police Department ("CPD"). During this period, critical evidence was recovered, including information that was introduced against Mr. Fell at trial. While some of this evidence was transferred to the FBI and law enforcement agencies in Vermont in connection with Mr. Fell's prosecution, it appears that some evidence may not have been transferred and was not provided to trial counsel for inspection.

Among other items, the withheld evidence includes the results of testing on potential narcotics found in the vehicle in Clarksville. Records indicate testing done on potential narcotic substances found in the vehicle. FBI Form FD-192 Description of Property Acquired, Jan. 22, 2001 (Ex. 81). The FD-192 obtained through a public records request shows the seizure of a bottle containing brown liquid and a Marlboro cigarette box containing small plastic bags. Id. A notation along the bottom of the record lists a drug weight of 69.20 grams. Id. In addition, two pipes that were the subject of testimony against Mr. Fell at trial were first found in the car driven by Mr. Fell and Mr. Lee at the time of their arrest in Clarksville, Arkansas. At trial, a police officer testified that these were marijuana pipes and not used to smoke crack, suggesting that Mr. Fell was lying when he said he smoked crack on the night of the crimes. Tr. Vol. I at144:14-147:6 (June 20, 2005). However, these pipes were never tested for crack residue, and they were not introduced into evidence. Id. An FBI report obtained by § 2255 counsel through a public records request indicates that after most of the evidence had been transferred to the FBI, CPD still had the "crack" pipes in their possession, yet there is no further indication of

310

the pipes on subsequent FBI inventory lists or chain of custody forms. FBI Report from Little Rock to Albany regarding Transfer of Evidence, Jan. 4, 2001 (Ex. 78).

### 2.    Withheld Documentation of 135 Robbins Street Evidence

A complete evidence log for 135 Robbins Street was not found in trial counsel's files. Such inventory list should have revealed whether there were any drugs or drug paraphernalia at the scene, the full extent of the alcohol abuse, and any and all other indications of the events leading up to the time of the crimes. To the extent the evidence log would indicate favorable evidence and or reveal any malfeasance of the officers collecting such evidence, the Government may be liable for withholding such information.

### 3.    Materiality

The Government's failure to turn over the results of any testing on the CPD items, to make available the items such as the pipes for trial counsel's testing, or to turn over a complete inventory list of the 135 Robbins Street evidence is a violation of the Government's Brady duties. See Mitchell v. Gibson, 262 F.3d 1036, 1059-60, 162-63, 1065 (10th Cir. 2001) (vacating death sentence in § 2254 case for failure to reveal exculpatory evidence testing on physical evidence). Mr. Fell needs access to the physical evidence and all testing or other documents relating to the above-referenced drug paraphernalia in order to determine whether drugs were in fact recovered when Mr. Fell and Mr. Lee were arrested. Likewise, Mr. Fell needs access to the inventory lists from 135 Robbins Street in order to more fully develop its case regarding the night of the crimes in Rutland.[109]

The presence of drugs or drug paraphernalia found in the car or at the crime scene would provide crucial corroborating information about Mr. Lee and Mr. Fell's drug use at the

---

[109]    Section 2255 counsel have been denied access to view the physical evidence in the possession of the Rutland City Police Department.

time of the crime and would refute the Government's overblown contention that there was absolutely no evidence to support such a proposition and that Mr. Fell was a liar. Tr. Vol. IV-2 at 69:22-70:12, 80:6-9 (June 24, 2005) (Government's guilt phase summation on crack use: "you also know it's a lie because … there was "nothing to do with crack cocaine [at 135 Robbins Street]; no paraphernalia, no glass pipes, no nothing." "… Mr. Bunin keeps raising this question about intoxication and crack use. Mr. Bunin said that. But there's no evidence in this trial of crack use by the defendant that night."); Tr. Vol. XII at 39:9-40:21 (July 13, 2005) (Government's penalty phase summation on crack: "Mr. Darrow explained to you that there really was no evidence in this case that the defendant was substantially impaired or significantly impaired at the time of these crimes … No one was doing drugs. [Witness] saw no drug paraphernalia."). The failure to disclose this evidence gives rise to a Brady violation.

Assuming arguendo the Government is deemed to have satisfied its Brady obligations, trial counsel would be ineffective for failing to seek this information regarding the use of alcohol and drug abuse on the night of the crimes. Strickland v. Washington, 466 U.S. 668 (1984).

XIX.     **The Government's Brady Violations, Both Singly and Cumulatively, Violated Mr. Fell's Fifth, Sixth, and Eighth Amendment Rights and Entitle Mr. Fell to a New Trial or at the Minimum a Reversal of his Death Sentence**

Because the specter of a death sentence is so different from any other criminal prosecution, the Government here was under a heightened duty to disclose any evidence that would be favorable to the defendant during the guilt and penalty phases. Both singly and cumulatively, the Government's failure to turn over the favorable material evidence cited in this motion prejudiced Mr. Fell because it could have impacted the verdict by causing at least one juror to vote for life instead of death. See Wiggins v. Smith, 539 U.S. 510 (2003) (stated in the

312

context of assessing the impact of counsel's ineffectiveness in failing to present the jury with mitigating evidence); <u>Kyles v. Whitley</u>, 514 U.S. 419, 436, 441 (1995) (the question is whether, considering the cumulative effect of the suppressed evidence "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.").

Due to the Government's withholdings the jury was deprived of critical information about Mr. Lee's violent and aggressive tendencies, as well as eye-witness information from a passing motorist, Mr. Bellantoni, about the argument he witnessed that would have impacted the jury's determination of Mr. Fell's relative culpability vis-à-vis his co-defendant Bobby Lee and Mr. Lee's influence over Mr. Fell with regard to Mrs. King's death.

The Government also withheld critical information about the aggravating evidence it presented regarding Mr. Fell's altercation with Mr. Eike that would have shown that the Government's claims regarding Mr. Eike's injuries were false and that the fight did not represent part of an upward trajectory of violence for Mr. Fell, but rather was an understandable response to a sexual assault on his sister. The Government similarly withheld critical information regarding aggravating evidence it presented with respect to Mr. Fell's disciplinary incidents in prison. Had this information been disclosed it would have cast Mr. Fell's conduct in an entirely different light. The withheld information would have shown that Mr. Pelkey attempted to assault Mr. Fell during the incident and had a lengthy history of violence against inmates. This evidence would have supported the contention that Mr. Fell's behavior during the incident was provoked and in response to a particular guard rather than evidencing a general inability to conform to the prison environment.

Finally, the Government withheld a host of information regarding physical evidence that would have supported Mr. Fell's mitigation defense of drug use the night of the

313

crime; criminal history information about Debra Fell that would have evidenced her chronic violence and drinking and drug use in Rutland and shown the jury the dysfunction and violence that set the stage for the crimes; documentation of the FBI and Dr. Welner's interviews with numerous lay mitigation witnesses who, having known Mr. Fell during critical period of his life, would have provided substantive mitigation information regarding Mr. Fell's upbringing, character and background; and other documentation from social service agencies demonstrating the same.

The Government misconduct deprived the jury of information that would have been critical to its determinations of Mr. Fell's guilt and punishment. The resultant prejudice undermines confidence in the outcome of the trial and demonstrates that a different outcome in conviction and sentencing was reasonably probable. Kyles at 437; United States v. Bagley, 473 U.S. 667 (1985). Mr. Fell was therefore deprived of a fair trial under the Fifth, Sixth, and Eighth Amendments to the United States Constitution and is entitled to relief from his conviction and sentence of death.

Despite diligent efforts, § 2255 counsel have been unable to obtain access to all potentially exculpatory material in the Government's possession.[110] This material contains favorable mitigation evidence that should have been disclosed to trial counsel. Counsel will amend this motion to include new details about the breadth and scope of these disclosure violations as new information becomes available through such discovery.

---

[110] In an effort to obtain information without the intervention of the Court, counsel have spent the past year aggressively pursuing records in the possession of over one hundred local, state and federal governmental agencies through public records statutes, the Freedom of Information Act, public databases and by contacting private organizations. Upon receiving partial or full denials of public record requests, Mr. Fell has diligently utilized the local, state and federal administrative appeals process in an attempt to obtain these records. Although Mr. Fell has been successful in obtaining many records through these means, there are critical records to which Mr. Fell has not been able to gain access and he requires a Court order in order to adequately develop his claims before his § 2255 motion must be filed.

**XX.     Mr. Fell was deprived of his rights under the Fifth, Sixth, and Eighth Amendments when the government engaged in additional prosecutorial misconduct during closing arguments**

In addition to the Government's misconduct in summation referenced above, the Government engaged in additional acts of misconduct in summation in both the guilt and penalty phases. All of the Government's misconduct in closing statements, including the misconduct referenced above, which is incorporated herein, combined to deprive Mr. Fell of a fair trial in violation of his Fifth, Sixth and Eighth Amendment Rights. See, e.g., Berger v. United States, 295 U.S. 78, 89 (1935).

**A.     The Government engaged in misconduct when it misstated the evidence regarding Mr. Fell's intoxication during the crimes during the guilt phase closing statements**

The Government grossly mischaracterized the evidence with respect to Mr. Fell's drinking the night of November 26, 2000 in the guilt phase closing. During the guilt phase rebuttal, the Government questioned the defense's references to the alcohol consumed by Mr. Fell the night Debra Fell and Charles Conway were killed, asserting, "In fact, there's actually no evidence of him drinking that night other than Mr. Bunin's speculation." Tr. Vol. IV-1 at 80:0-11 (June 24, 2005) (emphasis added). To the contrary, the record was rife with "evidence" that Mr. Fell had been drinking. See, e.g., Tr. Vol. I-2 at 45:15-22 (June 20, 2005) (describing the beer cans strewn throughout Debra Fell's apartment); Tr. Vol. I-2 at 67:2-5 (June 20, 2005) (introducing photographs of the beer cans found in the bathroom); Tr. Vol. II-1 at 28:10-11 (June 21, 2005) (reading from Mr. Fell's statement, which was introduced by the Government and which describes that Mr. Fell and the others in the Rutland apartment were "playing cards and smoking crack and drinking Budweiser); Tr. Vol. IV-1 at 29:19-21 (June 24, 2005) (including testimony of Government witness that Mr. Fell and Mr. Lee were "spacey" and their words were "not really 100% coherent). Photographs showing dozens of empty beer cans on tables, on

315

counters, and littered on the floor of Debra Fell's apartment were entered into evidence. The Government itself offered Mr. Fell's statements that night that described Mr. Fell's drinking. Tr. Vol. II-1 at 27:29-28:11 (June 21, 2005). Moreover, the Government was just wrong to assert as a fact that Mr. Fell was not drinking that night. There was extensive evidence not admitted at trial that clearly showed that Mr. Fell had been drinking that night and the Government was aware of it. For example, a letter written by one of the Government's mental health experts, Dr. Rabun, described how both Mr. Fell and Mr. Lee had described that they were intoxicated throughout that night and how Mr. Fell had estimated that he was intoxicated " 'every day' from the seventh grade to adulthood if alcohol was present." Letter from Rabun to Waples regarding Fell evaluation (Dec. 31, 2002) (Ex. 8).

The Government's gross mischaracterization prejudiced Mr. Fell. United States v. Whitten, 610 F.3d 168 (2d Cir. 2010). The Government was aware of the important role that Mr. Fell's intoxication, both that night and throughout his life, would play in the defense's mitigation case during the penalty phase. The statements were made in bad faith, as demonstrated by the overwhelming evidence that Mr. Fell had consumed alcohol that night. See United States v. Modica, 663 F.2d 1173 (2d Cir. 1981). The statements were insufficiently cured, as trial counsel failed to object. This failure was professionally unreasonably deficient in light of the evidence that Mr. Fell had in fact been drinking that night, denying Mr. Fell his Fifth Amendment due process rights, his rights to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment. Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510, 524 (2003). Moreover, the statements themselves constitute egregious prosecutorial misconduct which prejudiced Mr. Fell's subsequent death sentence.

316

### B.    The Government engaged in misconduct when it misstated the law regarding the evaluation of mitigation evidence

The Government repeatedly argued during its penalty phase summation that the jury should not consider mitigating factors that do not relate to the crime itself.  See, e.g., Tr. Vol. XII at 37:23–38:2 (July 13, 2005) ("I want to just talk to you and remind you again about the two questions I raised earlier about the mitigating factors, because, we submit to you, that you should consider, one, What do these factors have to do with the crimes in this case?").  This argument egregiously misstates well-settled law and the Court's instructions.  See Mem. Op. and Order, at 1, 2–3, No. 2:01-CR-12, Dkt. No. 139 (June 8, 2005) ("A capital defendant is entitled to present any relevant mitigating evidence in support of a sentence less than death. . . . In particular, the Court has concluded that information about a defendant's background and upbringing may be introduced as mitigating evidence.") (citing Payne v. Tennessee, 501 U.S. 808, 822 (1991)); Woodson v. North Carolina, 428 U.S. 280, 304 (plurality) (holding that "consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death"); McKoy v. North Carolina, 494 U.S. 433, 440-41 (1990) (applying a broad relevance standard to mitigating evidence); Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (explaining that evidence "about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."); Tr. Vol. XII at 152:18-24 (July 13, 2005) (Penalty Phase Juror Charge) ("A mitigating factor is simply an extenuating fact about a defendant's life or character, or about the circumstances surrounding the murder, or anything else relevant that would suggest that a

317

sentence of life in prison without the possibility of release is a more appropriate punishment than a sentence of death.").

This prosecutorial misconduct was severe, since the Government repeatedly told the jurors to ignore mitigation evidence that did not directly relate to the offense. See United States v. Elias, 285 F.3d 183 (2d Cir. 2002); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986). The Government introduced the mitigating factors during summation by asking, "What do these factors have to do with the crimes in this case?" Tr. Vol. XII at 38:1-2 (July 13, 2005). Shortly thereafter, when discussing the mitigating factors relating to Mr. Fell's background, a mitigating factor uniformly recognized as relevant by the United States Supreme Court, the Government remarked, "[T]his is the area where you have heard so much about the defendant's childhood, so much about his background, and again, let me just remind you, the question is, we submit to you, what's the connection between his background and childhood and these crimes?" Tr. Vol. XII at 52:6-13 (July 13, 2005). After dismissing the effect of Mr. Fell's childhood sexual abuse, the Government stated, "The question is, what does that sexual assault when he was four or five have to do with the crimes in this case?" Tr. Vol. XII at 55:3-5 (July 13, 2005). Again, only minutes later, the Government discussed the effect Mr. Fell's parents had on his upbringing and asked, "And what on earth do his parents have to do with Terry King? Nothing, ladies and gentlemen." Tr. Vol. XII at 61:3-5 (July 13, 2005). With respect to Mr. Fell's near-constant intoxication and drug use – as the Government describes it, the fact that Mr. Fell "liked to drink beer and smoke pot" – the Government asked the jury, "What does that have to do with this crime? Nothing." Id. at 16-20. These repeated improper arguments constitute severe and egregious prosecutorial misconduct. See Penry, 492 U.S. at 319 (holding that

318

evidence "about the defendant's background and character" can be important mitigating evidence to be considered by the jury in deciding whether to impose a death sentence)

These repeated improper arguments had an impact on the jury. The jurors found for Mr. Fell on a number of factors having to do with his background and childhood. See Special Verdict Form (Ex. 209 at FELL00002135-2137). But, following the Government's instruction, it apparently did not find those mitigating factors had anything to do with the crimes in this case. The question was not whether the mitigating factors had anything to do with the crimes in this case but rather whether they mitigated the punishment that should be imposed. See Penry, 492 U.S. at 319 (holding that evidence "about the defendant's background and character" can be important mitigating evidence to be considered by the jury in deciding whether to impose a death sentence). By telling the jury, otherwise, the Government's argument prejudiced Mr. Fell.

Trial counsel failed to object to any of the instances of improper argument with respect to mitigation evidence and the statements were made only hours before jury deliberations began. The Government's statements constitute egregious prosecutorial misconduct that deprived Mr. Fell of his rights under the Fifth, Sixth, and Eighth Amendments. Moreover, trial counsel's failure to object to these statements was professionally unreasonably deficient in light of the evidence that Mr. Fell had in fact been drinking that night, denying Mr. Fell his Fifth Amendment due process rights, his rights to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment. Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510, 524 (2003).

### C. The Government engaged in misconduct when it made inflammatory remarks about Mr. Fell's religious practices

The Government made numerous inflammatory remarks during its penalty phase closing regarding religious practices supposedly practiced by Mr. Fell. During a discussion of

319

Mr. Fell's life in prison since his arrest, the Government launched into the following improper and unconstitutional diatribe:

> This man signs up for bible study, and then files a lawsuit claiming to be American—a Native American. He files a lawsuit so that he can practice his Native American religion on the yard. It's bogus, ladies and gentlemen. You know it's even more bogus because, believe it or not, he observes Ramadan as a Muslim.

Tr. Vol. XII at 48:23–49:4 (July 13, 2005).

Mr. Fell has a First Amendment right to practice religion, even if not in a way that is sufficiently consistent to satisfy the Government. The Government's statements deprived Mr. Fell of his rights under the First Amendment, as well as the Fifth, Sixth and Eighth Amendments, because they attempted to inflame, and likely actually served to inflame, jurors on the basis of impermissible factors and evidence with minimal probative value. Flanagan v. State, 846 P.2d 1053 (Nev. 1993) (citing Dawson v. Delaware, 503 U.S. 159 (1992)) (finding that inflammatory references to non-mainstream religious practices during the prosecution's penalty phase closing arguments violated the appellants' First Amendment rights and vacating the death sentences); see also Dawson, 503 U.S. at 169 (Blackmun, J. concurring) ("Because of the potential chilling effect that consideration of First Amendment activity at sentencing might have, there is a substantial argument that harmless-error analysis is not appropriate for the type of error before us today."); Zant v. Stephens, 462 U.S. 862, 885 (noting that considering a defendant's religious practices as an "aggravating factor" violates the Eighth Amendment); 18 U.S.C. § 3593(f) (directing that the jury "shall not consider the race, color, religious beliefs, national origin, or sex of the defendant"); Berger v. United States, 295 U.S. 78, 88 ("The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury. . . . The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially

320

is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."). The Government's statement also mischaracterized Mr. Fell's fasting, imputing additional religious beliefs to which Mr. Fell had not professed and attempting to cast him in a poor light for exercising his First Amendment right to practice his own religious beliefs.

The Government's statements prejudiced Mr. Fell. The Government's sarcastic comments about Mr. Fell's various religious interests were intended to and did inflame the jury, and cast doubt upon the mitigating factor with respect to Mr. Fell's time in prison. Moreover, the statements were made at a time during which they were most likely to inflame the jury. The Government's references to Mr. Fell's religious interests in prison began during the cross-examination of a prison guard, where the Government also attempted to cast doubt upon the legitimacy of Mr. Fell's interests in Native American services because he is "of Polish descent" – an impermissible appeal to racist generalizations – and where the Government referenced Mr. Fell's decision to fast for Ramadan. Tr. Vol. VII-2 at 52:16-56:6 (July 6, 2005). These statements were made only one day before the London public transit bombings, when public anti-Muslim sentiment was particularly high. Paul Vitello, "The Bombings in London: In Americans, Lurking Fears Rise to Surface," N.Y. TIMES, July 8, 2005, at A1. The statements during the Government's closing were made only one week later. The Government's statements regarding Mr. Fell's religious interests constituted egregious prosecutorial misconduct that violated Mr. Fell's First, Fifth, Sixth, and Eighth Amendment rights.

### D. The Government engaged in misconduct when it impermissibly commented upon Mr. Fell's lifestyle in prison

The Government impermissibly characterized a life sentence without the possibility of release as "[a] cup of coffee, a good book, some exercise, a sunny day in the yard,

321

shooting hoop with your buddies." Trial Tr., Vol. XII at 130:6-8 (July 13, 2005). Courts have condemned such statements, which are frequently described as "three hots and a cot" arguments. Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002) (finding improper references to "clean sheets to sleep on every night, three good meals a day, visits by [petitioner's] friends and family"); Le v. Mullin, 311 F.3d 1002, 1014-15 (10th Cir. 2002) (finding improper references to "three meals a day and a clean bed every night and regular visits from his family"). The Government went further than merely referring to what life in prison would be like for Mr. Fell during its summation. The Government described how Mr. Fell "likes his cup of coffee. He likes those three square meals a day." Trial Tr., Vol. XII at 129:5-8 (July 13, 2005). In the same breath, without referring to evidence in the record, and with intent to inflame the jury, the Government declared that "Terry King died with a mouthful of blood." Id. The Government continued to describe the "perks" of life in prison without the possibility of release, including "rec. facilities, access to a gym, access to books in a library, phone privileges, correspondence, mail, game tables, letters, holidays, birthdays." Trial Tr., Vol. XII at 129:9-15 (July 13, 2005). The Government repeated that Mr. Fell will receive "three meals a day" and told the jury he would get "that cup of coffee that he didn't want to put down," referring to a video shown during the trial. Id.

The Government's impermissible commentary on prison life prejudiced Mr. Fell. United States v. Whitten, 610 F.3d 168 (2d Cir. 2010). The effect of the Government's statements was severe, and their statements were frequent and repeated. United States v. Elias, 285 F.3d 183 (2d Cir. 2002); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986). They were intended to and did inflame the jury and grossly mischaracterized a life sentence without the possibility of release. The effect of the Government's repeated impermissible references to

322

Mr. Fell "lik[ing] his cup of coffee" was magnified by the connection to the video presented to the jurors during the trial that showed an argument between Mr. Fell and prison guards relating to a cup of coffee. The Government's statements about "three square meals a day" were also particularly prejudicial because the jury was told more than once that Mr. Fell had gained weight since being in prison, a virtually inevitable result of eating regularly after a lifetime of eating sporadically and infrequently. Trial Tr., Vol. VIII-1 at 118:24-25 (July 6, 2005); Trial Tr., Vol. XII at 103:11-18 (July 13, 2005). The impact of the statements could not have been greater, as they were among the final statements the jury heard from either party before retiring for deliberations. The statements were insufficiently cured, as trial counsel failed to object and the Court did not specifically instruct the jury to ignore the statements during deliberations. The statements violated Mr. Fell's rights under the Fifth, Sixth, and Eighth Amendments.

Trial counsel's failure to object to the Government's "three hots and a cot" argument were professionally unreasonable. Trial counsel had numerous opportunities to object to the testimony, as the impermissible statements were repeated numerous times. Trial counsel also could have asked that the statements be struck or asked for a limiting instruction from the Court. By failing to take any of these corrective actions, trial counsel prejudiced Mr. Fell's right to effective assistance of counsel under the Sixth Amendment. Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510, 524 (2003).

Appellate counsel were ineffective for failing to raise this issue, clearly framed by the record, on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396-97 (1985) (finding a right to effective assistance of appellate counsel on first appeal); Strickland v. Washington, 466 U.S. 668 (1984); ABA Guidelines, Guideline 10.15.1(C) ("Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards

323

applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review."). There could be no reasonable strategy for neglecting to raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different. Evitts v. Lucey, 469 U.S. 387, 396-97 (1985); Strickland v. Washington, 466 U.S. 668 (1984); ABA Guidelines, Guideline 10.15.1(C).

These statements, taken alone and together, so infected the trial as to make it fundamentally unfair. Berger v. United States, 295 U.S. 78, 89 (1935).

## XXI. The Cumulative Impact of The Government's Prosecutorial Misconduct During Both the Guilt and Penalty Phases Resulted in Cumulative Prejudice Which Rendered The Trial Fundamentally Unfair

The separate instances of prosecutorial misconduct are described in detail above and are incorporated by reference herein, and each warrant reversal of Mr. Fell's conviction or sentence standing alone. However, even assuming *arguendo* that the separate instances of misconduct alone did not impact a single juror's weighing of the aggravating and mitigating factors, the cumulative effect of the Government's misconduct so infected the trial as to render it fundamentally unfair. See Berger v. United States, 295 U.S. 78, 89 (1935) ("[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with the probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded."). It is therefore unquestionable that these numerous instances of prosecutorial misconduct considered cumulatively deprived Mr. Fell of a fair trial and entitle him to a new trial.

324

Statements by the Government during both guilt and penalty phase arguments were improper, inflammatory and misstated both the facts and the law. Moreover the government elicited false or misleading testimony on multiple occasions. Finally, in its zeal to obtain a death sentence against Mr. Fell, the Government withheld critical documents from the defense it was required to turn over by law and violated the Court's April 7, 2005 order and performed unauthorized mental health testing upon Mr. Fell. This cumulative prosecutorial misconduct was egregious and deprived Mr. Fell of his rights under the Fifth, Sixth and Eighth Amendments. A death sentence resting on such egregious prosecutorial misconduct cannot stand.

Post-conviction counsel will file a discovery motion after the filing of this Motion seeking access to discovery material held in the Government's possession which counsel has been unable to obtain despite diligent efforts. It is anticipated that additional claims of prosecutorial misconduct may be identified during the course of discovery which warrant amendment to this motion.

## XXII. Mr. Fell ~~was~~Was Deprived of his Fifth, Sixth, and Eighth Amendment ~~Right~~Rights to an Impartial Jury

### A. ~~Jurors who would have been Stricken for Cause if they had been Truthful were Empanelled after Making Material Misstatements or Omissions During Jury Selection.~~

Several instances of juror misconduct deprived Mr. Fell of his Fifth, Sixth, and Eighth Amendment ~~right~~rights to a fair trial and impartial jury. ~~As appropriate for a capital case in which there~~Notwithstanding the Court's clear instructions to the jurors about the importance of answering voir dire questions completely and truthfully, several of the jurors in Mr. Fell's case gave false answers. In addition, at least two jurors were exposed to extraneous evidence;

325

and one juror engaged in unlawfully coercive conduct in the course of jury deliberations. As a consequence, the judgment must be vacated.

## A. Juror #162



























































### B. ~~2.~~ Juror #26.

Juror #26 was exposed to highly prejudicial extra-record information about Mr. Fell's case and misrepresented and concealed that knowledge. Throughout voir dire and continuing through trial, the Court went to great lengths to ensure that no juror was exposed to extra-record information and that Mr. Fell would be judged by a jury that heard information about the case exclusively in Court, during which he would have a right of confrontation, and not out of Court. In its initial, videotaped, instructions to the jury venire, the Court emphasized that it was critical that Mr. Fell be judged "on the evidence presented in the courtroom and not on anything that [jurors] may have heard or read or experienced outside the courtroom," that a juror who was exposed to extra-record information could not be fair and impartial, and that it was the entire purpose of voir dire to ensure that each juror who was ultimately selected had not been exposed to such information and could be fair and impartial. See, e.g., Tr. Videotaped Jury Instructions 13 (Fell Ex. 117). In the juror questionnaire, prospective jurors were asked whether

355

they knew anything about the case, including whether they had read any information about the case. During individual questioning, the Court asked jurors, including Juror #26, what they knew about the case. And, highlighting the importance that Mr. Fell be judged solely on the basis of the evidence in court, every day of trial, the Court reiterated the questions whether any juror had learned anything about the case from outside the courtroom.[177]

In order for the jurors to answer these questions, the Court explained the nature of the charges in the introduction to the long questionnaire. Before any juror completed the long questionnaire, the Court explained that "[t]he indictment in this case charges that the defendant and Robert Lee committed the crimes of kidnapping and carjacking related to the abduction of Teresca King from Rutland, Vermont and her murder in Duchess County, New York, on or about November 27, 2000. The indictment also alleges that the defendant Donald Fell possessed and brandished a firearm during the kidnapping and carjacking, and that he possessed the same firearm as a fugitive from justice. The defendant is facing the death penalty as a possible punishment." The Court also listed Robert Lee's name in the short list of those persons whose names might be mentioned at trial, inquiring whether the juror knew or had any connection with them. Fell Ex. 322 at FELL-00002749.

During voir dire, Juror #26 testified that he had not been exposed to any extra-record information. He answered the questionnaire by stating that he had not read anything about the case, and did not reveal that he had heard that Mr. Lee committed suicide. During the individual voir dire questioning, he was asked by the Court the extent of his knowledge of the case. First, the Court asked whether Juror #26 had heard anything about Mr. Fell's case, to

---

[177] See, e.g., Trial Tr. Vol. 1-1, 15, June 20, 2005; Trial Tr. Vol. 2-1, 3, June 21, 2005; Trial Tr. Vol. 3-1, 11, June 23, 2005; Trial Tr. Vol. 4-1, 24, June 24, 2005; Trial Tr. Vol. 5-1, 18-19, June 28, 2005; Trial Tr. Vol. 6, 3, June 29, 2005; Trial Tr. Vol. 7-1, 41, July 1, 2005; Trial Tr. Vol. 8-1, 3, July 6, 2005; Trial Tr. Vol. 9-1, 8,

which he responded "No, not really.  No." Voir Dire Tr. at 90:7-8 (May 13, 2005).  When pressed if he knew any of the facts of the case, Juror #26 offered only, "No.  I think at one point, a long time ago, I heard something in passing, but other than that, no." Id.  Finally, when pushed by the Court he admitted only that he knew "just that a woman had been kidnapped,"  id., but concealed the far more significant fact that Mr. Fell's co-defendant (whose name Juror #26 had now heard several times) had committed suicide while in jail following his arrest.

He recognized Mr. Lee's name and the fact that he had been exposed to extra-record information the first time he heard that name, yet when asked by the Court on a daily basis, he continued to state that he had never heard anything about the case outside of Court. Tr. of Sept. 27, 2013 Hr'g at 13 ("Sept. Hr'g Tr.").  Mr. Lee's name was then mentioned prominently during the first day of trial, and every day thereafter.  Juror #26 continued to conceal.

It now is undisputed that Juror #26 was exposed to highly prejudicial extra-record information that Mr. Fell never had an opportunity to confront and that he concealed and lied about his exposure to that information.  Juror #26 was interviewed by 2255 counsel on January 15, 2011.  During that interview, Juror #26 was asked about his knowledge with respect to Mr. Lee.  Juror #26 asked in response, "The one who hung himself in jail?" Juror #26 described that he had heard of Mr. Lee's suicide from a news report that had aired around the time of his death (years before the trial and juror voir dire).  In Court on September 27, 2013, Juror #26 confirmed that he heard before the trial that Mr. Lee had committed suicide.  Id.  He also confirmed that as soon as he heard Mr. Lee's name (which occurred during voir dire), he connected the case to this outside information that he had heard.  Sept. Hr'g Tr. at 15, 27-28. When Mr. Lee's name was

July 7, 2005; Trial Tr. Vol. 10-1, 3, July 8, 2005; Trial Tr. Vol. 11, 38, July 12, 2005; Trial Tr. Vol. 12, 11-12, July 13, 2005.

first mentioned, Juror #26 "remembered [he] had heard that name before, and then [he] realized . . . [that he] had heard it before because [he] had heard it on the news that he had committed suicide." Id. at 28.

That exposure was highly prejudicial. During trial, the Court granted Mr. Fell's motion to exclude any evidence relating to Mr. Lee's death. Opinion and Order, May 25, 2005, Dkt. 129. Moreover, Mr. Lee's role, the fact that he was not standing trial and facing the death penalty, and the relative culpability of the two defendants were central issues to the mitigation case. Among other things, and not by way of limitation, Mr. Fell argued that the jury should not impose the death penalty because Mr. Lee was not facing the death penalty. The fact that Mr. Lee was not facing the death penalty was never in dispute; what remained in dispute was the weight to be accorded to that mitigating factor. Mr. Fell fought hard to exclude evidence suggesting that Mr. Lee committed suicide, in part because it was highly contested whether he did in fact commit suicide, and he won a ruling from the Court excluding that evidence. Mr. Fell was deprived of the benefit of that ruling—and deprived of any opportunity to confront the prejudicial information—because Juror #26 received such information extra-record unbeknownst to the Court and the defendant. It is evident from Juror #26's testimony on September 27, 2013 that he heard not only that Mr. Lee had died, but that he had committed suicide, and that he knew this prior to trial. Sept. Hr'g Tr. at 27. Juror #26's knowledge caused Mr. Fell prejudice in the weighing of the mitigating facts regarding Mr. Lee, and ultimately in the jury's sentence. Accordingly, Mr. Fell is entitled to a new trial.

Juror #26 also misrepresented his prior criminal history and that of his family. Juror #26 answered "Nono" to the question, "Have you or has a family member or close friend ever been charged with a crime?" Juror Questionnaire (Ex. 125Fell Ex. 124 at FELL-00001369.

358

On his short questionnaire, he also answered "no" to the question whether he or "any relative or person close to" him had ever been accused of a crime. [Juror #26] Short Form Juror Questionnaire (Fell Ex. 332 at ~~Fell 00001369~~FELL-00003501). In fact, Juror #26 was convicted of several criminal charges, including one in April 1996 of criminal mischief, which Juror #26 informed 2255 counsel arose out of a marital dispute. Fell Ex. 240. Juror #26's misrepresentation about his prior criminal conviction prevented trial counsel from obtaining critical information necessary to a fair jury selection and would have given rise to a for cause strike. See Irvin v. Dowd, 366 U.S. 717, 722 (1961) (holding that the Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors). Juror #26's past criminal conviction in connection with a domestic dispute was highly relevant to whether he was qualified to serve as a juror in Mr. Fell's case and could objectively evaluate evidence of the domestic turmoil in Mr. Fell's life. That turmoil was important evidence with respect to at least two mitigating factors: first, that "~~As~~[a]s a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other," and second, that "Donald Fell's parents were violent alcoholics who abandoned him as a child." Special Verdict Form (Fell Ex. 209).

~~In addition, Juror #26 misrepresented his knowledge regarding Mr. Fell's case. During voir dire, he was asked by the Court the extent of his knowledge of the case. First, the Court asked whether Juror #26 had heard anything about Mr. Fell's case, to which he responded "No, not really. No." Voir Dire Tr. at 90:7-8 (May 13, 2005). When asked if he knew any of the facts of the case, Juror #26 responded, "No. I think at one point, a long time ago, I heard something in passing, but other than that, no." Id. When prompted by the Court he stated that he knew "just that a woman had been kidnapped." Id.~~

359

Juror #26 was also convicted of driving under the influence and charged with the misdemeanor of non-payment of wages. In response to this latter charge, Juror #26 hired one of the best lawyers in Vermont to defend him. When that lawyer subsequently died, Juror #26 was appointed a public defender. Only after all of this was he convicted of the crime and ordered to pay $2,875 in restitution.[178]

Juror #26 also failed to report his son's prior criminal history. Juror #26 was placed on probation in 2000 for smashing the window of a woman's car following a dispute.[179]

Juror #26 was interviewed by 2255 counsel on January 15, 2011. During that interview, Juror #26 was asked about his knowledge with respect to Mr. Lee. Juror #26 asked, "The one who hung himself in jail?" Without any prompting, Juror #26 described that he had heard of Mr. Lee's death from a news report that had aired around the time of his death (years before the trial and juror voir dire). Knowledge of Mr. Lee's death from a news report years before the trial plainly evidences an immensely vaster knowledge of the underlying facts of Mr. Fell's case than Juror #26 represented during voir dire. also omitted a long history of civil suits involving him or his family, on his short questionnaire.[180] He also withheld his connection with government office.[181]

Juror #26's material misstatement did not allow trial counsel to lodge what

This Court has already held that Mr. Fell has made facially valid claims that Juror #26 made material misstatements on voir dire, and that these misstatements would have been the basis for a successful challenge for cause. The evidence of Juror #26's exposure to pretrial publicity (particularly the pretrial publicity to which Juror #26 was exposed) would have

---

[178] Superior Court of Vermont, Essex Unit, Case No. 44-4-92 Ecr. (Fell Ex. 333 at FELL-00003525).

[179] Vermont State Police, A Troop Middlesex (Fell Ex. 334).

[180] Juror #26 was involved in at least two civil suits. South Main Body Shop Inc v. [Juror #26]; Calco, Inc. v. [Juror #26]. His father was also involved in at least two civil suits. Hodgdon v. Town of Victory; Hodgdon v. Brown. His son was involved in at least one. Citizens Savings Bank & Trust v. Hodgdon.

[181] A 2006 *Rutland Herald* article, "Granby: A red speck in a blue state," said that Frederick Hodgdon, Juror #26's father, was a "longtime selectboard chairman, road commissioner, civil defense director, energy coordinator, service officer, solid-waste supervisor and justice of the peace" and that he had served for "many decades." Fell Ex. 335.

360

required disqualification, without more, and would have supported a successful challenge for cause. Indeed, the details of Mr. Lee's death (and the nature of his relationship with Mr. Fell more broadly) were not admitted at trial, because of concern, *inter alia*, over the prejudicial implications with respect to the relative culpability of Mr. Fell and Mr. Lee. Indeed, evidence of Mr. Lee's death was the subject of a motion in limine, in which trial counsel argued that it would unfairly prejudice Mr. Fell and in which the Court preliminarily ruled that such evidence would be inadmissible, pending a specific Government proffer. Order of May 25, 2005 at 8. Trial counsel would have successfully removed Juror #26 for cause had it known of his actual knowledge of the facts. Accordingly, Juror #26's material misstatement prejudiced Mr. Fell and violated his Fifth, Sixth, and Eighth Amendment rights.

**B.    Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to a Fair and Unbiased Trial when Jurors Were Exposed to Extraneous Influences.**by trial counsel, and that Juror #26 was exposed to extra-record information. In this Amendment, Mr. Fell has added further detail demonstrating that Juror #26 provided answers in voir dire that were materially false, and demonstrating, as Juror #26 testified on September 27, that Juror #26 simply did not take his obligations in voir dire seriously. Sept. Hr'g Tr. at 12, 64. Accordingly, Mr. Fell is entitled to an evidentiary hearing to determine if these false responses impacted Juror #26's impartiality. See Order: Claim XXII at 9.

**C.    1. Juror #143**

For decades, the law in this Circuit and as set forth by the Supreme Court has been clear: the right to a speedy and public trial by jury during which the accused has the right to be confronted with the witnesses against him carries with it the guarantee that the case not be heard by a jury subject to extraneous evidence which has not been the subject of cross-examination and that the accused has not had the opportunity to confront. See United States v. Simmons, 923 F.2d 934, 943 (2d Cir. 1991) (holding that "facts that relate to a defendant's guilt, but which are not admitted as evidence during trial, should not be exposed to a jury during deliberations. Any other conclusion would permit a jury to consider incriminating evidence that has not been subject to confrontation or cross-examination"); see also Turner v. Louisiana, 379

361

U.S. 466, 472-73 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.").

This Court was extremely sensitive to that precept and protective of Mr. Fell's constitutional rights. The Court stated in its opening instructions to jurors before voir dire, "[A] jury's verdict must be free from outside influence. So, I am ordering each and every one of you not to discuss this case . . . . Please do not read, look at, or listen to any reports about this case." Script for Jury Instructions at Fell 00001355 (Ex. 117). The Court instructed the jury at the outset of trial, after it was impaneled: "I just want to remind all of you, particularly now that the trial has started, that it's just extraordinarily important that you make sure that you don't have any contact with anyone, discuss the case with anyone, listen or hear anything at all. I need to know about that right away." Tr. Vol. I 2 at 89:3-8 (June 20, 2005). The Court repeated a similar admonition twice on each day of the trial with the exception of June 23, 2005, on which the Court only provided one such warning. Tr. Vol. I 2 at 89 (June 20, 2005); Tr. Vol. II 2 at 38 (June 21, 2005); Tr. Vol. IV 2 at 52 (June 24, 2005); Tr. Vol. V 2 at 69 (June 28, 2005); Tr. Vol. VI 2 at 3, 61 (June 29, 2005); Tr. Vol. VII 2 at 98 (July 1, 2005); Tr. Vol. VIII 2 at 68 (July 6, 2005); Tr, Vol. IX 2 at 73 (July 7, 2005); Tr. Vol. X 2 at 68 (July 8, 2005).

The Court did not just instruct the jurors not to be exposed to extraneous information; it also asked the jurors whether they had honored that pledge. Tr. Vol. I, at 10 (June 20, 2005). On the first day of trial, the Court stated, "And again, as I have done in the past, I will be asking you that same question everyday, and also, by the way, it includes not discussing the case among yourselves for the same reasons that I have talked about before. … You need to tell

362

~~me … if you have learned anything else from outside the courtroom." Id. On the second day of the court proceedings, after the jury was impaneled, the Court asked jurors if they had "learned anything about the case from outside the courtroom" and received a negative answer from each of the jurors. Tr. Vol. III-1 at 11:14-15 (June 23, 2005). The Court repeated that question in one form or another at the start of each day throughout the trial. Tr. Vol. I at 10, 15 (June 20, 2005); Tr. Vol. II at 3 (June 21, 2005); Tr. Vol. III at 11 (June 23, 2005); Tr. Vol. IV at 24 (June 24, 2005); Tr. Vol. V-1 at 18 (June 28, 2005); Tr. Vol. VII-1 at 41 (July 1, 2005); Tr. Vol. VIII-1 at 8 (July 6, 2005); Tr. Vol. 8-1 at 8 (July 7, 2005); Tr. Vol. X-1 at 3 (July 8, 2005); Tr. Vol. XI at 38, 114 (July 12, 2005); Tr. Vol. XII at 11 (July 13, 2005). It received the same answer.~~

~~Unbeknownst to the court and to the defense, however,~~ Juror #143 violated his pledge <u>not to learn anything about the case outside of the courtroom during trial and thereafter lied about it both during trial and at the post-conviction hearing</u>. During the guilt phase of Mr. Fell~~'~~'s trial, he drove ~~for over two hours~~ to Rutland~~—~~, the scene of the ~~murder~~murders of ~~Mrs~~Ms. Fell and Charles Conway and the kidnapping of ~~Mrs~~Ms. King~~—~~ to undertake his own independent examination of the Fells' residence at 135 Robbins Street, where Debra Fell~~'s~~ and Charles Conway's bodies were discovered. This was also the apartment where Mr. Fell and Mr. Lee lived while in Vermont. ~~The trip required~~That drive would have taken about two hours ~~of travel~~there and two hours back.

Juror #143 also inspected the area surrounding the Price Chopper where Mr. Fell and Mr. Lee first encountered Mrs. King. Moreover, according to his own account, Juror #143 shared his impressions of the crime scene with other jurors. Juror #143 provided a statement to 2255 counsel on December 19, 2010 describing his investigation in Rutland and his discussions about his trip with other jurors. He explained that during guilt phase deliberations:

363

We discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper. The mother's neighborhood wasn't great, but it was okay. The house was decent. She was just trying to live her life. I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife into the dumpster in the parking lot . . . The lighting at the Price Chopper in Rutland was weak. At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit.

> Statement of Juror #143, Dec. 19, 2010 (Fell Ex. 241) .

Finally, it cannot be said that Juror #143's exposure to extraneous evidence or his exposure of that evidence to other jurors was harmless. Loliscio v. Goord, 263 F.3d 178, 185 (2d Cir. 2001) (citation omitted). One of the critical issues at trial and in the penalty phase was whether, at the time of the kidnapping and carjacking at issue and thereafter, Mr. Fell was intoxicated or was otherwise acting with an impaired capacity. Mr. Fell was operating with an impaired capacity. The Government disputed that, and argued for death. And among the critical facts the Government alleged to support its argument was Mr. Fell's accurate recollection at the time of his post arrest statements of the route he followed from 135 Robbins Street to the Price Chopper and his alleged conduct in "lurking in the shadows," immediately before the kidnapping of Mrs. King. Trial Tr., Vol. I 1 at 109 (June 20, 2005). The Government argued that because Mr. Fell remembered his route to the Price Chopper and sites on that route and because he had the forethought to wait in the dark for Mrs. King he could not have been highly intoxicated on the night of the crimes, that his capacity was fully intact, that the crimes were deliberate and premeditated, and that he thus deserved the death penalty. Indeed, the Government emphasized

364

that Fell "recalled the exact route block by block they took from the Robbins Street apartment, past Foley's, Uncle Sam's, Jiffy Mart, the Post Office, and the Stop Light Bar, and on down past the parking deck to the plaza." Trial Tr. Vol. IV-1 at 63:15-24 (June 24, 2005).[112] The defense argued to the contrary, that Mr. Fell was indeed intoxicated and his actions were not premeditated, saying, "[The Government] used this word plan over and over again" and, after noting the amount of beer consumed in the apartment that night by Mr. Fell and others, "There was some serious drinking going on that night." Trial Tr., Vol. IV-1 at 72:15; at 73:1-15 (June 24, 2005). And, putting the lighting of the Price Chopper parking lot directly at issue, "[L]et's talk about planning and what events happened here and whether they are consistent with some kind of plan or not … They left the door unlocked to the apartment and went out in the street with an unloaded shotgun in the middle of Rutland in the morning where anyone could see them. And they went to a parking lot that was lit." Trial Tr. Vol. IV-1 at 74:17-19; 75:6-10 (June 24, 2005).Juror #143's intentional trip to Rutland to inspect the crime scene put a heavy thumb on one side of the balance of this hotly contested issue. It exposed him to important, and prejudicial, information to evaluate this claim that was not presented in court and that the defense did not have an opportunity to confront. And the result was that Mr. Fell's rights to confront and challenge the evidence against him and his other jury trial rights were violatedJuror #143's observations of 135 Robbins Street and the surrounding neighborhood gave him information not introduced at trial, and this prejudiced Mr. Fell. First, he had extraneous information about the few issues in controversy at both the guilt and the penalty phases. Indeed, Juror #143 concluded from his visit that Mrs. Fell's house was "decent" and she was "just trying to live her life."

---

[112] Although the Government made no specific reference to Mr. Fell's statements about the path he took to the Price Chopper, they did argue during the penalty phase closing that Mr. Fell acted with premeditation and was "careful." Mr. Fell's level of intoxication was also relevant to two mitigators during the penalty phase,

365

Statement of Juror # 143 (Dec. 19, 2010) (Fell Ex. 241). Second, he gained information relevant to the guilt and penalty phase issues. Juror #143's inspection and experimentation in the area gave him the opportunity to experience the route from 135 Robbins Street to the Price Chopper that Mr. Fell traveled on the fateful night of November 27, 2000 in the way a person travelling that route would have experienced it—, noticing the distances between locations, how simple or complicated the route was, where different buildings were located, how easy or difficult they would be to remember, how easy or difficult the route would be to navigate, and the like. The jury was presented an aerial photograph that showed in a general, abstract way where certain locations in the downtown Rutland area were and witnesses described where the Price Chopper was relative to the nearby Dunkin Donuts and Wal-Mart. Trial Tr., Vol. I 1 at 72:21-23; at 89:14-21; at 106: 20-24 (June 20, 2005); Trial Tr., Vol. II 2 at 20:8-14; 21:13-18 (June 20, 2005). But, no witness described the path between 135 Robbins Street and the Price Chopper, or described where both 135 Robbins Street and the Price Chopper were. Indeed, a police officer who pointed the jury to the location of 135 Robbins Street on the map only noted that the house was "a few blocks from downtown Rutland." Trial Tr., Vol. II 2 at 21:13-18. Many of the individual buildings described by Mr. Fell were not visible from the aerial photographs, making them inadequate substitutes for a drive through the area, such as the one Juror #143 took. And no witness described what it actually was like to walk that route, how simple it was, how exposed Mr. Fell and Mr. Lee might have been to public view during their walk, or how memorable the sites and locations would be.

Juror #143 did so. He did so years after the events in question. And he did so in circumstances where the Court could not control his conduct and the defense had no opportunity

including whether Mr. Fell's capacity to appreciate his conduct was significantly impaired and whether he planned to kill Mrs. King at the time she was kidnapped. See supra.

~~to challenge what he was seeing — or to point out how his vantage might have been different from Mr. Fell's. He did so without telling anyone except, by his own account, his fellow jurors. By traversing that route himself, and doing so outside the presence and without the knowledge of the defense, Juror #143 took away from the defense one important argument it had — that the Government had not proven that Mr. Fell was fully sober and acting without an impaired capacity. And (although unnecessary to this claim) Juror #143 did so under circumstances that undoubtedly would have created an erroneous impression — during the day in Rutland many years later and not during the early morning hours of 2000.Moreover, Juror #143's inspection also was highly relevant to, and not harmless with respect to, the Government's argument that Mr. Fell acted with premeditation because he and Mr. Lee were "lurking in the shadows" of the Price Chopper parking lot. Trial Tr., Vol. I-1 at 109:10-11 (June 20, 2005); Trial Tr. Vol. IV-1 at 44:9-17 (June 24, 2005). Indeed, the Government offered no other evidence about the lighting conditions to support Mr. Trapasso's testimony. But, as reflected in Juror #143's statement, he clearly took note of the lighting conditions. Thus,~~ Juror #143 alone was able to observe ~~those lighting conditions and gain information with which to assess (consciously or subconsciously) the veracity of the Government's witness and thus whether Mr. Fell was acting in a premeditated fashion and deserved to die or not.~~<u>the lighting conditions in the Price Chopper parking lot.</u>

~~Finally, Juror #143's examination of 135 Robbins Street was also relevant to, and not harmless with respect to, the mitigation evidence in the penalty phase about Mr. Fell's troubled home life as a child. The violence and alcoholism in Mr. Fell's home were key features of the defense mitigation case. Juror #143's observations of 135 Robbins Street and the surrounding neighborhood from an outsider's perspective gave him a vantage point from which to form a view about Mrs. Fell that ran counter to the evidence presented about her violent tendencies and chronic alcoholism, and Mr. Fell's unstable home life. Indeed, Juror #143 concluded from his visit that Mrs. Fell's house was "decent" and she was "just trying to live her life," and thus necessarily (and as a result of his visit) was in a position to discount important~~

367

mitigating evidence about Donald Fell's life with his disastrously dysfunctional mother in Vermont. Statement of Juror #143 (Dec. 19, 2010).

### 2. Juror #26.

On the first day of the trial, immediately after the jury was sworn in, the Court asked jurors, "Has anyone, by inadvertence, for any other reason, heard any publicity, radio broadcast or TV on this case?" Tr. Vol. I at 10 (June 20, 2005). None of the jurors responded affirmatively. The Court made the same inquiry each and every other day of the proceedings. None of the jurors responded affirmatively.

However, by his own later admission, Juror #26 was exposed to a television news report that described the supposed suicide of Mr. Lee that he did not disclose to the Court or to counsel. The details surrounding Mr. Lee's death were not admitted at trial, and in fact were the subject of a motion in limine. Hr'g Tr. at 90 (May 13, 2005). The Court clearly recognized the prejudice that exposure to the news could cause Mr. Fell and therefore the importance that the jurors not be exposed, and that, if they were exposed, they inform the Court. The Court's instruction was clearly the prudent and appropriate measure. Had a juror been exposed and admitted it to the Court, the Court could have taken the appropriate measures, including questioning the juror in chambers, giving a curative instruction, or striking the juror and replacing the juror with an alternate. Unfortunately, Juror #26 defeated the Court's protective measures. News items had been specifically emphasized by the Court, in recognition of their prejudicial effect. Tr. Vol. I 1 at 10 (June 20, 2005).

Exposure to news of Mr. Lee's death was obtained without the evidentiary safeguards present at trial and was prejudicial to Mr. Fell for a number of reasons, only a few of which are laid out here. For one, the information was highly relevant to, and prejudicial with respect to, Mr. Fell's own culpability for the events at issue. The suicide of Mr. Lee was

368

information that could, and would, be understood to be reflective of Mr. Lee's guilty conscience. He killed himself because of the awful crime he had committed — or because he had no defense to charges with respect to that crime. But, if that was the implication with respect to Mr. Lee, it would also be the implication with respect to Mr. Fell. As the Court itself recognized in excluding this information, exposure to it was prejudicial.

The information also had a direct bearing on — and was prejudicial with respect to — the relative roles of Mr. Fell and Mr. Lee. Simmons, 923 F.2d at 943; Turner, 379 U.S. at 472-73. One mitigating factor read, "Robert Lee, equally culpable for the crimes, will not face execution." Out of court (and inaccurate) evidence with respect to how Mr. Lee died would prejudice a juror's consideration of this mitigating factor. There is a reasonable probability that Juror #26 would have a struck a different balance but for this exposure and Mr. Fell would not have been sentenced to death. Accordingly, Mr. Fell was deprived of his Fifth, Sixth, and Eighth Amendment rights.

C.   ~~Mr. Fell was Deprived of his Fifth, Sixth, and Eighth Amendment Rights to an Impartial Jury and an Uncoerced Jury Verdict when One Juror Coerced Another into Changing her Vote from a Life Sentence to a Death Sentence by Aiming a 12-Gauge Shotgun at her when she Resisted Voting for Death.~~

Moreover, demonstrating the prejudice from the information, Juror #143 lied about his trip both at trial and during the Court's investigatory hearing on August 15, 2013. At trial, he and the other jurors were repeatedly asked whether they had been exposed to any extrajudicial information about the case. He answered no, never revealing the secret trip he had made.

Moreover, in the post-conviction hearing, Juror # 143 retracted his admission that he went to Rutland at all during Mr. Fell's trial. Confronted with the fact that an extra-record trip could lead to a new trial for Mr. Fell, he admitted that he was "not happy" that the defense was using his statement and that he believed "it would be wrong if [his] statement could be used to undermine the sentence in this case." Aug. Hr'g Tr. 36. Confronted with the impact that his actions could have on the verdict, he then stated that the trip to Rutland only took place in 2010. Indeed, all statements in the declaration other than those that could influence this litigation were affirmed by Juror #143.

That retraction is false, as was clear from the hearing, and Juror #143's prior statement against interest provides evidence that is sufficient in and of itself that he made his own site visit and was exposed to extra-record information. Mr. Fell now has other evidence further contradicting Juror #143's retraction. Specifically, Mr. Fell can prove that Juror #143 did take a trip to Rutland in the summer of 2005, that he was accompanied by another person, that he talked with another person about taking this trip before he went, and that he discussed his findings with this person after he returned from the trip. Mr. Fell is entitled to an evidentiary hearing at which to present this evidence, which will prove that Juror #143 perjured himself in this proceeding.

~~Undersigned counsel undertook to interview the jurors in this case in order to determine whether there were any constitutional improprieties in the process of empanelling the juror and reaching a verdict. Without prompting, Juror #143~~<u>In addition to his unauthorized trip to Rutland, Juror #143 also</u> reported<u> in an interview with counsel</u> that during deliberations in the penalty phase, a female juror was among the jurors who believed that mitigating factors in Mr. Fell~~'~~<u>'</u>s life warranted the imposition of a life sentence~~, and not~~ <u>instead of</u> a death sentence. Among the factors she believed ~~militated~~<u>mitigated</u> against a death sentence was the fact that the shotgun Mr. Fell and Mr. Lee were carrying on the night of the crimes was not loaded. Juror #143, who believed a death sentence was appropriate, pointed the shotgun Mr. Fell and Mr. Lee had used at the female juror to intimidate her into changing her vote by instilling fear. According to Juror #143, he took the gun, "cocked and pointed" it at the juror and caused her to squirm. Juror #143 explained to 2255 counsel:

> A female juror pointed out that the shotgun was not loaded. The marshal then
>
> brought in the gun. We showed the jury that it was unloaded. I also made sure
>
> that the gun was unloaded. This was important to me because as a hunter, I am
>
> very serious about gun safety. I cocked and pointed it at her and she squirmed. I
>
> said, 'That~~'~~<u>'</u>s what they did, you were scared even though you knew it wasn~~'~~<u>'</u>t
>
> loaded.'"

Statement of Juror #143, Dec. 19, 2010 (<u>Fell </u>Ex. 241). After Juror #143 pointed the shotgun at the juror, she acquiesced to voting for Mr. Fell~~'s death. It would deprive him of his Sixth and Fourteenth Amendment rights to impose a death sentence on Mr. Fell that was obtained through such coercion. See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988); United States v. Pleva, 66 F.2d 529, 532 (2d Cir. 1933) (holding that jury coercion "strikes at the root of the right to a trial by jury"); see also United States v. Grieco, 261 F.2d 414 (2d Cir. 1958) (per~~

371

curiam), cert. denied, 359 U.S. 907 (1959) (holding that threats of violence, as well as other forms of threats, can be sufficient to overturn a verdict). Accordingly, Mr. Fell's death sentence must be overturned.'s death.

Juror #143's conduct also constituted an impermissible juror experiment since he was attempting to simulate the fear Mrs. King might have felt. Juror #143's experiment was not subject to confrontation during trial, and thus violated Mr. Fell's Sixth Amendment rights. See Turner, 379 U.S. at 472-73 ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."); Simmons, 923 F.2d at 943 (holding that "facts that relate to a defendant's guilt, but which are not admitted as evidence during trial, should not be exposed to a jury during deliberations. Any other conclusion would permit a jury to consider incriminating evidence that has not been subject to confrontation or cross-examination, in direct contravention of the Sixth Amendment's guarantees.").

The Court has already sustained both of these claims pertaining to Juror #143. Mr. Fell can now prove that Juror #143 did obtain extra-record information and lied about it to the Court when he was asked a direct question about it. Mr. Fell is thus entitled to an evidentiary hearing to prove that the information "would affect a typical juror, viewing the entire record, and taking into consideration the circumstances surrounding the exposure to the information." Order: Claim XXII at 15.

Juror #143 was also dishonest in his answers on voir dire. In his short questionnaire, Juror #143 represented that he had never been accused of a crime. [Juror #143] Short Form Juror Questionnaire (Fell Ex. 338). In his long questionnaire, Juror #143 represented

372

that he had never been the target of a criminal investigation.    [Juror #143] Long Form Juror Questionnaire, Dated May 11, 2005 (Fell Ex. 337 at FELL-00003573).   In fact, police records indicate that in 1995, Juror #143 was accused of theft and was investigated by the police in connection with this incident.[182]   Two individuals were informed that Juror #143 had stolen property from a public recreation area.[183]   They followed his vehicle and attempted to get Juror #143 to pull over.[184]   As they did this, Juror #143 reportedly threatened them with a handgun.[185]

### D.  Juror #27

Juror #27 misrepresented his prior criminal history.   On the long questionnaire, Juror #27 answered "No" to the question "Have you or has a family member or close friend ever been charged with a crime?"   [Juror #27] Long Form Juror Questionnaire, dated May 4, 2005 (Fell Ex. 342 at FELL-00003626).   On his short questionnaire, he also answered "no" to the question whether he, "any relative or person close to" him had ever been accused of a crime. [Juror #27] Short Form Juror Questionnaire, United States District Court for the District of Vermont (Fell Ex. 341 at FELL-00003607).   In fact, he was accused of driving while under the influence of alcohol (DWI).[186]   He pled guilty to the charge.[187]   He was also charged in a separate case with an assault.[188]   Juror #27 was 6'3", 205 lbs. at the time of the assault, and he hit the victim in the eye and in the mouth.[189]   The victim had glasses on when he was hit, and the

---

[182] Vermont State Police, A Troop – Middlesex, LAW Incident Table (Fell Ex. 339 at FELL-00003595-601).
[183] Id.
[184] Id.
[185] Id.
[186] Superior Court of Vermont, Washington District Court, 1075-9-82 Wncr., Docket and Disposition Report (Fell Ex. 326 at FELL-00003227-28).
[187] Id.
[188] Superior Court of Vermont, Washington District Court, 401-4-81 Wncr., Docket and Disposition Report (Fell Ex. 326 at FELL-00003224).
[189] Superior Court of Vermont, Washington District Court, 401-4-81 Wncr., Affidavit of Officer Richard Kinerson (Fell Ex. 326 at FELL-00003225).

glasses caused a ring ("severe discoloration scar") around his eye as a result of the assault. Id. The hit to the mouth chipped three of the victim's teeth. Id.

As this Court held with respect to Juror #162, this constitutes "substantial evidence" that the juror's response to the voir dire questionnaire was false. There is significant reason to believe that these concealed facts evince an inability of Juror #27 to consider the facts of Mr. Fell's case impartially, and Mr. Fell is entitled to an evidentiary hearing to determine the scope of Juror #27's misstatements. See Order: Claim XXII at 9.

### E. ~~D.~~ Additional Jurors in Mr. Fell's Case Engaged in Misconduct in Violation of Mr. Fell's Rights under the Fifth, Sixth, and Eighth Amendments

Petitioner's rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated by additional juror misconduct. Such misconduct included, but was not limited to, additional instances of improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, false or misleading responses of jurors on voir dire, and improper biases which infected the jury's deliberations. In particular, numerous prejudicial news reports were published at the time of Mr. Fell's arrest as well as shortly before and during the trial. These include (1) news reports, including photographs, of Mr. Fell's appearance at a hearing wearing a "Slayer" t-shirt, (2) news reports describing a possible witness who would testify that Mr. Fell "held a teenage girl against her will for three weeks" (which was not ultimately introduced as evidence at trial), (3) highly inflammatory quotes from Mr. Fell's family to the effect that Mr. Fell should receive the death sentence, (4) quotes describing the relationship and conversations between Mr. Fell and his mother, and (5) writings by Mr. Lee which were specifically excluded at trial. Counsel believe that there are numerous instances of such misconduct that would be further developed at a hearing.

374

Each of these instances of juror misconduct deprived Mr. Fell of his right to a fair trial and impartial jury under the Fifth, Sixth, and Eighth Amendments, requiring that the Court vacate Mr. Fell's unconstitutional conviction and vacate his sentence.

## XXIII.  Other Claims

### A.  Mr. Fell was Deprived of his Rights under the Fifth, Sixth, and Eighth Amendments when the United States Attorney General Decided to Seek the Death Penalty Against him on the Basis of Race, Gender and Geography, Three Constitutionally Impermissible Sentencing Factors.

Mr. Fell was deprived of his Fifth, Sixth, and Eighth Amendment rights when the Department of Justice ("DOJ"), through United States Attorney General John Ashcroft, rejected the plea agreement reached between the Government and trial counsel based in part on a discriminatory purpose – Mr. Fell's race.  On May 18, 2001, defense counsel sent a letter to the U.S. Attorney's Office requesting that it settle the case by way of a plea agreement and not seek the death penalty against Mr. Fell.  On October 24, 2001, Mr. Fell and the United States Attorney's Office for the District of Vermont reached an agreement for Mr. Fell to plead guilty to kidnapping with death resulting in exchange for a life sentence.  That agreement was drafted by the United States Attorney's Office in its entirety.  It was contingent on approval by the United States Attorney General.  To that date, the Attorney General had never rejected a plea agreement to life by a local United States Attorney's Office.

In January 2002, however, the DOJ, through Attorney General Ashcroft, rejected the plea agreement.  Based on that decision, the U.S. Attorney's Office for the District of Vermont subsequently filed a Notice of Intent to Seek the Death Penalty.  The rejection was not accompanied by any statement of reasons. It merely stated, "[t]he Government believes that the circumstances are such that if the defendant is convicted of either of those offenses, a sentence of death is justified," and listed the threshold culpability factors and aggravating factors.  However,

375

the rejection came at a time during which Attorney General Ashcroft advocated a wider use of the federal death penalty and sought to refute statistical studies reflecting racial disparities in its use. Dan Eggen, Ashcroft Aggressively Pursues Death Penalty, WASH. POST, July 1, 2002, at A1 (describing Ashcroft's frequent overruling of local prosecutors on the decision to seek the death penalty and noting that without interference from Ashcroft, the Vermont U.S. Attorney's Office likely would have proceeded with the plea agreement with Mr. Fell, who is white, which would have affected the racial distribution numbers); David Stout, Attorney General Says Report Shows No Racial and Ethnic Bias in Federal Death Sentences, N.Y. TIMES, June 7, 2001, at A29 (describing Ashcroft's rebuttal of the September 2000 DOJ study which had found racial bias); Raymond Bonner & Marc Lacey, Pervasive Disparities Found in the Federal Death Penalty, N.Y. TIMES, Sept. 12, 2000, at A18 (describing the comprehensive September 2000 DOJ study, which had found evidence of racial bias and a lack of geographical uniformity).

In particular, on September 12, 2000, the DOJ released a study (the "September 2000 Study") of its use of the federal death penalty between its reinstatement in 1988 and 2000. The study found racial bias and a lack of geographical uniformity. See U.S. DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000) (Sept. 12, 2000). Among other indicia of bias, the study found that U.S. Attorneys were more than twice as likely to seek death against a black defendant than a white defendant and that white defendants were nearly twice as likely as minority defendants to receive plea agreements that took the death penalty off the table. Id. at 12, 32. On June 6, 2001, less than a month after trial counsel submitted a letter to the U.S. Attorney's Office requesting that it not seek the death penalty, the DOJ revised its death penalty protocol. The introduction to the report describing the new protocol (the "June 2001 Report") refers to the September 2000 Study, yet overlooks or

376

dismisses much of the evidence found in the earlier study. See U.S. DEP'T OF JUSTICE, FEDERAL DEATH PENALTY SYSTEM: SUPPLEMENTAL DATA, ANALYSIS AND REVISED PROTOCOLS FOR CAPITAL CASE REVIEW (JUNE 6, 2001); Statement of Prof. David C. Baldus to the Senate Comm. on the Judiciary (June 11, 2001), available at http://www.deathpenaltyinfo.org/node/86. It denied that bias played a role in the disparities illustrated in the study and significantly reduced the discretion afforded to U.S. Attorneys over capital cases. Id. at 1. In particular, the revised protocols required that the Attorney General approve any plea agreement that reduces the offense from a capital-eligible offense to a non-capital offense. Id. at 17 (noting that the measure is intended to prevent local U.S. Attorneys from "effectively negat[ing] a decision by the Attorney General" to seek the death penalty).

### 1.    The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Race Violates His Constitutional Rights

There is evidence that at the time of the decision here, Attorney General Ashcroft was particularly concerned about showing that the federal death penalty was being sought against white defendants as well as against black defendants. In 2001, Congress requested General Ashcroft's testimony and the Attorney General testified, using the June 2001 Report as evidence that there was no racial bias in the use of the federal death penalty. General Ashcroft reportedly declared, "[o]ur analysis has confirmed that black and Hispanic defendants were less likely at each stage of the department's review process to be subjected to the death penalty than white defendants. There is no evidence of racial bias in the administration of the federal death penalty." Dan Eggen, U.S. Death Penalty System Not Biased, Ashcroft Declares, WASH. POST, June 7, 2001, at A29; Karen Gullo, Justice Study Finds No Racial Bias, WASH. POST, June 6, 2001. A few months later, in January 2002, General Ashcroft announced his decision in this

377

case, rejecting the plea agreement to life and demanding that the United States Attorney's Office seek the death penalty.

It is well established that the Government may not base its decision to seek the death penalty on a defendant's race. See United States v. Armstrong, 517 U.S. 456, 464 (1996) (holding that one of the constraints on prosecutorial discretion is that "the decision whether to prosecute may not be based on an unjustifiable standard, such as race, religion, or other arbitrary classification"); Vasques v. Hillery, 474 U.S. 254, 264 (1986) ("[A] conviction is void under the Equal Protection Clause if the prosecutor deliberately charged the defendant on account of his race."); United States v. Roman, 931 F. Supp. 960, 965-66 (D.R.I. 1996) (holding that a capital defendant who suspects that racial considerations influenced the decision to seek the death penalty can bring a claim for selective prosecution). If the government acts with a discriminatory purpose, that would violate the Constitution. See McCleskey v. Kemp, 481 U.S. 279, 291-98 (1987).

Here, there is good cause to believe that the death penalty was sought and imposed on the basis of Mr. Fell's race, in violation of the Constitution. Among other things,[113][190] there is evidence that the original agreement for life between the U.S. Attorney and Mr. Fell was made on the basis of consideration of all of the relevant factors by experienced prosecutors; there is no evidence that the original decision was infected by consideration of race or that it differed in any significant way from decisions made in other comparable cases across the country; the death penalty here was sought reportedly through the intervention of Attorney General John Ashcroft; and the decision was made just after the DOJ had been vigorously

---

[113][190]  Defense counsel have sought documents regarding the decision-making in this case and the basis on which the DOJ rejected the U.S. Attorney's carefully considered decision. However, public record requests have been rejected. At the appropriate time, counsel plan to present this Court with a motion seeking additional

378

criticized publicly and in Congress on the basis of statistical evidence that it sought the death

penalty disproportionately against black defendants and was in the process of defending itself –

again on the basis of statistics – against charges that the death penalty was imposed

disproportionately against black defendants.  See Furman v. Georgia, 408 U.S. 238, 253 (1972)

(Douglas, J.) (criticizing the implementation of a system in which "[p]eople live or die,

dependant on the whim of one man or of 12" on Eighth Amendment grounds).  Clearly, it was in

the interest of the DOJ and Attorney General Ashcroft to find a white defendant against whom to

authorize the imposition of the death penalty and to overrule the decision of the U.S. Attorney.

Indeed, this case is unlike McCleskey – here apparently the decision to seek death (unlike the

careful decision to agree to life) was made by a single person.[114][191]  See United States v.

Williams, 2004 WL 2980027, at **8-9 (S.D.N.Y. Dec. 22, 2004) (acknowledging a basis in the

argument that McCleskey was inapplicable because "fewer entities" were present in the decision

to seek the federal death penalty and acknowledging the Supreme Court's venire-selection and

Title VII cases, in which statistical evidence is deemed sufficient to establish constitutional

violation ).  See McCleskey, 481 U.S. at 295 (distinguishing venire-selection and Title VII cases

on the ground that "[i]n those cases, the statistics relate to fewer entities"); Turner v. Fouche, 396

U.S. 346, 359 (1970) (statistical evidence of disparity between percentage of minorities in jury

pool and percentage of minorities in population at large sufficient to establish constitutional

violation in decisions of six-member county juror commission); Bazemore v. Friday, 478 U.S.

---

records with respect to this claim and presenting further good cause to believe that racial considerations impermissibly infected the decision-making in this case.

[114][191]  When both parties tried to agree to a bench trial on sentencing, and the Court agreed that in that event, it could impose a fair sentence and would accept a stipulation waiving a jury trial, the Government informed the Court that such an agreement was also at Attorney General Ashcroft's discretion and that his travel plans would influence when that decision was made. Hr'g Transcript at 2 (Mar. 15, 2002); Letter from Assistant U.S. Att'y Gregory Waples to the Court (Apr. 16, 2002) ("At that time, I was told (for the first time) that the decision whether to authorize a bench trial on the question of punishment will actually be

385, 400-401 (1986) (Brennan, J., concurring in part) (statistical evidence of salary disparities based on race sufficient to establish violation in decisions made by state university president and county commissioners).

Moreover, the timing of trial counsel's meeting with the Government regarding a plea agreement on May 25, 2001 and the release of the revised death penalty protocol, less than two weeks later, represents a particularly cruel chance contingency. Compare Furman, 408 U.S. at 306 (Potter, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."). In light of the amended protocol and the general lack of geographical uniformity in the implementation of the death penalty, Mr. Fell appears to be in the position of the petitioners in Furman, who were "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." Id. That the ultimate punishment can be doled out in such an accidental manner is cruel and unusual, depriving Mr. Fell of his rights under the Eighth Amendment.

## 2.    The Attorney General's Decision to Seek the Death Penalty Based on Mr. Fell's Geographic Location Violates His Constitutional Rights

Mr. Fell was also deprived of his Sixth and Eighth Amendment rights when Attorney General Ashcroft rejected the plea agreement reached between the U.S. Attorney and trial counsel based in part on a campaign to nationalize the use of the federal death penalty, which is an arbitrary and capricious ground upon which to impose a death sentence. Gregg v. Georgia, 428 U.S. 153, 189 (1976); United States v. Bin Laden, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (finding that the Eighth Amendment would be violated if the federal government had decided to seek the death penalty on the basis of geographic considerations, yet concluding that the defendant had not made a sufficient showing of discriminatory intent). The

---

made by the Attorney General. I was also advised that, in light of the Attorney General's travel and

September 2000 Study had found a striking lack of geographical uniformity in the decision to seek the death penalty. It reported that forty-two percent of the cases submitted to the Attorney General came from five of the ninety-four federal districts, while U.S. Attorneys from forty districts never sought the death penalty. See U.S. DEP'T OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000), at 12. Reportedly, Attorney General Ashcroft sought aggressively to impose the death penalty on defendants from states that had sparingly or never used it. Dan Eggen, Ashcroft Aggressively Pursues Death Penalty, WASH. POST, July 1, 2002, at A1 (finding that Ashcroft had sought the death penalty in Michigan, Vermont and other states that have outlawed capital punishment).

In light of Attorney General Ashcroft's campaign to nationalize the death penalty, among other things, ~~115~~192 Mr. Fell's status as a defendant from Vermont, which had outlawed the death penalty and not sentenced a defendant to death in over half a century, provides a reasonable basis to conclude that the decision to seek the death penalty was based in part on the geographical area in which Mr. Fell would be tried. Such a decision would violate Mr. Fell's constitutional rights under the Fifth and Eighth Amendments. Gregg v. Georgia, 428 U.S. 153, 189 (1976); United States v. Armstrong, 517 U.S. at 464. The decision to seek the death penalty in part because of Mr. Fell's race and location deprived Mr. Fell of his rights under the Fifth, Sixth and Eighth Amendments.

### 3. The Attorney General's Decision to Seek the Death Penalty Based on the Race and Gender of the Victim Was Arbitrary and Capricious and Violated Mr. Fell's Constitutional Rights

Mr. Fell was also deprived of his Fifth, Sixth and Eighth Amendment rights when Attorney General Ashcroft rejected the plea agreement reached between the local U.S. Attorney

---

schedule commitments, it is absolutely impossible for him to make this decision by May 1.").

381

and trial counsel, and instead made the decision that a sentence of death should be sought based in part on consideration of the victim's race. The Department of Justice seeks the death penalty in a disproportionately larger share of cases in which the victim was white, and a disproportionately smaller share of cases in which the victim was black. Moreover, of the cases that go to trial involving white victims, there is a much greater likelihood of a death sentence. The Constitution does not tolerate a system in which capital-charging decisions are based in any part on the arbitrary fact of a victim's race. See McCleskey, 481 U.S. at 291 n.8 (holding that defendant has standing to raise a claim of discrimination based on the race of the victim).

The same is true for decisions based on the gender of the victim. A significantly higher percentage of cases involving female victims are selected as death cases. The likelihood that a defendant prosecuted for killing a white female will get a death sentence is disproportionately high. This trend was true at the time Mr. Fell's case went to trial, and trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions constituted deficient performance. Alternatively, statistics regarding the application of the federal death penalty since Mr. Fell's trial constitute new evidence that warrants review of this ground for relief. Although statistics regarding the race and gender of the victim may be insufficient alone to demonstrate purposeful discrimination, this trend warrants discovery and an evidentiary hearing concerning the Government's authorization and plea bargaining decisions. The Court should grant relief from Mr. Fell's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race and gender of the victim in violation of the Fifth, Sixth and Eighth Amendments.

---

[115][192] Mr. Fell plans to request further documents on this claim as well and will support that application with further good cause.

382

Moreover, to the extent that trial and appellate counsel should have raised these issues regarding race, gender, and geography, the undersigned incorporate by reference the preceding facts and law and allege that prior counsel's failure to raise such issues constitutes ineffective assistance of counsel, and that Mr. Fell was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

**B.    Trial Counsel were Ineffective for Failing to Adequately Voir Dire the Jury in Violation of Mr. Fell's Fifth, Sixth and Eighth Amendment Rights**

Trial counsel unreasonably failed to question jurors about whether they could fairly consider particular forms of mitigation evidence that were relevant to the case. The Supreme Court has emphasized that "*voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 183, 188 (1981) (plurality opinion) (emphasis in original) (italics omitted). The Supreme Court has also clearly stated that "general fairness and 'follow the law' questions" on *voir dire* are not sufficient to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." Morgan v. Illinois, 504 U.S. 719, 734-35 (1992). Indeed, as this Court has recognized, *voir dire* is designed to uncover prospective jurors' "biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing." United States v. Fell, 372 F. Supp. 2d

766, 773 (D. Vt. 2005); <u>Lockett v. Ohio,</u> 438 U.S. 586, 594 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

Trial counsel in capital cases must conduct a searching *voir dire* to uncover any potential biases in jurors that might impact their ability to consider the mitigation evidence to be offered during the penalty phase. As the ABA Guidelines make clear, "Jury selection is important and complex in any criminal case. In capital cases, it is all the more critical. Counsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of *voir dire* questions, planning a strategy for *voir dire*, and choosing a jury most favorable to the theories of mitigation that will be presented … Counsel should conduct a *voir dire* that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law because they will either automatically vote for death in certain circumstances, or are unwilling to consider mitigating evidence." ABA Guidelines, Guideline 10.10.2, Commentary at 101-102 (emphasis in original).

In Mr. Fell's case, trial counsel's questioning on *voir dire* fell below this standard of care in capital cases. The Court granted trial counsel an opportunity to ask case-specific questions to determine whether the jurors could fairly consider aggravating and mitigating facts. See <u>United States v. Fell</u>, 372 F. Supp. 2d 766, 773 (D. Vt. 2005) ("[T]he Court will permit counsel to ask questions raising case-specific facts if the questions are reasonably directed towards discovering whether the juror will be able to fairly and impartially weigh aggravating and mitigating factors.") Despite their ability to conduct a case-specific *voir dire*, trial counsel

384

failed to consistently ask the jurors whether they could fairly consider what they themselves considered to be critical aspects of Mr. Fell's mitigation case, including familial alcohol and drug abuse, and domestic violence.

For example, despite the centrality of alcohol and drug abuse to Mr. Fell's mitigation case, trial counsel asked very narrow questions about substance abuse on the questionnaire:

- Have you or any close friend or relative ever been **treated** for a substance abuse problem?

  o If yes, please explain.

- As a result of that problem, did you or your close friend or relative have any contact with the criminal justice system?

Juror Questionnaire, Question 44 (Ex. 123 at FELL-00001365 ).

The narrow question about treatment for substance abuse failed to elicit important information about whether jurors had ever experienced any problems with untreated substance abuse. In addition, trial counsel failed to include questions that were aimed at soliciting prospective jurors' attitudes about drug abuse generally, such as, whether they might have been victims of drug-related crime or whether they were otherwise exposed to drugs in their neighborhoods or schools or community. Problems with untreated substance abuse had just as much, if not more, potential to create bias against Mr. Fell than these related topics. This oversight was not cured through follow-up questioning.

The questionnaire also failed to ask jurors about other factors relating to Mr. Fell's childhood or to determine any potential biases with regard to these mitigating factors. Given the importance of these mitigating factors, and the wide latitude trial counsel had to ask case-specific questions, trial counsel was objectively unreasonable for failing to consistently ask jurors about their ability to evaluate this mitigation evidence fairly.

Donald Fell was prejudiced by this deficient performance because jurors were seated who were in fact unable to fairly consider these factors. For example, Juror 203, who was ultimately seated on the jury, said that he would not consider mitigation evidence in Mr. Fell's case in the absence of mental health testimony:

> Mr. Bunin: But if you heard things like the kind of things Mr. Darrow started talking about, about being abused as a child, not having parents, having no -- having your parents leave you at an early age and kind of being on your own, falling into drugs and alcohol, are those things that you could see as being mitigating, or are they just like -- would they have some other meaning to you?
>
> Juror 203: Well, if they are just said, then they aren't going to bear much weight. If there's a mental health testimony, things like that that brings some absolute facts to this situation, to be considered, then yes, I could see us considering that.
>
> Mr. Bunin: So if you heard evidence from folks that could tell you these things happened and then explanations of what they mean, that would be important to you?
>
> Juror 203: It would -- it would seem to be important to me, but more so to you.
>
> Mr. Bunin: If you sit on the jury, it's –
>
> Juror 203: It's important, yes.

Voir Dire Tr., JVD-12 at 164:24-165:19 (June 1, 2005).

Had trial counsel conducted a sufficient *voir dire* to expose these biases, these biased jurors would have been stricken for cause, and there is a reasonable probability that the outcome of the trial would have been different. See United States v. Fell, 372 F.Supp.2d 766, 773 (D.Vt. 2005) ("The Court will excuse a juror for cause whenever it finds that the juror cannot fairly weigh aggravating and mitigating factors as required by the Federal Death Penalty Act."), see also Strickland v. Washington, 466 U.S. 668, 688. Mr. Fell was therefore deprived of his Fifth, Sixth and Eighth Amendment rights to an impartial jury.

386

**C.    Trial Counsel Failed to Adequately Question or Attempt to Rehabilitate Prospective Jurors who Initially Suggested that they Could Not Vote for the Death Penalty**

"*Voir dire* need not establish juror partiality with 'unmistakable clarity.' Rather, it must be sufficient to permit a trial judge to form 'a definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' " United States v. Quinones, 511 F.3d 289, 301 (2d Cir. 2007) (quoting Witt, 469 U.S. at 424, 426) (internal citations omitted).The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." Gray v. Mississippi, 481 U.S. 648, 663 (1987). In those situations where a prospective juror is opposed to the death penalty but states that he or she would be able to follow the applicable law, including considering the imposition of the death penalty, it is defense counsel's obligation to attempt to rehabilitate that prospective juror.

The 2003 American Bar Association guidelines for the appointment and performance of counsel in death penalty cases stated that "trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including rehabilitation of venire members who initially state opposition to the death penalty." ABA Guidelines, Guideline 1.1 Commentary at 5, see also Wiggins v. Smith, 539 U.S. 510, 524 (2003) (explaining that ABA guidelines provide guidance in assessing defense counsel's performance under Strickland and citing other cases that support the same principle).

Defense counsel's failure to rehabilitate prospective jurors permeated the entire *voir dire* and resulted in a record substantially different from the one reasonable counsel would have produced through adequate questioning. Identifying with confidence all of the stricken potential jurors whom competent counsel might have rehabilitated is impossible. However there

387

were multiple instances where defense counsel did not meaningfully attempt to question and rehabilitate potential jurors whose initial indications of opposition to the death penalty made them potentially unqualified to sit on a death penalty jury.

For example, there was Prospective Juror 64, who was the subject of a challenge on appeal as an example of a juror who was erroneously excluded based on the fact that she generally opposed the death penalty and who even the Second Circuit agreed presented "a closer call" than the other contested prospective jurors as to whether she would be able to follow the applicable law. United States v. Fell, 531 F.3d 197, 211 (2d Cir. 2008).

Prospective Juror 64 expressed her willingness to "follow the law" and stated that she believed she could be impartial to both sides:

> Mr. Kelly: If you were me, if you were the government, who is seeking the death penalty
>
> Juror 64: Right
>
> Mr.Kelly: -- and you wanted a juror there who could be fair to both sides, as they sit there, not lean one way or the other before the beginning of the case, before hearing the evidence, not have a personal bias one way or the other that would interfere or substantially interfere with their verdict, are you the person that you would choose for such a serious case?
>
> Juror 64: Yes, I would.
>
> …
>
> Mr. Kelly: And the question is, is that personal view going to interfere, if you ultimately sat in that stage of the process of making that ultimate judgment about this man, Donald Fell, and whether or not he is to be put to death, which could be the ultimate decision you would have to make, are you the right, fair juror to make that choice given your answers to these questions?
>
> Juror 64: I think that I could make that decision.

Voir Dire Tr., JVD-5 at 243:10-20, 244:22-25, 245:1-6 (May 13, 2005).

Defense counsel then asked Prospective Juror 64 a line of follow-up questions:

Primomo: You in your own words, mentioned something that I would like to touch upon. You said "follow the laws of the government," and I assume - what do you mean by that? You feel obligated to follow the laws of government?

Juror 64: Well, the way our laws presently, in this type of case, allow for the death sentence. I'm not a supporter of that, but that is what is allowed presently.

Primomo: That's, that's – that's correct. And you understand that the law's part is going to be expressed to you by Judge Sessions. And as part of those laws, you will be asked to swear to an oath to follow those laws.

Juror 64: Yes.

Primomo: And it's pretty clear to me, and correct me if I am wrong, that you are willing to follow those laws as Judge Sessions expresses them to you?

Juror 64: Um hum.

Primomo: And even if those laws include your consideration, your honest consideration of imposing the death penalty; is that right?

Juror 64: Yes.

Voir Dire Tr., JVD-5 at 248:18-249:15 (May 13, 2005).

The Court then asked Prospective Juror 64 an additional follow-up question, and Prospective Juror 64 responded by saying that she "I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes." Voir Dire Tr., JVD-5 at 251:18-21, (May 13, 2005). At that point, as the Second Circuit observed, "after counsel for both sides declined the court's invitation to ask follow-up questions, Juror 64 was excused" pursuant to the prosecution's challenge for cause. Fell, 531 F.3d at 212. After getting a helpful response to its questioning and after a neutral response to the Court's follow-up questioning, defense counsel abandoned Prospective Juror 64 instead of asking

389

additional rehabilitation questions. There is a reasonable probability that counsel could have rehabilitated Prospective Juror 64 and prevented her excusal, and could have similarly rehabilitated other jurors. See Strickland v. Washington, 466 U.S. 668, 688. Trial counsel's abdication of their duty to rehabilitate jurors on *voir dire* constituted ineffective assistance of counsel under Strickland and rendered the *voir dire* so inadequate as to "lead us to doubt that [Mr. Fell] was sentenced to death by a jury empanelled in compliance with" the constitutional requirements of due process. Morgan, 504 U.S. at 739 (1992).

**D.    The Execution of a Man who was Developmentally a Juvenile at the Time of His Crimes is Cruel and Unusual under the Eighth Amendment**

In considering factors that mitigate culpability, the Supreme Court has recognized that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults… [and] often result in impetuous and ill-considered actions and decisions," that juveniles are "more vulnerable or susceptible to negative influences and outside pressures," and that "the character of a juvenile is not as well formed as that of an adult." Roper v. Simmons, 543 U.S. 551, 569-70 (2005) (holding that imposition of death sentence on those who were under eighteen at the time of their crimes constituted cruel and unusual punishment in violation of the Eighth Amendment). The Supreme Court reaffirmed and extended this holding in Graham v. Florida, 130 S. Ct. 2011 (2010), when it deemed cruel and unusual the imposition of a sentence of life imprisonment without parole for a non-homicide crime committed by someone under the age of eighteen.

Roper should be considered to apply with equal force in this matter. Mr. Fell's chronological age cannot be invoked talismanically to avoid Roper's import. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings v. Oklahoma, 455 U.S. 104, 115

390

(1983). "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper, 543 U.S. at 574. "[A]ge 18 is a necessarily arbitrary social choice as a point at which to acknowledge a person's maturity and responsibility, given the different developmental rates of individuals." In re Stanford, 537 U.S. 472, 474 (2003) (Stevens, J., dissenting from denial of certiorari in a case which would subsequently be abrogated by Roper).

Various amici in Graham, informed by the psychological and biological sciences, noted the considerable changes relevant to judgment and culpability that continue into young adulthood. The American Psychological Association and others explained that science "cannot, of course, draw bright lines precisely demarcating the boundary between childhood, adolescence, and adulthood." Brief for American Psychological Association et al. as Amici Curiae at 6, Graham v. Florida, No. 08-7412 (U.S. July 2009). It reported studies indicating that impulse control continues to develop into young adulthood, that "the skills required for future planning continue to develop until the early 20s," and that a shift in the brain's composition continues beyond adolescence "into young adulthood." Id. at 9, 12, 27.

While Mr. Fell was twenty years old when he was arrested – just two years beyond an age that would preclude his execution – and, functionally, he was still a juvenile. Mr. Fell suffered from chronic abuse and neglect throughout his childhood and adolescence, depriving him of a stable home environment from which to grow into a mature, responsible adult. He was abandoned by both of his parents by the age of 13, and dependent upon his abusive aunt Jackie and a corruptive community of peers throughout his teens. Moreover, multiple generations of his family suffered from mental impairments and drug and alcohol addiction, which resulted in Mr. Fell starting to abuse drugs and alcohol at a very young age, further stunting his development. Accordingly, Mr. Fell possessed precisely the same

immaturity and vulnerability to influence and psychological damage that the Supreme Court identified when it concluded that it was cruel and unusual to execute juveniles. Executing Mr. Fell would thus be cruel and unusual in violation of the Eighth Amendment.

To the extent that trial and appellate counsel should have raised this issue at the trial and/or appellate stage, the undersigned incorporate by reference the preceding facts and law in support of this claim and allege that prior counsel's failure to raise this use constitutes ineffective assistance of counsel, and that Mr. Fell was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

Moreover, trial counsel were ineffective for presenting the mitigation factor "Donald Fell was twenty years old at the time of the offense," while failing to investigate and explain to the jury the mitigating impact of Mr. Fell's youth. The Supreme Court decided Roper before Mr. Fell's trial, and thus trial counsel should have been aware of the powerfully mitigating evidence available to explain why Mr. Fell's youth made him less culpable and more likely to benefit from rehabilitation. Since trial counsel presented Mr. Fell's age as a mitigating factor, trial counsel's failure to investigate and present evidence about how Mr. Fell's age was mitigating was objectively unreasonable. If trial counsel had explained to the jury that Mr. Fell's character was still developing, and he was vulnerable to psychological damage and to peer influences at the time of the crimes due to his youth, the jurors would have reached a different result, and voted in favor of life. Mr. Fell was therefore prejudiced by counsel's deficient performance in violation of his constitutional rights under the Fifth, Sixth and Eighth Amendments.

392

**E.    The Manner in Which the Government Would Execute Mr. Fell Violates the Eighth Amendment**

Pursuant to the FDPA, a United States marshall "shall supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence is imposed.  If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law."  18 U.S.C. § 3596(a); see also United States v. Hammer, 121 F. Supp. 2d 794 (M.D. Pa. 2000) (the sentencing court is the "appropriate forum for considering all claims by [defendant] regarding the details of his scheduled execution execution in Indiana").  Vermont, the state in which Mr. Fell was sentenced, does not have the death penalty, and as a result, it is unclear by which State's laws Mr. Fell's sentence would be implemented and whether those procedures would protect his constitutional rights.

Of the 36 American jurisdictions that authorize lethal injection as a method of execution, 30 of those states use the same three drug cocktail.  See Baze v. Rees, 553 U.S. 35, 40, 44 (2008).[~~116~~193] The three-step protocol entails (1) using a general anesthetic to induce a deep coma-like unconsciousness followed by (2) the administration of a paralytic agent that inhibits all muscular-skeletal movements, including respiration, and (3) the administration of a potassium-based drugs that induces cardiac arrest.  Id. at 44. If the anesthetic is ineffective or adulterated, the three-step protocol will result in the condemned prisoner experiencing the severe pain and distress associated with paralysis, respiratory arrest and cardiac arrest.  Since 2009, the

---

[~~116~~193]  A condemned inmate may bring a challenge to lethal injection in a separate civil rights action under 42 U.S.C. § 1983.  See Hill v. McDonough, 547 U.S. 573 (2006).  To the extent Mr. Fell's death sentence is implemented under the laws of a state whose protocols are subject to challenge as cruel and unusual for a variety of reasons, including but not limited to the combination of drugs used, the protocols governing the execution, the use of untrained non-medical and unqualified persons to administer the protocol, and/or the

393

anesthetic drug used in the lethal injection trilogy, sodium thiopental, has not been available from any manufacturer in the United States. As a result, states have attempted to import sodium thiopental from foreign manufacturers or other states, and federal inmates have recently challenged the Food and Drug Administration's ("FDA") failure to regulate imported thiopental and have sought a permanent injunction prohibiting the FDA from releasing any future shipments of unapproved foreign thiopental into interstate commerce. See Complaint in Beaty v. Hamburg, 11 Civ. 289 (RJL) (D.D.C.) (Filed Feb. 2, 2011). This imported thiopental is not regulated to ensure safety, effectiveness, quality, or potency. To the extent the implementing state sought to administer imported sodium thiopental to Mr. Fell, such improper administration of sodium thiopental would very likely cause serious injury and needless suffering on the part of Mr. Fell and would therefore violate the Eighth Amendment. See Baze, 553 U.S. at 49-50.

In support of this claim, Mr. Fell incorporates by reference the facts and allegations set forth in this Motion along with all accompanying exhibits. Mr. Fell anticipates amending this claim if necessary after a full investigation, discovery, access to the Court's subpoena power, and an evidentiary hearing. Although Mr. Fell does not believe this claim is ripe, to the extent the Court finds that this claim should have been presented earlier and all prior counsel who failed to present the claim rendered ineffective assistance in not asserting it sooner, the Court should consider the claim on the merits.

---

physical space in which the execution is carried out, Mr. Fell could not be lawfully executed until such litigation was resolved

394

## <u>CONCLUSION AND PRAYER FOR RELIEF</u>

Donald R. Fell, Jr., was convicted and sentenced to death at a trial where who he is was hidden: it was obscured by his lawyers' failures to investigate and present key information and by the Government's lies and misrepresentations; it was belied by the stipulation that he had no mental illness; and it was shrouded by the Government's misleading case for aggravation. Without question, the homicide of Mrs. King was a terrible crime, one which any reasonable lawyer would have known could only be effectively mitigated with a meticulously zealous defense. Unfortunately, that did not happen here. Mr. Fell did not even receive the effective defense to which he is entitled under the Constitution. And in its determination to win at all costs, the Government engaged in misconduct.

The penalty in this case would have been different and the vote of any one juror different had the Government or the defense not committed one of the errors identified here:

- Had trial counsel investigated powerful and readily available mitigation evidence showing that Mr. Fell lived a life of unrelenting trauma, and his troubled home life did not simply resolve itself when Mr. Fell's father left the home;

- Had trial counsel prepared a mental health case for trial, or even looked at the records it obtained or had a doctor do so after it became clear the case was going to trial;

- Or had someone explained – as should have been readily apparent to the defense and easily explicable by them to the jury – that the flat affect which Mr. Fell presented (and about which the Government asked over and over) was not an expression of lack of remorse but a symptom of Mr. Fell's illness – an illness the defense never bothered to investigate;

- Had the Government not violated this Court's order with respect to Dr. Welner;

- Or had trial counsel not foregone a meritorious motion to exclude Dr. Welner and withdrawn the expert witnesses essential to explaining the mitigating factors in Mr. Fell's life whom the defense had promised the jurors would

testify – all out of a mistaken assumption that the Court would not entertain the motion on a timely basis;

- Had trial counsel taken the most minimal steps to interview the Gaceks at any point in time from December 2000 until July 2005 – and learned that the shooting the Government presented as aggravation was an accident for which Donny had shown extreme remorse, or had the Government disclosed the accurate information about the Gaceks and not misstated the circumstances of that event;

- Had the Government not misrepresented Mr. Eike's injuries and falsely compared them to those inflicted on Mrs. King and misrepresented the circumstances of that fight;

- Or had trial counsel taken the most minimal steps necessary to obtain the evidence to prove the Government's version false;

- Had the Government turned over the prison records or revealed the grievances against Officer Pelkey;

- Or had trial counsel taken the most minimal steps necessary to obtain the evidence to prove the Government's version false;

- Had the Government turned over the 302s or records of the FBI's interview of Mr. Bellantoni who saw Mr. Fell engage in an argument with Mr. Lee before Mrs. King was killed;

- Or had trial counsel interviewed Mr. Bellantoni;

- Or had trial counsel taken any steps to investigate the crime scene, put on a defense of diminished capacity, or even hired a forensic pathologist;

- Or had trial counsel objected to numerous instances of inflammatory and misleading evidence and statements offered by the Government;

- Or had trial counsel asked the many readily available witnesses in Mr. Fell's life who would be deeply impacted by his execution how they would feel if he were sentenced to death.

Each of these errors alone caused Mr. Fell constitutional prejudice. A finding by this Court that any one of them occurred would require that the judgment be vacated.

The cumulative impact of all of these errors was to present the jury with a fundamentally different person than Mr. Fell is. Mr. Fell did not experience the childhood of

unimaginable horrors that the jury found only to emerge "intact" as the Government argued. And the horrors did not end at age 10. The Government argued that Mr. Fell's family "got help from social services" and things "got better" and "the abuse that he suffered got more and more removed, and as it did, he got more and more violent." Tr. Vol. XII at 56:2-9, 53:22-24 (July 13, 2005).

The true picture of Mr. Fell is different in critically mitigating ways. The Government's account to the jury that Mr. Fell had intentionally inflicted serious injury previously was wrong. As was the claim that he was remorseless. It turns out that he was not released from the dysfunctional home life with the departure of his father; rather, the abuse, neglect, disappointment and cruelty was actually unrelenting, and continued all the way through his adolescence, right up to the time of the crimes. Mr. Fell arrived in Vermont having been betrayed by every caregiver in his life, including not only his parents and his babysitters when he was an infant, but also his mother's boyfriends, his grandmother, his guardian, and finally by the Government social workers who were authorized to intervene for his protection. And the impact of all of those events has left him a fundamentally impaired person. Mr. Fell has been forever scarred by his genetics and circumstance, and these factors have indelibly impacted his development, personality and behavior.

The first time Mr. Fell had the structure he has needed (but of which his family deprived him) was in connection with his incarceration in this case. Furthermore, the external environmental factors that exacerbated his mental health vulnerabilities are absent in prison. Killing Mr. Fell is simply not necessary. Absent the multiple constitutional errors that corrupted his capital prosecution, it is clear that Mr. Fell would not have been sentenced to death.

Movant Donald R. Fell asks that this Court provide the following specific relief:

1.     That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

2.     Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.     Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.     Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedures 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defense thereto raised by the Respondent's Answer;

5.     Permit Movant to Amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and to allow the amendment to relate back to the dates of the filing of this motion;

6.     Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.     Permit oral argument as appropriate and required;

8.     Vacate Movant's convictions and sentences and order that appropriate retrials be conducted; and

398

9.    Grant such further and additional relief as may be just.

Dated:  ~~March 21, 2011~~October 22, 2013          RESPECTFULLY  SUBMITTED,
Barre, Vermont


_____/s/
Richard  Rubin
RICHARD  RUBIN
Rubin,  Kidney,  Myer  &  DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514
Fax: (802) 479-2516


Dated:  ~~March 21, 2011~~October 22, 2013
New York, New York


_____

/s/ Lewis  J. Liman
LEWIS  J. LIMAN
Cleary Gottlieb  Steen & Hamilton  LLP
One Liberty  Plaza
New York, New York 10006
(212) 225-2550
Fax: (212) 225-3999


Dated:  ~~March 21, 2011~~October 22, 2013
New York, New York


_____

/s/ Cathleen  Price
CATHLEEN  PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193


~~Counsel~~Attorneys for Donald  Robert Fell ,
Jr.

399