UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
------------------------------------------------------------------------- X
                          :

DONALD FELL,                          :

           Movant,            :

      - against -          :     2:01-CR-12-01

                          :

UNITED STATES OF AMERICA,      :

         Respondent.      :

                          :
------------------------------------------------------------------------- X

## BRIEF IN SUPPORT OF AN EVIDENTIARY HEARING

LEWIS J. LIMAN
Cleary Gottlieb Steen &
Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

CATHLEEN PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193

RICHARD RUBIN
Rubin, Kidney, Myer & DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514

Date:  December 16, 2013

*Attorneys for Donald Robert Fell, Jr.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

    A.  Mr. Fell's Juror Misconduct Claim................................................................................ 4

    B.  The Government's Opposition.......................................................................................... 5

    C.  The Court's Ruling on the Government's Request for Summary Dismissal..................... 7

    D.  Further Factual Development ......................................................................................... 10

        1.  Juror #162 ............................................................................................................ 10

        2.  Juror #143 ............................................................................................................ 21

        3.  Juror #26 .............................................................................................................. 22

        4.  Juror #27 .............................................................................................................. 23

ARGUMENT......................................................................................................................... 24

        1.  Juror #162 ............................................................................................................ 24

            a.  Juror #162's Misstatements and Omissions at Voir Dire Were the Product of Dishonesty........................................................................................... 25

                i.  Juror #162 Lied When She Said Neither She nor People Close to Her Had Been Victims of Crimes ....................................................................... 25

                ii.  Juror #162 Lied About Her Son's and Her Own History of Criminal Accusations and Charges................................................................................ 29

                    1. Burglary Conviction in 1983 ................................................................ 32

                    2. 1992 Assault and Felony Trespass Convictions; Accusations Against Juror #162 .......................................................................................... 32

                    3. 1997 Simple Assault and Felony Trespass Convictions; Juror #162's Multiple Shared Residences with Patrick Ryan.......................................... 35

                    4. 2002 DWI #4 Felony Conviction and 2006 Domestic Assault.................. 37

                iii.  Juror #162 Lied About Her Son's and Her Own History of Treatment for Substance Abuse ..................................................................................... 39

                iv.  Juror #162 Lied About Her Participation in Civil Suits ................................ 41

                v.  Juror #162 Lied About Her Opinions of the Fields of Psychology and Psychiatry and About Her General Fitness as a Juror.................................... 42

            b.  Honest Answers on Voir Dire Would Have Provided a Valid Basis for a Challenge for Cause of Juror #162 ....................................................................... 44

        2.  Juror #143 ............................................................................................................ 48

            a.  Juror #143 Sought Out and Obtained Extraneous Evidence During Trial............ 49

            b.  Juror #143's Misconduct Caused Prejudice......................................................... 51

        3.  Juror #26 .............................................................................................................. 62

a.  Juror #26 Committed Misconduct By Concealing Material Information at Voir Dire and During Trial.................................................................................................. 63

   i.  Juror #26's Omissions at Voir Dire and During Trial Were the Product of Dishonesty.................................................................................................... 63

   ii.  Honest Answers on Voir Dire Would Have Provided a Valid Basis for a Challenge for Cause or Removal of Juror #26................................................ 68

b.  Mr. Fell's Conviction and Death Sentence Were Based on Impermissible Extraneous Evidence About His Codefendant....................................................... 69

CONCLUSION............................................................................................................ 73

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bibbins v. Dalsheim,
21 F.3d 13 (2d Cir. 1994) ........................................................................... 51, 69

Burton v. Johnson,
948 F.2d 1150 (10th Cir. 1991) .................................................................. 53

Dyer v. Calderon,
151 F.3d 970 (9th Cir. 1998) (*en banc*) .................................................... 67-68

In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,
739 F. Supp. 2d 576 (S.D.N.Y. 2010)......................................................... 66

United States v. Boney,
977 F.2d 624 (D.C.Cir. 1992)...................................................................... 53

United States v. Colombo,
869 F.2d 149 (2d Cir. 1989)......................................................................... 53

United States v. Morgan,
385 F.3d 196 (2d Cir. 2004)......................................................................... 50

United States v. Peterson,
385 F.3d 127 (2d Cir. 2004)......................................................................... 69

United States v. Roshko,
1991 WL 18146 (S.D.N.Y. Feb. 7, 1991)................................................... 6162

United States v. Sampson,
820 F. Supp. 2d 151 (D. Mass. 2011) ......................................................... passim

United States v. Sampson,
724 F.3d 150 (1st Cir. 2013)........................................................................ 44-47

United States v. Stewart,
433 F.3d 273 (2d Cir. 2006)......................................................................... 53

United States v. Thomas,
116 F.3d 606 (2d Cir. 1997)......................................................................... 69

United States v. Tucker,
137 F.3d 1016 (8th Cir. 1998) .................................................................48-49, 53

iii

Woodson v. North Carolina,
428 U.S. 280 (1976)................................................................................................... 62

**Rules and Statutes**

2 McCormick On Evidence § 263 (7th ed. 2013) ................................................. 70, 72

Fed. R. Crim. P. 23(b)(3) ......................................................................................... 69

Rules Governing § 2255 Proceedings, Rule 7, 28 U.S.C. 2255 ........................................ 3

Donald Fell respectfully submits this brief pursuant to the Court's Memorandum Opinion and Order pertaining to the Government's motion for summary dismissal of Mr. Fell's Claim XXII: Juror Misconduct, under which the parties stipulated that forty-five days after the juror inquiry they would brief the Court to address further factual developments or proceedings, if any, that either party may seek with respect to Claim XXII of the Amended Motion of Donald Fell for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and For a New Trial Pursuant to 28 U.S.C. § 2255 ("2255 Motion").  Proposed Stipulated Order for Procedures for the Inquiry of the Jurors, Dkt No. 376 (June 10, 2013).

## PRELIMINARY STATEMENT

In its May 10, 2013 Memorandum Opinion and Order, this Court sustained Mr. Fell's Claim XXII: Juror Misconduct, holding that Mr. Fell had shown sufficient grounds for further inquiry with respect to those allegations.  The parties stipulated under the Order that they would submit supplementary briefing regarding additional factual developments or proceedings, if any, that either party may seek with respect to Mr. Fell's juror misconduct claim; pursuant to that stipulation, Mr. Fell submits this briefing.  As set forth below, Mr. Fell has established evidence demonstrating the merit of his juror misconduct claim, and seeks an opportunity to present that evidence to the Court to support his 2255 Motion for a new trial.

In the May 10 Order, this Court sustained Mr. Fell's juror misconduct claim with respect to Juror #162, based on her failure to disclose at voir dire that she had been the victim of the crime of sexual abuse.  Mr. Fell has since established evidence demonstrating that Juror #162 lied both in response to numerous additional voir dire questions and in the examination of her conducted at the August 15, 2013 investigatory hearing—lies that further demonstrate that Juror #162 was incapable of hearing the evidence in Mr. Fell's case fairly.  Mr. Fell has amended his

2255 Motion to plead further factual allegations based on this additional evidence, and is entitled to an opportunity to present that evidence to the Court.

This Court also sustained Mr. Fell's juror misconduct claim as it related to Juror #143, based on that juror's intentional pursuit of extraneous evidence, and his coercion of a fellow juror. At the August 15 hearing, Juror #143 retracted his prior statements disclosing this misconduct and claimed it did not occur. As set forth below, Mr. Fell has since obtained evidence that this retraction was false, as well as evidence that Juror #143 lied on voir dire, and is entitled to a hearing to present that evidence to the Court.

Mr. Fell also has a meritorious juror misconduct claim based on his factual allegations regarding Juror #26. At the September 27, 2013 investigatory hearing, this juror confirmed that he had been exposed to extraneous evidence regarding Robert Lee's death and testified that he continues to believe that Robert Lee committed suicide. Juror #26 also confirmed that he was aware of the connection between this supposed fact and Mr. Fell's case at voir dire and at trial and yet did not disclose his knowledge to the Court. This juror misconduct caused substantial prejudice to Mr. Fell and is sufficient to support Mr. Fell's Motion for a new trial.

And finally, Mr. Fell seeks an evidentiary hearing to present evidence that a fourth juror, Juror #27, was dishonest on voir dire and that the concealed facts would have provided the basis for a successful challenge for cause.

As Mr. Fell demonstrates below, this evidence, including the testimony of the jurors at the investigatory hearings and the documents introduced as part of Mr. Fell's Amended 2255 Motion, is sufficient to support Mr. Fell's claim that Mr. Fell was deprived of his Fifth, Sixth, and Eighth Amendment rights as a result of juror misconduct. Mr. Fell has shown he is

2

entitled to present this evidence—along with additional evidence, including in the form of

witness testimony—at an evidentiary hearing to prove that he has met the standard for a new

trial. Accordingly, Mr. Fell respectfully requests that the Court order an evidentiary hearing at

which Mr. Fell may present this evidence establishing the validity of his juror misconduct claim.

Mr. Fell also respectfully requests that this hearing be held in advance of the summer 2014

hearing on the remainder of Mr. Fell's claims. There is no overlap between the facts supporting

Mr. Fell's juror misconduct claim and the facts to be presented at the summer 2014 hearing, and

thus there would be no efficiency in combining the two hearings. There would, however, be

enormous efficiency and other benefit in adjudicating Mr. Fell's juror misconduct claim in

advance of the summer 2014 hearing; a ruling in favor of Mr. Fell would obviate the need for the

significant investment by this Court and the Government necessary to resolve the remainder of

Mr. Fell's well-pled allegations.[1]

## BACKGROUND

On March 21, 2011, Donald Fell moved this Court to vacate, set aside, or correct

the judgment and sentence of death imposed upon him by this Court on June 16, 2006, and to

grant him a new trial. The 2255 Motion was based on, among other things, specific allegations

that Mr. Fell received constitutionally ineffective assistance of counsel; that the prosecutors

engaged in multifaceted misconduct in violation of Mr. Fell's constitutional rights; and—

relevant to Mr. Fell's instant briefing to the Court—that misconduct by three jurors deprived Mr.

Fell of his Fifth, Sixth, and Eighth Amendment rights to an impartial jury.

---

[1] Mr. Fell also intends to file at the appropriate time a motion under Rule 7 of the Rules Governing Section 2254 and 2255 Cases to expand the record.

### A. Mr. Fell's Juror Misconduct Claim

In the 2255 Motion, Mr. Fell raised a claim of juror misconduct that arose in several instances. 2255 Motion at 323-40. He alleged that Juror #162 failed to disclose on her juror questionnaire that she was the victim of childhood sexual abuse, the same crime of which Mr. Fell and his sister had been victims. 2255 Motion at 325-27. Despite having answered "no" to the question of whether she had ever been the victim of a crime, Juror #162 told Mr. Fell's 2255 Counsel that she had endured repeated sexual abuse as a child by her adoptive father. Id. She also told 2255 Counsel:

> At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.

Statement of Juror #162, Jan. 5, 2011 (Ex. 280). Had this withheld information been disclosed in voir dire, Juror #162 would have been stricken for cause. 2255 Motion at 326-28.

Mr. Fell also alleged that Juror #143 deliberately sought out extraneous evidence and coerced another juror to change her vote to a death sentence by threat of force. Id. at 329-36, 337-39. Despite the Court's orders to the jurors—both at voir dire and every day at trial—not to expose themselves to out-of-court evidence regarding the case, Juror #143 disclosed to 2255 Counsel that he drove to the scene of the murder of Debra Fell and Charles Conway and the kidnapping of Teresca King in order to undertake his own independent examination. Id. at 331-32. He investigated Mrs. Fell's residence, her neighborhood, the route from her residence to the Price Chopper where Mrs. King was kidnapped, the area surrounding the Price Chopper, and the lighting of the parking lot where Mrs. King's car had been parked. Id. He also admitted discussing his findings from this trip with other jurors during guilt phase deliberations. Id. at

4

332. Mr. Fell argued that this extraneous evidence violated Mr. Fell's Fifth, Sixth, and Eighth Amendment rights to a trial by a jury not exposed to extraneous evidence. Id. at 329-30. Further, Mr. Fell alleged that Juror #143 informed 2255 Counsel that, when a female juror indicated that she believed a life sentence was appropriate, Juror #143 (who believed a death sentence was appropriate) obtained from the marshals the shotgun that Mr. Fell and Mr. Lee carried the night of Ms. King's abduction, and "cocked and pointed" it at the female juror, causing her to "squirm" and to change her vote from life to death. Id. at 337-39.

Finally, Mr. Fell alleged that Juror #26 was exposed to extraneous evidence and was dishonest at voir dire. Id. at 328-29, 336-37. Both at voir dire and during trial, Juror #26 concealed the fact that he had been exposed to highly prejudicial news reports describing the supposed suicide of Robert Lee. He concealed this fact when he was asked if he had heard anything about Mr. Fell's case before the jury selection process, and he concealed this fact every day at trial when he was asked by the Court if he had heard anything about the case outside the courtroom. Id. Mr. Fell argued that this withheld information, if revealed during voir dire, would have supplied the basis for a successful challenge for cause, and if revealed during trial, would have caused the Court to strike this juror and replace him with an alternate. Id. Mr. Fell further alleged that Juror #26 concealed his criminal history on voir dire when he represented that he had never been charged with a crime. Id. at 328.

## B. The Government's Opposition

On December 21, 2011, the Government filed an Amended Opposition to the 2255 Motion seeking summary dismissal of Mr. Fell's claims. The Government argued generally that Mr. Fell's juror misconduct claim was without merit, and that his claim was barred due to a "fail[ure]" to raise during trial. Am. Opp. of the United States to Fell's § 2255 Mot. Dkt. No. 338 (Dec. 2, 2011) ("Am. Opp."), at 313.

With respect to Juror #162, the Government argued that: (1) Mr. Fell's allegations implicated evidence barred by Rule 606(b); (2) Juror #162's voir dire response was not deliberately false; and (3) the facts alleged would not have supported a challenge for cause. Id. at 318-25. Specifically, the Government argued that Juror #162 was not deliberately dishonest because the events happened "approximately 50 years before trial" and that it was "likely" that Juror #162 "no longer thinks about her childhood abuse at all." Id. at 319, 21 (emphasis omitted). The Government supported this argument by noting that Juror #162 "readily disclosed the fact that her son had been charged with a crime 16 years prior to trial"—that he had been "placed under house arrest for Driving Under the Influence and Domestic Violence." Id. at 320.

The Government also sought to distinguish this case from the conduct of "Juror C" in United States v. Sampson, 820 F. Supp. 2d 151 (D. Mass. 2011), which led to the vacatur of the defendant's sentence. Am. Opp. at 320-21. The Government argued that in Sampson, "during both individual *voir dire* and a post-conviction hearing, juror C purposely and repeatedly concealed information in response to seven different juror selection questions. . . . She 'intentionally gave false answers to many important questions in her questionnaire, during individual voir dire, and in these § 2255 proceedings . . .'" Id. at 320 (quoting Sampson, 820 F. Supp. 2d at 181). The Government argued that, in contrast to Mr. Fell's case, the hidden information in Sampson was something that the juror "continued to experience as a 'humiliating' 'nightmare'" that "involved criminal activities by juror C's second husband, as well as by her daughter." Id. at 320 (quoting Sampson, 820 F. Supp. 2d at 187). The Government noted that "[w]hen those matters finally came out, the juror was intensely emotional." Id. at 321. In addition to the fact that there was evidence in Sampson that the juror deliberately lied both during voir dire and during the 2255 proceeding, in Sampson, the Government noted, Judge

Wolf relied on the fact that Juror C lied for reasons "'reflect[ing] her deep emotional distress about events similar to those presented in the trail [sic] and are, therefore, reasons that affect [her] impartiality." Id. at 321 (quoting Sampson, 820 F. Supp. 2d at 194) (quotation marks omitted). The Government argued that "Juror #162's alleged dishonesty concerned one written *voir dire* question, not seven, and related to events decades before trial, not three years," and that "juror 162 readily disclosed her prior experience . . . instead of desperately concealing it, like juror C in Sampson." Id. at 321.

With respect to Juror #143, the Government argued that the extraneous information to which he was exposed was cumulative and of "dubious significance" and therefore insufficient to establish prejudice. Id. at 330. The Government also argued that the allegation made by Mr. Fell regarding Juror #143's juror coercion implicated evidence prohibited by Rule 606(b). Id. at 332.

Finally, with respect to Juror #26, the Government argued that he did not deliberately conceal his criminal history, and that the offenses Juror #26 failed to disclose would not have supported a challenge for cause. Id. at 326. The Government also argued that Juror #26 was not deliberately dishonest regarding his knowledge of Robert Lee's supposed suicide because Juror #26 may not have considered Lee's death part of "this case," or because he did not immediately relate the report about Lee's death to the trial, and that this undisclosed fact would not have supported a challenge for cause, nor would have prejudiced Mr. Fell. Id. at 327-28, 331-32.

## C. The Court's Ruling on the Government's Request for Summary Dismissal

On May 10, 2013, the Court issued an Order pertaining to Mr. Fell's Claim XXII rejecting the Government's arguments. The Court held that "Fell's motion has demonstrated

7

reasonable grounds for further investigation," and ordered a "limited inquiry" of the jurors. Mem. Op. and Order: Claim XXII: Juror Misconduct, Dkt. No. 368 (May 10, 2013) ("May 10 Order"), at 19.

In the May 10 Order, the Court began its analysis of Mr. Fell's juror non-disclosure allegations by restating the importance of voir dire examination. "'One touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it.'" Id. at 5 (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)) (quotation marks omitted). The voir dire process designed by the parties and the Court and implemented and overseen by the Court "'serve[d] to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. . . . The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.'" Id. at 5 (quoting McDonough, 464 U.S. at 554).

The Court identified three forms of bias. The first is actual bias, or bias in fact. Id. at 5-6. The second is implied bias, or bias "presumed as a matter of law." Id. at 6. The third form of bias is inferable bias, which exists "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." Id. at 6 (quotation marks omitted).

The Court held that the statement made by Juror #162 to Mr. Fell's 2255 Counsel—"At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer."—

> suggests that this juror might not have been able to fairly and impartially consider
> evidence of childhood sexual abuse as a mitigating factor in a capital trial. Trial

counsel were deprived of the opportunity to determine whether this juror could have been challenged for cause, because the juror withheld the information that would have prompted the inquiry.

Id. at 8-9. The Court also held that the juror's statement provided substantial evidence that she failed to honestly answer the questions on the voir dire questionnaire. Id. at 9. The Court accordingly held that where, as here, "it is not clear whether the false response affected the juror's impartiality, the appropriate course is to conduct an evidentiary hearing." Id.

The Court also sustained Mr. Fell's claim as it pertained to Juror #143. The Court rejected the Government's argument that summary dismissal was appropriate because the extraneous information obtained by Juror #143 (and shared with the rest of the jury) was cumulative to other evidence introduced at trial, and that the information at issue was insignificant. Id. at 14. The Court held that the question of whether the Government could rebut the presumption of prejudice required a hearing at which the Court would "assess the likelihood that the information would affect a typical juror, viewing the entire record, and taking into consideration the circumstances surrounding the exposure to the information." Id. at 15.

With respect to Juror #26, the Court rejected the Government's argument that the information withheld by Juror #26 would not have supplied the basis for a challenge for cause, and reiterated that exposure to information that "Mr. Lee committed suicide [was]…of grave concern to [the Court] in terms of fairness to this defendant, as well as the government, for that matter," and that the Court had previously excused a juror for cause because he knew about Lee's death. Id. at 11, 12 n.4. The Court also rejected the Government's argument that the non-disclosure of Juror #26's criminal history, as well as the non-disclosure of his knowledge of Mr. Lee's death, did not permit an inference that Juror #26 made deliberate misrepresentations. Id. at 11. The Court found that because Juror #26 did not disclose during voir dire the information at

issue, "[t]he parties . . . did not have the information that might have prompted further inquiry into areas of possible bias." Id. Accordingly, the Court determined that it could not summarily dismiss this claim. The Court also held that the allegation that Juror #26 was exposed to extraneous evidence stated a claim, noting that "'[t]he law presumes prejudice from a jury's exposure to extra-record information.'" Id. at 12 (quoting United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011)).

### D. Further Factual Development

Pursuant to the May 10 Order, the parties stipulated that forty-five days after the juror inquiry they would brief the Court to address further factual developments or proceedings, if any, that either party may seek with respect to Claim XXII of the 2255 Motion. Proposed Stipulated Order for Procedures for the Inquiry of the Jurors. The Court conducted the inquiry of the jurors on August 15 and September 27, 2013. Both before and after these hearings, Mr. Fell uncovered extensive additional facts supporting his allegations of juror misconduct against Jurors #162, #143, and #26. Mr. Fell also uncovered facts demonstrating that a fourth juror, Juror #27, also engaged in juror misconduct by withholding a criminal history in violation of his disclosure obligations at voir dire. As a result of this new information, Mr. Fell filed an Amended 2255 Motion on October 22, 2013. The additional facts are described in Mr. Fell's Amended 2255 Motion, and also set forth in full below.

#### 1. Juror #162

During a sealed hearing on August 15, 2013, Juror #162 confirmed that she was the victim of childhood sexual abuse by her adoptive father. The facts introduced at that hearing, the testimony of Juror #162 in response to those facts, and further evidence offered by Mr. Fell in his First Amended 2255 Motion show much more that support this claim and warrant the reversal of Mr. Fell's conviction and death sentence.

10

Although she did not disclose this information during voir dire, Juror #162's life was marked by turmoil, abuse, victimization, mental illness, and the stress of raising and living with a son who has struggled for decades with drug and alcohol abuse, and who has a criminal history of repeated violent, assaultive offenses. Most of these offenses were committed under the influence of drugs and/or alcohol. Her difficulties, however, began when she was a toddler, when she was removed from her biological parents due to parental neglect.[2] As Juror #162 testified, she was separated from her siblings and placed in several foster homes after her removal from her family of origin, until she was ultimately adopted. Tr. of Aug.15, 2013 Hr'g ("Aug. Hr'g Tr.") at 183. It was in her adoptive home where she was subject to repeated sexual abuse by her adoptive father, over a period of years during her childhood. Id. Juror #162 disclosed the abuse to a neighbor when she was a teenager. Id. at 183-84. The neighbor later told Juror #162's adoptive mother, who called Juror #162 a liar. Id. Juror #162 has now disclosed that her current husband was also sexually abused as a child. Id. at 129. As a result of the sexual abuse she suffered, Juror #162 ran away from home for an extended period of time.[3]

Before she finished high school, Juror #162 moved across the country with her first husband.[4] Three months after giving birth to her first son, Patrick Ryan, her husband burned to death in a work accident.[5] This tragedy caused her to become severely depressed, leading her to move in with her in-laws.[6] Juror #162 has reported that her in-laws "stole" the money that she

---

[2] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002857).
[3] Id. at FELL-00002858.
[4] Id.
[5] Id.
[6] Id.

11

had received from a settlement related to her husband's death.[7]  Her depression caused her to cease functioning and to "not want to live anymore."[8]

Shortly thereafter, Juror #162 was institutionalized in the Vermont State Hospital in Waterbury, Vermont.  Aug. Hr'g Tr. at 165.  Her first institutionalization lasted five months. Just under four months after her first discharge, she was again institutionalized for 14 months. During her institutionalization, her infant son, Patrick Ryan, was taken into state custody, placed into foster care, and reportedly lived with an aunt for a period of time.[9]  In October 1963, Juror #162 filed a Voluntary Application for Appointment of Guardian for Infirm Person, which noted: "she deems herself unfitted for the prudent management of her affairs, and respectfully requests said Court to appoint Donald G. Milne, Esquire...as her Guardian."[10]  While she was institutionalized, her guardian, Donald Milne, stole "everything [she] had."  Aug. Hr'g Tr. at 165.  Milne sold real estate belonging to Juror #162, failed to file an accounting, and embezzled several thousand dollars.[11]  This theft left Juror #162 virtually penniless.[12]  Juror #162 engaged a lawyer in an attempt to recover the money from Milne.[13]  Milne apparently never returned any of the money, and Juror #162 was only able to recover a fraction of the money in a settlement with an insurance company that had bonded Milne as the guardian.

Although this history would have been enough to sustain a challenge of her service on Mr. Fell's jury, there was more relevant history that she failed to mention.  While she

---

[7] Id.
[8] Id.
[9] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858); State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894); Aug. Hr'g Tr. at 173.
[10] In re: Guardianship of Joyce Ryan of City of Barre, Vermont, of the Washington Unit of the Superior Court of the State of Vermont, Probate Division, Probate Form No. 67A (Ex. 324 at FELL-00003084).
[11] In re: Guardianship of Joyce Ryan of City of Barre, Vermont of the Washington Unit of the Superior Court of the State of Vermont, Probate Division, January 10, 1966 Letter from Judge Nora E. Olich (Ex. 324 at FELL-00003162).
[12] Aug. Hr'g Tr. at 165.
[13] In re: Guardianship of Joyce Ryan of City of Barre, Vermont of the Washington Unit of the Superior Court of the State of Vermont, Probate Division, Judgment Order (Ex. 324 at FELL-00003124-25).

was institutionalized, Juror #162 became involved with a nurse at the hospital; that relationship became abusive at some point after Juror #162's release.[14]  Juror #162 and her son—who was ultimately returned from state custody into her custody—lived with this woman for the remainder of his childhood.[15]  This woman, named Lucille Tatro, committed acts of violence against both Juror #162 and her son—including locking him outside in the winter while he was in only his underwear and dragging him downstairs by his hair.[16]  The abuse by Ms. Tatro against Juror #162 included incidents where she and Ms. Tatro threatened each other with knives.[17]  This violence and harassment continued after the relationship ended:  Ms. Tatro threw rocks at Juror #162's car, tried to smash the windshield, and tried to run Juror #162 and her husband off the road.[18]  Juror #162 filed a complaint with the police after this incident, and Ms. Tatro was arrested and prosecuted.[19]  Ms. Tatro also physically attacked Juror #162's husband, and accused him of raping her.[20]

In court records, Juror #162's son, Patrick Ryan, has described his upbringing— including but not limited to these incidents—as traumatic, abusive, and disruptive.[21]  He reported

---

[14] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858); State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894).

[15] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858).

[16] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894).

[17] Id.

[18] Washington County Criminal Court, File of Lucille Tatro, 943-8-82, Affidavit of Officer Richard C. Kinerson (Ex. 325 at FELL-00003211); State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858).

[19] Washington County Criminal Court, File of Lucille Tatro, 943-8-82, Affidavit of Officer Richard C. Kinerson (Ex. 325 at FELL-00003211).

[20] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002859).

[21] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894); Superior Court of Vermont, Washington District Court,  # 661-6-97 Wncr., Intermediate Sanction Report (Ex. 328 at FELL-00003362).

that he was in foster care for approximately four years amidst Juror #162's institutionalizations.[22] His recall of his time in foster care included some "traumatic abusive incidents, such as being tied up by other boys in the home."[23]  When he was reunited with his mother after her release from the state hospital, they went to live with Ms. Tatro—a period Ryan has described as defined by intimidation and abuse.[24]  Juror #162 was "drinking heavily" during this time.[25]  Juror #162 has in the past received counseling for alcohol abuse.[26]  When he was sixteen, Ryan got into a physical altercation with Ms. Tatro, punching her in the face.[27]  At this point, he moved out of the house for a period of time.[28]

Contrary to what was revealed during jury selection, it was shortly after this point in 1980 that Patrick Ryan's adult criminal history and substance abuse began.  In addition to numerous other arrests and charges, such as driving with his license suspended, failing to appear in court, and writing bad checks, between 1980 and Mr. Fell's trial in 2005, Patrick Ryan was arrested on thirteen different occasions for serious crimes.[29]  He pled guilty or nolo contedere after every arrest.[30]  Four of his convictions were felonies.

The first felony conviction was burglary, a charge to which he pled guilty in 1983.[31]  Ryan and an accomplice kicked in the doors of two different residences and stole six

---

[22] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002893-94).
[23] Id. at FELL-00002894.
[24] Id.
[25] Id.
[26] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002859).
[27] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894).
[28] Id.
[29] Ex. 340.
[30] Id.
[31] Superior Court of Vermont, Washington District Court, Case No. 151-2-83 Wncr., Affidavit of Officer Lawrence B. Dodge (Ex. 326 at FELL-00003233-35).

guns, as well as other valuables.[32]  For these offenses, Ryan was sentenced to two to six years in prison; he ultimately served approximately 12 months.[33]  The second felony occurred in 1992, when he was 31 years old.  In the middle of the night, Ryan climbed onto the roof of his ex-wife's home, broke in through her attic window, and threatened her and her friend.[34]  He was arrested, charged with felony burglary, and ultimately pled guilty to felony unlawful trespass.[35]  This offense occurred approximately three weeks after he had been arrested for and pled guilty to simple assault on the same woman, his ex-wife, for "throwing her down and punching her repeatedly in the face and stomach."[36]  For these 1992 offenses, he received a sentence of zero-to-three years in jail, suspended with probation.

In and among these two convictions, Ryan was arrested for and charged with numerous other offenses: (1) in 1980 for unlawful trespass (for kicking in the door of a store while in a "low emotional state");[37] (2) in 1982 for unlawful mischief (for again kicking in the door of a store while drunk and depressed);[38] (3) in 1982 for simple assault (for knocking another man unconscious when the man intervened in an argument Ryan was having with a girlfriend in a bar);[39] (4) in 1982 for aggravated assault and assault on a police officer;[40] (5) in 1988 for unlawful

---

[32] Id. at FELL-00003234-35.

[33] Superior Court of Vermont, Washington District Court, Case No. 151-2-83 Wncr., Notice of Plea Agreement (Ex. 328 at FELL-00003305); Superior Court of Vermont, Addison Criminal Division, Case No. 687-9-88 Ancr., Vermont Criminal History Inquiry (Ex. 327 at FELL-00003285).

[34] Superior Court of Vermont, Addison Criminal Division, Case No. 483-9-92 Ancr., Affidavit of Officer Donald Sweet (Ex. 327 at FELL-00003253).

[35] Id. at FELL-00003253-54.

[36] Superior Court of Vermont, Addison Criminal Division, Case No. 448-8-92 Ancr., Information by State's Attorney (Ex. 327 at FELL-00003240).

[37] Superior Court of Vermont, Washington District Court, Case No. 499-5-80 Wncr., Affidavit of Officer Patrick O'Neill (Ex. 326 at FELL-00003222).

[38] Superior Court of Vermont, Washington District Court, Case No. 214-2-82 Wncr., Affidavit of Officer Scott VanderBush (Ex. 326 at FELL-00003216).

[39] Superior Court of Vermont, Washington District Court, Case No. 669-6-82 Wncr., Affidavit of Officer Mark Moody (Ex. 326 at FELL-00003213).

[40] Superior Court of Vermont, Washington District Court, Case No. 669-6-82 Wncr., Letter from Probation and Parole Officer (Ex. 328 at FELL-00003315); Intermediate Sanction Report (Ex. 328 at FELL-00003362).  See also Superior Court of Vermont, Addison Criminal Division, Case No. 687-9-88 Ancr., Vermont Criminal History

15

trespass (when he acted disorderly with a female patron inside a bar and would not leave);[41] (6) in 1989 for driving while intoxicated ("DWI #1");[42] (7) in July 1992 for driving while intoxicated ("DWI #2")[43]; and (8) in November 1992 for driving while intoxicated yet again ("DWI #3").[44] He was sentenced to one to two years for DWI #3, all but six months of which was suspended.[45] He ultimately served approximately five months in jail for this crime from January 1993 to June 1993.[46]

Ryan had serious marital problems, and in June 1992 Juror #162 joined herself as a party to his divorce and child custody proceedings.[47] Over the next five years, Juror #162 was represented by counsel, and filed motions, affidavits, and letters on a regular basis.[48] None of this litigation activity was disclosed during jury selection. In September 1995, as part of the custody proceedings, two psychologists conducted an evaluation of Patrick Ryan and his ex-wife in order to make recommendations about visitation rights with Juror #162's grandson. In their report and recommendations, the psychologists "strongly emphasized that visitation . . . involves only [the child] and his father" because the child "has expressed a clear desire to not have

---

Inquiry (Ex. 327 at FELL-00003285); Case No. 649-6-82 Wncr., Conditions of Release Order (Ex. 328 at FELL-00003306).

[41] Superior Court of Vermont, Addison Criminal Division, Case No. 687-9-88 Ancr., Affidavit of Officer Donald Ploof (Ex. 327 at FELL-00003291).

[42] Superior Court of Vermont, Chittenden County, Case No. 4565-10-89 Ancr., Docket and Disposition Report (Ex. 329 at FELL-00003374).

[43] Superior Court of Vermont, Addison Criminal Division, Case No. 357-7-92 Ancr., Disposition Report (Ex. 327 at FELL-00003260).

[44] Superior Court of Vermont, Washington District Court, Case No. 1203-92-11151 Wncr., Affidavit of Officer Kevin Gaiwey (Ex. 328 at FELL-00003319-25).

[45] Superior Court of Vermont, Washington District Court,  Case No. 649-6-82 Wncr., Department of Corrections Petition for Satisfactory Discharge from Probation, Dkt # 0018-01-93 (Ex. 328 at FELL-00003338).

[46] Id.

[47] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Docket Report (Ex. 323 at FELL-00002764-71).

[48] Id.

contact with his grandmother, and she should not be included in visits" unless the child indicated

otherwise at a later date.[49]

In response, Juror #162 filed for grandparent visitation, and willingly subjected

herself to at least one individual psychological evaluation, which yielded a report noting

profound reservations about her mental health.[50]  Filed in June 1996, the psychologist's report

found that Juror #162's profile was "indicative of an individual who is somewhat defensive and

is likely minimizing their personal problems and attempting to present themselves in an overly

favorable manner.  Even within this defensive posture there are indications of

psychopathology."[51]  The psychologist noted Juror #162's "history of emotional problems, likely

related to early childhood abuse, which has included an extended hospitalization at Vermont

State Hospital, probable alcohol abuse, and a long subsequent period of medication for

depression."[52]

The psychologist also recommended that Juror #162 not have visitation rights

with her grandson.[53]  This recommendation was based in part on accusations that Juror #162 and

her husband had engaged in inappropriate sexual touching of their grandson.[54]  The psychologist

who evaluated her reported:

> There is nothing in the current evaluation that can decisively determine whether
> [Juror #162] has ever been sexually inappropriate with her grandson.  Her own
> childhood sexual abuse, and her apparent current minimization (i.e. characterizing
> her father as a 'very good and caring person' while at the same time reporting that
> he repeatedly molested her for two years, prompting her to run away from home)
> suggests that she may have problems recognizing in a child distress or discomfort

---

[49] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002910).

[50] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002857- 61).

[51] Id. at FELL-00002859.

[52] Id. at FELL-00002860.

[53] Id. at FELL-00002861.

[54] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002906 and FELL-00002909).

related to physical touching, or in accepting the child's perception that they do not consider such touching as benign or harmless as she assumes.[55]

The final order in the divorce case, dated April 11, 1997, dealt with a motion for grandparent visitation filed by Juror #162.[56] This order held that Patrick Ryan would be entitled to parent-child contact with his son one weekend per month, and that Juror #162 would be permitted to have only limited contact with her grandson during Ryan's parent-child contact time.[57]

One month later, in May 1997, Patrick Ryan was arrested for unlawful mischief, simple assault, and his third felony, unlawful trespass, after kicking a door and breaking a window in an ex-girlfriend's home, crawling through the broken window, and assaulting her and her friend.[58] In the arrest report for this incident, Ryan represented that his "ties to the local community" consisted of his local address and his mother, Juror #162.[59] He provided an address of 24 Middle Road, South Barre, Vermont, as the residence of Juror #162.[60] This was the same address he provided for himself in separate family court proceedings less than a year later.[61]

In an Intermediate Sanction Report completed in connection with this arrest, Ryan was found to have had a disruptive upbringing and a history of interpersonal violence.[62] The author of the report described an "assaultive history" dating back to 1983, and observed that

---

[55] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002860).

[56] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Docket Report (Ex. 323 at FELL-00002771).

[57] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Am. Order of Modification (Ex. 323 at FELL-00002772).

[58] Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Affidavit of Officer William Wolfe (Ex. 328 at FELL-00003345-46).

[59] Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Barre Town Police Department Record (Ex. 328 at FELL-00003349).

[60] Id.

[61] Joanne Pecor v. Patrick Ryan, Vermont Family Court, Chittenden County, Case No. 422-5-98, March 31, 1998 Memo to Linda Wilson, Family Court Clerk (Ex. 330 at FELL-00003434).

[62] Superior Court of Vermont, Washington District Court, Case No. 661-6-97Wncr., Intermediate Sanction Report (Ex. 328 at FELL-00003362).

"[a]llegedly all convictions took place under the influence of drugs or alcohol."[63]  In addition to Ryan's documented criminal history, the report describes at least one incident that had not been reported to the police, in which he dragged his then-girlfriend out of a car, "nearly choking her and verbally threatening her."[64]  In this report, dated September 18, 1997, Ryan recounted his abusive and chaotic upbringing.  He described Juror #162's "institutionalizations for an emotional breakdown," Ryan's resulting time in foster care and in the care of a relative, and the abusive relationship Juror #162 then engaged in with Lucille Tatro.[65]  Ryan also disclosed his "escalat[ing]" substance abuse, naming his "drugs of choice" as "alcohol, pharmacuticals [sic], cocaine and marijuana."[66]  He noted a treatment history including Champlain Drug and Alcohol Services, Maple Leaf Farm, and Alcoholics Anonymous, and informed the author of the report that he was currently attending three Alcoholics Anonymous meetings per week.[67]

The 1997 charges resulted in a sentence of two to four years in jail, but Ryan received a pre-approved furlough with a referral to the Intensive Domestic Abuse Program.[68]  He was paroled on February 23, 1999 and discharged from parole on January 22, 2001.[69]

Approximately ten months later, Ryan was charged with his fourth driving while intoxicated ("DWI #4"), another felony (his fourth), as well as possession of cocaine and marijuana.[70]  At the time of his arrest in 2001, Juror #162 and her son lived in adjoining

---

[63] Id.

[64] Id.

[65] Id.

[66] Id. at FELL-00003363.

[67] Id.

[68] Id.; Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Notice of Plea Agreement (Ex. 328 at FELL-00003367).

[69] State of Vermont, Department of Corrections, Movement History of Patrick M. Ryan (Ex. 336 at FELL-00003548).

[70] Ex. 340 at FELL-00003604; Superior Court of Vermont, Chittenden County,  Case No. 6916-11-01 Cncr., DUI Affidavit (Ex. 329 at FELL-00003393).

apartments in Colchester, a fact noted on the arrest report.[71]  In fact, Juror #162 and her son lived

in adjoining apartments through Mr. Fell's trial.[72]  These 2001 crimes were committed in a car

which Juror #162 co-owned, and which was registered in her name.[73]  The car was towed as a

result of the 2001 arrest.[74]

After he was convicted of DWI #4, Ryan's license was permanently revoked.[75]

He was sentenced to two to five years in prison, and was again referred to intensive counseling.[76]

He was living on parole in connection with this conviction in 2005, while Juror #162 filled out

her juror questionnaires and testified during voir dire.[77]  Her son's parole did not expire until

December 2005, several months after the Fell trial ended.[78]

As the Intermediate Sanction Report described, nearly every one of Patrick

Ryan's crimes was committed under the influence of drugs or alcohol.  This fact is confirmed by

both the nature of the conduct and the sentences imposed by courts.  For example: as a condition

of his release for the 1982 aggravated assault and assault on a police officer arrest, Ryan was

ordered not to enter any public establishments where alcohol was served; to take Antabuse daily

in the presence of his mother's partner, Lucille Tatro; to attend alcohol counseling; and not to

---

[71] Superior Court of Vermont, Chittenden County,  Case No. 6916-11-01 Cncr., DUI Affidavit (Ex. 329 at FELL-00003393).

[72] Superior Court of Vermont, Chittendon Family Division, Case No. 319-4-95, Petition to Modify Child Support dated December 9, 2005 (Ex. 331 at FELL-00003482) (listing address for Patrick Ryan as 573 Bay Road, Apartment 101, Colchester, VT 05446,  the same as at the time of his 2001 arrest).

[73] Superior Court of Vermont, Chittenden County,  Case No. 6916-11-01 Cncr., DUI Affidavit (Ex. 329 at FELL-00003393).

[74] Id.

[75] Superior Court of Vermont, Chittenden County,  Case Nos. 6916-11-01, 7413-11-01, 7414-11-01 Cncr., Affidavit of Officer Michael Fish (Ex. 329 at FELL-00003384).

[76] Superior Court of Vermont, Chittenden County,  Case Nos. 6916-11-01, 7413-11-01, 7414-11-01 Cncr., Docket Report (Ex. 329 at FELL-00003388-89).

[77] State of Vermont, Department of Corrections, Movement History of Patrick M. Ryan (Ex. 336 at FELL-00003548).

[78] Id.

operate a motor vehicle.[79]  The numerous DWI records indicate varying degrees of intoxication while driving, with police reports and affidavits reporting as follows: cocaine, marijuana, and fourteen alcohol containers were found in Ryan's car in connection with DWI #4;[80] he was unsteady on his feet and refused a breathalyzer test in his arrest for DWI #3;[81] and he said "F\*\*\* you" to police "no less than fifty times," physically threatened them, and "showed numerous mood swings ranging through anger, laughter, brief calm and tears" during his arrest for DWI #2.[82]  The victim of the 1992 assault (his ex-wife) reported that Ryan "reeked of beer" as he confronted her in her home after breaking in.[83]  The assault and unlawful trespass charge in 1997 began with an altercation in a bar, which led to Ryan being removed from the bar, and the responding officer noted that he smelled of alcohol.[84]  A condition of his release from the 1997 offenses was that he was prohibited from purchasing, possessing, or consuming alcoholic beverages.[85]  Many of the sentences Ryan received required him to undergo intensive and structured substance abuse treatment.[86]

### 2. Juror #143

At the August 15, 2013 Hearing, Juror #143 admitted that he signed a declaration stating that during trial he took a trip to Rutland, examined the house and neighborhood where Debbie Fell lived, made judgments about her neighborhood, inspected the area around the Price

---

[79] Superior Court of Vermont, Washington District Court, Case Nos. 649-6-82, 669-6-82 Wncr., Conditions of Release Order (Ex. 328 at FELL-00003306).

[80] Superior Court of Vermont, Chittenden County,  Case Nos. 6916-11-01 Cncr., DUI Affidavit (Ex. 329 at FELL-00003390, FELL-00003393).

[81] Superior Court of Vermont, Washington District Court, Case No. 18-1-93 Wncr., Letter from Probation Officer (Ex. 328 at FELL-00003321-22).

[82] Superior Court of Vermont, Addison Criminal Division, Case No. 357-7-92 Ancr., Affidavit of Sargent Thomas R. Noble (Ex. 327 at FELL-00003262).

[83] Superior Court of Vermont, Addison Criminal Division, Case No. 483-9-92 Ancr., Affidavit of Officer Donald Sweet (Ex. 327 at FELL-00003253).

[84] Superior Court of Vermont, Washington District Court,  Case No. 661-6-97 Wncr., Affidavit of Officer William Wolfe (Ex. 328 at FELL-00003345-47).

[85] Superior Court of Vermont, Washington District Court,  Case No. 661-6-97 Wncr., Conditions of Release (Ex. 328 at FELL-00003371).

[86] See Ex. 340.

Chopper, and made assessments regarding the lighting of the parking lot where Teresca King was kidnapped. Aug. Hr'g Tr. at 35. He admitted that he initialed each paragraph of the declaration, made changes where he believed it was inaccurate before signing the statement, and initialed each change that he made. Id. at 37-49. He admitted that—with the exception of the statements put at issue by Mr. Fell's 2255 Counsel relating to Juror #143's trip to Rutland and his use of a shotgun in the jury room—the other statements in the declaration were true. Id.[87] But he testified—falsely—that the trip he made to Rutland occurred in 2010, rather than in 2005, at the time of the trial.[88] These facts, and further evidence offered by Mr. Fell in his First Amended 2255 Motion, lend even more support to Mr. Fell's Claim XXII of juror misconduct and warrant a new trial.

### 3. Juror #26

On September 27, 2013, Juror #26 testified that, prior to trial, he heard a news report that Robert Lee committed suicide in jail. Tr. of Sept. 27, 2013 Hr'g at 14 ("Sept. Hr'g Tr."). He testified that the first time Robert Lee's name was mentioned during Mr. Fell's proceedings, he realized that this was the same man who had, according to Juror #26's understanding, committed suicide. Id. at 15. Mr. Lee's name was mentioned for the first time during voir dire and then repeatedly during trial. It is not disputed that the Court asked Juror #26 at voir dire whether he had been exposed to extraneous information, nor that the Court made the

---

[87] Juror #143 clarified that the statement in paragraph 4 of Juror #143's declaration—that "[T]he defense made a mistake by not having Fell testify"—was phrased differently when he originally made it: he said Mr. Fell's defense team "f***ed up." Aug. Hr'g Tr. at 42-43.

[88] Juror #143 was also dishonest in his answers on voir dire. Although Juror #143 represented at voir dire that he had never been accused of a crime or been the target of a criminal investigation, police records reveal that he was accused of theft in 1995, and that he was investigated by the police regarding that incident. Vermont State Police, A Troop – Middlesex, LAW Incident Table (Ex. 339 at FELL-00003598-600). Two individuals, informed that Juror #143 had stolen property from a public recreation area, followed Juror #143's vehicle and attempted to get him to pull over. Id. As they did this, Juror #143 reportedly threatened them with a handgun. Id.

22

same inquiry every day during the trial. There is also no dispute that Juror #26 indicated the answer was no.

Juror #26 also made multiple material and purposeful misstatements on voir dire. Juror #26 failed to disclose that he was charged with and convicted of various criminal offenses, including a conviction for criminal mischief in April 1996, which Juror #26 informed 2255 Counsel arose out of a marital dispute. Ex. 240. Juror #26 also failed to disclose that he was found guilty of driving under the influence and that he was charged with the misdemeanor of non-payment of wages, the latter resulting in a fine of $2,875 in restitution.[89] Juror #26 also lied during voir dire with respect to his son's criminal history: Juror #26 failed to disclose that his son, Fredrick Hodgdon III, was criminally charged and placed on probation in 2000 for smashing the window of a woman's car following a dispute.[90] Mr. Fell also has evidence showing that Juror #26 omitted from his responses to this Court on voir dire a long history of civil suits involving him and his family.[91] He also withheld his father's connections with government office.[92]

### 4. Juror #27

Juror #27 lied to this Court on voir dire when he misrepresented his prior criminal history. Although he did not disclose any criminal history at voir dire, police reports show that Juror #27 was accused of, and pled guilty to, driving while under the influence of alcohol.[93]

---

[89] Superior Court of Vermont, Essex Unit, Case No. 44-4-92 Ecr., Letter from District Office Chief Clerk to Darrell Settergren (Ex. 333 at FELL-00003525).

[90] Vermont State Police, A Troop Middlesex (Ex. 334).

[91] Juror #26 was involved in at least two civil suits. South Main Body Shop Inc v. [Juror #26]; Calco, Inc. v. [Juror #26]. His father was also involved in at least two civil suits. Hodgdon v. Town of Victory; Hodgdon v. Brown. His son was involved in at least one. Citizens Savings Bank & Trust v. Hodgdon.

[92] A 2006 Rutland Herald article, "Granby: A red speck in a blue state," said that Frederick Hodgdon, Juror #26's father, was a "longtime selectboard chairman, road commissioner, civil defense director, energy coordinator, service officer, solid-waste supervisor and justice of the peace" and that he had served for "many decades." Ex. 335.

[93] Superior Court of Vermont, Washington District Court, 1075-9-82 Wncr., Docket and Disposition Report (Ex. 326 at FELL-00003227-28).

Juror #27 was also charged in a separate case with an assault, after hitting another man in the eye and the mouth, chipping three of the victim's teeth and causing a ring (described in the police report as a "severe discoloration scar") around his victim's eye as a result.[94]

## ARGUMENT

These four jurors engaged in misconduct that deprived Mr. Fell of his Fifth, Sixth, and Eighth Amendment rights to a fair trial and impartial jury. Despite clear instructions at voir dire, these jurors frustrated the efforts of the defense, the Government, and the Court to empanel a jury consisting of individuals capable and willing to decide the case before them based on the evidence they heard in court. With respect to the dishonesty on voir dire, the evidence to date shows that these misstatements were the product of deliberate dishonesty, and that the true facts responsive to the questions on voir dire would have provided valid bases for the jurors to be struck for cause. Mr. Fell is prepared to offer further proof at an evidentiary hearing. In addition, Jurors #143 and #26 were exposed to extraneous evidence and concealed that fact from the Court, precluding any possible remedy of the prejudice inherent in that exposure. Again, Mr. Fell can prove that this exposure and its concealment from the Court were deliberate, and that the extraneous evidence caused prejudice to Mr. Fell. Proof of any one of these factual allegations would support Mr. Fell's juror misconduct claim and entitle Mr. Fell to a new trial. As a result of this multifaceted misconduct, Mr. Fell's trial and sentencing were constitutionally flawed, and both his guilty verdict and his sentence of death must be vacated.

### 1. Juror #162

In its May 10, 2013 opinion on Claim XXII of Mr. Fell's § 2255 Motion, this Court explained the law applicable to juror dishonesty claims:

---

[94] Superior Court of Vermont, Washington District Court, 401-4-81 Wncr., Docket and Disposition Report (Ex. 326 at FELL-00003224-25).

24

> In *McDonough Power Equipment*, the United States Supreme Court held that a party seeking a new trial based on juror nondisclosure or misstatements must satisfy a two-part test. '[A] party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'

May 10 Order at 5 (quoting McDonough, 464 U.S. at 548). The facts of Mr. Fell's case meet that standard.

### a. Juror #162's Misstatements and Omissions at Voir Dire Were the Product of Dishonesty

Mr. Fell has established evidence that Juror #162 persistently lied in her short questionnaire, her long questionnaire, and at individual voir dire. She continued to lie during the investigatory hearing held by this Court on August 15, 2013. This evidence is strikingly similar to that which the court held was sufficient in Sampson v. United States to warrant not only full hearings, but also warrant vacatur of the defendant's sentence.

### i. Juror #162 Lied When She Said Neither She nor People Close to Her Had Been Victims of Crimes

Juror #162 was not mistaken when she asserted on voir dire that neither she nor people close to her had been the victim of or witness to a crime: she was being dishonest.

There were many instances in which Juror #162 and people close to her were victims of crimes. Both Juror #162 and her husband were molested as children. The abuse of Juror #162 was repeated and lasted for a matter of years, and impacted her so severely that she ran away from home. As part of an extended institutionalization in a Vermont state hospital, a guardian was appointed to oversee Juror #162's affairs. While Juror #162 was institutionalized, she was the victim of a major theft: the guardian stole "everything [she] had," leaving her destitute. Aug. Hr'g Tr. at 165-67.

She entered into a relationship with a nurse at the state hospital named Lucille Tatro, and, after Juror #162 regained custody of her young son upon release from the hospital,

25

she moved with her son into Ms. Tatro's apartment. Both Juror #162 and her child were victims of Ms. Tatro's physical violence, which included threatening Juror #162 with knives, dragging Juror #162's son downstairs by his hair, and locking him out in the cold while he was wearing only his underwear. The violence continued after Juror #162 purportedly ended the relationship and married someone else: both Juror #162 and her husband were stalked, harassed, and physically attacked. Ms. Tatro accused Juror #162's husband of raping her; burned cigarettes into their car's upholstery; attempted to smash their car windshield; and attempted to run them off the road. Juror #162 filed a police complaint about this activity, and Ms. Tatro was arrested and prosecuted.[95] Notwithstanding this history, Juror #162 stated that she had never been the victim of a crime when asked on voir dire. She was asked directly if she had ever filed a complaint with the police against anyone. She said no, despite the incontrovertible fact that she had filed at least one complaint for a serious matter, which resulted in a criminal prosecution,[96] and despite the fact that she had filed several complaints against her neighbors for a variety of grievances, including an accusation that a neighbor had decapitated her missing cat.[97]

Juror #162 compounded her lies about these incidents during the August 15 Hearing. With respect to the sexual abuse by her adoptive father, Juror #162 claimed that she "never even thought about it." Aug. 15 Hr'g at 99. She claimed that this episode of victimization did not impact her life, and that she "forgot about it." Id. This was false. As an initial matter, Juror #162 disclosed in voir dire that child sex crimes were at the forefront of her

---

[95] Washington County Criminal Court, File of Lucille Tatro, 943-8-82, Affidavit of Officer Richard C. Kinerson (Ex. 325 at FELL-00003209-11).

[96] Id.

[97] See Declaration of Lewis J. Liman in Support of Brief in Support of an Evidentiary Hearing, Ex. 343 (Colchester Police Department LAW Incident Table, Incident No. 03CC00030, Noise Disturbance, at FELL-00003693-95; Incident No. 03CC03512, Suspicion, at FELL-00003696-98; Colchester Police Department LAW Incident Table, Incident No. 01CC03523, Vandalism, at FELL-00003680-82 ([Juror #162] phoned police saying that she wanted it "noted" that there were scratches on the driver's door of her car and she suspected that one of her neighbors had caused the damage)).

26

mind: at the time of trial, she was following the Michael Jackson child molestation case closely, and she represented that the death penalty might be appropriate in murder cases involving "a sex crime of a child." Ex. 322 at FELL-00002742, FELL-00002757.

Moreover, contrary to Juror #162's testimony, she did not "forg[e]t about" this episode in her life. Juror #162 admitted in court that she confided in a neighbor about this victimization years after it occurred. Aug. Hr'g Tr. at 105. When Juror #162 was in her twenties—more than a decade after the molestation occurred—her mother wrote a letter to her condemning her for having accused her adoptive father of this abuse. Id. at 106-07. In 1996, in the context of her son's 1992-1997 divorce and child custody proceedings (to which Juror #162 was a party), Juror #162 underwent a psychological evaluation in which she discussed the child sexual abuse she endured as a prominent event in her life, one that "prompt[ed] her to run away from home." In this 1996 evaluation, she reported that "even now 'the thought makes [her] feel dirty.'"[98] Finally, the record is clear that she readily disclosed her prior history of sexual abuse, as well as that of her current husband, during her interviews with 2255 Counsel.

Juror #162 also claimed that she did not disclose this abuse because "I would attribute crime as . . . somebody stealing my purse or something of that nature." Aug. Hr'g Tr. at 106-07. This explanation is unpersuasive, since Juror #162 was also in fact the victim of a very serious theft—one that robbed her of "everything [she] had." She did not disclose that on voir dire either. She agreed in court that this was another example of a "very serious event, a criminal event, that [she was] a victim of that [she] did not disclose." Id. at 162. But she explained that she "went through a psychological trauma," and "[hadn't] thought about these things for years and years and years." Id. at 166. It is simply not true that she had not thought about this trauma

_____

[98] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858).

27

for "years and years and years."  In the same 1996 psychological evaluation in which she

discussed her own child sexual abuse, she again highlighted this event as a prominent one in her

life.  She referenced her guardian, Donald Milne, by name to the psychologist, and told the

psychologist that he "stole everything [she] had."[99]  This evaluation was conducted in 1996, over

thirty years after the theft occurred and less than ten years before voir dire.  Plainly, the distance

of time did not lead to her forgetting.

Juror #162 also lied at the August hearing about the physical abuse that her son

suffered as a child, which was not disclosed on voir dire.  When asked if it was untrue that Ms.

Tatro had "locked him out in the cold and threw him down a flight of stairs," Juror #162 said, "I

don't know anything about that.  Never heard of that."  Aug. Hr'g Tr. at 169.  This, too, was a

blatant lie.  She discussed this abuse in her psychological evaluation during her son's divorce

proceedings.[100]  Juror #162's son described these events in more detail in a 1995 psychological

evaluation that was conducted of him and other members of his family as part of these divorce

proceedings.  According to Ryan, Ms. Tatro was "abusive"—she "beat the s*** out of [him]" on

a regular basis, "dragged him downstairs by the hair," and "put [him] outside with nothing on but

underwear in the winter."[101]  Juror #162's son also reported that Ms. Tatro "beat . . . up" Juror

#162, that they "pulled knives on each other," and that he "recall[ed] an incident in which 'a gun

was involved.'"[102]  As a party to this divorce proceeding, Juror #162 saw this family

psychological evaluation—in fact, she submitted an affidavit specifically discussing it.[103]  She

was asked by Mr. Fell's 2255 Counsel if she knew of these events.  2255 Counsel provided her

---

[99] Id.

[100] Id.

[101] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan / Karen Currier (Ex. 323 at FELL-00002894).

[102] Id.

[103] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Affidavit of [Juror #162] (Ex. 323 at FELL-00002885).

with specific, unforgettable facts: her young son was dragged down the stairs by his hair, and locked outside in the Vermont cold in nothing but his underwear. She had heard these facts before. And yet she flatly lied to Mr. Fell's counsel and the Court by testifying that she did not know anything about those allegations of abuse: "Never heard of that." Aug. Hr'g Tr. at 169.

### ii. Juror #162 Lied About Her Son's and Her Own History of Criminal Accusations and Charges

Juror #162 also lied on voir dire when she said that the history of criminal accusations and charges against her and her family was limited to one incident, sixteen years prior to voir dire, in which her son, Patrick Ryan, received "house arrest" for "DWI and domestic abuse"—and when she said it was the "[b]est thing [that] ever happened to him. He is now a different person."[104]

The contrast between this statement and the truth is stark. First, Ryan had four felony convictions between 1983 and 2002. One of these was for a 1983 burglary, a crime in which he and an accomplice broke into two residences and stole six guns, along with other valuables. The second and third felonies were for violent, assaultive incidents in which he broke into the homes of an ex-wife and then an ex-girlfriend and threatened and assaulted them. Both of these crimes involved substance abuse. The fourth felony conviction was for his fourth DWI, in 2002. In addition to these felonies, Ryan has had at least eight other convictions—reckless, violent, and intoxicated offenses that include at least three assaults and three DWIs.

Far from the reported "house arrest," Ryan actually served two significant jail sentences: one for approximately one year, following his 1983 burglary conviction, and the second for approximately 5 months, following his third DWI conviction in 1992. Notably, he was never sentenced to nor served "house arrest," as the voir dire report would indicate. In

---

[104] [Juror #162] Long Form Juror Questionnaire (May 11, 2005) (Fell Ex. 322 at Fell-00002746).

addition to the incarceration sentences, he was on probation or parole for at least the following time periods: 1982-83, 1984, 1992, 1993-95, 1999-2001, and 2004-2005. In fact, Ryan was on parole at the time Juror #162 was filling out her voir dire questionnaire and through Mr. Fell's trial. His sentences variously called for, among other things: intensive supervision; residential drug and alcohol treatment; mandatory and structured outpatient drug and alcohol treatment; anger management counseling; restrictions on freedoms such as who he could associate with, where he could go, and which routes he could take to and from work; mandatory ingestion of medicines used to treat alcohol dependence; and revocation of his driver's license, including, after his fourth DWI conviction, a permanent revocation.

In Juror #162's testimony at the August 2013 hearing, she both admitted that she had not fully disclosed her son's criminal history at voir dire, and also continued to lie about the extent of his record. Juror #162 said that she was honest, truthful, open, and candid in her answers about her son on her juror questionnaire:

> Q You said that your son was under house arrest for D – DUI, DWI and domestic violence 16 years ago, and he now is the assistant manager at Shaw's, et cetera, right?
>
> A That's correct.
>
> Q And that was personal information?
>
> A Um-hum.
>
> Q You love your son?
>
> A I sure do.
>
> Q And you have been close to your son and still are?
>
> A Um-hum.
>
> Q And so you were willing to disclose that – that information?
>
> A Um-hum.

Q If you could say "yes," I think the court –

A Yes.

Q Okay. So that was honest and truthful and open and candid about your family?

A That's correct.

Q And I believe, I think – is it true that this incident with your son took place during the breakup of his marriage and when his life was in turmoil?

A That's correct.

Q And you were willing to say that he was a better person for having gone through that 16 years before. I think you said that?

A Well, I think he has learned a lot from it, yes.

Q Okay. So like the sexual molestation of you, which happened many years before, you were willing to disclose your son's history of criminal offenses which – or criminal involvement which took place a long time ago.  Right?

A That's correct.

Aug. Hr'g Tr. at 111-12.

Juror #162 was given several chances to clarify or correct her answers.  Instead, she prevaricated when she was asked about Ryan's DWI history, affirming her answer that he was convicted of DWI "16 years ago" (id. at 111, 129), and then, after being confronted, admitting that she knew—contrary to what she disclosed at voir dire—that her son was "picked up for several DWIs." Id. at 142 (emphasis added).  She also admitted that she knew—contrary to what she disclosed at voir dire—that Ryan had spent time in prison, but said she only knew about one such incident. Id. at 157.  She completely denied knowledge of the rest of Ryan's criminal history; she testified that his criminal conduct occurred when he was "in his twenties," and that "[h]e is 50 some odd now." Id. at 129.

Her denials were more lies.  As is described in full below, the evidence demonstrates that she in fact did have extensive knowledge of her son's criminal history both

31

before and after the incident 16 years prior to voir dire that she disclosed, and that she lied both on voir dire and under oath in open court when she testified otherwise.

### 1. Burglary Conviction in 1983

Mr. Fell's 2255 Counsel asked Juror #162 at the August hearing if she knew that in 1983, at age 21, her son and an accomplice broke into one home, stole six guns, a stereo, and other valuables, and then broke into another home and stole more valuables; that her son was arrested for these crimes and pled guilty to a felony; and that he spent a year in jail as a result. Aug. Hr'g Tr. at 156. Her response was: "I don't know anything about that." She was asked if she ever visited him in jail in connection with this conviction. She responded: "I know there was a time when he was in jail and I visited him, but I don't know anything about that ever happening." Id. Again, Juror #162 was asked about specific, unforgettable details, and again, she blatantly lied, under oath, to Mr. Fell's counsel and this Court. In fact, in the 1996 psychological evaluation she underwent as part of her son's divorce proceedings, she disclosed to the psychologist that she knew about this exact crime: she told him that around the time she entered into a relationship with her current husband (they married in 1982), her son "was in jail for 'stealing guns.'"[105] She knew about this event, purposely omitted it in her voir dire questionnaire, and lied in court about it.

### 2. 1992 Assault and Felony Trespass Convictions; Accusations Against Juror #162

Juror #162's voir dire response alluded to a charge of "domestic abuse" 16 years prior to voir dire. Giving Juror #162 the benefit of the doubt that this reference constituted a disclosure of Patrick Ryan's 1992 arrest for assault on his wife (13 years prior to voir dire), that disclosure was still extremely misleading even with respect to this incident, and Juror #162 knew

---

[105] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858).

it.  In fact, Ryan was arrested twice in the span of a month; he was charged with simple assault on his wife in August 1992, and then again with burglary in September 1992.[106]  When asked about this incident of violence at the August hearing, Juror #162's response was, "he hit his wife." Aug. Hr'g Tr. at 129.  She claimed to not know the details of Ryan's burglary arrest.  Mr. Fell's 2255 Counsel asked if she was aware that the charge "involved climbing onto [his] wife's roof, breaking into her attic, threatening her and her friend while wreaking [sic] of beer, and that a charge was burglary?"  She testified: "I was not there. I don't know what happened.  My son was not living with me so I don't know." Id. at 154-55.

That is not true.  Juror #162's son, who was 31 years old at the time, was released to her custody while on bail for this charge.  Additionally, as part of the divorce proceedings to which she was a party, she received copies of the docket reports indicating that her son was charged with multiple offenses based on separate incidents of violence during this short time period.[107]  She was informed, in a memorandum in opposition to her motion seeking grandparent's visitation, that Patrick Ryan and his ex-wife "were divorced in 1993 following a very violent marriage, during which [Ryan] repeatedly abused [his wife] both physically and emotionally, and often in front of the parties' minor child," and that Ryan "was convicted of simple assault on [his ex-wife], and of felony unlawful trespass for entering [her] apartment after their separation."[108]  Juror #162 was informed of the details of other serious instances of criminal abuse and assault by her son on his ex-wife:  that "in front of [Juror #162's grandson] [Ryan] pounded [her] around [her] head and stomach, causing a concussion as well as severe bruising,

---

[106] Superior Court of Vermont, Addison Criminal Division, Case No. 448-8-92 Ancr., Information by State's Attorney (Ex. 327 at FELL-00003239); Case No. 483-9-92 Ancr., Information by State's Attorney (Ex. 327 at FELL-00003251).

[107] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Docket Reports (Ex. 323 at FELL-00003033-35).

[108] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Mem. in Opp. to Mot. for Grandparent's Visitation (Ex. 323 at FELL-00002878).

33

for which [she] had to get treatment from the hospital. He told [her] he was going to kill [her]. He called [her] a 'f***ing slut' and other abusive names."[109] Juror #162 was also informed in this motion that as a result of this abuse, her grandson, Ryan's son, had been diagnosed with Post Traumatic Stress Disorder.[110] Accordingly, even in Juror #162's single allusion to Ryan's violent criminal history, she intentionally transformed multiple arrests and charges, including a charge of felony burglary and a conviction of felony trespass, based on two separate events of violence, into a single instance of "domestic abuse"—and she continued to lie about her knowledge of this episode in open court.

Juror #162 also lied about an accusation of crime that was lodged against her. During the same divorce proceedings in the mid-1990s, Juror #162 and her husband were accused of inappropriate sexual touching of their grandson.[111] This led to recommendations by numerous professionals—and eventually a court order—that Juror #162 be prohibited from having visitation with her grandson.[112] It is not credible that Juror #162 would have forgotten about this accusation during voir dire as she was describing her knowledge of the Michael Jackson case and other child sex crimes. Her son was also accused of physically abusing the same grandson.[113]

---

[109] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Affidavit of Karen Currier (Ex. 323 at FELL-00002935).

[110] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Mem. in Opp. to Mot. for Grandparent's Visitation (Ex. 323 at FELL-00002879).

[111] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002859); Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002902).

[112] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002861); Order of Modification (Ex. 323 at FELL-00002781); November 11, 1996 Letter from Frank Carruth, LCSW to Judge Matthew Katz (Ex. 323 at FELL-00002834-35).

[113] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002900).

### 3.  1997 Simple Assault and Felony Trespass Convictions; Juror #162's Multiple Shared Residences with Patrick Ryan

Juror #162 was also asked by Mr. Fell's 2255 Counsel if she knew about the felony for which her son was arrested in May 1997, when he was 35 years old and broke into an ex-girlfriend's home and assaulted her and her friend.  She testified: "If what you are telling me is true, this is the first time that I have heard of it."  She continued: "My son hasn't lived with me since he was like 18 years old.  So a lot of what you are telling me I don't – I don't know anything about it."  Aug. Hr'g Tr. at 157.  These were outright lies.  Juror #162 and her son lived together for multiple periods during his adult life, including just before and just after this 1997 crime.  In the bail statement for Juror #162's arrest for DWI #3 on November 11, 1992, Ryan gave the same address—9 Middle Road, South Barre, Vermont—for both himself and for Juror #162.[114]  He was over 30 years old by this time.  In 1996, Juror #162 reported that "her son, Patrick, . . . resides in her home."[115]  She further reported that this fact caused her stress, and that she felt that she was "being taken advantage of" by him.[116]  In the report for Ryan's 1997 arrest (the specific one 2255 Counsel questioned her about), he listed Juror #162 as his "tie to the local community."[117]  In this document, he lists an address of 24 Middle Road, South Barre, Vermont, for his mother, Juror #162.[118]  A March 31, 1998 family court filing provides this same address as the residence of Patrick Ryan.[119]  On information and belief, Juror #162 and her son lived in the same apartment in Colchester for some months until the adjoining apartment in the four-plex

---

[114] Superior Court of Vermont, Washington District Court, Case No. 18-1-93 Wncr., Bail Statement (Ex. 328 at FELL-00003326).

[115] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002859).

[116] Id.

[117] Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Barre Town Police Department Record (Ex. 328 at FELL-00003349).

[118] Id.

[119] Joanne Pecor v. Patrick Ryan, Vermont Family Court, Chittenden County, Case No. 422-5-98, March 31, 1998 Memo to Linda Wilson, Family Court Clerk (Ex. 330 at FELL-00003434).

building opened up.  Juror #162's son then moved into the adjoining apartment, where he lived

for several years.  Juror #162 admitted at the August 15 hearing that she and her son lived in

adjoining apartments in Colchester in 2001, at the time he was arrested for his fourth DWI.  Aug.

Hr'g Tr. at 142.  They lived in these same adjoining apartments through Mr. Fell's trial and for

several years thereafter.[120]  Most recently (and most stunningly, given her recent sworn

testimony), Juror #162 reported in an October 21, 2013 article in the Rutland Herald that her son

currently lives with her.[121]

　　　　　Her lies about their shared residences only bring into sharper relief how

inconsistent her testimony is with the deeply connected lives she and her son were living in the

decades leading up to voir dire.  In a 1992 affidavit filed as part of her son's divorce proceedings,

Juror #162 represented that she had spent time with her grandson, Patrick Ryan's son, "on a

regular basis since his birth, at least every other weekend."[122]

　　　　　The final order in the divorce proceeding is an Amended Order of Modification,

modifying a prior order prohibiting visitation of Juror #162 with her grandson, and allowing

Juror #162 to have "contact [with the grandson] during Pat[rick Ryan]'s parent-child contact

time."[123]  This order granted the visitation rights that Juror #162 had hired a lawyer, filed

motions and sworn affidavits, and litigated for over five years to obtain.  The order is dated April

11, 1997, one month before Patrick Ryan's May 15, 1997 arrest that Juror #162 swore she had

never heard anything about.  Ryan was convicted of two counts of simple assault and one count

---

[120] Superior Court of Vermont, Chittendon Family Division, Case No. 319-4-95, Petition to Modify Child Support dated December 9, 2005 (Ex. 331 at FELL-00003482) (listing address for Patrick Ryan as 573 Bay Road, Apartment 101, Colchester, VT 05446, the same as at the time of his 2001 arrest).

[121] *Juror: Fell lawyers trying to destroy my life*, Rutland Herald (Oct. 21, 2013), www.rutlandherald.com/apps/pbcs.dll/article?AID=/20131021/NEWS01/710219951/1002/news01?template=printart.

[122] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Affidavit of [Juror #162] (Ex. 323 at FELL-00003046).

[123] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Am. Order of Modification (Ex. 323 at FELL-00002772).

of felony unlawful trespass in connection with this arrest.[124]  He was sentenced to two to four years in jail and granted pre-approved furlough to the Intensive Domestic Abuse Program, which required multiple counseling sessions per week.[125]  Separate from her false testimony about whether or not she and her son lived together since he was 18 years old, it is simply implausible that after receiving the grandparent visitation rights she had sought for years, she would fail to exercise those rights—or, if she had exercised her right to joint grandchild visits with her son, that she could somehow not be aware of the dramatic and extensive contact with the criminal justice system Ryan was having at the exact same time those visits were taking place.

### 4.   2002 DWI #4 Felony Conviction and 2006 Domestic Assault

Mr. Fell's 2255 Counsel asked Juror #162 why she had not disclosed at voir dire—and why she concealed at the beginning of the August 2013 hearing (Aug. Hr'g Tr. at 129)—the fact that her son was arrested in 2001 at age 40 for his fourth DWI, a felony, and for possession of cocaine and marijuana, and that he was on parole for that DWI at the time of voir dire.  As she admitted, Juror #162 and her son were living in adjoining apartments at the time he was arrested.  Id. at 141-42.[126]  The car in which he was arrested was registered in her name and was towed as a result of the arrest.[127]  Moreover, Mr. Fell can produce multiple witnesses who will testify as to the close relationship between Juror #162 and her son at the time of this crime and in the time leading up to Mr. Fell's trial.  Yet, despite her deep involvement in her son's life, she testified that she did not recall these events.  Aug. Hr'g Tr. 152.  She said she did not recall that her son had to report to the Colchester Police Department as part of the conditions of his

---

[124] Superior Court of Vermont, Washington District Court,  Case No. 649-6-82 Wncr., Intermediate Sanction Report (Ex. 328 at FELL-00003359).

[125] Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Notice of Plea Agreement (Ex. 328 at FELL-00003367).

[126] See also Superior Court of Vermont, Chittenden County,  Case Nos. 6916-11-01 Cncr., DUI Affidavit (Ex. 329 at FELL-00003393).

[127] Id.

release. She said she did not recall that as a result of his conviction for this felony, his driver's license was permanently revoked, he was sentenced to two to five years in jail, and was referred to the Intensive Substance Abuse Program ("ISAP"), which involves mandatory counseling sessions multiple times per week. She said she did not recall—but would not deny—that she was the one who drove him to these meetings. Given the facts of her relationship with her son (and her refusal to directly answer 2255 Counsel's questions), it is not credible that she was not aware of these events in her son's life. And it is not credible that she forgot about all of these events when she was filling out her voir dire questionnaire. The only plausible explanation is that she deliberately omitted this information at voir dire and continued to try to conceal her knowledge of it at the August 2013 hearing, just like she misrepresented and concealed other relevant and responsive information.

Most recently, Juror #162 was quoted in an October 9, 2013 article in the Burlington Free Press as saying that she was aware that her son committed a crime seven years ago, in 2006.[128] This crime was another domestic assault, to which Patrick Ryan again pled nolo contendere.[129] He was sentenced to four to 12 months in jail, suspended.[130] In this incident, Ryan reportedly punched a an ex-girlfriend (a different victim from those in the 1992 and 1997 incidents) in the mouth, causing bleeding, and "'pound[ed] her with all he [could]' approximately 9 or 10 times."[131] Juror #162 therefore also knowingly misled the Court when she affirmed that her son had a single incident of criminal activity sixteen years prior to voir dire, and affirmed that he has since been rehabilitated. Aug. Hr'g Tr. at 111-12.

---

[128] *Juror in Fell death-penalty case slams defense appeal*, Burlington Free Press, Oct. 9, 2013, http://www.burlingtonfreepress.com/article/20131009/NEWS02/310090031/.
[129] Superior Court of Vermont, Chittenden County, Case Nos. 6916-11-01 Cncr., Docket Report (Ex. 329 at FELL-00003378).
[130] Id. at FELL-00003379.
[131] Superior Court of Vermont, Chittenden County, Case Nos. 6916-11-01 Cncr., Affidavit of Officer Matthew White (Ex. 329 at FELL-00003380).

### iii. Juror #162 Lied About Her Son's and Her Own History of Treatment for Substance Abuse

Juror #162 continued to lie on voir dire in response to the question of whether she or any close friend or relative had ever been treated for a substance abuse problem. She responded, "my son – alcohol," and, when asked whether any substance abuse problem resulted in contact with the criminal justice system, she answered, "yes, as explained above," referring to her answer regarding the DWI and domestic abuse arrests 16 years earlier, and her statement, "my son was treated fairly and it helped him change his life." Ex. 322 at FELL-00002747. During individual voir dire, when further questioned about these events, Juror #162 continued to conceal her and her son's extensive experience with substance abuse, testifying falsely that "he had some tough, tough learning things, tough things to go through to overcome his problem," that "[h]e hit the bottom before he went to the top," and that he did not commit any criminal acts. Voir Dire Tr., JVD-9 at 136:8–137:21 (May 23, 2005). At the August 15 hearing, Juror #162 confirmed that when she said, "my son – alcohol," she was referring to his treatment by an "alcohol counselor . . . at one time." Aug. Hr'g Tr. at 158-59. She said that she did not recall her son going to ISAP.

In fact, contrary to her disclosures at voir dire and her testimony at the August hearing, her son was treated for both alcohol and drug abuse on many occasions over the course of several decades. His substance abuse problems resulted in contact with the criminal justice system not once or twice, but over and over, beginning in the early 1980s and continuing through Mr. Fell's trial. As discussed above, nearly every one of her son's multiple arrests and convictions involved drug or alcohol abuse; the author of Ryan's 1997 Intermediate Sanction Report observed that "[a]llegedly all convictions took place under the influence of drugs or alcohol." He had four DWI convictions, one of which included an arrest for possession of

39

cocaine and marijuana.  Also in his 1997 Intermediate Sanction Report, Ryan disclosed his

"escalat[ing] substance abuse," naming his "drugs of choice" as "alcohol, pharmacuticals [sic],

cocaine and marijuana," and describing a treatment history including Champlain Drug and

Alcohol Services, Maple Leaf Farm, and Alcoholics Anonymous.[132]  This list does not include

other court-ordered treatments, including but not limited to his referral to ISAP after his 2002

felony DWI conviction.

Evidence demonstrates that Juror #162 was aware of far more than she disclosed,

either at voir dire or in court at the August hearing.  A condition of her son's release from his

1982 arrest for aggravated assault and assault on a police officer required him to take Antabuse

in the presence of Juror #162's domestic partner.  In an affidavit filed as part of her son's divorce

proceedings, Juror #162 swore:

> Between October 1992 and May 1995 my son, the Defendant, was living in
> various facilities and institutions as a result of alcohol related issues and criminal
> convictions.  Throughout that period my son resided at Maple Leaf Farm, The
> Windsor, Woodstock, Rutland and Chittenden Correctional Centers and Di[t]mas
> House in Burlington.  Throughout that period I transported Michael to see his
> father at his various locations regularly and faithfully each visitation period. . . . I
> essentially took over my son's visitation schedule while he was incarcerated.[133]

The practical and everyday connections between Juror #162's life and her son's—

represented by joint visitation of her grandson, repeated residence in shared or adjacent homes,

her son's lack of a driver's license for multiple periods and, ultimately, for life, and more—

underscore how farfetched Juror #162's claimed lack of knowledge of her son's history of

treatment is.  This explains why, when examined by 2255 Counsel as to her knowledge of her

son's extensive contact with substance abuse treatment following his 2002 conviction for his

---

[132] Superior Court of Vermont, Washington District Court, Case No. 661-06-97 Wncr., Notice of Plea Agreement, (Ex. 328 at FELL-00003363).

[133] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Affidavit of [Juror #162] (Ex. 323 at FELL-00002883-84).

fourth DWI (which she did not disclose on voir dire), she evaded the questions and claimed not

to remember these significant events of less than a decade ago.  Aug. Hr'g Tr. 152.

Finally, in the October 22, 2013 Rutland Herald article, Juror #162 disclosed

knowledge of drug abuse treatment that she withheld at voir dire and at the August 15 hearing.

The article reported:

> [H]er son began using drugs as a teenager and, on the advice of her doctor, she
> sent him to an inpatient treatment program.  When the drug use persisted despite
> the treatment, she said she again followed the doctor's advice not to enable her
> son and to deliver an ultimatum.  'I told him I wasn't going to stand for the drugs
> and he would have to leave my home if he didn't stop,' she said.[134]

She did not disclose anything about this instance of treatment either in voir dire or at the August

hearing, yet just two months later she brought it to the attention of a reporter.

Additionally, Juror #162 lied when she said that her son was the only person in

her family to have a problem with substance abuse that required treatment.  Juror #162 had in

fact had the same problem, having admitted to habitual drinking when she was younger.[135]  Ryan

also attested to his mother's heavy drinking.[136]  In fact, Juror #162 received treatment from a

therapist for alcohol abuse, which she did not disclose during jury selection.[137]

### iv.  Juror #162 Lied About Her Participation in Civil Suits

Juror #162 was asked at voir dire whether she or anyone close to her had ever

been a plaintiff or a defendant in a civil suit.  She falsely answered "no."  As discussed above,

Juror #162 fought in court for over a year to recover the money that Donald Milne stole from her,

---

[134] *Juror: Fell lawyers trying to destroy my life*, Rutland Herald (Oct. 21, 2013),
www.rutlandherald.com/apps/pbcs.dll/article?AID=/20131021/NEWS01/710219951/1002/news01?template=printar
t.

[135] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of
[Juror #162] (Ex. 323 at FELL-00002859).

[136] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of
Patrick Ryan/Karen Currier (Ex. 323 at FELL-00002894).

[137] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of
[Juror #162] (Ex. 323 at FELL-00002859).

and joined herself as a party to the five-year divorce and child custody proceedings involving her

son, his ex-wife, and Juror #162's grandson.  These proceedings were lengthy, involved

intensely personal and contentious issues and allegations, and determined events that were

deeply important to Juror #162's life.  It is inconceivable that she forgot about these events when

she was filling out her voir dire questionnaire.  The fact that Juror #162 failed to disclose at least

three other civil suits—less personally significant, but no less responsive to the question—

underscores the degree to which Juror #162 flouted the Court's instructions to answer the voir

dire questionnaires truthfully and completely.[138]

Had Juror #162 honestly answered this question and disclosed that she had been a

party to these contentious civil suits, Mr. Fell's trial counsel and this Court would have learned

facts about Juror #162's life that were pertinent to her qualification as a juror and that would

have led to her removal.  Knowledge of these civil suits would have led to disclosure of the

following facts, among others: Juror #162 had a background of mental illness, emotional

problems, and institutionalization; Juror #162 had been the victim of serious crime; Juror #162

had extensive (and contentious) interaction with psychiatrists and psychologists; Juror #162's

son had been placed in foster care and had experienced a chaotic and abusive upbringing; and

Juror #162's son's history of crime and substance abuse led to frequent contact with the criminal

justice system and had a serious impact on his life, as well as the life of his mother, Juror #162.

### v.   Juror #162 Lied About Her Opinions of the Fields of Psychology and Psychiatry and About Her General Fitness as a Juror

Juror #162 was asked at voir dire what her opinions were of the fields of

psychology and psychiatry.  She answered, "I am in the health care field and <u>respect</u> the opinion

of these people, ~~but~~ . . . ."  Ex. 322 at FELL-00002760.  In striking the word "but," Juror #162

---

[138] <u>Twombly v. [Juror #162]</u>, Dkt. No. 108-1-90 Wnsc; <u>The Medicine Shoppe v. [Juror #162]</u>, Dkt. No. 303-3-91 Wnsc; and <u>Northfield Fuel Co. v. [Juror #162]</u>, Dkt. No. 631-8-98 Wnsc.

alluded to a long and troubled history of psychiatric treatment, and a lifetime of crucial opinions formed about these fields. She has been institutionalized for long periods of time, has undergone treatment, including pharmaceutical treatment, and has been the subject of painful and critical psychological evaluations. Juror #162 gave more false testimony regarding these facts at the August hearing, representing that she was institutionalized for "about six months maybe." Aug. Hr'g Tr. at 166. In fact, she was institutionalized twice, for a total of over a year and a half— once for a period of five months, and once several months later for a period of 14 months.

Juror #162 was also asked several questions about her general fitness as a juror and about her ability to fairly and impartially consider the evidence in Mr. Fell's case. Despite Juror #162's long history of severe mental and emotional problems and her experiences fundamentally parallel to the critical facts of Mr. Fell's case, she kept silent.

The evidence that Mr. Fell has offered demonstrates that Juror #162's numerous misstatements at voir dire were the result of dishonesty, not mistake. The evidence also proves that Juror #162 continued to lie about these answers at the August Hearing. Still further, Juror #162 perjured herself in open court at the August hearing about the very process Mr. Fell's 2255 Counsel employed to uncover her untruths. In response to questioning from the Government, Juror #162 testified that she had never read the signed statement attributed to her and introduced by 2255 Counsel. Aug. Hr'g Tr. at 194-97. Regarding the signed statement, she said: "This is the first time I have seen this. . . . I did not read this. . . . I have never seen it before." Id. She said that when she signed the statement, 2255 Counsel simply put the signature page in front of her to sign; she was not provided with the whole statement. Id. She clearly testified that, before the day of the hearing, she had never seen the statement and never had an opportunity to correct misstatements in the document. Id. This claim is untrue on the face of the document to which

43

she was referring. She made changes to the document and initialed those changes.[139] When

confronted with this fact, she retracted her testimony, stating, falsely, "I said I didn't recall

seeing it. This – how many years ago was this? I don't remember this." Id. at 202.

### b. Honest Answers on Voir Dire Would Have Provided a Valid Basis for a Challenge for Cause of Juror #162

As this Court held, "'Challenges for cause are generally based on actual bias,

implied bias, or inferable bias.'" May 10 Order at 5 (quoting United States v. Greer, 285 F.3d

158, 171 (2d Cir. 2002)). "'[B]ias may be inferred when a juror discloses a fact that bespeaks a

risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse

the juror for cause, but not so great as to make mandatory a presumption of bias.'" Id. at 6

(quoting Greer, 285 F.3d at 171). A correct response to any one of the above voir dire questions

would have provided the parties and the Court with a valid basis for a challenge for cause;

collectively, they reveal a set of experiences that leaves no doubt that Juror #162 was fatally

impaired from considering and weighing the evidence in Mr. Fell's case impartially.

In Sampson v. United States, a case remarkably similar to this one, the First

Circuit recently undertook a searching analysis of the legal principles underpinning a district

court's determination of bias in the context of juror dishonesty. 724 F.3d 150 (1st Cir. 2013).

Judge Selya wrote:

> The outcome of [the challenge for cause] inquiry depends on whether a
> reasonable judge, armed with the information that the dishonest juror failed to
> disclose and the reason behind the juror's dishonesty, would conclude under the
> totality of the circumstances that the juror lacked the capacity and the will to
> decide the case based on the evidence (and that, therefore, a valid basis for
> excusal for cause existed).

Id. at 165-66.

---

[139] Aug. 15, 2013 Hr'g, Ex. 6.

The court identified several non-exclusive factors "that may be relevant in determining whether a juror has both the capacity and the will to decide the case solely on the evidence" and applied this framework to the facts found by the district court (Wolf, J.) regarding misstatements by a certain juror, "Juror C," in voir dire preceding the impaneling of a jury in a federal capital case in the District of Massachusetts. Id. Juror C had been dishonest in her disclosures regarding, among other things, whether she or anyone she knew had been the victim of a crime, and the substance abuse and criminal history of members of her family. Id. at 162-63. The First Circuit concluded that, "under the totality of the circumstances, [Juror C] lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." Id. at 167. It rested this conclusion "on three cross-braced pillars: (i) Juror C's habitual dissembling; (ii) the intense emotions Juror C exhibited when belatedly relating her life experiences involving [her family members]; and (iii) the similarities between Juror C's unreported life experiences and the evidence presented during the penalty-phase hearing." Id.

The same "cross-braced pillars," and more, exist in the case of Juror #162. First, Juror #162 "lied repeatedly in the voir dire questionnaire and directly to the court." Id. The evidence Mr. Fell has gathered proves that Juror #162 did not mistakenly omit and misrepresent information in voir dire; she intentionally misled the parties and the Court. She continued this pattern of lying in sworn testimony in open court, completely disavowing knowledge of specific events of which she was demonstrably aware, lying to the Court and the parties about her relationship with her son, including their history (and current status) of shared residence, and making false claims about Mr. Fell's 2255 Counsel's conduct in post-trial interviews of her.

45

Second, Juror #162 displayed profound emotional distress when questioned as to the withheld information during the August hearing. The transcript, which does not bare the full distress that was evident in the juror's body language and tone of voice, shows that Juror #162 was highly agitated, speaking over the Court, and exclaiming: "And you are sitting here and putting me through this about my son . . . I am getting very upset about this whole thing. . . . What does my son have to do with this? . . . I am really beginning to get upset. . . . But what does this have to do with this – with this trial and with my judgment on this trial? . . . I know what he is doing. I know that." Aug. Hr'g Tr. at 149-51. As the Court will recall, a recess was taken because of the juror's increasingly unstable demeanor. Immediately after the Court ordered the recess, the juror began sobbing audibly, into the open microphone. Her emotional distress at these events is also evident in her communications with the press. She described Mr. Fell's investigation of her misstatements as "trying to destroy" her.[140] She said that she was "victimized" on the witness stand, and that she is being "dragg[ed] . . . through the mud."[141]

Third, the information that Juror #162 concealed at voir dire and during the August hearing reveals life experiences unmistakably similar to the evidence presented during Mr. Fell's case. Even in the broad outline provided to Juror #162 by Mr. Kelly at the outset of individual voir dire, the comparison of the concealed facts of Juror #162's life, and the lives of her family members, to the facts of Mr. Fell's life is striking in its similarity: "the defendant grew up in an incredibly chaotic environment, he was abandoned by both of his parents as a child, and may have been subject to different types of abuse, physical and otherwise . . . the defendant suffered and took drugs and alcohol as an adolescent and as a young man . . . [and] the defendant

---

[140] *Juror: Fell lawyers trying to destroy my life*, Rutland Herald (Oct. 21, 2013), www.rutlandherald.com/apps/pbcs.dll/article?AID=/20131021/NEWS01/710219951/1002/news01?template=printart.

[141] *Juror in Fell death-penalty case slams defense appeal*, Burlington Free Press, Oct. 9, 2013, http://www.burlingtonfreepress.com/article/20131009/NEWS02/310090031/.

has made efforts to rehabilitate himself in prison." Voir Dire Tr., JVD-9 at 129:17-23 (May 23, 2005). A more detailed analysis of the trial record would yield a multitude of critical intersections between Juror #162's life experiences and those of key individuals in Mr. Fell's case: Mr. Fell himself (his experiences of sexual abuse and physical abuse, his drug and alcohol abuse, his violence, his criminal history, his psychiatric history and institutionalizations, his chaotic upbringing, the abandonment by his parents, his witness to family violence, and more); Debra Fell (her alcohol abuse, her experience with domestic violence, including violence with knives, her son's struggle with drug and alcohol abuse as well as violent crime); and Teri Fell (as a victim of sexual abuse). The testimony elicited from Juror #162 by the Government at the August hearing, that in her view she "could be fair and impartial in regard to consideration of the mitigating circumstances," is of no moment: "a person who harbors a bias may not appreciate it and, in any event, may be reluctant to admit her lack of objectivity." Sampson, 724 F.3d at 164 (quoting McDonough, 464 U.S. at 554); see also United States v. Torres, 8 F.3d 38, 47 (2d Cir. 1997) ("[O]nce facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant."). This is especially true where, as here, a profession of bias would result in a vacatur of the judgment and sentence and an admission of wrongdoing on the part of the juror.

In addition to all of the obvious indicia that Juror #162 would be incapable and/or unwilling to decide the case on the evidence, there is objective, contemporaneous evidence in the records Mr. Fell has obtained supporting this conclusion. For example, she described her adoptive father as a "very good and caring person," despite his years of repeated sexual abuse.[142] A psychologist evaluating Juror #162 attributed this remarkable statement to her "apparent

---

[142] State v. Patrick Ryan, #53-3-92, Addison County, Vermont, Family Court Records, Psychological Evaluation of [Juror #162] (Ex. 323 at FELL-00002858).

47

current minimization . . . [which] suggests that she may have problems recognizing in a child

distress or discomfort related to physical touching, or in accepting the child's perception that

they do not consider such touching as benign or harmless as she assumes."[143]

In short, the distinctions that the Government pointedly tried to draw between this

case and <u>Sampson</u> in their motion for summary dismissal do not, upon consideration of the

evidence introduced after Mr. Fell's 2255 Motion, hold up.  <u>Compare</u> <u>supra</u> pp. 4-5.  Through

her dishonesty, Juror #162 deprived the parties and the Court the opportunity to learn the true

facts responsive to the questions presented at voir dire, and to determine whether those facts

would have impaired Juror #162's ability to impartially weigh the evidence in Mr. Fell's case.

Mr. Fell now seeks an opportunity to present the facts that Juror #162 should have disclosed at

voir dire, and to prove that those facts would have provided the basis for a successful challenge

for cause.

### 2.  Juror #143

At the August 2013 hearing, Juror #143 disavowed the two statements from his

declaration that Mr. Fell put at issue in his 2255 Motion.  Mr. Fell can prove that Juror #143 lied

when he retracted these statements, and that the extraneous evidence that Juror #143 in fact did

obtain (and shared with other jurors) caused Mr. Fell prejudice.[144]  Where, as here, there is

considerable evidence that a juror lied in his denial of misconduct, the defendant is entitled to an

evidentiary hearing to determine the truth.  <u>See</u> <u>United States v. Tucker</u>, 137 F.3d 1016, 1032

(8th Cir. 1998) ("We conclude that a defendant who makes an allegation of serious misconduct

by a juror, supported by evidentiary materials with significant indicia of reliability, is entitled to

---

[143] <u>Id.</u> at FELL-00002860.

[144] Juror #143 was also dishonest in his answers on voir dire, and engaged in conduct that was unlawfully coercive during juror deliberations.  Am. Mot. at 357.  Mr. Fell respectfully respects an opportunity to prove the facts in support of these claims as well.

a more thorough investigation of his complaint than merely asking the juror whether he committed the misconduct.").

### a. Juror #143 Sought Out and Obtained Extraneous Evidence During Trial

Contrary to Juror #143's testimony at the August hearing, Mr. Fell can prove that Juror #143 did in fact take a trip to Rutland during trial to conduct his own investigation of key issues disputed in Mr. Fell's case.

Juror #143's retraction is unbelievable on the face of his declaration and the circumstances under which it was signed. He claimed that only two statements in the declaration were untrue. First, he claimed that, contrary to the statements in his declaration, he did not take a trip to Rutland during trial, but rather took it in 2010, and that he had not ever been to the Robbins Street crime scene prior to trial and did not go there during trial. Second, he claimed that, contrary to the statements in his declaration, he had only pantomimed aiming a gun at another juror. This retraction was intentionally selective. Juror #143 affirmed in substance the other 13 of the 15 paragraphs in the declaration. Aug. Hr'g Tr. at 38-60. Juror #143 initialed each paragraph before he signed the declaration, and admitted in court that he had intended his initials to indicate that he had read each paragraph. Id. at 38-39. Where he found a paragraph to be inaccurate, he corrected it himself. Id. at 44. He took the time to add statements to the declaration before he signed it. Id. at 48.

The two statements that he disavowed—the statements that he took a trip to Rutland during the trial, and that he pointed the shotgun from evidence at another juror—were the only statements put at issue by Mr. Fell in his 2255 Motion. Juror #143 certainly had no motive to lie when he signed this declaration, nor did he have any motive to state that he visited the crime scene or pointed a shotgun when he did not. Indeed, he has testified that he believed the people who obtained the statement from him—Mr. Fell's 2255 Counsel—were court

49

personnel, "representatives of Judge Sessions." Id. at 88. The Second Circuit has repeatedly held that "if the statement is made to a person whom the declarant believes is an ally," it is more likely to be trustworthy. United States v. Morgan, 385 F.3d 196, 209 (2d Cir. 2004) (quoting United States v. Matthews, 20 F.3d 538, 545-46 (2d Cir. 1994) (internal quotation marks omitted)). That is all the more so when, as here, the witness believes he is making the statement to the court.

Juror #143 has testified that, at the time he originally made these statements, he did not understand how they would be used. Aug. Hr'g Tr. at 35. He did eventually learn that Mr. Fell's 2255 Counsel intended to use these statements to prove juror misconduct sufficient to warrant vacating Mr. Fell's judgment and sentence. Id. at 35-36. He testified that he was not happy about that. Id. at 36. Juror #143 memorialized in his declaration—and testified in the August hearing—that he was upset about the two victims other than Terry King being "forgotten." Id. at 49. And he testified that he believed Mr. Fell was appropriately sentenced, and that it would be wrong for Juror #143's statement to be used to undermine that sentence. Id. at 35-36. It is no surprise, then, that he retracted the very statements that Mr. Fell put at issue—and only those statements.

At an evidentiary hearing, Mr. Fell intends to present testimony from the attorneys who took Juror #143's statement that his retraction was a lie.[145] Juror #143 has claimed that he rushed through the statement, that he did not understand what he was reading, and that he did not say that he went to Rutland during the trial. These attorney witnesses will testify otherwise, giving evidence that they interviewed Juror #143 on a Saturday, and that Juror #143 made the two statements that he has disavowed. They will testify that they prepared his declaration, and then came back—at his convenience—the following day for him to sign it, at

---

[145] Should the Court require them, Mr. Fell is also prepared to submit declarations in support of these proffers.

which point he affirmed his statements of the day before. They will testify that Juror #143 took his time in reading through the declaration, and was not rushed or pressured to sign it. These attorneys will also testify that the declaration faithfully reflected what Juror #143 told them. This fact is corroborated by the contents of the declaration: it is not limited to information helpful to Mr. Fell's 2255 proceedings, and indeed includes condemnatory statements as to Mr. Fell's lack of remorse.

The evidence demonstrating that Juror #143 lied at the evidentiary hearing is not limited to the contents, facts and circumstances surrounding the signing of his declaration. In fact, Mr. Fell is also prepared to present two witnesses who have first-hand, contemporaneous knowledge of Juror #143's misconduct, and who will unequivocally testify that, contrary to his testimony in court, Juror #143 in fact did go to Rutland during the summer of 2005, and spoke after the trip regarding what he found. These witnesses' testimony will confirm what is evident based on the content of Juror #143's declaration, the circumstances of its execution, and the nature of Juror #143's testimony at the August hearing—that his recantation was false and self-serving, and reflected a pre-meditated plan to frustrate Mr. Fell's efforts to prove the facts supporting his juror misconduct claim.

### b. Juror #143's Misconduct Caused Prejudice

Extraneous information that becomes known to the jury is "presumptively prejudicial." Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994). This Court held as much, stating that "'[t]he law presumes prejudice from a jury's exposure to extra-record information.'" May 10 Order at 12 (*quoting* Farhane, 634 F.3d at 168). The Government cannot rebut this presumption.

In order to determine whether the extraneous evidence to which Juror #143 exposed himself was prejudicial, "[t]his Court must assess the likelihood that the information

51

would affect a typical juror, viewing the entire record, and taking into consideration the circumstances surrounding the exposure to the information." Id. at 15. Given this standard, Juror #143 has raised the Government's hurdle much higher: by completely disavowing that his trip to Rutland happened in 2005, he has deprived the parties and this Court any opportunity to further inquire into the circumstances surrounding his exposure and cannot, therefore, provide the Government with any evidence rebutting the presumption of prejudice. It is impossible to know the details of the exposure—how long Juror #143 spent observing the crime scenes; what exactly he saw; what the circumstances were of his observation that Mrs. Fell's neighborhood was "okay," that her house was "decent"; whether the neighborhood was the same or different from how it appeared in November 2000; what time of day he made his observation that the parking lot of the Price Chopper was "weak[ly]" and "poorly lit" and "unsafe"; whether the lighting in place was the same as or different from that in November 2000; or any other specifics surrounding his excursion. The Court and the parties are thus in possession of only a limited set of facts on which to evaluate the circumstances surrounding Juror #162's exposure to extraneous information.

First, Juror #143's testimony at the August hearing did reveal one piece of information about the extraneous evidence: that Juror #143 is willing to perjure himself in order to conceal the fact that he obtained it. As courts have repeatedly held in the McDonough context, a juror's intentional dishonesty is convincing evidence of the import and impact of the withheld information. See United States v. Sampson, 820 F. Supp. 2d 151, 172-73 (D. Mass. 2011) ("McDonough recognizes the reality that 'in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial.'" (quoting

McDonough, 464 U.S. at 556 (Blackmun, J., concurring))).[146]  Juror #143's false disavowal of the trip in its entirety gives rise to an inference that the circumstances of it were prejudicial.

Second, while the fact that Juror #143 conveyed this extraneous evidence to other jurors is not a necessary predicate to the success of Mr. Fell's juror misconduct claim, see Tucker, 137 F.3d at 1031-32, it is further evidence of the circumstances of this misconduct and that it caused prejudice to Mr. Fell.  The Government has argued that the evidence obtained by Juror #143 was "cumulative" and "of dubious significance."  Am. Opp. At 329-30.  The mere fact that Juror #143 reported this information to the rest of the jury—and listed this evidence among that considered in his statements to 2255 Counsel during the post-conviction interview— suggests that Juror #143 himself viewed it as unique and significant and belies the Government's characterization.

Third, the objective facts surrounding Juror #143's trip to Rutland demonstrate the harm caused by the misconduct.  Juror #143 has testified that the trip would have required roundtrip travel of approximately 140 miles.  Aug. Hr'g Tr. at 73.  His declaration indicates that he visited multiple locations in Rutland and made specific, detailed observations.  The investment of time and effort that Juror #143 made to conduct this investigation is in and of itself indicative of the significance of it.  The Court can take judicial notice, and movant would be prepared to prove if the Court did not want to take judicial notice, that a trip of this length would have taken close to two hours each way—not counting time spent in Rutland.  Further, Juror #143 conducted this investigation against the express order of this Court.  At the end of every

---

[146] See also United States v. Boney, 977 F.2d 624, 634 (D.C. Cir. 1992) ("[L]ying or failing to disclose relevant information during voir dire itself raises substantial questions about the juror's possible bias."); Burton v. Johnson, 948 F.2d 1150, 1159 (10th Cir. 1991) ("This dishonesty, of itself, is evidence of bias."); United States v. Colombo, 869 F.2d 149, 152 (2d Cir. 1989) ("[H]er willingness to lie about it exhibited an interest strongly suggesting partiality."); United States v. Stewart, 433 F.3d 273, 304 (2d Cir. 2006) ("[C]ertain false statements that 'might be harmless in isolation' may present a 'much more sinister picture' when viewed as a whole." (quoting Green v. White, 232 F.3d 671, 678 n.10 (9th Cir. 2000)).

53

day of trial, the Court instructed the jurors not to speak about the case to anyone or be exposed to

extrajudicial information or learn anything about the case from outside the courtroom.  See, e.g.,

Trial Tr. Vol. 1-2 at 89; May 10 Order at 3.  They were repeatedly advised that their verdict must

be based on the evidence presented in the courtroom and not on anything they learned outside the

courtroom.  May 10 Order at 3.  And they were specifically told not to conduct their own

investigation.  Trial Tr. Vol. VI at 61; May 10 Order at 3.  This is not a case where a juror was

exposed in passing to minutia relating to that juror's case.  Rather, this juror deliberately sought

out evidence, spent significant time, money, and effort to obtain that evidence, and did all this at

the risk of criminal liability for contempt of court.

All of these facts give rise to an inference that the circumstances of Juror #143's

acquisition and introduction of the extraneous evidence were prejudicial to Mr. Fell, and exposed

Juror #143 and the rest of the jury to evidence that was unique, impactful, and probative of issues

that were disputed at trial and relevant to the jury's deliberations on both guilt and penalty.

A review of the record in this case only underscores the degree to which the

evidence went to critical disputed issues.  At the conclusion of the guilt phase, this Court

instructed the jury to pay particular attention to the circumstances of the crimes Mr. Fell

allegedly committed:

KNOWLEDGE, WILLFULNESS AND INTENT

> Knowledge, willfulness and intent involve the state of a person's mind. It often
> has been said to juries that the state of one's mind is a fact as much as the state of
> his digestion. Accordingly, this is a fact that you are called upon to decide.

> Medical science has not yet devised an instrument which can record what was in
> one's mind in the past. *Rarely is direct proof available to establish the state of
> one's mind. This may be inferred from what he says or does: his words, actions,
> and his conduct, as of the time of the occurrence of certain events.*

54

*The intent with which an act is done is often more clearly and conclusively shown by the act itself, or by a series of acts, than by words or explanations of the act uttered long after its occurrence. Accordingly, intent, willfulness and knowledge are usually established by surrounding facts and circumstances as of the time the acts in question occurred, or the events took place, and the reasonable inferences to be drawn from them.*

Trial Tr. Vol. IV-2 at 18-19 (emphasis added). The Court gave the same instruction before the penalty phase, emphasizing that the jury could "not rely solely upon [its] first-stage verdict of guilt or [its] factual determinations therein" but must instead decide the issue again. Trial Tr. Vol. XII at 141.

At the very beginning of its guilt phase opening, the Government identified as a key issue the degree of forethought that went into Mr. Fell's actions the early morning of November 27, 2000. The Government introduced Mr. Fell to the jury as a man "waiting in the darkness . . . for someone just like Terry King." Trial Tr. Vol. I at 18. The Government hammered this point throughout its opening statement, telling the jury that Mr. Fell left the Robbins Street apartment "with a plan," that Mr. Fell "decided to walk to the Price Chopper, which you will learn is one of the few stores that was open all night in Rutland," that he was "looking for an unsuspecting victim," that he was "lurking in the darkness near the Price Chopper that morning," and that he "made decisions again and again that led the path to Terry King's death." Id. at 18-19. In its opening statement at the guilt phase, the Government used the word "plan" no fewer than seven times to describe Mr. Fell's actions during the crimes. Id. at 18-35. Notably, Mr. Fell's trial counsel directly disputed this characterization, arguing in its opening at the guilt phase: "[B]ecause of the confusion and level of drinking they had done that night, they were making very bad decisions at that point. They were not planning." Id. at 56.

55

After putting on its case as to Mr. Fell's guilt, the Government returned to its theme of premeditation and forethought.  In its summation at the guilt phase, the Government argued:

> How about this, three common sense things to take into mind when you are thinking about someone really drunk or not.  One, can they drive a car?  Two, can they formulate a plan and implement that plan, a plan which requires a series of deliberate acts in order to get to a goal?  And, three, afterwards can they remember everything they did?

Id. at 59-60.  In outlining the "plan" that Mr. Fell adopted, the Government told the jury that Mr. Fell "walked from Robbins Street in a nice route down through the plaza where the Walmart and the Price Chopper were.  You'll recall Detective Pulsifer, based on Fell's statements, described that route that they took from Robbins Street down to the plaza here, Walmart here and the Price Chopper there."  Id. at 61-62.  The Government emphasized that Mr. Fell "recalled the exact route block by block they took from the Robbins Street apartment, past Foley's, Uncle Sam's, Jiffy Mart, the Post Office, and the Spot [sic] Light Bar, and on down past the parking deck to the plaza."  Id. at 63.  Mr. Fell's trial counsel focused its own summation on an effort to refute the Government's characterization of the crimes as "planned," setting up their argument by telling the jury: "They wanted to convince you that . . . everything that Donald Fell and Robert Lee did was planned and scripted. . . . Now, I want to talk to you about those things, because that's where we strongly disagree."  Trial Tr. Vol IV-1 at 72-73.

The issues of knowledge, willfulness, and intent were also keenly important in the penalty phase.  Each of the threshold eligibility factors for the death penalty—of which the jury had to find one in order to impose that sentence—require intentional action.  Trial Tr. Vol. XII at 140-41.[147]  Further, this type of evidence was of utmost importance in the jury's deliberation

---

[147] The threshold eligibility factors were: (1) Donald Fell intentionally killed Theresa King.  (2) Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Theresa King.  (3) Donald Fell intentionally

whether to exercise its discretion to sentence Mr. Fell to death.  Premeditation was an aggravator that would weigh in favor of the death penalty.  Ex. 209 at 8-9.  The Court defined premeditation for the jury as "thinking or deliberating about something and deciding whether to do it beforehand."  Trial Tr. Vol. XII at 150.  The Government argued this point emphatically in its summation of this phase, saying "You learned how [Teresca King] arrived at the Price Chopper that early morning at 4 a.m., her early morning shift, and there, waiting in the darkness, in the shadows, was Donald Fell. . . .  And you learned that that morning Donald Fell carefully selected Terry King as the perfect victim."  Id. at 13.  Evidence of knowledge, willfulness, and intent was also relevant to two mitigating factors that would have weighed against a death sentence: Donald Fell's capacity to appreciate his conduct was significantly impaired; and Donald Fell did not plan to kill Teresca King at the time she was kidnapped.

Issues relating to Debra Fell's (and Donald Fell's) living conditions—whether the neighborhood they lived in was "okay," whether their house was "decent," whether Mrs. Fell was "just trying to live her life"—were also central to both the guilt and penalty phases of Mr. Fell's trial.  The lion's share of Mr. Fell's trial counsel's opening at the penalty phase was devoted to informing the jury as to the horrible conditions of Debra Fell's house during Donald Fell's childhood and the neglect that characterized Donald Fell's upbringing.  Counsel described a house littered with beer cans, and a woman who was the primary source of dysfunction in a severely dysfunctional family.  Trial Tr. Vol. I at 54.  Over the course of the penalty phase, the thrust of the defense evidence pertained to these issues, in the form of both testimony and

participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Theresa King died as a direct result of such act or acts.  (4) Donald Fell intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act or acts constituted a reckless disregard for human life, and Theresa King died as a direct result of such act or acts.  Trial Tr. Vol. XII at 140-41.

exhibits. For example, Teri Fell testified that during Donald Fell's childhood the family lived in "filth[]," their home littered with dishes, garbage, beer cans and food. Trial Tr. Vol. VII-1 at 116-17. Officer Christopher Purcell testified that Debra and Donny Fell's house in Wilkes-Barre was "disheveled," with a "large amount of garbage piled around" the outside, and that, in the numerous times he was called to the house during Donny's childhood, he never remembers not finding it strewn with beer cans. Trial Tr. Vol. VII-2 at 39-40. Trial counsel also introduced photographs of the conditions of Mr. Fell's childhood home before his mother left. This evidence was offered in support of numerous mitigating factors, including: Donald Fell's parents were violent alcoholics who abandoned him as a child; Donald Fell was raised without positive role models; and Donald Fell was sexually and physically abused as a child.

The extraneous evidence sought out and obtained by Juror #143 was directly on point and probative of both of these sets of critical issues disputed by the parties and put to the jury at both the guilt and penalty phases of trial. Accepting as true what Juror #143 represented about his trip when he did not have a motive to lie—that he visited the Robbins Street crime scene, the surrounding neighborhood, and the Price Chopper crime scene; observed the condition of Mrs. Fell's neighborhood and home; observed the qualities of the immediate area around the Price Chopper; and reported on this evidence to the rest of the jury—it is plain that the Government cannot rebut the presumption that such extraneous evidence would have affected a typical juror, viewing it against the record presented at trial and the disputed issues laid out above.

Mr. Fell intends to present testimony and other evidence proving what Juror #143 would have seen in the course of his admitted investigation, and how that evidence compared to the limited information presented at trial regarding the Rutland crime scenes. The trial evidence

58

regarding the Rutland crime scenes was extremely truncated.  The Government introduced only head-on photographs of the apartment at 135 Robbins Street (from which the surrounding neighborhood was excluded) and aerial photographs of Rutland.  It did not present any evidence with respect to the neighborhood surrounding 135 Robbins Street or how a person would have experienced the trip from that location to the Price Chopper.  By contrast, the information unlawfully obtained by Juror #143 was not so limited.  Based on his account, he reviewed the neighborhood around 135 Robbins Street (not just the apartment), the area around the Price Chopper (including its lighting) and the areas in between the two.

Juror #143's impermissible inspection of the crime scene gave him a different vantage point from which to evaluate the evidence from that which was evident at trial.  Juror #143's inspection and experimentation in the Rutland area also gave him the opportunity to experience the route from 135 Robbins Street to the Price Chopper that Mr. Fell traveled on the night of the crimes in the way only a person travelling that route would have experienced it, noticing the distances between locations, how simple or complicated the route was, where different buildings were located, how easy or difficult they would be to remember, how easy or difficult the route would be to navigate, and the like.  Juror #143 drew conclusions about the sufficiency of the lighting at the Price Chopper, and the fact that it appeared "unsafe."  This evidence and these conclusions were directly relevant to the critical issues of knowledge, willfulness, and intent in both the guilt and penalty phases.  Juror #143 would have been able to assess whether the route was simple—the type that someone might have followed without forethought—or complex—the type that someone would have needed to plan ahead of time.  He would have been able to assess whether Mr. Fell's recollection of the route (a point put to great effect by the Government) was comprehensive and faithful, and he would have formed a unique

59

view as to what state of mind would have been required to recall that information. Juror #143 would have been able to make judgments as to the suitability of the Price Chopper parking lot as a place to "lurk" for an "unsuspecting victim"—and whether its character as a "poorly lit" and "unsafe" place reflected the degree of premeditation and planning suggested by the Government. Juror #143 also had the experience, alone among the jurors, of inspecting the very place where Mrs. King was abducted.

Juror #143 drew other conclusions from his visit, including that Mrs. Fell's neighborhood was "okay," her house was "decent" and she was "just trying to live her life," and relayed these conclusions to the rest of the jury. Statement of Juror #l43 (Dec. 19, 2010) (Ex. 241). These conclusions—not available from any evidence presented at trial—would have undermined the evidence presented by trial counsel during the penalty phase that Mrs. Fell was an alcoholic who drank to intoxication "almost daily" and kept the bottles and beer cans strewn about her house. Trial Tr. Vol. XII at 81.

This evidence was important to the mitigating factor of Mr. Fell's impairment at the time of the crimes. The extraneous evidence would also have stood in stark contrast trial counsel's argument that Donny Fell lived in an environment of extreme neglect—not in "decent" conditions with parents who were "just trying to live [their lives]."

A party can only rebut the presumption of prejudice by showing that the extra-record information was harmless. May 10 Order at 12 (*quoting* Farhane, 634 F.3d at 168). This Court has already rejected the Government's argument that the extraneous information obtained by Juror #143 (and shared with the rest of the jury) was cumulative to other evidence introduced at trial, and that the information at issue was insignificant. May 10 Order at 14-15. These Government arguments continue to lack merit. Juror #143 testified that he had never been to

60

Robbins Street before the trial, thus eliminating the possibility that his observation of it was part of his normal experiences. Aug. Hr'g Tr. at 50. The Government's evidence of 135 Robbins Street and the surrounding neighborhood consisted only of exterior photographs of the house alone and one satellite photograph of the entire Rutland area. Many of the buildings described at trial were not visible on that photograph. There was no evidence about the quality of the neighborhood. There was also no evidence that Debra Fell was "just trying to live her life." Additionally, the lighting at the Rutland Price Chopper was significant to the issue of premeditation: the Government argued that Mr. Fell was "lurking in the shadows" prior to kidnapping Mrs. King, and the defense countered that Mr. Fell had obviously not planned the night carefully, having gone "to a parking lot that was lit." Trial Tr. Vol. I-1 at 109; Trial Tr. Vol. IV-1 at 75. Joseph Trapasso, the delivery man who testified about his experience at the Price Chopper the morning of the crimes, testified that one could "see pretty good out there." Trial Tr. Vol. I at 118. Only Juror #143 observed the lighting firsthand, and only that observation could have led him to the conclusion that the parking lot was "poorly lit" and "unsafe."[148]

In United States v. Roshko, the government argued that the defendant could not have been prejudiced by extraneous information because the evidence against him was already very strong. However, the court held that it could not "be sure that the government's case against Roshko was so overwhelming that the extra-record evidence did not affect the outcome. The intent of the defendant is a matter which is particularly difficult to determine and while the

---

[148] As stated above, Juror #143 was also dishonest in his answers on voir dire. Police records show that, although Juror #143 represented that he had never been accused of a crime or been the target of a criminal investigation, he had in fact been accused of theft in 1995, a crime for which he was also investigated by the police. Vermont State Police, A Troop – Middlesex, LAW Incident Table (Ex. 339 at FELL-00003598-600). Two individuals had reportedly been informed that Juror #143 had stolen property from a public recreation area and followed Juror #143's vehicle, attempting to get him to pull over, at which point Juror #143 reportedly threatened them with a handgun. Id.

defense was not strong, it might have raised a reasonable doubt in the jury's view. . . .  The possibility that Roshko was prejudiced by the extra-record evidence is sufficient to warrant a new trial."  United States v. Roshko, No. 90 Cr. 265 (JAR), 1991 WL 18146 at *5 (S.D.N.Y. Feb. 7, 1991).  That is especially true in the "qualitatively different" case of a death sentence, where "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

Mr. Fell seeks an evidentiary hearing to present this evidence of juror misconduct, and to prove that Juror #143's impermissible actions have deprived Mr. Fell of his constitutional rights.

### 3.  Juror #26

Both during voir dire and in response to the Court's continued questioning, Juror #26 failed to reveal that prior to trial he had heard of Mr. Lee's death from a news report attributing that death to suicide.[149]  This undisclosed knowledge constitutes two forms of juror misconduct: first, it demonstrates that Juror #26 was dishonest both at jury selection, when he did not disclose this knowledge, and again each day in court when he continued to conceal his awareness of outside information; and second, it signals the introduction of prejudicial extraneous evidence.  Mr. Fell believes that there is sufficient evidence in the record as it stands to support his claim of juror misconduct as it pertains to Juror #162.  Accordingly, Mr. Fell respectfully requests that the Court order merits briefing on this claim either in advance of or in

---

[149] Juror #26 also concealed his criminal history on voir dire when he represented that he had never been charged with a crime.  2255 Motion at 329.  He admitted this criminal history in his recent testimony.  See, e.g., Sept. Hr'g Tr. at 5.  He also concealed his family's criminal history and several civil suits and a government relationship involving him and his family.

conjunction with the merits briefing on Mr. Fell's juror misconduct claim as it pertains to Jurors #162 and #143.

### a. Juror #26 Committed Misconduct By Concealing Material Information at Voir Dire and During Trial

#### i. Juror #26's Omissions at Voir Dire and During Trial Were the Product of Dishonesty

After Juror #26's testimony at the September hearing, there can be no dispute that he had in his possession at trial information that was not presented in court. This is sufficient to sustain a juror misconduct claim based on extraneous evidence. It is also clear, however, that Juror #26 was conscious that he possessed this extraneous information, aware of his obligations to disclose such information to the Court, and deliberately chose not to do so, supporting a juror misconduct claim based on McDonough.

In its initial, videotaped, instructions to the jury venire, the Court emphasized that it was critical that Mr. Fell be judged "on the evidence presented in the courtroom and not on anything that [jurors] may have heard or read or experienced outside the courtroom," that a juror who was exposed to extra-record information could not be fair and impartial, and that it was the entire purpose of voir dire to ensure that each juror who was ultimately selected had not been exposed to such information and could be fair and impartial. See, e.g., Tr. Videotaped Jury Instructions 13 (Ex. 117). In the juror questionnaire, prospective jurors were asked whether they knew anything about the case, including whether they had read any information about the case. The Court pressed this issue during individual voir dire questioning, asking jurors, including Juror #26, what they knew about the case. When Juror #26 reported that he "heard something in passing," the Court followed up, inquiring what exactly it was Juror #26 had heard. JVD-5 at 90.

Before any juror completed the long questionnaire, the Court explained the nature of the charges: "The indictment in this case charges that the defendant and Robert Lee

committed the crimes of kidnapping and carjacking related to the abduction of Teresca King from Rutland, Vermont and her murder in Duchess County, New York, on or about November 27, 2000. The indictment also alleges that the defendant Donald Fell possessed and brandished a firearm during the kidnapping and carjacking, and that he possessed the same firearm as a fugitive from justice. The defendant is facing the death penalty as a possible punishment." In the voir dire questionnaire itself, Robert Lee's name was listed in writing both in the summary of the charges and in the short list of those persons relevant to the case, inquiring whether the juror knew or had any connection with them. Ex. 322 at FELL-00002730, 49. The only other individuals listed here were the three victims.

During voir dire, Juror #26 stated that he did not have preexisting information about the case. He answered the questionnaire by stating that he had not read anything about the case, and did not reveal that he had heard that Mr. Lee committed suicide. During the individual voir dire questioning, he was asked by the Court the extent of his knowledge of the case. First, the Court asked whether Juror #26 had heard anything about Mr. Fell's case, to which he responded "No, not really. No." Voir Dire Tr. at 90 (May 13, 2005). When pressed if he knew any of the facts of the case, Juror #26 offered only, "No. I think at one point, a long time ago, I heard something in passing, but other than that, no." Id. Finally, when pushed by the Court, he admitted only that he knew "just that a woman had been kidnapped," id., but concealed the far more significant fact that Mr. Fell's co-defendant (whose name Juror #26 had by now heard) had committed suicide while in jail following his arrest.

Every single day at trial, as Mr. Lee's name continued to be mentioned and the importance of his death raised, the jurors were asked if they learned anything about the case from

64

outside the courtroom.  May 10 Order.[150]  Every day they were reminded of the importance of rendering a verdict based on the evidence presented in the courtroom only, when they were instructed not to be exposed to any outside information.  Id.  Despite this constant reminder, Juror #26 never disclosed to the Court that he was in possession of a serious and prejudicial piece of extraneous information.

The Court and the parties now know that this concealment was not the product of mistake or lack of awareness.  In Court on September 27, 2013, Juror #26 confirmed that he had in fact heard before the trial that Mr. Lee had committed suicide.  Id.  Juror #26 also clearly testified that as soon as he heard Mr. Lee's name (which occurred during voir dire), he connected the case to this outside information.  Sept. Hr'g Tr. at 15, 27-28.  When Mr. Lee's name was first mentioned, Juror #26 "remembered [he] had heard [Mr. Lee's] name before, and then [he] realized . . . [that he] had heard it on the news that [Mr. Lee] had committed suicide."  Id. at 28. Juror #26 had not forgotten the information nor was he mistaken about it.  He knowingly omitted the fact that he had heard of Mr. Lee's death.

When asked by the Court on a daily basis if he had heard anything about the case from outside of court, Juror #26 continued to conceal this extraneous information.  Id. at 13. Robert Lee took a central role in the arguments and evidence presented on the first day of trial and nearly every day thereafter.[151]  To say Robert Lee featured prominently in the Government's opening argument would be a gross understatement: he was mentioned, by name, more than *forty times* in that single address to the jury.  Of course, not once was it presented to the jury that this

---

[150] See also Trial Tr. Vol. 1-1, 15, June 20, 2005; Trial Tr. Vol. 2-1, 3, June 21, 2005; Trial Tr. Vol. 3-1, 11, June 23, 2005; Trial Tr. Vol. 4-1, 24, June 24, 2005; Trial Tr. Vol. 5-1, 18-19, June 28, 2005; Trial Tr. Vol. 6, 3, June 29, 2005; Trial Tr. Vol. 7-1, 41, July 1, 2005; Trial Tr. Vol. 8-1, 3, July 6, 2005; Trial Tr. Vol. 9-1, 8, July 7, 2005; Trial Tr. Vol. 10-1, 3, July 8, 2005; Trial Tr. Vol. 11, 38, July 12, 2005; Trial Tr. Vol. 12, 11-12, July 13, 2005.
[151] Mr. Lee's name was mentioned nearly every day of trial.  See, e.g., Trial Tr. V. I-I at 19; Trial Tr. V. II-I at 19; Trial Tr. V. III-I at 116; Trial Tr. V. IV-I at 41; Trial Tr. V.V at 28; Trial Tr. V. VII-I at 157; Trial Tr. V. VIII-I at 110; Trial Tr. V. XI at 47; Trial Tr. V. XII at 14.

man had committed suicide.  Yet Juror #26 continued to conceal his knowledge of this supposed

fact.  When he was read the stipulation that Mr. Lee had died an "accidental" death, he remained

silent, choosing not to disclose that he had information directly controverting this evidence.  And

he still did not raise his hand or speak up about his knowledge when told that one of the

mitigating factors he was supposed to consider as weighing against the death penalty for Mr. Fell

was that Robert Lee was equally culpable for the crimes and would not face execution.  This

repeated concealment was not the result of accident, but rather of intentional nondisclosure.  This

conduct at trial forms an independent basis for the claim of juror misconduct.  See, e.g., In re

Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 739 F. Supp. 2d 576, 611 (S.D.N.Y.

2010) (juror who learned of extraneous information about the case on the internet was subjected

to another voir dire and "was immediately excused after the Court learned of his misconduct").

The Government has argued that Juror #26 was not deliberately dishonest

regarding his knowledge of Robert Lee's supposed suicide because Juror #26 may not have

considered Mr. Lee's death part of "this case," or because he did not immediately relate the

report about Mr. Lee's death to the trial.  Am. Opp. at 327.  Both of these possible explanations

were eliminated by Juror #26's testimony that he recognized Mr. Lee's name as soon as he heard

it and continued to be aware of the connection throughout voir dire and trial.  Sept. Hr'g Tr. at

15, 27-28.  Even during the September hearing, the Government continued to believe that this

connection had not been made, arguing in chambers that the juror "had no intention of not

disclosing relevant information.  It simply didn't come to his mind . . . ."  Id. at 18-19.  This

argument is incorrect based on a *prima facie* review of the juror's testimony.  In response to the

government's argument, this Court stated, "Well, you may have – you may have heard different

versions of what he said.  I think he said that he clearly heard about the fact that Mr. Lee had

66

committed suicide. Didn't call him Mr. Lee, but committed suicide, in advance, and that *during the course of the trial* he had a better sense of the relevance of that." Id. at 19 (emphasis added). Juror #26 testified that he made the link between his undisclosed knowledge of Mr. Lee's suicide and the facts of Mr. Fell's case when he heard Mr. Lee's name. This name was presented to him, in writing, at voir dire. And Juror #26 continued to conceal this information every day afterward when asked about his knowledge of the case.

It is evident after the September 27 hearing that Juror #26 took on for himself a role constitutionally vested in this Court: the gatekeeper determining what information was relevant to his ability to impartially hear the evidence in Mr. Fell's case. As noted above, Juror #26 withheld other information at voir dire. He concealed a past criminal conviction in connection with a domestic dispute that was relevant to the inquiry as to whether he could objectively evaluate the mitigation evidence presented, particularly with reference to mitigation factors concerning Mr. Fell's exposure to family abuse and violence. Juror #26 omitted a litany of other responsive information at voir dire—his convictions of driving under the influence and non-payment of wages, his and his family's history with civil suits and connection with government office, and his son's prior criminal history—that was also relevant to the question of Juror #26's ability to hear the evidence impartially.

Juror #26 testified that he "filled [the voir dire questionnaire] out in a hurry," because he was "not expecting to get picked." Sept. Hr'g Tr. at 12, 64. He testified that he did not disclose his criminal conviction for nonpayment of wages because he did not think he would be picked for the jury, and because he "didn't think it was important." Id. at 33. Courts have held this exact type of situation, where a juror usurps the court's function of dictating the scope and implementation of voir dire, to constitute juror misconduct under McDonough. See Dyer v.

67

Calderon, 151 F.3d 970, 984 (9th Cir. 1998) (*en banc*) ("[T]he magnitude of [the juror's] lies and her remarkable display of insouciance—her expressed feeling that only she would decide what matters—fatally undermine our confidence in her ability to fairly decide [the defendant's] fate."). Juror #26 did that with respect to his and his family's criminal convictions, his and his family's history of civil litigation, and other information responsive to questions at voir dire. And he did it when he concealed his knowledge of the supposed fact of Robert Lee's suicide, despite knowing of the connection between that supposed fact and Mr. Fell's trial. In other words, in violation of his obligations at voir dire and trial, and in violation of Mr. Fell's constitutional rights, he "steadfastly maintained that [he]—not the court, not the defense, not the prosecutor— was the best and only judge of what information was relevant." Id. at 981.

### ii. Honest Answers on Voir Dire Would Have Provided a Valid Basis for a Challenge for Cause or Removal of Juror #26

The Government also argued that this undisclosed fact would not have supported a challenge for cause. Am. Opp. at 328. With respect to Juror #26, this Court has already rejected this argument, and reiterated that exposure to information that "Mr. Lee committed suicide [was] of grave concern to [the Court] in terms of fairness to this defendant, as well as the government, for that matter," and that the Court had previously excused a juror for cause because he knew about Mr. Lee's death. May 10 Order at 12 & n.4. During trial, the Court emphasized that it had been "particularly cautious in jury selection about the *cause* of death." Trial Tr. Vol. VI at 88 (emphasis added). Juror #26 knew both about Mr. Lee's death and that it had been attributed to suicide. The Court struck another juror, Juror #42, for this reason, and Juror #26 was equally subject to challenge. JVD-1 at 178-79, May 4, 2005. That is particularly true where, as here, neither the Court nor "[t]he parties [had] the information that might have

68

prompted further inquiry into areas of possible bias" because Juror #26 did not disclose during voir dire (or thereafter) his knowledge of the information at issue.  May 10 Order at 11.

Likewise, if the Court had discovered Juror #26's undisclosed knowledge during the course of the trial, Juror #26 could have been removed from the jury for misconduct.  United States v. Peterson, 385 F.3d 127 (2d Cir. 2004) (affirming judgment of district court entered after it had excused one juror for misconduct).  Such an excusal is consistent with Federal Rule of Criminal Procedure, Rule 23(b)(3), which states that, "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23.  The Court's instructions to the jury were crystal clear: it was of paramount importance that the jurors base their verdict only on evidence presented in the courtroom, and not on anything they learned outside of it, and that they had a continuing obligation to disclose to the Court any outside information they became aware of in the course of the trial.  Refusal to follow the law as instructed by the court provides good cause to remove a juror.  United States v. Thomas, 116 F.3d 606 (2d Cir. 1997).  Otherwise, the Court's instruction not to learn any new extraneous information—and to disclose any that was known—would be toothless.

### b.  Mr. Fell's Conviction and Death Sentence Were Based on Impermissible Extraneous Evidence About His Codefendant

Juror #26's knowledge of the supposed fact of Mr. Lee's suicide, and his connection of this supposed fact to Mr. Fell's case, constitute prejudicial extraneous information. Extraneous information that becomes known to the jury is "presumptively prejudicial." Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994).  The burden is on the government to prove that the outside information is harmless.  May 10 Order at 12 (quoting Farhane, 634 F.3d at 168).

69

Juror #26's exposure to information about Mr. Lee's alleged suicide was highly prejudicial for several reasons. During trial, the Court granted Mr. Fell's motion to exclude any evidence relating to Mr. Lee's death. Opinion and Order, May 25, 2005, Dkt. 129. Mr. Fell fought hard to exclude evidence suggesting that Mr. Lee committed suicide, in part because it was contested whether he did in fact commit suicide, and he won a ruling from the Court excluding that evidence. Mr. Fell was deprived of the benefit of that ruling—and deprived of any opportunity to confront the prejudicial information—because Juror #26 received such information extra-record unbeknownst to the Court and the defendant.

It is hornbook law that suicide is one of many acts that are "received as admissions by conduct, constituting circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself." 2 McCormick On Evidence § 263 (7th ed. 2013). With the "knowledge" that Mr. Lee committed suicide, a typical juror would have been led to believe that Mr. Lee—who committed the crimes with Mr. Fell—knew he was guilty of the crimes and thus accepted responsibility for them and showed remorse by ending his life, relieving the jury of the responsibility for making that decision. The juror would have been led to believe that—at least in Mr. Lee's mind—death was an appropriate consequence for his conduct (and the conduct of Mr. Fell). And the same juror would also have been led to believe that Mr. Fell—who engaged in the same conduct as Mr. Lee—had not accepted responsibility for those crimes and lacked any real remorse.

As the Court plainly recognized, information that Mr. Lee committed suicide (information that the Government now states is false) would also have significantly undermined more than one of the mitigating factors presented by Mr. Fell at the penalty phase. The jury was told only that Mr. Lee had died accidentally, and not that he had committed suicide. The

70

"acceptance of responsibility" presumed by Mr. Lee's suicide would have undercut the mitigating factor presented by Mr. Fell that he showed remorse for killing Teresca King. A juror who believed that Mr. Fell's codefendant had committed suicide out of guilt would well wonder why Mr. Fell, equally guilty, stood in front of the jury arguing that he should be spared. Mr. Fell also presented as a mitigating factor that Mr. Lee, equally culpable for the crime, would not face execution. But Juror #26 believed (based on his exposure to extraneous information) that Mr. Lee had taken his own life out of guilt and remorse (and had, in effect, made the jury's decision for it). That information thus transformed this mitigating factor into an aggravating factor. It would be Mr. Fell, not Mr. Lee, who the juror would view as having escaped punishment for his crimes up to that point. Further, belief that Mr. Fell's codefendant had taken his own life on account of his actions would have impermissibly relieved the jury of its moral burden of determining whether Mr. Fell's actions warranted a sentence of death—his codefendant, "equally culpable," as Mr. Fell's lawyers informed the jury, had implicitly approved that punishment by rendering it upon himself. The danger of a juror interpreting the extraneous information in these inflammatory ways is of course only exacerbated by the fact that the Court and the parties were deprived the opportunity of providing remedial instructions.

The Government can only rebut this presumption by showing that the extra-record information was harmless. May 10 Order at 12 (quoting Farhane, 634 F.3d at 168). The Government has made two arguments as to why Juror #26's knowledge of Mr. Lee's suicide was not prejudicial. First, the Government has argued that Juror #26 did not connect his awareness of Mr. Lee's suicide until after trial. Second, the Government has argued that Juror #26 would not have continued to believe Mr. Lee committed suicide once presented with the parties' stipulation

71

that Lee's death was accidental.  Am. Opp. at 331-32.  Both of these contentions can be quickly rejected.

As discussed above, it is plain that, whether or not Juror #26 made the connection at voir dire between his knowledge of Mr. Lee's suicide and Mr. Fell's case, he was aware of the connection during trial and before the jury was required to render a judgment of guilt or penalty. He has clearly testified that he made the connection when he heard Mr. Lee's name.  Sept. Hr'g Tr. at 28.  On the very first day of trial, Mr. Lee's name was repeated almost incessantly, and his role in the crimes (and in Mr. Fell's life) was described in great detail.  There can be no mistake that Juror #26 was quickly aware that this was the same person whom he knew to have committed suicide.

Second, the stipulation regarding Mr. Lee's death is demonstrably insufficient to overcome the prejudice inherent in this knowledge.  Juror #26's testimony at the September hearing demonstrates that he *continues to believe* that Mr. Lee committed suicide: he repeatedly referred to Mr. Lee as, based on his present understanding, "the person who had committed suicide."  Sept. Hr'g Tr. at 27; see also id. at 13, 15.  Nothing in his testimony indicates that his view that Mr. Lee's death was a suicide changed between the time he formed it and the conclusion of Fell's trial.  The Government's assertion that the introduction of the sensational fact of Mr. Lee's suicide was somehow erased by a four sentence stipulation read into the record is without merit.[152]

---

[152] In addition, this stipulation was not introduced until the penalty phase of trial.  It would therefore have had no impact on prejudice during the guilt phase of trial.  As discussed above, knowledge of Lee's alleged suicide would have created in the average juror an association of guilt with Mr. Fell.  See, e.g., 2 McCormick On Evidence § 263 (7th ed. 2013).  Indeed, the stipulation was not read to the jury until the very end of the penalty phase; it was among the last pieces of evidence introduced before the Government rested its case.  Accordingly, whatever ameliorative effects the Government claims it may have had would not have occurred until long after the jury had heard extensive evidence in the case and formed significant opinions as to Mr. Fell's culpability.

## **CONCLUSION**

For the reasons described above, Mr. Fell respectfully requests that the Court order an evidentiary hearing at which Mr. Fell may present this evidence establishing the validity of his juror misconduct claim.  Such hearing should be held in advance of the summer 2014 hearing on the remainder of Mr. Fell's claims.

Dated:  December 16, 2013                    RESPECTFULLY SUBMITTED,
Barre, Vermont


                                             /s/ Richard Rubin
                                             RICHARD RUBIN
                                             Rubin, Kidney, Myer & DeWolfe
                                             237 N. Main Street
                                             Barre, Vermont, 05641-4125
                                             (802) 479-2514
                                             Fax: (802) 479-2516


Dated:  December 16, 2013
New York, New York


                                             /s/ Lewis J. Liman
                                             LEWIS J. LIMAN
                                             Cleary Gottlieb Steen & Hamilton LLP
                                             One Liberty Plaza
                                             New York, New York 10006
                                             (212) 225-2550
                                             Fax: (212) 225-3999


Dated:  December 16, 2013
New York, New York


                                             /s/ Cathleen Price
                                             CATHLEEN PRICE
                                             P.O. Box 321762
                                             New York, New York 10032
                                             (212) 998-6193

                                             *Attorneys for Donald Robert Fell, Jr.*