**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| DONALD FELL, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **Civil Case No.** |
| | ) | **Criminal Case No. CR-01-12-S** |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent.* | ) | |

## <u>GOVERNMENT'S BRIEF RE JUROR MISCONDUCT CLAIMS</u>

**COMES NOW**, Respondent, the United States of America, by and through the

undersigned counsel, and, pursuant to this Court's Order of November 12, 2013, (Dkt. No. 434)

files the instant brief in support of its motion for dismissal of the juror misconduct claims raised

in Fell's 2255 Petition.[1]

## INTRODUCTION

On March 21, 2011, Fell filed a timely 2255 Petition. Among other things, Fell claimed

that three of the jurors at his trial engaged in misconduct. On December 22, 2011, the

Government filed its response in opposition requesting summary dismissal of all claims,

including the juror misconduct claims. The Court denied the Government's motion for summary

dismissal and in August and September, 2013, conducted an inquiry at which the three jurors

implicated by Fell's claims testified. The Court ordered the parties to brief the juror misconduct

claims following the juror inquiry. The Government submits the instant brief in response.

---

[1] The Government addresses only the claims raised in Fell's March 21, 2011 2255 Petition. Fell has moved the Court for leave to amend his original Petition, however, such leave has not yet been granted.

## PROCEDURAL BACKGROUND

Prior to the 2005 trial in this triple homicide case, this Court designed and implemented an extensive and thorough jury selection process.   Jurors first filled out the Court's standard, two-page questionnaire providing background information.  Jurors were then summoned to Court, provided with videotaped preliminary instructions by the Court, and then directed to complete an extensive 34-page questionnaire.  The questionnaire contained 75 questions divided into six parts.  That questionnaire inquired as to each prospective juror's:  (1) background; (2) experiences and beliefs; (3) grasp of basic legal principles; (4) views concerning the death penalty; (5) exposure to media treatment of the case or the death penalty; and (6) schedule during the anticipated three weeks of trial.  In addition, each juror's name and address was provided in each questionnaire.

In preparation for jury selection, the parties and the Court both had the completed juror questionnaires to review with prospective jurors.  Next, after the Court conducted general voir dire of groups of 16 jurors, each prospective juror was individually questioned, first by the Court, and then by attorneys for the parties.  At the request of the defense, and over the government's objection, the Court permitted case specific questions during individual voir dire. *See United States v. Fell*, 372 F. Supp.2d 766, 767 (D. Vt. 2005) (describing the "lengthy voir dire process" and the proper use of case-specific questions).  The Court invested a month selecting the jury in this case.

At trial the jury heard evidence of the brutal and gratuitous murders of three persons, Charles Conway and Debra Fell, knifed to death in Rutland, Vermont, by Fell and his co-defendant Robert Lee, and Terry King, kidnapped in Rutland and battered to death in Dover

Plains, New York, again by Fell and Lee. Fell admitted to the killings in multiple recorded statements. Having repeatedly kicked King in the head as she lay on her back praying in Dover Plains, her blood was found on his steel-toed boots. The jury also heard defense mitigation evidence from 14 penalty phase witnesses, including school teachers, social workers, and Fell family members, who described Fell's chaotic childhood and upbringing. The jury also heard from a number of correctional officers and an institutional teacher who described Fell's adjustment to prison.

In its unanimous July 14, 2005, verdict, the jury agreed with the defense unanimously as to eight mitigating factors (including that Fell as a child had been "sexually and physically abused" and "abandoned" by his parents), but ultimately found that the aggravating circumstances of the King murder warranted a sentence of death.

On April 24, 2006 ,the Court denied Fell's Rule 29 post-trial motion claiming prosecutorial misconduct. Dkt. No. 236. On June 16, 2006, the Court sentenced Fell to death on Counts One and Two, consistent with the jury's verdict. Dkt. No. 244. In 2007 the Court of Appeals affirmed the jury's verdict and sentence. *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008). The Supreme Court declined review on March 22, 2010. *Fell v. United States*, 559 U.S. 1031 (Mem 2010). On March 21, 2011 – the last day of the one-year § 2255 limitations period – Fell's § 2255 Petition was filed by Cleary Gottlieb Steen & Hamilton LLP.

The 365-page 2255 Petition, accompanied by over 300 exhibits, raises 21 sets of claims, most containing a multitude of sub-claims. It sets forth a blizzard of accusations against Fell's three trial lawyers, against the two Assistant U.S. Attorneys who prosecuted the case, and against jurors who satisfied this Court's thorough jury selection process and returned the verdict. The

motion urges that leading up to the trial, and on nearly every day of trial, all five lawyers representing the two parties committed serial errors of constitutional magnitude, such that the jury – itself infected with dishonest jurors who violated Court orders – returned an unjust verdict.  This pervasive failure of the federal criminal justice system, Fell contends, took place notwithstanding the Second Circuit's finding that this Court presided over the trial "with care, fairness, and an exemplary concern for the protection of Fell's rights." *Fell*, *supra*, 531 F.3d at 240.

The 2255 Petition attacks three of the jurors who convicted Fell, contending that they lied during jury selection, and subverted deliberations with extraneous evidence and coercive behavior.  In particular, Fell contends that Juror 162 answered Question 38 of the juror questionnaire falsely to conceal her childhood sexual abuse, which occurred over 50 years before trial; Juror 26 deliberately concealed two misdemeanor convictions sustained about 10 years before trial; and Juror 143 violated the Court's bar on extraneous evidence by inspecting Rutland crime scenes during trial and then sharing significant resulting observations with other juror during deliberations.  Finally, Fell contends that Juror 143 also corrupted the verdict by coercing another juror into voting for death when he pointed Fell's unloaded firearm at her to show her that even unloaded weapons are intimidating.

On December 22, 2011, the Government filed its Response in Opposition to the 2011 2255 Petition, seeking summary dismissal of all claims.  Specifically, the Government sought dismissal of the juror claims, arguing that Fell defaulted by failing to raise them during the criminal case, and that counsel violated Fed. Rule of Evid. 606(b) by interviewing jurors about

their deliberations and submitting evidence of juror statements about juror deliberations. Rule 606(b), the Government argued, barred the evidence from consideration by the Court.

As to the individual claims, the Government urged that Juror 162's childhood sexual abuse took place approximately 50 years before Fell's trial, and there was no reason to suspect that she deliberately concealed this fact during voir dire, particularly since she had freely discussed it with Fell's counsel. In any event, the new information about Juror 162 did not support a finding of bias that would have warranted a challenge for cause at the 2005 trial – in fact, Juror 162's statements, both during voir dire and during her interview with 2255 counsel years later, reflect a conscientious and impartial juror. "Amended Opposition of the United States to Fell's § 2255 Motion," filed December 21, 2011, pp. 318-25.

In addition to the formidable Rule 606(b) bar to the claims involving Juror 143, the Government pointed out that any Rutland observations made during trial were merely cumulative, since a series of photographs of the Robbins Street apartment and the Price Chopper location were introduced into evidence at trial. Moreover, the shotgun allegation, even if true, did not support a claim that Juror 143 coerced any other juror to change her vote.

As to Juror 26, the Government disclosed that a records check revealed a 1994 DUI misdemeanor violation, in addition to the mid-1990s unlawful mischief misdemeanor conviction cited by Fell. Nonetheless, the Government urged that non-disclosure of two minor infractions committed nearly a decade before trial, and media exposure years before trial, did not support an inference of deliberate deceit, and would not have served as grounds for a challenge for cause.

On August 20, 2012, Fell filed a "Reply to the Government's Amended Opposition to Motion of Donald Fell for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a

New Trial Pursuant to 28 U.S.C. § 2255," Dkt. No. 358, wherein he reiterated the 2011 2255 juror claims.

The Court's May 10, 2013, "Memorandum Opinion and Order: Claim XXII: Juror Misconduct," declined to dismiss summarily Fell's juror claims. The Court observed that Juror 162's statement that her childhood sexual abuse "didn't turn me into a murderer," "suggests that this juror might not have been able to fairly and impartially consider evidence of childhood sexual abuse as a mitigating factor in a capital trial." *Id*. at 8-9. As to Jurors 162, 26 and 143 generally, the Court found that more information was necessary. The Court scheduled and held inquiries in August (Jurors 162 and 143), and September (Juror 26), 2013, wherein the jurors were summonsed and testified. Prior to the inquiry, the Government moved the Court to require 2255 counsel to provide discovery regarding the allegations of juror misconduct. The Court declined the request in a July 23, 2013, phone conference with counsel.

## FACTUAL BACKGROUND

A.      <u>Juror 162</u>

1. <u>The Short Questionnaire</u>

Juror 162 completed a short 2-page questionnaire in which she indicated her name, town of residence, age, level of education, current occupation, current and previous employer, place of birth, number of children, whether she had ever worked for the federal government, spouse's occupation and employer, and children's employment. Defendant Exhibit 2, August 15, 2013 Hearing. The short questionnaire also asked whether the juror, any relative or person close to her had ever been the victim or witness to a crime, or been a complainant in a criminal case and she indicated no. It also asked whether the juror, any relative or person close to her had been

accused of a crime and Juror 162 indicated yes.  She explained: "My son was under Department

of Corrections House Arrest for DWI and domestic violence16 years ago.  He is now ass't

manager at Shaw's, so he sure has been a better person for it."  Juror 162 also informed that in

her spare time she reads, gardens, makes rugs and plants.  To a question which asked her to list

newspapers, magazines or periodicals she read, she responded: "Angels on Earth, Good

Housekeeping, True Crime Books, usually by Anne Rule."  Last, Juror 162 was asked whether

she or anyone close to her had been a plaintiff or a defendant in a civil suit and she responded

no.

　　　　　2.　　　The 34-Page Questionnaire

Juror 162 also completed the Court's 34 page questionnaire.  Defendant Exhibit 3,

August 15, 2013 Hearing.  In part I she provided information about her background, i.e, name,

address, age (Juror 162 indicated that she was 62 years old (Q. 8)); where she was raised; level

of education; whether she was married and for how long; her ethnic background; place of

employment and work description, previous employment; combined income; whether she or any

friend or relative had a law-related job; whether she had ever worked for the government (which

she had (Q. 19)); employment of her spouse; number of children, ages, level of education and

employment; whether she had any military service; whether she participated in groups that took

positions on social or legal issues; and whether she, a relative or close friend was a member of

the police, attended law school, practiced law or owned guns.

Juror 162 also provided more specific information about she read and watched on t.v.

She indicated that she read the Burlington Free Press occasionally and that she had written a

letter to the editor once, years ago, but could not remember what it was about.  (Q. 29)   She

again stated that she read true crime novels by Anne Rule, biographies and Good Housekeeping magazine. *Id.* In response to what were the last three books she had read, she stated that she was currently reading Bill Clinton's latest book, though she could not remember the title. She indicated that she thought it was called "My Life." *Id.* She had also read Anne Rule's latest book and John Walsh's latest book, but could not remember the title of either. *Id.* Juror 162 watched Larry King Live and Nancy Grace every night, (Q. 30) and listened to country music everyday at work. (Q. 31).

Juror 162 further indicated that she followed the criminal cases of Michael Jackson, Scott Peterson and O.J. Simpson. (Q. 32) She again stated that she enjoyed reading, gardening, rug making, plants, animals (humane society) and the environment, but did not belong to any social organizations or clubs. (Q. 33). Juror 162 had never served as a juror. (Q. 34, 35). Juror 162 again answered no to whether she had ever filed a complaint against anyone with the police. (Q. 36)

Part II of the 34-page questionnaire asked Juror 162 to provide information about her experiences and beliefs. She was again asked whether she followed any criminal trials in the newspapers or t.v. and again Juror 162 indicated that she followed the Scott Peterson and Michael Jackson cases on t.v. (Q. 37) When asked whether she had any opinions or beliefs as a result of those trial that would make it difficult for her to evaluate the evidence fairly and impartially, she stated no. *Id.* Juror 162 was again asked whether she, a family member or a close friend had been a witness to or the victim of a crime, and again Juror 162 stated no. (Q. 38)

Juror 162 further stated that she had no opinions regarding law enforcement in general that would make it difficult for her to be fair and impartial. (Q. 39) She did not think that the FBI, police or prosecutors treated any group unfairly, *id*., and did not think that the criminal justice system made it too hard for the police and prosecutors to convict people accused of a crime. (Q. 40) Juror 162 also indicated that she had never testified as a witness (Q. 41), and was not then under a subpoena in a criminal case, nor had she ever been questioned as part of a criminal investigation or been involved in a dispute with the Government. (Q. 42)

Question 43 asked Juror 162 whether she, a relative or close friend had ever been charged with a crime, to which she responded, yes. (Q. 43) Question 43(b) then asked the result of the prosecution, and Juror 162 stated:

> (House arrest) My son - DWI + domestic abuse - He was under the
> Dept of Corrections for 3 yrs - Intense counseling - Best thing ever
> happened to him - He is now a different person

Part (c) of question 43 asked whether she thought that (her son) was treated fairly by the criminal justice system and she said yes. Part (d) of question 43 asked whether there was anything about (her son's experience) that would make it difficult for her to sit as a fair and impartial juror in the case, and Juror 162 stated no, and added: "My son was treated fairly and it helped him change his life." Question 44 asked whether she, a relative or anyone close to her had been treated for a substance abuse problem and Juror 162 stated yes and added: "My son - alcohol." Question 44 further asked whether as a result of the substance abuse problem (her son) had any contact with the Criminal Justice system and Juror 162 stated: "yes, as explained above."

Questions 45 and 46 asked Juror 162 whether she knew any of the parties involved in hte prosecution of Fell or bored any prejudice, bias or sympathy toward either the defendant or the

Government.  Juror 162 answered no in each instance.  Question 47 asked whether she was familiar with Rutland, VT or Dutchess County, NY, she was not.   Questions 48 through 50 asked whether her personal beliefs or the nature of the charges would cause her not to be fair and impartial to which Juror 162 stated no.

Part III of the 34-page juror questionnaire asked Juror 162 a series of questions relating to a number of legal principles relevant to a criminal case, including the presumption of innocence, the defendant's right not to testify; the jury's duty to consider each crime separately; the need to evaluate the testimony of law enforcement officers fairly; evidence resulting from searches or tape recordings; and the jury's duty to follow the law as stated by the Court.  Juror 162 was asked whether she would have any difficulty following the rules stated and she answered no in each instance.

Part IV of the 34-page questionnaire informed Juror 162 that the Government was seeking the death penalty and that if the defendant was found guilty it would be for the jury to decide whether he should be sentenced to death.  Juror 162 was then asked several questions regarding the death penalty.  Question 56 asked Juror 162 to describe her views on the death penalty.  Juror 162 stated:

> once I was opposed, but in recent years, I have changed my mind, as there are certain crimes and circumstances which I now believe would constitute the death penalty.

Question 57 asked Juror 162 to indicate where she would place her opinion on a scale of 1 to 10 where 1 was strongly opposed and 10 was strongly in favor.  Juror 162 circled 7.  Question 58 asked whether she had ever held a different view and Juror 162 stated:

> as explained above, I did not believe anyone had the right to take a
> life but due to recent cases, I have changed my opinion.  It would
> depend on the crime + circumstances

Juror 162 further indicated that her views on the death penalty were not so strong that they

would prevent or interfere with her ability to perform her duties as a juror in accordance with her

oath and that she could make the decision of whether a defendant should live or die.  (Q. 59 and

60)  Question 61 asked Juror 162 to check the sentence that best described her view of the death

penalty and Juror 162 checked the following:

> I am generally opposed to the death penalty, but I would based a
> decision to impose it on the facts and the law in the case.

Juror 162 indicated that she would not hold the Government to a higher standard of proof than

proof beyond a reasonable doubt and the question of punishment would not enter her

deliberations on guilt or innocence.  (Q. 62 and 63)  Juror 162 also stated that she would not

always vote for the death penalty, nor would she always vote for life.  (Q. 64)  She explained

further:

> It depends on the crime and circumstances, if the death penalty
> would be warranted in those circumstances

When asked in Question 65(a) what kind of murder cases she thought that the penalty of life

imprisonment without parole was appropriate she indicated:

> (I would have to know the reason and circumstances) It would
> depend on the circumstances It's difficult to say unless I know the
> case.  Depends on pre-meditation, in some cases.

Juror 162 wrote "Difficult question" on the margin of Question 65.  Question 65(b) asked in

what kind of murder cases she thought that the death penalty was appropriate.  Juror 162

indicated:

> Taking the life of a child, premeditated murder like the sex crime
> of a child - It's hard to say - it would depend on the circumstances
> (like Scott Peterson, murdering his wife & baby - that is just evil.)

Question 66 asked whether the juror or an immediate family member or close friend ever belonged to an organization that opposed the death penalty and Juror 162 stated no. Question 67 asked whether her beliefs about what the law was or should be regarding the death penalty would make it difficult to follow the Court's l0egal instructions and Juror 162 stated no.

Part V of the 34-page questionnaire asked several questions concerning the media. Question 68 asked whether she had read anything about death penalty cases in the last year. Juror 162 stated yes. She indicated that she had read an article about Scott Peterson in People magazine, but that what she read would not affect her ability to be fair and impartial in a case where the prosecution was seeking the death penalty. Question 69 asked whether she had watched any television programs or movies regarding the death penalty or death penalty cases and she again stated yes. Juror 162 indicated that she had seen a Larry King Live and Nancy Grace show about the Scott Peterson case, but that what she saw would not affect her ability to be fair and impartial in a case where the prosecution was seeking the death penalty. Question 70 asked whether she had read any articles about the instant case and she stated no.

Last, Juror 162 was asked whether she had signed a petition seeking to establish the death penalty in the State of Vermont and she stated no. (Q. 71) Question 72 asked whether there was anything about the charges or the facts of the case that would affect her ability to be a fair and impartial juror and she stated no. Question 73 asked for her opinion about the fields of psychology and psychiatry and the ability of such persons to identify and explain reasons for

human behavior.  Juror 162 stated: "I am in the health care field and respect the opinion of these people."  Juror 162 then wrote "but," and scratched it out.

Part VI asked whether Juror 162 wanted to be excused for serious hardship and she stated no.

### 3.    The Individual Voir Dire

On May 23, 2005, Juror 162 was summoned for individual voir dire.  The Court asked her if she had read or heard anything about the case and she stated no.  Tr. at p. 114.  The Court asked Juror 162 to describe her views on the death penalty.  She stated that she used to be opposed to it, but in later years she had changed her mind.  Id. at 115.  The Court asked what had caused her to change her mind, and she stated:

> Well, certain cases that were just so, you know, reprehensible to me that ... Recently, like the Scott Peterson case.  Children that are killed during a sex crime, recently there's been several children.  Things like that.

*Id*.  When asked what kinds of cases she thought warranted the death penalty, she again stated that it depended on the circumstances, but added that the type of case she just described like the Scott Peterson case where he had killed his wife and child.  *Id*.  The Court then asked Juror 162 if thought there were cases where the death penalty should be imposed automatically, and she stated that she was not sure about that.  *Id.* 116.  The Court then explained what would happen in a penalty phase and the factors the jury would need to consider and asked Juror 162 if she could fair and impartial as she balanced those factors.  Juror 162 stated that she could be fair to both sides.  *Id*. at 116-17.

The then asked Juror 162 what sort of things she would like to know to help her make the decision.  She stated: "first of all, the reason . . . the psychological reason about why he would

have done it. The mitigating circumstances, you know. I would have to hear the whole –" *Id*. at 117. Regarding mitigating circumstances, Juror 162 stated that she would like to know about the defendant's childhood, upbringing, whether he was remorseful or had undertaken any efforts to rehabilitate himself. *Id*. at 117-18. Last, the Court asked whether there was anything in her personal life that would make it difficult for her to serve at that point, and Juror 162 stated no. *Id*. at 118.

The Court then allowed the Government to ask questions. The prosecutor began by asking about her current and previous employment and her duties. *Id*. at 119. Next he inquired into her husband's employment because he worked at a supermarket. Juror 162 clarified that both her husband and a son worked at a supermarket. *Id*. at 120. The prosecutors explained that the victim of the case worked at a supermarket, specifically at Price Chopper in Rutland, Vermont, and asked whether there was anything about her family that would in any way affect her ability to be fair and impartial in the case. Juror 162 stated no. *Id*.

The prosecutor also inquired into the books that Juror 162 had read, specifically the true crime novels, and asked whether she leave what she had read outside the Court and make a decision based upon the evidence she would hear in Court, and Juror 162 stated that she could. *Id*. at 121.

The prosecutor then asked Juror 162 why she circled a 7 in the scale of 1 to 10? *Id*. at 122. Juror 162 stated:

> Well, I don't take – I used to be a person that used to think that
> nobody had the right to take another person's life. Because I
> explained to the judge, I have come to change my mind somewhat
> with various cases that I have heard about, about the circumstances
> under which it happened. And so that's why I have sort of
> changed my mind. But I wouldn't take – I don't take it lightly.

*Id*. Juror 162 added that her earlier opinion was based on her own personal moral belief. Id. When asked whether she could consider the death penalty in cases other than a case such as the Scott Peterson case, Juror 162 indicated that she would have to hear the case. "I would have to know all the mitigating circumstances." *Id*. at 123.

After the prosecutor explained how a capital trial would proceed, he asked Juror 162 if she thought that she could be fair and impartial in the guilt part of the case, and she said, "Definitely." *Id*. at 124. The prosecutor next explained some of the aggravating circumstances she would hear in penalty and asked if she could keep an open mind and consider that evidence in sentencing. Juror 162 stated unequivocally, "Yes." *Id*. at 125. He then explained that the defense may present mitigating evidence,

> such as the defendant grew up in an incredibly chaotic
> environment, he was abandoned by both of his parents as a child,
> and may have been subject to different types of abuse, physical
> and otherwise. You may also hear that the defendant suffered and
> took drugs and alcohol as an adolescent and as a young man. You
> may also hear evidence that the defendant may have been
> remorseful after the crime, and you may also hear evidence that the
> defendant has made efforts to rehabilitate himself in prison.

*Id*. at 125-26. The prosecutor then asked: "could you keep an open mind and listen to all those things as a juror in that second phase of the trial?" *Id*. at 126. Juror 162 again unequivocally replied: "Certainly." *Id*. Juror 162 further reaffirmed that she would listen to all the evidence and weigh it carefully. *Id.*

The prosecutor next told Juror 162 that she may hear evidence from psychologists and psychiatrists about the defendant's state of mind at the time of the crime, and asked if she "could keep an open mind to all that evidence?" *Id*. Juror 162 said "Yes." *Id*. Juror 162 further stated

that she could consider competing opinions by psychologists and psychiatrists and use her own judgment to determine which one was more credible. *Id.*

Last, the prosecutor asked Juror 162 if she could in fact vote for the death penalty, and she stated, "Probably." *Id.* at 127. Upon the prosecutor noting hesitation in her response, he asked, "Is there hesitation in your mind?" *Id.* Juror 162 responded, "Well, it's a hard thing to say that you would – but I could do that, yes." *Id.* The prosecutor clarified that he was not asking whether she would vote for death, but merely if she could vote for death if the Government met it's burden, and Juror 162 again responded: "I could do it." *Id.* at 128. The Government then ended its voir dire.

The defense was then given an opportunity to ask Juror 162 questions. Counsel began by asking Juror 162 if at the end of the case she could consider a life sentence. Juror 162 stated: "It's so hard because I haven't heard any of the evidence." *Id.* at 129. Counsel clarified that he was merely asking whether she could consider it, and Juror 162 unequivocally stated: "I could consider it, yes." *Id.* Counsel then again explained to Juror 162 how a capital case would proceed, and then asked Juror 162:

> assuming that you found Mr. Fell guilty of an intentional killing, as Mr. Kelly described to you – abduction of a woman, innocent woman, 53-year-old woman abducted, going to work, as innocent as could be, how she was abducted, drove, and then essentially stomped to death, brutally stomped to death –knowing that you would have already found him guilty of that intentional killing, then could you consider a life sentence for Donald Fell?

*Id.* at 130-31. Juror 162 replied:

> Well, not hearing what the evidence is, I could – I could make a decision either way. . . I guess that's the easiest way to answer that. But I haven't heard any evidence yet, so – I think what you are asking me, if I am capable of making a decision for life in

>prison or for the death penalty, without hearing the evidence? . . . I
>would be capable of either one, but naturally I would have to hear
>all the mitigating circumstances first.

*Id.* at 131.

Counsel next told Juror 162 that there would be evidence in the case that Fell abused

alcohol and drugs from a very young age, and asked her "whether [her experiences with her son]

in any way could affect your ability to consider that as one of the mitigating circumstances?" *Id.*

at 132.  Juror 162 initially stated that this was a "hard question" because "drugs and alcohol can

do a lot to you, yes, from my own personal experience with my son." *Id.*  Juror 162 added that er

son was rehabilitated through the correctional system, "which was the best thing that ever

happened to him." *Id.*  Counsel next asked whether "the opportunity that your son had, that was

provided through the Department of Corrections, something that you thought was significant?

*Id.*  Juror 162 responded, "Very significant." *Id.*  She explained that her son had "some tough,

tough learning things, tough things to go through to overcome his problem.  Id.  Counsel asked:

"What did it take him to get intervention?" Id. at 133.  Juror 162 stated: "It took corrections

coming to his house periodically.  It took going to meetings every week.  It took losing his

driver's license.  I mean it took a lot.  He hit the bottom before he went to the top, yeah." *Id.*

Counsel next asked Juror 162 about a series of mitigating factors, specifically, "lack of

people to care;" "lack of authority;" "little criminal history;" "remorse;" – all of which Juror 162

stated she would consider.  *Id.* at pp. 133-35.  Counsel also asked Juror 162 whether she would

consider the defendant's age, to which Juror 162 responded: "I don't know, truthfully ... you're

not a child anymore at 20." *Id.* at 135-36.  Juror 162 ended by stating that she was not sure if it

was more probable to sentence Fell to life because he was 20. Counsel then ended his voir dire. *Id*. at 136.

### 4. The Sworn Declaration

Juror 162 was interviewed five and half years later, on January 4, 2011, by members of Fell's 2255 team. Upon information and belief, Fell's counsel interviewed each and every juror in this case. According to all available information, Fell's 2255 team had no reason to suspect any juror misconduct by Juror 162 prior to her interview. On January 5, 2011, members of Fell's 2255 team returned to Juror 162's house and asked her to sign a Sworn Declaration, which she did.

In paragraph one of the Sworn Declaration Juror 162 states her name, address, the fact that she was a juror in the Donald Fell case and that the trial occurred in Burlington, VT. In paragraph two Juror 162 indicates that she spoke with Kathy Carter (Clerk's Office Juror Coordinator) to make sure it was alright to speak to Fell's 2255 lawyers. In paragraph three, Juror 162 indicates that she remembers seeing two members of the media in the courtroom, but the jurors did not speak to the media during the trial. She also stated that the hardest part of being a juror was not being able to speak to anyone about the case and affirmed that she in fact did not speak to anyone about the case, not even her husband. In paragraph four Juror 162 indicates that the jurors were hounded by the media after trial and that she spoke briefly with Brian Joyce, but did not say much, except that it was a very difficult process.

In paragraph 5 Juror 162 states that she thought the trial was "really fair" and that the lawyers on both sides did an outstanding job. In paragraph 6 Juror 162 indicates that she paid

close attention to "what was happening and the evidence." She did not pay much attention to what Donald Fell was wearing or if he had on shackles.

In paragraph 7 Juror 162 states that at trial they learned that Donald Fell was abused as a child and that his parents were alcoholics. Juror 162 then states:

> I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.

In paragraph 8 Juror 162 states that she did not like that Donald Fell bragged during the police interrogation that he "could have let her go." She added, that she feels confident about what they did in the case, "there were no doubts about whether he was guilty."

In paragraph 9 Juror 162 states that she did not hear or read about the case prior to trial. She added that the trial had a great impact on her. She used to be a fan of true crime novels, but could not go back to reading those novels for about a year. She also suffered from macular migraines after the trial and they took a long time to go away. "This is something you just never get over."

### 5.    The Juror Inquiry

Based on Juror 162's Sworn Declaration, Fell moved for post-conviction relief. Fell asserted that he had presented the fact that he had been sexually and physically abused as a child as a mitigating factor in the penalty phase of the trial. Fell claimed that Juror 162's failure to disclose the fact that she had been the victim of childhood sexual abuse prejudiced him and required a new trial.

The Government moved for summary dismissal of Fell's juror misconduct claims,

-19-

including, the claim raised against Juror 162 that she failed to disclose the fact that she had been the victim of a crime. The Government argued that it was reasonable for Juror 162 not to have recalled the fact that she had been the victim of sexual abuse when she completed the 34-page juror questionnaire as the conduct occurred more than 50 years prior to trial. The Government also noted that it was likely that Juror 162 did not consider herself a victim. In any event, the Government submitted, Fell suffered no prejudice because Juror 162, along with the other 11 jurors, all found that "Donald Fell was sexually and physically abused as a child." *See* Special Verdict Form, Dkt. 200, p. 13, Factor 12. Therefore, Fell's childhood sexual abuse had indeed been considered by the jury during their deliberations.

Notwithstanding, the Court denied the Government's motion for summary dismissal, stating: "The juror's statement, 'it didn't turn me into a murderer,' suggests that this juror might not have been able to fairly and impartially consider evidence of childhood sexual abuse as a mitigating factor in a capital trial." *See* Opinion and Order of May 10, 2013, Dkt. 368, pp. 8-9. The Court conducted a juror inquiry on August 15, 2013, to determine whether the juror's childhood experiences affected her impartiality at trial . *See* Opinion and Order of May 10, 2013, Dkt. 368, p. 9.

During the juror inquiry conducted by the Court, Juror 162, as she had previously done when interviewed by Fell's 2255 team, candidly admitted to the Court that she had in fact been sexually abused as a child. Juror 162, who is now 71 years old, and was 62 years old when she sat as a juror in Fell's trial, responded to the Court's questions as follows:

> **The Court**: So can you tell me, without getting into the details of the sexual abuse, just the nature of that relationship that you had with the stepfather and how long it lasted, et cetera?

**Juror 162**: Well, it didn't last very long.  I was very, very young, and just so you know, I am 71 years old.  So this happened to me when I was –

**The Court**: Well, you have me beaten by a few years.

**Juror 162**: Yeah.

**The Court**: Not many, but –

**Juror 162**: So this happened to me when I was a very young child.  I was adopted.  And, you know, there was no actual intercourse, but there was touching that was inappropriate, and of course, back in those days [1950s] they didn't speak about sexual abuse, and I was very, very young and really didn't even understand what was going on until I got older and then realized what had happened.  But –

**The Court**: How old were you when you realized this?

**Juror 162**: How old was I?  I was like eight or nine when this happened to me, but it wasn't an ongoing thing.  It was just once in a while, and – but as I said, it didn't – it wasn't a continuous thing.

**The Court**: Okay, have you received treatment for –

**Juror 162**: No, No.

**The Court**: -- anything related to that relationship?

**Juror 162**: No.

**The Court**: Okay.  You answered the question that you were not the victim of any crime.  Why did you do that?

**Juror 162**: Because I didn't connect it.  You know, this is something that I have never even thought about.  I mean, I went on and lived my life, never considered it.  I never thought about it.  And so when that question came up in – you know, I would attribute crime as having somebody hold a gun to my head or somebody stealing my purse or something of that nature.  It's just something that I never thought about.
…

**The Court**: But is there – is there some linkage in your mind, at least during the course of the trial, that your experience had some relevance?

**Juror 162**: No.  You mean the decision that I made?  No.

**The Court**: Well, not necessarily the decision, but as you are going through the trial –

**Juror 162**: No.

**The Court**: -- did it bring back memories?

**Juror 162**: No, no.  This is something I never think about.…

Transcript, August 15, 2013, pp. 98-101.

Juror 162 provided similar answers on cross-examination by Fell, *see Id.* at pp. 104-07; 113; and upon questions by the Government.  *See Id.* at pp. 183-85.  Indeed, in explaining that she just did not think of what happened to her in childhood as a crime, Juror 162 explained that she did not have a problem in disclosing what happened to her son, and remembered it because

he went to jail.

> **Juror 162**: Exactly. You have to understand the psychological, you know, part of it. It's just – at my age, it's just something that I just did not connect to that question as being a crime. My son, yes, he went to jail. You know, he was accused of domestic abuse and convicted of it and went to jail. My father was not convicted of any crime, and I – I have not considered myself a victim in all these years, and I did not connect that question.

*Id.* at 114.

### B.    Juror 143

#### 1. The Short Questionnaire

Juror 143 is a Northfield, Vermont, man who since 1992 has worked as a biologist for the Vermont Agency of Transportation. In 2005 he also worked two nights a week at the Price Chopper grocery store in Berlin, Vermont. In his short questionnaire, Juror 143 listed as hobbies "fishing, hunting, bicycling, hiking."

#### 2.    The 34-page Questionnaire

In his long questionnaire, Juror 143 stated that he did not read the newspaper; he watched the History and Discovery Channels on television. In response to Question 47, inquiring as to familiarity with Rutland, he wrote "I've had many projects in and around the Rutland area for the VT Agency of Transportation."

Juror 143 stated that he "generally favored" the death penalty, but "would base a decision to impose it on the facts and the law in the case." (Q. 61) He explained that "The crime must be severe and the evidence clear. It's a very serious matter and would need to be based on measurable facts and not speculation. It's not to be taken lightly." (Q. 56) He added that he would, "need to evaluate the facts presented before reaching a final decision." (Q. 64) As to

Question 65, inquiring as to the kinds of murder for which Juror 143 would consider the death penalty, he wrote, "Pre-meditated, brutally violent or multiple victims."

### 3.     The Individual Voir Dire

At voir dire on June 1, 2005, Juror 143 affirmed that he would "be open to consider all of the circumstances." Tr., p. 15. He added several times that there would have to be "no doubt about it" to impose the death penalty. *Id.* at 15-16. After the Court explained the concept of impartiality, and the need for a juror to be able to balance all of the facts and circumstances, Juror 143 several times reiterated that he thought that he could be impartial. *Id.* at 18-19, 21. When the Court asked about the types of cases that would warrant the death penalty, he mentioned "the Oklahoma City bombing. . . . Where things are extremely heinous, premeditated, you know . . . maybe even a serial killer." *Id.* at 20.

In response to questions by the Government, Juror 143 repeatedly stated that he would "keep an open mind" and consider all the circumstances. *Id.* at 25-27. During questioning by Fell's attorneys, Juror 143 was asked whether, in a case involving "brutal, premeditated killings of three people . . . including one woman who was completely innocent . . . and brutally murdered," he would go into the penalty phase "leaning in favor of the death penalty." The juror responded, "No. No, I definitely am a case-by-case person." *Id.* at 35. Counsel then asked if evidence of significant childhood abuse, and "physical, psychological, sexual abuse," was the type of evidence that Juror 143 would consider in mitigation. He responded, "certainly." *Id.* at 35.

Based upon the foregoing, including Juror 143's Questionnaire and his answers on voir dire, he appeared to be a model juror for the 2005 trial. Neither party challenged him.

4.        The Sworn Declaration

The 2011 Petition alleges that during trial Juror 143 violated the Court's explicit

prescription against extraneous evidence, by going to Rutland and inspecting the exterior of the

Robbins Street apartment where Fell and Lee murdered Debra Fell and Charles Conway, and the

area outside the Price Chopper store where Fell and Lee car jacked and kidnaped Terry King.

The petition alleges that Jury 143 obtained significant extraneous information at both locations,

which he shared with other jurors so as to corrupt deliberations. Petition at 330-37. In addition,

the Petition asserts that Juror 143 coerced another juror's vote. During deliberations, the Petition

contends, when a female juror observed that Fell's shotgun was unloaded when Fell and Lee

used it to confront King, Juror 143 pointed the unloaded shotgun at the juror to demonstrate that

it was frightening even though the juror knew it was unloaded (and King did not know it was

unloaded). *Id*. at 338-340.

Exhibit 241 to the Petition, Juror 143's written statement, generally reflects conscientious

trial participation, and indicates that the case made him "more compassionate and involved" in

his community.  ¶ 1 ("I watch the news a lot now, and keep a watch on the kids in my

neighborhood"); ¶ 6 ("we took our role as jurors very seriously," etc.).  Paragraphs 5 through 9

of the 13-paragraph sworn statement contain Juror 143's description of the jury's deliberations.

Paragraph 5 reads:

> In making our decision, we were like racehorses, 18 conversations going at once.  We
> were going at each other and then we just sorted it out and it was clear, like that.  There
> was not a lot of disagreement about the guilt, there was no doubt that he did it.  We
> discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the the
> trip to Rutland during the trial when I looked at the mother's house on Robbins Street and
> the Price Chopper.  The mother's neighborhood wasn't great, but it was okay.  The house
> was decent.  She was just trying to live her life.  I told them about the Stewart's dumpster
> next to the Price Chopper where I think Fell threw the knife into the dumpster in the

parking lot.  After the trial I drove to New York on my motorcycle.  I recognized the spot [where Terry King was killed] from the photos and I felt a really negative energy while I was there.  The lighting of the Price Chopper in Rutland was weak.  At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit.  It isn't expensive to get better lighting.  They should do that.

*Id*.

Fell contends that Juror 143's reference to a "trip to Rutland during the trial," the "okay" Robbins Street neighborhood, and the "weak" lighting at the Price Chopper, constitutes prejudicial extraneous evidence that subverted jury deliberations.

Finally, Exhibit 241 states in paragraph 8 that:

A female juror pointed out that the shotgun was not loaded.  The Marshal then b[r]ought in the gun.  We showed the jury that it was unloaded.  I also made sure that the gun was unloaded.  This was important to me because as a hunter, I am very serious about gun safety.  I cocked and pointed it a[t] her and she squirmed.  I said, "that's what they did, you were scared even though you knew it wasn't loaded."

*Id*.

### 5.    The Juror Inquiry

At the August, 2013 hearing, Juror 143 denied inspecting Rutland crime scenes during trial.  Transcript, pp. 26-27; 44; 50-52; 68-69; 87.  He conceded that he, "probably went through Rutland for the job" during 2000-05,  but "didn't go investigating anything [for the trial]." Transcript at 85.  As part of Juror 143's work for the Agency of Transportation, he had "projects all over the state," including "numerous projects in and around the Rutland area."  Transcript at 41; *see also* 26 ("I'm very familiar with that whole downtown area"); 69 ("very familiar with Rutland").  It was in late 2010 – not mid-2005 – that Juror 143  took a newly acquired motorcycle on what he called his "trial tour" to inspect the Rutland and Dover Plains, New York, crime scenes.  *Id*. at 27.

Juror 143 testified in August that it was trial evidence upon which he based his understanding of the weak November, 2000, lighting at the Rutland Price Chopper, and his understanding of Fell's route from Robbins Street to the Price Chopper. The former was gained from trial testimony of "the bread truck . . . delivery guy" (Joseph Trepasso), Transcript at 45, 52, 57, and the latter was based upon an "aerial photo" of the area (the kind which he sees "every day in my job"). *Id*. at 56-59.

Also at the August, 2013 hearing, both Juror 143 and Juror 162 denied that Fell's shotgun was in the jury deliberation room. *See* Transcript at 81 (Question to Juror 143: "Was there a shotgun in the jury room?" Answer: "No"), 198 (Question to Juror 162: Do you remember seeing a firearm in the jury room?" Answer: "I never saw a firearm in the jury room, no").

    C.    <u>Juror 26</u>

        1.    <u>The Short Questionnaire</u>

Juror 26 completed a short 2-page questionnaire where he indicated his name, town of residence, age, level of education, current occupation, current and previous employer, place of birth, number of children, whether he had ever worked for the federal government, spouse's occupation and employer, and children's employment. The short questionnaire also asked whether the juror, any relative or person close to him had ever been the victim or witness to a crime, or been a complainant in a criminal case and he indicated no. It also asked whether the juror, any relative or person close to him had been accused of a crime and Juror 26 indicated no. Juror 26 also informed that in his spare time he practices hunting, camping, fishing, gardening and snow machining. Juror 26 was asked whether he or anyone close to him had been a plaintiff or a defendant in a civil suit and he responded no.

2.    34-Page Questionnaire

Juror 26 also completed the Court's 34 page questionnaire.  In part I he provided information about his background, i.e, name, address, age (Juror 26 indicated that he was 50 years old (Q. 8)); where he was raised; level of education; whether he was married and for how long; his ethnic background; place of employment and work description, previous employment; combined income; whether he or any friend or relative had a law-related job; whether he had ever worked for the government; employment of his spouse; number of children, ages, level of education and employment; whether he had any military service; whether he participated in groups that took positions on social or legal issues; and whether she, a relative or close friend was a member of the police, attended law school (to which he said yes, Q. 27), practiced law or owned guns (to which he said yes, three hunting rifles and three handguns, Q. 28).

Juror 26 further indicated that he rarely read books and if he did they were "how to manuals" (Q. 29); he watched the weather channel (Q. 30); and enjoyed camping, hunting and fishing in his spare time (Q. 33).

Part II of the 34-page questionnaire asked Juror 26 to provide information about his experiences and beliefs.  He responded no to each question, including Question 43(b), which asked whether he, a family member or close friend been charged with a crime.

Part III of the 34-page juror questionnaire asked Juror 26 a series of questions relating to a number of legal principles relevant to a criminal case, including the presumption of innocence, the defendant's right not to testify; the jury's duty to consider each crime separately; the need to evaluate the testimony of law enforcement officers fairly; evidence resulting from searches or tape recordings; and the jury's duty to follow the law as stated by the Court.  Juror 26 was asked

whether he would have any difficulty following the rules stated and he answered no in each instance.

Part IV of the 34-page questionnaire informed Juror 26 that the Government was seeking the death penalty and that if the defendant was found guilty it would be for the jury to decide whether he should be sentenced to death. Juror 26 was then asked several questions regarding the death penalty. Question 56 asked Juror 26 to describe his views on the death penalty. Juror 26 stated: "It would depend on the different factors in the case." On a scale of one to ten, Juror 26 stated that he would place his opinion about the death penalty at a 5. (Q. 57) He also indicated that he had never held a different view of the death penalty. (Q. 58)

Juror 26 further indicated that his views on the death penalty were not so strong that they would prevent or interfere with his ability to perform his duties as a juror in accordance with his oath and that he could make the decision of whether a defendant should live or die. (Q. 59 and 60) Question 61 asked Juror 26 to check the sentence that best described his view of the death penalty and Juror 26 checked the following:

> I have no opinion either for or against the death penalty, and I
> could base a decision to impose it based on the facts and the law in
> the case.

Juror 26 indicated that he would not hold the Government to a higher standard of proof than proof beyond a reasonable doubt and the question of punishment would not enter his deliberations on guilt or innocence. (Q. 62 and 63) Juror 26 also stated that he would not always vote for the death penalty, nor would he always vote for life. (Q. 64) He explained further: "It depends on the factors in the case."

Question 65(a) asked what kind of murder cases he thought that the penalty of life

imprisonment without parole was appropriate and he indicated: "non premeditated, unvisious." Question 65(b) asked in what kind of murder cases he thought that the death penalty was appropriate. Juror 26 indicated: "premeditated, tortuous situations." Question 66 asked whether the juror or an immediate family member or close friend ever belonged to an organization that opposed the death penalty and Juror 26 stated no. Question 67 asked whether his beliefs about what the law was or should be regarding the death penalty would make it difficult to follow the Court's legal instructions and Juror 26 stated no.

Part V of the 34-page questionnaire asked several questions concerning the media. Question 68 asked whether he had read anything about death penalty cases in the last year. Juror 26 stated no. Question 69 asked whether he had watched any television programs or movies regarding the death penalty or death penalty cases and he stated no. Question 70 asked whether he had read any articles about the instant case and he stated no. Juror 26 was asked whether he had signed a petition seeking to establish the death penalty in the State of Vermont and he stated no. (Q. 71) Question 72 asked whether there was anything about the charges or the facts of the case that would affect his ability to be a fair and impartial juror and he stated no.

Question 73 asked for his opinion about the fields of psychology and psychiatry and the ability of such persons to identify and explain reasons for human behavior. Juror 26 stated: "I believe there are different forms of mental health. It would depend on the testimony."

Part VI asked whether Juror 26 wanted to be excused for serious hardship and he stated no.

### 3.    The Individual Voir Dire

On May 3, 2005, Juror 26 was summoned for individual voir dire.  The Court began by asking him if he had heard anything about the case and he stated no.  Tr. at p. 87.  The Court then asked Juror 26 if he knew any of the facts at all?  Juror 26 stated: "No.  I think at one point, a long time ago, I heard something in passing, but other than that, no."  *Id*.  The Court asked if he remembered what he heard, and Juror 26 stated: "That just that a woman had been kidnapped, and that was the only thing that I, I can recall."  *Id*.

The Court then asked Juror 26 to describe his views on the death penalty.  Juror 26 stated:  "Well, I think it depends on the severity of the crime.  It's something that – if a person was brutally murdered, I would consider it."  *Id*. at 87-88.  The Court next asked in what kinds of offenses he would consider the death penalty appropriate, generally speaking.  *Id*. at 88.  Juror 26 stated: "Well, if someone stalked another person, and intended to kill them, that would be a plus on that side.  Mainly it's the brutality of it."  The Court then asked what sort of things Juror 26 would want to know before deciding whether or not to impose the death penalty or life imprisonment.  Juror 26 stated he'd want to know the circumstances around what happened, how it happened.  He again stated that the level of brutality would be important, whether it was done viciously.  *Id*.  The Court then asked what he would like to know about the defendant.  Juror 26 stated that he would like to know their mental state and what was going on in their lives.  *Id*. at 88-89.

The Court then explained the capital sentencing process and asked if he thought he would have any difficulty in doing that kind of analysis, and Juror 26 stated no.  *Id*. at 89.  The also asked whether Juror 26 thought he could be fair to both sides, and he said he could.  *Id*.  Last, the

Court asked whether there was anything in his personal or professional life that would make it difficult for him to serve on the jury, and Juror 26 stated no. *Id*. at 90.

The prosecutor then again explained how a capital case would be handled, and asked Juror 26 if he believed he could be fair and impartial in the first part of the case, the guilty phase, and he said yes. *Id*. at 92. The prosecutor then explained the second phase, the penalty phase, and some of the aggravating factors that Juror 26 might hear about, and asked if he could hear the evidence with an open mind and he said yes. *Id*. at 93. The prosecutor asked whether those were factors he could weigh in favor of the death penalty and Juror 26 stated: "Well, you need to know all the facts in order to make a decision like that." *Id*. The prosecutor then explained some of the mitigating factors Juror 26 may hear, including the fact that Fell grew up in a chaotic background as a child; that he was abandoned by one or both of his parents; that he was subject to abuse; and that he used alcohol and drugs as a youth, and asked whether Juror 26 would keep an open mind and consider that? Juror stated unequivocally that he would. *Id*. at 94. When the prosecutor asked whether there was anything that jumped out at Juror 26 as being "super important," Juror 26 stated: "No. I would just rather hear everything so that I could make a fair decision." *Id*. at 94.

Juror 26 also stated that he was confident he could weigh expert mental health testimony. *Id*. at 96. The prosecutor also asked whether Juror 26 thought that the death penalty should be imposed more or less often, and Juror 26 again stated that it would depend on the severity of the murder. *Id*. "[I]f it was found that they did murder someone, and it was very malicious, then I think it should be." *Id*. Juror 26 also stated that he would listen to the judge's instructions, would follow the law carefully, and would weigh everything in his determination. *Id*. Last, the

prosecutor asked whether Juror 26 could sentence the defendant to death if the government met its burden, and he said yes. *Id.* at 97.

Defense counsel asked Juror 26 about someone he knew who went to law school, and Juror 26 stated that his nephew would be graduating that year. *Id.* at 97-98. Counsel next asked Juror 26 how mental health would influence the case, and Juror 26 stated that it would depend on the evidence, and how severe it was. *Id.* at 99. Counsel explained to Juror 26 that he may hear mental health experts talk about how his environment (Fell's), how he developed and made choices in the future. Juror 26 stated that he would consider that evidence. *Id.* Juror 26 also stated that he would consider the defendant's background; and whether he expressed remorse. *Id.* at pp. 100-101. Counsel then asked Juror 26 what he considered to be a brutal murder and Juror 26 stated that if someone was treated viciously, and was begging for their life, but was murdered. *Id.* at 101. Counsel then asked Juror 26 that if that was what happened in the case, would that cause him to disregard mitigation evidence, and Juror 26 stated that he would have to hear everything. *Id.*

4.      The Juror Inquiry

In his 2255 Petition Fell alleged that Juror 26 failed to disclose a misdemeanor conviction for unlawful mischief, which took place approximately ten years prior to trial. Based on this information Fell claim he was entitled to post-conviction relief. Upon information and belief, Fell interviewed Juror 26; however no sworn statement by Juror 26 was submitted in support of his Petition. The Court summoned Juror 26 to testify on September 27, 2013.

The Court advised Juror 26 that he had been asked if he had any criminal convictions, and he said no. Tr. September 27, 2013, p. 4. Juror 26 stated:

> I think it – it was a long time ago, but I think you're right, yes.  I didn't.  I – I
> didn't think that I had  – well, I didn't think they were serious enough to be like –
> I didn't think of it as any more than a speeding ticket or, you know –

*Id*. at 4-5.  Upon questioning by the Court, Juror 26 stated that he had a DWI and an unlawful

mischief misdemeanor conviction for cutting a phone line.  *Id*. at 5.  Regarding the unlawful

mischief, Juror 26 explained that he and his wife had a falling out and they separated.  He was

unemployed and was worried about his wife running up the phone bill.  *Id*. at 5-7.  Therefore, he

went to his property and cut the phone line to the house, which he himself had installed.  *Id*.  His

wife filed a complaint and Juror 26 was issued a citation.  *Id*. at 7.  He informed that he went to

court with photographs of the location of the phone lines and the case was dismissed.  *Id*. at 8.

But then his wife filed a second complaint against him.  *Id*. at 9.  It is unclear what the ultimate

charges were, but Juror 26 implied that they had to do with the fact that he ran the phone lines to

his house himself from the telephone company lines.  *Id*. at 9-10.  In any event, in order to put a

stop to the situation and avoid further problems, Juror 26 paid a $100 fine.  *Id*.

The Court then asked Juror 26 when he was convicted for DWI, but Juror 26 could not

remember exactly, he stated that it had been in the 1990s.  *Id*. at 10.  He did explain that he was

supposed to spend the night at a friend's house, but started drinking before he got there, "I didn't

have a lot, but I had enough so that I got caught ..." *Id*.  He was charged in the State of New

Hampshire with DWI.  Juror 26 was found guilty of DWI, paid a fine and had his license

suspended for 180 days.  *Id*. at 11-12.  The Court then asked why he did not inform of his DWI

conviction when he was asked if he had any criminal conviction, and Juror 26 stated: "No, I

really didn't think about it at the time." *Id*. at 12.

The Court also reminded Juror 26 that he was asked some questions about whether he

knew anything about the case in advance, and asked Juror 26 what he had heard about the case prior to trial. *Id*. at 12-13. Juror 26 stated that he did hear something "about the other guy – who – who – who committed suicide in jail, but it didn't mean anything to me, and I never put two and two together. You know what I mean? I didn't know anything about it other than I knew it happened." *Id*. at 13. Juror 26 was not sure if he heard the information on the radio or television, and he didn't know at the time that this person was connected to Donald Fell. *Id*. at 14. "[H]e was apparently with Don – Mr. Fell at the time, but I didn't know that until later when I got picked for jury." *Id*. Juror 26 heard the information "quite a while before" trial. *Id*.

When the Court asked Juror 26 whether he remembered that he heard this information fairly clearly, he stated: "I don't know. The reason that I remember today is that – is because I have been asked about it a lot. Other than that, I wouldn't have – I don't remember his name." *Id*. at 14-15. The Court asked Juror 26 whether he remembered being asked during voir dire if he knew anything about the case, and Juror 26 explained that he didn't know at the time that he knew something because he did not yet know that there was a connection between what he heard and the trial. *Id*. Later during the trial when he learned that this other person was involved, he realized that he had heard that he had committed suicide. *Id*. at 15-16. The Court asked Juror 26 when he realized that this information was relevant, but Juror 26 indicated that "I never thought that it was that relevant other than – because he wasn't on trial, and he was actually passed away." *Id.* at 16.

After a brief recess, the Court again asked Juror 26 about what he had heard, and Juror 26 again explained that some time during the trial, when the co-conspirator's name was mentioned, he thought to himself that he had hear that name before, and later realized that it was the person

he had heard committed suicide. *Id*. at 28. The Court then asked Juror 26 why he thought that this was important, and he again stated: "No, I didn't at the time think it was important to anything." *Id*.

On cross-examination counsel asked Juror 26 whether he had been charged with a third misdemeanor offense back in the 1990s, and Juror 26 said he did not remember. *Id*. at 30. Counsel then asked whether it wasn't correct that he was charged with the non-payment of wages, and Juror 26 stated: "Oh, yes." *Id*. When asked to explain, Juror 26 stated that it lasted for years. *Id*. He indicated that he was a contractor and that it was his practice not to pay the people he hired to work with him until all the work was done. But he had one worker who insisted on getting paid earlier and for more work than he had actually completed and he refused to pay. *Id*. at 30-31. Juror 26 said he was willing to pay for the work he had done, but no more. The worker filed a criminal complaint. *Id*. at 31. Juror 26 could not remember exactly the amount of wages the worker claimed he owed him because it was a long time ago. *Id*. The charges dated back to 1992, 13 years prior to the Fell trial. *Id*. at 42. Juror 26 stated that it was a misdemeanor offense, that he fought it for a long time because he felt he had done nothing wrong, that he was found guilty and he agreed to pay the worker $1200. *Id*. at 31-33. When asked if he recognized that this was a crime he was charged with, Juror 26 testified that he understood that after he paid the money to the worker, the incident would not be reflected on his criminal record. *Id*. at 32. Juror 26 did not mention this incident during voir dire because he did not think it was important. *Id*. at 33.

**MEMORANDUM OF LAW**

"[P]ost-conviction relief on collateral review is an extraordinary remedy," *Singleton v. United States*, 26 F3d 233, 236 (1st Cir. 1994), and is limited to those rare occasions where a petitioner can establish a "fundamental defect which inherently results in a complete miscarriage of justice," "an omission inconsistent with the rudimentary demands of fair procedure," or, as Fell claims here, a constitutional error. *Hill v. United States*, 368 U.S. 424, 428 (1962); *United States v. Addonizio*, 442 U.S. 178, 185 (1975).[2]  The petitioner bears the burden of establishing his entitlement to relief. *David v. United States*, 134 F.3d 470, 474 (1988).  Moreover, "errors warranting a reversal on direct appeal will not necessarily support a collateral attack." *Knight v. United States*, 37 F.3d 769, 773 (1st Cir. 1994); *see also United States v. George*, 676 F.3d 249, 258 (1st Cir. 2012) ("[T]he further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment. Thus, direct review is more defendant-friendly than post-judgment review * * *.").

    A.    <u>A defendant is entitled to a fair and impartial jury</u>.

The Sixth Amendment guarantees that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI.  The protections of the Due Process Clause of the Fifth Amendment also have "long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v.*

---

[2] Relief is also available when the district court was without jurisdiction or the sentence exceeded the statutory maximum – both inapplicable here.

*Illinois*, 504 U.S. at 727.  The voir dire process serves to protect that right because it "provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently."  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994).

"One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).  *See also United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006); *United States v. Nelson,* 277 F.3d 164, 201 (2d Cir.2002).  "[A] party moving for a new trial based on juror nondisclosure or misstatements" must satisfy a two-pronged test: (1) "the party must show that a 'juror failed to answer honestly a material question on *voir dire;*' "and (2) "the party must show that 'a correct response would have provided a valid basis for a challenge for cause.' " *United States v. Greer,* 285 F.3d 158, 170 (2d Cir.2002) (quoting *McDonough,* 464 U.S. at 556).  This is no small feat.  The Second Circuit has never found reason to overturn a verdict on the basis of juror nondisclosure under *McDonough* and only once, *see United States v. Colombo,* 869 F.2d 149 (2d Cir.1989), has remanded for an evidentiary hearing on the matter.  *See Stewart*, 433 F.3d at 303.[3]

---

[3] In *Colombo,* a district court's decision to refuse Rule 33 relief on the basis of alleged false *voir dire* responses was vacated and the case was remanded for an evidentiary hearing. *Colombo,* 869 F.2d at 150.  But the alleged false responses asserted by Fell differ significantly from the ones at issue in *Colombo.*  There, the defendant's Rule 33 motion was supported by an alternate juror's affidavit, which stated that one of the jurors (i) confided that she failed to disclose that her brother was a government attorney because she feared the relationship would make her ineligible to serve on the jury and (ii) asserted familiarity with one of the conspirators' meeting places as a "hang out for gangsters." *Id.*  In *Colombo,* "it was not simply that the lies in question were deliberate, but that *the deliberateness of the particular lies evidenced partiality.*" *Greer,* 285 F.3d at 172-73 (discussing *Colombo*).  Thus, where the *Colombo* affiant specifically asserted that the juror admitted not only concealment, but concealment of facts from which specific bias could

-37-

In *McDonough*, a products liability tort case involving a boy injured by a lawnmower, the court asked the venire whether they or any member of their families ever suffered an injury "that resulted in any disability or prolonged pain and suffering." *Id.* at 555. The juror at issue did not respond, but after the trial the respondent discovered that the juror's son was severely injured by an exploding tire. *Id.* The respondent requested a new trial based on that new information. *Id.* at 549. The Court found the juror's lack of response to the question was not based on his dishonesty, but instead on the lack of specificity in the *voir dire* question. *Id.* at 555. The Court recalled other jurors' responses to the question and concluded the venire was confused on what constituted a "disability or prolonged pain and suffering." *Id.* The Court held the juror's response to the ambiguous question was accurate, and therefore, denied the request for a new trial. *Id.* at 556.

Challenges for cause are generally based on actual bias, implied bias, or inferable bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Actual bias is bias in fact. *Id.* Implied bias is bias presumed as a matter of law. *Id.* at 45. "In contrast to the inquiry for actual bias, which focuses on whether the record at *voir dire* supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced." *Id.* The Second Circuit has cautioned that "automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself." *Id.* "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the

be inferred, the alleged lies, if established, would demonstrate both dishonesty and partiality and would satisfy both prongs of the *McDonough* test. *Id.* That is not the case here.

juror for cause, but not so great as to make mandatory a presumption of bias." *Id*. at 47.  As with

actual bias, "the judge's determination [of inferred bias] must be grounded in facts developed at

*voir dire*." *Id*.

## ARGUMENT

I.      Fell Has Failed to Establish Any Juror Misconduct That Warrants Post-Conviction Relief

Fell claims that juror misconduct warrants the reversal of his death sentence.  He argues

that both jurors 162 and 26 failed to disclose information that would have subjected them to a

challenge for cause.  In addition, Fell claims that jurors 143 and 26 were exposed to extrinsic

information that was considered by each during jury deliberations, causing him prejudice.  Fell

has failed to establish any of his claims.

A.      Fell's Juror Misconduct Claims Are Barred by the Procedural Default Doctrine.

The procedural default doctrine generally bars consideration on collateral review of any

claim that the petitioner failed to raise during the criminal case.  Fell did not raise a juror bias

claim during his trial or on direct appeal, nor did he raise it in a Rule 33 motion.  Each of the

juror misconduct claims raised by Fell in his 2255 Petition years after trial could have been

raised either prior to trial, or in a post-trial motion or on direct appeal.  Without conceding the

appropriateness of the action,[4] Fell could have interviewed Jurors 143 and 162 after trial and

_____

[4] *See United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989) ("post-verdict inquiries may
lead to evil consequences:  subjecting juries to harassment, inhibiting jury room deliberation,
burdening courts with meritless applications, increasing temptation for jury tampering and
creating uncertainty in jury verdicts. This court has consistently refused to allow a defendant to
investigate 'jurors merely to conduct a fishing expedition.'")

learned the information he now submits in support of his claim.  Moreover, Fell could have certainly ran the criminal record of Juror 26, before, during or after trial.  While Fell presumably would argue that he had no obligation to search for information about jurors, this is precisely what he did, years after the judgment became final.

The Court notes that juror misconduct claims, like ineffective assistance of counsel claims, "may be poorly suited to resolution on direct appeal."  Opinion and Order of May 10, 2003, Dkt. 368, p. 4.  Respectfully, while this may at times be true, it is not always the case.  A defendant has a duty to investigate.  *Cf. Williams v. Taylor*, 529 U.S. 420, 443 (200) (cause shown where juror and prosecutor failed to disclose information) and cases cited by Court.  It is clear that the bulk of the claims of juror misconduct raised by Fell in his 2255 Petition were the result of juror interviews conducted by counsel with no motive whatsoever, but to try and uncover anything that would serve as a basis for a juror misconduct claim.  Certainly counsel could have done this earlier in the trial.  As he could have ran the record of Juror 26 to ascertain whether or not he had a misdemeanor conviction.  Unlike the average defendant, Fell, as a capital defendant, was granted a jury consultant who was available to uncover information favorable to Fell during the jury selection process.  Certainly running a juror's name through different computer programs to uncover useful information was part of the assistance provided.  Unlike potential ineffective of counsel claims, trial counsel would not have been inhibited in anyway from investigating and asserting juror misconduct claims.

Furthermore, Fell does not establish that his claims fall within an exception to the procedural default doctrine.  He has not shown his innocence, nor has he demonstrated cause and prejudice for his omission of this contention from earlier proceedings.  *See Schlup*, 513 U.S. at

321; *Wainwright*, 433 U.S. at 84.  The cause and prejudice doctrine requires proof of both cause

and "actual prejudice."  *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011), *petition for*

*certiorari filed*  (May 31, 2012) (No. 11A946, 12-5015).  To establish "actual prejudice," a

prisoner must show "not merely that the errors at * * * trial created a possibility of prejudice, but

that they worked to his actual and substantial disadvantage, infecting his entire trial with error of

constitutional dimensions."  *Frady*, 456 U.S. at 170.  It is a standard more demanding than that

for plain error.  *Ramirez-Burgos v. United States*, 313 F.3d 23, 32 n.12 (1st Cir. 2002).

Fell points to no factor external to the defense that prevented trial counsel from raising

his juror misconduct claims.   Further, he cannot show "by clear and convincing evidence that

but for a constitutional error, no reasonable juror would have found the petitioner eligible for the

death penalty."  *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).  Having failed

to raise these issues before, Fell cannot obtain collateral relief based on the contention that jurors

engaged in misconduct.

In any event, none of the claims set forth by Fell herein have any merit, and thus, do not

warrant post-conviction relief.

B.    No Juror Was Untruthful During the Course of Voir Dire in This Case

This Court conducted an extensive and thorough *voir dire* process.  Prior to the beginning

of *voir dire*, prospective jurors watched the Court's introductory video and filled out a 34-page

questionnaire.  The parties had the opportunity to review completed questionnaires in advance of

*voir dire*.  The Court then conducted a group *voir dire* to determine hardship.  Each prospective

juror was then individually questioned first by the court and then by attorneys for the parties.  In

addition, over the government's objection, the Court permitted case specific questions during

individual *voir dire*. *See Fell*, 372 F. Supp.2d at 770-71.

1.    Juror 162

a.    Fell has failed to establish that Juror 162 was untruthful.

A review of Juror 162's questionnaires reveal that she answered all questions posed to the best of her ability. Her answers taken together indicate that she could be a fair and impartial juror. Her responses during voir dire reaffirmed this conclusion. *See* Tr. August 15, 2013, p. 110 ("I did answer it [the questionnaire] honestly, yes.). *See also Id.* at 119; Juror 162 quickly grasped the complex issues that govern capital sentencing proceedings and demonstrated a sincere willingness to consider all evidence before reaching a decision. Notably, her responses in voir dire made clear that she would want to hear all evidence, particularly all mitigating evidence before reaching a decision. *Id.* at 117-18; 123; 131. They also made clear that Juror 162 would carefully weigh the evidence and would not take her responsibilities as a juror lightly. *Id.* at 122. She was asked several times whether she could fairly and impartially consider the evidence presented and she unequivocally responded yes. *Id.* at 116-17; 120; 125-26. Moreover, during the juror inquiry Juror 162 stated firmly that she had indeed been fair and impartial in considering the evidence.

> Q. And do you recall that he wanted to know if you could be fair and impartial when considering this kind of evidence, and you said that you could.
>
> A. That's correct, and I was.

*Id.*

Fell claimed in his 2255 Petition that Juror 162 purposely failed to disclose that she was sexually abused as a child during *voir dire*. According to Fell, she should have provided this

information in response to question number 38 of the juror questionnaire. Question 38 asked: "Have you or has a family member or close friend ever been a witness to or the victim of a crime?" Juror 162 marked "No" in response. During a post-conviction interview conducted by counsel, juror 162 was asked about her deliberative process and her reasons for voting for death. She responded as follows:

> At trial we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.

P. Exhibit 280 at 2-3, Fell-00002580-2581.

The Government argued that Juror 162's Sworn Declaration was insufficient to establish a claim of juror misconduct as it did not establish that Juror 162 purposely withheld any material information. In fact, it was rather unlikely given that she had freely discussed her childhood sexual abuse with 2255 Counsel. Moreover, it was reasonable for Juror 162 not to have remembered an experience that happened more than 50 years prior to trial when she completed the juror questionnaires. In addition, it was likely that Juror 162 did not consider herself a victim.

Following the juror inquiry, it is now pointedly clear that Juror 162 did not intentionally conceal her childhood sexual abuse when she completed her juror questionnaire. Indeed, Juror 162 quite candidly discussed with the Court and with counsel he childhood sexual abuse and stated that she simply did not think of it when she was completing the questionnaire.

> I didn't connect it. You know, this is something that I have never even thought about. I mean, I went on and lived my life, never considered it. I never thought about it. And so when that question

> came up in – you know, I would attribute crime as having
> somebody hold a gun to my head or somebody stealing my purse
> or something of that nature.  It's just something that I never
> thought about.  You know, I mean, I had a lot of other things
>
> happen to me.
>
> I think what happened to me about my husband being burned to death
> and having a three-month-old child affected me much more than what – you
> know, what this ever did.

Tr. August 15, 2013, p. 99-100.  *See also Id.* at p. 113-14.  There was no purposeful or

intentional withholding of information by Juror 162, she simply did not think of her childhood

sexual abuse, which took place more than 50 years prior to trial, when completing her juror

questionnaire.

> I did not connect what happened to me as being a crime.  And
> because I disclosed my son, that should prove to you that – I didn't
> say it about myself and I did about my son, that it was not
> intentional – I wasn't intentionally lying or intentionally trying to
> withhold information. . . . My son, yes, he went to jail.  You know,
> he was accused of domestic abuse and convicted of it and went to
> jail.  My father was not convicted of any crime, and I – I have not
> considered myself a victim in all these years, and I did not connect
> that question.

*Id.* at 113-14.

Moreover, the Court specifically asked if her childhood experiences had come to mind

during the Fell trial, and she unequivocally stated no.

> **The Court**:  But is there – is there some linkage in your mind, at least during the
> course of the trial, that your experience had some relevance?
> **Juror 162**:  No.  You mean the decision that I made?  No.
> **The Court**:  Well, not necessarily the decision, but as you are going through the
> trial –
> **Juror 162**:  No.
> **The Court**:  -- did it bring back memories?
> **Juror 162**:  No, no.  This is something I never think about.… I just didn't connect
> it.

Transcript, August 15, 2013, pp. 98-101. The Government asked Juror 162 again whether her childhood experiences had come to mind during the course of the trial, and Juror 162 again unequivocally stated no.

> **Prosecutor**: ... As you sat through the trial of Donald Fell and you listened to the evidence and you listened to the argument of counsel , those experiences that you had undergone when you were a child never came to your mind. . . .
>
> **Juror 162**: No, my experiences didn't, no.

*Id*. at 186. Juror 162 further asserted that despite her childhood experiences, she listened to the evidence fairly and impartially. *Id*.

Juror 162's responses were more than reasonable given that the conduct at issue took place more than 50 years before trial. In addition, no one was arrested or prosecuted for the sexual abuse that Juror 162 experienced, nor was the conduct reported at the time to anyone of authority. Tr. at p. 182-84. Juror 162 never spoke to anyone, other than a neighbor about it, and that neighbor took no action. *Id*. at 184. As she stated during the juror inquiry, sexual abuse was simply not discussed or talked about when she was a child, *id*. at 99, which would have been the mid 1950s. As a result, she did not consider herself a victim. *Id*. at 100; 114.

> **The Court**: To what extent did this experience, being abused, sexually abused by a stepfather, impact your life?
>
> **Juror 162**: I don't think it did. I think I forgot about it. <u>I never considered myself a victim</u>. It's just, I was so young. I mean, I went on and lived my life. There's so many different things that have happened to me in my life since then – I'm 71 years old – I never gave that – you know, I just – it's something you just don't think about.

*Id*. at 100 (emphasis added).

Further evidence that Juror 162 had no intent to withhold information is the fact that she unequivocally testified that had the questionnaire asked whether she had been the victim of sexual abuse, she would have responded yes. *Id.* at 185. The fact that she openly discussed her childhood experiences with 2255 counsel prior to an inquiry, and with the Court further supports the truthfulness of her response. If her past sexual abuse had been something that juror 162 had wanted to keep hidden she would not have spoken about it to defense counsel after trial. *See Id.* at 101. Instead, Juror 162 spoke openly to 2255 counsel about the trial, and even about her deliberative process. *See* Sworn Declaration, par. 7. Moreover, Juror 162 spoke to 2255 counsel again a couple of weeks prior to the juror inquiry of August 15, 2013. *See* Tr. at p. 102 (Counsel: Remember me? . . . We talked a couple weeks ago at your home. I thank you for welcoming us in and talking to us.). There is no allegation that Juror 162 was anything but forthcoming with counsel and with the Court.

Despite Juror 162's cooperation with counsel, her unequivocal answers, and notwithstanding the reasonableness of her explanations, Fell tried to impeach Juror 162's credibility by questioning Juror 162 about her interests on true crime novels and criminal trials, including the Michael Jackson trial, which involved allegations of child sexual abuse. *Id.* at pp. 119-125. The argument, presumably, would be that because Juror 162 read true crime novels and followed the Michael Jackson trial closely, her allegation that she did not remember her childhood sexual abuse when completing the juror questionnaire is not believable. Apparently true crime novels and 50-year-old childhood sexual abuse go hand in hand, so that answering questions on this subject must have certainly triggered memories of her childhood sexual abuse; however Juror 162 intentionally chose not disclose this fact.

Fell's cross-examination strategy defied logic. No one can say for certain what does and does not trigger childhood memories, particular memories that a person has purposely tried to put behind them. What triggers one person's memory may do nothing for another. This is why attorneys may use just about anything to refresh a person's recollection. The fact that Juror 162 read true crime novels or followed the Michael Jackson trial does not mean that either of these two things would necessarily trigger the memory of her childhood sexual abuse. People experience many different things during their lifetime. That they may not be able to recall them all at a specific moment in time does not mean that they are being untruthful.

Fell also contends that Juror 162 lied when she claimed that she forgot about her childhood sexual abuse. But Juror 162 never claimed to have forgotten about her childhood abuse, merely that she put it behind her so that it was not something she thought about. This in no way means that if specifically asked, she would not be able to recall what happened to her. Indeed, she testified that if the questionnaire had asked whether she had been the victim of sexual abuse she would have stated yes. *Id*. at 185.

Fell also attempted to impeach Juror 162's credibility by showing that she had failed to fully disclosed her son's criminal history. Question 43 asked if she, a relative or close friend had been charged with a crime. Juror 162 stated yes. Question 43(b) asked what was the result of the prosecution and she stated house arrest. She added that her son had been under the Department of Corrections for three years for DUI and domestic violence. Fell contends that Juror 162 knew that her son had additional criminal convictions and her failure to disclose her son's entire criminal record, which began 25 years prior to trial, shows that she was not truthful,

either when she answered her questionnaire or in voir dire.  In this regard, Fell's claim is not that Juror 162 failed to disclose material information, but that she did not disclose it completely.

First, nothing in the questionnaire required Juror 162 to summarize her son's entire criminal history, assuming that she could.  Juror 162 disclosed what she remembered at the time. *Id*. at 142, 149-50.  In fact, a review of her son's criminal record reveals that most if, not all of his offenses are related to his abuse of alcohol and domestic abuse, and took place more than a decade before trial.  Second, Fell failed to inquire further about her son's criminal record during voir dire.  Not a single question was asked during voir dire to ascertain the extent of her son's criminal conduct.[5]  Therefore, Juror 162 did not fail to answer any question on voir dire truthfully because no question was posed to her with regard to her son's record.[6]  *See United States v. Dall*, 970 F.2d at 969-70 (1st Cir. 1992) (jurors cannot be faulted for failing to disclose information for which they were never asked); *United States v. Aponte-Suarez*, 905 F.2d 483, 492 (1st Cir. 1990) ("Jurors cannot be faulted for failing to disclose ... since they were never asked during the course of voir dire to make such a disclosure.").

---

[5]  Fell may argue that counsel asked whether her son had committed any criminal acts and she stated no.  Voir Dire Tr. at 133.  But when read in the context of all of her responses it is clear that Juror 162 did not understand the question.  She had already disclosed in her questionnaire that her son had been charged with DUI and domestic violence, thus, clearly he had committed criminal acts. *See Id*. at 128-29.  Counsel, however, did not clarify.

[6]  The Court permitted 2255 counsel to cross-examine Juror 162 about the extent of her son's criminal record because it erroneously believed that Juror 162 had testified that "her son has been doing extraordinarily well for the last 16 years." *Id*. at 136,   when in fact what Juror 162 testified during her individual voir dire was that her son had rehabilitated. *See* Voir Dire at p. 132.  To Juror 162, the fact that her son had been able to maintain employment and drank much less than before his conviction was likely "rehabilitation."

Nonetheless, counsel went to great lengths to attempt to get Juror 162 to not be truthful on the witness stand by charging that she should have been completely familiar with her son's criminal record going back 25 years. *See Id*. at 147. "In the process of preparing to this hearing, we uncovered all of this evidence which we are now using for impeachment, because in the *Sampson* case, it was of great significance that the juror was not truthful on the witness stand." *Id*. But counsel's attempt to bring this case with the purview of *Sampson* is futile. Juror 162 bears no resemblance to Juror C in *Sampson*. Juror C purposely, intentionally, and repeatedly, during voir dire and in a subsequent inquiry by the Court, concealed her husband's history of domestic abuse; her status as domestic violence victim; and her daughter's drug abuse and incarceration because she did not want to endure the humiliation of discussing those matters publicly. 820 F.Supp.2d at 158, 183-85. Juror 162 had no such concerns. She disclosed both her son's criminal conduct and his substance abuse problems in her questionnaire. Moreover, when asked during voir dire whether she could consider mitigating evidence relating to the Fell's drug abuse, she readily admitted that it was a difficult question because she knew, from her own personal experience, that drugs could do a lot to a person. *See* Voir Dire at 132. There was no attempt by Juror 162 to hide information about her son's criminal conduct or drug abuse. Moreover, she was forthcoming with whatever information she knew regarding her son's criminal conduct during the juror inquiry.[7]

---

[7] Juror 162 became upset during the juror inquiry, not because she did not want to answer the questions, but because objections were argued in her presence during which 2255 counsel openly charged that Juror 162 was lying. *See* Tr. August 15, 2013, pp. 130-36; 141; 147-51; 177-182. Juror 162 was compelled to sit through counsel argument, while accusations of dishonesty were flying. Anyone in her position, not yet having been afforded an opportunity to explain herself, and being subjected to aggressive and at times irresponsible cross-examination would have been upset.

In this regard, Juror 162 is far more similar to Juror D in *Sampson*, who failed to disclose in response to a question in her juror questionnaire that her live-in boyfriend had worked as a police officer at a university. Upon inquiry by the Court, Juror D indicated that she simply forgot. 820 F.Supp. 2d at 198. Similarly, Juror D in *Sampson* did not recall when completing her questionnaire that her father and uncle had served in the military. *Id*. The Court determined in both instances that Juror D's responses were not intentionally false. *Id*. The *Sampson* court further concluded that because none of Juror D's answers were dishonest, they did not provide a basis for granting relief under McDonough. *Id*. *See also Amirault v. Fair*, 968 F.2d 1404, 1405 (1st Cir. 1992) (juror's failure to disclose 40 year old rape conviction which she had blocked from memory not intentionally untruthful).

As she testified during the juror inquiry, Juror 162 has long since moved past her childhood experiences. *Id*. at 100 ("I mean, I went on and lived my life. There's so many different things that have happened to me in my life since then – I'm 71 years old"). Indeed, Juror 162 has lived almost an entire life since her early childhood sexual abuse, and has endured far worse events in her life than what her adopted father did to her. *Id*. at 99-100. ("I think what happened to me about my husband being burned to death and having a three-month-old child affected me much more than what – you know, what this ever did."). That she would not recall this experience when faced with a question asking whether she had ever been the victim of a crime more than 50 years later is nothing less than reasonable.

Juror 162 tragically lost her husband in a fire at the age of 19, just three months after giving birth to her first child. *Id*. at 164. As a result, she fell into chronic depression and was hospitalized for a period of time. *Id*. at 166. Since she could not inherit because she was less

than 21 years old at the time, a legal custodian was appointed for her by the court. *Id*. at 167.

Unfortunately, that custodian, who was an attorney, embezzled Juror 162's money leaving her

practically destitute. *Id*. at 165. But this too Juror 162 endured and overcame. *See id*. at 174.

She has been married for more than 30 years to her current husband.

Based on these facts Fell claims that Juror 162 was also the victim of fraud, which she

should have also disclosed in response to Question 38. *Id*. at 162. When asked why she failed to

disclose this information on her juror questionnaire, Juror 162 stated: "because I didn't think of

it." *Id*. See also *Id*. at 1265. Counsel insisted that she had testified that when she thought of

criminal conduct, she thought of violence and people stealing things and theft. What Juror 162

actually testified was that she would "attribute crime as having somebody hold a gun to my head

or somebody stealing my purse," not theft. *Id*. at 99. Nonetheless, Juror 162 explained:

> Yeah, but you have to understand, I went through a psychological
> trauma. I haven't thought about these things for years and years
> and years. I answered the question – questionnaire truthfully at the
> time. To me, you know, a crime – I didn't take the crime – the
> word "crime" as what was done to me.

*Id*. at 166. Juror 162 confirmed that the conduct occurred when she was about 18 years old. *Id*.

at 166. That is approximately 44 years before she sat as juror in Fell's case.[8] Juror 162, therefore

did not intentionally fail to disclose information. Moreover, this information had no relevance to

Fell's case.[9]

---

[8] Juror 162 could not recall exactly if she was 18 or 19 when her first husband passed.

[9] Fell also tried to establish that Juror 162 failed to disclose that her son had been the victim of
an assault by a woman with whom Juror 162 lived with for a while. *Id*. at 169. But Juror 162
denied knowing anything about the alleged incident. *Id*. Counsel asked Juror 162 whether she
was aware that her son reported the incident to his probation officer. *Id*. She stated she was not.
*Id*. Clearly this is insufficient to establish or support a claim.

The same analysis set forth above applies to Juror 162's non-disclosure of her having been a victim of fraud. Juror 162 was the victim of fraud 44 years or so prior to trial. She simply did not recall the incident when answering her questionnaire. She was not intentionally untruthful. Similarly, Juror 162 had a conversation with her husband more than 20 years prior to trial during which he told her that he had been sexually abused as a child. *See Id*. at 129. As was the case with her childhood sexual abuse, no one was prosecuted for the fraud committed against her or the sexual abuse allegedly committed against her husband during his childhood.[10] There is no reason to doubt Juror 162's testimony that she simply did not recall these incidents when responding to her juror questionnaire when she was otherwise completely forthcoming in her responses.

Fell fails to meet the first prong of the *McDonough* test. Fell has failed to establish that Juror 162 failed to answer honestly a material question on *voir dire*. Where a juror did not intentionally withhold information, the first prong of the McDonough test is not met.

Moreover, Fell has also failed to show that a truthful answer would have provided a valid challenge for cause. Juror 162 stated that she had long since moved past her childhood experiences and go on with her life. It was not something she thought about, and it did not come to mind during the trial. Therefore, a truthful answer would not have provided a valid challenge for cause.

The conduct of Juror 162 resembles the conduct of a juror in *United States v. Adeniyi*, 277 Fed.Appx. 22, 24 (2d Cir. 2008). In *Adeniyi* a juror disclosed, on the second day of trial,

---

[10] Juror 162 stated that she had no knowledge of this incident other than what her husband told her.

that he had personal experience of fraud, in the form of bounced checks submitted to his business, but that it had not occurred to him during *voir dire* that this might make him a crime victim.  The district court found that the juror did not fail to answer honestly a material question on *voir dire* because "the information he provided was not directly responsive to any of the questions asked of him by the Court," and that nothing in the juror's disclosure, or in his responses to further questioning, permitted an inference of bias or provided the basis for a challenge for cause.

Much like the juror in *McDonough*, Juror 162 simply did not understand that question 38 required her to disclose that she had been sexually abused as a child.  Indeed, Juror 162, having clearly surpassed that part of her life, no longer saw herself as a victim.  Fell has thus failed to establish the first element of the *McDonough* inquiry as juror 162's incorrect answer was not made for an "illegitimate purpose" or with a "malicious design*." See, e.g., Greer*, *supra*, 223 F.3d at 48-49.  Juror 162's omission was clearly inadvertent.

> b.  <u>Fell has failed to establish that a truthful answer would have supported a challenge for cause</u>.

The Government submits that the Court need go no further, as no showing of bias can arise from a juror's inadvertent failure to disclose information.  "An innocent, unintentional error does not itself raise a question of whether an individual is able to decide a case based solely on the evidence...." *Sampson*, 820 F.Supp.2d at 172 (citing cases).  However, if the Court nonetheless considers *McDonough*'s second prong, the Government submits that had Juror 162 disclosed that she was sexually abused as child, this information, taken together with her answers to her questionnaire and during individual *voir dire*, do not permit an inference, much less a factual finding of bias that would have supported a challenge for cause.

As established above, *McDonough*'s second prong requires that a party moving for a new trial show that the correct answer to a question at *voir dire* would have provided a valid basis for a challenge for cause. *Greer*, 285 F.3d at 171. "The district court then must determine if it would have granted the hypothetical challenge." *Id*. *See also United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) (noting that under the second prong of *McDonough*, a defendant must have a basis for arguing that the district court is **required** to sustain his challenge for cause).

Fell cannot make this showing. Even if juror 162 had disclosed that she had been the victim of sexual abuse as a child, further inquiry would have revealed that the conduct had taken place more than 50 years earlier; that Juror 162 had not reported the conduct and one had been arrested or prosecuted as a result; that Juror 162 did not see herself as a victim and had long moved passed her childhood abuse; and that her childhood experiences would not have prevented her from fairly and impartially considering Fell's own childhood sexual abuse. No challenge for cause would have likely been made, much less granted.

We again note that the record establishes that Fell's childhood sexual abuse was in fact considered by all jurors, including Juror 162, as the Special Verdict Form indicates that the jury unanimously found that Fell had been sexually and physically abused as a child. Fell is not entitled to have the jury give weight to his mitigating evidence, only that they fairly consider the evidence. Given their unanimous vote, the jury clearly considered it.

The Supreme Court has acknowledged that jurors bring information, knowledge, and experience into deliberations with them. *Peters v. Kiff*, 407 U.S. 493, 503 (1972) ("Individual jurors bring to their deliberations 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.'"). In *McCleskey*, the Court found a

capital sentencing jury's ability to draw upon jurors' individual experiences during deliberations helped build "discretion, equity, and flexibility into" the legal system. *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987). In *Beck*, the Court discussed a juror's ability to draw on his experiences and acknowledged that "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." *Beck v. Alabama*, 447 U.S. 625 (1980) (quoting *Jacobs v. State*, 361 So.2d 640, 652 (Ala. 1978).

Past sexual abuse does not establish *per se* grounds for a challenge for cause. In *Lopez*, the district court concluded that two female jurors' failure to disclose past sexual abuse was not grounds for re-trial. *Lopez*, 417 F.Supp.2d at 1071. In that case, the defendant was accused of sexual harassment by several of his past employees. *Id*. at 1065. During *voir dire*, the court asked the venire if any member or someone in their families were victims of sexual harassment or discrimination. *Id*. at 1068. The court also asked whether there was any aspect of the case that would make any member question their impartiality and whether they, if a party in the case, would want a juror with a similar frame of mind as themselves to decide the case. *Id*. Following the jury's significant damages award to the plaintiffs, the defendant learned the jury was heavily influenced by two jurors who discussed their alleged past sexual abuse during deliberations. *Id*. at 1065. The defendant moved for an evidentiary hearing to investigate the jurors' failure to disclose that abuse at *voir dire*. *Id*.

The court noted that the first prong of its inquiry required consideration of whether the jurors could have "honestly believed" no response was required to the *voir dire* questions and, in turn, whether their answers were reasonable. *Id*. The court rejected the defendants' arguments by first finding that he never directly asked any of the venire members if they were victims of

sexual abuse. *Id*. at 1068-69. The court concluded the jurors' negative responses to the *voir dire*

questions were honest and accurate because sexual abuse and harassment were different things.

*Id*. The court also pointed out that the defendant had an opportunity to ask questions during *voir*

*dire* and failed to ask about sexual abuse. The court stated "[i]f the defendant was interested in

this topic, it had an obligation to ask more probing questions during voir dire in order to ferret

out this type of sensitive and specific information." *Id*. at 1070.

Similarly here, Fell's post-conviction claim that he would have moved to strike juror 162

for cause because she was sexually abused as a child is disingenuous. If this was so important an

issue for Fell he would have asked about it on voir dire. While Fell asked juror 162 about a

number of specific mitigating factors, including the use of drugs and alcohol, remorse, lack of

criminal history, defendant's age and the lack of authority figures in his life, he never asked

about childhood sexual abuse. *See* Tr. May 23, 2005 at 132-35.

Moreover, that juror 162 suffered sexual abuse as a child is not determinative of whether

she would have been excused for cause. If the court determined that Juror 162 could nonetheless

consider Fell's mitigation evidence fairly and impartially, she would not have been subject to

removal for cause. When conducting its analysis, the Government submits that the Court must

consider any allegation of potential bias against the entire record. Juror 162's answers, both in

her questionnaire, during individual *voir dire,* and during the juror inquiry, indicate that she was

anything but partial. Juror 162's responses in her questionnaire indicated that she was an

impartial juror. In responding to question 39, she indicated that she could evaluate the case

based upon the evidence presented at trial and in accordance with the court's instructions. *See*

Exhibit Q at 17. She further indicated that she harbored no bias towards either the defendant or

the government. *Id.* at 23-25. With regard to the death penalty, juror 162 indicated that she used to be opposed to it, but would consider it based on the facts of the case. *Id.* at 28-29. *See also* Tr. May 23, 2005, at 122. Nothing in her responses to her questionnaire gave rise to even an inference of partiality.

Moreover, juror 162's responses during individual voir dire further indicated that she would be a fair and impartial juror. *Id.* at 116-17. In fact throughout her voir dire examination juror 162 indicated that she would want to hear all mitigating evidence prior to making a decision, including evidence of the defendant's childhood, his mental state, the circumstances surrounding the offense, evidence of remorse and the defendant's potential for rehabilitation. *Id.* at 117-18, 123, 126, 131.

During the juror inquiry Juror 162 made clear that she had long moved past her childhood sexual abuse such that it was not something she thought about. She further indicated that she based her decision solely on the evidence she heard in court. This is the definition of "fair and impartial." *McDonough*, 464 U.S. at 554. The record as a whole indicates that Juror 162 was a fair and conscientious juror who provided as much information as was asked of her and responded to all questions posed as honestly and as completely as she could. No grounds for a successful challenge for cause existed here.

Fell must establish both elements of *McDonough* to be entitled to relief – that is, he must show that juror 162 purposely provided a false response to a question during voir dire and that a truthful answer would have subjected her to being challenged for cause. Fell has not established either element. Therefore, his claim for post-conviction relief based on the misconduct of juror 162 must be denied.

-57-

        c.      <u>Fell's argument is foreclosed by Rule 606(b)</u>.

As established in section IV(E)(1)(a) of the Government's opposition to Motion for Post-Conviction Relief, Rule 606(b) prohibits the use of juror testimony to attack the verdict.  It provides in pertinent part:

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations <u>or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict</u> or indictment or concerning the juror's mental process in connection therewith.

Fed.R.Evid.P. 606(b) (emphasis added).  The statement of juror 162 falls squarely within the parameters established by Rule 606(b) and cannot be considered by this Court.  Fell simply cannot rely on a juror declaration regarding her deliberative process to establish and/or support his claim.  Rather, Fell must produce evidence not barred by Rule 606(b).  *See Lopez v. Aramark Uniform & Career Apparel, Inc.*, 417 F.Supp.2d 1062, 1071 (N.D. Iowa 2006).  He has failed to produce any such evidence; therefore, his claim must be denied.

In its Opinion and Order the Court notes that the Rules of Evidence do not apply to a penalty phase hearing.  18 U.S.C. 3593.  Respectfully, the Court misunderstands the Government's argument.  We are not in a penalty phase hearing.  We are in a post-conviction proceeding where juror misconduct has been alleged.  The Government submits that post-conviction, Fell cannot rely on juror testimony regarding jury deliberations to prove his claim.

The Government expects that the Court will consider Juror 162's testimony at the juror inquiry in deciding Fell's claim.  However, the Government submits that Fell should not be permitted to circumvent clearly established rules and then draw a benefit.

2.      Juror 143

The 2011 petition charges that Juror 143 obtained significant extraneous information about the Rutland crime scenes by visiting them during trial, and shared that information with other jurors so as to corrupt deliberations.  Petition at 330-37.  The petition also charges that during deliberations, when a wavering juror observed that Fell's shotgun was unloaded when he and Lee confronted Terry King with it, Juror 143 pointed the unloaded shotgun at the juror to demonstrate that it was frightening even though the juror knew it was unloaded (which King didn't know).  *Id*. at 338-340.  In this manner, Fell alleges, Juror 143 coerced the other juror into voting for death.

a.      Fell has failed to establish that Juror 143 was exposed to extraneous information.

Exhibit 241 to the petition, Juror 143's written statement, generally reflects conscientious trial participation, and indicates that the case made him "more compassionate and involved" in his community.  ¶ 1 ("I watch the news a lot now, and keep a watch on the kids in my neighborhood"); ¶ 6 ("we took our role as jurors very seriously," etc.).  Paragraphs 5 through 9 of the 13-paragraph statement contain Juror 143's description of the jury's deliberations.  In listing various matters discussed by the jury "[i]n making our decision," the statement includes, "the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper."  *Id*.  Further along in paragraph 5, the statement reads:

> After the trial I drove to New York on my motorcycle.  I recognized the spot from the photos and I felt a really negative energy while I was there.  The lighting of the Price Chopper in Rutland was weak.  At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit.  It isn't expensive to get better lighting.  They should do that.

*Id*.

At the August 2013 hearing, Juror 143 denied inspecting the Rutland crime scenes during trial. Transcript, pp. 26-27; 44; 50-52; 68-69; 87. He "probably went through Rutland for the job" during 2000-05, but "didn't go investigating anything [for the trial]." Transcript at 85. A biologist for the Vermont Agency of Transportation, Juror 143 had "projects all over the state," including "numerous projects in and around the Rutland area." Transcript at 41; *see also* 26 ("I'm very familiar with that whole downtown area"); 69 ("very familiar with Rutland"). Juror 143 testified that it was in late 2010 – not mid-2005 – that he took a newly acquired motorcycle on what he called his "trial tour" to drive by the Rutland and Dover Plains, New York, crime scenes. *Id*. at 27.

Juror 143 was pressed at the August hearing as to why he signed a written statement (Exhibit 241) stating that he *did* inspect the Rutland crime scenes during the trial, and that Fell's shotgun *was* in the jury room during deliberations. He testified that when Fell's lawyers interviewed him at his home in late 2010 he thought they were "from the court," and they caught him at a volatile time: "I was in the middle of a big breakup with the gal I had been seeing [and was] on a pretty good bender." *Id*. at 62*;* 32, 66-67*; see also* 28 ("I had, you know, a few beers in me"). The following day the interviewers returned with the statement, prepared by them, and asked him to sign and initial it. He did so, feeling "pressured," *id*. at 83, but did not read it carefully. The Government submits; therefore, that Fell has failed to establish that Juror 143 failed to adhere to the instructions of this court and visited the Rutland crime scenes during trial.

b.    Even considering the alleged observations, which have not been proven, Fell has failed to establish that they corrupted the trial in any way.

If the Court is nonetheless inclined to consider the alleged out-of-court observations, which Juror 143 denied making, the Government submits that the extraneous information protested by Fell is insignificant. Fell argues that Exhibit 241 shows that Juror 143 corrupted deliberations with three types of extraneous information observed during his trip to Rutland: (1) the lighting outside the Price Chopper; (2) Debra Fell's Robbins Street neighborhood; and (3) the route Fell and Lee walked from Robbins Street to the Price Chopper. Reply to the Government's Amended Opposition . . .," filed August 20, 2012 (Dkt. 358), page 245. Each of these three arguments lacks force in light of the record. It was established by trial testimony that Terry King was kidnapped before 4:00 a.m. by Fell and Lee hiding in weak light; Juror 143's view that the Robbins Street apartment area "wasn't great, but was okay" was consistent with the photographs introduced at trial and was in any event insignificant, and there is no evidence that Juror 143 retraced the route Fell walked from Robbins Street to the Price Chopper. In any event that route was established at trial and had limited relevance.

Fell contends obscurely that the Price Chopper lighting was "potentially significant" because it "related to . . . [his] precise intentionality and the credibility of the observations about his impairment." *Id*. at 247. He also notes that the trial photographs of the Price Chopper were taken during the daytime, and therefore "were entirely unhelpful on any assessment of the lighting at night." *Id*. It is difficult to discern Fell's point regarding "precise intentionality," etc. In any event, however, Juror 143's statement about "weak" lighting was based on trial evidence and was insignificant. Exhibit 241 does not state that Juror 143 based his concern about the Price Chopper lighting on his own trip to Rutland. His statement that the lighting was weak

-61-

follows by several sentences his reference to a "trip to Rutland during the trial" and intervening

sentences address other subjects.  Juror 143's statement in Exhibit 241 could have been based on

the extensive trial testimony about the predawn, 3:30 - 4:00 a.m. kidnaping.[2]  And in fact, at the

August, 2013, hearing, Juror 143 testified that it was the trial testimony that informed his view of

the weak light when King was kidnaped:  "as for Price Chopper, I only know it was dark because

of the testimony of the guy with the bread truck . . . a delivery guy, that saw two dark shadows

come out from the side. . . ."  Transcript at 45; *see also* 52, 57 (repeating the same).

---

[2]  A series of witnesses established that Fell and Lee kidnapped King between 3:30 a.m. and 4:00 a.m. on November 27 – hours before sunrise in Vermont.  Norm King testified that on November 27, 2000 his wife Terry left the house for her early morning shift at the Price Chopper "around 3:30, quarter of 4" in order to "be there at four."  Jury Trial Transcript, June 20, 2005, pp. 73-74.  Terry King's co-worker William Liphardt testified that his shift with her began that morning at 4:00 a.m., and that since she always "very prompt," he was concerned when she was not in the store by five or ten minutes before 4:00 a.m.  *Id*. at 89-91.  He looked for her car at 4:15 a.m. but it was not there.  *Id*.  Peter Wink testified that he worked the "midnight to six" shift that morning at a Dunkin' Donuts restaurant just "a few minutes" from the Price Chopper.  Wink recalled that Terry came in for an order between 3:30 and 4:00 a.m.  *Id*. at p. 98.  Joseph Trepasso testified that he delivered bread to the Price Chopper that morning, and between 3:00 and 4:00 a.m., when it was "fairly dark" he saw "a couple individuals in the roadway to the back of the store."  *Id*. at 106 ("it was unusual").  Trepasso saw the two figures on his way to Dunkin Donuts for a coffee, and saw them again when he parked at the Price Chopper for a delivery.  *Id*., 106-08.  It was "dark," and "night," but "there were lights on in front of the store," and one of the two, a slim man with dark clothes and long hair, began to approach him while the second remained by the corner of the building.  *Id*. at 108.  The man stopped when Trepasso pretended to be talking on a cell phone.  *Id*.  Anthony Mistretta worked the night-shift maintenance crew at the Wal-Mart store in the same mall as the Price Chopper.  During the early morning hours of November 27, 2000, two males with wet hair and dry clothes asked to buy shotgun shells.  They cursed him when he told them the store was closed.  Trial Transcript Vol 4-1, June 24, 2005, pp. 24-26.  Finally, in a recorded statement Fell stated that after the murders of Charles Conway and Debra Fell he "hopped right in the shower," and then walked to the Price Chopper with his shotgun and Bobby Lee, where they waited "on the side of the building for about 15 minutes" until "some lady pulled up."  They confronted her with the shotgun and ordered her to "get the fuck in the back seat" of her car.  They then drove her to Dover Plains, New York, where they beat and kicked her to death.  *See* December 2, 2000 recorded statement, Trial Exhibit 11(i).

Consistent with Juror 143's explanation that it was trial evidence that led to his observation about weak lighting, there is no evidence that Juror 143 inspected the Price Chopper lighting at night (or before dawn), which is the only way he could have observed what the lighting was like at the time of the kidnaping (assuming Price Chopper did not alter or improve the lighting between 2000 and 2005). Juror 143 testified at the August hearing that it was during "daylight hours that I was there. It wasn't at the wee hours of the morning that this would have taken place." Transcript at 57 (adding that his "sense of the lighting was based on the testimony of some delivery truck driver during the case"). Fell's comment that the daylight photographs of the Price Chopper introduced at trial "were entirely unhelpful on any assessment of the lighting at night" therefore applies equally to Juror 143's daylight observations. Further, whether the lighting was "weak" was a non-issue at trial: it was uncontested that the kidnaping occurred between 3:30 and 4:00 a.m. – when it is dark in Vermont in late November – as Terry King arrived in the employee parking area at the Price Chopper. Whether the artificial lighting on the side of the store where King parked was "weak" or not has little or no bearing on the crime.[3] In sum, Juror 143's observation that the lighting was "weak" when Fell kidnaped King was not based on extraneous information and was insignificant.

Fell urges that Juror 143's statement that the Robbins Street neighborhood "wasn't great, but it was okay," "served to minimize the impact of Debra Fell's neglect and abuse of her son"

---

[3] Juror 143 apparently thought that Price Chopper should provide better lighting in employee parking areas. His statement expressed concerned about lighting at the employee parking area at the Barre-Berlin Price Chopper (where he worked during trial), adding that it was "also" unsafe. He may have concluded that the Rutland Price Chopper should have provided better lighting in the employee parking area. Yet this is a collateral issue that is not explained in Exhibit 241, was not explored at the August, 2013 hearing, and was not an issue at trial.

(and that normalcy "masked the deep dysfunction of the inhabitants"). Reply at 248. Yet Fell's

childhood neglect and abuse took place in Pennsylvania when he was a child, not in Vermont

(where he did not arrive until age 20). There was no evidence (or argument) at trial, from either

party, that the Robbins Street apartment was or was not an "okay" (or a "great") location. The

fact that the inhabitants of the Robbins Street apartment in late November, 2000 were "deeply

dysfunctional" was unequivocally established at trial by the (uncontested) fact that two of them

were murderers and the other two were murder victims – dysfunctional relations were obvious.

Further, at trial the government introduced eight photographs depicting the Robbins Street

apartment building from the outside, several of which show the surrounding area. *See* Exhibits

5(a)(1) - (8). Juror 143's vague observation that the neighborhood "wasn't great, but it was

okay," is not significant and cannot fairly be said to have corrupted the trial.[4]

Finally, Fell contends that Juror 143 "established for himself," supposedly when driving

from Robbins Street to the Price Chopper, "the distances between locations, how simple the

route was, where different buildings were located, how easy the route would be to navigate, and

the like." Reply at 248. This contention also lacks any merit. First, Juror 143 says nothing

about this subject in Exhibit 241. He simply says, "I looked at the mother's house on Robbins

Street and the Price Chopper." *Id.*, ¶ 5. Fell's claim that Juror 143 essentially retraced and

studied Fell's footpath is pure speculation.

Second, as with the lighting, Juror 143's memory about Fell's Rutland route (when

pressed by counsel at the August, 2013, hearing), was based upon trial evidence, not extraneous

---

[4] Of course, Juror 143's observation that Debra Fell "was just trying to live her life" could be
said about the majority of homicide victims.

evidence.  At the hearing, the juror referenced an "aerial photo" trial exhibit showing the area (adding that he used aerial photos "every day in my job").  *See* Transcript at 56-59.  Consistent with that testimony, trial Exhibit 12(d) was a satellite photograph depicting Rutland from 135 Robbins Street to the Price Chopper.  At trial, witness Rod Pulsifer, a Rutland Police Detective familiar with the area who interviewed Fell after his arrest, traced the route as described by Fell on Exhibit 12(d) with a blue marker, and stickers were placed on six locations that Fell described walking past.  *See* Exhibit 12(d), and June 21, 2005 Trial Transcript Vol II, pages 28-31.

The significance at trial of the route that Fell took from Robbins Street to the Price Chopper lay in the fact that he remembered it in detail when questioned four days later in Arkansas.  To counter the defense claim that Fell was intoxicated or otherwise lacking in functionality the night of the double homicide in Rutland, the government's guilt phase closing argument pointed out that in his recorded interview Fell "recalled the exact route block by block they took from the Robbins Street apartment, past Foley's, Uncle Sam's, Jiffy Mart, the Post Office, and the Spot Light Bar, and on down past the parking deck to the plaza.  He remembered all that."  June 24, 2005 Trial Transcript Vol 4-1, page 55.

Because there is no evidence that Juror 143 studied Fell's route from Robbins Street to the Price Chopper during the trial, because that route was well established and uncontested at trial, and it had limited relevance in any event, Fell's § 2255 attempt to claim that Juror 143 subverted the trial with the information is baseless.

c.    Consideration of Fell's attack on Juror 143 is barred by Rule 606(b).

The government's December, 2011 "Amended Opposition of the United States to Fell's § 2255 Motion," argued that the submission of Exhibit 241, and its detailed description of juror deliberations, violated Fed. Rule of Evid. 606(b). Rule 606(b)(1) provides that:

> During an inquiry into the validity or a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning the verdict. . . . The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

*Id.* Rule 606(b)(2)(A) adds as an "exception" to Rule 606(b)(1) that "[a] juror may testify about whether . . . extraneous prejudicial information was improperly brought to the jury's attention." Because the bulk of ¶¶ 5 - 9 of Exhibit 241 describes juror deliberations in violation of Rule 606(b)(1), those portions should be stricken.

The portion of ¶ 5 referring to extraneous information – "the trip to Rutland during the trial" – may fall within Rule 606(b)(2)(A), but is non-prejudicial for the reasons cited above.

d.    Fell has failed to established that Juror 143 threatened anyone.

The Government's 2011 opposition assumed that Fell's allegation as to Juror 143's manipulation of the shotgun during deliberations was accurate, but argued that it violated Rule 606(b) and was in any event non-prejudicial. However, it now appears that the allegation is inaccurate, because the shotgun was not in the jury deliberation room. At the August, 2013 hearing both Juror 143 and Juror 162 denied that the shotgun was in the jury deliberation room. *See* Transcript at 81 (Question to Juror 143: "Was there a shotgun in the jury room?" Answer: "No"), 198 (Question to Juror 162: Do you remember seeing a firearm in the jury room?" Answer: "I never saw a firearm in the jury room, no"). Although the Court has not permitted the

Government to interview members of the Clerk's Office regarding the matter, it is the Government's understanding that evidence consisting of firearms and drugs does not go into the jury deliberation room.[5]

### 3.    Juror 26

Fell claims that Juror 26 failed to disclose three misdemeanor convictions during *voir dire*. According to Fell, Juror 26 should have provided this information in response to question number 43(b) of the juror questionnaire, which asked: "Have you or has a family member or close friend ever been ever been charged with a crime?" Juror 26 marked "No" in response. According to a criminal record check, on April 2, 1996, Juror 26 was convicted of the misdemeanor offense of Unlawful Mischief, carrying a maximum penalty of a fine of $250 or less. He was fined $100. Tr. 9/27/13, pp. 9-10. Juror 26 was not arrested, but merely provided with a citation. *Id*. at 7. Further, Juror 26 was also convicted on January 4, 1995, in the state of New Hampshire for Driving Under the Influence for an offense that occurred on December 12, 1994. The Department of Motor Vehicle in Vermont where Juror 26 held his license was notified and suspended his license for 180 days. *Id*. at 11-12. Juror 26's license was reinstated in Vermont on September 3, 1996. During the juror inquiry conducted by the Court, Juror 26 also

---

[5] After members of the Clerk's Office cited instructions from the Court in refusing to be interviewed, the Government raised the matter at the August 15, 2013 hearing. The Court stated that, "if you want to speak with one of my employees, it seems to me that you should make a showing this is what you want to ask, this is why it's particularly relevant." Transcript at 10. When the Government sought to pursue the matter with Chambers in November, 2013, with a request for permission to speak to the Clerk's Office about the issue, it was required to channel all questions through the Court.

admitted that he was charged with a third misdemeanor conviction for failing to pay wages,[6] *id*.

at 30, but this sentence was deferred and later apparently expunged. *Id*. at 32-33.

   a.  Fell has failed to establish that Juror 26 was deliberately dishonest.

   i.  Failure to Disclose Misdemeanor Offenses

Fell's claim lacks merit.  Juror 26 responded no to question 43(b) because he did not

think that his unlawful mischief and DWI misdemeanor offenses were any more serious than

traffic offenses and did not understand that he needed to disclose them.  "I didn't think they were

serious enough to be like – I didn't think of it as any more than a speeding ticket or, you know."

Tr. 9/27/13, pp. 4-5.  Juror 26 did not think he needed to disclose the fact that he was charged

with misdemeanor non-payment of wages because he was told that the charge would not be

reflected on his record upon compliance with a settlement agreement and he did not think it

important.  *Id*. at 32-33.  Therefore, Juror 26 honestly, but mistakenly believed that his

misdemeanor convictions did not come within the purview of question 43(b).  Thus, Juror 26's

responses to the questionnaire were not intentionally false.

Again the Government submits that the fact that Juror 26 did not intentionally lie or was

dishonest ends the inquiry under *McDonough*.  "[I]mplications of an innocent error and a

dishonest answer are different.  An innocent, unintentional error does not itself raise a question

of whether an individual is able to decide a case based solely on the evidence."  *Sampson*, 820

F.Supp.2d at 172 (*citing McDonough*, 464 U.S. at 555-56).  "Such a mistake does not suggest

that the failure to disclose information that was solicited may have denied a party his right to an

---

[6]  As argued above, Fell's claim is barred by the procedural default doctrine.  Fell could have requested a criminal record check of Juror 26 prior to trial.

impartial jury." *Id*.  In the absence of juror dishonesty, there is no indicator that a juror may be biased or partial.

In any event, the Government submits that, had Juror 26 disclosed this information, it would not have subjected him to a challenge for cause.  Juror 26's answers during voir dire indicated that he was very much a middle of the road juror that would want to hear all of the evidence, including all mitigating evidence, before making a decision.  Tr. 5/13/05 at 90.  He repeatedly stated that he could be fair and impartial.  *Id*. at 90, 95, 98, 99.  Moreover, the misdemeanor offenses of Juror 26 bore no relation to the charges filed against Fell.  One can hardly argue that a dispute with a spouse over the cutting of a phone line to save money, or the non-payment of wages to a worker who abandoned his job relate in any way to murder.  Moreover, although Juror 26 also had a misdemeanor  DWI conviction, he testified that he did not have an alcohol problem and the court found he did not need substance abuse treatment.  Id. at 54.  Therefore, while evidence that Fell began drinking at an early age was presented in mitigation, there is no basis upon which to conclude that Juror 26 could not consider that evidence fairly and impartially.  Nothing in the record indicates that the information now being proffered by Fell would have led to Juror 26 being stricken for cause.  Juror 26's inaccurate answers do not provide a justification for grating Fell a new trial.

In order for a juror's failure to disclose information to support a strike for cause the information that the juror failed to disclose must be material.  *See McDonough*, 464 U.S. at 556.  "Generally, a matter is material if it has a natural tendency to influence, or be capable of influencing, the judge who must decide whether to excuse a juror for cause."  *Sampson*, 820

F.Supp.2d at 172 (*citing Neder v. United States*, 527 U.S. 1, 16 (1999)).  Here, the information

underlying Juror 26's misdemeanor convictions is clearly not material.

The situation of Juror 26 mirrors the conduct of Juror G in *Sampson*, who failed to

disclosed six prior misdemeanor convictions, all for driving related offenses and underage

drinking.  820 F.Supp.2d at 199-200.  The Court concluded that Juror G, sincerely, but

mistakenly interpreted the questions in the questionnaire soliciting information about "crimes" to

be asking about felonies rather than "traffic violations" or a citation for underage drinking.

Therefore, the Court concluded that Juror G's responses were not intentionally false.  *Id*. at 200-

01.  In addition, the Court concluded that the matters that Juror G failed to disclose were not

comparable to matters involved in Sampson's case.  *Id*. at 201.  As with Juror D, the Court again

found that because Juror G was not dishonest in his responses during voir dire, his inaccurate

answers do not provide a justification for grating a new trial.  *Id*.  Similarly here, Juror 26's

honest, but inaccurate answers do not justify vacating Fell's conviction and sentence.

ii.    <u>Failure to Disclose Media Exposure</u>

Juror 26 testified that he heard, either on the radio or television, that Fell's co-

conspirator, whose name he could not recall, committed suicide in prison, a long while before

trial.  Tr. 9/27/13, pp. 12-14.  Fell claims that Juror 26's exposure to this information prejudiced

him at trial.

Juror 26's testimony during the juror inquiry made clear that he harbored no intent to hide

information from the Court.  Juror 26 admitted that he had heard through a news report that

Fell's co-conspirator (Lee) had committed suicide in prison.  *Id*.  But when he was undergoing

voir dire, he did not know that the person (Lee) he had heard killed himself in prison was Fell's

-70-

co-conspirator in the case; therefore, he did not connect the two. *Id*. at 13. Juror 26 simply did not relate what he had heard on the news quite some time before trial to the trial he had been summoned to serve on.

The court routinely asked the jurors whether they had been exposed to any publicity "on this case." In fact, when asked during individual *voir dire* whether he knew anything about the case, juror 26 responded as follows:

> THE COURT: . . . Have you heard anything about this case?
>
> JUROR NO. 26: No, not really. No.
>
> THE COURT: Do you know any of the facts at all?
>
> JUROR NO. 26: No. I think at one point, a long time ago, I heard something in passing, but other than that, no.
>
> THE COURT: Do you remember what you heard?
>
> JUROR NO. 26: That just that a woman had been kidnapped, and that was the only thing that I, I can recall.

Tr. 5-13-05, p. 88. No intent to deceive can be inferred from Juror 26's responses. During voir dire he disclosed what little information he remembered.

Regarding the information about Lee's manner of death, Juror 26 heard the alleged news report quite some time before the Fell trial and did not relate the report about Lee's death to the Fell trial. It wasn't until after he had heard some evidence that Juror 26 thought to himself that he had heard the name (Lee) before, and then remembered the information he heard on the news. In any event, Juror 26 did not consider the information to have been important. The evidence does not establish that Juror 26 deliberately withheld information from the Court. Fell therefore,

has not met the first prong of the *McDonough* test as he has failed to establish that Juror 26 was dishonest.

Moreover, even if Juror 26 had disclosed the alleged information, he would not have been eligible for a challenge for cause. As stated above, Juror 26's remaining answers during *voir dire* reflect complete impartiality. The Court could have simply instructed Juror 26 not to share that information with other members of the jury, and to consider only evidence presented in Court. The information he heard about Lee on the news did not require that he be stricken for cause, particularly when the jury was informed that Lee died in prison. Thus, even if the Court reached it, the second prong of the *McDonough* test is also not met.

b.    <u>Juror 26's Exposure to Extraneous Evidence Was Not Prejudicial</u>

Of course, it is well-settled that "any extra-record information of which a juror becomes aware is presumed prejudicial." *Greer*, 285 F.3d at 173 (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)). However, "[a] government showing that the information is harmless will overcome this presumption." *Id*. "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.) (per curiam) (internal quotation marks omitted), *cert. denied*, 513 U.S. 901 (1994). The court's inquiry must focus on the information's probable effect on a "hypothetical average juror." *Id. See also United States v. Calbas*, 821 F.2d 887, 896 n. 9 (2d Cir.), *cert. denied*, 485 U.S. 937 (1988). "The touchstone of decision . . . is thus not the mere fact of infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann*, 435 F.2d 813, 817-18 (2d Cir.), *cert. denied*, 402 U.S. 906 (1971). The court may not

inquire into "the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Calbas*, 821 F.2d at 897 (citing Fed.R.Evid. 606(b)). *See also Greer*, 285 F.3d at 173 (same); *Bibbins*, 21 F.3d at 17 (juror's affidavit as to how extrinsic information affected the thinking and voting of the jurors or the deliberations of the jury as a whole was inadmissible).

Fell has failed to establish that Juror 26's exposure to news about the death of Robert Lee was prejudicial to a degree warranting a new trial. Juror 26 was exposed to a tv news report about Lee, which reported that Lee committed suicide, "a long while before trial." Fell claims that Juror 26's exposure to this extrinsic evidence affected him. But the parties stipulated that Lee died in prison. *See* Stipulation marked as Exhibit 17. That stipulation read:

> On February 1, Robert Lee and Donald Fell were charged by grand jury with the same capital crimes. On September 20, 2001, Lee died in his cell at the Northwest Correctional Facility in St. Albans, Vermont. His death was determined to be accidental. At the time of his death, Lee faced the same charges as Fell.

Clearly then the jurors were informed not only that Lee had died in prison while confined in his cell, but also that his death was accidental. Therefore, the only extrinsic evidence that Juror 26 appears to have heard is that Lee committed suicide. A typical juror would not consider such evidence and disregard a stipulation introduced into evidence by both parties at trial, and which he was instructed to follow by the Court. This is especially true given the Court's admonition to the jury that they were to render a decision based solely on the evidence heard at trial. There is no evidence that Juror 26 did not follow the Court's instruction. Therefore, there is no reasonable probability that Fell was prejudice from Juror 26's exposure to this information.

Moreover, there is no evidence that Juror 26 shared this extraneous information with other members of the jury.

> D.   There Is No Evidence of Any Additional Instances of Alleged Misconduct by Any Juror

Fell further asserts, without pointing to a single specific instance, that the jurors in this case engaged in all manner of constitutionally cognizable misconduct. Fell's conclusory assertion of error does not merit relief or warrant any further discovery. A § 2255 movant must state specific facts that describe each ground for relief. *Taylor v. United States*, 287 F.3d at 661 (7th Cir. 2002). A § 2255 petition must set forth sufficiently detailed factual claims to point the court to a demonstrable possibility of error. *See Oliver v. United States*, 961 F.2d at 1343 n.5 (7th Cir. 1992). Fell's factually unsupported claims of juror misconduct is an insufficient basis to grant him relief or discovery. *See United States v. Zuno-Arce*, 25 F. Supp. 2d at 1118. Of course, even if Fell had properly stated a claim, he could not raise an issue that he omitted to properly raise at trial or on appeal. Having failed to raise the issues at trial or on appeal, Fell cannot obtain collateral relief based on the jury's supposed misconduct.

## CONCLUSION

The record built by the Court through its juror inquiry, taken together with the record established at trial leads to the inevitable conclusion that no juror in this case engaged in any misconduct that would warrant vacating Fell's conviction and sentence.

Wherefore, the United States respectfully requests that Fell's post-conviction claims based on juror misconduct be denied.

Dated at Burlington, in the District of Vermont, this 16th day of December, 2013.

Respectfully submitted,

UNITED STATES OF AMERICA

By:

JACABED RODRIGUEZ-COSS
Trial Attorney
U.S. Department of Justice
1000 Lafayette Blvd.
Bridgeport, CT  06604
(203) 696-3027
Jacabed.rodriguez-coss@usdoj.gov


WILLIAM B. DARROW
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov


CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following all counsel of record.

By:

JACABED RODRIGUEZ-COSS
Trial Attorney
U.S. Department of Justice