# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| DONALD FELL, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Civil Case No. |
| | ) | Criminal Case No. CR-01-12-S |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent.* | ) | |

## GOVERNMENT'S RESPONSE TO FELL'S BRIEF
## RE JUROR MISCONDUCT CLAIMS

**COMES NOW**, Respondent, the United States of America, by and through the

undersigned counsel, and files the instant response to Petitioner's brief in support of his juror

misconduct claims raised in Fell's 2255 Petition.[1]

## Introduction

On March 21, 2011, Fell filed a timely 2255 Petition. Among other things, Fell claimed

that three of the jurors at his trial engaged in misconduct. On December 22, 2011, the

Government filed its response in opposition requesting summary dismissal of all claims,

including the juror misconduct claims. The Court denied the Government's motion for summary

dismissal and in August and September, 2013, conducted an inquiry at which the three jurors

---

[1] Fell urges an evidentiary hearing on the juror misconduct claims in advance of other matters at issue in his petition. While the government does not concede that a second juror hearing is necessary, if there is to be another hearing, the government agrees that it should be scheduled for the near future, so that the juror misconduct claims can be resolved. The government also agrees with Fell that these claims are independent of remaining claims, and that "[t]here would . . . be enormous efficiency and other benefit in adjudicating" these claims in advance. *See* Fell's "Brief in Support of an Evidentiary Hearing" (Document 451), page 3.

implicated by Fell's claims testified. The Court ordered the parties to brief the juror misconduct claims following the juror inquiry, which the parties did on December 17, 2013. The Government now files the instant brief in response to Fell's brief regarding the juror misconduct claims.

## Memorandum of Law

Petitioner in this case has engaged in a sweeping investigation of the lives of each of the jurors in this case giving rise to claims of misconduct against three of those jurors. This investigation has been conducted contrary to well established precedent, which dictates that fishing expeditions into jury deliberations for potential instances of bias, misconduct or extraneous influences are forbidden. Substantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict. As early as 1915 the Supreme Court explained the necessity of shielding jury deliberations from public scrutiny:

> "[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference."

*Tanner v. United States*, 483 U.S. 107, 199-120 (1987) (Citations omitted).

The Second Circuit has echoed the sentiments expressed by the Court in *Tanner*.

> As we have long recognized, trial courts "should be hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct, or extraneous influences." *United States v. Sun Myung Moon,*

-2-

718 F.2d 1210, 1234 (2d Cir.1983); *accord United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989).

*United States v. Escalera*, 2013 WL 4711465, p. 7 (2d Cir. 2013).  In *Escalera*, following a jury trial for conspiracy to distribute methamphetamines, defendant Eduardo Escalera appealed from the district court's denial for a hearing after a juror, in a post-verdict note to the court complaining about verbal abuse by other jurors during deliberations, noted that a fellow juror admitted that her brother was a drug addict, a fact that no juror had disclosed during *voir dire.* The Second Circuit noted that "precedent requires a trial judge to hold a post-trial jury hearing when "reasonable grounds for investigation exist." *United States v. Vitale,* 459 F.3d 190, 197 (2d Cir.2006).  The Circuit explained that "[r]easonable grounds are present when there is **clear, strong, substantial and incontrovertible evidence** that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Id.*

In *Escalera* the Second Circuit assumed *arguendo* that the unidentified juror made the remark about a brother's drug addiction as reported by the complaining juror, but explained that the non-disclosure would not be indicative of impropriety warranting a new trial absent a showing that the juror "failed to answer honestly a material question on *voir dire* " and that "a correct response would have provided a valid basis for a challenge for cause," citing *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548 (1984); and *United States v. Langford*, 990 F.2d 65, 68–70 (2d Cir.1993).  The Circuit noted that the defendant pointed to no record evidence that the juror intentionally failed to disclose the brother's addiction, much less that the reason for the non-disclosure was to avoid excusal (as opposed to embarrassment) or to conceal some bias that could have prejudiced the trial. *Cf. United States v. Colombo,* 869 F.2d

149, 15051 (2d Cir.1989).  Significantly, the court inferred no potential bias from the information concerning the brother's drug addiction, despite the fact that the trial was drug-related. Moreover, the court in *Escalera* further concluded that no prejudicial inference could be drawn from the mere report that, upon the start of deliberations, the juror was one of those favoring conviction.  Because the jurors had then heard all the evidence, the court concluded that a juror's prompt assessment of that evidence cannot by itself suggest impropriety.

In *United States v. Stewart*, 433 F.3d 273 (2nd Cir. 2006), the Second Circuit affirmed a district court's denial of a request for a hearing based on the defendants' allegations that a juror had failed to disclose the following five matters on his questionnaire, which defendants claimed concealed probable bias:  (i) an arrest and arraignment for assault of a former girlfriend; (ii) civil suits against the juror and members of his family; (iii) his son's conviction for attempted robbery; (iv) an accusation of embezzlement in his capacity as a Little League volunteer treasurer; and (v) termination for cause from employment with Citibank.  433 F.3d at 304.

The District Court found that the majority of Defendants' allegations did not satisfy the first prong of the *McDonough* test because they rested on "little more than hearsay, speculation, and in one instance, vague allegations made by a person who refused to identify himself." *Id*. (*quoting United States v. Stewart*,  317 F.Supp.2d 432, 438 (S.D.N.Y. 2004)).  "The District Court also found that certain ambiguities in the *voir dire* questions developed by the parties made it unclear that [the juror's] responses deliberately concealed the truth." *Id.*  "As to those alleged failures to disclose, this was not the type of showing that constitutes 'reasonable grounds' for investigation.  *Id*. (*quoting Moon*, 718 F.2d at 1234).

The District Court in *Stewart* credited Defendants with raising serious questions concerning deliberate concealment of two matters that the juror in question did not disclose, namely, the conviction of his son for attempted robbery in 2000 and a civil judgment against the juror and his wife in 1997, both of which were supported by objective evidence. *Stewart,* 317 F.Supp.2d at 441-42. But the District Court found that none of the alleged omissions satisfied the second part of the *McDonough* test, which requires the party seeking a new trial to demonstrate that the correct answer at jury selection would have provided a valid basis to challenge the prospective juror for cause.

On appeal, the defendants contended that the juror's multiple failures to disclose background information indicated a suspicious pattern sufficient to raise doubts about his impartiality which justified further inquiry in a hearing. *Id*. The Second Circuit disagreed, noting that only two of the allegations had been found to be supported by the "type of evidence that justifies further inquiry." *Id*. Moreover, the Court further noted that the district court found that even if it were established that the juror's responses were false as alleged, none of the correct answers would have supported an inference that he was biased or prejudiced against the defendants or had prejudged the evidence. *Id*. at 305.

The above cases articulate the well settled law seeking to protect verdicts and jurors from unwarranted intrusion into their lives and their deliberations. Application of that law to this case renders an evidentiary hearing unwarranted and unjustified.

**Argument**

**Juror 162**

A. <u>Fell has failed to show that Juror 162 was dishonest</u>.

The record in this case considered as a whole, including the juror questionnaires, the answers provided during individual voir dire, and the answers provided during the August 15, 2013, juror inquiry, do not support a finding that Juror 162 was dishonest.

1. <u>Juror 162's Failure to Disclose Childhood Sexual Abuse</u>

Here, Juror 162 failed to disclosed that she had been the victim of childhood sexual abuse, some 50 years prior to trial. Juror 162 disclosed this information to 2255 counsel when she was interviewed about the trial. As in *Escalera*, Petitioner here cited no evidence that Juror 162 had intentionally failed to disclose her childhood sexual abuse, much less that the reason for the non-disclosure was to avoid excusal, (and not because she simply did not recall the 50-year old incident at the time she completed her questionnaire), or to conceal some bias that could have prejudiced the trial. The alleged incident of sexual abuse is insufficient to support an inference of bias, given the remoteness of the incident (50+ years prior to trial), and the fact that Fell was not charged with any sort of sexual abuse related crime. Moreover, in Juror 162's case, the record is clear that her failure to disclose her childhood sexual abuse did not prejudice Fell given that the jury unanimously found as a mitigating factor that Fell had been sexually abused as a child. Dkt. 200, p. 13. Therefore, Juror 162 in fact considered the evidence of Fell's childhood sexual abuse and found that it was a mitigating factor. Thus, respectfully, this Court's expressed concern that her statement to 2255 counsel, that "I was sexually abused as a child and it didn't

turn me into a murderer," appears to indicate that she might not have considered Fell's sexual abuse in mitigation, is not correct. What could possibly be inferred from Juror 162's statement is that Juror 162 did not accord Fell's childhood sexual abuse much weight in the weighing process when deciding between life and death. But Fell is not entitled to have the jury accord weight to his proposed mitigating factors, he is only entitled to have the jury consider his mitigation evidence, which Juror 162 did. Thus, even it had been assumed as true, no prejudice could have been inferred from Juror 162's statement.

Nonetheless, on August 15, 2014, the Court held what was supposed to be a preliminary inquiry to determine the reasons why Juror 162 failed to disclose her childhood sexual abuse. Juror 162 was appointed counsel by the court and was told that she would be questioned regarding the statements that she provided to 2255 counsel regarding her childhood experiences. She appeared in court and responded to the Court's questions without hesitation, explaining that when she completed the juror questionnaire, and specifically when she responded to Question 38, which asked if she had been the victim of a crime, she did not think of her childhood sexual abuse, which had taken place more than 50 years prior to voir dire. No one was arrested or prosecuted for what happened to her. Her adoptive father, the perpetrator of the abuse, had passed away, and Juror 162 had long since moved on with her life.

Fell argues that Juror 162's explanation is not believable because there were other instances in the past when she recalled and discussed her childhood sexual abuse. For example, when she underwent a psychological evaluation approximately a decade before trial as part of her request for visitation rights with her grandson. Fell's argument may have some teeth to it if Juror 162 had claimed to have forgotten about her childhood sexual abuse altogether. But this is not

the case. That Juror 162 recalled and discussed her childhood sexual abuse at different points of her life does not lead to the conclusion that she intentionally lied about it when completing her juror questionnaire. A psychologist likely asked pointed questions, specifically aimed at uncovering past trauma. A psychological evaluation can hardly be compared to completing a juror questionnaire. Indeed, Juror 162 testified that had she been asked whether she had been the victim of sexual abuse, she would have said yes. Transcript of August 15, 2013, p. 185. The fact that she openly discussed her childhood sexual abuse with Fell's attorneys shows that Juror 162 did not forget about it or intended to conceal it. What she testified during the August 15, 2013, inquiry was that Question 38 of the juror questionnaire, which asked if she had been the victim of a crime, did not trigger that memory. "I simply did not connect it." *Id*. at 98-101. There is no basis to conclude that Juror 162 intentionally concealed her sexual abuse, much less that she did it to avoid excusal or to conceal some bias that could have prejudiced Fell. Indeed, if her response had been intentionally false she would have hardly revealed her childhood experiences to Fell's 2255 counsel when they interviewed her. Nor is there any evidence that Fell suffered any prejudice as the jury unanimously found the fact that Fell had been the victim of sexual abuse to be a mitigating factor in penalty.

The primary purpose of voir dire is to uncover potential bias that could affect the fairness of the trial. Fell spends a great deal of energy trying to demonstrate that Juror 162 intentionally concealed her childhood sexual abuse, despite the overwhelming evidence to the contrary. Petitioner then argues that he is entitled to a new trial because this information would have warranted Juror 162's removal for cause. He argues that this is so because he was to introduce evidence of his own childhood sexual abuse and thus the fact that Juror 162 was a victim of the

same type of abuse disqualified her from considering his mitigation evidence.  His argument

lacks logic.  The fact that Juror 162 shared a similar childhood experience likely would have

caused her to sympathize with Fell, not to be biased against him.  Fell points to no case where a

juror has been removed for cause merely because he/she shared a similar experience as the

defendant, wholly unrelated to the charges in the case.  Indeed, that is because more must be

shown.

To satisfy the second prong of *McDonough*, Fell must prove actual bias or implied bias.

Fell has proven neither.  While hints of bias may assist the parties in exercising their peremptory

challenges, they are not sufficient to warrant a challenge for cause.  *Stewart*, 433 F.3d at 303.

Here, not even a hint of bias can be inferred from the mere fact that Juror 162 was also the victim

of childhood sexual abuse 50 years prior to trial.

### 2.  Juror 162's Failure to Disclose that She Was the Victim of Embezzlement

Despite the reasonableness of Juror 162's explanations, and the fact that they yielded no

hint of bias, the Court permitted Petitioner to cross-examine her.  During a cursory cross-

examination regarding her childhood sexual abuse, Juror 162 reaffirmed her answers and again

explained why she had failed to disclose the incident when responding to the juror questionnaire.

Petitioner then proceeded to question Juror 162 regarding an alleged embezzlement of funds of

which she was also a victim when she was approximately 18 years of age.  No prior notice of this

allegation had been afforded to Juror 162, the Court or the Government.  No supporting evidence

whatsoever had been provided to the Court or to the Government to substantiate the allegation.

Therefore, as of August 15, 2013, the date of the hearing, Fell had not met his burden of showing

"there is **clear, strong, substantial and incontrovertible evidence** that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant" warranting a hearing on the issue. *Escalera, supra*.    Nonetheless, the Court permitted the questioning.

Juror 162 again explained what happened and further affirmed that she did not think of that incident either when completing the questionnaire because she did not associate it with the question [38]. *Id*. at 162; 165-66.   There was no intent to deceive or not disclose the information as Juror 162 herself provided the information to Fell's counsel when she was interviewed at home. *Id*. at 164.  ("You told us this when we met with you, correct? Um-hum.") She explained that the incident had taken place long ago, when she was approximately 18 years old, after her first husband died in a fire and she was appointed a custodian to look after the assets she inherited. *Id*.  Again, no one was arrested or prosecuted for this conduct either, which took place more than 40 years prior to voir dire.  Again Juror 162 freely discussed the events with counsel. Again, there is no evidence that Juror 162 intentionally concealed this incident when responding to her juror questionnaire.  Moreover, this conduct is wholly unrelated to the facts at issue in Fell's trial; therefore, no possible inference of bias could be drawn from Juror 162's failure to disclose this information.  Therefore, this information would not have led to Juror 162 being stricken for cause.

### 3.  Juror 162's Alleged Failure to Disclose Lucille Tatro's Alleged Conduct

Similarly, the conduct imputed to Ms. Lucille Tatro by Fell, which he claims Juror 162 should have also disclosed in response to Question 38 is comprised of a number of isolated

incidents that would not necessarily have come to Juror 162's mind when completing her questionnaire. For example, the allegation that Ms. Tatro dragged Juror 162's son by the hair and locked him outside in the cold while wearing only underwear was made by Juror 162's son, not by Juror 162. *See* Psychological Evaluation of Juror 162, Fell -00002858. In fact, during the psychological evaluation cited by Fell, Juror 162 denied any knowledge of any physical abuse by Ms. Tatro of her son. *Id*. It appears that it is not until years later, after her son's divorce proceedings, that Juror 162 became aware of her son's allegations and believed that it could have happened. But it is clear that she had no knowledge of it as she did not witness this conduct. Therefore, it is reasonable then that she would not have thought of it when completing the questionnaire.

Again, Fell demonstrates no prejudice. Fell makes no attempt to show how this information would have supported a showing of actual or implied bias against Fell at trial. Again, we note that the jury unanimously found that Fell was physically abused as a child as a mitigating factor in penalty. Dkt. No. 200, p. 13.

Ms. Tatro's assault against Juror 162's vehicle, which led her to file a complaint with the police is certainly an act committed against Juror 162 personally. And it is true that she thought it significant enough to file a complaint to the police. But Juror 162 also testified that she has been married 30 years; therefore, these are events that are very much in her past. Indeed, the referenced event occurred in 1982, 25 years prior to trial. No intent to not disclose information can be inferred from failing to disclose conduct that took place 25 years prior to trial. Moreover, nothing about the conduct can be said give rise to even an inference of bias against Fell.

#### 4.  Juror 162's Failure to Fully Disclose Her Son's Criminal Record

Having failed to establish any misconduct regarding Juror 162's failure to disclose either her childhood sexual abuse or her victimization by her legal custodian at the age of 18, Fell embarked in an aggressive and overzealous cross-examination of Juror 162 regarding her alleged failure to disclose her son's criminal record.  The Government objected in the first instance because Juror 162 had in fact disclosed that her son had been previously convicted of domestic violence and DWI.  Moreover, Juror 162 had also disclosed that her son had been treated for alcohol abuse and had engaged in criminal conduct as a result of his alcohol abuse.  Fell argued, however, that he had evidence that her son's record was far more extensive than disclosed by Juror 162 in her questionnaire and that Juror 162 must have known of his other convictions.  The Government objected again as no notice of the allegation had been provided to the Court, to the Government or to Juror 162.  Moreover, the conduct was not encompassed by the claim set forth in Fell's 2255 Petition.  Nonetheless, without affording Juror 162 an opportunity to consult with her counsel, who was present in court, or receiving a proffer of the information in Fell's hands in the absence of Juror 162, or affording Juror 162 an opportunity to offer direct testimony on the issue, Petitioner was permitted to cross examine Juror 162 on her failure to disclose her son's 25-year-old criminal record in a rather confrontational and offensive manner.  Indeed, Juror 162 received less protection from the court than has been afforded the Petitioner in this case, who stands convicted of capital murder.

The Second Circuit has stated that a hearing is appropriate when "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant."  The impropriety referenced by the Circuit

-12-

is not met by showing a failure to disclose, but by showing clear and convincing evidence that the failure was intentional and thus the juror was dishonest. Moreover, Fell bears the burden of further showing that the alleged intentional failure was prejudicial. As of the August 15, 2013, hearing Fell had not met either burden. Therefore, Fell's cross-examination of Juror 162 should not have been permitted.

Here, Juror 162 disclosed on her juror questionnaire that her son had a criminal record that included domestic violence and DWI, that he had been under the Department of Corrections for three years, and further that he had been treated for alcohol abuse, which was related to his criminal conduct. Admittedly, most if not all of Juror 162's son's criminal acts were committed while under the influence of alcohol. That she failed to disclose additional criminal conduct by her son, of the same nature as that which was disclosed, did not constitute "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety had occurred which could have prejudiced the defendant." Question 43(b) of the questionnaire did not require Juror 162 to provide 25 years worth of criminal conduct by her son. She provided what she considered was most important. Moreover, Juror 162 was not asked a single question regarding her son's criminal history. Trial counsel did not seek to learn the facts underlying the convictions that were disclosed; whether her son had reverted to drinking; how her relationship with here son had been affected by his criminal conduct; whether Juror 162 harbored any resentment toward her son as a result of his conduct; etc., or any other questions to could have led to further disclosures. Therefore, there is no evidence of intentional concealment. Having disclosed that her son had a domestic violence and DWI conviction, it is hard to fathom how Juror's 162's failure to disclose additional DWI or assault convictions could lead to an inference

of bias against Fell. Quite the contrary, "a prospective juror with a family member who had been convicted of a crime would more likely be considered biased in *favor* of criminal defendants." *United States v. Stewart*, 433 F.3d 273, 305 n. 7 (2d Cir. 2006). Nor did the fact that her son had additional criminal convictions than those disclosed by her in her questionnaire would have subjected Juror 162 to being excused for cause. *See Id*.

Nonetheless, the Court permitted Fell to cross-examine Juror 162 on this subject for the purposes of "probing her credibility." But in reality it was an effort by Petitioner to obtain grounds to file additional claims of juror misconduct. Fell admittedly attempted by any means necessary to get Juror 162 to appear to perjure herself.

> The Court: But you appreciate the fact that in your pleadings up to date, this particular series of what you describe as inaccuracies in her testimony were not discussed. This is somewhat of a new issue. I appreciate the fact that you want to use the general rubric of "she was not being accurate," completely, but this was not specifically identified. So that's why we end up getting into this whole complex area because nothing was known.
>
> Counsel: I think – right. What happened here, just procedurally, is the claim was stated broadly about juror dishonesty. Factually, it was focused on the failure to disclose her sexual abuse. In the process for preparing for this hearing, we uncovered all of this evidence which we are now using for impeachment, because in the *Sampson* case, it was of great significance that the juror was not truthful on the witness stand. So we felt that this was very significant impeachment relevant to what the Court has to decide.

*Id*. at p. 148. This is precisely the type of probing that the Second Circuit condemned in *Sun Myung Moon*, *supra*. The undertaking was nothing but a planned attack on an unsuspecting juror aimed at obtaining additional potential grounds for additional juror misconduct claims. Counsel tried to demonstrate that Juror 162 was aware or should have been aware of her son's entire

criminal record, including terms of probation and parole, which took place over the course of 25 years.  What he achieved by openly arguing to the Court, in Juror 162's presence (prior to any testimony on the matter) that she was a liar was to upset Juror 162.  Now in his post-hearing brief Fell faults Juror 162 for becoming upset on the stand.  But quite contrary to Fell's allegations, Juror 162 was not upset because she did not want to discuss her son's criminal record, which she had openly discussed with 2255 counsel during at least two prior interviews.  *Id*. at 142.  Juror 162 (and the Government for that matter)  was upset at being accused of lying and at the manner in which counsel was permitted to treat her.  When Juror 162, confused about the turn of events, asked what her son had to do with this case or her judgment on this case, no explanation was given.  Instead the Court instructed Juror 162 to just answer the question.

> Counsel:    When your son was arrested for DWI fourth, and you said he was living – which is a felony, you were living next door to him?
>
> Juror 162:  You have to understand, you know, I don't remember all of these things. You are sitting here and accusing me of lying, which I don't lie.  I am not a liar.  I detest lying.  I don't remember all of the things that my son was charged with.  And when I filled out this questionnaire, I wrote on this questionnaire what I remembered at the time.  And I resent you sitting here and telling me that I am a liar.  And I have 40 references at home from past employers and people that have known me all my life that will tell you that is one thing I do not do is lie.  And you are sitting here and putting me through this about my son –
>
> The Court:  All right, let me – let me just – let me – let me –
>
> Juror 162:  Yeah, well, I am getting very upset about this whole thing.

*Id*. at pp. 149-50.  Indeed, there was hardly anyone present in court on August 15, 2013, who was not upset at the manner in which Juror 162 was treated by Petitioner's counsel.  Counsel accused Juror 162 of lying before asking any questions at all.

The Government submits that Juror 162's responsibility to disclose information about her son's criminal record did not extend to an obligation to disclose the date, time, place and sentence of each and everyone of her son's convictions, paroles and probationary periods. Juror 162 cannot be faulted for failing to disclose the 10 pages of criminal history that Fell summarizes in his brief. Dkt. No. 451, pp. 29-38. At the August 15, 2013, hearing, Fell asked:

| | |
|---|---|
| Counsel: | Do you recall that when he was released – that he was also charged on the night of that DUI, or DWI, with possession of cocaine and possession of marijuana, the same incident? |
| Juror 162: | I don't know anything about that. |
| Counsel: | That he was required to report daily to the Colchester Police Department? |
| Juror 162: | I don't recall that. |
| Counsel: | Did you drive him there? |
| Juror 162: | I don't recall that. That may be. I'm not saying that it's not so. I'm just saying that I don't recall that. |
| Counsel: | Do you recall that in connection with that 2002 conviction for DUI, that he got a two-to-five-year sentence and was referred again to ISAP program? |
| Juror 162: | I don't recall that. |
| Counsel: | You know what the ISAP Program is, though, don't you? Intensive substance abuse program? |
| Juror 162: | Abuse program? |
| Counsel: | Yes. |
| Juror 162: | Vaguely I remember. |
| Counsel: | Your son was in that program at least twice and perhaps a third time, correct? |
| Juror 162: | I don't recall. |
| Counsel: | And, in fact, you knew that he was on parole, right? |
| Juror 162: | I do recall him being on parole at one time when he was under house arrest, I believe. |
| Counsel: | I am talking about on parole in connection with the DUI fourth in Colchester. |
| Juror 162: | I don't honestly recall that. |

*Id*. at p. 152-53. Through his cross-examination Fell attempted to establish that Juror 162 was not being honest. But what he established was that Juror 162 did not have a photographic memory when it came to her son's criminal record. Juror 162 can not be faulted for failing to remember, for example, on August 15, 2013, whether she had driven her son to, what appears to be a bail appointment, 11 years earlier. Juror 162 stated that she was not saying it did not happen, just that she did not recall. Who could remember if on a particular day, 11 years earlier they gave a family member a ride? If this is the standard for juror disclosure, then open the flood gates! Indeed, the Government would be surprised if her son's attorney remembers exactly what her son was charged with or sentenced to in 2002, 11 years earlier, without having an opportunity to review the file.

It is clear from her answers that Juror 162 had no reservations about discussing her son's criminal record. It is also clear that she did not remember every detail, and indeed, was likely not aware of every detail of her son's criminal past. On her questionnaire Juror 162 disclosed the most important convictions that came to mind. No intent to deceive can be inferred.

Petitioner further asserts that Juror 162 lied when she stated that the intervention by the Corrections Department with her son was "[b]est thing [that] ever happened to him. He is now a different person." in response to Question 43(b). According to Petitioner, Juror 162's son could not have been a different person as he continued to engage in criminal conduct. But how can the opinion of a mother that her son was a better person be a lie? Juror 162 stated that since his conviction for domestic violence and DWI that required him to spend time in prison, her son had maintained a steady job and had not gone back to prison. While this may not seem like much to some, it was clearly significant to Juror 162.

-17-

Fell references a segment of Juror 162's cross-examination as evidence that she insisted that her son's criminal record was limited to the convictions she disclosed on her questionnaire. Dkt. No. 451, p. 30. Petitioner misrepresents Juror 162's testimony. In the segment of the testimony quoted in his brief, Petitioner looked to confirm the information that Juror 162 had previously provided in her questionnaire. Fell begins his quote at page 111, line 15, but at page 109, line 11, Fell had referenced Juror 162 to her short questionnaire, so that the questions that followed referred to the answers she provided on that questionnaire. *Id*. at 109-112. The question posed at line 9 on page 111 makes this clear.

| Counsel: | And the form asked you if you or any person close to you had ever been accused of a crime, right? |
|---|---|
| Juror 162: | That's correct. |
| Counsel: | And you in fact disclosed that your son – you can see that on page two? |
| Juror 162: | Um-hum |
| Counsel: | You said that your son was under house arrest for D – DUI, DWI and domestic violence 16 years ago, and he is now the assistant manager at Shaw's , et cetera, right? |
| Juror 162: | That's correct. |

*Id*. at 111. Thus what Fell did was confirm Juror 162's answers on her short questionnaire. Yet in his brief Fell cites this segment of Juror 162's testimony in support of his argument that "[i]n Juror #162's testimony at the August 13 hearing, she both admitted that she had not fully disclosed her son's criminal history at voir dire, and also continued to lie about the extent of his record." Dkt. 451 at p. 30. But Fell never asked Juror 162 the extent of her son's record. Fell never asked Juror 162 whether that was the only criminal conduct that her son had engaged in. In

fact, Juror 162 later tells Fell's counsel that he son had several DWIs and that she had informed

him of that when he spoke to her at her home.

Counsel:    And your son was living at some point next door to you?

Juror 162:    He was living next door, um-hum.

Counsel:    And you recall him being arrested for DWI fourth?

Juror 162:    You know, this is the thing, I don't know every little thing that my son did. I know he – and I told you when you were sitting on the couch beside me that he was picked up for several DWIs, but, you know, I can't remember each and every thing that he did. And when I put this down here, I put down what I remembered about his conviction of his domestic violence, and I also told you I thought you represented him at one time for a DWI charge as a public defender. I told you that in my house.

The Government submits that Fell has failed to show misconduct on the part of Juror 162

in answering Question 43(b) of the long questionnaire. First, Juror 162 did not intentionally fail

to disclose her son's criminal record. She disclosed the conduct that she considered most

serious. Therefore, even if her disclosure is deemed to be insufficient, it certainly was not

intentionally so. In addition, the information provided was certainly sufficient for Fell to inquire

further into her son's criminal conduct during voir dire, which Fell elected not to do. Likely,

because as the Second Circuit has noted, a prospective juror with a family member who has been

convicted of a crime is likely to be biased in favor of the defendant. *Stewart, supra*. Particularly

in this instance where the family member was the juror's son.

Moreover, in this case, Juror 162 was not a strong death juror, that is, she was also a

favorable juror for the defense based on her views on the death penalty. Therefore, this is a juror

that Fell wanted on the jury. Fell, having elected not to inquire further during voir dire about her

son's criminal history, cannot now complain that Juror 162's disclosure was insufficient, much less intentionally so.

A juror has no obligation to read the minds of counsel and volunteer information that defense counsel would want to know. The fact is that Juror 162 was not asked further about her son's criminal record; she was not specifically asked about sexual abuse; she disclosed her son's substance abuse, but was not asked further about it. As this Court noted, "certainly you can't put a duty on a juror to come forward with candid information which may be helpful to one side or another." *Id*. at 177. Specific questions could have been asked by trial counsel but were not.

Fell audaciously faults Juror 162 for failing to disclose during voir dire that her life was marked by "turmoil, abuse, victimization, mental illness and the stress of raising and living with a son who has struggled for decades with drug and alcohol abuse and who has a criminal history..." Dkt. 451 at p. 11. But Juror 162 was not asked to give her life history or that of her son. She was asked specific questions and she provided specific answers. Each question must be examined individually. Juror 162 did not consider herself a victim, therefore, she did not disclose her childhood sexual abuse. "I just did not think of it." Nor did she recall the embezzlement by her custodian, more than forty years prior to trial. Moreover, while Juror 162 was asked about her opinion of psychologists and psychiatrists, she was never asked if she herself had ever suffered from a mental health condition. Juror 162 did disclose the stress of living with a son who struggled with drug and alcohol abuse that led to criminal behavior. She specifically stated: "Drugs and alcohol can do a lot to a person ...." When considered together with Juror 162's response to Question 43(b) indicating that her son had been prosecuted for domestic violence and DWI, the information provided was certainly enough to alert trial counsel

that Juror 162 had experienced significant turmoil in her life as it related to her son.

Despite the fact that Fell's 2005 trial counsel elected not to ask a single question about her son's criminal conduct, in 2013 Fell spends close to ten pages summarizing Juror 162's son's criminal record as if during the course of a 15 to 20 minute voir dire session Juror 162 should have disclosed her son's entire life. Juror 162 had no such responsibility. At some point her responsibility to disclose ends, and counsel's responsibility to inquire begins. Trial counsel here never inquired about Juror 162's son's criminal record.

B. Fell has failed to show that Juror 162 was biased.

Fell has failed to demonstrate that Juror 162 harbored any bias. This topic was in fact explored during her voir dire examination and her answers revealed no bias whatsoever. Indeed, neither party moved to strike Juror 162 on that basis. The fact that Juror 162's son had additional criminal convictions, of the same nature as those previously disclosed by her, does not lend itself to an inference of bias, certainly not against the defendant. Nor does this evidence support an inference that Juror 162 had prejudge the evidence such that Fell was denied a fair trial. Therefore, Fell has failed to meet the showing required by *McDonough*.

Petitioner misapprehends his burden. He must not only prove that a juror engaged in misconduct by being dishonest, which the Government submits he has not done, but he must also show that he was prejudiced because he was denied a fair trial. Prejudice is not shown by merely proving the alleged misconduct, prejudice must be shown by demonstrating that the juror engaged in misconduct because he/she was biased, and not because of some other unrelated reason. Fell has made no showing of bias on the part of Juror 162 that would have required her

to have been stricken for cause.  Therefore, even if this Court were to conclude that Juror 162 was dishonest, which the Government contests, Fell has failed to show that a truthful answer would have subjected Juror 162 to being stricken for cause.  *McDonough* held that a juror's dishonesty results in reversal only if a truthful answer "would have provided a valid basis for a challenge for cause."

"Traditionally, challenges for cause have been divided into two categories: (1) those based on actual bias, and (2) those grounded in implied bias."  United States v. Torres, 128 F.3d 38, 43 (2nd Cir. 1997).  See also *United States v. Wood*, 299 U.S. 123, 133 (1936) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law."); *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012) ("Traditionally courts have distinguished between two types of challenges for cause:  those based on actual bias and those based on implied bias.").  Actual bias is "bias in fact," *Wood*, 299 F.3d at 133, and "is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view."  *Fields v. Brown*, 503 F.3d 755, 767  (9th Cir. 2007) (en banc); *see also United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993) (actual bias can be demonstrated "either by an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed.").  The determination of whether a juror is actually biased is a question of fact, *see, e.g., United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010), *cert. denied,* 131 S. Ct. 1475 (2011); *Fields*, 503 F.3d at 767, and it frequently (and the Supreme Court has said, appropriately) turns upon the testimony of the juror in question. *See Smith v. Phillips*, 455 U.S. 207, 217 n.7 (1982).

1.  Juror 162 was not actually biased.

A juror is found by the judge to be partial either because the juror admits partiality, *see United States v. Haynes,* 398 F.2d 980, 984 (2d Cir.1968) (actual bias is "based upon express proof, e.g., by a voir dire admission by the prospective juror of a state of mind prejudicial to a party's interest"), or the judge finds actual partiality based upon the juror's voir dire answers, *see Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion) ("Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.").

For example, in *Torres*, *supra*, the Second Circuit affirmed the district court's excusal of three jurors based on actual biased. Juror 27 had engaged in prior structuring activity, the same crime charged against the defendant. 128 F.3d at 44. Some seven years prior to his selection as a venireperson, Juror 27 had deposited money into a partnership account for a real estate venture in two amounts of less than $10,000 in order to avoid having to file a Currency Transaction Report. *Id*. When questioned by the court at voir dire as to whether the instructions on the law of structuring would affect his ability to be fair and impartial in this case, he was unequivocal in stating that he could not be impartial under the circumstances. *Id*. When asked to explain, he stated: "Because I did it. I did it and you are telling me that I did something illegal, so I feel like you are accusing me of a criminal act." *Id*. Similarly, Jurors 38 and replacement 38 stated in substance that, because of personal experiences with drug dealers, they would not believe a drug dealer's testimony. Juror No. 38's second cousin was murdered by a drug dealer. When asked whether this fact would affect his ability to be fair and impartial, he said: "I would have in-bred doubt in my mind about that person to begin with, just because of my experiences in the past

with such individuals.... I don't think I could remain unbiased towards that person's testimony."

Replacement Juror No. 38 had a friend who was killed two years earlier by a drug addict. He

stated: "If [drug dealers] were witnesses or something like that, I think they're the worst people

on earth and I wouldn't believe them no matter what they said." When specifically asked whether

he could make a fair judgment as to the credibility of such a witness, he responded: "I don't think

I would be able to do that. I don't think they have any credibility."

Nothing about Juror 162's responses to her questionnaire, her testimony on voir dire or

during the August 15, 2013, hearing could lead to the conclusion that she was actually biased. At

trial, after the prosecutor explained how a capital trial would proceed, he asked Juror 162 if she

thought that she could be fair and impartial in the guilt part of the case, and she said,

"Definitely." *Id*. at 124. The prosecutor next explained some of the aggravating circumstances

she would hear in penalty and asked if she could keep an open mind and consider that evidence

in sentencing. Juror 162 stated unequivocally, "Yes." *Id*. at 125. He then explained that the

defense may present mitigating evidence,

> such as the defendant grew up in an incredibly chaotic
> environment, he was abandoned by both of his parents as a child,
> and may have been subject to different types of abuse, physical and
> otherwise. You may also hear that the defendant suffered and took
> drugs and alcohol as an adolescent and as a young man. You may
> also hear evidence that the defendant may have been remorseful
> after the crime, and you may also hear evidence that the defendant
> has made efforts to rehabilitate himself in prison.

*Id*. at 125-26. The prosecutor then asked: "could you keep an open mind and listen to all those

things as a juror in that second phase of the trial?" *Id*. at 126. Juror 162 again unequivocally

replied: "Certainly." *Id*. Juror 162 further reaffirmed that she would listen to all the evidence

and weigh it carefully. *Id.*

The prosecutor next told Juror 162 that she may hear evidence from psychologists and

psychiatrists about the defendant's state of mind at the time of the crime, and asked if she "could

keep an open mind to all that evidence?" *Id*. Juror 162 said "Yes." *Id*. Juror 162 further stated

that she could consider competing opinions by psychologists and psychiatrists and use her own

judgment to determine which one was more credible. *Id*.

Defense counsel then again explained to Juror 162 how a capital case would proceed, and

then asked Juror 162:

> assuming that you found Mr. Fell guilty of an intentional killing, as
> Mr. Kelly described to you – abduction of a woman, innocent
> woman, 53-year-old woman abducted, going to work, as innocent
> as could be, how she was abducted, drove, and then essentially
> stomped to death, brutally stomped to death –knowing that you
> would have already found him guilty of that intentional killing,
> then could you consider a life sentence for Donald Fell?

*Id*. at 130-31. Juror 162 replied:

> Well, not hearing what the evidence is, I could – I could make a
> decision either way. . . I guess that's the easiest way to answer that.
> But I haven't heard any evidence yet, so – I think what you are
> asking me, if I am capable of making a decision for life in prison or
> for the death penalty, without hearing the evidence? . . . I would be
> capable of either one, but naturally I would have to hear all the
> mitigating circumstances first.

*Id*. at 131.

Counsel next told Juror 162 that there would be evidence in the case that Fell abused

alcohol and drugs from a very young age, and asked her "whether [her experiences with her son]

in any way could affect your ability to consider that as one of the mitigating circumstances?" *Id*. at 132. Juror 162 initially stated that this was a "hard question" because "drugs and alcohol can do a lot to you, yes, from my own personal experience with my son." *Id*. Juror 162 added that her son was rehabilitated through the correctional system, "which was the best thing that ever happened to him." *Id*. Counsel next asked whether "the opportunity that your son had, that was provided through the Department of Corrections, something that you thought was significant? *Id*. Juror 162 responded, "Very significant." *Id*. She explained that her son had "some tough, tough learning things, tough things to go through to overcome his problem. *Id*. Counsel asked: "What did it take him to get intervention?" *Id*. at 133. Juror 162 stated: "It took corrections coming to his house periodically. It took going to meetings every week. It took losing his driver's license. I mean it took a lot. He hit the bottom before he went to the top, yeah." *Id*.

Counsel next asked Juror 162 about a series of mitigating factors, specifically, "lack of people to care;" "lack of authority;" "little criminal history;" "remorse;" – all of which Juror 162 stated she would consider. *Id*. at pp. 133-35. Counsel also asked Juror 162 whether she would consider the defendant's age, to which Juror 162 responded: "I don't know, truthfully ... you're not a child anymore at 20." *Id*. at 135-36. Juror 162 ended by stating that she was not sure if it was more probable to sentence Fell to life because he was 20. Counsel then ended his voir dire. *Id*. at 136.

Juror 162 was asked several times during voir dire whether she could fairly and impartially consider the evidence presented and she unequivocally responded yes. *Id*. at 116-17; 120; 125-26. Moreover, during the juror inquiry Juror 162 stated firmly that she had indeed been fair and impartial in considering the evidence.

> Q. And do you recall that he wanted to know if you could be fair and impartial when considering this kind of evidence, and you said that you could.
>
> A. That's correct, and I was.

In paragraph 5 of her sworn declaration Juror 162 states that she thought the trial was "really fair" and that the lawyers on both sides did an outstanding job. In paragraph 6 Juror 162 indicates that she paid close attention to "what was happening and the evidence." She did not pay much attention to what Donald Fell was wearing or if he had on shackles.

The events cited by Fell, to wit, her childhood sexual abuse, the embezzlement of funds against her and her relationship with Ms. Tatro, were all events that were well in the past, 50, 40 and 25 years prior to the trial in this case. They were events that Juror 162 had dealt with and surpassed. This is supported by the very psychological evaluation that Fell attempts to now use against her. The conclusion of the psychological evaluation cited by counsel was that Juror 162 has overcome most of her difficulties.

> Despite the personal adversity and emotional turmoil which [Juror 162] has endured, her overall functioning, especially over the past few years, indicates an ability to address and overcome these difficulties effectively. She has been highly responsible in her professional capacity and has attempted to construct a normalized home environment despite her son's anger towards her in relation to her lack of protection during the period of her emotional vulnerability, and her husband's extreme dependency on her a as a result of his disability. She has remained sober, and currently demonstrates no signs of a disabling depressive disorder, despite the fact that she has discontinued her medication. In support of this characterization, Karen Shingler has provided the examiner with eighteen personal references from Ms. Gagnon's colleagues which attest to her professionalism, stability, and interpersonal skills.
>
> There is nothing in the current evaluation that can decisively determine whether Ms. Gagnon has ever been sexually inappropriate with her grandson. ... It is not likely, however, that she herself, is sexually motivated or aroused by such behavior, or that she intended to be sexually inappropriate with her grandson. Her

explanation regarding his bathing appears credible, and it is only her possible
insensitivity to Michael's feelings that create a problematic situation.

Fell-00002860-61. Contrary to Fell's allegation, Juror 162 was never charged with touching her
grandson inappropriately. Question 43(b) of the long questionnaire asked whether the juror had
"ever been charged with a crime?" During a custody battle between Juror 162's son and the
mother of her grandson, Juror 162 requested visitation rights. The therapist of the then 5 or 6
year old boy "speculated" that there may have been some inappropriate touching based on the
fact that the boy did not want to visit with the grandmother, who apparently forced him to take
baths when he soiled his pants. At Juror 162's request a psychological evaluation was conducted.
No evidence of any wrongdoing was ever found. *Id*. This evidence hardly supports the argument
that Juror 162 should have disclosed this information in response to Question 43(b). The
Government submits that Fell's argument in this regard is again irresponsible.

Moreover, the Second Circuit has determined that a family member's criminal conviction
does not lead to a finding of bias against the defendant. Therefore, there is no basis to conclude
that any of the above-discussed events would have led to a finding that Juror 162 was actually
biased against Fell.

2.    Fell has failed to show implied bias against Juror 162.

Implied bias, by contrast, is "bias conclusively presumed as matter of law," *Wood*, 299
U.S. at 133, and is limited to "exceptional" or "extreme" circumstances, *Amirault v. Fair*, 986
F.2d 1404, 1406 (1st Cir. 1992) (per curiam). As Justice O'Connor has noted, some examples of
the "extreme situations that would justify a finding of implied bias" include "a revelation that the
juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of

the participants in the trial, or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith*, 455 U.S. at 222 (O'Connor, J., concurring). No showing of implied bias has been made here.

In *McDonough*, a products liability action, jurors were asked on voir dire whether they or any family members had ever suffered a severe injury. 464 U.S. at 550. One member of the panel, who ultimately became the jury foreperson, did not respond, even though his son had once suffered a broken leg from the explosion of a truck tire. *Id.* at 550-51. The jury found for the defendant company following a three-week trial. *Id.* at 551. After information about the juror was discovered, the plaintiff sought but was denied a new trial. *Id.* The Tenth Circuit reversed and ordered a new trial, finding that the withholding of the information prejudiced the plaintiff's right to exercise peremptory challenges. *Id.* at 551-52. The Supreme Court reversed, holding that the juror's good-faith response to the question (he did not consider his son's broken leg to be the type of injury asked about) was insufficient to warrant a new trial. *Id.* at 553-56.

In reaching this conclusion, the Court noted that "[o]ne touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it,'" and that "[v]oir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.* at 554 (quoting *Smith*, 455 U.S. at 217). The Court expressly distinguished, however, between the kinds of bias that would serve as a basis for a challenge for cause and those that might support a peremptory challenge: "Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause," the Court explained, while "hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." *Id.*

The Court also emphasized, however, that litigants are entitled to a fair trial "but not a perfect one, for there are no perfect trials," and that courts had "come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered citadels of technicality." *Id.* at 553 (internal quotations omitted). The Tenth Circuit's ruling "must be assessed against this backdrop," the Court stated, and the juror's failure to identify his son's injury during voir dire did not warrant a new trial because he apparently believed that his son's broken leg was not the kind of injury inquired of during voir dire. *Id.* at 554-55. Indeed, the Court noted, another juror had identified a relatively minor incident in response to the question and a third juror did not respond to the question when initially posed, and it was only subsequent questioning that brought out the fact that her husband had been injured in a machinery accident. *Id.* at 555.

In these circumstances, the Court held, "[w]hatever the merits of the Court of Appeals' standard in a world which would redo and reconstruct what had gone before upon any evidence of abstract imperfection," that standard was inconsistent with modern practice. *Id.* at 555. "A trial represents an important investment of private and social resources," the Court explained, "and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." *Id.* at 554. Rather, the Court concluded, a new trial is warranted only where a juror fails to answer honestly a material question on voir dire and there is a showing of bias on the part of the juror:

> We hold that to obtain a new trial in such a situation, a party must
> first demonstrate that a juror failed to answer honestly a material
> question on voir dire, and then further show that a correct response

> would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, *but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial*.

*Id*. at 556 (emphasis added).

Fell has not demonstrated that Juror 162 was "actually biased." Juror 162 did not reveal her childhood sexual abuse or the embezzlement committed against her because she did not recall either event when she completed the juror questionnaire, not because she harbored some unknown bias against the defendant. Indeed, neither sexual abuse or embezzlement had any relationship to the charges of capital murder pending against Fell. Nothing in the record would have indicated to Juror 162 that sexual abuse would be in an issue in this case – she was never asked about it. Therefore, Juror 162's reasons for nondisclosure cannot be said have affected the fairness of the trial.

Similarly, Fell has failed to establish that Juror 162 had an intent to conceal her son's criminal record. She disclosed that part which she deemed most important. No questions were asked of her about her son's record during voir dire. When 2255 counsel inquired further, she readily discussed her son's record and past problems with alcohol with him. No intent to conceal can be inferred from these facts. And even if the Court were to conclude that Juror 162 should have disclosed additional information, nothing about the additional information that she could have disclosed would have led to her being stricken for cause. The additional information would have been of the same nature as that which was disclosed. The fact that her son had a criminal record would not have disqualified Juror 162 from jury service. *See Stewart, supra*.

More significantly, Juror 162 consistently testified that nothing in her past experiences would affect her ability to be impartial. During the August 15, 2013, inquiry, she testified that her past experiences did not come to mind during the trial, she listened to the evidence presented and based her judgement on that. This is the definition of a fair and impartial juror.

Nor has Fell proved implied bias. There is nothing that has come to light that would support a finding of implied bias regarding Juror 162.

### 3. Fell has failed to show ground to infer bias.

Moreover, the Government submits, contrary to Fell's argument, that bias cannot be inferred from Juror 162's answers. Indeed, if Juror 162 would have favored anyone in this case it would have been Fell. Throughout her voir dire it is clear that Juror 162 was concerned with hearing all mitigating evidence before considering punishment. She specifically testified that she would consider the mitigating evidence presented. No possible bias could be inferred from this testimony.

But even if this Court were to determine that Fell has made some sort of showing of inferable bias, such a showing in insufficient to warrant post-conviction relief. Inferred bias would have only given the Court discretion to excuse Juror 162 for cause during voir dire, it would not have required that she be stricken as mandated by *McDonough* to warrant reversal of a conviction.

In *Torres*, *supra*, the Second Circuit recognized a third category of bias that could support a challenge for cause during the voir dire process, "inferable" or "inferred bias." The defendants in that case, who had engaged in structuring a cash transaction, argued, *inter alia*, that they were

entitled to a new trial pursuant to Rule 33 because the district court had erroneously excused four

potential jurors for cause during the voir dire process. 128 F.3d at 41-42.  The Second Circuit

concluded that three of the jurors were properly dismissed for actual bias, and that the district

court acted within its discretion in dismissing the fourth juror for "inferable bias," who had

admitted to having some involvement in a structuring transaction in the past.  *Id.* at 42-45.

In reaching this conclusion, the Second Circuit explained that "there exists a few

circumstances that involve no showing of actual bias, and that fall outside of the implied bias

category, where a court may, nevertheless, properly decide to excuse a juror." *Id.* at 46-47.  The

court described that category, which it referred to as  "inferable bias" or "inferred bias," as

follows:

> Bias may be inferred when a juror discloses a fact that bespeaks a
> risk of partiality sufficiently significant to warrant granting the trial
> judge discretion to excuse the juror for cause, but not so great as to
> make a mandatory presumption of bias.  There is no *actual* bias
> because there is no finding of partiality based upon either the
> juror's own admission or the judge's evaluation of the juror's
> demeanor and credibility following voir dire questioning as to bias.
> And there is no *implied* bias because the disclosed fact does not
> establish the kind of relationship between the juror and the parties
> or issues in the case that mandates the juror's excusal for cause.

128 F.3d at 47 (emphasis in original).  The court stated that it did not need to "consider the

precise scope of a trial judge's discretion to infer bias," but noted that "cases in which a juror has

engaged in activities that closely approximate those of the defendant on trial are particularly apt."

*Id.*

In then applying the category of "inferable bias," the Second Circuit found that given the

similarity of the juror's structuring activity to charges in the case, the district court acted within

its discretion in excusing the juror. *Id.* at 47-48. The court emphasized, however, that "[w]e do not hold today that, even in such circumstances, the district court would have erred had it kept Juror No. 7 on the jury," and the court's holding therefore was limited to the question whether the court "acted within its discretion in excusing her from the jury." *Id.* at 48. In other words, the Second Circuit did not hold in *Torres* that a showing of "inferable bias" would be sufficient to overturn a conviction based on a claim of juror bias, whether on appeal or on collateral review.

The *McDonough* test cannot be satisfied by a showing of "inferable bias." To establish a valid challenge for cause, Fell must prove actual or implied bias. The Court left no doubt about what it meant by a valid challenge for cause, having earlier explained that "[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause," while "hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." 464 U.S. at 554. "Demonstrated bias" thus means *proven* bias – whether bias in fact or bias conclusively presumed as a matter of law – and it is only *proven* bias that the Court stated "can truly be said to affect the fairness of a trial." *Id.* at 556. That the Court meant actual or implied bias is further confirmed by the fact that the only accepted challenges for cause at the time that *McDonough* was decided – other than for statutory ineligibility, *see* 28 U.S.C. §1865(b) – were for actual or implied bias. *See, e.g., Wood*, 299 U.S. at 133 (stating that "[t]he bias of a prospective juror may be actual or implied"); *Government of Virgin Islands v. Felix*, 569 F.2d 1274, 1277 n.5 (3d Cir. 1978) ("Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias."). Indeed, the theory of "inferable bias" was first identified as a distinct basis for a challenge for cause only in 1997 by the Second Circuit in *Torres*, more than a decade after *McDonough* was decided in 1984, and

-34-

that decision was limited to the question whether a district court has discretion to excuse a juror for "inferable bias" during the voir dire process; it did not involve a request for a new trial based on a claim of juror bias.

Moreover, "inferable bias" is not demonstrated or proven bias. It is "a *risk of partiality* sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make a mandatory presumption of bias," *Torres*, 128 F.3d at 47, and a "risk of partiality," by definition, does not amount to demonstrated or proven bias.[2] "Inferable bias" instead is akin to the "hints of bias" that the Court in *McDonough* said can aid a party in the exercise of peremptory challenges, but which would not warrant the granting of a new trial even if a juror withheld information during voir dire that prejudiced the party's right to exercise those peremptory challenges. Indeed, the Court rejected the Tenth Circuit's judgment that a new trial was warranted because the withholding of the information by the juror prejudiced the plaintiff's right to exercise peremptory challenges, holding that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." *Id.* at 555. The denial of the opportunity to uncover "hints of bias," in other words, did not warrant the granting of a new trial, and the denial of the opportunity to uncover a "risk of partiality" likewise does not warrant the granting of a new trial.

---

[2] The term "risk" is defined as "the possibility of loss, injury, disadvantage, or destruction." WEBSTER'S at 1961; *see also* BLACK'S at 1353 (defining "risk" as "[t]he uncertainty of a result, happening, or loss; the chance of injury, damage or loss; esp., the existence and extent of the possibility of harm.").

In concluding that the *McDonough* test could be satisfied by a showing of "inferable bias," the district court also failed to appreciate the difference between the breadth of a court's discretion during the voir dire process, and the showing that must be made when a defendant seeks to set aside a conviction based on juror bias. The Second Circuit's decision in *Torres* involved the former, rather than the latter, situation, and although that court held that a district court has discretion to excuse a venireperson for "inferable bias," it also expressly stated that it was *not* deciding when a venireperson *must* be (or, in hindsight, should have been) excused. 128 F.3d at 48. The Second Circuit also has questioned whether "inferable bias" could even support a juror bias claim where actual bias has not been shown. *See Greer*, 285 F.3d at 172.

The calculus is different when a defendant seeks to set aside a conviction based on juror bias. As *McDonough* makes clear, a court considering a claim that a juror should have been excused in such situations looks to whether the jury, in fact, was impartial, not whether a different jury might have been seated if all the information that should have been disclosed during voir dire had come to light. As the Court explained, even where a party "lacked an item of information which objectively he should have obtained from a juror on voir dire examination," which might have uncovered "hints of bias" that would have assisted the parties in exercising their peremptory challenges, a new trial to "recreate the peremptory challenge process" is not warranted. 464 U.S. at 554-56. Rather, the party advancing the claim must show "demonstrated bias" on the part of the juror such that the juror would have been excused for cause, as "only those reasons that affect a juror's partiality can truly be said to affect the fairness of a trial." *Id.* at 556.

The decision in *McDonough* thus reflects the fundamental difference between the consideration of challenges for cause during the voir dire process and during post-judgment review. As the Court has elsewhere recognized, the "reality of the jury selection process" is that "[c]hallenges for cause and rulings upon them * * * are fast paced, made on the spot and under pressure. Counsel as well as the court, in that setting, must be prepared to decide, often between shades of gray, by the minute." *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (internal quotation omitted). A district court, in other words, is given wide latitude to dismiss a juror for cause during the voir dire process, and the breadth of that latitude is greater than when a defendant seeks to set aside a conviction based on juror bias. *See, e.g., Fields*, 503 F.3d 811 n.17 (Berzon, J., dissenting) ("I accept the majority's implicit suggestion that implied bias operates to exclude a broader category of individuals when raised as a for-cause challenge during voir dire than when raised for the first time on appeal."). This is the interest that the Second Circuit validated by adopting the theory of "inferable bias" in *Torres*, as it allows a court discretion to dismiss a venireperson during the voir dire process when there are doubts about his or her impartiality, but it is an interest different from the determination of whether a juror, in fact, was impartial. *See, e.g., Torres*, 128 F.3d at 47 (although holding that the district court could excuse a juror for cause based on "inferable bias," also stating that "[t]here is no actual bias because there is no finding of partiality.").

"Inferable bias" thus operates in much the same fashion as did the claim that the plaintiff's right to exercise peremptory challenges had been prejudiced in *McDonough*, asking not whether the Juror 162, in fact, was impartial, but whether the court, in its discretion, would have excused her for cause during the voir dire process had it been aware of the information

-37-

which she should have disclosed. That form of inquiry is just the type of "recreation" of the voir dire process that the Court disavowed in *McDonough* as the basis for the granting of a new trial. It would be error to reverse based on a finding of inferred bias.

Nor does a collective analysis save Fell's argument. He urges this Court to consider the collective effect of the Juror 162's dishonesty. But that is not how the analysis is undertaken. Instead, each allegation of dishonesty is considered individually, and only those allegations that are sustained by the evidence are considered when determining whether a showing of bias has been made, focusing on the reasons behind the dishonesty and the facts of the case. *See Stewart*, 433 F.3d at 304 (rejecting consideration of "pattern of lies" allegation).

Fell describes the life experiences of Juror 162 almost with disdain, as if her life experiences alone should have disqualified her from being a juror. The Government disagrees. A juror is not subject to being stricken for cause because they had a difficult life. Juror 162 had a number of difficult life experiences, but she faced them, dealt with them, and moved past them. She eventually built a life with her current husband of 30 years. Fell is not entitled to jurors who have led perfect lives, free of turmoil and abuse. Jurors are not generally put on trial to see if they have led exemplary lives and are thus "worthy" of being jurors. A defendant is entitled to jurors who can be fair and impartial, that is, jurors who despite having had certain life experiences can nonetheless set them aside, and render a decision solely based on the evidence presented at trial. This is exactly what Juror 162 did. CITE. She expressed herself in court with sincerity. Juror 162 has been repeatedly forthcoming about matters that most people would find difficult to discuss. Yet she related her life experiences as requested, over and over again. Unfortunately, her ultimate decision was not the decision Fell wanted, but the verdict does

invalidate the process. Juror 162 considered all the evidence presented, she deliberated with her

fellow jurors and she reached a verdict she felt was just in light of the evidence presented. That

verdict should be sustained.

**Juror 143**

A.  Fell Fails to Show Prejudicial Misconduct By Juror 143

1.  Prior Proceedings as to Juror 143

The 2011 petition charges that Juror 143 inspected Rutland crime scenes during trial, and

shared resulting information with other jurors so as to corrupt deliberations. The charge is based

upon Exhibit 241 to the petition, Juror 143's written statement describing jury deliberations.[3] In

listing various matters discussed by the jury "[i]n making our decision," the statement cites, "the

trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the

Price Chopper." *Id*. Exhibit 241 contains Juror 143's observation that the Robbins Street

neighborhood "wasn't great, but it was okay." Further along, the statement cites a second, post-

---

[3] Exhibit 241's submission and consideration violates Fed. R. Evid. 606 and the rule disfavoring post-verdict questioning of jurors regarding deliberations. Fell's petition also charges that Juror 143 pointed Fell's unloaded shotgun at another juror during deliberations, to demonstrate that unloaded guns remain frightening. However, testifying jurors have denied that the gun was in the jury room. Fell's allegation regarding the shotgun appears to have no basis in fact (beyond Juror 143's curious and discredited written statement). Fell's new allegation that Juror 143 lied during voir dire by failing to disclose that in 1995 police asked him whether he had stolen a picnic table after two persons chased him in a car with that belief – does little more than demonstrate again the extreme lengths to which 2255 counsel will go in attacking this Court's jurors. The juror question at issue inquired whether Juror 143 had been "accused of a crime." No charge was filed based upon the 1995 episode, and it doubtless did not appear to the juror that an affirmative response was required. In any event, this matter was not alleged in the March, 2011 petition, filed on the last day before the statute of limitations expired (and has not to date been raised in a motion to amend).

trial trip to visit crime scenes. It then reads, "The lighting of the Price Chopper in Rutland was weak. At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit."

Fell argues that Exhibit 241 shows that Juror 143 corrupted deliberations with three forms of extraneous information observed during his trip to Rutland: (1) the lighting outside the Price Chopper; (2) the condition of Debra Fell's Robbins Street neighborhood; and (3) the route Fell and Lee walked from Robbins Street to the Price Chopper the night of the killings. The argument lacks force in light of the record and fail to establish prejudice. In sum, there is no evidence that Juror 143 inspected the Price Chopper lighting during the nighttime hours (when Terry King was kidnapped), nor is there evidence that Juror 143 retraced the route Fell walked that night. Exhibit 241 simply does not set forth that information. The condition of the Robbins Street neighborhood was not an issue at trial, and the fact that Juror 143 deemed it not great, but "okay" lacks significance.

The "Government's Brief Re Juror Misconduct Claims," filed December 16, 2013 (Doc #450) ("Government's Juror Brief"), urged that Juror 143's belief that King was kidnapped in weak light was – consistent with Juror 143's testimony at the August, 2013 hearing – based on trial evidence, and in any event had little significance. First, Exhibit 241 does not state that Juror 143 based his concern about weak Price Chopper lighting on a trip to Rutland during trial. There is no evidence that Juror 143 made a pre-dawn visit to the Price Chopper to inspect the lighting (and in any event, his purported visit was in 2005, not 2000). Juror 143 testified at the August hearing that it was during "daylight hours that I was there. It wasn't at the wee hours of the morning that this would have taken place." Transcript at 57. Second, trial evidence

-40-

overwhelmingly established that the kidnapping occurred before dawn, such that light along the side of the Price Chopper building was likely to be "weak." Finally, whether or not the light was weak between 3:30 and 4:00 a.m. on November 27, 2000 was neither a contested nor a significant issue at trial: the defense conceded that Fell and Lee kidnapped King as she arrived for work early that morning at the Price Chopper. In Fell's June 20, 2005, opening statement, counsel conceded that Fell and Lee killed Charles Conway and Debra Fell, Transcript, p. 54, and then "put the gun on" King at the Price Chopper.[4] There was no dispute that Fell and Lee kidnapped/carjacked King before dawn on November 27th, at 3:30 - 4:00 a.m., outside the Price Chopper: Fell's guilt phase culpability was essentially uncontested.[5]

At the August, 2013, hearing, Juror 143 testified that his belief that the light was weak when King was kidnapped was based upon trial testimony: "as for Price Chopper, I only know it was dark because of the testimony of the guy with the bread truck . . . a delivery guy, that saw two dark shadows come out from the side. . . ." Transcript at 45; *see also* 52, 57 (repeating the same; referencing bread delivery witness Joseph Trepasso).

---

[4] Fell's December 2, 2000, Mirandized, recorded statement – admitted into evidence at trial as Exhibit 11(j) – gave counsel little maneuvering room as to guilt. Fell stated that after he and Lee stabbed Conway and Debra Fell to death in the middle of the night at the Robbins Street apartment, they showered, packed, "grabbed the shotgun," and walked to the Price Chopper, where they "sat on the side of the building for about 15 minutes," having talked about "hijacking a car and just getting out of there." When King arrived, Fell could see that she was female and alone, and "was a perfect chance." They waited until she got out of her car, then approached with the shotgun. After King was ordered to "get the fuck back in the car," she was "begging for her life").

[5] The extensive, uncontroverted trial evidence establishing the predawn kidnapping was summarized in the Government's Juror Brief, page 62, note 2.

In response to the fact that the government introduced photographs at trial depicted the area around the Price Chopper where King was kidnapped, Fell observes that those daylight photographs "were entirely unhelpful on any assessment of the lighting at night." Yet that applies equally to Juror 143's daylight observations. Whether the artificial lighting on the side of the store where King parked was "weak" at 3:30 a.m. has little or no bearing on the crime.[6]

Fell also contends that during Juror 143's visit to Rutland during the trial, he inspected the route that Fell took on the night of the killings, walking from Robbins Street to the Price Chopper. This is a critical issue, Fell submits on collateral review, because his willfulness and intent were disputed in both the guilt and penalty phases. Fell has no evidence to support his claim that Juror 143 retraced Fell's steps that night. First, Juror 143 says nothing about inspecting the Robbins Street to Price Chopper route in Exhibit 241; Fell simply invents the supposed inspection. Second, Juror 143 testified at the August hearing that his understanding of the route was based on trial evidence, citing an "aerial photo." Consistent with his recollection, Fell's route that night – uncontested at trial – was shown in Exhibit 12(d), a satellite photograph depicting Rutland from 135 Robbins Street to the Price Chopper. Fell had described the route block-by-block after his arrest, and at trial, a Rutland police officer traced the route on Exhibit 12(d) with a blue marker. *See* Exhibit 12(d), and June 21, 2005 Trial Transcript Vol II, pages 28-31. Third, the Rutland route, uncontested in the guilt phase, not at issue in the penalty phase.[7]

_____

[6] Juror 143's apparent belief that Price Chopper should provide better lighting in employee parking areas is a collateral issue that is not explained in Exhibit 241, was not explored at the August, 2013 hearing, and was not an issue at trial.

[7] Fell imagines that Juror 143 may have noted "the distances between locations, how simple or complicated the route was, where different buildings were located, how easy or difficult they would be to remember, how easy or difficult the route would be to navigate, and the like." Brief

The government argued that Fell's ability to remember his middle of the night route in detail, four days later after his arrest, was one of a series of facts indicating that Fell was functional and unimpaired.[8]  That argument was advanced in the guilt phase to establish intent to kidnap, carjack, and kill King, and in the penalty phase to respond to Fell's claim of "significant impairment."  Even assuming – in the absence of evidence – that Juror 143 retraced Fell's route from Robbins Street to the Price Chopper, Fell fails to explain how resulting observations likely prejudiced the verdict.  Fell's simple and direct route from Robbins Street to the Price Chopper, described by him after arrest and depicted in Exhibit 12(d), was well-proven and uncontested.  The contested issue was his clarity of mind and intent.  One of the (many) facts informing that issue, the government argued, was his block-by-block recitation, four days later during an interview, of his route.  It was his memory that the government argued was probative, not the route.  Fell fails in attempting to explain how observations regarding the route were "critical" and prejudicial.  Nor has he advanced no evidence that Juror 143 gained extraneous information about Fell's Robbins Street to Price Chopper route during a trip to Rutland during trial.  Nor has he advanced any evidence that Juror 143 related such information to the jury.

---

in Support of an Evidentiary Hearing, p. 59.  This is pure speculation, advanced over eight years after trial with no supporting evidence.  In any event, the bulk of those matters were apparent in Exhibit 12(d) (showing that the route was simple, and depicting where the buildings were located).

[8]  Fell remembered in detail a variety of specific details and goal directed conduct the night of the killings, including accurate descriptions of killings in Rutland, including the locations of the bodies and details regarding the two knives; showering and packing in the Robbins Street apartment; walking downtown with the shotgun to carjack a car (and selecting a single older female driver as victim); driving four hours southwest in King's car before stopping to kill her in New York; details of King's killing; and where they then stopped for breakfast and what he ate.

The government based its arguments regarding Fell's functionality during the killings on well-established evidence. The arguments, of course, were not evidence, as the Court instructed the jury. *See* June 24, 2005 Transcript, p. 10-11 ("the arguments of the attorneys and the questions asked by the attorneys are not evidence in the case. Evidence that you will consider in reaching your sworn verdict consists, as UI have said, only of the sworn testimony of the witnesses, the stipulations made by the parties, and the exhibits that have been received in evidence"). Consistent with weighty evidence establishing Fell's functional, goal-directed activities on the morning of November 27, the jury unanimously determined that he did not suffer from significant impairment. *See* Special Verdict Form, Count 1, ¶ 1. It is nearly inconceivable that observations made by Juror 143, even if he did retrace Fell's route through Rutland that morning, would have changed that finding and the ultimate verdict.

Fell contends that if Juror 143 retraced Fell's Rutland route, his observations could be relevant in penalty to the four 18 U.S.C. § 3591(a)(2) "threshold eligibility factors" alleged in the Superceding Indictment and addressing his intent. The four statutory requirements set forth varying levels of intent, from intentionally killing King, to intentionally inflicting serious bodily injury resulting in King's death, to intentionally participating in an act contemplating that a life would be taken, and King died as a result, to intentionally engaging in an act of violence, knowing that it created a grave risk of death, and King died as a result. *See* Superceding Indictment, p. 7.

The jury unanimously found all four threshold eligibility factors. In so doing, they unanimously found the first two factors: that "Donald Fell intentionally killed Teresca King," and that "Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Teresca

King." Special Verdict Form, p. 4. This was not a case in which Fell's homicidal intentions while walking to the Price Chopper, at least four hours before King was killed, were at issue. His intentional killing of King in New York was well-proven, to the satisfaction of a unanimous jury. Again, Fell is simply unable to conjure any likelihood of prejudice.

### 2. Current Juror 143 Issues

Fell urges that extraneous information known to the jury is presumptively prejudicial, citing *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994). That is correct, as far as it goes. The extraneous information in *Bibbins*, however, was found not sufficiently prejudicial to warrant habeas relief. The court observed that, while such information is presumptively prejudicial, additional analysis was required:

> This presumption . . . may be overcome by a showing that the extra-record information was harmless. As we have said: "*The touchstone of decision . . . is* thus not the mere fact of infiltration of some molecules of extra-record matter . . . but *the nature of what has been infiltrated and the probability of prejudice.*"

21 F.3d at 16 (citation omitted; emphasis added).

The *Bibbins* court explained that, "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." 21 F.3d at 17. A "trial court's post-verdict determination of extra-record prejudice must be an objective one," focusing on the information's probable effect on a "hypothetical average juror." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir 2002) (citation omitted). The court may not inquire into "the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Id*. However,

in applying the objective test, the court "may appropriately consider the circumstances surrounding the introduction of [the] information in making [its] determination." *Id.*

"Because the determination of whether a petitioner's Sixth Amendment rights have been violated by the jury's consideration of extra-record information requires a determination of whether the extra-record information had a prejudicial effect on the verdict . . . . we typically proceed immediately to the harmless error determination, assuming without deciding that a Sixth Amendment violation has occurred." *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001).

Consistent with the foregoing, the initial question is, if Juror 143 made a trip to Rutland during the trial for the purpose of inspecting the crime scenes as alleged, under an objective test, what is the likelihood that the resulting information affected a typical juror and prejudiced the verdict?  Although it is not always clear from Fell's § 2255 pleadings, the "verdict" at issue is the penalty phase verdict.  Would Juror 143's observations about "weak" light, and the "okay" Robbins Street neighborhood have prejudiced the penalty phase verdict?  It is difficult to conceive how it could have.  The basic facts as to what happened in Rutland, including the trek from Robbins Street to the Price Chopper, and the kidnapping of Terry King, were conceded in the guilt phase, and were not at issue in the penalty phase.  Consistent with 2255 counsel's larger claims, the pivotal issue in the penalty phase was whether Fell's disfunctional childhood outweighed the aggravating circumstances – the double murder in Rutland, the third murder of a witness to Fell's flight from Rutland, the brutality of King's killing and the infliction of distress on her, and the impact of King's killing on her family.  In that calculus, information that Juror 143 may have obtained in Rutland was peripheral at best.  Fell's protestations about the predawn

light, the "okay" Robbins Street neighborhood, and the route Fell walked, are weakly supported, and are variously cumulative, uncontested, and/or insignificant.

Fell's "Brief in Support of an Evidentiary Hearing," filed December 16, 2013 (Document 451), urges that, when summonsed by the Court to address his mid-2005 trip to Rutland at the August hearing, Juror 143 falsely denied it.  Section 2255 counsel assert that they are "prepared to present two witnesses who have first-hand, contemporaneous knowledge . . . who will unequivocally testify that Juror 143 in fact did go to Rutland during the summer of 2005. . . ." *Id.*, page 51.

At the outset, it is unclear from the new assertion whether Fell's unidentified witnesses will testify that Juror 143 went to Rutland during trial for the purpose of "undertak[ing] his own independent examination" of the crime scenes, as alleged in the 2011 Petition.  *Id.*, p 332; *see also* p. 334 ("Juror #143's intentional trip to Rutland to inspect the crime scene").  It is possible that Juror 143 went to Rutland during the trial for other purposes, and during the trip viewed the Robbins Street and Price Chopper areas.[9]

Even if Juror 143 did testify falsely at the August 2013 hearing, it does not follow that Fell has met the *Bibbens* test.  Again, the law requires "a determination of whether the extra-record information had a prejudicial effect on the verdict."  *Loliscio v. Goord*, 263 F.3d at 185. For the reasons addressed above, the claimed extraneous information is weak at best.

---

[9]  At the August, 2013 hearing, Juror 143 testified that he "probably went through Rutland for the job" during 2000-05,  but "didn't go investigating anything [for the trial]."  Transcript at 85.  An employee of the Vermont Agency of Transportation, Juror 143 had "projects all over the state," including "numerous projects in and around the Rutland area."  Transcript at 41; *see also* 26 ("I'm very familiar with that whole downtown area"); 69 ("very familiar with Rutland").

Fell contends that a false denial in 2013 about a 2005 trip to Rutland itself strongly supports the requisite prejudice finding. Yet while such false testimony – if proven – is troubling, it does not undermine the unanimous 2005 verdict of 12 jurors.

At the outset, Juror 143's testimony regarding events over eight years before should have little weight. The issue is what happened during the 2005 trial, not Juror 143's recitation of related events in 2013. Further, the Supreme Court has observed that, "Substantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict." *Tanner v. United States*, 483 U.S. 107, 119 (1987). The *Tanner* Court quoted prior Supreme Court rulings setting forth those considerations:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference.

483 U.S. at 119-20; *see also United States v. Escalera*, 2013 WL 4711465, *7 (2d Cir. Sept. 3, 2013) ("As we have long recognized, trial courts 'should be hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct, or extraneous influences'") (citation omitted); *United States v. Dioguardi*, 492 F.2d 70, 79-80 (2d Cir. 1974) ("There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision . . . . [including] 'inhibition of juryroom deliberations, harassment of jurors, and increased incidence of jury tampering'") (citation omitted).

The question of whether any information obtained by Juror 143 in Rutland had weight in deliberations must also be considered in light of the fact that the Court instructed the 2005 jury to consider only evidence submitted in Court, and to disregard any extraneous information. The Court instructed the jury that:

> Evidence that you will consider in reaching your verdict consists, as I have said, only of the sworn testimony of the witnesses, the stipulations made by the parties, and all the exhibits that have been received in evidence. Anything you have seen or heard outside the courtroom is not evidence and must be entirely disregarded. You are to consider only the evidence in the case.

June 24, 2005 Transcript, pp. 10-11. As the Supreme Court repeatedly has observed, "jurors are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993), quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see also Spencer v. Texas*, 385 U.S. 554, 562 (1967) ("[T]he jury is expected to follow instructions in limiting . . . evidence to its proper function").

Urging that Juror 143's Rutland information was prejudicial, Fell's Brief in Support of an Evidentiary Hearing argues that: (1) the 140-mile round-trip took "time and effort," such that it must have been significant to Juror 143, and (2) the "mere fact that Juror 143 reported th[e] information to the rest of the jury . . . suggests that [he] viewed it as unique and significant." *Id*. at 53. This argument, however, is a *non sequitur*. Assuming the unproven premise that Juror 143 made the trip to Rutland during trial for the purpose of inspecting crime scenes, and relayed the information cited in Exhibit 241 to other jurors, it does not follow that there was a prejudicial effect on the verdict. Again, the law turns on "the nature of what has been infiltrated and the probability of prejudice." *Bibbons*, 21 F.3d at 16. Collateral circumstances such as the duration

of a Rutland trip, or the fact that Juror 143 may have described the trip, have dubious weight. Such circumstances may better reflect a weekend day with little to do, and an enthusiastic fellow with an ebullient nature.

Fell's new filing also urges that Juror 143's observation that the Robbins Street neighborhood was "okay" was critical, because "issues relating to Debra Fell's (and Donald Fell's) living conditions . . . were . . . central to both the guilt and penalty phases of . . . trial." Brief in Support of an Evidentiary Hearing, p. 57. Yet that proposition considerably overstates the matter. The condition of Debra Fell's home *during Donald Fell's childhood in Pennsylvania* was a significant issue *in the penalty phase*. Thus, Fell's discussion in his "Brief in Support of an Evidentiary Hearing" goes on to consistently reference "the horrible conditions of Debra Fell's house during Donald Fell's childhood . . . ." *Id*., p. 57; *see also* p. 58 ("during Donald Fell's childhood the family lived in filth"; "during Donny's childhood" police were called to the house"; photographs were introduced of "Fell's childhood home before his mother left").

Fell's claim that the condition of the Robbins Street neighborhood was a "critical issue" in either phase of trial is incorrect and unsupported. The Fell neighborhood – when he was a child in Pennsylvania during roughly 1985 - early 1994, or an adult in Rutland in 2000 – was not an issue in the guilt phase. And in the penalty phase, only the Fell homes in Pennsylvania when Fell was a child were at issue. Debra Fell left her home in Pennsylvania around Christmas of 1993 or January of 1994 when Fell was a child. So how she kept her home (and the condition of her neighborhood), ceased to be an issue after that date. In any event, Juror 143's vague observation that the Robbins Street neighborhood as he may have seen it in mid-2005 "was okay" is not significant and cannot fairly be said to have corrupted the trial. Further, multiple

photographs of the exterior of the Robbins Street building were introduced at trial, and if Juror 143 viewed the building during trial, he would have seen nothing more.

Regardless of whether Juror 143 did or did not go to Rutland during the trial, Fell has failed to establish that resulting extraneous information was prejudicial.

### Juror 26

A.   Juror 26's exposure to extraneous evidence does not warrant an evidentiary hearing or reversal of the verdict in this case.

Fell claims that Juror 26's exposure to extraneous evidence (that Lee committed suicide in prison), in and of itself supports a juror misconduct claim. Dkt. 451 at 63. Fell either misunderstands, or purposely misrepresents the law. A new trial is not required solely because a juror was *exposed* to extrinsic information. *Manley v. Ambase Corp*. 337 F.3d 237, 252 (2nd Cir. 2003). Fell must further prove that the extraneous information prejudiced him. "The issue, as Judge [Henry] Friendly observed, is 'not the mere fact of [jury] infiltration ... but the nature of what has been infiltrated and the probability of prejudice.' " *Id*. (*quoting United States ex rel. Owen v. McMann*, 453 F.2d 813, 818 (2d Cir. 1970). After a jury verdict, what weight a juror might have accorded the information is irrelevant as the Court should not inquire into jury deliberations. "Rather, courts must apply an objective test focusing on two factors:  (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Id*. at 252.

Juror 26 testified that he indeed heard over the radio, "quite a while before trial," Transcript of September 27, 2013, p. 14, that a person by the name of Lee had committed suicide

in prison. However, he did not connect that Lee, to co-defendant Robert Lee, until the trial had begun. *Id*. Fell goes to great lengths to argue that Juror 26 lied during voir dire, but the record is clear that he did not remember what he had heard on the radio until after the trial started and he began to listen to evidence. *Id*. at 14-16. Juror 26 clearly explained that "I didn't know that it had anything to do with this case until later on when I – when I started hearing the – evidence that they had against – against him." *Id*. at 16. And contrary to Fell's argument, Juror 26 never testified that his memory was triggered the first time he heard Lee's name. What Juror 26 testified was that he remembered "some time during trial." *Id*. at 28. Even so, Juror 26 did not think the information was in anyway relevant. "I never thought it was that relevant other than – because he wasn't on trial, and he was actually passed away." *Id*. at 16. After a short recess the Court asked Juror 26 again, why he thought the information was important? Juror 26 again stated that he did not think it was. "No, I didn't at the time think it was important to anything." *Id*. at 28.

The conduct at issue here is nothing like the conduct of the juror excused for cause in *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 739 F.Supp.2d 576, 611 (S.D.N.Y. 2010) cited by Fell in support of his argument. The juror at issue in *In Re Methyl* knowingly and intentionally disregarded the Court's instructions and engaged in internet research about the case. He subsequently shared the information he found with the other jurors. This is hardly the case here. Juror 26 did not go looking for information about Lee. He had heard the information quite a while before trial on the radio. He did not connect it to the trial after evidence was being heard. And even then he did not consider it relevant.

In an attempt to salvage his claim of misconduct, Fell argues that Juror 26 continued to lie "on a daily basis" about the information he heard over the radio. But Juror 26 clarified that he made the connection some time during the trial and did not think it was relevant to anything because Lee was passed away and was not on trial. No finding of intentional deceit can be made from this record.

Fell faults Juror 26 for disclosing that he had heard about a woman being kidnapped, but "concealed the far more significant fact that Mr. Fell's co-defendant (whose name Juror #26 had by now heard) had committed suicide while in jail following his arrest." Dkt. 451 at 64. How exactly Juror 26 was supposed to know that Lee having committee suicide was so significant, Fell does not explain. Fell attempts to argue that Juror 26 somehow knew it was and hid it from the Court. Nothing could be more absurd. Juror 26 explained that he did not connect the Lee he heard about in the radio to Lee, Fell's co-defendant until after trial began. And further testified that at that point he did not think it relevant. Clearly Juror 26 had not intent to be dishonest.

Fell argues that Lee's name was mentioned everyday at trial. But the nature of Lee's death bears no significance to his conviction. Fell confessed to killing King. The jury saw it live on video. Her blood was found on his boots! Moreover, in Fell's June 20, 2005, opening statement, counsel conceded that Fell and Lee killed Charles Conway and Debra Fell, Transcript, p. 54, and then "put the gun on" King at the Price Chopper. How Lee died, or even the fact that he took his own life was completely irrelevant to the jury's guilty verdict, particularly given the overwhelming weight of the Government's case.

The allegation that Juror 26 "never disclosed to the Court that he was in possession of a serious and prejudicial piece of information" is disingenuous. First, Juror 26 had no idea it was prejudicial, thus, the implication that Fell wants the Court to make, that Juror 26's non-disclosure was intentional, is simply not supported by the record. Second, the information was not prejudicial in light of the fact that the jury was told that Lee died in prison, and further that his death was accidental. There is no basis to conclude that Juror 26 would ignore the stipulation read by the Court and give weight to something he heard over the radio years before.

Next, Fell argues that one of his mitigating factors was that Robert Lee was equally culpable for the crimes and would not face execution, and that the fact that Lee committed suicide would somehow undermine that factor. This is a little difficult to comprehend given that Lee died after the commission of the offenses charged, therefore, there is no doubt he participated in the crimes with Fell. Indeed, the jury unanimously found this mitigating factor. Dkt. 200, p. 13. Therefore, it is hard to grasp Fell's argument, that because a single juror was exposed to evidence that Lee killed himself in prison, somehow his mitigation case was prejudiced. First, only one juror was so exposed. Second, the jury was told that Lee died in prison and that his death was accidental, leaving little room for prejudice.

Fell counters that Juror 26 did not follow the stipulation because he still believes that Lee killed himself. There is no evidence of this as Juror 26 has not been asked whether he believed what he heard on the radio, he was only asked what did he hear on the radio. But even assuming arguendo that Juror 26 believed that Lee killed himself and his death was not accidental, this does not lead to the conclusion that he then must have reasoned that Fell was more culpable. Quite the contrary. If Lee killed himself, and Juror 26 believed he did so because of his crimes

and not for some other unknown reason, the logical conclusion would be that he felt more culpable than Fell, not less. After all, Fell did not feel so culpable that he killed himself. The Government submits that Fell's argument is nothing but speculation. The argument that Juror 26 would have deemed Fell more deserving of death because he knew Lee committed suicide even more so.

     B.     <u>Juror 26's misdemeanor convictions did not render him actually or impliedly biased</u>.

None of Juror 26's misdemeanor convictions (for DUI, unlawful mischief and non-payment of wages) was remotely related to the charges raised against Fell or the evidence presented at trial. Moreover, they were incurred by Juror 26 more than a decade before trial. The Court advised Juror 26 that he had been asked if he had any criminal convictions, and he said no. Tr. September 27, 2013, p. 4. Juror 26 stated:

> I think it – it was a long time ago, but I think you're right, yes. I didn't. I – I didn't think that I had – well, I didn't think they were serious enough to be like – I didn't think of it as any more than a speeding ticket or, you know –

Juror 26 simply did not consider the information relevant or important enough to disclose. He had no intent to deceive the court. Fell faults him for admitting that he completed the questionnaire quickly and did not take time to recall all his past actions. While we certainly want our jurors to be diligent in all aspects of their participation, completing a juror questionnaire so quickly that one forgets to mention three ten-year old misdemeanor convictions for DUI, unlawful mischief and non-payment of wages, which bears no relation to the charges pending against the defendant, does not amount to misconduct.

-55-

**Conclusion**

The record built by the Court through its juror inquiry, taken together with the record established at trial leads to the inevitable conclusion that no juror in this case engaged in any misconduct that would warrant vacating Fell's conviction and sentence.

Wherefore, the United States respectfully requests that Fell's post-conviction claims based on juror misconduct be denied.

Dated at Burlington, in the District of Vermont, this 24th day of January, 2014.

Respectfully submitted,
UNITED STATES OF AMERICA

By:

JACABED RODRIGUEZ-COSS
Trial Attorney
U.S. Department of Justice
1000 Lafayette Blvd.
Bridgeport, CT  06604
(203) 696-3027
Jacabed.rodriguez-coss@usdoj.gov

WILLIAM B. DARROW
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following all counsel of record.

By:     s/Jacabed Rodriguez-Coss
        JACABED RODRIGUEZ-COSS
        Trial Attorney
        U.S. Department of Justice