# EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

- - - - - - - - - - - - - - - - - - - -x
DONALD FELL,

        Petitioner,

    vs.                      Case No.
                                0112-S
THE UNITED STATES OF AMERICA,

        Respondent.
- - - - - - - - - - - - - - - - - - - -x


        DEPOSITION of ELIZABETH BOCHNAK, taken by

Respondent, held at the offices of U.S. Attorney's

Office, 86 Chambers Street, New York, New York, on

Thursday, March 6, 2014, commencing at 1:55 p.m.,

before Jean Wilm, a Registered Professional

Reporter, Certified LiveNote Reporter and Notary

Public within and for the State of New York.

A P P E A R A N C E S:

CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Attorneys for Petitioner
        One Liberty Plaza
        New York, New York 10006-1470

    BY:  SCOTT S. BUELL, Esq.
            sbuell@cgsh.com

         LEWIS J. LIMAN, Esq.
            lliman@cgsh.com

UNITED STATES DEPARTMENT OF JUSTICE
        CAPITAL CASE UNIT
        Attorneys for Respondent
        1331 F. Street N.W.
        Third Floor
        Washington, D.C. 20530

    BY:  JACABED RODRIGUEZ-COSS, Esq.
            jacabed.rodriguez-coss@usdoj.gov

         JEFFREY B. KAHAN, Esq.
            jeffrey.kahan@usdoj.gov

Page 3

Bochnak

E L I Z A B E T H   B O C H N A K,

called as a witness, having been first

duly sworn/affirmed by Jean Wilm, a

Notary Public within and for the State

of New York, was examined and testified

as follows:

EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    Give us your name.

MR. BUELL:  Before we start, if you

want, I can give you production of

documents responsive to the subpoena you

sent yesterday.

MS. RODRIGUEZ-COSS:  Great, yes.

MR. BUELL:  These are stamped from

us.

MS. RODRIGUEZ-COSS:  That is what

you previously had sent us by e-mail,

right, what I am looking at right now?

MR. BUELL:  No, this is new.  The

original request was for her work product

as it pertained to Juror 162.

MS. RODRIGUEZ-COSS:  I have this?

Maybe not.

Page 4

Bochnak

MR. BUELL:  The subpoena yesterday specifically asked for documents, work product from Ms. Bochnak with respect to the other two jurors.

MS. RODRIGUEZ-COSS:  Twenty-six, okay, and is this 143, I guess?  You have different numbers.  I don't know why.

THE WITNESS:  In the order in which they are qualified.  That's why.

MR. BUELL:  If you will look at the names, you will see they correspond.  We are producing these without acknowledging their relevance or waiving her work product.

MS. RODRIGUEZ-COSS:  We will go over these and compare to these to what we have.

BY MS. RODRIGUEZ-COSS:

Q     Just give us your name.

A     Beth Bochnak.

Q     Before we begin, you don't have any problems with your hearing?

A     No.

Q     Your eyesight, nothing that will

Page 12

Bochnak

Q    So did you provide the first draft of that questionnaire?

MR. BUELL:  I'm going to object to your -- I do think we have a standing position that Ms. Bochnak's work product, in as far as it doesn't pertain to the four jurors as to which we made claims, it continues to be protected.

MS. RODRIGUEZ-COSS:  Okay.  So noted.

Q    Did you draft the first questionnaire?

MR. BUELL:  I'm not just putting it on the record.

I'm going to instruct her not to answer any questions that I think violate a continuing work product protection.

MS. RODRIGUEZ-COSS:  We can do it this way.  It's just going to extend this entire process and derail this hearing. But I think that you have made a claim that a number of jurors in this case have falsely answered questions in that questionnaire and that their answers to questions in that questionnaire have

Bochnak

influenced or influenced your decision-making process during voir dire or the decision-making process of the trial attorneys during voir dire.

We are going to insist that we be given some latitude in exploring the jury selection process in this case, the preparation by counsel for the jury selection process in this case, and if we're going to stop this deposition to get a ruling from the court on a basic question like that, it's going to be -- it's going to be a long haul.

MR. BUELL:  Can you explain why the work product protection or the attorney-client privilege would be waived by our assertion that four jurors in this case lied at voir dire?

MS. RODRIGUEZ-COSS:  Look, I don't think we're going to get into back-and-forth objections here.

I thought we were going to conduct a deposition, you'd note your objections for the record, and we would get our

Bochnak

responses, and then the court can decide whether the responses are going to be admitted in court or whether we will be allowed to go into it in court if we decide to call her as a witness at the evidentiary hearing.

MR. BUELL:  I think that is the position we would take if we were objecting based on relevance perhaps, but with respect to something we believe is protected work product or protected by the attorney-client privilege, I can't permit her to answer.  It would potentially waive the privilege.

Secondarily, I think the court has been pretty clear about what the scope of these depositions are.

MS. RODRIGUEZ-COSS:  The court has been anything but clear about the scope of the hearing or the depositions, the discovery, or anything else that has taken place in this case.

MR. BUELL:  I can point you to the section of the transcript where you said

Bochnak

you are going to ask Mr. Bunin whether he would have struck this juror for cause or struck these jurors for cause.

MS. RODRIGUEZ-COSS:  Clearly, we are not going to hold the depositions to ask Mr. Bunin one question and I don't think we made Ms. Bochnak come over here to ask her one question.

There is a strategy to our defense to your claims and I think we are entitled to develop that strategy.

MR. BUELL:  You can ask her about the jurors as to which we made claims.

It is our position that her work product and the attorney-client privilege associated with that and trial counsel's work product isn't waived outside of those jurors.

Our position is that it isn't waived with respect to those jurors, but we are willing to let you explore those.

BY MS. RODRIGUEZ-COSS:

Q     Let me just, so we are clear as to what we are referring to here, I will show the

Bochnak

I mean, it says Mr. Fell can't have a trial with everybody in Vermont being the jury.

Q    Right, for example, if that said Mr. Jakes can't have a trial, it would be applicable as well, correct?

MR. BUELL:  I object to the form of the question.

A    My -- as far as I can tell looking at these, these are general voir dire questions.

Q    Did you prepare similar case-specific questions for the Fell case?

MR. BUELL:  Again, I'm going to instruct you that the work product is protected and to the extent your answer reveals any of your work product, you should not answer.

THE WITNESS:  Okay.

MS. RODRIGUEZ-COSS:  I'm going to insist on an answer to that question.  We requested her work product specifically for the US v. Donald Fell case.

What I am asking her is if she provided trial counsel with specific, case-specific questions to be asked of

Bochnak

potential juror members and what was asked of jurors and what was not asked of jurors is highly relevant in this hearing for the government.

I'm going to insist on her answering that question.  I want to know whether I have all of the work product we requested and we understand that we are entitled to it.

MR. BUELL:  You requested the -- Bill requested in the initial request the work product as it pertained to Juror 162. That is what we produced to you.

We produced it on the understanding that we did not believe that the work product, even with respect to that narrow question, was waived.

And I'm telling you that it is our position that the work product with respect to the broader question you are asking is not waived.

And the scope of these depositions as it has been laid out by Judge Sessions is limited to the jurors as to which we've

Page 28

Bochnak

made claims.

BY MS. RODRIGUEZ-COSS:

Q     Did you prepare any case-specific questions in United States v. Donald Fell that were designed to be asked of Juror 162, 143, or 26?

A     I may have, but I wouldn't have them any longer.

Q     Why not?

A     Because they were post-it notes and I throw them away at the end of the case.

Q     So what you are saying is, you would not have -- okay.  Let's back up a little bit and make sure we are clear on what your testimony would be.

Bringing your attention back to Exhibit 18, Government's Exhibit 18, you reviewed the long questionnaire marked under Exhibit 10 and you fill in the information on the top part of this form, correct?

A     Yes.

Q     And based on this review, you don't prepare written proposed questions for each potential juror in the case?

A     I prepared questions --

Bochnak

BY MS. RODRIGUEZ-COSS:

Q    So is it possible that you prepared something like this, and I'm referring to Government Exhibit 15, for each potential member of the venire -- in other words, for each potential juror in the case -- and you just don't recall right now?

MR. BUELL:  I have the same objection and I instruct you not to answer.

If you want, we can take a break and I can talk to the witness about where I think the protection exists and if you have further questions along this line --

MS. RODRIGUEZ-COSS:  I don't see how -- I'm holding these exhibits here. We have been given this and we have been asking for this and you have given it to us.

I don't see how asking whether she prepared something similar to this but tailored to a particular juror based on her review of that particular juror's questionnaire, I don't see how that is infringing on your client's privileges or

Bochnak

rights.  I honestly don't.

MR. LIMAN:  Let's take a break because I think we may be able to get you answers to some of your questions.  Let's take a break and we will go through it with the witness and come back in and get this deposition done.  Okay?

THE WITNESS:  Sounds good to me.

(Whereupon, a recess was taken from 2:32 p.m. to 2:39 p.m.)

E L I Z A B E T H   B O C H N A K,

called as a witness,

having been previously sworn/affirmed,

was examined and testified further:

MS. RODRIGUEZ-COSS:  I will give this back to the court reporter.  This is the voir dire questions.

(Document Bates-stamped TRIALCOUNSEL00054429 through TRIALCOUNSEL00054451 was marked as Government's Exhibit 15 for identification, as of this date.)

MR. BUELL:  Do you want to read back the last question?  I think I can give you

Bochnak

where we believe she can answer.

So if the question was whether she prepared something like that for specific jurors, I think we would permit her to answer the question if you limit it to did she prepare something like this for the four jurors as to which we've made claims in the 2255 motion.

MS. RODRIGUEZ-COSS:  Okay.  Let's start there.

BY MS. RODRIGUEZ-COSS:

Q    Did you prepare something like Government's Exhibit 15 for either Juror 162, 26, 143, or 27?

A    No, I did not.  To the best of my knowledge, I did not.

Q    Is it possible you did but you don't recall since you didn't recall preparing 15?

MR. BUELL:  I object to the form of the question.

A    To the best of my knowledge, if you are asking me if I prepared something along these lines -- is that what you are asking me?

Q    Yes.

Bochnak

considered, yes, in making a decision about Juror 162? What was important to you from the questionnaire?

A      All of the facts.

MR. BUELL:  Objection to the form.

Q      Well, not all of them, because you said that the apartment really was neither one way nor the other, right?

MR. BUELL:  Objection to the form.

Q      So what did you consider? I want to -- I'm going to go question by question. I'm going to go question by question. You have a background in jury selection.

What is your Ph.D. on? Psychology?

A      I don't have a Ph.D.

Q      All right. I'm sorry.

You conducted postgraduate studies?

A      Yes.

Q      Were they on psychology?

A      Yes.

Q      Based on those studies, do you try to define factors, criteria, characteristics that generally tend to favor a criminal defendant as opposed to the government?

Bochnak

MR. BUELL: Objection to the form.

A    Yeah, we are looking, in general, in Juror 162 -- as regarding Juror 162, we are looking for someone who would be favorable to our client.

Q    And did you find her to be favorable to your client?

A    No, we did not.

Q    Did you move to strike her?

A    No, we did not.

Q    So she is not favorable to your client but you did not move to strike her.

Did you decide preemptory challenge on her? Obviously not because she is on the jury.

MR. BUELL: Objection to the form.

Q    Did you recommend that she be stricken?

MR. BUELL: Objection to the form.

A    We did not like this juror.

Q    Why not?

A    Because she changed her mind about the death penalty.

Q    Did you like her age?

MR. BUELL: Objection to the form.

A    We just didn't look at it that way.

Bochnak

experience working with criminal defendants, capital cases, and jury selection, do you find that people in the healthcare field may be more sympathetic to a criminal defendant than people in other professions?

MR. BUELL:  Objection to the form.

A    I can't speak for the healthcare field or whatever the other fields were that you said because it depends on the person.  It all depends on the person.

Q    Did you find Juror 162 would be more sympathetic to your client?

A    Who is 162?  Is that this one?

Q    Yes.

MR. BUELL:  Objection to the form.

A    As I've said, we did not like this juror.

Q    Did you find that she would be more sympathetic to Donald Fell --

MR. BUELL:  Objection.

Q    -- than other jurors in the pool?

MR. BUELL:  Objection to the form.

A    We were not happy with the pool.

Q    That was not my question.

A    So --

Page 107

Bochnak

Q    Did you find that Juror 162 based on her answers to the questionnaire and on voir dire would be more sympathetic to Donald Fell than other jurors in the pool?

MR. BUELL:  Objection to the form.

A    Are you asking me if some jurors were worse?

Q    I am asking if she was -- you found her to be someone who would be sympathetic to your client?

A    No, no, we did not.

Q    You did not think she would be sympathetic to your client?

A    No, we did not.

Q    Based on her responses in the questionnaire and the voir dire?

A    Correct.

Q    You did not?

A    We did not.

Q    So at page 9 of that questionnaire, question 22, she indicates that she has two children?

A    Uh-hum.

Q    Is that something that you considered

Bochnak

favorable to you?

MR. BUELL:  Objection to the form.

A      It was just information about her.

Q      You didn't think that a mother would be more sympathetic to a criminal defendant than someone who was not a mother?

MR. BUELL:  Objection to the form.

A      It would depend on the individual.

Q      Okay.  And based on your examination of her questionnaire and the voir dire examination in court, did you find that she would be?

A      Sympathetic to our client?

Q      Yes.

A      No.

Q      No, you did not?

A      No, we did not.

Q      You didn't find that she had two children something that was favorable to your client?

MR. BUELL:  Asked and answered.

Q      No?  Not favorable?

A      The fact that she had two children?

Q      Yes.  62-year-old mother of two.

A      No.

Page 125

Bochnak

A       I understood it, as I said.  That's what I thought, that he had not ever committed any crime.

Q       Any crime.

MR. BUELL:  Just let her finish her answer.

MS. RODRIGUEZ-COSS:  I'm sorry.  You are right.  I'm probably just a little tired.  That's all.

BY MS. RODRIGUEZ-COSS:

Q       Was that something -- so that wasn't a concern to you, though, right?

A       What?

Q       The son's criminal conviction --

MR. BUELL:  Objection.

Q       -- if there had been one?

MR. BUELL:  Objection to the form.

A       Was I concerned that he had had a criminal conviction?

Q       Right.

A       Well, I didn't think he had a criminal conviction, so no.

Q       Well, the fact that he engaged in domestic violation, DWI, and been under the

Bochnak

supervision of the Department of Corrections for three years, that did not concern you?

MR. BUELL:  Objection to the form.

A        That -- not that -- not if you stop there.

Q        It was favorable to your client; wasn't it?

MR. BUELL:  Objection to the form.

A        I don't see why it would be favorable when you have a client who has killed a couple of people that your son had, a long time ago, had a DWI and a DV problem which I did not think had risen to the level of even a crime because she said he was never convicted of a crime.

Q        She looked well upon the Department of Corrections' intervention with her son; did she not?

MR. BUELL:  Objection.

A        Yeah, that was the impression -- I'm sorry.

MR. BUELL:  Objection to the form.

A        She said getting under the Department of Corrections and intense counseling was the best thing that ever happened to him and he is now a different person.

Bochnak

Q    So this is a juror who considered her son to have been helped by the Department of Corrections and having spent time under their supervision; is that correct?

A    Yes.

MR. BUELL:  Objection.

THE WITNESS:  Sorry.

Q    Is that not something that you would have considered to have been favorable to your client?

MR. BUELL:  Objection to the form.

Q    As a jury consultant and someone selecting a jury, this is not a good factor for a defendant?

MR. BUELL:  Objection to the form.

I'm sorry.  Could you read the question back?

(The record was read.)

A    When you say this is not a good factor for a defendant --

Q    A good characteristic?

A    Do you mean is it not -- I can't tell if you are asking me is it good or is it bad.

Q    Is it good?

Bochnak

MR. BUELL: Is what good?

A    If you are asking me whether the fact that he seemed to have gotten in trouble a long time ago and got counseling and something happened with the Department of Corrections and he was under house arrest and he is now a different person, and she goes farther I think even in her voir dire to say he hit bottom and then he rose to the top is my recollection, but I don't remember what the words were, that was basically her only favorable quality to me.

Q    The fact that the department -- she considered that the Department of Corrections helped her son?

A    Yes.

Q    That was favorable -- that was a favorable trait to you?

MR. BUELL: Objection. Objection to the form.

A    The fact that the Department of Corrections had helped him turn his life around and become a different person was a, I thought, would be favorable to the defendant.

Q    What if this is someone who had a son

Bochnak

Q    Was she not a juror interested in listening to mitigation evidence and willing to consider mitigation evidence?

MR. BUELL:  Objection to the form.

A    I don't believe she was.

Q    You don't believe she was?

A    No, I do not.

Q    Okay.  So you decide, based on her questionnaire and on the answers to the voir dire examination, that you are not going to move to strike her for cause, right?

A    There was no --

MR. BUELL:  Objection.  Objection to the form.

Q    And you are not going to move to strike her on a preemptory challenge?

MR. BUELL:  Objection to the form.

A    We didn't strike her.  We didn't challenge her.

Q    You did not challenge her.  So when you talk about this holistic review or analysis that you conduct, what's your criteria?

MR. BUELL:  Objection to the form.

A    What do you mean?

Bochnak

Q     You say that -- you know, we went over most of her responses.  You respond that most of those things were either nonconsequential -- right?

MR. BUELL:  Objection.  Misstates her testimony.

A     No.

MR. BUELL:  She never testified to that.

Is there a question?

Q     Well, ultimately, you decide you are not going to strike her.  Based on what?

MR. BUELL:  Objection to the form.

A     Ultimately, we decide we can't strike her because there are worse people.  I'd be happy -- I mean, there are examples in the transcript I'm sure that you could see that would indicate that she was not a good juror for us.

Q     So what was a good juror for you?

MR. BUELL:  Objection to the form.

Are you asking --

Q     They're your terms.  That's your response.  You said, "she was not a good juror for us."

What was a good juror for you?  Who

Bochnak

was a good juror for you?

A    She was not a good juror for us because my impression was, they asked if she could vote for the death penalty.  She said, "Probably. It's a hard thing to say but I could do that."

And my notes say, I believed she just didn't want to have to say it in front of Donnie.

And then she said, "So you're asking me to say yes or no," and then she said, "Oh, no, I could do it."  She definitely could do it.

So I am weighing jurors' merits based on whether I think they're going to vote to kill the defendant or not, and I believe that she was going to vote to kill the defendant, but so were a large number of other people in this venire.

Q    And you base that on her response to the question whether you could vote for the death penalty?

A    No.  In light of all of the questions.

Q    Here's my question, though:  Every juror who is death qualified has to be willing to impose the death penalty; is that not correct?

A    That's correct but death scrupled jurors --

Bochnak

MR. BUELL:  Objection to the form.

A    I don't.  I think maybe we -- I don't know.  I'd be guessing.

MS. RODRIGUEZ-COSS:  We are asking for that unredacted.

MR. BUELL:  Okay.  I just have a few questions.

EXAMINATION

BY MR. BUELL:

Q    So is it your testimony that following Juror 162's questionnaires and following her individual voir dire, you were left with the understanding that her son's trouble with the law had occurred in the significant past?

A    Yes.

Q    And is it your testimony that your understanding, following Juror 162's questionnaires and individual voir dire, that her son's trouble with the law had been an isolated incident?

A    Yes.

Q    And is it your testimony that your understanding, following Juror 162's questionnaires and individual voir dire, that her son's trouble with the law had turned his life around?

Bochnak

A    Yes.

Q    I'm going to ask you a couple of hypothetical questions.

If, instead of being an isolated incident, Juror 162's trouble with the law, her son's trouble with the law had been repeated, would that have changed your view of Juror 162 as a juror?

A    Yes.

Q    How would it have changed your view?

A    She would have been a much worse juror for us.

Q    And the second hypothetical question is:  If, instead of occurring in the significant past, her son's trouble with the law had occurred more recently, would have that changed your view of Juror 162 as a juror?

A    I would have wanted to know a lot more about it.

Q    Ms. Rodriguez-Coss pointed you to a few places in the individual voir dire of Juror 162 that discussed mitigating evidence.

When Juror 162 testified in individual voir dire about her ability to hear mitigation evidence, would you have taken -- did you take that

Bochnak

testimony at face value?

A    No, I did not.

Q    Back to the hypothetical questions that I asked.

If you had left Juror 162's questionnaires and her individual voir dire with the understanding that her son had had a criminal history that was repeated and more recent to voir dire, would that have impacted your view under 162's ability to hear mitigating evidence?

A    Yes.

Q    How?

A    She would have been a different juror than she appeared to be and I think -- if you could repeat the first part of your question.  I think I'm getting tired.

Q    Sure.  So the question is:  If you were left with the understanding that her son had a criminal history that was repeated or chronic and recent to voir dire, do you think that those facts would have made Juror 162 less able to hear mitigation evidence in this case?

A    Yes, definitely.

Q    Do you think it would have made her

Bochnak

unable to hear mitigation evidence?

A    I think it would have made her mitigation impaired.

MR. BUELL:  I don't have any more questions.

EXAMINATION (Continued)

BY MS. RODRIGUEZ-COSS:

Q    So you think that -- you just testified that if you had the impression that Juror 162's son had engaged in criminal conduct closer to trial, you are saying that you had this notion that his criminal conduct was remote, although she never testified to that and did not write it on her questionnaire, you have that impression, however, that it was remote?

A    Uh-hum.

Q    And had you had --

(Interruption.  Knock on door.)

Q    If you had known that the criminal conduct by the son had been closer to trial, you understand that she would have been mitigation impaired?

MR. BUELL:  Object.

Q    In other words, she would have been