# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

--------------------------------
DONALD FELL,

        Petitioner,

vs.

THE UNITED STATES OF AMERICA,

        Respondent.
--------------------------------

D E P O S I T I O N
-of-
GENE PRIMOMO

taken on Tuesday, March 11th, 2014,
at the United States Attorney's Office
151 West Street, 3rd Floor, Library Conference Room
Rutland, Vermont.


APPEARANCES:

ON BEHALF OF THE PETITIONER:

        RICHARD I. RUBIN, ESQUIRE
        Rubin, Kidney, Myer & DeWolfe
        237 North Main Street
        Barre, Vermont  05641

                - AND-

        CATHLEEN I PRICE, ESQUIRE
        Cathleen I. Price, Esq.
        P.O. Box 321762
        New York, New York  10032

(APPEARANCES CONT. ON PAGE TWO)



O'Brien Reporting Services, Inc.
223 Killington Avenue - Post Office Box 711
Rutland, Vermont  05702-0711

Page 2

APPEARANCES CONT:

ON BEHALF OF THE RESPONDENT:

    WILLIAM DARROW, ASST. U. S. ATTORNEY
    United States Attorney's Office
    11 Elmwood Avenue - 3rd Floor
    Post Office Box 570
    Burlington, Vermont 05402-0570

DEPOSITION REPORTER:  Maureen A. Booth, RMR
                      New Hampshire License #142

- - -

INDEX OF EXAMINATION

| Witness | Page | Line |
|---|---|---|
| GENE PRIMOMO | | |
| Examination by Attorney Darrow | 4 | 17 |
| Examination by Attorney Rubin | 47 | 21 |

INDEX OF EXHIBITS

| | Page | Line |
|---|---|---|
| Government Exhibit No. 1 (Executive Summary) | 8 | 1 |
| Government Exhibit No. 2 (Jury Selection Documentation - 6 pages) | 9 | 14 |
| Government Exhibit No. 3 (Short Form Questionnaire - Juror 162) | 31 | 15 |
| Government Exhibit No. 4 (Long Form Questionnaire - Juror 162) | 31 | 15 |

distinction for us, for lawyers, and I'm wondering if you recall how you understood this at the time.

A.    I understood this to be some type of diversionary result.

Q.    Okay.  So, probably -- well, and where did that fall in your mind on the charge-conviction continuum?

A.    I don't, I don't recall.

Q.    Okay.  162 was one of the jurors who indicated that she was interested in crime media TV shows, Nancy Grace, books, John Walsh, and that she followed the Peterson trial, and I think she said the Michael Jackson trial.

Do you recall how that kind of juror played for you guys?  I could also ask it, do you recall whether that was considered a favorable or unfavorable attribute?

A.    Unfavorable.

Q.    And why is that?

A.    The sensationalism of TV drama is really not an accurate or I should say it would be a little bit concerning for real life application of the type of considerations that jurors would need to make in the courtroom.

Q.    Right.  Yeah, we on the prosecutor's side, we sometimes also consider it unfavorable because we're

considered that jurors watching CSI shows think that the forensics are going to be locked down so tight that there's no question about anything and that's rarely so. So, that's interesting that we both see it that way. All right. We talked about 162's answer to 43B. If you turn the page, 43D contains her statement, my son was treated fairly and it helped him change his life.

Do you recall whether that answer was something that was significant to you voir diring her or considering her as a prospective juror?

A.    Her son's experience was something that was discussed by -- was discussed in voir dire by all of us if I remember correctly.

Q.    I think you're right.

A.    So, it was something that I expected would be explored at voir dire.

Q.    All right. And you did explore it at voir dire, and my question for you is, did you consider that experience with her son as she perceived it to be a favorable or unfavorable attribute for this juror?

A.    At what time?

Q.    Well, if it changed, maybe you could just tell us how it changed.

A.    I think it went from something to inquire

about at the time I reviewed this form and indicated that on my questionnaire sheet to after completing voir dire was -- voir dire was complete, to something that had happened a long time ago and didn't have a whole lot of significance with regard to her really one way or the other based on the questions and answering that occurred during voir dire.

Q.    Okay.  So, you didn't think the fact that she thought a young man could be -- could change and be rehabilitated through experience with the Criminal Justice System was a favorable thing?

ATTORNEY RUBIN:  Objection.

A.    Well, are we talking about her son or are we talking about the crime that Donny was eventually convicted of?

Q.    Well, I mean, I think we're talking about whether -- about this juror and whether the defense team thought that it was a favorable thing that this juror had had a son who had had experience with the Criminal Justice System and was improved by it.

A.    I think the reality of the seriousness of the offense that we were dealing with was so serious compared to the way -- and the trouble that her son had indicated -- she had indicated her son had, that in the general scope of her as a juror, it wasn't a monumental

correlation to be extremely favorable one way or the other.

Q.    All right.  Do I understand you to be saying that the discrepancy between Fell's offenses on the one hand and DWI and domestic on the other was so significant that you didn't think this juror's perceptions of her son's, quote, improvement, close quote, was a big deal?

A.    That's fair, yes.

Q.    All right.  This Juror 162 indicates in her long questionnaire that, that in the past she had been opposed to the death penalty, but that she had changed her mind; is that right?

ATTORNEY RUBIN:  Object.  Which question are referring to?

ATTORNEY DARROW:  It's question number 56.

A.    She indicated her beliefs with regard to the change in question 56, correct.

Q.    Right.  And I'm wondering if the fact that she had once been opposed to the death penalty but had changed her mind, whether that was seen as favorable or unfavorable to the defense team at the time?

A.    Generally unfavorable.

Q.    Well, certainly because you would rather she'd stayed opposed, but unfavorable because presently she had decided that the death penalty was okay in some

circumstances?

A.    That's, that's accurate.

Q.    Okay.  If you look at question number 61, allowing a prospective juror to choose one of seven different categories describing her view on the death penalty, this juror chooses, I'm generally opposed, but I would base the decision to impose it on the facts and the law in the case.  Do you see that?

A.    Yes.

Q.    She also on question 57 chooses number 7 on the opposed versus in favor line, do you see that?

A.    Yes.

Q.    Do you recall whether that struck you as anomalous at the time?

A.    I don't recall how it struck me at the time.

Q.    Okay.  Do you recall during voir dire at one point with her -- I think you asked her something like, well, was your son -- did he commit a criminal offense? Does that sound familiar?

A.    It sounds familiar.  I don't recall -- if you want me to look at the transcript, I'll trust the transcript is more accurate than my memory.

ATTORNEY DARROW:  Okay.  Let's mark the transcript as, where are we, 5?

ATTORNEY RUBIN:  Yes.

BY ATTORNEY DARROW:

Q.    I'll write number 5 in the bottom and pass that to you.  And on page -- the page numbers are sometimes a third of the way up from the bottom, but page 138, line 16, during -- do you see that?

A.    Yes.

Q.    During a discussion of 162's son, you ask --

ATTORNEY RUBIN:  I'm sorry.  Can we just go off the record for a second?

ATTORNEY DARROW:  Yeah.

(Discussion off the record.)

BY ATTORNEY DARROW:

Q.    In lines 16 and 17, you ask the juror, had he, meaning the son, been involved -- did he commit any criminal acts?  And the juror said no.  And your next question is, he was just having -- it was affecting his life?

And I guess, you know, my question is whether it seemed anomalous to you that she has written on both her questionnaires, she refers to DWI and domestic, but here she says he didn't commit criminal acts.  I wonder if you recall that that struck you as peculiar at the time.

A.    I don't, I don't recall.  I don't recall how that struck me, you know, at the time.  It was her answer

that she didn't perceive what he did as a criminal act.

Q.    Okay.  I would ask you to review pages -- the page preceding this and this page, pages 132 and 133 on the bottom, unless you've recently done so.

A.    No, I haven't.

Q.    All right.  Maybe take a look at those again.

A.    Where do you want me to start?

Q.    How about at the top of page 132, Mr. Primomo, and I shifted numbers.  The page says 137 on the right-hand margin and 132 on the bottom.

ATTORNEY RUBIN:  He's now shifted to these. So, it's 132 here and 137 here.

Q.    To make sure we're both in the right place, the question on line 8 says, "MR. PRIMOMO:  Let me just back up a little bit."

ATTORNEY RUBIN:  Can we just say at least for purposes of this transcript it's page 137 of the transcript to be consistent with what you referred to as 138 a moment ago?

ATTORNEY DARROW:  Sure.

ATTORNEY RUBIN:  Thank you.

A.    Okay.  Bill, I'm sorry.  Now go ahead and ask your question.

Q.    My question is related to the question I

asked you earlier about whether you thought it's significant that this juror believed that her son had essentially been improved or turned his life around during his time with the Criminal Justice System, and you said you didn't think so because the offenses were so different.

And so let me ask you, did you think it was important that the juror's experience with her son might result in her being more able to consider as a mitigating circumstance the fact that her son's experience with the Criminal Justice System had involved intervention by others and Fell had not had the benefit of intervention? I know that's a long question. I can try and put it in different words, but I'm trying to distinguish on the one hand, her viewing her son's experience as helpful to you guys because he had been improved or rehabilitated by the system and, on the other, the idea that she might be more sensitive to the mitigating circumstance of Fell not having a sufficient intervention?

A.    That was the area of my inquiry to see how receptive she might be to the concept of the failed social services and so forth that were going to be presented in Donny's case.

Q.    Okay.  And did you conclude that she would

be receptive to that mitigating circumstance?

A.    Not really.

Q.    And that surprises me just because I thought that you had very carefully examined her on that and she had committed to -- well, are you saying not really because she said probably --

A.    Correct.

Q.    -- as opposed to definitely?

A.    Correct.

Q.    Okay.  So, you felt she was holding back a little bit?

A.    I don't know whether she was holding back or not.

Q.    But it was soft?

A.    She answered, she answered probably.

Q.    Okay.  All right.

ATTORNEY PRICE:  Are you done with this?

ATTORNEY DARROW:  I think we are.  Let's get these numbered guys together.

BY ATTORNEY DARROW:

Q.    I'm trying to figure out if I've got more questions for you, so let me ask a general one unrelated, which I did want to ask you.  You are on, if memory serves, the 2255 witness list for a hearing next week?

A.    Yes.

Q.    Okay.    Do you expect to attend the hearing and testify?

A.    Yes.

Q.    Okay.    Can you tell me what you expect to testify to?

A.    Generally matters as you've inquired today.

Q.    Right.

A.    That's my understanding.

Q.    Who has prepared you to testify from the 2255 team?

A.    Well, I've probably had a few conversations with Mr. Rubin in the past couple of weeks.

Q.    Okay.    Now, other than that you intend to testify about jury selection, can you be more specific and tell us what about jury selection you intend to say?

A.    What I remember occurred.    I'll do my best to answer every question as accurately and as completely as I remember them.

Q.    Okay.    As you've done today?

A.    That's what I'm trying to do today, yes.

Q.    All right.    Have you talked with the 2255 team or Mr. Rubin at all about addressing hypotheticals?

A.    Yes.

Q.    Like what if you had known that X and Y?

A.    Correct.

Q.    Okay.    Can you tell me about those conversations?

A.    There was discussion about anticipating what would I have done should -- what would have happened or what should I have done if I knew the extent of the background that the 2255 investigation had produced regarding Juror 162.

Q.    Okay.    And I assume that your expected testimony would be that if you had known that, you would certainly have thought to strike her, the juror?

A.    That's correct.

Q.    Okay.    And do you recall what aspects of the juror's background or prior experiences are at issue there?

A.    I have read the pleadings.

Q.    Oh okay.

A.    I mean I've read the formal pleadings.

Q.    That's a significant project.

A.    Well, I mean -- that's correct, it is a significant project, but I have more recently just read the events that the 2255 investigation has revealed involving, involving Juror 162 in the pleadings.    I mean I haven't looked at anything other than the section of the pleadings that deal with what their investigation turned up.

Q.    Okay.    The 2255 Petition as filed focuses on 162's prior sexual abuse as a minor when she's a girl growing up.    Are you aware of that?

A.    Yes.

Q.    Okay.    If memory serves, in the various attachments filed with the 2255 Petition, there's a statement by Alex Bunin saying that had he known about that, in effect, had he known about that, he would have moved to strike, but I don't recall seeing that in your statement.

So, let me ask you about 162's childhood sexual abuse, is that something that you expect to address at the hearing next week?

A.    If it's asked, I will.

Q.    Okay.    Well, have you been -- do you know -- have you been told that that's one of the things that they want to talk about?

A.    Not necessarily.    No.    I mean that's something that we discussed that may come up.

Q.    Okay.

A.    But I haven't --

Q.    Well, let me ask you, since it is in Alex's statement, and the statements are very short, I know, but it's not in your statement, do you have a view on it?

A.    A view on what?

Q.    On whether the fact that Juror 162 some four or five decades before trial was sexually abused would have been material to your consideration of her qualifications as a juror?

A.    It would have.

Q.    Okay.  And I'm assuming the son's experience with the Criminal Justice System is something that you've talked about?

A.    Yes.

Q.    All right.  And that you expect to address?

A.    If asked, I will, yes.

Q.    And I think you will be asked.  And is your testimony going to be, had you known the extent, the full extent of the son's prior arrest and conviction record, you would have either engaged in a different voir dire or sought to strike that juror?

A.    Yes, that's correct.

Q.    All right.  Okay.  Let me ask you, since you did in voir dire of 162 ask questions about the son and since both her 162's Short Form and Long Form Questionnaire referenced DWI and domestic abuse, do you know looking back on it why or do you recall why you didn't ask the juror to state what convictions her son had?

A.    I felt that she answered the question no and

essentially I took her for her word and that was the end of my questions.  Beyond that, I don't know why else I didn't ask any more questions.

Q.    I may be done.

A.    Okay.

Q.    Let me just review here a little bit.

A.    Sure.

ATTORNEY DARROW:  I think I'm done.

ATTORNEY RUBIN:  Why don't you give Cathleen and I a second to see if we have any follow-up?

(Brief recess taken.)

ATTORNEY RUBIN:  Since you asked about what he may testify at trial, I thought I would just try to flush it out a little bit.

ATTORNEY DARROW:  On the record?

ATTORNEY RUBIN:  So, that you won't say that he wasn't asked.  So, that you won't say you weren't given notice.

ATTORNEY DARROW:  Okay.  I don't think I would do that, but whatever you want to do.

EXAMINATION

BY ATTORNEY RUBIN:

Q.    The Government has asserted in its pleadings that trial counsel liked Juror 162 and wanted her on the ultimate panel; is that true?

A.    That defense counsel wanted her on the jury?

Q.    Yeah, because of some of the reasons that Mr. Darrow has stated.

A.    No, that's not true.

ATTORNEY RUBIN:  That's all.

ATTORNEY DARROW:  We could quibble about that, but I don't think it's necessary.

(Whereupon, the deposition was concluded at 12:34 p.m.)