# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

------------------------------------x

DONALD FELL,

                    Petitioner,

   -against-

THE UNITED STATES OF AMERICA,

                    Respondent,

Case No.:   01-12-S

------------------------------------x

                         One Liberty Plaza
                         New York, New York

                         March 14, 2014
                         9:15 a.m. Time


        Deposition of ALEXANDER BUNIN, pursuant

to Agreement, before Sophie Nolan, a Notary

Public of the State of New York.


     ELLEN GRAUER COURT REPORTING CO., LLC
        126 East 56th Street, Fifth Floor
           New York, New York  10022
                212-750-6434
                Ref:  106597

A P P E A R A N C E S :

CLEARY GOTTLIEB STEEN & HAMILTON

Attorneys for Petitioner

    One Liberty Plaza

    New York, New York   10006-1470

BY:   LEWIS J. LIMAN, ESQ.

    PHONE    212-225-2550

    FAX      212-225-3999

    E-MAIL   lliman@cgsh.com


UNITED STATES DEPARTMENT OF JUSTICE

Attorneys for Respondent

    1331 F. Street N.W.

    Washington, D.C.   20530

BY:   JACABED RODRIGUEZ-COSS, ESQ.

    PHONE    202-353-7172

    FAX      202-262-7243

    E-MAIL   jacabed.rodriguez-coss.usdoj.gov

BUNIN

A.    It starts -- and it's in no particular order because I was just, you know, writing as I heard.  In the furthest left side it says, "Could consider lack of criminal history, remorse some value."  And then I put in quotes "20", meaning age 20, "may not be mitigating" because of her answer to that.

And these impressions were based on the questioning Gene did which is in the transcript.

Q.    Okay.

A.    And then she says "I could" and then I put "could" in quotations, and I believe that was probably in response to Mr. Kelly's questioning about whether she could impose the death penalty.

Q.    And why did you put that in quotations, because it sounded like she wasn't sure?

MR. LIMAN:  Objection to the form.

A.    No, I don't think it was.  I don't think that's what I meant.  I meant that that was her word.  I wasn't putting a spin on it.

And then she says "Certain cases

BUNIN

caused her to come to support death penalty,"
and then the Scott Peterson case and child
murders were her examples, "Could be fair and
impartial."  That's what she said in response
to a number of the questions.  "Would consider
remorse, rehabilitation.  Husband works at
Shaw's.  She used to be a receptionist at the
Housing Authority," and I wrote and this is not
something she said, this is my impression,
"Wants to get on the jury."

And below here, this is during
Gene's questioning, so when it says "probably
could" and then I have "- sincere?" I'm not
sure she's being sincere in her answers to him,
especially when she answers "probably" and then
I pointed out it was hard to look at Donny.
She would not even look over toward our table.
And I don't remember much about her, but I have
that particular memory that she was just
staring straight at Gene and she would not look
over at us.

Then it says "Drugs and alcohol can
do a lot to you."  That's her words in
reference to her son's case.  And then it says,

BUNIN

"Son rehab in correctional system, that he hit bottom."

Q.    So you don't remember much about her, but you remember the fact that she could not look at your table?

A.    I hadn't written that about anybody else so that is a specific -- that refreshes my memory.

Q.    You reviewed your 500 plus summaries?

A.    No.

Q.    So, but --

A.    No, but I can recall that that was a fairly -- that that was a unique comment that I made.

Q.    But you'd agree with me that a lot of jurors don't look over at the defendant?

A.    They usually glance, but there was a -- she had a particular affect that she was rock solid, would not look.

Q.    Could you identify her in a lineup right now?

A.    Probably not.

Q.    But you remember this?

BUNIN

MR. LIMAN: Objection.

A. Even if you gave me the full document, I still would give you the same answer. I don't deny there was a strike list. I just don't remember.

Q. So the strike list was in order. Maybe there was a strike list of 1 through 20 and maybe they were qualified somehow but you don't remember because you're not looking at the strike list, you're looking at an entirely redacted document.

A. It would not tell me what the order was. The order wouldn't tell me what it meant because I don't have an independent memory of it.

Q. All right.

MS. RODRIGUEZ-COSS: We want an unredacted version of that document.

Q. At the end of the day you didn't strike juror 162?

A. She was on the jury.

Q. She was not among the worst of the worst?

A. If we had more strikes, we would

BUNIN

have struck her.

Q.    If you had more strikes you would have struck her after how many?  Where was she on your list?

A.    I don't remember.  I just remember I didn't like her.

Q.    She wasn't in the top 52.  She was an alternate?

A.    We didn't like most of the folks that got left.

Q.    How many did you like, Mr. Bunin?

A.    I can't recall liking any of them and I really didn't like her.

Q.    Okay.  So you can't recall liking any of them, but she wasn't among the top 52 you didn't like because she made it to the jury?

MR. LIMAN:  Objection to the form.

A.    Some of those were government strikes, not all of them were ours.

Q.    She wasn't your strike.

A.    We couldn't -- based on the information we had, we couldn't afford to use a strike.