*CORRECTED*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA      *
                              *
            V                 *
                              *
DONALD FELL                   * CRIMINAL FILE NO. 01-12


CONTINUED HEARING ON JUROR MISCONDUCT
Tuesday, March 18, 2014
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge


APPEARANCES:

    JACABED RODRIGUEZ-COSS, ESQ., United States
        Department of Justice - Criminal Division,
        1331 F Street, N.W., Washington, D.C.;
        Attorney for the United States

    WILLIAM B. DARROW, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    LEWIS J. LIMAN, ESQ. and SCOTT BUELL, ESQ.,
        Cleary Gottlieb Steen & Hamilton LLP,
        One Liberty Plaza, New York, New York;
        Attorneys for the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
        New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
        DeWolfe, 237 North Main Street, Barre, Vermont;
        Attorney for the Defendant


ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# I N D E X

### E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **KAULENE KELSEY** | | |
| Direct by Mr. Buell | 20 | 11 |
| Cross by Mr. Darrow | 35 | 3 |
| **JANICE DeGOOSH** | | |
| Direct by Mr. Buell | 47 | 11 |
| Cross by Ms. Rodriguez-Coss | 52 | 17 |
| | 56 | 14 |
| **DINA ZLOCZOWER** | | |
| Direct by Mr. Liman | 58 | 2 |
| Cross by Mr. Darrow | 82 | 10 |
| Redirect by Mr. Liman | 115 | 15 |
| Recross by Mr. Darrow | 118 | 22 |

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 42 | Zloczower business card | 66 |
| 43 | Jar of jam | 75 |
| 44 | Map of Vermont | 75 |

TUESDAY, MARCH 18, 2014

(The following was held in open court at 1:36 p.m.)

COURTROOM DEPUTY:  This is case number 1-12, United States of America versus Donald Fell.  The defendant is not present in the courtroom.  Present on behalf of the defendant are attorneys Richard Rubin, Lewis Liman, Cathleen Price and Scott Buell.  The government is present in the courtroom through their attorneys, William Darrow and Jacabed Rodriguez-Coss.

The matter before the Court is a continuation of the juror misconduct hearing.

THE COURT:  Mr. Fell is not here.  My understanding is that Mr. Fell has waived his right to be present for this particular hearing, Mr. Liman; is that still correct?

MR. LIMAN:  That is correct, your Honor.

THE COURT:  Okay.  All right.  The Court began a preliminary evidentiary hearing in the past based upon partially the testimony, submissions of the parties. The Court found cause to conduct a full evidentiary hearing in regard to the allegations of judicial -- or judiciary -- of juror misconduct in regard to three individuals, and in regard to the fourth, the Court denied the defendant's efforts to open up the process for an evidentiary hearing.

Now, are we set to proceed at this point?

MR. LIMAN:  Your Honor, on behalf of Mr. Fell, we are set to proceed.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  The government's ready.

THE COURT:  Okay.  You want to call your first witness?

MR. LIMAN:  Your Honor, before we do that, can we take care of some preliminaries, and then we will call the first witness?

THE COURT:  Sure.

MR. LIMAN:  The first preliminary has to do with exhibits.  There are a number of documents that have -- whose admission we would move.  We have placed in front of you, I believe, the exhibit list that we provided to the Court and to the government a week and a half ago.

THE COURT:  This is the 33 exhibits?  I'm sorry, more than that.

Okay.  All right?  You are moving for the admission of those documents?

MR. LIMAN:  We are moving for the admission -- your Honor, the first eight documents and Exhibits A through D have already been received.  We are moving for the admission of Exhibits 9 through 25 and Exhibit 28.

THE COURT:  All right.  Ms. Rodriguez-Coss?
What's --

MS. RODRIGUEZ-COSS:  Your Honor, we are going
to have an objection to some of these documents.

THE COURT:  Okay.  Which ones are you
objecting to?

MS. RODRIGUEZ-COSS:  We received about a
thousand pages initially from petitioner worth of
exhibits they wanted to introduce in this hearing, and
we objected to the voluminous nature of the exhibits and
asked petitioner if he would streamline some of those
exhibits, and this binder that I am holding in my hand
right now is their idea of streamlining the exhibits.
We have reviewed some.  We are in the process of
reviewing the remainder.  Some of the ones that we have
reviewed, quite honestly we have an objection on the
basis of relevance.

The exhibits are provided in numerical order, and
they are identified with regards to what they are, but
they are not identified in the sense that we have not
been provided with what do they relate to or which claim
do they relate to or what is it that they purport to
prove.

THE COURT:  All right.

MS. RODRIGUEZ-COSS:  So I would suggest that

we set that aside.

THE COURT: Right. Let's make sure we keep moving forward.

Mr. Liman, apparently this would suggest that perhaps you should meet with the government to actually make sure that these are the exhibits that you wish to introduce and there's no objection. My question is in regard to the witnesses whom you intend to call: Are there any particular exhibits which you would need to introduce as part of their testimony?

MR. LIMAN: Your Honor, not of the exhibits that I mentioned to you. The exhibits that I mentioned to you are exhibits that, pursuant to agreement with the government, we don't need to call a witness to establish the evidentiary foundations for the issues; just limited to relevance.

I did misspeak. My colleague informs me we also would be moving the admission of Exhibits 28 to 37.

THE COURT: All right. So that's 9 through 25, 28 through 37, and you have already admitted A through D; is that correct?

MR. LIMAN: That's correct.

THE COURT: Okay. So again, were any of those exhibits linked to any of the testimony of any of the witnesses whom you intend to call this afternoon?

MR. LIMAN:  No, they're not.  If you noticed, the exhibit list that we put in, all of these exhibits are exhibits to the amended 2255.  That's what the relevance is for.

THE COURT:  All right.

MR. LIMAN:  One other preliminary, before we call the witnesses, there is the issue of juror names and identities.  The first two witnesses we intend to call are lay witnesses with respect to Juror 162.  They know Juror 162 by his first and last name.  They obviously don't know him by his juror number.

THE COURT:  Are you asking 143 or 162?

MR. LIMAN:  I'm sorry, 143.

THE COURT:  All right.  So they know him -- it's a him -- as 140 -- as by -- by name?

MR. LIMAN:  By name.

THE COURT:  Is there any difficult in them actually just translating that to 143, if I in fact instruct them to refer to this juror as 143?

MR. LIMAN:  As long as there's agreement with the government that the person that they are referring to is actually the person whose identity is 143.

THE COURT:  Okay.  Ms. Rodriguez-Coss, any objection to that?

MS. RODRIGUEZ-COSS:  No objection, your Honor.

THE COURT: Okay. All right. So I will instruct them to refer to this particular juror as 143.

And, again, so the parties can actually meet at the close of the session today to go over these particular submissions. My understanding, also, is that there is some objection to the introduction of records from institutions. Lawyers are present to deal with that particular issue?

MR. LIMAN: Your Honor --

THE COURT: Is that correct?

MR. LIMAN: My understanding is that we have reached an agreement with respect to the documents that are requested. We have narrowed the request from those institutions. My understanding is the institutions are agreeable to turning over the narrative information. The institutions, for understandable reasons, would rather not mention their names in open court because it has to do with --

THE COURT: Sure.

MR. LIMAN: -- medical issues.

THE COURT: I understand that. And from the government, is that -- by Mr. Liman's reference to an agreement, is that an agreement with the government as well?

MS. RODRIGUEZ-COSS: I'm not quite certain

what he is referring to.

THE COURT:  I think what he is suggesting is that there was an arrangement made with the institutions, names of which I will not mention, in regard to what exhibits should be introduced.  Is that correct?

MR. LIMAN:  No, your Honor, that's not correct.  These are documents that we have subpoenaed.  We haven't seen the documents yet.  We're not moving their admission.  This is pursuant to subpoenas that -- to the institutions that your Honor reviewed, that the government saw, and where the documents had not yet been produced.

We have reached an agreement so that we are not seeking the underlying records but simply dates.

THE COURT:  All right.  So looking at the audience, I see two people who look like lawyers, whom I know to be lawyers, standing, and so your reaction to Mr. Liman's statement?

ATTORNEY TOM SOMERS:  Good afternoon, your Honor.  Tom Somers on behalf of one of the institutions.

THE COURT:  Right.

ATTORNEY TOM SOMERS:  We are not in agreement to hand the documents, if there are any documents, over.

The procedure would call for the Court to review the documents, and then issue an order to disclose such documents to the defense if -- or to the petitioner if that is what the Court desires.  And our position is if the Court issues such an order, then such an order -- we will certainly comply with it, forthwith.

THE COURT:  Okay.  Mr. Smith, is that true as well?

ATTORNEY WHIT SMITH:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

ATTORNEY WHIT SMITH:  We have a slightly different variation for my unnamed organization.

It is my understanding that the Court would issue an order directing us to turn over to the defense the rough dates of dates of services provided, period; no records going to the Court for *in camera* review, no records being disclosed to the defense or the government.

THE COURT:  Does that mean that you are being treated differently than Mr. Somers' institution?

ATTORNEY WHIT SMITH:  I can only speak for the arrangement that I reached agreement with the defense.

THE COURT:  Mr. Somers, did you reach an agreement with the defense as well that in fact it's --

the dates are being turned over and not the substance of the materials?

ATTORNEY TOM SOMERS: That was what their subpoena requested, and it's -- we think that that's very narrow. However, the confidentiality law and its regulations require the Court to review them, and we must bring that to your attention as an issue.

THE COURT: Oh, all right. But as far as your understanding with the defense -- I will turn to the government in a second. Your understanding with the defense is that you have reached an agreement that you are just going to be turning those over. It's your understanding that they would be submitting only the dates of service as opposed to the records themselves; is that correct?

ATTORNEY TOM SOMERS: That's agreeable to me.

MS. PRICE: Yes, that's our position, your Honor.

THE COURT: Okay. What about the government's position? You also have access to those records. Is that your understanding as well?

MS. RODRIGUEZ-COSS: I don't know who these gentlemen are. I don't know what institutions they represent. We have not been privy to any discussions between them and the petitioner. I have no idea to what

records they are referring to.  So we have not been notified of any additional subpoenas other than the ones the Court had issued a ruling on.  So --

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  We have not been provided an opportunity.

THE COURT:  Okay.  So as I am reading this, you have been given copies of all of the materials that the defense has been given.  The defense is not seeking to introduce any of those exhibits, those records themselves, but they are seeking to introduce the dates upon which service were given.

These are representatives of the two institutions whose records you have reviewed, and they apparently have no objection to the surrender of the dates upon which the service has been provided, but the government hasn't been a part of this whole discussion, so someone has to talk to the government --

MS. RODRIGUEZ-COSS:  I believe the --

THE COURT:  -- and see if this can be done --

MS. RODRIGUEZ-COSS:  The government and Mr. Liman --

MS. PRICE:  Your Honor -- Miss Rodriguez-Coss, you have received the subpoenas we issued.

THE COURT:  You can't talk between each other

at this point.

MS. RODRIGUEZ-COSS:  I'm sorry, I thought Mr. Liman --

THE COURT:  All right.  Ms. Rodriguez-Coss?

MS. RODRIGUEZ-COSS:  -- said that these were the records that have not yet been provided and we have not yet seen.  Did I misunderstand that?

MS. PRICE:  That's right, that's right, your Honor; that we have not received -- we have not received --

MS. RODRIGUEZ-COSS:  I don't --

MS. PRICE:  -- the records yet.

MS. RODRIGUEZ-COSS:  I don't think these --

THE COURT:  Oh, these are not the records --

MS. RODRIGUEZ-COSS:  No.

THE COURT:  -- that you in fact had received?

MS. RODRIGUEZ-COSS:  No.

THE COURT:  Okay.  Well, then my suggestion is we take a brief recess, the lawyers for both the government, the defense, and the lawyers for the institutions get together and see if this can be resolved, because I had -- was mistaken as to what records in fact were --

MS. RODRIGUEZ-COSS:  Yes.

THE COURT:  -- to be surrendered.

So, with that, it's -- there's no jury here.  Let's take a brief recess.  Perhaps you can all meet and see if this can be resolved.  Okay.

(Court was in recess at 1:49 p.m.)

(The following was held in open court at 1:58 p.m.)

THE COURT:  Okay.  Please be seated.

Is there any progress made in regard to the review of those records?

MS. PRICE:  Yes, your Honor.  I think we have all gotten to an agreement.

Mr. Fell had issued subpoenas to two institutions to receive some information.  The lawyers for the institutions are here.  We are all in agreement about a portion of that information being made available to us, but pursuant to the rules, the institutions need a court order allowing that information.

THE COURT:  Okay.  So are both sides agreeing that you both want access to these records?  Is that correct?

MS. PRICE:  The institutions are not in agreement that we get access to the records.

THE COURT:  No, I understand the institutions are not.  They're asking -- they're suggesting that the Court would review the records before it orders them to be surrendered to both sides.

MS. PRICE:  No, your Honor.

THE COURT:  Well, all right.  Then let's start over again.  So --

MS. PRICE:  Excuse me.

THE COURT:  -- tell me what the defense and the government have agreed to.

MS. PRICE:  The defense and government have agreed to receiving from the institutions information about a specific portion of the information, specifically dates.  That information does not require disclosure of the actual substantive records, and the institutions are in agreement that upon court order of, report of the dates, the relevant dates, that they would be willing to turn those over to both sides.

THE COURT:  Okay.  All right?  Ms. Rodriguez-Coss, is that your understanding as well?

MS. RODRIGUEZ-COSS:  That's -- that's my understanding, saving our objection -- our objections on other grounds to the information.

THE COURT:  Okay.  So the parties have stipulated that they seek the dates of the records held by these two institutions; is that correct?

MS. PRICE:  Yes, your Honor.

MS. RODRIGUEZ-COSS:  Well, the defense -- the petitioner is seeking the records.  We are agreeing that

they can get them in this manner. We are not seeking these records.

THE COURT: Okay. All right. So -- but you are not objecting to the dates being turned over by the institutions to the defense, and you need a court order for these institutions to surrender the dates of those particular records to the defense, copy of which goes to the government. Is that correct?

MS. RODRIGUEZ-COSS: Yes, sir.

MS. PRICE: Yes, your Honor.

THE COURT: Okay. And my understanding is -- and tell me if the lawyers in the audience object, but assuming that the Court does order that those dates be surrendered to the parties, you would do so?

ATTORNEY WHIT SMITH: Yes, your Honor. We have no objection to that.

THE COURT: Okay. Mr. Somers?

ATTORNEY TOM SOMERS: I am in agreement with that, your Honor.

THE COURT: Okay. It is so ordered that the dates that are sought by the parties, the government and the defense, be surrendered to the government and the defense, and if you need me to look at that *in camera* before it actually is physically turned over to them, I would be glad to do that. But the order's in effect

that those dates should be turned over, consistent with the understanding that has been raised by the parties, between the parties and the institutions. Are we clear?

ATTORNEY WHIT SMITH: Thank you, your Honor.

ATTORNEY TOM SOMERS: Yes, your Honor. And as I -- I don't want to belabor this, but as I understand it, what you mean is we orally give them the dates.

THE COURT: Correct.

ATTORNEY TOM SOMERS: And not on any paper.

THE COURT: That's what they are asking for, right?

MS. PRICE: Your Honor, I think we actually do need a report of the dates in some written, certified form.

THE COURT: Do you have any difficulty actually not having -- I mean, assuming that they're standard records -- you wouldn't necessarily have dates separate and apart from the records -- can you actually just draft up a list of the dates of the records that they are seeking, and then certify that these are taken right from the records? Both sides would then have the written list of dates. Any objection to that?

ATTORNEY TOM SOMERS: I have no objection to that, your Honor.

THE COURT: Okay. Mr. Smith, any objection to

that?

ATTORNEY WHIT SMITH:  I think we have reached agreement with the defense and the prosecution that we would give them the periods of time during which services were provided because we are an outpatient provider.

MS. PRICE:  We agree to that.

THE COURT:  The periods of time -- okay, that's fine?

MS. PRICE:  (Nods head.)

THE COURT:  Okay.  If you can list the periods of time, and, Mr. Somers, if you can list the dates of service, and they are actually in written form, to sign, the fact that they are those dates of service, and then submit them to the parties, then that satisfies the obligation.  Okay?

MS. PRICE:  Your Honor, Mr. Fell respectfully requests that the Court specify a date by which that document should be provided.

THE COURT:  Oh, I don't think I -- you are going to go do this right away, aren't you?

ATTORNEY TOM SOMERS:  Yes.

THE COURT:  I mean, really, they are going to be here -- can you do it by tomorrow morning?

ATTORNEY TOM SOMERS:  I can do it right now

in --

THE COURT:  Good.  Why don't you do it right now, Mr. Somers.  You can sit there or you can go out and -- in the hallway and write the dates and then give them to the attorneys.

MS. PRICE:  Thank you, your Honor.

THE COURT:  Okay?  All right.  We ready for our first witness?

MR. LIMAN:  Call the first witness.

MR. BUELL:  Mr. Fell calls Kaulene Kelsey.

KAULENE KELSEY,

having been duly sworn by the courtroom deputy, was examined and testified as follows:

THE COURT:  All right.  Good afternoon, Miss Kelsey.  I thought I was the one who just went on senior status.

Good afternoon.

THE WITNESS:  Good afternoon.

THE COURT:  You are going to be asked a series of questions by the lawyers, perhaps by the Court just as well, and I think questions may relate to a juror --

THE WITNESS:  Okay.

THE COURT:  -- I think you know.  And the juror's referred to here as Juror 143.

THE WITNESS:  Okay.

THE COURT:  All right.  You can just refer to the person as "juror" or as "143."  I'd ask that you not disclose the name at this point.

THE WITNESS:  Okay.

THE COURT:  All right?

THE WITNESS:  Okay.

THE COURT:  Do you have any difficulty with that?

THE WITNESS:  No.  Thank you.

THE COURT:  All right.  Thank you.  Okay.

DIRECT EXAMINATION

BY MR. BUELL:

Q    Good afternoon, Miss Kelsey.

A    Good afternoon.

Q    Where do you live?

A    I live in Northfield, Vermont.

Q    How long have you lived in Vermont?

A    I have lived in Vermont for almost 12 years.

Q    And where did you live prior to that?

A    In Connecticut.

Q    Do you know the date approximately when you moved to Vermont from Connecticut?

A    Yes.  I moved here in August of 2002.

Q    Are you appearing here today pursuant to a subpoena?

A    I am.

Q    And do you know Juror 143?

A    Yes.

Q    When did you meet him?

A    I met him in the 1970s.  We actually grew up together.

Q    And in the 1970s, what was your relationship to Juror 143?

A    We were friends originally, and then we dated.

Q    Did there come a time when you stopped dating?

A    Yes.

Q    When was that?

A    Roughly 1981.

Q    And when -- did there come a time when you started dating again later in the future?

A    Yes.

Q    And when was that?

A    That was in 2002.

Q    Where were you living at the time in 2002 when you began dating Juror 143 again?

A    In Connecticut.

Q    And where was Juror 143 living?

A    He was living in Vermont.

Q    And why did you move, in the summer of 2002, from Connecticut to Vermont?

A    I moved to be with him.

Q    Where did you move to when you moved to Vermont?

A    To Northfield.

Q    Were you living with anybody when you moved to Vermont, when you lived in Vermont?

A    With the juror.

Q    And did there come a time when you stopped dating the juror the second time?

A    Yes.

Q    And when was that?

A    That was in the summer of 2005.

Q    So the proceeding that we are in court for today is the case of Donald Fell.  Are you familiar with that case?

A    Yes, I am.

Q    How did you become familiar with that case?

A    Through the juror.

Q    Were you dating the juror at the time he was a juror on Donald Fell's case?

A    Yes.

Q    Were you living with him at the time he was a juror on Donald Fell's case?

A    Yes.

Q    Do you know where the crimes that are the subject of this case occurred?

A    Yes.

Q    Where was that?

A    In Rutland, Vermont.

Q    Have you ever been to Rutland, Vermont?

A    Yes.

Q    Have you ever been to Rutland, Vermont, with Juror 143?

A    Yes.

Q    When did you go to Rutland, Vermont, with Juror 143?

A    We went in the summer of 2005.

Q    Whose idea was it to go to Rutland in the summer of 2005?

A    It was his idea.

Q    And what did he say to you about that?

A    He wanted to go to Rutland to see for himself, visit the crime scenes and visit the area himself.

Q    When you say "the area," can you be more specific?

A    Yes.  The house first -- first the house where Donald Fell's mother was murdered, and then the Price Chopper.

Q    And had you ever been to Rutland prior to this trip?

A    No.

Q    And when you went to Rutland with Juror 143, where

did you leave from?

A    From Northfield.

Q    And can you approximate how long the trip was from Northfield to Rutland?

A    Probably an hour to an hour and a half.

Q    When you were in Rutland with Juror 143, where did you go?

A    We went to the home of Donald Fell first, and then we went to Price Chopper.

Q    When you visited these places, did you know if they had any significance at Donald Fell's trial?

A    Yes.  I knew that the murders -- the murder took place at the home.

Q    And how did you know that?

A    Through the juror; the juror explained that to me.

Q    And which did you go to first, the home -- I think you said earlier you went to two locations when you were in Rutland; is that right?

A    That's right.

Q    And which of those two locations did you go to first?

A    We went to the home first.

Q    Where did you go second?

A    To the Price Chopper.

Q    And when you were at the home where Donald Fell's

mother lived, did you observe -- what -- what did you and Juror 143 observe?

A    We looked at the house and looked at the surrounding neighborhood.

MS. RODRIGUEZ-COSS:  Objection as to what Juror 143 observed.

THE COURT:  You want to rephrase the question?

MR. BUELL:  Sure.

BY MR. BUELL:

Q    What did -- I guess where were you in relation to the house where Donald Fell's mother lived?

A    We drove to the house.

Q    Did you drive anywhere else around the house?

A    We drove through the neighborhood.

Q    How did you learn that the house you were looking at was the crime scene in the Donald Fell case?

A    Juror told me that.

MS. RODRIGUEZ-COSS:  Objection to what -- hearsay, your Honor.

THE COURT:  Objection overruled.

You can answer the question.

BY MR. BUELL:

Q    You can answer the question.  I don't know if you --

A    Okay.

Q    You may not have gotten into the record.  I will re-ask the question.

How did you learn that the house you were looking at was a crime scene in the Donald Fell case?

A    The juror told me.

Q    And did he tell you what happened there?

MS. RODRIGUEZ-COSS:  Objection, your Honor.

THE COURT:  Objection overruled.

You can answer the question.

A    Yes, he did.

BY MR. BUELL:

Q    And what did he tell you --

A    He told --

Q    -- about the house that he --

MS. RODRIGUEZ-COSS:  Same objection, your Honor.  Clearly hearsay as to what someone else told --

THE COURT:  Objection -- it's not hearsay.  It's not being offered to prove the truth of the matter asserted therein.  It's being offered for other purposes.  So objection's overruled.  He can answer the question.

MS. RODRIGUEZ-COSS:  May we request that --

THE COURT:  She can answer the question.

MS. RODRIGUEZ-COSS:  -- petitioner's counsel

make clear why he is exactly requesting the statement for, if not for the truth of the matter?

THE COURT:  It -- it is going for a number of purposes, including the fact that this testimony may have been inconsistent with the testimony that was given by Juror No. 143, thereby impeaching the testimony, just as one of the purposes.  But, frankly, what he said to her during this exchange is vital to their case.  They should have an opportunity to introduce this testimony.

So the objection's overruled.  You can ask the question.

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, but if I -- if the Court will indulge me, Rule 613 states that in order for a prior inconsistent statement to be admitted not for the truth of the matter but to impeach the testimony of the declarant, the declarant has to be afforded an opportunity to explain the statement.

I don't believe that the declarant, Juror 143, was ever confronted by any statements made by this witness during his testimony in court.

THE COURT:  The juror was asked whether he went down to Rutland in 2005, and he said he never made the trip.  It doesn't take a brain surgeon to figure out that this testimony would be slightly inconsistent with

the testimony that the juror gave earlier in this hearing.

MS. RODRIGUEZ-COSS:  Well, that may be so, your Honor.  We just want -- for the record, he was never confronted with the statements of this juror -- of this witness.

THE COURT:  Okay.  Go ahead.

BY MR. BUELL:

Q   Okay.  So I will back up a second.

Did he tell you what happened at the house that you observed?

A   Yes.

Q   What did he tell you?

A   He told me that Donald Fell -- Donald Fell and his friend murdered his mother and her friend.

Q   Do you recall if it was light out or dark out when you were at the house in Rutland?

A   It -- I recall it to be dusk, before dark.

Q   And I think you said a moment ago that you drove around the neighborhood surrounding Juror 143's *[sic]* house; is that correct?

A   Yes, around -- yes.

Q   Did Juror 143 make any comments to you about the neighborhood surrounding the house?

A   He did.

Q    What did he say?

MS. RODRIGUEZ-COSS:  Could we just have a standing objection on those?

THE COURT:  Yes.  Okay.

What did he say?

BY MR. BUELL:

Q    What did he say?

A    He said he made note that the house did not look as he expected it to be; that he believed that Donald grew up in less of a neighborhood, a less --

THE COURT:  I'm sorry, I couldn't quite hear you.

A    He believed that -- that the house we were looking at was more of a middle class-type house, and that's not how he perceived Donald Fell's upbringing to be.

BY MR. BUELL:

Q    Did he say why he -- why he was expecting something different?

A    He said that -- yes, he said that he expected to just see less of a house than Donald portrayed that he was brought up in without parents and without supervision and with drugs and alcohol.

Q    What, if anything, when he was making this comment to you, did he say about evidence that was introduced at Donald Fell's trial?

A    Um, not specifically.  Just that that was the impression that he had, that he was surprised to see that the house was in a halfway decent neighborhood.

Q    So after leaving the house in Rutland, where did you go next?

A    We went to Price Chopper.

Q    Can you recall how long the drive was from the house to the Price Chopper?

A    I don't recall.

Q    Can you recall how you got from the house to the Price Chopper?

A    I don't.

Q    Do you recall if you drove down an alley near the -- near the house?

A    I don't remember.

Q    Is it possible that you did?

A    Yes.

Q    Do you recall if you drove along the front side of the shopping center to reach the Price Chopper?

A    I don't recall.

Q    Is it possible that you did?

A    Yes.

Q    Do you recall if you drove around the back alley of a shopping center to reach the Price Chopper?

A    I don't recall.

Q    Is it possible you did?

A    Yes.

Q    When you got to the Price Chopper, was it light out or dark out at that point?

A    It was getting dark, just about dark.

Q    When you were at the Price Chopper, did Juror 143 make any comments to you at that point?

A    Yes.

Q    What did he say?

A    He first noted that it didn't look very well lit in the parking lot, and he then act- -- was showing me the area that he thought that -- where the crime scene was and how things took place in the parking lot.

Q    Did he say anything else to you about that?

A    He -- just how -- again, how things might have happened, how the -- they might have approached the car where Terry was abducted.

Q    Was he -- were you in the car when you were having this conversation?

A    Yes.

Q    And was he gesturing in any way?

A    Yes, just converbally *[sic]* reenacting it, *per se*.

Q    Approximately how long were you and Juror 143 in Rutland?

A    I'd say not more than a half hour total.

Q    Do you recall what type of vehicle you took from
Northfield to Rutland?

A    I don't recall.

Q    Do you recall if it was a car or a motorcycle or a
truck?

A    It would have either been a Subaru or a minivan.
Those are the two vehicles we had at the time.

Q    So why do you say that?

A    I'm sorry.  We also had a truck, but I just don't
think -- that's not the vehicle that we normally would
have taken to take a road trip.

Q    When you say "we," who are you referring to?

A    The juror -- 143.

Q    And, sorry, can you state again.  You said that it
would have been a Subaru or -- what was the second
option?

A    A van, a minivan.

Q    And is that because you and Juror 143 -- did you
own these two cars jointly?

A    Yes.

Q    And who --

A    Not jointly, but we did own them.  I owned the van,
and he owned the Subaru.

Q    At the time you were in Rutland with Juror 143, did
you have any thoughts about whether it was okay for him

to be there?

A    I did.

Q    Did you share those thoughts with Juror 143?

A    I did.

Q    What did you say?

A    I asked him specifically should he be here, that I didn't -- it didn't seem to me like this is something that he should be doing.

Q    How did he respond?

A    He basically said that he wanted to see things for himself, and that nobody knows he is there so it didn't make any difference.

Q    When you went to Rutland with Juror 43 *[sic]*, did you go at the time he was a juror on Donald Fell's trial?

A    Yes.

Q    Since -- I think you said earlier you broke up with Juror 143 in summer of 2005?

A    Um-hum.

Q    Since that time, have you ever -- have you gone on any trips to Rutland with Juror 143?

A    No.

Q    Have you been back to Rutland at all since that time?

A    I have driven through Rutland, yes.

Q    When was the last time, approximately, you think you drove through Rutland?

A    Probably two to three years ago.

Q    Do you recall anything striking you as different when you drove through two to three years ago?

A    No.

MR. BUELL:  If I could have one moment, your Honor?

THE COURT:  Yes.

(Brief pause.)

BY MR. BUELL:

Q    I just wanted to ask you if you could state for the record, what do you do for a living currently?

A    Currently?  I am -- I am working managing a restaurant.

Q    All right.

THE COURT:  I'm sorry?

THE WITNESS:  I work for a restaurant.  I am a manager at a restaurant.

BY MR. BUELL:

Q    Where is that?

A    In Northfield, Vermont.

MR. BUELL:  I don't have anything further.

THE COURT:  Okay.

MR. BUELL:  Thank you very much, Miss Kelsey.

THE COURT:  All right.  Cross examination?

MR. DARROW:  A few questions, your Honor.

CROSS EXAMINATION

BY MR. DARROW:

Q    Good afternoon.

A    Hi.  Good afternoon.

Q    My name is Bill Darrow.  I represent the United States.

Do you recall being questioned by an FBI agent about the events you've just been describing?

A    Yes.

Q    Twice?

A    Yes.

Q    And that FBI agent was Michelle Delpha, who is in court today?

A    Yes.

Q    You didn't mention to Agent Delpha when she interviewed you many of the things you just described, did you?

A    I don't recall, to be honest.

Q    Well, do you recall that Agent Delpha asked you whether the purpose of this drive to Rutland, that you have been describing, was to go to crime scenes or whether maybe you were going somewhere else that day and happened to go through Rutland?

A     I'm sorry.  Can you say that again?

Q     Do you recall that Agent Delpha asked you about the purpose of the trip?

A     Um-hum.

Q     Okay.  Do you recall what you told her?

A     I don't.

Q     Okay.  Well, today you have testified that the purpose of the trip that day was to go to Rutland crime scenes, correct?

A     Yes, that is why we went -- that is -- we went to Rutland and visited the crime scenes.

Q     And you don't recall addressing that matter with Agent Delpha?

A     I don't, no.

Q     You have testified today that you were familiar with the fact that there had been this kidnapping and these murders in Rutland because that's what the juror told you?

A     Yes.

Q     You didn't read any media at the time talking about the two murders in Rutland?

A     I wasn't living in Vermont at the time.

Q     You weren't living in Vermont at the time of the trial?

A     At the time of the trial, yes.  I thought you

meant --

Q    There was some media coverage of the case during the trial?

A    Yes.

Q    But you didn't see any of it?

A    No.

Q    And you didn't tell Agent Delpha that you were familiar with the two locations in Rutland because the juror told you about them, did you?

A    Did I tell her that?

Q    Yes.

A    Yes, I did.

Q    You did?

A    Yes.  That's the only reason I had ever been to Rutland was with Juror 143 to visit those two locations.

Q    And you testified today that at the -- at Fell's apartment you drove through the neighborhood.

A    Um-hum.

Q    And just so that I understand that correctly, I mean, to drive by that house, you drive through the neighborhood, I suppose, and so let me ask you to explain to us, what did you mean by driving through the neighborhood?

A    What I meant was driving -- we were looking for the house, so looking at houses before the house, after the

house, on our way to the house.

Q    Okay.  So you had the address of the house, and you were driving down the street looking for the house?

A    Yes.

Q    And that's what you meant by driving through the neighborhood?

A    Right.

Q    Okay.  Now, you testified that the juror made observations to you about the neighborhood.  You didn't tell that to Agent Delpha, did you?

A    I don't know if she asked me that, to be honest.

Q    Okay.  Now, you also testified that while driving past the Price Chopper -- and let me interrupt for a moment.

Did you get out of the car anywhere?

A    No, not that I recall.  Not that I recall.

Q    Okay.  You testified that driving by the Price Chopper, the juror -- you testified that the light -- the juror observed to you that the lighting was weak, or something along those lines?

A    Um-hum.

Q    You didn't mention that to Agent Delpha either, did you?

A    Again, if she asked that, I would have answered her yes.

Q    Okay.  Let me ask you, did anyone show you at some point a statement of that juror?

A    I don't remember, to be honest.  I don't believe so.

Q    No?  Do you know whether anyone -- and I suppose by "anyone," I am referring to the folks on that side of the courtroom.  Did anyone sit down with you to prepare you for your testimony today?

A    We talked, yes.

Q    Okay.  Did they tell you what the juror had previously said?

A    No.

Q    Okay.  They didn't read to you a statement or show you a statement?

A    Honestly, I don't recall reading a statement, no.

Q    Okay.  And the question was, they didn't read to you a statement or show you a statement?

A    No.  Not that I recall.

Q    Okay.  Now, do you recall Agent Delpha asked you when this trip took place?

A    Yes.

Q    Okay.  Do you recall when it took place?

A    I don't recall the exact date, no.

Q    Well, do you remember the general date?

A    I remember that it was in June or July of 2005.

Q    Okay.  And how do you remember that?  That's eight and a half years ago.  That's quite a while.

A    The only reason, honestly, I remember it, because I remember questioning Juror No. 143, should we be here. I didn't feel right about being there because it was during the trial.

Q    Okay.  And let me press you on that.  It sounds like you hadn't been paying any attention to the trial in the media.

A    Um-hum.

Q    Correct?

A    No, very little.  Not much at all, actually.

Q    Okay.  But I gather you had an understanding that jurors during a trial should not be looking at evidence.

A    Yes.

Q    That was your understanding?

A    Yes.

Q    Now, your relationship with this juror didn't end well, correct?

A    It did not, no.

Q    And is it correct that the month after this trip you are talking about, it fell apart?

A    Yes.

Q    And it was somewhat acrimonious, correct?

A    Correct.

Q    And, in fact, he began dating a good friend of yours?

A    Not a good friend of mine, no.

Q    A friend of yours?

A    No, a friend of his.

Q    Oh, she wasn't a friend of yours?

A    No.  An acquaintance.

Q    Okay.  And who was that?

A    Janice DeGoosh.

Q    Excuse me?

A    Janice DeGoosh.

Q    Thank you.

Now, the juror didn't say anything to you about relaying this information to other jurors during deliberations, did he?

A    No.

MR. DARROW:  Judge, may I have a moment?

THE COURT:  Yes.

(Brief pause.)

BY MR. DARROW:

Q    And during the trial, he didn't tell you about evidence at the trial, did he?

A    No, he did not talk about the trial a lot.

Q    Well, he was very good about not talking to you about the trial, right?

A    He did not talk about the trial.  The day in Rutland was the day I heard most of the trial.

Q    Well, it was the day that you heard more than you had heard from him at any time about the trial?

Let me just try and --

A    Yes.

Q    Because he didn't talk at any other time about the trial, did he?

A    He did not talk in detail about the trial.

Q    Well, I thought you had just testified during the trial he did not tell you about the trial except for that day in Rutland.  Is that right?

A    He did not talk about the trial on a regular basis, no.

Q    Okay.  So perhaps I misheard your prior testimony then.  I thought you had said he did not talk about the trial.

A    He didn't talk about the trial on a regular basis, no.  On -- when we were in Rutland, yes.

Q    Okay.

A    His purpose of being there was to look at places and see for himself.  At that point, yes, he was talking about the trial.

Q    Okay.  Other than that day, he did not talk about the trial?

A    No.

Q    Okay.

MR. DARROW:  Judge, may I have another second?

THE COURT:  Yes.

(Brief pause.)

BY MR. DARROW:

Q    And I apologize.  I think a final question.

The only reason why you believed that this trip was during the trial was because you had this gut feeling that you shouldn't be doing that, or he shouldn't be doing that.

A    Two reasons.  One -- yes, that is the main reason, because I questioned that, saying that this doesn't feel right, should you be here.  And his response was, I can do what I want to do.  I need to see this for myself. That is -- that is my main reason.

The other -- I don't have the timeline of the trial, but our relationship started to fall apart pretty badly in July.  My guess is that this was in June. I'm -- it could have been early July.  But it was either in June or July.

Q    And just so that I can understand that second reason, the reason is that you remember, it was before the relationship fell apart?

A    Yes.

Q    And when did the relationship fall apart?

A    August.  The end of August.

Q    August 30th, thereabouts?

A    Yes.  For several weeks before that it had been falling apart.  August 30th was the last day that we had anything to do with each other.

Q    Okay.  I apologize.  The trial ended July 15th.

A    Okay.

Q    So it sounds like really the main reason is that you had this gut feeling that you shouldn't be down there.

A    Oh, definitely.

            MR. BUELL:  Objection.

Q    Is that right?

A    Yes.

            MR. BUELL:  Objection.

            THE COURT:  Objection overruled.

        You can answer that.

            MR. DARROW:  Thank you.

            THE COURT:  I just want to ask a couple of questions.

            THE WITNESS:  Sure.

            THE COURT:  Just in your own words, tell me how you know that this trip was during the trial.

            THE WITNESS:  Again, I didn't feel right about

being there because I knew -- I just asked -- I remember asking him, like, you shouldn't -- Should we be here? Are you supposed to be here while you are a juror on a case? And he said, Nobody -- nobody's here. Nobody can see us. I need to see this for myself.

THE COURT: Well, had you talked about the fact that he wasn't supposed to learn anything, or did he say anything about not learning anything about the facts of the case from outside the courtroom? Had he said anything about that?

THE WITNESS: I'm sorry, is --

THE COURT: Had he described to you any instructions that he had received about not conducting his own investigation or not talking to anybody about the case?

THE WITNESS: He had mentioned things about him not supposed to be watching the news or reading the newspaper, things like that. I honestly was just -- that was my gut feeling just from, whatever, TV court or whatever. I said, Are you supposed to be here? Are you -- are you -- it just didn't feel right that he should be doing his own investigation.

THE COURT: But did he then go back to the trial after this trip to Rutland? In other words, he was still in the trial at that point?

THE WITNESS:  Yes.

THE COURT:  And while you are engaged in conversations about the house or the neighborhood or the lighting, what did you say to him?

THE WITNESS:  Again, I was -- to be honest, I was kind of creeped out about being there because it just felt weird.  It felt like we shouldn't be there.  And he just -- this was what he wanted to do.  And he is very controlling, and he was driving, and, you know, that's just --

THE COURT:  Okay.  Any further questions?

MR. BUELL:  No further questions.

(Brief pause.)

MR. BUELL:  No further questions, your Honor.

THE COURT:  Okay.  All right, Mr. Darrow?

MR. DARROW:  No further questions.

THE COURT:  All right.  Thank you.

(Witness excused.)

THE COURT:  You want to call your next witness?

MR. BUELL:  Yes.  Mr. Fell calls Janice DeGoosh.

JANICE DeGOOSH,

having been duly sworn by the courtroom deputy, was examined and testified as follows:

THE COURT:  Good afternoon, Miss DeGoosh.

Now, my understanding is that you may be testifying about a juror and obviously a juror that you probably know.  It's important that you refer to the juror not by name at this point but by "juror" or "Juror 143."  You just say "juror" or "Juror 143."

THE WITNESS:  Okay.

THE COURT:  That would be fine.

THE WITNESS:  Yes.

THE COURT:  Okay?  Okay.

DIRECT EXAMINATION

BY MR. BUELL:

Q    Good afternoon, Miss DeGoosh.

A    Hi.

Q    Where do you live?

A    East Montpelier, Vermont.

Q    How long have you lived in Vermont?

A    52 years.

Q    Are you appearing here today pursuant to a subpoena?

A    Yes.

Q    Do you know Juror 143?

A    Yes.

Q    When did you meet Juror 143?

A    In March of 2005.

Q    How did you meet Juror 143?

A    We were at a funeral of a friend.  Mutual friend.

Q    After you met him in March of 2005, what was your relationship with Juror 143 around that time?

A    Casual friend.

Q    And did there come a time when your relationship with Juror 143 became romantic?

A    Yes.

Q    And when was that?

A    Mid-to-late August of that year.

Q    Was he seeing someone else when your relationship with him became romantic?

A    Yes.

Q    Do you know who?

A    Yes.

Q    What was her name?  First name is fine.

A    Kaulene.

Q    Did there come a time when his relationship with Kaulene ended?

A    Yes.

Q    And when was that?

A    Beginning of September of that year.

Q    The proceeding that we are here in court today for is the case of Donald Fell.  Are you familiar with that case?

A    Yes.

Q    When did you become familiar with that case?

A    At the time it was in the news.

Q    And how did you become familiar with it?

A    By the news.

Q    In any other way did you later become more familiar with the case?

A    Well, Juror 143 was on the jury and mentioned that.

Q    And is that another way in which you became familiar with the case of Donald Fell?

A    Yes.

Q    Were you dating Juror 143 when he was a juror on this case?

A    No.

Q    When he was a juror on this case, did he ever speak to you about anything in connection with it?

        MS. RODRIGUEZ-COSS:  Objection.  Hearsay, your Honor.

        THE COURT:  Objection overruled.

    You can answer the question.

        MS. RODRIGUEZ-COSS:  Same grounds as before, please.

        THE COURT:  Yes, that's fine.

BY MR. BUELL:

Q    I will re-ask the question.  When Juror 143 was a

juror on this case, did he ever speak to you about the case in any way?

A    Yes.

Q    And what did he say to you?

A    He told me he was going to go on a field trip to do some investigating of his own.

Q    Did he say where he was going to go?

A    He was going to Rutland to a dumpster.

Q    What, if anything, more in particular did he say about what he was going to do?

A    Besides visit the dumpster, he was going to go to another location, but I don't remember what the location was.

Q    Do you recall him saying anything about the dumpster?

A    No.

THE COURT:    Can you tell me what timing this was?

THE WITNESS:    I don't remember exactly.  I'm thinking it was July, but I -- I can't say for sure.

THE COURT:    This is before you started your relationship -- your romantic relationship with him?

THE WITNESS:    Yes.

THE COURT:    Okay.  All right.

BY MR. BUELL:

Q    And do you know if he and Kaulene were still dating when he told you this?

A    Yes.

Q    Do you recall whether he said if Kaulene was going to go with him?

A    I remember he said she might go.  I don't -- I don't know if she did.

Q    Did this remark that he made to you about going to visit Rutland raise any concern in your mind?

A    Yes.

Q    What was that concern?

A    Well, it seemed unethical to me.

Q    Why did it seem unethical?

A    I -- I don't know.  I have never been in court, but I have seen Court TV.  It just seemed like common sense would say there's boundaries.

Q    Boundaries separating what?  If you could just explain a little more what you mean.

MS. RODRIGUEZ-COSS:  I would object at this time.  She is obviously not a legal expert on the rules applying to court.

THE COURT:  She is not testifying as a legal expert.  She is testifying about her observations, and those are relevant, so objection overruled.

You can answer the question.

A    It just seemed common sense, my common sense would say this isn't right.

BY MR. BUELL:

Q    And what about it didn't seem right?  Was it something --

A    Going on his own to check out the scene.

Q    Going on his own to check out the scene while he was a juror on the case?  I'm sorry, did you say --

A    Yes.

MR. BUELL:  Just one second, your Honor.

THE COURT:  Yes.

(Brief pause.)

MR. BUELL:  I have no further questions, your Honor.

THE COURT:  Okay.

MR. BUELL:  Thank you.

CROSS EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    So, Miss DeGoosh, you are not sure when this happened?

A    No.

Q    You have no recollection exactly of the date when Juror 143 might have told you this, right?

A    No.

Q    All right.  In fact, you weren't even sure as to

whether he told you he was going to go on a trip or whether he had already gone on a trip?

A    If he went on it or was going to go on it.

I believe he told me he was going on the trip.

Q    Well, my question was, you're not sure --

A    No.

Q    -- as you sit here, right?  And so you said that it happened in -- or you -- the best you can ascertain, July.  It could have been late July?

A    Could have been.

Q    Could have been.  In fact, when you spoke to FBI agent Miss Michelle Delpha, you weren't even sure if it was during the trial or after the trial was over; is that correct?

A    No -- I don't know.

Q    You don't know.

A    I don't know.

Q    And as you sit here today, you're not sure.

A    No, I guess.

Q    Okay.  Juror 143 didn't talk to you about the details of the case, did he?

A    No.

Q    He didn't talk to you about the evidence he was listening to in court, did he?

A    No.

MS. RODRIGUEZ-COSS:  We don't have anything further, your Honor.

THE COURT:  Okay.

MR. BUELL:  No further questions, your Honor.

THE COURT:  You were feeling uncomfortable. Why were you feeling uncomfortable?

THE WITNESS:  Because I -- I didn't really want to be here.

THE COURT:  You didn't want to be here in court?

THE WITNESS:  No.

THE COURT:  No, I understand that.  I am not asking you about whether you are feeling uncomfortable at this point, but I thought you testified that you felt uncomfortable back then, and I am wondering what -- why?

THE WITNESS:  You mean uncomfortable with him going?

THE COURT:  Yeah.  Well, maybe I was confused. When you said you -- you testified earlier that you felt uncomfortable or this is unethical or something, what were you thinking?

THE WITNESS:  Well, just his trip, his -- his so-called field trip to investigate on his own, I just -- knowing -- it felt unethical to me.  It just -- when you -- when you are on a jury, they pick you

because you don't have any outside feelings or anything to do with the case from the outside information.  I only know this from -- I have never been in a court.  I have never been on a jury.  I only have watched Court TV, and so information coming in from the outside, you are not supposed to cloud your thoughts with outside information, and to me that feels like outside information.  It's not information that all jurors are getting.

THE COURT:  But you were unclear as to whether in fact he was on a jury at that point or not.

THE WITNESS:  Well, I guess that would sort of clear things up that he must have been, you know, because I was like -- it seems like he was, but I'm not a hundred percent sure because I don't remember the date.

THE COURT:  So you are not -- you are not sure, but that --

THE WITNESS:  Makes it seem like, yes, he must have still been on the jury in order to make me feel uncomfortable that he was doing something that was trying to obtain information that was not given in the court.  Does that make sense?

THE COURT:  Well, he didn't express any statements that the Court may have made about not

going -- conducting your own investigation or --

THE WITNESS:  No.

THE COURT:  -- anything of that sort?

THE WITNESS:  No.

THE COURT:  He didn't talk about the actual facts of the case other than the fact that he's going to go down and do this field trip?

THE WITNESS:  Right.

THE COURT:  Okay?

MR. BUELL:  No further questions.

MS. RODRIGUEZ-COSS:  May we follow up, your Honor?

THE COURT:  Yes.

CROSS EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    And your assumption that it might have been during the trial is general uncomfortable feeling that you had with what he was doing, but you can't sit here, under oath, for certain and say it was absolutely during the trial.

A    Right, right.  I'm not clear about dates of any of this.  So --

Q    Did he tell you what he saw?

A    No.

Q    No.

MS. RODRIGUEZ-COSS:  Thank you.

THE COURT:  Okay.  Anything further?

MR. BUELL:  No further questions.

THE COURT:  All right.  Thank you, Miss DeGoosh.

THE WITNESS:  Okay.

(Witness excused.)

THE COURT:  Okay.

MR. LIMAN:  Mr. Fell calls Dina Zloczower.

DINA ZLOCZOWER,

having been duly sworn by the courtroom deputy, was examined and testified as follows:

THE COURT:  Good afternoon, Miss -- is it Zloczower?

THE WITNESS:  Zloczower.

THE COURT:  Zloczower.

THE WITNESS:  That's correct.

THE COURT:  Again, if you are asked to talk about jurors, you probably know the numbers of the jurors as opposed to names.

THE WITNESS:  Um, I do.

THE COURT:  You can refer to the names -- or the numbers.

THE WITNESS:  Okay.

MR. LIMAN:  May I, your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. LIMAN:

Q    Good afternoon, Miss Zloczower.

A    Good afternoon.

Q    Would you tell the Court where you are currently employed?

A    Yes.  I am currently employed with Appellate Advocates, a not-for-profit in New York.

Q    And what do you do there?

A    We represent indigent defendants in criminal appeals.

Q    And are you an attorney admitted to practice?

A    Yes.

Q    And where are you admitted?

A    New York and New Jersey.

Q    Would you give us briefly your educational background?

A    I graduated with a B.A. from the University College of London in the U.K.  I have a Master's degree from the University of Leuven in Belgium and another Master's degree from the City University of New York.  And my JD is from Rutgers University.

Q    When did you get your JD degree?

A    2012.

Q    What did you do for a living after you finished law school?

MS. RODRIGUEZ-COSS:  I'm sorry, is she being presented as an expert witness or -- I thought she was a factual witness.

THE COURT:  This is a fact witness I had thought; is that correct?

MR. LIMAN:  That's correct.

THE COURT:  But that's just background.  I don't -- you can just quickly go through the background.

THE WITNESS:  Can you repeat your question.

BY MR. LIMAN:

Q    What did you do for a living after you graduated from law school?

A    I went to work for Cleary Gottlieb in New York.

Q    And over approximately what time period were you at Cleary Gottlieb?

A    I'm sorry, I graduated from law school 2007.  This is when I started working at Cleary, and I ended up at Cleary in 2012.

Q    Were you an associate at Cleary Gottlieb?

A    Yes, I was.

Q    And while you were an associate at Cleary Gottlieb, did you work on Cleary Gottlieb's representation of Mr. Fell, the movant in this case?

A    Yes, I did.

Q    Now, I want to direct your attention to December of 2010.  Did there come a time during that month when you interviewed a juror identified and known to you as Juror 143?

A    Yes, I did.

Q    Were you alone or with someone else when you did that?

A    I was with a colleague from Cleary.

Q    And where did you interview Juror 143?

A    At his house.

Q    And was that in Vermont?

A    Yes.

Q    Do you recall approximately where?

A    About an hour from here.

Q    Okay.  And when you interviewed Juror 143, would you describe how you introduced yourself?

A    Yes.  I -- we knocked on his door.  I told him what my name was.  I told him that I worked for Cleary Gottlieb and that we were court appointed to represent Mr. Fell.

Q    And what, if anything, did you tell Juror 143 about why you wanted to talk with him?

A    I told him that we had some questions about his experience on the trial.

Q    Would you describe what happened next, Miss Zloczower?

A    I asked him whether he would mind if we asked him these questions, and he said --

MS. RODRIGUEZ-COSS:  Your Honor, same objection to the hearsay testimony with regard to 143, if the Court please.

THE COURT:  Objection overruled.

Go ahead.

A    I told him that we had questions about his experience on the trial.

BY MR. LIMAN:

Q    And did he invite you in to talk with him about those?

A    He didn't invite us in all the way, but we stepped into the front part of his house and -- sort of in between the front part of his house and the veranda, and he said that he would be willing to answer some questions.

Q    And do you recall approximately how long you spoke with Juror 143 that day?

A    About two, two and a half, three hours.

Q    Now, during the course of the conversation with Juror 143, did there come a time that you discussed with Juror 143 whether he had made a trip to Rutland to visit

the crime scene?

A    Yes.  He brought it up.

Q    Would you tell us how that came up in the conversation and, to the best of your recollection, what you recall Juror 143 saying?

A    He told us what he had considered in making his determinations and what had been discussed with his federal jurors, and that's when it came up.  He told us that he took a drive to the scene in Rutland.

Q    And what did he tell you, if anything, about his drive to the scene in Rutland?

A    He drove there and said that he went there for the specific reason of looking at the neighborhood and the street that Miss Fell lived in.  He wanted to know whether it really was that bad.  He also wanted to take a look at the Price Chopper.

Q    And did he tell you when in relationship to the trial he made this trip?

A    No, not exactly when, but he did say that he made the trip during -- during the trial.

Q    Now, what, if -- did he tell you what observations, if any, he made during the trip?

A    Yeah.  He said he looked at the street and at the house.  He thought that it, again, wasn't bad; wasn't that bad.  And that he also took a look at the Price

Chopper, and he expressed some criticisms, I could say, of the lighting conditions there.

Q    Now, during the course of your conversation with Juror 143, did you discuss the topic of whether or not he pointed a gun at another juror during -- in the jury room?

A    Yes.

MS. RODRIGUEZ-COSS:  Objection as to hearsay. We would renew our objection.  This is in violation of 606.

THE COURT:  First of all, the witness has in fact been asked this -- this juror has been asked questions which cover these same subjects, so clearly this is being offered for the purposes of impeachment. There are other grounds as well.

Regardless, you can go ahead and testify.

A    Yes.  He brought up that during deliberations, he asked the marshal to bring in the shotgun, and he explained that a fellow juror had expressed that the -- that Miss King may have not been scared when the shotgun was pointed at her, and so he asked the shotgun to be -- he asked for the marshal to bring in the shotgun.

BY MR. LIMAN:

Q    And what, if anything, did he tell you about what he did with the shotgun?

A   He said that he made sure that it was not loaded, it was very important to him, and then he said that he took the shotgun from the marshal and pointed it at the juror.

Q   And what did he say about her reaction?

A   He said that the juror squirmed and that he said, Look, you know, you knew that it wasn't loaded and you were scared.

Q   Now, at the time Juror 143 made these comments to him, did you tell him how you might use them in court?

A   No.

Q   Juror -- Juror 143 has testified in this proceeding that when he spoke with you, he was drunk and on a bender.  Did -- was Mr. -- was Juror 143 drunk when you spoke to him on the first day?

A   No.

Q   Would you describe how the meeting ended?

A   He was getting -- he said he was getting tired, and I asked if he would be willing to sign a statement.  He said not today, he needed to rest.  I asked if we may come back the next day, and he agreed that that would be fine.

Q   Did he tell you when you should come the next day?

A   Yes.  He said he had two appointments that day:  He was going to go to church in the morning and celebrate

his grandmother's birthday in the afternoon, so we should come between those two times.

Q    And did he tell you approximately when it was that you should arrive?

A    Around two o'clock or so.

Q    Now, do you recall -- you said he was going to church the next day.  Do you recall what day of the week that next day was?

A    We met with him the first time on a Saturday, so that would have been a Sunday.

Q    And focusing on the Sunday, did there come a time when you heard from Juror 143 again?

A    Yes.  I received a voice mail notification on my BlackBerry that I had received a voice mail in my office phone number, so I listened to that voice mail, and it was the juror who asked where we were and that we should come soon so that he could make the party.

Q    Do you know how Juror 143 had your telephone number?

A    Yes.  I handed him my business card after our first meeting and said this is my business card, if there was anything that came up and he needed to contact me, this was the best way to reach me.

MR. LIMAN:  May I approach, your Honor?

THE COURT:  Yes.

BY MR. LIMAN:

Q    Miss Zloczower, I am handing you Exhibit 42.

MR. LIMAN:  Your Honor, it's in your exhibit book, government's exhibit book.

BY MR. LIMAN:

Q    Do you recognize Exhibit 42?

A    Yes.

Q    What is Exhibit 42?

A    This is my business card when I was with Cleary Gottlieb.

Q    And is that a copy of a business card that you gave to Juror 143?

A    Yes.

MR. LIMAN:  Your Honor, we would move Exhibit 42.

THE COURT:  Any objection to 42?

MS. RODRIGUEZ-COSS:  No.

THE COURT:  So admitted.

MS. RODRIGUEZ-COSS:  No, your Honor.

(Defendant's Exhibit 42 was received in evidence.).

BY MR. LIMAN:

Q    Now, Miss Zloczower, after you received the voice mail from Juror 143, what did you do?

A    I called him and I said we were not far away and

that we would be there very soon.

Q    And how did he respond?

A    He said, Great.

Q    What happened next?

A    As I said, we got there.  We weren't far at all. We parked the car and walked up to his house and knocked on the door.

Q    And what happened after you knocked on the door?

A    He opened the door for us.  He welcomed us in.  He said he had tidied up for us.  The room wasn't very tidy.  He asked us to take a seat in the -- in the chairs.  We chitchatted a little.  We did some small talk.  Television was on, a football game.  I told him about my love for football, the -- although it was on mute.  And then after a while I told him that I had brought the statement for him to look at and to review, and he said okay.

Q    And did you give him a copy of the statement?

A    I did.

MR. LIMAN:  And, your Honor, may I approach?

THE COURT:  Yes.

BY MR. LIMAN:

Q    Miss Zloczower, I am handing you Exhibit No. 1 in evidence.  Do you recognize that?

A    Yes.

Q    What is that?

A    That is the statement that I brought with me.

Q    And is that the -- the statement that you handed him to review?

A    Yes, indeed.

Q    Did you give him any instructions when you gave him a copy of the statement?

A    I asked him to review it carefully and to make any changes he saw fit.

Q    And what did you see happen next?

A    We were -- I think we were already seated on the -- on the chairs in the middle of the room.  He went and sat down at a table by the windows about seven feet away from us or so.  He took out his reading glasses and a pen, and he sat down at the table and started reviewing and reading.

Q    Now, I have -- Juror 143 has testified in this proceeding, page 83 of the August hearing, lines eight to -- to 12, that you stood over him and waited for him to read it and that you imposed quite a bit of pressure on him while he reviewed it.  Is that testimony accurate?

A    No.

Q    Describe for us what happened.

A    He was sitting away from -- from us, from where we

were sitting.  My colleague and I were seated on two wooden chairs in the middle of the room.  I was somewhat focused on the football and TV, and the juror was seated, as I said, at a table, small kind of dining room table, by the window by himself.  And there was pretty much silence as he was reading the statement.

Q    Now, you look at the statement, you see that there are initials on the left side of each of the paragraphs?

A    Yes.

Q    Okay.  And without reading the initials, are those the initials of Juror 143?

A    Yes.

Q    Now, whose idea was it to put the -- withdrawn.

     Were the initials on the statement when you handed it to Juror 143?

A    No.

Q    Do you know whose idea it was to put the initials on -- next to each paragraph?

A    It was -- the idea was his.  He said, I'm going to initial these, and I said that's fine.

Q    And whose handwriting is -- are the initials in?

A    The juror's.

Q    And the Juror 143 testified in this proceeding, again page 38, lines 13 to 18, that he put his initials next to each paragraph because you and your colleague

told him to.  Is that testimony truthful?

A    No.

Q    Now, would you describe how Juror 143 reviewed the statements, from your observation?

A    He reviewed them from top to bottom, in consecutive order.  He a couple times said "yes" and "um-hum," something like that.  And I saw his pen move.

Q    Now, would you turn your attention to the second page of Exhibit 1, paragraph four.

A    Um-hum.

Q    You see that there are a couple of crossouts there and an initial?

A    Yes.

Q    And whose are those?

A    Those are the juror's.

Q    And if I could direct your attention to the fifth paragraph of Exhibit 1.  Do you see in the middle of that fifth paragraph it says, "We discussed the evidence like the rock, the shotgun, the photos of Mrs. King and the trip to Rutland during the trial.  When I looked at the mother's house on Robbins Street and the Price Chopper, mother's neighborhood wasn't great but it was okay.  The house was decent.  She was just trying to live her -- her life."

When -- did Juror 143 say anything to you about

this paragraph or those statements when you saw him reviewing it?

A    No.

Q    Okay.  Now, the statements that are in paragraph five, how did those compare to what Juror 143 told you the preceding day?

A    They reflect accurately what he told us.

Q    Now, just a couple more questions about Juror 143. Juror 143 has testified in this proceeding that he told you that the trip that he made to Rutland to visit the crime scene was in the fall of 2010.  Is that consistent with what he told you?

A    No.

Q    How is it inconsistent?

A    He told us that he went there during the trial.

Q    Would you turn your attention to paragraph eight, page three, of Exhibit 1.

A    Yes.

Q    You see that there's information in this paragraph with respect to the pointing of a -- of a shotgun?

A    Yes.

Q    And where did the information in this paragraph come from?

A    From the juror.

Q    Okay.  And, Miss Zloczower, as the juror was

reading this paragraph, did Juror 143 make any comments about this paragraph?

A    Yes.  He said that now that he's looking at this, he wasn't sure whether or not he in fact pointed the actual shotgun at the -- at his fellow juror or whether he used his arm and his hand to symbolize the shotgun.

Q    And how did you respond to that?

A    I told him -- I asked him to put down what he remembers best; whatever his recollection is is what should be in his statement.

Q    And what did you see him do after that?

A    He -- he looked at it again and said, No, I think that's okay.

Q    Did Juror 143 express any similar reservations about the information with respect to the visit to Rutland that's in paragraph five?

A    No, he didn't express any reservations about paragraph five.

Q    Now, turn your attention, please, to paragraph 13.

A    Yes.

Q    Is paragraph 13 in your handwriting?

A    Yes.

Q    Okay.  And am I correct that's a different pen than the pen that -- with respect to the preceding paragraphs?

A    That's correct.

Q    Would you explain how and when and why that language was added?

A    The juror, after reading the preceding paragraphs, asked me to add a paragraph and essentially dictated this paragraph to me, and I think I may have used his pen for that.

Q    Now, do you know whose signature it is directly below paragraph 13?

A    It's the juror's.

Q    And whose signature is it below that, where it says 12/19/10?

A    That's my signature.

Q    How did the meeting with Juror 143 end?

A    I thanked him and we did some more small talk, and then we -- he followed us to the front door, and he was kind enough to give us each a jar of homemade jam and a map of Vermont.

Q    And by the way, Ms. Zloczower, let me ask you to turn back to paragraph five of Exhibit 1.

A    Yes.

Q    And I am going to focus your attention on the -- on the sentence that says, "We discussed the evidence like the rock."  Do you see that?

A    Yes.

Q    Okay.  And the "we discussed," what was -- who is the "we" referring to in that sentence?

A    The jurors.

Q    And did -- and did Juror 143 in fact tell you that he had discussed the trip to Rutland with his fellow jurors?

A    Yes, among other things.

Q    Now --

MR. LIMAN:  May I approach?

THE COURT:  Yes.  Are you asking the witness or are you asking the Court?

MR. LIMAN:  I am asking the Court.

THE COURT:  Right.  Got it.

BY MR. LIMAN:

Q    I placed before you Exhibits 43 and Exhibits 44. Would you identify those for the record?

A    This is the jam that I received from the juror and the map of Vermont.

MR. LIMAN:  Your Honor, we would ask that those be admitted.

THE COURT:  All right.  Any objection to the jam and the map?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  Okay.  So admitted.

(Defendant's Exhibits 43 and 44 were received

in evidence.)

BY MR. LIMAN:

Q    Now, Miss Zloczower, I wanted to direct your attention to the following month, January of 2011.  Did there come a time that you interviewed a juror identified or known to you as Juror 162?

A    Yes.

Q    And was that at Juror 162's home?

A    Yes.

Q    When you went to visit Juror 162, did you go alone or were you accompanied by somebody else?

A    I was accompanied by someone else.

Q    And who were you accompanied with?

A    I was with Cathleen Price.

Q    And that's Miss Price here?

A    Yes.

Q    Now, would you describe for us what happened when you went to visit Juror 162?  How did the -- how did the meeting or the conversation begin?

A    We approached her house.  We knocked on the door and introduced ourselves in the same way that I just described.  I can repeat that.  I identified myself by name, who I worked for, who I was employed for, and that we were court appointed in the Fell case.

Q    And did you tell Juror 162 what you wanted to talk

with the juror about?

A    Yes.  We told her that we wanted to talk about her experience on the jury.

Q    And would you describe -- when you first started talking to her, did you talk about the trial itself or did you have more general conversation?

A    No, we had a more general conversation.  Her husband was there, and we were doing small talk amongst other things.  We discussed her recent purchase of the Kindle, and I showed her how that works.

Q    And did you discuss with her books?

A    Yes.  We did discuss books.  She -- she is an avid reader, and she told us about her love for true crime novels and anything crime related, really.

Q    And did she offer you or your colleague any books?

A    Yes.

MS. RODRIGUEZ-COSS:  We are going to raise our objection again at this point.  Now we are hearing prior consistent statements offered for what purpose I am unclear on.

THE COURT:  Okay.  You want to respond to that?

MR. LIMAN:  Your Honor, in the -- the juror testified about this proceeding in ways that are -- and these interviews in ways that are inconsistent with what

Miss Zloczower will be testifying to.

THE COURT:  All right.  So what you are proposing, what you are suggesting is that eventually she will testify to inconsistencies, and you are putting in context those inconsistencies; is that --

MR. LIMAN:  That's exactly right, your Honor.

THE COURT:  All right.  So objection overruled.

MS. RODRIGUEZ-COSS:  Your Honor, the government would object to any prior consistent statements being solicited from this witness.

THE COURT:  Well, to the extent -- to the extent that consistency is not being used because it's a prior consistent statement, it's being used to put in context the inconsistent statements, it is admissible. So therefore, objection overruled.

You can answer.  Is there a pending question?

THE WITNESS:  Yes.

A    She actually went to get some books and handed over two big bags of books for Miss Price.

BY MR. LIMAN:

Q    I am not going to offer them, but are those these books that are -- I have marked as Exhibit 48?  You have looked at them before court today?

A    Yes, those are some of them.

Q    Now, during the course of your conversation with Juror 162, did the topic come up about whether she had been the victim of sexual abuse when she was a child?

A    Yes.  She brought it up.

Q    How did the subject come up?

          MS. RODRIGUEZ-COSS:  Objection.  Relevance.

          THE COURT:  Objection overruled.

     Go ahead.

A    We asked her generally what, if any, impact the mitigation evidence had on her that was presented at trial.

          THE COURT:  I'm sorry, I didn't quite understand you.

          THE WITNESS:  I think the question was how did the issue come up, and it was in -- the juror brought up her sexual abuse in response to a question about -- our question about what, if any, impact the mitigation evidence had at trial on her.

BY MR. LIMAN:

Q    And what, if anything, did she say about child abuse when raised the question of the -- withdrawn.

     What did she say when you raised the question about how the mitigation evidence impacted her?

A    She recalled that there was evidence at trial that Mr. Fell was sexually abused as a child and that his

parents were alcoholics.  And then she brought up that she herself was sexually abused and that she did not think that made -- would explain why he murdered because it didn't -- her own sexual abuse didn't turn her into a murderer.

Q   Now, Juror 162 has testified in this proceeding at page 104, lines 17 to 23, among other places, that she mentioned the topic of sexual abuse only after you had raised it and in response to you raising that Mr. Fell had been sexually abused.  Is that accurate?

A   No.

Q   When you mentioned mitigation, did you single out any particular mitigating fact?

A   No.

Q   Did you single out child sexual abuse?

A   No.

Q   Now, during the -- during the first day that you met with her, did you have a statement that you asked her to sign?

A   No.

Q   Would you describe how the meeting ended?

A   She said that she had to go and pay a bill for her son.  And so we said we still had a couple questions and some follow-up, whether we could come back the next day.

Q   And how did she respond?

A    She said that's fine.

Q    And did you in fact return the next day?

A    Yes.

Q    And would you describe what happened when you returned the next day?

A    This time we did have a statement with us, and, again, we had some small talk with her in her living room.  We then asked her to review the statement and, if she was okay with it, to sign it.

Q    And what did she do after that?

A    She sat down and read through the statement from top to bottom.

Q    Now -- and how do you know she read through it from top to bottom?

A    I saw her.

Q    Now, Juror 162 has testified in this proceeding that she did not read the statement before she signed it.  Is that true?

A    No.

        MR. LIMAN:  May I approach?

        THE COURT:  Yes.

BY MR. LIMAN:

Q    I am handing you what's been previously received as Exhibit 6 in evidence.  Do you recognize that?

A    Yes.

Q    What is it?

A    That's the statement I brought with me and we gave to the juror.

Q    Okay.  And do you see that there is -- there's some things stricken out in some of the paragraphs; paragraph three, for example?

A    Yes.

Q    Is that your handwriting that's in the strikeout?

A    No.

Q    Whose handwriting is that?

A    It's the juror's.

Q    And paragraph six, the strikeout, whose is that?

A    The juror's.

Q    Paragraph eight, whose strikeout and handwriting is that?

A    The juror's.

Q    And paragraph nine, whose is that?

A    The juror's.

Q    Now, the language at the end, paragraph 11, whose is that?

A    The juror's.

Q    Okay.  And how did the information in paragraph 11 come to be added?

A    She wanted to add it.

Q    Okay.  And then the signature, whose is that?

A    The juror's.  The first one is the juror's.

Q    And the second one?

A    Is mine.

MR. LIMAN:  Give me a moment, your Honor?

THE COURT:  Yes.

(Brief pause.)

MR. LIMAN:  I have no further questions, your Honor.

THE COURT:  Okay.  All right, Mr. Darrow?

CROSS EXAMINATION

BY MR. DARROW:

Q    Hello.

A    Hello.

Q    Welcome back to Vermont.

A    Thank you.

Q    Decided not to try the jam?

A    I did actually taste a little bit of it.  It was very good.

Q    Glad to hear it.

I'm so impressed with your memory for detail.  Let me ask you how you prepared for the hearing.

A    I met with Mr. Liman.

Q    Okay.  Did you review -- review any notes or materials, recordings?

A    He showed me the statements.

Q    Okay.  Did you prepare -- did you write notes during these interviews?

A    Yes.

Q    Okay.  Did you review those notes?

A    No.

Q    Okay.  Did you record the interviews?

A    On a tape, you mean?  Tape recordings?

Q    By any means at all.

A    No, I didn't record them in any -- any way.

Q    All right.  You conducted the juror interviews with a second person; is that right?

A    Yes.

Q    Who did you conduct the 163 -- the 143 interview with?

A    The 143 is the first one.  With my colleague, Bryan Faubus.

Q    How do you spell Faubus?

A    F-A-U-B-U-S.  I think that's right.  And I think his first name is with a Y.

Q    And can you just tell us who Mr. Faubus is?

A    At the time he was a litigation associate at Cleary Gottlieb.

Q    Okay.  And Cathleen Price was with you for the 162 interview?

A    Yes.

Q    All right.  When did you conduct the juror
interviews?

A    The first -- the 143 in December of 2010, and the
second one in January of 2011.

Q    And you seem to have a very fine memory of those
two juror interviews.  Did you conduct other juror
interviews?

A    I tried.  I mean, I attempted to conduct other
juror interviews but didn't have occasion to speak with
anyone.

Q    So is it correct that these are the only two jurors
that you actually spoke to?

A    That's correct.

        MR. DARROW:  Your Honor, we'd like to see the
notes that this witness made from her interview of juror
143.

        THE COURT:  Do you still have the notes?

        THE WITNESS:  No.

        THE COURT:  What happened to the notes?

        THE WITNESS:  When I returned to New York and
the statements were signed and the memo was written, I
discarded them.

        THE COURT:  Okay.

        MR. DARROW:  In which case the memorandum
summarizing the notes, if that's what it is.

THE COURT:  Do you have a memorandum summarizing the notes?

THE WITNESS:  I don't have them, no.

MR. DARROW:  Well --

THE COURT:  Well, do they -- do you have a memorandum which summarized your notes in New York or --

THE WITNESS:  I don't have private possession -- or any possession of the notes themselves. I'm sorry, I discarded the notes and I have no possession of the memorandum -- memoranda.

THE COURT:  Okay.

MR. DARROW:  If I understand, she no longer works for Cleary, and I assume Cleary still has it and the request would go to them.

THE COURT:  Okay.  Do you have a copy of the memoranda that you drafted contemporaneous with this interview of Juror 162?

THE WITNESS:  I'm sorry, I did not draft both memoranda, so -- I only drafted -- I did not draft the 143 memorandum.  I only drafted the second one.

MR. DARROW:  Okay.  Let me try and clarify then.  If there was paperwork prepared summarizing or trying to memorialize the interview, we'd like it.

THE COURT:  All right.  The government would be entitled to it.

MR. LIMAN:  Your Honor, there do exist interview memoranda.  There's some opinion work product, I believe, with respect to those, there's some that is plainly factual work product with it, and --

THE COURT:  I appreciate the work product is an issue obviously between the sides, but I had thought the whole concept of work product was waived when you are actually talking about at least the four jurors that were involved, now the three jurors that were at issue. Right?

MR. LIMAN:  There -- with respect to opinion work product -- well, with respect to factual work product, it's the first time we have received this request.  Miss Zloczower has been on the witness list for a long time.  We have -- I have no problem turning over the factual work product.  There are some notations, I believe, that are plainly opinion work product about the significance, next steps, and material like that.  They really would not be appropriate to turn over, and we could turn over the redacted --

THE COURT:  I appreciate that you could turn over the redacted version.  There's a question as to whether in fact work product would apply in situations like this in which you called the witness and the witness in fact drafted the memoranda and may have

included notes on the memoranda and whether there's an -- essentially a waiver of work product at this point. I can't obviously rule upon that, nor can you argue this, in the abstract, but the government is entitled to this information.

Do you have it with you today or is this something that needs to be furnished in the future?

MR. LIMAN: I believe we have a copy of the interview memoranda. I haven't seen it for some -- you know, for some time, but I believe we have got it in one of our boxes here.

THE COURT: Okay. My question is, would Miss Zloczower --

You don't pronounce the K, is that it? Zloczower.

THE WITNESS: Zloczower is fine.

THE COURT: Will you be here tomorrow as well?

THE WITNESS: I wasn't planning on it.

MR. LIMAN: Your Honor, I think we can -- if we could take a short recess, we can try to provide a copy of the -- of the statements with respect to those two jurors.

THE COURT: All right. Well --

MR. LIMAN: And I could provide a -- you know, if there is opinion work product, I could hand up the material that we think is --

THE COURT: Okay.

MR. LIMAN: -- not appropriate to --

THE COURT: My question, is that sufficient with the government that you have this document today and that you continue the cross examination, or do you need some additional time to continue the cross examination?

MR. DARROW: Well, I mean, the sooner we can get it, the better. There's quite a raft of attorneys here. Perhaps one of them could make a copy of it now. I am happy to go on, and if for some reason they can't give it to us until tomorrow, we could resume the examination tomorrow, if it has to be resumed.

But one note, counsel said we never requested it before. I think actually we requested these materials last August but letter request was unsuccessful.

THE COURT: Okay, so can someone actually look for that exhibit at this point, that memorandum, and then we will continue on, and take a break so that you can actually look at that, and then continue with your cross examination?

MR. DARROW: Absolutely.

THE COURT: Okay.

MR. LIMAN: Your Honor, I am told that there may have been a ruling with respect to work product and

these interview memos --

THE COURT:  Pardon me?

MR. LIMAN:  -- where the claim of work product was sustained, but that said, I am going to have an associate pull the memo and -- I am told, your Honor, that there -- this issue was -- when this issue was first raised, the claim of work product was made and sustained.  That said, to move this along, I have no problem having somebody look and making sure that any of the factual statements are turned over to the government.

THE COURT:  Of course this is a different situation.  We are at a different stage in the proceedings, and my understanding, reading between the lines and the various pleadings that I read prior to today's hearing, is that in various depositions, in particular of Mr. Primomo and Mr. Bunin, there was essentially waiver of work product in regard to anything which related to the three jurors, or at that point it was four jurors.  And so I thought that the defense had taken the position that any work product was waived, but regardless, you can look at the document.  If there's an assertion of work product, then we will deal with it at that point.

MR. LIMAN:  That was, your Honor, with respect

to the three jurors, with respect to trial counsel. Obviously current 2255 counsel has extensive work product with respect to our -- our prosecution of these claims.  That has not been waived.

THE COURT:  Right.  No -- right.  I guess that -- right.  That's correct.  Right.

MR. DARROW:  If I may, your Honor:  Perhaps the factual portion of the memo could be turned over very quickly and we could discuss the work product materials tomorrow.

THE COURT:  Okay.

MR. DARROW:  Okay.  Thank you.

CONTINUED CROSS EXAMINATION

BY MR. DARROW:

Q    Hello.

A    Hi.

Q    Do you have the written statement of Juror 143 in front of you?

A    Yes.

Q    Marked -- I think it's Exhibit 1?

A    Um-hum.

Q    Who wrote that?

A    The handwriting's mine.

Q    Okay.  So you wrote it?

A    Yes.

Q    And it's, what, four and a half pages of material
from a two-and-a-half- to three-hour interview?

A    Yes.

Q    How did you decide what to put in and what not to
put in?

A    I tried to reflect substantively what the juror
said to me in his own words in order.

Q    But you were not exactly an unbiased reporter of
the interview, were you?

A    What do you mean?

Q    I mean, you were an attorney representing Mr. Fell,
correct?

A    Yes.

Q    And as such, you are obligated to, within the
bounds of the law, pursue his interest, correct?

A    Yes.

Q    And your interests or his interest that you were
pursuing at the time was seeking juror misconduct; is
that right?

A    No.  I -- what I was there for was to collect facts
and information, first and foremost.

Q    Oh.  So you weren't there to identify any possible
juror misconduct in the case?

A    That wasn't my job then, no.

Q    Oh.  What was your job?

A    To get a sense of what the jurors' experience at the trial was and what their view of the evidence was. You know, we wanted to know what they thought of the performance of the lawyers and, of course, you know, wanted to know generally whether they considered extraneous evidence.

Q    Consideration of extraneous evidence would be a form of juror misconduct; is that right?

A    Yes, can be.

Q    So what's your answer to the question as to whether you were trying to identify any juror misconduct?

A    The way I understood your question was whether that was my main objective, and I am just saying that my main objective was to go there and have -- to hear from the juror what his or her experiences were.

Q    Right. But in representing Mr. Fell, just finding out about the experiences of the jurors wouldn't be of great interest unless it would somehow further Mr. Fell's interests, correct?

MR. LIMAN:    Objection to the form.

THE COURT:    Objection overruled.  I think she can answer that.

A    Um, a juror's view on the personal opinions of a particular lawyer on either side would have been of interest, but it may not further Mr. Fell's interests.

BY MR. DARROW:

Q    Right.  Perhaps we are quibbling here but you make it sound like sort of an intellectual curiosity that led you to interview these jurors, and I am suggesting that actually, in representing Mr. Fell, you had a more pointed interest in the interviews?

A    Yes, I had a professional interest.  That's why I was there.

Q    Okay.  And did that interest inform what materials you put in the statement and what you left out?

A    Um, partially, yes.

Q    Okay.  Now, drawing your attention to paragraph five, this paragraph describes juror deliberations, correct?

A    Yes.

Q    While you were having a discussion with this juror about his experiences, did you inquire about juror deliberations?

A    No, not directly.

Q    He -- not directly.  Did you indirectly inquire about juror deliberations?

A    No.  I asked him what evidence he thought was convincing, and that's how this came up.

Q    Sounds like a question about how he reached his decision.

MR. LIMAN:   Objection.

THE COURT:   Objection overruled.

You can answer that.

A   I asked him generally what type of evidence was more or less convincing to him.

BY MR. DARROW:

Q   Okay.  And are you saying that is not a question about juror deliberations?

A   No.

Q   It's not?

A   I don't think so, no.

Q   Okay.  In paragraph five, you -- he states -- or strike that.

Paragraph five has written on it that there was not a lot of disagreement about the guilt.  There was no doubt that he did it.  Correct?

A   Yes.

Q   And the next sentence specifies a series of considerations that -- a series of things that were taken into consideration.  Correct?

A   Yes.

Q   So is it correct that that next sentence was talking about things that were considered in determining guilt?

A   I can't say that it -- I can't say that exactly.

Q    Just say it inexactly.

A    I can recall he didn't tell me exactly when that particular discussion occurred, whether that was during the guilt phase or not.

Q    Well, the preceding sentence, it's talking about guilt; is that right?

A    That's true.

Q    Okay.  And sentence consideration doesn't come up until paragraph seven, two pages later, right?

A    I don't know.  One second.

      (Brief pause.)

A    That's correct.

BY MR. DARROW:

Q    So does it not stand to reason that we are talking about -- the sentence we are talking about in paragraph five following the discussion of guilt was relating to guilt?

A    That's certainly an argument.

Q    Excuse me?

A    Yes.  That's certainly a reasonable inference, yes. I am just saying that I don't have an independent recollection of it.

Q    All right.  So is it -- I am not looking for argument here but I am trying to get your best understanding.

A    Yes.

Q    And let me put the question this way:  Do you know whether or not the juror was talking about these matters in the sentence in paragraph five beginning, "We discussed the evidence" -- do you know whether he was talking about guilt or sentencing?

A    No, that's what I am trying to tell you, I don't.

Q    So you have no idea?

A    No.

Q    Okay.  Are you aware that a capital trial is bifurcated into two different trials?

A    Yes.

Q    Okay.  And you prepared for these interviews by familiarizing yourself with the basic law --

A    Yes.

Q    -- fair to say?  All right.

And did you also familiarize yourself with the facts?

A    The facts of the case?

Q    Yes.

A    Um, not specifically, no.

Q    You didn't?

A    But I was relatively familiar with them.

Q    And I ask because there was a couple factual considerations that I wanted to bring up with you

because I didn't understand them.  One was talk about a
dumpster.  Do you remember that?

A     During my interview with the juror?

Q     Yes.

A     Yes.

Q     And if you look at the top of the third page of the
statement which is deep into the long paragraph five, it
says, "I told them about the Stewart's dumpster next to
Price Chopper where I think Fell threw the knife into
the dumpster in the parking lot."  Correct?

A     Um-hum.

Q     Did you know that the knife was never in a
dumpster?

A     Yes.

Q     Did you ask him about whether that made any sense?

A     I didn't ask him about whether that made any sense.

Q     Okay.  But you knew at the time that the knife was
not recovered from a dumpster?

A     I wasn't sure.

Q     Okay.  Well, is it possible that he was telling you
actually about a pocketbook that was recovered from the
dumpster?

A     I don't know.

Q     Okay.  So you don't remember what he told you about
the dumpster?

A    No.  I remember him telling us about the dumpster being close to the Price Chopper and that he thought that that's where the knife was -- that -- where the knife was thrown.

Q    Okay.  And did you know at the time that that made no sense because the knife was not in the dumpster?

A    I didn't know that then.  I mean, knowing it, as in certain.  I thought maybe -- I wasn't sure that I had -- that I knew that about the facts of the case.

Q    So -- I am confused.  You didn't know at the time where the knife was recovered?

A    I wasn't -- let me put it this way:  I was uncertain whether that was accurate or not and made a note to myself that I needed to check up on that.

Q    Okay.  But you wrote it down as your testimony because that's what he was saying, whether it was -- made sense or not?

A    Yes.

Q    Okay.  And the second area concerns the neighborhood.  You said, if memory serves, something about how he was surprised by the neighborhood around the Robbins Street apartment?

A    I don't know if he said the word "surprised."  He said it wasn't that bad.  It wasn't -- it wasn't great. It wasn't that bad.

Q   Well, did he tell you why that had any significance that it wasn't that bad?

A   He mentioned that there was testimony suggesting that it was -- that she was living a life that was, you know, unhealthy; not -- that she wasn't living under the best living conditions.

Q   Okay.  So he was talking about where -- the life that she was living in her neighborhood, not the life that Fell had grown up in?  The area that Fell had grown up?

A   When he went to visit Rutland, so yes.

Q   I'm not following you.

A   To my understanding, Mr. Fell didn't grow up in Rutland.

Q   He did not grow up in Rutland.

A   Correct.

Q   That's my understanding as well.

A   Right.

Q   I think he grew up in Pennsylvania?

A   Right.

Q   So you are saying that the -- to the extent that -- that the juror told you that the neighborhood seemed okay, or better than expected, that related to his understanding of where Mrs. Fell had lived?

A   Yes, and that was the reason he went there, to look

at it.

Q   Okay.  But again, you don't know whether he was telling you this in connection with the guilt phase or the penalty phase of trial?

A   I don't know whether that came up during the guilt phase or the penalty phase of the trial.

Q   You didn't ask him?

A   No.

Q   Okay.  Now, further in paragraph five, after that sentence about the dumpster -- do you have this in front of you?

A   Yes.

Q   Okay.

A   It's on the next page, right?

Q   Correct.  The next sentence after the dumpster sentence says, "After the trial I drove to New York on my motorcycle."  Do you remember that?

A   Yes.

Q   And then he talks about his experience in New York, and then he -- the statement says, "The lighting at the Price Chopper in Rutland was weak."

A   Um-hum.

Q   Do you know whether -- or did you ask him whether his opinion as to the weak lighting was based on his trip to Rutland during the trial, his trip on the

motorcycle after the trial, or trial evidence?

A    I think that was in the context of his trip to Rutland that came up after.  So during our discussion -- it was referring to his trip to Rutland, but he talked about it after speaking about his trip to New York after the trial.  So seems as if it were out of sequence here, but it reflects the sequence the way it was communicated to me.

Q    It does seem a little out of sequence because of course it comes after the second trip discussion.  And you sound -- and I mean this respectfully, you sound possibly a little unsure.  You said "I think."

Do you recall whether or not this statement about the lighting at the Price Chopper was something that the juror told you about based on his trip to Rutland during the trial?

A    To the best of my recollection, yes.

Q    In which case, how come you wrote it after describing the second trip to New York on the motorcycle?

A    Because he brought it up after talking about the trip to New York.  He didn't tell us about it when he was talking about his trip to Rutland the first time.  When done with talking about his trip to Rutland the first time, he then went on to speak about the trip to

New York --

Q    Right.

A    -- and then brought up the trip to Rutland again in terms of the lighting at the Price Chopper.

Q    Okay.  Although it doesn't say that on the statement, does it?

A    No.

Q    Now, of course you wrote out this statement after the interview, the long interview that day, right?

A    Correct.

Q    And you decided to put it after the motorcycle trip.

A    No, I just said that I tried to reflect the sequence that the juror used.

Q    Now, on the shotgun, it sounds as though that memory was a little uncertain, as the juror told you?

A    Ah, yeah -- yes.

Q    He told you when reviewing what you had written that he wasn't sure if the shotgun had actually been in the jury room?

A    Yes.

Q    Okay.

A    He said he wasn't sure whether he actually pointed the shotgun at the juror.

Q    Okay.  And did he say whether or not the shotgun

was actually in the jury room?

A    He didn't express reservations about that, so I don't -- I can't answer that.

Q    Well, it's a yes-or-no question, actually.  Did he or did he not tell you that the shotgun was in the jury room?

A    He didn't say that he couldn't remember whether or not that the shotgun was in the jury room.  He said he couldn't -- wasn't certain, now that he is looking at it, whether or not he pointed the shotgun at the fellow juror.

Q    Did he tell you that the shotgun was in the jury room?

A    At -- when he was reviewing the statement, he didn't say whether or not the shotgun was in the jury room.  That was not -- his uncertainty wasn't about whether or not it was in the jury room.

Q    Okay.  And I apologize, but I have to try this one more time --

A    Yes.

Q    -- because it's really a yes-or-no question.

A    Okay.

Q    Did the juror tell you that the shotgun was in the jury room during deliberations?

A    No, he didn't tell me.

Q     Okay.

MR. DARROW:  Your Honor, may I have a moment?

THE COURT:  Yes.

(Brief pause.)

MR. DARROW:  We're almost done.

BY MR. DARROW:

Q     On the shotgun again.

A     Um-hum.

Q     So you are saying -- or I think you testified on direct that he said it might have been his arm that he was pretending to be holding a shotgun?

A     Yes.

Q     That's what he told you that he -- might have happened?

A     He said he wasn't certain -- now that he is reading it, he wasn't certain whether or not he actually used the shotgun to point at the juror, whether he was using his arm and hand.

Q     Sort of using an arm and a hand in a gesturing way to pretend he was holding a gun?

A     Correct.

Q     Okay.

MR. DARROW:  Your Honor, may I have a moment?

THE COURT:  Yes.

(Brief pause.)

MR. DARROW:  Your Honor, just may be able to save some time, may I ask if they've found the memorandum yet?

THE COURT:  Mr. Liman, have you got the memorandum?

MR. LIMAN:  I think it's in the process of being -- I am not sure.  If we take a short break -- this is our last witness for the day.

THE COURT:  Okay.  Let's take a brief recess, and my expectation is there's nothing else to talk about at this point, at the close of the evidence, prior to tomorrow.  Is that correct?

MR. LIMAN:  There's -- I think it would be helpful to talk about scheduling, your Honor.

THE COURT:  Do you think, Miss Rodriguez-Coss, there's anything else to be discussed today?

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  Okay.  What --

MS. RODRIGUEZ-COSS:  Yes, work related.

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  Work related, yes.

THE COURT:  Oh, work related.  What other issues need to be addressed today?

MS. RODRIGUEZ-COSS:  Well, we have some pending motions, and I think that the schedule that Mr.

Liman is referring to may depend on those motions.

THE COURT: Okay. All right. Let's take a -- just a brief recess, and let me know when you are ready for me to come back. Okay.

(Court was in recess at 3:45 p.m.)

(The following was held in open court at 4:28 p.m.)

THE COURT: Okay, first of all, was the memorandum submitted to the government?

MR. LIMAN: Without redaction, your Honor.

THE COURT: Okay.

MR. LIMAN: In its entirety.

MR. DARROW: And we would like a few follow-up questions.

THE COURT: Sure.

MR. DARROW: Thank you.

CONTINUED CROSS EXAMINATION

BY MR. DARROW:

Q    Hello again.

A    Hi.

Q    Sorry to pull you back up here. We are trying to get you out by the end of the day.

A    Thank you.

Q    I want to ask a few more questions of you about -- beginning with your interview of Juror 143.

A    Okay.

Q    Do you recall trying to find him?  A couple times driving by his house, he wouldn't be there, asking at a neighbor's house before the interview?

A    Yes.

Q    Okay.  Do you recall neighbors telling you he was at camp?

A    Hunting, yes.

Q    At hunting camp.  Okay.  Have you ever heard the phrase "deer camp"?

A    No.

Q    You don't know what "deer camp" in Vermont means?

A    No.

Q    Okay.  Do you recall -- well, I'm sorry, I'm cross examining.

When you did finally meet up with Juror 143, did you conclude that he had been drinking?

A    I -- there was a scent of alcohol on his breath.

Q    I'm sorry, was that a yes or no?

A    Yes.

THE COURT:  Is this during the first day or the second day?

THE WITNESS:  First day.

THE COURT:  Just for clarification.

MR. DARROW:  Yes.  Okay.  Let me try and be a little clearer.

BY MR. DARROW:

Q   It was on a Saturday towards evening when you first actually met this juror?

A   Correct.

Q   Okay.  And when you first -- when he first came to the door, he is dressed just in a pair of denim jeans; is that right?

A   Yes.

Q   And you said he smelled like alcohol?

A   Yeah, there was a scent of alcohol on his breath.

Q   Was -- is it correct that he was highly animated during his discussion?

A   Parts of it, yes.

Q   Yes.  And very emotional as well?

A   Parts of it, yes.

Q   In fact, he began crying and became overwhelmed at one point; is that true?

A   Um-hum, yes.

Q   Okay.  And his voice around those times became contorted?

A   Yeah.

Q   And is that when he was speaking about what had happened to Mrs. King?

      May I withdraw that and ask another question?

A   Sure.

Q    Is that when he was talking about Mrs. King's relationship with her family?

A    Yes.  That was difficult -- that was difficult for him.

Q    Okay.  Is it correct that the juror told you that the girlfriend with whom he was living during the trial repeatedly asked him to talk about the trial, but he refused?

A    Um, yes.  And I remember that because he told us that it -- the -- part of the reason why the experience was difficult for him was that he couldn't talk to anyone about it.

Q    Right.  Okay.  And do you recall him telling you that his girlfriend with whom he lived during the trial collected news clippings and taped televised coverage of the trial?

A    Yes.

Q    And she would try -- did he tell you that she tried to get him to look at the media coverage?

A    I don't know if I remember that independently of you telling me that.

Q    Okay.  Do you recall him telling you that he had taken notes during the trial?

A    What I recall is that he told us that he and some other jurors maybe took notes during the trial.

Q    Okay.  You didn't obtain from him any notes though, I take it?

A    No -- no, I didn't.  I didn't ask him for them either.

Q    Just the jar of jam and the map?

A    Yes.  I didn't ask for those, though.  He gave those to me.

Q    Ah.  You testified earlier that he talked about the knife used to murder one or both of the Rutland victims being in a dumpster?

A    I talked -- you asked me earlier about the knife. I don't think you were that specific earlier when you asked me about it.

Q    And I apologize.  I was trying to find out what he had told you, and my question was inartful.  Did he tell you about a knife being in a dumpster?

A    Yes.

Q    Okay.  Did he also tell you about a wallet being in a dumpster?

A    Um, I'm inferring that that's what he did, because you are looking at this piece of paper, but I don't have a --

Q    Don't --

A    I don't have a separate recollection of that.

Q    Okay.  Is it correct that when you first met

{Juror 143} at his door --

MR. DARROW:  I apologize.  Strike that, your Honor.  Juror 143.  Thank you.

BY MR. DARROW:

Q    When you first met Juror 143, you told him that you and the other fellow with you, Bryan, were court-appointed representatives of Donald Fell?

A    Yes.

Q    And do you recall during your meeting with the juror the day that you showed him the statement that you wrote, he received a call on his cell phone?

A    Um-hum.

Q    And do you recall him speaking briefly with the person and then stating that the folks from the court are here and it shouldn't take much longer?

A    Again, I don't have an independent recollection of him saying that.

Q    Okay.  Do you think it would refresh your recollection if you reviewed the memorandum that your associate, Bryan Faubus, wrote describing your interview and what you said?

A    I can give it a try.

MR. DARROW:  Your Honor, I would like to show her Exhibit 6 --

THE COURT:  Yes.

MR. DARROW:  -- for identification.

BY MR. DARROW:

Q    And let me just ask you to read to yourself the last page, page seven, of this document, and I am drawing your attention to the third-from-last paragraph. And then I will have another question for you.

A    Okay, it might take me some time.

(Brief pause.)

BY MR. DARROW:

Q    And I haven't asked you a question yet, but when you are done reading it, please tell me.

A    Um-hum.

(Brief pause.)

BY MR. DARROW:

Q    You ready?

A    Yes.

Q    Can you turn that over, please, that document, because I am going to ask you about you reading it again.

A    (Witness complied.)

Q    Thanks.

That paragraph that you read, does that help refresh your recollection?

A    No.

MR. DARROW:  Your Honor, may I have a moment?

THE COURT:  Yes.

(Brief pause.)

MR. DARROW:  Thank you.

BY MR. DARROW:

Q    Let me ask you a couple questions about your interview the following month of Juror 162.

A    Um-hum.

Q    Is it correct that before Juror 162 agreed to talk to you, she called the clerk's office to essentially confer with them first?

A    Yes.  I wasn't privy to that conversation, but that's what she said she'd be doing.

Q    Okay.  I have a -- oh, I see.  She told you that's what she did?  Is that right?

A    She told us that's what she was going to do.  She then stepped out of the room to, I assume, do it.

Q    Okay.  I appreciate your distinction.

And she had a conversation with someone in the clerk's office; that's your understanding?

A    When she came back, that's what she made us understand, yes.

Q    Did she tell you what they had told her?

A    That it was okay to speak with us, and she doesn't want to talk about deliberations.  She doesn't want us to ask her about deliberations.

Q    Did she tell you that Kathy Carter, at the clerk's office, had read Judge Sessions' instructions about jury deliberations over the phone and that she was going to adhere to those instructions and not speak about deliberations?

A    Yes, I think I have a memory of that.

Q    Okay.  But I gather this was an instruction from the Court that you didn't know about back when you interviewed Juror 143?

A    He didn't bring it up, no.

Q    Nor did you, because you had quite a discussion about deliberations, didn't you?

          MR. LIMAN:  Objection.

          THE COURT:  Objection overruled.

     You can answer that.

A    I -- no, I didn't ask either juror any specific questions about their deliberations.

BY MR. DARROW:

Q    Do you remember my question?

A    Yes.  You asked me whether I had extensive or some -- I don't -- something like that.

Q    I might have used the word "quite," but you had a discussion with the juror about jury deliberations?

A    The juror brought it up, yes.

Q    So is that a "yes" answer to my question?

A      Yes, I -- yes, the juror brought the deliberations up.

Q      And, yes, you had a discussion about juror deliberations with him?

A      Yes.

            MR. DARROW:  Your Honor, may I have a moment?

            THE COURT:  Yes.

            MR. LIMAN:  Just a couple, your Honor.

            THE COURT:  Oh, I don't think he is quite ready yet.

            MR. DARROW:  Thank you.

            (Brief pause.)

            MR. DARROW:  Thank you, your Honor.

            THE COURT:  Okay.

                        REDIRECT EXAMINATION

BY MR. LIMAN:

Q      Miss Zloczower, Mr. Darrow asked you some questions about the gun that was in the jury room and Juror 143's statements about that.  I want to follow up on some of those questions, okay?

        On the first day that you interviewed -- spoke to Juror 143, did the juror tell you that he had the gun brought into the jury room?

A      Yes, he told us that he had asked the marshal to bring the shotgun into the jury room.

Q    And did the juror tell you, when you spoke to him, that he had pointed the gun at another juror?

A    Yes.

Q    And is that what you wrote down in paragraph five of the -- of the declaration that Juror 143 signed?

A    Yes.

Q    Now, on day two, is it correct that Juror 143 expressed some --

A    I'm sorry, I think that's paragraph eight where I wrote that down.

Q    You're quite right.  So let me ask you the question just so we have a clean transcript.

A    Yes.

Q    You wrote on paragraph eight that the juror pointed the gun at another juror.  Correct?

A    Yes.

Q    And that's because that's what Juror 143 said to you.

A    Correct.

Q    Now, the second day when you returned -- by the way, on the second day, did you smell any scent of alcohol on Juror 143?

A    Absolutely none.

Q    And that day, I take it, he expressed some ambivalence about whether he actually pointed the gun at

the juror; is that correct?

A    Correct.  That's correct.

Q    Did he express any ambivalence about the gun actually being in the jury room?

A    None whatsoever.

Q    And then after he expressed the ambivalence about whether he pointed the gun, would you tell us what you said and what you recall him saying?

A    I told him that he -- that he can correct whatever he thinks is appropriate so that it reflects an accurate -- his accurate memory.  So he gave it some more thought and then decided to move on and not to make any changes.

Q    Okay.  And did he ever back off of the statement that he made that the gun was in the jury room?

A    No.

Q    Now, finally, Mr. Darrow asked you some questions about your understandings of your obligations as an attorney.

A    Um-hum.

Q    Let me just ask you, as a member of the bar and as an officer of the court, do you have an understanding of your duties with respect to candor towards the tribunal?

A    Of course.

Q    Would you tell us what your understandings are?

A    That I must respond truthfully to the questions posed to me before the tribunal unless an exception applies to when I do not have to respond to a certain question because of my role as an attorney.

Q    And in your conduct throughout this case, have you complied with your obligations of candor with respect to --

MS. RODRIGUEZ-COSS:  Objection, your Honor. It's clearly bolstering this witness.

A    Absolutely.

MS. RODRIGUEZ-COSS:  Objection.

THE COURT:  First of all, I think it's -- Mr. Darrow's supposed to be objecting, but assuming that there's an objection, objection overruled.

Have you complied with what your understanding is of your responsibility toward the tribunal?

THE WITNESS:  Absolutely.

THE COURT:  Okay.

MR. LIMAN:  Nothing further, your Honor.

THE COURT:  Okay?  Mr. Darrow?

MR. DARROW:  A couple follow-ups.  Thank you.

RECROSS EXAMINATION

BY MR. DARROW:

Q    So make sure I'm clear as to what you testified to in response to Mr. Liman.  When the juror told you that

he had pointed a gun at another juror during deliberations, that was after he had gotten back from deer camp and smelled like alcohol?

A    Yes.

Q    Okay.  And the next morning, when he did not smell like alcohol, he said actually he wasn't sure that happened?

A    Yes.

Q    And even though he expressed uncertainty about whether that extraordinary event ever happened, you didn't change the written statement you put in front of him, did you?

A    No.  I asked him to make any changes he thought were appropriate to reflect his memory of what happened.

Q    Right.  So that's a no?

A    That's a no.

        MR. LIMAN:  Objection.

        MR. DARROW:  Excuse me.

        (Brief pause.)

        MR. DARROW:  Nothing further, your Honor. Thank you.

        THE COURT:  Okay.  Anything further?

        MR. LIMAN:  Nothing.

        THE COURT:  All right.  Thank you.

        THE WITNESS:  Thank you.

THE COURT:  Is she free now to leave at this point to go back to New York?

MR. DARROW:  And, yes, your Honor, it's okay with the government if she takes the jam.

THE WITNESS:  It's all right.

THE COURT:  Well, it is four years old.

THE WITNESS:  And in evidence.

THE COURT:  All right.  Thank you.

(Witness excused.)

THE COURT:  Now, the government has indicated that there are some issues outstanding.  Of course there are motions outstanding.  I haven't gotten the government's reply in regard to the deposition -- extension of the deposition for Ms. -- is it Ms. Bochnak?

In light of the fact that was a deposition, I was not necessarily going to address that particular issue until the government's had a chance to reply to the response from the defense, I had thought, because the deposition would be submitted after these particular hearings.  But I certainly would be amenable to discussing that at this point.

MS. RODRIGUEZ-COSS:  Your Honor, the government would be happy to formulate a reply.  We only got -- received the petitioner's opposition yesterday,

in the midst of preparing for today, and we would be happy to reply in writing. We just aren't sure that we will be able to do that this week.

THE COURT: Yeah, I'm not putting the obligation on you responding this week. I had thought that because this is a deposition, that you would reply in due course, and then the Court would rule as to whether in fact there should be an extension on the deposition and in fact would address the work product issue.

I, in fact, was going to be asking for the depositions because they appear to be interrelated -- at least based upon the pleadings that have been submitted so far, I was going to be asking for the current deposition of this particular witness together with the depositions of the attorneys, Mr. Bunin and Mr. Primomo, because there's some discussion of work product in relationship to the three jurors. So that I fully anticipated taking some time over.

MS. RODRIGUEZ-COSS: All right. Very well. We can certainly do that and submit what we have with respect to the depositions --

THE COURT: All right.

MS. RODRIGUEZ-COSS: -- so far to the Court for *in camera* inspection.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  But then that affects obviously the timing of the hearing with regards to Mr. Primomo's testimony because we obviously would like to conclude and complete our discovery prior to having to cross examine Mr. Primomo with regards to his testimony. So that's why we wanted to bring it up with the Court.

THE COURT:  Oh, you need to know what evidence is going to be introduced from her deposition before you cross examine Mr. Primomo?

MS. RODRIGUEZ-COSS:  Well, in the first instance, your Honor, we were not taking her deposition and that was never discussed that we were taking her deposition in lieu of testimony.

THE COURT:  Right.

MS. RODRIGUEZ-COSS:  The deposition was taken as part of our own discovery process.  And second, yes, we would like to conclude our discovery on the jury selection process prior to proceeding with the cross examination of Mr. Primomo.

We raised this at the February 26th hearing.  I think the Court entertained the idea of bifurcating the hearing and taking the lay witnesses this week and taking the other witnesses later if need be.  We attempted to conclude our discovery.  We did our best.

We deposed Mr. Bunin last week in New York. We deposed Mr. Primomo. But the deposition of Miss Bochnak was severely obstructed by the petitioner, as we represented in our papers to the Court, and we would very much like to conclude that part of our discovery before proceeding with those witnesses.

THE COURT: Okay. Well --

MS. RODRIGUEZ-COSS: The attorneys --

THE COURT: All right. Before I get the -- get the -- Mr. Fell's response, just tell me what other witnesses would be impacted by the delay in addressing Miss Bochnak's testimony. Is there any other witness?

MS. RODRIGUEZ-COSS: Just the trial attorneys and the jury consultant.

THE COURT: Okay. And what is the expectation tomorrow? I know the defense intended to call four witnesses. Perhaps Mr. Primomo was one of them. And are there -- is this going to be done tomorrow? Is that --

MR. LIMAN: Your Honor, our expectation was that this would be entirely done tomorrow. Mr. Primomo is here. We informed the government -- the Court said -- as the Court will recall, last pre-hearing conference, which was set precisely to ensure that there would be a schedule for today and for tomorrow, the

Court directed each side to exchange witness lists and exhibit lists.

THE COURT: By March 7th.

MR. LIMAN: By March 7th.

THE COURT: Right. And so that was done. I know that you have not received a response from the government as to any witnesses they intend to call.

MR. LIMAN: Correct. They -- well, in fact I believe we did, which was that they did not intend to call any witnesses.

THE COURT: All right. So let me get right to the question of Mr. Primomo. I think the government should have the opportunity to at least ask him questions that may arise as a result of the deposition of Ms. Bochnak, and I am not at this point ready to argue with anyone about that particular ruling.

Obviously Mr. Primomo has a whole bunch of other things to testify to, I would suppose, and is there any way in which he could testify, leaving the government the opportunity after the completion and the submission of her deposition, to ask any follow-up questions?

MR. LIMAN: Your Honor, I don't think so. I have an alternative suggestion that could maybe cut through this, but I don't think the notion of putting him on for direct and then leaving cross examination --

THE COURT:  No, I wasn't -- I wasn't -- I wasn't suggesting that.  What I was suggesting is that he -- he could testify to the -- the main contents of his -- well, his statement, his testimony.  There could be cross examination, but there could be a follow-up cross examination or follow-up direct examination once the deposition of Ms. Bochnak has been introduced.  It would be brief.  Obviously the majority of his testimony would be resolved tomorrow.  And sometimes that can be done by way of videotape, video deposition.  He practices in Albany; is that correct?

MR. LIMAN:  He does.

THE COURT:  Right.

MR. LIMAN:  Your Honor, my -- my concern is this:  In -- in a case -- well, Mr. Primomo's going to be testifying about a very narrow issue and something, frankly, that even we think is -- is not particularly relevant to the issues before the Court.

The question is whether the Juror 162 lied.  Mr. Primomo is not -- doesn't know Juror 162's state of mind.  I think we proved that other ways.  And then whether the information that she concealed would have led to a challenge for cause.

She and everybody else will say that had they known the information that was concealed, there is no way they

would have wanted this juror on --

THE COURT:  Well, I thought actually -- just reading between the lines from the submissions that you have proffered at this point, that he also is going to be testifying to whether in fact 162 was a favored juror or not favored juror, whether they liked 162, didn't like 162.  All of that was going to be testified to.

And then you were going to ask the ultimate question:  Assuming that you had this particular information, what would you have done?  And then he would respond.  That's what -- I don't mean to -- I don't mean to suggest that I am taking your role here, but that seems to be what I thought you were going to offer him for.

MR. LIMAN:  And that is the thrust of the testimony.  The -- the government's examination of Ms. Bochnak isn't on some totally unrelated subject.  Mr. Primomo's testimony's going to be short.  We don't think -- let me tell you why I don't think the suggestion would work, and then let me make an alternative suggestion.

I don't think that this is something that can be easily carved out of Mr. Primomo's cross examination now.  I am concerned, frankly, by putting him on, having a cross examination of him, leaving the cross

examination open, we are going to be prolonging the proceedings. My suggestion is the following:

The government last night sent us an e-mail in which they suggested -- they said that they wanted three things: One was the continuation of Miss Bochnak's deposition. That's the subject of the motion.

They said to us that they wanted to put off Mr. Primomo so that they would have the opportunity to cross examine him after having Miss Bochnak's deposition.

And they said for the first time that they wanted to call Mr. Bunin as a -- as a witness. I'm not sure why, but they said that they wanted to call Mr. Bunin as a witness.

We reached out to Mr. Bunin this morning, corresponded with the government. We reached out to Miss Bochnak. Here's what I can report to the Court:

The -- the questions that were asked of Ms. Bochnak, to which she -- where she was given an instruction and ultimately did not answer -- I'll try to use my words carefully -- are extremely few.

THE COURT: Are extremely what?

MR. LIMAN: Few.

THE COURT: Few, okay.

MR. LIMAN: In fact, your Honor, I believe there was --

THE COURT:  You mean there was not an objection faster, more quickly than every minute?

MR. LIMAN:  There was, your Honor, a -- there was not a -- there were objections as to form, all of which were -- were well-made objections, and then, your Honor, there were -- when they -- the questions went into general processes with respect to Ms. Bochnak's secret sauce as a jury consultant, there was an instruction:  The Court has said this is about three jurors.  Answer the question with respect to the three jurors.

There's one -- a single question that was asked. It was not followed up on by the government, but where there was an instruction -- and I can proffer to you what Miss Bochnak would say, and she is available to get on the phone if we wanted to do it by deposition.  We could do it by a telephone deposition.  And that is the question, Did you go into jury -- the jury selection process in United States versus Fell with a certain criteria that you were looking for in members of the venire, things that you have identified based on your experience in prior criminal cases, things that you identified based on mock trials that you conducted in this case that you understood were characteristics favorable to Donald Fell?

There was an instruction, Don't go into work product. The government never did what they're required to do in deposition, which is to say, Miss Bochnak, can you answer that question. They moved on to -- to other questions.

We have asked Miss Bochnak that question again, to cut through this, and the answer to that question is, No, there were not certain criteria that were identified in advance.

THE COURT: Well, I thought -- I mean, again, correct me if I am wrong, because I went through this relatively quickly, having just arrived, but I thought there were two thrusts to the government's request. The first was, just as you say, was there a standard set of values that you look for in assessing whether a juror would be a favorable or unfavorable person; and the second related to the drafting or her participation in the drafting of the questionnaires.

And I thought that the government was very interested in that as well. Am I not correct about that?

MR. LIMAN: I think you are not correct, your Honor. I think it's slightly different. The government was very interested in her participation in the questions that were to be asked of the jurors during

the voir dire, her review of the question -- of the questionnaires, her comments with respect to the questionnaires.

THE COURT:  Well, let me just ask you, you basically are suggesting that you are withdrawing that objection to the question about whether there's this general policy or set of guidelines that -- that Mr. Fell had during the jury selection process.

The same question was asked of Mr. Bunin.  The same question was asked of Mr. Primomo.  All of the responses have been made.  If that is the case, where -- and in light of the fact that you are willing to disclose that work product, or what you call work product, where is the objection?  Where's the difference of opinion between both sides?

MR. LIMAN:  Well, your Honor, that's actually precisely my point.  I think we can get Ms. -- I think our view is that we do have a valid claim of work product.  In order to get through this -- we would like to get through it this week -- we are prepared to make Ms. Bochnak available.

Your Honor, the last time you said assume the depositions were short, we went through hours of depositions of the -- of the --

THE COURT:  Well, her deposition, as I recall,

was four hours long, but I bet the government may say that, let's see, an objection every minute, let's see, that's 240 objections.  Is that right?

MR. LIMAN:  That -- first of all, I don't think they could say that, but second, they don't seem to be complaining that the other depositions also took hours.

THE COURT:  No.  No, I thought actually Mr. Bunin's took an hour and Mr. Primomo's took two.

MR. LIMAN:  Not correct, your Honor.  Mr. Bunin's took a little bit over -- took about two hours, and Mr. Primomo's 90 minutes.

THE COURT:  Pardon me?

MR. LIMAN:  90 minutes.

THE COURT:  Okay.

MR. LIMAN:  Mr. --

THE COURT:  Well, tell me, is there a way -- let me ask both sides, I mean, to cut down -- to cut the debate.  Is there a way where both sides can get together and just work out how we are going to move forward on this?

MR. LIMAN:  We have offered to make Mr. Bunin available Thursday afternoon.  He could come here.  He could testify.  We can be done with it.

When we spoke to him this morning, he had not even

heard from the government about the request that he be able --

THE COURT:  I thought he was in a major trial.

MR. LIMAN:  His trial ended.  That permitted him to come to New York.  He came to New York for the deposition.  He corresponded with the government yesterday because his bills haven't been paid for coming to New York to sit for their deposition.  He said to them, you know, Here are the bills.  Would you -- would you pay them.  And not a peep about, well, we are going to need you as a -- as a witness.

THE COURT:  Well, all right.  Let's not -- let's not go backwards here.  I mean, right now we are in a situation where what you are suggesting is that you are more flexible in regard to whether Ms. Bochnak -- is that how you pronounce her name? -- can testify about the areas of concern that the government has, and that you would make her available for testimony tomorrow. You would make Mr. Bunin available for testimony on Thursday.  Mr. Primomo would go forward on Wednesday.

Does that -- does that address the concerns the government has?

MS. RODRIGUEZ-COSS:  No, your Honor, it does not.  I -- and here's the problem the government is having with this.

We have over the last couple of weeks tried to conclude the discovery that the Court stated that we were entitled to. The Court said, You can depose trial counsel. You can depose the jury consultant.

And we have gone -- we have bent over backwards to try and get this done to be prepared today for this hearing.

Last week we had two days taken away from us with the snowstorm. Nonetheless, you know, I traveled to New York on Friday. I deposed Mr. Bunin. We put that together within a week. Mr. Darrow, within a week, was available to depose Mr. Primomo. I talked to him before then to depose the jury consult. And here's how it generally works in litigation.

We get to conduct our discovery. We get to conclude the discovery that we understand we are entitled to conduct. We get to at least have more than 24 hours to sit back and look at what we have done and look at the materials that we have collected during the course of discovery, and then decide how we are going to proceed at a particular hearing --

THE COURT: Right, right --

MS. RODRIGUEZ-COSS: -- and we are being denied that opportunity. Just for the Court's notice, Mr. Bunin's deposition -- I was looking at my phone

before because I was looking for the time.  Mr. Bunin's deposition was just sent to me at 2:48 today.  I ordered it overnight.  It was supposed to be sent to me on Saturday.  It wasn't.  The court reporter was arranged through Cleary Gottlieb.  I was not able to contact the court reporter.  I have been driving backwards since yesterday to try to see why.

THE COURT:  I appreciate that this was really -- this was really expedited, but tell me, Ms. Bochnak, you want to complete the deposition of Ms. Bochnak.

MS. RODRIGUEZ-COSS:  And we'd like to then have an opportunity to sit back and evaluate that deposition, evaluate Mr. Primomo's deposition, evaluate Mr. Bunin's deposition, and then decide whether we are going to call anyone as a witness and how we are going to proceed.  And I think -- and I am -- you know, I think we are entitled to that, your Honor.

I don't understand why we are being forced to proceed in such an expedited and accelerated fashion when I think we have done our best to prepare it.

THE COURT:  Well, you know, the Court had sort of indicated by March 7th all of the discovery would be completed.  It would be -- the witness lists would be exchanged and we would be ready to go forward at this

point.

MS. RODRIGUEZ-COSS:  Well --

THE COURT:  So you tell me, Mr. Liman, Ms. Rodriguez-Coss has a point that she has not had the opportunity to get a full deposition of Ms. Bochnak and that may impact her examination of Mr. Primomo, theoretically Mr. Bunin as well.

You know, I appreciate it -- appreciate there's a scheduling difficulty, but the Court is clearly able to schedule this on notice now at a reasonable date in the future.

Is there some difficulty in the delay of a week to get these matters expedited and resolved?

MR. LIMAN:  Your Honor, I -- respectfully, I don't think she does have a point.  The conference before your Honor on February 26th, your Honor was very specific about the scope of the deposition and made a point of asking both parties whether they agreed to the scope.

Your Honor said, "Well, as far as the scope of the deposition, at this point he is not being deposed on all of the issues raised by the 2255; is only being deposed in regard to his reaction to some of the information which has come out from some of the jurors, in particular, whether he would have exercised a challenge

for cause, peremptory challenge; is that right?"

You asked me that question; I said, "That's right."

THE COURT:  Right.  I saw that quote.

MR. LIMAN:  And you asked them --

THE COURT:  And you know the quote that you took from her statement about the lack of clarity from the Court about the nature of the depositions and the time limits, et cetera.  And I take that, you know, at face -- at face value.

MR. LIMAN:  Your Honor, we --

THE COURT:  I am not holding that against anyone.  So --

MR. LIMAN:  We followed your instructions. Our instructions were almost *in haec verba*.

THE COURT:  You know, I -- that I appreciate. I think it is fair to say that I am making every effort I can possibly make to give both sides the opportunity to present the case that they want, and if this means a delay of just a short period of time so that each side has an opportunity to look at the deposition testimony, to think about it and to present it, I just don't see any harm.

I appreciate the fact that this creates a scheduling difficulty for you or members of your law firm, for the defense in general, but I also want to

make sure -- just like I bent over backwards for you to be able to present your case, I think it's equally important that I bend over backwards for the government to present its case.

And it is true that I set the 7th. I focused in primarily on the three witnesses or then four; I excluded one. There's no question about that.

MR. LIMAN: Your Honor, my -- my main concern is that Ms. Bochnak is a -- you know, a lay witness, not under the control of us or anybody. She spent a long time in the depo- -- in the deposition, and that the taking her deposition, we believe that the government actually was permitted to ask, and she answered, every question that was relevant to -- to this case.

In fact, the government hasn't identified a single question where they didn't get an answer.

THE COURT: Well, you just conceded a new question that she is available for, and that is her assessment as to whether in fact there was a value set on a particular form of juror.

MR. LIMAN: My concern is that's one question. That should be an extremely short deposition. I -- I don't want -- I don't think it would be appropriate, I don't think it would be justified, I don't think the rules permit the government to use the occasion of

calling Ms. Bochnak to ask questions that it chose not to ask when they took her deposition.

There wasn't a -- or where there was an instruction --

THE COURT: So tell me then, Mr. Liman, what your reaction is to a suggestion that I go through the standard process permitting the government to make a -- to file a reply memorandum. I make an assessment as to what areas of examination still can been conducted. You already filed a rigorous objection to the extension of the deposition. And that I could clarify exactly what is to be said. The only harm, as far as I can tell, from your perspective, is the fact that Mr. Primomo, who is here, would not testify until after that is done. Or Mr. Bunin would not testify until after that is done.

MR. LIMAN: May I confer with my colleagues?

THE COURT: Sure.

(Brief pause.)

MR. LIMAN: That would be acceptable, your Honor.

THE COURT: So, let's see, did you put your finger to the air and catch the drift?

MR. RUBIN: Local counsel, your Honor.

THE COURT: Local counsel.

MR. RUBIN: No, no, no, no. Only kidding.

MR. LIMAN:  Without prying into the back and forth.

THE COURT:  So what do you think of that?

MS. RODRIGUEZ-COSS:  That's fine, your Honor. We -- I think within a week we can get that done.  We are otherwise ready to proceed.

We also advised petitioner that we would recall Juror 162, so they give us an estimate as to how long they think they will take to conclude their evidence tomorrow, we will have her here ready to go.

THE COURT:  Well, you have three witnesses left.  I assume it will be in the morning, right?

MR. LIMAN:  I believe so.  We should finish our case in the morning.

THE COURT:  That's right.

MR. LIMAN:  With the exception of --

THE COURT:  And she could be called in the afternoon.

MS. RODRIGUEZ-COSS:  Very well.

THE COURT:  And that would leave only the lawyers.  You want to call Mr. Bunin and Mr. Primomo, and -- and then the question as to whether there should be an extension of the deposition and how long it would take.

And, you know, frankly, if -- well, I was going to

offer to go to Albany or offer to go to New York, but the fact is this -- this is a case of public concern and I should be here because the public and the family should be here, so --

MR. LIMAN:  Can we get some sense of what Juror 162 is going to testify to first?

THE COURT:  Yeah, I -- that's not up to me. That's up to the government.  So -- you know, you might want to talk a little bit and try to streamline this obviously, but that's up to the two of you.

MR. LIMAN:  I mean, we are -- by sending the e-mail late at night to us a week after witness lists were due, I frankly think we are being sandbagged.  I think it's not --

THE COURT:  Well, I think it's important that both sides talk to each other about whether this in fact could be expedited.  But, you know, certainly the government's got the right to call witness -- Juror 162.

Now, did you suggest that there were any other motions that were outstanding?

MS. RODRIGUEZ-COSS:  Your Honor, we had a motion to interview the clerk's staff, and that was outstanding.

THE COURT:  I frankly didn't see that.  The defense hasn't -- has a motion to interview the

marshals.  I didn't see a motion, frankly, to interview the staff.

MS. RODRIGUEZ-COSS:  Well, I guess --

THE COURT:  And I was going to ask, frankly, whether I have the authority to say one way or another as to whether in fact you can speak with the marshals. They're in the Department of Justice.  I had thought that you wanted to speak with court personnel.  I was going to arrange for the court personnel.

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  Now there's a question about the marshals, and I think, you know, that's -- that's a question for which I have no answer.

I don't know if I can restrict them.  And I do want to remind you that, you know, at the very beginning, when there was a request from the defense counsel to interview jurors, I looked at our policy and found out there was absolutely no policy.  Now there is a policy restricting communications without court permission, but at this point there was no policy.  And that's why I never responded to the defense because there was no policy.  I don't know of a policy which would in any way control whether I can limit access to the marshals.

MR. DARROW:  Judge, we were wondering also when the letter from the 2255 team went to you on the

subject and they only mentioned marshals, because we had thought the issue involved the clerk's staff.

THE COURT:  Right.

MR. DARROW:  As you indicate, the marshals are not part of the judiciary.  So I just didn't understand that and we can maybe chat with them, but --

THE COURT:  Yeah, I --

MR. DARROW:  But there was -- you know, both parties, I thought, at the last hearing, which I was not present at, did ask you about the possibility of talking to the clerk's staff because both parties are trying to get more information about was the shotgun in the jury room.  So, you know, that matter may still be out there.

THE COURT:  Well, all right.  So maybe both sides can get together to arrange for that discussion.

Again, all I was asking for, in terms of the court staff, as their supervisor -- remember the whole debate about I'm their supervisor.  You are actually debating -- you are actually interviewing the Court itself.  Just tell me who you want and what you want to ask them, but I'm, frankly, confused about whether I have any control over the marshals at all.  So maybe both sides can arrange it.

I certainly would speak with the court personnel if they want -- if you want to meet with them, perhaps

on -- well, either Wednesday afternoon or Thursday. That's fine. And I -- and we'd discuss whether I would be present. I clearly feel I should not be present, and, you know, that can be arranged.

But do you have any law on the issue as to whether I in fact can control access to marshals?

MR. LIMAN: I -- I don't, your Honor. Nothing that I am prepared -- that I am sufficiently confident to address right now.

I do think there's another issue of housekeeping maybe we can --

THE COURT: And that is the -- the sealing of the records of the deposition that was taken from --

MR. LIMAN: Well, it's first the offer of the deposition of the witness who's taken south, and on that, we designated certain pages of the deposition. The government said they wanted the entire deposition to go in. And so I would offer the deposition of the out-of-state witness.

THE COURT: Okay.

MR. LIMAN: How would the Court like to receive that? I have got copies.

THE COURT: Just submit -- just submit the deposition tomorrow. I -- I feel that in light of the public interest, the family's interest in this

particular case, that -- that everything should be public, and as a result, I am not inclined to permit it to be sealed.  It should be public.  If the Court is going to rely upon it, the public should know what I am relying upon.  So, I don't -- I can't recall if your particular request for the sealing of that document and the sealing of the notice of deposition was addressed, but my intention is clearly to make that public.

MR. LIMAN:  Fine.  So we will submit that.

THE COURT:  And I think that is technically granting the government's motion to deny the sealing, as I recall.

MR. LIMAN:  I think actually the motion itself may be moot because the motion applied just to the deposition itself, and when we submit it to the Court, it then becomes a court record, and, you know, we --

THE COURT:  Okay.

MR. LIMAN:  I was prepared to -- to make a motion, if your Honor would entertain it, but I have heard your Honor, and I will submit it.

THE COURT:  Okay.  I think it should be open.  All right.  What else is there to be addressed this morning, or this afternoon?

MR. LIMAN:  So I assume we are not going to call Mr. Primomo.  We will work out a -- with the

government a potential date.

THE COURT: Correct.

MR. LIMAN: And just to inform the government, we expect to -- the Court, we expect to sit down with the government after court is over to go through the relevance objections with respect to the documentary exhibits.

THE COURT: That's excellent. And I will tell you that I will be available at any time to finish this testimony. There's a real need to move along.

Again, I want to address the -- at the close of this particular aspect of the case, what happens in regard to the other claims. So.

But I am ready to -- to schedule this on short notice. So if you could figure out a day when you think you can commit yourselves to the completion of this testimony, I'm available.

MR. LIMAN: What we are going to need is a date from the government for filing the reply, and then how should we, since it's --

THE COURT: You can expect that the response, after the government has filed a reply, would be within 48 hours, so any time after that is when --

MR. LIMAN: Good. Thank you.

THE COURT: Okay. Anything else at this

point?

Okay.  Well, thank you for staying late.

MR. DARROW:  Thank you for your time, your Honor.

(Court was in recess at 5:21 p.m.)

*** ** ***


C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matte

May 14, 2014
Date                    Anne Nichols Pierce