UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA   *
                           *
            V              *
                           *
DONALD FELL                * CRIMINAL FILE NO. 01-12


CONTINUED HEARING ON JUROR MISCONDUCT
Wednesday, March 19, 2014
Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
    District Judge


APPEARANCES:

    JACABED RODRIGUEZ-COSS, ESQ., United States
        Department of Justice - Criminal Division,
        1331 F Street, N.W., Washington, D.C.;
        Attorney for the United States

    WILLIAM B. DARROW, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    LEWIS J. LIMAN, ESQ. and SCOTT BUELL, ESQ.,
        Cleary Gottlieb Steen & Hamilton LLP,
        One Liberty Plaza, New York, New York;
        Attorneys for the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
        New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
        DeWolfe, 237 North Main Street, Barre, Vermont;
        Attorney for the Defendant


ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **JEAN RATTA-ROBERTS** | | |
| Direct by Mr. Rubin | 8 | 24 |
| Cross by Ms. Rodriguez-Coss | 34 | 23 |
| Redirect by Mr. Rubin | 43 | 16 |
| **SUZANNE WIDENER** | | |
| Direct by Mr. Liman | 46 | 18 |
| Cross by Ms. Rodriguez-Coss | 64 | 7 |
| **SCOTT BUELL, ESQ.** | | |
| Direct by Mr. Liman | 84 | 7 |
| Cross by Mr. Darrow | 114 | 20 |
| Redirect by Mr. Liman | 118 | 7 |
| **JUROR NO. 162** | | |
| Direct by Ms. Rodriguez-Coss | 127 | 1 |
| Cross by Mr. Rubin | 159 | 11 |
| Redirect by Ms. Rodriguez-Coss | 201 | 3 |
| Recross by Mr. Rubin | 205 | 15 |
| **MICHELLE DELPHA** | | |
| Direct by Ms. Rodriguez-Coss | 209 | 7 |
| Cross by Mr. Liman | 222 | 14 |

# **I N D E X**

**E X H I B I T S**

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| A - D | (Admitted into evidence during 9/27/2013 hearing) | 7 |
| 1 - 8 | (Admitted into evidence during 8/15/2013 hearing) | 7 |
| 18 | Juror 26 short form questionnaire | 7 |
| 19 | Juror 26 records, Vermont Superior Court, Essex County | 7 |
| 23 | Juror 143 long form questionnaire | 7 |
| 24 | Juror 143 short form questionnaire | 7 |
| 26 | Juror 27 short form questionnaire (WITHDRAWN) | 7 |
| 27 | Juror 27 long form questionnaire (WITHDRAWN) | 7 |
| 34 | Juror 26 long form questionnaire | 7 |
| 35 | Selected pages from in camera John Doe Department of Corrections records | 7 |
| 38 | Videotape | 105 |
| 39 | Videotape | 105 |
| 40 | Video clip 3 | 113 |
| 41 | Video clip 4 | 114 |
| 42 - 44 | (Admitted into evidence during 3/18/2014 hearing) | 7 |
| 45 | Photograph of 573 Bay Road apartment building | 7 |
| 45A | Photograph of Bay Road apartment building | 19 |

4

## I N D E X

### E X H I B I T S

| DEFENDANT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 45B | Photograph of Bay Road apartment building | 56 |
| 46 | Photograph of 573 Bay Road apartment building | 7 |
| 47 | Photograph of 573 Bay Road apartment building | 7 |
| 48 | Deposition transcript of Tina Boyce | 125 |

WEDNESDAY, MARCH 19, 2014

(The following was held in open court at 9:40 a.m.)

COURTROOM DEPUTY: This is case number 1-12, United States of America versus Donald Fell. Mr. Fell is not present in the courtroom by waiver. Present on behalf of Mr. Fell are attorneys Richard Rubin, Cathleen Price, Scott Buell and Lewis Liman. Present for the government are attorneys Jacabed Rodriguez-Coss and William Darrow.

The matter before the Court is a continuation of the juror misconduct hearing.

THE COURT: I don't think Mr. Liman is here; is that correct?

MR. RUBIN: He is in the hallway doing a little work. He will be in in a few minutes, your Honor. I am doing the first witness, so I will cover it.

THE COURT: All right. Are both sides ready to proceed?

MS. RODRIGUEZ-COSS: Yes, sir.

THE COURT: Okay. Mr. Rubin, you want to call your next witness?

MR. RUBIN: Yes, but before we do that, the parties, at your request, talked about the exhibits.

THE COURT: Okay.

MR. RUBIN:  And there's been substantial progress.  Miss Price will tell the Court which --

THE COURT:  Substantial progress suggests that there is some progress yet to be accomplished; is that --

MR. RUBIN:  She will explain it to you.

THE COURT:  Okay.

MS. PRICE:  Yes, your Honor.  The parties have agreed that there are no objections to a number of the exhibits that we offered yesterday.

THE COURT:  Okay.

MS. PRICE:  I could list them?

THE COURT:  Yes.

MS. PRICE:  Per the exhibit list, it's 1 through 8, Exhibits 18 and 19, 23, 24, 26, 27, 34, 35, 42, 43, 44, 45, 46, 47, and Exhibit A, Exhibit B, Exhibit C, Exhibit D, and that's all.

THE COURT:  All right.  So is that correct, from the government's perspective?

MS. RODRIGUEZ-COSS:  That is correct, your Honor.  And what we requested was -- some of the remaining exhibits are still somewhat voluminous, and we may have objections to part of it and not to other parts of it.  We'd like an opportunity to, in writing, provide the Court with Bates stamped numbers to ones we do

object to and ones we don't object to.

THE COURT:  Okay.  So based upon the stipulation of the parties, the Court will admit 1 through 8, 18 through 19, 23 through 24, 26 through 27, 34 through 35, 42 through 47, and A through D.

MS. PRICE:  Yes.  Thank you, your Honor.

(Defendant's Exhibits A, B, C and D were received in evidence.)

(Defendant's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 18, 19, 23, 24, 26, 27, 34, 35, 42, 43, 44, 45, 46 and 47 were received in evidence.)

THE COURT:  All right.  Is there anything else to be accomplished at this point, or do you want to wait for the -- the government's response?

MR. RUBIN:  No, we are ready to go with our first witness.

THE COURT:  All right.  You want to call your first witness?

MR. RUBIN:  Jean Ratta-Roberts.

THE COURT:  And just before Ms. Roberts testifies, defense is calling three witnesses?

MR. RUBIN:  Yes.

THE COURT:  Is that correct --

MR. RUBIN:  Yes.

THE COURT:  -- today?  And has the government

been noticed as to when you would have your witness available?

MS. RODRIGUEZ-COSS:  We have Juror 162 coming in this afternoon.

THE COURT:  Okay.  This would be this afternoon?

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  And do you anticipate your three witnesses would be done this morning?

MR. RUBIN:  Yes.

THE COURT:  Or early this morning?

MR. RUBIN:  Yes.

THE COURT:  All right.

MR. RUBIN:  Well, I don't know how long the third witness will take.

THE COURT:  Okay.

JEAN RATTA-ROBERTS,

    having been duly sworn by the courtroom deputy,

    was examined and testified as follows:

THE COURT:  Good morning.  Is it Ratta-Roberts?

THE WITNESS:  Jean.

THE COURT:  Good morning.

DIRECT EXAMINATION

BY MR. RUBIN:

Q   You want some water?

A   No, thank you.

Q   Okay.  Good morning to you.  How are you doing?

A   Good morning.  I'm fine, thank you.

Q   State your name, please.

A   Jean Ratta-Roberts.

Q   And where do you live?

A   In Colchester.

Q   What address do you live at?

A   573 Bay Road.

Q   How long have you lived at that address?

A   50 years plus.

Q   And is this the building where *{Juror 162}* and her son, Patrick Ryan, lived?

A   Yes, it is.

        MS. RODRIGUEZ-COSS:  Sorry, your Honor, we had an agreement we would refer to the jurors by number.

        THE COURT:  Yes, right.  I just -- I would ask --

        MR. RUBIN:  I'm sorry.

        THE COURT:  -- in referring to the juror that you actually refer to the number 162 as opposed to mentioning the juror's name.

        THE WITNESS:  Okay.

        THE COURT:  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  Or actually you could just refer to her as "the juror" if you forget the number; "juror" or "162."

THE WITNESS:  Okay.

MR. RUBIN:  So if I ask you a question, did you have a conversation with "the juror," you will understand that -- who we are talking about?

THE WITNESS:  Yes.

MR. RUBIN:  Okay.

BY MR. RUBIN:

Q    So you lived at this address for 50 years?

A    Yes.

Q    How old are you?

A    74.

Q    Where were you born and go to high school?

A    I was born in Massachusetts, but I was brought up in Bristol, Vermont, and I went to high school in Bristol.

Q    And after you graduated from high school, did you get married?

A    I did.

Q    And do you have any children?

A    I have three grown daughters.

Q    And where do they live?

A    My oldest daughter Shara lives in Ireland.  My daughter Stacy lives in Essex.  And my daughter Sheila lives in Highgate.

Q    And one of these daughters is married to someone of note?

A    Yes, she does.  My daughter Stacy is married to Gary Sedowski.

Q    The weather man?

A    The weather man.

Q    And you have grandchildren?

A    I do.  I have five grandsons.

Q    And do you have great-grandchildren?

A    I have two great-grandchildren.

Q    At some point did you move to Burlington from Bristol?

A    Yes, I did.

Q    With your husband?

A    Yes, he did.

Q    And what did your husband do for work?

A    My husband was a milkman.

          THE COURT:  I'm sorry.  He was a what?

          THE WITNESS:  I'm sorry?

          THE COURT:  He was what?

          THE WITNESS:  He was a milkman.

          THE COURT:  He was a milkman?

THE WITNESS:  Doing home delivery milkman.

THE COURT:  Oh, as opposed to a farmer who gets the milk from the cow.

THE WITNESS:  Yes.

THE COURT:  He delivered the milk to the door.

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. RUBIN:

Q   All right.  And then in the mid '70s, you and your husband -- or you moved to your present address?

A   Yes.

Q   Now, you said that the address is 573 Bay Road in Colchester?

A   That is correct.

Q   There was a change of everybody's address when they put the 911 system in, right?

A   Yes.

Q   Do you recall what your address was before they made the change?

A   Yes.  It was 76 Bay Road.

Q   So 76 Bay Road is the same building as 573 Bay Road?

A   It is.

Q   In the '70s, were you employed at Fletcher Allen?

A   Yes.

Q    What did you do there?

A    I was a nurse aid.

Q    And how long were you employed at Fletcher Allen?

A    25 years.

Q    Did you enjoy your work there?

A    I did, very much.

Q    And what unit were you on?

A    Excuse me?

Q    What -- where did you -- what floor did you work on?  What service?

A    Baird 6.  It was a general surgery floor.

Q    And you retired in 1997?

A    Yes, I did.

Q    Still living on Bay Road?

A    Yes, sir.

Q    More recently, have you been employed in the Malletts Bay school system?

A    Yes.

Q    And what was your job or is your job?

A    Classroom assistant.

Q    And how long have you done that?

A    Nine years.

Q    This year you are on a medical leave?

A    I am.

Q    Are you planning to go back in the fall?

A    Yes, I am.

Q    And do you have any plans to retire?  Do you have any plans to retire?

A    No, not yet.

Q    Okay.  Do you know *{Juror 162}* -- I'm sorry, Juror 162?

A    Yes, I do.

Q    And do you know her son, Patrick?

A    Yes, I do.

Q    When did you first meet them?

A    When *{Juror 162}* moved in, into the building where I live.

MS. RODRIGUEZ-COSS:  Move to replace, your Honor, the reference to the name with the juror number.

THE COURT:  Right.  Again, you are going to have to refer to her as "the juror."

BY MR. RUBIN:

Q    Okay.  You had referred to her by her first name, so we gotta refer to her as when "the juror" moved in.  Got it?  Okay?

A    I can -- say that again, please, sir.

THE COURT:  You just -- whenever referring to this person, the juror, you should refer to the person as "juror" as opposed to using her name.

THE WITNESS:  Okay.

THE COURT:  Okay?

THE WITNESS:  Yes, sir.

BY MR. RUBIN

Q    You just forgot and used her first name.
That's just this morning, just to say when "the juror"
moved in.

A    Okay.

Q    I made the same mistake, so --

A    Okay.

Q    -- we will try and remember.

Did you become friendly with the juror?

A    Yes, I did.

Q    And, in fact, she worked at the hospital where you
worked?

A    Yes, she did.

Q    And would you often talk about the hospital and
gossip about the hospital and things like that?

A    Yes.

Q    Did you like the juror?

A    Yes, I did.

Q    No ax to grind against her?  No ax to grind?  No?

A    No, sir.

Q    And did you also have conversations after they
moved in with her son, Patrick?

A    I did.

Q    I have placed a picture in front of you, all right?

A    Yes, sir.

Q    And this is a -- is marked Exhibit 45, and this is a picture of the building where you live?

A    It is.

Q    And is this the building where you have lived for 50 years?

A    Yes, it is.

Q    And is this the building where the juror and her son lived as well?

A    Yes, it is.

MR. RUBIN:  I had a marker and I think I have lost your marker.

THE COURT:  Is there a second entrance to the building?

THE WITNESS:  No, sir.  Excuse me, sir.  There are back doors from each apartment.

THE COURT:  Okay.  So you would live in an apartment in this building?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

MR. RUBIN:  I'll explain it, too.

BY MR. RUBIN:

Q    So we are looking at the building from the street

in this picture?

A    Yes, sir.

Q    You can either look on the screen or you can look in front of you, whatever is more comfortable for you.

How many apartments are there in this building?

A    Four.

Q    Two upstairs, two downstairs on each floor?

A    Yes.

Q    Okay.  Where, when the juror moved in, did she live, looking at the picture?

A    She lived on the lower left, looking at the building.

Q    Okay.  So why don't you write on there, just kind of next to -- is that window next to the doorway a window into her apartment?

A    That's her living room window.

Q    So why don't you write right next to there "J" for juror.

A    I wrote "juror" under it.

Q    Good.  Okay.  And did she live in that apartment with her son?

A    Yes, she did.

Q    At some point did her son move into another apartment in the building?

A    Yes, he did.

Q    Which apartment, looking at it?

A    Looking at it, he moved into the apartment on the lower right.

Q    And why don't you put just his initials, "PR."

A    Okay.  I did.

Q    Where were you living at the time that they were living together?  It doesn't show on the picture, right?

A    Yes, it shows in the picture.  It's in upper right-hand.

Q    In the front right?

A    In the front right.

Q    Okay.  And then at some point a few years ago, the son moved out and you moved downstairs?

A    The son moved out.  Then my grandson and his wife moved into the downstairs apartment.

Q    Okay.  And then you moved in eventually?

A    We -- we changed -- my grandson and I changed apartments.

Q    Okay.

A    I moved downstairs, and they moved upstairs on the right.

Q    Look at the screen.  So -- and this is the exhibit on which you have marked the location of the juror and the location of where the son moved into, correct?

A    That is correct.

Q    But initially, they lived together; is that right?

A    That is correct.  Yes, sir.

Q    So I have added to the picture "PR and juror."  Can you see that?

A    Yes, sir.

Q    Is that correct?

A    That is correct.

          MR. RUBIN:  I am going to offer Exhibit 45.

          THE COURT:  Any objection to -- 45 is already admitted, is it not?

          MS. RODRIGUEZ-COSS:  No, your Honor.

          THE COURT:  It is admitted.

          MR. RUBIN:  We should call it 45A.

          THE COURT:  All right.  45A is admitted.

          (Defendant's Exhibit 45A was received in evidence.)

BY MR. RUBIN:

Q    Exhibit 47 is a picture of the hallway, the downstairs hallway looking from the stairs walking down into the hallway?

A    Yes, sir.

Q    All right.  Does this fairly represent what the hallway and the front door looks like?

A    Yes, it is.

Q    Okay.  So looking down the stairs, when they were

living together, the juror and their son, they were living in the right-hand apartment looking down the stairs?

A    Yes, that's correct.

Q    And then he moved across the hall?

A    Yes.

Q    The son did.

A    The son did, Patrick.

Q    How far are those two doors one from the other?

A    Approximately five feet.

Q    Could I reach out and touch both doors at the same time?

A    Yes, you could.

            MR. RUBIN:  47 is already admitted, your Honor?

            THE COURT:  Yes.

BY MR. RUBIN:

Q    Did the juror ever mention to you that she was serving on a murder trial?

A    Yes, she did.

Q    And --

A    That was the extent of the conversation.

Q    I am not interested in whether she told you anything about the trial, but what actually did she tell you led you to conclude that she was --

MS. RODRIGUEZ-COSS:  Objection.  Hearsay.

MR. RUBIN:  It's not offered for its true.

THE COURT:  Objection overruled.

MS. RODRIGUEZ-COSS:  What is it offered for?

THE COURT:  I would assume it's being offered for timing; is that correct?

MR. RUBIN:  Exactly.

THE COURT:  So it's not being offered to prove the truth of the matter asserted in the statement.  It's offered as to the timing or knowledge.  So, objection overruled.

You can answer that question.

A    Yes, she did tell me.  We were just having conversation in the backyard.  She said she was selected as a juror on a murder trial.

BY MR. RUBIN

Q    And where -- was the juror and her husband *[sic]* living in your building at the time of this trial?

A    Yes, they were.

Q    And they were living five feet apart from each other?

A    Excuse me?

Q    The apartments were five feet apart from each other at that time?

A    Yes.

MS. RODRIGUEZ-COSS:  I'm sorry, did you say husband?

MR. RUBIN:  I meant to say her son.  The juror and her son.

BY MR. RUBIN

Q    And they had been living in the building for several years prior to the jury trial?

A    Yes.

Q    In August, the juror testified that the only person that she had told about her having been sexually abused was a neighbor she told when she was a young girl.  Did she tell you that she was sexually abused?

A    Yes, she did.

Q    And do you recall the circumstances of her telling you that?

A    We were just having a conversation out in our backyard.  I don't know what precipitated the conversation.  And it was just that, a statement by her, and that was it.

Q    The juror said during the juror selection that her son had had a drinking problem but was rehabilitated approximately 15 years before the trial began, or in 1990, roughly.  Did the juror ever mention to you --

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor.  I apologize, counsel, but is this -- I didn't quite grasp

the first part of his question.  His tone of voice was lower.  Can you -- ask you to just speak into the microphone.

THE COURT:  Okay, do you want it repeated from the reporter or can you begin the question again?  It was a preliminary question.

MR. RUBIN:  Okay.

BY MR. RUBIN:

Q    Did you hear my question?

A    Yes, I did.

Q    Did the juror ever mention to you her son having a DWI or DUI conviction at or about the time they were living together?

A    Yes.

Q    And what did she say to you about that conviction?

A    She said that he had gotten a DUI conviction, and it was just putting a strain on her life having to take him -- drive him different places, to appointments, his work.

Q    Court?

A    And to court.

THE COURT:  Can you put some time -- approximate times of these conversations?

THE WITNESS:  Actually, I can't, sir, because we just had several conversations out in -- in the --

the backyard.  She was out or I was out.  A conversation would start, and, you know, we had a conversation probably every day.

MR. RUBIN:  Your Honor, we have, I think, maybe already in evidence to show the date of that DUI conviction.

THE COURT:  All right.  I was more interested in the question about the sexual abuse and putting some relative dates on that, but you can't -- you don't know when that would have been?  For instance, was it 10 years ago or --

THE WITNESS:  No, it was probably maybe five -- four, five years ago or even longer than that because {Juror 162} has been gone for a while.

BY MR. RUBIN:

Q    Let me ask it this way:  Was it before the jury trial that she told you this?

A    Yes.

Q    And if I told you or if the evidence was that she lived in your building for five years before she sat as a juror --

MS. RODRIGUEZ-COSS:  Objection to what he is telling her, your Honor.  From here on out, we are really going to object to leading the witness.

THE COURT:  Well, I appreciate the leading

nature but the foundation for the question. You have evidence to suggest that in fact she was living at the residence for five years, and do you realistically anticipate that that evidence would be introduced?

MR. RUBIN: It may already have been introduced as part of the exhibits. Yes, we do.

THE COURT: Oh, all right.

MR. RUBIN: We have motor vehicle records to show --

MS. RODRIGUEZ-COSS: Objection, your Honor.

MR. RUBIN: He asked me.

MS. RODRIGUEZ-COSS: We would object to counsel proffering information to the Court in the presence of the juror -- of the witness. And I think that it's important that she provide testimony based on her own knowledge and recollection and not what Mr. Rubin is volunteering to the Court.

He may have records from independent sources that provide distinct information, but --

THE COURT: There is -- there is --

MS. RODRIGUEZ-COSS: -- that doesn't mean that the witness has any knowledge.

THE COURT: There's certainly -- there's nothing objectionable about a question which begins with "assuming evidence which has been introduced into court

exists, just assuming that to be the case." Then you ask an open-ended question. That's perfectly appropriate, assuming that you have the foundation to be able to ask the question. That's why I asked the question as to whether or not there was some evidence to suggest a particular given period of time. He can certainly ask that question. If in fact there's an improper foundation, that's your objection, but that's essentially it.

And in regard to the leading nature of the question, you know, I remind counsel to make sure that the question is not leading in nature and that she responds in ways other than just yes or no.

So having said that, do you have the question in mind?

MR. RUBIN: Yes. I can do it again.

THE COURT: Okay.

BY MR. RUBIN:

Q    Assuming that the murder trial was in the summer of 2005, and assuming that {Juror 162} -- the juror moved in in -- was there from at least 1999 and her son moved in in 1999, do you have an opinion as to when she told you about having been sexually abused, before or after the murder trial?

MS. RODRIGUEZ-COSS: Objection to the request

for an opinion.

THE COURT: Yeah, objection over- --

BY MR. RUBIN:

Q    What is your best estimate of when you were told?

A    Approximately 10, 12 years ago.

THE COURT: 10 or 12 years ago from today's date, you are talking about?

THE WITNESS: Probably, yes, sir.

THE COURT: All right. So today -- that's approximately 2004 -- 2002 to 2004?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. RUBIN:

Q    In the years before the murder trial, did the juror express any concerns to you about her son's drinking, ongoing drinking?

A    Yes, she did.

Q    And how did she express those concerns? What did she say?

MS. RODRIGUEZ-COSS: Objection. Hearsay.

THE COURT: Objection overruled. You can answer that question.

BY MR. RUBIN:

Q    You can answer.

A    She said she was really frustrated because -- and

concerned because she had to drive her son everywhere he had to go for -- to work, to court, anywhere he had to go, and it was putting a stress on her.  And --

Q    And did they -- go ahead.

A    She was very upset and concerned about that, about his drinking and --

Q    Did you hear them argue?

A    Yes, I did.

MS. RODRIGUEZ-COSS:  We -- this -- it's not a prior inconsistent statement.  We would like to know which -- under which hearsay exception counsel is submitting these statements.

THE COURT:  What do you mean it's not a prior inconsistent statement?

MS. RODRIGUEZ-COSS:  It's not a prior inconsistent statement.  The juror has not denied that her son had a drinking problem.  On the questionnaire she said, "My son was treated for alcohol abuse."

THE COURT:  I had thought -- maybe I am mistaken, but I had thought that she had indicated that he had a DWI, but he had come to grips with his addiction to alcohol and he was doing much better.  And I thought that this particular statement contradicted that observation.

MS. RODRIGUEZ-COSS:  Well, then I think

Mr. Rubin needs to put a date on this particular statement --

THE COURT:  Well --

MS. RODRIGUEZ-COSS:  -- and he can submit it as a prior --

THE COURT:  -- then your objection is to lack of a date, and you can clarify that, but that is clearly a statement which is inconsistent with the statement that was presented earlier on.

But you want to clarify the date again of that?

MR. RUBIN:  Well, the question had a date in it.  Maybe it wasn't picked up.  I asked, in the years before the jury trial, the murder trial, did she express concerns about her son's ongoing drinking?  That was the question, and I think she has answered it.

THE COURT:  Okay.  All right.  So move on.

BY MR. RUBIN:

Q    Did you hear them yelling about his drinking back and forth?

A    Yes.

Q    What would she yell at him?

A    Just that he was a problem causing her many, many problems, and many headaches, to -- she had given him -- excuse me.  He had given her several headaches over the years with his problems.

Q    All right.  Did she also express concern to you in the years before the murder trial about her son's drug use?

A    Yes.

Q    And what did she say to you that led you to conclude that she was concerned about his drug use?

A    She said he'd probably be in constant trouble with the law, and if she could find who was his -- whoever his dealer was, that she'd turn 'em in.

Q    Do you know whether he was smoking marijuana in your building while they were living together in the years before the murder trial?

A    Yes, I do.

Q    Tell us about that.

A    You could smell it when you came down from upstairs and going out the front door.  You just -- could smell it coming from his apartment.  And I knew that other people in the building did not smoke.

Q    Do you believe that the juror herself had a drinking problem?

A    I do believe she did.

            MS. RODRIGUEZ-COSS:  Objection, your Honor.

            THE COURT:  Objection --

            MS. RODRIGUEZ-COSS:  What's the foundation for that?

THE COURT: -- sustained as to "do you believe." If there are observations which she has, which she can testify to.

BY MR. RUBIN:

Q    Tell us about your observations about the juror's pattern of alcohol.

MS. RODRIGUEZ-COSS: You know, we are going to have a standing objection to this line of questioning. It does not refer to any particular questions during voir dire.

THE COURT: Objection overruled. You can --

MS. RODRIGUEZ-COSS: Your Honor, they have not connected it to a specific question about --

THE COURT: Objection has been overruled. Okay, go ahead.

BY MR. RUBIN:

Q    Tell us what you observed about the juror's drinking pattern.

A    I would see *{Juror 162}* having --

Q    "The juror." It's all right. Go ahead.

A    -- the juror having beers out in the backyard when we were sitting out there, out there talking, and she stated to me that she had to have three beers every night just to cope with everything.

Q    One of the things that was said in the

questionnaire is that the juror did not file any civil complaints or any complaints to the police, the courts. While you were living with her in that building, in the years prior to the murder trial, did she file complaints with the Colchester Police Department?

A    Yes, she did.  Several.

Q    And without getting into the details, generally what was the nature of the complaints that she filed?

A    People dragging furniture across the floor above her apartment or people in the cellar working and fumes going up through the floors to her apartment.

Q    Was this happening once a year or more frequently than that?

A    I'd say probably about once a month.

THE COURT:  By the filing of civil complaints, what do you mean?  Just calling the police or --

THE WITNESS:  Yes.

THE COURT:  Just calling the police?

THE WITNESS:  Yes.

BY MR. RUBIN:

Q    And would the police come?

A    Yes, they would.

Q    And would they investigate or ask questions?

A    Yes.

MR. RUBIN:  Your Honor, I think part of the

record now already is -- has been admitted?

MR. LIMAN:  No.

MR. RUBIN:  Not yet.  Well, we have offered a number of complaints.

BY MR. RUBIN:

Q    Did the juror have a reputation in that community in which you have lived for 50 years for being truthful or untruthful?

A    Untruthful.

Q    And how do you know what her reputation was for truthfulness or lack of it?

A    With the conversations with other people that lived in the building and just by us talking about the inconsistent statements made by her to different tenants.

Q    Would other tenants over the years comment on her lack of truthfulness?

MS. RODRIGUEZ-COSS:  Objection to the request for statements of others.

THE COURT:  Pardon me?  I didn't hear that objection.

MS. RODRIGUEZ-COSS:  Objection to the request for statements of others through her, your Honor.

THE COURT:  Okay.  Objection sustained.

BY MR. RUBIN:

Q    Do you have a personal opinion, apart from the reputation she may have had, with respect to the juror's truthfulness?

A    Yes, I do.

Q    And what is your personal opinion?

A    I believe she was untruthful.

Q    And one last question regarding the juror's statement that her son had been rehabilitated 15 years before -- before the murder trial.  Did she say to you, in the years before the trial, how her son's alcohol and substance abuse had affected her over time?

MS. RODRIGUEZ-COSS:  Asked and answered, your Honor.

THE COURT:  Objection overruled.  You can answer that.

A    Yes, she did.

BY MR. RUBIN:

Q    And what did she say?

A    She said that it had caused her many headaches over the years.

MR. RUBIN:  Thank you very much.

THE COURT:  Okay.  Any cross examination?

CROSS EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    Good morning.

A    Good morning.

Q    So, Miss Ratta, you spoke to defense attorneys in this case -- Mr. Rubin -- before your testimony here today, right?

A    Right.

Q    And he -- he went to your house and asked you a number of questions?

A    Yes, he did.

Q    And he told you that Juror 162 had come into court and had been untruthful; is that correct?

A    We discussed her, yes.

Q    He told you she had been untruthful in court.

A    Yes.

Q    Okay.  He told you she had been untruthful about several things that she testified to in court.

A    Yes.

Q    He said that she had been asked whether there had been any trauma in her family and she said no.

A    That is correct.

Q    And he also said that Juror 162 had been untruthful about telling the Court about her son's criminal record; is that correct?

A    That is correct.

Q    All right.  So would it surprise you to learn that in fact in her written juror questionnaire she did

disclose that her son had a criminal record?

A     That I don't know, ma'am.

Q     All right.  You lived in the same apartment complex with Juror 162 for some years.

A     Yes.

Q     Can you tell me the exact date that Juror 162 moved in?

A     I cannot tell you the exact date.

Q     Can you tell me the month?

A     I cannot tell you the month.

Q     Can you tell me the year?

A     I cannot tell you the year.

Q     Can you give me an approximate date?

A     (Witness shakes head.)

Q     Is that because you don't remember?

A     I don't.

Q     And you don't remember because it's been a long time?

A     That is correct.

Q     You are 74 today; is that right?

A     I am 74.

Q     Would you consider that your memory is as good today as it was 10 years ago?

A     No.

Q     No?  So a little while ago, you stated that -- you

have testified that Juror 162 told you about her childhood sexual abuse, correct?

A    Correct.

Q    And you initially stated that it was about four or five years ago.  That would make it 2009, 2010?

A    It was much longer than that.

Q    It was longer than that?

A    Yes.

Q    So your initial answer was not correct?

A    I'm sorry?

Q    Your initial response to that question was not correct?

MR. RUBIN:  Objection.  Objection.  She is characterizing the evidence.  She can ask the witness what she said.

THE COURT:  Objection overruled.  She can pursue the timing of the observation.

So go ahead.  Do you want -- have you got a pending question?

A    It was much longer ago, ma'am.

BY MS. RODRIGUEZ-COSS:

Q    It was much longer ago?

A    Yes.

Q    And then you said it was prior to the trial.

A    It was.

Q    And the trial that you are referring to is the trial of Donald Fell?

A    Correct.

Q    And do you remember when that trial took place?

A    I'm not -- I don't know the exact dates.

Q    Do you recall the year?

A    In the 2000s.

Q    In the 2000s.  But you don't know when in the 2000s?

A    No, ma'am, I do not.

Q    Okay.  You said that at some point in time, while you were neighbors with Juror 162, her son moved in with her.

A    That is correct.

Q    Do you remember the year when that happened?

A    No, ma'am.

Q    Do you remember -- do you know where he was living before he moved in with her?

A    No, I do not.

Q    Do you know if his intent, when he moved in with her, was to live with her permanently?

A    No, it was not.

Q    It was not.  Okay.  So he intended to just stay with her until he found a place of his own?

A    That's correct.

Q    So did I hear you say that you worked at the same hospital where Juror 162 worked?

A    Yes, we did.

Q    Okay.  And did she work -- did you -- both of you work there before she moved in next door to you?

A    Yes.

Q    Okay.  Did you know her before she moved in next door to you?

A    No, I did not.

Q    So you were working at the same hospital that she worked at for some time, but you did not know her?

A    I worked at the main hospital.  She worked at UHC, at admitting down at UHC, which was the old DeGoesbriand Hospital.

Q    Okay.  And since she moved out from living next door to you, have you seen her or spoken to her?

A    No, I have not.

Q    So you have not kept in touch with each other?

A    No, we have not.

Q    And when was that?

A    Why was that?

Q    No, when -- when was it that she moved out?

A    I do not remember the exact date.

Q    You don't remember?

A    No, ma'am.

Q    Okay.  Sometime after the trial?

A    Yes.

Q    Okay.  And would it also be fair to say that you don't remember exactly for how long her son stayed with her before he moved into next door?

A    Not exactly.

Q    Okay.  And when she -- you talked about having a conversation with her in the backyard, and her telling you about her childhood sexual abuse, correct?  And when she told you about that, did she have any apprehensions about discussing that with you?

A    Say that again, please, ma'am.

Q    Did she appear to have any apprehension about discussing that with you, or was it a casual conversation she had with you?

A    It was a passing comment.  She made that comment, the subject was dropped.

Q    All right.  She didn't ask you to keep it a secret, obviously?

A    I'm sorry?

Q    She didn't ask you to keep it a secret?

A    No.

Q    And with regards to your observations about her drinking, you would observe her -- or you said you observed her -- no, I think that you -- I believe you

said you had a conversation with her --

A    I did.

Q    -- in the backyard --

A    Yes.

Q    -- of your complex?

A    Yes.

Q    I gather it was sort of a meeting place for neighbors?

A    Again, please.

Q    It was a meeting place for neighbors?

A    Yes.

Q    And she said that sometimes she would have three beers in a day; is that right?

A    Correct.

Q    Okay.  So you didn't observe her drinking three beers every day?

A    No, but I have observed her drinking beer.

Q    Okay.  But you didn't observe her drink three beers every day?

A    No.

Q    No.  It was a comment she made to you.  It was a comment she made to you.

A    Yes.

MS. RODRIGUEZ-COSS:  Your Honor, with the Court's indulgence?

THE COURT: Yes.

(Brief pause.)

MS. RODRIGUEZ-COSS: Just one last --

THE COURT: Yes.

BY MS. RODRIGUEZ-COSS:

Q   Miss Ratta, you stated, to questions by Mr. Rubin, that in the years before the trial, the juror commented to you that she was driving her -- her son around --

A   That is correct.

Q   -- because he had had another DWI, correct?

A   Yes.

Q   Okay. Do you remember when that was?

A   No, I don't.

Q   So the years before the trial could be five, six, seven, 10 years before the trial?

A   Correct.

Q   Okay. You couldn't put a -- your finger on -- on a particular year?

A   No, ma'am.

Q   Okay. And you said that the son had lost his license. And fair to say it's been almost 10 years since the trial took place? Do you know that or --

A   Could you repeat that, please?

Q   Is it fair to say that it's been almost 10 years since the trial took place?

A    Yes.

Q    Okay.  So could it have been after the trial?

A    No, ma'am.

Q    It was before the trial?

A    It was before.

Q    Okay.  So sometime before the trial he had lost his license?

A    Yes.

Q    Do you know if he regained it?  Do you know if he regained it and then lost it again?

A    No, I do not.

Q    You do not know that.  Okay.

MS. RODRIGUEZ-COSS:  Thanks, your Honor.  We have nothing further.

THE COURT:  Okay?

REDIRECT EXAMINATION

BY MR. RUBIN:

Q    When she told you in the backyard that she had been sexually abused as a child, was anybody else there?

A    No.

Q    And the prosecutor asked you about your memory.  Is your memory good enough to remember what happened over those years as you testified here today?

A    When {Juror 162} testified?  When she was --

Q    No.  I want to know whether any issues you have

with your memory because you are 74 has affected your testimony, your testimony today.

MS. RODRIGUEZ-COSS: Your Honor, isn't that for the Court to determine?

THE COURT: Well, this is an assessment of her memory. She can make a self-assessment.

So, can you respond to that question?

THE WITNESS: Repeat the question, please.

BY MR. RUBIN:

Q    You said that your memory wasn't as good now as it was when you were younger, right?

A    That is correct.

Q    Has any loss of your memory affected your ability to testify about what happened as you have done here today?

A    No. No, sir.

MR. RUBIN: Thank you.

THE COURT: Okay?

MS. RODRIGUEZ-COSS: Nothing further.

THE COURT: Ms. Rodriguez-Coss, any --

I just want to ask one general question.

She was living on that first floor for approximately how long before she left?

THE WITNESS: Approximately five, six years.

THE COURT: So you think she was there five or

six years total?

THE WITNESS:  Yes.

THE COURT:  And her son, how much time was he there?  Was he that whole period or --

THE WITNESS:  He probably lived in the building for approximately four -- three or four years all told.

THE COURT:  Okay.  And do you know if he was living there at the time when she described being involved in a murder trial?

THE WITNESS:  No, he was not.

THE COURT:  Okay.  All right?  Anything further for the defense?

MR. RUBIN:  Nothing.

THE COURT:  Anything further from the government?

MS. RODRIGUEZ-COSS:  (Shakes head.)

THE COURT:  Okay.  Thank you.

(Witness excused.)

THE COURT:  Okay.  Mr. Liman?

MR. LIMAN:  We call Susan Widener.

SUZANN WIDENER,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

THE COURT:  Good morning, Ms. Widener.

THE WITNESS:  Good morning.

THE COURT:  Is she going to be referring to a juror?

MR. LIMAN:  Yes.  I think it's appropriate; she is going to be referring to Juror 162.

THE COURT:  Okay.

MR. LIMAN:  I have given her the instruction, but I think it would be helpful for the Court to remind her.

THE COURT:  Okay.  We are not using the names.

THE WITNESS:  Yes.

THE COURT:  And I think you are going to be asked about Juror 162, so rather than refer to her by name, if you would refer to her either as "juror" or as "Juror 162."

THE WITNESS:  Okay.

THE COURT:  All right?  Okay.

                DIRECT EXAMINATION

BY MR. LIMAN:

Q    Good morning, Miss Widener.  How are you?

A    Good morning.  Good.  How are you?

Q    Okay.  Have you ever been known by any other names?

A    Yes.  Suzann Justice and Suzann Ballard.

Q    And is Suzann Justice your prior married name?

A    Yes, it was.

Q    Would you describe your educational background?

A    Um, I have an Associate's degree in social services.

Q    And where did you get your Associate's degree from?

A    Champlain College.

Q    And is that right here in -- in Burlington, Vermont?

A    Yes, it is.

Q    Approximately when did you get your Associate's degree?

A    2003.

Q    And is it 2003 or 1993?

A    I mean, I'm sorry, 1993.

Q    And can you tell us, tell the Court what you did for a living after getting your Associate's degree?

A    I started out as an instructional assistant at a local high school working with mainly boys with severe behavioral and learning problems.

Q    Is that something that you had studied at -- at school, at Champlain?

A    Yeah.  It wasn't my main study, but, yes.  And the --

Q    Okay --

A    I moved on --

Q    How long did you work there for?

A    I only worked there for about a year and a half.

Q    What did you do next?

A    And then I went on to work at Head Start.  I started out as a home visitor and then a family advocate, which was much more in my line of work as far as social services goes.

Q    And were you doing that right here in Vermont?

A    Yes, I was.

Q    In Burlington?

A    Um, I did some in Essex, some Winooski, and some Burlington.  That's where the families that I worked with lived.

          MR. LIMAN:  If you move forward, maybe -- the microphone is right in front of you.  You see it there?  If you put it in front of you.  Put it down.

BY MR. LIMAN:

Q    How long, approximately, did you work for Head Start?

A    Approximately seven years.

Q    Where are you from originally?

A    Essex Junction, Vermont.

Q    And do you have family?

A    Yes.

Q    Would you tell us about your family?

A    Um, I have my parents who live in Essex, and my

sister and her husband and nephew also live in Essex. My daughter -- I have a daughter and a grandson that also live in Essex. And a brother that lives in Milton. And many nieces and nephews.

Q    How old is your daughter?

A    She's 23.

Q    What do you do now for a living?

A    I'm -- well, I am a homemaker, and I am on disability for health problems.

Q    Now, I want to direct --

MS. RODRIGUEZ-COSS:  I didn't quite understand the last phrase.

THE COURT:  She is on disability for health problems.

MS. RODRIGUEZ-COSS:  Health problems.

THE COURT:  Um-hum.

BY MR. LIMAN:

Q    I want to direct your attention to the period from the late 1980s until around 2003, 2004. Were you -- where were you living during that time period?

A    Um, in -- approximately around 1989, I moved to Colchester, to Bay Road.

Q    And where on Bay Road did you move to?

A    It was 76 Bay Road until 911, and then it was 532, I believe, or -- 5 --

Q    The number changed after 911.

A    Yeah, the number changed after 911.  Our mailing address was still 76 Bay Road, but as far as for 911, it changed to --

Q    A different number; is that fair?

A    Yes.  5 -- I can't -- something.  I can't remember the exact number.

Q    Okay.

THE COURT:  If you could just move up a little bit closer to the microphone.  Your voice tends to lower, so --

THE WITNESS:  I'm sorry.  I don't have much room.

MS. RODRIGUEZ-COSS:  The microphone may move to you.  It doesn't?  Oh.

THE COURT:  Or just try to speak up if you can.

THE WITNESS:  All right.  I'm sorry.

THE COURT:  That's okay.

MS. RODRIGUEZ-COSS:  That's better.

BY MR. LIMAN:

Q    Do you recall approximately when you moved out of the building on Bay Road?

A    Approximately 2003 or 2004.

Q    Okay.  Who was the landlord of the building at Bay

Road?

A    Donald Gonyeau.

Q    And is he any relationship to you?

A    Yes, he is my uncle.

Q    Were there other buildings in the same complex that 76 Bay Road was part of?

A    Yes.  It wasn't a complex, but it was like on a main street.  There was another apartment right next to it that my uncle also owned.  They were side by side.

Q    Did they share any facilities?

A    Yes.  The laundry room was shared.  There were four apartments in each building.

Q    And did they share a backyard between the two buildings?

A    Yeah.

Q    Now, during the period of time that you lived at the building on Bay Road, did you know the woman we're referring to as Juror 162?

A    Yes, I did.

Q    Was she your neighbor?

A    Yes, she was.

Q    Was she your neighbor during the entire time that you were on Bay Road or just a portion of the time?

A    A portion of the time.

Q    And do you recall how long approximately that she

was your neighbor?

A    I would say that she moved in approximately in 1998 or '99, and she was there until we moved out.

Q    So when you -- when you moved out, was she still living there?

A    Yes, she was.

Q    And during the period of time that you were on Bay Road, did you know a man named Patrick Ryan?

A    Yes, I did.

Q    And did you know what Patrick Ryan's relationship was to Juror 162?

A    Yes.

Q    What was the relationship?

A    It was her son.

Q    Was Mr. Ryan living in the building while you were in the building?

A    Yes, he was.

Q    Do you recall approximately when he moved into the -- into the building?

A    He moved in shortly after the juror did.  I cannot say the exact date, but I'd say it was within a year.

Q    And when you moved out of the building, was Patrick Ryan still living in the building?

A    Yes, he was.  At that time he was renting an apartment across the hall.  Before that he lived in the

same apartment as the juror.

Q    Okay.  And do you recall, not by number but by location, which apartment the juror was living in?

A    Yes.

Q    Is it correct that the Bay Road apartment building had four apartments?

A    It did.

Q    And there were two on the bottom and two on the top?

A    Correct.

Q    And so if you are facing Bay Road, do you -- the building, where was Juror 162?

A    If you were facing and looking at the building, she lived on the lower left, and I lived on the upper right.

Q    And you mentioned that Mr. Ryan was living with Juror 162; is that correct, for a period of time?

A    Yes, that is correct.

Q    Do you recall approximately how long Mr. Ryan was living with Juror 162?

A    I am not sure on the date.  A year or -- approximately.

Q    Is that your best estimate?

A    Yeah, and then he --

        THE COURT:  Can I interrupt for a second.

        Ms. Ratta-Roberts, where did she live?  Was she on

the upstairs right?

THE WITNESS:  She was on the upstairs right.

THE COURT:  Okay.  Were you on the upstairs right?

THE WITNESS:  I was on the upstairs left.

THE COURT:  Oh, I'm sorry.  I thought you said you were on the upstairs right.  You're on the upstairs left?

THE WITNESS:  I maybe did, and I apologize.  No, I was on the upstairs left.  She -- Ms. Roberts was on the upstairs right.  And the juror was on the bottom left.

THE COURT:  Okay.  So the juror was right below you?

THE WITNESS:  Yes, she was.

THE COURT:  Okay.

MR. LIMAN:  Your Honor, maybe it's easier if I ask the witness to mark up Exhibit 45A, what we'll designate as 45B.

BY MR. LIMAN:

Q    I am now placing in front of you an exhibit that's been marked as 45A.  And do you recognize that as the building that you lived in?

A    Yes, I do.

Q    And you see it says 573 on the --

A    Yes.

Q    Does that refresh your recollection?

A    Yes, it does.

Q    And after 911, what was the number of the building?

A    The building was 573.  That's correct.

Q    And you see that there's a -- the bottom left has some handwriting that says "PR and juror"?

A    Um-hum.  Yes.

Q    And do you recognize that as the apartment --

A    That was the apartment she lived in.

Q    With Mr. Ryan?

A    Correct.

Q    And then it says next to it "PR."  Do you see that?

A    Yes.  That's where Patrick lived when the apartment came open.

Q    And after he moved out of the apartment with juror -- the juror?

A    Yes.

Q    Okay.  And now I am going to give you my pen, which is blue, and ask you if you can mark on 45A where your apartment was and where Ms. Ratta-Roberts' apartment was.

A    Do you want me to just write initials?

Q    Yeah, why don't you put your initials.

A    Should I use the initials as what they were at the

time?

Q    Um, that will -- let me ask you, at the time, what was your name, your last name?

A    Suzann Justice.

Q    So why don't you write "SJ."

A    Okay.

Q    And then why don't you write "JRR" for Ms. Ratta-Roberts.

A    (Witness complied.)

Q    And so is it correct that for you, you have got -- you lived right above where the juror and her son lived?

A    Yes, it is.

Q    And then Ms. Ratta-Roberts lived right above the apartment that Mr. Ryan moved into?

A    Yes, that's correct.

MR. LIMAN:  And, your Honor, we would move -- well, I guess 45A is in evidence.  I don't need to.

THE COURT:  That becomes 45B.  And is there any objection to 45A -- B being admitted in evidence? That's the marking of 45A to make it 45B.

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  Okay.  So admitted.

(Defendant's Exhibit 45B was received in evidence.)

BY MR. LIMAN:

Q    Now, while you and the juror were living at Bay Road, would you talk to the juror from time to time?

A    Yes.

Q    What were the circumstances or the occasions in which you and the juror would have conversations?

A    Often when coming and going, but most often when I went to the apartment building next door to do laundry or if we were outside hanging our laundry or if I was just out back with my daughter.

Q    And is it fair to say that you would talk to her frequently?

A    Yeah.

Q    It's a small building.  Would you hear the juror -- overhear the juror from time to time?

A    Yes, I did.

Q    And can you tell us about that?

MS. RODRIGUEZ-COSS:  Objection, your Honor. Relevance.  Hearsay.

THE COURT:  Objection --

MR. LIMAN:  It's laying a foundation.

THE COURT:  Objection overruled.  Go ahead.

A    There was a lot of yelling.  Do you want me to tell you specific --

BY MR. LIMAN:

Q    No.  For now, is it fair to say you would overhear

her because there's yelling?

A    Yeah, I would overhear lots of yelling and --
yelling in the hallway.

Q    Now --

MS. RODRIGUEZ-COSS:  Move to strike,
your Honor.  It's completely irrelevant.

THE COURT:  Objection overruled.  So go ahead.

BY MR. LIMAN:

Q    During the time period that the two of you were
living in the building, did the juror ever call the
police with respect to you?

A    Yes, she did.

Q    And were there occasions where you also felt
compelled to call the police with respect to her?

A    Yes, I did have to.

Q    And can you describe the circumstances?

MS. RODRIGUEZ-COSS:  I'm sorry, the
circumstances that the witness called the police,
your Honor?  We would move to strike.

THE COURT:  I think she is talking -- he is
asking the question as to whether or not you called the
police, and then describe the circumstances under which
you called the police.

Is that the question?

MR. LIMAN:  That is the question.

THE COURT: Okay.

A    There was an incident where I was in my house sitting watching TV, my daughter was in bed, and all of a sudden I heard screaming, like top-of-your-lungs screaming, coming from the hallway. So both myself and Miss Roberts came out, and she was screaming, and you could see spit flying, and she was yelling, "It's people like you that make people commit suicide." And it continued and continued. We tried to calm her down. We tried to ignore it. But I had a daughter at home that did not need to hear that, so I did have to call the police, and while I was on the phone with the police, they heard the screaming.

Q    Now, during the time the Juror 162 was your neighbor, did you ever have a conversation with her on the subject of whether she had been the victim of sexual abuse when she was a child?

A    Yes, I did.

THE COURT: Can I just -- just before you change the topic, can I just go back to that episode in which you heard screaming.

Was the screaming directed at you or was the screaming --

THE WITNESS: I'm not sure where it was directed, because both myself and Miss Roberts were in

the hallway, and she was saying, "It's people like you." So I don't know exactly what "people like you" mean, if it was directed at me, if it was directed at both of us.

THE COURT:  Oh, all right.  So you don't know if it was directed at her son, for instance --

THE WITNESS:  No.

THE COURT:  -- or some other person?

THE WITNESS:  She was looking upstairs at us, so I would definitely say it was directed at us.  Her son was -- well, I don't think he -- I don't even think he was there at the time, you know, in the apartment.  I think he had gone somewhere.

MR. LIMAN:  I'll link it all up, your Honor.

BY MR. LIMAN:

Q    Now, do you recall what the juror said on the subject of whether, when she was a child, she had been the victim of child sexual abuse?

A    Yes, I do.  I do not remember exactly how the conversation came up, but -- she had told me as a child she was molested.

Q    Do you recall where you were when she said this?

A    We were in the backyard.

Q    And was it just the two of you or were there others there?

A    No, it was just the two of us.

Q    Do you recall anything else about the conversation right now?

A    Just discussing that.

Q    Now, during the time period that you and Patrick and Juror 162 were living in the building on Bay Road, did you ever have a conversation with the juror about whether Patrick had or was having any problems with the law?

A    Yes.  She had told me that since he was approximately 17, that he had had trouble with the law, and at that time -- or approximately around that time, he had been in trouble with the law for a DWI, and it was -- I believe it was like his fourth, third or fourth.

Q    And do you recall her saying anything to you about the subject of whether Patrick had been arrested for an assault?

A    Yes.  On his girlfriend.

Q    What do you recall her saying about that?

A    I remember her telling me that he was arrested for assault on his girlfriend, but she -- I'm sorry.  Excuse me.  She also stated that he did not do it.

Q    Okay.  Now, based on the time that you were in the building with Juror 162, do you have a personal opinion about Juror 162's character for truthfulness?

MS. RODRIGUEZ-COSS:  Your Honor, we object.

THE COURT:  Objection's overruled.  You can answer that.

MS. RODRIGUEZ-COSS:  Your Honor, may we place our objection on the record.  I think to solicit her reputation as her -- you know, for character for truthfulness, it can't just be that she knows the juror --

THE COURT:  Actual- --

MS. RODRIGUEZ-COSS:  -- and has had limited conversation with the juror.  She must know the juror's reputation in the community.

THE COURT:  Well --

MS. RODRIGUEZ-COSS:  And there's been no foundation as to that here.

THE COURT:  Actually, the rule has been changed.  The rule now covers not only the reputation but also the opinion, and to the extent that it is relevant, she can express that.  So go ahead.

MR. LIMAN:  Thank you, your Honor.

A    My opinion was she was not an honest woman at all.

BY MR. LIMAN:

Q    And do you have -- do you know what Juror 162's reputation -- withdrawn.

Did Juror 162 have a reputation in the community

for having a character for truthfulness --

A    Amongst two apartment buildings, there were many people that felt she was not an honest woman.

MS. RODRIGUEZ-COSS:  Same objection, your Honor.  Same objection.

THE COURT:  And under Rule 405, which talks about the use of reputation and also opinion, this is admissible.  So objection's overruled.  Go ahead.

MR. LIMAN:  One moment.

(Brief pause.)

MR. LIMAN:  I have got nothing further.  Thank you.

THE COURT:  And just to clarify that, under Rule 405(a), By reputation or opinion when evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion.

And since I was a trial lawyer, I think it's been changed.

MR. LIMAN:  Should I -- I have the original exhibit.  Should I put it on the witness stand?

THE COURT:  The original, yes.  That's fine. Well, actually, why don't you give it to Ms. Rodriguez-Coss and see if she wants to use it.

MS. RODRIGUEZ-COSS:  Thanks.

THE COURT:  Actually, it is 11:15 -- or quarter of 11.  This is the time we usually take a break.  You want to take a break just before --

MS. RODRIGUEZ-COSS:  I'd rather just finish. I won't be very long.  It wasn't very long testimony.

THE COURT:  Okay.

CROSS EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    So is it Justice Widener or Widener?

A    Yes.

Q    And I think you said you went by another name, that of Bowers.  Did I catch that right?

A    Ballard.

Q    Oh, Ballard, like B-A-L-L-A-R-D?

A    Yes.  That's my birth name.

Q    Okay.  And so I gather you got married again?

A    Yes, I did.

Q    And you said you moved into Bay Road sometime in '89; is that correct?

A    Approximately.

Q    Approximately in 1989.

A    Yes.

Q    Okay.  And to the best of your recollection, Juror 162 moved in around 1998, 1999?

A    Yes, approximately.

Q    So approximately 10 years later or so?  After you had been living there?

A    I would guess that would be right.

Q    And you had a daughter while you were living there?

A    Yes, I did.

Q    And do you remember telling Miss Delpha of the FBI that you -- your daughter is currently 23?

A    Yes.

Q    And that you moved out of Bay Road when she was 10 or 11?

A    No.

Q    You don't remember telling Miss Delpha that?

A    No.

Q    No.  How old was your daughter when you moved out?

A    She was in 8th grade, so she would have been around 13.

Q    Okay.  So that would put it where, at like 10 years ago you moved out?

A    Approximately.  I would say in 2000 -- yeah, about 2003, 2004.

Q    She graduated from 8th grade while she was at Bay Road?

A    No, she did not.  She continued to go to school in Essex.

Q    Okay.  Did she start 8th grade there?

A     No, she did not.

Q     So she was not in 8th grade then.  So did she finish 7th grade there?

A     Yes.

Q     And she finished 7th grade there, and you moved out?

A     And part of 8th.

Q     Okay.  I thought you said she did not start 8th grade.

A     She started 8th grade, part of 8th grade in Colchester, and then continued on to Essex.

Q     All right.  So you moved out then in 2003?

A     2003, 2004, approximately.

Q     You can't be sure of the date?

A     I -- it was 2003, 2004.

Q     Okay.  And Juror 162 is still living there?

A     Yes, she was.

Q     And when she moved in, her son was not living there?

A     No, he was not.

Q     He moved in later?

A     Yes.

Q     Do you remember when?

A     Well, I would -- it was within a year.

Q     Within a year of what?

A    After her moving in.

Q    Within a year of her moving in, her son moved in. Are you sure about that?

A    To the best of my knowledge.

Q    To the best of your recollection?

A    Yes.

Q    So you could be wrong.  That would put it at 2000.

A    She moved in around 1989.

Q    So that would put her around '99 then?

A    Approximately, to the best of my knowledge.

Q    And then you moved in with her for --

THE COURT:  Well, you said 1989 and you said '99.  Did -- she moved in approximately what year?

THE WITNESS:  1999 or 1990.  I can't be --

THE COURT:  So you were mistaken when she said --

THE WITNESS:  Did I say '89?

THE COURT:  You actually said '89.

THE WITNESS:  Yeah.  Yes, I --

THE COURT:  Okay.

THE WITNESS:  My daughter wasn't even born in '89, so I don't know why I said that.  I apologize. Excuse me.

THE COURT:  But Ms. Rodriguez-Coss said 1999, so I thought --

BY MS. RODRIGUEZ-COSS:

Q    You said you weren't even born in '89?  What?

A    I said my daughter was not born.

Q    Oh, your daughter was not born in '89.

A    No, she was born in 1990.

Q    I see.

A    So I transposed numbers.  I do do that.

Q    You transpose numbers?

A    Sometimes.

Q    You did indicate that you were having some health problems?

A    Yes.

Q    And were -- generally, in relation to what?

A    Excuse me?

Q    Your health problems.

A    Are you asking me what they are?

Q    Yes.

A    I have fibromyalgia and degenerative disk disease in my back.

Q    And that keeps you from working?

A    Yes, it does.

Q    Okay.  Do the medications that you take for your condition affect your memory in any way?

A    Absolutely not.

Q    So you -- presumably, you would be on pain killers?

A   I do take some, yes.

Q   Pretty strong pain killers?

A   If you want to call them that.

Q   Is -- I mean, am I misunderstanding your condition? Isn't that a pain-causing condition?

A   Yes.

Q   You take those daily?

A   Yes.

Q   Do they sometimes make you sleepy?

A   No.

Q   Never?

A   No.

Q   And so sometime after she moved in, her son moved in?

A   Yes.

Q   You just can't be certain of the date.  And he moves in initially with her?

A   Yes.

Q   And stays with her for a period of time.

A   Yes, until an apartment across the hall opened up.

Q   All right.  And do you know where he lived before that?

A   Before he lived with the juror?

Q   Before he came to Bay Road, right.

A   He lived with a girlfriend somewhere.

Q    He lived with a girlfriend somewhere?

A    I believe.

Q    Okay.  Are you sure?

A    No.  I mean, I'm not sure.

Q    Okay.  Do you know if he had been in prison?

A    I know he had been in jail at some point in time.

Q    You don't know when?

A    The exact dates, no.

Q    And defense counsel interviewed you before your testimony here today, correct?

A    Yes.

Q    And did he lead you to believe that Juror 162 had not been honest in court?

A    No.  That's my opinion.

Q    That's your opinion.  You didn't tell the FBI agent that interviewed you that Mr. Liman --

A    I'm not sure what you're asking.

Q    Let me finish my question and I'll clarify.

     Did you not tell the FBI agent who interviewed you that Mr. Liman had led you to believe that Juror 162 had answered some questions untruthfully?

A    Led me to believe -- what do you mean exactly by led me to believe?

Q    Mr. Liman told you that Juror 162 had provided some responses in court that were not correct, were not

honest.

A    Yes.

Q    Okay.  And they had to do with her son's criminal record.  Correct?

A    Not only that.

Q    Not only.  But including that?

A    Yes.

Q    Okay.  So he didn't tell you that she actually informed the Court that her son had a criminal record?

A    I'm -- I believe she said that he had had a criminal record when he was 17 but had been in no trouble since then.

Q    All right.  So if -- if Juror 162 told the Court that in fact her son had been convicted of DWI and domestic violence, that would be a surprise to you?

A    No, because --

Q    It would not be a surprise to you?

A    -- she said he was in trouble at 17.  He was much older than 17 when he moved in, and he got into trouble after the age of 17.

Q    So when you say that she said he had been in trouble when he was 17, that's -- is that what the defense told you that she said in court?

A    No.

Q    No?

A    That's what she told me.

Q    Oh, she told you that her son had been in trouble when he was 17?

A    Yeah, and that he had not really been in any trouble since then, until he was in trouble again.

Q    Okay.  So you are referring to conversations you had with Juror 162 while you were -- while you were neighbors.

A    Yes.

Q    Not what she might have said in court then.

A    I was also asked if I remembered her mentioning anything.

Q    Okay.  Now, when you leave Bay Road, is her son still living there?

A    Yes, he was.

Q    And when did you leave?

A    It was approximately 2003, 2004.

Q    So he was still living in his apartment there?

A    Yes, he was.

Q    And was Juror 162 still living there?

A    Yes, she was.

Q    Was that before or after the trial?

A    That was before the trial.

Q    Before the trial.  So while Juror 162 is on trial, you did not --

A    No, I did not.

Q    You were not neighbors?

A    No.

Q    You did not speak to her.  And were you close friends?

A    No.

Q    No.

A    Not really.

Q    Did you socialize with her?

A    Yes.

Q    So was your socialization limited to the conversations you would have when you were both doing laundry?

A    We -- no.  We talked at other times.  She was my neighbor.  I mean --

Q    Did you invite her into your home?

A    In the beginning.

Q    And would she come?

A    Yes.

Q    And you got -- you would socialize with her, have conversations with her?

A    It -- she didn't stay long.

Q    Okay.  Did you have other interactions with her other than the ones you have described to the Court?

A    We spoke often, if we were both outside, and there

were incidents of disagreement.

Q    So there were incidents of disagreement between you and her?

A    Yes.

Q    So you had arguments?

A    Disagreements.

Q    Okay.  So would -- since you moved out of Bay Road, have you had any contact with her?

A    I have seen her in the store --

Q    Okay.

A    -- and said hello to her, but no.

Q    But that's it?

A    Yeah.

Q    All right.  So you didn't keep in touch with her?

A    No.

Q    You didn't maintain a friendship with her?

A    No.

Q    All right.  And when you had surgery, did she help you in any way?

A    When -- shortly after she first moved in, I did have surgery, and she did cook meals for us and brought them up.

Q    For you and your daughter?

A    For me and my husband and my daughter, and brought them up.

Q    Is that the sort of socialization you referred to when you first moved in?  You guys --

A    Yeah.

MS. RODRIGUEZ-COSS:  An indulgence, your Honor?

(Brief pause.)

MS. RODRIGUEZ-COSS:  We have nothing further, your Honor.

THE COURT:  Okay.  Mr. --

MR. LIMAN:  Nothing further.  We do have a matter that we would like to address with the Court during -- before the recess, but nothing of this witness.

THE COURT:  Thank you, Miss Widener.

THE WITNESS:  You're welcome.

(Witness excused.)

THE COURT:  All right.  You have an issue to raise before the break?

MR. LIMAN:  Your Honor, as you are aware and as the government informed all of us yesterday, they expect to call Juror 162 this afternoon.  Pursuant to the understanding of the parties, Juror 162 was not in the courtroom this morning for the testimony.

In light of the nature of the testimony, we would ask that the Court direct that the juror not be informed

about the testimony that took place in the courtroom this morning. That's just an application of the sequestration rule. It would be ordinary for the juror to be excluded during the testimony. The same rule would apply during the recess.

THE COURT: Well, that's a little broad application of the rule. Generally speaking, if a witness is to be testifying, the lawyer who calls the witness may want to ask questions of the witness regarding her memory of particular incidents or episodes, and I appreciate that may be logically inconsistent and -- at least to some extent with the sequestration rule, but that's generally, you know, what happens.

She's not present in the courtroom, but lawyers generally ask the questions in advance to see if she -- she has any memory of this particular incident or these particular episodes. And how are you prejudiced by that?

MR. LIMAN: Well, I think we are prejudiced in that the credibility of Juror 162 is very much at issue. It's one of the central issues.

THE COURT: Yeah, and then the logical response is that when this -- when Juror 162 testifies, then you have the opportunity to find out exactly what

was said by counsel to the witness and just as, obviously, the government's counsel has done in regard to these particular witnesses. And I am not so sure it -- you know, it makes any difference as to whether that kind of testimony relates to statements that lawyers made to the witness way in advance or right in advance as a result of testimony. But, anyway.

What's the government's response to that?

MS. RODRIGUEZ-COSS: Your Honor, I think the Court is correct. I mean, I don't plan to bring a transcript of the testimony from the court this morning, but I do believe the government's entitled to ask, Do you know this person? And what was your relationship with this person? And to what extent did you relate to this person while you were neighbors? And what problems, if any, did you have with this person? And what interactions did you have with this person?

THE COURT: Yeah, I think that that's appropriate. I appreciate that there is some conflict with the sequestration rule here, but that's the standard way that's been addressed in the future -- in the past, and the defense obviously is going to have an opportunity to question the witness about everything that was said by the lawyer to impeach the testimony of that witness. So it seems to me that that's the better

way of approaching this issue.

I am not going to restrict the government from asking her what her relationship was like with these particular witnesses and, in fact, asking her about any incidents. But you certainly have the opportunity to cross examine her in regard to whatever statements were made to her.

All right, anything further at this point? Let's take --

MR. LIMAN: Our next witness involves a videotape, and we will set that up in advance, so --

THE COURT: It's a videotape?

MR. LIMAN: There's a videotape.

THE COURT: Okay. So who do you have left?

MR. LIMAN: One more witness.

THE COURT: Is that Mr. Buell talking about the video of 143?

MR. LIMAN: Of Rutland. And that will be it. I expect that he will be relatively short.

THE COURT: Okay. But he has to testify?

MR. LIMAN: He has to testify to authenticate the tape and to establish that it's a fair and accurate representation, and then we would propose to play the tape for the Court, an opportunity to be cross examined.

MS. RODRIGUEZ-COSS: Your Honor, we have

objected to -- to the testimony of Mr. Buell. We think it's highly irregular. In fact, I have never had an attorney on the other side pretend to testify to a matter in a case where he is currently representing one of the parties.

We have raised it with the defense team last night. We think it's highly irregular. We would object to the attorney from the other side --

THE COURT: Well, I would agree with you it would be highly irregular if he was to testify about his own observations or testify as an expert witness or anything other than identifying a particular video.

MS. RODRIGUEZ-COSS: But --

THE COURT: Basically what --

MS. RODRIGUEZ-COSS: It's a video that he himself made, and so it necessarily entails his own personal observations and his own appreciation of what he is recording. In creating the video, he is deciding what to record and what not to record, and how is that not his own personal impressions?

THE COURT: That -- it may be that he makes the ultimate choice as to what to record and what not to record. He can testify, it seems to me, to authenticate the videotape: This is what existed between the house, as I assume he is going to testify to, and the Price

Chopper, and this is when the images were taken.

You have a much better objection when it comes to questions about what does this mean for the defense's case. Then he is testifying as a witness on an ultimate theory of the defense. And that would be inappropriate for a lawyer. But to actually identify a particular video exhibit, and this is where it was taken --

MS. RODRIGUEZ-COSS: Well --

THE COURT: -- that's it.

MS. RODRIGUEZ-COSS: -- this is the thing: Then we would object to the admissibility of the videotapes because without accompanying testimony that relates the videotape to the testimony that's already been admitted by the Court, it's irrelevant. Correct?

THE COURT: Well, I don't know if that's true. I haven't seen the video. But if you are essentially just introducing a videotape, this is what it looks like between the house, into the alleyway to Price Chopper, and this is when it's taken, this is the details, the foundation of the introduction of this particular video, that's fine.

Assuming that there's no theories or arguments, et cetera, about its particular relevance, then I assume that you have, at the end, an objection. If there's no relevance of this particular videotape, there's no one

who can actually suggest that it's relevant, then I'd address the relevance question.

But here, this is just a foundation question, and, you know, anyone can testify, assuming that they have got the knowledge to the foundation of a videotape, as long as you don't get into the theories.

Mr. Liman, are you doing the examination of Mr. Buell?

MR. LIMAN: I am doing the examination. I think I understand the guidelines and the rules. He will testify where he went. He will testify that the videotape is a fair and accurate representation of the route that he took. He will testify with respect solely to the assumptions that -- for the foundation of where he went. So we will lay that out.

As to whether those assumptions are well grounded or not, that's a matter for argument. He is not going to be talking about whether he believes those assumptions are well grounded or not.

And then we will play the videotape. He will point out where on the videotape the visual depiction is and how it relates to -- and where it is in Rutland and where it is in relationship --

THE COURT: Well, if he is testifying to the actual identifying factors of the videotape and that's

it, that's fine.  Then he can use assumptions to say, well, based upon general assumptions, you know that Mr. Fell went from this particular residence, which is, again, partly an assumption, all the way down to the Price Chopper, and this is what it looks like, that's fine.

I guess the devil is in the details.  You can't get him to testify about this is what my theory is or this is why I think this is particularly relevant, because that's a lawyer advocating for the --

MR. LIMAN:  And he doesn't have any personal knowledge.  That would not be witness testimony.

THE COURT:  Yeah, I think that he can certainly lay the foundation, this is what it looks like, that's it.  And then you don't get into a whole using a witness to argue your case, which is of course totally inappropriate.

MS. RODRIGUEZ-COSS:  But of course -- so he provides the foundation:  That's the videotape that I took --

THE COURT:  I'm sorry, that's the videotape I took?  Right.

MS. RODRIGUEZ-COSS:  That's the videotape I took.  It accurately reflects what I videotaped.  It represents that it's a Price Chopper, and in fact that

is an accurate image of the Price Chopper as I observed it in, whatever date, 2014.  Right?

THE COURT:  Um-hum.

MS. RODRIGUEZ-COSS:  For them -- that merely provides the foundation for the authentication of the videotape.  That does not provide the other element for admissibility, which is, how is that relevant?  Why should it be admitted into evidence?

THE COURT:  That is a totally separate question.

MS. RODRIGUEZ-COSS:  He is going to connect --

THE COURT:  He is not to testify about that because he is a witness.  So I assume that you will both rigorously argue the fact that this may not be relevant because it was taken at a different time and under different lighting conditions and different circumstances, and if there is no other testimony to be introduced by the -- by the defense which actually links up the videotape to relevance, then I'd review that.

Okay.  So let's take a 15-minute break.  Thank you.
(Court was in recess at 11:15 a.m.)
(The following was held in open court at 11:31 a.m.)

THE COURT:  Okay.  Please be seated.

No, it's all right, you can stand, Mr. Liman.  You have the next witness?

MR. LIMAN:  We do.  Mr. Buell, Scott Buell.

SCOTT BUELL, ESQ.,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

THE COURT:  Okay.  Good morning, Mr. Buell.

THE WITNESS:  Good morning.

DIRECT EXAMINATION

BY MR. LIMAN:

Q    Mr. Buell, are you an associate at Cleary Gottlieb?

A    I am.

Q    And when did you graduate from law school?

A    2009.

Q    Are you a member of the bar?

A    I am.

Q    And what -- what bars are you -- what -- which bar were you admitted to?

A    The state of New York.

Q    As an associate at Cleary Gottlieb, are you assigned to work on the case of Fell against the United States?

THE COURT:  He is *pro hac vice* in Vermont, is he not?

MR. LIMAN:  He is.

THE COURT:  Right.  Because he did an examination here, I just wanted to make sure he is

licensed.  Right.

MR. LIMAN:  Your Honor grants the -- graceful enough -- gracious enough to grant his application.

THE COURT:  Right.

BY MR. LIMAN:

Q    Are you assigned to work on the Fell case?

A    I am.

Q    Let me direct your attention to Sunday, February 16th and Monday, February 17th of this year.  Did you perform any activities in connection with your assignment to the Fell case?

A    I did.

Q    What did you do?

A    I went to Rutland, Vermont, and traveled a route between two addresses in Rutland.

Q    What were the two addresses?

A    135 Robbins Street and the Price Chopper.

Q    Did you do that alone or were you with someone else?

A    I was with someone else.

Q    Who were you with?

A    I was with Bryan Neiman.

Q    And who was he and what was his role?

A    He is a videographer.  His role that day was to record by video the route that I traveled between those

two addresses.

Q    Now, I have placed in front of the Court, and the government brought with it today, trial exhibit 12D, Government 12D, from the trial of Fell -- United States against Fell, which was the exhibit that was used by Detective Pulsifer in that case to describe the route that he believed Mr. Fell and Mr. Lee took between the 135 Robbins Street address and the Price Chopper.

I am going to ask you if you would step down and describe for the Court, using Exhibit 12D, the route that you took.

A    Okay.

I began at 135 Robbins Street.  I traveled east on Robbins Street to Noyes Street, proceeded south on Noyes Street to where it dead-ends.  It's a dead-end street. I was doing this in a car, so I proceeded back north on Noyes Street, west on Robbins Street, south on Baxter Street until State Street, east on State Street, and then at the exit of the Foley laundry parking lot, I proceeded north into the Foley laundry parking lot, through the parking lot to where it would meet the southern dead-end of Noyes Street, south through the Foley laundry parking lot back to State Street, east on State Street towards Pine Street, south on Pine Street towards West Street, east on West Street until Evelyn

Street, and then south on Evelyn Street into the entrance of the Amtrak, Walmart and Price Chopper shopping center parking lot.

There were two videos -- or I re-created the route twice, and there were two videos showing each re-creation. One video depicts the route around the front of the Walmart-Price Chopper shopping center until it reaches the Price Chopper employee parking lot.

The second video depicts the route beyond the Walmart and the stores in between the Walmart and the Price Chopper until the Price Chopper employee parking lot.

Q   If you could stay down there for a moment.

There aren't street names identified for all of the streets on Exhibit 12D, but there's a blue marker. Do you see that?

A   Yes.

Q   And can you describe generally how the trip that you made compares to the blue marker on Exhibit 12D?

A   It followed my -- the route that I took follows the blue marker on Exhibit 12D with an exception, in that it follows the blue route east on Robbins and south on Noyes until, as I said, Noyes dead-ends. At that point I retraced the route north on Noyes until Robbins, west on Robbins, and I went south on Baxter Street and east

on State Street, back north through the Foley laundry parking lot.

Q    And then did you pick the blue line back up?

A    I did.

Q    Okay.  And then did you follow the blue line the rest of the way?

A    I did.  I followed the -- my route followed the blue line until the entrance to the Walmart-Price Chopper parking lot shopping center.  And as I said, there are two blue lines here, and I followed each route.

Q    You can take your seat.  Thank you.

THE COURT:  All right.  Can I just get a proffer about the blue line here?

That was put onto that exhibit by the police officer during the trial?  Is that correct?

MR. LIMAN:  That's correct.

THE COURT:  Mr. Darrow, do you remember that?

MR. DARROW:  That's my memory, your Honor. May I just take a look at it?

THE COURT:  Sure.

MR. DARROW:  I'm pretty confident, because we talked about this in one of the jury briefs filed December or January, that the blue line from the Robbins Street down to the mall was put on by the Rutland police

detective based upon the recorded statement of Fell about the route he walked on the night of the murders.

THE COURT:  Okay.  So the difference between Mr. Buell's video and the blue line is only because he went down one street, which turned out to be a dead-end, and then he retraced his steps, and that, by and large, his video is of the same route as traced by the blue line, which was admitted into evidence, and was admitted based upon Mr. Fell's statement to the police after his arrest?  Is that correct?

MR. DARROW:  That's my memory.

MR. LIMAN:  And that's our view as well, your Honor.

THE COURT:  Okay.  All right.

BY MR. LIMAN:

Q    Now, when you took the route that you just described represented in part by the blue line, was the videographer taking a video of the route?

A    He set up a camera in the car such that it recorded the video of that route.

Q    And can you tell us whether the video camera was stationary or whether the videographer -- you exercised any judgment about the pictures that should be taken from the video?

A    It was stationary.  It was affixed to the dashboard

looking out the windshield of the car.

Q   Now, you testified that you actually traced the route two times; is that correct?  Once in front of the shopping center and the other going behind the buildings in the shopping center?

A   That's correct.

Q   And I'm now placing in front of you what's been marked for identification as Exhibits 38 and 39.  Do you recognize those?

A   I do.

Q   What is 38?

A   38 is the video depiction of the route around the front of the shopping center.

Q   And what is 39?

A   39 is the video depiction of the route behind the Walmart, the stores in between, and the Price Chopper.

Q   It's accurate to say you reviewed both videos before coming to court?

A   Yes.

Q   And do the images on the videos accurately reflect what you saw when you were retracing the routes that are on Exhibit 12D?

A   Yes.

        MR. LIMAN:  Your Honor, we would offer 38 and 39.

THE COURT: All right. Well, let me just be clear as to what exactly you are proffering. You are proffering these particular videos of the route, understanding that what the route looks like other than its gross observations about the roads which haven't changed, but only those -- only that is relevant. I mean, certainly any other obstructions or anything else which may not have existed in 2000 obviously would not be relevant. So this is just the bold-faced this is what you looked like -- what it looks like to walk today from this particular location to the Price Chopper.

MR. LIMAN: Your Honor, I think that there's -- we'll link it up. I believe there's evidence that -- in the record and evidence which the Court can take judicial notice that the streets in Rutland, and the buildings in Rutland, have not changed much since 2005.

THE COURT: All right. So it's relevant to show the buildings and the routes and the roads, et cetera. It's not relevant when you may see garbage cans or anything else which you cannot link up to existing in the year 2000.

MR. LIMAN: That's correct, your Honor. We are not offering it for those purposes.

THE COURT: Pardon me?

MR. LIMAN:  We are not offering it for anything that's new.

THE COURT:  Okay.  So anything that I see there, which has nothing to do with the actual pathway, the actual road and the buildings and the general location of the Price Chopper, is -- it's not offered for that purpose, for instance, lighting or anything of that sort.

MR. LIMAN:  Well, the -- I think it is offered for the purpose of lighting, because that hasn't changed since 2004, 2005.

THE COURT:  Well, to the extent that the placement of the lighting may be the same, assuming that you can lay the foundation for that, but certainly not the quality of the lighting --

MR. LIMAN:  Your Honor, I think that that is --

THE COURT:  -- or the dumpster.  You are not offering it for the dumpster.

MR. LIMAN:  We are not offering it for the dumpster.

THE COURT:  All right.  Mr. Darrow, with that understanding, it's just the permanent things in the route.

MR. DARROW:  We have to object, your Honor.

You know, with respect to my brothers, I think it's of marginal probative worth in any event, so I don't want to go too far with it, but the -- as we under- -- the real problem is relevance.

As we understand the relevance, this goes to the Juror 143 trip to Rutland in '05 as opposed to the Fell walking in November 2000. And the problem, of course, is, as I understand Mr. Scott's testimony on the videotape, the video images --

THE COURT: You mean Mr. Buell's.

MR. DARROW: I'm sorry, Mr. Buell.

THE COURT: Scott Buell.

MR. DARROW: I apologize, Mr. Buell.

The videotape tries to sort of -- I mean, it's peculiar. It tries to follow the path that Fell walked in the middle of the night back in 2000 by driving a car sort of as close as you can get to it, and you can't get that close to it, because there's a couple times that he is offroad, and this is supposedly relevant because of the trip that 143 made to Rutland during trial.

However, the only witnesses to that trip said that he never got out of the car, so he -- he didn't retrace Fell's steps. And the only places they described going were -- they drove by Robbins Street, and they drove into the Price Chopper mall, and he said, you know,

that's where she was abducted.

So all this business about following the route Fell took doesn't really make sense because there wasn't testimony that 143 took that route.

MR. LIMAN: Your Honor, I can make a proffer with respect to that.

THE COURT: Okay.

MR. LIMAN: And there was in fact testimony that Juror 143 attempted to retrace the route as he understood the testimony at trial. Juror 143 admitted to that, although he -- he testified falsely, in our view, that he only did that in 2010. So --

THE COURT: All right.

MR. LIMAN: -- for that reason, among others, we think that it's -- it's relevant.

THE COURT: You know, I must say, I mean, the relevance is not significant, frankly.

MR. LIMAN: Nor through this witness have I attempted to elicit that following the Court's instructions, but I -- but we will link it up in our briefing because we believe there's the evidence in the record that would establish that the juror took the route that he understood was testified to at trial. He took it because he wanted to -- to examine for himself the -- the area. And he's admitted that he took that --

the route between the Price -- the Robbins Street --

THE COURT: When did he admit this? Because, frankly, you have taken a little bit of an inconsistent approach. On the one hand, he obviously made a statement when he was being interviewed, but on the other hand, you know, you have made a really strenuous point that he said he never went in 2005, and as a result, the government is going to have trouble responding to the presumptive prejudice from the -- from this exposure of this information because he basically is not subject to cross examination because he now says that he never took this route.

And so when you start arguing that, oh, let's see, he did take this route, and there's other evidence of him taking this route, is that not inconsistent with what you put in your briefing, which is essentially the government can't respond to the presumptive prejudice obligation that they have to respond to because he is not subject to cross examination because he basically lied and said that he didn't take the trip during the trial?

So, what's your position?

MR. LIMAN: So what are we doing?

THE COURT: Yeah.

MR. LIMAN: The government has -- has -- we've

taken that position, we believe, that it is the right position.  We believe the Court should adopt that position.

THE COURT:  What position?

MR. LIMAN:  Which is that --

THE COURT:  The presumptive prejudice, they have the obligation --

MR. LIMAN:  That the --

THE COURT:  Yeah, I'm sorry.  Go ahead.  I -- go ahead.

MR. LIMAN:  We believe that we have established presumptive prejudice.  We believe that the government cannot respond to it.  The government has not agreed with that position.  It has taken the view that the juror saw things -- when he inspected the area around Rutland, he saw only what he would have seen from his prior visits to Rutland.  We don't believe that's supported by the evidence.  But since the government hasn't stipulated, the Court hasn't found that presumptive prejudice has been established, we are offering this to show that there was prejudice from Juror 143's visit.

THE COURT:  Well, I mean, first of all, in their responsive pleading on presumptive prejudice, they acknowledge -- the government acknowledged that if a

person is exposed to inappropriate outside influence or information during the course of a trial, that a juror's exposed to that, it raises the presumptive prejudice argument, and I thought the government acknowledged that but that they relied primarily upon the fact that -- that they have established prejudice -- that they have established no prejudice; that it was essentially harmless. I thought they had acknowledged that.

MR. LIMAN: And --

THE COURT: So I thought both sides had sort of agreed to the concept of law here when you apply exposure from a juror -- to a juror of inappropriate information, and the only question was whether the government has met its burden to show that the information that the juror received was harmless. Am I wrong?

MR. LIMAN: I think you are right. We, I think, have the right to put in evidence to show that the government cannot meet that burden.

THE COURT: Right. I don't mean to suggest that you can't, but I just want to make sure I understand exactly what the relative positions of the parties are.

Mr. Darrow, is that correct?

MR. DARROW: Well, I am seeing the issue

through a slightly different prism, your Honor, if you will indulge me.

THE COURT:  And this is digressing from the admission of this document.  It's just --

MR. DARROW:  Right.

THE COURT:  -- helpful, in light of the fact there's no jury, to figure out what the government's theories are.

MR. DARROW:  Appreciate that.  Our problem with the videotape goes to the distinction between 143's drive to Rutland and Fell's walk through Rutland.

The defense has introduced three types of evidence -- or three bits of evidence on the drive. They have Exhibit 1, which is the written statement taken by the former Cleary associate of 143, in which he says, you know, Among the things we discussed was my drive to Rutland when I saw the house or the neighborhood, which didn't look that bad, and then drove to the Price Chopper, and the evidence was weak.

143 then got on the stand and said, Well, I didn't go down there during the trial.  That drive was after the trial, with my motorcycle.

Then yesterday we had two witnesses from the defense, both former romantic liaisons of 143, the first being Kaulene Kelsey, and she said, Well, I drove with

him, and I think it was during the trial because I had a feeling it was the wrong thing to do, and we drove by the Robbins Street -- or we drove by a house, and he said that's where Debbie Fell and Charles Conway were killed; and then we drove to the Price Chopper and he said that's where Terry King was kidnapped, essentially.

And then the second witness, Janice DeGoosh, was the woman who followed Kaulene Kelsey in 143's interests, and she essentially said, He told me that -- I don't know that he -- had or he wanted to -- I can't remember exactly --

THE COURT:  He was intending to and he was going to go with her.

MR. DARROW:  Right.  To drive to Rutland, but --

THE COURT:  Right, with Miss Kelsey.

MR. DARROW:  Exactly.  But there's been no evidence, I mean, unless I am missing something -- and if Mr. Liman can correct me, I ask him to do so -- we -- I don't think there's any evidence that 143 tried to retrace Fell's footsteps on the night of the Rutland murders and the route that Fell described walking from Robbins Street down to the Price Chopper.

And that is the route, as we understand it, that Mr. Buell tried to re-create by video.

THE COURT: All right. Well, that's not addressing the legal theory question that I asked Mr. Liman about.

MR. DARROW: And as to that, your Honor, I apologize. I know we did write that up in several briefings. I think you are probably talking about the last one filed in January. And I'd rely on what that briefing is. I don't have it in mind right now.

THE COURT: I think the briefing is that whenever a juror -- we are talking about 143 again. Totally different situation than the exercise of peremptories or challenges for cause.

143. If a juror is exposed inappropriate -- to inappropriate information, then it creates a presumption of prejudice, which satisfies the second prong, and that the government then has the burden to show that there was no prejudice.

Of course, obviously the defense has the opportunity to introduce evidence about prejudice as well. I think that that was the approach. And then the defense had -- and the reason I think Mr. Liman is smiling is that the defense had somewhat of an alternative approach when one analyzes exactly what the defense's position is.

On the one hand, what they say is that Juror No.

143 lied when he testified, and as a result, said he never went on the trip, so how could anybody ever find out what he saw, how he was prejudiced in any particular way, because he refused to testify, and the government, therefore, cannot meet its burden. I thought that was the approach the defense was taking.

But then alternatively -- and maybe this is just alternative. Maybe, alternatively, what they are suggesting is that there may have been things along the way that he might have seen which would have prejudiced his ultimate judgment. And if that's the case, then I suppose that a route is more relevant.

On the other hand, the only things that one can take from the video is where the buildings are and what's the street like and what the lighting, theoretically, is if -- assuming they can show that it wasn't changed. Other than that, there's nothing that is relevant, as far as I can tell.

MR. LIMAN: If your Honor would permit me to make a proffer?

THE COURT: Sure.

MR. LIMAN: Testimony will show that there are two potential routes that one could take from Robbins Street to the shopping center where the Price Chopper is. We have offered, right now, the two videotapes of

the route from Robbins Street to the Price Chopper going in front of the buildings in the shopping center and behind the buildings in the shopping center, the route that was testified to by doctor -- by Detective Pulsifer.

We intend to offer, and Mr. Buell traveled, an alternative route. There is a different route that one can get from Robbins Street to the Price Chopper.

THE COURT: Okay.

MR. LIMAN: And we will argue and present evidence to the Court that if the juror had taken the route that was testified to by Detective Pulsifer, the notable thing about that route is that the buildings in -- one of the notable things is that the buildings on that route generally tend to be the backs of buildings, railroad tracks, at areas where there would not be much commercial activity or much activity at all on the morning of the murders and the abduction, whereas the alternative route is a heavily-traveled commercial space.

The videotape will also show the area around 135 Robbins Street. As your Honor will recall, in the juror's statement that was submitted and that he signed, he testified that he looked at the neighborhood. The neighborhood was okay. It wasn't so bad. She was just

trying to live her life.  The videotape will show what that neighborhood looks like.

There are other ways in which we will be able to show the prejudice from these -- from the route that was taken, but those are a couple of the ways that I would highlight for the Court.

THE COURT:  Well, I guess my question, in light of the fact that this is not a jury trial and no one's being prejudiced by the admission of an exhibit like this, and in light of the fact that the Court is really expressing some concern about its relevance beyond then, perhaps, a general video of the house and the neighborhood that obviously hasn't changed, although I assume that would be relevant, so it may be relevant to that extent, you are not offering it for -- for anything which is movable or would not have existed in 2000 or, for that matter, 2005, if that's the relevance.

So, you know, with a representation, from my perspective, that this may not have a whole lot of significance, but I should hear the argument, the legal argument as to why it's relevant somewhere down the road as opposed to through a witness -- Mr. Buell can't testify to that, but you might be able to argue that this is relevant for these particular reasons, is there any objection to -- just to the tentative admission of

these exhibits and require that the defense link up the relevance of this in their legal memoranda?

MR. DARROW:  Well, your Honor, we -- I apologize.  And I appreciate the consideration you are giving the issue and the remarks that you have made.

We think it's not relevant.  We think there's no foundation for it, so we do press our objection.

THE COURT:  All right.  Well, I am going to admit it provisionally.  I think that there are some things which may very well be relevant.  For instance, if the video actually portrays the community -- obviously there have been a number of statements made by Juror 143 in regard to the relevance of that particular issue.  In fact, there's a statement that he made to Miss Kelsey about the neighborhood and the consistency with his perception of the neighborhood to Mr. Fell's mitigation.  So to that extent, that video may -- that part may be relevant.

I don't know what the defense's theory is with regard to any others, but it seems to me that at this stage, this video should be admitted provisionally and give the defense an opportunity to link up exactly what portions of the video are relevant.

And, again, I just want to remind you that anything that's movable or anything that could have changed or

anything which is different from at least 2005, if not 2000, you know, would be totally inadmissible.

MR. LIMAN:  Thank you.

THE COURT:  So I will admit it provisionally under those -- under that understanding.

(Defendant's Exhibits 38 and 39 were received in evidence.)

THE COURT:  Now, my question is about Mr. Buell's testimony.  I mean, he is admitting this video.  He has laid the foundation.  The video is not judgmental.  He didn't -- he's just put it right in the front, or a videographer did that.  Is there any reason to get him to testify about observations that he made at this point?

MR. LIMAN:  Your Honor, I think what we can do, with your Honor's permission, is he -- I was planning to have him testify where particular frames on the video corresponded to locations on the map.

We may be able to do that by stipulation with the government so that when your Honor has the videotape, we would envision being able to have a stipulation that says this -- these frames depict the location from this place to that place, and then we will submit the argument as to why we think it's prejudicial.

I think that that would -- I do have a couple more

exhibits to offer, but I think that would speed things up.

THE COURT: Okay. That would be helpful, to the extent both sides say, okay, this is a video of this particular location, and if that's relevant --

MR. LIMAN: And then we work -- if we are not able to reach agreement, which I -- I can't imagine that we wouldn't be able to reach agreement, but if we are not able to reach agreement, we would reserve the right to call Mr. Buell to testify that, you know, section 26 is Noyes Avenue, that kind of testimony.

THE COURT: All right. What are the other exhibits you seek to introduce?

MR. LIMAN: One is the alternative route, and then a -- that is Exhibit 19 -- give me a moment. 40.

And Exhibit 41 is the area around the Price Chopper in the -- at dusk. Relevance of that is obvious. That's when the testimony establishes that Juror 143 was there.

THE COURT: Well, is it --

MR. LIMAN: We think so.

THE COURT: -- around dusk?

MR. LIMAN: I don't mean to presume, but --

THE COURT: Well, you are not offering it to show the lighting that existed in 2000, are you?

MR. LIMAN: We are offering it to show what that area would have looked like at dusk in 2005 when the evidence shows that the -- that the juror was there. Not in 2000, but in 2005.

THE COURT: But that -- you can't show that the lighting would have been similar in 2005 to 2014, right?

MR. LIMAN: I think when you see the videotape, you will be able to see that, your Honor. It hasn't changed.

THE COURT: Okay?

MR. DARROW: I mean, unless the videotape travels through time, that -- or respectfully to Mr. Liman, that doesn't make sense, because we don't know what the lighting was in 2005; and moreover, I would have done this on cross examination, but I think that video camera has an automatic light-filtering adjustment in it. When I looked at it, it looked like when it got into dark areas, things brightened up. Most cameras do that these days. I think that camera did that.

And in any event, there's been no testimony that 143 took that route behind the Walmart and the Price Chopper that is in the video.

And lastly, your Honor, Mr. Liman says that there are only two routes that 143 could have taken, and I

guess we are supposed to guess which one he did. But respectfully to Mr. Liman, there are multiple routes that 143, if he went down there, could've taken, and the most sensible one would have been -- if he knew his way around Rutland, which he said he did, would have been to drive in on a main thoroughfare, go up to Robbins Street, and then come back out and go to the Price Chopper. It wouldn't have been to go through all these back neighborhoods where Fell was walking that night.

So, again, the video just doesn't make sense to me.

THE COURT: I mean, going --

MR. LIMAN: Your Honor, Exhibit 40 is in fact what Mr. Darrow just testified was the most sensible route --

THE COURT: All right. Well --

MR. LIMAN: -- and we don't agree that that's the most sensible route. We agree --

THE COURT: Right. It seems to me tentatively that can be admitted, and then you can try to link that up as to its relevance, although I'm telling you that I've got some questions about its relevance.

But as to the lighting, 2005 versus 2014, this is what it would have looked like at dusk, assuming that the vision was impacted by the lighting --

MR. LIMAN: Your Honor, I believe that the

video will show that all of the lights were on in the employee parking lot, save for one. Obviously the lighting from the sun --

THE COURT: But how do you know --

MR. LIMAN: -- at dusk doesn't change from 2005 to 2014.

THE COURT: No, but how do you know that the lighting in -- of the units did not change between 2005 and 2014? You have evidence to say that the power of the lighting over that nine-year period was not enhanced or changed in any way?

MR. LIMAN: Your Honor, I believe we will be able to link that -- that up. I understand if we can't link it up, then -- but I would ask that your Honor receive it tentatively.

THE COURT: Well, let me -- receive it tentatively, that's fine, but I would say that if you are going to talk about lighting and what he would have seen under this particular set of lighting, type of lighting, that you have to be able to show that the lighting was not changed over a nine-year period, and that's -- that's a -- well, I guess it's not a tough task. I suppose that if you go to the lighting company, you could do that, but --

MR. LIMAN: Your Honor, we actually have --

and I would like to brief extensive case law that says that the duration of time goes to weight and not to the admissibility, and so -- probably should leave well enough alone, but we do believe that the issues with respect to whether there have been changes go not to admissibility but to the weight that is ascribed to it.

THE COURT:  Okay.  Well --

MR. LIMAN:  And given the fact that Juror 143 himself could not be questioned about the lighting conditions, we believe that it is -- you know, we have satisfied our burden with respect to admitting this -- this tape.  But I understand your Honor's position. We'll address it.

THE COURT:  Okay.  And I -- yes.  So I will tentatively admit all of those, but I have expressed a concern, and I clearly recognize I have digressed to get into the questions about the ultimate theories that the defense is projecting and the theories of the government, as I read it from the pleadings.

Obviously there will be much more substantive pleadings coming on.  But I was -- it's helpful for me to understand exactly what the theories are and basically what you are suggesting as an alternative theory.  Because you can't question him, because he said he never took the trip, you can't figure out what he saw

or anything of that sort; or alternatively, you try to use the statement that he made to your investigator, or the statements that he made to Miss Kelsey, as relevant. That's what you are doing.

MR. LIMAN: Yes. That's correct. And I appreciate the opportunity to make the proffer to your Honor. It's nice not to have a --

THE COURT: All right. Is there anything that you need to ask Mr. Buell at this point?

MR. LIMAN: I think I need to ask him to identify the tapes and what they represent and what routes were traveled to capture, and then obviously whether it's a fair and accurate representation.

THE COURT: All right. Okay.

CONTINUED DIRECT EXAMINATION

BY MR. LIMAN:

Q    So let me approach and offer you -- place in front of you Exhibits 40 and 41 and ask you if you recognize each of them?

A    I do.

Q    And would you describe what Exhibit -- what Exhibit 40 is?

A    Exhibit 40 depicts an alternate route that I took between the Price Chopper and 135 Robbins Street, and the route that it depicts is different from the

highlighted blue route on Exhibit 12D.  And it differs in that it proceeds out the southeast exit of the Price Chopper-Walmart parking lot onto Strongs Avenue, northwest on Strongs Avenue to Merchants Row, north on Merchants Row to West Street, and then west on West Street until it hits Evelyn Street, and that's where the highlighted blue route on Exhibit 12D reappears.

Q    And on the route that's reflected in Exhibit 40, was there a restaurant called The Sandwich Shop?

A    Yes, that's on Merchants Row, just south of West Street.

Q    Okay.  And is it correct that Merchants Row is generally one of the commercial roads within Rutland?

A    Yes.

Q    Does Exhibit 40 fairly and accurately reflect the alternative route that you traveled?

A    Yes.

Q    Okay.

MR. LIMAN:  Your Honor, we would offer Exhibit 40.

THE COURT:  Again, just make sure the record is clear about why and to what extent I am admitting these exhibits:  I am admitting these exhibits because I am giving the defense an opportunity to link up the relevance by legal argument.  He can't testify to

relevance. He is a witness. He is not the lawyer. So I am admitting these provisionally based upon my understanding that the defense will attempt to show this relevance.

If there is no relevance -- and of course the government takes the position there is no relevance to this -- then the Court would not consider this as a part of its ultimate order. But I think that in light of the fact that this is somewhat of a unique situation in which one of the lawyers is a witness and not testifying as an expert, can't render an opinion, I will give the defense an opportunity to show why this is relevant.

MR. LIMAN: Thank you, your Honor.

THE COURT: So with that, the government's objection is preserved, and we will address that at some future time.

(Defendant's Exhibit 40 was received in evidence.)

BY MR. LIMAN:

Q    What is Exhibit 41?

A    Exhibit 41 is a video depiction of the Price Chopper employee parking lot and area behind the Price Chopper employee parking lot in the evening hours.

Q    And would you describe the route that Exhibit 41 reflects?

A    It reflects the area in the front and side and rear of the Price Chopper.

Q    And is that a route that you traveled when you went to Rutland?

A    Yes.

Q    And does Exhibit 41 fairly and accurately reflect the areas around the Price Chopper in the evening that you saw when you went to Rutland?

A    Yes.

MR. LIMAN:  Your Honor, we would offer Exhibit 41.

THE COURT:  Same order.

(Defendant's Exhibit 41 was received in evidence.)

MR. LIMAN:  I have got nothing further.

THE COURT:  All right?  Mr. Darrow.

MR. DARROW:  Your Honor, I don't want to try your patience, but I do want to ask a few questions.

THE COURT:  That's fine.

CROSS EXAMINATION

BY MR. DARROW:

Q    Mr. Buell, hello.

A    Hi.

Q    Do you know what Rutland looked like back in 2005?

A    No, not to my personal knowledge.

Q    Okay.  You took these -- is it four videos we have been talking about?

A    Yes.

Q    Okay.  You took these videos when?

A    February of 2014.

Q    Okay.  There's a -- I looked at them earlier, and there's a lot of snow on the ground.  Was it shortly after a significant snowstorm?

A    I think so.

Q    Let me ask you a couple questions about the camera that your videographer used.  And let's start with the one that's already come up.

     Do you know whether that camera had an active light metering on it such that when the -- there was less light to work with, the camera automatically brightened the image?

A    I don't know if it had an automatic -- automatic light filter.  Is that what you --

Q    Active light metering?

A    I don't know if it had an active light meter.  I know there was no alteration of the footage that was taken by the camera.

Q    You mean you -- and by that, you mean the camera was turned on and you didn't turn it off until you were done driving?

A    I mean that, and then I mean after it was turned off, the video was not edited to affect the lighting or anything like that.

Q    I understand.  But you don't know whether the video camera itself altered the image based on available light?

A    I don't know that.

Q    Okay.  Now, what about the lens of the video camera?  The images to me seemed a little stretched out laterally.  Do you know whether the lens was a -- a wide-angle lens, maybe 35 or 38 millimeter, as opposed to a 55?

A    I don't know the details.  I do know that it was put on a wide-angled lens in order to capture essentially the breadth of the windshield of the car.

Q    Okay.  So it is a wide-angled lens?

A    Yes.

Q    All right.  Now, there's been a fair amount of publicity recently about the opiate and heroin problem in Vermont, and in Rutland in particular.  Are you familiar with that?

A    Yes, I have read some media.

Q    I think the -- if memory serves, the Senate Judiciary Committee was down in Rutland just --

THE COURT:  Monday.

Q    -- Monday.  Do you know whether the neighborhood around Robbins Street has changed at all in the eight and a half years since the summer of 2005?

A    I don't have personal knowledge of what it looked like in 2005.

MR. DARROW:  Excuse me.

(Brief pause.)

MR. DARROW:  I don't think I have anything else, Judge.  Thank you.

THE COURT:  There are photographs taken, that were admitted at trial, were there not, of the area?

MR. DARROW:  Yes.

MR. LIMAN:  Your Honor, we --

THE COURT:  Have those been admitted into this particular hearing?

MR. DARROW:  I don't think they have, but we wouldn't object to any trial exhibits coming in.

THE COURT:  To show consistency, basically.

MR. LIMAN:  Right.  And, your Honor, I didn't offer Exhibit 12D because my understanding is that on the 2255, the Court can take notice of and rely upon the evidence that was admitted at trial.

If I need to offer an exhibit, I would offer Exhibit 12D.  My understanding is --

THE COURT:  Well, it is admitted or has been

admitted.  But in particular, the photographs of the house, as I recall, may or may not show consistency, and that would be helpful.

MR. LIMAN:  I think they do.  Let me ask just one or two questions.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. LIMAN:

Q    Mr. Buell, when you traveled this route to -- in Rutland -- let me just focus you on the area around Robbins Street and Noyes Avenue and Foley laundry -- did you notice any new construction around those areas?

A    I did not.

Q    And focusing your attention on the area around the Price Chopper, the Walmart, did you notice any new construction around -- around those areas?

A    I did not.

Q    And in general -- I know that there was a renovation of the post office, but in general, did you notice a lot of renovation within the route that you traveled in Rutland?

A    I did not.

MR. LIMAN:  All right.

THE COURT:  Anything further?

MR. DARROW:  No, your Honor.  Thank you.

THE COURT: All right. Thank you, Mr. Buell.

THE WITNESS: Thanks.

(Witness excused.)

THE COURT: Are there any other witnesses to be called by the defense at this point?

MR. LIMAN: Not at this point, your Honor.

THE COURT: Okay.

MR. LIMAN: We will leave it open because we do have an attorney to call. We would like the hearing left open.

THE COURT: Okay. And --

MR. DARROW: I think that Ms. Rodriguez-Coss is not with us now because she is preparing for the afternoon, but my understanding is that we will be calling the juror in the afternoon.

THE COURT: Okay. All right. And just to make sure that I understand the scope of the hearing into the future, I mean, all of the evidence in regard to Juror 143 has been introduced with the exception of potentially security officers or members of the court that may testify as to whether or not the shotgun was taken into the jury room. But other than that, all of the evidence in regard to Juror No. 143 are closed. Is that correct?

MR. DARROW: That's what we had thought.

THE COURT:  Okay?

MR. LIMAN:  Let me just -- give me a second.

(Brief pause.)

MR. LIMAN:  Your Honor, we're still working out the admission of exhibits, but -- which I believe Miss Price addressed, but with the exception of that, we don't intend to call any other witnesses.

THE COURT:  You had suggested that you wanted to make sure everything was wrapped up.  I raise this because my understanding is that no additional witnesses, other than potentially witnesses who may testify about the shotgun going into the jury room -- that's it, as far as I understand it.  So this is closed.  I mean, the parties can begin their briefing on this particular issue, right?  No additional witnesses to be called.

And the stipulation, obviously you are going to address the issue -- issues in regard to Juror No. 26 are probably resolved as well, right?  There's no additional evidence in regard to Juror 26?

MR. DARROW:  I think that's right, Judge.

MR. LIMAN:  That's correct.

THE COURT:  And we are left with Juror 162, and you have the potential of three witnesses:  Juror 162, Mr. Primomo, and Mr. Bunin.  Is that it?

MR. DARROW: There's the jury consultant. I suppose --

THE COURT: Oh, right.

MR. DARROW: I don't know what's going to come of that.

THE COURT: Right, to the extent that has to be resolved.

MR. DARROW: Right.

THE COURT: And I think that's coming by way of video.

MR. DARROW: Yes. And I think the defense yesterday said that they might try to introduce the deposition from out of state.

THE COURT: Out-of-state witness, right. There's one out-of-state witness that you are introducing, I thought, in regard to the relationship with Juror 162's son and his difficulties in life, I thought.

MR. LIMAN: Your Honor, I apologize. My colleagues were whispering something to me, and I missed the beginning part.

THE COURT: Maybe I should ask Miss Price then.

What -- do you have the potential of another -- I thought there was another deposition that was being

introduced that was taken in Clarksville, Tennessee.

MS. PRICE:  Yes, your Honor.  Yes, we have that.

MR. LIMAN:  And, your Honor, there is a point to address with respect to that.

After court yesterday, we conferred with the government.  As your Honor has been informed, there were some security issues with respect to the juror.  We have agreed with the government, subject to your Honor's agreement, that the -- the juror's address would be redacted from the deposition transcript.  It's not relevant.  And also the juror -- I'm sorry, the witness's address would be redacted from the transcript.

THE COURT:  That's fine.

MR. LIMAN:  And the witness today goes by a different last name than the witness was known by at all -- at the time of the events relevant to this hearing.  We have agreed with the government, and subject to your Honor's consent, that we would substitute her name at the time of the events in question for her name today so that it only -- it does not contain her name today.

THE COURT:  Okay.  That's fine with me.  Is that your understanding?

MR. DARROW:  That was the request of the

defense, and we don't have a problem.

THE COURT:  Okay.  So that's going to be submitted by stipulation.

MR. LIMAN:  With respect to the juror consultant, we did not have an understanding that the juror consultant's deposition would be presented.  Our understanding was that that -- if they want the juror consultant, that the juror consultant would be called to -- to testify at the hearing.

THE COURT:  Okay.  Well, let's take this in order.  The first thing is I have to review the request of the motion to compel answers to the deposition.  That's resolved.  Once that's resolved, then you decide whether she is to be called as a witness or whether the complete deposition is to be submitted, right?  Isn't that the case?  That was a deposition to preserve her testimony, was it?

MR. LIMAN:  No, it was a discovery deposition.

THE COURT:  Oh, it was.

MR. LIMAN:  It was a discovery deposition.

THE COURT:  Oh.  Then she is clearly anticipated to be a witness.

MR. LIMAN:  We would -- we would propose, your Honor, that in light of the issues addressed yesterday about scope, we would ask permission,

actually, that by the end of this week, we could submit a letter, no longer than two pages with no legal argument, that just lays out where we think the line should be drawn.

THE COURT:  That's fine.  All right.

Well, so there's the potential of four additional witnesses:  Mr. Primomo, Mr. Bunin, Mrs. Bochnak -- is it Bochnak?  Is that her name?

MR. LIMAN:  Bochnak.

THE COURT:  Bochnak.  As well as Juror No. 162.  And that's it, right?

MR. DARROW:  That's my understanding.

MR. LIMAN:  Yes, your Honor.

THE COURT:  Okay.  We are making great progress then.  So let's reconvene at 1:30.

MR. DARROW:  Thank you, your Honor.

MR. LIMAN:  Thank you, your Honor.

(Court was in recess at 12:26 p.m.)

(The following was held in open court at 1:36 p.m.)

THE COURT:  Okay.  Good afternoon.

MR. DARROW:  Good afternoon, your Honor.

MR. LIMAN:  Your Honor, one matter of housekeeping:  The deposition, which is the deposition of Tina Boyce, has been marked as Exhibit 38 *[sic]*, and we would ask that it be admitted.

THE COURT: Okay. All right. It is admitted.

(Defendant's Exhibit 48 was received in evidence.)

THE COURT: Any objection to that? That was the --

MS. RODRIGUEZ-COSS: No, sir.

THE COURT: That was done by stipulation.

The other thing is that in the initial part of this hearing, again which has all been consolidated into the final hearing, a number of exhibits were sealed, and the Court's intention is to unseal the records with the exception of BCIC records of the juror's son. Suggest that that be -- that the name be stricken unless there's some objection. And also in some of the written statements, there's a reference to the name of the juror who made the statement. I'd ask either we redact the name or just have it submitted by another side or by the parties, and then it would be unsealed.

MS. RODRIGUEZ-COSS: The Court will only be referring to those exhibits that have been admitted at the previous hearing, correct?

THE COURT: Correct.

MS. RODRIGUEZ-COSS: Not -- all right.

THE COURT: Other exhibits have been admitted, and I think that these should be released, frankly, in

light of the state of the evidence at this point.

So, any objection to me just asking the clerk's office to scratch out the names of the jurors? And also leaving the record, the BCIC record, of Juror 162's son sealed?

(Brief pause.)

THE COURT: Okay. I am told by the powers that be that the clerk's office would not redact the names; that you need to -- that both sides need to get together and submit a revised written statement with the name removed. Any objection to that?

MS. RODRIGUEZ-COSS: No.

MR. LIMAN: No, your Honor.

THE COURT: Okay. All right. So, government ready to call its witness?

MS. RODRIGUEZ-COSS: Yes. We are going to call Juror 162 back to the stand, your Honor.

THE COURT: Okay.

JUROR NO. 162,
having been duly sworn by the courtroom deputy, was examined and testified as follows:

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: And do you want some water?

THE WITNESS: I have some right here.

DIRECT EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    Good afternoon.  And for purposes of this hearing, we are going to call you "Ms. Juror 162."

A    Okay.

Q    All right.  So I want to bring your attention to what has been marked Defendant's Exhibit 3, which I believe in previous discussions we have been referring to as the long questionnaire that you completed.

Do you see -- if you look at the screen there next to you, you can see question 36.  And it says, "Have you ever filed a complaint with the police against anyone?" And do you remember marking "no"?

MR. RUBIN:  Objection.

A    Well, I don't remember it, but I -- evidently I did.

THE COURT:  Just one second.  You have an objection?

MR. RUBIN:  Leading.

THE COURT:  Well, this is a preliminary question, and then you are going to ask a follow-up, I assume.

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  Which would not call for leading -- leading response.  So --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- objection overruled.  Go ahead.

A    I don't recall that, but evidently I did because it's marked "no."

BY MS. RODRIGUEZ-COSS:

Q    Okay.  So you don't -- you don't specifically recall responding to that question?

A    No.

Q    Okay.  But you -- evidently you responded "no." Was that because you did not recall -- or why did you respond "no"?  Let me ask you that.

A    Because at the time I didn't recall -- I knew of no instances where I would have done that, no.

Q    All right.  And as you sit here today, do you -- do you recall any instances where you have filed complaints against some -- you know, anyone, or called the police -- I guess it's filed a complaint with the police against anyone?

A    Is this prior to the trial or -- or before -- or after?

Q    It would have been prior to the trial.

A    Well, there were times in Colchester when I lived in Colchester, there was a neighbor that I called the police about, yes.

Q    And what was the nature of the complaint that you

filed with the police?

A    Well, this young fellow had a vehicle that he put down in the cellar, that was full of gasoline, with propane tanks that were down in the cellar.  And the fumes from this came up into my apartment.  I'm asthmatic.  I couldn't take that.  But the most important thing was a fire hazard, so I did make a complaint about that, yes.

Q    Okay.  And any additional complaints that come to mind that you might have filed with the police?

A    There was a neighbor upstairs that made -- on purpose, would take his feet and -- and pound his feet against the ceiling to aggravate, and, yes, I called the police about that.  But I will say that at the time that I -- I didn't remember that.

Q    Okay.

A    It didn't come to my mind.

Q    So generally, disagreements between neighbors and that sort of thing?

A    Right.  When you live in an apartment with other people, sometimes things like that occur where you have disagreements.

Q    And let me bring your attention to --

MS. RODRIGUEZ-COSS:  I apologize, your Honor. I have the long questionnaire.

BY MS. RODRIGUEZ-COSS:

Q    Let me bring to your attention what has been marked Defendant Exhibit 2, already in evidence.  Is that clear?  Can you see that?

A    I can, yes.

Q    Okay.  Great.  It's been a while since I handled these instruments.

And so -- and Exhibit 2 is the -- what we've referred to at various times as the short questionnaire that you completed initially and mailed in to -- in to the court, and I specifically want to bring your attention to a question here on the right-hand side of the second page of your short questionnaire where it says, "Have you or anyone close to you been a plaintiff or a defendant in a civil case?" and you marked "no."  Why did you mark "no"?

A    Because I didn't remember anything other than -- it was no.  I didn't recall anything.

Q    And as you sit here today, do you recall you having been a plaintiff or a defendant in a civil suit?

A    I was never a plaintiff -- I never went to court.  No one ever took me to court, and I never took anyone to court.

Q    Okay.  And we have seen some records of divorce proceedings of your son, Pat, wherein you requested

visitation rights with your grandson.  Do you recall that?

A    I do, um-hum.

Q    Why did you not list that case under that question?

A    Because that particular case, I went with my son during his court case.  It was the two together.

Q    Was that --

A    I just went with him.

Q    In that particular case, was -- was this a divorce -- was that his divorce proceeding?

A    That was his divorce proceeding.  That didn't have anything to do with me.

Q    So were the main parties in that case your son and his ex-wife?

A    That's correct.

Q    And you hired an attorney during the course of that case; is that correct?

A    That is true.

Q    And what was the purpose of you retaining an attorney?

A    For --

Q    What was it you wanted to accomplish as far as --

A    I wanted custody of my grandson.

Q    Did you want custody of your grandson in -- during the divorce proceedings or before?

A    Well, during the divorce proceedings I wanted visitation rights, yes.

Q    So tell me about you wanting custody of your grandson.

A    Well, because my daughter-in-law was a severe alcoholic, and my son was taking drugs and alcohol, and I didn't think that -- at the time that either one of them, you know, should have him.

Q    And when was it that you thought or contemplated the possibility of requesting custody of your grandson?

A    I really don't -- chronology, I can't --

Q    Okay.  So in relation to the divorce case where you were seeking visitation rights, when was it that you thought about asking the court for custody of your grandson?

A    That was when Karen left my son and went to her mother's.

Q    So your son and his ex-wife separated?

A    They were separated at the time, yes.

Q    Okay.  And at that time you contemplated requesting custody of your grandson?

A    Yes.

Q    And for the sake of clarity, we are talking about Michael, correct?

A    Michael, right.

Q    You have more grandchildren?

A    I have another grandson, yes.

Q    Okay.  And did you ever actually go to court and request custody of your grandson?

A    No, because my -- I think because of that issue, my daughter-in-law went back to my son, so --

Q    All right.  And is it sometime later that they finally filed for a divorce?

A    It was after -- I'm not sure just how much later, but it was after that, yes.

Q    All right.  And is it then during the divorce proceedings that you seek to have your visitation rights as a grandmother?

A    Correct.  But that was at the same time as my son, so --

Q    As --

A    It wasn't -- it wasn't a separate court case.  I don't recall ever going to court specifically for that.

Q    Oh, I see.

A    It was part of my son's divorce proceeding.

Q    Oh, I see.  Okay.

And --

MS. RODRIGUEZ-COSS:  With the Court's indulgence?

(Brief pause.)

BY MS. RODRIGUEZ-COSS:

Q    Does the name Tombley ring a bell with you?

A    No.  Vaguely.  Very, very vaguely.

Q    Vaguely in what sense?

A    Vaguely.  It just -- I don't recall.

Q    Do you remember ever having any sort of legal action with a person by the name of Tombley?

A    No.

Q    Okay.  What about The Medicine Shoppe?  Does that ring a bell with you?

A    No.

Q    Do you recall that?

A    No.

Q    Okay.

A    I'm not saying it didn't happen.  I am just -- I don't recall it.

Q    You can't recall it?

A    No.

Q    Okay.

        THE COURT:  So do you have the approximate date when, I guess, your son's wife left and you pursued with a lawyer interest in getting visitation rights?

        THE WITNESS:  I couldn't tell you what the date was.  My grandson was a toddler, and he's 21 now, so I couldn't remember that.

MS. RODRIGUEZ-COSS:  Well, let's see if we can assist the Court.

BY MS. RODRIGUEZ-COSS:

Q    Your son served some time in prison for domestic violence; is that correct?

A    That's correct.

Q    You testified to that before.  In relation to that event, when was it that your son filed for divorce?

A    I'm not sure which came first.

Q    The divorce filed --

A    You know, the divorce was filed first or the --

Q    He went to prison first --

A    -- or that he went to prison.

Q    Okay.  But when he was in prison, he separated from his -- was he separated from his wife while he was in prison?

A    I believe so.  Yeah.

Q    Do you remember visiting him in prison?

A    I do.

Q    Do you remember bringing Michael to visit him in prison?

A    I don't remember bringing Michael to prison.  I remember bringing Michael to Maple Leaf Farms when my son was there undergoing alcohol treatment.

Q    And was that after he had completed his time in

prison?

A     I believe so, yes.

Q     And was that pursuant to a court order authorizing those visits?  Do you remember that or --

A     I don't remember that.  I remember that he had to go through programs while he was in prison, yes --

Q     Okay.

A     -- as part of his treatment there, yes.

Q     Right.

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, did I address the Court's question?

THE COURT:  Yes.

MS. RODRIGUEZ-COSS:  All right.

BY MS. RODRIGUEZ-COSS:

Q     Okay.  And so on the subject of your son, let me ask you, there were a number of questions asked of you last time that you were in court with regards to his criminal record.  And I want to first bring your attention to your voir dire testimony.

So I'm referring -- I am going to refer to Exhibit 5.

Okay.  So, bringing your attention to page 136, and -- so bringing your attention to page 136, do you see that up there?

A     Yes, I can.

Q    So Mr. Primomo up here is asking you -- well, first he tells you that there may be evidence with regards to the defendant having abused alcohol and drugs from a very, very young age, as young as eight years old.  And then he asks you, "I'm curious as to your own personal experience with your son, whether that in any way could affect your ability to consider that as one of the mitigating circumstances."  Do you see that?

A    Um-hum.

Q    And your response was, "You asked me a hard question.  Drugs and alcohol can do a lot to you, from my own personal experience with my son," and you add, "I mean, my son, you know, was rehabilitated through the correctional -- through corrections, which was the best thing that ever happened to him."

And I want to ask you, when you used the term "rehabilitated," "my son was rehabilitated through corrections," what did you mean by that?

A    Well, because he had to take treatment there.  He had to go through anger management.  He had to go through alcohol counseling there.  So in order to -- to follow the -- the rules, he had to go through all of that.

Q    Okay.  And do you know --

A    "Rehabilitated," meaning -- I don't know if that's

probably the correct term, but --

Q    But what did you mean when you used that term during your voir dire?

A    That he completed the process.

Q    Okay.  So he completed the programs that he was assigned to --

A    That he was asked to do, yes.

Q    Okay.  And after he served the time in prison, you indicated earlier that he then went to Maple Leaf?

A    He went to --

MR. RUBIN:  Excuse me.  Objection.  It's leading.

THE COURT:  Objection overruled.  It's a preliminary question.

You going to ask an open-ended question as a result of that --

MS. RODRIGUEZ-COSS:  Right.

THE COURT:  -- answer?

MS. RODRIGUEZ-COSS:  I am just referring her to her own previous testimony.

A    After prison.

BY MS. RODRIGUEZ-COSS:

Q    You indicated earlier that he went to Maple Leaf; is that correct?

A    I believe he went to Dismas House after prison.

Q    Oh, okay.  And what's Dismas House?

A    That's a halfway house, and you have to still go through the programs there in order to stay there.

Q    All right.  And did he successfully go through those programs?

A    I believe so.

Q    And was it after the Dismas House that he went to Maple Leaf?

A    He has been to Maple Leaf twice.  Like I said, it's been so long ago, chronologically, I can't --

Q    Okay.

A    I know that he was there twice.

Q    All right.  And was it your understanding that he completed the programs successfully so that his -- his parole ended early?

A    He actually got out of prison early, and he ended his parole early because of that, yes.

Q    And since that time, since the time that -- that time that he spent in prison -- and again, we are referring to the time he spent in prison pursuant to his domestic violence conviction; is that correct?

A    Um-hum.

Q    Since that time, was he gainfully employed?

A    Yes.

Q    And he was able to maintain employment since then

throughout?

A    Yes.

Q    Did he ever go back to prison?

A    Not to prison, no.

Q    Did you ever have any other problems with domestic violence?

A    Not to my knowledge.

THE COURT:  So you are talking about a time period any -- anywhere between, what, 2002 or 2003 and the present?

THE WITNESS:  After -- right.  No, he hasn't been back to prison, no.

BY MS. RODRIGUEZ-COSS:

Q    We are saying since he was in prison.  Do you recall the years he was in prison?

A    No.

Q    Since we are referring to the time that he actually served time in prison for domestic violence.

A    Right.

Q    Is that what you meant when you said to the attorney you consider your son had been rehabilitated through the correctional system?

A    I assume so, yes.

MR. RUBIN:  Objection.

THE COURT:  Yeah, objection sustained.  That's

a leading question.  Maybe you can ask her what she meant.

MS. RODRIGUEZ-COSS:  Okay.

BY MS. RODRIGUEZ-COSS:

Q    So what did you mean then when you told Mr. Primomo?

A    Well, when you go through a process like that, and you end it, and, you know, he was off parole early, I assumed that it was part of the rehabilitation process.

Q    All right.

A    Yes.

Q    And did you consider that -- did you -- did you appreciate a significant change in your son's conduct since he went through that process?

A    From the anger management?

MR. RUBIN:  Objection.

A    Yes.

BY MS. RODRIGUEZ-COSS:

Q    And Mr. Primomo then asked you whether you considered the opportunity that you -- I'm sorry.  Was the opportunity that your -- oh, it's here -- your son had, that was provided through the Department of Corrections, something that was -- that you thought was significant?  And you say, "Very significant."  Correct?

A    Yes.

Q    And you explain how -- how so, and he says, "What did it take him to get intervention?"

"The authority."

"What did it take him to get" --

MR. RUBIN:  Excuse me.  What page are you on?

MS. RODRIGUEZ-COSS:  Right below that, 137. I'm sorry.  Right below it.  Right below 136.  Whoops.

BY MS. RODRIGUEZ-COSS:

Q    And you said, "It took corrections coming to his house periodically.  It took going to meetings every week.  It took losing his driver's license.  I mean, it took a lot.  He hit bottom before he went to the top."

And then Mr. Primomo asked you, "Had he been involved -- did he commit any criminal acts?"

And you say, "No."

What did you mean by that?

A    Well, we had been discussing, if I remember correctly, this -- the treatment through corrections, so obviously he then -- through the Department of Corrections.  And I meant right at that time while he was undergoing that treatment, no.

Q    So you thought the question referred to that?

A    At that particular time, no.

THE COURT:  Objection sustained as to the leading nature, but what -- what exactly did you mean by

that answer?

THE WITNESS:  At that particular time, because we were talking about his treatment through the Department of Corrections, so obviously that meant that he was under the Department of Corrections.  So he had to have committed some act to be under their jurisdiction, so I assumed that he was speaking about that particular time period.  No, not during that time period he didn't perform any -- didn't -- no criminal act, no.

BY MS. RODRIGUEZ-COSS:

Q    So it's your understanding that your son complied with the conditions --

A    He did comply, yes.

MR. RUBIN:  Objection.  I wish she could finish the question, and I would have a chance to object, and the witness could be instructed perhaps to wait until the question's finished.

THE COURT:  Okay.  So let's just make sure that you don't speak over the answer, but let's go -- let's go back to the question, Ms. Rodriguez-Coss, and go ahead.

BY MS. RODRIGUEZ-COSS:

Q    So your understanding is your son was complying with the conditions of his parole and getting treatment

and remaining employed?

MR. RUBIN: Objection.

A    He did, yes.

THE COURT: Can you just make sure that you try to have her testify as opposed to you testify? That's --

MS. RODRIGUEZ-COSS: She has already testified to that.

THE COURT: I appreciate it, but you actually are asking a question for which response is to be given which is leading in nature. So just ask open-ended questions. That's all.

BY MS. RODRIGUEZ-COSS:

Q    Had Mr. Primomo asked you about the circumstances of your son's domestic violence conviction, would you have answered his question?

A    Yes. And I filled it out on the form.

Q    Had he asked about the circumstances of his DWI conviction, would you have responded -- would you have responded to his questions?

A    Yes.

Q    Would you have had any problem discussing your son's criminal history --

A    No.

Q    -- with Mr. Primomo or -- or any other attorney, or

the Court --

A    No.

Q    -- during the course of --

A    It was what it was, so --

Q    All right.

A    I can't deny it.

Q    Bringing your attention back to Exhibit 3, page -- question 43B of Exhibit 3, which is again the long questionnaire that you completed.

Can you see the question there before you, where it says, "Have you or has a family member or close friend ever been charged with a crime?" and you said, "My son. DWI and domestic abuse.  He was under the Department of Corrections for three years.  Intense counseling.  Best thing ever happened to him.  He is now a different person."

Did you mean for that to be a complete history of your son's criminal history?

A    Well, I think that's a summarization.  It pretty much tells his -- what has happened to him under the -- his criminal activity, yes.

Q    And why do you consider that to be an accurate summary of your son's criminal history?

A    Because that is -- it is what happened to him --

Q    Okay.

A    -- other than one other thing that was mentioned that I don't -- didn't recall.

Q    Okay.  So your recollection is your son's criminal history has been primarily DWIs and his domestic violence conviction; is that right?

A    Yes.

MR. RUBIN:  Objection.

THE COURT:  Objection overruled.  Going on to the next topic.

BY MS. RODRIGUEZ-COSS:

Q    When you included there in parenthesis "house arrest" -- do you see that there next to the question of --

A    Yes.

Q    -- "If 'yes,' what was the result of that prosecution?" what was he under house arrest -- to the best of your recollection and understanding, what was he under house arrest for?

A    I believe that was for a DWI conviction, and he was on parole at the time, so they came -- the Department of Corrections periodically came unannounced --

Q    And --

A    -- to -- to give him Breathalyzers and --

Q    All right.  And when you said he was under the Department of Corrections for three years, to which

conviction were you referring?

A    I believe it was the DWI conviction.

Q    That he was -- he was in prison for?

A    I don't believe he ever went to prison for DWI.

Q    Okay.

A    He went to prison for the domestic abuse.

Q    Okay.  So he went to prison for the domestic violence?

A    Um-hum.

Q    So my question then is when you talk here or you mention here DWI and domestic violence, you are talking about two different convictions --

A    That's correct.

Q    -- at two different points in time?

A    That's correct.

Q    And was -- did he only have one DWI or were there more?

A    I believe there were more.  Just how many, I couldn't tell you.

Q    Okay.  Had you been asked during voir dire whether there were more, would you have responded to that?

A    Yes, um-hum.

Q    Did you discuss those DWI convictions in fact with Mr. Rubin, for example, when he went to interview you at your --

A     When he came to me, I told him that, yes.

Q     And question 44 on the next page, do you see that there in the screen?  It says, "Have you or any close friend or relative ever been treated for a substance abuse problem?" and you said, "Yes, my son, alcohol," had the attorneys inquired into his treatment of alcohol, would you have responded to those questions?

A     Yes.

Q     You would not have had a problem disclosing that information?

A     No.

Q     Or any additional information that was not disclosed?

A     No.

Q     Now, you indicated earlier that you thought that the summary you provided in 43B was accurate except for one other thing that was mentioned that you did not recall.  Do you remember that?

A     That's correct.

Q     Do you remember what that other thing was?

A     Well, I guess -- I didn't remember at the time.  I guess it was an incident where there was a burglary and, at the time that I filled out this questionnaire, I didn't remember that.

Q     Okay.  And when you were previously in court, I

believe Mr. Rubin asked you whether it was true that your son had had a burglary conviction where he had broken into a -- a home and stolen some firearms. Do you recall that?

A    I do.

Q    And you said, "I don't know anything about that." Do you recall that?

A    I do.

Q    Okay. Why did you answer in that manner to Mr. Rubin's question?

A    Because I didn't remember it at that time.

Q    Do you remember it now?

A    Yeah, because I went home, I asked my son about it, and he refreshed my memory. And it was another person involved in that whom I didn't even recall and don't even recall to -- today, so --

Q    So without your son having refreshed your memory, you had no recollection of that?

A    No.

Q    So when you completed the questionnaire, you didn't remember that --

A    No.

Q    -- particular conviction or that particular incident?

A    No.

Q   Now, Mr. Rubin also asked you whether -- wasn't it true that your son had been convicted of, I believe it was, five felonies?  Do you recall that --

A   Offhand, yes.

Q   -- previously?  Do you understand what a felony is?

A   I do.

Q   And so you understood what he was asking you?

A   Yes.

Q   And I believe your answer was, again, that you didn't know that.  Why did you respond that way?

A   That I didn't know what?

Q   Well, let me show you the transcript.

MS. RODRIGUEZ-COSS:  With the Court's indulgence, your Honor.  I should have had that marked.

BY MS. RODRIGUEZ-COSS:

Q   I am going to read it to you because I have it marked, but Mr. Rubin stated, "And in fact your son was convicted of multiple serious crimes."  And you responded, "Serious crimes?" as in asking a question.  And he said, "Yes.  Five felonies."  And you responded, "I don't know that."

And you testified here today that he has several DWIs and has a domestic violence conviction, correct?

A   That's correct.

Q   When Mr. Rubin said, "Yes.  Five felonies," and you

said, "I don't know that," why did you respond, "I don't know that"?

A    Because, to me, a felony is a pretty serious crime, which I believe domestic abuse would be one of them. The DWIs, I'm not sure whether they're misdemeanors, could -- you know.  I answered it with the knowledge that I had at that time.

Q    So what you are saying is you weren't certain whether all of the DWI convictions were misdemeanors or were felonies?

A    Correct.

MR. RUBIN:  Object.

THE COURT:  Your objection is on leading question?

MR. RUBIN:  Yes.  I'm sorry.

THE COURT:  Okay, objection --

MS. RODRIGUEZ-COSS:  I don't think it could be leading if I am giving her an alternative.

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  I don't believe it's leading if posing it in the alternative.

THE COURT:  Actually, if you are suggesting the answer --

MS. RODRIGUEZ-COSS:  She has already --

THE COURT:  -- within the question itself,

that technically is leading.  I am going to overrule the objection.  She has already responded to it.  I just ask that you ask open-ended questions --

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  -- so she can testify.

MS. RODRIGUEZ-COSS:  Yes, sir.

BY MS. RODRIGUEZ-COSS:

Q   Do you -- as you sit here today, do you know how many -- do you know exactly how many DWI convictions your son has?

A   No.

Q   But you know that --

A   I know there was enough for him to lose his license for life, yes.

Q   Do you know when he lost his license -- was that before or after trial -- for life?

A   I can't -- I couldn't tell you, honestly.

Q   So you are not aware of the chronology, is what you're --

A   I am not aware of the chronology.  I am aware of the -- the incidents, yes.

Q   Very well.

A   Mainly because I have to cart -- I have to drive him around all the time.  So that's -- I know that.

Q   And Mr. Rubin also -- in the midst of asking you

about your son's criminal acts, you tell Mr. Rubin that your son has not lived with you since he was like 18 years old.  Do you remember making that statement?

A    I do, um-hum.

Q    And why did you say that?

A    Because he hasn't actually lived with me for any long period of time since that.  He has stayed with me period -- you know, at intermittent times when his life has been -- like in between apartments and living conditions.

Q    So, did he -- tell us about that.  When do you recall that your son stayed with you?  When he was in between apartments and so forth?

A    He stayed with me when I was in Colchester for a little while, and then -- until the apartment next door to me opened up, and then he moved right next door.  And I believe there was a time in South Barre he and his girlfriend stayed with me until they found a house.  But these were very -- these were short durations of time.

Q    And when he stayed with you in Colchester, was that when he was coming out of the halfway house?

A    I'm not -- I can't remember that.  I know that he stayed with me.

Q    Okay.  And --

A    I don't think he was coming out of the halfway

house at that time, no.  I think it was a living condition.  He didn't -- his living conditions.

Q    He was just without an apartment?

A    Right.

Q    And so was the intent that he would be living with you permanently or --

A    No.

Q    -- was the intent that --

A    No, no.

Q    What was the intent?

A    Until he found a place of his own.

Q    Okay.

A    Which he has done.

Q    And this person that you mentioned stayed with you sometimes in -- or for a brief period of time in South Barre, who are we referring to?

A    I am referring to Tina, his -- he had a girlfriend named Tina.

Q    Do you remember her last name?

A    No.

Q    So you don't consider that he and Tina lived with you?

A    I think that -- no, they stayed with me until they could find their own place, which they did.

Q    That was my next question.  Did they find their own

place --

A    Yes, they rented a house.

Q    And then they moved in together?

A    In together, right.

Q    Did he have any problems with Tina, do you recall?

A    Not that I recall.

Q    Okay.  You stated earlier that he completed his domestic violence or -- was it anger management?  I'm sorry.  Did you say he completed an anger management program in prison?

A    I'm not quite sure what you would call it.  I guess part of it was anger management.  And I believe they gave alcohol counseling, drug counseling, in prison.

Q    And did he any time after that, again, incur any sort of domestic violence violation that you know of?

A    Well, there was one instance that he was with a girl named Mary, and they were -- now, I wasn't there.  This is just what I was told.  They were sitting in a car, and there happened to be a passerby who -- according to the passerby, their observation and impression was that my son was hitting her, but it was actually the other way around.  She was beating up on him.  And so the police took him into their -- to interrogate him, and I think he said it was because of his past history that they interrogated him, and -- you

know, but nothing came of that, to my knowledge, so --

Q    And who told you about that?

A    My son did.

Q    And you were also asked about some alleged incidents that took place when you were living with a lady by the name of Lucille Tatro?

A    Um-hum.

Q    I'm not sure if I'm pronouncing it correctly.

During the years that you lived with Miss Tatro, were you aware of any physical abuse by her of your son?

A    No, I never observed any physical abuse, no.

Q    When, if at any time, did you become aware of any allegations by your son?

A    Later on, as the years progressed, my son told me certain things that she did to him, but I myself never observed it.  I never saw her do anything to my son, no.

THE COURT:  I thought there was also an allegation that actually she assaulted you as well; is that not correct?

THE WITNESS:  There was a -- well, she did at one time cuz I went out with somebody, and she took a knife and just came at me, but she didn't do anything with it, no.

BY MS. RODRIGUEZ-COSS:

Q    Was that the only instance where you had any sort

of confrontation with Miss Tatro, that you can recall?

A    Well, I didn't have a confrontation with her.  She came at me.

Q    All right.  Was that reported --

A    No.

Q    -- to any authority?

A    No.

Q    Okay.

A    No.

Q    Did you resolve the matter with Miss Tatro?

A    Yes, because I lived with her for many years, so yes.  I will say, I don't think she intended to -- she was just very, very angry.

Q    All right.  Now, let me ask just a couple more questions.

When you were here last, the last time that you were in court for a hearing, you became upset.  Do you recall that?  And the Court --

A    Oh, yes.

Q    -- took a recess.

A    Um-hum.

Q    Can you tell us why you became upset?

A    Because I am accused of being a liar, and I resent that because that is one thing that I am not.  I may have recall problems, but a liar I am not.  So, yes, I

became upset about that.

Q   So your being upset had nothing to do with the questions you were asked about your son?

MR. RUBIN:  Objection.

A   Oh, no.

THE COURT:  Objection sustained.  That's a leading question.

MS. RODRIGUEZ-COSS:  Okay.

BY MS. RODRIGUEZ-COSS:

Q   Was there any other reason why you were upset while you were in court last before Judge Sessions?

A   Well, when -- I was accused of abandoning my son, you know.  I had just gone through a traumatic -- my husband was burned to death.  It took me 10 years to get over that, so I was in no position to take care of my son.  My son was three months old when my husband was killed.  And I also resented that.  And that did upset me, because I went to court and reclaimed custody of my son, and my son lives with me today.  So, I did not abandon my son, and that did upset me, yes.

Q   So -- and those questions -- those statements that you have just made reference to were posed -- statements and/or comments were posed by Mr. Rubin; is that correct?

A   That is correct.

Q    Do you hold any grudge against Mr. Rubin?

A    I understand Mr. Rubin has a job to do, and I respect that, and so I hold no grudges against him, no. He is doing his job.

MS. RODRIGUEZ-COSS:  With the Court's indulgence, your Honor?

(Brief pause.)

MS. RODRIGUEZ-COSS:  We have nothing further, your Honor.

THE COURT:  Okay.  Any cross examination?

CROSS EXAMINATION

BY MR. RUBIN:

Q    How you doing?

A    I'm fine.

Q    You're doing my job again.  Thank you for --

A    That's fine.

Q    -- answering my questions.

You have just testified that you and your son are living together now?

A    We are.

Q    And do you recall that you spoke to a reporter from the Rutland Herald in October?

A    I actually spoke to two reporters, I believe.

Q    If you could just try and answer the question.

A    Okay, that's fine.

Q    Okay.  And you told him at that time in October that your son was living with you, right?

A    I don't actually recall my words, no, but -- I might have.  I don't recall that.

Q    Did you read the article that he wrote?

A    I did.

Q    And if the article says, "She said, adding that her son now lives with her," would that be accurate?

A    Well, we live together.  We share the rent together.

Q    All right.  So regardless of what you told him, in fact he was living with you in October.  Right?

A    Yes.  We moved into this house in September of this year, yes.

Q    Oh.  This is -- so in October you were living with him, and that would be October 2013?  I think you just said yes to that?

A    I believe so.  September, yes.

Q    September?

A    Um-hum.

Q    And you are living now with him; is that --

A    Well, my husband and I are living together, yes.

Q    Yes.  And is this at 110 Whitney Hill Homesteads?

A    No.  I just moved out of there.  This is a house.

Q    All right.

A    24 Germaine Court in Williston.

Q    When did you move in there?

A    September.

Q    So prior to that, you were living at 110 Whitney Hill Homestead?

A    That's correct.

Q    In Williston?

A    Um-hum.

Q    And you were living there last July when myself and Cathleen Price came to talk to you?

A    That's correct.

Q    And your son was also living with you at the time, correct?

A    No.  He never lived with me at -- he stayed with me at Whitney Hill prior to going to Maple Leaf, and I think that was a year ago in February, in 2012 or 2011. He stayed with me for two weeks.

Q    He went to Maple Leaf in 2010?

A    He did.

Q    11 -- 11 or 12?

A    It was recent.  Two years.  I know it was in February.  I'm not sure if it was last year or -- or 2012.

Q    So I guess he was--

A    Or 2013.

Q    So it seems he was having a little relapse from his rehabilitation when he went back to Maple Leaf?

A    Yes.

Q    And, in fact, I think you told us a few -- earlier today that after he had gone through all this correctional treatment, he was rehabbed and basically been okay?

A    Well --

Q    Did you tell us that?

A    No, I believe that he --

Q    Excuse me.  Do you remember --

            MS. RODRIGUEZ-COSS:  She should be allowed to finish her response before he continues his question.

            THE COURT:  She was not responding -- ask the question again, just respond to the question, and move to the next question after that.

            MS. RODRIGUEZ-COSS:  May I ask that counsel allow the witness to complete her response before --

            THE COURT:  She was not being responsive --

            MS. RODRIGUEZ-COSS:  -- he asks another one?

            THE COURT:  -- to the individual question.

    So you want to read -- have the court reporter read

the question back?

(The pending question was read back by the reporter as follows:

Question:  And, in fact, I think you told us a few -- earlier today that after he had gone through all this correctional treatment, he was rehabbed and basically been okay?)

BY MR. RUBIN:

Q    Did you tell us that?

A    I think I said that he didn't commit any more crimes --

Q    Okay.

A    -- since then.  I didn't say anything about -- that he's rehabbed, no.  I don't remember that.

Q    But, in fact, he did commit another crime --

MR. RUBIN:  Which was the Exhibit 8, your Honor.

BY MR. RUBIN:

Q    And that's when he was arrested for aggravated assault on a police officer -- I'm sorry, wrong crime.

This is Exhibit 8.  February 11th, 2006, arrested for domestic assault after choking, scratching and beating his girlfriend.  Final relief from abuse order is filed.  Pled to amended charge of simple assault. Sentenced to four to 12 months, all suspended, placed on

probation, psychotherapy.

A     When was that?

Q     Well, the offense date was in February 2006.  Is that the charge you said he just told you about, where he was in the car --

A     That was the one that I mentioned about him being -- the passerby going by and seeing that in the car.

According to my son, it was her that was hitting him.  That's all I know.  I wasn't there, Mr. Rubin.

Q     So I want to go back to the living conditions.  I asked you whether your son was living with you in July of 2013 at Whitney Hill Homestead with you and your husband, and your answer was no?

A     No, he has never lived with me.  He stayed with me for two weeks there.  You couldn't -- you can't -- couldn't have anyone stay with you longer than two weeks.  And I never went against that rule at Whitney Hill.  No.

Q     Are you aware that he filed an application for a Vermont nondriver identification on July 10th, 2013 --

A     No, I am not aware of that.

Q     -- listing your address, or 110 Whitney Hill Homestead, as his address?  Are you aware of that?

A     I am not aware of that, but I can understand why he

did that because he was living --

Q    Excuse me.

A    -- in his -- in his camper on his friend's property, and he did not have an address at that time. So he listed mine as a mailing address.  This was prior --

Q    My --

A    This past summer he lived in the camper, prior to moving us -- getting this house in September.

Q    You didn't happen to -- I believe it takes -- when you seek a nondriver Vermont I.D. and you list an address, you have to submit additional evidence that you actually live in the place where you say you live --

       Let me finish my question.

       -- so people don't get these for fraudulent purposes.  And one of the things is people sign --

              MS. RODRIGUEZ-COSS:  Wait, wait, wait.  We object any further to the question.

              THE COURT:  Finish the question.

              MS. RODRIGUEZ-COSS:  Well, we would --

              THE COURT:  Then make your objection.

              MS. RODRIGUEZ-COSS:  -- not want counsel to finish the question because he's about to answer his own question.  And so my objection is he is asking the juror about the legal requirements of submitting --

THE COURT:  No, he is not asking about that. He is -- he is setting that as the foundation, and then he is asking a question.  That's why you have to let him ask the question before he's --

MS. RODRIGUEZ-COSS:  He's --

THE COURT:  -- you object.

So you want to finish -- what is the specific question you are going to ask -- the question?

MR. RUBIN:  Did she fill out an affidavit saying that her son was living at this address in support of his application for the nondriver identification.

THE COURT:  Okay.

THE WITNESS:  I don't remember that, no.  I didn't fill out any affidavit.

BY MR. RUBIN:

Q   So it's also true that he lived with you starting in 1999 at 573 Bay Road, right?

A   Like I --

Q   That's a yes-or-no question.  If you don't understand the question, tell me.

A   I don't know.

MS. RODRIGUEZ-COSS:  Objection.  He's arguing with the witness.

THE COURT:  Objection overruled.

MS. RODRIGUEZ-COSS: She's already said she doesn't know dates or chronology.

THE COURT: Objection overruled. The question called for a yes or no, literally.

Do you have an answer to that?

THE WITNESS: I don't recall.

MS. RODRIGUEZ-COSS: Your Honor, I don't understand why other witnesses have walked into this court and been allowed to present explanations and try to ascertain dates or answer questions not exactly yes or no or being limited, and yet Mr. Rubin is permitted to curtail the testimony --

THE COURT: First of all, first of all, this is cross examination. Cross examination ordinarily requires that the lawyer ask the questions for which a yes-or-no response is -- is ordered. Then both either he or you have the opportunity to get them to explain that. That is like basic law.

MS. RODRIGUEZ-COSS: I agree.

THE COURT: So I appreciate the fact that you are -- strike that. That's what the law is. So, go ahead.

MR. RUBIN: Would you please ask her the question or read the question back.

THE COURT: She actually did respond to that

question.

MR. RUBIN:  The question was --

THE COURT:  She did not remember.

MR. RUBIN:  I'm sorry.

THE COURT:  Right.

BY MR. RUBIN:

Q    At some point on -- you and your son lived together at 573 Bay Road in Colchester, correct?

A    I don't know how to respond to that because he stayed with me.  He was not living with me, as I explained before.  It was a very short duration.  Living with somebody?

Q    Six to 12 months?

A    I don't recall that.

Q    And then it is true that he lived across the hall from you in that building for four or five more years, right?

A    He had his own apartment next door to me, yes.  It was a separate apartment, not across the hall.  He had his own apartment.  He had a roommate.

Q    Was my question unclear?

A    No.  I am answering your question.

Q    Do you -- so then moving back from 1999, I think you told the prosecutor that Tina and Pat lived with you before they moved out and got their own place, right?

A    They stayed with me for a while before they got their own place.

Q    And this was in 1996?

A    I do not recall the year.

Q    And there was an incident after they moved out where they -- there was some legal troubles. They had a fight and they broke up? Do you recall that?

A    What I recall is that she was married, separated from her husband, and she went back -- her child was with her husband, and she went back to her husband for the sake of her child. That is what I recall. I do not recall what -- what transpired in their house. No, I don't.

Q    All right. You were a party to your son's divorce case because you wanted to have initially visitation, right?

A    That's correct, um-hum.

Q    And as part of that -- that process went on for several years, didn't it?

A    Mr. Rubin, I can't tell you how long it went on.

Q    Well, if the records show that it went on from 1992 to 1996 or 7 --

          MS. RODRIGUEZ-COSS:  Are you testifying?

Q    -- would that be correct?

          THE COURT:  I'm sorry, you have an objection?

MS. RODRIGUEZ-COSS: No, sir.

THE COURT: Okay. Go ahead.

A    I'm not going to -- I can't sit here and tell you how long it went on because I don't recall it. This was when my son was -- and my grandson was a toddler. He is 21 years old. I can't recall that.

BY MR. RUBIN:

Q    As part of that process, you volunteered or were asked to speak to a psychologist who was making a report to the court?

MS. RODRIGUEZ-COSS: Your Honor, before we go on with this line of questioning, could we approach?

THE COURT: You want to approach outside the hearing of the --

MS. RODRIGUEZ-COSS: Yes, sir.

THE COURT: Okay.

I am going do turn the husher on. You are free to stand and stretch and relax.

(The following was held at the bench.)

MS. RODRIGUEZ-COSS: Your Honor, the reason we wanted to approach is we believe Mr. Rubin is intending on referring to the psychological evaluation that was conducted of the juror. It's a sealed document, that I understand still remains sealed.

THE COURT: First of all, what's the relevance

of the sealed --

MR. RUBIN:  Excuse me.  It wasn't sealed.

MS. PRICE:  It's no longer sealed.

THE COURT:  So what's the relevance?

MS. RODRIGUEZ-COSS:  I'm sorry, I didn't --

MS. PRICE:  We got it from the court pursuant to a public records request.

THE COURT:  Okay.  So it's not sealed in the state system.

MS. RODRIGUEZ-COSS:  It is sealed in the state system.

MR. RUBIN:  No, it's not.

THE COURT:  Regardless, what's the point of the evaluation?

MR. RUBIN:  The point is, she told the psychologist that she was living with her son, not staying, and that it was causing her great stress.  She has testified here in August, unequivocally she volunteered, "I don't know anything about this because I haven't lived with him since he was 18."  This is impeachment of that.  She reiterated that, so --

THE COURT:  All right.  You are not seeking to introduce anything in the psychological evaluation --

MR. RUBIN:  Not at this point.

THE COURT:  -- about her history, her stay at

the Waterbury State Hospital, or anything of that sort? What you are seeking to introduce is just a literal statement made by that -- made by her to that therapist?

MR. RUBIN:  Under the -- yes.

THE COURT:  You are not going --

MR. RUBIN:  Under the rule of prior inconsistent statements, I have to ask her, did you make this statement, and that's my intention.  And there's a couple of other statements that she made.

MS. RODRIGUEZ-COSS:  All right, there is a couple of other statements, and I am wondering whether you are going to raise the issue of why the psychological evaluation was conducted to begin with --

MR. RUBIN:  No.

MS. RODRIGUEZ-COSS:  -- because we move *in limine* --

MR. RUBIN:  No, I am not.  Just factual statements that she made to this psychologist that she has -- claims she either didn't make or has no memory of, and they're significant.

THE COURT:  To the extent that you have inconsistent statements to impeach her credibility, that's fine.  To the extent that you are going to get involved in a psychological evaluation, or her history at Waterbury State Hospital on two separate occasions,

whatever --

MR. RUBIN:  No.

THE COURT:  -- that would be totally inappropriate.

MR. RUBIN:  I'm not.

THE COURT:  You're not getting into that?

MR. RUBIN:  Correct.

THE COURT:  In light of that, there's no objection?

MS. RODRIGUEZ-COSS:  Yes, sir.

(The following was held in open court.)

BY MR. RUBIN:

Q   Do you recall -- and I am not going to get into a lot of the -- any of the details of your past life or anything like; that I am just asking you a couple of specific questions.

A   That's fine.

Q   All right.  Do you recall speaking to a psychologist in connection with your request for visitation?

A   Vaguely.

Q   All right.  Do you recall telling the psychologist in 1996 that your son was living with you, and the fact that he was living with you was causing you stress?

A   No, I don't remember that.

Q    Was the fact that your son was living with you in 1996 causing you stress?

A    I don't remember it.

MR. RUBIN:  This is page 157, your Honor, of the transcript of the juror's testimony in August.

BY MR. RUBIN:

Q    And do you recall -- I think you discussed this with the prosecutor -- that I was asking you about a series of crimes or misconduct by your son, and you in one case said that you were not able to recall a lot of those.  Correct?

A    That's probably true.

Q    All right.  So take a look at what's -- what's on the board.  And that would be line 15.  15, 16, 17.

And do you recall saying, "Can I interject something?  My son hasn't lived with me since he was like 18 years old, so a lot of what you are telling me, I don't know anything about it."

You said that?

A    That's true.

Can I interject something here?

Q    I don't think so.

A    I can explain that.

Q    I don't think so.

THE COURT:  Well, I mean, it has been

addressed. I mean, there's a difference in her mind between staying with and --

THE WITNESS: Right.

THE COURT: -- or living with --

THE WITNESS: That's what I was going to say.

THE COURT: -- which is what she was about to say.

So, that's correct?

THE WITNESS: You got it right. Thank you.

THE COURT: Got it?

THE WITNESS: You got it.

BY MR. RUBIN:

Q    Now, it is true that on your forms you never listed cocaine as one of your son's substance abuse problems, right?

A    Did it ask me that?

Q    It asked you about drugs or alcohol.

MS. RODRIGUEZ-COSS: I'm sorry, your Honor. What is counsel referring to? Who asked?

THE COURT: I --

MR. RUBIN: I didn't hear what you said.

MS. RODRIGUEZ-COSS: I'm sorry. I didn't hear his question entirely.

THE COURT: And I didn't hear the question. You asked something about cocaine, and I didn't hear

literally what you asked her.

MR. RUBIN:  Okay.

BY MR. RUBIN:

Q    It is true, is it not, that the form -- the juror forms that you filled out asked about substance abuse, including drugs or alcohol, on your part or your family member's part, correct?

A    I don't recall that form, but if you say it, then I guess that's so.

Q    You now told us on --

That's Exhibit 3, question 44.  I guess it doesn't say drugs.

Now you have told us on -- that your son did have --

MS. RODRIGUEZ-COSS:  I thought counsel was going to show her Exhibit 3.  Perhaps that would be --

THE COURT:  Actually, I think that counsel just recognized that the question didn't ask about cocaine; just generally substance abuse.

MR. RUBIN:  Right.

THE COURT:  Withdraw the question and you can ask another one.  Is that right?

MR. RUBIN:  Yes.

THE COURT:  Okay.

BY MR. RUBIN:

Q    You never mentioned cocaine on any forms that you filled out.  Right?

A    If that's what you say, but I don't remember.

Q    And now you acknowledge that your son has had a problem with cocaine for years and years?

MS. RODRIGUEZ-COSS:  You know, we object, because --

THE WITNESS:  No, I can answer the question.

MS. RODRIGUEZ-COSS:  No.

MR. RUBIN:  I'm sure you can.

THE WITNESS:  I can -- I don't mind answering.

THE COURT:  What is the --

MS. RODRIGUEZ-COSS:  We have an objection because that's not what the question asked.  And that's why we asked that the question be put to the juror, the question that's actually on the questionnaire.

THE COURT:  Well, it's --

MS. RODRIGUEZ-COSS:  The question on the questionnaire does not say, Did you, a close friend or family member "use" controlled substances.  The question asked, Did you, a close friend or family member -- ever been "treated" for substance abuse.  That's the question.  Those are two different things.

THE COURT:  He is not asking a question about --

MS. RODRIGUEZ-COSS:  Well, he is --

THE COURT:  -- what's on the form.  He is not asking a question was treated.  Apparently he has some evidence someplace to suggest that she has acknowledged that her son abused cocaine.

MS. RODRIGUEZ-COSS:  Which she has acknowledged during the last court hearing.  That's clear.

THE COURT:  Okay, and that's the question that he is asking, and I assume that that will lead to other questions about cocaine.  He is not actually connecting that in any particular way to any question, because I don't see any question here which relates to cocaine.  He is asking the general question as to whether she acknowledges that he used cocaine.

And apparently you can respond to that.

MS. RODRIGUEZ-COSS:  Well, but isn't that why we are here is to explore whether or not the answers to the questions actually posed in the questionnaire were accurate?  And if that question was never posed, then why would that be relevant?

THE COURT:  I don't know where this examination is going, frankly, so you -- he is asking the question to follow up things that she had said earlier on, and then we will see whether it's linked in

any way to a dishonest response.

So, I think that you were about to answer the question.

THE WITNESS:  Can you repeat the question, Mr. Rubin, if you don't mind, please?  I'm sorry.

BY MR. RUBIN:

Q   It's true, is it not, that your son has had a significant cocaine -- has had a cocaine problem since he was 18?

A   Well, I didn't know about it in the beginning, but, yes.  I don't know exactly when that took place, but I don't know of him being treated for cocaine.  I know he was treated for alcohol.

Q   Is it not the case that you told the reporter that you talked to from the Rutland Herald in October of last year -- did you tell him that your son had used coke -- used drugs as a teenager, and on the advice of a doctor, she sent him to an inpatient treatment center?  And that you told him that you wouldn't stand for the drugs and he would have to leave his home if he didn't stop?  Right?  Did you say that to the reporter?

A   I don't recall that.

Q   And you do recall that in 2002, when your son was arrested and subsequently convicted of DWI fourth, cocaine was -- he was also charged with possession of

cocaine in connection with that?

A    I didn't know that, no.

Q    And you told Jean Ratta-Roberts sometime a few years after that, or -- that if you could find your son's drug dealer, you'd turn him in?  Do you remember telling her that?

A    I don't recall it.  I might have said that. Because if I had, I probably would have turned him in, yes.

Q    Changing the subject.  You told us, and I think that what brought you here initially, was that you were molested by your adoptive father when you were young, and that -- that you -- that was not on one of the forms, right?

A    It was not on one of the forms, no.

Q    Okay.  And do you recall that the first person who asked you questions about that incident was the judge? And Judge Sessions asked you why you didn't answer the question that you were not the victim of any crime?  Do you remember him asking you that question?

MS. RODRIGUEZ-COSS:  May we have a page reference, your Honor?

MR. RUBIN:  Yeah.  99.

MS. RODRIGUEZ-COSS:  Thank you.

MR. RUBIN:  Line 12.

BY MR. RUBIN:

Q    Do you remember him asking you that question?

A    What was the question that he was supposed --
Judge --

Q    I will read it.

"Okay.  You answered the question that you were not
a victim of any crime.  Why did you do that?"  That's
the judge's question.  Do you --

A    Well --

Q    I am just asking you now whether you recall --

A    I do not recall that, no.

Q    -- recall --

And do you recall that in part you said, well, you
never considered it a crime; but do you also recall that
you said, "You know, this is something that I have never
even thought about.  I mean, I went on and lived my life
and never considered it"?

Is that true?

A    That is true.  I survived.

Q    And a few pages later in the transcript, when the
judge was asking you again --

MS. RODRIGUEZ-COSS:  I'm sorry, Judge.  Can
counsel just refer us to the page?

MR. RUBIN:  102, line six.

MS. RODRIGUEZ-COSS:  Thank you.

BY MR. RUBIN:

Q    The judge said, "Well, you just didn't connect it," and you again said, "It's like I said, I just never thought about that during my life.  This thing happened to me back when I was a little kid."

A    That's true.  I did not connect it as being a crime, no.

MS. RODRIGUEZ-COSS:  What page?  I'm sorry. What page, counsel?  What page was that last one?

MR. RUBIN:  102.

THE COURT:  Line six.

MS. RODRIGUEZ-COSS:  Oh, I got it.  Thank you. Sorry, your Honor.

BY MR. RUBIN:

Q    So then a little further on in the hearing, I reminded you that you had told a neighbor when you were in adolescence about this event, and you said, "That's correct."  Right?

A    I was little when I told the neighbor, yes.

Q    And then the prosecutor, Ms. Rodriguez-Coss, asked you -- if I can find it.  Page 184.  Asked you -- I'm showing you page 184 -- if you could look up there -- of the transcript of your testimony, and look starting at line six.

And this is the prosecutor asking you, "So it went

unreported, no one was charged, no one was prosecuted, you never appeared in court," et cetera.

Line 11: "All right."

"And the only person you ever talked to about that was that neighbor that one time."

And you answered, "That neighbor, yes."

Right?

A    Um-hum.

Q    Do you recall that in 1997, you told the psychologist, who was evaluating you in connection with the custody case with your son, that your adoptive father engaged in fondling and sexual manipulation?

A    I don't remember that.  I think what we were talking about here though is at the time when I was a little girl that I told the neighbor.

MS. RODRIGUEZ-COSS:  Can the record reflect that when the juror said "here," she's pointing to the screen where the transcript was showing.

THE COURT:  That's fine.

BY MR. RUBIN:

Q    Well, do you -- if the report indicates that you told Dr. Candido that your adoptive father, when you were 13, engaged in fondling and sexual manipulation, that that is -- that you didn't tell him that?

A    I don't remember -- I don't recall that, no.

Q    And you also told Jean Ratta-Roberts that you were sexually abused as a child?

A    I don't recall that either, but I think we are talking about two separate things here.

Q    I am only talking about one thing.

A    Yeah, but we are talking about what --

Q    Actually --

A    -- what I said there that when I was a little girl that I told the neighbor.  This doesn't have anything to do with -- with the years after that.  No.

Q    You also told Suzann Widener that you were sexually abused?

A    I don't even know who she is.

Q    She was Suzann Justice; she was the landlord's niece on Bay Road?  She was the woman that they told you had testified here this morning?

A    Oh, I don't recall that.

        THE COURT:  So, I'm not quite sure I understand your testimony then.  So you said the only time that you talked about this when you were a child was this one.

        THE WITNESS:  That's what I assumed that we were talking about here.

        THE COURT:  So as an adult --

        THE WITNESS:  As an adult, certainly I have

spoken to people about it.  Yes, yes.

THE COURT:  Okay.

BY MR. RUBIN:

Q    So the question here on page 184 by Ms. Rodriguez-Coss was, "And the only person you ever talked to about that was that neighbor that one time?"

And you answered, "Yes, that neighbor."

Question:  "And we're talking about something that happened over 60 years ago?"

A    That's exactly right.  At that time, that's the only person that I ever said anything to.

Q    And you volunteered this information of your sexual abuse when the lawyer from Cleary Gottlieb came and asked you questions about your experience as a juror; you -- you remember she came to your house?  She's the one who took your statement?

A    That's correct, um-hum.

Q    And she asked you generally about the -- how the mitigation evidence -- what you felt about the mitigation evidence, how it impacted you, and at that time you volunteered that you were molested as a child and you didn't kill anybody?

A    That is correct.

Q    Now, you said that you -- never occurred to you that this was a crime.

A    No.  Back in those days, that wasn't -- I mean, nowadays it's a crime.

Q    Yes, it is.

A    And I -- right.

Q    And it was a crime in 2005, wasn't it?

A    Right.  But --

Q    And, in fact, you were following the Michael Jackson trial.  Right?

A    I didn't connect that question to a crime.

Q    Excuse me.  You were following --

THE COURT:  Let her -- let her respond to that.

Go ahead.  You want to respond to that?

A    You know, I don't know how many times I have to answer this question, and I am going to say the same thing no matter how many times or on how many different ways you ask me.

I did not connect what happened to me when I filled out that form as a crime.  I didn't even think about it when I filled out that form.  And I am not -- I'm going to say the same thing.

BY MR. RUBIN:

Q    I suspect you are, and I am ask -- going to ask different -- I'm going to ask questions, okay?

A    That -- go for it.

Q   You were watching the Michael Jackson proceedings and trial at about the time of the voir dire, right?

A   I was working at the hospital full time at that time, so I followed it periodically, maybe at night, as probably everybody else did, yes, at that time.

Q   And he was charged with crimes for fondling and sexually abusing children in California.  Correct?

MS. RODRIGUEZ-COSS:  Your Honor, these questions have been asked and answered already, right, at this hearing?  I don't know what --

THE COURT:  Objection overruled.

You can answer that.

A   That's what he was charged with, yes.

BY MR. RUBIN:

Q   Who else have you told that you were sexually abused other than your husband, I guess, as well?

A   My son knows.  I don't go around telling everybody that.

Q   The prosecutor asked you about the case where your son was charged with stealing guns.  Right?  Do you remember she talked to you a few minutes ago about that?

A   Um-hum.

Q   And at the time she talked to you -- last August, you said, "I don't know anything -- I don't know anything about that."  Right?

A     Correct.

          MS. RODRIGUEZ-COSS:  Could I have the page again, counselor?

          MR. RUBIN:  56, in the middle.

          MS. RODRIGUEZ-COSS:  Thank you.

          MR. RUBIN:  Line 18.

BY MR. RUBIN:

Q     And then after the hearing, you -- you told us today, after the hearing you went home and talked to your son, and he -- you asked him what that was about, and he told you?

A     Yes.  He told me that they stole gun -- they burglarized and stole guns to buy cocaine.  That is what he told me.

Q     So he was staying with you in August at the time of the hearing here?

A     No.

Q     Just happened to be there?

A     No.  I see my son off and on no matter where he is.

Q     And that's been your practice your whole life?

A     He is my son.

Q     Do you recall that you told your -- Dr. Candido in that psychological evaluation in 1996 that your son had been in jail for stealing guns?

A     I'm not going to say that I didn't say that --

Q    Well, if you did say it --

A    -- but I don't recall it.

Q    Well, if you did say it, then it wouldn't be accurate that the first you heard about it was from your son after you testified here in August.  Right?

A    Mr. Rubin, you have to remember my recall.  I don't have recall on a lot of this.  That's my problem.  I don't remember a lot of it.  It's so many years ago.  I mean, I don't remember what I ate three days ago, so it's -- you know, it's recall, not lying.  It's my recall.

Q    One of the questions on the long form was, "Have you ever filed a complaint with the police" --

MR. RUBIN:  I just have a few more questions.

THE COURT:  Well, I was going to take a break at this point.

MR. RUBIN:  Well, I only have got two minutes.

THE COURT:  Okay.

MR. RUBIN:  It's up to you.

THE COURT:  No.  That's fine.  Let's finish.

BY MR. RUBIN:

Q    One of the questions on the long form was, "Have you ever filed a complaint with the police against anyone?" and you said "no."  Correct?  Yes?

A    That's what I -- yes -- saw.  Yes.

Q    And now after speaking with the prosecutors, your memory has been refreshed and you now acknowledge that you did file complaints with the police while you were living in Colchester.  Right?

A    Yeah, but I believe this was after this -- the trial.  Yes.

Q    Well, how many complaints do you think you might have filed between 2000 and 2012?

MS. RODRIGUEZ-COSS:  Objection, your Honor. The question was not -- the trial was over in July of 2005.  What's the relevance how many complaints she has filed?

THE COURT:  Yeah, what is the relevance of the post-trial?

MR. RUBIN:  Because she just said that the complaints were after the trial.

THE COURT:  Okay.  So that means the relevance are those complaints which were filed between 2000 and 2005, aren't they?

MR. RUBIN:  Yes.  But this has to do with credibility, but I will ask it a different way.

BY MR. RUBIN:

Q    How many -- you say that you don't recall filing any complaints between 2000 and 2005 --

A    When I lived in Colchester at 573 Bay Road, I filed

a complaint about suspicion of drugs and also about the -- about Jean's grandson putting a vehicle filled with gasoline down in the cellar which was sending fumes up into my apartment. I'm an asthmatic. I can't take that. And furthermore, there were propane-filled propane tanks in that cellar. I had a husband that was burned to death, you know. That's a fire hazard. You can't have that, so, yes.

THE COURT: You had talked about the one about the gasoline and the propane.

THE WITNESS: Right.

THE COURT: You made --

THE WITNESS: And there was another one about --

THE COURT: Well, can I --

THE WITNESS: Sure. Go ahead.

THE COURT: Calm down here. Right.

You said you also raised a complaint about someone and drugs.

THE WITNESS: Yes. I had a suspicion that -- Ryan Sands, who lived upstairs, was pounding his feet up over my ceiling and -- on purpose, and then these people would come with these small packages, and he would come down the stairs and take this little package and then go, and they would go, and Jean, who you talked with,

told me later on that he ended up in -- in prison for that very thing. So, yes, I did file those complaints, but I believe this was after this trial.

MR. RUBIN: Well, we have the complaints, your Honor.

BY MR. RUBIN:

Q    But is it true -- I am going to refresh your recollection -- that you filed at least five complaints between 2000 and the time of trial?

A    I can't tell you -- I can't tell you the dates.

Q    Do you recall that the last complaint that you filed with the Colchester police alleged that somebody decapitated your cat?

A    That is -- no. Can I explain that whole situation?

Q    Let me just first ask you --

A    That's not true.

Q    Let me just ask a question. Do you recall filing a complaint with the Colchester police prior to the trial that somebody in your building had decapitated your cat?

A    No, because that's not true. I can explain that.

THE WITNESS: Can I explain that?

THE COURT: Well, the question actually is whether you filed the complaint. I don't know that we need to get into the whole decapitation.

THE WITNESS: Okay. No.

THE COURT:  But did you file a complaint?

THE WITNESS:  There was a call to the police department but it was not anything about decapitation of my -- that's an erroneous thing.  That's just totally untrue.

BY MR. RUBIN:

Q    Well, did you -- are you saying that the incident is untrue or the complaint that you filed?

A    The whole -- you don't give me a chance to explain it, so what am I going to say?  It's not true.  There was -- there was no report of a decapitation of my cat, no.

Q    Okay.

A    I can explain it.

Q    No, it's just fine.  You just did.

A    Okay.

Q    The record --

A    I can explain what happened because I remember it was my cat.  If you'd like to hear it, I can explain it.

THE COURT:  What was at issue is whether you filed a complaint.  It doesn't matter what the substance was.

THE WITNESS:  It bothers me what the -- because the complaint didn't have anything to do with the cat decapitation.  That's totally -- it's laughable.

MR. RUBIN: We'll offer the complaint about the -- the complaints in the relevant time period for the Court to review.

THE WITNESS: But I wish I could explain it.

THE COURT: He is going to offer the document and --

THE WITNESS: Let me explain this situation.

MS. RODRIGUEZ-COSS: Then --

THE COURT: Okay. So you are going to offer the complaint at some point?

MR. RUBIN: We have already.

THE WITNESS: If you are going to offer it, I should explain it.

THE COURT: Okay. Then why don't you go ahead and explain exactly what happened.

THE WITNESS: All right. My cat, Ebony, was in chronic renal failure, and my cat was sick, and he broke through the screen of my kitchen and was gone for two days. And when I went out looking for him, I went all over the neighborhood --

Are you listening to me, Mr. Rubin?

MR. RUBIN: Actually, I -- I am looking, but I am listening to you.

THE WITNESS: Okay.

And so I went all over the neighborhood looking for

my cat, Ebony. He was gone for two days, which he had never been before. So in -- during the time that I was meandering all over the neighborhood, I saw these pelts of -- these animals that had been skinned at my neighbors, and the first thing I could think of, because I'm a -- an animal lover, was somebody was -- was hunting these animals and skinning them for their pelt. So, yes, I reported that to the police, and they came and looked at it, and it was bear pelts or something like that, and that was the whole issue. It didn't have anything really to do with my cat. I was just out looking for my cat.

MR. RUBIN: Okay?

THE WITNESS: Decapitation, this -- that -- that's just -- I don't know where that came from.

MR. RUBIN: Well, if it came from the police report --

THE WITNESS: Well, the police aren't always -- you know, sorry, but that's just not true.

MR. RUBIN: You weren't worried that these pelts were the result of someone decapitating your cat?

THE WITNESS: No. I was worried about the fact that somebody was -- was catching these animals and was skinning them.

THE COURT: All right. So there --

THE WITNESS:  So that's the situation.

THE COURT:  There are other complaints between 2000 and 2005.  Why don't we -- if we can just move on.

THE WITNESS:  I don't know if you call that a complaint.  I wanted them to come and check the situation out.

MR. RUBIN:  I just want to ask you one more question about that because you wanted to talk about it.

BY MR. RUBIN:

Q    If a police officer report said that he was dispatched to meet {Juror No. 162} regarding her cat possibly --

MS. RODRIGUEZ-COSS:  I'm sorry.  I apologize, your Honor, but is this going to be -- this document is not in evidence, so we object to Mr. Rubin reading from a document not in evidence.

THE COURT:  I thought this complaint was already submitted into evidence.

No.

MS. RODRIGUEZ-COSS:  Not into evidence, not as far as I understand.

MR. RUBIN:  It's one of the documents offered.

MS. RODRIGUEZ-COSS:  Not admitted.

MR. RUBIN:  Correct.

MS. RODRIGUEZ-COSS:  And so that's objection

number one.

MR. RUBIN:  Not yet admitted.

MS. RODRIGUEZ-COSS:  So objection number two, this isn't her statement.

MR. RUBIN:  I am going to move on.

THE COURT:  Yes, move on.

BY MR. RUBIN:

Q    You -- I think we talked about Lucille Tatro is a woman that you were living with in the late '70s and early '80s, correct?

A    That's correct, um-hum.

Q    And, in fact, you did file a criminal complaint against her, correct?

A    No, that's not correct.  It was my husband that filed the complaint, not me.

Q    Well, the complaint -- I can --

A    He was not my husband at the time.

MR. RUBIN:  Too many documents, your Honor.

BY MR. RUBIN:

Q    Did you file -- was a complaint filed and alleged that Lucille Tatro threw a rock at your car, tried to smash your windshield, treated you -- you in a threatening manner and burned the upholstery on your car?

A    The car belonged to my --

Q    It's not --

A    The car belonged to my husband, who was not my husband at the time.  It was his car.  I believe it was he that filed the complaints.

Q    You were not -- were you not also the victim of her anger in that incident?

A    Probably was, but it was him that filed the complaint.

Q    And that's why you didn't mention it earlier, because he filed it and not you?

A    I don't remember -- I don't -- these things are -- I don't recall.  At the time -- if you are talking about the questionnaire I filled out, I wouldn't have even thought about that at the time.

Q    Let me just ask you one more question.

      MR. RUBIN:  Is this in evidence yet?

      (Brief pause.)

BY MR. RUBIN:

Q    Do you recall, in July 1982, you contacting an Officer Kinnerson, giving a statement about unlawful mischief in Middlesex in July 1982 regarding the incident I just discussed?

A    No.  I might have talked to somebody, but -- during that time with Moe, but --

Q    Do you recall that you told Officer Kinnerson that

you were driving a 1982 silver Toyota, you stopped at Lucille Tatro's residence, that Lucille Tatro dented the driver's door by throwing a rock?

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, what is the -- the question, because the question on the questionnaire regarded complaints filed.  Is he just asking her whether she remembers the incident?

THE COURT:  No, I think he is asking the specific facts to see if that refreshes her recollection as to whether she did or did not file the complaint. That's what he is doing.

MS. RODRIGUEZ-COSS:  Is that what he is doing?

THE COURT:  Do you have an objection to that?

MR. RUBIN:  I am impeaching her as well. Both.  I am asking her whether she recalls speaking to the officer, giving all the details of the complaint.

MS. RODRIGUEZ-COSS:  Speaking to the officer doesn't entail filing a complaint.  It entails providing testimony.

THE COURT:  Well, objection overruled.  You can ask the question and then --

THE WITNESS:  The car was my now husband's car.  I might have been with him at the time, but he -- I couldn't file a complaint about -- it wasn't my car. Think about that.  He had to be initially the one to

file the complaint.

THE COURT:  So is that the -- is that the distinction that you may have talked to the officer?

THE WITNESS:  That's -- I may have talked to the officer with him as a witness.  And furthermore, and I will just -- that was not her residence.  I didn't stop by her residence.  It was my residence.

BY MR. RUBIN:

Q    You seem to have a pretty good recollection of that event.

A    Because we both, me and Lucille Tatro, lived together at this house trailer, and it happened at the house trailer which was then still legally my residence.

Q    You don't recall suing Don Milne to get the money back that he stole from you when you were in his guardianship?

A    I remember going to Joe Palmisano and trying to find out about it, yes.

Q    You don't remember filing an actual --

A    No.

Q    -- legal suit to --

A    I'm sure Joe Palmisano did all of that.

MR. RUBIN:  No further questions.

THE COURT:  Okay.  Any redirect?

MS. RODRIGUEZ-COSS:  Just like two quick

things, your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    In any event, you are recalling the details of this incident with Miss Tatro now because Mr. Rubin has brought your attention to that specific incident?

MR. RUBIN:  Objection.

BY MS. RODRIGUEZ-COSS:

Q    Correct?

THE COURT:  Objection overruled.  You can answer that question.

A    Yes, because I don't sit -- these -- I mean, I don't think about these things, and over a period of years and years and years, you don't think about it anymore, but then when somebody mentions something to you, hey, well, yeah, maybe I vaguely remember that.  So that's just a human thing, I mean, as far as I'm concerned.

BY MS. RODRIGUEZ-COSS:

Q    Right.  And your son went back to Maple Leaf, I believe you said, either in -- was it 2012 or 2011?

A    February, yeah.

Q    In February.  You weren't sure whether it was 2011 or 2012?

A    Yeah, it was a couple of years ago, yes.

Q    And what was -- if you know, what was the purpose of him going back to Maple Leaf?

A    Still alcohol.

Q    All right.  But was there a general purpose for him -- what was it that he was trying to accomplish?

MR. RUBIN:  Objection.

BY MS. RODRIGUEZ-COSS:

Q    What was it --

MS. RODRIGUEZ-COSS:  If she knows.

THE COURT:  As to her knowledge, it's relevant, so objection overruled.

You can answer the question.

A    His -- his purpose was to stop drinking alcohol --

BY MS. RODRIGUEZ-COSS:

Q    Okay.

A    -- which he accomplished for like five months totally.

Q    And you mentioned previously that he -- his license had been suspended for life; is that correct?

A    That is correct.

Q    Is he --

A    Unless he still goes through certain things for which he has to pay for.  And it interferes with his work.  He works full time, so --

Q    When you say that, unless he goes through certain things that he has to pay for, are you referring to treatment?

A    I am referring to an alcohol counselor, which he did start off with, but he has to pay for that, like $75 a visit.  Plus he has to go to Alcoholic Anonymous, which he tried doing, but he would have to take the bus into Burlington and then come all the way back to Williston, which would be like 10 o'clock at night.  He couldn't -- even summer.  And then he had to get up the next day and go to work and work full time, so the whole -- this whole -- this whole treatment sort of makes it difficult for somebody sometimes when you don't have any transportation.

THE COURT:  Can we push this along at this point?

THE WITNESS:  Yes.

MS. RODRIGUEZ-COSS:  Yes.

THE WITNESS:  Sorry.

MS. RODRIGUEZ-COSS:  I was just --

BY MS. RODRIGUEZ-COSS:

Q    My last question was, so a part of him going back to treatment were his efforts to regain his license; is that right?

A    Exactly.

MS. RODRIGUEZ-COSS:  And just the very last question, your Honor.  We have one on redirect.

BY MS. RODRIGUEZ-COSS:

Q    Mr. Rubin tried to bring your attention back to the time when your son was 17 or 18, I believe, and you discovered that he had been using cocaine.  Do you recall that?

A    I don't know exactly what it was he was using, but I discovered he was using it, yes.  Using drugs.

Q    How did you discover that he was using drugs?

A    Because there were needles that were in the car for which he said were for diabetes, but I worked at the hospital, so I took the needles in to the -- the -- Rama Cloud (phonetic), who was the director of the lab, and he analyzed them, and it came back that he was drugs -- it was drugs, and that's the first time that I ever really knew that my son was into drugs.  I was very naïve about the whole thing.

Q    And did you give him an ultimatum at the time?

A    When he was 17, or almost 18, the doctor, Dr. Matthew, who was at the Plainfield Health Center, said that my son's liver was jeopardized -- was compromised, and that -- that I needed to -- to do tough love.  Tough love, in other words, is what they called it; give him an ultimatum, either go to Brattleboro Retreat or leave,

because emotionally, I -- I couldn't deal with it, because I would come home from work and -- one time a grandfather clock was on the floor. He had people in there, and -- and so --

Q   So essentially did he -- which option did he take?

A   He left.

Q   All right. So to the best of your recollection, when -- when you discovered that he had this problem, did he receive any substance abuse for cocaine or drugs, whatever the substance was that he was using?

A   I don't -- I don't remember that.

Q   All right.

        MS. RODRIGUEZ-COSS: We have nothing further.

        THE COURT: Okay. Anything further?

                RECROSS EXAMINATION

BY MR. RUBIN:

Q   So your son has had a struggle with substances for most of his life, right?

A   Yes.

Q   It's been hard for you?

A   Very hard.

Q   And directing your attention -- this is 158 of the transcript, line 19. Can you see that?

    Question: "I am going to show you question 44 on the long form which asks, 'Have you or a close friend or

relative ever been treated for substance abuse?' and you answered, 'Yes,' did you not?  'My son, alcohol.'"

And you answered, "Yes, I believe he went to an alcohol counselor, yes, at one time."

Right?  Is that what you said?

A    Evidently, if that's there.

Q    Yeah.  He has had -- he has been to alcohol counselors on and off for decades, right?

A    I recall -- I recall his Maple Leaf, when he went to Maple Leaf, and I recall him going to an alcohol counselor in -- off of Patchen Road to try to get his license back, because that was one of the conditions that he had to -- to go there.  That's what I recall.

Q    Maple Leaf twice?

A    He has been at Maple Leaf Farm twice.

Q    Yeah.  Dismas House?

A    Well, Dismas House is a halfway house when you are released from prison, to help you try to get back into --

Q    Alcohol counseling in connection with CRASH, to get your license back, right?

A    See, I only know what he told me.  You know, he went through these -- these treatments in prison.

MR. RUBIN:  No further questions.

A    But other than that, I don't know.

THE COURT:  All right.  Any further questions?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  All right.  Thank you.

THE WITNESS:  Can I go?

THE COURT:  You can go.

THE WITNESS:  Thank you.  Nice to see you.

THE COURT:  Okay.  All right.

(Witness excused.)

THE COURT:  Any additional witnesses to be called by the government?

MS. RODRIGUEZ-COSS:  Oh, yes.  We are going to be calling agent Michelle Delpha.

THE COURT:  Okay.  And how long do you expect her testimony to last?

MS. RODRIGUEZ-COSS:  Not very long, your Honor.

THE COURT:  I mean, the question is whether we end at this point.

MS. RODRIGUEZ-COSS:  What?  I'm sorry.  What did you say?

THE COURT:  The question is whether we have a break at this point.

Mr. Liman, are you -- you have an objection?

MR. LIMAN:  We received 302s with respect to one person that the agent interviewed.  If it's the --

that person and that -- those set of interviews is the limit of it, I would be ready to conduct cross examination. I don't know whether the agent proposes to testify --

THE COURT: Well, in particular, you have 302s on an interview conducted by the agent for whom?

MR. LIMAN: It is for Kaulene Kelsey.

THE COURT: Okay. Is that -- that's the limit?

MS. RODRIGUEZ-COSS: Yes, that's correct. We are going to solicit some prior inconsistent statements by Miss Kelsey.

THE COURT: Does the parties -- I mean, we could go through this in 15 minutes?

MS. RODRIGUEZ-COSS: Direct and cross, you mean, or is Mr. Liman --

THE COURT: Direct and cross. Let's take a break at this point. I don't want to rush this, so I will take a 15-minute recess.

MS. RODRIGUEZ-COSS: All right.

(Court was in recess at 3:20 p.m.)

(The following was held in open court at 3:35 p.m.)

THE COURT: Okay. The government want to call its next witness.

MS. RODRIGUEZ-COSS: Yes, your Honor. We call

Special Agent Michelle Delpha.

MICHELLE DELPHA,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

THE COURT:  Good afternoon, Agent.

THE WITNESS:  Good afternoon, your Honor.

DIRECT EXAMINATION

BY MS. RODRIGUEZ-COSS:

Q    And could you state your name, please?

A    Michelle Delpha.

Q    And how are you currently employed?

A    Special agent with the FBI.

Q    And how long have you been employed as a special agent with the FBI?

A    18 years.

Q    And you were the original case agent on the case of United States versus Donald Fell; is that correct?

A    No.  I was the second case agent.

Q    All right.

A    I have been with the case since the first day the FBI became involved.

Q    All right.  And you were involved through the trial?

A    Yes.

Q    Okay.  And recently, you have been involved in

assisting the government in the post-conviction case; is that correct?

A   Yes.

Q   All right.  And as part of that assistance, did you have an occasion to interview Kaulene Kelsey?

A   Yes.

Q   And when was that?

A   I have interviewed her twice.  The first time was on November 25th, 2013.

Q   And the second time?

A   Very recently.  March 4th, 2014.

Q   And was the second interview over the telephone?

A   Yes.

Q   But the first interview was in person, correct?

A   Yes.

Q   And where did you meet Miss Kelsey?

A   At her residence.

Q   And for how long did you speak to her?

A   A long time.  At least two hours.  But I don't recall specifically how long.

Q   All right.  And what was the primary purpose of your visit or your interview of Miss Kelsey?

A   Was to determine what information it was that the defense -- why she was interviewed by the defense.

Q   And why was that?

A    Why was that?

Q    Yes.  What was -- what did you learn?

MR. LIMAN:  Objection.

MS. RODRIGUEZ-COSS:  All right, strike that.

BY MS. RODRIGUEZ-COSS:

Q    Did she talk to you about the trip to Rutland that she described in court today?

A    Yes.

Q    Okay.  And what did she tell you about that trip?

MR. LIMAN:  Objection, your Honor.  Unless there's a proffer of inconsistent statement, I think it's hearsay.

THE COURT:  Actually, there was cross examination of her which suggested that a statement that she made to the agent was inconsistent with the testimony that she gave today.  Doesn't that inconsistency warrant further exploration as to what was said between Agent Delpha and the witness?

MR. LIMAN:  If -- if the witness was asked about a statement to the agent and denied making that statement or didn't recall making that statement, counsel's permitted to inquire.  They haven't laid the foundation for doing that.

MS. RODRIGUEZ-COSS:  I believe we did, your Honor, inquire this morning.

THE COURT: Why don't you lay the foundation. What specifically will she offer which is inconsistent with the testimony of Ms. Kelsey?

MS. RODRIGUEZ-COSS: She's going to testify as to the purpose of the trip that they took to Rutland and what Juror 143 told her.

MR. LIMAN: I've got no objection to that question.

THE COURT: Okay. Go ahead.

BY MS. RODRIGUEZ-COSS:

Q    So what did she tell you -- sorry. What did Miss Kelsey tell you with regards to the purpose of the trip that she described taking to Rutland with Juror 143?

A    She told me that they went out for a ride, and they ended up in Rutland and that they -- they went to two crime scenes: to the Price Chopper, through the parking lot, and then also to a residence.

Q    And did you specifically inquire as to what the purpose -- the original purpose of the trip was?

A    Yes. And she told me that she couldn't recall where they were going, but they did not specifically set out to go to Rutland to look at crime scenes.

Q    All right. And was that something that was important to the government?

MR. LIMAN: Objection.

THE COURT: Objection overruled. You can answer that question.

A    Yes, it was.

THE COURT: Your intent. Okay. Go ahead.

BY MS. RODRIGUEZ-COSS:

Q    And did you ask her again about that -- throughout your interview, approximately how many times did you ask her about her original purpose in going to Rutland?

A    Well, I asked her multiple times. It was due to the fact that we were trying to ascertain when she went, or when this trip went -- when they went. And I asked her multiple times as to, you know, why -- where they were going that day that they ended up in Rutland.

Q    And her response was repeatedly what?

A    She couldn't recall where they were going, but somehow they ended up in Rutland.

Q    So she was consistently clear that the intent of the trip was not to conduct an investigation?

MR. LIMAN: Objection.

THE COURT: Objection -- that's leading. Sustained.

BY MS. RODRIGUEZ-COSS:

Q    What was her consistent answer when --

MR. LIMAN: Objection.

THE COURT: Well --

214

BY MS. RODRIGUEZ-COSS:

Q    What was her answer?

THE COURT:  What was her answer?  Go ahead.

A    Her answer was that she couldn't recall where they were going, but they did not specifically set out that day to go to the crime scenes in Rutland.

BY MS. RODRIGUEZ-COSS:

Q    Very well.

And with regards to the two locations that she stated that they saw in Rutland, what did she tell you?

MR. LIMAN:  Objection.  There's been no proffer of an inconsistent statement.

THE COURT:  How is that inconsistent with what she testified to?

MS. RODRIGUEZ-COSS:  Well, I -- your Honor, it's an introductory question to then ask her what statements she made about the Price Chopper and what statements she made about the house.

THE COURT:  Okay.

MS. RODRIGUEZ-COSS:  We understand.

THE COURT:  What is your proffer -- what is your proffer as to the inconsistencies that she said to the agent about the Price Chopper and the house with her testimony?

MS. RODRIGUEZ-COSS:  She added information.

She never mentioned the lighting.  She never mentioned that they went around the building.  Those are the -- those are the two inconsistencies.

THE COURT:  Okay.  Those are inconsistencies with what she said, so any objection?

MR. LIMAN:  As to those limited questions, no problem.

THE COURT:  Okay.  Go ahead.

THE WITNESS:  I don't remember the question. I'm sorry.

BY MS. RODRIGUEZ-COSS:

Q    What did she tell you about the locations that they observed or saw in Rutland?

A    Okay.  So for the Price Chopper, she told me they drove through the parking lot; they looped through.  She used the word "looped."  They looped through the parking lot, and the juror pointed out that that was the location where Mrs. King had been abducted.

Q    Okay.  Did she mention the lighting of the Price Chopper?

A    She did not.

Q    Did she mention going around the building?

A    She told me she was asked by the defense investigator if they had gone behind the building, and she told me that they did not.

Q    And what about the house that she described visiting or driving by?

A    She told me the second location was the -- the residence where -- that they went to that residence where Donald Fell killed his mom and her friend.

Q    And what -- according to your interview of her, what did she tell you with regards to what Juror 143 said with regards to that location?

MR. LIMAN:  Objection, your Honor.  There's no showing again of inconsistencies, as far as we can --

THE COURT:  You didn't proffer this as an inconsistency.  Is there?

MS. RODRIGUEZ-COSS:  Can the record just reflect that he has her 302 in front of him; that we provided the 302.

THE COURT:  I appreciate that, but just tell me what the proffer is about the inconsistencies.

MS. RODRIGUEZ-COSS:  So the witness testified today that Juror 143 made comments about the characteristics of the neighborhood and the house.  She made no such comments to Miss Delpha.

THE COURT:  Well, how is -- that is inconsistent?  How is that inconsistent?

MS. RODRIGUEZ-COSS:  Miss Kelsey was asked this morning, What did Juror 143 say about the residence

where Donald Fell's mother was killed? and she made several statements this morning about the socioeconomic characteristics of the neighborhood --

THE COURT:  Consistent with the --

MS. RODRIGUEZ-COSS:  -- driving through the neighborhood, and the houses around.

Miss Delpha posed the same question to her:  What did Juror 143 say, if anything, with regards to that location?  And all she told Miss Delpha was that that was the location where Donald Fell's mother was killed.  That was it.  She provided no other information to Miss Delpha.

THE COURT:  Okay.  All right.

MR. LIMAN:  Your Honor, I don't think that's inconsistent.

THE COURT:  It is an inconsistency assuming that the question is -- and I recall the question being asked this way -- as to what exactly did he say at the house, and describing the house; and then she went on to say various things, including the socioeconomic level, the fact that -- that the house would not -- was not consistent with what the defendant said or the defendant's case projected about his theory of the defense.  That became particularly relevant.  If she in fact did not say the same thing, that technically is an

inconsistency.

So do you remember the question?

THE WITNESS:  Late in the day.

BY MS. RODRIGUEZ-COSS:

Q    During the course of your interview, did you ask Miss Kelsey what, if anything, Juror 143 had said about Donald Fell's mother's house?

A    That -- she said that the juror pointed out the house and said that is where Donald Fell killed his mother and her friend.

Q    And according to the statements that Miss Kelsey made to you during your interview, did she tell you whether Juror 143 said anything else about that house?

A    No.

Q    Now, did you ask her when the trip took place?

A    I did.

Q    All right.  Was she able to tell you when the trip took place?

MR. LIMAN:  Your Honor, again, I don't think there's any inconsistency.

MS. RODRIGUEZ-COSS:  We are introducing it as foundation, your Honor.

THE COURT:  Well, are you proffering an inconsistency about what she said about the timing, that is, during the course of the trial?

MS. RODRIGUEZ-COSS:  We are going to offer, your Honor, the fact that this morning Miss Kelsey testified that Juror 143 said, "I don't care," with regards to his potential visit to Rutland being in violation of the instructions of the Court, and she never made that statement to Miss Delpha.

MR. LIMAN:  Your Honor, first of all, that's -- that's not what the witness said.  It also was -- was yesterday.  And then lastly, I do have the 302s, and what the witness said to the agent repeatedly was exactly consistent with her testimony at trial, which was that she went during -- she went to the site in Rutland during the trial.

THE COURT:  Well, all right.  She went during the course of the trial.  There's no question that that is totally consistent, and she would have affirmed this.

There was a statement that she said, Miss Kelsey said, that Juror 143 said, and, in particular, "I don't care.  I wanted to come check this out.  No one's going to catch me.  No one's here to see me," et cetera, and that's the inconsistency that they are seeking to introduce.

MR. LIMAN:  If we can show you the 302, I think the 302 would show that's exactly what the --

MS. RODRIGUEZ-COSS:  I don't care if it's in

the 302 --

THE COURT:  Okay.

MR. LIMAN:  That's exactly --

MS. RODRIGUEZ-COSS:  I apologize.  I apologize.  I should not have done -- addressed --

THE COURT:  Okay.  Right.

There is something in the 302 which addresses Juror 143's comments about why he was there and the fact that no one would catch him.  Is that correct?

Go -- I am asking you, Mr. Liman, just to -- just to see if the inconsistency is established.

MR. LIMAN:  The 302 reflects that Miss Kelsey informed the agent that she was pretty certain it was during the trial because -- because of the gut feeling she had when they went to the sites:  it looked poor, shouldn't be doing this; and that he responded by saying that he just wanted to check things out.  I don't see how that's inconsistent.

THE COURT:  Well, it is not inconsistent to the first part of what he said.  It's inconsistent to the second part of what he said, and that is that nobody's going to catch 'em, and other things that she testified to about his version that he wasn't going to get caught, he wasn't going to get in trouble, nobody was there to see him.  All of that she testified to.

That, theoretically, is sufficiently inconsistent that the question can be asked, and then of course you have the opportunity to raise consistent statements, so --

MR. LIMAN:  I'll cross.

THE COURT:  Okay.  So you may ask that question.

MS. RODRIGUEZ-COSS:  Thank you, your Honor.

BY MS. RODRIGUEZ-COSS:

Q    With regards to Juror 143 being able to see those crime scenes, what did Miss Kelsey tell you?

A    He said that -- he told her that he just wanted to check things out.

Q    Did she tell you that he said, "I don't care" with regards to violating the Court's instructions?  "I'm not going to get caught.  Nobody's going to see me."  Did she make any of those statements to you?

A    No.

Q    Okay.  And when you asked her whether Juror 143 had talked to her about the trial, what was her response?

A    She said he did not.

Q    And did you ask her whether she was familiar with the locations in Rutland as they related to the Donald Fell case?

A    Yes.  Well, that -- that came up during a question

I had, whether he had talked about the trial. She said that he was good at not talking about the trial. And I had asked if he had said anything about those locations, anything else about the trial, and she said, "No, I was already familiar with the locations because of the media reporting during trial."

Q   So she told you that she had seen media records and had familiarized herself with the locations?

A   Yes.

MS. RODRIGUEZ-COSS:  We have nothing further, your Honor.

THE COURT:  Okay.  Any cross?

MR. LIMAN:  Briefly, your Honor.

CROSS EXAMINATION

BY MR. LIMAN:

Q   Good afternoon, Agent.

A   Good afternoon.

Q   You have been on this case, am I correct, since December of 2000?

A   Um, that would be correct.  Whenever the vehicle was first located in Arkansas, that day I was involved.

Q   A long time?

A   A long time.

Q   Practically your entire career with the FBI?

A   Yeah, a majority of it.  Yes.

Q    And now you -- you interviewed Miss Kelsey twice, correct?

A    Yes.

Q    The first time was a visit with her?

A    Yes.

Q    And how long was that visit?

A    It was at least two hours.

Q    And then the second time was a telephone call?

A    Yes, a brief call.

Q    And you -- you recorded in your 302s the statements that you say Miss Kelsey made during those encounters?

A    Yes.

Q    Okay.  You didn't record everything that she said; is that fair?

A    That's fair.

Q    And I'm going to hand you copies of your 302s. This may make things move more quickly.

        Exhibit 49 is the -- the 302 of your interview with -- with Miss Kelsey when you met with her; is that right?

A    Yes.

        MR. LIMAN:  Just give me a second.  I apologize.

        (Brief pause.)

BY MR. LIMAN:

Q    And that was on November 25th; is that right?

A    Yes.

Q    And your 302 is four and a half pages, correct?

A    Yes.

Q    Okay.  And so it's pretty accurate to say that in a four-and-a-half-page 302, you would not be able to record everything that Miss Kelsey said to you?

A    Yes.

Q    Now, I want to ask you about some things that she did say to you.  Focusing on the fourth paragraph of the 302, do you see that?

A    Yeah.  The last paragraph of the first page?

Q    The first paragraph of the fourth -- of the first page.  Is it correct that one of the things that she -- well, she referred to a member of Mr. Fell's defense team as an investigator by the name of Melissa; is that right?

A    Yes.

MS. RODRIGUEZ-COSS:  I'm sorry, your Honor, but to the extent Mr. Liman is now soliciting consistent statements, it would be hearsay.  What's not hearsay are prior inconsistent statements.

THE COURT:  This is -- this is what happens: You raise an inconsistency in your direct examination, inconsistency between her testimony in trial and also

her 302, and then the other side goes back through the 302 and says, oh, no, this is not evidence of her intentionally misrepresenting.  Look at all the -- look at all the consistent things that people say.  And it is essentially to rehabilitate the witness.

So, you can proceed.

MR. LIMAN:  Thank you, your Honor.

BY MR. LIMAN:

Q    And focusing on that last paragraph on the first page, it is correct, isn't it, that one of the things Miss Kelsey advised you of is that she told our investigator that she accompanied *{Juror 143}* on a trip to Rutland?

THE COURT:  Again, strike on the record --

MR. LIMAN:  I'm sorry.

THE COURT:  -- the reference to the name. This is witness 143 -- Juror 143.

MR. LIMAN:  Let me start again.

THE COURT:  Okay.

THE WITNESS:  Thank you.

BY MR. LIMAN:

Q    It is correct, isn't it, that one of the things that Miss Kelsey advised you of is that she told our investigator that she accompanied Juror 143 on a trip to Rutland which occurred during the trial?  She said that

to you, correct?

A    She did say that.

Q    And that was on November 25th, correct?

A    Yes.

Q    Okay.  And then focusing a little bit further down, same paragraph, she said to you that she could not recall what led them to the Rutland area; is that correct?  She said that to you?

A    Yes.

Q    Okay.  But then she went on to say, *{Juror 143}*, "who was driving either his vehicle or Kelsey's vehicle, drove into the Price Chopper parking lot and looped through the parking lot."  She told you that, correct?

A    Yes.

        MS. RODRIGUEZ-COSS:  Could we move to --

BY MR. LIMAN:

Q    And she --

        THE COURT:  Pardon me?

        MS. RODRIGUEZ-COSS:  He is again using the juror's name.

        THE COURT:  Right.

        MR. LIMAN:  I'm sorry.  I'm sorry, your Honor.

        THE COURT:  Strike that and replace it with 143.  Go ahead.

BY MR. LIMAN:

Q    And she didn't tell you -- is that the paragraph -- the sentence that you are referring to, when you said that Miss Kelsey told you that she did not go behind the -- the buildings in the shopping center?

A    That would be in my notes.  It's not reflected in the FD 302.

Q    So it's not even reflected in the 302, correct?

A    That's right.

Q    You didn't think it was important enough to put it in the 302?

A    I believe I overlooked that.

Q    And then you go on to say -- and we will get to that in a moment.  You go on to say that -- and here you are recording what Miss Kelsey is telling you -- that Juror 143 told Ms. Kelsey that this -- referring to the -- the Price Chopper -- was where the victim, Terry King, had been abducted.  Correct?

A    Yes.

Q    And so that's what Ms. Kelsey was reporting to you had been told her by the juror when she went during the time of trial with the juror to the Price Chopper, correct?

A    Yes.

Q    And then -- then the next thing that Ms. Kelsey told you is that she vaguely recalled seeing a white

house, possibly two stories, on a corner lot, in a residential area, correct?

A    Correct.

Q    And you recognized that, right, as the location of 135 Robbins Street?

A    Except for the color of the house, yes.

Q    And then Miss Kelsey also told you back in November that during this trip to the crime scene during the time of trial, Juror 143 pointed out the location to Miss Kelsey as being where Mr. Fell killed his mother and her friend, correct?

A    Yes.

Q    Okay. And then you -- you go on. I am now on the second page of the 302. You asked Ms. Kelsey several times, correctly, whether the trip to Rutland occurred during the trial?

A    I did.

Q    Okay. And referring to the second page, the first full paragraph of the 302, Miss Kelsey told you that they didn't -- that she and Juror 143 did not travel to New York where Terry King's body was found. You see that?

A    Yes.

Q    And that's something that Miss Kelsey told you, correct?

A    Yes.

Q    And then Miss Kelsey said to you that she was certain that this trip to Rutland occurred during the trial and not afterward, okay?  Is that correct?  She said that to you?

A    Yes.

Q    And she said it to you, that she was certain because she had the gut reaction that the juror shouldn't be doing this at the time they were looking at the sites, correct?

A    Correct.

Q    And she further told you that when they were going to the crime scene during the time of trial, that the juror said to -- that she asked the juror why they were looking at the sites, correct?

A    Correct.

Q    And when she asked the juror why they were looking at the sites, the juror told her -- and during this trip at the time of trial -- that he just wanted to check things out, correct?

A    Correct.

Q    And then, next paragraph, you asked Miss Kelsey several times whether the trip occurred during the trial.  That's what the 302 reflects, correct?

A    Correct.

Q    And, again, Ms. Kelsey advised you that she was pretty certain it was during the trial because of the gut feeling she had when she went to the sites that {Juror 143} shouldn't be doing this, correct?

A    Correct.

THE COURT:  Again, strike the {Juror 143} -- strike the name --

MR. LIMAN:  Sorry.

THE COURT:  -- and put the number.  Yes, go ahead.

MR. LIMAN:  Okay.

BY MR LIMAN:

Q    And then you had a discussion with Ms. Kelsey about the time of day it was when they were in Rutland visiting the crime scene, correct?

A    Yes.

Q    And Ms. Kelsey informed you that she recalls it being dusk out when they were in Rutland, but she was not certain about that, correct?

A    Correct.

Q    And then you testified a little bit earlier, in response to Ms. Rodriguez-Cross's [sic] questions, that -- that there was testimony about whether Juror 143 had been to the sites before, correct?

Well, let me ask you the question.  Is it correct

that -- referring to the third full paragraph -- Miss Kelsey advised you that she did not know if Juror 143 had visited the sites prior to this trip?

A     That's correct.

Q     Okay.  And -- and then Ms. Kelsey --

MR. LIMAN:  Give me a second, your Honor.

(Brief pause.)

MR. LIMAN:  I'm sorry, I am looking for an exhibit sticker.

BY MR. LIMAN:

Q     Agent, would you tell us what the last exhibit number is, please, if it's in front of you?

A     50.

Q     I am going to ask for your handwritten notes to be marked as Exhibit 51, and I have only been given one copy of this.  It reflects some highlighting of mine, so I am going to stand over next to you, if that's okay?

A     Okay.

MS. RODRIGUEZ-COSS:  Sorry, your Honor, did counsel say for exhibit or identification?

THE COURT:  I'm sorry?

MR. LIMAN:  Identification.  I'm not offering it.  It's identification.

THE COURT:  All right.

BY MR. LIMAN:

Q    Placing in front of you Exhibit 51.  Are these your handwritten notes from the discussion on November 25th?

A    Yes.

Q    Okay.  And would you -- would you look through those, please, and tell me where it says anything about not going behind the back of the shopping center?

A    Right here, on the first page.

Q    Where it says -- well, would you read what the entire thing says?

A    My handwriting's horrible.  Into parking lot -- well, that's PKG for parking lot -- of PC, for Price Chopper.  Pulled in, looped around and left.  Not behind -- supposed to be building, BLD.

Q    Well -- and as you sit here today, it just says building.  You don't know which buildings it refers to.  Doesn't say anything about that, correct?

A    Well, my notes don't but I do recall that conversation.

Q    Okay.  But your notes don't reflect it?

Now, let me ask you about your second conversation with Ms. Kelsey.  You called her again, correct?

A    I did.

Q    Okay.  And you spoke to her, that was by telephone, on March 4th?

A    Yes.

Q    And when you spoke to her on March 4th, she again confirmed to you that she went to Rutland during the time of trial, correct?

A    Correct.

Q    Okay.  And in fact, she told you on that occasion that she did not recall anyone else being with her and Juror 143 during the trip made during the time of trial besides the two of them, correct?

A    Yes, she said she didn't recall anyone else.

Q    And then she also told you that she -- you asked her questions about who else might know this trip to Rutland, correct?

A    I did.

Q    And she told you that she wasn't sure, but she thought that the juror may have told Janice DeGoosh about the trip to Rutland.  Correct?

A    Yes.

Q    And she described Ms. DeGoosh as the woman the juror had been with at the end of her relationship and the juror's relationship, correct?

A    Yes.

MR. LIMAN:  Nothing further.

THE COURT:  Okay?  Any further questions?

MS. RODRIGUEZ-COSS:  No, your Honor.

THE COURT:  All right.  Thank you, Agent.

(Witness excused.)

THE COURT:  Now, any additional witnesses to be called by the government at this point?

MS. RODRIGUEZ-COSS:  Not at this point, your Honor.  As the Court knows, we still have some dealings with regard to some exhibits that have been offered by the petitioner, and we have yet to come to an agreement as to whether we agree that they be admitted or we have any objections.

In reviewing those proposed exhibits, there is some documents there that relate, for example, to Juror 26 and specifically related or allegedly related to some of the additional claims that Court has now permitted for the petitioner to proceed on.

We do not yet at this time anticipate recalling Juror 26.  But we do want to preserve that possibility.

THE COURT:  Okay.  Yes?  Miss Price?

MS. PRICE:  I just want to add something about the exhibits.  As we said earlier, we have come to agreement on a lot of them.  We still are pending resolution on a couple of them.  We have got the exhibits offered and ready to provide to Court.

The process is that the government is going to let us know what objections it has in the next couple of days.

THE COURT: Okay. So can we put a deadline of next Monday as the date, or is that too quick?

MS. PRICE: That works for us, your Honor.

MS. RODRIGUEZ-COSS: That may be a little too quick for the government, your Honor. Can we -- we are going to work as expeditiously as we can on this.

THE COURT: Well, then let's make it by next Friday.

MS. RODRIGUEZ-COSS: We will shoot for Monday. We will shoot for Monday, and if we need more time on any particular exhibits, we will let you know.

THE COURT: That's fine. And we will put a deadline by the following Friday. You should try to get this done as quickly as possible, and then by the following Friday there should be the submission of the remainder of these exhibits.

Now, there is the potential of a number of witnesses to be called; first, Ms. Bochnak. The Court is going to address, after receiving the reply memorandum from the government, the motion for the compelling of the depositions. So you need to submit that. And when would you have that submitted by?

MS. RODRIGUEZ-COSS: Try and have that submitted by Monday.

THE COURT: Okay. And then the Court will

address that, I think we said, within 48 hours, right?

MS. RODRIGUEZ-COSS:  Yes, sir.

THE COURT:  So by the end of next week we will have that clearly out.  Then my expectation is that once the deposition has been completed, if it has been completed, or whether it's extended, when that is completed, then she would be available as a witness; then Mr. Bunin, I had thought, was going to be called by the government; Mr. Primomo is going to be called by the defense.  And those are it for witnesses.  Is that correct?

MR. LIMAN:  Your Honor, from the perspective of Mr. Fell, the only witness we intend to call is -- is Mr. Primomo.  Our understanding as to documents is that that's going to be resolved on papers, the issues to --

THE COURT:  Right.  But you indicated that the government was going to call Mr. Bunin.

MR. LIMAN:  Correct.  And then with respect to Miss Bochnak, I think we indicated that her deposition was a discovery deposition, and that if she -- if her testimony is to be presented, it would be presented live.

THE COURT:  Okay.  So my -- my question is, when do we schedule this last segment of this hearing?

MR. LIMAN:  We have a proposal we have made to

the government.  I don't know if they have had a chance to -- to decide whether it works for them.

Because of various absences from people on our -- our team, we would propose April 21st as the date.  That would permit us to get the deposition done, and it's really the earliest date that would work for us to do it.

THE COURT:  I am actually gone on April 21st, so how about the previous week?

MS. RODRIGUEZ-COSS:  I apologize, your Honor. I don't have my calendar before me.

THE COURT:  All right, so --

MS. RODRIGUEZ-COSS:  I don't expect that it will --

THE COURT:  Then what I am going to suggest is that you get together and that you work this out with the Court.

MS. RODRIGUEZ-COSS:  But earlier, we certainly envisioned -- and what I told Mr. Liman this morning, we envisioned if the Court wanted to proceed earlier, I was thinking the first week of April.

THE COURT:  I want to proceed as quickly as possible.  I mean, obviously it's going to take some time to be able to figure out whether there's going to be an extension of the discovery deposition, and -- but

I would hope in April this would be resolved.

And what is the deadline that would be reasonable to both sides for the submission of the final hearing briefs?  Three weeks after the hearing?

MS. RODRIGUEZ-COSS:  At least 30 days, your Honor.

THE COURT:  Pardon me?

MS. RODRIGUEZ-COSS:  At least 30 days.

THE COURT:  30 days?

MR. LIMAN:  That would be fine.  We will meet whatever schedule works for your Honor.

THE COURT:  Okay.

MR. LIMAN:  Would you like those --

THE COURT:  30 days after -- 30 days after the final hearing.

MR. LIMAN:  Would you like those in the form of proposed findings and conclusions pursuant to Rule 52, since this is --

THE COURT:  You don't have to do them in that proposed form.  You are going to -- you know, there will be a lengthy opinion, no doubt, and I wouldn't necessarily follow the proposed findings of fact.  So you don't need to follow that particular structure; just a memorandum.

MR. LIMAN:  And just a reminder, we promised

the Court and the government that by Friday we would give -- provide a two-page letter, not legal argument, about the scope that we believed to be appropriate with respect to the questions with respect to the jurors.  We will try to get that to everybody as quickly as possible.

And then --

THE COURT:  Okay.  All right.

MR. LIMAN:  -- your Honor asked about the depositions of Mr. Bunin and -- and the others.  I don't want to make -- I don't want to drop a ball here.  Would it be helpful for the Court for us to supply copies of the final --

THE COURT:  Yes.

MR. LIMAN:  -- depositions?

THE COURT:  It would.

MR. LIMAN:  Of all -- of all three?

THE COURT:  In particular, I think the --

MS. RODRIGUEZ-COSS:  All three.

THE COURT:  -- depositions of Mr. Primomo, Mr. Bunin, are relevant to issues that Ms. Bochnak --

MS. RODRIGUEZ-COSS:  Well, your Honor --

MR. LIMAN:  We will provide all three.

MS. RODRIGUEZ-COSS:  -- we would object, your Honor.  We did not take those depositions with the

idea that they would be -- that they would substitute in-court testimony.

THE COURT:  It is not intended --

MS. RODRIGUEZ-COSS:  Our understanding is that --

THE COURT:  It would not be intended for that purpose.  What -- what it seems to me relevant to are issues in regard to her work product.  Basically I had thought that you suggested that the lawyers waived work product objections to one, two and three jurors, the three jurors; and at issue in the deposition is whether in fact the work product applies in her situation.  They're asserting work product; you are asserting that there should be no work product.  I had thought that they had waived work product on some of the same issues that were being addressed by Ms. Bochnak, so as a result, it would seem to me that I would look at that deposition on that particular issue, not on any issue of substance.

MS. RODRIGUEZ-COSS:  Misunderstood the Court.

THE COURT:  Right.  That was the only point, frankly.

MS. RODRIGUEZ-COSS:  Could we have 30 seconds, your Honor, let me ask counsel --

THE COURT:  Sure.

(Brief pause.)

MR. LIMAN:  Your Honor, we had submitted a letter with respect to the interviews of both the marshals and the court personnel.  We understand the Court's views with respect to the marshals, and I don't have any --

THE COURT:  Yeah, I didn't see a letter for the court personnel.  What I saw was your request for interviews with the CSOs as well as the deputy marshals.

MR. LIMAN:  I had thought that the CSOs were under authority of the court and not of the marshals.

THE COURT:  No.

MR. LIMAN:  Okay.  And then I understand the Court's instruction, and --

THE COURT:  Yeah, they have.

MR. LIMAN:  -- we don't have to go through the court.

THE COURT:  Right.  They have a contract with the U.S. Marshal Service.  So you tell me whether you need my permission, but frankly, I don't think that you do.

MR. LIMAN:  I'm not aware of any authority that suggests that we do.  If I -- I will look into it, and if we do --

THE COURT:  Sure.

MR. LIMAN:  -- we will bring it before the Court.

THE COURT:  You know, I would say that sometimes when you are making an effort to interview marshals as potential witnesses, there are regulations within the U.S. Marshal Service.  I think that may very well apply to U.S. Attorney's Office as well.  I'm not familiar with them.  I just know that they have general regulations in regard to interviews to make marshals potential witnesses.  I just raise that as a cautionary flag.  But I don't think that I have got any ability or control over them.

I only raised issues about court personnel, which are members of the clerk's office.  It's totally different, so --

MR. DARROW:  And as to those persons over whom you have plenary authority, is -- do we understand now that they will be available for interview by the government at some point?

THE COURT:  Well, as soon as I get correspondence.  You had indicated that you sent me correspondence -- and, frankly, I have never seen that -- as to whom you -- who you want to interview, whom you want to interview, and what kind of questions that you want to ask, and then we will arrange for that

to be made available.

MR. DARROW: Okay. And I don't know right now who in the clerk's office might have information about whether or not firearms were allowed in the jury room back in the summer of 2005. So --

THE COURT: As a policy matter?

MR. DARROW: Well, as a policy matter, and I suppose as a factual matter. One question is as a policy matter; another is, what if a juror says they'd like to see something. Related question: Does that come out in a note? Would that be on a piece of paper? Was there such a piece of paper? How would they have responded?

I mean, you know, I can imagine a lot of follow-up questions, but initial questions would be who were the primary people on duty.

THE COURT: You know, one of the fairly simple ways of getting the information that you are seeking is some draft -- I mean, you can call them interrogatories, but draft particular requests of, you know, members of the court staff who would be responsible for bringing exhibits into the jury room. The clerk, the courtroom deputy, you know, those are -- those are the personnel.

And if in fact you are asking for the simple question of is there a policy about guns in the jury

room, is there any memory of guns going into the jury room, I think a pretty simple -- simple written question could then be addressed by anybody, and then you wouldn't have to come up again. But, you tell me.

MR. DARROW: Certainly with those questions. I just -- knowing the way these things go, I just imagine that from either side there would always be a follow-up question, and I can imagine us sort of -- this going on with a lot of paper or it being resolved fairly simply if we could spend 10 minutes with whomever those persons were --

THE COURT. Okay.

MR. DARROW: -- and have them answer whatever follow-up questions.

THE COURT: Well, it's essentially up to you. I mean, I would have thought that if you had asked the very simple question, did a gun go in the -- into their memory -- do they even remember anything about a gun going into the jury room, or is there any policy about guns going into the jury room during deliberations, you know, my guess is that you probably would get a fairly direct response, and then you can decide whether you want to interview them personally. But I --

MR. DARROW: Why don't we confer about that and then reach out for you.

MR. LIMAN:  That would be fine.

THE COURT:  Okay.  All right.  Is there anything else that needs to be addressed at this point?

MR. DARROW:  No, thank you, your Honor.

THE COURT:  All right.  Thank you.

(Court was in recess at 4:20 p.m.)

*** ** ***

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matte

April 22, 2014                    _____
Date                             Anne Nichols Pierce