UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA      *
                              *
            V                 *
                              *
DONALD FELL                   * CRIMINAL FILE NO. 01-12


ATTORNEY ADMISSION OF JEFFREY B. KAHAN, ESQ.
                    and
CONTINUATION OF HEARING ON JUROR MISCONDUCT
            Friday, May 9, 2014
            Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III
        District Judge

APPEARANCES:

    JEFFREY B. KAHAN, ESQ., United States Department of
        Justice - Capital Case Section, 1331 F Street,
        N.W., Washington, D.C.; Attorney for the
        United States

    WILLIAM B. DARROW, ESQ., Assistant United States
        Attorney, Federal Building, Burlington, Vermont;
        Attorney for the United States

    LEWIS J. LIMAN, ESQ., SCOTT BUELL, ESQ. and
        MICHAEL J. KAHN, ESQ., Cleary Gottlieb Steen &
        Hamilton LLP, One Liberty Plaza, New York,
        New York; Attorneys for the Defendant

    CATHLEEN PRICE, ESQ., P.O. Box 321762, New York,
        New York; Attorney for the Defendant

    RICHARD I. RUBIN, ESQ., Rubin, Kidney, Myer &
        DeWolfe, 237 North Main Street, Barre, Vermont;
        Attorney for the Defendant

                ANNE NICHOLS PIERCE
        Registered Professional Reporter
        United States District Court
            Post Office Box 5633
        Burlington, Vermont  05402
                (802) 860-2227

FRIDAY, MAY 9, 2014

(The following was held in open court at 9:28 a.m.)

COURTROOM DEPUTY: Your Honor, the first matter is 14-MC-47 in regards to admission of Jeffrey Kahan. The government -- the moving attorney is present, William Darrow, Assistant United States Attorney. Following will be criminal number 01-CR-12, United States of America versus Donald Fell. The government will be present through Assistant United States Attorney William Darrow and Jeffrey Kahan. The defendant is not present in the courtroom but is represented through his attorneys Richard Rubin, Lewis Liman, Cathleen Price and Scott Buell.

The matter before the Court will be continuation of the hearing regarding juror misconduct.

THE COURT: Okay. You are William Darrow?

MR. DARROW: I am, your Honor, from the District of Vermont, U.S. Attorney's Office.

THE COURT: Right. I wonder if you have a motion?

MR. DARROW: I do. Thank you, your Honor.

It's my pleasure and my privilege this morning to move for the admission *pro hac vice* of Mr. Jeff Kahan, who is with me at counsel table. Mr. Kahan's been with the Department of Justice for a long time, and we're

looking forward to having him join us now hopefully as a matter of record on this collateral litigation.

Mr. Kahan's been advising us in the background for several years, but at this point Ms. Rodriguez-Coss has been called away to other matters, and we're hoping that you will allow Mr. Kahan to join the U.S. Attorney's Office in representing us.

THE COURT:  Okay.  Mr. Kahan, are you from Washington?  Are you based in --

MR. KAHAN:  I am, your Honor.  I am -- my office is in D.C., a couple blocks from The White House.

THE COURT:  Okay.  Well, get used to the flight between Washington and here.  Usually -- the six o'clock flight is the one that I used to always take, which of course you are going the other way, so --

MR. KAHAN:  Well, I am hoping to be on it tonight.

THE COURT:  All right.

All right.  The motion is granted.  And would the oath for Mr. Kahan be administered.

(Mr. Kahan was administered the oath.)

THE COURT:  All right.  Welcome.

MR. KAHAN:  Thank you.

THE COURT:  All right.  Mr. Liman, do you have any witnesses to call today?

MR. LIMAN: Your Honor, we don't, but we would be -- what we would like to do is move the admission of certain exhibits that we previously provided to your Honor and to the government, and then with that, we would be -- we are prepared to rest our case with respect to juror misconduct.

THE COURT: All right. My understanding is -- the submission that I have received, is that you are proposing Exhibits 52 through 65?

MR. LIMAN: That's right, your Honor. In addition, there are certain exhibits that at the last hearing were offered; the government had indicated that it wanted to review them before taking a position. They were not the subject of the motion before your Honor because the government didn't object to those exhibits, but they have not yet been formally received, and I can give your Honor those --

THE COURT: Okay. Would you identify those?

MR. LIMAN: Those would be Exhibits 10 through 15, 20 to 21, 29, 32, 33.

THE COURT: All right. And, in addition, 52 through 65?

MR. LIMAN: That's correct, your Honor.

THE COURT: All right. Well, Mr. Darrow, the government's position in regard to these exhibits?

MR. DARROW:  Thank you.  Your Honor, may I speak to Mr. Liman briefly?

THE COURT:  Sure.

(Brief pause.)

MR. DARROW:  I apologize.  Thank you, your Honor.

With regard to the new exhibits, 54 through 64, I wanted to address those.  We do not object to new exhibits 52 and 53.  I evidently had -- I was under the impression your recent order regarding exhibits had addressed the older ones, but you didn't address the ones identified by Mr. Liman; is that correct?

THE COURT:  No, I think we did address 52 -- I thought we addressed all of the district lighting in -- the district -- district environmental commission's records in regard to the lighting of the shopping plaza.  I thought those were addressed.

MR. DARROW:  Okay.  Actually those haven't been.  Those are the new ones.  And the --

THE COURT:  Oh, I thought in fact they had been included, but -- okay.

MR. DARROW:  In any event, we were not objecting to the authenticity.  We don't have a foundation objection, et cetera.  What we have is a relevance objection, and that's -- which relates also to

the Rutland videos, and that's the only matter that I wanted to --

THE COURT:  Okay.  But as far as authenticity, you have no objection --

MR. DARROW:  Yes.

THE COURT:  -- to the videos of the various routes that Mr. Buell is to testify to today?

MR. DARROW:  Yes.  Understand what we have today are the new exhibits 50 -- well, back up.

There are a series of new exhibits.  52 and 53 relate to Juror 162 and are essentially old police and law enforcement records, and we are not objecting to those.

THE COURT:  Right.

MR. DARROW:  The 53 ones are more current; the 52 ones are older.  But we are not going to fuss over those.

Exhibits 54 through 64 are the environmental commission records related --

THE COURT:  I thought that had been dealt with, but maybe that's not right.  But you are objecting just based on relevance?

MR. DARROW:  Right.

THE COURT:  You are not objecting to authenticity grounds?

MR. DARROW:  Right.

THE COURT:  And there was some debate over the summary exhibit, which was number 65.

MR. DARROW:  Yes.  So that last exhibit relates to the Rutland videotapes that Mr. Buell made in, I think, February of this year, and we had a discussion about those, Mr. Liman and myself, with you at the March hearing, and for the same reasons I pressed then, we press our objection relevance to the videos, and to the extent that the new summary really just is where the videos are taken, you know, this street, that corner, the next street, the same objection applies, and we wanted to urge that.

At the last hearing, the government argued, as it has argued before in papers most recently in its January filing on the juror misconduct issue regarding Juror 143, that the defense still -- the 2255 counsel still have failed to establish the linkage that they promised to you at the March hearing, which is that Juror 143 retraced Fell's nocturnal footpath from November 2000 during his trip to Rutland during the trial in 2005. There's just no evidence that he did so.

And accordingly, this persistent attempting to show what the footpath looked like with videotapes made in February 2014, after a big snowstorm, what they might

have -- what the footpath might have looked like in 2004 or in 2000 is just -- there's just no relevance to it.

THE COURT:  But you don't think that the -- the testimony of his girlfriend, in which she identified, first, the location of the crime scene and then ultimately described going to the parking lot at separate occasions necessarily creates that linkage?

MR. DARROW:  I don't, your Honor.  The girlfriend corroborated the 2255 team's claim as exists also in Exhibit 241, which is a written statement by Juror 143 regarding his visit to the Robbins Street apartment where the two murders took place and his visit to the Price Chopper parking lot where King -- Theresa King was kidnapped.  That was it.

There was nothing about how Fell got from one to the other, and as you know, Fell, with Lee, walked in the middle of the night from the former to the latter, and indeed the girlfriend, who accompanied 143 during his mid-2005 trip to Rutland, said they never got out of the car.

THE COURT:  Well, I can -- I can imagine what Mr. Liman would say in response; that is, you have testified that Juror No. 143, during the course of the trial, was at the Robbins Street apartment, was then at the Price Chopper.  There is no testimony as to what

route was taken, and they are prejudiced because there, in fact, could be multiple routes that were taken, which would then have created other impressions upon the juror, and they're not in a position to be able to see exactly what that juror was exposed to because the juror then came into the court and did not tell the truth about the visit. And so as a result, who knows what he was exposed to. And to that extent, what he could have been exposed to by way of the various routes in the video that Mr. Buell is going to testify to becomes relevant.

I think -- I don't mean to suggest -- I don't mean to say that's exactly what Mr. Liman would have said, but my guess is probably that's what he would have said, and so to the extent that there may have been exposure to the juror to other information during those routes becomes relevant.

MR. DARROW: I appreciate that. Thank you.

THE COURT: You anticipate that they would have said that?

MR. DARROW: I defer to Mr. Liman on that, but I doubt he will -- he will say you were wrong.

In any event, what you have described of course is -- is true. We don't know how 143 got from Robbins Street to Price Chopper. And you're right, there's a

problem relying on his testimony regarding that, although when he testified in August, he said, "I -- my knowledge of the route is based on that aerial photograph from trial." However, the point is, from our perspective, it's pure speculation. There is no evidence that he walked the route; if he walked the route, which route he walked.

All we know is Mr. Buell, in a car, drove in -- the approximate route, because it's a footpath that's sometimes off road in a couple instances -- Mr. Buell drove a couple possible car routes in February 2012, but there's just no factual basis to say that that's the route that 143 took. It's -- it's pure speculation.

Moreover, your Honor, it's speculation, if I may, as to a matter which has no probative value anyway because what happened in Rutland was not in dispute.

You will recall, on the first day of trial, I'm thinking June 20th, 2005, Mr. Bunin, in his opening statement, told the jury that Fell had killed two victims in Rutland and then had seized Terry King at gunpoint with Lee at the Price Chopper and taken her south.

And after his opening statement, after the jury left, there was some conversation about what had just happened. You referred to it as essentially a judicial

admission, and you stated -- and this is on the trial transcript, volume one, pages 58 and 59. You said that Bunin had admitted to the essential elements of the offense. You went through the acknowledged killings of the first two individuals, and then you described the kidnapping process. So we had a little conversation right here about --

THE COURT: So why are we going forward on the guilt or innocence, right?

MR. DARROW: Exactly. And he said it was about acceptance of responsibility, and the burden is on the government, and you said, okay, off we go.

And I mention that because what happened in Rutland was never at dispute at trial. The dispute at trial was a penalty-phase dispute, and the fact that there was a kidnapping outside the Price Chopper was admitted on day one.

It follows that whether the light bulbs were changed outside the Price Chopper or not, or whether it was at dusk or whether it was at dark, those simply -- they were not issues, and so this -- I think we are really way out on an epicycle -- off an epicycle here talking about the -- the footpath and the lighting.

And I had some other remarks on the environmental commission documents.

THE COURT:  Okay.  And what are the other --

MR. DARROW:  Just briefly, your Honor. Those -- I apologize.

Those documents also have no probative value for the general reason that I mentioned, but they're also -- they're incomplete and they are unexplained.  They're incomplete because the records include, for example, a Schedule B but there's no Schedule A.  I assume there must have been.  I don't know if there was a C or not.

The records also include an Exhibit 19, but there are no other exhibits, so we don't have Exhibits 1 through 18.  One of the records that is included refers to Exhibit 6 and 28, which supposedly address exterior light fixtures, but we don't have Exhibits 6 or 28.

The only exhibit we have regarding showing light fixtures is Exhibit 19, but it only shows light fixtures in the public parking area.  It doesn't have anything on the side where the employee parking area is or in the back where Fell and Lee said later that they had walked around.

So they don't really address -- we don't know what they mean.  They are incomplete.  They're irrelevant. And we don't have anyone to explain what Act 250 requirements, if any, applied to the employee parking lot on the side of the Price Chopper or in the back.

And we just don't know -- all we know there is that this kidnapping was in the middle of the night anyway.

THE COURT: All right. So how about Exhibits 10 through 15, 20 through 21, 29, 32 and 33? I don't have those. What --

MR. DARROW: We thought you had addressed those already. I know Ms. Rodriguez-Coss met at length with counsel regarding those after the March hearing.

THE COURT: Okay. Then let me --

MR. DARROW: And I don't think we have objections to those, but frankly, I didn't really come prepared to -- I didn't know they were in dispute today.

THE COURT: All right. Well, let me ask Mr. Liman to establish relevance with regard to the environmental commission records, the lighting, as well as the Buell videos.

MR. LIMAN: Be happy to, your Honor.

I don't have much to add with respect to your Honor's statement with respect to our argument on the Rutland route except to say, though, the following:

That in addition to the points that your Honor identified and suggested that I might be raising, we also believe that there is evidence in the record from which the Court could make a finding that the juror retraced the steps that the evidence established

Mr. Fell took.

THE COURT: Well, was there some testimony from his former partner that they had attempted to retrace Mr. Fell's steps after the Robbins Street murders?

MR. LIMAN: I think, your Honor, the testimony came from the juror himself who testified that when he did make the trip, he attempted to retrace the steps from the Robbins Street residence to the Price Chopper.

With respect --

THE COURT: And are you suggesting that he could have been exposed to something on those particular trips that would have been prejudicial?

MR. LIMAN: Absolutely, your Honor. I mean, as your Honor will recall, it was a matter of substantial debate and argument both with respect to the guilt phase and with respect to the penalty phase as to what the lighting conditions were both at the Price Chopper and on route, the -- whether the route that was taken by Mr. Fell and Mr. Lee reflected an intent and deliberateness or whether they just happened to end up at the -- at the Price Chopper.

The government argued extensively that there was a plan and premeditation in terms of going from the residence to the -- to the Price Chopper; that the Price

Chopper was chosen because that would be a perfect place to find a -- a victim without being seen.

All of those points were made by the government and were disputed by the defense and went not only with -- to guilt-phase issues but went to asserting critical factors that were argued during the penalty phase because, as your Honor will recall, the -- all of the guilt-phase evidence was before the jury with respect to penalty and the jury was told that they should consider the evidence during the guilt phase.

THE COURT:  So there's nothing in the routes unto themselves which would have exposed the juror to prejudicial information.  It is just his assessment as to whether in fact there was a direct route by way of planning as opposed to a disorganized scheme to get to the Price Chopper?

MR. LIMAN:  Your Honor, if I --

THE COURT:  Is that right?

MR. LIMAN:  If I suggested that, I misspoke. We believe that there --

THE COURT:  Or I misheard, but -- right.

MR. LIMAN:  We believe that there is -- there is evidence with respect to what he would have seen on the route that is relevant to the guilt-phase issues and to the penalty-phase issues with respect --

THE COURT:  What would he have seen in those videos?  What would he have seen in those videos which would have been prejudicial?

MR. LIMAN:  Well, first with respect to the neighborhood around the Robbins Street residence; that's issue number one.  The evidence at trial --

THE COURT:  And the comment that he apparently made to his girlfriend, or his partner, about this is a neighborhood which was not consistent with Mr. Fell's assertion of his defense.  That could have been obtained -- that information could have come in addition to the observation of the house, the neighborhood in general.

MR. LIMAN:  Only from the neighborhood in general.  And it was an observation not only to the girlfriend but to the rest of the jury.  So that's issue number one.

Issue number two is that if you watch the video and look at the route from the Robbins Street residence to the -- to the Price Chopper, what you observe, that was not a matter of testimony at trial, is that it passes by a number of residential locations that are -- would be quiet, boarded up, people wouldn't have seen anybody on those early hours of the night of the crime.

It's not something that you -- that was a matter of

testimony at trial.  It's something that you see when you observe the video that shows the route from the Robbins Street residence to -- to the Price Chopper.

Number three:  With respect to the Price Chopper itself, there were pictures at trial of the area around the shopping center and by the side of the shopping center where the kidnapping/carjacking took place, but what the juror would have seen was that the locations around that parking lot consisted of boarded-up buildings, no windows looking out on -- onto the area where the kidnapping took -- took place.

They would have seen an area that would have been consistent with the government's argument that the actions of the defendants showed plan and premeditation. It's not supported by physical evidence or any testimony at trial, and that was contrary to a point that the defense contested based upon the evidence that the jury was exposed to in this courtroom.

Your Honor, I believe that there are other things on -- on the videotape that we're also prepared to address in our papers which are due in two weeks; that the test for relevance, as your Honor knows, is a -- is a relatively generous one.

The arguments that I hear being made by Mr. Darrow, that seems to me go to weight, and as I have indicated,

we don't think that they are very persuasive even with respect to weight.

I would like to address the lighting records if your Honor would like?

THE COURT: Um-hum.

MR. LIMAN: With respect to the lighting records, when Mr. Buell testified, your Honor raised the question, do we know that the lighting was the same at the time that we took the video as at the time that the juror went to the scene of the crime back in 2005?

We investigated that, and the records that we're offering to your Honor show that the lighting was the same. It's the same back at the crime in 2000, time of the crime -- of the visit in 2005, and the time of the video.

THE COURT: Yeah, I observed that. Okay.

MR. LIMAN: If your Honor has other questions, I would be prepared to --

THE COURT: No.

Mr. Darrow you want to respond to that?

MR. DARROW: Just briefly, Judge.

On the first point, the path: Mr. Liman, at the March 19th, 2014 hearing, when he was pressed as to whether there was any evidence that 143 had retraced Fell's footsteps, told the Court, page 94 of the

transcript, "we believe there's evidence in the record that would establish that the juror took the route that he understood was testified to at trial, to examine for himself the area." Now he is -- "and he has admitted that he took that route between the Price Chopper and Robbins Street."

And the Court pressed him when did he admit this, et cetera. And the Court then admitted those videotapes only provisionally to allow Mr. Liman to come forward with that evidence.

Well, that's exactly what he just told you again now six weeks later: We believe there's evidence on the record to show the juror took that route.

Counsel's had three years to try and come up with that evidence. We are deep into this, into the weeds there. It's not there. Mr. Liman is unable to find that evidence.

So we -- from the lack of that evidence, which indicates that we are just speculating as to 143's -- what he did between Robbins Street and Price Chopper in the summer of 2005 -- actually, we are not entirely speculating because the girlfriend testified they never got out of the car, so it follows that he did not retrace Fell's route because Fell was on foot and he went in a couple places where cars can't go.

So, again, we just --

THE COURT:  Well, it seems to me the logical thing to do at this point is provisionally admit the exhibits and have the parties brief the relevance of those exhibits.

I mean, basically what Mr. Liman is also suggesting is that the videos are relevant not necessarily because of the route that was taken by the defendant to show that he was organized and intentional, but also in light of his statement to his -- his girlfriend about this neighborhood does not look like this neighborhood -- or this house does not look like what he anticipated it would look like in regard to Mr. Fell's defense, that maybe those videos may be relevant to show what the nature of the neighborhood was.

MR. DARROW:  And -- that's a good point.  I mean, that's one good point I heard.  If Mr. Buell had gone to one -- to -- is it 135 Robbins Street, and panned the area with a video camera and submitted that, then the only discussion we'd be having is whether that area in February 2014 resembled the area in June or July of 2005.  Because you're right, there -- Juror 143 did talk about the area in his written statement in 241.  What he did not talk about is retracing Fell's footsteps.  That is pure speculation.  There is no

factual basis for it, and that's what the videos are introduced to show.

THE COURT: All right. Well, so provisionally they are introduced, and I would like some briefing on whether these particular exhibits are relevant, what they're being proffered for. I have heard Mr. Liman suggest that they are being proffered both for the routes to go to the issue of whether or not Mr. Fell was organized in his thinking as opposed to being impaired, just as an example, but also the nature of the neighborhood in light of the juror's statement to the investigator about being surprised at the nature of the house and the neighborhood, and also in light of the juror's statement to his girlfriend as they were there suggesting that this was inconsistent with Mr. Fell's defense.

MR. DARROW: Okay. Thank you.

And to the extent the Court's provisionally allowing the videotapes, the index I would think would be on the same -- same path, as it were?

THE COURT: Yes.

MR. DARROW: And with regard to the environmental commission lightings, I would rest on my comments.

THE COURT: I would like some briefing on that

because that's not something I am aware of.

I understand -- I looked at those. I thought those were provisionally admitted, but I had thought that those records were being proffered for the simple proposition that in 2000 and 2005, and also in 2011, the lighting was consistent, and that was the only purpose of that exhibit.

MR. DARROW: Well, the question, of course, is the lighting where. I think that the lighting in a public parking area was within the scope of the Act 250 permit, and based on a phone call I made to the commission, it would follow that if the Price Chopper or any other tenants at the mall wanted to change that lighting, they would have to go through the permit process. But I had understood the lighting at issue was the lighting on the side, the employee parking area of the Price Chopper, and behind, where Mr. Buell drove to try and show the lighting in his videotapes, and those matters are not addressed in the commission documents, that I could find.

THE COURT: In which case your claim about irrelevance has more weight. This is not an exhibit which is going to be exposed to a jury. I can take a look at the exhibits -- take a look at the arguments of counsel and its relevance and give it whatever weight it

deserves.

MR. DARROW:  Thank you.

Your Honor, moving on.  My co-counsel wants to address, I think, a couple paper government exhibits as well.

THE COURT:  Okay.

MR. LIMAN:  Your Honor, before we do that, just a couple of matters, further matters of housekeeping.

First, on the briefing, what I would request is that we address the issues of relevance in connection with any of the same papers that we're submitting with respect to juror misconduct in two weeks.

THE COURT:  Yes, that's fine.

Now, in addition to the exhibits, do you have any witnesses to call or any additional exhibits to proffer?

MR. LIMAN:  No witnesses to call.  With respect to exhibits, just to inform the Court, we have a certified copy of Exhibit 36, which are the civil court records for Juror 26.  Exhibit 36 has been admitted. What we would propose to do is substitute the certified records for the -- for the record that has been admitted.

Second matter of housekeeping is that we have provided your Honor's staff the unredacted copies of the

exhibits.  We intend to spend a couple of days redacting them.  We will discuss the redactions with the government and we will submit redacted copies.

THE COURT:  Okay.  All right.  So defense rests -- or Mr. Fell rests.

All right.  Now, Mr. Kahan?

MR. KAHAN:  Thank you, your Honor.

We have two exhibits that have been used during the depositions in this matter with regard to Ms. Bochnak and Mr. Primomo, and I have discussed the matter with Mr. Liman.  We don't think they have any objections in principal to either of these documents.

Mr. Liman and I have discussed the fact that it would make sense to introduce them alongside of the testimony at the depositions that authenticates and explains what they are.  And that was something we were going to attend to early next week.

THE COURT:  Okay.  So is there going to be any objection to the admission of the exhibits which the government is proffering?

MR. LIMAN:  No, subject to us offering the relevant deposition testimony by way of completeness, which, as we discussed, we -- as Mr. Kahan represented, we will discuss with him at the beginning part of next week, and we'll send a letter to your Honor indicating

the portions of the deposition testimony that should come in by way of completeness.

THE COURT:  All right.

Okay?

MR. KAHAN:  Thank you, your Honor.

THE COURT:  Is that all you intend to introduce?

MR. DARROW:  That's all we have, your Honor. Thanks.

THE COURT:  Okay.  Well, let me just ask the question, just for completeness.  I thought that -- that the defense was proffering, either by way of deposition or by way of oral testimony, the testimony of the lawyers who would say, in regard to Juror 162, that they would have struck her.  And I don't mean to suggest that I'm -- well, I don't mean to suggest that I necessarily had thought that he was going to testify, Mr. Primomo or Mr. Bunin, but is there being -- is that -- is that a part of what is being proffered here or is that not?

MR. LIMAN:  Your Honor, we don't think that the issue, the subjective issue about whether Juror 162 would have been struck by trial counsel or trial counsel liked or disliked her prior to knowing -- without knowing of the omitted information is relevant.

THE COURT:  So I am going to get no testimony

with regard to either of the lawyers testifying about their application of a general approach to jury selection nor the jury consultant who would have testified about, you know, the general scheme of deciding what kind of jurors would be struck and what kind of jurors would not.

MR. LIMAN:  Your Honor, we don't think that there's any evidence that would support the notion that the trial lawyers liked this particular juror.  In fact, all of the evidence -- and we direct your Honor to the papers that we put in in opposition to the motion to compel the continuation of depositions -- supports the notion that the trial team -- every member of the trial team disliked this -- this particular -- particular juror.  So we are prepared to rest on the papers as it stands.

MR. RUBIN:  Lewis.

MR. LIMAN:  Give me just one moment.  I will speak to my wiser half.

MR. DARROW:  Your Honor --

THE COURT:  Yes.

MR. LIMAN:  Your Honor, we will also, as Mr. Rubin points out, have the benefit of the relevant portions of the depositions which we think will address this point.  And the plaintiffs rest.

THE COURT: Okay.

MR. DARROW: Well, your Honor, we are also surprised. We came down to court today thinking that Mr. Primomo was going to testify to along the lines of what you suggested. We first heard he wasn't 30 minutes or so ago.

Moreover, regarding counsel's last statement about the deposition transcripts, we had understood those were discovery depositions, and we have been understanding of the reinforced communications with counsel, so -- and we had understood that all the facts were being in today and we were closing this matter up. So we defer to their decision not to call him, but we were also surprised.

THE COURT: Okay. Well, I am sure I will receive briefs on both sides -- from both sides on that issue.

All right. The evidence is closed. The government does not wish to submit any additional evidence.

MR. DARROW: Yes, your Honor.

THE COURT: And no additional evidence from the petitioner.

MR. LIMAN: Not with respect to the juror misconduct issues. Your Honor's aware there is a whole 'nother half of this case. I'd be prepared to address

that briefly, if your Honor would like.

THE COURT:  Well, I think we are addressing the juror misconduct issue first.  I thought that was by agreement of the parties.  That's why I am asking for expedited briefing.  I am going to get this resolved quickly, and then we decide where we go from there.

MR. LIMAN:  That's -- that's -- that's fine, your Honor.  I would just note that during -- right now, there is a lot of discovery that we have not gotten from the government.  We have between us agreed, that during the period of time up until the close of the case with respect to juror misconduct, we would put discovery on hold.

The government essentially hasn't produced any discovery to us besides some 302s and the reproducing evidence that they said trial counsel received.  If -- if there's a delay in producing that discovery, that will have the impact of setting back the whole other half of the case.

THE COURT:  You know, I appreciate that.  The reason I asked for an expedited briefing is that -- it's fair to say that we are engaged in research at this point.  My expectation is that I will try to address these issues relatively quickly once the briefing is in, and then we see where we go from there, really.

All right.  Anything else to be brought up at this point?

MR. LIMAN:  We don't have anything, your Honor.

THE COURT:  Okay?

MR. DARROW:  No, your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

(Court was in recess at 10:07 a.m.)

*** ** ***

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matte

May 14, 2014
Date                              Anne Nichols Pierce