**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| **DONALD FELL** | ) | |
| | ) | |
| v. | ) | No. 2:01-CR-12 |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |

**POST-HEARING MEMORANDUM OF THE UNITED STATES
ON § 2255 JURY MISCONDUCT ALLEGATIONS**

The United States submits this post-hearing memorandum following the hearing held on

Fell's 28 U.S.C. § 2255 jury misconduct claims.

**A.  INTRODUCTION**

At this juncture, Fell does not contest his involvement in the underlying triple homicide.

He protests only the jury that adjudged him.  Fell's jury misconduct claims have been

extensively briefed by the parties.  The government's position is set forth in the "Amended

Opposition of the United States to Fell's § 2255 Motion," filed December 21, 2011; the

"Government's Brief Re Juror Misconduct Claims," filed December 16, 2013, and the

"Government's Response to Fell's Brief Re Juror Misconduct Claims," filed January 24, 2014.

This memorandum responds to information received in connection with hearings held in March

and May of this year.

The government maintains that Fell's misconduct claims should fail, as the defendant has

failed to show that any juror acted in an intentional or prejudicial manner.  The lives of the jurors

who returned the verdicts have been subjected to microscopic scrutiny.  Fell has spared no time

or expense in examining the jurors' conduct, background and family lives.  This extraordinary

practice, years after trial, was initiated in the absence of any evidence of misconduct.  It was, in

1

short, a fishing expedition. The accusations Fell brings against Jurors 162 and 143 are based upon information first obtained more than five years after trial.

A fair trial requires a jury willing and able to decide a case "solely on the evidence before it." *McDonough Power Equip., Inc. v. Gr*eenwood, 464 U.S. 548, 554 (1984); *see United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006). But the law strongly presumes against overturning verdicts on the basis of juror misconduct. *United States v. Greer*, 998 F. Supp. 399, 405 (D. Vt. 1998) (citing *Tanner v. United States*, 483 U.S. 107, 120 (1987)). As stated by the Supreme Court:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference.

*Tanner*, 483 U.S.at 119; *see also United States v. Escalera*, 2013 WL 4711465, *7 (2d Cir. Sept. 3, 2013) (holding that courts should hesitate to "haul juror in" to "probe for potential instances of bias, misconduct, or extraneous influences') (citation omitted); *United States v. Dioguardi*, 492 F.2d 70, 79-80 (2d Cir. 1974) (noting "many cogent reasons militating against post-verdict inquiry into jurors' motives for decision . . . . [including] 'inhibition of juryroom deliberations, harassment of jurors, and increased incidence of jury tampering'") (citation omitted).

Nonetheless, the final verdict in this case was "followed by an inquiry in the hope of discovering something which might invalidate the finding." *Tanner*, *supra*. Jurors have been "harassed and beset by the defeated party in an effort to secure from them evidence of facts

which might establish misconduct sufficient to set aside a verdict." *Id.* The effort, however invasive, is ultimately in vain, as discussed below.

**B. DISCUSSION**

The Supreme Court has held that a new trial was not required in a product liability case when a juror failed to disclose, during voir dire, that an exploding tire had broken his son's leg. *McDonough*, 464 U.S. at 555. Because the juror had not considered his son's injury to have involved "disability or prolonged pain and suffering," the matter involved mistake, not dishonesty, and the Court reasoned that invalidating a three-week trial because of

> . . . a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination.

464 U.S. at 555-56.

To obtain reversal of a judgment due to a juror's false statement "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556; *see United States v. Greer*, 285 F.3d 158, 170 (2d Cir. 2002) (applying the standard to a criminal case). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

A lack of impartiality does not always require a juror's removal. Challenges for cause allow removal only "on a narrowly specified, provable and legally cognizable basis of partiality." *Swain v. Alabama*, 380 U.S. 202, 220 (1965), *overruled on separate grounds by Batson v. Kentucky*, 476 U.S. 79 (1986). Thus, challenges for cause generally stem from actual

3

bias, implied bias, or inferable bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). *But see United States v. Sampson*, 724 F.3d 150, 165 (1st Cir. 2013) (finding the categorical distinction between biases "unhelpful" and noting that *McDonough* "saw no need to use pigeonholes of this sort"). Actual bias is bias in fact. *Id*. Implied bias is presumed in "exceptional situations" in which "an average person in the position of the juror in controversy would be prejudiced." *Id*. at 45, 46. *But see Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) (calling into question the legal viability of presumed prejudice). Such presumptions generally arise for "jurors who are related to the parties or who were victims of the alleged crime." *Torres,* 128 F.3d at 45; *see also Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., conc.) (providing examples that might give rise to a presumption of bias). As a third category, "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Torres*, 128 F.3d at 47.

As with actual bias, "the judge's determination [of inferred bias] must be grounded in facts developed at voir dire." *Torres*, 128 F.3d at 47. Whether a court can infer bias after trial remains an open question. *Greer*, 998 F. Supp. at 408. Assuming the availability of such inferences after trial, courts have recognized them only where a juror's experiences bear an extremely close relationship to the facts at issue during trial. *See Torres*, 128 F.3d at 47 (holding that "cases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt" to provide an inference of bias); *cf. Greer*, 998 F. Supp. at 408-09 (rejecting implied bias based on the attenuation between the juror's experience and the facts at trial).

4

The law of this circuit requires a showing of intentional juror dishonesty as a prerequisite to relief.[1] *United States v. Shaoul*, 41 F.3d 811, 815-16 (2d Cir. 1994). In jurisdictions that permit inferences of bias from innocent omissions, courts demand a very high threshold showing. For instance, the Sixth Circuit holds that only when a juror has deliberately concealed material information may a court infer bias; otherwise "the movant must show actual bias." *See, e.g., Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995) (emphasis omitted). Though the Fourth Circuit considers the possibility of inferred bias for unintentional nondisclosure, it held that a capital juror did not demonstrate bias when she innocently failed to reveal that her husband had been murdered. *United States v. Fulks*, 454 F.3d 410, 431-33 (4th Cir. 2006); *see also Fields v. Green*, 503 F.3d 755, 774 (9th Cir. 2007) (holding that the spouse of a rape victim is not an extreme or extraordinary situation that would require excusal of a potential juror).

1. Juror 162

In this § 2255 action, Fell has shown that juror 162 did not disclose every facet of her son's criminal record, nor did she mention that she had been the victim of a fraud perpetrated in the 1960s, or of sexual abuse in the 1950s. Fell has also shown that juror 162 did not inform the court of allegations that a former roommate physically abused her son. None of these circumstances relate to the murder at issue in this case or the sentence imposed by the jury. Accordingly, the facts developed in this litigation do not demonstrate that juror 162 labored under actual, inferred, or implied bias.

---

[1] Fell cannot establish dishonesty through a collective analysis of statements. Each allegation of dishonesty is considered individually, and only those supported by evidence are considered when determining bias. *See Stewart*, 433 F.3d at 304 (rejecting consideration of "pattern of lies" allegation).

a. Underline New Evidence

At the March 2014, hearing, Fell introduced further evidence about Juror 162, including testimony from two former neighbors, Jean Ratta-Roberts and Suzanne Widener, along with a series of exhibits detailing her son's criminal history. For its part, the government recalled Juror 162, to her to defend herself against Fell's charges.

According to her testimony, Ratta-Roberts and her husband moved into a four-unit apartment building in Colchester, Vermont, in the 1970s, where they resided at the time of her testimony. Tran. Mar. 19, 2014, at 12, 16-17. At some point, juror 162 and her son moved into separate apartments of Ratta-Roberts's building, and were both living there at the time of Fell's trial. *Id*. at 14, 17-18, 21-22. From 1972 until 1997, Ratta-Roberts worked as a nurse's aide at Fletcher-Allen Hospital, which also employed juror 162, and the two women were friendly. *Id*. at 13, 15.

Sometime between 2002 and 2004, juror 162 made a passing comment to Ratta-Roberts about having suffered childhood sexual abuse. Tran. Mar. 19, 2014, at 22, 24, 27, 40. Juror 162 also once mentioned to Ratta-Roberts that her son had received a DUI conviction and, as a result, she had to drive him places. *Id*. at 23. Ratta-Roberts heard juror 162 complain about, and argue with, her son about the stress caused by his substance abuse problem and having to transport him. *Id*. at 27-29, 34. Ratta-Roberts also heard juror 162 complain about her son's drug use and state that she would report his dealer to the police if she knew his or her identity. *Id*. at 30. Ratta-Roberts believed that juror 162's son smoked marijuana while living in her building. *Id*. at 30-32, 41. According to Ratta-Roberts, juror 162 called the police to report disturbances in the building about once a month. *Id*. at 32. Juror 162 had a reputation for untruthfulness, and Ratta-Roberts believed she was dishonest. *Id*. at 32-34.

6

Another resident of the building, Widener, lived there from approximately 1992 to 2004. Tran. Mar. 19, 2014, at 49-50, 51-52. Widener observed juror 162 and her son living in the same apartment until another unit became available for him. *Id*. at 54-55. Widener sometimes heard juror 162 screaming in the building's hallway. *Id*. at 57. Once, the screaming – which may have been directed at Widener – caused the witness to call the police. *Id*. at 58-59.

Juror 162 once mentioned to Widener that she had been molested as a child. Tran. Mar. 19, 2014, at 60-61. Juror 162 also told Ms. Widener that her son had had trouble with the law since he was around 17, that he had three or four DWI convictions, and that he had been arrested for assaulting a girlfriend. *Id*. at 61. Juror 162 told Ms. Widener that her son had not committed the assault. *Id*. Ms. Widener did not believe that juror 162 was honest, an opinion held by many other people. *Id*. at 62-63.

Juror 162 wrote on her questionnaire that she never filed a police report because she did not recall having done so, but she admitted that she had called the police to complain about her neighbors. Tran. Mar. 19, at 127-29, 190-91. She stated in the questionnaire that she had never been a party to a civil suit, but she did accompany her son during his divorce proceedings to request visitation of her grandson. *Id*. at 130-32.

During voir dire, juror 162 stated that her son was rehabilitated, by which she meant he had completed anger management and alcohol counseling, and was forced to follow institutional rules. *Id*. at 137-38. As juror 162 understood it, her son's successful completion of the programs led to early release from custody. *Id*. at 139. To her knowledge, her son had not returned to prison and had no further incidents of domestic violence. *Id*. at 140. She believed her son had complied with the conditions of his treatment and had maintained employment. *Id*. at 143-44. When juror 162 said, during voir dire, that her son had not committed any criminal acts, she

referred to his conduct during treatment. *Id*. at 142. Juror 162 stated on her questionnaire that her son had received alcohol treatment, and she was unaware whether he had received treatment for cocaine use. She did, however, concede that her son had a significant "cocaine problem." *Id*. at 179; Ex. 3 q. 44. Juror 162 discovered her son was using drugs at age 17, when she found hypodermic needles in his car and had them analyzed. *Id*. at 204. She gave him an ultimatum about entering rehabilitation, and he elected to move out. *Id*. at 204-05.

Had defense counsel asked juror 162 about her son's criminal history, she would have explained it. Tran. Mar. 19, 2014, at 144-45. Her questionnaire responses concerning her son's convictions were intended as summaries that she believed were accurate, though she had forgotten about a burglary conviction. *Id*. at 145-46, 148-49. Juror 162 knew that her son served a period of house arrest for a DWI conviction. *Id*. at 146-47. She also knew her son had gone to prison for domestic violence, but did not believe he had ever served time for a DWI conviction, of which she thought he had more than one. *Id*. at 147, 152. Juror 162 believed that after his imprisonment, her son was arrested on one occasion when a woman struck him, and the police elected to take him into custody on the basis of his record. Her son was not prosecuted in connection with that incident. *Id*. at 155-56. She did not witness the event and only related the details she learned from her son. *Id*. at 164.

Juror 162 previously testified that her son had not lived with her since he was 18 years old.[2] In fact, they had briefly shared living spaces, but she explained, "he hasn't actually lived with me for any long period of time since that. He has stayed with me . . . at intermittent times when his life has been -- like in between apartments and living conditions." Tran. Mar. 19, 2014, at 152-53. Those stays "were short durations of time" without the intent of maintaining

---

[2] Subsequent to that testimony, her son moved in with her. Tran. Mar. 19, 2014, at 160.

permanent residency. *Id*. at 153-54. In her mind, juror 162 distinguished short stays from cohabitation. *Id*. at 174-75.

Juror 162 also previously testified that she did not connect her child molestation experience with voir dire questions about having been the victim of a crime and "just never thought about that during my life." Tran. Mar. 19, 2014, at 182. Juror 162 did not recall telling a psychologist, Ms. Ratta-Roberts, or Ms. Widener about the molestation. *Id*. at 183-84.

Juror 162 lived with Lucille Tatro for many years. The juror never observed her son suffer any abuse at Ms. Tatro's hands. On one occasion, Ms. Tatro became upset with juror 162 and "came at" her with a knife, but the juror did not consider it a "confrontation" and the incident did not result in any police involvement. Tran. Mar. 19, 2014, at 156-57. Juror 162's husband filed a complaint against Tatro after she threw a rock at his car. *Id*. at 197-98.

   b. Sexual Abuse

The jury questionnaire utilized before trial asked, "have you or has a family member or close friend ever been a witness to or the victim of a crime?" Ex. 3 q. 38. Juror 162 checked the "NO" box. But subsequent investigation disclosed that during the 1950s, Juror 162's adoptive father had sexually molested her. Juror 162 disclosed this information to § 2255 counsel during a post-trial interview. At a hearing before this Court, juror 162 explained,

> So this happened to me when I was a very young child. I was adopted. And, you know, there was no actual intercourse, but there was touching that was inappropriate, and of course back in those days they didn't speak about sexual abuse,[3] and I was very, very young and really didn't even understand what was going on until I got older and then realized what had happened.

---

[3] Juror 162's perception of the 1950s appears accurate: Between 1976 and 1986, reported cases of child molestation increased 2,100%, and in the next five years, reports increased another 227%. *Kennedy v. Louisiana*, 554 U.S. 407, 455 n.2 (2008) (Alito, J., dissenting). Even that increased recognition of appears to leave a great many cases unreported. *See State v. Friedrich*, 398 N.W.2d 763, 777 (Wis. 1987).

Tran. Aug. 15, 2013, at 98-99. Juror 162 further explained that the abuse occurred sporadically over a two-year period. *Id*. at 99. She did not report the incidents in her questionnaire because she "didn't connect it." *Id*.; *see also id*. at 114 ("My father was not convicted of any crime, and I -- I have not considered myself a victim in all these years, and I did not connect that question."). She did not consider herself a victim as a result of the incidents. *Id*. at 100, 107.

While juror 162 made a near-contemporaneous report of her molestation to a neighbor, no police response resulted. Indeed, the neighbor did not make any known mention of the molestation until after juror 162 had reached adulthood and left home. Tran. Aug. 15, 2013 at 183-84. The juror's molester was never arrested, prosecuted or accused of any offense. *Id*. The underlying conduct occurred approximately a half century before Fell's trial. Over the ensuing 50 years, it appears the juror made occasional references to the incidents, none of which she recalled. *See id.* at 26-27, 37-38, 40, 60, 183-84. However, the jury questionnaire did not indicate that child molestation might become an important topic at trial. *See* Ex. 3. Likewise, the voir dire did not focus on prior victimization generally or sexual abuse specifically. *See* Ex. 5. Given the lack of prompts during jury selection,[4] and the remoteness of the abuse, it appears clear that juror 162 did not purposely conceal the molestation. Accordingly, no relief should lie. *See Shaoul*, 41 F.3d at 815-16.

In any event, Fell has not offered proof of actual bias that juror 162 might have harbored for him or his case. While Fell has presented voluminous records concerning juror 162's life history, not a word of it connects her to him, his victims, or his crime. Fell cannot identify any aspect of juror 162's questionnaires, voir dire, or testimony that prove she had fixed attitudes or

---

[4] Juror 162's molestation understandably came to mind when Fell's investigator asked about the mitigation evidence presented at trial, which included information about the defendant's own experience. *See* Tran. Mar. 18, 2014 at 78.

beliefs that prevented her from fairly judging the evidence in this case. *Cf. McDonough*, 464 U.S. at 554 (characterizing impartial jurors as those "capable and willing to decide the case solely on the evidence"). As such, there exists no basis upon which to find juror 162 was actually prejudiced. Indeed, none of the facts developed during this litigation show that juror 162 had any bias with regard to criminal prosecutions or the death penalty, generally. For want of any proof of actual bias, there exists no legal theory upon which to grant Fell any relief.

Assuming, arguendo, that Fell could succeed by demonstrating inferred or implied bias, he has failed to make any such showing with regard to juror 162's experience as a victim of childhood sexual abuse. Juror 162 may have given occasional thought to, or made mention of, the molestation, she made clear that the abuse had long ceased to influence her by the time she served on the Fell panel. *See* Tran. Aug. 15, 2013 at 98-100. Her infrequent allusions to a temporally-distant experience create no significant connection between juror 162 and this case.

While Fell presented trial evidence that he was molested as a child, his mitigation case did not focus on those events. Rather, he presented broad evidence about a dysfunctional, physically abusive and alcohol-driven family life. Overall, the defense clearly sought to explain Fell as a once-happy child who was driven to increasingly violent and anti-social conduct by an unhappy upbringing, of which molestation was one small part. While there might exist some de minimis connection between Fell and juror 162 on the basis of a shared history of childhood molestation, these events were not central to either of their lives and were extremely remote for the panelist. *See United States v. Umana*, ___ F.3d ___, ___, 2014 WL 1613886, *13-14 (4th Cir. 2014) (rejecting inference of bias from experience remote in time). Juror 162's experience during the 1950s provides no basis for inferring or implying bias during a trial held a half

11

century afterward, in which molestation evidence was only one part of a larger mitigation strategy.  *See Fulks*, 454 F.3d at 431-33; *Torres*, 128 F.3d at 47.

### c. Embezzlement

In response to a questionnaire inquiry about having been a crime victim, Juror 162 also omitted to disclose that an attorney defrauded her of money in the 1960s.  Juror 162 explained that the events occurred decades before Fell's trial and she simply did not think of them when she completed the questionnaire.  *Id*. at 162; 165-66.  She had no intent to deceive and later provided the information to Fell's investigator.  *Id*. at 164.  As with her molestation, no one was arrested or prosecuted as a result of embezzling money from juror 162, conduct wholly unrelated to the issues at Fell's capital trial.

Fell has not provided any reason to suspect that juror 162 intentionally suppressed this information during the course of jury selection.  One can hardly conceive of a reason why she might have done so.  Juror 162 has made no effort to hide any detail of the event that she recalls. *See* Tran. Aug. 15, 2013 at 166-68.  Unlike molestation, embezzlement does not evoke any social taboos.  Furthermore, nothing in the questionnaire would have occasioned a recollection of a decades-old white collar crime.  In fact, the questionnaire informed the venire that the defendant had pleaded not guilty to "kidnapping and carjacking related to the abduction of Teresca King from Rutland Vermont and her murder in Duchess County New York."  Ex. 3 at 3.  The questionnaire also mentioned Fell's fugitivity and possession of a firearm.  *Id*.  But nothing in the document or the voir dire would have led juror 162 to recall a non-violent theft from which she had apparently recovered.  *Cf. United States v. Andreas*,  No.  96 CR 762, 1999 WL 515484, *14 (N.D. Ill. July 15, 1999) (noting the popular perception that white collar crimes were not serious).

12

Because Fell has not shown that juror 162 intentionally suppressed the information, no relief should lie. *See Shaoul*, 41 F.3d at 815-16. In any event, Fell has made no showing of actual bias: he has not presented any evidence that juror 162 held attitudes or beliefs that prevented her from fairly judging the evidence in this case.

Assuming, arguendo, that Fell could obtain relief through a demonstration of inferred or implied bias, he has failed to make such a showing. Simply stated, juror 162's decades-old experience as a victim of embezzlement, at the hands of a court-appointed guardian, bears no conceivable relationship to the facts at issue in Fell's trial. Furthermore, the experience does not connect her to Fell or his crimes. *See Umana*, 2014 WL 1613886, *13-14. As such, her innocent omission does not permit an inference or implication of bias.

### d. Lucille Tatro's Alleged Conduct

During jury selection Juror 162 did not mention that her son, while a child, had suffered abuse at the hands of Lucille Tatro.[5] Allegations of that abuse were discussed during a psychological evaluation conducted in connection with the divorce proceedings of juror 162's son. During the evaluation, Juror 162 denied knowledge of the abuse but conceded the plausibility of the allegations. Given that juror 162 only heard of the alleged abuse years after it supposedly occurred, Fell cannot show that she failed to disclose any fact known to her, much less that she did so intentionally.

As with the other claims of misconduct, Fell cannot relate the nondisclosure to a showing of bias. Again, Fell has presented no evidence that juror 162 labored under an actual bias – an inability to fairly consider facts at trial. Certainly, juror 162's awareness of accusations that a

---

[5] Juror 162 did not make a police report about an incident in which Tatro damaged a car. The complaint came from a third party, (Tran. Mar. 19, 2014, at 197-98.) and juror 162 had no obligation to disclose it.

13

former cohabitant had abused her son years before this trial provides no grounds for finding she had some sort of inferred or implied bias. In fact, to the extent juror 162 credited her son's mistreatment, one would naturally anticipate that the information might only tend to make her more sympathetic of evidence that Fell was abused. Nothing about this information, which is almost entirely divorced from the very concrete evidence of Fell's dysfunctional upbringing, provides a reason to imply bias. *Cf. Torres*, 128 F.3d at 47.

> e. Son's Criminal Record

As the government has argued, Juror 162 disclosed in her questionnaire the fact that her son had convictions for domestic violence and DWI. She also disclosed that her son had been treated for alcohol abuse and had engaged in criminal conduct as a result of his alcohol abuse. Juror 162's short questionnaire asked if anyone close to her had "been a complainant in a criminal case," to which she volunteered, "[M]y son was under House [*sic*] arrest for DWI and domestic violence 16 years ago. He now asst manager at Shaw, so he sure has been a better person for it." She interlineated "Dept of Corrections," alongside the reference to house arrest. Ex. 2. In her long questionnaire, juror 162 responded to a question whether a family member had ever been charged with a crime. She answered, "[M]y son – DWI & domestic abuse. He was under the Dept of corrections for 3 yrs – [i]ntense counseling. Best thing ever happened to him. He is now a different person." She stated in parentheses above her response, "House arrest." Ex. 3 q. 43(b). When asked if her son's experience could make it difficult for her to sit on the panel, juror 162 answered, "My son was treated fairly and it helped him change his life." *Id*. at q. 43(d). When asked to explain if any relative had "been treated for a substance abuse problem," juror 162 wrote, "My son -- alcohol." *Id*. at q. 44.

14

During voir dire, defense counsel did not ask juror 162 to recount the details of her son's criminal record. Instead, he asked her if her "personal experience with [her] son, whether that in any way could affect your ability to consider [defendant's substance abuse] as one of the mitigating circumstances?" Tran. May 18, 2005, at 136. When juror 162 opined that her son was rehabilitated through corrections, counsel asked, "Was the opportunity that your son had, that was provided through the Department of Corrections something that you thought was significant?" *Id.* at 137. Juror 162 answered affirmatively, and counsel asked "[H]ow so?" to which she responded that her son had "some tough, tough learning . . . to overcome his problem." *Id.* Counsel then asked "What did it take him to get intervention? The authority? What did it take to get him to a point where authority had --" *Id.* The juror interrupted with the correctional steps she felt were effective: "corrections coming to his house periodically. It took going to meetings every week. It took losing his driver's license. I mean, it took a lot. He hit the bottom before he went to the top, yeah." Counsel and juror 162 then engaged in the following colloquy:

> MR. PRIMOMO: Had he been involved – did he commit any criminal acts?
> JUROR NO. 162: No.
> MR. PRIMOMO: He was just having – it was affecting his life?
> JUROR NO. 162: Definitely. Most definitely.
> MR. PRIMOMO: Is it fair to say there were people who observed this and cared for him?
> JUROR NO. 162: Definitely.
> MR. PRIMOMO: Are there authorities who saw this and cared for him?
> JUROR NO. 162: Yes.

*Id.* at 137-38.

Rather than asking juror 162 to detail her son's criminal history, defense counsel sought to learn how her perceptions of her child's experience would affect her view of Fell's case. Indeed, counsel followed up his voir dire questions about juror 162's son with an inquiry

15

concerning the defendant: "Could you consider the lack of authority at key and important times in a young man's life as a mitigating factor in considering a life sentence for Donald Fell?" Tran. May 18, 2005, at 138. Taken as a whole, the voir dire demonstrates that Fell's counsel had no interest in detailing the criminal record of the juror's adult child or in clarifying what she perceived as rehabilitation. Only now, with the benefit of hindsight, has Fell seized on the tertiary question of a juror's child's criminal history as a basis for relief.

Juror 162, however, never denied that her son was a convicted criminal, never denied he served a prison term, and never denied that he had convictions for DWI and domestic violence. Her responses provide no basis for an inference of deception or concealment. *Cf. Sampson*, 724 F.3d at 162 (noting that a juror, who's apocrypha formed the basis for relief, had failed to even acknowledge the existence of a troubled daughter during jury selection). She asserted that her son was rehabilitated, by which she meant he had completed his mandated programs, avoided further conviction for domestic violence, and maintained employment. Tran. Mar. 19, 2014 at 137-40, 143-44. She also observed a qualitative change in her son's behavior following his anger management classes and believed he had received an early parole as "part of the rehabilitation process." *Id*. at 141. While she had reason to know he had committed a fourth DWI three years before Fell's trial, juror 162 could maintain that he had not returned to prison and had continued to earn a living, the hallmarks of rehabilitation in her mind. *See id.* at 137-40, 143-44. Furthermore, juror 162 would have answered detailed questions about her son's conduct, had counsel asked and believed she had accurately summarized her son's interaction with the criminal justice system in her long questionnaire. *Id*. at 144-45.

Fell cannot show that juror 162 intentionally deceived the court and counsel. She was not a legal professional, she lacked access to her son's court records, and she had not lived with him

16

full time during his adulthood.  Given imperfect information, imperfect recollection, and an imperfect understanding of the criminal justice system, juror 162 likely permitted a parent's view of her child to color her assurances that her son was rehabilitated.  *See e.g., Coleman v. Lemke*, 739 F.3d 342, 352 (7th Cir. 2014) (citing *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir.2005) and noting the likely testimonial bias of a parent for a child).  Any inaccuracy in juror 162's qualitative assessment of her son's rehabilitation bears no resemblance to the outright prevarications at issue in *Sampson*.   There, although the juror at issue "signed the written voir dire questionnaire under the pains and penalties of perjury . . . no fewer than ten of her responses were apocryphal." 724 F.3d at 162.

The possibility that juror 162 painted an overly-rosy picture must have occurred to Mr. Primomo, as familial bias is widely acknowledged.  *See Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998) (citing *Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir.1995) and *Gullett v. Armontrout*, 894 F.2d 308, 310 (8th Cir.1990)).  But he made no effort to probe juror 162's understanding, because he had more apparent interest in establishing her receptivity to the possibility of rehabilitation than in determining the validity of her opinions about her son.  Mr. Primomo did not act in a vacuum, as his jury consultant had recommended,

> The failure of child services, law enforcement, treating physicians and mental health workers to rescue Donald from his abusive home makes them responsible parties in this situation.  Jurors should be led to feel that Donald could have turned out differently if he'd received the help he needed and it is unfair for the government to seek to kill him now.

Gov't Depo Ex. 16 at TC-00020941.   Thus, Mr. Primomo entered jury selection aware of the need to find jurors who would find consider an argument that Fell was failed by society. Regardless of whether the consultant's note influenced his thinking, the importance of jurors

17

sympathetic to rehabilitation clearly resonated with Mr. Primomo, as he made a note to ask juror 162 about her son's opportunity at redemption in an "ISAP-type program." Gov't Depo. Ex. 24.

Having identified a juror who expressed a belief in the redemptive power of her state's correctional apparatus, Mr. Primomo had reason to avoid specific discussion of her son's rehabilitation. Counsel surely understood that any examination that underscored the criminality of the juror's son was apt to signal to the prosecution that it should strike her peremptorily. *See Stewart*, 433 F.3d at 305 n.7. Thus, counsel had to walk a fine line – identifying a juror who would give credence to an important theme of the defense case without signaling to the government that she merited excusal. The resulting voir dire touched lightly on the crimes of the son but elicited an endorsement of the correctional system from juror 162.

Mr. Primomo exercised valid tactical discretion during voir dire, but Fell can hardly complain that juror 162 failed to volunteer information that was uninvited and partially unknown to her. Thus, Fell has failed to show that juror 162 purposely concealed any aspect of her son's history, and this Court should deny relief. *See Shaoul*, 41 F.3d at 815-16.

Moreover, Fell has not offered any proof of actual bias. He has set forth in detail the criminal record of juror 162's son, but has not shown that any aspect of juror 162's testimony, voir dire, or questionnaire responses reflects beliefs that prevented her from fairly judging the evidence. Fell might stand on different ground if he could show that juror 162's purposefully provided abbreviated information about her son's criminal history to camouflage her skepticism of her son's rehabilitation. But she and her son presently live together (Tran. Mar. 19, 2014, at 160), a fact that underscores the sincerity of her belief in his rehabilitation. On this record, Fell simply cannot show actual bias.

18

Assuming, arguendo, that Fell can succeed by demonstrating inferred or implied bias to justify a strike for cause, he has failed to make such a showing with regard to juror 162's knowledge of her son's criminal history. To the extent that the defendant has shown reasons to doubt juror 162's belief in her son's rehabilitation, there still exists no relationship between the juror and Fell or Fell's murder victims. *Cf. Torres,* 128 F.3d at 45. As such, there exists no basis for presuming prejudice. Furthermore, Fell cannot show that the undisclosed facts at issue here illustrate a meaningful relationship between juror 162's experience and the facts at issue during the trial. *See Torres*, 128 F.3d at 47. The trial revolved around Fell's participation in three murders, a kidnapping, and a carjacking, none of which relates to the criminal record of juror 162's son. Fell will likely observe that he and the juror's son both abused intoxicants and were both assaultive. But those facts were known to the defense during jury selection and could not possibly have supported a strike for cause. Even with the advantage of complete information about juror 162's son, the defense cannot show that his crimes were so indistinguishable from Fell's that the court was obligated to strike the panelist. Juror 162's son had a more extensive criminal record than was understood at trial, but his crimes pale in comparison to Fell's wanton homicidal violence and cannot support a conclusion that his mother was incapable of fairly deciding this case. *See Fulks*, 454 F.3d at 431-32.

Fell might prevail if the facts showed that juror 162 was so calloused by her son's conduct that she had utterly rejected the concept of rehabilitation. But her conduct demonstrates the opposite – she has bailed her son out of jail, transported him to his obligations, and lived near him or with him. Such actions imply a sincere belief in the redemptive possibilities of the criminal justice system – precisely the quality Fell sought in a juror.

If juror 162's relationship to a person with a criminal record sufficiently implied bias for cause, virtually no one with any life experience could ever sit on a jury. *But see United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013) (observing the impracticality of requiring "each juror's mind to be a tabula rasa"); *Hard v. Burlington N.R.R. Co.*, 870 F.2d 1454, 1462 (9th Cir.1989) (denying new trial where one juror used personal knowledge of x-ray interpretation to sway others because "[i]t is expected that jurors will bring their life experiences to bear on the facts of a case"). Juror 162 bore no bias against Fell, real, inferred, or implied, and the conduct of her son should not justify relief from the instant judgment.

2. Juror 143

Fell's 2011 § 2255 motion charges that Juror 143 corrupted jury deliberations by (1) coercing another juror by pointing a shotgun at her during deliberations, and (2) inspecting Rutland crime scenes during trial and sharing resulting information with other jurors during deliberations. The first, and more troubling, claim lacks factual support and should be abandoned or denied. The second claim, the assertion that juror 143 visited Rutland crime scenes during trial, gains strength from March, 2014 testimony. However, the possibility that he learned anything that corrupted deliberations is remote.

The trip was, at most, a one-half hour drive-by in which juror 143 did not get out of the car. Further, the purpose of the Rutland trip, and what happened during it, remains obscure. After over three years of investigating the matter, Fell's § 2255 team remains unable to establish that anything juror 143 saw in Rutland was even material, much less prejudicial. While it is troubling if juror 143 testified falsely in August, 2013 that he did *not* inspect Rutland crimes scenes during trial, such deceit would indicate his 2013 regret and embarrassment, not corruption of the 2005 verdict. All juror 143 would have seen in 2005 in Rutland were buildings that were not at issue during trial.

20

At the March, 2014 hearing, Fell's counsel called three witnesses regarding juror 143: two former girl-friends and the former Cleary Gottlieb lawyer who interviewed the juror in 2010 and wrote Exhibit 241, the juror's statement about deliberations. Counsel also has offered new exhibits: records of the Vermont's District 1 Environmental Commission reflecting filings for the mall containing the Rutland Price Chopper, and a video, with associated index, created by another Cleary Gottlieb lawyer driving around Rutland in February, 2014. The Court received these new exhibits provisionally, pending Fell's showing of relevance (which remained uncertain through the two 2014 hearings).

The two girlfriends testified as to the Rutland visit. The more significant witness, Kaulene Kelsey, lived with juror 143 during the 2005 trial. She testified that during trial she accompanied him on a drive to Rutland after he told her that "he wanted to go to Rutland" to see for himself" and "visit the area himself." Tran. Mar. 18, 2014, at 23. When she told him that it didn't seem like "something that he should be doing," juror 143 responded that since "nobody knows," "it didn't make any difference." *Id*. at 33. The duration of the visit was "not more than a half hour total." *Id* at 31.

During the drive to Rutland, "we went to the home of Donald Fell first, and then we went to Price Chopper." Tran. Mar. 18, 2014, at 24. Kelsey knew that two of the murders took place at the home, because "the juror explained that to me." *Id*. Kelsey testified that they then "drove around the neighborhood" of the Fell home, and that the juror expressed surprise that it appeared to be a middle class type area, because at trial Fell was portrayed as having been brought up in a lesser area. *Id*. at 29-30. Kelsey could not recall the route they drove from the Fell house to the Price Chopper, *id*. at 30, but testified that they reached the latter location as it "was getting dark."

*Id.* at 31.  She testified that at the Price Chopper, juror 143 observed that "it didn't look very well lit in the parking lot," and showed her the area where he thought "things took place."  *Id.* at 31.

On cross-examination, Kelsey testified that she could not recall whether she had mentioned, during two interviews with the FBI, many of the things she described at the hearing. She did not recall what she told the FBI about the purpose of the Rutland trip.  Kelsey testified that during the trip she did not recall ever getting out of the vehicle.  *Id.* at 38.  She did not see "any" of the media coverage of the case during the trial.  *Id.* at 37.  She did not pay much attention at all to the media coverage.  *Id.* at 40.  By driving "around the neighborhood," Kelsey explained that she simply meant driving down the street until they got to the (Robbins Street) house.  *Id.* at 37-38.  During trial, juror 143 "did not talk about the trial" with Kelsey.  *Id.* at 42. Lastly, Kelsey conceded that her relationship with juror 143 "did not end well"; in fact, it was acrimonious.  *Id.* at 40.

On March 19, the government called the FBI agent who twice interviewed Kelsey prior to the hearing, Michelle Delpha.  Agent Delpha testified that she interviewed Kelsey for "at least two hours" face-to-face on November 25, 2013, and interviewed her again by phone on March 4, 2014.  Tran. Mar. 19, 2014, at 210.  Kelsey's statements during those interviews were starkly different from her testimony.  Agent Delpha specifically asked Kelsey, "multiple times," what the purpose was of the 2005 trip to Rutland, and Kelsey responded that she and Juror 143 "did not specifically set out to go to Rutland to look at crime scenes."  *Id.* at 212, 213 ("She couldn't recall where they were going, but somehow they ended up in Rutland"), 215 ("Her answer was that she couldn't recall where they were going, but they did not specifically set out that day to go to the crime scenes in Rutland").  Further, Agent Delpha testified that Kelsey told her that at the Price Chopper they simply "looped through" the parking lot, without mention of the lighting.  *Id.*

at 215. The *second* location Kelsey recalled visiting with juror 143 was the residence where the first two murders took place. *Id*. at 216. The only thing Kelsey recalled about that location was Juror 143 saying, "that is where Fell killed his mother and her friend." *Id*. During the interview, Kelsey did not mention juror 143 saying that nobody was going to see him so the visit wouldn't matter. *Id*. at 221. Finally, Kelsey explained that she was "already familiar with the locations because of the media reporting during trial." *Id*. at 222.

Agent Delpha's testimony indicated that Kelsey's account was significantly altered in preparation for the hearing. Alternatively, Kelsey was dishonest during her FBI interviews. Between the interviews and the hearing, Kelsey revised her recollection of the purpose of the trip, of statements attributed to juror 143, and even of the chronology of the drive through Rutland (testifying that Robbins Street was the first location they drove by, but telling Agent Delpha that it was the second). Each change was favorable to Fell's claims.

Janice DeGoosh was the girlfriend of juror 143 after Kelsey. She testified that before she began dating the juror, perhaps in July of 2005, he told her that he was "going on a field trip . . . to Rutland to a dumpster." Tran. Mar. 18, 2014, at 50. On cross-examination, DeGoosh testified that she did not know when Juror 143 made the statement, and wasn't sure if it was during the trial or after the trial. *Id*. at 53. Juror 143 didn't talk to her about the case during the trial. *Id*.

Assuming, in the wake of Kelsey and DeGoosh's testimony, that juror 143 drove by the Robbins Street apartment and the Price Chopper during the 2005 trial, there remains no basis to find corruption of the verdict. As the Court is aware from trial, events in Rutland were uncontested. Rutland events, including the first two murders at Robbins Street and the kidnapping at the Price Chopper, were admitted by the defense in the guilt phase. Lead trial counsel Alex Bunin told the jury, in his opening statement on June 20, 2005, that Fell and Lee

23

knifed Charlie Conway and Debra Fell to death in Rutland in the Robbins Street apartment, and then "ran into Mrs. King at the Price Chopper," "put the gun on her and got in the car" and drove south. Tran. Vol I, pp.54-55. Indeed, the Court commented on the admission after the jury was excused – referring to it as a judicial admission, and observing that Bunin had "admitted to the essential elements of the offense, you went through the acknowledged killings of the first two individuals, and then you described the kidnapping process . . . ." *Id*. 58-59. The trial was never about what happened in Rutland. Further, as the government has argued previously, at trial multiple photographs of both the Robbins Street apartment and the Price Chopper were admitted during the guilt phase. Accordingly, any observations made by Juror 143 of the scenes were cumulative and insignificant.

In trying to lend substance to the alleged visit, Fell persists in urging the significance of a viewing of the "neighborhood" around the Robbins Street apartment. Thus, Kelsey testified that she and juror 143 "drove around the neighborhood" of the Fell home, and that the juror expressed surprise that it appeared to be a middle class type area, because Fell was portrayed at trial as having been brought up in a lesser area. *Id*. at 29-30. The government previously has pointed out that Fell was brought up in Pennsylvania, not Vermont, a fact that either juror 143 or Fell's § 2255 team seems confused about. The critical penalty phase mitigation evidence regarding Fell's dysfunctional childhood concerned locations in *Pennsylvania*, not Vermont.

Similarly, Fell urges that in 2005, juror 143 may have retraced Fell's nocturnal footpath from Robbins Street to the Price Chopper, with accompanying observations. As the government repeatedly has urged, there is no evidence whatsoever that he did so. The retracing the footpath claim is based upon pure conjecture. The government made this point in its January 2014 memorandum, and repeated it at the March 2014 hearing. In response, at the latter hearing,

defense counsel asserted that "we believe there's the evidence in the record that would establish that the juror took the route that he understood was testified to at trial . . . because he wanted to examine for himself the area.  And he's admitted that he took that route."  Tran. Mar. 19, 2014, at 94.  Yet, when the hearing continued in May, counsel remained unable to identify a connection.  The failure is unsurprising: there is no evidence that juror 143 walked the route – in fact, Kelsey testified that they never exited the car, and the videotapes made by defense counsel in February 2014, approximating Fell's 2000 route, are irrelevant.

Fell's final attempt to claim that the juror's Rutland trip was significant turns to the lighting at the Price Chopper.  In Exhibit 241, several sentences after juror 143 identified considerations the jury used "in making our decision," after referencing his post-trial motorcycle trip to crime scenes, he states "the lighting at the Price Chopper was weak," *id*., adding, "at the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit."  Particularly in view of the fact, again, that Rutland events were uncontested at trial, it appears that the juror was making a general observation about possible improvements at Price Chopper stores.  The lighting is not listed among the evidence that the jury discussed at the outset of Exhibit 241, paragraph 5.  For these reasons, the incomplete and unexplained records that Fell seeks to admit from Vermont's District 1 Environmental Commission lack any probative value.

If the Court finds that juror 143 falsely denied the trip when he testified in September of 2013, there is a ready explanation for why he did so: he abruptly realized that his foolish excursion had been identified as an embarrassing transgression.  Thus, 2013 emotion, not 2005 corruption of the verdict, informs any deceit on the juror's part.

25

Dina Zloczower testified that she was one of two Cleary Gottlieb lawyers who interviewed juror 143 in December, 2010. Tran. Mar. 18, 2014, at 60. The two lawyers interviewed the juror for "about two, two and a half, three hours," on Saturday evening, December 18, 2010. *Id.* at 61. The following morning they returned with a written statement for him to sign (Exhibit 241).

During the Saturday interview, the two lawyers talked with the juror about "what he had considered in making his determinations and what had been discussed with his fellow jurors." Tran. Mar. 18, 2014, at 62. Among those considerations was a trip to Rutland he said that he took during the trial. In Exhibit 241, Zloczower summarized juror 143's statement as follows:

> In making our decision, we were like racehorses, 18 conversations going at once. We were going at each other and then we just sorted it out and it was clear, like that. There was not a lot of disagreement about the guilt, there was no doubt that he did it. We discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper. The mother's neighborhood wasn't great, but it was okay. The house was decent. She was just trying to live her life. I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife. . . .

*Id.*, paragraph 5.

In her direct testimony in March, 2014, Zloczower recalled that juror 143 also told her the *purpose* of his Rutland trip: "he went there [to Rutland] for the specific reason of looking at the neighborhood and the street that Miss Fell lived in. He wanted to know whether it really was that bad. He also wanted to take a look at the Price Chopper." Tran. Mar. 18, 2014, at 62. That "specific" purpose does not appear in Exhibit 241. Like Kelsey, Zloczower embellished events.

During Zloczower's direct examination, counsel told her that juror 143 "has testified . . . that when he spoke with you, he was drunk and on a bender . . . was juror 143 drunk when you spoke to him?" *Id.* at 65. Zloczower responded, "no." *Id.* In fact, the description of juror 143's testimony was inaccurate, and thereby permitted the witness's negative answer. At the August

26

15, 2013 hearing, juror 143 testified that when the two lawyers showed up at his house that Saturday evening, he was "coming back from deer camp" and "was drinking." Tran. Aug. 15, 2013, at 60. He added that "they probably should have smelt it on me." *Id.*, 62. As defense counsel's factual summary of the interview demonstrated, the juror's testimony was truthful. *See, e.g., id.* at 106-08.

Over three years after filing the § 2255 motion's incendiary allegation that Juror 143 had pointed a shotgun at another juror during deliberations, during the March 2014 examination of Zloczower, counsel revealed for the first time that that allegation was uncertain. Zloczower testified that, reviewing Exhibit 241 – her written summary of the juror's statement provided the prior evening – juror 143 said that, "he wasn't sure whether or not he in fact pointed the actual shotgun at . . . his fellow juror or whether he used his arm . . . to symbolize the shotgun." Tran. Mar. 18, 2014, at 72. The juror made this retraction the morning after his initial interview (when sober).

On cross-examination, Zloczower conceded that in preparing to interview juror 143, she did not "specifically" familiarize herself with the facts of the case. Tran. Mar. 18, 2014, at 96 (she was "relatively" familiar with them). This deficit impaired her ability to interview the juror, and write Exhibit 241, effectively. Thus, when the juror told her about a knife used in the Rutland murders being in a dumpster, she "wasn't sure" whether that was a fact from trial. *Id.* at 97, 98 (Q: "did you know at the time that made no sense because the knife was not in the dumpster?" A: "I didn't know that then"). Zloczower also did not know that at trial, the undisputed evidence was that Terry King's pocketbook was recovered from a dumpster (in New York). In fact, when asked, "is it possible that he was telling you actually about a pocketbook that was recovered from the dumpster?" Zloczower responded, "I don't know." *Id.* at 97.

It may also have been the result of lack of familiarity with the case that Zloczower did not know if juror 143's statements about the knife and the neighborhood, and his trip to Rutland, related to the guilt phase of trial, as opposed to the penalty phase. Tran. Mar. 18, 2014, at 96 ("I have no idea"), 100 ("I don't know whether that came up during the guilt phase or the penalty phase of the trial").

Zloczower conceded that juror 143's memory was uncertain, and in fact he wasn't sure if the shotgun had actually been in the jury room. Tran. Mar. 18, 2014, at 102. After Fell's counsel were ordered to surrender their memorandum setting forth a detailed description of the interview, Zloczower admitted that during the interview she concluded that the juror *had* been drinking. *Id*. at 107. Not only was there "a scent of alcohol on his breath," (*id*.), but he came to the door dressed only in a pair of denim jeans, and was "highly animated" and "very emotional" during the interview (*id*. at 108). These facts were omitted from Exhibit 241, from all § 2255 briefing, and from the direct examination.

 Also on cross-examination, Zloczower testified that juror 143's girlfriend (Kelsey) repeatedly asked him during trial to talk about the trial, and it was difficult because he could not do so. Tran. Mar. 18, 2014, at 109. Juror 143 also told Zloczower that his girlfriend collected news clippings and taped televised coverage of the trial. *Id*. These statements contradict Kelsey's testimony.

In sum, the allegation that juror 143 coerced another juror with a shotgun during the 2005 trial is based entirely upon a statement made over five years after trial, by a man in an inebriated, emotional and confused state – as cried, smelled of alcohol and voiced ideas about dumpsters and knives that made no sense. He expressed uncertainty about the presence of the firearm on

the following morning, and later denied it.  It would be a marked variation from customary practice in this District for a firearm to be in the jury room at all.

As to the juror's 2005 visit to Rutland, it is highly improbable that anything he saw there prejudiced the verdict, given the uncontested and overwhelming evidence of events in Rutland. "The touchstone of decision . . . is thus not the mere fact of infiltration of some molecules of extra-record matter . . .  but the nature of what has been infiltrated and the probability of prejudice."  *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994); *see also United States v. Greer*, 285 F.3d 158, 173 (2d Cir 2002) ("trial court's post-verdict determination of extra-record prejudice must be an objective one" focusing on the information's probable effect on a "hypothetical average juror"); *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001) ("Because the determination of whether a petitioner's Sixth Amendment rights have been violated by the jury's consideration of extra-record information requires a determination of whether the extra-record information had a prejudicial effect on the verdict . . . . we typically proceed immediately to the harmless error determination, assuming without deciding that a Sixth Amendment violation has occurred").

## C.  CONCLUSION

For the reasons set forth above, the government urges the Court to reject Fell's claims of juror misconduct.

Dated at Burlington, in the District of Vermont, this 23rd day of May, 2014.

Respectfully submitted,
UNITED STATES OF AMERICA

TRISTRAM J. COFFIN
United States Attorney

By:    /s/ Jeffrey B. Kahan
Jeffrey B. Kahan
Capital Case Section
1331 F Street, NW; Rm.337
Washington, DC 20530
Jeffrey.Kahan@usdoj.gov

/s/ William B. Darrow
WILLIAM B. DARROW
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov