UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
---------------------------------------------------------------------- X
                                                                        :
DONALD FELL,                                                            :
                                                                        :
                          Movant,                                      :
                                                                        :            2:01-CR-12-01
              - against -                                              :
                                                                        :
UNITED STATES OF AMERICA,                                              :
                                                                        :
                          Respondent.                                  :
                                                                        :
---------------------------------------------------------------------- X


## <u>BRIEF IN SUPPORT OF AMENDED 2255 MOTION</u>


LEWIS J. LIMAN                          CATHLEEN PRICE
SCOTT S. BUELL                          P.O. Box 321762
Cleary Gottlieb Steen &                 New York, New York 10032
Hamilton LLP                            (212) 998-6193
One Liberty Plaza
New York, New York 10006                RICHARD RUBIN
(212) 225-2000                          Rubin, Kidney, Myer & DeWolfe
                                        237 N. Main Street
                                        Barre, Vermont, 05641-4125
                                        (802) 479-2514


                                        *Attorneys for Donald Robert Fell, Jr.*

Date:   May 23, 2014

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

PROCEDURAL HISTORY................................................................................................... 2

GENERAL STATEMENT OF THE LAW .......................................................................... 3

    I.     Juror Non-Disclosure or Misstatements at Voir Dire and During
           Trial.......................................................................................................... 3

    II.    Juror Exposure to Extraneous Evidence .................................................... 10

    III.   Juror Coercion........................................................................................... 10

PART I: JUROR #26 CONCEALED IMPORTANT FACTS ON VOIR DIRE,
    INCLUDING HIS KNOWLEDGE OF INCULPATORY EXTRINSIC
    INFORMATION ABOUT MR. FELL'S CODEFENDANT THAT HE FAILED
    TO DISCLOSE AT VOIR DIRE OR AT ANY OTHER POINT DURING THE
    TRIAL, AND AS A CONSEQUENCE MR. FELL'S CONVICTION AND
    DEATH SENTENCE VIOLATE THE FIFTH, SIXTH, AND EIGHTH
    AMENDMENTS TO THE U.S. CONSTITUTION AND ARE DUE TO BE
    REVERSED. ................................................................................................... 13

    INTRODUCTION ......................................................................................... 13

    THE FACTS OF JUROR #26'S MISCONDUCT ......................................... 13

    ARGUMENT.................................................................................................. 16

        I.     Juror #26 Intentionally Withheld Material Information in Response
              to Questions at Voir Dire and During Trial, and the Truth Would
              Have Led to His Removal....................................................................... 16

            A.    The Intentional Nature of Juror #26's Nondisclosure Is
                 Evident Not Only in His Uncontroverted Testimony that He
                 Remembered Mr. Lee's Suicide When the Name Came Up,
                 But Also in the Fact of His *Pattern* of Lies on Voir Dire............ 17

            B.    The True Facts Would Have Provided a Valid Basis to
                 Challenge Juror #26 for Cause Before He Was Seated;
                 Indeed He Would Have Been Removed ..................................... 20

            C.    Juror #26 Would Still Have Been Removed for Cause Even
                 If, as the Government Has Argued, Juror #26 Did Not
                 Realize the Significance of the Information to Which He
                 Was Exposed Until After He Was Seated as a Juror ................... 22

            D.    Juror #26 Would Also Have Been Struck for Cause Based
                 on His Undisclosed Criminal History ......................................... 25

i

5:01-cr-00012-gwc   Document 509   Filed 05/23/14   Page 3 of 146

II. Mr. Fell's Conviction and Death Sentence Are Independently Reversibly Because of Juror #26's Exposure to Extraneous Information ...................................................................................... 27

PART II: JUROR #143 ENGAGED IN MULTIPLE FORMS OF GROSS MISCONDUCT WHILE A JUROR, INCLUDING VISITING THE VERMONT CRIME SCENES, FAILING TO REPORT TRUTHFUL RESPONSES ON VOIR DIRE, AND USING THE SHOTGUN ADMITTED INTO EVIDENCE TO COERCE ANOTHER JUROR TO VOTE FOR DEATH .................................................. 31

INTRODUCTION ......................................................................................... 31

THE FACTS OF JUROR #143'S MISCONDUCT....................................... 32

ARGUMENT................................................................................................. 43

I. Juror #143's Lies Prove That He Was a Partial Juror............................. 44

II. The Established Prejudice from the Extra-Record Exposure Cannot Be Rebutted............................................................................................ 46

A. The Circumstances of Juror #143's Misconduct Support a Finding of Prejudice.................................................................... 47

B. What Juror #143 Saw Prejudiced Mr. Fell................................... 50

i. Juror #143 Investigated and Interjected into the Jury's Deliberations Extra-Record Evidence That Bore Directly on the Vigorously Disputed Issues of Mr. Fell's Intent and Diminished Capacity...................... 50

1. Juror #143's Prejudicial Observations of the Price Chopper Employee Parking Lot ................. 54

2. Juror #143's Prejudicial Observations of 135 Robbins Street and the Route from 135 Robbins Street to the Price Chopper.................... 59

ii. Juror #143 Investigated and Interjected into the Jury's Deliberations Extra-Record Evidence that Struck at the Center of Mr. Fell's Case for Life .............. 68

III. Mr. Fell Was Deprived of His Sixth Amendment Right to a Fair Trial by Juror #143's Coercion of Another Juror into Voting to Sentence Mr. Fell to Death by Threatening Her with a Shotgun............. 72

Conclusion ................................................................................................. 74

PART III: MR. FELL'S CONVICTION AND DEATH SENTENCE SHOULD BE REVERSED BECAUSE JUROR #162 LIED ON VOIR DIRE ABOUT MATTERS THAT WOULD HAVE GIVEN RISE TO A VALID CHALLENGE FOR CAUSE.. ................................................................................................. 75

INTRODUCTION ......................................................................................... 75

THE FACTS OF JUROR #162'S MISCONDUCT....................................... 77

A.      Juror #162 Was Repeatedly the Victim of Crimes ...................... 85

      i.      Sexual Abuse .................................................. 85

      ii.     Embezzlement................................................. 93

      iii.    Physical Abuse................................................ 95

B.      Criminal History ........................................................ 98

      i.      Direct Evidence of Juror #162's Knowledge of Her
            Son's Criminal Record.................................... 100

      ii.     Juror #162 Lied Regarding Her Knowledge of Her
            Son's Record.................................................. 108

C.      Treatment for Substance Abuse................................. 115

D.      Police Complaints and Civil Suits ........................... 117

ARGUMENT.............................................................................. 119

I.      Juror #162's Misstatements and Omissions at Voir Dire Were
Intentional ................................................................................ 119

II.     Truthful and Complete Answers on Voir Dire Would Have
Provided a Valid Basis for a Challenge for Cause of Juror #162 .......... 121

A.      Juror #162 Was Biased Under Every Categorical Definition.... 121

B.      Juror #162 Was Not a Favorable Juror to Mr. Fell.................... 121

CONCLUSION............................................................................ 134

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Alford v. N.Y. Cent. R.R. Co.,
339 F.2d 1019 (7th Cir. 1964) ...................................................................................... 54

Anderson v. Ford Motor Co.,
186 F.3d 918 (8th Cir. 1999) ........................................................................................ 49

Anderson v. Miller,
346 F.3d 315 (2d Cir. 2003)....................................................................................12, 73-74

Andrus v. Glover Const. Co.,
446 U.S. 608 (1980)...................................................................................................... 55

Bailey v. Bd. of County Comm'rs,
956 F.2d 1112 (11th Cir. 1992) .................................................................................... 7

Benjamin v. Fischer,
87 Fed. Appx. 761 (2d Cir. 2004)................................................................................. 47

Bibbins v. Dalsheim,
21 F.3d 13 (2d Cir. 1994) .......................................................................................10-11, 46

Bruton v. United States
391 U.S. 123 (1968)...................................................................................................... 28

Burton v. Johnson,
948 F.2d 1150 (10th Cir. 1991) ...............................................................................50, 88, 126

Clark v. Comm'r of Soc. Sec.,
143 F.3d 115 (2d Cir. 1998).......................................................................................... 70

Clark v. United States,
289 U.S. 1 (1933)........................................................................................................... 4

Crawford v. United States,
212 U.S. 183 (1909)....................................................................................................... 7

Dyer v. Calderon,
151 F.3d 970 (9th Cir. 1998) ..................................................................................... passim

Edel v. Astrue,
No. 6:06-CV-0440 (LEK/VEB), 2009 WL 890667 (N.D.N.Y. Mar. 30, 2009)................ 70

Edwards v. Hyundai Motor Mfg. Ala. LLC,
701 F. Supp. 2d 1226 (M.D. Ala. 2010) ................................................................ 50

Fields v. Brown,
503 F.3d 755 (9th Cir. 2007) ............................................................................. 7, 9

Fisher v. ACR Hous. LLC,
No. 04-61389-CIV., 2005 WL 5956614 (S.D. Fla. Dec. 22, 2005)................................... 54

Gomez v. United States,
490 U.S. 858 (1989) ............................................................................................. 3

Gray v. Hutto,
648 F.2d 210 (4th Cir. 1981) .............................................................................. 120

Gunnell v. Rastatter,
No. 3:08-cv-064, 2008 WL 9010060 (S.D. Ohio Sept. 17, 2008)................................... 46

Hill v. United States,
622 A.2d 680 (D.C. Cir. 1993) .............................................................................. 59

In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,
739 F. Supp. 2d 576 (S.D.N.Y. 2010)................................................................... 24, 25

Irvin v. Dowd,
366 U.S. 717 (1961)............................................................................... 3, 10, 29

Jamison v. Grier,
No. 01-cv-6678, 2002 WL 100642 (S.D.N.Y. Jan. 25, 2002) ......................................... 59

Jhirad v. Ferrandina,
401 F. Supp. 1215 (S.D.N.Y. 1975)..................................................................... 67

Kramer v. Time Warner Inc.,
937 F.2d 767 (2d Cir. 1991)............................................................................... 90

Lowenfield v. Phelps,
484 U.S. 231 (1988)...............................................................................11-12, 72

Mason v. Scully,
16 F.3d 38 (2d Cir. 1994) ................................................................................. 28

McDonough Power Equip., Inc. v. Greenwood,
464 U.S. 548 (1984)................................................................................... passim

Morgan v. Illinois,
504 U.S. 719 (1992)................................................................................... passim

Neal v. John,
110 F.R.D. 187 (D.V.I. 1986) ...................................................................................... 48

Nelson v. Scully,
672 F.2d 266 (2d Cir. 1982)........................................................................................ 67

Person v. Miller,
854 F.2d 656 (4th Cir. 1988) ...................................................................................... 9

Remmer v. United States,
347 U.S. 227 (1954)..................................................................................................... 10

Rich v. Tee Bar Corp.,
No. 1:10-cv-1371 (MAD/CFH), 2013 WL 5442277 (N.D.N.Y. Sept. 27, 2013)............... 54

Sampson v. United States,
724 F.3d 150 (1st Cir. 2013)..................................................................................... passim

Sanders v. Easley,
No. CIV. 1:98CV184-V, 1999 WL 33321105 (W.D.N.C. Dec. 30, 1999) ....................... 49

Satterwhite v. Texas,
486 U.S. 249 (1988).................................................................................................... 30

Sears, Roebuck & Co. v. Penn Cent. Co.,
420 F.2d 560 (1st Cir. 1970)....................................................................................... 54

Silva v. Brazelton,
No. 1:10-CV-00409 LJO, 2013 WL 1003519 (E.D. Cal. Mar. 13, 2013) ......................... 48

Skaggs v. Otis Elevator Co.,
164 F.3d 511 (10th Cir. 1998) .................................................................................... 7

Tennard v. Dretke,
542 U.S. 274 (2004).................................................................................................... 126

Thompson v. Oklahoma,
487 U.S. 815 (1988)..................................................................................................... 1

United States v. Boney,
977 F.2d 624 (D.C. Cir. 1992)............................................................................... 50, 108

United States v. Calbas,
821 F.2d 887 (2d Cir. 1987)........................................................................................ 11

United States v. Carboni,
204 F.3d 39 (2d Cir. 2000)........................................................................................... 89

United States v. Carpa,
271 F.3d 962 (11th Cir. 2001) ....................................................................... 50

United States v. Chapin,
515 F.2d 1274 (D.C. Cir. 1975) .................................................................. 86, 91

United States v. Colombo,
869 F.2d 149 (2d Cir. 1989)......................................................................45, 50, 122

United States v. Daugerdas,
867 F. Supp. 2d 445 (S.D.N.Y. 2012)............................................................. passim

United States v. DeZarn,
157 F.3d 1042 (6th Cir. 1998) ...................................................................... 86, 94

United States v. Dolney,
No. 04-CR-159 (NGG), 2005 WL 2129169 (E.D.N.Y. Sept. 1, 2005) ............................ 90

United States v. Everett,
270 F.3d 986 (6th Cir. 2001) ....................................................................... 89

United States v. Farhane,
634 F.3d 127 (2d Cir. 2011) ...............................................................10, 11, 27, 46

United States v. Frederick,
868 F. Supp. 2d 32 (E.D.N.Y. 2012) ............................................................... 43

United States. v. Fuentes,
No. 2:12-CR-50-DHB, 2013 WL 4483062 (D. Me. Aug. 19, 2013)................................. 72

United States v. Glenn,
312 F.3d 58 (2d Cir. 2002).......................................................................... 91

United States v. Gonzalez,
110 F.3d 936 (2d Cir. 1997)........................................................................ 89-90

United States v. Greer,
285 F.3d 158 (2d Cir. 2002)........................................................................ 5, 6, 10

United States v. Greer,
998 F. Supp. 399 (D. Vt. 1998)..................................................................... 123

United States v. Guillen-Rivas,
950 F. Supp. 2d 446 (E.D.N.Y. 2013) .............................................................. 43

United States v. Haynes,
729 F.3d 178 (2d Cir. 2013)........................................................................ 25

United States v. Inserra,
34 F.3d 83 (2d Cir. 1994) ......................................................................................... 17

United States v. Kanahele,
951 F. Supp. 928 (D. Haw. 1996) ............................................................................ 49

United States v. Kemp,
379 F. Supp. 2d 690 (E.D. Pa. 2005) ...................................................................... 49

United States v. Langford,
990 F.2d 65 (2d Cir. 1993)...................................................................................... 123

United States v. Lawson,
677 F.3d 629 (4th Cir. 2012) .............................................................................. 57, 72

United States v. Lighte,
782 F.2d 367 (2d Cir. 1986)...................................................................................... 91

United States v. Martinez,
14 F.3d 543 (11th Cir. 1994) .................................................................................... 49

United States v. Morrison,
No. 04-cr-699 (DRH), 2013 WL 5933928 (E.D.N.Y. Nov. 6, 2013)................................. 24, 45

United States v. Nektalov,
325 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................... 89

United States v. Nelson,
277 F.3d 164 (2d Cir. 2002)............................................................................3, 7, 25, 29

United States v. Perkins,
748 F.2d 1519 (11th Cir. 1984) .............................................................................. 122

United States v. Ortiz,
315 F.3d 873 (8th Cir. 2002) ...................................................................................... 4

United States v. Peterson,
385 F.3d 127 (2d Cir. 2004)...................................................................................... 25

United States v. Pleva,
66 F.2d 529 (2d Cir. 1933)........................................................................................ 12

United States v. Rattenni,
480 F.2d 195 (2d Cir. 1973)................................................................................. 10, 48

United States v. Reingold,
731 F.3d 204 (2d Cir. 2013) ...................................................................................... 87

United States v. Resko,
3 F.3d 684 (3d Cir. 1993) ...................................................................................... 72

United States v. Reveron Martinez,
836 F.2d 684 (1st Cir. 1988)................................................................................. 93

United States v. Roshko,
No. 90 Cr. 265 (JAR), 1991 WL 18146 (S.D.N.Y. Feb. 7, 1991) ...................................... 67-68

United States v. Sampson,
820 F. Supp. 2d 151 (D. Mass. 2011) ................................................................. 7, 124

United States v. Schwarz,
283 F.3d 76 (2d Cir. 2002)................................................................................... 28

United States v. Scott,
854 F.2d 697 (5th Cir. 1988) ............................................................................... 19

United States v. Seal,
165 Fed. Appx. 975 (3d Cir. 2006)....................................................................... 49

United States v. Shaoul,
41 F.3d 811 (2d Cir. 1994).................................................................................... 5

United States v. Simon,
425 F.2d 796 (2d Cir. 1969)............................................................................ 17, 85

United States v. Stewart,
433 F.3d 273 (2d Cir. 2006)........................................................................ 5-6, 134

United States v. Taylor,
745 F.3d 15 (2d Cir. 2014).................................................................................. 28

United States v. Taylor,
767 F. Supp. 2d 428 (S.D.N.Y. 2010).................................................................. 97

United States v. Thomas,
116 F.3d 606 (2d Cir. 1997)............................................................................... 123

United States v. Torres,
128 F.3d 38 (2d Cir. 1997)............................................................................. passim

United States v. Tucker,
137 F.3d 1016 (8th Cir. 1998) ............................................................................. 48

United States v. Williams,
205 F.3d 23 (2d Cir. 2000).................................................................................. 89

United States ex rel. Owen v. McMann,
435 F.2d 813 (2d Cir. 1970).......................................................................... 10, 28

Veliz v. Crown Lift Trucks,
714 F. Supp. 49 (E.D.N.Y. 1989) ...................................................................... 54, 59

Wainwright v. Witt,
469 U.S. 412 (1985) ......................................................................................... 6, 7

Wellons v. Hall,
130 S. Ct. 727 (2010)....................................................................................... 46

Zant v. Stephens,
462 U.S. 862 (1983)......................................................................................... 1

**Rules and Statutes**

U.S. Const. amend. VI ....................................................................................... 3

**Other Authorities**

Charles Wright and Victor Gold, 28 Federal Practice and Procedure § 6113 (2d ed.)....... 92

Edie Green & Kirk Heilbrun, Wrightman's Psychology and the Legal System
(7th ed. 2011)................................................................................................... 126

Federal Judicial Center, Manual on Recurring Problems in Criminal Trials
(6th ed. Tucker Carrington 2010) ..................................................................... 24

Scott Sundby, A Life and Death Decision (2005) ............................................... 126

Stephen A. Saltzburg, et al., 2 Federal Rules of Evidence Manual §608.02[15] ............... 92

x

Donald Fell respectfully submits this brief in support of his Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial Pursuant to 28 U.S.C. § 2255 ("Amended 2255 Motion"). Dkt. No. 422 (Oct. 23, 2013).

## PRELIMINARY STATEMENT

It is beyond controversy that use of the death penalty requires trial proceedings that allow for a heightened reliability. Zant v. Stephens, 462 U.S. 862, 884 (1983); see also Thompson v. Oklahoma, 487 U.S. 815, 856 (1988) ("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments"). To this end, this Court opened Mr. Fell's trial for his life with an extensive voir dire process that was meticulously designed to uncover any aspect of the jurors' lives that could have disrupted their capacity to be fair and impartial in their consideration of the evidence. Notwithstanding this effort, that process was fatally undermined by several significant corruptions. Three jurors – 25 percent of the deliberating body – failed to truthfully respond to critically important voir dire questions. In doing so, these jurors obscured from Mr. Fell, as well as from this Court and the Government, important facts and biases that would have plainly required those jurors' removal for cause. In addition, two of those same jurors were aware of evidence and information that had been omitted or excluded from the case at trial – one of whom sought it out on his own initiative. Both of these jurors concealed their knowledge from the Court in the face of its daily questioning about external exposures. Finally, one of those jurors admitted to using the gun that had been admitted into evidence to convince another juror to vote for Mr. Fell's death.

Indeed, two of these jurors – Jurors #143 and #162 – continued to lie to the parties and the Court during these post-conviction proceedings. The degree of this continued deception is disturbing, and only exacerbates the fact that Mr. Fell's conviction and death sentence were not the products of a fair process. Each of these instances of juror misconduct deprived Mr. Fell

of his right to a fair trial and an impartial jury under the Fifth, Sixth, and Eighth Amendments, and requires the vacatur of his unconstitutional conviction and death sentence.

**PROCEDURAL HISTORY**

Donald Fell timely filed his initial 2255 Motion on March 21, 2011.  On December 21, 2011, the Government filed an opposition to the motion seeking summary dismissal of all of Mr. Fell's claims, including his claim that the conduct of certain jurors had deprived him of his constitutional right to an impartial trier of fact.

On May 10, 2013, the Court denied the Government's request for summary dismissal with respect to the majority of Mr. Fell's claims, including Mr. Fell's claim of juror misconduct.  The Court found that Mr. Fell had "demonstrated reasonable grounds for further investigation," and ordered an inquiry of Jurors #26, #143, and #162.  Mem. Op. & Order: Claim XXII: Juror Misconduct at 19, Dkt. No. 368 (May 10, 2013) ("May 10, 2013 Order").  That inquiry began on August 15, 2013, with the examination of Jurors #143 and #162, and continued on September 27, 2013, with the examination of Juror #26.  On October 22, 2013, Mr. Fell filed an Amended 2255 Motion, supplementing his juror misconduct claim with additional factual allegations, and on March 12, 2014, the Court permitted the amendment and held that Mr. Fell's additional factual allegations regarding Jurors #26, #143, and #162 were timely.  The inquiry into those jurors continued, and concluded with evidentiary hearings on March 18-19 and May 9, 2014, at which exhibits and witness testimony were admitted into evidence.

Following the close of evidence, the Court ordered the instant briefing on the merits of Mr. Fell's juror misconduct claim.  Mr. Fell's brief provides a statement of the law with respect to the juror misconduct claim generally, and then proceeds in three separate parts, one for each juror.  This brief incorporates by reference the arguments advanced in Mr. Fell's Brief in

Support of an Evidentiary Hearing, Dkt. No. 451 (Dec. 16, 2013), and his Reply to

Government's Brief re Juror Misconduct Claim, Dkt. No. 464 (Jan. 24, 2014).

<u>**GENERAL STATEMENT OF THE LAW**</u>

**I.      Juror Non-Disclosure or Misstatements at Voir Dire and During Trial**

"One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and

willing to decide the case solely on the evidence before it.'"  May 10, 2013 Order at 5 (quoting

<u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 554 (1984)).  This right to an

impartial jury is, of course, guaranteed by our Constitution's Sixth Amendment:  "In all criminal

prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of

the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.

Further, "due process alone has long demanded that . . . the jury must stand impartial and

indifferent to the extent commanded by the Sixth Amendment."  <u>Morgan v. Illinois</u>, 504 U.S.

719, 727 (1992).  The Supreme Court has called this protection our "most priceless" safeguard of

individual liberty.  <u>Irvin v. Dowd</u>, 366 U.S. 717, 721 (1961).  Nowhere is that more apparent

than when a defendant is on trial for his life.  If, in a capital case, a prospective juror would "fail

in good faith to consider the evidence of aggravating and mitigating circumstances as the

instructions require him to do," a defendant may challenge any such juror for cause.  <u>Morgan</u>,

504 U.S. at 729.  A violation of a defendant's right to an impartial adjudicator is a "structural"

error; it "'can never be treated as harmless'" and "require[s] automatic reversal."  <u>United States v.

Nelson</u>, 277 F.3d 164, 204 n.48 (2d Cir. 2002) (quoting <u>Gomez v. United States</u>, 490 U.S. 858,

876 (1989)).

"'Voir dire examination serves to protect that right by exposing possible biases,

both known and unknown, on the part of potential jurors.'"  May 10, 2013 Order at 5 (quoting

<u>McDonough</u>, 464 U.S. at 554).  "[P]art of the guarantee of a defendant's right to an impartial

3

jury is an adequate *voir dire* to identify unqualified jurors." Morgan, 504 U.S. at 729. The entire voir dire process administered by the Court in this case – the drafting of separate questionnaires by the parties, the submission to the Court by the parties of a joint proposed questionnaire, revisions by the Court to that joint questionnaire, 15 days of individual voir dire from May 4, 2005 through June 6, 2005, jury selection on June 9, 2005, repeated questioning of the jury thereafter – was directed towards an ultimate goal of enabling the Court to fulfill its "'responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence.'" Op. & Order re Voir Dire at 2, Dkt. No. 130 (May 25, 2005) (quoting United States v. Ortiz, 315 F.3d 873, 888 (8th Cir. 2002)) ("Voir Dire Order"). To that end, among other things, the questionnaire submitted to the jury pool inquired into the prospective jurors' backgrounds, experiences and beliefs, understandings of legal principles, views on the death penalty, and exposure to media coverage of Mr. Fell's case.[1]

"'The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.'" May 10, 2013 Order at 5 (quoting McDonough, 464 U.S. at 554). Those who are dishonest during voir dire make the court's "processes a mockery," Clark v. United States, 289 U.S. 1, 12 (1933), and the constitutional right to an impartial jury along with it. "If the answers to the questions are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only." Id. at 11.

In its May 10, 2013 Order, this Court explained the law applicable to juror dishonesty claims:

> In *McDonough Power Equipment*, the United States Supreme Court held that a party seeking a new trial based on juror nondisclosure or misstatements must satisfy a two-part test. '[A] party must first demonstrate that a juror failed to answer honestly a

---

[1] See Ex. 3, passim. Unless otherwise specified, citations to exhibits throughout this brief refer to the exhibits admitted as part of the continued evidentiary hearing beginning August 15, 2013 and concluding May 9, 2014.

4

material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'

May 10, 2013 Order at 5 (quoting McDonough, 464 U.S. at 548). The facts of Mr. Fell's case meet that standard, and his conviction and death sentence are due to be reversed.

As the Court explained during trial, it was determined to "excuse a juror for cause whenever it [found] that the juror [could not] fairly weigh aggravating and mitigating factors as required by the Federal Death Penalty Act." Voir Dire Order at 17. The Court "evaluate[d] challenges for cause based on the totality of the juror's responses, together with an assessment of that juror's demeanor." Id.

All challenges for cause are directed at the same ultimate objective: the exclusion from the jury of persons who cannot fairly or impartially judge the evidence of guilt or penalty. When the Court has identified such a juror, it must remove her from the jury. In other words, "'[c]hallenges for cause are generally based on actual bias, implied bias, or inferable bias.'" May 10, 2013 Order at 5 (quoting United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2002)). In the adjudication of a McDonough claim, "the test is not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response 'would have provided a valid basis for a challenge for cause.'" United States v. Daugerdas, 867 F. Supp. 2d 445, 470 (S.D.N.Y. 2012) (quoting McDonough, 464 U.S. at 556).[2] "To do so, the district court must

---

[2] In its Brief re Juror Misconduct Claims, the Government cites to United States v. Shaoul, 41 F.3d 811 (2d Cir. 1994), for the proposition that "a defendant must have a basis for arguing that the district court is **required** to sustain his challenge for cause" in the context of a 2255 petition. Dkt. No. 450 (Dec. 16, 2013), at 54 (emphasis in original). That is a misreading of Shaoul, a case involving the appellate review of a district court's findings on a post-conviction motion that it would not have removed a challenged juror for cause had the judge known of the undisclosed facts. 41 F.3d at 815. The Second Circuit concluded that such finding was not error as a matter of law – the district court was not "required to sustain such a challenge for cause." Id. at 816. But to say that an appellate court would not reverse – as an abuse of discretion – the trial judge's decision to seat a particular juror is not to say that the trial judge is required to let a verdict stand when the trial judge reaches the firm and definite conclusion that a seated juror would not have been impartial. That is the case here. Moreover, McDonough requires the district court only to answer whether it would have removed a juror for cause. See, e.g., Daugerdas, 867 F. Supp. 2d at 474

5

'determine if it would have granted the hypothetical challenge.'" United States v. Stewart, 433 F.3d 273, 304 (2d Cir. 2006) (quoting Greer, 285 F.3d at 171). And as Judge Calabresi reminds in Torres, that hypothetical challenge need not even have come from the petitioner: "the presiding trial judge has the authority and responsibility, either *sua sponte* or upon counsel's motion, to dismiss the prospective jurors for cause." United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997) (emphasis added).

Indeed, the court must grant a new trial based on juror misconduct if "a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." Sampson v. United States, 724 F.3d 150, 165-66 (1st Cir. 2013) ("Sampson II"); see also Daugerdas, 867 F. Supp. 2d at 470 ("A juror is biased – i.e., not impartial – if her experiences 'would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985) (alternations in original) (quotation marks omitted)).

"Actual bias is . . . the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." Torres, 128 F.3d at 43. "Whether a juror is actually biased is a question of fact determined by the trial judge." Daugerdas, 867 F. Supp. 2d at 470. "A juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." Torres, 128 F.3d at

---

(holding, in the McDonough context, that "the doctrine of inferable bias . . . permits a court in its discretion to dismiss a juror because of an inference that the juror will not be able to decide the case based solely on the evidence"). And in any event, under the facts here a court would be required to remove the jurors as a matter of law.

6

43. "Indeed, a trial judge might find that a juror is biased even in a situation where, when specifically asked, the juror professes that he or she could be impartial." Id. at 44 n.6. The trial judge has "broad discretion" in finding actual bias, "because a finding of actual bias 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" Torres, 128 F.3d at 44 (quoting Wainwright, 469 U.S. at 428). "'[D]oubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid.'" Nelson, 277 F.3d at 202 (quoting Bailey v. Bd. of County Comm'rs, 956 F.2d 1112, 1127 (11th Cir. 1992)).

Implied bias is bias presumed as a matter of law. May 10, 2013 Order at 6. "In some circumstances, bias is . . . implied 'when there are similarities between the personal experiences of the juror and the issues being litigated.'" United States v. Sampson, 820 F. Supp. 2d 151, 164 (D. Mass. 2011) ("Sampson I") (quoting Skaggs v. Otis Elevator Co., 164 F.3d 511, 517 (10th Cir. 1998)). Where bias is implied, "evidence of its actual existence need not be given." Crawford v. United States, 212 U.S. 183, 196 (1909); Daugerdas, 867 F. Supp. 2d at 472 ("Significantly, courts imply bias 'where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury.'" (quoting Fields v. Brown, 503 F.3d 755, 770 (9th Cir. 2007))). Indeed, "[i]n such cases, we do not consider the actual bias question of 'whether [the juror] was disposed to cast a vote against [the defendant].'" Fields v. Brown, 503 F.3d 755, 806 (9th Cir. 2007) (Berzon, J., dissenting) (quoting Dyer v. Calderon, 151 F.3d 970, 981 (9th Cir. 1998) (en banc)).

Finally, "[b]ias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.'" Torres, 128 F.3d

7

at 47. "[I]nferable bias is closely linked to both [actual bias and implied bias] . . . once facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant." Torres, 128 F.3d at 47. "[C]ases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt . . . 'Because [in such cases] the bias of a juror will rarely be admitted by the juror himself, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it, partiality necessarily must be inferred from surrounding facts and circumstances.'" Id. (quoting McDonough, 464 U.S. at 558 (Brennan, J., concurring)).

Contrary to the Government's argument (see Government's Response to Fell's Brief re Juror Misconduct Claims at 32-38, Dkt. No. 465 (Jan. 24, 2014) ("Government's Response")), the form of bias the juror is demonstrated to have is irrelevant to whether McDonough relief is available. There is nothing in McDonough itself to support the notion that relief is available only when a juror is found to be actually or impliedly biased, and not when a juror lies on voir dire about facts that give rise to inferred bias. The language of McDonough makes clear that the only requirement is that a truthful response provide a valid basis for a challenge for cause, and not that such challenge be based on actual bias or implied bias.

There is also nothing in the logic of McDonough, the cases on which it is based, or its progeny that supports the Government's argument. The McDonough inquiry is directed to the identification of jurors who have compromised the defendant's right to a fair and impartial jury. That right is equally compromised when a juror (after the fact) admits that she cannot decide the case based on the evidence (actual bias), admits to facts from which the law would imply bias even where the juror credibly denies the existence of bias (implied bias), or admits to facts which create an intolerable risk that the juror was biased or unable to decide the case fairly

8

on the facts (inferred bias).  In all cases, were the facts disclosed before the juror was seated, and

the judge to reach the conclusion that the juror could not fairly and impartially decide the case,

the Court would be required to excuse the juror.  A judge cannot permit a juror to sit who cannot

be fair or impartial.  In each case, the underlying facts give rise to a <u>risk</u> of bias rather than a

conclusive determination of bias, e.g., in the case of implied bias, a risk that it is "<u>highly unlikely</u>

that the average person could remain impartial in his deliberations under the circumstances.'"

<u>Daugerdas</u>, 867 F. Supp. 2d at 472 (emphasis added) (quoting <u>Person v. Miller</u>, 854 F.2d 656,

664 (4th Cir. 1988)); <u>Torres</u>, 128 F.3d at 45-46 ("even though a person may declare that he feels

no prejudice in the case[,] . . . the law <u>cautiously incapacitates him</u> from serving on the jury

because it <u>suspects</u> prejudice, because in general persons in a similar situation would feel

prejudice.") (quotation marks omitted) (emphasis added); <u>Dyer</u>, 151 F.3d at 982 ("Of course, a

juror could be a witness or even a victim of the crime, perhaps a relative of one of the lawyers or

the judge, and still be perfectly fair and objective.  Yet we would be quite troubled if one of the

jurors turned out to be the prosecutor's brother because it is highly unlikely that an individual

will remain impartial and objective when a blood relative has a stake in the outcome."); <u>see also</u>

<u>Fields</u>, 503 F.3d at 806 (Berzon, J., dissenting) ("[T]he implied bias doctrine exists principally to

disqualify jurors who have an excess *probability* of being influenced in their deliberations by an

extraneous consideration." (emphasis in original)).[3]  In seating a jury, the District Court judge

has a singular duty with respect to bias – it cannot seat a juror when it concludes there is

sufficient risk she is not "'capable and willing to decide the case solely on the evidence before

[her].'"  May 10, 2013 Order at 5 (quoting <u>McDonough</u>, 464 U.S. at 554).  And, consequently, in

---

[3] For that reason, the Government's attempted distinction of inferable bias as bias that only creates a risk of partiality is unavailing.  Government's Response at 32-38.  All three forms of bias turn on the risk of partiality.

9

all cases where a juror has frustrated the responsibility of the Court and the parties to ensure a fair and impartial jury, McDonough entitles the defendant to relief.  464 U.S. at 554.

Finally, the Government has previously made the identical argument – that inferable bias cannot serve as the basis for a McDonough claim – in Sampson II, see Government's Opening Br. and Pet. at 75-102, Nos. 12-1643, 12-8019, Sampson v. United States (1st Cir. Sept. 27, 2012) – and it was rejected.  There, the First Circuit affirmed the vacatur of the defendant's sentence on the basis of facts that District Judge Wolf held to constitute inferable bias (and only inferable bias).  724 F.3d 150, 168 (1st Cir. 2013).

## II.    Juror Exposure to Extraneous Evidence

The Sixth Amendment guarantees criminal defendants the right to a jury verdict "based upon the evidence developed at trial,"  Irvin, 366 U.S. at 722, and "the law presumes prejudice from a jury's exposure to extra-record information."  May 10, 2013 Order at 12 (quoting United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011)); accord Greer, 285 F.3d at 171 ("It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial.").  Prejudice can result from even one juror's exposure to extra-record information.  See Morgan, 504 U.S. at 729 ("[i]f even one [partial] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence"); United States v. Rattenni, 480 F.2d 195, 198 (2d Cir. 1973) (Clark, J.) ("The verdict must be set aside where even one juror in effect admits prejudice; after all, a defendant is entitled to twelve fair and impartial jurors.").  The Government can only rebut the presumption of prejudice through a showing that the extraneous information is harmless.  See May 10, 2013 Order at 12 (quoting Farhane, 634 F.3d at 168).  If the Government fails to carry this burden, a defendant is entitled to a new trial.  See Remmer v. United States, 347 U.S. 227, 230 (1954); United States ex rel. Owen v. McMann,

10

435 F.2d 813, 814, 821 (2d Cir. 1970) (Friendly, J.) (jury's exposure to extra-record information entitles defendant to a new trial).

To determine whether the Government can carry its burden to rebut this presumption, "the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." May 10, 2013 Order at 12 (quoting Bibbins v. Dalsheim, 21 F.3d 13, 17 (2d Cir. 1994)). The Court's focus should be on "the nature of the information or contact at issue, and its probable effect on a hypothetical average jury." May 10, 2013 Order at 12 (quoting Farhane, 634 F.3d at 169). In making its determination, the Court "'may appropriately consider the circumstances surrounding the introduction of [the] information.'" May 10, 2013 Order at 13 (quoting United States v. Calbas, 821 F.2d 887, 896 n.9 (2d Cir. 1987)).

Here, these circumstances include the fact that "[f]rom their first contact with the Court, prospective jurors and those who were seated for Fell's trial were repeatedly advised and reminded that their verdict must be based on the evidence presented in the courtroom and not on anything that [they] may have heard or read or experienced outside the courtroom." May 10, 2013 Order at 2-3 (citation omitted).[4] They include the fact that the jurors were "repeatedly advised and reminded not to discuss the case with others or among themselves." Id. (citation omitted). They include that "[a]t the beginning of each day of trial the seated jurors were asked if they had spoken to anyone about the case, or learned anything about the case from outside the

---

[4] The Court emphasized the importance of these instructions. See, e.g., Trial Tr. Vol. I, 15, June 20, 2005 ("[I]t's very important that you not discuss the case among yourselves at all . . . [Y]ou need to tell me . . . if you have learned anything else from outside the courtroom.").

11

courtroom." Id. (citation omitted).[5] And they include that the Court "specifically advised the jurors not to conduct their own investigation." Id.[6]

### III.    Juror Coercion

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). Jury coercion "strike[s] at the root of the right to a trial by jury. No person may lawfully be convicted by a jury unless every juror actually agrees that upon the evidence and the law of the case that person is guilty. If a verdict of guilty is returned for any other reason, it is a perversion of the constitutional guaranty to a jury trial." Anderson v. Miller, 346 F.3d 315, 326 (2d Cir. 2003) (quoting United States v. Pleva, 66 F.2d 529, 532 (2d Cir. 1933)). When "a juror's safety is threatened by fellow jurors," that "raise[s] serious constitutional concerns with respect to a defendant's right to a fair trial." Anderson, 346 F.3d at 327 (citation omitted).

*       *       *

Against this legal landscape, Mr. Fell argues several instances of reversible error as follows.

---

[5] See Trial Tr. Vol. 1-1, 15, June 20, 2005; Trial Tr. Vol. 2-1, 3, June 21, 2005; Trial Tr. Vol. 3-1, 11, June 23, 2005; Trial Tr. Vol. 4-1, 24, June 24, 2005; Trial Tr. Vol. 5-1, 18-19, June 28, 2005; Trial Tr. Vol. 6, 3, June 29, 2005; Trial Tr. Vol. 7-1, 41, July 1, 2005; Trial Tr. Vol. 8-1, 3, July 6, 2005; Trial Tr. Vol. 9-1, 8, July 7, 2005; Trial Tr. Vol. 10-1, 3, July 8, 2005; Trial Tr. Vol. 11, 38, July 12, 2005; Trial Tr. Vol. 12, 11-12, July 13, 2005.

[6] See Trial Tr. Vol. 5-2, 52, June 28, 2005 ("[N]ow in particular, it's just extraordinarily important that you not be exposed to any information about this case outside of the courthouse.").

**PART I:   JUROR #26 CONCEALED IMPORTANT FACTS ON VOIR DIRE, INCLUDING HIS KNOWLEDGE OF INCULPATORY EXTRINSIC INFORMATION ABOUT MR. FELL'S CODEFENDANT THAT HE FAILED TO DISCLOSE AT VOIR DIRE OR AT ANY OTHER POINT DURING THE TRIAL, AND AS A CONSEQUENCE MR. FELL'S CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARE DUE TO BE REVERSED.**

## INTRODUCTION

Juror #26 never mentioned on voir dire or at any other point that he was aware of a blockbuster fact: that Mr. Fell's co-defendant, Robert Lee, had killed himself while in prison awaiting trial.  It is now clear that prior to his jury service, Juror #26 knew those facts.  He admitted to pretrial knowledge of those facts at the September 27, 2013 post-trial hearing.  During jury selection, Juror #26 was directly asked by the Court whether he had been exposed to extra-record information but stood silent and arrogated to himself the right to determine whether he was fit to sit in judgment whether Mr. Fell should live or die.  The facts of the co-defendant's death were evidence that was extraneous to the body of evidence admitted against Mr. Fell.  There were few issues potentially more consequential to Mr. Fell than the circumstances of Mr. Lee's death after his arrest.  In addition to this, Juror #26 failed to mention that he had a prior criminal history, and failed to correctly respond to other important questions posed at voir dire.  Juror #26's post-trial testimony establishes a serious violation of the Sixth Amendment and law that a criminal defendant may only be convicted based on evidence introduced in court.

## THE FACTS OF JUROR #26'S MISCONDUCT

At the September 2013 hearing, Juror #26 admitted that, <u>prior to trial</u>, he heard that Mr. Lee committed suicide while listening to a news report about Mr. Fell's case.  September 27, 2013 Hearing Transcript ("Sept. Hr'g Tr.") at 14 ("Q: Was it before or after the trial that you heard about this person committing suicide?  A: It was before.").  By his own

13

account, Juror #26 "remembered [he] had heard [Mr. Lee's] name before, and then [he] realized . . . [that he] had heard it on the news that [Mr. Lee] had committed suicide" when Mr. Lee's name first was "brought up." Sept. Hr'g Tr. at 28. He further testified that he connected this information to Mr. Fell's trial and "put the two together" when he came to court and first heard Mr. Lee's name. Id. at 27.

Before the voir dire, the Court stressed with Juror #26 the importance of being honest, as well as the requirement that jurors only consider evidence presented in the courtroom. In the Court's videotaped instructions to the venire, played before the jurors filled out their long-form questionnaires, the Court explained that "[t]he purpose of this procedure we are about to go through is to try to insure the fairness and impartiality to both sides in this case," and made clear that "to serve 'fairly and impartially' means to base any verdict in the case on the evidence presented in this courtroom and not on anything that you may have heard or read or experienced outside the courtroom." Ex. 117 at FELL-00001348. The Court explained that it was critical that the answers to questions posed during the voir dire process be accurate and complete and "must be truthful under the penalty of perjury." Id. at FELL-00001356.

Mr. Lee's name was first "brought up" prior to voir dire. At the beginning of the long-form questionnaire, the Court prominently mentioned Mr. Lee's name: "The indictment in this case charges that the defendant and Robert Lee, committed the crimes of kidnapping and carjacking related to the abduction of Teresca King from Rutland, Vermont and her murder in Duchess County, New York, on or about November 27, 2000." Ex. 34 at 3. Mr. Lee's name was also used later in that same long-form questionnaire when it asked each potential juror whether he or she had any connection with one of four individuals involved in the case: Debra Fell, Charles Conway, Teresca King, and Robert Lee. Id. at 22 (Question 46(e)). Three of those

14

names were names of the victims. Juror #26 could not have missed the significance of the fourth name.

Moreover, Juror #26 admitted at voir dire to his having learned information about the case before trial, but he conspicuously – and even in the face of the Court's identification of Mr. Lee and its instructions regarding the importance of disclosing extrajudicial knowledge of any of the facts – omitted the critical fact that he heard that Mr. Lee committed suicide. The very first question that the Court asked Juror #26 during individual voir dire was whether he had heard anything about Mr. Fell's case. JVD-5 at 90 (May 13, 2005). Juror #26 curtly responded: "No, not really. No." Id. The Court pressed further, asking if Juror #26 knew "any of the facts at all," to which Juror #26 offered only: "No. I think at one point, a long time ago, I heard something in passing, but other than that, no." Id. The Court again pressed Juror #26: "Do you remember what you heard?" Id. The juror finally disclosed an untruth, that he had heard "just that a woman had been kidnapped." Id.[7] It is unmistakable that Juror #26's omission was intentional and Mr. Fell asks the Court to so find.

In addition to his dishonesty on voir dire, Juror #26 falsely and intentionally responded negatively every day during trial when the Court asked if anyone had been exposed to extra-record information. See supra at p. 11. The Court should also so find. On the first day of trial, the Court specifically asked, "Has anyone, by inadvertence, for any other reason, heard any publicity, radio broadcast or TV on this case?" Trial Tr. V. I at 10 (June 20, 2005). Juror #26 was silent. The Court continued to ask the same question in some form at the start of each day of trial. Every time, Juror #26's answer was the same: that he knew nothing about the case from outside of the courtroom.

---

[7] In addition to concealing his knowledge of Mr. Lee's suicide, Juror #26 also intentionally omitted other material information in response to voir dire questions. See infra at pp. 17-18.

In fact, as Juror #26 repeatedly testified at the September 2013 hearing, at the time he was sitting, he connected the news report he heard that Mr. Lee had committed suicide to Mr. Fell's trial. After testifying that he recalled the news report upon first hearing Mr. Lee's name, the Court asked, "So you heard that some time during the trial?" Sept. Hr'g Tr. at 28. Juror #26 responded, "Yes." Id.; see also id. at 16 (testifying that he recognized the significance of Mr. Lee's suicide in the context of "hearing the – the evidence that they had against [Mr. Fell]"); id. (recognizing that his knowledge about Mr. Lee's suicide was important "after I found out from testimony on – on the stand from different people"). The Government does not dispute that Juror #26 made this connection during trial. See Government's Response at 53.

Juror #26 also lied during jury selection about his and his family's criminal history.[8] He lied about his and his family's involvement in civil litigation.[9] And he lied about his family's history of government employment.[10]

## ARGUMENT

### I.     Juror #26 Intentionally Withheld Material Information in Response to Questions at Voir Dire and During Trial, and the Truth Would Have Led to His Removal

The record establishes that Juror #26 deliberately chose not to disclose information responsive to questions posed to him during voir dire and after he was seated as a juror. The Court should also find that if he had been truthful and candid, the Court would have had valid grounds to remove him for cause – indeed would have been required to remove him. These facts establish a Sixth Amendment violation under McDonough.

---

[8] See Ex. C (convicted of unlawful mischief); Sept. Hr'g Tr. at 10 (conviction of DWI); Ex. B (unlawful insurance payment, non-payment of wages, and failure to keep records); Ex. 20 (son on probation for smashing the window of a woman's car following a dispute).

[9] See Ex. 36a (Main Body Shop Inc v. [Juror #26], Calco, Inc. v. [Juror #26], Hodgdon v. Town of Victory, Hodgdon v. Brown, and Citizens Savings Bank & Trust v. Hodgdon).

[10] Ex. 21 at FELL-0003543.

**A. The Intentional Nature of Juror #26's Nondisclosure Is Evident Not Only in His Uncontroverted Testimony that He Remembered Mr. Lee's Suicide When the Name Came Up, But Also in the Fact of His *Pattern* of Lies on Voir Dire**

Juror #26's failure to disclose his knowledge about Mr. Lee during voir dire was not a mistake.

First, as discussed supra, Juror #26 admitted to knowing during voir dire that the report about Mr. Lee's suicide related to Mr. Fell's case. Juror #26 admitted in the post-conviction hearing before this Court that he realized as soon as Mr. Lee's name was "brought up" by the Court that the news report about Mr. Lee's suicide was related to Mr. Fell's trial. Mr. Lee's name was first "brought up" twice on the long-form questionnaire. Thus, by his own admission, Juror #26 made the connection prior to his individual voir dire – in which he initially denied knowledge of the case, and, only when pressed, admitted only that he had heard that a woman had been kidnapped. There is no contrary evidence.

Second, Juror #26's pattern of lies on voir dire, and the "reasons" he gave for those lies, demonstrate his lack of mistake in omitting his knowledge about Mr. Lee's death. See United States v. Simon, 425 F.2d 796, 809 (2d Cir. 1969) (intentional omission on one part of a document is evidence that another omission was intentional); see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (prior conviction for false statement admissible to prove knowledge and intent to make the separate false statement at issue). In addition to withholding his knowledge about Robert Lee, Juror #26 intentionally omitted information in response to several other questions asked of him during voir dire. The following chart summarizes the truth that should have been reported in response to the questions during jury selection:

17

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| [Short Form Questionnaire]: Have you, or anyone close to you, been a plaintiff or a defendant in a <u>civil</u> case? | Juror #26 was involved in at least two civil suits. <u>South Main Body Shop Inc v. [Juror #26]</u>; <u>Calco, Inc. v. [Juror #26]</u>. His father was also involved in at least two civil suits. <u>Hodgdon v. Town of Victory</u>; <u>Hodgdon v. Brown</u>. And his son was involved in at least one. <u>Citizens Savings Bank & Trust v. Hodgdon</u>.[11] |
| [Long Form Questionnaire] Q. 19: Do you (or any of your immediate family) work for or have ever worked for a government agency (city, state or federal)? | His father was a "longtime selectboard chairman, road commissioner, civil defense director, energy coordinator, service officer, solid-waste supervisor and justice of the peace" who served for "many decades."[12] |
| [Short Form Questionnaire]: Have you, any relative or person close to you ever been any of the following: . . . (c) Accused of a crime?<br><br>[Long Form Questionnaire] Q. 43(a): Have you or has a family member or close friend ever been involved in or been the target of a criminal investigation?<br><br>[Long Form Questionnaire] Q. 43(b): Have you or has a family member or close friend ever been charged with a crime? | Juror #26 was convicted of unlawful mischief in 1996, which arose out of a marital dispute with his wife.[13] He was also convicted of driving under the influence.[14] Further, he was investigated for and charged with the misdemeanors of unlawful insurance payment, the non-payment of wages, and failure to keep records.[15] The litigation for these charges lasted for years, and he hired a prominent Vermont lawyer to defend him.[16] In addition, Juror #26's son was arrested and ultimately served probation in 2009 for smashing the window of a woman's car following a dispute.[17] |

---

[11] <u>See</u> Ex. 36a.

[12] Ex. 21 at FELL-00003543.

[13] Ex. C.

[14] Sept. Hr'g Tr. at 10.

[15] Ex. B.

[16] <u>Id.</u>

[17] Ex. 20.

Contrary to the actual facts, Juror #26 responded "no" in response to each of these questions. Juror #26 did not inadvertently fail to answer the Court's questions, or forget the events he should have reported, or misunderstand the Court's questions. Instead, he simply arrogated to himself the decision of what to report, and what not to report. Juror #26's testimony makes it clear that his failure to truthfully and completely disclose whether he had "ever been charged with a crime," was not a mistake. When asked by the Court why he did not report his unlawful mischief conviction on his questionnaires, Juror #26 admitted that he simply decided on his own it was not important enough: "I just thought that it was kind of a joke." Sept. Hr'g Tr. at 10. Similarly, he did not report that he was accused of failure to pay wages and related crimes, which involved criminal proceedings that lasted for many years and represented a significant episode in his life, because he "didn't think it was important." Id. at 33.[18]

Under the law, however, this is error. It was not for Juror #26 to decide for himself which information to report and which information to omit. The Court repeatedly instructed the members of the venire to be honest and candid – regardless of whether they thought the questions the Court asked were important ones or "jokes." See generally Ex. 117. It was for the Court to determine what information was important for prospective jurors to disclose. United States v. Scott, 854 F.2d 697, 699 (5th Cir. 1988) (ordering a new trial where a juror "consciously censored the information" during voir dire and "believed that it was *his* place, and not the place of the court or defense counsel, to determine whether [his undisclosed information was] a bar to jury service in this case") (emphasis in original); see also Dyer, 151 F.3d at 984 ("[T]he magnitude of [the juror's] lies and her remarkable display of insouciance – her expressed

---

[18] His statement is belied by the facts of this criminal proceeding. He signed a form stating that he had "been charged with a serious offense." Ex. B at FELL-00003520. He testified that he "had to come to court once every month" during a period of supervision. Sept. Hr'g Tr. at 49. And he hired a prominent attorney, Richard Davis, whom this Court judicially noted "charged a lot," to fight the charges. Id. at 50. Clearly, this was an important event in Juror #26's life, and not one he would forget when filling out his voir dire questionnaires.

feeling that only she would decide what matters – fatally undermine our confidence in her ability to fairly decide [the defendant's] fate.").

In addition, Juror #26 readily recalled the suicide when interviewed by Mr. Fell's lawyers in 2011 – even though that was nearly six years after trial and nine years after Mr. Lee's death. It is implausible that he would not have had equal, if not greater, recall of it in 2005 when pushed by the Court for accurate answers.[19] It is equally implausible that he did not connect it to the case: Mr. Lee killed himself while in jail for the same crimes for which Mr. Fell was on trial. Indeed, Juror #26 has testified that as soon as he heard Mr. Lee's name he remembered the extraneous information he had heard about Mr. Lee's death. See Sept. Hr'g Tr. at 28. In fact, Juror #26 suggested that he declined to reveal his knowledge about Mr. Lee's suicide for the same reason that he omitted his criminal history. He decided it was not "relevant other than – because he wasn't on trial, and he was actually passed away [sic]." Sept. Hr'g Tr. at 16. But, as noted, it was not for Juror #26 to decide what was relevant. It was for him to answer whether he knew of extra-record facts, and he plainly did.

### B. The True Facts Would Have Provided a Valid Basis to Challenge Juror #26 for Cause Before He Was Seated; Indeed He Would Have Been Removed

Even without the other withheld information, Juror #26's exposure to reports that Mr. Lee committed suicide provided a valid basis for a challenge for cause before Juror #26 was seated. As the Government acknowledged during trial, the Court "had extreme concern during jury selection and otherwise that the jury hear about [Mr. Lee's death]." Trial Tr. Vol. VI at 87:21-22 (June 29, 2005). The Court agreed, noting further that "I was particularly cautious in jury selection about the cause of death." Id. at 88 (emphasis added). A review of the voir dire

---

[19] Juror #26's memory is sharp. At the September 2013 hearing, he recalled minute details about the phone line he installed prior to his 1996 misdemeanor conviction, more than 17 years before the hearing. See Sept. Hr'g Tr. at 5-7. Given his recall for the unremarkable despite the passage of time, it is incredible that he did not remember the news report about Mr. Lee's suicide when called for jury duty in Mr. Fell's trial.

transcript confirms that the circumstances surrounding Mr. Lee's death were of grave concern to the Court.

When a veniremember disclosed knowledge of Mr. Lee's death, the Court was quick to probe the extent of that knowledge. For example, when Juror #86 testified that "I believe the other gentleman [Mr. Lee] passed away," the Court followed up by asking, "Do you know the circumstances around his passing away?" JVD-I at 94:22-25 (May 4, 2005).[20] Although she responded that she did not know, see id., the Court nonetheless dismissed Juror #86, in part because "the fact that she is aware of another person in this offense who is dead, creates a real risk, in my view, to tainting the remainder of the jury." Id. at 98. The Court likewise dismissed another veniremember, Juror #42, under similar circumstances. Juror #42, like Juror #26, knew more about the circumstances of Mr. Lee's death, stating, "I think one of them has since committed suicide." JVD-1 at 174:11-12. The Court dismissed this juror, explaining:

> [H]e has got some information about this case which no one else has, and that is that Mr. Lee committed suicide. And if he is allowed to sit on a jury, that means the entire jury gets to know that Mr. Lee committed suicide. And that is of grave concern to me, in terms of fairness to this defendant, as well as to the government, for that matter . . . .

JVD-1 at 177 (emphasis added); see also May 10, 2013 Order at 12 n.4. The Court's analysis is uncontested. As argued in Section II infra, knowledge of Mr. Lee's suicide was prejudicial. Among other prejudicial inferences, a juror who believed that Mr. Lee intentionally killed himself after having been arrested for the murders of Mrs. King and the two other victims could have easily inferred that Mr. Lee believed himself guilty of the murder of the three victims. And, a juror who inferred that Mr. Lee was guilty of murder could also have easily concluded that Mr.

---

[20] See also JVD-II at 50:25-51:3 (May 5, 2005) ("JUROR #44: There was another man involved, but I believe he is dead. Died in prison. THE COURT: Okay. What happened to him? JUROR #44: I don't know.").

Fell – Mr. Lee's partner in crime and the person who along with Mr. Lee participated in the deaths – was likewise guilty of murder. It is clear that a prospective juror's awareness of such information was sufficient to excuse them for cause. See Torres, 128 F.3d at 43.

### C. Juror #26 Would Still Have Been Removed for Cause Even If, as the Government Has Argued, Juror #26 Did Not Realize the Significance of the Information to Which He Was Exposed Until After He Was Seated as a Juror

The evidence supports the finding that Juror #26 knew during voir dire that he was exposed to extrajudicial information but nonetheless chose to lie about that exposure. Moreover, given the Court's daily questioning of the jurors during trial about whether they had become aware of any extrinsic information, Juror #26's intentional failure to disclose it then was additional misconduct that gave rise to the same constitutional violation.

There is no doubt that Juror #26 knew during the trial at the latest that the report that he had heard about Mr. Lee's suicide was a fact related to Mr. Fell's case, and that that fact and the circumstances of Mr. Lee's death were of critical importance. He admitted to such knowledge. The Court asked him, "And so at some point during the trial you recognized that this [Mr. Lee's suicide] was important, that you had known this piece of information, or - - ." Sept. Hr'g Tr. at 16. Juror #26 responded, "Yes, later on." Id. The Court sought clarification: "What do you mean later on?" Id. Juror #26's answer made clear that he realized the importance of the news report about Mr. Lee's suicide during the trial: "You know, after I found out from testimony on - - on the stand from different people." Id.

He could not have testified otherwise. Mr. Lee played a central role in both the guilt and penalty phases of trial.[21] At the beginning of trial, during the Government's guilt phase

---

[21] See generally Trial Tr. Vol. I-1, 15, June 20, 2005; Trial Tr. Vol. II-1, 3, June 21, 2005; Trial Tr. Vol. III-1, 11, June 23, 2005; Trial Tr. Vol. IV-1, 24, June 24, 2005; Trial Tr. Vol. V-1, 18-19, June 28, 2005; Trial Tr. Vol. VI, 3, June 29, 2005; Trial Tr. Vol. VII-1, 41, July 1, 2005; Trial Tr. Vol. VIII-1, 3, July 6, 2005; Trial Tr. Vol. IX-1, 8, July 7, 2005; Trial Tr. Vol. X-1, 3, July 8, 2005; Trial Tr. Vol. XI, 38, July 12, 2005; Trial Tr. Vol. XII, 11-12, July 13, 2005.

opening statement alone, he was mentioned by name more than forty times.  His name continued to be mentioned nearly every day of trial.[22]  Mr. Lee was at the heart of Mr. Fell's case:  As the Government (outside the presence of the jury) argued during trial, "it's our view that Bobby Lee is in the middle of this case.  He has been in the middle of this case from the beginning."  Trial Tr. Vol. XI at 6 (July 12, 2005).  In response, the Court simply stated, "Agreed," reflecting the self-evident centrality of Mr. Lee to Mr. Fell's trial.  Id. at 6.  At the penalty phase of Mr. Fell's trial, Mr. Lee was explicitly mentioned in two of Mr. Fell's mitigating factors: (1) "Robert Lee, equally culpable for the crimes, will not face execution," and (2) "Donald Fell and Robert Lee acted in concert in committing the crimes."  Trial Tr. Vol. XII at 154 (July 13, 2005).  In fact, Juror #26 first heard these mitigating factors at the very beginning of the penalty phase case when the Court read each mitigating factor as part of its preliminary instructions – and was thus keyed into the significance of Mr. Lee's death (and of his extrajudicial information about the cause of Mr. Lee's death) for penalty as soon as the sentencing phase began.  Trial Tr. Vol. V-1 at 28.[23]  The Government elicited substantial testimony from multiple witnesses in rebuttal to these mitigating factors.  See Trial Tr. Vol. XI at 46-47 (July 12, 2005) (testimony of Matt Cunningham); Trial Tr. Vol. V-2 at 62 (June 28, 2005) (testimony of Vertith Oberle).  And during its closing argument, the Government spent time attacking both of the mitigating factors involving Mr. Lee.  See Trial Tr. Vol. XII at 51-52 (July 13, 2005).

Yet, each day, when Juror #26 was asked whether he had heard any extrajudicial information about this case, he answered no.  The Court began each day of trial by asking the jury if any of them had "learned anything about the case from outside the courtroom," and it

---

[22] See, e.g., Trial Tr. V. I-I at 19; Trial Tr. Vol. II-I at 19; Trial Tr. Vol. III-I at 116; Trial Tr. Vol. IV-I at 41; Trial Tr. Vol. V at 28; Trial Tr. Vol. VII-I at 157; Trial Tr. Vol. VIII-I at 110; Trial Tr. Vol. XI at 47; Trial Tr. Vol. XII at 14.

[23] The mitigating factor "Donald Fell and Robert Lee acted in concert in committing the crimes" originally read "Donald Fell would not have committed the crimes without the influence of Robert Lee."  Id.

ended each day of trial by instructing them not "to be exposed to publicity or learn anything about the case from outside the courtroom." May 10, 2013 Order at 3. The Court asked these questions because all judges have a duty "to ensure that a jury remains impartial throughout the trial and deliberations." Federal Judicial Center, Manual on Recurring Problems in Criminal Trials 11 (6th ed. Tucker Carrington 2010) (emphasis added). "The necessity of truthful answers by [each member of the jury] if this process is to serve its purposes is obvious." See May 10, 2013 Order at 5 (quoting McDonough, 464 U.S. at 554). Juror #26 knew that the correct answer to the Court's question was yes – that he had been exposed to extrajudicial information – but (even though he knew Mr. Lee and his death were important to the trial) he nonetheless falsely answered no. Due to his daily lies, Juror #26 successfully thwarted the Court's efforts to ensure that Mr. Fell had a fair and impartial jury.

This establishes a McDonough violation. The gravamen of a McDonough violation is not just the lie at voir dire itself; it is that by lying to the Court with respect to a fact that would give rise to an excusal for cause based on bias, the juror has compromised the defendant's fair trial rights. Those rights are no less compromised whether the lie occurs before the juror is seated or after the juror is seated in response to a question designed to ensure the juror is fair and impartial. See United States v. Morrison, No. 04-cr-699 (DRH), 2013 WL 5933928, at *9 (E.D.N.Y. Nov. 6, 2013) (granting new trial pursuant to McDonough where juror was offered bribe during deliberations and concealed that fact from the court). Voir dire means "to speak the truth." Daugerdas, 867 F. Supp. 2d at 449. A juror's obligation to speak the truth does not end with a pretrial voir dire.[24] After a juror is seated, as much as before the juror is

---

[24] Nor is the concept of voir dire, and the McDonough case law regarding omissions during voir dire, limited to the questioning of jurors prior to trial. In fact, in In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., Judge Scheindlin explicitly referred to her mid-trial questioning of a juror about misconduct as "conduct[ing] a voir dire." 739 F. Supp. 2d at 591. Additionally, a juror's lies in response to a court's questions directed at the whole jury panel (as opposed to an individual voir dire) suffice to show a McDonough violation. See Daugerdas, 867 F. Supp

24

seated, if the juror reveals information demonstrating that the juror cannot be fair or impartial, the judge is under an obligation to remove the juror.  See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 739 F. Supp. 2d 576, 611 (S.D.N.Y. 2010) (juror who learned of extraneous information about the case on the internet was subjected to another voir dire and "was immediately excused after the Court learned of his misconduct"); United States v. Peterson, 385 F.3d 127, 132-35 (2d Cir. 2004) (dismissing a sitting juror and noting that "a court looking into juror misconduct must investigate and, if necessary, correct a problem"); Sampson I, 820 F. Supp.2d at 196 (dismissing two sitting jurors after discovering that these jurors were dishonest on their voir dire questionnaires).[25]  Indeed that is precisely why the Court would ask the questions it did during trial.  After a juror is seated, as much as before the juror is seated, the juror is obliged to answer the Court's questions truthfully and not lie or intentionally withhold information.  After the juror is seated, as much as before the juror is seated, the withholding of information that would lead to the juror's removal frustrates the Court's ability to ensure a fair factfinder.  And, in both instances, it is the juror's participation in deliberations, after having intentionally lied or omitted information, that is the gravamen of the constitutional violation.

Accordingly, regardless when Juror #26 lied – whether before being seated or after being seated – that lie gives rise to a constitutional violation requiring a new trial.

**D. Juror #26 Would Also Have Been Struck for Cause Based on His Undisclosed Criminal History**

In addition to lying about his exposure to prejudicial extrajudicial information, Juror #26 also lied about his criminal history.  Had he told the truth, he would have been struck

---

at 449-50 (McDonough claim sustained in part on false answers given in response to questions asked of the whole venire).  Thus, Juror #26's lies in response to this Court's daily questions posed to the jury panel establish juror misconduct under McDonough.

[25] See also United States v. Haynes, 729 F.3d 178, 191-92 (2d Cir. 2013) (abuse of discretion for trial court not to investigate allegations of misconduct by sitting jurors); United States v. Nelson, 277 F.3d 164, 202-04 (2d Cir. 2002) (reversible error if a biased veniremember is empaneled).

for that reason as well.  In particular, the circumstances of his unlawful mischief conviction reflect an inability to fairly hear and consider mitigation evidence about the domestic turmoil in Mr. Fell's life.  Juror #26 explained that, prior to committing this crime, "my wife and I were having [a] bad time, and I got thrown out [of the house]."  Sept. Hr'g Tr. at 7.  In the midst of this dispute with his wife, he came back to the house (where his wife alone was living) and cut the phone line which gave service to the house.  Id.  He did not report this crime during voir dire because he "thought that it was kind of a joke."  Id. at 10.  Juror #26's rendition of the narrative surrounding this crime ("my bills were getting kind of high . . . and I was a little worried about the phone line," id. at 7) elides that he and his wife were in a fight serious enough for Juror #26 to be kicked out of the house.  His belief that this crime "was kind of a joke" reflects a complete lack of understanding of the fear that his wife must have felt when she was completely cut off from the outside world at the same time that she was fighting with her husband.[26]  As the court records demonstrate, the couple lived in a remote area.  Without an operational phone, she could not call to get her road plowed, and thus had to walk a distance through the snow to get to a neighbor's phone.[27]  This experience was no "joke" to his wife, who was upset enough about the incident to file a police report and launch an investigation.  His inability to appreciate the gravity of his wrongful acts – which was also revealed in response to questions about his other crimes – suggests that he could not fairly consider evidence involving similar incidents in the Fell household.  These facts, especially when considered cumulatively with Juror #26's knowledge of Mr. Lee's suicide, would have given rise to a valid basis for a challenge for cause.  See Voir Dire Order at 17.

---

[26] See Ex. 19 at 14-15 (his wife's Victim Impact Statement).

[27] See id.

## II.     Mr. Fell's Conviction and Death Sentence Are Independently Reversible Because of Juror #26's Exposure to Extraneous Information

The record establishes beyond a doubt that Juror #26 was exposed to extraneous evidence about Mr. Lee's death.  See supra at pp. 13-14.  Accordingly, prejudice is presumed. May 10, 2013 Order at 12 (quoting United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011)). This presumption is irrefutable since it is clear that Juror #26's exposure to the report that Mr. Fell's co-defendant committed suicide was extremely harmful and prejudicial.  The same evidence also establishes the existence of a valid challenge for cause.

The parties vigorously contested what the jury should be told about the fact and manner of Mr. Lee's death.  Prior to trial on the guilt phase, Mr. Fell's counsel filed Fell's Motion *in Limine* to Exclude Evidence of Robert Lee's Death, Dkt. No. 97 (Mar. 29, 2005), which sought "to exclude the admission of, or reference to, evidence relating to the death of Robert Lee, for the reason that it is not relevant to the indictment and will unfairly prejudice the defendant during trial." Id. at 1.  The Government opposed this motion.  Opposition of the United States to Defendant's *in Limine* Motions for the Guilt Phase of Trial at 25-26, Dkt. No. 112 (Apr. 29, 2005).  After receiving briefing on the issue, the Court determined that jurors should not be told anything about Mr. Lee's death:  "At this time, any evidence relating to Lee's death is inadmissible."  Opinion and Order at 8, Dkt. No 129 (May 25, 2005) ( "May 25, 2005 Order").  The Court also cautioned the Government to "make a proffer to the Court describing the purpose for which the evidence is being introduced" in the event that the Government wanted to introduce evidence of Mr. Lee's death in rebuttal during the penalty phase. Id.  In short, the Court recognized that information about Mr. Lee's death was aggravating, and that such information could be unfairly prejudicial to Mr. Fell's case for a sentence of less than death.

Notwithstanding all of this care, Mr. Fell's jury was nonetheless tainted with the belief that Mr. Fell's co-defendant Mr. Lee committed suicide.  Mr. Fell was thus deprived of the benefit of the May 25, 2005 Order excluding all evidence of Mr. Lee's death.[28]  The prejudice that a defendant suffers when a juror believes that a co-defendant committed suicide is clear, as an accused's suicide is "received as [an] admission[] by conduct, constituting circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself."  2 McCormick On Evidence § 263 (7th ed. 2013); cf. Bruton v. United States, 391 U.S. 123, 135-36 (1968) (a co-defendant's out-of-court confession is so "powerfully incriminating" that it is never admissible against a defendant);[29] United States v. Schwarz, 283 F.3d 76, 99-100 (2d Cir. 2002) (extraneous information about co-defendant's guilty plea required a hearing because "a co-defendant's admission of wrongdoing can be very powerful evidence against a remaining defendant").

This is not only hornbook law, but it would be the common sense conclusion reached by the average juror.  In fact, one veniremember, Juror #1, had heard about Mr. Lee's suicide, and told the Court, "And to me I think that guy would have to realize, you know, this guy killed himself because of what he did."  JVD-V at 27 (May 13, 2005).[30]  A juror armed with this extrinsic information, as Juror #26 was, would begin his jury service with preconceived notions as to Mr. Fell's guilt: if Mr. Lee was guilty (he committed suicide, ergo, he was guilty), then Mr. Fell was likewise guilty.  Such a juror is no juror at all, and his service on a jury, especially in a capital case, is an effrontery to the Constitution's guarantee of an impartial jury.

---

[28] The only evidence that came in about Mr. Lee's death was this stipulation:  "Robert Lee and Donald Fell were charged by grand jury indictment with the same crimes. On September 20th, 2001, Lee died in his cell at the Northwest Correctional Facility in St. Albans, Vermont. His death was determined to be accidental.  And at the time of his death, Lee faced the same charges as Fell." Tr. V. XI at 93:13-19 (July 12, 2005).  Juror #26 disregarded this stipulation, and continues to believe that Mr. Lee committed suicide. Sept. Hr'g Tr. at 13, 15, 27.

[29] See also United States v. Taylor, 745 F.3d 15, 28-30 (2d Cir. 2014); Mason v. Scully, 16 F.3d 38, 42-43 (2d Cir. 1994).

[30] This juror was ultimately dismissed.  Id. at 49-50.

28

See <u>United States ex rel. Owen v. McMann</u>, 435 F.2d 813, 814, 821 (2d Cir. 1970) (Friendly, J.);

<u>see</u> <u>also</u> <u>Irvin v. Dowd</u>, 366 U.S. 717, 727-28 (1961); <u>Nelson</u>, 277 F.3d at 202-04 (a juror's

unrepented "predisposition to believe in the guilt" of a defendant amounts to actual bias).

The juror's knowledge that Mr. Lee committed suicide likewise prejudiced the

penalty phase of Mr. Fell's trial.[31]  Extrinsic evidence that Mr. Lee killed himself bears on at

least three mitigating factors: (1) "Robert Lee, equally culpable for the crimes, will not face

execution," (2) "Donald Fell and Robert Lee acted in concert in committing the crimes," and (3)

"Donald Fell has shown remorse for killing Theresa [sic] King."  Trial Tr. Vol. XII at 154 (July

13, 2005).  With the "knowledge" that Mr. Lee committed suicide, a juror could not avoid the

belief that Mr. Fell, who committed the same crimes, lacked comparable remorse, having not

killed himself.  Furthermore, that "knowledge" would have led a juror to attach additional

aggravation to the Government's argument that Mr. Fell lacked remorse, since Mr. Fell insisted

on asking the jury to spare his life when Mr. Lee had relieved them of this burden.  It was not

mitigating that Mr. Lee would not "face execution"; it was aggravating to Mr. Fell that Mr. Lee

had taken responsibility himself for making that decision, and had not imposed it on the jurors.

And, furthermore, because Mr. Lee <u>did</u> kill himself because of his crimes, it would be <u>Mr. Fell</u>

who would escape justice if the jury did not sentence him to death.[32]  To a juror who had heard

---

[31] The Government contends that the stipulation read into evidence during the penalty phase that Mr. Lee died accidentally before trial rebuts any prejudice that Juror #26's extra-record information might have caused. Government's Response at 54.  But, in every case of extrajudicial exposure to information, the information to which the juror is exposed differs from that presented at trial; that is the point of the doctrine.  That therefore cannot be sufficient answer to a claim of exposure to extra-record information.  Moreover, the record demonstrates  Juror #26 <u>continues to believe</u> that Mr. Lee committed suicide despite the stipulation read at trial.  <u>See</u> Sept. Hr'g Tr. at 13, 15, 27.  Moreover, the stipulation was not read to the jury until the very end of the penalty phase; it was among the last pieces of evidence introduced before the Government rested its case.  Accordingly, whatever ameliorative effects the Government claims it may have had would not have occurred until long after the jury had heard extensive evidence in the case and formed significant opinions as to Mr. Fell's culpability.

[32] Regarding both Mr. Fell's culpability and remorse, the Government <u>agrees</u> that Juror #26's extra-record information is relevant – the Government just misunderstands the conclusion that the average juror would make knowing that Mr. Lee committed suicide: "If Lee killed himself, and Juror #26 believed he did so because of his crimes and not for some other unknown reason, the logical conclusion would be that he felt more culpable than Fell,

that Mr. Lee committed suicide, highlighting Mr. Lee's death transformed this mitigator into an aggravator: Mr. Fell's plea to the jury for his life became affirmative proof of his lack of remorse in light of Mr. Lee's guilt-induced suicide. This extra-record evidence, and the corresponding prejudicial inferences, would have been at the forefront of any juror's mind as he entered deliberations – with devastating consequences to Mr. Fell.[33]

---

not less. After all, Fell did not feel so culpable that he killed himself." Government's Response at 54-55. This inference is prejudicial, however, because the average juror would conclude that Mr. Fell did not feel sufficient remorse nor accept full responsibility for his crimes because "Fell did not feel so culpable that he killed himself" unlike his equally culpable and equally responsible co-defendant, Mr. Lee. Id. at 55.

[33] Although the foregoing establishes that the injection of this extrajudicial information was prejudicial, the nature of the penalty phase proceeding in and of itself is a barrier to a finding that this constitutional error was harmless. Unlike a typical proceeding, "which turns largely on an evaluation of objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime." Satterwhite v. Texas, 486 U.S. 249, 261 (1988) (Marshall, J., concurring). Writing for the Court in Satterwhite, Justice O'Connor emphasized that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." Id. at 258. Given the subjective analysis that each juror must individually perform at the penalty phase, see Trial Tr. V. XII at 158:16-22 (this Court's instructions to the jury), the information about Mr. Lee's suicide cannot be neatly excised from the calculus of whether aggravating factors sufficiently outweighed mitigating factors. Thus, in addition to the prejudice that Mr. Fell has established was caused by Juror #26's extrajudicial information, the nature of the penalty phase serves as an additional hurdle to a finding of harmlessness.

**PART II:    JUROR #143 ENGAGED IN MULTIPLE FORMS OF GROSS MISCONDUCT WHILE A JUROR, INCLUDING VISITING THE VERMONT CRIME SCENES, FAILING TO REPORT TRUTHFUL RESPONSES ON VOIR DIRE; AND USING THE SHOTGUN ADMITTED INTO EVIDENCE TO COERCE ANOTHER JUROR TO VOTE FOR DEATH.**

## INTRODUCTION

It is now obvious that Juror #143 visited the scene of the crime in Rutland during Mr. Fell's trial in violation of this Court's repeated instructions. This trip entailed an extra-record investigation of the location where two of the murders occurred, along with the surrounding neighborhood. It also entailed travel of the route between that location and the Price Chopper, and investigation of the Price Chopper itself. Juror #143 then reported his findings to the capital jury while they were deliberating.[34] The evidence establishes that he did all of this because he was interested in what was to be seen there, did not care about the Court's instructions, and did not think he would get caught.

The evidence also establishes that Juror #143 lied during the trial about his visit to the crime scene. He lied about it to the Court every day when the Court asked whether the jurors had been exposed to extra-record information and Juror #143 answered no. He again lied about it at the August 2013 hearing where both the Court and Mr. Fell's counsel asked Juror #143 whether he had visited Rutland during trial and communicated his findings to the jury, and Juror #143 testified that he had not.

Juror #143 also coerced a holdout juror into voting for Mr. Fell's death by pointing a shotgun at her and cocking it. And he lied on voir dire in deliberately failing to disclose his criminal history.

---

[34] See Ex. 1.

31

Thus: (1) Juror #143 intentionally sought out and obtained extraneous evidence which was prejudicial to Mr. Fell's case, (2) he lied both at voir dire and every day at trial and the true facts would have led to his removal from the jury, and (3) he improperly coerced another juror into voting for death.

### THE FACTS OF JUROR #143'S MISCONDUCT

On December 19, 2010, before he had any motive to fabricate, Juror #143 signed a statement in which he admitted that, during the trial and in violation of the Court's instructions, he visited the scenes of the crimes in Rutland. He stated that, during deliberations:

> We discussed . . . the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper. The mother's neighborhood wasn't great, but it was okay. The house was decent. She was just trying to live her life. I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife into the dumpster in the parking lot . . . The lighting at the Price Chopper in Rutland was weak.[35]

Juror #143 also swore that, during deliberations, he pointed a shotgun at a juror with whom he had a disagreement, cocked the gun, and made her "squirm[]."[36] Juror #143 signed his declaration, attesting that "I have had the opportunity to review and correct the foregoing, and it is true and accurate to the best of my knowledge."[37] And he did so after waiting a day to reflect on what he said to Mr. Fell's lawyers, reviewing the declaration carefully, making deletions and additions where he believed they were appropriate, and, on his own initiative, initialing each paragraph. Juror #143 had made the admissions in his statement the day before he signed it. See infra at pp. 40-41.

---

[35] Ex. 1 at FELL-00002377-78.

[36] Id. at FELL-00002379. In full, Juror #143 stated that "A female juror pointed out that the shotgun was not loaded. The marshal then brought in the gun. We showed the jury that it was not loaded. I also made sure that the gun was unloaded . . . I cocked and pointed it at her and she squirmed. I said, '[t]hat's what they did, you were scared even though you knew it wasn't loaded.'"

[37] Ex. 1 at FELL-0002380.

32

Juror #143 then falsely denied his own admissions, after a motive to fabricate arose. At the August 2013 hearing, in response to questions put to him directly by the Court, he falsely denied visiting Rutland during trial. August 15, 2013 Hearing Transcript ("Aug. Hr'g Tr.") at 26. He conceded that he took a trip to Rutland, visiting 135 Robbins Street and the Price Chopper parking lot. He testified that he "tried to retrace the steps that [he] understood Mr. Fell had taken" from 135 Robbins Street to the Price Chopper. Id. 56; see id. at 59 (Juror #143 took the "whole journey" that Mr. Fell and Mr. Lee took); id. at 72 (conceding in response to Government's questioning that he was "not denying that you took a trip and went to Rutland to see these places. [His] only argument with the defense is that it didn't happen during the trial. It happened after the trial."). But, after coming to the understanding of the purposes for which his testimony was being used, and even after being prepared by the Government,[38] he falsely testified that this trip only took place in 2010 – the year he signed his statement. Id. at 27. He specifically disclaimed his prior statement that during trial he visited 135 Robbins Street ("I did not go to Robbins Street during the trial, so you can save your question"[39]), retraced the route from Mr. Fell's mother's house to the Price Chopper, and examined the Price Chopper parking lot. Id. at 50. He also denied injecting his observations into the jury's deliberations. Id. at 27; see id. at 44 ("I did not go to Rutland or any place of concern for this case during the trial. So that would make talking to the jurors about that false."); id. at 87 ("I didn't go to Rutland during the trial. And we didn't discuss any trips. Not me . . . no other juror went to Rutland."). And he falsely denied pointing a shotgun at another member of the jury; according to Juror #143, he only "simulated pointing a gun at somebody," which made her "nervous." Id. at 28-30, 54-55.

---

[38] See Aug. 15 Hr'g Tr. at 45.

[39] Id. at 50.

The Court asked Juror #143 what he had told Mr. Fell's post-conviction counsel when they visited him in 2010. Juror #143 said that he had told them that the trip to Rutland occurred after trial. Id. at 28. He further accused Mr. Fell's post-conviction counsel of having "grossly simplified, contorted, and actually left out a lot of what we actually discussed" in the statement that Juror #143 signed.

Juror #143's attempt to deny what he had earlier admitted in his affidavit is incredible and, in any event, has now been proven false. In Court under oath, Juror #143 admitted the truth of most aspects of his 2010 affidavit: that he voluntarily spoke with Mr. Fell's post-conviction counsel when they visited him;[40] that he believed them to be representatives of the Court; and that he did not know how his statements could be used. Id. at 32, 35-36. He also admitted that he waited a day before signing his statement. Id. at 34. Indeed, with respect to every paragraph other than the two paragraphs that Mr. Fell's post-conviction counsel argue entitle Mr. Fell to a new trial, Juror #143 had no problem owning the fact that he had made those reports. There are additional indicia of reliability in the written statement, including specific changes that Juror #143 made in places where he saw assertions that he did not find quite accurate, and additions to correct omissions that were important to him.[41] He admitted that he initialed each paragraph. Id. at 38. He also conceded that, once it had incorporated his modifications, he agreed with everything in the statement except those parts which gave rise to the constitutional claims in Mr. Fell's 2255 Motion. See id. at 37-49.[42]

---

[40] Juror #143 suggested that post-conviction counsel had misled him into thinking that they were Court representatives, but he admitted that post-conviction counsel gave him a business card, and that he called them at area code 212. Id. at 87-88.

[41] Juror #143 changed paragraph 4 to reflect his view that Mr. Fell showed "no" remorse as opposed to "barely any" remorse, and he added a new paragraph at the end, stating that "It bothered me that there were two more murders that never went to trial and that the victims were forgotten." See Ex. 1 at FELL-00003477, 00003480; Aug. Hr'g Tr. at 36, 37.

[42] Juror #143 explained that the portion of paragraph four of his statement that read "I think the defense made a mistake by not having Fell testify" was "false" because in fact "I said they f***ed up." Id. at 42-43.

34

Juror #143 gave a variety of explanations for why he signed the statement as "true and accurate to the best of my knowledge." At one point, he claimed that he had "a few beers in me" and was "on a pretty good bender." He did not explain why being on a "bender" would cause him to confuse a trip in 2010 (the year he signed the declaration) with a trip during trial or cause him to misreport only the facts that would entitle Mr. Fell to a new trial. Id. at 28, 53-54.[43] He said that he read his statement "[h]astily kind of" and that post-conviction counsel "stood over [him] and waited for [him] to read it" so that he felt "quite . . . pressure[d]" (although he denied that anybody told him to read it quickly and again did not explain why that would cause him only to misreport the two statements that entitle Mr. Fell to a new trial). Id. at 34, 83. He also claimed, at one point, to be marginally literate. See id. at 35 ("I'm not the best reader," "I'm not the sharpest tack in the box," "I don't read super well"). But he later admitted – on cross examination – that he is a biologist with a degree from the University of Connecticut who has worked conducting environmental impact analysis and drafting reports for the Vermont Agency of Transportation since 1992. See id. at 36, 41, 69, 70.

Juror #143 selectively repudiated only those parts of his statement that support Mr. Fell's 2255 Motion, and then only after a motive to fabricate arose. At the August 2013 hearing, Juror #143 admitted that he believed "it would be wrong if [his] statement could be used to undermine the sentence in this case." Id. at 36. Indeed, he is emphatically committed to Mr. Fell's death in part because of his belief that Mr. Fell had shown "no remorse." Id. at 43. He was also infuriated by what he perceived as the fact that two people – "Rutlanders" – had been

---

[43] Additionally, one of Mr. Fell's attorneys who interviewed Juror #143 testified that he was sober on the day that he signed the statement, and that there was "absolutely no[]" alcohol on his breath. March 18, 2014 Hearing Transcript ("Mar. 18 Hr'g Tr.")  at 116.

forgotten.  Id. at 49.[44]  At one point, instead of answering post-conviction counsel's questions about the extent to which Juror #143 was exposed to extra-record information that had been missing from trial, Juror #143 burst out that "[t]he only thing missing is a lot of details in [Juror #143's sworn statement]: the fact that two people got murdered [sic], that your client tried to allude [sic] police, that they carjacked some people, that they beat some woman senseless with a rock while she pleaded, she feared for her life, she tried to dive out of a moving car.  I didn't forget."  Id. at 59.  It is clear that Juror #143's lies on the stand were motivated by his interest in preserving Mr. Fell's sentence of death regardless of the prejudice of his extra-record crime scene visit.  This is not a case where Juror #143 was surprised on the stand and reacted defensively; even by his own lights, he had known the use to which post-conviction counsel intended to put his statement well in advance, since at least when post-conviction counsel visited him in July, and he even spoke to the Government several times before the August 2013 Hearing in order to prepare.[45]  Indeed, he went so far as to concoct a false basis for why the trip had to have taken place in 2010 instead of 2005, and provided the Government with supposed documentary evidence in an effort to lend credence to his fabricated story.[46]

Subsequent testimony showed the existence of the false exculpatory.  At the March 2014 hearing, Mr. Fell called three witnesses who testified that Juror #143 had visited Rutland during trial, and the Government called a witness who – during cross-examination – corroborated this account.

---

[44] Juror #143's bias was also on display in his generally combative attitude toward post-conviction counsel.  He testified that when post-conviction counsel came to interview him a second time he told them "[g]et the hell out . . . capeesh?"  Id. at 31.  He also stated that they accelerated another of his breakups, and spoiled his Fourth of July.  Id. at 63, 64.

[45] See Aug. Hr'g Tr. at 67-68.

[46] See Aug. Hr'g Tr. at 73-79.

First, Kaulene Kelsey, who was Juror #143's girlfriend at the time of the trial, testified that she accompanied Juror #143 on an approximately three-and-a-half hour trip from Northfield to Rutland, Vermont while Juror #143 was serving on Mr. Fell's case. Mar. 18 Hr'g Tr. at 20-21, 23, 24, 31, 33. According to Ms. Kelsey, Juror #143 decided to visit Rutland in order to "see [it] for himself, visit the crime scenes and visit the area himself." Id. at 23. She testified that they arrived in Rutland at dusk and examined "first the house where Donald Fell's mother was murdered, and then the Price Chopper." Id. at 23, 25.[47] Juror #143 first investigated the house where Mr. Fell's mother lived and "drove through the neighborhood." Id. at 25, 28. Juror #143 expressed "surprise[] to see that the house was in a halfway decent neighborhood," and observed that the 135 Robbins Street location was "more of a middle class-type house" and "not how he perceived Donald Fell's upbringing to be." Id. at 29-30. Juror #143 then drove to the Price Chopper, reaching it at "just about dark." Id. at 31. He "noted that it didn't look very well lit in the parking lot" and he showed Ms. Kelsey how he believed that "things took place in the parking lot." Id. Ms. Kelsey also agreed that it was possible, as Juror #143 had repeatedly stated,[48] that they had driven down an alley near 135 Robbins Street, and both the front and back sides of the shopping center where the Price Chopper was located. When Ms. Kelsey asked Juror #143 whether he should be in Rutland during trial, Juror #143 responded that "he wanted to see things for himself, and that nobody knows he is there so it didn't make any difference." Id. at 33.

Ms. Kelsey was subject to aggressive cross-examination on all of these topics, yet her testimony remained consistent. She testified that she remembered that she and Juror #143

---

[47] By contrast, in another lie, Juror #143 testified that "I have never been to Rutland in the night." Aug. Hr'g Tr. at 53.

[48] See Aug. Hr'g Tr. at 56 (Juror #143 "[t]ried to retrace the steps that [he] understood Mr. Fell had taken . . ."); id. at 72 (Juror #143 does not "deny[] that [he] took a trip and went to Rutland to see these places. [His] only argument with the defense is that it didn't happen during the trial.").

had visited Rutland during trial, "in June or July of 2005," because "I remember questioning

Juror #143, should we be here.  I didn't feel right about being there because it was during trial."

Id. at 39, 40.  She explained in detail that:

> [T]he main reason [I believed that the trip occurred during trial is] I questioned that, saying that this doesn't feel right, should you be here.  And his response was, I can do what I want to do.  I need to see this for myself.  That is — that is my main reason.
>
> The other — I don't have the timeline of the trial, but our relationship started to fall apart pretty badly in July.  My guess is that this was in June . . . it could have been early July.  But it was either in June or July.

Id. at 43.  She also maintained that they observed the neighborhood surrounding 135 Robbins

Street, "looking at houses before the house, after the house, [and] on our way to the house."  Id.

at 37.  Ms. Kelsey further testified that the purpose of her and Juror #143's trip to Rutland was to

visit the crime scenes, and that she and Juror #143 ended their relationship the month after the

trip to Rutland.  Id. at 40.  In response to the prosecutor's questions, Ms. Kelsey made clear that

her recollection was an independent one: she testified that Mr. Fell's counsel did not show her

Juror #143's statement or tell her what the juror had previously said.  Id. at 39.  She remembered

the events – and her recollection coincides precisely with what Juror #143 admitted in his

declaration.

Finally, in response to questions posed by the Court, Ms. Kelsey reiterated that

she knew that her trip to Rutland with Juror #143 had occurred during trial because "I remember

asking him . . . [s]hould we be here?  Are you supposed to be here while you are a juror on a case?

And he said . . . nobody's here.  Nobody can see us.  I need to see this for myself."  Id. at 44-45.

She stated that she was "creeped out" by the juror's investigatory trip, and she confirmed that

Juror #143 had discussed with her the Court's instructions to the jurors not to expose themselves

to extra-record evidence.  <u>Id.</u> at 45-46.  In short, her cross-examination was devastating to Juror #143's credibility.

Janice DeGoosh, who was Juror #143's friend during the trial and became his girlfriend in the months that followed the trial, testified that while Juror #143 was serving as a juror on Mr. Fell's trial, he had told Ms. DeGoosh that "he was going to go on a field trip to do some investigating of his own," and visit multiple locations in Rutland.  <u>Id.</u> at 50.  She testified clearly that he had told her this while he was serving as a juror.  <u>Id.</u>  She testified that Juror #143 was dating Kaulene Kelsey (not Ms. DeGoosh) at the time,[49] and confirmed that Juror #143 took the trip with Ms. Kelsey.  <u>Id.</u> at 48-51.  She testified that she remembered that Juror #143's trip to Rutland took place during Mr. Fell's trial because his "[g]oing on his own to check out the scene . . . seemed unethical to me."  <u>Id.</u> at 51, 52.  Ms. DeGoosh said that, while she was not "a hundred percent sure" that the trip occurred during trial, she believed that Juror #143 "must have still been on the jury in order to make me feel uncomfortable that he was doing something that was trying to obtain information that was not given in the court."  <u>Id.</u> at 55.  Consistent with Ms. Kelsey's testimony, Ms. DeGoosh testified that she first met Juror #143 in March 2005 and started dating him beginning in August, i.e., her testimony put the trip in June or July 2005.  <u>Id.</u> at 48.  Cross examination failed to shake her testimony.

Finally, Dina Zloczower testified about the interview she, along with another lawyer, conducted of Juror #143 over a span of two consecutive days in 2010 when Ms. Zloczower was an associate of Mr. Fell's appointed counsel Lewis Liman.  <u>Id.</u> at 60-64.  Ms. Zloczower testified that on the first day Juror #143 told her, without prompt, that he had made a trip to Rutland while he was a juror on Mr. Fell's trial "for the specific reason of looking at the

---

[49] Kaulene Kelsey confirmed in her testimony that she and Juror #143 were dating in the summer of 2005 and that Juror #143 began dating Ms. Degoosh as the relationship with Ms. Kelsey fell apart about a month after the trip to Rutland.  Mar. 18 Hr'g Tr. at 40-41.

neighborhood and the street that Miss Fell lived in.  He wanted to know whether it really was that bad.  He also wanted to take a look at the Price Chopper."  Id. at 61-62.  Juror #143 observed that 135 Robbins Street "wasn't that bad" and that the lighting conditions at the Price Chopper were poor.  Ms. Zloczower also testified that Juror #143 "brought up that during deliberations, he asked the marshal to bring in the shotgun, and he explained that a fellow juror had expressed . . . that Miss King may have not been scared when the shotgun was pointed at her . . . and then he said that he took the shotgun from the marshal and pointed it at the juror . . . [and] the juror squirmed . . . ."  Id. at 63-64.

Ms. Zloczower further testified that Juror #143 did not sign any statement the first time she met him.  Specifically, at the end of the first day's meeting, Juror #143 indicated that he was too tired to sign a declaration, asked Ms. Zloczower and her colleague to return the next day, and fixed a time for them to return.  Id. at 64-65.  He told them to come in the afternoon – after he would be returning from church and before he needed to attend a birthday party for his grandmother – a time when he was unlikely to be on a "bender."  Id. at 64-65.  Ms. Zloczower testified that she left a business card indicating that she was an employee of Cleary Gottlieb Steen & Hamilton LLP in New York and that her work phone number had a New York area code.[50]  And, contrary to Juror #143's suggestion in his testimony that the lawyers were overbearing, the next day, before Ms. Zloczower arrived at Juror #143's residence, he reached out and left her a voicemail message – on her work voicemail – asking her to come to his house.  Id. at 65.

Ms. Zloczower's testimony makes clear that Juror #143 was not forced to sign the statement and that he signed it under conditions that confirm its veracity, including the admission regarding the crime scene visit.  She testified that she gave Juror #143 the signed statement and

---

[50] See Mar. 18 Hr'g Tr. at 65-66; Ex. 42 (Cleary Gottlieb Steen & Hamilton LLP business card of Dina Zloczower).

40

"asked him to review it carefully and to make any changes he saw fit." Id. at 68. She did not stand over Juror #143 and pressure him while he reviewed the statement. Instead, she and her colleague sat a distance away from Juror #143, watching football, while Juror #143 read through his statement at his dining room table. Id. at 68-69. She testified that Juror #143 reviewed his statement paragraph-by-paragraph and pen-in-hand, now and again uttering "yes" and "um-hum." Id. at 70. Ms. Zloczower testified that Juror #143 himself made edits to parts of the statement with which he disagreed, and that, contrary to what Juror #143 had told the Court, he decided to initial each reviewed paragraph on his own initiative. Id. at 69, 70. Before signing the statement, Juror #143 also asked Ms. Zloczower to add a paragraph that he felt should be included in the statement. Id. at 73. He then signed. Id.

Ms. Zloczower's testimony further reveals that Juror #143 reviewed his statement critically before signing it. She said that Juror #143 initially expressed doubt about whether he had brandished the shotgun at a fellow juror or simply mimicked brandishing a shotgun, but that she told him "to put down what he remembers best" and that he then said "No, I think that's okay" and signed that paragraph. Id. at 72. She also testified that he expressed no similar questions with respect to the paragraph admitting to his crime scene visit and reporting on his discussion of that visit with the jurors prior to their verdict. Id. at 70, 71, 72. Juror #143 was not intimidated by the two lawyers: the meetings were so cordial that, at the end of the second meeting with them, he gave each a jar of jam and a map of Vermont. Id. at 73.[51]

Ms. Zloczower was also subject to aggressive cross-examination, which failed to shake her testimony. She testified that she believed that Juror #143 had some alcohol the first day that she spoke with him, but made clear that he had "absolutely no[]" alcohol on his breath when he reviewed and signed his statement. Id. at 107, 116.

---

[51] Exs. 43, 44.

41

The Government called one witness to testify with respect to Juror #143, FBI Agent Michelle Delpha.  Her testimony only further corroborated Ms. Kelsey's testimony and the other evidence that Juror #143 took an improper visit to the crime scene during trial.[52]  She admitted that she asked Ms. Kelsey repeatedly whether she was sure that she had visited the crime scene during trial and that her repeated questions elicited consistent answers – she and Juror #143 visited the crime scene during trial.  See Mar. 19 Hr'g Tr. at 210, 225-26.  Ms. Kelsey stood up to the FBI questioning.  She consistently told the agent:

- She had accompanied Juror #143 on a trip to Rutland while he was a juror on Mr. Fell's trial, and she knew it was during trial because "of the gut feeling she had when she went to the sites that (*Juror 143*) shouldn't be doing this . . .".  Id. at 225-26, 230.

- When Ms. Kelsey asked Juror #143 why he was undertaking to tour the sites during trial, the juror explained that he "wanted to check things out."  Id. at 229.

- During the trial tour, Juror #143 drove either Ms. Kelsey's vehicle or his own "into the Price Chopper parking lot and looped through the parking lot," and to a house Agent Delpha recognized as 135 Robbins Street.  Juror #143 told Ms. Kelsey that the Price Chopper was where Teresca King had been abducted, and that the house was where Debra Fell and Charles Conway had been killed.  Id. at 226, 227, 228.

- Ms. Kelsey "recall[ed] it being dusk out when they were in Rutland."  Id. at 230.

- Ms. Kelsey believed that Janice DeGoosh also knew about the trip to Rutland that Juror #143 took.  Id. at 233.

Ms. Kelsey's testimony was also corroborated by a police incident report from September 2, 2005 indicating that police served an abuse prevention order on Juror #143 on that

---

[52] Agent Delpha's testimony did not identify a single inconsistency between what Ms. Kelsey told Agent Delpha about her trip to Rutland with Juror #143 and Ms. Kelsey's testimony at the March 18 Hearing.  Instead, Agent Delpha acknowledged on cross examination that Ms. Kelsey had told her that she and Juror #143 had visited Rutland, had examined the Price Chopper parking lot and 135 Robbins Street, had driven between the two, and had done all of these things during trial.  The fact that Ms. Kelsey responded with different levels of granularity to different questioners posing their own open-ended questions regarding the details of her trip is not an inconsistency.

date.[53]  This "exhibit supports Ms. Kelsey's testimony that her relationship with Juror 143 ended

in late summer, 2005," i.e., shortly after the trial, thus confirming the date of the visit to be

during the trial.  Order Re: Proposed Exhibits at 7, Dkt. No. 498 (May 7, 2014).

Thus, both documentary evidence and the "consistent, detailed, and credible live

testimony" of Ms. Kelsey, Ms. DeGoosh, Ms. Zloczower and Agent Delpha – the Government's

own witness – leaves no doubt that Juror #143 took an investigatory trip to Rutland during the

trial and that confronted about the fact and the circumstances of the visit, Juror #143

demonstrated a guilty knowledge and lied.  United States v. Guillen-Rivas, 950 F. Supp. 2d 446,

452 (E.D.N.Y. 2013); see United States v. Frederick, 868 F. Supp. 2d 32, 46 (E.D.N.Y. 2012)

(crediting "credible . . . consistent . . . corroborated" testimony and discrediting "self-serving

statements that were not supported by any objective evidence").[54]

## ARGUMENT

Mr. Fell is entitled to a new trial due to Juror #143's misconduct for three distinct

reasons.  First, Juror #143's repeated lies, including both at voir dire and during trial, prove he

was a partial juror who was incapable of following this Court's instructions and that he would

have been dismissed for cause.  Second, Juror #143 intentionally sought out extraneous

prejudicial information and further prejudiced Mr. Fell by intentionally injecting this information

into the jury's deliberations.  Indeed, Juror #143's false exculpatory in response to questions

about the visit alone permits the Court to infer (and the Court should infer) that Juror #143

---

[53] See Ex. 37.

[54] Juror #143 also lied about his criminal history on voir dire, falsely representing that he had never been accused of a crime, see [Juror #143] Short Form Juror Questionnaire (Ex. 24), and that he had never been the target of a criminal investigation, see [Juror #143] Long Form Juror Questionnaire, dated May 11, 2005 (Ex. 23 at FELL-00003573).  Both of these statements were lies.  In 1995, Juror #143 was accused of the crime of theft of property from a public recreation area and was accused of having fled the scene in his vehicle.  According to a police report generated in the ensuing investigation, when two individuals who witnessed the theft attempted to get Juror #143 to pull over, Juror #143 threatened them with a handgun.  See Vermont State Police, A Troop – Middlesex, LAW Incident Table (Ex. 25 at FELL-0003598-600).

inspected all the locations he had been told about at trial and formed prejudicial impressions. Third, Juror #143 coerced a holdout juror into voting for Mr. Fell's death by threatening her with physical assault.

## I.      Juror #143's Lies Prove That He Was a Partial Juror

The evidence establishes that Juror #143 has lied to the Court over and over again as a veniremember, as a juror, and as a witness in Mr. Fell's post-conviction proceedings. Specifically, as Mr. Fell has shown above, Juror #143 lied to the Court on voir dire about his criminal history, he lied about brandishing a shotgun in the jury room, and he lied every day during trial when he answered no every time the Court asked if any member of the jury had been exposed to extraneous evidence. This last set of lies alone entitles Mr. Fell to relief. Despite the fact that, indisputably, Juror #143 had undertaken an extra-record investigation of the crime scenes, and, indisputably, he was asked every day by the Court whether he had done so, he answered no and deprived the Court of the opportunity to remove him for cause.[55]

Juror #143 also lied at the evidentiary hearing convened to determine whether Juror #143 had committed the misconduct underlying Mr. Fell's constitutional claims. Juror #143's lies were serious. He lied about matters that the Court singled out as "extraordinarily important." Trial Tr. Vol. IV at 46; see Trial Tr. Vol. 5-2 at 52 ("[I]t's just extraordinarily important that you not be exposed to any information about this case outside of the courthouse."). And he lied repeatedly in response to questions posed by both post-conviction counsel and the Court: fabricating outlandish stories about his own intoxication, the conduct of post-conviction

---

[55] See Trial Tr. Vol. 1-1,10, June 20, 2005; Trial Tr. Vol. 2-1, 3, June 21, 2005; Trial Tr. Vol. 3-1, 11, June 23, 2005; Trial Tr. Vol. 4-1, 24, June 24, 2005; Trial Tr. Vol. 5-1, 18-19, June 28, 2005; Trial Tr. Vol. 6, 3, June 29, 2005; Trial Tr. Vol. 7-1, 41, July 1, 2005; Trial Tr. Vol. 8-1, 3, July 6, 2005; Trial Tr. Vol. 9-1, 8, July 7, 2005; Trial Tr. Vol. 10-1, 3, July 8, 2005; Trial Tr. Vol. 11, 38, July 12, 2005; Trial Tr. Vol. 12, 11-12, July 13, 2005.

44

counsel, and even his own ability to read in an effort to conceal that he undertook an extra-record investigation of Rutland during trial.

Juror #143's lies, including his lies every day during trial in response to the Court's questions about seeking out extraneous evidence, constitute what this Court has accurately perceived to be Juror #143's "pattern of deceit" and require that Mr. Fell's conviction and sentence be reversed. Memorandum Opinion and Order: Motion to Amend Petition at 14, Dkt. No. 478 (Mar. 12, 2014). These lies during trial give rise to a claim under McDonough no less than if they had occurred at voir dire. See United States v. Morrison, No. 04-cr-699 (DRH), 2013 WL 5933928, at *9 (E.D.N.Y. Nov. 6, 2013) (granting new trial pursuant to McDonough where juror was offered bribe during deliberations and concealed that fact from the court). Juror #143's lies, and his violation of the Court's repeated and emphatic instructions, "exhibit[] a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime," demonstrating an "impermissible partiality" and an "[in]ability to weigh the evidence fairly and obey the instructions of the court." United States v. Colombo, 869 F.2d 149, 151-52 (2d Cir. 1989); United States v. Daugerdas, 867 F. Supp. 2d 445, 473 (S.D.N.Y. 2012) (reversing defendants' convictions because of juror's "sweeping dishonesty [which] demonstrates that she is incapable of weighing evidence, measuring credibility, and applying the law as instructed by this Court"); see also supra at Part I.I.C.

In addition, Juror #143 would have "been excused from continued service for implied (or 'presumed') bias or for 'inferable bias'" because of the lies that he told every day during trial – part of the "pattern of deceit" that has continued into the post-conviction proceedings – and the information that those lies concealed. Morrison, 2013 WL 5933928 at *9. Particularly in a capital case, a verdict of death cannot stand where it has been rendered by a juror who has proven himself incapable of following the Court's instructions, adhering to his

45

oath, or being truthful with the Court.  See Wellons v. Hall, 130 S. Ct. 727, 728 (2010) (per curiam) (jurors must approach a capital case with "dignity and respect").[56]

## II.    The Established Prejudice from the Extra-Record Exposure Cannot Be Rebutted

Mr. Fell's conviction also cannot stand because Juror #143 investigated extraneous prejudicial information and because he then injected that information into the jury's deliberations.  Where, as here, a juror has exposed himself to extraneous information about the case, "[t]his Court must assess the likelihood that the information would affect a typical juror, viewing the entire record, and taking into consideration the circumstances surrounding the exposure to the information."  May 10, 2013 Order at 15.  This analysis begins with a presumption that the extraneous exposure is prejudicial.  See May 10, 2013 Order at 12 (quoting United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011)) ("The law presumes prejudice from a jury's exposure to extra-record information."); see also Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994) (extraneous information that becomes known to the jury is "presumptively prejudicial").  As is explained below, there is no persuasive rebuttal of that presumption; indeed, the evidence of both what Juror #143 saw and how he conducted himself affirmatively establishes the existence of prejudice.

### A.  The Circumstances of Juror #143's Misconduct Support a Finding of Prejudice

The facts (1) that Juror #143 intentionally sought out extra-record evidence, (2) that he violated the Court's instructions and exposed himself to charges of contempt in doing so,

---

[56] Mr. Fell's conviction must also be set aside because Juror #143 lied about his criminal history on voir dire, falsely representing that he had never been accused of a crime.  In fact, in 1995, Juror #143 stole property from a public recreation area and fled the scene in his vehicle; when two individuals who witnessed the theft attempted to get Juror #143 to pull over, Juror #143 threatened them with a handgun.  See Vermont State Police, A Troop – Middlesex, LAW Incident Table (Ex. 339 at FELL-0003598-600).  On voir dire, Juror #143 disclosed none of this, although he did disclose a separate, earlier property crime from 1979 that he claimed had been expunged from his record.  Had Juror #143 been truthful during voir dire, counsel would have had a valid challenge for cause.  See McDonough, 464 U.S. at 556.  Indeed, counsel noted their concern with Juror #143's criminal record, but stated that they would not challenge Juror #143 for cause because he only had one isolated criminal incident.  See JVD-12, 37-38, June 1, 2005.

46

and (3) that he has <u>untruthfully disavowed</u> his investigatory trip to Rutland, all prove that what Juror #143 saw during his trip prejudiced Mr. Fell.

The evidence has established that Juror #143 intentionally exposed himself to extra-record information. He invested substantially in his investigation: not counting the time he spent actually investigating the scenes, Juror #143 undertook a 3 hour roundtrip from Northfield to Rutland in the middle of a lengthy trial. <u>See</u> Mar. 18 Hr'g Tr. at 24. And he did it, as Ms. Kelsey credibly testified, because he "need[ed] to see [the scenes] for myself." <u>Id.</u> at 43, 45.[57] "This was not a situation where the obtaining of extrajudicial material was inadvertent." <u>Gunnell v. Rastatter</u>, No. 3:08-cv-064, 2008 WL 9010060, at *6 (S.D. Ohio Sept. 17, 2008). Rather, as Ms. Kelsey's testimony establishes, Juror #143 drove out of his way to visit Rutland. And (as Juror #143 has admitted), he drove to places in Rutland that he had never been before,[58] to investigate extra-record evidence. It is clear that Juror #143 "was engaged in research to gain information to help [him] and others decide the case." <u>Gunnell</u>, 2008 WL 9010060 at *6. This fact – that Juror #143 expended "extraordinary efforts to discover" extra-record information – itself is powerful evidence of prejudice to Mr. Fell. <u>Benjamin v. Fischer</u>, 87 Fed. Appx. 761, 763 (2d Cir. 2004) (holding exposure to extraneous evidence prejudicial where "jurors engaged in extraordinary efforts to discover information"). Worse, Juror #143 then compounded the

---

[57] Agent Delpha's testimony is not to the contrary. She testified that, according to Ms. Kelsey, visiting Rutland was not the "<u>original</u> purpose" of Juror #143's trial tour, and that while "they did not specifically <u>set out</u> that day to go to Rutland to look at the crime scenes," "somehow they ended up" there. Mar. 19 Hr'g at 212, 213, 214 (emphases added). But regardless whether Juror #143 and Ms. Kelsey set out to go to Rutland the moment they got in the car or he only formed that intention after they left Northfield, the evidence is uncontradicted – and admitted by Juror #143 in his statement itself – that when Juror #143 went to Rutland, he did so to visit the crime scene. <u>See</u> Mar. 18 Hr'g Tr. at 62 (Juror #143 told Ms. Zloczower that he visited Rutland for the "specific reason" of investigating extra-record evidence); <u>id.</u> at 23 (Ms. Kelsey's testimony on direct that the trip to Rutland was Juror #143's idea and "[h]e wanted to go to Rutland to see for himself, visit the crime scenes and visit the area himself"); <u>id.</u> at 36 (Ms. Kelsey's cross examination testimony that "the purpose of the trip that day was to go to Rutland crime scenes . . ."). Ms. DeGoosh confirmed Ms. Kelsey's testimony, testifying that Juror #143 told her he was going to go on a "field trip" to investigate the crime scenes <u>before he did so</u>. <u>Id.</u> at 50. Indeed, there is no evidence he and Ms. Kelsey did anything in Rutland other than visit the crime scene.

[58] Aug Hr'g Tr. at 50 ("Never been to Robbins Street before.").

prejudicial effect of his deliberate misconduct – and by doing so demonstrated the significance of the information he had obtained through this misconduct – by "intentionally interject[ing] extraneous information, directly concerning [the] defendant and substantially related to important matters raised during trial, into deliberations." Silva v. Brazelton, No. 1:10-CV-00409 LJO, 2013 WL 1003519, at * 45 (E.D. Cal. Mar. 13, 2013). While just one prejudiced juror requires that Mr. Fell's conviction be overturned, see Morgan v. Illinois, 504 U.S. 719, 727 (1992); United States v. Rattenni, 480 F.2d 195, 198 (2d Cir. 1973) (Clark, J.),[59] the fact that Juror #143 reported this information to the rest of the jury further underscores the materiality and unfortunate consequence of the extra-record information he deliberately obtained. See Neal v. John, 110 F.R.D. 187, 189 (D.V.I. 1986) ("The juror obviously attached importance to [the extraneous evidence that a defense witness was paid for his testimony] because she recounted it to fellow jurors.").

Juror #143 also knowingly violated the Court's instructions, and his own oath as a juror, in undertaking his trial tour of Rutland. He acted in deliberate contravention of instructions that the Court not only gave every day, but also emphasized were "extraordinarily important." See, e.g., Trial Tr. Vol. 5-2 at 52. Ms. Kelsey credibly testified that when she asked Juror #143 whether he should be visiting Rutland during trial, he told her "I can do what I want to do. I need to see this for myself." Mar. 18 Hr'g Tr. at 43. She also credibly testified that he justified his misconduct based on the fact that he was not going to get caught: "nobody's here. Nobody can see us. I need to see this for myself." Id. at 45.[60] As courts have repeatedly found,

---

[59] See also United States v. Tucker, 137 F.3d 1016, 1031-32 (8th Cir. 1998).

[60] Agent Delpha testified that Ms. Kelsey did not volunteer to her that Juror #143 made these remarks about disregarding the Court's instructions, but there is no evidence that Agent Delpha asked whether Juror #143 said anything about the Court's instructions. In any event, the Court daily admonished the jury not to seek outside information, and daily inquired whether they had done so, so Juror #143 was well-aware of the instructions that he disregarded. And the instruction is so commonsense that each of Ms. Kelsey and Ms. DeGoosh – neither of whom was in Court to hear the instruction – independently and contemporaneously understand that it was wrong to visit

48

a juror's deliberate and knowing violation of the Court's instructions not to undertake extra-record investigations is convincing evidence that the juror has been prejudiced;[61] it proves that the evidence Juror #143 sought out was so important to him that he was willing to violate the Court's orders, flout his oath as a juror, and expose himself to charges of contempt, in order to obtain it.

Finally, Juror #143's lies to the Court about undertaking his extra-record investigation provide yet further evidence to support the finding that his trip was prejudicial. Juror #143 did not lie because his conduct was inconsequential.  He lied because it was consequential and he had something to hide.  His visit represented an inspection based on the evidence at trial that exposed him to information kept from the trial and that was harmful to Mr. Fell.  He heard evidence regarding where Mr. Fell went on the morning of the murders and a dispute regarding the lighting, the neighborhood around Robbins Street, and the route to the Price Chopper and Mr. Fell's intent, and he wanted to check it out himself.  There is every reason to believe he did so.  Particularly given Juror #143's admitted motivation to preserve Mr. Fell's death sentence, the Court can and should infer from the fact that Juror #143 has lied about his trip to Rutland that what he saw was consequential.  See Anderson v. Ford Motor Co., 186 F.3d 918, 920 (8th Cir. 1999) (mistrial appropriate where juror undertook an experiment

---

the crime scene.  See Mar. 18 Hr'g Tr. at 44-45 (Ms. Kelsey's testimony that she understood it to be wrong); id. at 54-55 (Ms. DeGoosh's testimony that she understood it to be wrong).

[61] See United States v. Seal, 165 Fed. Appx. 975, 978 (3d Cir. 2006) (finding prejudicial juror misconduct where juror intentionally sought out extra-record information "in complete disregard of the court's instructions"); United States v. Martinez, 14 F.3d 543, 551 (11th Cir. 1994) (finding prejudicial juror misconduct where "in light of . . . the jury's willingness to disregard the district court's instructions, the jury's [exposure to extra-record evidence] further taints its deliberations"); United States v. Kemp, 379 F. Supp. 2d 690, 707 (E.D. Pa. 2005) (excuse juror because she was "refusing to follow instructions" and "violating her oath"); Sanders v. Easley, No. CIV. 1:98CV184-V., 1999 WL 33321105 (W.D.N.C. Dec. 30, 1999) (finding prejudicial juror misconduct where "ample evidence that the jurors were disregarding the trial court's instructions concerning their duties and the law"); United States v. Kanahele, 951 F. Supp. 928, 938 (D. Haw. 1996) (manifest necessity to declare mistrial because reasonable possibility that extrinsic information could have affected verdict where juror "violated the Court's instructions by performing independent . . . research" and "interjected the results of his research into the jury deliberations").

49

"contrary to the court's instructions, and . . . was not truthful with the court" about it). And, in addition, as is the case in the <u>McDonough</u> context, when a juror lies at an evidentiary hearing the Court can, based on this fact alone, infer that the juror's conduct was prejudicial. <u>See</u> <u>Edwards v. Hyundai Motor Mfg. Ala. LLC</u>, 701 F. Supp. 2d 1226, 1232 (M.D. Ala. 2010) (fact that juror was "dishonest[] during the evidentiary hearing . . . is a powerful indication… of bias").[62]

Standing alone, each of the above circumstances of Juror #143's investigation proves that it was prejudicial. In combination the facts that Juror #143 intentionally sought out extra-record information, in deliberate violation of this Court's instructions, and then lied about it to the Court afterward leave no doubt that what Juror #143 saw prejudiced Mr. Fell.

### B.  What Juror #143 Saw Prejudiced Mr. Fell

In addition, the record evidence of the substance of Juror #143's extra-record investigation also establishes that the information he provided himself and the jury was prejudicial. Specifically, as demonstrated below, Juror #143's observations of 135 Robbins Street, the Price Chopper, and the route between the two bore directly on critical issues that were hotly contested at guilt and penalty, including (1) Mr. Fell's intent and diminished capacity, and (2) the mitigating effect of Mr. Fell's difficult upbringing and traumatic relationship with Debra Fell.

### i.   Juror #143 Investigated and Interjected into the Jury's Deliberations Extra-Record Evidence That Bore Directly on the Vigorously Disputed Issues of Mr. Fell's Intent and Diminished Capacity

First, the extra-record information that Juror #143 investigated and then interjected into the jury's deliberations bore directly on the issue of Mr. Fell's impairment, and

---

[62] This proposition is black-letter law. <u>See</u> <u>United States v. Carpa</u>, 271 F.3d 962, 967 (11th Cir. 2001) ("A juror's dishonesty is a strong indication of bias); <u>United States v. Boney</u>, 977 F.2d 624, 634 (D.C. Cir. 1992) ("[L]ying or failing to disclose relevant information during voir dire itself raises substantial questions about the juror's possible bias."); <u>Burton v. Johnson</u>, 948 F.2d 1150, 1159 (10th Cir. 1991) ("This dishonesty, of itself, is evidence of bias."); <u>Colombo</u>, 869 F.2d at152 ("[H]er willingness to lie about it exhibited an interest strongly suggesting partiality.").

ability to act intentionally, on November 26 and 27, 2000.  These issues were critical to both the guilt and penalty phases of Mr. Fell's trial.

Mr. Fell's intent at the time of the carjacking was the central issue during the guilt phase of Mr. Fell's trial.  At the start of their case, trial counsel conceded that Mr. Fell killed Charles Conway, stole Teresca King's car, drove her to Dover and killed her.  See Trial Tr. Vol. I at 55-57.  The focus of their presentation was therefore on raising a reasonable doubt about Mr. Fell's intent at the time of the kidnapping and carjacking.  During both their guilt phase opening and their guilt phase closing, trial counsel repeatedly emphasized Mr. Fell's "confusion and intoxication" and the poor decisions he made, including going "to a parking lot that was lit."  See id. at 45; id. at 56; Trial Tr. Vol. IV-1 at 75.  They also directly contested the Government's argument that Mr. Fell acted with intent, stating "[t]hey wanted to convince you that . . . everything that Donald Fell and Robert Lee did was planned and scripted . . . Now, I want to talk to you about those things because that's where we strongly disagree."  Trial Tr. Vol. IV-1 at 72.

For its part, the Government vigorously argued that Mr. Fell was acting with intent when he kidnapped Mrs. King, repeatedly emphasizing that Mr. Fell was acting "deliberately" and with a "plan."[63]  As evidence of this, the Government pointed to Mr. Fell's decision to "lurk[] in the darkness" in the Price Chopper parking lot, "waiting in the darkness . . . for someone just like Terry King."  Trial Tr. Vol. I at 18, 19.  The Government returned to the theme of Mr. Fell's intent during the guilt phase summation, emphasizing that Mr. Fell had "formulate[d] a plan and implement[ed] that plan, a plan which requires a series of deliberate acts in order to get to a goal."  Trial Tr. Vol. IV-1 at 59-60.  The Government foregrounded, as evidence of Mr. Fell's intentionality, the route he took from 135 Robbins Street to the Price

---

[63] As Mr. Fell has previously noted, the Government used the word "plan" no fewer than seven times in the opening statement alone to describe Mr. Fell's actions during the crimes.  See Brief in Support of Evidentiary Hearing at 55, Dkt. No. 451 (Dec. 16, 2013).

51

Chopper, noting that Mr. Fell "walked from Robbins Street in a nice route down through to the plaza where the Walmart and the Price Chopper were." Trial Tr. Vol. IV-1 at 59-60, 61-62.

Issues related to intent were also critical to the penalty phase. Each threshold eligibility factor, at least one of which the Government needed to prove beyond a reasonable doubt before Mr. Fell could be sentenced to death, required a finding of intent, including at the time of the carjacking and kidnapping. See Trial Tr. Vol. XII at 134, 140-41. Issues of intent were also central to more than half of the Government's aggravators (each of which the Government had the burden of proving beyond a reasonable doubt), including: (1) Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode; (2) Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder; (3) Donald Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities; and (4) Donald Fell participated in the murder of Teresca King after substantial planning and premeditation to commit the crime of carjacking.[64] In addition to the aggravating factors, evidence of intent was directly related to two of the mitigating factors that would have weighed against a death sentence: (1) Donald Fell's capacity to appreciate his conduct was significantly impaired; and (2) Donald Fell did not plan to kill Teresca King at the time she was kidnapped. See Trial Tr. Vol. V-1 at 27, 29.[65]

As it was at the guilt phase, Mr. Fell's intent and diminished capacity while he was in Rutland were hotly contested during the penalty phase of Mr. Fell's trial. In arguing for death, the Government emphasized that Mr. Fell was "waiting in the darkness, in the shadows . . .

---

[64] See Ex. 209 to the Amended 2255 Motion at FELL-00002129-32 (Special Verdict Form). The Court defined "premeditation" for the jury as "thinking or deliberating about something and deciding whether to do it beforehand." Trial Tr. Vol. XII at 150.

[65] See Ex. 209 to the Amended 2255 Motion at FELL-00002135.

52

you learned that that morning Donald Fell carefully selected Terry King as the perfect victim." Trial Tr. Vol. XII at 13.  The Government also argued that Mr. Fell's decision to wait in the shadows rebutted that Mr. Fell was substantially impaired: "You remember the planning, the showers, the packing.  You know that they stopped at the Wal-Mart to get shotgun shells.  You know how they sized up Mr. Trapasso.  You know how they waited for Terry King."  Trial Tr. Vol. XII at 39 (emphasis added).

Defense counsel's penalty phase case thus focused directly on the issue of intent at the time Mrs. King was kidnapped.  Trial counsel also directly contested the Government's penalty phase case for intent and a lack of diminished capacity, arguing on summation that "the evidence shows something quite different[]" from the Government's position that "the Rutland [crimes], and then eventually Mrs. King's killing, was a perfect plan."  Trial Tr. Vol. XII-I at 74. Trial counsel adduced substantial evidence to support that claim, as demonstrated below.  The picture defense attempted to paint thus was dramatically different from that painted by the Government: two deaths caused when the defendant was significantly impaired, an irrational walk that ended up in the Price Chopper employee parking lot, and a panicked decision to kidnap Mrs. King.

As proven by Juror #143's own admissions, the credible testimony of Kaulene Kelsey, and the video evidence that Mr. Fell has offered, however, defense counsel's arguments were undermined by Juror #143's crime scene visit.  It should no longer be in dispute that Juror #143 visited Rutland.  It also should not be in dispute that he did so for the purpose of obtaining further information about the sites and routes that he heard about at trial.  It is undisputed what those sites and routes were and Juror #143 testified that he retraced what he heard about.  And there is now evidence of what he would have seen had he done what the evidence establishes overwhelmingly that did – his own crime scene inspection.  That evidence shows Juror #143

53

obtained extra-record information that bore significantly on the issues of intent and regarding the

neighborhood around Robbins Street. Mr. Fell's trial counsel never had the opportunity to

confront that information.[66] Juror #143 then provided that information to the jury. The

information he obtained was unique and prejudicial. It requires a new trial.

### 1. Juror #143's Prejudicial Observations of the Price Chopper Employee Parking Lot

First, the record establishes Juror #143 examined the Price Chopper parking lot,

observing that it was poorly lit. The video evidence reflects that a visitor to the Price Chopper

employee parking lot would have at minimum observed – what the trial evidence never showed

and which was devastating to the defense – that the lighting in the Price Chopper parking lot

consisted exclusively of a row of low-powered light fixtures affixed to the wall of the Price

Chopper.[67] There were no floodlights affixed to the Price Chopper, nor were there any street

lamps shining into the employee parking lot.[68] (The lighting in the Price Chopper parking lot has

---

[66] This Court has provisionally admitted Mr. Fell's video evidence, Exhibits 38 – 41, subject to a showing of relevance. See Mar. 19 Hr'g Tr. at 103-104. As detailed below, Mr. Fell submits that these videotapes are relevant to show the numerous prejudicial observations that Juror #143 made when he visited 135 Robbins Street and the Price Chopper parking lot, and examined the route that Mr. Fell took between the two. The "mere passage of time" between Juror #143's visit and the time the videos were shot has no bearing on their relevance. Fisher v. ACR Hous. LLC, No. 04-61389-CIV., 2005 WL 5956614, at *2 (S.D. Fla. Dec. 22, 2005). Mr. Fell offers these videos for what they reflect about permanent structures that were in existence at the time Juror #143 took his trial tour. He does not offer them for what they reflect about new or transient structures, or, obviously, for the weather conditions when Juror #143 visited Rutland during trial. See Sears, Roebuck & Co. v. Penn Cent. Co., 420 F.2d 560, 563 (1st Cir. 1970) (any differences between picture taken months after an incident and one taken two weeks after an incident "affect the weight and not the admissibility of the pictures"); Alford v. N.Y. Cent. R.R. Co., 339 F.2d 1019, 1021 (7th Cir. 1964) (admitting photographs of an accident scene taken 3.5 years after accident over objections about changed conditions because "[s]uch objections more properly go to the weight to be accorded such evidence rather than to its admissibility"); see also Rich v. Tee Bar Corp., No. 1:10-cv-1371 (MAD/CFH), 2013 WL 5442277, at *3-4 (N.D.N.Y. Sept. 27, 2013) (dissimilarities between video evidence and actual events "affect the weight of the evidence, not the admissibility"); Veliz v. Crown Lift Trucks, 714 F. Supp. 49, 51 (E.D.N.Y. 1989) (same).

[67] See Ex. 38 at 7:36-7:56 (depiction of route from the front of the Price Chopper, through the Price Chopper employee parking lot, to the back of the Price Chopper).

[68] See Ex. 38 at 07:45 (depicting the view from the front corner of the Price Chopper looking back through the employee parking lot to the train tracks).

not changed since Juror #143 examined it during Mr. Fell's trial.  See Ex. 54-64.[69]).  There were

also no additional sources of light on the (boarded-up) buildings on the opposite side of the Price

_____

[69] The Court provisionally admitted these exhibits subject to linkage in pleadings.  Mr. Fell submits these are relevant to show that the lighting conditions in the Price Chopper parking lot, as depicted in Ex. 38-41 and from which Juror #143 would have made prejudicial observations, have not changed since Juror #143 took his investigatory trip to Rutland during Mr. Fell's trial.

At the May 9 hearing, counsel for the Government claimed that the District 1 Environmental Commission records regarding the lighting in the Rutland Plaza in Rutland, Vermont – contained in Mr. Fell's Exhibits 54-62 – are unreliable for two reasons.  First, counsel for the Government claimed that the documents are "incomplete because the records include, for example, a Schedule B but there's no Schedule A….The records also include an Exhibit 19, but there are no other exhibits, so we don't have Exhibits 1 through 18.  One of the records that is included refers to Exhibit 6 and 28, which supposedly address exterior light fixtures, but we don't have exhibits 6 or 28."  See May 9 Hr'g Tr. at 12.  The Government's assertion that the permit records are incomplete is simply inaccurate.  As the Rutland Plaza Permit History Report shows, and as the District 1 Environmental Commission has certified under penalty of perjury and without contradiction or cross examination, Exhibits 54 through 62 constitute complete copies of all permits and permit amendments issued for the Rutland Plaza.  See Ex. 54.  The permit History Report indicates that a total of six permits and amendments were issued for Rutland Plaza between 1992 and 2014.  See Ex. 54.  Complete copies of all of these permits and amendments are included in Mr. Fell's Exhibits 55, 56, 57, 58, 61, and 62.  Furthermore, it is clear from Mr. Fell's Exhibits 59 and 60, and from the District 1 Environmental Commission stamps and notations on the first page of each, that these are the Exhibits 6 and 28 discussed on pages 2 and 11 of the permit issued in 2004 (Rutland Plaza Permit number 1R0736-3, and Mr. Fell's Exhibit 58), which the Government asserts they "don't have."  The District 1 Environmental Commission stamp and notation on the first page of Exhibit 59 reads, "District Commission #1 Application # 1R0736-3, Exhibit # 6."  See Ex. 59.  The District 1 Environmental Commission stamp and notation on the first page of Exhibit 60 reads, "District Commission #1 Application # 1R0736-3, Exhibit # 28."  See Ex. 60.

Counsel for the Government also claimed that Mr. Fell has not demonstrated that the permit records apply to the Price Chopper employee parking area.  See May 9 Hr'g Tr. at 22.  This is flat wrong.  The permits pertain on their face to the Rutland Plaza and parking lot, including Price Chopper employee parking.  The permits make multiple references to, and clearly encompass, parking areas for Rutland Plaza employees.  See, e.g., Ex. 55 at 2, 12; Ex. 56 at 2, 7; Ex. 57 at 8; Ex. 58 at 8.  And Permit 1R0736, issued in 1992, specifically mentions "48 parking spaces…located to the side or rear of the proposed grocery store" that "might be suitable for employee parking."  Ex. 55 at 11.  The Price Chopper parking lot is also connected to and directly adjacent to the public parking lot for the shopping center.  See Ex. 38 and 40.  Permit 1R0736 (Rev) does expressly exempt certain lands near the Rutland Plaza from the scope of the permit – the "triangular parcel of land located behind the shopping plaza bounded on the north by the railroad tracks, bounded on the west by Spruce Street, and bounded on the east by River Street."  Ex. 56 at 11.  This land is located to the southwest of, and separated by the railroad tracks from, the Price Chopper employee lot.  If the District 1 Environmental Commission deemed it necessary to explicitly exempt this land from the parcel of "lands which comprise the Rutland Plaza," it would also exempt land located immediately next to the Price Chopper and connected to the Rutland Plaza public parking lot, if that land was not covered by the permits.  The fact that they did not exempt this area indicates that it is included.  Cf. Andrus v. Glover Const. Co., 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions…, additional exceptions are not to be implied, in the absence of a contrary legislative intent.").  Furthermore, the map of the Rutland Plaza submitted with the application for the permit issued in 2004, and incorporated by reference in the 2004 permit, includes the Price Chopper employee parking area.  Ex. 60 at 3; see also Ex. 58 at 2.

In any event, the Government has put on no evidence tending to show that the Price Chopper employee parking lot is not subject to these permits or the District 1 Environmental Commission permit requirements.  Nor has the Government identified – nor can it – any permit or amendment that exists that indicates the lighting has changed between 2005 and 2014.  Instead, as the Government itself put it: "the lighting in a public parking area was within the scope of the Act 250 permit, and…it would follow that if the Price Chopper or any other tenants at the mall wanted to change that lighting, they would have to go through the permit process" (May 9 Hr'g Tr. at 22), yet "[t]he only exhibit we have regarding showing light fixtures is Exhibit 19, [and] it only shows light fixtures in the public

55

Chopper employee parking lot from the Price Chopper.[70]  And, as shown in the video depicting

the Price Chopper employee parking lot at dusk, the lot in the evening hours is poorly lit and

shrouded in shadows.[71]

Juror #143's prejudicial extra-record observations of the lighting in the Price

Chopper parking lot exposed him to information that was not presented at trial and that is

contrary to the arguments made by trial counsel based on the evidence at trial.  Only two pieces

of evidence offered at trial were at all on point:  three daytime photographs of the exterior of the

Price Chopper[72] and Joseph Trapasso's testimony about the lighting in the Price Chopper parking

lot.  The three daytime photographs of the exterior of the Price Chopper did not convey

numerous critical details that the video evidence reveals Juror #143 would have observed.  They

did not reveal the character of the lighting in the Price Chopper employee parking lot: they did

not show the lack of floodlights affixed to the portion of the Price Chopper overlooking the

employee parking lot, nor did they reveal the absence of light fixtures affixed to the boarded up

buildings opposite the Price Chopper employee parking lot.  Indeed, only two photographs show

(just a small portion of) the Price Chopper employee parking lot, and in each of these

photographs the wall of the Price Chopper was in the shade, obscuring from view what, if

anything, was affixed to it.[73]  The photographs also did not show the parking lot at dusk, when

Juror #143 saw them.

---

parking area.  It doesn't have anything on the side where the employee parking area is" (May 9 Hr'g Tr. at 12).
Under Federal Rule of Evidence 803(10), the implication is clear – among the records for the Rutland Plaza site
there exists no record showing that lighting has changed between 2000 and 2014 in the Price Chopper employee
parking lot, because no such change has occurred.

[70] See Fell Ex. 38 at 07:35 – 07:56 (left hand side of the screen during this segment of the video depicts the façade of
the boarded-up buildings opposite the Price Chopper that overlook the Price Chopper parking lot, and shows that no
light fixtures are affixed to them).

[71] See Ex. 41.

[72] See Gov. Trial Ex. 12(a)(1) – 12(a)(3).

[73] See Gov. Trial Ex. 12(a)(1), 12(a)(2).

As for the second piece of evidence presented at trial, the testimony of Joseph Trapasso, Juror #143's observations about the poor quality of the Price Chopper lighting directly contradicted Mr. Trapasso's consistent testimony that the Price Chopper employee parking lot was well lit.  Mr. Trapasso repeatedly testified to this on both cross and direct, stating on direct that "you could see [Mr. Fell and Mr. Lee] out" and admitting in response to trial counsel's cross examination that (1) "there were lights on in front of the store;" (2) "[y]ou could see that corner of the parking lot" where Mr. Fell and Mr. Lee were standing; and (3) "you could see pretty good out there."  Trial Tr. Vol. I at 118, 119.[74]

In addition to the weak lighting in the Price Chopper employee parking lot, the video evidence shows that Juror #143 was, at minimum, exposed to the following other prejudicial extra record information about the lot:

First, a visitor to the Price Chopper employee parking lot would have observed that there were no guardhouses or any other indicia that the Price Chopper employee parking lot was regularly patrolled.[75]  This information was nowhere contained in the evidence introduced at trial.  There was no testimony on point, the aerial maps do not provide close to the level of detail necessary to determine the presence or absence of permanent checkpoints or guardhouses,[76] and the two photographs that depict the Price Chopper parking lot at all only depict a small portion of

---

[74] The Government argument that Joseph Trapasso's testimony "informed [Juror #143's] view of the weak light when King was kidnaped" is therefore simply false.  See Government's Brief re Juror Misconduct Claims at 62. The Government also speculated that Juror #143's assessment of the lighting in the Price Chopper "could have been based on the extensive trial testimony about the predawn, 3:30 – 4:00 a.m. kidnaping."  Id.  In light of the fact that Joseph Trapasso was the only witness to testify about the lighting in the Price Chopper parking lot, and he actually testified that the parking lot was well-lit, not "weak[ly] lit" as the Government claimed, this speculation is ill-founded. Moreover, "could have" is insufficient:  the Government cannot carry its burden to rebut the presumption that Mr. Fell was prejudiced by speculating that he was not.  See United States v. Lawson, 677 F.3d 629, 648 (4th Cir. 2012) ("highly speculative" considerations inadequate to rebut the presumption of prejudice).

[75] See Ex. 38 at 07:34-08:04, 08:38-09:07 (revealing absence of guardhouses or security checkpoints through the entirety of the Price Chopper employee parking lot and even in back of it).

[76] See Gov. Trial Ex. 12(b)-12(d).

it,[77] leaving the remainder (where security apparatus could well have been located) entirely obscured.

A visitor to the Price Chopper employee parking lot also would have observed that it is entirely obscured from view from Strongs Avenue by a high retaining wall and the backs of boarded-up buildings.[78] Additionally, he would have seen that the Price Chopper employee parking lot was otherwise bordered by train tracks and the windowless façade of the Price Chopper wall abutting the employee parking lot.[79] No trial evidence was on point: the aerial map of the Price Chopper that was introduced at trial did not give any indication of the retaining wall, and did not capture the degree to which Strongs Avenue was set back from the Price Chopper employee parking lot.[80] And the only other piece of evidence even arguably on point – the picture of a portion of the Price Chopper parking lot that, to the far left, depicted a segment of the retaining wall – likewise gave no indication of the degree to which Strongs Avenue was set back from the retaining wall or of the full height of the retaining wall as it sloped up toward Strongs.[81]

The foregoing observations were prejudicial as to both guilt and penalty, were not cumulative to what was adduced at trial but did tend to confirm the Government's position at trial that Mr. Fell and Mr. Lee were "lurking," and tended to refute the defense case at trial that

---

[77] See Gov. Trial Ex. 12(a)(1), 12(a)(2).

[78] See Ex. 38 at 07:34-08:04 (depicting the route from the front of the Price Chopper to the back of the employee parking lot).

[79] See Ex. 38 at 7:43-7:57 (The righthand side of the screen reflects that the Price Chopper wall abutting the employee parking lot was entirely windowless and only had two apertures: the employee entrance and a heavy iron service door).

[80] See Gov. Trial Ex. 12(d).

[81] Compare Gov. Trial Ex. 12(a)(3) (photograph of a portion of the retaining wall introduced at trial) with Ex. 38 at 7:39 (demonstrating the extent of the slope and setback of the retaining wall that Juror #143's extra-record investigation would have exposed him to).

Mr. Fell and Mr. Lee were too impaired to be capable of such thoughtful planning.[82]  And, because these were extra-record observations, absent the evidentiary protections afforded Mr. Fell by the law and enforced by the Court, Juror #143 deprived defense counsel of the opportunity to confront these observations and rebut them in open court.  Significantly, these observations stood in opposition to trial counsel's argument that Mr. Fell could not have been thinking clearly because he stood with a shotgun for 15 minutes in a lit parking lot, as Price Chopper contractors and employees came and went, waiting for someone to kidnap.  They also tended to enhance the Government's argument, pressed at both the guilt and penalty phase of Mr. Fell's trial, that Mr. Fell was acting deliberately in "lurking in the shadows."  See Hill v. United States, 622 A.2d 680, 685 (D.C. Cir. 1993) (holding a juror's extra-judicial investigation of lighting prejudicial where it was a factor bearing on an important issue and "undeniably an important issue *for this juror*, who purposely went to the area the night before deliberations to inspect those conditions himself") (internal quotation marks omitted).

## 2. Juror #143's Prejudicial Observations of 135 Robbins Street and the Route from 135 Robbins Street to the Price Chopper.

Juror #143 also examined the neighborhood around 135 Robbins Street and the route that Mr. Fell and Mr. Lee took from 135 Robbins Street to the Price Chopper, and observed

---

[82] The Government has argued that Juror #143's observation was not prejudicial because "there is no evidence that Juror 143 inspected the Price Chopper lighting at night (or before dawn), which is the only way he could have observed what the lighting was like at the time of the kidnaping (assuming Price Chopper did not alter or improve the lighting between 2000 and 2005)."  Government's Brief re Juror Misconduct Claims at 63. First, the only testimony on point is Kaulene Kelsey's that Juror #143 inspected the Price Chopper parking lot in the dark.  See Mar. 18 Hr'g Tr. at 31.  Second, because the Government has the burden to show that Juror #143's extra-record investigation was not prejudicial, it cannot rebut this burden by pointing to the possibility that Juror #143 might not have inspected the Price Chopper lighting in the darkness.  Finally, even if Juror #143 had made his extra-record observations of the Price Chopper's lighting under conditions of less than total darkness, if those observations were that the lighting was inadequate, and if those are the observations he communicated to the jury, then Mr. Fell was prejudiced.  It is well recognized that observations made under different conditions can be relevant to a reasonable jury's deliberations.  See Jamison v. Grier, No. 01-cv-6678, 2002 WL 100642, at *17 (S.D.N.Y. Jan. 25, 2002) (no error in admission of a photograph taken in daylight even when crime occurred at midnight); Veliz, 714 F. Supp. at 51 (citation omitted) ("[D]issimilarities affect the weight of the evidence, not its admissibility".).

extraneous evidence bearing directly on the issue of Mr. Fell's intent.[83]  The Government has

challenged this assertion but it is well-founded in the evidence and the Court should make a

finding.  At the time of his visit, Juror #143 would have known this route from the trial testimony

of Rutland Police Detective Rodney Pulsifer, who described it based on Mr. Fell's recorded

statement to the police (which was also played for the jury), and who traced it on a black-and-

white aerial photograph that gave a bird's eye view of the route.[84]  And, given the fact that he

admittedly traveled from 135 Robbins Street to the Price Chopper and that his reason for doing

so was to make his own observations regarding what he had been told about at trial, the inference

is inescapable that Juror #143 retraced what he had been told by both Mr. Fell and Detective

Pulsifer was the route.  Indeed, Juror #143 admitted that he retraced the route.[85]

Moreover, an examination of the video of the route from 135 Robbins Street to

the Price Chopper reveals the prejudicial extra-record observations that any visitor traveling the

route that Mr. Fell and Mr. Lee took from 135 Robbins Street to the Price Chopper would have

made.  Unbeknownst to trial counsel, Juror #143 would have seen what the trial evidence did not

show, "evidence" from which an inference would follow that Mr. Fell's and Mr. Lee's route was

organized to avoid detection.  These observations bore directly on Mr. Fell's intent on the

---

[83] This extraneous evidence was also prejudicial with respect to Mr. Fell's mitigation case.  See infra II.B.ii.

[84] See Gov. Trial. Ex. 12(d).  Relying on the statement that Mr. Fell made to the police, Detective Pulsifer testified that, after the incident at 135 Robbins Street, Mr. Fell and Mr. Lee exited 135 Robbins and walked east to Noyes Street.  They then turned south on Noyes and walked to the Foley Laundry loading dock.  From the loading dock they proceeded to State Street, and then traveled east on State until they reached Pine Street.  At the intersection of State and Pine they turned south and traveled to West Street, which they took east to Evelyn Street.  They then traveled south on Evelyn until they reached the shopping plaza where the Price Chopper was located, where they either walked along the front, past the Walmart, to the Price Chopper employee parking lot, or circled around the back of the shopping complex.  See Trial Tr. Vol. II at 30-31.

[85] There is no question that Juror #143 sought to retrace Mr. Fell's route as it was described during the testimony of Rutland Detective Rodney Pulsifer.  Juror #143 admitted that he "tried to retrace the steps that [he] understood Mr. Fell to have taken" from 135 Robbins Street to the Price Chopper employee parking lot, that he did a "loop" from Robbins Street to the Price Chopper, and that he took the "whole journey" that Mr. Fell and Mr. Lee took.  Aug. Hr'g Tr. at 56, 59.  He even agreed with the Government, during their examination of him, that his "only argument with the defense is that [his investigations of Rutland] didn't happen during the trial."  Id. at 72.

evening of the Rutland crimes, lending support (in the absence of any opportunity for defense counsel to rebut) to the argument that Mr. Fell acted with intent, and tending to undermine trial counsel's argument that Mr. Fell and Mr. Lee were not acting deliberately or with intent when they walked "where anyone could see them." Trial Tr. Vol. IV-1 at 75.

First, any visitor to 135 Robbins Street would have observed that for at least two blocks in every direction from 135 Robbins Street the neighborhood was <u>exclusively</u> residential, and that 135 Robbins Street was the only apartment building in a neighborhood that appeared to be otherwise solely made up of single family homes.[86] This observation directly bore on trial counsel's argument about Mr. Fell and Mr. Lee's lack of forethought, evident from their walking "in the street with an unloaded shotgun in the middle of Rutland in the morning where anyone could see them." Trial Tr. Vol. IV-1 at 75. Residences, unlike businesses receiving early morning deliveries, are unlikely to receive pre-dawn visits. An observation thus would support the prejudicial inference that Mr. Fell and Mr. Lee had no reason to be wary of being seen. The fact that the surrounding neighborhood was purely residential, and thus that there was virtually no chance of Mr. Fell and Mr. Lee being observed departing 135 Robbins Street in the bloody clothing they had on, also undermined trial counsel's argument that Mr. Fell and Mr. Lee leaving the door to 135 Robbins Street unlocked implied that they were not thinking deliberately or acting with intentionality. <u>See</u> Trial Tr. Vol. IV-1 at 75.

---

[86] The video evidence makes clear that, looking both north and west from the intersection of Baxter and Robbins Street, a visitor would have seen nothing but residences. <u>See</u> Ex. 38 at 00:00, 1:35. Similarly, proceeding east on Robbins from its intersection with Baxter to Noyes Street, a visitor would not see a single business until he reached the Foley Laundry loading dock at the far end of Noyes. <u>See</u> Ex. 38 at 00:08-00:44 (route from the intersection of Baxter and Robbins Street to the Foley loading dock). And, likewise, proceeding south on Baxter Street to State Street (which Juror #143, who was driving, must have done in order to rejoin Mr. Fell's route because Noyes dead-ends at the Foley Laundry loading dock), a traveler seeking to retrace Mr. Fell and Mr. Lee's route would have passed a full seven, well-spaced residential homes on either side of the street before he encountered the first businesses, located at the intersection of Baxter and State. <u>See</u> Ex. 38 at 01:43-02:07.

This information was not cumulative of trial evidence.  To the contrary, the only evidence directly on point was Officer Curtis Moore's testimony that the neighborhood was a mixed commercial and residential neighborhood with "mom and pop stores . . . right in that immediate area."  Trial Tr. Vol. I-2 at 34.  Otherwise, the most nearly relevant trial evidence was limited to a few close-up photographs of 135 Robbins Street that revealed nothing about the character of the surrounding neighborhood, and aerial maps of Rutland and its downtown that depicted the neighborhood surrounding Robbins Street off to one side and at too high a level of generality to determine the uses to which the neighborhood buildings were put (or even whether they were inhabited or not), and only purported to identify a few select Rutland-area businesses. See Trial Ex. 12(b)-12(d).

Observations of the rest of the route from 135 Robbins Street to the Price Chopper also supported, in a way no trial evidence did, the inference that the route Mr. Fell and Mr. Lee took was well-suited to avoiding detection.  The route down Noyes Street to the Foley Laundry loading dock shows that Noyes is bordered on one side by the backs of two one-story homes and on the other side by an empty commercial lot.[87]  Absent rebuttal from trial counsel, the inference would have arisen that the route was a perfect one for someone intending to be furtive. Traveling on Noyes Street, a visitor would have seen what was not presented at trial: that the two houses on Noyes had small windows and were each separated from Noyes by large trees (and two evergreens loomed over the house closest to Foley Laundry), thus lending further support to the inference that Mr. Fell and Mr. Lee made a careful choice of a route designed to be furtive.[88] A visitor would also see that Noyes Street leads to the side of the Foley Laundry loading dock,

---

[87] See, e.g., Ex. 38 at 00:27.

[88] See Ex. 38 at 0:26-0:43 (depicting Noyes Street; to the left hand side of the screen are the two houses abutting Noyes).

62

not its front, leading to the inference that Mr. Fell and Mr. Lee were unlikely to encounter a

delivery truck as they walked down Noyes.[89]

Because Noyes Street dead-ends at the side of Foley Laundry, in order to continue

to retrace Mr. Fell's and Mr. Lee's route, a visitor would have had to return back to the

intersection of Baxter and Robbins, and then to have proceeded down Baxter to its intersection

with State Street.  The video evidence shows that a visitor would have observed that this

alternative route down Baxter Street that Mr. Fell and Mr. Lee could have taken, but chose not to

take, is far more exposed than the route the trial evidence shows they took: fronted by fourteen

multi-story residences (each with multiple windows overlooking Baxter Street) and two

businesses.[90]  Save for an aerial photograph that did not depict Baxter Street in any detail,[91] there

was no evidence presented at trial about the nature of this alternative route.  Neither the aerial

photograph nor any trial testimony reflected that the buildings that the alternative route passed by

were inhabited, that two of them were businesses, nor that they were all multi-story structures

with large, multi-panel windows overlooking Baxter Street.[92]  Juror #143's extra-record

observations, which trial counsel did not have the opportunity to rebut, thus would give rise to an

inference that right at the moment they exited 135 Robbins Street Mr. Fell and Mr. Lee chose the

most surreptitious of the available routes from 135 Robbins Street toward the Price Chopper.

---

[89] Compare Ex. 38 at 0:26-0:43 (center of the screen depicts the side of the Foley Laundry loading dock) with Ex. 38 at 2:33 – 3:00 (minutes 2:52 to 2:57, particularly, depict the front of the loading dock, illustrating that, unlike the side of the dock at the end of Noyes Street, it has a sheltered loading bay that is capable of accommodating two trucks).

[90] See Ex. 38 at 1:39 – 2:08.

[91] See Gov. Trial Ex. 12(d).

[92] See Ex. 38 at 1:39 – 2:08 (length of Baxter Street; on either side of the street are multi-story houses with large paneled windows, and two businesses are at the intersection of Baxter and State).

Continuing to retrace Mr. Fell's and Mr. Lee's route from the Foley Laundry loading dock,[93] a visitor would have observed that Mr. Fell's and Mr. Lee's route continued along a path that remained secluded.  He would have observed that the back of the Foley Laundry lacked windows, light fixtures, or security cameras,[94] and that Mr. Fell and Mr. Lee proceeded through a parking lot that was well-removed from any residences or other buildings until they attained State Street.[95]  Again, there was no evidence or trial testimony related to the secluded character of the parking lot behind Foley Laundry.

Detective Pulsifer testified that, after exiting the Foley Laundry parking lot and walking up State Street to the intersection of State and Pine Street, Mr. Fell turned right and proceeded south on Pine.[96]  A visitor retracing Mr. Fell's route would have observed that Pine Street is bordered on the east side – where Mr. Fell told the police he and Mr. Lee walked – by parking lots for the Jiffy Mart and the Post Office.[97]  A visitor would have observed that the buildings on the east side of Pine Street were significantly set back from the street itself, and that there were no ground-story windows on those buildings (whereas the buildings on the west side of Pine Street, all of which directly abutted the street, all had ground floor windows overlooking Pine).[98]  A visitor would also have observed that, by contrast, the post office, by which Mr. Fell and Mr. Lee decided to walk, had no ground-level windows through which anybody could have

---

[93] See Ex. 38 at 03:00.

[94] See Ex. 38 at 3:15-3:21 (right hand side reflects the Foley Laundry).

[95] See Ex. 38 at 3:15 – 3:34 (route from back of Foley Laundry to State Street).

[96] See Trial Tr. Vol. II at 30.

[97] Gov. Trial Ex. 11(j) (Transcript of Fell's Statement: 12/2/2000); see Ex. 38 at 04:08 – 04:40.

[98] See Ex. 38 at 4:08-4:32 (the left side of the screen depicts the row of houses on the west side of Pine Street, all of which have first-story windows).

observed Mr. Fell and Mr. Lee as they made their way toward West Street and the Price Chopper.[99]  Again, there was no trial testimony on point.

A person continuing to retrace Mr. Fell's route would have turned left onto West Street at the intersection of Pine and West, and proceeded east along West Street to its intersection with Evelyn Street.  These observations supported the inference that this portion of the route, too, was well-suited to avoiding detection: the post office is the only building on the north side of West Street (with its parking lot taking up half of the block), and to the south there are just two low-slung commercial properties with a sizeable parking lot in between.[100] Similarly, Evelyn Street is bordered on the east side by parking lots and on the west by low-slung commercial properties.[101]  There was no testimony about the character of this portion of Mr. Fell's and Mr. Lee's route, and the aerial map revealed only that it was near the heart of downtown Rutland.[102]

Finally, after proceeding along Evelyn Street to the shopping complex, a visitor retracing Mr. Fell's and Mr. Lee's footsteps would have made additional prejudicial observations on either of the two routes that Detective Pulsifer testified Mr. Fell could have taken.  Going along the front of the shopping complex, anybody retracing Mr. Fell's footsteps would have observed that the entire length of the complex offered concealment in the form of a covered

---

[99] See Ex. 38 at 4:25-4:34 (right-hand side of the screen illustrates that the side of the post office overlooking Pine Street had no ground floor windows).

[100] See Ex. 38 at 5:08.

[101] See Ex. 38 at 05:27.

[102] Juror #143's examination of this segment of the route that Mr. Fell and Mr. Lee took would also have provided an extra-record basis for the inference that it was vastly better suited to avoiding detection than the alternative route that Mr. Fell and Mr. Lee could have taken, but chose not to take along Merchants Row.  Juror #143 testified that he was familiar with this route and that he regularly drove down Merchants Row to eat at the Sandwich Shoppe.  See Aug. Hr'g Tr. 26.  As the video evidence makes clear, in contrasting the secluded route to the Price Chopper that Mr. Fell and Mr. Lee took with the busy route along Merchants Row and Strongs Avenue, Juror #143 would have determined that Mr. Fell's path allowed him to avoid a dense, commercial thoroughfare running through the center of downtown Rutland that is home to financial institutions, jewelers, restaurants, and numerous other businesses. See Ex. 40 at 0:50 – 2:21.

65

walkway that would have provided Mr. Fell and Mr. Lee cover as they walked south toward the Price Chopper.[103]  He would further have observed that the route along the front of the Price Chopper is set off from the nearest road by an expansive parking lot.[104]  Likewise, circling around the back of the Shopping Complex, a visitor would have seen that the complex is secluded from any road or residential property and bordered on one side by the windowless façade of the back of the shopping center and on the other by train tracks.[105]  No evidence offered at trial related to the secluded nature of either of these routes.  There was no testimony on this issue, the aerial photographs reflected neither an overhang along the front of the Price Chopper nor the absence of windows around back, and the photographs of the Shopping Complex that were introduced focused exclusively on the Price Chopper and did not reflect anything about the route that Mr. Fell and Mr. Lee would have taken along the Shopping Center complex to get there.[106]

Defense counsel could have taken on these observations.  But without any information that Juror #143 had taken this secret trip, they had no ability to effectively defend Mr. Fell.

Moreover, in light of how intent must be proved, the fact that Juror #143's extra-record observations bore on Mr. Fell's forethought, intentionally, and mental impairment meant that they were particularly prejudicial.  As the Court instructed the jury at both the guilt and penalty phases of Mr. Fell's trial, the <u>surrounding facts and circumstances</u> of Mr. Fell's offense were the critical pieces of evidence in determining whether Mr. Fell had the requisite intent:

---

[103] <u>See</u> Ex. 38 at 06:12-07:34.

[104] <u>See</u> <u>id.</u>

[105] <u>See</u> Ex. 39 at 07:31-09:14.

[106] <u>See</u> Gov. Trial Ex. 12(a)(1), Gov. Trial Ex. 12(d).

> Medical science has not yet devised an instrument which can record what was in one's mind in the past. <u>Rarely is direct proof available to establish the state of one's mind.</u> This may be inferred from what he says or does: his words, actions, and his conduct, as of the time of the occurrence of certain events. The intent with which an act is done is often more clearly and conclusively shown by the act itself, or by a series of acts, than by words or explanations of the act uttered long after its occurrence. <u>Accordingly, intent, willfulness and knowledge are usually established by surrounding facts and circumstances as of the time the acts in question occurred, or the events took place, and the reasonable inferences to be drawn from them.</u>

Trial Tr. Vol. IV-2 at 18-19 (emphasis added); <u>see</u> <u>also</u> Trial Tr. Vol. XII at 141 (same instruction plus instruction that jury could "not rely solely upon [its] first-stage verdict of guilt or [its] factual determinations therein" but must decide the issue of intent again). The Court's instructions underscore that intent, "the secret, silent operation of someone's mind," is difficult to prove. <u>Nelson v. Scully</u>, 672 F.2d 266, 269 (2d Cir. 1982) (Friendly, J.) (internal quotation marks omitted); <u>see</u> <u>Jhirad v. Ferrandina</u>, 401 F. Supp. 1215, 1218 (S.D.N.Y. 1975) ("To fully ascertain the question of intent one must examine the operation of another man's mind which is always a difficult problem for a finder of fact."). The Government has argued that Juror #143's exposure to extra-record information was "insignificant."[107] <u>See</u> Government's Brief re Juror Misconduct Claims at 61. But, even more so than in <u>United States v. Roshko</u>, it cannot be said "that the government's case against [Mr. Fell] was so overwhelming that the extra-record evidence did not affect the outcome. The intent of the defendant is a matter which is particularly difficult to determine and while the defense was not strong, it might have raised a reasonable doubt in the jury's view . . . The possibility that [Mr. Fell] was prejudiced by the extra-record evidence is sufficient to warrant a new trial." <u>United States v. Roshko</u>, No. 90 Cr. 265 (JAR),

---

[107] The Government also argues that the extra-record evidence that Juror #143 was exposed to was cumulative. This Court has already disagreed with that assessment, <u>see</u> May 10, 2013 Order at 14-15, and Mr. Fell has shown it to be false.

1991 WL 18146, at *5 (S.D.N.Y. Feb. 7, 1991). Here there is not just a possibility that Mr. Fell was prejudiced but a near certainty.

### ii.    Juror #143 Investigated and Interjected into the Jury's Deliberations Extra-Record Evidence that Struck at the Center of Mr. Fell's Case for Life

Mr. Fell was further prejudiced by Juror #143's observations that Mrs. Fell's neighborhood was "okay," "middle class," "decent," and she was "just trying to live her life" because they struck at the core of Mr. Fell's mitigation case. See Ex. 1at FELL-00002377-78; Mar. 18 Hr'g Tr. at 29. None of these observations could have been made from the limited photographic evidence presented at trial. That evidence consisted of direct shots of 135 Robbins Street, without the surrounding neighborhood. These observations, moreover, directly contradicted critical evidence and argument adduced in support of at least four mitigators: (1) Donald Fell was sexually and physically abused as a child, (2) As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other, (3) Donald Fell was raised without positive role models, and (4) Donald Fell's parents were violent alcoholics who abandoned him as a child. See Trial Tr. Vol. V-1 at 28-29.

Much of trial counsel's penalty phase presentation was given over to portraying the chronically abusive and neglectful conditions in which Mrs. Fell raised Donald Fell. Trial counsel sought to emphasize the effect of Mrs. Fell's "corruptive" influence on Mr. Fell in arguing for life. Trial Tr. Vol. XII at 86. Trial counsel's opening statement described repeated drunken knife fights. Trial Tr. Vol. V-1 at 47-48. It described a mother who was too intoxicated to provide basic care to her children – and who actively undermined efforts to provide Mr. Fell with appropriate psychiatric treatment – but who was a steady source of alcohol, drugs, and physical abuse. See id. at 49-50, 52. Trial counsel closed on the same themes, arguing the mitigating effect of Mr. Fell's lamentable upbringing: the "daily intoxication on the part of Mrs.

68

Fell" including her abuse of drugs, Trial Tr. Vol. XII at 86, the neglect, id. at 87, the violence, id. at 88, and the "filth" in which Mr. Fell was raised.  Id. at 96.  Trial counsel also focused specifically on the character of 135 Robbins Street, describing it as a "chaotic scene . . . You saw pictures of cans and cans of beer, empty cases of beer."  Trial Tr. Vol. IV-1 at 73.[108]

Testimony at both the guilt and penalty phases supported trial counsel's characterizations.  During the guilt phase, Detective Chris Kiefer, who investigated the 135 Robbins Street incident, acknowledged finding drugs and alcohol, including multiple beer cans and carriers, strewn in the apartment.  Trial Tr. Vol. I-II at 46, 53, 63.  She also conceded that the apartment was "messy," with furniture made partly of milk crates, and surfaces littered with beer cans and piles of dirty clothes.  Id. at 62, 67, 72.  Special Agent James Caudle likewise testified to Mr. Fell's statement that Debra Fell and Charles Conway smoked crack at the 135 Robbins Street location.  Trial Tr. Vol. II-I at 9.

The punishment phase testimony likewise provided support to trial counsel's account of Debra Fell's persistently indecent, abusive lifestyle both in Wilkes-Barre and when she was living at 135 Robbins Street.  Marsha Thompson, the bartender at the Stop Lite bar in Rutland, testified on cross-examination that Debra Fell was a regular who "on a number of occasions" drank pounders of beer until she was so intoxicated that she had to be cut off or thrown out for disorderliness.  See Trial Tr. Vol. V-II at 50-52.  Vertithe Oberle likewise confirmed on cross-examination that Mrs. Fell was a "pretty heavy drinker" in Vermont.  And

---

[108] The Government, by contrast, sought to portray Debra Fell as caring and well-intentioned.  On their account, after Mr. Fell and Teri Fell were sexually abused by their babysitters, Mrs. Fell "quit work so she could stay home and take care of the kids."  Trial Tr. Vol. V-1 at 38.  According to the Government, she also took the initiative to "thr[o]w the father out of the house" after which, the Government suggested, things improved: social services "found no violence in the home and no evidence at the time of Debra drinking excessively."  Id. at 49.  And, contrary to trial counsel's argument that Mrs. Fell deprived Mr. Fell of the treatment he required, the Government argued that Mrs. Fell was instrumental in making sure that "Donald Fell continued to receive counseling."  Id. at 38.  The Government sought to bolster its case with testimony, eliciting that "Debbie Fell has been providing a safe and stabile [sic] environment for her children," see, e.g., Trial Tr. Vol. IX-1 at 97, and that Mr. Fell did not grow up in complete squalor,  e.g. Trial Tr. Vol. IX-I at 110.

many witnesses, including Susan Benczkowski, Teri Fell, Deanna German, Christopher Purcell, and Ellis Carle, attested to Mrs. Fell's similarly irresponsible, neglectful, and abusive conduct while she was raising Mr. Fell in Wilkes-Barre, and to the filthy, shambolic state of the Fell household.[109]

Juror #143's observations that Debra Fell's house at 135 Robbins Street was a "decent," middle class-type house" in an "okay" neighborhood sharply contrasted with the evidence that had been presented about Mrs. Fell in her son's defense. As Juror #143 himself pointed out, his observations about the character of 135 Robbins Street ran directly contrary to "how [the jury would have] perceived Donald Fell's upbringing to be" and were "surprising" due to their inconsistency with the testimony and argument at trial.[110]

The video shows what could not be seen from the photographs: that 135 Robbins Street is a tidy, multistory house with two decks and a bay window abutting the exterior covered stairwell on the south side of the structure.[111] 135 Robbins Street is also surrounded, in all

---

[109] See, e.g., Trial Tr. Vol. VII-1 at 58-59, 61, 63 (Susan Benczkowski testifying to Mrs. Fell's "constant[]" intoxication, that she drank throughout her pregnancy with Mr. Fell, and that she fought with other members of the household, frequently to the point of drawing blood); id. at 86-87, 104, 110-111 (Teri Fell's testimony that Mrs. Fell regularly attacked Mr. Fell when he was a child, that she was "staggering" drunk on Thanksgiving and Christmas, and that the Fell household was filthy with "dog feces everywhere in the basement"); Trial. Tr. Vol. VII-II at 39 (Officer Christopher Purcell's testimony that the Fell household was "disheveled" with "large amounts of garbage . . . piled around the house."); Trial Tr. Vol. VII-II at 51-52 (Ellis Carle's testimony that the Fell residence was "pretty much a shambles"); Trial Tr. Vol. IX-I at 117-118 (Deanna German's testimony that Mrs. Fell was abusive and prevented Mr. Fell from receiving care).

[110] The Government's argument that Juror #143's observations of the "decent," "middle class" conditions of Debra Fell's apartment at 135 Robbins Street have no bearing on Mr. Fell's upbringing because "Fell's childhood neglect and abuse took place in Pennsylvania when he was a child, not in Vermont . . ." ignores that trial counsel had portrayed Debra Fell as a lifelong alcoholic and drug addict who died as she had lived, drunk and high on crack. See Government's Brief re Juror Misconduct Claims at 64. As powerfully illustrated by Juror #143's statement that his observations were "surprising[ly]" contrary to how Mr. Fell's upbringing was portrayed at trial, a juror confronted with extra-record evidence that this purportedly congenital drug-addict was, in fact, living a "decent," "middle class" life could have inferred that Mrs. Fell's Wilkes-Barre lifestyle was similarly decent, and that trial counsel's characterization of it was overblown. See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 119 n.1 (2d Cir. 1998) (citation omitted) ("[W]hen the question is as to a condition existing at one time, evidence as to that at a different time" is probative when the condition is "permanent or lasting"); Edel v. Astrue, No. 6:06-CV-0440 (LEK/VEB), 2009 WL 890667, at 22 (N.D.N.Y. Mar. 30, 2009) (evidence from "before or after [a given] period" probative of circumstances during the period).

[111] See Ex. 38 at 00:00.

70

directions, by rows of well-kept, attractive, single family homes.[112]  Looking east down Robbins

Street, in the direction of Noyes Street, a visitor would have observed well-maintained, gabled

houses on either side of the road.[113]  Both houses closest to Baxter Street on the south side of

Robbins had airy sun porches, and the house closest to Baxter Street on the north of Robbins had

a wraparound covered deck.[114]  Also apparent to anybody visiting the neighborhood of 135

Robbins Street was the absence of any dilapidation: none of the properties visible from the

intersection of Baxter and Robbins appear abandoned or even neglected; there are no broken

windows or barbed wire, no chain link fences around any residences, nor any other obvious

indicia of poverty or blight.

The apparently well-kept houses in an apparently quiet, orderly, "middle-class"

neighborhood that a visitor would have seen on his trip to 135 Robbins Street and to the

surrounding neighborhood were jarringly contrary to trial counsel's portrayal of Mrs. Fell living

eviction-to-eviction in a series of blighted, "unkept," drug-and-alcohol besotted households.

And they bolstered the Government's case that Mrs. Fell was a well-meaning mother who simply

could not handle Mr. Fell as he became increasingly violent and aggressive.  The upshot of Juror

#143's extra-record investigation of 135 Robbins Street and the surrounding neighborhood was

therefore a body-blow to Mr. Fell's mitigation case that powerfully bolstered the case for guilt

and death, and significantly prejudiced Mr. Fell.

The facts and circumstances detailed above establish the <u>minimum</u> prejudice that

Mr. Fell could have suffered.  The Court cannot know the full extent to which Mr. Fell has been

---

[112] See id. at 00:04 (looking north down Baxter Street from the corner of Baxter and Robbins); id. at 00:12 (looking east down Robbins from 135 Robbins Street); id. at 01:36 (looking west from the corner of Baxter and Robbins); id. at 01:45 (looking south down Baxter from the corner of Baxter and Robbins).

[113] Id. at 00:12.

[114] Id.

prejudiced because Juror #143 continued to lie to the Court and deny having taken a trip to Rutland during trial.  This is yet another reason why Mr. Fell's conviction and sentence cannot stand.  Where there is an "absence of information and . . . consequent inability of the district court meaningfully to assess the nature and extent of the [jury misconduct] in order to ascertain whether there has been any prejudice to the defendant[]," the Government cannot rebut the presumption of prejudice.  United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993); see also Lawson, 877 F.3d at 651 (prejudice requiring vacatur of conviction and sentence existed where "there are many uncertainties" because "it is the prosecution that bears the risk of uncertainty"); United States. v. Fuentes, No. 2:12-CR-50 -DHB, 2013 WL 4483062, at *5 (D. Me. Aug. 19, 2013) ("[S]ince this juror denies his [misconduct] outright, [there is] no basis upon which to reach a conclusion . . . that he could and did overcome it in deliberations.").  And where, as here, it is the juror's own lies that are the cause of the uncertainty, the Court should infer that Juror #143 made all of the numerous prejudicial observations, related to both intent and mitigation, that he could have uncovered during his trial trip to Rutland.

### III.    Mr. Fell Was Deprived of His Sixth Amendment Right to a Fair Trial by Juror #143's Coercion of Another Juror into Voting to Sentence Mr. Fell to Death by Threatening Her with a Shotgun

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body."  Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).  Mr. Fell was deprived of this right by Juror #143's threat to physically assault a holdout juror who was making an argument for sentencing Mr. Fell to life.

Juror #143 has admitted that he cocked and aimed a shotgun at a holdout juror, who then voted to sentence Mr. Fell to death.[115]  Juror #143's admission is true.  As with his admission about undertaking an extra-record investigation of Rutland during trial, Juror #143

---

[115] See Ex. 1 at FELL-00002379.

made this admission to people he perceived to be representatives of the Court as opposed to representatives of Mr. Fell. Juror #143 also made this admission before he learned how Mr. Fell's counsel intended to use it, and therefore before his motive to fabricate arose. See Mar. 18 Hr'g Tr. at 64 (post-conviction counsel did not inform Juror #143 how they might use his statements about the shotgun). And Juror #143's admission was considered: Ms. Zloczower testified that she specifically told Juror #143 to record his best recollection of the shotgun incident, and that Juror #143 carefully thought about whether his admission was accurate before concluding that it was, initialing the paragraph containing the admission, and signing his statement. Ms. Zloczower also testified that Juror #143's statement about cocking and aiming the shotgun at a hold out juror was consistent with what he had told her during their meeting in 2010.[116]

There also should be no question that Juror #143's engaged in juror coercion. When "a juror's safety was threatened by fellow jurors," that "raise[s] serious constitutional concerns with respect to a defendant's right to a fair trial." Anderson v. Miller, 346 F.3d 315, 327 n.3 (2d Cir. 2003) (citation omitted). That is exactly what happened here. Juror #143 threatened a holdout juror who was arguing against sentencing Mr. Fell to death: cocking and aiming a shotgun at her and causing her to feel "scared" and to "squirm[]." After this experience, the threatened juror changed her vote to give Mr. Fell the death penalty.

In Anderson, the Second Circuit held that a jury's verdict was not coerced where jurors may have "felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction," but no juror faced "threats of violence." Anderson, 346 F.3d at 329. Here,

---

[116] At the August 2013 hearing, Juror #143 retracted his admission that he had pointed a shotgun at a fellow juror, but, as with his denying that he undertook an extra-record investigation of Rutland, this retraction is a lie that he is telling because he is powerfully motivated to ensure that Mr. Fell's conviction and sentence stand, and he now understands that juror coercion is one of Mr. Fell's grounds for 2255 relief.

by contrast, where Juror #143 cocked and pointed the alleged murder weapon directly at a holdout juror with whom he disagreed, "a reasonable juror, standing in the shoes of [the juror who Juror #143 threatened], would have thought herself to be facing a physical assault if she refused to vote for conviction." Id.  This is paradigmatic juror coercion that entitles Mr. Fell to a new trial.

## CONCLUSION

Juror #143 committed multiple acts of misconduct each independently entitling Mr. Fell to a new trial.  He investigated prejudicial extra-record information and injected it into the jury's deliberations.  He lied during trial about information regarding the trip that, had it been disclosed, would have provided a valid basis for a challenge for cause.  He also lied on voir dire. And Juror #143 coerced a holdout juror into voting for death by brandishing a shotgun at her. Accordingly, Mr. Fell's conviction and sentence are due to be reversed.

\*    \*    \*

**PART III:  MR. FELL'S CONVICTION AND DEATH SENTENCE SHOULD BE REVERSED BECAUSE JUROR #162 LIED ON VOIR DIRE ABOUT MATTERS THAT WOULD HAVE GIVEN RISE TO A VALID CHALLENGE FOR CAUSE.**

## INTRODUCTION

Through dishonest responses at voir dire, Juror #162 misrepresented to the parties and the Court central facts about herself, and manipulated her way onto a jury on which she never would have been seated had her disclosures been truthful.  Contrary to her reports during jury selection, Juror #162's life experience was marked with serious victimization, including numerous crimes.  As a young child, she was removed from her birth home and adopted into a family where she was sexually abused by her adoptive father.  This abuse continued over a period of years, and she spoke about this trauma again and again over the course of her life, including on more than one occasion just prior to Mr. Fell's trial.  Juror #162's husband was a victim of sexual abuse as a child as well.

A few years later, when she was approximately 21, Juror #162 was robbed of an inheritance – all she had – while she was under court-appointed guardianship.  This embezzlement was not reported during jury selection.  The guardianship followed a separate disaster: her young husband was killed in a tragic accident, leaving her with an infant.  As a result of this terrible experience, she was declared incompetent at 21 and institutionalized more than once over a span of four years.  She emerged from this period in a relationship with a nurse who worked at that hospital, a relationship that eventually included episodes where she was physically abused and attacked with a knife.  Her young son and her next partner were both physically abused and attacked by this woman as well.

Juror #162's experience of trauma has continued.  Her eldest son, who was born in 1961, began to abuse drugs and alcohol as a teenager.  Thus began what has turned out to be a

75

lifelong pattern of drug abuse, alcoholism, and violent behaviors.  Over the course of twenty-five years, from 1980 to 2005, her son, Patrick Ryan, was convicted of four felonies – a burglary in 1983, an incident of assault and trespass against an ex-wife in 1992, an incident of assault and trespass against an ex-girlfriend in 1997, and felony DWI #4 in 2002.  Contrary to Juror #162's report about his history during jury selection, her son had spent two significant periods in prison – once for a year, and once for six months – as a result of these crimes.  He was on parole from the fourth felony conviction during voir dire and through Mr. Fell's trial.  Interspersed among these felony convictions were at least thirteen misdemeanor convictions and charges.  These included many counts of assault, multiple DWI convictions, and a charge for possession of cocaine and marijuana.  Juror #162's son has been under nearly continuous supervision by the Vermont Department of Corrections for his entire adult life.  Since 1983, he has spent more time under such supervision than not – in prison, on parole, on probation, subject to visits by probation officers, subject to restrictions on his freedom, subject to mandatory treatment and counseling.

Juror #162's lies about these matters were not inadvertent.  Rather, the omissions and misrepresentations regarding these foundational life experiences were intentional.  This conclusion is bolstered by Juror #162's demonstrated willingness to lie and her character for untruthfulness: she made other convenient and blatant misrepresentations and omissions at voir dire, and she continued her pattern of untruthfulness during these post-conviction proceedings.

Juror #162's long history of traumatic experiences rendered her – as it would anyone – incapable of impartial judgment of Mr. Fell.  Had she been truthful on voir dire in her responses to the questions designed to elicit these kinds of disruptive experiences, she would have been stricken for cause.

76

## THE FACTS OF JUROR #162'S MISCONDUCT

In the Amended 2255 Motion, Mr. Fell articulated the many relevant life facts that Juror #162 failed to report. Mr. Fell has now substantiated those allegations with evidence.

Had Juror #162 answered her voir dire questionnaire and the questions at individual voir dire truthfully, candidly, and completely, as she was required to do, the totality of her responses would have been dramatically different from the answers she provided and would have included the following information.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| No. 36: Have you ever filed a complaint with the police against anyone? | 1. On July 25, 1982, Juror #162 contacted the Vermont State Police and filed a complaint reporting a crime. She reported that when she went to the residence of Lucille Tatro, Juror #162's former girlfriend, to pick up personal belongings, Tatro "dented the drivers door by throwing a rock," "attempted to smash the windshield," followed Juror #162's vehicle in a van "threatening to drive into [Juror #162's] vehicle," and used a cigarette to "burn[] the upholstery" of the car Juror #162 was driving.[117]<br><br>2. Between June 2000 and trial, Juror #162 filed at least five complaints with the police. The complaints pertained to incidents including: the collision of a boat and trailer with her car;[118] a handicapped person impeding traffic;[119] excessive noise;[120] and the possible decapitation of her cat.[121] |

---

[117] See Ex. 11 at FELL-00003211 (Washington County Criminal Court records of Lucille Tatro); Ex. 53 (Vermont State Police, Middlesex Records Pertaining to Case No. 630-746) (July 25, 1982 Report citing Juror #162 as complainant).

[118] See Ex. 28b at FELL-00003665-67 (Colchester Police Records for Patrick Ryan, Juror #162 and Lucille Tatro).

[119] Id. at FELL-00003683-85.

[120] Id. at FELL-00003693-95.

[121] Id. at FELL-00003696-98.

77

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| No. 38(a): Have you or has a family member or close friend ever been a witness to or the victim of a crime?  If yes, please explain.<br><br>No. 38(b): Did you or your family member or close friend report that crime to the police or other law enforcement agency?<br><br>…<br><br>No. 38(e): Is there anything about this experience which would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?  If yes, please explain. | 1.  Juror #162 was the victim of repeated incidents of child sexual abuse by her adoptive father over a period years.[122]  As a result of the sexual abuse, Juror #162 ran away from home for an extended period of time.[123] She discussed this event repeatedly throughout the course of her life, prior to Mr. Fell's trial, with family members, neighbors, friends, and doctors.[124]  She discussed her experience with sexual abuse in the years just before Mr. Fell's trial,[125] and said less than a decade before Mr. Fell's trial that the thought of it still "[made] her feel dirty."[126]<br><br>Juror #162 has connected this incident to her ability to judge Mr. Fell's case based on the evidence presented at trial, in accordance with the Court's instructions.  She said:<br><br>> At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics. I was sexually abused by my stepfather for years and it didn't turn me into a murderer. We all have choices in life and Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to change things and he didn't take them. That was important to me.[127]<br><br>2.  Juror #162 was also the victim of a traumatic embezzlement.  When she was approximately 21 years |

---

[122] See Aug Hr'g Tr. at 105, 183.

[123] See Ex. 9 at FELL-00002858 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[124] See Aug. Hr'g Tr. at 106 (testimony by Juror #162 that she told her neighbor); Mar. 19 Hr'g Tr. at 187 (testimony by Juror #162 that she has told her husband and son); Mar. 19 Hr'g Tr. at 22 (testimony by Jean Ratta-Roberts that Juror #162 told her about this incident of victimization); Mar. 19 Hr'g Tr. at 60 (testimony by Suzann Widener that Juror #162 told her about this incident of victimization); Ex. 9 at FELL-00002858.

[125] Mar. 19 Hr'g Tr. at 27 (testimony by Jean Ratta-Roberts that Juror #162 told her about this incident of victimization in the period from 2002 to 2004); id. at 60 (testimony by Suzann Widener that Juror #162 told her about this incident of victimization while they were both living on Bay Road, approximately 1999 to 2004).

[126] Ex. 9 at FELL-00002858.

[127] Statement of Juror #162, Jan. 5, 2011 (Ex. 6 at FELL-00002580-81).  Juror #162 has twice affirmed under oath that this statement reflects her opinion of Mr. Fell's own history of abuse.  See Aug. Hr'g Tr. at 100; Mar. 19 Hr'g Tr. at 185.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
|  | old, Juror #162 was declared incompetent amid two extended institutionalizations.[128] Attorney Donald Milne was appointed her guardian.[129] Between October 1963 and May 1965, Mr. Milne stole "everything [she] had."[130] Regarding this incident, Juror #162 has testified: "now I know that I was a victim."[131]<br><br>3. Juror #162 was also physically abused and attacked by her one-time partner, Lucille Tatro.[132]<br><br>4. Juror #162's husband was also the victim of child sexual abuse.[133]<br><br>5. Juror #162's son and husband were also assaulted and abused by Lucille Tatro.[134] |
| No. 43(a): Have you or has a family member or close friend ever been involved in or been the target of a criminal investigation? If yes, please explain.<br><br>No. 43(b): Have you or has a family member or close friend ever been charged with a crime? If yes, | At the time of trial, Juror #162's son, Patrick Ryan, had a lengthy and protracted criminal record including two significant periods in prison, four felony convictions, and at least thirteen misdemeanor convictions or charges over the course of almost 25 years. Patrick Ryan was approximately 44 years old at the time of trial; his adult criminal history began when he was approximately 18 years old and continued through Mr. Fell's trial (and indeed well after).<br><br>1. In August 1980, at the age of 19, Mr. Ryan pled guilty to unlawful mischief.[135] |

[128] See Ex. 10 at FELL-00003084 (Probate Records of Juror #162).

[129] See Ex. 10.

[130] Aug. Hr'g Tr. at 165.

[131] Aug. Hr'g Tr. at 166.

[132] See Ex. 9 at FELL-00002858 (Psychological Evaluation of Juror #162 as part of Family Court Records); Mar. 19 Hr'g Tr. at 156-57. This testimony is consistent with reports detailed in divorce and child custody proceedings to which Juror #162 joined herself as a party. See Ex. 9 at FELL-00002894 (Psychological Evaluation of Patrick Ryan, Karen Currier as part of Family Court Records) (report from Patrick Ryan that Juror #162 and Ms. Tatro "pulled knives on each other" and that there was an incident in which "a gun was involved"); Ex. 11 at FELL-00003211 (Washington County Criminal Court Records of Lucille Tatro); Ex. 53 (Vermont State Police, Middlesex Records Pertaining to Case No. 630-746).

[133] Aug. Hr'g Tr. at 129.

[134] See Ex. 9 at FELL-00002894, FELL-00002858.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| what was the result of that prosecution?<br><br>No. 43(c):  If you answered "YES" to (a) or (b) above, was the individual who was investigated or charged treated fairly by the criminal justice system?<br><br>No. 43(d):  If you answered "YES" to (a) or (b) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?  If yes, please explain. | 2.  Two years later, in 1982, Mr. Ryan pled guilty to unlawful mischief.[136]<br><br>3.  Also in 1982, Mr. Ryan was arrested for aggravated assault and assault on a police officer and pled guilty to simple assault.[137]<br><br>4.  Later that same year, in October 1982, Mr. Ryan was arrested for of simple assault, and pled guilty to disorderly conduct.[138]  He was on probation in connection with this conviction until September 1984.[139]<br><br>5.  In April 1983, while still on probation, Mr. Ryan pled guilty to felony burglary, in an incident that involved stealing six firearms, among other items, from two residences.  He was sentenced to two to six years, with a sentence for a violation of probation in connection with a prior conviction to be served concurrently.[140]  He spent approximately one year in jail as a result of this conviction.[141]<br><br>6.  In September 1988, Mr. Ryan pled guilty to unlawful trespass.[142]<br><br>7.  In January 1990, Mr. Ryan was found guilty of DWI, his first DWI conviction.[143]<br><br>8.  In September 1992, Mr. Ryan pled guilty to DWI, his second DWI conviction. He was sentenced to serve three days to two years, all suspended but three days, and was ordered to undergo alcohol treatment.  He was |

---

[135] See Ex. 12 at FELL-00003221 (Washington District Court Records of Patrick Ryan).

[136] See Ex. 12 at FELL-00003215.

[137] See Ex. 14 at FELL-00003362 (Washington District Court Records of Patrick Ryan); Ex. 13 at FELL-00003285 (Addison Criminal Court Records of Patrick Ryan).

[138] See Ex. 12 at FELL-00003212.

[139] See Ex. 14 at FELL-00003314.

[140] See Ex. 12 at FELL-00003233; Ex. 14 at FELL-00003305.

[141] See Ex. 14 at FELL-00003305-15.

[142] See Ex. 13 at FELL-00003289.

[143] See Ex. 15 at FELL-00003374 (Chittenden County Court Records of Patrick Ryan).

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| | on probation in connection with this conviction until February 1995.[144]<br><br>9. In November 1992, Mr. Ryan also pled nolo contendere to simple assault.  He was sentenced to serve eleven to twelve months.[145] This conviction arose out of an incident in August 1992 in which Mr. Ryan grabbed his wife, Karen Ryan, threw her to the ground, and punched her repeatedly in the face and stomach.[146]<br><br>10. In November 1992, Mr. Ryan pled nolo contendere to felony unlawful trespass.  He was sentenced to zero to three years, suspended, and was ordered to undergo alcohol treatment as well as mental health treatment including anger management and domestic violence counseling.[147]  He remained on probation in connection with this conviction until February 1995.[148] This conviction arose out of an incident in September 1992 in which he climbed onto the roof of his ex-wife's house, broke into an attic window and threatened his ex-wife and her friend.[149]<br><br>11. In March 1993, while still serving probation on his 1992 convictions, Mr. Ryan was found guilty of DWI, his third DWI conviction.  He was sentenced to serve one to two years, all suspended but six months, which Ryan served in jail, and was ordered to undergo alcohol treatment.[150]<br><br>12. In September 1997, Mr. Ryan pled guilty to felony unlawful trespass and two counts of simple assault. He was sentenced to serve two to three years on the felony charge, and zero to twelve months on each simple assault charge.  He was granted pre-approved |

---

[144] See Ex. 13 at FELL-00003258-59.

[145] See Ex. 13 at FELL-00003237-38.

[146] See Ex. 13 at FELL-00003242.

[147] See Ex. 13 at FELL-00003248-50.

[148] See Ex. 13 at FELL-00003250.

[149] See Ex. 13 at FELL-00003253.

[150] See Ex. 14 at FELL-00003338.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| | furlough pursuant to the Intensive Domestic Abuse Program ("IDAP").[151] This crime arose out of an incident in which Mr. Ryan kicked in the door and broke a window at the home of an ex-girlfriend, Tina Boyce, crawled through the broken window, and assaulted her and her friend.[152] Mr. Ryan was discharged from IDAP in 1999 and was on parole until 2001.[153] <br><br> 13. In November 2001, in connection with his arrest for DWI #4, Mr. Ryan was charged with possession of cocaine and possession of marijuana.[154] <br><br> 14. In March 2002, Patrick Ryan pled guilty to felony DWI, Ryan's fourth DWI conviction. He was sentenced to serve two to five years, with pre-approved furlough pursuant to the Intensive Substance Abuse Program ("ISAP").[155] He was discharged from ISAP in 2004 and was placed on parole. He was on parole at the time of voir dire and remained on parole through Mr. Fell's trial.[156] |
| No. 44: Have you or any close friend or relative, ever been treated for a substance abuse problem? If yes, please explain. <br><br> As a result of that problem, did you or your close friend or relative | Juror #162's son, Patrick Ryan, has been in and out of substance treatment, both for drugs and alcohol, for his entire adult life. A review of his "assaultive history" from 1983 to 1997 (the date of his last violent offense prior to trial, but not his last offense) shows that "[a]llegedly all convictions took place under the influence of drugs or alcohol."[157] And the inverse is true as well: nearly all of his substance abuse treatment was the direct result of or related to the criminal justice system. Mr. Ryan's history of treatment for drugs and |

---

[151] See Ex. 14 at FELL-00003340-41.

[152] See Ex. 14 at FELL-00003345-47.

[153] See Ex. 22 at FELL-00003548 (Patrick Ryan Vermont Department of Corrections Movement History).

[154] See Ex. 15 at FELL-00003385.

[155] See Ex. 15 at FELL-00003387-88.

[156] See Ex. 22 at FELL00003548.

[157] Ex. 14 at FELL-00003359-62 (September 1997 Intermediate Sanction Report).

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
| have any contact with the Criminal Justice system? | or alcohol includes at least the following: 1. Alcohol counseling in connection with his 1982 simple assault conviction.[158] 2. In the early 1980s, Juror #162 sent Mr. Ryan to an inpatient drug treatment program.[159] 3. Alcohol counseling with Champlain Drug & Alcohol services in connection with Mr. Ryan's 1992 DWI conviction.[160] 4. Alcohol counseling with Champlain Drug & Alcohol services in connection with Mr. Ryan's 1992 felony unlawful trespass and simple assault convictions.[161] 5. A residential treatment program at Maple Leaf Farm Associates beginning November 1992.[162] 6. Alcohol counseling with Champlain Drug & Alcohol services in connection with Mr. Ryan's 1993 DWI conviction.[163] 7. Substance abuse treatment programs during the period of Mr. Ryan's incarceration.[164] 8. Residential treatment at the Windsor in the period 1992 to 1995.[165] 9. Substance abuse screening, counseling, and treatment in connection with Mr. Ryan's 1997 felony unlawful trespass conviction.[166] |

---

[158] See Ex. 14 at FELL-00003306.

[159] See Ex. 31 at p.2 (Brent Curtis, "Juror: Fell Lawyers Trying to Destroy My Life," Rutland Herald, Oct. 21, 2013).

[160] See Ex. 14 at FELL-00003334; Ex. 13 at FELL-00003269.

[161] See Ex. 13 at FELL-00003254-57.

[162] See Ex. 9 at FELL-00003028 (Patrick Ryan Motion for Continuance, Addison Family Court).

[163] See Ex. 14 at FELL-00003336-38.

[164] Mar. 19 Hr'g Tr. at 136 (testimony by Juror #162 that Mr. Ryan underwent such treatment in prison).

[165] See Ex. 9 at FELL-00002883-84 (Affidavit of Juror #162, Addison Family Court).

[166] See Ex. 14 at FELL-00003363.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
|  | 10. Intensive Substance Abuse Program in connection with Mr. Ryan's 2002 felony DWI #4 conviction.[167]<br><br>11. Treatment with an individual counselor in an effort to regain his driver's license following the lifetime suspension he received as a result of DWI #4.[168]<br><br>REDACTED |
| [Short Form Questionnaire]: Have you, or anyone close to you, been a plaintiff or a defendant in a <u>civil</u> case?  If so, please explain.[170] | 1. Juror #162 litigated for over a year to recover money that Donald Milne embezzled from her.[171]  This litigation marked the culmination of a traumatic sequence of events in which Juror #162 lost her husband in a tragic accident, placed her son, Patrick Ryan, in foster care, was institutionalized in a state mental hospital and declared incompetent, and was robbed of "everything [she] had"[172] by an attorney who was entrusted with her guardianship.<br><br>2. Juror #162 joined herself as a named party to the Addison Family Court divorce and child custody proceeding pertaining to her son and her grandson that lasted from 1992 through 1997.[173]  She was joined as a party to this litigation in June 1992 and was an active participant; she retained counsel, filed numerous motions, affidavits, and letters throughout the litigation, and the final order resolving the case in April 1997 dealt with a motion filed by her.[174]<br><br>3. Juror #162 was involved in at least three other civil suits: <u>Twombly v. [Juror #162]</u>, Dkt. No. 108-1-90 Wnsc; <u>The Medicine Shoppe v. [Juror #162]</u>, Dkt. |

---

[167] <u>See</u> Ex. 15 at FELL-00003388-89.

[168] Mar. 19 Hr'g Tr. at 206.

[R] ███████████████

[170] <u>See</u> Ex. 2 at FELL-00002727 (Short Form Questionnaire of Juror #162).

[171] <u>See</u> Ex. 10 at FELL-00003124 (Probate Records of Juror #162).

[172] <u>See</u> Aug. Hr'g Tr. at 165.

[173] <u>See</u> Ex. 9 at FELL-00002764 (Addison Family Court Docket Sheet).

[174] <u>See</u> Ex. 9 at FELL-00002764-71.

| QUESTION | TRUTHFUL RESPONSE |
|---|---|
|  | No. 303-3-91 Wnsc; and <u>Northfield Fuel Co. v. [Juror #162]</u>, Dkt. No. 631-8-98 Wnsc.[175] |

The gulf between the true picture of Juror #162's background and experience at the time of Mr. Fell's trial and the picture she painted in her misleading responses is staggering. The evidence also establishes that Juror #162's false answers were not the product of inadvertence or negligence, but represented knowing and intentional falsehoods.

## A. Juror #162 Was Repeatedly the Victim of Crimes

### i. Sexual Abuse

Contrary to the Government's argument, Juror #162's failure to disclose the crime of sexual abuse committed against her was not inadvertent. The facts which Juror #162 kept from the Court and counsel were hardly unknown or insignificant to her. She was abused for a period of <u>years</u> by her adoptive father when she was a little girl, and that abuse was sexual.[176] It is difficult to imagine a more searing personal event, even were its occurrence isolated. The fact that the abuse lasted years only underscores that this is not the type of experience that is easily forgotten, or that Juror #162 forgot. As the Second Circuit long ago held in sustaining a verdict that a defendant was criminally liable for lying, "there are many cases where from the actor's special situation and continuity of conduct an inference that he did know the untruth of what he said or wrote may legitimately be drawn." <u>United States v. Simon</u>, 425 F.2d 796, 809 (2d Cir. 1969). That alone thus would support a finding that Juror #162's falsehoods were lies.

There is more evidence that the failure to disclose was intentional. The questions posed to Juror #162 were "clear, simple, and direct." <u>Daugerdas</u>, 867 F. Supp. 2d at 469 (finding

---

[175] <u>See</u> Ex. 29.

[176] Aug. Hr'g Tr. at 100.

false answer was intentional where court's question was "clear, simple, and direct"). The questionnaire asked: "Have you or has a family member or close friend ever been a witness to or the victim of a crime?"[177]  The question was broad and easily understood. Indeed, Juror #162 has not denied she understood the question and that it applied to all crimes.

Juror #162 was not universally reticent in her answers to the questions on the questionnaire. For example, when she was asked what books she read, her answer was extensive. She responded that she liked true crime books, and the author Anne Rule in particular, and that she also liked biographies, and the magazine *Good Housekeeping*. She reported that she had recently read Bill Clinton's latest book, as well as Anne Rule's and John Walsh's latest books.[178]  When she was asked what hobbies she had, her answer was again extensive. She told the Court that she liked rug making, gardening, reading, plants, animals (particularly the Humane Society), and was an environmentalist.[179]  These questions were no more or less direct than the question whether she was a victim of a crime (or whether her son had committed crimes), and yet she gave complete answers.[180]

In addition, the events Juror #162 "lied about were . . . personally significant." Daugerdas, 867 F. Supp. 2d at 469 (noting, in finding that a juror's voir dire responses were untruthful, that "[t]he events she lied about were . . . personally significant"). She told a falsehood not about something that happened to somebody else distant from her, but to herself. See United States v. DeZarn, 157 F.3d 1042, 1050 (6th Cir. 1998) (holding that fact that event in question was a major event was probative that defendant who claimed not to remember it

---

[177] See Ex. 3 at FELL-00002743.

[178] See Ex. 3 at FELL-0002740.

[179] Id. at FELL-00002741.

[180] See United States v. Chapin, 515 F.2d 1274, 1281 (D.C. Cir. 1975) (finding in perjury prosecution that defendant's ready willingness to tell the truth regarding "innocuous" issues could support an inference that he knowingly lied about more significant issues).

86

intentionally lied).  And one that involved perhaps the most intimate violation one could bear.

See United States v. Reingold, 731 F.3d 204, 218 (2d Cir. 2013) (impossible to "deny . . .

scarring effect" of sexual abuse on a child).

Furthermore, this event was not hidden in the recesses of Juror #162's mind.  The

undisputed evidence that post-conviction counsel was able to compile over even the short period

of the investigation is compelling.  When she was 16 or 17 years old, just a few years after the

abuse had taken place, Juror #162 discussed with a neighbor (what she failed to disclose to the

Court) that she had been a victim of sexual abuse when she was a child.[181]  Approximately 45

years after the events, in 1996, she also discussed, as part of a court-ordered psychological

evaluation, the fact that she had been sexually abused by her adoptive father when she was a

child.  She told the psychologist that the child sexual abuse was a prominent event in her life, one

that "prompt[ed] her to run away from home."[182]  Indeed, she reported that "even now 'the

thought makes [her] feel dirty.'"[183]  None of that was disclosed to the Court.

On the eve of trial, Juror #162 initiated independent discussions with each of two

neighbors that she was a victim of sexual abuse while a child.  Jean Ratta-Roberts, Juror #162's

neighbor on Bay Road in Colchester, Vermont, from approximately 1999 through trial, testified

that Juror #162 discussed her experience of sexual abuse sometime in the period from 2002 to

2004.[184]  Another neighbor, Suzann Widener, testified that Juror #162 also told her that Juror

#162 "had been the victim of sexual abuse when she was a child."[185]  Ms. Widener was able to

date the conversation even more clearly to the time period just before trial.  Juror #162 moved

---

[181] Aug. Hr'g Tr. at 105-106.

[182] Ex. 9 at FELL-00002860 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[183] Ex. 9 at FELL-00002858, 2860.

[184] Mar. 19 Hr'g Tr. at 27 (testimony by Jean Ratta-Roberts that Juror #162 told her about this incident of victimization).

[185] Mar. 19 Hr'g Tr. at 59-60 (emphasis added); Ex. 9 at FELL-00002858.

into Bay Road only in 1999 and Ms. Widener left that location in 2004, only one year before trial.[186]  The two witnesses were not describing the same conversation; Juror #162 told each of the witnesses separately.[187]

Juror #162 also remembered that she was a victim of sexual abuse as a child when – five years after trial – she was interviewed by Mr. Fell's post-conviction counsel.  In her interviews with those lawyers, she said, in response to a question regarding what she thought of the mitigation evidence presented at Mr. Fell's trial, that she recalled that there was evidence at trial that Mr. Fell was sexually abused as a child and that his parents were alcoholics.  Neither Ms. Zloczower nor Ms. Price, also present, singled out any particular fact when they asked Juror #162 about the mitigation evidence, and neither Ms. Zloczower nor Ms. Price raised the issue of child sexual abuse.[188]  Juror #162 volunteered that she herself was a victim of sexual abuse as a child, and added that her own sexual abuse did not turn her into a murderer.[189]  Not only does this exchange further demonstrate that Juror #162 had access to the memory of her history of abuse, and that she freely spoke about these experiences, it also establishes that Juror #162 connected this personal experience to the mitigation case she was hearing during Mr. Fell's trial.  She was made aware at voir dire that the mitigation case at Mr. Fell's trial could involve

---

[186] Mar. 19 Hr'g Tr. at 65-66.

[187] Ms. Ratta-Roberts testified that no one else was with them when Juror #162 disclosed that she was a victim of sexual abuse. Mar. 19 Hr'g Tr. at 43.

[188] Mar. 18 Hr'g Tr. at 79.

[189] Id. at 78-79.  The Government has claimed that the disclosure by Juror #162 of this experience and of her connection of this experience to Mr. Fell's trial supports the argument that Juror #162's disclosures at voir dire were truthful.  That claim has no merit.  First, that evidence of inaccurate voir dire responses was adduced from the juror herself is not antagonistic to the conclusion that those inaccuracies were the result of dishonesty.  See Burton v. Johnson, 948 F.2d 1150, 1157-58 (10th Cir. 1991) (affirming district court ruling that juror was dishonest where evidence of inconsistencies at voir dire was adduced through interview of juror).  Second, the disclosure by Juror #162 of her sexual abuse occurred after she had achieved her objective of securing a spot on Mr. Fell's jury, and at a point when she would have had no reason to believe her admission would have resulted in the vacatur of the jury's verdict.  Third, the manner in which the truth was uncovered does not change the basic facts: the juror was asked a clear and direct question; she had information responsive to that question; she knew it was responsive; and she withheld it nonetheless.

evidence that the "defendant grew up in an incredibly chaotic environment, he was abandoned by both of his parents as a child, and may have been subject to different types of abuse, physical and otherwise."[190]  Juror #162 did not disclose at that point, either, that she had been the victim of the same sort of abuse – despite the fact that she has now confirmed, multiple times, that she made the connection between the mitigation case and her own experience and continues to make that connection.[191]  In other words, Juror #162's claims that there was no linkage between Mr. Fell's case and her memory of being sexually abused, and that the only reason she brought her experience up to Mr. Fell's counsel in the January 2011 interview was because counsel first raised the issue of Mr. Fell's own experience with child sexual abuse, were simply false.

The Court can also draw the inference that Juror #162's falsehoods were intentional from the lies that she told elsewhere during voir dire.  As laid out above, and described more fully below, Juror #162 told falsehoods about her extensive history of filing police complaints, her son's criminal history, her son's substance history, and her own history as a plaintiff in civil suits – all items that she would have known could have potentially disqualified her.  If she lied about each of those subjects, there is every reason to believe that her false statements that she was never a victim were not innocent mistakes but intentional omissions.[192]

---

[190] Ex. 5 at 129 (Individual Voir Dire Transcript).

[191] See Ex. 6 at FELL-00002580; Aug. Hr'g Tr. at 100; Mar. 19 Hr'g Tr. at 185.

[192] Indeed, these lies are so "inextricably intertwined" with her false statements about her victimhood that they are substantive evidence that those statements, too, were lies.  See United States v. Everett, 270 F.3d 986, 992 (6th Cir. 2001) (prosecution for bank fraud in which all evidence of the checks signed by appellant was admitted, whether legally authorized or not, because both the authorized checks and the unauthorized checks were "inextricably intertwined" and part of the same "circumstances surrounding the offense") (internal citation omitted); United States v. Nektalov, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004) (admitting evidence of prior transactions to the charged money laundering offenses as "background" evidence); United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (finding uncharged evidence that defendant added fictitious items to inventory lists to be "inextricably intertwined" with the charged offense of making false statements to secure additional credit lines); United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (finding evidence of defendant's prior criminal conduct admissible under 404(b) because it was relevant "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed") (quotation marks omitted); United States v. Gonzalez, 110 F.3d 936 (2d Cir. 1997) (relying in part on the contemporaneous nature of the two acts, the court found that burglaries committed on the same night were

Juror #162 also clearly knew at the time of voir dire that sexual abuse was a crime. Juror #162 has testified that "nowadays [child sexual abuse is] a crime," and that she knew in 2005 it was a crime as well.[193] It could not be otherwise. She disclosed at voir dire and affirmed in her post-conviction testimony that true crime is an interest of hers, that she is an avid reader of true crime books and news and an avid watcher of true crime television shows, and that at the time of trial she was following the Michael Jackson trial, a case that was defined by allegations of child sexual abuse.[194] She listed that case at the top of her list.[195]

Moreover, the Court can also draw an inference that Juror #162's falsehoods about being a victim of sexual abuse were intentional from her testimony when confronted with the falsehoods. She did not immediately and openly own up to her violation of the Court's rules and provide an innocent explanation for the false answer. Instead, she continued to lie. To take one example, at the August 2013 hearing, she claimed that she had not thought about the sexual abuse for the half century before the trial.[196] She falsely testified: "This is something I never think about. . . . I just never thought about that during my life, this thing that happened to me way back when I was a little kid."[197] Indeed, on cross-examination, to highlight the point, in response to questions from the Government, Juror #162 testified that the only conversation that

---

[193] Mar. 19 Hr'g Tr. at 186.

[194] See People v. Jackson, No. 1133603 (Cal. Sup. Ct. Apr. 21, 2004) (Indictment at pp. 9-13), available at http://news.findlaw.com/cnn/docs/jacko/camj43004ind.html; see also Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

[195] Ex. 3 at FELL-00002741.

[196] Juror #162's other lies during the post-conviction proceedings are discussed infra at pp. 108-115.

[197] Aug. Hr'g Tr. at 100-02.

she had had about the crime was approximately 60 years earlier with a neighbor and that since

that time the topic had never come up in a conversation with anyone:

> Q: So it went unreported, no one was charged, no one was prosecuted, and you never appeared in court. You never had to undergo any hearings or testimony or give any statements about it.
>
> A: No.
>
> Q: All right. <u>And the only person you ever talked to about that was that neighbor that one time.</u>
>
> A: That neighbor, yes.[198]

This was before she was confronted with evidence that, at a minimum, she had

discussed this crime with a psychologist and with her neighbors. This testimony was false and a

false exculpatory.[199]  <u>United States v. Glenn</u>, 312 F.3d 58, 69 (2d Cir. 2002) (false exculpatory

statements may constitute "circumstantial evidence of consciousness of guilt and may strengthen

inferences supplied by other pieces of evidence.").

The Court may also infer that Juror #162 was dishonest in her concealment of her

victimization based on extrinsic evidence of her dishonesty. Both Jean Ratta-Roberts and

Suzann Widener knew Juror #162 well. They lived close to her in a small building for many

years. Ms. Ratta-Roberts associated with Juror #162 on a regular basis and had no "ax to

---

[198] Aug. Hr'g Tr. at 184 (emphasis added).

[199] Juror #162's self-serving explanation for this inconsistency was that her prior testimony was only meant to refer to whom she told when she was a little girl. Mar. 19 Hr'g Tr. at 184. This is not what Government counsel's question was, and the juror's post hoc, idiosyncratic interpretation of the question is not entitled to weight. See United States v. Lighte, 782 F.2d 367, 372 (2d Cir. 1986) (holding that on a perjury charge, the interpretation of questions is objective, and "[t]he jury should determine whether the question – as the declarant must have understood it, giving it a reasonable reading – was falsely answered"); United States v. Chapin, 515 F.2d 1274 (D.C. Cir. 1975). In any event, no matter how one interprets that exchange from the August 2013 hearing, these additional facts offered by Mr. Fell, and Juror #162's own testimony once confronted with them (that "[a]s an adult, certainly [she has] spoken to people about [her sexual abuse]," Mar. 19 Hr'g Tr. at 184-85), controvert Juror #162's primary justification for omitting this critical fact from her voir dire disclosures: that she forgot about it, never thought about it, never thinks about it, never speaks about it.

grind."[200]  Her testimony was unambiguous: Juror #162 had a reputation in the community, in

which Ms. Ratta-Roberts lived, for being untruthful.  She testified that she knew this based on

"the conversations with other people that lived in the building and just by us talking about the

inconsistent statements made by her to different tenants."[201]

Ms. Widener's testimony was to the same effect.  She testified that, "[a]mongst

two apartment buildings, there were many people that felt she was not an honest woman."[202]

Ms. Ratta-Roberts and Ms. Widener also provided their personal opinions regarding Juror #162's

propensity to be untruthful.  Ms. Ratta-Roberts testified that it was her personal opinion that

Juror #162 was untruthful.[203]  Ms. Widener testified:  "My opinion was she was not an honest

woman at all."[204]  The testimony of both Ms. Widener and Ms. Ratta-Roberts that they believe

that Juror #162 is an untruthful person is powerful evidence that Juror #162 is a person whose

word this Court should not believe.  It is hornbook law that "[w]hen the witness is impeached for

having an untruthful character, the charge is that the witness generally lies."  Stephen A.

Saltzburg, et al., 2 Federal Rules of Evidence Manual §608.02[15] (Matthew Bender 10th ed.).

Evidence that a witness has an untruthful character "conveys some judgment about the ethics or

morality of that witness" and goes beyond merely impeaching the "believability of specific

testimony."  Charles Wright and Victor Gold, 28 Federal Practice and Procedure § 6113 (2d ed.).

Finally, there is now record evidence demonstrating why Juror #162 would lie:

she wanted to be on Mr. Fell's jury.  Her questionnaire is replete with evidence that she was

fascinated with trials and the legal process.  Her first two answers to the question asking what

---

[200] Mar. 19 Hr'g Tr. at 15.

[201] Mar. 19 Hr'g Tr. at 33.

[202] Mar. 19 Hr'g Tr. at 63.

[203] Mar. 19 Hr'g Tr. at 34.

[204] Mar. 19 Hr'g Tr. at 62.

types of books she liked to read were, "true crime" and "Anne Rule."  Among the last three

books she read were Anne Rule's latest book and John Walsh's latest book – both true crime

authors.  She said that she watched Nancy Grace "every night," as well as Court T.V.  And she

said that she followed numerous true crime stories, including the Michael Jackson case, the Scott

Peterson case, and the O.J. Simpson case.[205]  Her testimony on this point at the August 2013

hearing was insistent, and she clarified her interest for the Court.  True crime is still an interest of

hers, but "my interest isn't just in the crime. . . . [M]y interest are [sic] the trials, and the

psychology behind it. . . . I like the trials. . . . I like the trial, the actual trials. . . . It's mainly the

trials and the psychology in it."[206]  Her behavior throughout voir dire – withholding facts,

dishonestly minimizing the severity of experiences, lying – was in service of this goal.  The

Court may infer from Juror #162's motive to lie that her responses were knowingly inaccurate

and misleading.  See United States v. Reveron Martinez, 836 F.2d 684, 690 (1st Cir. 1988).

### ii.  Embezzlement

Juror #162 has also acknowledged, under oath, that she was the victim of a

serious embezzlement by Donald Milne, a crime that was life-changing but not mentioned during

voir dire.

The theft by Milne followed the death of her husband in an accident and

subsequent hospitalization of Juror #162 for severe depression.[207]  She spent over a year in a

mental hospital,[208] and her infant son, Patrick Ryan, was placed into foster care.[209]  In October

1963, Juror #162 filed a Voluntary Application for Appointment of Guardian for Infirm Person

---

[205] See Ex. 3 at FELL-00002740-41.

[206] Aug. Hr'g Tr. at 122-23.

[207] See Ex. 9 at FELL-00002858 (Psychological Evaluation of Juror #162).

[208] See Ex. 9 at FELL-00002858; Ex. 32.

[209] See Ex. 9 at FELL-00002858, 2893-4; Aug. Hr'g Tr. at 173.

in Probate Court, which noted: "she deems herself unfitted for the prudent management of her affairs, and respectfully requests said Court to appoint Donald G. Milne, Esquire . . . as her Guardian."[210]  Pursuant to the order, Juror #162 had no authority over her money or assets. Thereafter, Attorney Milne stole "everything [she] had."[211]  Although she was left destitute by this theft, she failed to mention it on voir dire.  Given the significance of this event, this Court can infer that the omission was intentional.  See Daugerdas, 867 F. Supp. 2d at 469; DeZarn, 157 F.3d at 1050.

It is also plain that Juror #162 had not merely forgotten about this event.  At the time, she engaged another attorney and fought in Court for over a year to obtain restitution of this money.[212]  In the same 1996 psychological evaluation (mentioned above) in which she discussed her own child sexual abuse, she again highlighted this event as a prominent one in her life.  She referenced her guardian, Donald Milne, by name to the psychologist.[213]  That these statements were made in 1996, over thirty years after the theft occurred and fewer than ten years before trial, also confirms that the event was not distant from her memory at the time of voir dire.

Juror #162 has also explained that she considers theft to be a prototypical "crime."[214]  She agreed in court that the theft by Donald Milne was another example of a "very serious event, a criminal event" of which she was the victim,[215] and she has testified that she "know[s] [she] was a victim" of this crime.[216]

---

[210] See Ex. 10 (Probate Records of Juror #162).

[211] Aug. Hr'g Tr. at 165.

[212] See Ex. 10.  Milne apparently never returned any of the money, and Juror #162 was only able to recover a fraction of the money in a settlement with an insurance company that had bonded Milne as the guardian.

[213] See Ex. 9 at FELL-00002858.

[214] Aug. Hr'g Tr. at 99.

[215] Aug. Hr'g Tr. at 162.

[216] Aug. Hr'g Tr. at 166.

94

### iii. Physical Abuse

Juror #162 also failed to disclose that she, her son, and her husband were physically abused and attacked by her former partner, Lucille Tatro. While Juror #162 was institutionalized, she became involved with Ms. Tatro, who had been a nurse at the hospital. Juror #162 continued that relationship after her institutionalization ended; she and Patrick Ryan lived with Ms. Tatro for the remainder of Ryan's childhood.[217] As the relationship progressed, Ms. Tatro became "very violent" towards Juror #162.[218] Juror #162 has now admitted that at one time, Ms. Tatro "took a knife and just came at me."[219] Ms. Tatro "stalked" her, tried to run her off the road, and attacked Juror #162 in the 1982 incident that led Juror #162 to report her to the police.[220] Although it was responsive to subpart (b) of Question 38 on the questionnaire, Juror #162 failed to disclose that Ms. Tatro was prosecuted for these latter crimes on the strength of a complaint filed and a written statement entered by Juror #162 herself.[221]

Lucille Tatro also assaulted and abused Juror #162's son and the man whom she married following the end of their relationship. Ms. Tatro "physically abused" Juror #162's husband more than once, including an incident in which Ms. Tatro "picked up a mop and tried to hit him, and told everybody that he tried to rape her." At another point she tried to run him off the road as well.[222] Further, while Juror #162 and her young son, Patrick Ryan, were living with

---

[217] See Ex. 9 at FELL-00002858.

[218] See Ex. 9 at FELL-00002858.

[219] Mar. 19 Hr'g Tr. at 156. This testimony is consistent with reports detailed in divorce and child custody proceedings to which Juror #162 joined herself as a party. See Ex. 9 at FELL-00002894 (report from Patrick Ryan that Juror #162 and Ms. Tatro "pulled knives on each other" and that there was an incident in which "a gun was involved").

[220] See Ex. 9 at FELL-00002858; Ex. 11 at FELL-00003211.

[221] See Ex. 11 at FELL-00003211 (Washington County Criminal Court records of Lucille Tatro); Ex. 53 (Vermont State Police, Middlesex Records Pertaining to Case No. 630-746) (July 25, 1982 Report citing Juror #162 as complainant).

[222] See Ex. 9 at FELL-00002858-59 (Psychological Evaluation of Juror #162 as part of Family Court Records).

Ms. Tatro, Ms. Tatro was abusive towards Patrick; this violence included episodes in which she locked Ryan outside in the Vermont winter with nothing on but his underwear, and in which she dragged him down a flight of stairs by his hair.[223]

Juror #162 knew about these events and knew that they were responsive to the questions she was asked. She was a victim of this abuse herself, and was aware of the abuse of her husband and son. It was she who reported the abuse of her husband as part of her 1996 psychological evaluation.[224] In his own psychological evaluation, her son reported in detail the abuse he suffered at the hands of Ms. Tatro.[225] She received this evaluation and read about these events[226] – events which were in any event happening under her own roof. Yet when asked about them at the post-conviction hearing, she continued to lie. In August, before she was confronted with evidence that she had knowledge of the details of this abuse, Juror #162 completely – and falsely – denied any knowledge of physical abuse by Lucille Tatro against her son:

---

[223] See Ex. 9 at FELL-00002894 (Psychological Evaluation of Patrick Ryan, Karen Currier as part of Family Court Records).

[224] See Ex. 9 at FELL-00002858-59 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[225] See Ex. 9 at FELL-00002894 (Psychological Evaluation of Patrick Ryan, Karen Currier as part of Family Court Records).

[226] See Ex. 9 at FELL-00002885 (Affidavit of Juror #162, Addison Family Court discussing psychological evaluation in which Ryan discussed these events).

Q: [A]t the time, when [your son] was 16, you were living with a woman in – in Barre who punched him and pushed him down a flight of stairs?  Do you remember that?

A:  No, I don't. . . .

Q: Did it strike you as untrue that your son reported to a probation officer that this woman locked him out in the cold and threw him down a flight of stairs?

A:  I don't know anything about that.  Never heard of that.[227]

In March 2014, after being confronted with evidence she had heard these unforgettable facts before – that Ms. Tatro had dragged her young son down a flight of stairs by his hair, and locked him outside in the Vermont winter in nothing but his underwear[228] – Juror #162 changed her tune, testifying: "Later on, as the years progressed, my son told me certain things that she did to him, but I never myself observed it."[229]  She did not mention that she herself signed a statement on the basis of which Ms. Tatro was prosecuted.  It took post-conviction counsel to uncover that evidence – which it did (and offered) shortly before the close of the evidence.[230]

These "evolv[ing]" explanations are yet further false exculpatories demonstrating that Juror #162 was intentionally lying.  See United States v. Taylor, 767 F. Supp. 2d 428, 434 (S.D.N.Y. 2010).

---

[227] Aug. Hr'g Tr. at 168-69 (emphasis added).

[228] Ex. 9 at FELL-00002894 (Psychological Evaluation of Patrick Ryan, Karen Currier as part of Family Court Records), FELL-00002885 (Affidavit of Juror #162, Addison Family Court) (responding to psychological evaluation of Patrick Ryan and Karen Currier).

[229] Mar. 19 Hr'g Tr. at 156.

[230] Ex. 53 at p. 4 (Vermont State Police, Middlesex Records Pertaining to Case No. 630-746) (July 25, 1982 Report citing Juror #162 as complainant).

### B. Criminal History

Finally, Juror #162 also lied at voir dire about her son's criminal history. During jury selection, Juror #162 told the Court and the parties that her son's criminal history was limited to an isolated incident of DWI and domestic abuse 16 years earlier as a direct result of which he received treatment and became rehabilitated, causing him to go from the "bottom" to the "top."[231] In probing her son's history of alcohol abuse, Mr. Fell's trial counsel asked "had he been involved – did he commit any criminal acts?" Juror #162 answered "no."[232] Before the August hearing, and before it investigated the son's lengthy criminal history, the Government vouched for those answers, arguing that evidence that Juror #162 had been truthful about her sexual abuse was that she "readily disclosed the fact that her son had been charged with a crime 16 years prior to trial." Am. Opp. to 2255 Motion at 320, Dkt. No. 338 (Dec. 21, 2011).

At the August hearing, before she knew that Mr. Fell's counsel had investigated her son's criminal history, Juror #162 repeated and reaffirmed her false answers from jury selection, testifying that her son's criminal history was limited to house arrest for DWI and domestic violence 16 years earlier during the breakup of his marriage when he was in his twenties and his life was in turmoil. Indeed, she went as far as to say – as she did during jury selection – that, at the time of jury selection, her son's encounters with the criminal justice system had "t[aken] place a long time ago." She testified:

---

[231] Juror #162's short form voir dire response stated that "[her] son was under house arrest (Department of Corrections) for DWI and domestic violence 16 yrs ago. He is now asst manager at Shaw's, so he sure has been a better person for it." Ex. 2 at FELL-00002727. On her long form questionnaire, she disclosed that her son had been charged with a crime, and reported that the result of that prosecution was: "(House arrest) My son – DWI + domestic abuse. He was under the Dept of Corrections for 3 yrs – Intense Counseling. Best thing [that] ever happened to him – He is now a different person." Ex. 3 at FELL-00002746. At Individual Voir Dire, Juror #162 testified: "he hit the bottom before he went to the top, yeah, yeah." Ex. 5 at 137.

[232] Ex. 5 at 137.

Q:  You said that your son was under house arrest for . . . DWI and domestic violence 16 years ago, and he now is the assistant manager at Shaw's, et cetera, right?

A: That's correct.
…
Q: So that was honest and truthful and open and candid about your family?

A: That's correct.
 …
Q: [I]s it true that this incident with your son took place during the breakup of his marriage [in 1992] and when his life was in turmoil?

A: That's correct.

Q:  And you were willing to say that he was a better person for having gone through that 16 years before.  I think you said that?

A: Well, I think he has learned a lot from it, yes.

Q: Okay.  So like the sexual molestation of you, which happened many years before, you were willing to disclose your son's history of criminal offenses which – or criminal involvement which took place a long time ago.  Right?

A: That's correct.
…
Q: [Q]uestion 43, like the short form, it asked again if a family member had been charged with a crime, right?  And you again honestly reported that your son was charged with DUI, domestic abuse, he received counseling, and he was a better person for it.

A: That's right.
…
A:  I think it says did he commit any criminal acts?

Q:  Right.  And you said no.

A:  Well, why would anyone ask someone that if I had already told them . . . that he hit his wife and was under DWI.

Q:  Well, I don't know why they asked you, but I'm – you apparently said no.  Right?

99

A: It is what it is. <u>My son was convicted of DWI and domestic abuse.</u>

Q: <u>16 years earlier, right?</u>

A: <u>Yeah, he is 50 some odd now. This happened when he was a – in his twenties, I believe.</u>[233]

Those answers were lies during jury selection and lies at the August 2013 Hearing.

### i. Direct Evidence of Juror #162's Knowledge of Her Son's Criminal Record

At the time of trial, Juror #162's son had a criminal history that included some 17 separate charges and convictions, which resulted in numerous instances of probation, parole, jail, intensive diversionary programs, and supervision. In her most recent testimony, on March 19, 2014, Juror #162 admitted – as she now had to – that she knew this.[234] The truth about Ryan was not some recent revelation; rather, Juror #162 knew those facts at the same time she was saying that the son's criminal history consisted of a DWI and domestic violence 16 years earlier when he was in his twenties.

Giving Juror #162 the benefit of the doubt, she disclosed at voir dire her son's 1992 arrest for assault on his wife (13 years prior to voir dire) and DWI #3 conviction (12 years prior to voir dire), but the evidence establishes that she knew of his entire criminal record and that even with respect to the criminal activity "16 years" before voir dire she was intentionally misleading.

The evidence of Juror #162's knowledge is abundant and essentially undisputed. Mr. Fell has offered certified records of Amherst Bail Bonds, Inc., demonstrating that in November 2001, less than four years before trial, Juror #162 bailed her son out – signing for the

---

[233] Aug. Hr'g Tr. at 111-129 (emphasis added).

[234] Mar. 19 Hr'g Tr. at 147.

$5,000 bail bond, plus a $500 bail bond fee, in connection with Patrick Ryan's DWI #4 arrest –

one of the felonies not disclosed during jury selection.[235]  He was also charged with possession

of cocaine and marijuana in connection with this arrest.[236]

At the time of his arrest in 2001, Juror #162 and her son lived in adjoining

apartments in Colchester, a fact noted on the arrest report.[237]  In fact, Juror #162 and her son

lived in adjoining apartments through Mr. Fell's trial.[238]  These 2001 crimes, which she claimed

to not know of, were committed in a car which Juror #162 co-owned, and which was registered

in her name.[239]  The car was towed as a result of the 2001 arrest.[240]



REDACTED

Juror #162's neighbors also each testified that, in the period before trial, she told

them about this specific incident – which she decided not to disclose to the Court or the parties.

Jean Ratta-Roberts testified that, at the time Ratta-Roberts and Juror #162 were neighbors, Juror

#162 told her that her son "had gotten a DUI conviction, and it was just putting a strain on her

---

[235] See Ex. 52 (Amherst Bail Bond's Records for Patrick Ryan).

[236] See Ex. 15 at FELL-00003385 (Chittenden County Court Records of Patrick Ryan).

[237] Ex. 15 at FELL-00003393.

[238] Ex. 17a at FELL-00003481 (Chittenden Family Court Records of Patrick Ryan) (listing address for Patrick Ryan as 573 Bay Road, Apartment 101, Colchester, VT 05446,  the same as at the time of his 2001 arrest).

[239] Ex. 15 at FELL-00003393.

[240] Id.

R ████████

R ████████

life having to take him – drive him different places, to appointments, his work . . . [a]nd to court."[243]  Suzann Widener testified that, "during the time period that [she] and Patrick and Juror 162 were living in the building on Bay Road," approximately 1999 to 2004, "[Juror #162] had told me that since [Ryan] was approximately 17, that he had had trouble with the law, and at that time – or approximately around that time, he had been in trouble with the law for a DWI, and it was – I believe it was like his fourth, third or fourth."[244]

Juror #162 was not just aware of this conviction.  She was aware of all of her son's criminal problems.  The two were mother and son.  There is no evidence he concealed information from her.  Rather, the evidence reveals that he relied on her, and that their lives were far too intimate for her to have been unaware of his legal problems.  Contrary to her testimony at the evidentiary hearing, for much of his adult life, they literally lived together.  For example, Ryan's 1997 felony trespass conviction arose just after they had been living together (and just before they resumed living together).  The fact that they lived together caused her stress, and she reported at the time that she felt that she was "being taken advantage of" by him.[245]  In the report this 1997 arrest, for felony unlawful trespass and two counts of simple assault, Ryan listed Juror #162 as his "tie[] to the local community."  In this document, he lists an address of 24 Middle Road, South Barre, Vermont for Juror #162.[246]  A March 31, 1998 family court filing provides this same address as the residence of Patrick Ryan.[247]  Juror #162 and Ryan lived together for a

---

[243] Mar. 19 Hr'g Tr. at 23

[244] Mar. 19 Hr'g Tr. at 61.

[245] Ex. 9 at FELL-00002859 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[246] Ex. 14 at FELL-00003349  (Washington District Court Records of Patrick Ryan).

[247] Ex. 16a at FELL-00003434 (Chittenden Family Court Records of Patrick Ryan).

significant period of time in 1999 and/or 2000 in a shared apartment on Bay Road, prior to Ryan moving into his own apartment adjoining Juror #162's apartment.[248]



REDACTED

      Another example of their close relationship arises in Mr. Ryan's family court problems.  One month before Patrick Ryan's May 15, 1997 arrest, Juror #162 obtained a court order, allowing her to have "contact [with her grandson] during Pat[rick Ryan]'s parent-child contact time."[250]  The years that she spent litigating for those rights, and the fact that she was given those rights (which she no doubt exercised) once again demonstrate the intimacy of mother and son and the type of information they shared and corroborate she knew about the arrest.  Juror #162 joined herself as a party to her son's divorce and child custody proceedings in 1992, hired a lawyer, filed motions and sworn affidavits, and litigated for over five years.[251]  She was involved in all of these activities up to one month before the arrest, and there is no evidence that – with the two having expended such efforts on child custody – they immediately ceased to be close.

---

[248] See Mar. 19 Hr'g Tr. at 52-53.

[R] ▮▮▮▮▮▮▮

[250] See Ex. 9 at FELL-00002772 (Addison Family Court Records, Amended Order of Modification).

[251] Ex. 9 at FELL 00002764-71 (Addison Family Court Docket Sheet).

Indeed, the testimony of Tina Boyce, the victim of the 1997 assault and trespass, makes clear Juror #162 knew of that arrest, although she failed to disclose it. Ms. Boyce knew Juror #162 well, and testified to the shared lives that Juror #162 and her son were leading at the exact time this crime took place. Boyce testified that she lived with Juror #162 and her son for a period of months in a two bedroom home with one bathroom. Eventually, Boyce and Ryan moved into their own apartment, but after they broke up, Ryan returned to his mother's home. And, Boyce testified, after Ryan assaulted her, he continued to reside with Juror #162.[252] In fact, Suzann Widener testified that Juror #162 admitted to her that Patrick had been arrested for assault on his girlfriend[253] – the assault of Ms. Boyce.[254]

Juror #162's disclosures at voir dire with respect to her son's "DWI" and "domestic violence" were misleading as well. Her son was charged with felony trespass in September 1992, at the age of 31; he was released to his mother's custody following this crime.[255] In December 1992, Mr. Ryan pled nolo contendere to this crime.[256] This conviction arose out of an incident in September 1992 in which he broke into the home of his ex-wife, Karen Ryan, through an attic window and menaced Ms. Ryan, along with their three-year-old son.[257] He was on probation in connection with this conviction until February 1995.[258]

---

[252] Tr. of Dep. of Tina Boyce, Mar. 6, 2014, at 10-20.

[253] Mar. 19 Hr'g Tr. at 61.

[254] That incident was much closer in time to 1999, the year Ms. Widener and Juror #162 met, than any other instance in which Ryan was arrested for assault. Moreover, Ryan's previous conviction for assaulting a woman, dating from 1992, was an incident involving his wife – not a girlfriend – and that is how Juror #162 refers to that incident: she testified that the 1992 incident "involved his wife. . . . At the time he was married, yes." Aug. Hr'g Tr. at 154.

[255] See Ex. 13 at FELL-00003248 (Addison Criminal Court Records of Patrick Ryan).

[256] See Ex. 13 at FELL-00003249-50.

[257] See Ex. 13 at FELL-00003253.

[258] See Ex. 13 at FELL-00003250.

104

In November 1992, Mr. Ryan pled nolo contendere to simple assault. He was sentenced to serve eleven to twelve months.[259] This conviction arose out of a separate incident in August 1992 in which Mr. Ryan grabbed Ms. Ryan, threw her to the ground, and punched her repeatedly in the face and stomach.[260]

As part of the Ryan family's divorce and child custody proceedings to which Juror #162 was a party, during this exact time period from 1992 to 1997, Juror #162 received copies of the docket reports showing that her son was charged with multiple offenses based on separate incidents of violence in this short time period.[261] She was informed, in a memorandum in opposition to her motion seeking grandparent's visitation, that Patrick Ryan and his ex-wife "were divorced in 1993 following a very violent marriage, during which [Ryan] repeatedly abused [his wife] both physically and emotionally, and often in front of the parties' minor child," and that Ryan "was convicted of simple assault on [his ex-wife], and of felony unlawful trespass for entering [her] apartment after their separation."[262]

Juror #162 was informed of the details of other serious instances of criminal abuse and assault by her son on his ex-wife: that "in front of [Juror #162's grandson] [Ryan] pounded [her] around [her] head and stomach, causing a concussion as well as severe bruising, for which [she] had to get treatment from the hospital. He told [her] he was going to kill [her]. He called [her] a 'f***ing slut' and other abusive names."[263] Juror #162 was also informed in this motion that as a result of this abuse, her grandson, Ryan's son, had been diagnosed with Post

---

[259] See Ex. 13 at FELL-00003237-38.

[260] See Ex. 13 at FELL-00003242.

[261] See Ex. 9 at FELL-00003033-35 (Addison Family Court Records, Addison Criminal Court Docket of Patrick Ryan).

[262] See Ex. 9 at FELL-00002878 (Addison Family Court Records, Mem. in Opp. to Mot. for Grandparents' Visitation).

[263] See Ex. 9 at FELL-00002935 (Addison Family Court Records, Affidavit of Karen Currier).

Traumatic Stress Disorder.[264]  Juror #162 herself repeatedly made affirmations to the court that establish her detailed knowledge of her son's conviction and jail sentence.[265]  Indeed, she herself repeatedly drove her grandson to visitations with her son in more than one jail.[266]  Accordingly, even in Juror #162's single allusion to Ryan's violent criminal history, she intentionally transformed multiple arrests and charges, including a charge of felony burglary and a conviction of felony trespass, based on two separate events of violence, into a single instance of "domestic abuse."

In March 1993, Mr. Ryan was found guilty of DWI, his third DWI conviction. He was sentenced to serve one to two years, all suspended but six months, which Ryan served in jail, and he was ordered to undergo alcohol treatment.[267]  Contrary to Juror #162's disclosures, this arrest and conviction was separate and distinct from both the felony trespass conviction in December 1992 and the simple assault conviction in November 1992.  And, also contrary to Juror #162's disclosures, it did not result in house arrest; it resulted in incarceration.

Juror #162 was also aware of her son's 1983 felony burglary conviction which she declined to divulge.  This event was indisputably significant in the life of Juror #162 and her son.  This guilty plea was Ryan's first felony conviction, and occurred when he was only 21 years old, almost the same age as Mr. Fell at the time of the crimes for which he was on trial. Ryan was sentenced to two to six years of prison, with a concurrent sentence for a probation violation in connection with a prior conviction.[268]  He spent approximately a year incarcerated as

---

[264] See Ex. 9 at FELL-00002879 (Addison Family Court Records, Mem. in Opp. to Mot. for Grandparents' Visitation).

[265] See Ex. 9 at FELL-00002883-85 (Addison Family Court Records, Affidavit of Juror #162).

[266] See Ex. 9 at FELL-00002883-85.

[267] See Ex. 14 at FELL-00003338 (Washington District Court Records of Patrick Ryan); Ex. 22 at FELL-00003549-50 (Patrick Ryan, Vermont Department of Corrections Movement History).

[268] See Ex. 12 at FELL-00003233; Ex. 14 at FELL-00003305  (Washington District Court Records of Patrick Ryan).

a result of this conviction.[269]  It now cannot be disputed that she knew of these events contemporaneously; indeed she discussed them in the psychological evaluation that she underwent in 1996, fewer than ten years before Mr. Fell's trial.[270]

Between 1980 and 1992, in addition to the above charges of felony burglary, simple assault, and felony trespass, Ryan was convicted of at least the following crimes: unlawful mischief (1980); criminal mischief (1982); aggravated assault and assault on a police officer (1982); simple assault and disorderly conduct (1982); unlawful trespass (1988); DWI #1 (1990); and DWI #2 (1992).[271]  These convictions resulted in near-constant contact with the criminal justice system over the course of this decade, and resulted in sentences and conditions of release that included, among other things, mandatory alcohol counseling; restrictions on Ryan's movement and freedom; and mandatory ingestion of anti-alcoholism drugs.[272]  Ryan was on probation for periods of years as a result of these crimes.[273]

The evidence establishes that Juror #162 was not somehow estranged from her son while all of this criminal history was accruing.  Juror #162 has testified that she "ha[s] been close to [her] son and still [is.]."[274]  She has testified that she "see[s] [her] son off and on no matter where he is."[275]  When counsel asked if that had been her practice her whole life, she took the answer as a given, indeed she almost seemed offended by the question, responding, curtly: "He is my son."[276]  As was the practice her whole life, she was seeing her son regularly, she was

---

[269] See Ex. 14 at FELL-00003305-15.

[270] See Ex. 9 at FELL-00002858 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[271] See supra at pp. 79-81.

[272] See supra at pp. 82-83.

[273] See Ex. 14 at FELL-00003314.

[274] Aug. Hr'g Tr. at 111.

[275] Mar. 19 Hr'g Tr. at 188.

[276] Mar. 19 Hr'g Tr. at 188.

a major part of his life, and she was living in the same small towns, during this decade when he was continuously arrested, punished, treated, restricted, and arrested again.

This degree of closeness between Juror #162 and her son is consistent with the extensive evidence that Juror #162 had considerable knowledge regarding her son's criminal history, that she was involved in his interactions with the criminal justice system, and that she intentionally withheld this information when she represented at voir dire (and confirmed in her August testimony) that her son's criminal history consisted of an incident of DWI and domestic violence sixteen years prior to voir dire, when he was "in his twenties."  In addition to the many, many facts demonstrating that Juror #162 knew about this history and deliberately chose not to disclose it, the Court is permitted to draw an inference that the "striking difference between what [Juror #162's voir dire responses] said and what [they] needed to say in order to reveal the truth resulted not from mere carelessness but from design."  Id. at 810; see also Dyer v. Calderon, 151 F.3d 970, 981 (9th Cir. 1998) (en banc) ("[The juror] overlooked too many incidents for us to attribute her responses to mere forgetfulness.").  Moreover, "[l]ying about a factor as important (and as easy to verify through public records) as felon status raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality."  United States v. Boney, 977 F.2d 624, 634 (D.C. Cir. 1992).

### ii.  Juror #162 Lied Regarding Her Knowledge of Her Son's Record

The undisputed facts laid out above demonstrate that Patrick Ryan's criminal history was far more extensive, more serious, and more recent than Juror #162 disclosed.  These undisputed facts also demonstrate that Juror #162 was a major part of her son's life at all stages of it; that she was directly involved in his interaction with the criminal justice system, bailing him out on multiple occasions, visiting him in jail, taking over custody of his son when he was incarcerated, driving Ryan to required supervision, meeting with probation and parole officers

108

when they stopped by Ryan's residence, and more; and that she was well aware of his many crimes and their serious consequences. Juror #162 has now been confronted with this body of evidence, twice. The testimony that Juror #162 has given regarding the extent of her knowledge of her son's criminal history – first in August 2013, before she was confronted with additional facts that post-conviction counsel's public records investigation had yielded, then again in August, after she was confronted with facts, and finally in March 2014, after Mr. Fell had offered further facts regarding Juror #162's awareness of Ryan's criminal history – further establishes her intentional deceit.

As noted, when Juror #162 was first asked about her son's criminal record in August 2013, before she became aware that Mr. Fell's post-conviction counsel knew about that record, she told the same lies that she had told during voir dire. She confirmed her disclosure at voir dire that her son was under house arrest for DWI and domestic abuse 16 years before trial; she testified that "this incident with [her] son took place during the breakup of his marriage [in 1992] and when his life was in turmoil"; she confirmed that that was "honest and truthful and open and candid" about her son's criminal history; she testified that "this incident with [her] son took place during the breakup of his marriage [in 1992] and when his life was in turmoil"; she confirmed that her son's criminal history took place "a long time ago"; and she testified that the charges she disclosed occurred when her son was "in his twenties."[277]

Juror #162 was then confronted with her son's criminal record and the indisputable evidence that her son's criminal history was recent, extensive, and serious. In the face of that evidence, she changed her testimony. She backed away from the testimony that her son's experience with crime was limited to a single incident during the breakup of his marriage when he was "in his twenties." She now testified to what she knew she would have to admit

---

[277] See supra pp. at 98-100.

(and only that) – that her son's experience with crime was not an isolated incident, testifying that Mr. Ryan "was picked up for several DWIs."[278]  While she previously testified that her disclosures at voir dire were honest and complete, she now testified that she did not intend her disclosure that her "son had a DWI conviction and a domestic violence conviction" to be "a complete summary of [her] son's life problems with drugs and alcohol" (even though the Court's instructions required her answers to be complete).[279]

Even then, she continued to lie.  She stated: "you know, I can't remember each and every thing that he did."[280]  She went on: "All I know is he was picked up several times on DWI charge."[281]  She testified that she had bailed him out one time, on the "domestic abuse" charge she had disclosed at voir dire.[282]

While she admitted that she and her son were living in adjoining apartments in 2001 and 2002,[283] she claimed to recall no facts whatsoever regarding her son's 2001 arrest and 2002 conviction for DWI #4:

> Q:  In fact, [your son] lived in an adjoining apartment when he was arrested [for DWI #4].
>
> A: I don't recall that.
>
> Q: The car that he was driving when he was arrested for DUI fourth was registered to both you and him; isn't that correct?
>
> A: I don't recall that.
>
> . . .
>
> Q: Do you recall that when he was released – that he was also charged on the night of that DUI . . . with possession of cocaine and possession of marijuana, the same incident?

---

[278] Aug. Hr'g Tr. at 142.

[279] Aug. Hr'g Tr. at 199.

[280] Aug. Hr'g Tr. at 142.

[281] Aug. Hr'g Tr. at 155-56.

[282] Aug. Hr'g Tr. at 157.

[283] Aug. Hr'g Tr. at 152.

A: I don't know anything about that.

Q: That he was required to report daily to the Colchester Police Department?

A: I don't recall that.

Q: Did you drive him there?

A: I don't recall that. That may be. I am not saying that it's not so. I'm just saying that I don't recall that.

Q: Do you recall that in connection with that 2002 conviction for DUI, that he got a two-to-five-year sentence and was referred again to the ISAP program?

A: I don't recall that.

…

Q: And, in fact, you knew he was on parole, right?

A: I do recall him being on parole at one time when he was under house arrest, I believe.

Q: I am talking about on parole in connection with the DUI fourth in Colchester.

A: I don't honestly recall that.

Q: And . . . do you recall that he was on parole in May and June and July of 2005 . . . while you were filling out these questionnaires and answering questions?

A: I don't recall that.[284]

Contrary to her voir dire answers, she now stated that she <u>knew</u> her son had been in jail, and that she had visited him. She offered the implausible explanation that she omitted to tell the Court and the parties that critical fact in 2005 because "[h]e was in jail first and then under house arrest," and thus she considered her disclosure of "house arrest" to cover both of these elements of his punishment.[285] But she further testified that he had only been to jail that one time.[286]

---

[284] Aug. Hr'g Tr. at 152-54.

[285] Aug. Hr'g Tr. at 114.

[286] Aug. Hr'g Tr. at 156.

She was asked if she was aware that her son was convicted of felony burglary after he and an accomplice kicked in the doors of multiple residences, stole valuables, electronics, and six guns – and had spent a year in jail for this conviction. She falsely testified in August: "I don't know anything about that. . . . I know there was a time when he was in jail and I visited him [referring to his time in jail in 1993], but I don't know anything about that ever happening."[287]

Finally, when pressed by Mr. Fell's counsel that she must have known of her son's criminal record because he was her son, she offered a blanket denial. Unaware that counsel would seek to discover whether she and her son lived together (and not confronted with any evidence that they did live together), she testified that she could not have known of his lengthy criminal record. Counsel asked if she recalled her son's 1997 felony arrest. She responded: "No, I do not. Can I interject something? My son hasn't lived with me since he was like 18 years old. So a lot of what you are telling me I don't – I don't know anything about it."[288]

Juror #162's August testimony was rife with falsehoods.

In the period of time from August 2013 to the continued hearing in March 2014, Mr. Fell's counsel continued to collect and present evidence of Juror #162's false testimony at the post-conviction hearing and false answers on voir dire regarding her son. Mr. Fell's counsel presented evidence that (i) Juror #162 lived with her son in at least 1992[289], 1996,[290] 1998,[291]

---

[287] Aug. Hr'g Tr. at 156.

[288] Aug. Hr'g Tr. at 157.

[289] Ex. 14 at FELL-00003326 (Washington District Court Records of Patrick Ryan).

[290] Ex. 9 at FELL-00002859 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[291] See Ex. 14 at FELL-00003349; Ex. 16a at FELL-00003434 (Chittenden Family Court Records of Patrick Ryan).

1999,[292] and 2013[293]; (ii) that they lived in adjoining apartments in the years leading up to and through Mr. Fell's trial;[294] REDACTED ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (iv) that she bailed him out on multiple occasions, including after his 1992 felony trespass charge[296] and after his 2001 DWI #4 charge[297]; (v) that she spoke to her neighbors about her son's extensive criminal history, including his 2002 DWI and his domestic abuse charges;[298] and (vi) that she did know about Ryan's 1983 burglary conviction and jail time, and discussed these events with a psychologist.[299]

Confronted with this newly-discovered evidence, Juror #162's statements changed yet again. She no longer claimed that she did not live with her son and that therefore she could not have known of his criminal behavior. She now claimed that when she said he did not live with her, she did not mean that he did not live with her. Juror #162 claimed that when she said her son never "lived" with her she meant to exclude instances when he "stay[ed]" with her over an extended period.[300] Left unexplained (and unexplainable) was that if that was her purpose (to limit "live" to instances when his name was on an apartment lease) what that had to do with her claim that she knew next to nothing about her son – how he could spend a year in jail without her knowing, how he could, in small towns in Vermont in which they both lived, get

---

[292] Mar. 19 Hr'g Tr. at 53.

[293] Ex. 31 (Brent Curtis, "Juror: Fell Lawyers Trying to Destroy My Life," Rutland Herald, Oct. 21, 2013).

[294] Ex. 17a at FELL-00003481 (Chittenden Family Court Records of Patrick Ryan) (listing address for Patrick Ryan as 573 Bay Road, Apartment 101, Colchester, VT 05446, the same as at the time of his 2001 arrest).

[R] ▮▮▮▮▮▮▮▮

[296] See Aug. Hr'g Tr. at 157.

[297] See Ex. 52 (Amherst Bail Bonds Records).

[298] Mar. 19 Hr'g Tr. at 23, 61.

[299] Ex. 9 at FELL-00002858 (Psychological Evaluation of Juror #162 as part of Family Court Records).

[300] Mar. 19 Hr'g Tr. at 153.

picked up for unlawful mischief, criminal mischief, assault on a police officer, simple assault, felony burglary, unlawful trespass, DWI, simple assault again, felony unlawful trespass, DWI again, DWI again, felony unlawful trespass again, simple assault again (two counts), DWI again, possession of cocaine and marijuana, and more, without her knowing about more than an isolated incident "in his twenties."

She also no longer claimed that she did not know he was on parole at the time of the trial – at the time she answered that his only criminal history was 16 years earlier and that he had reached the top. She admitted in March 2014 that, after Ryan's DWI conviction, "he was on parole at the time, so they came – the Department of Corrections periodically came unannounced . . . to give him Breathalyzers."[301] She now testified, contrary to her August testimony, that when she disclosed at voir dire that Ryan was "under the Department of Corrections for three years," she "believe[s]" she was referring to the DWI conviction – an incident she now claimed to be distinct and at a separate point in time from the "domestic violence."[302]

Finally, in March 2014, Juror #162 testified for the first time that she was aware that her son had spent time in jail after being convicted of felony burglary in 1983 following an incident in which he and an accomplice broke into residences and stole guns, among other things.[303] Again, she only made this admission after she was forced to: this testimony followed the introduction of evidence by Mr. Fell proving that Juror #162 had knowledge of these crimes and the result of the prosecution.[304]

Juror #162 also lied, blatantly, in her August testimony about the manner in which her statement was obtained by 2255 counsel. Juror #162 testified: "This is the first time I have

---

[301] Mar. 19 Hr'g Tr. at 146.

[302] Mar. 19 Hr'g Tr. at 146-47 (emphasis added).

[303] Mar. 19 Hr'g Tr. at 148-49.

[304] See Ex. 9 at FELL-00002858.

114

seen this. . . . I did not read this. . . . I have never seen it before." She said that when she signed the statement, Mr. Fell's counsel simply put the signature page in front of her to sign; she was not provided with the whole statement. She clearly testified that, before the day of the hearing, she had never seen the statement and never had an opportunity to correct misstatements in the document.[305] This claim is untrue on the face of the document to which she was referring. She made changes to the document and initialed those changes.[306] It is also flatly contradicted by sworn testimony from Dina Zloczower. Ms. Zloczower testified that she and Ms. Price provided Juror #162 with her entire statement, asked her to review it, and to sign it if she agreed with it. "[Juror #162] sat down and read through the statement from top to bottom."[307] Falsehoods permeated her testimony in August and continued in her testimony in March.

### C. Treatment for Substance Abuse

Juror #162 also lied about her son's history of treatment for substance abuse.

At the August hearing, counsel for Mr. Fell asked her to affirm her answer at voir dire that her son had been treated for alcohol abuse. She did, testifying: "Yes, I believe he went to an alcohol counselor, yes, at one time."[308]

Once again, at the March hearing, she changed her story after being confronted with specific and contradictory facts. The evidence described above regarding Ryan's criminal history itself demonstrates that he was treated over and over again for drug and alcohol abuse, and that Juror #162 knew it. In addition, Mr. Fell has offered evidence indicating that she was aware that her son had spent time at Maple Leaf Farm Associates.[309] REDACTED

---

[305] Aug. Hr'g Tr. at 194-97.

[306] See Ex. 6.

[307] Mar. 18 Hr'g Tr. at 80.

[308] Aug. Hr'g Tr. at 158.

[309] See Ex. 9 at FELL-00002884 (Affidavit of Juror #162, Addison Family Court).

115

REDACTED

In the face of this evidence, Juror #162 admitted to being aware of these additional instances of substance abuse treatment, admitted to a stay by her son in Dismas House, a halfway house, and admitted that he received alcohol treatment in prison.[311]  But she cut counsel off when he tried to press on the precise extent of her knowledge of her son's history of substance abuse treatment, and continued to conceal substantial portions of that history, including, at least: Ryan's participation in the Intensive Substance Abuse Program during the period he lived in an apartment adjoining Juror #162's (and when he had no driver's license);

; and his treatment by a doctor for cocaine abuse when he was younger, which Juror #162 reported to the press.[313]

Ryan's substance abuse is inextricably linked to his criminal history.  As a correctional officer put it in drafting an Intermediate Sanction Report following Ryan's 1997 felony arrest:  "Mr. Ryan has an assaultive history that dates back to 1983.  Allegedly all convictions took place under the influence of drugs or alcohol."[314]  Juror #162 herself succinctly described how Ryan's substance abuse history affected her personally: she told Jean Ratta-Roberts that those problems "had caused her many headaches over the years."[315]  Juror #162 deceivingly described this life-long, crippling problem, and the unceasing (and unsuccessful)

---

[311] Mar. 19 Tr. at 206.

[313] Ex. 31 (Brent Curtis, "Juror: Fell Lawyers Trying to Destroy My Life," Rutland Herald, Oct. 21, 2013).

[314] Ex. 14 at FELL-00003362 (Washington District Court Records of Patrick Ryan) .

[315] Mar. 19 Hr'g Tr. at 34.

attempts at intervention and treatment, as: "I believe he went to an alcohol counselor, yes, at one time." This is simply not the truth, and she knew it.

### D. Police Complaints and Civil Suits

Juror #162 also knew that she omitted from her disclosures at voir dire the indisputable facts that she had filed many complaints with the police including one that led to the criminal prosecution of her former partner, Lucille Tatro, following the pattern of abuse and violence by Ms. Tatro on Juror #162 and members of her family.

Between June 2000 and trial, Juror #162 filed at least five complaints with the police. The complaints pertained to incidents including: the collision of a boat and trailer with her car;[316] a handicapped person impeding traffic;[317] excessive noise;[318] and the possible decapitation of her cat.[319] Juror #162's neighbor, Jean Ratta-Roberts, testified that Juror #162 filed "[s]everal" complaints with the Colchester police.[320] Likewise, Juror #162's other neighbor in the years leading up to trial, Suzann Widener, testified that Juror #162 used to call the police on her as well.[321] Juror #162 plainly had knowledge of these complaints, and deliberately chose not to disclose them.

Juror #162 also filed a complaint in 1982 regarding her former partner, Lucille Tatro. On July 25, 1982, Juror #162 contacted the Washington County police and gave a written statement reporting a crime. Juror #162 reported that when she went to the residence of Lucille Tatro to pick up personal belongings, Tatro "dented the drivers door by throwing a rock,"

---

[316] See Ex. 28b at FELL-00003665-67 (Colchester Police Records for Patrick Ryan, Juror #162 and Lucille Tatro).

[317] Id. at FELL-00003684-85.

[318] Id. at FELL-00003695.

[319] Id. at FELL-00003696-98.

[320] Mar. 19 Hr'g Tr. at 32.

[321] Mar. 19 Hr'g Tr. at 58.

"attempted to smash the windshield," followed Juror #162's vehicle in a van "threatening to drive into [Juror #162's] vehicle," and used a cigarette to "burn[] the upholstery" of the car Juror #162 was driving.[322] Again, Juror #162 plainly had knowledge of this incident, and again she simply chose to conceal it.

In March 2014, Juror #162 tried to explain why she did not disclose this complaint at voir dire by testifying:

> Q: And, in fact, you did file a criminal complaint against [Lucille Tatro], correct?
>
> Q: No, that's not correct. It was my husband that filed the complaint, not me.[323]

At the time she gave this testimony, Juror #162 was not aware that Mr. Fell's counsel had contrary evidence. Since that testimony, Mr. Fell has obtained and presented documentary evidence showing that Juror #162 was the complainant in the case, that Juror #162 is the one who contacted the police about the crime, and that Juror #162 gave a signed, written statement to the police detailing the events.[324]

Juror #162 also omitted from her disclosures at voir dire her history of civil litigation. Juror #162 fought in court for over a year to recover the money that Donald Milne stole from her.[325] She also joined herself as a party to the five-year divorce and child custody proceedings involving her son, his ex-wife, and Juror #162's grandson. Over the next five years, Juror #162 was an active party to the litigation.[326]

---

[322] See Ex. 11 at FELL-00003211 (Washington County Criminal Court records of Lucille Tatro).

[323] Mar. 19 H'rg Tr. at 197.

[324] See Ex. 53 at p. 4 (Vermont State Police, Middlesex Records Pertaining to Case No. 630-746) (July 25, 1982 Report citing Juror #162 as complainant).

[325] See Ex. 10 at FELL00003124 (Probate Records of Juror #162).

[326] Ex. 9 at FELL-0002764-71 (Addison Family Court Docket Sheet).

These proceedings were lengthy, involved intensely personal and contentious issues and allegations, and determined events that were deeply important to Juror #162's life. [327] It is inconceivable that she forgot about these events.[328]

## ARGUMENT

**I.   Juror #162's Misstatements and Omissions at Voir Dire Were Intentional**

The evidence here is undeniable that Juror #162's lies and omissions during voir dire were intentional.  The jurors were told, again and again, the critical importance of the voir dire process.[329]  They were informed, in no uncertain terms, that they were swearing to the veracity of their answers "under the penalty of perjury."[330]  Based on the nature of the questionnaire and the force of the instructions given during the voir dire process, the Court is entitled to presume that Juror #162 acted knowingly when she provided her responses.

The jurors were also told, repeatedly, that they were obligated to answer the questions at voir dire completely and truthfully.  The video the jury was shown prior to filling out their questionnaires told them: "[T]here are no right or wrong answers to the questions contained in the form.  All we ask is that you answer the questions truthfully to the best of your ability."[331]  This instruction was repeated: "We are only asking that you answer truthfully and to

---

[327]  The fact that Juror #162 failed to disclose at least three other civil suits – less personally significant, but no less responsive to the question – underscores the degree to which Juror #162 flouted the Court's instructions to answer the voir dire questionnaires truthfully and completely.  See Ex. 19 (Twombly v. [Juror #162], Dkt. No. 108-1-90 Wnsc; The Medicine Shoppe v. [Juror #162], Dkt. No. 303-3-91 Wnsc; and Northfield Fuel Co. v. [Juror #162], Dkt. No. 631-8-98 Wnsc.).

[328] In her March testimony, Juror #162 claimed that she did not disclose her role in her son's divorce proceedings at voir dire because "[t]hat was his divorce proceeding.  That didn't have anything to do with me."  Mar. 19 Hr'g Tr. at 131. That is not true.  She was a named party.  Over a period of five years Juror #162 was represented by counsel; she filed motions, sworn affidavits, and letters on a regular basis; she underwent two psychological evaluations to advance her case; and rights that were critically important to her were at stake and ultimately decided.  Ex. 9 at FELL-00002764-71.

[329] See Ex. 117 to Amended 2255 Motion at FELL-00001348; Ex. 3 at FELL-00002729; Voir Dire Tr., JVD-1 at 9 (May 4, 2005).

[330] Ex. 117 to Amended 2255 Motion at FELL-00001356.

[331] See Ex. 117 to Amended 2255 Motion at FELL-00001346.

119

the best of your ability."[332]  The first sentence of the long form questionnaire itself told the

jurors: "Upon your oath or affirmation, you must give true and complete answers to all

questions."[333]  And at the opening of individual voir dire, the Court reminded the jurors:

> [T]here are no right and wrong answers to the questions.  They're intended not to pry, but to insure that if you are selected to serve in this particular case, that you would be fair and impartial, and that the jury would in fact be fair and impartial to both sides. . . . And I'd ask that you focus in upon the questions and try to be as candid and honest as you possibly can. . . . I just ask that you be absolutely candid and honest about your views and your responses to the questions.[334]

The evidence set forth above demonstrates that Juror #162 persistently lied and

deliberately withheld central information in her short questionnaire, her long questionnaire, and

at individual voir dire.  She continued to lie and conceal during the August 15 and March 19

hearings.  Her attempts to explain away these inconsistencies, laid out above, are wholly

unavailing.  "With the manifestly strong pressures on the juror to exculpate herself from a quite

untenable position, her self-serving statements should not count for much."  Daugerdas, 867 F.

Supp. 2d at 470-71 (quoting Gray v. Hutto, 648 F.2d 210, 211 (4th Cir. 1981)).  Based on these

lies, demonstrably proven by record evidence, these inconsistencies, plain on the face of Juror

#162's shifting and contradictory testimony, and these entirely futile attempts to justify her

answers, the Court should find that Juror #162's many misstatements and omissions at voir dire

were intentional and satisfy the first prong of McDonough.

---

[332] See Ex. 117 to Amended 2255 Motion at FELL-00001356.

[333] See Ex. 3 at FELL-000002729.

[334] Voir Dire Tr., JVD-1 at 9:1 – 9:15 (May 4, 2005).

II.    **Truthful and Complete Answers on Voir Dire Would Have Provided a Valid Basis for a Challenge for Cause of Juror #162**

   A. **Juror #162 Is Biased Under Every Categorical Definition**

Had she told the truth on voir dire, Juror #162's history would have would have revealed an inescapable bias that would have grounded her removal for cause. Jurors can be removed for cause if they appear to be actually biased, impliedly biased, or inferably biased. Torres, 128 F.3d at 46-47.

In Sampson II, the First Circuit addressed the issue of juror bias in the context of a 2255 motion. Judge Selya identified several non-exclusive factors "that may be relevant in determining whether a juror has both the capacity and the will to decide the case solely on the evidence," including: the juror's interpersonal relationships; the juror's ability to separate her emotions from her duties; the similarity between the juror's experiences and important facts presented at trial; the scope and severity of the juror's dishonesty; and the juror's motive for lying. Sampson II, 724 F.3d 150, 166 (1st Cir. 2013). The panel then applied this framework to the facts found by the district court (Wolf, J.) regarding misstatements by one of the jurors during the voir dire of Mr. Sampson's capital case. Id. The juror, known in the records as "Juror C," had been dishonest about whether she or anyone she knew had been the victim of a crime, and the substance abuse and criminal history of members of her family. She was also dishonest about other matters. Id. at 162-63. The First Circuit concluded that, "under the totality of the circumstances, [Juror C] lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." Id. at 167. It rested this conclusion "on three cross-braced pillars: (i) Juror C's habitual dissembling; (ii) the intense emotions Juror C exhibited when belatedly relating her life experiences involving [her family

121

members]; and (iii) the similarities between Juror C's unreported life experiences and the evidence presented during the penalty-phase hearing." Id.

The same "cross-braced pillars," and more, exist in the case of Juror #162. These pillars support the conclusion that Juror #162 was actually, impliedly, and inferably biased.

First, Juror #162 "lied repeatedly in the voir dire questionnaire and directly to the court," which in and of itself implies a bias that would support her removal for cause. Id. The evidence Mr. Fell has gathered proves that Juror #162 did not mistakenly omit and misrepresent information in voir dire; instead, she intentionally misled the parties and the Court. She continued this pattern of lying in sworn testimony in open court, completely disavowing knowledge of specific events of which she was demonstrably aware, lying to the Court and the parties about her relationship with her son, including their history (and current status) of shared residence, and making false claims about Mr. Fell's post-conviction counsel's conduct in post-trial interviews of her. "[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (Blackmun, J., concurring); see also United States v. Colombo, 869 F.2d 149, 152 (2d Cir. 1989) ("[A juror's] willingness to lie [at voir dire] exhibited an interest strongly suggesting partiality."); Daugerdas, 867 F. Supp. 2d at 473 ("The nature, scope and extent of the lies a juror tells may, in and of themselves, demonstrate an undue partiality or bias.").[335]

Moreover, evidence in the record suggests that Juror #162 lied in order to secure a spot on Mr. Fell's jury, because of her plain interest in true crime plus her consistent

---

[335] See also Dyer, 151 F.3d at 983 ("If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror-to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions with equal scorn."); United States v. Perkins, 748 F.2d 1519, 1532 (11th Cir. 1984) (lying "in and of itself, is a strong indication that [the juror] was not impartial").

commitment to withholding anything about herself that would have resulted in her removal.[336]

This is precisely the sort of motivation that courts have found to create an impermissible risk of

partiality. "The individual who lies in order to improve his chances of serving has too much of a

stake in the matter to be considered indifferent. Whether the desire to serve is motivated by an

overactive sense of civic duty, by a desire to avenge past wrongs, by the hope of writing a

memoir or by some other unknown motive, this excess of zeal introduces the kind of

unpredictable factor into the jury room that the doctrine of implied bias is meant to keep out."

Dyer, 151 F.3d at 982; United States v. Greer, 998 F. Supp. 399, 406 (D. Vt. 1998) ("Greer I")

(distinguishing honest juror from juror "who deliberately lies 'precisely because [he or she wants]

to sit on the case'") (quoting United States v. Langford, 990 F.2d 65, 69 (2d Cir. 1993)

(alterations in original)).[337]

Second, Juror #162 displayed profound emotional distress when questioned as to

the withheld information. The transcript, which does not reveal the full distress that was evident

in the juror's body language and tone of voice, shows that Juror #162 was highly agitated,

speaking over the Court, and exclaiming: "And you are sitting here and putting me through this

about my son . . . I am getting very upset about this whole thing. . . . What does my son have to

do with this? . . . I am really beginning to get upset. . . . But what does this have to do with this –

with this trial and with my judgment on this trial? . . . I know what he is doing. I know that."

Aug. Hr'g Tr. at 149-51. A recess was taken because of the juror's increasingly unstable

demeanor. Immediately after the Court ordered the recess, the juror began sobbing audibly, into

---

[336] See supra at p. 93.

[337] That said, this specific motivation is not necessary to find reversible error in the juror's lying at voir dire. Daugerdas, 867 F. Supp. 2d at 473 (quoting United States v. Thomas, 116 F.3d 606, 617 & n.10 (2d Cir. 1997)) ("Even when a prospective juror is dishonest for reasons other than a desire to serve on a jury, dishonest answers to voir dire questions indicate that a juror is unwilling or unable 'to apply the law as instructed by the court to the evidence presented by the parties' and, therefore, suggest partiality.").

the open microphone.  Her emotional distress at these events is also evident in her

communications with the press.  She described Mr. Fell's investigation of her misstatements as

"trying to destroy" her.[338]  She said that she was "victimized" on the witness stand, and that she

is being "dragg[ed] . . . through the mud."[339]

Third, the information that Juror #162 concealed at voir dire and during the

August 2013 hearing reveals life experiences uncannily similar to the evidence presented during

Mr. Fell's case.  It is undisputed that where there are similarities between the personal

experiences of the juror and the issues being litigated, bias may be implied or inferred.  See

Torres, 128 F.3d at 47; Sampson I, 820 F. Supp. 2d at 164.  Virtually every fact that Juror #162

withheld touches on or overlaps with critical evidence presented at Mr. Fell's trial.  For example,

Juror #162, her husband, and Donald and Teri Fell were all victims of sexual abuse as children.

The fact of this victimization figured prominently in Mr. Fell's trial, and the import of this was

squarely presented to the jurors to assess for its mitigating weight.  This aspect of the mitigation

case was so significant to the defense at trial that the Government wasted no time trying to

undercut the weight of this mitigator, arguing in its opening statement that, after Mr. Fell's

victimization as a young child, things improved: there was intervention by social services, Mr.

Fell received counseling, and there must have been little harm since Mr. Fell began doing well in

kindergarten.[340]

In their attempt to present Mr. Fell's history, trial counsel developed relatively

detailed evidence of this episode at trial.[341]  Again, in their closing statement, the Government

---

[338] Ex. 31 (Brent Curtis, "Juror: Fell Lawyers Trying to Destroy My  Life," Rutland Herald, Oct. 21, 2013).

[339] Ex. 30 (Sam Hemingway, "Juror in Fell Death-Penalty Case Slams Defense Appeal Tactics," Burlington Free Press, Oct. 9, 2013).

[340] Trial Tr. Vol. V-I at 38.

[341] Trial Tr. Vol. VII-I at 132-13; Trial Tr. Vol. IX-I at 25-26.

124

strove to minimize this evidence, arguing that "things started to get better. . . . [A]fter that event happened, the social services came in, the family adjusted and they continued. They received social services. They received counseling. And you can see in those records how actually they did better." [342] The Government continued: "There's nothing about that background and that history that shows you that he is less responsible for the decisions that he made, decisions like killing a witness."[343] Finally, in its rebuttal, the Government summed up Mr. Fell's mitigation presentation with two words: "abuse excuse."[344]

Because Juror #162's family life featured similar forms of extraordinary abuse and those instances had a significant impact on her, there was a substantial risk of bias unacceptable for a sitting juror. See May 10, 2013 Order at 8-9 (observing, based on the facts uncovered post-trial about Juror #162's history of sexual abuse, the risk of bias is that "this juror might not have been able to fairly and impartially consider evidence of childhood sexual abuse as a mitigating factor in a capital trial"). The fact of Mr. Fell's sexual victimization when a child was not in dispute; the only question for the jurors was what weight to give that fact in mitigation. Here, had Juror #162 told the truth it would have been obvious that the facts of her own extraordinary experience would have had exactly the same corrupting and distorting effect that she admitted they did have: her history of having been a victim of sexual abuse "did not turn [her] into a murderer." And the fact that Mr. Fell had experienced that traumatic experience did not mitigate the crime he committed. "Donald Fell just chose evil. Donald Fell had plenty of chances to get help, including from teachers and principals. He was given lots of chances to

---

[342] Trial Tr. Vol. XII at 53-55.

[343] Trial Tr. Vol. XII at 53-55.

[344] Trial Tr. Vol. XII at  118.

125

change things and he didn't take them."  Juror #162 has now repeatedly affirmed that statement in sworn testimony.[345]

Such a juror would be mitigation-impaired, as Juror #162 plainly was.[346]  See Burton v. Johnson, 948 F.2d 1150, 1159 (10th Cir. 1991) (a juror, sitting in a murder trial where the defendant's defense was battered wife syndrome, was presumed to be biased because the juror herself was involved in an abusive family situation at the time of the trial).[347]

Moreover, had Juror #162 disclosed the extensive and extraordinary criminal record and history of substance abuse and substance abuse treatment of her son, that too would have revealed a bias which would have given rise to a challenge for cause.  The issues raised by Juror #162's son's criminal record and substance abuse history were precisely those raised by the facts and arguments presented in mitigation of Mr. Fell's conduct at trial.  The following mitigating factors were put before the jury at the outset of the penalty phase:

- Donald Fell's capacity to appreciate his conduct was significantly impaired.

- Donald Fell does not present a risk to prison officials or other inmates if he is sentenced to life in prison without the possibility of release.

---

[345] Mar. 19 Hr'g Tr. at 185; Aug. Hr'g Tr. at 100.

[346] See Scott Sundby, A Life and Death Decision at 112 (2005) ("[I]dentifying with a defendant's experiences often [led jurors] to become the most vocal advocates of a death sentence precisely because in their minds they *knew* that the defendant had a choice . . . most jurors [with identifying experiences] responded similarly as they listened to an expert tell about the defendant's hardships, thinking 'Yeah, well, I went through that and didn't end up a killer".); Edie Green & Kirk Heilbrun, Wrightman's Psychology and the Legal System at 285 (7th ed. 2011) ("[T]he so-called black sheep effect may apply: Although people generally favor individuals who are part of their in-group, they may sometimes strongly sanction those fellow members who reflect negatively on and could embarrass the in-group.").

[347] The Government has previously argued that no matter what facts Juror #162 concealed, she could not have been impaired from impartially considering Mr. Fell's own childhood sexual abuse because the jury unanimously found that Mr. Fell had been sexually and physically abused as a child.  Government's Brief re Juror Misconduct Claims at 54.  But the requirement that the jury be impartial does not end at its ability to find the existence of an undisputed fact to have been proven by a preponderance of the evidence.  Rather, the Supreme Court has held that the "Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." Tennard v. Dretke, 542 U.S. 274, 285 (2004) (internal citation omitted) (emphasis added) .

126

- Donald Fell has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances.

- Donald Fell was twenty years old at the time of the offense.

- Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.[348]

Juror #162's painful ordeal with her son bears striking similarity to each of these circumstances posed to explain Mr. Fell's life. Juror #162's son's history of crime and substance abuse was not defined by an isolated event, in the distant past, that had turned his life around and caused him to go from the "bottom" to the "top." He led a life of longstanding and recent crime, ongoing parole, repeated recidivism, and chronic drug and alcohol abuse. He was presented with numerous opportunities to rehabilitate his behavior, and to prove that he could turn his life around, contain his violent impulses, make positive contributions, and manage his drug and alcohol addictions. Her son failed at every single turn, unvaryingly recidivating, returning to violence, relapsing to drugs and alcohol, and finding himself back in the criminal justice system. One who had experienced that record as intimately as Juror #162 could not help but to unfairly relate those experiences to the evidence in Mr. Fell's case. Each of these atypical and extraordinary circumstances would have presented a substantial risk that Juror #162 was unable to be fair or impartial, giving rise to a for-cause challenge. To illustrate just a few examples: Juror #162's son had committed crimes in his twenties, but had continued to commit crimes into his thirties and forties. That would have inevitably distorted her ability to judge Mr. Fell's mitigating factor that he had been in his twenties when he committed the crimes for which he was on trial. Juror #162's son "ha[d] an assaultive history that dates back to 1983. Allegedly all

---

[348] Trial Tr. Vol. V-I at 27-29.

127

convictions took place under the influence of drugs or alcohol."[349]  He also had a lifelong

addiction to drugs and alcohol, and committed multiple violent, intoxicated crimes.  But he had

never killed anybody.  Juror #162 was being asked to consider whether Mr. Fell's capacity to

appreciate his conduct was significantly impaired and whether he had abused drugs and alcohol

from a young age and whether those facts were mitigating.  No reasonable juror could put the

facts Juror #162 experienced with her own son out of her mind and fairly or impartially judge Mr.

Fell's case on the basis of its own facts after what Juror #162 lived through.  Juror #162's son

had had the opportunity to be rehabilitated many times, through his repeated exposures to the

criminal justice system and those opportunities did not appear to be successful – at the time of

trial, he was still under supervision.  Yet, Juror #162 was being asked to judge whether the fact

that Mr. Fell was deprived of the opportunity to be rehabilitated should be considered mitigating.

How could a juror in that position ever put her own son's experience to the side and judge Mr.

Fell's case fairly and impartially?  Finally, it is evident that Juror #162 bore extreme emotions

and anger as a result of her son's experiences.  No reasonable juror in that position could be

expected or should be expected to be a juror in Mr. Fell's case. The typical person, in hearing

this type of evidence, would feel a degree of personal connection such that she would "be unable

to divorce her consideration of this case from her own . . . experience."  Torres, 128 F.3d at 48.

Such a juror would have been "mitigation impaired."

       Of course, each of the above factors did not operate in isolation.  They must be

viewed collectively.  See Voir Dire Order at 17 (This Court "evaluate[d] challenges for cause

based on the totality of the juror's responses, together with an assessment of that juror's

demeanor.").  As Mr. Fell's jury expert testified after being given a hypothetical about just some

---

[349] Ex. 14 at FELL-00003362 (Washington District Court Records of Patrick Ryan).

128

of these facts, Juror #162 was "mitigation impaired."  See Tr. of Dep. of Beth Bochnak, Mar. 6, 2014, at 159:18 – 160:4.

The Fell family history presented as the core of Mr. Fell's mitigation case also intersects with this extraordinary history of trauma that Juror #162 did not disclose at voir dire.[350] In addition to the sexual abuse that both Juror #162 and her husband had suffered as children, Juror #162's son was himself the victim of significant physical abuse as a child, and also witnessed significant abuse among his caretakers, including an attack by Lucille Tatro on Juror #162 with a knife.  Juror #162's son reported that Ms. Tatro "beat . . . up" Juror #162, that they "pulled knives on each other," and that he "recall[ed] an incident in which 'a gun was involved.'"[351]  Juror #162 went so far as to file a police complaint and sign a witness statement following an incident of abuse and harassment.  Juror #162 has confirmed that Ms. Tatro came after her with a knife, and that her son has reported to her that he was the victim of child abuse by Ms. Tatro.[352]  She was also aware that Ms. Tatro "dragged [Ryan] downstairs by the hair," and "put [him] outside with nothing on but underwear in the winter."[353]  Patrick Ryan's history of crime included repeated violent attacks on ex-wives and ex-girlfriends, including two felonies, one of which ended with a prison sentence and another of which ended with pre-approved furlough for enrollment in the Intensive Domestic Abuse Program.  Juror #162 was herself informed that as a result of this abuse, her grandson, Ryan's son, had been diagnosed with Post

---

[350] Among the mitigating factors placed before the jury were: Donald Fell was sexually and physically abused as a child, and, separately, as a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other.

[351] Ex. 9 at FELL-00002894 (Psychological Evaluation of Patrick Ryan, Karen Currier as part of Family Court Records).

[352] Mar. 19 Hr'g Tr. at 156.

[353] See Ex. 9 at FELL-00002894; Ex. 9 at FELL-00002885 (affidavit by Juror #162 discussing family psychological evaluation in which Ryan discussed these events).

129

Traumatic Stress Disorder.[354]  These facts corresponded unmistakably to facts presented at Mr. Fell's trial, including the significant physical abuse that Mr. Fell faced at the hands of his caretakers, the spousal abuse that Mr. Fell was forced to witness growing up, the impact that this spousal abuse had on Mr. Fell as a young child, and the violent attacks by his caretakers on one another, including, down to startling detail, attacks with knives.

Further, Juror #162's son's history of substance abuse, and treatment for substance abuse, substantially overlapped with facts about Mr. Fell's family that were presented at Mr. Fell's trial.  Her son began abusing drugs and alcohol habitually at a young age, and continued a cycle of treatment, relapse, and abuse for his entire adult life.  These facts would have impaired Juror #162's ability to consider the mitigating weight of Mr. Fell's history of growing up in a household defined by drug and alcohol abuse; in order to assign mitigating weight to this evidence she would have had to condemn her own son for raising his son, her grandson, the subject of a five-year custody litigation to which Juror #162 was a party, in such an environment.

Also as part of the pattern of extraordinary trauma that marked Juror #162's life experience (that she did not disclose at voir dire), she was robbed of an inheritance by a court-appointed guardian, following a truly scarring series of events, including the death of her young husband, her declaration of incompetence and commitment to a mental hospital, and the loss of her young son to foster care.

Between her own experiences in her childhood family, the events that plagued her family of destination, her continued extraordinary exposure to abuse and violence, and her son's long history of substance abuse and violent crime, Juror #162 must have found Donald Fell's life, as expressed through the trial testimony, very familiar.  Each one of the facts laid out above –

---

[354] See Ex. 9 at FELL-00002879.

each withheld at voir dire – would have independently served as the basis for a challenge for cause.

Juror #162 has herself articulated the actual bias (and implied and inferable bias) that she brought with her through voir dire and into the trial as a result of her experience of sexual abuse, condemning Mr. Fell for having failed to overcome a trauma where she succeeded. The statement demonstrates that Juror #162 was biased; it "demonstrates that [Juror #162] personalized the case and compared [her experiences] to that of [Mr. Fell], a consideration that is inherently improper." Daugerdas, 867 F. Supp. 2d at 471.

The myriad other traumas that Juror #162 withheld at voir dire and held with her through trial further confirm that she was a biased juror – actually biased, impliedly biased, and inferably biased. The links between these traumas and the evidence in Mr. Fell's case are precisely the sorts of connections that courts have deemed to be far too close for comfort in analyses of juror bias. As Judge Kozinski noted in Dyer, associations like these give rise to multiple concerns over a juror's ability to be impartial and to judge the case based on the evidence presented at trial. 151 F.3d at 982. Similarly, the First Circuit held in Sampson II:

> [T]he jurors heard evidence that the defendant threatened bank tellers at gunpoint during the string of North Carolina bank robberies and his murder victims at knife point. For her part, Juror C was frequently threatened by her then-husband once with a shotgun and other times with his fists. . . . These parallels raise a serious concern as to whether an ordinary person in Juror C's shoes would be able to disregard her own experiences in evaluating the evidence.

Likewise, here, there was significant evidence presented in the mitigation case regarding spousal abuse, child abuse, and even attacks with a knife. Juror #162 herself was the victim of domestic abuse, including an attack with a knife. Juror #162 also herself dealt with

131

child abuse.  And she was well aware of her son's long history of committing domestic violence against partners his whole life.

The Sampson II court continued:

> [T]he government presented evidence during the penalty-phase hearing that the defendant had substance abuse problems – problems that contributed, inter alia, to the dissolution of his marriage.  For her part, Juror C was forced to deal with the substance abuse of both her husband and her daughter. . . . These parallels raise a serious concern as to whether an ordinary person in Juror C's shoes would be able to disregard her own family's involvement with substance abuse and avoid a bias against the defendant on account of his substance abuse.

Likewise, in Mr. Fell's case, the significant parallels between the evidence presented at trial regarding the defendant's substance abuse problems, and the substance abuse history of her son that Juror #162 withheld at voir dire, raise serious concerns.

Judge Selya went on:

> Then, too, the jury heard evidence during the penalty-phase hearing anent the defendant's criminal history, including his incarceration for robbery.  Analogously, Juror C's daughter committed larceny and was incarcerated as a result.  Juror C testified that she was deeply ashamed of her daughter's immurement.  These parallels raise a serious concern as to whether an ordinary person in Juror C's shoes would be able to disregard J's troubles with the law and avoid a bias against the defendant on this account.

724 F.3d 150 at 168.

Likewise, in Mr. Fell's case, there is a high risk that Juror #162 would have felt deep anger, frustration and disappointment over her son's failed attempts to rehabilitate and his constant recidivism; this anger would have caused her to judge Mr. Fell unfairly.  Suffice it to say that it would be impossible for a juror with these experiences to judge Mr. Fell's case impartially, and that a juror with these closely linked personal experiences "would be lacking the

132

quality of indifference which, along with impartiality, is the hallmark of an unbiased juror." Dyer, 151 F.3d at 982.

As the Sampson II court held: "We conclude that if fully informed of Juror C's willingness to lie repeatedly, her fragile emotional state, her past experiences with P and J, and the similarities between those experiences and the evidence to be presented during the penalty-phase hearing, any reasonable judge would have found that the cumulative effect of those factors demonstrated bias (and, thus, a valid basis for excusal for cause)." 724 F.3d 150, 168 (1st Cir. 2013) (emphasis added). As in Sampson, Mr. Fell was subject to judgment by a juror who was profoundly biased in the precise areas where careful process was due. His resultant conviction and death sentence are due to be reversed.

### B.  Juror #162 Was Not a Favorable Juror to Mr. Fell

Finally, without anything more, the Government has argued that Mr. Fell's trial counsel believed that Juror #162 was a favorable juror, and that they would not have moved to strike her for cause. That the Government resorts to this argument shows the weakness of its position. There is not a shred of evidence that anyone on Mr. Fell's trial team viewed Juror #162 as favorable to the defense. In fact, and to the contrary, all of the evidence on the record proves that every member of the trial team disliked Juror #162. See, e.g., Tr. of Dep. Of Alex Bunin, Mar. 14, 2014, at 103:6-7 ("I just remember I didn't like [Juror #162]."); Tr. of Dep. Of Gene Primomo, Mar. 11, 2014, at 47:23 - 48:4 ("Q:  The Government has asserted in its pleadings that trial counsel liked Juror 162 and wanted her on the ultimate panel; is that true? . . . A:  No, that's not true."); Mar. 6 Bochnak Dep. Tr. at 151:3-15 ("She was not a good juror for us . . . I believe[d] that she was going to vote to kill the defendant  . . .").[355]  Even if the evidence had

---

[355] See also Tr. of Dep. of Beth Bochnak, May 8, 2014, at 213:6-12 (Q:  And why didn't you like Juror 162?  A: She was a number seven on the scale.  I think it's a one to ten scale on the death penalty, which means she was very much in favor.  She was not sympathetic to the litigation questions that were asked, and I didn't like her."); Mar. 6

133

shown that Mr. Fell's trial team liked Juror #162 – and it distinctly does not – the assertion that the defense likes a juror based on false information provided by that juror about herself does not defeat a claim that the defense would have stricken the juror when she presented the true and accurate information. Nor does it defeat a McDonough claim. In every McDonough case, by definition, the defense has chosen not to use a peremptory to strike the juror at issue. Had it used a peremptory, there would be no occasion for the McDonough inquiry. Finally, Mr. Fell's trial team's views of Juror #162, even based on the true facts, are legally irrelevant. The Court maintains both the authority and the responsibility to dismiss sua sponte any juror who is incapable of judging the case impartially and on the evidence presented at trial. Torres, 128 F.3d at 43. And, here, the undisclosed information easily "would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556.[356]

\*       \*       \*

## CONCLUSION

For the foregoing reasons, Mr. Fell's conviction and sentence must be vacated.

Mr. Fell also hereby requests Exhibits 38-41 and 54-65 be admitted into evidence.

Bochnak Dep. at 77:6-8 ("Q: And did you find [Juror #162] to be favorable to your client? A: No, we did not."); id. at 107:13-18 ("Q: You did not think [Juror #162] would be sympathetic to your client? A: No, we did not. Q: Based on her responses in the questionnaire and the voir dire? A: Correct.").

[356] The Second Circuit's opinion in United States v. Stewart, 433 F.3d 273 (2d Cir. 2006), relied upon by the Government (Government's Response at 14), is not to the contrary. There, the court quoted dicta from the district court that "a prospective juror with a family member who had been convicted of a crime would more likely be considered biased in favor of criminal defendants," 317 F. Supp. 2d 432 (S.D.N.Y. 2004), in the course of affirming the district court's finding (on far different facts) that it would not have excused a particular juror for cause. The court did not hold, nor could it, that a juror's relationship with a family member convicted of crime could never give rise to a challenge for cause. To the contrary, the Second Circuit held that the applicable McDonough test standard is that which Mr. Fell argues here, whether "a correct answer at voir dire would have provided a valid basis to challenge the prospective juror for cause," and that to weigh this, the district court "must determine if it would have granted the hypothetical challenge." See also Dyer, 151 F.3d at 982 ("The effect of [kinship] would be impossible to predict: Would the juror yield to his sympathies, or fight them and lean the other way? There is no way to know, but permitting such a juror to serve would introduce into the jury room an extraneous influence that could materially color the deliberations.").

Dated:  May 23, 2014
Barre, Vermont

RESPECTFULLY SUBMITTED,


/s/ Richard Rubin
RICHARD RUBIN
Rubin, Kidney, Myer & DeWolfe
237 N. Main Street
Barre, Vermont, 05641-4125
(802) 479-2514
Fax: (802) 479-2516


Dated:  May 23, 2014
New York, New York


/s/ Lewis J. Liman
LEWIS J. LIMAN
SCOTT S. BUELL
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Fax: (212) 225-3999


Dated:  May 23, 2014
New York, New York


/s/ Cathleen Price
CATHLEEN PRICE
P.O. Box 321762
New York, New York 10032
(212) 998-6193

*Attorneys for Donald Robert Fell, Jr.*

135