**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

_____

DONALD FELL,                                     )
                                                 )
                      Movant,                    )
                                                 )
          v.                                     ) 2:01-CR-12-01
                                                 )
UNITED STATES OF AMERICA,                        )
                                                 )
                      Respondent.                )
                                                 )
                                                 )
                                                 )
                                                 )
_____ )

## MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255

# VOLUME II OF VII

# EXHIBITS 2-38

# TABLE OF CONTENTS

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

Exhibit

Donald Fell Mitigation Binder.................................................................................................1

Van Gorp Report (Apr. 6, 2001)............................................................................................2

Mills Report (May 7, 2001) ...................................................................................................3

Lipman Report (May 14, 2001) ..............................................................................................4

Cunningham Report (June 14, 2005) ......................................................................................5

Declaration of Mark Cunningham, Ph.D., ABPP (June 27, 2005) .................................................6

Wetzel Report (Oct. 11, 2002) ...............................................................................................7

Rabun Report (Dec. 31, 2002) ...............................................................................................8

Wetzel Report (June 27, 2005) ...............................................................................................9

Welner Report (July 5, 2005)................................................................................................10

CYS Contact Sheet (Apr. 22, 1985) ......................................................................................11

CYS Contact Sheet (May 8 1985) .........................................................................................12

CYS Contact Sheet (Sept.—Oct.1985)...................................................................................13

CYS Contact Sheet (Aug. 8, 1991)........................................................................................14

CYS Contact Sheet (Aug. 8, 1991)........................................................................................15

CYS Contact Sheet (Aug. 8, 1991)........................................................................................16

CYS Contact Sheet (Oct. 1991).............................................................................................17

First Hospital Wyoming Valley Discharge Report (Oct. 31, 1991) ............................................18

Wilkes-Barre General Hospital Progress Record (Apr. 1992)....................................................19

Wilkes-Barre General Hospital Adolescent Psych. Unit Interdisciplinary Progress Record (Apr. 1992)............................................................................................................20

Wilkes-Barre General Hospital Discharge Face Sheet (June 6, 1993) ........................................21

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Apr. 1992)..........22

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Jan. 1993) ..........23

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (June 1993) .........24

CRR Group Home Selection and Review (Sept. 22, 1993)..........................................................25

Psychological Consultation of Donald Fell (Apr. 12, 1994) ........................................................26

Service Plan (Medical) (1994).....................................................................................................27

Service Plan (Medical – Dental) (1995) ......................................................................................28

CYS Contact Sheet (May 26, 1995) ............................................................................................29

Intentionally Left Blank...............................................................................................................30

Rutland City Police Department Incident Table (Jan. 11, 1996).................................................31

Rutland City Police Department Incident Table (Sept. 4, 1996) .................................................32

Rutland City Police Department Incident Table (Nov. 6, 1996) .................................................33

Rutland City Police Department Incident Table (Nov. 6, 1996) .................................................34

Rutland City Police Department Incident Table (Mar. 4, 1997)..................................................35

Rutland City Police Department Incident Table (July 3, 1997)...................................................36

Rutland City Police Department Incident Table (Sept. 16, 1997) ...............................................37

Rutland City Police Department Incident Table (Jan. 14, 1998).................................................38

Rutland City Police Department Incident Table (June 5, 1998)...................................................39

Rutland City Police Department Incident Table (July 28, 1998)..................................................40

Rutland City Police Department Incident Table (Apr. 30, 1999) ................................................41

Rutland City Police Department Incident Table (May 26, 1999).................................................42

Rutland City Police Department Incident Table (Oct. 30, 1999) .................................................43

Rutland City Police Department Incident Table (Feb. 20, 2000) .................................................44

Luzerne County Detention Center Admission Page (Sept. 10, 1996) ..........................................45

Sullivan County Sheriff's Department Criminal Complaint (Aug. 12, 2000) ..............................46

New York State Incident Report and Arrest Report (Aug. 12, 2000)...........................................47

Sullivan County Sheriff's Department Statement of Donny McNeeley (Aug. 12, 2000) ............48

Sullivan County Sheriff's Department Statement Joshua Jones (Aug. 12, 2000) ........................49

New York State Incident Report (Aug. 12, 2000) .......................................................................50

Sullivan County Sheriff's Department Statement (Teri Fell) (Aug. 12, 2000) ............................51

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................52

Sullivan County Sheriff's Department Supporting Deposition (Aug. 12, 2000)..........................53

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................54

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................55

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................56

FBI FD-302 (Nov. 30, 2001 – Dec. 1, 2001)..............................................................................57

Intentionally Left Blank...............................................................................................................58

Intentionally Left Blank...............................................................................................................59

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 1, 2000) .....................60

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................61

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................62

New York State Police Investigation Report (Dec. 1, 2000).......................................................63

New York State Police Supporting Deposition (Dec. 2, 2000) ...................................................64

Autopsy Report of Teresca King (Dec. 2, 2000) ........................................................................65

3

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................66

United States Marshals Service Prisoner Intake ...........................................................................67

New York State Police Supporting Deposition of Francis Bellantoni (Dec. 1, 2000)...................68

Warrant Information Network Subject Report (Dec. 15, 2000) .....................................................69

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
     (Dec. 22, 2000)  ...................................................................................................................70

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................71

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................72

NWSCF Facility Incident Report (Dec. 27, 2000) .......................................................................73

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
     (Dec. 28, 2000) ....................................................................................................................74

Prison Medical Records of Donald Fell........................................................................................75

2001 FBI Report ...........................................................................................................................76

Vermont Department of Corrections Disciplinary Hearing Report (Dec. 27, 2000)....................77

FBI Report (Jan. 4, 2001) .............................................................................................................78

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
     (Jan. 8, 2001).......................................................................................................................79

Letter from Alex Bunin to A.U.S.A. Gregory Waples (Jan. 9, 2001) ..........................................80

FBI FD-192 (Jan. 22, 2001)..........................................................................................................81

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
     (Jan. 24, 2001).....................................................................................................................82

Redacted E-mail (Mar. 15, 2001) .................................................................................................83

Letter from A.U.S.A Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
     (Mar. 26, 2001) ....................................................................................................................84

New York State Certificate of Disposition (Mar. 28, 2001)..........................................................85

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch (Apr. 5, 2001).................................................................................................................86

Memorandum from Cynthia Ayres to Dr. Mark Mills (Apr. 23, 2001).........................................87

Letter from Peggy Peterson, Luzerne County CYS.....................................................................88

Letter A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht (Apr. 5, 2001).................................................................................................................90

Handwritten D Management Team Meeting Notes (Apr. 21, 2001) .............................................91

Vermont Department of Corrections Facility Report Form (June 13, 2001)................................92

Correctional Medical Services Interdisciplinary Progress Notes (July 2001) ..............................93

Pennsylvania State Police Central Repository Criminal History of Christopher Eike .................94

Handwritten D Management Team Meeting Notes (July 16, 2001).............................................95

D Wing Activity Sheet................................................................................................................96

Redacted E-mail (Sept. 20, 2001) .............................................................................................97

Redacted E-mail (Sept. 20, 2001)..............................................................................................98

Redacted E-mail (Sept. 20, 2001)..............................................................................................99

Redacted E-mail (Sept. 20, 2001)............................................................................................100

Redacted E-mail (Sept. 20, 2001)............................................................................................101

Vermont Department of Corrections Facility Report Form (Sept. 20, 2001)..............................102

Redacted E-mail (Sept. 20, 2001)............................................................................................103

Handwritten note of Bobby Lee................................................................................................104

Handwritten note of Bobby Lee................................................................................................105

Individual Voir Dire (May 4, 2005)..........................................................................................106

Redacted E-mail (Sept. 25, 2001)............................................................................................107

Commonwealth of Pennsylvania Police Criminal Complaint against Christopher Eike
(Nov. 7, 2001) ....................................................................................................108

Prison Health Records of Robert Lee ........................................................................109

Intentionally Left Blank ............................................................................................110

Intentionally Left Blank ............................................................................................111

Vermont Department of Corrections Incident Report (Mar. 17, 2004) .......................112

Intentionally Left Blank ............................................................................................113

FOIA 302 (Apr. 6, 2005) ..........................................................................................114

Letter to Judge Sessions from A. Bunin (Apr. 27, 2005) ...........................................115

Sealed Document Order, Case No.:2:01-CR-12 (Apr. 28, 2005) ................................116

Jury Instructions......................................................................................................117

Intentionally Left Blank ............................................................................................118

FOIA 302 (May 9, 2005) ..........................................................................................119

Intentionally Left Blank ............................................................................................120

Intentionally Left Blank ............................................................................................121

Letter from William B. Darrow and Stephen Kelly to Alexander Bunin, Gene Primomo, and Paul
Volk............................................................................................................................122

Blank Juror Questionnaire ........................................................................................123

Juror No. 26 Questionnaire (May 13, 2005) ..............................................................124

Juror No. 162 Questionnaire (May 23, 2005) ............................................................125

Intentionally Left Blank ............................................................................................126

Intentionally Left Blank ............................................................................................127

FBI Report (June 14, 2005) ......................................................................................128

FBI 302 Report of Interview with Christopher Eike (June 15, 2005) ..........................129

United States' Trial Memorandum, United States v. Donald Fell ...............................................130

Letter to Judge Sessions from David V. Kirby (June 29, 2005).................................................131

FBI 302 Report of Interview with [Redacted] (July 5, 2005) ....................................................132

FedEx Air Bill from Town of Bethel Justice Court to Andrew Bartnick (July 6th, 2006)..........133

Letter to Judge Sessions from Alex Bunin (July 8, 2005) .........................................................134

Stipulation (July 8, 2005).........................................................................................................135

Intentionally Left Blank............................................................................................................136

Memorandum to Alex Bunin from Paul Volk (July 20, 2005)...................................................137

Donald Fell's Motions for Judgment of Acquittal and New Trial, United States v. Donald Fell
    (Aug. 26, 2005)...................................................................................................................138

Affidavit of Richard Wetzel, Ph. D (Sept., 12, 2005)...............................................................139

Appeal from the United States District Court for the District of Vermont, Brief of the United
    States, United States v. Donald Fell (May 25th, 2007) .........................................................140

Letter to Victims Resource Center from Wanda Rivera (Apr. 21, 2005) ...................................141

Letter from Victims Resource Center to Andrew Bartnick (May 4, 2005) ................................142

School Heath Record of Donald Fell ........................................................................................143

Intentionally Left Blank............................................................................................................144

Wilkes-Barre General Hospital Progress Record of Donald Fell (June 1993) ...........................145

Raymond Kotzer and Theresa Kotzer Divorce Records (Oct. 22, 1967) ...................................146

Arrest Warrant Affidavit for Donald Fell, Sr. (Mar. 4, 1990) ...................................................147

CYS Contact Sheet (Apr. – May 1990) ....................................................................................148

Jenkins Township Incident Report (Apr. 21, 1990)...................................................................149

CYS Contact Sheet (June 1990) ...............................................................................................150

Service Planning/Family Functioning Report (June 1990).........................................................151

CYS Contact Sheet (Nov. 28, 1990).......................................................................................152

CYS Contact Sheet (Jan. 14, 1991) .....................................................................................153

CYS Contact Sheet (Feb. 14, 1991).....................................................................................154

Intentionally Left Blank.......................................................................................................155

Intentionally Left Blank.......................................................................................................156

CYS Contact Sheet (Mar. 19, 1991) ....................................................................................157

Suspected Child Abuse Referral Note (Apr. 18, 1993) ........................................................158

CYS Contact Sheet (May 1, 1991) .......................................................................................159

CYS Contact Sheet (May 2, 1991) .......................................................................................160

CYS Contact Sheet (June 4, 1991) .......................................................................................161

CYS Contact Sheet (June 24, 1991) .....................................................................................162

CYS Contact Sheet (July 8, 1991) ........................................................................................163

CYS Contact Sheet (Dec. 20, 1991) .....................................................................................164

CYS Contact Sheet (Dec. 23, 1991) .....................................................................................165

CYS Contact Sheet (Jan. 13, 1992) ......................................................................................166

CYS Contact Sheet (Mar. 3, 1992).......................................................................................167

CYS Contact Sheet (Apr. 20, 1992)......................................................................................168

Intentionally Left Blank.......................................................................................................169

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (1993) ......................170

CYS Client Information Profile (Apr. 18, 1993) ......................................................................171

CYS Contact Sheet (Apr. 20, 1993)......................................................................................172

Police Report (Jan. 26, 2001)...............................................................................................173

Intentionally Left Blank.......................................................................................................174

8

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (June 8, 1993)..........175

Office of the Sheriff, Luzerne County (Aug. 31, 1993)................................................................176

CYS Client Information Profile (Jan. 19, 1994) ........................................................................177

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................178

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................179

CYS Contact Sheet (Feb. 4, 1993)..............................................................................................180

CYS Contact Sheet (Mar. 10, 1994) ..........................................................................................181

CYS Contact Sheet (Mar. 24, 1994) ..........................................................................................182

CYS Contact Sheet (Apr. 7, 1994)..............................................................................................183

CYS Contact Sheet (Apr. 12, 1994)............................................................................................184

CYS Contact Sheet (Apr. 12, 1994)............................................................................................185

St. Michael's School Psychiatric Note (May 1994).....................................................................186

St. Michael's School Psycho Social Summary (Apr. 1994) ........................................................187

FBI Identification Record for Debra Fell (June 9, 1994).............................................................188

Wilkes-Barre Police Department Jailer's Report (Oc. 18, 1994) ...............................................189

Arrest Report for John Rhodes (Oct. 18, 1994) ..........................................................................190

Citation for John Rhodes (Oct. 18, 1994) ..................................................................................191

Wilkes-Barre Police Special Report for John Rhodes (Oct. 18, 1994).......................................192

Risk /Severity Assessment Form (Oct. 26, 1994).......................................................................193

Arrest Report for John Rhodes (Jan. 12, 1995) ..........................................................................194

Arrest Warrant for John Rhodes (Feb. 9, 1994)..........................................................................195

Arrest Warrant for John Rhodes (Jan. 12, 1995) ........................................................................196

CYS Contact Sheet (Jul. 1995) ..................................................................................................197

Substance Abuse Evaluation for Donald Fell (Sept. 16, 1996) ....................................................198

Affidavits Submitted in Motion in Limine in United States v. Haynes (May 24, 2000).............199

Letter to Judge Niedermeier (Dec. 5, 2000) .................................................................................200

Letter to Charles Tetzlaff (Dec. 5, 2000)......................................................................................201

Letter to Judge Murtha (Dec. 11, 2000).........................................................................................202

Rutland Herald Article (May 13, 2002)..........................................................................................203

Burlington Free Press Article (May 15, 2002)...............................................................................204

Donald Fell's Objections to Punishment-Related Questions (Jun. 10, 2002).............................205

Declaration of Thomas V. Ryan .....................................................................................................206

Letter to David Kirby (Feb. 23, 2005) ...........................................................................................207

Letter to Judge Sessions (Jun. 29, 2005)........................................................................................208

Special Verdict Form (Jul. 14, 2005)..............................................................................................209

Criminal History Record of Deborah Fell (Apr. 10, 1996) ..........................................................210

Rutland City Police Department Incident Report (1996) .............................................................211

Rutland City Police Department Report (1994-2000) ..................................................................212

New York State Police Investigation Report (Dec. 1, 2000).........................................................213

Criminal Docket for Christopher Eike (Oct. 8, 2002) ..................................................................214

Government Opposition to Motion (Jul. 10, 2002)........................................................................215

FBI Record (Apr. 25, 2005)............................................................................................................216

Donald Fell Event Table (Apr. 30, 2005) ......................................................................................217

FBI Record (May 11, 2005).............................................................................................................218

FBI Record (May 16, 2005).............................................................................................................219

FBI Record (Jun. 9, 2005)...............................................................................................................220

FBI Record (Jun. 6, 2005)............................................................................................................221

Adolescent Psychiatric Reports for Donald Fell (1993) ..............................................................222

Bail Certificate (Mar. 4, 1997)....................................................................................................223

CYS Contact Sheet (May 20, 1992) ............................................................................................224

FBI Record (Jun. 27, 2005)..........................................................................................................225

FBI Record (Jun. 9, 2005).............................................................................................................226

Statement by Teri Fell to Sullivan County Sheriff (Aug. 12, 2000)...........................................227

Deposition of Lance Rowland (Aug. 12, 2000)...........................................................................228

Certificate of Disposition (Aug. 16, 2000) .................................................................................229

Individual Voir Dire (Jun. 1, 2005) ............................................................................................230

Police Report (Nov. 1, 2002) ......................................................................................................231

Wilkes-Barre Times Leader Article (Oct. 5, 2004) ....................................................................232

Law and Human Behavior Article (1991) ...................................................................................233

Specialty Guidelines for Forensic Psychology ...........................................................................234

United States v. Fell Court Order (Apr. 7, 2005).........................................................................235

Transcript Excerpt (May 13, 2005)..............................................................................................236

Intentionally Left Blank...............................................................................................................237

Fell Motion to Dismiss Notice of Intent to Seek Death Penalty ................................................238

Declaration of Juror 23 ...............................................................................................................239

Conviction Record of Juror 26 (Apr. 2, 1996).............................................................................240

Declaration of Juror 143 ..............................................................................................................241

Declaration of Sally Fell Francis .................................................................................................242

Declaration of Ronald Cupano......................................................................................................243

Declaration of Rose O'Hop ........................................................................................................244

Declaration of Claudia Bublo ...................................................................................................245

Trial Transcript Excerpt (May 13, 2005)..................................................................................246

Declaration of Robert Fell .........................................................................................................247

Declaration of Dorothy Grivner.................................................................................................248

Declaration of John Timek..........................................................................................................249

Declaration of Florence Wallace ...............................................................................................250

Declaration of John Gacek..........................................................................................................251

Declaration of Adele Gacek .......................................................................................................252

Declaration of Ernie Schuldaski ................................................................................................253

Declaration of Jon Migatulski.....................................................................................................254

Declaration of Steve Ratte ..........................................................................................................255

Declaration of Marc Pelkey ........................................................................................................256

Voir Dire Transcript....................................................................................................................257

Declaration of Richard T. Callery, M.D., F.C.A.P. ...................................................................258

Intentionally Left Blank..............................................................................................................259

Declaration of Mark J. Mills, J.D., M.D. ..................................................................................260

Intentionally Left Blank..............................................................................................................261

Declaration of Andrew Bartnick.................................................................................................262

Declaration of Gene Primomo ....................................................................................................263

Declaration of Alexander Bunin .................................................................................................264

Declaration of Cynthia Ayres  ...................................................................................................265

Declaration of Sandra Shum .......................................................................................................266

Declaration of Deborah Wisell .............................................................................................267

Declaration of Anthony Mistretta ........................................................................................268

Declaration of Dora Carter...................................................................................................269

Declaration of Jeff Van Buren .............................................................................................270

Declaration of Pat Johnson ..................................................................................................271

Declaration of Mary Bell .....................................................................................................272

Transcript of Juvenile Proceedings (Apr. 8, 1994) .............................................................296

Childline Record (Apr. 22, 1991) ........................................................................................297

Officers Report.....................................................................................................................298

Prison Record (Jun. 11, 2001)..............................................................................................299

Declaration of Michael Sikirica ...........................................................................................300

Declaration of Francis Bellantoni ........................................................................................301

Declaration of Lucinda Fruean ............................................................................................302

Declaration of Michael Leight..............................................................................................303

Declaration of Paul Stoss.....................................................................................................304

Declaration of Paul Volk ......................................................................................................305

Declaration of Charles Wetli ...............................................................................................306

Birth Certificate of Theresa Kozersky (Aug. 9, 1935).........................................................307

Death Certificate of Frances Kozerski (Apr. 20, 2001) .......................................................308

Declaration of John Edens ...................................................................................................309

Government Motion in Limine to Exclude Report (Jul. 6, 2005)..........................................310

Individual Voir Dire Excerpt (Jun. 6, 2005).........................................................................311

Photographs of Fell Home ...................................................................................................312

Declaration of Jamie Dominick ...............................................................................313

**SEALED EXHIBITS**

15

# EXHIBIT 2





**Joan and Sanford I. Weill**
**Medical College**

Neuropsychological Assessment Program

525 East 68th Street, Box 147
New York, NY 10021
Telephone: 212 821-0596
Fax: 212 821-0617

## NEUROPSYCHOLOGICAL EVALUATION

NAME: Donald Fell
DOB: 4/30/1980
AGE: 20
EDUCATION: 9.5
DOMINANT HAND: Right
DATE OF TESTING: 4/6/01

### REASON FOR REFERRAL:
Donald Fell is a 20-year old, right-handed, male who was referred for an independent neuropsychological evaluation to determine his current level of neuropsychological functioning.

### CONFIDENTIALITY ISSUES:
Donald Fell was evaluated on 4/6/01 by Dr. Wilfred G. van Gorp and was assisted by a postdoctoral fellow, Dr. Kimberly Walton who administered the various neuropsychological tests. Mr. Fell was informed of the purpose of this evaluation, specifically to provide an assessment of his cognitive and personality functioning, and that the information gathered in the evaluation would be included in a verbal/written report to Messrs. Bunin and Primomo, and was, therefore, not confidential. Mr. Fell indicated that he was aware that we would be preparing a report for Messrs. Bunin and Primomo and he consented to the evaluation. Information pertaining to the presenting case were gathered from an interview with Mr. Fell and a review of the records listed in Appendix 1.

### PSYCHOSOCIAL HISTORY:
Mr. Fell was born in Wilkes-Barre, Pennsylvania on April 30th, 1980. No complications with the birth or pregnancy were reported. Mr. Fell grew up in a house with several family members including his mother, father, sister, brother, aunts, uncles, grandmother, and cousins. These family members lived in the house at sporadic times during Mr. Fell's childhood. Mr. Fell completed the 9th grade and dropped out of school soon after he entered the 10th grade.

FELL-00000377

Neuropsychological Report
Fell, Donald
Page 2 of 15

Mr. Fell began drinking alcohol at the early age of 8 years old. He stated that he had frequent access to a keg of beer that his father kept in the basement of his home. By age 12, Mr. Fell was drinking alcohol every day (12-pack) and subsequently did not attend school on a regular basis. By age 16, Mr. Fell was drinking an excessive amount of alcohol on a daily basis. Mr. Fell received several suspensions from school for disruptive behaviors. He went to live with his friend at age 17 and continued to drink alcohol and began using several recreational drugs. Mr. Fell's most frequent use of drugs included alcohol, marijuana, and amphetamines. Mr. Fell reported having sleep disturbances since age 19. He does not report nightmares or a sense of fear relating to his sleep disturbances. Mr. Fell stated that he consistently wakes up several times every night. Mr. Fell's arrest records date back to age 12 and continue through adolescence into adulthood.

PSYCHIATRIC HISTORY:
Mr. Fell has had numerous psychological and psychiatric evaluations including five psychiatric hospitalizations before the age of fourteen. In 1991, he was referred by Children's Service Center for psychological testing due to his ongoing behavior problems. Testing indicated that he was a young man of average intellectual functioning (FSIQ = 99); mild depression and anxiety; less than adequate stress tolerance; Conduct Disorder undifferentiated type. In 1992, Mr. Fell accidentally shot a boy in the chest with a hand gun. The boy survived and no charges where brought against Mr. Fell. He was voluntarily committed by his mother in 1993. Of note, Mr. Fell revealed that he was sexually abused by babysitters and physically abused by his father, who was diagnosed with schizophrenia. An application for an involuntary emergency examination in 6/2000 was submitted.

While the early diagnoses centered on Conduct Disorder, the later diagnoses emphasized his major affective and possibly a psychotic condition. His treatment included not only antidepressant medication but also antipsychotic medication. In 1992 his psychiatrist, James W. Feussner, M.D., J.D., viewed him as having a highly disorganized (and having a hyperkinetic conduct diorder, too), perhaps psychotic core in addition to a shell of antisocial audacity. As Mr. Fell's behavior problems and his parents' inadequacy persisted, he was placed at St. Michael's, a locked juvenile facility. He resided there for approximately two years. Following discharge from St. Michael's , he returned to school briefly, completing the ninth grade and dropping out in the tenth. Between the time of leaving school and his arrest for the present crimes, Mr. Fell largely drifted from one job to another.

FELL-00000378

Neuropsychological Report
Fell, Donald
Page 3 of 15

## MEDICAL HISTORY:

Mr. Fell reported being hit on the head with a brick when he was 12 years old. He could not remember if he had a loss of consciousness associated with this injury. Mr. Fell stated that he could not speak or open his eyes after the brick struck his head (rt. parietal hematoma; a localized area of blood from vessel bleeding). After being taken to the hospital by an ambulance, Mr. Fell remained hospitalized for one week. He did not report any problem with neuropsychological functioning following this incidence. No other medical hospitalizations related to head injuries where reported. Mr. Fell is not currently taking any medications.

## BEHAVIORAL OBSERVATIONS:

Mr. Fell was evaluated on April 6, 2001 in Vermont at St. Albans Prison. Mr. Fell wore prison issued pants and a T-shirt that had the sleeves cut off. He has three prominent tattoos on his body. A symbol of "anarchy" was tattooed on his right arm, the symbol of Satan was on his left arm, and the partial tattoos of the letters D-E-A-T-H were visible and written across the knuckles of his left hand (see APPENDIX III). Mr. Fell stated that he tattooed the letters himself using a sewing needle. Mr. Fell was cooperative during the evaluation. He worked diligently at all tasks presented and took breaks when needed. Mr. Fell was oriented to person, place and date. He denied current suicidal or homicidal ideations. He reported his mood to be "ok" but stated that he was "bored" in the confines of his cell. Mr. Fell stated that he passes the time away by reading several books and magazines.

## TEST ADMINISTERED:

Beck Depression Inventory II
Boston Naming Test (BNT)
Clinical Interview
Controlled Oral Word Association (COWA)
Grooved Pegboard
Judgement Of Line Orientation
Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
Rey-Osterrieth Complex Figure (Rey-O)
Rorschach
Ruff Figural Fluency Test
Structured Clinical Interview for DSM-IV (Psychotic Screen)
Stroop (Golden) Color Word Test
Structured Interview of Reported Symptoms (SIRS)
California Verbal Learning Test Second Edition (CVLT-II)
Color Trails Test 1 and 2
Validity Indicator Profile (VIP)
Wechsler Memory Scales-III (WMS-III)
Wechsler Adult Intelligence Scale - III (WAIS-III)
Wide Range Achievement Test - 3 (WRAT-3)
Wisconsin Card Sort Test (WCST)

FELL-00000379

Neuropsychological Report
Fell, Donald
Page 4 of 15

MOTIVATION/EFFORT:
Mr. Fell was administered various tests of motivation to perform his best on the cognitive and emotional measures. On the Validity Indicator Profile, Mr. Fell obtained a performance in the valid and compliant range on the verbal portion of the test and he similarly performed in the valid range on the non-verbal portion of the test, indicating appropriate motivation to perform his best. Additionally, the Structured Interview of Reported Symptoms (SIRS) was administered to detect whether or not Mr. Fell tends to embellish or feign during questioning of psychiatric-type symptoms. On this test, there are eight scales, and Mr. Fell obtained scores in the Honest range on all eight of the scales, indicating that he responded in an honest and forthright manner to various psychiatric-type questioning and he did not tend to embellish or amplify any of his symptoms complaints.

Finally, Mr. Fell was administered the MMPI-2, which contains a number of indices of both symptom amplification or minimization, as well as response consistency. On essentially all of the validity scales, Mr. Fell performed within normal limits indicating that he did not tend to either amplify or minimize his psychological symptoms and the results also indicate that he performed in a consistent manner throughout the 567 items of the test. Taken together, these results indicate that Mr. Fell responded to the evaluation in an entirely forthright and honest manner and he exerted full effort to perform his best on the various cognitive tests as well. Thus, the results that follow may be taken as a valid representation of Mr. Fell's neuropsychological and emotional functioning.

## DISCUSSION OF TEST RESULTS:

**EMOTIONAL FUNCTIONING:** On the Beck Depression Inventory, Mr. Fell achieved a score of 20 placing him the Moderate range of clinical depression. He was administered the MMPI-2, which revealed some evidence of an atypical and confused thought process in a man who tends to be somewhat egocentric and manipulative. His atypical thinking is likely to take the form of a decided suspiciousness of others and may extend to frank paranoia. Notably, on a subscale of this personality task which reflects Mr. Fell's tendency to either take charge or be directed by others, he obtained an exceedingly low score on the Dominance Scale, indicating a personality style of being quite submissive and responsive to the direction of others.

The Rorschach Inkblot Test was administered to provide an indicator of overall level of Mr. Fell's form of thought. Qualitatively, many of his responses were atypical and reflect the idiosyncratic thought process reflected in the MMPI-2 as noted above. On a number of the blots he saw blood, as well as damaged insects and other damaged things. There was a decidedly depressive quality to his responses and it is believed that these responses indicate that he has the potential for a frank breakdown in his thought process leading to a psychotic

Neuropsychological Report
Fell, Donald
Page 5 of 15

depression should he become sufficiently depressed. When the Rorschach was subjected to a more formal quantitative scoring, Mr. Fell's responses were significant for a positive score on the Coping Deficits Index, indicating that he is a young man who has great difficulty coping with the complex demands of his world. The Schizophrenia Index failed to be positive by one point, and we believe this is further evidence of the somewhat atypical thought process he has which makes him vulnerable to a frank breakdown in his thought process and in which he can display a frank psychosis if under sufficient stress. Of note, if the Schizophrenia Index is not positive, it does not necessarily rule out a psychotic process, but simply indicates that there is no firm data on which to hypothesize that a thought disturbance is present.

## INTELLECTUAL:

Mr. Fell was administered the Wechsler Adult Intelligence Scale-III (WAIS-III). He obtained a Verbal IQ of 97, a Performance IQ of 106, and a Full-Scale IQ of 101, placing him squarely in the Average range of overall intellectual ability. There was no appreciable difference between his verbal and non-verbal IQ scores. When we look at the various index scores of the tests (there are a number of subtests on this intelligence test but they may be distilled into four component indices), Mr. Fell performed in the Average range on overall measures of verbal comprehension as well as perceptual organization. In contrast, he performed in the Superior range on a measure of attention and concentration (working memory) and he performed in the Very Superior range on an index of speed of information processing. These results indicate that Mr. Fell is of average intelligence and this is consistent with his estimated pre-morbid level of intellectual functioning. His index scores are as follows:

| Index | Standard Score | Percentile |
|---|---|---|
| Verbal Comprehension (VCI) | 96 | 39th |
| Perceptual Organization (POI) | 99 | 47th |
| Working Memory (WMI) | 121 | 92nd |
| Processing Speed (PSI) | 137 | 99th |

His individual age-corrected scores (based on a mean of 10 and a standard deviation of 3) for the WAIS-III were as follows:

| VERBAL | ACSS | Percentile | PERFORMANCE | ACSS | Percentile |
|---|---|---|---|---|---|
| Vocabulary | 10 | 50th | Picture Completion | 11 | 63rd |
| Similarities | 8 | 25th | Digit Symbol-Coding | 17 | 99th |
| Arithmetic | 10 | 50th | Block Design | 11 | 63rd |
| Digit Span | 15 | 95th | Matrix Reasoning | 8 | 25th |
| Information | 10 | 50th | Picture Arrangement | 8 | 25th |
| Comprehension | 5 | 5th | Symbol Search | 16 | 98th |
| Letter-Number | 16 | 98th | | | |

FELL-00000381

Neuropsychological Report
Fell, Donald
Page 6 of 15

## ACADEMIC ACHIEVEMENT:

Mr. Fell was also administered a measure of academic achievement (Wide Range Achievement Test-Third Edition (WRAT-3). On the WRAT-3, Mr. Fell demonstrated a post-high school reading level (66th percentile), a high school spelling level (34th percentile), and a 7th grade arithmetic level (18th percentile). Of note, the discrepancies between Mr. Fell's arithmetic score compared to his other abilities on the WRAT-3 raises the possibility of the presence of a Mathematics Disorder.   On this test he achieved the following scores:

| WRAT-3 | Score | Percentile | Grade Level |
|---|---|---|---|
| Reading | 106 | 66th %ile | Post HS |
| Spelling | 94 | 34th %ile | HS |
| Arithmetic | 86 | 18th %ile | 7th |

## ATTENTION AND CONCENTRATION:

Mr. Fell performed in the superior range on a test of attention and immediate auditory memory requiring repetition of verbal digit strings of increasing length (WAIS-III Digit Span: 95th percentile) and on an auditory attention task that requires the repetition and systematic re-ordering of digits and letters in spans of increasing length (Letter-Number Sequencing: 98th percentile). On a timed psychomotor test of attention (Color Trails 1), Mr. Fell performed very rapidly (99th %ile) indicating a very high level of attention as well as psychomotor speed. Thus, no abnormalities in the domain of attention and concentration were evident.

## LANGUAGE:

On discrete measures of language, Mr. Fell's results indicate that his abilities are in the average range. As noted above, Mr. Fell's overall verbal comprehension as evident on the WAIS-III are within average range (VCI = 96, 39th percentile). Mr. Fell was administered a measure of confrontation naming (Boston Naming Test).  On this test he achieved a score of 55 out of 60 placing him squarely in the Average range.  On a measure of word list generation (FAS), Mr. Fell achieved a score placing him in the low Average range.  When asked to generate names of as many animals as he could think of within in one minute, he achieved a score in the Average range.  Thus, no abnormalities were evident in the domain of language functioning.

## LEARNING AND MEMORY:

Mr. Fell performed within the average to superior range on measures of learning and memory. He was administered a word list learning task that presents verbally a list of 16 words over 5 learning trails.  Although his initial recall was relatively poor (5/16, 11th percentile), his progressive learning curve and ability to recall 15 of 16 words by the fifth trial placed him in the high average range (CVLT-II, total recall: 84th percentile).  His recall of the list after a 20-minute delay was 15 of 16

FELL-00000382

Neuropsychological Report
Fell, Donald
Page 7 of 15

words, which is in the superior range. However, when asked to reproduce a complex geometric figure after having copied it, Mr. Fell performed in the average range (Rey-O, 30-minute delay: 27th percentile). On a test to measure immediate memory of faces, Mr. Fell also performed in the average range (Faces I: 37th percentile). On a test to measure delayed memory of faces, Mr. Fell performed in the average range (Faces II: 25th percentile). Thus, no abnormalities are evident in the domain of learning and memory.

## VISUAL SPATIAL:
Mr. Fell's visual spatial skills and constructional skills were between the low average and average range of performance. As was noted above, his overall perceptual organizational abilities are within the average range (WAIS-III Perceptual Organization Index: 47th percentile). His ability to distinguish essential from non-essential visual details was also in the average range (WAIS-III Picture Completion: 63rd percentile). On a task of rapid visual spatial reasoning that requires the manipulation of colored blocks to reproduce two-dimensional designs, she performed in the average range (Block Design: 63rd percentile). He achieved a Low Average range score in his copy of a complex figure (Rey Osterrieth Complex Figure) and he had a number of difficulties in recognition of various details of this figure. In contrast, on a measure of judgment of line orientation (another non-motor visual spatial test), Mr. Fell performed within the Average range (40th percentile). Thus, there is no convincing evidence that Mr. Fell has significant problems in tasks of visual spatial ability.

## EXECUTIVE FUNCTIONING:
This domain assesses various tasks associated with more complex cognitive operations such as shifting of cognitive set, planning, and inhibiting responses. On a task of cognitive set shifting (Color Trails 2), Mr. Fell performed in the Superior range (96th percentile). Similarly, he performed within normal limits on a task of response inhibition (Stroop; 66th percentile). When given a task of problem solving in which he had to deduce the correct the problem-solving solution (Wisconsin Card Sorting Test), Mr. Fell performed fully within normal limits and did not make a significant number of perseverative errors. When administered the Ruff Figural Fluency Test he performed within the Average range generally. Thus, there were no abnormalities evident in the domain of executive functioning.

## MOTOR FUNCTIONING:
Mr. Fell's fine motor coordination was within normal limits (Grooved Pegboard: dominant hand, 96th percent; nondominant hand 66th percentile). He demonstrated very superior abilities on other psychomotor speed tasks overall (WAIS-III PSI = 137, 99th percentile). For example, on a task that that requires mental processing speed, Mr. Fell performed in the superior range (Symbol Search = 98th percentile). Similarly, on a task that requires psychomotor speed,

FELL-00000383

Neuropsychological Report
Fell, Donald
Page 8 of 15

Mr. Fell again performed in the superior range (Digit Symbol-Coding = 99th percentile).

## SUMMARY/CONCLUSION:

The results of this evaluation reveal Mr. Fell to be a young man who is appears to be forthright, candid, and well motivated to perform his best on the various cognitive and emotional tests and there was no indication whatsoever of either malingering or symptom amplification. He is a young man of average intelligence (Full-Scale IQ of 101) with an essentially normal neuropsychological profile. However, the discrepancies between Mr. Fell's arithmetic score compared to his other abilities on the WRAT-3 raises the possibility of the presence of a Mathematics Disorder. The more revealing findings were in the emotional realm in which he harbors a good deal of atypical thinking, depression, propensity to a breakdown in his thought process if under sufficient stress, and a decidedly acquiescent style when directed by others. He also tends to be somewhat egocentric and frankly manipulative of others. These findings point to his atypical thought process and depression and are fully consistent with his history of many years of psychiatric hospitalizations and treatment. Mr. Fell is clearly a troubled young man in need of continued structured psychiatric intervention.

Please let us know if you need additional information regarding these findings. The results have also been communicated to Dr. Mark Mills for incorporation into his report.

Kimberly Walton, Ph.D.
Postdoctoral Fellow of Neuropsychology
Weill Cornell Medical College

Wilfred G. van Gorp, Ph.D., ABPP
Professor of Psychology in Psychiatry
Director, Neuropsychological Assessment Service
Weill Cornell Medical College

FELL-00000384

Neuropsychological Report
Fell, Donald
Page 9 of 15

## APPENDIX I

## DOCUMENTATION REVIEWED

As part of this evaluation, the following available records were reviewed:

- Curriculum vitae of Jonathan Joseph Lipman, Ph.D., MIBiol., FACN
- Wanda I. Rivera: letter (2/23/01)
- Letter from Jonathan J. Lipman, Ph.D. to Gene Primomo, Esquire (1/31/01)
- Media accounts
- Wilkes Barre General Hospital: medical records of Donald Fell
- Luzerne County Children and Youth Services: records of Donald Fell
- Wyoming Valley West High School: letter re not finding records of Donald Fell
- Children's Service Center: records
- Luzerne County Social Services
- Wilkes Barre Area Vocational-Technical School records
- Lisa M. Woodworth of the Court Advocate Program: letter (1/16/01)
- Juvenile Probation Department: letter (9/16/96)
- Commonwealth of Pennsylvania: criminal record
- Luzerne County Court of Common Pleas: re Deborah Fell
- Luzerne County Court of Common Pleas: re Donald Fell
- Luzerne County Court of Common Pleas: re Donald Fell, II
- Penn State Geisinger Wyoming Valley Medical Center: medical records
- Police records
- Brian J. Benedetti: letter (2/2/01)
- City of Wilkes Barre Bureau of Police: records
- Alex Bunin, Esquire: letter (3/1/01)
- Cynthia Carter Ayres, M.S.W.: letter

FELL-00000385

Neuropsychological Report
Fell, Donald
Page 10 of 15

## APPENDIX II
## NPSY Summary Sheet

### Effort/Malingering

| Test | Score | Norms | Conclusion |
|------|-------|-------|------------|
| VIP | | | |
| Nonverbal | 84/100 | Manual | Valid/Compliant |
| Verbal | 64/78 | Manual | Valid/Compliant |

### SIRS

| | |
|---|---|
| # of Primary Scales in Definite range | 0 |
| # of Primary Scales in Probable range | 0 |

**8/8 in Honest Range 95% likelihood of honest responding**

### Intellectual/Academic

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|------------|-------|------------|
| WAIS-III | | | | |
| VIQ | 97 | 42nd %ile | Manual | Average |
| PIQ | 106 | 66th %ile | Manual | Average |
| FSIQ | 101 | 53rd %ile | Manual | Average |

Difference between VIQ and PIQ = -9 (p<.15, Freq = 42.7%)

| Verbal Subtests | | | | |
|------|-------|------------|-------|------------|
| Vocabulary | 10 | 50th %ile | Manual | Average |
| Similarities | 08 | 25th %ile | Manual | Average |
| Arithmetic | 10 | 50th %ile | Manual | Average |
| Digit Span | 15 | 95th %ile | Manual | Superior |
| Information | 10 | 50th %ile | Manual | Average |
| Comprehension | 05 | 5th %ile | Manual | Borderline |
| Letter-Number Seq. | 16 | 98th %ile | Manual | Superior |

| Performance Subtests | | | | |
|------|-------|------------|-------|------------|
| Picture Completion | 11 | 63rd %ile | Manual | Average |
| Digit Symbol-Coding | 17 | 99th %ile | Manual | Very Superior |
| Block Design | 11 | 63rd %ile | Manual | Average |
| Matrix Reasoning | 08 | 25th %ile | Manual | Average |
| Picture Arrangement | 08 | 25th %ile | Manual | Average |
| Symbol Search | 16 | 98th %ile | Manual | Superior |

FELL-00000386

Neuropsychological Report
Fell, Donald
Page 11 of 15

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| Index Scores | | | | |
| *Verbal Comprehension* | 96 | 39th %ile | Manual | Average |
| *Perceptual Organization* | 99 | 47th %ile | Manual | Average |
| *Working Memory* | 121 | 92nd %ile | Manual | Superior |
| *Processing Speed* | 137 | 99th %ile | Manual | Very Superior |

## Achievement

| Test | Score | Percentile | Norms | Grade |
|------|-------|-----------|-------|-------|
| WRAT-3 | | | | |
| *Reading* | 106 | 66th %ile | Manual | Post High School |
| *Spelling* | 94 | 34th %ile | Manual | High School |
| *Arithmetic* | 86 | 18th %ile | Manual | 7th grade |

## Attention and Concentration

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| WAIS-III | | | | |
| *WMI* | 121 | 92nd %ile | Manual | Superior |
| *Arithmetic* | 10 | 50th %ile | Manual | Average |
| *Digit Span* | 15 | 95th %ile | Manual | Superior |
| *Letter-Number* | 16 | 98th %ile | Manual | Superior |
| *Digit Symbol-Coding* | 17 | 99th %ile | Manual | Very Superior |
| *Symbol Search* | 16 | 98th %ile | Manual | Very Superior |
| Colors Trails 1 | 18" | 99th %ile | Manual | Very Superior |

## Language

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| BNT | 55/60 | 38th %ile | Farmer (1990) | Average |

COWAT

| | Score | Percentile | Norms | Conclusion |
|--|-------|-----------|-------|-----------|
| *F* | 14 | 52nd %ile | Tombaugh, Kozak, & Rees (1996) | Average |
| *A* | 09 | 31st %ile | Tombaugh, Kozak, & Rees (1996) | Average |
| *S* | 17 | 71st %ile | Tombaugh, Kozak, & Rees (1996) | Average |
| **Total** | 30 | 21st %ile | Tombaugh, Kozak, & Rees (1996) | Low Average |
| **Animals** | 23 | 73rd %ile | Tombaugh, Kozak, & Rees (1996) | Average |

WAIS-III

| | Score | Percentile | Norms | Conclusion |
|--|-------|-----------|-------|-----------|
| *VCI* | 96 | 39th %ile | Manual | Average |
| Vocabulary | 10 | 50th %ile | Manual | Average |
| *Information* | 10 | 50th %ile | Manual | Average |
| *Similarities* | 08 | 25th %ile | Manual | Average |

FELL-00000387

Neuropsychological Report
Fell, Donald
Page 12 of 15

## Visual-Spatial

| Test | Score | Percentile | Norms | Conclusion |
|---|---|---|---|---|
| WAIS-III | | | | |
| POI | 99 | 47th %ile | Manual | Average |
| Picture Completion | 11 | 63rd %ile | Manual | Average |
| Block Design | 11 | 63rd %ile | Manual | Average |
| Picture Arrangement | 08 | 25th %ile | Manual | Average |
| Matrix Reasoning | 08 | 25th %ile | Manual | Average |

| Rey-O | | | | |
|---|---|---|---|---|
| Copy | 32/36 | 13th %ile | Meyer & Meyer | Low Average |

| JLO | | | | |
|---|---|---|---|---|
| Correct | 24/30 | 40th %ile | Benton (1977) | Average |

## Memory

| Test | Score | Percentile | Norms | Conclusion |
|---|---|---|---|---|
| WMS-III | | | | |
| | | | | |
| Subtests | | | | |
| Logical Memory I | | | | |
| Recall Total Score | 13 | 84th %ile | Manual | High Average |
| Logical Memory II | | | | |
| Recall Total Score | 14 | 91st %ile | Manual | Superior |
| Faces I | 09 | 37th %ile | Manual | Average |
| Faces II | 08 | 25th %ile | Manual | Average |

| Test | Score | Percentile | Norms | Conclusion |
|---|---|---|---|---|
| CVLT-II | | | | |
| Trial 1 | 05 | 11th %ile | Manual | Low Average |
| Trial 2 | 08 | 50th %ile | Manual | Average |
| Trial 3 | 16 | >99th %ile | Manual | Very Superior |
| Trial 4 | 16 | >99th %ile | Manual | Very Superior |
| Trial 5 | 15 | >99th %ile | Manual | Very Superior |
| Trials 1-5   (T-Score ) | 60 | 84th %ile | Manual | High Average |
| List B | 06 | 23rd %ile | Manual | Low Average |
| Short Delay Free Recall | 15 | >99th %ile | Manual | Very Superior |
| Short Delay Cued Recall | 14 | 98th %ile | Manual | Superior |
| Long Delay Free Recall | 15 | >99th %ile | Manual | Very Superior |
| Long Delay Cued Recall | 16 | >99th %ile | Manual | Very Superior |

FELL-00000388

Neuropsychological Report
Fell, Donald
Page 13 of 15

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| **Delayed Recognition:** | | | | |
| Total Hits | 16 | | Manual | |
| Total False Positives | 0 | | Manual | |
| Forced Choice Recognition | | 16/16 | | |
| **Rey-O** | | | | |
| *Immediate Recall* | 22.36 | 24th %ile | Meyer & Meyer | Low Average |
| *30 minute* | 22/36 | 27th %ile | Meyer & Meyer | Low Average |

**Executive Functions**

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| Color Trails 2 | 51" | 96th %ile | Manual | Superior |
| Stroop | | | | |
| *Word* | 106 | 50th %ile | Manual | Average |
| *Color* | 98 | 88th %ile | Manual | High Average |
| *Color-Word* | 53 | 79th %ile | Manual | High Average |
| *Interference* | 3 | 66th %ile | Manual | Average |
| **WCST** | | | | |
| Categories | 6/6 | | Manual | WNL |
| Errors | | 11 | Manual | |
| Perseverative Errors | | 4 | Manual | |
| % Perseverative Errors | | 4.8% | Manual | |
| Failure to Maintain Set | | 1 | Manual | WNL |

**RUFF Figural Fluency Test**

| | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| Total Unique Designs | | 98 | 32nd %ile | Average |
| Error Ratio | | .0737 | 72nd %ile | Average |

**Psychomotor**

| Test | Score | Percentile | Norms | Conclusion |
|------|-------|-----------|-------|-----------|
| **WAIS-III** | | | | |
| *PSI* | 137 | 99th %ile | Manual | Very Superior |
| *Symbol Search* | 16 | 98th %ile | Manual | Superior |
| *Digit Symbol* | 17 | 99th %ile | Manual | Very Superior |
| **Grooved Pegboard** | | | | |
| Right (Dominant) | 52" | 96th %ile | Heaton | Superior |
| Drops | 0 | | | |
| Left (Nondominant) | 61" | 66th %ile | Heaton | Average |
| Drops | 0 | | | |

FELL-00000389

Neuropsychological Report
Fell, Donald
Page 14 of 15

## Emotional Functioning

| Test | Score Percentile | Norms | Conclusion |
|------|------------------|-------|------------|
| BDI | 20 | | Moderate Range |

## SCID-Psychotic Screening Module

did not endorse psychotic symptoms

## MMPI-2

| | |
|------|----|
| L | 52 |
| F | 89 |
| K | 47 |
| F-K | 3 |
| TRIN | 57 |
| VRIN | 61 |
| Hs | 68 |
| D | 64 |
| Hy | 61 |
| Pd | 92 |
| Mf | 36 |
| Pa | 86 |
| Pt | 72 |
| Sc | 89 |
| Ma | 88 |
| Si | 46 |

FELL-00000390

Neuropsychological Report
Fell, Donald
Page 15 of 15

## APPENDIX III

## TATTOS OBSERVED

Right Arm
Symbol of "Anarchy"



Left Arm
Symbol of "Satan"



FELL-00000391

# EXHIBIT 3

# FORENSIC SCIENCES MEDICAL GROUP, P.C.

**3301 New Mexico Avenue, N.W., Suite 252**
**Washington, District of Columbia 20016**
**Phone (202) 298-8600  Fax (202) 298-8603**
**office@forensicsciences.com**

Mark J. Mills, J.D., M.D.
Susan E. Mills, R.N., M.H.P.

Robert B. Shearin, M.D.
Deborah L. Gutterman, Ph.D.

## C O N F I D E N T I A L

May 7, 2001

**Via FedEx**

Alexander Bunin, Esquire
Federal Public Defender
Gene V. Primomo, Esquire
Assistant Federal Public Defender
Office of the Federal Public Defender
Districts of Northern New York & Vermont
39 North Pearl Street
Fifth Floor
Albany, New York 12207

Re: *United States v. Fell*
    *01-CR-12*

Dear Messrs. Bunin and Primomo:

This letter summarizes my psychiatric impressions of Mr. Donald R. Fell. Both before and after the evaluation, I reviewed those documents that I received from your office concerning his case.[1]

---

[1] They include the following, numbered in the order in which they were received: 1) Curriculum vitae of Jonathan J. Lipman, Ph.D.; 2) Letter (2/23/01) from Wanda I. Rivera re documents; 3) Letter (1/31/01) from Jonathan J. Lipman, Ph.D. to Gene Primomo, Esquire re Donald Fell and attached interview notes and test results; 4) Media accounts; 5) Medical Records of Donald Fell from Wilkes Barre General Hospital; 6) Records of Donald Fell from Luzerne County Children and Youth Services; 7) School Records of Donald Fell; 8) Records of Donald Fell from First Hospital Wyoming Valley; 9) Records of Donald Fell from Children's Service Center; 10) Note from Wyoming Valley West High School re not finding records of Donald Fell; 11) Records of Donald Fell from Luzerne County Social Services; 12) Records of Donald Fell from Wilkes-Barre Area Vocational-Technical School; 13) Letter (1/16/01) from Lisa M. Woodworth of the Court Advocate Program of Luzerne County to Wanda I Rivera re Donald Fell; 14) Letter (9/16/96) from Lisa M. Randazzo of the Court Advocate Program to Mr. Robert Roman of the Luzerne County Juvenile Probation Department re Donald Fell; 15) Records from Commonwealth of Pennsylvania re crimes of possessing a small amount of marijuana and possession of drug paraphernalia committed by Donald Fell; 16) Records from Luzerne County Court of Common Pleas re Deborah A. Fell; 17) Records from Luzerne County Court of Common Pleas re Donald R. Fell; 18) Records from Luzerne County Court of Common

FELL-00000392

# FORENSIC SCIENCES MEDICAL GROUP, P.C.

Alexander Bunin, Esquire
Gene V. Primomo, Esquire
Re: *United States v. Fell*
May 7, 2001
Page 2 of 5

As part of the preparation for Mr. Fell's evaluation, I administered two psychological tests, (the Minnesota Multiphasic Personality Inventory, 2 (MMPI-2) and the Validity Indicator Profile (VIP). Additionally, Wilfred G. van Gorp, Ph.D. and Kimberly Walton, Ph.D. administered a battery of tests that included: Beck Depression Inventory II, Boston Naming Test (BNT), Clinical Interview, Controlled Oral Word Association (COWA), Grooved Pegboard, Judgment Of Line Orientation, Rey-Osterrieth Complex Figure (Rey-O), Rorschach, Ruff Figural Fluency Test, Structured Clinical Interview for DSM-IV (Psychotic Screen), Stroop (Golden) Color Word Test, Structured Interview of Reported Symptoms (SIRS), California Verbal Learning Test Second Edition (CVLT-II), Color Trails Test 1 and 2, Wechsler Memory Scales-III (WMS-III), Wechsler Adult Intelligence Scale - III (WAIS-III), Wide Range Achievement Test - 3 (WRAT-3) and the Wisconsin Card Sort Test (WCST). I reviewed the results and their interpretations in preparing this report.

You may recall that I evaluated Mr. Fell on March 26 and 27, 2000 for a total of about seven hours, including approximately two hours of psychological test administration. Mr. Fell appeared cooperative throughout his evaluation, answering questions directly about the matters that underpin his criminal indictment. He is a lean, youthful-looking Caucasian male with very short hair, as many prisoners have, who made good eye contact, shook hands firmly and never appeared unduly upset or anxious. He did, however, appear sad when speaking about his mother's death and his role in the killing of Mrs. King. His thoughts flowed logically; he denied hallucinations, bizarre thoughts (delusions) and homicidal or suicidal ideation. He related easily, only hesitating when asked to describe the murders of his mother, her boyfriend and Mrs. King. Despite his initial reluctance, however, he appeared forthcoming when he discussed those details.

Mr. Fell's personal background is replete with examples of significant abuse and dramatic acts of abandonment. At the age of three or four, his babysitter and/or her husband sexually molested him. Although he denies recalling the incident now, his records from his psychiatric hospitalizations indicate that he had a fairly clear recollection of the events as a child/early adolescent. More significant is the fact that both of his parents were chronic and severe alcoholics, that his father was physically abusive towards him and that his mother abandoned him and his younger sister without any warning, when he was thirteen. As is the case with many children of abusive parents, Mr. Fell maintains that his childhood was not that different from most of his peers, but the multiple encoun-

---

Pleas re Donald R. Fell, II; 19) Medical Records of Donald Fell from Penn State Geisinger Wyoming Valley Medical Center; 20) Police Records; 21) Letter (2/2/01) from Brian J. Benedetti, Principal, Daniel J. Flood Elementary School, re not finding records re Donald Fell; 22) Records from City of Wilkes-Barre Bureau of Police; 23) Letter (3/1/01) from Alex Bunin, Esquire re retention; 24) a set of draft observation concerning Mr. Fell's father prepared Cynthia Carter Ayres, M.S.W. and information from the County of Sullivan (NY) regarding the matter of the People of the State of New York against Donny R. McNeely.

FELL-00000393

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Alexander Bunin, Esquire
Gene V. Primomo, Esquire
Re: *United States v. Fell*
May 7, 2001
Page 3 of 5

ters with social service providers (documented in the records that you asked me to review) belie his statements in this regard. Overall, it appears that his childhood was mostly abusive by neglect, lack of supervision and poor role modeling. His father was frequently violent towards him and he was sexually molested on at least one occasion.

Whether because of this neglect, because of his genetic predisposition (numerous studies, most prominently those of Marc C. Schuckit, M.D., have demonstrated that the children of alcoholics are at greatly increased risk of developing alcoholism themselves) or both, Mr. Fell reports that he began drinking experimentally at age six or seven and regularly (to the point of intoxication) by age eight or nine. The social service records amply document that he was abusing drugs, including alcohol, at an unusually early age. A detailed history of Mr. Fell's use/abuse of alcohol and illicit substances is presented in the report of Jonathan J. Lipman, Ph.D.

Because of the chronic problems with Mr. Fell's truancy, behavior at school and intoxication at school, he had numerous psychological and psychiatric evaluations including five psychiatric hospitalizations before the age of fourteen. While the early diagnoses centered on conduct disorder, the psychiatric equivalent of bad behavior, the later diagnoses emphasized his major affective disorder. More tellingly, his treatment included not only antidepressant medication but also antipsychotic medication. In fact, it was only when antipsychotic medication was added to his therapeutic regimen that significant positive changes were noted in his behavior. His psychiatrist, James W. Feussner, M.D., J.D., diagnosed him with having a major depression with psychotic features, as is evident in his prescription of antipsychotic medication. Because of Mr. Fell's behavioral problems and his parents' inadequacy (although by this point Mr. Fell's father was no longer on the scene) he was placed at St. Michael's, a locked juvenile facility. He resided there for about two years. The records suggest that in that highly structured environment, he was able to function comparatively well and was not a behavior problem.

Following discharge from St. Michael's, he returned to school briefly, completing the ninth grade and dropping out in the tenth. Mr. Fell describes some other troubling behavior during the period prior to his incarceration at St. Michael's. On one occasion, he and a neighbor were playing with the neighbor's father's nine-millimeter pistol and this friend was shot when Mr. Fell was holding the gun. Although he miraculously recovered, the nature of the injury to the neighbor was such that that boy easily could have been killed.

During the two and a half year period between the end of high school and his arrest for the present crimes, besides drifting from one job to another, Mr. Fell was mostly intoxicated and/or "stoned". It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated. During this period of virtually constant intoxication, Mr. Fell was arrested in Sullivan County (New York) following an incident in which he severely beat another young man who had been sexually inappropriate with his sister, Teri. As with the murders of his mother and her friend, Mr. Fell has no memory because he was so "stoned"

FELL-00000394

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Alexander Bunin, Esquire
Gene V. Primomo, Esquire
Re: *United States v. Fell*
May 7, 2001
Page 4 of 5

and intoxicated. He does not recall his rage, the degree of injury he inflicted or the fact that he urinated on the victim.

The reports of Drs. van Gorp and Walton discuss the test results in greater detail than I do here. However, certain results are readily apparent from Mr. Fell's results. Scores on several instruments, particularly the VIP, the Structured Interview of Reported Symptoms (SIRS) and the MMPI-2 validity scales suggest that overall Mr. Fell was not malingering and that he put forth consistent effort in his testing. Mr. Fell appears to be of average intelligence, of somewhat less than average educational achievement and somewhat greater than average motor ability. He does not appear to be grossly psychotic; however, his scales demonstrate that he should be considered pre-psychotic or potentially psychotic.

Essentially, Mr. Fell experienced a highly deprived childhood that resulted in early and recurrent inappropriate social behavior and intoxication. His misbehavior led to frequent social service interventions, psychiatric evaluations and hospitalizations (five) and long-term incarceration by age fifteen. Interestingly, many of these evaluations and/or interventions failed to describe the extent of his substance abuse. The psychiatric hospitalizations established that Mr. Fell improved on antipsychotic medications and thereby that he has a pre-psychotic or psychotically disorganized core, and his incarceration demonstrated that in structured settings, and away from many drugs of abuse, he could function relatively well. Further, his risk-taking and zealously macho behaviors were also evident in childhood. Finally, a similar (intoxication, provocation, violence and dramatically impaired memory and judgment) combination of events and behaviors occurred four months prior to the killings in this case.

Mr. Fell is neither floridly psychotic nor significantly cognitively impaired, at present. Still, his history of responding to anti-psychotic medication and his disorganization of the MMPI-2 and Rorschach suggest incipient psychosis or pre-psychotic breakdown. Such issues are clearly relevant to a decision about the imposition of the death penalty. The best scientific, medical and psychiatric evidence suggests both that psychotic illness and substance abuse have strong familial and genetic components. That is, Mr. Fell did not choose his predispositions in these regards. Neither did he choose to be abused, molested and abandoned. In aggregate, these phenomena, genetic, familial and environmental, have much to do with his chronic disturbances and the killings that he committed.

In recounting his time in Vermont, Mr. Fell explained that he was hoping to find the loving mother that he felt he never had while growing up. He explained that he and his mother had come to something like a resolution about her abandoning him and his sister. However, Mr. Fell's fantasy of her being emotionally available and supportive was dashed by her continuing substance abuse. Characteristically, he responded to his disappointment (something that he has little insight into) with his own increased substance abuse. It seems highly unlikely that her murder and that of her boyfriend would have occurred without Mr. Fell's profound obtundity and intoxication. Further, without those murders, Mr. Fell's guilt (particularly over the killing of his mother) and his fear of being

FELL-00000395

## FORENSIC SCIENCES MEDICAL GROUP, P.C.

Alexander Bunin, Esquire
Gene V. Primomo, Esquire
Re: *United States v. Fell*
May 7, 2001
Page 5 of 5

apprehended, the abduction and subsequent killing of Mrs. King would not have occurred.

Three closing observations may he useful. Drs. van Gorp and Walton directed my attention to Mr. Fell's very low score on the MMPI-2 Dominance Scale. This score tends to confirm Mr. Fell's statements that he had not intended to hurt Mrs. King, that he had intended to release her, but that he acceded to the demand of Mr. Lee that she be killed because she knew their identities. In effect, his score means that Mr. Fell is incapable of standing up for his beliefs and that others can easily dominate him. Second, as alluded to above, Mr. Fell did comparatively well when incarcerated at St. Michaels. As I understand it, this reflects the facts that there were few drugs available there and that the rules of conduct and the consequences for breaking them were clear (unlike his family situation). By analogy, I believe that if he were imprisoned, he would be a conforming prisoner who would comply with prison regulations. The final observation is of a different kind. In the many death penalty cases in which I been have consulted, it is common for the defendant to endeavor to find psychiatric or psychological issues that could be exculpatory, or failing that, at least mitigating. This search often leads to extraordinary efforts at testing or history gathering to find comparatively minor indicia of psychiatric illness. Mr. Fell's case stands in sharp contrast to those efforts. His history of abuse, misbehavior, illness and treatment with antipsychotic medications long antedates his present situation. There is no question that for nearly a decade he has had a condition that was perceived as psychotic-like (another indicator of this fact can be found in the test results of doctor's van Gorp and Walton where Mr. Fell's score on the Rorschach were virtually in the schizophrenic range). To my mind then, this condition should preclude the imposition of the death penalty for the present offenses. This is because his psychiatric condition is overwhelmingly biologically and/or environmentally caused and *not* something that he chose.

If you have any questions about this report, please let me know.

Sincerely,

Mark J. Mills, J.D., M.D.
Principal

MJM/srs
Enclosures: *curriculum vitae*
                  Four-year case history

FELL-00000396

# Mark J. Mills, J.D., M.D.

## CURRICULUM VITAE
(Revised: January 2001)

**Principal**
**Forensic Sciences Medical Group**

**Clinical Professor**
**Department of Psychiatry**
**New York Medical College, St. Vincent's Hospital**

**Clinical Professor**
**Department of Psychiatry**
**Georgetown University School of Medicine**

3301 New Mexico Avenue, N.W.
Suite 252
Washington, District of Columbia 20016

(202) 298-8600; (202) 298-8603 (facsimile)

mjmills@forensicsciences.com

Licensed in District of Columbia, California and Massachusetts

Board Certified - Psychiatry

Board Certified - Forensic Psychiatry

FELL-00000397

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 2

| | |
|---|---|
| **BORN** | ████████; Pasadena, California |
| **MARITAL STATUS** | Married: Susan E. Mills, R.N., B.A., M.H.P.<br>Three children: Henry Mark, William John and Elizabeth Susan |
| **CITIZENSHIP** | United States of America |
| **EDUCATION** | A.B., University of California, Berkeley, 1967<br>J.D., Harvard Law School, 1970<br>M.D., Stanford University School of Medicine, 1975 |
| **LICENSURE** | MD32430 (District of Columbia, 2000-)<br>G32251 (California, 1976-)<br>Massachusetts (inactive) |
| **DEA NUMBER** | BM7051600 |
| **SOCIAL SECURITY** | RE ████████ |
| **TAX ID NUMBER** | 95-4097387 |

## ACADEMIC AWARDS AND HONORS

| | |
|---|---|
| 1967 | A.B. *cum laude* |
| 1967 | Phi Beta Kappa |

## POSTGRADUATE TRAINING

| | |
|---|---|
| 1970-1971 | Graduate Student Assistant in Psychiatry, Massachusetts General Hospital, Boston, Massachusetts |
| 1975-1976 | Intern in Psychiatry, Stanford University Medical Center (and Veterans Administration Medical Center), Stanford, California |
| 1976-1977 | Resident in Psychiatry, Stanford University Medical Center, (and Veterans Administration Medical Center), Stanford, California |
| 1977-1978 | Chief Resident, Department of Psychiatry, Veterans Administration Medical Center, Palo Alto, California (for Stanford University) |

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1978-1980 | Assistant Professor (Clinical), Department of Psychiatry and Behavioral Sciences, Stanford University School of Medicine, Stanford, California |
| 1980-1981 | Instructor, Department of Psychiatry, Harvard Medical School, Boston, Massachusetts |
| 1981-1983 | Assistant Professor, Department of Psychiatry, Harvard Medical School, Boston, Massachusetts |
| 1983-1986 | Lecturer, Department of Psychiatry, Harvard Medical School, Boston, Massachusetts |
| 1983-1985 | Associate Professor, Department of Psychiatry and Biobehavioral Sciences, University of California Los Angeles School of Medicine, California |
| 1985-1987 | Professor, Department of Psychiatry and Biobehavioral Sciences, University of California Los Angeles School of Medicine, California |
| 1987-1999 | Clinical Professor, Department of Psychiatry and Biobehavioral Sciences, University of California Los Angeles School of Medicine, California |
| 1997- | Clinical Professor, Department of Psychiatry, New York Medical College, St. Vincent's Hospital, New York, New York |
| 1997- | Clinical Professor, Department of Psychiatry, Georgetown University School of Medicine, Washington, District of Columbia |

FELL-00000398

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 3

## HOSPITAL APPOINTMENTS

| | |
|---|---|
| 1977-1978 | Acting Director, Psychiatric Evaluation Unit, Palo Alto Veterans Administration Medical Center |
| 1978-1980 | Director, Psychiatric Evaluation Unit, Palo Alto Veterans Administration Medical Center |
| 1980-1981 | Executive Officer, Massachusetts Mental Health Center |
| 1980-1981 | Co-Director, Program in Psychiatry and the Law, Massachusetts Mental Health Center |
| 1980-1981 | Walk-In Supervisor, Massachusetts Mental Health Center |
| 1983-1987 | Chief, Psychiatry Service, West Los Angeles Veterans Administration, Brentwood Division |
| 1984-1991 | Director, Program in Psychiatry and the Law, Neuropsychiatric Institute, University of California Los Angeles, School of Medicine |
| 1985- | Member, Stanford Medical School Alumni Resource Group |

## BOARD CERTIFICATION, FELLOWSHIPS, AWARDS, GRANTS

| | |
|---|---|
| 1982- | Diplomate, American Board of Psychiatry and Neurology, No. 24196 |
| 1983- | Diplomate, American Board of Forensic Psychiatry, No. 143 |
| 1978- | Fellow, American College of Legal Medicine |
| 1981 | Harry C. Solomon Award |
| 1982 | Harry C. Solomon Award (co-recipient) |
| 1985 | Distinguished Service Award, American Society of Law & Medicine |
| 1985 | Bronze Medal, 28th Annual International Film and Television Festival of New York, "In the Absence of Angels - A Report on the Homeless Mentally Ill Chronology" |
| 1986- | Fellow, Pacific Rim College of Psychiatrists |
| 1986- | Fellow, American Psychiatric Association |

## OTHER LICENSURE

| | |
|---|---|
| 1980- | Massachusetts License, No. 46279 (inactive) |

## PROFESSIONAL SOCIETY MEMBERSHIPS

MEMBERSHIPS, OFFICES, AND MAJOR COMMITTEE ASSIGNMENTS

| | |
|---|---|
| 1976- | American Psychiatric Association |
| 1976-1980 | Committee on Psychobiology, Northern California Psychiatric Society (Chair, 1978-1979) |
| 1978- | American Academy of Psychiatry and the Law |
| 1978- | American College of Legal Medicine |
| 1979-1984 | Commission on Judicial Action, American Psychiatric Association |
| 1980- | American Association for the Advancement of Science |
| 1980-1987 | Committee on Accreditation of Training Programs in Forensic Psychiatry, American Academy of Psychiatry and the Law |
| 1981-1985 | Committee on the Abuse of Psychiatry and Psychiatrists, American Academy of Psychiatry and the Law |
| 1981-1982 | Commission on the Mentally Disabled, American Bar Association (Consultant) |
| 1981-1983 | American College of Mental Health Administration |
| 1981-1983 | Committee on Law, Chair, National Association of State Mental Health Program Directors |
| 1982-1987 | Program Committee, American Academy of Psychiatry and the Law |
| 1982-1983 | Committee on Comprehensive Health Planning, American Psychiatric Association (Chair) |
| 1982-1987 | American Association of Psychiatric Administrators |
| 1982- | American Society of Law and Medicine |
| 1983-1987 | Committee on Psychiatry and the Law, California Psychiatric Association |
| 1983-1989 | Southern California Psychiatric Society |
| 1983-1987 | Program Committee, Hospital and Community Psychiatry Institute Program, American |

FELL-00000399

**Mark J. Mills, J.D., M.D.**
*Curriculum Vitae*
**Revised:  January 2001**
**Page 4**

|  | Psychiatric Association (Chair, 1986-1987) |
|---|---|
| 1984-1988 | Committee on Public Psychiatry, American Psychiatric Association |
| 1984-1995 | American College of Psychiatrists |
| 1984-1989 | American Association of Social Psychiatry |
| 1985-1994 | Benjamin Rush Society |
| 1985-1990 | Committee on Confidentiality, American Psychiatric Association (Consultant) |
| 1986- | Pacific Rim College of Psychiatrists (Fellow) |
| 1986-1989 | Council on Psychiatry and Law, American Psychiatric Association (Vice Chair) |
| 1989-1995 | San Diego Society of Psychiatric Physicians |
| 1991-1995 | Committee on Occupational Psychiatry, American Psychiatric Association |
| 1994- | American Medical Association |
| 1994-1995 | California Medical Association |
| 1995- | Medical Society of the District of Columbia |
| 1995- | Washington Psychiatric Society |

EDITORIAL BOARDS

| 1981-1991 | Assistant Editor, Behavioral Sciences and the Law |
|---|---|
| 1982-1989 | Associate Editor, Bulletin of the American Academy of Psychiatry and the Law (Section Editor, Discourse and Dispute) |
| 1982-1987 | Advisory Board, Hospital and Community Psychiatry |
| 1984-1985 | Associate Editor, Legal Aspects of Psychiatric Practice |
| 1985-1990 | Associate Editor, Alzheimer's Disease and Associated Disorders |
| 1986-1990 | Associate Editor, Psychiatric Journal of the University of Ottawa |
| 1987-1989 | Editorial Board, International Journal of Law and Psychiatry |
| 1987- | Associate Editor, Journal of Clinical Psychiatry |

BOARD OF DIRECTORS

| 1982-1985 | American Society of Law and Medicine |
|---|---|
| 1985-1988 | International Academy of Law and Mental Health |
| 1985-1989 | Center for the Study of Psychological Trauma (Advisory Council) |
| 1986-1989 | Greater Los Angeles Partnership for the Homeless |
| 1995- | Advisory Board, Wender-Weis Foundation for Children, Palo Alto, California |
| 1999- | Forensis, Inc. |
| 1999- | Parental Alienation Syndrome Foundation |

JOURNAL SOLICITING MANUSCRIPT REVIEW
> *American Journal of Psychiatry*
> *Archives of General Psychiatry*
> *Psychosomatics*
> *Journal of Legal Medicine*
> *Journal of Clinical Psychiatry*
> *American Journal of Medicine*

**PROFESSIONAL AND EDUCATIONAL APPOINTMENTS**

MAJOR COMMITTEE ASSIGNMENTS IN HOSPITALS AND MEDICAL SCHOOLS

| 1970-1973 | Medical School Admissions Committee, Stanford University Medical Center |
|---|---|
| 1975-1976 | Residence Education Committee, Stanford University Medical Center |
| 1978-1980 | The Committee on Patients' Rights, Palo Alto Veterans Administration Medical Center |
| 1979-1980 | Clerkship Coordinator, Department of Psychiatry and Behavioral Sciences, Stanford University Medical Center |
| 1980-1981 | Safety Committee, Chairman, Massachusetts Mental Health Center |
| 1983-1985 | Therapeutic Agents and Pharmacy Review Committee, Chairman, Veterans Administra- |

**Mark J. Mills, J.D., M.D.**
*Curriculum Vitae*
Revised: January 2001
**Page 5**

|  |  |
|---|---|
|  | tion Medical Center, West Los Angeles, California |
| 1983-1987 | Physicians Professional Standards Board, Veterans Administration Medical Center, Brentwood Division |
| 1983-1984 | Residency Education Committee, Neuropsychiatric Hospital, University of California, Los Angeles |
| 1983-1986 | Residency Education Committee, Veterans Administration Medical Center, Brentwood Division, Los Angeles |
| 1983-1986 | Medical Center Planning Committee, Veterans Administration Medical Center, Brentwood Division, Los Angeles |
| 1983-1984 | Human Subjects Committee, Veterans Administration Medical Center, Brentwood Division, Los Angeles |
| 1983-1986 | Public Policy and Political Action Committee, Department of Psychiatry and Biobehavioral Sciences, University of California, Los Angeles |
| 1983-1986 | Budget Committee, Veterans Administration Medical Center, Brentwood Division, Los Angeles |
| 1983-1986 | Committee on Academic Promotions, Department of Psychiatry and Biobehavioral Sciences, University of California, Los Angeles |
| 1984-1986 | Committee on Executive Development, Neuropsychiatric Institute, University of California, Los Angeles |
| 1984-1987 | Policy Advisory Committee, Robert Wood Johnson Clinical Scholars Program, University of California, Los Angeles |

STATE APPOINTMENT
1981-1983    Commissioner, Department of Mental Health, Massachusetts

VISITING APPOINTMENTS
1979-1980    Cooperating Clinical Assistant Professor, Stanford Law School
1980-1983    Physician in Residence, Veterans Administration, Washington, D.C.
1981-1982    Visiting Lecturer, Harvard Law School
1986-1988    Consultant, Tourette Syndrome Association
1987-1988    Consultant, Task Force on Mental Health and Correctional Issues, California Council on Mental Health

CONSULTATION TO GOVERNMENT
1980-1981    Consultant, State of Nevada, Department of Mental Health
1984-1986    Consultant, Civil Rights Division, United States Department of Justice
1984-1986    Consultant, State of California, Select Committee on Mental Health
1985-1988    Consultant, State of New York, Office of Mental Health
1987-1988    Consultant, State of Oregon, Office of the Department of Justice
1987-1989    Consultant, State of Arkansas, Office of the Attorney General
1987-        Consultant, United States Attorney, United States Department of Justice
1987-1990    Consultant, State of Arizona, Department of Health Services
1987         Consultant, State of Maryland, Department of Health and Mental Hygiene
1988-1991    Consultant, State of California, Department of Mental Health, Division of Forensic Services
1989         Consultant, State of Tennessee, Department of Mental Health and Mental Retardation
1989-1991    Consultant, State of Maine, Office of Attorney General
1997-1998    Consultant, State of Illinois, Department of Mental Health and Developmental Disabilities

CONSULTATIONS TO INDUSTRY
1987-95    Southern California Edison Company
1989-95    Pacific Gas and Electric Company
1990       Arizona Public Service Company

FELL-00000401

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 6

## EDUCATIONAL ACTIVITIES

MAJOR TEACHING EXPERIENCE

1969          Organizer and lecturer: "Practical Law for the Layman," six-lecture series to students at a Cambridge, Massachusetts high school.

1977          Organizer and lecturer: "Emergency Psychiatry," ten introductory lectures given to first-year residents, Stanford.

1977-1980    Organizer and lecturer: "The Psychiatric Interview," "Affective disorders," and "Neurosis" for clerkship students, Psychiatry 300, Stanford.

1977-1980    Organizer and lecturer: "Major Clinical Syndromes," psychopathology course for second-year psychiatry residents, Stanford.

1979-1980    Organizer and lecturer: "Psychopathology and Mental Health Law" (with David Rosenhan), Law 338, Law School, Stanford.

1979-1980    Organizer and lecturer: "Topics in Psychobiology" (with Philip A. Berger), Human Biology 163, Stanford.

1980          Organizer and lecturer: "Psychiatry and the Law" (with Thomas G. Gutheil), a two-lecture series for first-year psychiatric residents, Massachusetts Mental Health Center.

1980          Organizer and lecturer: "Experience of Therapy," Psychiatry 700a, a twelve-lecture series for first-year students, Harvard Medical School.

1981          Organizer and lecturer: "Prediction and Prevention of Harmful Conduct" (with Alan D. Dershowitz and Thomas G. Gutheil), Harvard Law School.

1982          Organizer and lecturer: "Program in Psychiatry and Law" (with Thomas G. Gutheil), Massachusetts Mental Health Center.

1983-         Organizer and lecturer: "Seminar in Law and Psychiatry," series for psychiatric residents, University of California, Los Angeles.

1983-1984    Course Chairman: Inpatient clerkship for medical students, University of California, Los Angeles.

1983-1984    Course Chairman: Outpatient clerkship for medical students, University of California, Los Angeles.

1983-1984    Course Chairman: Six-week clinical clerkship for medical students, University of California, Los Angeles.

1983-1984    Course Chairman: Clinical fundamentals clerkship for second year medical students, University of California, Los Angeles.

1983-1984    Organizer and lecturer: "The Insanity Defense" (with William J. Winslade), seminar for law students, School of Law, University of California, Los Angeles.

1984          Lecturer: "Legal Issues in Geriatric Psychiatry," for geriatric fellows, West Los Angeles Veterans Administration Medical Center, Los Angeles.

1984          Lecturer: "Psychiatric Issues in Civil Commitment," (with Robert Goldstein, J.D.), seminar for law students, School of Law, University of California, Los Angeles.

1985-1986    Lecturer: "The Psychiatric Hospital in History, Medicine and Law" (with Dora B. Weiner), class for undergraduates, College of Letters and Sciences, University of California, Los Angeles.

## PUBLICATIONS - ARTICLES (REFEREED JOURNALS)

1.    Mills, M.J. and Stunkard, A.J. Behavioral changes following surgery for obesity. American Journal of Psychiatry, 133:526-531, 1976.

2.    Watson, S.J., Berger, P.A., Akil, H., Mills, M.J. and Barchas, J.D. Effects of naloxone on schizophrenia: reduction in hallucinations in a subpopulation of subjects. Science, 201:73-76, 1978.

FELL-00000402

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 7

3.    Yesavage, J.A.; Fill, N.A.; Lapp, D.; Becker, J.; Mills, M.J. and Bourgeois, M. Psychopathologie et traitement des psychotiques violents aux Etats-Unis.  Annales Médicopsychologiques, 137:760-763, 1979.

4.    Mills, M.J.; Hsu, L.C. and Berger, P.A.  Informed consent:  psychotic patients and research.  Bulletin of the American Academy of Psychiatry and the Law, 8:119-132, 1980.

5.    Mills, M.J.  The rights of involuntary patients to refuse pharmacotherapy:  what is reasonable?  Bulletin of the American Academy of Psychiatry and the Law, 8:313-334, 1980.

6.    Mills, M.J.  The continuing clinicolegal conundrum of the Boston State Hospital Case.  Medicolegal News, 9:9-18, 1981.

7.    Yesavage, J.A.; Werner, P.D.; Becker, J.M.T.; Holman, C.A. and Mills, M.J.  Inpatient evaluation of aggression in psychiatric patients.  Journal of Nervous and Mental Disease, 169:299-302, 1981.

8.    Yesavage, J.A.; Becker, J.M.T.; Werner, P.D.; Mills, M.J.; Holman, C.A. and Cohn, R.  Serum level monitoring of thiothixene in schizophrenia:  acute single-dose levels at fixed doses.  American Journal of Psychiatry, 139:174 -178, 1982.

9.    Mills, M.J. and Gutheil, T.G.  Guardianship and the right to refuse treatment:  a critique of the Roe case.  Bulletin of the American Academy of Psychiatry and the Law, 9:239-246, 1982.

10.   Gutheil, T.G. and Mills, M.J.  Legal conceptualizations, legal fictions and the manipulation of reality: conflict between models of decision-making in psychiatry and law.  Bulletin of the American Academy of Psychiatry and the Law, 10:17-27, 1982.

11.   Yesavage, J.A.; Werner, P.D.; Becker, J.M.T. and Mills, M.J.  Short-term civil commitment of the violent patient:  a study of legal status and hospital behavior.  American Journal of Psychiatry, 130:1145-1149, 1982.

12.   Yesavage, J.A.; Benezech, M.; Bourgeois, M. and Mills, M.J.  Etudes des correlations entre modes d'intèrnement et comportement agressif dans une unité psychiatrique californienne.  Annales Médicopsychologique, 137:770-776, 1982.

13.   Yesavage, J.A.; Werner, P.D.; Becker, J.M.T. and Mills, M.J.  The context of involuntary commitment on the basis of danger to others:  a study of the use of the California 14-day certificate.  Journal of Nervous and Mental Disease, 170:622-627, 1982.

14.   Mills, M.J. and Cummins, B.D.  Deinstitutionalization Reconsidered.  International Journal of Law and Psychiatry, 5:271-284, 1982.

15.   Mills, M.J.; Gutheil, T.G.; Igneri, M.A. and Grinspoon, L.  Mental patients' knowledge of in-hospital rights.  American Journal of Psychiatry, 140:225-228, 1983.

16.   Mills, M.J. and O'Keefe, A.M.  Legal issues in outpatient treatment.  Journal of Clinical Psychiatry, 44:33-40, 1983.

17.   Rubin, L.C. and Mills, M.J.  Behavioral precipitants to civil commitment, American Journal of Psychiatry, 140:603-606, 1983.

FELL-00000403

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 8

18.    Mills, M.J.; Yesavage, J.A. and Gutheil, T.G.  Continuing case-law development in the right to refuse treatment.  American Journal of Psychiatry, 140:715-719, 1983.

19.    Yesavage, J.A.; Becker, J.M.T.; Patton, M.J.; Seeman, K; Werner, P.D.; Brunsting, D.W. and Mills, M.J.  Family conflict, psychopathalogy and dangerous behavior by schizophrenic inpatients.  Psychiatry Research, 8:271-280, 1983.

20.    Mills, M.J.; Cummins, B.D. and Gracey, J.S.  Legal issues in mental health administration.  International Journal of Law and Psychiatry, 6:39-55, 1983.

21.    Benezech, M.; Yesavage, J.A.; Addad, M.; Bourgeois, M. and Mills, M.J.  Homicide by psychotics in France:  a five-year study.  Journal of Clinical Psychiatry, 45:85-86, 1984.

22.    Mills, M.J.; Pearsall, T.D.; Yesavage, J.A. and Saltzman, C.  Electroconvulsive therapy in Massachusetts.  American Journal of Psychiatry, 141:534-538, 1984.

23.    Mills, M.J.  The so-called duty to warn: the psychotherapeutic duty to protect third parties from patients' violent acts.  Behavioral Sciences and the Law, 2:237-258, 1984.

24.    Mills, M.J.  Legal issues in psychiatric treatment.  Psychiatric Medicine, 2:245-261, 1984.

25.    Senter, N.W.; Winslade, W.J.; Liston, E.H. and Mills, M.J.  Electroconvulsive therapy:  evolving legal regulation.  Journal of Social Psychiatry, 4:11-15, 1984.

26.    Mills, M.J.  The mental health commissionership:  major changes over a decade.  Hospital and Community Psychiatry, 36:363-368,1985.

27.    Phelan, L.A.; Mills, M.J. and Ryan, J.A.  Prosecuting psychiatric patients for assault.  Hospital and Community Psychiatry, 36:581-582, 1985.

28.    Escobar, J.I.; Mann, J.J.; Keller, J.; Wilkins, J.; Mason, B. and Mills, M.J.  A comparison of injectable molindone and haloperidol followed by transition to oral forms in the treatment of acutely ill schizophrenics.  Journal of Clinical Psychiatry, 46:15-19, 1985.

29.    Irwin, M.; Lovitz, A.; Marder, S.R.; Mintz, J.; Winslade, W.J.; Van Putten, T. and Mills, M.J.  Informed consent understanding in psychosis.  American Journal of Psychiatry, 142:1351-1354, 1985.

30.    Friedlander, A.H. and Mills, M.J.  The dental management of the drug-dependent patient.  Oral Medicine, 60:489-492, 1985.

31.    Beaber, R.J.; Marston, A.; Michelli, J. and Mills, M.J.  A brief test for measuring malingering in schizophrenic individuals.  American Journal of Psychiatry, 142:1478-1481, 1985.

32.    Fogel, B.S.; Mills, M.J. and Landen, J.E.  Legal aspects of the treatment of delirium.  Hospital and Community Psychiatry, 62:154-158, 1986.

33.    Bursztajn, H.; Gutheil, T.G.; Mills, M.J.; Hamm, R.M. and Brodsky, A.  Process Analysis of Judges' Commitment Decisions:  a preliminary empirical study.  American Journal of Psychiatry, 143:170-174, 1986.

34.    Mills, M.J.; Norquist, G.S.; Shelton, R.C.; Gelenberg, A.J. and Van Putten, T.  Consent and li-

FELL-00000404

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 9

ability with neuroleptics:  the problem of tardive dyskinesia.  International Journal of Law and Psychiatry,  8:243-252, 1986.

35.    Mills, M.J.  Civil commitment of the mentally ill:  an overview.  Annals of the American Academy of Political and Social Sciences, 484:28-41, 1986.

36.    Yesavage, J.A.; Benezech, M.; Larrieu-Arguille, R.; Bourgeois, M.; Tanke, E.; Roger, P. and Mills, M.J.  Recidivism of the criminally insane in France:  a 22-year follow-up.  Journal of Clinical Psychiatry, 47:465-466, 1986.

37.    Mills, M.J.; Sullivan G. and Eth, S.  Protecting third parties: a decade after Tarasoff.  American Journal of Psychiatry, 144:68-74, 1987.

38.    Friedlander, A.H.; Mills, M.J. and Gorelick, D.A.  Alcoholism and dental management.  Oral Surgery, Oral Medicine, Oral Pathology, 63:42-46, 1987.

39.    Friedlander, A.H.; Mills, M.J. and Wittlin, B.J.  Dental management considerations for the patient with post-traumatic stress disorder.  Oral Surgery, 63:669-673, 1987.

40.    Young, J.L.; Mills, M.J. and Sach, R.L.  Civil commitment by conservatorship:  the workings of California's law.  Bulletin of the American Academy of Psychiatry and the Law, 15:127-139, 1987.

41.    Mills, M.J. and Eth, S.  Legal liability with psychotropic drug use:  extrapyramidal syndromes and tardive dyskinesia.  Journal of Clinical Psychiatry, 48:28-33, 1987.

42.    Kuo, S.H.; Chien, C.P. and Mills, M.J.  Forensic psychiatry in Taiwan: civil case litigation.  International Journal of Law and Psychiatry, 10:297-309, 1987.

43.    Mills, M.J. and Eth, S.  Consent and liability with psychotropics:  special problems with anxiolytics.  Journal of Clinical Psychiatry, 48:29-32, 1987.

44.    Friedlander, A.H.; Mills, M.J. and Cummings, J.L.  Consent for dental therapy in severely ill patients.  Oral Surgery, 65:179-182, 1988.

45.    Mills, M.J.  Civil commitment:  the relationship between perceived dangerousness and mental illness.  Archives of General Psychiatry, 45:770-772, 1988.

46.    Ornish, S.A.; Mills, M.J. and Ornish, M.C.  Prearraignment forensic evaluations:  towards a new policy.  Bulletin of the American Academy of Psychiatry and the Law, 24:453-470, 1996.

47.    Gerasimov, M.R.; Ashby, C.R., Jr.; Gardner, E.L.; Mills, M.J.; Brodie, J.D. and Dewey, S.L.  Gamma vinyl-GABA Inhibits Methamphetamine, Heroin, and Ethanol-Induced Increases in Nucleus Accumbens Dopamine.  Synapse, 34:11-19, 1999.

48.    Hirose, S.; Ashby, C.R., Jr. and Mills, M.J.  Effectiveness of ECT combined with Risperidone against aggression in schizophrenia:  An open study.  (In press)

49.    Lipian, M.S., Mills, M.J. and Southern, M.N.  Children's false allegations of abuse:  a psychiatric overview.  (In review)

50.    Reeves, R., Mills, M.J., Billick, S.B. and Brodie, J.D.  The limitations of brain imaging in the

FELL-00000405

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 10

assessment of criminal intent. (In review)

## PUBLICATIONS - ARTICLES (NON-REFEREED JOURNALS)

51. Mills, M.J. and Levey, B.E. The Mills case: the issue of treatment refusal remains unresolved. American Academy of Psychiatry and the Law Newsletter, 7:10-13, 1982.

52. Winslade, W.J.; Lyon, M.A.; Levine, M.L. and Mills, M.J. Making medical decisions for the Alzheimer's patient: paternalism and advocacy. Psychiatric Annals, 14:206-208, 1984.

53. Mills, M.J. and Winslade, W.J. Clinicolegal aspects of treating demented patients. Psychiatric Annals, 14:209-211, 1984.

54. Mills, M.J. The Tarasoff duties expand. American Academy of Psychiatry and the Law Newsletter, 9:8-11, 1984.

55. Mills, M.J. A psychotherapeutic duty to fourth parties. American Academy of Psychiatry and the Law Newsletter, 10:15, 1985.

56. Mills, M.J. and Raiss, C. California law limits Tarasoff liability. American Academy of Psychiatry and the Law Bulletin, 11:12-14, 1986.

57. Mills, M.J. Treating the treatment-refusing patient. American Academy of Psychiatry and the Law Newsletter, 13 (2):12-13, 1988.

58. Mills, M.J. and Rosenberg, J.E. Question: Is there a duty to disclose possible peer-review activities to patients? American Academy of Psychiatry and the Law Newsletter, 19 (3):65-66, 1994.

59. Mills, M.J. Obtaining Informed Consent for Clozaril Treatment. The Clozaril (clozapine) Monitor 1 (5):4, 1998.

## PUBLICATIONS - BOOK

60. Halleck, N.H., Halleck, S.L., Hodge, S.K., Pfaehler, G.T., Miller, R.D., Mills, M.J. and Sadoff, R.L. The Use of Psychiatric Diagnoses in the Legal Process. American Psychiatric Association Task Force Report No. 32, Washington, D.C., 1992.

## PUBLICATIONS - BOOK CHAPTERS

61. Mills, M.J. and Avery, D. The legal regulation of electroconvulsive therapy. In Mood Disorders: The World's Major Public Health Problem. F.J. Ayd (ed.), Frank Ayd Communications, Baltimore, Maryland, 154-183, 1978.

62. Avery, D. and Mills, M.J. Electroconvulsive therapy and antidepressants in the treatment of depression. In Mood Disorders: The World's Major Public Health Problem. F.J. Ayd (ed.), Frank Ayd Communications, Baltimore, Maryland, 138-153, 1978.

63. Mills, M.J. Helping the obese patient. In Psychiatry for the Primary Care Physician. A.M. Freeman, R.L. Sack, and P.A. Berger (eds.), Williams and Wilkins, Baltimore, Maryland, 317-332, 1979.

FELL-00000406

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
**Page 11**

64.    Mills, M.J.  The right to treatment: little law but much impact.  In <u>Psychiatry 1982</u>: <u>American Psychiatric Association Annual Review</u>, L. Grinspoon (ed.), American Psychiatric Association Press, Washington, D.C., 361-370, 1982.

65.    Gutheil, T.G. and Mills, M.J.  Legal aspects of pseudoseizures.  In <u>Pseudoseizures</u>, T.L. Riley and A. Roy (eds.), Williams and Wilkins, Baltimore, Maryland, 213-223, 1982.

66.    Mills, M.J. and Gutheil, T.G.  Legal approaches to treating the treatment-refusing patient.  In <u>Refusing Treatment in Mental Health Institutions - Values in Conflict</u>. A.E. Doudera and J.P. Swazey (eds.), AUPHA Press, Ann Arbor, Michigan, 95-99, 1982.

67.    Gutheil, T.G. and Mills, M.J.  Clinical approaches to patients who refuse medication.  In <u>Refusing Treatment in Mental Health Institutions - Values in Conflict</u>. A.E. Doudera and J.P. Swazey (eds.), AUPHA Press, Ann Arbor, Michigan, 101-106, 1982.

68.    Mills, M.J.  Expanding the duties to protect third parties from violent acts.  In <u>Legal Encroachments into Psychiatric Practice</u>, New Directions for Mental Health Service Series, S. Rachlin (ed.), Jossey-Bass, Inc., San Francisco, California, 61-68, 1985.

69.    Gutheil, T.G.; Rachlin, S. and Mills, M.J.  Differing conceptual models between psychiatry and law.  In <u>Legal Encroachments into Psychiatric Practice</u>, New Directions for Mental Health Service Series, S. Rachlin (ed.), Jossey-Bass, Inc., San Francisco, California, 5-11, 1985.

70.    Mills, M.J. and Beck, J.C.  The Tarasoff case.  In <u>The Potentially Violent Patient and the Tarasoff Decision in Psychiatric Practice</u>.  James C. Beck (ed.), American Psychiatric Association Monograph Series.  American Psychiatric Association Press, Washington, D.C., 2-7, 1985.

71.    Lamb, H.R. and Mills, M.J.  The chronically mentally ill: changes in law and procedure.  In <u>Hospital and Community Psychiatry</u>, 37: 475-480, 1986.  (Refereed Article)  Reprinted in, <u>Developments Affecting Those with Chronic Mental Illness</u>.  J.A. Talbott (ed.), American Psychiatric Press, Washington, D.C., 133-144, 1986.

72.    Mills, M.J. and Daniels, M.L.  Medical-legal issues.  In <u>Principles of Medical Psychiatry</u>, A. Stoudemire and B.S. Fogel (eds.), Grune & Stratton, Orlando, Florida, 463-474, 1987.

73.    Mills, M.J. and Eth, S.  Legal aspects of treating patients with organic mental syndromes.  In <u>Treatments of Psychiatric Disorders</u>. T.D. Karasu (ed.), A Task Force Report of the American Psychiatric Association, Washington, D.C., 983-994, 1989.

74.    Eth, S. and Mills, M.J.  Ethical issues in the treatment of patients with organic mental syndromes.  In <u>Treatments of Psychiatric Disorders</u>. T.D. Karasu (ed.), A Task Force Report of the American Psychiatric Association, Washington, D.C., 994-1008, 1989.

75.    Eth, S. and Mills, M.J.  Ethical and legal considerations in geriatric psychiatry.  H.I. Kaplan and B.J. Kaplan (eds.) In <u>Comprehensive Textbook of Psychiatry/V</u>., Williams & Wilkins, Baltimore, Maryland, 2059-2062, 1989.

76.    Eth, S. and Mills, M.J.  Treating patients who threaten violence: ethical concerns.  In <u>Critical Issues in American Psychiatry and the Law</u>, 7: Ethical Issues in Psychiatry and the Law, Richard Rosner and Robert Weinstock (eds.), Plenum, New York, 197-206, 1990.

77.    Mills, M.J. and Lipian, M.S.  Psychiatry and legal regulation:  Thirty years of beneficence or

FELL-00000407

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 12

three decades of bedevilment?  In <u>The Mosaic of Contemporary Psychiatry in Perspective</u>.  A. Kales, C. Pierce and M. Greenblatt (eds.), Springer-Verlag, New York, 24-35, 1991.

78.     Mills, M.J. and Lipian, M.S.  Malingering.  In <u>Comprehensive Textbook of Psychiatry/VI</u>.  H.I. Kaplan and B.J. Kaplan (eds.), Williams & Wilkins, Baltimore, Maryland, 1614-1622, 1995.

79.     Lipson, G. S. and Mills, M.J.  Stalking, Erotomania, and the Tarasoff Cases.  In <u>The Psychology of Stalking - Clinical and Forensic Perspectives</u>.  J. Reid Meloy (ed.), Academic Press, San Diego, California, 258-273, 1998.

80.     Lipian, M.S. and Mills, M.J.  Malingering.  In <u>Comprehensive Textbook of Psychiatry/VII</u>.  H.I. Kaplan and B.J. Kaplan (eds.), Lippincott, Williams & Wilkins, Philadelphia, Pennsylvania, 1898-1908, 2000.

## PUBLICATIONS – LETTERS

81.     Mills, M.J. and Stunkard, A.J.  A misinterpretation?  <u>American Journal of Psychiatry</u>, 134:459-460, 1977.

82.     Mills, M.J.  More on Rogers v. Okin.  <u>Medicolegal News</u>, 9:2, 1981.

83.     Mills, M.J.  The problems of public psychiatry.  <u>New England Journal of Medicine</u>, 309:113-114, 1983.

84.     Mills, M.J.; Phelan, L. and Ryan, J.A.  Response to letter.  <u>Hospital and Community Psychiatry</u>, 36:1321-1322, 1985.

85.     Mills, M.J.; Sullivan G. and Eth, S.  Duty to protect.  <u>American Journal of Psychiatry</u>.  144:1107-1108, 1987.

86.     Altshuler, L.L.; Cummings, J.L. and Mills, M.J.  Differential diagnosis of mute patients.  <u>American Journal of Psychiatry</u>, 144:1107-1108, 1987.

87.     Altshuler, L.L.; Cummings, J.L. and Mills, M.J.  Differential diagnosis of mute patients.  <u>American Journal of Psychiatry</u>, 144:1113, 1987.

88.     Ornish, S.A.; Mills, M.J. and Ornish, M.C.  Prearraignment forensic evaluations: toward a new policy.  <u>Journal of the American Academy Psychiatry and the Law</u>, 25:426-432, 1997.

## PUBLICATIONS - OTHER

89.     Mills, M.J.  The use of drugs by law students.  Harvard Law School Library, Cambridge, Massachusetts.  (Thesis for Juris Doctor)

90.     Gutheil, T.G. and Mills, M.J.  Nobody has done the study.  <u>American Academy of Psychiatry and the Law Newsletter</u>, 7:28, 1982.  (Editorial)

91.     Mills, M.J.  Knowing right from wrong:  the insanity defense of Daniel McNaughtan by Richard Moran.  Bulletin of the <u>American Academy of Psychiatry and the Law</u>, 11:91-92, 1983.  (Book Review)

92.     Mills, M.J.  Psychiatric interventions and malpractice.  <u>Clinical Psychopharmacology</u>, 3:335,

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 13

1983. (Book Review)

## SELECTED PRESENTATIONS

1.  Mills, M.J. and Stunkard, A.J. Behavioral changes following surgery for obesity. Presented at the American Psychiatric Association Annual Meeting, Anaheim, California, May 1977.

2.  Mills, M.J. and Stunkard, A.J. Surgery for obesity. Presented at the American College of Physicians Annual Meeting, Dallas, Texas, April 1977.

3.  Mills, M.J. Informed consent with psychotic patients. Presented to the Northern California Psychiatric Society, Carmel, California, (by invitation), April 1977.

4.  Mills, M.J. Informed consent and research. Presented at the American Psychiatric Association Annual Meeting, Toronto, Ontario, Canada, (by invitation), May 1977.

5.  Mills, M.J. and Avery, D. (How) should the law regulate ECT? Presented at the VI World Congress of Psychiatry, Honolulu, Hawaii, August 1977.

6.  Sack, R.L.; Young, J.; and Mills, M.J. Conservatorship for the mentally ill. Presented at the VI World Congress of Psychiatry, Honolulu, Hawaii, August 1977.

7.  Lederberg, M.S.; Mills, M.J.; and Freeman, A.J. Psychiatric consultation for legal reasons. Presented at the VI World Congress, Honolulu, Hawaii, August 1977.

8.  Mills, M.J. and Avery, D. The legal regulation of ECT. Presented at the Tenth Annual Taylor Manor Symposium, Ellicott City, Maryland, (by invitation), April 1978.

9.  Mills, M.J. The rights of involuntary patients to refuse pharmacotherapy: what is reasonable? Presented at the Tenth Annual Meeting of the American Academy of Psychiatry and the Law, Baltimore, Maryland, (by invitation), October 1979.

10. Mills, M.J. Legislative issues in head injury care: legal protection for family and client. Presented at the National Association for the Head Injured Annual Meeting, San Jose, California, (by invitation), March 1980.

11. Mills, M.J. Legal protection - guardianship/conservatorship. Presented at the National Association for the Head Injured Annual Meeting, San Jose, California, (by invitation), March 1980.

12. Mills, M.J. Legal issues and the treatment of the resistant patient. Presented at Treating the Resistant Patient: Inpatient and Community Perspectives. The First Annual Shoul Memorial Conference, Harvard Medical School, Boston, Massachusetts, (by invitation), October 1980.

13. Mills, M.J. Resolved: Psychiatrists should participate in the death sentence. Presented at the 11th Annual Meeting of the American Academy of Psychiatry and the Law, Chicago, Illinois, (by invitation), October 1980.

14. Mills, M.J. Research in mental health law. Presented at the 32nd Annual Meeting of the American Society of Criminology, San Francisco, California, (by invitation) November 1980.

15. Mills, M.J. On the right to refuse treatment. Presented at the Psychiatry Law Update: New de-

FELL-00000409

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 14

velopments affecting clinicians and attorneys, Harvard Medical School, Boston, Massachusetts, (by invitation), February 1981.

16. Mills, M.J. Forensic aspects of psychological testing. Presented to the Department of Psychology, Massachusetts Mental Health Center, Boston, Massachusetts, (by invitation), March 1981.

17. Mills, M.J. Developing case law in the right to refuse treatment. Presented at the 21st International Conference on Legal Medicine, San Diego, California, May 1981.

18. Mills, M.J. The right to refuse treatment: evolution and revolution. Presented at the UCLA Colloquium on Behavioral Sciences, Los Angeles, California, (by invitation), May 1981.

19. Mills, M.J. The right to refuse treatment reconsidered. Presented at the Department of Psychiatry Conference, Harbor Medical Center, Long Beach, California, (by invitation), September 1981.

20. Mills, M.J. Public-sector constraints on mental health delivery. Presented at the Psychiatry Grand Rounds, Brigham and Women's Hospital, Boston, Massachusetts (by invitation), October 1981.

21. Mills, M.J. Rethinking the limits of deinstitutionalization. Presented at the Annual Meeting of the American Psychology-Law Society, Cambridge, Massachusetts, (by invitation), October 1981.

22. Mills, M.J. Forensic psychiatry and DSM-III: Problems of administration. Presented at the 12th Annual Meeting of the American Academy of Psychiatry and the Law, San Diego, California, (by invitation), October 1981.

23. Mills, M.J. Complexities and realities of public-sector mental health delivery: can the present system survive? Presented at the Florence Heller Graduate School (Brandeis University), Boston, Massachusetts, (by invitation), November 1981.

24. Mills, M.J. The *zeitgeist* and mental health delivery. Presented at the Connecticut Mental Health Center (Yale), New Haven, Connecticut, (by invitation), January 1982.

25. Mills, M.J. Competency to stand trial: The functional approach, or much ado over little. Presented at the Massachusetts Bar Association's Criminal Justice Section and the Social Science Research Institute, Boston, Massachusetts, (by invitation), April 1982.

26. Mills, M.J. Public policy and the behavioral disorders of the developmentally disabled. Presented at Tufts University School of Medicine, Medford, Massachusetts, (by invitation), April 1982.

27. Mills, M.J. Civil law-psychiatry interfaces of note: civil commitment, the right to refuse treatment, and the right to treatment. Presented at the Grand Rounds, Massachusetts General Hospital, Boston, Massachusetts, (by invitation), April 1982.

28. Mills, M.J. New federalism and the states. Presented at the Brattleboro Retreat, Brattleboro, Vermont, (by invitation), May 1982.

29. Mills, M.J. The right to treatment: little law but much impact. Presented at the American Psy-

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 15

chiatric Association Annual Meeting, Toronto, Canada, (by invitation), May 1982.

30.    Mills, M.J.  Continuing case-law development in the right to refuse treatment.  Presented at the American Psychiatric Association Annual Meeting, Toronto, Canada, (by invitation), May 1982.

31.    Mills, M.J.  Block grants in mental health:  principles and policies.  Presented at the American Psychiatric Association Annual Meeting, Toronto, Canada, (by invitation), May 1982.

32.    Mills, M.J.  The role of the state in mandating services to persons with the dual diagnoses.  Presented at the American Association of Mental Deficiency Annual Meeting, Boston, Massachusetts, (by invitation), June 1982.

33.    Mills, M.J.  Legal issues in the administration of mental health and retardation services.  Presented at the Eighth International Congress on Law and Psychiatry, Quebec, Canada, June 1982.

34.    Mills, M.J.  The right to refuse treatment in the wake of *Mills*, *Rennie* and *Youngberg*.  Presented at the National Association of State Mental Health Program Directors, Arlington, Virginia, (by invitation), July 1982.

35.    Mills, M.J.  Patients' rights:  important recent developments.  Presented at the Veterans Administration Medical Center, Salisbury, North Carolina, (by invitation), September 1982.

36.    Mills, M.J.  General hospital psychiatry:  a Massachusetts perspective.  Presented at the Mental Health Project Annual Meeting, Framingham, Massachusetts, (by invitation), October 1982.

37.    Mills, M.J. and Klein, J.I.  Between a rock and a hard place.  Presented at the American Psychiatric Association 34th Institute of Hospital and Community Psychiatry, Louisville, Kentucky, (by invitation), October 1982.

38.    Mills, M.J. and Goldstein, W.H.  Administration for clinicians.  Presented at the American Psychiatric Association 34th Institute of Hospital and Community Psychiatry, Louisville, Kentucky, (by invitation), October 1982.

39.    Mills, M.J. and Goldstein, W.H.  Creative administration and staffing.  Presented at the American Psychiatric Association 34th Institute of Hospital and Community Psychiatry, Louisville, Kentucky, (by invitation), October 1982.

40.    Mills, M.J. and Gutheil, T.G.  Guardianship and the right to refuse treatment: a critique of the *Roe* case.  Presented at the Thirteenth Annual Meeting of the American Academy of Psychiatry and the Law, New York, NY, October 1982.

41.    Gutheil, T.G. and Mills, M.J.  Legal fictions and the manipulation of reality.  Presented at the Thirteenth Annual Meeting of the American Academy of Psychiatry and the Law, New York, NY, October 1982.

42.    Mills, M.J.  Choices for the Commonwealth:  the condition of politics and public policy in Massachusetts.  Presented at the John F. Kennedy Library, Boston, Massachusetts, (by invitation), October 1982.

43.    Mills, M.J.  Public administration in the Department of Mental Health.  Presented at the Sloan School of Management, Massachusetts Institute of Technology, Cambridge, Massachusetts, (by invitation), October 1982.

FELL-00000411

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 16

44.    Mills, M.J. Mental health treatment of adjudicated persons. Presented at the National Commission on the Insanity Defense, Arlington, Virginia, (by invitation), October, 1982.

45.    Mills, M.J. National perspectives on the state of mental health delivery. Presented at the National Council of Community Mental Health Centers, Springfield, Massachusetts, (by invitation), November 1982.

46.    Mills, M.J. Legal developments affecting patient care. Presented at the Psychiatric Grand Rounds, Saint Vincent's Hospital, Worcester, Massachusetts, (by invitation), November 1982.

47.    Mills, M.J. Issues in public sector mental health delivery. Presented at the Joint Grand Rounds, Department of Psychiatry and Department of Medicine, Rhode Island Hospital and Brown University, Providence, Rhode Island, (by invitation), November 1982.

48.    Mills, M.J. Future directions in mental health care. Presented at Boston University School of Medicine, Department of Psychiatry and Social Work, Boston, Massachusetts, (by invitation), November 1982.

49.    Mills, M.J. and Hilliard, J. Confidentiality and *Tarasoff*: the current status. Presented at Issues in Mental Health and Law, Massachusetts Mental Health Center, Harvard Medical School, Boston, Massachusetts, (by invitation), December 1982.

50.    Mills, M.J. The future of general hospital psychiatry units and community mental health centers in an era of fiscal constraints. Presented at A Community Interface: The Mental Health Center and the General Hospital, St. Anne's Hospital, Charlton Memorial Hospital and Corrigan Mental Health Center, Westport, Massachusetts, (by invitation), January 1983.

51.    Mills, M.J. Legal reform and deinstitutionalization: changes in the mental health care system. Presented at the Rutgers-Princeton Post Doctoral Program in Mental Health Research, New Brunswick, New Jersey, (by invitation), February 1983.

52.    Mills, M.J. Constitutional litigation involving mental health systems. Presented at the Annual Meeting of the Association of State Mental Health Attorneys, Arlington, Virginia, (by invitation), February 1983.

53.    Mills, M.J. Recent developments in mental health law affecting practitioners. Presented at the Philip Pinel Institute, University of Montreal, Montreal, Canada, (by invitation), February, 1983.

54.    Mills, M.J. Legal issues in outpatient treatment. Symposia: Compliance and the schizophrenic outpatient. Presented at the American Psychiatric Association Annual Meeting, New York, NY, (by invitation), May 1983.

55.    Mills, M.J. Some recent problems confronting deinstitutionalized patients. Presented at the American Psychiatric Association Annual Meeting, New York, NY, May 1983.

56.    Mills, M.J. Civil commitment: standards and procedures. Presented at Recent Developments in Mental Health Law, sponsored by the American Society of Law and Medicine, Chicago, Illinois, (by invitation), June 1983.

57.    Mills, M.J. Evolving civil commitment standards. Presented at the 14th Annual Meeting of the American Academy of Psychiatry and the Law, Portland, Oregon, October 1983.

FELL-00000412

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 17

58.    Mills, M.J. National dilemmas in public-sector mental health delivery.  Presented at the Portland City Club, Portland, Oregon, (by invitation), October 1983.

59.    Mills, M.J. Civil commitment:  do the new standards make sense?  Presented at the 35th Annual Meeting of the American Society of Criminology, Denver, Colorado, November 1983.

60.    Mills, M.J. Further development in the right to refuse treatment.  Presented at the Colloquium Series, Department of Psychiatry, University of Missouri, Columbia, Missouri, (by invitation), December 1983.

61.    Mills, M.J. Legal issues in psychiatry:  consent and liability with neuroleptics; evolving civil commitment criteria; rights to and to refuse treatment; and the insanity defense.  Presented at the Psychiatry Conference, Beth Israel Conferences, Vail, Colorado, (by invitation), February 1983.

62.    Mills, M.J. Assaults on professional staff:  systems resistance to prosecution.  Presented at the American Academy of Forensic Sciences, Anaheim, California, (by invitation), February 1984.

63.    Mills, M.J. Rethinking civil commitment.  Presented at the Sepulveda Veterans Administration Medical Center, Sepulveda, California, (by invitation), March 1984.

64.    Mills, M.J. Psychotherapist's duties to third parties.  Presented at the University of Southern California School of Medicine, Los Angeles, California, (by invitation), March 1984.

65.    Mills, M.J. Dangerousness: the duties to warn and protect. Presented at the Department of Psychiatry, Kern Medical Center, Bakersfield, California, (by invitation), March 1984.

66.    Mills, M.J. The psychotherapist's duties in dealing with violent patients.  Presented at the Isaac Ray Center, Rush-Presbyterian-St.Luke's Medical Center, Chicago, Illinois, (by invitation), April 1984.

67.    Mills, M.J. Legal evolution of *Tarasoff.*  Presented at the Clarke Institute of Psychiatry, Toronto, Ontario, Canada, (by invitation), April 1984.

68.    Mills, M.J. Psychiatric ethics.  Presented at Delamo Hospital, Torrance, California, (by invitation), April 1984.

69.    Mills, M.J. Interviewing in special circumstances:  the assaultive patient.  Presented at the American Psychiatric Association Annual Meeting, Los Angeles, California, May 1984.

70.    Mills, M.J. A collaborative law/psychiatry relationship:  co-mediated divorce by a psychiatrist and a lawyer.  Presented at the American Psychiatric Association Annual Meeting, Los Angeles, California, May 1984.

71.    Mills, M.J. *Tarasoff* and its legal progeny.  Presented at the American Psychiatric Association Annual Meeting, Los Angeles, California, May 1984.

72.    Mills, M.J. Some legal aspects of prescribing anti-psychotic medications.  Presented at the 8th Annual Psychiatry Symposium on "Trends in Psychiatry," Kaiser Permanente, Newport Beach, California, (by invitation), June 1984.

73.    Mills, M.J. Expanding duties to third parties:  further sequelae to *Tarasoff.*  Presented at the 10th

FELL-00000413

**Mark J. Mills, J.D., M.D.**
*Curriculum Vitae*
**Revised: January 2001**
**Page 18**

International Congress of Law and Psychiatry, Banff, Alberta, Canada, (by invitation), June 1984.

74.    Mills, M.J. Evolving duties when using neuroleptic therapy: problems of consent and liability. Presented at the Seminar on Tardive Dyskinesia, Detroit-Wayne County Community Mental Health Board, Detroit, Michigan, (by invitation), June 1984.

75.    Mills, M.J. Mental health and mental retardation issues in equal employment opportunity assessment. Presented at the Conference on Equal Employment, Los Angeles, California, (by invitation), June 1984.

76.    Mills, M.J. Some aspects of California's civil commitment procedures. Presented at the Veterans Administration Center, Sepulveda, California, (by invitation), September 1984.

77.    Mills, M.J. Recent developments affecting hospitalization standards. Presented at the Recent Developments in Mental Health Law Meeting, sponsored by the American Society of Law and Medicine, Los Angeles, California, (by invitation), October 1984.

78.    Mills, M.J. Forensic update. Presented at the American Psychiatric Association 36th Institute on Hospital and Community Psychiatry, Denver, Colorado, (by invitation), October 1984.

79.    Mills, M.J. and Winslade, W.J. Confidentiality. Presented at the American Psychiatric Association 36th Institute on Hospital and Community Psychiatry, Denver, Colorado, (by invitation), October 1984.

80.    Mills, M.J. Heterocyclic antidepressants and cardiotoxicity. Presented at the People-to-People International Medical Conference of the CMA on Affective Psychosis, Huang Shan City, People's Republic of China, (by invitation), November 1984.

81.    Mills, M.J. Clinicolegal consequences of deinstitutionalization. Presented at the People-to-People International Delegation to the Korean Medical Association, Seoul, South Korea, (by invitation), November 1984.

82.    Mills, M.J. Predicting dangerousness: the clinical relevance of *Tarasoff*. Presented at the Patton State Hospital Colloquium, Patton California, (by invitation), December 1984.

83.    Mills, M.J. Clinical management of the dangerous patient: does *Tarasoff* make sense? Presented at Gladman Memorial Hospital, Oakland, California, (by invitation), December 1984.

84.    Mills, M.J. Problems in psychiatry. Presented at the 1985 Medical Malpractice Seminar, U.S. Department of Justice, Attorney General's Advocacy Institute, Long Beach, California, (by invitation), January 1985.

85.    Mills, M.J. Legal boundaries in psychiatric practice. Presented at the Benjamin Rush Society Meeting, Tucson, Arizona, (by invitation), January 1985.

86.    Mills, M. J. Current themes in malpractice litigation. Presented at Kaiser Permanente, Van Nuys, California, (by invitation), February 1985.

87.    Mills, M.J. Legal changes affecting homelessness. Presented at the Forum for the Homeless, Los Angeles, California, (by invitation), March 1985.

FELL-00000414

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 19

88.    Mills, M.J.  Legal issues in psychiatric care.  Presented at  the Ventura County Medical Center, Ventura, California, (by  invitation), March 1985.

89.    Mills, M.J.  Clinical issues in the right to treatment/right to refuse treatment.  Presented at the American Orthopsychiatric Association Annual Meeting, New York, NY, (by invitation), April 1985.

90.    Mills, M.J.  Further clinicolegal conundra in the *Tarasoff* progeny.  Presented at the Connecticut Mental Health Center (Yale), New Haven, Connecticut, (by invitation), April 1985.

91.    Mills, M.J.  Legal and ethical considerations for professionals treating violent patients.  Presented to the Institute for the Advancement of Human Behavior, Chicago, Illinois, (by invitation), April 1985.

92.    Mills, M.J.  Some legal issues arising in the treatment of violent patients.  Presented to the Fellows in Psychiatry and Law, USC Medical Center, Los Angeles, California, (by invitation), May 1985.

93.    Mills, M.J.  Interviewing in special circumstances:  the assaultive patient.  Presented at the American Psychiatric Association Annual Meeting, Dallas, Texas, May 1985.

94.    Mills, M.J.  Patient confidentiality:  should precedence take over other interests except where life is at stake (Scientific Debate)?  Presented at the American Psychiatric Association Annual Meeting, Dallas, Texas, (by invitation), May 1985.

95.    Lamb, R.H. and Mills, M.J.  Our chronic patients' future in a changing world:  change in laws and procedures.  Presented at the American Psychiatric Association Annual Meeting, Dallas, Texas, (by invitation), May 1985.

96.    Mills, M.J.  Legal approaches to treating the violent, non-compliant patient in the community.  Presented at the Seattle CMHC/University of Washington Annual Meeting on Innovation in Community Treatment, Seattle, Washington, (by invitation), June 1985.

97.    Mills, M.J.  Legal implications of tardive dyskinesia.  Presented to Department of Psychiatry and Behavioral Sciences, The University of Texas Medical Branch at Galveston, Galveston, Texas, (by  invitation), October 1985.

98.    Mills, M.J., et al.  Violent and threatening patients:  legal, regulatory, and professional issues.  Presented at Veterans Administration Medical Center Tucson, Arizona, (by invitation), October 1985.

99.    Mills, M.J.  Liability, limitation, protecting third parties and *Tarasoff*.  Presented to American Academy of Psychiatry and the Law, Albuquerque, New Mexico, (by invitation), October 1985.

100.   Mills, M.J. and Klein, J.  Forensic Update.  Presented at the American Psychiatric Association 37th Institute on Hospital and Community Psychiatry, Montreal, Quebec, Canada, (by invitation), October 1985.

101.   Lamb, H.R., Goldfinger, S. and Mills, M.J.  The problem of homelessness.  Presented at the American Psychiatric Association 37th Institute on Hospital and Community Psychiatry, Montreal, Canada, (by invitation), October 1985.

FELL-00000415

**Mark J. Mills, J.D., M.D.**
*Curriculum Vitae*
Revised: January 2001
Page 20

102.    Mills, M.J. The prevention of psychiatric malpractice. Presented at the Sepulveda Veterans Administration Medical Center, Sepulveda, California, (by invitation), November 1985.

103.    Mills, M.J. Legal issues affecting the treatment of schizophrenia. Presented at CPC Walnut Creek Hospital, Walnut Creek, California, (by invitation), December 1985.

104.    Mills, M.J. Managing the violent patient: clinical and legal perspectives. Presented at Thallians Mental Health Center (Cedars-Sinai Medical Center), Los Angeles, California, (by invitation), January 1986.

105.    Mills, M.J. How psychotherapists can avoid malpractice litigation. Presented at El Centro Mental Health Center, East Los Angeles, California, (by invitation), February 1986.

106.    Mills, M.J. Avoiding psychotherapeutic malpractice while protecting threatened third parties. Presented at the Sheppard Pratt Hospital, Baltimore, Maryland, (by invitation), March 1986.

107.    Mills, M.J. The clinical management of the violent and potentially-violent patient. Presented at the University Extension Program (Dangerousness: Legal and Clinical Aspects), Irvine, California, (by invitation), March 1986.

108.    Mills, M.J. Legal and ethical issues in psychiatric treatment. Presented at Woodview-Calabasas Hospital, Calabasas, California, (by invitation), March 1986.

109.    Mills, M.J. Interviewing in special circumstances: the *Tarasoff* problem. Presented at the American Psychiatric Association Annual Meeting, Washington, DC, May 1986.

110.    Roth, L.H., Appelbaum, P.S., Bloom, J.D., Rada, R.T., and Mills, M.J. Legal psychiatry: update and new issues. Presented at the American Psychiatric Association Annual Meeting, Washington, D.C., May 1986.

111.    Hartman, N. and Mills, M.J. Legal/ethical issues in psychopharmacologic research. Presented at the International Conference on Mental Health and Technology, Vancouver, British Columbia, Canada, June 1986.

112.    Mills, M.J. Protecting third parties from the violent patient: recent developments in the United States. Presented at the Department of Psychiatry, University of Ottawa, Ontario, Canada, (by invitation), June 1986.

113.    Mills, M.J. Roundtable discussion of forensic psychiatry. Presented at the Healthways Communications Conference, Keystone, Colorado, (by invitation), July 1986.

114.    Mills, M.J. Insanity: an expert's view. Presented to the Los Angeles County Public Defenders, Los Angeles, California, (by invitation) August 1986.

115.    Mills, M.J. American deinstitutionalization: a critical appraisal. Presented at the First Pacific Regional Congress on Law and Mental Health (The Australian Institute of Criminology), Canberra, Australian Capital Territory, Australia, (by invitation), August 1986.

116.    Mills, M.J. Evolution of the right to refuse treatment in the United States. Presented at the First Pacific Regional Congress on Law and Mental Health (The Australian Institute of Criminology), Canberra, Australian Capital Territory, Australia, (by invitation), August 1986.

FELL-00000416

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 21

117.    Beliveau, L. and Mills, M.J.  New ethical issue:  the rationalization of professional resources based on the effectiveness of treatment for psychiatric patients in security institutions.  Presented at the International Conference on Health Law and Ethics (American Society of Law and Medicine), Sydney, New South Wales, Australia, (by invitation), August 1986.

118.    Mills, M.J.  The politics of deinstitutionalization in the United States.  Presented at the International Conference on Health Law and Ethics (American Society of Law and Medicine), Sydney, New South Wales, Australia, (by invitation), August 1986.

119.    Mills, M.J.  The right to refuse treatment:  developments in American law.  Presented at the International Conference on Health Law and Ethics (American Society of Law and Medicine), Sydney, New South Wales, Australia, (by invitation), August 1986.

120.    Mills, M.J.  The evolution of the *Tarasoff* doctrine:  protecting third parties from the violent acts of patients.  Presented at The Northside Clinic, Greenwich, New South Wales, Australia, (by invitation), August 1986.

121.    Mills, M.J.  Current United States trends in the delivery of public mental health services.  Presented to the New South Wales Branch of the Australian College of Psychiatry, Sydney, New South Wales, Australia, (by invitation), August 1986.

122.    Mills, M.J.  The right to refuse treatment in the institutional setting.  Presented to Atascadero State Hospital, Atascadero, California, (by invitation), October 1986.

123.    Mills, M.J.  Maintenance treatment in psychosis:  New trends (legal developments).  Presented to Princeton American Communication Company, Princeton, New Jersey (video presentation by invitation), October 1986.

124.    Mills, M.J.  The violent patient:  legal and public policy perspectives.  Presented to the Department of Psychiatry and Behavioral Sciences, The University of Texas Medical/Branch at Galveston, Galveston, Texas, (by invitation), November 1986.

125.    Mills, M.J.  Legal developments affecting the delivery of public mental health services.  Presented to the Department of Psychiatry, Hahnemann Medical School, Philadelphia, Pennsylvania, (by invitation), November 1986.

126.    Mills, M.J.  Strategies of dealing with threatening and potentially violent patients.  Presented to the Department of Psychiatry, Health Science Center, University of Oregon, Portland, Oregon, (by invitation), November 1986.

127.    Mills, M.J.  Avoiding psychiatric malpractice:  perspectives in irony.  Presented at the Veterans Administration Medical Center, Psychiatric Service Case Conference, Seattle, Washington, (by invitation), November 1986.

128.    Mills, M.J.  Avoiding psychiatric malpractice.  Presented to the Department of Psychiatry, Thalians Mental Health Center, Cedars-Sinai Medical Center, Los Angeles, California, (by invitation), November 1986.

129.    Mills, M.J.  Mental health legal reform, or do the issues ever change:  libertarianism versus paternalism.  Presented at the 7th Annual Congress of the Australian and New Zealand Association of Psychiatry, Psychology and Law, Newman College, Melbourne, Victoria, Australia, (by invitation), November 1986.

FELL-00000417

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 22

130.  Mills, M.J. Malpractice and legal reform in psychiatry. Presented to the Department of Psychiatry and the Behavioral Sciences, University of Southern California, Los Angeles, California, (by invitation), December 1986.

131.  Mills, M.J. Anxiety: quest for improved therapy. Presented to the Los Angeles audience of the Mead Johnson Television Seminar, Los Angeles, California, (by invitation), January 1987.

132.  Mills, M.J. Avoidance of psychiatric malpractice. Presented to Atascadero State Hospital, Atascadero, California, (by invitation) April 1987.

133.  Mills, M.J. Some observations on the right to refuse treatment. Presented to the New York State Office of Mental Health, Office of Counsel, Lake George, NY, (by invitation) April 1987.

134.  Mills, M.J. Legal ramifications of extrapyramidal symptoms. Presented at the 140th Annual Meeting of the American Psychiatric Association, Chicago, Illinois, (by invitation) May 1987.

135.  Mills, M.J. Psychotropic therapy: the issue of drug-induced impairment (potential legal implications). Presented at the 140th Annual Meeting of the American Psychiatric Association, Chicago, Illinois, (by invitation) May 1987.

136.  Mills, M.J. Controversies in law and psychiatry: update (the duty to protect). Presented at the 140th Annual Meeting of the American Psychiatric Association, Chicago, Illinois, May 1987.

137.  Mills, M.J. Inpatient management of the aggressive patient: some legal aspects. Presented at the 140th Annual Meeting of the American Psychiatric Association, Chicago, Illinois, May 1987.

138.  Mills, M.J. Preventing psychiatric malpractice: practitioners' dilemmas for the eighties. Presented at the Southern California Psychiatric Society, Inland Region, Colton, California, (by invitation) May 1987.

139.  Mills, M.J. Ethics and legality of seclusion and restraint. Presented at Patton State Hospital, Patton, California, (by invitation) July 1987.

140.  Mills, M.J. Unwillingness, non-competence and antipsychotic medication. Presented at Napa State Hospital, Napa, California, (by invitation) July 1987.

141.  Mills, M.J. Psychiatric malpractice: new dilemmas posed by *Tarasoff*. Presented at Northridge Hospital Medical Center, Northridge, California, (by invitation) September 1987.

142.  Mills, M.J. The malpractice crisis: implications for treatment and liability. Presented at Veterans Administration Hospital, Sepulveda, California, (by invitation) October 1987.

143.  Mills, M.J. Treatment for affective disorders: an update on legal complications. Presented at Ochsner Clinic, New Orleans, Louisiana, (by invitation) November 1987.

144.  Mills, M.J. Psychiatric malpractice: how to stay out of the courtroom. Presented at Veterans Administration Medical Center, Palo Alto, California (by invitation) November 1987.

145.  Mills, M.J. The patient's record: information appropriate for "eupractice". Presented at Cedars-Sinai Medical Center, Los Angeles, California (by invitation) November 1987.

FELL-00000418

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 23

146.    Mills, M.J.  Recent legal developments in psychiatric practice.  Presented at Woodview-Calabasas Hospital, Calabasas, California (by invitation) January 1988.

147.    Mills, M.J.  Confidentiality and privileged communication.  Presented at Patton State Hospital, Patton, California (by invitation) February 1988.

148.    Mills, M.J.  Forensic aspects of psychopharmacology.  Presented at The Southern California Psychiatric Society, Los Angeles, California (by invitation) February 1988.

149.    Mills, M.J.  Avoiding psychiatric malpractice:  refining the physician-patient role.  Presented at the University of Cincinnati, Cincinnati, Ohio (by invitation) March 1988.

150.    Mills, M.J.  Legal developments in psychiatric practice.  Presented at the University of Texas, Houston, Texas  (by invitation) April 1988.

151.    Mills, M.J.  Avoiding psychiatric malpractice.  Presented at the University of California Davis Medical Center, Sacramento, California (by invitation) April 1988.

152.    Mills, M.J.  A comprehensive review of the laws regulating psychotherapists:  an emphasis on emerging situations.  Presented at the Washington Association of County Designated Mental Health Professionals, Olympia, Washington (by invitation) April 1988.

153.    Mills, M.J.  Privacy, confidentiality and privileged communication:  ongoing dilemmas for the psychotherapist.  Presented at Atascadero State Hospital, Atascadero, California (by invitation) April 1988.

154.    Mills, M.J.  Management of the aggressive patient:  some legal aspects.  Presented at the 141st Annual Meeting of the American Psychiatric Association, Montreal, Quebec, Canada, May 1988.

155.    Bear, D.M., Pollock, D.C., Ervin, F.R. and Mills, M.J.  Neuropsychiatric perspective on human aggression.  Presented at the 141st Annual Meeting of the American Psychiatric Association, Montreal, Canada, May 1988.

156.    Pollock, D.C., Bear, D.M., Ervin, F.R. and Mills, M.J.  Evaluating aggression.  Presented at the 141st Annual Meeting of the American Psychiatric Association, Montreal, Canada, May 1988.

157.    Ervin, F.R.; Bear, D.M.; Pollock, D.C. and Mills, M.J.  Pathological aggression.  Presented at the 141st Annual Meeting of the American Psychiatric Association, Montreal, Canada, May 1988.

158.    Mills, M.J.  National trends in mental health law.  Presented at Metropolitan State Hospital, Norwalk, California (by invitation) May 1988.

159.    Mills, M.J.  "Malpractice-proofing" the medical record:  problems for the 1990's.  Presented at Southern California Edison Corporation, Rosemead, California (by invitation) May 1988.

160.    Mills, M.J. Legal and ethical pitfalls in primary-care psychiatric counseling.  Presented at Southern California Edison Corporation, Rosemead, California (by invitation) May 1988.

161.    Mills, M.J.  Evolving legal issues in psychiatric practice.  Presented at the Oakwood Hospital, Dearborn, Michigan (by invitation) June 1988.

162.    Mills, M.J.  Innovative ways of avoiding medical malpractice suits.  Presented at the Valley

FELL-00000419

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 24

Community Hospital, Santa Maria, California (by invitation) June 1988.

163.    Mills, M.J.  Psychopharmacologic treatment:  legal regulations, liability and abuse.  Presented at Advancement in Neurosciences:  Psychopharmacology update, sponsored by the Association for the Advancement in Neurosciences, Rome, Italy (by invitation) September 1988.

164.    Mills, M.J.  Avoiding medical malpractice:  strategies and tactics.  Presented at the Centinela Hospital Medical Center, Inglewood, California (by invitation) October 1988.

165.    Mills, M.J.  Immunity, disease and civil liability.  Presented at the 19th Annual Meeting of the American Academy of Psychiatry and the Law, San Francisco, California October 1988.

166.    Mills, M.J.  Medical/legal problems in handling legal psychiatric cases.  Presented at the Truck Insurance Exchange and California Hospitals Medical Malpractice Seminar, Los Angeles, California (by invitation) November 1988.

167.    Mills, M.J.  Strategies for avoiding psychiatric malpractice.  Presented at the Langley Porter Psychiatric Institute, San Francisco, California (by invitation) November 1988.

168.    Mills, M.J.  Legal issues in psychiatry:  avoiding malpractice.  Presented at Fair Oaks Hospital, Summit, New Jersey and at Clinton Inn, Tenafly, New Jersey (by invitation) November 1988.

169.    Mills, M.J.  Adolescent civil commitment:  issues in controversy.  Presented at The Regent Hospital, New York, NY (by invitation) November 1988.

170.    Mills, M.J.  The theory and practice of "eupractice":  does malpractice litigation make for better patient care? Presented at the Humana Hospital, Las Vegas, Nevada (by invitation) December 1988.

171.    Mills, M.J.  Ethical issues in the practice of psychopharmacology.  Presented at the Benjamin Rush Society Annual Meeting, Baja California, Mexico (by invitation) January 1989.

172.    Mills, M.J.  Clinicolegal issues in the prevention of medical malpractice.  Presented at Canyon View Hospital, Twin Falls, Idaho (by invitation) January 1989.

173.    Mills, M.J.  The legal use of medical experts:  their selection and preparation.  Presented at The Magic Valley Bar Association, Twin Falls, Idaho (by invitation) January 1989.

174.    Mills, M.J.  Legal aspects of psychopharmacologic intervention:  neuroleptics, antidepressants and anxiolytics. Presented at the St. Alphonsus Hospital, Boise, Idaho (by invitation) January 1989.

175.    Mills, M.J. *Tarasoff* duties:  prediction of dangerousness in release of mental patients. Presented at Atascadero State Hospital, Atascadero, California (by invitation) March 1989.

176.    Mills, M.J. Informed consent and the use of psychotropic medication.  Presented at Menninger Clinic, Topeka, Kansas (by invitation) April 1989.

177.    Mills, M.J. Tardive dyskinesia, neuroleptics, and informed consent.  Presented at Menninger Clinic, Topeka, Kansas (by invitation) April 1989.

178.    Mills, M.J. Stigma of ECT:  legal perspectives.  Presented at the 142nd Annual Meeting of the

FELL-00000420

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised:  January 2001
Page 25

American Psychiatric  Association, San Francisco, California (by invitation) May 1989.

179.    Mills, M.J. Psychiatry and the law:  have the last three decades of legal regulation been productive? Presented at the UCLA Neuropsychiatric Institute, Los Angeles, California (by invitation) May 1989.

180.    Mills, M.J. Ethical dilemmas in forensic psychiatry.  Presented at Atascadero State Hospital, Atascadero, California (by invitation) May 1989.

181.    Mills, M.J. Controversial issues in psychiatric administration.  Presented at Metropolitan State Hospital, Norwalk, California (by invitation) May 1989.

182.    Mills, M.J. Issues in psychiatric malpractice.  Presented at Harbor Hospital, Los Angeles, California (by invitation) June 1989.

183.    Mills, M.J. Current themes in psychiatric malpractice litigation.  Presented at Metropolitan State Hospital, Norwalk, California (by invitation) June 1989.

184.    Mills, M.J. Implementing informed consent criteria for the hospitalized chronically mentally ill. Presented at the Department of Mental Health and Mental Retardation, Nashville, Tennessee (by invitation) June 1989.

185.    Mills, M.J. Insanity:  Do we need it?  Presented at Atascadero State Hospital, Atascadero, California (by invitation) June 1989.

186.    Mills, M.J. Legal developments affecting patient care. Presented at Olive View Medical Center, Sylmar, California (by invitation) June 1989.

187.    Mills, M.J. The legal issues affecting psychiatric patients' assault.  Presented at Napa State Hospital, Napa, California (by invitation) September 1989.

188.    Mills, M.J. Tort law and malpractice.  Presented at Atascadero State Hospital, Atascadero, California (by invitation) December 1989.

189.    Mills, M.J. The future of forensic mental health services. Presented at Mayhem, Madness and Mental Health, San Luis Obispo, California (by invitation) April 1990.

190.    Mills, M.J. The role of the nuclear utility medical review officer:  issue of drug testing in the workplace.  Presented at the Nuclear Management and Resources Council Meeting, Detroit, Michigan (by invitation) September 1990.

191.    Mills, M.J. The role of the nuclear utility medical review officer:  practical issues for physicians. Presented at Healthcare Centers for Business in Industry, Phoenix, Arizona (by invitation) October 1990.

192.    Mills, M.J. The devil made me do it:  some thoughts on the role of mental illness in violent crime. Presented at Plexis II:  The Neurobiology of Aggression (Healthcare Rehabilitation Center), Austin, Texas (by invitation) November 1990.

193.    Jackman, J.A., Mills, M.J. and Wells, S.H. Medical/legal aspects of mental illness. Presented at the Whittier Bar Association, Whittier, California (by invitation) November 1991.

FELL-00000421

Mark J. Mills, J.D., M.D.
*Curriculum Vitae*
Revised: January 2001
Page 26

194. Mills, M.J. The theory and practice of defending psychological injury in tort claims: the evaluation and implications of Post-Traumatic Stress Disorder (PTSD). Presented at the Torts Branch, Civil Division, United States Department of Justice, Washington, D.C. (by invitation) June 1992.

195. Mills, M.J. Substance abuse and stress management in the legal profession. Presented at the California District Attorney's Association Annual Meeting, South Lake Tahoe, California (by invitation) June 1992.

196. Mills, M.J. The politics of the right to refuse treatment. Presented at the Fifteenth Annual Scientific Meeting of the International Society of Political Psychology, San Francisco, California (by invitation) July 1992.

197. Mills, M.J. Malpractice risk reduction. Presented at the Southern California Edison Health Care CME Offsite, Pomona, California (by invitation) January 1993.

198. Mills, M.J. Legal issues in medicine. Presented in conjunction with the course, "The Anthropology of Medicine" to the University of California School of Medicine, La Jolla, California (by invitation) February 1993.

199. Mills, M.J. Psychiatric dangerousness and civil commitment criteria. Presented at the MCLE Seminar, Rushfeldt, Shelley & Drake, Sherman Oaks, California (by invitation) March 1993.

200. Mills, M.J. and Rosenberg, J.E. Is it proper to sue and prosecute psychiatric patients for assault? Presented to the American Academy of Psychiatry and the Law, 25th Annual Meeting, Maui, Hawaii (by invitation) October 1994.

201. Mills, M.J. Is there a link between mental illness and dangerousness? Presented at the UCSD Department of Psychiatry Conference Seminar titled "Breakthroughs in Psychiatry and the Law: Dealing with Dangerousness in the 90's," San Diego, California (by invitation) February 1995.

202. Ornish, S.A., Mills, M.J., Humphrey, J., Matthews, D. and Pippin, J.D. Ethics, law and prearraignment evaluations. Presented to the American Academy of Psychiatry and the Law, 28th Annual Meeting, Denver, Colorado (by invitation) October 1997.

203. Mills, M.J. Psychiatric issues in nursing home care. Presented at A.I. Healthcare, New York, New York, April 1999.

204. Mills, M.J. Current topics in forensic psychiatry. Presented at Grand Rounds for Howard University Department of Psychiatry, Washington, D.C. (by invitation) November 2000.

205. Mills, M.J. Psychiatric issues in criminal prosecution. Presented to the United States Attorney, Central District (Florida), Tampa, Florida (by invitation) December 2000.

FELL-00000422

# EXHIBIT 4



**NEUROSCIENCE CONSULTING, INC.**

*154 Brookhill Road*
*Libertyville, IL 60048*
*Phone (847) 549-9141*
*Fax (847) 549-6752*

*Jonathan J. Lipman, Ph.D.*
*FACN, BCFE, BCFM*
*Neuropharmacologist*

Report of Neuropharmacological Consultation

Donald FELL

May 14, 2001

## Scope of consultation:

I am consulted by Alexander Bunin, Esq., of the Office of the Federal Public Defender for the Districts of Northern New York and Vermont, to opine on neuropharmacological influences acting upon Donald ("Donnie") Fell at the time of the November 2000 offenses responsible for his current incarceration.

## Opinions

Having interviewed and evaluated Donald Fell, and having relied upon the facts and information described more fully below, it is my opinion, which I hold to a reasonable degree of scientific certainty, that:

1.  Donald Fell suffers from a constitutional and historic predisposition toward the abuse of drugs. This is most likely in part genetic and in part results from chronic early exposure during a critical developmental period. As a result of this appetitive drive, his pre- and early-teen years were influenced by regular and intense intoxication, the neuropharmacological consequences of which impacted his maturation and personality development, both then and in later years.

2.  His early chronic history of abusing drugs and alcohol, began at age eight with beer, continued at age eleven with liquor, marijuana and LSD, at age twelve with cocaine and pharmaceutical drugs including the stimulants, depressants and opiates. This chronic early drug abuse existed comorbidly with developing mental illness characterized by depression with psychotic and borderline aspects, resulting in his repeated psychiatric hospitalization.

3.  Arrested and consigned to custodial care at age 13 he was maintained in a drug-free state until age sixteen when upon his release he recommenced his abuse of alcohol and drugs, including phencyclidine, hallucinogenic mushrooms, opiates, tranquillizers and various unidentified drugs including one which rendered him insensible for two days. He began to abuse ecstasy (MDMA) in the months before the offense and his LSD use increased, as did his use of alcohol (beer and liquor), particularly the latter in the pre-crime weeks





FELL-00000423

4.    Considering Mr. Fell's diagnostic history and his current psychometric and projective psychological test findings, these interpreted in light of his relatively normal current neuropsychological test performance, it appears that in addition to suffering a pathological drug appetite, he also suffers from a related constitutional neuropsychobiological vulnerability to psychotic decompensation under extreme conditions of emotional stress. Historically this has been associated with uncontrolled rage. This vulnerability would be expected to increase when intoxicated and to increase further when chronically intoxicated, as was the case at the time of the offenses.

## Materials reviewed and considered

1. Records of First Hospital Wyoming Valley 9-30-91 to 10-30-91
2. School Records Wilkes Barre District, Grades 1-6
3. Records of Wyoming Valley Health Care System – Wilkes Barre General Hospital
4. Kingston Municipal Police Records, call sheets, sundry documents, pp16
5. Handwritten 4 pages with attachment titled 'Burger Kings from Bennington" faxed from VT ST. Police
6. Affidavit of FBI SA Christopher DESTISO, dated 1 Dec 2000
7. Newspaper Clip Files, on-line, including Lexis-Nexis output
8. Handwritten statement of Robert LEE, dated 12-1-00, pp11
9. Transcript of Interview of Robert Joseph LEE, Dec 2 2000, pp73
10. Transcript of Interview of Donald FELL, Dec 2, 2000, pp50
11. Report of Mark J. Mills JD MD dated May 7, 2001
12. Report of Wilfred VanGorp PhD dated April 19, 2001, MMPI-2 profile
13. Personal interview and testing of Donald Fell conducted by me on January 30, 2001 (about eight hours) including clinical history, Clinical Analysis Questionnaire / 16-PF, Addiction Proneness Scale, D2 test of concentration endurance and the Magical Ideation Scale

## Reasons for my opinions

### 1. Mr. Fell's self-reported drug abuse history: excerpted synopsis

At interview, Mr. Fell described his father and mother as being *"bad alcoholics."* His father, whom he described as abusive when drunk, would beat 'everyone' when he got into this state. His father kept in the basement a tapped keg of *Pabst Blue Ribbon* beer in a refrigerator modified for this purpose, for his own consumption, Donnie described his parents as not being very social, in that they *"never really had much company."*

FELL-00000424

Donnie started drinking at an early age, he estimated age eight, from his father's keg in the basement. He started to abuse liquor at age eleven, drinking with his friends.

The friends would drink mostly at his friend Pat Evans's house, he said, and they also enjoyed walking around drunk in the shopping mall. They kept beer in their lockers at school, and Donnie would 'chug' a couple of beers between classes.

It was also in his eleventh year that he began to use pot and acid (Lysergic acid diethylamide, LSD), he said. After his introduction to marijuana (pot), he used it *"every day,"* it's effect being to make him *"laugh a lot,"* and concerning the effect of acid (LSD), he said: *"amazing, it became my favorite. Everything was silhouetted in colors, things echoed...my body was numb...if it was raining I couldn't see or feel the rain...the trees were eerie... I'd lay down a lot and look at the sky, mostly at night... the stars and moon were wonderful...if I could I'd trip for the rest of my life."*

He used LSD twice in his eleventh year.

After his parents separated his mother began to abuse cocaine and he would steal this from her, when he was twelve years of age. Describing his alcohol consumption at age twelve, he said that he preferred whiskey, 151 Rum and tequila, and he would drink socially with his friends. It was in his twelfth year that he started "hanging out" with an eighteen year-old woman called Lacy LNU who dealt (sold) acid, and he and his friends sold it for her. He quickly discovered that acid cannot be used two consecutive days to the same intensity of effect: *"you'd do it one day and double [the dose] the next...I'd take two hits the first day, then four the next, then wait a couple, three, days, before taking more...the most I've ever taken is twenty five hits."* He has always taken it by mouth, he added, never by eye drops or injection.

He recalled images of times when he was on acid: *"some kid running around cutting people with a razor blade... and one time my friend's hair was on fire and I was smacking him on the head – but I discovered his hair wasn't on fire."* Summarizing the visual effects he most enjoyed, he offered: *"multiple vibrating images all shrouded in colors."*

The acid he began to use at age twelve, when enrolled (but hardly ever attending) Plains Junior High in Wilkes-Barre, was *"a better grade of acid,"* he said. He used it intermittently in his twelfth year – enjoying it for a few months then stopping for a few months when he was admitted to what he called *'the nut ward'* for psychiatric hospitalization. In those months that he consumed it he employed it twice per week *"at least ten hits at a time."* I asked if he described this to his psychiatrists at the time, but he said that he did not: *"I didn't feel like talking to them... the urine test came back with pot once, but they can't test for acid."*

He was prescribed various medications in his twelfth year. He recalled: *"Dexedrine, Tofranil and others of all shapes and sizes... they made me feel like a zombie... slowed*

Dr. Jonathan J. Lipman      Report of Neuropharmacological Consultation                    3
                           on Donald FELL              May 14, 2001

FELL-00000425

*me down... I was always tired, taking them. One day I decided not to take them any more and mixed them with Vicodin – my mother's boyfriend's pills, his leg was screwed up by a car – and sold them at school."* His mother's then boyfriend, who has since died of a drug overdose, was named Ellery WILCOK, he recalled

In his thirteenth year, having to repeat seventh grade again at Plains Junior High, he: *"ended up locked in St. Michael's... a home for juveniles.* He was interned there from shortly before his fourteenth birthday, he said, and lived at St. Michael's until he had turned sixteen. Living at St. Michael's (for two years) his drug use came to a halt except for 'pot' that was smuggled in by the non-boarding children who attended 'day treatment.' He described St. Michael's as a Catholic Institute, and added that he volunteered for 'altar boy' duty so that he could steal matches and wine. The matches were valuable contraband needed for lighting cigarettes, he explained, and the wine *"goes down real easy,"* when it was his duty to pour it for the priest.

Two months before he was released from St. Mike's (as he called it), he attended a meeting at the school with his Aunt Jackie, where she offered to foster him since his natural mother (her sister) now lived in Vermont. This being agreed, when he was released from St. Michael's, then aged sixteen, he went to live with Jackie. She resided at her mother's, Donnie's grandmother's, house - who had recently died of bone cancer, 'on morphine,' Donnie said. He initially continued to attend St. Michael's for 'day treatment' and was transported back to Aunt Jackie's house after school. His aunt let him smoke cigarettes, he said, and he watched TV, and *"it was kinda like being in jail... she'd let me out twice a week, but when she was asleep I could do anything I wanted."* His sister and her boyfriend, Shawn CAMPBELL sometimes lived there also, he said. He attended school and in the evenings worked several casual jobs: first at a racetrack as a busboy, then as a dishwasher – a job that he took because it allowed him to drink the residues of beer pitchers the waitresses brought back from the tables. After work he would go out drinking, often staying out all night before returning home just in time to go to school. His aunt Jackie abused him physically, he said: she would hit him with a cane and push him through doors, evidently in a hopeless attempt to discipline him. Ultimately he was ejected from his Aunt Jackie's house at age seventeen as a result of his drug abuse, drinking and misbehavior. He said that: *"from that point on I drank every day and had lots of drugs..."*

Asked about his drug use in these two years before his arrest, Donnie said that acid was hard to find, but he was introduced to and used angel dust (phencyclidine, PCP) about fifteen times that first year after leaving Jackie's. He described the effects as : *"different... I really didn't trip from it... I was out in space from it... not myself... sometimes violent... once I blacked out and I was told I was swinging at people, smashing things.. I didn't believe them, but I came to believe them when I saw the fear in their eyes... they were scared, and there were holes in the walls they said I'd made."*

I asked him what it was about angel dust that he enjoyed, and he said: *"I'd feel like I was outside my body, looking in... that's basically why it was pleasurable.... I felt tingly, numb."* He denied self-injury under its influence.

Dr. Jonathan J. Lipman    Report of Neuropharmacological Consultation      **4**
                       on Donald FELL         May 14, 2001

FELL-00000426

He also discovered (hallucinogenic) mushrooms in this year. A girl who returned from Florida with them gave these to him and his friends, he said. In response to my question regarding their type, he confessed that he did not know, but observed that she had picked them herself and they had 'cowshit' on them. He said: *"I was so drunk I couldn't taste them... next thing I know I'm pounding on car windows, telling people they're going to die... my friend was with me wearing a jester's hat... we went to the hangar* [a party venue] *and I was shaking people's hands."* Later he discovered that no one else had been there, that he had been shaking the hands of imaginary people, he said. He denied nausea or other adverse effects except 'wicked heartburn.'

The next time he did mushrooms was the following Summer 2000, attending the Woodstock festival, he added. He took them there twice.

He also 'took a lot of pills' he said. He described these as oxycontin, pain pills and tranquillizers, including Valium *"by the handful"*. Asked for details and doses, he was unable to supply these. He essentially took anything he could get his hands on, he said. The oxycontin he took on three occasions, he added.

He also snorted heroin on at least three occasions. The first time was unknowing: he was at a music concert (biohazard was performing): *"and this girl stuck four lines of powder in front of my nose, and I thought 'yellow coke?.. strange' and I snorted it all, and then they tell me it was heroin and I'm going to vomit and get tired... but I didn't, it gave me energy, I was full of energy in the mosh pit all night... my friend Gary Yale was vomiting, though... we got a couple bags of heroin after that,"* he added.

In his eighteenth year Donnie moved in with a female drug dealer. He declined to name her, to protect her identity. I suggested that we give her an arbitrary name for purposes of his present interview, and he offered 'Nancy.' She was 48 years old, he said, and lived with her boyfriend MARK (a.k.a 'Chopper') and her nine year old son MARKY. Nancy supplied Donnie with drugs.

In the year before his arrest he would drink liquor twice a week: Jack Daniels, Green or black label... *"two fifths in a day...most of it mine.... I'd chase the liquor with beer... most people chase beer with liquor, but I'd chase liquor with beer... in the summer of 1999 every day we had barrels of beer and rum and whisky and tequila... I could go for days drinking without sleep, till I passed out... I've never been able to sleep well, even now,"* he added.

He obtained occasional work at MEDICO INDUSTRIES, a weapons manufacturer situate on Route 315 in Plains. He continued drinking daily and smoking pot ("a lot") daily and taking 'a lot of pills,' also daily – sundry tranquillizers including valium, whilst working there, he said.

At Christmas 1999 Donnie stopped taking 'pills' after he 'blacked out' for two days. He described being with his friend Gary Yale at the time, and they found a purse containing

FELL-00000427

pills that were *shaped 'like houses – with a little chimney... tiny little things.'* He said they each took two: *"they fucked us up... we had six cases of beer, Rolling Rock, and Captain Morgan's rum and took more pills by the handful... next thing I know I wake up on the floor... my friends all surrounding me. They told me I was hitting people... knocked the Christmas tree over... then I blacked out for two days, from Friday to Monday."* Other blackout incidents had previously occurred, he mentioned: on one of these his friends had told him he had been complaining of 'demons.' He had no memory of this.

After abandoning 'pills' his typical daily consumption of alcohol was *"two cases of Budweiser between four of us."* He would drink faster than anyone but Mikey Raymond, he added. In response to my question concerning how many days per month he did not drink, he offered that: *"very seldom did I not drink... but on the days I didn't drink I didn't get the shakes... I was just a little bit bored... I'd pick up my guitar."*

In June 2000 he obtained employment with a carnival. The Carnival was immune from police incursion, Donnie said, and all the drugs he wanted were available. He started taking ecstasy in July 2000, a drug that he found did not make him want sex, as it did others. August was *"a big month for acid"* he recalled. He had used acid twice in June when he joined the carnival, taking six or seven hits at a time. He took more in July, eight or nine times per month, taking six or seven or ten hits at a time, and August was a 'big' month for acid more in quantity than in frequency, he explained. He found that a couple of times that he took it, it *'didn't work,'* and on one occasion a day after taking ten hits, he took fifteen hits to maintain the efficacy. *"When I wasn't working I was in a drunken stupor...I had a different girl every day, it was exciting,"* he said.

He used mushrooms once before visiting the Woodstock festival, in August, and he remained there four or five days. He recalled that in Woodstock he took two hits of acid one day and eleven the next. Two days later when he took more, it had no effect.

His last night at the carnival – and the reason he lost his job, he added - he took twenty-five hits of 'paper' acid and a bag of mushrooms. Someone was on stage playing Fleetwood Mack. People were appearing and disappearing, he said. He found himself unable to feel the rain, uncertain if it was in fact raining, and running around asking people if it was raining, if they could feel it. His sister was there that day, he recalled.

He continued: *"I was with STEPHANIE LNU that I worked with at the carnival... we went into the woods and stumbled on a campfire, with tents all over, and coolers and bottles of 'Parrot Bay' and we're out there sword fighting with light sticks, singing Pink Floyd... next thing I know I'm coming down and start feeling the rain and we try to go back to work but the cops have towed the car... me and Billy and his brother ANTHONY took a walk to smoke hash ... we come back and this kid, CHRIS, is trying to force himself on my sister... I beat him up...I broke his leg... I was in a frenzy... I pissed on him... then six guys came up and we ended up fighting with them... my sister smashed the shit out of one guy.."* After the battle they were walking down the road, smoking pot and *"a cop rolled up and they took us to jail... he found a bit of acid on me, but he made the*

FELL-00000428

*mistake of leaving it on the table when he left the room and I ate it. Me and my sister and Bobby and his brother went to court five days later... had to pay a fine but I didn't give my real name."*

He returned to Wilkes Barre after Woodstock, I understood him to say, and stayed at his Aunt DONNA's house. He said that he blacked out there after drinking a bottle of whisky, that his cousin Jamie WILLIAMS saw him pull a shelf off a wall, but he himself had no recollection of this.

Donnie said that he decided that he wanted to visit his mother, from whom he had been estranged since he entered St. Michael's at age fourteen. Once he had made the decision and plans had been made, he *"got a bad feeling about it,"* and discussed this with his aunt Donna: *"and she said I didn't have to go, that I could live with her, but plans had been made, so I felt I had to go... but I felt something bad was going to happen."*

He had been given the impression that she had sobered up, he said: *"I was expecting to find a new woman, but I found her worse."*

His grandmother Stella BANAS drove him to his mother's house, a six or seven-hour journey. On arrival he found himself isolated and bored, since he knew no one there. He drank heavily, and *"started blacking out more... I'd wake up and wonder how I'd got to bed or even when I'd went to bed."*

After a month of living at his mother's, he telephoned his friend (the codefendant) Bobby and invited him to come and visit. Bobby immediately agreed and arrived by bus. He and Bobby sat at home and drank most of the time, he said. His mother would return home, drunk, and try to start arguments *"but we'd ignore her."*

His drinking was not excessive when he was working, Donnie said: he drank after work, though, and that on thanksgiving he *"had quite a bit."* On Friday he had two beers after work at his boss's house, then went home. On Saturday he got paid and he and Bobby bought a hash pipe. The seller told them it had been used to smoke crack and still had crack in it. Donnie said that he enjoyed the 'high,': *"it was instant... I felt like I was floating... I was jamming on music, playing cards with Bobby in the kitchen... playing a drinking game with Budweisers... a good game to get drunk quick... I was playing a 'Cradle of Filth' CD on my CD player, through the tape player in the kitchen... Charlie and mom came in at about nine O'clock carrying a couple of cases of beer... we all started drinking and having a good time... mom and Charlie were in the TV room listening to music on digital cable. I took a pill I was told was ecstasy about an hour before mom came home... a little black pill with red writing on it... it didn't feel like ecstasy... I didn't feel any effects that I know of."* The pill came from by BOREN LNU, described as *"a black dude who used to live down the road from the Jiffy Mart in Rutland. He's missing his pinkie (finger) on his left hand... "* Donnie said.

To this point in the evening he and Bobby had worked their way through four cases of Budweiser starting at 9 AM and ending at 1 AM. He felt 'hammered.' He was

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          7
                               on Donald FELL          May 14, 2001

FELL-00000429

responsible for half of the beer consumed, he said. He weighed 130 Lb at the time (weighs 140 now) and his height was 5' 8 ¾ "

The killing of his mother and her friend Charlie he described as unanticipated, unrehearsed and inexplicable. He could offer no explanation for what led up to it or the reason it occurred.

## 2. Factors related to early drug and alcohol abuse

Mr. Fell's parents were alcoholics. Although the mechanism(s) responsible for an inherited vulnerability are not entirely clear (but see below), alcoholism does have a high degree of genetic penetrance or phenotypic 'loading'. Human family studies have shown that first-degree relatives of alcoholics are more likely to be alcoholic than first degree relatives of non-alcoholics (Cotton 1979)[1]. Adoption studies have shown that adopted-away children are more likely to develop alcoholism than adopted-away children of non-alcoholic parents (Goodwin et al 1973)[2]. Twin studies have found that monozygotic twins are more likely to be concordant for alcoholism than dizygotic twins (Kaij, 1960)[3]. And as Schukitt has shown, children of alcoholics are at higher risk than children of non-alcoholics to develop alcoholism, and differ in their responses to alcohol (Schukitt 1985)[4]. These findings collectively reveal a clear genetic vulnerability (Pickens & Svikis, 1988)[5]. The biological basis of this inherited vulnerability is likely due to inheritance of the A1 allele of the D2R dopamine receptor gene – a mutation conferring susceptibility to alcoholism being present in the vicinity of the Taq 1 enzymes, located in the DRD2 gene. The number of DRD2 sites are found to be reduced in human alcoholics (Amadeno et al, 1993; Noble & Blum,1993; Gelemter et al, 1993 )[6]

Notwithstanding Mr. Fell's liability to genetic inheritance of drug, including alcohol, abuse, and unlike the children of alcoholic parents raised apart from their parents, as in the research cited above, Mr. Fell was raised in a home where alcohol- abusive behaviour was commonplace and available for patterning. He was introduced to beer drinking at a shockingly early age by modeling his father's beer consumption, taking it from his basement store. His graduation to liquor drinking also occurred earlier than is usual. Generally, in the experience of clinicians, the younger the drug-abuse habit is acquired the greater are the later and resulting consequences.

---

[1] Cotton NS (1979) The familial incidence of alcoholism, *J. Stud. Alcohol* 40:89-116.
[2] Goodwin DW et al (1973), Alcohol problems in adoptees raised apart from alcoholic biological patents, *Arch. Gen. Psychiat* 28:238-243
[3] Kaij L (1960) Alcoholism in twins: studies on the etiology and sequellae of alcohol abuse. Stockholm: Almqvist & Wiksell [cired in Roy & Pickens, 1988]
[4] Schukit M (1985) Studies of populations at high risk for alcoholism, *J. Psychiatr. Dev.* 3:31-63
[5] Pickens RW & Svikis DS (1988) Genetic vulnerability to drug abuse, in: Biological vulnerability to drug abuse, NIDA Research Monograph 89, USPHS (pubs).
[6] Amadeno S et al (1993), Dopamine receptor genes and alcoholism, *J. Psychiatr. Res.* 27:173-179; Noble EP & Blum K (1993) Alcoholism and the D2 dopamine receptor gene, *J.Am. Med. Ass.* 270:1547; Gelemter J et al (1993) Alcoholism and the D2 dopamine receptor gene, *JAMA* 270: 1547-1548

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          8
                               on Donald FELL          May 14, 2001

FELL-00000430

His suffering of sexual abuse in childhood at age 4, documented in the record at the hands of a babysitting couple, is a third factor to be considered in regard to Mr. Fell's adoption of an early drug abuse career. Although the association between such childhood abuse and the adoption of alcoholism is strikingly clear in females (Langeland & Hartgers, 1998)[7], the co-variance is not absent in males (Hummel 1999)[8]. In part this statistically may arise as a result of alcoholics tending to sexually abuse their first-degree relatives, the tendency to alcoholism being inherited rather than engendered by the abuse, but the proportions follow the abuse incidence rate rather than the incidence of alcoholism, which suggests a causal relationship between the abuse and the alcoholism resulting in the child.

### 3. Comorbidity of drug and alcohol abuse and other disorders

In children and adults alike, alcohol and drug abuse commonly coexists with other mental disorders. The cause and effect relationship is never entirely clear, in this or any other case, since mental problems may forecast drug and alcohol abuse as self-medication and for subjective pain relief as certainly as drug and alcohol abuse deranges the biological substrates of normal mental function, to engender mental disorders. The co-existence of such abuse and mental disorders is thus a complex inter-relationship. Notwithstanding this uncertainty, a syndrome of affective depression is known to be associated with chronic intoxication and depression is very common in alcoholics. Research conducted in a controlled setting has shown that prolonged drinking leads to progressive depression with rapid relief of symptoms and little recall after resolution and sobriety (Tamerin & Mendelson, 1969)[9]. Yet other studies have determined clear etiologies wherein chronic depression predates and precedes the alcoholic habitus, drinking arising from self-medication of subjective distress, with pathological consequences in the objective psychiatric sphere (see Solomon 1989 for review)[10]

Review of Fell's early institutional records reveals his comorbidity and most particularly reveals a stunning lack of appreciation by his therapists of the existence and relevance of his drug and alcohol abuse. As an eleven year old, in the sixth grade, he was admitted to hospital in Wyoming Valley with severe behavioral disorders, his alcohol abuse apparently going unrecognized at that time. He was psychiatrically admitted in a psychotic state at age 12 ½ and his borderline personality traits noted diagnostically (*vide infra*), but record review indicates that his therapists were unaware of his alcohol abuse or of his abuse of his mother's cocaine and other drugs (vide supra), or of the diagnostic relevance these would have had. He was treated with and responded well to thioridazine (mellaril), an antipsychotic drug. Although his urine screen tested positive for amphetamines (which he was not then prescribed at that time, though he was later), the

---

[7] Lagrland W & Hartgers C (1998), *J. Stud. Alcohol* 59(3):336-348
[8] Hummel P (1999) Familial alcohol abuse in the context of sexual and physical abuse offenses by male adolescents and young adults, *Prax Kinderpsychol Kinderpsychiatrr* 48(10):734-750;
[9] Tamerin JS & Mendelson JH (1969), The psychodynamics of chronic inebriation: Observations of alcoholics during the process of drinking in an experimental group setting, *Am. J. Psychiat.* 125:886-899
[10] Solomon J (1989) Alcoholism and psychiatric disorders, Chapter 9 in: *Alcoholism:Biomedical and genetic aspects*, Goedde & Agarwal, (eds), Pergamon Press

Dr. Jonathan J. Lipman        Report of Neuropharmacological Consultation                9
                               on Donald FELL        May 14, 2001

FELL-00000431

significance of his drug abuse seems to have been unrecognized and essentially unreported in his psychiatric records. His condition was seen as an atypical depression NOS.

Hospital admissions in the seventh grade at age thirteen, whilst ostensibly for treatment of injuries - including concussions and head injuries - suffered as a result of his misbehavior, also record his suspension from school, and continue to omit any consideration of his alcohol or drug abuse. His multiple psychiatric admissions this same year continue the oversight, yet capture his diagnosis of major depression with psychotic features and borderline personality traits, both of which increased in diagnostic relevance and prominence over time, in my opinion. His LSD use –and its contribution to his condition - went unrecognized. Had his therapists known that he was using increasing doses of LSD, and that he was employing ten 'hits' (doses ) at a time, more than once a week, it is reasonable to assume that they would have recognized the comorbid contribution to his psychiatric condition wrought by the organic changes in his brain underlying and mediating this developing tolerance to LSD's effects.

He responded well to antipsychotic medication, which observation in retrospect now provides useful diagnostic information, and when later he responded well to Ritalin (methylphenidate), prescribed ostensibly to treat his hyperkinetic condition, the observation appears not to have been made that Ritalin is also an excellent antidepressant drug. In children, depression often manifests as conduct disorder such as he was displaying. The distinction between conduct disorder manifestations secondary to primary depressive disorder vis-à-vis conduct disorder as an emergent and primary pre-antisocial trait is an important one, since the former can be treated with antidepressant drugs while the latter does not respond well pharmacotherapeutically.

## 4. Contributions of Fell's drug abuse to neurodevelopmental problems and personality maturation

Brain development does not cease prior to adolescence. The functional interconnections of this organ's constituent neurons continue to grow and multiply and to undergo selective 'pruning' through late childhood and into early adulthood. These changes occur naturally in response to learning experiences, to obstacles overcome, to emotional achievements reached, to milestones attained, to hormonal developmental stages achieved and to social skills acquired (Watkins & Williams, 1992; Sisman & Petersen, 1992)[11]. The abuse of drugs during these crucial years interferes with these maturational and neurodevelopmental processes and such interference leaves its mark on personality development, reality testing and emotional integration. The imposition of drug abuse and

---

[11] Watkins JM & Williams ME (1992) Cognitive neuroscience and adolescent development in: McAnarney ER et al (eds), *Textbook of adolescent Medicine*, WB Saunders (pubs) pp99-106 ; Sussman J & Petersen AC (1992) Hormones and behavior in: : McAnarney ER et al (eds), *Textbook of adolescent Medicine*, WB Saunders (pubs) pp125-130

FELL-00000432

neurotoxicity during these crucial years upon these maturational processes contributes to coping mechanisms not learned, to the mislearning of social skills and to barriers erected to the learning of emotional resilience - all of which contribute in turn to later adjustment problems of late adolescence and adulthood. Such drug-abusing children – like Donald Fell - appear and behave outwardly immature, suffer temper tantrums, act impulsively and fail to attain normal rates of emotional and neurological maturation – consistent with clinical observations made by his psychiatrists to age thirteen, when he was incarcerated. Although much of the drug-abusing child's maturational delays may ultimately be compensated neurologically and neuropsychologically after abstinence is achieved, the effects of such delay on personality development cannot so easily be rectified, if at all. His present personality structure likely represents, at least in part, the consequences of such deficits in formation.

## 5. Borderline Syndrome

As described above, Mr. Fell as a child was diagnosed with depressive disorder with psychotic and borderline features, and he was treated with and responded well to, antipsychotic drugs (thioridazine, trifluperazine and molindone), drugs which are unhelpful in the treatment of, and may even exacerbate, primary depressive disorders. His condition was described as 'borderline' by several of the psychiatrists treating him.

The borderline Syndrome – which has latterly been diagnostically fragmented into several different nosological entities in the United States due to the influence of the Diagnostic and Statistical Manual - imposes itself on all aspects of the individual's psyche. To the extent that it colors personality development, persons with this condition are labeled 'borderline personalities' – but the condition penetrates more than the domain of personality. The core feature of the Borderline sufferer is their inability to tolerate emotional stress, and their experiencing psychotic decompensation when such stress is unavoidable. Unlike the schizophrenias, the psychotic decompensation of the borderline sufferer is transient, but many researchers believe that the underlying condition taxonomically belongs in DSM's Axis-1. The condition was early considered a form of 'latent schizophrenia' sometimes called 'pseudoneurotic schizophrenia,' differing from classical schizophrenias by the absence of ongoing overt psychotic thought processes[12].

Further evidence for Fell's borderline condition having its origins in childhood –and a neuropharmacological factor in distinguishing his condition at that time from simple primary depression, is the fact that antipsychotic drugs helped him. The borderline syndrome does not respond very well to pharmacological treatment, but it does respond to drugs of this class. As with Fell, Trifluoperazine and related drugs have been employed with some success (see Cowdry 1987)[13].

---

[12] Hock P, Polatin P (1949) Pseudoneurotic forms of schizophrenia, *Psychiatr. Quart.* 23:248-276; Frosch J (1960) Psychotic character, *J. Am. Psychoanal. Assoc.* 8:544-551

[13] Psychopharmacology of borderline personality disorder: A review, *J. Clin. Psychatry* 48:8(supp)15-22

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation          11
                                on Donald FELL          May 14, 2001

FELL-00000433

A historic examination of the etiology of the Borderline Syndrome is complicated by the changes of diagnostic names, a blurring of taxonomic boundaries, which have occurred over the past thirty years. The condition resides somewhere on the continuum that encompasses labile affective instability and attributes of schizotypy, penetrating at times the psychotic boundary, and a further discussion of this aspect of Mr. Fell's condition, diagnosed in childhood and manifested in present examinations by Drs Mills and Van Gorp, lies outside the scope of this present report.

The key features of the Borderline are encompassed by (1) affective dyscontrol, (2) behavioral dyscontrol and (3) intrapsychic and interpersonal problems. Within the term 'affective dyscontrol' are subsumed affective instability and inappropriate intense anger or lack of control of anger. Within the term 'behavioral dyscontrol' are subsumed potentially self-damaging impulsivity and self-damaging acts. Within the intrapsychic / intrapersonal domain are subsumed identity disturbance, chronic feelings of emptiness and boredom, intolerance of being alone and unstable and intense personal relationships.

## 6. Psychometric findings

Consistent with known Borderline characteristics, and as described by Dr. Van Gorp, Mr. Fell's Rorschach test results reflect atypical and idiosyncratic thought process with poor coping skills and abnormalities which scored just short of the schizophrenic range. Described further by Dr. Mark Mills, the combined disorganization exposed by his test findings reveals *"incipient psychosis or pre-psychotic breakdown."* Both doctors are describing a vulnerability to (quoting Dr. Van Gorp) *"frank breakdown in his thought process and in which he can display a frank psychosis if under sufficient stress."*

My review of the MMPI-2 profile provided by Dr. Van Gorp reveals a pattern (described as an 84 codetype in one convention, with an 896 peak). Neuropharmacologically, this pattern describes an individual with emotional pain who might drink alcohol to allay their subjective suffering and boredom, yet with a vulnerability to experiencing paranoid and psychotic thought when intoxicated and/or emotionally stressed[14].

Performed for the neuropharmacological insight it would provide into his sensitivity to the adverse effects of drugs, the CAQ/16- PF completed by Mr. Fell during my evaluation confirms his depression at the time of interview (in agreement with Dr. Van Gorp's Beck Inventory) and detected in his psychometric profile aspects of *'suspiciousness' 'paranoid'* and *'compulsive'* thoughts and *'impulsivity'*, while confirming his lack of overt 'psychoticism' – this latter in agreement with my impression

---

[14] A psychologist usually associates the 68 codetype with paranoid schizophrenia when 4 is elevated (as in the present case) but such considerations do not describe the present case and lie outside of the present neuropharmacological purview. When scale 7 lies ten points lower than the adjacent scales 6 and 8 (as here), this is termed the 'paranoid valley' and emphasizes the presence of paranoid ideation in such cases, as here. If the F scale is elevated when 6 and 8 are above T-scores of 80, this pattern does not necessarily indicate an invalid profile since high 'F' is characteristic for this condition. A paranoid state is also a frequent diagnosis with the 6/8 code [see: Groth-Marnat, G (1984) *Handbook of psychological assessment,* Van Nostrand (pubs)]

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation                    12
                               on Donald FELL          May 14, 2001

FELL-00000434

formed over several hours of face-to-face interview. The CAQ likewise confirmed his being *'easily swayed by feelings,'* confirmed his *'immature hedonic'* nature and his characterological *'insecurity'* and *'apprehensiveness'* – all characteristics that would tend to drive an individual to seek solace and subjective relief of psychic pain in drugs and alcohol, and all consistent with the Borderline typology. The Addiction Proneness subscales calculated from his CAQ responses provided Sten scores (scaled to a possible maximum of 10) on his Alcohol Addiction Proneness of 4.6 and on his Narcotic Addiction Proneness[15] of 8.0, consistent with his abuse history, though perhaps somewhat underestimating his alcohol abuse liability based on history. His lack of overt psychoticism, mentioned above, was likewise consistent with his score on the Magical Ideation Scale of 15. This is outside of the normal male norm of $8.56 \pm 5.24$, but less than the two standard deviations above the norm that characterize psychotics, although consistent with the schizotypal aspects of a borderline syndrome.

Apropos of Dr. Mills' comments pendant from Dr. Van Gorp's MMPI observations that Mr. Fell scored very low on the Dominance Scale, I note that his score on the CAQ Dominance scale was likewise not elevated.

### 7. Neurotoxicological, including neuropsychological, impairments induced by drug abuse

Of possibly greatest relevance at the time of the offense is the identity of the drug Mr. Fell obtained from the drug dealer that evening, yet this is unknown. The effects of his acute alcohol intoxication at the time of the offense must be interpreted in terms of his own idiosyncratic case. Factors determining this effect include those specific for ethanol pharmacokinetics and pharmacodynamics (*vide infra*) and neurobiological factors engendered by his underlying mental condition (discussed above) and factors contributed by his history, and the effects such history has likely exerted on his underlying neurobiological state, including neuropsychological toxicities existing at the time of the present offenses. His chronic high-dose LSD abuse and his alcohol abuse are the factors of greatest import in this regard, since –of those he was consuming - these drugs when abused toxically and at high doses for considerable time produce chronic neurotoxic effects, which cumulatively outlast their presence in the body.

LSD:

---

[15] The naming of these scales being rather arcane, the 'Narcotic Addiction Proneness' index was derived by statistically discriminating alcohol abusers from abusers of all other drugs without differentiation and contrasting these by Principle Component Analysis with Sten scores of non-drug abusing controls, so that 'narcotic' in this context refers to any and all drugs except alcohol

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation                    13
                                on Donald FELL          May 14, 2001

FELL-00000435

LSD, an enormously powerful drug[16] induces depersonalization, hallucination, dissociative delirium and a condition essentially indistinguishable from psychosis, called 'psychotomimesis,' by neuropharmacologists[17]. This occurs against a backdrop of psychostimulation and activation with transcendent overtones. LSD is not a drug that one might sleep through. In most people who use the drug occasionally and recreationally no lasting harm is produced – though the experience is often of such profound intensity and import that users feel their lives have changed utterly by the epiphanies induced and the grandiose transcendency experienced. The effects of LSD were well studied by neuropharmacologists in the 1950s and 1960s and to a lesser extent (now that the drug has been placed in Schedule 1) it continues to be studied as a model psychosis-producing drug, against which potential antipsychotic drug candidates are tested.

In the experimental research setting the LSD effect is usually described as transient, limited to a few hours or at most a day. The persistence of ideational or emotional changes beyond 24 hours may be defined as 'prolonged effects' and in a medical setting – where subjects are well screened and selected for stability – is perhaps surprisingly rare. The adverse prolonged effects generally include spontaneous reoccurrences of the acute LSD experience, persistent psychotic decompensations, usually with a strong paranoid quality, with durations of between weeks and years and in certain individuals considered uniquely vulnerable (schizophrenics, other psychotics) these may be permanent.[18] Not all of the prolonged or recurrent adverse reactions to LSD are psychotic in nature. Spontaneous panic reactions are the most frequent non-psychotic reaction to LSD, followed by terror, confusion, anxiety and depressive reactions (Smart & Bateman, 1967)[19]. The breadth of variety of the psychotic adverse effects are quite wide: catatonia, schizoaffective and undifferentiated schizophrenias have been mimicked, maniacal episodes and depressive episodes have occurred and a number of borderline conditions identified, including dissociations. A hallucinosis in which the visual hallucinations persist with little or no associated thought disorder may also take place.

It is seemingly paradoxical, but those who are most vulnerable to undesirable adverse reactions are also those who are most attracted to the drug. Unstable, immature or rigid personalities are particularly susceptible and the excessively paranoid or depressed run into difficulties with the drug. Particularly vulnerable are schizoid persons or the close relatives of schizophrenics (Cohen, 1985, *ibid*). Vardy and Kay (1983)[20] studying a cohort of 52 LSD psychotics and 29 matched first-break schizophrenics have determined that the rate of parental alcoholism for LSD psychotics far exceeds that for schizophrenics and the general population (cf Mr. Fell's parentage). The two groups were distinguished on some clinical features but were equivalent in premorbid adjustment, on

---

[16] Cohen S (1985), LSD: the varieties of psychotic experience, *J. Psychoactive Drugs* 17(4):291-296
[17] Denson R (1967) Dissociative delirium after treatment with lysergide, *Can. Med. Ass. J.* 97:1222-1224; Dewhurst K & Hatrick JA (1972), Differential diagnosis and treatment of lysergic acid diethylamide induced psychosis, The Practitioner, 209:327-332
[18] Fink M et al (1966) Prolonged adverse reactions to LSD in psychotic subjects, *Ach Gen Psychiat* 15:450-454
[19] Smart RG & Bateman K (1967) Unfavourable reactions to LSD, *Canad. Med. Ass. J.* 97:1214-1221
[20] Vardy MM & Kat SR (1983) LSD psychosis or LSD-induced schizophrenia: A multimethod enquiry, *Arch. Gen. Psychiatry* 40:877-883

Dr. Jonathan J. Lipman          Report of Neuropharmacological Consultation                    14
                                on Donald FELL          May 14, 2001

FELL-00000436

most cognitive measures when initially hospitalized or reassessed three to five years later and in a number of subsequent re-hospitalizations. Thus, in most respects LSD psychotics were found to be fundamentally similar to schizophrenics in genealogy, phenomenology and course of illness but with more parental drug and alcohol abuse. Their findings supported a model of LSD psychosis as *a drug-induced schizophreniform reaction in persons vulnerable to both substance abuse and psychosis.*

Donald Fell, whilst not overtly psychotic, harbors psychotic tendencies, thought patterns and cognitive styles characteristic of the Borderline sufferer and in common with the schizotypal patient. That his LSD use was excessive is self-evident from his history, and that his brain was organically altered as a result of his LSD use is manifest in the tolerance he developed to this drug, bordering on stupendous (ten 'hits' at a time). Just as the chronic high dose LSD user undergoes measurable changes in their color vision[21] (Fell's has not been tested) so do neurochemical changes occur in the biological substrates underlying their increased vulnerability to subsequent psychotic decompensation.

Ethanol:

By witness and self-report, Mr. Fell's crime was conducted while very heavily intoxicated. Alcohol's effect at any one time depends on a number of factors, including weight, medical condition, nutritional status, gender and –perhaps most importantly – drug abuse history. The pharmacokinetics of ethanol change on chronic drinking, altering the way that the body handles the drug both in terms of its metabolism, and clearance and in terms of its volume of distribution. Thus, in regular male drinkers of alcohol the apparent volume of distribution for ethanol is raised from 0.77 L/Kg to 0.88 L/Kg. The body's metabolic response is dynamic – such that heavy drinkers can metabolize very much faster than naïve drinkers, but since chronic use of large doses damages the liver – where ethanol is metabolized – those with cirrhotic livers suffer a failure in metabolism. Chronic use likewise wreaks pathological changes on multiple body systems, not least the endocrine system, and female-pattern adiposity and gynecomastia (breast growth, in men as well as women) is a commonly seen endocrine consequence of this toxicity in older persons. Similarly, chronic use of ethanol damages the brain. This toxicity, an enduring 'neurointoxication,' characterized as an Organic Brain Syndrome' persists for longer than the drug remains in the body and in some cases – such as Wernicke's and Korsakoff's encephalopathies – may be permanent. Between the extremes of acute intoxication (the common 'drunk' ) and end-stage encephalopathic psychosis, lies a continuum of damage induced by chronic ethanol abuse on the brain.

At the time of the offense, the intoxication from which Mr. Fell suffered was thus a combination of both the acute effects due to his recent consumption and the chronic and enduring effects caused by his past two years abuse.

---

[21] Abraham HD (1982) A chronic impairment of colour vision in users of LSD, *Brit. J. Psychiat.* 140:518-520

Dr. Jonathan J. Lipman    Report of Neuropharmacological Consultation    15
                          on Donald FELL          May 14, 2001

FELL-00000437

Although he currently tests –in his drug-free state - within the normal range on various neuropsychological measures of brain function (per Drs Mills and Van Gorp), a considerable body of work supports the conclusion that chronic heavy use deranges various tests of cognitive performance in a way that persists for weeks and sometimes months after the drug is withdrawn. Eckardt et al (1978)[22] have shown, in tests performed in drug-free alcoholics (n=95) seven days after their last drink, that intensity of drinking (time and dose) predicts neuropsychological deficits on eight cognitive tests and explains 20% or more of the variance on five others: TPT-total time, Digit Symbol, Object Assembly, Benton Visual Retention and Shipley-Hartford CQ. Other researchers have measured the chronic effects of alcohol intoxivation – measured after discontinuation of the drug – on tests of abstracting ability, conceptual shifting, associative learning, and complex visuospatial and visuomotor processing. These deficits have been associated with age and duration of drinking[23], time since last drink[24] and other variables. In Echardt's study (ibid), consumption variables predicted certain scores on Object Assembly and increased 'lifetime gallons consumed' predicted poorer performance on Trails-B. For all of their tests, increased consumption was associated with poorer performance. Parenthetically these researchers note that more education was associated with better scores (which protective benefit would not apply to Mr. Fell). Mr. Fell described himself as being at different times either a bout drinker (or binge drinker) and a continuous drinker. The influence of these different patterns of consumption has also been studied in the laboratory. Sanchez-Craige (1980)[25] has shown that the very simple trail-making test (on a version of which Mr. Fell scored in the normal range most recently) detects differences among these patterns. Thus: bout drinkers and young drinkers performed better on the Trail Making Test than did daily drinkers and older drinkers. Duration of problem drinking has a weaker effect on performance on part 'A' of the test – the simplest part. Sanchez-craige found that differences could not be detected between performances of those who were tested less than 2 weeks after abstinence and those who were tested more than two weeks after abstinence – from which conclusion one parsimoniously infers that the deficit in TMT performance persists beyond two weeks from abstinence.

---

[22] Eckardt MJ et al (1978) Relationship between neuropsychological performance and alcohol consumption in alcoholics, *Biol. Psychiat.* 13(5):551-565

[23] Jones BM (1971) Verbal and spatial intelligence in short term and long term alcoholics, *J. Nerv. Ment. Dis.* 153:292-297; Jones BM & Parsons OA (1971) Impaired abstracting ability in chronic alcoholics, *Arch. Gen. Psychiat.* 24:71-75; Tarter RE (1973), An analysis of cognitive deficits in chronic alcoholics, *J. Nerve. Ment. Dis.* 157:138-147; Tarter RE & Parsons OA (1971) Conceptual shifting in chronic alcoholics, *J. Abnorm. Psychol.* 77:71-75

[24] Page RD & Linden JD (1974) Reversible organic brain syndrome in chrobic alcoholics: a psychometric evaluation, *Q.J.Stud. Alc.* 35:98-107; Clarke J & Houghton HA (1975) A study of intellectual impairment and recovery rates in heavy drinkers, *Br. J. Psychiat.* 126:178-184; Goldman MS. et al (1978) Recovery of sensory and motor functioning following chronic alcohol abuse, *in:* Seixas FA (ed) Currents in Alcoholism Vol 3, Grune& Stratton, pp493-504

[25] Sanchez-Craige, M (1980) Drinking pattern as a determinant of alcoholics' performance on the train-making test, *J. Stud. Alc.* 41(11):1982-1090

FELL-00000438

# EXHIBIT 5

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
Board Certified in Forensic Psychology – American Board of Professional Psychology
417 Oak Bend, Suite 260    Lewisville, Texas
972 459 0658    Fax:  972 459 0958    mdc@markdcunningham.com

06-14-05

Mr. Alex Bunin, Esq.
Office of the Federal Public Defender
39 North Pearl Street
Albany, New York 12207

Re: U.S. v Donald Fell (capital sentencing)

Dear Mr. Bunin:

You have requested that I summarize my findings and opinions to date regarding my capital sentencing evaluation of Mr. Donald Fell relative to the presence of any factors that might be considered mitigating. As will be detailed below, these findings and opinions are based on interview of Mr. Fell, review of summaries of interviews by FBI personnel, review of reports of other mental health experts involved in the case, review of records, and review of scholarly literature. These sources are of a sort that are customarily relied upon by clinical and forensic psychologists in coming to expert opinions. I would caution that third party interviews and additional review of records are pending. Accordingly, my findings and conclusions may be modified by additional information that may be made known to me.

**Findings and conclusions:**

An extensive body of research is available to demonstrate a nexus between deleterious developmental events or factors and adverse outcome. More specifically, research on factors associated with an increased risk of chronic delinquency, substance abuse, and serious violence in the community has been conducted and synthesized under the sponsorship of the U.S. Department of Justice (DOJ) as part of their increasing commitment to violence prevention programs. Consistent with past explanations (e.g. Masten & Garmezy, 1985), DOJ sponsored reviews have concluded that risk of violent criminal outcome is a function of the interaction or balancing of risk and protective factors (see U.S. Department of Justice, June 1995; Hawkins et al., 2000; Wasserman et al., 2003). Other DOJ sponsored longitudinal studies detail the effects of child maltreatment (Widom, 2000; Kelley, Thornberry, & Smith, 1997); the effects of family disruption (Thornberry et al., 1999) and the cumulative effects of hostility, observed violence, and personal violent victimization within the family (Thornberry, 1994) on

FELL-00000439

criminal outcome and violence rates. Other publications such as the Surgeon General's Report on Mental Health (1999) also detail ways in which neglect and traumatic experience may deflect the developmental trajectory. Important research on the risks associated with various developmental factors has been published in the peer reviewed literature apart from the sponsorship of DOJ as well. Mr. Fell's developmental history demonstrates many of the risk factors and few of the protective factors identified in the above studies. These include the following (factors present in Mr. Fell's development identified with check marks or plus-minus sign):

> *U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention*

Risk Factors:

**Conception to age 6:**
- ✓ Perinatal difficulties
- Minor physical abnormalities
- ± Brain damage
- ✓ Family history of criminal behavior and substance abuse
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

**Age 6 through adolescence:**
- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- ✓ Transitions and mobility
- ✓ Availability of firearms
- ✓ Media portrayals of violence
- ✓ Family management problems
- ✓ Family conflict
- ✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- ✓ Early and persistent antisocial behavior
- ✓ Academic failure
- ✓ Lack of commitment to school
- ✓ Alienation and rebelliousness
- ✓ Association with peers who engage in delinquency and violence
- ✓ Favorable attitudes towards delinquent and violent behaviors
- ✓ Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

2

FELL-00000440

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

Protective Factors:

    Individual characteristics:
        Female gender
        Intelligence
        Positive social orientation
        Resilient temperament

    Social bonding to positive role models:
  ±  Family members
        Teachers
        Coaches
        Youth leaders
        Friends

    Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.

    Effective early interventions

*Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.*

**Individual factors**
- ✓ Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- ✓ Aggressiveness (x 1.5 - 6)
- ✓ Early initiation of violent behavior (x 6)
- ✓ Involvement in other forms of antisocial behavior
- ✓ Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- ✓ Parental criminality (x 1 - 3.8)
- ✓ Child maltreatment
- ✓ Poor family management practices (x 2)
- ✓ Low levels of parental involvement
- ✓ Poor family bonding and family conflict
- ± Residential mobility (±)
- ✓ Parental attitudes favorable to substance abuse and violence (x 2)
- ✓ Parent-child separation

3

FELL-00000441

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

## School factors
- ✓ Academic failure
- ✓ Low bonding to school
- ✓ Truancy and dropping out of school
- Frequent school transitions
- ✓ High delinquency rate schools

## Peer-related factors
- Delinquent siblings
- ✓ Delinquent peers
- Gang membership (x 3-4)

## Community and neighborhood factors
- Poverty (x 2)
- Community disorganization (crime, drug-selling, gangs, poor housing)
- ✓ Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

## Situational factors



*Wasserman, G.A., Keenan, K., Tremblay, R.E., Coie, J.D., Herrenkohl, T.I.,
Loeber, R., & Petechuk, D. (April, 2003). Risk and protective factors of child
delinquency. Child Delinquency Bulletin Series. U.S. Department of Justice, NCJ
193409.*

## Individual factors
- ✓ Early antisocial behavior
- ✓ Emotional factors such as high behavioral activation and low behavioral inhibition
- Poor cognitive development
- Low intelligence
- ✓ Hyperactivity

## Family factors
- ✓ Parenting
- ✓ Maltreatment
- ✓ Family violence
- ✓ Divorce
- ✓ Parental psychopathology
- ✓ Familial antisocial behaviors
- Teenage parenthood
- Family structure
- Large family size

4

FELL-00000442

U.S. v Donald Fell
Capital sentencing – Mark D. Cunningham, Ph.D., ABPP

**Peer factors**
- ✓ Association with deviant peers
- Peer rejection

**School and community factors**
- ✓ Failure to bond to school
- ✓ Poor academic performance
- ✓ Low academic aspirations
- Living in a poor family
- Neighborhood disadvantage
- Disorganized neighborhood
- ✓ Concentration of delinquent peer groups
- ± Access to weapons

The above research provides an explanation for the developmental trajectory observable from adolescence and early adulthood which culminated in the charged capital offenses. I anticipate that in my testimony at capital sentencing I will particularize these factors to Mr. Fell and the resulting trajectory of his life. These and other adverse factors including those listed below impacted not only on Mr. Fell's life trajectory, but also on his underlying value system, moral development, perception of life options and nature of choices.

Additionally, I anticipate describing in more extensive detail a number of damaging developmental factors present in Mr. Fell's history that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood. Again, these will be supplemented by research findings demonstrating a nexus between such factors and disrupted developmental trajectory and adverse developmental outcomes including substance abuse, criminal activity, and criminal violence. These include:

**Generational and biological factors**
- Family dysfunction from generation to generation
- Genetic predisposition to alcoholism and drug addiction
- Genetic predisposition to psychological disorders
- Prenatal alcohol exposure
- Attention Deficit Hyperactivity Disorder in childhood
- Inhalant abuse
- Closed head injury
- Youthfulness

**Parenting**
- Inadequate maternal attachment
- Alcoholism of both parents
- Observed mutual combat of parents
- Disinterest and emotional neglect by both parents

5

<u>U.S. v Donald Fell</u>
**Capital sentencing – Mark D. Cunningham, Ph.D., ABPP**

- Physical abuse
- Abandonment by father
- Abandonment by mother
- Corruptive influence of mother
- Negligent supervision and structure

**Community**
- Sexual abuse and sexually traumatic exposures
- Inadequate social services intervention
- Corruptive peers
- Drug-related deaths of friends

**Disturbed Trajectory**
- Childhood onset psychological disorders
- Poly-drug abuse and dependence from childhood
- Institutionalization in early adolescence
- School dropout
- Intoxication at time of offenses

I also anticipate testifying regarding an additional mitigating factor of positive prisoner adjustment (i.e. Skipper evidence). There are a number of factors that point to Mr. Fell being likely to have a positive (i.e. without serious violence) adjustment to prison, including absence of serious violence in pretrial confinement, participation in constructive activities in pre-trial confinement, and correctional appraisal. Further, seriousness of offense and/or life-without-parole sentence is not predictive of serious violence in prison. More specifically, there is large scale research demonstrating that inmates convicted of murder and/or serving life without parole are not a disproportionate risk of violence in prison.

Please advise me if additional information is desired. Thank you for your consideration.

Sincerely,

*Via email*

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

6

FELL-00000444

# EXHIBIT 6

**Declaration of Mark D. Cunningham, Ph.D., ABPP**

**Re:** U.S. v Donald Fell

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

1.      I am a clinical and forensic psychologist, licensed as a psychologist in the States of Texas, Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oregon, South Carolina, and Tennessee. I have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.      I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I completed a one-year internship in clinical psychology at the National Naval Medical Center of Bethesda, Maryland. I subsequently served as an active duty Clinical Psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981. I was an assistant professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981. My curriculum vitae is attached (Attachment A).

3.      I was board certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology. This distinction follows a rigorous examination process and is held by approximately 200 psychologists in the United States. I have provided forensic evaluation services in over 450 cases. I have participated in extensive continuing education in the area of forensic psychology. I have been recognized as a clinical and forensic psychology expert, and testified regarding capital sentencing determination issues including mitigation and/or violence risk assessment, in federal courts including U.S. District Courts in Alabama, Arkansas, Colorado, Illinois, Iowa, Louisiana, Maryland, Michigan, Missouri, Pennsylvania, Puerto Rico, North Carolina, New York, Texas, Virginia, and West Virginia.

4.      I am the first author or co-author of twelve published or in-press peer reviewed papers in the field of forensic psychology. I am the author of two brief articles and two case reports published in a scholarly book describing standards for forensic assessment. I am first author of the chapter on capital sentencing evaluations in the 12-volume Handbook of Psychology. I am the author of an invited chapter in an in press scholarly text regarding capital sentencing determinations. Four of these scholarly publications address the role of mitigation in capital cases and outline research demonstrating the nexus between deleterious developmental experiences and adverse outcome in adulthood including criminal violence:

> Cunningham, M.D. (2002). Capital sentencing [case study] (152-171). In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook. New York: Oxford University Press.

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

Cunningham, M.D. & Reidy, T.J. (2002). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M.D. & Goldstein, A. (2003). Sentencing determinations in death penalty cases (pp. 407-436). Chapter in A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

5.    The American Academy of Forensic Psychology is an association of psychologists who are board certified by the American Board of Forensic Psychology. A primary mission of the Academy is to raise the standard of practice of psychology to the courts. Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of the Academy I provided full day workshops under their auspices on: "The role of the forensic psychologist in death penalty litigation" (March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 – San Diego, California; September 2003 – Cincinnati, February 2005 - La Jolla, California.). These workshops emphasized research literature, statistics, and conceptualizations relevant to mitigation and violence risk assessment consultations regarding capital defendants. Since 2000, these workshops have prominently featured research published by the U.S. Department of Justice regarding risk and protective factors in delinquency and criminal violence.

6.    The U.S. Supreme Court in Lockett v. Ohio (1978) described mitigation at capital sentencing as including: "…any aspect of a defendant's character or record, or any of the circumstances of the offense that the defendant proffered as a basis for a sentence less than death." What may be considered as mitigating, then, is extraordinarily broad and multi-faceted. While mitigation is a multi-faceted consideration, a central component is the concept of moral culpability. Moral culpability involves what the Supreme Court in Woodson v. North Carolina (1976) characterized as "the diverse frailties of humankind" (at 304). Further, moral culpability implicates sentencing-phase issues of formative and situational influences, and associated risk factors for adverse outcomes (e.g. Eddings v Oklahoma, 1982; Penry v. Lynaugh, 1989). Thus the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice. In other words, while equally criminally responsible, capital defendants may vary in their moral culpability and, ultimately, in their blameworthiness. More specifically, the nature and quality of understanding, perception, impulse control, judgment, and values that underlie choice – even choice that results

2

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

in heinous violence – are influenced by developmental, cognitive, neuropsychological, relationship, cultural, community, and situational factors (Haney, 1995). Haney (1997), as well as others (Shah, 1978; Monahan, 1981, 1996), have identified this "interactional" convergence of "nature, situation, context, and structure" as the primary explanation for criminal violence.

7.      An obvious tension is present at capital sentencing between the perspectives of the defense and prosecution regarding moral culpability. The defense theory at sentencing is typically deterministic – embracing the view that bio-psycho-social factors underlie violent criminal behavior, and applying associated risk factors present in the defendant's life to the analysis of his or her moral culpability. In contrast, the perspective advanced by the prosecution emphasizes the operation of willful choice, asserting that "a defendant's crime stems entirely from his evil makeup and that he therefore deserves to be judged and punished exclusively on the basis of his presumably free, morally blameworthy choices…" (Haney, 1997, p. 1459). In the absence of expert testimony regarding current developmental research findings and the relationship of this research to deviant developmental trajectory, adverse adult outcome, and criminal violence, the jury is unable to test these contrasting assertions. Thus the ability of the defense to support its assertion of reduced moral culpability is not only dependent on delineating the specific developmental experiences of the defendant, but also on the presentation of scientific evidence regarding the developmental risks and impacts of those specific types of developmental experience and/or impairments. Further, these empirically validated findings regarding developmental outcome are critically important to rebut common prosecution assertions and juror misconceptions of "abuse excuse."

8.      An extensive body of research is available to demonstrate a nexus between deleterious developmental events or factors and adverse outcome. The U.S. Department of Justice has taken a leading role in sponsoring, synthesizing, publishing, and promulgating research regarding developmental risk and protective factors for delinquency, drug abuse, criminality, and criminal violence; so that these findings can illuminate public policy and prevention efforts with the best available science. More specifically, research on factors associated with an increased risk of chronic delinquency and serious violence in the community has been conducted and synthesized under the sponsorship of the U.S. Department of Justice (DOJ) as part of their increasing commitment to violence prevention programs. Consistent with past explanations (e.g. Masten & Garmezy, 1985), DOJ sponsored reviews have concluded that risk of violent criminal outcome is a function of the interaction or balancing of risk and protective factors (U.S. Department of Justice, June 1995). These are outlined in Table 1 in Attachment B.

9.      Hawkins et al. (2000), in research sponsored by the DOJ, identified a number developmental arenas and associated specific factors that have a cumulative effect on the risk for chronic delinquency and serious violence by young adulthood (See Table 2 in Attachment B). Other DOJ sponsored longitudinal studies detail the effects of child maltreatment (Widom, 2000; Kelley, Thornberry, & Smith, 1997); the effects of family disruption (Thornberry et al., 1999) and the cumulative effects of hostility, observed violence, and personal violent victimization within the family (Thornberry, 1994) on criminal outcome and violence rates. Other publications

3

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

such as the Surgeon General's Report on Mental Health (1999) also detail ways in which neglect and traumatic experience may deflect the developmental trajectory. U.S. Government sponsored research and publications relevant to mitigation conceptualizations are emphasized for two reasons. First, these research summaries are quite comprehensive and reflect the involvement of researchers of substantial stature. Second, the origins of the research almost entirely insulate the findings from being ridiculed as an "abuse excuse."

10. Important research on the risks associated with various developmental factors has been published in the peer reviewed literature apart from the sponsorship of DOJ as well. For example, there are empirical findings illuminating adverse outcomes associated with teenage mother, father absence, disrupted attachment, youthfulness, learning disability, peer alienation and rejection, frequent moves and household instability, observed community violence, personal victimization, corruptive family and/or community, sexual abuse, trauma exposure, inadequate supervision and guidance, neuropsychological deficits, psychological disorders, substance abuse and dependence, and other adverse circumstances and developmental risks.

11. A capital jury would almost certainly not be familiar with the research findings demonstrating a nexus between adverse developmental factors and criminally violent outcome. Further, a capital jury would almost certainly be unaware that the U.S. Department of Justice had embraced the nexus between developmental factors and criminal outcome in its own research findings and resultant prevention efforts.

12. Knowledge of the developmental research regarding experiences in the defendant's background is necessary for the jury to make an informed consideration of what weight to give those adverse experiences in determining a capital defendant's moral culpability – and thus his death worthiness.

13. The relevance of the above developmental research to a particular defendant is not dependent on either a defendant's personal insight or external "proof" regarding whether an adverse event in the defendant's developmental history "caused" a currently observed condition or outcome in adulthood in the defendant. Rather, certain historical/developmental factors are identified as risk factors that contributed to the adult outcome with varying degrees of weight - based on research on groups of similarly situated individuals. The clinical practice of medicine and psychology similarly rests on the application of such group derived "risk" data to the specific patient. This is demonstrated in diagnosis and diagnostic procedures, the meaning of clinical findings and genetic predispositions, establishing prognosis, and formulating sound treatment regimens – all of which are derived from group data and experience that did not specifically include the patient being assessed. To assert that such group-derived data is irrelevant to an explanation of the course and outcomes of a particular person represents a fundamental misunderstanding of the nature of scientific data in the fields of medicine and psychology, where virtually all clinical and scientific expertise rests on knowledge of extensive group-derived data. The larger the group on which such procedures are based, the greater the

4

FELL-00000448

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

reliability of the finding.

14.    The application of research findings to the developmental experiences of a particular patient of defendant is based on the presence or absence of these events in the defendant's history, not on whether this history was self-described or accompanied by insight. Further, it is not anticipated that a patient or defendant has comprehensive insight into how he has been affected by these developmental risk factors, nor is the impact dependent on his recognition of it. Thus, apart from the history obtained, interview observations and/or testing data do not illuminate the nexus between adverse developmental experience and criminal and/or violent outcome. Consistent with this conclusion, findings of the U.S. Department of Justice regarding the nexus between adverse developmental factors and criminal/violent outcome by late adolescence and early adulthood, and the associated prescription of preventative measures, are without recourse to interviewing or testing specific at-risk youth to determine whether the nexus applies to them.

15.    At sentencing in a capital case, a tragic adult outcome is an adjudicated certainty. Not uncommonly, the adult life trajectory has been deviant as well. A psychologist who is familiar with the research demonstrating the relationship between various damaging developmental factors and adverse adult outcomes including criminality and violence can reliably inform a capital jury of this nexus so that the jury can give informed weight to the presence of adverse developmental factors in the defendant's life.

16.    My testimony regarding adverse developmental factors present in a capital defendant's life, illustrative anecdotal examples, research studies (i.e. group derived data) have typified my testimony regarding mitigation in federal and state capital sentencing cases since 1995. Because of the impressive scholarship and broad acceptance of the above described research sponsored and published by the U.S. Department of Justice demonstrating the nexus between adverse developmental factors and adverse/criminal outcome, since 2000 my testimony regarding the implications of adverse developmental factors at capital sentencing has extensively cited this research by the Department of Justice. This has routinely been accompanied and illustrated by extensive demonstrative exhibits. Below I have listed federal capital cases where I described research regarding the nexus between adverse developmental factors and criminally violent outcome, with those heard in 2000 and following citing DOJ studies regarding risk and protective factors:

*Capital sentencing testimony regarding the nexus between adverse and/or protective developmental factors and criminally violent outcome:*

    **U.S. v Louis Jones, Jr.** (1995),  Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas.

FELL-00000449

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

**U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana.

**U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas.

**U.S. v Trinity Ingle** (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division.

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division

**U.S. v Darryl Johnson** (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District Court for the Northern District of Alabama.

**U.S. v  Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in U.S. District Court, Eastern District of Arkansas.

*Capital sentencing testimony citing DOJ risk and protective developmental factors for delinquency and criminal violence, as well as other scholarly sources:*

**U.S. v Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in U.S. District Court, Western District of Texas, Waco Division.

**U.S. v Willis Haynes** (2000), Criminal No. PJM 98 0520 in U.S. District Court for District of Maryland.

**U.S. v Daymon Smith** (2000),  No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Aquilia Marcivicci Barnette** (2002),  3:97CR23-T in U.S. District Court for the Western District of North Carolina, Charlotte Division.

**U.S. v Aaron Haynes** (2003), CR-01-202-47 in the U.S. District Court for the Western District of Tennessee, Western Division.

6

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

> **U.S. v John Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.
>
> **U.S. v Wesley Purkey** (2003), Cause No. 01-308-01-CR-W-1, in the U.S. District Court, Western District of Missouri, Western Division, Missouri.
>
> **U.S. v Keon Moses, et al**. (2004), CCB-02-0410 in U.S. District Court for the District of Maryland, Northern Division
>
> **U.S. v Styles Taylor** (2004), Cause No 2:01-CR-0073, in the U.S. District Court, Northern District of Indiana, Hammond Division
>
> **U.S. v Hernaldo Medina-Villegas** (2005), in the U.S. District Court, Puerto Rico.
>
> **U.S. v Angela Johnson** (2005), in the U.S. District Court, Sioux City, Iowa.

17. As a result of having testified in so many federal capital cases regarding research in this arena sponsored and published by the U.S. Department of Justice, as well as other scholarly sources, the Government is quite familiar with my testimony and its typical basis; and routinely cross-examines me from transcripts of my sentencing phase testimony in multiple past federal capital cases. Despite this familiarity, to my knowledge, the Government has never put on expert testimony in rebuttal to assert that the DOJ studies I cited were scientifically flawed or their application in error. Indeed, Dr. Park Dietz, a forensic psychiatrist repeatedly retained by the U.S. Department of Justice in capital sentencing evaluations, did not rebut these studies when called by the Government in U.S. v Barnette (2002); and last month in People vs. Edgar Osorio (California) characterized these studies as the best available research. Following my capital sentencing testimony this last month in U.S. v Angela Johnson, which extensively cited DOJ research on risk and protective factors for delinquency and criminal violence, the Government waived my cross-examination.

Sworn and affirmed under penalty of perjury on June 27, 2005.


Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

7

FELL-00000451

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

References

Estelle v. Smith, 451 U.S. 454 (1981).

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Haney, C. (1995). Symposium: The social context of capital murder: Social histories and the logic of mitigation. Santa Clara Law Review, 35, 547-609.

Haney, C. (1997). Violence and capital law. Stanford Law Review, 49, 1447-1486.

Hawkins, J. D., Herrenkohl, T. I., Farrington, D. P., Brewer, D., Catalano, R. F., Harachi, T. W., & Cothern, L. (2000, April). Predictors of youth violence. OJJDP Juvenile Justice Bulletin. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C.: U.S. Department of Justice.

Kelley, B. T., Thornberry, T. P., & Smith, C. A. (1997, August). In the wake of childhood maltreatment. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention (NCJ-165257). Washington, D.C.: U.S. Department of Justice.

Lockett v. Ohio, 438 U.S. 604 (1978).

Masten, A. S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology. In Advances in clinical child psychology (Vol 8) (pp. 1-52). New York: Plenum Press.

Monahan, J. (1981). Predicting violent behavior: An assessment of clinical techniques. Beverly Hills, CA: Sage.

Monahan, J. (1996). Violence prediction: The past twenty years. Criminal Justice and Behavior, 23, 107-120.

Penry v. Lynaugh, 492 U.S. 1 (1986).

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

Thornberry, T.P. (1994, December). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C: U.S. Department of Justice.

Thornberry, T.P., Smith, C.A., Rivera, C., Huizinga, D. & Stouthamer-Loeber, M. (1999). Family disruption and delinquency. OJJDP Juvenile Justice Bulletin, U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Washington, D.C.: U.S. Department of Justice.

FELL-00000452

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

U.S. Department of Justice (1995, June).  Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. OJJDP Update on Programs. Juvenile Justice Bulletin.  U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention (NCJ 153571). Washington, D.C.: U.S. Department of Justice.

Widom, C.S. (2000, January). Childhood victimization: Early adversity, later psychopathology. National Institute of Justice Journal.

Woodson v. North Carolina, 438 US 304 (1976).

9

FELL-00000453

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

**Undergraduate:**   Abilene Christian College, Abilene, Texas
    Bachelor of Arts, (May 1973)
    Majors: Psychology, Mass Communications

**Graduate:**   Oklahoma State University, Stillwater, Oklahoma
    Master of Science  (December 1976)
    Doctor of Philosophy (December 1977)
    Specialty:  Clinical Psychology  (APA accredited)

**Internship:**   National Naval Medical Center, Bethesda, Maryland
    (February 1977 to February 1978)
    Specialty:  Clinical Psychology  (APA accredited)

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 | New Mexico #0768 |
| Oregon #1333 | South Carolina #764 | Tennessee #2255 |
| Texas #2351 | | |

10

FELL-00000454

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (2)

### PROFESSIONAL PRACTICE

**1981 – date**    Clinical and Forensic Psychologist, Private practice

**1978 – 1981**    Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut

### ACADEMIC APPOINTMENTS

**1981 - 1983**    Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

**1978 - 1980**    Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

**1974 - 1977**    Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

### PROFESSIONAL AFFILIATIONS

Board Certified in Forensic Psychology, American Board of Professional Psychology (examiner)
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)
Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

### EDITORIAL

Ad hoc reviewer: Assessment
Behavioral Sciences & the Law
Law & Human Behavior

11

FELL-00000455

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (3)

## HONORS AND AWARDS

John Augustus Award – for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004

Al Brown Memorial Award - for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

Navy Commendation Medal - for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980

Magna Cum Laude – Bachelor of Arts, Abilene Christian College, 1973

## SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M. D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.

12

FELL-00000456

Declaration of Mark D. Cunningham, Ph.D., ABPP
U.S. v Donald Fell, 06-27-05

Behavioral Sciences & the Law, 16, 333-351.

## CURRICULUM VITAE (4)

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law, 20, 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. Professional Psychology: Research and Practice, 34, 233-239.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review, 15, 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. Behavioral Sciences & the Law, 23, 307-320.

13

FELL-00000457

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (5)

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (*in press*) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? American Journal of Criminal Law.

*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (114-115). New York: Oxford University Press.

*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, U.S. Navy Medicine, 69, 26-28.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. Prosecutor's Brief: California District Attorneys Association, 20, 9-11.

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21, 2, 8-9.

14

FELL-00000458

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

## CURRICULUM VITAE (6)

*Manuscripts under review:*

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*)   An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*)  Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates.

*Manuscripts in preparation:*

Sorensen, J. R. & Cunningham, M. D. (*manuscript in preparation*)  Does the severity of the offense predict prison adjustment? A comparative study of the violent institutional misconduct rates of convicted murderers and other offenders.

15

FELL-00000459

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

**Attachment B**

Table 1

U.S. Department of Justice Model: Risk Factors for Violence in
the Community

**Age 6 to Conception**

- Perinatal difficulties

- Family history of criminal behavior and substance abuse

- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

- Minor physical abnormalities

- Family management problems

- Family conflict

- Brain damage

**Age 6 through Adolescence**

- Extreme economic deprivation

- Community disorganization and low neighborhood attachment

- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

- Availability of firearms

- Media portrayals

- Family management problems

- Family conflict

- Early and persistent antisocial behavior

- Academic failure

- Lack of commitment to school

- Alienation and rebelliousness

- Association with peers who engage in delinquency and violence
- Favorable attitudes towards

16

FELL-00000460

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

           delinquent and violent behaviors
- Constitutional factors (e.g., low intelligence, hyperactivity, attention-deficit disorders)

---

<u>Note.</u> Adapted from "Guidelines for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders," by U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, June 1995.

17

FELL-00000461

**Declaration of Mark D. Cunningham, Ph.D., ABPP**
**U.S. v Donald Fell, 06-27-05**

Table 2

U. S. Department of Justice Model: Predictors of Youth Violence

**Individual Psychological Factors**

- Internalizing disorders
- Hyperactivity, concentration problems, restlessness, and risk taking
- Aggressiveness
- Early initiation of violent behavior
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior

**School Factors**

- Academic failure
- Low bonding to school
- Truancy and dropping out of school
- Frequent school transitions

**Peer Related Factors**

- Delinquent siblings
- Delinquent peers
- Gang membership

**Family Factors**

- Parental criminality
- Child maltreatment
- Poor family management practices
- Low levels of parental involvement
- Poor family bonding and family conflict
- Parental attitudes favorable to substance use and violence
- Parent-child separation

**Community and Neighborhood Factors**

- Poverty
- Community disorganization
- Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

Note. From "Predictors of Youth Violence," by J. D. Hawkins, T. I. Herrenkohl, D. P. Farrington, D. Brewer, R. F. Catalano, T. W. Harachi, and L.Cothern. U. S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, April 2000.

18

FELL-00000462

# EXHIBIT 7

# ⚜ Washington University in St.Louis

## SCHOOL OF MEDICINE

Department of Psychiatry

October 11, 2002

Gregory Waples, Esquire
Assistant United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

                              Re: United States v. Donald Fell

Dear Mr. Waples:

     As you know, I was asked to review the reports of three
experts (Drs. Mills, Van Gorp and Lipman) retained by the Federal
Public Defender's Office, to review documents relevant to the
charges against Mr. Fell and to perform an examination on him in
order to prepare rebuttal testimony, if clinically warranted, for
the penalty phase of the this capital murder trial.

     I reviewed the three reports, a large number of additional
documents (listed in Appendix A), including almost all of the raw
test data used to evaluate Donny by the Defense's experts.

     Donny Fell was interviewed on two occasions, September 18
and September 19, 2002, at the Northwest State Correctional
Facility in St. Albans Vermont. The interview on 9/18/02 began at
about 9:45 A.M. and lasted until about 12:00 noon. He then
completed the MMPI-2 finishing shortly before 1:30 P.M.  He was
given the cognitive examination from the Cambridge Examination
for the Elderly from about 9:20 A.M. until about 9:35 A.M. on
9/19/02.  He then was interviewed again for about one hour.

     Prior to my examination, the intended scope of my
examination was discussed with his counsel.  I noted that the
issue of Donny's dominance or submissiveness had been raised by
defendant's experts.  I disclosed my opinion that to evaluate
that claim properly, I would need to discuss his role and
relationship to any of his associates in each prior criminal act
and to explore the relationship between Donny Fell and Bobby Lee
in detail.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, *www.wuphysicians.org.*,  www.wustl.edu

FELL-00000463

Donny Fell Report

Prior to beginning the examination, his attorney, Paul Volk, informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes. He also indicated that no inquiry should be made about the use of knives. His counsel also indicated that the issue of dominance and submissiveness would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney and an investigator from the federal public defender's office. He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court. I left the room once each day briefly when his counsel and Donny conferred about my questions.

## Summary of opinions

1.    Donny Fell and Bobby Lee jointly committed the murders with which they are charged. (Author's note: Since I was not allowed to discuss the crimes Donny committed with Donny, I cannot offer any comments about his mental state at the time of the crime. His statements to the police do indicate a remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims. See appendix B for my summary of the relevant material.)

## Defense opinions that cannot, in my opinion, be rebutted

1.    Donny was the victim of sexual abuse as a young child. (Author's note: The documentation is such that I would support this conclusion as it relates to his baby sitters. I basically agree with Dr. Mills. See Appendix C for my history and analysis)

2.    Donny was the victim of physical abuse as a young child. (Author's note: The documentation is such that I would support this conclusion as it relates to his parents and baby sitters. I basically agree with Dr. Mills. See Appendix D for my history and analysis)

3.    Donny grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children.

2

FELL-00000464

Donny Fell Report

He did not receive even minimal parental guidance and supervision for many years at a time.

He had no role models for either sobriety or self control.

He was abandoned by both of his parents at times.

(Author's note: The documentation is such that I would basically support Dr. Mills' conclusion.  I may differ on details; his report is concise. See Appendix E for my history and analysis)

4.    Based on the his denial of the symptoms to me, I am unable to state with reasonable degree of certainty that Donny ever had or did not have hyperactivity or attention deficit disorder (ADHD).  The neuropsychological testing does not show any likely correlates of it today.  He certainly shows none of the characteristics of these disorders at present. The medical record is fairly clear that competent professionals thought he had ADHD or at least hoped he had it.  (Author's note: See Appendix F for my history and analysis.)

5.    Donny began abusing alcohol and drugs at a remarkably early age.  When not in custody, he has used an amazing amount of intoxicating substances.  He qualifies for the diagnoses of abuse and dependence on a number of substances.  (Author's note: The documentation is such that I would basically support Dr. Mills' and Dr. Lipman's conclusions.  I may differ on details.  See Appendix G for my history and analysis)

6.    Donny has received a competent neuropsychological evaluation. Dr. Van Gorp has concluded, correctly in my opinion, that he has no cognitive deficits detectable on neuropsychological testing.  My own, very limited examination also showed no deficit.  It is amazing that his extended use of alcohol and drugs has left no deficits. (Author's note: See Appendix H for my history and analysis. There are trivial differences in the history obtained.)

3

FELL-00000465

Donny Fell Report

7.    The available history shows that

    A.    His father lied to the authorities about the nature and
          extent of substance abuse and violence in Donny's home.
    B.    His mother lied to the authorities about the nature and
          extent of substance abuse and violence in Donny's home.
    C.    When Donny described the substance abuse problem in his
          home, he was not believed or received an inadequate
          response.
    D.    The Children and Youth Services had adequate
          information from the police and others (his grandmother
          *inter alii*) to alert them to these problems.
    E.    Multiple professionals failed to understand the
          problems that are now quite clear in retrospect.
          (Author's note: See Appendix I for my history and
          analysis.)

8.    It has been alleged that Donny has showed no signs of
      malingering.  The conclusion is mildly overstated, but
      broadly true.  (Author's note: See Appendix J for my history
      and analysis.)

9.    Donny began displaying the types of a social and antisocial
      behaviors called conduct disorder at an early age and to a
      degree that is more severe than average for persons with
      this diagnosis. (Author's note: The documentation is such
      that I would support Dr. Mills' conclusion to a significant
      degree.  I may differ on severity of the disorder.  See
      Appendix K for my history and analysis.)

**Defense opinions that could be qualified, if desired.**

1.    Donny meets some or all of the criteria for a number of
      Cluster B personality disorders, displaying antisocial,
      borderline and narcissistic traits.  These disorders along
      with his substance abuse do have a genetic and a familial
      basis.  (Author's note: The evidence is such that I will
      agree in part and disagree in part with Dr. Mills'
      conclusions. See Appendix L for my history and analysis.)

**Defense opinions that could be rebutted**

1.    It has been alleged that Donny shows signs of psychosis on
      testing; I disagree strongly.

4

FELL-00000466

Donny Fell Report

  A. the use of projective drawings in 1993 was invalid for the conclusions reached.

  B. the MMPI-2 does not support a diagnosis of psychosis or prepsychosis and

  C. the Rorschach does not support a diagnosis of psychosis or prepsychosis.

  D. On clinical examination, no defense expert has noted any indication of thought disorder, hallucination or delusion. I fully agree. (Author's note: See Appendix M for my history and analysis.)

2. Donny has been diagnosed with an affective disorder in the past. His depression has been alleged to have been severe, even psychotic in degree. Based on the history that I obtained and the review of the relevant documents, I am unable to state that he ever had a depressive syndrome. If he did have one, it was neither severe nor psychotic in degree. (Author's note: See Appendix N for my history and analysis.)

3. The issue of dominance versus submission has been raised by over-interpretation of one test score. The record alone is sufficient to disagree that Donny is submissive, although without direct examination the conclusions are surely less certain. (Author's note: See Appendix O for my history and analysis.)

These opinions can be offered to a reasonable degree of professional certainty.

**Comment**

Donny Fell has been a full participant in three murders and the other crimes associated with those murders.

**Emotional, physical and sexual abuse**

The defense and its experts have presented evidence that Donny was sexually abused. That it has occurred is indisputable. How often it occurred is unclear. The only issues are the number of people involved in his sexual abuse, their relationship to Donny and the duration of the sexual abuse.

5

FELL-00000467

Donny Fell Report

The defense and its experts have presented evidence that Donny was physically abused.  That it has occurred repeatedly is indisputable.  The only issue is whether the abusers include some of his second degree relatives as well as his parents and his baby sitters.

The defense and its experts have presented evidence that Donny was emotionally abused.  That it has occurred is indisputable.

Donny comes from a markedly dysfunctional family that did little to divert him from his asocial and intoxicated lifestyle. One cannot point to a good role model in his life.

It is obvious that Donny has had behavioral and substance abuse problems for many years.  His parents misrepresented to the case workers, to the mental health professionals and others about the nature and extent of the substance abuse problems, violence and other forms of abuse in his parents' home.  Their behavior was not simply a lack of insight.  This deception interfered with early, prompt and thorough interventions which *might* have affected the course of his development.  We will never know.

It is also clear that the public agencies did not respond competently to the information that was given to them.

The relationship of the abuse to the commission of the crimes is unknown.  I will offer no opinions on this point.

## Substance abuse

It must be conceded that he was quite intoxicated for months prior to the crimes and at the start of them.  It is uncertain (from my review of the police record; I did no examination of him on this point) that he was ever sober during these crimes. Voluntary intoxication is no defense to the elements of the crime in the guilt phase, but it has been accepted as a statutory mitigator in the penalty phase in some states.  When, as in this case, the "voluntary" intoxication begins at age eight and is full blown by age twelve, the meaning of "voluntary" is quite unclear.  This volitional behavior certainly began before what some would call the age of reason.

The defense and its experts opine that these murders would

6

FELL-00000468

Donny Fell Report

not have occurred were Donny Fell sober.  This conclusion seems reasonable.  However, Donny had done his best not to be sober for months or years.  In essence then, the argument becomes this murder would not occurred if Donny were not Donny.  It has been pointed out that there are genetic (and environmental) risks factors for alcohol and drug abuse.  It should be added that these factors also contribute to personality disorders.  All of these seem present in Donny's case.

**Psychosis**

It has been alleged that Donny is prepsychotic, that is, he might become psychotic in prison.  One cannot refute that someone might become psychotic in the future.  The only person who would not meet that description is someone who is already psychotic. We know that Donny is not psychotic now.  We do know that he did not develop alcoholic hallucinosis or alcoholic paranoia despite consumption of incredible amounts of alcohol.  We do know that he did not develop a psychosis as a result of his frequent, heavy and unselective use of drugs.

The evidence that he might become psychotic in the future is incredibly weak.

The defense argument is, "If the MMPI-2 given by Dr. Mills is wrong and he does not have a severe personality disorder, then he might have schizophrenia." The argument continues, "If the Rorschach is wrong, then he might have schizophrenia."

If the MMPI-2 is right, he has the severe personality disorder found on both administrations of the test.  If the Rorschach is right, he has a severe personality disorder.  The results of all three tests converge and match his history.

His score on the Rorschach is average for persons with cluster B personality disorders (3 indicia present) and is below the level where one might cautiously assert that schizophrenia is present (4 indicia present).  Using the cutoff of 4 (which he does not meet; he is just close), there is a 40% error rate in diagnosis of persons with cluster B personality disorder and a 16% error rate in normals.  One does not have to resolve the issue of the credibility of Rorschach findings that do meet Exner standards to resolve the issue of the credibility of those that do not.  Turning knowledge about the errors a test may make

7

FELL-00000469

Donny Fell Report

occasionally into evidence is odd.  If the test erred, it erred. It can be discounted, but it cannot be turned into gold.

Obviously, given the state of present day knowledge, one could not state that a person with any Axis I diagnosis was not more likely to develop a psychosis than a person without any Axis I diagnosis.  However, one cannot state the amount of the increased risk; it would be small.

Obviously, given the state of present day knowledge, one could not state that a person with a second degree family member with a history of psychosis was not more likely to develop a psychosis than a person without any such family history[1]. However, one cannot state the amount of the increased risk; it would be small, especially in the case of schizophrenia.

Thank you for this interesting referral.  I have discussed my impressions with Dr. John Rabun.  I have given him a typed copy of my interview notes as well as the appendices relating to the psychological testing.

---

[1] (Author's note: During Donny's second hospitalization, Mrs. Fell reported that his maternal grandmother had a chronic psychosis and died in a state mental hospital.  During Donny's third psychiatric hospitalization, Mrs. Fell reported that his father was schizophrenic.  In addition, Donny's grandmother was said to be chronically psychotic and chronically on psychotropic medication.   During his fourth psychiatric hospitalization, Mrs. Fell apparently asserted to a social worker, Robert Tryzenski, that Donny's paternal grandfather was "schizophrenic" and alcoholic.  She asserted that his paternal grandmother had received shock treatment for depression.  She also reported that her sister, Donny's aunt, had been in psychiatric treatment. Mrs. Fell is not considered an accurate source of psychiatric information.)

8

Donny Fell Report

**Diagnostic impression:**

Axis I      Polysubstance abuse
            Alcohol dependence
            Marijuana dependence

Axis II     Personality disorder - NOS with antisocial, borderline
            and narcissistic features

Axis III    S/P mild concussions without residual deficits
            S/P brain contusion

Axis IV     Legal problems, family problems, Substance abuse

Axis V      45

Sincerely yours,

Richard D. Wetzel, Ph.D.
Professor of Psychiatry
Professor of Neurology and of Neurological Surgery
Washington University School of Medicine

9

FELL-00000471

## Table of contents

| | | |
|---|---|---|
| **Report** | | 1- 9 |
| Appendix A - | Documents Reviewed | 10- 17 |
| Appendix B - | the Government's Account | 18- 32 |
| Appendix C - | History of sexual abuse | 33- 34 |
| Appendix D - | Physical Abuse | 35- 38 |
| Appendix E - | Dysfunctional family | 39- 44 |
| Appendix F - | Attention Deficit Hyperactivity Disorder | 45- 46 |
| Appendix G - | Alcohol and substance abuse | 47- 52 |
| Appendix H - | Cognitive functioning | 53- 61 |
| Appendix I - | Misrepresentation and misapprehension of the situation | 62- 68 |
| Appendix J - | Malingering | 69 |
| Appendix K - | Conduct disorder | 70- 75 |
| Appendix L - | Personality disorder | 76- 77 |
| Appendix M - | Depressive syndrome | 78- 83 |
| Appendix N - | Psychosis and psychological testing | 84-100 |
| Appendix O - | Dominance and Submission - a misleading interpretation | 101-105 |
| Appendix P - | Typed notes | 106-127 |
| Computer output - Mills MMPI-2 | | |
| | Forensic | 128-139 |
| | Clinical | 140-159 |
| Computer output - Wetzel MMPI-2 | | |
| | Forensic | 160-172 |
| | Clinical | 173-193 |

FELL-00000472

Appendix A - Documents Reviewed

**Appendix A**

**Documents reviewed prior to the evaluation**
**Provided by the United States of America**

1. Letter from Peter W. Hall, US Attorney, and Gregory Waples, AUSA, confirming my agreement to consult in this case with a description of the facts of the case as seen by the government.

2. The indictment dated 2/1/01.

3. The letter from the office of the federal public defender of Northern New York and Vermont reporting their view on and opposition to the death penalty in this case.

4. The notice from the USA to seek the death penalty.

5. The psychiatric report of Dr. Mark J. Mills, the defense's expert psychiatrist. His CV.

6. The report of a neuropsychological and psychological evaluation of Donny Fell conducted by Dr. W.G. van Gorp, assisted by Dr. Kimberly Walton, a neuropsychology fellow. His CV.

7. The report of Dr. Jeffrey J. Lipman, a self-designated neuropharmacologist[2], and his CV.

8. A background report labeled 7A-AL-44453 which summarizes multiple interviews and record checks performed by the FBI.

9. A letter by James J. Hudziak, M.D., dated 5/24/02.

10. Handwritten notes on an interview with Bobby Lee dated 12/2/00 at 2:15 P.M..

11. A Miranda warning apparently signed by Donny Fell on 12/1/00.

12. Handwritten noted on an interview with Donny Fell dated on 12/2/00 at 4:55 P.M.

13. A transcript of an interview between Sheriff Wes Kendrick of

---

2 He seems to have sought and obtained certification in multiple other areas.

10

FELL-00000473

Appendix A - Documents Reviewed

Johnson County, Tom Aiken of the N.Y. State Police, Donny Fell and an unidentified male dated 12/1/00.

14. A Miranda warning apparently signed by Donny Fell on 12/2/00.

15. A transcript of an interview between Det. Sgt. James Cruise of the Vermont State Police, Det. Cpl. Rod Pulsifer and Det. David Schauwecker of the Rutland PD in Vermont, Special Agent James Caudle of the FBI and Donny Fell dated 12/2/00 at 5:01 P.M.

16. A hand written statement of Bobby Lee dated 12/1/00. (ten pages)

17. The first hand written statement of Donny Fell dated 12/1/00. (three pages with a map).

18. A second hand written statement of Donny Fell dated 12/1/00. (two pages).

13. A transcript of an interview between Sheriff Wes Kendrick of Johnson County, Tom Aiken of the N.Y. State Police, Bobby Lee and an unidentified male dated 12/1/00.

**Provided by the Federal Public Defender or its experts in the mail**

1. The report and raw data of a neuropsychological and psychological evaluation of Donny Fell conducted by Dr. W.G. van Gorp, assisted by Dr. Kimberly Walton, a neuropsychology fellow.

    A. Five pages of notes are provided, apparently taken on 4/6/01.
    B. Five pages identified as psychotic screening module.
    C. A six page neuropsychological testing summary sheet is enclosed.
    D. Twenty two pages from the Wechsler IQ administered on 4/6/01. Thirteen of fourteen scales were administered; this is a frequent or standard practice.
    E. Twenty four pages from the Wechsler Memory Scale test. Only selected scales were used - Logical Memory I & II, Faces I & II, Letter Number sequencing and Logical memory recognition were performed (six scales). Information and orientation, Verbal Paired Associates I & II, Family Pictures I & II, Word lists I & II, Visual Reproduction I & II, Spatial span, Mental control,

11

FELL-00000474

Appendix A - Documents Reviewed

Digit span[3] were omitted (twelve scales).
F.    Nineteen pages of output from the Psychological
      Corporations program for interpreting the WAIS-III and
      WMS-III (complete record).
G.    The WRAT-3 was given and answers provided spelling,
      arithmetic and reading (complete record).
H.    A structural summary blank, two location charts, two
      unmarked sheets of notes and calculations, a
      constellation worksheet and the output from the
      Rorschach.

2.    The psychiatric report of Dr. Mark J. Mills. (The raw data
      of the tests he said he did were sent to me with the raw
      data of Drs. van Gorp and Walton.)

      A.    The Validity Indicator Profile answer sheet and NCS
            output.
      B.    A two page answer sheet for the MMPI-2 which apparently
            was sent out for scoring and interpretation by the NCS
            service.  The NCS output was not enclosed; scores from
            13 scales were included.

3.    The report of Dr. Jeffrey J. Lipman.

      A.    Dr. Lipman reported that he gave the CAQ / 16 PF
            (Clinical Assessment Questionnaire / 16 Personality
            Factors of Cattell).  This has not been provided yet.

2.    **Provided by the Federal Public defender on CD**

Label
1-11        Interview notes - Bobby Lee - 12/2/00 2:15 P.M.

12          Miranda rights form - Donny Fell - 12/1/00 - 2:50 A.M.

13-15[4]    Interview Notes - Donny Fell - 12/2/00 - 4:55 P.M.

17-66       Transcript - telephone interview with Donny Fell -
            12/1/00.

67          Miranda rights form - Donny Fell - 12/2/00 - 5:01 P.M.

68-116      Transcript - Donny Fell - 12/2/00 - 5:01 P.M.

---

3 Scores from the IQ test were entered on the page, but the
individual items are not marked.

4 13-16

12

FELL-00000475

Appendix A - Documents Reviewed

117          FBI label - handwritten statement of Bobby Lee - 10
             pages - 12/1/00.

118-127      Handwritten statement of Bobby Lee - 10 pages -
             12/1/00.

128          FBI label - Two pages original written statement of
             Donny Fell - 12/1/00 - 9:40 A.M. - third interview.

129-130      Two pages original written statement of Donny Fell -
             12/1/00 - 9:40 A.M. - third interview.

131          FBI label - Original hand written statement provided by
             Bobby Lee - 12/1/00 - 12:25 A.M.

132-135      Original hand written statement provided by Bobby Lee -
             12/1/00 - 12:25 A.M.

136-187      Transcript of telephone interview of Bobby Lee by N.Y.
             State Police - Aiken.

188          Miranda rights form - Bobby Lee - 12/2/00 - 2:15 P.M.

189-260      Transcript of interview with Bobby Lee - 12/2/00 - 2:15
             P.M.

261-264      Transcript of administrative segregation hearing -
             Donny Fell - 12/18/00

265-290      Transcript - grand jury testimony - S.A. Stephen B.
             Hardegree - 12/14/00

291-352[5]   Transcript - grand jury testimony - interstate movement
             of Neon and shot gun -S.A. Stephen B. Hardegree -
             12/14/00

296-352      Transcript - grand jury testimony - Det. Rod Pulsifer -
             Rutland City P.D. - title and pages 2 - 56 - 12/21/00 -
             1:27 P.M.

353-364      Transcript - grand jury testimony - Det. Rod Pulsifer -
             Rutland City P.D. - title and pages 2 - 11 - 12/21/00 -
             1:27 P.M.

365-408      Grand jury - Continuation of the reading of the
             transcript of Bobby Lee - 12/21/00

---

5 291-295

13

FELL-00000476

Appendix A - Documents Reviewed

409-461    Transcript of grand jury testimony of Bethany Brashears
           - 1/11/01.

462        Letter of AUSA to Christian Kolojeski stating he is not
           a target and granting use immunity for grand jury
           testimony.

463-497    Transcript[4] of grand jury testimony of Christian
           Kolojeski

498-569    Transcript of grand jury testimony of Michael Leight

570-572    Statement of Glynn Edgar Baker

M1-M3      Letter from the Court Advocate Program of Catholic
           Social Services - 1996 - substance abuse - Donny Fell

M4-M82[6]  Letters from the Court Advocate Program of Catholic
           Social Services - 1996 - substance abuse - Donny Fell

M9-M24     Police reports

M39-M46    An affidavit prepared by an FBI agent

M47        Birth certificate - Theresa Kozersky Sharpe- child of
           Stephen Banas and Frances Kozersky - MGM

M48        Death certificate - Theresa K. Sharpe - MGM

M49        Death certificate - Frances Kozersky - MGGM

M50        Birth certificate - Frances Kozersky - MGGM

M51        Birth certificate - Marilyn Joan (Baby Girl) Fell -
           child of Donald T. Fell and Myrtle Fritz.

M52        Death certificate - Marilyn Joan Fell

M53        Death certificate - Donald T. Fell - PGF

M54        Birth certificate - Geraldine Ann Fell - PAunt

M55        Birth certificate - Donald R. Fell - Father

M56        Birth certificate - Sandra Jean Kotzer

---

6 M4-M8

14

FELL-00000477

Appendix A - Documents reviewed

M57        Birth certificate - Donna Marie Kotzer

M58        Birth certificate - Donna Louise Fell - half sister

M59        Birth certificate - Susan Jean Fell - half sister

M60        Birth certificate - Robert Donald Fell - half brother

M61        Birth certificate - Jacqueline Sharpe - MAunt

M62        Birth certificate - Donald Robert Fell II - defendant

M63-M68    Subpoenas for official certificates

M69        Death certificate - Myrtle Jeanette Fritz Fell - PGM

M70        Marriage certificate - Donald Fell and Debbie Fell

M71        Marriage certificates - Raymond Kotzer and Theresa F.
           Banas - 8/29/53

M72        Marriage certificates - Donald Fell and Beatrice G. -
           first wife

M73        Marriage records - Donald T Fell and Myrtle Fritz - PGP

M74        Marriage records - John McDonald and Theresa Banas
           Sharpe. - MGM

M75        Divorce decree - John McDonald and Theresa Sharpe - MGM

M76        Divorce records - Raymond Kotzer and Theresa Kotzer

M77        Marriage certificates - John Sharpe and Theresa Kotzer

M78-M79    Petition for involuntary commit for Donny Fell on
           6/13/00

M80-M89    Omission noted

M90-M95    Medical records of Dr. John C. Gaudio, a pediatrician.

M96-M107   Medical records First Hospital Wyoming Valley - Donny
           Fell 1991

M108-M116  Medical records of Pennsylvania State Greisinger   -
           Donnie Fell - July 1999

15

FELL-00000478

Appendix A - Documents reviewed

M123-M146 The social service records from Monroe County for Donny Fell

M147      No juvenile records for Donny's father located

M148-M151 The arrest records of Debbie Fell, his mother.

M1520M157[7] Arrest records for Donnie Fell

M158-M279 Luzerne County Pennsylvania Children and Youth Services records for Donny Fell

M280-M288 School records for Donny Fell

M289-M292 Arrest records for Donny Fell

M293-M303 Application for appointment of a public defender - prior offense

M304-M319 School records for Donny Fell

M320-M322 School records for Donny Fell not located

M323-M325 School records for Donny Fell not located

M326-M333 School records

M334-M364 School records

M365-M416 Arrest records related to Donny Fell
          M392-M414 Arrest records for Debby Fell

M417-M474 Medical records related to the Fell Family

M475-M932 The medical records of the Wilkes-Barre General Hospital including

          M860-M926 Admission of 4/14/92 to 5/2/92
          M673-M860 Admission of 1/26/93 to 2/26/93
          M539-M672 Admission of 6/6/93 to 6/30/93
          M478-M538Medical admission of 11/23/93 to 11/27/93
          M927-M932 ER visit

          Incorporated records

M933-M938 The report of Dr. Mark Mills

---

7 M152-M157

16

FELL-00000479

Appendix A - Documents reviewed

M939-M949 The report of Dr. Jonathon Lipman

M950-M964 The report of Dr. William van Gorp.

**Documents provided after the evaluation**

1.  The autopsy report on Deborah Ann Fell by Dr. Paul L. Morrow.

2.  The autopsy report on Charles Thomas Conway by Dr. Paul L. Morrow.

3.  The autopsy report on Teresca King by Dr. Michael Baden.

17

FELL-00000480

FELL-00000481

**Appendix B - the Government's Account**

**Opinion:**  None

**Comments:** His statements to the police do indicate a remarkable lack of empathy for the emotions and thoughts of other people, both investigators and victims. This will be used to support the diagnosis of personality disorder - NOS.

**The Government's account**
**11/30/00**

Donny Fell and Bobby  Lee were arrested in Clarksville Arkansas in Mrs. King's Dodge Neon.  When a local police officer ran the plates on  her car, the plates were listed as stolen.  He stopped them.

A police officer sent to his mother's house at 138 Robbins Street in Rutland to obtain information about Donny and Lee discovered the dead bodies by looking through the windows.  He called it in and other officers responded to the scene.

Detective Rod Pulsifer was sent to Mrs. Fell's home after the bodies were discovered.

He was the first officer to enter the home.  Both Charlie Conway and Mrs. Fell died of multiple stab wounds and a slicing of the neck from one side to the other.

**Donny Fell - first interview**

According to a report by Special Agent Jimmie Caudle of the FBI, Donny Fell said he had left Vermont because of his mother's drug use and conflicts between them about her use.  He reported that they had stolen Mrs. King's car from a man named John.

**12/1/00**
**Bobby Lee - first interview**

Bobby Lee was interviewed shortly after midnight.  He initially reported that they had left Rutland Vermont several days earlier.  When informed that the police knew of the murders, Bobby made a number of admissions.

However, Bobby Lee admitted to being present at the murder scene.  He minimized his role and said that Donny Fell had committed both murders. He stated that the motive was the complaints Mrs. Fell and Charlie Conway made about the noise that Donny and Bobby were making when they were trying to sleep.  He

18

FELL-00000482

Appendix B - the Government's Account

said that Donny alone had committed the car jacking and kidnaping. Donny alone had taken Mrs. King into the woods and had killed her.

**Donny Fell - second interview**

When told of Lee's statement, Donny denied any participation in any murder again.

**Donny Fell - third interview**

Later that morning, Donny requested and did have another interview with the FBI. Donny then said he killed Conway because he was going to turn him into the police. Mrs. Fell came upon the killing and was killed herself by Lee. They took a shotgun and went to Price Chopper. After 15 minutes, they car jacked Mrs. King's vehicle at gun point. When they released Mrs. King, she tried to flag down a car. Donny said that Bobby then told Donny that he had to kill Mrs. King. He agreed and they did. She was a witness who could identify them. They punched her, kicked her and then smashed her face, skull and head in with rocks.

**Bobby Lee - second interview**

When informed by Special Agent Caudle that he believed Bobby was minimizing his involvement in the killings, Bobby insisted his first written statement was accurate.

**Bobby Lee - third interview**

Shortly after being informed Donny had made a statement, Lee demanded to make a second statement. In that statement, he admitted killing Mrs. Fell and participating in the killing of Mrs. King.

**The New York State Police telephone interview with Donny Fell - the fourth interview**

Donny Fell gave an interview over the phone to Senior Investigator Tom Aiken of the New York State Police. An unidentified officer from Johnson County Arkansas handled the phone at that end. Sheriff Wes Kendrick was said to be in the room.

He said that he had known Bobby Lee all of his life.

19

FELL-00000483

## Appendix B - the Government's Account

He had been arrested and fingerprinted once in Montecello New York. Some "dude" tried to rape his sister. He caught him and "I put him in a coma[8] for a day." The charges were dropped.

He told Investigator Aiken that he did not really know what happened at his mother's home. He was not arguing; "it just happened". Bobby Lee had cut his mother's throat before he knew that would happen. He said he was close to his mother[9]. He also said he had not seen her for seven years prior to the killings.

Donny said he did not know Terry [King].

The unidentified officer said that Donny wanted to help the police locate Terry (Mrs. Teresca King). Donny stated that he did not know the Vermont or New York area well. He said Bobby was equally unfamiliar with the area. Donny said this had been his first visit to his mother's home in Rutland Vermont. He was not familiar with the route by which he came [from Wilkes-Barre Pennsylvania] to Rutland Vermont. His aunt had driven him there.

He said that after his mother and Charlie were dead, he and Bobby walked over to Price Chopper which was two blocks away. Terry was there going to work.

She was wearing a "white pullover sweater deal" and blue jeans. She had another coat in the car.

He denied that she told him much about herself or her family. He assumed she had children because there was a child seat in the back of the car. She did offer them donuts. He recalled that they were Dunkin' Donuts. She had just been there. Donny admitted that she was trying to be nice to them. She was also scared.

She had money on her, "a lot of money". She had it with her when they picked her up. They took the money without asking for it.

He said that he did not remember the route they took out of Rutland because "... I was pretty hammered. Ah, I was real screwed up." He thought, without certainty, that they had been on route 4. He recalled the Diamond Run Mall at the intersection of route 7 and route 4 where he would have turned on to Route 4.

------

8 Drug-induced by physicians which he did not understand.

9 This is a very remarkable statement.

20

FELL-00000484

### Appendix B - the Government's Account

He said that they left Vermont at about 2:30 AM[10]. He said her car clock said 2:30 A.M. He also said Terry was in the car with them for about four and a half hours. It was just turning light when they killed her[11]. Donny later said it was early Monday morning.

He recalled a sign that said "Welcome to New York". He remembered the next town of Whitehall. She was still with them when they reached Whitehall. He did not remember the terrain well because he had to watch "her in the back seat". She did try to jump out of the car once while it was moving. He had to grab her back into the car.

He said they were driving, just driving.

He was sure that her body was in New York.

He said that he was getting nervous about her being in the car. He didn't want her in the car anymore.

They parked on the road shoulder on the "wrong side" of the road facing oncoming traffic at a little dirt / gravel pull off. He did observe a truck parked by the side of the road. "I was thinking maybe some guy was out hunting or something like that.[12]" He said that they stopped about thirty feet away from the truck, a white Ford F-150. He did not observe any fence or guide rails or center guide rail in the area.

He corrected himself to say that she got out on the driver's side, agreeing that was away from traffic. He told her to walk up into the woods and she would be free to go. He told her to walk back through the woods and then she would be free. Bobby said that she had their names and descriptions and that they "had to" kill her. Donny said he didn't really want to kill her, but "ya know". "... well Bobby had a different idea." They went and followed her back a ways. She had started to cut back toward the

---

10 It was probably sometime shortly after 3:30 A.M. since that was the last time she was seen at a donut shop near the place where she was abducted.

11 Donny did not explicitly use the words kill or murder or any direct equivalent.

12 Stopping in the vicinity of someone they would reasonably expect to be armed when they had no ammunition for their shotgun seems to be remarkably poor planning. It may suggest continuing intoxication.

21

FELL-00000485

## Appendix B - the Government's Account

road.  Bobby caught her and pulled her back up the hill.    "...
then it happened."

    She initially walked about fifty feet into the woods to the
edge of the woods.  There were trees with no leaves.  He did not
recall seeing any water around the site.  He did not see any
houses.

    They killed her at the edge of the woods at a spot that
could not be seen from the road.  They did not cover her body.
Donny did not think there was any chance she was alive.   He
mentioned, "Ah, there was a pretty big rock".   He said Bobby
used the rock on her and he used his feet.

    Donny admitted he took her pocket book and threw it in a
dumpster at Burger King.  That was half an hour from where "we
dropped her off".

    They turned left off the highway to enter a Burger King.  He
did not recall seeing anything around it, but noted that would be
unusual.  He did not remember any stores or businesses around the
Burger King.  He remembered they went through the drive through
at Burger King.  He recalled that there were a couple of other
customers there.  He got a couple of "sausage, egg and cheese,
ah,  thingies".

    He said that even after they left the body, "... I was still
pretty much drunk ...."

    He definitely recalled seeing the signs for Troy.

    At some point they observed a sign for the Tappan Zee
Bridge.  Bobby told him that they had to go on that bridge to get
to Pennsylvania.

    She had been killed by the time Donny and Bobby reached
Stillwater / Mechanicville.  They did not go into those towns,
but he remembered the signs.

    About two and a half to three hours after the killing, they
refilled with gasoline in Lebanon.  Bobby's grandmother lived
there.  He recalled her home was about five miles from the
station according to Bobby.

    He said he was awake the entire time from leaving Rutland to
coming to his friend's house [in Wilkes-Barre].

22

FELL-00000486

### Appendix B - the Government's Account

### Bobby Lee - the fourth interview

Bobby asked to be interviewed by Agent Caudle again. He made a statement admitting that he helped to kill Mrs. Fell, Mr. Conway and Mrs. King. He provided a ten page handwritten account.

### The New York State Police telephone interview with Bobby Lee - fifth interview

Bobby Lee gave an interview over the phone to Senior Investigator Tom Aiken of the New York State Police. An unidentified officer, (Jim Cutty - p. 52) from Johnson County Arkansas handled the phone at that end. This followed the conversation between Donny Lee and Investigator Aiken.

He was asked for information to help the police locate the body for the sake of the family of Mrs. King.

He reported that Donny and his mother were always fighting. She would come home drunk and find something about which to fight. Charlie was a "dick"; he was behaving in his usual manner before the killing.

He admitted kidnaping her at the Price Chopper store. She was completely out of her car walking to the store when they grabbed her. She said she worked in the Deli section. He stayed with her while Donny got their stuff out of the Fell home; she did not see their bodies. They went straight on a road that went by the Rutland Mall. They turned when they saw a sign that said south and stayed on that road.

Bobby said eventually that they were on route seven into New York and probably turned off onto route 22.

He talked to her a little bit while she was in the car. He confirmed she tried to get out of the car while it was moving. Donny grabbed her and Bobby sped up, keeping her in the car. He recalled seeing the "Welcome to New York" sign before they killed her. They passed route 22 and a Tappan Zee bridge.

She got out of the car on the passenger side. She went thirty feet into the woods and stopped. They yelled for her to go further. She went another ten feet and stopped again. They then got out of the car. When she saw that, she ran up a hill. Donny followed her directly while he "flanked her" in case she tried to come back to the road. She fell down the hill. Bobby stopped her. Donny came up to her. They made her walk back up

23

FELL-00000487

## Appendix B - the Government's Account

the hill on a four wheeler path.  At the top of the hill Donny knocked her out.  Both threw rocks at her then.  Donny kicked her, but Bobby didn't because he did not want to hurt his foot.  Bobby said there was no possibility she was still alive.  Her body remained at the top of the hill at the edge of a woods composed of bushes.  It was near a dumping site with a target attached to a hay bale and a "homemade motorcycle".  The site was 50 to 75 yards from the highway.  The site was one fourth to one half a mile from the nearest house.

Afterwards, they passed some children leaving their school buses.  Then they stopped at a Burger King.  He described what they ordered.  They attempted to obtain some marijuana[13].  Donny dumped her purse and other items in the dumpster.  Her wallet was thrown away later about fifteen minutes after they left the Burger King.  They kept her money and dumped the rest.  He described the Burger King attendant, the purse.  He said they got lost when they left the Burger King.

Her body was found by the New York State Police at 8:15 PM on 12/1/00.

## The autopsy of Deborah Ann Fell

The autopsy was performed by D. Paul L. Morrow who determined that the mode of death was homicide.  He found multiple sharp force injuries including a deep incised wound of the neck and the carotid artery at the bifurcation, multiple wounds to the larynx and multiple stab wounds to the head, face, back and left side.  Toxicology showed a blood alcohol level of 0.325%.  Toxicology was also positive for amphetamine and proplyphenethylamine.

## The autopsy of Charles Thomas Conway

The autopsy was performed by D. Paul L. Morrow who determined that the mode of death was homicide.  He found severe commingled stab wounds of the back of the head and neck, a posterior incision of the left internal carotid[14], bleeding into the neck tissues, multiple wounds in the face and chin, multiple wounds in the upper left chest and a few defensive wounds on both

---

13 The clerk at Burger King was later identified as Michael Leight who confirmed parts of this confession.

14 The diagram attached seems to show a larger wound on the right side of the neck.

24

FELL-00000488

## Appendix B - the Government's Account

hands.   Toxicology showed an alcohol blood level of 0.392% and a urine blood level of 0.439%.

### 12/2/00

### The autopsy of Mrs. Teresa King

The autopsy was performed by Dr. Michael Baden.   He determined that the mode of death was homicide.   She died from multiple blunt force injuries to the head with fractures of the facial and skull bones.   She also had contusions of the brain, She had a traumatic compression of the neck with asphyxia.

### Bobby Lee -the sixth interview

An interview was held with Robert Joseph Lee (Bobby Lee) by multiple investigators (Det. Sgt. James Cruise, Det. David Schauwecker, Det. Rod Pulsifer and  Special Agent James Caudle) at 2:15 P.M. (CST)   Bobby said his date of birth was 11/28/80. He was given his Miranda rights.   He admitted he was unable to read his own writing, but he could read typed materials.   He was not intoxicated, by his report.

As background, Bobby reported that, while in Pennsylvania, he and Donny got drunk and started robbing cars for the hell of it.   Somebody thought Donny was his brother and told the police that Bobby and his brother were robbing the cars.   The police went to his house and talked to Donny and his brother.   Because the police were interested in him, Donny called and asked him to go to Vermont with him.   Donny wanted to do that so the police would not find him.   The police did come by looking for him. Donny left Pennsylvania about one month before Bobby Lee.   As police interest in him continued, Bobby scheduled a meeting with a detective to give himself an extra day to flee Pennsylvania.

When he got to Vermont, Donny and his mother were having big fights when she came home drunk.   He would fight with his mother over some stupid little thing.   The whole thing in Vermont was "nothing but a big fight" between Donny and Donny's mom.   She would come back drunk and she would find something to bitch about.   Mrs. Fell was using alcohol and crack.

Charlie Conway and a woman friend came to visit Donny's Mom, Debbie Fell.   She said Charlie and the woman  were thieves and should be watched constantly.   Charlie got into a fight with Donny at Thanksgiving.   Charlie and his friend left.

The Sunday after Thanksgiving,  Bobby and Donny did some

25

FELL-00000489

**Appendix B - the Government's Account**

crack (10 hits apiece) and some marijuana.  They had just finished the last hit when Mrs. Fell, Charlie and Charlie's female friend walked in.  Donny, Bobby and another guy drank a case of beer.  Mrs. Fell brought in some beer; they had some more.

Bobby pushed Charlie's female friend out so they would not have to watch her.  Charlie was getting agitated and was wrestling with Donny.  Bobby and Donny went out and got a third case of beer.  They drank it.  Charlie kept passing out and then waking up.  Mrs. Fell was in the same condition, but not quite as drunk.

Bobby left the room.  When he returned Charlie was threatening to call the cops to tell them about the cars in Pennsylvania.  Donny got angry and pushed Charlie back into his chair.  Donny threw the phone across the room.  Charlie tried to call again about half an hour later when he awoke.  He was stopped; he was told he couldn't leave the house until the next morning.  Mrs. Fell got up and started yelling for the phone.

Charlie tried to leave the house.  He was brought back in and told he couldn't leave.  They gave him two more beers and he passed out again.

After that, Donny got into a fight with his mother, Debbie, in another room.  Charlie woke up and was fighting with Donny again.  Donny was angry and threatening to kill him.  He asked Bobby to help him kill Charlie and his mother.  Bobby said he went along with Donny's request.  Donny grabbed a long serrated knife.  He gave Bobby another knife.  Bobby saw Donny run the knife across Charlie's throat.  Seeing that cutting, Bobby cut Donny's mother's throat.  She asked Donny why he was doing this to her.  Bobby kept on cutting her repeatedly.  Donny and Bobby kicked her as she lay on the floor.

Bobby hurt his foot repeatedly and said "ow" as he kept kicking her.  Mrs. Fell did not respond; she just sat there. Bobby then kind of "blacked out" and "went nuts".  He grabbed a shotgun and hit Mrs. Fell repeatedly in the head with the gun. He hit her in the head for about eight minutes.  When his mother moved, Donny encouraged Bobby to cut her throat again.  She was screaming for her life, "No, Binker[15], No."

They also kicked Charlie.  That's how all the blood got on

---

15 A family nickname for Donny.

26

FELL-00000490

## Appendix B - the Government's Account

the walls.  They both were covered with blood.    Bobby said Donny put his hand into Charlie's open throat to grab the muscles and pull them out; Donny looked odd or "fucked up" to Bobby.   Bobby put a finger into Charlie's open throat to see what it felt like.

Donny told Bobby to pack a bag while he took a shower. After Donny finished, Bobby also took a shower.  They left everything they packed  in the kitchen so they could grab it immediately and leave after they stole a car.

They thought about stealing a car to get away.   They took a gun with them.  They went to Jiffy Mart.  They then went to Wal Mart, which was closed.  Some man looked at them and watched them.  They decided to move on to another place.  They walked along the tracks to Price Chopper.

(Mrs. Teresca) Terry King pulled into the lot.  Donny said this was their chance. They decided to let her get completely out of her car so she would be more easily controlled.  After she got out of the car, they approached her and asked her for the keys. They showed her the gun.  She still refused.  They pushed her. They kept asking for the keys.  She gave them up.   Bobby said that the two of them decided to take Mrs. King.  They put her in the back seat.

They returned to the Fell home and picked up their bags. Donny was driving initially.   Mrs. King kept asking whey they were doing this.  She told them about her family - children and grandchildren.  At some point she tried to jump out of the car when it was moving.  Donny pulled her back in.

Later, Donny pulled over and told Terry to get out of the car.  She tried to wave down a passing car.  They got out and chased her into the woods.  Donny walked her into some bushes and punched her unconscious.  They threw rocks at her over and over again.  Donny kicked her in the head repeatedly.   Bobby did not since he said he knew from kicking Charlie that it would hurt his foot.

Bobby agreed that they made a number of decisions:

1.    decided to put Terry in the car
2.    decided not to leave her when she tried to escape
3.    decided not to just leave her where she was killed
4.    decided to kill her when she decided not to run
5.    decided not to call help for her.

Bobby said his intention had been to allow her to escape.

27

FELL-00000491

## Appendix B - the Government's Account

Donny made the decision to kill her; he went along. Bobby reported that it was "like another person came into me and started controlling me."

After the killing, Donny and Bobby did weed and ecstasy in Wilkes-Barre, Pennsylvania.

Donny never talked about killing his mother before the day on which it happened. The police came repeatedly to Mrs. Fell's home because of complaints. Bobby volunteered that he would love to kill his own mother.

## Donny Fell- fifth interview

An interview was held with Donald R. Fell Jr. (Donny Fell) by multiple investigators (Det. Sgt. James Cruise, Det. Rod Pulsifer, Det. David Schauwecker, and Special Agent James Caudle[16]) at 5:01 P.M. (CST).

He stated that he understood his Miranda rights. He said he was not under the influence of any substance, prescribed or other.

He stated that he came to Vermont on 9/23/00, the day after his sister's birthday. Prior to that time, he had been traveling with a carnival. Sybil Banas, his great-grandmother, drove him to Vermont. He went to see his mother because he had not seen her for seven years[17] and he missed her.

Things went well between him and his mother for a while (p. 3). After a while, he called and asked Bobby Lee to join him. His relationship with his mother was "pretty decent" although they argued "every now and then". "My mom was pretty weird she liked to smoke crack and drink a lot and she'd get kind of rowdy." He had an argument with her at the "Stop Lite". After a woman kicked him, he spit on her. His mother smacked and punched him for that. He pushed his mother away without hitting her. She fell down. The police came and he spent the night in the drunk tank. The cops came to her home because of complaints by the neighbors "quite a few times".

---

16 Spelling of name changed by me.

17 She left the state when she was released from jail because she had warrants and fines she did not want to deal with. He was confined to St. Michael's at the time. When she tried to come back, his aunt would try to have her arrested.

28

## Appendix B - the Government's Account

Charlie was just a friend of his mother. Her boyfriend, Alan Reynolds, was in jail at the time. This was the third time Charlie had been at his mother's home of which he knew.

On the night of the murders, Donny said he and everyone else was pretty well "wasted". He didn't know what really happened except he was standing over a dude with his throat cut. Later in the interview, he recalled he had been drinking, playing cards and listening to the radio. He knew he was drunk. He got the knife when he was in the kitchen with Bobby. He remembered that the knife said Hawk on it and had a serrated edge. It was a pretty thick knife. Charlie and his mother were in the living room at that time. He did not remember. Despite not remembering, he said he ran into the living room and attacked Charlie in the recliner where he was sitting. He recalled cutting his throat and then stabbing him. Later in the interview, he said he did not remember the first cut, but he did recall the rest of the stabs. He recalled thinking that his behavior was wrong. He does not know why he did it; his mind must have snapped.

Bobby came back and found out Charlie was going to call the cops. Charlie did not know that Donny had legal problems in Pennsylvania. Bobby had legal problems there too, but Charlie was ignorant of that as well. His mother did know about their legal problems. She would not have told Charlie.

Then he saw Bobby had already cut his mother's throat. He said he had no idea why Bobby Lee killed his mother. While she was being stabbed to death, his mother told him she loved him[18]. She said "Bye." She called him by his nickname, "Binker". He said he did not understand why she was saying she loved him while his friend was cutting her throat. He admitted that he had made a mistake ("I fucked up so bad.")

He implied he played no role in her death. He did not try to defend or save her by his report; he knew it was too late. He then told Bobby to stop. He said Bobby listened to him. He did not call for help. He did nothing to help her; he knew it was too late. He left the room and took a shower. He put back on the clothes he had been wearing during the killing(s). He said that there was no blood on his clothes.

He briefly considered turning himself in for the murder of Charlie. However, when he saw his mother was dead, he decided

---

18 I find this a remarkable statement.

29

FELL-00000493

## Appendix B - the Government's Account

that no one would believe him if Bobby said he had done both murders.  He briefly considered beating Bobby up, but rejected it.

He may have cleaned off the knives.  He wrapped them in a towel, intending to take them.  They were left by mistake.

He thought of turning himself in, but he was scared and just wanted to split.

(Author's note: When told he was not telling all because it was so bad, he provided more details.)

He said he did not recall the kicking of either victim.

Donny said Bobby suggested the car jacking.  He agreed. They took Donny's shotgun and left.  He stated that the shot gun was not loaded when he was asked whether Bobby Lee had ever threatened him with the shotgun.  He added, " ... even if he did that I would have stuck it up his ass."  He could have walked away at any time.  He was pretty scared.  He didn't want to get caught. He admitted that he chose to stay and participate in the car jacking.  He said it would have been pretty stupid to try to flag someone down in order to get a car.  "I'm not really stupid you know."

They waited for fifteen minutes until Mrs. King came.  They could see that she was alone.  They waited until she was out of the car to approach her.  They waited until she got close to them before they showed the gun.  They did not want her to panic and drive off.  Bobby confronted her with the gun.  Mrs. King pled for them not to take her.  He said that Bobby could not have stopped him from letting her go.  He was unsure what Bobby might have done if he had left her on the parking lot.  Donny admitted he had taken her hostage and kidnapped her.  She begged for them not to hurt her.  She asked them not to kill her.  Donny assured her that she would be fine.  He really intended to let her live. Her name was Terry; this amused[19] him since it was his sister's name as well.

Originally, Donny intended to let her live.  Mrs. King did

---

19 This statement is remarkable for the lack of empathy it displays for both his victim and his audience.  One suspects they did not find it amusing.

30

FELL-00000494

**Appendix B - the Government's Account**

try to jump out of the car.  He pulled her back in gently[20].  He did not hit her.   Bobby was "pretty rotten" toward her; he yelled and screamed at her.

Donny stopped the car in a graveled pull over and parked about thirty feet from a light truck 150.  He thought it might belong to a hunter.  Donny opened her door and told her to walk up into the woods.  When he got back into the car, Bobby said they had to kill her because she had their descriptions and knew their first names[21].  He said "Okay".  He was scared and did not want to be caught.  He got out of the car intending to kill her.  She was not trying to hurt them.  She was not trying to escape.  She only knew their first names and about the car jacking.  He walked up the hill and Booby went down to the hill and caught her as she tried to run to the road.  Both of them started hustling her up the hill.  It was "not harsh or nothing.[22]"  Donny said he found a place that could not be seen from the road.  He pushed her down to the ground. She started to pray with her hands together in front of her.  They started kicking her in the head.  She didn't struggle.  She just took it.  Then Bobby slammed a big rock down on her head.  Donny wiped his boot off with her shirt.  She looked dead to Donny, but she was still bleeding when they left her.

Killing Mrs. King was not premeditated.  It was spur-of-the moment.  They said "let's go" [do it].

After they left the Burger King, they drove to Wilkes-Barre and stayed for two nights with a friend, Chris Kolonjeski.  When they left, they switched plates with another Neon car.  They had to stop to buy a screwdriver and return to the Neon in order to get the plates.  They threw Mrs. King's license plates into the river.  Bobby talked about car jacking somebody else.  Donny did not want to do it because he did not want to get more blood on his hands.  They did not.

Donny expressed remorse several times about what he had done.  "To tell the truth you should be smacking my head off the wall."

---

20 This statement shows a marked lack of empathy for both his victim and his audience.

21 The police could have connected them to the murders through her although she did not know that.

22 Another statement showing a lack of empathy with his audience.

FELL-00000495

## Appendix B - the Government's Account

He stated that he was not a liar. He admitted killing Charlie and participating in the death of Mrs. King, but he did not touch a hair on his mother. He loved her.

He admitted a history of angel dust, marijuana, mushrooms, peyote, coke, crack, speed, pills and alcohol; he denied heroin[23].

He also admitted in the past that he had stabbed a person. His friend, Julie, fought with him and she "kneed him in the nuts" and pushed him through a fish tank. He picked up his fork and threw it at her and it stuck in her leg. He was put into a psychiatric unit.

He also had shot his friend, Johnny[24], in the shoulder. He had used a gun belonging to Johnny's father. A clip had been removed from the gun, but the cylinder was not emptied. His friend "jumped in the way[25]". They did not believe, he said, his claim that it was an accident and he was placed in a psychiatric unit ("Nut ward").

The interview ended at 6:08 P.M. (CST).

### 12/18/00

Donny Fell was interviewed again in an administrative hearing on whether he should be kept in administrative segregation. He said "I'm not wacky like those people back there." He needed things to do. He said he liked to talk to people. He said he was charged with three murders, but had only committed one. He said this was his first time in jail. When he "did it", he was heavily on drugs and did not know what he was doing.

---

23 This differs from the history I obtained from him.

24 Gasic

25 Again a lack of empathy for his audience is displayed.

32

FELL-00000496

FELL-00000497

**Appendix C - History of sexual abuse**

his history of sexual abuse.  Donny was discharged from care on 10/30/91.

**January-February 1993**

The record from his in-patient treatment at Wilkes-Barre Hospital revealed reports that he had been sexually abused at age four by a husband and wife baby-sitting team.

**Summer 1993 - psychiatric hospitalization**

Donny talked in group on 6/17/93 about the fact that he had been molested by two male baby sitters when he was five or six years old.

Dr. Mills stated that Donny told him he had no recall of the sexual abuse by his baby sitters.  He told me the same thing; he has no recall.

Dr. van Gorp does not refer to the issue, directly or indirectly.

Dr. Lipman reported that Donny said he had his first sexual contact with a young lady of eighteen who was drunk at the time. He reported that an adult male named Raymond and several other girls were present at the time.  It would seem difficult to characterize this as anything but sexual abuse of an eight-year-old child[26].  If he was eleven, I would still consider it sexual abuse.

I questioned Donny about his sexual history.  His initial report was that his first voluntary sexual contact was at age sixteen.  I reminded him of his comment to Dr. Lipman.   He confirmed that it had happened although he seemed vague on the details.  He was willing to accept my report that Dr. Lipman had said it had occurred at age eleven without comment or protest. Donny was definite that it occurred in Pittson which makes eleven more likely than age eight.

From reviewing the history of a drunken mother repeatedly bringing home men for short stays and a child fascinated by nakedness and frequently drunk as well, one suspects that additional sexual abuse may have occurred.  His sexual history suggests some psychological problems.  He denied that he has ever

---

26 Donny also said that this occurred in Pittston.  He attended the Pittston school in 1990 to 1991.

33

FELL-00000498

## Appendix C - History of sexual abuse

had a meaningful relationship with a woman he liked despite hundreds of contacts.  His sexual behavior at the carnival seems to have been "out of control".

He denied any history of rape by him or of voluntary sexual contact with men.

The documentation is adequate to accept that he was sexually abused by his baby sitters.  One supposes, but does not know that there was more.

34

FELL-00000499

FELL-00000500

**Appendix D - Physical Abuse**

### Physical abuse

(Author's note: Donny had numerous well baby examination from Dr. Gaudio. No references to indicia of physical abuse were noted.)

**12/12/82**

A police report was received from his mother alleging that Donny and his sister Terri were being abused by their father. He had been slapped.

**5/2/85**

Donny reported to a worker and a detective that he had been hit with a board, locked in a room, etc.

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers. They were both physically abusive to each other. Both denied to Children and Youth Services that they had abused their children.

Both admitted that in the past they have had physical confrontations with each other. When these confrontations occurred, the children became fearful and cried. Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983). The case worker, based on 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report. Despite this, the case worker stated, "There is a great deal of love and support between parents and children."

He had another physical examination without references to injuries after this incident.

**1987 - 1990**

Donny attended the Flood Elementary School in Wilkes-Barre, Pennsylvania. Donald Sabatino, the principal, recalled to investigators that Donny was no problem and was easily controlled in the first and second grade.

**4/21/90**

A female police officer informed Children and Youth Services

35

FELL-00000501

### Appendix D - Physical Abuse

of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police. The police officer involved noted that "the police were continuously at this home for domestic disputes".

The officer reported that she had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time.

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence.

### 10/29/90

Mrs. Fell forced Mr. Fell to leave the home because of drinking and physical violence. It was reported that he had slapped Donny (ten years and a half) in the face.

When asked, he told the officer his father had hit him. His mother agreed with his story. A restraining order was entered against his father.

### 1/19/94

The Children and Youth Services case file was re-opened. There was an allegation that, while drunk, Mrs. Fell hit Teri across the lip, splitting it. Children and Youth Services arranged for the children to move next door to be under the protection and supervision of his maternal grandmother, Therese Sharpe. (Author's note: The case worker incorrectly reported that this was the third time a file was opened; it was the fourth.)

It was noted that there was a long-standing history of alcohol abuse and violence in this family. "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell."

### 2/1/94

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulted her live-in boyfriend, Maxwell, leading to a call to the police. She was arrested for assault. Mrs. Fell said to the case worker she was

36

FELL-00000502

## Appendix D - Physical Abuse

"no different from her mother who used to beat her".

### 5/25/94

Mrs. Fell was arrested for public intoxication.  She also slapped her daughter.

### 7/22/94

According to Children and Youth Services records, Donny tore a telephone off the wall.  When she tried to fix it, he assaulted her.  She then "accidentally stabbed" him with a fork.

The worker commented, "Mrs. Fell states she is no different than her mother who used to beat her and remembers alcohol problems in her childhood."

### Donny's report
### His relationship with his father

He said he really did not like his father.  He was mean.  He "liked to beat us".  He beat his mother, his sister, Teri, and him.  He liked to beat them.  He used a belt at times.  He came home drunk and beat them.  This happened more that once a month. He yelled and screamed and beat them.  He did not recall whether his had any special target for abuse in the family.  He was uncertain when his father left and why he left.

His father never said anything positive to him.  He did say many things that were negative and demeaning.

### His relationship with his mother

His relationship with his mother was fine in his earliest years.  They did not fight or nothing until his father left.  He amended that, saying there may have been, one or two conflicts a year.

He didn't fight with his mother until he started seventh grade or about age twelve.  He fell in with the wrong crowd. This change occurred when he changed schools from Flood Elementary to Plains Junior High.  He started to do what he pleased.  He hung out with a group of kids his age; one or two may have been a year or two older.  He hung out with them and they all got drunk or high.

Surprisingly, he said his mother never said anything

37

FELL-00000503

**Appendix D - Physical Abuse**

positive about him and nothing negative.

**Aunt Jackie**

His Aunt Jackie bad mouthed him repeatedly.

**St. Michael's**

He stated, when specifically asked, that he had also been physically abused at St. Michael's. A few of the aides wanted to find someone to restrain or pick on. One aide did that do him; he said another interfered and asked for an explanation from the first. On another occasion, an aide thought he was ignoring him and grabbed him. He said he did not really mind this because he could think of ways to embarrass the aides afterwards.

(Author's note: It is likely that Donny suffered some physical abuse from his mother, father and his aunt. The physical consequences of the abuse seems limited in that he never required nor received medical care as a result. Given the family dynamics, only a relatively severe injury to Donny or Teri would have been reported to the police or to medical personnel.)

38

FELL-00000504

## Appendix E - Dysfunctional family

### Dysfunctional family

**Opinion:**   Donny grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children.

He did not receive even minimal parental guidance and supervision for many years at a time.

He had no role models for either sobriety or self control.

He was abandoned by both of his parents at times.

It was reported by counsel for the defense that Mrs. Fell's parents divorced because of her father's physical abuse of her mother.

They also reported that she had some of the symptoms of conduct disorder herself, including repeated running away. She reportedly suffered sexual abuse at age thirteen.

### 11/10/79

Deborah Kotzer, his mother, and Donald R. Fell Sr., his father, were married. Mr. Fell had been married once before to Beatrice L. Gelsleichter on 10/9/59. Apparently, Mrs. Fell was three months pregnant at the time of the wedding[27].

### 4/30/80

Donald Robert Fell II (Donny[28]) was born. It has been reported that she continued to drink during her pregnancy, risking fetal alcohol syndrome for her son.

When Donald Fell refused to allow her to have her tubes tied after her second delivery, she threatened him with a knife.

### 4/21/85

Donny's parents were in a fight and stabbed each other.

---

[27] Letter of Alexander Bunin and Gene Primono, Esquires, dated 5/18/01.

[28] In order to avoid confusion, the defendant will be called Donny throughout and his father, Mr. Fell.

39

FELL-00000505

## Appendix E - Dysfunctional family

Mrs. Fell reported that she had wanted to talk to her husband. Instead, he went to sleep on the couch. She stabbed him in the back. He became furious and stabbed her back. He left. After the police found him limping and bleeding, walking in the street, they questioned him. Based on his answers, the police went to the Fell home and found Mrs. Fell bleeding heavily. Both adults had been drinking heavily.

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers. It was noted that both parents has tempers and an aggressive nature. They were both physically abusive to each other. Both denied to Children and Youth Services that they had abused their children. Both said that they were committed to their marriage despite the difficulties.

Both admitted that in the past they have had physical confrontations with each other. When these confrontations occurred, the children became fearful and cried. Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983).

The case worker, based on April 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report. Despite this, the case worker stated[29], "There is a great deal of love and support between parents and children." The parents were supportive of Donny and Teri.

**6/31/85**

Children and Youth Services closed the case. The report[30] said that the children receive appropriate care and love. Discipline has also been appropriate.

**10/31/85**

The supervising case worker stated that the parents had made progress in their relationship and the relationship was now stable[31].

---

29 One doubts the accuracy of this opinion.

30 One doubts the accuracy of this report.

31 One doubts the accuracy of this report.

40

FELL-00000506

## Appendix E - Dysfunctional family

**4/21/90**

A police officer informed Children and Youth Services of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police.

A female police officer involved noted that "the police were continuously at this home for domestic disputes". She reported that a similar call alleging parental fighting and child neglect had been made to Children and Youth Services in September 1989. She noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." She reported that she had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time. Interestingly, his drinking was said to have started when Donny was molested.

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence.

Mrs. Fell reported that she and her husband had a good marriage and fought no more than other married couple. Mrs. Fell denied being abused by her husband (sic).

Oddly, Mrs. Fell said that she would rather have her children live with a stranger to having them stay with her mother.

Mr. Fell conceded that he had a drink occasionally at night, but said that neither he nor his wife had a drinking problem. His wife, Mrs. Fell, also told the worker that neither had a drinking problem. Interestingly, his mother-in-law, Theresa Sharpe, reported his first wife and the three children from that union had no contact with him because of his drinking.

**10/29/90**

Mrs. Fell forced Mr. Fell to leave the home because of drinking and physical violence. It was reported that he had slapped Donny (ten years and a half) in the face.

41

FELL-00000507

## Appendix E - Dysfunctional family

**May 1991**

Mr. Fell was living outside of the home.  It was stated that there was no evidence that Debbie was drinking excessively.

**August 1991**

Children and Youth Services was informed that Mrs. Fell was drinking heavily.  Her boyfriend had moved in.

**9/2/91**

Mrs. Fell, his mother, was arrested for public drunkenness. She fought with the officers.

**May 1992**

The Children and Youth Services caseworker stated that Mrs. Fell was providing a stable and safe environment for her children.  She was not drinking excessively.  However, she was not compliant with drug and alcohol treatment.

**1993**

The FBI report noted that a social worker reported in 1993 that Donny came from a "very dysfunctional family."  He also said that Mrs. Fell home "was infested with rats, cockroaches and mice.  The home was filthy, had litter, feces, and beer cans scattered in the living room.  Mrs. Sharpe stated that Debra's home was in this shape for two years."

..."there were numerous inconsistencies in  Donald's care. Mrs. Sharpe called Children and Youth weekly about the conditions that the children were living in, and she expressed personal anger toward Children and Youths Services of Luzerne Count. However, Mrs. Sharpe refuses to take responsibility for the condition her grandchildren were living under on the property she owns."

**1/14/94**

Mrs. Fell was arrested for hitting and injuring his sister.

**1/19/94**

The Children and Youth Services case file was re-opened. There was an allegation that, while drunk, Mrs. Fell hit Teri

42

FELL-00000508

### Appendix E - Dysfunctional family

across the lip, splitting it. It was noted that there was a long-standing history of alcohol abuse and violence in this family. "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell."

During the time that the case was closed, Children and Youth Services continued to receive calls[32] from Mrs. Sharpe regarding Mrs. Fell's continued drinking.

**1/29/94**

Mrs. Fell was arrested for public intoxication on simple assault. She tried to assault the man living with her, Ellery Wilcox, and was restrained by her son, Donny. She pulled the man out of his car, knocked him to the ground, scratched his face and broke his glasses.

**2/1/94**

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulting her live-in boyfriend, leading to a call to the police. She was arrested for assault. However, because of considerable bruising, she was released without prosecution and her live-in male companion was arrested and forced to leave the home under a protective order.

Mrs. Fell then went on a binge. Mrs. Fell said she was "no different from her mother who used to beat her".

**5/25/94**

Mrs. Fell was arrested for public intoxication. She also slapped her daughter.

**7/22/94**

According to Children and Youth Services records, Donny tore a telephone off the wall. When Mrs. Fell tried to fix it, he assaulted her. She then "accidentally stabbed" him with a fork.

The case worker, John Koslowski, performed an unannounced home visit one week prior to a dependency hearing and found that Mrs. Fell had left her children home alone unattended. He counted seventeen beer cans in the kitchen and living room. It

_____

32 Interestingly, I saw no documentation in the CYS files of any calls at that time.

FELL-00000509

## Appendix E - Dysfunctional family

was alleged that Mrs. Fell was bringing multiple men home (in serial fashion) for a day or two at a time.

Despite the evidence, Mrs. Fell denied that she did "any drinking". The case worker commented, "... Mrs. Fell is quite intelligent when she is sober." "... it appears that she has not been sober long enough ... for two years." "Mrs. Fell's relationships have centered around her drinking." Mrs. Fell "went on the prowl, bring men home indiscriminately to meet her needs for companionship."

The case worker commented that Mrs. Fell took no responsibility for her actions and did not expect her children to be responsible for their behavior either.

### 10/26/94

The Children and Youth Services plan noted that the whereabouts of both Mr. and Mrs. Fell was unknown.

### June 1995

Mrs. Fell was jailed again.

(Author's note: One is aware that Mrs. Fell has an equal excuse to that of her son for her failures as a person and a parent. The same is probably true of Mr. Fell.)

### Knives

Donny's father stabbed his mother.

Donny's mother stabbed his father, held a knife to his father's throat and stabbed Donny with a fork.

Donny stabbed someone with a fork and repeatedly threatened to stab people.

44

FELL-00000510

**Appendix F - Attention Deficit Hyperactivity Disorder**

**Attention Deficit Hyperactivity Disorder (ADHD)**

During my interview, I asked about the symptoms of ADHD.

According to his report, when he was in school, he never had any problems with the details of his work. He never forgot to bring papers or pencils or books to school, because he never took them home. He had no problems in school until seventh grade. He did his homework in school until he got to seventh grade. He had no problems in school with finishing his work. He did not dislike mental tasks. He did not lose things. He did not remember whether he was ever easily distracted. He did not remember whether he had memory problems.

He had no problems sitting still in class. He did not fidget or squirm. He had no problems staying in his seat in school. He was never told that he should stay in his seat or reprimanded. He denied that he was a noisy kid. He learned not to annoy his father at home; it carried over. He was not restless. He did not have any problem relaxing. However, he was always on the go, doing something. He was not told that he talked too much in school. He did not blurt things out in class. He never was told not to interrupt conversations or to intrude into others' activities. He had no difficulty waiting his turn.

(Author's note: I find it cogent that an abused child would point out that it was not safe to be hyperactive at home. If he could control his behavior in one setting, the diagnosis is not appropriate. On the other hand, the medical record is fairly clear.)

**1/26/93**

The medical record reported that he had problems with keeping still and concentration when he did not receive his Tofranil and Dexedrine.

**6/7/93**

The psychiatric intake evaluation of Dr. Cyril Puhalla dictated on 6/7/93 notes that "Donald has an extensive history of psychiatric involvement going back to at least 9 years of age. He presented with a history of inappropriate overactivity, distractibility, cognitive social and behavioral impulsivity."

Dr. Puhalla noted that he was "fidgety", "restless", and had trouble paying attention. Dr. Puhalla diagnosed attention deficit - hyperactivity disorder.

45

FELL-00000511

## Appendix F - Attention Deficit Hyperactivity Disorder

The admitting nurse thought his motor activity was normal, but placed a "?" next to hyperactive.

It was noted that early in this stay in the hospital, he was fidgety and had difficulty staying still.  He was thought to be less hyperactive on Moban 5 mgs. It was increased to 10 mgs BID and perhaps increased again.  He developed akathisia.

He was placed on Ritalin.  Dr. Feusner said he saw some beneficial effects.

There are frequently neuropsychological correlates of ADHD, although there is not a definitive signature.  The examination by Dr. van Gorp did not show any problems with the control of attention or other executive functions at this time.  However, children with ADHD frequently outgrow their problems.

I saw no indications of ADHD during my examination.

FELL-00000512

### Appendix G - Alcohol and substance abuse

Alcohol and substance abuse

**Opinion:** Donny began abusing alcohol and drugs at a remarkably early age.  When not in custody, he has used an amazing amount of intoxicating substances.  He qualifies for the diagnoses of abuse and/or dependence on a number of substances.

<u>History of alcohol and drug abuse</u>

Dr. Mills obtained a history according to which Donny began drinking at age six or seven.  He began being intoxicated at age eight or nine.  He began using drugs at an unusually early age.

Dr. Lipman obtained a history according to which he began drinking beer at age eight and hard liquor at age eleven.

He told me he started drinking at age eight.  His father had a keg in the basement.  He would be sent to get a glass of beer for his father or mother.  He would drink some and refill the glass.  He would sneak a taste or a drink.  He liked the taste of beer immediately, he said.  He did not understand my questions about beer being an acquired taste.  He liked the taste of beer immediately.  He said he began drinking on a daily basis at age eight.

(Author's note: Since he said he took beer from his father's beer keg regularly, he probably started drinking before his father left home.)

He drank to get drunk.  The first few times he drank he got sick to his stomach.  He did throw up.  He said he never got headaches.  He said that he has never been hung over.  When he was a young and inexperienced drinker, he had stomach upset.  It went away.  He denied any other symptoms from his alcohol consumption[33].

His first psychiatric hospitalization evaluation was in September 1991 when he was eleven.  It was mentioned that his mother was concerned about smoking and drinking, but there was no additional substantial reference to alcohol or drug abuse.  There was a report of significant behavioral problems consistent with conduct disorder.

---

[33] Don Goodwin, one of the first serious students of the genetics of alcoholism, once commented to me that he thought that the absence of unpleasant effects, like hangover, was one of the genetic factors in alcohol dependence.

47

FELL-00000513

### Appendix G - Alcohol and substance abuse

His second admission (age close to twelve) to a psychiatric service occurred at the Wilkes-Barre General Hospital in the Spring of 1992 after he had shot his friend, John Gasic, accidentally.  On this admission, there was no reference to any abuse of alcohol or drugs.  Donny was receiving prescribed medication - Dexedrine and Tofranil.

Donny said he started really heavy alcohol drinking at age twelve.  He began using whiskey and vodka.  He continued to drink heavily until he was arrested in the current matter at age twenty.  He admitted that he stopped drinking while locked up.

His third admission to a psychiatric service occurred at the Wilkes-Barre General Hospital in January and February of 1993.  For the first time, there was an extended reference in his chart to alcohol abuse.  He was twelve at the time.  This seems to support his claim about when he started heavy drinking.

He did notice over time that it took more alcohol to get him drunk.  He was able to quantify an increase in consumption from a six pack to eight, ten or twelve beers.  It also took more alcohol to keep him drunk.

His fourth admission to a psychiatric service occurred at the Wilkes-Barre General Hospital in the Summer of 1993.  He was thirteen.  Dr. Puhalla suspected he was abusing alcohol and drugs, but he denied it.  The belief that Donny was abusing alcohol was repeated by others.

While at St. Michael's, he had an alcohol and drug assessment at Catholic Social Services and completed the recommended counseling.  It was noted that he was thought to be withholding information about the nature and extent of his substance use.

### 9/11/96

Donny completed an evaluation at Catholic Social Services. He met the criteria for a substance abuse disorder.  He was accepted for treatment.  He received the Western Personality Inventory, the Alcohol Use Profile, a psychosocial index he filled out and an Adolescent Problem Severity Index.

He reported he started drinking alcohol at age 8.  He began regular use of alcohol at age 13.  He said he drank two six packs daily and a fifth of rum on weekends.  In addition, he did binge drinking.  He said he stopped drinking in April 1994 (29 months earlier when he was confined).

48

FELL-00000514

**Appendix G - Alcohol and substance abuse**

He began using marijuana at age 13 on a daily basis.  He used on weekends.  He said he did not use marijuana for the period from April 1994 to August 1995 (when he was confined by the state).  He returned to use in August, increasing to daily use again by winter 1995.  He said his last use of marijuana was on 7/4/96.  He said he tried LSD twice at age 13.  The counselor, Lisa Randazzo, thought he was minimizing his use.

(Author's note: This record is consistent with his reports now and occurred prior to him being in any substantial legal difficulty.)

**1995-1996**

For a time, (from the end of his first year through the start of his second year at Aunt Jackie's) he worked at a race track, Pocono Downs.  He started as a busboy and then was a dishwasher.  He needed a ride and came home with his boss.  His boss, "Speed", took him out drinking after work.  He got home after a night of drinking at 5 or 6 A.M. and then went to school.  He said he slept in class; the teachers frequently did not seem to mind.

After he left his Aunt Jackie's, he hung out at a friends house.  He stayed at Sean's house for seven or eight months.  He was drinking and getting high.  He supporting himself by stealing.  He broke into cars and stores.  He never committed any holdups.

When he returned from Nebraska, he lived next door to Sean's house with a woman friend of his mother's.  She was a nice lady who dealt pot.  He got his pot free.  He also used alcohol, but this woman did not like alcohol that much.

He moved back to his Aunt Jackie's home when he was about nineteen and a half.  He complained that his Aunt Jackie controlled his drinking quite a bit.  He never went as long as a month without drinking.

He attended a concert at Yasgur Farms for three days.  He used drugs, acid in particular, very heavily with multiple hits starting at three and working up to twenty five hits at a time.  He was really high - tripping.  He saw "tracks".  He was unsure whether it was raining or not.   He could not see or feel rain, but it was muddy. (Author's note: From his comments, the people he asked to confirm his impressions were not reliable observers at that time.)  His use of acid was much longer and more intense than ever before.

49

FELL-00000515

## Appendix G - Alcohol and substance abuse

During May 2000, Bethany Brashears reported that he was drinking at the time.  Donny drank almost everyday.  He also used drugs.  He had weed laced with something.  He had crack cocaine.  She said that there were also needles around the home, suggesting other drugs or forms of drug use.

## Staying with his mother

While he was in Vermont (slightly more than two months), his mother was drinking and drunk every day.  If she brought people home with her, they would sit up all night drinking.  She also used crack whenever she could get it; then she would use crack and drink all night. Donny and Bobby would drink and drug with her and her friends; they would hang out together.  She used crack or whatever else she could get all night.

| Substance | Lipman | Wetzel | Record |
|---|---|---|---|
| Alcohol | yes | yes | yes |
| Marijuana | yes | yes | yes |
| Cocaine | yes | yes | yes |
| Crack | yes | yes | yes |
| LSD | yes | yes | no |
| Angel dust | yes | yes | no |
| Mushrooms | yes | yes | no |
| Ecstasy | yes | yes | no |
| Heroin | yes | yes | no |
| | | | |
| Valium | yes | yes | no |
| Percocet | | yes | no |
| Clonopin | | yes | yes |
| Xanax | | yes | yes |
| Amphetamine | | yes | no |
| Oxycontin | yes | yes | |
| Unknown | yes | yes | no |

## Discussion

Dr. Mills has cited the excellent work of Dr. Marc Shuckit on the genetics of alcoholism.  I would agree that there is both a genetic and an environmental component to alcoholism.  In addition to Shuckit, I would refer to the interesting studies of Dr. Robert Cloninger.

Donny can be said to have type II alcoholism.  Type II alcoholism begins early in adolescence and is usually associated

50

FELL-00000516

**Appendix G - Alcohol and substance abuse**

with criminal behavior[34]. The person drinks in order to feel euphoric. He has an inability to abstain from drinking, but the alcoholism is usually not progressive.

In a study of adoptees, it was found that "alcoholism in at least one birth parent increased the son's risk of abusing alcohol, whereas alcoholism in the adoptive parents did not." "Although type II alcoholism was much less common among male adoptees than type I alcoholism, men who were genetically predisposed to Type II alcoholics were at a significantly higher risk of becoming alcoholic themselves than men with a genetic or environmental predisposition to type I alcoholism."

**Rates of Alcoholism in Adopted Sons**

| | | |
|---|---|---|
| Father - Non-alcoholic | Mother - non-alcoholic | 14.7% |
| Father - Alcoholic | Mother - non-alcoholic | 22.4% |
| Father - Non-alcoholic | Mother - Alcoholic | 26.0% |
| Father - Alcoholic | Mother - Alcoholic | 33.3% |

When the father is non-alcoholic, alcoholism in the mother increases the risk of alcoholism by 12.3%. When the father is alcoholic, an alcoholic mother increases it by 10.9%.

"The strongest and most consistent co-morbid psychiatric disorder in substance abusers is antisocial personality disorder[35]." "Antisocial personality leads to early onset of a variety of behaviors that may be characterized as risk taking, danger seeking, or stimulation seeking. Antisocial individuals are easily bored and need stimulation ... including polydrug abuse with little concern for its illegal or dangerous complications." (p. 406).

"Polysubstance abuse is frequently associated with strong familial aggregation of substance abuse, childhood conduct disorder, teenage onset of substance abuse, and in adulthood, antisocial personality disorder, low adaptive functioning and

---

34 Cloninger, CR, Sigvardssen S and Bohman H. (1996) Type I and Type II alcoholism: an update. <u>Alcohol Health and Research World</u>. 20:18-23.

35 Cloninger CR and Dinwiddie SH. (1993) Genetic risk factors in susceptibility to substance abuse in Biological basis for substance abuse, New York, Oxford Press, pp. 405-412.

FELL-00000517

**Appendix G - Alcohol and substance abuse**

severe dependence ....[36]

Cloninger has pointed out that genes are not destiny. Character can modify the expression of genes.  Many children of alcoholics are abstainers and avoid their parents' problems.

Of course, one may legitimately ask where in his family Donny might have observed character or learned to develop and display character.

---

36 Cloninger CR. (1998) Genetics of Substance Abuse in Galanter M and Kleber HD (eds.) Textbook of substance abuse treatment: second edition. Washington D.C. The American Psychiatric Press, p.59.

52

FELL-00000518

## Appendix H - Cognitive functioning

**Opinion:** Donny has received a competent neuropsychological evaluation. He has no cognitive deficits detectable on neuropsychological testing.

### Cognitive functioning and cognitive deficits

Donny Fell received what appears to be an excellent neuropsychological evaluation on 4/6/01 from Dr. van Gorp and Dr. Walton. The scoring, administration and interpretations appear quite competent. Due perhaps to an excess of caution, I decided to do a very quick evaluation of my own. I gave Donny the Cambridge Examination for the Elderly developed by Sir Martin Roth, M.D. on 9/19/02. This test can be described as an extended mini-mental status examination. This test is not an in-depth examination, but can reveal obvious deficits.

Focused neuropsychological history
4/88

On the Comprehensive Test of Basic Skills, Donny scored at the 77th percentile in reading, the 75th percentile in language arts, and the 91st percentile in math. His composite score was at the 81st percentile.

4/89

His reading total score on the Comprehensive Test of Basic Skills was 71st percentile in reading, the 90th percentile in language arts and the 72nd percentile in math. His composite score was at the 82nd percentile.

4/24/90

His composite score on the Sanford Achievement Test was at the 67th percentile, ranging from the 50th percentile to the 88th.

4/23/91

His composite score on the Stanford Achievement Test was at the 72nd percentile, ranging from the 60th percentile to the 86th percentile.

10/91

During his first psychiatric evaluation in October 1991, he received a standard psychological assessment. He was thought to have normal intelligence (verbal IQ = 95, performance = 104; full scale = 99). He received a typical psychological evaluation,

53

FELL-00000519

## Appendix H - Cognitive functioning

including IQ testing, projectives and a test of self-concept.
Apparently he had relatively low scores on the information scale
(8) and on the comprehension scale (7)[37].   He had a very high
score (18) on digit span.

### 11/23/93 - A medical hospitalization

Donny was seen in the Wilkes-Barre General Hospital ER after
being struck the right parietal region of the head.  He was
suspended from school at the time of this incident.  He had
thrown a brick at a boy who then hit him in the head.  He had a
loss of consciousness estimated as less than one minute.  He
complained of fatigue, nausea and headache.  He vomited in the
ER.  He had peritraumatic amnesia.  His neurological examination
in the ER was normal and nonfocal.

A CT scan showed a small, one centimeter "hemorrhagic
contusion" in the right parietal region.  A repeat CT scan showed
an additional hematoma in the right occipital region.

He told me that he suffered a brief loss of consciousness
after he was hit by the brick.  He was tripping on acid.  The
"little birds were making too much noise".  They wanted to make
them go away by throwing bricks at the birds.  One brick hit him.
He went to the ground.  (Author's note: He denied any loss of
consciousness to Dr. van Gorp.)  He was sure that for a period he
was unable to talk.  He got up, but had trouble walking because
he was "so dizzy".  He sat down twice, but was able finally to
make it to the street.  He told his friend to call to call an
ambulance.  He passed out in the ambulance.  He said he woke up
in the hospital and threw up.

He told me, as he told Dr. van Gorp, that he suffered no
cognitive problems after this injury.  He specifically denied
headache, neck problems, fatigue and problems with concentration
and memory.

He was told that he had to be psychiatrically cleared.
Someone thought, he said with indignation, he had jumped under
the brick deliberately.

According to the record, a consultation was obtained from a
psychiatrist.  He diagnosed "atypical conduct disorder".  His
consult noted truancy, oppositional and defiant behavior.  His
mother opined that he "needed to be put away".  His problems were

---

[37] This may be important since this scale measures one's
ability to describe socially appropriate behavior.

54

FELL-00000520

**Appendix H - Cognitive functioning**

of long standing.  No evidence of psychosis was noted.  He
demonstrated no thought disorder, hallucinations or delusions.

Testing in 1994

In one report from St. Michael's in 1994, Donny was called a
seventh grade student.  His reading standard score was 124, at
the post high school level.  Spelling was 107 and arithmetic 83.
His scores on a more extensive reading test showed vocabulary at
the 61st percentile and comprehension at the 68th percentile for
grade seven.

8/25/95

Donny Fell left St. Michael's School.  He was described by
the director of admissions as quiet and intelligent.

Fights

He said that he has been in dozens of fights.  He was
unwilling to estimate the number; he didn't keep track.  He was
never knocked out in a fight.  However, he said he did not win
them all.  He reported that he had been stunned several times.
It was difficult to elicit any details, but it seems likely that
he has had a number of very mild concussions (alteration in his
sensorium without loss of consciousness.)  He declined to
estimate the frequency.  He did not know whether he had any
cognitive after effects.

7/9/99

According to the records, Donny Fell was taken to the Penn
State Geisinger Wyoming Valley Medical Center after he was in a
motor vehicle accident.  He suffered a blow to his head.  He was
not knocked out.  Lumbar and cervical x-rays were read as normal.
A mass was seen in the cervical area.  A lumbar strain was
diagnosed.

Donny said he had been in one motor vehicle accident.  The
car in which he was rear-ended.  His companion was shook up and
taken to Mercy Hospital [sic] in an ambulance.  He went as well
when offered the chance to do so.  He did not seem to think he
had any cognitive problems from the accident.

Substance abuse

Donny, as described at length elsewhere, has consumed a
staggering amount of alcohol and drugs.  These can cause brain

55

FELL-00000521

**Appendix H - Cognitive functioning**

damage and brain dysfunction.  No persisting cognitive effects were elicited.

The sole exception was one occasion around Christmas 1999 when he took a large number of pills of unknown type.  He was told that he became combative (according to Dr. Lippman's report).  He reported to both of us that he was amnestic for two days later.  However, he was able to describe the pills and their effects to Dr. Lippman and to me.

**The Examination**
**Orientation**

The patient was fully oriented to person, place, date and time.  There were no signs of delirium or intoxication.

**IQ**

Dr. van Gorp gave a standard IQ test which showed that he had average intellectual abilities.  His working memory and his processing speed were distinctly above average.

**Academic achievement**

His reading score on the WRAT-3 given by Dr. van Gorp showed average ability.  His spelling level was also average, consistent with a high school graduate.  (Author's note: Arithmetic is the subject most dependent on schooling.)  His arithmetic score was lower, comparable to a seventh grade student.  This is consistent with his educational effort.  He told me that while he is weak in arithmetic, he has suffered no negative consequences in his life because of his weakness in mathematics.  (Author's note: This precludes any psychiatric diagnosis.)

**Simple Calculations**

On the Camcog, he was able to solve two simple arithmetic problems correctly.

**Attention and Concentration**

The patient was able to count backwards from 20 to one by ones without error.  He did serial sevens without error.

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly superior.  On the three scales for which a percentile was given, the lowest was at the 95th percentile.

56

FELL-00000522

**Appendix H - Cognitive functioning**

This suggests excellent executive functions.

**Language**

The patient understood and responded correctly to a series of verbal directions and questions. He correctly obeyed two directions he read. Mr. Fell was able to do a two-step command, but he obeyed only two parts of a three-step oral command. He was able to name seven of eight objects. The patient was able to name more than ten animals in one minute. Verbal fluency was average. He was able to define all of a series of simple terms in general or abstract ways. The patient was able to write a complete sentence of his own choice. Mr. Fell was able to address an envelope correctly when the name and address were dictated to him. Language comprehension and usage were in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly average or normal.

**Memory**

Mr. Fell was able to recall five of six pictures previously seen. He was able to recognize all six of the same pictures when they were among a series of pictures shown to him. He was able to answer four of six easy questions about world history from 1914 to 1945. Because of his limited education, I did not expect him to know any of the questions about relatively remote history. He surprised me by knowing the date of the start of World War II, the roles of Hitler and Stalin in World War II, and that the Lindbergh baby had been kidnapped. His estimate of the start of World War I was close. He commented that he had been reading <u>The Rise and Fall of the Third Reich</u> recently. The patient was reasonably well acquainted with current events. The patient had no trouble registering the names of three items (apple, table, and penny). He was able to recall all three objects at five minutes. He remembered all five of the five elements on the address of an envelope he had written five minutes earlier. Total score on memory items was above average, well within in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was average or normal. His lowest score was at the 25th percentile.

**Praxis**

He was able to copy correctly all three of three figures

57

## Appendix H - Cognitive functioning

shown to him.  The patient was able to draw a clock, but not to represent the hands showing the requested time.  (Author's note: The hour and the minute hands were appropriately placed but of equal length.)  Mr. Fell was able to mime three requested actions in a concrete way.  The patient's score for performance of requested behaviors was in the nondemented range.

On the more extensive and intensive testing done by Dr. van Gorp, he was average or normal.

## Motor functioning

On the more extensive and intensive testing done by Dr. van Gorp, he was clearly superior.

## Perception

He was able to identify one of two coins by touch alone.  The patient was able to recognize both of two famous persons' pictures.  The patient was shown pictures of six common objects photographed from unusual angles.  He identified five of them. Two bystanders were correctly identified by name or role.  The patient's score on perceptual tasks was in the nondemented range.

## Abstract Thinking

Mr. Fell was able to respond in an appropriate, abstract way to some items in a series of verbal reasoning questions.  The patient's performance on abstract thinking tasks was in the nondemented range.

Dr. van Gorp defined executive functioning as associated with "more complex cognitive operations such as shifting of cognitive set, planning and inhibiting responses.  On the more extensive and intensive testing done by Dr. van Gorp, he was average or better than average.  Dr. van Gorp said, ""thus, there were no abnormalities evident in the domain of executive functioning."  If this is true, and the testing seems quite clear, Donny's inability to control his anger and rage relates to some combination of his intoxication, his personality and / or the inability of his family to model appropriate self-control or to insist that he learn it.

## Camdex Total Score

Donny's score on the Camcog I gave was excellent, well

58

FELL-00000524

## Appendix H - Cognitive functioning

within the nondemented range.  He had a perfect score on the mini-mental status examination.

## Symptom Validity Testing

Dr. van Gorp gave him the Validity Indicator Profile.  That test showed that he made an adequate effort on both verbal and nonverbal sections of that test.  Since he showed no deficits on the rest of the testing, one can conclude with confidence that he made an adequate effort.

59

FELL-00000525

**Appendix H - Cognitive functioning**

Neuropsychological Assessment Report
Psychological Assessment Laboratory
Renard Hospital-W.U.M.C.
4940 Children's Place
St. Louis, MO  63110
(314) 362-2465


Patient Name: Donny Fell

Sex: male      Age:    22 Marital Status: widowed     Race: white

Occupation:  Inmate                        Education: 9   (Years)

Type Patient: Forensic

Referring Doctor(s): Gregory Waples, Esquire
                     AUSA

Admitting Diagnoses:

 Conduct disorder by history
 Major depression by history
 Antisocial personality disorder by history
 Alcohol dependence
 Poly substance abuse and dependence

Date Tested:  09/19/02

Validity of Examination:

X  Adequate results; appears to be an adequate measure
   of current level of functioning

Remarks:

 Very co-operative with this part of the examination

60

FELL-00000526

**Appendix H - Cognitive functioning**

The Cambridge Examination for
Mental Disorders of the Elderly

Name:   Donny Fell                                    Age: 22

Referred by: Gregory Waples, Esquire          Sex: male

Date:   09/24/02                    Examiner: Richard D. Wetzel, Ph.D.

| SUB-SCALES | OBTAINED | POSSIBLE | PERCENT |
|---|---|---|---|
| Orientation | 10 | 10 | 100 |
| Language Comprehension | 9 | 9 | 100 |
| Language Expression | 18 | 21 | 86 |
| Total Memory | 24 | 27 | 89 |
| Remote Memory | 4 | 6 | 67 |
| Recent Memory | 4 | 4 | 100 |
| Learning | 16 | 17 | 94 |
| Attention | 7 | 7 | 100 |
| Praxis | 11 | 12 | 92 |
| Calculation | 2 | 2 | 100 |
| Abstract Thinking | 6 | 8 | 75 |
| Perception | 9 | 11 | 82 |
| Total Score | 96 | 107 | 91 |

Score is in normal range

MINI-MENTAL STATUS EXAMINATION
Scores and Ranges

Obtained Score                                    30

Percentile-NORMALS                                91
Percentile-DEPRESSED PATIENTS                     80
Percentile-DEPRESSED with COG. IMPAIR.            95
Percentile-DEMENTED PATIENTS                      **

**-Unlikely to be group member P < 0.5

61

FELL-00000527

**Appendix I - Misrepresentation and misapprehension of the situation**

**Opinion:** The available history shows that

1.  His father misrepresented to the authorities the nature and extent of substance abuse and violence in Donny's home.

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979. Mrs. Fell said both had bad tempers and were physically abusive to each other. Both denied to Children and Youth Services that they had abused their children. Both said that they were committed to their marriage despite the difficulties.

**4/21/90**

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence. Mr. Fell conceded that he had a drink occasionally at night, but said that neither he nor his wife had a drinking problem.

The police officer involved noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." The report indicated that the officer had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk, very belligerent and cursing all the time.

**6/16/90**

Both of Donny's parents were ordered by the court to undergo alcohol and substance abuse evaluations.

**7/16/90**

Mr. Fell was ordered to undergo alcohol counseling.

2.  His mother failed to disclose to the authorities the nature and extent of substance abuse and violence in Donny's home.

62

FELL-00000528

**Appendix I - Misrepresentation and misapprehension of the situation**

**6/6/85**

Mr. And Mrs. Fell had lived together for two and one half years prior to their marriage in November 1979.  Mrs. Fell said both had bad tempers and were physically abusive to each other.  Both denied to Children and Youth Services that they had abused their children.  Both said that they were committed to their marriage despite the difficulties.

Both admitted that in the past they have had physical confrontations with each other.  Mrs. Fell reported that these confrontations had stopped two years earlier (about 1983).  The case worker, based on 1985 stabbing incident, doubted the accuracy of Mrs. Fell's report.

**4/21/90**

When seen by the Children and Youth Services case worker, both parents denied that there had been any physical violence.  Mrs. Fell denied being abused by her husband.  Mrs. Fell reported that she and her husband had a good marriage and fought no more than other married couple.

**January 1993**

It was reported that his maternal grandmother had a "chronic psychosis" and died in a state hospital.  (Author's note:  The reader is reminded that his maternal grandmother, Theresa Sharpe, was his guardian after his mother abandoned him.)  On 2/3/93, his mother told the staff that his father had been diagnosed with schizophrenia.  She also called him alcoholic and physically abusive.

**Summer 1993**

When he was admitted again to psychiatry, he blamed his mother for his problems and complained that she was an alcoholic.  She countered that she drank a few beers, but his father was a psychopathic alcoholic.

In her discharge summary, Donny's social worker wrote "There remain questions regarding Donald's mother and her parental functioning."  "There is a sense that the family is blocking some

63

**Appendix I - Misrepresentation and misapprehension of the situation**

aspect of their interaction which may be impinging upon Donald's growth and development."

**7/22/94**

Despite the evidence, Mrs. Fell denied that she did "any drinking". The case worker commented, "... Mrs. Fell is quite intelligent when she is sober." "... it appears that she has not been sober long enough ... for two years." "Mrs. Fell's relationships have centered around her drinking." Mrs. Fell "went on the prowl, bring men home indiscriminately to meet her needs for companionship."

3. When Donny described the substance abuse problem in his home, he was not believed or received an inadequate response.

At admission to the psychiatric service on 1/26/93, he complained about his mother's drunkenness. He implied that she was quite nice until she drank and her personality changed. She drank only episodically according to Donny.

When brought to the hospital in the summer of 1993, he told the examiner that the real cause for his admission was that his mother did not want him around. He was depressed and was on the verge of tears when talking about his perception of his mother rejecting him.

He blamed his mother for his problems and complained that she was an alcoholic. She countered that she drank a few beers, but his father was a psychopathic alcoholic.

4. The Children and Youth Services had adequate information from the police and others (his grandmother *inter alii*) to alert them to these problems.

**4/21/85**

After Donny's parents were in a fight and stabbed each other, the Children and Youth Services case worker apparently believed that his parents were unable to deal with or talk about the sexual abuse of their children, leading to drinking and fighting.

64

FELL-00000530

## Appendix I - Misrepresentation and misapprehension of the situation

**6/6/85**

His parents reported that "in many ways Donald is blaming them for the assault upon him." They were reluctant to set limits on him or control him because of what he had been through. (Author's note: This seems a convenient spin on the facts.)

**6/31/85**

Children and Youth Services closed the case. The report said the children receive appropriate care and love. Discipline has also been appropriate.

**10/31/85**

The supervising case worker noted that supportive services and counseling had been provided to the Fell children and to the Fell parents by Children and Youth Services and the Victim's Resource Center. They stopped therapy at the Victim's Resource Center in July. The caseworker stated that the parents had made progress in their relationship and the relationship was now stable.

**4/21/90**

A police officer informed Children and Youth Services of a report that Mr. And Mrs. Fell were fighting in front of Donny (nine years, eleven months old) and Teri. Mr. Fell threatened to kill Mrs. Fell in front of his children. He was intoxicated. Mrs. Fell left the home and the children ran to a neighbor's house to call the police.

A female police officer involved noted that "the police were continuously at this home for domestic disputes". She reported that a similar call alleging parental fighting and child neglect had been made to Children and Youth Services in September 1989.

She noted that Mr. Fell had been arrested twice in the last ten days for driving under the influence. She noted that Mr. Fell had hit a child with his car in the first DUI. She stated, "Mr. Fell is always intoxicated." The report indicated that the officer had urged Mrs. Fell to seek a protective order on more than one occasion. Another witness described him as a drunk,

65

FELL-00000531

## Appendix I - Misrepresentation and misapprehension of the situation

very belligerent and cursing all the time.

Interestingly, his mother-in-law, Theresa Sharpe, reported his first wife and the three children from that union had no contact with him because of his drinking.

The case worker thought that parental drinking was the primary problem, but that both Mr. Fell and his wife "had very little insight".

### May 1991

It was stated by the Children and Youth Service worker that there was no evidence that Debbie was drinking excessively.

### August 1991

Children and Youth Services was informed that Mrs. Fell was drinking heavily.  Mrs. Fell was referred to the Wyoming Valley Alcohol and Drug Service.

### 9/2/91

Mrs. Fell was arrested for public drunkenness.  She fought with the officers.

### November 1991

Children and Youth Services had been informed that Mrs. Fell was drinking frequently.  At the urging of the case worker, she began treatment, but dropped out when Donny went into the hospital.

The focus of Children and Youth Services was now on Donny's behavior problems and Mrs. Fell not drinking in front of the children. (Author's note: *As opposed to not drinking*?)

### May 1992

The Children and Youth Services caseworker stated that Mrs. Fell was providing a stable and safe environment for her children.  She was not drinking **excessively**.  However, she was

66

FELL-00000532

## Appendix I - Misrepresentation and misapprehension of the situation

not compliant with drug and alcohol treatment.

**1/19/94**

The Children and Youth Services case file was re-opened due to an allegation that, while drunk, Mrs. Fell hit Teri across the lip, splitting it.

It was noted that there was a long-standing history of alcohol abuse and violence in this family. "Most of the past domestic violence had been surrounding Donald Fell, the children's father, and Mrs. Fell." (Author's note: Right conclusion fairly late, despite evidence nine years earlier.)

During the time that the case was closed, Children and Youth Services continued to receive calls from Mrs. Sharpe regarding Mrs. Fell's continued drinking.

**1/29/94**

Mrs. Fell was arrested for public intoxication on simple assault. She tried to assault the man living with her, Ellery Wilcox, and was restrained by her son, Donny. She pulled the man out of his car, knocked him to the ground, scratched his face and broke his glasses.

**2/1/94**

According to Children and Youth Services records, Mrs. Fell was out drinking, got drunk, came home and assaulting her live-in boyfriend, Maxwell, leading to a call to the police. She was arrested for assault. However, because of considerable bruising, she was released without prosecution. Mrs. Fell then went on a binge.

**5/25/94**

Mrs. Fell was arrested for public intoxication. She also slapped her daughter.

**7/22/94**

According to Children and Youth Services records, Donny tore

67

FELL-00000533

**Appendix I - Misrepresentation and misapprehension of the situation**

a telephone off the wall.  When she tried to fix it, he assaulted her.  His mother then "accidentally stabbed" him with a fork.

It was noted that Mrs. Fell then went on an extended bender that lasted until she was jailed.  She was jailed, according to the report, because Donny had attended school on only 14 days in a 21 month period.

The case worker, John Koslowski, performed an unannounced home visit one week prior to a dependency hearing and found that Mrs. Fell had left her children home alone unattended.  He counted seventeen beer cans in the kitchen and living room.  It was alleged that Mrs. Fell was bringing multiple men home (in serial fashion) for a day or two at a time.

The case worker commented that Mrs. Fell took no responsibility for her actions and did not expect her children to be responsible for their behavior either.

The case worker noted, "Due to the ongoing alcohol abuse by Mrs. Fell, Donald's lack of attendance at school and total neglect of the children, ... " services would be provided.

5.    Multiple professionals failed to understand the problems that are now quite clear in retrospect.

At admission to the psychiatric service on 1/26/93, he complained about his mother's drunkenness.  He implied that she was quite nice until she drank and her personality changed.  She drank only episodically according to Donny.

Dr. Feusner, his child psychiatrist, noted that his mother had withdrawn him from outpatient care at the partial hospital program.  Against medical advice, she had stopped his medication.  When his behavior became worse, she had restarted him on medicine, but that had not changed his behavior for the better.

The record noted that his mother had been "in prison" for driving under the influence and for other additional offenses.  Donny reported on 2/19/93, that his father had abused him too.

68

FELL-00000534

**Appendix J - Malingering**

**Opinion:** Broadly stated, Donny has showed no significant signs of malingering on psychological and neuropsychological testing.

### Malingering

Dr. Lipman made no comment on malingering.

Dr. van Gorp used one of the symptom validity tests that I prefer (the VIP). I agree with his comments on that test and on the neuropsychological battery as a whole. I concur on his comments on the Structured Interview of Reported Symptoms (SIRS). Donny did not claim psychotic symptoms that he does not have.

I differ in a minor way from Dr. van Gorp's statements about the MMPI-2. He did have sufficiently elevated scores on F(p) on both MMPIs that the NCS forensic program refused to accept it as a valid profile. This suggests a degree of exaggeration or embellishment. As I will state later, I believe this goes to the weight that should be placed on the MMPI-2s, not to a complete rejection.

I would concur with Dr. Mills' slightly more cautious statement that **overall** Donny was not malingering.

69

**Appendix K - Conduct disorder**

**Opinion:** Donny meets the criteria for severe, childhood onset conduct disorder.

### Criteria for personality disorders

**A.    Before age fifteen**

His first psychiatric hospitalization occurred at age eleven on 10/30/91.  He was admitted for ongoing behavioral problems of a severe nature.  He was oppositional, combative, assaultive, defiant, smoked, refused to do homework and caused problems at school.  He admitted hitting his mother.  She was said to be afraid of him.  He had a history of running away.  His mother said he had set fires.

The Children's Service Center[38] recommended admission because his behavior was becoming increasingly dangerous.

While there was some depression and anxiety on projective tests, "Aggression appears to be viewed as a major vehicle to express himself...."

While in the hospital, he was noted to be angry and threatening to other patients he considered threats to himself. He showed minor destructive behaviors, but none that could be called major.

Donny was discharged from First Hospital Wyoming Valley on 10/30/91.  The discharge diagnosis was conduct disorder, undifferentiated type (312.90), listed on Axis I.  No Axis II disorder was listed.

He was admitted to the psychiatric service of Dr. Feusner for his second admission, the first at Wilkes-Barre General Hospital.  Three days prior to this admission, Donald and his friend, John Gasic, were playing with a 9 mm. handgun belonging to the victim's father.  The gun fired, hitting John Gasic in his shoulder.  The bullet came close to his heart, but did not cause any major injury.

Initially, Donny was said to show no remorse.  His mother

---

38 I have not identified any records from this center in the materials submitted to me.

70

## Appendix K - Conduct disorder

reported that he threatened to shoot her as well.   On the ward, it was said he initially bragged about the shooting.

The record includes a list of reported misbehavior.

1.   Keeping knives hidden in his room
2.   Punching his sister's girl friend
3.   Chasing his mother with a curtain rod
4.   Throws objects
5.   Hit his mother and sister
6.   Pulled out his mother's hair
7.   Curses authority figures
8.   Refused to follow household rules.

His mother said, "She fears that he will use it on her when he is angry, because he does violence without thinking of the consequences when he is angry."

Dr. Feusner[39] said he had personally observed that Donny

1.   Was demanding
2.   Was manipulative
3.   Was defiant
4.   Was oppositional
5.   Had severe temper tantrums with crying, screaming, kicking and threats to hurt others
6.   Had trouble with the law for throwing rocks at cars.

His affect was labile and "extreme".  His mood was angry and depressed.  He was thought to have less insight and judgement than expected for his age (almost twelve).  He was impulsive.

During this hospitalization, Dr. Feusner wrote that his oppositional, impulsive and disrespectful behavior to the staff was controlled by the medication he prescribed.  His behavior toward his mother changed from oppositional and defiant to very cooperative.  He apologized.  Near the end of his stay, he was confronted with the shooting of his friend.  This time he cried and seemed to show genuine remorse.

He was discharged to partial hospitalization at the

---

39 Apparently Dr. Feusner had treated Donny earlier before this admission at the Children's Service Center.

71

FELL-00000537

## Appendix K - Conduct disorder

Children's Service Center.  The discharge diagnoses were atypical depression - NOS and hyperkinetic conduct disorder.

On 5/31/92, Children and Youth Services closed out the Fell family file, noting that Donny continued to have behavioral problems.

On 1/26/93, he was admitted again to the Wilkes-Barre General Hospital under the care of Dr. Feusner on and stayed a full month.  On one form, the chief complaint was said to be school suspension and aggressive acting out behavior at home. His mother said that she was afraid to sleep because Donny might kill her in her sleep.

The record includes a long list of reported misbehavior.

1.  Keeping knives in his room
2.  Throwing a knife at his mother
3.  Repeatedly punching his mother's live-in boyfriend, including punching him in his broken leg[40].  He refused to allow the man to discipline him.
4.  Repeated truancy with no school attendance for months.
5.  A history of school suspensions.  He claimed the number was ten.
6.  Staying out late at night without permission.
7.  Breaking his mother's finger just before Christmas[41]
8.  A history of physically beating his mother
9.  A history of physically beating younger children
10. A history of fights at school
11. He was drinking enough for it to be described as alcohol abuse in the record.
12. Shooting another boy "accidently" and without showing remorse.
13. It was said that he cried profusely when he did not get his own way.
14. It was said that he had temper tantrums when he did not get his own way.
15. Allegedly, he told his younger sister that he planned to

---

40 He had been hit by a car several months earlier and was scheduled for surgery in the next few days.

41. He reported, in his own defense, that his mother had attacked him while drunk and the finger injury occurred while he was defending himself.

72

FELL-00000538

## Appendix K - Conduct disorder

kill his parents with a "razor sharp" knife.

16. He had been picked up by the police for throwing pebbles at patrons entering a gay bar.

The record indicates that on 1/28/93, his mother confronted him with his "violent, dangerous, disrespectful, defiant behavior".

His insight and judgement were impaired by the strength of his emotional reactions and by his impulsivity. When it was clear that he was lying, he maintained his statement unreasonably, "almost to the point of delusion[42]".

It was noted that he had difficulty sitting still and concentrating when he was off of his Dexedrine and Tofranil.

On 6/6/93, He was brought to the Wilkes-Barre General Hospital for fourth psychiatric hospitalization by commitment on papers signed by his mother because of increasing violence, particularly at home, but also in school, and depression on 6/6/93. The day before he had injured a friend sufficiently by throwing a fork that the friend had needed medical care. He denied he had any problems of his own.

Elsewhere in the record, it noted that he had refused his medication, Moban, for five days[43]. He was trashing his home. He had stabbed his friend[44]. He was drinking and smoking pot. He was fighting with his mother and sister. He had been suspended from school several times for violence. He was skipping school regularly and was failing seventh grade for the second time.

Unit records said he was very angry and he shouted demeaning things at his mother. He was described as sarcastic and argumentative. He disagreed with everything his mother said.

---

42 This could be said to cut against my opinions; therefore I included it.

43He initially did not explain why he had stopped taking his Moban when he admitted it calmed him down. He later suggested that it was because he was gone too much to take it regularly.

44 The record does not definitively say whether he threw the fork or stabbed with the fork.

73

FELL-00000539

**Appendix K - Conduct disorder**

Donny denied at that time any use of alcohol or drugs. He admitted there were empty beer cans in his room, but he denied they were his. He said the condom in his pocket also did not belong to him.

His psychiatric problems went back to at least age nine (four years earlier). He was overactive and impulsive.

He told the examiner, a psychiatrist, Dr. C.M.J. Puhalla, that he was doing well in junior high school. However, it was noted that he might be failing. His mother reported that in school, he was disruptive, easily distracted, cursed at teachers, threw things and at times just walked out of school. He refused to obey the school rules as he did at home.

By history, he had poor judgment and insight. It was suspected, he was abusing alcohol and drugs, but he denied it.

A nursing note later said that he was much calmer after his mother left the unit. He denied that he had any problem with his mother. Later, he said that his sister was the whole problem, not his mother.

He became angry on 6/12/93 when another child said he wrote curses on a desk. He became angry enough that security was called and he was placed in four point restraints. He yelled that he would kill the boy when he got out. He then calmed down and was released.

On 6/22/93, Donny denied that he had received points for bad behavior in front of the staff person who gave him the points and his mother. She apparently listened to the staff.

He was discharged from the hospital on 6/30/93. Dr. Feusner noted that he continued to manifest disrespectful, silly and covertly oppositional behavior. He tried to induce others to misbehave as well.

Dr. Feusner noted on 6/11/93 that Donny expressed regret for hanging out with older boys arrested for burglary, but denied participating with them in any burglary. Dr. Feusner noted that his mother was trying to have criminal charges placed against Donny.

Donny was seen on 11/23/93 in the Wilkes-Barre General

74

FELL-00000540

**Appendix K - Conduct disorder**

Hospital ER after being struck the right parietal region of the head. He was suspended from school at the time of this incident. The record said that he had thrown a brick at a boy who then hit him in the head. Donny gave me a quite different version. He had been throwing bricks at birds while "tripping". It was an accident that he was hit in the head. He added that someone suspected he was trying to commit suicide by jumping under the brick.

A consultation was obtained from a psychiatrist. He diagnosed "atypical conduct disorder". His consult noted truancy, oppositional and defiant behavior. His mother opined that he "needed to be put away". His problems were of long standing.

St. Michael's School - 4/8/94 to 5/8/95

Donny was placed in the temporary custody of the Luzerne County Children and Youth Services by court order. He was admitted to the treatment program at St. Michael's[45]. St. Michael's stated that his diagnoses were adjustment disorder with disturbance of conduct and adolescent/authority conflict.

It was noted on 7/24/94 that Donny had been truant very frequently. It was noted that Donny had been suspended more than once for disruptive behavior.

Donny told me that St. Michael's was a "typical lockup" for kids.

---

45 Bobby Lee was at St. Michael's from 9/19/94 to 8/15/95 and from 12/12/96 to 6/13/97. They were both enrolled during the period from 9/19/94 to 8/25/95.

75

FELL-00000541

FELL-00000542

**Appendix L - Personality disorder**

**After age fifteen**

1.  He has clearly failed to conform to social norms with respect to lawful behavior.

    A.  He told me that after he left his Aunt Jackie's home, he hung out at Sean's house for seven or eight months. He was drinking and getting high. He supporting himself by stealing. He broke into cars and stores. He denied committed any holdups.

    B.  Before he joined the carnival, he had sex with quite a few women. He denied that he ever had a relationship in which he cared for a woman or in which he restricted his sexual activity.

    C.  When he was traveling with the carnival shortly before going to Vermont, he was have sex at least daily and frequently had sex with several women a day. They were doing drugs, drinking and having sex all the time.

    D.  He attended a concert at Yasgur Farms (Woodstock) for three days. He used drugs very heavily with multiple hits starting at three and working up to twenty five hits at a time. He was really high - tripping. He was very active sexually. While there, he was involved in a beating. He beat up a young man who assaulted his sister, Teri. The young man tried to "push on" (rape) Teri. Donny beat him up, broke his leg and pissed on him. Donny said that man was in a coma for a day. He told Dr. Lipman this was followed by a confrontation with six other men. When arrested in this matter, he told Dr. Lipman he gave the police an alias.

    E.  He reported that he had been arrested five times before age fifteen and three times after age eighteen. These included an arrest in Nebraska for being in a stolen car, an arrest in Pennsylvania for stealing a car and the arrest for assault at Yasgur Farms.

    F.  He admitted a continuing pattern of shoplifting at stores.

2.  He does not have a consistent work history.

76

## Appendix L - Personality disorder

3.   He is irritable and aggressive.

Donny certainly displays most of the features of antisocial personality disorders.

When examined, only his antisocial features were revealed by his admissions.

However, his history of explosiveness, his sensitivity to even the reasonable demands of teachers, his repeated attempts to defend his mother against his own accurate allegations strongly suggest borderline features as well.  His history demonstrates the love-hate relationship with his mother sometimes seen in borderline patients.

His history is replete with explosions into violence with trivial provocation.  One notes his report to Dr. Lipman of chasing a police officer with a red hot poker when the police came to take him to a hospital after he shot his friend, John Gasic.  One notes reports of multiple incidents during which he attacked his associates while under the influence of drugs.  One notes that he described himself in a frenzy when he beat the young man at Yasgur farms into a coma.

He has very little, if any, empathy for others.  He does not understand how others might respond to his attitudes.  This suggests narcissistic features as well.

Taken together, the diagnosis of personality disorder - NOS with antisocial, borderline and narcissistic (Cluster B) features seems the most accurate description.  Nothing in his history or his testing contradicts this impression.

Dr. Mills, Lipman and van Gorp in their reports avoided making any diagnosis of personality disorder; it should be made.

Personality disorders, like most psychiatric disorders, run in families.  This due both to environmental and genetic transmission.  Certainly one can see the roots of antisocial behavior in each of his parents and their behavior.  As Dr. Mills said Donny did not choose either his genes or his family of origin.  However, that does not relieve him of responsibility for his behavior.

77

FELL-00000544

**Appendix M - Does he have a depressive syndrome - now or in the past?**

## Does he have a depressive syndrome?

His first psychiatric hospitalization was on September 30, 1991 at First Hospital. He does not recall any symptoms or any treatment. He did recall he had been treated prior to that at the Children and Youth Child Welfare. He was said to be "sad and angry about coming into the hospital." His bad behaviors occurred when he was upset ("high affect state"). He was said to have "high anxiety levels". His performance on projective testing showed mild levels of anxiety and depression. His mood was characterized by hostility, anxiety and lability. He was said to have poor adjustment in school, but only since he came to the Wilkes-Barre school system. No diagnosis of depression, typical or atypical, was made. Sufficient symptoms to diagnosis depression were not listed.

### 4/14/92

During his second psychiatric hospitalization, Donny's affect was labile and "extreme". His mood was called angry and depressed. Toward the end of his stay, his behavior improved. Dr. Feusner wrote that his oppositional, impulsive and disrespectful behavior to the staff was controlled by the medication he prescribed. His discharge diagnosis was atypical depression. A depressive syndrome was not described. Sufficient symptoms to diagnosis depression were not listed.

### 1/26/93

He was admitted to the Wilkes-Barre General Hospital under the care of Dr. Feusner on 1/26/93 for his third psychiatric hospitalization; he stayed a full month. On one form, the chief complaint was said to be school suspension and aggressive acting out behavior at home. His mother said that she was afraid to sleep because Donny might kill her in her sleep. It was stated that he had a long history of beating his mother as well as beating younger children. It was stated that his maternal grandmother had chronic psychosis and died in a mental hospital[46].

---

46 This cannot be accurate. It may refer to the paternal grandmother.

FELL-00000545

**Appendix M - Does he have a depressive syndrome - now or in the past?**

During this hospitalization, he admitted that he "may have" had suicidal and homicidal ideation in the past. Three problems areas were identified and targeted for treatment; none of these included depression.

**6/6/93**

He was brought to the Wilkes-Barre General Hospital for a fourth psychiatric admission on 6/6/93 because of increasing violence at home and in school. He was also said to be depressed. When brought to the hospital, he told the examiner that the real cause for his admission was that his mother did not want him around. He was depressed and was on the verge of tears when talking about his perception of his mother rejecting him. He denied any problems of his own.

Dr. Puhalla diagnosed depressive disorder - NOS, attention deficit hyperactivity disorder and thought he had some borderline personality traits. Dr. Puhalla reported that Donny had a history of being "sad and depressed, not enjoying life as much as he should." At times, Donny talked of being better off dead, but denied any current suicide or homicide ideation.

Dr. Feusner placed him on Stelazine and Clonidine. He was thought to be doing the best he had ever done on these medications. Dr. Feusner noted that he seemed to be getting used to the Clonidine.

Dr. Feusner changed the discharge diagnoses to major depression with psychotic features, hyperkinetic conduct disorder and borderline personality traits.

**St. Michael's**

Donny was admitted to the treatment program at St. Michael's; he was there from 4/8/94 through 5/8/95. St. Michael's stated that his diagnoses were adjustment disorder with disturbance of conduct and adolescent/authority conflict. No mention was made of depression.

79

FELL-00000546

**Appendix M - Does he have a depressive syndrome - now or in the past?**

**His reports to me about a disorder of mood**
**Anxiety**

He has anxiety attacks **now** which come out of nowhere.  His face, lips and arm go numb.  He has a pins-and-needles sensation. He cannot breathe,  He feels like he is going to have a heart attack.  He perspires.  He denied a lump in his throat.  He said he did not really have anxiety attacks before he was charged with murder.  He did have anxiety, but it was not really bad.  He did have some pins-and-needles sensation in his left arm the summer before he went to find his mother in Vermont.

He then added that he thought he had an anxiety attack when he was younger when he got hit in the head by a brick.  (Author's note: One anxiety attack, especially in a stressful situation, would not warrant a psychiatric diagnosis.)

The Prozac helps his anxiety attacks.  His attacks are less severe and less frequent.  The Prozac has had no effect on worrying; he never worried.

**Depression**

He does not recall being sad or depressed.  He immediately commented that he was on antidepressants as a child beginning with the doctor from the Children's Service Center.  He did not recall, but recognized the name of Dr. Feusner when I mentioned it.  He did not like Dr. Feusner.  He said that Dr. Feusner never listened to him.  He told Dr. Feusner that he was not the one with a problem; his mom was the problem.  "He didn't believe me. Nobody believed the kids.  They always took the parents word." [on matters of fact].  Because Dr. Feusner did not listen to him, he never listened to Dr. Feusner.  He said he was willing to listen, but Dr. Feusner was not.

Donny said he does not remember ever telling anyone that he had nothing to live for anymore.  He says that he has never has considered suicide.  He has never attempted suicide.  He denied that he ever had scars on his right wrist as described on one admission physical.  He displayed his wrists for inspection.  I

80

FELL-00000547

**Appendix M - Does he have a depressive syndrome - now or in the past?**

detected no scars[47].

The record shows that at times Donny has been upset about his family life.  He has been upset about what he perceives to be rejection by his family, particularly his mother.  A depressive syndrome is never described as a syndrome or piece meal (one symptom at a time).  He never described nor did the record describe a two week period in which he was depressed or irritable or had a loss of pleasure with four other symptoms.

One could conclude that he had difficulty adjusting to a difficult family situations, but he had only limited anxiety and depressive symptoms.

**First comment**

I do not believe he has ever had a clinical depression, but it is reasonable for other experts to believe he did have a clinical depression based on the diagnoses reported on his three admissions at Wilkes-Barre General Hospital.

I am willing to listen to his report that his depression never lasted long enough to make the diagnosis.

**Has his depression, if present, been of psychotic degree?**

It has been suggested that the fact that Donny was calmer and better managed with antipsychotic medications also implies that he is psychotic or prepsychotic.  This seems to assume that each individual medication has only one use or indication.  The logic of this assertion is equivalent to the suggestion that juveniles with behavior disorders who respond to drugs like Tegretol have epilepsy or pre-epilepsy or that patients who are tranquilized with major tranquilizers before surgery are psychotic or prepsychotic.

**The standard for psychosis**

The presence of psychosis is shown by the report of or observation of psychotic symptoms.  No valid symptoms or

---

47 I would defer on this point to a physician.

81

FELL-00000548

### Appendix M - Does he have a depressive syndrome - now or in the past?

indicators of psychosis are reported during his hospitalization. Dr. Mills did not elicit any hallucinations, delusions or thought disorder. Dr. van Gorp did not report any such symptoms. On the SCID-II psychotic screening module, not one symptom was elicited.

During his first psychiatric admission on 9/30/91, it was noted that he did not show thought disorder. There was no indication of "an underlying thought disorder or gross affective disturbance."

During his second psychiatric hospitalization (4/14/92), Donny denied hallucinations and delusions. He did not display thought disorder. "His thinking is goal oriented and easy to follow." The diagnosis was atypical depression - NOS. No reference to psychosis was noted.

Writing about his third psychiatric hospitalization (1/26/93), when he received antipsychotic medication, it was stated, "He shows no hallucinations or other signs of psychosis however." He showed no signs of thought disorder. His mood was described as anxious, angry and depressed. A careful reading of the medical record shows that he wanted to leave the hospital and go home. He began to bargain with his mother, promising good behavior, in order to get out of the hospital. At the same time, his (Mellaril) medicine was increased. His behavior on the unit improved. His psychiatrist attributed this change to the increase in medicine. The record also noted that he was trying to get his mother to trust him.

During his fourth psychiatric hospitalization (6/6/93), he was examined by Dr. Puhalla. He did not find any delusions, hallucinations or thought disorder. Dr. Feusner thought he did better on Stelazine than he did on Moban during that hospitalization. "He does well on antipsychotic medications, better than he does on oral tricyclics." He became calmer and more reasonable. Dr. Feusner did not identify any depressive symptom or any psychotic symptom which improved on medication. He did not voice any disagreement with Dr. Puhalla's statements about the absence of psychotic symptoms.

### My examination

Donny reported to me that he has had visual hallucinations ("trails") only while taking hallucinogenic drugs. He had these

82

**Appendix M - Does he have a depressive syndrome - now or in the past?**

phenomena only with LSD and with mushrooms. He obviously, by his report and his body language while describing them, enjoyed them. The hallucinations lasted "quite a few hours"; they did not persist until the next day unless he took the pills close to midnight. He did continue taking acid for up to three to four days. The hallucinations never lasted as long as a week.

He never heard voices. He never heard running comments on his behavior. He never heard commands to do anything. His thoughts about things he observed were his own and came from no one else. He denied thought insertion and thought deprivation.

He denied any olfactory hallucinations. He denied any tactile hallucinations. Nothing has ever controlled any part of his body.

He denied any unusual experiences.

He stated that no one was plotting against him. He paused, smiled, then added "except for the government." No one is or has spied on him. No one is or had been following him. He never was concerned that "the narcs" were after him before his arrest. Elsewhere in the interview, he denied going to Vermont because there were warrants out for his arrest. (Author's note: He admitted that he might have had warrants related to unpaid fines, but he did not worry about that. He said he is not a worrier.)

He reported that he had been talked to him about some stolen cars because an informant said he had something to do with the thefts. He said the informant lied. The police acted in good faith on bad information. The police had been interested in him before but for good reason. The police have nothing personal against him.

**Second comment**

Based on his reports to Dr. Mills, to me and the medical record, he has never had a psychotic illness.

FELL-00000550

FELL-00000551

**Appendix N - Psychosis and psychological testing**

**Psychosis on psychological testing?**

**Opinions:** It has been alleged that Donny shows signs of psychosis on testing; I disagree strongly.

- A.   the use of projective drawings in 1993 was invalid for the conclusions reached.
- B.   the MMPI-2 does not support a diagnosis of psychosis or prepsychosis[48] and
- C.   the Rorschach does not support a diagnosis of psychosis or prepsychosis.

The contention that Donny is prepsychotic or about to become psychotic rests on two prongs as I read the reports of the defense's experts.  The first prong is a rather questionable interpretation of his psychological testing.  The testing includes projective drawings described in 1993, the MMPI-2 and the Rorschach, both done after his arrest.

The second is the fact that he was given medications for depression (major tranquilizers) which are recognized as appropriate for the management of psychosis.

**1.   Projective drawings**
**Wyoming Valley - 1991**

He received a typical psychological evaluation, including IQ testing, projectives and a test of self-concept.  He reported a very strong self confidence (93rd percentile) on the Piers - Harris.

It was noted that he did not show thought disorder.  There was no indication of "an underlying thought disorder or gross affective disturbance."  He had "Thinking disturbance characterized by impaired judgment[49]."  His judgment became worse when he was more upset[50].

---

48 This is not a term of art in psychiatry or psychology.  It is meaningless.

49 This is a very unusual way to describe poor judgement.

50 This is fairly normal in eleven-year-old children.

84

FELL-00000552

## Appendix N - Psychosis and psychological testing

There was some depression and anxiety on projective tests. "Aggression appears to be viewed as a major vehicle to express himself...."

### Wilkes-Barre Hospital - 1993

Dr. Feusner referred rather obliquely in his discharge summary to drawings during the second hospitalization in 1993 when he changed Donny's diagnosis from atypical depression to a psychotic depression. There is no psychological report in the record; it is unclear therefore who asked him to make the drawings, the criteria for supposing he had borderline or psychotic features. "His drawings suggest a psychotic or borderline process." He offered no other evidence for the change in diagnosis.

Projective drawings done by children are not accepted as a method of diagnosis of psychosis that is well established scientifically. Most academic child psychiatrists do not believe in that use. Studies have not been done with these drawings that state their accuracy rates or their error rates.

Rachel Klein[51], a well known child psychiatrist, has written, "In fact there is very little evidence to document the belief that children's personality characteristics are well estimated by projective testing..... It is a grave error to make diagnostic or psychotherapeutic decisions on the basis of projective testing.... It is important to repeat that the very negative picture presented here pertains only to projective testing. There are other psychological testing procedures, such as tests of cognitive ability, that have great merit."

The reproducibility of ratings of the same set of projective drawings is quite low, even when rated by the initial rater after several months[52].

---

51 Rachel G. Klein, Questioning the clinical usefulness of projective psychological tests for children. In: Chess S, Thomas A, Hertzig M (eds), Annual Progress in Child Psychiatry and Child Development, New York, Brunner and Mazel, 1987.

52 R.D. Wetzel, Psychological Testing in S.B. Guze (Ed.), Adult Psychiatry, St. Louis, Mosby, 1997 p. 42.

85

FELL-00000553

Appendix N - Psychosis and psychological testing

The drawings should be ignored; they do not help with diagnosis.

2.    The MMPI-2
A. Should the MMPI-2 be interpreted?

The MMPI-2 obtained by Dr. Mills apparently was submitted for scoring on 3/26/01 at 5:26 P.M. to the NCS.  The first sheet implies that the test was completed on that day.  The exact program requested[53] is not known to me.  It was sent to the attention of Dr. Cliff Smith.  The report was faxed back to 212-821-0617[54].

I also gave him an MMPI-2 on 9/18/02.

The MMPI-2™ (Minnesota Multiphasic Personality Inventory - 2) is a 567-item paper-and-pencil, true-false test thought particularly helpful in screening for Axis I psychiatric disorders.  It also has excellent scales for assessing one's approach to the evaluation (defensiveness vs. openness vs. exaggeration or malingering of psychiatric disorder).

Comparison of the two MMPIs allows one to assess the stability and repeatability of the scores.

Validity Scales

The MMPI-2 has a number of validity scales[55].  One set of scales looks at whether it is likely that the person evaluated was able to respond in the way he wished to respond to the test.

---

53 NCS has multiple programs for interpreting the MMPI-2 depending on the situation.

54 The results of the MMPI-2 seem central to the opinions of Dr. Van Gorp, but it apparently was obtained by Dr. Mills.

55 Validity as used in testing means something slightly different than it does in ordinary English usage.  Validity in testing refers to one's approach to the test and the testing situation. As psychologists use the term validity, if one believed one was very ill and answered accordingly, the test would be valid.  Even if one's opinion were incorrect, one would say the test was valid.

86

FELL-00000554

**Appendix N - Psychosis and psychological testing**

The Q scale measures the number of unanswered question; he answered them all which is expected. The VRIN scale consisted of 67 pairs of logically related items (e.g. I loved my father and my father was a good man). He agreed with then logical answer 59 of 67 times which is well above chance. This is slightly below average (T = 61[56]). The TRIN scale looks at inconsistency when both items are answered the same way (True or false). He was very close to average with a raw score of 8 and a T score of 57F. One can conclude that he was able to respond to the test as well as he wished. One can take his answers as representing how he wished to present himself.

|        | Q | VRIN  | T  | TRIN | T   |
|--------|---|-------|----|------|-----|
| Mills  | 0 | 59/67 | 61 | 8    | 57F |
| Wetzel | 2 | 59/67 | 61 | 9    | 50  |

In terms of his ability to understand item content and to respond as he wishes, there has been no change in ability or effort. While his limited education might theoretically cause concern, his IQ and his reading ability documented by Dr. Van Gorp indicates the MMPI-2 is potentially appropriate.

Another set of scales looks at defensiveness or the unwillingness to admit flaws or problems. He had an average score on the L (lie scale T = 52), a measure of claims of improbable virtue. He had an average score (T = 47) on the K scale (a measure of defensiveness) indicating the claim that he can handle the demands of everyday life as well as the average person. He has a comparable score on the S or superlative scale[57] (T = 44).

|        | L  | K  | S  |
|--------|----|----|----|
| Mills  | 52 | 47 | 44 |
| Wetzel | 48 | 43 | 36 |

He was slightly less defensive or slightly less inclined to report good ability to function to me.

---

56 A T score of 50 is dead average. Two thirds of scores from normal persons will be between 40 and 60. A T score of 61 would be at the 86th percentile.

57 One may wish to note that he is well below average in the denial of moral flaws. He admits flaws.

87

FELL-00000555

**Appendix N - Psychosis and psychological testing**

Another set of scales looks at the exaggeration or false representation that one has psychiatric disorder.  These include the F scale (60 items infrequently endorsed -  < 10% or less frequently endorsed by normals on the MMPI - interspersed between item #1 and #370).  Mr. Fell had a high score on this scale (raw score - 17 T score = 89).  Because almost two hundred items follow the last item on the F scale, a more recent development is a scale called F(B) of F on the back of the test.  It runs from about item 250 to the end of the test - #567.  Interestingly, his scorer on F(B) is lower (T = 67).  The most recent development in this type of validity scale is the F(P) scale.  A few very floridly psychotic patients (whom no reasonable clinician could miss) can have high score on the F scale up to a raw score of 23.  This twenty seven item scale (Fp) includes items seldom endorsed either by normal persons or persons in psychiatric hospitals[58].  Mr. Fell had a very high score on the F(P) scale (T =94).

|          | F  | F-K | FB | FP |
|----------|----|-----|----|----|
| Mills    | 89 | 3   | 67 | 94 |
| Wetzel   | 79 | 2   | 63 | 94 |

Donny has a consistently high score on FP; that is he endorses rare and unusual symptoms not endorsed by psychotic patients.

The forensic NCS output states, ""His high score on the F(P) scale suggests that the test is invalid as a result of extreme item endorsement.  Individuals who score in this high range on F(P) may be malingering psychiatric symptoms.  This individual presented more extreme psychological problems than most psychiatric inpatients."

Both the Mills and the Wetzel MMPI-2s were rejected by the NCS Forensic program.  No graphs are printed and instead, across the graph space for the clinical scales and for the content scales, the program prints ""THIS IS AN INVALID PROFILES BECAUSE F(P) IS GREATER THAN 89".

The clinical NCS output for the Mills MMPI-2 says, "This MMPI-2 profile should be interpreted with caution.  There is some

_____

58 cf Graham JR. MMPI-2: Assessing personality and psychopathology. Oxford University Press 2000.  pp. 35-36 and pp. 46-53.

88

**Appendix N - Psychosis and psychological testing**

possibility that the clinical report is an exaggerated picture of the client's present situation and problems. He is presenting an unusual number of psychological symptoms. This response set could result from poor reading ability, confusion, disorientation, stress, or a need to seek a great deal of attention for his problems."

It continued, "His test-taking attitudes should be evaluated for the possibility that he has produced an invalid profile. He may be showing a lack of cooperation with the testing or he may be malingering by attempting to present a false claim of mental illness. Determining the sources of his confusion, whether conscious distortion or personality deterioration, is important because immediate attention may be required. Clinical patients with this validity profile are often confused and distractible and have memory problems. Evidence of delusions and thought disorder may be present. He may be exhibiting a high degree of distress and personality deterioration."

The clinical NCS output for the Wetzel MMPI-2 says, "This is a valid MMPI-2 clinical profile. The client has cooperated in the evaluation, admitting to a number of psychological problems in a frank and open manner. Individuals with this profile tend to be blunt and may openly complain to others about their psychological problems. The client tends to be quite self-critical and may appear to have inadequate psychological defense mechanisms. He may be seeking psychological help at this time because he feels that things are out of control and unmanageable.

In a setting with a higher rate of malingering expected, these MMPI-2s would not be interpreted. In a setting where evaluees have less motivation to malinger, they would be. In this specific context, I would, based on my experience and training, suggest that less weight be given to these tests than usual, but that they be considered with some caution.

**Clinical Findings**
**Axis I**

For an individual with elevated scores on the F and F(P) scale, Mr. Fell did not have a very high elevations on the standard clinical scales on the Mills MMPI-2. His highest score

89

## Appendix N - Psychosis and psychological testing

was on scale 4 (the Pd[59] scale T = 92, well into the top one percent of the population). In addition, he had elevated scores on three other scores in the range between T = 89 and T = 86. These were scales 6[60], 8[61] and 9[62]. (Author's note: In general, profiles with scale 4 highly elevated tend to reflect personality disorders. A profile dominated by 4 and 6 can suggest a person with a passive-aggressive[63] or antisocial personality disorder. A profile dominated by 4 and 8 can suggest a bizarre antisocial personality disorder[64]. A profile dominated by 4 and 9 is classic for antisocial personality disorder[65].

|            | Hs  | D  | Hy  | Pd  | Mf | Pa  | Pt  | Sc  | Ma  | Si |
|------------|-----|----|-----|-----|----|-----|-----|-----|-----|----|
| Mills      | 68  | 64 | 61  | 92  | 36 | 86  | 72  | 89  | 88  | 46 |
| Wetzel     | 51  | 57 | 42  | 74  | 32 | 61  | 53  | 70  | 75  | 59 |
| Difference | -17 | -7 | -19 | -18 | -4 | -25 | -19 | -19 | -13 | 13 |

---

59 Pd represents psychopathic deviant, a name for antisocial personality in use in the 1930s when the MMPI was first developed.

60 Scale 6 is also called the paranoia scale.

61 Scale 7 is also called the schizophrenia scale. It measures a concept of schizophrenia popular in the 1930s that has been rejected by the psychiatric research community. Using current concepts of schizophrenia, the schizophrenia scale does not discriminate between patients with and without schizophrenia. cf. Ben-Porath YS, Butcher JN & Graham JR (1991) Contribution of the MMPI-2 Content scales to the differential diagnosis of schizophrenia and major depression. <u>Psychological Assessment: A Journal of Clinical and Consulting Psychology</u>, 3:634-640. There is a residual belief that the schizophrenia scale has something to do with schizophrenia in some circles.

62 This is also called the mania scale. One cannot get a true manic to sit still long enough to answer 567 items. It was developed on manic patients while they were hypomanic.

63 Cf. Graham p. 100-101

64 Cf. Graham p. 101. But see also p. 108 on the 4-6-8 combination.

65 Cf. Graham p. 102-3.

FELL-00000558

**Appendix N - Psychosis and psychological testing**

usually quite stable with small changes[66].  He reported fewer
problems on the second examination[67].  The pattern is relatively
unchanged.  He had a 4*896" codetype the first time and a 94'8
codetype this time.  His paranoia score (scale 6) decreased
markedly.

It is frequently helpful to look at the reasons for an
elevation on a scale.  This can be done by inspecting the Harris-
Lingoes scales[68].  On the Mills MMPI-2, he had elevated scores on
4 - Pd2 (T = 92) due to authority problems (T = 80) and
alienation from others (Pd4 T = 87).  These remain the highest
components on the Wetzel MMPI-2.

He had elevated scores on the Mills MMPI-2 on Pa (T = 86)
because of persecutory ideas (T = 100).  That remained the
highest component on the Wetzel MMPI-2.  He had an elevated score
on schizophrenia because of social alienation (T = 84) and
emotional alienation (T=88).  These two remained the highest on
the Wetzel MMPI-2.

The NCS forensic report did not comment at all, calling this
an invalid profile.

The Mills NCS clinical report reports on the combinations of
scales 4, 8 and 9 directly and of 6 in the added comments.  It
stated, "This report was developed using the *Pd* and *Sc* scales as
the prototype.  The client's MMPI-2 clinical profile suggests
that he has many psychological problems at this time.  He appears
to be angry and alienated, and he tends to act out impulsively
and unpredictably in antisocial ways.  He may engage in dangerous
or extremely pleasure-oriented behavior just for the thrill of
it, and he has probably had many sexual problems.  He is likely
to be viewed as immature and irresponsible, and he may have a
long history of deviant behavior including poor achievement, poor
work history, and problems with authority."

The Mills MMPI-2 clinical output added, "His low *Mf* score

---

66 This could be considered a problem.

67 This is not a concern.

68 Cf. Graham p. 117-118, especially the first full paragraph on
118, which is exactly on point.

91

FELL-00000559

**Appendix N - Psychosis and psychological testing**

suggests a limited range of interests and a preference for stereotyped masculine activities rather than literary and artistic pursuits or introspective experiences."

Further, "He has endorsed a number of items suggesting that he is experiencing low morale and a depressed mood. He may feel somewhat estranged and alienated from people. He is suspicious of the actions of others, and he may tend to blame them for his negative frame of mind. He has endorsed a number of items reflecting a high degree of anger. He appears to have a high potential for explosive behavior at times. He reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past. He views the world as a threatening place, sees himself as having been unjustly blamed for others' problems, and feels that he is getting a raw deal out of life. He is rather high-strung and believes that he feels things more, or more intensely, than others do. He feels quite lonely and misunderstood at times. He endorses statements that show some inability to control his anger. He may physically or verbally attack others when he is angry."

The Mills MMPI-2 clinical output commented, "Profile interpretation can be greatly facilitated by examining the relative frequency of clinical scale patterns in various settings. The client's high-point clinical scale score (*Pd*) occurs in 9.1% of the MMPI-2 normative sample of men. However, only 3.3% of the normative men have *Pd* as the peak score equal to or greater than a T score of 65, and only 1.9% have well-defined Pd spikes. This elevated MMPI-2 profile configuration (4-8/8-4) is very rare in samples of normals, occurring in less than 1% of the MMPI-2 normative sample of men."

The Wetzel MMPI-2 clinical output said, "The clinical scale prototype used to develop this report incorporates correlates of *Pd* and *Ma.* Because these scales are not well defined in the clinical profile (the highest scales are relatively close in elevation), interpretation of the clinical profile should not ignore the adjacent scales in the profile code. The client appears to have long-standing impulse-control problems. Extroverted, uninhibited, and rather self-indulgent, he has a low frustration tolerance and a need for constant stimulation that cause him to behave recklessly or irresponsibly at times. He apparently has an exaggerated sense of importance and may have grandiose plans. He has a gift for charming others and for

92

FELL-00000560

### Appendix N - Psychosis and psychological testing

appearing self-confident, but he may actually feel quite insecure and inadequate."

The Wetzel MMPI clinical output continued, "He becomes involved in numerous activities, does not follow through sufficiently on commitments, and tends to deny problems or blame them on others. He may be having symptoms of irritation, agitation, changeable moods, and overactivity, and he may explode angrily when he becomes frustrated. Many individuals with this profile develop problems in day-to-day living."

"His low *Mf* score suggests a limited range of interests and a preference for stereotyped masculine activities rather than literary and artistic pursuits or introspective experiences."

The clinical output for the Wetzel MMPI-2 stated, "He has endorsed a number of items reflecting a high degree of anger. He appears to have a high potential for explosive behavior at times. He shows a tendency to reject authority and may have conflicts over rules. He reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past. He seems to be highly manipulative and self-indulgent. He seems to have had much past conflict with authority and is quite resentful of societal standards of conduct. The client does not appear to be an overly anxious person prone to developing unrealistic fears. Any fears he reports are likely to be viewed by him as reality-based rather than internally generated. He endorses statements that show some inability to control his anger. He may physically or verbally attack others when he is angry."

### Axis II

Neither NCS forensic report made any comment because the tests were seen as invalid.

The Mills NCS clinical report said, "He appears to have poor social skills and, although he is insecure in relationships, he may manipulate others through aggression and intimidation. He is overly sensitive and frequently misunderstands the motives of others. He seems to have great difficulty relating to the opposite sex. He may use other people for his own gratification with little concern for their needs. His lack of trust may prevent him from developing warm, close relationships. Many

93

## Appendix N - Psychosis and psychological testing

individuals with this profile type are unable to develop loving relationships and never trust anyone enough to marry."

It continued, "He appears to be an individual who has rather cynical views about life.  Any efforts to initiate new behaviors may be colored by his negativism.  He may view relationships with others as threatening and harmful.  He feels intensely angry, hostile, and resentful of others, and he would like to get back at them.  He is competitive and uncooperative, tending to be very critical of others."

The output of the clinical program for the Wetzel MMPI-2 stated, "A natural ability to charm, persuade, or even con others is usually found in individuals with this profile. They are very sociable and outgoing, but their relationships are usually quite superficial and manipulative. They tend not to be open and honest in relationships. He appears to act impulsively and may become involved in difficult relationships. He may hedonistically use other people for his own satisfaction without concern for them."

The Wetzel output continued, "He appears to be an individual who has rather cynical views about life. Any efforts to initiate new behaviors may be colored by his negativism. He may view relationships with others as threatening and harmful. He feels like leaving home to escape a quarrelsome, critical situation and to be free of family domination. He feels intensely angry, hostile, and resentful of others, and he would like to get back at them. He is competitive and uncooperative, tending to be very critical of others."

### Diagnosis

The NCS forensic output offered no comment because the profile was considered invalid.

The Mills NCS clinical profile opined, "Many individuals with this profile receive a diagnosis of severe Personality Disorder.  The possibility of a Schizophrenic Disorder should also be considered, however.  His response content is consistent with the antisocial features in his history.  These factors should be taken into consideration in arriving at a clinical diagnosis."

It added, "His extremely high scores on the addiction proneness indicators suggest the possible development of an

94

FELL-00000562

**Appendix N - Psychosis and psychological testing**

addictive disorder.  Further evaluation of substance use or abuse problems is strongly recommended.  In his responses to the MMPI-2, he has acknowledged some problems with excessive use or abuse of addictive substances."

The content areas look at what the evaluee thinks is the problem.  He has significant elevations on anger (T=74), cynicism (T=74) and antisocial practices (T=79).  He has mild elevations on anxiety (T = 67) and depression (T = 70).  (Author's note: The Biz scale - bizarre mentation - is the best indicator on the test of schizophrenia.  His score is in the normal range (T = 60 - 86th percentile for normal persons.)

The output for the Wetzel MMPI-2 stated, "Individuals with this profile are usually diagnosed as having a Personality Disorder. The possibility of a Cyclothymic Disorder should be evaluated, however. His response content is consistent with the antisocial features in his history. These factors should be taken into consideration in arriving at a clinical diagnosis."

The output for the Wetzel MMPI-2 stated, "His extremely high scores on the addiction proneness indicators suggest the possible development of an addictive disorder. Further evaluation of substance use or abuse problems is strongly recommended. In his responses to the MMPI-2, he has acknowledged some problems with excessive use or abuse of addictive substances."

Mills Wetzel

| | | Mills | Wetzel |
|---|---|---|---|
| Disconstraint | (DISC) | 85 | 89 |
| Aggressiveness | (AGGR) | 74 | 69 |
| Psychoticism | (PSYC) | 65 | 52 |
| Neuroticism | (NEGE) | 57 | 64 |
| Introversion | (INTR) | 52 | 54 |

This set of five scales are a relatively new addition to the MMPI-2.  They are intended to describe the personality of the individual taking the test.  Both agree that the most impressive features about Donny's personality are his lack of inhibition and his aggressiveness.  He does not particularly show indications of psychoticism (a disconnection with reality) or neuroticism.

The NCS program was used by Dr. Mills or his psychological consultant to interpret the MMPI-2.  That would seem to mean that the expert regards that as a clinically and scientifically

95

FELL-00000563

**Appendix N - Psychosis and psychological testing**

acceptable program.  At most, the NCS program suggests that if
the most likely explanation for this profile (severe personality
disorder - which seems to fit the clinical history very well) is
wrong, then second choices might be either schizophrenia (Mills
MMPI) or cyclothymic personality disorder (Wetzel MMPI).

There does not seem to be any clinical reason to look beyond
the reproducible first choice - severe personality disorder.

**Both MMPIs show that he has a significant personality
disorder with antisocial features.  Both are consistent with his
history of alcohol and drug abuse.  Both show his lack of
willingness to control himself and his aggressiveness.  *They are
not as helpful as his history in understanding why he is the way
he is today.***

**3.    The Rorschach**

Dr. van Gorp alleges that Donny is prepsychotic or has a
potential to become psychotic, in part, on the basis of his
performance on the Rorschach.

The schizophrenia index on the Rorschach was developed in
1981, using the Research Diagnostic Criteria[69] for schizophrenia.
There were significant problems with the index and a series of
studies were done to improve it[70].  A series of more than 50
discriminant functions was run involved random drawings from
subject samples including nonpatients, schizophrenic patients and
non-schizophrenic patients.  Five different random drawings were
made from the same subject pools.  (Author's note: Drawing
repeatedly from the same pool would tend to improve the results
on an artifactual basis.)

---

69 These criteria are much more like current diagnostic standards
for schizophrenia than the concepts used in the development of
the MMPI schizophrenia scale.  They were the immediate
predecessor of DSM-III.  Thus, they are much more likely to agree
with the clinical diagnosis of schizophrenia than the MMPI.

70 Exner, John E. Jr., The Rorschach: a comprehensive system;
Volume 2: interpretation Second edition. New York, Wiley Inter-
science, 1991.

96

FELL-00000564

**Appendix N - Psychosis and psychological testing**

1.    Donny does not meet the criteria for schizophrenia on the Rorschach.  He had an adequate number of responses (N=19).  His score on the index was 3.

The research on the Rorschach showed that there were six relevant tests for schizophrenia.  The SCZI was developed to assess four basic areas of impairment (inaccurate impairment, disordered thinking, inadequate controls, and interpersonal ineptness) found in individuals with schizophrenia ....[71]  The scores on the schizophrenia index can range from zero (none present) to six (all six present).  "The critical value in the SCZI[72] is 4; that is a value of 4 indicates a significant probability that schizophrenia is present but also a possibility of a false positive.  Values of 5 or 6 are more definitive, indicating a strong likelihood of schizophrenia and a very low probability of a false positive."

The index was tested on samples drawn from the original pool.  "The false positive rates vary from 0 to 11% depending on the group studied.  However, 76 of 105 false positive records (72%), have SCZI values of 4.  For this reason, SCZI values of 4 must be approached with caution.[73]"  Inspection of his table 6 on p. 24 shows that 38 of the false positives occurred in adolescents with behavioral problems, a 7.6% false positive rate.  Only one false positive was seen in nonpatients.

The defense and its experts are trying to make their case on a value of three because it is close to four which is less reliable than a higher score.  The usual interpretation of a score of 3 is that he does not have schizophrenia.

Exner states, "if the value is not positive, it does not rule out schizophrenia, but simply indicates that there is no firm actuarial basis on which to develop a postulate that

---

71 Hilsenroth, MJ. Fowler, JC, and Padawer, Jr. The Rorschach Schizophrenia Index (SCZI): an examination of reliability, validity and diagnostic efficiency. <u>Journal of Personality Assessment</u> (1998) 70(3), p. 515.

72 This is the jargon for the SChiZophrenia Index.

73 Exner, pp. 22-23.

FELL-00000565

## Appendix N - Psychosis and psychological testing

schizophrenia is present.[74]"

Hilsenroth et al (1998)[75] reported a study of the diagnostic efficiency of the Rorschach.  In describing their methods, they stated, "in accordance with the established SCZI cutoff of 4 (Exner, 1993), ..." they examined the effect of using the cut off of 4+, 5+ and 6.  Using the cutoff of 4+, they reported that 40% of non-psychotic patients with cluster B Axis II personality disorders were positive (9 of 23).

2.    Donny has psychological characteristics that "explain" a slightly elevated score in the normal range as well as or better than being prepsychotic.

Exner comments favorably on an article by Nancy Andreason (1989) who commented that the definition of schizophrenia has become very narrow, limited to severe forms.  She added that the idea of a schizophrenic spectrum had become more acceptable. Exner pointed out that , "... Rorschach features clearly overlap between the schizophrenic and the schizotypal personality disorders....[76]"  "Nevertheless, the false positive rate in the SCZI was often disconcertingly high, often between 10 and 20% for some groups, especially adolescent behavior problems, drug induced psychosis, and some more severe affective disorders. The false positive problem in the SCZI was highlighted further in a study comparing schizophrenics with schizotypal and borderline personality disorders (Exner, 1986).  In that study 66 of 80 schizophrenics (82%) were correctly identified , but 28 of 76 schizotypal (40%) and 11 of 84 borderlines (13%) were incorrectly identified as being schizophrenic.[77]"

Hilsenroth et al[78] found that the average score on the 0 to

---

74 Exner, op. cit. p. 258.

75 Hilsenroth, MJ. Fowler, JC, and Padawer, Jr. The Rorschach Schizophrenia Index (SCZI): an examination of reliability, validity and diagnostic efficiency. Journal of Personality Assessment (1998) 70(3), 514-534,

76 Exner, op. cit. p. 256.

77 Exner, op. Cit. P. 257.

78 Hilsenroth et al, Table 3, p. 521.

FELL-00000566

**Appendix N - Psychosis and psychological testing**

6 SCZI for psychotic patients was 4.5.  The average score for patients with Cluster B personality disorders was 3.0.  Donny's score was 3, exactly what was expected.  The most discriminating criteria for separating cluster B personality disorder patients from psychotic patients in this study were items 4 and 5 which measure thought disorder.  Sixty two percent of psychotic patients have these (tow) while only twenty three percent of patients with cluster B personality disorder do.  Donny is negative on both criteria four and five.  He did not show any thought disorder on the Rorschach.

It is difficult to see how a trier-of-fact is going to be helped by presenting a test with some reasonable validity in diagnosing schizophrenia as accurate when raising suspicions, but inaccurate when the scientifically determined criteria for schizophrenia are not met.  This is especially true when there is no clinical history that suggests schizophrenia and the score Donny obtained is average for the disorders everyone must admit he has.  There is much history that confirms personality disorder and drug abuse.

The qualitative nature of some of his responses has been raised.  Doctors and medical students see more anatomy on the Rorschach than the average person.  It is not surprising that a young man with a strong interest in the macabre, satanic material and violence sees blood or ninjas when being tested for the court.

He does meet the criteria for coping deficits.  Exner says, "The CDI[79] is not a second depression index.  People with scores of 4 or more on this index are likely to have impoverished or unrewarding social relationships.[80]"    There is abundant clinical history to support this score.

**The Rorschach is most consistent with a cluster B personality disorder.**

---

[79] Jargon for the Coping Deficit Index

[80] Exner, op. cit. p. 303.

99

**Appendix N - Psychosis and psychological testing**

*Comment*

*Both MMPIs and the Rorschach are more consistent with a cluster B personality disorder and substance abuse than they are with being psychotic or prepsychotic.*

100

FELL-00000568

**Appendix O - Dominance and Submission - a misleading interpretation**

**Opinion:** The issue of dominance versus submission has been raised by over-interpretation of one test score.  The record alone is sufficient to disagree that Donny is submissive, although without direct examination the conclusions are surely less certain.

**What is the evidence for Donny Fell being "exceedingly low on dominance" and "being quite submissive"?**

On the MMPI-2 obtained by Dr. Mills, he had a score of 10 on the Dominance Scale, resulting in a T-score of 30.  On  the test I administered, he had a raw score of 8[81] and a T-score of 30. This T-score means that he is well below the fifth percentile.

Therefore, one can not dispute Dr. Van Gorp's descriptive statement that he has a low score on the dominance scale on that date.  However, Dr. Lipman also gave him a test, the CPI[82], with the dominance scale on it.  On any earlier occasion - 1/30/01, his score was in the average region[83].  It is usually unwise to base opinions on single scores, especially when they are not reproducible.

Persons high on the dominance scale are likely to be leaders.  Donny, based on his statements, believes in anarchy, that is, no leaders.  However, he does not believing in following either.

---

81 Any score equal to or less than a raw score of 10 receives a T-score of 30.

82 A dominance scale was developed by Harrison Gough and his associates early in the history of the MMPI; many items were taken from the original MMPI.  Gough later continued his work by using some 300 overlapping items from the original MMPI to develop the California Personality Inventory.  The goal of the MMPI is to predict how clinicians will describe someone.  The goal of the CPI is to predict how the average person on the street will describe an individual.

83 He had a sten (standardized score - ten) score of five.  A sten score divides the distribution of scores into ten groups; middle scores (5 and 6) are average. Lower sten scores reflect less dominance; higher more.

101

FELL-00000569

**Appendix O - Dominance and Submission - a misleading interpretation**

Graham[84] described high scores on the Dominance scale as:

1. poised and self-assured
2. secure ans self-confident
3. behaves in a straightforward manner
4. optimistic
5. resourceful and efficient
6. realistic and achievement oriented
7. can handle problems
8. persevering

9. has a dutiful sense of morality
10. has a strong need to face reality
11. comfortable in social situations
12. if a psychiatric patient, has fewer symptoms and complaints

One should note that Graham does not report any descriptors (adjectives research shows are more frequently applied to people with a certain score) that can be assigned to persons with low scores. The MMPI-2 manual[85] does not report any descriptors for low scores. Greene states[86], "Low scorers on the *Do* scale (T scores less than 45) have been less adequately investigated."

A low score on this scale seems valid. A relevant comparison might be the relationship between the scores of Donny and Bobby, not Donny and society as a whole.

Dr. Van Gorp's further comment that Donny is submissive is clearly wrong, ignoring his other test scores. For example the same MMPI-2 output states that "... he may manipulate others through aggression ...".

His history makes it clear that he has not been submissive.

---

84 Graham J.R. (2000) <u>MMPI-2: Assessing personality and psychopathology,</u> New York, Oxford University Press. pp. 174-176.

85 Butcher, Jn, Graham JR, Tellegen A, Dahlstrom WG and Kaemmer B. (2001) MMPI-2™ (Minnesota Multiphasic Personality Inventory - 2™: Manual for administration, scoring and interpretation - revised edition.

86 R.L. Greene (1991) The MMPI-2 / MMPI : an interpretive manual. Boston, Allyn and Bacon, p.210.

102

FELL-00000570

**Appendix O - Dominance and Submission - a misleading interpretation**

The CYS worker on 6/6/85 described Donny as "extremely aggressive and active." At times he was uncontrollable.

On at least six occasions (10/23/95, 11/13/95, 2/6/96, 3/19/96, 3/27/96 and 3/28/96), he was suspended from school for insubordination.

Mr. Fell admitted to me all of the criteria for oppositional defiant disorder except vindictiveness. He said that when he had been treated unfairly, he merely informed people that he felt he had been treated unfairly (sic). He admitted that he has a marked problem with temper, is touchy and easily annoyed, defies and refuses to accept directive from authority figures, blames others when his desires are not satisfied and is angry and resentful.

His life history as documented clearly supports this diagnosis.

The history of the crimes as described by Donny and in their multiple statements to the police show that Donny was not submissive.

**A.    Behavior**

Donny resisted and did not submit to the demands of the police to confess longer than Bobby did.

1.    During his first interview, Donny denied any wrong doing. He did not give in to the demands of the police.

2.    During his first interview, when informed that the police knew of the murders, Bobby made a number of admissions.

3.    When told of Lee's statement, Donny again denied any participation in any murder again. (Author's note: He did not follow Lee's tactics.)

4.    Shortly after being informed Donny had made a statement, Lee admitted killing Mrs. Fell and participating in the killing of Mrs. King. (Author's note: It could be said that Bobby Lee followed Donny's tactics.)

103

FELL-00000571

**Appendix O - Dominance and Submission - a misleading interpretation**

**B.    Statements by Bobby Lee**

Bobby Lee in his statement on 12/2/00 did not describe Donny as submissive or dominated by him.  (Author's note: He had an obvious reason to represent himself as a lesser participant.)

1.    As background, Bobby reported that, while in Pennsylvania, he and Donny got drunk and started robbing cars for the hell of it.  Because the police were interested in him, Donny called and asked him to go to Vermont with him.  Donny wanted to do that so the police would not find him.  The police did come by looking for him.  Donny left Pennsylvania about one month before Bobby Lee.

2.    After that, Donny got into a fight with his mother, Debbie, in another room.  He asked Bobby to help him kill Charlie and his mother.  Bobby said he went along with Donny's request.

3.    Donny told Bobby to pack a bag while he took a shower.  After Donny finished, Bobby also took a shower.  They left everything they packed  in the kitchen so they could grab it immediately and leave after they stole a car.

4.    Terry King pulled into the lot.  Donny said this was their chance.

5.    Bobby said that the two of them decided to take Mrs. King.  They put her in the back seat.

6.    Bobby said his intention had been to allow her to escape.

7.    Donny made the decision to kill her; he went along.

**C.    Statements by Donny Fell**

Donny's statements in his confession on 12/2/00 show that he did not think he was dominated by Bobby or submissive to him.

1.    He implied he played no role in his mother's death.  He did not try to defend or save her by his report; he knew it was too late.  He then told Bobby to stop.  He said Bobby listened to him.

104

FELL-00000572

**Appendix O - Dominance and Submission - a misleading interpretation**

2. Donny said Bobby suggested the car jacking.  He agreed. They took Donny's shotgun and left.

3. He stated that the shot gun was not loaded when he was asked whether Bobby Lee had ever threatened him with the shotgun. He added, " ... even if he did that ·I would have stuck it up his ass."  He could have walked away at any time.  He was pretty scared about being caught.

4. They waited for fifteen minutes until Mrs. King came.  Bobby confronted her with the gun.  Mrs. King pled for them not to take her.  He said that Bobby could not have stopped him from letting her go.  He was unsure what Bobby might have done if he had left her on the parking lot.

5. Bobby talked about car jacking somebody else.  Donny did not want to do it because he did not want to get more blood on his hands.  They did not.

D. **Both made statements implying they made some decisions as equals.**

105

**Appendix P - Organized interview notes**

Donald Robert Fell II (Donny Fell) was interviewed on two occasions, September 18 and September 19, 2002, at the Northwest State Correctional Facility in St. Albans Vermont. The interview on 9/18/02 began at about 9:45 A.M. and lasted until about 12:00 noon.  He then completed the MMPI-2 finishing shortly before 1:30 P.M.  He was given the cognitive examination from the Cambridge Examination for the Elderly from about 9:20 A.M. until about 9:35 A.M. on 9/19/02.  He then was interviewed again for about one hour.

Prior to my examination, the intended scope of my examination was discussed with his counsel.  I indicated that I expected to evaluate his mental state at the time of the crime. I further noted that the issue of Donny's dominance or submissiveness had been raised by defendant's experts.  I disclosed my opinion that to evaluate that claim properly, I would need to discuss his role and relationship to any of his associates in each prior criminal act and to explore the relationship between Donny Fell and Bobby Lee in detail.  Prior to beginning the examination, his attorney informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes.  He also indicated that no inquiry should be made about the use of knives.  His counsel, Paul Volk, indicated that the issue of domination would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney and an investigator from the federal public defender's office.  He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court.  I left the room each day briefly when his counsel and Donny conferred.

I have reorganized my notes in order to bring related material together.  I jumped around a great deal, not unintentionally.

106

**The Interview**

He said his name was Donny Fell.  He was born on 4/30/80.
When asked his name again, he said it was Donald Robert Fell.  He
was unaware that he was Donald  Robert  Fell II according to his
birth certificate.

**Social and developmental history**

His father was Donald Robert Fell and his mother Debra Ann
Fell.  He was born in Wilkes-Barre, Pennsylvania in a hospital.
He doe not know its name.  He was their oldest child. As far as
he knows, his mother had no problems with her pregnancy with him,
her labor or delivery.  As far as he knows, he had no problems
after he was born - fetal distress or fetal alcohol syndrome.
(Author's note: Some records indicate that, against medical
advice, she continued to drink heavily during her pregnancy with
Donny.  The records of his birth have not been located as yet.)

Theresa Sharpe was his maternal grandmother.  Stella Banas
was called "Nanny": by him; he could not identify her
relationship to him.

He lived in Kingston, PA during his early years.   He
recalled a teacher he really liked in kindergarten named Miss
Henchy.  He has few memories other than that.

When he was in school, he never had any problems with the
details of his work.  He never forgot to bring papers or pencils
or books to school, because he never took them home.  He had no
problems in school until seventh grade.  He did his homework in
school until he got to seventh grade.  He had no problems in
school with finishing his work.  He did not dislike mental tasks.
He did not lose things.  He did not remember whether he was ever
easily distracted.  He did not remember whether he had memory
problems.

He had no problems sitting still in class.  He did not
fidget or squirm.  He had no problems staying in his seat in
school.  He was never told that he should stay in his seat or
reprimanded.  He denied that he was a noisy kid.  He learned not
to annoy his father at home; it carried over.  He was not
restless.  He did not have any problem relaxing.  However, he was
always on the go, doing something.  He was not told that he
talked too much in school.  He did not blurt things out in class.

107

FELL-00000575

He never was told not to interrupt conversations or to intrude into others' activities.  He had no difficulty waiting his turn.

He did start a number of fires, a lot of fires, when he was a kid.  He set nearby fields on fire, burned up piles of paper, etc.  Fire trucks were called to the scene.  He only burned down one building, a shed, right behind his house.  He was going to Flood elementary school at the time.

### His relationship with his father

He said he really did not like his father.  He was mean.  He "liked to beat us".  He beat his mother, his sister, Teri, and him.  He liked to beat them.  He used a belt at times.  He came home drunk and beat them.  This happened more that once a month.  He yelled and screamed and beat them.  He did not recall whether his had any special target for abuse in the family.  He was uncertain when his father left and why he left.

His father never said anything positive to him.  He did say many things that were negative.

When asked, he said he never had a father figure that he could respect and look up to.  However, he said he liked Ellery Wilcox.  He could remember nothing positive and nothing negative that Mr. Wilcox said or did with him.  He does not remember when he left.  When Mr. Wilcox left, it did not affect his mother's day-to-day life.

### His relationship with his mother

His relationship with his mother was fine in his earliest years.  They did not fight or nothing until his father left.  He amended that, saying there may have been, one or two conflicts a year.

His mom was always drunk.  He told on one Christmas where he had to wrap the presents for himself and Teri so Teri could have a real Christmas.  His mother was too drunk to wrap them and put them under the tree.

He didn't fight with his mother until he started seventh grade or about age twelve.  He fell in with the wrong crowd.  This change occurred when he changed schools from Flood Elementary to Plains Junior High.  He started to do what he

108

pleased.  He hung out with a group of kids his age; one or two may have been a year or two older.  He hung out with them and they all got drunk or high.

Surprisingly, he said his mother never said anything positive about him and nothing negative.

His Aunt Jackie bad mouthed him repeatedly.

**Bobby Lee**

He met Bobby Lee in second grade.  Bobby's brother was a year older than Bobby.  Donny and his brother were in the same class.

**Substance abuse**

He said he started drinking at age eight.  His father had a keg in the basement.  He would be sent to get a glass of beer for his father or mother.  He would drink some and refill the glass.  He would sneak a taste or a drink.  He liked the taste of beer immediately, he said.  He did not understand my questions about beer being an acquired taste.  He liked the taste of beer immediately.  He said he began drinking on a daily basis at age eight.

He drank to get drunk.  The first few times he drank he got sick to his stomach.  He did throw up.  He said he never got headaches.  He said that he has never been hung over.  When he was a young and inexperienced drinker, he had stomach upset.  It went away.  He denied any other symptoms from his alcohol consumption[87].

I mentioned that in one report to his doctors, Mrs. Fell claimed that she only drank about once a month. He denied that there was ever such a time.  She always drank daily.  She was not describing matters accurately.

---

[87] Don Goodwin, one of the first serious students of the genetics of alcoholism, once commented to me that he thought that the absence of unpleasant effects, like hangover, was one of the genetic factors in alcohol dependence.

FELL-00000577

After his father left, there was no keg in the basement[88]. He stole his alcohol from his mother from her supplies. He also provided alcohol taken from her to the group he hung with. One of the others in the group was the son of a bar owner; that boy stole liquor from his father. Another boy in the group had a big brother who would buy alcohol for them. Donny provided the price of the liquor without any fee paid to the brother. He was drinking daily.

Donny said he started really heavy alcohol drinking at age twelve. He began using whiskey and vodka. He continued to drink heavily until he was arrested in the current matter at age twenty. He admitted that he stopped drinking while locked up.

He did notice over time that it took more alcohol to get him drunk. He was able to quantify an increase in consumption from a six pack to eight, ten or twelve beers. It also took more alcohol to keep him drunk.

His first psychiatric hospitalization was in 1991 at First Hospital. He was there for about thirty days. He does not recall any treatment. He had been treated prior to that at the Children and Youth Child Welfare. He does not recall any benefit from this stay.

He was in the hospital again in 1992. He doesn't remember the reason for that stay.

He was in the hospital once for shooting a friend, John Gasic, the son of a police officer. John lived across the street; he was a good kid. They were playing with John's dad's gun. They had taken the clip out and put it up on the dresser. They did not know about the one remaining in the chamber. He pulled the trigger. He said there was a "delayed fire". He pointed to an area of his chest and said John got shot here. It was close to John's heart. John was able to run up the hill and tell his mother to call an ambulance. It was an accident, pure and simple. He was twelve. He visited the Gasic home the next day. He visited him in the hospital. Several days after that visit, he was put into a psychiatric unit.

---

88 Thus his age at the time his father left becomes a factor in evaluating his ability to describe his history of substance abuse.

FELL-00000578

He commented that he had seen John Gasic before he had come to Vermont and that John had visited him in jail after the murders.

He told me that he suffered a brief loss of consciousness (in 1993) after he was hit by the brick. He was tripping on acid. The "little birds were making too much noise". they wanted to make them go away by throwing bricks at the birds. One brick hit him. He went to the ground. (Author's note: He denied any loss of consciousness to Dr. van Gorp.) He was unable to open his eyes. He was sure that for a period he was unable to talk. He got up, but had trouble walking because he was "so dizzy". He sat down twice, but was able finally to make it to the street. He told his friend to call to call an ambulance. He passed out in the ambulance. He said he woke up in the hospital and threw up.

He told me, as he told Dr. van Gorp, that he suffered no cognitive problems after this injury. He specifically denied headache, neck problems, fatigue and problems with concentration and memory.

He was told me that he had to be psychiatrically cleared. Someone thought, he said with indignation, he had jumped under the brick deliberately.

He said that he has been in dozens of fights. He was unwilling to estimate the number; he didn't keep track. He was never knocked out in a fight. However, he said he did not win them all. He reported that he had been stunned several times. It was difficult to elicit any details, but it seems likely that he has had a number of very mild concussions (alteration in his sensorium without loss of consciousness.) He declined to estimate the frequency. He did not know whether he had any cognitive after effects.

He was again in the hospital in 1993. He said "I didn't do anything wrong." He was drinking a lot. He told them that his mother did it to get rid of him.

He said he had been in the hospital once for a sprain in the thoracic-lumbar region of his back. He was in the hospital another time when a vehicle was rear-ended.

He said he did not recall anything about his mother's

111

FELL-00000579

efforts to have him removed from her care and placed in custody. (Author's note: A the request of his counsel, I did not inquire about his interests in knives or his mother's expressed concerns about him killing her with a knife during his hospitalizations.)

When asked why his mother left him, he said his mother was in jail when he was sent to St. Michael's. She was there because he was truant and she did not do anything about it. He was curiously defensive about whether she had abandoned him. He would not accept that characterization (abandon) of her leaving the state without taking him or his mother.

**His memory**

He commented that his memory of his childhood is "mostly a blur". One should ask his sister, Teri, for the facts. He added that for considerable periods of time he was never home.

**St. Michael's**

He was "locked up" in St. Michael's for two years. His mother never came to see him. His grandmother, Theresa Sharpe, did come to visit him. His aunt Jackie came to see him as well. They came about as often as the rules would allow, he said. His grandmother Theresa died, he recalled, while he was in St. Michael's around Christmas or New Year's. He said he did not really have any feelings[89] about his mother not coming to see him. It did not bother him then. It does not bother him now. He does not give it much thought. He had been thrown in jail. She needed to get away.

He is unsure whether his grandmother and his aunt cared about him or not. Sometimes, it seemed like they cared and sometimes like they did not. His Aunt Jackie sometimes loved him and sometimes said he was too much. He described her as "just wacked". She had a temper and blew up frequently. She had one psychiatric hospitalization at First Hospital. He did not know

---

[89] Donny was very reluctant to talk about his feelings. When asked directly, he indicated that he was to an extent withholding information, to an extent was demonstrating a habitual pattern and that he has never paid much attention to his feelings other than anger and resentment. Some of his reluctance was a realistic suspiciousness in an adversarial relationship.

FELL-00000580

whether she was depressed or not.

St. Michael's was a place you don't want to be - a typical kid lockup.  They had a gym, baseball field.

He just didn't want to be locked up.  He didn't drink in there.  (Later in the interview, he said he became an altar boy while at St. Michael's.  He lit the candles or rang bells, He said he took the communion wine two or three times and drank it.) They had day students who could bring in drugs.  He had pot about twice a week.  The school was just like any school.  There was nothing else to do.

What he liked was doing drugs and alcohol and being with his friends and hanging out.

He developed no relationships there.  The teachers were boring.  He did not talk about his problems there.  He said he had difficulties talking about his problems.

He stated, when specifically asked, that he had also been physically abused at St. Michael's.  A few of the aides wanted to find someone to restrain or pick on.  One aide did that do him; he said another interfered and asked for an explanation from the first.  On another occasion, an aide thought he was ignoring him and grabbed him.  He said he did not rally ming this because he could think of ways to embarrass them afterwards.

**Aunt Jackie's**

He lived with his Aunt Jackie for about one and one half years after he left St. Michael's.  He said that stay was "like being in jail".  He could not do anything or go anywhere.  He said he had no idea why she would treat him like this.

She abused him physically.  She hit him a couple of times. On one occasion, she hit him with an iron.  (When asked if any blood relative of his had not abused him physically, he thought and said his Aunt Donna had not.  He lived with her a couple of times for short periods.  His grandmother, Therese Sharpe, used a paddle on one occasion.)

The first year he lived with her, he attended the Vocational - Technical High School.  He had vocational training (auto mechanics) in the morning and four classes in the afternoon.

113

FELL-00000581