(Author's note: He said he has never worked as a mechanic for pay.) He said he went to school every single day. He enjoyed school there. He did get suspended, but not really that much. He was always there in the morning; he did skip classes in the afternoon. When he skipped, he would go down into the woods. He and his friends smoked pot there.

He repeated he was not suspended that much that year. He never received any in-school suspensions. Despite, his missing classes, they passed him any way. He said he thought they did not really care about what he learned in class.

He did get into a number of fights with other students. He said he did not get into any fights with teachers. He did have multiple arguments with teachers. One teacher did incorrectly report that Donny tried to hit him. The teacher caught him shooting rubber bands in class. He told him to take a rubber band off his wrist. When the teacher tried to pull it off his wrist, it hurt and Donny pushed his hand away.

The second year after he left St. Michael's, he attended Vocational - Technical High School in the morning and Coughlin High School in the afternoon. He said he did "pretty good there"; he did not get into too much trouble. However, he refused to go to gym class. He thought gym was pointless. He didn't like sports. He said he could play sports well, but he did not like them any way. He was given detentions for his failure to attend gym class. He refused to go to detention for missing gym class. He was suspended from school for forty days for refusing to go to detention. The school refused to accommodate his dislike of gym class. He refused to accommodate their desire to send him to detention. He returned to school after his first suspension. He continued to refuse to go to gym class and detention. He was suspended again.

His Aunt Jackie refused to take him back to school after his second suspension. Someone from the school came to the house and informed him he had been expelled. He denied that he quit school; he was kicked out. However, he accepted his expulsion as a "vacation".

While he lived with his Aunt Jackie, he drank about once a week. He also said he drank "every chance he had".

For a time, (from the end of his first year through the

114

FELL-00000582

start of his second year at Aunt Jackie's) he worked at a race track, Pocono Downs. He started as a busboy and then was a dishwasher. He needed a ride and came home with his boss. His boss, "Speed", took him out drinking after work. He got home after a night of drinking at 5 or 6 A.M. and then went to school. He said he slept in class; the teachers frequently did not seem to mind.

Aunt Jackie kicked him out when he was seventeen. Someone called the cops. They came to the house. They agreed he could just go to the station if he left. He did. He was gone for several years.

He hung out with Bobby after he left St. Michael's.

**After Aunt Jackie's**

After he left his Aunt Jackie's, he hung out at a friends house. He stayed at Sean's house for seven or eight months. He was drinking and getting high. He supporting himself by stealing. He broke into cars and stores. He never committed any holdups.

He left Sean's house when a girl, Gerry (?), asked him to go to the state of Washington with her. They got as far as Lincoln, Nebraska. They were pulled over there. The license plates on the car were stolen. He was just a passenger on the trip. He did not know personally whether the car or the plates were stolen. He was taken to jail ands released the next morning. He waited for Gerry over the weekend at the Salvation Army.

When she did not get out, he hitched with a guy he met back east. The car, a Volkswagen, broke down. They pushed it into a creek and then hitch-hiked back to Wilkes-Barre.

**Next door to Sean**

He lived next door to Sean's house with a woman friend of his mother's. She was a nice lady who dealt pot. He got his pot free. He also used alcohol, but this woman did not like alcohol that much. He stayed there until he was about nineteen and a half.

He worked a factory called Medico, making mortar shells. He

115

FELL-00000583

ran a heat press to form the container for the explosive.  He
worked there almost until he went to Rutland.

## Back to Aunt Jackie's

He moved back to his Aunt Jackie's home when he was about
nineteen and a half.  While there he was working construction.
He quit the factory job because he had no car and it was too far
to walk from her home.

He complained that his Aunt Jackie controlled his drinking
quite a bit.  He never went as long as a month without drinking.

## The carnival period

Despite the application for an involuntary commitment in the
summer of 2000, he was never taken to a hospital for evaluation.
He did not know whether Lynn Roberts ran away from a hospital or
treatment center.  He did not want Bethany around.  He does not
ever recall threatening her.  She was a pain.  He wanted her to
leave.  "I just didn't like her."  Bobby did not like her either.
She had nothing to do with his decision to go to Vermont.

He attended a concert at Yasgur Farms for three days.  He
used very heavily with multiple hits starting at three and
working up to twenty five hits at a time.  He was really high -
tripping.  He saw "tracks".  He was unsure whether it was raining
or not.  He could not see or feel rain, but it was muddy.
(Author's note: From his comments, the people he asked to confirm
his impressions were not reliable observers at that time.)  His
use of acid was much longer and more intense than ever before.

## Staying with his mother

He wanted to see his mother; there was no other reason.  He
did not go in order to avoid warrants for his arrest.  There may
have been warrants because of unpaid fines, but he was not aware
of them.

His family nickname was Binker[90].

---

90 There were different versions in the records.  I asked for
clarification.

116

FELL-00000584

While he was in Vermont (slightly more than two months), his mother was drinking and drunk every day. She did work, doing something at the Holiday Inn. After she left work, she went to the Stop Light bar. It was a typical bar with a pool table. After work, she would get drunk there and come home drunk. If she came home alone, she went to bed and slept until she had to get up to go to work. If she brought people home with her, they would sit up all night drinking. She also used crack whenever she could get it; then she would use crack and drink all night. Donny and Bobby would drink and drug with her and her friends; they would hang out together. She used crack or whatever else she could get all night. He said that she did not appear to let any concerns about going to work affect her partying. However, she always went to work.

He admitted reluctantly that he did argue with his mother occasionally, not too often. He estimated that between the end of September and the end of November, they argued about five times. Usually, when she complained to him, he could not understand what she wanted or was upset about. Her speech would be "too slurred to understand". He sometimes laughed at that. She did not appear to like his amusement. She slapped him a couple of times. He would push her away. When he pushed her away, she would start screaming that he had hit her.

There was one incident at the Stop Light bar. She called and asked him to come get her to take her home. She was having trouble walking. When he entered the bar to get her, one of her woman friends started hitting him. Since he does not believe in hitting women, he just spit on the woman. His mother had not seen the woman hitting him. She became upset when she saw him spit on her friend. She started hitting Donny. He backed away, going out the bar door. His mother followed him, hitting him. Outside, he pushed her away again. She fell down on her "butt". Someone advised that the police had been called, implying that he should leave. He said "good" and stayed, believing he was in the right. However, he was arrested and spent the night in the "drunk tank".

When asked specifically whether he was in fact drunk, he said he was unsure. He had been drinking. He hadn't started drinking much at that time; he would drink from Friday night to Monday night without stopping. He quit when he ran out of beer. When asked how he would determine whether he was drunk, he replied that he would have a pins-and-needle sensation throughout

117

FELL-00000585

his entire body and feel light headed.

His mother never told him to leave Vermont. He knew that Bobby was ready to split. However Bobby never said so explicitly.

She did volunteer several times while he was there that she loved him. He said he did not recall her reaction when he first arrived in Vermont. He does not remember that he told anyone that he was coming.

**Altercations with his mother prior to Vermont**

He said that he had physical altercations with his mother only twice in his life.

On one occasion, he was upstairs in his room with eight friends. His mother was drunk. She came up to his room. She was slapping him. He scratched her. She was on top of him, slapping him. He bit her finger which made her get off of him. His friends tried to pull her off of him. She hit one of his friends for that.

On the second occasion, they fought over his check for SSI. She ordinarily took "his" SSI money and spent it on her alcohol needs. He did not think that fair. He complained about it. He had the check in his hand and she tried to take it away from him. He said there was slapping and pushing and shoving.

He does not remember what she said to him during these altercations. It might have been derogatory, but he does not recall.

He commented that both of them were "very stubborn". They argued frequently. Both "always" maintained their opinions.

He added that he thought she was comical when she was drunk. He characterized her as a "mean sloppy drunk". I inquired about the meaning of mean. He said she was "always trying to start something with somebody".

**His interests**

He said he listened to a lot of "evil music" when he was at home. He was into "death metal" and "satanic" music. Death

118

metal music involves a lot of "blood and guts" - people get ripped to shreds. That appealed to him. He was angry and full of animosity at the time. He also liked the music. He started listening when he was in seventh grade. Two groups he liked were "Metallica" (heavy metal) and "Slayer" (heavy, heavy metal and satanic).

When asked, he stated he had never participated in any satanic worship or rituals.

He was a musician. He played the guitar. He was in two bands. One with his friends, including Bobby Lee, was just formed. They were learning how to play and how to play together. They did not play too well, but were not bad either. They never were paid to perform or performed publically.

He sang with the other group. They did Death Metal music.

**Tattoos**

He has an upside down cross with three sixes. He got this tattoo at age twelve from a friend. 666 is from the Apocalypse and is the mark of Satan. Everything satanic interested me. He denied any participation in any form of satanic worship.

He has one tattoo with a symbol that represents anarchy. It is a non-professional tattoo acquired ate age 17. Anarchy, he said, means no rules. It is against the government. The concept of anarchy just appealed to him. He disliked the whole system.

He has started a tattoo of death on his left hand. He is doing itself in his cell. Death, he said, refers to a musical group.

He has also started a tattoo on his chest. At present, it is a very light circle. He intends a pentagram, a satanic symbol.

**Sexual history**

He said , "I have a weakness for women."

Initially, he said his first sexual experience was at age sixteen. He said that he initiated the contact at age sixteen. After discussion, he said his second voluntary sexual experience

119

was at sixteen after he was released from St. Michael's.

His first sexual experience was with an older teen age woman named Stacey when he was eleven[91]. That occurred while he lived in Pittson in a trailer. The incident happened around a corner. He had met them at his sister's friend home.

When he was traveling with the carnival shortly before going to Vermont, he was have sex at least daily and frequently had sex with several women a day. They were doing drugs, drinking and having sex all the time. He stated that his male companions in the carnival life reported multiple contacts with Lynn Roberts. That is why he dropped her; he was never jealous about her.

Before he joined the carnival, he had sex with quite a few women. He denied that he ever had a relationship in which he cared for a woman or in which he restricted his sexual activity.

While reluctant to discuss his sexual conduct in any depth, he denied that he had any sexual difficulties. He has never had sex voluntarily with a male before his arrest. (Author's note: I did not ask about later behavior.) He says he has no recall of any sexual contact with a man or of the molestation reported early in his childhood. (Author's note: I do not find that remarkable.)

He admitted that he had cut each palm once at the request of two different young ladies. They drank his blood and he then had sex with them. His motivation for cutting was only to have sex. He would not comment on why they wanted to suck his blood; it didn't matter to him if it made them sexually available to him.

## Military

He has never been in the service.

## Medications

He is on Verapamil for high blood pressure and headache, Tetracycline for pimples and Prozac for anxiety attacks.

---

91 I suggested the age; he did not disagree. His recall of the incident seems hazy at best.

120

FELL-00000588

**The evidence for psychiatric disorder**
**Anxiety**

The anxiety comes out of nowhere. His face, lips and arm go numb. He has a pins-and-needles sensation. He cannot breathe, He feels like he is going to have a heart attack. He perspires. He denied a lump in his throat. He said he did not really have anxiety attacks before he was charged with murder. He did have anxiety, but it was not really bad. He did have some pins-and-needles sensation in his left arm the summer before he went to find his mother in Vermont.

He then added that he thought he had an anxiety attack when he was younger when he got hit in the head by a brick.

The Prozac helps. His panic attacks are less severe and less frequent.

The Prozac has had no effect on worrying; he never worried.

**Depression**

He does not recall being sad or depressed that he can recall. He immediately commented that he was on antidepressants as a child beginning with the doctor from the Children's Service Center. He did not recall, but recognized the name of Dr. Feusner when I mentioned it. He did not like Dr. Feusner.. He said that Dr. Feusner never listened to him. He told Dr. Feusner that he was not the one with a problem; his mom was the problem. He didn't believe me. Nobody believed the kids. They always took the parents word on matters of fact. Because Dr. Feusner did not listen to him, he never listened to Dr. Feusner. He said he was willing to listen, but Dr. Feusner was not.

He had no person who supported him that he could identify. That included neighbors and teachers. He had no one at the hospital on the staff who listened to him. He was certain that no one in his family believed him with the possible exception of his grandmother, Theresa Sharpe. He was uncertain about her.

Donny said he does not remember ever telling anyone that he had nothing to live for anymore. He says that he has never has considered suicide. He has never attempted suicide. He denied that he ever had scars on his right wrist as described on one

121

FELL-00000589

admission physical.  He displayed his wrists for inspection.   I
detected no scars.  He denied any cutting or scratching of his
wrists or forearms.  (Author's note: He has two female relatives
who have.)

**Alcohol dependence**

He had stomach problems early in his use of alcohol.

He never had any headaches.

He is unable to say whether he had any loss of control
because he never wanted to stop drinking.

Alcohol was his drug of first choice after he left St.
Michael's.

He got into plenty of fights when he was drinking. However,
he got into just as many fights when he was not drunk.  He does
not think that the alcohol was the reason for the fights.

He was arrested once for driving while drunk.  He was
driving a stolen car and drove it off the road getting it stuck
on a dirt mound.

He was unsure whether he had any other arrests while
drinking.

He had no other accidents while drinking.

He drank in the morning, around the clock, etc.  He did not
drink to relieve any hangover or withdrawal symptoms.

He denied any history of shakes.

He initially denied any withdrawal symptoms from alcohol or
any other substance.  Not drinking had no effect, other than
leaving him bored.  He did not become jumpy, shaky, have nausea
of vomiting or have seizures.  He did have some trouble going to
sleep; he would toss and turn in bed.   He reported a mild sense
of agitation, but no pacing.  He did feel like he had to do
something.

He has seen other people withdrawal, including his mother.

122

FELL-00000590

He has not had those symptoms.. (Author's note: He described the symptoms of opiate withdrawal.)  He never developed any physical symptoms.)

**Time line for alcohol use**

| | | |
|---|---|---|
| age eight | He began drinking | mild |
| age twelve | He increased drinking | heavy |
| age fourteen | He stopped - in custody | very mild to none |
| age sixteen | Aunt Jackie | mild |
| age seventeen | on his own | heavy |
| arrested | in custody | stopped |

Drinking, he said, was always his choice.  He never experienced a loss of control.

**Drug history**
**marijuana**

| | |
|---|---|
| age twelve | heavy |
| At St. Michael's | twice a week |
| After St. Michael's | heavy, daily until arrest |

**Acid**

He first used at age twelve.  He used it quite a bit, every now and then.  During the three weeks at the carnival, he did it a lot.

He did report tolerance to LSD.  He had to double the dose as he continued to use it.  His high was about ten hits at a time before he joined the carnival and about twenty five while with the carnival.

**Mushrooms**

He used mushrooms once or twice before he joined the carnival.  He used it to a much greater degree while with the carnival.

**Angel dust**

At times, he and his friends sprinkled angel dust on their marijuana.

123

FELL-00000591

**Ecstacy**

He first used this drug while traveling with the carnival. He really enjoyed it; it was an amazing drug.

**Cocaine**

He has snorted cocaine.  He said that it calms him down.  He has never injected it or any other drug..  He has smoked crack. He called it a "worthless" drug because the effect was too transitory.  He has never tried methamphetamine.

**Heroin**

He has snorted heroin.  The first time he took it, he thought it was cocaine.  He found it stimulating.

**Prescription medications**

He has "eaten" a lot of pills, including Valium, Percocet, Clonopin, Xanax and possibly amphetamine.  He has also taken Oxycontin.

He has taken pills (square like a house with a triangle on top) without knowing what they were.  On one occasion, he took three bottles and had no recall for two days there after.  He denied any other history of blackouts or amnesia at any time.  He commented that he always washed the pills down with alcohol, partially because of the potentiating effect of the combination.

When he was using drugs, he just did not care.  Now, he cares.  He is done with it.  "It's what got me here."  "If I were sober, none of this would have happened[92]."

**Psychosis**

Donny reported that he has had visual hallucinations ("trails") only while taking hallucinogenic drugs.  He had these phenomena only with LSD and with mushrooms.  He obviously, by his report and his body language while describing them, enjoyed them. The hallucinations lasted "quite a few hours"; they did not

---

92  He used the subjunctive.

124

FELL-00000592

persist until the next day unless he took them close to midnight. He did continue taking acid for up to three to four days. The hallucinations never lasted as long as a week.

He never heard voices. He never heard running comments on his behavior. He never heard commands to do anything. His thoughts about things he observed were his own and came from no one else. He denied thought insertion and thought deprivation.

He denied any olfactory hallucinations. He denied any tactile hallucinations. Nothing has ever controlled any part of his body.

He denied any unusual experiences.

He stated that no one was plotting against him. He paused, smiled, then added "except for the government." No one is or has spied on him. No one is or had been following him. He never was concerned that the narcs were after him before his arrest. Elsewhere in the interview, he denied going to Vermont because there were warrants out for his arrest. (Author's note: He admitted that he might have had warrants related to unpaid fines, but he did not worry about that. He said he is not a worrier.)

He reported that he had been talked to him about some stolen cars because an informant said he had something to do with the thefts. He said the informant lied. The police acted in good faith on bad information. The police had been interested in him before but for good reason. The police have nothing personal against him.

## Mathematics disorder

Donny said he did have a problem with math. He has problems with diameter, fractions and the like. It has not affected his life, he said. No one else has told him his arithmetic has caused problems. He has no trouble making change and handling money. His skills in arithmetic do not interfere significantly with academic achievement or activities of daily living.

## Oppositional defiant disorder

Mr. Fell admitted all of the criteria for oppositional defiant disorder except vindictiveness. He said that when he had been treated unfairly, he merely informed people that he felt he

125

FELL-00000593

had been treated unfairly.  He admitted that he has a marked problem with temper, is touchy and easily annoyed, defies and refuses to accept directive from authority figures, blames others when his desires are not satisfied and is angry and resentful.

### Conduct disorder

He admitted to me that he bullied other children in school, that he engaged in multiple fights with students[93] in school and out, that he was cruel to and teased some people, that he abused cats on a limited number of occasions, that he vandalized or broke into property, that he stole and shoplifted with significant frequency and that he disobeyed or ignored the rules laid down for him at school and at home. He stayed out all night frequently.  Even suspension from school was unable to induce him to obey school rules; accordingly, by his report he was expelled.

He denied plausibly that he had ever fought with a teacher and that he had ever forced anyone to have sexual contacts they wished to refuse.

His counsel advised him not to answer any questions about the use of weapons in fights at any time in his life; accordingly I did not ask.

He reported that he had been arrested five times before age fifteen and twice after age eighteen.  That was amended to three times. These included the arrest in Nebraska for being in a stolen car, for stealing a car and for the arrest when he beat up the young man who assaulted his sister, Teri.  He tried to "push on" (rape) Teri.  He beat him up and pissed on him.  Donny was that man was in a coma for a day.

### Family history of psychiatric disorder

His mother, his Aunt Donna, his Uncle Willie and his grandmother, all on the maternal side of the family had / have problems with alcohol.  His father has a problem with alcohol. He does not know enough about the paternal side of his family to offer an opinion.

---

93 He said he only picked on kids his size or bigger.  He was perfectly capable of handling them in a fight.  He claimed he left smaller children alone.

126

FELL-00000594

His Aunt Jackie had a problem with alcohol when she was a kid.

His sister, Teri, has a problem with cutting herself.

His mother and father have been in jail.

He does not know about any drug problems in his family.

127

FELL-00000595

# EXHIBIT 8

**John S. Rabun, M.D.**
1034 Brentwood Blvd., Suite 1280
St. Louis, Missouri 63117

Telephone: (314) 727-8099  Facsimile (314) 727-6796

Diplomate, ABPN
with board certification in General Psychiatry
with board certification in Forensic Psychiatry
Diplomate, NBME
Licensed in Missouri and Illinois

December 31, 2002

Mr. Gregory L. Waples
Assistant United States Attorney
United States Department of Justice
United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

RE: United States vs. Donald Fell
DOB: 04/30/80

Dear Mr. Waples:

Pursuant to your request, the examiner evaluated Donald Fell to form opinions on issues related to mitigation in the instant case. Mr. Fell is a 22-year-old, single, never married, right-handed, white male, who allegedly was involved in three murders. The United States Attorney's Office has given notice that the government will seek the death penalty for Mr. Fell. Mr. Fell is presently detained at the Northwest State Correctional Facility in Vermont.

Prior to the formal interview, the examiner explained to Mr. Fell the reason for the evaluation. Mr. Fell was told that the examiner had been retained by the United States Attorney's Office to evaluate him and form opinions on whether or not any mitigating factors apply to his case. Mr. Fell was cautioned that the interview was on the record. Mr. Fell was warned that the examiner had to generate a report, which could include his statements in the interview, and this report would be distributed to his attorney, the U.S. Attorney, and the presiding judge. The examiner then asked Mr. Fell if he had any questions or needed to speak with his attorney. Mr. Fell responded that he understood the examiner's purpose in the evaluation and gave his consent to be interviewed. Throughout the interview, Mr. Fell's

FELL-00000596

Donald Fell                                                                      Page 2

attorney, Paul Volk, was present, and an investigator from the Federal Public Defender's Office. One 5-minute break occurred during the interview, and at that time, Mr. Fell conferred in private with his attorney. It is important to note that Mr. Fell's attorney did not interrupt or impede the interview. The examiner is of the opinion that the presence of the investigator and Mr. Fell's attorney in the interview did not significantly alter the evaluation process.

Before the evaluation, the examiner also discussed with Mr. Fell's attorney the scope of the interview. Mr. Fell's attorney indicated that his client would not discuss his state of mind during the charged offenses. Therefore, the examiner did not question Mr. Fell about his mental state at the time of the allegations. Accordingly, the examiner questioned Mr. Fell in detail about his personal history and then performed a mental status examination. Even though Mr. Fell was not questioned about the instant offenses, more than enough information was gathered from the interview and available records to allow the examiner to form opinions, within a reasonable degree of medical certainty, as to whether or not mitigation exists in this case.

### Sources of Information:

1. An interview with Donald Fell at the Northwest State Correctional Facility on 12/12/02. The interview began at 9:40 a.m. and was concluded at 1:10 p.m. A 5-minute break was taken between 11:40 and 11:45 a.m. The interview was not audio or videotaped.

2. The law enforcement reports regarding the charged offenses. The law enforcement reports included confessions from Mr. Fell and the co-defendant.

3. A forensic psychiatric evaluation conducted by Dr. Mark Mills.

4. A neuropsychological evaluation conducted by Dr. W.G. van Gorp.

5. An evaluation conducted by Dr. Jeffrey Lipman, a neuropharmagologist.

6. A letter written by Dr. James Hudziak concerning the instant case.

7. A psychological and neuropsychological evaluation conducted by Dr. Richard Wetzel.

8. Raw psychological data from Dr. van Gorp's evaluation of Donald Fell.

9. Several transcripts from Grand Jury testimony by S. Hardgeree, R. Pulsifer, B. Brashears, C. Kolojeski, and M. Leight.

FELL-00000597

10. Marriage certificates, birth certificates (including that of Mr. Fell), and divorce decrees from various family members related to Donald Fell.

11. Mr. Fell's pediatric medical records.

12. Mr. Fell's medical records from Pennsylvania State.

13. Mr. Fell's medical records from First Hospital Wyoming Valley.

14. Mr. Fell's medical records from Wilkes-Barre General Hospital.

15. School records regarding Donald Fell.

16. Social service records regarding Donald Fell.

17. Prior legal records regarding Donald Fell.

18. Autopsy reports regarding the three victims in the instant case.

I.   **ALLEGATIONS**:

According to the law enforcement reports, the alleged criminal acts occurred on Sunday, November 26, and Monday, November 27, 2000. The reports indicate that Mr. Fell and a co-defendant were involved in three homicides, two of the victims were killed in Vermont, and the third victim was killed in New York. The reports suggest that on November 26, Mr. Fell and a co-defendant murdered Charles Conway and Deborah Fell at Ms. Fell's home in Vermont, and then abducted Teresca King, and murdered her during the early morning hours on November 27 in New York. Subsequently, Mr. Fell and the co-defendant were arrested on November 30 in Clarksville, Arkansas, driving Teresca King's vehicle. Mr. Fell and the co-defendant were questioned by law enforcement officials and provided several statements. Mr. Fell and the co-defendant admitted that they were involved in the three homicides, though they differed at times in regards to specific facts.

Mr. Fell's confessions, and those of the co-defendant, suggest that Deborah Fell and Charles Conway were murdered during the evening on Sunday, November 26, 2000. Mr. Fell and the co-defendant described how they used marijuana, crack-cocaine, and alcohol prior to the first two murders. Both individuals related that they were intoxicated around the time of the murders. The confessions relate that an argument started involving Mr. Fell, Mr. Conway, and Ms. Fell. A short time later, Mr. Fell and the co-defendant retrieved knives from the kitchen and entered the living room, where they stabbed to death Charles Conway and Deborah Fell. Apparently, Mr. Fell stabbed to death Charles Conway, and the co-defendant stabbed to death Deborah Fell. Following the initial two

FELL-00000598

murders, Mr. Fell and the co-defendant left the scene armed with a shotgun. Mr. Fell and the co-defendant then used the shotgun to abduct Teresca King. The confessions reveal that Mr. Fell and the co-defendant returned to the first murder scene to retrieve their belongings.

After Mr. Fell and the co-defendant obtained their belongings, they and the third victim left the area using the victim's vehicle. The confessions indicate that Mr. Fell and the co-defendant drove Teresca King into the state of New York, where they stopped and ordered her to run into the woods. The confessions relate that Ms. King did not comply with the instructions, so Mr. Fell and the co-defendant chased her into the woods, where they struck the victim with several rocks. In addition, Mr. Fell allegedly kicked and stomped the third victim until she was motionless. Mr. Fell and the co-defendant returned to the third victim's vehicle and drove away from the area. Following the third homicide, Mr. Fell and the co-defendant stopped at a Burger King and purchased breakfast. Both individuals then used the third victim's vehicle to drive south and west, though they were apprehended in Clarksville, Arkansas on November 30.

Subsequently, law enforcement officials discovered the bodies of Deborah Fell and Charles Conway at Ms. Fell's residence on November 30. After obtaining several statements from Mr. Fell and the co-defendant, law enforcement officials were able to locate Teresca King's body on December 1. Ms. King's body was found not far from Route 22 in New York. Moreover, police officers recovered Ms. King's wallet near Route 22, several miles south of her body. In addition, Ms. King's purse was found at the Burger King where Mr. Fell and the co-defendant stopped for breakfast. As well, one of the employees at the Burger King identified Mr. Fell and the co-defendant. Further, authorities interviewed an individual in Wilkes-Barre, Pennsylvania, who stated that Mr. Fell and the co-defendant stayed with him on November 27 and November 28. The individual recalled that Mr. Fell and the co-defendant left on November 28, stating they were driving to California.

Autopsies were performed by the medical examiner on all three victims. Teresca King's autopsy revealed that she suffered multiple blunt force injuries to her head and neck. The autopsies of Deborah Fell and Charles Conway revealed that both individuals died from multiple stab wounds to the head, neck, and chest. In addition, both Deborah Fell and Charles Conway were intoxicated at the time of their deaths. Deborah Fell's blood alcohol was ".325%," and Charles Conway's blood alcohol was ".392%." As well, Deborah Fell's blood tested positive for amphetamines.

## II. **PERSONAL HISTORY**:

Mr. Fell's entire personal history will not be summarized in the examiner's report. The examiner directs the parties involved in the case to Dr. Wetzel's report dated 10/11/2002, which contains a thorough summary of Mr. Fell's background. The examiner will instead

FELL-00000599

focus on specific areas of Mr. Fell's life that should be considered by all parties involved in the instant matter. The following is a summary of Mr. Fell's statements to the examiner about key areas of his personal history.

Home Environment: The examiner questioned Mr. Fell in detail about his home environment and relationship with his parents. Mr. Fell told the examiner on several occasions that he did not fully recall his home environment. He indicated that he has no current relationship with his father. He informed the examiner that his father left home when he was in the "fourth grade." He said that he has learned that his father lives in Jacksonville, Florida. The examiner asked Mr. Fell if his father has shown any interest in helping him now that he is facing the death penalty. Mr. Fell replied that he has learned from other sources that his father has no interest in wanting to help him with the instant matter.

The examiner asked Mr. Fell to describe what he remembers about his father. He said that he recalls his parents "fighting" and how his father "hit" him with his fists and "kicked" him. He reported that his father was an "alcoholic" who "drank every night." He informed the examiner that his home environment was filled with daily incidents of physical abuse, to him, his sister, and mother. He indicated that his mother "kicked my father out" after a "fight." He "vaguely" remembered that his parents' relationship ended with a stabbing incident, where his mother and father stabbed each other. He recounted that he saw his mother "cut [my father's] arm" and then "I ran back into my room." He added that, to the best of his recollection, the last time he saw his father was around the time of the stabbing incident. It is important to note that Mr. Fell's first and clearest memories of his father were that his father as an "alcoholic" who daily engaged in acts of physical violence.

The examiner also questioned Mr. Fell about his mother. He again said that he did not recall "much" about his mother when he was a young child. He noted that his mother "drank a lot too." In addition, by the "seventh grade," he realized that his mother "did drugs." He recalled that he saw his mother with "cocaine and pills." He told the examiner that his mother drank "everyday" and fought with his father. The examiner asked Mr. Fell if his mother ever gave him any positive reinforcement as a child, and to the best of his recollection, he did not know of any positive statements from his mother. In addition, he could not recall any positive reinforcements from his father. In fact, he stated that he never heard either parent telling him that they loved him or hoped that he achieved certain goals in life.

The examiner asked Mr. Fell what he thought about his parents as parents. He responded, "I don't think they were very good parents." He indicated that his father was "mean" and he "didn't see too much of my mom, she was always working or drunk." He was questioned about how he would raise children, this question was posed to him to help uncover how he was raised, since children as adults often mirror the parental practices of their parents. Mr. Fell answered, "I don't even know, a lot differently, I certainly wouldn't hit them, I would raise them to be independent." The examiner then probed for Mr. Fell's thoughts about how his home environment changed him as an adult. He replied with surprisingly good insight, "it

FELL-00000600

implanted some deep psychological scars that might pop out in intoxication, if I had guidance, I had no guidance, I wouldn't be in this situation now." As well, he believed that his own abuse changed him in the following manner, "it has made me more aggressive, I have a temper, it is hard to keep it in check, and when you are intoxicated, it is almost impossible to keep my temper at a level, and with such scars (i.e. abuse) in my past, they just appear, and it makes a person more susceptible to violence."

Mr. Fell discussed his mother's behavior after his father left the family. He reported that he never received any encouragement from his mother. He indicated in general that his family life did not change, even though his father was gone. He noted that his mother had "boyfriends" at the house who also drank alcohol and used drugs. He again told the examiner that if his mother was not working, she was intoxicated. He remembered that eventually his mother lost custody of him. He recounted how he was placed at "St. Michael's" for an extended period of time and then went to live with his grandmother. He informed the examiner that prior to the charged offenses, he had not had any contact with his mother since the age of "13." Mr. Fell spontaneously said that he was placed at "St. Michael's" and eventually with his grandmother and aunt because he was "an unwanted kid." He added that he did not find any support or love from his grandmother or aunt because "they told me I was uncontrollable, they didn't want me either." He remembered that at the age of 17, his aunt "kicked me out, and I was on my own."

Interestingly, at times, Mr. Fell defended his mother during the examiner's interview. For example, the examiner questioned Mr. Fell about the conditions of his mother's home when he was a child, and he responded, "there was always food in the house, the house was clean." The examiner reminded Mr. Fell of the allegations by social service agencies that his home was unsanitary and infested with vermin, and he answered that this description of his home was not what he remembered it was like. In addition, Mr. Fell blamed himself for one of his mother's periods of incarceration. He informed the examiner that his mother was arrested and placed in jail because he was not attending school. The available evidence reviewed by the examiner suggests that his mother was arrested and incarcerated for wholly different reasons.

The examiner asked Mr. Fell if he felt love from either parent. He responded that he was unsure if his father loved him. He again noted that his father never said that he loved him or provided him with any positive reinforcement. He also stated to the examiner that he never heard his mother say that she loved him. He instead related, "I guess she acted like it," meaning his mother's actions at times suggested to him that she loved him, though he was never sure. Importantly, he was completely unable to point to any actions or statements that would indicate that he was raised in a positive, loving environment.

Childhood Behavior: The examiner questioned Mr. Fell about his behavior as a child. The examiner focused on symptoms suggestive of Attention-Deficit/Hyperactivity Disorder. Mr. Fell indicated that he could not recall problems with hyperactivity or a limited attention span as a child. He indicated that he had at times difficulty "sitting still," a problem that he

FELL-00000601

said continues to bother him as an adult. Mr. Fell's descriptions of his behavior as a young child did not support or refute a diagnosis of Attention-Deficit/Hyperactivity Disorder. In other words, Mr. Fell noted that he could not remember any specific problems with his behavior as a child in regards to hyperactivity or deficits in concentration.

The examiner then questioned Mr. Fell about his capacity to concentrate as an adult. He indicated that since he has been in jail for the charged offenses, he has read a considerable number of novels. He reported that he reads "Tom Clancey" and the "sports section" of the newspaper. He informed the examiner that he can remain seated and read for "hours" in his cell. In addition, he has attempted to read law books to educate himself about his present legal difficulties, but discussed how this particular area is difficult for him because the law has a technical language all of it's own. Importantly, he did not provide any current information to suggest that he now meets criteria for Attention-Deficit/Hyperactivity Disorder. As Dr. Wetzel pointed out in his report, Mr. Fell's medical records document a childhood history of Attention-Deficit/Hyperactivity Disorder. In fact, Mr. Fell's medical records state that he was treated with Ritalin, with some benefit.

According to Mr. Fell, his behavior changed in the "seventh grade." He stated that he was "out of control," starting in the "seventh grade." He blamed his behavior problems on "the wrong crowd." He told the examiner that he lost interest in school, was frequently truant, and engaged in illegal acts. He estimated that his truancy was significant in that he only went "two days" during the second half of the seventh grade. In addition, he informed the examiner that his first illegal act occurred at the age of "12," he was then "shoplifting." Moreover, he "stole cars," vandalized property, and was involved in numerous physical altercations. Mr. Fell discussed how he developed a "bad temper" and had difficulty controlling his anger. He reported that his "temper" was fueled by his alcohol and illicit drug use. The examiner asked Mr. Fell if he was involved in an identified gang. He responded that although he "fell into the wrong crowd," he was not in an actual gang. While discussing his misconduct as an adolescent, Mr. Fell again showed remarkable insight by commenting, "I could kick myself for my lack of education, instead of going this way, I might have gone that way," meaning that he perceived his lack of education as, in part, contributing to his present situation. As well, he was questioned about whether or not his behavior as an adolescent mirrored his father's behavior as an adult. He replied, "I have given a lot of thought to that since I have been here, I was usually a happy drunk, but on certain instances I got drunk and I reminded me of my father." He added that he thought his misconduct was in part due to, "no concrete guidance, no one to steer me on the right path," again suggesting that Mr. Fell has both significant insight into his present situation and the capacity to engage in rational self-reflection.

Mr. Fell also discussed his prior arrests as a juvenile. He reported that he was arrested for "truancy." In addition, he told the examiner about his contacts with social services as a juvenile and his placement with family members after his mother lost custody of him. The examiner inquired about Mr. Fell's behavior following his arrest for the charged offenses. According to Mr. Fell, he has not received any conduct violations during his present period of

detention. He reported that he spends most of the day reading books and trying to educate himself. In fact, he informed the examiner that he has thought about pursuing a higher degree in "physics" or "chemistry." He said that he enjoys scientific subjects and hopes to obtain further education in this area in prison. Importantly, Mr. Fell's descriptions of his behavior and pursuits in jail suggest that in a controlled environment free from alcohol and illicit substances, he does not engage in acts of violence.

Use of Alcohol and Drugs: Mr. Fell indicated that his problems with alcohol and illicit substances started in the "seventh grade." He recalled that he first used alcohol at the age of "8." He said that his father had a "beer tap" in the basement, and he would "sample" the beer when he filled his father's mug. He noted that he started using alcohol daily in the seventh grade. He estimated that he was intoxicated "everyday" from the seventh grade to adulthood if alcohol was present. He described several signs suggestive of alcohol dependence, including: tolerance; realizing that alcohol was a problem in his life, but continued use despite this knowledge; drinking more alcohol and over a longer period of time than he originally intended; giving up important social activities to use alcohol; and, spending significant time and money to obtain alcohol. He, however, did not endorse any features associated with alcohol withdrawal.

Mr. Fell discussed with the examiner the illicit substances he has used. He estimated that his use of illicit substances began between the ages of "12 and 13." He noted that he started smoking "marijuana." He reported that after he left "St. Michael's," he smoked marijuana "everyday." In addition, he has used Valium, Vicodan, amphetamines, heroin, cocaine, Phencyclidine, LSD, Psilocybin, and ecstasy. He told the examiner that his drug of choice was "LSD." He related that he could use up to "25 hits" a day of LSD, suggesting tolerance for this substance. Mr. Fell also recalled that his mother used "cocaine." He indicated that on several occasions, he has seen cocaine in his mother's purse and at times has stolen this substance from his mother for his own use.

The examiner questioned Mr. Fell about how his use of alcohol and drugs altered his temperament, or disposition. Mr. Fell reported that in general, he was "shy" if he was sober. He related that if he was intoxicated, he was disinhibited. He then reflected that he has been "sober" for the past "2 years" due to his incarceration, and feels "good about being sober." He reported that he now understands how substances affected his "judgement" in daily life. He informed the examiner that now he would avoid the use of alcohol or illicit substances after recognizing the differences in his personality sober and not sober.

Psychosexual History: Mr. Fell has never been married. He reported that he has had numerous sexual relationships. He, however, has never maintained a monogamous relationship. He estimated that his first consenting sexual experience occurred as a "teenager." The examiner questioned Mr. Fell about an incident that he reported in earlier evaluations that involved him at a young age having sexual contact with an older female. He remembered that the incident the examiner referred to happened when he was "in the fourth or fifth grade." He

stated that the incident in the "fourth or fifth grade" involved an older female and several other individuals, but he had no other clear recollection for this incident. The examiner inquired if Mr. Fell had any memory of being sexually abused. He was aware of the allegations in his social service records which indicated he was sexually abused as a young child by a babysitter. He related that he did not remember the episodes of sexual abuse, but named the babysitters who were allegedly involved, "Frank and Cookie." He then spontaneously added, "I detest child molesters," describing how children are young and naïve. The examiner also inquired if Mr. Fell was ever physically or sexually abused by his mother's boyfriends. He replied that he was never physically or sexually abused by any of his mother's boyfriends. The examiner asked Mr. Fell if he ever engaged in a sexual relationship with his mother. He answered that he never had any sexual contact with his mother. He again noted that between the ages of "13 and 20" he did not have any contact with his mother.

Medical History: Mr. Fell was questioned about physical illnesses and injuries as a child and adult. He told the examiner that he now has "back pain" that began at the age of "19" while he was working at a factory. In fact, he said to the examiner he injured "one of my lower vertebra in the thoracic-lumber region." Mr. Fell reported that he has never had surgery. He did describe several head injuries. He noted that he had a significant head injury between the ages of "12 and 13." He indicated that he was struck in the head by a "brick." He described the head injury at the age of "12 or 13" for the examiner, saying that he was "on LSD" and "saw chickadee birds in the air, and they were getting on my nerves, so I lobbed a brick up into the air, and the brick came down on my head." He recalled that he did not lose consciousness, but could not see or talk for several moments. In addition, he has "seen stars" on several occasions during physical altercations. The examiner questioned Mr. Fell about symptoms suggestive of a generalized seizure. He said that on several occasions, he has been aroused from sleep by a "shaking" feeling. He, however, did not endorse specific symptoms associated with a generalized seizure. In regards to his physical integrity as a child, Mr. Fell did not remember any serious infections or chronic physical illnesses during childhood. Mr. Fell informed the examiner that presently, he is taking Tetracycline for acne, Verapamil for "headaches," and Prozac for "anxiety attacks."

Religious Affiliation: Mr. Fell indicated that he was raised "Catholic." He recalled that as a young child, he went to "Sunday school." The examiner inquired if Mr. Fell now considers himself Catholic, and he responded, "I have been through a lot of phases, I worshiped the devil at one point, but here I go to church," and "you can consider me a Catholic now." Mr. fell reported that between the ages of "16 and 20," he "worshiped the devil." He said that satanic activities "interested me, but I don't know why." He added that he was never a "real" practitioner of Satanism. For example, he never engaged in animal sacrifices or other ritualistic activities. He did show the examiner two homemade tattoos of a satanic nature, one on his left deltoid of an inverted cross with 666, and another of a pentagram. He described his interest in Satanism as "an adolescent phase, I was never a practitioner of the sordid arts." Mr. Fell related that he never believed he could communicate with Satan or have actual supernatural powers.

FELL-00000604

Psychiatric History: Mr. Fell was questioned about his history of psychiatric symptoms and treatment. He recalled that he was first treated by a psychiatrist as a "child." He was unsure as to the reason for his initial psychiatric treatment. He stated that as a child and adolescent, he was placed on several different psychotropic medications, including Dexedrine, Tofranil, Mellaril, and Thorazine. In addition, he remembered that he was hospitalized on several occasions for psychiatric treatment. He told the examiner that he saw no reason for his psychiatric hospitalizations at that time, or even now when he reflects on those hospitalizations.

The examiner reviewed Mr. Fell's extensive psychiatric records. Mr. Fell was treated as a child for symptoms consistent with Attention-Deficit/Hyperactivity Disorder. In fact, he was described by a psychiatrist as showing signs of "distractibility" and "impulsivity" since the age of "9." For his "hyperactivity," Mr. Fell was treated with several different medications, such as Moban, Tofranil, Dexedrine, and Ritalin. The medical records suggest that Mr. Fell's behavior improved with medication treatment.

Mr. Fell was also hospitalized on several occasions for his inappropriate behavior. His first psychiatric hospitalization occurred in 1991, and he was diagnosed with Conduct Disorder. Mr. Fell was described in his first hospitalization as being aggressive and oppositional. Mr. Fell's misconduct continued as an adolescent, and this precipitated three additional psychiatric hospitalizations to the Wilkes-Barre General Hospital. Mr. Fell was again treated with psychotropic medications that helped to control his pattern of oppositional, defiant, and aggressive behavior, a pattern of behavior well documented in the medical and social service records. As well, Mr. Fell received treatment at St. Michael's School between 1994 and 1995 for what was described as an adjustment disorder. In reviewing the medical records for Mr. Fell, the examiner found no evidence to suggest that he ever suffered from an episode of major depression or a psychotic illness. The medical record does suggest that Mr. Fell's misconduct and inappropriate behavior improved on psychotropic medications, some of which are used to treat depressive and psychotic disorders. Even though his behavior responded to certain antipsychotic and antidepressant agents, the medical record reflects that his pattern of behavior flowed from Conduct Disorder and not a major depressive or psychotic disorder.

Role Models: As documented earlier in this report, Mr. Fell described a chaotic home environment with no positive role model. Mr. Fell discussed with the examiner how he witnessed his parents use excessive amounts of alcohol on a near daily basis. In addition, he noted that his mother used cocaine, a substance that he stole from her on occasion. Mr. Fell's statements about his mother's use of alcohol and illicit substances are supported by the social service records and Deborah Fell's autopsy report, which document that she had an ethanol level of ".325%" and tested positive for amphetamines. Further, Mr. Fell stated to the examiner that he was abandoned by both his parents and his grandmother and aunt, who later cared for him. Starting as a young child, he also witnessed physical altercations and excessive

arguing between his parents. Interestingly, Mr. Fell informed the examiner that he was abandoned by the school system. He related that he actually did not quit school, but was instructed to leave school at the age of 17 due to his truancy and poor academic performance.

The examiner asked Mr. Fell about any positive experiences that he might have had with his parents as a child. Mr. Fell could not remember his dad taking him on any trips or vacations. Further, he could not recollect any family vacations. Moreover, he told the examiner that he never received any affectionate hugs or kisses from his parents. As well, his parents never surprised he or his sister with gifts. He recalled that during one Christmas, he had to wrap his sister's Christmas presents because his mother was "passed out drunk." The examiner inquired about family pictures and important stages in development, and Mr. Fell recounted a vivid memory of a picture of himself as a young child. He noted that in the picture, he was wearing "giant sunglasses," and in the background was a "stuffed Pabst blue ribbon beer can." In Mr. Fell's opinion, this picture of himself as a young child summarized his family experiences and the role model his father set for him.

The examiner asked Mr. Fell why he returned to Vermont just before the charged offenses. He reported that several family members suggested that he make contact with his mother, even though he had not had any contact with his mother for 7 years. He related that he went to Vermont, hoping to find a different person. He said that he hoped to enjoy a positive relationship with his mother. He, however, found that she was "no different." He told the examiner that his mother was still drinking alcohol and using crack-cocaine. He estimated that his mother drank alcohol everyday that he was visiting with her in Vermont. As well, he described how his mother "smacked" him at a bar during a verbal disagreement. The examiner inquired as to why Mr. Fell did not leave his mother's residence in Vermont. He responded that he had decided to leave his mother just before the alleged offenses took place. According to Mr. Fell, he decided to leave his mother because, "I could not deal with it, the aggravation, every time she got drunk, she had to start a fight." He informed the examiner that on the day of the incident, his mother and the male victim were both intoxicated. He added that "everyone" was "drunk and high" at the time of the allegations.

### III. **MENTAL STATUS EXAMINATION**:

Mr. Fell was a 22-year-old, white male, who was neat and clean in appearance. He maintained good eye contact with the examiner. He did not lose his train of thought during the evaluation. For example, he answered the examiner's questions on point. He was able to recite the months of the year in reverse order. As well, he did not exhibit any hyperactivity or involuntary movements. Further, he remained calm and controlled throughout the interview, even when the examiner questioned him about emotional topics.

Mr. Fell's flow of thought was logical, sequential, and goal-directed. He did not exhibit any features of a formal thought disorder. His speech was adequately modulated in rate and tone. His affect was serious. He smiled on several occasions at the appropriate

times during the interview. Further, while discussing his home environment and parents, his eyes were wet with tears. He, however, did not lose his composure. Mr. Fell described his mood as "okay." He did not endorse any symptoms consistent with major depression, now or in the past. He noted that before the charged offenses, he was "never a sad fellow, I never dwelled on things and got down." He told the examiner that following his arrest for the alleged offenses, he had some trouble feeling "depressed." His feelings of "depression" did not involve a loss of appetite, energy, changes in sleep, suicidal ideas, or anhedonia. Rather, he discussed a fluctuating pattern to his mood, reporting that "one minute" he would be "depressed," and then the next he would be "cheered up." In fact, he told the examiner that he has never considered suicide. Despite his present situation, he continues to hope for the best. He said, "I hope I don't get the death penalty" and "I just want to live out the rest of my life in a federal prison where I can learn, I hope to get several degrees, I would like to have a kid, but there is no way of doing that." In addition, Mr. Fell did not elaborate any thoughts of hopelessness or worthlessness. Instead, he described himself in positive terms, saying, "I'm not really a bad person" and "at first, I hated myself (i.e. after the homicides), I wasn't too happy with myself, it is not the type of person I am or the type I wanted to be, I am disturbed it came down to this, I am absolutely sorry about the things that allegedly happened."

Mr. Fell's content of thought did not reveal any psychotic ideas. Mr. Fell noted that he has experienced psychotic episodes while intoxicated on illicit substances, primarily LSD. For example, while using LSD, he saw a "little invisible green guy with red skin." Moreover, he discussed how he saw "trails" while intoxicated on LSD. He, however, did not endorse any psychotic experiences or beliefs absent intoxication. Mr. Fell did not affirm any examples of delusional thinking provided by the examiner, such as thought insertion, thought broadcasting, thought control, thought withdrawal, grandiosity, or paranoia. He related that he has never received messages from the television or radio or heard "voices" talking to him or about him.

The examiner questioned Mr. Fell about symptoms consistent with mania. He did not endorse any features associated with an acute manic episode. Moreover, given his documented history of physical and sexual abuse, the examiner asked Mr. Fell about symptoms associated with Posttraumatic Stress Disorder. Mr. Fell did not affirm any examples of symptoms found in Posttraumatic Stress Disorder.

Mr. Fell did describe clear evidence of a panic disorder. Mr. Fell likened his panic attacks to "anxiety attacks." He estimated that his "anxiety attacks" started at the age of "20." He noted that following his arrest for the charged offenses, he was placed on "Prozac," which has helped his "anxiety attacks." He estimated that before he was treated with "Prozac," he experienced "one to two attacks a week." His "anxiety attacks" involve acute episodes lasting 20 to 35 minutes and involving the following: facial numbness; upper extremity numbness; shortness of breath; dizziness; feeling "disoriented;" fears of "dying;" and, the thought that he is having a "heart attack." Although he related that he

has always had difficulty with crowds, he did not associate his "anxiety attacks" with being in crowded places or leaving his home. He told the examiner that he does "feel better" if he is with friends and avoids being alone in a crowded situation.

Mr. Fell's memory was intact. The examiner found no evidence to suggest that he suffers from a cognitive disorder. Mr. Fell was alert and oriented to time, place, person, and reason for the evaluation. He remembered three words immediately and after 5 minutes of distraction. He named the current president and listed the presidents in reverse order through Reagan. He listed 7 digits forward and 5 in reverse. He serially subtracted 7 from 100 to 58 without error. He discussed at length several events in the national news. He also commented on recent sports events around the nation. As well, Mr. Fell was able to provide a personal history that was consistent with the available sources of information.

Mr. Fell's higher executive functions were intact. He pantomimed the use of a comb, a toothbrush, and waving "bye." He copied intersecting pentagons without difficulty. He repeated "no ifs, ands, or buts," after the examiner, without hesitation. He wrote a complete sentence, "The dog ran through the field." He identified several colors in the exam room. He was able to name a metal attracted to a magnet, name four different materials used in building, and how he would find his way if lost in a forest. Mr. Fell could not describe what the two proverbs, living in glasshouses, and a rolling stone, meant to him. He said that he had never heard these proverbs. He appropriately related what he should do if he found a stamped, addressed envelope on the ground, or smelled smoke in a theater.

Mr. Fell's intellectual capacity was judged to be in the average range. Mr. Fell's use of language and capacity to live independently both suggested that he is of average intellectual abilities. In fact, Mr. Fell's use of language and insight into his own past suggested that, despite his excessive substance use, he retains excellent cognitive functioning.

## IV. **DIAGNOSES**:

Axis I:          Panic Disorder Without Agoraphobia 300.01
                  Alcohol Dependence, In a Controlled Environment 303.90

Axis II:         Personality Disorder, Not Otherwise Specified (Cluster B Features)
                       301.9

Axis III:        No Diagnosis

In preparing this report, the examiner used the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, published by the American Psychiatric Association in 2000.

FELL-00000608

## V. **OPINIONS**:

After reviewing the discovery information and interviewing Mr. Fell, the examiner offers the following opinions to a reasonable degree of medical certainty:

1. Mr. Fell is not afflicted by a psychotic disorder. Mr. Fell's medical records and prior evaluations do not support a diagnosis of a primary psychosis. The examiner's interview and mental status examination did not reveal any symptoms or signs suggestive of a psychotic disorder. Moreover, Mr. Fell did not even describe odd beliefs or unusual perceptual experiences outside of periods of drug intoxication. Accordingly, the examiner cannot support a diagnosis of a primary psychotic disorder of any type in this case.

2. The examiner found no evidence to suggest that Mr. Fell is afflicted by a major depressive disorder. Mr. Fell did not endorse any features consistent with major depression. He did describe a fluctuating pattern to his mood, but not the pervasively low mood of two or more weeks associated with other symptoms found in major depression. Moreover, a review of Mr. Fell's medical records does not support a diagnosis of major depression. Mr. Fell's medical records point to a diagnosis of Conduct Disorder. Accordingly, the examiner cannot support a diagnosis of major depression of any degree in this case.

3. Mr. Fell's intellect and cognitive functions are surprisingly intact despite his extensive use of alcohol and illicit substances. Mr. Fell does not show evidence of a limited intellectual capacity or a cognitive disorder. Mr. Fell's memory and executive functions are intact. His intellectual capacity is preserved as indicated by his use of language, reasoning, and thoughtful reflection during the examiner's interview. Accordingly, the examiner cannot support a diagnosis of Delirium, Dementia, Amnesia, or Other Cognitive Disorders, as described in DSM-IV TR, in this case.

4. Mr. Fell has a documented history of sexual and physical abuse as a young child. Mr. Fell's history of sexual and physical abuse would effect his behavior as an adult. Male children who are victims of physical and sexual abuse are known in certain situations to become aggressive as adults. Accordingly, the examiner can support the finding that Mr. Fell's sexual and physical abuse are mitigating factor in this case.

5. Mr. Fell qualifies for a diagnosis of Alcohol Dependence. Moreover, Mr. Fell has used many illicit substances leading up to the charged offenses. Further, Mr. Fell told the examiner, and other evaluators, that he was

FELL-00000609

Donald Fell                                                                      Page 15

intoxicated around the time of the alleged offenses. Clearly, Mr. Fell's intoxication did contribute to his commission of the instant offenses. Accordingly, the examiner can support the opinion that Mr. Fell's substance use is a mitigating factor in this case.

6. Mr. Fell was raised in a chaotic and dysfunctional family. Mr. Fell repeatedly witnessed acts of physical violence as a child. It is also clear that Mr. Fell had no positive role models in his life. Moreover, Mr. Fell felt abandoned by his parents and other significant caregivers. Mr. Fell's lack of supervision, chaotic home environment, and poor role models, would have negatively contributed to his personality development. Accordingly, the examiner can support the opinion that Mr. Fell's home environment is a mitigating factor.

7. Mr. Fell told the examiner that he hopes to achieve several higher degrees while in prison. He reported that he is interested in "physics" and "chemistry." Clearly, Mr. Fell has the intellectual capacity to pursue his dream of achieving a higher education, as indicated by his use of language and the material that he is presently reading for pleasure. Further, Mr. Fell displayed remarkable insight into his inappropriate behavior, especially the differences in his behavior when he is sober and when he is not. As well, Mr. Fell has recently demonstrated the capacity to modulate his behavior in a controlled environment. The combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs, suggests that he will adjust positively to a prison setting. Accordingly, the examiner can support the opinion that Mr. Fell will exhibit a positive prison adjustment.

Respectfully submitted,

John S. Rabun, M.D.

Cc: Richard Wetzel, Ph.D.

JSR/cs

FELL-00000610

# EXHIBIT 9

P-25-2005 10:35 FROM:                                 TO:9P18029516540P246463P.12

# ✠ Washington University in St.Louis

## SCHOOL OF MEDICINE

Department of Psychiatry

June 27, 2005

William Darrow, Esquire
Assistant United States Attorney
District of Vermont
United States Courthouse and Federal Building
P.O. Box 570
Burlington, Vermont 05402-0570

> **Re: United States v. Donald Fell**
> Transmission by fax 1-802-951-6540
> **This is a revised, partial report**

Dear Mr. Darrow:

As you know, I was originally asked to review the reports of three experts (Drs. Mills, Van Gorp and Lipman) retained by the Federal Public Defender's Office and private counsel, to review documents relevant to the charges against Mr. Fell and to perform an examination on him in order to prepare rebuttal testimony, if clinically warranted, for the penalty phase of the this capital murder trial.

I reviewed the three reports, a large number of additional documents, including almost all of the raw test data used to evaluate Mr. Fell by the Defense's experts.

For my initial report, Mr. Fell was interviewed on two occasions, September 18 and September 19, 2002, at the Northwest State Correctional Facility in St. Albans Vermont. The interview on 9/18/02 began at about 9:45 A.M. and lasted until about 12:00 noon. He then completed the MMPI-2 finishing shortly before 1:30 P.M. He was given the cognitive examination from the Cambridge Examination for the Elderly[1] from about 9:20 A.M. until about 9:35 A.M. on 9/19/02. He then was interviewed again for about one hour, for a total of slightly more than three hours.

Prior to my examination, the intended scope of my

---

[1] The cognitive portion of an extensive mini-mental status examination.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, www.wuphysicians.org., www.wustl.edu

140

FELL-00000611

*Revised Report on Donny Fell - Fax June 27, 2005*

examination was discussed with his counsel.  I noted that the issue of Donny's dominance or submissiveness had been raised by defendant's experts.  I disclosed my opinion that to evaluate that claim properly, I would need to discuss his role and relationship to any of his associates in each prior criminal act and to explore the relationship between Mr. Fell and Bobby Lee in detail.

Prior to beginning the examination, his attorney present at that examination, Paul Volk, informed me that Mr. Fell would not discuss the events involved in the murders or his mental state at the time of the crimes.  He also indicated that no inquiry should be made about the use of knives.  His counsel also indicated that the issue of domination would not be raised at trial and that Donny, on advice of counsel, would not discuss these relationships.

All interviews and testing were conducted in the presence of his attorney, Mr. Volk, and an investigator from the federal public defender's office.  He was reminded before we began that what he said would not be kept confidential and might be disclosed in conversation, a report or in testimony in court.  I left the room once each day briefly when his counsel and Mr. Fell conferred about my questions.

Since that time, a decision was made by the defense to present mental health evidence at the penalty phase of his trial that might include references or opinions related to his mental state at the time of these crimes.  Because of that, the Honorable William Sessions, Judge of the Federal District Court, entered an order on allowing a supplementary examination of Mr. Fell by the undersigned.

After reviewing additional materials and conversations with several people, I returned to Vermont and interviewed Mr. Fell again on Monday, June 13, 2005.  The interview began approximately at 8:35 AM.  It was concluded at about 6:00 P.M.  By agreement between counsel approved by the court the court, a videotape was made of almost all of the interview.  One tape ran out very briefly, less than five minutes.  With the cooperation of Mr. Fell, we repeated the content of that brief interval to the best of our mutual memory.  A break of about one hour for lunch was taken during the interview.  Both Mr. Fell and I were provided with adequate liquids; it was extremely hot and humid,

2

FELL-00000612

*Revised Report on Donny Fell - Fax June 27, 2005*

reminiscent of St. Louis summer weather. Mr. Fell was offered as many breaks as he wished; he took none. He wished to complete this evaluation as quickly as possible. He stated this in so many words. I took one very brief break for water.

To the best of my knowledge and belief, Counsel for the defense and/or his assistant were available for consultation with Mr. Fell throughout the entire interview. Counsel for the plaintiff was also present for all or almost all of the interview; he said he went to his car on one occasion to obtain something.

I had a list of points I wished to evaluate on my laptop in the interest of completeness. I also made notes, somewhat briefer than usual, in the event of a videotaping disaster. I am currently preparing a summary of the relevant points in that interview. I will submit as soon as it is ready.

Based on these additional sources of information and this additional interview time, I have clarified, revised or supplemented my opinions as follows.

**Summary of opinions**

1.  Mr. Fell and Bobby Lee jointly committed the murder of Mrs. Teresca King after kidnaping her and car jacking her car. Prior to that, they had killed Charlie Conway and Debra Fell. Mrs. King was killed in order to eliminate a witness that might lead the police to their prior crimes and to further their escape.

    The physical evidence, the statements of the Donald Fell, Robert Lee, Lee's letters and the interviews with Mr. Fell all indicate that Mr. Fell participated in this murder and bears criminal responsibility for it.

    By his own admissions, given multiple times with somewhat inconsistent detail, Mr. Fell also admitted that he murdered Mr. Conway. He was present during the murder of his mother which took a significant period of time. It is not unreasonable to conclude that he was also culpable for the murder of his mother.

2.  Mr. Fell reported that he consumed extremely large

3

142

FELL-00000613

EP-25-2005 10:33 FROM:                    TO:9P180295516540P246463P.9

*Revised Report on Donny Fell - Fax June 27, 2005*

quantities of alcohol and drugs on the night of the murder. He reported that he had consumed large amounts of alcohol regularly while in Vermont for a considerable number of days, sufficient to cause physical addiction.

A.   In my opinion, he has exaggerated the amount of alcohol used.  While almost certainly above the legal blood alcohol level initially, he made many considered decisions after the death of his mother and Mr. Conway. This is also shown by the planful nature of the kidnaping and killing of Mrs. King.

B.   He did not develop withdrawal symptoms when suddenly forced to stop alcohol consumption by his arrest.

C.   He denied that he has ever had withdrawal symptoms.  He has claimed that he has unusual tolerance for alcohol.

3.   The available information indicates that Mr. Fell was generally the leader in his relationship with Bobby Lee. This is supported by many kinds of information.  It is plausible that Bobby started something (the killing of Donny's mother) he thought Mr. Fell wanted done without Donny's explicit consent.  It is not plausible, in my opinion, that Bobby Lee kidnaped Mrs. King or killed her without the explicit consent and active participation of Mr. Fell.

4.   If asked, I would offer the following additional opinions:

**Statutory Mitigators**

A.   Mr. Fell's  capacity to appreciate the wrongfulness of the his conduct or to conform his conduct to the requirements of law was not significantly impaired.

B.   Mr. Fell was not under duress and was either the leading or equal participant in these murders.

C.   I will offer no comments on his criminal record except as it relates to psychiatric diagnosis.

D.   Mr. Fell was not under the influence of a severe mental or emotional disturbance at the time of the crimes.

4

143

FELL-00000614

*Revised Report on Donny Fell - Fax June 27, 2005*

E.   Mrs. King did not consent to her murder or any other participation in any crime. Neither of the other two victims consented to their murders.

**Other Factors in Mitigation That I Would Support to a Degree**

A.   Mr. Fell was the victim of sexual abuse, probably repeatedly, as a young child by his baby sitters. I do not suspect anyone else.

    i.   Mr. Fell did not report any causal connection between this abuse and his participation in any of the murders, car jacking and kidnaping. I agree; I also do not see a causal connection.

    ii.   The abuse did occur and would affect his personality.

B.   Mr. Fell was the victim of repeated physical abuse as a young child.

    i.   Mr. Fell did not report any causal connection between this abuse and his participation in any of the murders, car jacking and kidnaping.

    ii.   Mr. Fell's account of his mental state this year is inconsistent with any causal connection between his history of abuse and the murder of Mrs. King. His account is also inconsistent with any causal relationship between the physical abuse and the murder of Mr. Conway.

    iii.   I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship.

    iv.   The abuse did occur and would affect his personality.

C.   Based on additional information obtained from reports and from this year's interview of Mr. Fell, I am changing my opinion to a degree.

5

144

FELL-00000615

*Revised Report on Donny Fell - Fax June 27, 2005*

     i.   Mr. Fell grew up in a home with markedly dysfunctional parents who abused each other emotionally and physically in the presence of their children.

     ii.  Mr. Fell was physically abused by his father.

     iii. His mother made multiple ineffective attempts to control Mr. Fell's behavior and guide him. He refused and she accepted this defeat perhaps too easily.

     iv.  Members of his extended family also made some attempts, also ineffective, to control his behavior.

     v.   Placement at St. Michael's shows that the state also made ineffective attempts to control his behavior.

         a.  Mr. Fell seems to sincerely believe that his family did not try to guide him. He is aware that he defied them repeatedly.

         b.  He does believe that he was abandoned by his mother at about age thirteen when she went to Vermont. He does report that he felt responsible for her abandoning him and his sister.

         c.  The failure to seize control has had long term effects on his personality.

D.  Mr. Fell began abusing alcohol and drugs at a remarkably early age. When not in custody, he has reported he used an amazing amount of intoxicating substances documented in several sources. He qualifies for the diagnoses of abuse and/or dependence on alcohol and a number of other substances.

     I.   Mr. Fell and others have reported that he drank heavily while he was in Vermont prior to the day of the first murders. He reported heavy, controlled drinking that he did not

6

145

*Revised Report on Donny Fell - Fax June 27, 2005*

allow to interfere with his work schedule.

ii.    He said that the murders in this case were caused by his intoxication alone. He "snapped" under the influence of alcohol and drugs.

iii.    While I would not dispute that it was likely that he was drinking excessive amounts of alcohol on that night, I would also state that over time he had developed considerable tolerance to alcohol. Further, his reported behavior, across his many statements, indicates that despite his drinking he was able to think cooly and make rational choices.

iv.    If asked, I would say, in my opinion with reasonable professional certainty, that neither crack nor marijuana had any effects on the events of the day.

E.    Mr. Fell began displaying the types of asocial and antisocial behaviors called conduct disorder at an early age and to a degree that is more severe than average for persons with this diagnosis. Mr. Fell meets some or all of the criteria for a number of Cluster B personality disorders, displaying antisocial, borderline, narcissistic and paranoid traits. He meets the criteria for antisocial personality disorder fully. I have no doubt about this diagnosis.

This disorder, as well as his alcohol dependence, do have a genetic and a familial basis.

F.    The history of his psychiatric care suggests that his parents consistently misrepresented the real problems in the family that needed to be dealt with if therapy were to have a reasonable chance to help him when he was a child or early teenager. Mr. Fell confirmed that his parents lied about the nature and extent of the problems in their home. He asserted that he did tell Dr. Feusner, his psychiatrist, about these problems. He asserted angrily that Dr. Feusner did not listen to

7

146

FELL-00000617

*Revised Report on Donny Fell - Fax June 27, 2005*

> him and did not care.  Dr.  Feusner just wanted to give him drugs.  Multiple other professionals failed to understand the problem that is now quite clear in retrospect.

**Other**

A.   On clinical examination, no defense expert has noted any indication of thought disorder, hallucination or delusion. No sign of psychosis was reported.  I fully agree.

B.   Mr. Fell has received a competent neuropsychological evaluation. It was concluded, correctly in my opinion, that he has no cognitive deficits detectable on neuropsychological testing.  Careful review of the test data offered and my own, very limited examination also showed no deficit.

**Proposed Matters in Mitigation That I Could Not Support**

A.   Based on the history that he gave to me and the limited documentation in his medical records, I am unable to state with reasonable professional certainty that Mr. Fell ever had hyperactivity or attention deficit disorder.  He certainly shows none of the characteristics of these disorders at present.  I would concede that most persons with these disorders outgrow them by his current age.

B.   Mr. Fell has been diagnosed with an affective disorder in the past.  His depression has been alleged to have been severe, even psychotic in degree.  Based on the history that I obtained and the review of the relevant documents, I am unable to state that he ever had a depressive syndrome.

D.   It has been alleged that Mr. Fell has showed no signs of malingering.  The conclusion is true for the neuropsychological evaluation.  There is apparent exaggeration on the MMPI-2, but not the Rorschach.

E.   It has been alleged that Mr. Fell shows signs of

8

FELL-00000618

SEP-25-2005  10:32  FROM:                          TO:9P19029516540P246463P.4

*Revised Report on Donny Fell – Fax June 27, 2005*

psychosis on testing[2].  The test data do not show psychosis; they show personality disorder.

I.   The use of projective drawings in 1993 was invalid for the conclusions reached.

ii.  The MMPI-2 does not support a diagnosis of psychosis or prepsychosis.

iii. The Rorschach does not support a diagnosis of psychosis or prepsychosis.

F.   I would strongly oppose the contention that Mr. Fell was dominated by Bobby Lee.

G.   While it seems unlikely, I might comment on future dangerousness if asked.

## Comment

Mr. Fell has been, in my opinion, a full participant in three murders and the other crimes associated with the murders. He was frequently intoxicated in the months prior to the crimes and probably was intoxicated when he murdered Charlie Conway. Voluntary intoxication is no defense to the elements of the crime in the guilt phase, but it has been accepted as statutory mitigator in the penalty phase in some jurisdictions.

When I interviewed Mr. Fell, he attributed these crimes to only two things – his state of intoxication at the time of the death of Mr. Conway and the decision of his friend, Bobby Lee, to kill Mrs. King because she could identify them and knew their names.

---

[2]    It has been alleged that Mr. Fell is prepsychotic, that is, he might become psychotic in prison.  One cannot refute that someone might become psychotic in the future.  We know that Mr. Fell is not psychotic now.  He was not at the time of the crime. We do know that he did not develop alcoholic hallucinosis or alcoholic paranoia despite consumption of unusually excessive amounts of alcohol.  We do know that he did not develop a psychosis as a result of his reported frequent, heavy and unselective use of drugs.

9

148

FELL-00000619

*Revised Report on Donny Fell - Fax June 27, 2005*

Mr. Fell said to me that killing Mrs. King was a decision Bobby made **that needed to be done**. His second response was, "I stated I didn't want to hurt the woman." When I repeated that he reported that Bobby was stoppable before, he responded that "Bobby could not make me do anything I didn't want to." He added that he didn't try to stop him.    There would be no stopping Bobby. He said that he did not know whether or not he could have stopped Bobby. He didn't try. He really does not know whether or not he could have stopped Bobby. He did not think that Bobby was out of control. Eventually, he agreed with Bobby and the murder is what happened.

In addition to these two causal factors, there is evidence for a number of other factors that may have set Mr. Fell on his life path (or failed to deter him from it), but that do not explain his murderous actions. These include the genes he inherited from his parents predisposing him to antisocial personality disorder, the undisciplined environment (which he partially created) in which he was raised as a child, his exposure to sexual and physical abuse, the failure of his family and extended family to gain effective control of his behavior and the failure of psychiatric treatment. He, of course, contributed to this failure.

Thank you for this interesting referral.

**Diagnostic impression:**

Axis I       Polysubstance abuse
             Alcohol dependence
             Marijuana dependence

Axis II      Antisocial Personality disorder with borderline and
             narcissistic features

Axis III     S/P mild concussions without residual deficits
             S/P brain contusion

Axis IV      Legal problems, Family problems, Substance abuse

Axis V       45 in 2002, 60 now

10

149

FELL-00000620

SEP-25-2005 10:32  FROM:                    TO:9P18029516540P246463P.2

*Revised Report on Donny Fell - Fax June 27, 2005*

Sincerely yours,

Richard D. Wetzel, Ph.D.
Professor of Psychiatry
Professor of Neurology and of Neurological Surgery
Washington University School of Medicine

11

150

FELL-00000621

# EXHIBIT 10



# THE FORENSIC PANEL

224 W. 30TH ST., SUITE 806  NEW YORK, NY 10001  TEL: 212.535.9286  FAX: 212.535.3259  MICHAEL WELNER, M.D., CHAIRMAN

Bill Darrow, Esq.
US Attorney
PO Box 570
Burlington, Vt. 05402-0570

United States v. Donald Fell, Jr.

July 5, 2005

Dear Mr. Darrow,

Pursuant to your request, I have completed a forensic psychiatric assessment of the above defendant. He is a 25 year old native of Pennsylvania who was convicted of the November 27, 2000 carjacking and kidnapping of Terri King with her death resulting. The incident occurred shortly after Mr. Fell's involvement in the killings of Charles Conway (a guest) and Debra Fell (his mother) in Mrs. Fell's home on 135 Robbins St. in Rutland Vt., where the defendant had been residing.

Also reportedly involved in the killings was Robert Lee, a friend of Mr. Fell's who was staying in the home as well. Both Mr. Fell and Mr. Lee were arrested within days of the three killings. Mr. Lee was found dead in his jail cell on September 20, 2001; cause of death was later ruled as sexual asphyxia.

Mr. Fell has been convicted of the subsequent carjack murder of Terri King, whom he and Robert Lee accosted near the scene of the first two killings.

In anticipation of an eventual trial, Mr. Fell was evaluated by several professionals, exploring the possibility of psychosocial, psychiatric, and forensic mitigating issues.

Mark Mills, M.D., Jonathan Lipman, Ph.D., and Wilfred van Gorp, Ph.D. submitted reports which engaged, to some degree, earlier diagnoses by mental health professionals, as well as their own diagnostic impressions and suggestions for what applied to Donald Fell on the day he was involved in the deaths of three people. Dr. Mills, in his report of May 7, 2001, characterizes Mr. Fell with a "mental impairment" and having had a "psychotic-like condition."

Dr. Lipman's narrative of Mr. Fell's self-report focuses in part on Mr. Fell's illicit substance use, contributing to Dr. Mills' impression of Mr. Fell as "the most drug abusing and chronically intoxicated individual whom I have evaluated." Dr. van Gorp and his assistant detailed their interpretations of various intelligence, cognitive and personality tests administered to Mr. Fell -- who has reported the inability to recall a number of details inquired of him -- in a report dated April 6, 2001.

BEHAVIORAL SCIENCES  •  FORENSIC SCIENCES  •  PEER REVIEWED®
WWW.FORENSICPANEL.COM   EMAIL: INFO@FORENSICPANEL.COM

FELL-00000622

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 2

Those three doctors, as well as Mark Cunningham, Ph.D., presented numerous opinions and inferences relating to Mr. Fell's personal background and family relationships, reports of sexual and physical abuse, substance abuse and intoxication, antecedents of his violence, brain damage, the availability of role models and supports, earlier life deprivation, previous agency failures, the dynamic between Mr. Fell and Mr. Lee, Mr. Fell's distinct personality qualities, and his remorse, with opinions linking their relevance to his homicidal and criminal behavior of November 27, 2000.

These doctors' reports have drawn from and been supplemented by the testimony of social service workers, family, and friends on the aforementioned issues.

Based upon Dr. Cunningham's portrayal of factors noted in scientific and non-scientific literature, he offers the impression, "These and other adverse factors impacted not only on Mr. Fell's life trajectory, but also on his value system, moral development, perception of life options and nature of choices."

The forensic psychologist also presented impressions of factors that predict Mr. Fell's likelihood of serious violence in prison. Dr. Cunningham's report of June 14, 2005 states his belief that Mr. Fell's adjustment will be positive, and points out features of Mr. Fell that he asserts are irrelevant to consideration of risk for violence in prison.

The case has been referred to me to review all of the available reports and evidence of psychiatric and psychosocial consequence, interview family, friends, and acquaintance sources to fully elucidate psychiatric and psychosocially relevant history. Then, to independently examine the scientific viability of each of the issues raised with respect to Mr. Fell's mental condition, substance use, adaptive intellectual functioning, family problems, sexual and physical abuse, violence and other behavioral problems, fantasy life and sexuality, relatedness to others such as Bobby Lee, emotional impact of the killings and their losses, and risk of violence in prison.

Given the information reviewed to date, I have been asked to address the following questions:

1) *At the time of the murders of Debra Fell, Charles Conway, and Terri King, did Donald Fell meet criteria for any diagnoses? Are there diagnoses that have been mentioned that he is not likely to have?*
2) *What other aspects of Donald Fell's development distinguish themselves? How have these features impacted his life trajectory, underlying value system, moral development, perception of life options and nature of choices?*

FELL-00000623

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 3

3) *What is the relevance of his history of alcohol and illicit drug use to the murders of Debra Fell, Charles Conway, and Terri King?*

4) *Do the murders of Debra Fell, Charles Conway, and Terri King reflect the disorganization of a major mental illness or intoxicated condition?*

5) *How is Donald Fell distinguished in his cognitive abilities or shortcomings, specifically as it relates to his actions from the time of the murders until his capture?*

6) *How spontaneous was the homicidal violence displayed?*

7) *What distinguishes the violence history of Donald Fell and how his behavioral style manifested in these murders?*

8) *Was Mr. Fell sexually abused as a child, and in what manner has he been affected by this history?*

9) *Given his parents' qualities, what evidence is there that Mr. Fell's diagnoses, behavior, and circumstances are genetically driven?*

10) *What role models have been available to Donald Fell to promote prosocial behavior, self-control, and sobriety?*

11) *How has the relationship between Donald Fell and his mother evolved, from when she was raising him to when he was living with her in Vermont, and the how had the circumstances of each changed at the time Ms. Fell was killed?*

12) *Was Donald Fell the product of a deprived childhood and adolescence?*

13) *How did the relationship between Donald Fell and Bobby Lee relate to the eventuality of three people murdered? What evidence reflects on the prime mover, and the dynamic between the two?*

14) *What evidence reflects on Mr. Fell's remorse for the crimes of November 27, 2000?*

15) *Given all of the above diagnostic and developmental information, what aspects of Mr. Fell's history represent the most demonstrated nexus to a criminally violent and homicidal outcome?*

16) *What history reflects on whether Mr. Fell will be a serious risk of violence in prison?*

## SOURCES OF INFORMATION

1) Police investigation reports, SA James Caudle
2) Initial interview transcripts, Donald Fell- Police 11/30/00 at 11:30pm
3) Interviews, Lee and Fell- Police, Dec. 1-2, 12:25a – 2:19pm
4) Autopsy Report, Robert Lee, Sep. 20, 2001.
5) Autopsy Report, Charles Thomas Conway, Dec. 1, 2000.
6) Autopsy Report, Deborah Ann Fell, Dec. 1, 2000.
7) Autopsy Report, Teresa King, May 3, 2001 date of autopsy Dec. 2, 2000.
8) Report of Mark Mills, M.D., May 7, 2001.

FELL-00000624



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 4

9) Report of Wilfred van Gorp, Ph.D., April 6, 2001.
10) Report of Neuropsychological consultation, Jonathon Lipman, Ph.D.
11) Report of James Hudzink, M.D., May 24, 2002.
12) Letter from AUSA Peter Hall to John Rabun, M.D., May 30, 2002.
13) Report of John Rabun, M.D., Dec. 31. 2002
14) Report of Richard Wetzel, Ph.D., Oct. 11. 2002.
15) F.B.I- Notes Evaluation records reviewed by Andrew Varzaly MSW, March 30, 2001.
16) F.B.I- Notes Interviews of officials at Wilkes Barre Area Vocational - Technical School.
17) F.B.I- Notes Interviews of officials at James M. Coughlin High School, March 29, 2001.
18) F.B.I- Notes Interview of officials at Plains Junior High School, April 10, 2001.
19) F.B.I- Notes Interview of officials at Daniel J. Flood Elementary School, April 10, 2001.
20) F.B.I- Notes Interview of officials at Luzerne Intermediate Unit 18, April 10, 2001
21) F.B.I- Notes Interview of officials at Wilkes – Barre Area School District, April 3, 2001
22) F.B.I- Notes Interview of officials at Children's Service Center, Wyoming Valley, April 3, 2001.
23) Criminal records of Robert Lee.
24) Interviews of employer, Humanik Construction, April 3, 2001.
25) Interviews of employer, DJ Concessions, April 3, 2001.
26) Interviews of employer, Northeast Concessions, April 12, 2001.
27) Interview of probation officer John Cookus, Luzerne County Juvenile Probation Center, April 6, 2001.
28) Interview of Lt. Dale Rinker, Wilkes Barre Police Department, April, 10, 2001.
29) Interview of Jacqueline Sharp, aunt, by F.B.I.
30) Interview of Bonnie S. Tonte, mother of Robert Lee, by James J. Glenn, April 5, 2001.
31) Interview of Terri Fell, sister of Donald Fell, April 5, 2001.
32) Interview of Donna Williams, relative of Donald Fell, April 11, 2001.
33) Autopsy and crime scene photos.
34) Court Advocate program, Wyoming Valley, records.
35) Records of Kingston Police Department investigating child abuse.
36) Report of suspected child abuse, May 22, 1985
37) Records of Assaults Proceeding, August 12, 2000.
38) Application for commitment of Donald Fell, June 13, 2000.
39) Grand Jury Testimony of Bethany Brashears, January 11, 2001
40) Records of Wyoming Valley Hospital
41) Records of Luzerne County Court
42) Investigation of Incident, Children and Youth Services, March 11, 1985

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 5

43) Update of records from Victim Resource Center, October 1985

44) Children and Youth Service recommendations, June 1990

45) Records of Pediatric Associates of Kingston, PA

46) Records of Wilkes Barre VoTech

47) Records of Luzerne Co. Day Treatment – April 30, 1994 – August 25, 1995

48) Arrest records of Deborah Fell

49) Hospital records of Donald Fell

50) Non-testimonial order, Rutland City Police

51) Interview of Alan Reynolds, boyfriend of Debra Fell, by Det. Raymond Lamoria, December 1, 2000

52) Interview of Florence Prescott, companion of Charles Conway, by Det. Raymond Lamoria, December 12, 2000

53) Interview of Carole Fraser, bartender at Spotlight Bar, by Det. Rod Pulsipher, December 8, 2000

54) Interview of Kevin Bodette, friend of Debra Fell, by Det. Raymond Lamoria, December 1&4, 2000

55) Investigative reports, Rutland City Police

56) Supplemental report of Raymond Lamoria, December 11, 2000

57) Supplemental report of Det. David Schauwecker, Jan 10, 2001

58) Pennsylvania State Police material

59) Notes of Jonathan Lippman, Ph.D.

60) Draft report of Mark Mills, M.D.

61) Belongings from apartment

62) Grand jury testimony of Lynn Roberts, January 25, 2001

63) Grand jury testimony of Bethany Brashears, January 11, 2001

64) Interview of John Kozerski, teacher, April 6, 2005

65) Discussion with Trooper Charlie Ptula, April 6, 2005

66) Interview of Lynn Roberts, April 6 & 7, 2005

67) Interview of Jeannette Banas, April 6, 2005

68) Letters of condolence for Debra Fell

69) Newspaper articles

70) Interview of Stanley Kowalski, April 6, 2005

71) Discussion with Jessie Williams, April 7, 2005

72) Discussion with Matt Cunningham April 7, 2005

73) Discussion with Janet Smith, mother of Lynn Roberts, April 7, 2005

74) Discussion with Joe Humanik, April 7, 2005

75) Discussion with Jackie Sharp, April 7, 2005

76) Discussion with Terri Fell, April 7, 2005

77) Discussion with Michael Baden, M.D. June 8, 2005

78) Interview of Janet Roberts, April 7, 2005

79) Interview of Cynthia Dazzi, Price Chopper employee, by SA Michelle Heilner, April 18, 2005

FELL-00000626



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 6

80) Interview of Nina Flory, Holiday Inn employee, by SA Michelle Heilner, April 12&18, 2005
81) Interview of Corporal Greg Phillips, Clarksville, AR PD, by SA Michelle Heilner, April 18, 2005
82) Interview of John Ketchum, Kimberton Fair mgr, by SA Michelle Heilner, April 20, 2005
83) Interview of Dora Carter, friend of Debra Fell, by SA Michelle Heilner, April 21, 2005
84) Interview of Mary Alice Waterman, Price Chopper employee, by SA Michelle Heilner, April 20, 2005
85) Interview of Vertith Oberle, Price Chopper employee, by SA Michelle Heilner, May 10, 2005
86) Interview of Kelly Calvin, Hawk Hill Mountain Inn employee, by SA Michelle Heilner, April 14, 2005
87) Interview of Terri Gates, witness, by SA Michelle Heilner, April 12, 2005
88) Interview of Patricia Hopp, Hawk Hill co-worker, by SA Michelle Heilner, April 14, 2005
89) Interview of Mike Lannon, employer, by SA Michelle Heilner, April 14-15, 2005
90) Interview of Joel Maranville, co-worker, by SA Michelle Heilner, April 15, 2005
91) Interview of Jeffrey vanBuren, acquaintance, by SA Michelle Heilner, April 14, 2005
92) Interview of Gwen West, employer, by SA Michelle Heilner, April 14, 2005
93) Interview of Shelley Wisell, co-worker, by SA Michelle Heilner, April 13, 2005
94) Grand Jury testimony of Christian Kolojeski, December 21, 2000
95) Grand Jury testimony of Michael Leight, January 4, 2001
96) Jail records
97) Dept. of corrections Incident reports
98) Medical records of John Gaudio, M.D.
99) Statement of Glynn Edgar Baker
100) Toxicology reports of Charles Conway and Debra Fell
101) Interviews of Robert Lee Sr., by SA James Glenn, May 10 & 24, 2005
102) Interview of Sandy Bowles, Debra Fell's sister, by SA James Glenn, May 18, 2005
103) Interview of Erika Balestra, employer, by SA Michelle Heilner, May 10, 2005
104) Interview of Theodore Settas, acquaintance of Don Fell, by SA James Glenn, May 9, 2005
105) Interview of Ellis Carle, former St. Michael's employee, by SA James Glenn, May 10, 2005
106) Interview of Diane Sergi, CYS employee, by SA William Mullins, May 11, 2005
107) Interview of Deanna German, CYS employee, by SA William Mullins, May 11, 2005
108) Interview of Sharon Hinchey, kindergarten teacher, by SA James Glenn, May 9, 2005
109) Letters from Robert Lee Jr. to father, from prison

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 7

110) MMPI raw data from 9/18/02

111) Interview of Gary Yale, April 7, 2005

112) Discussion with John, Sarah, Dan Ketchum, John and Dee's Fun and Games, June 22, 2005

113) Discussion with Shawn Campbell, June 22, 2005

114) Discussion with Robert Lee, Sr. June 22, 2005

115) Interview of Donald Fell, by Dr. Richard Wetzel, June 13, 2005

116) Discussion with Mark Innocenzi, July 1, 2005

117) Interview of June Kondraski, July 1, 2005

118) Interview of Carole Fraser, July 2, 2005

119) Investigation of Incident, Children and Youth Services, March 11, 1985

120) Interview of June Kondraski, by FBI SSA James Glenn, May 24, 2005

121) Interview of Christopher Fike, acquaintance, by SA Tim O'Malley and SA C Patrick Austin, June 15, 2005

122) Criminal records of Don Fell, Jenkins, PA

123) Interviews of Susan Fell Benczkowski, stepsister, by Cynthia Ayres, January 23, 2001 and June 5, 2002

124) Interview of Tim Brooks, July 2, 2005

125) Interview of Cindy Golden, neighbor, July 2, 2005

126) Interview of Leo Diamond, attorney for Robert Lee, July 2, 2005

127) Interview of Liz Jones, friend, July 2, 2005

128) Interviews of Terri Fell, sister, by Cynthia Ayres, April 25, 2001 and March 30, 2005

129) Interview of Carmen Devizia, landlord, by Cynthia Ayres, March 30, 2005

130) Interviews of Jackie Sharp, aunt, by Cynthia Ayres, January 22 & 23, 2001 and March 31, 2005

131) Interviews of Donna Williams, aunt, by Cynthia Ayres, January 22, 2001 and March 30, 2005

132) Interview of Sharon Hinchey, teacher, by Cynthia Ayres, April 1, 2005

133) Interview of Nancy Messersmith, acquaintance, by Cynthia Ayres, May 13, 2005

134) Interview of Cataldo Medico, employer, by Cynthia Ayres, May 13, 2005

135) Interview of Nancy Migatulski, friend, by Cynthia Ayres, May 18, 2005

136) Interview of Mark Migatulski, friend, by Cynthia Ayres, May 18, 2005

137) Interview of Mary Loncoski, teacher, by Cynthia Ayres, May 18, 2005

138) Vermont court documents of Debra Fell

139) Vermont court documents of Charlie Conway

140) Donald Fell corrections health records

141) Interview of Shane Lee, July 3, 2005

142) Records of Donald Fell from Victims Resource Center

143) Report of Mark Cunningham, Ph.D., June 14, 2005

144) Affidavit of Adam Barcomb, Corrections Officer, June 9, 2005

145) Report of James Aiken, June 15, 2005

FELL-00000628

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 8

146) School records
147) Interview of Donna Williams, aunt, by SA James Glenn, April 6, 2005
148) Interview of Justine Taylor, landlady, by SSA Michelle Heilner, May 19, 2005
149) Interview of Tim Brooks, acquaintance, by SSA Michelle Heilner, May 19, 2005
150) Interview of Geraldine Fell, relative, by SA Eric Pulwicz, May 13, 2005
151) Interview of Mark Balestra, acquaintance, by SSA Michelle Heilner, May 16, 2005
152) Interview of Jason Rushlow, Northwest State Correctional Facility, by SSA Michelle Heilner, May 11, 2005
153) Interview of Ronald Barclay, Correctional Officer, by SSA Michelle Heilner, May 11, 2005
154) Interview of Marianne Chiumento, police officer, by SSA Michelle Heilner, May 20, 2005
155) Interview of Mary Jo Scott, educator, by SSA Michelle Heilner, May 16, 2005
156) Interview of James Bailey, Correctional Officer, by SSA Michelle Heilner, May 11, 2005
157) Interview of Chris Purcell, Police Officer, by SSA Michelle Heilner, May 20, 2005
158) PCL-R, administered July 4, 2005
159) WRAG, administered July 4, 2005

## FORENSIC PSYCHIATRIC ASSESSMENT

*1) At the time of the murders of Debra Fell, Charles Conway, and Terri King, did Donald Fell meet criteria for any diagnoses? Are there diagnoses that have been mentioned that he is not likely to have?*

### ANTISOCIAL PERSONALITY DISORDER
### ALCOHOL DEPENDENCE

### ANTISOCIAL PERSONALITY DISORDER

This diagnosis is given when there is a history, since age 15, of a pervasive pattern of disregard for and violation of the rights of others, as indicated by <u>at least three of the following</u>:

- failure to conform to societal norms by repeatedly performing acts that are grounds for arrest;
- deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;
- impulsivity or failure to plan ahead;
- irritability and aggressiveness, as indicated by repeated fights;
- reckless disregard for the safety of others;

FELL-00000629



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 9

- consistent work and financial irresponsibility;
- lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Moreover, history must demonstrate the presence of **Conduct Disorder** prior to age 15.[1] Conduct Disorder requires a history, over at least a one year period, the presence of three of the following:[2]

- often bullies, threatens, or intimidates others
- often initiates physical fights
- has used a weapon that can cause serious physical harm to others (eg; brick, knife, gun)
- has been physically cruel to people
- has been physically cruel to animals
- has stolen while confronting a victim
- has forced someone into sexual activity
- has deliberately engaged in fore setting with the intention of causing serious damage
- has deliberately destroyed others' property other than by fire setting
- has broken into someone else's house or car
- often lies to obtain goods or favors or to avoid obligations
- has stolen items of nontrivial value without confronting a victim
- often stays out at night despite parental prohibitions, beginning before age 13
- has run away from home overnight at least twice while living in parental or parental surrogate home
- often truant from school, beginning before age 13

Conduct Disorder is also distinguished based on onset of childhood vs. adolescent, and from mild to severe, based upon the number of problems and their impact on others.

At the time of the murders of Debra Fell, Charles Conway, and Terri King, Donald Fell demonstrated evidence for the following criteria of **Antisocial Personality Disorder.**

**Failure to conform to societal norms by repeatedly performing acts that are grounds for arrest** – Donald Fell admits to have killed; at approximately the same time, Mr. Fell carjacked, kidnapped, reportedly stole items from his mothers' home, stole a

[1] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 702
[2] Ibid. p. 98-99

FELL-00000630

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 10

license plate, and defrauded WalMart (by cashing in receipts they found in parking lots for items never purchased).

His lawbreaking did not limit itself to the occasion of the instant offenses. Mr. Fell assaulted his mother, used illegal drugs, brought an unregistered shotgun with him to Vermont, acknowledges that he participated in burglary and theft, and harbored a fugitive (Bobby Lee) while there. He did not pay fines mandated in Pennsylvania for other offenses committed there. And in the years from his 18th birthday on, he admitted to having seriously assaulted someone, broke into cars and stolen cash and items, and was identified by witnesses as having kidnapped, destroyed property, committed sexual abuse, and taken part in the destruction of cats and other animals.

**Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure** – Joe Humanik, a contractor who formerly employed him, observed, "I noticed I couldn't trust him. He would get back at you when your back was turned."

In the instant case, Mr. Fell gave statements that were blatantly untrue. For example, in his first interview, he told questioners that he and Bobby Lee stole the Neon they were driving from a person they had gotten a lift from while they were hitching across country. He volunteered -- notwithstanding his history of having assaulted his mother and sister in his youth, kidnapped Bethany Brashears at gunpoint in early 2000 and, according to witness Lynn Roberts, pointed a gun at her head and pulled the trigger, placed a knife to the throat of Shannon Irish in the presence of Robert Lee Sr., openly promised to one day go on a killing spree, beginning with his mother, and finally, killed Terri King and abetted his mother's murder – that he "wouldn't hurt a woman."

The defendant also made other statements that facts prove to be clear lies, including his assertion that Debra Fell did not struggle as she was being murdered, that he did not intervene to save her because she was already dead, that he thought about turning himself in after killing Charlie Conway, and that Debbie Fell had been using crack when they had the confrontation that culminated in her murder.

While Fell and Lee were on the run from police, and low on cash, Fell – a demonstrated Satan adherent -- hoisted up a sign for help from passersby with the expressed gratitude, "God Bless." Notes from interviews with Mr. Fell shortly after his arrest note his staring straight at officers, without blinking. His self-possessed apparent certitude in stating the incredible recalls a notation in his chart from his hospitalization at age 13, in which staff noted that he "lies to the point of delusion."

After his arrest on these charges, Mr. Fell made assertions about his drug use that prompted one professional to call him "the most drug abusing and chronically

FELL-00000631

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 11

intoxicated individual whom I have evaluated." Nevertheless, his friends and family offered history, as did findings from his neuropsychological testing, of a substantially less dramatic substance use history.

Likewise, Mr. Fell represented that he was "abandoned by school," a characterization markedly dissimilar from his available school record.

As for his communication on other occasions, Lynn Roberts, his ex-girlfriend, volunteered that he was a "compulsive liar...I never knew what to believe about him."

Mr. Fell used aliases when arrested for an August 12, 2000 assault on Chris Eile near Woodstock. Likewise, he furnished Rutland police with an alias when arrested October 6, 2000. The defendant reported to Dr. Wetzel that he would use aliases on a regular basis, only one of which is for an ID over 21 that he can use for alcoholic beverages. The defendant reveals that he has obtained social security numbers and through that information, has gone to the end of obtaining birth certificates and "legitimate fake IDs," in "planning for eventualities, in case I need them."

**Impulsivity of failure to plan ahead** – Among his friends, Donald Fell was the spark for the idea of what exploits they would undertake. In other aspects of his life, Mr. Fell has been impulsive as well; his cousin and former boss, Jesse Williams, describes his picking up and abandoning work obligations to go to a rock concert in Woodstock in August 2000. His September 2000 travel to Vermont to live with his mother was also without substantial deliberation and consideration of other options.

While he long dreamed of going on a killing spree, Mr. Fell's killing began without particular warning. No evidence has yet emerged that at the beginning of the evening of November 26, 2000, Donald Fell anticipated that the evening would end with three dead before breakfast.

The defendant's history reflects no sign that he was bothered by his lack of life direction. Donald Fell went to Vermont with no goals and no committed vocational direction; he liked music, he liked Satan, he liked weapons. The defendant left Vermont planning only where he and Bobby Lee could live if homeless during the winter months in the street. This would not have been the first time Mr. Fell reports having been homeless. In recent years, he relates traveling to Nebraska with a female friend, Jerry, who was arrested along the trip. On his return, as he made his way through several Midwestern states, notes Mr. Fell, he lived as a homeless person by train tracks.

His Vermont life path paralleled his existence in Pennsylvania, in which he dropped out of school, followed no vocational path or direction to self-reliance, drifted from home

FELL-00000632

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 12

to home, and left for Vermont only when he learned of warrants for his arrest because of unpaid fines.

**Irritability and aggressiveness, as indicated by repeated fights** – Donald Fell has a long history of emotional reactivity when annoyed, whether it be throwing tantrums to challenging others to fight. Even before participating in the killing of his mother, Mr. Fell was threatening and beating his mother up to the point that she was telephoning his family in Pennsylvania, appealing to them for help; had called the police for assistance in October; and was seeking out men to accompany her home at night and to protect her should Donald attack her upon her return.

Gary Yale, another friend of Mr. Fell's characterized him as "having a short fuse – it didn't matter who you were." Even those closest to him were afraid to anger him. John Ketchum, a supervising concessionaire at Kimberton Fire Co. Fairgrounds, where Donald Fell worked for his cousin Jesse, observed Mr. Fell's reaction, in summer 2000, when Jesse set limits with Fell's repeated dress code violations. "just keep f'ing with me, I'll burn down the house trailer with you (to Jesse) in it," recalls Ketchum.

Jesse Williams told Mr. Fell that Mr. Ketchum had warned Jesse that continued trouble from Mr. Fell would result in Mr. Williams' losing access to sell at Kimberton. Shortly afterward, Mr. Williams recalls that he spied Mr. Fell walking toward Mr. Ketchum's trailer with a chainsaw. Jesse states he ran over to intervene, and Mr. Fell told him, "I'm going to kill him, I'm going to kill the f'in a-hole." Had he not interceded, recounts Mr. Williams, he believes Mr. Fell would have continued to the Ketchum trailer, chainsaw in hand.

Liz Jones, another friend of Mr. Fell, spoke of how Mr. Fell would challenge people to fight, and invite others along to watch.

**Consistent work and financial irresponsibility** - In all of Donald Fell's adult years, he lived in the homes of others. Despite having manual skills to be offered construction, roofing, and manufacturing work, he lived in the homes of Debra Fell without contributing financially – and invited his friend Bobby in as well.

Financial pressures contributed to arguments between Mr. Fell and his mother, according to her cousin, Jeanette Banas' recollections of her telephone calls. Indeed, the week before the killings, Mr. Fell performed work at Rutland Plywood and Mark Balestra's home. Even at Rutland Plywood, however, Mr. Fell did not return to work the day after Thanksgiving – although the company had given him a free turkey.

His adult life before coming to Vermont also reflected consistent irresponsibility in Donald Fell. Although Jesse Williams got him a job with his carnival, Mr. Fell wore out

FELL-00000633



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 13

his welcome, and repeated warnings, by defying the dress code and by refusing to follow the directives of his boss. Mr. Humanik experienced Mr. Fell as irresponsible – if able bodied – as well.

**Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another** – In summer 2000, according to his then-girlfriend Lynn Roberts, Mr. Fell kidnapped Bethany Brashears and held her at gunpoint for approximately 2 ½ weeks – until she escaped. Ms. Roberts observed that during the period of her confinement, he pointed a gun that Ms. Brashears mistakenly believed to be loaded at Ms. Brashears and pulled the trigger, among other things. Ms. Brashears, noticed Ms. Roberts, was clearly traumatized during the experience; Mr. Fell showed no remorse or regret over his conduct during the incident. Ms. Brashears described him as joking and laughing. Ms. Roberts adds that he later spoke to Ms. Roberts of killing and disposing of Ms. Brashears to eliminate her as a witness.

The impressions of Mr. Fell's lack of remorse for his actions is consistent with the impressions of his teachers. Whether it was threatening to stab one of his teachers, attempting to rile up his classmates, defying authority, or destroying property, recalls John Kozerski, Donald Fell would show no remorse. "He would return from suspension with a wry smile – that was it," added Mr. Kozerski.

Likewise in the instant case, Mr. Fell's response to what he had done was strikingly remorseless in behavior and expression.

**Conduct Disorder** – Prior to age 15, Mr. Fell clearly manifested a history of number of symptoms of conduct disorder. While other criteria may also have been present, viewed most favorably to the defendant, I note only those criteria for which documentation or witnessed input is clearly available, rather than implied.

<u>Bullying</u> – While smaller than others, Donald Fell still impressed a number of people as a bully. Jesse Williams, his cousin (who later employed him, recalled being bullied by him in earlier years to try a cigarette, and to rob the attic in his grandmother's house next door. "He probably bullied everybody – that was just his personality," reflects Mr. Williams. People were afraid of him, the way he talked about going on a killing spree and stuff. I didn't want to set him off."

<u>Often initiates physical fights</u> – Donald Fell would fight in the community and even in the controlled environment of the hospital – notes reflected that he would brag about the fighting afterward. His records noted multiple suspensions for fighting.

<u>Used a weapon that can cause serious physical harm to others (eg: brick, knife, gun)</u> – At age 12, Donald threw a brick at a bird; on another occasion at around the

FELL-00000634

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 14

same age, he threw a rock through the windshield of a passing motorist. On another occasion, he reportedly stabbed a female acquaintance with a fork. At age thirteen, Donald Fell shot John Gacek, a reported friend of his, in the chest, and did not show remorse after the fact when he was first admitted into the hospital. At the time of that same hospital referral, he reportedly had been threatening his mother that he would kill her while she slept at night – with a knife that he was keeping in his room.

Has been physically cruel to people – After Debra Fell separated from Donald's father Donald Sr., Ellery Wilcox moved in with the Fells. Records reflect that Donald did not experience Mr. Wilcox as mean, but on one occasion that Mr. Wilcox attempted to discipline him, Donald reported that he kicked him in a leg he had broken and was attempting to rest and heal.

Lies – Staff documented in his 1993 records, "Lies to the point of delusion."

Has been physically cruel to animals – Matthew Cunningham, a friend of Donald's witnessed his shooting off the tails of squirrels in the woods with a .22 caliber pistol. Jeanette Banas, a relative, revealed him to have cut off the tails of squirrels he had found in the woods, and amusedly told her of how they would run around in circles.

Shane Lee detailed a number of incidents he personally witnessed, although he notes that Mr. Fell would brag about things he would conjure up to do to animals he happened to catch. Shane Lee states that he witnessed Donald Fell catch a fish, stuff a "quarterstick" – a powerful firecracker – into its mouth, light the quarterstick and throw the fish back. When the fish exploded, according to Mr. Lee, Mr. Felll would express great satisfaction with himself.

While he did not actually witness other such attacks on fish, Mr. Lee reports that cats were a particular favorite target of Mr. Fell. On one occasion, he recounts, Mr. Fell led him to a clothesline, where the mutilated corpses of two cats slumped. Mr. Lee relates that Mr. Fell told him he had tied the cats' tails together, and slung them over the clothesline so that they could claw one another to death.

Other carcasses Mr. Lee reports being shown by Mr. Fell included a cat with its eyes burned out by cigarettes, cats set afire, and others that "were unrecognizable. One other cat corpse that Mr. Fell showed Shane Lee was one in which the defendant had somehow worked barbed wire up its anus. According to Shane Lee, what was left of the cat had been physically ripped up inside.

Mr. Lee indicates that "Donnie was the kind of guy that when he was bored, he'd go get a magnifying glass so he could light bugs on fire." "He thought it was funny to think of

FELL-00000635



Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 15

different ways to torture animals," recalls Shane Lee, adding that these behaviors took place when he was approximately 15 years old.

<u>Has deliberately engaged in fire setting with the intention of causing serious damage</u> – Donald Fell reportedly burned down a shed behind his house while in elementary school. In 1991, Debra Fell told mental health professionals that she was afraid of him, for fires that he had set. Other records indicate that fire trucks were called to the scene of where he had set fires.

<u>Has deliberately destroyed others' property other than by fire setting</u> - Documentation from a hospital chart in 1993 noted, "destroys house when angry." Matthew Cunningham noted this, commenting, "I saw him smash plates when he had a fight with aunt, then he would go upstairs and smash everything so she wouldn't have it." Shane Lee talked of how Donald Fell would invite the group to come with him on sprees of smashing windows and slashing tires.

<u>Has stolen items of nontrivial value without confronting a victim</u> – According to Stanley Kowlaski, a former friend of Debra Fell, she told him that Donald "liked to steal." Available records note that, at age 13, in discussions with peers, he talked of stealing. Matthew Cunningham recalls Donald Fell smashing in the window of Philadelphia Subs and grabbing as many six packs as they can. Liz Jones recounts Mr. Fell and other being banned from stores for stealing "whatever they could."

<u>Often stays out at night despite parental prohibitions, beginning before age 13</u> – Notes from January 1993 noted Debra Fell's history that Donald was staying out late. He confirms in his interview, that this happened with regularity.

<u>Has run away from home overnight at least twice while living in parental or parental surrogate home</u> – 1991 records noted the history that Donald was running away from home when his mother was attempting to, discipline him. Police records also noted Donald's history of running away. "I'd be gone a couple of days," explains Mr. Fell, adding that he would be back home before police would find him.

<u>Often truant from school, beginning before age 13</u> – According to Terri Fell, her brother's truancy began while he was enrolled at Plains Junior High. Donald Fell was truant to an exceptional degree, and he would not obey his mother's directives to go to school. Notes indicate his truancy may have contributed to his admission to St. Michael's in 1994.

Donald Fell's conduct disorder, according to records from previous evaluations, manifested itself from age 9. Given the multiplicity of his conduct disordered behavior,

FELL-00000636

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 16

and the impact of his conduct disorder on others, he met criteria for Conduct Disorder, Childhood Onset, Severe.[5]

ALCOHOL DEPENDENCE

Donald Fell's primary substance of abuse was alcohol, by all accounts of those who knew him well and spent time around him. A number of friends drank with him, and these social activities were part of a recreational lifestyle that he maintained, especially during his stay in different homes in the Wilkes–Barre area in his late teens.

Friends such as Matthew Cunningham and Bobby Lee commented on his high tolerance for alcohol. Lynn Roberts, his ex-girlfriend, observed that he would tell her that he could drink a case of beer without getting drunk. She adds that while she observed him drink alcohol on many occasions, she did not at any time experience him as drunk.

Mr. Fell continued to use alcohol despite his recognition of how it impacted the functioning of his mother and father. As a person who was referred to Al-Anon, and who participated in structured mental health care with alcohol related groups and education, he was aware of the variety of potential problems associated with alcohol. He may have experienced blackouts, but this could not be confirmed by any history of his presenting for medical attention.

Clearly, he showed more oppositional, more antisocial, and more drug seeking behavior that coincided with his heavier use of alcohol. His relative Jeanette Banas observed that when he drank, he would be silly, but would want to drink more.

Donald Fell did not demonstrate a withdrawal syndrome; there is no history of seizures, no morning shakes, and he did not require medical attention after incarceration removed him from the opportunity to ingest alcohol.

Notwithstanding claims of prodigious amounts of alcohol Mr. Fell has cumulatively consumed for years, his neuropsychological testing does not show evidence for damage from the chronic effects of alcohol abuse. There is, likewise, no evidence for any physical damage to Mr. Fell from alcohol use – be it gastritis, impotency, or hepatitis. His provided history is therefore not an accurate representation of what his body tells us.

Neither did he demonstrate any efforts to cut down his alcohol abuse. When alcohol was available to him, he drank, but he did not demonstrate a history of spending exceptional time obtaining alcohol. Lynn Roberts remembers him struggling to keep up

---

[5] Ibid, p. 99

FELL-00000637



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 17

at the carnival after having drank heavily the night before. However, employers like Jesse Williams who noted him to be drinking at night would also recall him to be working, often unaffected, the next day. "It didn't affect him with customers," recounts Mr. Williams. I would hear he was drinking after work, but he always looked the same to me."

Shawn Campbell and Jackie Sharp, with whom he lived, curtailed his alcohol use; by their account, he usually complied with their rules for him to restrict his alcohol intake – even when Shawn chose to drink alcohol. Likewise, Nancy Miggatulski, with whom he reportedly lived for approximately one year, promoted his alcohol and drug abstinence.

Mr. Fell enjoys how alcohol makes him feel. Rather than drinking more alcohol than he had intended, he likely at times did not drink as much as he would have wanted. His available history reflects little regret over his alcohol use.

Because Mr. Fell led a lifestyle of reliance upon others, he had little to forego for his alcohol abuse. Independent of his alcohol and other drug abuse, he exhibited little initiative for responsible school and work. He gave up and reduced interest in school and in compliance with structure and hierarchy at work because of his psychopathy.

Socially, Mr. Fell enjoyed sex and music; these activities, as well as his social circle, intertwined with his alcohol use. He has not demonstrated other social and recreational interests that were otherwise submerged by his alcohol use.

Given the above, Mr. Fell's diagnosis could, realistically, be **Alcohol Abuse**. The diagnosis of Alcohol Dependence is given, in this case, because of Mr. Fell's clearly compulsive pattern of alcohol use in late November 2000.

**Other Conditions Considered, But Not Present**

While some of the above symptoms may also be found in other conditions – impulsivity with Borderline Personality Disorder,[1] depressive spectrum disorders,[5] adult ADHD,[6] or Intermittent Explosive Disorder,[7] for example – Mr. Fell did not have these conditions at the time of the crimes.

Those with **Borderline Personality Disorder** may be responsible for dramatic and occasionally violent behavior.[8] Exquisitely sensitive to emotional issues of attachment

[1] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 706-710
[5] Ibid. p. 345-400
[6] Ibid. p. 85-93
[7] Ibid. p 663-667
[8] Ibid. p. 706-707

FELL-00000638

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 18

and separation, it is frantic efforts to avoid abandonment that may result in violence –
which may be self-inflicted." There is no history of Donald Fell's pathological
attachment to anyone; his emotional attachments are distinguished for his indifference
to them. He does not have Borderline Personality Disorder.

Nor was Donald Fell suffering from a depressive condition at the time be participated
in the three killings. Only hours before, Cindy Oberle recalled him enjoying a card
game. The days before, he worked, without impairment. Erika Balestra recalled his
anticipating Christmas, and eyeing a coffee table as a gift for his mother – only one day
earlier. His notes demonstrated that he was enjoying his musical interests, learning
German and Satanism, playing Dungeons and Dragons, and video games. Mr. Fell told
Ms. Balestra that he was happy to have been given the gift of a Thanksgiving turkey by
his new employer, Rutland Plywood.

Subsequent to the homicide, their was no evidence for his despairing; soon after
destroying Ms. King and discarding her belongings, Mr. Fell and Mr. Lee returned to
trawling for marijuana while returning to Wilkes-Barre, Chris Kolojeski, and the same
activities they typically enjoyed with him. Fell mused to Mr. Kolojeski, contemplating
using drugs, that he had nothing to live for; he had stated that before. Notwithstanding
that comment, Mr. Fell then undertook a number of evasive initiatives with Mr. Lee, to
keep them from being captured and to collect the monies to get as far away as possible.
Ultimately, the two were caught because of Bobby Lee's driving, not any manifestation
of hopelessness of Mr. Fell.

**Major Depression** and **Dysthymia** (minor depression) require a history of low mood
most of the day, most days, along with the persistence of other symptoms such as a
decline – from previous baseline – of initiative, energy, concentration, physical activity,
sleep, self-esteem, appetite, or desire to live. For some, symptoms may present as
excessive worry, irritability, and overeating. But there was no evidence for Donald Fell
suffering a decline in his mood accompanied by other depressive symptoms.[10]

Mr. Fell does not meet criteria for **Intermittent Explosive Disorder**. This diagnosis
describes people who become wildly destructive out of proportion to the provocation,
and demonstrate profound regret upon realizing what they have done.[11] Mr. Fell and
others describe numerous instances of his belligerence and destructiveness, as was his
handiwork on November 27, 2000. However, his violent episodes have historically
occurred in the setting of his feeling provoked, and giving people what he believes they
deserve.

---

[9] **Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR).**
Washington, DC: American Psychiatric Association, 2000, p. 707
[10] Ibid, p. 378
[11] Ibid, p. 664



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 19

In the instant offense, Mr. Fell's behavior leading up to and after the attacks was organized, coolly composed, and involved elaborate crime concealment. His attacks stopped not when a condition subsided, but when he believed his victims were finally dead. Furthermore, Mr. Fell displayed no signs remorse or sadness long after it was clear that he was calmed. He does not meet criteria for Intermittent Explosive Disorder.

Mr. Fell also presents a history of using a number of other illicit substances. On the night he participated in the killing of Charlie Conway, Debra Fell, and Terd King, Bobby Lee said that at the beginning of the night, he and Bobby Lee ingested crack cocaine residue on a pipe. No crack paraphernalia was found at the scene, however.

Furthermore, Mr. Fell reported that he used acid in a number of occasions; he did not report acid use that November 26-27, 2000 night, however. There is no evidence that he was affected in a detrimental way by either of those medicines; cocaine calmed Donald Fell down, by his account, and acid was enjoyable to him.

The only other substance that he was using during the period preceding the Vermont murders was marijuana. There is no evidence, however, that Mr. Fell failed to fulfill his responsibilities and experienced work, personal, or scholastic failures because of his marijuana use. Nor is there evidence for recurrent legal problems because of his marijuana abuse, use of marijuana in physically hazardous situations (such as a construction site). He was not known to have experienced any social or interpersonal problems as a result of his marijuana use. Therefore, while marijuana is the only drug that history reflects even remotely approaches the frequency of his use of alcohol, Mr. Fell does not meet criteria for **Marijuana Abuse.**[12]

In the late 1980's and early 1990's, when Donald Fell was school age, many children who demonstrated behavioral problems, including impulsivity, were treated for **Attention Deficit Hyperactivity Disorder (ADHD).** Donald Fell's record notes that he was calmed by the psychostimulant drug dextroamphetamine (Dexedrine). That history is consistent supports a diagnosis of ADHD.

On the other hand, there is no evidence for Donald Fell having problems of hyperactivity and inattention before age 7 – a requirement for the diagnosis.[13] Sharon Hinchey, Mr. Fell's kindergarten teacher, recalls him as a "sweet boy, so nice" who "loved school" and posed no behavioral problems as her student (1985-86 school year). Donald Fell's school records reflect no decline in his performance before age 7, and he was not referred for medical attention then, either. Because Donald Fell's

---

[12] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 199
[13] Ibid. p 92

FELL-00000640

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 20

behavioral and management became an issue for school and home at age 9 or later, he did not meet criteria for Attention Deficit Hyperactivity Disorder.

Any remaining question about whether Donald Fell had ADHD persisting into adulthood is resolved in the neuropsychological testing performed after his arrest. Attention and concentration show no impairment, and there are no soft neurological signs that associate with adult ADHD.[14]

Other treatments given Donald Fell include the major tranquilizers molindone (Moban) and thioridazine (Mellaril). Mental health staff noted thioridazine to have produced a more noticeable improvement in his symptoms (fighting and oppositional behavior); because of thioridazine's sedating qualities, that would suggest that conduct disorder was his primary problem.[15] Molindone reportedly calmed Donald Fell as well; sedating major tranquilizers will reduce agitation of any type (with the notable exception of anticholinergic delirium).[16]

When Depression was suggested as a possible diagnosis, the speed with which his anger and irritability resolved was not consistent with any antidepressant effects of dextroamphetamine – which does not effect depression treatment in days.[17]

The available history therefore supports my professional opinion that Donald Fell's most likely diagnosis in his earliest contacts with mental health professionals was Conduct Disorder.

Psychosis refers to disturbances of the following domains – reality (delusions or hallucinations), communications, cognition, emotions, and behavior.

Mr. Fell's history reflects no history of delusions - fixed, false ideas that he truly believes and organizes his life around.[18] While he has used hallucinogens and has subsequently seen things that others do not, at the time, there is no evidence that on November 26 and 27, he was seeing or hearing things that others do not see. Likewise there is no evidence for disorientation or the frank confusion of psychotic disturbances in cognition. His communication was clear enough to collaborate with Mr. Lee on an escape plan; there is no history of his psychotic communication.

[14] Fargason RE, Ford CV. (1994). Attention deficit hyperactivity disorder in adults: diagnosis, treatment, and prognosis. South Med J, 87:302-9.
[15] Stahl, SM (2000). Essential psychopharmacology: Neuroscientific basis and practical applications. Cambridge University Press: New York, p. 271
[16] Kaplan HI Sadoff BJ, Grebb JA (1991). Synopsis of Psychiatry: Behavioral Sciences Clinical Edition. 7th ed.: Williams & Wilkins, p. 946-947.
[17]
[18] Kaplan HI Sadoff BJ, Grebb JA (1991). Synopsis of Psychiatry: Behavioral Sciences Clinical Edition. 7th ed.: Williams & Wilkins, p. 305

FELL-00000641



While psychosis may manifest briefly in individuals with particular conditions such as Borderline Personality Disorder under conditions of extreme stress, there is no evidence that Mr. Fell has developed psychosis under stress – only that he becomes furious when others anger him. Not surprisingly, his psychological testing does not reflect a psychotic disorder.

Donald Fell's consistent presentation, before and during incarceration and with no medication, has reflected organized behavior for instrumental motives, no delusions, no hallucinations, organized cognition and communication.

2) *What other aspects of Donald Fell's development distinguish themselves? How have these features impacted his life trajectory, underlying value system, moral development, perception of life options and nature of choices?*

Donald Fell is the son of parents who had an erratic relationship in which both drank heavily. Physical examinations nevertheless chronicled Donald's healthy physical development. There was no evidence for malnutrition, fetal alcohol syndrome, soft neurological signs, or need for special education. The sexual abuse incidents of early 1985 represented the first remarkable setback for the family that could not be adjusted for by family resources alone.

Records indicate that Mr. and Mrs. Fell were greatly tormented that the babysitting incident involving Frank and Cookie Bublos had happened to their own Fell children. The regrets undermined the Fell's union, even though Donald Sr. and Debra had sought and received help from Victim Services. Debra stopped working at a job she maintained in order to supervise the children, rather than trust a babysitter. Donald Sr. began drinking heavily, and became increasingly withdrawn. Hostilities between the defendant's parents escalated.

The next month, in April 1985, both parents stabbed each other while heavily intoxicated. Donald and Terri witnessed the blood on the ground from their father walking around before he ultimately exited the house. He was so intoxicated at the time that he was not aware that he had a knife blade stuck in his back. EMS workers found Debra with a knife protruding from her leg. While social services attempted to sort the crisis out, the children were removed to Theresa Sharp's home.

Evaluators eventually returned Donald and Terri to their parents, noting "a great deal of love and respect between parents and children." Donald Fell gave the impression of being attached to his father. The parents impressed social service employees as extremely protective of the children.

FELL-00000642

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 22

Notwithstanding the frequent fighting between the parents, Theo Settas, a playmate of Donald Fell's until age nine, experienced Donald Fell as a normal child whom he enjoyed spending time with on the playground, who was not violent or otherwise remarkable. That paralleled the impression of his school principal, who noted that Donald posed no problems in first and second grade. Whatever was going on in the home between the parents, and with Terri, Donald did not demonstrate remarkable behavior changes before age 9.

While Donald's father was in the home, no bruises or injuries were noted by school or CYS officials. Terri Fell asserts that her father was physically abusive to her, not to Donald.

On October 29, 1990, Debra Fell asked her husband to leave after he reportedly slapped Donnie Jr. in the face. Donald Sr. agreed; he did not seek custody, and faded from their lives. No reports ever followed of any physical, verbal, or sexual abuse toward Donald from the adult men he later lived with.

In May 1991, Ms. Fell requested counseling for her children to deal with the likelihood that she and Donald Sr. would not likely reconcile. In late September 1991, Debra referred the defendant to Wyoming Valley for hospital admission. It was clear from the hospital chart that Donald Fell's mother was afraid of him by then. She reported severe, ongoing behavioral problems, that he would not accept rules in home, was aggressive and oppositional at school, hit her and was increasingly aggressive towards her.

Donald reportedly threw darts at his mother and her boyfriend, and admitted this was dangerous. While Donald did not experience Mrs. Fell's boyfriend Ellery as "mean," as he described his father, he was noted to be oppositional and defiant towards him. By that time, according to Debra Fell, Donald had been setting fires.

During that fall 1991 inpatient evaluation, staff noted, "Fairly positive perception of family, but views mother as authoritarian, non-stimulating…views father more positively." He was noted to be calmer when his mother was not around. Still, staff referred to Debra's concerns as appropriate. However, staff described Donald as "bored…little motivation to deal with problem solving in effective fashion."

Mr. Wilcox, on disability after a motorcycle accident, remained in the home as well. When Mr. Wilcox, an alcoholic who was recuperating from a badly broken leg, would reportedly attempt to set limits with Donald Fell, Donald would kick his crutches out from under him. At around age 12, Donald reportedly tattooed himself with an upside down cross bearing the inscription "666." This was the earliest sign of his embracing Satanism.

FELL-00000643



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 23

Donald's behavior was problematic enough for Debra to have referred him for hospitalization three more times between 1992 and June 1993. There were no behavioral difficulties with Terri Fell; according to Stanley Kowalski, Ms. Fell's close friend, Debra characterized her daughter as a "good kid."

By then, Debra had been living in a house adjoining her sister, Jackie Sharp, and her mother, Theresa Sharp. Ms. Sharp had been trained as a foster parent and had taken a foster child, Ronnie Ebert, into the home.

According to Theresa Sharp, at least as early as 1991, Mrs. Fell's home was exceptionally dirty and neglected. Donald's hygiene was neglected as well, and he was found to have head lice. In the 1991 evaluation at Wyoming Valley however, psychological testing revealed strong self-confidence – a 93rd %ile, in fact, on the Pierce-Harris test.

There was no accusation or consideration that Debra Fell was physically abusive to Donald Fell before of during that time. However, Donald Fell was reported to have been pulling out his mother's hair, hitting her with a curtain rod, and threatening to stab her. The situation only worsened; however, in early 1993, records noted a long history of Donald beating his mother, resisting rules and curfew, and of Ms. Fell was expressing unwillingness to sleep at night for fear her 13-year old would kill her.

After she admitted him, hospital staff experienced Debra Fell as involved; she came to family meetings, supported his treatment, visited regularly, expressed concern for minor problems such as the warts on his hand, and delivered gifts to him on the unit.

Debra Fell remained willing to take Donald Fell back into the house even given the history of his threatening to kill her or shoot her, even though he had beaten her up in the past, even though he had shot a friend of his, and had threatened to shoot her as well. He was discharged to her custody.

While Donald expressed a strong preference to stay with his mother rather than institution, he would not listen to her and very hostile toward her. Donald remained truant, among other behaviors.

On Christmas Day 1993, according to Jackie Sharp, Debra left home telling her children she was going shopping, and did not return. Jackie and Theresa took Donald and Terri next door. Debra returned in January 1994, but on January 19, 1994 police came to the house when a drunk Debra Fell split the lip of her daughter Terri. The children moved next door once again; subsequently, Theresa and Jackie were unwilling to return the children; Theresa fought for and eventually gained custody.

FELL-00000644

Re: **Donald Fell**
*Michael Welner, M.D.*
July 5, 2005

Page 24

In the years after taking custody of Donald and Debra, Jackie prevented her contact with Donald, according to Jeanette Banas, Furthermore, "She would belittle Donnie's mother to him. Jackie would pound into Terri and Donnie's head that mother was no good, that she doesn't care about him," remembers Shawn Campbell, Ms. Sharp's ex-live in boyfriend. Jackie would remind Donald that his mother "called him a bastard and a good for nothing," recounts Mr. Campbell.

Others described Donald Fell as close with his grandmother. His truancy and uncontrollable behavior continued, however. And in April 1994, Donald was committed to the St. Michael's reformatory.

The defendant later told his girlfriend Lynn Roberts that he experienced St. Michael's as "like a jail," and blamed and specifically blamed and resented Jackie for placing him there.

Mr. Fell remained in St. Michael's until well into 1995. Theresa died in December 1994, Debra expressed an interest in regaining custody of her children, but she did not comply with her community service, and so Donald was released to Jackie's custody. Debra reportedly had not visited Donald while he in St. Michael's; while she scheduled a meeting with New York social services in June 1995 to discuss her future plans, she did not appear.

After returning to Jackie Sharp's home, Donald Fell remained there for 2-3 years. According to Shawn Campbell, Jackie "Made him and his sister her slave for chores. When he worked, she would take all of his money. She chased him with knives, chased me with knives." When Mr. Fell broke her rules, according to Mr. Campbell, Jackie grounded him, for as long as weeks."

Ms. Sharp, however, had equal opportunity outbursts, according to Mr. Campbell, who asserts that the same Ms. Sharp threw a headboard at him, and once set his clothes on fire. When it came to Donald, according to Mr. Campbell, "we got along fine...I just kept him away from her."

Recalls Mr. Campbell, "Donnie played video games and worked on cars with me...and we bonded over music." Mr. Campbell adds, "I wasn't allowed by Jackie to drink around him – and I told him all the time not to smoke pot." Mr. Campbell and Jackie allowed Donald to drink "rarely."

Eventually, Mr. Campbell left the home. Sometime after his 17th birthday, Jackie asked Donald to leave as well. Mr. Fell reflected to Dr. Wetzel that this was the second most wonderful thing that had ever happened to him.

FELL-00000645



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page: 25

After living with other friends and leaving because he was not contributing to rent financially, or getting repeatedly evicted for antisocial behavior (such as from Robert Lee's father's home), Donald Fell lived on the road as a carnival employee and then, returned to different relatives in 2000.

He moved in for approximately one month and stayed with his aunt Donna Williams, before she asked him to leave. The defendant then went to great aunt Stella and Jeanette Banas' home. He was there when his mother, who would keep in touch with Jeanette, learned he was living there. Debra Fell asked to speak to him, and soon afterward, invited him to Vermont; he accepted. Dr. Mills noted in his report, "he and mother had come to some resolution about her abandoning him and his sister."

Repeated reference has been made to Debra abandoning her children. That she did. But even before leaving the state, if she were incarcerated for his truancy or for not paying other fines, she could not have been mothering her children from jail, and was inevitably going to be removed from them.

Before she relinquished custody in 1993-94, when Debra Fell found Donald Fell uncontrollable, and she referred him for hospital admissions that staff deemed appropriate. Theresa Sharp, held in high regard by Donald, could not inspire him to attend school or work with their home rules either. Jackie Sharp, who dealt with Mr. Fell's defiance by committing him to St. Michael's group home for over a year until mid-1995, arguably discarded Donald Fell even more meaningfully than did Debra.

At no time did Jackie Sharp engage Donald Fell to explore his role in driving Debra Fell from Pennsylvania. Ms. Fell was accountable for his truancy; and may have been fined and jailed, and he continued truant and unwilling to respond to her limit-setting. She did not leave the home, she left the state altogether.

While ample documentation notes that Debra Fell feared young Donald would kill her, little acknowledgment of that was made after she left for Vermont – although Terri Fell, Jeanette, and Stella all acknowledged they wondered about Donald's potential threat to Debra even before he traveled to re-unite with her.

Poor parental relationships in his first decade, along with neglect, contributed to his defiance of authority, and general oppositional demeanor.[19] The history demonstrates that Donald Fell, while posing some management problems, was not a particularly dangerous person in his first decade. Notwithstanding his parents' alcoholism and their

---

[19] Webster-Stratton, Carolyn, et al. (2004). Treating Children With Early-Onset Conduct Problems: Intervention Outcomes for Parent, Child and Teacher Training. Journal of Clinical Child and Adolescent Psychology. 33:1, 105-124.

FELL-00000646

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 26

marital collapse, a closer look at his chronological history demonstrates he had greater difficulty after the disintegration of his nuclear family unit.

Debra Fell was an alcoholic who neglected adequate care for her son Donald Fell at a time when his conduct disorder and own emerging alcoholism raised particularly special needs that a perfect parent would have enormous difficulty controlling and remedying. After all, hospital care did little to reverse what staff experienced as "criminal" attitudes visible in his relatedness to others. Debra Fell did, nevertheless, maintain a loving openness and interest in him, at times more visible than others.

Donald Fell emerged in his teens as a stimulation-seeking, drug-seeking hedonist who did not take to limit setting. While his unpleasant family experiences contributed to his alienation, there were many in his life who offered him love and nurturance. He gleaned positive traits such as charm and sophistication about a range of topics, and retained his callus alienation.

By early teens, Mr. Fell was insisting on making the rules of his life, and surrounded himself with others who would feed his hedonist life choices. As he said, "we were living like rock stars before we were rock stars." Moral development has not occupied Donald Fell's consideration, especially as he has demonstrated fascination with destruction. All of the constructive examples, programs, and models brought to him could not divert him from his taste for violent adventure. And, valuing only his concrete needs, Donald Fell did not seek to being integrated into society.

Mr. Fell observed of himself that he was "never a sad fellow, I never dwelled on things and got down. Given how meeting his immediate gratification was so important to him, the notion of life options, for Donald Fell, was strictly a matter of living in the moment. The nature of his choices related closely to his getting his perceived needs met as immediately as possible.

**Psychopathy** - Psychopathy is a construct that differs in criteria from antisocial personality disorder, although some of the criteria of psychopathy – specifically pathological lying, impulsivity, lack of remorse, poor behavioral controls, lack of realistic long-term goals, impulsivity, irresponsibility, lack of remorse, criminal versatility, juvenile delinquency, and early behavior problems [20] – are found in antisocial personalities, and although antisocial personality has, in the past, been sometimes referred to as psychopathy.[21]

---

[20] Hare, RD. (2003). Hare Psychopathy Checklist-Revised (PCL-R) technical manual. Multi-health Systems: Toronto, p. 35-46

[21] Diagnostic and Statistical Manual of Mental Disorders IV Text-Revision (DSM IV-TR). Washington, DC: American Psychiatric Association, 2000, p. 702

FELL-00000647



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 27

The PCL-R is a twenty item inventory is a twenty-item scale for the assessment of psychopathy in clinical and forensic settings.[22] The standard administration of the PCL-R involves the collection of history from interview in combination with collateral history. In certain instances, if interview is impossible, research has demonstrated that a valid PCL-R can be administered if the collateral information is of sufficiently high quality.[23] For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Mr. Fell.

In addition to those features noted in antisocial personality disorder, Mr. Fell met criteria for the following qualities:

Grandiose – Most vividly, Donald Fell's grandiosity manifested in his promises to go on a spree killing, that he would not be taken alive. In his grievances from jail, Mr. Fell dictates to corrections staff about laws and procedures, despite being unfamiliar with same.

Two of his relatives, Jesse Williams and Terri Fell, used the characterization "cocky" to depict the defendant's personality – as did observations from two hospitalizations. The latter notation, chronicled June 25, 1993 (just before his discharge after many days in the care of professionals), observed Donald Fell to be "cocky and has a wise guy attitude." Patrick Tosh, a teacher in the Head Start program acquainted with Mr. Fell in 1995-96, noted him to challenge even people who were bigger and stronger than him.

Even after intervention from St. Michael, Catholic Services, and Head Start agencies, James Murphy of the Coughlin High School observed Mr. Fell to be "a gangster wannabe" with a "cocky manner that intimidated other students." Joseph Humanik, a later employer, described Mr. Fell's attempts to intimidate him in order to immediately receive his paycheck. "He was cocky and mouthy," recalls the contractor. "If he didn't want to do something, he wouldn't do it.

Williams, as did Mr. Fell's carnival employer John Ketchum, remember Fell for defying a simple dress code for the carnival. Dan Ketchum, Mr. Ketchum's son and a manager with their concession business, recalls Mr. Fell bragging about torturing a cat. Shane Lee likewise recalled Mr. Fell bragging about the different things he would do to cats and other animals, with great pride. Lynn Roberts, the defendant's ex-girlfriend, spoke of how they considered stealing her mother's truck and traveling out of state; she recalls Donald Fell suggesting how they should change license plates when they move from

---

[22] Hare, RD. (2003). Hare Psychopathy Checklist-Revised (PCL-R) technical manual. Multi-health Systems: Toronto, p. 1
[23] Ibid, p.19

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 28

state to state, bragging about how smart he was at beating the system, and would say, "they'll never catch me because I'm too smart."

**Stimulation seeking** – Even from his early teens, when he reportedly chased police officers with a hot poker, Donald Fell has displayed a propensity for risk-taking behavior. Risk taking behavior reflected in Mr. Fell's criminal exploits as well – from his throwing pebbles at patrons of a gay bar, to his throwing rocks from an overpass though the windshield of a car below.

His April 2005 confrontation with six corrections officers in NWCF echoed history from his friends of a willingness to challenge even formidable opponents to fight him. The defendant's drug use has been experimental enough that he once took a number of pills without even knowing what they were – and suffered the consequences of prolonged sleep afterward.

Mr. Fell's work history reflected only short-term employment before voluntarily leaving; in the case of Rutland Plywood, Medico Industries, and Humanik Construction, he gave no warning. The latter employer recalled Mr. Fell openly refusing to do tasks he did not wish to do.

A similar disinterest reflects in Mr. Fell's school records, where he did not demonstrate sustained interest, and reportedly dropped out as soon as he legally could, the occasion of his 17th birthday.

**Glibness/Superficial Charm** –Admiring his slick manner, his friend Matthew Cunningham notes, "He could sell a TV to a blind man if he wanted to."

Bobby Lee wrote of admiring this quality as well. In his videotaped interview with Dr. Wetzel, Mr. Fell relates with an easy smoothness, voluble and verbally facile. His expression is self-serving, but he does not mind the improbability of his comments. For example, he endeavors to inform the examiner that he "gently" pulled Terri King into the car when she tried to escape, and that he "prodded her" along as he led her to her death, crediting himself for not having dragged her.

Mr. Fell is always ready with a quick comeback He was asked what the saddest three things that ever happened to him were. When the examiner then noted that Mr. Fell did not mention Bobby Lee or his mother's passing, he replied, "well, if you made the list longer…"At the same time, Mr. Fell notes that he knows nothing about the funeral arrangements or services after his mother's death.

**Manipulative** – Both Donald Fell and Bobby Lee acknowledge that the killing spree began with Donald Fell killing Charlie Conway. Bobby Lee later wrote that following

FELL-00000649



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 29

this killing, Fell turned to him and said, of his mother Debra, "kill her come on you have to I killed him." Bobby Lee had no reported conflict with Debra Fell – so for someone who had told his friends he wanted to kill his mother, this eventuality evokes Dr. Mills' interpretations that Mr. Fell, "may use other people for his own gratification with little concern for their needs."

As Robert Lee Jr. noted about Fell, "there is something he has that can control people." Likening Donald Fell to a co-worker in Florida, he added, "There was something about him that he can play with the mind of others very confident about his words he would have a baby reaching into his diaper for a twenty."

Lee's observations paralleled the impressions of mental health professionals from hospital referrals in his early teens, who noted how Donald Fell would attempt to get his needs met from throwing tantrums.

Mr. Fell "played me like a fiddle," relates Robert Lee Sr., recalling Donnie Fell's politeness when he needed a place to stay. Mr. Lee asserts he never experienced anything unusual about Donald Fell until the day he saw him holding a knife to Shannon Irish's throat – and then came to experience a more hostile and menacing side of Mr. Fell when Mr. Lee Sr. came to her aid.

According to the testimony of his sister Terri King, Don Fell would steal money daily from the carnival concessions business run by his cousin Jesse – who had hired him to a job that Mr. Fell needed.

Discussing his use of aliases, Mr. Fell revealed he used the name Ecix Vellum, purposely choosing it since it was so peculiar that police would never doubt it was real.

For a time, added Mr. Fell, he went by the name Joseph at the carnival, thinking that if he impregnated someone while he was working, to be later confronted by a relative looking for the father, he could reply that he was Donald Fell, and that if they were looking for Joseph, they had the wrong man.

Now in custody, according to corrections official Jason Rushlow, Mr. Fell – who tells the mental health examiner that he is now "a Christian" -- has assembled a pornography collection that he lends to others in exchange for canteen items. He signed himself up to observe Ramadan, in order to avail himself of the food offerings, although Mr. Fell acknowledges that he does not practice any other rituals of Islam.

**Shallow Affect** – Donald Fell's indifference toward his attachments manifests vividly in how abruptly they dissolve. He participated in his mother's death one day after speaking of buying her a coffee table for Christmas. Only hours after her killing, he was back to

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 30

smoking pot and playing cards. The same indifference presents in the recordings of his confessions in the instant cases.

Describing himself as "not a worrier," Mr. Fell's social imperturbability is frequently described in psychopaths. Ron Musto, a teacher at his intermediate school, described Mr. Fell as a "cold" personality.

A review of history reveals Mr. Fell to have had many personal encounters, through social gatherings at places like The Hangar in Wilkes-Barre, musical heavy metal concerts shared, and jobs such as carnival work in 2000 through which he met many girls. Very few of these relationships, however, achieved any personal intensity. "He really did love Terri (his sister), and that was it," commented Lynn Roberts, who has been characterized as the defendant's closest girlfriend.

In his videotaped interview, Mr. Fell discussed emotionally significant topics with very little depth of expression. After describing the specifics of the crime, he soon afterward was able to joke in lighthearted conversation.

**Callous/ Lack of empathy** – Mr. Fell watched as his mother was killed, even as she implored to him, "I love you Binker." According to Mr. Lee, who admitted to stabbing Mrs. Fell, Mr. Fell joined him in kicking his mother when she was dead, to ensure that she was deceased. These examples of callous behavior manifested on other occasions even earlier in Donald Fell's life.

According to Jesse Williams, Donald Fell persuaded him to join him in breaking into his own grandmother's attic, where they stole an antique violin of great value to Jackie Sharp, his aunt. Jackie later learned, she reported in our interview, that he pawned it. On another occasion, he shot a prized dog who had been living in the Sharp household; then, he laughed about it in when volunteering that he had done so to his employer, as contractor John Humanik drove him to work.

Mr. Fell told of how, shortly before he left Pennsylvania, he had been caught, virtually red-handed, stealing a car. The victim came with police to his home – only to identify Anthony Tonte – whom Mr. Fell says was not involved - as the guilty party. Mr. Fell relates that he spoke to the victim, who was waiting while police processed the situation, in a conventional, easy discussion; all the while, he was accepting of the notion that he was allowing Mr. Tonte to be fingered for a crime that Mr. Fell had actually attempted to commit.

During his time in Debra Fell's Vermont household, Mr. Fell demonstrated numerous examples of what Robert Lee Sr., Lynn Roberts, experienced as "he didn't care about nobody, or nothing." When his mother was on the phone, according to her friend Jeff

FELL-00000651

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 31

van Buren, he would play his music louder. Mrs. Fell slept on the couch while Donnie took her bedroom. When he visited Wilkes-Barre friend Chris Kolojeski's house before traveling to Vermont, he was so insistent on listening to his own music that the two came to blows. Cindy Oberle, an acquaintance of Ms. Fell's recalls him disrespectfully swearing at his mother and calling her names in front of Ms. Oberle as early as the very first time Ms. Oberle had met him. In a November confrontation, he spat at his mother.

**Parasitic Lifestyle** – Debra Fell cooked, cleaned, and worked two jobs to pay to support Donald Fell – and his friend. Yet writings from her home demonstrated him to be a person of initiative, studying German, using the computer, writing and learning his music, and with artistic and writing talents. It took Debra Fell engaging friends of hers and a former employer to find work for Donald Fell before he set out to bring some financial support into the home.

In his previous family stops – with Stella Banas and Donna Williams – there is no evidence that he assumed any financial contribution to the home. According to Liz Jones, this accounted for his being asked to move.

**Promiscuous Sexual Behavior** – Mr. Fell and notes a history of many sex partners, and from a relatively early age. He provided a history of "hundreds" of sexual contacts, with particular frequency when he was working for Jesse Williams at the carnivals. Mr. Fell told one interviewer that he was having sex regularly by age 11.

His ex-girlfriend, Lynn Roberts, also confirmed Donald Fell's significantly active sex life, recalling that he wanted to have sex 3-4 times a day. She asserts that he would force her to have sex even when she was not interested, by manipulating her fears about his infidelity.

**Failure to accept responsibility for his actions** – Be it in the Head Start program of his late teens, or hospital records, or later in Vermont with Debra Fell, Donald Fell showed no accountability for infractions large and small. He spurned detention for breaking rules to the point that he was suspended. In his opinion, however, he was "abandoned by the school system."

Even in the instant case, Mr. Fell has only accepted responsibility to the extent that his role can be demonstrated by evidence or his own previous admissions. His assertions portray a person who would deflect the responsibility for the three murders onto Bobby Lee whenever he can manage that impression. Recollection of events, Donald Fell now suggests that Bobby Lee slammed a rock down on Terri King's face as he "looked away," as if he could not bear to watch. When questioned about how he had DNA on his boot, he replied, "We must have stepped in some weird dirt."

FELL-00000652

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 32

Such a sense of responsibility is embodied in his statement to Dr. Rabun, "I am absolutely sorry about the things that allegedly happened."

Donald Fell scores a 38 on the PCL-R, with one item omitted as not relevant to him – many short term marital relationships. In addition to the above qualities, he meets the definition criteria for **Juvenile Delinquency**, and **Revocation of Conditional Release**. Mr. Fell ranks in the 100th percentile for both Factor One and Factor Two, and in his total prorated score of psychopathy.

As a psychopath, Mr. Fell's life trajectory, nature of choices, moral development, values, and perception of life options are all substantially affected, and in a far more direct manner than the aforementioned aspects of his development. While psychopathy may be caused by a variety of developmental factors, that question has not yet been resolved.[24] There is no way of knowing to what degree Mr. Fell's life circumstance contributed to his development of psychopathy – only that psychopathy has a direct devastating impact on the lives of those around him – such as his mother, Bobby Lee, Jacky Sharp, Lynn Roberts, Bethany Brashears, Charlie Conway, Terri King, Chris Eile, and others known only to Mr. Fell's aliases.

Beyond psychopathy, Mr. Fell's moral development and life choices also reflect his having been told – and communicated his belief – that he could kill someone and get away with it. While his Aunt Jacky reminded him that hs previous psychiatric treatment would make that possible, he later bragged to people like Lynn Roberts that he had the destiny of a serial killer and the intellect that he would not be caught. Before then, his life experience of kidnapping, thefts, intimidation, assaults with weapons and other offenses passed without accountability to him. Even when he was arrested, as he was for a Woodstock assault in 2000, he gave an alias, a convincing story blaming the victim, and was released to brag once more of his achievement.

> 3)  *What is the relevance of his history of alcohol and illicit drug use to the murders of Debra Fell, Charles Conway, and Terri King?*

### Alcohol

Clearly, Donald Fell ingested a considerable quantity of alcohol the night of November 26-27. That was not unusual for him, noted Chris Kolojeski, the friend Mr. Fell visited after the murders. And friends knew him to be able to drink a large quantity of alcohol without showing its effects. "I've seen him put a case of beer away with no problem, put the case down on the table and walk out like he was stone cold sober," noted Mr. Cunningham. "We would drink anybody under the table and be able to laugh about it and drink more," wrote Bobby Lee.

---

[24] Ibid, p. 7



Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 33

"He didn't need to drink to get himself up to do a crazy stunt. He was up for anything," remembers Matthew Cunningham. "He was the same when he was sober," noted Cunningham, who added that Mr. Fell spoke about his homicidal fantasies when he was sober as well. Records documented Mr. Fell's menacing and fighting even when he had nothing to drink.

Mr. Kolojeski commented that when Mr. Fell drank, he would "feel he had to prove something," that "you don't mess with him." He recalled a 2000 confrontation over music playing in his apartment that Mr. Fell escalated into something physical. The killing on November 27, however, began with Mr. Fell attacking Charlie Conway – whose post-mortem blood alcohol concentration was .392 % and a urine alcohol concentration was .439% – and who was so intoxicated that he endured the entire knife assault on him without even the level of physical capacity to leave his chair. Indeed, Bobby Lee noted in his statement that he and Donald Lee were preventing him from leaving the scene, and were <u>plying</u> him with alcohol to keep him inebriated before he was killed.

Mr. Cunningham recounted that when Mr. Fell was truly affected by alcohol, he would have difficulty walking without staggering. Subsequent to the instant offense, Donald Fell and Bobby Lee moved around the neighborhood, ambushed Terri King, and then drove away, to kill Ms. King a few hours later. There is no history or indication of Donald Fell being ataxic or uncoordinated. The two seized upon Terri King, and did not even fall when she struggled briefly. The Neon did not attract attention for erratic driving; and when they killed Terri King a few hours later, it was Terri King who fell down in the wooded area in which they were chasing her down – not Mr. Fell.

The timing of the King murder is additionally significant because neither Fell nor Lee suggests they were drinking after they took control of Terri King and her automobile. By the time they killed her, therefore, the alcohol they ingested earlier in the evening would have been considerably metabolized. If Donald Fell had a particularly significant amount to drink, they would have been confronted with the sedating effects of alcohol metabolism by then.[25] But Donald Fell neither rested after the murders of Charlie Conway and his mother, nor after carjacking Terri King, and not even after they killed her.

Mr. Cunningham was one of a considerable number of friends who would drink with Donald Fell and Bobby Lee at a local abandoned building they dubbed The Hangar, and other places they hung out. A number of the group suffered tragic fate; two reportedly died of overdose, one was the victim of hit-and-run, and others have been jailed on

---

[25] Mark T. Fillmore & Jessica Weafer (2004). Alcohol impairment of behavior in men and women, *Addiction*. 99, 1237–1246.

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 34

drug related charges. None else, according to Liz Jones, have been incarcerated for violent crime, however.

Although Donald Fell had a longstanding history of heavy alcohol consumption since his early teens, there is no evidence of meaningful effects on his neuropsychological functioning, such that he might have been particularly impaired by any effects of brain damage from that alcohol use.

Cocaine

Any ingestion of cocaine by Donald Fell, in my professional opinion, had no relevant impact on his decisions and participation in the killing of Charles Conway, Debra Fell, and Terri King.

There is no evidence or testimony that Mr. Fell and Mr. Lee ingested any cocaine around the time of the crime. No cocaine paraphernalia was found at the scene, nor in the carjacked Neon when later recovered. The Neon was not cleansed, either; police found marijuana when they unexpectedly stopped Mr. Fell and Mr. Lee.

According to Mr. Fell, the killing took place in the hour between 2 and 3 AM. Several hours earlier, Cindy Oberle saw Donald Fell, Bobby Lee, Charles Conway, and Debra Fell playing cards good-naturedly.

If, however, Mr. Lee's statement is accurate about his and Donald Fell's having ingested crack cocaine before Charlie Conway and Debra Fell arrived at her home, any crack would have been already metabolized in the hours before the killing took place.[26] If cocaine was influencing Mr. Fell's behavior that night, it would have done so after he ingested it, he would have been more hostile at the table earlier that evening when Cindy Oberle came calling.

The time course does not support cocaine being in a position, metabolically, to influence Donald Fell's actions when the killing began. Furthermore, Mr. Fell has asserted that cocaine calms him down, behaviors inconsistent with the events of the murders.

Other Drugs

Notwithstanding the variety of drugs Donald Fell states that he has ingested, there is no evidence or history of his using amphetamines, LSD, heroin, or marijuana in the period

---

[26] Encyclopedia of Forensic Sciences, Vol. 3 (2000), Academic Press, p. 1241

FELL-00000655



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 35

preceding the instant offense. He has no history of withdrawal syndromes when he has not had access to these drugs.

Furthermore, there is no history that when intoxicated with LSD (or its analogs) or marijuana, he is violent. Mr. Fell has described acid as calming and enjoyable, not an agent that moves him to irritability or to homicidal fantasy. No account of this crime suggests that Mr. Fell was hallucinating when he participated in any of the three murders.

On other occasions, Mr. Fell became involved in fights, or became belligerent, and did not kill, even when having ingested a substantial amount of alcohol. A physical confrontation between Charlie Conway and Donald Fell just days earlier, on Thanksgiving, did not culminate in Fell attempting homicide.

That Donald Fell was homicidal on November 27, 2000, therefore, reflects that other factors fueled his homicidal decisions and actions. My opinion is further supported in that no alcohol or drug association can be drawn to the Terri King killing. Yet Mr. Fell killed her with his hands and feet, and as she prayed, certainly the most intimate of his attacks.

> 4) *Do the murders of Debra Fell, Charles Conway, and Terri King reflect the disorganization of a major mental illness or condition?*

It is my professional opinion that Donald Fell's behavior around the time of his participation in the murders of Charlie Conway, Debra Fell, and Terri King primarily reflected organization, and not signs of a mental illness or intoxication.

Shortly before launching the lethal assaults in the REDACTED - FELL apartment, Mr. Fell reportedly pulled the telephone out of wall. This prevented police or family from being called for help; Debra Fell had already called Jeanette Banas that night to express her fear that Donald Fell was going to kill her.

Charlie Conway died of a number of a number of stab wounds. The wounds were primarily directed at vital organs and the neck. As such they demonstrate an unwavering homicidal agenda.

Mr. Fell reportedly supplied Mr. Lee with the knife. Then, according to Mr. Lee, implored Mr. Lee to kill her, because Mr. Fell had killed Mr. Conway. Whatever their exchange, Bobby Lee then killed Debra Fell, while Mr. Fell remained in the area and watched. According to Mr. Lee, Mr. Fell directed him as to how he could more effectively end her life, specifically where to cut her. These actions and communications reflect Donald Fell's focus on the activity at hand.

FELL-00000656

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 36

After Mr. Lee stabbed and attacked Debra Fell, Donald Fell joined Bobby Lee in ensuring that she was dead, not merely wounded. This included, according to Mr. Lee, the two sitting together to watch that she did not move. Attention to this detail recognized that were she to have survived, she would have been able to identify them to a later investigator.

Mr. Fell and Mr. Lee wiped the murder weapon knives and replaced them in the kitchen. Eliminating traces of evidence shows their awareness of a need to make it harder for police to later prove their responsibility for the double-homicide.

According to Mr. Lee, he and Mr. Fell discussed whether to hide the bodies and clean the scene, and decided that it would be too cumbersome. With that, the two reportedly elected to steal a car and leave the area.

Subsequent to the killings, Donald Fell had the presence of mind to shower. The shower was quick, according to Mr. Lee, reflecting the sensible urgency of washing off blood combined with the priority of exiting the scene.

The two packed clothes, demonstrating their knowing they would be away for a while.

They also packed important personal effects, from Fell's Randy Rhodes tapestry to a camera and ceramics. This decision-making demonstrates how the killers were not panicked in their preparations to leave, and specifically considered items of personal value.

They also collected Donald Fell's gun to take with them. Arming themselves when going out to steal a car notes their awareness that a car might have to be taken by force, and that Mr. Fell and Mr. Lee might feel the need to defend themselves as fugitives.

They decided to leave their bags until they could secure a car, so that they would not have to carry around bags while looking for transportation. This demonstrates impressive foresight for recognizing it would be harder for them to find a car to steal quickly were they to be bogged down with carrying baggage.

According to Bobby Lee, the two first took up by the side of the road, with Donald Fell attempting to flag a passing motorist while Bobby Lee waited in the shadows, with the gun. This modus operandi exhibits the sensibility that a motorist would be far less likely to stop for two men (let alone one of them armed); and, that Mr. Fell, who was considerably more socially agile, was the better to engage an unsuspecting motorist. Mr. Fell disputes that this took place.

FELL-00000657



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 37

The two did seek to buy ammunition from Walmart, but the store was closed. This choice demonstrates that they knew the weapon was unloaded, and that they were prepared to use the weapon in order to secure whatever else they needed, car, safe passage, or otherwise.

In searching for a car, Mr. Fell and Mr. Lee were careful in their movements. This course included walking behind stores, on the train tracks, and behind trains. They changed course when they felt someone was watching them. A presence of mind to avoid the attention of passersby is organized behavior.

The two killers also exercised selectivity in deciding on which car to steal, and skipped options before Donald Fell identified Terri King as the target. There were no failed attempts. Mr. Fell's selection of an ultimately successful option reflects the organization of his thinking at that time.

When he spotted Terri King and immediately determined that she would be attacked, Donald Fell cautioned that he and Bobby do it only at the right time – after she turned off her car and could no longer escape. His identifying her as the target reflect quickness of his thinking, for she could have exited the car and made her way into the Price Chopper store soon enough. Furthermore, his sensitivity to timing and patience to wait until Terri King exited her car demonstrate organization of thinking.

Despite Terri King's panic and the tense and urgent demand of forcing her to calm down, Mr. Fell remembered to return to ᴿᴱᴰᴬᶜᵀᴱᴰ⁻ᶠᴱᴸᴸ ., and did so. He thus was not so panicked by the cargo of a kidnapped woman in a carjacked automobile to return to the scene of two murders.

The return to Robbins St. was not a sloppy undertaking, however. According to Mr. Lee, Donald Fell cautioned him to turn the lights off so that were the car door to be opened, the interior – with a hostage at gunpoint – would not be illuminated for neighbors to see. This reflects clever thinking in an awareness of the surroundings of potential witnesses.

Mr. Fell exited the car to retrieve the perpetrators' bags from the home, and did so. He accounted for keeping Ms. King secure by leaving Bobby in the car with a gun on her. This too reflects an attention to detail.

The two killers' attention to detail included the family car; they discussed letting her go, knowing she would be without food for an uncertain period. This contemplation of time reflects their orientation to time and foresight, as well as an additional example of how they were capable of thinking outside of themselves.

FELL-00000658

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 38

Mr. Fell was not affected by returning to the scene and encountering his mother's corpse. According to Mr. Lee, Terri King never did learn that Debra Fell and Charlie Conway had been murdered. Therefore, in all of the time they were driving, Donald Fell did not emotionally unravel in any way as to speak about the killings in the presence of a potential witness. This too reflects the discipline of Mr. Fell's thinking.

At no time in their kidnapping of Ms. King did they note that she had trouble understanding them. Donald Fell and Bobby Lee revealed no difficulty in the organization of their communication with her.

Their communication was so effective that they were able to lie to her to get Terri King to calm down, according to Mr. Lee. Such assurance would have been hard to accomplish if Ms. King perceived them to be out of control, irrational, or impaired.

Mr. Fell reports that he later seized Ms. King's wallet and admonished her that if she jumped out, they would know where she lived and where to find her. This offers another example of how Mr. Fell was able to effectively manipulate her into passivity, and his awareness of the importance of keeping her composed while they attempted to flee the scene. Such higher level problem-solving too reflects the organization of Donald Fell's thinking.

Donald Fell elected to kill Ms. King for concern that she might alert someone to them. The decision to conceal their crime was rational and reflected no delusional or hallucinatory influence. Their choice to kill her paralleled the aforementioned choices and movements that furthered the rational plan of ensuring their escape.

After exiting the car, both men chased Ms. King into the woods. They pursued her on each flank, in order to cut off her potential for escape. This demonstrated an orientation to space and sensible, effective planning.

Ultimately, despite the pursuit taking place in dense woods, she fell – not they. This demonstrated how Mr. Fell had the clear faculties to chase someone in unfamiliar footing without uncoordination or misperception of the environment that would contribute to his fall or injury. This history further underscores my clinical impression that at this time, they were not intoxicated.

When the two men caught up to Ms. King, Mr. Fell reportedly led her to a small area where the ground was depressed – where he then immediately began the fatal assault as she prayed. This choice reflects his recognition that such an area would offer a natural concealment of the body.

FELL-00000659



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 39

After killing Ms. King, and leaving the scene, Mr. Lee recalls that Mr. Fell instructed him to walk slowly, "like we belong here." This demonstrates his awareness of passing motorists, and the need to avoid attracting attention – another example of Mr. Fell's discipline and focus.

Rather than discard her belongings there, Mr. Fell and Mr. Lee drove some distance until they could discard them in a waste bin at a Burger King. Taking care to avoid exposing evidence of the whereabouts of the now missing Terri King reflects discipline and awareness that littering her belongings where a scavenger might find them could lead to her discovery.

While at the Burger King, the two men engaged a drive-through attendant to purchase marijuana. He took them seriously enough to take a break and meet them in a private part of the premises. This demonstrates that they were intact enough as to be deemed approachable by someone who was risking his job by following up on their request.

When they could not agree on a price with him, Mr. Fell and Mr. Lee parted uneventfully from their intended source. Maintaining his sensibilities for what pot would be worth to him – relative to the money they had from looting Terri King's possessions – Mr. Fell moved on. There were no irrational displays of emotion by Donald Fell, and he remained just another passing drive through customer to the Burger King attendant until the FBI showed up to inquire about his now-important customer.

From there, the two men continued toward Wilkes Barre – and arrived there without further incident. Plenty of non-psychotic and non-intoxicated travelers get lost on such unfamiliar roads.

Donald Fell and Bobby Lee arrived at Chris Kolojeski's home and stayed over two days; Mr. Fell left no sense with Mr. Kolojeski that he was unusually different from his usual self. His behavior was normal for the Donald Fell he knew, and his communication, cognition were clear, and Mr. Fell expressed no irrational ideas.

When they were later apprehended, Mr. Fell's memory of the events was clear enough to present a detailed account of the killings. He helped guide police to where Terri King was located, no small feat given her having been killed by a highway he had never traveled, at dawn, and in a heavily wooded area.

*     *

While the above reflect organization of thinking and no evidence of psychosis, disorganization, or intoxication, a few aspects to the story remains unusual.

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 40

Matricide is a very uncommon crime. Debra Fell was killed while saying to Donald Fell, "I love you Binker (an affectionate name from his infancy)."

Subsequent to his killing Mr. Conway, according to Robert Lee, Donald Fell invited him over to put his hands into the neck muscles that had been cut into.

These items will be engaged in subsequent questions. Mr. Fell has a history of attempting to use intimidation and aggression to get what he wants from others. Furthermore, his history demonstrates his enduring ambition for embarking on a spree killing – including his mother as a prime target -- and fascination with death and gore even when sober.

It is my professional opinion with psychiatric certainty, based upon the history available about Mr. Fell, that neither of these two aspects of the case ultimately represented signs of the disorganization of mental illness or intoxication.

   5) *How is Donald Fell distinguished in his cognitive abilities or
      shortcomings, specifically as it relates to his actions from the time of the
      murders until his capture?*

It is my professional opinion, with a reasonable degree of psychiatric certainty, that Donald Fell demonstrated no cognitive impairment, and in some respects, utilized superior cognitive capabilities for criminal success in the instant offenses.

Neuropsychological testing performed by a defense retained neuropsychologist demonstrated no soft neurological signs consistent with minimal brain dysfunction, and no signs of long term sequela of alcohol or drug induced brain damage, or head trauma. There were no signs of neurodevelopmental abnormalities – findings that could be attributed to his parents' genes.

Instead, Mr. Fell possessed very superior information processing speed and superior mental processing speed. He showed well-developed cognitive set shifting and superior attention and concentration (working memory).

It is therefore not surprising to consider how thoughtful he was in reacting and spotting events as they unfolded, in order to facilitate his and Bobby Lee's escape from the crimes scenes.

Mr. Fell's experience, as well as his cognitive skills, enhance his capacity for success in criminality. He has not parlayed his cognitive abilities into life successes because he

FELL-00000661



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 41

prioritizes hedonism and more immediate gratification. In the two men's jaunt across America, however, Mr. Fell's sensibilities were mobilized in order to accomplish the priority – staying free.

So mindful was Mr. Fell to not drawing attention that when he and Mr. Lee stopped in Pennsylvania, they parked a car with out of state plates covered. They engaged a parking lot attendant to avoid citation for a moving violation.

Mr. Fell, following through on a modus operandi he once reportedly boasted to Lynn Roberts about, replaced Terri King's Vermont license plates with those he stole from another vehicle – then discarded Ms. King's plates so that they would not be found.

So attentive were they to not attracting police attention that Mr. Fell and Mr. Lee avoided sitting in the middle of the seat, in order to avoid covering the rear view mirror.

When the two ran short of money, it was Donald Fell's preference not to rob; rather, he proposed, and they undertook, cashing in receipts that they found in the parking lot of Walmart for items they "returned." Robbery would have been a far more high visibility crime, and would have made it easier to track them.

The two made it all the way to Clarksville, AR before Bobby Lee's driving attracted the attention of local police.

### *6) How spontaneous was the homicidal violence displayed by Donald Fell?*

It is my professional opinion that the Conway-Fell murders were spontaneous events, but that Mr. Fell contemplated them beforehand.

There is no available history that Bobby Lee and Donald Fell plotted to kill Charlie Conway and Debra Fell that particular night.

According to Jeanette Banas, Debra Fell telephoned her earlier that evening, expressing her fear of assault by Mr. Fell, and suggested she would go to the laundry to watch the football game on television. Ms. Fell did not mention Mr. Conway to her sister. Sarah Prescott, who lived with Charlie Conway, indicated that Mr. Conway escorted Debra Fell home that night because Debra feared being beaten by Donald.

Cindy Oberle saw the four of them amiably playing cards, earlier that same evening at approximately 9 PM.

Ms. Oberle also noted that sometime earlier, the very first time she met Mr. Fell, he threatened his mother in her presence. The Fell family in Pennsylvania knew of the

FELL-00000662

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 42

threats; Debra Fell telephoned Stella and Jeanette Banas, as well as Terri, and advised them of her fears of his physically beating her.

Back in Vermont, Debra Fell would tell patrons and bartenders at the Stoplite Bar that she was afraid to go home without an escort, for fear that her son would beat her. Carole Fraser, a Stoplite bartender, recalls Donald Fell calling her at the bar repeatedly, as often as 2-3 times an hour, demanding that she come home, with such comments as "Are you going to stay in this bar all fucking night you fucking bitch?"

Donald and Debra Fell had a physical confrontation at Stoplite in mid-November 2000, in which he came to the bar, grabbed his mother by the hair and dragged her outside. Then, he spat at people who attempted to intervene, according Ms. Fraser. Police were called that night. However, Ms. Fell had little confidence that police would protect her in the future. She expressed hesitation to evict Donald Fell. She told some, like Cindy Oberle, he had no place to go. To others like Mr. van Buren, Ms. Fell indicated that she feared he would violently retaliate if she put him out.

Mr. Fell had outstanding warrants in Pennsylvania, as did Mr. Lee – who hadn't even told his father Robert Lee Sr. that he was in Vermont. (rather than Florida).

Debra Fell hosted Charlie Conway and his companion for dinner Thanksgiving week, and they joined Donald Fell and Bobby Lee. That night, the mood turned foul; late in the evening, Mr. Fell reportedly confronted his mother by attempting to slap her, and Mr. Conway placed himself in the way, grabbed Mr. Fell's arm and warned Mr. Fell not to raise his hand to his mother. Mr. Conway and Ms. Prescott left that evening without further incident between Mr. Conway and Mr. Fell.

Jeff van Buren, an acquaintance, noted about Mr. Conway that he was obnoxious when drunk. His blood alcohol levels confirm the history that he was drinking heavily on the night he was murdered.

When later interviewed about the killings, Mr. Lee volunteered that Mr. Conway threatened to call the police that night. Mr. Lee added that Mr. Fell and he would not allow him to leave, and kept providing him with alcohol to inebriate him.

Debra Fell saw something coming. According to Jeanette Banas, Ms. Fell telephoned her exclaiming that Donald was going to kill her. When Jeanette asked to speak to Donald, she relates, the telephone went dead. She states that when she called back, the line was not even connected to the answering machine, suggesting that the phone had been disconnected.

FELL-00000663



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 43

Matthew Cunningham, a longtime friend of Mr. Fell's describes him thusly: "As soon as you made him mad, you were going to deal with him whether he won or lost. As soon as the opportunity arose. He wouldn't let you back down. If you said, "Don't worry about it," he wouldn't let it go, he'd say, "No, I'm going to worry about it, and so are you."

Others described his willingness to fight as intimidating. Those willing and able to stand up to Donald Fell confronted a small man, notwithstanding his barking and willingness to bite. John Humanik was threatened by Mr. Fell, who promised his boss that he would appear at Mr. Humanik's home expecting his due paycheck. The contractor, fearing for his family, made his way home – only to find that his wife met Fell's aggressiveness by going right back at him – and Fell backed off, threatening even as he retreated.

Robert Lee Sr. recalls a similar experience with Donald Fell; he told of "kicking his ass" when Mr. Lee intervened after Fell held a knife to a female peer's throat, and Fell "mouthed off to me." According to Mr. Lee, following the beating, "He told me that if I hadn't been on disability with a bad back, he'd have come back and killed me."

Charlie Conway ended an evening at the Fells by confronting Donald Fell. Donald Fell, whatever he had to drink that night, backed down. Only days later, Mr. Conway specifically went to the Fell home that night because of the degree of fear Debra Fell was experiencing. While the evening began gently enough, he drank heavily, and was known to others as an obnoxious drunk.

By the time the attacking started, Mr. Conway was in no position to be obnoxious or even physically provocative, let alone defend himself. Donald Fell wouldn't fight the Mrs. Humanik who challenged him back, he wouldn't fight a drinking Charlie Conway a few nights before. But with Conway – who may have been threatening to call police on two men with outstanding warrants in Pennsylvania – in repose, inebriating him with an otherwise valued commodity ensured Fell would not be backing down on this night.

As for Mrs. Fell, she feared dying at the hands of Donald since he was as young as 13 years old, and she expressed those fears quite openly to mental health professionals. Years later, even as she eagerly anticipated Donald's arrival that September 2000, she still entertained fears that Mr. Fell would kill her, according to her friend Kevin Bodette, with whom she shared those prescient concerns.

### 7) What distinguishes the violence history of Donald Fell and how his behavioral style manifested in these murders?

Different individuals experienced the menace and temper of Donald Fell differently.

FELL-00000664

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 44

Jeanette Banas and Stella Banas, with whom Mr. Fell lived just before he left for Vermont – and who drove him to Rutland while encouraging him to be nice to his mother – described him as polite and not a management problem at all. His aunt, Donna Williams, characterized him as an "even-tempered boy." So did Nancy Mingatulski, with whom he lived in his late teens.

Clearly that differed from the experience of Bethany Brashears, kidnapped and held hostage by Donald Fell, as he contemplated whether to kill her to keep her from revealing that he had helped his girlfriend Lynn Roberts escape from an institution. Bethany, who eventually escaped, had a more fortunate fate than Terri King. Ms. Roberts explains the distinction thusly: "If he knew he could not express it – if he knew he would get into trouble with the law, he would hold back. Jesse was his boss, and held his pay, so he would not flip out on him in any way."

Still, Donald Fell's temper is well chronicled from his early years. When he first came to the attention of social service agencies and mental health professionals, he had a history of frequent fighting. Stanley Kowalski, who once was a close friend to Debra Fell, recalled her observation of her then 12-13 year old son as having "a bad temper, and an evil look in his eyes." That same impression, from Don Ketchum, a passing acquaintance who worked at the Kimberton Fair, recounts Donald Fell bragging about having destroyed a cat. "I don't remember how he looked so much as I remember the look in his eye," he notes. "It gave me chills."

Shawn Campbell, who lived with Jackie Sharp and assumed a paternal role from Fells' age 15-18, acknowledged Mr. Fell's temper, but found him manageable. "His Aunt Jackie would set him off, she would push his buttons. She used to run around saying that he had papers saying he was certifiably crazy, and that if he wanted to kill somebody he could get away with it."

Asked if he felt Donald was 'crazy', Mr. Cunningham replied, "no, he was a good kid. He got into typical teenage stuff." Recalls Mr. Cunningham, "He used to talk about fighting with his aunt, but I never saw him go after her physically. When he got upset with her, he would go upstairs and smash everything so she wouldn't have it."

John Kozerski, a teacher of Mr. Fell's in the Head Start program, recalls Mr. Fell as among the most defiant of authority he has ever encountered. "He was ready to fight right off the bat, he would be always ready to react, observes Mr. Kozerski, whom Donald Fell once threatened to stab. "He would boast to whomever would listen about his threats."

FELL-00000665



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 45

Mr. Fell "liked to fight," recalls his old friend Matthew Cunningham. "We all carried knives, but he would show up with brass knuckles and a baton," he remembers. According to Jesse Williams, Mr. Fell would brag about his fighting prowess, and attempt to intimidate others. The cousin recalled how, in a dispute with Joe Humanik over a paycheck, he threatened to break Mr. Humanik's kneecaps. Mr. Fell got his paycheck.

Notwithstanding the criminal and unwise choice this approach may represent, Mr. Fell reserves the right to be violent, as a personal style and without reservation. The traits of psychopathy – not to be confused with psychosis – endow him with the freedom to dispense with worrying about the sensitivities of others.

The threat of his violence was enough for many to avoid setting him off. The same Thanksgiving night of his first confrontation with Charlie Conway, Donald Fell smashed Bobby Lee's head into a mirror, breaking it, according to Sarah Prescott. Mr. Lee later wrote, "He always has to have his own way and I do not live up to his expectations he'll flip."

Patrick Tosh, another staffer from the Head Start program who taught Mr. Fell in 1995-96, called him, "One of the most disturbed kids" he had taught in 30 years, the teacher reflecting that he "knew his temper would get the best of him."

For all the observations of the above, and the others unnamed, Jeanette Banas never experienced his outbursts. Still, she recounts, only weeks before he went to Vermont, Donald Fell availing himself of gory pictures and video on the internet. "Everything was about Satanism and how to kill animals," she reports. "He showed me gory things, dead people, people blown up, bodies blown apart. He went into all these websites about Satan. Heads missing, eyes missing, people blown up." When Donald showed her where he was browsing, she recalls she remarked, "this is sick shit."

Lynn Roberts recalls Donald Fell "Loved death. It would make him happy to see dead things." It would make him happy to see dead things. He liked 'Faces of Death' movies, he would think it was funny, to see people eaten by bears; he told me they showed a cannibal orgy – bunch of people having group sex, started eating each others' flesh, and about a monkey's head being cracked open and brains getting eaten. He thought it was funny."

Apart from the video, she recalled, "He loved the mausoleum on River St. across from General Hospital; it was fascinating to him. She also recalled his favorite website "The Gore Gallery – he showed me it; videos of people jumping off buildings, getting splattered, weird pictures of skin diseases, that kind of stuff."

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 46

Jesse Williams also recalls Mr. Fell's enthusiasm for the senses of death. On one occasion, during a leisurely drive, they passed by a dead animal along the road. "(Donald Fell) inhaled it, and said 'I love the smell of death.' It smelled awful, I almost puked." It looked like he meant it – I didn't think he was trying to get a rise out of me. The conversation, recalls Mr. Williams, gave rise to Mr. Fell musing about how he wanted to go on a spree killing one day.

"He told me he was eventually going to go on a killing spree. Probably even as far back as when we were kids," relates Mr. Williams. "Him and Bobby used to joke about a killing spree, and that they would get away with it. They would have half a case of beer in them, would cover their tracks, remembers Terri Fell, Donald's sister.

Recounts Lynn Roberts, "He said he was so angry with his mother, he would kill her first." Mr. Fell brought the idea up about three times, she recalls. He would say, if he was ever going to kill someone, he wouldn't just kill one person because he knew he would eventually get caught. So he would kill people he resented." Evidently Jackie Sharp took his threat seriously: when Mr. Fell was at large, according to Shawn Campbell, Ms. Sharp expressed a fear that he would come back for her.

According to Ms. Roberts, Donald Fell entertained the idea earlier in 2000, when she was institutionalized for behavior and drug problems. "He talked about going to the FDCC, to bring a shotgun up and hold everyone hostage and kill them off one by one and take someone with us." Ultimately, he helped her escape from the facility.

Away from his traditional group, Mr. Fell revealed his fantasies to even his mother's acquaintances in Vermont. Robert Spencer reported that Donald asked him if Mr. Spencer wanted to go on a killing spree with him, to see what it was like to kill someone.

Independent of his temper, independent of alcohol, independent of his heavy metal music passion, independent of his wayward friends, Donald Fell nurtured homicidal aspirations and a relish for the sensations of death with far more passion and determination than he did scholastic or vocational pursuits. And so three deaths became his destiny, capped by the emphatic stomp of his foot that crushed every bone of Terri King's neck.

### 8) Was Mr. Fell sexually abused as a child, and in what manner has he been affected by this history?

Social service records reflect that Donald and Terri Fell were sexually abused at age 5. A babysitter couple was involved. When the two children appeared to be obsessed with nakedness, Debra Fell and the children's father, Don Fell Sr. sought help and

FELL-00000667



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 47

terminated the babysitters immediately. Mrs. Fell stopped working at that point in order to stay at home.

Donald had no findings on physical exam, but reported nightmares, was aggressive, and refused to accept any limits on him. He subsequently reported to a counselor that he was struck with a board, locked in a room, and was forced to engage in anal sex.

Records indicate that from the time of the abuse report, the elder Mr. Fell began to drink heavily, and the parents' marriage suffered. Donald Fell's father was described as withdrawn, and fighting increased between the parents while Donald was neglected. Records indicate that subsequent to the event, his parents were reluctant to discipline Donald, though their interactions with him became more appropriate by social services observations.

In his earliest years, Donald Fell's intrafamilial aggression was directed most visibly at his sister, according to social service records. In the period following her being sexually assaulted by babysitters, Donald was more attention seeking, and his aggression manifested itself in the presence of his parents in that context.

The Fells placed Mr. Fell in the Victim Resource Center. He went through treatment and was eventually discharged, deemed improved. A positive outcome is consistent with a positive recollection of his teacher Ms. Hinchey. She found him, subsequent to the events, "A sweet boy" during the 1985-86 academic year. More personally, Theo Settas, a friend of his until age 9 offered that Donald Fell was never violent while he knew him.

While he was very upset at the time of the abuse report, Donald Fell, Jr. did not recall the event in years afterward – let alone suffer intrusive recollections of it.

Records from his previous hospitalizations note Donald Fell's acknowledging that the event happened. However, he did not raise his sister's abuse as an issue for him, nor did he demonstrate any pronounced emotional response when the reported history was raised, not an avoidance of same. Mr. Fell has not displayed symptoms of emotional numbing either.

There was no history of Mr. Fell protecting his sister from sexual assault; Terri reports, for example, that she was sexually assaulted at age 9 – again – by two of Donald's friends, in the woods. He did not reportedly defend her at that time, or retaliate against the aggressors.

It is my professional opinion, therefore, that the impact of the sexual abuse – and of Donald Fell witnessing it – is indirect. Donald received care for the event, and was

FELL-00000668

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 48

discharged from treatment as improved. To that end, he has exhibited no signs of post-traumatic stress disorder.

His aggressive behavior, which he began to more clearly exhibit after the abuse, did go unchecked. Still, his ghoulishness and frank homicidality only manifested years later.

It is therefore unclear whether Donald Fell encrusted into a callous, oppositional, and hedonistic early teenager because of the abuse of years earlier, or because no limits were set on his acting out at a time when he was in emotional pain. Since a majority of sexually abused children do not receive any treatment and do not become psychopaths,[27] Mr. Fell's life outcome – both of committing multiple homicides and of meeting criteria for psychopathy - remains exceptional even for a person who has experienced sexual abuse – and especially, for someone who appeared to respond well to clinical treatment.

Given the absence of his PTSD symptoms, relative to Donald Fell's own experiences or those he once witnessed, evidence that the actual sexual abuse has emotionally tormented him is scant. Certainly in reams of later social service notes and documented interviews with him, he has been free about expressing many things, and communicating with mental health professionals – but exhibited no distress over an event that reportedly happened even before his 5th birthday. There is no evidence for Donald Fell sexually molesting or assaulting another, such as may be seen in history's trajectory for many abused.[28]

Yet by history, Donald Fell became highly sexually active and at an early age. Prior to his arrest, he was a keen consumer of internet porn. Donald Fell's sex life was highly enjoyable and not at all distressing to him. This history either reflects the hypersexuality of his psychopathy, a precocity that serves as a more direct link to the sexual abuse, or both.

   9)  *Given his parents' qualities, what evidence is there that Mr. Fell's*
       *diagnoses, behavior, and circumstances are genetically driven?*

With two parents who were alcoholics, the evidence for Mr. Fell's genetic contribution to his alcohol abuse is robust. Genetic factors are responsible for a person's low response to alcohol – and Mr. Fell presents a history of no significant effects despite drinking substantial quantities of alcohol.[29] The genetics support my earlier opinion,

---

27

[28] Romano E, DeLuca RV. (1997). **Exploring the Relationship Between Childhood Sexual Abuse and Adult Sexual Perpetration.** *Journal of Family Violence.* 12(1)
[29] Schuckit, Marc A. (2000). Genetics of the risk for alcoholism. American Journal on Addictions. 9:2, 103-113.

FELL-00000669



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 49

based upon additional information, that the crime does not reflect that Mr. Fell was intoxicated.

A genetic contribution to Donald Fell's psychopathy is more elusive. Donald Fell's behavior noticeably changed in the 7th grade, and particularly, as his parents' relationship was falling apart and he began abusing alcohol. By the time he was 11, this small pre-teen had his mother fearing for her life, and was not afraid to fight her boyfriends. By the time he was 15-17, he was distinguishing himself with brazen kidnapping and homicidal aspirations.

Mr. Fell's mother was not a psychopath. The defendant's father was a violent alcoholic who physically fought his mother, and physically struck his sister and to a lesser degree, Donald. There is no family history of homicide. Mr. Fell reports his father did not expose him to or involve him in criminal enterprise.

There is a family history of physical assault, and reactive aggression, sometimes with weapons.

There is, however, no family history of homicidal fantasy, or preoccupation with gore. His sister, exposed to the same elements only with greater physical violence from his father, has no history of violent arrests.

It is therefore my professional opinion, with a reasonable degree of psychiatric certainty, that Mr. Fell's alcoholism has a genetic antecedent. It is also my professional opinion that his reactive violence has roots in what he was exposed to, in his nuclear family environment.

It is, however, my professional opinion that Mr. Fell's homicidal fantasy and necrophilia do not have genetic or familial influences.

Notwithstanding Mr. Fell's genetic and environmental influences, the greatest predictive force on future violence in the community is psychopathy.[30] A family history of reactive violence does increase the likelihood that someone will later react to a given stressor violently.[31] However, Mr. Fell's psychopathy was the greatest predictive quality of his constitution that foretold his violence.

   *10) What role models have been available to Donald Fell to promote prosocial behavior, self-control, and sobriety?*

---

[30]
[31]

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 50

Mr. Fell has been quoted as suggesting to psychiatrist Dr. John Rabun, "If I had guidance, I wouldn't be in this position."

From his earliest years, Mr. Fell knew his great aunt, Stella Banas, to be loving, prosocial, non-violent, responsible, and drug-free. He lived with her uneventfully for the two weeks preceding his sojourn to Vermont, and Ms. Banas accompanied him to his mothers' house. Ms. Banas admonished him to "be nice to your mother", and he advised her that he would.

Theresa Sharp, Mr. Fell's grandmother, was an available and nurturing presence from birth through his placement in St. Michael's at age 14. She fought to gain custody of him, and thus demonstrated her love for him. Mr. Fell spoke of seeing her every day during a period in which he was reported to be menacing to his mother, and others. Ms. Sharp did not drink, was not violent, cooked for him and showed him consistent good temperament. Notably, Theresa Sharp was eagerly there when Donald Fell needed her most – as his mother progressively failed in her maternal responsibilities after Mr. and Mrs. Fell's breakup when Donald was eleven years old.

Donald Fell was described as polite by a number of people – Stella Banas, Donna Williams, Jeanette Banas, Robert Lee Sr., Janet Smith (Lynn Roberts' mother) -- who encountered him in the period preceding the homicides. He relates politely to Dr. Wetzel in the videotaped interview conducted this past month. This comportment reflects that he encountered models from whom he learned how to carry himself civilly.

When Mr. Fell was hospitalized on several occasions between ages 11-13, the record reflected his defiance and hostility to authority. Hospital notes chronicle that he refused household rules. That would mean there were rules to follow, set up by someone attempting to be a role model.

In the hospital, Mr. Fell composed his behavior in order to return home, rather than face commitment to St. Michael's group home. As Mr. Fell was able to compose his behavior sufficiently to convince his mother that he could be managed at home, he had some role model for controlling his belligerence, truancy, and alcohol abuse.

Interviews with teachers demonstrate that Donald Fell registered impressions of both his strengths and weaknesses. He was liked and made positive impressions on his earliest teacher, and his early grade marks reflected how school was constructive to him. From middle school, his defiance of authority and fighting led to repeated suspensions. When he returned to school, however, he did so under programs geared toward truants and behavior management problems. Faculty was particularly sensitive to be open and to promote adaptive choices, from drug and alcohol-free environment, to the mastery of a trade, to conflict resolution through non-violence.

FELL-00000671



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 51

Mr. Fell challenged his teachers and abandoned school as soon as he could.

Therapeutic institutions have been available to Mr. Fell for years, promoting non-violence, adaptive thinking, and sobriety. In four hospital admissions, in some instances extended, Donald Fell was managed by numerous trained staff, working 24-hours a day, on a mileu that enforced and promoted non-violent conflict resolution and abstinence from drugs and alcohol.

Once committed to St. Michael's group home, Mr. Fell again was provided trained, concerned staff, familiar with issues confronting Mr. Fell from exceptional experience with his peer group. These staffers, as did those employees of the hospitals in which he was housed, were mandated to promote drug and alcohol abstinence, anger management, development of prosocial attitudes, and alternatives to violence. As Mark Innocenzi, a social worker who was employed at St. Michael's, explains, "There is no access to drugs and alcohol, regular blood monitoring, and a very nurturing attitude by the staff. Because of that, and a low turnover of staff, those committed there have the opportunity for well-established relationships with trained staff."

Likewise, through Catholic Youth Services, Mr. Fell was administered to by role models for a drug and alcohol free life, and elimination of behaviors that contributed to his earlier commitment to St. Michaels. In the Head Start program, he encountered numerous teachers who provided similar examples of mature presence, physical restraint, drug and alcohol abstinence, and willingness to work with him even when he was threatening. As such, Mr. Fell not only had role models, he had the uncommon advantage of a number of people who were even trained to be better role models.

Through his exposure to church agencies, Mr. Fell likewise gained exposure to spiritual role models who instilled the values in others that would lead one away from indulgence, violence, and the exploitation of others.

Even his employers were there to provide examples of responsible, drug and alcohol-free behavior. Joe Humanik was a family man who drove Mr. Fell to work; Mark Balestra exposed Mr. Fell to his own family. Jesse Williams was a cousin who abandoned his own irresponsible habits to become a responsible fixture in S&S Concessions. He hired Donald Fell and communicated and interacted with him closely and daily. Mr. Williams vividly embodied a person who matured into a law-abiding, non-violent, young man with direction who avoided dead-end habits.

Even among his family, Donald Fell had numerous relatives who were role models for non-violence, from Donna Williams to Stella Banas to Theresa Sharp.

FELL-00000672

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 52

Jackie Sharp, with whom he lived following his discharge from St. Michael's, was violent and tempestuous, by others' accounts. Ms. Sharp, however, was reportedly very strict about limiting Donald's access to alcohol. Shawn Campbell, who lived with Donald Fell and Ms. Sharp, was not reportedly violent to Donald, and engaged the defendant as a supportive, warm presence. Mr. Campbell did not use drugs nor get drunk in the home.

Mr. Fell lived for an extended period in the late 1990's with Nancy Miggatulski, who was loving, embracing, law-abiding, and non-violent.

Subsequent to actively participating in this triple homicide, Mr. Fell has needed no medicines to ensure his self-control, even earlier in his incarceration. Given that he could immediately respect authority, then obviously adaptive authority models were available to him at an earlier stage whom he could not bully and who taught him to control himself.

Possessed of particular cognitive skills for processing his environment, Donald Fell learned what knowledge to reflect to gain discharge from hospital commitments and a group home placement. This too demonstrates that role models for self-control and drug and alcohol abstinence were available – and accessed – by Mr. Fell.

Donald Fell's parents did not represent adequate role models for abstinence and behavioral self-control. In his interview with Dr. Wetzel, however, the defendant notes how he spent time with other children and away from his home in his earliest years. On his own, he sought out more comforting environments, be they a tree house or the woods. When his parents divorced, and when he was subsequently placed, Mr. Fell benefited from exposure to a variety of role models for drug and alcohol-free lifestyles and non-violence.

Was Donald Fell exposed to fighting? Yes.
Was Donald Fell exposed to violence? Yes.
Was Donald Fell exposed to alternatives to fighting? Yes.
Was Donald Fell exposed education that violence is wrong? Yes.
Was Donald Fell exposed to torture? Self-referred..
Was Donald Fell exposed to murder? He was self-referred to Faces of Death.

Whatever the variety of placements and professional role models available to him, and actively involved with him, Donald Fell continually opted for a drug lifestyle and violent persona. "I did what I want, when I wanted," he observes. Beyond that, Mr. Fell sought guidance from sources of media that appealed to his thirst and curiosity for gore and the capacity to inflict it.

FELL-00000673

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 53

Whether it was watching "Natural Born Killers" ten times – as he says that he did – or surfing gory pictures on the internet in Jeanette Banas' home, or marveling of the handiwork of his torturing animals to Shane Lee and others, Mr. Fell sought his own role models. His behavior is not the byproduct of a lack of role models; rather the example of the perverse role models that Donald Fell sought out for himself.

It is my professional opinion that this quality of Donald Fell, of answering only to himself, has rendered even the most effective of role models irrelevant.

> *11) How has the relationship between Donald Fell and his mother evolved, from when she was raising him to when he was living with her in Vermont, and the how had the circumstances of each changed at the time Ms. Fell was killed?*

Earlier records observed that Donald Fell was closer to his father when the family was intact. There is no documentation of Donald Fell's aggression towards his mother until he was admitted to the hospital at age eleven. At that time, he had been aggressive and fighting out of the home as well, and records portray his being generally uncontrollable and violent, rather than specifically in conflict with his mother.

Whatever the alcoholism of his mother, and her shortcomings as a homemaker and caregiver, Donald sought to return to home, rather than to other caregivers such as his grandmother Theresa. At the height of Debra Fell's instability – a lack of an intimate relationship, consequences from alcohol abuse, increasing abuse of drugs, pronounced neglect of her management of the home, legal problems from owed fines (and possibly, curtailed drivers' license and wage-earning consequences) and fears for her safety from Donald's threats to her – Donald still sought to return to her custodial home.

Donald's motivations may have had more to do with his freedom; for by his own account, he ignored his mother's curfew and attempts to establish rules, and did as he pleased.

Each time he returned from his four hospitalizations between 1991 and 1993, Mr. Fell's defiant unmanageability resumed. No matter how erratic Debra Fell was, however, she did not give any indication of abandoning Donald until she did so without warning in December 1993.

According to Jeanette Banas, Ms. Fell left for Rutland after seeing the name of the town and musing that were she to embark on a fresh start in a new location, that might be an appropriate place, because she felt that she was in a rut.

FELL-00000674

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 54

In January 1994, Ms. Fell returned to her home, and her children returned from Theresa and Jackie to stay with her. It was only after Debra Fell was arrested for assault, after she beat her daughter Terri, that Donald (and Terri) were removed from Debra's home indefinitely. Donald did not voluntarily leave the home; and Theresa Sharp petitioned for, and was granted, custody.

In the years that followed, Debra Fell lived out of state, as she faced contempt of court charges for failing to pay an outstanding court fine. She reportedly attempted on several occasions to contact Terri and Donald, but Jackie spurned her contact. Instead, according to Shawn Campbell, Jackie's previous live-in relationship, Jackie emphatically and repeatedly reminded the children that their mother had abandoned them, and of the mean things she said and did to them when they were all together.

Friends such as Lynn Roberts and Liz Jones recall Donald's expressing his desire to kill his mother from his adolescence. Ms. Jones recalls that the defendant would link his fantasy to his feelings over his mother abandoning him. At the same time, according to Shawn Campbell and Shane Lee, Jackie Sharp, with whom he lived, was more violent and more abusive to him. Indeed, Mr. Fell recalls the day she kicked him out of the house as one of the happiest days of his life. Nevertheless, Mr. Fell far less frequently vocalized homicidal dreams about Jackie.

Even before they resumed contact, Donald Fell entertained a reunion with his mother. By May 2000, Donald Fell was openly speaking of absconding to Vermont and living with his mother, according to Lynn Roberts and Bethany Brasheats – though he had not spoken to her in years.

Debra Fell maintained contact with Stella and Jeanette Banas. While Jackie Sharp continued to actively discourage Donald and Terri Fell from taking their mother's telephone calls, Donald did begin speaking with his mother in late summer 2000. Very soon afterward, he agreed to travel to see her, with no plans to return to the Wilkes Barre vicinity.                    (

To Terri Fell, Mr. Fell had the impression that his mother was no longer drinking. Employers interviewed for this examination indicate that Debra Fell maintained an excellent and responsible work record. Pictures from shortly after his arrival in Vermont show a well-maintained and furnished home at 135 Robbins St. Ms. Fell maintained both male and female peer friendships.

Numerous acquaintances remember Debra Fell's anticipating the arrival of her son, with hope for being able to be a mother to him. Kevin Bodette notes her apprehensiveness as well. The optimism of her preparations, however, is reflected in Price Chopper

FELL-00000675



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page: 55

employee Cynthia Dazzi's account of Ms. Fell shopping for lasagna ingredients as she planned to cook for her son.

However, Ms. Fell was still abusing alcohol, along with drugs. She had been again involved in an intimate relationship with a violent alcoholic -- Alan Reynolds -- who had only recently been incarcerated following his assault of her. Her nest was empty, and a violent alcoholic named Don Fell headed northward with Stella and Jeanette Banas.

This Donald Fell was not the thirteen year-old Debra could commit to the hospital when he got out of hand. He was a man now, and with ample experience of sensing and exploiting when someone was afraid of him; and memories of how he had his way with his mother when living with her years earlier. Stella Banas recalls how she admonished Mr. Fell, when they reached Vermont, to "be nice to your mother."

Within two weeks, according to Terri Fell and Jeanette Banas, Donald called to complain that Ms. Fell was still drinking. So, very much, was he. Ms. Banas recalls that Debra complained how he was not working; and she insisted that he get a job to contribute to paying expenses.

In 2000 Vermont, her friend Ms. Oberle observed that they played Donald's music and his television programs, and that she had relinquished her bedroom to him. On the occasion of her first meeting Donald in her friend Debra's home, he addressed his mother with profanity and threatened her. Their exchanges would arise over such matters as her wanting him to turn his music down. Mr. Fell "He had physical control over her," adds Ms. Oberle.

According to Mr. Fell, his mother now included him in get-togethers with his friends, some of whom would give him drugs for free. The defendant had been concerned enough about cost-effective ways to enjoy a high, he recounts, that he spent time researching locally grown intoxicants in the Rutland Public Library. Despite her own drug use, relates Mr. Fell, his mother would not use drugs in his presence.

In late October, Mr. Fell sent for Bobby Lee to join him in Vermont. This history is particularly notable in that Mr. Lee had a desirable option available to him -- and perhaps both of them -- in Florida, where Bobby was developing as a successful animal handler. So they didn't have to be in Vermont, in order to be far from Pennsylvania. For the early part of Mr. Lee's stay, Ms. Fell now also supported both able-bodied men.

Meanwhile, according to Terri Fell and Jeanette Banas, Ms. Fell telephoned them on more than one occasion and asserted that Donald was beating her. She did not demonstrate a secondary agenda, for she did not demand that he leave or that they take

FELL-00000676

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 56

him back. Rather, she only appealed to them to prevail upon him to stop battering her. According to Terri, Mr. Fell would reply that he was not striking his mother.

Mr. Fell asserted that he never hit his mother at all. Unlike the period of their living together in Pennsylvania, Donald Fell never characterized his mother as abusive. "We argued, but in five minutes we were fine," he explained. "Things were pretty decent," he reflected. Once Bobby arrived in late October, there is no indication that he had undertaken any plans to leave her home, or the area.

On November 2000, Donald Fell assaulted his mother outside the Stoplite Bar. Mr. Fell spat on his mother in the ensuing confrontation. One might consider this to be a manifestation of his rage. Nevertheless, Mr. Fell spat on other bystander as well – whom he had no ongoing conflict with. That demonstrates, in my professional opinion, the visceral resourcefulness of his aggression moreso than the focus of it.

Carole Fraser, a bartender at the StopLite, relates that Donald would telephone, looking for his mother, and demanding money from her. While Ms. Fraser indicates that Debra would not drink to the end of heavy intoxication, she would linger at the StopLite in order to avoid having to return home. Ms. Fell told many acquaintances of her fear to return home, and to beatings from her son.

Battering of a parent, as Mr. Fell did, is far less common than sex abuse, or physical abuse. Yet Donald Fell, by the accounts of is mother and his sister, did beat Debra Fell – and resumed battering her as a stronger and more intimidating presence seven years later.

Whatever her progress, Debra Fell was still a woman vulnerable to the clutches of a battering relationship. Employers who praised her optimism noted, following Donald's arrival in Vermont, a deterioration in her as her anxieties mounted over her own safety at home. History reflects that she was spending more time at the Stoplite – thus challenging her need for sobriety – for fear of coming home and being forced to confront Donald's intimidation and physical aggression.

Friends, learning of Mr. Fell's battering of his mother, suggested that she ask him to leave. To some, she suggested that he had no place to go, that she could not. To others, she expressed that she was afraid of what he would do if she did evict him – and that she feared the Rutland police would not be able to protect her.

On the last night of Debra Fell's life, Cindy Oberle encountered her enjoying a friendly card game with Donald Fell. There was no indication, from any documentation or accounts, that the evening was slated to end as it did.

FELL-00000677



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 57

The scene, of Debra Fell engaged with her adult son, sharing a game with him, showing him attention in the kitchen she cooked for him in, on a day off from the job she found for him, with the friend of his she took in and was supporting, was a substantially different Debra Fell from the woman who left Donald Fell in Pennsylvania seven years earlier.

When Donald Fell menaced his mother in his earlier teens, he was admitted as a minor to the hospital because he could have killed her at any time. Her being away only introduced his menace to a far more responsible – and less patient – Theresa Sharp, who promptly signed the unmanageable Donald Fell into St. Michael's group home.

It is my professional opinion, with a reasonable degree of psychiatric certainty, that Ms. Fell's abandonment of Donald preserved her safety, indeed her life. It was her later decision in Vermont, to not abandon him, that cost Debra Fell her life.

Ms. Fell's last words, "I love you Binker (referring to her affectionate nickname for him)," underscore how her killing was not borne of old antagonism or grudges. It is my professional opinion, however, with psychiatric certainty, that just as Terri King a short time later, she was a witness to a major crime – Donald Fell's killing Mr. Conway -- who could identify her assailant. At that point, the inconvenience of her life outpaced the convenience of her love.

There is no indication that Donald Fell killed Charlie Conway (victim 1) or Terri King (victim 3) because of lingering conflicts over Debra Fell(victim 2)'s leaving him to his grandmother and aunt when he was 14.

While emotions and emotional history earns consideration in patients seeking resolution of family conflicts, Mr. Fell's comportment after the crimes more clearly manifested his cold, detached psychopathy. According to Bobby Lee, Mr. Fell showered, helped him pack, cleaned the scene, and engaged Mr. Lee to see if *he* was all right – not the other way around.

Furthermore, Debbie Fell was found uncovered. Emotional connections to the victim are frequently expressed, when a perpetrator lingers at the crime scene, by the perpetrator covering some part of the victim.[32] That was not the case in Mr. Fell's reaction to Debra Fell's body – again reflecting Mr. Fell's detachment from his mother.

That account of the less affected Mr. Fell is consistent with Mr. Fell's choice -- after taking possession of Ms. King's Dodge Neon and returning to the 135 Robbins St.

---

[32] Douglas JE, Burgess AW, Burgess AG, Ressler RK. (1992). Crime classification manual: A standard system for investigating and classifying violent crimes. Jossey-Bass Publishers San Francisco. p. 251.

FELL-00000678

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 58

address – to re-enter the death scene himself in order to pick up their packed bags, rather than avoid encountering his dead mother by delegating the duty to Mr. Lee, who remained in the car watching Ms. King.

It is therefore not surprising that in his accounts to Dr. Wetzel, in their videotaped interview, Mr. Fell does not express an emotional attachment to his deceased mother any different than he does the relative stranger Charlie Conway and the complete stranger Terri King. That includes the absence of contempt or rage for old emotional scores to settle. Rather, it is his detached lack of emotion, consistent with his being a psychopath, that demonstrates to the examiner how the emotions one conjures over a mother killed are the emotions of the beholder only – not Donald Fell.

Debra Fell drew abusive men to her; her family history and personal relationships repeatedly followed such a pattern. Any consideration of dynamics, genetics, and history must include Donald Fell as the last batterer of this repeatedly abused woman.

Such sadistic and controlling precedent was not unprecedented for Mr. Fell. According to Shane Lee, Mr. Fell maintained a relationship with a Wilkes Barre peer, Shannon Irish, in which he would humiliate her in a variety of ingenious ways, sometimes with her tacit permission. Shane Lee personally witnessed Mr. Fell handcuff Ms. Irish to a toilet, and leave her there without indication about when he would return. Or on other occasions, recalled Mr. Lee, Mr. Fell would dunk the restrained Ms. Irish face first in the toilet, for example.

Mr. Lee recalls one occasion in which Mr. Fell placed eggs inside Ms. Irish's vagina while she was passed out from intoxication. The point was, per Mr. Fell's intended prank, that she would go to the bathroom upon awakening, pass an egg into the commode, and then be left to contemplate whether she was capable fo laying eggs. Mr. Lee relates that when Ms. Irish told a group of them that he had done this, Mr. Fell laughingly replied, "Well you must be part chicken." ,

While the sampling of what Mr. Fell has done is dramatic, and removed from the patina of mitigation that so much attention to his family background supplies, this recreational dehumanization is entirely consistent with what some have witnessed Mr. Fell doing to animals over the years – and consistent with Bobby Lee's account of his handling of Mr. Conway's neck, after stabbing him.

Large percentages of alcoholics, children of alcoholics, and products of abusive homes are neither abusive, homicidal, nor psychopathic, and are very much emotionally connected. Mr. Fell, based upon his history, has less in common with that very large population than he does the unusually rare population of eleven year olds who are lethal enough to represent a homicidal risk.

FELL-00000679

### 12) Was Donald Fell the product of a deprived childhood and adolescence?

Donna Williams, Mr. Fell's aunt, has remarked, "Donny was not treated well by anyone and did not get loved by anyone"

Mr. Fell was unable to derive the benefit of growing up with parents who were alcohol and drug free. Likewise, his parents contributed to a sense of chaos and hostility in the Fell household – although he was fed, clothed, and medically cared for. When his parents divorced, Donald Fell no longer had the opportunity to complete his development in an intact household of his own parents.

Donald and Terri Fell developed and fostered a true closeness. Lynn Roberts, the defendant's ex-girlfriend, offers that she believes Terri is the only person that he has felt close to. They shared experiences and supported each other.

The Fell family extended to a number of relatives locally and out of state. Donald maintained differing degrees of contact with those family members. Two of those family members, Stella Banas and Theresa Sharp, were supportive, embracing, and constructive, and grandmotherly in nature.

Over the course of his development, Mr. Fell lived close to and experienced the support of Jeanette Banas, Donna Williams, and her children. The oldest of those Williams children, Jesse, was close to Donald Fell.

Mr. Fell also had numerous friends, friendships, and a social circle that accepted him and at times, followed his whims. While Bobby Lee has received the most attention given the circumstances of this case, Mr. Fell's social network included many others.

When Mr. Fell's father left the Fell home when he was ten, Ellery Wilcox moved in soon afterward. Mr. Wilcox, while eventually an all-too-frequent abuser of alcohol, displayed concern for the Fell children and attempted to maintain a paternal presence and to solidify the rules of the home. Donald Fell did not experience him as mean; Mr. Wilcox reached out for continued contact with the Fell children, even providing them with some money, even after Ms. Fell and he broke up.

Ms. Fell was very much involved in Donald Fell's hospital evaluation and care. She participated in therapeutic programs for his benefit from early years through his 1993 hospitalization. He was afforded hospitalization for extended terms and treated in

FELL-00000680

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 60

individual as well as group modalities. Even as she felt threatened by Donald Fell, Debra Fell took him back rather than committing him to a group home.

When Ms. Fell left the home, or when violence and chaos required intervention, Theresa Sharp, who was trained and experienced as a foster parent, was there to take Donald Fell and his sister in. He experienced her in a wholly positive and nurturing way. Theresa Sharp fought for legal custody of him, contributing to the message that he was wanted. Indeed Donald Fell never reached the point of going into foster care, as so many products of dissolved marriages or alcohol-affected homes do.

When Mr. Fell overwhelmed Ms. Sharp's ability to manage him – even with her special training as a foster home – Ms. Sharp admitted him to St. Michael's group home. St. Michael's, according to social worker Mark Innocenzi, a veteran of twenty years and thirty facilities, is "One of the best well rounded, well-run residential placements I have ever worked in. The quality of care the residents received, there is no stone unturned."

It is my professional opinion, with psychiatric certainty, that Mr. Fell did not reap the benefits of sober, peaceful parents. The stormy and progressive disintegration of their marriage also kept Mr. Fell from experiencing the qualities of a more safe and secure household.

The problems of the Fell home were identified early, however, and excellent resources were made fully available to Donald Fell. When less intrusive supports did not prevent him from worsening aggression in his early teens, hospital inpatient care provided concerned, professional attention – with the provision of follow up.

When he continued to place himself on the periphery, breaking curfew, seeking trouble and those who could join him troublemaking – he was placed into St. Michael's, an exceptionally caring and nurturing facility. The St. Michael's program includes an integrated care model – so help was made available to Jackie Sharp as well, as she anticipated his return to her home.

In St. Michael's, and in Catholic Services after it, the programs have well-developed treatment and counseling arms to promote alcohol sobriety. These programs were provided to Mr. Fell as well.

With his having dropped out of school, Mr. Fell's social workers enrolled him in a Head Start education program. Head Start has a faculty and staff comfortable with students who share Mr. Fell's conduct problems. The examinee was also exposed to vocational rehab as well.

FELL-00000681



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 61

When Mr. Fell was evicted from Jacky Sharp's home, for his unwillingness to follow her rules, he found friends and friends parents' willing to house him. Nancy Miggatulski, for example, hosted Mr. Fell for one year. In the context of being interviewed for this case, she described a loving atmosphere free of chemical dependency in which Mr. Fell was supported and welcomed – which ultimately ended when she came to believe he had been involved in crime.

Mr. Fell had the social skills and manual capabilities, and the youthful vigor, to find work offered to him. While some workplaces maintained a positive impression, he could not sustain an interest and commitment to those opportunities. In some instances, he was frankly threatening, such as with S&S Amusements and Humanik Construction.

Even when Donald Fell left for Vermont, Mr. Fell knew he was welcome at Donna Williams' and Stella Banas' homes – both places where he had lived in the past. Even if his ruining his housing arrangements with his defiance of authority or incorrigible delinquency, he did not stay unwanted for long.

The available record supports my professional opinion, with psychiatric certainty, that Donald Fell was recognized for when he needed help, and was given exceptional help. On some occasions he refused or undermined the help through his absence or by defying clearly manageable rules. In the case of teachers, employers, and his mother, he has even attacked help.

Donald Fell is a man for whom there were no cracks he had to fall into, but a man who created cracks faster than others could fill them.

> **13) How did the relationship between Donald Fell and Bobby Lee relate to the eventuality of three people murdered? What evidence reflects on the prime mover, and the dynamic between the two?**

From earlier in his adolescence, peers recount Donald Fell as a person who took initiative and sought to involve others in his exploits, be they destroying property, stealing beer from a local eatery, or killing squirrels. "It was always Donny's idea," recalls one of his friends, Matt Cunningham.

Mr. Cunningham recalls their group as "everyone was a tough guy but Bobby. He didn't start trouble. He definitely looked up to Donnie." Donald Fell is recalled by teachers such as John Kozerski as vocal and actively seeking to instigate others to misbehave. Mr. Lee, on the other hand, was described as quiet, and a loner. "Wherever Donnie went, Bobby was sure to go, like Mary and her little lamb," observes Terri Fell.

FELL-00000682

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 62

According to Robert Lee Sr., when Donald Fell would be suspended, he would encourage Robert Lee to join him and hang out. "Bobby would go in, tell a teacher, 'fuck you,' and they'd go hang out together," recalls Mr. Lee.

Further evidence of the dynamic between the two emerges in their comportment after arrest. Mr. Lee wrote long letters to his father, discussing his relationship with Mr. Fell.

Bobby Lee wrote, "he always has to have his own way and I do not live up to his expectations he'll flip, throw a tantrum till he gets his own way and me having to do what he expects me to do. Puts me into jeopardizing my friendship ((half of it)) and lose the best friend I have ever had. He thinks he can read me like a book but he can't..."

The letters reveal how difficult it was for Mr. Lee to bear rejection or even disapproval of Mr. Fell.

Mr. Lee's records describe his history of behavior problems relating to jealousy over the attention his siblings got. He wrote of Mr. Fell, "He was a person that thought of me first...once we started something I would really have no choice but to finish it with him because he wanted me around..."

One of those more recent Fell exploits was the reported kidnapping of Bethany Brashears in late spring 2000. Ms. Brashears reports that after Donald Fell began to hold her against her will, Bobby Lee joined him in the apartment where they were holed up with Mr. Fell's girlfriend Lynn Roberts. Mr. Fell would, at times, assure her that were he to kill her in the woods somewhere, friends of his would help him to cover it up and to hide her body. Mr. Lee chimed in to affirm Mr. Fell's claim, contributing to her intimidation.

Jesse Williams employed both in his carnival in summer 2000. Bobby Lee was working for an animal preserve in Florida. Mr. Fell convinced Mr. Lee to join him in Pennsylvania that summer, working in the carnival. Given Mr. Lee's love of animals, there is no clear indication why Mr. Lee chose to work with Mr. Fell instead, other than his attachment to his friend.

According to Jesse Williams, "Bobby followed Donny; he looked up to Donnie, anything Donnie told him to do, he would do it. He would follow my direction whenever he was on a different game, but not when he was around Donnie. For that reason I would work them separately. Donnie was always his way or no way."

During that same period, Mr. Fell and Mr. Lee traveled one day to Woodstock with Chris Eile and Mr. Fell's sister Terri. Mr. Eile later reported to police that with little provocation, Donald Lee attacked him by kicking him in the head and ribs. Mr. Lee

FELL-00000683



Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 63

joined in by striking Mr. Eike as well; the assault ended with Mr. Fell urinating on Mr. Eike as he lay unconscious. Mr. Eike, according to Mr. Fell, ended up in a coma; Mr. Fell and Mr. Lee were arrested on assault charges.

Later, according to Ms. Kondraski, she challenged Bobby about why he took part in the assault that led to his arrest. Bobby replied, she relates, that Donald Fell had asked him to. Shane Lee recalls how Mr. Fell later bragged that he attacked Mr. Eike because he did not feel like paying the victim for the drugs Mr. Eike had given them; Mr. Lee asserts that Mr. Fell concocted a story, and Terri Fell joined them in a lie, that Mr. Eike had gotten fresh with her.

Both the Lee and some members of the Fell families assert that the other man brought out the worst in their relative. Both may be right.

There is evidence, however, that the Lee family more actively endeavored to keep Donald Fell away from Bobby Lee. Consequently, Bobby would conceal the contact he had with Donald Fell. When Donald Fell went to stay with Bonnie Tonte, for example, Bobby Lee never told his father that he was going to see him, recalls Robert Lee, Sr. "We thought he was going to see his step-brother Anthony," recalls June Kondraski.

On the other hand, while the Fell family did not express particular fondness for Bobby Lee during this evaluation, no history has emerged that the Fells or Williams attempted to keep them apart – to the end that Donald Fell needed to lie to hide his contact with Bobby. Robert Lee was in Vermont, a guest of Debra Fell. Yet Mr. Fell has long ago left Bonnie Tonte's home, and was no longer welcome in June Kondraski's home.

Donald Fell went to Vermont for a number of reasons: he had been invited by his mother, and he had outstanding warrants and increasing attention to a flurry of car break-ins he had been involved in. Other than Vermont, however, there were no established locations where Mr. Fell could attempt to start fresh and without the encumbrances of police familiarity with his delinquency.

Bobby Lee, meanwhile, had already spent considerable time in Florida, and was planning to return. There, he had discovered his unusual talent for exotic animal handling. Mr. Lee's family had expected him to return to his emerging calling in Florida; he prepared them, by saving his money, arranging a payday, and having his family drive him to the bus station. Two buses were leaving from Wilkes-Barre at the same time, reports Robert Lee, Sr. One was headed to Florida; the other, to Vermont.

Instead, however, Robert Lee secretly boarded the bus from Vermont. Mr. Lee had no job there, no family there, no familiarity with the area, and no plan. But Donald Fell asked him to come to Rutland, and so he did, that late October 2000 day.

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 64

All the while they were there, Mr. Lee never asked his family to return to Pennsylvania, and did not even advise them where he was. Yet the month he spent in Vermont provided no significant endpoint, gain, or opportunity for Mr. Lee.

Mr. Lee's decision to travel to Vermont, and to stay indefinitely, solely as a result of the request of Mr. Fell, supports my professional opinion that Mr. Fell had a dominant influence on Mr. Lee, and was able to influence his significant life decisions.

There is no dispute that the fatal assaults began with Mr. Fell's attack on Charlie Conway. While the sequence of subsequent events is disputed, several points remain clear:

> a) Bobby Lee was hosted by Debra Fell, and had no history of a particular ongoing conflict with her when he killed her
> b) The conflict history between Mr. Fell and his mother has been well-documented
> c) The attack took place so physically close to where Mr. Fell killed Charlie Conway that Mr. Fell could have easily and successfully intervened – especially since Debra Fell was addressing him with "I love you Binker."
> d) Jeanette Banas received a telephone call that night in which Debra Fell indicated that she believed Donald Fell would kill her
> e) Given that two people were killed – Debra Fell and Terri King, thus silencing them as witnesses to a major crime, Mr. Fell had everything to gain by enlisting Mr. Lee as an accomplice. Were Mr. Lee not to have killed Ms. Fell, Mr. Fell would have been faced with the dilemma of a murder on his hands and two witnesses. With Mr. Lee's involvement in Debra Fell's death, Mr. Fell eliminated witnesses and now cemented Mr. Lee to be invested in their successful escape from the scene.

According to Mr. Lee, Mr. Fell implored him to attack Ms. Fell with, "kill her come on you have to I killed him fucking stab her cut her though she was on the floor moving kick her make her stop stab her cut her through (sp?) some more start kicking-hacking make me hear it keep cutting now good I am going to take a shower I want you to start packing the (clothes - ) and bring me some pants."

Mr. Fell asserts that he was not involved in his mother's death, and that he could not stop Mr. Lee from carrying out an attack on her, despite being in the same room. Still, Mr. Fell is quite clear that he had no fear of Bobby Lee, whom he had reportedly smashed head first into a mirror only days earlier. Asked what he would have done had Lee confronted him with a gun, Mr. Fell replied to investigators, "I would have stuck it up his ass."

FELL-00000685



Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 65

Subsequent to Ms. Fell's killing, Mr. Fell did not confront Mr. Lee in any way. Chris Kolojeski, who encountered them only one day after the murders, observed Mr. Fell and Mr. Lee to be very active together, and the two left the Wilkes-Barre area as a team.

It is therefore my professional opinion, with psychiatric certainty, that Robert Lee would not have threatened or participated in the murder of Debra Fell, his friends mother without – at the very least -- Donald Fell's active approval.

Mr. Fell has indicated that seizing Ms. King and her car was his idea. There is not enough information to distinguish a leader and follower for the murder of Terri King. Both men took an active part, and each savaged her with rocks crushing her head and kicks and stomps that crushed her neck, respectively.

Subsequent to their arrest, Robert Lee asked to be separated from Mr. Fell. Mr. Fell sought appointment to NWCF janitorial detail and reportedly engaged Mr. Lee as he worked in the area. According to Robert Lee Sr., his son wrote letters to him, expressing a sense of intimidation by Mr. Fell.

Clearly, Donald Fell was an extraordinarily important person in Robert Lee's life. Mr. Fell's influence on him to take initiatives he would not otherwise take is well established and observed by others. Mr. Lee, as an explosive, emotionally unstable person, was exploited on other occasions by Mr. Fell, as an antisocial-by-proxy, extending Mr. Fell's ability to be destructive.[33]

Available history does not reflect the same level of influence of Robert Lee on Donald Fell. While the two were closest of friends, Mr. Fell did not demonstrate the level of affectedness that Mr. Lee did. When asked by Dr. Wetzel about Robert Lee's death, Mr. Fell showed no particular emotion, and did not even think to list the item among the three saddest things that had ever happened to him – although Mr. Fell reported seeing Mr. Lee's body taken away from his cell after its discovery. Some who had no acquaintance with Mr. Lee might be expected to register an emotional response to witnessing that spectacle alone.[34]

---

[33] Starwnt, TL. (1997). **Antisocial personality by proxy: The Norton-Sims Syndrome.** Journal of Psychology, January 1997, 131(1)

[34] Ursano, RJ & McCarroll, JE (1990). The nature of a traumatic stressor: Handling dead bodies. Journal of Nervous & Mental Disease, 178(6), 396-398.

FELL-00000686

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 66

> *14) Given all of the above diagnostic and developmental information, what aspects of Mr. Fell's history represent the most demonstrated nexus to a criminally violent and homicidal outcome?*

Violence is a multifactorial public health problem. Like other public health issues, however, it is helpful to distinguish the most influential factors that elevate one's risk for future violence. As in risk assessment in other populations, actuarial prediction of violence outpaces the predictive accuracy of clinical judgment.[35]

The most demonstrated predictive link to future violence is psychopathy, as borne out by the PCL-R.[36] This instrument identifies traits that are stable over time and provides a measure of an enduring violence risk.

The VRAG, or Violent Risk Appraisal Guide[37], is the first well-researched and widely used actuarial risk assessment instrument that specifically explored recidivistic violence. Rather than clinical impressions, VRAG variables were measured with reference to detailed and complete psychosocial histories.

Twelve scorable and other variables of high and low risk comprise the VRAG, which reflect childhood history, adult adjustment, offense characteristics and test assessment. The PCL-R is the most potentially heavily weighted item on the VRAG, and contributes heavily to Mr. Fell's high score in this case.

Indicators of high risk are Mr. Fell's not having lived with his biological parents to age 16, school maladjustment before grade 8 featuring severe discipline and attendance problems, history of alcohol problems, having never married, failure to comply with court conditions, personality disorder diagnosis, not a schizophrenic, attitudes unfavorable toward convention, attitudes supportive of crime; and a PCL-R score of 35 or more.

Mr. Fell scores a 29 on the VRAG. This places him at a percentile of 99 and with a likelihood of violent recidivism exceptionally high relative to his peer group.

Other factors that show significant correlation are Mr. Fell's history of school suspension, first arrest before age 16, childhood behavior problems before age 16, short jobs only, living in a transient situation, admission to corrections, history of charges for

---

[35]

[36]

[37] Quinsey, V.L., Harris, G.T., Rice, M.E. & Cormier, C.A. (1998). **Violent offenders: Appraising and managing risk.** Washington, D.C.: American Psychological Association. pp 141.-149

FELL-00000687

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 67

a violent offense in the past, age of offense below 26, a score of over 35 on the PCL-R, and stranger victim.

The Violence Risk Appraisal Guide, featuring twelve items, one of which is the PCL-R, outperforms clinical predictive efforts, but does not account for patient and life variables such as family support, access to weapons, and changes in procriminal attitudes.

The Historical/Clinical/Risk Management (HCR-20) incorporates 10 historical items (previous violence, young age at first violent incident, relationship instability, employment problems, substance use problems; major mental illness; psychopathy; early maladjustment; personality disorder; prior supervision failure), 5 clinical items (lack of insight, negative attitudes, active symptoms of major mental illness, impulsivity, unresponsive to treatment), and 5 risk management items (plans lack feasibility, exposure to destabilizers, lack of personal support, noncompliance with remediation attempts; stress).

While there is clearly overlap among the instruments, especially with regard to the historical factors, clinical qualities even in non-patients do enrich the sensitivity for identifying at risk individuals. Mr. Fell is clearly represented in the HCR, but not to the complete degree that his history reflects in the other instruments.

These factors also demonstrate how some psychosocial factors contribute to risk of future violence, but clearly represent less of a causal nexus than those arrives at through careful methodological study. Furthermore, clinical judgment is helpful to account for items that have not been sufficiently proven or disproven to relate. Mr. Fell's sadism and blood lust are unusual and rarely studied. The link of these items to Mr. Fell's violent trajectory embraces his stated threats and ambitions, and his source of passion.

### 15) *What evidence reflects on Mr. Fell's remorse for the crimes of November 27, 2000?*

It is my professional opinion, with psychiatric certainty, that from the point of his recognition of what he had done, Donald Fell has demonstrated no more than superficial remorse for his actions.

According to Robert Lee, Mr. Fell invited him to explore the neck muscles of Charles Conway's corpse. This depersonalizing relationship to the corpse is devoid of remorse.

After Debra Fell was killed, Mr. Lee recalled Mr. Fell engaging him excitedly. "Do you realize we're free?" he quoted Fell. "This is only the beginning!" Mr. Fell's reported expression of excitement is devoid of remorse.

FELL-00000688

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 68

There is no indication that Mr. Fell delayed his departure from the REDACTED death scene, or were disorganized in any way. That Mr. Fell did not show signs of contemplation or hesitation reflects his lack of remorse at the time.

According to Bobby Lee, after the killings, Mr. Lee felt panicked and distressed, and did not immediately pack clothes as Mr. Fell had directed. Meanwhile, Donald Fell took a shower and then, joined Mr. Lee as they packed belongings.

After kidnapping Ms. King, Mr. Fell drove with Mr. Lee and Ms. King for hours before killing her. There is no indication that they discussed what happened. Mr. Fell indicates that Ms. King was not aware of what they had already done. His not communicating about the crime also supports the impression of Mr. Fell's lack of remorse.

All three bodies were left with no attempt at covering them. Those gestures have been associated with remorse in the forensic literature.[38]

Upon disposing of Ms. King's belongings, Mr. Fell engaged Michael Leight, a Burger King employee, hoping to buy recreational drugs with money stolen from Ms. King. Mr. Fell showed no sign of emotional distress to Mr. Leight that would reflect remorse.

When the killers could not work out a deal with Mr. Leight on the marijuana they sought, Mr. Fell continued on. He displayed no deviation from his appointed escape out of need to cloud his head of what he had done. That Mr. Fell did not aggressively seek out intoxicants in the aftermath of the crime supports my professional opinion of a lack of remorse.

When he later reached Chris Kolojeski, Mr. Fell carried on as usual. He played cards, sought drugs, hung out, and displayed no unusual behavior to his friend. At one point, Mr. Fell observed that he had nothing to live for, this comment could reflect regret. However, it is a comment that Mr. Fell has made at other times as well. As such, that comment did not inspire any particular concern in Mr. Kolojeski. Nothing in Mr. Fell's behavior suggested the remorse of a person who had killed another — let alone his own mother.

Mr. Fell never turned himself into police, and never planned to.

---

[38] Douglas JE, Burgess AW, Burgess AG, Ressler RK. (1992). Crime classification manual: A standard system for investigating and classifying violent crimes. Jossey-Bass Publishers: San Francisco. p. 251.

Re: Donald Fell
Michael Welner, M.D.
July 5, 2005

Page 69

Mr. Fell never expressed an apology to his family in the aftermath of the killing. Even after he was arrested -- and no longer had to conceal himself from arrest -- Mr. Fell primarily used his communications to assert that it was not he who killed Debra Fell.

When taken into custody, Mr. Fell displayed no remorse in his first statements to police.

Even when confronted, by police, completely sober, he exhibited no remorse.

Only when he confirmed that Debra Fell referred to him as Binker did Mr. Fell acknowledge regret, in the context of his mother.

Mr. Fell contributed to the discovery of Ms. King's body, only in the context of fostering good relations with the authorities, not manifesting any regret over her passing.

Subsequent to his arrest, Mr. Fell has neither required nor requested mental health counseling to help him cope with his part in the three killings. In his interview with Dr. Wetzel, he does not mention any of the victim's names, nor note any distinct personal message.

"I was sorry for what occurred... There's not a day that I'm not sorry about this things. If I could change things, I'd rewind." Asked about another victim, he responds, "pretty much along the same lines...."

Later interviewed by Dr. Rabun, as he pursued his defense, Mr. Fell asserted, "I am absolutely sorry about the things that allegedly happened."

That he took no ownership of the crime reflected his lack of remorse. In the interview with Dr. Wetzel, Mr. Fell maintained a detached relationship to what happened, referring at most to what he attributes to Mr. Lee.

Reflecting on his actions several years later, Mr. Fell explains,. "At the end of April," he says, "I accepted Jesus Christ. It took that long to forgive myself so that I could ask forgiveness from God. Because if I couldn't forgive myself, how could God?" According to Mr. Fell, "Having found Jesus means I can try to put the worst of it behind me....whenever I think about it, I'll definitely be sad...I know I can definitely put it behind me" He adds,

"It's best to ignore (what he has done)....(You) don't want to put yourself in a position to tempt yourself to do wrong."

FELL-00000690

Re: Donald Fell
*Michael Weiner, M.D.*
July 5, 2005

Page 70

Mr. Fell's expressions are more conspicuous in their hollowness when compared to the writings of Mr. Lee, who penned to his father, "I will never be at peace with myself...there is no hard feelings about nothing blame me. You have never done anything to hurt me just to help. Tell Anthony I love him and to stay out of trouble."

### 16) What history reflects on whether Mr. Fell will be a serious risk of violence in prison?

The literature on risk of violence in prison is emerging. Actuarial prediction of violence continues to challenge the predictive value of clinical judgment. However, because prison violence is not as well studied, research is increasingly focusing on this important area.

VRAG Scores have shown some predictive value of assaults and other disciplinary infractions in a maximum security prison.[39] Mr. Fell's score of 29 is 99% among inmates.

One prison study independent of the VRAG and PCL-R found that violent prisoners were more likely to have a juvenile arrest history and a history of psychiatric hospitalization. They were less likely to be married. The violent prisoners were also more likely to have a history of violence by arrest or self-report, during the previous five years.[40]

A federal prison population, in which Mr. Fell resides, has demonstrated that the presence of psychopathy is a valid predictor of violent recidivism among the incarcerated.[41]

A recent study centered in a maximum security setting identified several variables to examine, among other things, the most influential predictors of prison violence. Inmates lower than 21 upon entry were 3 times more likely to commit violent acts than those ages 31-35. Those who had not completed high school were twice as likely to commit violent acts. Those with prior prison terms were likely to commit violence s well.[42]

---

[39] Kroner and Mills 1997
[40] Shaffer. C. Edward; Waters, William F.; Adams, Serrhel G.; **Dangerousness: Assessing the Risk of Violent Behavior** *Journal of Consulting & Clinical Psychology*, Vol 62(5), Oct 1994. pp. 1064-1068
[41] Serin R, Amos N **The role of psychopathy in the assessment of dangerousness** Int'l Jl of Law and Psychiatry Vol 18(2), Spr 1995.
[42] Cunningham 2005

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 71

As a young adult, it is unclear how much on Mr. Fell's institutional adjustment will parallel his earlier experience. At St. Michael's group home, according to Terri Fell, Donald Fell would "constantly" get into fights. The group home was well structured, but as Terri Fell relates, "he didn't like it because of the black kids."

Out in the community, Mr. Fell has the opportunity to choose his acquaintances. Behind bars, however, he may confront his sensitivities. Jesse Williams, his cousin, and his ex-girlfriend Lynn Roberts characterized him as a racist, and Mr. Fell acknowledged his mother brought a black man home to meet him because she had the same impression of him. While Mr. Fell, in his pre-sentencing psychiatric interview, asserted that he is not a racist, his possessions on REDACTED included a Ku Klux Klan patch and, inexplicably, a book on conversational German.

In the current pre-trial setting, Mr. Fell has been involved in occasional incident that have not led to major injury. His medical record notes, on one occasion, an ice pack to his hand after he had "got into a fight with the wall."

Asked if he has a problem with his temper in the psychiatric interview, Mr. Fell replies, "I did. Somehow I've managed to get a reign on it. I've come to see things in a different way since this has happened." When confronted about incident since he has been in custody, Mr. Fell replies, "Things that used to bother me don't bother me any more." He explains that the reason he "blew up" in custody is that "I don't have people to talk to, things build up…now I'm trying to relieve that pressure in a positive manner. I've started working out again."

Since actuarial methods have greater predictive value, it is unclear what can be discerned from Mr. Fell redirecting his anger and energies. He remains, in his grievances against corrections officials, prone to interpreting their actions as breaches of protocol and takes personal umbrage. While the grievance mechanism is a non-violent outlet, he expresses frustration with losing disciplinary reviews.

For a man who, by his own admission, is used to getting what he demands, Mr. Fell's adjustment to the limits ahead of him remains difficult to predict. He has initiated violence for far easier provocations than those confronting him in prison.

Ultimately, there is substantial risk that Mr. Fell will become violent in custody, based upon actuarial approaches. The newness of establishing a methodology for ascertaining risk of violence in maximum-security institutions is relatively new, however. Therefore, while Mr. Fell is a psychopath whose VRAG score is quite high, interpretations in this setting must allow for more progress to come in this area.

Re: Donald Fell
*Michael Welner, M.D.*
July 5, 2005

Page 72

## Update

Additional documents have been submitted by defense counsel in recent days, and have not yet been made available for my review. These include Dr. Mills notes, Dr. Cunningham's notes and slides, and additional sources not noted above. When I have the opportunity to review these, I will supplement my findings accordingly. This report, however, is being provided in order to comply with the Court's request for timely notification to both sides of my findings.

Very truly yours,


Michael Welner, M.D.

Associate Professor of Psychiatry, NYU School of Medicine
Chairman, The Forensic Panel

FELL-00000693

# EXHIBIT 11

# CONTACT SHEET

CASE NUMBER:   —

CLIENT NAME:   fells

ADDRESS:   —

MONTH:   April '85

WORKER:   JMc for F.K.

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE)<br>2.) OUTCOME: (WHAT TRANSPIRED) |
|---|---|
| DATE: 4/22/85<br>LOCATION: fell home<br>WHO SEEN:<br>Mrs. fell<br>Don "<br>Terry "<br><br>Theresa Sharpe<br>(maternal grandmother) | 1.)<br>2.) Mrs. fell began expressing remorse for the incident which occurred on 4/21/85. She reports that she & husband began arguing over issue of sexual abuse of their daughter. Mrs. fell stated husband was angry & struck out at ▨▨ a pillow & got her leg w/ the knife. She reports wound as being superficial. She states she retaliated w/ the knife and cut his back-again states injury is superficial. Mrs. fell signed |

FELL-00000694

release of information for hospital record,
verification of extent of injuries.
Questioned parents use of alcohol &
Mrs. Fell stated both she & her husband
rarely drink. Mrs Sharpe verified this
statement, both attribute it to recent stress in
family. Children appeared to be very
hyper, climbing all over this worker
while speaking with their mother.

Worker explained that information
received today will be given to Frank
Kumski as he is active with the case.


Direction: children do not appear to
be at risk at present. Children
will remain at home. follow up
by active worker after 4/24/85.

FELL-00000695

# EXHIBIT 12

# CONTACT SHEET

CASE NUMBER:                                    MONTH: May 85

CLIENT NAME: Fell                              WORKER: Kumich

ADDRESS: REDACTED - FELL

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE) |
| | 2.) OUTCOME: (WHAT TRANSPIRED) |

DATE: 5-1-85

LOCATION: Agency

WHO SEEN: Phone call to Mrs. Fell

1.) Called Mrs Fell after a CPS referral.

2.) Called to make arrangements to meet with the family. Made arrangements to meet with them on 5-1-85. The allegations are that Mr. Buble had hit Donald with a board and performed anal sex on him.
      I called Det. Keiper and he would accompany me to the interview on 6-6-85.

Date: 5-6-85

Location: Fell Home

Who seen: Mr Fell
              Mrs Fell
              Donald Fell
              Terr Fell
              Det Keiper

1.) Meeting with the family
2.) Interviewed Donald. Donald was very hyper and could not sit still. But he was able to state that Mr. Buble penetrated him digitally. Det Keiper felt that Donald can not be qualified as a witness. No Criminal charges.
      Informed family physical would be unfounded. Sexual would be indicated.

Date: 5-8-85

Location: Agency Office

Who seen: Called URC

1.) Called about the Fell family Treatment Plan.
2.) Informed Parlette that our agency had indicated the Sexual abuse. Also informed that we would assign family to Services.

FELL-00000696

Date: 5-16-85
Location: Agency Office
Who Seen: called Mrs Fell

1.) Called to carry by to the home
2.) Open of the 5-21-85

Date: 5-22-85
Location: Agency Office
Who Seen: called URC, Paula

1.) Call about the family, wanted to know if they are needed treatment

2.) Family members all audio therapy

Date: 5-24-85
Location: Agency Office
Who Seen: Call from Mrs Fell

1.) Called about visit to the home
2.) Visit cancelled reset for 5-31-85

Date: 5-31-85
Location: Fell Home
Who Seen: Mrs Fell
              Mr Fell
              Donald
              Teri

1.) Visit to the home
2.) Took Social History. D. + intake assessment for Sarai..

FELL-00000697

# EXHIBIT 13

# CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: 7/85

WORKER: Ceairarro

| CONTACTS: | 1.) GOAL OF CONTACT: (PURPOSE) 2.) OUTCOME: (WHAT TRANSPIRED) |
|---|---|
| DATE: 7/12/85 LOCATION: Homevisit WHO SEEN: Transfer Visit W/ Frank Kromoke | 1.) Met Mr & Mrs Fell & the Children. Kids were healthy 2.) appeared happy. No issues Parents communicating better. Mr Fell working - Mr Fell watches kids. |

7/19/85
Had scheduled H.V
- Had to be canceled
due to emergency on
mothers case.

FELL-00000698

9/26

Unannounced H.V. - no one at home.

10/24
H.V
Mrs Fell
Donald
Terri

Had interview w/ Mrs Fell, Donald &
Terri, Mr. Fell was at work.
The children appeared healthy &
well cared for. Donald had been
disciplined for not obeying mom —
He was sent to his room for
a short duration. Donald is reportedly
somewhat hyper in school. No major
issues at this time. Mrs Fell may
be laid off soon & will be staying
home w/ the children. Mrs Fell showed
me the Halloween costume she made
for the children.

FELL-00000699

# EXHIBIT 14

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: August

WORKER: DiSerena

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
|---|---|
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 8/8/91

Location: Phone

Who Seen:

Jackie Sharp
(sister)

Kids were
in Virginia all week

last night - during
- al beats her
up

1. ) Jackie claims that
Debbie is drunk every
2. ) night + she has a
different guy there every
night (al, Bud + Danny).

— She ~~~~ starts drinking
around 4 pm. — Jackie
said the kids stay
at her place quite often.
— last night Terri stayed
overnight b/c some guy Danny
was there + he threatened
to throw her in the pool.
Jackie said her family is
concerned ab the kids — als

FELL-00000700

then put Danny J on the phone,
but he told her that Al &
his mom broke up & he has only
been to their new apt. once.
He said his mom doesn't drink
Terri then got on the phone & she
said Al sometimes comes over on the
weekend & sometimes he hits her mom.
She said her mom does drink every
night, — Last night she slept at
her grandmothers b/c mom had a
friend, Danny, over & they were
drinking & she didn't like it b/c
he threatened to throw her into the
pool.
        —while we were talking there was a
commotion in the background & Jackie got back
on the phone & said Debbie was there b/c
Danny told her that Jackie had called.
— Debbie's mother, Theresa Sharpe, then
got on the phone, she said "My
daughter has a drinking problem."

FELL-00000701

was afraid to go out she
she didn't want her mom to
be mad her.

Wkr then called Ellis Carle + he
said to ~~[redacted]~~ get Teri to talk to.
— He also suggested that Debbie go to
her mom for a urinalysis.
Teri then came outside + told her
mom she wanted her to get help for
drinking — Debbie asked her why she
thought that + Teri replied "B/c
aunt Jackie said so." They talked
a little while longer + Teri agreed
to go home. The police officer left
+ Teri went upstairs to ~~[redacted]~~ put her
clothes on.

Wkr talked to Debbie a/b having
men over + drinking. Wkr pointed out
that she could smell alcohol on her
now (however, she did not appear
intoxicated) — Debbie said it was
from last night — that she hasn't
brushed her teeth yet, but she

FELL-00000702

[Fell F2]

She them asked wkr to come over. wkr could hear Debbie in the background asking wkr to call her. wkr said she'd ~~will~~ be over in an hour.

---

A few minutes later Theresa called Rach asking wkr to come out immediately b/c Debbie was leaving w the kids.
— wkr notified Ellis Carle, supervisor, of the situation. He said if Debbie is intoxicated now, wkr needs to assess if she is capable of taking care of the children.

---

When wkr arrived Debbie was outside, Donny was in his bedroom + Teri was in her grandmother's side of the house.
— Debbie had called the police + Sgt Smith arrived. — Debbie wanted Teri to come out. wkr went in + spoke to Teri, but she said she didn't want to come out — she said she wanted her L. + h.ls. — She said she

FELL-00000703

FELL-00000704

thinks he needs to be evaluated —
Beats up on Levi + his mom. + he
smokes. — Says Debbie is on speed
given to her by her Doctor, Dr Alexan
on Susquehanna Ave in Pittston.
— Theresa then called her daughter Donna
William + gave her the phone. — Donna
told her last Sat. she saw Al pick
Debbie up + threw her on the floor. Al
was drunk. Donna said "I've seen
Debbie drinking, but I don't know if she's
ever been drunk around the kids."
      Theresa then asked her to call
Tony's Bar + Grill + talk to the waitress
her name is Rose + she told her
that — als 5 wks ago Debbie was in there
drinking + the kids came = looking for
her + she chased them out. — She
said Debbie was intoxicated. — Alex asked
if she knew where the kids went +
she said they were staying w/ friends
she at a n  -n lod -l the bar. — She

FELL-00000705

discussed the children's need for stability and appropriate relationships w/ men - i.e., not violent ones. — She claims he only hit her once + that was while the kids were in Virginia w/ their aunt.

She said her mom just wants to take her kids away + she does not want her to ever get them. She also said her mum wants her to live life the way she does.

Wher again told Debbie to go to the court advocate. - She said she would. — Wher also told Donny that his mom had to go to an appt. + he would need to go to his grandmothers.

---

Wher called Court Advocate + told them to expect Debbie - C+P and pay for urinalysis + breathalyzer

FELL-00000706

(Fell / )

did tell wkr that Debbie used to
come in during the day + drink.
and z cald

- Theresa then told wkr that
Teri ___ also have lice -

- At this point Teri came back.
Wkr explained that she + Denny cold
stay here while her mum went to
an appt. - She said Denny was
mad at her b/c she talked to
this wkr. - Both this wkr + Theresa
encouraged ___ Teri to tell the truth
+ wkr explained she is there to help.

- Wkr then went over to Debbie's
+ told her to go to the Court advocate
before 12:30 and her mother could
watch the kids. - Denny came downstair
but he really wouldn't talk to wkr.
wkr also discussed w/ Debbie her
___ drinking + the various men that
___ supposedly in + out of her home. - Wkr

FELL-00000707

# EXHIBIT 15

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: August

WORKER: D. L. Feima

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 8/8/91

Location: Phone

Who Seen:

3:18pm

Jerri

1. ) To return Theresa's call.

2. ) - Theresa was not in - wkr spoke to Jack - he said Theresa would be back in a little bit. - He said Donny had went w/ Theresa, but Jerri was there. wka asked Jerri where her mom was + she said she went to her appt.

See attached Pink Sheet

Theresa called wkr to say that Debbie would not let Jerri stay overnight. - wkr explained that Debbie has the right ⟹

3:40 pm

to allow her children to stay overnight
or not stay overnight. - Theresa
said she felt if Leri went over there,
her mum may go to Lenny's.
— Wkr then hung up & spoke to Ellis Carle
Supervisor, - he concurred al wkr that Debbie
is the mother & has custody of the kids;
therefore she can tell her daughter that she
has to sleep at home.
— Wkr called to Theresa back &
relayed Ellis' words. wkr explained that
Theresa needs to go along w/ Debbie's
decision & not undermine her authority.
She said if Debbie said no, then
she'd tell Leri she can't stay over.
Wkr reminded her that if the children
are in danger she can call Helpline
after hours.

FELL-00000709

# EXHIBIT 16

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: August

WORKER: DKReimer

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
|          | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 8/8/91
Location: Phone Call to the Court Advocate 3pm
Who Seen:

1. ) To find out if Debbie came in for her urinalysis.

2. ) — No she was not in.

8/8/91
Phone Call to Debbie at 3:17pm

— no answer

See attached Pink Sheet

8/8

Cindy, from the Court Advocate called + informed who that Debbie had came in at 3:45pm + the breathalyzer came out negative for alcohol.
— They also asked for a urine samp

FELL-00000710

But she said Debbie only
gave a small amount.
—She said the urinalysis does
not test for alcohol.

FELL-00000711

# EXHIBIT 17

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: October

WORKER: DSSkin

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 10/11/91

Location: Phone

Who Seen:

Bruce
Wilson

1. ) To get an update on Denny's behavior.

2. ) Bruce said Denny was hospitalized b/c of very aggressive behavior. — He is doing okay at the hospital. He will keep informed after b/c his progress. — The plan is for him to be returned home.

FELL-00000712

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: October

WORKER:

---

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

---

Date: 10/25/91

Location: cont

Who Seen:

Bruce Wilson

1. )

2. ) Bruce Wilson informed w/kr that:

Denny being discharged on Wednesday, Oct 30, 1991 will be recomending Out-patient through CSC and In-Home Based Team.

— Says mother has been attending counseling at Denny.

FELL-00000713

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: November

WORKER: DGlenn

| CONTACTS | 1. ) GOAL OF CONTACT: (PURPOSE) |
| | 2. ) OUTCOME: (WHAT TRANSPIRED) |

Date: 11/6/91

Location: Voice Mail

Who Seen:

1. )

2. ) Jean called + left message for wkr to call her re. Don Fell

11/7/91
Phone
Jean

next appt:
Tues 11/12 at 2pm

1) To return Jean's call

2) Donny was released on Oct 30 — He had an appt the next day which was ^they cancelled + then they had one for 11/4 which she missed b/c she forgot. Then she came in on 11/6/91. — she said she understands

FELL-00000714

that the hospital recommended
Home-Based, but she needs a
written referral.

Wen said she'd check up
Bruce Wilson at the hospital
to ensure that he was sending
them something.

FELL-00000715

# EXHIBIT 18

DISCHARGE/REFERRAL FORM

## First Hospital Wyoming Valley

A FIRST HOSPITAL CORPORATION FACILITY

149 Dana Street
Wilkes-Barre, PA 18702
717-829-7900    1-800-624-9902
FAX 717-829-7943

**DATE:** October 31, 1991

**TO:** Luzerne County Child & Youth
Attn: Deanna German

# REDACTED - FELL

**APPOINTMENT DATE/TIME:** _____

**PATIENT NAME:** FELL, Donald #7483    **BIRTHDATE:** 04/30/80

**ADDRESS:** REDACTED - FELL    **TELEPHONE:** REDACTED - FELL
Wilkes-Barre, Pa. 18702

| 09/30/91 | CHILDREN'S | Anthony T. Denaro, M.D. |
|---|---|---|
| **ADMISSION DATE** | **PROGRAM** | **ATTENDING PSYCHIATRIST** |

**DISCHARGE DATE:** 10/30/91

**DISCHARGE/REFERRAL DIAGNOSES:**

**AXIS   I:** Conduct Disorder, Undifferentiated type.

**AXIS  II:** No Diagnosis.

**AXIS III:** No Diagnosis.

**DISCHARGE/REFERRAL MEDICATION (Including amount):**

NONE.

## FHC Pennsylvania Network

Clarion Psychiatric Center, First Hospital Wyoming Valley, Hickory Ridge Chemical Dependency Services,
The Horsham Clinic, The Meadows Psychiatric Center, Roxbury, Southwood Psychiatric Center

FELL-00000716

CLINICAL ABSTRACT:

Donald Fell is an eleven year-old white male who was voluntarily admitted to First Hospital Wyoming Valley by his mother, Debbie Fell, upon the recommendation of the Children's Service Center. Prior to admission, Donald was extremely oppositional at home, was having trouble within the school setting, was physically aggressive towards family members which included kicking his mother and throwing darts at his mothers boyfriend. Donald, reportedly, has been playing with matches within the home and also has frequently threatened to run away from school or from home. Donald resides with his mother and sibling in Wilkes-Barre and attends the Daniel Flood Elementary School where he reportedly does inadequately behaviorally as well as academically.

Throughout his hospitalization, Donald was involved in individual, group and family therapy; in addition to, unit milieu therapy and full-time enrollment within First Hospitals Genesis School. While hospitalized, Donald received the following formal psychological test: the Wechsler Intelligence Scale for Children Revised, the House Tree Person, Piers Harris Children Self-Concept Scale, Robert's Apperception Test for Children and the Children's Sentence Completion Test.

On the milieu, Donald presented as generally compliant with the expectations and rules. He displayed underdeveloped social skills but throughout his hospitalization did exhibit improvement in his ability to relate to others. Donald exhibited minor testing of limits but was responsive to redirection. Overall, Donald did respond to authority, and the consistency and structure of the milieu. Donald also displayed improved problem solving and coping skills and only had one difficulty with a peer with regard to physical aggression. Within group therapy, initially, Donald presented as guarded with limited verbal skills. As his hospitalization progressed, Donald was able to share of his past abuse at the hands of his father, examine his anger towards his mother, and share frustration with regard to his mothers boyfriend's very recent accident. Donald was able to improve his problem solving skills with his peers and displayed an ability to be supportive to them in addition to being open to encouragement from others. In individual therapy, initially, Donald presented as guarded and denied any presenting problems and responsibility for his actions. Donald readily admitted to being angry with his biological father for his past abuse but, initially, denied any resentment or anger toward his mother. As the hospitalization progressed and Donald developed more trust within the therapeutic setting, he began to readily examine the presenting problems and his feelings with regard to family members. Donald was able to share of resentment with his mother for having allowed his father back into house on several occasions and also was able to see how his aggression towards his sister was a result of this anger towards his mother. Donald was also able to share of sadness and confusion with regard to his mothers boyfriend who had been in an accident during his hospitalization. Donald displayed good motivation to improve his behaviors and stated that he was able to forgive his mother for her poor judgement in the past. Through discussions, Donald was able to enhance his problem solving and coping skills and this was evidenced in his overall behavior on the milieu. Donald was able to examine alternatives to his acting out and together with his mother worked on a behavioral management system to be implemented in the house following his discharge.

(Continued)

FELL-00000717

CLINICAL ABSTRACT CONTINUED:
FELL, DONALD #7483
PAGE 2

Donald was also able to see how his behaviors in many ways paralleled that of his fathers and displayed strong motivation to alter these. Within family therapy, Deborah Fell presented as concerned and frustrated with Donald's behavior. She was open to suggestions and interventive strategies given and readily admitted to having short comings with regard to her parental skills. She appeared to have a fairly good understanding of Donald's feelings and anger and was encouraging of Donald to share these within therapy. She was also open to Donald expressing his resentment toward her and was also able to see how her authority had been diminished within the home. Family therapy focused on establishing appropriate expectations, with Deborah Fell able to work with Donald in establishing a behavioral management system. Deborah Fell understood the need to assert authority over Donald and her daughter and also recognized the need to continue to work on her parental skills. She was in agreement with the recommendation for in-home base family services and made assurances to follow through on treatment recommendations for Donald. Both Donald and Deborah Fell felt Donald benefitted significantly from hospitalization with Donald being discharged into the custody of Deborah Fell.


TREATMENT RECOMMENDATIONS:

    Individual and Family treatment. An initial appointment has been scheduled for Thursday, October 31, 1991 at 3:00 P.M. with Jean Viglione of Children's Service Center.

    It is recommended that the Fells be involved in the in home family based treatment program.


ATTENDING PSYCHIATRIST
Anthony T. Denaro, M.D.

THERAPIST
Bruce Wilson, L.S.W.


D:   11/07/91
T:   11/07/91
ATD/BW/dlk

FELL-00000718

# EXHIBIT 19

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

FELL, DONALD
3711793
C41492  0119

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.

REDACTED - FELL

p. Donald Fell

[handwritten clinical notes — largely illegible]

0352

FELL, DONALD
371-703
041402-0119P    11Y    043080
REDACTED - FELL
WILKES BARRE
CO

383700
043080
824-5842

PA  M  S

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

**Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.** (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tonsils etc.)

| DATE | |
|------|---|
| 4/15/92 | *[handwritten progress note]* |
| 4/16/92 | *[handwritten progress note]* |
| 4/17/92 | *[handwritten progress note]* |

FELL-00000720

FELL, DONALD

REDACTED - FELL

WILKES-BARRE GENERAL HOSPITAL

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.

| DATE | |
|------|---|
| | *[handwritten notes, illegible]* |
| | |
| | |
| | |
| | |
| 4/20/9? | Pt. behaving well on the whole on unit but conduct is often times impulsive. Very self-centered & cannot minimize for his age. Is responding to Desedrine medication. M.?. Barnes MD |
| 4/21/9? | Behaving well on Unit. He seems to be responding to medication but seems quite tense & rather unhappy. The home situation has been difficult for him & he seems most closely attached to his grandmother. M. E. Barnes MD |
| 4/??/? | *[handwritten notes, illegible]* |

FELL-00000721

FELL, POWELL
383700
REDACTED - FELL

REDACTED - FELL

WILKES-BARRE GENERAL HOSPITAL

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Torsula etc.)

| DATE | |
|---|---|
| 4/23/92 | [handwritten notes, illegible] |
| 4/24/92 | [handwritten notes, illegible] |
| 4/26/92 | Had the family meeting done. He was [unexpectedly] - cooperative at the meeting. He is at level - C |
| 4/26/92 | over all [notes] Behaviors more [much] better friendly, pleasant, cooperative [level] |

0355

FELL-00000722

FELL, DONALD

REDACTED - FELL

**WILKES-BARRE GENERAL HOSPITAL**

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tetania etc.)

| DATE | |
|---|---|
| 4/27/92 | Pt. behaving himself on Unit. He is still a very tense, unsmiling lad but he is all full of good intentions as to how he will behave after discharge. Does need hospitalization. *M. E. Barron MD* |
| 4/28/92 | Pt. behaving well on Unit. Still quite tense. Responding to medication. *M. E. Barron MD* |
| 4/29/92 | [illegible handwritten note] |
| 4/30/92 | [illegible handwritten note] |
| 5/1/92 | [illegible handwritten note] |

0356