

**PRISONER INTAKE**
**USM 129**
WESTERN DISTRICT OF ARKANSAS

USMS NO    LAST NAME    FIRST NAME    MIDDLE
05305-010    LEE    Robert    Joseph

SEX    RACE    HAIR    EYES    HEIGHT    WEIGHT
M    W    bro    HZL    508    135

BIRTH DATE    PLACE OF BIRTH    STATE    CITIZENSHIP
REDACTED - FELL
-80    NY    NY    US

FBI NO    SOCIAL SECURITY NO    ALIEN NO
REDACTED - FELL
-4687

STREET ADDRESS    CITY    STATE    ZIP

PHONE NO

---

MEDICAL:

USMS PERSONNEL PROCESSING NEWLY ARRESTED PRISONER(S) WILL VERBALLY INQUIRE OF ARRESTING/TRANSPORTING OFFICIAL WHETHER:

1) The prisoner(s) displayed any suicidal tendencies while in their immediate custody.

NO _____    YES __X__    If yes, explain.    TALKED ABOUT WANTING TO DIE.

2) The official has any independent knowledge of a suicidal history of the prisoner(s).

NO __X__    YES _____    If yes, explain.

3) Has the prisoner(s) had previous suicide attempts.

NO __X__    YES _____    If yes, explain.

VA BENEFITS  NO    MAJOR MEDICAL?  NO

FELL-00001152



*ARREST*

AGENCY CODE          LOCATION OF ARREST          ARREST DATE  CASE NO

CHARGES

******NOTE****
IF SUBJECT IS ARRESTED ON OUR CHARGES, USE THE ARREST DATE OF THE ARRESTING AGENCY
TO GENERATE A JAIL BILL FROM DATE OF ARREST.

*STATUS*

(USE IN-ADMIN WHEN SUBJECT IS RELEASED ON BOND) OTHERWISE, USE WT-TRIAL.)

LOCATION

SPECIAL HANDLING

PROPERTY

# EXHIBIT 68

SUPPORTING DEPOSITION (CPL Sec.100.20)   GENL-4 REV 01/98E                    New York State Police

STATE OF NEW YORK                                    COUNTY OF   Dutchess

_____ COURT                      Town _____ of   Dover

THE PEOPLE OF THE STATE OF NEW YORK          )                                    E-11
                                             )
              --vs.--                         )
_____            )
                                             )       SUPPORTING DEPOSITION
_____            )
                              (Defendant     )

STATE OF NEW YORK                            )
COUNTY OF   Dutchess                         )       ss.
Town _____ of   Dover                  )

| DATE | | TIME STARTED | am | FULL NAME |
| On  121200 | at | 4 :00 | ● pm | I,  Francis R Bellantoni |

DATE OF BIRTH: REDACTED - FELL 48 | NO. & STREET  REDACTED - FELL | C/T/V  Dover Plains | STATE  NY

state the following: I recall that one day I was travelling to work along ST 22 in the morning hours , I saw a car facing north along the pull off on ST 22. I saw two males outside of the car coming from the wooded area , they were about fifteen feet apart from each other, it appeared that one of the males was agitated with the other. I noticed the car and and as I passed the car I saw it had vermont plates, I also noticed a female inside the car in the rear on the passenger side. I went further down the road and realized I forgot my cell phone, so I turned around by the Palumbo block sign and headed north on ST Route 22, When I approached tthe area that the car was pulled off the road, I noticed that a female was walking towards the woods with two males behind her. They were about eight to ten feet behind her. I continued to my house and on my return trip heading south on ___ the car and the people I saw were now gone, I estimate approx ten minutes elapsed.

Q. ___ou you recall what day or time it was?

A. No

Q. Can you describe the car?

A. No, I just remember the Vermont plates

Q. The people you saw, was the women being taken by force?

A. No

Q. How fast were you driving your car on ST 22?

A. 55 mph

Q. Do you have anything to add?

A. No

### NOTICE
(Penal Law Sec.210.45)

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this ___12th___ day of ___December___ , YR  2000
              -- OR --
*Subscribed and Sworn to before me

_____ day of _____ , YR _____

(SIGNATURE OF DEPONENT)  Francis R Bellantoni

(WITNESS)

(NAME OF PERSON TAKING DEPOSITION)

| TIME ENDED | am |
| 4 :25 | ● pm |

# EXHIBIT 69

```
              Warrant Information Network
                 LIMITED OFFICIAL USE
                   SUBJECT REPORT          PAGE   1
           Generated by Transaction - Interactive Query
                 Date: 12/15/2000 Time: 07:57:14 EST


                   Name : LEE,ROBERT
                   FID # : 526229
                   Status : HISTORICAL  Subject is NOT in NCIC for USMS
```

*Alias:
 Seq. #   Alias
    1     LEE,ROBERT JOSEPH
    2     LEE,ROBERT L

*Date and Place of Birth:
 Seq. #   Date of Birth   Place of Birth
    1     REDACTED-FELL 1980     NY - NEW YORK
    2     REDACTED-FELL 1979       -

*Social Security Number:
 Seq. #   Soc. Sec. Num.
    1     REDACTED-FELL -4689

*Description:
 Seq. #   Eyes   Hair   Height   Weight   Skin   Race   Sex   Marital Stat
    1      HAZ    BRO     508      135     MED     W      M    SINGLE

                   Nationality : US - USA
                   Citizenship : US - USA
Descriptive Remarks :
 DISPLAYS SUICIDAL TENDENCIES

*Scars, Marks, and/or Tattoos:
 Seq. #   Scar/Mark/Tattoo
    1     SC R HND    3" PALM
    2     SC L HND    3" BACK

*USMS Number:    (from PTS/PPMS)
 Seq. #   USMS Number
    1     05305-010

*Subject Address:
 Seq. #   Phone          Address
    1     802-773-7920   REDACTED - FELL
                         RUTLAND, VT 05702     USA


*Profile Information:

    Money Launderer    No      DEA - GDEP
    "Kingpin"          No      Violent Offender          Yes
    Triggerlock Case   No      International Lookout Placed   No
```

```
*Name: LEE,ROBERT      SUBJECT REPORT     PAGE 2
*FID #: 526229 Generated by Transaction - Interactive Query
*                   Date: 12/15/2000  Time: 07:57:14 EST
```

*Criminal History:

|  | Arrests | Convictions |  | Arrests | Convictions |
|---|---|---|---|---|---|
| Immigration | 0 | 0 | Homicide | 0 | 0 |
| Kidnapping | 0 | 0 | Rape/Sex Assault | 0 | 0 |
| Assault/Battery | 0 | 0 | Robbery | 0 | 0 |
| Burglary/Larceny | 0 | 0 | Narcotics | 0 | 0 |
| Weapons (Firearms) | 0 | 0 | Extortion | 0 | 0 |
| Weapons (Other) | 0 | 0 |  | 0 | 0 |
| Forgery/Fraud | 0 | 0 |  | 0 | 0 |

*Threat(s):
*Warrant(s):

FELL-00001156

# EXHIBIT 70

```
*Name: LEE,ROBERT      SUBJECT REPORT      PAGE 3
*FID #: 526229 Generated by Transaction - Interactive Query
*                    Date: 12/15/2000  Time: 07:57:14 EST


                Warrant Number: 0182-1204-0294-J


                Warrant Status: CLOSED
            Originating District: 082 VT   BURLINGTON


Charge Information:
                        Agency: FBI  - Federal Agency
                                Federal Bureau of Investigation
                        Charge: 1006, KIDNAP ADULT -
                  Warrant Date: 12/01/2000
                 Date Received: 12/01/2000
                          OCDE: No
Warrant Remarks:
ORG CHG:UNLAW SEIZE, KIDNAP, ABDUCT IN INTERSTATE COMMERCE AND CARJACKING


Close Information:
                   Date Closed: 12/04/2000
                 Date Executed: 12/01/2000
                Execution Code: ARREST BY OTHER AGENCY
           Arrested in District: 010
              Arresting Agency: LOC2
        Arresting Agency Case ID:
              To Be Prosecuted: Y


Close Summary:
SUBJECT WERE ARRESTED IN AR AFTER A VEHICLE STOP.
```

FELL-00001157

**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

*United States Courthouse and Federal Building*
*Post Office Box 570*                                          *(802) 951-6725*
*Burlington, Vermont 05402-0570*                      *Fax: (802) 951-6540*

December 22, 2000

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

    Re:   <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

    The Magistrate Judge has signed an order enlarging until February 1, 2001 the time within which an indictment in this case may be returned. Accordingly, the Government will begin turning over all discovery to which you are now entitled under the Federal Rules of Criminal Procedure and Vermont's Local Rules.

**I.    Statements of the Defendants**

    Both defendants have made numerous statements to law enforcement authorities, and to others. Enclosed is a copy of a three-page written statement Robert Lee gave to the FBI in Arkansas. Reports of oral statements to the FBI by Lee and Donald Fell are not yet available to us, but will be turned over promptly upon receipt. The same is true of written <u>Miranda</u> waivers.

    Lee and Fell both made lengthy statements to New York State Police Investigator Thomas Aiken in the course of attempting to help authorities locate Teresca King's body. Aiken tape recorded those conversations and copies of the tapes, together with Aiken's scanty handwritten notes, are enclosed. Transcripts are not yet available, but will be turned over upon completion.

    Both defendants also made tape recorded statements to Rutland City Police and Vermont State Police investigators. Jim Cruise of the Vermont State Police and Rod Pulsifer of Rutland each had a recorder and separately taped the interviews. Enclosed are copies of Cruise's tapes, transcripts and the

FELL-00001158

written <u>Miranda</u> waivers.  Detective Pulsifer had a micro-cassette recorder and we are in the process of obtaining the best possible copies of those tapes.  They will be turned over upon receipt.

Enclosed also is a copy of a letter that Fell sent to Chris Kolojeski after Fell's arrest.  The original letter, and the envelope (which I am told bears Donald Fell's name) are in the custody of the FBI.  I will try to get a copy of the envelope to you as soon as possible.

## II.  Defendants' Prior Records

Records of any prior arrests, convictions, juvenile adjudications and any related matters will be turned over as they become available.

## III. Documents and Tangible Objects

Enclosed are copies of photographs taken by the New York State Police at the scenes where Teresca King's wallet and purse were found.  Also enclosed is a CD-Rom containing digital pictures taken where King's body was recovered.  35-millimeter photographs from the location where King's body was found; from the Rutland murder scene; and from the search of King's car have been requested for you and will be turned over upon receipt. Also enclosed are videotapes from the Robbins Street murder scene, and from a surveillance camera situated at a convenience store not far from where King's body was found.  That tape may or may not depict King's car passing by before her murder.

Enclosed also are miscellaneous police reports, teletypes, search inventories and other documents.  Many additional reports are in the final stages of preparation and will be turned over when completed.

King's car is being transported to an FBI lot in Albany where it will be safeguarded for your inspection.

Substantial quantities of physical evidence were recovered from the Rutland murder scene, from the place where King's body was found, and from her car.  That evidence will be sent to the FBI and the Vermont Crime Lab for analysis.  Upon its return, it can be inspected at a mutually convenient time and place.

Copies of the contents of Lee's wallet are enclosed.

## IV.  Reports of Examinations and Tests

We anticipate many such reports but none are now available, other than the preliminary autopsy reports pertaining to Debra

2

FELL-00001159

Fell and Charles Conway, copies of which are enclosed. All such reports received in the future will be promptly turned over.

**V.   Search Warrants and Electronic Surveillance**

No electronic surveillance was conducted. Search warrants, affidavits, applications and inventories will be turned over as they become available.

**VI.   List of Witnesses**

The following law enforcement authorities participated in various interviews of the defendants: Detectives Rodney Pulsifer and David Schauwecker of the Rutland City Police; Detective James Cruise of the Vermont State Police; Special Agent Jimmie Caudle of the FBI in Ft. Smith, AK; Thomas Aiken of the Brunswick Station of the New York State Police. Jeff Ross of the Clarksville, Arkansas, Police Department will also testify about the stop of the car being driven by Fell and Lee. Many other law enforcement officials participated in the recovery of evidence. Reports of those seizures are being or will be disclosed as they become available. Until the relevance of specific pieces of evidence becomes apparent, we cannot determine who may be witnesses.

Non-law enforcement witnesses who may testify at the guilt phase of any trial include Norman King, 23 Fire Lane Rd., North Clarendon, VT; Tara Richards, 695 North Franklin St., Wilkes-Barre, PA; and Christian Kolojeski, 13 East Chestnut St., Wilkes-Barre, PA. Other witnesses will be identified as they come to our attention.

The names of witnesses whom the Government may call at any penalty-phase trial will be disclosed if and when the Attorney General determines that the Government should seek the death penalty in this case.

**VII.   Exculpatory Evidence**

The Government recognizes its obligation to turn over exculpatory evidence and will promptly do so if and when such information comes into our possession. At the present time, we are unaware of any information that we would consider to be exculpatory.

**VIII.   Rule 404(b) Notice**

Pursuant to Rule 404(b) of the Federal Rules of Evidence, please take notice that, at the trial of any charges relating to the kidnapping and killing of Teresca King, the Government

3

FELL-00001160

intends to introduce evidence that shortly before hijacking King's car at shotgun-point, Fell and Lee murdered Debra Fell and Charles Conway.

Sincerely yours,

CHARLES R. TETZLAFF
United States Attorney

By:

GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

4

FELL-00001161

# EXHIBIT 71

_____ 
I. D. (or Docket)·

**Vermont Department of Corrections**
**Division of Correctional Services**

FACILITY CAMP

| | FSU | |
|---|---|---|
| ☒ NWSCF ☐ SERCF | ☐ ST. ALBANS | ☐ BRATTLEBORO |
| ☐ NWRCF ☐ NESCF | ☐ BURLINGTON | ☐ WHITE RIVER JCT |
| ☐ MVRCF ☐ NERCF | ☐ RUTLAND | ☐ BARRE |
| ☐ SESCF ☐ NECSC | ☐ BENNINGTON | ☐ ST. JOHNSBURY |

## INMATE DISCIPLINARY REPORT

_____
### (TO BE COMPLETED BY REPORTING OFFICER)

Name of Inmate: ___Lee, Robert___ Date of Incident: _12-27-00_ Time: _2009 HRS_

Living Assignment: ___Delta___ Security Level: _Close_ Place of Incident _Cell #51_

Description of Violation: __Major B# 21 Conduct which disrupts or interferes with inmate safety or security or the orderly running of the facility__

Witness(es) of Incident: _S_____ , COI _____ COI _____ , COI   _b6_
_____ COI _____ and _____      _b7C_

cription of Physical or Documentary Evidence: _See Reports_

| Signature of Reporting Officer | Date and Time | Name and Title (Printed) |
|---|---|---|
|  | 12-27-00 2033 HRS | COI |

### (TO BE COMPLETED BY SHIFT SUPERVISOR AT TIME OF INCIDENT)

Was Inmate's Security Level Changed?    Yes _____    No _O_
Date and Time of Change_____
Signature_____ If Yes, to What _____

Does hearing need to be held within 72 hours?    Yes _____    No _____

INVESTIGATION Employee Assigned by Superintendent/Designee    Date _12-27_    _b6_
_b7C_

### (TO BE COMPLETED BY INVESTIGATING OFFICER)

Delive_____ | Date and Time 12-27-00 / 2036 HRS

1. Wi_____  No ___ Yes (if yes then suspend investigation)
2. Did you interview confidential informants? ___ No ___ Yes (See Appendix VI for guidance)
3. Did you interview inmate? ___ Yes ___ No (briefly explain_____

Did you compile available documentary evidence and statements of witnesses? ___ Yes ___ No (briefly explain)_____

5. Did you contact and/or interview the relevant witnesses? ___ Yes ___ No (briefly explain)_____
6. Recommendation: ___ Refer for resolution
___ Do not refer for resolution
___ MODIFY VIOLATION TO: _____

**WHITE (CASE FILE)**        **YELLOW (CENTRAL OFFICE)**        **PINK (INMATE)**

FELL-00001162

# EXHIBIT 72

_____
_n...i020i - 7_
I. D. (or Docket)

**Vermont Department of Corrections**
**Division of Correctional Services**

· FACILITY/CAMP

☐ NWSCF    ☐ SERCF
☐ NWRCF    ☐ NESCF
☐ MVRCF    ☐ NERCF
☐ SESCF    ☐ NECSC

FSU

☐ ST ALBANS       ☐ BRATTLEBORO
☐ BURLINGTON      ☐ WHITE RIVER JCT
☐ RUTLAND    ·    ☐ BARRE
☐ BENNINGTON      ☐ ST. JOHNSBURY

## INMATE DISCIPLINARY REPORT

### (TO BE COMPLETED BY REPORTING OFFICER)

Name of Inmate: _Lee, Robert_    Date of Incident: _12-27-00_ Time: _2009 hrs_

Living Assignment: _Delta_    .    Security Level: _Closed_    Place of Incident _Cell 51_

Description of Violation: _Major B #20, Possession, introduction or use of_
_Any alchol, Narcotics, depressants, Stimulants, Hallucinogenic substance_ b6
_or marijuana or related Paraphernalia N_    b7C

Witness(es) of Incident: _S-_ [____] _CoI_ [____] _CoI_ [____] _CoI_ [____] _CoI_
[____] _and_ [____]

_____

ription of Physical or Documentary Evidence: _See Reports_

| ·Si | | Date and Time 12/27/00 2037 hrs | Name and CoI | |

### (TO BE COMPLETED BY SHIFT SUPERVISOR AT TIME OF INCIDENT)

Was Inmate's Security Level Changed?    Yes _____    No _✓_
Date and Time of Change_____
Signature_____    If Yes, to What _____    b6
    b7C

Does hearing need to be held within 72 hours?    Yes _____    No _____

INVESTIGATION Employee Assigned by Superintendent/Designee    Date

### (TO BE COMPLETED BY INVESTIGATING OFFICER)

Delivered to Above Inmate by (Signature)    | Date and Time 12/27/00 / 2041 hrs

_____ al investigation?    ___ No    ___ Yes (if yes then suspend investigation)
2. Did you interview confidential informants?    ___ No    ___ Yes (See Appendix VI for guidance)
3. Did you interview inmate?    ___ Yes    ___ No (briefly explain _____

Did you compile available documentary evidence and statements of witnesses?    ___ Yes    ___ No (briefly explain)_____

5. Did you contact and/or interview the relevant witnesses?    ___ Yes    ___ No (briefly explain)_____
6. Recommendation:    ___ Refer for resolution
    ___ Do not refer for resolution
    ___ MODIFY VIOLATION TO: _____

WHITE (CASE FILE)    YELLOW (CENTRAL OFFICE)    PINK (INMATE) ·

# EXHIBIT 73

# Northwest State Correctional Facility
## Facility incident report

To: Hearing Officer

From: CFSS [ ]

Date: 12-27-00

Re: Robert Lee

On the above date this writer was called via radio to go to Delta when I arrived in the unit I was informed that inmate Lee had flooded his cell, I observed a large amount of water covering the unit #2 floor, I also observed water coming out from under the door of inmate Robert Lee.

I went to inmate Lee's cell door and asked him why he flooded he stated that he was bored, I then asked him to put his hands out the chute as he was going to be moved to shower, he was then placed in handcuffs and escorted to the shower, I then told staff to strip his cell while they were stripping his cell Co/I [ ] found to cups containing homebrew, as it had the odor of alcohol, I asked the booking officer to bring the breathalyzer to delta, I administered the breathalyzer to inmate Lee, I had to do this 2 times do to him giving small breaths, the last reading I got registered .002BAC, I asked him if he had drank any of this homebrew he stated that he had a little bit. After his cell was stripped he was brought back to his cell, This writer heard and observed inmate Lee talk out his window to inmate [ ] that we had taken his homebrew, I then informed staff that he would be receiving 3 major DR's for flooding, and possession of alcohol, and for use of alcohol, I then departed the unit. I was called approx. 15min later I was called by Co/I [ ] tating that inmate Lee was trying to smash out his cell light and that he was acting very strange, I went down to Delta and observed inmate Lee running from the window to his cell door hitting both, I asked him why he was doing this he would just glare at me, I then decided to move him to booking for his own safety and to stop the unit from escalating any further, as they were getting vocal. Inmate Lee was then placed in Cuffs and escorted up to booking cell, he was stripped and informed that when the cuffs were removed he was to keep his hands on the bunk, if he failed to comply with my commands he would be sprayed with OC, inmate Lee cooperated with the commands.

b6
b7C

b6
b7C

# EXHIBIT 74



**U.S. Departi    it of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                              *(802) 951-6725*
*Burlington, Vermont 05402-0570*                          *Fax: (802) 951-6540*

December 28, 2000

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5<sup>th</sup> Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

     Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

     Enclosed is additional discovery that I just received.  This package consists of written statements Fell and Lee made to the FBI in Arkansas; summaries of oral statements that the defendants made to the FBI; and miscellaneous investigative reports.

     Also enclosed is a copy of the tape of Fell's administrative segregation hearing at the Northwest State Correctional Facility. At the beginning of the hearing, Fell was advised of the decision to place him in segregation because, among other things, he was charged with killing three people.  Fell responded, in substance, that he committed only one murder.

     Additional discovery will be turned over as it becomes available.

                       Sincerely yours,

                       CHARLES R. TETZLAFF
                       United States Attorney

         By:

                       GREGORY L. WAPLES
                       Assistant U.S. Attorney

Enc.

FELL-00001165

# EXHIBIT 75

CHS 99-206



## Correctional Healthcare Solutions, Inc.

### SICK CALL REQUEST

**PART A:**    To be completed by inmate          Date: 12-28-00

Inmate's Name: Donald Fell

ID #:

DOB: 4-30-80

Facility: St ALBANS Northwestern State Correctional facility

Housing Location: Delta

Problem: I have trouble Breathing followed by Chronic Severe Chest
Pains. I cant sleep my nose has been Bleeding and
I have severe headaches

How long have you had this problem?    Hours: _____    Days: 5 days

Past Treatment(s) for this Problem?    None

------------------------------------------------------------

**PART B:**    To be completed by medical personnel (Do not write below this line)

T 98² P 70 R 16 BP 102/80 WT _____

| | |
|---|---|
| **S.** | I haven't had a cig in 36 days & drugs either. I always had trouble breathing. Now my chest hurts. HA's too- |
| **O.** | Pt presents disheveled and odorous. lungs CTA bilaterally. ⊕ tenderness over chest ē palpation. From neck, shoulders, waist. long hx of drug use. |
| **A.** | At in comfort r/t CP. |
| **P.** | Diagnostic Tests: |
| | Request Specialty Referral: MD. |
| | Referral to Chronic Care Clinic? ☐ Yes ☐ No Will refer to MD for evaluation. Notify medical if breathing problems worsen. |

**Education:**    Discuss with patient follow-up care:          ☑ Yes  ☐ No
Discuss with patient medication side effects:    ☐ Yes  ☑ No
Discuss with patient alternative therapies such as: _____

Follow up Appointment: _____          Check if RTC prn acceptable ☐

C Bean LPN          1/5/01          0934
Medical Staff Signature          Date          Time

FELL-00001166



CHS 99-206

## Correctional Healthcare Solutions, Inc.

### SICK CALL REQUEST

**PART A:**     To be completed by inmate          Date: 3-1-01

Inmate's Name: Don Fell

ID #:

DOB: 4/30/80

Facility: Northwest Correctional facility

Housing Location: Delta

Problem: I have trouble sleeping I wish to have a pillow sent in to correct that Problem I was told to request this from you

How long have you had this problem?     Hours: _____     Days: 77

Past Treatment(s) for this Problem? _____

**PART B:**     To be completed by medical personnel **(Do not write below this line)**

T _____    P _____    R _____    BP _____    WT _____

**S.** "I need a pillow to sleep." I don't have one

**O.** Per Officer inmate does not have pillow.

**A.** Alt, comfort R/T need for pillow.

**P.** Diagnostic Tests:

Request Specialty Referral:

Referral to Chronic Care Clinic?  ☐ Yes  ☐ No

Per Security - They -DOC will provide a pillow. Request denied for pillow - not in P.

**Education:**    Discuss with patient follow-up care:         ☐ Yes  ☐ No
                 Discuss with patient medication side effects:  ☐ Yes  ☐ No
                 Discuss with patient alternative therapies such as: _____

Follow up Appointment: _____          Check if RTC prn acceptable ☐

_Medical Staff Signature_          Date 3/2/01    Time 0930

FELL-00001167

## MENTAL HEALTH EVALUATION

**Inmate Name:** Fell, D
**Facility:** NW

**DOB:** 2/ /70
**Date:** 6/25/01

| Mental Health History |
|---|
| • Mental Health: *Include indicated and contraindicated medications and placements, major side effect/dangerous behaviors, and estimated intellectual ability/need for further assessment*<br>• Alcohol and Drug Use/Abuse: *include the need for further evaluation, as indicated*<br>• Physical Health: *Include any potential interactions between mental and physical health problems/needs* |

IM reports being hospitalized x6 at General Hospital in Wilkes Barre PA for anger and being an uncontrollable minor. He was last admitted in 1994. Reports having a hx of taking Tonfrival and Dexadrine for a couple of years. IM reports having a polysubstance dependance problem. States his drug of choice was LSD. He also stated he smoked marijuana daily - drank alcohol daily. Has used Crack cocaine, Ectasy, and heroin. Was in outpatient counseling briefly to address those issues. IM denies any self injurous behavior. Denies suicidal ideation.

| Family/Social History |
|---|
| *Include Education, Military History (Discharge Status), Family Criminal History and History of Victimization* |

IM has completed through the 10th grade. Denies any military service history. States that he grew up with his family in Wilkes Barre PA. Says that prior to coming to VT and murdering his mother he hasn't didn't see her for 8 years.

| Legal/Criminal History |
|---|
| *Include Prior Imprisonment, Prior Arrests/Charges, History of Sex Offenses and/or Violence* |

IM was on probation in PA for punching a school teacher

FELL-00001168

| Diagnostic Impressions | DSM Code | √ Primary Diagnosis |
|---|---|---|
| AXIS I: Adjustment Disorder | | |
| Primary Insomnia | | |
| AXIS II: ASPD | | |
| | | |
| AXIS III: None. | | |
| | | |

AXIS IV:    Psychosocial Stressors

A. Stressor(s): ☒ Solitary Confinement.

B. Severity:    ☒ None          ☐ Severe          ☐ Inadequate Info/No Change
                ☐ Mild          ☐ Extreme
                ☒ Moderate      ☐ Catastrophic

C. Duration:    ☐ Predominantly Acute Event      ☒ Predominately Enduring Circumstances

AXIS V:    Global Assessment of Functioning *(enter two digit scores from 00-100)*

A. Current GAF Score   50          B. Past Year GAF Score   50

**Treatment Needs and Recommendations**
*Include Needs/Problems, Strengths/Assets, Emotional Response to Incarceration, Prognosis, & Recommendations*

Im has been in facility for 8 months - Asking to see MH to address insomnia and anger problems. Will read for records and refer to Bill Cote.

MH Staff Signature and Degree: _____ L. _____ CMC    Date 6/8/01

FELL-00001169

## MENTAL STATUS EVALUATION

Inmate Name: _Fell, D_    DOB: _2/80_    Facility: _NW_

| PSYCHIATRIC HISTORY | ☑ Yes ☐ No |
|---|---|

Where _General Hospital Wilkes Body Penn._    When _95-94_

| SUBSTANCE ABUSE TX HISTORY | ☑ Yes ☐ No |
|---|---|

Where _Drug/Alcohol Counseling - did not go several years ago_    When

| HISTORY OF MEDICATION | ☑ Yes ☐ No |
|---|---|

_Tonfrinal, Dexadrine_

| CURRENT MEDICATIONS | ☐ Yes ☑ No |
|---|---|

| APPEARANCE | OK | POOR |
|---|---|---|
| Hygeine | ☑ | ☐ |
| Eye Contact | ☑ | ☐ |
| Psychomotor | ☑ | ☐ |

Notable Physical Characteristics: _____

| ORIENTATION | OK | POOR |
|---|---|---|
| Person | ☑ | ☐ |
| Place | ☑ | ☐ |
| Time | ☑ | ☐ |

| MOOD | | | | |
|---|---|---|---|---|
| Normal | ☑ | Irritable | ☐ | Depressed ☐ |
| Euphoric | ☐ | Anxious | ☐ | |

| AFFECT | | | |
|---|---|---|---|
| Appropriate | ☑ | Flat ☐ | Blunted ☐ |
| Inappropriate | ☐ | | |

| SPEECH | | | |
|---|---|---|---|
| Normal ☑ | Pressured ☐ | Monotonous ☐ |
| Slurred ☐ | Poverty of Content ☐ | Slowed ☐ |

| THOUGHT PROCESSES | | | |
|---|---|---|---|
| Normal ☑ | Tangential ☐ | Disorganized ☐ |
| Circumstantial ☐ | Loose Assoc. ☐ | Flight of Ideas ☐ |
| Delusional ☐ | | |

| PERCEPTUAL PROCESSES | | | |
|---|---|---|---|
| Normal | ☑ | Visual Hallucinations | ☐ |
| Illusions | ☐ | Tactile Hallucinations | ☐ |
| Auditory Hallucinations | ☐ | Olfactory Hallucinations | ☐ |

| ATTENTION & CONCENTRATION | | | |
|---|---|---|---|
| Normal | ☑ | Impaired | ☐ |

| MEMORY | Short-Term | Long-Term |
|---|---|---|
| Grossly Intact | ☑ | ☑ |
| Impaired | ☐ | ☐ |

| PHOBIAS, OBSESSIONS, COMPULSIONS | | | |
|---|---|---|---|
| None (Normal) | ☑ | Obsessive | ☐ |
| Phobic | ☐ | Compulsive | ☐ |

| INSIGHT | Good ☐ | Fair ☑ | Poor ☐ |
|---|---|---|---|
| JUDGEMENT | Good ☐ | Fair ☐ | Poor ☑ |

| DRUG ABUSE | None/Minimal | Abusive/Dependent |
|---|---|---|
| Alcohol | ☐ | ☑ |
| Cocaine | ☐ | ☑ |
| Opiods | ☐ | ☑ |
| Cannabis | ☐ | ☑ |
| Hallucinogens | ☐ | ☑ |
| Inhalents | ☐ | ☑ |
| Other: _LSD_ | ☐ | ☑ |

| PROVISIONAL DIAGNOSIS | ☐ None |
|---|---|

Axis I    _R/o Adjustment Disorder / Primary Insomnia._

Axis II    _____

Axis III    _____

| TREATMENT RECOMMENDATIONS |
|---|
| ☐ No further intervention needed at this time |
| ☐ Outpatient treatment |
| ☑ Scheduled for further evaluation |
| ☐ Inpatient treatment |
| ☐ Addiction services |
| ☐ Other: _____ |

Signature of MH Staff: _Fell, Licsw/Npc_    Date/Time: _6/15/01_

DOC/CO/PRO/361.01.04-A
Rev. 1/98

FELL-00001170

**OBSERVATION SHEET**

Inmate Name: Fell, Donald

Facility: NwSCF

DOB: _____

Date: _____

| Start Date: 9-21-01 | Start Time: 0001 | Cell Location: E-76 | Discontinuation Date/Time: |

### Suicide Watch Conditions

| ✓ | STANDARD - Physical checks at staggered intervals not to exceed every 30 minutes (e.g., 5,10, or 12 minutes) |
| | SPECIAL - Continuous, uninterrupted observation |
| | Special Accommodations: |

### Code for Inmate Behavior and Staff Interventions

A. Quiet
B. Sleeping  *Appears*
C. Agitated Behavior
D. Destructive Behavior
E. Eating
F. Threatening Behavior
G. Out of Cell Activities
H. Other

| Time | Codes | Correctional Officer | Time | Codes | Correctional Officer | Time | Codes | Correctional Officer |
|------|-------|----------------------|------|-------|----------------------|------|-------|----------------------|
| 0001 | A | R. Marcoux | 0800 | B | | 1600 | E/F | |
| 0030 | A | R. Marcoux | 0830 | B | m | 1630 | E/G | |
| 0100 | B | R. Mou | 0900 | B | m | 1700 | E/g | |
| 0130 | B | R. Marcoux | 0930 | B | m | 1730 | E | |
| 0200 | B | R. Marcou | 1000 | B | | 1800 | G | |
| 0230 | B | R. Marcou | 1030 | B | m | 1830 | E | |
| 0300 | B | R. Marcoux | 1100 | E | m | 1900 | E | |
| 0330 | B | R. Marcou | 1130 | A | m | 1930 | E | |
| 0400 | B | R. Marcou | 1200 | A | m | 2000 | G | |
| 0430 | B | R. Marcou | 1230 | A | m | 2030 | G | E. Baron |
| 0500 | B | R. Marcoux | 1300 | B | m | 2100 | G | F.B |
| 0530 | B | R. Marcoux | 1330 | B | m | 2130 | A | E.B |
| 0600 | B | Jm Alfred | 1400 | B | M. Barton | 2200 | A | R. Marcou |
| 0630 | E | m | 1430 | B | | 2230 | A | R. Marcou |
| 0700 | B | | 1500 | B | | 2300 | A | R. Marcou |
| 0730 | B | | 1530 | B | E. Turcotte | 2330 | A | R. Marcou |

Robert MARCOUX

Shift Supervisor's Signature: _____   Date: _____   Time: _____

*Fell -30-*

F.76

FELL-00001171

***DO NOT THIN***

# MENTAL HEALTH TREATMENT PLAN/PROGRESS REPORT

Inmate Name: _Donald Fell_  
Facility: _NWSCF_  
Provider Name: _Todd Hill Licsw/LADC_

Date of Birth: _____  
Date of Report: _3/25/02_

---

**Problem:** _Panic attacks_  
**Goal:** _To be able to reduce # of attacks and control sx of attacks_  
**Target Date:** _7/25/02_  
**Interventions:** _Medication management — Counseling as needed_  
_On closed custody minds_  
**Evidence of Progress:** _Self report of ↓ in sx_

**Problem:** _____  
Goal: _____  
Target Date: _____  
Interventions: _____

Evidence of Progress: _____

**Problem:** _____  
**Goal:** _____  
**Target Date:** _____  
**Interventions:** _____

**Evidence of Progress:** _____

**Problem:** _____  
Goal: _____  
Target Date: _____  
Interventions: _____

Evidence of Progress: _____

---

## Area(s) of Concern (Please check all that apply)

☐ Depressed Mood  
☐ Decreased Energy  
☐ Grief  
☐ Hopelessness  
☐ Worthlessness  
☐ Guilt  
☐ Anxiety  
☑ Panic Attacks  
☐ Obsessions/Compulsions  
☐ Elevated Mood  
☑ Irritability

☐ Impulsivity  
☐ Hyperactivity  
☐ Disruption of Thought Process/Content  
☐ Delusions  
☐ Hallucinations  
☐ Paranoia  
☐ Dissociative States  
☐ Oppositional/Defiant Behavior  
☐ Somatic Complaints  
☐ Concomitant Medical Condition  
☐ Emotional/Physical/Sexual Trauma Victim

☐ Emotional/Physical/Sexual Trauma Perpetrator  
☐ Substance Use (check one)  
    ☐ Active Substance Abuse  
    ☐ Early Full Remission  
    ☐ Early Partial Remission  
    ☐ Sustained Full Remission  
    ☐ Sustained Partial Remission  
☐ Antisocial Personality Disorder  
☐ Borderline Personality Disorder  
☐ Other (specify):_____  
☐ Other (specify):_____

(PLEASE CONTINUE ON THE OTHER SIDE)

FELL-00001172

**Primary Treatment Approach (check all that apply)**
☐ Problem Focused
☑ Symptom Focused
☐ Complex Case
☐ Therapeutic Stabilization
☐ Medication Management Only
☐ Psycho-educational

Expected Treatment Outcomes (check all that apply)
☐ Reduction in symptoms and discharge from active treatment
☐ Return to highest GAF and discharge from active treatment
☐ Transfer to self-help/other supports and discharge from active treatment
☑ Provide ongoing supportive counseling and maintain stabilization of symptoms
☐ Provide ongoing medication management

**Progress in Treatment (check one)**
☑ Treatment recently initiated
☑ Continues with/or recurrence of acute presenting symptoms
☐ Somewhat improved
☑ Much improved
☑ Needs support/maintenance only   *As of 7/25*
☐ Near completion of treatment
☐ Inmate discharged from mental health roster (complete section below)
☐ Other

Psychotropic Medications
Is the patient on medications?    ☑ Yes    ☐ No
Is s/he compliant with taking her/his medications?    ☑ Yes    ☐ No *as of 7/25/02*
Has there been clinical improvement related to medications?    ☑ Yes    ☐ No

**RATE OF PARTICIPATION IN TREATMENT (please circle)**
Refusal    1    2    3    ④    5    High

Clinical Summary/Formulation:
_____
_____
_____
_____
_____

**Plan discussed with inmate:**    ☑ Yes    ☐ No

Discharge Summary
Inmate discharged to:   ☐ Other Facility    ☐ Community    ☐ General Population    ☐ Residential Program
Reason for discharge:   ☐ Treatment Complete    ☐ Refused Services    ☐ Transfer    ☐ Max Out    ☐ Other
Follow-up and recommendations:   ☐ Continued Tx    ☐ Substance Abuse Tx    ☐ Inpatient Tx    ☐ Self-help

Reviewed by treatment team:  3/25/02  _Todd Hill_ LICSW/CADC (intake)
(Date/Provider Signature)  4/25/02  _Todd Hill_ LICSW/LADC (one-month)
7/25/02  _Todd Hill_ LICSW/CADC  1 (quarterly)  4 4/25/03  _Todd Hill_ LICSW, CADC
10/25/02  _Todd Hill_ LICSW/CADC  2 (quarterly)  5 8/4/03  _dB_____
1/25/03  _Todd Hill_ LICSW/CADC  3 (quarterly)  6 3/3/04  _____ M.A.

DOC/CO/PRO/361.01.06-A
Rev. 12/00                    Todd Hill, LICSW, CAC    6/16/04
                                                      9/20/04

## CORRECTIONAL MEDICAL SERVICES
## HEALTH SERVICES REQUEST FORM

> **OR MEDICAL USE ONLY**
> Date Received: _2-25-03_
> Time Received: _0530_

Print Name: _Donald Robert Fell_    Date of Request: _2-24-03_

ID #: _56467_    Date of Birth: _4/30/80_    Housing Location: _Echo_

Nature of problem or request: _a screw fell out of my glasses, I would also like to see the doctor, I have been having trouble sleeping for quite some time due to back and neck pain._

I consent to be treated by health staff for the condition described.

_____
SIGNATURE

### PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA
### DO NOT WRITE BELOW THIS AREA

Triaged by: _KM_    Referred to: (Circle ONE)
Initials

(NSC)   Mid-level SC   Physician SC   MH   Dental
Other: _____

## HEALTH CARE DOCUMENTATION

Subjective:

Objective: BP _____ T _____ P _____ R _____ Wt _____

_I/M Refused to come to sick call_

_C o S Melcher_

Assessment:

Plan: _7/u if I/m request_

☐   Inmate education handout reviewed with and given to the patient.
Refer to : (Circle any applicable)   Mid-level   Physician   MH   Dental   Other: _____

Signature & Title: _Bessette LPN_    Date: _4/1/03_ Time: _____

CMS 7166 Rev 6/01

Jim Bessette, LPN

FELL-00001174

**CORRECTIONAL MEDICAL SERVICES**

## INTERDISCIPLINARY PROGRESS NOTES

Patient Name _FELL, DONALD_ I.D. # _4/30/80_ Institution _____

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 12/3/13 | | 4 YRS L-S BACK PAIN INSOMNIA HE SAYS " " CAUSATION HA ERRATIC W/ LACK OF SLEEP | - |
| | | L-S BACK FROM, NO WEAKNESS no spasms | |
| | | CN INTACT | |
| | | IMB L-S PAIN (M-S) neg straight Leg raise ↑ NAPROXYN 500 B/ID RTC 2 WKS ___ | |
| 2/4/04 | 1035 | S c/o persistent frontal h/a, b/l, almost daily in p.m. Also, momentary postural dizziness. Did not notice if relief c̄ naproxen. Back pain + sleep improved. Has been taking verapamil for h/a prophylaxis × 2½ yrs. Also fluoxetine + tetracycline Denies pulsatile h/a, photophobia. Admits to mild occasional nausea not assoc. c̄ h/a. Drinks 7-10 cups coffee QD | |
| | | O General: Well 23yo male. Vitals: T 98.6, HR 76, RR 16, BP 110/68 wt 183lb HEENT: Normocephalic, TM's — cards clear, sinus tenderness pharynx clear. cont (over) Seth Wells, PAC | |

FORM #7113 8/94

FELL-00001175

2/4/04 | cont

O Cardio: RRR S₁S₂∅M.
Chest: CTAB
Neuro: CN I-XII intact. Strength 5/5
DTR's 2/4. ⊕ Romberg.

A/P ① h/a, presumed tension-type
→ ibuprofen 800 mg BID prn
use + risks reviewed.
d/c verapamil.
↓ coffee consumption to 1-2 QD.
↑ water. Discussed risks with dad
h/a.
② dizziness likely 2° postural hypotension
→ see above plan.

Seth Miller, FNP-C

SIGNATURE | NOTES | TIME | NAME

# EXHIBIT 76

7A-AL-44453
JJG:mh

1

## EDUCATION

ST. MICHAEL'S SCHOOL
HOBAN HEIGHTS
P.O. BOX 37
TUNKHANNOCK, PENNSYLVANIA (PA) 18657

On March 30, 2001, ANDREW M. VARZALY, MSW, LSW, Executive Director, reviewed the academic records of DONALD R. FELL, Date of Birth (DOB) April 30, 1980, Social Security Account Number (SSAN) REDACTED-FELL-7294, and ROBERT JOSEPH LEE, DOB REDACTED-FELL 1980, SSAN REDACTED-FELL 4688. VARZALY advised that DONALD FELL attended ST MICHAEL'S SCHOOL from April 8, 1994-August 25, 1995. ROBERT JOSEPH LEE attended ST. MICHAEL'S SCHOOL from September 19, 1994-August 15, 1995. LEE was once again admitted to ST. MICHAEL'S during the period December 12, 1996-June 13, 1997.

VARZALY advised that ST. MICHAEL'S SCHOOL is a residential treatment facility which serves the academic and psychological needs of delinquent and deprived youngsters who have demonstrated behavioral and mental health issues at school. ST. MICHAEL'S provides elementary, secondary, and special education classes to its students. The school provides in-house group counseling and/or individual counseling as needed. VARZALY stated that if the student does not succeed at ST. MICHAEL'S, chances are good that the student will end up in a lock-down facility.

VARZALY advised that copies of FELL's and LEE's academic records could not be shared without a subpoena.

On March 30, 2001, LISA LUCKE, Director of Admissions, ST. MICHAEL'S SCHOOL, was interviewed regarding her knowledge of DONALD FELL and/or ROBERT JOSEPH LEE. LUCKE advised that her job responsibilities include reviewing references of students wishing to attend ST MICHAEL'S SCHOOL. The requests are then presented to a Multi-Disciplinary Admissions Committee which has the final say as to whether a student will be admitted into their academic program. LUCKE stated that ST. MICHAEL'S is very selective as to who is admitted to the school, and students with a long history of criminal acts are excluded. LUCKE specifically recalled ROBERT JOSEPH LEE attending ST. MICHAEL'S SCHOOL. Initially, LEE was admitted to the day treatment area of ST. MICHAEL'S SCHOOL but was eventually moved into residential treatment. LUCKE described LEE as a disheveled, uninterested, and bizarre boy who made absolutely no progress from the day he entered treatment

7A-AL-44453

2

until the day he was released from ST. MICHAEL'S. LUCKE stated that LEE had a particular look in his eye that forebode trouble. LUCKE stated that she worked with LEE in day treatment, and he did poorly. LUCKE stated that LEE's father tried to stay involved in LEE's treatment; however, LUCKE saw his efforts as doing the minimum that was required and no more. LUCKE stated that LEE attended the CHILD SERVICE CENTER, Wilkes-Barre, PA, where he received additional counseling and prescription medicine. LUCKE stated that while at ST. MICHAEL'S, LEE demonstrated poor socialization skills, did not respond well to adults, and would never allow anyone to get close to him. On several occasions, LEE acted out and had to be physically restrained so as not to harm himself or others. LUCKE advised that LEE seemed to be attracted to those boys who would create trouble at the school. She described LEE as a follower more so than a leader. LEE seemed to act out more often when confronted by teachers and staff to do his work. LEE wished to be left alone to do what he wanted to do. LEE would very seldom initiate any conversation with staff members and seemed quiet until provoked. LUCKE recalled that LEE was referred to ST. MICHAEL'S SCHOOL because of his chronic absenteeism. LUCKE stated that one word used to describe BOBBY LEE would be "psychotic." LUCKE stated that it did not surprise her to read in the newspapers that LEE was involved in a homicide. This view is based upon her observations and direct work with LEE at ST. MICHAEL'S SCHOOL.

LUCKE advised that she did not recall and that she never worked with DONALD R. FELL.

On March 30, 2001, WALTER OPSHINSKI, Director of Child Care, ST. MICHAEL'S SCHOOL, stated that he has been employed at ST. MICHAEL'S for approximately 25 years. OPSHINSKI advised that he recalled DONALD FELL being a seventh grade student at ST. MICHAEL'S during the academic year 1994-1995. FELL was housed in the Hoban Dormitory, a residential building that houses younger students. OPSHINSKI described FELL as a relatively quiet youngster who demonstrated some intelligence and one who remained relatively quiet during his stay at ST. MICHAEL'S. OPSHINSKI could not recall any violent episodes involving FELL. OPSHINSKI stated that FELL was freckled faced and of small stature.

OPSHINSKI stated that BOBBY LEE was admitted and re-admitted to ST. MICHAEL'S SCHOOL on two or three occasions. Initially, LEE was in day treatment but was soon moved into residential treatment. OPSHINSKI stated that LEE, in his opinion, was more problematic than FELL and often acted out against other students and staff members. OPSHINSKI recalled that LEE's brother was also once a resident at ST MICHAEL'S.

FELL-00001178

7A-AL-44453

3

OPSHINSKI stated that LEE, like FELL, was of small stature and wore long black hair.

WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL (WBAVTS)
JUMPER ROAD, P.O. BOX 1699
WILKES-BARRE, (PA) 18705

On March 30, 2001, PATRICK TOSH, Teacher, WBAVTS, provided academic records to Special Agent JAMES J. GLENN for review related to former students DONALD R. FELL and ROBERT JOSEPH LEE. FELL attended WBAVTS in the Headstart Program from September 1995-June 1996. LEE was also enrolled in the Headstart Program during the academic year September 1996-June 1997.

TOSH explained that in the 1980's, the Headstart Program was designed solely for students entering the ninth grade to give them a chance to take both vocational training and academics. The program focused on "high risk" students, i.e. those with poor study habits or truancy problems who may be prone to quit school. The class sizes were small in number and offered students more individual attention and less academic pressure.

TOSH advised that during the time that FELL was a student at WBAVTS, TOSH was coordinator of the in-school suspension program. Students receiving detention were sent to TOSH's classroom with an assignment that had to be completed at the end of the day. Tosh recalled meeting FELL in September 1995 when he was sent to TOSH during one of his many in-school suspensions. TOSH described FELL as a very angry and volatile young man who often acted out in and out of the classroom. TOSH stated that profanity was FELL's basic vocabulary. TOSH further advised that FELL had a short fuse and had difficulty diffusing his anger. TOSH stated that he has been involved in the teaching profession for nearly 30 years, 10 of them involving emotionally disturbed youngsters. TOSH stated that in all of his years in teaching, DONALD FELL ranks first or second as being the most emotionally disturbed students that he has ever had to deal with. TOSH advised that FELL had an apparent dislike for stronger male authority figures. TOSH stated that it was a chore to diffuse FELL's anger, and it would often take 20 minutes for FELL to cool down.

TOSH stated that he saw FELL in the in-school suspension room between 30-40 times in just one academic year. TOSH stated that he was aware of FELL's home situation as he also taught FELL's aunt, JACKIE SHARPE, with whom FELL resided. TOSH advised that SHARPE was somewhat emotionally disturbed herself; however, TOSH respected her for graduating from high SCHOOL. TOSH

FELL-00001179

7A-AL-44453

4

stated that FELL was small in stature yet challenged students and staff alike who were physically bigger and stronger than he. TOSH related that FELL had to be physically removed from the Auto Shop when he refused to leave after class. FELL's response was to run out of the school building. TOSH stated that even at the age of 15 he could tell that FELL's temper would one day get the best of him.

A review of FELL's academic record reflected the following incidents/student referrals:

| DATE | CLASS | OFFENSE | DISPOSITION |
|---|---|---|---|
| 9/19/1995 | Auto Mech I | Vulgarity | In-School Suspension |
| 9/29/1995 | Auto Mech I | Profanity | In-School Suspension |
| 10/12/1995 | Auto Mech I | Disruptive Behavior in Class | Detention |
| 10/23/1995 | Auto I | Disruptive Behavior | 2 day suspension |
| 11/13/1995 | HVEP | Throwing snowballs Profanity | 5 day suspension |
| 1/11/1996 | Auto Mech I | Absenteeism | |
| 2/6/1996 | HVEP | Insubordination Disruptive Behavior | 2 day suspension |
| 2/21/1996 | HVEP | Fighting with another student | 2 day suspension |
| 3/18/1996 | HVEP | Insubordination toward an instructor | 3 day suspension |
| 3/27/1996 | HVEP | Insubordination toward an instructor; horseplay | 3 day suspension |
| 3/28/1996 | HVEP | Use of profanity; Insubordination toward an instructor; shop safety violation | 10 day suspension |
| 5/23/1996 | HVEP | Safety Violation; Lying; Horseplay; Unmodified behavior; Disruptive Behavior (Throwing Objects that could cause injury). | 9 day suspension |

In one student referral form, dated March 28, 1996, FELL entered the Social Science classroom of Mr. JOHN KOZERSKI and said he was going to "stab him". KOZERSKI attempted to subdue FELL. FELL said he was going to come back and kill him.

On April 16, 1996, FELL was adjudicated delinquent, Petition #96-503.

FELL-00001180

7A-AL-44453

5

On December 11, 1996, FELL's Auto II teacher wrote that FELL has been absent 26 out of 65 days. The teacher commented that FELL needed intense guidance and communication with his parole officer.

TOSH advised that his last encounter with FELL occurred in 1997, when he ran into FELL at a local hospital. On that occasion, FELL was very pleasant to him. TOSH stated that it did not surprise him to read in the local papers that FELL was involved in a homicide. He felt that FELL never controlled his anger and was destined to either commit violence or become a victim of it.

TOSH recalled that FELL returned to WBAVTS during the first half of the 1996-1997 academic year but ended up quitting school on his 17th birthday.

TOSH recalled ROBERT JOSEPH LEE as a quiet yet truant student who did as little as possible to get by. TOSH described LEE as a follower who was never confrontational with him. TOSH did not believe that LEE came to school as often as DONALD FELL. TOSH found a student referral form on LEE dated December 5, 1996. LEE was reported for insubordination and received a four day suspension. TOSH believed that Mr. KOZERSKI and Mr. LoBRUTTO could provide additional information relative to ROBERT JOSEPH LEE.

On March 30, 2001, JOHN KOZERSKI, Social Studies Teacher, WBAVTS, advised that he taught Social Studies to both DONALD FELL and ROBERT LEE. KOZERSKI stated that he first met FELL in January 1996. KOZERSKI described FELL as a bit of a loner who came from a troubled family life. KOZERSKI went to high SCHOOL with FELL's aunt, JACKIE SHARPE, with whom FELL resided. KOZERSKI stated that SHARPE was emotionally disturbed herself, thus, possibly contributing to FELL's disruptive family background. KOZERSKI stated that FELL always appeared to be dirty looking and always wore a baseball cap to conceal his greasy hair. Generally, FELL was quiet unless instructed to do some schoolwork. On those occasions, FELL became belligerent and would "flip out," i.e., act out inappropriately. FELL's basic vocabulary consisted of obscenities, and he was not afraid to get right in the face of a teacher. KOZERSKI did not believe that the other students were afraid of FELL because, like FELL, they too were part of an at risk class and were tough in their own right. On one occasion, FELL got into a fight with another student during class simply because he wanted a particular computer disk. FELL ended up throwing a chair at the other student that resulted in a fist fight.  KOZERSKI related that he threatened to call

FELL-00001181

7A-AL-44453

6

FELL's guardian if he did not behave. FELL simply would say, "Go ahead and call." KOZERSKI recalled that FELL failed ninth grade and was suspended from class all the time. FELL would associate with only a select few, usually other trouble makers. KOZERSKI stated that he was not surprised when he read about FELL's involvement in a triple homicide. He always believed that FELL would either end up in prison or killed.

KOZERSKI recalled teaching Social Studies to ROBERT LEE. KOZERSKI stated that LEE was not enrolled very long at WBAVTS and had a long history of absenteeism. KOZERSKI believed that he had LEE in class during the first semester of 1996. KOZERSKI described LEE as a somewhat quiet student who never did a lick of work. KOZERSKI related that he is an assistant football coach at COUGHLIN HIGH SCHOOL, Wilkes-Barre, PA, and was surprised to learn that LEE had tried out for the team. LEE was small in stature and never completed any tasks. Shortly after joining the football team, several players complained that personal items were missing from their lockers. LEE was eventually kicked off the football team when it was learned that he had something to do with the thefts. KOZERSKI advised that LEE was strictly a loner. Like FELL, LEE wore combat boots and rarely washed himself. LEE's clothing always looked dirty, and he made no effort to improve his hygiene. KOZERSKI stated that FELL had some intelligence, but LEE was as "dumb as a stump". LEE could not read or write very well. KOZERSKI related that LEE was the kind of kid who would enter the classroom, put his head down on the desk, and show total disinterest. On a few occasions, KOZERSKI saw LEE in the company of DONALD FELL and thought to himself, "trouble attracts trouble". KOZERSKI stated that when seen together, FELL would be the leader and LEE the follower.

On March 30, 2001, CARMEN LoBRUTTO, Science Teacher, WBAVTS, was interviewed regarding his knowledge of DONALD FELL and ROBERT LEE. LoBRUTTO advised that he first met FELL in 1996, when FELL was in his science class. LoBRUTTO described FELL as a small framed person with a high frustration level. FELL displayed average hygiene for a person enrolled in the at risk curriculum. FELL often used profanity but seldom acted out in LoBRUTTO's class. LoBRUTTO related that he takes a soft approach with his students, and FELL somewhat responded to this approach. As a result, FELL mingled with the rest of the class yet seemed an outcast.

LoBRUTTO described ROBERT LEE as a very quiet and unmotivated student. LEE was dirtier in appearance than the average student. LEE was more of a loner than FELL and never acted out in LoBRUTTO's class. Having observed both FELL and LEE,

FELL-00001182

7A-AL-44453

7

LoBRUTTO was not surprised to read in the local papers that both were involved in the death of others. LoBRUTTO stated that many of the at risk students enrolled at WBAVTS share some of the same traits and behavioral problems exhibited by FELL and LEE.

JAMES M. COUGHLIN HIGH SCHOOL
80 N. Washington Street
Wilkes-Barre, PA 18701

        On March 29, 2001, the following investigation was conducted by SA JAMES J. GLENN:

        Dr. BERNARD S. PREVUZNAK, Assistant Principal, COUGHLIN HIGH SCHOOL (CHS), provided the academic records on file for DONALD R. FELL and ROBERT JOSEPH LEE. Copies of the records were not available without a release signed by FELL and LEE or an appropriate court order. PREVUZNAK verified that DONALD R. FELL was born on April 30, 1980, Social Security Account Number: 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. FELL was enrolled at CHS in September 1996, and dropped out of school on April 30, 1997. FELL was in the 10th grade when he quit school. FELL's listed legal guardian was JACKIE SHARPE, aunt,        REDACTED - FELL        , Wilkes-Barre, PA. FELL's records indicate that he attended the following educational institutions:

        1986-1987 - SCHUYLER AVENUE ELEMENTARY SCHOOL,
                    Kingston, PA
        1987-1988 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1988-1989 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1989-1990 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1990-1991 - LINCOLN ELEMENTARY SCHOOL, Pittston, PA
        1991-1992 - FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA
        1992-1993 - PLAINS JUNIOR HIGH SCHOOL, Plains, PA
        1993-1994 - PLAINS JUNIOR HIGH SCHOOL, Plains, PA/ST.
                    MICHAEL'S SCHOOL, Tunkhannock, PA
        1994-1995 - ST. MICHAEL'S SCHOOL, Tunkhannock, PA
        1995-1996 - HEAD START - WILKES-BARRE AREA VOCATIONAL-
                    TECHNICAL SCHOOL, Wilkes-Barre, PA
        1996-1997 - Enrolled COUGHLIN HIGH SCHOOL (10TH
                    grade); Dropped Out: 4/30/1997.

        PREVUZNAK stated that he first met DONALD FELL in approximately 1992, when FELL was a seventh grade student at the PLAINS JUNIOR HIGH SCHOOL. At that time, PREVUZNAK taught seventh grade art and had FELL in class. During the period, 1992-1994, PREVUZNAK generally saw FELL in school two to three times a week. PREVUZNAK related that he never had any serious disciplinary problems with FELL during class but was aware that FELL may have

7A-AL-44453

8

caused other teachers problems because he was often observed sitting outside the principal's office. PREVUZNAK described FELL as a low functioning student who earned a D grade in his class. PREVUZNAK explained that if a student just gave some effort during class, the student would be assured at least a C grade. This was not the case with FELL, as he never put forth the effort.

PREVUZNAK described FELL's appearance as "an unkept bed". FELL always looked disheveled. He looked as though he slept in his clothes and wore his hair long. His hair was rarely washed and looked greasy. FELL usually wore a baseball cap and associated with students who would be described as behavioral problems. PREVUZNAK recalled that once classes were dismissed for the day, FELL would make a bee line for the curb across the street from the school to have a cigarette with his buddies. PREVUZNAK remembered that FELL had to repeat the seventh grade at PLAINS JUNIOR HIGH SCHOOL and spent the eighth grade at St. MICHAEL'S SCHOOL, Tunkhannock, PA.

PREVUZNAK stated that FELL spent the ninth grade in the Head Start Program, housed at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL, Wilkes-Barre, PA. PREVUZNAK advised that FELL was the perfect candidate for Head Start because the program worked with high risk students, i.e. those students identified by their home schools, as most likely to drop out of school in the future. Head Start worked with students demonstrating behavioral difficulties, delinquent tendencies, and aggressiveness. The focus of the program was to expose the students to various trades with the hope that the student may become interested and stay in school.

PREVUZNAK advised that FELL's academic folder was replete with referrals for disciplinary action, suspensions, and juvenile adjudication. As early as 1991, FELL attended the WYOMING VALLEY HOSPITAL, 149 Dana Street, Wilkes-Barre, PA, for psychiatric testing.

Based on the initial assessment and classroom observation, FELL experienced difficulty with interpersonal relationships with both peers and adults. He demonstrated poor impulse control, attending to and completing tasks, and appeared to have poor self-esteem.

PREVUZNAK located FELL's year end grades at PLAINS JUNIOR HIGH SCHOOL, dated June 22, 1993. They reflected the following:

FELL-00001184

7A-AL-44453

9

English: D; Developmental Reading: E (Below 70%- Fail);
Social Studies: E; Math: E; Science: E; Art: D;
Voc. Explor.: C; Music: E; Physical Ed.: F

In 1994, FELL successfully completed the summer session at ST. MICHAEL'S SCHOOL, and was promoted to Grade 8. His grades are as follows:

Reading: A; English: A; Spelling: A; Math: C;
Science: B; Social Sciences: A; health: A; Art: B;
Computers: C; Physical Ed.: B

PREVUZNAK advised that his last contact with FELL occurred sometime in May 2000, when FELL came to CHS to provide a ride to his sister, TERRI FELL, who resided with her aunt, JACKIE SHARPE, Wilkes-Barre, PA. During their conversation, FELL alluded to the fact that TERRI's living conditions were bad and that TERRI was looking for a new place to live. PREVUZNAK stated that FELL looked raggedy, his hair was long and greasy, yet he remained respectful to him. PREVUZNAK stated that he was not surprised to read that FELL was involved in a triple homicide, as he always hung with a rough crowd and appeared destined for failure.

PREVUZNAK advised that he never had any contact with ROBERT JOSEPH LEE. LEE's academic file had little paperwork in it but reflected the following information:

LEE attended the Head Start Program at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL during school term 1996-1997. In a report dated June 11, 1997, LEE missed 22 days of school due to absenteeism.

An Alternative Learning Center Report Card for the term 1995-1996 reflected the following grades earned by LEE:

| CLASS | 1st | 2nd | Leave of Absence | 4th | Final |
|---|---|---|---|---|---|
| English | 80 | 54 | x | 83 | 72 |
| Science/Health | 75 | 45 | x | 84 | 68 |
| Math | 90 | 45 | x | 87 | 74 |
| Social Studies | 80 | 45 | x | 82 | 69 |
| Literature | 80 | 50 | x | 80 | 70 |
| Computer App. | 80 | 80 | x | 80 | 80 |

On November 12, 1996, LEE's report card at Head Start reflected the following grades:

FELL-00001185

7A-AL-44453

10

English: 65; Social Studies: 60;  Mathematics: 68; Science: 65; Pre Voc: 65.

On March 29, 2001, JAMES S. MURPHY, Home/School Visitor, JAMES M. COUGHLIN HIGH SCHOOL, was interviewed concerning his knowledge of DONALD R. FELL and/or ROBERT JOSEPH LEE. MURPHY advised that he has no knowledge of LEE but knew DONALD FELL.

MURPHY stated that he has been a teacher for 20 years and a Home/School Visitor for the last 11 years. MURPHY's first encounter with DONALD FELL occurred sometime in 1993, when FELL was a student at the PLAINS JUNIOR HIGH SCHOOL, Plains, PA. As part of MURPHY's duties, he would send legal notices to the home of a truant student. On January 28, 1992, MURPHY contacted DEBRA FELL, FELL's mother, concerning FELL's truancy. MURPHY explained that years ago, parents were cited when their child did not show up for school. The law changed in the mid-1990's, to the point where both the parent and child are now cited to assure compliance.

MURPHY stated that on May 28, 1993, DONALD FELL was cited at the PLAINS JUNIOR HIGH SCHOOL for disorderly conduct. FELL had called his teacher an obscenity and was walking on the tops of cafeteria tables.  The disorderly citation was filed with the local magistrate, and FELL's mother received a copy from MURPHY via registered mail.

MURPHY recalled that when FELL attended COUGHLIN HIGH SCHOOL, circa 1996 - 1997, he resided with his aunt, JACKIE SHARPE, at 32 East Chestnut Street, Wilkes-Barre, PA. SHARPE was listed as FELL's legal guardian, and MURPHY dealt directly with her. On November 9, 1996, SHARPE was sent a legal notice indicating that DONALD FELL had missed 12 days of school. According to school policy, a doctor's note must be sent to the school whenever a student was absent three days in a row or longer. No such note was ever received from SHARPE. On February 13, 1997, a citation was sent to SHARPE and DONALD FELL because at that point, FELL had 87 illegal days (truant days) on file. FELL and SHARPE were no shows at the magistrate's office.

MURPHY stated that SHARPE never liked him and wrote several nasty letters with excuses why FELL missed school or why she never contacted the school. MURPHY described FELL as having a slight build but a tough guy attitude. He described FELL as a gangster wanna be who was extremely antagonistic. FELL was generally uncooperative and cocky and quit high school on the day of his 17th birthday. According to school policy, a student may

FELL-00001186

7A-AL-44453

11

quit school at the age of 16 provided they had a job on the outside that provided 35 - 40 hours per week. If a student had no job outside of school, they had to wait until they attained the age of 17.

On April 30, 1997, MURPHY advised that he made a home visit to the SHARPE residence to find out why DONALD FELL had not been attending school. JACKIE SHARPE simply said, "He quit." MURPHY advised that SHARPE never had the decency to notify school officials of FELL's intentions. MURPHY stated that FELL intimidated other students by his cocky attitude. Once he quit school he was often observed out in front of the school at dismissal time to meet up with his friends. It was FELL's way of saying to the other students, "look at me I'm cool".

MURPHY recalled that FELL was on probation with the LUZERNE COUNTY JUVENILE PROBATION OFFICE. His Probation Officer was ROBERT NILON.

MURPHY related that FELL came from a problem family and exhibited behavioral problems throughout his school years. MURPHY stated that FELL never displayed his temper in his presence, but he knew FELL was a powder keg just waiting to go off.

On March 30, 2001, ELIZABETH DiPASQUALE, Guidance Counselor, JAMES M. COUGHLIN HIGH SCHOOL, Wilkes-Barre, PA, was interviewed concerning her knowledge of DONALD R. FELL and ROBERT JOSEPH LEE. DiPASQUALE advised that she first met DONALD FELL in August 1995. On that occasion, DiPASQUALE had to meet with FELL's legal guardian and aunt, JACKIE SHARPE, to get her signature/ authority on a form which would allow FELL to enroll in the ninth grade Head Start Program housed at the WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL, Wilkes-Barre, PA.  DiPASQUALE stated that she vividly recalls the visit to SHARPE's residence on East Chestnut Street, Wilkes-Barre, PA, because the house and yard were in deplorable condition. There were broken bottles in the front yard, the exterior fence was broken, and the house was in general disarray. DiPASQUALE met SHARPE on the front porch and had her sign the appropriate paperwork. FELL was present that day but remained at the front door.

DiPASQUALE recalled that DONALD FELL was lethargic and a marginal student at best. He had a long history of truancy and was the product of a broken home. FELL was emotionally, socially, and culturally deprived. It was believed that he could benefit from the Head Start Program which provided marginal students with the opportunity to learn various trades coupled with a more relaxed academic schedule. DiPASQUALE stated that FELL showed

FELL-00001187

7A-AL-44453

12

absolutely no progress in Head Start and was constantly in detention or was suspended from school. DiPASQUALE stated that FELL's sister, TERRI, was a year or two younger than FELL and also resided at SHARPE's home. TERRI FELL never graduated from high school. DiPASQUALE believed that FELL's mother had a history of alcohol abuse. No father figure was ever present in FELL's life. DiPASQUALE stated that FELL dropped out of high school in the 10th grade. This was the last time she saw him in school until May 2000, when FELL came to the school to pick up his sister. On that occasion, DiPASQUALE briefly spoke to FELL in her office and learned that it was his sister's intention to drop out of school. FELL wanted his sister to remain in school which may have lead to some friction between the two of them. FELL alluded to the fact that things were not going so well for his sister at the SHARPE residence. TERRI FELL was making plans to move to a new residence. DiPASQUALE advised that this was the last time she saw DONALD FELL. DiPASQUALE's recollection of FELL was that he always looked dirty and needed a good bath.

DiPASQUALE stated that her recollection of ROBERT LEE was not as vivid as DONALD FELL. She recalled that LEE resided with his father on Hurley Street, Wilkes-Barre, PA. She described LEE as a person who was lost. LEE had a history of detentions and suspensions and was a chronic truant. During his ninth grade, LEE attended the Head Start Program at WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL. DiPASQUALE remembered that LEE's father came to the school to sign the form necessary to enroll LEE into the Head Start Program.

DiPASQUALE reviewed LEE's academic records and advised that LEE was a Special Education student who attended the DALLAS ALTERNATIVE SCHOOL and admitted to the Luzerne Intermediate Unit (LIU) on September 28, 1995.

On March 30, 2001, THOMAS M. ZELINKA, English teacher, was interviewed regarding his knowledge of DONALD R. FELL and ROBERT JOSEPH LEE. ZELINKA advised that prior to being transferred to the COUGHLIN SENIOR HIGH SCHOOL, he taught English in the Head Start Program at WILKES-BARRE AREA VOCATIONAL-TECHNICAL SCHOOL (WBAVTS), Wilkes-Barre, PA. ZELINKA advised that he first encountered DONALD FELL and ROBERT LEE in approximately 1996, when both were ninth graders at WBAVTS. ZELINKA found FELL to be relatively bright yet extremely undisciplined. ZELINKA advised that FELL appeared to have a chip on his shoulder and tried to intimidate others by his boisterous behavior. ZELINKA recalled FELL as wearing the same outfit all the time, a flannel shirt wrapped around the waist, a long jacket, and a bandana worn on the head. ZELINKA stated that FELL attempted to do some school

7A-AL-44453

13

work; but, when confronted, he would strike out aggressively. ZELINKA described FELL and his temper as a "loaded gun"; one never knew when he would unload on somebody. ZELINKA recalled one incident wherein FELL was physically carried from the Social Science class because he was acting out. FELL pointed his finger into the face of the instructor, JOHN KOZERSKI, and told him that he was going to kill him.

ZELINKA stated that he last saw FELL in approximately December 2000, smoking cigarettes outside the Top Dog fast food restaurant, Wilkes-Barre, PA. FELL was in the company of ROBERT LEE, just hanging out and playing video machines. FELL never recognized ZELINKA who was at the restaurant to celebrate his daughter's birthday. FELL looked as he always did; dirty, unkept, with an attitude.

ZELINKA stated that ROBERT LEE was nicknamed "The General" by staff members at the WBAVTS. LEE never got the connection between his name and that of General ROBERT E. LEE. ZELINKA described LEE as a dirty looking and disruptive student who just took up space in the classroom. LEE never did any School work and missed an extraordinary amount of school days due to truancy. ZELINKA stated that LEE was definitely a loner and that the other students found him a bit strange. On several occasions ZELINKA observed LEE and FELL together at the school. ZELINKA advised that FELL and LEE were two of a kind. ZELINKA stated that based on LEE and FELL's attitude, he seriously doubted that either boy would be productive members of society. ZELINKA stated that he was not surprised to read in the papers that LEE and FELL had killed someone because both were going nowhere fast.

FELL-00001189

7A-AL-44453

14

PLAINS JUNIOR HIGH SCHOOL
62 Abbott Street
Plains, PA
September 1992 - June 1993
September 1993 - June 1994

On April 10, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

WAYNE WASLOWSKY, Home/School Visitor, PLAINS JUNIOR HIGH SCHOOL (PJHS), REDACTED-FELL  telephone number 570-826-7224, advised that he first became familiar with DONALD FELL in approximately September 1993, when FELL was a seventh grader at PJHS. At that time, FELL was residing with his mother, DEBRA FELL, at  REDACTED-FELL  Wilkes-Barre, PA. FELL was becoming a recurrent truancy problem; and during the academic year 1993-1994, it was safe to say that FELL was never in school. WASLOWSKY reviewed notes in an old folder which indicated that on December 9, 1993, he spoke with DEBRA FELL, and she had been petitioned to the Juvenile Court because of non-payment of fines relating to FELL's truancy. WASLOWSKY advised that the Juvenile In-Take Worker recommended that FELL be placed at ST. MICHAEL'S SCHOOL for dependent and delinquent children. On December 13, 1993, a meeting was held to discuss FELL's academic future, and it appeared that the court was going to agree that FELL be sent to the Day Treatment Unit of ST. MICHAEL'S.

WASLOWSKY stated that although FELL had the reputation of being a "foul mouth" at school, he never had any real significant dealings with FELL. WASLOWSKY stated that FELL just did not give a "shit" about school. WASLOWSKY recalled that his mother was relatively compliant with school officials but demonstrated little control over FELL. WASLOWSKY stated that he never observed FELL's temper; however, he recommended Special Agent GLENN to teacher THOMAS MC DERMOTT who once observed FELL firsthand in a rage. WASLOWSKY related that he can still visualize FELL attired in his black tee shirt, black pants, and black steel toed boots. After FELL left PJHS, WASLOWSKY has had no further contact with him.

On April 10, 2001, THOMAS M. MC DERMOTT, Social Science Teacher, PJHS, was interviewed concerning his recollection of FELL. WASLOWSKY advised that his first encounter with FELL occurred in the cafeteria as opposed to the classroom. MC DERMOTT recalled that in the academic year 1992-1993, he observed FELL engaged in a heated exchange with a female colleague. MC DERMOTT recalled that FELL was shouting

FELL-00001190

7A-AL-44453

15

obscenities in the middle of the cafeteria and was totally out of control. To that end, MC DERMOTT, sensing that FELL may get violent, intervened and confronted FELL. At that point, FELL called him a "fucking asshole" and then ran from the cafeteria. MC DERMOTT pursued FELL and grabbed him in the hallway before he had a chance to leave the school building. MC DERMOTT stated that he immediately marched FELL into the principal's office and told the principal about FELL's actions. To MC DERMOTT's surprise, ten minutes later, FELL returned to the cafeteria. At that point, FELL attracted everyone's attention by walking across the tabletops in the cafeteria. MC DERMOTT stated at that point, he had enough and spoke to the Home/School Visitor, JAMES MURPHY. MC DERMOTT stated that he wanted FELL cited for his abuse of language; however, MURPHY told MC DERMOTT that language alone would not be enough to cite a student. MC DERMOTT then related to MURPHY how FELL had walked across the tabletops in the cafeteria. With that, MURPHY was able to cite FELL for disorderly conduct.

MC DERMOTT recalled that during the academic 1993-1994, he was scheduled to have FELL in his Social Science class. FELL showed up for the first day of class, walked out of the class, and MC DERMOTT has yet to see him again. From what MC DERMOTT could remember of FELL, he was a small framed, little boy, with long hair. To his knowledge, FELL was not in school very often as opposed to his sister, TERI FELL, who was a cooperative and quiet student.

On April 10, 2001, JAMES LASIEWICKI, Assistant Principal, PJHS, advised that he has been involved in the teaching profession for nearly 28 years. His first recollection of DONALD FELL was when he taught him English in the seventh grade, circa 1992. LASIEWICKI described himself has a strict disciplinarian, therefore, had little behavioral difficulties with FELL. LASIEWICKI stated that he taught FELL during the first period of the day; and initially, FELL did the assigned work. He described FELL as a quiet and reserved boy who slacked off as the year progressed. LASIEWICKI stated that FELL was a D student. LASIEWICKI observed FELL with other students and recalled that FELL was a small boy for his age whose temper could be explosive when agitated by the other children. Eventually, FELL would calm down during these periods of trial. LASIEWICKI knew nothing of FELL's home life and has not seen him since the seventh grade.

FELL-00001191

7A-AL-44453

16

DANIEL J. FLOOD ELEMENTARY SCHOOL
565 North Washington Street
Wilkes-Barre, PA  18702
March 1, 1988-May 25, 1988

The following investigation was conducted by Special Agent JAMES J. GLENN:

On April 10, 2001, BRIAN BENEDETTI, Principal, FLOOD ELEMENTARY SCHOOL (FES), provided the academic records of ROBERT JOSEPH LEE, JR.  A copy of these records is attached hereto this report.  BENEDETTI was not working at FES when LEE was enrolled at the school; however, he believed that the former Principal, DONALD SABATINO, now retired, may have some knowledge of LEE.

LEE's records indicate that he attended FES for only three months during the period March 1, 1988-May 25, 1988, and was enrolled in the first grade.  LEE had transferred in from a school in Brooklyn, New York, where he spent the first half of first grade.  On May 25, 1988, LEE transferred from FES to attend school in Tunkhannock, PA.  Records indicated that LEE spent his kindergarten year, 1986-1987, at the CHESTER STREET SCHOOL, Kingston, PA.  Records indicated that LEE was born on November 28, 1980, in Brooklyn.

REDACTED-FELL On April 10, 2001, DOANDL SABATINO, white male, DOB 1931, REDACTED-FELL 0214, was interviewed at his residence,  REDACTED-FELL  Wilkes-Barre, PA, 18702.  SABATINO was employed by the Wilkes-Barre School District for approximately 33 years before retiring in 1993.  SABATINO stated that he opened the FLOOD ELEMENTARY SCHOOL in 1969, where he worked as the school's principal until 1993.  SABATINO recalled the names of students DOANDL FELL and ROBERT LEE; and to his recollection, neither was a behavior problem.  SABATINO stated that both boys were probably only in the first or second grade when he knew them; and generally, at that age, they are much more controllable than the older grades.  SABATINO recalled that LEE's father was very cooperative with school officials and that LEE may have possessed some emotional problems.  SABATINO could add no additional information but added that most of their teachers have either been transferred or retired.

7A-AL-44453

17

LUZERNE INTERMEDIATE UNIT 18
Alternative Learning Center (ALC)
33 West Carey Street
Plains, PA 18702
1995 - 1996

        The following investigation was conducted by Special
Agent JAMES J. GLENN:

        On April 10, 2001, SANDRA OSTROWSKI, Secretary, ALC, 33
REDACTED-FELL   Plains, PA, provided academic records for
ROBERT LEE, JR. which indicated his attendance at ALC from 1995 -
1996.  Contained within LEE's folder was an Individualized
Education Program, dated May 31, 1995, and a Comprehensive
Evaluation Report, dated May 4, 1995.  Both reports are attached
hereto this report.  According to LEE's 1995 - 1996 report card,
he was absent only four days, and it was recommended that he be
promoted to grade nine.  LEE took the following medications:
Dexidrene, Clonidine, and Thorazine.  LEE was described has
hyperactive and explosive.  LEE's report card reflected the
following:

| Course | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 | Final |
|--------|-----------|-----------|-----------|-----------|-------|
| English | 80 | 45 | Incomplete | 83 | 72 |
| Science/ Health | 75 | 45 | Incomplete | 84 | 68 |
| Math | 90 | 45 | Incomplete | 87 | 74 |
| Social Studies | 80 | 50 | Incomplete | 82 | 69 |
| Literature | 80 | 80 | Incomplete | 80 | 70 |

        A equals 90 to 100
        B equals 80 to 89
        C equals 70 to 79
        D equals 60 to 69
        F equals Fail

        ROBERT LEE was admitted from March 21, 1996, to
April 4, 1996, and he was enrolled in the Genesis School at FIRST
HOSPITAL WYOMING VALLEY.  His teacher was TIM LAVELLE who
provided the following Progress Report, dated April 8, 1996:

Subject Areas

        English       - 80
        Math          - 93
        Social Studies - 80

7A-AL-44453

18

```
Science               -   72
Reading               - 100
Physical Education - Pass
Art                   - Pass
Music                 - Pass
```

Work/Study Skills

1.  Follows Directions - shows improvement.

2.  Completes Assignments - needs strengthening.

3.  Works Independently - shows improvement.

4.  Works Cooperatively in a Group - shows improvement.

5.  Participates in Class - needs strengthening.

Social/Emotional Growth

1.  Practices Good Health Habits - satisfactory progress.

2.  Shows Respect for Others and Their Property - shows improvement.

3.  Obeys Rules - shows improvement.

4.  Demonstrates Self Control - satisfactory progress.

5.  Shows Courtesy in Speech and Behavior - shows improvement.

6.  Expresses Feelings Verbally - shows improvement.

7.  Demonstrates Concern for Others - shows improvement.

8.  Shows Ability to Act Appropriately in a Variety of Situations - shows improvement.

9.  Demonstrates the Ability to Attend - shows improvement.

10. Demonstrates the Ability to Relate to Peers - satisfactory progress.

FELL-00001194

7A-AL-44453

19

11. Demonstrates the Ability to Relate to Staff - shows improvement.

Recommendations

LEE was discharged from FIRST HOSPITAL WYOMING VALLEY on April 5, 1996. Recommendation is to return to previous school setting and follow up on appropriate after care services that have been arranged.

LEE's file indicates an Incident Report at the ALC.

Date of Incident:    February 27, 1996
Class:               Lunch

LEE was written up for insubordination, threatening or intimidating another person, profanity, and other (destruction of property).

Narrative:  "ROBERT was brought to the office for his lunch period because of inappropriate classroom behavior. ROBERT threw two items over the wall and proceeded to pick them up when instructed by Mr. MUSTO. He then threw and busted a glass salt shaker off the wall. He was removed by Mr. MUSTO and brought to another empty room. After being restrained for approximately two minutes, he proceeded to throw a desk across the room, causing institutional vandalism to another desk. ROBERT again needed to be restrained and expressed that he would clean the office and pick up the desk. He intentionally continued to bang the broom into doors and walls before hitting a student in the legs with the broom." Signed by Mr. RON MUSTO.

Comments:  "I entered the Quiet Room, and ROBERT was out of control. I interceded and placed ROBERT in an upper torso. After one minute, he indicated he could speak rationally. He sat in the chair and was able to talk about his responsibilities and our expectations. The session ended on a positive note."

LEE was engaged in a second incident, dated October 16, 1995, at ALC.

Details:  "BOBBY was placed in the Time Out Room by Mr. DOMBROSKI. While in the room, he displayed poor behavior and became verbally abusive to the staff, had an altercation with another student, and kept making noises and throwing objects. Mr. LEE also kicked a hole in the wall, approximately 16 inches by 14 inches. He eventually put his hands down and calmed down."

7A-AL-44453

20

Comments:   "Student should pay for the damage to the wall."

A report of the Woodcock Reading Mastery Test - Form G was administered and dated January 25, 1998, Grade:   10.5.   The following instructional level profile is as follows:

Word Identification:       Grade Level   9.3
Word Attack:               Grade Level  12.9
Word Comprehension:        Grade Level   6.0
Passage Comprehension:     Grade Level   8.9

Observation:   "BOBBY said he does not like to read; however, he does possess adequate ability to enjoy a diversified reading diet.   He needs motivation and later a vocabulary progression."   Signed by KAREN MISOLEK, Reading Specialist.

The following 1997 - 1998 report card for ROBERT LEE, Grade 10, was found in the ALC file:

| Course | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
|---|---|---|---|---|
| English | 85 | 85 | Incomplete | Incomplete |
| Science/ |  |  |  |  |
| Health | 85 | 86 | Incomplete | Incomplete |
| Math | 85 | 87 | Incomplete | Incomplete |
| Social |  |  |  |  |
| Studies | 85 | 89 | Incomplete | Incomplete |
| Literature | 85 | 85 | Incomplete | Incomplete |

Recommendations:   Remain in grade 10.   Remain at ALC.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 11, 2001:

RONALD MUSTO, Head Teacher, ALC,     REDACTED - FELL
Plains, PA, 18702, telephone number 570-208-3823, advised that he has been in the education field for 11 years.   MUSTO described ALC as an institution that has been developed for "at risk" youth, i.e. those children having problems functioning in the public school system.   The aim of the program is to structure the student's daily functioning and to nurture their emotional and leaning needs.   The violations of the students who attend ALC range from truancy to weapons violations.   The majority are here for disruptive classroom behavior.   Presently, there are approximately 110 students at ALC, and MUSTO described the center as a temporary set-up until those students can either be placed

7A-AL-44453

21

back into the school or are dismissed altogether from a public school system.

MUSTO stated that when ROBERT LEE was at ALC, it was a different program altogether. At that time, there were only 40 students in the program; and since LEE's departure, the program has tripled in size. MUSTO stated that he is very doubtful that LEE would have survived the program the way it exists today; because, there is a zero tolerance for any students acting out at ALC. Students displaying destructive behavior are immediately cited and taken before a local District Justice. MUSTO advised that ALC is going back to a traditional grading system where students are graded on assignments, and classes are textbook oriented. Back in 1995 - 1996, when LEE was placed at ALC, it was the proper placement for him.

MUSTO recalled that ROBERT LEE always wore black attire. He wore a black leather jacket with a chain that attached to his black wallet, he wore black boots and pants, and had rough, thick black hair. MUSTO stated that LEE had a cold and sneaky personality and was more likely to be verbally confrontational than physically confrontational with students and staff. In MUSTO's opinion, LEE knew how to play the system and was never known for his academic prowess. MUSTO stated that LEE never removed his jacket in the classroom and was not a socially interactive student. It seemed that LEE was more of a loner, and the other students knew that you would not want to go near LEE because you would not know what you might get. LEE slept a lot in class, and it appeared as though he never got the appropriate rest at home. MUSTO advised that LEE picked his battles and was smart enough not to pick on anyone bigger than he. MUSTO recalled that after leaving ALC, LEE entered the ninth grade at WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 11, 2001:

GREG ELLSWORTH, Gym Instructor, ALC, REDACTED - FELL Street, Plains, PA, advised that he was familiar with both DONALD FELL and ROBERT LEE, as ELLSWORTH was head of the Physical Education Department at ST. MICHAEL'S SCHOOL, Tunkhannock, PA. ELLSWORTH recalled that ROBERT LEE resided at ST. MICHAEL'S much longer than DONALD FELL and was known to be a quiet kid with an occasional outburst. ELLSWORTH recalled that one particular teacher, named JIM BRESKY, took an interest in LEE and tried to help him. BRESKY is no longer at ST. MICHAEL'S and lives out of state. ELLSWORTH recalled that LEE was not a participant in many of the gym classes but at least he tried. In some ways, he was

7A-AL-44453

22

picked on by the other kids because he was fairly small for his age.  ELLSWORTH stated that he had a hard time believing that LEE was responsible for killing anyone because he was more on the quiet side.

ELLSWORTH stated that DONALD FELL was also a small kid when he encountered him at ST. MICHAEL'S.  At that time, FELL was only about 14 years of age and had a series of confrontations at ST. MICHAEL'S.  It appeared that FELL had many more friends than LEE and was only at ST. MICHAEL'S for about a one year period.

FELL-00001198

7A-AL-44453

23

WILKES-BARRE AREA SCHOOL DISTRICT
730 South Main Street
Wilkes-Barre, Pennsylvania (PA)   18711

On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

Dr. EDWARD BLACEJEWSKI, Director of Pupil Personnel, REDACTED - FELL   Wilkes-Barre, PA, 18711, telephone number 570-826-7121, provided the interviewing Agent with information concerning ROBERT JOSEPH LEE's academic attendance.  LEE's records revealed the following:

1986-1987 - LEE attended kindergarten at the CHESTER STREET SCHOOL, Kingston, PA.

September 1987-February 1988 - LEE attended the first part of first grade in Brooklyn, New York.

March 1, 1998-May 25, 1988 - LEE completed first grade at the FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA.

1988-1992 - LEE attended school in the TUNKHANNOCK AREA SCHOOL DISTRICT.

January 1992-March 1993 - LEE attended classes at the CHILDREN'S SERVICE CENTER SERVICE CENTER (MILFORD BARNES SCHOOL), 335 South Franklin Street, Wilkes-Barre, PA; LEE also attended ST. MICHAEL'S SCHOOL FOR BOYS, Tunkhannock, PA.

1993-1995 - LEE attended grade sixth and seventh at ST. MICHAEL'S SCHOOL FOR BOYS (Court Adjudicated).

1995-1996 - LEE's eighth grade was spent in the DALLAS ALTERNATIVE SCHOOL, Dallas, PA.

1996-1997 - LEE attended ninth grade at the Head Start Program, WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL, Wilkes-Barre, PA.

1997-1998 - LEE attended tenth grade at COUGHLIN HIGH SCHOOL but quit SCHOOL on his 17th birthday.

BLACEJEWSKI advised that psychiatric and psychological evaluations contained within LEE's special education file may be obtained through subpoena through the Custodian of Records, Dr. KOURY, 730 South Main Street, Wilkes-Barre, PA, 18711.

FELL-00001199

7A-AL-44453

24

CHILDREN'S SERVICE CENTER
  OF WYOMING VALLEY
335 South Franklin Street
Wilkes-Barre, Pennsylvania (PA) 18702
January 1992 - March 1993

On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

ANTHONY B. BLACK, Director of Non-Residential Services, CHILDREN'S SERVICE CENTER OF WYOMING VALLEY, 335 South Franklin Street, Wilkes-Barre, PA, 18702, telephone number 570-825-6427, extension 244, reviewed records pertaining to ROBERT JOSEPH LEE and shared the following results:

A review of LEE's academic folder disclosed that LEE attended classes at the MILFORD BARNES SCHOOL contained within the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY at 335 South Franklin Street, Wilkes-Barre, PA, during the period January 1992-March 1993. While at the school, LEE was assigned a psychiatrist, therapist, and counselor for a myriad of emotional problems he had. LEE was referred to the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY as a result of his volatile behavior at home and in school. LEE was prescribed psychiatric medication to assist him in his anger management and was observed in class to see how his medication affected his relationship with staff and fellow students.

BLACK advised that the MILFORD BARNES SCHOOL is a partial hospitalization program for students experiencing emotional and/or behavioral problems and who cannot function on their own. BLACK advised that during the 1992-1993 academic year, LEE lived with foster parents and was involved in the school's parent/counselor program. BLACK stated that LEE's folder also indicates that LEE had a visit in the FIRST VALLEY HOSPITAL, a psychiatric hospital located on Dana Street, Wilkes-Barre, PA. BLACK advised that due to the sensitive nature of the psychological and psychiatric reports found in LEE's file, release of this information can only be made through the appropriate court orders or by subpoena. BLACK advised that LEE continued, on an out-patient basis, to visit the CHILDREN'S SERVICE CENTER OF WYOMING VALLEY to see his therapist. Other appointments were to review LEE's psychiatric medication, and follow-up homebound services were provided to LEE's home. Upon release from the MILFORD BARNES SCHOOL, LEE attended ST. MICHAEL'S SCHOOL, Hoban Heights, Tunkhannock, PA.

7A-AL-44453

25

EMPLOYMENT

HUMANIK CONSTRUCTION
56 Kado Street
Wilkes-Barre, Pennsylvania (PA) 18705
October 4, 1999 - December 24, 1999
March 20, 2000 - May 26, 2000

      On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

      JOSEPH HUMANIK, Owner, HUMANIK CONSTRUCTION, <sup>REDACTED-FELL</sup> Street, Wilkes-Barre, PA, 18705, telephone number 570-824-9438, was interviewed concerning his knowledge of DONALD R. FELL. HUMANIK reviewed employment records which reflected that FELL was hired on a full-time basis beginning on October 4, 1999, and extending to December 24, 1999. HUMANIK rehired FELL during the period March 20, 2000 - May 26, 2000. HUMANIK stated that FELL was hired as a construction helper, and his job responsibilities included the removal of roofing material so that a new roof could be applied and general clean up.

      HUMANIK stated that in approximately September 1999, he was in need of extra help at his construction business and visited the WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and was fortunate to hire a student on a part-time basis. The student was JESSE WILLIAMS who was hired to work the hours 12:30 p.m.- 4:30 p.m. In the morning hours, WILLIAMS attended classes at WILKES-BARRE VOCATIONAL TECHNICAL SCHOOL. HUMANIK stated that his business was going so well that he asked WILLIAMS if he knew of anyone who would be interested in full-time employment. A short time later, WILLIAMS arrived at work with his cousin, DONALD FELL. HUMANIK stated that initially, FELL was a good worker who did what he was told. Since FELL did not drive, HUMANIK often picked him up at the TURKEY HILL MINI MARKET near his residence and would drop him off at night at his aunt's house on East Chestnut Street, Wilkes-Barre, PA. HUMANIK stated that he never observed FELL using drugs or alcohol on the job and stated that he came to work straight. In conversations with FELL, he learned that there was a large age difference between FELL's mother and father; the father being older. FELL was raised without a father for most of his life. HUMANIK advised that FELL never had a good word to say about his father and never cared for his mother.

      HUMANIK stated that FELL had a bad disposition about everything. He described him as a Dr. Jekyll and Mr. Hyde

7A-AL-44453

26

personality and would definitely describe FELL as a troubled kid. HUMANIK advised that FELL started to argue all the time and would not take instructions. HUMANIK advised that even when he tried to do nice things for FELL, no thank you was ever received. HUMANIK stated that FELL was very cold hearted individual who had no regard for anything. On one occasion, one of his aunt's dogs was giving her trouble, and FELL supposedly took the dog in the woods and shot it. HUMANIK recalled that on the day after the event, FELL joked about killing the dog.

HUMANIK stated that FELL was a slightly built boy, yet came off as being a tough guy. Since he was not manly enough to confront a person face-to-face, FELL would often say or do things behind HUMANIK's back. HUMANIK emphasized the fact that there were good times with FELL. HUMANIK believed that there were times when he thought he had him in control; however, FELL's hot headedness would get in the way. HUMANIK stated that one of his wife's friends had a son who attended a drinking party with FELL. During the course of the evening, FELL picked up an iron frying pay and smacked the boy in the face. HUMANIK did not know the outcome of that episode.

In approximately May 2000, FELL started to miss work, a day here and a day there. Eventually, FELL missed three days in a row and showed up on a Wednesday afternoon demanding his paycheck. HUMANIK stated that he had FELL's check at his residence and not at the job which angered FELL. As HUMANIK was working on a roof, he overheard FELL say to his cousin, JESSE WILLIAMS, "I'll break his kneecaps." HUMANIK stated that FELL was fired because of his not showing up for work. HUMANIK explained that he attempted to find FELL when he did not show up for work. HUMANIK called his Aunt JACKIE looking for FELL, and she informed him that FELL was tangled up with a girl who was committed to a mental health facility. HUMANIK learned that FELL convinced the girlfriend not to return to the facility which angered his aunt, and she requested that he find a different place to live.

HUMANIK stated that he was not surprised to read in the newspapers that FELL killed his mother and others. Although not physically intimidating, HUMANIK stated that FELL was "not wrapped too tight," i.e. he had some psychological problems. HUMANIK stated that he was relieved that FELL left his employment because he became an unreliable worker, and HUMANIK had to be on him all the time to get work out of FELL.

FELL-00001202

7A-AL-44453

27

DJ CONCESSIONS
115 Willow Street
Wilkes-Barre, Pennsylvania (PA) 18702
June 1999 - August 1999
June 2000 - August 8, 2000

     On April 3, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

     JESSE WILLIAMS, Date of Birth August 4, 1982, Social Security Account Number REDACTED-FELL 5935, was interviewed at his residence, REDACTED-FELL Wilkes-Barre, PA, 18702, telephone number 570-822-7360. WILLIAMS advised that his mother, DONNA WILLIAMS, and DONALD FELL's mother, DEBORAH KOTZER FELL, were sisters. As kids, WILLIAMS and FELL grew up a block away from each other. WILLIAMS resided on West Chestnut Street, and FELL resided on East Chestnut Street, Wilkes-Barre, PA. WILLIAMS stated that FELL is approximately two years his senior; and when they were approximately six and eight years of age, respectively, WILLIAMS would see FELL several times a week in the neighborhood. WILLIAMS stated that in approximately 1996, at about the age of 14, FELL moved in with his Aunt JACKIE at REDACTED-FELL Street, Wilkes-Barre, PA.

     Prior to that time, FELL was living with his grandmother; however, upon her death, JACKIE SHARPE became FELL's legal guardian. WILLIAMS explained that FELL's mother was an alcoholic and could not function as a mother. WILLIAMS advised that in approximately 1980, at age eight, WILLIAMS and his mother moved to another part of the city; therefore, his contact with FELL was not as often. A short time later, WILLIAMS' family moved to West Virginia, and did not return to Wilkes-Barre, PA, for another six years. WILLIAMS recalled that when he returned to Wilkes-Barre, FELL was approximately 16 years of age and was attending the WILKES-BARRE AREA VOCATION TECHNICAL SCHOOL. WILLIAMS recalled that as a youth, FELL attended FLOOD ELEMENTARY SCHOOL, ST. MICHAEL'S SCHOOL, WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL, and COUGHLIN HIGH SCHOOL.

     WILLIAMS stated that FELL always had a bad temper even as a kid. It was not uncommon for him to use profanity, and he often bragged about his fighting prowess; however, WILLIAMS never observed him physically fighting with anyone. WILLIAMS described FELL as a biker wannabe and advised that FELL emulated the look of a biker, i.e. wore a flannel shirt around his waist, wore his hair long, often wore jeans with holes in them, and biker boots. If FELL did not wear a baseball cap, he would then wear a

FELL-00001203

7A-AL-44453

28

bandanna.  WILLIAMS stated that FELL had fairly poor hygiene and was slightly built.

WILLIAMS stated that FELL always displayed a cocky attitude and enjoyed partying with his friends.  WILLIAMS stated that he never hung around FELL's friends because they drank alcohol and did drugs which WILLIAMS is totally against. WILLIAMS stated that he is a member of STRAIGHT EDGE, a group that is anti-smoking, anti-drugs, and anti-alcohol.  During the course of the interview, WILLIAMS wore a STRAIGHT EDGE tee shirt. WILLIAMS was aware that FELL was a troubled individual.  It seemed that he was always in and out of trouble at school and in the home.  Through family conversations, WILLIAMS learned that FELL had once broken the wrist of his Aunt JACKIE with whom he resided.  WILLIAMS advised that other than ROBERT LEE, he did not know the names of FELL's friends and did not care to know them.

WILLIAMS recalled that FELL dropped out of school in the tenth grade in the spring of 1997.  In the fall of 1999, WILLIAMS was offered a part-time job while attending WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL by JOSEPH HUMANIK, owner of HUMANIK CONSTRUCTION, Wilkes-Barre, PA.  At that time, HUMANIK needed workers in his construction business, and WILLIAMS recommended FELL to him as a full-time helper.  WILLIAMS advised that FELL ended up quitting the job and once threatened to break HUMANIK's kneecaps if he did not get his paycheck.  During the summer of 1999, WILLIAMS hired FELL to help him with his traveling carnival show.  WILLIAMS stated that he contracted with S&S AMUSEMENTS to run his concessions in the traveling carnival. WILLIAMS advised that he ran the rat game which involves a rat running in a wheel and picking a particular color when it stops. FELL ran the goldfish game which involves throwing a ball toward a fish bowl, and if it lands in the bowl, a contestant wins a fish.  WILLIAMS advised that once FELL was fired from HUMANIK CONSTRUCTION in May 2000, WILLIAMS rehired him for the traveling carnival show.  WILLIAMS stated that FELL was hired in June 2000, and that they traveled to carnivals held in Allentown, PA; Honesdale, PA; Hereford, PA; Bath, PA; Philadelphia, PA; and Cementon, PA.

WILLIAMS stated that FELL brought along his friend, ROBERT LEE, and asked that WILLIAMS introduce him to members of the carnival so that he could obtain employment. WILLIAMS described LEE as a small framed individual with long curly hair and glasses.  WILLIAMS stated that LEE acted like FELL, i.e. displayed a cocky attitude, when in the company in FELL but was nicer when alone.  During the period June 2000-August 8, 2000, WILLIAMS hired LEE to run the quarter throw concession in the

FELL-00001204

7A-AL-44453

29

traveling carnival. WILLIAMS stated that he may have met LEE through FELL one or two years prior to hiring him but really paid no attention to him. WILLIAMS advised that initially both LEE and FELL were fairly good workers and helped him set up his concessions at each town. Eventually, both became mouthy, and it was difficult getting any work from them. WILLIAMS stated that he towed an equipment trailer behind his camper and used the camper to sleep in. Each evening, WILLIAMS would lock the door of his camper at a certain hour; and if FELL and LEE were not back, they would not sleep in the camper. Since FELL and LEE were prone to drinking alcoholic beverages, practically every evening, LEE ended up buying a tent for them to sleep in. FELL's sister, TERI, and his friend JOHN EAVARONE also accompanied him during the carnival run. WILLIAMS remarked that TERI FELL saved every paycheck that she earned and used the money to pay rent when she returned to the Wilkes-Barre area. LEE and FELL, on the other hand, spent the money as fast as they earned it.

WILLIAMS stated that FELL often spent his free time reading fantasy books that involved dragons and wizards. He also liked to listen to hard rock music. LEE listened to music and engaged in devil worship. Both FELL and LEE sported upside down cross tattoos on their bodies with the number "666". WILLIAMS knew that both were engaged in drug activity and would use anything they could get their hands on to include Ecstasy and crack cocaine. WILLIAMS stated that he did not observe them actually taking the narcotics but overheard their conversations the next day.

WILLIAMS recalled that at one carnival near Monticello, New York, FELL and LEE decided to travel to Woodstock, New York, after work. WILLIAMS advised against them doing so because they had to work the next day, but the two did not listen and ended up assaulting a man and were arrested. WILLIAMS stated that FELL and LEE used fictitious names during their arrest and were also in the company of TERI FELL. Although TERI FELL was not involved in the actual assault, the police detained her until a family member could pick her up. WILLIAMS stated that he had to travel to Woodstock to bail out FELL and LEE. Since he lost so much business, both individuals were terminated. Upon their return to Wilkes-Barre, TERI FELL resided with WILLIAMS during the months of October, November, and part of December 2000. She eventually ran out of money, and WILLIAMS asked her to leave. He did not know where TERI FELL is presently residing but knew that she had been living with friends in Falls, PA. DONALD FELL made plans that same summer to travel to Rutland, Vermont, and to live with his mother. WILLIAMS stated that FELL was fairly excited about the trip and took LEE with him. TERI FELL would call her to get

FELL-00001205

7A-AL-44453

30

updates on FELL's behavior and learned that FELL was being disruptive and abusive to his mother.

WILLIAMS recalled one episode in the same week when FELL and LEE were fired in New York. Members of the carnival were extremely upset because a cat had been found beaten to death. Although WILLIAMS did not know the true account, rumor had it that FELL and LEE had torn the cat apart. Another account was that they had played hockey with the cat. The cat belonged to one of the girls working at the carnival. WILLIAMS recalled that FELL walked with a fake limp when carnival workers were trying to find out who was responsible for the cat's death. FELL told everyone that his foot got run over by a car which WILLIAMS said was a complete lie.

On another occasion, prior to New York, WILLIAMS and LEE got into an argument, and LEE threatened to burn down WILLIAMS' camper. WILLIAMS was asked if he ever observed FELL in possession of a weapon. WILLIAMS stated that he observed FELL holding a rifle inside of his camper. WILLIAMS stated that he was extremely angry at FELL for carrying the rifle and asked him if he had a license to carry it. FELL said that he did but added that the gun was not loaded. WILLIAMS described the weapon as being black in color but did not know the caliber or type since he does not like guns. WILLIAMS warned FELL to keep the weapon out of sight which he did. No further conversation about the weapon occurred, and WILLIAMS never asked FELL where he got the gun.

Based upon his knowledge of FELL and his observations of LEE, WILLIAMS stated that he was not surprised to know that both were involved in a homicide. FELL once told WILLIAMS that he was going on a killing spree some day and would keep on killing until the cops killed him. WILLIAMS related that after FELL left JACKIE SHARPE's residence, in late spring 2000, he briefly stayed with WILLIAMS' mother, DONNA WILLIAMS, REDACTED-FELL REDACTED-FELL Wilkes-Barre, PA, telephone number 570-822-7188, for a few weeks. WILLIAMS' mother resides with BARRY SEIWELL.

FELL-00001206

7A-AL-44453

31

NORTHEAST CONCESSIONS, INCORPORATED
C/O POCONO DOWNS
1280 Highway 315
Wilkes-Barre, PA   18702

On April 12, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

MARIO PISANO, Director of Food Services, NORTHEAST CONCESSIONS, INCORPORATED at POCONO DOWNS RACETRACK, 1280 Highway 315, Wilkes-Barre, PA, telephone number 570-825-6681, advised that he has been employed as Director of Food Services at the racetrack for approximately 15 years.  PISANO stated that he was not familiar with the name DONALD FELL and reviewed past records, as far back as 1997, and no folder was found on FELL.  PISANO called his former secretary, KIM, in the Accounting Department, and FELL's name was not found in any computer record.

PISANO stated that he has a good feel for every employee he has ever hired, and FELL's name just does not ring a bell.  PISANO stated that every employee, part-time or full-time, must obtain a license from the PENNSYLVANIA HARNESS RACING COMMISSION.  To that end, CHRISTINE ABRAHAM, PENNSYLVANIA HARNESS RACING COMMISSION, was called, and no record of a license was ever issued to DONALD FELL.

PISANO stated that if FELL were employed by him, it may be under an alias, because no record of a DONALD FELL was found.

FELL-00001207

7A-AL-44453

32

LAW ENFORCEMENT CHECKS

LUZERNE COUNTY JUVENILE PROBATION CENTER
280 North River Street
Wilkes-Barre, PA  18702

On April 6, 2001, JOHN COOKUS, Juvenile Probation Officer, provided the juvenile records for ROBERT JOSEPH LEE, JR., DOB REDACTED - FELL 1980, REDACTED - FELL 4689, home residence 25 Hurley Street, Wilkes-Barre, PA, and also the records of DONALD R. FELL, DOB REDACTED - FELL 1980, REDACTED - FELL 7294, home address 32 East Chestnut Street, Wilkes-Barre, PA.

LEE's first encounter with the Juvenile Justice System occurred in an informal adjustment made on August 18, 1992, wherein, LEE was charged with Criminal Mischief.  The charges were filed by Detective WAYNE COONEY and JOHN GONOS, WILKES-BARRE POLICE DEPARTMENT, Wilkes-Barre, PA.  LEE was placed under temporary supervision and had to cooperate with authorities by use of a random blood, breath, and urine test and to cooperate with the CHILDREN'S SERVICE CENTER and CHILDREN AND YOUTH SERVICES.  LEE's mother was listed as BONNY TONTI, Route 92, Harding, PA, and his father was listed as ROBERT LEE, 25 Hurley Street, Wilkes-Barre, PA.

A copy of LEE's juvenile history is attached hereto this report.

LEE's history with the Juvenile Justice System begins in August 1992, and extends to his arrest in Arkansas in 2000. LEE's first appearance before a Court of Common Pleas Judge occurred on January 31, 1996, with the charges of Aggravated Assault, Resisting Arrest, Criminal Trespass, Disorderly Conduct, and Criminal Mischief.  LEE was adjudicated delinquent of Aggravated Assault, Resisting Arrest, Disorderly Conduct, and Criminal Mischief.  The charge of Criminal Trespass was amended to define Trespass which LEE was found delinquent.  By order of Judge CHESTER MUROSKI, LEE was remanded to the LUZERNE COUNTY JUVENILE DETENTION CENTER for a full-scale psychological evaluation with final disposition at a later date.  Additionally, LEE was to pay all court-related costs immediately.  LEE's parents were also responsible to contribute towards the cost of their son's stay in detention in the amount of $20 per day.

LEE's file reflects that on February 14, 1996, LEE was found to be in need of treatment, rehabilitation, and

FELL-00001208

7A-AL-44453

33

supervision.   LEE was ordered to abide by rules and regulations in his probation supervision plan.

A psychiatric evaluation conducted by THOMAS L. D'ZMURA, M.D., Child Psychiatrist, CHILDREN'S SERVICE CENTER, dated August 19, 1994, reflected the following, some of which is paraphrased:

"ROBERT is now 13 years, 9 months old.  He has been seen on an emergency basis.  ROBERT was seen before on July 26, 1994.  At that time, ROBERT was in ongoing treatment at CHILDREN'S SERVICE CENTER. ROBERT was extremely angry at his mother, perceiving her favoring of his siblings, particularly his four year old half brother.  A past diagnosis for ROBERT included major depressive disorder; recurrent and severe; conduct disorder; organic brain disorder, and temporal lobe epilepsy were not to be ruled out.

The evaluating psychiatrist learned that ROBERT's younger brother told the mother that ROBERT had taught him how to masturbate and that ROBERT abused him sexually.  ROBERT's mother confronted him about this, and he became extremely angry, violent, and threatening murder of his mother and half brother. He acknowledged all of these things when talked to, but he seemed to feel no remorse about it.  It seemed impossible for him to step back and view his own behavior in an objective fashion.

A foster home was discussed and noted when done before, as a follow-up to his first meeting with ROBERT, ROBERT had been very aggressive towards younger children in that home.  He did not want to be hospitalized.  He has been hospitalized four times prior because of his violence.

RECOMMENDATIONS

ROBERT should enter into the hospital again.  His behavior is indeed dangerous, he seems to have no real appreciation of his potential danger to other people, and he seems to have no motivation to make positive changes in his behavior.  It seems to me that he is indeed dangerous and should be hospitalized for his own safety as well as the safety of other people.

In my review of the chart, it does not show that diagnostic possibility of temporal lobe epilepsy has been ruled out.  This particular diagnostic entity might well be present here in ROBERT's case, and I think it should be searched for diligently."

FELL-00001209

7A-AL-44453

34

A second and earlier psychiatric evaluation was conducted on ROBERT LEE on March 17, 1993, by Dr. CYRIL M.J. PUHALLA, Board Certified Child and Adolescent Psychiatrist. PUHALLA's evaluation, again paraphrased in some parts, reads as follows:

"ROBERT LEE is a 12 year, 4 month old, white male brought by his Parent/Counselor Program (PCP) counselor and father for an updated, routine psychiatric evaluation.

Since September 1992, ROBERT has been living in PCP foster care with the PARNELLs, adjusting well to this environment. ROBERT has been involved in most therapeutic divisions of CHILDREN'S SERVICE CENTER, including outpatient treatment, partial hospitalization, and home base intensive family services program.

ROBERT's medications include Mellaril, up to 100 mgs per day, and Clonidine to help with severe behavioral disorganization, cognitive disorganization, and aggressiveness.

ROBERT has presented in the past with an ADHD-type of syndrome that has been relatively unresponsive to the usual stimulant medications and Tricyclic anti-depressants.

ROBERT's father has collaborated that ROBERT can get quite destructive, aggressive, and dangerous to himself. His history includes four hospitalizations, three at WILKES-BARRE GENERAL, and the first being at FIRST HOSPITAL when much younger.

ROBERT's father is concerned because ROBERT has always been the child who has been "easily led by others" and most recently has verbalized his obsession with sexual things. ROBERT's father reports that ROBERT says inappropriate sexual remarks to women and, on at least one occasion, brought home an audio tape that had inappropriate sexual music or verbal material on it.

The father describes his son as easily provoked by minor stresses, having excessive amounts of energy, and being explosive. The father denies mental history but through collateral references it became clear that the father, himself, admits to having an explosive temperament at slight provocation but never to the extent that ROBERT or his brother, SHANE, demonstrate.

ROBERT's father is hoping that once ROBERT is out of the PCP, he could be reunited with ROBERT and SHANE. The father

FELL-00001210

7A-AL-44453

35

plans to get a full-time nanny, at least during the daytime, to watch the boys when he is at long hours of work where he is the manager of a trucking company.

ROBERT's father is concerned about ROBERT's relationship with SHANE. He is very envious and has a jealous-type relationship that goes back to his earliest of childhood. At age three, the father vividly recalled ROBERT knocking SHANE out with a glass ashtray. SHANE was taken to the hospital and evaluated for a broken scull. The father has had problems in the past complying with the treatment recommendations, including his involvement in a Home Base Intensive Family Services Program; however, over the last one or two months, the father has become more compliant to our treatment recommendations.

ROBERT, age 12, presently attends ST. MICHAEL'S SCHOOL and is on Mellaril for aggressiveness and destructiveness. There is a 9 year old boy who has been adopted by the biological mother's new husband with whom he now lives. There is a heavy history of a biological-type of depression on the mother's side of the family with the biological mother being hospitalized at least three times for depression with suicide attempts and needing medication.

MENTAL STATUS EVALUATION

ROBERT's mother stated having a severe depressive illness when ROBERT was about four years of age. Even on his Mellaril and Clonidine, one could see that ROBERT barely has control of his aggressive drives and cognition; and if not continuously directed and helped to keep on track, he becomes circumstantial and tangential. More clinical observation needed to see if, in fact, his associations become loose enough to be considered diagnosed and illogical and to have a formal thorough process disorder.

In the past, some of his behaviors, which he admits to, include being aggressive, setting fires, and destroying property, do indicate he can have severe conduct problems that he engages in by himself. He is entering the early stages of puberty. He was open with his examiner in discussing some concerns and issues he has about his burgeoning sexuality and, in some ways, presented inappropriately, again almost hypo-manic in nature. He had very little insight into his problems; and by history, he shows poor social judgement.

FORMULATION

FELL-00001211

7A-AL-44453

36

ROBERT brought in by KIM MARTINI, PCP, and his biological father.  ROBERT has had an extensive psychiatric history with four hospitalizations because of depression and severe aggressive behaviors.  He has done poorly in all treatment modalities and on all medications.  He is only maintaining tenuous control of his aggressive and newly found sexual drives. At times, he feels like he is two people and may, in fact, be having disassociative experience.  He may have other psychotic symptoms such as cognitive and behavioral disorganization to the point where he loses touch with reality, and can be collaborated by recent projective testing.  He has a history of being involved in severe conduct problems, including being physically aggressive, destructive to property, and setting fires.  He admits to impulses of wanting to runaway but is free of any present suicidal/homicidal ideation, intent, or plan.  The heavy family history of depression with psychosis on the biological mother's side of the family and perhaps some schizoid tendencies; and dad has known, himself, to have an explosive temper and to somatize his anxiety, depression, and aggressiveness into physiological illnesses, such as a chronic "ulcer" problem.  Dad, in some ways, is too optimistic about the future, believing he will do well with ROBERT and SHANE, two very aggressive boys, who require anti-psychotic medications and a nanny to watch them during the day.  When explained to the dad about this and tried to explain the reality of the situation that even under those circumstances, it still may require another very special kind of person to help understand and control these young men, dad seemed not to hear or understand my concerns or understand the seriousness, depth, and nature of both of his sons' mental health issues.

DIAGNOSIS

ACCESS I.   296.23-Major Depression Disorder, recurrent, severe, with psychotic features.

312.00-Conduct Disorder, solitary aggressive-type.

ACCESS II.  None.

ACCESS III.  Presently, physically healthy.
R/O organic brain disorder caused temporal lobe epilepsy (partial complex seizures) or other central nervous system disorders.

ACCESS IV.  Moderate.

ACCESS v.  CGAF:  35, highest in last year - 45.

FELL-00001212

7A-AL-44453

37

## RECOMMENDATIONS

ROBERT needs to remain in his present PCP home and receive ancillary outpatient treatment and remain in his partial hospitalization program. In the future, as he grows, it is likely that he will need an increase of his neuroleptic medication, perhaps a mood stabilizing medication, such as Lithium, Tegretol, or Depallote. There should also be given consideration to moving to a higher potentency neuroleptic, if there is a further deterioration and clear cut psychotic symptoms. At present, he presents almost hypo-manic nature and barely controlling his aggressive and newly found sexual drives. He shows some control in a structured situation and is showing no side affects, such as tardive dyskinesia eps from his neuroleptic medication. Further clarification needs to be gotten about the automaticity of his aggressive outbursts; and if a sleeping and awakening EEG has not been done, perhaps it should be considered to rule out some central nervous system problems, such as partial complex seizures as contributing to his behavioral discontrol, disorganization, and aggressive disruptiveness."

Contained within LEE's juvenile probation record was a day treatment discharge summary from ST. MICHAEL'S SCHOOL. The period covered was from September 19, 1994-August 15, 1995. LEE's date of arrival was May 25, 1993, and date of readmission was September 19, 1994. The referring agency was listed as the LUZERNE COUNTY CHILDREN AND YOUTH SERVICES. The day treatment discharge summary is as follows:

## "MEDICATION

Upon his readmission to ST. MICHAEL'S Day Treatment Program, ROBERT was taking 125 mgs of Mellaril, QHS, Clonidine .1 mgs, B.I.D., and Dexedrine 5 mgs. The Dexedrine was discontinued, Clonidine lowered to .1 mg, B.I.D. (noon and 3:00 p.m.), and Mellaril lowered to 50 mgs.

## EDUCATION STATUS

Upon readmission, ROBERT was placed in the seventh grade curriculum, EL3 Class, with ST. MICHAEL'S program. He was promoted to the seventh grade prior to discharge on June 17, 1994. During the past school year, he was able to demonstrate significant progress academically. He was placed on the honor roll, two out of four quarters, and was nominated one of twenty "students of the year" from all of ST. MICHAEL'S population. It is recommended that ROBERT return to a public school setting.

FELL-00001213

7A-AL-44453

38

## PRIORITY NEEDS

Need #1 - BOB needs to respect the rules of authority figures and consistently use appropriate language.

Need #2 - BOB needs to identify and verbalize feelings regarding family relationships.

Need #3 - BOB needs to complete all class work.

*All needs addressed during treatment.

## SECONDARY NEEDS

Need #4 - BOB needs to consider part-time employment. *Need met.

Need #5 - BOB needs to verbalize feelings and participate in individual counseling and possible involvement in the Sexual Offenders Program through CHILDREN'S SERVICE CENTER. *Need not met.

Need #6 - BOB needs to focus on and improve independent decision making skills.  #Need partially met.

Need #7 - BOB needs to be made aware of and discuss family feelings/concerns of father's current illegal status. #Need unmet.

## EXTERNAL NEEDS

Need #8 - BOB needs to participate in an evaluation through the Adolescence Sexual Offenders' Program (ASOP) at CHILDREN'S SERVICE CENTER.  *Need unmet.

Need #9 - BOB needs to participate in a drug and alcohol evaluation through CATHOLIC SOCIAL SERVICES (WB Office). *Need unmet.

## SUMMARY OF CHILD'S PROGRESS AND ADJUSTMENT

While in the Day Treatment Program, BOB's attitude and interactions with peers fluctuated.  BOB has been involved in a few altercations with peers, but these have been addressed with BOB in individual counseling sessions and have not repeated themselves.  He seems to take confrontation by staff as persecution and externalizes blame for many of his inappropriate and negative behaviors on others.  He seems to relate to younger

FELL-00001214

7A-AL-44453

39

peers better than older ones as evidenced by the peer group with which he selects to associate.

Throughout his placement, BOB generally maintained appropriate levels within ST. MICHAEL'S behavioral system. Within the Day Treatment Program, BOB basically follows the rules and staff directions. At times, he demonstrated verbal outbursts when confronted on rule infractions but, generally, was appropriate. These outbursts mainly occurred when he felt as if he was being treated unfairly. Upon discharge, BOB will remain in the care of Mr. ROBERT LEE and reside at 25 Hurley Street, Wilkes-Barre, PA. He will return to a public school setting and follow all the after care plans established by ST. MICHAEL'S and the referring agency.

AFTER CARE

Records will be forwarded to PLAINS JUNIOR HIGH SCHOOL.

COUGHLIN may be the most positive setting for the 1995-1996 academic year.

BOB will remain involved with LUZERNE COUNTY CHILDREN AND YOUTH SERVICES.

BOB will participate in and complete a drug and alcohol evaluation through CATHOLIC SOCIAL SERVICES.

BOB will participate in the Youth Advocate Program."

A psychological evaluation conducted by LENORA HERRMAN FINN, PhD, Clinical Psychologist, Director of Assessment, CHILDREN'S SERVICE CENTER, Wilkes-Barre, PA, was completed on February 5, 1996, and reads as follows:

"INTERVIEW OF ROBERT LEE, SR.

Mr. LEE is bitter and angry, reports that BOB's biological mother divorced him sometime prior to 1986. He believes that the ex-wife used the kids against him and brought charges just to get at him. Both parents may have made allegations of abuse and alcohol and/or involvement. ROBERT and his older sibling, SHANE, 16, were cared for by the paternal grandmother from 1986-1987, while Mr. LEE was a truck driver. From 1988, until late spring 1995, both boys resided with Mr. LEE, until his ex-wife obtained court custody. After 15 days with his mother (now remarried) and his four younger half brothers, ROBERT was accused of sexually molesting one of his

FELL-00001215

7A-AL-44453

40

half siblings and was hospitalized at the WILKES-BARRE GENERAL HOSPITAL, Adolescent Psychiatric Unit.  ROBERT has also been hospitalized on four or five prior occasions at WILKES-BARRE GENERAL HOSPITAL or FIRST HOSPITAL WYOMING VALLEY.  The father claims that ROBERT has been hit eight separate times by cars.  He just rides into the street.

ROBERT has attended at least six schools to include MAIN STREET, DAN FLOOD, NYC, ST. MICHAEL'S, and the Alternative Education Program, Dallas, PA.

Mr. LEE recalls that ROBERT first demonstrated violent behavior at age four-five when he "beat up" his Head Start teacher.  Expelled from public school in NYC for overturning desks, ROBERT threatened his principal at DAN FLOOD with some type of letter opener.  He has runaway for one week with a female youth and has been accused of shoplifting at least ten times at TURKEY HILL, FAY'S, POCONO DOWNS, PRICE CHOPPER, etc.  Most recently, ROBERT assaulted a Plains police officer, claiming that the officer first slapped his face for vulgar language during transport to the police station following a trespassing charge.

RECOMMENDATION

ROBERT's extensive past psychiatric history, explosive anger, alcohol abuse, chaotic family background, and alleged sexual molestation of his younger half sibling, all speak to the need for an updated psychiatric evaluation."

On August 19, 1994, ROBERT LEE, JR. was admitted to the care of Dr. FEUSSREN, Psychiatrist, and was dismissed on September 16, 1994.  The results of Dr. FEUSSREN's evaluation are as follows:

"ADMITTING DIAGNOSIS

Major depression with psychotic features.

Hyper-kinetic conduct disorder.

Atypical bi-polar disorder.

DISCHARGE DIAGNOSIS

Major depression with psychotic features.

Hyper-kinetic conduct disorder.

FELL-00001216

7A-AL-44453

41

Personality disorder traits.

Atypical bi-polar disorder.

REASON FOR REFERRAL

Actions and furtherance of homicidal and suicidal threats.

SUMMATION

ROBERT's four year old half brother, GEORGE, describes oral and anal sex with ROBERT. ROBERT denies the oral and anal sex but admits to showing GEORGE how to masturbate. ROBERT becomes angry and threatens to kill GEORGE, saying that he "blows things up" or exaggerates things. He grabbed GEORGE by the throat and banged his head against the wall. His parents stopped him, he threatened to shoot the mother and stepfather, and to cut their throats at night while they slept. He described how he would cut their throats and how he could blow up their house with pipe bombs. ROBERT admitted to all these things to the emergency worker but still denied oral and anal sex.

ROBERT and his one year older brother SHANE have been shuffled from one parent to the other since 1985, when the parents divorced. The mother has a history of psychiatric treatment and suicidal behavior. There is a six month old sister who died of Sudden Infant Death Syndrome. A nine year old brother currently lives with the mother. ROBERT was placed in a foster home for one and half years. Upon his return to the father in 1991, he was admitted to FIRST HOSPITAL for Active Violence, such as setting two fires in the house, attempting to stab the school principal, and acts of vandalism at the school. He was discharged on 25 mgs of Thorazine, three times a day, which the father said helped to control the behavior. At that time, ROBERT was age nine. At the CHILDREN'S SERVICE CENTER, partial hospital, we tried medications for hyperactivity such as Ritalin and Tofranil which also worked well at that time. His full-scale IQ was 100.

ROBERT was admitted to the WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on March 25, 1992, from the CHILDREN'S SERVICE CENTER, partial hospital, where he scratched teachers, damaged furniture, and tried to stab peers with a knife, and had to be physically restrained on the floor to prevent resuming such behavior. He had been drawing pictures of a girl in his class having sex with animals. ROBERT was admitted to WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on May 4, 1992, for beating up

FELL-00001217

7A-AL-44453

42

an eight year old boy very severely who had wanted to ride his bicycle.  After being scolded by his father, ROBERT reacted by "trashing his room" and threw everything in the middle of the floor.  The father was afraid of the severe temper tantrums ROBERT was having, during which ROBERT lost control of himself and became extremely violent.  The father was afraid he might seriously hurt one of the younger children in the neighborhood.

ROBERT was again admitted to the WILKES-BARRE GENERAL HOSPITAL, Adolescent Unit, on September 11, 1992, for fighting with his brother, SHANE, and for hitting younger children in the neighborhood.  He had been attending CHILDREN'S SERVICE CENTER, partial hospital, where he was frequently aggressive towards peers and staff.  He cried profusely and showed severe mood swings from anger through depression to silliness.  He was always calmed down by the 25 mgs of Mellaril.  He had to be admitted to the hospital when he refused to take Mellaril, and the severe behavior continued.

After his discharge from his last hospitalization at the WILKES-BARRE GENERAL HOSPITAL on September 28, 1992, he was placed at a PCP foster home, administered by CHILDREN'S SERVICE CENTER.  While at the home, he showed improvement on his medications.  He did attend the CHILDREN'S SERVICE CENTER for most of the year and was eventually transferred to a public school.  He also spent a year of time at ST. MICHAEL'S, Day Program, which also had been attended by his older brother, SHANE, who did very well there.  ROBERT did well there as long as he took his Mellaril and Clonidine.

In June 1994, ROBERT and SHANE were suddenly transferred to the custody of the biological mother.  The mother had been wanting for the opportunity to take the children for years and finally jumped at the chance; and apparently, there is no objection by the father.  At first, the mother questioned whether ROBERT and SHANE should be receiving any medications at all.  She stopped SHANE's medicine altogether and, at first, was inconsistent in giving ROBERT his medications.  Towards the end of the summer, the mother was requesting whether ROBERT's medications could be raised.  She learned violent, impulsive, and dangerous ROBERT could be when unmedicated.  The Clonidine increased to three times a day.  A home base treatment team of the CHILDREN'S SERVICE CENTER called when the parents had the problem of GEORGE describing sex acts by ROBERT.  The team will continue to be involved with the family after ROBERT's discharge."

FELL-00001218

7A-AL-44453

43

A discharge summary from the YOUTH SERVICES OF BUCKS COUNTY was found in LEE's folder. The report was written by G. YEAGER. The date of the intake was June 3, 1998, and LEE's discharge date was August 1, 1998. According to Probation Officer STEVEN ADAMCHICK, ROBERT LEE was ordered to spend time in the Adventure Challenge Program which ADAMCHICK described as a camp setting to turn delinquent youth around. The following is the counseling observation from G. YEAGER:

"ROBERT has developed a consistent pattern of negative interaction with others since his arrival. Although he possesses potential, he is dramatically lacking in social skills with even simple chores and physical training that require a minimal amount of interaction.

This client's skill deficit has become so problematic that at present he lacks not only the social skills but also sufficient, positive relations with both staff and clients to engage him in the potent benefit available from the group oriented therapeutic design of the **ADVENTURE CHALLENGE PROGRAM**. In fact, at present, it has become routine to isolate ROBERT in order to minimize the risk he presents to himself and others. Initially, this was done to provide opportunities for ROBERT to compose himself and for staff to process his outbursts with the rest of his group. However, unlike other clients, ROBERT's attitude grew worse with each new episode. It has become apparent that this client is not only willing to challenge the limits of our behavioral expectation, he actually enjoys the attention he receives from violating them.

Consequently, it is the consensus opinion of the staff that ROBERT LEE is no longer appropriate as a client at Adventure Challenge. Treatment goals should include helping ROBERT learn to take responsibility for his behavior, learning basic social skills, coming to terms with his life circumstances, and making the best of opportunity."

LEE's record at the JUVENILE DETENTION CENTER is approximately four inches thick. On December 11, 1996, LEE was found to be delinquent and was committed to the Diagnostic Program at ST. MICHAEL'S under the supervision of LUZERNE COUNTY CHILDREN AND YOUTH SERVICES and the Juvenile Probation Department. On February 5, 1997, LEE was discharged from ST. MICHAEL'S Diagnostic Program and was committed to ST. MICHAEL'S Residential Program effective February 5, 1997. On June 12, 1997, LEE was released from ST. MICHAEL'S into his father's custody. He was placed on parole for an indefinite period of time and must participate in ST. MICHAEL'S Weekender Program on

FELL-00001219

7A-AL-44453

44

July 25, August 22, and September 26, 1997. He was also ordered to attend A&A/NA meetings, have random blood, breath, and urine tests, plus pay court costs. On August 20, 1997, an amended court order from June 12, 1997, released LEE into the custody of his father and was placed on probation for an indefinite period of time.

On June 2, 1998, LEE was charged with Possessing Instruments of Crime. He was remanded to the LUZERNE COUNTY JUVENILE DETENTION CENTER for further planning/placement. On June 3, 1998, LEE received a hearing and was committed to the Adventure Challenge Treatment Program, ordered to pay restitution, and was placed on probation and supervision. On August 4, 1998, LEE was released from the Adventure Challenge Treatment Program. He was remanded to LUZERNE COUNTY JUVENILE DETENTION CENTER for further planning and/or placement. On August 10, 1998, LEE was committed to the Youth Forestry Camp #3 and was to be returned to the JUVENILE DETENTION CENTER upon completion of the program. On February 18, 1999, LEE was released from Youth Forestry Camp #3; no probation/supervision.

A complaint filed on October 20, 1994, by NANCY SMITH, Juvenile Officer, reported that ROBERT LEE was charged with three counts of Deviant Sexual Intercourse against his half brother, GEORGE TONTE, JR. The incident occurred between June 14-August 18, 1994. LEE shoved his finger into the victim's rectum even after the victim told LEE to stop; then LEE shoved his penis into the victim's rectum. The complaint was withdrawn on December 30, 1994, as the police requested informal disposition. It was believed that the victim being five years old would not be cooperative in prosecution. The charges were resolved by way of informal disposition which were approved on November 18, 1994.

In a complaint filed on December 22, 1993, by Mr. ED CASELLA, 28 Hurley Street, Wilkes-Barre, PA, ROBERT LEE took Christmas lights from CASELLA's home and smashed them in the driveway. On January 14, 1994, Magistrate MARTIN KANE sentenced ROBERT LEE, JR. to pay $170 for Deviant Trespass, Docket #NT-0001276-93.

According to the LUZERNE COUNTY JUVENILE PROBATION DEPARTMENT records, DONALD FELL, white male, DOB April 30, 1980, SSAN 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, first became known in the Juvenile Justice System through an informal adjustment on December 13, 1993. On that occasion, FELL was charged with Failure to Pay Fines/Costs (Disorderly Conduct) by District Justice 11-308. FELL was placed in temporary supervision and was to cooperate with random blood, breath, and urine testing and to cooperate with CHILDREN AND

FELL-00001220

7A-AL-44453

45

YOUTH SERVICES, CHILDREN'S SERVICE CENTER, and school officials. A copy of FELL's summary sheet is attached hereto this report.

On December 5, 1995, in an informal adjustment, FELL was charged with non-payment of fines, filed by Magistrate DIANE MALAST. FELL was ordered to pay $50 in restitution and $10. In an informal adjustment, dated April 16, 1996, FELL was charged with TERRORISTIC THREATS. This was filed by Officer WASLOWSKY of the Wilkes-Barre Area School District. FELL's first court appearance occurred on September 13, 1996, where he was adjudicated delinquent by Judge GIFFORD CAPPELLINI. FELL was charged with terroristic threats and was released into the custody of his aunt, JACKIE SHARPE; placed on probation for an indefinite period of time; was to report to his probation officer twice a week; cooperate with a court advocate program; follow all recommendations; and pay all court-related costs immediately. FELL was not to apply for an operator's license without permission of the court.

On March 28, 1996, FELL entered Mr. KOZERSKI's class at the WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and threatened to stab him. Mr. KOZERSKI subdued him, and FELL said he was going to come back and kill him.

FELL's records indicate that he was admitted to ST. MICHAEL'S, Diagnostic Intake Unit, Purcell Place, by CHILDREN AND YOUTH SERVICES on April 8, 1994. At that time, he was 13 years old. FELL's initial intake synopsis is as follows:

"DONALD comes from a very dysfunctional family. He was residing with his mother, DEBRA, and sister, TERI. When DONALD was fined for truancy from school, his mother did not pay the fine so she was placed in jail. The children were placed with the maternal grandmother but stated that she could not care for DONALD due to the out of control behavior he was displaying.

DEBRA and her mother resided in a side-by-side duplex which the maternal grandmother, THERESA SHARPE, owns. When her daughter was placed in jail, she had the home condemned. The home was infested with rats, cockroaches, and mice. The home was filthy, had litter, feces, and beer cans scattered in the living room. Mrs. SHARPE stated that DEBRA's home was in this shape for two years.

It should be noted at this time that there were numerous inconsistencies in DONALD's care. Mrs. SHARPE called CHILDREN AND YOUTH weekly about the conditions that the children were living in, and she expressed personal anger toward CHILDREN

FELL-00001221

7A-AL-44453

46

AND YOUTH SERVICES of Luzerne County.  However, Mrs. SHARPE refuses to take responsibility for the condition her grandchildren were living under on the property she owns. DONALD has had a long history of mental health interventions, including hospitalizations.  He was hospitalized at FIRST VALLEY in 1992, for out of control behavior and suicidal ideation.  Mrs. SHARPE's home was very neat and clean in its appearance.  Mrs. SHARPE stated that her son-in-law used alcohol regularly.  The children were sexually abused; and on one occasion, he stabbed DEBRA during a drinking binge.

In an interview of DONALD, he claimed both parents beat him.  The last school that he attended was PLAINS JUNIOR HIGH SCHOOL.  He was repeating seventh grade, was chronically truant, and ungovernable when he was there.  His grades were poor mostly due to him not paying attention and refusing to do the work.

SPECIAL CONCERNS

DONALD is a very confused young man.  He has acted as his own caretaker for sometime and is not readily acceptable to help.  His mother's drinking upsets DONALD.  DONALD's grandmother, THERESA SHARPE, made allegations that DONALD was sexually abused by a babysitter and by DEBRA FELL's boyfriend, but DEBRA did nothing about it.

IMPRESSIONS

DONALD needs supervision and structure.  He has to address issues surrounding alcoholism, truancy, and aggression. It is recommended that DONALD remain in a residential care unit until custody can be given to his grandmother or until his mother's situation becomes stable.  DONALD will attend drug and alcohol counseling and individual therapy, as well as attend school on campus.

DONALD's parents were married on November 10, 1979. They separated after ten years of marriage and have two children, DONALD and TERI.  Both parents abused alcohol and raised the children in a dysfunctional home.  FELL abused his wife, and the police were called often to their home for domestic violence.  At age six, DONALD's parents stabbed each other during a fight."

This assessment was written by MARK INNOCENZI, Social Worker.

On April 18, 1994, in the Court of Common Pleas of Luzerne County, Juvenile Division, it was ordered by the

FELL-00001222

7A-AL-44453

47

Honorable CHESTER B. MUROSKI, Juvenile Court Judge, that LUZERNE COUNTY CHILDREN AND YOUTH SERVICES and the JUVENILE PROBATION OFFICE shall share case management for the cost of placement OF the minor child, DONALD FELL.  Temporary legal custody of TERI FELL was transferred to her maternal grandmother, THERESA SHARPE. It was ordered that DONALD FELL be enrolled in ST. MICHAEL'S SCHOOL for a 30 day diagnostic evaluation.  The natural mother, DEBRA FELL, shall undergo a comprehensive drug and alcohol induction as arranged by LUZERNE COUNTY CHILDREN AND YOUTH SERVICES.  The natural mother and minor children, DONALD and TERI FELL, shall undergo comprehensive medical evaluations as arranged.

On May 28, 1993, DONALD FELL was cited by JAMES MURPHY, Home/School Visitor, Wilkes-Barre Area School District, for Disorderly Conduct.  FELL directed obscenities at a classroom teacher and walked on table tops in the cafeteria.  He was fined $375 by Magistrate DIANE MALAST on October 30, 1993.  An informal adjustment was entered on December 13, 1993, as FELL was already under the supervision of CHILDREN AND YOUTH SERVICES and the JUVENILE PROBATION DEPARTMENT.

FELL's juvenile probation records indicated that on September 16, 1996, an evaluation was written by LISA M. RANDAZZO, Drug/Alcohol Treatment Specialist, Court Advocate Program.

The evaluation was to determine the existence of a drug and/or alcohol issue, and recommendations were completed on DONALD FELL on September 11, 1996.  Diagnostic tools utilized in this evaluation consisted of administration of the Western Personality Inventory (WPI) and Alcohol Use Profile (AUP), a psycho-social assessment supplied by DONALD and an Adolescent Problem Severity Index (APSI).

"DONALD reported his first experience with alcohol occurred at age eight.  He reported drinking beer from a tap when serving beer to adults in his home.  DONALD reported regular use of alcohol began at age 13.  DONALD stated that he consumed one 12 pack of beer daily and one-fifth of rum on weekends for one and a half years.  DONALD stated that he also drank unknown amounts of alcohol on a binge basis during this time period. DONALD reported achieving an intoxicated state during each drinking episode.  DONALD reported his last use of alcohol occurred in April 1994.

DONALD report he began to use marijuana (THC) at age 13 on a daily basis.  DONALD reported unknown amounts of THC smoked

FELL-00001223

7A-AL-44453

48

daily and binged use of THC on weekends.  DONALD stated he did
not use THC from April 1994 to August 1995, due to an out of home
placement.  However, DONALD admitted he returned to almost daily
and weekend usage of THC since the winter of 1995.  DONALD
reported he has noticed a significant decrease in the amount of
THC currently smoked when compared to the amounts smoked prior to
April 1995.  DONALD was unable to give specific amounts of THC
used.  DONALD reported his last use of THC occurred on July 4,
1996.

DONALD reported he experimented two times with LSD at
age 13.  He denied further use of this drug.

Scores on the WPI correlate with those who are prone to
abuse alcohol.  Scores on the AUP revealed a profile associated
with alcoholism-denied.

From the information collected from DONALD, it is
apparent he has a current THC abuse problem.  He may also have a
current alcohol abuse problem although he has denied use of
alcohol since April 1994.  It is my opinion DONALD is minimizing
his use of alcohol and THC.

It is recommended that DONALD be tested by the JUVENILE
PROBATION DEPARTMENT on a random basis and participate in
drug/alcohol counseling at the Court Advocate Program with
continued monitoring for in-patient drug/alcohol treatment."

In a letter, dated September 9, 1996, LISA RANDAZZO
informed ROBERT ROMAN, Juvenile Probation Supervisor, that DONALD
FELL did not attend appointments at the Court Advocate Program on
August 21, August 22, September 3, and September 5, 1996.  As a
result, on September 10, 1996, FELL was lodged in the JUVENILE
DETENTION CENTER for Failure to Cooperate.  On September 12,
1996, FELL was released on probation.

In a Court of Common Pleas Court Order, dated
December 11, 2000, the JUVENILE PROBATION DEPARTMENT's
recommendation for DONALD FELL was commitment into the YOUTH
SERVICES AGENCY OF PENNSYLVANIA at Camp Adams.  This was
recommended because continuation in his residence would be
contrary to the welfare of the child and said placement was
necessary because reasonable efforts were made prior to the
placement to prevent or eliminate the need for removal of this
child from his home.  Currently, it was hereby ordered that the
case of DONALD FELL be closed, as he was detained in the State of
Vermont on three counts of murder.  Failure to pay fines and
costs levied by a District Justice in the amount of $228.50 filed

FELL-00001224

7A-AL-44453

49

on April 20, 1999, by Martin Kane was also nol-prossed resulting from FELL's arrest in Vermont.

On April 6, 2001, ROBERT CHARLES NILON, Juvenile Probation Officer,      REDACTED - FELL      Wilkes-Barre, PA, 18702, was interviewed regarding his knowledge and dealings with DONALD R. FELL. NILON advised that he has been a Juvenile Probation Officer for 29 years and had DONALD FELL under his supervision for approximately a four month period in approximately 1994. NILON stated that FELL was respectful to him and was quiet in his presence. He recalled that FELL never ran the streets but was always at home. NILON stated that FELL could never give him a reason why he did not show up for school, but FELL just did not want to leave the house. During the period that NILON was supervising FELL, he was residing with his mother on East Chestnut Street, Wilkes-Barre, PA. At that time, NILON never recalled FELL to be using drugs or possessing any weapons. He was approximately 14 years of age during his supervision. FELL, at that time, was classified as a school refusal; and after a short period of supervision, the school basically handled FELL's attendance problem. During the short time that NILON supervised FELL, he noticed minimal progress with FELL's truancy. NILON stated that several informal adjustments occurred with FELL, but he never appeared before a Juvenile Judge during his tenure. NILON recalled that the Juvenile Justice System got involved with FELL when he was petitioned for non-payment of fines. NILON recalled FELL as being a short and skinny boy but never observed any outward violence on FELL's part.

NILON recalled ROBERT JOSEPH LEE and believed that he supervised him during a two month period when LEE was at ST. MICHAEL'S SCHOOL. NILON recalled that LEE was somewhat on the quiet side and was cooperative with him. His recollection was that LEE was referred for supervision as a result of him fighting with his brother. NILON seemed to recall that LEE's father brought him in to the JUVENILE DETENTION CENTER for NILON to meet with him.

On April 6, 2001, MATTHEW SKREPANEK, Juvenile Probation Officer, was interviewed regarding his supervision of ROBERT JOSEPH LEE and DONALD R. FELL. SKREPANEK advised that he has been a probation officer for approximately five years and took over supervision of ROBERT LEE from FRANK ANDRUKEWICZ who retired as a probation officer. SKREPANEK recalled that LEE was approximately 16 years of age when he first met him at the JUVENILE DETENTION CENTER. At that time, LEE was described as a rolly-polly boy who dropped out of school and who spent a great deal of time in residential facilities, as directed by the

7A-AL-44453

50

Juvenile Justice Court.  SKREPANEK stated that he always interviewed LEE at the detention center and that LEE's father always brought him in.  SKREPANEK recalled he met with LEE every Thursday afternoon and that on a few occasions, LEE's urine was hot for the use of marijuana.  Since the detention center has a zero tolerance, LEE would have been housed in the JUVENILE DETENTION CENTER.  SKREPANEK recalled that LEE was a frail kid who was obviously disturbed and angry.  He never smiled, spoke in a low monotone, was never disrespectful to him, but at the same time, never expressed any pleasantries.  LEE was never social among his peers and appeared destined for adult prison based on his attitude.  SKREPANEK recalled that LEE had been referred to the CHILDREN'S SERVICE CENTER and CHILDREN AND YOUTH SERVICES for a myriad of problems.  SKREPANEK did not recall if LEE was supervised by any other probation officer after being supervised by SKREPANEK.

SKREPANEK advised that he also supervised DONALD R. FELL from April 1997, to August 1997.  SKREPANEK described FELL as a small framed teenager who resided with his aunt on REDACTED-FELL  REDACTED-FELL  Wilkes-Barre, PA.  Since the JUVENILE PROBATION DEPARTMENT was not school based in 1997, he would have met FELL at the JUVENILE DETENTION CENTER.  SKREPANEK recalled that FELL was more personable than ROBERT LEE and appeared to have more going on (intelligence) than LEE but did not like going to school.  SKREPANEK stated that FELL respected his position as a probation officer and did what he needed to do while under supervision.  FELL was a vocational/technical student who quit school in the tenth grade.  Among his hobbies were attending rock concerts and listening to music.  SKREPANEK's recollection of FELL was that he failed very few drug tests and worked part-time in a traveling carnival show.

FELL-00001226

7A-AL-44453

51

WILKES-BARRE POLICE DEPARTMENT (WBPD)
15 North Washington Street
Wilkes-Barre, PA 18701

On April 10, 2001, the following investigation was conducted by Special Agent JAMES J. GLENN:

Lieutenant DALE RINKER, Detective Bureau, WBPD, REDACTED - FELL REDACTED - FELL Wilkes-Barre, PA, telephone number 570-208-4225, reviewed criminal history records relative to ROBERT LEE, JR. and DONALD FELL. A copy of the police records are attached hereto this report and reflect the following:

DONALD FELL

On December 2, 1992, DONALD FELL, DOB REDACTED - FELL 1980, REDACTED - FELL Wilkes-Barre, PA, was suspected of throwing rocks at the window of MICHAEL DENNIS. No disposition found, and no hard copy of the report was located.

On May 21, 1993, DEBRA FELL, REDACTED - FELL Wilkes-Barre, PA, reported the theft of a Dyno 28 inch red bicycle, owned by DONALD FELL, that was taken in the vicinity of REDACTED - FELL Wilkes-Barre, PA. Disposition: Bike theft report initiated.

On August 1, 1993, a Missing Person's Report was filed by DEBRA FELL, REDACTED - FELL Wilkes-Barre, PA. She advised the police that 13 year old DONALD FELL, same address, has not been home since Thursday. Disposition: Returned home.

On March 21, 1997, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was cited for Disorderly Conduct. Disposition: FELL cited and released.

On May 24, 1997, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was listed as a complainant and complained that he was pushed into a car; treated at GENERAL HOSPITAL. FELL was cited for Harassment and released.

On February 3, 1998, DONALD FELL was issued a traffic violation at Penn Street, Wilkes-Barre, Pennsylvania. Disposition: traffic citation issued.

On February 18, 1998, DONALD FELL, 32 East Chestnut Street, Wilkes-Barre, PA, was charged with Harassment, resulting from the theft of cigarettes from the TURKEY HILL MINI MART, 1056

7A-AL-44453

52

George Avenue, Wilkes-Barre, PA. Disposition: Cited, then released.

On July 22, 1998, District Justice MARTIN KANE found FELL guilty of the above offense.

REDACTED-FELL On September 6, 1999, DONALD FELL,  REDACTED-FELL Wilkes-Barre, PA, was arrested by the WBPD per dispatch to 112 Regent Street, Wilkes-Barre, PA, for a report of a person on the porch of that residence and that the resident wanted the person removed. FELL, who matched the description, was on the front porch. FELL was patted down for weapons and was found to be in possession of marijuana and drug paraphernalia. A copy of this arrest report is attached hereto this report. Disposition: FELL was cited and released.

On September 13, 1999, DONALD FELL, 39 Westminster Street, Wilkes-Barre, PA, was arrested for Disorderly Conduct. FELL was observed at  REDACTED-FELL  Wilkes-Barre, PA, attempting to gain entry into a motor vehicle that did not belong to him. Disposition: FELL was cited and released. A copy of this report is attached.

On August 30, 2000, DONALD FELL,  REDACTED-FELL Wilkes-Barre, PA, was cited for Driving Without a License; Failure to Make Payment; no hard copy found.

Lieutenant RINKER advised that hard copies of FELL's criminal citations were either purged or could not be located. RINKER did locate computer printouts of the aforementioned incidents and provided same to be included in this report.

ROBERT JOSEPH LEE, JR.

On December 9, 1993, ROBERT LEE, JR., DOB REDACTED-FELL 1980, was cited for Criminal Mischief after a report of a domestic dispute was occurring outside of 25 Hurley Street, Wilkes-Barre, PA. An Offense Report was made for Criminal Mischief and Vandalism. Disposition: Dismissed.

REDACTED-FELL On December 21, 1993, ROBERT LEE, JR.,  REDACTED-FELL Wilkes-Barre, PA, was charged with Defiant Criminal Trespass. Disposition: Dismissed.

On December 5, 1995, a Missing Person's Report was filed for ROBERT LEE, JR.,  REDACTED-FELL Wilkes-Barre, PA. Disposition: Returned.

FELL-00001228

7A-AL-44453

53

On December 8, 1996, ROBERT LEE, JR., 25 Hurley Street, Wilkes-Barre, PA, was charged with Vandalism and Criminal Mischief as a result of kids spraying graffiti on a building in the BOG Park, Wilkes-Barre, PA. Disposition: LEE cited and released to parent.

On May 24, 1998, ROBERT LEE, JR., 25 Hurley Street, Wilkes-Barre, PA, was cited for the offense of Harassment and Implausible Assault regarding a domestic dispute. The subject was taken to NESBITT HOSPITAL. Disposition: LEE cited and released.

The following investigation was conducted by Special Agent JAMES J. GLENN on April 10, 2001:

Detective WAYNE COONEY, Juvenile Division, WBPD, REDACTED - FELL REDACTED - FELL Wilkes-Barre, PA, advised that he recalled both DONALD FELL and ROBERT LEE, JR. COONEY stated that he has been employed by the WBPD for nearly 30 years and checked his records but found nothing relative to juvenile petitions or arrests filed on behalf of the Juvenile Division of the WBPD. COONEY recalled that FELL resided on East Chestnut Street, Wilkes-Barre, PA, and was involved in the local drug scene. FELL was into drinking alcohol and listening to satanic music. FELL was known to hang out with BOBBY LEE from Hurley Street, Wilkes-Barre, PA. COONEY stated that LEE resided directly across the street from Wilkes-Barre Patrolman ED CASELLA.

COONEY stated that FELL and LEE had "tombstones" in their eyes, i.e. no future. COONEY stated that FELL was always getting himself cited, but COONEY recalled that the incidents were never of a violent nature. COONEY described FELL and LEE as psychopaths and stated that he was not surprised to read in the papers that they were involved in murder.

COONEY specifically recalled the wardrobe warn by LEE. It consisted of a black tee shirt, black pants, black boots, and silver chains. The associates of LEE dressed in a similar fashion, and every cop in the city knew LEE and his brother because they looked like freaks and could be spotted 200 yards away.

COONEY stated that his brother and he have a joint interest in a deli located in the Miners Mills Section of the City of Wilkes-Barre. Approximately two years ago, the front glass plate window of the deli was smashed, and the only things removed were two six packs of beer. COONEY stated that the surveillance tape depicted a young man dressed in all black

7A-AL-44453

54

committing the crime.  COONEY was convinced that LEE was
responsible but stated that he could not prove it.  LEE and his
brother, SHANE, were questioned at Police Headquarters and denied
any involvement in the crime.  COONEY stated that LEE had
emotional and mental health issues but was smarted enough or drew
the line far enough to become involved with the police.

FELL-00001230

7A-AL-44453

55

## FAMILY

On April 5, 2001, JACQUELINE SHARPE, white female, DOB REDACTED-FELL 1973, SSAN REDACTED-FELL 4131, home telephone number 570-819-2158, was interviewed at her residence,    REDACTED-FELL REDACTED-FELL, Wilkes-Barre, PA.  SHARPE is a single mother who is raising her four year old daughter, HALEY, and one year old son, ZACHARY.  SHARPE advised that she has three sisters, DEBRA (deceased), DONNA WILLIAMS, and SANDRA SHARPE.  SHARPE advised that her parents, THERESA SHARPE and JOHN SHARPE, are both deceased.

SHARPE advised that her nephew, DONALD FELL is the son of her late sister, DEBRA FELL.  DEBRA FELL married her husband, DONALD FELL, who was approximately 20 years her senior, in the late 1970s.  Initially, DEBRA and her husband resided in the 200 Block of East Bennett Street, Kingston, PA.  SHARPE stated that both DONALD FELL, SR. and DEBRA FELL were alcoholics who constantly fought.  When DONALD FELL, JR. was approximately seven years of age, FELL, SR. just got up one day and left and has not returned.  SHARPE believed that FELL, SR. resides in Florida.  He has never called nor written the children.

SHARPE stated that DONALD FELL attended first grade in Kingston, PA, and grades second to fourth at the FLOOD ELEMENTARY SCHOOL, Wilkes-Barre, PA.  At that time, DEBRA FELL and her two children were residing in an apartment on West Chestnut Street, Wilkes-Barre, PA.  SHARPE stated that in approximately 1990, DEBRA FELL and her children moved to REDACTED-FELL Inkerman, PA, and that DONALD attended fifth grade at the LINCOLN ELEMENTARY SCHOOL, Pittston, PA.  In 1992, her sister, DEBRA, DONALD, and TERI FELL moved into the left side of her duplex at REDACTED-FELL REDACTED-FELL Wilkes-Barre, PA.  Also residing with DEBRA FELL was her boyfriend, ELLORY WILCOX.  SHARPE stated that her mother and she lived next door at    REDACTED-FELL    SHARPE advised that DEBRA FELL lived in a filthy house and was abusive to both DONALD and TERI.  Even as a child, DONALD was always being put down by his mother; and whenever they had a verbal altercation, she would call him a bastard and a good for nothing. SHARPE recalled that DONALD was once molested by his babysitters, a woman named COOKIE LAST NAME UNKNOWN and her husband.  This happened for approximately a two year period when DONALD was between the ages of two and a half and four and half years of age.

SHARPE stated that as DONALD grew in age so did his problems at home.  DEBRA FELL continued to drink all the time

7A-AL-44453

56

which led her boyfriend, ELLORY WILCOX, to leave her over seven years ago. SHARPE specifically recalled that on Christmas Eve 1993, DEBRA FELL left her kids and started staying with an unknown male. As a result, the FELL children were left abandoned, and THERESA SHARPE, DONALD's grandmother and JACQUELINE's mother, received temporary, legal custody. In January 1994, DEBRA FELL came back, and THERESA SHARPE had to relinquish the children to her. A few weeks later, DEBRA beat TERI FELL, and SHARPE recalled that she could hear the child crying through the paper thin walls between their homes. CHILDREN AND YOUTH SERVICES OF LUZERNE COUNTY eventually placed the FELL children in the custody of THERESA SHARPE. SHARPE stated that when DONALD was 14 years of age, her mother got full and legal custody of DONALD and TERI FELL.

SHARPE stated that after attending FLOOD ELEMENTARY SCHOOL, DONALD FELL attended PLAINS JUNIOR HIGH SCHOOL, Plains, PA. In approximately seventh grade, DONALD FELL became a constant truant. On December 31, 1994, THERESA SHARPE passed away. SHARPE advised that she received legal custody of DONALD FELL and his sister TERI in approximately March 1995. SHARPE recalled that DONALD was placed on medications by Dr. FEUSNER (Phonetic), CHILDREN'S SERVICE CENTER, Wilkes-Barre, PA, because of his bad temper. SHARPE recalled that DEBRA FELL would sell his medication for money and would tell the doctor that the medication was no good and that he needed some stronger prescriptions. SHARPE stated that whenever DONALD got really mad, he would often black out and have no memory of the incident. She recalled that he actually received Supplemental Security Income for his problem.

SHARPE advised that DONALD FELL's truancy problems came to a head while he attended PLAINS JUNIOR HIGH SCHOOL. SHARPE pointed to the fact that his mother, DEBRA, would allow him to miss school. Additionally, DONALD had trouble with one particular teacher at the school who seemed to give him a hard time. As a result, DONALD never wanted to go back to the school; and when he did, he was often suspended within days. DONALD eventually resided at ST. MICHAEL'S SCHOOL, Tunkhannock, PA, in their residential treatment center. Once at ST. MICHAEL'S, DONALD started to get good grades and was returned to the public school system. For a short while, a juvenile probation officer was assigned to supervise DONALD. SHARPE recalled an incident where DONALD, his friend BOBBY LEE, and a third unrecalled friend threw a rock through someone's windshield when they were standing on a train trestle that crosses River Street in Wilkes-Barre. DONALD never received any jail time for that event but was placed under her supervision. SHARPE stated that she received approximately

7A-AL-44453

57

five to six fines resulting from DONALD's truancy.  The fines were approximately $180 to $200 a piece.

SHARPE recalled that throughout DONALD FELL's teenage years, his closest friend was BOBBY LEE.  Additionally, he was friends with a MICHAEL ROMUNDI (Phonetic) who was killed a few years ago when struck by a car on Route 309, Wilkes-Barre Township, PA.  FELL also hung out with LEE's brother, SHANE, who is now in the UNITED STATES ARMY in New York.  In his free time, FELL played the guitar and often associated with JASON JONES, Plains, PA.  SHARPE stated that more and more, LEE started hanging out at her house with FELL.  SHARPE stated that she tolerated LEE but found him to be cocky and bit of a smart ass at first.  Eventually, she had a verbal altercation with LEE, and he knocked off his attitude.  SHARPE stated that FELL has known LEE since age six and both were, at one time, in the CHILDREN'S SERVICE CENTER together.  On many occasions, FELL was content just to stay home and listen to music; however, LEE was more apt to get him to do things like go to the mall, skip school, etc.

SHARPE stated that she set a curfew for FELL to be home at night.  Generally, during the week, he had to be home by 11:00 p.m., and 12:00 midnight on weekends.  Most of the time, he was out with LEE.  On one occasion, SHARPE related that she dropped one of FELL's JIM MORRISON pictures which is a collector's item. He flew into a rage and grabbed her by the arm and would not let go.  SHARPE stated that even though FELL is skinny and scrawny, he is also very strong.  He somehow bent back her thumb and sprained it.  At no time did he ever break her wrist.  SHARPE stated that she was not afraid of FELL and that he eventually cooled down after the above incident.

During FELL's ninth grade year, he attended the WILKES-BARRE AREA VOCATIONAL SCHOOL, Wilkes-Barre, PA, in what was known as the Head Start Program.  FELL continued his truancy problems and got in trouble once at school when he threatened a teacher. The teacher never pressed charges, to her knowledge; however, FELL was adjudicated delinquent and was placed on probation for an indefinite period of time.  In approximately 1997, during his tenth grade year at COUGHLIN HIGH SCHOOL, FELL quit school. SHARPE recalled that someone from the high school came to her residence to have him sign a document indicating that he was finished with school.

SHARPE recalled that her sister, DEBRA, spent some time at the LUZERNE COUNTY PRISON for writing bad checks or something to that affect.  Her sister was never in the picture during FELL's teenage years, and she eventually moved to Rutland,

FELL-00001233

7A-AL-44453

58

Vermont, mostly on a whim. DEBRA would call only once a year to ask how the kids were doing but still managed to cut FELL down. DEBRA seemed to like TERI much better.

SHARPE stated that FELL was caring in his own way and could be counted on whenever she was in need. Even though he had a bad outlook on life, he was protective of his sister and of herself. SHARPE stated that she saw indications of FELL drinking; however, he never drank in her house. SHARPE used to take FELL and his sister to church with her on Sundays, but she learned that he does not believe in God. FELL was very close to SHARPE's mother and was hurt when he could not be at her wake while he resided at ST. MICHAEL'S SCHOOL. This fact seemed to always be embedded in FELL. In his free time, FELL enjoyed reading fantasy books like Dungeons and Dragons, constructing model cars, and listening to his music. Although he acted dumb at times, he was actually fairly intelligent. SHARPE recalled that FELL once held a dishwasher's job at POCONO DOWNS, Plains, PA; however, BOBBY LEE managed to get him fired from that position because FELL would end up skipping work to hang out with LEE.

When FELL was approximately 17 years of age, he obtained a job with the HUMANIK CONSTRUCTION COMPANY where he did some roofing work. FELL started to drink alcohol heavily; and in approximately May 2000, he went on the run with his girlfriend, LYNN ROBERTS. SHARPE recalled that the WILKES-BARRE POLICE DEPARTMENT came to her door looking for LYNN ROBERTS who was apparently a runaway from a crisis intervention center. FELL was fired from his construction job when he failed to show. After losing the job, FELL hung around the house all day and was not motivated to find employment. This led SHARPE to ask him to find a job or leave. FELL eventually found employment with his cousin, JESSE WILLIAMS, the son of her sister, DONNA WILLIAMS, Wilkes-Barre, PA. FELL assisted WILLIAMS in his traveling carnival show, and FELL ran a concession where people would throw balls into a fish bowl. Also accompanying FELL and WILLIAMS was LEE. Soon after, TERI FELL went to work for WILLIAMS.

SHARPE asked her sister DONNA how FELL was doing and learned that at the end of the summer of 2000, he was getting ready to move. SHARPE stated that she told her sister that FELL would have to move his belongings from her house, or she would throw them out. In a conversation with FELL, FELL agreed to visit SHARPE before he moved to Vermont. SHARPE stated that when she learned that FELL was moving to Vermont, she was upset because this meant that he would be living with his natural mother, thus, having access to more alcohol and possibly drugs.

FELL-00001234

7A-AL-44453

59

In addition, LEE was to accompany him.  SHARPE recalled that FELL left the area for Vermont in the fall of 2000; and in November 2000, SHARPE was awaken one night by an officer from the WILKES-BARRE POLICE DEPARTMENT and was told that FELL was being held and questioned for the murder of two people.  At the time, it did not dawn on SHARPE to ask the officer if one of the victims was her sister.  The next day, SHARPE, acting on a hunch, looked up her sister's name on the Internet and found an article in Vermont about the murder.  SHARPE stated that although she was angry at FELL for his actions, she believes it is 100 percent DEBRA FELL's fault for bringing this problem to her.  SHARPE stated that it was DEBRA who supplied the drugs and alcohol to FELL and LEE, and she firmly believes that FELL had no recognition of what he was doing under the influence of the drugs.  SHARPE expressed her remorse for the woman who was kidnapped in Vermont and later found slain in New York.

SHARPE stated that her nephew's life was one full of abuse, abandonment, and chaos.  SHARPE stated that she attempted to raise FELL as her own child; however, he did as he wanted under the influence of his friend LEE.

FELL-00001235

7A-AL-44453

60

On April 5, 2001, the following interview was conducted by Special Agent JAMES J. GLENN:

BONNIE S. TONTE, white female, DOB April 2, 1960, SSAN 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, RD 1, Box 93A, Harding, PA, 18643, telephone number 570-388-1077, advised that she is the biological mother of ROBERT JOSEPH LEE, JR. TONTE stated that she was reluctant to speak to any members of the Federal Government because she was keenly aware of the fact that the Federal Government was seeking the death penalty in the State of Vermont against her son for kidnapping and carjacking. TONTE provided the following information:

In approximately 1984, when ROBERT was four years of age, TONTE separated from her first husband, ROBERT LEE, SR. TONTE stated that her former husband had a very bad temper and was physically abusive to her. As a child, ROBERT exhibited hyperactivity and was absolutely uncontrollable. To that end, he was taken to the CHILDREN'S SERVICE CENTER and was prescribed Ritalin. As part of her divorce agreement, ROBERT LEE, SR. received custody of her sons, ROBERT, JR., presently 20 years of age, and SHANE, presently 21 years of age. TONTE took custody of her son, ANTHONY, presently age 17.

TONTE is presently married to GEORGE TONTE who is employed at CELOTEX, Route 92, Harding, PA. Together, GEORGE and she have four sons: GEORGE, JR., age 11; MICHAEL, age 9; and twin boys, KEVIN and KEITH, age 7.

TONTE stated that ROBERT, JR. has always exhibited poor self-esteem. Their relationship has not been very positive over the years, and she described him as having a "bad gene". For a brief time in the early 1990s (exact dates unrecalled), ROBERT, JR. attended ST. MICHAEL'S SCHOOL, Tunkhannock, PA. Initially, the school bus would pick him up in front of her home and take him to school for the day. Eventually, ROBERT was enrolled in the Residential Program at ST. MICHAEL'S. TONTE recalled that when ROBERT lived with her for a brief period in Harding, PA, he was approximately 14 years of age and molested her son, GEORGE. ROBERT was referred to the CHILDREN'S SERVICE CENTER and resided with foster parents for approximately one year. TONTE stated that ROBERT spoke often about sex and put sexual content in his normal language.

TONTE stated that she could not recall any employments held by ROBERT other than an animal training job in Florida. This job occurred after he quit school in the tenth grade from COUGHLIN HIGH SCHOOL. She recalled that he only worked in

FELL-00001236

7A-AL-44453

61

Florida for approximately one year sometime after 1998. Her telephone toll records indicate that he called from Florida; however, TONTE does not know the name of the business or its location. In the summer of 2000, ROBERT teamed up with DONALD FELL and worked in a traveling carnival. FELL's cousin hired the boys to work a concession stand. After returning to the area in the late summer of 2000, ROBERT and FELL stayed with her for approximately one month in October 2000. At about that same time, several cars in the area were being broken into, and an eyewitness provided authorities with a description which matched that of ROBERT. TONTE believes that ROBERT was caught by the police and that he provided them with the name of ANTHONY LEE. TONTE stated that ANTHONY had to travel to the PENNSYLVANIA STATE POLICE Barracks and undergo a polygraph test to prove his innocence. Shortly after this incident, FELL and ROBERT moved to Vermont and were accused of a triple homicide. At this point in the interview, TONTE stopped answering questions.

ANTHONY LEE was on hand to be interviewed but advised that he is age 17, DOB REDACTED-FELL 1983. ANTHONY LEE works at the PETRO STOP, off Interstate 81 in Dupont, PA. ANTHONY advised that he works in the IRON SKILLET cafeteria. ANTHONY agreed to answer questions but was awaiting a ride to work. Since he is a juvenile and needs to be interviewed in the presence of his mother, no further questioning was done.

On April 5, 2001, TERI FELL, white female, DOB REDACTED-FELL 1982, SSAN REDACTED-FELL 6064, home telephone number 570-819-2158, was interviewed in the front seat of Special Agent JAMES J. GLENN's Bureau vehicle at       REDACTED-FELL Wilkes-Barre, PA, where FELL is presently residing. FELL resides with her Aunt Jackie (JACQUELINE SHARPE) and has been there only a few weeks.

FELL stated that as a child, her family, which consisted of her father, mother, and brother, DONALD, resided in Kingston, PA, for approximately one or two years when she was about five years of age. The family then moved into an apartment on West Chestnut Street, Wilkes-Barre, PA, for about one year and then moved to Pittston, PA. After a one year period, the family then moved to       REDACTED-FELL       Wilkes-Barre, a double block residence adjacent to her grandmother's home. FELL stated that her grandmother, THERESA SHARPE, lived at REDACTED-FELL REDACTED-FELL with her aunt, BECKY SHARPE.

FELL stated that her brother and she attended elementary school at the DANIEL J. FLOOD ELEMENTARY SCHOOL, North Washington Street, Wilkes-Barre, PA. After elementary school,

7A-AL-44453

62

DONALD and she attended the PLAINS JUNIOR HIGH SCHOOL, Plains, PA.  It was there that her brother DONALD started experiencing truancy problems.  As a result, DONALD was placed at ST. MICHAEL'S SCHOOL, Tunkhannock, PA, for approximately two years.

FELL recalled that her father left the family when she was seven years of age.  FELL recalled that her father did not want her and physically abused her and not DONALD.  Once her father left the house, she believed he moved to Florida; but she has had no contact with him since 1989.  FELL stated that her mother was an alcoholic who spent time in and out of jail.  FELL recalled that on Christmas 1993, her mother gave up custody of herself and DONALD and moved out of the house.  FELL recalled that her mother was jailed for bouncing checks and public drunkenness.  At age 11, FELL and DONALD resided with their grandmother, THERESA SHARPE.  In 1994, her grandmother died and her Aunt Jackie received custody of DONALD and herself.

FELL recalled that as early as eight years of age, DONALD struck up a friendship with ROBERT LEE.  Their friendship was on and off over the years but became stronger during their teenage years.  FELL stated that LEE always liked her, and he acted as her protector.  In essence, LEE had the "hots" for her. FELL stated that she did not like LEE when she was growing up and found him to be a jerk and very cocky.  He thought everything was funny and had one of the worse attitudes that she has ever seen. He had a smart remark for everything.  FELL stated that DONALD seemed to take things more seriously than LEE, but DONALD was still fairly cocky in his own right.

FELL described her brother as funny, sarcastic, nice, and would do anything for her.  FELL recalled that when DONALD lived with their mother, he was on medication to help with his temper problem.  Once released from ST. MICHAEL'S SCHOOL, DONALD continued counseling at the CHILDREN'S SERVICE CENTER.  Outside of LEE, FELL said that the only other true friend of DONALD's who is still living was GARY YALE.  FELL recalled that YALE may be living in Exeter, PA.  Two of DONALD's friends died of an overdose, and one was hit by a car a few years ago.

FELL recalled that DONALD was in and out of trouble as he was growing up.  Besides his truancy problems, DONALD was once caught in 1996, with drugs by the WILKES-BARRE POLICE DEPARTMENT. She believed that he was fined for the offense.  In his free time, DONALD liked to read fantasy medieval books, play his guitar, draw, construct model cars, work on jigsaw puzzles, and collected baseball cards.  DONALD believed in Satan and not in Jesus and was prone to wearing dark clothing.  FELL was aware of

FELL-00001238

7A-AL-44453

63

the fact that DONALD liked to drink alcohol and smoke marijuana. DONALD said that drinking alcohol and smoking marijuana seemed to relax him.

During DONALD's ninth grade year of school, he attended WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL and quit COUGHLIN HIGH SCHOOL when he reached the age of 17. To her knowledge, DONALD had few jobs, but one specific job which she recalled was him working in the construction field for a person named JOE. She estimated that this occurred in 1999.

In the spring of 2000, FELL introduced DONALD to her friend LYNN ROBERTS. They spoke one day and found out that they had a mutual interest in playing the guitar. FELL stated that DONALD had a slapped together band that would jam, and the band needed a bass player. ROBERTS could play the bass; and soon after, DONALD started dating her. In approximately May 2000, ROBERTS was at a residential treatment facility in Pittston, PA. With the assistance of DONALD, ROBERTS left the facility and never returned. In approximately July 2000, ROBERTS briefly worked with DONALD and LEE at their cousin's traveling carnival show. FELL stated that her cousin, JESSE WILLIAMS, had a goldfish game, a quarter toss, and other amusements, and needed help during the summer. In July 2000, FELL met the show at Kimberton, PA. FELL stated that it was her job to relieve the other workers so that they could have a break. FELL stated that DONALD and LEE did not like their cousin JESSE and took money from his business on a daily basis. FELL advised that LEE and DONALD had the same tattoo which was an upside down cross over the number 666. She stated that both were devil worshipers but were not into animal slayings. FELL recalled an incident which she believed occurred in Kimberton, PA, wherein, LEE killed a cat. FELL stated that apparently the cat was suffering from an unknown illness, and LEE broke its neck. She stated that he hit its head off a concrete block. By the end of the evening, the girl who owned the cat had embellished the story to make it sound as though LEE had tortured and cut up the cat. LEE never disputed the various versions but only laid back and agreed with whatever story came forward. FELL described LEE as not much of a talker; but if he had something to say, he would say it and then shut up. In her opinion, DONALD was more of a leader than LEE, and it was not uncommon for DONALD to physically strike and hit LEE. Generally, LEE would aggravate DONALD to the point where he would lash out at him; and as kids, DONALD often punched LEE in the face. As they got older, DONALD stopped bossing LEE around.

FELL recalled that LEE's mother hated him; and therefore, LEE lived with his father and brother, SHANE. FELL

FELL-00001239

7A-AL-44453

-64

stated that SHANE is one year older than LEE and also has a brother, ANTHONY, age 17; stepbrothers, GEORGE, age 11; MICHAEL, age 9; and twin brothers, KEITH and KEVIN, age 7. FELL believes that LEE's father now resides in Honesdale, Pennsylvania.

For approximately a one month period in January 2001, FELL lived with BONNIE TONTE, LEE's mother. She described her as being psychotic. FELL also lived with her cousin, JESSE WILLIAMS, during the latter part of November and December 2000. She eventually ran out of money and has moved around ever since.

FELL advised that when LEE, DONALD, and she worked in Monticello, New York (NY), they decided to go to a concert in Woodstock, NY. While they were partying, a man began to hit on her and tried to rape her. DONALD and LEE immediately came to her defense and beat the man senseless. All three of them were held by the police until JESSE WILLIAMS bailed LEE and DONALD out of jail.

When DONALD returned to the Wilkes-Barre area, he moved in with his Aunt Jackie again and then stayed with associates here and there. In approximately October or November 2000, he decided to visit their mother in Rutland, Vermont. LEE accompanied DONALD, and it was there that they were accused of killing her mother, her boyfriend, and another woman from the Rutland area. FELL stated that she heard that LEE and DONALD were smoking crack with her mother. It is FELL's belief that DONALD had no idea what he was doing at the time her mother was killed because he and LEE, from what she has heard, were under the influence of alcohol and drugs. FELL believes that her brother would never hurt her intentionally and has always been there when she needed him. She always felt protected with him nearby. To this day, she continues to write him in prison. FELL related that she has never seen DONALD in possession of any weapon. When questioned about a stolen rifle from the WILKES-BARRE POLICE DEPARTMENT, FELL stated that she never saw DONALD in possession of such a weapon.

7A-AL-44453

65

The following investigation was conducted by Special Agent JAMES J. GLENN on April 11, 2001:

DONNA WILLIAMS, white female, DOB REDACTED-FELL 1959, SSAN REDACTED-FELL3523,      REDACTED - FELL     Wilkes-Barre, PA, telephone number 570-822-7188, stated that she is the second oldest of four daughters in the SHARPE family. Her sister, SANDY, is the oldest daughter and resides in South Carolina. WILLIAMS is the second oldest, then DEBRA (deceased), and JACKIE SHARPE, Wilkes-Barre, PA. WILLIAMS stated that after Special Agent GLENN called to schedule an interview with her, she immediately contacted DONALD FELL's Federal Public Defender to ask him if it was appropriate for her talk with the FBI. Upon getting the okay, WILLIAMS granted the interview.

WILLIAMS stated that her sister, DEBRA, married DONALD FELL, SR. in approximately 1978. Initially, the FELLs lived on Church Street and then Bennett Street in Kingston, PA. Their marriage was abusive in nature, and both fought constantly. The police were always at their residence; and on one occasion, they stabbed each other with a knife. WILLIAMS stated that young DONALD FELL appeared to get the brunt of everything from his mother and father. In addition to DONALD, her sister, DEBRA, had a daughter named TERI who is two years younger than DONALD. WILLIAMS recalled that DONALD FELL will be 21 later this month. WILLIAMS recalled that DONALD FELL may have attended first grade in Kingston; and in approximately 1984, DONALD FELL, SR. left his family and has not been seen ever since. WILLIAMS stated that her sister, DEBRA, then rented a place on West Chestnut Street for about a year before moving to Jenkins Township, PA. WILLIAMS stated that during the period 1986-1991, she resided in the left half of a double block owned by her mother at 30 East Chestnut Street, Wilkes-Barre, PA. Her mother and sister, JACKIE, lived at 32 East Chestnut Street. WILLIAMS recalled that DEBRA moved into 30 East Chestnut Street after WILLIAMS and her family moved to the Greater Williamsport area, then returned to Wilkes-Barre and bought their present home at 39 Westminster Street. WILLIAMS stated that she is a single mother of two girls and resides with her boyfriend, BARRY SEWELL. WILLIAMS stated that her sister, DEBRA, was an alcoholic; and although she loved her sister, she did not like the way she treated her children. DEBRA, when drinking, physically abused her children and did not take care of their basic needs. DEBRA lived with a steady boyfriend named ELLORY who eventually left her and was found dead in a truck in Kingston, PA. WILLIAMS stated that her sister spent time in the LUZERNE COUNTY PRISON for not paying fines relative to DONALD's truancy. WILLIAMS recalled that when DONALD FELL was approximately 12 years of age (1992), her mother got custody of

7A-AL-44453

66

DONALD and his sister, TERI.  WILLIAMS stated that after her mother died, her sister, JACKIE, got custody of the children.  To her knowledge, DONALD FELL attended FLOOD ELEMENTARY SCHOOL; PLAINS JUNIOR HIGH SCHOOL; ST. MICHAEL'S SCHOOL, due to a truancy problem; WILKES-BARRE AREA VOCATIONAL TECHNICAL SCHOOL; and dropped out of COUGHLIN HIGH SCHOOL when he was approximately 17 years of age.  WILLIAMS believed that DONALD FELL was a busboy at POCONO DOWNS and assisted her son, JESSE WILLIAMS, in his traveling carnival show that featured board games, a quarter toss, etc.  DONALD FELL worked the traveling carnival during the summers of 1999 and 2000.

WILLIAMS stated that, to her knowledge, DONALD FELL was never jailed for any criminal acts he committed.  WILLIAMS described DONALD FELL as a quiet, fairly even tempered person who never acted out his anger in her presence.  In his free time, DONALD liked to read books and listen to his music.  She recalled that he played guitar.  Of all her relatives, WILLIAMS believed that DONALD was closest to her.  WILLIAMS was questioned as to whether or not DONALD FELL had a drinking problem, and she denied that fact, stating that she never saw him drinking in her presence.

WILLIAMS stated that DONALD FELL associated with ROBERT LEE whom she did not like.  WILLIAMS stated that LEE was very cocky and always had a smile on his face that looked more like a smirk.  After September 2000, DONALD FELL resided with WILLIAMS for a couple of months and was in and out of the house at various times.  In approximately October 2000, DONALD traveled to Rutland, Vermont, to see his mother.  WILLIAMS recalled that FELL called her house on Thanksgiving to wish her a happy holiday and talked about returning to Wilkes-Barre to visit.  After the murder of her sister, DEBRA, the WILKES-BARRE POLICE visited JACKIE SHARPE's home to make sure that they were not harmed.  WILLIAMS stated that she did not learn of her sister's death until two days later.  WILLIAMS stated that DEBRA FELL called her home on one or two occasions when she lived in Vermont.  She usually was drunk, and WILLIAMS did not wish to talk to her.

WILLIAMS stated that DONALD FELL always seemed to hang out with ROBERT LEE but also had a friend who resided in a trailer park in Exeter, PA.

WILLIAMS stated that after DONALD FELL's arrest, the WILKES-BARRE POLICE DEPARTMENT came to her home and questioned her about a shotgun that was stolen from the police department and was in the possession of DONALD FELL.  WILLIAMS stated that DONALD FELL showed up with that same shotgun in approximately

FELL-00001242

7A-AL-44453

67

November 1999, and stated that he had purchased the weapon for target practice.  WILLIAMS stated that FELL never confided in her as to where he purchased the weapon until last month (March 2001) when she spoke to FELL while he was in prison in Vermont.  On that occasion, FELL called her Collect and told her that he had purchased the weapon from a Wilkes-Barre Police Officer's son.  FELL would not identify the boy from whom he purchased the weapon.

WILLIAMS stated that based upon FELL's dysfunctional family background, she can almost understand why he was so angry at his mother.  WILLIAMS stated that FELL's pent up anger and hostility probably came to a boiling point, and she learned that FELL was very disappointed in his mother when he learned that she was still drinking in Vermont.  FELL felt betrayed because his mother had lied to him and said that she had quit her drinking.

FELL-00001243

7A-AL-44453

68

## FRIENDS

During the April 5, 2001, interview of TERI FELL, DONALD FELL's sister, she advised Special Agent JAMES J. GLENN that two of DONALD FELL's closest friends are now deceased. MICHAEL OMUNDI (phonetic) was stuck by a car and killed and another friend, name unrecalled, died from a drug overdose.

In an effort to expedite this report to FBI Rutland, Vermont, Gary Yale, REDACTED-FELL Plains, PA, 18705, former friend of DONALD FELL, was not interviewed. The Scranton Office of the FBI will locate and interview YALE should the Rutland RA deem it necessary.

To date, the only friends associated with ROBERT JOSEPH LEE, JR. have been DONALD R. FELL and LEE's brother, SHANE LEE.

FELL-00001244

# EXHIBIT 77

APPENDIX V

Vermont Department of Corrections
Division of Correctional Services

Page 1 of 2

01 c2c1-3
.D. (or Docket)

DISCIPLINARY HEARING REPORT

mate: _____ Robert Lee _____ (Print)

:aring Officer: _____ (Print)

:senter: _____ (Print)

:olation Charged: _____

(e.g.. Major "A" #4)

### FACILITY/CAMP

- ☐ CCWC        ☐ Chittenden RCF
- ☐ Marble Valley CF   ☐ NERCF
- ☑ Northwest SCF    ☐ NSCF
- ☐ SESCF       ☐ Woodstock RCF

#### CCSC

- ☐ Barre        ☐ Bennington
- ☐ Brattleboro    ☐ Burlington
- ☐ Rutland       ☐ St. Johnsbury
- ☐ WhiteRiver Jct.

#### CRSU

- ☐ Barre        ☐ Bennington
- ☐ Brattleboro    ☐ Burlington
- ☐ Rutland       ☐ St. Johnsbury
- ☐ WhiteRiver Jct.

ate of Violation: 12 / 27 / 00

ate/Time Notice: 12 / 29 / 00 0750

ate/Time Hearing: 01 / 02 / 01 1020

id inmate waive 24 hours notice? ✓ No _____ Yes

:mate's plea: _____ not guilty  Determination   _____ not guilty
✓ guilty                    ✓ guilty

-id the inmate attend the hearing? ✓ Yes _____ No (briefly explain)

·· NA

.ca _____

:ame. NA

:eason: _____

What alternative forms of testimony were used for witnesses (including reporting officer) who were not reasonably available? none

Did you limit inmate's presentation or participation in hearing because of misconduct or other reason? ✓ No _____ Yes
briefly explain). _____

Was any of the evidence presented at the hearing confidential? ✓ No _____ Yes (if Yes fill out Appendix VI and attach it to this report) Was inmate represented by a Hearing Assistant? _____ Yes ✓ No (explain) did not want a hearing assistant.

Did inmate request continuance? ✓ No _____ Yes (if Yes was it granted?) _____ Yes _____ No (briefly explain) _____

Did superintendent/designee order a continuance? ✓ No _____ Yes (explain) _____

: Presented at Hearing (e.g.. names of witnesses, list of contraband, etc.)

b6
b7C

By presenter major B#21 DE, reports from   By Inmate: none.
CCI _____ CA _____ CFSS _____

WHITE (CASE FILE)   YELLOW (CENTRAL OFFICE)   BLUE (ACCOMPANIES RECEIPT)   PINK (INMATE)

Lee, Robert          Twenty-3          B#21          APPENDIX V
                                                      Page 2 of 2

...ngs of Fact to Support Determination: By a preponderance of the evidence I find you guilty
of a major B#21, DE Use for the following facts.
(1) your own admission of guilt.
(2) reports from cell ⬜⬜⬜ and CPSO ⬜⬜⬜                                    b6
                                                                          b7C

...nctions Recommended: Sanction A  5 days lock in

...ignature of Hearing Officer: ⬜⬜⬜⬜⬜⬜              Date: 01-02-01

⬜⬜⬜⬜⬜⬜                                                    b6
                                                           b7C

Signature    01-02-01     ___ Determination      ___ Recommended
             Date              upheld                sanctions upheld
             1/3/01         ___ Determination      ___ Recommended
             Date              reversed               sanctions modified
                            ___ Findings Modi-        to: _____
                                fied to: _____

Superintendent's Review:                              b6
                                                      b7C
⬜⬜⬜⬜⬜    1/4/01  0815    X  Determination upheld
                Date.Time    ___ Determination reversed
                             ___ New proceedings ordered as follows: _____
                             X  Following sanctions approved: as recommended

WHITE (CASE FILE)    YELLOW (CENTRAL OFFICE)    BLUE (ACCOMPANIES RECEIPT)    PINK (INMATE)

# EXHIBIT 78

(Rev. 10-01-1999)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                              **Date:** 01/04/2001

**To:** Albany                    **Attn:** Rutland, Vermont RA
                                          SA
      Little Rock                         EC

**From:** Little Rock
        Squad 7/Fort Smith RA
        **Contact:** SA [                    ], (501)[              ]

**Approved By:** [                              ]                        b6
                                                                        b7C
**Drafted By:** [                      ]jdc                              b2

**Case ID #:** 7A-AL-44453-65 (Pending)

**Title:** ROBERT JOSEPH LEE;
        DONALD R. FELL;
        TERESCA RUTH KING - VICTIM;
        KIDNAPPING

**Synopsis:** Clarksville Police Department Reports being forwarded
to Rutland RA. Lead covered for receiving possession of Mossberg
shotgun and forwarding to FBI Rutland RA.

**Package Copy:** Being forwarded under separate cover is one black
Mossberg 12 gauge shotgun, serial number P224645.

**Enclosure(s):** Five (5) original and one copy each FD-302s for
the following:

        One FD-302 re faxed copy of affidavit, search warrant,
                and return for the search of the Neon.
        One FD-302 re faxed copy of Clarksville PD Incident
                Report completed on 11/30/00.
        One FD-302 re faxed copy of Clarksville PD Vehicle
                Impoundment Record.
        One FD-302 re FBI receiving custody of black Mossberg
                12 gauge shotgun, serial number P224645.
        One FD-302 re FBI preparation of shotgun, serial number
                P224645 for shipping.

        Four (4) FD-340s (1As) (numbered 28-31) for the
following:

        28.  FD-597 for custody of Mossberg shotgun from
                Clarksville PD.

Registry Number 4310 5113 2308
Date Evidence Shipped 1-16-01
Employee sending evidence package DX
Method of Shipment Fedex
Reimbursable Value —0—

7A-AL-44453-1816

7A-AL-44453-65
SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____
JAN 17 2001
FBI - ALBANY

To: Albany  From: Little Rock
Re: 7A-AL-44453, 01/04/2001

29. Four (4) Polaroid photographs of wrapped Mossberg
    shotgun as prepped by Clarksville PD.
30. Wrapping paper from Mossberg shotgun used by
    Clarksville PD.
31. One Polaroid photo of Mossberg shotgun sans
    wrapping.

**Details:** FBI Fort Smith RA has learned that Clarksville PD is
still in possession of two "crack" pipes and a small pocketknife
that were seized and removed from the Neon during the stop on
11/30/00. CPD has maintained possession of these items to date
as evidence. The FSRA will obtain possession of these items from
CPD and forward to FBI Rutland RA.

2

FELL-00001248

To:  Albany  From:  Little Rock
Re:  7A-AL-44453, 01/04/2001


**LEAD(s):**

**Set Lead 1:  (Adm)**

    <u>ALBANY</u>

        <u>AT RUTLAND, VERMONT RA</u>

        Fort Smith Lead covered.


&#9670;&#9670;

3

# EXHIBIT 79



**U.S. Departi    it of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                    *Fax: (802) 951-6540*

January 8, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

        Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

    Enclosed is additional discovery consisting of: search
warrant, application and inventory relating to the search of
Teresca King's car in Arkansas: various signed <u>Miranda</u> waiver
forms, interview notes and copies of handwritten statements that
you probably have already received; an immunity letter given to
Christian Kolojeski; and photographs taken by the Rutland Police
Department in connection with this case.  The photos are from the
scene of the murders of Charles Conway and Debra Fell; morgue
photos of Conway and Fell; from the Price Chopper where Teresca
King was abducted; and from the search of King's car in Arkansas.
Accompanying each roll of film is a photo log.

    The U.S. Attorney's Office has already reimbursed the
Rutland Police Department for your share of the cost of these
photographs.  To cover these costs, counsel for each defendant
should arrange to have a check for $123.24, payable to the U.S.
Attorney's Office, sent to my attention.  Thank you in advance
for your anticipated cooperation.

    Additional civilian witness whom the Government might call
include Michael Leight, REDACTED-FELL Brewster, NY; and Keith
Cancel,   REDACTED-FELL   Poughquag, NY.

FELL-00001250

Sincerely yours,

CHARLES R. TETZLAFF
United States Attorney

By:

GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

FELL-00001251

# EXHIBIT 80

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

**ALBANY · MAIN OFFICE**
**39 NORTH PEARL STREET**
**5TH FLOOR**
**ALBANY, NY 12207**
**(518) 436-1850**
**(518) 436-1780 FAX**

**SYRACUSE · BRANCH OFFICE**
**4 CLINTON EXCHANGE**
**3RD FLOOR**
**SYRACUSE, NY 13202**
**(315) 701-0080**
**(315) 701-0081 FAX**

**BURLINGTON · BRANCH OFFICE**
**110 CHERRY STREET**
**2ND FLOOR**
**BURLINGTON, VT 05401**
**(802)862-6990**
**(802)862-7836 FAX**

**RESPOND TO ALBANY OFFICE**

January 9, 2001

Mr. Gregory L. Waples
Assistant United States Attorney
P.O. Box 570
Burlington, VT 05402-0570

Re: USA v. Fell

Dear Greg:

Please make sure Fell and Lee's clothing are preserved after they are examined by the government's forensic lab. We need to submit the clothing, or portions thereof, to an independent expert for examination.

Sincerely,

Alex Bunin

cc: John Pacht

FELL-00001252

# EXHIBIT 81

01/22/01                                    **FD-192**                              ICMIPR01
13:36:12                                                                            Page  1

**Title and Character of Case:**

LEE, ROBERT, JOSEPH
FELL, DONALD, R

| Date Property Acquired: | Source from which Property Acquired: |
|---|---|
| 12/02/2000 | VEHICLE SEARCH/ <br><br> CLARKSVILLE AR |

**Anticipated Disposition:**  Acquired By:                        Case Agent:

**Description of Property:**                                        Date Entered
   1B 24
                                                                    b6
   (1) ONE (1) BOTTLE CONTAINING BROWN LIQUID, LABELED:           b7C
       "PATCHOULI TUNISIAN"
   (2) MARLBORO BOX CONTAINING SMALL PLASTIC BAGS
       ITEM A-30

   Barcode: E01729699    Location: ECR1      DRUGS                 12/02/2000

   DRUG WEIGHT:     69.20 GRAMS          Est Dollar Value:          .00
   Sealed By:                            Witnessed By:

   Case Number:   7A-AL-44453 -11324
   Owning Office:  ALBANY

SEARCHED       INDEXED
SERIALIZED     FILED

JAN 1 8 2001

FBI - ALBANY

**File Copy**

FELL-00001253

# EXHIBIT 82



**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                          *Fax: (802) 951-6540*

January 24, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5ᵗʰ Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

        Re:    United States v. Donald Fell and Robert Lee

Gentlemen:

        Enclosed is additional discovery consisting of FBI and New
York State Police reports.

        Also enclosed is a copy of all pages from Robert Lee's
notebook which contain any writing or entries.  Agent Hardegree
initialed and numbered each page, including blank pages.  We have
reproduced for you only pages on which any writing appears.  The
totally blank pages are 20-38, 125-215, and 217-268.  We will
maintain custody of the original notebook at the U.S. Attorney's
Office if you need to examine it.

        The Plymouth Neon which the defendants stole from Teresca
King is being flatbedded back to the area and will be stored by
the FBI in Albany.  The King family would like to sell the
vehicle when it is no longer needed for evidence.  We have
already examined the car and have no desire to retain it.  I
assume neither defendant needs to have the car preserved after
you have had the opportunity to perform a forensic examination.
Please advise if this is incorrect.  I also ask that you try to
have any examination of the car completed by the end of February
so that it can then be released to the King family.

Sincerely yours,

DAVID V. KIRBY
United States Attorney

By:

GREGORY L. WAPLES
Assistant U.S. Attorney

Enc.

FELL-00001255

# EXHIBIT 83

To:      [redacted]
From:    [redacted]
Date:    03-15-01
Re:      Lee, Robert - [redacted]

On the above date at approx. 1220 hrs this officer was asked by          b6
inmate Lee if I could give inmate [redacted] a magazine. This officer    b7C
honored the request, but checked the magazine prior to giving it to
inmate [redacted] for contraband.

While flipping through the magazine, I noticed a page that was
folded and taped shut. This officer inspected this page and found
a hand written note inside of the this folded page. SEE ATTACHED;)

The note basically explained the dangers of ingesting comet
cleaner, and basically something about taking a hospital trip.

Inmate Lee was the only inmate to use the comet cleaned this day,
and due to the nature of the note, This officer shook down inmate
Lee's cell for possible comet in his cell. I later shook inmate
[redacted] cell for comet and CO/II [redacted] found a container of water
with approx. 1/4 inch of comet on the bottom of the container.
When asked what it was, [redacted] stated it was cleaner for his toilet.
[redacted] was advised that he could not keep such items in his cell and
the item was removed.

From reading the note found it would seem that inmate [redacted] was
looking for a way to get to the hospital and it seems that he was    b6
possibly going to drink the cleaner to get there..                   b7C

What concerns me about this is why inmate [redacted] so intently wants to
go to the hospital. He was sent here from Newport as a high
security escape risk. Should we be watching inmate [redacted] a little
more closely when he is being transported out of the facility or
thinking of moving him from unit to unit in the future.

How do we want to deal with this issue.


[redacted] CO/I


                                        b6
                                        b7C

# EXHIBIT 84



**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                         *(802) 951-6725*
*Burlington, Vermont 05402-0570*                     *Fax: (802) 951-6540*


March 26, 2001


Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5th Floor
Albany, NY 12207

John L. Pacht, Esq.
Leo Duval, Esq.
P.O. Box 1124
Burlington, VT 05402

    Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

    Enclosed is additional discovery consisting of bank records for an account maintained by Robert Lee, and New York police and court records relating to what we believe was the arrest last summer of both Lee and Fell for assault.


                       Sincerely yours,

                       DAVID V. KIRBY
                       United States Attorney

        By:

                       GREGORY L. WAPLES
                       Assistant U.S. Attorney

FELL-00001257

# EXHIBIT 85

STATE OF NEW YORK  ::  COUNTY OF SULLIVAN

    JUSTICE COURT  ::  TOWN OF BETHEL

_____ X

THE PEOPLE OF THE STATE OF NEW YORK

      -against-

...Joshua Jones AKA Robert Lee.........

               DEFENDANT

               REDACTED - FELL

               D.O.B............80

CERTIFICATE OF

DISPOSITION

_____ X

    The above named Defendant having appeared before this Court, charged with the offense(s) of _Assault 2'd_ in violation of section(s) _120.05_ of the _Penal_ Law of the State of New York, this is to certify that the charge(s) aforesaid, on the _16th_ day of _August 2000_ were disposed of by: _reduced to Assault 3rd Sect 120.00 fined $500 plus $125 Surcharge 1-8-01 resentenced to time served-four days per ADA Joey Drillings_

DATED: _March 28 2001_

Kauneonga Lake, New York 12749

_Elita Shapiro_

~~TOWN JUSTICE~~ / COURT CLERK

TOWN OF BETHEL JUSTICE COURT

FELL-00001258

# EXHIBIT 86



**U.S. Departt of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                    *Fax: (802) 951-6540*

April 5, 2001

Alex Bunin, Esq.
Eugene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl St., 5ᵗʰ Floor
Albany, NY 12207

John L. Pacht, Esq.
Bradley S. Stetler, Esq.
P.O. Box 1124
Burlington, VT 05402

       Re:  <u>United States v. Donald Fell and Robert Lee</u>

Gentlemen:

     Enclosed is additional discovery consisting of more documents relating to Donald Fell's and Robert Lee's arrest for assault last summer in New York.

     Inquiry last week revealed that none of the autopsy reports on the three homicides is yet available.

                              Sincerely yours,

                              DAVID Y. KIRBY
                              United States Attorney

                    By:  _____
                              GREGORY L. WAPLES
                              Assistant U.S. Attorney

FELL-00001259

# EXHIBIT 87

**ATTORNEY/CLIENT WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

TO:        Dr. Mark Mills
FROM:    Cynthia Carter Ayres
RE:        Donald Fell
DATE:     April 23, 2001

I gather from Wanda Rivera that you are most interested in my interview with Donnie's father and any psychotic or bizarre behavior exhibited by Donnie reported to me by other informants.   I have summarized my interview with Donnie's father and pulled together the pertinent information from my other interviews.  I am hoping to interview Donnie's sister, Teri, and his maternal grandfather (described by all informants as a chronic alcoholic) this week and will provide you with those notes as soon as possible afterward.  Please feel free to call me any time: (804) 353-0113 or (757) 259-9007 or cell phone (757) 291-3294.

I interviewed Donald Robert Fell (DOB    REDACTED   39) in Neptune Beach, Florida, on February 19, 2001, in the bar he frequents on a daily basis.  His sister Geraldine had told me that he was not willing to talk to me, but after tracking him down at Pete's, I was able to talk with him for a couple of hours.   I am combining the information I obtained from both Geraldine and Donald.

Mr. Fell completely acknowledges his long history of alcoholism and seems to recognize that his drinking has been a way of coping with lifelong depression.  His mother suffered from depression and underwent electroshock treatments when he was a young child.   Mr. Fell's mother was also an alcoholic, as her father may have been.

Mr. Fell was born and raised in Wilkes-Barre, Pennsylvania, by his parents, Donald Townsend Fell (d. 1977) and Myrtle Fritz Fell (d. 1980).    Donald T. Fell worked for American Auto Stores all his life.  Donald and Myrtle's oldest child, a girl, was born in 1929 and died of a strep infection when she was five.   Donald's living siblings are Geraldine Fell (70), a retired social worker who never married, and Sally Fell Francis, a nurse who lives in California with her husband, an attorney, and two children.  Sally has no contact with her brother.

Mr. Fell attended public schools in Wilkes-Barre and graduated from Meyers High School there.   However, during his senior year he was arrested for joyriding and sent to a local juvenile facility for approximately one month. Mr. Fell states that he was very small as a teenager and would do anything to impress his peers.

Mr. Fell married Beatrice Gelsleichter in 1959, when he was twenty and she was eighteen.   They had three children, Robert Donald Fell (b. 1965), Donna Fell Christner (b. 1960), and Susan Fell Benczkowski (b. 1964).    Donald and Beatrice

were divorced in 1976 because she could no longer tolerate his drinking and occasional physical abuse. Mr. Fell has no contact with his youngest daughter and only minimal contact with his two other children.

Mr. Fell met Debra Kotzer in a bar where he was working in Wilkes-Barre in 1976 or 1977. According to Mr. Fell, Debra was extremely promiscuous and their relationship was based primarily on sex. Debra was then twenty. Mr. Fell states that Debra told him she had been raped at age thirteen by a bar owner. Mr. Fell also states that Debra and all her sisters left home when they were around thirteen. Mr. Fell could not explain exactly what led them to leave home so young other than to describe Debra's mother, Theresa Banas Kotzer, as a monster. Mr. Fell states that Debra was already a serious alcoholic when he met her. He describes her as unable to hold a glass because her hands shook so badly. Mr. Fell also states that Debra abused amphetamines, made several suicide attempts, and had numerous sexual partners.

Mr. Fell married Debra in October 1979 after learning that she was pregnant. He did not want to marry her but felt it was the right thing to do. Donnie was born six months later. Mr. Fell reports that Debra drank daily during her pregnancy with Donnie. Mr. Fell states that he kept a refrigerator in the basement full of beer with a tap.

Mr. Fell recalls that Donnie and his sister Teri were sexually abused by a babysitter and her husband. Mr. Fell states that Claudia (Cookie) and Frank Bublo babysat for the children in the Fells' home; Donnie was attending preschool at the time, but Cookie Bublo picked him up and brought him home in the afternoons. Mr. Fell recalls noticing that the blinds in the living room were always closed when he and Debra returned home. At some point Donnie told them that Frank Bublo was hanging Terri by her diaper from a plant holder in the living room. Mr. Fell recalls that the police investigated the case, but did not pursue it. Mr. Fell states that in retrospect he realizes how affected Donnie was by the abuse. Mr. Fell states that before the abuse Donnie was a "sweet little boy" but that he became increasingly diffcult afterward. Mr. Fell also states that Donnie became very protective toward Teri on the school bus.

Mr. Fell confirms that his marriage was combative and violent. He states that Debra stabbed him on several occasions and that he still has the scars (Mr. Fell does have numerous scars on his arms and back). He recalls that after Teri was born, Debra wanted to have her tubes tied, for which she had to have his permission. He thought she was too young to have the procedure and told her he would not sign the papers. He woke up the next morning to find Debra holding a knife to his throat and threatening to cut his throat if he refused to sign the papers.

Mr. Fell states that his marriage to Debra ended because several of the men she was having extramarital affairs with threatened to beat him if he did not leave. He recalls that he returned to the trailer where they had been living to collect his

FELL-00001261

belongings and found them outside where Debra had thrown them.   The dog, which had been left for days in their bedroom, had chewed through the waterbed to get to the water, which was still all over the floor.  Mr. Fell states that Debra never kept a clean house and that he did the majority of the domestic chores while they were married.

The last time Mr. Fell tried to see Donnie was when Mr. Fell learned from his oldest son, Robert, that Donnie was in the hospital.  When Mr. Fell went to see Donnie, Mr. Fell was informed by staff that Donnie did not want to see him and that a visit was not advisable.  Mr. Fell has not had any contact with Donnie since then.

After splitting up with Debra, Mr. Fell eventually ended up living in a homeless shelter in Wilkes-Barre.   He lost his job in 1993 and started collecting welfare.  His sister Geraldine invited him to live with her in Florida; he lives in a self-contained unit in the basement of her house.

**Stella Kozerski Banas** is often identified as Donnie's great-grandmother, but is in fact his great-greataunt.  She raised her niece Theresa Banas Kotzer Sharpe (d. 1995), who was Donnie's maternal grandmother and the mother of Debra Kotzer Fell. Stella Banas still lives in Wilkes-Barre with her daughter Jeannette.  Donnie stayed with Stella and Jeannette from August 5 until September 23, 2000, when Stella and Jeannette drove Donnie to Vermont to stay with his mother.

Stella and Jeannette both report that during the time Donnie stayed with them he was polite and kind and was not a bother in any way.  He read books, cut the grass, and earned some money locally by cutting wood and picking tomatoes.   Donnie built Stella an outdoor swing to replace her broken one.  They were disturbed when he brought home a gun he said he had borrowed from a friend of his aunt Donna. He also told Jeannette that he had cut off a squirrel's tail; his sister Teri told them that Donnie had tortured other animals.  Jeannette and Stella stated that when they arrived in Vermont, Donnie ran to his mother and hugged her.

**Donna Kotzer Williams** (41) is Donnie's maternal aunt.   She states that Donald Fell used to slap Donnie around when Donnie was very young and that there was constant violence in Donald and Debra's house.   After Debra was on her own, Donna tried to involve Child and Youth Services because Debbie was constantly drunk and often left Donnie and Terri alone.

Donnie told Donna that he participated in Satanic worship, which included sacrificing animals.

**Jessie Williams** (18) is Donnie's first cousin on his mother's side.  Donnie worked for Jessie last summer as a carnival game operator.  Jessie states that he only hired Donnie because he was desperate for help; Jessie states that Donnie did not have the knack for encouraging people to play the game.  Donnie was disrespectful to Jessie, and Jessie finally got fed up with Donnie when he started stealing from him and not

showing up for work. Jessie states that Donnie has been in trouble as long as he can remember and has been constantly drunk or high in recent years. Jessie also states that Donnie told him he was going to kill someone some day and that when he did he would never stop.

While they were working at a carnival in New York State last August, Donnie got into a fight with a guy who had sexually assaulted his sister Teri.

Teri told Jessie that Donnie and Bobby (codefendant) had played hockey with a cat, tortured and killed it. Donnie told Jessie that the cat had gotten hurt and that he had simply put it out of its misery. Donnie has told Jessie that he worships Satan.

**Sandy Kotzer Bowles** (44) is Donnie's maternal aunt. She now lives in the Myrtle Beach area of South Carolina. Sandy recalls that Debbie and Donald fought constantly during their marriage and that they were both drunk constantly. Sandy avoided going to see Debbie because the atmosphere in her house was so upsetting. Sandy recalls that Donnie and Teri always had head lice when they were living with Debbie.

When Donnie was about eleven or twelve, Sandy invited him and Teri to visit her for a week in Virginia, where she lived at the time. Donnie enjoyed himself and did not cause any problems for Sandy.

Sandy states that by the time her mother died, Donnie and Teri were "so far gone that no one else wanted them."

**Jackie Sharpe** (27) is Debra Fell's younger half-sister. Theresa Banas Kotzer married Jackie's father, John Sharpe, in the late 1960s; he died while she was pregnant with Jackie. Jackie was living with her mother when she had custody of Donnie and Teri, and after Theresa's death Jackie had temporary custody of them. Jackie states that Donnie lived with her after he was released from St. Mike's in 1995 until she kicked him out in 1999. Jackie states that she took care of her niece and nephew because no one else would. Everyone I spoke with stated that Jackie was at best difficult and at worst violent and unpredictable. Nonetheless, Jackie provided information that if verified could be helpful.

Jackie states that Debbie's boyfriends used to beat Donnie, that his mother allowed him to smoke marijuana and drink from the age of seven, and that Debbie used to sell Donnie's prescription medicines to her friends. Jackie states that Dr. Feussner at General Hospital described Donnie as psychotic and capable of blacking out and having no memory of things he had done. Jackie recalls that when Donnie got mad, his eyes would get very dark and he would occasionally black out.

Jackie states that Donnie is involved in Satan worship. Donnie told Jackie that he and Bobby and another boy had sacrificed a cat and drunk its blood.

FELL-00001263

Donnie told Jackie when he was drunk that he remembered being sexually molested; that he remembered being tied up and put in a closet.

Jackie states that when Donnie and Teri were still living with Debbie her house was littered with beer cans and ashtrays, smelled of dog urine, and was infested with rats and roaches. According to Jackie, Donnie kept his room very neat. He had a hamster for years that he loved. When he went to St. Mike's, Jackie kept it for him, and when she told him the hamster had died he was devastated.

Donnie's close friend Mikey Ramondi died in a car accident two months before Donnie left for Vermont. Jackie states that Donnie took it really hard.

FELL-00001264

# EXHIBIT 88



LUZERNE COUNTY COMMISSIONERS
THOMAS A MAKOWSKI, ESQ , CHAIRMAN
THOMAS P PIZANO
STEPHEN A URBAN

EUGENE N CAPRIO, M S NCC
*DIRECTOR*

EUGENE R KLEIN
*Chief Clerk / Administrator*

JAMES P BLAUM, ESQ
*County Solicitor*

JACQUELINE S ORKISZ
*Executive Administrative Assistant*

## LUZERNE COUNTY

### CHILDREN AND YOUTH SERVICES

111 North Pennsylvania Boulevard, Wilkes-Barre, Pa 18701-3697 • 570-826-8710
Fax Number 570-821-7355
TDD (570) 825-1860

Office of the Federral Public Defender
District of Northern New York & Vermont
39 North Pearl Street
5$^{\text{th}}$ Floor
Albany, NY 12207

Re. Donald Fell
   DOB 4-3-80

Dear Ms. Rivera,

Enclosed please find the information you requested from the Luzerne County Children
and Youth Services' record of Donal Fell..

If you have any questions, please do not hesitate to contact me at 570-826-8710 ext
1165

Sincerely,

Peggy A Peterson, MSW
Adolescent Unit Supervisor



FELL-00001265

LUZERNE COUNTY COMMISSIONERS
THOMAS A MAKOWSKI, ESQ CHAIRMAN
THOMAS P PIZANO
STEPHEN A URBAN



EUGENE N CAPRIO, M S NCC
*DIRECTOR*

EUGENE R KLEIN
*Chief Clerk / Administrator*

JAMES P BLAUM ESQ
*County Solicitor*

JACQUELINE S ORKISZ
*Executive Administrative Assistant*

## LUZERNE COUNTY

CHILDREN AND YOUTH SERVICES

111 North Pennsylvania Boulevard, Wilkes-Barre  Pa  18701-3697 • 570-826-8710
Fax Number  570-821-7355
TDD (570) 825-1860

Re: Donald Fell
DOB 4-30-80

Please be advised that additional information regarding Donald Fell may be
obtained from the following sources:

The Victims Resource Center
85 South Main Street
Wilkes-Barre, Pa, 18701

Saint Michael's School for Boys
Hoban Heights,
PO Box 370
Tunkhannock, PA, 18657

First Hospital of Wyoming Valley
149 Dana Street
Wilkes-Barre, PA, 18702

The Children's Service Center
335 South Franklin Street
Wilkes-Barre, PA, 18702



# EXHIBIT 89

Dun!

# "D" MANAGEMENT TEAM MEETING
## 4/30/2001

FF PRESENT:

b6
b7C

## — CASE REVIEWS —

Robert LEE : More vocal lately. Negative attitude, maybe learning from others

Donald Fell : (Seen by DMT.) Reviewed request. Review again in 60 days

Maybe provoking other inmates. Monitor carefully.

Has been joking around / laughing / more open — Appropr

2 more DR's pending. Threw water / liquid on

Denied clothes. Denied change of rooms. Behavior inappropu

Review again next week.

b6
b7C

Investigation still pending _____ will update w/info.

(Seen by DMT.) Review again next week for Medi. 5/6. Denied movement this week. Still verbally aggress

Dineen has results of investigation. _____ will determi status. OOS still on option / ISC.

(Seen by DMT.) _____ v/pts. DR (minor) not heard yet.

CONT.

FELL-00001267

Needs Officer instruction . [ ] will move
~~this guy~~

DR sent him to D Unit 4/17/01 . (Seen by DMT.)
Review for Event 5/17 (30 days)

b6
b7C

off cabin today (Seen by DMT.) Reviewed status
will determine placement .

Mostly / Verbally aggressive .

— Special OBS —

21 placed on 30's — CODE #3

— Movement List —

— 0 —

# EXHIBIT 90

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

**ALBANY · MAIN OFFICE**
**39 NORTH PEARL STREET**
**5ᵀᴴ FLOOR**
**ALBANY, NY 12207**
**(518) 436-1850**
**(518) 436-1780 FAX**

**SYRACUSE · BRANCH OFFICE**
**4 CLINTON EXCHANGE**
**3ᴿᴰ FLOOR**
**SYRACUSE, NY 13202**
**(315) 701-0080**
**(315) 701-0081 FAX**

**BURLINGTON · BRANCH OFFICE**
**110 CHERRY STREET**
**2ᴺᴰ FLOOR**
**BURLINGTON, VT 05401**
**(802)862-6990**
**(802)862-7836 FAX**

**RESPOND TO ALBANY OFFICE**

May 18, 2001

Mr. David V. Kirby, Acting United States Attorney
Mr. Gregory L. Waples, Assistant United States Attorney
Mr. John P. Tavana, Assistant United States Attorney
United States Courthouse and Federal Building
Post Office Box 570
Burlington, VT 05402-0570

Re: *United States of America v. Donald Fell*, No. 2:01-CR-12

Gentlemen:

This letter and its attachments are submitted in anticipation of our meeting on May 25, 2001 in your offices.[1] Our purpose in writing and meeting with you is to attempt to convince you that the United States should not seek capital punishment for Mr. Fell. We believe that there is much in Mr. Fell's history, mental health, and the circumstances of this case, that weigh against the imposition of the death penalty.

1. A short history of Donny Fell. Born on April 30, 1980, Donald Robert Fell II (hereinafter "Donny") is the child of Donald Robert Fell, Sr. and the late Debra Kotzer Fell. They married in Wilkes-Barre, Pennsylvania, three months after Debra became pregnant with Donny. Donald Fell, Sr. was previously married to Beatrice Gelsleichter Fell, who divorced him after years of physical abuse.

Debra Kotzer was born to Theresa and Ray Kotzer. Her parents' marriage ended in divorce because of Ray's violence toward Theresa and his abuse of alcohol. Debra repeatedly ran away from home. At thirteen, she was raped by a bartender. She finally left home for good, living with bikers for several years. She later returned to Wilkes-Barre with her first husband.

---

[1] This information is provided pursuant to §9-10.000 (B) of the United States Attorneys Manual with the understanding, that any statement made here cannot be used against the defendant in any way inconsistent with Federal Rule of Criminal Procedure 11 (e) (6) and Federal Rule of Evidence 410.

Page 1 of 9

FELL-00001269

Debra Kotzer and Donald Fell, Sr. met for the first time in a Wilkes-Barre bar. They were both chronic alcoholics. When Debra became pregnant with Donny, she continued to drink and smoke daily. She rationalized her drinking by claiming "barley" was good for the baby.

After Donny's birth, his parents fought constantly. They regularly went to bars where they became drunk and violent toward each other. These fights often involved weapons, particularly knives. On one occasion in their home, each parent stabbed the other. The police took them away, leaving baby Donny with his sixteen-year-old stepsister, who had to clean up the blood.[2]

When Donny was two, Debra filed charges against Donald Sr., accusing him of beating herself and Donny. When Donny was three, Debra became pregnant with his sister, Teri. Debra wanted to have her tubes tied to prevent further pregnancies. Donald, Sr., refused to agree. He woke up the next morning to find Debra holding a knife to his throat, demanding his consent.

When Donny was four, he and his younger sister Teri were regularly left with a man and his wife. When Teri complained that the couple had "hurt her pee pee," Children and Youth Services began an investigation. It was discovered that the man had been hanging Teri from her diaper on a hook. He performed oral sex upon her and required her to perform oral sex upon himself. This occurred in Donny's presence. After therapy, two months later, Donny finally disclosed that the man hit him with a board, locked him in a room, and engaged in anal sex with him. Today, Donny denies any memory of this.

Shortly after these events, Debra and Donald Sr. had a fight in their home. Debra stabbed Donald, Sr. in the back. He retaliated by stabbing her in the thigh. The police arrived to find blood all over the house. Debra was seated in a chair with a beer in her hand. The knife was still stuck in her thigh. When the police tried to assist her, she fought furiously to maintain her beer. Emergency medical technicians followed a trail of blood upstairs to find Donny and Teri, unhurt but alone. Another trail of blood led police to a local bar where Donald Fell, Sr. sat drinking a beer, with a broken blade still in his back. Donny and Teri were placed in the temporary custody of Debra's mother.

After the sexual abuse, Donny began having nightmares. He became less compliant at home. He did very well in school during first and second grade, but was getting only passing marks by third grade. His father keep a keg of beer constantly on tap in the basement. It was around this time Donny began drinking from the keg.

In fourth grade, Donny's father left home for good and entered a detoxification program for alcoholism. Twice during the school year, Donny and Teri were discovered to have head lice. In fifth grade, Donny took the Stanford Achievement Test. Despite declining school work and chaos at home, he scored above grade level in every area.

---

[2] All events are confirmed by police, hospital, and social services reports made at the time of the occurrence. The reports are corroborated by recent interviews with persons who were present at the events.

Page 2 of 9

During this time, Debra was drinking frequently. She was arrested for driving under the influence of alcohol, and later for public drunkenness. She began living with boyfriend Ellery Wilcox, who later died of a drug overdose. Donny began actively abusing alcohol with friends and used cocaine that he stole from his mother. His drinking included whiskey, rum and tequila.

When Donny was in sixth grade he started using marijuana and LSD. Debra admitted him to a hospital where he was diagnosed with conduct disorder. Testing revealed that he viewed his mother as an authoritarian figure who related poorly to her children. In the winter, he withdrew from elementary school.

He was again admitted to a hospital when he accidently shot his friend in the shoulder with a handgun that the friend's father had left available. Neither boy apparently knew it was loaded. Donny was found shivering and scared. The hospital psychiatrist noted that Donny appeared angry and depressed. He found that Donny's insight and judgement were below age level, and were impaired by mood swings and impulsivity. He was put on medication and treated for head lice. Against medical advice, Debra stopped giving Donny his medication.

The next fall, he entered middle school, where he was absent 56 out of 181 school days and failed most classes. He took the Iowa Tests and scored significantly lower than on earlier standardized tests.

Donny was still only twelve when Debra admitted him to the hospital for behavioral disorders. Donny was again treated for head lice. The psychiatrist noted that Donny greatly improved on 50 mg. of Mellaril per day. On the medication he showed "no anxiety, depression, mood swings, temper tantrums, impulsiveness, or hyperactivity."

Debra called the police one day to complain that Donny was next door with relatives who would not let him come home. When officers investigated, they found Donny asleep in his room and that Debra was intoxicated.

Several months later, Debra again admitted Donny to the hospital. Donny had stopped taking prescribed medication, which he admitted made him calmer. He increased his use of illegal drugs, particularly LSD. The psychiatrist described Donny as depressed and on the verge of tears, "especially when discussing the fact that he feels that his mother does not want him anymore and basically she does not care for him." He was discharged with diagnoses of Major Depressive Disorder with Psychotic Features, Hyperkinetic Conduct Disorder, and Borderline Personality traits. He was prescribed Stelazine and Clonidine.

In November, Donny was knocked unconscious by a brick. Debra Fell told the doctors that Donny "needs to be put away." The doctors recommended that the entire family participate in outpatient treatment. The day Donny was discharged, Debra acknowledged she had been drinking all day.

Page 3 of 9

FELL-00001271

On Christmas Eve of that year, Donny was thirteen. When their mother failed to return home, Donny and Teri wrapped their own presents and went to bed. The children woke up on Christmas morning, to find Debra passed out on the couch. Unable to wake her, they unwrapped their presents alone. Debra got up sometime that afternoon and told her children that she was going out to buy a ham for dinner. She never returned.

A month later, Debra was arrested for harassment and public drunkenness after slapping eleven-year-old Teri with the back of her hand, leaving a small laceration. Two weeks later, Debra was arrested for assault and public drunkenness. Donny watched as she dragged, punched, and scratched her boyfriend while he attempted to leave the house. The police found lacerations on the man's face and pieces of his glasses on the sidewalk. Debra was too drunk to sign the citation.

By spring, Debra was in prison and the children were placed in temporary custody of Debra's mother, Theresa Sharpe. By the fall, Theresa was diagnosed with cancer. She died on New Years' Eve. Donny and Teri were placed with Debra's sister, twenty-one-year-old Jackie Sharpe. When Debra got out of prison she moved to Vermont without the children. Donny did not see her again for almost seven years. She never visited Donny or Teri.

Jackie was unable to substitute as a parent to Donny. For almost three years, Donny was confined to St. Michael's School. He responded well there. He had little access to drugs or alcohol. His grades were good. When he was released, he returned to live with Jackie Sharpe. He briefly attended a vocational school but then left school permanently at sixteen.

The rest of his teenage years were filled with illegal drug use, temporary hospitalizations, and juvenile detentions. He had a series of odd jobs. Some of the drugs he used during this time were angel dust, mushrooms, oxycontin, pain pills, tranquilizers, valium, heroin, marijuana, LSD, cocaine, and alcohol. However, he was taking no medication to address his psychiatric conditions.

In summary, there was no sustained period of Donny's life that could be described as normal. As a small child he was abused and neglected. His mother allowed their home to become filthy, exposing her children to vermin and lice. Only twice did social services intervene. When he was finally taken from his home it was only because Debra was going to prison.

As soon as he was old enough to pour his own drinks Donny began abusing alcohol. Once drugs became available he abused those. He was abandoned by his father at age ten and by his mother at age thirteen. From then on, he had no parent or role model. He lived with serious mental health conditions that were unaddressed and aggravated by his use of illegal drugs and alcohol.

2. Donny Fell's Mental Health. An assessment of Donny Fell's mental health is attached in the form of reports by Psychiatrist Mark J. Mills, J.D., M.D.;Clinical Psychologist Wilfred G.

Page 4 of 9

van Gorp, Ph.D.; and Neuropharmacologist Jonathan J. Lipman, Ph.D., MIBiol., FACN. The curriculum vitae of each is also attached.

In summary, these reports found that Donny had a psychotic-like condition since at least adolescence. This condition was treated with success when Donny was first hospitalized. However, Donny stopped taking the prescribed medications. Instead, he treated himself with illegal drugs and alcohol, which only aggravated the underlying conditions.

Dr. Lipman cited studies indicating "schizophreniform reactions" in persons with borderline psychosis who use LSD. He referred to Donny's use of LSD as "bordering on stupendous." Dr. Mills stated, "It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated."

Even without the introduction of drugs and alcohol, Doctors Mills and van Gorp amply documented Donny's damaged mental health. As Dr. van Gorp stated, "The Schizophrenia Index failed to be positive by one point, and I believe this is further evidence of the somewhat atypical thought process he has which makes him vulnerable to a frank psychosis if under sufficient stress."

3. The circumstances of the offense. The charged offense involves the murder of Teresa King. However, it is impossible to isolate that murder from the deaths of Debra Fell and Charles Conway.

When Donny went to visit his mother in Rutland, Vermont in September, 2000, he had not seen her in almost seven years. His great-great-aunt Stella Banas, and her daughter Jeanette Barnes, drove Donny to Rutland to reunite him with his mother. Donny hoped he could reestablish a relationship with his mother.

Donny quickly found that his mother still abused drugs and alcohol. She had a series of male visitors. She gave him drugs, alcohol and cigarettes. She and Donny argued regularly. By the time of her death, Donny had come to the conclusion that he could never have a normal mother-son relationship with Debra.

The physical evidence and the statements of the defendants are what remain of November 27, 2000. In most important respects, each corroborates the other two. The murders of Debra Fell and Charles Conway appear to have been spontaneous acts that were carried out with great fury. The acts were fueled by tremendous amounts of drugs and alcohol. Donny's actions are consistent with the type of impulsive behavior and uncontrolled anger described by the doctors who examined him.

No rational motive has ever been stated by the defendants for the murders of Debra Fell and Charles Conway. Donny has repeatedly stated that he liked "Charlie" and could not explain his actions. It seems possible that Donny's fury, expressed toward Conway, was actually anger

Page 5 of 9

FELL-00001273

toward his mother.

According to Robert Lee, Donny asked him to kill Debra. If this was true, it does much to confirm that Donny's actions toward Conway were directed toward his mother. He had many years of rage built up inside, but she was still his mother and he may have felt that he could not personally harm her.

Both defendants have expressed the feeling that they were not acting like themselves at the time of the murders. When faced with the enormity of what they had done they clearly had trouble making decisions about what to do next. Donny showered, but put the same clothes back on. He washed and wrapped the knives used in the murders, but left them on the kitchen table.

Because the defendants were strangers in a small city in a mostly rural state, they agreed to get a car. However, they left the apartment with no clear plan. They wandered around town on foot with an unloaded shotgun. They were incapable of stealing an unoccupied locked car.

By seeking to take an occupied car, the defendants placed themselves in a hopeless situation. Upon stopping Mrs. King, they quickly realized that unless they took her with them, she would inform the police and capture was imminent. Once they had her, the only perceived option was to release her in a place where she was too far from others to immediately report their whereabouts. This proved impossible because they did not know the area well enough to drive to such a place. When they finally let her out on a less traveled section of road, her reaction was to try to flag down another vehicle. When they told her to run into the forest they then realized they could not stop her from coming right back to the road.

The defendants made what any clear-thinking person would consider an irrational decision. They decided to murder Mrs. King. They later said it was because she could identify them. However, there was already so much evidence linking them to the murders of Debra Fell and Charles Conway, that King's possible identification of them as robbers seems inconsequential. Their only real need at that point was to restrain her long enough to allow them time to drive away. They could have done this by simply tying her up.

There is nothing in Donny's history to indicate he was otherwise predisposed to murdering someone in order to steal their property. The murder of Mrs. King was the irrational act of two very young men who were influenced by drugs, alcohol, and the stress of the previous murders. In Donny's case, this is another situation in which his borderline psychosis may have also played a role, preventing critical thinking.

4. Why capital punishment is inappropriate in this case. The federal death penalty statute (18 U.S.C. §3591) lists factors that the finder of fact shall consider mitigating against the imposition of the death penalty. Of those, relevant to this case are:

(1) Impaired capacity - The defendant's capacity to appreciate the wrongfulness of

Page 6 of 9

FELL-00001274

the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

\* \* \*

(5) No prior criminal record - The defendant did not have a significant prior history of other criminal conduct.

\* \* \*

(6) Disturbance - The defendant committed the offense under severe mental or emotional disturbance.

\* \* \*

(8) Other factors - Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death penalty.

The basis for the application of those factors is covered in the sections above, relating to Donny's upbringing, mental health, and the circumstances of the offense. However, one of the most compelling reasons against the death penalty in this case is not specifically listed among the statutory mitigating factors. That factor can best be described as a lack of future dangerousness.

Under some capital punishment schemes, such as Texas, the jury must answer special issues. One of those issues is whether the defendant poses a future danger to the community. If the jury answers negatively, a death sentence cannot be imposed.

There is a great deal of evidence that Donny Fell thrives in a controlled environment that is free from drugs and alcohol. This was proven by his temporary hospitalizations, his confinement to St. Michael's School, and his imprisonment for over five months in this case. Confined to prison, there is no reason to believe Donny Fell will be a danger to other inmates, prison personnel, or himself.

Due to the seriousness of his charges, Donny has been locked in the mental health/punitive segregation wing of the Northwest Correctional Facility for his entire pretrial detention. During that time, no disciplinary reports have been filed against him. He has managed to cope under stressful circumstances. Disturbed inmates in his ward often scream all night and smear feces in their cells.

Initially, he was completely locked down without contact with other inmates and got only one hour outside his cell each day. In March, there was a meeting to discuss moving Donny into the general population. A corrections officer came on his day off to advocate for Donny based upon his good behavior. Donny was given the privilege of going to the recreation room and the job of mopping floors.

Page 7 of 9

Donny has not been moved to general population. According to Superintendent Steven Maranville, the reason for this is that a previous federal capital defendant tried to escape after entering general population. Maranville is understandingly apprehensive about repeating those circumstances. He agreed that there were no disciplinary problems with Fell.

The State of Vermont considers prison an adequate punishment for convicted murderers. The community standards of Vermont should be considered in this case. Vermont Senator Patrick Leahy proposed legislation that would bar the federal government from seeking the death penalty for this crime in states which do not have capital punishment under their own laws. (Section 401, Innocence Protection Act of 2000).

There is also a regional bias against the use of the death penalty. Of the New England states, only New Hampshire and Connecticut have death penalties. No person has been executed in New Hampshire since 1939 and no inmate is on death row. Last year, the state legislature voted to abolish capital punishment, but the bill was vetoed by the governor. There are seven death row inmates in Connecticut, but none have been executed since 1960.

Recently, the first federal capital case was tried in New England. The defendant, Kristen Gilbert, was convicted of multiple premeditated murders of patients in a veterans' hospital. Even though she would not accept responsibility for the crimes, a jury refused to impose a death sentence.

New York State does have a death penalty. There are six inmates on death row, but there have been no executions and none are imminent. More important, no federal jury has imposed a death sentence in any of New York's four federal districts. Those capital trials involved multiple contract killings by members of the Mafia, drug organizations, and street gangs. None got death sentences.

The only federal case in the Northeastern United States where a death sentence was rendered was in the Middle District of Pennsylvania. In that case, an Oklahoma prisoner serving a 1200+ year sentence at the Allenwood federal prison, strangled his cellmate to death.

5. <u>Conclusion</u>. The deaths of Teresa King, Charles Conway and Debra Fell are tragedies. The defendants immediately and repeatedly confessed their guilt to their murders. The only question is how they should be punished.

In the case of Donny Fell, there is extensive evidence of impaired capacity and disturbance. These alone should mitigate against capital punishment. One of the charges is for kidnapping in which a death resulted. If convicted, this crime requires a life sentence.

An agreed resolution provides certainty. Certainty not only benefits the parties, but the relatives of the victims. In the case of the Oklahoma City bombing, relatives of the victims were promised they could witness the execution of Timothy McVeigh on May 16, 2001. The

Page 8 of 9

justification was that witnessing his death would provide closure so they could go on with their lives. That execution was postponed because thousands of documents had not been provided to the defense prior to trial. McVeigh's sentence and conviction may now be challenged.

McVeigh's prosecution was the most thorough and expensive criminal case in history. If certainty cannot be guaranteed in that case, it can be guaranteed in no other. Given the certainty of a prison sentence, and the uncertainty of a death sentence, seeking the death penalty is not warranted in this case.

Sincerely,

Alexander Bunin, Federal Public Defender

Gene V. Primomo, Assistant Federal Public Defender

Page 9 of 9

FELL-00001277

# EXHIBIT 91

"D● MANAGEMENT TEAM MEETING
5/21/2001

Present:                                                                      b6
                                                                             b7C

— CASE REVIEWS —

Robert LEE: (MH) Maybe smoking in cell — officers be aware. Superintendent request denied / radio. (DMT will revisit every 90 days)

Donald Fell: Quiet / No issues / Reviewed status / no changes.                b6
                                                                              b7C

_____: OOS Hearing held last week — / awaiting OOS placement.

_____: Very vocal. Security needs to revisit the inside of cell.

_____: Currently in Medical office / infirmary. Medical nee

_____: Reviewed status / Investigation completed — to remain in D-unit until OOS is reviewed with possible move ba to NH.

                                                          b6
                                                          b7C

_____: Moved over to E-unit 5/21/01.

_____) Currently under review for move back to Windsor per π

_____ (Seen by DMT.) Mostly, Verbally Aggressive. Abusive towards female nurse. Reviewed status.
(CONT.)

(Seen by DMT.) High profile case prohibits medium placement at this time. Review case in 2 weeks.

: No issues. Doing good. Review in 1 wk for Fac' (no DR/unit)

: Reviewed smoking issue as it pertains strictly to him. Needs to be medium for Newport consideration

b6
b7C

AD/SEG Hearing held last week. (Seen by DMT.) Hearing officer recommended: AD/SEG to unit (Restrictions) not 23/7 (30 days/Phase I). Inmate questions a possible Transfer from this Facility. Review status: 6/9/01

(Seen by DMT.). Requests to be moved to Unit I so he can be closer to Aquian.

More DR Lock-IN Time coming DRUG/Possession ( Consider AD/SEG to unit.

Move to "D" unit / Major DR - tampering w/ fire alarm.

b6
b7C

— Special OBS.—

— off OBS/per [ ].
— No change
— No change.

FELL-00001279

③

## — Unit Issues —

Reviewed MH program for unit I & unit II   Officers have a copy.
Tobacco issue reviewed.   [   ] will put out a [   ]/UNIT II   b6 b7C
Handbook after all officers get a chance to review new program.

# EXHIBIT 92

 

VERMONT DEPARTMENT OF CORRECTIONS
FACILITY REPORT FORM

Page__1__of__1__                               _XX_N.W.S.C.F.

TO: Hearing Officer                    .    Type of Report;
                                            _X_Incident _X_DR
FROM: C/O [ ]
                                            ___Informational___Confidential .
DATE: 13 June 2001

RE: Lee, Robert

Report: On the above date at approx 1037hrs I heard a noise comming
from Activity room 2. C/O I [ ] also heard the noise and was
ahead of me in checking it out. He told me to hurry up as he called
a "33" in Delta. As I looked in the activity room I observed inmate    b6
Lee, Robert repeatedly punching inmate [ ] in the head and           b7C
shoulder area. I kicked the door and yelled for inmate Lee to stop.
He did not. As staff had not yet responded and the fact that inmate
[ ] was taking alot of punches, I asked inmate [ ] to try to
pull inmate Lee off of inmate [ ] At first he refused and when
I asked again he complied, to which Lee immediately stop his
aggression and went to the back of the activity room. Staff were
responding at this time, so I ordered the door to be openned and I
entered the activity room and ordered all inmates to face the wall.
I approached inmate Lee and placed him in handcuffs. He was then
escorted back to his cell by C/O's [ ] All inmates
present in the activity room were then escorted back to their
cells./////////////////END OF REPORT\\\\\\\\\\\\\\\\\\\\\\\

FELL-00001281

# EXHIBIT 93

**CORRECTIONAL MEDICAL SERVICES**

**INTERDISCIPLINARY PROGRESS NOTES**

Patient Name _Don Fell_____  I.D. # _043080_____  Institution _MWSCF___

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 7/5/01 | | S) Acne under control. needs benzoyl peroxide renewal. would like to continue doxycycline. O) Skin mostly clear. few papules + a couple of small pustules forehead/back. A/P) Acne - cont current meds. | |
| 7/6/01 | 1530 | RN called to Delta c ice pack to assess pt @ hand ↑ punching walls. I/M stated just angry and "got into a fight c the wall" Reminded I/M by d/w RN to talk to infirmary staff if MH ø available. *Ann C. Preston RN* | |
| 7/6/01 | 1100 | Addendum to above note: pt hand swollen, rom c pain ø obvious injury. v'd chart - ø documentation if pt having been seen for last MH referral by RN. *Ann C. Preston RN* | — |
| 7/20/01 | 00³⁰ | S/M still on 10" CWTLC. Per Bill Cott, if S/M asks, should be told of "friends's" DOOH. SI/HOM ø at this time. W— *Heather E. Cornell RN* | |
| 7/21/01 | 05⁰⁰ | S/M informed of "friends's" DOOH. offers to make suptmt. MH referral W. W↑ *Heather E. Cornell RN* | |

FORM #7113 8/94

FELL-00001282

# EXHIBIT 94