**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

_____

DONALD FELL,

                Movant,

        v.

UNITED STATES OF AMERICA,

                Respondent.

_____

)
)
)
)
)
) 2:01-CR-12-01
)
)
)
)
)
)
)
)
)

**MOTION OF DONALD FELL FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C. § 2255**


# VOLUME IV OF VII


# EXHIBITS 115-145

# TABLE OF CONTENTS

## INDEX TO EXHIBITS

## NON-SEALED EXHIBITS

Exhibit

Donald Fell Mitigation Binder...............................................................................................1

Van Gorp Report (Apr. 6, 2001) ..........................................................................................2

Mills Report (May 7, 2001) .................................................................................................3

Lipman Report (May 14, 2001) ...........................................................................................4

Cunningham Report (June 14, 2005) ...................................................................................5

Declaration of Mark Cunningham, Ph.D., ABPP (June 27, 2005) .....................................6

Wetzel Report (Oct. 11, 2002) ............................................................................................7

Rabun Report (Dec. 31, 2002) ............................................................................................8

Wetzel Report (June 27, 2005) ...........................................................................................9

Welner Report (July 5, 2005)............................................................................................10

CYS Contact Sheet (Apr. 22, 1985) .................................................................................11

CYS Contact Sheet (May 8 1985) ....................................................................................12

CYS Contact Sheet (Sept.—Oct.1985).............................................................................13

CYS Contact Sheet (Aug. 8, 1991)...................................................................................14

CYS Contact Sheet (Aug. 8, 1991)...................................................................................15

CYS Contact Sheet (Aug. 8, 1991)...................................................................................16

CYS Contact Sheet (Oct. 1991).........................................................................................17

First Hospital Wyoming Valley Discharge Report (Oct. 31, 1991) ..................................18

Wilkes-Barre General Hospital Progress Record (Apr. 1992)..........................................19

Wilkes-Barre General Hospital Adolescent Psych. Unit Interdisciplinary Progress Record (Apr. 1992)......................................................................................................20

Wilkes-Barre General Hospital Discharge Face Sheet (June 6, 1993) ..........................................21

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Apr. 1992)..........22

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (Jan. 1993) ..........23

Wilkes-Barre General Hospital Adolescent Psychiatric Unit Nursing Record (June 1993) .........24

CRR Group Home Selection and Review (Sept. 22, 1993)..............................................................25

Psychological Consultation of Donald Fell (Apr. 12, 1994) ..........................................................26

Service Plan (Medical) (1994)........................................................................................................27

Service Plan (Medical – Dental) (1995) .......................................................................................28

CYS Contact Sheet (May 26, 1995) ...............................................................................................29

Intentionally Left Blank..................................................................................................................30

Rutland City Police Department Incident Table (Jan. 11, 1996)....................................................31

Rutland City Police Department Incident Table (Sept. 4, 1996) ....................................................32

Rutland City Police Department Incident Table (Nov. 6, 1996) .....................................................33

Rutland City Police Department Incident Table (Nov. 6, 1996) .....................................................34

Rutland City Police Department Incident Table (Mar. 4, 1997)......................................................35

Rutland City Police Department Incident Table (July 3, 1997).......................................................36

Rutland City Police Department Incident Table (Sept. 16, 1997) ..................................................37

Rutland City Police Department Incident Table (Jan. 14, 1998).....................................................38

Rutland City Police Department Incident Table (June 5, 1998).......................................................39

Rutland City Police Department Incident Table (July 28, 1998)......................................................40

Rutland City Police Department Incident Table (Apr. 30, 1999) .....................................................41

Rutland City Police Department Incident Table (May 26, 1999)......................................................42

Rutland City Police Department Incident Table (Oct. 30, 1999) ..................................................43

Rutland City Police Department Incident Table (Feb. 20, 2000) ..................................................44

Luzerne County Detention Center Admission Page (Sept. 10, 1996) ...........................................45

Sullivan County Sheriff's Department Criminal Complaint (Aug. 12, 2000)...............................46

New York State Incident Report and Arrest Report (Aug. 12, 2000)...........................................47

Sullivan County Sheriff's Department Statement of Donny McNeeley (Aug. 12, 2000) .............48

Sullivan County Sheriff's Department Statement Joshua Jones (Aug. 12, 2000) ........................49

New York State Incident Report (Aug. 12, 2000) ........................................................................50

Sullivan County Sheriff's Department Statement (Teri Fell) (Aug. 12, 2000) ............................51

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................52

Sullivan County Sheriff's Department Supporting Deposition (Aug. 12, 2000)..........................53

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................54

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................55

Sullivan County Sheriff's Department Handwritten Notes (Aug. 12, 2000)................................56

FBI FD-302 (Nov. 30, 2001 – Dec. 1, 2001) ..............................................................................57

Intentionally Left Blank...............................................................................................................58

Intentionally Left Blank...............................................................................................................59

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 1, 2000) .....................60

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................61

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) .....................62

New York State Police Investigation Report (Dec. 1, 2000).........................................................63

New York State Police Supporting Deposition (Dec. 2, 2000) ....................................................64

Autopsy Report of Teresca King (Dec. 2, 2000) .........................................................................65

Interview of Donald Fell at Johnson County Sheriff's Department (Dec. 2, 2000) ......................66

United States Marshals Service Prisoner Intake ...........................................................................67

New York State Police Supporting Deposition of Francis Bellantoni (Dec. 1, 2000)...................68

Warrant Information Network Subject Report (Dec. 15, 2000) .....................................................69

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
        (Dec. 22, 2000)  ...............................................................................................................70

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................71

Vermont Department of Corrections Inmate Disciplinary Report (Dec. 27, 2000) ......................72

NWSCF Facility Incident Report (Dec. 27, 2000) .......................................................................73

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
        (Dec. 28, 2000) ................................................................................................................74

Prison Medical Records of Donald Fell.........................................................................................75

2001 FBI Report ............................................................................................................................76

Vermont Department of Corrections Disciplinary Hearing Report (Dec. 27, 2000)....................77

FBI Report (Jan. 4, 2001) .............................................................................................................78

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
        (Jan. 8, 2001)....................................................................................................................79

Letter from Alex Bunin to A.U.S.A. Gregory Waples (Jan. 9, 2001) ..........................................80

FBI FD-192 (Jan. 22, 2001)..........................................................................................................81

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch
        (Jan. 24, 2001)..................................................................................................................82

Redacted E-mail (Mar. 15, 2001) .................................................................................................83

Letter from A.U.S.A Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht
        (Mar. 26, 2001) ................................................................................................................84

New York State Certificate of Disposition (Mar. 28, 2001).........................................................85

Letter from A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Patch (Apr. 5, 2001)...................................................................................................86

Memorandum from Cynthia Ayres to Dr. Mark Mills (Apr. 23, 2001).........................................87

Letter from Peggy Peterson, Luzerne County CYS.....................................................................88

Letter A.U.S.A. Gregory Waples to Alex Bunin, Gene Primomo, and John Pacht (Apr. 5, 2001)...................................................................................................90

Handwritten D Management Team Meeting Notes (Apr. 21, 2001) ............................................91

Vermont Department of Corrections Facility Report Form (June 13, 2001)................................92

Correctional Medical Services Interdisciplinary Progress Notes (July 2001) ..............................93

Pennsylvania State Police Central Repository Criminal History of Christopher Eike .................94

Handwritten D Management Team Meeting Notes (July 16, 2001)..............................................95

D Wing Activity Sheet................................................................................................................96

Redacted E-mail (Sept. 20, 2001) ..............................................................................................97

Redacted E-mail (Sept. 20, 2001)...............................................................................................98

Redacted E-mail (Sept. 20, 2001)...............................................................................................99

Redacted E-mail (Sept. 20, 2001).............................................................................................100

Redacted E-mail (Sept. 20, 2001).............................................................................................101

Vermont Department of Corrections Facility Report Form (Sept. 20, 2001).............................102

Redacted E-mail (Sept. 20, 2001).............................................................................................103

Handwritten note of Bobby Lee................................................................................................104

Handwritten note of Bobby Lee................................................................................................105

Individual Voir Dire (May 4, 2005)..........................................................................................106

Redacted E-mail (Sept. 25, 2001).............................................................................................107

Commonwealth of Pennsylvania Police Criminal Complaint against Christopher Eike (Nov. 7, 2001) ...................................................................................................108

Prison Health Records of Robert Lee ........................................................................109

Intentionally Left Blank.............................................................................................110

Intentionally Left Blank.............................................................................................111

Vermont Department of Corrections Incident Report (Mar. 17, 2004) ....................112

Intentionally Left Blank.............................................................................................113

FOIA 302 (Apr. 6, 2005) ..........................................................................................114

Letter to Judge Sessions from A. Bunin (Apr. 27, 2005) .........................................115

Sealed Document Order, Case No.:2:01-CR-12 (Apr. 28, 2005) ..............................116

Jury Instructions........................................................................................................117

Intentionally Left Blank.............................................................................................118

FOIA 302 (May 9, 2005) ..........................................................................................119

Intentionally Left Blank.............................................................................................120

Intentionally Left Blank.............................................................................................121

Letter from William B. Darrow and Stephen Kelly to Alexander Bunin, Gene Primomo, and Paul Volk..........................................................................................................................122

Blank Juror Questionnaire ........................................................................................123

Juror No. 26 Questionnaire (May 13, 2005) .............................................................124

Juror No. 162 Questionnaire (May 23, 2005)............................................................125

Intentionally Left Blank.............................................................................................126

Intentionally Left Blank.............................................................................................127

FBI Report (June 14, 2005) ......................................................................................128

FBI 302 Report of Interview with Christopher Eike (June 15, 2005) .......................129

United States' Trial Memorandum, United States v. Donald Fell ...............................................130

Letter to Judge Sessions from David V. Kirby (June 29, 2005) ..................................................131

FBI 302 Report of Interview with [Redacted] (July 5, 2005) ....................................................132

FedEx Air Bill from Town of Bethel Justice Court to Andrew Bartnick (July 6th, 2006)..........133

Letter to Judge Sessions from Alex Bunin (July 8, 2005) ..........................................................134

Stipulation (July 8, 2005).............................................................................................................135

Intentionally Left Blank...............................................................................................................136

Memorandum to Alex Bunin from Paul Volk (July 20, 2005).....................................................137

Donald Fell's Motions for Judgment of Acquittal and New Trial, United States v. Donald Fell
    (Aug. 26, 2005) ......................................................................................................................138

Affidavit of Richard Wetzel, Ph. D (Sept., 12, 2005).................................................................139

Appeal from the United States District Court for the District of Vermont, Brief of the United
    States, United States v. Donald Fell (May 25th, 2007) .........................................................140

Letter to Victims Resource Center from Wanda Rivera (Apr. 21, 2005) ....................................141

Letter from Victims Resource Center to Andrew Bartnick (May 4, 2005) .................................142

School Heath Record of Donald Fell ...........................................................................................143

Intentionally Left Blank...............................................................................................................144

Wilkes-Barre General Hospital Progress Record of Donald Fell (June 1993) ...........................145

Raymond Kotzer and Theresa Kotzer Divorce Records (Oct. 22, 1967) ...................................146

Arrest Warrant Affidavit for Donald Fell, Sr. (Mar. 4, 1990) ....................................................147

CYS Contact Sheet (Apr. – May 1990) .......................................................................................148

Jenkins Township Incident Report (Apr. 21, 1990).....................................................................149

CYS Contact Sheet (June 1990) ..................................................................................................150

Service Planning/Family Functioning Report (June 1990)..........................................................151

CYS Contact Sheet (Nov. 28, 1990)............................................................................................152

CYS Contact Sheet (Jan. 14, 1991) ............................................................................................153

CYS Contact Sheet (Feb. 14, 1991)............................................................................................154

Intentionally Left Blank...............................................................................................................155

Intentionally Left Blank...............................................................................................................156

CYS Contact Sheet (Mar. 19, 1991) ...........................................................................................157

Suspected Child Abuse Referral Note (Apr. 18, 1993) ..............................................................158

CYS Contact Sheet (May 1, 1991) ..............................................................................................159

CYS Contact Sheet (May 2, 1991) ..............................................................................................160

CYS Contact Sheet (June 4, 1991) ..............................................................................................161

CYS Contact Sheet (June 24, 1991) ............................................................................................162

CYS Contact Sheet (July 8, 1991) ..............................................................................................163

CYS Contact Sheet (Dec. 20, 1991) ...........................................................................................164

CYS Contact Sheet (Dec. 23, 1991) ...........................................................................................165

CYS Contact Sheet (Jan. 13, 1992) .............................................................................................166

CYS Contact Sheet (Mar. 3, 1992) .............................................................................................167

CYS Contact Sheet (Apr. 20, 1992)............................................................................................168

Intentionally Left Blank...............................................................................................................169

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (1993) .....................170

CYS Client Information Profile (Apr. 18, 1993) ........................................................................171

CYS Contact Sheet (Apr. 20, 1993)............................................................................................172

Police Report (Jan. 26, 2001)......................................................................................................173

Intentionally Left Blank...............................................................................................................174

Wilkes-Barre General Hospital Adolescent Psych. Unit Progress Record (June 8, 1993)..........175

Office of the Sheriff, Luzerne County (Aug. 31, 1993)...............................................................176

CYS Client Information Profile (Jan. 19, 1994) ........................................................................177

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................178

CYS Contact Sheet (Jan. 24, 1994) ...........................................................................................179

CYS Contact Sheet (Feb. 4, 1993).............................................................................................180

CYS Contact Sheet (Mar. 10, 1994) ..........................................................................................181

CYS Contact Sheet (Mar. 24, 1994) ..........................................................................................182

CYS Contact Sheet (Apr. 7, 1994).............................................................................................183

CYS Contact Sheet (Apr. 12, 1994)...........................................................................................184

CYS Contact Sheet (Apr. 12, 1994)...........................................................................................185

St. Michael's School Psychiatric Note (May 1994)....................................................................186

St. Michael's School Psycho Social Summary (Apr. 1994) ........................................................187

FBI Identification Record for Debra Fell (June 9, 1994).............................................................188

Wilkes-Barre Police Department Jailer's Report (Oc. 18, 1994) ...............................................189

Arrest Report for John Rhodes (Oct. 18, 1994) .........................................................................190

Citation for John Rhodes (Oct. 18, 1994) .................................................................................191

Wilkes-Barre Police Special Report for John Rhodes (Oct. 18, 1994).......................................192

Risk /Severity Assessment Form (Oct. 26, 1994)......................................................................193

Arrest Report for John Rhodes (Jan. 12, 1995) .........................................................................194

Arrest Warrant for John Rhodes (Feb. 9, 1994).........................................................................195

Arrest Warrant for John Rhodes (Jan. 12, 1995) .......................................................................196

CYS Contact Sheet (Jul. 1995) .................................................................................................197

Substance Abuse Evaluation for Donald Fell (Sept. 16, 1996) ...................................................198

Affidavits Submitted in Motion in Limine in United States v. Haynes (May 24, 2000).............199

Letter to Judge Niedermeier (Dec. 5, 2000) ...................................................200

Letter to Charles Tetzlaff (Dec. 5, 2000).....................................................201

Letter to Judge Murtha (Dec. 11, 2000)........................................................202

Rutland Herald Article (May 13, 2002)........................................................203

Burlington Free Press Article (May 15, 2002)................................................204

Donald Fell's Objections to Punishment-Related Questions (Jun. 10, 2002)............................205

Declaration of Thomas V. Ryan ...............................................................206

Letter to David Kirby (Feb. 23, 2005) .......................................................207

Letter to Judge Sessions (Jun. 29, 2005).....................................................208

Special Verdict Form (Jul. 14, 2005).........................................................209

Criminal History Record of Deborah Fell (Apr. 10, 1996) .....................................210

Rutland City Police Department Incident Report (1996) .......................................211

Rutland City Police Department Report (1994-2000) ...........................................212

New York State Police Investigation Report (Dec. 1, 2000)....................................213

Criminal Docket for Christopher Eike (Oct. 8, 2002) .........................................214

Government Opposition to Motion (Jul. 10, 2002)..............................................215

FBI Record (Apr. 25, 2005)...................................................................216

Donald Fell Event Table (Apr. 30, 2005) .....................................................217

FBI Record (May 11, 2005)....................................................................218

FBI Record (May 16, 2005)....................................................................219

FBI Record (Jun. 9, 2005)....................................................................220

FBI Record (Jun. 6, 2005)..........................................................................................221

Adolescent Psychiatric Reports for Donald Fell (1993) ............................................222

Bail Certificate (Mar. 4, 1997)...................................................................................223

CYS Contact Sheet (May 20, 1992) ...........................................................................224

FBI Record (Jun. 27, 2005).........................................................................................225

FBI Record (Jun. 9, 2005)...........................................................................................226

Statement by Teri Fell to Sullivan County Sheriff (Aug. 12, 2000)...........................227

Deposition of Lance Rowland (Aug. 12, 2000)...........................................................228

Certificate of Disposition (Aug. 16, 2000) .................................................................229

Individual Voir Dire (Jun. 1, 2005) ............................................................................230

Police Report (Nov. 1, 2002) ......................................................................................231

Wilkes-Barre Times Leader Article (Oct. 5, 2004) ....................................................232

Law and Human Behavior Article (1991) ...................................................................233

Specialty Guidelines for Forensic Psychology ...........................................................234

United States v. Fell Court Order (Apr. 7, 2005).........................................................235

Transcript Excerpt (May 13, 2005)..............................................................................236

Intentionally Left Blank...............................................................................................237

Fell Motion to Dismiss Notice of Intent to Seek Death Penalty .................................238

Declaration of Juror 23 ................................................................................................239

Conviction Record of Juror 26 (Apr. 2, 1996).............................................................240

Declaration of Juror 143 ..............................................................................................241

Declaration of Sally Fell Francis .................................................................................242

Declaration of Ronald Cupano......................................................................................243

Declaration of Rose O'Hop ........................................................................................244

Declaration of Claudia Bublo ....................................................................................245

Trial Transcript Excerpt (May 13, 2005) ...................................................................246

Declaration of Robert Fell .........................................................................................247

Declaration of Dorothy Grivner..................................................................................248

Declaration of John Timek..........................................................................................249

Declaration of Florence Wallace ................................................................................250

Declaration of John Gacek..........................................................................................251

Declaration of Adele Gacek .......................................................................................252

Declaration of Ernie Schuldaski .................................................................................253

Declaration of Jon Migatulski......................................................................................254

Declaration of Steve Ratte ..........................................................................................255

Declaration of Marc Pelkey ........................................................................................256

Voir Dire Transcript.....................................................................................................257

Declaration of Richard T. Callery, M.D., F.C.A.P. ....................................................258

Intentionally Left Blank...............................................................................................259

Declaration of Mark J. Mills, J.D., M.D. ...................................................................260

Intentionally Left Blank...............................................................................................261

Declaration of Andrew Bartnick..................................................................................262

Declaration of Gene Primomo .....................................................................................263

Declaration of Alexander Bunin ..................................................................................264

Declaration of Cynthia Ayres .....................................................................................265

Declaration of Sandra Shum ........................................................................................266

Declaration of Deborah Wisell ..................................................................................................267

Declaration of Anthony Mistretta ..............................................................................................268

Declaration of Dora Carter.........................................................................................................269

Declaration of Jeff Van Buren ...................................................................................................270

Declaration of Pat Johnson ........................................................................................................271

Declaration of Mary Bell ...........................................................................................................272

Transcript of Juvenile Proceedings (Apr. 8, 1994) ...................................................................296

Childline Record (Apr. 22, 1991) ..............................................................................................297

Officers Report...........................................................................................................................298

Prison Record (Jun. 11, 2001).....................................................................................................299

Declaration of Michael Sikirica.................................................................................................300

Declaration of Francis Bellantoni ..............................................................................................301

Declaration of Lucinda Fruean ..................................................................................................302

Declaration of Michael Leight ...................................................................................................303

Declaration of Paul Stoss............................................................................................................304

Declaration of Paul Volk ...........................................................................................................305

Declaration of Charles Wetli ......................................................................................................306

Birth Certificate of Theresa Kozersky (Aug. 9, 1935)...............................................................307

Death Certificate of Frances Kozerski (Apr. 20, 2001) ............................................................308

Declaration of John Edens .........................................................................................................309

Government Motion in Limine to Exclude Report (Jul. 6, 2005)...............................................310

Individual Voir Dire Excerpt (Jun. 6, 2005)..............................................................................311

Photographs of Fell Home ..........................................................................................................312

Declaration of Jamie Dominick ................................................................313

## SEALED EXHIBITS

15

# EXHIBIT 115

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

Albany - Main Office
39 North Pearl Street
5ᵀᴴ FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

Syracuse - Branch Office
4 Clinton Exchange
3ᴿᴰ FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

Burlington - Branch Office
P.O. Box 1112
BURLINGTON, VT 05402-1112
(802)951-6472
(802)951-6282 FAX

Respond to Albany Office

April 27, 2005

EX PARTE & SEALED

Honorable William K. Sessions
United States Chief District Judge
11 Elmwood Street
Burlington, Vermont 05401

       **Re:**   **USA v. Donald Fell**
              **Case No.: 2:01-CR-12**

Dear Judge Sessions:

Enclosed please find a proposed order with regards to obtaining records from the Luzern County Children and Youth Services. This agency is required by state law not to disseminate its records without a Court order.

It is anticipated that these documents may be utilized during the penalty phase, if any, in the above-reference trial, and may be discoverable to the government at that time. It is anticipated that the records may contain sensitive information involving Mr. Fell's treatment and counseling when he was a minor and therefore, the defense we are making this request ex parte and moves that the Order be sealed.

Respectfully submitted,

ALEX BUNIN
FEDERAL PUBLIC DEFENDER
Gene V. Primomo
Assistant Federal Public Defender

GVP/ls

enc.

cc:    Paul Volk, Esq.

FELL-00001342

# EXHIBIT 116

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF VERMONT

UNITED STATES OF AMERICA

v.                                          Case No.: 2:01-CR-12

DONALD FELL

**ORDER**

SEALED DOCUMENT

NOW, this 28 day of April, 2005, at 10:00 o'clock a.m., following a Court Review, Luzerne County Children and Youth Services is directed to provide a copy of its investigative file from 1982 to 1998 regarding the minor child, Donald Fell, DOB 4/30/1980 to Alex Bunin, Gene Primomo and Paul Volk, attorneys for Donald Fell. Referral sources, anyone who cooperated in any investigation, any reports originating from other agencies, medical records, confidential information concerning the foster home and foster parents, and any statements made by Donald Fell to his/her therapist shall not be released. A list of all of the documents not released shall be provided to defense counsel. These records shall be used for Court purposes only and shall not be released by the parties or counsel to any other person or entity. These records in their entirely shall be returned to Luzerne County Children and Youth Services following final disposition of this case.

BY THE COURT,

Honorable William K. Sessions, III
United States Chief District Judge

# EXHIBIT 117

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA             :
                                     :
              v.                     :        2:01-CR-12-01
                                     :
DONALD FELL                          :
                                     :

JURY INSTRUCTIONS

Good Morning, Ladies and Gentlemen.  I want to welcome you to this proceeding of the United States District Court for the District of Vermont and thank you for coming here today.  My name is William K. Sessions III and I am the chief judge of the United States District Court for the District of Vermont.

I will be presiding over the case of United States v. Donald Fell.  I will be discussing this case briefly with you in a moment.

Before I get into the case, however, there are a couple of preliminary points that I want to make to you.  First, I want to repeat my thanks for your being here today.  The jury is central to the administration of justice under our American system of law.  The obligation of every citizen to appear and to participate on a jury is one of the few responsibilities of citizenship specifically mentioned in our Constitution.  In a very real sense your presence today and your participation in this jury selection process is part of a long and honored

1

FELL-00001344

tradition involving hundreds of thousands of Americans over the years.

At the same time, I want you to know that I recognize, and all of us at the court recognize, that, for some of you at least, your appearance here today is an inconvenience. The jury selection can be tedious and jury service does disrupt the jurors' daily lives. We will be doing everything we can at the Federal Court to make sure that the process runs as smoothly and efficiently as possible. Nevertheless, I do want to recognize that what is probably obvious to everyone, that it may for some of you be a bit of a pain to be here this morning.

You perhaps noticed that I said the obligation to serve as a juror falls on everyone. Recognizing that jury service is a duty of citizenship, and also something of an inconvenience, I hope that you will also come to find, if you serve as a juror, or even as you go through this jury selection process, that the experience is valuable, worthwhile and perhaps even inspiring. It is relatively rare that citizens gather to work together on something as important as a jury trial. I make it a practice after every trial to speak privately with the jury. I do not make any inquiry with regard to the substance of the jury's deliberations, which I consider to be sacred, but I do ask the jurors generally about their experience and if there is anything the court could have done to make that experience more convenient

2

FELL-00001345

or more interesting. I am told unanimously that jurors find their experience to be worthwhile and interesting, though at times difficult. I hope you will find the same if you come to serve on a jury in federal court.

Let me tell you something about the time involved this morning, and give you some information about the case that we will be addressing.

First, as to this morning. Once I finish these preliminary remarks, a questionnaire will be distributed to you. As you fill it out, please do not discuss the questions or your answers with anyone else in the room. Also, please remember that there are no right or wrong answers to the questions contained in the form. All we ask is that you answer the questions truthfully to the best of your ability. The questionnaires are not designed to pry into personal matters unnecessarily. By filling out the questionnaires, you will make the jury selection process move more efficiently and smoothly.

Returning again to this morning's proceedings, once you have filled out the questionnaire and given it to our clerk staff by the main door, you will be free to leave. The questionnaires will be photocopied and reviewed by the attorneys working on this case. No other person will be permitted to look at the questionnaires, and they will be maintained under seal for review only by the court and the lawyers connected with this case. In

3

FELL-00001346

other words, the questionnaires will be confidential.  They will not be disclosed to the public generally and will be reviewed only by court personnel, the attorneys and their staff.

The formal process of jury selection will begin on Wednesday, May 4, as groups of 15 to 30 jurors are called in daily for discussion about their ability to serve.  Because this is only a preliminary proceeding, and to avoid unnecessary complications, I have requested that neither Government witnesses, nor defense witnesses, nor the defendant himself be present here today.  The attorneys have agreed to this.  I have tentatively planned to begin the trial during the week of July 5th.  Once the trial begins, we will be sitting from 8:00 a.m. to 2:30 p.m. daily, with occasional breaks.  The trial is expected to last through the month of July.  As you can see, this is a relatively long case, but we will all do our best to try to complete it in a shorter period if possible.

Once again, I do want to stress also that I am not insensitive to the disruption jury service on this case could work on your daily lives and routines.  But I do ask you to keep uppermost in your minds the important goals that this process, and ultimately the jury itself, serves.  You will be given the opportunity to inform the court if service in such a lengthy trial will work an exceptional hardship on you.

It is important that the men and women who are selected as

4

FELL-00001347

jurors in this case be confident that they can hear the evidence offered at trial and render their verdict fairly and impartially. I will be using the terms "fairly and impartially" at times during the jury selection process. Let me explain to you what I mean, to serve "fairly and impartially" means to base any verdict in the case on the evidence presented in this courtroom and not on anything that you may have heard or read or experienced outside the courtroom. The purpose of this procedure we are about to go through is to try to insure the fairness and impartiality to both sides in this case.

In a minute, I am going to summarize the charges in this case, and the possible structure of the trial. Please keep in mind that I do this only so that you can understand what the case will be about. The charges against the defendant Donald Fell are not evidence in any way. As we begin the trial, the defendant, like all defendants, is presumed innocent. This is not merely a technicality. The defendant at the beginning of a trial is to be presumed innocent, in the same way that any other individual in this room - - you, me or anyone else - - would be presumed innocent. He cannot be found guilty of anything unless the Government proves him guilty beyond a reasonable doubt using evidence properly presented in the courtroom. You should not assume in any way that by describing the charges against the defendant here, I am suggesting that the defendant is guilty.

5

FELL-00001348

The burden is on the Government at the trial to prove the defendant guilty beyond a reasonable doubt before he can be found guilty of anything.

The Government has brought four charges against the defendant. The first charge:

**Count 1:  On or about November 27, 2000, in the District of Vermont, the defendant DONALD FELL, with intent to cause death and serious bodily harm, took by force and violence and by intimidation from the person and presence of Teresca King a 1996 Plymouth Neon automobile, a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, and the death of Teresca King resulted from such taking of the automobile.**

**Count 2:  On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL unlawfully seized, kidnapped, abducted and carried away Teresca King and held her for ransom, reward and otherwise, and willfully transported her, while she was alive, in interstate commerce from the State of Vermont to the State of New York, resulting in the death of Teresca King.**

**Count 3:  On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL knowingly possessed and brandished a firearm, specifically a Mossberg 12-**

FELL-00001349

gauge shotgun, in furtherance of crimes of violence for which they may be prosecuted in a court of the United States, namely, carjacking and kidnapping, in violation of 18 U.S.C. §§ 2119 and 1201.

**Count 4:** On or about and between November 27, 2000 and November 30, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL, who was a fugitive from justice, transported a firearm, to wit, a Mossberg 12-gauge shotgun, in interstate commerce between the State of Vermont and the States of Arkansas.

Having summarized the charges, it is important for me to emphasize again that these are only charges and no more.  Charges are not evidence.  The defendant has denied any involvement in the crimes charged against him and he is presumed innocent.  He may be found guilty only if the Government proves him guilty beyond a reasonable doubt by proper evidence offered to the jury.

I want to say something more about two of the charges brought against the defendant.  Counts 1 and 2 carry a possible sentence of death.  Counts 1 and 2 charge Fell with carjacking and kidnapping, both with death resulting

Such a charge is often referred to as "capital offense." The Government has advised both this court and Mr. Fell that, if he is found guilty by a jury of any one of these two counts, it will ask the jury to impose the death penalty.

7

Some of you may wonder how the Government can ask for a sentence of death given that the State of Vermont does not have the death penalty. The simple answer is that the two counts brought against Mr. Fell involve a federal, not state, crime, and that Congress, our national legislature, has provided for death as a possible penalty for this offense.

The most serious and difficult decision any jury can be asked to make is whether the death penalty should be imposed in a particular case. When we begin the further process of jury selection this week, with small groups of jurors coming to court every day, I will be asking the potential jurors individually about this subject. It may be useful for me to explain to you briefly how the death penalty statute at issue in this case works, so that you can begin to think about this subject with some care before I begin questioning you, and as you prepare to answer the questionnaire.

Because of the capital charges, the trial of this case will potentially involve two stages. During the initial stage, the jury's sole task will be to determine whether the Government has proved Mr. Fell guilty beyond a reasonable doubt of the charges brought against him. During this initial stage of the trial, the possibility of punishment may not enter into your deliberations at all. Indeed, as to all the charges with the exception of the two counts I mentioned, the issue of any possible sentence in a

8

case such as this would be for the court alone to consider. Except in capital cases, juries bear only the responsibility of deciding whether the Government has proved its case. Thus, if the jury should be determine that the Government has not carried its burden of proving the defendant guilty beyond a reasonable doubt with regard to any of the two charges, then the jury's responsibility will be completed. If the jury concludes that the Government has carried its burden of proving the defendant guilty beyond a reasonable doubt on any of the other charges, then the court will have the responsibility of determining the sentence, which would not include capital punishment.

On the other hand, if, at the conclusion of the first stage, the jury reports that it does find Mr. Fell guilty beyond a reasonable doubt of at least one of the two counts for which the death penalty may be imposed, we would proceed to a second stage, a sentencing hearing addressing whether the death penalty should be imposed.

During that further hearing, the Government would have the opportunity to introduce evidence as to certain things referred to in the law as "aggravating factors." Aggravating factors would be circumstances that make the offenses alleged particularly serious and, therefore, in the Government's view, tend to favor the imposition of the death penalty. Mr. Fell would have the opportunity at such a hearing to demonstrate to

9

you the existence of what are referred to as "mitigating factors." Mitigating factors are circumstances about the crime, or about Mr. Fell's background or character, that would suggest that the death penalty in not appropriate in this case.

Before a jury could vote to impose a death penalty, it would have to be unanimously persuaded that certain threshold factors that I would identify for you in my instructions had been proven beyond a reasonable doubt. Further, before a jury could vote to impose a death penalty, it would have to be unanimously persuaded that aggravating factors outweigh mitigating factors that one or more jurors found existed. Even if the jury did not find any mitigating factors in a given case, it would still have to be unanimously persuaded that the aggravating factors were themselves sufficient to justify a death sentence. Absent such unanimous agreement a jury could not vote to impose death upon the defendant. This decision whether or not to impose the death penalty is left exclusively to you, the jury. If you determine that the defendant should be sentenced to death, or to life imprisonment without possibility of release, the court is required to impose that sentence.

Obviously what I have just stated is only an overview of the law applicable to a jury's consideration of the death penalty. If this case were ever to require a sentencing hearing - - and I am by no means suggesting it will because I emphasize again Mr.

10

Fell, as he begins this trial, is presumed innocent under the law of the charges brought against him - - I would instruct the jury in much more detail about its duties.

I go over the law in this regard only to help you begin to think about the issues. During the jury selection process, I will be asking you whether you can fairly and impartially consider the death penalty should this case require a sentencing hearing. Specifically, I will be asking each of you whether, as a matter of moral or religious or philosophical or personal beliefs, you think you could ever vote to impose the death penalty under any circumstances. I will also be asking you a reverse type question: whether you think you would vote to impose the death penalty in any case in which intentional murder was proved, or in which intentional multiple murders were proved, without giving consideration to mitigating factors that might be presented.

There are no right or wrong answers to these questions. I will be asking them simply because, if this case goes to a sentencing hearing, both sides of the case are entitled to a jury that does not have its mind made up, one way or another, about the death penalty issue before the hearing begins.

Now, Ladies and Gentlemen, although you have only heard briefly about this case this morning and, indeed, have heard no evidence yet, it is extremely important that you do not discuss

11

FELL-00001354

this case with anyone.  This is because a jury's verdict must be free from outside influence.  So, I am ordering each and every one of you not to discuss this case with family, friends or any other persons from this point on until I either excuse you, or if you are selected as a juror, until the case concludes.  You may discuss the schedule with your family and employers, because they are entitled to know when you might not be available.  However, you are not to discuss anything else about this case, not even the nature of the case, whether it is civil or criminal, the names of the parties, or anything else, with anyone until you are either excused, or until the trial concludes.  In giving you this instruction I include the order that you are not to discuss the case amongst yourselves.

I have one other point to make before I let you begin the questionnaires.  It is possible this case will receive some coverage in the media.  Please do not read, look at, or listen to any reports about this case until you are either excused, or if you are selected as a juror, until the case concludes.  If you should by chance encounter a news story in the newspaper, on the radio, on television, or on the internet, please just turn the page, change the channel, or close the screen.  Do not read, listen to or watch anything related to this case.

To recap the schedule, once you have complete the questionnaire, please turn it in to one of the court staff.

12

Kathy will tell you when you need to return to the court for individual interviews. Then you will be free to leave. Remember not to discuss the answers with anyone else. Remember also that there are no right or wrong answers to any of the questions. We are only asking that you answer truthfully and to the best of your ability. The answers to these questions will be used by the court and the attorneys solely for the selection of the jury in this case and for no other reason. The confidentiality of these answers will be maintained by the court. Please do write or print clearly. If you cannot answer a question because you do not understand it, write "Do not understand" in the margin next to the question. If you cannot answer the question because you do not know write "Do not know." If you want to explain your answer, do so either in the space provided on the questionnaire, or on one of the sheets appended to the questionnaire. Please write the number of the question, if you use one of the blank sheets. If for any reason you do not wish to answer any particular question, please write the word "Private" in the margin next to the question and we will take this matter up with you privately, if necessary.

Because your answers are part of the jury selection process and become part of the record of this court, the answers must be truthful under the penalty of perjury, and you must sign the questionnaire at the end.

13

Let me conclude as I began, by thanking you for being here this morning and taking part in this questionnaire.  We will now distribute the questionnaire.

14

FELL-00001357

# EXHIBIT 118

# INTENTIONALLY LEFT BLANK

FELL-00001358

# EXHIBIT 119

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/10/2005

b6
b7C

White male, Date of Birth,
Social Security Account Number:                    cell phone
number:            home phone number:            was
interviewed at his
                                                where he is employed as a
                        stated that he resides at
                After being advised of the official identity of the
interviewing agent and nature of the interview,        provided the
following information:

        advised that he first became acquainted with
DONALD FELL in approximately 1986 when        and FELL were five
years of age.        explained that the FELL family resided in a
double block home on Bennett Street, Kingston, PA.
grandparents resided in the other side of the double block and
owned the building. The FELL family paid monthly rent to his
                stated that the FELL family consisted of DONALD
FELL, DONALD's mother; DEBRA, his father;        and
                stated that        as just a baby when he knew
DONALD.        described DONALD FELL as his first childhood friend.
        stated that he would play with DONALD on almost a daily
basis from age 5 - 9.        visited his grandparents each day and
made it a point to see DONALD.        stated that DEBRA FELL taught
him to ride a bicycle.

        recalled that DEBRA and        argued a great
deal. Even as a child,        could tell that DONALD's parents
consumed beer a lot.        never recalled seeing the police at
their home for any domestic reasons.        stated that he never
attended the same school as DONALD FELL because he did not live in
the same neighborhood.        stated that when he was ten years of
age and in the fourth grade, he attended school in Greece. His        b6
father's side of the family still resides in Greece.        advised    b7C
that as a child, he often vacationed in Greece during the summer
months. When he was ten years old, his vacation in Greece was
extended, therefore, it was decided by his parents, that he spend
the entire school year in Greece. Right before he departed for
Greece was the last time he saw DONALD FELL.

        described FELL as a normal child who enjoyed            b6
riding his bike and playing board games. They would occasionally    b7C

7A-AL-44453-302
-78

Investigation on    05/09/2005    at Kingston, Pennsylvania

File #  7A-AL-44453  (SRA) -302 - 78                Date dictated  05/10/2005

by   SA                        jg      b6
                                       b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-AL-44453 (SRA)

Continuation of FD-302 of _____, On 05/09/2005, Page __2__

spend time together at a local playground located on Church Street in Kingston, PA. [          ] stated that he never observed FELL act in a violent manner during the four years that he knew him. [          ] stated that he heard about FELL'S parents being engaged in a stabbing at their residence that occurred in approximately 1985, however, he heard about this incident when he was much older and did not recall the incident when it happened.

b6
b7C

# EXHIBIT 120

# INTENTIONALLY LEFT BLANK

FELL-00001361

# EXHIBIT 121

# INTENTIONALLY LEFT BLANK

FELL-00001362

# EXHIBIT 122

**U.S. Department of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                                        *(802) 951-6725*
*Burlington, Vermont 05402-0570*                            *Fax  (802) 951-6540*
May 18, 2005

**By Hand**:

Alexander Bunin, Esq.
Gene Primomo, Esq.
Office of the Federal Public Defener
39 North Pearl Street
Albany, NY 12207

Paul S. Volk, Esq.
Blodgett, Watts & Volk
P. O. Box 8
Burlington, VT 05402-0008

        Re:    United States v. Donald Fell
               Criminal No. 2:01-CR-12

Dear Messrs. Bunin, Primomo, and Volk:

        Please find enclosed copies of the defendant's prison file from the Northwest
Correctional Facility in St. Albans, Vermont.  The United States may offer records from this file
and/or call witnesses to incidents described in these records as part of our rebuttal case in the
sentencing phase of the trial.  Also, please be advised that the United States is seeking additional
materials from the Northwest Correctional Facility for its rebuttal case, which will be made
available to you upon receipt.

        If you have any questions concerning this matter, please contact me directly at (802) 951-
6725.

                        Sincerely,

                        DAVID V. KIRBY
                        United States Attorney

        By:

                        WILLIAM B. DARROW
                        STEPHEN D. KELLY
                        Assistant U.S. Attorneys

FELL-00001363

# EXHIBIT 123

## UNITED STATES v. DONALD FELL
### 2:01 CR 12-01

Juror No.

FELL-00001364

20

(d) If you answered "YES" to (a) or (b) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

YES _____ NO _____

IF YES, please explain _____

_____

_____

44.    Have you or any close friend or relative, ever been treated for a substance abuse problem?


IF YES, please explain _____

_____

_____

As a result of that problem, did you or your close friend or relative have any contact with the Criminal Justice system?

_____

_____

_____


45.    This case is being prosecuted by the United States Attorney's Office for the District of Vermont. The United States Attorney for this District is David V. Kirby. Do you or does any relative or friend know or have any connection with David V. Kirby or anyone associated with the office?


IF YES, please explain _____

_____

_____

# EXHIBIT 124

## UNITED STATES v. DONALD FELL
### 2:01 CR 12-01

Juror No. 26

5/13/05
9am

FELL-00001366

19

(d) If you answered "yes" to (a), (b) or (c) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

YES _____ NO _____

IF NO, please explain_____

_____

_____

43.    (a)  Have you or has a family member or close friend ever been involved in or been the target of a criminal investigation?

YES _____       NO ___✓_____

IF YES, please explain _____

_____

_____

(b) Have you or has a family member or close friend ever been charged with a crime?

YES _____       NO ___✓_____

IF YES, what was the result of that prosecution?

_____

_____

(c) If you answered "YES" to (a) or (b) above, was the individual who was investigated or charged treated fairly by the criminal justice system?

YES _____ NO _____

IF NO, please explain _____

_____

Juror # 26

FELL-00001367

# EXHIBIT 125

UNITED STATES v.  DONALD FELL
2:01 CR 12-01

Juror No. _/62_____

5/23/05
1pm

FELL-00001368

16

IF YES, please explain.

_____

_____

_____

38.   (a) Have you or has a family member or close friend ever been a witness to or the victim of a crime?

YES _____      NO __✓__

IF YES, please explain _____

_____

(b) Did you or your family member or close friend report that crime to the police or other law enforcement agency?

_____

(c) Did law enforcement personnel respond to the report appropriately?

_____

(d) Were you, or was your family member or friend, called to testify?

_____

(e) Is there anything about this experience which would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?

YES _____      NO _____

IF YES, please explain _____

_____

Juror # _162_

FELL-00001369

# EXHIBIT 126

# INTENTIONALLY LEFT BLANK

FELL-00001370

# EXHIBIT 127

# INTENTIONALLY LEFT BLANK

FELL-00001371

# EXHIBIT 128

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** PRIORITY

**Date:** 06/14/2005

**To:** Philadelphia

**Attn:** Williamsport RA:
SA

**From:** Albany
Vermont - Rutland RA
Contact: SA                      (802-

**Approved By:**

**Drafted By:**

b6
b7C
b2

**Case ID #:** 7A-AL-44453     (Pending)

**Title:** ROBERT JOSEPH LEE, JR. (DECEASED);
DONALD FELL;
TERESCA KING - VICTIM (DECEASED);
11/27/2000;
KIDNAPPING/CARJACKING

**Synopsis:** To set lead for interview of

b6
b7C

**Administrative:** Reference telcal between SA
and SA                       on 06/14/2005.

**Details:** Captioned kidnapping/carjacking (death resulting) case
is scheduled to go to trial, in Burlington, Vermont, on
06/20/2005. Subject Donald Fell is facing the death penalty. (The
other subject, Robert Lee, Jr., "accidently" killed himself in
jail in September 2001.) During captioned investigaiton, it was
learned that both subjects, Fell and Lee,

b6
b7C
b7D

The manner to which King was killed by Fell and Lee was

Background of captioned case as well as
additional information regarding                       Fell and
Lee, is listed below.

**Background of Case:** On 11/27/2000, the Vermont State Police, in
Rutland, Vermont, initiated an investigation into the mysterious
disappearance of Teresca Ruth King, aka Terry King, of Clarendon,

7A-AL-44453
-186

b6
b7C

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

Vermont.  King had last been seen at the drive-up window of the
Dunkin Donuts, Main Street, Rutland, Vermont at approximately
3:30 a.m. on 11/27/2000, while on her way to work (4am-8am shift)
at the Price Chopper grocery store.  According to records at the    b6
Price Chopper, King did not report to work that morning. [        ]  b7C
[        ] became concerned when he returned
home from work at approximately 5:30 p.m. and did not find King
at home.  King's normal routine was to return home from work by
8:00 a.m. and then spend the day with her daughter and
grandchildren. The Vermont State Police then entered Teresca King
and her vehicle into NCIC as missing.

        On 11/30/2000, the Clarksville, Arkansas Police
Department stopped a vehicle matching the description of King's
Dodge Neon pursuant to a motor vehicle violation.  The vehicle
was missing the registered Vermont license plate and was instead
displaying Pennsylvania license plate BAY8383 which had been
reported stolen from Wilkes-Barre, Pennsylvania on 11/30/00.  The
vehicle was being driven by Lee while Fell was in the driver's
passenger seat.  The registration for the vehicle revealed the
vehicle belonged to Teresca and [              ] of North Clarendon,   b6
Vermont.  The Clarksville Police Officer subsequently arrested       b7C
Lee and Fell on traffic charges and misdemeanor drug charges.
After Fell was arrested and placed into the patrol car, he
attempted to escape by kicking the car's window out.

        Additional investigation by the Clarksville Police
Department led to the discovery of pieces of clothing which
matched the last known clothing that Teresca King was wearing at
the time of her disappearance.  Also uncovered was a Mossberg
shotgun.  The Clarksville Police Department then contacted the
Vermont State Police after running the vehicle through the NCIC
system.

        The Vermont State Police immediately contacted the
Rutland, Vermont Resident Agency and requested the FBI's
assistance with this investigation.  The Albany Division then
initiated a kidnapping investigation with regards to the
disappearance of Teresca King. The Albany Division then requested
the Little Rock Division to have the subjects interviewed at the
conclusion of a background check on the subjects in the Vermont
and Pennsylvania areas.

        That same day, at approximately 6:30 p.m., the FBI
directed officers from the Rutland Police Department to the
residence of Debra Fell, Donald Fell's mother, at 135 Robbins
Street, Rutland, Vermont.  Upon their arrival the officers
observed two individuals in the front living room area who
appeared to have been murdered.  FBI Special Agents and Rutland
Police Detectives responded to the scene.  Further investigation

2

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

into the apartment revealed a white female, later identified as
Debra Fell, and a white male, later identified as Debra Fell's
male friend, Charles Conway.  Further investigation revealed that
Conway's throat had been cut and Fell had been stabbed multiple
times in the back and throat.  A folding knife was located in a
bathroom sink and a steak knife, covered in what appeared to be
blood, was found on the kitchen table.

After the discovery of the two murdered victims in
Rutland, VT, the Albany Division immediately contacted the Little
Rock Division to advise them that Fell and Lee were now the prime
suspects in the Rutland, VT, double homicide, and most likely
kidnapped and murdered Teresca King.  Special Agents of the FBI
Little Rock Division, Ft. Smith Resident Agency, arranged to
interview Lee and Fell.  After waiving their Miranda rights and
agreeing to speak with the agents, Lee and Fell both confessed to
their involvement with the murders of Fell's mother, Debra Fell,
and her friend Charles Conway. Both Lee and Fell also admitted to
kidnapping/carjacking King with an unloaded shotgun, then killing
her by stomping on her and beating her with a rock, in the woods
off of Route 22, in Dover Plains, New York, approximately 3 1/2
hours from Rutland, Vermont.  With information provided by Lee,
King's body was found by the New York State Police on 12/01/2000,
at approximately 8:15 pm.

On 12/01/2000, an affidavit was filed in the U.S.
District Court of Vermont, Burlington, Vermont, in support of a
complaint charging Fell and Lee with kidnapping and carjacking in
violation of Title 18, U.S.C. 1201(a) and 2119.   Arrest warrants
were then issued by U.S. Magistrate Judge Jerome J. Niedermeier
for both subjects.

On 02/01/2001, Fell and Lee were indicted by a Federal
Grand Jury, in the District of Vermont, Burlington, Vermont, on
charges of kidnapping (death resulting), carjacking (death
resulting), brandishing a firearm in furtherance of crimes of
violence, and possessing a firearm while a fugitive from justice.

As previously mentioned, Lee accidently killed himself
in jail, in September 2001, while awaiting trial for captioned
matter. Fell's trial is scheduled to begin 06/20/2005. The U.S.
Government will be seeking the death penalty against Fell.

**Background of the**⌐                                       ⌐Captioned
investigation determined that subjects Fell and Lee

b6
b7C
b7C

3

FELL-00001374



To:  ??  From: Albany
Re:  7A-AL-44453, 06/14/2005

b6
b7C
b7D

b6
b7C
b7D

         Note:  Copies of all the reports obtained from the[            ]  b6
were previously provided to SA[                    ] via facsimile,   b7C
on 06/14/2005.                                                        b7D

[                          ]occurred approximately[            ]      b6
prior to the murders in Rutland and the kidnapping and murder of      b7C
victim Teresca King.[                    ]during which both Fell      b7D
and Lee[                              ]the assault and murder
of kidnapping victim King. Fell and Lee killed King by kicking,
stomping and hitting her in her face with a rock, while she lay
on the ground praying for her life.

         The Williamsport RA is requested to interview
[                 ]DOB[          ]who is currently[                ]
[                ]In an attempt to locate[      ]case agent SA[      ]   b6
[                ](writer) telephonically contacted[               ]    b7C
[                ]telephone number[                    ]at which        b7D
time writer learned that[                    ]Writer asked
[              ]to ask her[            ]the next time he called her,
whether he remembered the incident. On 06/13/2005,[              ]
told writer that she spoke with[            ]and that he recalled

4

FELL-00001375

To:   ??  From:  Albany
Re:   7A-AL-44453, 06/14/2005

the incident, including the guy named Don ____ is expecting to      b6
be interviewed by the FBI regarding ____                            b7C
                                                                    b7D

     An NCIC III and CCH conducted for ____ on 06/14/2005.
revealed the following criminal history for ____

                                                                    b6
                                                                    b7C

     During the interview, ____ should be questioned
regarding his knowledge of Donald Fell, Robert Lee, ____
____ and any others who associated with them.
should also be asked about ____ and to provide as many            b6
details as he can remember, specifically ____                      b7C
                                    ____ should be asked            b7D
about the drugs used by him and the others and the types of drugs
used. Other questions regarding any other violent or bizarre
incidents involving Fell and Lee should also be asked. (Note:
Investigation has determined that Fell tortured, dismembered and
killed a cat at a fair in Pennsylvania, not long before the
____

____ Fell and Lee, may be used by              b6
the prosecution as an aggravating factor in support of the death   b7C
penalty during the penalty phase after fell is convicted. It is    b7D
possible that ____ and brought to
Vermont to testify during the penalty phase.

     Due to the fact that the trial is scheduled to begin
06/20/2005, it is requested that the interview be handled
expeditiously. Albany/Rutland RA appreciates the receiving the
Williamsport RA's assistance with this short notice request.

5

FELL-00001376

To:  ??  From:  Albany
Re:  7A-AL-44453, 06/14/2005

**LEAD(s):**

**Set Lead 1:  (Action)**

    <u>PHILADELPHIA</u>

        <u>COAL TOWNSHIP, PENNSYLVANIA</u>

        Interview ☐☐☐☐☐ DOB ☐☐☐☐ who is currently ☐☐☐☐☐☐☐☐ regarding the ☐☐☐☐☐ and other issues as requested in the EC.

b6
b7C
b7D

♦♦

6

FELL-00001377

# EXHIBIT 129

FD-302 (Rev 10-6-95)

-1-

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/15/2005

CHRISTOPHER EIKE, date of birth<sup>REDACTED - FELL</sup>1983, was interviewed at the State Correctional Institute (SCI), Coal Township, Pennsylvania. After being advised of the identities of the interviewing agents and the purpose of the interview, EIKE provided the following information:

EIKE was asked if he recalled the events surrounding his being assaulted on August 12, 2000. EIKE said yes and provided the following information:

EIKE worked an ice cream concession stand at the Wayne County Fair. While working at the fair EIKE met a man named DON who also worked at the fair. EIKE did not recall what attraction or concession DON worked. EIKE also met a man he thinks was DON'S brother, and a girl he thinks was DON's sister while working at the fair. EIKE did not recall this man's name but said the girls first name was TERRI.

On the second day of the fair EIKE drove DON, DON's brother, his friend TIM, TERRI, and a girl named CRYSTAL LNU to Woodstock, New York in his Camero. EIKE recalled CRYSTAL LNU working the dart game at the fair and living in a trailer park near Beach Lake, Pennsylvania. The group went to Woodstock to drink and do drugs. EIKE recalled having a minor traffic accident on the way to Woodstock. His car slipped off the wet road into the woods where it became stuck. The group pushed his car out and continued on their way to Woodstock.

On the fourth day of the fair, two days after the first trip to Woodstock, DON, Don's brother, TERRI LNU, and CRYSTAL LNU asked EIKE to drive them to Woodstock again. Because his friend TIM would not be going, he initially told them no. EIKE changed his mind when they offered to pay for gas and give him drugs.

They arrived at Woodstock around midnight, listened to a band, and began smoking weed, doing acid and mushrooms. EIKE said the drugs were purchased at Woodstock. DONALD FELL provided mushrooms and TERRI LNU provided acid. This was the first time EIKE had done mushrooms or acid.

| | | |
|---|---|---|
| Investigation on | 06/15/2005 | at Coal Township, PA |

File # 7A-AL-44453    Date dictated  06/15/2005

SA Timothy K. O'Malley
by  SA C. Patrick Austin

This document contains neither recommendations nor conclusions of the FBI It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

04573

FD-302a (Rev 10-6-95)

7A-AL-44453

Continuation of FD-302 of    Christopher Eike                                    , On 06/15/2005 , Page    2

Around 6:00 AM that morning DON, DON's brother, TERRI LNU, CRYSTAL LNU, and EIKE were in Yazgar's Barn. EIKE told the others that he had to drive them back because they had work that day. However, EIKE's Camero had been towed sometime during the night. Although his car had been towed, EIKE told the others that he needed to drive them back several more times. He did this because "I was on acid so I was kind of messed up".

When EIKE took the keys to his car out of his pocked and again told the others he needed to drive them back, DON took off his shirt and said "that's it". DON came over to EIKE and punched him in the face. EIKE fell to the ground. DON got on EIKE and repeatedly punched him in the face and slammed his head into the floor. The floor was covered in rocks, possibly slate. DON walked away momentarily to drink beer. When DON walked away, "another guy" kicked EIKE in the back. When DON returned, he urinated on EIKE's leg and kicked him in the head and ribs. EIKE does not recall DON saying anything during the assault. He heard the others laughing and recalled seeing the girls laughing.

Two men and an Italian looking girl with black hair wearing a shiny blue jacket came to EIKE's assistance. The two men stopped the assault as the girl called 911. EIKE passed out around this time. When he regained conscious he was in an ambulance and recalled someone treating him say that they had brought him back. EIKE believed that he had died and was resuscitated.

EIKE claims the police told him it wasn't wise to file charges because there were allegations that EIKE attempted to rape DON's sister the night of the assault. EIKE said the allegation was untrue but was the basis for he and his parents decision not to file charges.

At the time of the assault EIKE had only known DON for a few days. EIKE said he had no idea why DON assaulted him.

EIKE stated that he is willing to testify about this assault.

04574

FELL-00001379

# EXHIBIT 130

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 JUN 17 AM 11 16

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA    )
    )
v.    )    Criminal No. 2:03-CR-12-01
    )
DONALD FELL,    )
    Defendant.    )

## <u>UNITED STATES' TRIAL MEMORANDUM</u>

UNITED STATES OF AMERICA

DAVID V. KIRBY
United States Attorney
District of Vermont

WILLIAM B. DARROW
STEPHEN D. KELLY
Assistant U.S. Attorneys

FELL-00001380

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF EVIDENCE AT GUILT PHASE . . . . . . . . . . . . . . . . . 1

    A.    The Disappearance of Terry King on November 27, 2000. . . . . . . 1

    B.    The Arrest of Donald Fell on November 30, 2000. . . . . . . . . . . . . 3

    C.    The Discovery of Debra Fell and Charles Conway on
        November 30, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.    Statements of Donald Fell on
        November 30-December 2, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.    Evidence Regarding Accuracy of Fell's Statements . . . . . . . . . . . 7

        a.  Discovery of Terry King and New York Crime Scene . . . . . . . . 7
        b.  Wilkes-Barre, Pennsylvania Evidence and Witnesses . . . . . . . . 9
        c.  Rutland Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
        d.  Search of Plymouth Neon . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    F.    DNA Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  GUILT PHASE IN LIMINE MOTIONS . . . . . . . . . . . . . . . . . . . . . . . .14

    A.    Motion *In Limine* Regarding Mitigation Evidence and
        Reference to Death Penalty at the Guilt Phase of Trial . . . . . . . . .14

    B.    Response to Motion In Limine Regarding
        Background and 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . . . . . .15

    C.    Motion *In Limine* Regarding the Admission of Any
        Evidence by Defense at Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Motion for Production of Witness Statements
        Pursuant to Rule 26.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.    SENTENCING PHASE *IN LIMINE* MOTIONS ......................19

    A.    Response to Motion *In Limine* Concerning
          Offer to Plea by Defendant ................................19

    B.    Response to Motion *In Limine* Concerning
          Letters of Robert Lee .... ...............................19

    C.    Response to Motion In Limine Concerning
          Testimony of Dr. Welner ..................................21

FELL-00001382

I.    **PRELIMINARY STATEMENT**

The United States of America, by and through its attorney, David V. Kirby, United States Attorney for the District of Vermont, files this trial memorandum outlining the evidence it intends to present at trial, identifying evidentiary issues that may arise, and responding to the defendant's trial memorandum and his new *in limine* motions.

II.    **SUMMARY OF EVIDENCE AT GUILT PHASE**

The government anticipates calling witnesses and offering evidence to present the case in a chronological fashion as the investigators and victim's family learned of the crimes. The government has worked with defense counsel to streamline the guilt phase of the trial and anticipates offering substantial evidence by stipulation, including certain fact witnesses and expert testimony. As discussed below, the government may also reduce the scope of testimony and number of witnesses to be offered at the guilt phase, provided the Court and defense agree that the testimony would be more appropriate at the sentencing phase of trial. At present, the government anticipates calling between 20 and 25 witnesses at the guilt phase.

A.    **The Disappearance of Terry King on November 27, 2000**

The first witnesses called will establish the circumstances surrounding the disappearance of Terry King.

Norman King, her husband, will testify concerning the morning of Monday, November 27, 2000, when he last saw his wife. He will testify that Terry King was a woman of regular routines and habits, and that when she and her car were unaccounted for that afternoon, the family was concerned, contacted police, and filed a missing persons report.

William Liphardt, Terry King's co-worker at the Price Chopper, will testify that every

1

FELL-00001383

other Monday he and Terry King worked a special, early shift beginning at 4 in the morning. He will describe where Terry King parked at the Price Chopper and her work-related routines. For example, King routinely brought coffee and donuts to share with him before their early morning shift. He also will testify that on November 27th Terry King did not appear at work.

Peter Wink, an employee at Dunkin' Donuts on Route 7 in Rutland at the time, will testify that Terry King usually stopped at Dunkin' Donuts for coffee and donuts before work. He will describe how, consistent with her usual routine, on November 27th she stopped at Dunkin' Donuts between 3:30 and 4 in the morning. Wink was the last person, besides Donald Fell and Robert Lee, to see Terry King alive.

Finally, Joseph Trapasso, a baked goods delivery man, will testify that he arrived at the Price Chopper around 3 in the morning, and noticed two men lurking near the side of the Price Chopper building near where employees park. Initially, Trapasso noticed the two men as he drove by the Price Chopper on his way to pick up coffee at Dunkin' Donuts. Later, he stopped at the Price Chopper, as he did very early each morning, to check on what items he needed to deliver later in the morning. He parked near the front entrance to the Price Chopper and again noticed the two males near the building in the darkness. One was kneeling down, and the other was standing. He was suspicious of them and decided to lock the doors to his delivery van, something he did not normally do. As he walked toward the entrance to the Price Chopper, one of the males began walking toward him, then stopped, and Trapasso looked directly at him.[1] Trapasso was suspicious of the two men, but continued into the store. He spent approximately

---

[1] Several days later, Trapasso saw this individual on television while watching news reports related to the arrest of Fell and Lee. The individual was Fell.

2

FELL-00001384

15 minutes in the Price Chopper and then returned outside to his delivery van. He looked for the two males, but could not see them.

**B.    The Arrest of Donald Fell on November 30, 2000**

Next, the government will introduce evidence of Fell's arrest in Terry King's car on November 30, 2000 in Clarkesville, Arkansas. The Court will recall the suppression hearing testimony of Clarkesville police officer Jeff Ross, who again will describe the arrests. Officer Ross will introduce evidence seized at the arrests, including Fell's shotgun, Lee's Florida license, and the Vermont registration for King's Dodge Neon. By stipulation, the government will also introduce booking photographs of Fell and Lee, as well as the clothing and footwear they wore when arrested.

**C.    Discovery of Debra Fell and Charles Conway on November 30, 2000**

After Clarkesville police found Terry King's Vermont registration in her car, they telephoned Vermont authorities and learned that King had been reported missing on the afternoon of November 27. When Vermont authorities learned that Donald Fell had been arrested in King's car, Rutland Police Officer Curtis Moore was dispatched to the apartment where Fell had been living with his mother, Debra Fell, at 135 Robbins Street in Rutland, Vermont.

Officer Moore was familiar with the apartment at 135 Robbins Street and had previously responded to several disturbances there. He will describe finding several unread newspapers lying outside the door to the Fell apartment, which was locked. Officer Moore then found an another entrance that was unlocked, but the door was blocked by furniture inside. He managed to push open the door several inches, and then he saw what appeared to be a dead male body

3

FELL-00001385

slumped in a chair and the hand of a second dead victim on the living room floor. He then secured the scene and contacted his supervisors.

Rutland Police Detective Chris Kiefer responded to the Robbins Street apartment, and she will testify about the initial entry into the apartment, as well as her processing of the crime scene that night and over the next several days. Det. Kiefer is trained in crime scene techniques and is Rutland's most senior crime scene technician. She and two other officers first entered the apartment to identify the bodies. At that time, officers did not know if one of the bodies might be Terry King. The officers later confirmed that the bodies were Charles Conway and Debra Fell. Det. Kiefer will also testify concerning her collection of evidence from the crime scene, including the two knives that appeared to be the murder weapons (they were wrapped in a towel on the kitchen table). Det. Kiefer also identified and took samples of numerous blood stains and droplets at the scene, and took photographs depicting the scene as it appeared. Det. Kiefer found no evidence of "crack" use at the apartment.

The government will offer photographs from the crime scene to show the layout of the apartment, the location of blood in the apartment, and the location of the bodies. The government has limited the photos of Conway and Debra Fell to four, three of which show an overall view of the living room and one of which shows the legs of Debra Fell only. Among the photographs available to the government (more than a hundred were taken at the scene), these are the least graphic and have the broadest overview. The defense has been advised of the four photographs depicting bodies that the government intends to offer.

At the guilt phase, the government may or may not call Medical Examiner Paul Morrow to explain the cause of death for the two Rutland murder victims. The government believes his

4

FELL-00001386

testimony is relevant to show the clear intent and state of mind of the attackers (there were multiple stab wounds to both bodies and clearly a struggle took place with Debra Fell at the scene) and to rebut Fell's claims that he did not know how or why the murders occurred (as Fell claimed in his later statements to police). Dr. Morrow would also testify that neither Debra Fell, nor Charles Conway had any illegal drugs in their systems, contradicting statements by Fell that everyone in the apartment was smoking "crack" cocaine that night. The government, however, may be willing to reserve the testimony of Dr. Morrow's for the penalty phase if the Court and the defense agree that his testimony would be more appropriate at that point (the government bears the burden of proving that Fell intentionally killed Conway and Debra Fell as aggravating factors in the sentencing phase). Thus, the government would offer the death certificates of Conway and Fell at the guilt phase, and call Dr. Morrow in the sentencing phase.

**D.      Statements of Donald Fell from November 30 to December 2, 2000**

On the afternoon of November 30, Clarkesville police officers placed Fell and Lee in detention at the Johnson County Detention Center. After Vermont officers found the two murder victims at the Fell apartment in Rutland, the FBI sent two Arkansas-based agents to interview Fell and Lee in Clarkesville. Over the next two days, Fell made five statements to various police authorities.

FBI Special Agent Jim Caudle will describe Fell's three initial statements to authorities. Before each statement, Fell was given Miranda warnings and each time he voluntarily agreed to speak to authorities.

In Fell's first statement, at around 11:30 pm on November 30, he claimed that a man named "John" driving King's car had picked him up hitchhiking with Lee. When the man

5

FELL-00001387

stopped at a store, Fell and Lee stole the car. Among other things, he claimed that the last time he saw his mother in Rutland she was fine.

The two FBI agents next interviewed Lee, who confessed to the three murders and the carjacking during an interview that lasted nearly two hours. Just before 3 in the morning, the agents then returned to speak with Fell again. The agents confronted Fell with the fact that the bodies (including the body of his mother) had been discovered in Rutland and Terry King, the owner of the car in which he had been arrested, had been missing for several days. In his second statement, Fell flatly denied wrongdoing ("I wouldn't kill my fucking mother", "I don't know any fucking Terry", and "I'm sticking by my first statement"). It was early in the morning, and the agents left the detention center to sleep.

The next morning (December 1), Agent Caudle learned that Fell had thought things over during the night and wanted to talk with the FBI again. Shortly after 9 in the morning, Agent Caudle returned to the detention facility and took a third statement from Fell. This time, Fell admitted to the killings and also wrote a two-page statement. Later that day (December 1), a New York State Police officer interviewed Fell and Lee by telephone, seeking to elicit information about where they had left King's body. Agent Caudle sat with Fell in Arkansas during the recorded interview, and he will introduce the recorded conversation (Fell's fourth statement).

Finally, the next day (December 2) three Vermont police officers who had viewed the Rutland crime scene flew to Arkansas and recorded a fifth statement by Fell. Detective Rodney Puslifer, then of the Rutland Police Department, will introduce Fell's final statement.

6

FELL-00001388

E.    **Evidence Regarding the Accuracy of Fell's Confession**

The next phase of the government's case will extend to evidence which corroborates and undermines, respectively, different parts of Fell's statements. In general, Fell admitted to certain facts that can be verified, while minimizing his responsibility for the crimes and at times lying about other facts.

**1. The Discovery of Terry King's Body and the New York Crime Scene**

On the evening of December 1, 2000, New York State police officers discovered Terry King's body in a wooded area near Route 22 in Dover, New York. Evidence from the murder scene corroborated aspects of Fell's confession. In his statements, Fell did not describe the area in any detail, but said that at some point not long after dawn on November 27, while he drove King's car south after passing into New York State (with King in the backseat and Lee in the front passenger seat), he stopped the car near a clearing. He told King to get out of the car and walk into the woods. He and Lee then got out, pursued her, and battered her to death – Fell kicking and stomping her, while Lee struck her with rocks. The two men left King's remains where they had killed her. They returned to King's car and proceeded south. Lee drove while Fell searched King's wallet for cash. After taking the cash, Fell tossed the wallet out the passenger window of her car. The two men then stopped at a Burger King and ate breakfast. Fell threw King's purse in a dumpster at the Burger King.

Three New York State Police officers and an FBI agent will describe the discovery of King's body and the evidence found at or nearby the crime scene.

Gary Mazzacano, a New York State Police Senior Investigator, will testify that on December 1, 2000 he participated in discussions regarding the possible location of Terry King's

7

FELL-00001389

body. Investigator Mazzacano received information that day from the telephonic interviews with Fell and Lee in Arkansas. Fell's information was too vague to be of much help. However, Lee recalled not only that they had killed King near a small clearing near a two lane north/south road in rural New York, but also that there was a target back-board in the clearing. Investigator Mazzacano, who had once been stationed in the Dover Plains, New York state police barracks, recalled that there was a clearing near Route 22 in Dover containing a target back-board near an abandoned gravel pit. Investigator Mazzacano drove to the area with two FBI agents. He also contacted the local Dover Plains barracks, which sent two troopers to assist in the search. Trooper Darren Bialiek will describe finding King's body in that area on December 1 as darkness fell. He will describe securing the crime scene that night.

The next morning, around sunrise, the New York State Police and the FBI sent evidence technicians to process the scene. New York State Police Senior Investigator Thomas Martin, one of the supervisors that morning, will describe the area and the location of the body, which was found more than 400 feet from Route 22 in the old gravel pit. He will introduce photographs and will describe finding two fiber samples on a thorn branch near the body. He also will describe how evidence technicians made footwear impression casts from foot prints leading from the road to the body. Martin also recovered a bloody rock near King's head. He will use a summary chart created by his team, which shows the area and the location of the footprints, the rock, the fiber, and other items. By stipulation, the government will offer the findings of FBI forensic examiners regarding the footwear impressions and one of the fiber samples. The footwear impressions were similar to the boots worn by Fell and Lee and one of the fibers matched clothing worn by Fell and Lee.

8

FELL-00001390

Next, FBI Special Agent Mark Promutico will describe finding King's wallet alongside Route 22 about 3.7 miles south of the body, and finding her purse at a Burger King in Pawling, New York, about 15 miles south of the body. He will introduce related photographs. There was also a Dunkin' Donuts bag found in King's purse. By stipulation, the government will offer evidence that a palm print of Robert Lee was found on the bag.

Michael Leight will testify that on November 27, 2000 he worked at the Pawling, New York Burger King. Leight took Fell's and Lee's breakfast orders that morning. When they asked him about buying marijuana, Leight later met with Fell and Lee outside the restaurant to discuss that possibility, but it never happened. Leight recalls that Fell and Lee were not acting out of the ordinary.

Finally, as with Dr. Morrow, the government will likely reserve the testimony of Medical Examiner Michael Baden, to describe Terry King's cause of death and offer his testimony only at the sentencing phase. At the guilt phase, the government will likely offer King's death certificate.

### 2. Wilkes-Barre, Pennsylvania Evidence and Witnesses

In his confessions, Fell stated that after killing Terry King in New York, he and Lee drove to their home town of Wilkes-Barre, Pennsylvania, where they stayed with neighborhood friends Matthew and Christian Kolojeski until the night of November 29. While in Wilkes-Barre, Fell found another Neon sedan like King's parked nearby and stole its Pennsylvania license plate. He then threw King's Vermont plates off a bridge into a brook not far from the Kolojeski apartment. The government will offer witnesses and evidence corroborating these admissions by Fell.

Matthew Kolojeski will testify that Fell and Lee arrived in Wilkes Barre on the afternoon

9

FELL-00001391

of November 27, 2000 driving a greenish car like a Neon sedan. Fell stated that he needed a screwdriver to do something with his car's license plates. The friends hung out for a couple days before Fell and Lee departed in the car, saying that they were going to California.

By stipulation, the government will offer the testimony of Wilkes-Barre resident Tara Richards, whose license plate was stolen by Fell and Lee. Richards parked her Pennsylvania plated Neon sedan near the street outside her home a few blocks from the Kolojeski apartment and she noticed that her license plate was missing sometime on November 29, 2000. Her stolen plate was found on King's Neon when Fell and Lee were stopped in Arkansas.

FBI Special Agent James Glenn will testify that he recovered the Vermont plates belonging to Terry King's car in a Wilkes-Barre brook near the Kolojeski residence.

### 3.    Rutland Witnesses

In his statements to authorities, Fell repeatedly claimed that he did not have serious arguments or disputes with his mother, that they had a good relationship in Rutland, and that he loved his mother. According to Fell, Lee also had a good relationship with his mother. He professed to have no idea why his mother and Conway were killed. Fell recalled an incident in mid-November 2000 when he was arrested by police in Rutland outside the Stop Lite bar on West Street. According to Fell, his mother called him from the bar and asked him to pick her up, then at the bar a patron came up to Fell and began kicking and spitting on him. According to Fell, his mother then began punching him, and pushing him out of the bar. Outside the bar, Fell said his mother fell to the ground after trying to kick him. Witnesses at the bar establish that Fell was lying: they observed Fell come in looking for his mother (not summoned by her), and then be ejected from the bar because of his aggressive behavior toward her and others. Outside the

10

FELL-00001392

bar, he knocked her down and spat on his mother. Other Rutland witnesses also describe Fell's intense animosity towards and assaults on his mother in the weeks before her murder. As argued in prior pleadings, this evidence is admissible on several grounds. *See* Opposition of the United States to Defendant's *In Limine* Motions for the Guilt Phase of Trial, Dkt. #112, at 7-13).

Vertith "Cindy" Oberle will testify that she was a friend of Debra Fell's in late 2000. In the late summer, she recalls discussions with Debra Fell before her son came to Vermont when she seemed excited, but nervous, about his arrival. After Fell's arrival, Oberle recalls visiting the apartment at 135 Robbins Street, where she observed Donald Fell interact with Debra Fell in a hostile and threatening manner. At that time, Debra Fell also told Oberle that she feared her son. Oberle told Fell to call the police, but Debra Fell was reluctant to do so.

Oberle also was present in the Fell apartment at 135 Robbins Street on the night of the murders. She stopped in sometime between 9 and 10 at night. Everyone at the apartment appeared to be in good spirits. She remembers Conway, Debra Fell, Donald Fell, and another young man that she did not know by name at the time (she later learned it was Lee) drinking beer and playing cards at the kitchen table. No one was doing drugs and no one appeared to be on drugs (Oberle did not know Debra Fell to do any illegal drugs).

Jeff Vanburen will testify that he was a very close friend of Debra Fell. He visited Debra Fell almost every day in the summer of 2000 and was in regular phone contact with her in the fall of 2000. Like Oberle, Vanburen recalled that Debra Fell initially was excited about her son's visit to Vermont, but then became fearful after his arrival. Vanburen observed how Fell dominated Debra Fell, often swearing at her while she talked with Vanburen on the phone. Vanburen recalls several visits to the Fell apartment in the fall of 2000, and he spent a full

11

FELL-00001393

Sunday with Donald Fell, Debra Fell, Lee, and another friend in the weeks just before the murders. Vanburen observed Donald Fell be verbally abusive of his mother. In other conversations, Vanburen recalls Debra Fell crying and saying her son had beaten her. Vanburen also interacted with Fell and Lee, and he observed Fell to be animated and outgoing, while Lee was quiet and reserved. In November 2000, Vanburen generally talked to Debra Fell everyday on the telephone, and then suddenly after Thanksgiving she did not answer her phone. He left a message on her answering machine (his message was found on the answering machine tape at the apartment), but she did not return his calls. He went to the apartment and noticed newspapers outside her door, which was locked (according to Vanburen, both were unusual as Debra Fell did the crossword puzzle every day and generally left her apartment door unlocked). A few days later he learned that Debra Fell and Conway had been murdered in the apartment.

Marsha Thompson will testify that she was working at the Stop Lite Bar the day that Fell assaulted his mother. Thompson was friendly with Debra Fell, and Fell told Thompson about her son. In the summer of 2000, Debra Fell seemed excited about her son coming to visit Vermont, but also apprehensive about reuniting with her son. After his arrival, Debra Fell brought her son to the bar and introduced him to Thompson. Throughout the fall, Donald Fell would call the bar trying to find his mother, and, at times, he would come to the bar looking for her. At this time, Debra Fell told Thompson that she was afraid of her son and he was threatening and assaulting her. Thompson told Debra Fell to call the police, but Debra Fell did not want to call the police on her son.

On November 2, 2000, Fell came to the Stop Lite Bar looking for his mother. He found her at the bar, and tried to take money from her. He swore at his mother and spat at others.

12

FELL-00001394

Debra Fell and her son then went outside where Fell proceeded to push her down to the ground and spit on her. Fell had brought Lee with him, and they proceeded to spit on others at the scene as well. The police were called and Fell was taken into custody for the night. After the incident, Debra Fell came back into the bar and began crying. She told Thompson that she was afraid of her son and did not want to return home.

The government may also call police officers who responded to the Stop Lite and to the apartment at 135 Robbins Street to corroborate the statements of these witnesses.[2] The police reports reflect that Debra Fell expressed concerns about her safety in staying in the same apartment with her son.

To the extent this evidence is not admissible at the guilt phase of trial, the government will offer it at any punishment phase.

### 4. Search of Plymouth Neon

FBI Special Agent Gerry Spurgers will describe searching King's Neon in Clarkesville, Arkansas after Fell and Lee were arrested. Agent Spurgers will introduce photographs of the Neon sedan and several items recovered from it, including Lee's wallet containing his bus ticket from Wilkes Barre to Vermont, and some of King's personal effects.

### F.   DNA Evidence

FBI Forensic Examiner Brendan Shea, from the FBI Laboratory's DNA Analysis I Unit, will describe examining stains on Fell's and Lee's boots, as well as the rock found next to King's

---

[2] Several Fell family members have also stated that Debra Fell called them during the fall of 2000 afraid that her son would kill her.

13

head.  The rock had King's DNA on it.  King's DNA also was found on Fell's left boot[3] and

Lee's right boot.  Lee's left boot also had Debra Fell's DNA.

The government may offer additional evidence through other witnesses not summarized

above.

## III.    GUILT PHASE *IN LIMINE* MOTIONS

The government seeks rulings from the Court addressing the following *in limine* motions

related to the guilt phase of trial.

### A.    Motion *In Limine* Regarding Mitigation Evidence and References to the Death Penalty at the Guilt Phase of Trial

The government moves for an *in limine* order barring the defense, during the guilt phase,

from presenting mitigation evidence or referring to the death penalty.  In its proposed jury

instructions, the defense has indicated that they will seek to introduce mitigation evidence from

expert and fact witnesses related to no less than 20 mitigating factors at any penalty phase in this

case.  These factors include evidence related to a history of physical and sexual abuse as a child,

a history of alcohol and drug use as an adolescent and an adult, the defendant's mental condition

at the time of the offenses, the defendant's emotional disturbance at the time of the offense, the

defendant's conduct in prison, and a myriad of other factors.  Much of this evidence may be

admissible at the punishment phase, but it is inadmissible at the guilt phase.  At this point, the

government has received no notice of any defense evidence for the guilt phase.  Therefore, as

discussed below, the government will be seeking to exclude any evidence offered by the defense

at the guilt phase unless it is provided notice, reciprocal discovery, and an opportunity to object.

---

[3]    There was DNA from another contributor on Fell's left boot.  That contributor is presumed to be Conway.  One of Fell's knife thrusts severed his carotid artery.

14

FELL-00001396

The defense may also argue or make reference to mitigating evidence during cross-examination of government witnesses, or in opening statements or arguments before the jury. Such evidence and argument is an improper appeal to sympathy at the guilty phase, and should be precluded.[4]

In addition, the jury should not be exposed during the guilt phase to consideration of the death penalty, and both parties should be barred from referring to it at the guilt phase. While the parties did refer to it during *voir dire*, the Court should not allow any issues related to the possible imposition of the death penalty on two of charged counts to interfere with the jury's guilt phase determinations. Again, both parties should be precluded from referring to the death penalty during addresses to the jury or in questioning of witnesses at the guilt phase.

**B.**     **Response to Motion *In Limine* Regarding Background and Potential 404(B) Evidence in the Guilt Phase of Trial**

The defendant's trial memorandum argues that the government will attempt improperly to introduce evidence related to the background of the charged crimes. Def. Trial Mem. at 3-4. The defendant has pled not guilty to all charges, and the government bears the burden of establishing all elements of the charged crimes beyond a reasonable doubt. Among other things, the government must prove the defendant's knowing participation in the charged crimes which begin with the murders of Charles Conway and Debra Fell. The circumstances leading up to the charged crimes are highly relevant and are admissible as intrinsic, background evidence under

---

[4] Notably, the government has already agreed to such a limitation in response to a defense *in limine* motion related to aggravating factors.

15

well-established case law.[5] Moreover, contrary to the defense's specious claims, the government will not offer expert testimony from Dr. Welner, M.D., at the guilt phase of trial, and, as outlined above, the government will only offer fact witnesses to events and circumstances that bear directly on the charged crimes.

The Rutland murders are not only at the center of this case, they are the genesis of the resulting offenses against King.[6] As discussed extensively in prior filings with the Court, Fell and Lee carjacked and kidnapped King immediately after their double murder in Rutland and fled in King's car to avoid arrest. They killed King several hours later because she was a witness to their flight from the Rutland murders. After his arrest, Fell made statements to authorities, but denied any knowledge about why the Rutland murders occurred and adamantly claimed that he

---

[5] Background evidence may be admitted to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed. *See United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997) (evidence of burglary admissible to prove possession of firearms and "to provide crucial background evidence that gave coherence to the basic sequence of events."); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.1991) (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988)). Furthermore, "evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed.R.Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.' " *United States v. Towne*, 870 F.2d 880, 886 (2d Cir.1989)(quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983) and citing *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983)). *See United States v. Chin*, 83 F.3d 83, 87-88 (4th Cir. 1996) (evidence of contract murder not 404(b) evidence where intrinsically intertwined with drug transaction); *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir.1992) (evidence of prior double murder not 404(b) evidence where directly relevant to prove firearm possession); *United States v. Roberts*, 933 F.2d 517, 520 (7th Cir. 1991) (evidence of shooting incident not 404(b) evidence where intrinsically intertwined with charged firearm possession); *United States v. Muhammad*, 928 F.2d 1461 (7th Cir.1991) (evidence of shooting incident not 404(b) evidence where relevant to unlawful possession of ammunition).

[6] Fell also is charged with possession of a firearm as a fugitive. He was a fugitive because he was fleeing the Rutland murders.

16

FELL-00001398

had nothing to do with Debra Fell's murder. As noted above, the government will be attacking

the credibility of these statements at the guilt phase of trial, as the defense may use them to

establish a defense. In fact, the evidence could not be more clear that, in his statements, Fell was

minimizing and lying to authorities about his responsibility for the charged crimes, and the

evidence from the weeks before the murder clearly demonstrates Fell's increasing hostility

towards and assaults on his mother. Her murder was the logical and causal result of his conduct

(as she anticipated and feared). The evidence rebuts Fell's claim that he did not have the intent

necessary to commit the charged crimes and had no idea why they occurred. As discussed in the

opposition to Fell's initial *in limine* motion regarding 404(b) evidence, the evidence is admissible

as intrinsic, background evidence to the charged crimes, and alternatively is admissible under

Rule 404(b) to prove intent, motive, opportunity, plan, and lack of mistake. *See* Dkt. #112.

Furthermore, by offering evidence of the charged crimes during the guilt phase, the

government is not creating any new aggravating factors for the sentencing phase. *See* Def. Trial

Mem. at 6-7. The government is obligated to present all the relevant, admissible evidence of the

charged crimes to prove its case. Witnesses who describe crucial background are appropriate for

the guilt phase. Indeed, it is vital if the jury is to understand the murders underlying the

kidnaping and carjacking and the credibility of Fell's statements after his arrest. As such,

evidence of the Rutland murders is not a new, aggravating factor in the case.

For all these reasons, the government fact witnesses should be allowed to testify at the

guilt phase of trial.

**C.      Motion *In Limine* Regarding Admission of Any Evidence at
Guilt Phase by the Defense, Including Expert or Witness Testimony**

17

As noted in prior pleadings, the defense has provided no notice of any witnesses to be called at the guilt phase of trial and has produced no reciprocal discovery related to the guilt phase. The only reciprocal discovery provided by the defense relates to penalty phase fact and expert witnesses. The defense may not call any witnesses or offer any direct case in the guilt phase. Nonetheless, the government seeks an *in limine* motion from the Court barring the defense from calling witnesses or introducing evidence at the guilt phase unless reciprocal discovery is immediately provided to the government.

**D.     Motion for Production of Witness Statements Pursuant to Rule 26.2**

The government has requested that the defense provide witness statements pursuant to Rule 26.2 prior to the commencement of trial. *See* Fed. R. Crim. P. 26.2 (requiring production of a witness's prior statements that relates to the subject matter of the witness's testimony). It is not clear if the defense will offer any witnesses at the guilt phase of trial, but the government may have to seek a delay in the trial if statements are not produced sufficiently in advance for the government to prepare its cross-examination. The government has provided witness statements well in advance of trial and requests that the defense be required to provide the same. To avoid any delays at trial, the government moves for the production of statements by all defense witnesses at the guilt and penalty phases, and requests a Court order requiring the production of such statements under Rule 26.2.

18

FELL-00001400

## IV.    SENTENCING PHASE *IN LIMINE* MOTIONS

The government requests the opportunity to supplement its responses to the defendant's

*in limine* motions filed in his trial memorandum at a future date.  At this time, the government

offers the following responses to various issues recently raised by the defense.

**A.      Response to *In Limine* Motion Concerning
the Defendant's Offer to Plead Guilty**

The government agrees to stipulate at the sentencing phase that the defendant offered to

plead guilty to Count 2 in return for the promise that the government would not seek to the death

penalty, and that offer was rejected by the government.  We will draft an appropriate stipulation.

The other proposals suggested by the defense (calling AUSA Waples or offering a copy of the

plea agreement) would be unnecessary, unduly prejudicial, and infringe upon the Court's prior *in*

*limine* order.

**B.      Response to *In Limine* Motion Concerning Letters of Robert Lee**

Prior to his death Robert Lee wrote numerous letters to his father and other family

members.  The government has provided copies of them to the defense and will offer them at the

penalty phase to rebut Fell's claim that he "would not have committed the crimes without the

influence of Robert Lee."  Def. Jury Instructions at 14.  The letters were handwritten by Lee and

provided to the government by his father.  There is no question as to their authenticity.

It is apparent from the letters that Fell was the dominant personality in their relationship.

Lee felt that: "Something that he has that can control people.  There is just something there."

He also wrote:

> That is like my friendship with Donnie.  He always has to have his
> own way and if you do not live up to his expectations he'll fly

19

FELL-00001401

> throw a ___ or tantrum till he gets his own way and me have to do
> what he expects me to do put me into jeopardizing my friendship
> ___ with him and ___ the basically best friend that I ever had in my
> whole life . . .

Lee also describes how Fell, after killing Conway, urged him him to kill Debra Fell. Lee wrote:

> He started saying after he did Charlie he kept saying kill her come
> on you have to. I killed him. Fucken stab her, cut her fucken
> through. She was on the floor moving. Kick her, make her stop,
> stab her, cut her through some more.

> \* \* \* \*

> When Donny grabbed me in the house and said do you realize what
> we just did. This is only the beggining [sic]. Wile [sic] asking me
> if I am OK. Telling me to take a shower and told me this was only
> the beggining [sic].

The letters of Robert Lee are not barred by *Crawford v. Washington*, 541 U.S. 36 (2004), as the statements are non-testimonial.[7] The letters are admissible hearsay at sentencing, where the rules of evidence do not apply. They are reliable and consistent with all of Lee's prior

---

[7] *Crawford* departs from prior Confrontation Clause jurisprudence by establishing a *per se* bar on the admission of out-of-court testimonial statements made by unavailable declarants where there was no prior opportunity for cross-examination. Subsequent decisions have sought to define what constitutes a "testimonial statement" for purposes of *Crawford*. *See United States v. McClain*, 377 F.3d 219 (2d Cir. 2004)(co-defendant's plea allocution is "testimonial"); *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004)(co-conspirator's statement to an undercover confidential informant is not "testimonial"). In *Saget*, the court observed that, "the types of statements cited by the Court [in *Crawford*] as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her reponses might be used in future judicial proceedings." 377 F.3d at 228. Lee's letters do not share those characteristics. The letters were written to confidants in a private and non-coercive setting. Moreover, they contain multiple inculpatory statements strongly against his penal interest.

FELL-00001402

statements on these subjects. Further, as to Lee's relationship with Fell, his letters are consistent

with the independent observations of witnesses who knew them. In all these circumstances, the

evidence shows that Fell, not Lee, was the aggressor and Lee was the follower. Again and again,

in his prior statements, Lee explained that it was Fell, not Lee, who initiated the murders in

Rutland, the plan to commit the carjacking, and ultimately the murder of Terry King. In this

context, the letters are reliable statements of an unavailable witness and should be admitted at the

sentencing phase to rebut Fell's claims. Otherwise the jury could be misled by Fell's false

evasions and minimizing in his post-arrest statements.

**C.**      **Response to *In Limine* Motion Concerning Testimony of Dr. Welner**

The defense continues to raise specious objections to the anticipated testimony of Dr.

Michael Welner, a rebuttal witness for the government at the penalty phase. Dr. Welner has not

completed his evaluation. In fact, the final videotaped interview of Fell only occurred this week.

Instead of waiting to hear Dr. Welner's findings, the defense attempts to impugn his integrity and

methodology without foundation. Needless to say, the defense will have ample opportunity to

cross examine Dr. Welner if he testifies. The government will reserve a full response to Fell's

latest objections until his report is complete and disclosed, but a limited response is appropriate

at this time.

First, the defense cites to a recent New Jersey decision in a non-death penalty case. *See*

*State v. Vandeweaghe*, 177 N.J. 229, 827 A.2d 10298 (2003). In *Vandeweaghe*, Dr. Welner

offered testimony in a murder trial about the mens rea of the defendant. As the court is aware,

the legal and evidentiary standards to be applied for the admissibility of expert testimony are

substantially different for sentencing, as opposed to trial. The New Jersey case is inapplicable to

21

FELL-00001403

our case, where Dr. Welner would only be testifying at sentencing. *Vandeweaghe* does not suggest that Dr. Welner's methodology or his diagnosis were wrong, only that the trial judge erred in admitting portions of his testimony at trial.

Second, the defense mischaracterizes Dr. Welner's imagined rebuttal testimony as creating a new, aggravating factor. The scope of Dr. Welner's testimony will remain unknown until the defense presents its case at a potential penalty phase. Dr. Welner will be called only to rebut evidence of mitigation presented by the defense. Therefore, the scope of Dr. Welner's testimony will largely be determined by the defense mitigation evidence. Until the defense completes their case at the penalty phase, all discussions about Dr. Welner's testimony are premature and should be seen for what they are -- desperate attempts to impugn his credibility.

## V.    CONCLUSION

For all the foregoing reasons, the Court should make rulings on the pending in limine motions as requested by the United States in this memorandum.

Dated at Burlington, in the District of Vermont, this 17th day of June, 2005.

Respectfully submitted,

DAVID V. KIRBY
United States Attorney

By:

WILLIAM B. DARROW
STEPHEN D. KELLY
Assistant U.S. Attorneys

22

FELL-00001404

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA                )
                                        )
        v.                              ) Criminal No. 2:01-CR-12
                                        )
DONALD FELL                             )

## CERTIFICATE OF SERVICE

I, Stacie Brosky, do hereby certify that I have served a copy of the foregoing **UNITED**

**STATES' TRIAL MEMORANDUM** on the Defendant by faxing a copy to Defendant's

counsel:

Alexander Bunin, Esq.
Gene Primomo, Esq.
Office of the Federal Public Defender
39 North Pearl Street
Albany, NY 12207
*Fax: (518) 436-1780*

Paul S. Volk, Esq.
Blodgett, Watts & Volk
P. O. Box 8
Burlington, VT 05402-0008
*Fax: (802) 862-8997*

DATED and SIGNED at Burlington, Vermont on this 17th day of June, 2005.

Stacie Brosky
Legal Assistant

# EXHIBIT 131



**U.S. Departm    t of Justice**

*United States Attorney*
*District of Vermont*

---

*United States Courthouse and Federal Building*
*Post Office Box 570*                                *(802) 951-6725*
*Burlington, Vermont 05402-0570*          *Fax: (802) 951-6540*

June 29, 2005

Hon. William K. Sessions, III
United States District Court
District of Vermont
Burlington, VT 05402-0928

      Re:    *United States v. Fell*
              No. 2:01-CR-12-2

Dear Judge Sessions:

      After advising you this afternoon that our mental health expert, Dr. Michael Welner, would produce his evaluation in the above case by Friday of this week, I called Dr. Welner to advise him of the situation. He answered on his cell phone in Florida where he is working on an unrelated matter through Thursday. He reports that he won't even be back into his office until late Thursday this week, and cannot have the evaluation done on Friday. He added that he did not receive copies of Dr. Mark Cunningham's report and the June 13, 2005 defendant interview until recently.

      I apologize for representing that Dr. Welner's evaluation would be done Friday, and ask your indulgence for a little more time. Dr. Welner reports that he will work over the weekend and get the report done on Tuesday. I note that the report at issue is a rebuttal report, which if provided by Tuesday would still give the defense ample time to prepare for cross examination on Friday next week.

      Thank you for your attention to this matter.

                         Very truly yours,

                         DAVID V. KIRBY
                         United States Attorney

               By:

                         WILLIAM B. DARROW
                         Assistant U.S. Attorney

CC:    Alex Bunin, Esq.
        Gene Primomo, Esq.
        Paul Volk, Esq.

FELL-00001406

# EXHIBIT 132

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/05/2005

b6
b7C

_____, a male, born _____ SSN _____ _____ residing at _____ cellular phone number _____ was telephonically interviewed regarding DONALD FELL. _____ was listed as a witness for the defense for the penalty phase of the trial for DONALD FELL. After being advised of the identity of the interviewing agent and the purpose of the interview, _____ provided the following information:

_____ is currently employed as a _____ for grades 10 through twelve. _____ used to be employed at the St. Michael's School. While _____ was at St. Michael's, DONALD FELL was a residential student. _____ worked with FELL for about a year. _____ could not recall the dates or the year(s) that he worked with FELL. When FELL first arrived at St. Michael's, _____ was employed in the b6 position of Child Care Worker. During this time, it was _____ job b7C to make observations regarding FELL for 8 hours a day. _____ could not recall how long of a period of time, such as number of months or weeks, that _____ observed FELL. The observations would strictly be for behaviors exhibited by FELL upon his admission to the school. The behaviors observed by _____ would have been analyzed by a psychologist and/or psychiatrist. _____ later became a Case Manager, which is, essentially, a Social Worker. As a Case Manager, _____ was assigned to a treatment team. _____ was on the treatment team assigned to FELL. _____ advised that each treatment team was assigned to approximately 15 to 30 students.

_____ recalled that FELL was placed into St. Michael's due to truancy issues as he was not going to school. _____ could not recall any specific incident that caused FELL to be admitted to the school. _____ recalled that FELL was fairly cooperative, yet despondent and depressed. _____ advised that, most of the time that b6 _____ knew FELL at the school, FELL was "flat," which meant b7C despondent and depressed. _____ stated that FELL was willing to do whatever was necessary, as required by the school, to get out of the school _____ recalled that FELL followed the rules. As a social worker, _____ would have met with FELL daily to monitor his progress at the school.

_____ stated that FELL participated in the alcohol and drug program. However, the alcohol and drug program was kept confidential at the school. Because of the confidentiality of the

7A-AL-44453-302 -105

| | | | |
|---|---|---|---|
| Investigation on | 07/05/2005 | at Burlington, Vermont | (telephonically) |
| File # 7A-AL-44453-302 | b6 b7C | Date dictated | 07/05/2005 |
| by SA _____ | | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-AL-44453-302

b6
b7C

Continuation of FD-302 of _____ , On 07/05/2005 , Page ___2___

b6
b7C

program[   ]would not have known any other information regarding
FELL's participation in the program or anything about FELL's
alcohol or drug use/abuse.

[      ] monitored FELL's progress to determine if FELL could
be discharged as a residential student. [   ] advised that there
would have been extensive reports written by him and others
regarding FELL. However, some of these reports could not be located
by the school for FELL's defense attorneys.

b6
b7C

[      ] recalled that FELL had a bad family life. When asked
to elaborate as to what he meant by a bad family life, [   ] stated
that he recalled that FELL's mom was "gone." [   ] then explained
that the most stable thing in FELL's life at that time was his
grandmother. When FELL first arrived at St. Michael's, FELL's
grandmother was alive. While FELL was at the school, FELL's
grandmother died. [   ] recalled spending a lot of time discussing
FELL's grandmother's death with FELL. [   ] stated that the
grandmother's death was very traumatic for FELL.

b6
b7C

[      ] left his employment with St. Michael's school
sometime around the Fall of 1995. While still employed with St.
Michael's, [   ] was involved with the discharge of FELL from the
school as a residential student. [   ] working in conjunction with
the treatment team and with the county's Child and Youth Services,
decided that FELL should be placed into the custody of his aunt
[            ] who was only 21 years old at the time. [   ] stated
that [      ] was thought to be FELL's "best chance." at the time.
[      ] made home visits to [      ] residence. [   ] advised that,
although [      ] residence was located in a "rundown,"
questionable neighborhood, [      ] house was "okay" and suitable
to place FELL in.

b6
b7C

The following conditions would have been placed on FELL
upon his discharge from the residential program at St. Michael's:
(1) FELL was required to receive follow up care which would have
been arranged by St. Michael's and Child and Youth Services; and
(2) FELL had to participate in the "day program" at St. Michael's.
[   ] advised that [      ] residence was located approximately 35
minutes away from St. Michael's [   ] did not know if FELL
participated in the day program as required. [   ] stated that he
left St. Michael's shortly after FELL's discharge from the
residential program.

b6
b7C

# EXHIBIT 133

**This service area is provided for your internal use
ience. Service must be marked on airbill.**

FedEx Service:

**FedEx** PRIORITY OVERNIGHT  **Extremely Urgent**
emp: 47345    THU
TRK# **8153 5731 4176**  FORM
0200
05401    Deliver By:
07JUL05

BTV
ED BTVA    AA

**FedEx** USA Airbill  **815357314176**

1 From
Date  7/6

Sender's
Name

Company  TOWN OF BETHEL  JUSTICE COURT
Address  3586  RT 55
City  KAUNEONGA LAKE  State  NY  Zip  12749

2 Your Internal Billing Reference

3 To
Recipient's
Name  ANDY BARTNIK  Phone  2ND FL

Company

REDACTED - FELL
Address

City  BURLINGTON  State  VT  Zip  05401

**8153 5731 4176**

165476
165475
165476F25
165475F60
REV 06/04  RY

4a

4b Express Freight Service
☐ FedEx 1Day Freight  ☐ FedEx 2Day Freight  ☐ FedEx 3Day Freight

5 Packaging
☐ FedEx Letter  ☐ FedEx Pak*  ☐ Other Pkg

6 Special Handling
Saturday Delivery  Sunday Delivery  HOLD Weekday  HOLD Saturday

Does this shipment contain dangerous goods?
☐ No  ☐ Yes  ☐ Yes  ☐ Dry Ice

☐ Cargo Aircraft Only

7 Payment Bill to:
☐ Sender  ☒ Recipient  ☐ Third Party  ☐ Credit Card  ☐ Cash/Check

Total Packages  Total Weight  Total Declared Value  Total Charges
$  .00

8 Release Signature

360

100%
Recycled
Paperboard
POST CONSUMER CONTENT

FELL-00001409

# EXHIBIT 134

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY · MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE · BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON · BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

E-MAIL ALEX.BUNIN@FD.ORG

July 8, 2005

Hon. William K. Sessions III
Chief United States District Judge
11 Elmwood Avenue
Burlington, VT 05401

Re: USA v. Donald Fell, No. 01-12

Dear Judge Sessions:

The defense will rest after the testimony of James Aiken. We withdrew our Notice of Expert Evidence of a Mental Health Condition, filed pursuant to FRCP 12.2 (b) (2). The Court indicated that there may still be a need to have a hearing to decide the admissibility of the government's mental health expert during rebuttal. I bring to the Court's attention FRCP 12.2 (c):

> (4) <u>Inadmissibility of a Defendant's Statements</u>. No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
> * * *
> (B) *has introduced expert evidence* in a capital sentencing proceeding requiring notice under Rule 12.2 (b) (2) (emphasis added).

The commentary to this section explains:

> As amended, Rule 12.2 (c) (4) provides that the admissibility of such evidence in a capital sentencing proceeding is *triggered only by the defendant's introduction of expert evidence*. The Committee believed that, in this context, it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant *has first introduced expert evidence* on the issue (emphasis added).

FELL-00001410

Therefore, since the defendant has presented no expert mental health testimony pursuant to Rule 12.2 (b) (2), the government is precluded from calling an expert witness regarding the defendant's mental health.

That leaves the question of what other rebuttal evidence the government may properly present. Rebuttal evidence in a capital case "must be reasonably tailored to the information the ... testimony is intended to rebut." <u>United States v. Stitt</u>, 250 F.3d 878, 897-98 (4th Cir. 2001); <u>see also</u> <u>Dawson v. Delaware</u>, 503 U.S. 159, 167-68 (1992) (gang membership improper to rebut good character evidence).

In this case, the Defendant's mitigation case had two facets: (1) evidence of the defendant's background until he was discharged from St. Michael's School at age 15, and (2) his acclimation to the Northwest Correctional Facility since December, 2000. Rebuttal reasonably tailored to these issues is proper.

No mitigation evidence was presented about Fell from age 15 until his incarceration in Vermont. The government apparently has a number of witnesses who may testify about misconduct by Fell between ages 15 to 20. Since there has been no mitigation evidence offered about this period of Fell's life, acts of misconduct during this time would not be proper rebuttal.

Respectfully submitted,

/ s /

Alex Bunin

cc: Stephen Kelly, AUSA
    William Darrow, AUSA

FELL-00001411

# EXHIBIT 135

FELL-00001412

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA     )
                             )
          v.                 )     Criminal No. 2:01-CR-12-01
                             )
DONALD FELL,                 )
          Defendant.         )

## STIPULATION

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned parties that:

After his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; (3) and he did not suffer from any mental disease or defect. The examination also found that Fell was competent to stand trial and knew the difference between right and wrong at the time of the offenses on November 27, 2000.

Dated at Burlington, in the District of Vermont, this 8th day of July, 2005.

                                    UNITED STATES OF AMERICA

                                    DAVID V. KIRBY
                                    United States Attorney

                         By:        _____
                                    WILLIAM B. DARROW
                                    STEPHEN D. KELLY
                                    Assistant U.S. Attorneys

_____
Alex Bunin, Esq.
Attorney for Donald Fell

GOVERNMENT
EXHIBIT
14

FELL-00001413

# EXHIBIT 136

# INTENTIONALLY LEFT BLANK

FELL-00001414

# EXHIBIT 137



MEMORANDUM TO FILE

**BY FAX 1-518-436-1780 and U.S. MAIL**

TO:        Alex Bunin, Esq. and Gene Primomo, Esq.

FROM:    Paul S. Volk, Esq.

RE:        <u>United States v. Donald Fell</u>
             Recent telephone conversations with John Rabun, M.D. and Richard Wetzel,
             Ph.D.

DATE:    July 20, 2005

This will summarize two telephone conversations which recently took place between Paul S.
Volk, Esq. and Drs. John Rabun and Richard Wetzel.

On April 21, 2005, Mr. Volk spoke with Dr. John Rabun at his office in St. Louis, Missouri. In
that conversation, Dr. Rabun indicated that he was not as of then under subpoena to testify in the
<u>Fell</u> matter. He further indicated that he was not sure if he would be called by the Government,
and that he would voluntarily accept service of a subpoena by either the Government or the
defense in this case.

Dr. Rabun indicated that he recently had several discussions with David Kirby and with William
Darrow and Stephen Kelley. He described his conversations with Mr. Kirby as being very
friendly and cordial. He described his conversations with Mr. Kelley and Mr. Darrow as being
extremely confrontational. He in essence indicated that he was essentially cross-examined by
Mr. Darrow and Mr. Kelley, who went to significant lengths to get him to say that while there
may have been mitigation evidence on the first two murders (Debra Fell and Conway), there was
none on the third homicide (Ms. King), particularly relative to intoxication or drug use at the
time of that killing. It should also be known that in subsequent conversations, Dr. Rabun backed
off this description of his subsequent discussions with Mr. Kelley and Mr. Darrow, and
attempted to explain their initial confrontational, cross-examination based style as being the
result as simply being nervous and/or unfamiliar with the facts of the case.

On ~~December~~ *July* 20, 2005 Paul Volk, Esq. spoke with Richard Wetzel, Ph.D., at his office in St.
Louis, Missouri. In this conversation, Dr. Wetzel indicated the following:

1. It is his position that a psychologist or psychiatrist is not supposed to testify about the mental
condition of someone whom you have not examined, under the so-called Apple rules. He offered
his unsolicited opinion that Dr. Welner was trying to get around this requirement by posing
various questions which he wanted Dr. Wetzel to ask Mr. Fell at the rule 12.2 interview
conducted by Dr. Wetzel on June 13, 2005 at the Northwest State Correctional Facility.

FELL-00001415

2. Dr. Wetzel indicated that prior to the rule 12.2 interview of Mr. Fell on June 13, 2005, he had received a received a list of questions posed by Dr. Welner which he was expected to ask of Mr. Fell. When questioned further, Dr. Wetzel indicated to Mr. Volk that he was not sure if this process began with Dr. Welner or with William Darrow, Esq., but that he was quite certain that the questions which he was asked to ask Mr. Fell were posed and/or drafted by Dr. Welner.

3. Dr. Wetzel indicated that he had spoken with William Darrow, Esq. two times prior to conducting the June 13, 2005 rule 12.2 interview of Mr. Fell. He further indicated that at some point in these discussions which took place prior to the June 13, 2005 interview, Mr. Darrow specifically informed him that it was fine and appropriate for him to ask Mr. Fell the questions that Dr. Welner wanted him to ask Mr. Fell.

4. Dr. Wetzel also spontaneously indicated to Mr. Volk "I am not a puppet" for Dr. Welner. He further indicated that Dr. Welner's list of questions were not necessarily the most intelligent questions which he had ever considered asking an individual in a proceeding similar to this.

5. Dr. Wetzel further indicated that the list of questions from Dr. Welner were some of the type of questions which he would ordinarily ask of a person in Mr. Fell's position.

6. Dr. Wetzel further indicated that he was offended by the sentence in Dr. Welner's subsequent report to the effect that Dr. Welner had provided the questions to be posed to Mr. Fell for use in his supposed examination and administration of the PCL-R psychopathy test.

7. Dr. Wetzel also indicated spontaneously that he was not too impressed with the report of the defense expert, Dr. Cunningham, which he obviously had reviewed. His position and opinion was that Dr. Cunningham focused too much on the aggravating factors themselves, rather than on attempting to focus attention on strong mitigating factors. This is included simply to state what Dr. Wetzel informed Mr. Volk, not to comment on the validity of the same.

8. Dr. Wetzel further informed Mr. Volk that his impression, from his discussions with Mr. Darrow, was that he was being asked to be the expert witness who was to ask Mr. Fell all questions for both sides as well as for the other experts involved in this matter.

9. Finally, Dr. Wetzel indicated that if he and Dr. Rabun had been called to testify at the penalty phase of the trial in this matter, they would have been both helpful and harmful to both sides. In his opinion, and in essence in his words, both sides would have "hated us by the time we were done testifying."

FELL-00001416

# EXHIBIT 138

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 AUG 26 AM 9 59

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,                    )
                Plaintiff,                   )
                                             )
        v.                                   )      Criminal No. 2:01-CR-12
                                             )
DONALD FELL,                                 )
                Defendant.                   )

## DONALD FELL'S MOTIONS FOR JUDGEMENT OF ACQUITTAL AND NEW TRIAL

Pursuant to Federal Rules of Criminal Procedure 29 (c) and 33, Defendant Donald Fell moves the Court to impose a life sentence, or alternatively, to grant a new sentencing hearing.[1] A jury returned verdicts of death as to Counts One and Two of the Superceding Indictment on July 14, 2005. Within ten days of that date, the Court extended the time for the filing of Rules 29 (c) and 33 motions until August 26, 2005. This motion does not attack Fell's conviction but seeks the imposition of a life sentence, or alternatively, a new sentencing hearing, based upon violations of due process of law.

## I. ISSUES

There are three issues. All three involve violations of due process based upon misconduct by the government causing a miscarriage of justice to occur. First, the government made false representations to the Court about its compliance with Federal Rule of Criminal Procedure 12.2 (c), upon which the Court relied. The Court's reliance on those misrepresentations and subsequent response harmed Fell by causing him to withdraw all expert mental health evidence.

---

[1] The standards for reviewing these motions by a district court in a federal capital case were recently discussed at length. See United States v. Honken, _ F.Supp. 2d _, 2005 WL 1793481 (N.D. Iowa July 29, 2005) (Bennett, C.J.).

1

FELL-00001417

Second, the government improperly took inconsistent positions about Fell's mitigation evidence, and because of previous rulings, Fell was prevented from explaining that discrepancy to the jury. Third, the government improperly argued that there must be a nexus between the defendant's mitigation evidence and the murder of Mrs. King, a proposition that has been repeatedly rejected by the Supreme Court.

## II. MENTAL HEALTH EVIDENCE

1. Summary. The Court ordered that any mental health interview or testing of Donald Fell be limited to Drs. Rabun and Wetzel and that any new tests performed either be consensual or by court order. The government violated this order by using Dr. Wetzel to perform an eight-hour interview of Fell so that a third expert, Michael Welner, M.D., could perform additional tests that had never been discussed by the parties, nor approved by the Court. Fell then moved to bar Welner's testimony because Dr. Wetzel was used to violate the Court's order, and that Welner then used a video recording of the interview in order to perform new tests for which the defense had not received notice, much less given consent.

When directly asked by the Court whether the government had violated the previous order in this manner, the government denied doing so, and claimed it was prohibited from discussing the matter with its experts. The Court accepted the government's assertion that the doctors had arranged the questioning on their own. However, the government's representations to the Court were false.

On two occasions before the interview, the government intervened by specifically telling Dr. Wetzel to use Welner's questions for the purpose of conducting the interview. Additionally, the government misrepresented its authority to perform the new tests upon the defendant without

2

FELL-00001418

consent or court order.

Relying upon these misrepresentations, the Court withheld its ruling on whether Welner would be allowed to testify. At that point, the defense could only be assured he would not testify by withdrawing its notice of mental health evidence.[2] The notice was withdrawn and the defense presented no expert mental health testimony. The Court's failure to exclude Welner, which was based upon the government's misrepresentations, caused Fell to be harmed.

2. <u>Facts</u>. On February 13, 2002, the government moved for mental health testing of Donald Fell by government experts in order to prepare for trial. (Documents 34 and 131, p. 11-12, n. 3). At that time, the government was represented by Assistant United States Attorneys Gregory Waples and John Tavana. On May 16, 2002, John Tavana was replaced by Assistant United States Attorney William Darrow. (Docket Sheet).

The government ultimately chose Psychiatrist John Rabun, M.D. and Psychologist Richard Wetzel, Ph. D. (Document 100, p.11). Fell and his counsel agreed to allow those doctors to test and interview Fell without court order. (Id.).

Dr. Wetzel administered two tests: the Minnesota Multiphasic Personality Inventory-2 and a portion of the Cambridge Examination for the Elderly. He issued a written opinion. (Letter from Richard D. Wetzel, Ph. D. To Gregory Waples, Assistant United States Attorney, dated October 11, 2002). Both tests consisted of oral questions posed to Fell by Wetzel. Dr. Wetzel recorded Fell's answers for later analysis.

Dr. Rabun also provided a written report. Some of his opinions were: "Mr. Fell's history

---

[2] The Court did schedule a hearing on the admissibility of Welner's testimony, but that was to be held after the appearance of defense mental health expert Mark Cunningham, Ph. D.

3

FELL-00001419

of sexual and physical abuse would affect his behavior as an adult." "Clearly, Mr. Fell's intoxication did contribute to his commission of the instant offenses." "Mr. Fell's lack of supervision, chaotic home environment, and poor role models, would have negatively contributed to his personality development." "The combination of Mr. Fell's intellectual abilities and capacity to control his behavior in a locked environment, free from alcohol and drugs, suggests that he will adjust positively to a prison setting."(Letter from John S. Rabun, M.D. to Gregory Waples, Assistant United States Attorney, dated December 31, 2002).

On September 24, 2002, the Court entered an order granting Fell's motion to strike the special findings from the Superceding Indictment. (Document 70). That ruling was appealed by the government. (Document 71). While the case was appealed, the Federal Rules of Criminal Procedure were amended on December 1, 2002, requiring defendants to give notice of their intention to introduce expert evidence of mental health conditions at capital sentencing hearings. FRCP 12.2 (c). The case was not remanded to the Court until November 5, 2004. (Document 73).

On November 8, 2004, Gregory Waples withdrew from the case and Assistant United States Attorney Stephen Kelly filed his appearance. (Docket Sheet). Sometime later that month, Assistant United States Attorneys Darrow and Kelly called Fell's counsel and requested that an unnamed third doctor be allowed to interview Fell. That was refused. On December 1, 2004, Fell filed notice of his intent to present expert evidence of a mental condition if the case proceeded to a capital sentencing hearing. (Document 74).

A pretrial conference was held on December 16, 2004. The Court scheduled jury selection to begin May 3, 2005. (Docket Sheet). The next day, the government filed a memorandum stating the government had retained psychiatrist Michael Welner, M.D. in early

4

FELL-00001420

2004. ("Dr. Welner has reviewed voluminous written materials and has met with government counsel") (Document 77, p. 3). The pleading sought a court order that Welner be allowed to interview Fell pursuant to newly amended Federal Rule of Criminal Procedure 12.2 (c). The memorandum promised, "The government is not seeking, and will instruct its expert not to seek, aggravation evidence." (Id, at 11).

Attached to the memorandum was a proposed order giving a mental health expert access to interview and test Fell. Most of the language was later adopted verbatim by the Court. (See Document 101). The proposed order required that any additional tests upon Fell be by agreement, or by court order. This command was later incorporated in the Court's order (Id).

Fell filed a response complaining that the government should not be allowed a third interview by a new expert. (Document 78). Fell also objected to the procedure proposed by the government, anticipating future problems. (Id, at 2) ("The government's proposed order makes no attempt to 'firewall' the two prosecutors in the case from Dr. Welner. Although the proposed order makes the final report inaccessible to the parties – unless a punishment hearing is held – it makes no provision to segregate the prosecutors from their expert before then."). Fell's reply suggested that  the prosecutors had already discussed the previous mental health reports with Welner, and that given Welner's history of diagnosing criminal defendants as psychopaths, the only thing the prosecutors lacked from him was a written report. (Id).

The government responded, mostly by invoking Welner's credentials and defending his theories, including his so-called "Depravity Scale."(Document 79). However, the response also alleged that no "firewall" was necessary because "the unexpected need to do additional testing ... would have to be communicated to a government attorney, to defense counsel, and to the court."

5

FELL-00001421

(Id, at 6-7, citing the procedure in United States v. Sampson, 335 F. Supp. 2d 166, 244 (D. Mass. 2004).

The Court held that the government had a right to have one expert interview Fell, but not three. (Document 100, p. 17). A separate order, issued the same day, outlined the procedures to be followed, and limited the examiners to Rabun, Wetzel, or both. It required that any new tests be performed either with the defendant's consent or by court order. Any disputes about testing had to be decided by the Court before the tests could go forward. (Document 101). The order, which was issued a month before jury selection was scheduled, required that the examination take place before the start of jury selection. (Id). It also stated that no "fire-walling" procedures were necessary. (Id).

Instead of complying with the order, the government sought its reconsideration. (Document 105). The government urged that Welner be allowed to examine Fell, promising that he "will not conduct new neurological, personality or intelligence testing." The government claimed that Rabun and Wetzel had been used "to inform the defense settlement offer, not for trial."(Id).

The motion suggested that the government had no intention of calling Rabun or Wetzel at trial, regardless of whether or not the Court changed its ruling. ("Those experts were not retained to prepare the case for trial, and were not anticipated as trial witnesses.") (Id). Instead, the government intended to call only Welner:[3]

During the ensuing 14 months Dr. Welner has been engaged in an extensive

---

[3] "The government expects to call Dr. Welner for the penalty phase rebuttal whether or not he conducts the final interview. He will testify based upon his extensive psychiatric inquiry, informed by the results of the 2005 interview (by whomever conducts it)."(Id, at 5).

6

FELL-00001422

evaluation of the defendant. He has reviewed thousands of documents relating to Fell, including work papers, interview reports and test results generated by the 2001-02 experts, as well as historical records from Pennsylvania schools and family service entities, and documents created during the criminal investigation, such as crime scene evidence, photographs and police reports. He has also spent three days in Fell's hometown of Wilkes-Barre, Pennsylvania, meeting with and personally interviewing over a dozen persons knowledgeable about Fell and Robert Lee, such as friends, school teachers, and family members. Dr. Welner has conducted a far more comprehensive study of Fell to date than either of the government's 2002 experts. Moreover, those 2002 experts have not worked on the case since 2002. It would be difficult and resource consuming at this point to prepare them for the interview and trial. In contrast, during 2004-05 government counsel has spent many hours in multiple face-to-face meetings and lengthy phone consultations with Dr. Welner. (Id, at 4-5).

Fell then filed a motion in limine seeking to limit Welner's testimony. (Document 107). In it, Fell pointed out that Welner would violate medical ethical rules if he testified about a person he had not examined. (Id, at 5). The government responded by arguing the ethical requirement was met as long as Welner made an earnest effort to do a personal examination of Fell. (Document 113). The government also attached the affidavit of Gregory Waples, allegedly to establish that Rabun and Wetzel were hired only to support plea negotiations. (Id). Additionally, for the first time, the government began to claim its communications with Welner were limited:

> Dr. Welner has not communicated his conclusions to the government. Nor has his inquiry been directed by the government. The independence of his examination was a written precondition of his agreeing to take on this case. He will file a report at the completion of his inquiry. If an interview is permitted, his report will be maintained and disclosed consistent with the provisions of Rule 12.2 and the Court's prior order. (Id, p. 4, n. 6).

Jury selection began on May 5, 2005. (Document 118). On May 26, 2005, the Court denied the government's motion for reconsideration. (Document 131). The Court found the government's claim that Rabun and Wetzel were merely hired to advise plea negotiations to be a

7

FELL-00001423

misrepresentation. ("To say these interviews were *only* to advise the Government concerning plea negotiations misrepresents what the experts were hired to do." (Id, p. 14). The Court held that the introduction of a third expert would be unfair:

> Here, the Government and defense knowingly and voluntarily entered into an agreement permitting the Government to select experts to evaluate Fell and report their findings regarding issues relevant to the penalty phase of the proceeding. The criminal justice system functions best when litigating parties enter into stipulations to resolve differences regarding process. Agreements of this sort are basic to the sound administration of justice. Implicit within the agreement was the representation that these were the experts whom the government chose. To permit the Government to enter into an agreement of this sort with Drs. Rabun and Wetzel, and then decide, for whatever reason, it wanted a different expert to go through the same process two or three years later, violates the spirit, if not the language, of the agreement. From the perspective of the criminal justice system, such a finding would discourage agreements between the parties. Simply put, such a finding would be unfair. (Id, at 15-16).

The following week, two months after the Court's original order permitting Rabun and Wetzel to re-interview Fell, the government requested that the interview proceed. Despite the fact that the original order required the interview to occur before jury selection began – and the only delay was the government's motion for reconsideration – the Court allowed the interview to go forward. An interview by Dr. Wetzel was scheduled for Monday, June 13, 2005, four days after a jury had been selected, and exactly one week before the trial was to begin.

On June 13, 2005, Dr. Wetzel interviewed Fell at the Northwest Correctional Facility in Swanton, Vermont for approximately eight hours. No defense counsel was in the room. The interview was recorded. Wetzel employed no psychological tests, but asked questions about the circumstances of the charged offenses and Fell's background.

The next day, Fell filed a Trial Memorandum. (Document 142). In it, Fell predicted that the government would call Welner as its sole mental health expert, that Welner would diagnose

8

Fell as a psychopath, that Welner would seek to testify about hearsay describing uncharged

misconduct, and that he would opine that the defendant is a liar. (Id, at 7-8). The basis for this

prediction was Welner's previous testimony in other cases, including two published opinions,

State v. Vandweaghe, 827 A. 2d 1028 (N.J. Sup. Ct. 2003) and United States v. Sampson, 335 F.

Supp. 2d 166, 22, n.27 (D. Mass. 2004).

The government responded that Fell's complaints were premature. (Document 143).

Welner allegedly had not completed his evaluation. ("In fact, the final videotaped interview of

Fell only occurred this week.") (Id, at 21).

The following week, June 20, 2005, trial began. (Document 144). The government had

tapes of Wetzel's interview digitized on DVDs and distributed them to Rabun, Wetzel, and

Welner, but not to defense counsel. Testimony in the guilt phase was completed on June 24,

2005. (Document 155). The jury returned guilty verdicts on all counts that same day. (Document

156).

It was not until late on June 27, 2005, that the defense received copies of the DVDs.

(Document 160). In a pleading, Fell complained that neither the defense attorneys nor defense

experts would be able to view the eight-hour recording before the government began its

punishment case the next day. (Id). On June 28, 2005, the government began its punishment case.

(Document 172).

On June 29, 2005, the government provided a "revised, partial report" of Dr. Wetzel to

the defense. The report was less favorable to Fell than Wetzel's original findings. However,

Wetzel still maintained that Fell's physical and sexual abuse as a child affected his development.

A cover letter from the government stated, "In discussions with Dr. Wetzel he

9

FELL-00001425

commented that he had been asked to write the 2002 report in a way that was sympathetic." The letter also said, "We would be interested in knowing whether you intend to call Dr. Wetzel as a witness. He repeatedly has asked whether and if he needs to come to Vermont, so that he can make advance plans."

In open court on June 29, 2005, the government reiterated it had no desire to call Wetzel at trial. ("As you know the expert we've been relying upon is Dr. Welner.") (Vol. VI, 1, p. 104). The Court pressed the government about producing Welner's report:

> THE COURT: All right. Well, I mean you can't wait until 24 hours before he testifies. So realistically it's got to be this week I would think.
>
> MR. DARROW: Okay.
>
> THE COURT: He's relying upon reports of others. He apparently now has the most recent report from Dr. Wetzel. He's done a lot of interviews. Is there any difficulty in setting a deadline of Friday so the defense has the opportunity over the weekend to take a look at his report?
>
> MR. DARROW: No, Your Honor.
>
> THE COURT: So we'll set the deadline for Friday in that regard. (Id, at 105).

In response to Wetzel's "revised, partial report," Fell filed a motion in limine challenging the admissibility of some of its statements. (Document 177). Fell also pointed out that the cover letter's reference to Wetzel's "sympathetic" 2002 report contradicted the previously filed affidavit of Assistant United States Attorney Gregory Waples that "neutral, professional opinions" had been sought. (Id, at 3).

Dr. Wetzel followed up his revised report with a letter to Assistant United States Attorney William Darrow on June 30, 2005. In it he wrote, "Both ASPD [Anti-Social Personality Disorder] and psychopathy are quite common in prison populations. Common characteristics in a

10

FELL-00001426

population seldom, if ever, become useful in predicting rare events, like homicide or suicide."

On Friday, July 1, 2005, the government reported to the Court that there would be no report from Welner before the three-day July 4th weekend. (Vol. VII, 1, p. 8). In explaining the delay, AUSA Darrow said, "Also we had Welner walled off after the interview until the guilt phase. So he didn't receive - - he hasn't reviewed the June 13, 2005 interview of the defendant." (Id, at 15). Later, the Court stated:

> I'm not going to exclude Dr. Welner from testifying. There's a request that I exclude him. I'm not going to exclude him from testifying, but in light of the late delivery of the letter, it seems to me that surrebuttal responds to that, so you'll have an opportunity to rebut as well as cross-examine. (Vol. VII, 2, p. 95).

Four days later, on July 5, 2005, at approximately 9:30 p.m., Fell's counsel received a faxed 72-page report written by Welner. In the report, Welner confirmed that Dr. Wetzel had been used as a proxy to ask Welner's questions at the re-interview. ("... a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Fell) (Welner Report, p. 27). The report also indicated Welner had performed several new tests, never disclosed to the defense: Psychopathy Check List-Revised ("PCL-R"), [4] administered July 4, 2005; Violent Risk Appraisal Guide ("VRAG"), administered July 4, 2005; The Historical/Clinical/Risk Management ("HCR-20"), date unspecified. (Id, at 8, 67).

As anticipated, Welner's report relied heavily on uncharged misconduct and the statements of persons who either, were not potential trial witnesses, or were not identified at all:

---

[4] "For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided the questions to be posed for Mr. Fell." Welner scored Fell at the 100th percentile. (Id, at 27, 32)."Mr. Fell scores a 29 on the VRAG. This places him at a percentile of 99 and with a likelihood of violent recidivism exceptionally high relative to his peer group." (66).

11

FELL-00001427

And in the years from his 18th birthday on, he admitted to having seriously assaulted someone, broke into cars and stolen cash and items, and was identified by witnesses as having kidnapped, destroyed property, committed sexual abuse, and taken part in the destruction of cats and other animals. (Id, at 10).

While Fell and Lee were on the run from police, and low on cash, Fell – a demonstrated Satan adherent – hoisted up a sign for help from passersby with the expressed gratitude, "God Bless." Notes from interviews with Mr. Fell shortly after his arrest note his staring straight at officers without blinking. His self-possessed apparent certitude in stating the incredible recalls a notation in his chart from his hospitalization at age 13, in which staff noted that he "lies to the point of delusion." (Id).

Dr. Welner chronicled every bad allegation provided to him about Fell, never once questioning the credibility of the sources or the information. He quoted persons saying that Fell was a liar (11, 14), that he dreamed of going on a killing spree (11, 46), that he engaged in Satanism (11, 45), that he was quick to become violent and threatening (12, 45), that he started fights (12, 28, 44), that he did not show remorse or accept responsibility for misconduct (13, 14, 30, 31, 32), that he was a bully (14, 32, 33, 40), that he was cruel to people and animals (14, 27, 30, 44, 58), that he set fires and destroyed property (15), that he liked to steal (15, 27), that his tolerance for alcohol allowed him to function unaffected (16, 32-33, 35), that he was belligerent and destructive (18, 32, 35, 43), that he engaged in risk taking behavior (28, 32, 35, 43, 45, 46), that he was superficially charming and manipulative (28-29, 31), and that he could control others (29, 31, 40).

Welner explained any problem in Fell's life as "psychopathy." Welner ascribed Fell's declining school work and erratic work history as evidence of psychopathy. (17). He depicted Fell's behavior leading up to and after the charged crimes as "organized, cooly composed, and involved elaborate criminal concealment."(19). "Describing himself as 'not a worrier' Mr. Fell's

12

FELL-00001428

social imperturbability is frequently described in psychopaths."(30). "Beyond psychopathy, Mr.

Fell's moral development and life choices also reflect his having been told – and communicated

his belief – that he could kill someone and get away with it." (32). "The traits of psychopathy –

not to be confused with psychosis – endow him with the freedom to dispense with worrying

about the sensitivities of others." (45).

Much of the report retold the events of the charged crimes and allowed Welner to put a

spin on what they meant. In many respects, the report was little more than a very lengthy closing

argument.[5] Absent the discussion of psychopathy, there was hardly any reference to psychology

or psychiatry at all.

Welner downplayed Fell's sexual abuse and claimed it had no effect on him: "It is my

professional opinion, therefore, that the impact of the sexual abuse – and of Donald Fell

witnessing it – is indirect. Donald received care for the event, and was discharged from treatment

as improved." (47). Welner claimed Fell had many positive role models, but that did not matter:

"It is my professional opinion that this quality of Donald Fell, of answering only to himself, has

rendered even the most effective of role models irrelevant." (53). Welner was even able to blame

Donald Fell for his mother's desertion when he was Thirteen: "It is my professional opinion,

with a reasonable degree of psychiatric certainty, that Ms. Fell's abandonment of Donald

preserved her safety, indeed her life." (57).

According to Welner, virtually no external forces affected Fell's development: "Donald

---

[5] E.g.: "Donald Fell wouldn't fight the Mrs. Humanik who challenged him back, he wouldn't fight a drinking Charles Conway a few nights before. But with Conway – who may have been threatening to call police on two men with outstanding warrants in Pennsylvania – in repose, inebriating him with an otherwise valued commodity ensured Fell would not be backing down this night."(p. 43).

13

FELL-00001429

Fell is a man for whom there were no cracks he had to fall into, but a man who created cracks

faster than others could fill them." (61). "It is my professional opinion, with psychiatric certainty,

that from the point of recognition of what he had done, Donald Fell has demonstrated no more

than superficial remorse for his actions." (67).

The day after receiving the report, July 6, 2005, Fell filed a motion to exclude Welner's

testimony because the government had violated the Court's April 7, 2005 order, by using Dr.

Wetzel as a proxy for Welner's interview, and by allowing Welner to perform tests that were

neither consensual nor approved by the Court. (Document 182). The motion also complained

about the hearsay and uncharged misconduct in the report, as well as the psychopathy diagnosis.

(Id). The motion was discussed that day in open court:

> THE COURT:  Did he use Dr. Wetzel to ask the defendant questions for his own
> testing?  Is that what happened?
>
> MR. DARROW:  We -- what happened, Your Honor, is we -- as you know, Dr.
> Welner was working on this case intensively, and I can't remember the exact
> dates.  We've briefed it several times.  But in -- I think it was 2003 and 2004, or
> maybe it's 2004 and 2005.  But for a couple years coming into the trial.  And we
> had been out of touch, frankly, with -- with Wetzel and Rabun, who had not been
> involved in the case since, I think it was, 2002.  And again, I'm a little uncertain of
> my numbers.  I think that's right.  And that's why we had wanted to use him.  He
> had done a lot of work.  And in fact, when we were trying to get our motion for
> reconsideration in front of you, Welner had -- had flown out to Wilkes-Barre and
> started pounding the pavement and interviewing family members and friends and
> people who knew Mr. Fell when he was growing up in Wilkes-Barre, and so he
> was -- he had started with a very comprehensive psychiatric approach.  We, as we
> indicated in the papers at the time, have all along regarded him as our -- as our
> first choice and our primary mental health rebuttal expert for those reasons, and
> we didn't give up on him when -- when the Court decided that he shouldn't be the
> one doing the interview.
>
> THE COURT:  Did you tell him to tell Dr. Wetzel to ask the questions that Dr.
> Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel had to
> support his opinion?  Is that what you did?

14

FELL-00001430

MR. DARROW:  No.  Those two were in consultation with each other prior to the interview.  We told Dr. Wetzel to conduct the interview as -- as he saw fit, but we also told him that -- you know, to be in touch with Dr. Welner about it, and we know that Dr. Welner prepared some of the questions, not all of them, for him to ask.  I didn't -- we were not involved in a lot of this stuff.  Moreover, my understanding from speaking to him today is that the -- the name of the psychopathy test, which I can't remember, is not a test which was administered.  It's a historical scale that was done after the fact.  We had understood your court order saying, you know, any -- any further psychological testing, bring it up with counsel, to refer to psychological testing during the interview; in other words, with the defendant at the facility, and there wasn't any.  You know, what Welner did was after he had gotten all this information together, including the DVD of the interview and all these collateral interviews that he's been doing, is he plugged in that -- whatever the name of that scale is and -- and reached results.  Not dissimilar, Your Honor, to an antisocial personality disorder diagnosis, which is the primary diagnosis that Dr. Welner reaches.  You know, it's not a piece of paper like the MMPI that you put in front of the defendant and have him fill things in. Instead, it's a review of his history.  You know, what was he doing before the age of 15, for example.  That's one of the primary factors for antisocial personality disorder diagnosis.  And a lot of that stuff's just historical. (Vol. VIII, 2, pp. 72-75).

The Court accepted that answer and the government's explanation that the prosecutors were not telling the experts what to do:

THE COURT:  You know, I'm not pointing the finger at one particular -- in one particular direction, because this has been going on both sides.  I mean, we're now in the middle of a penalty phase.  I understand that the government has to set up the wall so that there's some justification for you not having spoken with people in advance because you had to wait for the conviction, if there was to be a conviction.  I understand that.  But, you know, I'm just expressing my frustration on both sides that -- that discovery -- we're in the middle of a discovery phase in a capital punishment case and discovery is like -- it's just not happened. (Vol. VIII, 2, p. 77).

The next day, Fell withdrew his Notice of Expert Evidence of a Mental Health Condition. (Vol. IX, 2, p. 3). That was followed by a written declaration of the same. (Document 191).

After the trial ended, Dr. Wetzel was contacted by defense counsel. Dr. Wetzel said that on two occasions before his June 13, 2005 interview of Donald Fell he spoke to Assistant United

15

FELL-00001431

States Attorney William Darrow. At some point in these conversations, Darrow encouraged

Wetzel to use questions prepared by Michael Welner, M.D. for the interview. Wetzel stated it

was not his idea to ask Welner's questions.

3. Argument. Due process protects the accused from actions that violate "those

fundamental conceptions of justice which lie at the base of our civil and political institutions and

which define the community's sense of fair play and decency." United States v. Lovasco, 431

U.S. 783, 790 (1977). The requirement of "fundamental fairness" is a core value "embodied in

the Due Process Clause of the Fourteenth Amendment." In Re Winship, 397 U.S. 358, 369

(1970).

Prosecutors serve a unique role in assuring that an accused receives fair play and decency

in the judicial process. As opposed to being an ordinary party to a controversy, it is the

prosecutor who serves as a critical representative of the sovereignty, which has the "obligation to

govern impartially." Berger v. United States, 295 U.S. 78, 88 (1935). In a criminal prosecution,

the prosecutor's role "is not that it shall win a case, but that justice shall be done." Id. "It is as

much his [or her] duty to refrain from improper methods calculated to produce a wrongful

conviction as it is to use every legitimate means to bring about a just one." Id.

The Court was very specific in its May 26, 2005 order. The Court refused to reconsider its

previous order, which denied Dr. Welner an opportunity to interview Donald Fell. The Court said

that it would be unfair to allow a third expert when the parties had previously agreed to two.

(Document 131, p. 16). The circumvention of the Court's order by using Dr. Wetzel as a proxy

for Welner's questions was equally unfair. Secretly employing psychological tests in violation of

the order was also unfair. Misrepresenting to the Court that this was done was a violation of due

16

FELL-00001432

process of law.

On July 6, 2005, the Court asked the government if the prosecutors had violated the order in this manner. The response from the government to the Court was "no" and that the doctors had created the procedure themselves. The government even allowed the Court to believe that the prosecutors could not have intervened because the rules of procedure prevented such contact. The prosecutors explained the unauthorized testing by claiming they thought the prohibition referred only to paperwork that the defendant had to complete himself. None of these representations were true.

Even at that time, it was clear that the government's responses were not forthcoming. There was no credible reason why Dr. Wetzel would have agreed to ask Welner's questions without first speaking to a prosecutor. The two doctors have, and had, no professional relationship. Dr. Wetzel knew that his authority to re-interview Fell was by court order. He knew that the order limited the interview to be performed by either himself or Dr. Rabun. There was absolutely no way he would have assumed that Welner had the authority to write the questions for him.

It was only after the trial was over, and after speaking to Dr. Wetzel, that the defense learned the truth of what had only been previously suspected. Assistant United States Attorney William Darrow told Dr. Wetzel that he should accept Welner's questions and pose them to Fell. According to Wetzel, Darrow said so at some point in two different conversations. Darrow and Wetzel cannot both be correct.

The government was untruthful. After investing tremendous time and effort in trying to insert Dr. Welner into the case, the government overreached. Mr. Darrow did not want to be left

17

FELL-00001433

with the two doctors who he was heard to disparage as "Greg's experts" (referring to Gregory Waples's selection of Rabun and Wetzel).

However, more egregious than the use of Wetzel as a proxy was the additional testing performed by Welner. It was the government that proposed the condition that there be no new testing of Fell unless the defense consented or unless the court ordered it first. (Document 77). It was the government that wrote there needed to be no fire-walling from their expert because any new tests would have to first be presented to both parties and the Court. (Document 79). It was the government that wrote there was no need to be skeptical of an examination by Welner because he would not seek "aggravation evidence" and that the government would instruct him accordingly. (Document 77). It was the government that assured the Court that Welner "will not conduct new neurological, personality or intelligence testing."(Document 105). According to Welner's report, none of that was true.

The government may claim that a psychopathy diagnosis is not "aggravation evidence," but there is no conceivable parsing of "neurological, personality or intelligence testing" to exclude the PCL-R, VRAG, and HCR-20 tests. Mr. Darrow's rationale that the government thought new tests were those "that you put in front of the defendant and have him fill things in," is belied by the fact that none of the tests previously administered to Fell required him to do anything but answer questions – exactly like the eight-hour interview on June 13, 2005. Apparently, that was the only explanation Mr. Darrow could come up with for why there was such an obvious violation of the Court's order.

Prosecutors violate due process by concealing facts or presenting false evidence. See Mooney v. Holohan, 294 U.S. 103 (1935); Napue v. Illinois, 360 U.S. 264 (1959); Giglio v.

18

FELL-00001434

<u>United States</u>, 405 U.S. 150 (1972). This is true whether the misconduct affects the conviction or the sentence. <u>See Green v. Georgia</u>, 442 U.S. 95 (1979). As the Supreme Court stated in <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

Even overwhelming evidence of guilt does not immunize the sentencing phase evaluation of aggravating and mitigating factors. "[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978). Prosecutorial misconduct in the sentencing hearing can operate to preclude the jury's proper consideration of mitigation. "When a prosecutor's actions are so egregious that they effectively 'foreclose the jury's consideration of ... mitigating evidence,' the jury is unable to make a fair, individualized determination as required by the Eighth Amendment." <u>See Buchanan v. Angelone</u>, 522 U.S. 269, 277 (1998).

In this case, the government's actions precluded the jury's consideration of mitigation evidence by causing Fell to withdraw all expert mental health evidence. This was not a decision the defense took lightly, as counsel had promised expert mental health evidence to the jury during the opening statement. (Vol. V, 1, pp. 56-57). However, faced at the last moment with the toxic claims of Dr. Welner,[6] the defense had the choice of (1) withdrawing its notice of expert

_____

[6] The differences between Rabun's and Welner's findings were dramatic. Even Wetzel's revised report maintained that Fell's childhood physical and sexual abuse affected his development. Welner completely discounted any explanations for Fell's development except

19

FELL-00001435

evidence, thereby preventing Welner's testimony entirely, or (2) calling its expert, Dr. Mark

Cunningham, Ph. D., and then trying to limit Welner's testimony at a hearing outside the

presence of the jury. Since the Court had already stated that Welner would be allowed to testify,[7]

there was no assurance that the latter choice would be satisfactory.

Defense counsel would not have been handed this Hobson's choice if Welner's testimony

had been excluded for being in violation of the Court's previous orders. This was not the Court's

fault since the information the Court relied upon in making its decision was false. It was the

government that made those misrepresentations to the Court. What the government did –

surreptitiously using a third expert – was exactly what the Court had previously characterized as

"unfair."(Document 131). It did not become any more fair because the government was able to

secretly accomplish what the Court refused to order.

The Special Verdict Form indicated that of the 19 listed mitigating factors, there were

only three that no jurors supported. (Document 200-1). Eight of the mitigating factors were found

unanimously by all twelve jurors. A twentieth mitigating factor was added and supported by 10

jurors. It is impossible to know how the weighing process was employed. However, there is

absolutely nothing in the record to assure that, absent the government's misconduct, a death

sentence was a certainty.

This issue does not involve a technical interpretation of Federal Rule of Criminal

---

"psychopathy." Further, Welner alleged that the psychopathy diagnosis predicted Fell's risk of
danger in prison, a claim that was completely rejected by Wetzel.

[7] Although the Court held that the defense could call a different expert, Dr. Mark Mills, in
surrebuttal, only the withdrawal of all defense expert testimony would have prevented the
government from calling Welner. See FRCP 12.2 (c) and Document 101.

20

5:01-cr-00012-gwc   Document 512-23   Filed 04/15/14   Page 136 of 260

Procedure 12.2 (c). It is a question of fairness. The government repeatedly flouted this Court's orders and made misrepresentations to the Court. Those actions harmed Fell.

## III. INCONSISTENT POSITIONS

1. Summary. During settlement negotiations and in a plea agreement, drafted by the government, the government made the following assertions: that Fell was impaired at the time of the crimes; that his mental health history and background were mitigating; that he had shown remorse and had accepted responsibility for his conduct; that he assisted law enforcement in locating Mrs. King's body; and that he did not have a substantial prior criminal history. Fell moved to prevent the government from seeking the death penalty because these statements were judicial admissions. That motion was denied. Fell then requested to introduce evidence of the plea agreement and its contents as evidentiary admissions. That too was denied.

In its penalty case, and particularly in closing argument, the government not only argued against its previous positions, it belittled them. Because of the Court's previous rulings, Fell was not allowed to answer the government's argument. The government's inconsistent positions denied Fell a fair trial and due process of law because he could not respond.

Fell's previous arguments in favor of using the plea agreement relied on principles of estoppel and the evidentiary rules about admissions of a party-opponent. Here, Fell is arguing a more basic point of fairness: if a prosecutor takes an inconsistent position, opposing counsel must be allowed to bring the conflict to the factfinder's attention.

2. Facts. In 2001, the government drafted a plea agreement. (Document 40, Attachment). In exchange for pleading guilty to Count Two of the Indictment, Fell was to receive a sentence of life in prison without the possibility of release. The language of the plea agreement was

21

FELL-00001437

composed and written entirely by the government. It contained the following assertions of fact:

> The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history.

Fell and his attorneys signed the agreement. Pursuant to Department of Justice protocol, the Attorney General of the United States had to approve the settlement before the United States Attorney could sign the agreement. Attorney General John Ashcroft refused to allow the plea agreement and required the United States Attorney to file a Notice of Intent to Seek the Death Penalty. (Document 32).

Fell filed a motion to dismiss the government's Notice of Intent to Seek the Death Penalty. (Document 40). In a Memorandum Opinion and Order (Document 56), the Court denied Fell relief. The Court found that the plea agreement was neither a contract, nor a judicial admission, and thus could not be used as an estoppel to the government's capital prosecution. Later, in response to the government's motion in limine (Document 103), the Court ruled that the plea agreement was also not admissible as an evidentiary admission. (Document 131).

In closing argument at punishment, the government affirmatively took positions that contradicted the statements that were made in the plea agreement. Referring to the mitigating factors contained in the Court's instructions and verdict sheet, Assistant United States Attorney Stephen Kelly said:

> First one reads: After his arrest, Donald Fell truthfully admitted his responsibility for Terry King's murder. Simply not true. ... He has never been truthful about these crimes. (Vol. XII, pp. 42-43).

22

FELL-00001438

This one reads: Donald Fell assisted law enforcement in finding Terry King's body. Again, it's just not true. ... The fact of the matter is Donald Fell did not lead them to the scene where she was recovered. That's the evidence in this case. (Vol. XII, pp. 43-44).

Where, ladies and gentlemen, where in the evidence of this case is there any remorse for Terry King's murder? ... There's no evidence of remorse for his murder of Terry. (Vol. XII, pp. 44-45).

Let's move on to the next factor: Donald Fell offered to plead guilty to kidnapping and murdering Terry King knowing that the law requires a sentence of life imprisonment without the possibility of release and he has maintained that offer to this day. Ladies and gentlemen, the judge instructed you. You know the law. Life imprisonment without the possibility of release is the minimum sentence that Donald Fell faces for kidnapping with death resulting. It's the minimum sentence. When he offered to make that plea, he knew the evidence against him was overwhelming. He knew there was no doubt he was going to be convicted, so he asked for the minimum sentence. We rejected that, ladies and gentlemen. We wanted a jury to decide the appropriate sentence in this case. And, ladies and gentlemen, let's take a look at the last part of this: He's maintained that offer to this day. Ladies and gentlemen, we had to try and convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden. We proved it. And now we are here to decide what is the just sentence. The minimum sentence? Or the death sentence? (Vol. XII, pp. 49-50).

You will see that he began to develop the proclivity for violence when he was very young. It got worse and it got worse, and respectfully, ladies and gentlemen, it's not because of his childhood and background. (Vol. XII, p. 53).

3. Argument. A jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. United States v. GAF Corp., 928 F.2d 153, 1260 (2d Cir. 1991). This is because a jury, and not the government, must ultimately decide the case. United States v. Salerno, 937 F.2d 797, 812 (2d Cir. 1991).

It is one thing to say that a defendant may not use a failed plea agreement to attack the government. It is quite another for the government to be allowed make inconsistent arguments

23

FELL-00001439

without fear of having to answer for them. In this case, the government sought and received a ruling preventing Fell from mentioning the plea agreement. That left the government free to disparage Fell without consequence. That is exactly what happened.

At first, the government agreed that Fell accepted responsibility and was remorseful. Then at trial they argued he was not. The government first agreed that Fell assisted in finding Mrs. King's body. Then at trial they argued he did not. The government first agreed to allow Fell to plead guilty because of mitigating circumstances. Then at trial they argued they did not. The government first agreed that Fell's background and childhood were mitigating. Then at trial they argued they were not.

Recently, the Supreme Court addressed the issue of inconsistent positions by a prosecutor. Bradshaw v. Stumpf, 125 S.Ct. 2398 (2005). In that case, Stumpf pleaded guilty to a potential capital crime. A three-judge panel imposed a death sentence, in part because the prosecutor proved Stumpf shot the decedent. Later, Stumpf's accomplice Wesley was caught and tried before a jury for capital murder. The same prosecutor alleged that Wesley was the shooter. Wesley was convicted, but received a life sentence. Stumpf then challenged his conviction and death sentence for the reason that the prosecutor's inconsistent positions denied him due process of law. After litigation through the state and federal courts, the Sixth Circuit agreed with Stumpf and overturned his conviction and sentence.

The Supreme Court reversed on a narrow point. Justice O'Connor, writing for a unanimous Court, found that by pleading guilty Stumpf had voluntarily and intelligently admitted all the necessary elements of the crime. Therefore, what happened afterward – Wesley's

24

FELL-00001440

prosecution – was simply not relevant to the validity of Stumpf's conviction.[8]

More important, is what members of the Court opined about how inconsistent positions by a prosecutor should be treated. Justice O'Connor wrote that the case would be remanded to the court of appeals to decide whether, absent an invalid conviction, the facts justified vacating Stumpf's death sentence: "The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." Id, at 2407-08.[9]

In a concurrence by Justice Souter, joined by Justice Ginsberg, Souter pointed out the graveness of a sovereign taking inconsistent positions, and he quoted Justice Stevens, that "the heightened need for reliability in capital cases only underscores the gravity of those questions."Id, at 2409 (Souter, J., concurring), quoting Jacobs v. Scott, 513 U.S. 1067, 1070 (1995). However, more relevant to the case at bar, was Justice Thomas's concurrence, joined by Justice Scalia, that "a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention." Id, at 2419 (Thomas, J, concurring).

In other words, a clear majority of the Supreme Court believes that a defendant should at least be able to address a prosecutor's inconsistent statements. That did not occur in this case

---

[8] This ruling does not appear to affect precedents holding that a prosecutor's inconsistent arguments in obtaining convictions in successive jury trials violated due process. See e.g. Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000).

[9] Unless it is less offensive for a prosecutor to take inconsistent positions in the same case, as opposed to succeeding cases, the same reasoning should apply here.

25

FELL-00001441

because the Court twice previously ruled that the plea agreement was inadmissible. However, those rulings were based upon Fell's use of the evidence as a sword to attack the government, not a shield to protect him from inconsistent arguments. The government was then able to affirmatively take inconsistent positions without fear of a response from the defense. The jury was never given the opportunity to evaluate the credibility of those different positions.

The Second Circuit has consistently held that the remedy for addressing a party's use of inconsistent positions is to allow the opponent to expose them to the jury. See Salerno, 937 F. 2d at 812 (defendant should have been allowed to expose government's inconsistent positions in succeeding trials). The Circuit justified the practice as follows:

> To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of the facts within their personal knowledge between trials and to conceal these changes from the trier of fact.

United States v. McKeon, 738 F. 2d 26, 31 (2d Cir. 1984); see also GAF Corporation, 928 F. 2d at 1260 (successive trials of same defendant). Even when the policy of encouraging plea negotiations was overridden, the Circuit found that fairness required the admission of relevant evidence, in order to expose a party's inconsistent statements. See United States v. Barrow, 400 F.2d 109, 116 (2d Cir. 2005) (government could confront defendant with inconsistent proffer statements at trial).

Fell was clearly harmed by the government's inconsistent positions. Most of the reasons that the government offered for his execution – lack of remorse, failure to accept responsibility, the irrelevance of his childhood and background – refuted positions that the government had

26

FELL-00001442

originally taken in the plea agreement. This was unfair.

## IV. IMPROPER ARGUMENT

1. Summary. The government repeatedly argued to the jury that they should not consider mitigating evidence about Fell's background for the reason that its was not connected to the crimes. This was an incorrect statement of law, as Fell had a constitutional right to have the jury consider any mitigating evidence, regardless of whether or not it had a nexus to the charged crimes. Fell was harmed by that argument.

2. Facts. In closing argument during the penalty phase, Assistant United States Attorney Stephen Kelly asked rhetorically, "What do these [mitigating] factors have to do with the crimes in this case?" (Vol XII, p. 38); "What's the connection between [Fell's] background and childhood and these crimes?" (Vol. XII, p. 52); and, "What does the sexual assault when he was four or five have to do with the crimes in this case?" (Vol. XII, p. 55). He summed up his answer as follows:

> What's the evidence of the mitigating factors? To the extent you find some, there are not that many respectfully, and they really don't relate to the crimes. They really relate to his childhood. (Vol. XII, p. 64).

After the defense made a closing argument, Assistant United States Attorney William Darrow stated, "What you just heard was a very articulate expression of what's called the abuse excuse." (Vol. XII, p. 118). He went on:

> There are thousands and thousands of children, unfortunately, who grow up in rotten families with rotten backgrounds, without a parent, without any parents. There are tens of thousands of them in foster care, in abusive foster care homes. They don't all grow up to be murderers, particularly that kind of murderer. (Vol. XII, p. 125).

Nowhere in the Court's charge to the jury was there an explanation that mitigating factors do not

27

FELL-00001443

need to have any connection to the capital murder, in order for the mitigating factors to be found, and then to be weighed against aggravating factors.

3. Argument. A capital defendant's mitigating evidence need not have any link or nexus to the capital murder for which he has been convicted. Tennard v. Dretke, 124 S.Ct. 2562, 2571-72 (2004); Smith v. Texas, 125 S.Ct. 400, 405 (2004). A sentencer must be allowed to give full consideration and full effect to those mitigating circumstances. Penry v. Johnson, 532 U.S. 782, 797 (2001). The jury must be given a vehicle for expressing its reasoned moral response to that evidence and make a reliable determination that death is the appropriate sentence. Id, see also Woodson v. North Carolina, 428 U.S. 280, 304, 305 (1976).

In this case, the jury was told repeatedly by the prosecutors that Fell's mitigation evidence did not matter because it had nothing to do with Mrs. King's death. By saying this over and over, with no legal instruction to the contrary, it affected the ultimate decision to sentence Fell to death.

The prosecutors were on notice that their arguments were incorrect statements of law because the Court had issued a written memorandum opinion and order addressing the issue. (Document 139). In its order of June 9, 2005, the Court detailed the extent that a capital jury must consider and give effect to mitigating evidence. The Court specifically referred to information about a defendant's background and upbringing as the type of mitigating evidence that is relevant and must be considered by the sentencer.

In the order, the Court excused a potential juror because the person believed a defendant's background and upbringing were not an excuse for capital murder. That is exactly what the prosecutors argued that the jury should do in closing argument – to pay no attention to what the

28

FELL-00001444

government termed "the abuse excuse." This argument was improper.

The Second Circuit has held that the standard for prevailing on a claim of improper argument by the government is (1) that the prosecutor's remarks were improper, and (2) that the remarks, taken in the context of the entire trial, resulted in substantial prejudice. United States v. Bautista, 23 F.3d 726, 732 (2d Cir. 1994). The remarks by the prosecutors in this case were improper because they were false statements of the law regarding Fell's Eighth Amendment right to present, and to have the jury consider, mitigating evidence.

In assessing that context, the court of appeals focuses on three factors – (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990). First, the government's argument – that Fell's mitigation evidence had nothing to do with Mrs. King's murder – was repeated over and over and could not have been ignored by the jury. Second, the Court's instructions did not ameliorate the statements in any way. Third, absent the misconduct, a death sentence was not certain. The jurors found a majority of the mitigating factors, either unanimously or in part, and there is no way to know how the aggravating and mitigating factors were ultimately weighed.

In Friedman, 909 F.2d at 708-10, the court of appeals reversed the defendant's conviction when the prosecutor distorted the roles of prosecutor and defense counsel in closing argument and undermined the presumption of innocence. "Here, the gravity of the misconduct was substantial, the District Court's response was insufficient to preclude a significant risk of prejudice, and we cannot confidently say that a conviction would surely have been obtained in the absence of the misconduct." Id, at 710.

FELL-00001445

In Floyd v. Meachum, 907 F.2d 347, 354-55 (2d Cir. 1990), the prosecutor commented upon the defendant's failure to testify during closing argument. The court of appeals reversed the conviction for prosecutorial misconduct. A defendant's right to remain silent is a constitutional right in the same way the jury's consideration of mitigating evidence in a capital case is a constitutional right. Neither, is allowed to be undermined by a prosecutor's closing argument.

## V. CONCLUSION

The government misrepresented facts to the Court, took inconsistent positions about its evidence, and misstated the defendant's constitutional rights to the jury. For each of these reasons, and in combination, Fell was denied due process of law, resulting in a miscarriage of justice. The Court should hold a hearing at which the defense may subpoena Drs. Rabun, Wetzel, and Welner. Each of the doctors, and the prosecutors, should be ordered to preserve all correspondence and notes related to their work in this case. Any documents that are claimed to be privileged or work product should be first examined by the Court *in camera*.

Misconduct by the government can only be deterred if there are consequences. In this case, the appropriate consequence is that the Court should impose a sentence of life imprisonment. The sanction "should be tailored to the injury suffered for the Constitutional violation and should not unnecessarily infringe on competing interests." See United States v. Gordon, 156 F. 3d 376, 381 (2d Cir. 1998), quoting United States v. Morrison, 449 U.S. 361, 364 (1981). That result would be no different than if the jury had failed to reach a verdict on the punishment. In that situation, the Court would have imposed a life sentence. Alternatively, the Court should order a new sentencing hearing.

30

FELL-00001446

Respectfully submitted,

By: _____

Alexander Bunin
Federal Public Defender

Gene V. Primomo
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

Paul Volk
Blodgett, Watts & Volk, P.C.
72 Hungerford Terrace
Burlington, VT 05401
(802) 862-8919

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United States Attorneys William Darrow and Stephen Kelly, on this 26th day of August, 2005.

_____

31

FELL-00001447

# EXHIBIT 139

# Washington University in St. Louis

## SCHOOL OF MEDICINE

Department of Psychiatry

**AFFIDAVIT**

STATE OF MISSOURI    )
                     )    ss:
CITY OF ST. LOUIS    )

I, Richard D. Wetzel, Ph.D., do hereby depose and state the following:

1.  I am a licensed psychologist in the state of Missouri (license #434; health service provider # PY00434) employed by the Department of Psychiatry at Washington University School of Medicine as a clinical psychologist and faculty member since Oct 1, 1970. I currently hold appointments as Professor of Psychiatry, Professor of Neurology and Professor of Neurological Surgery.

2.  I would ask the readers of this affidavit to note that while I did my best to memorialize what was said in my interviews with the defendant, Mr. Fell, by taking reasonably complete notes except when I knew it was being videotaped[1], I never kept notes about my interactions with Dr. Hudziak, Mr. Waples, Mr. Volk, Mr. Darrow, Mr. Kirby or Mr. Kelly. I am forced to rely on my memory and impressions for events that I did not suppose at the time to be very important.

3.  There seem to be three issues that I may be able to help the court to understand.

    A.  Why I called my report in 2002 "sympathetic" in 2005, apparently disagreeing with the affidavit of Mr. Waples.

---

1 Then, I took what I would call "disaster notes", less complete, in case the tapes were lost or destroyed or some other disaster occurred. I had almost completed notes from the DVDs in anticipation of being a witness when it became clear I would not be called. I have added to them after the motion for a new hearing.

Washington University School of Medicine at Washington University Medical Center, Campus Box 8134
660 South Euclid Avenue, St. Louis, Missouri 63110-1093, *www.wuphysicians.org.*, www.wustl.edu

FELL-00001448

*Affidavit of Richard D. Wetzel, Ph.D.*

    B.    Did I, with or without my personal knowledge, help the USA subvert the court's refusal to allow Dr. Welner to interview the defendant, Mr. Fell.

    C.    Did I, with or without my personal awareness, assist Dr. Welner to circumvent the court's order that additional formal psychological testing could only be done with the consent of both parties or by order of the court.

**A.    Why I called my report in 2002 "sympathetic" in 2005, apparently disagreeing with the affidavit of Mr. Waples.**

**The Events of 2002**

1.    I was initially approached about serving as a forensic examiner in the case of the United States of America versus Donald Fell by Dr. James Hudziak, a former resident in our program, currently a Professor of Child Psychiatry at the University of Vermont. He mentioned that he had consulted on this case. He knew that I had participated for both the prosecution and the defense in many capital cases in Missouri before and after the initial trial and was known to some degree by the authorities in Missouri. I did not record the conversation or make notes to memorialize the conversation. He indicated that he and others thought that there were mitigating matters in this case that might justify accepting a plea to life without parole (LWOP). He asked whether or not I would be willing to participate in an evaluation for the United States Attorney's office in Vermont. I indicated that I was willing. He made no request or suggestion that I reach any particular conclusion. He did disclose his views which favored a plea bargain.

FELL-00001449

*Affidavit of Richard D. Wetzel, Ph.D.*

2. Sometime after that I was called by Mr. Waples. He then offered to retain me as an expert in this case. Mr. Waples gave me his account of the history of this case. From my point of view as a forensic examiner not an expert on legal ethics, he behaved entirely properly. He expected me to perform a full, fair and honest professional evaluation. He never suggested that I change or shade my opinions in any way. At the same time, I thought I understood his view of the case. He indicated that the decision on seeking the death penalty properly belonged to a committee in Washington, DC that made recommendations to the Attorney General. The Attorney General, after considering that recommendation, then had the final decision on whether or not to seek the death penalty. He did disclose to me that the local office had recommended entering into a plea agreement for life without parole. The recommendation had been rejected. I did infer that he thought an objective professional evaluation would support LWOP.

3. When I was in Vermont to perform my evaluation in 2002, almost all of my interactions were with the counsel for the defendant, Mr. Volk, and an investigator, Andy Bartnik, from the Federal Public Defender's office. I was never requested to meet with Mr. Waples or anybody else in the United States Attorney's office. Both Mr. Volk and I commented to each other that this was quite unusual in our experience.

4. I was restricted in my evaluation appropriately, given the defendant's rights, to evaluating the matters in mitigation or extenuation presented by defense experts in their reports or that I came upon in my evaluation. I was prohibited specifically from evaluating his mental state at the time of the crime, at the time of any previous crime, his

Page 3 of 25

FELL-00001450

*Affidavit of Richard D. Wetzel, Ph.D.*

relationship with Mr. Lee or his interest in the use of knives. I learned from Mr. Waples' affidavit only this year that this assertion of his rights occurred just before my evaluation and was a surprise to the government.

5. After the evaluation was finished, I did stop off at the United States Attorney's Office and said hello to Mr. Waples. I was asked to write a report by Mr. Waples. He indicated two things multiple times before and after he heard my opinions. His office intended to send my report and my evaluation of the matters in mitigation back to Washington to the Attorney General with a request that the office reconsider its decision. He hoped, but did not request, that I could write a report that would lead that office to change its mind. At the same time, he repeated **several times** that I was not to present anything other than my honest professional opinions.

6. I have reviewed his affidavit dated 04/29/05. I agree that he described his communications with me fully, accurately and objectively. However, I did personally expect the matter to proceed to trial at that time because of my personal views about the very low probability of a change in decision by Mr. Ashcroft, not because of anything Mr. Waples said. I told him I believed that and expected the case to proceed to trial. I do not recall any statement that there was no possibility I would be used or called at trial.

7. I then wrote my report.

8. I described my 2002 report to Mr. Darrow in 2005, casually on the phone, using the word "sympathetic". He was concerned with my use of that word. He reported my characterization of my report which was then disclosed to the defense at the direction of the United State's Attorney.

Page 4 of  25

FELL-00001451

*Affidavit of Richard D. Wetzel, Ph.D.*

I used the word sympathetic for the following reasons.

A.    I accepted some of the opinions offered by the defenses experts and disagreed with others.  When I did not agree with some of the opinions offered by the defense, I did not simply just state my disagreement.  I wrote at great length the reasons why I disagreed with the opinion.  I did this so that the defense would not be surprised by my testimony at any time, even in the absence of deposition[2].  I also did this so the defense would have the option of withholding or withdrawing what I regarded as poorly founded opinions that I or Dr. Rabun would be forced to rebut.  I also did this so that the Attorney General's office would not think that I was accepting uncritically the subset of opinions about mitigation with which I did agree.
One of their experts failed to find any material in his field that would be mitigating.  I stated my agreement and my acceptance of their failure to find deficits strongly with supporting evidence.

B.    In order to have my views be persuasive and credible to the reviewers in Washington, I presented all of the facts I was aware of to support my opinions whether they agreed with or contradicted those of the defense experts.  The court may wish to note the unusual length and detail of my 2002 report.

C.    By sympathetic, I did not mean that I had biased my opinions or slanted my opinions.  I believed that I had met both of Mr. Waples' requests – presented my honest

---

2 An interesting difference between state courts and federal courts.  I have done much more in state courts.

Page 5 of    25

FELL-00001452

*Affidavit of Richard D. Wetzel, Ph.D.*

professional opinions and produced a document that could be usefully presented in a reconsideration of the decision to seek the death penalty. I was aware that there was some surprise that I was so little impressed by the history of hospitalization for "depression" and of treatment with anti-psychotic medications.

**B.    Did I, with or without my personal knowledge, help the USA subvert the court's refusal to allow Dr. Welner to interview the defendant Mr. Fell.**

**The Events of 2005**

1.    I was contacted by Mr. Darrow. He made it clear that there was considerable ambivalence about using either me or Dr. Rabun as experts in the case. He indicated that they had been consulting most recently with Dr. Welner, another forensic psychiatrist. He said he was unsure whether or not the court would allow Dr. Welner to examine Mr. Fell or to testify as a rebuttal witness.

2.    At some point, I had a discussion on the phone with Mr. Darrow, Mr. Kelly and Mr. Kirby. We discussed my report in general and my views about Fell's psychiatric hospitalizations.

3.    Shortly after that, Mr. Darrow called again. If the court were to preclude Dr. Welner from testifying, he had to have some expert available for rebuttal testimony. In addition, he did not know everything that might be offered by the defense. He also had to be prepared for that contingency. He asked me to participate on that basis; I would be called if and only if needed for rebuttal testimony. He asked me to do what I needed to do to be prepared to offer expert testimony in rebuttal of testimony by the defense's experts.

Page 6 of  25

*Affidavit of Richard D. Wetzel, Ph.D.*

4.  He indicated that a considerable amount of new material had been acquired by the FBI and by Dr. Welner.

5.  He sent that to me for review. For time, he continued to send me additional material. He made it clear that Dr. Welner would be willing to discuss material with me. He encouraged me to contact Dr. Welner and to do anything else I felt was necessary to become prepared. He offered to assist me in any way he could with Dr. Welner or anyone else. I did talk to two different FBI agents.

6.  At some point, after a telephone conversation with Mr. Volk, I accepted a subpoena via the mail from the defense. I reported this to Mr. Darrow's office.

7.  My memory of the sequencing of events is somewhat unclear. But I believe that shortly after that happened, I was informed that the defense proposed to offer testimony related to Mr. Fell's mental state at the time of the crime.

8.  Because I had been barred from exploring his mental state at the time of the crime, a second examination to evaluate that would be necessary and was allowed by the court. Without examining Mr. Fell on those issues, I would have been unable to offer any opinion on those issues.

9.  To the best my recollection, I first contacted Dr. Welner when it was uncertain whether Dr. Rabun or I would perform the evaluation. I commented to him that psychiatrists were likely to perform strictly psychiatric interviews better than neuropsychologists would, perhaps opening the door to Dr. Welner and his enthusiasm.

9.  Dr. Rabun and I discussed who would do the interview and what should be done as well. He pointed out some differences between his report and mine. It became clear to me that I needed the benefit of an additional interview more

Page 7 of  25

FELL-00001454

*Affidavit of Richard D. Wetzel, Ph.D.*

than he did.

9.  I then began to prepare in earnest for that examination.  It is not at all unusual in such cases for experts retained by the same party, especially when they represent different areas of expertise, to confer and to clarify the issues in the case.  It is not unusual at times to agree upon a division of labor with each expert accepting an area of major focus.  It is also not unusual to agree to asking a few supplementary questions in the other's area.  This is routine clinical practice in medical settings and therefore unremarkable in medical legal situations.

10.  I understood from Mr. Darrow that Dr. Welner might or might not be allowed to examine Mr. Fell; the point was to be reconsidered by the court.
I also received a call from Mr. Volk indicating his belief that no interview would occur because jury selection had started.  I slowed down my preparation.

11.  The court then amended its order allowing me to perform an interview after the start of jury selection.  By that time, Dr. Rabun was unable to schedule a return visit.

12.  I contacted Dr. Welner again.  He expounded his belief that a careful interview was needed.  In response, I explicitly asked Dr. Welner to give me whatever advice or help he wished.  I do not recollect whether the initial suggestion to send questions came from him or from me.  Whoever first mentioned it, I agreed to receive them.  I was trying to be gracious.  I was also being diligent; until one sees something, one cannot tell whether it would help.  I have made such an offer before many times.  (I made the same request of Dr. Rabun in this case.)  I was expecting a few questions, five or ten at the most.  A few questions as a

Page 8 of  25

FELL-00001455

*Affidavit of Richard D. Wetzel, Ph.D.*

favor was fine. Dr. Welner e-mailed me a long list of questions which I reviewed before I came to Vermont. To the best of my recollection, I left the printout of that list in St. Louis when I went to Vermont. Dr. Welner knew when I was going to Vermont. He sent a revised list of questions to Mr. Darrow's office for me. Mr. Darrow handed them to me. I had the impression, rightly or wrongly, that he was acting simply as a mail man. I did keep that paper and reviewed it in my hotel room. Dr. Welner's message in that e-mail implied I needed to ask his questions his way.

13. When I received the first set of questions, I was very surprised at the length and number of questions that he gave me. I was also surprised at the instructions he included on how to ask them. I inferred that he did not think I was knew what I was doing. Rightly or wrongly, I was insulted. He may have been trying to cover all contingencies, performing his own task diligently. I did not take it that way.

14. I never intended before I did the examination or while I was doing the examination that I was doing anybody's examination, but my own. I was doing the evaluation I thought appropriate to give the testimony I thought I might be required to give at trial (whoever called me), in the absence of details about the specific issues on which testimony would be expected. What I asked Mr. Fell was based on my understanding of his history and the facts in the case and the reasonable hypotheses about Mr. Fell that could be derived from those facts.

15. I, of course, did know that the interview would be made available to Dr. Rabun, Dr. Welner, the defense and its experts and the United States Attorney's office. I knew

Page 9 of 25

FELL-00001456

*Affidavit of Richard D. Wetzel, Ph.D.*

that what I asked might be helpful to any or all of them, including the defense, in preparing their testimony.

16. I was told that there was a firewall until a verdict was rendered at the guilt phase. At some point, I was sent or received a copy of the court's order dated 04/07/05.

**Mr. Darrow's Behavior**

15. *Mr. Darrow did not direct me to do anything.* At no time before or during my visit did Mr. Darrow direct me to modify or alter my evaluation. I assume he is a very skillful attorney. He said nothing improper to me or even anything approaching the improper.

   A. I did specifically ask him whether there was a problem in any way with using any of Dr. Welner's questions. He did say, after an apparent pause for reflection, that he could think of no legal reason why I should not use some of Welner's questions if I wanted to do so.

   B. On more than one occasion on the phone and in Vermont, I made a negative comment about Dr. Welner's long list of questions. Mr. Darrow did not comment on my negative reactions as I recall except to chuckle at a mildly[3] sarcastic comment I made in Vermont about Welner being pushy. I continued. The word arrogant in some form was used by me. Even after my comments about arrogance, Mr. Darrow still did not respond by directing me to take Dr. Welner's advice or to ask his questions.

   C. There was a considerable overlap between the questions offered by Dr. Welner and those I would have asked

_____

3 The qualification may be inaccurate; I hope I was not too impolite.

Page 10 of 25

FELL-00001457

*Affidavit of Richard D. Wetzel, Ph.D.*

anyway.  He had presented new information recently obtained in his interviews about Mr. Fell's family.  I wished to check that information out and would have inquired about it without his questions.  I did and would have asked about all three killings since that was the focus now allowed by the court.  The degree of overlap was related primarily to the facts in the case and the facts in the new interviews by Dr. Welner and the FBI, not his list of questions.   He did not propose irrelevant questions.

D.   When I first read his report, I noted Dr. Welner's claim that he had directed my evaluation.  I was insulted again.  Forensic psychiatrists as a group tend to think that testifying about a live person one has not personally examined is dubious, although it is not proscribed[4].  As I said in my telephone conversations with Mr. Volk and Mr. Darrow, I thought he said this to deal with any ethical concerns about testimony about someone he had not personally examined (although he had substantial collateral information).   Mr. Volk should have reasonably inferred that I thought Dr. Welner had overstated his influence on me.  I said so explicitly.

16.   The defense refers to the inconsistency between what I said or what Mr. Volk understood me to say on the phone and what Mr. Darrow told the court (motion pages 15-16).

A.   I wished to do my own examination, not be a proxy for Welner.  It was not my intent to ask a great number of questions for Dr. Welner.  I was only willing to be

---

[4] Comments about an evaluee who refused to answer questions would be acceptable.

Page 11 of  25

FELL-00001458

*Affidavit of Richard D. Wetzel, Ph.D.*

helpful to him with a few questions. I would not knowingly have done an examination solely for Dr. Welner. I fully expected that the interview would produce information helpful to all the experts on both sides.

B.   It appears now I stated the role of Dr. Welner's questions incorrectly, artlessly or imprecisely to Mr. Volk. I have no reason to suppose that Mr. Volk misrepresents what he thought I said. He may be more accurate about that conversation than I, especially if he took notes. It is possible, although I do not recall stating it poorly or incorrectly, that I just stated what happened poorly or incorrectly.

C.   It was my belief, then and now, that Mr. Darrow was internally pleased that I would ask at least some of Welner's questions. I believed he wanted to have as many options as possible in presenting the government's case. To the extent I helped Welner, it offered Mr. Darrow more options.

D.   Mr. Darrow[5] never said that. He never hinted that. He never asked me to help Dr. Welner. Most of the Welner questions related to the facts of the case. The rest dealt with his history of abuse, substance abuse and conduct disorder. In my opinion, I would have asked them anyhow since almost all were obviously pertinent. All forensic experts would walk someone through a series of crimes like this step-by-step. Of course, I asked many of my questions in the form I chose, not

---

[5] For the sake of completeness, no one else in his office, including Mr. Kirby and Mr. Kelly, or affiliated with the government did that either.

Page 12 of  25

FELL-00001459

*Affidavit of Richard D. Wetzel, Ph.D.*

Welner's.  Many were answered by Mr. Fell as he brought up material, without a specific question from me, and I followed his lead.  Mr.  Darrow never crossed the line and asked me to ask Welner's questions or to perform Welner's examination.

E. I *may* have been careless in talking to Mr. Volk between distinguishing between what Mr. Darrow said and what I thought he wanted, but did not say.

F. I did not think Dr. Welner had the authority to write questions for me.  I did assume that he could give me his insights into the case which *might* benefit my understanding of the case.  I did think that understanding which issues he thought important would be helpful which *might* be beneficial to me in my examination.

G. If I said to Mr. Volk that Mr. Darrow directed me to ask the questions, I was wrong.  That did not happen.

H. I cannot and would not attempt to refute Dr. Welner's claim he used my examination as his.  He told me that I was "gentle" and "informative" after he viewed the material.

I also note that the defense accurately predicted the substance of his report prior to his receipt of the DVDs showing my evaluation.

C. **Did I, with or without my personal awareness, assist Dr. Welner to circumvent the court's order that additional formal psychological testing could only be done with the consent of both parties.**

1. Dr. Welner stated in his report that he administered three additional psychological tests, the Hare Psychopathy

Page 13 of  25

FELL-00001460

*Affidavit of Richard D. Wetzel, Ph.D.*

Checklist - Revised (PCL-R), the Violent Risk Appraisal Guide (VRAG) and the Historical/Clinical/Risk Management (HCR-20)[6] to Mr. Fell after the date of my evaluation. He said he used part of that evaluation in this effort.

2. From my point of view as a psychologist, frequently qualified as an expert on testing, I did not administer any of the three tests at issue in my evaluation on any of the three dates (9/18 and 9/19 in 2002 and 6/13 in 2005) on which I saw Mr. Fell.

I have reviewed the test manual for the Hare Psychopathy Check List[7]. I did not ask any systematic, longitudinal questions about his life history of glibness / superficial charm, previous diagnosis as a psychopath, proneness to boredom, pathological lying, lack of affect, callousness, lack of empathy, promiscuity, irresponsible behavior as an adult or marital problems. This information would be needed to score the test reliably. I did inquire about a few specific events related to some but not all of the material to be explored for this test. I did not advertantly or inadvertantly administer any of these tests in a sufficient detail by using either my or Dr. Welner's questions.

3. Dr. Welner wasn't there; he could not have administered them either.

4. The only logical possibility that I see is that he interpreted or coded the material that I elicited along with all the other material he possessed *as if* he had

---

6 I enclose some material that may assist the court and counsel in a supplement to this affidavit.

7 Robert D. Hare. (1991) The Hare Psychopathy Checklist - Revised: Manual, North Tonawanda, NY, Multi-Health Systems.

Page 14 of 25

FELL-00001461

*Affidavit of Richard D. Wetzel, Ph.D.*

administered the tests.

5.    There are so many different psychological tests and types of tests that it is relatively difficult to come up with a simple definition of what is a psychological test and what is not a psychological test.  Checklists for elements in a history are used all the time in Social Security determinations and/ or criteria in psychiatric diagnosis. These are not considered psychological tests in ordinary practice.  However, when there is an intent to quantify, scores are given and those scores are normed in specific populations, it is hard to say that this is not a psychological test.  Most psychologists would agree that these three instruments are properly called psychological tests.  I would agree that when properly given they are psychological tests.

6.    It is important to understand that Hare's Psychopathy Checklist - Revised has two factors.  One looks at psychological feelings and behavior while the other looks at lifelong patterns of behavior.  These lifelong patterns of behavior are very similar to and correlate very highly with the diagnostic criteria of DSM-IV-TR[8] for antisocial personality disorder.  The subjective feelings or reactions are less reliably measured.  The goal of the estimates of these feelings and reactions is to rate lifelong patterns of

---

8 American Psychiatric Association. (2000) **Diagnostic and Statistical Manual of Mental Disorders: Fourth Edition – Text Revision.**  Washington, D.C.: American Psychiatric Association. This is the current standard accepted by psychiatrists and frequently used by other mental health professionals.

FELL-00001462

*Affidavit of Richard D. Wetzel, Ph.D.*

feelings and reactions[9].  Dr. Welner specifically used Mr. Fell's interview with me to gauge this, according to his report.

I reviewed his description of the Psychopathy Checklist as it related to my interview.  He made no references to my interview under the grandiosity and stimulation seeking items.  I saw none that day.  I did not find Mr. Fell either glib or charming.  He did on occasion come up with poor explanations for his behavior; apparently, Dr. Welner thought that his occasional verbal facility was glibness and charm.  His life time examples were much less forced.  I would agree that Mr. Fell showed little emotion and little remorse[10].  I would suggest that Mr. Fell was in a cruel, markedly stressful and atypical situation when I saw him.  His death penalty trial was in progress.  Remorse with full disclosure increased his risk of death.  Lack of disclosure could be used against him.  He had to make a choice.  I would agree with his statements to me that he did not appreciate the legal nuances[11] of his situation.  I would not say this was a typical day in his life or a reasonable sample of his lifelong emotional reactions.  If this day were a typical example of his emotional reactions, I would not agree with Dr. Welner's scoring.

(I would have no problem with Dr. Welner inferring Fell's prevailing emotional reactions and feeling from his life-long history.  His other examples are quite relevant.

---

9 We all have been insensitive or without remorse at some time. Typical, recurring reactions are the issue.

10 Note I did not say none.  He isn't very good at it.

11 My word; he used "dumb".

Page 16 of  25

*Affidavit of Richard D. Wetzel, Ph.D.*

However, that would be inferring, not administering the test.)

7. I regularly cause to people to receive tests through assistants or technicians or "puppets[12]". When I do so, I tell them they are giving the tests. I assure myself that they have been trained by me or someone else to administer each specific test. I expect them to administer the test **precisely according to protocol.** I expect them to do this according to the protocol so that the responses can be scored according to the protocol. Unless standard conditions for testing and standard rules for scoring are observed, the scores are invalid and meaningless.

8. Dr. Welner never attempted to give me the kind of direction that would have led me to believe I was operating as a technician and administering these three tests in his behalf. He never inquired into my experience with these tests.

9. It would be impossible to escape the conclusion that if I were thought to have administered these tests during my evaluation, that it was poorly done and the scores derived at a later time by Dr. Welner would be less valid than usual or invalid and would not assist a trier-of-fact to understand Mr. Fell or his behavior.

10. There is research in the literature that indicates that the these three tests can be validly used without any interview at all, if sufficient records are available. They then become ways of "coding" the information one has, without formally giving a test. Dr. Welner could reasonably, with

---

12 Whether rightly or wrongly, I have the feeling that the allegation that I was acting as a puppet has been made.

Page 17 of 25

FELL-00001464

*Affidavit of Richard D. Wetzel, Ph.D.*

sound scientific basis, allege that the checklists were used, but not that they were administered to Mr. Fell. As an expert on testing, I would state under oath that he could reasonably process or review the information he acquired in the light of these checklists and still believe and say in good faith that he did not give any new psychological tests.

**Other**

1.  I have retained all of the materials I have received that are not duplicates. As far as I know, this is still a request by the defense and not an order of the court.

2.  I attach the guide I prepared in St. Louis for my evaluation in Vermont.

Further affiant sayeth naught.

_____
Richard D. Wetzel, Ph.D.

SUBSCRIBED AND SWORN to before me, a Notary Public, this 12th day of September, 2005.

_____
Notary Public

My Commission Expires:

" NOTARY SEAL "
Kay L. O'Brien, Notary Public
St. Louis County, State of Missouri
My Commission Expires 1/27/2007

FELL-00001465

*Affidavit of Richard D. Wetzel, Ph.D.*

**Supplementary Material**

For the information of the court and counsel, I selected some material on each of these tests.

(Author's note: The following material is selected verbatim[13] from the following articles and websites (without permission, but with deference. I have reformatted this material, added my own emphasis and used a consistent type face.)

**A.    from Christopher D. Webster, PhD, FRSC, PRCPsych**

"This material is provided courtesy of PsychDirect, a public education website of the Department of Psychiatry & Behavioural Neurosciences, McMaster University, Hamilton, Ontario, CANADA. All material is copyright protected and may be printed for personal use only. Any other use is strictly forbidden without the express written permission of the author."

**PsychDirect 2002,2003, 2004**
Last Updated April 12, 2005
Risk Assessment:
Actuarial Instruments & Structured Clinical Guides

**Overview**

"The research of the last two decades has produced a number of assessment tools designed to assess risk of violence. While it still may not be possible to predict risk with unequivocal accuracy, these tools have undoubtedly improved predictive assessment, particularly when used in combination with clinical evaluations. Many of the instruments continue to be refined, develop with continued research, and incorporate new findings. The tools are divided into two principal categories: *actuarial instruments* and *structured clinical guides*."

"*Actuarial instruments* attach specific statistical weighting to different variables which assess the risk. They are premised on the idea that, if accuracy of prediction is the most important factor, it is best to find out how members of a comparable group of individuals conducted themselves over time. This is achieved by pains-staking follow-up research on a particular group over set periods of time. With the follow-up data on violence

---

[13] Obviously, I omitted some sections to preserve a focus.

Page 19 of  25

FELL-00001466

*Affidavit of Richard D. Wetzel, Ph.D.*

available, it is possible then to link these statistically to various data obtained at an earlier time. It is similar, in principle, to the way in which insurance companies evaluate risk for many types of eventuality in order to set their rates accordingly. A key defining aspect of actuarial instruments is that scores obtained on individuals can be related to massed statistical reference data."

"*Structured Clinical Guides*, in contrast, invite clinicians to consider a number of variables which will have some application to the assessment of risk in the case under consideration. This type of assessment is based on the idea that a great deal has been learned over the past two decades about the factors which should be taken in account when conducting risk assessments on various types of mental health, forensic, and correctional populations. The various structured guides (see below) define terms, provide items which seem merited on the basic of scientific and professional grounds, and suggest methods of scoring."

(Author's note: Psych Direct lists the three instruments for evaluating future dangerousness in adults, two actuarial risk assessment instruments and one structured clinical guide. These are the ones used by Dr. Welner. After the description of each test from PsychDirect, I included other descriptions.)

**Violent Risk / Violent Recidivism**

1.    Hare Psychopathy Checklist Revised (PCL-R)

2.    Historical Clinical Risk -20 (HCR-20)

3.    Violent Risk Appraisal Guide (VRAG)

**The Two Actuarial Risk Assessment Instruments:**

**Psychopathy Checklist - Revised (PCL-R) Hare, 1991 & 2002**

"Even though it was not originally designed as a risk assessment device, the Hare PCL-R has gradually come to be used to assess likely future recidivism and violent offending. It is a 20-item rating scale, scored on the basis of both semi-structured interview and collateral information. It has been validated for use in adult male correctional and forensic psychiatric samples. Over recent years, research has shown that it is a relatively good predictor of violence across diverse populations.  Hare

Page 20 of  25

FELL-00001467

*Affidavit of Richard D. Wetzel, Ph.D.*

PCL-R scores are incorporated into a number of subsequently developed risk assessment tools and guides."

Another description of this test.

"**PCL-R.** The PCL-R (Hare, 1991) is a 20-item measure of the construct of psychopathy, first clearly described by Cleckley (1941). Although it is not a risk instrument per se, it has been found to relate to violence across many settings and samples (see Hare, 1996, for a review). The PCL-R is comprised of two subscales. One of these includes items that relate mainly to emotional and interpersonal deficits, such as callousness, shallow emotion, lack of guilt or empathy, and manipulativeness. The other scales pertain to behavioral aspects, such as poor behavior controls and parasitic lifestyles.

Items are scored in the same manner as those of the HCR-20, and, as noted above, the PCL-R scoring system is used by the HCR-20. The PCL-R has interrater reliability in the .90s (Hare, 1991). extensively researched with respect to violence (Andrews&Bonta, 1995b). Currently, there are no data on the HCR-20 in correctional samples. This is seen as a necessary step for its further development."

### VRAG (Violent Risk Appraisal Guide) Quinsey, Harris, Rice, Cormier (1998)

"This instrument contains a 12-item actuarial scale which has been widely used to predict risk of violence within a specific time frame following release in **violent, mentally disordered offenders**[14]. Developed at Penetanguishene Mental Health Centre, the tool uses the clinical record, particularly the psycho-social history component, as a basis for scoring as opposed to interview or questionnaires. The Hare PCL-R (Psychopathy Checklist -Revised) score is incorporated into the VRAG calculations of risk.

The VRAG is not available as a stand-alone commercially available scheme but the current version is detailed in the text Violent Offenders, Appraising and Managing Risk (p.237) by Quinsey et al."

---

[14] Antisocial personality disorder and psychopathy are not included in the mentally disordered category.

Page 21 of  25

FELL-00001468

*Affidavit of Richard D. Wetzel, Ph.D.*

Another description of this test from its developers[15].

**What Is the Basis of the VRAG?**

"These actuarial tools are not typical psychological tests[16] in which patients fill out questionnaires or answer questions in an interview. The research was based entirely on carefully assigning a numerical score for each variable to each case. *This scoring used only the clinical record, especially comprehensive psychosocial histories.* The VRAG requires a comprehensive psychosocial history addressing childhood conduct, family background, antisocial and criminal behavior, psychological problems, and details of the index offense. Psychosocial histories adequate to score the VRAG include more than past and present psychiatric symptoms and use a lot of information gathered from third parties (friends, family, schools, correctional facilities, police, and the courts). In the area of predicting crime and assessing risk, it is insufficient to rely on what an offender says about himself."

"The Violence Risk Appraisal Guide (VRAG)... [is an] actuarial tools for the prediction of violent recidivism. (At first, the VRAG was called the *Statistical Risk Appraisal Guide*[17]). The tools give the probability (from zero to 100%) that an offender will commit a new violent offense (including sex offenses) **within a specified period of community access.** It was not developed to predict violence while in custody in prison."

"Certainly, compiling an adequate psychosocial history requires skills on the part of a case historian. At our institution, it requires, on average, approximately 2.5 person-days to complete a suitable psychosocial history."

---

[15] Harris, G.T., Rice, M.E., & Quinsey, V.L. (1993). Violent recidivism of mentally disordered offenders: The development of a statistical prediction instrument. **Criminal Justice and Behavior,** 20, 315-335.

[16] One might then reasonably infer that it was an *atypical* psychological test.

[17] This title may reflect its nature more accurately. This title does not, however, help sales to psychologists.

FELL-00001469

*Affidavit of Richard D. Wetzel, Ph.D.*

**Structured Clinical Guides:**

**HCR-20, Version 2 (Historical, Clinical, Risk-20) Webster, Douglas, Eaves, & Hart, 1997**

"Originally made available in 1995, the HCR-20 Structured Guide for the Assessment of Violence Risk was later modified in light of actual clinical experience gained from initial trials. It is intended for use with civil psychiatric, forensic, and criminal justice populations. It consists of 20 items as well as the Hare PCL-R. There are 10 historical variables, 5 clinical variables, and 5 risk management factors. Each item is scored as 0 (not present), 1 (possibly present) or 2 (definitely present) to yield a score out of 40. It includes variables that capture relevant past, present, and future considerations. It can be regarded as an important first step in the risk assessment process. The manual provides information about how and when to conduct violence risk assessments, reviews the research on which ... into several different languages and is under active examination internationally. Its work is guided, to an extent, by a consortium of researchers and clinicians who make up the RISC-TEAM, a sub-group of the International Association of Forensic Mental Health Services."

Another description of this test.

"**The HCR-20.** This device, available as a manual (Webster, Douglas, et al., 1997;Webster, Eaves, et al., 1995), contains three scales and 20 variables. The Historical (H) scale contains 10 items of a mainly static nature that are unlikely to fluctuate greatly over time: (a) previous violence, (b) young age at first violent incident, ©) relationship instability, (d) employment problems, (e) substance use, (f) major mental illness, (g) psychopathy, (h) early maladjustment, (I) personality disorder, and (j) prior supervision failure. The Clinical ©) scale has five items, refers to current mental, emotional, and psychiatric status, and includes risk markers that are dynamic and changing in nature: (a) lack of insight, (b) negative attitudes, ©) active symptoms of major mental illness, (d) impulsivity, and (e) unresponsive to treatment. The Risk Management ®) scale also has five items and is concerned with forecasting the future social, living, and treatment circumstances of an individual and with attempting to anticipate the person's reactions to those conditions: (a) plans lack feasibility, (b) now published (Webster et al., 1997), the content of items is directly comparable to Version 1. Two other measures, treated as

Page 23 of  25

*Affidavit of Richard D. Wetzel, Ph.D.*

concurrent devices for comparison to the HCR-20, were the VRAG and the PCLR.  Both of these instruments have more data in support of their relationship to violent behavior than does the HCR-20, and both are used in correctional assessments. For these reasons, they were considered useful comparison measures to the HCR-20."

Another description of this test from its developers.

Kevin S. Douglas, Christopher D. Webster. The HCR-20 Violence Risk Assessment Scheme, Concurrent Validity in a Sample of Incarcerated Offenders, **Criminal Justice and Behavior**

"The HCR-20 is a 20-item checklist to assess the risk for future violent behavior in criminal and psychiatric populations. Items were chosen based on a comprehensive review of the literature and input from experienced forensic clinicians. The HCR-20 includes variables which capture relevant past, present, and future considerations and should be regarded as an important first step in the risk assessment process. The manual provides information about how and when to conduct violence risk assessments, research on which the basic risk factors are based, and key questions to address when making judgments about risk. *Violence is defined as "actual, attempted, or threatened harm to a person or persons*[18]." The professional who completes the HCR-20 Coding Sheet must first determine the presence or absence of each of the 20 risk factors according to three levels of certainty (i.e., Absent, Possibly Present, Definitely Present). In some settings, responsibility for the assessment may be divided among several different professionals."

**Other**

Grann M. Langstrom N. Tengstrom A. Stalenheim EG. Reliability of file-based retrospective ratings of psychopathy with the PCL-R. Journal of Personality Assessment. 70(3):416-26, 1998 Jun.

"A rapidly emerging consensus recognizes Hare's Psychopathy Checklist-Revised (PCL-R; Hare, 1991) as the most valid and useful instrument to assess psychopathy (Fulero, 1995; Stone, 1995). We compared independent clinical PCL-R ratings of 40 forensic adult male criminal offenders to retrospective file-only

---

18 Emphasis added.

FELL-00001471

*Affidavit of Richard D. Wetzel, Ph.D.*

ratings. ***File-based PCL-R ratings, in comparison to the clinical
ratings, yielded categorical psychopathy diagnoses with a
sensitivity of .57 and a specificity of .96***[19]. The intraclass
correlation (ICC)[20] of the total scores as estimated by ICC(2,1)
was .88, and was markedly better on Factor 2, ICC(2,1) = .89,
than on Factor 1, ICC(2,1) = .69. The findings support the belief
that for research purposes, file-only PCL-R ratings based on
Swedish forensic psychiatric investigation records can be made
with good alternate-form reliability."

---

19  Sensitivity means that they identified 57% of the persons
thought to be psychopaths based on all available information from
review of the files alone. Specificity means that they made
almost no mistaken diagnoses of psychopathy (only 4%) when only
the files were used.

20  The Intraclass Correlation (ICC) assesses rating reliability
by comparing the variability of different ratings of the same
subject to the total variation across all ratings and all
subjects.  The reported difference in the correlations for the
factors means that different raters agree on the pattern of
behaviors much more than they agree on the pattern of emotional
reactions.

FELL-00001472

### Ground Rules

- Usual information
- Any problems today
- Reviewed anything?
- Avoid advice from attorneys

---

**I Would Like to Get It Straight in My Mind**

**Who you lived with
and
When?**

---

**How Old Were You When Either One of Your Parents Was Gone for a Significant Period of Time?**

- Which one left?
- For how long?
- What happened then?

- Who did you live with next?

---

**How Old Were You When Either One of Your Parents Was Gone for a Significant Period of Time?**

- When did your mother leave?

- Who did you live with then?

---

**Parental Fighting**

- When do you first recall your parents having problems, and fighting?
- How old were you?
- After that, how frequently did they fight?

---

**Your Father**

- Tell me about him.
- What did you like about him?
- What didn't you like about him?

1

FELL-00001473

### Your Father

- Was he involved in criminal activity?
- Was he a fence?
- Did he buy your stuff?
- What has he had to do with the police difficulties you had in your hometown?
- Did he get you started?

### Maternal Grandmother

- What was your grandmother's name?
- Tell me about her.
- What did you like about her?
- Where did she live?
- Where was she when all of your parents' troubles were going on?
- What was she like?
- Did she drink?
- Did she use drugs?
- Was there a time in which she took care of you?

### Maternal Grandmother

- How did she relate to Jackie Sharpe?
- Was she ever violent to Jackie?
- Was Jackie ever violent to her?
- Was there a time when you lived with your grandmother?
- What was that experience like?

### Stella Banas

Did she drink?

Did she use drugs?

Was she ever violent?

What has your relationship been like, over the years?

What do you like about her?

What do you not like about her?

### Stella Banas

Where was she, when all of your parents' troubles were going on?

Did she ever offer for you to live with her?

And did you take her up on that offer?

(If no) – Why not?

Was there a time in which she was

### Jeanette Banas

Tell me about Jeanette Banas.

What has your relationship been like, over the years?

What do you like about her?

What do you not like about her?

2

FELL-00001474

### Jeanette Banas

Where was she, when all of your parents' troubles were going on?

Did she ever offer for you to live with her?

And did you take her up on that offer?

Why not?

Was there a time in which she was violent to others in her family?

---

### Donna Williams

What has your relationship been like, over the years?

Where was she, when all of your parents' troubles were going on?

What do you like about her?

What do you not like about her?

---

### Donna Williams

Did she ever offer for you to live with her?

And did you take her up on that offer?

Was there a time in which she was violent to others in her family?

---

### Teri Fell

- Tell me about your relationship with your sister, Teri.
- Are you close?
- How do you feel about that relationship?

---

### Mother Going to Jail

- How old were you when your mother started getting locked up because you weren't going to school?
- How did you feel about her getting locked up?
- Did her repeatedly getting locked up get you to be better in school with your attendance?

---

### Mother Going to Jail

- How did she feel about getting locked up over and over because you weren't going to school?
- How did she take that up with you?
- How did you respond?

3

FELL-00001475

## What Did You Want to Achieve in Your Life?

- Before you got locked up, what kinds of career plans did you have?
- How were you pursuing them?

## Which of the United States Have You Been In, Before This Happened?

- Nebraska
- When were you in Nebraska?

## Motivation for Going to Vermont

How did you come to go there?
- Did you go to Vermont, on that September 23, because you had to? (If yes) why?
- Bobbie lee seemed to report he had to go to avoid the police; How do you understand that

## What Did You Take With You to Vermont?

- Musical instruments?
- What did you play?
- Did you write songs there?

## Cards

- Who did you play cards with?
- Who else?

## Activities in Vermont

- When you lived with your mother in Vermont, what kinds of things did you do with your time?
- (If he says something vague like, 'hung out') what places did you hang out?
- What did you do when you hung out?

4

FELL-00001476

### Did You Work?

- Did you seek work there?
- (If yes) from whom?
- How?
- When?
- Did you fill out an application?

### Did You Work?

- Rutland Plywood
- Why didn't you go back the day after Thanksgiving?

### Three People

- Dora Carter
- Kevin Bodette
- Borne Spencer

### Contact With People in Pennsylvania?

- Did you keep in touch with them?
- How?
- Why?

### Money for Expenses

- How did you pay for food?
- How did you pay rent?
- How did you pay for cigarettes?
- How did you pay for alcohol?

### Money for Expenses

- Did you use drugs?
- Which?
- How did you pay for the drugs?

5

## Sleeping Arrangements

- Donny
- Debra
- Bobby
- Where in the house?

## Activities With His Mother

- What kinds of things did you do with your mom?

## Activities With His Mother

- How often would you drink together?
- How often would you be drunk together?

## The Gun

- How did you come to get the gun you bought to Vermont?

## The Gun

- Do you have problems with your memory?
- If you have problems with your memory, should I rely on Robert lee's input from before he died, and from other witnesses, instead of your input?

## Do You Remember the Names of the People Who Examined You?

- Do you remember what they did?
- Do you remember what you told them?

6

FELL-00001478

### Do You Remember the Names of the People Who Examined You?

- If you have problems, would you have any problem with my telling the court that you don't remember things, and so whatever you said to Dr. Mills, Lippman or van Gorp should not be believed?
- Or that what you told Dr. Rabun and myself should not be believed?

### The Gun Continued

- Who brought the gun to you?
- How did this person get it?
- When you bragged to Bethany Brashears and Lynn Roberts that the gun belonged to a police officer, did you not know then?
- Did you have ammunition for?
- What ammo did you have for it?
- How did you get the ammo?

### His Temper

- Can you describe your temper to me?
- What was your temper like, growing up?
- How would others experience your temper?

### Do You Remember Vandalizing Things, Like Spray Painting Them?

- Give me an example.
- Do you remember the things you may have trashed, like rooms, mailboxes, or other things?
- Please give me an example.

### Was There Ever a Time That People May Have Found You Unmanageable?

- Please tell me about that.

### Seeing Dead or Mutilated Persons

- What kind of homicidal violence were you exposed to, in your earlier years?
- How old were you when you saw your first picture or video of a truly dead person?
- Was that on the internet?

7

FELL-00001479

### Seeing Dead or Mutilated Persons

- What websites were you exposed to that had violent and graphic images?
- And were those the websites you saw at Jeanette Banas's Webtv?
- What other websites did you remember seeing there?

### Seeing Dead or Mutilated Persons

- How did those websites affect you?
- How did you find out about those websites?

### Mutilation

- Did you see mutilation?
- What kind?
- Where?
- How did that affect you?
- How often would you look at that stuff?
- Whom else would you see it with?

### Did You See Torture?

### Did You See a Murder?

- What kind?
- Where?
- How did that affect you?
- How often would you look at that stuff?
- Whom else would you see it with?
- What kind?

### Kicking to Death

- Did you ever see someone kicked to death?
- Where?
- What was your response to this?

8

FELL-00001480

### Stoned to Death?

- Where?
- What was your response to this?

### Video Games

- How often have you played video games?
- Has there been a time in your life when you played video games more frequently?
- How frequently?

### Video Games

- What were some of your favorites?
- What did you like about them?
- Did you bring any video games with you when you went up to Vermont?
- Which ones?
- Did you buy any there?
- Which ones?
- Did you like them?

### What Was the First Violent Thing You Did in Vermont?

- What was the first thing you did that other people might call violent?
- When did that occur in Vermont?

### Did Your Mother Ask You to Leave?

- How did you feel about that?

### At What Point Did You Speak to Your Family About Leaving?

- Did Stella Banas say you could not return to her home?
- Did Jeanette Banas say you could not return to her home?
- Did Paula Williams say you could not return to her home?
- What kept you from returning to Pennsylvania?

9

FELL-00001481

### Violence at the Bar

Were you hitting your mother in Vermont?

Did you get into an argument or a quarrel with her in a bar?

(If no) Is there a reason why witnesses at a bar would speak of your hitting your mother outside a bar?

Did you not drag her by the hair, as witnesses reported?

### Violence at the Bar

What would be the reason for people to say, specifically, that you dragged someone by the hair unless you had?

Did your violence toward your mom come up in your conversations with family back in Wilkes Barre?

### Accuracy of His Family's Information

- So if they have already made statements in this case about conversations they had with you about your violence, would Stella, Jeanette, Paula Williams and your sister all be lying, or is it possible there is a bit more you might now remember about those discussions?

### Accuracy of His Family's Information

- Should I consider all of them to be lying to me?
- What would be the reason they would all lie to me?

### Accuracy of His Family's Information

Do you feel your sister is trying to help your case?

### Accuracy of His Family's Information

- So if she lies to me, and makes herself unbelievable, or makes you unbelievable, does that help your case, or are each of you more likely to help your case if someone like myself can think that you are being straight with me when we speak?

10

FELL-00001482

## Accuracy of His Family's Information

- What was the reaction of the people in your family who your mother told you were hitting her?
- A number of people said you threatened your mother in Vermont, even in front of strangers? Why would you do that?
- Why did you not just leave?

## Charlie Conway

- How would Charlie Conway have described you, based on your experience with him?
- When did you meet him?
- What did you know about him?
- Had your mother, or anyone else told him that you had outstanding warrants in Pennsylvania?
- How did that come up?

## Charlie Conway

- When was the first time you and he had a confrontation?
- How many times had he come over the house?
- When was the first time he came over the house?
- Who else was there at the time?

## Charlie Conway

- What was that confrontation about?
- What happened (trace through carefully)?
- How did you feel, at the time, about how things ended up that night?

## Was Charlie Conway a Problem?

- Did you get a sense at that time that he might be a problem to you? What kind of problem? How, at that time, did you think you were going to resolve that problem?

## Charlie Conway

- Had your mother, or anyone else told him that you had outstanding warrants in Pennsylvania?
- How did that come up?

11

FELL-00001483

**Charlie Conway**

Who else was there at the time?
- What was that confrontation about?
- What happened (trace through carefully)?

**Charlie Conway's Attempt to Flee**

- When did Charlie Conway attempt to leave the house, on the night you killed him?
- How far away did he get?
- He had a girlfriend to go home to, how did you keep him from going?

**Charlie Conway's Attempt to Flee**

- When you got him back inside, how did you come to get him in if he was so drunk?

**Charlie Conway's Attempt to Flee**

- What was the reason you did not want him to leave?
- (If he says he was drunk) I wonder if there was another reason – because he was pretty drunk on thanksgiving, too, but you let him leave then.

**Confrontation**

- On Thanksgiving night, according to your relatives, you had a confrontation with Charlie Conway and your mother.
- What was that about?

**Confrontation**

What happened?
- So you have nothing to add to the details they already provided us?

12

FELL-00001484

## Confrontation

- What happened to Bobby Lee that night?
- Why?

## Did Your Mother See It Coming?

- Your family says your mother called them the night of her death and said you were going to kill her.
- What was their response to you?
- What was your response to them?

## Did Your Mother See It Coming?

- What made you pull the phone out of the wall after your mom was saying she was afraid you would kill her?

## Did You Behavior Surprise You?

- Did you think you were capable of killing someone before this happened?

## Did You Behavior Surprise You?

- You know that a number of your friends and family told us you talked about going on a killing spree in past years.
- What made that idea so appealing?
- What kept you from doing it sooner?

## Did You Behavior Surprise You?

- When did you first think about going on a killing spree?
- Whom did you include as logical targets?

13

FELL-00001485

## Did You Behavior Surprise You?

- Your friends mentioned you noted you would start with your mother.
- How high was she on your list?
- Did you consider that possibility, before you came up to Vermont?
- Did you consider that possibility, after you came up to Vermont?

## Did You Behavior Surprise You?

- Why did you ask Robert Spencer if he wanted to go on a killing spree with you?

## Did You Behavior Surprise You?

- Were there others you had hoped to kill, as well?
- What was the reason you wanted to kill that person?

## Did Charlie Suffer?

- Do you think Charlie Conway suffered when you killed him?
- How much of a struggle did Charlie Conway put up, when you killed him?
- How did he injure you?

## Hands in His Throat

- After you killed Charlie Conway, you put your hands inside his neck...what did that feel like?
- Did you touch the muscles?
- What did you do to them – did you pull them apart, or rip them?

## Hands in Her Throat

- Did you do the same thing with your mother?
- Why / why not?

14

FELL-00001486

**Passed Out**

Once Charlie Conway and your mother were passing out, what kind of problem could they then have represented?

**Did Charley Conway Deserve to Die?**

Why?

**Your Mother's Dying Statement**

- When your mother was dying, and she said, "I love you Binker," were you surprised?
- Why

**What Was the Reason You Allowed Your Mother to Be Killed?**

- How do you discuss your mother's killing with your relatives, seeing as you could have prevented it from happening?

**What Was the Reason You Allowed Your Mother to Be Killed?**

- Do you think your mother was a threat to you when she was killed?
- How?
- How does that relate to her saying, "I love you Binker" when she was dying?

**What Was the Reason You Allowed Your Mother to Be Killed?**

- Do you think she suffered?
- How?
- How do you feel about that?

15

FELL-00001487

## Options

- What did you consider doing after your mother was dead?

- List each?

- Advantages / disadvantages of each

## Showers

- Why did you take a shower after the death of your mother?
- Change clothes?
- Put on the same clothes / boots?
- Pack up?
- Wrap up the knives?

## Preparations for Fleeing

- The gun
- Ammo
- Places visited
- Why
- Problems

## If You Felt Bad

- Why did you shower?
- Pack carefully
- Help Bobby Lee escape?

## His Mother's Funeral

- What do you know about your mother's funeral (as much detail as possible)?
- Whom do you think was most affected by her death?
- How?

## Was Mrs. King the First Target?

- How many cars or trucks did you consider stealing that night before you happened upon Terri King?
- Tactics
- Picking her up

16

FELL-00001488

### The King Murder

- Were you concerned that whomever was in that truck would see you chase Terri King?
- What eased your concern?

### The King Murder

- Picking the spot
- When you got out of your car before you killed Terri King, when did you see a truck nearby?
- How far away?
- How did you know that you weren't seen?

### The King Murder

- What prompted you to stop the car to let Terri King out?
- What was the reason you hadn't done that sooner?
- Later

### The King Murder

- When was it decided that she would die?
- Who made the decision?

### The King Murder

- Anyone object?
- After you decided to kill her, were you not worried that they would see you?
- How did you account for that?

### The King Murder

- How was she killed?
- What was the reason you didn't shoot her, but killed her with your hands and feet?

17

FELL-00001489

### The King Murder

- You talked about kicking her, and stomping on her?
- When the blood shot out of her mouth, while she was on the ground, how high did it shoot?
- Did it get on your pants?

### The Autopsy Report

- The autopsy showed that when you stomped on her, you pressed your foot down on her neck.
- You mentioned that you stopped when her blood shot out of her mouth.

### The Autopsy Report

- What was her expression like, when you were stepping on her neck?
- What were her eyes doing?
- What was the reason you stepped on her neck, seeing as she was already pretty much immobilized?

### Any Struggle

- Was Terri King an athletic woman?
- Could she have outrun you when you chased her?
- And she fell down, correct?

### What Was the Reason You Chose to Kill Terri King?

- After you killed her, how long did it take for you to get back to the road?
- Did you run, or walk?
- Did you not worry that the people in the truck might see?

### The effect of Mrs. King's death

- How did you feel, at the time, about how things ended up that night?
- Now?

18

FELL-00001490

### The King Murder

- Whom do you think was most affected by Terri King's death?
- How do you think they were affected?
- What do you think they feel about your case?

### Bobby Lee

- Who was Robert Lee to you?
- Did you have contact with Robert Lee after the arrest?
- What ever happened to Robert Lee?
- Are you surprised?
- How do you feel about that?
- Who were you to Bobby Lee?

### Bobby Lee

- Who were you to Bobby Lee?
- He said he was so grateful to you — Why?
- He said you had a power over him?
- You could get into his head?

### Sad Moments

- When were the three saddest moments or experiences of your life that you can recall?
- Please tell me about them.

### Happy Moments

- When were the three happiest moments or experiences of your life that you can recall?
- Please tell me about them.

### Jail

- What has jail been like for you?
- Is there anyone whom you particularly like there?

19

FELL-00001491

### Religion

- What religious activities are you involved in jail?
- How did you come to be involved in them?
- What kinds of practices do you follow in jail?

### Religion

- Who is your religious guide?
- What books have you read, in that regard?
- (How about the Koran?
- Have you progressed? How?

### Violence in jail

- Have you been involved in any violent incidents while in jail?
- Tell me about them.
- Different in than out?

### Correctional officers

- How do you feel about the corrections officers at the jails you are in?
- Are they any different from any other facility you might find?
- Would you fight with any of them if you had the chance?
- Do the officers have any reason to be afraid of you?

### Correctional officers

- Were any of the officers injured in this fight?
- How do you feel about that?

### The Future As You See It

- Where do you see yourself in ten years?
- Twenty?
- How long do you think you will live in prison?
- What would you think about spending the rest of your life in prison?

20

FELL-00001492

## The Future As You See It

- How easy do you think it would be to escape from custody?
- Do you think you could pull something like that off?
- Could you ever see yourself trying, if you had the opportunity?

## Animal Abuse

- Terri, your sister, told Dr. Welner about the incident involving a cat, that led to your being dismissed from the job with Jesse's carnival. What can you tell and us about that incident, adding to what Jesse and Terri had to say?

## Animal Abuse

- How old were you when you killed Jackie's dog in the woods behind your house?
  - What would be the reason you would tell someone else about it, after it happened?
  - Is it something you find difficult to discuss, or do you recognize that many people have shot dogs before?

## Animal Abuse

- Which friends also were with you when you shot the dog?
  - Did someone else do the shooting?
  - Who?

## Animal Abuse

- Were there other animals you shot?
- What kind?
- People who were with you talked about the squirrels in the woods.
- Who would you go with to shoot squirrels in the woods?
- And what would you do?
- After the squirrels would be killed, what would you then do?

## In the Hospital

- When you were hospitalized in your early teens, your mother reported that you had threatened her. How old were you when you first threatened your mother?
- What were the circumstances?

21

FELL-00001493

## The First Assault

- How old were you when you first struck her?
- Did you ever consider that your mother may have left, to Vermont, because she was physically afraid of you?
- She seemed especially good at enraging you? Why do you think that was?

## In the Hospital

- When your mother communicated to you and to clinicians when you were hospitalized that you were scary and uncontrollable to her, did you ever consider, when you were younger, that she left because she couldn't parent you?
- Do you regret threatening your mother, under the circumstances?

## In the Hospital

- Did they understand?
- Did your Mom tell them what was really going on?

## In the Hospital

- Did anything help?
- Hurt?

## Aliases

- Have you ever used an alias?
- First time?
- Why?
- With whom?
- Did it work?
- How did you feel?

## Satanism

- When did you first take an interest in Satan?
- What was appealing about Satanism?
- Whom did you share this interest with?

22

FELL-00001494

### Satanism

- Bobby Lee?
- Tattoos?
- Worship?
- Group?

### Satanism

- Drinking blood?
- Cannibalism?
- Why?
- Bethany Brashears & Lynn

### Beliefs

- An eye or an eye?
- People who push you around?
- Any changes?

### Beliefs

- If anyone hurt your sister,
- What would be appropriate?

### Mistakes and Guilt

- What mistakes have you made, in all of this?
- What do you consider to be your fault?

### Statements to the Dead

- What would you say now to Charlie Conway, if you could?

23

FELL-00001495

**Statements to the Dead**

- What would you say to Terri King, if you could?

**Statements to the Dead**

- What would you say now to your mother, if you could?

The Pictures

Anything You Would Like to Add?

24

FELL-00001496

# EXHIBIT 140

Docket No. **06-2882-cr**

To Be Argued By
**William B. Darrow, Assistant U.S. Attorney**
**Paul J. Van de Graaf, First Assistant / Criminal Chief**

\* \* \* \* \* \* \*
**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**
\* \* \* \* \* \* \*

**UNITED STATES OF AMERICA,**
      Appellee,

   v.

**DONALD FELL,**
      Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Vermont**

---

**BRIEF OF THE UNITED STATES**

---

            **THOMAS D. ANDERSON**
            United States Attorney

            **WILLIAM B. DARROW**
**THOMAS BOOTH**            **GREGORY L. WAPLES**
United States Department of Justice    **PAUL J. VAN DE GRAAF**
Criminal Division            Assistant U.S. Attorneys
950 Pennsylvania Ave., Rm. 1511    P.O. Box 570
Washington, DC 20530        Burlington, VT 05402-0570

FELL-00001497

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   THE OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   2001 - 2004 PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . 2

      C.   2005 JURY SELECTION AND TRIAL . . . . . . . . . . . . . . . . . . 5

      D.   FELL'S POST-TRIAL MOTION . . . . . . . . . . . . . . . . . . . . . . 47

      E.   SENTENCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN
   DISMISSING THREE PROSPECTIVE JURORS WHO EXPRESSED
   DEEP RESERVATIONS ABOUT THEIR ABILITY TO IMPOSE THE
   DEATH PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      A.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . 53

      B.   LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      C.   THE INDIVIDUAL JURORS . . . . . . . . . . . . . . . . . . . . . . 58

II.  NO DUE PROCESS VIOLATION RESULTED FROM THE DISTRICT
   COURT'S EXCLUSION OF THE 2001 DRAFT PLEA AGREEMENT . 84

      A.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

FELL-00001498

B.    STANDARD OF REVIEW .............................. 91

C.    THERE WAS NO ABUSE OF DISCRETION IN EXCLUDING THE
      DRAFT PLEA AGREEMENT. ........................... 93

D.    FELL'S "FAIR REBUTTAL" CLAIM FAILS TO MEET THE
      PLAIN ERROR STANDARD AND MAKES NO SENSE. ...... 98

III.   THE PROSECUTORS' UNOBJECTED TO SUMMATION REMARKS
       ABOUT FELL'S EXERCISE OF HIS RIGHT TO A JURY TRIAL, AND
       ARGUMENT THAT FELL'S MITIGATION EVIDENCE DID NOT
       EXCUSE HIS CRIMES, DID NOT INFRINGE ON FELL'S
       CONSTITUTIONAL RIGHTS NOR DID IT AMOUNT TO PLAIN
       ERROR. ........................................... 105

A.    BACKGROUND ..................................... 105

B.    THE STANDARD OF REVIEW .......................... 115

C.    LEGAL ANALYSIS .................................. 116

V.     PROSECUTORS DID NOT VIOLATE THE TRIAL COURT'S ORDER
       ABOUT HOW THE GOVERNMENT'S MENTAL EXAMINATION OF
       FELL WAS TO BE CONDUCTED AND THE COURT DID NOT ERR IN
       FAILING TO RULE ON FELL'S MOTION TO EXCLUDE A
       GOVERNMENT REBUTTAL MENTAL HEALTH EXPERT UNTIL
       AFTER THE DEFENSE COMPLETED ITS MITIGATION CASE. ... 127

A.    STANDARD OF REVIEW ............................. 128

B.    BACKGROUND ..................................... 130

C.    DR. WELNER'S REPORT ............................. 147

D.    THE DEFENSE'S DECISION NOT TO OFFER MENTAL HEALTH
      EVIDENCE ........................................ 153

FELL-00001499

VI.    IN THE ABSENCE OF ANY OBJECTION, THE COURT BELOW
       DID NOT COMMIT PLAIN ERROR IN ADMITTING EVIDENCE
       SHOWING FELL'S INTEREST IN SATANISM AND THE
       INSINCERITY OF HIS CLAIMED ADHERENCE TO ISLAM AND
       NATIVE AMERICAN BELIEFS. ............................ 157

       A.    BACKGROUND ................................. 157

       B.    LEGAL ANALYSIS .............................. 166

VII.   TO REPUTE ONE PROPOSED MITIGATING FACTOR, THE
       TRIAL COURT PROPERLY ADMITTED DEBRA FELL'S POST-
       ASSAULT STATEMENT THAT SHE WAS "AFRAID" OF HER
       SON. ................................................ 173

       A.    STANDARD OF REVIEW ......................... 173

       B.    BACKGROUND ................................. 174

       C.    LEGAL ANALYSIS .............................. 176

VIII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
       PERMITTING  REBUTTAL PENALTY PHASE TESTIMONY THAT
       FELL HAD PREVIOUSLY TALKED ABOUT KILLING HIS
       MOTHER. ............................................ 191

       A.    BACKGROUND ................................. 192

       B.    STANDARD OF REVIEW ......................... 199

       C.    ARGUMENT .................................. 200

IX.    REVERSAL IS NOT WARRANTED UNDER THE "CUMULATIVE
       IMPACT" RULE. ....................................... 207

iii

FELL-00001500

X.   THE JURY'S CONSIDERATION OF ASSERTEDLY DUPLICATIVE
     NON-STATUTORY AGGRAVATING FACTORS DID NOT RENDER
     ITS DEATH SENTENCE UNCONSTITUTIONALLY ARBITRARY.  IN
     ANY EVENT, THE NON-STATUTORY AGGRAVATORS WERE NOT
     DUPLICATIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

     A.   STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

     B.   DOUBLE-COUNTING THEORY . . . . . . . . . . . . . . . . . . . . . . . . 210

     C.   AGGRAVATING FACTORS IN THIS CASE  . . . . . . . . . . . . . . 215

     D.   HARMLESS ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

XI.  THE INDICTMENT DID NOT RUN AFOUL OF THE FIFTH
     AMENDMENT BY FAILING TO ALLEGE THE NON-STATUTORY
     AGGRAVATING FACTORS.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

XII. THE FEDERAL DEATH PENALTY ACT IS NOT UNCONSTI-
     TUTIONAL BECAUSE IT ALLOWS THE PROSECUTION TO
     INTRODUCE, DURING THE PUNISHMENT HEARING, EVIDENCE
     THAT IS RELEVANT TO AGGRAVATING FACTORS BUT WHICH
     MAY BE IRRELEVANT TO DEATH ELIGIBILITY. . . . . . . . . . . . . . 228

XIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

VIRUS PROTECTION CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

iv

FELL-00001501

TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT CASES

*Apprendi v. New Jersey,*
        530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178-81, 224-25, 230

*Ayers v. Belmontes,*
        127 S. Ct. 469 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Barclay v. Florida,*
        463 U.S. 939 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166-168

*Berger v. United States,*
        295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Boyde v. California,*
        494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-19, 121

*Brady v. United States,*
        397 U.S. 742 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*Brown v. Sanders,*
        126 S. Ct. 884 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

*Brown v. Payton,*
        544 U.S. 133 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Buchanan v. Angelone,*
        522 U.S. 269 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 179

*Coy v. Iowa,*
        487 U.S. 1012 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Crawford v. Washington,*
        541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 21, 173, 182-84

FELL-00001502

*Cunningham v. California,*
      127 S. Ct. 856 (2007) ............................. 52, 224-25, 227

*Darden v. Wainwright,*
      477 U.S. 168 (1986). .................... 55, 57, 63, 82, 117, 124, 128

*Davis v. Washington,*
      126 S. Ct. 2266 (2006) ...................................... 183

*Dawson v. Delaware,*
      503 U.S. 159 (1992) ............................... 166-67, 169

*Eddings v. Oklahoma,*
      455 U.S. 104 (1982) ............................... 87-88, 99

*Gardner v. Florida,*
      430 U.S. 349 (1977) ...................................... 100

*Gray v. Mississippi,*
      481 U.S. 648 (1987) ....................................... 56

*Green v. Georgia,*
      442 U.S. 95 (1979) ...................................... 100

*Gregg v. Georgia,*
      428 U.S. 153 (1976) ...................................... 180

*Harris v. United States,*
      536 U.S. 545 (2002) ...................................... 179

*Holmes v. South Carolina,*
      547 U.S. 319 (2006) ....................................... 87

*Jones v. United States,*
      527 U.S. 373 (1999) ... 92, 118, 122, 129, 157, 177, 190, 212-13, 222, 231

FELL-00001503

*Jurek v. Texas,*
        428 U.S. 262 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*Kyles v. Whitley,*
        514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Patton v. Yount,*
        467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 71

*Payne v. Tennessee,*
        501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Reynolds v. United States,*
        98 U.S. 145 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*Ring v. Arizona,*
        536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 178, 181, 230

*Sattazahn v. Pennsylvania,*
        537 U.S. 101 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 180

*Satterwhite v. Texas,*
        486 U.S. 249 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Simmons v. South Carolina,*
        512 U.S. 154 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-100, 102

*Skipper v. South Carolina,*
        476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-102

*Stringer v. Black,*
        503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*Tennard v. Dretke,*
        542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

FELL-00001504

*Thompson v. Keohane,*
    516 U.S. 99 (1995) ........................................ 54

*Tuilaepa v. California,*
    512 U.S. 967 (1994) ...................................... 177

*United States v. Booker,*
    543 U.S. 220 (2005) ...................................... 224

*United States v. Cotton,*
    535 U.S. 625 (2002) ...................................... 126

*United States v. Dominguez Benitez,*
    542 U.S. 74 (2004) ........................................ 92

*United States v. Olano,*
    507 U.S. 725 (1993) ....................................... 92

*United States v. Robinson,*
    485 U.S. 25 (1988) ................................... 117, 180

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) .......................... 115, 117, 121

*United States v. Young,*
    470 U.S. 1 (1985) ......................................... 97

*Wainwright v. Witt,*
    469 U.S. 412 (1985) ............................... 54, 55, 81

*Weeks v. Angelone,*
    528 U.S. 225 (2000) ...................................... 119

*Whorton v. Bockting,*
    127 S. Ct. 1173 (2007) ................................... 184

FELL-00001505

*Williams v. New York,*
     337 U.S. 241 (1949) ..................................... 176, 180

*Wisconsin v. Mitchell,*
     508 U.S. 476 (1993) ......................................... 166

*Witherspoon v. Illinois,*
     391 U.S. 510 (1968) ...................................... 54, 56

*Zant v. Stephens,*
     462 U.S. 862 (1983) ..................................... 178, 179


OTHER FEDERAL CASES

*Allen v. Toombs,*
     827 F.2d 563 (9th Cir. 1987) ............................... 162

*Allen v. Woodford,*
     395 F.3d 979 (9th Cir.),
     *cert denied*, 126 S. Ct. 134 (2005) ......................... 211, 216

*Cargill v. Turpin,*
     120 F.3d 1366 (11th Cir. 1997) ............................. 119

*Corkle v. Johnson,*
     881 F.2d 993 (11th Cir. 1989). .............................. 168

*Ford v. McGinnis,*
     352 F.3d 582 (2d Cir. 2003) ................................ 167

*Fuller v. Johnson,*
     114 F.3d 491 (5th Cir. 1997) ............................... 167

*Goff v. Graves,*
     362 F.3d 543 (8th Cir. 2004) ............................... 167

FELL-00001506

*Jackson v. Johnson,*
    194 F.3d 641 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124-25

*Jackson v. Mann,*
    196 F.3d 316 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Kapadia v. Tally,*
    229 F.3d 641 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Malicoat v. Mullin,*
    426 F.3d 1241 (10th Cir. 2005),
    *cert. denied*, 126 S. Ct. 2356 (2006) . . . . . . . . . . . . . . . . . . . . . . . . 119

*Miranda v. Bennett,*
    322 F.3d 171 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*O'Neal v. Delo,*
    44 F.3d 655 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Patrick v. LeFevre,*
    745 F.2d 153 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Paxton v. Ward,*
    199 F.3d 1197 (10th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . 100, 189

*Searles v. Dechant,*
    393 F.3d 1126 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Sims v. Brown,*
    425 F.3d 560 (9th Cir. 2005),
    *cert denied,* 127 S. Ct. 62 (2006) . . . . . . . . . . . . . . . . . . . . . . . 115, 119

*Szabo v. Walls,*
    313 F.3d 392 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

FELL-00001507

*United States v. Alexander,*
    331 F.3d 116 (D.C. Cir. 2003) .............................. 185-86

*United States v. Allen,*
    247 F.3d 741 (8th Cir. 2001),
    *vacated on other grounds,* 536 U.S. 953 (2002) ................... 219

*United States v. Allen,*
    406 F.3d 940 (8th Cir. 2005)(*en banc*),
    *cert. denied,* 127 S. Ct. 826 (2006) .............................. 227

*United States v. Barnette,*
    211 F.3d 803 (4th Cir. 2000) .............................. 56-57

*United States v. Barnette,*
    390 F.3d 775 (4th Cir. 2004),
    *vacated on other grounds,* 126 S. Ct. 92 (2005) ................ 56, 64

*United States v. Beckford,*
    968 F. Supp. 1080 (E.D. Va. 1997) ........................... 212

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) ................................ 118

*United States v. Bourgeois,*
    423 F.3d 501 (5th Cir. 2005),
    *cert. denied,* 126 S. Ct. 2020 (2006) ........................... 223

*United States v. Brown,*
    441 F.3d 1330 (11th Cir. 2006),
    *cert. denied,* 127 S. Ct. 1149 (2007) .......... 56, 182-83, 186, 223, 227

*United States v. Chanthadara,*
    230 F.3d 1237 (10th Cir. 2000) .............................. 57

*United States v. Clemmons,*
    461 F.3d 1057 (8th Cir. 2006) .............................. 183

FELL-00001508

*United States v. Cusack,*
    229 F.3d 344 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

*United States v. Danford,*
    435 F.3d 682 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*United States v. Dunnaway,*
    88 F.3d 617 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*United States v. Elias,*
    285 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 117

*United States v. Espinal,*
    981 F.2d 664 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Feliz,*
    467 F.3d 227 (2d Cir. 2006),
    *cert. denied,* 127 S. Ct. 1323 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 184

*United States v. Fell,*
    217 F. Supp.2d 469 (D. Vt. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Fell,*
    360 F.3d 135 (2d Cir. 2004),
    *cert. denied,* 543 U.S. 946 (2004) . . . . . . . . . . . . . . . . . . 5. 87, 166, 180

*United States v. Fell,*
    372 F. Supp.2d 766 (D. Vt. 2005) . . . . . . . . . . . . . . . . . . . . . 6, 58, 216

*United States v. Fields,*
    483 F.3d 313 (5th Cir. 2007) . . . . . . . . . . . . . . 116, 129, 173, 182, 229-30

*United States v. Flaherty,*
    295 F.3d 182 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Frank,*
    8 F. Supp. 2d 253 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 219

FELL-00001509

*United States v. Fulks*,
   454 F.3d 410 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 229

*United States v. Gordon*,
   974 F.2d 1110 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*United States v. Greer*,
   285 F.3d 171 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Hadley*,
   431 F.3d 484 (6th Cir. 2005),
   *cert. denied*, 127 S. Ct. 47 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 185

*United States v. Higgs*,
   353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 223

*United States v. Jackson*,
   327 F.3d 273 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Jones*,
   299 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185-86

*United States v. Kaczynski*,
   1997 WL 716487 (E.D. Cal., Nov. 7, 1997) . . . . . . . . . . . . . . . . . . . . . . 220

*United States v. Kane*,
   452 F.3d 140 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*United States v. Lee*,
   374 F.3d 637 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

*United States v. MacDonald*,
   688 F.2d 224 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

FELL-00001510

*United States v. Martinez,*
    413 F.3d 239 (2d Cir. 2005), *cert. denied,* 126 S. Ct. 1086 (2006) . . . . . 177

*United States v. Melendez,*
    57 F.3d 238 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Mercedes,*
    287 F.3d 47 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Modica,*
    663 F.2d 1173 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Moore,*
    149 F.3d 773 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. McCullah,*
    76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

*United States v. Nelson,*
    347 F.3d 701 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Nussen,*
    531 F.2d 15 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

*United States v. Parker,*
    903 F.2d 91 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*United States v. Paul,*
    217 F.3d 989 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*United States v. Purkey,*
    428 F.3d 738 (8th Cir. 2005), *cert. denied,*
    127 S. Ct. 443 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 93, 223

*United States v. Robinson,*
    367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . 178-79, 212, 227

FELL-00001511

*United States v. Rodriguez,*
    968 F.2d 130 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*United States v. Ruiz,*
    987 F.2d 243 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 166, 171

*United States v. Sampson,*
    2007 WL 1393742 (1st Cir., May 7, 2007) . . . . . . . . . . . . . . . . 56, 88, 200

*United States v. Saunders,*
    973 F.2d 1354 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*United States v. Scarpa,*
    913 F.2d 993 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

*United States v. Sepulveda,*
    15 F.3d 1161 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Stitt,*
    250 F.3d 878 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 190, 206

*United States v. Thomas,*
    453 F.3d 838 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*United States v. Tipton,*
    90 F.3d 861 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 211

*United States v. Tocco,*
    135 F.3d 116 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 116-17, 186

FELL-00001512

*United States v. Verdoorn,*
    528 F.2d 103 (8th Cir. 1976) ................................. 95

*United States v. Villarreal,*
    324 F.3d 319 (5th Cir. 2003) ............................... 207

*United States v. Vitale,*
    459 F.3d 190 (2d Cir. 2006) ........................... 173, 189

*United States v. Webster,*
    162 F.3d 308 (5th Cir. 1998) ............................... 56

*United States v. Wellington,*
    417 F.3d 284 (2d Cir. 2005),
    *cert denied,* 126 S. Ct. 774 (2005) ........................ 130

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ......................... 91, 199, 207

*United States v. Yu-Leung,*
    51 F.3d 1116 (2d Cir. 1995) ............................... 130

*United States v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000). ................................ 92

*Walker v. Nationsbank of Florida,*
    53 F.3d 1548 (11th Cir. 1995) ............................. 95

*Williams v. Calderon,*
    52 F.3d 1465 (9th Cir. 1995) ............................. 124

## STATE CASES

*State v. Bennett,*
    81 P. 3d 1 (Nev. 2003) ................................... 168
*People v. Williams,*
    148 P. 3d 47 (Cal. 2006) ................................. 168

FELL-00001513

*State v. Crumb,*
704 A.2d 952 (N.J. Super. 1997) .............................. 168


## FEDERAL STATUTES

18 U.S.C. § 3591 ........................................... 3
18 U.S.C. § 3591(a)(2) ...................................... 3
18 U.S.C. § 3591(a)(2)(D) ................................... 65
18 U.S.C. § 3592(a)(8) ..................................... 118
18 U.S.C. § 3592(c) ....................................... 177
18 U.S.C. § 3592(c)(9) ..................................... 201
18 U.S.C. § 3593(f) ....................................... 224
18 U.S.C. § 3593(c) ....................................... 207
18 U.S.C. § 3593(e) .................................... 179, 213
18 U.S.C. § 3594 .......................................... 48
18 U.S.C. § 3595(c) .................................... 91, 199
18 U.S.C. § 3595(c)(2) ................................. 189, 205
18 U.S.C. § 3661 ......................................... 180
21 U.S.C. § 848(e) ....................................... 211


## FEDERAL RULES

Fed. R. Evid. 149 ........................................ 149
Fed. R. Evid. 403 ..................................... 95, 185
Fed. R. Evid. 803(2) ............................. 175, 185, 188
Fed. R. Evid. 1101(d)(3) .................................. 180


## OTHER AUTHORITIES
U.S.S.G. §3E1.1 ......................................... 123


Rory K. Little, "The Federal Death Penalty: History and Some
Thoughts About the Department of Justice's Role,"
26 *Fordham Urban L.J.* 347 (1999) .............................. 180

FELL-00001514

## PRELIMINARY STATEMENT

Donald Fell appeals from the death sentence imposed on him on June 16, 2006 by Chief Judge William K. Sessions III in the U.S. District Court in Vermont. Fell was found guilty, after a jury trial, of kidnapping with death resulting, carjacking with death resulting and two non-capital crimes. The same jury unanimously agreed that the proven aggravating factors sufficiently outweighed Fell's mitigating evidence so as to warrant the punishment of death.

On this direct appeal, Fell challenges only his death sentence, raising a host of allegations, including facial attacks on the Federal Death Penalty Act and the indictment; argument that the court improperly excused death-qualified jurors; that prosecutors engaged in misconduct; and claims that the court wrongly admitted aggravating and rebuttal evidence and excluded mitigating evidence.

Although Fell's contentions are numerous and lengthy, they ultimately are groundless. This Court should affirm his sentence.

1

FELL-00001515

STATEMENT OF THE CASE

A.    THE OFFENSES

On November 27, 2000, at around 2:30 in the morning, Donald Fell and Robert Lee brutally murdered Fell's mother, Debra Fell, and her friend Charles Conway in Fell's Rutland, Vermont apartment. Around 3:45 a.m., the two killers carjacked and kidnapped Terry King, a 53-year-old grandmother, as she arrived for work at a local supermarket. Accosting King with Fell's shotgun in pre-dawn darkness, Fell and Lee forced her into the backseat of her car. Fell drove King's car out of Vermont while Lee, in the front passenger seat, held the shotgun on the terrified King in the back seat. After driving southwest for about four hours, Fell stopped in rural New York and ordered King out of the vehicle. Chasing King into the woods, Fell pushed her to the ground; he and Lee then battered and stomped their third victim to death by kicking her head, stepping on her neck, and smashing her face with a rock. Several days later, the two men were arrested in Arkansas in King's car.

B.    2001 - 2004 PROCEDURAL HISTORY

On February 1, 2001, a federal grand jury in Vermont charged Fell and Lee with four crimes: carjacking with death resulting (Count 1); kidnapping with death resulting (Count 2); use of a firearm during a crime of violence (Count 3); and

2

FELL-00001516

being fugitives in possession of a firearm (Count 4). Counts 1 and 2 were capital offenses.

In 2001, the government considered Fell's offer to plead guilty to kidnapping with death resulting, in exchange for a sentence of life imprisonment.[1] Ultimately, however, the government declined the deal. On January 30, 2002, the government filed a "Notice of Intent To Seek Death Penalty" (the "Original Notice"), in compliance with the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et seq*. The notice declared the government's intent to prove various "narrowing" elements. Those elements consisted of four threshold culpability factors under § 3591(a)(2),[2] three statutory aggravating factors under § 3592(c),[3]

---

[1] Lee died in prison in 2001.

[2] The threshold culpability factors related to Fell's mental state vis-a-vis the murder of Terry King. They were that Fell: (1) intentionally killed Terry King; (2) intentionally inflicted serious bodily injury that resulted in the death of King; (3) intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and King died as a direct result of such act or acts; and (4) intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and King died as a direct result of such act or acts.

[3] The statutory aggravating factors were that: (1) the death of King occurred during the commission of a kidnapping; (2) Fell killed King in an especially heinous, cruel or depraved matter that involved serious physical abuse; and (3) Fell

3

FELL-00001517

and four non-statutory aggravating factors under § 3593(a).[4]

On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same four offenses as the first indictment. The Superseding Indictment was sought in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), and alleged the threshold culpability factors and statutory aggravating factors set forth in the Original Notice. On the same date, the United States filed a Supplemental Notice of Intent to Seek Death Penalty, alleging the same non-statutory aggravating factors as the Original Notice.

In mid-2002, Fell filed various pretrial motions, including a motion to have the FDPA declared unconstitutional. On September 24, 2002, the district court granted the latter motion, holding that 18 U.S.C. § 3593(c), the FDPA's relaxed evidentiary standard for the penalty phase of a capital trial, rendered unconstitutional any jury findings as to the aggravating factors necessary to impose a sentence of death. The district court struck the aggravating factors from

---

intentionally killed more than one person in a single criminal episode.

[4] The non-statutory aggravating factors were that: (1) Fell participated in the abduction of King to facilitate his escape from the area in which he and Lee had committed a double murder; (2) Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking to authorities; (3) Fell participated in the murder of King after substantial premeditation to commit the crime of carjacking; and (4) the killing of King caused her family extreme emotional suffering and severe and irreparable harm.

4

the Superseding Indictment, as well as the Supplemental Notice. *United States v. Fell*, 217 F. Supp.2d 469 (D. Vt. 2002). A at 72.[5]

In November, 2004, on the government's appeal, this Court reversed the district court's order. *United States v. Fell*, 360 F.3d 135 (2d Cir. ), *cert. denied,* 543 U.S. 946 (2004). Judge Walker's opinion for the unanimous panel held that § 3593(c)'s standard was consistent with the requirement of heightened reliability in capital trials. "[I]n order to achieve such heightened reliability, *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors . . . ." *Id.* at 143 (original emphasis).

C.    2005 JURY SELECTION AND TRIAL

(1)    Jury Selection

Jury selection by individual *voir dire* began on May 4, 2005. Prior to the *voir dire*, prospective jurors filled out a 34-page questionnaire containing 75 questions divided into six parts. The questionnaire inquired as to each prospective juror's: (1) background; (2) experiences and beliefs; (3) grasp of basic legal principles; (4) views concerning the death penalty; (5) exposure to media treatment of the case or the death penalty; and (6) schedule during the anticipated

---

[5] Citation to pages of Fell's Appendix are in the form "A at ___."

5

three weeks of trial.[6] The parties had the opportunity to review completed questionnaires in advance of *voir dire.*

Individual *voir dire* continued, intermittently, through June 6. Each prospective juror was questioned first by Judge Sessions and then by attorneys for the parties. Judge Sessions set forth his views on the *voir dire* process in a written opinion. *United States v. Fell*, 372 F. Supp.2d 766 (D. Vt. 2005); A at 142.

(2)    Evidence Introduced During the Guilt Phase

The guilt phase of the trial began on June 20, 2005. The government called witnesses to describe (1) the disappearance of Terry King during the early morning hours of November 27, 2000; (2) the arrest of Fell and Lee in Arkansas on the early afternoon of November 30, 2000; (3) the discovery of the bodies of Debra Fell and Charles Conway in Rutland on the evening of November 30; (4) the interviews of Fell in Arkansas; (5) the discovery of King's body in New York on December 1; and (6) forensic evidence, including King's blood and DNA on one of Fell's steel-toed boots. The defense introduced no evidence.

---

[6] Citation to pages of the government's Supplemental Appendix are in the form "SA at ___."

6

(a)    The Disappearance of Terry King on November 27, 2000

Norman and Terry King, married 37 years, lived in the village of North Clarendon, Vermont, several miles south of Rutland. Both Kings worked: Norman full-time and Terry about 15 hours a week at Price Chopper, a Rutland grocery store.

On Monday, November 27, 2000, Terry's shift began at 4:00 a.m. Norman stayed in bed when his wife rose very early, showered, dressed, and ate breakfast. After a brief conversation about dinner that evening, Terry drove off to work, around 3:30 a.m., in her green Plymouth Neon. Later that day, when Norman returned from work, Terry unexpectedly was not home. He called their older daughter, who checked with their younger daughter and then called Price Chopper employees. No one had seen Terry since she left home early that morning.

Anthony Mistretta worked the night-shift maintenance crew at the Rutland Wal-Mart close to Price Chopper and in the same mall. The Wal-Mart was open 7 a.m. to 9 p.m. Mistretta and his maintenance crew worked through the night to clean the store before it opened. While the crew worked, store lights were on and the front doors were occasionally open for the crew to take breaks. During the early morning hours of November 27, 2000, two males with wet hair and dry clothes came in the front door and asked to buy shotgun shells. Mistretta told

7

them that the store was closed. Tr. IV-1 at 29.[7] The men needed to be told twice to leave, and swore at Mistretta as they departed.

William Liphardt was Terry King's co-worker at the Price Chopper for over ten years. On November 27, he arrived at the store at about 3:30 a.m. Terry usually brought in two cups of coffee, one for him and one for her, along with a bag of Dunkin Donuts for co-workers. She usually parked her car next to his, in the employee parking area on the east side of the building, around the corner from the main entrance. On the morning of November 27, Liphardt was surprised when King did not arrive for the start of the 4:00 a.m. shift. At 4:15 a.m., he went outside to look for her car, and checked again several minutes later. He discussed King's unusual absence with his manager; they decided that she must be sick. Tr. I-1 at 95.

Peter Wink worked the midnight shift at the Dunkin Donuts on U.S. Route 7, between North Clarendon and Rutland. Terry King was one of his regular morning customers. Between 3:30 and 4:00 a.m. on November 27, she stopped for her usual order of coffee and doughnuts. *Id.* at 101. Wink was the last person, besides Fell and Lee, to see Terry King alive.

---

[7] References to pages of the trial transcripts will be cited as "Tr. _-_ at __." The first, Roman numeral, refers to the day of trial, the following number 1 or 2 refers to the morning session or afternoon session, respectively.

8

FELL-00001522

Joseph Trapasso delivered baked goods to supermarkets and restaurants in and around Rutland. Trapasso stopped at his customer sites twice early in the morning: first to take the order, and later to deliver it. Between 3 and 4:00 a.m. on November 27, Trapasso parked his delivery van in front of the Price Chopper's main entrance. Walking toward the store, he saw two men standing by the eastern corner of the building near the employee parking area. One of them, a tall male with dark clothes and long hair, began to approach. After Trapasso returned to his van, locked it, then walked back toward the store, the man retreated. When Trapasso came out of the store, about 20 minutes later, the two men were gone. Tr. I-1 at 113.

(b)    The Arrests of Fell and Lee in Arkansas

Clarkesville, Arkansas is about an hour-and-a-half west of Little Rock on I-40, an interstate East/West highway. At about 1:30 p.m. on November 30, 2000, Clarkesville Police Officer Jeff Ross refueled his marked cruiser at a service station near I-40. As Officer Ross drove out of the station, he fell behind a green Plymouth Neon leaving a gas station across the street. He noticed that the male passenger repeatedly turned to look at him. After about a mile, the Neon turned right into a residential section of town. As it did so, the passenger turned again and looked at Ross. Ross decided to call his dispatcher to run a check on the

9

FELL-00001523

Neon's Pennsylvania license plate. Tr. I-1 at 127.

Dispatch reported that the plate had been stolen in Pennsylvania the night before. Ross stopped the Neon and secured its two male occupants. Ross found a .12 gauge pump-action shotgun in the car, along with two pot pipes and a knife in the front passenger door compartment. The shotgun was a police model, with extended magazine capacity, black synthetic stocks, and a shorter than usual length. In the glove box was a Vermont registration indicating that the car belonged to Norman and Theresa King. Ross detained Lee, the driver, and Fell, the passenger, on suspicion of possessing stolen property and drug instrumentalities.

Shortly after the stop, Clarkesville police called the Vermont State Police and learned the Neon had been missing from Vermont, with its owner, since November 27. Officers transported Fell and Lee to the nearby Johnson County Detention Center. During booking, two license plate screws were found in Fell's pants pocket.

(c)    The Discovery of the Bodies of Debra Fell and Charles Conway in Vermont

Early in the evening of November 30, after Vermont authorities learned that Fell and Lee had been apprehended driving the car of the still-missing Terry King,

10

Rutland Police Detective Curtis Moore went to Debra Fell's apartment on Robbins Street in Rutland to inquire about her son Donald Fell. When no one responded to his knock on the locked door, he contacted the landlord and learned of an alternate entrance. Pushing that unlocked door partially open, he saw two dead bodies in the apartment. He retreated and summoned forensics specialists.

Investigators found Charlie Conway's body in an easy chair and Debra Fell's body lying on the floor. Conway's neck had been "literally sawn, um, with his tendons and his insides . . . exposed." Tr. I-2 at 39. There was "blood spattered across the wall" behind Conway. *Id.* at 39. Debra Fell lay on her stomach on the floor, in a bathrobe, with blood on her legs and the bottoms of her bare feet. *Id.* at 39.

Officers photographed the scene and collected physical evidence. Blood samples were recovered from floors and walls in multiple rooms. *Id.* at 51. Among the items seized were two blood-stained knives, found wrapped in a towel on the kitchen table. *Id.* at 47. The only drug-related evidence in the apartment was a film container of marijuana seeds and some cigarette rolling papers. The apartment was littered with beer cans. *Id.* at 53-54.

11

(d)    The Interviews of Fell in Arkansas

On the evening of November 30, 2000, Jimmie Caudle, a Special Agent with the Federal Bureau of Investigation in Arkansas, received instructions to report to Clarkesville to assist with a developing double-murder, missing person investigation. Upon arrival, Agent Caudle and fellow FBI Agent Daniel Sturgill met with other investigators and spoke by phone with Rutland officers and the Vermont State Police.

At 11:30 p.m., the agents met with Fell at the Detention Center. Fell signed a written *Miranda* waiver, then described how he had come to Arkansas. He stated that he was hitch-hiking across the country with Lee when a man named "John" picked them up in the Neon. When John stopped and went into a convenience store, Fell and Lee stole the car. Fell admitted that the shotgun, the pipes, and some of the clothing in the car belonged to him. Asked about prior legal trouble, he mentioned "putting a guy in a coma" at the recent "Woodstock Festival." Tr. II-1 at 6. Fell said he had been visiting his mother in Rutland until the prior week. He claimed he left because she was a crack addict. He was intending to call her when he had access to a phone. *Id.* at 8. The interview ended at 12:17 a.m. on December 1.

12

FELL-00001526

The two agents then questioned Lee for several hours. Returning to Fell, they began a second interview at 2:50 a.m. After Fell signed a second *Miranda* waiver, the agents told him that his mother and Conway had been found murdered, and that Terry King, the owner of the Neon, had also been murdered. They asked Fell for his explanation. Fell stared at the agents without a blink and replied, "I wouldn't kill my fucking mother. I don't know any fucking Terry. I'm sticking with my first statement." With that, the interview ended. Tr. II-1 at 15.

At 9:40 a.m., Agent Caudle returned to the jail after learning that Fell wanted to talk again. After signing a third *Miranda* waiver, Fell stated that he and Lee had killed Conway and Debra Fell. He said that after the four had been playing cards, he got a knife from the kitchen and attacked Conway. He slashed Conway's throat and "kept stabbing him and stabbing him." At the same time, Lee was slashing and stabbing Debra Fell.

After the two murders, Fell and Lee showered, took the shotgun and walked through downtown Rutland to the Price Chopper. They waited there for about 15 minutes, looking for a car to steal. When Terry King drove in, they pointed the shotgun at her, forced her into the back seat and fled Vermont. King tried to jump out of the car but Fell restrained her. At some point after entering New York State, Fell stopped the car and told King she could leave. Fell said that Lee told

13

FELL-00001527

him they had to kill her because she could identify them. *Id.* Fell agreed and the two men took her up into the woods. Fell hit King and knocked her down. He and Lee then started kicking her. Fell said that Lee picked up a rock and slammed it down on her head and face. When she was dead, Fell wiped his boots off on her clothing.

Returning to the car, Fell and Lee continued south and stopped for breakfast at a Burger King restaurant. The killers paid for breakfast with money from King's purse, then discarded the purse in the restaurant's dumpster. *Id.* at 23, 25. The two men continued on to their hometown of Wilkes-Barre, Pennsylvania, where they stole a Pennsylvania license plate off another Plymouth Neon and put the stolen plate on King's car. *Id.* at 22. They threw King's Vermont license plates into a stream, and also tossed away a baby seat that Terry used to transport her grandchild.

After completing this oral statement, Fell agreed to write out a statement. Caudle invited Fell to "say anything he wanted," including whether he was sorry for what he had done. In its entirety, Fell's written statement reads:

> We were playing cards and smoking crack and drinking Budweiser. Then I don't even know what happened except that for some reason I grabbed a knife and I cut Charlie's throat. Then continued to stab him until I was sure he was dead. When I saw what I did I wanted to turn myself in, but I turned around and saw Bobby killing my mom, Debbie. I tried to stop it, but she

14

FELL-00001528

was already too far gone.  We then took showers and grabbed my shotgun and left.  We went to Price Chopper and grabbed a girl named Terry and took her car.  That happened when she pulled up and Bobby ran up to her with the shotgun and told her to get in the back seat.  He jumped in the passenger side and I drove.  We went south.  Somewhere along the way we stopped and let Terry out.  I believe it was in New York.  I told her to walk through the woods and we would leave and let her live.  At which point Bobby said we could not let her live because she had our names and descriptions, that we had to kill her.  So we followed her into the woods.  And she was running towards the road.  Bobby got her at the bottom of a hill.  I came down from the top and told her to go back up.  We found a spot where the traffic could not see.  I proceeded to kick her.  And Bobby found a rock and threw it on her face at which point we thought she was dead and left.  We left Vermont at about 2:30 a.m.  When we dropped her off it was light outside.  We went to Burger King, got breakfast.  And I threw her purse into the dumpster.  And we left.  We continued.  I'm not sure which way we went, but we got into Wilkes-Barre, PA about 6:00 p.m.

We spent the day in Wilkes-Barre and left the next night.  We switched license plates, threw her plates into the creek and headed to 81 south.

*Id.* at 28-29.

The interview concluded at 11:10 a.m.  Caudle described Fell's manner as "neutral" and "matter of fact."  Tr. II-1 at 29.

As of mid-day on December 1, King's body had not been found.  Early that afternoon, Caudle sat with Fell in Arkansas as a New York State Police investigator interviewed Fell by telephone about the possible location of King's body.[8]

---

[8] The investigator also interviewed Lee on the same subject.

15

FELL-00001529

Rutland Detective Sergeant Rod Pulsifer was one of three Vermont law enforcement officers who flew to Arkansas to interview Fell and Lee. The officers had familiarized themselves with the Rutland murder evidence. By the morning of December 2, the Vermont officers learned that the New York State Police had found King's battered body. After discussing that crime scene with New York officers on the telephone, the Vermont officers tape-recorded interviews with Lee and then Fell. Pulsifer *Mirandized* Fell and at trial introduced the recording of the Fell interview.

Fell stated that he went to Vermont from Wilkes-Barre on September 23, 2000, to visit his mother, who previously had moved to Rutland. Prior to that, Fell had been traveling with a carnival and staying with his aunt and his great-grandmother in Pennsylvania. Fell described his mother as "a good person," who "cook[ed] us dinner" and "bought me cigarettes when I needed them and stuff like that." SA at 30. But she "liked to smoke crack and drink a lot." *Id.* He described an altercation with her at the Stop Lite bar in Rutland. Fell said that his mother had:

> called me up and asked me to come down and get her, so I went to get her and, ah, I went into the bar and I am talking to my mom, some old guy and some black dude named Reggie. And ah, next thing I know Tina Conway comes up behind me and starts kicking me. And ah, so I turned around and I spit on her, cause you know I don't feel right hitting a woman you know?

16

FELL-00001530

And ah, so my mom grabs hold of me, and the whole way as she is pushing me out of the bar she is smacking me and punching me, and she is yelling at me for spitting on her friend. And I am like, "she was kicking me," and when we got outside the bar she wouldn't stop, so I kind of shoved her off me. You know what I mean, instead of hitting her or anything I just kind of pushed her off me, I said "get away from me." I guess she was real drunk and she fell like a dump, and ah, I tried helping her up, she wouldn't let me help her up or nothing. They called the cops, and I waited there for them, and they ah, took me to the drunk tank.

SA at 39.

Fell described the brutal murders of Debra Fell and Conway as follows:

Ah, well, what happened was, is, ah, we were all kind of wasted, you know, pretty, pretty fucked-up. My mom was, we were all smoking crack, and, you know, drinking lots of alcohol and shit. Ah, to tell you the truth I don't really, ah, know what happened to, to lead up to what happened, you know what I mean? All I know is I was standing over a dude and he had a cut throat and I continued to stab him and ah, I turned around, and I was thinking I was going turn myself in. And then I turned around and I saw Bobby had already cut my mom's throat and he was stabbing her, and I thought maybe I could stop it in time but she was already too far gone, you know what I mean?

SA at 40.

When Sgt. Pulsifer asked, "Well, why did Bobby cut your mom's throat?"

Fell replied:

I have no idea. I was sitting in there trying to think about it and man the only thing I could think of is maybe when I grabbed the knife he might, I guess he just kind of followed me right into the room with another knife, you know? But I don't know why, I don't even know why I did it . . . .

*Id.*

17

Fell said that he had met Conway twice before, and that Conway and his mother "were just friends." He could offer no reason for the Rutland killings.[9]

Officers then questioned Fell about the senseless murder of Terry King. Fell recalled that when he and Lee grabbed Mrs. King, she pleaded, "please, please, leave me alone, don't hurt me." During the drive, she offered them doughnuts from a Dunkin Donuts bag. Fell and Lee took turns driving and holding the shotgun on King. Fell recalled that:

> at one point in time she, after we switched drivers, me and Bobby switched. And at one point in time, driving down the road, she tried to jump out of the moving vehicle and ah, I pulled her back in by her arm. I was gentle with her, I didn't hit her or nothing you know, and ah, I pulled her back in and I told her not to try it again. Well, Bobby continued driving he was pretty, he was pretty rotten towards her, he was screaming and yelling . . . .

SA at 46.

After driving for around four-and-a-half hours, Fell found "a nice little spot" on the side of the road and pulled the car over. He repeated that he intended to let King go, but Lee insisted that they had to kill her. The two men then brought her into the woods:

---

[9] When asked for a motive and a more detailed narrative, Fell said "I guess, I ran, ah, I don't remember, I'm telling you. I really don't, I ran in and I suppose, I started cutting Charlie apart man, but that's, that's all I can tell you. Like I said, I told him [Agent Caudle] plenty of times already. You, ah, I don't see how you figure that I am holding out information on it or nothing." SA at 42.

18

we both hustled her back up the hill, not, not harsh or nothing hard you know what I mean, just go ahead walk up the hill, you know. And, ah, I found a little, a little spot where you couldn't see from the highway, and ah, well we started kicking her in her head.

SA at 47-48.

When the officers asked how King wound up on the ground, Fell responded:

I pushed her down first, she was on her back. . . . [S]he started to pray. And ah, we started kicking her and ah, Bobby went and ah, he found a rock and it was about, yah big, and ah, slammed it right down on her head.

SA at 48.   Fell said that King "wasn't struggling at all throughout the whole thing, she didn't even try to struggle, she just took it." Asked how he knew she was praying, he recalled that she had held her hands together in front of her. SA at 48.

Fell stated that after "I was pretty sure she was dead . . . I wiped my boot off with her shirt, um, and we left." SA at 48. Returning to the car, the two men continued south. Fell stated:

About a half hour later we, we pulled up to a Burger King, ah, and we, we got breakfast. Um, I threw her purse and the doughnuts into the dumpster, ah, like we found like $220 on her, in, in bank envelopes and stuff like that. That's how we got gas and ate breakfast and stuff, for a while, and we just continued driving.

SA at 48.

Before leaving Wilkes-Barre, the two men "saw another Neon parked right by where [King's] car was. So I thought we would take the tags off that Neon, the

19

Pennsylvania one." SA at 49.

Towards the close of the interview, the officers asked why Fell had come to Vermont. Fell said that he wanted to visit his mother, whom he had not seen for several years:

> I got locked up when I was 14 for not going to school, I skipped two complete years of school. So they threw me in a boy's home. And I, I was in the boy's home for two years, and they threw my mom in jail for it. Ah, after she got out of jail, ah, she split, she just left the State. Ah, she had warrants and fines, and she didn't want to deal with it, and, ah there were a couple points in time when she tried coming back into the state, and ah, my aunt would call the cops on her or something and have her arrested. So, she just decided to stay in Vermont.

SA at 50. Fell added that "every time she would call, my aunt, ah, was pretty rotten and she hated my mom's guts. Ah, she would never put me on the phone with her. Ah, she would always tell my mom that I wasn't around, um, so I never got a chance to talk to her." SA at 50.

Fell gave the Vermont officers a block-by-block description of his walk from the Robbins Street apartment to the Price Chopper. SA at 52. His demeanor during the interview was "matter-of-fact," "cooperative, [and] calm." Tr. II-1 at 34. The one exception was when the officers asked him about his mother's dying words ("I love you"), when he became emotional for 30-60 seconds. *Id.* at 33-

20

34.[10]

Fell also gave Pulsifer a detailed description of the murder weapons. Lee used a "black-handled steak knife" with a serrated blade. The one Fell used to slaughter Conway was a "pretty thick knife" with the word "Hawk" inscribed on the blade. SA at 44-45. Afterwards, Fell wrapped the murder weapons in a towel, planning to bring them with him, but mistakenly left them behind in the apartment. SA at 51. Before leaving, Fell showered ("I just . . . hopped right in the shower") and then put the same clothes back on. SA at 44.[11]

    (e)    The Discovery of King's Body in New York

A day after the arrests of Fell and Lee in Arkansas, investigators in New York and Vermont were still trying to find Terry King. They had only very vague information: Fell remembered breakfast at Burger King shortly after the killing, and Lee described the location where King got out of the car as a gravel pull-off on a two lane road, next to a field with a back-board used for target practice. Investigators focused upon several north/south roads in New York State between Rutland and the Tappan Zee Bridge.

---

[10] The officers first learned of Debra Fell's last utterance from Lee's interview.

[11] Lee's post-arrest statement was far more detailed than Fell's. The district court excluded it under *Crawford v. Washington*, 541 U.S. 36 (2004).

21

Terry King's body was finally located on the night of December 1. Early that evening, officials consulted with Gary Mazzacano, a Senior Investigator with the New York State Police who once had been assigned to the Dover Plains, New York, Police Barracks. Mazzacano recalled a gravel pull-off in Dover Plains on Route 22, a north/south highway by a field with a target practice back-board. He also knew that there was a Burger King in Pawling, a town 13 miles south of Dover Plains on Route 22. Tr. III-1 at 15-16.

Picking up two New York State Troopers, Mazzacano drove to the area, arriving after dark. Trooper Darren Bialek found King's body. In the bitterly cold December night, officials secured the area for a forensics team scheduled to arrive the following morning.

Senior Investigator Thomas Martin of the New York State Police supervised the processing of the crime scene on the morning of December 2. *Id.* at 25-26. King lay face-up in a wooded area about 400 feet from Route 22. The brutality of her death was readily apparent: there were "extensive injuries to [her] face, head and neck . . . large bruising and markings and trauma-type wounds." *Id.* at 51. Forensics investigators photographed the scene, took plaster footwear impressions, collected fibre samples, and retrieved a rock and other items from near the body.

22

FELL-00001536

(f)   Miscellaneous Additional Guilt Phase Evidence

FBI Special Agent Mark Promutico was assigned to search for evidence along Route 22 south of the crime scene. Two to three miles south, down an embankment on the west side of the road, Agent Promutico found King's wallet. It contained her identification documents but no cash. *Id.* at 75-82. From a dumpster at the Burger King in Pawling, the agent recovered King's purse; inside was a Dunkin Donuts bag. *Id.* at 76-83.

Michael Leight worked the 7:30 a.m. shift at Burger King on November 27. Tr. At III-1 at 94. Early in his shift, two males in a small, greenish car ordered breakfast at the drive-through window. The driver asked if they could buy some marijuana. Leight met the men in the parking lot behind the restaurant. After a discussion about drug prices, a sale was declined. The driver was wearing a jean jacket with "heavy metal band patches" on it and glasses. *Id.* at 96. The men said that they were en route to New York City from Vermont. Leight gave them directions. Both men seemed "normal."

Matt Kolojeski, a recovering drug abuser, had lived in Wilkes-Barre, across the street from Donald Fell. Sometime in 1999 or 2000, Fell showed Kolojeski a shotgun and told him that it had been stolen from a police car. Tr. III-1 at 112-13. Late on November 27, 2000, Fell arrived at the Kolojeski's Wilkes-Barre

23

FELL-00001537

residence in a green car with a man named Bobby Lee. Fell and Lee both seemed normal and calm. That night they "started drinking and smoking a little weed with [Kolojeski's] brother." *Id.* at 115. Fell had done that before, and had a high tolerance for alcohol. *Id.* at 117-18. Fell and Lee stayed the night of November 27 and most of the following day. They talked about going to California. Before they left, they borrowed a screwdriver to do something with their car.

FBI Agent James Glenn recovered King's Vermont license plates from Mill Creek, a stream near Kolojeski's house. The plates had been folded in half, with Vermont's distinctive green coloring concealed on the inside of the fold.

In Arkansas, FBI Agent Jerry Spurgers searched King's car. He recovered clothing; a map of Vermont and New York; Lee's wallet (containing an October 22, 2000 bus ticket from Wilkes-Barre to Rutland); receipts from fast food restaurants on highways between Wilkes-Barre and Clarkesville; and a card-board sign reading, "Stranded travelers in need of food. Please help. God bless." *Id.* at 149.

Brendan Shea, a forensic examiner in the FBI Laboratory, testified as an expert forensic DNA analyst. Tr. III-2 at 4. Shea compared samples of King's and Debra Fell's blood with stains found on boots worn by Fell and Lee when arrested. Lee's boots were stained with blood from both Debra Fell and King.

24

Fell's right boot tested positive for blood, but Shea was unable to type the small amount of DNA. *Id.* at 21. Fell's left boot had mixed bloodstains on it, with King being the major contributor. The rock found near King's body was stained with her blood.

The government introduced stipulations that: (1) photographs, clothing and footwear (introduced as Exhibits 2(a) - (f) and 3(a) - (e)) were taken from Fell and Lee at the Johnson County Detention Center in Arkansas on November 30, 2000; (2) footwear impressions found at the New York crime scene, between King's body and Route 22, corresponded in design and size to the boots worn by Fell and Lee when arrested; (3) cotton fibers recovered at the New York crime scene, in close proximity to King's body, shared the same microscopic characteristics and optical properties as the fibers comprising the T-shirt worn by Fell and the jeans worn by Lee when arrested; (4) if called as a witness, Tara Richards would have testified that she lived in Wilkes-Barre near Matt Kolojeski's residence; that she owned a Plymouth Neon registered in Pennsylvania; and on the evening of November 29, 2000, she noticed that her rear license plate (found on Terry King's car in Arkansas) was missing and reported it to police immediately; (5) King's Plymouth Neon was manufactured in Mexico and had been shipped in interstate commerce; (6) the Mossberg 12-gauge shotgun found in the Neon on November

25

FELL-00001539

30 was a "firearm" under federal law; (7) blood samples from the bodies of Debra Fell and Terry King were forwarded to the FBI laboratory and maintained there in accordance with accepted forensic best practices; and (8) toxicology tests on blood samples from the bodies of Debra Fell and Charles Conway found high alcohol content but no illegal drugs.

On June 24, 2005, the government rested its guilt phase case. The defense introduced no evidence. That same afternoon, the jury returned guilty verdicts on all four counts.

(3)    Evidence Introduced During the Penalty Phase

The penalty phase of the trial opened on June 28, 2005 with preliminary jury instructions, in which the court gave the jury an overview of the law.

(a)    The Government's Direct Penalty Phase Evidence

During the penalty phase, the government supplemented the guilt phase evidence with graphic proof of the monstrously brutal manner in which Fell and Lee killed their victims; victim-impact evidence showing the devastating effect the murder of Terry King had on her close-knit family; and testimony about Fell's interactions with his mother in Vermont shortly before her murder.

FBI Agent T. Kevin Talley assisted in the search for evidence near Mrs. King's body in New York. After her body was removed by the medical examiner,

26

FELL-00001540

Talley recovered two teeth, an earring and an earring post from the area around where the body lay. Tr. V-1 at 64.

Dr. Michael Baden, an expert forensic pathologist, responded to the New York crime scene on the morning of December 2, 2000, and later performed an autopsy on King's body. At the crime scene, Dr. Baden observed that King lay "on her back, fully clothed, with extensive evidence of injury to the head and neck area." *Id.* at 79. During the autopsy, Dr. Baden first noticed that there was "no evidence of any droplets of blood falling downward," which is "something we look for to see if the person was standing or lying down when bleeding occurred." *Id.* at 82. There were no injuries below the neck; "[a]ll the injuries were confined to the face, the head, the neck area." *Id.* at 82.

The extensive injuries to King's head and neck included blunt force trauma on both sides of the head, extensive damage to the windpipe and the Adam's apple, and extensive fractures to the skull, many "emanating from . . . a severe blow to the . . . bridge of the nose." *Id.* at 83. There had been "severe compression to the neck by a powerful force" which had not broken the skin. That "crushing injury" was consistent with a forceful "stomp" by the boots worn by Fell and Lee when arrested. *Id.* at 87. Dr. Baden opined that the neck injury required "more than 150 pounds of pressure." *Id.* at 89. There were also separate impact

27

FELL-00001541

injuries to the mouth area, because there were fractures of the upper and . . . lower jaw." *Id.* at 88. The teeth recovered from the area around the body weren't broken: "these were teeth that popped out of their sockets . . . after the bone was cracked," indicative of "another stomping type injury." *Id.* The blow to King's nose was consistent with the blood-stained rock found near her body.

As to the cause of death, Dr. Baden testified that "there was a kind of overkill." King died from blunt force injuries to the face, head and brain and traumatic compression of the neck with asphyxia: "homicidal assault." *Id.* at 90-91. "[T]here were many more injuries than necessary to cause death." *Id.* at 95.

Dr. Paul Morrow, then-Chief Medical Examiner for Vermont, performed autopsies on Debra Fell and Charles Conway. Tr. V-1 at 104-05. Conway died of multiple stab wounds – "there were approximately 50 stab wounds on the body." *Id.* Dr. Morrow found a complex of deep stab wounds of the left side of Conway's neck – one of which cut his carotid artery – as well as serial stab wounds to the back of the neck, the front of the neck (including a long, gaping six to seven inch wound), the face, the back, the chest and the upper abdomen. Conway also had slicing wounds on his hands. The wounds were consistent with the bloody knives found in the apartment. Conway bled to death as a result of the wounds, and in particular the severing of his carotid artery. *Id.* at 120.

28

FELL-00001542

Dr. Morrow concluded that Debra Fell also died from "multiple sharp force injuries," or "approximately 40" stab wounds. Tr. V-2 at 3. Debra Fell had a 21 centimeter long cut across the front of her neck, made by several wounds, some of which were deep enough to reach her vertebrae. That complex of wounds severed her carotid artery. *Id.* at 5-6. There were also stab wounds on both sides of Debra's head, on her face, on her back, on her side, and on her hands. Debra had blood on the bottoms of her legs and feet, consistent with walking through blood. She bled to death.

Marsha Thompson worked at the Stop Lite Bar in Rutland. *Id.* at 40. Debra Fell was a regular customer during the last months of her life. In the Summer of 2000, Debra let it be known that her son was coming to live with her. When he arrived, Debra brought him into the bar and introduced him as "my son Donny." *Id.* at 43-44. One day in mid-November 2000, when Debra Fell was at the Stop Lite, Donald Fell entered the premises. After drinking from Debra's beer, he tried to take the change she had left on the bar. Debra tried to stop him, but Fell "grabbed her hair and punched her in the head." *Id.* at 45. When Thompson ordered Fell out, he spat and kicked at her. Debra said, "he'll leave if I leave," and walked towards the door. After Fell followed her out, Thompson saw Donald push Debra down on the sidewalk. Thompson called police, who arrived and took

29

Donald away. Afterward, Debra came back into the bar crying. She told Thompson that she was afraid of her son and didn't want to go back to her apartment. Thompson advised Debra to kick Donald out. Debra replied: "I can't. He's my son, and I love him." *Id.* at 49.

Vertith Oberle was a friend of Debra Fell's, and visited her a number of times in her apartment. *Id.* at 58-59. She never saw Debra use drugs or get angry. After Fell and Lee arrived in Vermont, Oberle saw them several times at Debra's apartment. Fell was "mean" to his mother. He was more "outgoing" than Lee, who was the "more quiet" of the two. *Id.* at 62. On the evening of November 26, 2000, Oberle visited Debra's apartment between 9:30 and 10 p.m. Debra, Conway, Fell and Lee were all sitting in the kitchen, playing cards and drinking beer. They seemed to be having a good time. No one appeared drunk or angry. No one was using drugs, and no drug paraphernalia were visible. *Id.* at 65.

The government's remaining penalty phase witnesses were five members of King's family: her two daughters and her three siblings. They described Terry King's personal characteristics, and the impact of her murder on their lives and the lives of other family members. The government then rested. Tr. VI-1 at 59.

30

(b)    The Defendant's Direct Penalty Phase Evidence

Fell introduced testimony from 14 penalty phase witnesses. The witnesses included family members, teachers, and social service providers who testified about Fell's past, as well as prison officials who testified about Fell's adaption to prison. The defense also introduced a "Mitigation Binder" – hundreds of historical documents from Fell's background generated by schools, social services agencies, and health-care providers.

The first defense witness was Susan Benczkowski, Fell's older step-sister and the daughter of his father and his father's first wife. Benczkowski's parents divorced when she was 10. She testified that her father, Donald Fell, Sr., drank alcohol on a daily basis. Her mother later told her that he was abusive. As a young teen, Benczkowski visited her father and his new wife, Debra Fell. Benczkowski once confronted Debra Fell about drinking beer when pregnant with Donald; Debra replied that "[b]arley is good for the baby." Tr. VII-1 at 58. When Benczkowski was 15 and Fell an infant, she lived with her father and Debra Fell for the summer. She often was responsible for feeding, changing and caring for the baby. Debra Fell and her father argued and drank constantly. Benczkowski once saw Debra Fell become enraged and attack her father with a knife. There was "blood everywhere" and her father locked himself in the bathroom.

31

Benczkowski called the police, who took her father away. She cleaned up the blood, and found a piece of her father's scalp.

Teri Fell, Fell's 22 year-old younger sister, testified that during their childhood her parents were always drunk and "yelling at each other." *Id.* at 81. She recalled one night, when she was very young, Donald Sr. and Debra got in a big fight and there was "lots of blood everywhere." Her grandmother came to take her and Fell out of the house. At one time, her father kept a beer keg in the basement. Sometimes she and Fell would sneak downstairs and "drink beer out of the keg without him knowing it." *Id.* at 84. Police came to the house when her parents fought. Her brother and Debra also fought. *Id.* at 87. She saw him hit her mother, and her mother hit him. Donald Fell protected Teri as she grew up. After Teri had a fight with her mother in January 1994, Debra moved out of the home and Teri did not see her again.

On cross-examination, Ms. Fell testified that Debra regularly worked during her childhood. Her brother frequently refused to go to school and stayed out late at night. She witnessed Fell engage in serial acts of violence. These included stabbing a childhood friend with a fork; taking the crutch of an injured friend of her mother's and striking him on his bad leg; throwing a door at the same man; and, in a joint assault with Bobby Lee in the Summer of 2000, beating another

32

man "very badly," kicking him violently and repeatedly when he was on the ground. *Id.* at 146. After stomping the victim into a coma, Fell urinated on him. *Id.* at 153. When arrested for the assault, Fell used a false name. After Fell went to Vermont in the Fall of 2000, Debra confided to Teri in a phone conversation that "she was afraid of him." *Id.*

The defense called two police officers from Jenkins Township, Pennsylvania, where the Fell family lived in 1989-90. In 1989, Officer Marianne Czanker-Chiumento twice arrested Donald Fell, Sr. for driving while intoxicated and without a license. In one instance, Fell, Sr. struck a child on a bicycle with his car; the other arrest occurred when he had children in the car. Czanker-Chiumento also responded to several domestic disputes at the Fell house, in which she found both parents intoxicated and arguing. Tr. VII-2 at 10-15.

Czanker-Chiumento acknowledged that her only contact with the Fells was between October 1989 and October 1990. Donald, Sr. was usually the aggressor in the domestic disputes. The officer never saw Debra Fell physically or verbally abuse a child. In October 1990, Debra "finally threw [Donald, Sr.] out." Tr. VII-2 at 25. After that, officers had no reason to respond to the residence.

Officer Christopher Purcell also responded to alcohol-related domestic altercations at the Fell residence in 1989-90. Officer Purcell perceived Mr. Fell to

33

FELL-00001547

be the main assailant, and Mrs. Fell to be essentially a battered spouse. Prior to late October 1990, Debra had been afraid to take legal action against her husband. On October 29, 1990, however, Officer Purcell responded after Debra Fell reported that her husband had slapped Donald, then age 10, for refusing to take a shower. Observing that the boy had "a bloody lip," the officer arrested Fell, Sr. That incident finally induced Debra Fell to obtain a court order requiring her husband to stay away from the house.

Ellis Carle was a former supervisor of Luzerne County, Pennsylvania Children and Youth Services ("CYS") and a medic with the Kingston Ambulance Association. Tr. VII-2 at 48. Late one night in April 1985, Carle was dispatched to the Fell house for a domestic altercation. Inside, he found Debra Fell with a knife wound in her leg, intoxicated and holding a beer she did not want to put down. Both children were sleeping upstairs. A "blood trail" led to the kids' bedroom and the bathroom; "she obviously had gone up to check the kids or something." *Id.* at 52. Carle arranged for the children to spend the night with their maternal grandmother, Theresa Sharpe. Sharpe was a trained foster parent with whom Carle had worked in past. *Id.* 57. Carle and another social worker collected the children. "[T]he boy [Donald] was kind of groggy" and "didn't want to wake up." *Id.* at 52. The girl (Teri) was "sound asleep" and "wasn't waking up

34

for nothing." *Id.* at 52, 58. Carle recalled that when the boy noticed the blood on the floor, they told him it was spilled paint. *Id.* at 58. Donald, Sr. was found on a nearby street, also with a knife wound.

Carle testified that in the wake of the Fell family's 1984-85 problems, which included a 1984 report of sexual abuse of the two children by a baby sitter, CYS and the Victim Resource Center began providing services to the family. This included counseling, home visits, office visits and phone conferences, as well as an evaluation of the family's housing, medical, emotional and physical needs. *Id.* at 81, 84.

In 1994-96, Donald Fell again came to Carle's attention when chronic truancy landed him in juvenile court. Tr. VII-2 at 86. Initially, the court penalized Debra Fell for her son's truancy (including jailing her a few times), but she convinced the court that "she had done everything she could to get him to school," after which the court focused on Fell. *Id.* at 87. Eventually, a juvenile court ordered Fell to St. Michael's, a residential facility for problem boys. *Id.* at 66.

At St. Michael's, Fell received anger management and drug and alcohol counseling. *Id.* at 90. Carle recalled that Fell initially had "a rough time" at St. Michael's but, after discharge a year or so later, did "pretty good." Carle's office continued to supervise the family for about six months after Fell's discharge in

35

FELL-00001549

mid-1995, then closed the case. *Id.* at 69-70. The last notation in Carle's file indicated that in 1996, Debra Fell sought to regain custody of her children but was told that it had been transferred to Donald Fell's aunt, Jackie Sharpe. *Id.* at 70.

Sharon Hinchey was Fell's Kindergarten teacher in 1985-86. She described Fell at the time as "a wonderful little boy" with whom she never had a problem. After he went on to first grade the following year, he used to "pop in and say hi." Tr. VIII-1 at 14.

Mary Grance Loncoski was Fell's fifth grade teacher in 1990-91. Fell was a "normal, likeable" boy. *Id.* at 37. He "was a very good reader," who assisted first graders learning to read. Academically he was "average and slightly above average." *Id.* at 33. Late in the year his attendance and work declined.

Mary Jo Scott was a teacher at the Northwest Correctional Facility in Vermont, where Fell was detained pending trial. After meeting Fell in mid-2001, Scott helped him prepare for a GED high school equivalency test. She described Fell as "well-read," "curious," "eager," "prepared," and "focused." *Id.* at 73-75. Based upon scores and testing, he was "in the upper percentile" in comparison with other inmates. *Id.* at 74. Scott opined that, "given the opportunity," Fell "would attend further educational opportunities." *Id.* at 76. Asked what impact Fell's execution would have upon her, Scott replied that she valued her ongoing

36

FELL-00001550

accomplishments with him and "would hate to see . . . an end to that." *Id.* at 82.

Ronald Barclay, a Correctional Officer from Northwest, never had difficulties with Fell. However, Barclay was not aware of Fell's prison disciplinary record.

James Bailey, another Correctional Officer, testified that during the time he worked in "Echo Unit," where Fell was held, Fell "followed policies [and] procedures" and was a "quiet" inmate. Tr. VIII-1 at 133. On direct, Bailey testified that Fell took part in "educational and religious opportunities" offered at the facility. *Id.* at 134. Cross-examination revealed that Bailey's only exposure to Fell was as an occasional "float" officer temporarily assigned to Echo Unit. Full-time officers in that Unit had a lot more interaction with him. *Id.* at 137.

Correctional Officer Jason Rushlow was also assigned to Echo Unit. On direct, he described Fell as a "quiet" inmate who "fit in well." Tr. VIII-2 at 27. He participated in "religious and Bible studies." Tr. VIII-2 at 11-12. On cross-examination, Rushlow reviewed a list of Fell's disciplinary violations. Rushlow recalled that Fell had an "anger management problem." *Id.* at 48-49 ("[h]e can be explosively angry, and you don't know when it's coming"). During one serious incident shortly before trial, Fell fought with and injured guards. *Id.* Fell sued the prison for infringing upon his right to practice Native American religion, *id.* at 54-

37

FELL-00001551

55, and sought to participate in Ramadan as a Muslim. *Id*. at 55-56. He had an "anarchy" tattoo on one arm, and an "upside down cross with 6, 6, 6" tattooed on the other. *Id*. at 60. Fell also filed a multitude of grievances and said derogatory things about officers (calling them "lazy," "stupid," and "things of that nature"). *Id*. at 58.

Deanna German Habib, a CYS case worker in Wilkes-Barre, worked with the Fell family in 1990-92, when Fell was 10-12 years old. She testified about Fell's youth, based upon documents in the defense "Mitigation Binder" and her own memory. She touched again on incidents already related to the jury by Carle and Officers Czanker-Chiumento and Purcell. German Habib identified as "risk factors" the facts that both parents abused alcohol and engaged in domestic violence while he was young, and that, according to her, "there was not a lot of extended family." Tr. IX at 20-26. She read into the record the 1985 allegation that Fell had been sexually abused by a baby sitter. *Id*. at 30-31.

German Habib said that at age 10-12, Fell "seemed like a normal kid." *Id*. at 64. He was on a Little League baseball team and in the Boy Scouts. *Id*. He was also "an A-B student in school," where he had no behavioral problems.

German Habib conceded that when CYS closed its initial supervision of the Fell family in late 1985, the file indicated the children were "receiving appropriate

38

FELL-00001552

care and love," that "discipline has also been appropriate," and that "there [were] no issues of abuse or neglect that would warrant further involvement." *Id.* at 75. Subsequently, when CYS reopened the case in 1990 and German Habib became involved, CYS documents noted that "there appear to be no behavioral or other attendance problems at school," "the children were dressed neatly and in clean clothes," and the "physical hygiene and appearance of Mr. and Mrs. Fell are not an area of concern." *Id.* at 79.

German Habib confirmed that the father left in late 1990, after Debra Fell had him "kicked out" for slapping young Donald. *Id.* at 80-81. German Habib's contemporaneous notes concluded that the mother had "acted appropriately" at the time. *Id.* at 81. Subsequent reports from the Spring of 1991 indicated that, after the father's departure, domestic violence abated and there was no more evidence of Debra Fell drinking excessively. *Id.* at 87. However, in 1991 Fell's behavior began to deteriorate and he became aggressive with his mother and his sister. *Id.* at 85, 89. By September 1991, Fell's violence had become "quite severe," and resulted in him being hospitalized. *Id.* at 89. By sixth grade, Fell was "aggressive and oppositional" at school, and had hit and thrown darts at his mother, who was afraid of him. *Id.* at 95.

In May 1992, Fell was hospitalized again for violence. He had shot a young

39

friend with a 9 mm pistol; punched his sister; chased his mother with a curtain rod; and kept knives in his room. *Id.* at 103. Debra Fell was afraid that he would use the knives on her. *Id.* at 104.

When German Habib closed her file on the Fell family in mid-1992, there were no concerns about excessive drinking or abuse by Debra Fell; on the contrary, she was "providing a safe and stable environment" for her children. *Id.* at 106. The agency's concern was with Donald Fell's behavior. *Id.* at 107.

William Kane taught at St. Michael's when Fell was at that facility in 1994-95. Kane testified that Fell "adjusted pretty well." He was "always respectful" to Kane. He "wasn't a communicator," and was "mostly flat and depressed." But "there were very few incidents that I can recall that were problematic." Tr. IX-2 at 15.

The last defense witness was James Aiken, a consultant and former prison warden and correctional commissioner in South Carolina, Indiana and the U.S. Virgin Islands. Aiken was retained by the defense to "make an assessment of Mr. Fell in relationship to his adjustment to a prison environment for a long period of time." In Aiken's opinion, Fell's history of prison disciplinary infractions was "fairly minor," and "fairly insignificant." *Id.* at 63-64. If Fell were sentenced to life imprisonment, he would be designated to a United States penitentiary, a "very,

40

FELL-00001554

very high-security facility" which keeps close control over inmates. *Id.* at 66. Aiken had met with Fell (for "at least an hour"), and concluded that he had begun to "mature" and "chill out." *Id.* at 70-71. Fell was a man who could "be adequately managed within the Federal Bureau of Prisons for the remainder of his life," *id.* at 71, "without causing an undue risk of harm to staff, inmates, and the public." *Id.* at 72.

(c)    The Government's Rebuttal Penalty Phase Evidence

The government's rebuttal witnesses in the penalty phase included three prison officials and two witnesses from Fell's past: a teacher, and a former friend.

Gregory Machia, a Correctional Officer from Northwest, described an incident on March 17, 2004, when a fight broke out among inmates in Echo Unit's outdoor "bull-pen." Tr. X-1 at 109. Responding officers secured the area by ordering all inmates to put both hands on the perimeter fence. Fell refused to put his hands on the fence or put down his cup of coffee. Machia forced the cup away from Fell and pushed him against the fence. Fell was then handcuffed and removed for disobeying orders. The ensuing scene was captured on videotape, which Machia introduced. The tape depicted Fell screaming obscenities and taunts at officers tasked with taking him back into the facility; it showed him kicking, threatening, and spitting in an officer's face. Tr. X-1 at 112-13.

41

Correctional Officer Michael Gordon testified about another violent encounter with Fell only a month before jury selection. After Fell refused to come out of his cell, an "extraction team" of four officers was sent to remove him. The incident was again videotaped. Gordon, a member of the team, introduced the tape and described what happened. As soon as the team opened the cell door, Fell charged them aggressively. He held a "property box" top in one hand, and had wrapped his head with a towel to mitigate the effects of pepper spray (which was not used). *Id.* at 137, 141-42. As the officers pushed back, Fell fought, kicked, and tried to bite them. One officer was kicked in the knee and injured – he was still out of work at the time of Fell's trial. *Id.* at 138-39. Once shackled and removed from the cell, Fell lay down on the floor and had to be carried. *Id.* at 139. Upon reaching another cell, he threatened an officer. *Id.* at 140.

David Duncan was a 20-year employee with the U.S. Bureau of Prisons and Associate Warden at FCI Manchester in Kentucky. Duncan had worked at four United States Penitentiaries. Tr. X-2 at 4. He was qualified as an expert in classification and security matters in federal prisons. Duncan told the jury that, ordinarily, inmates in pretrial detention are better behaved than those who have been convicted and sentenced. "Basically their life is hinging on the outcome of the trial still at that point, so they don't want to do anything negative to be used

42

FELL-00001556

against them." *Id.* at 17. Duncan found Fell's disciplinary violations on pre-trial detention "extremely excessive," and indicated Fell was an inmate "who has a real problem following instructions, following orders from anybody, and seems to be aggressive back at them." *Id.* at 18-19. Also, in light of the fact that Fell's disciplinary infractions increased in number and severity over time, Duncan believed that he "seems to be getting worse on his path rather than better." *Id.* at 19 ("he's not adjusting").

The two videotaped prison incidents alarmed Duncan. As to the cell extraction, he observed that Fell "seemed to have planned it out. He wanted the confrontation." *Id.* at 23. Similarly, with respect to the bull-pen incident, Duncan noted that Fell was trying to "goad" the officers into a confrontation. "He didn't want to avoid the conflict. He wanted to accelerate the conflict." *Id.* at 24. Duncan stated that, based upon his review of Fell's record, it appeared he would have "major conflicts or ongoing conflicts with staff" at a future prison facility. *Id.* at 34. He also testified that prisons were dangerous places: during his two-year tour of duty at the penitentiary in Florence, there had been "seven homicides and roughly 41 major assaults or stabbings." *Id.* at 30-31.

Matt Cunningham was a friend of Fell's during 1997–99. Since that time, Cunningham had married, had a child, and was employed as a concrete worker.

43

FELL-00001557

Tr. XI-1 at 39-40. He and Fell "hung out" together nearly every day. There were four other members of their group, one of whom was Bobby Lee. *Id.* at 43. The group drank, smoked pot, and committed low-level crimes. Cunningham never saw Fell take harder drugs, like heroin or crack. *Id.* at 48. They all carried knives. *Id.* at 48. Fell was more "outgoing" than other members of the group and "more of a leader than some of the rest of us." *Id.* at 46. In contrast, Bobby Lee was the quietest and least violent of the group; his nickname was "Twiggy." *Id.* at 47.

Cunningham testified that Fell "made it very clear that he didn't . . . like his mother at all," and said things like, "I could kill her." *Id.* at 51. Cunningham also recalled a conversation in which Fell said that, "if you killed one person, why stop there? Because you are going to get the same punishment anyway." *Id.* at 52.

John Kozierski was one of Fell's teachers at the Wilkes-Barre Vocational Technical School in 1995-96. Kozierski taught in the school's Head Start Program. Program students were mostly from dysfunctional families; the program was designed to help them get a "head start" and choose a vocation. *Id.* at 59. Kozierski loved his job because students really needed him: "these students don't really have anybody they can rely on outside of the school . . . they only have us to count on. . . . [W]ith these students, you can really foster something beyond that [traditional teacher-student relationship]. It makes it – it really fulfills me, and

44

that's why I love it." *Id.* at 63-65.

Fell left an indelible impression on Kozierski. He was "[c]onfrontational, disruptive, uncooperative, discourteous, ill-tempered, [and] hot headed." *Id.* at 65. Yet, testing indicated that Fell was "an intelligent person," *id.* at 70 ("very intelligent"), and "there was no reason why he couldn't excel." *Id.* at 71. Kozierski recalled a day in class when Fell refused to sit down, as requested. Fell became irate and began to curse the instructor. When Fell tried to leave, Kozierski stood in the doorway and said, "whoa, where are you going?" In response, Fell got "right in my face . . . and says, 'get the fuck out of my way or I will fucking stab you.'" *Id.* at 67. Kozierski testified that the threat "totally caught me off guard, to say the least." *Id.* The incident propelled Fell back into juvenile court, where he denied that it ever happened. *Id.* at 68. Upon returning to school, "there was no apology" or any "sign of remorse whatsoever." Fell later "smirk[ed]" at Kozierski, "like I got the best of you." *Id.* at 69.

According to Kozierski, Fell was "legendary" at the school. Of the "between 700 and 800" students he had worked with in the Head Start program, Fell was one of the most unforgettable. *Id.* at 79. He was "confrontational" and "hot-headed" with all teachers, and generated a multitude of disciplinary reports and referrals. *Id.* at 73.

45

FELL-00001559