The government's remaining rebuttal consisted of two stipulations. One concerned the accidental pretrial death of Robert Lee. The second, Exhibit 14, concerned Fell's mental health. It provided as follows:

> It is stipulated and agreed by and between the . . . parties that after his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that: (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; and (3) he did not suffer from any mental disease or defect. The examinations also found that Fell was competent to stand trial, and knew the difference between right and wrong at the time of the offenses on November 27th, 2000.

*Id.*

By way of brief surrebuttal, the defense introduced documents relating to Fell's August 2000 arrest in New York for assault. Summations and jury instructions were delivered the following afternoon, July 13.

(d)    Verdict

The jury returned its 20-page "Special Verdict Form" on July 14, 2005. A at 562. The jury unanimously found in favor of each of the eligibility and aggravating factors alleged by the government. The jury unanimously agreed that Fell had proven eight of the 19 mitigating factors, including six relating to his childhood. In addition, 10 jurors found an additional mitigator, handwritten on the form as follows:

46

FELL-00001560

Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*Id.*

The jury decided unanimously that the aggravating factors sufficiently outweighed the mitigating factors such that, as to both Count 1 and Count 2, "a sentence of death shall be imposed."

## D.    FELL'S POST-TRIAL MOTION

Fell filed a post-trial motion asking Judge Sessions to overturn the jury's capital verdict, and either empanel another jury for a new penalty phase hearing, or impose a life sentence. The motion did not challenge the sufficiency of the evidence or the accuracy of the court's legal instructions, but asserted that: (1) misstatements by prosecutors led Fell not to call mental health experts during the penalty phase; (2) prosecutors wrongfully took positions at the 2005 trial inconsistent with positions they took during 2001 plea negotiations; and (3) prosecutors improperly urged the jury, during penalty-phase summation, that certain of Fell's proposed mitigation factors should be discounted because they "didn't relate" to his crimes.

In a lengthy opinion filed on April 24, 2006,  Judge Sessions denied Fell's motion.  As to the mental health expert issue, the court noted that Fell raised the

47

issue during trial and the court scheduled a hearing to explore the allegation. However, prior to the hearing, Fell decided against presenting mental health evidence; by doing so, Judge Sessions ruled, Fell "abandon[ed]" and "waiv[ed]" the claim." A at 723-24.

Judge Sessions squarely rejected Fell's contention that it was either unfair or improper for the government to take one position about Fell's acceptance of responsibility in 2001, during failed plea negotiations, and another, assertedly inconsistent, position at the 2005 trial.

Finally, Judge Sessions agreed that the prosecutor should not have argued that mitigation evidence did not "relate to the crimes." However, the court found that the error, taken in context with jury instructions requiring the jury to consider all mitigation evidence, was harmless.

E.    SENTENCING

Formal sentencing took place on June 16, 2006. Judge Sessions complied with the FDPA's mandate that "the court shall sentence the defendant" in accordance with the jury's verdict. 18 U.S.C. § 3594. The court sentenced Fell to death on Counts 1 and 2 of the Superseding Indictment. The court also imposed 120 months of imprisonment as to Count 4, and 84 months of imprisonment on Count 3, consecutive to Count 4. This direct appeal followed.

48

FELL-00001562

## SUMMARY OF ARGUMENT

Fell argues that Judge Sessions erred during jury selection by dismissing three qualified jurors. Because the dismissed jurors gave ambiguous and equivocal responses to questions about whether they impartially could consider imposition of the death penalty, the court did not abuse its discretion by granting for cause challenges.

Fell argues that Judge Sessions erred by excluding the 2001 draft plea agreement the government considered, but ultimately declined without signing or filing. Judge Sessions' repeated and careful rejection of this claim below was not an abuse of discretion. The court did permit Fell to introduce into evidence his willingness to plead guilty in exchange for a sentence of life imprisonment.

Fell argues the prosecution made two improper arguments to the jury: (1) by pointing out that despite his claim to have accepted responsibility, he pleaded not guilty at the guilt phase of trial, and (2) by asking rhetorical questions about how Fell's unfortunate youth mitigated his responsibility for killing Terry King and urging that the background mitigation evidence had little weight in comparison to the aggravation evidence. Fell did not object to either argument during trial, and Judge Sessions rejected his second argument in his ruling denying the motion for a new trial. The prosecution's arguments were proper: in any event, no plain error

49

FELL-00001563

resulted.

Fell argues that government misconduct and error by Judge Sessions caused him not to introduce mental health evidence in the penalty phase. His claim of prosecutorial misconduct is meritless and was waived below (and was rejected by the district court). His claim that Judge Sessions erred by failing to rule promptly on a motion *in limine* founders on the fact that he never asked for a prompt ruling, and he withdrew his mental health evidence before a scheduled hearing on his motion.

The district court did not abuse its discretion in admitting evidence of Fell's interest in Satanism, and testimony concerning his claimed interest in the Bible and Native American and Muslim religions. The evidence properly rebutted mitigation evidence presented by Fell relating to his character, and his rehabilitation and adaptation to prison. In any event, because Fell never objected to any of the testimony, the limits of plain error review prevent any conclusion that the evidence rendered his trial fundamentally unfair.

Judge Sessions did not abuse his discretion in permitting Marsha Thompson to testify that, after Fell attacked his mother at the Stop Lite Bar, Debra Fell stated that she was afraid of her son. The statement was properly admitted as an excited utterance and did not violate Fell's rights under the Confrontation Clause.

50

FELL-00001564

Furthermore, during the defense mitigation case, Fell's sister also testified, without objection, that Debra Fell had expressed her fear of the defendant. On appeal, Fell does not argue that testimony was improper, so even if Thompson's testimony should not have been admitted, it is obvious any error was harmless beyond reasonable doubt.

The trial court did not abuse its discretion in admitting Matt Cunningham's testimony that Fell had previously talked about killing his mother and others. That evidence was highly relevant to the issue of Fell's character, a critical issue raised by the defense mitigation case which bore directly on the jury's responsibility to weigh aggravating factors against mitigators in deciding whether a death sentence was justified.

There is no merit to Fell's allegation that several of the non-statutory aggravating factors were duplicative, thus skewing the jury's weighing process. The Tenth Circuit's decision in *United States v. McCullah* should not be followed because it is inconsistent with Supreme Court precedent. Even if some of the aggravators overlapped to some degree, the Supreme Court has never held that that circumstance impermissibly skews the jury's decision-making process. On the contrary, the Court has held that a jury's penalty phase deliberations are skewed only when it considers an invalid aggravating factor. Fell does not argue

51

FELL-00001565

that any of the non-statutory factors were invalid.

The federal courts uniformly agree that, because non-statutory aggravating factors are relevant only to death selection, not the death eligibility determination, the Indictment Clause of the Sixth Amendment does not require them to be charged in the indictment. Nothing in the Supreme Court's recent decision in *Cunningham v. California* can be read to require a different result.

There is no authority supporting Fell's novel argument that the FDPA is facially unconstitutional because it allows the jury to hear evidence that is relevant only to death selection before it makes the formal finding of death eligibility. This Court has held that the Federal Rules of Evidence do not apply to death-eligibility factors. Moreover, a jury is presumed able to follow instructions that some evidence may be relevant to some of its deliberations but not relevant to others.

52

ARGUMENT

I.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN
      DISMISSING THREE PROSPECTIVE JURORS WHO EXPRESSED
      DEEP RESERVATIONS ABOUT THEIR ABILITY TO IMPOSE THE
      DEATH PENALTY.

Fell contends that the district court erred in granting for-cause challenges to

three prospective jurors who gave ambiguous and equivocal responses to

questions about their ability to impose a death sentence.  Judge Sessions did not

abuse his discretion in striking any of the jurors.

A.    STANDARD OF REVIEW

This Court reviews a district court's ruling on a challenge for cause for an

abuse of discretion.  "There are few aspects of a jury trial where we would be less

inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in

ruling on challenges for cause in the empanelling of a jury."  *United States v.

Stewart*, 433 F.3d 273, 304 (2d Cir. 2006), *quoting United States v. Greer*, 285

F.3d 171, 172 (2d Cir. 2002).

B.    LEGAL ANALYSIS

A defendant's Sixth Amendment right to an "impartial jury" includes the

right to challenge a prospective juror for cause on the ground that he has "formed

an opinion as to [an] issue to be tried."  *Reynolds v. United States*, 98 U.S. 145,

53

FELL-00001567

155 (1878). A district court's ruling on a for-cause challenge should not be set aside unless the "error is manifest." *Id.* at 156; *see Patton v. Yount,* 467 U.S. 1025, 1036-38 (1984). A reviewing court owes substantial deference to the trial court's ruling because "the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words." *Reynolds,* 98 U.S. at 156-57. The determination of juror bias essentially requires an assessment of the juror's credibility and demeanor, qualities a higher court cannot easily review from a cold appellate record. *Id.* at 157. *See Patton,* 467 U.S. at 1038; *Thompson v. Keohane,* 516 U.S. 99, 111 (1995).

These principles fully apply to capital cases. In *Witherspoon v. Illinois,* 391 U.S. 510 (1968), the Court held that the defendant's right to an impartial jury had been violated by application of a state statute which allowed the dismissal of "any veniremen who expressed qualms about capital punishment." *Id.* at 513. The Court explained that an individual can be trusted to render an impartial verdict in a capital case even if he philosophically opposes the death penalty. Thus, a death sentence may not be carried out if the jury that recommended or imposed it was chosen by excluding jurors for cause simply because they were generally opposed to the death penalty.

Thereafter, in *Wainwright v. Witt,* 469 U.S. 412 (1985), the Court clarified

54

FELL-00001568

that the standard for determining whether a juror may be excused for cause in a capital case "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (internal quotation marks omitted); *Darden v. Wainwright,* 477 U.S. 168, 175 (1986). A potential juror's bias need not be established with "unmistakable clarity" before a trial judge is justified in excusing him for cause because

> determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.

*Wainwright v. Witt,* 469 U.S. at 424-25. The trial court must be given considerable deference because there will be situations in which it is left with the "definite impression" that the juror will not be able to faithfully apply the law despite a lack of clarity in the printed records. *Id.* at 425-26. *See Darden v. Wainwright,* 477 U.S. at 178. The case for deference is particularly strong (and the costs of reversal particularly high) in a case like this one – where the trial court has *granted* a motion to strike for cause – because there is no risk that a biased

55

juror will actually sit in judgment of a man charged with a capital crime. In other words, one fair and impartial juror is substituted for another. Nevertheless, a wrongful excusal of a single juror at a capital trial constitutes reversible error. A *Witherspoon* error is not subject to harmless error review. *Gray v. Mississippi,* 481 U.S. 648 (1987).[12]

The courts of appeals have held that a district court does not abuse its discretion when it excuses a juror for cause from a federal capital trial based on ambiguous, contradictory, or equivocal statements in *voir dire. See United States v. Sampson,* 2007 WL 1393742 *22-*24 (1st Cir., May 7, 2007); *United States v. Brown,* 441 F.3d 1330, 1356-57 (11th Cir. 2006), *cert. denied,* 127 S. Ct. 1149 (2007); *United States v. Purkey,* 428 F.3d 738, 751-52 (8th Cir. 2005), *cert. denied,* 127 S. Ct. 443 (2006); *United States v. Barnette,* 390 F.3d 775, 790-94 (4th Cir. 2004), *vacated on other grounds,* 126 S. Ct. 92 (2005); *United States v. Nelson,* 347 F.3d 701, 711-12 (8th Cir. 2003); *United States v. Barnette,* 211 F.3d 803, 811-12 (4th Cir. 2000); *United States v. Webster,* 162 F.3d 308, 340-41 (5th

---

[12] In *Uttecht v. Brown,* No. 06-413, *cert. granted,* January 12, 2007, the Supreme Court will decide whether, and in what circumstances, a court of appeals should defer to a state court's decision to remove a juror for cause under *Witt.* Because *Uttecht* involves the deferential standard of review under AEDPA, not a direct appeal from a federal conviction, the decision in *Uttecht* will not control this case.

FELL-00001570

Cir. 1998); *United States v. Moore,* 149 F.3d 773, 780 (8th Cir. 1998); *United States v. Tipton,* 90 F.3d 861, 880-81 (4th Cir. 1996). *Cf. United States v. Chanthadara,* 230 F.3d 1237, 1269-72 (10th Cir. 2000) (declining to defer to the district court and finding reversible error in exclusion of prospective juror, without *voir dire,* based solely on written questionnaire responses). A district court may disregard a juror's express assurance that he can follow the law and the court's instructions if the juror's answers, as a whole, show he cannot be impartial. *See, e.g., Barnette,* 211 F.3d at 812; *Moore,* 149 F.3d at 780.

Applying these precepts, the district court did not abuse its discretion in excusing Jurors 64, 141 and 195. As demonstrated below, those jurors expressed deep reservations about their ability to impose the death penalty on Fell. Each juror gave ambiguous or equivocal answers when questioned about those reservations. In the end, those qualms justified the court's conclusion that the jurors' ability to discharge their duties would be substantially impaired.

In arguing that the jurors might have been able to temporarily put aside their feelings and opinions, Fell focuses upon isolated statements by each of those jurors. However, those snippets of *voir dire,* wrenched from context, are insufficient to disturb the district court's assessments of credibility and demeanor. *See Darden,* 477 U.S. at 178 (totality of circumstances justified juror's removal);

57

*Witt,* 469 U.S. at 434-35 (holding that a trial judge, aided by the opportunity to observe prospective jurors, is entitled to resolve ambiguities against the defendant).

## C.    THE INDIVIDUAL JURORS

At the beginning of *voir dire*, Judge Sessions ruled that the parties would be permitted to question potential jurors about certain case-specific facts, since those facts bore upon jurors' willingness and ability to consider the aggravating and mitigating factors in the case.  The court also announced that, in resolving challenges, it would consider the jurors' demeanor in addition to their literal answers to counsels' questions.  *United States v. Fell,* 372 F. Supp.2d 766, 767 (D. Vt. 2005);  A at 142-49.

### (1)    Juror 64

In response to Question 57 on her Juror Questionnaire, "[o]n a scale of one to ten, with 1 being strongly opposed to the death penalty, and 10 being strongly in favor, where do you place your opinion?"  Juror 64 circled the number "1."  A at 182; SA at 30.  She also wrote, "I would have to say that I do not believe in the death penalty" in response to Question 56 ("Describe your views on the death penalty")  SA at 30.  When the court asked Juror 64 for her views on the death

58

FELL-00001572

penalty, she responded, "I don't believe in the death penalty." A at 175. She explained that "I never imagined myself being in a position to have to decide someone else's fate as far as their life goes, and I guess in theory, I have always felt that I wouldn't believe in the death penalty." *Id.* She said that the death penalty would be appropriate for perpetrators of genocide, mass murder and war crimes, but not automatically for premeditated murder, or for particularly cruel and heinous killings. A at 176. She said that she could follow the court's instructions on the death penalty "process," and that she would be fair to both sides. A at 176-78.

The court asked Juror 64 to square her last answer with her opposition to the death penalty. She replied, "I would not lean towards the death penalty as being my first choice by any means. I mean, again, I – I never considered being in a position of making that kind of decision, but I can't honestly say and – sit here and say to you that I absolutely unequivocally do not believe in the death sentence." A at 179. She said she "could" vote to impose a death sentence if she thought that it was appropriate given the court's legal instructions. *Id.*

The prosecutor asked Juror 64 how she could be fair and impartial if she were opposed to the death penalty. She replied, "I guess I feel like I could be fair and impartial, but that certainly my – it would be a very difficult decision for me

FELL-00001573

to make to actually vote for someone for the death penalty, yes." A at 181-82. She acknowledged that she was "pretty strongly opposed to the death penalty, yes," but she maintained that she could vote to impose it despite her personal opposition to it. A at 182, 185.

The prosecutor noted that this case did not involve genocide, mass murder or war crimes, and asked whether Juror 64 would therefore lean toward life imprisonment. She candidly confessed that she would. She explained, "I would lean more generally to having someone be sentenced to life imprisonment without parole than to be sentenced to death. That's true." A at 186. Asked whether her answer would apply to premeditated murder, she replied, "Yes, I would probably lean toward, more strongly towards that than certainly the death penalty, yes." *Id.* Regarding her questionnaire, she said, "I guess what I would – what I was trying to say there [by checking box 1] is that that is not – would not be an easy decision to make, and yes, that generally I would be opposed to the death sentence." A at 187.

The prosecutor asked whether Juror 64 could honestly vote to impose the death penalty if the government met its burden in the case. She said that she could "make that decision." A at 187-88.

60

FELL-00001574

During questioning by defense counsel, Juror 64 agreed to follow the court's instructions on the law, including those on the death penalty. A at 188-89. The court summarized for her the sentencing procedure and the jury's role in a federal death penalty case, then pressed the juror for a soul-searching answer:

> Q:  You know, you try your best to follow the directives of the Court in regard to how you weigh evidence, but that's the ultimate moment when you decide and whether you do so fairly and impartially, and I guess, I am going to ask you for a very thoughtful, reflective response. In light of your views, in light of your willingness to except [sic] the directives of the Court, more than that, just not following the Court's instructions, just the fundamental question about whether you can be fair to both sides, that's what I need to know. And so, do you think that, based upon your views, you might lean unfairly in one favor toward one side or the other? Or do you feel that you could put aside any views or you don't have any views which would prejudice you in any way and that you could be very impartial in your decision about whether the death penalty is appropriate or whether life imprisonment is appropriate? And that's – I am asking for quite an honest, reflective response.
>
> A:  I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes.

A at 190-91.

61

FELL-00001575

Judge Sessions struck Juror 64 for cause over Fell's objection. The court explained:

> I am going to rely upon the case of Goose versus Gander. Essentially, we started this process in which the government suggested that as long as people can follow the instructions of the Court, then they are qualified. That was, let's see, how many days ago was that?
>
> And, the Court indicated in ruling that certain persons were disqualified, that it was necessary to go beyond that because anybody can say that they can follow the instructions of the Court. It's not necessarily definitive, quite frankly. Or follow what the law is.
>
> I mean, 99 percent of the juror[s] would say that they can follow that. The question is whether somebody, in light of their own particular views, can be impartial, and fair. And, I really wanted an honest response and I think I got an honest response at the very end. I mean, at the precise moment when the jury – the juror has to decide a particular decision, I asked whether she could be fair, and her response was, "I would lean toward life imprisonment."
>
> That is a statement of belief, of value structure, which I think suggests that, in light of all of the questions that were asked, that she would not be fair and impartial. And, I appreciate that she said she could follow instructions but I – I think my responsibility, in both contexts, from both perspectives, is to make an analysis as to whether somebody really could be fair and impartial. And so that's my view.

A at 193-94. Judge Sessions added that, in arriving at his decision to grant the government's challenge, he had considered Juror 64's responses in the jury questionnaire, including her personal opposition to the death penalty except in cases of genocide, mass murder and war crimes. Finally, the court noted that even if Juror 64 could follow instructions, "in context, she could not be fair and

62

FELL-00001576

impartial, and so that's the Court's ruling." A at 194-95.

Weighing her answers not in isolation or hypercritically, but as a whole, Judge Sessions did not abuse his discretion in removing Juror 64 for cause. *See Darden,* 477 U.S. at 175-76; *Witt,* 469 U.S. at 432-34. Juror 64's strong personal opposition to the death penalty and her "honest" answer that, despite the court's instructions, she would "lean more towards life imprisonment" than the death penalty, A at 191, made her unfit to serve.

Finely parsing Juror 64's colloquy, Fell's contends (Appellant's Brief at 54-56) that the district court struck her solely because it misconstrued her final answer as a statement about her fairness. This claim is inaccurate, for it ignores the court's own express finding that, in assessing her capacity to sit as an impartial juror, it had relied on all of Juror 64's responses, both during *voir dire* and in the jury questionnaire. Fell's further contention that the district court did not rely on her demeanor is inexplicable, given the court's statement that Juror 64's final answer was "honest." Indeed, that characterization implies the court found her earlier responses – in which she professed a willingness to consider the death penalty for Fell – were not credible. Such a finding was consistent with the court's additional belief, based on the "context" of her answers, that Juror 64 could not follow the law. Finally, it was not manifestly wrong for Judge Sessions

63

to construe Juror 64's answer that she "lean[ed]" against the death penalty to mean that she could not fairly consider the death penalty in this case. *See Barnette,* 390 F.3d at 790-92 (upholding excusal of juror who used the term "lean" to express his opposition to or reservations about the death penalty).

(2)   Juror 141

Juror 141 had checked box 4 (again, on a scale of 1 to 10) in response to question 57 on his juror questionnaire. As the juror put it to Judge Sessions,

> I guess I'm not completely opposed to the death penalty, although I –
> I guess I find it hard, in most cases, to say that, you know, I would
> agree with the death penalty. I think it depends on the case, really.

A at 201. On further questioning, Juror 141 agreed that the death penalty would be an option for premeditated, intentional or "planned-out murder." He explained his personal belief that it would be important to know why the defendant committed the crime, and stated that he would "try my hardest" to be fair in judging the case. A at 201-04.

The prosecutor asked Juror 141 to expand upon his "try my hardest" remark. Juror 141 mused about the monumental responsibility of condemning another human being to death: "the death penalty – it would be a hard thing for me to do it actually, to say to someone that they were going to die." A at 210. The

64

FELL-00001578

prosecutor then asked whether he could vote for the death penalty in a non-premeditated murder case. Juror 141 was straightforward and adamant about not being able to consider imposing a death sentence in such circumstances.

> Q: Now if this case didn't involve murder, but simply involved someone engaging in violence, knowing that the act created a grave risk of death – not premeditated murder, but just what I told you – could you consider the death penalty for that case?
>
> A: No.
>
> Q: And if you heard in this case that it was only an act that constituted a reckless disregard for human life, not that it was first degree or premeditated murder, could you consider the death penalty in that case?
>
> A: No.
>
> Q: Absolutely not?
>
> A: No.

A at 212-13. Fell's counsel objected to those questions. At a bench conference, the prosecutor explained that the carjacking and kidnapping counts did not require proof of an intent to kill, and that the gateway mental culpability factors alleged in the Superseding Indictment included the "grave risk of harm/reckless disregard for human life" factor under 18 U.S.C. § 3591(a)(2)(D). The court overruled Fell's objections. A at 213-21. The prosecutor resumed his *voir dire* of Juror 141:

> Q: [I]f you were selected in this case, whether or not you would consider the death penalty in a case where the defendant didn't commit a premeditated murder, but

65

FELL-00001579

committed an act or engaged in violence knowing that the act created a grave risk of death and the death resulting? Would you consider the death penalty in that type of case?

A: No.

Q: Would you consider the death penalty in a case where the defendant committed an act that constituted reckless disregard for human life, but again, he did not commit premeditated –

A: No.

Q: Why do you feel that way?

A: I just – I really feel that the person, in order to be convicted of a death penalty, needs to have known what they were doing, to realize the consequences of what they were doing.

Q: I understand. And that was very clear from your questionnaire that the defendant's mental state at the time seems very important to you.

A: That's correct.

Q: And that's a strongly-held view?

A: Yes.

Q: And that's something you clearly thought about?

A: Well, since I came and filled out the questionnaire, yes. I hadn't really thought about it before.

A at 221-22.

Juror 141 declared that he was opposed to the death penalty in most cases because "I just feel taking someone's life is a really drastic step to take when – if you are going to give somebody a life sentence without parole, I think that's a pretty severe sentence in itself." A at 222. He added that an offense would have

66

to be "very, very severe" to justify the death penalty, a defendant would have to have "no regard for that other person's life." Juror 141 agreed with the prosecutor that the defendant would have to be of a "clear mental state completely." A at 223. The juror said that he would vote for life imprisonment if the murder was "committed without thought or intention." A at 224.

Defense counsel asked if Juror 141 could ascertain a defendant's intent if the evidence showed he stomped on and used rocks to kill his victim. Juror 141 replied, "it might." A at 235. He also said that photographs of a dead person would help him judge the intent of the killer, and that he would consider the heinousness of the crime in determining whether to vote for life or death. A at 235-36.

Judge Sessions then closely examined Juror 141.

Q: If the evidence showed that the defendant did not intentionally kill --
   in other words, did not think about killing -- but intentionally
   engaged in an act of violence, knowing that the act created a grave
   risk of death, and that is, I think the facts, at least the defense is
   suggesting here, involved kicking or stomping, and that is that there
   wasn't necessarily an intent to kill, but that it was an intent --
   intentionally acted with a grave risk of death to a person.
A: Right.
Q: In that given situation, could you impose the death penalty or not?
A: Yes.
Q: Okay. Why? I mean, is that – is that a – I guess, is my

67

FELL-00001581

question different than what the government said?

A:    I – no. I realized I am somewhat contradicting myself, but I guess from what – what you are saying is that they almost knew what they were doing. They were –

* * *

Q:    Rather than someone intentionally thinking to themselves, I'm going to kill another human being, someone is intentionally deciding to engage in a violent act, recklessly disregarding the fact that that act caused a grave risk of death to another person. In other words, if you asked that person, did they intend to kill, they would say no, but they are intentionally entering into that violent act.

* * *

Q:    That particular situation, could you impose the death penalty or not?

A:    Yes.

Q:    Okay. Why? I mean, why – why do you respond positively in that situation? I'm sorry to put you on the spot.

A:    No, I know it's important that you know what my feelings are.

Q:    Right.

A:    You don't have to apologize. I just feel that if – in that case, that if somebody's gone to that extent of doing bodily damage, that they – that they would have had some regard as far as what they were doing, and that they would –

Q:    Okay. So that, in that given situation, just hypothetically now, assuming that the government has proven beyond a reasonable doubt Mr. Fell's guilt in regard to the kidnapping or the carjacking charge, and then they introduced evidence that he engaged in the conduct which I think has generally been described here, not necessarily with an intent to kill – in other words, he was not thinking that he was going to kill anyone – but that he intentionally acted in this violent kind of way, in reckless disregard of the fact that it created a grave risk of death to someone, in that kind of situation, is the death penalty

68

FELL-00001582

an option for you or is it not?

A:    It is an option for me if – if I think that he was in a
      mental state that he knew what he was doing, yes.

A at 239-41.

Discussing Juror 141's qualifications, the government pointed out its theory

of the case was that not just Fell's brutal beating of King, but also his role in the

carjacking and kidnapping of King, by itself satisfied the "grave risk of harm"

eligibility factor.  A at 243-44.  Defense counsel stated that Juror 141 had honestly

answered the court's questions.  The court stated:

> It is true that he did respond that particular way, but it is unclear as to
> whether he responded in light of my comments about stomping, as
> opposed to the general theory which now the government is
> proposing.  If the government wants to rely upon that particular
> theory, and if this juror says that he could not follow that theory and
> impose a – a death sentence, then he is not eligible to serve.  If that is
> the viable theory.  I asked him the question because I thought you
> were relying upon stomping as the violent act unto itself.  What you
> are saying is that the kidnapping itself may be sufficiently reliable,
> sufficiently grave – creating sufficient grave risk to warrant the death
> penalty.

A at 245-46.

Over Fell's objection, the court excused Juror 141 for cause, stating, "I tell

you what: This is . . . sufficiently close.  This juror is so close, I don't think it's

going to be fair to proceed with him.  I am going to grant the challenge for cause.

69

FELL-00001583

That's my ruling." A at 246.

That ruling was correct; certainly, Judge Sessions did not abuse his discretion in concluding there were grave reservations about the juror's ability to fairly evaluate all of the government's theories. Juror 141 gave open-ended and contradictory answers regarding his ability to consider the death penalty for Fell. During initial questioning by the prosecutor, he stated that he was opposed to the death penalty for a crime committed recklessly or without premeditation. A at 212-13. Upon further probing, he said that he would not impose the death penalty for a killing where the defendant knew that his conduct created a grave risk of death or where the defendant acted with reckless disregard for human life. A at 221-22. Thereafter, during questioning by defense counsel about a "stomping" murder, Juror 141 ventured that he "might" be able to determine a defendant's mental state from the manner in which he killed his victim. A at 235-36. Then, during the court's questioning, the juror suddenly reversed himself and said that he could consider the death penalty for a killing committed with an intent to cause a grave risk of death. A at 239-41. He even admitted that he had "contradict[ed]" himself, A at 239, but did not explain that inconsistency. Those contradictions were sufficient to justify his removal.

70

FELL-00001584

Fell errs (Appellant's Brief at 36-38) in contending that Judge Sessions was required to accept Juror 141's final responses and ignore his earlier ones. On the contrary, the court was entitled to discount Juror 141's belated indication that he could impose the death penalty for a "grave risk of harm" killing because "only the trial judge could tell which of the answers was said with the greatest clarity and certainty." *Patton,* 467 U.S. at 1040 (trial court properly credited juror's earlier testimony instead of later responses).

Fell's further argument (Appellant's Brief at 38) that this case did not require the trial judge to evaluate Juror 141's credibility ignores the reality that a juror's credibility is always important, and was particularly critical given the juror's highly confusing and inconsistent responses. Indeed, Judge Sessions' observation that the case for bias was "so close" indicates that Juror 141's credibility was highly significant in the court's calculus. In such circumstances, deference to the district court's decision is particularly appropriate. *See Witt,* 469 U.S. at 434.

Juror 141 seemed to indicate that he could consider the death penalty for a "grave risk of harm" killing where the facts, such as brutality, showed that the defendant had acted "in a mental state that he knew what he was doing." A at 241. The government's case, however, did not necessarily depend on that scenario. As

71

FELL-00001585

the prosecutor explained, the government's theory was that the "grave risk of harm" gatekeeping factor applied even if Fell's carjacking and kidnapping of King did not involve beating her to death. Because Juror 141 was not prepared to consider the death penalty in that situation, he was properly excused.

### (3)    Juror 195

Juror 195 chose "8" in response to Question 57 on her written questionnaire (the 1-10 scale on the death penalty), which indicated moderate support. SA at 298. However, in response to Question 56, "Describe your views on the death penalty," she wrote "[a]t a philosophical level, I am in favor of the death penalty, but don't know if I could vote in favor of it when the decision is in my hands." *Id.* In response to Question 60 inquiring whether she could make the death penalty decision, Juror 195 wrote, "don't know." *Id.*[13]

Asked by Judge Sessions how she felt about the death penalty, Juror 195 replied:

> I have never really had to think about it too much . . . it's not
> appropriate for every murder, but I would . . . justify it if it was a

---

[13] Juror 195 also wrote that she "[w]ould hold the government to a higher standard than proof beyond a reasonable doubt" in response to Question 62. SA at 299. She added, "There could be absolutely no doubt of guilt before I could vote for the death penalty." *Id.*

72

serial killer or mass murder, say on a mass shooting spree, say things like that. The death – I guess taking anybody's life, I am not in favor of that, but do you justify – for one death, do you justify with the death of another? It's kind of an – an issue I am not sure how I would go, but in general, if it's probably the death of more than one person, maybe look at considering the death penalty.

A at 254-55. Juror 195 reiterated that, to her, multiple murders implied a "mass shooting or serial killer where it's going on for a period of time." A at 255. The court noted that Juror 195 had stated on the questionnaire that the death penalty might be appropriate if there were multiple killings "[a]nd if brutal." Juror 195 explained that an acquaintance had been killed trying to flee from a kidnapper, a killing she characterized as brutal. But she emphasized that incident involved a single killing. A at 255-56.

The court asked whether Juror 195 could follow its instructions to balance the aggravating and mitigating factors at the sentencing hearing. Juror 195 replied that she was open-minded and could "base my decision on that." A at 256-58.

The prosecutor pointed out that on the questionnaire, Juror 195 had described herself as a moderate on the death penalty, but had expressed reservation about actually participating in a decision to vote for death in a capital case. Juror 195 responded that "looking at a case remotely . . . if the guy mass-murdered or serial killer, . . . he deserves to be executed. I don't like taking

73

FELL-00001587

a life for a life. . . . I never really had to think about it too much." A at 260.

The prosecutor described a scenario based on Fell's three killings. Juror 195 agreed that the hypothetical did not describe a mass murder; she volunteered that "it's not a serial killing, either." A at 261-62. The prosecutor then asked whether Juror 195 could fairly consider the death penalty in the hypothetical situation. Juror 195 answered that she would "have to consider it. I wouldn't say strongly yes or no at this time." A at 262.

Juror 195 was again asked whether she could participate in a decision to impose the death penalty. She repeated that she could weigh the aggravating and mitigating factors, A at 263-65, but when the prosecutor reminded her of her concern about sentencing a defendant to death, Juror 195 admitted that she had "never had to face a decision like that . . . I really don't know how I would . . . answer, how I would act when the time came." A at 267-68. After further questioning, she added, "I am just not sure how I would decide. I guess it would be a matter of listening to everything that was presented and go from there." A at 269. She also said that she could not state "which way I would go" but that she would listen to the evidence. A at 270-72.

74

FELL-00001588

The court asked Juror 195 whether she could impose the death penalty after listening to the court's instructions.  Juror 195 replied that she "could lean toward the death penalty" and then expressed her level of certainty as "60/40."  A at 273-74.  Questioned further by the prosecutor, Juror 195 agreed that she "was open to the death penalty" and could vote for a death sentence "based on everything that we hear."  A at 275-76.

The prosecutor returned to the "single killing" scenario, and asked whether Juror 195 could follow a legal instruction that a single killing could qualify a defendant for the death penalty.

A:   For one killing, I don't think I would vote in favor of the death penalty, for one killing.  If other killings are part of this evidence and comes in, then that would say, okay, now, I – I seriously need to consider the death penalty versus one – like I said before, one life for another just doesn't justify it, but if other killings are involved and that comes out at evidence, then it sways me more to, yes, I would be more in favor for the death penalty than if it was just one killing and I didn't know about anything else.

Q:   So even if the judge instructed you that a single killing could make one eligible for the death penalty –

A:   I wouldn't lean towards it in that case.

Q:   You would not apply that law?

A:   If we – if all we hear is that there was one killing, I don't think I could go for the death penalty in that case. If other killings come into play here, and there's other

75

FELL-00001589

things involved, then I would be more on the death
penalty side than not.

A at 277-78.  The court asked Juror 195 whether she "could follow the instruction and consider the possible death penalty for one – if there's only one death."  A at 278.  Juror 195 answered, "Probably not.  I would probably not be in favor of the death penalty in that scenario."  A at 278-79.  The prosecutor moved to strike Juror 195 for cause.  The court, deferring a ruling until Fell's counsel could question Juror 195, stated:

My assessment is she is totally confused about applying the facts as
she knows this case to suggest, and always she keeps going back into,
well, if we present this without these two killings – it's really
confusing to me, but I will give you an opportunity to question.  Then
we can address your challenge for cause.

A at 279-80.  During *voir dire* by defense counsel, Juror 195 stated that she could impose the death penalty, had not ruled the death penalty out in any case, and would listen to the details of the case.  Asked whether she would "preclud[e]" the death penalty for a single killing, Juror 195 replied, "No."  A at 282.  She added that her personal beliefs would not prevent her from considering the death penalty. A at 283.

76

FELL-00001590

The court then asked Juror 195 whether she could vote for the death penalty in accordance with its instructions if that sentence was "suitable [or] appropriate." A at 283. She replied that she could, but that she would have to know "why this person is being sentenced to death." A at 287. The court asked Juror 195 whether she could vote for the death penalty if it were an appropriate sentence. She replied:

> I think yes, but again, I – I can't say yes emphatically that I could do that. I just -- I just don't know how I would react, you know, sitting here, listening to the evidence, and then you get to that point. I don't know. My answer has to be I don't know because I don't know when – when that time comes, whether I could make that decision. I could sit here and say yeah, I am 60/40 yes, but when the time comes, I don't know; maybe I would be a 40/60. I know I am not answering your question, but I really just don't know.

A at 285. Upon further questioning by defense counsel, Juror 195 said that she "could consider" imposing the death penalty but emphasized that the aggravating factors "need to be brutal and, whatever, versus . . . to have just one death involved." A at 286. The court asked her whether she could vote for a death sentence if death were an appropriate sentence. She replied:

> As a simple question – well, not a simple question, but – yes, but I guess I keep getting back to, voting for the death penalty, in my mind, execution of one person for the death of another, I can't warrant one life for the other. I can't balance that, versus, in this scenario, where someone is a serial killer or whatever, where they've just randomly just killed people, and, you know, stuff like that. Then I could say the

77

death penalty – my conscious [sic] would say, I don't have a problem with picking the death penalty in that scenario.

A at 287. The prosecutor sought clarification:

Q:    If I understand you correctly, you are saying that a single victim of a killing does not warrant the death penalty?

A:    From the way I feel when I am sitting over there, yes. That is my general feeling that – like I said, I don't like the thought of one life for another. But if it's, you know, a bigger crime than that, then it's easier for me to say I have no – I have no second doubt. I don't doubt that I would go for the death penalty. To me, it warrants it if you are killing a lot of people. When it's just one, and that's all you see and that's all you hear about, I'm not sure I can say, take a life for another, and I know I am – I am not answering your question, but I just –

Q:    And I think – I will try and put this as a yes-or-no question. If you don't feel it is, then let me know, but I will try and put it as one. If the judge instructed you that the killing of a single person or the death of a single person made a defendant eligible for the death penalty, you would not be able to apply that law?

A:    Of a single person, I would probably say no, I would not be able to choose the death penalty.

                                * * *

But if it was, you know, mass – you know, the other scenarios as described, I – then I think it would be easier to make that decision to say yes, I would go for it.

A at 288-89.

78

FELL-00001592

The prosecutor renewed his challenge because Juror 195 could not impose the death penalty for a single killing and because she never unequivocally said that she would vote to impose the death penalty if that sentence was appropriate. Fell opposed the challenge. The court stated:

> Well, she said she can consider the death penalty. Did she say that she could render a death penalty verdict if she found that the government had essentially established their case? It's not a question of just considering it at that particular point. It's a question about the ability to impose the death penalty if she found, consistent with the instructions, that the aggravating factors substantially outweigh the mitigating factors and the death penalty was warranted, and she declined to answer the question.

A at 292. The court excused Juror 195 for cause.

> I am going to grant the challenge for cause, on a number of grounds: The first is, she would have difficulty following the instructions with regard to the single killing. She clearly said that she would. And of course this is essentially a single-killing case.
>
> But more than that – well, there's two other grounds. The second is that whether or not she could actually vote for the death penalty, no matter what her views are, is really up in the air. And the third fact is essentially a question of fairness. The Court's put in a position, as a result of long Supreme Court case law, to make an assessment as to whether a juror could be fair to both sides, and as I listen to her responses, I cannot feel assured that she would be fair to the government's side because she could very well find in their favor and then say, I could not impose the death penalty. And she couldn't – you know, she just couldn't get to the point of saying she could ever vote for that, in my view. So, as a result, she is challenged for cause.

79

FELL-00001593

A at 292-93.

The district court appropriately removed Juror 195 for cause because she could not faithfully follow its instructions on applying the death penalty to Donald Fell. Juror 195 was generally opposed to the death penalty for a single killing; she also made it plain that, at the eligibility stage of a capital proceeding, she would not consider the death penalty for a just one killing. A at 277-79. Because this was a case in which the jury could find that Fell was death-eligible based on a single murder, Juror 195 would have been unable to follow the court's instructions.

Under the FDPA, a defendant is death-eligible if the jury finds the charged homicide; a statutory intent element or threshold mental culpability factor under section 3591(a)(2); and at least one statutory aggravator set forth in section 3592(c). Fell was charged with three statutory aggravators, including the multiple-killings-in-a-single-criminal-episode aggravator under section 3592(c)(16). Thus, under the law, Fell would be death-eligible if the jury found that Fell was over 18 years old; that he possessed at least one of the threshold mental culpability factors; and that one of the non-multiple killings aggravators was present.

80

FELL-00001594

Juror 195 was not qualified to sit on Fell's case because she made unequivocally clear that she was unwilling to find Fell death-eligible based on a single killing. In effect, she would have required a multiple killings finding not only to make Fell death-eligible, but also to impose the death penalty upon him.[14] And given her singular view that the death penalty should be reserved for mass murderers and serial killings – scenarios she admitted were not involved in this case – she probably could not have followed the court's instructions at all.

In sum, Judge Sessions had every right to believe that Juror 195's views about capital punishment "would prevent or substantially impair the performance of [her] duties as a jury in accordance with [her] instructions and [her] oath." *Wainwright v. Witt,* 469 U.S. at 424. The court did not abuse its discretion in allowing the challenge for cause.

---

[14] Fell overlooks that fact when he notes (Appellant's Brief at 46-48) that Juror 195 stated that she could consider the death penalty for multiple killings, and fails to acknowledge the implications of her statement.

Although the jury ultimately, and properly, found the multiple killings aggravator based on evidence that three killings occurred in a single criminal episode as required by section 3592(c)(16), the government and the court could well anticipate, at the jury selection stage, that the defense would argue the killings occurred in two episodes that were geographically and temporally separated.

81

FELL-00001595

There was, moreover, a second and independent basis for excluding Juror 195.  Quite simply, her views were "up in the air" concerning the circumstances in which she could consider the death penalty.  Her answers varied with the questions.  *Compare* A at 262 (could consider death penalty) with A at 267-69 ("I am just not sure how I would decide"), and A at 272 ("I just don't know which way I would go once we got to that point").  She admitted that her mind went from "60-40" to "40-60" and that "I really just don't know."  A at 285.  Fell's argument (Appellant's Brief at 48) that the court did not rely on her demeanor overlooks that the court not only promised to consider each juror's demeanor during *voir dire*, but did so here.  In particular, the court's remark that, after "listen[ing] to her responses" (A at 293), Juror 195 was "confused" and that she would not have been fair to the government shows that it had evaluated her credibility and demeanor.

Fell's hypertechnical argument (Appellant's Brief at 47-48) that the court befuddled Juror 195 by using the term "vote" instead of "consider" during its questions is meritless.  The precise words used during *voir dire* are not dispositive; the key is the context in which the juror's responses are made.  *See Darden,* 477 U.S. at 178.  The court did not ask Juror 195 whether she *would* impose the death penalty; it merely asked whether she *could* vote for death if that was the "appropriate" sentence under the facts of the case.  *See, e.g.,* A at 273, 276, 283-

82

85. Viewed against the *voir dire* as a whole, Juror 195 surely understood that. As shown by the many FDPA cases decided by the courts of appeals, *see* pp. 56-57, *supra,* the trial judge does not abuse his discretion when he excuses a juror because the panelist has given ambiguous, contradictory and equivocal answers to questions about her qualifications to sit in fair judgment of a capital case.

83

FELL-00001597

II.    NO DUE PROCESS VIOLATION RESULTED FROM THE DISTRICT
COURT'S EXCLUSION OF THE 2001 DRAFT PLEA AGREEMENT.

Fell faults the District Court for excluding from evidence in the penalty

phase a draft plea agreement generated during unsuccessful 2001 plea

negotiations. The 2001 document cites "substantial mitigating evidence" favoring

a life sentence.[15] Fell also raises a new argument: that he had a due process right

to introduce the draft agreement after a prosecutor during closing argument stated

that, "[i]f he wanted to plead guilty, he could have." Fell made no

contemporaneous objection during trial, and there was no plain error.

A.    BACKGROUND

In 2001, the U.S. Attorney's Office in Vermont considered Fell's offer to

plead guilty to Count 2 of the original indictment in exchange for a sentence of life

imprisonment. In October 2001, Fell and his lawyers negotiated and signed a draft

plea agreement, prepared by the U.S. Attorney's Office. Both parties were well-

aware that a plea to life imprisonment in a capital case required approval from the

---

[15] In particular, the document's preamble cites "the defendant's mental health
and impaired capacity, his mental health history and background; his remorse and
acceptance of responsibility; his assistance to authorities in locating Teresca King's
body; the fact that he was 20 years old when he murdered Teresca King; and the fact
that he does not have a substantial prior criminal history." A at 57.

84

FELL-00001598

Attorney General.  The draft agreement explicitly provided that it could not become effective unless "approved by the Attorney General of the United States or his delegate, and until thereafter signed by the United States Attorney for the District of Vermont."  A at 61.  Neither the Attorney General nor his delegate approved the proposed agreement (nor did the United States Attorney, or any government lawyer, sign it).[16]  On January 30, 2002, the government filed its Notice Of Intent To Seek Death Penalty.

Fell first sought to exploit the failed plea negotiations in a May 14, 2002, "Motion to Dismiss Notice of Intent to Seek Death Penalty," in which he sought to enforce the aborted deal based upon the unratified language.  He also argued that the section of the draft agreement citing "substantial mitigating evidence" constituted "admissions" which could be introduced against the government.  A at 52.  At the hearing on the motion, however, Fell's counsel stated that he did not at that time seek a ruling on the admissibility of the proposed agreement's text.  A at 69.  Judge Sessions denied the motion.  A at 63.

---

[16]  Fell incorrectly asserts that "the plea agreement . . . was . . . signed by a representative of the U.S. Attorney's Office."  Appellant's Brief at 75.Similarly, Fell mischaracterizes the draft agreement as "a plea agreement reached by [the defense] and the United States Attorney for the District of Vermont."  Appellant's Brief at 56. Yet (as Judge Sessions repeatedly pointed out below) there was no "plea agreement" because the draft document was never adopted by the government.

85

On April 8, 2005, with trial imminent, the government filed a motion *in limine* to bar Fell from introducing the draft agreement. A at 117. Fell opposed the motion. A at 128.

On May 25, 2005, Judge Sessions granted the motion to exclude. A at 158. The court pointed out that both parties knew in 2001 that any agreement was conditioned upon approval by the Attorney General, and that therefore "the Government never adopted the statements in that document." A at 160. The court also reasoned that "a prosecutor's statements of personal belief regarding [the presence or absence of aggravating and mitigating] factors should have no bearing on the jury's independent evaluation of the evidence." A at 160 ("[a]s the Supreme Court has noted, 'assertions of personal knowledge [by a prosecutor] are apt to carry much weight . . . when they should properly carry none.'")[17]

---

[17] Fell mischaracterizes the ruling in stating that Judge Sessions found the plea agreement "not probative because the government's statement was conditional on the Attorney General's approval." Appellant's Brief at 61. Judge Sessions explicitly held that the agreement was not probative because "a prosecutor's statements of personal belief regarding those [aggravating and mitigating] factors should have no bearing on the jury's independent evaluation of the evidence." A at 160.

FELL-00001600

In excluding the draft agreement Judge Sessions cited the evidentiary standard in § 3593(c),[18] and determined that the probative value of the evidence was outweighed by its danger of confusing the issues:

> While the Government's statements in the proposed plea agreement have little or no relevance, this evidence would be very likely to distract the jury. The Court agrees with the Government's claim that information regarding settlement negotiations is likely to lead to jury to second-guess the Government's in-house plea deliberations. The jury should be focused on its independent assessment of the evidence regarding mitigating and aggravating factors.

A at 160-161.

Finally, Judge Sessions cited "strong support on policy grounds" for exclusion of the draft agreement. A at 161. [19] The district court ruled, however,

---

[18] 18 U.S.C. § 3593(c), provides, in part, that evidence "is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."

[19] Fell notes on appeal that Judge Sessions' pretrial order failed to address the constitutionality of excluding the draft agreement. A capital defendant has a due process right to introduce, "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Judge Sessions was, of course, aware that § 3593(c) "does not alter a district court's inherent obligation to exclude evidence the admission of which would violate a defendant's Constitutional Rights," as this Court ruled in reversing his 2002 dismissal of the indictment. *United States v. Fell*, 360 F.3d at 145 (adding, "under the FDPA standard, 'judges continue their role as evidentiary gatekeepers and

87

that Fell could introduce his offer to plead guilty in exchange for a life sentence, and the government's declination of his offer. A at 161-62.

Fell first asserted his acceptance of responsibility at the outset of the trial. In his opening statement, counsel asserted that "Donald Fell admitted his responsibility for Teresca King's death five years ago. He is not denying responsibility for that." Tr. I-1 at 59.[20] In his guilt phase closing, Fell similarly argued that "he accepted responsibility five years ago . . . ." Tr. IV-1 at 78.

At the penalty phase, Fell alleged as a mitigation factor that he had "offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day." He also alleged that "[a]fter his arrest, [he]

---

. . . retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair,'") (citation omitted). Judge Sessions' holding that the draft agreement was non-probative (and prejudicial) implicitly found that it was not an *Eddings* "mitigating factor" which Fell had the right to introduce. "Well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 1732 (2006)(capital case); *see also Sampson*, 2007 WL 139372 * 28 (trial court may exclude confusing mitigation evidence of marginal relevance).

[20] Fell's opening statement in the guilt phase led Judge Sessions to join the government in wondering "why we have to spend the next week . . . going through a [guilt] trial" if Fell didn't deny his guilt. Tr. I-1 at 61.

88

truthfully admitted his responsibility for Teresca King's murder."

Consistent with Judge Sessions' order, Fell introduced at the penalty phase a stipulation regarding his offer to plead guilty in exchange for a life sentence. The stipulation provided that:

> on May 18th, 2001, Donald Fell, through his attorneys and in writing, offered to plead guilty to Count II of the indictment, kidnapping, death resulting, in exchange for a life sentence without the possibility of release. The government refused that offer.

Tr. IX-2 at 39.

During closing argument in the penalty phase, the prosecutor addressed each of Fell's 19 allegations of mitigating circumstances. As to the claim that Fell had "offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day," the prosecutor made the following argument:

> Ladies and gentlemen, the judge instructed you. You know the law. Life imprisonment without the possibility of release is the minimum sentence that Donald Fell faces for kidnapping with death resulting. It's the minimum sentence. When he offered to make that plea, he knew the evidence against him was overwhelming. He knew there was no doubt he was going to be convicted, so he asked for the minimum sentence. We rejected that, ladies and gentlemen. We wanted a jury to decide the appropriate sentence in this case.

89

And, ladies and gentlemen, let's take a look at the last part of this: He's maintained that offer to this day.

Ladies and gentlemen, we had to try and convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden. We proved it. And now we are here to decide what is the just sentence. The minimum sentence? Or the death sentence?

Tr. XII-1 at 49. Fell made no objection to the argument.

After the verdict, Fell's post-trial motion protested the exclusion of the draft plea agreement, arguing that the government unfairly had taken inconsistent positions during 2001 plea negotiations and the 2005 trial.

Again Judge Sessions rejected the claim. The court held that:

As this Court has previously stated . . . , there is a fundamental distinction between the cases cited [by Fell] and Fell's situation: the statements in the government's draft plea agreement (to the extent that they can be considered statements of fact rather than opinion) were never presented by the government to a court or to a jury. The plea agreement was never executed; it was never filed with the Court, except as an attachment to the briefing on this matter. The government did not make inconsistent arguments in this case; as Fell's brief attests, in the context of plea negotiations, the government did not "argue" a position at all. At that time [in 2001] it "agreed" with Fell's view of the evidence, but later argued to the contrary to the jury. [Citation omitted.] It was not unfair to withhold evidence of the failed plea negotiations from the jury.

A at 728.

90

FELL-00001604

On appeal, Fell again protests Judge Sessions' exclusion of the draft agreement. He also argues that its exclusion deprived him of the right to fairly rebut the prosecutor's "misrepresentation" of his plea offer by stating in closing argument that "if he wanted to plead guilty he could have."[21]

Judge Sessions did not abuse his discretion in excluding the draft agreement, the government made no misrepresentation in commenting that Fell could have entered a guilt phase plea, and the stipulation regarding the plea protected any interest Fell may have had in "rebutting" the comment.

B.    STANDARD OF REVIEW

This Court "review[s] a district court's evidentiary rulings for abuse of discretion, and will not reverse unless the district court's decision was 'manifestly erroneous.'" *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003). *See also* 18 U.S.C. § 3595(c)(2)("The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless . . . where the Government establishes beyond a reasonable doubt that the error was harmless").

---

[21] Fell refers on appeal to "the parties' agreement to limit mention of the plea agreement to the stipulation," and suggests the prosecutor's closing argument violated the "agreement." Appellant's Brief at 69. He provides no citation for the "agreement," and the government is unaware of one.

91

FELL-00001605

Claims raised for the first time on appeal are subject to "plain error" review. Under the plain error doctrine, a court will grant relief only if a defendant shows that there was an (1) error, (2) that is plain, and (3) that affects substantial rights. If those conditions are met, the court may exercise its discretion to note the error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., Jones v. United States,* 527 U.S. 373, 389-90 (1999) (FDPA case). The "substantial rights" prong requires the defendant to show that there was a reasonable probability that the result would have been different absent the error. *United States v. Dominguez Benitez,* 542 U.S. 74, 83 (2004). To prevail on appeal, the defendant must show that the prosecutor's conduct amounts to a "flagrant abuse." *United States v. Zichettello,* 208 F.3d 72, 103 (2d Cir. 2000).[22]

---

[22] If a defendant preserves his claim of improper argument at trial, this Court reviews for harmless error and considers the severity of the misconduct, any curative action by the court, and the strength of the government's case in evaluating a preserved improper argument claim. *United States v. Elias,* 285 F.3d 183, 190-92 (2d Cir. 2002). On plain error review, unlike harmless error review, the defendant has the burden of showing prejudice. *See United States v. Olano,* 507 U.S. 725, 734 (1993).

FELL-00001606

## C.   THERE WAS NO ABUSE OF DISCRETION IN EXCLUDING THE DRAFT PLEA AGREEMENT

Judge Sessions did not abuse his discretion in excluding the 2001 draft agreement and its recitation of "substantial mitigation." The court made a careful and well-reasoned determination that the document had "little or no relevance" and was "very likely to distract the jury" and lead it to "second-guess the Government's in-house plea deliberations." The FDPA's low barriers to admission of evidence in a capital sentencing hearing "do[] not mean that the defense has *carte blanche* to introduce any and all evidence it wishes." *United States v. Purkey*, 428 F.3d at 756.

Judge Sessions correctly determined that the 2001 draft was not relevant. "[A] prosecutor's statements of personal belief regarding [the presence or absence of aggravating and mitigating] factors should have no bearing on the jury's independent evaluation of the evidence." A at 160. The court added that, "[a]s the Supreme Court has noted, 'assertions of personal knowledge [by a prosecutor] are apt to carry much weight . . . when they should properly carry none.'" A at 160, citing *Berger v. United States*, 295 U.S. at 88. Judge Sessions also found that because "the Government never adopted the statements in that document," it never reflected the government's position, even in 2001. A at 160 ("statements made by

93

FELL-00001607

the local prosecutors . . . were conditional"). Fell failed below, and fails again on appeal, to explain how a draft plea agreement, discussed four years before trial but never signed, never filed, and never adopted, was relevant to the jury's deliberations after introduction of the related stipulation.

In addition to being immaterial, the 2001 draft agreement carried serious risks of confusing the issues and unfairly prejudicing the government. The district court held that the draft was "likely to lead the jury to second-guess the Government's in-house plea deliberations," while it should be "focused on its independent assessment of the evidence regarding mitigating and aggravating factors." A at 160-61. The danger of unfair prejudice included the risk that the 2001 document would undermine the advocacy and credibility of the government during the 2005 trial. The document contained a view of the mitigation evidence inconsistent with the government's evidence and position at trial. The 2001 proposal could have caused the jury to fault the government for perceived inconsistency, for improperly weighing mitigation evidence, and for seeking to circumvent the jury's role in weighing that evidence. It also would risk collateral inquiry into the early plea negotiations. *See* 2 C.B. Mueller & L.C. Kirkpatrick, *Federal Evidence* § 149, pp. 167-68 (1994)(discussing the exclusion of plea negotiations; citing "obvious risks of confusing the issues if the statement is

94

FELL-00001608

offered and the government then seeks to rebut or explain it, which inevitably must lead to an exploration of the plea bargaining which failed and which may well require the prosecuting attorney to take the stand").

Judge Sessions's ruling was consistent with the reasoning of other courts excluding government statements in plea negotiations or in-house memoranda regarding the strength of a case. *See United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir. 1976)(affirming exclusion of defense evidence that government offered pleas to reduced counts with lighter sentences in exchange for testimony); *United States v. MacDonald*, 688 F.2d 224, 230 (4th Cir. 1982)(affirming exclusion, in murder trial of Army officer, report by investigating Army colonel on probable cause; report was immaterial, and "would have tended to perplex, in that it likely would have distracted the jury's attention from its task of ascertaining guilt or innocence to second-guessing" prior investigation); *Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1554-55 (11th Cir. 1995)(affirming district court determination in jury trial on employment discrimination claim that Fed. R. Evid. 403 barred plaintiff from introducing EEOC letter finding discrimination; "the district court was properly concerned that admitting the determination letter would shift the jury's focus away from the issue of whether the bank considered a

95

FELL-00001609

prohibited factor in terminating [the plaintiff]").[23]

Similarly, this Court and others have barred prosecutors from expressing to the jury personal belief or opinion as to the veracity of witnesses or evidence of guilt, based in part upon the undue weight that the jury may accord such matters. *United States v. Modica*, 663 F.2d 1173, 1178-81 (2d Cir. 1981)("The prosecutor is cloaked with the authority of the United States Government; he stands before the jury as the community's representative"; "it may be difficult for [the jury] to ignore his views, however biased and baseless they may in fact be")(collecting cases); *United States v. Melendez*, 57 F.3d 238, 240-41 (2d Cir. 1995)("The

---

[23] Fell cites prior decisions from this Court approving the introduction into evidence at trial of a party opponent's inconsistent prior pleadings, *United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir 1991)(the government's bill of particulars filed in connection with a prior trial on the same charges), and counsel's opening statement at a prior trial. *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984). Judge Sessions carefully distinguished those cases below on several grounds, including the fact that, unlike the admissions in *GAF Corp.* and *McKeon,* the "statements" in the 2001 draft plea "were made neither in court proceedings nor in pleadings." A at 68. Fell now argues that Judge Sessions failed to consider "the capital/non-capital distinction." Appellant's Brief at 74. He urges incorrectly that "the plea agreement, although not made in court, was put in writing and signed by a representative of the U.S. Attorney's Office." *Id.* at 75. Fell adds that the "fundamental principle of fairness" requires that "if a party makes statements that misrepresent the truth, the other party should be able to introduce evidence of the misrepresenting party's prior position – so long as the evidence is reliable." *Id.* at 76. Yet there was no misrepresentation by the government. *See infra* at 103-04.

96

FELL-00001610

essential vice of a statement of personal belief by the prosecutor is the implication that the prosecutor's opinion is based on matters uncovered by the Government's investigation but not presented in the evidence at trial. . . .   In addition, 'the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence'")(*quoting United States v. Young*, 470 U.S. 1, 18-19 (1985)).

The foregoing authorities are not capital cases; however, they stand for the well-settled propositions, adopted by Judge Sessions and applicable to any case tried by a jury, that government statements in unsuccessful plea negotiations, and personal opinions of government officials regarding the strength of a case, are immaterial to juror deliberations, and raise substantial risks of confusing and misleading the jury, and prejudicing the government.

The jury in the penalty phase was tasked with determining whether the government had proven the required threshold eligibility factors, which aggravating and mitigating factors had been proven, and "whether all the aggravating factor of factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death. . . ." 18 U.S.C. § 3593(e). Fell failed below, and fails on appeal, to explain how the 2001 draft plea agreement was probative to the jury's determinations, and why any nominal

97

FELL-00001611

mitigating relevance was not outweighed by the significant risks of confusion and prejudice. The nub of the matter is that Fell wanted the jury to know that some government lawyers, in 2001, agreed with his weighing of the mitigation factors. Yet Judge Sessions did not abuse his discretion in determining that opinion (not fact) to be immaterial and likely to confound the jury.

### D. FELL'S "FAIR REBUTTAL" CLAIM FAILS TO MEET THE PLAIN ERROR STANDARD AND MAKES NO SENSE

Fell argues that his due process rights were violated by his inability to introduce the 2001 draft agreement in the wake of the government's improper penalty phase closing argument that he "could have pleaded guilty." Fell cites *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Skipper v. South Carolina*, 476 U.S. 1 (1986), but he made no objection during trial and did not ask Judge Sessions to reconsider the exclusion order after the government's closing. Fell's claim, therefore, is reviewed for plain error, of which there was none. In any event, the claim is incoherent.

In *Simmons* and *Skipper*, the state asserted future dangerousness of the defendant as an aggravating factor warranting a capital sentence. In rebuttal, defendants proposed to introduce mitigating evidence of good behavior in prison (*Skipper*), and the fact that an alternative term of life imprisonment carried with it

98

no possibility of parole (*Simmons*).  The state courts excluded the mitigating evidence and the juries returned death sentences.

Reversing in *Skipper*, the Court relied upon the general due process rule requiring that in capital cases "the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 476 U.S. at 4, *quoting Eddings v. Oklahoma*, 455 U.S. at 110.  The Court then held that, where future dangerousness is asserted by the government, "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.  Under *Eddings*, such evidence may not be excluded from the sentencer's consideration." 476 U.S. at 5.

In *Simmons*, after the state introduced evidence of future dangerousness, the defense requested a jury instruction explaining that, under state law, there was no possibility of parole in the event of life imprisonment.  The state court denied the request.  Vacating Simmons' death sentence, the Supreme Court pointed out that "the jury reasonably may have believed that petitioner could be released on parole if he were not executed." 512 U.S. at 162.  Citing *Skipper*, the Court ruled that the defendant's right to introduce evidence in rebuttal to the state's aggravating evidence was infringed upon:

99

FELL-00001613

> The State . . . succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole.

*Id. Cf. Gardner v. Florida*, 430 U.S. 349 (1977)(defendant sentenced to death on basis of presentence report not made available to him; reversed: due process does not permit capital sentence "on the basis of information he had no opportunity to deny or explain"); *Green v. Georgia*, 442 U.S. 95 (1979)(reversing capital sentence where trial court in penalty phase applied state hearsay rule to bar defendant from introducing reliable evidence of his lesser involvement in capital crime).

Fell also relies upon *Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999). Like *Simmons* and *Skipper*, *Paxton* was a federal habeas attack on a state court death penalty conviction where the government alleged future dangerousness as an aggravating factor and the defendant's rebuttal evidence was excluded. One of the "future dangerousness" circumstances involved an earlier prosecution of the defendant for murdering his wife. The state filed a dismissal of that prosecution, noting that defendant had passed a polygraph test. In the later death penalty prosecution, the government introduced evidence implicating the defendant in the

100

FELL-00001614

murder, but stipulated that the prosecution had been dismissed. In rebuttal, the defense sought to introduce the fact that the dismissal had been based upon the polygraph test. The government objected, and the state trial court, citing state law barring the use of polygraph tests, excluded reference to the test. In closing argument, the prosecutor argued that "the defense had the same opportunity to put evidence on . . . about that [prior] killing that we did." As to why the prosecution was dismissed, the prosecutor stated to the jury, "[w]e don't know why it was dismissed." *Id.* at 1212-13.

> In reversing the state death sentence, the Tenth Circuit observed:

> [The prosecutor] clearly and deliberately made two critical misrepresentations to the jury: he told the jury that [the defendant] had been given the opportunity to present any evidence showing that he had not killed his wife, and he told the jury that the reason for the dismissal was unknown. In fact, as [the prosecutor] well knew, his objections had prevented [the defendant] from presenting evidence that he had passed a polygraph test in connection with the shooting, and that those test results were the reason for the dismissal. It is against this factual background that we assess whether [the defendant's] inability to present mitigating evidence rendered his sentencing proceeding constitutionally invalid.

*Id.* at 1213.

Applying the *Skipper* "fair rebuttal" rule, the Tenth Circuit held that the state rule barring introduction of polygraph evidence should not have impeded a capital defendant's due process right to introduce rebuttal mitigation evidence.

101

FELL-00001615

The court reasoned that:

> The mechanistic application of a per se evidentiary rule operated to exclude evidence that proceedings against [the defendant] in the death of his wife were dismissed because . . . he had been cleared by a polygraph examination. Under our view of controlling Supreme Court authority, this exclusion denied [the defendant] his right to present mitigating evidence as a basis for a sentence less than death.

*Id.* at 1216-17. The court also held that, "the misconduct [in the prosecutor's closing argument] which undisputedly occurred here was an integral part of the deprivation of [the defendant's] constitutional rights to present mitigating evidence, to rebut evidence and argument used against him . . . ." *Id.* at 1217-18.

*Paxton*, like *Skipper* and *Simmons*, involved the exclusion of rebuttal mitigation evidence offered in response to government evidence of aggravating future dangerousness. The due process violation in *Paxton* was worsened by the prosecutor's repeated false statements in closing argument exploiting the exclusion.

Fell cites these cases in support of his argument that "[t]he trial court's exclusion of the plea agreement denied [him] the opportunity to fairly rebut the government's misrepresentation of [his] plea offer." Appellant's Brief at 77. His argument makes no sense. First, the cases cited by Fell are inapposite because the mitigating evidence at issue (the 2001 draft agreement) was never offered in

102

response to government evidence of aggravating circumstances. To the contrary, Fell proposed to introduce the document to prove a mitigating circumstance. Thus his invocation of the "fair rebuttal" doctrine is misplaced.

Second, Fell protests that he wished to introduce the 2001 draft to rebut the prosecutor's statement that "he could have pleaded guilty." Yet Fell introduced, by stipulation, his offer to plead guilty. The fact that he was willing to plead guilty in exchange for a life sentence was never in doubt, and presented the best response to the prosecutor's comment.

Third, Fell suggests that he was prevented from responding to the government's comment. Yet he had the opportunity to object (and request some curative measure), and also had the opportunity, in his closing argument following the prosecutor's peroration, to argue the point based upon his stipulated offer. He availed himself of none of those opportunities.

Analogizing to *Paxton,* Fell characterizes the government's comment that he could have pleaded guilty as an "affirmative misrepresentation." Appellant's Brief at 70. Yet he fails to explain what fact was misrepresented in the closing argument. It is true – not false – that Fell could have pleaded guilty during the guilt phase of trial, as argued by the prosecutor. Fell pleaded *not* guilty, putting

103

FELL-00001617

the government to its proof and requiring the jury to determine guilt. By refusing to enter a guilt phase plea, while arguing that he accepted responsibility and was willing to plead guilty, Fell created an anomaly inviting the prosecutor's observation.

Fell's argument also makes no sense because the reason why he wanted to introduce the 2001 draft agreement was not that it memorialized his offer to plead guilty: that fact was stipulated and in evidence. Instead, it was because that document contained a sympathetic view of his mitigation factors, inconsistent with the government's view at trial. Yet that fact had no tendency to rebut the prosecutor's argument that he could have pleaded guilty, and carried with it an exceptional potential of prejudice to the government.

Fell's attempt to fit the circumstances of this case into the "fair rebuttal" rule is incoherent.

104

FELL-00001618

III.   THE PROSECUTORS' UNOBJECTED-TO SUMMATION REMARKS
       ABOUT FELL'S EXERCISE OF HIS RIGHT TO A JURY TRIAL, AND
       ARGUMENT THAT FELL'S MITIGATION EVIDENCE DID NOT
       EXCUSE HIS CRIMES, DID NOT INFRINGE ON HIS
       CONSTITUTIONAL RIGHTS NOR DID IT AMOUNT TO PLAIN
       ERROR.

In points III and IV of his brief, Fell contends he was denied a fair

sentencing hearing because the prosecutor improperly argued the jury could not

consider mitigating evidence that was unrelated to the crimes for which he had

already been found guilty, and suggested that he had not truly accepted

responsibility for his crimes because he exercised his right to plead not guilty.  A

close examination of the remarks in question demonstrates that Fell's complaints

are baseless.  Moreover, Fell never raised any contemporaneous objection at trial

to any of the supposedly offensive comments.  Thus, these claims are reviewed

only for plain error.  Simply put, there was no error – plain or otherwise.

       A.   BACKGROUND

       (1)   The Guilt Phase Arguments

On June 20, 2005, the parties made opening statements during the guilt

phase of the trial.  Fell's attorney summarized the facts and stated that, before trial,

Fell had confessed to the murder of Terry King.  Defense counsel concluded:

105

FELL-00001619

Now, this is the part of the case where you decide responsibility. Donald Fell admitted his responsibility for Theresa King's death five years ago. He is not denying responsibility for that. What we are asking of you is to wait until you have heard all the evidence, and listen carefully, and understand what happened, and at the end of the proof, I am going to come back to you and talk to you again.

Tr. I-1 at 59.

On June 24, the prosecutor delivered closing argument in the guilt trial.

Government counsel stated:

[D]efense counsel, Mr. Bunin, told you in his opening statement that Donald Fell accepted responsibility for what he did. But that's not entirely true because as the judge told you on the first day of trial Donald Fell has pleaded not guilty. And because he pleaded not guilty a jury must find whether or not the Government can introduce evidence beyond a reasonable doubt to overcome the presumption of innocence that the law provides to Donald Fell.

* * *

Now, defense counsel also said that Fell accepts responsibility for what he did. But he pleaded not guilty. And that's why we're here. And that's why you are here. And let's think a little bit about that. Think about the very nature of the crimes that he's charged with. They are all about evasion, about escape, about trying to avoid responsibility for what he did. They are all about getting out of Rutland and getting out of Vermont after killing two innocent people. They are all about getting that car and getting out no matter what.

* * *

[L]adies and gentlemen, I said at the beginning the evidence in this case is overwhelming. It's beyond any reasonable doubt. Donald

106

FELL-00001620

Fell has plead not guilty. He's never been held accountable for his crimes. And today is the day for you to hold him accountable and return guilty verdicts on all four of the charges. Thank you.

Tr. IV-1 at 42, 64, 72. Fell did not object to any portion of the prosecution argument. Tr. IV-1 at 72. Within a few hours, the jury convicted Fell on all four counts.

(2)    The Sentencing Arguments and Instructions

On June 27, the first day of the sentencing hearing, the district court instructed the jury on preliminary issues. The court read the government's alleged aggravating factors and Fell's proposed mitigation factors. Fell's mitigation factors included his contentions that he had truthfully admitted his responsibility for Terry King's murder, and that he had consistently offered to plead guilty to kidnapping and murdering Terry King, knowing that the law required a sentence of life in prison without the possibility of release. Tr. V-1 at 18-29. The court then instructed the jury that counsel's opening statements, but warned that those "opening statements and any other comments by counsel and their summations are not evidence." *Id.* at 31.

The government delivered its penalty phase opening on June 28. The prosecutor stated that both sides would present evidence. He then asked:

107

FELL-00001621

> Generally, when you hear the defense evidence, ask yourself, does it lessen Donald Fell's responsibility for the killing of Terry King? How does it relate to Fell's decision to kill Terry King in Dover? And does it have any mitigating relation to the manner in which Donald Fell killed Terry King?

Tr. V-1 at 46. Fell voiced no objection to this statement. *Id.* at 46.

The government presented its closing arguments on July 13. The prosecutor began by briefly summarizing the case in aggravation, and urged the jury to listen carefully to the court's instructions. A at 456-57. He stated that if the jury found that Fell was eligible for the death penalty, it "will then be considering all the aggravating and mitigating factors alleged by the parties in the case," and added, "[w]e will ask you to consider all the alleged mitigating factors and I will talk about them in a moment." A at 458-59.

The government said that the aggravating factors "overwhelm[ed]" Fell's mitigating factors, the latter of which it grouped into five categories: Fell's conduct before his crimes; during his crimes; after arrest; and in prison; and, finally, the conduct of his accomplice Robert Lee. A at 477. With respect to those factors, the prosecutor urged jurors to ask themselves:

> one, what do these factors have to do with the crimes in this case? And do these factors actually lessen the defendant's responsibility and culpability for these crimes?

108

FELL-00001622

As you go through, please keep those questions in mind and use your common sense here, ladies and gentlemen, because even if you find evidence of some of these mitigating factors, we submit to you that the weight of these factors is not that heavy, and you need not give them much, if any, weight based upon those two questions.

A at 477-78. Concerning Fell's offer to plead guilty, the government argued:

Ladies and gentlemen, the judge instructed you. You know the law. Life imprisonment without the possibility of release is the minimum sentence that Donald Fell faces for kidnapping with death resulting. It's the minimum sentence. When he offered to make that plea, he knew the evidence against him was overwhelming. He knew there was no doubt he was going to be convicted, so he asked for the minimum sentence. We rejected that, ladies and gentlemen. We wanted a jury to decide the appropriate sentence in this case.

And, ladies and gentlemen, let's take a look at the last part of this: He's maintained that offer to this day. Ladies and gentlemen, we had to try and convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden. We proved it. And now we are here to decide what is the just sentence. The minimum sentence? Or the death sentence?

A at 493-94. Turning to Fell's background evidence, the prosecutor stated:

This is the area where you have heard so much about the defendant's childhood, so much about his background, and again, let me just remind you, the question is, we submit to you, what's the connection between his background and childhood and these crimes? What about his background and childhood makes him less responsible, less culpable? What about them means that he should receive a less – a lesser sentence? So let's go through this.

109

FELL-00001623

Because, ladies and gentlemen, candidly, there certainly is evidence, a lot of evidence about the background of the defendant. The question is, what does it mean? What does it mean? Because we submit to you, ladies and gentlemen, if you look at all the records that are in the so-called mitigation binder – I can't go through all of them with you this morning, you would be very upset with me if I did, but basically we want you, we invite you to read that mitigation binder, because what it will show you is simply this:

There was a serious, unquestionably terrible background for Mr. Fell when he was a young child. No question about it. I will go through it in a minute. But at a certain point, ladies and gentlemen, his father was kicked out of the house. Things started to get better. If you read through that whole thing, you will see that he began to develop the proclivity for violence when he was very young. You have seen some of this already. It got worse and it got worse, and respectfully, ladies and gentlemen, it's not because of his childhood and background. I will explain to you why. It's because it's who he is. He has grown up and made choices to be violent, and you can begin to see that if you look through the mitigation binder. You heard about it from the hospital records. You could see it in the social services records. You could see it in his high school records. And it just shows you this trajectory. It's gotten more and more violent the older he has gotten. And by the way, the abuse that he suffered got more and more removed, and as it did, he got more and more violent.

A at 496-97. The government referred to the sexual abuse that Fell suffered as a child, and then asked:

The question is, what does that sexual assault when he was four or five have to do with the crimes in this case? Sixteen years later, there's nothing sexual about these crimes. There's nothing about that background and that history that shows you that he is less responsible for the decisions that he made, decisions like killing a witness. How does that have to do with what happened to him, which was terrible?

110

FELL-00001624

A at 499. The prosecutor stressed that Fell had made "his own choices. He became the man he is today by making those choices." A at 501. The prosecutor argued that the weight of the evidence relating to the mitigating factors other than Fell's childhood was "very, very light." A at 506.

Addressing the evidence of Fell's deprived childhood, the government pointed out that Fell's siblings also had a poor childhood, but had not committed murder. The prosecutor noted that Terry King, the victim, had herself been raised in an alcoholic and abusive family but had risen above her circumstances. He continued:

> Ladies and gentlemen, use your common sense. Use your everyday life experiences. You know that just because someone has a poor childhood, even as bad as the childhood that you heard about in this case, that doesn't relate to crimes like what we have seen in this case. People who have poor childhoods, have poor childhoods. They may continue to even go on and commit small crimes. Crimes like this, ladies and gentlemen? No way. No way.

> What we have in this case, ladies and gentlemen, is someone who's made choices as he has become a man, and those choices, ladies and gentlemen, were made on November 27th of 2000. He made choices leading up to that day. You have heard about them in this case. That's why we are here. He made choices after his childhood, choices to be the man he is today.

A at 507. Moments later:

111

> What's the evidence of the mitigating factors? To the extent you find some, there are not that many, respectfully, and they really don't relate to the crimes. They really relate to his childhood. They don't relate to the choices that he made growing up. Ladies and gentlemen, how do you decide? . . . We ask you to follow the law.

A at 508. Fell did not object to any of the foregoing remarks. A at 509.

During its rebuttal summation, the government emphasized that Fell had presented an "abuse excuse" defense, in which Fell's attorneys argued that he was not "morally culpable" because of his childhood. A at 510-11. The prosecutor contended that, despite his upbringing, Fell had made a choice to commit murder. He also pointed out that other persons suffer from a deprived childhood, but "they don't all grow up to be murderers." A at 517. He stressed that individuals have "free will to do the right thing and to decide what's right and what's wrong," and that "people are responsible for what they do." A at 519-20. The prosecutor also argued that Fell only accepted responsibility when he was cornered. A at 514-15.

The district court instructed the jury to weigh the aggravating factors against the mitigating factors, which it described as "those that may serve as a basis for a sentence less than death." A at 534, 536. The court explained:

> A mitigating factor is not offered to justify or excuse a defendant's conduct. A mitigating factor is simply an extenuating fact about a defendant's life or character, or about the circumstances surrounding the murder, or anything else relevant that would suggest that a

112

FELL-00001626

sentence of life in prison without the possibility of release is more appropriate punishment than a sentence of death.

A at 551. The court listed Fell's 19 mitigating factors and told jurors they could consider any additional mitigating factors that had not been specifically raised. The court informed the jury that it had broader discretion in considering mitigating factors than aggravating factors. It instructed them to weigh the aggravating factors against the mitigating factors to determine whether a death sentence should be imposed, and charged that "[e]ach juror must individually decide what weight or value is to be given to a particular aggravating or mitigating factor in the decision-making process." A at 552-56.

The jury unanimously found the government had proven, beyond all reasonable doubt, all four of the threshold eligibility factors, all three of the statutory aggravating factors, and all four of the non-statutory aggravating factors. A at 564-71. It also unanimously found eight of Fell's 19 mitigating factors, including the following background factors: Fell was sexually and physically abused as a child; he was treated and institutionalized several times for mental health conditions; he had abused alcohol and drugs since childhood; and his parents were violent alcoholics who had abandoned him as a child. Ten jurors (on Count 1) and nine jurors (on Count 2) found that Fell was raised without positive

113

FELL-00001627

role models; eight jurors (on Count 1) and nine jurors (on Count 2) found that Fell had been forced to witness family violence as a child. One juror found that Fell had made positive contributions while in prison. In addition, 10 jurors found as an independent mitigator Fell's "total life experience," and that Pennsylvania social and mental health services had failed to intervene to prevent Fell's childhood abuse. A at 572-78.

### (3)    The New Trial Motion

After conviction, Fell moved for new trial, claiming the prosecutor had improperly argued that the jury could not consider mitigation evidence unrelated to the crimes for which he had been found guilty. The district court denied the motion, finding the challenged statements inappropriate but harmless.

Specifically, Judge Sessions ruled that the prosecutor erred in arguing that "the jury need not give much weight to Fell's background and childhood evidence *based upon* its irrelevance to the crimes he committed." A at 728-30 (emphasis in original). The court also ruled that, although the prosecutor had legitimately argued the jury should accord little or no weight to Fell's mitigating evidence, he erred in tying that legitimate argument to his improper argument. The court rejected the government's contention that its argument was consistent with

114

FELL-00001628

comments approved in *Sims v. Brown,* 425 F.3d 560 (9th Cir. 2005), *cert denied,* 127 S. Ct. 62 (2006). Judge Sessions essentially declared that the panel majority in that Ninth Circuit case was wrong because its decision was inconsistent with the constitutional rule that relevant mitigating evidence need not demonstrate a link to the crime. *Id.*

Nevertheless, Judge Sessions concluded that a new trial was unwarranted because the prosecutor's argument was not "particularly inflammatory, even though it was emphasized." The court observed that Fell's counsel had stressed the mitigating effect of Fell's childhood, and did not object to the prosecutor's argument or ask for a curative instruction. The court pointed out that, in its charge, it had defined mitigating factors to include Fell's childhood and background, and had required the jury to weigh the aggravating and mitigating factors in deciding whether Fell should be sentenced to death. A at 730-33.

## B.    STANDARD OF REVIEW

A claim that the prosecutor made an improper summation or argument is reviewed only for plain error if the defendant did not make a contemporaneous objection to the argument. *United States v. Young,* 470 U.S. 1, 14 (1985); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 238-239 (1940); *United States v.*

115

FELL-00001629

*Fields*, 483 F.3d 313, 347 (5th Cir. 2007) (capital case). Because Fell never objected to any portion of the government's punishment-phase closings, he is consigned to plain error review.[24]

### C.    LEGAL ANALYSIS

A prosecutor has broad discretion in the inferences he asks a jury to draw during argument, provided he does not misstate the evidence. *United States v. Tocco,* 135 F.3d 116, 130 (2d Cir. 1998). A reviewing court should not lightly assume a prosecutor intends for an ambiguous remark to have its most damaging meaning, or that the jury will understand the remark in that way when there are more innocuous interpretations. A prosecutor's argument must often be improvised on the spot, which leads to imperfect syntax and ambiguous meanings. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974).

---

[24] In his brief, Fell fails to acknowledge that he registered no objection to the government's summations, a circumstance which severely circumscribes this Court's review. On the contrary, by suggesting that, "[f]ollowing summations" (Appellant's Brief at 87), the defense protested the prosecution's comments about the relevance of mitigating evidence, Fell seems to imply that his objection was contemporaneous and, therefore, this claim was properly preserved for plenary review.

This word-play is misleading at best. It is true that Fell objected to the prosecutor's argument "[f]ollowing summation," but the objection was hardly contemporaneous: it was raised for the first time in his motion for a new trial, filed five weeks after the verdict. *See* A at 610.

116

FELL-00001630

A prosecutor also has broad latitude to respond to arguments by the defense. Under the invited or fair response doctrine, a defense summation may open the door to an otherwise inadmissible prosecution rebuttal. *United States v. Robinson*, 485 U.S. 25, 32 (1988); *Young*, 470 U.S. at 11; *Darden v. Wainwright*, 477 U.S. at 182 (capital case); *Tocco*, 135 F.3d at 130. Thus, if a defendant refers to his constitutional rights in his argument, the prosecutor may do so in reply. In *Robinson*, the Supreme Court held that a prosecutor's rebuttal argument, which referred to the defendant's right to remain silent, did not impinge on his exercise of that right because the defendant himself had adverted to his silence in his opening argument.

A reviewing court must consider the entire record in evaluating prejudice. *Young*, 470 U.S. at 16; *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992). An isolated error is less prejudicial than repeated misconduct. *See Donnelly*, 416 U.S. at 646; *Socony-Vacuum Oil Co.*, 310 U.S. at 242; *Elias*, 285 F.3d at 190-91. A prosecutor's argument is less likely to be prejudicial than an erroneous jury instruction because courts often instruct juries (just as Judge Sessions did in this case) that counsel's arguments are not evidence and are not substitutes for the court's substantive instructions on the law. *Boyde v. California*, 494 U.S. 370, 384 (1990) (capital case). Moreover, a jury is presumed to follow a district court's

117

curative or limiting instruction. *Jones,* 527 U.S. at 394. Only in the "rare case" will an improper argument justify a new trial. *United States v. Rodriguez,* 968 F.2d 130, 142 (2d Cir. 1992). *Accord Young,* 470 U.S. at 11-12.

(1)    The prosecutor properly argued that Fell's mitigating factors did not excuse his crimes

The Eighth Amendment requires that a defendant be allowed to present, and a jury to consider, all relevant mitigating evidence, including evidence of the defendant's character and background that does not relate to the crime. *See, e.g., Tennard v. Dretke,* 542 U.S. 274, 285 (2004). The FDPA mirrors that standard. 18 U.S.C. §§ 3592(a)(8), 3593(c). A constitutional violation occurs only if there is a reasonable likelihood that the jurors believed themselves precluded from considering mitigating evidence. *See Boyde,* 494 U.S. at 386; *United States v. Bernard,* 299 F.3d 467, 485 (5th Cir. 2002); *United States v. Paul,* 217 F.3d 989, 999-1000 (8th Cir. 2000). The critical factors bearing upon this probability determination are the nature and strength of the evidence presented, the tenor and context of the prosecutor's argument, and the jury instructions. *See, e.g., Ayers v. Belmontes,* 127 S. Ct. 469, 480 (2006); *Boyde,* 494 U.S. at 376-86.

It is perfectly proper for a prosecutor to argue that the defendant's mitigating evidence is minimal in relation to the aggravating factors, or that the

118

FELL-00001632

defendant must take responsibility for his crimes despite a deprived background, so long as he does not argue that the jury is forbidden from considering evidence of the defendant's background and character. *Compare Boyde,* 494 U.S. at 385-86 (prosecutor properly argued that defendant's evidence did not sufficiently mitigate his conduct), *Sims v. Brown,* 425 F.3d 560, 580 (9th Cir. 2005), *cert. denied,* 127 S. Ct. 62 (2006)(same); *Malicoat v. Mullin,* 426 F.3d 1241, 1257 (10th Cir. 2005), *cert. denied,* 126 S. Ct. 2356 (2006)(same); and *Cargill v. Turpin,* 120 F.3d 1366, 1384-85 (11th Cir. 1997) (same), with *Brown v. Payton,* 544 U.S. 133, 138 (2005) (prosecutor improperly argued that jury could not consider defendant's post-offense religious conversion as a mitigating factor). In addition, the Eighth Amendment does not require a capital jury to be instructed on the concept of mitigating evidence generally, or on particular statutory mitigating factors. *Buchanan v. Angelone,* 522 U.S. 269, 270 (1998). It follows that a jury instruction which defines mitigating factors and directs a jury to consider the defendant's mitigating evidence satisfies the Eighth Amendment. *Weeks v. Angelone,* 528 U.S. 225, 232 n.2 (2000).

At the outset, the government disagrees with the district court's conclusion that the prosecutor did, in fact, argue that the jury could not consider Fell's deprived childhood and background as relevant mitigating evidence. *See* A at

119

FELL-00001633

729-30. The prosecutor did no such thing, and the court's contrary view reflects a strained interpretation of the words the prosecutor actually spoke. *See Donnelly,* 416 U.S. at 647.

Specifically, Judge Sessions erred in holding that the prosecutor's rhetorical questions, his statement that the mitigating factors did not "relate" or were not "connected" to the crime, and his comment "[w]hat do these factors have to do with the crimes in this case?" A at 477-78, 496, 508, amounted to an argument that the jury could not legally consider Fell's childhood and background as relevant mitigation. The court overlooked that the prosecutor made those comments after he had already summarized Fell's mitigating evidence, so the statement logically referred to all of Fell's mitigating factors, not just to his deprived childhood or his conduct in prison. At no time did the prosecutor tell the jury that Fell's mitigation factors were legally irrelevant. To the contrary, he earlier had told the jury to follow the court's instructions and had specifically argued that "[w]e will ask you to consider all of the mitigating factors." A at 459; *see also* A at 496-98 (prosecutor urges jury to read Fell's "mitigation binder"); A at 457, 459, 464-65 (prosecutor tells jury to follow court's instructions).

Consistent with this approach, the prosecutor repeatedly argued that the proffered mitigation evidence showed that Fell's background did not make him

120

"less responsible" for his offenses, A at 499, or in any way excuse them, A at 514-20. It was for *that* reason – because Fell's mitigation evidence paled in comparison to the proven aggravating factors, not because the evidence was legally irrelevant – that it was entitled to little weight by the jury. A at 479-509. As in *Boyde,* the prosecutor's point, which was certainly clear enough, was not to contend that "background and character were irrelevant," but "that despite [the defendant's] past difficulties, he must accept responsibility for his actions." 494 U.S. at 385. This argument was entirely proper.

In any event, as the district court found, Fell was not prejudiced by those remarks. First, the challenged comments covered no more than one and one-half pages of a 53-page opening argument and a 13-page rebuttal argument, A at 452-509, 510-23. Otherwise, the prosecutors conceded that Fell's deprived background and his conduct in prison were proper mitigating factors. *See Socony-Vacuum Oil Co.*, 310 U.S. at 242 (isolated remarks in long closing argument were "not at all reflective of the quality of the argument as a whole").

Second, Fell presented mitigation evidence relating to his background and childhood, and to his conduct in prison, for approximately four days during the sentencing hearing. Since the court allowed Fell so much time to develop this mitigation evidence, the jury could hardly have believed the evidence was legally

121

FELL-00001635

irrelevant. *See Buchanan*, 522 U.S. at 278.

Third, the district court instructed the jury that counsel's arguments were not evidence, and that the jury should consider Fell's entire list of 19 mitigating factors and his mitigation evidence. The court went on to define mitigation evidence as any "fact about a defendant's life, or character," not merely the circumstances surrounding the crime. A at 551. Even in a capital case, the jury is presumed to have followed both instructions. *Jones,* 527 U.S. at 394.

Fourth, the jury's special verdict demonstrated beyond any doubt not only that it fully considered Fell's mitigation evidence, but that it was persuaded by some of it. The jury unanimously found four background mitigation factors; ten jurors independently found that Pennsylvania social service agencies had failed to treat Fell's early anti-social behavior; nine jurors found that Fell was raised without positive role models and had witnessed family violence as a child; and one juror found that Fell had made positive contributions while in prison. Indeed, the jury found an additional mitigating factor not previously raised by the defense. Under all of these circumstances, Fell cannot carry his burden of demonstrating constitutional error.[25]

---

[25] Fell's reliance (Appellant's Brief at 91-96) on *Payton* and *Belmontes* is misplaced. Both cases involved collateral attacks on state capital convictions, and in

122

(2)    The prosecutor properly rebutted Fell's argument that he had accepted responsibility by pointing out that Fell had gone to trial

Fell complains that, four times during its guilt-phase and penalty-phase summations, Tr. IV-1 at 42, 64, 72; A at 493-94, the government impermissibly argued that his decision to stand trial was inconsistent with his claimed acceptance of responsibility. There is no merit to this argument.

The first three statements were made during the guilt phase of the trial; only the last occurred during the capital sentencing hearing. The guilt-phase remarks properly rebutted defense counsel's opening statement that Fell had accepted responsibility for his crimes. The prosecutor's comment mirrored a rule in the acceptance of responsibility guideline, U.S.S.G. §3E1.1, Application Note 2, that a person who pleads not guilty and puts the government to its burden of proof is not

---

both cases, the Supreme Court ruled that the defendant was entitled to no relief. In *Payton*, the Court held that, under AEDPA, a state court did not unreasonably apply Supreme Court precedent in concluding there was no reasonable likelihood that a capital jury believed it was required to disregard the defendant's mitigation evidence, despite an improper argument by the prosecutor. In *Belmontes*, the Court held that under the totality of the circumstances, there was no reasonable likelihood a capital jury believed it could not consider the defendant's mitigation evidence. Neither case even suggests that a defendant would be entitled to reversal of his death sentence on direct appeal on the basis of an improper prosecutorial argument that was not objected to at trial and as to which the district court gave a correct mitigation instruction. In addition, neither case involved a special verdict form that showed the jury had actually considered the defendant's mitigation evidence.

123

FELL-00001637

entitled to acceptance of responsibility credit. Furthermore, limiting the acceptance credit to one who pleads guilty does not infringe on a defendant's constitutional right to plead not guilty. *United States v. Parker*, 903 F.2d 91, 105 (2d Cir. 1990); *accord United States v. Saunders,* 973 F.2d 1354, 1362 (7th Cir. 1992) (collecting cases); *cf. Brady v. United States,* 397 U.S. 742, 753 (1970) (state can reward defendants who plead guilty to crimes). In this narrow context, the prosecutor's rebuttal argument was not error, much less a plain one. Nor did the prosecutor exceed the boundaries of fair reply, as he did not urge the jury to punish Fell because he had pleaded not guilty.

In addition, the prosecutor's argument at the guilt phase did not cause the jury to disregard Fell's acceptance-of-responsibility mitigation factor at sentencing. At the guilt phase, the parties and the jury were focused on whether the government had proven each element of each charged offense beyond reasonable doubt – not on the subject of mitigation. Accordingly, the jury undoubtedly viewed the prosecutor's statements as relevant only to the guilt-related issues directly before it. *See Darden,* 477 U.S. at 183 n.15 ("in this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing"); *Jackson v. Johnson,* 194 F.3d 641, 653 (5th Cir. 1999); *cf. Williams v. Calderon,* 52 F.3d 1465, 1481 (9th

124

Cir. 1995) (guilt phase anti-sympathy instruction did not affect jury at sentencing phase where jury was correctly instructed on mitigation evidence).

The prosecutor's fourth challenged remark was advanced during the punishment phase and represented a legitimate retort to Fell's claim that he had consistently offered to plead guilty. The prosecutor properly advocated that Fell's proposed guilty plea was not the equivalent of an actual guilty plea; that Fell's proposed guilty plea was hollow because (especially in light of the overwhelmingly strong case against him) he simply wanted to avoid the death penalty; and, absent a guilty plea to the charged offenses, the government was entitled to have a jury decide Fell's fate. *See, e.g., United States v. Salameh,* 152 F.3d 88, 134-35 (2d Cir. 1998) (jury told that it was deciding serious terrorist crime); *Jackson,* 194 F.3d at 655 (jury was conscience of community and charges were serious); *United States v. Ruiz,* 987 F.2d 243, 249 (5th Cir. 1993) (jury told to do its duty). The prosecutor's further argument that the government had met its burden at the guilt phase was a self-evident proposition that did not infringe on Fell's decision to plead not guilty.

In any event, Fell cannot show he was prejudiced by any of the remarks. Before any evidence or argument was presented during the punishment phase, Judge Sessions reminded the jury that counsels' arguments were not evidence.

125

FELL-00001639

That instruction, which the jury presumably followed, minimized the impact of any possibly improper argument.

More importantly, when examined within the framework of the entire capital trial, the comments were clearly of minor significance. The government's case against Fell was staggeringly strong. *Cf. United States v. Cotton,* 535 U.S. 625, 633-34 (2002) (overwhelming evidence of guilt required affirmance under "public reputation" prong of the plain error doctrine). The jury found all of the threshold culpability factors and all of the charged statutory aggravating and non-aggravating factors had been proven beyond a reasonable doubt. To make those findings, all twelve jurors necessarily had to agree that Fell was responsible for three indescribably brutal murders. Moreover, the jury was instructed to consider Fell's mitigation evidence. The jury unanimously believed Fell's offer to plead guilty and accept a life sentence was a mitigating factor, and six jurors found mitigation in the fact that Fell truthfully admitted his responsibility for King's murder. These findings demonstrated that the jury accepted Fell's contention he had partially accepted responsibility for his crimes. The findings also prove (although it is Fell himself who bears that burden) that he was not prejudiced by the comments in question.

126

V.    PROSECUTORS DID NOT VIOLATE THE TRIAL COURT'S ORDER ABOUT HOW THE GOVERNMENT'S MENTAL HEALTH EXAMINATION OF FELL WAS TO BE CONDUCTED AND THE COURT DID NOT ERR IN FAILING TO RULE ON FELL'S MOTION TO EXCLUDE A GOVERNMENT REBUTTAL MENTAL HEALTH EXPERT UNTIL AFTER THE DEFENSE COMPLETED ITS MITIGATION CASE.

Fell accuses prosecutors of misconduct for allegedly disobeying limitations Judge Sessions set about the manner in which the government could conduct his mental health examination. His argument proceeds in three steps. First, he argues that the prosecution committed misconduct by violating the court's order relating to the government mental health examination. Second, he asserts that one of the government's experts, Michael D. Welner, M.D., should have been excluded as a potential rebuttal witness as a sanction for that violation. Third, he posits that he was entitled to a ruling on the motion to exclude prior to completion of his mitigation case.

Each step in Fell's analysis is flawed. He fails to make any showing that the government engaged in misconduct. As he did during the trial, Fell focuses on two factual claims: 1) contacts between two of the government's mental health experts were improper, and 2) Dr. Welner violated the court's procedural order by conducting additional, unauthorized tests. The defense raised objections about

127

FELL-00001641

these matters during the trial, and the court scheduled a hearing to look into the complaint. However, the defense never asked the court to resolve the claims before it rested its mitigation case. Put simply, the defense made a conscious decision to forego litigation over the admissibility of various mental health expert opinions and to take those opinions out of the mitigation case. Fell calls into question the prosecutors' conduct in a failed attempt to find someone else to blame for his unforced choice to abandon the presentation of mental health mitigation evidence. This Court should reject Fell's attempt to recast history.

## A.   STANDARD OF REVIEW

Prosecutorial misconduct occurs only where a prosecutor's act "so [infects] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (citation omitted). As this Court has written, "prosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003), *quoting Donnelly v. DeChristoforo*, 416 U.S. at 647-48. Alleged prosecutorial misconduct does not warrant a new trial unless the defense makes a two-part showing: first, that the government acted improperly and, second, that the misconduct significantly prejudiced the defendant. *See United States v. Flaherty*, 295 F.3d 182, 202 (2d Cir. 2002).

128

FELL-00001642

Fell ignores this well-established case law and suggests that the due process clause creates some heightened standard for government conduct in a death penalty case. The government has been unable to find any case supporting such a principle. To the contrary, the Supreme Court has repeatedly held that various standards for review are applied consistently in capital and non-capital cases. For example, in *Satterwhite v. Texas*, 486 U.S. 249, 256-59 (1988), the Supreme Court refused to create a special death penalty exception to traditional harmless error review. In *Jones v. United States*, 527 U.S. at 389-90, the Court applied traditional plain error review in a FDPA case. Indeed, *Kyles v. Whitley*, 514 U.S. 419 (1995), which Fell cites, illustrates the lack of any distinction between capital and non-capital decisions reviewing claims that prosecutors improperly withheld exculpatory evidence. Finally, other courts of appeals addressing prosecutorial misconduct claims in capital cases have applied traditional standards. *See, e.g., Fields*, 483 F.3d at 340; *United States v. Jackson*, 327 F.3d 273, 296-97 (4th Cir. 2003). The Court should reject Fell's invitation to concoct some novel standard.

Fell also fails to address whether he waived his claims below. If a defendant makes a tactical decision not to pursue a legal argument during trial, he loses the ability to argue that claim on appeal. For example, where "the party consciously refrains from objecting as a tactical matter, then that action constitutes

129

FELL-00001643

a 'true waiver,' which will negate even plain error review." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995); *accord United States v. Wellington*, 417 F.3d 284, 290 (2d Cir.), *cert denied*, 126 S. Ct. 774 (2005); *United States v. Mercedes*, 287 F.3d 47, 57 (2d Cir. 2002). As discussed below, Fell made a tactical decision not to offer mental health mitigation evidence – a circumstance which short-circuits his allegation of prosecutorial misconduct.

## B.   BACKGROUND

### (1)   Early Mental Health Developments

As noted above, in 2001, in light of Fell's confessions and the overwhelming evidence of guilt, the defense encouraged the government to consider a guilty plea to a life sentence. Under the federal death penalty protocol, the defense had the right to present mitigating evidence to both the United States Attorney's Office and the Attorney General, who would make the final decision whether to accept such a plea offer. Also in 2001, the defense retained three mental health experts: a psychiatrist, Mark Mills, and two psychologists, Jonathan Lipman and Wilfred van Gorp. The defense provided copies of reports from these experts to the government and relied on those expert opinions as part of its unsuccessful effort to convince the Attorney General to allow a plea to life

130

FELL-00001644

imprisonment.

After filing its notice to seek the death penalty in early 2002, the government moved for discovery of mental health evidence, noting the possibility that expert testimony would be offered at the trial. SA at 64. The government sought an order requiring production of all the defendant's medical records and his participation in mental health examinations by government experts.

The court did not initially rule on the government's motion. Instead, the defense informally allowed the government to obtain copies of certain records and to have government experts meet with Fell for purposes of a preliminary examination. At that point, the government retained two experts: a psychiatrist, John Rabun, and a psychologist, Richard Wetzel. Drs. Rabun and Wetzel reviewed the defense reports and conducted limited examinations of Fell. Fell's attorneys did not allow either Rabun or Wetzel to question Fell about the murders themselves, his mental state during those crimes, his interest in knives, his prior criminal behavior, or the dynamics of his relationship with accomplice Robert Lee. These restrictions seriously impacted the completeness of the government experts' work. Dr. Wetzel's report noted that "[s]ince I was not allowed to discuss the committed offenses with Donny, I cannot offer any comments about his mental state at the time of the crime."

131

FELL-00001645

The mental health issues were not revisited until after this Court reversed Judge Sessions' order declaring the FDPA unconstitutional. On December 1, 2004, Fell filed a formal notice, pursuant to Fed. R. Crim. P. 12.2(b), stating that he would introduce "expert evidence bearing on a mental condition" if convicted of a capital crime. SA at 96. (Rule 12.2 had been amended in late 2002 to require such notice.) Rule 12.2(c)(1)(B) provides, among other things, that "[i]f the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court." Since such an examination will almost invariably involve matters bearing on the defendant's guilt, Rule 12.2(c)(2) delays the disclosure of the reports until after the defendant is found guilty of a capital crime. In a memorandum accompanying his notice, Fell argued that, even though the district court had never ordered a government examination, the government should not get further access to Fell because its experts had already met with him. SA at 92.

In early 2004, the government retained the services of Dr. Welner, a forensic psychiatrist. The government filed a memorandum supplementing its original motion for mental health evidence. SA at 98. The motion noted that while Drs. Mills, Lipman and van Gorp had unlimited discussions with Fell, the government had not yet had the chance to conduct a complete mental health

132

FELL-00001646

evaluation. The government urged the court to order that at least one government expert be allowed to conduct a complete interview of the defendant. Since the government planned to rely heavily on Dr. Welner, it asked to have Dr. Welner perform that examination.

On April 7, 2005, Judge Sessions ruled on the procedures for the ongoing mental health inquiries. The court agreed that "the government should be afforded the opportunity to have a mental health expert interview Fell concerning his mental condition at the time of the offense." A at 107. The court also addressed procedures concerning video feeds and the presence of counsel. Finally, the court exercised its discretion to require that the interview be conducted by Dr. Rabun and/or Dr. Wetzel, both of whom had previously met with Fell. A at 107-08. The court signed the order prepared by the government, adding that "[t]he examination may be conducted by either Dr. Rabun or Dr. Wetzel, or both." A at 113.

Although not discussed by the parties in the pleadings, the order also included restrictions on "mental health testing." The order provided that:

> Prior to any mental health testing being conducted by any expert for the government, the government shall provide to counsel a list of any tests its expert wishes to perform. The government's expert shall not identify more than one test for the purpose of measuring the same mental function(s). Within one week of receiving the government's list, the defendant shall identify any such tests to which he objects. The defendant and the

133

FELL-00001647

government shall attempt to come to an agreement as to the designation of specific testing measures to be administered by the defense and prosecution witnesses and shall consider sharing data between the experts. If a dispute exists which the government and the defense cannot resolve, the parties shall notify the Court and a hearing will be held. No mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert. In the event of such an unresolved conflict, nothing in this paragraph shall create a preference in favor of the government or a burden on the defendant at a hearing conducted pursuant to this paragraph.

A at 114-15. This language appears to have been aimed at regulating the conduct of the meeting between Fell and the government expert(s), in part to make it more efficient.

Wishing for Dr. Welner to conduct the interview, the government moved for reconsideration. SA at 116. Fell moved to exclude certain aspects of Dr. Welner's anticipated testimony.[26] SA at 123. At this point, however, Dr. Welner had not completed a report of his findings, the defense had not provided discovery on the expert testimony that might be subject to rebuttal, and the interview with Fell had not been completed. The defense requested a proffer from the government as to Dr. Welner's testimony and reserved the right to argue that the court should not allow Welner's testimony. Just before jury selection, the defense advised the

---

[26] The defense also suggested that it might be unethical for Dr. Welner to testify without personally meeting with Fell.

134

government that it intended to call Mark Cunningham, a psychologist, relating to issues of moral culpability. However, Fell did not provide an expert disclosure relating to Dr. Cunningham's testimony, as required by Fed. R. Crim. P. 16(b)(1)(c).

Although not directly relevant to his claims, Fell brands as misconduct the government's statements in 2005 about its intentions at the time it hired Drs. Rabun and Wetzel. Fell repeatedly states in his brief that the government misrepresented in 2005 that the "sole" purpose of hiring Drs. Wetzel and Rabun was to inform plea discussions. Given the seriousness of this case, any allegation of misconduct requires some response, so it must be noted here, if only as an aside, that the government's strategy with respect to mental health experts evolved between 2002 and 2005, as the two assistants who originally handled Fell's prosecution were replaced by the ones who eventually tried and convicted him. As Judge Sessions himself found, when forced to decide the issue, Fell's allegations that the trial attorneys misled the court about their changing litigation plans were spurious.

This issue arose when the government sought to explain why, in 2005, it considered Dr. Welner to be a better expert witness, and why it wanted him to conduct the follow-up interview with Fell. In a December 2004 pleading, the

135

government noted that, in 2002 when Drs. Wetzel and Rabun were hired, the United States Attorney's Office planned to ask the Attorney General reconsider his decision to seek the death penalty. The government wrote: "the two experts who did meet with Fell in 2002 were doing so primarily to inform the government's penalty consideration." SA at 100. By using the word "primarily,"the government acknowledged there were other purposes in the retention. Obviously, there was a pending indictment, for which the Attorney General had authorized a capital prosecution. The government needed potential expert witnesses for trial. But a "primary" purpose should not be confused with a "sole" purpose.

After the district court issued its procedural order prohibiting Dr. Welner from meeting with Fell, the government, in its motion to reconsider, stated that "the government retained two mental health experts [Drs. Wetzel and Rabun] specifically for the purpose of evaluating the defense expert reports. Those two experts were not retained to prepare the case for trial, and were not anticipated as trial witnesses." SA at 119. Further, the government pointed out that it had had very little contact with Wetzel or Rabun since mid-2002. In effect, the motion asserted that early in the litigation, the government had been primarily concerned with plea negotiations, but since 2004, it no longer considered Drs. Wetzel and Rabun as trial witnesses. Any possible confusion about the real reasons why

136

FELL-00001650

Wetzel and Rabun were engaged, however, was dispelled before Judge Sessions ruled on the motion for reconsideration. In its response to Fell's initial motion to exclude Dr. Welner, the government submitted an affidavit from Gregory Waples, the lead AUSA in 2002 who had hired the two doctors. Waples confirmed the government's position that the primary purpose of retaining Drs. Rabun and Wetzel in 2002 was to inform plea negotiations. Waples stated that in 2002 "it was my hope, plan, and expectation, that I could avert trial and arrange for a plea agreement with the help of Rabun and Wetzel. Both Rabun and Wetzel were aware of my intentions. The primary purpose of their evaluations was not to prepare a government mental health case for trial." SA at 137-38. Waples also realized the case might proceed to a capital trial. Again, by using the words "primary purpose," the government acknowledged that another purpose for retaining Drs. Rabun and Wetzel was as potential witnesses at a possible capital trial. All the government was trying to explain was that obtaining trial testimony was not the primary purpose of retaining Drs. Wetzel and Rabun, and that in 2004, when the government knew that there was going to be death penalty trial, it intended to use Dr. Welner.

137

FELL-00001651

(2)    The Trial Court's Preliminary Decision Regarding Dr. Welner

On May 26, 2005, during jury selection, Judge Sessions denied the

government's motion to reconsider and, simultaneously, deferred ruling on the

motion to exclude Dr. Welner. The court found that one of the government's

purposes in hiring Drs. Wetzel and Rabun was for trial testimony.[27] Since the

defense had agreed to let Wetzel and Rabun interview Fell in 2002, it struck the

court as "unfair" to allow "a different expert to go through the same process two to

three years later." A at 158. The court concluded that allowing Drs. Rabun and

Wetzel unfettered discretion to interview Fell would not prejudice the government.

At the same time, the court left open the possibility of the government calling Dr.

Welner as a witness. The court noted that "[h]e will not have interviewed Fell,

however his testimony may shed light on Fell's upbringing and other relevant

factors concerning sentencing." The court held that it would revisit "the

admissibility of his testimony only after disclosure of the subject of that

testimony." *Id.*

---

[27] The court wrote that "[t]o say that these interviews were *only to* advise the
Government concerning plea negotiations misrepresents what the experts were hired
to do." A at 157. The court did not and could not find the government had attempted
to mislead the court, inasmuch as it relied on and credited Waples' affidavit. In any
event, before any of the key events relating to decisions about the expert witnesses,
the court had a clear picture of the government's evolving intentions.

138

FELL-00001652

Fell does not seem to suggest on appeal that the court erred in declining to rule on the motion to exclude Dr. Welner at this point. The defense had recently added to its witness list a new expert relating to mental health issues. Neither party anticipated that the evidence was frozen. Moreover, the government was attempting to sketch the scope of its rebuttal case at a point when it did not have a clear picture of the mitigation case it was rebutting. Under such circumstances, it was entirely proper for Judge Sessions to delay ruling on sought-after limitations on the government's rebuttal case until the defense mitigation case came into view.

(3)    Dr. Wetzel's Report and Dr. Mills's Testimony

The government selected Dr. Wetzel to interview Fell, and worked to familiarize him, as well as Dr. Rabun, with the advances in the investigation since 2002. The government shipped to both doctors hundreds of documents not reviewed by them in 2002. The documents included a multitude of witness interviews conducted since 2002; crime scene photographs and investigative reports not seen before; prison documents related to Fell which had been generated since the doctors first interviewed him; prison correspondence from Robert Lee not possessed in 2002; and autopsy and toxicology reports not reviewed in 2002. In addition to digesting these materials, Dr. Wetzel prepared

139

FELL-00001653

for the interview by consulting with Drs. Welner and Rabun.

The parties negotiated a date and time for Fell's interview, selecting Monday, June 13, 2005.[28]  On June 9, a Thursday, the district court conducted peremptory challenges and the final jury draw, then scheduled opening statements for June 20.  Dr. Wetzel flew to Vermont on Sunday, June 12.  On June 13, he interviewed Fell for most of the day.  The interview took place behind closed doors without interruption.  It was videotaped, consistent with the court's order and the agreement of the parties.  Afterward, Dr. Wetzel returned to Missouri to prepare his report.  The government considered his work on the report, and the videotape of the examination, to be "walled off" until the return of a guilty verdict.[29]

The jury returned guilty verdicts on all counts on June 24.  Later that day, the government notified Dr. Wetzel that the "wall" was down, and asked for his

---

[28] Defense counsel initially refused to permit the examination. Citing Judge Sessions' April 7 Order, which required the exam to take place "before jury selection begins," counsel argued the interview was too late.  The district court promptly intervened and overruled the objection.

[29] After the interview the government arranged for an outside facility to digitalize the video, converting it to DVD form on CDs.  Copies of the DVD conversion promptly were sent to Drs. Weltzel and Rabun (also deemed to be walled off).  At a later date, a copy was sent to Dr. Welner.

140

FELL-00001654

report. Dr. Wetzel responded that he needed the weekend to complete it.

On Monday, June 27, both parties filed memoranda with the court regarding penalty phase issues. The government filed motions *in limine* and requested overdue discovery. Among other things, the government sought a *Daubert* hearing to challenge Dr. Cunningham's proposed testimony as to Fell's low moral culpability.

At approximately this time, the government learned that Fell had made damaging statements during his June 13 interview with Dr. Wetzel, not the least of which concerned King's murder. Fell told the doctor that he had only kicked Mrs. King two or three times in the torso, then averted his eyes as Lee inflicted the fatal injuries to her head. He contended that, given his lack of involvement in the killing, King's blood or DNA should not have been on his boots. His only explanation for the fact that there was blood and DNA on his boots was because he had "stepped in something weird" in another state.[30] These statements were likely be presented to the jury as part of any mental health case.

---

[30] Fell's false denial and explanation was refuted by the DNA expert at trial. Fell made many other false and/or damaging statements during his interview, including descriptions of the two episodes of prison violence proved false by the prison videotapes (entered in evidence). The government mental health experts were impressed with Fell's lack of affect and detachment during his description of the three killings.

141

On June 27, the government received Dr. Wetzel's Report.[31] SA at 140. Dr. Wetzel concluded that Fell:

– had "exaggerated the amount of alcohol used" on the night of the killings and in fact "was not significantly impaired." *Id.* at 143. "While I would not dispute that it was likely that he was drinking excessive amounts of alcohol that night, I would also state that over time he had developed considerable tolerance to alcohol. Further, his reported behavior, across his many statements, indicates that despite his drinking he was able to think cooly and make rational choices." *Id.* at 146.

– "was generally the leader in his relationship with Bobby Lee." *Id.* at 143.

– "was not under duress" and "was not under the influence of a severe mental or emotional disturbance at the time of the crimes." *Id.*

– was the victim of sexual abuse as a young child, but did not report any causal connection between the abuse and the murders, and "I agree – I also do not see a causal connection." *Id.* at 145.

– was the victim of "repeated physical abuse as a young child," but "I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King. I am completely confident that there is no relationship." *Id.*

– "meets the criteria for antisocial personality disorder fully. I have no doubt of this diagnosis." *Id.* at 146.

– "no defense expert has noted any indication of thought disorder,

_____

[31] Dr. Wetzel entitled his 2005 report a "Revised, Partial Report," as it revised, and presumed familiarity with, his 2002 report.

142

FELL-00001656

hallucination or delusion. No sign of psychosis was reported. I fully agree." *Id.* at 147.

– there are "no cognitive deficits detectable on neuropsychological testing." *Id.*

On Tuesday, June 28, the penalty phase trial commenced. The government introduced testimony and evidence from pathologists and crime scene investigators regarding the extraordinary brutality of the three murders. That same day, the government provided Dr. Wetzel's report to the defense. The government rested its penalty phase evidence on June 29. The court discussed with the parties the mitigation case, concluding that the defense would present its witnesses on July 1, 6 and 7.

Fell's June 28 witness list included only two mental health experts: Drs. Mills and Cunningham. Thus, by June 28 the defense had decided not to rely upon the other three experts on its May 3 witness list (Drs. Lipman, Wetzel, and Rabun). The June 28 list scheduled Dr. Mills to testify on Friday, July 1, and Dr. Cunningham to testify on Thursday, July 7. During the June 29 hearing, the government protested that the defense had only that same day produced the "Declaration of Mark D. Cunningham" and had failed to disclose the notes from

143

FELL-00001657

that expert's interview of Fell.[32] The government also expressed concern that the proposed testimony from Dr. Cunningham was primarily argument.[33] The court responded that Dr. Cunningham's testimony was "something that we need to address in a *Daubert* hearing." Tr. VI-1 at 103.

Fell now suggests that the government's work with Dr. Wetzel was improper. Fell claims that the government had no intention of calling Dr. Wetzel and that it used Dr. Wetzel as a shill to feed Dr. Welner information. Based upon these assertions, Fell then claims that the government improperly sought to undermine the court's procedural order about the government's examination of him. Fell, however, misreads the record. For example, Fell states that on June 29 "the government reiterated that it did not intend to call Wetzel as a witness." Appellant's Brief at 105. On that day, the prosecutor said nothing of the sort: "We haven't made a decision about Dr. Wetzel. We wanted to talk to defense counsel about who, if anyone is going to call him today. As you know, the expert we've

---

[32] The Court's April 7 Order required "all . . . records" upon which defense experts "relie[d] upon to any extent for their report" to be produced prior to Dr. Wetzel's June 2005 interview of Fell.

[33] The government's July 7 "Memorandum Regarding Dr. Cunningham's *Daubert* Hearing," challenged that expert's proposed testimony. Court Document 187. Dr. Cunningham proposed to testify that adverse childhood circumstances diminished the ability of adult violent offenders to choose not to offend, mitigating their moral culpability for such choices.

144

FELL-00001658

been relying upon is Dr. Welner." Tr. VI-1 at 104. Dr. Wetzel had been on the witness list of both parties. The prosecutor was clear that Dr. Wetzel might be a government witness. At this point, on June 29, the defense's plans about its mental health case had not been presented with clarity. Again, Fell's argument relies on ill-conceived notions of misconduct.

On Friday, July 1, the defense began its penalty phase case. Among other witnesses, Dr. Mills was to testify that day. The government made an *in limine* regarding Dr. Mills, based upon several factors, including additional discovery lapses by the defense, such as its failure to disclose the notes of Dr. Mills.[34] The court pressed Fell's attorneys, pointing out that "the rules require that the notes be turned over." Upon eliciting from counsel that there were, in fact, undisclosed notes, the court announced that Dr. Mills "is not going to testify until the notes are provided to the government." Tr. VII-1 at 7. The government also noted that it had not received any summary of Dr. Mill's proposed testimony, beyond his May 2001 five-page report. The court made clear that it intended to give the defense wide latitude in presenting its case, so long as it supplied the government with an

---

[34] The government had several times asked the defense to disclose the notes Dr. Mills wrote during his March 2001 interview of Fell. The court's April 7 Order required those notes to be turned over.

145

advance outline of Dr. Mills' testimony. Given the uncertainty about which mental health witnesses the defense intended to call, the government understandably was in no position at that juncture to make any final decisions on whom it would call in rebuttal. The government reiterated that it might call Dr. Wetzel, Dr. Welner or both. Tr. VII-1 at 14-15.

During a recess on July 1, the court asked Dr. Mills to come forward and address the question of missing notes. Dr. Mills promised to try and locate them immediately. The court also discussed postponing Dr. Mills' testimony if the notes were not promptly produced. After a discussion of Dr. Mills' schedule, it was agreed that Tuesday of the following week (July 5) was a potential day for his testimony. It was agreed that scheduling would depend upon when the notes were produced. Tr. VII-1 at 98-99.[35]

Just before lunch on July 1, counsel advised the court that Dr. Mills' missing notes had been located and turned over to the government. Tr. VII-1 at

---

[35] Fell claims that he renewed his motion to exclude Welner's testimony on June 29 and July 1. His citations to the record do not support that assertion. The court had much earlier stated that it would delay a decision about the admissibility of Dr. Welner's testimony until the receipt of Dr. Welner's report and the defense's decisions about what to offer in its mitigation case. There is no factual support for the suggestion that the decision about calling Dr. Mills turned on alleged misconduct associated with Dr. Welner's report. The information supporting the misconduct claims came from the Welner report received on July 5.

146

162. Less than an hour later, however, counsel announced that the defense had decided not to call Dr. Mills. When the court inquired, "you're not going to put him on at all?" counsel responded:

> No. I'm going to save him for surrebuttal if we need him. There's still Dr. Cunningham who's an expert who will testify next week. If they believe that somehow raises rebuttal questions, I'm sure they'll try to present such an expert.

Tr. VII-2 at 4. This defense decision to abandon the idea of calling Dr. Mills had nothing to do with Dr. Welner's report, which had not been completed. The defense did not ask to defer deciding whether to call Dr. Mills until it had seen Dr. Welner's report.

## C.    DR. WELNER'S REPORT

On Tuesday, July 5, the defense turned over to the government Dr. Cunningham's notes of his interview with Fell. Late that day, Dr. Welner's report arrived at the U.S. Attorney's Office, and the government delivered a copy to the local hotel where defense counsel were staying.

Dr. Welner's report was a comprehensive analysis of all mental health issues raised in the case since early 2001, when the first three defense experts offered opinions, through mid-2005, when Fell finally was interviewed about the

147

offenses by Dr. Wetzel and Dr. Cunningham's opinions were received. SA at 176. Dr. Welner analyzed each defense expert's opinions and each alleged mental health mitigation factor. The first issue addressed in Welner's report was Fell's psychological diagnosis. Dr. Welner concluded that Fell had an Antisocial Personality Disorder ("ASPD"), with Alcohol Dependence. SA at 182. In a later section of the report, Dr. Welner addressed the questions, "What other aspects of Donald Fell's development distinguish themselves? How have these features impacted his life trajectory, underlying value system, moral development, perception of life options and nature of choices?" SA at 192. In that discussion, Dr. Welner opined that Fell met the criteria for psychopathy, noting that it is a construct closely similar to ASPD (and that the two terms are sometimes used interchangeably). Dr. Welner's discussion of psychopathy consumed only several pages of his lengthy report. SA at 197-02.

On, the jury heard additional penalty phase defense witnesses. Also on July 6, the defense filed its (second) Motion *In Limine* to Exclude Report and Testimony of Michael Welner, M.D. SA at 236. In the motion, Fell raised, among other things, the precise issues he renews on appeal. He accused the government of using Dr. Wetzel as "merely a proxy for Dr. Welner" during the Fell interview, thereby subverting the court's April 7 order barring Dr. Welner from conducting

148

the interview. This charge was based upon one sentence in Dr. Welner's report: "For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Mr. Fell." SA at 197. Having manipulated Dr. Wetzel and the interview, the defense protested, Dr. Welner then "performed several new tests" in contravention of the court's order requiring that testing be agreed upon by the parties. Fell asserted that Dr. Welner's report had "only one purpose – to get the word 'psychopath' before the jury."[36] SA at 239.

That afternoon, after testimony ended, the court scheduled hearings to explore the defense charges about Dr. Welner, as well as the government's concerns about the suitability of Dr. Cunningham's testimony. The hearing about Dr. Cunningham's testimony was set for the next day, July 7; the hearing for Dr. Welner was scheduled for Monday, July 11. The court also pressed the government as what testimony it intended to elicit from Dr. Welner. Tr. VIII-2 at 72. The government responded that it had not made a decision about the metes and bounds of testimony from Dr. Welner, but did allow that his report was "considerably more comprehensive at 72 single-spaced pages than would be

---

[36] Dr. Wetzel also concluded that Fell was a psychopath.

149

needed. We asked him to take a comprehensive approach because, frankly, it appears sometimes that where the defense is going shifts a little bit, and also we're not sure where they're going to be going tomorrow by the time the defense case rests." *Id.*[37]

A major theme of Fell's brief is that the government violated the court's April 7 order by using Dr. Wetzel as a proxy for Dr. Welner, and having Dr. Welner conduct unauthorized tests. There is no merit to the allegation that the government committed misconduct, or that such supposed wrongdoing justified the wholesale exclusion of Dr. Welner's testimony. There is no evidence in the record supporting the claim that Dr. Wetzel was a proxy for Dr. Welner. The prosecutor represented to the court on July 6 that Dr. Wetzel had been asked to conduct the examination as he felt appropriate[38] and Dr. Wetzel, in an affidavit

---

[37] One contentious aspect of Dr. Welner's report was his psychopathy diagnosis. But even if the court had excluded that bit of testimony, Dr. Welner had substantial other testimony to offer. For example, Dr. Welner could have provided useful rebuttal evidence had either Dr. Cunningham or Mills testified.

[38] Anticipating the scheduled July 11 hearing on Dr. Welner, the court asked the government, "[d]id you tell him [Dr. Wetzel] to ask the questions that Dr. Welner wanted so that Dr. Welner could use the interview that Dr. Wetzel had to support his opinion?" The government responded:

No. Those two were in consultation with each other prior to the interview. We told Dr. Wetzel to conduct the interview as he saw fit, but we also told him that, you know, to be in touch with Dr. Welner about it, and we know that Dr.

150

filed in connection with the post-trial motions, confirmed that the government asked him to exercise his independent judgment. A at 671-75. The evidence in the record shows that Dr. Welner spoke with Dr. Wetzel, that Dr. Welner sent Dr. Wetzel questions that Dr. Welner thought should be asked during the interview, and that Dr. Wetzel only asked those questions he felt were appropriate to his evaluation. *Id.*

With regard to the subject of additional testing, the government represented, during the post-trial litigation, that it understood the court's order as regulating the manner in which the interview was conducted, not the subsequent analysis of the information provided in the interview.[39] A at 653. Judge Sessions did not find that the prosecutors had acted in bad faith in that interpretation of his order. While the court found that Dr. Welner's "testing" was inconsistent with the order, it

---

Welner prepared some of the questions, not all of them, for him to ask. I didn't – we were not involved in a lot of this stuff.

Tr. VIII-2 at 73-74. Dr. Wetzel confirmed the accuracy of this statement. Prior to Dr. Wetzel's affidavit, the defense represented in a pleading that Dr. Wetzel had told one of Fell's attorneys that Darrow had told him to use Dr. Welner's questions. Dr. Wetzel denied this under oath. A at 674-75.

[39] Under the defense's view of mental health "tests" it is difficult to see the distinction between "tests" and diagnoses or analysis. Nothing in the court's April 7 order prohibited Dr. Welner from reviewing the tape of the interview and considering the interview in making his diagnosis or analysis.

151

concluded that any violation was unintentional or that it rose to the level of prosecutorial misconduct. A at 721. To the extent that Dr. Welner's work went beyond the court's contemplated parameters, Fell could have, had he chosen to do so, asked the court to limit Dr. Welner's testimony. Indeed, that is precisely what Judge Sessions invited Fell's attorneys to do:

> I'd ask for the defense to come up with a memorandum describing their specific objections to what Dr. Welner would testify to. I mean, from the beginning, from day one, I have suggested to both sides that they be afforded an opportunity, a fair opportunity, to put on expert witnesses, and I'm hard-pressed to try to stop an expert witness from testifying. On the other hand, there are a lot of things in Dr. Welner's report, I am told of new facts which would be prejudicial – highly prejudicial, and would need the defense to be given an opportunity to look into them.

> I mean, what I need is somebody to narrow the precise issues down so that I know what the government wants to introduce, what the defense's objections are . . . .

Tr. VIII-2 at 83-84.

In sum, on July 6 the defense raised the issue of whether the government subverted the April 7 order, and moved *in limine* to exclude or limit Dr. Welner's testimony. In response to that motion, the court scheduled a hearing for July 11, at which Dr. Welner was going to be present for examination. Judge Sessions made unequivocally clear his intention to explore the matter fully – "[t]his is a big

152

deal"– and requested memoranda.[40]

### D.   THE DEFENSE DECISION NOT TO OFFER MENTAL HEALTH EVIDENCE

Although the court was prepared to hold a hearing on the defense motion to bar Dr. Welner, Fell now complains that it should have decided the issue before he rested his mitigation case. This position on appeal is puzzling, to put it mildly, in light of the fact that he never *asked* the court for a ruling in advance of completing the defense case.   Rather, the defense freely chose to avoid the issue.  Fell waived his right to seek exclusion of Dr. Welner's testimony, and this Court should relieve him of the burden of his unforced choice.

On July 7, the defense rebuttal case continued.  The government filed a *Daubert* memorandum outlining its concerns with Dr. Cunningham's proposed testimony. Doc. 187.  During the lunch break, counsel announced the defense was going to rest after calling two additional fact witnesses. Tr. IX-2 at 3.  The decision not to present mental health mitigating evidence, of course, meant that it was no longer necessary to conduct hearings about proposed testimony from Dr. Cunningham or Dr. Welner.  Counsel added, "for the record, we withdraw our

---

[40] Of course, even if Dr. Welner had been excluded, Dr. Wetzel's report was in large part consistent with Dr. Welner's report.  Thus, the defense could not have prevented the government from presenting powerful mental health expert rebuttal testimony even if had prevailed on its motion to exclude.

153

12.2 notice . . . . There would be no surrebuttal . . . unless you allow them to call an expert for some reason, we would not have surrebuttal." *Id.* at 4. Fell never complained about being forced to decide whether to forego presenting mental health evidence without knowing whether Dr. Welner would be allowed to testify. Fell did not ask for the Welner hearing to proceed before he completed his mitigation case. The defense never suggested that its decision not to call Dr. Cunningham had anything to do with Dr. Welner's potential testimony.

On the morning of July 8, the defense submitted a letter in which it argued that, having withdrawn its Rule 12.2 notice, the government should be barred from introducing mental health evidence.[41] When the government finished cross-examining Fell's last fact witness, the defense rested. The defense entered into the a stipulation about Fell's mental functioning.

In the wake of these developments, the government presented no mental health rebuttal evidence other than the stipulation. The July 11 hearing to explore the defense claims about Dr. Welner was cancelled and Fell's motion to exclude the witness was denied as moot.

---

[41] At the time the government assumed that the letter was intended to preclude any government attempt to introduce Fell's statements during the June 13 interview (such as having "stepped in something weird in another state").

154

FELL-00001668

Fell's repeated protestations (*e.g.*, Appellant's Brief at 113, 120) that the court "forced" him to make a premature decision to rest his mitigation case before knowing whether Welner could testify is sheer hyperbole. To the contrary, the record clearly refutes the claim that Fell's decision not to present mental health experts was driven by the Welner issues. The defense raised the arguments Fell renews on appeal. The district court was interested in the claims. Counsel could have asked to have the Welner claims heard before they finalized their decisions about what mitigation evidence to present. The fact that they made so such request demonstrates the Welner issues were not critical to their decision not to open the mental health can-of-worms (which undoubtedly would have triggered damaging rebuttal testimony) . The defense chose not to call Dr. Mills even before Welner completed writing his report. Thus, the defense strategy to decrease reliance on mental health expert testimony had already been set before the Welner issues were known. Obviously, other factors were influencing the defense tactics. For example, Fell's lawyers undoubtedly wanted to keep out Dr. Wetzel's taped interview of Fell. They probably also wanted to keep Dr. Wetzel and Dr. Welner off the stand and there was no hope that Dr. Wetzel would not be called if Fell presented a mental health expert. A capital sentencing hearing may often resemble a chess match, with both sides looking several moves ahead, trying

155

FELL-00001669

their best to dictate the end-game. Fell's attorneys looked ahead and, at a minimum, saw Dr. Wetzel as a certain government witness offering powerful rebuttal testimony. Their tactical decision to curtail the mitigation case so as to minimize the scope of the government's rebuttal is not something this Court should second-guess.

In sum, Fell's charge of prosecutorial misconduct is meritless. Even if some form of misconduct had occurred, Fell should not be heard to complain about it now, since he consciously chose not to pursue the issue. As Judge Sessions put it in denying Fell's post-trial motions:

> When Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct by the government in obtaining its rebuttal evidence. Regardless of the reasons for Fell's decision to withdraw his expert evidence, he waived his prosecutorial misconduct claim by failing to pursue it at sentencing when the essential facts of his claim were known by him.

A at 724-25 (footnote omitted).

156

VI.    IN THE ABSENCE OF ANY OBJECTION, THE COURT BELOW
       DID NOT COMMIT PLAIN ERROR IN THE ADMITTING
       EVIDENCE SHOWING FELL'S INTEREST IN SATANISM AND
       THE INSINCERITY OF HIS CLAIMED ADHERENCE TO ISLAM
       AND NATIVE AMERICAN BELIEFS.

Fell contends that the government violated his constitutional right to

religious and associational freedom by presenting evidence of his interest in

Satanism and his claimed interests in Christianity, Native Americanism and Islam.

Fell did not object to that evidence at trial, which limits review of his belated

attempt to raise the issues to plain error. *Jones v. United States*, 527 U.S. at 389-

90; *United States v. Dunnaway*, 88 F.3d 617, 618-19 (8th Cir. 1996) (plain error

review of claim that defendant's racist beliefs were improperly admitted).  There

was no error, much less plain error.

A.    BACKGROUND

During the guilt phase, the government presented evidence of Fell's interest

in Satanic or demonic images during the killings.  Fell killed his victims while

wearing a T-shirt emblazoned with the word "SLAYER" and a large demonic

image.  SA at 270 (photo); Tr. II-1 at 33.[42]  Fell's T-shirt was admitted into

_____

   [42] Fiber from the T-shirt was recovered from near King's body, and Fell stated
that after the Rutland killings and his shower, he "threw [the same clothes] right back
on."  SA at 44, 51.

157

FELL-00001671

evidence at the guilt phase. A at 524. During closing argument, the prosecutor commented that the T-shirt "speaks for itself." Tr. IV-1 at 55-56. Fell also had an anarchy tattoo on one arm and a tattoo of an upside-down cross and "666" on the other.

During the penalty trial, Fell presented substantial evidence of his dysfunctional childhood, including testimony from his sister Teri Fell. Fell also presented two mitigating factors relating to his pretrial confinement at the Northwest Correctional Facility. Mitigating Factor Five alleged that Fell "does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release." Mitigating Factor Six alleged that Fell "has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve prison grievances." A at 552. Fell presented the testimony of James Aiken, an expert witness in penology, and correctional officers Ronald Barclay, James Bailey and Jason Rushlow to support those factors.

The government sought to rebut the evidence of Fell's rehabilitative potential with evidence that he was a significant disciplinary problem at Northwest. The government also showed that Fell had manipulated the prison grievance process by filing a prison grievance and then a lawsuit alleging he had

158

FELL-00001672

been denied the right to practice a Native American faith, and that he participated in the Muslim feast of Ramadan. To further show that Fell's interest in those religions was not sincere, the government sought to establish he had exhibited no interest in any religion before he was incarcerated. The government also presented evidence of Fell's tattoos.

During the prosecutor's cross-examination of Teri Fell, the following exchange occurred:

Q: Now, when you were growing up, and in Wilkes-Barre, did Donald like to sort of read books and play guitar and things like that?

A: Yes.

Q: Did he have any other interests in religion?

A: No.

Q: Did he have any interests against religion?

A: He wasn't a religious person at all.

Q: Can you explain that to the jurors?

A: He didn't believe in God.

Q: What did he believe in?

A: Well, when we were first living in Wilkes-Barre, he didn't believe in anything, and then towards -- by the time I moved out of Aunt Jackie's house when I was 16, he talked about Satan, but I don't know if he worshipped Satan. I don't believe that he worshipped Satan. He didn't have a Satanic bible or anything like that.

Q: What did he say, if anything, about Satan?

A: He would just make jokes about Satan being the kindest

159

FELL-00001673

beast, and that was it, and that he normally talked to me
about National Geographic.

Q:    And, I'm sorry, you said Satan is the kindest beast?

A:    Yes.

Q:    I'm sorry, what does that mean?

A:    I don't know.

Q:    Do you know, if as a result of that, he has any tattoos?

A:    Yes, he does.

Q:    And what are those tattoos?

A:    On his left arm, I do believe he has got an upside down cross with
666  And on his right arm he has got an anarchy sign.

Q:    Do you know what the upside down cross with 666 means?

A:    It represents Satan.

Q:    Do you know when he got that?

A:    I don't know that.  Probably – I think he was 15 or 16
when he got it.

A at 357-59.

Later, the government introduced a prison chart which depicted the tattoos
on Fell's arms.  A at 369-70, 530.  Aiken testified on cross-examination that he
knew Fell had tattoos, that having a tattoo was "significant," and that a "666"
tattoo meant a "possible involvement in some type of relationship with an
organization."  A at 392-93.

160

FELL-00001674

Fell did not object to the Satanism evidence.[43] To the contrary, he cross-examined Matt Cunningham, a government rebuttal witness, on how he (Fell) had acquired the tattoos. Cunningham testified that he, Fell, Lee and others were friends who smoked marijuana during the middle and late 1990s. Fell's defense counsel established that Fell and his friends were very interested in forming a band devoted to heavy metal music. Cunningham agreed that the "dress and the getting of tattoos . . . was . . . consistent with what [we] were trying to do." A at 447.

During the defense case, James Bailey testified that Fell had signed up for educational and religious activities while detained at NCF. Bailey admitted he did not know whether Fell had actually participated in those activities. Tr. VIII-1 at 133-34.

Jason Rushlow, whose duties included investigating prison grievances, testified as a mitigation witness that Fell regularly took advantage of religious programs, including Christian Bible studies, and educational and recreational opportunities at Northwest. At some point, Fell was selected by his fellow inmates to be a unit representative, a liaison between the inmates and prison officials regarding grievances. Tr. VIII-2 at 11-15.

---

[43] The Appellant's Brief states incorrectly that the government's questioning took place "[d]espite defense counsel's protests." *Id.* at 14.

161

On cross-examination, the prosecutor brought out that Fell had enrolled in Christian Bible studies and sought to show that Fell was Polish (and therefore not a Native American). Rushlow, however, did not know Fell's ethnicity. A at 362. The prosecutor also established that Fell had filed a prison grievance and a lawsuit in which he claimed he was a Native American who needed to have "sweat lodges" and "talking circles" in prison to practice his faith. A at 363.[44]

Judge Sessions admitted into evidence a copy of Fell's lawsuit. In part, the complaint alleged, "Mr. Fell would like to practice his Native American religion . . . [and] '[t]alking circles' are an integral part of Mr. Fell's Native American faith, akin to a Christian church service." Rushlow also testified that Fell had filed other documents "basically claiming to be a Native American and wanting to practice these things." A at 363-65.

The government then sought to show that Fell also had professed to be a practicing Muslim. The following exchange occurred on cross-examination:

---

[44] A Native American "sweat lodge" ceremony involves the creation of a "sauna" inside a tent using heated rocks. *See Allen v. Toombs*, 827 F.2d 563, 565 n.5, 566-67 (9th Cir. 1987) (rejecting inmate's demand for a "sweat lodge" based on prison security needs). A Native American "talking circle" ceremony involves a group discussion on any number of issues. *See* www.nativescholars.org/DigitalTalkingCircle (last visited May 16, 2007).

162

Q: Now, during the time that you worked with him as a caseworker, did he also claim to have other religious interests and practice other religions other than Christianity and being a Native American?

A: Yes. He participated in Ramadan, which is Muslim.

Q: Did – when you were working with him as a case worker, he also represented that he wanted to participate in a Ramadan?

A: Yes.

Q: As a Muslim?

A: Yes.

Q: Have you ever seen him pray to Mecca?

A: No, I have not.

Q: So this is an example of one of the grievances that you got from Mr. Fell while you were a case worker there?

A: Yes.

A at 365-66. Rushlow further testified Fell had filed numerous other grievances, including protests that a Sunday breakfast had no bacon, and that he was denied access to a recreation room which had been closed for security purposes. One of Rushlow's motivations for helping select Fell as a unit representative was the hope that would reduce the number of grievances Fell was filing. A at 366-68.

On redirect-examination, defense counsel established that Rushlow knew Fell was interested in Native Americanism and Christianity. Fell's attorney asked whether Fell had told Rushlow he a Muslim. The following exchange occurred:

A: No. I knew that he participated in Ramadan.

Q: He was interested in Ramadan?

163

FELL-00001677

A:   Yes.

\* \* \*

Q:   Do you know what Ramadan focuses on, primarily?

A:   Yes.

Q:   And what is that?

A:   Fasting and not eating during the day.

Q:   Okay.  And Mr. Fell expressed some interest in that?

A:   He participated.

Q:   Did he tell you at all why he was interested in it?

A:   No.

Q:   But he expressed interest in fasting?

A:   Yes.

Tr. VIII-2 at 64-65.  Counsel also established that Fell had dismissed his Native American lawsuit, and that Rushlow did not know why Fell had tattooed his arms. *Id.* at 65-67.

In his penalty phase summation, the prosecutor argued:

This one's good:  Donald Fell has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances.  Let's get real.  You saw those videotapes.  What positive contributions has this man made to the Northwest Correctional Facility? . . . They want to claim that he is a positive contribution in resolving grievances?  You heard from Jason Rushlow.  The man generated grievances.  Are you kidding me?  You saw the lawsuit.  You can read it for yourself when you go back there.  This man signs up for bible study, and then files a lawsuit claiming to be American – a Native American.  He files a lawsuit so that he can practice his Native American religion on the yard.  It's bogus, ladies and gentlemen.  You know it's even more bogus

164

FELL-00001678

because, believe it or not, he observes Ramadan as a Muslim. Ladies
and gentlemen, what do you see from this? He's still manipulating
even from prison. That's who he is. He hasn't changed. He won't
change. Gotten more violent in prison. Ladies and gentlemen, that's
not proven.

A at 492-93.

In his own closing, defense counsel argued that Fell wanted "to experiment

with other religions" and that his lawsuit was a means to allow him to "observe his

religious affiliation, to explore and experiment." Counsel denied that Fell had

filed grievances to manipulate the system. Tr. XII-1 at 109-110.

Judge Sessions instructed the jury that it "must not consider" Fell's religious

beliefs or his national origin because they "were completely irrelevant to any

determination that the death penalty is justified." The court also directed the jury

that it "may not impose the sentence of death unless you have concluded that you

would impose that sentence no matter what the race, color, religious beliefs,

national origin or sex of [Fell]". A at 559.

Pursuant to 18 U.S.C. 3593(f), each juror certified in writing that he/she did

not consider Fell's religious beliefs or ethnicity in deciding to impose the death

penalty. A at 581.

165

FELL-00001679

B.    LEGAL ANALYSIS

A capital sentencer has broad discretion to consider a "wide range of relevant material" in deciding whether a death-eligible defendant should receive capital punishment. *Dawson v. Delaware*, 503 U.S. 159, 164 (1992), *quoting Payne v. Tennessee*, 501 U.S. 808, 820-21 (1991). That standard is mirrored in section 3593(c), which authorizes the admission of all relevant evidence regardless of admissibility under evidentiary rules, as long as the evidence is not unduly prejudicial. The goal is to admit more evidence, not less. *United States v. Fell*, 360 F.3d at 143; *United States v. Fulks*, 454 F.3d 410, 437-38 (4th Cir. 2006).

The "[C]onstitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 486 (1993), *quoting Dawson*, 503 U.S. at 165; *United States v. Kane*, 452 F.3d 140, 142 (2d Cir. 2006) (collecting cases); *Kapadia v. Tally*, 229 F.3d 641 (7th Cir. 2000). Evidence of a defendant's beliefs may be relevant to show his motive for committing a crime, *Mitchell*, 508 U.S. at 485-86; *Barclay v. Florida*, 463 U.S. 939 (1983) (plurality opinion); *United States v. Salameh*, 152 F.3d at 111-12, or to rebut the defendant's evidence. *Kane*, 452 F.3d at 143-44.

166

FELL-00001680

These principles also apply in a capital case. *Dawson,* 503 U.S. at 163-68. In *Barclay,* the defendant's racist views showed his motive to murder a victim of a different race, and was thus relevant to the statutory aggravating factors that the crime posed a "great risk of death to many persons" and was "especially cruel, atrocious, and heinous." 463 U.S. at 949-50 & n.7. *See also Fuller v. Johnson,* 114 F.3d 491, 497-98 (5th Cir. 1997) (future dangerousness); *O'Neal v. Delo,* 44 F.3d 655, 661 (8th Cir. 1995) (motive). On the other hand, in *Dawson*, evidence of the defendant's membership in a racist prison gang was deemed not relevant because his crime was unrelated to race, the government did not link his beliefs to his future dangerousness and, under the circumstances, did not rebut his mitigation evidence. 503 U.S. at 164-68.

A defendant who charges that the government infringed on his religious beliefs has the threshold burden of showing those beliefs are sincerely held and are, in fact, religious in nature. *See, e.g., Ford v. McGinnis,* 352 F.3d 582, 588-89 (2d Cir. 2003); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir. 1999); *Searles v. Dechant,* 393 F.3d 1126, 1131 (10th Cir. 2004); *Goff v. Graves,* 362 F.3d 543, 547 (8th Cir. 2004). The sincerity requirement serves to distinguish a belief rooted in the individual's conscience from a belief motivated by fraud and deceit. *Ford,* 352 F.3d at 588; *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984).

167

(1)   Fell's Interest In Satanism Was Properly Admitted To Show
Motive

Fell's motive was an issue in the case. He participated in three savage and

gratuitous killings. His brutal slaying of King was incomprehensible. The

"multiple killings" and the "heinous, cruel and depraved manner" statutory

aggravators made Fell's motive relevant to sentencing. *See Barclay*, 463 U.S. at

949-50. At the time of the killings, Fell had Satanic images on his body and on his

clothes -- he had an "anarchy" tattoo on one arm and an inverted cross and "666"

tattoo on the other; he also wore a "SLAYER" T-shirt with a large demonic image.

The number "666" refers to the "mark of the beast" in the New Testament, Book

of Revelation, 13:17-18, and is often a symbol of the Antichrist. *See United States*

*v. Gordon*, 974 F.2d 1110, 1114 (9th Cir. 1992). "Slayer" is a heavy metal band.

*See* www.myspace.com/slayer and www.slayerized.com. (last visited May 2,

2007). The heavy metal music culture trades in violent and Satanic imagery. *See,*

*e.g., People v. Williams*, 148 P. 3d 47, 60-61 (Cal. 2006); *State v. Bennett*, 81 P. 3d

1, 4-5 (Nev. 2003); *State v. Crumb*, 704 A.2d 952, 965 (N.J. Super. 1997) An

expert has observed that a Satanist believes he can "murder, rape or rob at will

without regard for the moral or legal consequences" and that "life should be lived

according to individual desires without regard for conscience." *See McCorkle v.*

168

FELL-00001682

*Johnson*, 881 F.2d 993, 995 (11th Cir. 1989).

The government permissibly presented evidence that Fell's interest in Satanism began when he was 15 or 16 years old to show that he had developed a deep and longstanding hatred toward society's mores and values – an attitude that helped explain the savagery of his killings. Fell's attitude was visible during the killings: he wore a demonic image on his "SLAYER" T-shirt and a satanic tattoo on his arm. Fell did not dispute that he had a longterm interest in Satanism. Indeed, he specifically linked the tattoos with his teenage interest in heavy metal music. The evidence that Fell's interest in Satanism corresponded to the development of his deep hostility toward the world was hardly surprising in light of mitigation evidence portraying him as the victim of a severely dysfunctional childhood and upbringing.[45]

---

[45] Fell's reliance (Appellant's Brief at 135) on *Dawson* is misplaced for two reasons. First, in *Dawson*, the government could not link the defendant's racists beliefs to the murder because the defendant and the victim were of the same race. 503 U.S. at 166. Here, in direct contrast, Fell's obsessive interest in Satanism was vividly displayed on his body and his clothes during the crime. Second, *Dawson* preserved his claim for review. Fell did not; indeed, Fell himself sought to demonstrate to the jury that his infatuation with Satanism and heavy metal music was longstanding.

FELL-00001683

For these reasons, Fell cannot demonstrate either that the admission of the satanism evidence prejudiced him or violated the "public reputation" prong of the plain error doctrine.

(2)    The Prosecutor Properly Rebutted Fell's Attempt To Portray Himself As A Good Prisoner By Exposing As False His Claims To Practice Native American And Muslim Religions

In support of another mitigator, Fell attempted to prove that he was rehabilitating himself in prison by attending Bible studies and handling grievances for fellow inmates.  The government properly rebutted that evidence by showing that Fell had manipulated the prison grievance system – signing up for Christian Bible studies, but then filing grievances in which he falsely claimed he was a Native American religion practitioner, and then a Muslim.  *See, e.g., United States v. Higgs*, 353 F.3d 281, 329-30 (4th Cir. 2003) (evidence of capital defendant's poor prison record properly admitted to rebut evidence of his good prison record).  The rebuttal presentation did not denigrate any sincere religious beliefs Fell may have had; instead, as the prosecutor argued in closing, it showed only that Fell did not file the grievances in good faith.  Fell could "explore" any religion he wished, but he could not falsely claim, in prison grievances and a lawsuit, that he practiced a Native American faith and Islam.  Further, Fell never established at trial that he

170

FELL-00001684

had a sincere interest in Native Americanism or in Islam. Fell showed that he had dismissed the Native American lawsuit, and his own attorney brought out the fact that Fell did not tell Correctional Officer Rushlow that he was a practicing Muslim.

Fell errs (Appellant's Brief at 137) in contending the government did not prove that he manipulated the prison grievance system. His numerous unjustified grievances showed his intent to do so, which rebutted his claim that he was becoming rehabilitated in prison.

Moreover, even if the evidence were insufficiently probative, Fell cannot meet the prejudice prong of the plain error standard. The prosecutor argued only that Fell was simply manipulating the prison grievance system by falsely claiming to practice Native Americanism and Islam; he did not challenge any sincere religious belief that Fell may have had. The jury was instructed that it could not consider Fell's religious beliefs and his national origin in deciding whether to sentence Fell to death. *Cf. Salameh*, 152 F.3d at 112 (court instructed jury that defendant's political beliefs were not on trial). The other evidence against Fell was overwhelming. Finally, as required by section 3591(f) of the FDPA, each juror personally certified that Fell's religious beliefs and his national origin did not play any role in his or her decision to impose the death penalty. There was

171

FELL-00001685

therefore no risk that Fell was sentenced to death based on an impermissible factor.

Finally, Fell has not – and cannot – carry his burden of proving that admission of the challenged evidence would violated the "public reputation" prong of the plain error doctrine.

172

FELL-00001686

VII.  TO REBUT ONE PROPOSED MITIGATING FACTOR, THE TRIAL COURT PROPERLY ADMITTED DEBRA FELL'S POST-ASSAULT STATEMENT THAT SHE WAS "AFRAID" OF HER SON.

Fell contends that Judge Sessions erred in admitting, through Marsha Thompson, Debra Fell's extrajudicial statement, made shortly after Fell assaulted her, that she was afraid of him. Fell argues the statement was "testimonial" hearsay under *Crawford v. Washington*, 541 U.S. 36 (2004) and the Confrontation Clause and, in any event, was not admissible as an "excited utterance."

Fell's belated appellate objection to the evidence is odd, inasmuch as Teri Fell, defendant's sister, likewise testified – during the mitigation case and without objection – that her mother feared Fell. Fell does not challenge that testimony from his sister, so it is difficult to fathom how Thompson's similar testimony was plain error. Regardless, the court properly admitted Debra's statement.

A.  STANDARD OF REVIEW

The admission of evidence under the FDPA is reviewed for an abuse of discretion. *See, e.g., Fields*, 483 F.3d at 354. A Confrontation Clause challenge is reviewed *de novo. United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006).

173

FELL-00001687

B.    BACKGROUND

Fell's Mitigation Factor Three was that he had "truthfully admitted his responsibility for Terry King's murder." A at 573. That factor was based on the multiple confessions he made to law enforcement authorities after his arrest in Arkansas. In one of those statements – the tape recorded interview with Rutland detectives on December 2, 2000 – Fell sought to minimize his hostile relationship with his mother in the weeks before the killings. Fell admitted that he had had arguments with Debra, but stated they were insignificant. Fell told detectives about one occasion when he went to pick up his mother at the Stop Lite bar. He got into a physical confrontation with a friend of Debra's. Debra hit Fell and pushed him out of the bar. On the street, he pushed Debra and told her to "get away" from him. Debra, drunk, fell down. Someone called the police, who arrested Fell and took him to a drunk tank. SA at 39.

The government sought to rebut Fell's self-serving characterization of his relationship with his mother, and his account of the Stop Lite altercation, by calling three witnesses – Jeffrey Vanburen, Vertith Oberle and Marsha Thompson – to testify that, shortly before her death, Debra had expressed her fear of Fell to them. In addition, Thompson, employed at the Stop Lite, witnessed the fight and described it quite differently from Fell.

174

FELL-00001688

After Fell objected, Judge Sessions excluded Vanburen and Oberle's testimony as unreliable under the Confrontation Clause and § 3593(c). A at 350-51. However, the court ruled that Thompson's testimony was admissible under the FDPA because it properly rebutted Fell's claim that he was truthful with the police. It also held that the evidence was reliable under the Confrontation Clause because Debra was "visibly upset and crying" when she made her statement to Thompson. The court further held that her statement was an "excited utterance" under Fed. R. Evid. 803(2) because "an assault is a startling event" and Debra was "still upset because of this event when she talked to Marsha Thompson." Finally, the court concluded that the statement had "minimal prejudicial effect." A at 350-54.

Thompson testified that during the fall of 2000, Fell occasionally came to the bar to look for Debra. One day in the middle of November (about two weeks before the murders) when Debra was at the bar, Fell and Robert Lee entered. Fell drank from Debra's beer. Thompson told Fell he would have to leave if he did it again. Fell then tried to take Debra's change, lying on top of the bar. When Debra grabbed Fell's hand to prevent him from taking her money, Fell grabbed her by the hair and punched her in the head.

175

FELL-00001689

Thompson ordered Fell to leave the bar. Fell kicked and spat at Thompson. Debra said, "he'll leave if I leave," and left the bar with Fell. Outside, Fell pushed his mother to the ground. Thompson called the police, who arrested Fell. About fifteen minutes later, Debra returned to the bar, "showing emotion" and "crying." Debra told Thompson that she "couldn't take it" because "she was afraid of him and she didn't want to go back home." Thompson asked why Debra did not order Fell to leave her home. Debra replied that he was her son and that she loved him. Thompson did not know whether Debra spoke to the police before returning to the bar. A at 311-29.[46]

## C.    LEGAL ANALYSIS

### (1)    The Confrontation Clause Only Applies At The Eligibility Phase Of A Federal Capital Case

The Supreme Court has never decided whether the Confrontation Clause applies to capital sentencing proceedings. *But see Williams v. New York*, 337 U.S. 241 (1949) (holding that the imposition of a death sentence based upon

---

[46] On direct-examination, Thompson testified that she was concerned for Debra because Debra had previously expressed her fear of Fell. Fell objected to that testimony. The prosecutor apologized, stating that he had told Thompson not to testify as to those prior statements. Fell specifically told the court that he did not want a curative instruction because that would "amplify" things. No instruction was given. A at 319-20.

176

FELL-00001690

information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination orthose rebuttal did not violate due process). Similarly, although this Court has concluded that the Confrontation Clause is inapplicable in non-capital sentencing hearings, *see United States v. Martinez*, 413 F.3d 239 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 1086 (2006), it has not resolved whether, and to what extent, the Clause applies in a capital sentencing hearing.

Nevertheless, it is clear that the Confrontation Clause plays some role in capital sentencing proceedings. The evidentiary and deliberative process in the penalty phase of a federal capital trial has two discrete elements: eligibility and selection. *See Jones v. United States*, 527 U.S. at 376-79 (discussing the jury decisionmaking process under the FDPA and the distinction between eligibility and selection); *see also Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994). The fact-finder – usually a jury – initially determines whether the defendant falls into the narrowed class of offenders who are statutorily eligible for the death penalty. A defendant is eligible for the death penalty only if the jury finds beyond a reasonable doubt that he had the requisite "intent" as delineated in 18 U.S.C. 3591(a)(2), and that the government has proven at least one statutory aggravating factor for which he received notice. 18 U.S.C. §§ 3592(c) and 3593(c),(e).

177

FELL-00001691

If the defendant is eligible for the death penalty, the jury proceeds to selection, which entails "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime" whether *this* defendant should receive a death sentence. *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (citing cases) (italics in original). At this stage, jurors must weigh aggravating factors against any mitigating factors to determine whether a sentence of death is justified. 18 U.S.C. § 3593)(c)-(e).

The eligibility portion of the penalty phase, in some respects, can be described as a continuation of the guilt phase of the trial. The Supreme Court has held that the facts that are necessary to render a defendant eligible for a death sentence – in the federal system, the requisite intent and at least one statutory aggravating factor – "operate as 'the functional equivalent of an element of a greater offense.'" *Ring v. Arizona,* 536 U.S. at 609(quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n. 19 (2000)). Accordingly, like the statutory elements of a crime, eligibility-defining factors are subject to the Jury Trial Clause of the Sixth Amendment and must be proved to a jury beyond a reasonable doubt. *Ring,* 536 U.S. at 609. Such factors also trigger the protections of the Grand Jury and Double Jeopardy Clauses of the Fifth Amendment. *Sattazahn v. Pennsylvania,* 537 U.S. 101, 108 (2003); *United States v. Robinson*, 367 F.3d at 284.

178

FELL-00001692

The selection decision, on the other hand, is more akin to the individualized determination made by a sentencing court in the non-capital context. Selection does not involve proof of facts that operate as the functional equivalent of elements, and the Supreme Court has accorded it "differing constitutional treatment" than the eligibility decision. *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998) (citing cases). The selection determination instead involves a qualitative, individualized judgment about whether a particular death-eligible defendant should be sentenced to death. *Zant v. Stephens*, 462 U.S. at 879 (citing cases). As part of the selection determination, the jury is asked to make additional findings regarding the existence of mitigating and non-statutory aggravating factors. Unlike statutory aggravators, non-statutory aggravators are unnecessary to render a defendant eligible for the death penalty. Such facts merely affect the selection of an appropriate sentence within the available statutory maximum; accordingly, they are not subject to the rule of *Apprendi*. *Robinson*, 367 F.3d at 289 n. 16 (citing cases); *see also Harris v. United States*, 536 U.S. 545, 565-68 (2002). The same is true of the jury's decision whether all the aggravating factors "sufficiently outweigh" the mitigating factors so as "to justify a sentence of death." 18 U.S.C. § 3593(e). The weighing required by § 3593(e) is "a non-mathematical process, not determined merely by whether there are more aggravating or mitigating factors on

179

FELL-00001693

the jury's list of findings," which affects the selection of a sentence within the maximum sentence authorized by the jury's antecedent eligibility determination. Rory K. Little, "The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role," 26 *Fordham Urban L.J.* 347, 397 (1999).[47]

Because the Supreme Court has characterized the factors that define eligibility for the death penalty as the "functional equivalent of an element" of a substantive capital offense, it is entirely possible that, as an implication of *Ring*, *Sattazahn*, and *Robinson*, the constitutional limitations on the admissibility of

---

[47] The Supreme Court has stressed that the selection determination should be guided by full and complete information about the defendant, and that the admission of more rather than less evidence increases reliability by allowing for an individualized inquiry into the appropriate sentence for the offense. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 203-04 (1976) (joint opinion) ("preferable not to impose restrictions" on the admissibility of evidence at capital sentencing hearings, as "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision"). *See also, United States v. Fell*, 360 F.3d at 143 ("[I]n order to achieve . . . heightened reliability, *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors . . . .") Selection is thus like non-capital sentencing, in which "[n]o limitation" is "placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also* Fed. R. Evid. 1101(d)(3) (providing that the Rules of Evidence do not apply in sentencing proceedings). Indeed, in *Apprendi*, the Supreme Court affirmatively cited *Williams v. New York* in reiterating that evidence that is disparate in its "sources and types" may properly be considered in determining an appropriate sentence "*within the range prescribed by statute.*" 530 U.S. at 481 (emphasis in original).

180

penalty phase evidence establishing the existence of statutory aggravating factors may be substantially the same as the constitutional limits on evidence introduced at the guilt phase to prove the elements of a substantive capital offense. *See Szabo v. Walls*, 313 F.3d 392, 399 (7th Cir. 2002) (noting, without "attempt[ing] to predict how the Supreme Court jurisprudence will develop," that "*Apprendi* and *Ring* may portend more changes" in capital jurisprudence). Accordingly, the Confrontation Clause may apply to such evidence.

In extending other protections of the Fifth and Sixth Amendments to capital sentencing, however, the Supreme Court has distinguished between the facts that are necessary to render a defendant eligible for the death penalty (which operate like offense elements), and other facts that relate only to the selection of a sentence within the maximum (which do not). Assuming the Confrontation Clause applies at all in the penalty phase of a federal capital trial, there is no principled reason for treating it differently than the Grand Jury Clause, the Jury Trial Clause, and the Double Jeopardy Clause. The Confrontation Clause should apply, if at all, only to evidence bearing on the defendant's eligibility for the death penalty and not to evidence that relates solely to the selection determination.

In *Fields,* the Fifth Circuit essentially adopted the foregoing analysis to conclude that the Confrontation Clause "does not operate to bar the admission of

181

testimony relevant only to a capital sentencing authority's selection decision."

*Fields*, 483 F.3d at 326. *But see United States v. Brown*, 441 F.3d at 1361-62 &

n.12(noting that court had ruled the right to cross-examine applies at a state capital

sentencing proceeding, but declining to rule whether *Crawford* applies to a federal

capital proceeding, and offering no opinion whether a federal capital proceeding

should be trifurcated to allow for the penalty phase to be conducted in two parts).

Judge Sessions admitted Debra's challenged statement to rebut Fell's claim

that his confessions to the police were truthful. Because the evidence was relevant

only to the jury's selection determination, not its antecedent determination that

Fell was eligible for the death penalty, the Confrontation Clause did not govern its

admissibility.

 (2) Debra's Statement Was Not Testimonial Hearsay Under
   *Crawford*

In *Crawford v. Washington*, the Supreme Court held that the Confrontation

Clause bars admission of testimonial hearsay statements. *Crawford* did not define

"testimonial" comprehensively, but noted that a testimonial statement would

include:

> ex parte in-court testimony or its functional equivalent– that is,
> material such as affidavits, custodial examinations, prior testimony
> that the defendant was unable to cross-examine, or similar pretrial

182

FELL-00001696

statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51-52 (citations omitted). On the other hand, *Crawford* suggested that a person's "casual remark to an acquaintance" would not be testimonial. *Id.* at 51. The opinion did hold that a declarant's statement to the police during interrogation was testimonial and therefore inadmissible hearsay.

Two years after *Crawford,* in *Davis v. Washington*, 126 S. Ct. 2266 (2006), the Court held that a victim's statement about a domestic disturbance in response to a 911 operator's questions was non-testimonial because the victim was reporting the events as they actually occurred, an emergency was ongoing, and the 911 operator's interrogation was informal. *See also United States v. Clemmons*, 461 F.3d 1057, 1060-61 (8th Cir. 2006); *United States v. Thomas*, 453 F.3d 838, 843-44 (7th Cir. 2006). Similarly, a person's spontaneous statement to a non-policeman is not testimonial. *See, e.g., United States v. Brown*, 441 F.3d at 1359-60 (declarant's statement to her son); *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (employee's conversation with store manager).

183

FELL-00001697

*Crawford* did not decide whether, and to what extent, the Confrontation Clause applies to non-testimonial statements. In *Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007), however, the Supreme Court clarified that the Confrontation Clause does not apply to non-testimonial statements and therefore does not restrict the admission of such statements, even if they lack reliability. *Accord United States v. Feliz*, 467 F.3d 227, 230-34 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1323 (2007).

Debra's statement that she was afraid of Fell was not testimonial, so its admission did not violate *Crawford*. Debra made her oral statement spontaneously to Thompson, a personal friend, not to the police. The statement was not transcribed in a formal document, nor made in circumstances in which a reasonable person would believe that it would later be used at trial against Fell. Because Debra's statement was non-testimonial, no showing of reliability was required under the Confrontation Clause.

(3)    Debra's Statement Was Properly Admitted As An Excited Utterance

Under the FDPA, evidence is admissible at a capital sentencing hearing regardless of its admissibility at trial, except that evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the

184

FELL-00001698

issues, or misleading of the jury.  18 U.S.C. § 3593(c).  It follows that if a statement is admissible under the Federal Rules of Evidence and is not excludable under Rule 403, it should normally be admissible at a sentencing hearing.  Fed. R. Evid. 803(2), the excited utterance exception to the hearsay rule, authorizes the admission of a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale for admissibility is that a statement made as a result of excitement is more likely to be truthful than one made after a period of deliberation.  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002); *United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003).  Because the "excited utterance" rule is based on the psychological impact that prompts the statement, it permits a broader range of statements than the hearsay exception for present sense impressions under Rule 803(1).  *Jones*, 299 F.3d at 112 n. 3.

An "excited utterance" requires (1) a "startling event," (2) a declarant under the stress of excitement caused by that event, and (3) a statement which relates to that event.  *Alexander,* 331 F.3d at 122.  An assault is a "startling event," especially when the declarant is also the victim of the assault.  *See United States v. Hadley*, 431 F.3d 484, 486 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 47 (2006).  As to causation, the statement does not have to be made contemporaneously with the

185

FELL-00001699

event; the length of time between the event and the statement is merely one factor in determining whether the declarant was still under the stress of the event. *See e.g., Jones*, 299 F.3d at 112; *United States v. Tocco*, 135 F.3d at 127. A person can be under the stress of an event 15 minutes later, *Alexander*, 331 F.3d at 123 (collecting cases), or even several hours later. *Tocco*, 135 F.3d at 127-28; *United States v. Scarpa*, 913 F.2d 993, 1016-17 (2d Cir. 1990). Evidence that the declarant made a statement while he was "crying," *Brown*, 441 F.3d at 1359; "scared," *Jones*, 299 F.3d at 113; or "stressed, afraid, [and] frightened," *Alexander*, 331 F.3d at 124, will support a finding that the event caused the statement. The government does not have to eliminate all possibility of deliberation between the event and the statement. *See United States v. Alexander*, 331 F.3d at 124 (intervening phone call to third party did not preclude statement to 911 operator from being an "excited utterance").

Debra's statement to Thompson that she was afraid of Fell easily qualified as an excited utterance; certainly, Judge Sessions did not abuse his discretion in finding that it did. Fell's attack on his mother – which included pulling her hair, punching her and throwing her to the ground – was a startling incident. Thompson's testimony proved that Debra was still under the stress of excitement from that assault when she made her statement fifteen minutes later because she

186

was emotional and crying. Her statement that she was afraid of Fell clearly related to the assault.

Nor did the court abuse its discretion in concluding that Debra's statement was not unfairly prejudicial. Thompson described Fell's assault on Debra and Debra's subsequent statement in a straightforward manner; she did not overly emphasize Fell's assault. In addition, Thompson's testimony comprised a minor portion – 18 pages (A at 311-29) – of the government's case against Fell. The assault that prompted Debra's statement was distinct from the three killings and paled in comparison in terms of violence, so the statement could not have confused or misled the jurors, or unduly influenced them.

Fell's contention (Appellant's Brief at 152-54) that Debra's statement was the result not of the assault, but her long and troubled relationship with Fell, is meritless. The district court properly concluded that Debra's statement was precipitated by Fell's assault because she made it within fifteen minutes. Debra may have had additional reasons for fearing Fell, but those reasons cannot alter the fact that her statement was directly caused by Fell's attack on her.

Fell's further suggestion (Appellant's Brief at 154) that Debra had time to deliberate before making her statement did not make her statement an unexcited

187

one as a matter of law. There will often be an interval between an event and a declarant's excited statement about it, but the government does not have to eliminate all possibility of deliberation in order for the statement to qualify as an excited utterance. *Alexander*, 331 F.3d at 124.

Fell's argument (Appellant's Brief at 153) that Judge Sessions' ruling allowing Thompson to testify was inconsistent with his other rulings excluding similar statements to Vanburen and Oberle is also baseless. The court barred those statements on the grounds that the government did not establish they were reliable under the Confrontation Clause and § 3593(c). A at 350-52. Debra's statement to Thompson did not become inadmissible simply because other statements she made to other witnesses were deemed inadmissible on other grounds. *See Alexander*, 331 F.3d at 124 n. 10 (statement properly admitted under Rule 803(2) not subject to exclusion because other statements excluded). Finally, Fell's claim (Appellant's Brief at 154 n. 70) that Debra's statement was unreliable because she might have talked to the police before she talked to Thompson is purely speculative. There is no record evidence Debra spoke to the police before speaking with Thompson. Because the evidence on appeal is evaluated in the light most favorable to the government as the prevailing party below, this Court must assume that she did not.

188

Fell's reliance (Appellant's Brief at 154-55) on *Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999), is misplaced. In *Paxton*, a state capital case, the Tenth Circuit held that a statement that the defendant had shot his wife was not an excited utterance and was unreliable under the Confrontation Clause. The declarant was the defendant's three-year-old daughter, and she had made the statement while crying and under interrogation by an adult several hours after the murder. The Tenth Circuit stressed that it was unclear whether the child had witnessed the shooting or instead had been told about it, and there was no evidence as to the child's mental state between the shooting and her statement. Thus, "[a]ny number of intervening events could have occurred that would have influenced or even brought about the statement in issue," and there was no evidence that the declarant was crying or was upset during the entire period. 199 F.3d at 1207-11. In marked contrast to *Paxton*, Debra was herself the victim of Fell's assault, and she made her statement fifteen minutes afterward.

(4)    Any Error Was Harmless Beyond A Reasonable Doubt

A violation of the Confrontation Clause is subject to harmless error review. *See Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988); *Vitale*, 459 F.3d at 195. Harmless error review is also required by section 3595(c) of the FDPA. Any error

189

here was harmless beyond a reasonable doubt. Debra's statement was a tiny

fraction of the government's case in aggravation. In addition, jurors already knew

that Debra was afraid of Fell because the defendant's own sister told them that

"she [Debra] told me that she was afraid of him," during the mitigation phase.

Thus, even absent Debra's statement, this Court can be confident, beyond

reasonable doubt, that the jury would have imposed the death penalty. *Jones*, 527

U.S. at 404-05. The jury found all of the statutory and non-statutory aggravating

circumstances beyond a reasonable doubt. By contrast, Fell's mitigating factors –

most of which related to his deprived childhood – were unremarkable. In sum,

Debra's statement added little to the aggravating evidence showing Fell had

participated in three shockingly brutal killings. *See e.g., United States v. Stitt*, 250

F.3d 878, 898-99 (4th Cir. 2001)(erroneously admitted evidence at capital

sentencing hearing was harmless error).[48]

---

[48] That the jury was not unduly influenced by Debra's statement is clear from the fact that six jurors on Count 1 and five jurors on Count 2 found that Fell had truthfully admitted his responsibility for King's murder. A at 573, 576.

190

## VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN PERMITTING REBUTTAL PENALTY PHASE TESTIMONY THAT FELL HAD PREVIOUSLY TALKED ABOUT KILLING HIS MOTHER AND OTHERS.

Fell argues that the district court abused its discretion in permitting government rebuttal witness Matt Cunningham to testify that Fell had discussed murdering people, including his mother, several years before the savage events of November 27, 2000. He contends that Judge Sessions failed to discharge the statutory obligation under § 3593(c) of balancing the relevance of the testimony – which he does not appear to contest – against its potential for unfair prejudice. He also argues that the government exploited the improperly admitted evidence in its rebuttal summation, portraying Fell as a person who had thought about killing people for years.

Fell's objection to Cunningham's testimony is groundless. As Judge Sessions noted in his thorough treatment of the issue below, which followed briefing and oral argument, the testimony was proper rebuttal to the extensive but selective mitigation evidence offered by the defense. Cunningham's testimony bore directly upon the question of what, if any, weight the jury should accord to Fell's mitigating evidence about his childhood abuse impacting his character development. The court recognized that it would have been extremely unfair to

191

FELL-00001705

allow the defense to pick-and-choose evidence from Fell's disadvantaged

background, giving the jury an incomplete and one-sided insight into his character.

Cunningham's testimony was not "unfairly" prejudicial at all; at the very least, it

was more probative than prejudicial and thus admissible under the FDPA. Fell's

suggestion that Judge Sessions essentially abandoned his gatekeeping function by

overlooking the potential for prejudice inhering in Cunningham's testimony is

absurd.

A.    BACKGROUND

The defense completed its direct penalty phase evidence on July 8, 2005.[49]

Nine of the 14 mitigation witnesses talked about Fell's childhood, background and

character; these witnesses included family members, school teachers, social

service providers and police officers. The testimony was offered to support

several proposed mitigating factors, one of which referred generally to "factors in

Donald Fell's childhood, background or character." In addition, the defense

introduced its "Mitigation Binder," a multitude of documents pertaining to Fell's

---

[49] Prior to any penalty phase evidence, Judge Sessions issued his "Opinion and Order: Evidentiary Standards," which addressed "the evidentiary standards that apply at a sentencing hearing conducted pursuant to the [FDPA]." SA at 151. The 25 page opinion makes it perfectly clear that Judge Sessions was intimately familiar with § 3593(c)'s command that he balance the probativeness of aggravating and mitigating evidence against its potential for unfair prejudice.

192

FELL-00001706

background generated by schools and social service agencies between 1985 and mid-1997.[50] Generally, as argued by counsel at the close of the penalty phase trial, the background and character evidence was offered to establish that the three murders in November 2000 were the result of factors beyond his control, and therefore made him less morally culpable.[51]

After Fell's attorneys completed their case in mitigation, Judge Sessions excused the jury and conducted a hearing regarding mental health evidence and two of the government's proposed rebuttal witnesses: Matt Cunningham and Bethany Brashears.[52] Cunningham had been Fell's friend in Pennsylvania during

---

[50] The last dated document in the Mitigation Binder (at Tab 43) appears to be the April 30, 1997 "Pupil Change in Status Report,"memorializing Fell's withdrawal from Coughlin High School in Wilkes-Barre.

[51] Counsel argued that Fell's ability to make sound decisions had been damaged during his deplorable youth. "We are talking about what formed Donnie's decisions. What made Donnie – what clouded his ability and shaped his choices. What was his moral system." Tr. XII-1 at 69. *See also* 70 ("damaging factors" in Fell's background reduced his "moral culpability" and "damaged" his "being"). In concluding, counsel argued, "[I]f Susan [Benczkowski] could have taken her little baby brother home and raised him in her house with her mother. . . . We wouldn't be here today. He would have been loved, cared for, nurtured, not abused." *Id.* at 113. "[B]y the time he got out, he was damaged beyond anything that Vo-Tech was going to do for him. . . ." *Id.* at 115.

[52] Both witnesses were identified in the government's April 20, 2005 witness list. In addition, the "United States' Sentencing Memorandum and *In Limine* Motions for Penalty Phase," filed on June 27, 2005, surveyed the government's penalty phase evidence, including proposed testimony to be given by Cunningham.

193

FELL-00001707

the period 1997-99, with whom Fell had discussed murders. Brashears, a teen-ager, was a victim whom Fell kidnapped and threatened with death in early 2000. The defense initially objected to those witnesses as not properly rebutting its direct evidence: the defense case had been limited to describing "Donald Fell till age 15 and then Donald Fell in the correctional institution [from late 2000 through trial]." Tr. X-1 at 63. The rebuttal witnesses, by contrast, would testify about Fell's behavior during a different time frame – "in his late teens" up through 2000, to shortly before the murders. *Id.* In other words, the defense background and character evidence focused on the time periods 1980 - 1996, and December 2000 to the time of the trial, as opposed to 1997 through early 2000.

Judge Sessions responded as follows to the defense's attempt to prevent the jury from hearing evidence about the three-year period of Fell's life that led up to his move to Vermont:

> Well, do you really think that you've []offered this evidence to suggest that his character was only relevant . . . to [age] 15 and so that any acts after 15 become totally irrelevant then the acts in 2000 become relevant again? I mean weren't you suggesting that this all contributes to who Mr. Fell is as a person? And if that's the case, you don't set-up artificial deadlines or time periods and exclude or include acts during that time period and exclude all other acts . . . outside that time period?

*Id.* at 55-56.

194

FELL-00001708

After further discussion with counsel, Judge Sessions observed:

Well, I guess I need to have a proffer from the Government. It seems to me that when you offered the testimony of persons who knew him when he was a youngster, or up to age of 15, you were doing so not necessarily with that kind of restricted relevance. You are, you are attempting to show who he is as a person. And, you know, to make artificial barriers into behaviors which occurred after 15 is really unfair. That's my sense.

Now, you are raising other questions about whether or not the information . . . is overly prejudicial and outweighs its probative value. And that your argument is that you haven't focused in upon that particular period of time. I think that time is relevant. No question about that.

I suppose that perhaps it plays a part in the balancing between prejudicial impact and probative value. But I, I think restricting the evidence based upon his age at 15 is totally unfair to the Government because they've got some conduct after 15 which bears question on character. But then you have to go through the prejudicial versus probative value analysis.

*Id.* at 65. That same day, the government provided the court with FBI reports of interviews of Cunningham and Brashears, as well as transcripts of 2001 grand jury testimony by Brashears (and Lynn Roberts, a witness to the Brashears kidnapping). *Id.* at 98, 105.

On July 11, 2005 the government filed a memorandum setting forth the proposed testimony to be given by Brashears and Cunningham, and explaining its evidentiary basis. SA at 242. This memorandum explained the relevance of the evidence and its function in rebuttal:

195

The defense contends that Fell's November, 2000 offenses must be understood in context with his troubled background. As explained by counsel during the first opening statement, in order to understand what Fell did, "[y]ou have to understand how . . . he got there."

The defense introduced nine witnesses and a multitude of historical documents to explain Fell's unfortunate background. The essence of the mitigation case appears to be that Fell endured adverse life experiences that fundamentally shaped him psychologically, socially, and emotionally, and thus contributed to his offense. . . . The defense suggests that Fell's life resulted in such a "complicated" relationship with his mother that her murder is understandable. The remaining killings were collateral to that primary event, and hence – so the argument would seem to go – also understandable. The defense background evidence generally left off when Fell dropped out of high school at 17, although his sister Teri Fell without objection described events on cross-examination during the Summer and Fall of 2000.

The government wishes to correct the portrayal of Fell as simply a tormented youth consumed with his mother's wrongs. That image is only possible if the critical few years between the ages of 17 and 20 – when Fell matured into an adult – are ignored. For during that time Fell's trajectory of deeply oppositional and aggressive ideation and conduct reached the homicidal. His violent acts and ideas, perhaps conceived in part in a wretched childhood, were not predetermined by it, but were fostered by him to become a defining attribute of his character. When that adult came to Vermont in late 2000, he was fully formed and ready to act on his homicidal ideas.

The government offers several witnesses to rebut, explain and disprove the false impression created by the defense evidence that Fell is a victim, a victim of 17 years of abuse, who is not fully responsible for his offenses.

SA at 242-43. That same day, the defense filed the "Defendant Donald Fell's

Memorandum on Extraneous Acts at the Punishment Hearing," arguing for

196

FELL-00001710

exclusion of the testimony. SA at 262.

On the morning of July 12, 2005, Judge Sessions resumed discussion of proposed rebuttal testimony by Cunningham (and John Kozierski, one of Fell's former teachers).[53] In a lengthy colloquy, the court focused on four issues: (1) whether Cunningham and/or Kozierski could describe Robert Lee's character; (2) whether Cunningham could mention that Fell had committed robberies, burglaries, and/or thefts; (3) whether Cunningham could testify that Fell talked about killing his mother; and (4) whether Cunningham could testify that Fell once stated that if he was going to murder one person, why stop there? Tr. XI at 5-29.

As to the third issue, counsel argued that evidence Fell had previously discussed killing his mother was "explosive," and that "the prejudice of admitting it outweighs any probative value." *Id.* at 27. The court responded that the defense case had already presented ample evidence supporting the notion that "Mr. Fell is extraordinarily angry at his mother for being abandoned. Is there any dispute over that?" *Id.* When counsel responded that the evidence was more than that, the court replied, "I appreciate that, but I think that that's relevant as well." As to

---

[53] By this point, the parties had agreed that, in exchange for the government not calling Brashears, the defense would withdraw its mitigation factor alleging Fell's lack of criminal history.

197

issue (4), whether Fell said, in effect, if he was going to murder one person he might as well kill others, counsel argued that such testimony was not relevant. *Id.* at 28.

After a recess, the court announced that it would allow Cunningham (and Kozierski) to testify about Fell's leadership role in his interactions with fellow-killer Lee, but not about "Mr's Lee's character independent of Mr. Fell, because that was not raised in the defense [direct case]." The court also permitted Cunningham to testify that Fell had talked about killing his mother and others. *Id.* at 33.

As a witness before the jury (and facing Fell), Cunningham was reserved and cautious, often minimizing his prior statements and evading questions. He did testify, however (after asking the prosecutor to "rephrase the question"), that Fell had stated about his mother, "I hate that bitch," and "I could kill her." *Id.* at 51. Cunningham also recalled a conversation (after noting that "Fell wasn't the only one involved" in it) that "went along the lines of, well, if you killed one person, why stop there? Because you are going to get the same punishment anyway." *Id.* at 52.

198

## B.    STANDARD OF REVIEW

This Court "review[s] a district court's evidentiary rulings for abuse of discretion, and will not reverse unless the district court's decision was 'manifestly erroneous.'" *Yousef*, 327 F.3d at 156.

Generally, "the trial court has a wide discretion over what evidence may or may not be presented on rebuttal." *United States v. Nussen*, 531 F.2d 15, 20 (2d Cir. 1979).  The FDPA provides that both parties, "shall be permitted to rebut any information received at the [penalty phase] hearing . . . ." § 3593(c).

"[E]ven if the district court errs in admitting or excluding evidence, harmless error analysis applies in determining whether reversal is required." *Yousef, supra*, 327 F.3d at 156; *see also* 18 U.S.C. § 3595(c)(2)("The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless . . . where the Government establishes beyond a reasonable doubt that the error was harmless").  "To determine if an error is harmless, 'we consider principally whether the government's case against the defendant was strong, whether the evidence in question bears on an issue that is plainly critical to the jury's decision . . . whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury, and whether the case was

199

FELL-00001713

close.'" *United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000).

### C.   ARGUMENT

On appeal, Fell argues that the probative value of Cunningham's testimony was outweighed by the danger of unfair prejudice, and that the trial court abdicated its duty to perform the delicate balancing called for by § 3593(c). Fell is wrong. He fails to establish that the evidence was "unfairly prejudicial" (or that the government exploited any "unfairness" in summation). In any event, when the evidence of Fell's homicidal fantasies are placed in context with the theory of the defense – that Fell had been irreparably damaged by a childhood of abuse and neglect – any danger of prejudice was slight.

Matt Cunningham's testimony that, in his late teens (within three years of the Rutland murders and carjacking), Fell talked favorably about murdering people was prejudicial in the sense that all probative evidence is prejudicial – it tends to support the proponent's case or rebut the opponent's. But that reality does not render the evidence prejudicial for purposes of § 3593(c). "Only *unfair* prejudice enters into the decisional calculus." *Sampson*, 2007 WL 1393742 * 25 *(original emphasis)*. Fell cites as prejudicial the possibility that a juror "could have inferred" that he planned the 2000 murders years before, and that he

200

therefore had "premeditated intent" to commit them. Appellant's Brief at 172-73 (Cunningham's testimony "had potential to plant th[e] unsubstantiated suggestion [of planning and premeditation] in a juror's mind"). This argument is pure speculation, and falls far short of making the case for exclusion under § 3593(c)'s relaxed evidentiary standard.

The government did not allege that Fell premeditated any of the murders as a statutory aggravating factor (as provided in § 3592(c)(9)).[54] Nor did the government introduce evidence that Fell planned the murder of his mother, or argue years of premeditation to the jury. The idea that, years before, Fell planned and premeditated the triple slaying in late 2000 was simply never raised at trial.

Equally baseless is Fell's claim, raised for the first time on appeal, that the government "exploited" the "potential . . . unsubstantiated suggestion" in summation. In its penalty phase closing, the government, consistent with its position seeking admission of the Cunningham testimony, argued that Fell had evolved from a troubled youth to an adult predator harboring robust homicidal ideation. The prosecutor suggested that Fell had long thought about murder, and

---

[54] The government did allege as a non-statutory aggravator that Fell killed Terry King after substantial premeditation to commit carjacking, but there is no basis in the record for any suggestion that this factor embraced premeditation prior to November 27, 2000.

201

FELL-00001715

his serial murders in 2000 were consistent with long-standing ideation.

This line of argument was proper rebuttal to the evidence and argument Fell's attorneys offered about their client's character. The only place in his rebuttal summation in which the prosecutor commented on Fell's talk about killing occurred when he discussed the murder of Terry King. The prosecutor asked the jury to evaluate that gratuitous slaying within the context of a defendant who had long fantasized about murder:

> You know as a matter of common sense that people have free will, and particularly when they grow up, they have free will to do the right thing and to decide what's right and what's wrong. And you know that for years, Donald Fell thought about killing. He thought about killing John Kozierski, his teacher, back when he was starting out in high school. A couple more years went by, and in conversations with Matthew Cunningham, a guy he hung out with back then, he thought about killing then. Talked about maybe killing his mother. And he thought, if you're going to kill someone, why stop at one.
>
> And more years went by, and he became an adult, and he came to Vermont, and after years of thinking about killing, he decided to kill, and kill again, and he had four hours to think about what to do with Terry King, and he decided to kill her too.
>
> People are responsible for what they do, particularly when they do severe, heinous crimes like this. The killing of Terry King was completely unnecessary. Those guys could have driven her up a dirt road, several miles up some dirt road, off of Route 22, or it could have been in Vermont, and they could have dropped her off, and they could have said, "Give us your shoes and give us your clothes. You're staying here." And they would have

202

had hours to get out of there. They could have tied her to a tree, or in Dover they could have knocked her out. They could have punched her hard, and that woman, she would have been knocked out cold and they could have driven away.

But again, that wasn't the choice he made. Instead, again, she got subjected to that way-over-the-top ultra-violence.

Tr. XII at 127-29.

In this passage, the prosecutor did not even refer to the killing of Fell's mother (or to her co-deceased, Charles Conway), much less insinuate that those murders were the product of malice aforethought. Nor did he (nor could he) assert or intimate that Fell had somehow premeditated years before the killing of Terry King (a perfect stranger). To the contrary, it was argued that King's killing – both the fact and the manner – was so gratuitous (and brutal) that it could only be understood within the logic of Fell's predatory character.

This argument built upon the guilt phase evidence establishing that King was a random victim who had the ultimate misfortune of crossing paths with a latent murderer. It responded directly to Fell's selective mitigation evidence, which was offered to persuade the jury not to impose a death sentence upon a person of Fell's "character."

203

FELL-00001717

In short, the government did not misuse or exploit Cunningham's testimony and Judge Sessions did not abuse his discretion in permitting the jury to hear it. The evidence was clearly relevant to one or more mitigating factors proposed by the defense, and even on appeal Fell does not suggest otherwise. Even if the testimony carried with it some small potential for unfair prejudice, the court correctly concluded the balance tipped in favor of admissibility.

The primary thrust of Fell's long presentation of background and character evidence was that the abuse and abandonment he suffered as a youth had deformed him into a person not fully accountable for his crimes. Much of the evidence of abuse and neglect the jury heard about had been inflicted by Debra Fell (in an attempt, no doubt, to mitigate Fell's moral culpability for her murder). As Judge Sessions observed, in the context of that evidence, the fact that Fell was "extraordinarily angry at his mother" was hardly a surprise.

In short, Fell's penalty phase evidence cast his suffering as a child at the hands of a drunken, violent, neglectful mother who ultimately abandoned him as mitigating evidence. Judged against the backdrop of that defense evidence, the government's countervailing evidence – that as a teen Fell said that he hated his mother and could kill her, or had talked with friends about killing more than one person – was neither explosive nor weighty because such sentiments were still

204

FELL-00001718

arguably consistent with the position that the Donald Fell who murdered three people was the hapless product of a terrible upbringing.

Judge Sessions received extensive briefing on the admissibility of the government's proposed rebuttal evidence. He excluded some of that evidence (and the government withdrew other parts of it) and carefully circumscribed the scope of that which he did admit. His written opinions on the subject, and his colloquy with counsel, unequivocally demonstrate the care with which he balanced factors weighing in favor of and against admissibility. His decision to admit portions of Cunningham's proposed testimony reflected a consumate exercise of discretion.

Finally, even if this Court were to conclude that the admission of Cunningham's testimony was improper, any error was harmless beyond a reasonable doubt. 18 U.S.C. § 3595(c). Uncontested evidence established that Fell's homicidal ideas both preceded his statements to Cunningham (he threatened to kill Kozierski) and post-dated them (his 2000 killings). Taken in context with the defense evidence of Fell's dysfunctional and abusive childhood, proof that Fell hated and "could kill" the mother who abused and abandoned him was not very significant. Nor does talk by neer-do-well teenagers in Wilkes-Barre about killing more than one person change the calculus.

205

FELL-00001719

If the statements had not been admitted, it is highly unlikely the jury would have reached a different penalty phase verdict. The jury found unanimously every statutory and non-statutory aggravating factor with which it was presented, including multiple intentional killings; the killing of King in an especially heinous, cruel or depraved manner that involved serious physical abuse; and the imposition of extreme emotional suffering and severe and irreparable harm on King's family.

By contrast, the mitigating factors found by the jury were relatively "unremarkable." *United States v. Stitt*, 250 F.3d 878 at 898 (improper admission of government rebuttal testimony in capital case harmless error). Evidence of Fell's good adjustment to prison was undermined by testimony and video evidence of his several violent altercations with prison staff. It was undisputed (and found by the jury) that Fell had a wretched childhood. But, as the government pointed out to the jury, many are subjected to severe abuse and neglect in their youths. Fortunately, extraordinarily few do what Donald Fell did – turn into triple-killers. "Considered against the overwhelming force of the aggravating factors found by the jury which showed the violent and predatory nature" of Fell, it is clear beyond a reasonable doubt that the jury would have imposed the death penalty had Cunningham's testimony not been admitted. *Stitt*, 250 F.3d at 899.

206

IX.    REVERSAL IS NOT WARRANTED UNDER THE "CUMULATIVE IMPACT" RULE.

Fell argues that reversal is warranted under the "cumulative error" doctrine. But because the district court did not err or, alternatively, whatever errors did occur were harmless even when viewed in the aggregate, the cumulative error doctrine provides no basis for relief.

This Court has recognized claims that "the cumulative effect of all the district court's trial errors" may violate a defendant's right to a fair trial. *Yousef*, 327 F.3d at 161; *accord United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999). "There is case law to the effect that the cumulative effect of a series of errors may require reversal, even though a single one of those errors, standing alone, would not require such a result." *United States v. Villarreal*, 324 F.3d 319, 328 (5th Cir. 2003)(adding, "[w]e have stressed, however, that a reversal based on the cumulative effect of several alleged errors is a rarity").

Fell fails to establish any prejudicial errors at his trial, so there is nothing to accumulate. As found by the First Circuit dismissing this claim in *Sampson*, "the district court handled the case patiently and sensitively. None of its individual rulings worked any cognizable harm to [the defendant's] rights. It necessarily follows that the cumulative error doctrine finds no foothold in this appeal." 2007

207

FELL-00001721

WL 1393742, * 35.

Even if the district court erred, "the errors, in the aggregate, do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict." *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993). The evidence supporting the verdict is overwhelming, and the district court resolved many procedural and evidentiary issues in a manner favorable to the defense, providing Fell with more protection than the law required in many respects. No accumulation of errors warrants overturning the verdict.

208

FELL-00001722

X.    THE JURY'S CONSIDERATION OF ASSERTEDLY DUPLICATIVE NON-STATUTORY AGGRAVATING FACTORS DID NOT RENDER ITS DEATH SENTENCE UNCONSTITUTIONALLY ARBITRARY.  IN ANY EVENT, THE NON-STATUTORY AGGRAVATORS DID NOT DUPLICATE EACH OTHER.

Fell argues that death sentence was arbitrary because the jury's weighing of aggravating and mitigating factors was skewed by improper consideration of "duplicative" non-statutory aggravating factors.  Fell's argument proceeds in two steps.  First, he invites this Court to join the Tenth Circuit, *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), in holding that if the jury returns a death sentence based upon duplicative aggravating factors, the death sentence must be vacated unless the government can show the error was harmless.  Second, Fell contends that three non-statutory aggravating factors found proven by his jury were duplicative.

Fell is wrong on both counts.  This Court should decline to follow *McCullah* because that decision is inconsistent with Supreme Court precedent – some new, some that was in place before *McCullah* was wrongly decided. Regardless, each non-statutory aggravating factor properly called upon the jury to consider a different, relevant circumstance in making the individualized determination as to whether Fell should be sentenced to death.

209

## A.   STANDARD OF REVIEW

The district court denied Fell's pre-trial claim that the alleged non-statutory aggravating factors were duplicative. This decision is subject to *de novo* review. For the first time on appeal, Fell now argues that the government's penalty phase summation, coupled with the court's jury instructions respecting the non-statutory aggravating factors, translated those aggravators into duplicative circumstances. This argument should thus be review for plain error. There was no error, much less plain error.

## B.   DOUBLE-COUNTING THEORY

Fell's claim hinges on this Court adopting the Tenth Circuit's analysis in *McCullah*. The panel in *McCullah* reversed a death sentence because "the district court erred in submitting duplicative and cumulative aggravating factors to the jury." 76 F.3d at 1111. Specifically, the trial court submitted the following two factors, which "substantially overlapped": the defendant "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in death of the victim" and the defendant "committed the offenses as to which he is charged in the indictment." *Id.* The jury was also instructed to consider two overlapping mental culpability aggravators – first that

210

FELL-00001724

the defendant intended to kill the victim, and second that the defendant intentionally engaged in conduct which he knew created a grave risk of death, and death ensured.   The *McCullah* court concluded that "double counting of aggravating factors, especially under a weighing scheme has a tendency to skew the weighing process and creates the risk that the death penalty will be imposed arbitrarily and thus, unconstitutionally." *Id.* Apparently because the court had already determined that a separate error necessitated a new penalty phase trial, *see id.* at 1102, the court did not attempt to determine whether the duplication was harmless.  The Fourth and Ninth Circuits have expressed their agreement with the Tenth Circuit's conclusion that the submission of duplicative aggravating factors can result in the imposition of an arbitrary death sentence, in violation of the Eighth Amendment, but each concluded that the double-counting was harmless beyond a reasonable doubt under the circumstances. *See United States v. Tipton*, 90 F.3d 861, 899-901 (4th Cir. 1996); *Allen v. Woodford*, 395 F.3d 979, 1012-13 (9th Cir.), *cert denied,* 126 S. Ct. 134 (2005).[55]

---

[55]*McCullah* and *Tipton* were capital prosecutions under the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e).  That law identified as statutory aggravating factors each of the culpable mental states which, under the FDPA, make a defendant potentially death-eligible. In *McCullah,* as in Fell's case, the jury properly found that the defendant's conduct qualified under multiple culpable mental states.  Under the ADAA, the jury was permitted to weigh multiple overlapping mental state aggravators in deciding whether aggravating factors sufficiently outweighed

211

Relying on the Supreme Court's first interpretation of the FDPA in *Jones v.*

*United States*, 527 U.S. 373 (1999), however, the Fifth Circuit has bluntly rejected

this double-counting analysis. *See United States v. Robinson*, 367 F.3d 278 (5th

Cir. 2004). As the unanimous court in *Robinson* put it,

> There is no legal basis for Robinson's claim that two of the
> aggravating factors specified by Congress were used in such a way as
> to be unconstitutionally duplicative. Although our caselaw once
> framed the issue in those terms, the Supreme Court recently
> admonished that it does not support that theory of review. *See Jones
> v. United States*, 527 U.S. 373, 398 (1999). Rejecting the idea that a
> similarity between two factors could make their combined use
> invalid, the Court explained that it had only held that "the weighing
> process may be impermissibly skewed if the sentencing jury considers
> an invalid factor." *Id.* (citing *Stringer v. Black*, 503 U.S. 222, 232
> (1992)).

*Id.* at 292-93. *Robinson* went on to note that neither of the allegedly duplicative

aggravating factors was invalid. *Id.* at 293.

Like *Robinson*, this Court should reject the double-counting theory of

---

mitigating factors so as to warrant a death sentence. Under the FDPA, in contrast, a jury finding that the government has proven one or more of the alleged culpable mental states merely makes the accused death eligible. In deciding whether a death sentence is justified, an FDPA jury weighs only the statutory and non-statutory aggravating factors, not the threshold mental culpability factors. Several Courts have recognized that the FDPA has eliminated the constitutional flaw identified in *McCullah v. Tipton*. *See, e.g., United States v. Beckford*, 968 F. Supp. 1080, 1086 (E.D. Va. 1997); *United States v. Nguyen*, 928 F. Supp. 1525, 1538-41)(D. Kan. 1996).

212

FELL-00001726

review.  The submission of overlapping aggravating factors that are based on the same evidence does not skew the weighing process, particularly where, as here, the jury is instructed, in accordance with federal death penalty law, 18 U.S.C. § 3593(e), that the weighing task is not a mechanical tallying process.  In *Jones*, the Supreme Court was presented with the double-counting theory adopted in *McCullah*, but chose to avoid consideration of the validity of the theory because "the factors as a whole were not duplicative."  527 U.S. at 399.  Nevertheless, the Court went on to note that "any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a conclusion on which number is greater.'" *Id.*

The Supreme Court's recent decision in *Brown v. Sanders*, 126 S. Ct. 884 (2006), which Fell fails to acknowledge, further undermines his double-counting theory.  Sanders had been sentenced to death after his jury found four "special circumstances" – any one of which made him death eligible.  The California Supreme Court struck two of the special circumstances on state law grounds but nonetheless upheld Sanders' sentence.  On habeas review, the Ninth Circuit invalidated the death sentence because it believed the jury's consideration of two invalid special circumstances skewed its deliberations in the direction of death.

213

The Supreme Court reversed the Ninth Circuit and reinstated Sanders' death sentence. The Court held that the submission of an invalid aggravating factor violates the Constitution by "adding an improper element to the aggravation scale in the weighing process" only when "the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id.* at 892. Applying that standard, the Court concluded that the jury's weighing of two invalid factors aggravating factors did not result in a constitutional error because "all of the facts and circumstances admissible to establish [the two invalid aggravators] were also properly adduced as aggravating facts bearing upon [one or more other, valid] sentencing factor." *Id.* at 894.[56]

*Sanders* forecloses Fell's double-counting claim. Even if this Court were to agree that there was overlap among the non-statutory aggravating factors submitted to Fell's jury, that would not have impermissibly skewed its deliberations. As in *Sanders*, all of the evidence the government introduced to establish its case in aggravation would have been admissible even if one or more of the allegedly duplicative non-statutory aggravating factors had been stricken.

---

[56] Although California is a weighing state (126 S. Ct. at 893) and the FDPA seems to establish a weighing scheme, the *Sanders* court constructed a single rule for assessing invalidated sentencing factors. *Id.* at 892.

214

FELL-00001728

Thus, the Court found no error not merely despite the submission of duplicative aggravating factors, but because one aggravating circumstance "necessarily subsume[d]" two others.

## C.    AGGRAVATING FACTORS IN THIS CASE

Even if this Court were to adopt the double-counting theory of review, it should reject Fell's claim that the three non-statutory aggravating factors were duplicative.  The first non-statutory aggravating factor focused on Fell's motive for abducting Mrs. King:  "Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder."  The second factor addressed Fell's motive for killing Mrs. King:  "Donald Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking."  The third non-statutory aggravator concerned Fell's planning about the carjacking that led to Mrs. King's murder:  "Donald Fell participated in the murder of King after substantial premeditation to commit the crime if carjacking."  To be sure, these aggravators were factually interrelated, but each factor focused upon a different aspect of moral culpability. There was no real risk that the jury saw these as duplicate factors.

215

FELL-00001729

Prior to trial, the defense challenged the non-statutory aggravating factors, relying on this double-counting theory. The district court acknowledged the double-counting issue, but concluded that each non-statutory aggravating circumstance addressed a different fact. 372 F. Supp. 2d 753, 763-65, A at 99-111.

On appeal, Fell is not clear about whether he challenges the duplicity of the aggravating factors themselves, or whether his claim turns on what argument the government advanced to the jury in support of the non-statutory aggravating factors. To the extent that Fell is basing his challenge on the face of the allegations themselves, his claim is frivolous. No allegation subsumed another.

Rather, Fell places heavy reliance on the Ninth Circuit's analysis in *Allen v. Woodford*, 395 F.3d at 1012-13, that even where aggravating factors potentially address different facts, the trial court instructions and the prosecutor's arguments can force the jury to understand that the factors actually subsume each other. Fell has made no such showing here. To the contrary, the government's closing argument addressing the aggravating factors mirrored the precise terms of the written allegations, and the court's instructions did nothing to undercut the plain meaning of those allegations.

216

FELL-00001730

Fell acknowledges that the first factor addressed his motive in abducting Terry King, but then mistakenly claims that "the second addresses the same motive." Appellant's Brief at 185. This is wrong, as the prosecutor's closing argument demonstrates:

> So let's move on to the [second] nonstatutory aggravating factor. It reads, Donald Fell participated in the murder of Terry King to prevent her from reporting the kidnapping and carjacking to authorities. Again, absolutely no question about it. Alongside Route 22 in Dover, New York, Donald Fell made the decision to kill Terry King because she was a witness.

A at 468-69. The government clearly distinguished between the motive for the abduction and the motive for the murder of Mrs. King. The two events were separated by several hours in time and involved different moral calculations by the defendant. The government noted in its opening statement in the penalty phase that the two motives were related – Fell did not want to get caught – but that hardly means that the factors were duplicative. Fell unsuccessfully tries to transform two related facts into the same facts. None of the doubling-counting theory case law supports the notion that the jury's consideration of related, but logically distinct, aggravating factors unconstitutionally skews the balancing process.[57]

---

[57] Fell mistakenly contends in a footnote that "[t]o the extent that the second nonstatutory aggravating factor retains any identity beyond the first onstatutory

217

Addressing the first and third factors, Fell claims that they are duplicative because they both "address[] the motive for the abduction." Appellant's Brief at 185. Again, this is just wrong. The first non-statutory aggravating factor focused on the *reason* for the abduction, while the third related to the *substantial planning* for the carjacking. Discussing the first factor in closing, the prosecutor noted that it addressed the reason for abducting Mrs. King "to facilitate his escape from the area." A at 467. In contrast, the prosecutor noted that the third factor focused on the amount of planning for the carjacking.

> You remember that they showered, they packed, they took the shotgun. What did they do with the shotgun, ladies and gentlemen?
>
> You remember the testimony of Anthony Mistretta. He was working in the Wal-Mart at the same plaza were the Price Chopper was. He told you that two young men came into the Wal-Mart that night, they had wet hair and dry clothes. Who was that, ladies and gentlemen? That was Donald Fell and Robert Lee. What did they do? They asked for shotgun shells for what you know, ladies and gentleman was the shotgun that they had. That, ladies and gentlemen, along with everything else you have heard, is substantial premeditation.
>
> . . .

---

aggravator, it is that Mrs. King was killed in the course of a kidnapping, which is subsumed in the (c)(1) statutory aggravator." Appellant's Brief at 185 n. 88. To the contrary, the jury properly considered the motive for killing Mrs. King as a separate aggravating circumstance from the simple fact that the killing took place during the commission of another offense, here kidnapping.

218

> They went to the Price Chopper, and they waited behind the Price Chopper, and what did they wait for? They waited for the person that they wanted to kidnap, that they thought that they could. They saw Mr. Trapasso.
>
> . . .
>
> One of them walked towards him. They were thinking about doing what they did to Terry King to Mr. Trapasso. But he was a man. He had something in his hand that they thought they might get caught. Again, more premeditation, ladies and gentlemen. In fact, in this case, Donald Fell himself told you how careful they were in picking out Terry King as their perfect chance.

A at 469-71. Granted, the reason for doing something can may bear some relationship to the amount of planning necessary to accomplish the task. But the fact remains that the two concepts are different – one looks back on what happened before for the reason for a decision, and the other addresses the amount of effort needed to carry out what has been decided. The jury properly could consider as independent reasons for imposing the death penalty the reason Fell abducted Mrs. King and the amount of planning he engaged in for the abduction.

The function of the non-statutory aggravating factors under the FDPA is to provide relevant information about the defendant to the capital sentencer – so that the sentencing decision is as nuanced and individualized as possible under the circumstances. *See, e.g., United States v. Allen*, 247 F.3d 741, 757-58 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); *United States v. Frank*, 8

219

FELL-00001733

F. Supp. 2d 253, 267-70 (S.D.N.Y. 1998); *United States v. Kaczynski*, 1997 WL 716487 at \*5 (E.D. Cal., Nov. 7, 1987).  Once the jury unanimously finds that at least one mental culpability factor and at least one statutory aggravating circumstance have been proven beyond reasonable doubt, the focus of the trial appropriately shifts to the task of providing the jury with all possible relevant evidence to assist it in tailoring its verdict to the individual defendant.  The non-statutory aggravating factors submitted to Fell's jury each focused upon a different aspect of his moral culpability for the death of Terry King, and each was properly considered by that body as it strove to arrive at an "individualized" sentence. *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

D.    HARMLESS ERROR

To the extent the Court finds substantial overlap among the non-statutory aggravating factors, the Court should decline to vacate the sentence because any error was harmless beyond a reasonable doubt.  The Fourth Circuit in *Tipton*, 90 F.3d at 899-900, found two potential ways that duplicate aggravators could prejudice a defendant:

> first, by causing the jury to assess the weight of the [duplicate] circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor . . . ; second, by allowing the jury to find a more morally culpable circumstance than was supported by the

220

sentencing information, including the guilt-phase evidence, that was before it.

*Id.* The *Tipton* court went on to examine the jury instructions and the evidentiary support for each of the duplicate aggravators. The court discounted any chance that the jury gave greater weight to these overlapping circumstances than it would have to the most severe. "We are bolstered in this conviction by the district court's careful instructions which emphasized both the impropriety of quantitative weighing of factors and the overlapping "lesser-included" relationship between the [duplicate] circumstances it allowed the jury to find." *Id.* at 900. Nor did the court find "any possibility" that the duplicate aggravators "permitted the finding of a higher degree of culpability that was supported by the evidence."

Similarly, here Judge Sessions carefully instructed the jury about the qualitative aspects of the weighing process.

> The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone if you find no mitigating factors, is by no means a mechanical process. In other words, you should not simply count the total number of aggravating and mitigating factors and reach a decision based on which number is greater; rather you should consider the weight and value of each factor. . . .

> The law contemplates that different factors may be given different weight or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors

221

proven, do not, standing along, justify the imposition of a sentence of death beyond a reasonable doubt.

A at 555-56. The jury here obviously exercised its duties diligently, as evidenced by its careful verdict. It is clear that any overlap did not taint the weighing process. Just as in *Jones*, 527 U.S. at 399-400, "any risk that the weighing process would be skewed was eliminated by the District Court's instruction."

Moreover, even if there was overlap among the non-statutory aggravators there were distinctions that allowed consideration of different circumstances the jury could legitimately consider. For example, it was appropriate for the jury to consider both the reason Fell abducted Mrs. King and the substantial planning for the carjacking. Even if these circumstances should have been included in one allegation, the government could argue and the jury could consider these distinct aspects of Fell's conduct in assessing the appropriate penalty. As in *Tipton*, there was no chance the allegations and the instructions permitted the jury to find a higher degree of culpability than was supported by the evidence. Any conceivable error was harmless beyond a reasonable doubt.

222

FELL-00001736

## XI.   THE INDICTMENT DID NOT RUN AFOUL OF THE FIFTH AMENDMENT BY FAILING TO ALLEGE THE NON-STATUTORY AGGRAVATING FACTORS.

Fell attacks the sufficiency of the capital indictment, claiming the Fifth Amendment's indictment clause prohibits a trial jury from considering non-statutory aggravating factors that have not first been alleged by a grand jury. The Court should reject this interpretation of the Indictment Clause.

Fell acknowledges that every federal appeals court to have addressed the issue has rejected his argument. The courts of appeals have uniformly held that, while an indictment under the FDPA must allege at least one statutory aggravating factor, it need not allege any non-statutory aggravating factors. *See United States v. Brown*, 441 F.3d at 1336; *United States v. Purkey*, 428 F.3d at 749-50; *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005); *cert. denied,* 126 S. Ct. 2020 (2006); *United States v. Higgs*, 353 F.3d at 298-99. The rationale of these decisions is that "a non-statutory aggravating factor is not one of those 'facts legally essential to the punishment' that must be included within the indictment." *Brown*, 441 F.3d at 1368. Put simply, the non-statutory aggravating factors are not eligibility findings; rather, they are death-selection factors – circumstances the jury can weigh in deciding the appropriate penalty.

223

Fell argues that, despite this uniform body of law, the courts of appeals have all got it wrong, as demonstrated by the Supreme Court's decision this term in *Cunningham v. California*, 127 S. Ct. 856 (2007). In *Cunningham*, the Court considered the constitutionality of California's determinate sentencing regime. That law prescribed three determinate sentences for a sexual assault conviction: 6 years, 12 years or 16 years. The Court considered whether the Sixth Amendment required a jury finding beyond reasonable doubt for facts that triggered eligibility for the 16 year sentence. The Court reviewed and relied on its line of cases addressing the jury-trial guarantee, from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), through *United States v. Booker*, 543 U.S. 220 (2005). Under these precedents, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by a defendant." 127 S. Ct. at 860. The California scheme violated this requirement. Based upon the jury's verdict, the statute obligated the judge to impose a 12-year term on Cunningham. The 16-year sentence actually meted out was based on additional facts found by the court, not the jury. The majority in *Cunningham* believed that *Apprendi-Booker* prohibited the sentencing judge making factual findings of her own to increase the sentence beyond the 12-year statutory

224

maximum authorized by the jury verdict.

Fell maintains "[t]he statutory scheme invalidated in *Cunningham* is indistinguishable from the FDPA fact-finding and weighing procedures". Appellant's Brief at 189. With respect, we believe this Court will have no great difficulty in concluding the FDPA differs in magnitudes from California's determinate sentencing law. Under the FDPA, the jury must make a series of determinations before an accused can be considered eligible for the death penalty. First, the jury must convict the defendant of a crime for which Congress has authorized imposition of the death penalty. Second, the jury must find the defendant committed the homicide with one or more of the requisite gatekeeping mental states. (It must also find the defendant was over 18 years old.) Third, the jury must find at least one statutory aggravating factor. Once these decisions are made, the jury has the power to impose the death penalty – the maximum sentence is then death. Of course, the federal scheme contemplates the jury weighing aggravating factors against mitigation factors. Moreover, federal law requires the jury to consider only those aggravating factors it found proven beyond reasonable doubt, but these aspects of federal law are not mandated by the jury-trial right developed in *Apprendi* and its progeny.

225

Fell's argument goes far beyond even the most extravagant reading of the Court's Sixth Amendment jurisprudence. If Fell's reading of precedent were correct, *any* fact that influences a sentencing decisionmaker's weighing of aggravating and mitigating facts – in other words, virtually every fact about every defendant facing sentencing in every courtroom around this country – would have to be alleged in the indictment (and found by a jury beyond a reasonable doubt). This simply is not the state of the law. The Supreme Court has repeatedly limited its jury-right holdings to facts which increase the statutory maximum sentence an accused faces, and those decisions are not applicable to facts that might be relevant to the appropriate sentence within the maximum range.

Indeed, the Supreme Court has never held that the Constitution requires a jury, as opposed to a judge, to perform the balancing in a death penalty case.

> What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring v. Arizona*, 536 U.S. at 612 (Scalia, J., concurring).

226

FELL-00001740

*Cunningham* does nothing other than define the statutory maximum under California law. Because Fell has not – and cannot – show that the non-statutory aggravating factors increased the statutory maximum sentence he faced, his Fifth Amendment objection fails.

Even if it were constitutional error to omit the non-statutory aggravating factors from Fell's indictment, however, such error would be harmless beyond a reasonable doubt here. Fell had written notice of the non-statutory aggravating factors. The jury here found each of the four non-statutory aggravators had been proven beyond reasonable doubt. The evidence overwhelmingly showed there existed probable cause to charge Fell with these aggravating factors. As alternative holdings, other courts have found harmless any putative error in an indictment's failure to allege aggravating factors. *See Brown*, 441 F.3d at 1368 (non-statutory aggravating factors not alleged in indictment); *United States v. Allen*, 406 F.3d 940, 945 (8th Cir. 2005)(en banc), *cert. denied*, 127 S. Ct. 826 (2006)(statutory aggravating factors not alleged in indictment): *United States v. Robinson*, 367 F.3d at 288-89 (same).

227

FELL-00001741

XII.   THE FEDERAL DEATH PENALTY ACT IS NOT UNCONSTI-
TUTIONAL BECAUSE IT ALLOWS THE PROSECUTION TO
INTRODUCE, DURING THE PUNISHMENT HEARING, EVIDENCE
THAT IS RELEVANT TO AGGRAVATING FACTORS BUT WHICH
MAY BE IRRELEVANT TO DEATH ELIGIBILITY.

Fell's final challenge to his death sentence is almost his shortest; certainly,

it enjoys the least support in existing caselaw.  He argues that despite the

bifurcated guilt/sentencing procedure Congress crafted in enacting the FDPA, the

statute nonetheless violates his Fifth and Sixth Amendment rights because it

permits the prosecution to introduce potentially prejudicial aggravating evidence

that may be irrelevant to the jury's threshold task of determining whether a

defendant is death-eligible.  As Fell himself acknowledges, no court seems to have

addressed this novel issue.

Fell's two-stage trial conformed to the format prescribed by the FDPA.  The

first or guilt phase called upon the jury to find whether Fell was guilty of

kidnapping and/or carjacking, the two charged crimes for which Congress has

authorized a sentence of death.  Following its return of guilty verdicts, the jury

turned to the question of punishment.

During this penalty phase trial, the jury first had to decide whether the

government had proven beyond reasonable doubt that Fell was eligible for the

228

FELL-00001742

death penalty (*i.e.*, that he was 18 years old at the time of the killings; that he possessed one or more of the requisite culpable mental states; and the existence of at least one statutory aggravating factor). Once the jury unanimously agreed that Fell was death-eligible, it proceeded to the ultimate deliberation about whether all aggravating factors sufficiently outweighed all mitigators so as to justify a death sentence. Fell maintains that his right to due process and a jury trial were abridged because the FDPA permits the jury to hear aggravating evidence (most particularly victim impact testimony) – which may be irrelevant to the death-eligibility determination – before the jury actually decides whether the threshold eligibility factors have been proven. This cart-before-the-horse order of proof, in Fell's estimation, undermines the presumption that a defendant is innocent of a capital crime until he is proven guilty by relevant evidence.

In the earlier appeal in this case, this Court roundly rejected the claim that the FDPA ran afoul of the Constitution because it authorized use of a relaxed evidentiary standard during the penalty trial. *United States v. Fell*, 360 F.3d at 143-46. Two other courts of appeals have reached the same conclusion. *See United States v. Fulks*, 454 F.3d at 438; *United States v. Lee*, 374 F.3d at 648. Although Fell is right that none of these cases directly addressed the claim he now advances, it is equally clear that none seemed to perceive the constitutional flaw

229

FELL-00001743

he now discerns. *See e.g.*, *Fell*, 360 F.3d at 140-41; 143-45 (discussing bifurcated trial requirement and relaxed evidentiary standard).

Because Fell apparently has found no cases which squarely (or even obliquely) buttress his constitutional argument, he has crafted it out of whole cloth – and first principles. Citing scarcely more authority than Justice Scalia's concurring opinion in *Ring v. Arizona* – the case in which the Court construed the Sixth Amendment as requiring a jury to find proven beyond reasonable doubt all facts that make a defendant eligible for the death penalty – Fell argues the Constitution requires a death penalty scheme that bifurcates not just the guilt determination on the underlying offense from the remaining penalty issues, but which separates the hearing on all death eligibility factors from the trial on other issues (non-statutory aggravating factors and mitigation).

*Ring* does not sweep this far, nor does any other precedent. *Ring*, like every *Apprendi* decision, addresses when the jury is required to make certain findings beyond a reasonable doubt. There, the Court held that Arizona law impermissibly allowed a judge to make a finding critical to eligibility for the death penalty. The Court's holding does not even attempt to prescribe the trial process.

230

FELL-00001744

Apart from the dearth of authority it enjoys, Fell's argument conflicts with the logic of this Court's decision in his earlier appeal. This Court recognized that a defendant has no right to have the government's proof concerning eligibility factors limited by the Federal Rules of Evidence. Congress has the power to decree that the jury shall consider these eligibility factors under the same evidentiary standards as applies to other relevant sentencing facts. By extension, Congress should have the power to order the jury to consider these facts during one unitary proceeding. Just as a defendant is not protected by the Federal Rules of Evidence with regard to eligibility factors, he should not be protected from the jury hearing, in a single proceeding, all evidence relevant to the question of punishment.

Fell's argument is rooted in a presumption that a jury cannot make findings based on relevant evidence. For example, the Fell jury heard testimony in the penalty phase relating to the "heinous, cruel, or depraved" statutory aggravating factor, and also heard mitigating evidence about his difficult childhood. Fell assumes that, in their minds, jurors could not separate the evidence bearing upon one factor from evidence relevant only to another. This assumption runs contrary to the Supreme Court's belief that, even in federal death penalty trials, juries are presumed to follow the court's instructions. *See Jones v. United States*, 527 U.S.

231

FELL-00001745

at 394.

As this case illustrates, the evidence relating to the eligibility factors is often easily distinguished from the death-selection proof. At Fell's trial, there was no real dispute about what happened during the murders of Terry King, Debra Fell and Charles Conway. The gatekeeping intent facts were easily established; indeed, they were admitted by Fell in his multiple confessions. Of the three statutory aggravating factors, two were undisputed, and the third (the heinous, cruel or depraved allegation) focused on the physical abuse inflicted upon Mrs. King, the medical and forensic proof of which was overwhelming. The jury could easily separate the distinct evidence relating to other aggravating factors and the mitigating factors. Moreover, in light of the uncontested nature of the evidence respecting the eligibility factors, Fell cannot seriously argue that death-selection evidence – victim impact testimony, for example – created any risk that the jury's consideration of the eligibility factors was tainted.

Finally, Fell complains about the absence of a procedure he failed to request. Some district courts have allowed the bifurcation of the penalty phase to address the concerns Fell points to here. *See, e.g., United States v. Henderson*, 2007 WL 1321722 * 37 (S.D. Ohio, May 4, 2007). The FDPA provides district courts with the flexibility to conduct sentencing hearings with procedures deemed

232

FELL-00001746

fair based on individual circumstances. Fell did not seek such an accommodation here – probably because it made little sense. His complaint about the rigidity of the FDPA should be rejected.

XIII.  CONCLUSION.

The judgment of the district court should be affirmed.

> Respectfully submitted,
> THOMAS D. ANDERSON
> United States Attorney
>
> WILLIAM B. DARROW
> GREGORY L. WAPLES
> PAUL J. VAN DE GRAAF
> Assistant U.S. Attorneys
> P.O. Box 570
> Burlington, VT 05402-0570
>
> THOMAS BOOTH
> Attorney, Appellate Section
> Criminal Division
> U.S. Department of Justice
> 950 Pennsylvania Ave., NW, Rm. 1264
> Washington, DC 20530

233

FELL-00001747

## VIRUS PROTECTION CERTIFICATE

This .pdf file has been scanned for potential viruses using Trend Micro

Office Scan. United States Attorney's Office documents are scanned as written to

disk by Trend Micro Office Scan. When transmitted outside of the Department of

Justice, attachments are scanned by Trend Micro Virus Wall.

Dated at Burlington, in the District of Vermont, this 25th day of May, 2007.

Respectfully submitted,

UNITED STATES OF AMERICA

THOMAS D. ANDERSON
United States Attorney

WILLIAM B. DARROW
Assistant U.S. Attorney
P.O. Box 570
Burlington VT 05402-0570

FELL-00001748

These principles also apply in a capital case. *Dawson,* 503 U.S. at 163-68. In *Barclay,* the defendant's racist views showed his motive to murder a victim of a different race, and was thus relevant to the statutory aggravating factors that the crime posed a "great risk of death to many persons" and was "especially cruel, atrocious, and heinous." 463 U.S. at 949-50 & n.7. *See also Fuller v. Johnson,* 114 F.3d 491, 497-98 (5th Cir. 1997) (future dangerousness); *O'Neal v. Delo,* 44 F.3d 655, 661 (8th Cir. 1995) (motive). On the other hand, in *Dawson,* evidence of the defendant's membership in a racist prison gang was deemed not relevant because his crime was unrelated to race, the government did not link his beliefs to his future dangerousness and, under the circumstances, did not rebut his mitigation evidence. 503 U.S. at 164-68.

A defendant who charges that the government infringed on his religious beliefs has the threshold burden of showing those beliefs are sincerely held and are, in fact, religious in nature. *See, e.g., Ford v. McGinnis,* 352 F.3d 582, 588-89 (2d Cir. 2003); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir. 1999); *Searles v. Dechant,* 393 F.3d 1126, 1131 (10th Cir. 2004); *Goff v. Graves,* 362 F.3d 543, 547 (8th Cir. 2004). The sincerity requirement serves to distinguish a belief rooted in the individual's conscience from a belief motivated by fraud and deceit. *Ford,* 352 F.3d at 588; *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984).

167

(1)    Fell's Interest In Satanism Was Properly Admitted To Show Motive

Fell's motive was an issue in the case. He participated in three savage and gratuitous killings. His brutal slaying of King was incomprehensible. The "multiple killings" and the "heinous, cruel and depraved manner" statutory aggravators made Fell's motive relevant to sentencing. *See Barclay*, 463 U.S. at 949-50. At the time of the killings, Fell had Satanic images on his body and on his clothes -- he had an "anarchy" tattoo on one arm and an inverted cross and "666" tattoo on the other; he also wore a "SLAYER" T-shirt with a large demonic image. The number "666" refers to the "mark of the beast" in the New Testament, Book of Revelation, 13:17-18, and is often a symbol of the Antichrist. *See United States v. Gordon*, 974 F.2d 1110, 1114 (9th Cir. 1992). "Slayer" is a heavy metal band. *See* www.myspace.com/slayer and www.slayerized.com. (last visited May 2, 2007). The heavy metal music culture trades in violent and Satanic imagery. *See, e.g., People v. Williams*, 148 P. 3d 47, 60-61 (Cal. 2006); *State v. Bennett*, 81 P. 3d 1, 4-5 (Nev. 2003); *State v. Crumb*, 704 A.2d 952, 965 (N.J. Super. 1997) An expert has observed that a Satanist believes he can "murder, rape or rob at will without regard for the moral or legal consequences" and that "life should be lived according to individual desires without regard for conscience." *See McCorkle v.*

168

*Johnson*, 881 F.2d 993, 995 (11th Cir. 1989).

The government permissibly presented evidence that Fell's interest in Satanism began when he was 15 or 16 years old to show that he had developed a deep and longstanding hatred toward society's mores and values – an attitude that helped explain the savagery of his killings. Fell's attitude was visible during the killings: he wore a demonic image on his "SLAYER" T-shirt and a satanic tattoo on his arm. Fell did not dispute that he had a longterm interest in Satanism. Indeed, he specifically linked the tattoos with his teenage interest in heavy metal music. The evidence that Fell's interest in Satanism corresponded to the development of his deep hostility toward the world was hardly surprising in light of mitigation evidence portraying him as the victim of a severely dysfunctional childhood and upbringing.[45]

---

[45] Fell's reliance (Appellant's Brief at 135) on *Dawson* is misplaced for two reasons. First, in *Dawson*, the government could not link the defendant's racists beliefs to the murder because the defendant and the victim were of the same race. 503 U.S. at 166. Here, in direct contrast, Fell's obsessive interest in Satanism was vividly displayed on his body and his clothes during the crime. Second, *Dawson* preserved his claim for review. Fell did not; indeed, Fell himself sought to demonstrate to the jury that his infatuation with Satanism and heavy metal music was longstanding.

169

FELL-00001751

# EXHIBIT 141

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

| Albany - Main Office | Syracuse - Branch Office | Burlington - Branch Office |
|---|---|---|
| 39 North Pearl Street | 4 Clinton Exchange | P.O. Box 1112 |
| 5TH FLOOR | 3RD FLOOR | BURLINGTON, VT 05402-1112 |
| ALBANY, NY 12207 | SYRACUSE, NY 13202 | (802)862-6990 |
| (518) 436-1850 | (315) 701-0080 | (802)862-7836 FAX |
| (518) 436-1780 FAX | (315) 701-0081 FAX | |

Respond to Albany Office

April 21, 2005

Attn:  Records Department
Victims Resource Center
85 S. Main Street
Wilkes Barre, PA 18701

Re: records request

Dear Records Officer:

The Federal Public Defender Office is representing Mr. Donald Fell in a pending Federal criminal case.  The Office of the Federal Public Defender requests any and all records of Mr.  Fell, including but not limited to: notes; evaluations; counseling; in-patient and out-patient records; psychological reports; psychiatric reports, emergency room intake sheets, x-ray results, doctor's notes, nurse's notes, intake sheets and discharge sheets.

Enclosed you will find an Authorization for Release of Information signed by Mr. Fell, authorizing the Federal Defender Office access to these records.   Since we are Federal agency we can not pre-pay *any* bills for record requests.   If you could please forward a bill with the records a check will be sent quickly and promptly.   If you have any questions, please do not hesitate in calling our office at the above referenced number.   I thank you for your time and consideration in this matter and I eagerly await your reply.

Sincerely,


Wanda I. Rivera
Investigator

FELL-00001752

# EXHIBIT 142





www.vrcnepa.org

1.866.206.9050 Hotline

570.823.0766 Office
570.823.9115 Fax
support@vrcnepa.org Email

85 South Main Street
Wilkes-Barre, PA 18701
570.823.0765 Hotline

119 Warren Street
Tunkhannock, PA 18657
570.836.5544 Hotline

616 North Street
Jim Thorpe, PA 18229
570.325.9641 Hotline

May 4, 2005

Andrew Bartnick, Investigator
Office of the Federal Public Defender
110 Cherry Street, 2nd Floor
Burlington, Vermont 05401

Re: Donald Fell

Dear Mr. Bartnick

As per your request and with Mr. Fell's permission to release his records while he was a client at Victims Resource Center, the copy of Mr. Fell's records are enclosed.

If I can be of any further assistance, please do not hesitate to call or write.

Sincerely,

Tammi Burke
Counselor/Advocate
Supervisor Client Services

M1455

FELL-00001753

# EXHIBIT 143

H511.341  REV 3-79
(H 18 320.6)

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF HEALTH**
**DIVISION OF SCHOOL HEALTH**

## SCHOOL HEALTH RECORD

| NAME  LAST, FIRST, MIDDLE | BIRTH DATE MONTH, DAY, YEAR | SEX: |
|---|---|---|
| Fell, Donald Robert II | 4-30-80 | ☑ MALE  ☐ FEMALE |

HOME ADDRESS  REDACTED - FELL      HOME ADDRESS
HOME ADDRESS                         HOME ADDRESS

| | SCHOOL | DISTRICT | COUNTY |
|---|---|---|---|
| 1. | Schuylkill ave | Wyoming Valley West | Luzerne |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

SCH YR. | 85/86 86/87
GRADE | K 1
ROOM OR
SECTION

**SPECIAL HEALTH PROBLEMS**

FATHER'S NAME  LAST, FIRST, MIDDLE

Fell, Donald R.

MOTHER'S NAME  LAST, FIRST, MAIDEN

Fell Debbie Katter

PERSON WITH WHOM PUPIL LIVES (IF OTHER THAN PARENT)

### IMMUNIZATIONS AND TESTS

| | DATE INITIAL SERIES COMPLETED | BOOSTERS AND DATES | | |
|---|---|---|---|---|
| DIPHTHERIA | 7/11/80 | 12/8/81 | 9/17/84 | |
| TETANUS | 10/3/80 | | | |
| PERTUSSIS | | | | |

POLIO  1/4/80, 2/20/81, 4/28/81, 4/30/82

MEASLES VACCINE – TYPE _____ DATE 8/28/81 OR HAD MEASLES YEAR _____
GERMAN MEASLES VACCINE   DATE 8/28/81   MUMPS VACCINE   DATE 8/28/81

| | DATE | RESULT | DATE | RESULT | DATE | RESULT |
|---|---|---|---|---|---|---|
| TUBERCULIN TESTS | 10-27-83 | neg. | 8-16-85 | neg. | 10-28-86 | neg. |
| CHEST X-RAYS | | | | | | |

**HOME AND FAMILY CONDITIONS, FAMILY MEDICAL HISTORY, PARENT CONCERNS:**

**CONFIDENTIAL INFORMATION ON FILE AT:**

FELL-00001754

PAGE 2

PAGE 3

EXAMINATION I. GIVE SIGNIFICANT DETAILS OF CHILD'S MEDICAL HISTORY INCLUDING SERIOUS ILLNESS, CHILDHOOD DISEASES, OPERATIONS, ACCIDENTS, HANDICAPPING CONDITIONS (CONGENITAL OR ACQUIRED), ETC. NOTE SIGNIFICANT FACTORS RE SCHOOL ADJUSTMENT GROUP PLAY, PHYSICAL, SOCIAL, OR EMOTIONAL ABNORMALITY

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | 8/28/85 | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

DID PARENTS ATTEND  YES ☐  NO ☐

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

Physical by private doctor - negative

_____ SIGNATURE OF EXAMINER _____

EXAMINATION II.  INTERVAL HISTORY·  SUMMARIZE MEDICAL HISTORY AND NOTE SCHOOL PROGRESS, INTEREST IN GROUP AND EXTRA-CURRICULAR ACTIVITIES, GROUP GROWTH AND DEVELOPMENT.

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

_____ SIGNATURE OF EXAMINER _____

EXAMINATION III.  INTERVAL HISTORY·  SUMMARIZE MEDICAL HISTORY, NOTE SCHOOL PROGRESS, INTEREST IN GROUP AND EXTRA-CURRICULAR ACTIVITIES, STAGE OF ADOLESCENT GROWTH AND DEVELOPMENT

| | DATE | GENERAL NUTRITION | SKIN | EYES | EARS | NOSE & THROAT | TEETH & GINGIVA | GLANDS | HEART | PULSE | BLOOD PRESSURE | LUNGS | ABDOMEN | GENITALIA (MALE) | NEURO-MUSCULAR SYSTEM | SKELETAL | EMO-TIONAL STATUS | ALL OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORMAL | | | | | | | | | | | | | | | | | | |
| ABNORMAL | | | | | | | | | | | | | | | | | | |

EXPLAIN FINDINGS AND NOTE RECOMMENDATIONS

_____ SIGNATURE OF EXAMINER _____

## PROGRESS NOTES

NOTES: INCLUDE CONFERENCES WITH TEACHER, ADMINISTRATOR, PARENT, AGENCY, PERSONNEL, FAMILY PHYSICIAN, DENTIST AND OTHERS. INCLUDE REPORTS OF SPECIAL EXAMINATIONS.

| DATE | | NAME |
|---|---|---|
| | | |

FELL-00001755

PAGE 4

Fell, Donald

## VISION SCREENING

| DATE OF EXAM. | SNELLEN | | WITH PLUS LENS | | OTHER DISORDER | REPORT OF EYE EXAMINER | CORRECTED VISION | |
|---|---|---|---|---|---|---|---|---|
| | Visual Acuity | | P | F | | | Right | Left |
| | Right | Left | | | | | | |
| 8/5/86 | 30 | 30 | | | | | | |
| 8/6/87 | 30 | 30 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## HEARING SCREENING

PASS – INDICATE SCREENING LEVEL IN DB FOR EACH FREQUENCY
FAIL – INDICATE THRESHOLD LEVEL IN DB FOR EACH FREQUENCY

| DATE OF EXAM. | GRADE | TESTER | RIGHT EAR | | | | | | LEFT EAR | | | | | | Pass (P) Or Fail (F) | Wearing Hearing Aid | Date Report Received From Ear Examiner |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 250 | 500 | 1000 | 2000 | 4000 | 8000 | 250 | 500 | 1000 | 2000 | 4000 | 8000 | | | |
| 8/1/86 | K | RSS | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | P | | |
| 8/7/87 | 1 | JCS | 25 | | | | →| | 25 | | | | →| | P | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

## ANNUAL HEIGHT AND WEIGHT

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | 8/5/86 | 8/6/87 | | | | | | | | | | | |
| HEIGHT | 44½ | 45½ | | | | | | | | | | | |
| WEIGHT | 43 | 48 | | | | | | | | | | | |

FELL-00001756

# EXHIBIT 144

# INTENTIONALLY LEFT BLANK

FELL-00001757 - FELL00001790

# EXHIBIT 145

FELL, DONALD [illegible]
383700
824-5942
REDACTED - FELL
WILKES BARRE
COO
PA M S

**WILKES-BARRE GENERAL HOSPITAL**

**PROGRESS RECORD**

02
2 dictated
3 [illegible]
9-21C

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Voiding etc.)

| DATE | |
|---|---|
| | Admission Psychiatric |
| 6/7/93 | 13 y/o S W ♂ admitted (vol) for Truant behavior, depression & symptoms of ADHD. |
| | cc "I'm here because she (mom) don't want me around" |
| | HPI This is the 4th psych admission (3rd WBGH) 1st at FHWV (1991) for depression, Truancy, & S&S of ADHD. Pt [illegible] stopped meds x 3-5 days Mellaril 15 mg/day "it helped [illegible] took it". Has been not taking care of self [illegible] poor hygiene, [illegible] truancy [illegible] OP Pt [illegible] at CSC. Pt admits (+) ETOH, pot [illegible]. No current med probs or allergies. [illegible] |
| | [illegible] |
| | MSE Pt is quiet, almost non verbal, appears depressed, tearful, [illegible] for admission, [illegible] Denies [illegible] psychotic symptoms. O x 4 Memory intact. [illegible] judgment [illegible] very poor, impulse controls very poor. Pt [illegible] all problems including ETOH, & THC use. Denies [illegible] |
| | Dx: I Depression D. NOS, ADHD II [illegible] |
| | Rx. [illegible] individual, group [illegible] PRN [illegible] Routine [illegible] Med/Ped clearance. [illegible] |
| | (dictated 11:44AM 6/7/93) [signature] |

FELL-00001791

FELL, DORAL J
3*75499
C1-0-03 C935F    13Y    383700    013380
321-5842

REDACTED - FELL

WILKES BARRE

000

PA M S

WILKES-BARRE GENERAL HOSPITAL

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Postpere please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Deserbuloe, Tubal tied.)

| DATE | |
|---|---|
| 6/8/93 | *[handwritten clinical notes, largely illegible]* |
| 6/9/93 | *[handwritten clinical notes, largely illegible]* |

FELL-00001792

FELL, DONALD
3875499
C10691 0936P    383700
FF CONFK   IA    13Y 043080
                824-5842

REDACTED - FELL

WILKES-BARRE    PA M S

CCO

WILKES-BARRE GENERAL HOSPITAL

## PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipple, Phlebitis, Sutures removed, hemorrhoids, Tampons etc.)

| DATE | |
|------|--|
| 6/10/9? | _[handwritten progress note, largely illegible]_ |
| 6/11/?? | _[handwritten progress note, largely illegible]_ |
| 6/12 | _[handwritten progress note, largely illegible]_ |

WILKES-BARRE GENERAL HOSPITAL

FELL, DONALD
7975499
C: 9795 0936?    383700
13Y  043080
H SSNER, JI        824-5842

REDACTED - FELL

WILKES BARRI        PA N 3

GOO

PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerperae please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Vessels, etc.)

| DATE | |
|------|---|
| 6/13 | [handwritten clinical note, illegible] |
| 6/14/93 | [handwritten clinical note, illegible] |
| 6/15/93 | [handwritten clinical note, illegible] |

FELL-00001794

FELL, DONALD                                    WILKES-BARRE GENERAL HOSPITAL
3H75499                    383700
C 0693 0936P   13Y  043080
FRUISNER, JA              824-5842
REDACTED - FELL
WILKES BARRE    ·    PA M S                      PROGRESS RECORD
OCU

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tension etc.)

| DATE | |
|---|---|
| 6/16/9 | *[handwritten clinical note, largely illegible]* |
| 6/17/9 | *[handwritten clinical note, largely illegible]* |
| 6/18/9 | *[handwritten clinical note, largely illegible]* |

FELL-00001795

FELL. DONALD
3A754419
GA069: 0936P   13Y   383700
FEUSSIER, JA        043080
                    824-5842   WILKES-BARRE GENERAL HOSPITAL

REDACTED - FELL

WILKES BARRE        PA N S
000

## PROGRESS RECORD

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tonsils etc.)

| DATE | |
|---|---|
| 6/19/9? | was the family meeting, yesterday after the meeting. acted very angry e cursing. |
| 6/20/93 | got in to the physical front r further patient was place in the full restraint yesterday. Today, he is very calm. |
| 6/21/93 | Pt remarkably calm on Mabon, no side effects noted for some mild muscle fasciculation (in forearm) Pt does not E.P. or T.D. Considered + tangulicum costall, more euthymic with, though appropriate to mood - sleeps well. Frustration tolerance still very poor, easily triggered by poor provocation. |

FELL-00001796

REDACTED - FELL

FELL, DONALD

383700

WILKES-BARRE GENERAL HOSPITAL

13Y  043080

824-5842

PA H S

PROGRESS RECORD

WILKES BARRE
000

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.

| DATE | |
|------|---|
| 6/21/93 | *[handwritten notes, largely illegible]* |
| | |
| 6/23/93 | *[handwritten notes, largely illegible]* |
| | |
| 6/24/93 | *[handwritten notes, largely illegible]* |
| 6/25/93 | *[handwritten notes, largely illegible]* |

**WILKES-BARRE GENERAL HOSPITAL**

FELL. DONALD
SA75499
CC0693 0936P      383700
FRUSSNER. JA    13Y   043080
REDACTED - FELL    824-5842
WILKES BARRE      PA N S
COO.

**PROGRESS RECORD**

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed,
Respiration, Vessels, etc.)

| DATE | |
|---|---|
| | *(handwritten progress notes, largely illegible)* |
| 6/?? | *(handwritten notes)* |
| 6/?? | *(handwritten notes)* |
| 6/28/9 | *(handwritten notes)* |

FELL, DONALD
7670499
( ?4?? 0936P   13Y   383760
?? SSNER, JA            043080
                   824-5842

REDACTED - FELL

WILKES BARRE          PA W S
000

**WILKES-BARRE GENERAL HOSPITAL**

*PROGRESS RECORD*

Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient.
(In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tumers etc.)

| DATE | |
|---|---|
| 6/29/73 | *[handwritten clinical notes]* |
| | *[handwritten clinical notes]* |

### Discharge Note

| 6/30/73 | *[handwritten clinical discharge note]* |

FELL-00001799

FELL, DONALD
3875499          363700          WILKES-BARRE GENERAL HOSPITAL
CC0693 0936P    3Y  043080
FEUSSNER  JA        824-5842

REDACTED - FELL

WILKES BARRE        PA M S          **PROGRESS RECORD**
000

| Note daily progress of case, complications, consultations, changes in diagnosis, instructions to patient. (In case of Puerpera please note: Fundus Height, Condition of Perineum, Lochia, Breasts and Nipples, Phlebitis, Sutures removed, Hemorrhoids, Tonsil etc.) | |
|---|---|
| DATE | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |
|  | |

FELL-00001800