

A Program of Catholic Social Services

# THE COURT ADVOCATE PROGRAM

of Luzerne County

September 16, 1996

Mr. Robert Roman, Supervisor
Luzerne County Juvenile Probation Department
280 North River Street
Wilkes-Barre, Pa. 18702

RE: Donald Fell
D.O.B.: 4-30-80
REDACTED - FELL -7294

Dear Mr. Roman:

Consistent with your request, an evaluation to determine the existence of a drug and/or alcohol issue and recommendations was completed on Donald Fell on September 11, 1996. Diagnostic tools utilized in this evaluation consisted of administration of the Western Personality Inventory (WPI) and Alcohol Use Profile (AUP), a Psychosocial Assessment supplied by Donald, and an Adolescent Problem Severity Index (APSI).

Donald reported his first experience with alcohol occurred at age eight. He reported drinking beer from a tap when serving beer to adults in his home. Donald reported regular use of alcohol began at age thirteen. Donald stated he consumed one twelve pack of beer daily and one-fifth of rum on weekends for one and one-half years. Donald reported he also drank unknown amounts of alcohol on a binge basis during this time period. Donald reported achieving intoxicated states during each drinking episode. Donald reported his last use of alcohol occurred in April 1994.

Donald reported he began to use THC (Marijuana) at age thirteen on a daily basis. Donald reported unknown amounts of THC smoked daily and binge use of THC on weekends. Donald stated he did not use THC from April, 1994 to August, 1995 due to an out of home placement. However, Donald admitted he returned to almost daily and weekend usage of THC since the winter of 1995. Donald reported he has noticed a significant decrease in the amount of THC currently smoked when compared to the amount smoked prior to April, 1995. Donald was unable to give specific amounts of THC used. Donald reported his last use of THC occurred on July 4, 1996.

33 East Northampton St., Wilkes-Barre, PA 18701-2484
(717) 829-3460 • FAX (717) 829-7781

  ACCREDITED

FELL-00002040

Mr. Robert Roman                          September 16, 1996
RE: Donald Fell                           Page 2

Donald reported he experimented two times with LSD at age thirteen. He denied further use of this drug.

Scores on the WPI correlate with those who are prone to abuse alcohol. Scores on the AUP revealed a profile associated with alcoholism-denied.

From the information collected from Donald, it is apparent he has a current THC abuse problem. He may also have a current alcohol abuse problem although he has denied use of alcohol since April, 1994. It is my opinion, Donald is minimizing his use of alcohol and THC.

It is recommended Donald be drug tested by the Juvenile Probation Department on a random basis and participate in drug/alcohol counseling at the Court Advocate Program with continued monitoring for inpatient drug/alcohol treatment.

I hope this information is helpful.

Sincerely,

Lisa M. Randazzo
Drug/Alcohol Treatment Specialist
Court Advocate Program

LMR/dp
cc: Frank Andrukiewicz

FELL-00002041

# EXHIBIT 199

Affidavits Submitted in Support of
<u>Motion in Limine to Exclude Expert Testimony</u>
<u>Regarding the PCL-R and HCR-20 Risk Assessment Instruments</u>
<u>and the Diagnosis of Psychopathy,</u>
in *U.S. v. Willis Haynes*, May 24, 2000

1

FELL-00002042

AFFIDAVIT OF STEPHEN D. HART

I, Dr. Stephen David Hart, do declare the following:

1.    I am an Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada, where I teach, conduct research, and supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

2.    I obtained a doctoral degree in clinical and forensic psychology from the University of British Columbia in Vancouver, British Columbia, Canada, a graduate training program accredited by the American and Canadian Psychological Associations, where my studies focused on the assessment of psychopathy and my clinical training included supervised practice in the assessment and treatment of violent offenders.

3.    I have written more than 150 books, chapters, and peer-reviewed articles in the area of forensic psychology and, more specifically, assessment of psychopathy and violence risk; presented more than 150 papers at academic and professional meetings on the same topics; and have co-authored psychological test and assessment procedures for assessing psychopathy and violence risk.

4.    I am professionally active in the field of forensic psychology being, *inter alia*, a member of the executive committee of the American Psychology-Law Society (Division 41 of the American Psychological Association); a member of the editorial boards of academic journals, including *Law and Human Behavior* and *Legal and Criminological Psychology*; and a reviewer of articles submitted to academic journals and applications for funding submitted to granting agencies in Canada and the United States.

5.    I have conducted more than 100 training workshops for legal, law enforcement, correctional, and forensic mental health agencies in the United States (including the U.S. Federal Bureau of Prisons, the U.S. Army, and the U.S. Navy), Canada (including the Correctional Service of Canada and the Royal Canadian Mounted Police), and the United Kingdom (including Her Majesty's Prison Service and the Scottish Prison Service), as well as in Sweden, Norway, Germany, and New Zealand.

6.    I have testified as an expert witness concerning the topic of forensic psychology and, specifically, assessment of violence risk before courts, hearings, and tribunals in the Canadian provinces of British Columbia, Alberta, Manitoba, and Ontario; in the states of Florida, Washington, and Wisconsin; and before the Canadian Parliament.

7.    I worked with Prof. Robert Hare, first as a student and later as a colleague, on the development and validation of the Hare Psychopathy Checklist-Revised (PCL-R), a psychological test for the assessment of psychopathic personality disorder; and I have conducted numerous training workshops on the use of the PCL-R, often with Prof. Hare.

2

FELL-00002043

8. I worked with Prof. Christopher Webster, Dr. Derek Eaves, and Mr. Kevin Douglas on the development and validation of the HCR-20, a set of structured professional guidelines for the assessment of violence risk; and I have conducted numerous training workshops on the use of the HCR-20, often with Prof. Webster.

9. The PCL-R, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the test manual allows that the PCL-R can be administered on the basis of case history information if that information is sufficiently detailed.

10. Research indicates that PCL-R Total scores are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the North America.

11. Research indicates that PCL-R Total scores are reliable when assessed in many populations; but to date only one published, peer-reviewed study has examined systematically the reliability of PCL-R scores in African-American correctional offenders in the United States. The results of that study were ambiguous, suggesting the need for further research on the reliability and applicability of the PCL-R in this context.

12. Research indicates that PCL-R Total scores are correlated violence when scored on the basis of case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items 1, 2, 6, 7, 8, 13, and 16).

13. The HCR-20, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the manual allows that the HCR-20 can be administered on the basis of case history information if that information is sufficiently detailed.

14. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of HCR-20 ratings with respect to institutional violence in correctional offenders in the United States.

15. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in correctional offenders in the United States.

16. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in African-American individuals.

3

FELL-00002044

17. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence when based on case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of HCR-20 scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items C1 through C5 and R1 through R5).

18. It is my opinion, which I hold with a reasonable degree of scientific certainty, that there is no direct scientific evidence that the PCL-R and HCR-20 are predictive of institutional violence in correctional offenders in the United States; and that the PCL-R and HCR-20 are not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Stephen D. Hart, Ph.D.
19 May 2000

4

FELL-00002045

Affidavit of Kirk Heilbrun

I, Kirk Heilbrun, state as follows:

1. I am currently Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. I am also Co-Director of the Law-Psychology Program, joint program in the Department of Clinical and Health Psychology at MCP Hahnemann and Villanova School of Law. I hold a Ph.D in Clinical Psychology from the University of Texas at Austin (1980), and completed a Postdoctoral Fellowship in Psychology and Law at Florida State University (1981-82). I am a Diplomate in Clinical Psychology and in Forensic Psychology, American Board of Professional Psychology.

2. I currently serve as a Violence Risk Assessment Consultant to the New Jersey Department of Human Services, Division of Mental Health Services and to the Pillsbury Corporation and the Giant Food Corporation as a Fitness for Duty Assessment consultant. I serve on the Advisory Board to the Forensic Psychology Program of the Federal Bureau of Investigation, and have previously served as a grant reviewer for the Office of Victims of Crimes for the United States Department of Justice. Between 1991 and 1993, I was the Clinical Director of Forensic Services for Central State Hospital in Florida, and prior to that was staff psychologist and later Chief Psychologist in the Forensic Service, Florida State Hospital.

3. Since 1981, I have presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. These have included invited lectures and presentations to the United States Department of Justice, the Federal Bureau of Prisons, the U.S. Medical Center for Federal Prisoners, the American Academy of Forensic Psychology, and the Forensic Services Unit of the Cook County Circuit Court. I have been the

5

FELL-00002046

principal investigator or co-principal investigator on several grants to conduct research on risk assessment and criminal recidivism.

4. I have published extensively in the leading journals in my field on risk assessment and criminal behavior. These publications include more than 40 peer reviewed articles, five book chapters, and eight technical manuals. I am currently on the editorial boards of Law and Human Behavior, Journal of Threat Assessment, Criminal Justice and Behavior, Correctional Mental Health Report and the Journal of Behavioral Health Services and Research, and am an ad hoc reviewer for numerous additional journals.

5. Risk assessment and risk management have been a primary focus of my work since completion of my doctorate in 1980.

6. As a result of my extensive work in the field of risk assessment, I am familiar with the use of Psychopathy Checklist - Revised (PCL-R), having used it as a research instrument and in some applied clinical settings and forensic contexts with adults. I have administered the PCL-R and supervised its use in research. I am familiar with the published literature on the PCL-R and other risk assessment tools. Additionally, I have personal expertise in risk assessment and in the evaluation of reliability and validity as it relates to assessment instruments such as the PCL-R. I believe that the PCL-R can be a useful too with which to assess the risk of future violent and nonviolent criminal behavior when used in the proper context and for the proper purposes.

7. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual=s score on the instrument is related to the likelihood that this individual will commit acts of violence or

6

FELL-00002047

aggression while in a secure prison environment. This is particularly true for prison settings that are the most structured and restrictive (the highest level of security). While it is certainly possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, very few studies have addressed the institutional adjustment of *any* population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) according to PCL-R score, let alone the specific population from the immediate case (death-sentenced or life-sentenced inmates) in the particular environment in which the defendant will be incarcerated (a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer reviewed literature to assess the instrument=s predictive capacity in a prison setting, the PCL-R should not be used to judge an individual=s risk of future violence in such a prison setting.

8. Although the predictive accuracy of the PCL-R has been studied in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Those studies do not allow us to reach any conclusions about the predictive validity of the PCL-R in the secure correctional institution setting because it is expected that a) civil and forensic psychiatric patients and convicted prisoners are dissimilar in significant ways, b) the treatment and psychiatric intervention needs of psychiatric patients are different than for prisoners, and c) the highly structured environment of prison is different in certain respects from even a structured forensic psychiatric hospital. Research based on psychiatric and community samples are substantially different from incarcerated samples, with whom little research has been focused on institutional adjustment. At this time, there is insufficient research to make

7

FELL-00002048

generalizations from community behavior to prison behavior, and from psychiatric to life or death-sentenced correctional populations.

9. In any event, even the research conducted upon a secured psychiatric population suggests that the PCL-R may not be a strong predictor of institutional violence. I am the lead author on a study that examined how well the PCL-R predicted aggression in a mentally disordered offender population while in a forensic hospital (see, Kirk Heilbrun, Stephen Hart, Robert Hare, David Gustafson, Catherine Nunez and Adam White (1998) AInpatient and postdischarge aggression in mentally disordered offenders@ Journal of Interpersonal Violence 13(4) 514-27). We measured the PCL-R=s predictive validity during the first two months and the last two months of secure forensic hospitalization. The PCL-R failed to predict aggressive behavior for the last two months of custody, as PCL-R scores were not significantly correlated with aggression during these final two months. The PCL-R had a statistically significant but modest-sized correlation with physical aggression during the first two months of custody. That correlation coefficient was .14, meaning that the PCL-R was accounting for approximately 2% of the variance in observed aggression. One conclusion of the study was that the PCL-R was not a consistent predictor of institutional behavior, ranging from a modest association with aggression early in hospitalization to no association with aggression later in hospitalization. Any attempt to use the PCL-R to predict institutional aggression, therefore, would have resulted in a substantial rate of error. It should be added that none of the aggression observed in this study resulted in the death or serious injury of another individual.

8

10. While this study does not provide evidence about behavior in a prison setting, and should not be generalized to do so, it does provide some information concerning the overall predictive power of the PCL-R in a setting more similar to prison than in previous studies, which have followed individuals after they have been released into the community. Such research could be done, but has not, in a maximum security prison setting to determine the predictive validity of the PCL-R in relation to institutional violence by incarcerated life- or death-sentenced offenders. At this time, the PCL-R has not been tested and evaluated in this context.

11. There is also limited research at present using the PCL-R with African Americans or youth. Insufficient research has been performed to date to determine whether the meaning of PCL-R scores are comparable when the PCL is administered to African Americans.

12. Similarly, insufficient research has been done to determine whether the instrument is reliable and valid when used with a youthful or adolescent population. We do not currently know whether an adolescent who scores high on the PCL-R at the age 16 will persist in aggressive behavior beyond the late teens or early 20s. We do not yet have data to discriminate between Alife course persistent@ vs. Adesistent@ youth with respect to aggression; both may score high on the PCL when administered at the ages of 15 or 16, and the score may fail to discriminate between those who will persist and those who desist in aggression later in life. In addition, not all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end

9

FELL-00002050

of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult Acore personality structure@ has been formed.

13. Absent such research, we cannot assume that the instrument possesses similar predictive validity when administered to African Americans or youths as it does with adult white males.

14. The PCL-R is a useful tool when used with a population and in a context in which it has been validated. Research conducted in non-prison settings cannot be generalized to the prison setting, and currently, there is insufficient scientific research to validly apply the PCL-R toward assessing future violence risk in a highly structured prison environment. Until sufficient research has been conducted with the PCL-R with this population and for this purpose, the scientifically sound conclusion is that it should not be used in this way.

15. The HCR-20, which is a risk assessment instrument that incorporates the PCL-R score as one of its items is a promising but new tool. Only in the past 1-2 years have studies begun to be published in the scientific literature. At this time, insufficient validation and research has been completed on the HCR-20 to determine its predictive power. Use of the HCR-20 at present to predict violent behavior in a correctional setting would result in all the problems discussed in relation to the PCL-R (in the context of correctional populations and sentencing). As with the PCL-R, the HCR-20 should not presently be used to assessing future violence risk in a highly structured prison environment until that research has been conducted, peer reviewed, and published.

10

FELL-00002051

I hereby declare under penalty of perjury that the foregoing is true and correct.


_____          _____
Kirk Heilbrun                            Date


11

FELL-00002052

## Affidavit of Norman Poythress

I, Norman Poythress, state as follows:

1. I am currently a professor in the Department of Mental Health Law and Policy at the University of South Florida, where I teach forensic assessment (psychological evaluations for legal contexts) and conduct research on a variety of law-and-psychology issues.

2. I hold a Ph.D in clinical psychology from the University of Texas at Austin (1977) and am currently licensed to practice psychology in Florida. I have previously been licensed in Michigan and Alabama. I am a fellow of the American Psychological Association (APA) and past-president of the American Psychology-Law Society (Division 41 of APA).

3. I have published more than 50 book chapters and articles in peer-reviewed journals, most on psychology-and-law issues. I am a co-author of Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (1997), which is widely recognized as a leading resource on issues relating to psychological evaluations in the courts. I have served as faculty on risk assessment and risk management workshops for both clinical and legal (FBI, Secret Service) audiences and have served as a consultant to the Secret Service on issues related to risk management of persons who threaten government officials under their protection.

4. Prior to my academic career at the University of South Florida (1990-present) I worked as a forensic psychologist in maximum security forensic psychiatric hospitals (Center for Forensic Psychiatry, Ann Arbor, MI; Taylor Hardin Secure Medical Facility, Tuscaloosa, AL). In these settings my primary clinical duties were to conduct forensic psychological evaluations for the state courts on issues such as competence-to-proceed, insanity defense, and sentencing (including, in Alabama, capital sentencing). I have testified as an expert witness in state courts

12

FELL-00002053

in Michigan, Florida, Alabama, and New Mexico, and before the House Armed Services Committee of the U.S. Congress regarding the U.S.S. Iowa incident.

5. Only very limited research is available that investigates the utility of the Psychopathy Checklist - Revised (PCL-R) in correctional settings for assessing the risk of violence posed by an individual while in custody. There is no such research available on individuals sentenced to life terms in federal prisons in the United States.

6. Error rates for the PCL-R, including false positive rates (the number of people who test high on the PCL-R and do not act aggressively), have not been established for estimates of risk for institutional violence for prison inmates. In order to assess these error rates, prospective studies which followed people sentenced to sufficiently long terms in custody need to be conducted. As a result of the lack of research, the predictive validity of a high score on the PCL-R in this context is unknown.

13

FELL-00002054

7. In a study which I co-authored, we administered the PCL-R to a group of youthful offenders in Florida and retrospectively assessed in-custody aggressive behavior [John Edens, Norman Poythress and Scott Lilienfeld (1999) *Identifying Inmates at Risk for Disciplinary Infractions: A Comparison of Two Measures of Psychopathy*, Behavioral Sciences and the Law 17:435-43]. We found a relatively low statistical association between PCL-R scores and institutional violence during the first year of incarceration, and we concluded that the PCL-R has only limited utility for purposes of individual classification. As our study is one of the few to assess in-custody behavior, albeit using a retrospective methodology, and given our findings, it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores.

8. I know of no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness of persons serving a life sentence in a federal prison. In my opinion, the conclusions reached by Cunningham and Reidy in their recent review article [Mark D. Cunningham and Thomas J. Reidy (1998), *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, Behavioral Sciences and the Law: 16, 333-351] fairly represent the state of the field:

AIn summary, there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. Although some promising trends are apparent, estimations of the institutional assaultive potential of psychopaths remain tentative, particularly as a few studies cite no differences according to psychopathy

14

FELL-00002055

ratings. Until a better research base develops caution should be exercised in utilizing the

PCL-R in forecasting the likelihood of future serious prison violence@ (p. 343).

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____          _____

Norman Poythress                          Date

15

FELL-00002056

AFFIDAVIT OF JOHN F. EDENS

1.   I, John F. Edens, Ph.D., am a licensed clinical psychologist in the state of Texas (license number 3-1105) and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

I have conducted research on the area of risk assessment since 1997 and have published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

I also occasionally conduct risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas. These evaluations by statute require an assessment of psychopathy. When conducting these assessments I administer the Psychopathy Checklist-Revised (PCL-R).

2.   I am familiar with the PCL-R, having used it in both clinical and research settings. Being familiar with the literature on it and having published original research related to its use, I believe it is an appropriate risk assessment instrument that can be helpful in making judgments regarding future violence in certain instances in which there is sufficient scientific support to justify its use.

3.   At this time, however, there are relatively few studies examining the utility of the PCL-R in estimating the likelihood or risk for aggressive acts of incarcerated people. Those studies that have been conducted among inmates suggest an inconsistent association (e.g., some studies showing a weak to moderate relationship and others showing no significant relationship) between being identified as a "psychopath" (i.e., PCL-R score $\geq 30$) and engaging in higher rates of various forms of prison violence. I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates with life sentences who are kept in 23-hour per day lock-down facilities.

4.   In my own study of a multi-cultural (54% African American, 32% Caucasian, 12% Hispanic) sample of 50 youthful offender prison inmates incarcerated in Florida (Edens, Poythress, & Lilienfeld, 1999), which is one of the few to use the PCL-R to assess in-custody infractions, my colleagues and I found a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration. More specifically, we found that 5 of the 10 (50%) PCL-R-identified psychopaths committed some form of violent act that was judged by staff to warrant a disciplinary report. Of the 40 inmates whose PCL-R score was below 30 (i.e., "non-psychopaths"), 18 (45%) committed a violent infraction during this same time period. Notably, our study, as well as most others that have examined institutional misbehavior among psychopaths, was a postdictive (rather than predictive) design, in that we used PCL-R scores in an attempt to

16

FELL-00002057

predict behavior that had already occurred, rather than predict future behavior. Whether it would have performed similarly in terms of predicting inmates' subsequent violent acts is unknown.

5.    In conclusion, I have significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated.

I declare under penalty of perjury that the foregoing is true and correct.


_____          5/22/00
John F. Edens, Ph.D              Date

17

FELL-00002058

**AFFIDAVIT OF DONALD N. BERSOFF**

I, Donald N. Bersoff, Ph.D., J.D., state that:

1.      I am a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School.  I have served in those capacities since January 1990.

2.      As a faculty member in the above universities, I direct a J.D./Ph.D. Program in Law & Psychology jointly sponsored by both institutions.

3.      I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

4.      I have been a full member of the American Psychological Association (APA) since 1965 and was elected a fellow in 1974.  I was granted Diplomate status from the American Board of Professional Psychology in 1974.  Since 1997 I have presented annual workshops on the ethics of forensic testimony for the American Academy of Forensic Psychology.  From 1980-1981 I served as president of the American Psychology-Law Society and am a Fellow of that group.

5.      I have been a faculty member at several universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and the Ohio State University.

6.      From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee and conducted all appeal hearings from decisions of the Ethics Committee.  From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the current APA Code of Conduct (Code of Ethics) in 1992. From 1994-1997 I served on APA's 11-member elected Board of Directors.  Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics

18

FELL-00002059

Committee that led to expulsion or a stipulated resignation of APA members. I currently serve again on the Council of Representatives (1999-2001) and served as chair of the APA's Policy and Planning Board (1999-2000).

7. I am the author of Ethical Conflicts in Psychology, originally published by APA in 1995, and subsequently published in a second edition in 1999. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

8. In all, I have published four texts, 25 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of those publications and presentations concern ethical, legal, and policy issues in psychology. Most particularly, I have written and presented on the use and misuse of social science evidence in the legal system. In March 2000, I served as chair of a symposium on the impact of Daubert v. Merrell Dow Pharmaceutical Co. on the admissibility of social science evidence and presented a paper on that topic at the biennial meeting of the American Psychology-Law Society. In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges on The Application of Daubert to Forensic and Social Science Evidence in Denver, Colorado. In March and April 1996 I presented papers on the admissibility of expert psychological testimony at the Sixth Annual National Symposium on Mental Health and the Law and at American Psychology-Law Society, respectively. I am currently drafting a law review article entitled, The Admissibility of Forensic and Social Science Evidence from Daubert to Kumho: A Quantitative and Qualitative Analysis. I have been selected to moderate an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute

19

FELL-00002060

of Justice, the Criminal Justice Section of the ABA, the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an amicus curiae brief in the original Daubert case before the U.S. Supreme Court in 1993.

9.     I have been retained, on a pro bono basis, by counsel for Defendant in the instant case for the purpose of advising this court regarding the validity of the conclusion drawn by Thomas V. Ryan, Ph.D. that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary," based on the Psychopathy Check List Revised (PCL-R) and the HCR-20. Ryan, Capital Sentencing Evaluation, May 12, 2000, at 7.

10.    For the purposes of this affidavit, I have reviewed Dr. Ryan's Capital Sentencing Evaluation ("Evaluation") of the instant defendant, and the affidavits of Kirk Heilbrun, Ph.D., Stephen D. Hart, Ph.D., Norman Poythress, Ph.D., and John F. Edens, Ph.D. in this case.

11.    Dr. Ryan's psychological evaluation of the defendant, a 22 year old African-American male, consisted solely of administration of the PCL-R, the HCR-20, and Dr. Ryan's assessment of a variety of historical and demographic factors deemed to be associated with violence recidivism. In arriving at his opinion, he also relied on materials supplied by county, state and federal agencies, including audio and videotapes. He never personally saw, interviewed, nor tested the defendant. Nevertheless, Dr. Ryan asserted "that the impact of not personally examining Mr. Haynes resulted in essentially no limitations regarding conclusions rendered." Evaluation at 2.

12.    Dr. Ryan makes three other statements that are relevant herein. First, he concludes that the defendant exhibits psychopathic features and asserts, "There is a plethora of empirical studies which

20

FELL-00002061

demonstrate that individuals with psychopathic personalities are at very high risk for violence recidivism, including those who are institutionalized." Evaluation at 6. Second, based on the HCR-20, Dr. Ryan concludes the defendant is "at the high range regarding final risk judgement." Evaluation at 6. Finally, his ultimate conclusion is that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary." Evaluation at 7.

13. Based on my knowledge of the American Psychological Association's Code of Ethics[1] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[2] ("Specialty Guidelines"), the Heilbrun, Hart, Pothress, and Edens affidavits, and my research on the application of Daubert to forensic psychological testimony, it is my opinion, to a reasonable certainty, that the opinions of Dr. Ryan, quoted above, do not represent an appropriate application of generally accepted ethical principles to the issues presented and violate the generally accepted standards of forensic psychological practice.

14. One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that empirically-supported and generally accepted scientific conclusions are presented to the court. Forensic experts recognize that their credentials and testimony may have a profound impact on jury decisionmaking and, therefore, have a responsibility to confirm that their opinions are firmly grounded in science and that any inferences they draw from science are generally supported.

---

[1]    APA, Ethical Principles of Psychologists and Code of Conduct, 47 **Amer. Psychologist** 1597 (1992).

[2]    Committee on Ethical Guidelines for Forensic Psychologists, 15 **L. & Hum. Behav.** 655 (1991).

21

FELL-00002062

15.   Dr. Ryan first states that a plethora of empirical studies demonstrates that institutionalized psychopaths are at a very high risk of recidivism for violent conduct.  That statement is misleading because it implies that the studies referred to involved criminal offenders in correctional institutions. In fact, there are many kinds of institutionalized populations, including those with mental disabilities who are civilly committed and those who are in forensic criminal institutions.  Based on the affidavits of Drs. Hart, Heilbrun, and Edens, there are no published, peer-reviewed studies examining the predictive validity of the PCL-R or the HCR-20 with respect to institutional violence in correctional offenders in the United States.  See Hart Affidavit at paras. 10, 14, 20; Heilbrun Affidavit at paras. 7, 8, 9, 14, 15; Edens Affidavit at para. 4.

16.   Second, Dr. Ryan fails to acknowledge the fact that the defendant is a young African-American adult.  Both Drs. Hart and Heilbrun indicate that at most there is one study on the PCL-R and none on the HCR-20 evaluating the psychometric soundness (i.e., reliability) of these instruments with African-American correctional offenders, particularly youthful ones.  See Hart Affidavit, paras. 11, 15, 16; Heilbrun Affidavit, paras. 11, 12, 13, 15.  Dr. Ryan makes no mention of this fact and fails to acknowledge the resulting potential for inaccuracy in his conclusion.

17.   Third, Dr. Ryan, based solely on a subjective impression, concluded that his opinions were in no essential way limited by the fact that he did not personally examine the defendant.  This opinion is at variance with that of Dr. Hart, one of the authors of the PCL-R, that "the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores," particularly on 7 of the 20 items that rely heavily on behavioral observations and the assessment of future plans.  Hart Affidavit at para. 11.  See also para. 17 (same conclusion regarding the HCR-20). It is also at variance with at least one study indicating that administration of the PCL-R based solely

22

FELL-00002063

on file review, as here, results in higher psychopathy scores than when combined with a personal interview.[3]   Dr. Ryan fails to acknowledge this source of inaccuracy as well.

18.   Based on the evidence of Drs. Hart, Heilbrun, Poythress, and Edens that: (1)  There is not a generally accepted set of published, peer-reviewed studies examining violent recidivism on the population of offenders represented by defendant (young African-American males incarcerated in secure correctional facilities); (2) there are no studies using the PCL-R or the HCR-20 that establish error rates for in-custody populations concerning predictions of violent recidivism; (3 ) the use of the PCL-R and the HCR-20 to predict institutional violence in correctional offenders in the United States is not generally accepted in the relevant scientific community; and given that many federal cases have rejected psychological evidence in situations where the tests have not been validated for the specific purposes used in litigation, where there is insufficient published literature addressing the validity of the technique used in litigation, where there is the absence of a personal evaluation of the party by the expert, or, in the alternative, where the expert relied improperly on statements by the party calling the expert, it is my opinion that the evidence represented by Dr. Ryan's evaluation is inadmissible under <u>Daubert</u>.

19.   Dr. Ryan's conclusions are not only inadmissible in my opinion under <u>Daubert,</u> but may also be at variance with accepted  professional standards.  The following provisions of the APA's Code of Ethics are relevant:

> Standard 1.06:  Psychologists rely on scientifically and professionally derived knowledge when making scientific or professional judgments . . . .

> Standard 1.15:  Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence.

---

[3]   R. C. Serin, Diagnosis of Psychopathy With and Without an Interview, 49 <u>J. Clin. Psychology</u> 367 (1993).

FELL-00002064

Standard 2.01(b):  Psychologists' assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation of their findings.

Standard 2.02:  (a)  Psychologists who . . . administer, score, interpret, or use psychological assessment techniques . . . do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of techniques.

(b)  Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these techniques provide.

Standard 2.04:  (a)  Psychologists who . . . administer, score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper application and the uses of the techniques they use.

(b)  Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c)  Psychologists attempt to identify situations in which particular . . . assessment techniques or norms may not be applicable or may require adjustment in administration or interpretation because of factors such as individuals' . . . age, race, ethnicity . . . .

Standard 2.05:  [P]sychologists . . . indicate any significant reservations they have about the accuracy of their interpretations.

Standard 3.03:  Psychologists do not make public statements that are false, deceptive [or] misleading . . . .

Standard 7.01:  Psychologists who perform forensic functions . . . base their forensic work in appropriate knowledge of and competence in the areas underlying such work, including specialized knowledge concerning special populations.

Standard 7.02:  (a)  Psychologists' forensic assessments, recommendations and reports are based on information and techniques (including personal interviews of the individual, when appropriate) sufficient to provide appropriate substantiation for their findings.

(b)     Except as noted in (c) below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

(c)     When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

24

FELL-00002065

Standard 7.04(b): Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions.

20. Similarly, Dr. Ryan's report may be at variance with relevant provisions of the Specialty Guidelines:

Guideline VI(A): Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional, and legal developments within their area of claimed competence.

Guideline VI(H): Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statement, opinion, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Guideline VII(A): Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will . . . avoid deception.

Guideline VII(B): Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special reponsibility for fairness and accuracy in their public statements.

Guideline VII(D): Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence . . . .

21. Only the APA ethics committee can judge whether an APA member has violated the APA's code of ethics. However, it is my opinion, to a reasonable certainty, that in rendering the conclusion that the defendant is a "relatively high risk for engaging in violence recidivism," given the dearth of data generally accepted in the relevant psychological community to support his opinion, his improper generalization of the test scores to the defendant, his failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview, and his misleading use of extant studies, Dr. Ryan acted below the professional standards of those holding themselves out as forensic psychologists.

25

FELL-00002066

I declare under the penalty of perjury that the foregoing is true and correct.

_____
Donald N. Bersoff, Ph.D., J.D.
May 24, 2000

26

FELL-00002067

# EXHIBIT 200

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

| | | |
|---|---|---|
| ALBANY - MAIN OFFICE | SYRACUSE - BRANCH OFFICE | BURLINGTON - BRANCH OFFICE |
| 39 NORTH PEARL STREET | 4 CLINTON EXCHANGE | 110 CHERRY STREET |
| 5TH FLOOR | 3RD FLOOR | 2ND FLOOR |
| ALBANY, NY 12207 | SYRACUSE, NY 13202 | BURLINGTON, VT 05401 |
| (518) 436-1850 | (315) 701-0080 | (802)862-6990 |
| (518) 436-1780 FAX | (315) 701-0081 FAX | (802)862-7836 FAX |

RESPOND TO ALBANY OFFICE

December 5, 2000

Hon. Jerome J. Niedermeier
United States Magistrate Judge
District of Vermont
P.O. Box 836
Burlington, VT 05402-0836

   Re: Donald Fell and Robert Joseph Lee

Dear Judge Niedermeier:

   I am waiting to hear from Charlie Tetzlaff about whether his office intend to continue to prosecute Fell and Lee for potential capital crimes. I have seen conflicting reports about which jurisdiction will handle the case. By federal statute, if there is a potential capital case, the Court must seek the advice of the Federal Public Defender about appointment of counsel.

   If the case is prosecuted in the District of Vermont, I will personally seek appointment. Federal statute also encourages that capital defendants receive the assistance of two attorneys. Therefore, the Court will also need to consider the appointment of three other lawyers, if both defendants are prosecuted for capital crimes.

   I have a suppression hearing later this morning. I will be around the rest of the day, if the Court needs to speak with me. If necessary, I can come to Burlington tomorrow. I am planning to come Friday, otherwise.

        Sincerely,

        Alex Bunin

cc: David Kirby

FELL-00002068

# EXHIBIT 201

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

| | | |
|---|---|---|
| **ALBANY - MAIN OFFICE**<br>39 NORTH PEARL STREET<br>5TH FLOOR<br>ALBANY, NY 12207<br>(518) 436-1850<br>(518) 436-1780 FAX | **SYRACUSE - BRANCH OFFICE**<br>4 CLINTON EXCHANGE<br>3RD FLOOR<br>SYRACUSE, NY 13202<br>(315) 701-0080<br>(315) 701-0081 FAX | **BURLINGTON - BRANCH OFFICE**<br>110 CHERRY STREET<br>2ND FLOOR<br>BURLINGTON, VT 05401<br>(802)862-6990<br>(802)862-7836 FAX |

**RESPOND TO ALBANY OFFICE**

December 5, 2000

Mr. Charles R. Tetzlaff
United States Attorney
District of Vermont
P.O. Box 570
Burlington, VT 05402-0570

    Re: Donald Fell and Robert Joseph Lee

Dear Charlie:

    Please let me know as soon as possible whether your office intends to prosecute Fell and Lee. I have seen conflicting reports about what jurisdiction will handle the case. By federal statute, if there is a potential capital case, the Court must seek the advice of the Federal Public Defender about appointment of counsel.

    If the case is prosecuted in the District of Vermont, I will personally seek appointment. Federal statute also encourages that capital defendants receive the assistance of two attorneys. Therefore, the Court will also need to consider the appointment of three other lawyers, if both defendants are prosecuted for capital crimes.

    I have a suppression hearing later this morning. I will be around the rest of the day. If necessary, I can come to Burlington tomorrow. I am planning to come Friday, otherwise.

                        Sincerely,

                        Alex Bunin

cc: David Kirby

FELL-00002069

# EXHIBIT 202

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICTS OF NORTHERN NEW YORK & VERMONT

ALBANY - MAIN OFFICE
39 NORTH PEARL STREET
5TH FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

SYRACUSE - BRANCH OFFICE
4 CLINTON EXCHANGE
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

BURLINGTON - BRANCH OFFICE
110 CHERRY STREET
2ND FLOOR
BURLINGTON, VT 05401
(802)862-6990
(802)862-7836 FAX

RESPOND TO ALBANY OFFICE

December 11, 2000

Hon. J. Garvan Murtha
Chief Judge
United States District Court
P.O. Box 760
Brattleboro, VT 05302-0760

Re: USA v. Fell and Lee

Dear Judge Murtha:

Pursuant to 18 U.S.C. §3005 and the District of Vermont's CJA Plan, I am making recommendations regarding appointment of counsel in the potential capital prosecutions of Donald Fell and Robert Joseph Lee.

I recommend that my office represent Mr. Fell. Myself and Gene Primomo will be responsible for that representation. We will also have death qualified counsel from other federal defender offices assisting us.

I recommend that John Pacht and Brad Stetler represent Mr. Lee. I have discussed this choice with the Administrative Office's death penalty resource counsel, David Bruck, Kevin McNally and Richard Burr, as well as New York State Capital Defender Kevin Doyle. They agree this appointment is appropriate.

If the Court needs any further information about these recommendations, please contact me.

Respectfully,

Alex Bunin
Federal Public Defender

FELL-00002070

# EXHIBIT 203

Print    Close



# Fell makes move to avoid receiving death sentence

May 13, 2002

(from the *Front Page* section)

By ALAN J. KEAYS Herald Staff

Lawyers for accused killer Donald Fell will ask a federal judge to uphold a plea agreement that would spare his life.

U.S. Attorney General John Ashcroft decided this year to seek the death penalty against Fell, 21, rejecting a plea agreement signed by Fell's lawyers and supported by the U.S. Attorney's Office in Vermont.

The plea deal required Fell to plead guilty to charges of kidnapping with death resulting. In exchange, he would receive a life sentence with no chance for parole.

In a motion expected to be filed today, Alexander Bunin, a federal public defender representing Fell, wants to have the court dismiss Ashcroft's intention to seek the death penalty.

"The government's statements preclude the government from seeking the death penalty in this case. The government stated in the plea agreement that it sought a life sentence because of substantial mitigating evidence," the motion read.

"Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal DOJ (Department of Justice) policy to force the USA (United States Attorney) to try this case. That administrative decision has no legal effect upon the authority of this court."

U.S. Attorney for Vermont Peter Hall said Monday that he could not comment on the motion since it hadn't been filed yet. He added that any response would be made in writing to the court.

Fell is accused of kidnapping Teresca King, 53, of North Clarendon at gunpoint when she arrived at work at the Price Chopper in Rutland at 3 a.m. on Nov. 27, 2000. Fell and a co-defendant, the late Robert Lee, allegedly beat King to death just off Route 22 in Pawling, N.Y., later that morning.

The two men were fleeing Rutland after allegedly committing two other murders. They allegedly killed Fell's mother, Debra Fell, and her friend, Charles Conway, at Debra Fell's apartment in Rutland. No charges have been filed in connection with their deaths.

Lee accidentally hanged himself in his prison cell last September.

In addition to the federal kidnapping charge, Fell faces a charge of carjacking with death resulting.

Conviction on either charge could result in execution. Vermont does not have a death penalty, but since the federal government has jurisdiction in the case, the federal death penalty applies.

FELL-00002071

The Rutland Herald Online -

In October, Fell and his attorney signed a plea agreement that had been supported by the U.S. Attorney's Office in Vermont. But the deal was contingent on Ashcroft's approval.

In January, Ashcroft decided to seek the death penalty, without ever mentioning the proposed plea agreement.

In the motion to be filed today, Fell's attorneys noted that it was the U.S. Attorney's Office in Vermont who initially drafted the agreement.

"In early October 2001, the USA for Vermont contacted Fell's counsel and agreed to settle the case, subject to approval from the AG. The USA drafted a plea agreement," the motion read.

"Although a draft of the agreement was sent to counsel for review, no changes were requested and none were made. The agreement was written entirely by the USA, with no input from Fell.

On October 24, 2001, Fell and his counsel signed the plea agreement and returned it to the USA."

Prosecutors listed six mitigating factors that influenced their decision, including Fell's mental health and impaired capacity at the time of the murder, his age, lack of a substantial criminal history, his mental health history and background, his assistance in locating King's body and his remorse and acceptance of responsibility.

Several of King's family members had sent letters to Ashcroft supporting the death penalty.

Following Ashcroft's decision, the two sides met with the court on March 15. At that time, Fell's attorney said his client would plead guilty to the charges and allow U.S. District Judge William Sessions to determine the sentence.

"Both Judge Sessions and local prosecutors agreed to this procedure," the motion read. "After the meeting, the local prosecutors were told by DOJ that only DOJ could approve the waiver of a jury at sentencing. DOJ promised to consider the matter."

On May 1, Fell's attorneys received a fax from prosecutors stating that only Ashcroft could make the decision, the motion read.

"On May 9, 2002, Fell's counsel received a voice-mail message that the attorney general had denied the request," the motion said.

Now, Fell's attorneys want to have the court uphold the first plea agreement.

"Allowing the government to change positions without consequences would deny Fell due process of law," the motion read.

"The Court should hold the government to its initial position — that a life sentence is justified — and dismiss the notice of intent to seek the death penalty."

Contact Alan Keays at Alan.keays@rutlandherald.com

© 2000 Rutland Herald and Times Argus

FELL-00002072

# EXHIBIT 204

**LOCAL NEWS**    Wednesday, May 15, 2002    Print this page

More Local News    Local News Archives for:  Mon  Tue  Wed  Thu  Fri  Sat  Sun

## Government should not seek death penalty in Fell case, Bunin argues

By Emily Stone
Free Press Staff Writer

The federal government is contradicting itself by seeking the death penalty against murder suspect Donald Fell, his lawyer said in court papers filed Tuesday.



Federal Public Defender Alex Bunin asked a judge to prohibit prosecutors from arguing for the death penalty at trial. Prosecutors stated in January that they intend to ask for a death sentence.

Bunin said the government's logic is inconsistent because prosecutors last year offered Fell a plea deal that would spare his life. The deal, which would have given Fell a sentence of life in prison without a chance of parole, was at that time considered appropriate by prosecutors.

Fell, 22, has pleaded innocent to kidnapping Teresa King from a Rutland parking lot, driving her to New York and killing her in November 2000. His trial in U.S. District Court in Burlington is scheduled for September.

Prosecutors in the local U.S. Attorney's Office wrote up the proposed plea agreement, which Fell signed in October. The deal said that Fell's history of mental illness, his age and his remorse should qualify him for a life sentence instead of the death penalty.

However, the deal was never finalized. All plea agreements in potential death penalty cases must be approved by U.S. Attorney General John Ashcroft.

In January, Ashcroft turned down the plea deal in favor of pursuing the death penalty. The local prosecutors then filed papers saying the death penalty was warranted because of the brutality of the crime. This is a contradiction of the prosecutors' earlier position that life in prison would suffice, Bunin said.

He said this was the first time the attorney general has required a U.S. attorney to seek the death penalty after the local prosecutor indicated he or she wanted to settle the case. The Justice Department's rule requiring Ashcroft's personal approval of all plea deals in death penalty cases has only been in place since last year.

U.S. Attorney Peter Hall would not comment on Bunin's motion to withdraw the death penalty. Hall's office will file written comments with the court within the next two weeks. A hearing has been set for this summer.

Hall did say that these decisions are out of his office's control.

"The only person in the country who has the authority to make these decisions, finally, is the attorney general," Hall said.

Fell was accused along with his friend Robert Lee. Lee, 20, was found hanging in his cell in September. His death was ruled an accident.

The two men were also linked to the deaths of Fell's mother and her friend in Rutland. Fell has not been charged with these deaths because federal charges carry heavier penalties. King's murder is being prosecuted federally because she was brought across a state line before being killed.

Fell again offered to plead guilty in March, Bunin said. This time, Fell would have allowed the judge to set a sentence. Local prosecutors agreed to this, but stipulated again that Ashcroft had to approve the deal.

Bunin said he was told last week that Ashcroft had denied the request.

FELL-00002073

Burlington Free Press - Local Stories

"The Court should hold the government to its initial position -- that a life sentence is justified," Bunin wrote in his motion. "Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal (Department of Justice) policy to force (Hall) to try the case."
Contact Emily Stone at 660-1898 or estone@bfp.burlingtonfree- press.com.

Email this news item to:

[            ]    Send

Back to index

FELL-00002074

# EXHIBIT 205

ORIGINAL 50

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,      )
  Plaintiff,      )
            )
    v.      )  Criminal No. 2:01-CR-12
            )
DONALD FELL,      )
  Defendant.      )

## FELL'S OBJECTIONS TO PUNISHMENT-RELATED QUESTIONS OR, ALTERNATIVELY, MEMORANDUM IN SUPPORT OF REQUEST FOR APPROPRIATE PUNISHMENT-RELATED VOIR DIRE, ATTORNEY QUESTIONING, USE OF A JURY QUESTIONNAIRE AND FOR INDIVIDUAL, SEQUESTERED VOIR DIRE ON CERTAIN TOPICS

### I. INTRODUCTION

Donald Fell, by counsel, submits this memorandum in order to lodge his objection to qualifying a jury based on moral, religious, political or other views about punishment and, in the alternative, to summarize the relevant legal principles governing voir dire in capital cases, including the proper standards for challenges for cause and appropriate methods of questioning.

Fell also submits this memorandum to advise the Court of methods and means by which the voir dire in the upcoming trial may be conducted lawfully, fairly, and efficiently, while simultaneously eliciting all necessary information to discern whether potential jurors harbor any disqualifying prejudice. Such will allow counsel to intelligently request removal of venire-members for cause and to exercise peremptory challenges.[1]

Specifically, this memorandum proceeds from the fundamental constitutional principle

---

[1] Voir dire lays "the predicate for both the judge's and counsel's judgment about the qualifications and impartiality of potential jurors. Without an adequate foundation, counsel cannot exercise sensitive and intelligent peremptory challenges, that suitable and necessary means of ensuring that juries be in fact and in the opinion of the parties fair and impartial." *United States v. Baker*, 638 F.2d 198, 200 (10th Cir. 1980).

1

FELL-00002075

that any juror who would 1) automatically vote for the death penalty if the defendant is found guilty of intentional, aggravated murder, or who is 2) so supportive of capital punishment as to be "substantially impaired" in considering any alternative, or 3) who cannot consider and give effect to mitigating circumstances relating to the defendant or this case, must be disqualified for cause. In order to implement these concepts, we request that the scope of voir dire be defined accordingly, so as to allow inquiry and follow-up inquiry by defendant's counsel sufficient to determine whether individual jurors are (1) predisposed to give the death penalty in all or nearly all such cases (so called, but misnamed, "*automatic* death penalty," or ADP's), (2) incapable of considering and giving effect to all relevant mitigating evidence, or (3) do not think life in prison without parole is an adequate punishment for someone who intentionally kills another person in the course of multiple killings and by beating the victim to death.

Fell also asks that the Court inform each individual juror that punishment questions are required in every such case and there is absolutely no suggestion that Fell is guilty merely because such questions are asked. To this end, Fell requests that the Court employ the draft admonition tendered by defendant [attached as Exhibit "A"] and employ a jury questionnaire as will be tendered to the Court, and to permit counsel to ask certain questions of individual jurors in a location separate from other members of the panel.

II.    EXCLUSION OF JURORS WITH A REVERENCE FOR LIFE
        VIOLATES THE EXPRESS TERMS OF 18 U.S.C. §3592(a)

The federal death penalty statute pursuant to which Fell is being tried, 18 U.S.C. § 3592 (a), specifically instructs that, "in determining whether a sentence of death is to be imposed on a defendant, [the jury] shall consider *any mitigating factor*." The statute further provides that each

2

FELL-00002076

juror shall consider "other factors in the defendant's background, record, or character . . . that mitigate against imposition of the death penalty." § 3592 (a) (8).

Thus, that a juror may view human life as sacred and be inclined to believe that defendant's existence as a human being, in and of itself, is a death-trumping mitigating factor, cannot be considered a basis for disqualification under the federal death statute.

The process of "death qualification," held to be constitutionally permissible – if state law provides for it – *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985) – is neither required nor permitted under the federal death scheme. The *Witherspoon/Witt* rule is predicated on the notion that some jurors may possess death penalty views that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, *quoting Adams v. Texas*, 448 U.S. 38, 45 (1980). But *Witherspoon* does *not* provide a "ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude." *Adams*, 448 U.S. at 47-48. Congress can, and has, given the defendant more protection than the Constitution requires.

A juror who enters the box believing absolutely in the sanctity of human life as a mitigating factor will not be "prevented or substantially impair[ed]" from doing his duty under federal law. This is because under federal law, first, *anything* may be considered a mitigating factor, and second, under the federal statute a sentence of death is never required. *See* § 3592 (e). In short, the systematic removal of jurors who believe in the sanctity of human life violates the intent and the explicit directive of the statute that jurors "shall consider any mitigating factor."

*Witherspoon* and *Witt* simply permit the state to exclude jurors under certain conditions.

3

FELL-00002077

The federal statute at issue here does not mandate exclusion of anyone. Nor, like many state statutes, does it limit or channel juror consideration of mitigating evidence. A juror who believes that the defendant's human life is sacred may consider that to be mitigating factor, and regardless of what other jurors think, may give the factor decisive weight. The statute says "any" – and the word should be held to mean what it says.

This literal reading of "any" and the other statutory terms is consistent with the Supreme Court's teaching about statutory interpretation. *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991) (Rejecting argument that "the congressional purpose in enacting [a statute] must prevail over the ordinary meaning of statutory terms").

Moreover, we are dealing with a criminal statute. Ever since Chief Justice Marshall's opinion in *Wiltberger v. United States*, 18 U.S. (5 Wheat) 76 (1820), it has been clear that the courts cannot fill statutory gaps by judicial legislation. From *Wiltberger,* there is a straight line to holdings that criminal statutes must be construed strictly, in favor of the accused, under the principle of lenity. *See, e.g., Kozminski v. United States*, 487 U.S. 931 (1988). Indeed, the principle of strict construction, or lenity if you will, was developed in England precisely to mitigate the rigor of capital statutes. *See generally*, Kahan, *Lenity and Federal Common Law Crimes*, 1994 Sup. Ct. Rev. 345, 358-59 and *passim* (Citing authorities, discussing the principle, but disagreeing with its application). The "ordinary meaning" of this statute is that the individual juror is a sovereign in her own right when it comes to respect for life.

4

FELL-00002078

Congress has given us an ever-expanding list of capital crimes. It is fair to insist that courts observe the limits inherent in the language Congress has chosen. The remaining portion of this jury selection memorandum argues in the alternative, without waiving the above contention.

### III. THE CONSTITUTION DEMANDS THAT FELL BE TRIED BEFORE A JURY COMPOSED OF INDIVIDUALS WHO WILL CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE.

The Sixth and Eighth Amendments of the United States Constitution guarantee a capital defendant the right to a fair trial before a panel of impartial and indifferent jurors. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Duncan v. Louisiana*, 391 U.S. 145, 147-158 (1968); *Turner v. Louisiana*, 379 U.S. 466, 471-473 (1965); *Irwin v. Dowd*, 366 U.S. 717, 722-723 (1961).

In *Morgan*, the Supreme Court confirmed, as it had previously suggested in *Ross*, that, in order to protect a capital defendant's right to a fair trial, a juror is properly removed for cause at any stage of the proceedings if it becomes clear that the juror's views in favor of the death penalty would *"prevent or substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 728-729, *quoting Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980).[2] In *Morgan*, the Court "reiterate[d]" that a juror, for example, who would "automatically" impose a death sentence

---

[2] Death qualification, which "[limits] the State's power to exclude" jurors for cause based upon their conscientious scruples against the death penalty, *Wainwright*, 469 U.S. at 423, is governed by the same standard. *See Morgan*, 504 U.S. at 728, 734-735 ("Jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath...whether they be unalterably *in favor of or opposed to* the death penalty in every case...by definition are ones who cannot perform their duties in accordance with the law") (emphasis added); *Wainwright*, 469 U.S. at 423-424; *Adams*, 448 U.S. at 47-48; *Witherspoon v. Illinois*, 391 U.S. 510, 512-513 (1968).

FELL-00002079

following conviction for murder is properly excluded under this standard. *Morgan,* 504 U.S. at 729, 736. Such "ADP" jurors are properly excused because they "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736.

The *Morgan* standard of exclusion (sometimes referred to as "life qualification"), however, encompasses more than the class of ADP jurors, i.e., those who would "automatically" choose death as a general proposition for all convicted of murder. Pursuant to *Morgan,* "[a]ny juror to whom mitigating factors are. . . irrelevant"—not merely those jurors who "obviously" deem it so--"should be disqualified for cause, for [they have] formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 738-739. This much was recognized by Justice Scalia: "The Court today holds that the Constitution requires that voir dire directed to this specific 'bias' be provided upon the defendant's request; and that the more general questions about 'fairness' and ability to 'follow the law' that were asked during voir dire in this case were inadequate." *Id.* at 739 (Scalia, J., dissenting).[3]

*Morgan* establishes, then, that any person whose preconceptions about the propriety of the death penalty—either generally or related to the specific case — are such that the juror's ability to follow the trial court's penalty phase instruction that he or she consider the mitigating evidence presented by the defendant is substantially impaired, should not be qualified. In other

---

[3] Furthermore, Justice Scalia noted in his dissent in *Morgan v. Illinois,* 504 U.S. at 7 n. 3, that under the majority's holding a juror who does not think that a particular mitigating factor is mitigating -- the examples he used were "extreme mental or emotional disturbance" or "bad childhood" -- "must also be excluded." This provides further support for a capital defendant's ability to ask questions about the factors in a particular case.

6

FELL-00002080

words, if a juror is substantially impaired in his or her ability to meaningfully consider and give

effect *to any mitigating evidence relevant in the defendant's particular case*, the juror must be

removed.[4]

It is important to emphasize that the "consideration" of mitigating evidence required by

the post-*Lockett* cases, *see* note 4, *supra*, is more than a passive willingness to listen to the

defendant present his case. As used by the Supreme Court, the term "consider" means to actively

---

[4] *Morgan*'s holding is rooted in a long line of Supreme Court cases requiring that jurors consider and be permitted to give effect to mitigating factors relating to the individual defendant before assessing the ultimate punishment. *See, e.g., Morgan*, 504 U.S. at 736 (Explaining that the dissenting opinion rejects "the line of cases tracing from *Woodson* and *Lockett*, developing the nature and role of mitigating evidence in the trial of capital offenses").

In *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), the Supreme Court first held that imposition of a mandatory death sentence without consideration of the character and record of the individual offender is inconsistent with the fundamental respect for humanity that underlies the Eighth Amendment. The Court reaffirmed and extended this principle in *Shuman v. Sumner*, 483 U.S. 66 (1987), by invalidating a mandatory death sentence imposed on a Nevada inmate (who had been serving a life term without parole) for killing a prison guard on the ground that the sentencing scheme failed to give individualized consideration to the defendant's character and record. The Court's holdings in *Woodson* and *Shuman*--that the Constitution does not permit mandatory death sentencing in theory—are given practical effect in *Morgan*, which prohibits mandatory death sentencing in fact.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court struck down the Ohio death penalty statute based on this principle because it did not permit the type of individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments. *See id.* at 605 ("A statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"). The Court went further in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), vacating a death sentence because the state court declined to consider the defendant's unhappy upbringing, emotional disturbance, and turbulent family history as relevant mitigating circumstances. As the Court explained this extension of *Lockett*, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Id.* at 113-114. The Court exercised this principle in *Skipper v. South Carolina*, 476 U.S. 1 (1986), reversing a death sentence where the petitioner was prevented from introducing the testimony of prison guards and a frequent jail visitor as evidence of his good adjustment in prison. *Id.* at 9. Exclusion of this testimony at the sentencing phase, the Court found, "deprived [petitioner] of his right to place before the sentencer relevant evidence of mitigation of punishment." *Id.* at 4.

Finally, in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Court extended the *Lockett* principle once again. Although, consistent with *Lockett* and *Eddings*, neither the Texas legislature nor the Texas trial court prohibited the jury from "considering" mitigating factors, that was not enough. The Court held that the trial court had to allow the jurors to "give effect" to these factors by specifically instructing them that they must be considered in making the life or death decision. *Id.* at 328.

7

FELL-00002081

take into account, "enter into the decision" or "weigh in the balance." As Justice Powell explained in *Eddings*, "[the jurors] may determine the weight to be given relevant mitigating evidence...[b]ut they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114. *Penry* reinforced this notion by requiring that the trial court not only ensure that the jurors "consider" mitigating evidence in the passive sense of listening, but also guarantee that jurors both "consider and give effect to" the mitigation in their deliberation. *Penry*, 492 U.S. at 319 ("*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence"); *compare id.* at 355 (Scalia, J., concurring/dissenting in part) ("What the Court means by 'fully consider' is to consider for all purposes . . .").

In sum, a capital defendant's constitutional right to a fair trial is protected--and the constitutional mandate satisfied--only where each individual juror actively considers and gives effect to all relevant mitigating evidence as a meaningful part of his or her life or death decision.

IV.    FELL IS ENTITLED TO A MEANINGFUL VOIR DIRE, WHICH ALLOWS INQUIRY SUFFICIENT TO ENSURE THAT THE JURY IS COMPOSED OF INDIVIDUALS WHO WILL CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE.

"Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan*, 504 U.S. at 729; *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). An adequate voir dire enables a capital defendant to exercise his constitutional right to an impartial jury by challenging prospective jurors for cause

8

FELL-00002082

before a judge able to accurately rule on their removal. *See Morgan*, 504 U.S. at 729-730; *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

Of course, voir dire is "conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristiano v. Ross*, 424 U.S. 589, 594-95 (1976). Yet, in exercising this discretion, the court must keep in mind the requirements of the Constitution. "[A] suitable inquiry is permissible in order to ascertain whether the juror has *any* bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Mu'Min*, 500 U.S. at 431. *Morgan* clarifies that, in a capital case, questioning of potential capital jurors as to whether they would automatically or nearly always vote for the death penalty on the facts of the particular case, or could consider and give effect to the relevant mitigating factors in the case, is not only suitable, but constitutionally required if a capital defendant is to receive a voir dire adequate to protect his right to a trial before an impartial tribunal.

During voir dire, therefore, a capital defendant is not limited to general or theoretical inquiries as to whether a prospective juror has a bias for the death penalty as a general proposition. Fell must also be allowed to question potential jurors as to whether they will consider and give effect to the mitigating factors relevant in the particular case.[5]

Federal capital sentencing statutes include similar provisions. *See* 18 U.S.C. § 3592 (a), 21 U.S.C. § 848 (m). Here, as in *Morgan*, only if jurors actively consider and give effect to mitigating evidence can the statutory mandate be satisfied. Accordingly, the Sixth Amendment

---

[5] *See, e.g., McQueen v. Scroggy*, 99 F.3d 1302, 1329 (6th Cir. 1996) (Allowing exploration of jurors' attitudes toward drugs and alcohol intoxication as a mitigating circumstance).

9

right of a capital defendant to adequate voir dire of potential jurors must include the right to inquire into a juror's ability to consider and give effect to any and all relevant mitigating evidence in a particular case. This includes the use of hypothetical questioning of jurors insofar as it is necessary to ascertain a juror's ability to weigh particular, case-specific mitigating evidence.

V.     FELL IS ENTITLED TO A MEANINGFUL VOIR DIRE, WHICH ALLOWS INQUIRY SUFFICIENT TO ENSURE THAT THE JURY IS COMPOSED OF INDIVIDUALS WHO WILL CONSIDER A LIFE SENTENCE ASSUMING ALL RELEVANT STATUTORY AGGRAVATING FACTORS HAVE BEEN PROVEN.

In this case, Fell must also be allowed to qualify jurors on aggravating factors which will be in issue. The real question is whether a juror can consider a sentence other than death for someone who intentionally kills another person in the course of multiple killings and by beating the victim to death. To allow a juror whose beliefs would compel a vote for death under such circumstances to serve in this case would have the same effect, for example, as the Nevada statute mandating death sentences for those who murder while incarcerated. Of course, that law was struck down as unconstitutional in *Shuman v. Sumner*, 483 U.S. 66 (1987). In other words, just as the legislature may not mandate death for inmates who kill while imprisoned--nor for another particular type of aggravated murder--neither may a juror's beliefs be allowed to accomplish the same impermissible result. Thus, in order to determine whether jurors can follow the law as set forth in *Shuman*, the Fell must be allowed to question them on the salient aggravating facts of this case.

The scope of questioning that Fell seeks to pursue regarding the ability of potential jurors to meaningfully consider mitigating evidence--to establish that they *could* truly consider and

10

FELL-00002084

evaluate it--is distinct in form and intent from an inquiry into *how* jurors *would* weigh particular evidence at trial. The latter approach, to which the labels "staking out," "sneak preview" or "loaded questioning" are frequently applied, is often prohibited. *See United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) (Overruling *United States v. Evans*, 917 F.2d 800 (4th Cir. 1990)) (No error to disallow question whether juror would give more weight to testimony of a "[corrections officer], police officer or member of the FBI" than to that of "any other citizen in the community"); *State v. Southerland*, 316 S.C. 377, 382, 447 S.E.2d 862, 866 (S.C. 1994) ("An inquiry as to the weight a juror would give one kind of witness over another invades the province of the jury"). Nonetheless, many federal courts allow this type of questioning. *Lancaster*, 96 F.3d at 747-49 (Dissent); *see, e.g., Brown v. United States*, 338 F.2d 543 (D.C.Cir. 1964); *United States v. Martin*, 507 F.2d 428, 432-33 (7th Cir. 1974); *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979); *United States v. Gelb*, 881 F.2d 1155, 1164-65 (2d Cir. 1989); *United States v. Victoria-Peguero*, 920 F.2d 77, 84 (1st Cir. 1990); *United States v. Amerson*, 938 F.2d 116, 117-18 (8th Cir. 1991); *United States v. Nielsen*, 1 F.3d 855, 859 (9th Cir. 1993).

In contrast, the scope of questioning which Fell seeks asks jurors neither for a relative assessment of the weight they would give certain substantive evidence nor for an assessment of the weight they would give to evidence presented by certain classes of people. Regardless of whether it would be inappropriate during voir dire to ask jurors how they would weigh certain aggravating or mitigating factors, if jurors already have prejudice, then it is an appropriate subject for inquiry and a basis for disqualification.

Therefore, by making inquiry on voir dire to ascertain a juror's *ability* to weigh or give effect to mitigating evidence, the defendant is not obtaining an unsanctioned "sneak preview" of

11

FELL-00002085

how jurors will weigh specific mitigating or aggravating evidence at trial. Rather than an improper "preview," such inquiry is a necessary and constitutionally sanctioned *view* into whether a juror is already biased. Such case-specific penalty bias remains a basis for disqualification even if the juror, in the hypothetical capital case, could consider a penalty less than death. *Morgan, supra.* Nor is the scope of inquiry proposed by Fell an improper attempt to "stake out" jurors. Fell is merely protecting his constitutional right to a fair trial by assuring that all jurors before whom he is tried *are capable of* weighing all relevant mitigating factors.

During voir dire, therefore, Fell's counsel should be allowed, at the very least, to inquire (or have the Court inquire) about each juror's ability to consider and give effect to the relevant statutory mitigating factors listed in 18 U.S.C. § 3592 (a) such as the fact that "the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform to the requirements of the law was significantly impaired." 18 U.S.C. § 3592 (a) (1). Additionally, counsel must also be permitted to inquire into each individual juror's ability to consider and give effect to all other relevant evidence of mitigation,[6] including the following:

_____

[6] Any evidence is mitigating which leads to an inference that "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5, *quoting Lockett*, 438 U.S. at 604. Under *Lockett*, relevant mitigating evidence includes, per se, anything which bears upon the record, background and history of the defendant or the circumstances of the crime, and lessens the defendant's moral culpability. *Cf. Skipper, supra* at 7 n.2 (Evidence of defendant's 'personal hygiene practices' would be irrelevant to a sentencing determination); *State v. Plath*, 313 S.E.2d at 627 ("'How often [defendants] will take a shower' is irrelevant to the sentencing determination"). All relevant mitigating evidence must be considered by the jury. *Morgan*, 504 U.S. at 729; *see Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Eddings*, 455 U.S. at 114 (1982); *Lockett*, 438 U.S. at 604 (1978). Accordingly, defense counsel must be allowed to pursue on voir dire the ability of each potential juror to consider and give effect to such evidence.

Moreover, defense counsel must be allowed to inquire as to any bias that would impair a juror's ability to follow the law with respect to mitigating evidence presented or elicited at either the guilt/innocence or sentencing phase of the trial. Indeed, the question that the Supreme Court insisted should have been asked in *Morgan*, "[i]f you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?," *Morgan*, 504 U.S. at 733, refers to the "facts" to be elicited at trial. By requiring the proposed question in *Morgan*, the Supreme Court mandated inquiry into whether jurors harbor any preconceptions that would prevent them from considering the "facts" elicited at trial because they have "predetermined the terminating issue of [the]

12

1.    Whether the juror has any bias with respect to the death penalty in a hypothetical case that would prevent or substantially impair his or her ability to perform his or her duties as a juror to consider all evidence, mitigating and aggravating, prior to rendering a penalty verdict.

2.    Whether the juror has any bias or opinion with respect to individuals who have been involved in a kidnapping or carjacking resulting in death, that would prevent or substantially impair his or her ability to perform his or her duties as a juror to consider all evidence, mitigating and aggravating, prior to deciding upon a penalty verdict.

3.    Whether the juror has any bias or opinion with respect to multiple killings that would cause him or her to impose a verdict of guilty or a sentence of death without regard to other evidence that may be adduced at either phase of trial.

4.    Whether the juror has a bias or opinion with respect to an alleged beating death that has been characterized as especially heinous, cruel or depraved, that would cause him or her to impose a verdict of guilty or a sentence of death without regard to other evidence that may be adduced at either phase of trial.

5.    Whether the juror has a bias or opinion or experience with respect to relevant mitigating evidence, such as poverty, neglect, physical abuse, childhood exposure to violence, that would cause him or her to be unable to consider and weigh such a background at the penalty phase of trial.

6.    Whether the juror has a bias or opinion because of exposure to pretrial publicity or discussion about this case or that would cause him or her to render a verdict of guilty without regard to evidence that may be adduced at trial.

7.    Whether the juror has a bias or opinion because of exposure to pretrial publicity or discussion about this case that, in the event the defendant is convicted of a capital offense, would prevent or substantially impair the juror from considering a life sentence.

### VI.  THE FORM OF ORAL VOIR DIRE: SPECIAL PRECAUTIONS.

Case law, social science studies, and experience teach that the process of a capital voir

---

trial, that being whether to impose the death penalty." *Id.* at 736.

13

FELL-00002087

dire can have deleterious effects on the ability of counsel and the Court to obtain all necessary information and, all other things held equal, may indeed incline jurors toward conviction and a sentence of death. For these reasons, we ask that the Court take specific precautions during the voir dire at the defendants' trial to ensure fairness of process.

        1.      Avoiding "Processing" Effect.

Social science studies establish that the process of death qualification itself has a prejudicial effect on the jurors who end up sitting on the jury. *See, e.g.,* Haney, *On the Selection of Capital Juries,* 8 Law & Hum. Behav. 121-33 (1984) ("Haney I"); Haney, *Examining Death Qualification: Further Analysis of the Process Effect,* 8 Law & Hum. Behav. 133-151 (1984) ("Haney II").

Death qualification biases capital juries "not only because it alters the composition of the group 'qualified' to sit, but also because it exposes them to an unusual and suggestive legal process." Haney I at 121. The "process" of death qualification involves the asking of questions that presume the likelihood of a penalty phase. This inclines jurors toward returning a guilty verdict in the initial phase and a death verdict at sentencing:

> Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the defendant. The death qualification process led subjects to perceive both prosecutor and judge as more strongly in favor of the death penalty, and to believe that the law disapproves of people who oppose the death penalty. And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it. Thus, persons who had been exposed to death qualification not only differed from non-death-qualified subjects, but they differed in ways that were consistently prejudicial to the interests and rights of the defendants.

Haney I at 128-29.

14

FELL-00002088

The "processing effect" stems from the necessarily extended discussion of penalty before any determination of guilt. Jurors in novel or unfamiliar situations are especially sensitive to cues from authority figures like judges. When judges, from the very start of voir dire, begin to focus and dwell on the death penalty, it resolves uncertainty in the minds of the jurors in a way prejudicial to the defendant.[7] Because expectations are important determinants of the way subsequent information is received, interpreted, and acted upon, "[o]nce jurors have imagined themselves in the penalty phase of the trial, they may come to assume that it will occur, and begin to organize subsequent information in a manner consistent with that assumption." *Id.* at 130, 131.

Another distorting factor is that death qualification requires jurors to take a public stand, affirming their willingness to consider imposing the death penalty. Because public advocacy of a position intensifies one's belief in it, "[t]he public affirmation required by death qualification may thus intensify jurors' commitments to use the death penalty . . . [or cause jurors to] become invested in a 'tough' image that will affect them in deliberations." *Id.* at 130-31.

The Court, therefore, should remain vigilant at all times that the method by which questions are asked does not implicitly convey the notion that a penalty phase is likely or inevitable or that the law would favor a guilty verdict followed by a death sentence.

Fell asks that the Court make strong efforts to minimize the processing effects of the death penalty voir dire on the prospective jurors by employing the tendered admonition prior to voir dire. [Attached as Exhibit "A"]. The Court must carefully ascertain whether the prospective

---

[7] Without attorney participation these process effects are magnified because it is the judge who seems so very focused on the defendant's punishment.

15

FELL-00002089

juror recognizes that the procedure must be followed in every potential capital case--namely the questioning on punishment issues being conducted before trial. The prospective juror must be able to understand that the procedure cannot be allowed to affect either the prospective juror's view of the defense, the presumption of innocence, or the prosecution's burden of proof.

2.    Obtain Information Before Instructing.

Fell asks that the Court permit counsel to fully explore the depth and strength of any punishment-related feelings, biases, opinions or prejudices *before* the jurors are instructed about legal obligations or requirements of the law. Otherwise, both counsel and the Court are deprived of the opportunity to learn the jurors' true feelings, on which counsel must rely to intelligently exercise challenges, and which the Court must assess if it is to reliably and fairly rule on cause challenges. "[S]ufficient information concerning the juror's predilections . . . is much more likely to be expressed freely when the juror is not constrained by an instruction from the court on what kind of answer leads to automatic dismissal." *State v. Williams*, 550 A.2d 1172, 1182 (N.J. 1988).

3.    Leeway To Ask Open-Ended Questions.

Fell asks that the Court permit counsel to ask open-ended questions designed to inquire into the actual feelings, opinions, and knowledge of prospective jurors relating to punishment views.

To conduct a proper capital voir dire that fully protects the defendant' rights and interests, the Court must permit counsel to fully develop each prospective juror's feelings about the death penalty in general, with repeated inquiries if the questionnaire, in-court answers, demeanor and body language of the person suggest that repetition is advisable and necessary. It is only through

16

FELL-00002090

a penetrating voir dire that a juror's feelings, beliefs, views, opinions, attitudes, and convictions about the death penalty can be adequately explored.

Moreover, such voir dire is particularly important in order to discover those jurors who may harbor pro-death penalty views that are well camouflaged:

> [A] far greater percentage of death penalty skeptics identify themselves at voir dire than do death penalty supporters. Review of the voir dire transcripts of automatic appeals decided by this court confirms the existence of the problem. Although death penalty supporters vastly outnumber opponents, it is a rare voir dire transcript where more venire persons acknowledge support for capital punishment than opposition.

*People v. Turner*, 690 P.2d 669, 699 (Cal. 1984) (Bird, C.J., concurring and dissenting).

*Compare Ross v. Oklahoma*, 487 U.S. 81, 83-84 (1988) (Juror initially indicated he could vote to recommend life if the circumstances were appropriate, but "on further examination by defense counsel declared that if the jury found petitioner guilty, he would vote to impose death automatically").

4.    Leeway to Probe Jurors' Understanding of the Concept of Mitigation.

The case law is clear that jurors may not make their life or death decision on the basis of the crime itself, no matter how horrific. The circumstances of the offense *and the offender* must be considered. *See, e.g., Penry v. Lynaugh,* 492 U.S. 302 (1989); *Shuman v. Sumner,* 483 U.S. 66 (1987); *Spaziano v. Florida,* 468 U.S. 447 (1984); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Bell v. Ohio,* 438 U.S. 637 (1978); *Lockett v. Ohio,* 438 U.S. 586 (1978); *Woodson v. North Carolina,* 428 U.S. 280 (1976).

Unfortunately, a growing body of social science research demonstrates that capital sentencing jurors often fail to understand the mitigating significance of evidence concerning the

17

FELL-00002091

defendant. See Sandys, *Cross-Overs–Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 Ind. L. J. 1183, 1220-21 (1995); Constanzo & Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 L. & Hum. Behav. 185 (1992). Capital instructions typically use complex language, unfamiliar words, one-sentence definitions of terms, and many sentences with double negatives, all of which make the instructions difficult for jurors to understand. Luginbuhl & Howe, 70 Ind. L. J. at 1169. Without a coherent guiding explanation, jurors fall back on their own knowledge, but have little appreciation of many of the concepts in a capital sentencing trial, especially mitigation.[8] *Id.*

Specifically, many jurors believe that they must unanimously agree that a mitigating circumstance is present in the case before it can be considered. In fact, as Eisenberg and Wells report, over sixty percent of jurors in South Carolina capital cases labor under this significant misperception. Eisenberg & Wells, 79 Corn. L. Rev. at 11;[9] *see, also* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (49% of jurors thought unanimity was required to give effect to mitigating

---

[8] According to Haney,

> Some of this derives from the fact that we seem to have become a society that has, at this time in our history, a very difficult time conceptualizing and legitimizing compassion, mercy, charity, and understanding — all concepts that are intertwined with mitigation but which now have become terribly hard for our citizens to define, harder to assert, and virtually impossible to connect to something resembling a principled point of view.

Craig Haney, 70 Ind. L.J. at 1227.

[9] Moreover, in a test conducted by the Cornell Death Penalty Project to study juror comprehension (hereinafter "Cornell Study"), the subject of greatest confusion was whether unanimity was required in considering mitigating evidence. In the study, conducted at Cornell Law School, twenty-three mock jurors were read a set of model South Carolina instructions for a capital sentencing jury. The jurors were then immediately given a questionnaire to assess their comprehension of the substance of the instructions. Even with the instructions having just been read to them, only five of the twenty-three jurors understood that they did not have to unanimously agree as to the existence of a mitigating circumstance in order to give it effect. Fifteen of the twenty-three jurors said they all had to agree, and three did not know. *Id.*

18

FELL-00002092

circumstances); Diamond & Levi, 79 Judicature at 224.

Many jurors also believe that mitigating circumstances must be established beyond a reasonable doubt. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (41% of jurors thought standard of proof for mitigating factors was 'beyond a reasonable doubt'); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (Almost half); Cornell Study (Four of twenty-three thought standard was 'beyond a reasonable doubt'; seven thought standard was 'preponderance of the evidence'; four did not know).

Moreover, many jurors do not understand that they can consider *any* factor in mitigation. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (Only 59% understood that they could consider any evidence as be constituting a mitigating factor); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (Less than a third of the jurors understood that a mitigating circumstance must be proven only to the juror's satisfaction).

Furthermore, of particular relevance here, a significant number of jurors believe that the death penalty is mandatory for an intentional or vicious or heinous murder. *See* Eisenberg, Garvey & Wells, 44 Buff. L. Rev. at 360 ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness"); Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings*, 70 Ind. L. J. 1043, 1091 n.32 (1995) (Many jurors); Geimer & Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L. 1, 41 (1989) (Significant number of jurors believed that death penalty was mandatory or presumed for first degree murder). In the Cornell Study, only nine of twenty-three jurors understood that once an aggravating circumstance was established, there was neither a

19

presumption leaning towards a life sentence nor a presumption leaning towards the death penalty. Of those remaining, six thought the death penalty was presumed.

Indeed, empirical research suggests that capital jurors enter the sentencing phase with a substantial bias in favor of, or a "presumption" of, death. *See* Eisenberg & Wells, 79 Corn. L. Rev. at 12-14, 38 n.12; *compare* Bowers, 70 Ind. L. J. at 1090, Table 6 (In study of actual capital jurors, one-half had made up their minds as to penalty once they had convicted the defendant); Sandys, 70 Ind. L. J. at 1228 ("One half of the jurors had actually made up their minds – were 'absolutely convinced' or 'pretty sure' – about the appropriate penalty once they had convicted the defendant at the guilt phase").

Even when jurors do understand, they are likely to operate independently of the judge's instructions and fail to properly utilize that information in reaching a fair and just verdict. For example, in Geimer and Amsterdam's study of Florida jurors, over half of the jurors interviewed attached little or no significance to the aggravating circumstances and mitigating circumstances presented. Geimer & Amsterdam, 15 Am. J. Crim. L. at 24. To the extent such circumstances were considered important, it was for the wrong reasons. "Some jurors indicated that the list may have helped confirm their understanding that death was the mandatory or expected recommendation." *Id.* In the words of one juror, "[i]t seemed that the State of Florida called for the death penalty. There didn't seem to be any choice." *Id.* at 25.

Thus, the Court at voir dire should permit counsel to probe deeply into jurors' understanding of the concept of mitigation. In particular, counsel should be free, in formulating these questions, to "clearly articulate and underscore the importance of broadening the focus of the penalty phase inquiry" and assure himself that the jurors can extend their "moral assessment

20.

to the issues beyond the guilt-phase crime itself." *Id.* at 1229. Otherwise, Fell may be confronted with a jury likely to decide the punishment issue during the guilt phase, and unlikely to consider fairly all mitigating evidence.

## VII.  THE COURT SHOULD ALLOW COUNSEL TO QUESTION POTENTIAL JURORS

### 1.  Introduction.

Some federal judges personally conduct voir dire. In courts where such is the practice, lawyers don't even bother to ask to participate. The Supreme Court has never held there is a constitutional right compelling judges to permit defense counsel an opportunity to question prospective jurors.[10] *See e.g., United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969), (Claim that Rule 24(a) is unconstitutional is "frivolous") *cert. denied*, 397 U.S. 1062 (1970); *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36, 41 (1980), *cert. denied*, 451 U.S. 1011 (1981), *rev'd on other grounds*, 476 U.S. 28 (1986). But this is no ordinary case. Defense counsel in this case "ask to ask."

Of course, Rule 24 (a) of the Federal Rules of Criminal Procedure gives trial courts discretion in deciding the scope and method of jury voir dire. *United States v. Magana-Arevalo*, 639 F.2d 226 (5th Cir. 1981). However, this Court has the duty to ensure that Fell receives a fair trial under the Fifth Amendment to the United States Constitution by uncovering and neutralizing

---

[10] In contrast, some courts do see constitutional rights implicated when attorneys are not allowed to participate in voir dire. *See, e.g., Maddux v. State*, 825 S.W.2d 511, 514 (Tex. App. 1992) ("The right to pose such questions is part of the *right to counsel under ... the Texas constitution ...*"). *See also, Oden v. State*, 90 N.W.2d 356, 358 (Neb. 1958) ("The usual and better practice is to permit counsel to conduct the examination under the direction and supervision of the court."); *State v. Hankins*, 441 N.W.2d 854, 866 (Neb. 1989) ("The defendant... has the right to put pertinent questions to prospective jurors..."). *Cf. Strube v. State*, 739 P.2d 1013, 1016 (Okl. Cr. 1987) ("Rule six, as well as the ABA Standards Relating to Trial Courts, Section 2.12 (1976) and the ABA Standards for Trial by Jury, section 15-2.4 (1978), make clear that participation by ... the defense in voir dire, at least in criminal proceedings, is a right).

FELL-00002095

juror prejudice. *See generally Turner v. Louisiana*, 379 U.S. 466 (1964) (Bailiffs who were also prosecution witnesses were never asked whether they talked to the jury about the case); *Irvin v. Dowd*, 366 U.S. 717 (1961) (Jury infected by prejudice due to pretrial publicity); *Turner v. Murray*, 476 U.S. 28 (1986) (Voir dire required on racial bias when interracial capital crime alleged). While this Court may well be able to meet any constitutional minimum, or to choose a procedure which will mask any failing, Fell asks the Court to exercise its discretion and to err, if at all, on the side of fairness and caution.

In recent years, federal courts have recognized, even in non-capital cases, the importance of attorney participation in order to ensure both parties a more effective jury selection process. *See, e.g., United States v. Ible*, 630 F.2d 389 (5th Cir. 1980); *United States v. Ledee*, 549 F.2d 990 (5th Cir. 1977). In *Ible*, 630 F.2d at 389 n.8., the Court stated:

> [W]hile Federal Rule of Criminal Procedure 24 (a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court does not take into account the fact that it *is the parties, rather than the court, who have a full grasp of the nuances and the strengths and weaknesses of the case* ... Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill the need than an exclusive examination in general terms by the trial court.

> \* \* \* \* \* \*

> More recently, records reviewed in this court reflect a new pattern by trial courts. The trial judge will explain the nature of the case in general terms, point out the parties and counsel, cover the most basic points of law (burden of proof, presumption of innocence, right to remain silent, etc.), explain the procedures and schedule to be followed and then turn the questioning over to trial counsel. We encourage this approach.

630 F.2d at 395; emphasis added. As federal judges experiment with attorney-participation in voir dire, a majority have come to view the practice is preferable in certain cases. *See*, Report of

22

FELL-00002096

the Committee on Juries of the Judicial Council of the Second Circuit, 12-31 (August 1984) (Judges in criminal cases favored the experimental procedure by a 12-4 vote.)

### 2. Capital Punishment Questioning is Unique.

In capital cases, requests for attorney participation in voir dire are routinely made and *routinely granted*. Both the legislative[11] and judicial branches have recognized that death penalty cases are different when it comes to determining the structure of jury selection. Fed. R. Crim. P. 24 (b) itself evidences that capital trials are different from non-capital actions.[12] Death penalty cases are different, and nearly every member of the Supreme Court since *Furman* has so declared.[13] Any lawyer who has experienced voir dire in a capital case knows why.

In the modern era, probing juror punishment views, particularly about death as a sanction, is unfamiliar in federal courts. Experience from the trial of capital cases in state courts teaches that extracting reliable information regarding venire members' views on the death penalty is a delicate operation. To the uninitiated, it can be confusing and complex. "Given the important, delicate and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry...." *State v. Williams*, 550 A.2d at 1182.

For example, every knowledgeable court and commentator recognizes that, with many

---

[11] 18 U.S.C. § 3432 requires that "at least three entire days before commencement of trial ... a person charged with ... [a] capital offense ... shall ... be furnished with ... list of the veniremen."

[12] Fed. Crim. Proc., Rule 24 (b) requires "20 peremptory challenges" for "each side" in cases where the "offense charged is punishable by death ..." Otherwise, the "defendant or defendants jointly" are entitled to "10 peremptory challenges."

[13] "[E]very member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any punishment, and hence must be accompanied by unique safeguards ...." *Spaziano v. Florida*, 468 U.S. 447, 468 (1985) (Stevens, J., dissenting); *Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976).

23

FELL-00002097

jurors, initial responses to death-qualifying questions cannot be taken at face value. *See Gray v. Mississippi,* 481 U.S. 648, 662-663 (1987) ("[D]espite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated. It might have become clear that they could set aside their scruples and serve as jurors.") The Court in *Wainwright v. Witt,* 469 U.S. 423, 425 (1985), recognized that a searching inquiry is often necessary before jurors can be excluded on the basis of moral, philosophical or practical reservations regarding a particular punishment. "[T]hese veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."[14] It is for this reason that the Supreme Court has often assumed, without suggesting it was deciding, that counsel would at least be permitted to participate in the death qualification process.

> As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.

*Wainwright v. Witt, supra,* 469 U.S. at 423.

The Supreme Court has often noted defense counsel's failure to participate in death-qualification as indicative of support for, or at least acquiescence in, the court's ruling on a juror's impartiality. "In this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did not ... attempt rehabilitation." 469 U.S.

---

[14] By way of example, the *Witt* Court cited excerpts from voir dire in *O'Bryan v. Estelle,* 714 F.2d 365, 379 (5th Cir. 1983), *cert. denied,* 465 U.S. 1013 (1984), demonstrating a juror's confused and seemingly contradictory answers to punishment related questions. 469 U.S. at 425 n. 6.

24

FELL-00002098

at 430-431.[15]

*Adams v. Texas*, 448 U.S. 38 (1980), as interpreted in *Wainwright v. Witt*, 469 U.S. 412 (1984), modified the stringent "automatic" and "unmistakably clear" standard that must be met before a juror's punishment views could result in disqualification from service in a capital case. *Compare Witherspoon v. Illinois*, 391 U.S. 510, 520 n. 9, 522 n. 21 (1968) *with Adams v. Texas*, 448 U.S. 38, 45 (1980) (Before a cause challenge is granted, the juror's punishment views must "*prevent or substantially impair* the performance of his duties as a juror ... ") *and Wainwright v. Witt*, 469 U.S. at 424 ("Standard is whether the jurors views would '*prevent or substantially impair* the performance of his duties as a juror . . . .'"). While this relaxed somewhat the rigors of inquiry on the "anti-death penalty" side of the punishment equation, in the long run it complicates matters. This is because "death-qualification," actually "punishment-qualification" now becomes a three-dimensional phenomenon for the interrogator.

First, jurors who are "substantially impaired" by virtue of anti-capital punishment views must be identified.[16] Second, jurors who are "substantially impaired" by virtue of *pro*-capital punishment views must be identified.[17] *See Morgan, supra*. Third, venire members must be

---

[15] "Defense counsel did not object or attempt rehabilitation." *Witt*, 469 U.S. at 416. "We note in addition that respondent's counsel chose not to question Colby himself . . . . This questioning might have resolved any perceived ambiguities in the questions . . . ." *Id.*, at 434.

[16] Anti-death penalty venire members may be referred to as "*Witherspoon-Witt* excludables," or "WEs". *See Lockhart v. McCree*, 476 U.S. 162, 167 n. 1 (1986).

[17] Sometimes phrased in now-outdated *Witherspoon* terms, courts refer to such jurors as having "automatic death penalty" views. This means they are jurors "biased in favor of the death penalty under all circumstances," *Patterson v. Commonwealth*, 222 Va. 653, 659, 283 S.E.2d 212, 216 (1981), or who have "an unalterable bias in favor of . . . the extreme death penalty." *Clozza v. Commonwealth*, 228 Va. 124, 142, 321 S.E.2d 273, 276 (1984) *cert. denied*, 469 U.S. 1230 (1985). After *Witt*, "automatic" is not the applicable standard. Nevertheless, these potential jurors are often referred to as "automatic death penalty jurors" or ADPs.

25

identified who are substantially impaired *in considering lawful mitigating evidence.*

"Presumably, under today's decision *a juror who thinks a 'bad childhood' is never mitigating must also be excluded.*" *Morgan*, 504 U.S. at 7, n. 3 (Scalia, J., dissenting). Counsel is simply in a better position to accomplish this required line of questioning, especially as to mitigation questions.[18]

### 3. The Judge As Referee Or Advocate?

Each of the participants in capital voir dire has a role which is highly differentiated. It is unwise and indeed unseemly for a trial judge to be placed in a position of pulling a juror in one direction or another[19] (i.e., trying to rehabilitate) when the juror is clearly uncertain of his own views or, perhaps, even dissembling.[20]

Second, the judge simply does not know enough of the facts, from the defense

---

[18] In *State v. Williams*, 550 A.2d at 1182 - 1173, this type of death qualification was discussed.

Our examination of the record indicates ten instances in which the trial court, faced with a jury who favored the death penalty in certain cases, refused defendant's request to inquire whether a conviction for both murder and rape should cause the juror to refuse to consider mitigating factors. As we stated in *State v. Bey II*, 112 N.J. 123, 152 (1988), the standard for exclusion for cause of jurors derived from *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *Adams v. Texas*, 448 U.S. 38 (1980), and *Wainwright v. Witt*, 469 U.S. 412 (1985), applies to jurors who support the death penalty as well as those opposed . . . The issue is whether the juror's capacity to credit the evidence in mitigation would be 'substantially impaired' within the meanings of *Adams and Witt*. *Bey II, supra,* 112 N.J. at 154.

[19] "The purpose of voir dire is not to elicit from a potential juror the correct answer; it is to draw out the potential juror's views, biases, and inclination and to provide both counsel and the court . . . with sufficient information with which to challenge potential jurors intelligently--whether for cause of peremptorily." *State v. Biegenwald,* 126 N.J. 1, 39, 594 A.2d 172 (1991).

[20] Citizens are unfortunately not always candid during death qualification. They may wish to "get on" or "get off" the jury depending on their motivation. *See, e.g., Gray v. Mississippi,* 481 U.S. at 653 n. 4, where the "plurality . . . hints that . . . potential jurors may not have been properly excludable for cause because they were merely feigning objections to capital punishment in order to avoid jury service." Although the dissent argues "the Constitution certainly permits the exclusion for cause of potential jurors who lie under oath about their views of capital punishment", no one suggests such jurors do not exist. *Gray,* 481 U.S. at 676 (Scalia, J., dissenting).

26

FELL-00002100

perspective, to do a thorough job. "This Court has previously stressed that voir dire examination not conducted by counsel has little meaning." *United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980). While a defense lawyer's failure to adequately cover all critical aspects of capital voir dire is almost certain to meet constitutional standards,[21] no such presumption of competency or tactical motivation will aid a trial judge in his or her lonely journey across the jury selection minefield.[22] *See, e.g., State v. Williams*, 550 A.2d at 1186 (Reversing death penalty case) ("Based on an independent review . . . we find the trial court relied much too heavily on close-ended questions, and on several occasions did not ask adequate follow up questions. . . . ").

On a more practical level, it is essential for the Court to pay strict attention to the jurors' responses and demeanor. "[T]he manner of the juror while testifying is oft times more indicative of the real character of his opinion than his words." *Reynolds v. United States*, 98 U.S. 145, 156 (1879). Such a focus is "peculiarly within a trial judge's province" and is undermined by concentration on the next question or topic required of the interrogator. *Witt*, 469 U.S. at 428.

### 4. Other Jurisdictions.

Many states, either through statute or court rule, specifically permit attorney-conducted voir dire *as of right* in all criminal proceedings.[23] Some only do so in capital cases.[24] But the

---

[21] *But see generally, Marzullo v. Maryland*, 561 F.2d 540, 546 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011 (1978) (The attorney's conduct at the voir dire . . . failed to protect client); *Cannellas v. McKenzie*, 160 W.Va. 431, 236 S.E.2d 327, 331 (1977) ("other instances" of ineffective assistance included counsel's failure to interrogate prospective jury members about whether they had read prejudicial newspaper articles immediately before trial).

[22] It seems counter-productive to appoint "learned" counsel, pursuant to 18 U.S.C. §3005, experienced in capital jury selection and then limit counsel's input to the awkward and time consuming role of suggesting follow-up questions to the Court for each juror.

[23] *See, e.g.*, Ala. Rule Crim. Proc. 18.4(c) ("The court shall permit the parties or their attorneys a reasonable examination of prospective jurors."); *Fields v. City of Alexander City*, 597 So.2d 242, 244 (Ala. Cr. App. 1992) ("It is readily apparent that the use of mandatory term 'shall' in Rule 18.4(c) . . . *requires* that parties or their attorneys have the absolute right to conduct a reasonable examination of prospective jurors . . ." The rule is "in line with

27

FELL-00002101

common practice in American death penalty trials is to permit the lawyers to ask. Citing

Gutman, *The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right*, 39 Brooklyn

L.Rev. 290, 324 (1972), the Commentary to the American Bar Association Standards for

Criminal Justice (2nd Ed. 1986), Trial by Jury, § 15-2.4, states that "'the overwhelming majority

of state courts hold that attorney-conducted voir dire in criminal cases is essential to fundamental

fairness under state con-stitutions, as well as the Sixth Amendment.'" *Id.* at 55. This is surely

true of the *practice* in the vast majority of states.[25]

### 5. Cause Challenges.

While a judge is obviously capable of asking whether a prospective juror would "lay

aside" any objectionable opinions or impressions and "render a verdict based upon admissible

evidence alone", or similar boilerplate and rhetorical questions, such standard fare is unlikely to

---

Alabama practice and local custom." *Id.*); Ark. Rule Crim. Proc. 32.2 (The judge shall also permit such additional questions by the defendant or his attorney . . ."); *Fauna v. State*, 582 S.W.2d 18, 19 (Ark. 1979) (The trial judge is required to permit reasonable questions by the defendant or his attorney.); Article 786, La. Code Crim. Proc. ("The court, the state and the defendant shall have the right to examine prospective jurors."); Nev. Rev. Stat. 175.031 ("The . . . defendant or his attorney . . . are entitled to supplement the examination by such further inquiry as the Court deems proper. Any supplemental examination must not be unreasonably restricted."); N.C. Gen. Stat. §15 A-1214(c) ("The . . . defense counsel . . . may personally question the prospective jurors individually . . . . [and] is not foreclosed from asking a question merely because the court has previously asked the same or similar question."); Ohio Rule Crim. Proc. 24(A) (The "court shall permit the state and defense to supplement the examination by further inquiry."); Okl. Rule Dist. Courts 6 (1992) ("The parties or the attorneys *shall be allowed* a reasonable opportunity to supplement such examination.").

[24] South Carolina and Texas confer upon defense counsel a right by statute to personally question jurors in death penalty cases. *See* S.C. Rev. Stat. § 16-3-20 (In "cases involving capital punishment any person called as a juror shall be examined by the attorney for the defense."); *State v. Atkins*, 350 S.E.2d 302, 304 (S.C. 1987) (Denial of attorney participation in capital voir dire error); Tex. Code Crim. Proc. Art. 35.17(2) ("Then, on demand of the state or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principle propounded by the court.").

[25] *Compare Turner v. Commonwealth*, 273 S.E.2d at 41 with the common Virginia practice. "Although the statute formerly required the judge alone to ask the questions, in practice most trial courts permitted counsel to ask directly." Boyd, *Practice and Pleading-- The Twelfth Annual Survey of Virginia Law: 1966-1967*, 53 Va.L. Rev. 1763, 1781 (1967).

28

FELL-00002102

be seen as adequate in a racially sensitive death penalty case. In *State v. Williams, supra,* the Court reversed a death sentence in part because "the tenor of the questions often appears to lead the juror inevitably to the 'correct' response . . . " A capital defendant has a due process right to ferret out venire members who are prejudiced. It is not up to the Court to do this for Fell. "[O]ur jury selection system permits parties *to protect themselves* against prejudice by allowing [attorney voir dire] . . . to exclude unacceptable jurors." *State v. Hedgepath,* 310 S.E.2d 920, 922 (N.C. App. 1984). In capital cases, attorney participation will lead to an "enhanced record [which] is imperative to society's interest in a fair trial." *State v. Williams,* 550 A.2d at 1182. As a practical matter, how can a judge actually and thoroughly commit to using his or her considerable authority to "discover basis for intelligent exercise of cause and peremptory challenge . . . " *State v. Jones,* 596 So.2d 1360, 1366 (La.App. 1992). "We are convinced that prohibiting attorney-conducted voir dire altogether may seriously impede that objective." *Whitlock v. Salmon,* 752 P.2d 210, 212 (Nev. 1988).

### 6. Peremptory Challenges.

Peremptory challenges remain one of the most important rights of the accused. *Swain v. Alabama,* 380 U.S. 202 (1965). In view of the sensitive and complex issues in this case, counsel's participation in questioning of prospective jurors on certain limited topics is essential. Such a ruling would permit counsel to make an individual judgment regarding peremptory challenges rather than a stereotypical assumption or a crude guess, thereby impairing the peremptory challenge right. *See United States v. Harris,* 542 F.2d 1283, 1294 (7th Cir.), *cert. denied,* 430 U.S. 934 (1976) ("The defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective jurors to enable them to exercise intelligently their

29

FELL-00002103

peremptory challenges"); *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir.), *cert. denied*, 434

U.S. 902 (1977) ("Peremptory challenges are worthless if trial counsel is not afforded an

opportunity to gain the necessary information upon which to base such strikes.").

### 7. Social Science Evidence.

When the judge conducts the voir dire, it usually consists of leading questions which

cause prospective jurors to agree unquestioningly. It is not uncommon to hear a judge ask a

prospective juror, "You can be fair and impartial, can't you?" to which the obvious appropriate

answer is, "Yes." Few jurors ever dare to disagree. However, simply opting for a more open-

ended, court-conducted voir dire fails to address the inherent constraints on the inquiry which

arise naturally from the average juror's view of his or her relationship to the court. Social

science studies have repeatedly shown that jurors are acutely aware of even the most subtle cues

or indications from the judge. Fearing the court's disapproval, jurors will usually respond to the

court's queries in a manner they believe is acceptable to the court without actually considering

their own individual, personal and honest responses. Note, *Judges' Non-Verbal Behavior in Jury

Trials: A Threat to Judicial Impartiality*, 61 Va. L. Rev. 1266 (1975); *see* Broeder, *Voir Dire

Examinations: An Empirical Study*, 38 S.Cal. L. Rev. 503, 506, 513 (1965). The Supreme Court

has noted:

> The influence of the trial judge on the jury "is necessarily and properly of great
> weight" and "his lightest word or intimation is received with deference, and may
> prove controlling."

*Oeurcia v. United States*, 289 U.S. 466, 470 (1933), *quoting Starr v. United States*, 150 U.S. 614,

626 (1894).

Attorney conducted voir dire is a more effective tool for eliciting bias than questioning

30

FELL-00002104

conducted by the court alone.  The social distance between the questioner and the prospective jurors is reduced and jurors may feel less inhibited about offering more candid responses to an attorney.  Furthermore, the judge cannot have the same interest in discerning juror bias as does an adversary, and the adversaries may be more sensitive to those juror responses which may need follow-up inquiry.  Moreover, the trial judge is less familiar with the evidence and case theories than are the parties.  In *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977), the Court stated:

> A judge cannot have the same grasp of the facts, the complexities and nuances as the trial attorneys entrusted with the preparation of the case.  The court does not know the strength and weakness of each litigant's case.  Justice requires that each lawyer be given an opportunity to ferret out possible bias and prejudice of which the juror himself may be unaware until certain facts are revealed.

*See also* Frates & Green, *Jury Voir Dire: The Lawyer's Perspective*, 2 A.B.A. Litigation (1976).

Attorney conducted voir dire is the standard practice in most  state courts in death penalty cases, and for good reason.  Social science research demonstrates that attorneys are more effective than judges in eliciting candid self-disclosure from potential jurors.  Attorney conducted voir dire minimizes the pressure to conform to a set of perceived judicial standards that arises due to questions from the judge.  In one study, subjects changed their answers almost twice as much when questioned by a judge as when interviewed by an attorney.  Jones, *Judge-Versus Attorney-Conducted Voir Dire*, 2 Law and Human Behavior 131 (1987).  Thus, "trial courts should be especially sensitive to counsel's requests to supplement the court's voir dire examination [and] should be sensitive to permitting attorneys to conduct some voir dire." *State v. Williams*, 550 A.2d at 1189, n. 10 (Reversing conviction and death sentence due to erroneous cause challenge and to overall inadequacy of judge-conducted voir dire).

31

FELL-00002105

### 8. ABA Standards.

After initially recommending that judges have the option of conducting voir dire without permitting counsel to question jurors personally, the American Bar Association reversed its position. It now recommends at least some personal participation in voir dire by counsel in every case, not just death penalty cases. American Bar Association, *Standards for Criminal Justice* (2nd ed. 1986), *Trial by Jury*, § 15-2.4 provides:

> Interrogation of jurors should be conducted initially and primarily by the judge, but counsel for each side should have the opportunity, subject to reasonable time limits, to question jurors directly, both individually and as a panel.

The Standard further advises that if there is reason to believe that jurors have been previously exposed to information about the defendant's case "counsel should be given liberal opportunity to question jurors individually about the existence and extent of their preconceptions." *Id.*

The Commentary to the Standard recognizes "[t]here are limits to what a trial judge can do in conducting an adequate examination." *Id.* at 54. This is so because the trial judge will not be familiar with many important aspects of the case. "The court's task in voir dire examination must be to control counsel's inquiry and not to presume unto itself the role of defendant's advocate." Gutman, *supra* at 326-327.

### 9. Judicial Economy.

Upon request, certain topics must be covered and certain questions must be asked[26] by the

---

[26] A trial judge does not have unlimited discretion to ignore proposed questions, nor to arbitrarily refuse such questions. *See United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). For example, in *United States v. Hill*, 738 F.2d 152 (6th Cir. 1984), the district court refused to ask the venire regarding the presumption of innocence. Reversing, the Court of Appeals reasoned: "A negative or hesitant answer from any prospective juror would surely have produced a defense challenge and, if the judge did not excuse the prospective juror, the exercise of a peremptory challenge by defense counsel." 738 F.2d at 153. *See also United States v. Contreras-Castro*, 825 F.2d 185 (9th Cir. 1987) (Although the court questioned prospective jurors regarding their relationship with law enforcement officers and general questions regarding impartiality, the court's failure to question the entire panel

32

FELL-00002106

Court. It seems more efficient to permit counsel to simply ask rather than waste time approaching the bench, or asking the juror to step outside, to request follow up questions after a juror discloses information on certain critical topics. This seems a small request from a citizen who is facing death.

## VIII. THE COURT SHOULD EMPLOY USE OF AN EXTENSIVE JURY QUESTIONNAIRE AND SHOULD CONDUCT SEQUESTERED QUESTIONING OF INDIVIDUAL JURORS.

It has become common practice in complex federal criminal cases to employ the use of an extensive jury questionnaire. This practice is becoming uniform in federal capital prosecutions. Use of a jury questionnaire is time efficient and a relatively non-obtrusive way of gathering important information regarding prospective jurors.

Individual questioning of jurors is necessary in a capital case. This is the near uniform practice in federal capital cases. Likewise, district courts consistently perform or permit such individual questioning out of the presence of other jurors so as to avoid the potential contamination of an entire group of jurors and to reduce the deleterious effects of questions regarding punishment. Since individual questioning is already necessary, it takes no additional time to question jurors separated from the pool.

---

about specific bias concerning the veracity of government-agent witnesses was reversible error); *United States v. Ible*, 630 F.2d 389 (5th Cir. 1980) (Questions concerning prospective jurors' moral or religious beliefs regarding alcohol was a "very appropriate" area for inquiry in a trial for possession of counterfeit currency where the government intended to introduce evidence that the defendant traded the currency for alcohol); *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972) (Failure to conduct minimal inquiry into jurors' attitudes regarding the Vietnam protest and towards the youth culture was held to be error in a prosecution arising out of anti-war demonstration), *cert. denied*, 410 U.S. 970 (1973); *United States v. Poole*, 450 F.2d 1082 (3rd Cir. 1971) (Reversed for failure to ask whether "you or any member of your family ever been the victim . . . "); *United States v. Napoleone*, 349 F.2d 350 (3rd Cir. 1965) (Reversible error to refuse to inquire into whether jurors had a repugnance towards liars or lying where crux of defense to charge of false impersonation was that while defendant had lied regarding the purpose of his investigation he did not present himself as a federal officer); *cf. United States v. Magee*, 821 F.2d 234 (5th Cir. 1987) (Refusal to question jurors in a drug conspiracy case regarding their use of marijuana was not error where the court questioned jurors concerning their use and attitude regarding drugs in general).

33

FELL-00002107

## IX. THE COURT SHOULD EMPLOY THE STRUCK-JURY METHOD OF JURY SELECTION.

A struck-jury method of jury selection is designed to facilitate the overall intelligent exercise, by both sides, of peremptory challenges. In a November 1978 report of the Federal Judicial Center, two researchers examined the utility of the struck jury method and wrote:

> We have already seen that, in the words of Justice White, a primary purpose of peremptory challenges is to "eliminate extremes of partiality on both sides." (*Swain v. Alabama*, 380 U.S. 202, 219). The struck jury method's superiority in accomplishing this purpose is manifest. On this basis, therefore, subject to verification with other input distributions, modifications of method, and uncertainty about our scale of measurement, we agree . . . that the struck jury method of peremptory challenge should be used.

Bermant & Shepard, *The Voir Dire Examination, Juror Challenges, and Adversary Advocacy* (Federal Judicial Center 1978), at p. 36. The method was commented upon approvingly by the United States Supreme Court in *Swain v. Alabama*, 380 U.S. 202, 217-18 (1965), by the Fifth Circuit in *United States v. Sames*, 470 F.2d 751, 754 (5th Cir. 1972), by the Ninth Circuit in *Amsler v. United States*, 381 F.2d 37, 44 (9th Cir. 1967), and, by the Tenth Circuit in *United States v. Morris*, 623 F.2d 145, 152 (10th Cir. 1980). In *United States v. Blouin*, 666 F.2d 796 (2d Cir. 1981), the sole issue on appeal was whether the trial court's denial of defendant's request to use the struck jury method, as distinct from the "jury box" method, amounted to a denial of fair trial rights. While concluding that the defendant's rights had not been violated, the Second Circuit discussed at length the differences between the two systems of jury selection:

> By permitting full comparative choice among a panel of . . . prospective jurors, the "struck jury" system lets the parties make the most effective use of their challenges, in the sense that through their choices, they are able to determine from the initial panel not only who will not serve but also who will serve as the petit jury . . . .

34

FELL-00002108

> The "jury box" system does not afford the opportunity, or the danger, of full comparative choice, for the parties do not know ahead of time who the replacement for a challenged juror will be. While avoiding opportunity for an enhanced and perhaps undue impact upon the profile of the petit jury, this system has the inherent disadvantage that each side must accept at least one juror whom he has not had an opportunity to challenge. Whoever goes second in the final round will have used his last challenge before knowing the identity of the juror who replaces that last challenge.

*United States v. Blouin*, 666 F.2d at 798.

The struck method is used as a matter of course in many states, VanDyke, *Jury Selection Procedures*, Appendix D, 282-84 (1977) and is recommended by the American Bar Association:

> The approach of striking jurors, as opposed to other types of peremptory challenge, the Court observed in *Swain*, has been praised "as a fairer system to the defendant and prosecutor and a more efficacious, quicker way to obtain an impartial jury satisfactory to the parties." Ibid. It is true that each party, at the time he exercises each peremptory challenge, is confronted with the total number of persons from whom the final jury will be formed, and thus is always in a position to exclude the person most objectionable to him. Under the other systems, by contrast, there is always the chance of some other person or persons coming on the panel who are more objectionable than those already challenged.

*American Bar Association Standards for Criminal Justice* (2d Ed. 1982), § 15-2.6, Commentary at p. 70. In *State v. Ramseur*, 106 N.J. 123, 524 A.2d 188 (1987), the New Jersey Supreme Court, while rejecting an argument that the struck jury method is constitutionally required in death penalty cases, stated:

> We understand the attraction of the struck jury procedure: under it, the parties are confronted with all of the jurors who might hear the case, enabling the parties to make a comparative assessment before exercising a peremptory challenge . . . . Certainly the struck jury system is not necessarily more fair for defendants; its benefits accrue also to the prosecutor, who will likewise use the opportunity to make a comparative assessment of potential jurors.

*State v. Ramseur*, 106 N.J. at 241-42 (citations omitted).

The suggested procedure for implementation of the struck-jury method of selection is as

35

FELL-00002109

follows: On September 10, 2002, a panel of prospective jurors is brought to the courthouse,[27] with all parties present. The Court, in a prepared statement that has been reviewed by the parties for comment and/or objection, summarizes the charges in the indictment and discusses general principles concerning burdens of proof, the function of an indictment and an overview of how a criminal trial proceeds in general and how the federal death penalty operates. Fell and all counsel are introduced to the panel. The Court explains that defense counsel are court-appointed.

Following the initial orientation to the case, the potential jurors complete the questionnaires under the supervision of court staff. As the questionnaires are completed, each juror is given information on how to find out whether they will be called back for additional individual questioning, but that in no event will they be required to return until Tuesday, September 17, 2002.

The process of orientation/questionnaire-completion continues until the Court has an initial group of potential jurors. At this juncture, depending on the ability of the court staff to duplicate the questionnaires, it is requested that the parties be given the opportunity to undertake an initial evaluation of the questionnaires and that the Court endorse a procedure by which the parties reach agreement on the exclusion, by consent, of those prospective jurors whose questionnaire answers clearly demonstrate either a legitimate hardship or views that make it unlikely, in all counsels' judgment, that the particular juror will "survive" further questioning.

Once this initial "culling" has been completed, jurors would be scheduled to return for individual questioning in groups of 12 to 18, numbers which can be adjusted up or down based

---

[27] The Court may want to reserve someplace larger than its normal courtroom for the initial jury assembly.

FELL-00002110

on experience. On the day they return, each individual juror is brought to the courtroom for follow-up questioning by the Court and counsel as seems appropriate, in light of answers on the questionnaire and, as well, in regard to topics such as the criminal-justice system and the death penalty. It is suggested that the prospective juror be seated in the jury box for that interview. At the conclusion of the juror's individual *voir dire*, the Court immediately hears and decides any cause challenge. Those jurors who are not excused for cause are sent home with instructions to remain on call. This process continues until the requisite number of pre-qualified jurors is obtained. That number will be the number of jurors and alternates to be empaneled plus the total number of available peremptory challenges allocated among the parties and a few additional jurors over the absolute bottom number in the event that pre-qualified jurors, for any number of reasons, wind up not being able to serve after all.

Finally, strikes be exercised in alternating rounds so that each side is always aware of which jurors actually remain in the pool, and, thus, which jurors remain actually eligible to sit on the final jury. The final "striking" process, once a sufficient qualified pool has been chosen, need not be a lengthy one and would not require the actual presence of the jurors themselves.

## X. CONCLUSION.

WHEREFORE, for all the foregoing reason, Fell respectfully requests that the Court prohibit "punishment qualification" or, at least, permit counsel to conduct meaningful voir dire so that both the Court and counsel may identify all potential jurors who may harbor any bias with respect to either the guilt-or-innocence or penalty phases of the trial. This requires voir dire sufficient to determine whether jurors are predisposed to give the death penalty or incapable of considering and giving effect to all mitigating evidence relevant to this case. Fell further requests

37

FELL-00002111

that the Court remain especially vigilant that jurors not be preconditioned during the voir dire

process into surmising that a penalty phase is inevitable. In addition, Fell requests that this Court

use a juror questionnaire tendered by Fell and permit counsel to question jurors individually in a

sequestered setting. Finally, Fell requests that peremptory challenges be exercise by use of the

struck-jury method of jury selection.

Respectfully submitted,

By: _____

Alexander Bunin
Federal Public Defender
Federal Bar ID No. 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

Gene V. Primomo
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United
States Attorney Gregory Waples, on this 10th day of June, 2002.

_____

38

FELL-00002112

## EXHIBIT A

### COURT'S INSTRUCTION TO THE VENIRE IN
### A CAPITAL PROSECUTION

In most criminal cases, the jury only determines whether the accused is guilty or not guilty. For those defendants whom the jury finds guilty, the question of sentence is then decided by the judge, and the jury has nothing to do with choosing the punishment. However, whenever a defendant is charged with a crime which carries the death penalty as a possible sentence, the jury decides not only whether the defendant is guilty or innocent, but also--if he or she is found guilty--whether the death penalty or life in prison without the possibility of release should be the punishment.

Of course, the jury only has to decide on a defendant's punishment if the government first proves beyond a reasonable doubt that he or she committed a crime that permits the death penalty as one possible punishment. If the jury does not find the defendant guilty, then there is obviously no need to decide what the punishment should be. However, if the jury does find beyond a reasonable doubt that the defendant committed a crime for which the death penalty can be imposed, then a second trial must be held so the jury can consider additional evidence on the question of whether the defendant should be sentenced to death or life imprisonment without possibility of release. The jury, guided by the judge's instructions, would decide what would be the most appropriate punishment under the circumstances.

Now, in this case one of the charges against the defendant is that he intentionally killed someone during a kidnapping or carjacking. If a jury convicts someone of such an intentional killing, the jury can, under some circumstances, impose the death penalty after hearing additional evidence at the second, sentencing part of the trial. The death penalty is never automatic, and the jury is never required to impose the death penalty in any case, no matter what the facts and circumstances may be. However, when the jury finds itself in a situation where it must consider the death penalty at the end of the trial, the law requires that each possible juror be questioned at the beginning of the process about any feelings and opinions, if any, he or she may have about the death penalty or about life in prison without the possibility of release and the potential juror's ability to follow the law.

It is very important, however, that you understand something about this questioning. As I have told you, the defendant is presumed innocent of all the charges against him. Unless the government proves his guilt beyond a reasonable doubt, he must be found not guilty, and in that case there will be no sentencing hearing. The fact that I and the attorneys question you about punishment views now certainly does not mean that any defendant is guilty of any crime. It does not mean that I think he is guilty, or that I or the attorneys expect him to be convicted. This questioning is simply a routine part of every trial of this nature. We will ask you about your views concerning punishment for intentional murder before the trial even starts only because this is, under our required procedures in every case, the only chance to do so. You are not to draw any conclusions about the case or the evidence from the fact that we are asking you about punishment before a decision has been made about whether the defendant is guilty or innocent.

FELL-00002113

# EXHIBIT 206

I, Thomas V. Ryan Ph.D., ABPP, declare as follows:

1. I testified as an expert witness on the issue of future dangerousness in the case of *United States v. Richard Thomas Stitt.*

2. Based on the defendant's score on a psychological instrument called the Psychopathy Checklist-Revised (PCL-R), I testified that he met the criteria for psychopathy. I testified about the defining characteristics of psychopathy and about the utility of the PCL-R as a predictor of future violence in prison. Based upon the defendant's PCL-R score, I offered the opinion that he would be a future danger if sentenced by the jury to life without parole.

3. Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.

4. My testimony to the best of my recollection, without reviewing the transcript of my testimony about the defendant, included the following statements relating to the PCL-R and psychopathy:

   a) that based on his score on the PCL-R, the defendant presented a high risk of future violence even in the context of a maximum security federal prison;
   b) that because he was a psychopath as defined by the PCL-R, the defendant was essentially untreatable and not amenable to rehabilitation;
   c) that because he was a psychopath as assessed with the PCL-R, the defendant would not "burn out" after age forty like other violent offenders, but instead would continue to be violent;

5. The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes.* In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

FELL-00002114

6. Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt*.

7. My experience in *Haynes* prompted me to review my future dangerousness testimony in the *Stitt* trial.

8. At the time I testified in Stitt, there was enthusiasm among psychologists about the PCL-R's potential use as a tool for assisting mental health professionals in determining whether mentally disordered individuals could safely be released into the community. Because it was a newly developed instrument, however, there were few published, peer reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in North America. It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

9. In a comprehensive review of the literature relating to institutional violence and the PCL-R that focused on the use of the PCL-R in capital sentencing proceedings, John Edens, a psychologist with extensive experience in the area of risk assessment, concluded, "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable...." Edens, J., Petrila, J., & Buffington-Vollum, J.K, 2001, Psychopathy and the death penalty: can the PCL-R identify offenders who represent "a continuing threat to society?" Journal of Psychiatry and Law, 29, 433-481. Although other experts have expressed different opinions, I generally agree with Dr. Edens' conclusion, and believe it is an accurate summary of the prevailing view among forensic psychologists.

10. Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*. The government's continued confidence in my work speaks, I believe, to the integrity of my assessments and my professional decision-making.

11. In addition to the PCL-R, I based my testimony in the *Stitt* trial on documents pertaining to the defendant and his history provided by the government, my own clinical interview of Mr. Stitt, my administration and interpretation of both the PCL-R and another psychological instrument, the Minnesota Multiphasic Personality Inventory

FELL-00002115

(MMPI), and the psychological assessment of the defense psychologist, Dr. Thomas Pasquale, which was provided to me.

12. In the course of discussions with counsel assisting Mr. Stitt in his post-conviction proceedings, I have been advised of significant historical and background facts pertaining to Mr. Stitt that I did not know of at the time of my evaluation and testimony and were not brought to my attention. Had I known of these facts at the time of my evaluation, they may have caused me to arrive at conclusions different from the ones I testified to at trial. Had I not known of them at the time of my evaluation but simply been cross-examined based on assertions that such facts were true, I probably would have testified that such facts, if true, would cause me to question the conclusions that I had previously reached about this individual.

13. I am speaking specifically of information regarding the family history and upbringing of the defendant. I believed and testified that although the defendant was born to a mother who was young and unable to appropriately care for him, he had been raised by a warm and nurturing grandmother until the age of twelve, in a home that was across the street from his maternal and paternal grandfathers, who engaged in fatherly activities with the defendant during his childhood. I believed that the pattern of behavioral problems manifested by the defendant as a child were unexplained by any major mental illness or other factor and therefore that he had manifested a conduct disorder at an early age. This, together with the defendant's continued criminal conduct as an adult, and the psychological profile indicated by his MMPI results, led me to conclude that as an adult the defendant did not suffer from a major mental illness or other mental disorder and was best described as having an antisocial personality disorder.

14. Post-conviction counsel for Mr. Stitt have advised me that their investigation has indicated that in fact his grandmother's home was a chaotic, violent and frequently terrifying environment; that Mr. Stitt lost even that home when his grandmother died when he was eight years old; and, most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings.

15. Although all of this information would have been important for my evaluation, the information about the diagnoses of the defendant's mother and her first-degree relatives would be very helpful. I have been advised that the defendant's mother experienced repeated involuntary emergency psychiatric hospitalizations for acute episodes of bipolar disorder, and that at least one aunt has been diagnosed with bipolar disorder as well.

16. Bipolar and other mood disorders have a higher than normal genetic link, and are diagnosed on the basis of an individual's behavior and family history. With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light. For example, Mr. Stitt scored high on the mania scale of the MMPI, leading to a recommendation in the report of his scores to consider a diagnosis of mood disorders including manic episodes, hypomanic states, and cyclothymia. I certainly would have seriously considered this result more heavily had I been aware of the diagnoses of Mr. Stitt's mother and his aunt. Instead, I focused on the

FELL-00002116

psychopathic deviance scale, on which Mr. Stitt also scored high, and emphasized personality qualities that were similar to the features of psychopathy that he had scored high for on the PCL-R.

17. Similarly, I would most likely interpret differently statements that Mr. Stitt made to me during our clinical interview. For example, when asked to rate himself on a scale of one to ten, Mr. Stitt awarded himself a fifteen. He told me that if released he would pursue an acting career in Hollywood, and that he could anticipate no difficulty in achieving such a goal. With an awareness of his bipolar family history, this could be alternatively viewed as those indicative of mania or hypomania, suggesting the possible presence of a mood disorder.

18. Furthermore, information about a bipolar family history would have caused me to question whether the early behavior problems manifested by Mr. Stitt were indications of early onset bipolar disorder. The out-of-control behavior described in the information I was provided about Mr. Stitt's childhood could be consistent with the behavior of children suffering from early onset bipolar disorder, and therefore could have been symptomatic of a mental illness rather than a volitional decision by Mr. Stitt not to conform to societal expectations. If, on cross-examination at trial, Mr. Stitt's counsel had questioned me in this area and informed me about the family history of bipolar disorder, I certainly would have conceded that it raised substantial concerns about the possibility of mental illness in Mr. Stitt.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection at this time.


_____

Thomas V. Ryan, Ph.D., ABPP
May 12, 2003

FELL-00002117

# EXHIBIT 207

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICTS OF NORTHERN NEW YORK & VERMONT

**ALBANY - MAIN OFFICE**
**39 NORTH PEARL STREET**
**5ᵀᴴ FLOOR**
**ALBANY, NY 12207**
**(518) 436-1850**
**(518) 436-1780 FAX**

**SYRACUSE - BRANCH OFFICE**
**4 CLINTON EXCHANGE**
**3ᴿᴰ FLOOR**
**SYRACUSE, NY 13202**
**(315) 701-0080**
**(315) 701-0081 FAX**

**BURLINGTON - BRANCH OFFICE**
**110 CHERRY STREET**
**2ᴺᴰ FLOOR**
**BURLINGTON, VT 05401**
**(802)862-6990**
**(802)862-7836 FAX**

**RESPOND TO ALBANY OFFICE**

February 23, 2005

Mr. David V. Kirby
United States Attorney
United States Courthouse and Federal Building
11 Elmwood Avenue
Burlington, VT 05401

Re: *United States of America v. Donald Fell*, No. 2:01-CR-12

Dear David:

In 2001, I wrote to you, documenting the mitigation evidence in this case. Based upon meetings with you, and United States Attorney Peter Hall, we reached an agreement to settle the case for a plea of guilty to kidnapping with death resulting. Under federal law, that would have resulted in a mandatory life sentence. The agreement was later rejected by the United States Attorney General and a notice of intent to seek the death penalty was filed.

The purpose of this letter is to provide you with additional, new mitigation evidence so that the Department of Justice, and the United States Attorney General, may reconsider the decision to seek the death penalty in this case. The Department of Justice's Manual provides that if the United States Attorney seeks withdrawal of a death penalty notice, any changes in facts and circumstances must be provided to the Attorney General. See Section 9-10.090.

Since the original decision to seek the death penalty in this case, there have been at least three major developments that affect the appropriateness of seeking a death sentence. First, are the findings by the government's mental health experts that there is substantial mitigating evidence against seeking a death sentence in this case. Second, is Donald Fell's adjustment to confinement, and contributions to institutional life at Vermont's Northwest Correctional Facility. Third, are changes to case law that preclude the admission of the statements of deceased co-defendant Robert Lee. Each of these, separately, or in combination with the mitigation evidence previously provided, warrants a reexamination of the original decision to seek a death sentence.

On December 31, 2002, Dr. John S. Rabun, a forensic psychiatrist chosen by the government, issued a report on his examination of Donald Fell. Dr. Rabun was assisted by

Page 1 of 4

FELL-00002118

psychologist Dr. Richard Wetzel, who performed psychological testing on Fell. Both doctors met with Fell in person on separate occasions. Rabun's examination of Fell lasted approximately 3 hours and 25 minutes.

The decision to allow the government to test and question Fell was made by Fell and his attorneys. The testing preceded the amendment of Federal Rule of Criminal Procedure 12.2, which now allows a judge to order testing of a capital defendant who gives notice that he will present mental health evidence during the punishment phase. However, even that rule prohibits prosecutors from viewing the results until, and if, the defendant has first been convicted of a capital offense. In this case, it was agreed that the government could view the results immediately. The reports and conclusions of the defense mental health experts, were seen by Doctors Rabun and Wetzel before they reached their own conclusions.

Doctor Rabun's report was 15 pages. Since you have the report, I will not quote verbatim. He specifically confirmed factors that mitigate against a death sentence in this case. First, he pointed to Fell's history of being sexually and physically abused as a child. Second, he referred to Fell's prolific use of alcohol and illicit drugs, both on the day of the offense, and for years before. Third, he focused on Fell's chaotic and dysfunctional family, which made him a victim of violence, as well as having to witness violence committed against other family members. Fourth, he cited Fell's acclimation to prison and his history of reacting positively to institutional life.

Doctor Rabun wrote his report over two years ago. Fell has now been confined to Vermont's Northwest Correctional Facility for more than four years. Recently, we interviewed staff at the facility and examined Fell's institutional record there. We spoke to several correctional officers who have worked with Fell while he has been there. We spoke to his teacher, who is preparing him for his High School General Equivalency Degree (GED).

The consensus was that Donald Fell is respectful, polite, and deferential to authority. All of those interviewed genuinely like him. Those who have known him since he arrived, said that he had progressed from a scared kid to a more mature and social adult. One officer said that Fell has a "respect for the officer's job, and not just respect for the person." Another, said that Fell "adapted well to the structure" of the institution. A third, pointed out that although the break rooms tend to be divided racially, Fell has a unique ability get along with everyone.

Fell's teacher has been working with inmates at Northwest Correctional Facility for over 24 years. She said, "he devours every opportunity to learn like a sponge." She is a petite woman, who often works alone with Fell. She stated that she has never felt threatened or in danger. She described Fell as "timid," "polite," and "always very appreciative." She has dealt with many manipulative inmates, and says Fell is not. "He has never asked for anything extra," she said.

During his time in custody, Fell weathered several stressful events. First, was the death of long-time friend Robert Lee, who was in the same unit. Second, was his year-long incarceration in D Unit, which is the most restrictive location, allowed him no outdoor access, and houses the

Page 2 of 4

mentally ill inmates. Third, was the institution's change to a smoke-free environment, which required Fell to eliminate use of tobacco at once.

Donald Fell has been given several positions of trust at the institution. He began with a base level cleaning duty and now has the more desirable laundry position. Fell was elected by other inmates as the Echo Unit representative to the Echo Management Team, a group of corrections employees and an inmate representative, who meet regularly to defuse grievances in the unit. Fell's institutional records are consistent with what we were told. They are available for your review.

The third development, since the death notice was filed, is the change in the law related to the admission of out-of-court statements. When Judge Sessions found the Federal Death Penalty Act unconstitutional, he pointed to the fact that the government argued for the admission of deceased co-defendant Robert Lee's statements at the punishment stage, even though they were inadmissible during the guilt-innocence portion. United States v. Fell, 217 F.Supp. 2d 469, 485 (D. Vt. 2002). The judge found that it violated due process for some elements of capital murder to be proven by a lesser standard.

On appeal, the Second Circuit held that while the Sixth Amendment guarantee of confrontation also applies to the punishment stage, the FDPA protects that right by allowing a trial judge to exclude such evidence. United States v. Fell, 360 F.3d 135, 145 (2d Cir. 2004) (Under the FDPA, "the judge is the gatekeeper of constitutionally permissible evidence"). The court found that the constitutional rule requiring confrontation was consistent with such a balancing test.

One week later, the United States Supreme Court ruled that the right to confrontation absolutely barred testimonial statements that were not previously subject to cross-examination. Crawford v. Washington, 124 S.Ct. 1354 (2004). Lee's statements were made under custodial interrogation, as part of the investigation in this case. Therefore, since the right to confrontation applies to the punishment stage, and that right is an absolute prohibition, Lee's testimonial statements are now clearly barred from either portion of the trial. Another district court recently found similar evidence was barred from proving eligibility for the death penalty at a capital sentencing hearing. See United States v. Jordan, __ F.3d __, 2005 WL 399679 (E.D. Va. Feb. 9, 2005).[1]

The exclusion of Lee's statements at the guilt stage detract little from the government's case. Fell made lengthy and detailed statements admitting his conduct. However, it makes a difference at a sentencing hearing. Lee's statements are more favorable to Lee than Fell. Fell's

---

[1] The court indicated it planned to bifurcate the sentencing phase between evidence supporting the "eligibility" for and "selection" of the death penalty, and intended to admit the voluntary statements of an unavailable witness only at the "selection" phase. However, all of Lee's statements were the product of custodial interrogation. None were voluntary. Therefore, bifurcation will not solve the problem of their reliability.

Page 3 of 4

FELL-00002120

statements, which will be admitted, are more favorable to Fell than Lee. Because the jury will weigh the relative culpability of Lee and Fell, this will have an impact upon their choice of imposing a death sentence on Fell or not. Recent changes in case law have limited the government's punishment evidence on this point.

In summary, by the time this case begins jury selection, it will be close to five years since the events of the crime. Much has happened since. It is appropriate to reconsider the basis for going forward with such a lengthy and expensive trial that may be avoided by a guilty plea and a guaranteed life sentence.

Sincerely,

Alexander Bunin
Federal Public Defender

Page 4 of 4

FELL-00002121

# EXHIBIT 208



U.S. Departm    : of Justice



*United States Attorney*
*District of Vermont*

*United States Courthouse and Federal Building*
*Post Office Box 570*                                                    *(802) 951-6725*
*Burlington, Vermont 05402-0570*                             *Fax: (802) 951-6540*

June 29, 2005

Hon. William K. Sessions, III
United States District Court
District of Vermont
Burlington, VT 05402-0928

   Re: *United States v. Fell*
     No. 2:01-CR-12-2

Dear Judge Sessions:

  This letter responds to this morning's letter from counsel regarding the government's rebuttal case.

  First, counsel cites authority for the proposition that the government may not introduce statements from a defendant's Rule 12.2 government expert interview absent defense expert mental health testimony. Counsel recognizes, of course, that the government may introduce expert mental health evidence that does not include such statements.

  The fact that the defense will not call a mental health expert does not remove from the case the issue of defendant's mental health. The second mitigating factor cited by the defense directing places mental health at issue. Moreover, documents introduced in the defense mitigation binder repeatedly raise the defendant's mental health, including documents showing multiple psychiatric hospitalizations which refer to mental health diagnoses and prescriptions for drugs. Further, at least one recent defense witness, Michael Kane, testified that the defendant's mental condition required him to be placed in a special dormitory for mental health students at St. Michael's when he was 14-15 years old. Finally, the fact that the defendant is implicated in the murder of his mother raises mental health issues. For all these reasons, we are concerned that at least some jurors will be troubled by the question of mental health.

  We are proposing to resolve this matter with the defense without calling a government mental health expert by: (1) withdrawal of the second mitigating factor, and (2) a short stipulation regarding the defendant's mental health at the time of the offense.

  Second, the defense seeks to bar any rebuttal evidence regarding the defendant's activities between the age of 15 and 20, on the theory that they presented no evidence regarding that time period. That claim is specious. The defense called multiple witnesses regarding the defendant's life from infancy through kindergarden and early teens. Certainly his life in the following years is highly pertinent. Moreover, the remaining years prior to the murders are placed at issue by the

FELL-00002122

defense mitigation factors (such as his lack of criminal history). Accordingly, the government will offer testimony regarding those intervening years.

Thank you for your attention to this matter. Looking forward to seeing you in about 11 minutes.

Very truly yours,

DAVID V. KIRBY
United States Attorney

By:

WILLIAM B. DARROW
Assistant U.S. Attorney

CC:   Alex Bunin, Esq.
      Gene Primomo, Esq.
      Paul Volk, Esq.

FELL-00002123

# EXHIBIT 209

U.S. DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES DISTRICT COURT    FILED

DISTRICT OF VERMONT    2005 JUL 14  AM 11 53

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA    )
                           )
            v.             )    Crim. No. 2:01-CR-12-01
                           )
DONALD FELL                )

## SPECIAL VERDICT FORM

**GENERAL DIRECTIONS:**

This verdict form is supplied to you because you have previously found Donald Fell guilty of the two counts contained in the Superseding Indictment. Therefore, this form applies only as to your findings on Count One (carjacking with death resulting) and Count Two (kidnapping with death resulting).

1

FELL-00002124

### I.    DEFENDANT'S AGE AT THE TIME OF THE OFFENSE

**COUNT ONE**

That the defendant Donald Fell was at least 18 years of age at the time of the offense charged in Count One of the Superseding Indictment.

Unanimous Yes _____ X _____    Not Unanimous _____

**COUNT TWO**

That the defendant Donald Fell was at least 18 years of age at the time of the offense charged in Count Two of the Superseding Indictment.

Unanimous Yes _____ X _____    Not Unanimous _____

2

FELL-00002125

## II.  THRESHOLD ELIGIBILITY FACTORS

For each count, place an "X" next to "Unanimous Yes," for each "threshold eligibility factor" you unanimously find that the Government has proven beyond a reasonable doubt.  If you do not find that the Government has proven the eligibility factor beyond a reasonable doubt to your unanimous satisfaction, then place an "X" next to "Not Unanimous."  If you find at least one threshold eligibility factor for a count, unanimously and beyond a reasonable doubt, then move on to Section III, Statutory Aggravating Factors.

**COUNT ONE**

1.  Donald Fell intentionally killed Teresca King.

Unanimous Yes ____X____    Not Unanimous _____

2.  Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Teresca King.

Unanimous Yes ____X____    Not Unanimous _____

3.  Donald Fell intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts.

Unanimous Yes ____X____    Not Unanimous _____

4.  Donald Fell intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts.

3

FELL-00002126

Unanimous Yes _____X_____    Not Unanimous _____

**COUNT TWO**

1.   Donald Fell intentionally killed Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

2.   Donald Fell intentionally inflicted serious bodily injury that resulted in the death of Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

3.   Donald Fell intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts.

Unanimous Yes _____X_____    Not Unanimous _____

4.   Donald Fell intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts.

Unanimous Yes _____X_____    Not Unanimous _____

If you answered "Not Unanimous" with respect to all four of the "threshold eligibility factors" as to one count, then that ends your consideration of the death penalty as to that count. You must stop your deliberation as to that particular count.

If you answered "Not Unanimous" with respect to all four of the "threshold eligibility factors" as to both counts, that ends your consideration of the death penalty completely. You

4

FELL-00002127

should stop your deliberations, sign this Special Verdict Form, and advise the Court you have reached a decision.

If you answered "Unanimous Yes" with respect to one or more of the "threshold eligibility factors" as to any of the counts, then continue with your deliberations as to the count or counts for which you found a "threshold eligibility factor," by proceeding to Section III below.

5

FELL-00002128

### III.  STATUTORY AGGRAVATING FACTORS

For each of the counts for which you answered "Unanimous Yes" with respect to one or more of the "threshold eligibility factors" in Section II, place an "X" next to "Unanimous Yes" or "Not Unanimous" as to whether you, the jury, unanimously find that the Government has established beyond a reasonable doubt the existence of the statutory aggravating factors.

**COUNT ONE**

1.  The death of Teresca King occurred during the commission of a kidnapping.

Unanimous Yes _____X_____    Not Unanimous _____

2.  Donald Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

3.  Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode.

Unanimous Yes _____X_____    Not Unanimous _____

**COUNT TWO**

1.  The death of Teresca King occurred during the commission of a kidnapping.

Unanimous Yes _____X_____    Not Unanimous _____

2.  Donald Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King.

Unanimous Yes _____X_____    Not Unanimous _____

6

FELL-00002129

3.  Donald Fell intentionally killed or attempted to
    kill more than one person in a single criminal
    episode.

Unanimous Yes _____X_____    Not Unanimous _____

For each count that you are considering, if you do not unanimously find that the Government has proven beyond a reasonable doubt at least one of the above statutory aggravating factors with respect to that count, then your deliberations are over as to that capital count.

If you answered "Not Unanimous" with respect to all of the statutory aggravating factors as to both counts, that ends your consideration of the death penalty completely. You should stop your deliberations, sign this Special Verdict Form, and advise the Court you have reached a decision.

If you answered "Unanimous Yes" with respect to one or more of the statutory aggravating factors with regard to one or both counts, continue on to Section IV.

7

FELL-00002130

## IV.  NON-STATUTORY AGGRAVATING FACTORS

For each of the following non-statutory aggravating factors, answer "Unanimous Yes" or "Not Unanimous" as to whether you unanimously find that the Government has proven beyond a reasonable doubt the existence of that non-statutory aggravating factor for each count.

**COUNT ONE**

1.  Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder.

Unanimous Yes _____X_____    Not Unanimous _____

2.  Donald Fell participated in the murder of Teresca King to prevent her from reporting the kidnapping and carjacking to authorities.

Unanimous Yes _____X_____    Not Unanimous _____

3.  Donald Fell participated in the murder of Teresca King after substantial premeditation to commit the crime of carjacking.

Unanimous Yes _____X_____    Not Unanimous _____

4.  As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the Defendant caused loss, injury and harm to the victim and the victim's family, including but not limited to the following:

> a) Infliction of distress on the victim. During the four-hour interval between her kidnapping and murder, Teresca King suffered extreme anxiety and emotional suffering.

> b) Impact of the offense on the family of the victim. The kidnapping and murder of Teresca King have caused the King family extreme emotional suffering, and the victim's family

8

FELL-00002131

has suffered severe and irreparable harm.
Donald Fell caused loss, injury and harm to
Teresca King and her family.

Unanimous Yes _____X_____    Not Unanimous _____

**COUNT TWO**

1.    Donald Fell participated in the abduction of Teresca
King to facilitate his escape from the area in which
he and an accomplice had committed a double murder.

Unanimous Yes _____K_____    Not Unanimous _____

2.    Donald Fell participated in the murder of Teresca
King to prevent her from reporting the kidnapping
and carjacking to authorities.

Unanimous Yes _____X_____    Not Unanimous _____

3.    Donald Fell participated in the murder of
Teresca King after substantial premeditation to
commit the crime of carjacking.

Unanimous Yes _____X_____    Not Unanimous _____

4.    As reflected by the victim's personal
characteristics as an individual human being and the
impact of the offense on the victim and the victim's
family, the Defendant caused loss, injury and harm
to the victim and the victim's family, including but
not limited to the following:

     a) Infliction of distress on the victim.
     During the four-hour interval between her
     kidnapping and murder, Teresca King suffered
     extreme anxiety and emotional suffering.

     b) Impact of the offense on the family of the
     victim.  The kidnapping and murder of Teresca
     King have caused the King family extreme
     emotional suffering, and the victim's family
     has suffered severe and irreparable harm.
     Donald Fell caused loss, injury and harm to
     Teresca King and her family.

Unanimous Yes _____X_____    Not Unanimous _____

9

FELL-00002132

After you have completed your findings in this section (whether or not you have found any of the above non-statutory aggravating factors to have been proven), continue on to Section V.

FELL-00002133

## V.  MITIGATING FACTORS

For each count, you should indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

Recall that your vote as a jury need not be unanimous with regard to each question in this section.  A finding with respect to a mitigating factor may be made by one or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in making his or her individual determination of whether or not a sentence of death shall be imposed, regardless of the number of jurors who agree that the factor has been established.

In addition to the mitigating factors outlined by this court, this section also contains blank lines in which you may write any additional mitigating factors that any member or members of the jury may have found.  You may consider during your deliberations any other factor or factors in Donald Fell's background, record, character, or any other circumstance of the offense that mitigates against the imposition of the death sentence.  You may write these additional mitigating factors on the blank lines.  If you need additional space, simply write "continued" at the end of the

11

FELL-00002134

blank lines and write any additional factors on the back side of the paper. It is not necessary, however, for you to list a mitigating factor in order to consider it.

**COUNT ONE**

1. Donald Fell's capacity to appreciate his conduct was significantly impaired.

   _____0_____ Number of Jurors who so find.

2. Donald Fell did not plan to kill Teresca King at the time she was kidnapped.

   _____1_____ Number of Jurors who so find.

3. After his arrest, Donald Fell truthfully admitted his responsibility for Teresca King's murder.

   _____6_____ Number of Jurors who so find.

4. Donald Fell assisted law enforcement officers in finding Teresca King's body.

   _____6_____ Number of Jurors who so find.

5. Donald Fell does not present a risk to prison officials or other inmates if he is sentenced to life in prison without possibility of release.

   _____0_____ Number of Jurors who so find.

6. Donald Fell has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances.

   _____1_____ Number of Jurors who so find.

7. Donald Fell's execution would detrimentally affect persons who care about him.

   _____3_____ Number of Jurors who so find.

12

FELL-00002135

8.  Donald Fell has shown remorse for killing Teresca King.

_____ *0* _____ Number of Jurors who so find.

9.  Robert Lee, equally culpable for the crimes, will not face execution.

_____ *12* _____ Number of Jurors who so find.

10. Donald Fell and Robert Lee acted in concert in committing the crimes.

_____ *12* _____ Number of Jurors who so find.

11. Donald Fell offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day.

_____ *12* _____ Number of Jurors who so find.

12. Donald Fell was sexually and physically abused as a child.

_____ *12* _____ Number of Jurors who so find.

13. As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other.

_____ *8* _____ Number of Jurors who so find.

14. Donald Fell was raised without positive role models.

_____ *10* _____ Number of Jurors who so find.

15. As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions.

_____ *12* _____ Number of Jurors who so find.

16. Donald Fell was twenty years old at the time of the offense.

13

FELL-00002136

_____*12*_____ Number of Jurors who so find.

17. Donald Fell's parents were violent alcoholics who abandoned him as a child.

_____*12*_____ Number of Jurors who so find.

18. Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.

_____*12*_____ Number of Jurors who so find.

19. Any other factors that favor imposition of life imprisonment without possibility of release, including factors in Donald Fell's childhood, background or character.

_____*10*_____ Number of Jurors who so find.

Any additional mitigating factors:

*Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior*

_____*10* Number of Jurors who so find_____

14

FELL-00002137

**COUNT TWO**

1.  Donald Fell's capacity to appreciate his
    conduct was significantly impaired.

    _____0_____ Number of Jurors who so find.

2.  Donald Fell did not plan to kill Teresca King at the
    time she was kidnapped.

    _____1_____ Number of Jurors who so find.

3.  After his arrest, Donald Fell truthfully
    admitted his responsibility for Teresca
    King's murder.

    _____5_____ Number of Jurors who so find.

4.  Donald Fell assisted law enforcement
    officers in finding Teresca King's body.

    _____6_____ Number of Jurors who so find.

5.  Donald Fell does not present a risk to
    prison officials or other inmates if he is
    sentenced to life in prison without
    possibility of release.

    _____0_____ Number of Jurors who so find.

6.  Donald Fell has made positive
    contributions to the Northwest
    Correctional Facility by working, gaining
    an education, and helping to resolve
    inmate grievances.

    _____1_____ Number of Jurors who so find.

7.  Donald Fell's execution would detrimentally affect
    persons who care about him.

    _____3_____ Number of Jurors who so find.

8.  Donald Fell has shown remorse for killing Teresca
    King.

    _____0_____ Number of Jurors who so find.

15

FELL-00002138

9. Robert Lee, equally culpable for the crimes, will not face execution.

_____12_____ Number of Jurors who so find.

10. Donald Fell and Robert Lee acted in concert in committing the crimes.

_____12_____ Number of Jurors who so find.

11. Donald Fell offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day.

_____12_____ Number of Jurors who so find.

12. Donald Fell was sexually and physically abused as a child.

_____12_____ Number of Jurors who so find.

13. As a child, Donald Fell was forced to witness family violence, including seeing his parents stab each other.

_____9_____ Number of Jurors who so find.

14. Donald Fell was raised without positive role models.

_____9_____ Number of Jurors who so find.

15. As a child and teenager, Donald Fell was treated and institutionalized several times for mental health conditions.

_____12_____ Number of Jurors who so find.

16. Donald Fell was twenty years old at the time of the offense.

_____12_____ Number of Jurors who so find.

17. Donald Fell's parents were violent alcoholics who abandoned him as a child.

16

FELL-00002139

_____*12*_____    Number of Jurors who so find.

18. Donald Fell began regularly abusing alcohol and drugs as a child, and until the time of his arrest.

_____*12*_____    Number of Jurors who so find.

19. Any other factors that favor imposition of life imprisonment without possibility of release, including factors in Donald Fell's childhood, background or character.

_____*10*_____    Number of Jurors who so find.

Any additional mitigating factors:

_Total life experience, failure of the State of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior._

_____*10* Number of jurors who so find_

17

FELL-00002140

## VI.  DECISION

**COUNT ONE**

**1.    Sentence of Life Imprisonment without the Possibility of Release.**

We the jury decide, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed upon Donald Fell.

_____ Yes    ____X____ No

**2.  Death Sentence**

We the jury decide, by unanimous vote, that a sentence of death shall be imposed upon Donald Fell.

____X____ Yes    _____ No

**3.  Lack of Unanimity**

After making all reasonable efforts, the jury has been unable to reach a unanimous verdict regarding the proper and justified sentence to be imposed upon Donald Fell.

_____P.Geis_____

Foreperson

18

FELL-00002141

**COUNT TWO**

    **1.    Sentence of Life Imprisonment without the Possibility of Release.**

We the jury decide, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed upon Donald Fell.

    _____ Yes    \_\_\_X\_\_\_\_ No

**2.  Death Sentence**

We the jury decide, by unanimous vote, that a sentence of death shall be imposed upon Donald Fell.

   \_\_\_X\_\_\_\_ Yes    _____ No

**3.  Lack of Unanimity**

After making all reasonable efforts, the jury has been unable to reach a unanimous verdict regarding the proper and justified sentence to be imposed upon Donald Fell.

    _P. Quin_   _7/14/05_

    Foreperson

Note: If you have unanimously decided to impose the death penalty, proceed to Section VII.  If you have not imposed the death penalty, leave Section VII blank.  The foreperson should, in any event, sign the verdict slip and date it.

19

FELL-00002142

## VII.  CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or a victim was not involved in reaching his or her individual decision, and that the individual juror would make the same decision regarding the sentence for Donald Fell.

4. _____

11. _____

10. _____

5. _____

12. _____

#6 _____

#3 _____

#8 Fredrick Hodgdon _____

#22 _____

#7 _____

#9 _____

1. P. Geins _____

Foreperson

Dated at Burlington, Vermont, this 14th day of July, 2005.

_____
P. Geins
Foreperson

20

FELL-00002143

# EXHIBIT 210

# Fax Transmission

**Administration Department**
470 Main Street
Edwardsville, PA 18704-3299
phone: 570.288.6484
fax: 570.288.7041



Edwardsville
Borough
Luzerne County
Pennsylvania
Incorporated 1884

**TO:**
CLEARY GOTTLIED STEEN + HAMILTON

**# OF PAGES:**
19

**FROM:**
EDWARDSVILLE BOROUGH
POLICE CHIEF
DAVID SOUCHICK

**DATE:**

**RE:**
RECORDS REGARDING 1996 INCIDENT INVOLVING DEBORAH (DEBRA) FELL
OTHER REQUEST SHOULD BE ON STANDARD RIGHT-TO-KNOW REQUEST FORM

☐ Urgent     ☐ FOR REVIEW     ☐ Please Comment     ☐ Please Respond

NOTE: THIS FAX IS INTENDED FOR THE SOLE USE OF THE PERSON TO WHOM IT IS ADDRESSED. UNAUTHORIZED DISBURSEMENT, MISUSE, OR COPYING THE CONTENTS OF THIS TRANMISSION IS PROHIBITED AND MAY RESULT IN LEGAL ACTION.

**MESSAGE:**
Leo J Martin Jr
Borough Secretary
Right To Know Officer

c Page 1

FELL-00002144

FELL-00002145



# pennsylvania
### OFFICE OF OPEN RECORDS

## STANDARD RIGHT-TO-KNOW REQUEST FORM

**DATE REQUESTED:**

**REQUEST SUBMITTED BY:**     ◯ E-MAIL     ◯ U.S. MAIL     ◯ FAX     ◯ IN-PERSON

**NAME OF REQUESTER :**_____

**STREET ADDRESS        :**_____

**CITY/STATE/COUNTY/ZIP(Required):**_____

**TELEPHONE (Optional):**_____

**RECORDS REQUESTED:** *Provide as much specific detail as possible so the agency can identify the information.*

**DO YOU WANT COPIES?  YES or NO**
**DO YOU WANT TO INSPECT THE RECORDS?  YES or NO**
**DO YOU WANT CERTIFIED COPIES OF RECORDS? YES or NO**

**\*\* PLEASE NOTE: RETAIN A COPY OF THIS REQUEST FOR YOUR FILES \*\***
**\*\* IT IS A REQUIRED DOCUMENT IF YOU WOULD NEED TO FILE AN APPEAL \*\***

*FOR AGENCY USE ONLY*

**RIGHT TO KNOW OFFICER:**

**DATE RECEIVED BY THE AGENCY:**

**AGENCY FIVE (5) BUSINESS DAY RESPONSE DUE:**

*\*\*Public bodies may fill anonymous verbal or written requests. If the requestor wishes to pursue the relief and remedies provided for in this Act, the request must be in writing. (Section 702.) Written requests need not include an explanation why information is sought or the intended use of the information unless otherwise required by law. (Section 703.)*

P. 003

TEL:5702886484

EDWARDSVILLE BOROUGH

FEB. -17' 11(THU) 15:45

PAGE 1 OF 2
EDW401-7596 - CHR      04/10/96 18:45:46 - 04/10/96 18:45:45 BTK7YGWG06N5

SP4-137B
                    PENNSYLVANIA STATE POLICE CENTRAL REPOSITORY
        1800 ELMERTON AVENUE HARRISBURG, PENNSYLVANIA  17110  717-783-5592

ATTN: SGT SLUSARK                      ORI: PA0400400 EDWARDSVILLE PD

------------------------------------------------------------------------------

USE OF THE FOLLOWING CRIMINAL HISTORY RECORD FOR  *** SID/201-11-85-2 ***
REGULATED BY ACT 47, AS AMENDED.  *** III - SINGLE STATE OFFENDER ***
------------------------------------------------------------------------------
     REDACTED - FELL                      REDACTED - FELL
DOB:       54   SEX: F   RAC: W   SOC:        8195   FBI: 31339NA8
------------------------------------------------------------------------------
NAME: FELL,DEBORAH ANN                   OTN: C494141-4
ARRESTED: 03/13/91  PA0401100 PITTSTON PD                    OCA: 91027

        CC3929   RETAIL THEFT                  DISPOSITION UNREPORTED
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++.
NAME: FELL,DEBBIE ANN                    OTN: E620483-3
ARRESTED: 01/29/94  PA0401300 WILKES-BARRE PD               OCA: 15064

FELL-00002146

PAGE 1 OF 1

EDW401-7595 - CHR      04/10/96 18:44:16 - 04/10/96 18:44:16 BT27YGWG059P

*** RESPONSE FROM PA COMPUTERIZED CRIMINAL HISTORY FILE ***

ORI/PA0400400.NAM/FELL,DEBORAH          .DOB REDACTED-54.RNG/ .
SOC/      .OTN/        .FBI/        .SID/.
PUR/C.ATN/SGT SLUSARK              .OPR/.

*** RESPONSE FROM PA CCHRI - BASED ON IDENTIFIERS ABOVE ***

NAM/FELL,DEBORAH ANN       .  DOB/ REDACTED 54.  SEX/F.  RAC/W.
SID/201-11-85-2. FBI/31339NA8 . III/S. RAP STATUS/AUTOMATED
HGT/502. WGT/150. HAI/RED. EYE/HAZ. PRO-PAR MAX/     .
REDACTED-FELL8195.
OTN/C474141-4:E620483-3.
OTHER NAMES/FELL,DEBBIE          :FELL,DEBBIE ANN
THIS CCHRI RECORD LAST UPDATED : 062894

FINGERPRINTS REQUIRED FOR POSITIVE ID

FELL-00002147

FEB. -17 11 (THU) 15:45   EDWARDSVILLE BOROUGH

**ARREST REPORT**

| | | |
|---|---|---|
| 1. CONTROL NUMBER | ☒ ADULT  ☐ JUVENILE | 4. OFFENSE DATE 4/10/96 MO. DA. YR. |

**OFFENSE**

5. OTHER CHARGES

7. LOCATION OF ARREST  MAIN ST EDWARDSVILLE PA

| 8. WHEN ARRESTED 4/10/96 MO. DA. YR. HOURS | 9. TYPE OF ARREST ☐ ON VIEW  ☐ WARRANT  ☒ SUSPICION |
|---|---|

10.

**ACCUSED**

DEBORAH

15. ALIAS / NICKNAME

16. TELEPHONE  NONE

17. OCCUPATION  NONE

18. PLACE OF EMPLOYMENT / SCHOOL  NONE

20. PLACE OF BIRTH  WILKES BARRE PA

| 25. BLOOD TYPE | MALE ON L. ARM |
|---|---|

28. REDACTED - FELL   29. FBI NO.   30. SID NO.   31. PDID NO.   32. MILITARY NO.

| 33. VETERANS CLAIM NO. | 34. OPERATOR PERMIT NO. | 35. FINGERPRINT CLASSIFICATION | 36. PHOTO TAKEN ☒ YES  ☐ NO  EDW0293  NUMBER  TYPE WEAPON(S) |
|---|---|---|---|

| 37. FINGERPRINT CARD TO ☒ FBI  ☒ PSP | 38. INDICATION OF DRUGS: ☐ YES ☒ NO   ALCOHOL: ☒ YES ☐ NO | 39. DEFENDANT ARMED ☒ YES  ☐ NO | KNIFE |
|---|---|---|---|

41. PERSONAL ARTICLES RECEIPT GIVEN ☐ YES  ☐ NO   NUMBER

40. ARTICLES CONFISCATED FROM DEFENDANT  NONE

**VEH**

| 42. DEFENDANT VEHICLE IDENTIFICATION | YEAR | MAKE | MODEL | LICENSE NO./ST | DEFENDANT FAMILY CODE FOR BLOCKS 43 - 46  F - FATHER  W- WIFE  B - BROTHER  S - SON  M - MOTHER  S - SISTER  D - DAUGHTER |
|---|---|---|---|---|---|

**FAMILY**

| 43. | NAME | ADDRESS | PHONE (RESIDENCE / OFFICE) |
|---|---|---|---|
| 44. | | | |
| 45. | | | |
| 46. | | | |

**ACC**

| 47. NAME / ALIAS / NICKNAME OF ACCOMPLICE  NONE | 48. ADDRESS |
|---|---|
| 49. NAME / ALIAS / NICKNAME OF ACCOMPLICE | 50. ADDRESS |

**ATT**

| 51. ATTORNEY NAME | TELEPHONE NO. | 52. RIGHTS READ ☐ YES  ☐ NO | BY WHOM |
|---|---|---|---|

**STAT**

| 53. STATUS OF DEFENDANT  ☐ DETAINED AT  ☐ MONEY BOND - AMOUNT $  ☐ PROPERTY BOND | ☐ RELEASED  ☐ TURNED OVER TO | ☐ PERSONAL BOND |
|---|---|---|

**NARRATIVE**

| ITEM NO. | 54. CONTINUATION OF ABOVE ITEMS (INDICATE ADDITIONAL INFORMATION.)  SEE AFFIDAVIT |
|---|---|

55. ADJUDICATION  DATE AND TIME: ___ / ___ / ___

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

| | |
|---|---|
| Mag. Dist. No.: | 11-2-02 |
| DJ Name: Hon. | JOHN J. HOPKINS |
| Address: | 470 MAIN STREET EDWARDSVILLE, PA |
| Telephone: (717) 287-9645 | 18704-0000 |

OFFICER :

MICHAEL SLUSARK
EDWARDSVILLE BORO POLICE
470 MAIN ST
EDWARDSVILLE, PA 18704

**SUBPOENA CRIMINAL/SUMMARY CASE**

COMMONWEALTH OF

PENNSYLVANIA

VS.

DEFENDANT:    NAME and ADDRESS
FELL, DEBORAH
REDACTED - FELL
EDWARDSVILLE, PA 18704

L

| |
|---|
| Docket No.: CR-0000121-96 |
| Date Filed: 4/10/96 |
| OTN:    E 410135-5 |

TO: GILBERT, LAWRENCE
_____
(Name of Witness)

1. You are ordered by the court to come to:

| Event: PRELIMINARY HEARING | COMPLAINT NO. |
|---|---|
| Date: 4/16/96 | Place: DISTRICT COURT 11-2-02 |
| Time: 1:30 PM | 470 MAIN STREET EDWARDSVILLE, PA 18704-0000 |

to testify on behalf of SLUSARK, MICHAEL _____
_____    (Commonwealth) (Defendant) (Court)
_____, in the above case, and to remain until excused. **If you are disabled and require assistance, please contact the Magisterial District office at the address above.**

2. And bring with you the following: (complete if applicable)

_____

_____

_____

_____

COMPLETE FOLLOWING IF APPLICABLE:

This subpoena is issued upon application of: _____
                                              (Attorney)

Attorney's address and phone number: _____

( _____ )
_____ Date _____ John J. Hopkins _____ , District Justice

**WARNING:** Failure to comply with this subpoena may result in a finding of **CRIMINAL CONTEMPT** pursuant to **42 Pa.C.S. § 4137.** This offense is punishable by a fine and/or imprisonment.

My commission expires first Monday of January, 2000 .          **SEAL**

AOPC 605-94

FELL-00002149

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

**RELEASE OF PRISONER**

```
Mag. Dist. No.:
            11-2-02
DJ Name: Hon.
    JOHN J. HOPKINS
Address: 470 MAIN STREET
         EDWARDSVILLE, PA

Telephone: (717) 287-9645        18704-0000
```

Server

**COMMONWEALTH OF**

**PENNSYLVANIA**

**VS.**

DEFENDANT:            NAME and ADDRESS

FELL, DEBORAH
REDACTED - FELL
EDWARDSVILLE, PA 18704

```
Docket No.: CR-0000121-96
Date Filed:  4/10/96
OTN:       E 410135-5
```

18 §2702 §§A4 AGGRAVATED ASSAULT
_____
(Charge)

18 §2701 §§A1 SIMPLE ASSAULT
_____
(Charge)

To the Keeper of LUZERNE CO CORR FAC _____ Prison in said County,

You are hereby commanded to release the above named Defendant, if detained for no other cause than that mentioned in the attached commitment or other detainer of record. I hereby certify that this case has not been returned to court.

REASON FOR DISCHARGE:

☐ Hearing to be held at:

| Date; | Place: |
|-------|--------|
| Time: |        |

☐ Bail Posted

☐ Not Guilty of a Summary Offense

☒ Court Case Dismissed

☐ Charges withdrawn by Prosecution

☐ Other _____

_____

_____

Witness my hand and official seal at my office _____

this 16th day of April , 19 96

4-16-96 Date _____ , District Justice

My commission expires first Monday of January, 2000 .        SEAL

AOPC 602-95

FELL-00002150

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

RECOMMITMENT

**COMMONWEALTH OF**

**PENNSYLVANIA**

Mag. Dist. No.:

11-2-02

DJ Name: Hon.

**JOHN J. HOPKINS**

Address: **470 MAIN STREET**

**EDWARDSVILLE, PA**

Telephone: (717) 287-9645        18704-0000

Server

·VS.

DEFENDANT:        NAME and ADDRESS

FELL, DEBORAH

REDACTED - FELL

EDWARDSVILLE, PA 18704

Docket No.: CR-0000121-96
Date Filed:    4/10/96
OTN:        E 410135-5

18 §2702 §§A4 AGGRAVATED ASSAULT

(Charge)

18 §2701 §§A1 SIMPLE ASSAULT

(Charge)

To ANY AUTHORIZED PERSON of the above named County of this Commonwealth:

You are hereby commanded to convey and deliver into the custody of the Keeper of the county prison the above named defendant. You, the Keeper are required to receive the defendant into your custody to be safely kept by you until discharged by due course of law or for:

☐ A PERIOD OF _____ DAYS UNTIL _____

☐ A HEARING AT

| Date: | Place: |
|---|---|
| Time: | |

☐ A FURTHER HEARING

| Date: | Place: |
|---|---|
| Time: | |

☐ COMMON PLEAS COURT ACTION

☐ OTHER: _____

CURRENT AMOUNT OF BAIL: ___25,000.00___

Witness my hand and official seal this _16_ day of _April_, 19_96_

_____ Date _____ , District Justice

My commission expires first Monday of January, 2000        **SEAL**

AOPC 614-93

FELL-00002151

4/16/96
11-2-02

RECOMMITMENT                    COMMONWEALTH OF PENNSYLVANIA
                                            VS
CR-0000121-96                        FELL, DEBORAH

CHARGE                          DESCRIPTION

18 §2701 §§A3 SIMPLE ASSAULT

PRINTED:   4/16/96 13:47:03

FELL-00002152

4/16/96
11-2-02

DISTRICT JUSTICE SYSTEM
COMMONWEALTH OF PENNSYLVANIA

PAGE   1
ADDITIONAL CHARGES

RELEASE OF PRISONER

CR-0000121-96

COMMONWEALTH OF PENNSYLVANIA
VS
FELL, DEBORAH

CHARGE

DESCRIPTION

18 §2701 §§A3 SIMPLE ASSAULT

PRINTED:   4/16/96 13:47:44

FELL-00002153

FOR RECORDS OFFICE USE ONLY

**OFFENSE REPORT**

EDWARDSVILLE POLICE DEPT.

| 6. WHEN DISCOVERED | | | 5. TYPE OF PREMISE |
|---|---|---|---|
| 4 /10/96 | 1646 | | APARTMENT |
| MO.  DA.  YR. | HOURS | | |

**9. METHOD OF CRIME (ATTACK)**
STABBING

**10. MEANS OF CRIME (ATTACK), WEAPONS OR TOOLS USED**
PEARING KNIFE

| 11. LATENT FINGERPRINTS TAKEN | INL. | 12. PHOTOGRAPH TAKEN | INL. | 13. METHOD OF ESCAPE | 14. EVIDENCE LEFT BEHIND |
|---|---|---|---|---|---|
| [X] YES ☐ NO | | [X] YES ☐ NO NUMBER! | | | |

**VICTIM**

15. VICTIM'S NAME: LAWRENCE GILBERT — 16/17 AGE 35 — RACE WHI — SEX M — 18. ADDRESS 733 MAIN ST. APT #4 EDWARDSVILLE, PA

| 20. PHONE (RESIDENCE/OFFICE) | 21. JUVENILE | 22. DATE OF BIRTH | 23. INDICATION OF | | | |
|---|---|---|---|---|---|---|
| NO PHONE | ☐ YES [X] NO | REDACTED - FELL 61 MO. DA. YR. | DRUGS: ☐ YES [X] NO | ALCOHOL: [X] YES ☐ NO | | |

| 24. OCCUPATION (EMPLOYER/SCHOOL) | 25. INJURY | 26. HOSPITALIZED/TREATED AT |
|---|---|---|
| UNEMPLOYED | LEFT UPPER BICEP | [XX] YES ☐ NO |

**COMPLAINANT**

| 27. NAME OF COMPLAINANT (IF NOT VICTIM) | 28. AGE | 29. RACE | 30. SEX | 31. ADDRESS |
|---|---|---|---|---|
| SAME AS #15 | | | | |

| 32. PHONE (RESIDENCE/OFFICE) | 33. JUVENILE | 34. DATE OF BIRTH | 35. INDICATION OF | | |
|---|---|---|---|---|---|
| | ☐ YES ☐ NO | MO. DA. YR. | DRUGS: ☐ YES ☐ NO | ALCOHOL: ☐ YES ☐ NO | |

| 36. OCCUPATION (EMPLOYER/SCHOOL) | 37. CODE FOR BLOCK 35 |
|---|---|
| | W – WITNESS        P – PARENT        G – GUARDIAN |

**PARENT**

| 38. 39. NAME | 40. AGE | 41. RACE | 42. SEX | 43. ADDRESS |
|---|---|---|---|---|
| | | | | |

| 44. PHONE (RESIDENCE/OFFICE) | 45. JUVENILE | 46. OCCUPATION | 47. INDICATION OF | | |
|---|---|---|---|---|---|
| | ☐ YES ☐ NO | | DRUGS: ☐ YES ☐ NO | ALCOHOL: ☐ YES ☐ NO | |

**SUSPECT**

48. SUSPECT NAME: DEBBIE FELL — 49. AGE — 50. RACE WHI — 51. SEX F — 52. ADDRESS 733 MAIN ST. APT #4 EDWARDSVILLE, PA

| 53. ALIAS | 54. OCCUPATION | 55. PHONE (RESIDENCE/OFFICE) |
|---|---|---|
| | UNEMPLOYED | NO PHONE |

| 56. DATE OF BIRTH | 57. JUVENILE | 58. RELATIONSHIP TO VICTIM OR OWNER | 59. HEIGHT | 60. WEIGHT | 61. COLOR EYES | 62. COLOR HAIR | 63. COMP. |
|---|---|---|---|---|---|---|---|
| REDACTED - FELL 54 MO. DA. YR. | ☐ YES [X] NO | GIRLFRIEND | 504 | 200 | BRN | BRN | MED. |

| 64. CLOTHING WORN | 65. SCARS, MARKS, TATOOS | 66. WANT/WARRANT ON FILE | 67. ARRESTED |
|---|---|---|---|
| BLUE JEANS, BROWN SUADE COAT, RED HOOD | | [X] YES ☐ NO | [X] YES ☐ NO |

| 68. KNOWN HAUNTS | 69. KNOWN ASSOCIATES |
|---|---|
| C-MAJORS BAR, MAIN ST. EDWARDSVILLE | |

| 70. IF JUVENILE INVOLVED AS WITNESS, VICTIM, COMPLAINANT, SUSPECT | | | BY WHOM |
|---|---|---|---|
| PARENT OR GUARDIAN NOTIFIED: ☐ YES ☐ NO  TIME: | | MO. DA. YR. | |

**VEH**

**71. IF VEHICLE WAS INVOLVED IN CRIME**
☐ STOLEN    ☐ RECOVERED    ☐ USED IN CRIME    ☐ OTHER (EXPLAIN)

**NARRATIVE**

| ITEM NO. | 72. NARRATIVE: CONTINUATION OF ABOVE ITEMS. DESCRIBE OTHER WITNESSES OR SUSPECTS, EVIDENCE, PROPERTY DISPOSITION, INCIDENT. |
|---|---|
| | PRELIMINARY INVESTIGATION: ON THE ABOVE STATED DATE AND TIME THESE OFFICERS RESPOND |
| | TO A CALL FROM THE VICTIM, LAWRENCE GILBERT, THAT HE WAS STABBED IN THE ARM BY HIS |
| | GIRLFRIEND, DEBBIE FELL. THIS CALL WAS MADE FROM VIC MARS RESTAURANT. UPON PROCEEDING |
| | TO SAID LOCATION THE VICTIM WAS OBSERVED WALKING WEST ON MAIN STREET IN THE AREA OF |
| | MAIN AND GROVE STREETS. THE VICTIM WAS STOPPED BY SGT MICHAEL SLUSARK AND OFFICER |
| | HAROLD BOND. THE VICTIM STATED THAT HE WAS STABBED IN THE LEFT ARM BY HIS GIRLFRIEND |

**CONTROL**

| 74. COMM. NOTIFIED BY | 75. WHEN NOTIFIED | 76. MESS. NO. | 77. CANCELLED BY | 78. WHEN CANCELLED |
|---|---|---|---|---|
| | MO. DA. YR. HOURS | | | MO. DA. YR. HOURS |

**79. DISTRIBUTION**
☐ CHIEF    ☐ DETECTIVE    ☐ JUVENILE    ☐ NARCOTICS    ☐ OTHER (EXPLAIN)

**80. INCIDENT STATUS**
☐ OPEN    ☐ INACTIVE

82. REVIEWING OFFICER'S NAME                                DATE MO. DA. YR.

POLICE DEPARTMENT
**EDWARDSVILLE PD**

**SUPPLEMENT REPORT**

1. COMPLAINT NUMBER
96-1573

2. OFFENSE
**ASSAULT-STABBING**

3. NAME OF VICTIM
**LAWRENCE GILBERT**

4. DATE
4-10-96

5. [X] USED AS CONTINUATION SHEET OF CURRENT REPORT

6. TYPE REPORT CONTINUED OR SUPPLEMENTED
[X] INITIAL CRIME   [ ] VEHICLE   [ ] ARREST

7. [ ] USED TO REPORT SUPPLEMENTAL INVESTIGATION

8. NEW OFFENSE IF CHANGED

9. VALUED RECOVERED PROPERTY
$

10. STATUS
[ ] CLEARED   [ ] UNFOUNDED   [ ] NOT CLEARED

11. FURTHER ACTION & REPORT REQUIRED
[ ] YES   [ ] NO   (EXPLAIN BELOW)

12. MULTIPLE CLEAR-UP?
[ ] YES (LIST OTHER INCIDENT NOS. IN NARRATIVE)   [ ] NO

13. NARRATIVE: IN FOLLOW-UP USAGE, RECORD ALL DEVELOPMENTS TO LAST REPORT. LIST ANY ACCUSED AND/OR SUSPECTS AS FIRST ITEM, INCLUDE ARREST REPORT NUMBERS OF PERSONS ARRESTED, VALUE AND DISPOSITION OF RECOVERED PROPERTY (ATTACH PROPERTY RECORD), AND EXPLAIN ANY CHANGE IN OFFENSE.

ACCUSED/SUSPECT
DEBORAH FELL

WHO'S NAME IS DEBORAH FELL. GILBERT STATED THAT THEY BOTH WERE IN THE APPARTMENT AND AN ARGUEMENT STARTED OVER THE USE OF THE OVEN. THE ARGUEMENT ESCOLLATED TO WHERE BOTH ACCUSED EACH OTHER OF HAVING SEXUAL AFFAIRS WITH OTHER PERSONS. GILBERT STATED THAT FELL GRABBED A PEARING KNIFE AND SWUNG AT GILBERT WITH THE KNIFE, STRIKING HIM IN THE LEFT ARM. GILBERT STATED THAT FELL THEN FLED TO C-MAJORS BAR ON MAIN ST WHICH IS LOCATED SEVERAL DOORS AWAY FROM THE APPARTMEN' GILBERT WRAPPED A CLOTH AROUND HIS ARM AND WENT TO C-MAJORS BAR. THERE GILBERT BEGAN TO ARGUE WIT PATRONS IN THE BAR AND WAS ASKED TO LEAVE THE BAR. GILBERT THEN PROCEEDED TO WALK TO VIC MARS RESTAURANT WHERE HE CALLED POLICE AND PURCHASED 2 QUARTS OF BEER.

GILBERT REFUSED TO BE TRANSPORTED TO THE HOSPITAL VIA THE AMBULANCE AND REQUESTED THAT THE POLICE TRANSPORT HIM TO THE HOSPITAL, WHICH POLICE DID. AT THE HOSPITAL GILBERT TOLD OFFICER BOND THAT AFTER FELL STABBED HIM, SHE CLEANED UP BLOOD FROM THE FLOOR WITH A MOP. HE SAID THAT SHE STILL HAD THE KNIFE AND WOULD NOT LET HIM LAEVE THE APPARTMENT. HE WAS NOT ABLE TO LEAVE THE APPARTMENT UNTIL FELL WENT TO C-MAJORS.

GILBERT WAS TREATED AT THE NESBITT HOSPITAL IN KINGSTON BY THE ATTENDING EMERGENCY ROOM PHYSICIAN, DR RAINEY. THE INJURY WAS DESCRIBED AS EXTENSIVE WITH THE OBJECT (KNIFE) PENETRATING INTO AND THROUGH THE MUSCLE OF THE UPPER ARM. GILBERT WAS ADVISED TO CONTACT A BONE DOCTOR FOR EXAMINATION. THE WOUND WAS OBSERVED AS AN L-SHAPPED WOUND.

OFFICERS, AFTER LEAVING THE HOSPITAL WENT TO C-MAJORS BAR AND FOUND THE SUSPECT, DEBORAH FELL SEATED AT THE BAR. FELL WAS TAKEN INTO CUSTODY PURSUANT TO THE DOMESTIC VIOLENCE ACT AND PLACED UNDER ARREST FOR SIMPLE ASSAULT. SHE WAS TAKEN TO THE EDWARDSVILLE POLICE STATION FOR PROCESSING.

14. PAGE NO.

15. REPORTING OFFICER'S SIGNATURE

BADGE NO.

16. DATE OF INCIDENT

17. SUPV. INITIALS

TP

P. 012   TEL:5702886484   EDWARDSVILLE BOROUGH   FEB. -17. 11(THU) 15:49

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF: LUZERNE

Mag. Dist. No.:

11-2-02

DJ Name: Hon.

JOHN J. HOPKINS
Address: 470 MAIN STREET
EDWARDSVILLE, PA

Telephone: (717) 287-9645        18704-0000

COMMITMENT

COMMONWEALTH OF

PENNSYLVANIA

VS.

DEFENDANT:        NAME and ADDRESS

Deborah Fell
REDACTED - FELL
Edw., Pa

Docket No.:
Date Filed: 4-10-96

REDACTED - FELL

7.2. 2702.A-4. agg. assault. + Simple assault
(Charge)
A-1-3      2 Counts
(Charge)

DoB  REDACTED - FELL  54

SS#  REDACTED - FELL  8495

To ANY AUTHORIZED PERSON of the above named County of this Commonwealth:

You are hereby commanded to convey and deliver into the custody of the Keeper of the county prison the above named defendant. You, the Keeper are required to receive the defendant into your custody to be safely kept by you until discharged by due course of law or for:

☐  A PERIOD OF _____ DAYS UNTIL _____

☑  A HEARING AT

| Date: Tues. 4-16-96 | Place: 470 Main St. |
| Time: 1.30 PM | Edw. Pa |

☐  A FURTHER HEARING

| Date: | Place: |
| Time: | |

☐  COMMON PLEAS COURT ACTION

☐  OTHER: _____

CURRENT AMOUNT OF BAIL: $25,000        PA. 9PM

Witness my hand and official seal this 10 day of april, 19 96.

4-10-96   Date _____, District Justice

My commission expires first Monday of January, 2000.

SEAL

AOPC 609-93

FELL-00002156

CRIMINAL COMPLAINT (POLICE)

JOHN HOPKINS
DISTRICT JUSTICE
MAGISTERIAL DISTRICT NO. 11-2-02
470 MAIN ST EDWARDSVILLE PA 18704

**NUMBER**

Complaint Numbers if Other Participants

COMMONWEALTH OF PENNSYLVANIA

DEFENDANT: VS.

NAME
AND
ADDRESS

R.S.A.

A K A

I, **SGT MICHAEL SLUSARK**
(Name of Affiant)

of **EDWARDSVILLE PD**

do hereby state:

(1) [X] I accuse the above named defendant, who lives at the address set forth above or,

[ ] I accuse an individual whose name is unknown to me but who is described as

[ ] his nickname or popular designation is unknown to me and, therefore, I have designated him herein as John Doe; with violating the penal laws of the Commonwealth of Pennsylvania at **733 MAIN ST APT 4 EDWARDSVILLE**
(Place-Political Subdivision)

in **LUZERNE** County on or about **4-10-96 BETWEEN 1630 AND 1746 HRS**

Participants were (if there were participants, place their names here, repeating the name of above defendant).

(2) The acts committed by the accused were: (A) **PENNA CRIMES CODE SECTION 2702 (A)(4) AGGRAVATED ASSAULT-**
**(F-2)**
IN THAT THE DEFENDANT ON THE ABOVE STATED DATE,TIME AND PLACE SPECIFIED DID THERE AND THEN WITH INTENT,DID KNOWINGLY AND INTENTIONALLY CAUSE BODILY INJURY TO ANOTHER PERSON,THAT BEING ONE LAWRENCE GILBERT,BY STABBING HIM IN THE LEFT BICEP-TRICEP AREA OF HIS ARM WITH A PARING KNIFE.

PENNA CRIMES CODE SECTION 2701 (A)(1)(3) SIMPLE ASSAULT-(M-2) IN THAT THE DEFENDANT ON THE ABOVE STATED DATE,TIME AND PLACE SPECIFIED DID THERE AND THEN INTENTIONALLY AND KNOWINGLY DID CAUSE BODILY INJURY TO ANOTHER PERSON,THAT BEING LAWRENCE GILBERT,AND DID PLACE THAT PERSON IN FEAR OF IMMINENT SERIOUS BODILY INJURY WITH A DEADLY WEAPON BY STABBING HIM IN THE BICEP-TRICEP AREA OF THE LEFT ARM WITH A PARING KNIFE.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of ▓▓▓▓▓▓ and ▓▓▓▓▓▓ of the Act of ▓▓▓▓▓▓
(Section) (Sub-section)

or the ▓▓▓▓▓▓ Ordinance of ▓▓▓▓▓▓
(Political Sub-division)

(3) I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made.

(4) I, verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

April 10 , 19 96 _____
(Signature of Affiant)

AND NOW, on this April 10 , 19 96, I certify the complaint has been properly completed and verified, and that there is probable cause for the issuance of process.

11-2-02
(Magisterial District)

_____ (SEAL)
(Issuing Authority)

## ARREST WARRANT AFFIDAVIT

### DISTRICT JUSTICE
Magisterial District No. 11-2-02

JOHN HPOKINS 470 MAIN ST EDWARDSVILLE PA

| Complaint No. | Year | Type | Number |
|---|---|---|---|

Complaint Nos. of other Participants

OTN:

COMMONWEALTH OF PENNSYLVANIA } SS

COUNTY OF LUZERNE

COMMONWEALTH OF PENNSYLVANIA
vs.

DEFENDANT: (Name and address)

┌ DEBORAH FELL
REDACTED - FELL EDWARDSVILLE PA 18704
**DOB** REDACTED - FELL ┘

SGT MICHAEL SLUSARK  BADGE 2702  EDWARDSVILLE PD    717-288-8462

(Name of Affiant) ........ (Police Department or Address of Private Affiant) ........ (Telephone Number)

being duly sworn (or affirmed) before me, according to law, deposes and says that there is probable cause to believe that:

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES: (see instruc. below)

ON 04-10-96 AT APPROXIMATELY 1746HRS,THIS OFFICER AND OFFICER HAROLD BOND OF THE EDWARDSVILL POLICE RESBONDED TO THE AREA OF 733 MAIN ST EDWARDSVILLE ON A REPORT OF A STABBING.UPON ARRIVAL TO THE AREA,OFFICERS OBSERVED LAWRENCE GILBERT STANDING ON THE SIDEWALK.GILBERT STATED THAT HE HAD BEEN STABBED BY HIS GIRLFRIEND,DEBORAH FELL,ABOUT AN HOUR AGO.OFFICERS OBSERVED THE WOUN TO HIS LEFT BICEP-TRICEP AREA OF HIS LEFT UPPER ARM.THE WOUNB WAS BLEEDING AND AN ATTEMPT WAS MADE BY GILBERT TO CONTROL THE BLEEDING WITH A CLOTH.GILBERT AGREED TO GO TO NESBITT HOSPITAL ONLY WITH THE POLICE AND NOT BY AMBULANCE.UPON ARRIVAL TO THE HOSPITAL, GILBERT STATED THAT HE AND FELL HAD AN ARGUEMENT IN THIER APPARTMENT AT 733 MAIN ST APT 4 EDWARDSVILLE.HE SAID THE FEL GRABBED A PARING KNIFE AND SWUNG AT HIM WITH THE KNIFE,STRIKING HIM IN THE LEFT ARM.HE SAID THA FELL CLEANED UP THE KNIFE AND MOPPED UP THE BLOOD FROM THE FLOOR AND WOULD NOT LET HIM LEAVE THE APPARTMENT AS SHE WAS STILL IN POSSESSION OF THE KNIFE.GILBERT WAS UNABLE TO LEAVE THE APPARTMENT UNTIL FELL WENT SEVERAL DOORS AWAY TO C-MAJORS SPORTS BAR.GILBERT FOLLOWED HER TO TF BAR WHERE THE ARGUEMENT CONTINUED UNTIL THE BARTENDER FORCED GILBERT TO LEAVE.GILBERT WNET TO V MARS RESTAURANT ON MAIN ST AND CALLED POLICE REPORTING THE CRIME.

(CONTINUED)

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1. If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained. State also the factual basis for believing such other person to be reliable.

2. If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and state date, time and place of such surveillance.

3. State other pertinent facts within personal knowledge of affiant.

4. State any additional information considered pertinent to justify this application.

SIGNATURE OF AFFIANT           ADDRESS OF PRIVATE CITIZEN         BADGE NO.              DISTRICT/UNIT

Sworn to and subscribed before me this 10 day of april , 19 96

(Signature of Issuing Authority)          (SEAL)

DISTRICT JUSTICE COURT No. 11-2-2 OFFICE ADDRESS: 470 Main St,

Date Commission Expires: 1-3. 2000  PHONE: 28-7-9645

FELL-00002158

# ARREST WARRANT AFFIDAVIT

| | Complaint No. | Year | Type | Number |
|---|---|---|---|---|

### DISTRICT JUSTICE
Magisterial District No. 11-2-02

JOHN HOPKINS 470 MAIN ST EDWARDSVILLE PA

Complaint Nos. of other Participants

COMMONWEALTH OF PENNSYLVANIA } SS

COUNTY OF LUZERNE

OTN:

COMMONWEALTH OF PENNSYLVANIA
vs.

DEFENDANT:   (Name and address)

DEBORAH FELL
REDACTED - FELL    EDWARDSVILLE PA 18704
REDACTED - FELL  SSN-REDACTED - FELL-8195

SGT MICHAEL SLUSARK BADGE 2702   EDWARDSVILLE PD          717-288-8462

(Name of Affiant)      (Police Department or Address of Private Affiant)      (Telephone Number)

being duly sworn (or affirmed) before me, according to law, deposes and says that there is probable cause to believe that:

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES:  (see instruc. below)
(CONTINUATION OF PROBABLE CAUSE)

GILBERT WAS TREATED AT THE NESBITT HOSPITAL BY DR RAINEY,EMERGENCY ROOM PHYSICAN.THE INJURY WAS DESCRIBED AS EXTENSIVE WITH THE OBJECT (KNIFE) PENETRATING INTO AND THROUGH THE MUSCLE OF THE ARM.GILBERT WAS ADVISED TO SEEK FURTHER MEDICAL ATTENTION FROM A BONE DOCTOR.THE WOUND WAS L-SHAPPED.
OFFICERS ARRIVED AT C-MAJORS BAR AND OBSERVED THE SUSPECT DEBORAH FELL SEATED AT THE BAR. OFFICERS PLACED FELL UNDER ARREST PERSUANT TO THE DOMESTIC VIOLENCE ACT AND TRANSPORTED FELL TO THE EDWARDSVILLE POLICE STATION FOR PROCESSING.FELL WAS ALSO SERVED A WARRANT FOR HER ARREST ON A SUMMARY WARRANT FOR PUBLIC DRUNKENNESS SIGNED BY JUDGE JOHN HOPKINS ON OCTOBER 31,1995.

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1.  If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained.  State also the factual basis for believing such other person to be reliable.

2.  If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and state date, time and place of such surveillance.

3.  State other pertinent facts within personal knowledge of affiant.

4.  State any additional information considered pertinent to justify this application.

SIGNATURE OF AFFIANT          ADDRESS OF PRIVATE CITIZEN          BADGE NO.          DISTRICT/UNIT

Sworn to and subscribed before me this ...... 10 day of ...... April ...... , 19 96

(Signature of Issuing Authority)          (SEAL)

DISTRICT JUSTICE COURT No. 11-2-02 OFFICE ADDRESS: 470 Main St, Edw. PA

Date Commission Expires: 1-3-2000    PHONE: 287-96 45

STATED SHE USED A Paring Knife and STABBED
IN ARM –

AFTER STABBING Him She STARTED cleaning up BLOOD
with a mop. SHE would not let Him leave
SHE STILL HAD Knife.
She left APT. and went TO BAR.

He went TO Bar, Had words with Her
AND BARTENDER.

He left Bar, went To Vic Mars, Called
Police.

MR RAiNey –
Skin was Clasey
Advises     Bone Doctor in Future.
Extensive INJ.
Pulls news now Muscle – ↑ TROUGH

FELL-00002160

BOTH WERE IN APPARTMENT, APPEAR
FEW GRABBED A KNIFE
SWUNG AT GILBERT - STRUCK IN LEFT
BICEP.

FEW FLED TO C-MATAS
ARGUMENT W/ BATESON - LOU
FEW + LOU WERE THOUGHT TO BE
HAVING AN AFFAIR - ARGUMENT

GILBERT WANTED 2 GTS of BEER
C-MATAS - WOULD NOT SAVE
GILBERT WENT TO VICTIMS BANK 290
+ CALLED PAGER TO MEET HIM AT 733 MAIN

SHE MUST HAVE IT - IT WAS AN AFFAIR
NO CALLBACK -
WANTS KEYS BACK

FEB. -17. 11 (THU) 15:52    EDWARDSVILLE BOROUGH    TEL:5/0788684    P. 010

Fell accused clurget of [illegible]
Arbulet au Food –
Tiaues to Slops
Befo Becan to wared T.V
Fell lles up to Feet – [illegible] about Store.
Swurc steak Knife

FELL-00002162

FELL-00002163

# COMMONWEALTH OF PENNSYLVANIA

## COUNTY OF LUZERNE

To any authorized person:

In the name of the Commonwealth of Pennsylvania, you take into custody DOB: REDAC

(Name): FELL, DEBORAH ANN REDAC

(Address): REDACTED - FELL

WILKES BARRE, PA 18705

If the defendant be found in said Commonwealth, and bring the defendant before us at  JOHN J HOPKINS

(Address):   470 MAIN STREET
             EDWARDSVILLE, PA 18704-0000

to answer the Commonwealth or __EDWARDSVILLE BORO__
                                   (Political Subdivision)

upon the complaint or citation of SOUCHICK, DAVID charging the defendant with 18 §5505 §§

**PUBLIC DRUNKENNESS**

and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.

Witness the hand and official seal of the issuing authority on this

__31st__ day of __October__ , 19 95

SEAL _____ *(Signature)*

Magisterial District No.: 11-2-02

Citation No.: A601296
  FILED:   2/18/94
Docket No.: NT-0000114-94

Amount required to satisfy sentence:
Fine: $
Costs:$
Other:$
Total: $

Amount needed to satisfy collateral: $   171.00

*Return after 60 days*

C417-91       **COPY : DEFENDANT**

---

## RETURN WHERE DEFENDANT IS FOUND

By authority of this warrant

_____ , 19 ____

☐ I took into custody the within named

_____ .

☐ He is now at liberty on bail posted before_____

_____

☐ in the_____

_____ jail.

☐ before you for disposition.

☐ I accepted a guilty plea and collected

$_____
for fine and costs.

☐ I accepted a not guilty plea and collected $_____
for collateral.

☐ I accepted the fine and costs due in the amount of
$_____

_____
(Signature of Officer - Name & Title)

## RETURN WHERE DEFENDANT IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

## WARRANT OF ARREST

WARRANT CONTROL NO.:
    4685439

DOCKET NUMBER:

NT-0000114-94

**COMMONWEALTH
OF
PENNSYLVANIA**

**VS**

FELL, DEBORAH ANN

OFFENSE DATE      2/16/94

CHARGE

__18 §5505 §§__

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral for my appearance at trial stated in the warrant in the amount of

$_____

_____
(Defendant's Signature)

Officer's costs:

Warrant                    _____
Miles @        ¢           _____
Commitments                _____
Miles @        ¢           _____
Conveying to hearing_____
Miles @        ¢           _____
          Total            _____