WILKES-BARRE GENERAL HOSPITAL
ADOLESCENT PSYCHIATRIC UNIT

(Interdisciplinary Progress Record)

FELL, DONALD

REDACTED - FELL

| Date | Time | Heading | WILKES BARRE                     PA H S |
|------|------|---------|------------------------------------------|
| 6/3/93 | 12:30p | Group | Pt talking about how he feels he's getting better here. Pointed out he makes Jewan "faces" when people give him direction he doesn't like. Don also feels he's better at controling his temper by talking more. Pt also talked to the MD about his present meds. Feels the meds are helping his focus of concentration. Talked about his mother wanting him discharged tonight. |
| 6/3/93 | 8:00 - 3:00 | Shift | Pt. on level B, Bright, Pleasant and social. Can get busy. Borders on being obnoxious But responds rasily to redirection. Attends All groups And Activities. Active in rec time c peers. |

Formulated: April, 1988
Form #: 45(10.204.88

# EXHIBIT 223

| CERTIFICATION OF BAIL AND DISCHARGE | OTN | POLICE CASE NO. | D. J. NO. _IF50_ |
|---|---|---|---|
| | | | C.P. TERM & NO. |

**COMMONWEALTH VS.** *(Defendant Name and Address)*

**CHARGE(S):** *Criminal Trespass*

**DATE OF CHARGE(S)** 3/4/91

☐ ROR (no surety)   ☐ Nominal Bail
☒ Bail (total amount set, if any)   $ 2.500

☐ Conditions of Release (aside from appearing at court when required:)

### NEXT COURT ACTION

| DATE AND TIME | LOCATION |
|---|---|
| March 14, 2:00 | 50 Seund St. |

TO:   ☐ Detention Center   ☐ Other

I hereby certify that sufficient bail has been entered

☐ By the defendant   ☐ On behalf of the defendant by:

(attach addendum, if necessary)

**SECURITY OR SURETY (IF ANY)**
☐ Surety Company
☐ Professional Bondsman
☐ Realty
☐ Other

*(Name & Address of Surety)*   *(License No.)*

● Refund of cash bail will be made within 20 days after final disposition. (Pa.R.Cr.P. 4015(b))

● Refund of all other types of bail will be made promptly after 20 days following final disposition. (Pa.R.Cr.P. 4015(a))

● Bring Cash Bail Receipt to Clerk of Court.

**JUDGE OR ISSUING AUTHORITY**
LOUISE PESOTSKI

### APPEARANCE OR BAIL BOND

THIS BOND IS VALID FOR THE ENTIRE PROCEEDINGS AND UNTIL FULL AND FINAL DISPOSITION OF THE CASE INCLUDING FINAL DISPOSITION OF ANY PETITION FOR WRIT OF CERTIORARI OR APPEAL TIMELY FILED IN THE SUPREME COURT OF THE UNITED STATES.

DISCHARGE THE ABOVE-NAMED DEFENDANT FROM CUSTODY IF DETAINED FOR NO OTHER CAUSE THAN THE ABOVE STATED.

Given under my hand and the Official Seal of this Court,

this _____ day of _____, 19__.

_____ (SEAL)
*(Clerk of Court or Issuing Authority)*

WE, THE UNDERSIGNED, defendant and surety, our successors, heirs and assigns, are jointly and severally bound to pay to the Commonwealth of Pennsylvania the sum of *Two Thousand Five Hundred* dollars ($ 2,500.⁰⁰/₁₀₀).

### SEE REVERSE SIDE FOR BAIL CONDITIONS

## CERTIFICATION OF COUNTER INDEMNITY AND PREMIUM   (Applicable Only When Surety Is A Corporation)

_____, Principal, and _____, Surety,

hereby certify that the amount paid by said Principal to said Surety for bail in the above matter is $ _____ and that no further sum or sums is to be paid therefore by the said Principal or anyone on his behalf.

We further certify that said Principal has given to said Surety counter indemnity consisting of _____ of the value of $ _____ and no further counter indemnity is to be given the said Surety except as follows: _____

We further certify that there are no judgments against the said corporate surety outstanding and unpaid for a period of more than thirty days from the date of the entry of such judgment except those in which a petition to open or vacate the judgment has been filed and remains undisposed of:

Dated: _____, 19 _____

_____ (SEAL)
*(Principal)*

_____ (SEAL)
*(Surety)*

**MUST BE SIGNED IN PERSON BY THE APPROVED AGENT**

I ACKNOWLEDGE THAT I AM LEGALLY RESPONSIBLE FOR THE FULL AMOUNT OF THE BAIL.

*The following acknowledgement is also applicable if Percentage Cash Bail is used.*

THIS BOND SIGNED ON __March 4__ 19 _91_
at __Plains__ PENNSYLVANIA.

Signed and acknowledged before me this _4_ day of __March__, 19 _91_

_____
*(Clerk of Court or Issuing Authority)*

● In case of corporate surety bail, Power of Attorney must be affixed to bond or otherwise bond is invalid.

X _____ (SEAL)
SIGNATURE OF DEFENDANT

_____ (SEAL)
Signature of Surety (May be Bondsman, Bail Agency, or private individual or organization). Except when defendant is released on his own recognizance (ROR), this must be signed in all bail situations, including nominal bail.

_____
ADDRESS OF SURETY, SURETY COMPANY OR DEFENDANT

_____
Surety No. or Professional Bondsman License No. & Expiration Date

● In case of Percentage Cash Bail or Nominal Bail, Power of Attorney is not required.   AOPC 414-82

FELL-00002282

# EXHIBIT 224

CONTACT SHEET

CASE NUMBER:

CLIENT NAME: Fell

ADDRESS:

MONTH: May

WORKER: D. L. Seeman

| CONTACTS | 1.) GOAL OF CONTACT: (PURPOSE) 2.) OUTCOME: (WHAT TRANSPIRED) |
|---|---|
| Date: 5/20/72 Location: Phone Who Seen: Dan | 1.) To return Dan's call. 2.) Dan informed wkr that Donny was upset last week They met on Wed + Debbie admitted that she had been drinking over the weekend. "The kids were not neglected, but the time Donny did react to his mother's drinking." Dan said he just wanted to let the wkr know — that Debbie had been drinking + that she did not come home the one night. But Al was there + they had food + were not abused. He |

FELL-00002283

Said Debbie admitted that
she ripped up & that
some things were going on
& she ripped.

FELL-00002284

# EXHIBIT 225

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/27/2005

b6
b7C
b7D

[redacted] a white male, born [redacted]
residing at [redacted] home
telephone number [redacted] employed as a
(CO) at the [redacted]
[redacted] Vermont, was interviewed at his place of employment.
After being advised of the identities of the interviewing agents
and the purpose of the interview, [redacted] provided the following
information:

At the onset of the interview [redacted] was asked to
describe the [redacted] when



b6
b7C
b7D

b6
b7C
b7D

b7D

Investigation on    06/22/2005    [redacted]    Vermont

File # 7A-AL-44453-302          b6          Date dictated    06/23/2005
     SA [redacted]    lbg    b7C
by   SA [redacted]          b7D

This [redacted] 302 neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FELL-00002285

# EXHIBIT 226

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  06/09/2005

☐ born ☐ residing at ☐ b6
home telephone number b7C
employed as the ☐
located in ☐ business
telephone number ☐ was telephonically interviewed
regarding DONALD FELL. ☐ had been listed as a potential
witness for the defense for the upcoming trial.of FELL. After
being advised of the identity of the interviewing agent and the
purpose of the interview, ☐ provided the following
information:

☐ told the interviewing agent that he was not
comfortable speaking with the interviewing agent without any signed
releases by DONALD FELL. The interviewing agent told ☐
that he had previously been interviewed by an FBI agent in
Pennsylvania back in 2001, regarding DONALD FELL and ROBERT LEE.
☐ stated that he recalled that the agent had a signed
release for that information. The interviewing agent asked
☐ if it was alright if she summarized what ☐ had
told the FBI agent back in 2001, and if he could verify whether
that information was correct as he recalled. ☐ stated that
he did not see why he could not do that. The interviewing agent
then summarized information provided in a report from an interview
of ☐ on March 30, 2001. In the report of that interview,
it was noted that ☐ described FELL as a relatively quiet
youngster who demonstrated some intelligence and one who remained
relatively quiet during his stay at St. Michael's. It was also
noted in the report that ☐ could not recall any violent
episodes involving FELL. It was also noted in the report that
☐ stated that FELL was freckle-faced and of small stature.
Also noted in the report was that ☐ stated that BOBBY LEE,
in ☐ opinion, was more problematic than FELL and often
acted out against other students and staff members. ☐
stated that LEE like FELL, was of small stature and wore long,
black hair.

b6
b7C

☐ was asked if what was just mentioned to him was
accurate as he recalled. ☐ stated that yes, it is what he
remembered of FELL and LEE. ☐ was asked if it was possible
that he could have gotten FELL and LEE confused. It was explained
to ☐ that other individuals interviewed mentioned things

b6
b7C

302                           7A-AL-44453-302 -99

| Investigation on | 05/27/2005 | at Rutland, Vermont | (telephonically) |

File # 7A-AL-44453-302

b6
b7C

Date dictated 05/30/2005

by SA ☐ : lbg

b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-AL-44453-302

Continuation of FD-302 of _____ , On 05/27/2005 , Page ___2___

b6
b7C

that were consistent that FELL was more of how [_____] described
LEE, and LEE was more how [_____] described FELL.
stated that he did not have FELL and LEE confused, and that he
remembered them well. [_____] stated that FELL was the quieter
one and BOBBY LEE was more boisterous.

b6
b7C

[_____] was asked how often he would encounter LEE and
FELL at the school, as the Director of Child Care, at the time they
were attending. [_____] stated that he would see FELL and LEE
when they were in trouble, but not necessarily on a daily basis.
[_____] also obtained information regarding FELL and LEE from the
bus driver at the school, HELEN AVERY, who is now deceased.

b6
b7C

[_____] stated that he has not heard from any defense
attorneys regarding DONALD FELL nor his possible testimony at the
upcoming trial.

# EXHIBIT 227

## SULLIVAN COUNTY SHERIFF'S DEPARTMENT
## STATEMENT

STATE OF NEW YORK

PAGE ONE OF 4 PAGES

COUNTY OF Sullivan

DATED: Aug. 12, 00

Town OF Bethel

REDACTED - FELL

I, Terri N. Fell , AGE 17 , BORN ON 82 ,

HAVE BEEN ADVISED BY Dep Phil Anglin ,

OF THE Sullivan Co. Sheriffs Dept. , OF THE FOLLOWING:

*I HAVE THE RIGHT TO REMAIN SILENT, AND I DO NOT HAVE TO MAKE
ANY STATEMENT IF DON'T WANT TO.*

*IF I GIVE UP THAT RIGHT, ANYTHING I DO SAY CAN AND WILL BE USED
AGAINST ME IN A COURT OF LAW.*

*I HAVE THE RIGHT TO HAVE A LAWYER PRESENT BEFORE MAKING ANY
STATEMENT OR AT ANY TIME DURING THIS STATEMENT.*

*IF I SHOULD DECIDE I DO WANT A LAWYER, AND I CANNOT AFFORD TO
HIRE ONE, A LAWYER WILL BE APPOINTED FOR ME FREE OF CHARGE AND
I MAY HAVE THAT LAWYER PRESENT BEFORE MAKING ANY STATEMENT.*

*I ALSO UNDERSTAND THAT I HAVE THE RIGHT TO STOP AT ANY TIME
DURING THIS STATEMENT AND REMAIN SILENT AND HAVE A LAWYER PRESENT.*

I FULLY UNDERSTAND THESE RIGHTS, AND AT THIS TIME I AGREE TO GIVE UP MY
RIGHTS AND MAKE THE FOLLOWING STATEMENT:

X Terri Fell

SIGNATURE

Dep EJC

WITNESS

A question and answer statement between Dep. EJ Clouse
and Terri N. Fell at SCSD on Aug. 12, 00 at @ 8:30 AM.
Q = question - Dep EJ Clouse
A = Answer - Terri N. Fell

Q = What is your Name and address?
A = Terri Fell, I don't really have an address cause I
     run with the Carnival.
Q = What Carnival?
A = S and S Amusements.

X Terri Fell

FELL-00002288

## STATEMENT CONTINUATION SHEET    SULLIVAN COUNTY SHERIFF'S DEPARTMENT

PAGE __2__ OF __4__ PAGES

NAME: Terri NEell

DATE: 8/12/00

Q = Did Dep. Anglin read you your rights?

A = Yes

Q = Do you understand your rights?

A = Yes

Q = Were you at Yasgour farms this morning?

A = Yes

Q = What happened while you were there this morning?

A = Chris Attacked me, and tried to rape me.

Q = Chris who?

A = I don't know his last name.

Q = How do you know him?

A = Work

Q = What did you do after he attacked you?

A = I pushed him off me and told him No.

Q = Did he hit you?

A = NO. He was just very forceful.

Q = What did you do next?

A = I told Donald McNally, My brother what Chris had done.

Q = What did you brother say and do next?

A = He told Chris to leave me alone and Chris hit him, he punched him in the face.

### NOTICE

### (PENAL LAW 210.45)

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this __12__ day of __Aug__, 20 __00__.

- OR -

*Subscribed and Sworn to before me

this _____ day of _____, 20_____.

*THIS FORM NEED BE SWORN TO ONLY WHEN SPECIFICALLY REQUIRED BY THE COURT.

X _Teri Fell_

(SIGNATURE OF DEPONENT)

_Dep. E J C_

(WITNESS)                         TIME ENDED    AM

_____    PM

(NAME OF PERSON TAKING DEPOSITION)

FELL-00002289

**STATEMENT CONTINUATION SHEET**        **SULLIVAN COUNTY SHERIFF'S DEPARTMENT**

PAGE 4 OF 4 PAGES

NAME: Terri N. Fell

DATE: 8/12/00

Q= Is there any thing you would like to add?

A= No, owe wait yeah, about the whole Situation.

Q= About Six guys came out from the side, while Donald was helping Chris up, and they started hitting Donald and Joshua.

Q= Who were they?

A= I don't Know.

Q= Can you Identify any of them?

A= Yes, one had Blonde hair, Blue eyes and Skinny, Mustache and a blue flannel.

Q= Do you Know where they went?

A= No

Q= Was this statement given of your own free will, and not forced from you?

A= Yes

Q= Were you Promised anything in exchange for this statement?

A= No.

End

**NOTICE**

**(PENAL LAW 210.45)**

In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury

this 12ᵗʰ day of Aug, 20 00.
    - OR -
*Subscribed and Sworn to before me

this _____ day of _____, 20____.

*THIS FORM NEED BE SWORN TO ONLY WHEN SPECIFICALLY REQUIRED BY THE COURT.

X Terri Fell

(SIGNATURE OF DEPONENT)

Dep. S. / C

(WITNESS)                    TIME ENDED    AM

_____    PM

(NAME OF PERSON TAKING DEPOSITION)

FELL-00002290

# EXHIBIT 228

*PAGE 1 OF 2*

**SUPPORTING DEPOSITION (CPL 100.20)**     **SULLIVAN COUNTY SHERIFF'S DEPARTMENT**

STATE OF NEW YORK

_____Justice_____ COURT          COUNTY OF _Sullivan_
                                         _Town_ OF _Bethel_

THE PEOPLE OF THE STATE OF NEW YORK )
                                    )
              -VS                   )
                                    )          SUPPORTING DEPOSITION
_____        )
                                    )
_____        )
              (DEFENDANT(S) )

STATE OF NEW YORK,                  )
COUNTY OF _Sullivan_                )    ss.
_Town_ of _Bethel_                  )

                                         518-398-0287
                                    S.S. #REDACTED - FELL 0091

On DATE 8-12-00 at TIME STARTED 08:08 AM

FULL NAME LANCE MICHAEL ROWLAND

DATE OF BIRTH REDACTED - FELL 74    NO. REDACTED - FELL    C/T/V/ PINE PLAINS    STATE N.Y. 12567

STATE THE FOLLOWING: As I exited my vehicle I saw 3 guys kicking and urinating on a kid laying on the ground. The 3 guys were accompanied by two females. One guy wore a black t-shirt w/a neon necklace around his neck and his head was shaved. Another was taller and wore a flanel shirt and wore glasses. The third one had freckles and was about 5'9-5'10. One of the girls they were w/ had short straight black hair and said She was one of the guys sister. As I ran over to them, they backed away from the kid they were beating and started justifying why they did what they did. The kid on the ground had bumps all over his face, and his head was bleeding. A girl and more guys came over to help and thats when I went to get help. I gave the

**NOTICE**

(PENAL LAW 210.45)

    In a written instrument, any person who knowingly makes a false statement which such person does not believe to be true has committed a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury                    _Lance Rowland_
                                                     (SIGNATURE OF DEPONENT)
this __12__ day of _August_, 2000 .
          - OR -                                     _____ 104
*Subscribed and Sworn to before me                   (WITNESS)        TIME ENDED  AM
                                                                       9:00       PM
this _____ day of _____, 19_____ .               Dep. Hall
                                                     (NAME OF PERSON TAKING DEPOSITION)
*THIS FORM NEED BE SWORN TO ONLY WHEN SPECIFICALLY REQUIRED BY THE COURT.

FELL-00002291

# EXHIBIT 229

STATE OF NEW YORK  ::  COUNTY OF SULLIVAN

   JUSTICE COURT  ::  TOWN OF BETHEL

_____X

THE PEOPLE OF THE STATE OF NEW YORK

    -against-

_Joshua Jones AKA Robert Lee_      CERTIFICATE OF

                                  DISPOSITION

               DEFEND REDACTED - FELL

               D.O.B..    _80_

_____X

      The above named Defendant having appeared before this Court, charged with the offense(s) of _Assault 2^nd_ in violation of section(s) _120.05_ of the _Penal_ Law of the State of New York, this is to certify that the charge(s) aforesaid, on the _16^th_ day of _August 2000_ were disposed of by: _reduced to Assault 3^rd Sect 120.00 fined $500^oo plus $125^oo Surcharge 1-8-01 resentenced to time served - four days per ADA Joey Drillings_

DATED: _March 28 2001_
Kauneonga Lake, New York 12749

                                _Elita Shapiro_

                           TOWN JUSTICE / COURT CLERK

                           TOWN OF BETHEL JUSTICE COURT

FELL-00002292

# EXHIBIT 230

6/1/2005  9:15:00 AM

JVD-12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA   *

                           *

        V          *

                   *

DONALD FELL          * Criminal File No. 01-12

    INDIVIDUAL VOIR DIRE OF PROSPECTIVE JURORS

    (Nos. 113, 119, 120, 121, 143, 150, 174, 180,

      184, 203, 224, 239, 241, 243, 252, 280

          Wednesday, June 1, 2005

          Burlington, Vermont

BEFORE:

    THE HONORABLE WILLIAM K. SESSIONS III

    Chief District Judge

APPEARANCES:

    WILLIAM B. DARROW, ESQ. and STEPHEN D. KELLY, ESQ.,

      Assistant United States Attorneys, Federal

      Building, Burlington, Vermont; Attorneys for the

      United States

    ALEXANDER BUNIN, ESQ. and GENE PRIMOMO, ESQ.,

      Office of the Federal Public Defender, 39 North

      Pearl Street, Albany, New York; Attorneys for

      the Defendant

    PAUL S. VOLK, ESQ., Blodgett, Watts & Volk, P.C.,

      72 Hungerford Terrace, Burlington, Vermont;

      Attorney for the Defendant

          ANNE E. NICHOLS

      Registered Professional Reporter

      United States District Court

      Post Office Box 5633

      Burlington, Vermont  05402

      (802) 860-2227

Page -

FELL-00002293

114

factors, could you weigh it, could you put it into the balance, or do you feel so strongly about these factors that you just put it aside and would not assess it in the total scheme of things?

JUROR NO. 184: No, I would -- I would consider everything, but I couldn't tell you what, to a degree and --

THE COURT: Yeah, we are not asking the question about degree.

JUROR NO. 184: All right.

THE COURT: The question is whether, in the overall picture -- that's the confusing part, I think. It's unclear to me as to whether you understand that this is not a question about degree. This is a question about whether you just factor this into the whole process.

JUROR NO. 184: Yes.

THE COURT: And my question is, would you do that?

JUROR NO. 184: Yes.

THE COURT: All right. Again, I would follow it up, if you wish.

MR. PRIMOMO: Judge, I have no -- I think -- I think he has done, honestly, as best he can.

THE COURT: Okay. All right. Appreciate it.

115

Any further questions?

MR. KELLY: No, Judge.

THE COURT: All right. Appreciate very much your honest responses, your thoughtful responses, and -- okay. Thank you.

And I'd ask that you just stay outside in the hallway for just a couple minutes.

(Juror No. 184 exited the courtroom.)

THE COURT: Okay. You have a motion?

MR. KELLY: No motion, Judge.

THE COURT: Okay?

MR. PRIMOMO: Yes.

THE COURT: And your response?

MR. PRIMOMO: Judge, first of all, he specifically indicated that he had -- would not consider three main areas of mitigation evidence regarding this case: the alcohol and drug abuse, the child molestation which Mr. Fell experienced as a young boy, and the abandonment of the parental -- the chaotic household and the abandonment and lack of parenting that he received.

And of course there are many more mitigating factors, but that encompasses the absolute -- well, with the exception of anything in the future, just the whole bulk of our mitigation case. In which -- it wasn't just one factor, which I would submit to the Court probably

116

isn't valid for challenging for cause, but at least three specific enumerated mitigating factors which were rejected, and more importantly, almost the entire bulk of what our mitigation case is going to be.

Secondly -- and our mitigation case is going to be presented by, of course, factual witnesses which are going to describe these events, but more importantly, by professionals that are going to give their opinion about how those facts and those experiences affected his decision and wound up in the position that he is, and specifically why and how that mitigation -- those events translate to mitigation evidence. And a layperson is not going to do that, isn't capable of doing that, doesn't have the training, hasn't had the experience, hasn't had -- done the research to make that connection.

And he has specifically indicated he would not -- found bias -- regarding that type of evidence that we are going to be presenting.

And in fact, when I asked him, you know, is it -- will you be able to determine, you know, when they sit there -- I mean, I got not just generally psychologists or psychiatrists can be paid experts, can say what you want, but no, no, no. How about this case, when they are sitting in that case -- or in this case, would you still have that bias? And he indicated that

117

he would.

On your final questioning, Judge, he indicated that he would have difficulty finding mitigation regarding anything involving personal choices. And we are not putting on an insanity defense here. Everything is going to have been essentially a personal choice, which -- but the mitigating factors are just those: mitigating factors. They are not going to say that -- we are not going to present evidence that he was delusional or psychotic or anything like that.

So the issue of him outwardly rejecting, in his own words, to your open-ended question -- that I would have difficulty -- involving personal choices, he is going to reject that by -- factually and by our expert testimony.

And then, finally, I asked him whether he would be fair, sitting in our place, and his candid answer was he could not.

So, Judge, you know, this thing gets down to, is this going to be a fair juror in this case, and based on his responses, I think it's clear that it's not. The closest he got was just responding to direct, leading questions -- can you be fair, can you consider -- and he came up with, yes, he could consider. Realistically consider based on the record, I don't believe he can.

THE COURT: All right. I am going to ask you

FELL-00002294

162

you might consider. Let's talk about the other possible alternative, which is life in prison. Do you see life in prison as a serious sentence?

JUROR NO. 203: As a serious sentence? Oh, absolutely. Positively. Yes.

MR. BUNIN: Can you say why?

JUROR NO. 203: Well, it's life in prison. It's not -- that's the end. That's the end of your freedom, and I do have some experience with people who have had short jail terms, so I know what their reaction is to a six-month sentence. I can't imagine forever, you know. So it is a very serious sentence, yes.

MR. BUNIN: When you say -- when you give that example, the six-month sentence, you talking about the gentleman that you are working with?

JUROR NO. 203: Yeah, that's working on furlough, yeah. He actually is a personal friend. He had committed two arsons, just to give you the quick full picture. Not my problem, didn't prosecute him, didn't help him with the fires, didn't know about the fires, doesn't change my opinion of him as a friend. He is still a friend. I have got him out on furlough. He is doing trim work and stuff. Are we going to be bosom buddies and traveling across the border to Canada to the casino anymore? No. But within limits, we are still

163

friends, yes.

MR. BUNIN: Are your -- you said some strong things about feeling -- feelings about rehabilitation. Is some of that derived from your friendship with him or others?

JUROR NO. 203: Probably not. There's a lot of people who can be rehabilitated. There's just a lot of things that happen spur of the moment, in my opinion, and I am not in this field, and I don't know -- I don't see it every day, but I just think sometimes people just lose it. I can see that happening, and in that case, I can see where there's probably a potential for some rehabilitation there.

MR. BUNIN: Well, when you say rehabilitation, do you mean that they have to actually act as productive citizens out in the community, or can they show it in some other way?

JUROR NO. 203: Oh, I guess that I would sum up and say if you can contribute anything in any way and in a positive manner and live, you know, within the boundaries of society, you know, civil society, then you are -- that would be rehabilitated, so long as you pose no threat and you are of some use to society, not to be used by society, but useful and productive in some way.

MR. BUNIN: So if your society is the prison

164

society, you think that's still applicable, that reasoning?

JUROR NO. 203: Yes. I don't know how it would apply, but I think it's applicable, yes.

MR. BUNIN: You also answered questions about -- from the judge, about wanting to know about the defendant's background, and you said that was extremely important. Can you tell us why that would be extremely important?

JUROR NO. 203: Well, without -- without injecting into this case, because I don't know anything about it, but it's important to me that there's a trend set in a case that involves an individual's life. I just can't see, you know, a model citizen going off the deep end and creating an instantaneous tragedy. I guess the earmark I would look for is planning, you know, history of that type of thing, and if that doesn't come up in the trial -- I know there's different things that are admitted and not, and I don't know how that happens, but if it doesn't come up in the trial, it couldn't be considered, and it would -- it would probably bide in the defendant's favor, I would think, if you couldn't establish a long-term track record of problems.

MR. BUNIN: But if you heard things like the kind of things Mr. Darrow started talking about, about

165

being abused as a child, not having parents, having no -- having your parents leave you at an early age and kind of being on your own, falling into drugs and alcohol, are those things that you could see as being mitigating, or are they just like -- would they have some other meaning to you?

JUROR NO. 203: Well, if they are just said, then they aren't going to bear much weight. If there's a mental health testimony, things like that that brings some absolute facts to this situation, to be considered, then yes, I could see us considering that.

MR. BUNIN: So if you heard evidence from folks that could tell you these things happened and then explanations of what they mean, that would be important to you?

JUROR NO. 203: It would -- it would seem to be important to me, but more so to you.

MR. BUNIN: If you sit on the jury, it's --

JUROR NO. 203: It's important, yes.

MR. BUNIN: It's what you think matters. Could I have a moment, Judge?

THE COURT: Yes.

(Brief pause.)

MR. BUNIN: That's all, your Honor. Thank you.

FELL-00002295

# EXHIBIT 231

FELL-00002296

```
                      Print Key Output
  5722SS1 V5R4M0 060210                  CCS00P              Page  1
                                             02/03/11  12:02:22
  Display Device  . . . . . :  D11102A
  User . . . . . . . . . . :  MTERESAV

  CSE15D01           MAGISTERIAL DISTRICT JUDGE SYSTEM           2/03/11
  D11102A                   Charge Entry                        11-1-02
  Docket No: NT-0001161-93              Title:  COMMONWEALTH OF PENNSYLVANIA
  Case Type: PRIV. COMPLAINT                    vs FELL, DEBBIE
  ===============================================================================
  Offense Date (on or about)  7/13/93   Time          Charge  1   of  1
  Initial Charge Information:
      Type    S
      Title   18      Section/Sub-Sec 4105     / A1
      Desc    BAD CHECK
  Statute     BAD CHECKS - SUMMARY CASE


  Fines/Costs Allocation      Initial         Statute
     FINE                   $                   $.00
     JUDICIAL COMPUTER PR   $                  $1.50


     Total                    $.00            $1.50

  Do Statute Descrs. & Amts. Match Initial Charge (Y/N) N
  F3=Exit  F6=Case Notes  F12=Previous
```

FEB. -03' 11 (THU) 16:56    MAG. 11-1-05    TEL 52/13/4568    P. 002

| 1. Docket Number of Final Issuing Authority | 2. Common Pleas Docket Number | 3. State Identification Number | OTN |
|---|---|---|---|
| NT-0000417-94 | | | |

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| PAUL J. ROBERTS | 11  1  05 | | |

**DEFENDANT**

6. Name and Address (Last Name First)
FELL, DEBBIE
REDACTED - FELL

7. Date of Transfer    8. Docket No. of Initial Issuing Authority  NT-0000417-94

9. Affiant Who Signed Complaint (Name and Address)
NORTHEAST CREDIT & COLLECTIONS
P.O. BOX 197
DUNMORE, PA 18512

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. CRI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | U18173 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 08 01 94 | 08 02 94 | | 08 23 94 | | | |

| 26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | | | | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT. |
|---|---|---|---|---|---|---|

| 28. Description of Charges | Of. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition | 32. MM DD YY | 33. |
|---|---|---|---|---|---|---|---|
| 1A  BAD CHECKS | | S | 03 24 94 | CC4105A1 | GP | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |

| 34. Advised of His Right to Apply for Assignment of Counsel? Yes No | 35. Public Defender Requested by the Defendant? Yes No | 36. Application Provided for Appointment of Public Defender? Yes No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |
|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| a | a | c | c |
| b | b | d | d |

| 40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Attorney's Name and Address for:    46. I.D. No.

| 45. Commonwealth | | |
|---|---|---|
| 45. Complainant | | |
| 47. Defendant | | Private |
| | | Other |

| 49. Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 05 08 95 | $ .00 | $ .00 | REST:  40.35 | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Ball at Preliminary Arraignment | | | Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment | 56. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| 53. Type | 54. Amount $ | 55. Date Set MM DD YY | | |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Ball at Preliminary Hearing | | | | 60. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| 57. Type | 58. Amount $ | 59. Date Set MM DD YY | | |

| 61. If Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 03 11 |

Certified this ___3rd___ day of _Feb 2011_

My commission expires first Monday of January

I, the above named Issuing Authority certify that this is a true and correct Transcript of the Docket.

FELL-00002297

| Docket Number of Final Issuing Authority | State Identification Number | OTN |
|---|---|---|

NT-0000480-95

| 5. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 6. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| BERNARD J. HENDRZAK | 11 3 07 | | |

| 7. Date of Transfer | 8. Docket No. of Initial Issuing Authority |
|---|---|
| | NT-0000480-95 |

6. Name and Address (Last Name First)

FELL, DEBBIE
30 CHESTNUT ST.
WILKES-BARRE, PA 18702

9. Affiant Who Signed Complaint (Name and Address)

PRICE CHOPPER, ATTN: WM. JORDAN
110 EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | A56237 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | 09 05 95 | | | |

| 26. Prelim. Hear./Sum. Trial | 27. Address of Preliminary Hearing/Summary Trial | | | | | | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT. |
|---|---|---|---|---|---|---|---|---|

| 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition | |
|---|---|---|---|---|---|---|
| BAD CHECKS - SUMMARY CASE | | | 03 18 94 | CC4105A1 | DIS | |

| 34. Advised of His Right Apply for Assignment Counsel? | Yes No | 35. Public Defender Requested by the Defendant? | Yes No | 36. Application Provided for Appointment of Public Defender? | Yes No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: | Date MM DD YY |
|---|---|---|---|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| | a | | c |
| | b | | d |

| 40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendent | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|

Attorney's Name and Address for:

| | | 45. I.D. No. |
|---|---|---|
| Commonwealth | | |
| Complainant | | |
| Defendant | | Private |
| | | Other |

| Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ .00 |
|---|---|---|---|---|
| 3 03 05 | $ .00 | $ .00 | | |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

Bail at Preliminary Arraignment

| Type | 54. Amount | 55. Date Set MM DD YY | | 56. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| | $ | | | |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

Current Bail/Bail at Preliminary Hearing

| Type | 58. Amount | 59. Date Set MM DD YY | | 60. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| | $ | | | |

| Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January _____

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket.

DATE PRINTED: 2/07/11 11:01:50 AM

501A-99

| Docket Number of Final Issuing Authority | | Common Pleas Docket Number | | State Identification Number | OTN |
|---|---|---|---|---|---|

NT-0000481-95

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| BERNARD J. HENDRZAK | 11  3  07 | | |

**D E F E N D A N T**

6. Name and Address (Last Name First)

FELL, DEBBIE
30 CHESTNUT ST.
WILKES-BARRE, PA 18702

7. Date of Transfer

8. Docket No. of Initial Issuing Authority
NT-0000481-95

9. Affiant Who Signed Complaint (Name and Address)
PRICE CHOPPER, ATTN: WM. JORDAN
110 EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State PA | 15. CRI | 16. OCA A56236 | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | Preliminary Arraignment MM DD YY 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | 09 05 95 | | |

26. Prelim.Hear./Sum.Trial  27. Address of Preliminary Hearing/Summary Trial

32. Date Set For Preliminary Hearing  MM DD YY

33. CONT.

| 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition MM DD YY |
|---|---|---|---|---|---|
| A  BAD CHECKS - SUMMARY CASE | | | 03 18 94 | CC4105A1 | DIS |

| 34. Advised of His Right to Apply for Assignment of Counsel? | Yes | No | 35. Public Defender Requested by the Defendant? | Yes | No | 36. Application Provided for Appointment of Public Defender? | Yes | No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: | MM DD YY |
|---|---|---|---|---|---|---|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| | a / b | | c / d |

| 40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|

Attorney's Name and Address for:

45. I.D. No.

45. Commonwealth

46. Complainant

47. Defendant

Private

Other

| 49. Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 03 03 05 | $ .00 | $ .00 | | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

**Bail at Preliminary Arraignment**

| Type | 54. Amount $ | 55. Date Set MM DD YY | | 56. Date Bail Posted MM DD YY |
|---|---|---|---|---|

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

**Current Bail/Bail at Preliminary Hearing**

| Type | 58. Amount $ | 59. Date Set MM DD YY | | 60. Date Bail Posted MM DD YY |
|---|---|---|---|---|

| 61. If Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January 2014

*Michael G. Dotzel*

I, the above named Issuing Authority certify that this transcript is a true and correct Transcript of the Docket.

OPC 501A-99  DATE PRINTED:2/07/11 11:02:08 AM

FELL-00002299

Docket Number of Final Issuing Authority   Common Pleas Docket Number   State Identification Number

OTN

NT-0000482-95

Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | Transferred from Initial Issuing Authority | DISTRICT NO.

BERNARD J. HENDRZAK   11  3  07

| Date of Transfer | Docket No. of Initial Issuing Authority
NT-0000482-95

6. Name and Address (Last Name First)

FELL, DEBBIE
30 CHESTNUT ST.
WILKES-BARRE, PA 18702

9. Affiant Who Signed Complaint (Name and Address)
PRICE CHOPPER, ATTN: WM. JORDAN
EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D.
PA | | A56238 |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons MM DD YY | Date Issued MM | 21. Warrant DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
| | 08 29 95 | 08 30 95 | | | 09 05 95 | | | |

26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT.

| 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition MM DD YY |
| A  BAD CHECKS - SUMMARY CASE | | | 03 19 94 | CC4105A1 | DIS |

| 34. Advised of His Right to Apply for Assignment of Counsel? Yes No | 35. Public Defender Requested by the Defendant? Yes No | 36. Application Provided for Appointment of Public Defender? Yes No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
| | a | c | c |
| | b | d | d |

40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified

Attorney's Name and Address for: | 48. I.D. No.

45. Commonwealth

46. Complainant

47. Defendant | Private

Other

| Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
| 03 03 05 | $  .00 | $  .00 | | $  .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

Bail at Preliminary Arraignment
| Type | 54. Amount $ | 55. Date Set MM DD YY | | 56. Date Bail Posted MM DD YY |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

Current Bail/Bail at Preliminary Hearing
| Type | 58. Amount $ | 59. Date Set MM DD YY | | 60. Date Bail Posted MM DD YY |

| 61. Committed Date | 62. Code | 63. Place of Commitment |

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January ____

Michael G. Detzel

I, the above named Issuing Authority certify that this transcript is a true and correct Transcript of the Docket.

PC 501A-99
DATE PRINTED: 2/07/11 11:02:22 AM

6/4  .9  ON 8318 . 9/4   Feb. 7. 2011 10:51AM

**OTN**

1. Docket Number of First Issuing Authority
NT-0000483-95

4. Final Issuing Authority/to be completed by Final Issuing Authority
BERNARD J. HENDRZAK

DISTRICT NO. 11  3  07

5. Transferred from Initial Issuing Authority

6. Name and Address (Last Name First)
FELL, DEBBIE
30 CHESTNUT ST.
WILKES-BARRE, PA 18702

7. Date of Transfer

8. Docket No. of Initial Issuing Authority
NT-0000483-95

9. Affiant Who Signed Complaint (Name and Address)
PRICE CHOPPER, ATTN: WM. JORDAN
110 EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

14. State PA    15. ORI    16. OCA A56235    17. Badge Number/Officer I.D.

19. Date Complaint Filed or Citation Issued or Filed  08 29 95
20. Summons Date Issued  08 30 95
22. Summons Returned  09 05 95

| | 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition |
|---|---|---|---|---|---|---|
| A | BAD CHECKS - SUMMARY CASE | | | 03 15 94 | CC4105A1 | DIS |

COPY: MAG. DIST. JUDGE

64. Date Transcript Sent to Court
02  07  11

Certified this _____ day of _____
My commission expires first Monday of January
I, the above named Issuing Authority certify that this transcript is a true and correct Transcript of the Docket.

Michael G. Dotzel

PC 501A-99    DATE PRINTED: 2/07/11 11:07:15 AM

FELL-00002301

| 1. Docket Number of Final Issuing Authority | 2. Common Pleas Docket Number | 3. State Identification Number | OTN |
|---|---|---|---|
| NT-0000484-95 | | | |

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| BERNARD J. HENDRZAK | 11  3  07 | | |

**DEFENDANT**

| 6. Name and Address (Last Name First) | 7. Date of Transfer | 8. Docket No. of Initial Issuing Authority |
|---|---|---|
| FELL, DEBBIE | | NT-0000484-95 |
| 30 CHESTNUT ST. | 9. Affiant Who Signed Complaint (Name and Address) | |
| WILKES-BARRE, PA 18702 | PRICE CHOPPER, ATTN: WM. JORDAN  110 EAST END CENTRE  KIDDER STREET  WILKES-BARRE TWP, PA 18702 | |

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14.State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | A56234 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24.Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | 09 05 95 | | | |

| 26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | | | | | | | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT. |
|---|---|---|---|---|---|---|---|---|---|

| 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition |
|---|---|---|---|---|---|
| A  BAD CHECKS - SUMMARY CASE | | | 03 15 94 | CC4105A1 | DIS |

| 34. Advised of His Right to Apply for Assignment of Counsel? Yes ☐ No ☐ | 35. Public Defender Requested by the Defendant? Yes ☐ No ☐ | 36. Application Provided for Appointment of Public Defender? Yes ☐ No ☐ | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |
|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| a | a / b | c | c / d |

| 40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|

Attorney's Name and Address for:                                    48. I.D. No.

| 45. Commonwealth | |
|---|---|
| 46. Complainant | |
| 47. Defendant | Private / Other |

| 49. Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 03 03 05 | $ .00 | $ .00 | | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | 56. Date Bail Posted |
|---|---|---|---|---|
| 53.Type | 54. Amount $ | 55. Date Set MM DD YY | | MM DD YY |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | 60. Date Bail Posted |
|---|---|---|---|---|
| 57.Type | 58. Amount $ | 59. Date Set MM DD YY | | MM DD YY |

| 61. If Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January 2014    SEAL

*Michael H. Dotzel*

I, the above named Issuing Authority certify that this transcript is a true and correct Transcript of the Docket.

OPC 501A-99    **DATE PRINTED: 2/07/11 11:07:27 AM**

FELL-00002302

| Docket Number of Final Issuing Authority/Court of Common Pleas Docket Number | | | | State Identification Number | OTN |
|---|---|---|---|---|---|
| NT-0000485-95 | | | | | |

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | | DISTRICT NO. | | | 5. Transferred from Initial Issuing Authority | | DISTRICT NO. |
|---|---|---|---|---|---|---|---|
| BERNARD J. HENDRZAK | | 11 | 3 | 07 | | | |

| 6. Name and Address (Last Name First) | 7. Date of Transfer | 8. Docket No. of Initial Issuing Authority |
|---|---|---|
| FELL, DEBBIE<br>30 CHESTNUT ST.<br>WILKES-BARRE, PA 18702 | | NT-0000485-95 |

9. Affiant Who Signed Complaint (Name and Address)
PRICE CHOPPER, ATTN: WM. JORDAN
110 EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | A56233 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | 09 05 95 | | | |

| 26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | | | | | | | | | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT. |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition | MM DD YY | CONT. |
|---|---|---|---|---|---|---|---|---|
| A | BAD CHECKS - SUMMARY CASE | | | 03 12 94 | CC4105A1 | DIS | | |

| 34. Advised of His Right to Apply for Assignment of Counsel? Yes No | 35. Public Defender Requested by the Defendant? Yes No | 36. Application Provided for Appointment of Public Defender? Yes No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |
|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| | a | | c |
| | b | | d |

| 40. Enter 'C' for witness for Complainant Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|
| | | | | |

| Attorney's Name and Address for: | | 45. I.D. No. |
|---|---|---|
| Commonwealth | | |
| Complainant | | |
| 47. Defendant | | |
| | Private | |
| | Other | |

| 49. Date of Decision M DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 3 03 05 | $ .00 | $ .00 | | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | | 56. Date Bail Posted MM DD YY |
|---|---|---|---|---|---|
| Type | 54. Amount $ | 55. Date Set MM DD YY | | | |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | | 60. Date Bail Posted MM DD YY |
|---|---|---|---|---|---|
| Type | 58. Amount $ | 59. Date Set MM DD YY | | | |

| 61. Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|
| | | |

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January 2014 SEAL

*Michael G. Dotzel*

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket.

PC 501A-99

DATE PRINTED: 2/07/11 11:02:45 AM

FELL-00002303

| 1. Docket Number of Final Issuing Authority | 2. Common Pleas Docket Number | 3. State Identification Number | OTN |
|---|---|---|---|
| NT-0000486-95 | | | |

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | | DISTRICT NO. | | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|---|---|
| BERNARD J. HENDRZAK | | 11 | 3 | 07 | |

**DEFENDANT**

| 6. Name and Address (Last Name First) | 7. Date of Transfer | 8. Docket No. of Initial Issuing Authority |
|---|---|---|
| FELL, DEBBIE<br>30 CHESTNUT ST.<br>WILKES-BARRE, PA 18702 | | NT-0000486-95 |

| 9. Affiant Who Signed Complaint (Name and Address) |
|---|
| PRICE CHOPPER, ATTN: WM. JORDAN<br>110 EAST END CENTRE<br>KIDDER STREET<br>WILKES-BARRE TWP, PA 18702 |

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | A52845 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | 21. Warrant MM DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | 09 05 95 | | | |

| 26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | | | | | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT. |
|---|---|---|---|---|---|---|---|

| 28. Description of Charges | Off. Chgd | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition |
|---|---|---|---|---|---|
| A   BAD CHECKS - SUMMARY CASE | | | 03 12 94 | CC4105A1 | DIS |

| 34. Advised of His Right to Apply for Assignment of Counsel? Yes No | 35. Public Defender Requested by the Defendant? Yes No | 36. Application Provided for Appointment of Public Defender? Yes No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |
|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|

| 40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified |
|---|---|---|---|---|

| Attorney's Name and Address for: | | 48. I.D. No. |
|---|---|---|
| 45. Commonwealth | | |
| 46. Complainant | | |
| 47. Defendant | Private | |
| | Other | |

| 49. Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 03 03 05 | $ .00 | $ .00 | | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | 58. Date Bail Posted |
|---|---|---|---|---|
| 53. Type | 54. Amount $ | 55. Date Set MM DD YY | | MM DD YY |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | 60. Date Bail Posted |
|---|---|---|---|---|
| 57. Type | 58. Amount $ | 59. Date Set MM DD YY | | MM DD YY |

| 61. If Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January, 2014

*Michael G. Dotzel*

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket.

OPC 501A-99   DATE PRINTED: 2/07/11 11:10:12 AM

No. 8318   P. 8/9   Feb. 7. 2011 10:52AM

FELL-00002304

Docket Number of Final Issuing Authority | Common Pleas Docket Number | State Identification Number | OTN

**NT-0000487-95**

| 1. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| BERNARD J. HENDRZAK | 11  3  07 | | |

7. Date of Transfer | 8. Docket No. of Initial Issuing Authority **NT-0000487-95**

| 6. Name and Address (Last Name First) |
|---|
| FELL, DEBBIE |
| 30 CHESTNUT ST. |
| WILKES-BARRE, PA 18702 |

9. Affiant Who Signed Complaint (Name and Address)
PRICE CHOPPER, ATTN: WM. JORDAN
110 EAST END CENTRE
KIDDER STREET
WILKES-BARRE TWP, PA 18702

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| | | | | PA | | A52750 | |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Date Issued MM DD YY | Date Issued MM | 21. Warrant DD YY | 22. Summons Returned MM DD YY | 23. Preliminary Arraignment Date MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|---|
| | 08 29 95 | 08 30 95 | | | 09 05 95 | | | |

26. Prelim. Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | 32. Date Set For Preliminary Hearing | 33. CONT.

| 28. Description of Charges | Off. Char. | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition | MM | DD | YY |
|---|---|---|---|---|---|---|---|---|
| A   BAD CHECKS - SUMMARY CASE | | | 03 10 94 | CC4105A1 | DIS | | | |

| 34. Advised of His Right to Apply for Assignment of Counsel? | 35. Public Defender Requested by the Defendant? | 36. Application Provided for Appointment of Public Defender? | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: MM DD YY |
|---|---|---|---|
| Yes ☐ No ☐ | Yes ☐ No ☐ | Yes ☐ No ☐ | |

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| | a | c | c |
| | b | d | d |

40. Enter 'C' for witness for Complainant- Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Defense Persons to be notified

Attorney's Name and Address for: | 45. I.D. No.

Commonwealth
46. Complainant
47. Defendant | Private | Other

| Date of Decision MM DD YY | 50. Fines Amount | 51. Costs | 52. Judgment of Sentence | BAL: $ |
|---|---|---|---|---|
| 03 03 05 | $ .00 | $ .00 | | .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | 56. Date Bail Posted |
|---|---|---|---|---|
| Type | 54. Amount $ | 55. Date Set MM DD YY | | MM DD YY |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | 60. Date Bail Posted |
|---|---|---|---|---|
| Type | 58. Amount $ | 59. Date Set MM DD YY | | MM DD YY |

| If Committed Date | 62. Code | 63. Place of Commitment |
|---|---|---|

COPY: MAG. DIST. JUDGE

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 02 07 11 |

Certified this _____ day of _____

My commission expires first Monday of January, 2016

*Michael G. Detel*

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket.

PC 501A-99   **DATE PRINTED: 2/07/11 11:12:08 AM**

NO. 8318   P. 9/9

Feb. 7. 2011 10:52AM

FELL-00002305

# EXHIBIT 232



Search History  Saved Articles

Search Results for **alexanderian** in All Text

Pennsylvania - Selected Source Types

Edit Search | New Search    Did you mean: *alexandrian*

 Show Help ▼

Back To Results    ◀ Previous  Article 21 of 36  Next ▶    Save this Article ☐

# NARCOTICS PROBE - AREA DOC TARGET OF DRUG BUST DR. HARRY ALEXANDERIAN BEING ACCUSED BY STATE ATTORNEY GENERAL OF MAKING LARGE-SCALE RX SALES TO ADDICTS.

**Times Leader, The (Wilkes Barre, PA)** - Tuesday, October 5, 2004

*Author: TERRIE MORGAN-BESECKER tmorgan@leader.net*

WEST PITTSTON - A 78-year-old borough doctor earned $2,000 to $4,000 per day selling prescription narcotics to addicts who flocked to his office in a posh West Pittston neighborhood, state authorities said Monday.

Dr. Harry **Alexanderian** saw up to 100 patients per day and once purchased so much Tylenol with codeine that he ranked as the largest physician purchaser of codeine in the United States, state Attorney General Jerry Pappert said at a press conference announcing charges against the physician.

**Alexanderian** is charged with illegally selling narcotic painkillers and anxiety medications, including Valium, Darvocet, Vicodin and Tylenol with codeine, from his home and office at 1010 Susquehanna Ave. from 1997 to 2003. He was also charged with money laundering and unlicensed treatment of drug addiction.

Authorities said some of **Alexanderian** 's patients were heroin addicts who went to him on the false belief he could cure their addiction - an aspect of the case Pappert said he found ``particularly reprehensible."

``We're alleging Dr. **Alexanderian** gave drugs to people he knew were drug addicts, and far from helping them detox, he was exacerbating the problem," Pappert said.

The arrest is part of an initiative Pappert announced earlier this year to target the illegal the sale of prescription drugs, he said.

``There is not the same stigma attached to distributing prescription drugs," Pappert said. ``Just because he was not delivering drugs during the middle of the night on a street corner does not diminish the seriousness of the crime. In many ways this defendant is one of the biggest drug dealers in the area."

The investigation began in early 2002. The arrest comes seven months after agents raided **Alexanderian** 's office. Approximately 190,000 pills and thousands of documents were seized.

Agents interviewed more than 100 of **Alexanderian** 's patients. The case was then taken to a statewide Grand Jury, which recommended the charges.

Financial records showed **Alexanderian** purchased $500,000 worth of drugs from various pharmaceutical companies from December 2001 to February 2004, Pappert said. It's alleged he sold the drugs directly to patients after performing a minimal medical evaluation,

---

 **Related Articles**

Tell us what you think...

▸ NET DRUGS CAN BE BAD MEDICINE - DOCTORS, PHARMACIS...

▸ No Child Left Untested? - Should Schools Conduct R...

▸ DOCTOR CHARGED IN DRUG MISUSE

▸ Drug Dangers - Common Drugs That Can Hurt You

▸ Life-or-Death Lottery - The medicine is scarce; it...

▸ Strange Medicine

▸ Saying No to Big Pharma - Some Docs Decline Drug F...

▸ Made to Order Medicine - A revolution in genetic r...

▸ STING NETS MORE THAN 20 DRUG SUSPECTS/ TWENTY-THRE...

▸ An AIDS Drug-Price War - An Indian firm takes on t...

○ **4 Saved Articles**
⦿ **this article**

✉ Email                    ▼

🖨 Print                     ▼

↗ Bibliography (export)

**Quick Links**

▸ Find articles by TERRIE MORGAN-BESECKER tmorgan@leader.net
▸ Find more articles from page 1A
▸ Find more from section "NEWS"
▸ Find all articles from October 5,

FELL-00002306

or, in some cases, no evaluation at all.

Pappert said some of **Alexanderian** 's patients died from drug overdoses. His office is now investigating it if can link any of the deaths to **Alexanderian** 's sale of narcotics.

**Alexanderian** 's 37-year-old daughter, Nancy, an attorney, was 30 weeks pregnant when she died on Dec. 15, 1998, from an overdose of painkillers and tranquilizers. The fetus was stillborn.

Nils Frederiksen, a spokesman for the Attorney General's Office, said he could not say whether Nancy **Alexanderian** 's case is among those the office is investigating.

Authorities were tipped to the alleged drug dealing by neighbors, who were suspicious of the high volume of people entering and exiting the office, sometimes at night.

The neighborhood contains many stately homes. West Pittston Police Chief Ralph Zezza said neighbors complained there would sometimes be 30 to 40 cars parked on the narrow street, blocking their driveways. Some of **Alexanderian** 's patients would also urinate on neighbors' properties and bother children who were playing, he said.

``It's a very nice neighborhood. They stuck out like a sore thumb," Zezza said.

Pappert said at least three of the patients were heroin addicts who sought treatment for their addiction. **Alexanderian** sold them various narcotics, including Darvocet and Valium, on the pretense it would help them get clean. None of the drugs he sold is recognized as treatments for heroin addiction, he said.

**Alexanderian** charged $40 to $60 per visit, plus the cost of the drugs. The majority of the patients paid in cash. Pappert said his office is still investigating if the doctor may have fraudulently billed a small portion of the drug sales to the Medicaid program.

The Federal Drug Enforcement Agency stripped **Alexanderian** 's ability to prescribe controlled substances, but he still maintains his medical license, Pappert said. Pappert said his office is taking steps with the Department of State to have the license revoked.

**Alexanderian** declined to comment after his arraignment Monday before District Justice Joseph Carmody on seven counts of violating the state's controlled substance act and one count each of unlicensed treatment of drug addiction and money laundering. He was released on $20,000 bail after posting property as collateral. A preliminary hearing is scheduled for Oct. 12.

TIMES LEADER STAFF PHOTO/S. JOHN WILKIN

Lawyer Frank Nocito, left, leaves District Justice Joseph Carmody's courtroom with his client Dr. Harry **Alexanderian** on Monday morning.

---

*Edition:* MAIN
*Section:* NEWS
*Page:* 1A
*Record Number:* 0410050024
*Copyright (c) 2004 The Times Leader*

To bookmark this article, right-click on the link below, and copy the link location:
NARCOTICS PROBE - AREA DOC TARGET OF DRUG BUST DR. HARRY ALEXANDERIAN BEING ACCUSED BY STATE ATTORNEY GENERAL OF MAKING LARGE-SCALE RX SALES TO ADDICTS.

**Back To Results**     ◀ Previous  **Article 21 of 36**  Next ▶

FELL-00002307



Search History   Saved Articles

Search Results for **alexanderian** in All Text

Pennsylvania - Selected Source Types

Edit Search | New Search    Did you mean: *alexandrian*

? Show Help ▼

Back To Results    ◀ Previous  Article 20 of 36  Next ▶    Save this Article ☐

# WEST-PITTSTON DOCTOR RECEIVES MORE FRAUD, DRUG CHARGES

**Times Leader, The (Wilkes Barre, PA)** - Thursday, October 28, 2004

*Author: TERRIE MORGAN-BESECKER tmorgan@leader.net*

WEST PITTSTON - A borough physician charged with illegally selling narcotics was hit with additional charges Wednesday for billing the state's Medicaid program for drugs and treatment prosecutors say were not necessary.

Dr. Harry **Alexanderian** learned of the new charges as he arrived at District Justice Joseph Carmody's office for his preliminary hearing on related charges filed by the state office of attorney general on Oct. 4.

The new offenses, also filed by the attorney general's office, charge **Alexanderian** with five counts of Medicaid fraud and four counts of violating the state's controlled substance act.

Prosecutors say **Alexanderian** , 78, of 1010 Susquehanna Ave., provided powerful pain killers and anxiety drugs to numerous patients who had no legitimate need for the medications.

In the Oct. 4 case, prosecutors said **Alexanderian** earned $2,000 to $4,000 per day by providing narcotics to patients, many of whom were drug addicts. He was charged with seven counts of violating the state's controlled substance act and one count each of unlicensed treatment of drug addiction and money laundering.

The new charges are based on his treatment of five patients whose medications and/or treatments were billed to the Medicaid program.

In each case, prosecutors say **Alexanderian** provided only minimal medical care for the patients, typically only taking their blood pressure, and made no effort to ascertain if the medical complaints were legitimate. The records were reviewed by another physician, who determined the medications prescribed served little to no legitimate purpose.

In one case, prosecutors said **Alexanderian** treated a patient for ``cough symptoms'' for more than one year by dispensing cough syrup with codeine without referring the patient for testing.

Prosecutors say **Alexanderian** was also aware that at least four of the patients were addicted to drugs or alcohol, but continued to prescribe narcotics.

Frank Nocitio, **Alexanderian** 's attorney, said he voluntarily surrendered his medical license after his arrest on Oct. 4.

A preliminary hearing for both sets of charges is scheduled for Nov. 11 at 10 a.m. **Alexanderian** was released on $20,000 unsecured bail pending the hearing.

*Edition: MAIN*



**Related Articles**

Tell us what you think...

▸ MORE CHARGES SET FOR DOCTOR DR. FRANK RUHL PETERSO...

▸ ASGARI'S PATIENTS PONDER LESSONS - THE LOCAL DENTI...

▸ Lackawanna County doctor anxious to have cases res...

▸ 'Everybody May Not Make It Out' - Vindicated Katri...

▸ PROSECUTION ANSWERS WEAKLEY/HUGO REQUESTS WEAKLEY ...

▸ PROSECUTORS: CHAPMAN PAID SITTER WITH MARIJUANA TA...

▸ LAWYERS ARGUE OVER INFO REQUEST IN SELENSKI CASE D...

▸ DOC FACES STEROID CHARGES PROSECUTORS SAY CHARLES ...

▸ PAGNOTTI CASE - HINDSIGHT CAN REFINE NEW CHARGES, ...

▸ LOCAL NURSE'S TESTIMONY DOES NOT HELP DOCTOR UTAH ...



○ 4 Saved Articles
◉ this article

✉ Email ▼

🖶 Print ▼

↗ Bibliography (export)

FELL-00002308

*Section:* NEWS
*Page:* 3A
*Record Number:* 0410280091
*Copyright (c) 2004 The Times Leader*

To bookmark this article, right-click on the link below, and copy the link location:
WEST-PITTSTON DOCTOR RECEIVES MORE FRAUD, DRUG CHARGES

**Back To Results**    ◀ Previous  **Article 20 of 36**  Next ▶

**Quick Links**
▸ Find articles by TERRIE MORGAN-BESECKER tmorgan@leader.net
▸ Find more articles from page 3A
▸ Find more from section "NEWS"
▸ Find all articles from October 28, 2004

FELL-00002309

**NewsBank**®

**America's Newspapers**

English ▲▼     **Other NewsBank Products**

Search History   Saved Articles

Search Results for **alexanderian** in All Text
Pennsylvania - Selected Source Types

Edit Search | New Search     Did you mean: *alexandrian*

? Show Help ▼

Back To Results     ◀ Previous  Article 19 of 36  Next ▶     Save this Article ☐

# DOCTOR, 78, PLEADS GUILTY IN DRUG SCHEME/ DR. HARRY ALEXANDERIAN OF WEST PITTSTON PROVIDED NARCOTICS TO DRUG ADDICTS WHO HAD NO NEED FOR THEM.

**Times Leader, The (Wilkes Barre, PA)** - Wednesday, May 25, 2005
*Author: DAVID WEISS dweiss@leader.net*

WILKES-BARRE - Prosecutors will ask a judge to send a 78-year-old doctor to prison for illegally selling narcotics and billing the state's Medicaid program.

Dr. Harry **Alexanderian** , of Susquehanna Avenue in West Pittston, pleaded guilty Tuesday to 16 charges connected to the drug-dealing scheme he operated from his office.

Luzerne County Court of Common Pleas Senior Judge Gifford Cappellini will sentence **Alexanderian** July 20 after a background report on the doctor is compiled.

Cappellini on Tuesday told **Alexanderian** his charges carried maximum sentences of several years in prison, but he cautioned the doctor that does not mean he will impose the maximum sentences on the charges.

The state Office of Attorney General charged against the doctor last year, accusing **Alexanderian** of earning $2,000 to $4,000 per day by providing narcotics to the patients, many of whom were drug addicts.

Prosecutors said the doctor doled out powerful pain killers and anxiety drugs to the patients, who had no legitimate need for the medications.

In each case, prosecutors said **Alexanderian** provided only minimal medical care for the patients, typically only taking their blood pressure, and made no effort to ascertain if the medical complaints were legitimate.

Deputy Attorney General Andy Demarest said the nature of the charges warrants a jail sentence.

"We'll detail that at the sentencing," Demarest said after the guilty plea. "We have a series of drug felonies and treating drug-dependent people without going through the proper clinics."

Demarest said there was no agreement as to what type of sentence **Alexanderian** will receive, but the charges call for anywhere between probation and jail.

The doctor's attorney, Frank Nocito, was unavailable after the sentencing.

**Alexanderian** voluntarily surrendered his medical license after his arrest on Oct. 4.

**Memo:** David Weiss, a Times Leader staff writer, may be reached at 831-7397.

*Edition: MAIN*
*Section: NEWS*



NEW **Related Articles**

__Tell us what you think...__

▸ DOCTOR GETS LIGHT TERM IN PRISON/ DR. ABUL HUSSAIN...

▸ DOCTOR GUILTY OF FRAUD, DRUG CHARGES

▸ DOCTOR CHARGED IN DRUG SCHEME DR. NORMAN E. WENGER...

▸ FREELAND MAN WILL SERVE TIME FOR ONE OF 26 CHARGES...

▸ DOCTOR, EX-PHARMACIST FOUND GUILTY OF DRUG CHARGE

▸ DOCTOR GETS 5 TO 10 IN DRUG CASE - LAUREANO MANUEL...

▸ DOCTOR ADMITS STEALING DRUGS EX-ANESTHESIOLOGIST P...

▸ INMATE CONVICTED ON DRUG CHARGES RAY FLORES, IN JA...

▸ JUDGE SPARES W. PITTSTON DOCTOR, 78, JAIL IN DRUG ...

▸ EX-COP PLEADS GUILTY TO 2 DRUG CHARGES EUGENE J. M...

○ **4 Saved Articles**
◉ **this article**

✉ Email          ▼
🖨 Print          ▼
↗ Bibliography (export)

FELL-00002310

*Page:* 3A
*Record Number:* 0505310409
*Copyright (c) 2005 The Times Leader*

To bookmark this article, right-click on the link below, and copy the link location:
DOCTOR, 78, PLEADS GUILTY IN DRUG SCHEME/ DR. HARRY ALEXANDERIAN OF WEST PITTSTON PROVIDED NARCOTICS TO DRUG ADDICTS WHO HAD NO NEED FOR THEM.

**Quick Links**
- Find articles by DAVID WEISS dweiss@leader.net
- Find more articles from page 3A
- Find more from section "NEWS"
- Find all articles from May 25, 2005

**Back To Results**    ◀ Previous  **Article 19 of 36**  Next ▶

FELL-00002311



Search History   Saved Articles

Search Results for **alexanderian** in All Text

Pennsylvania - Selected Source Types

Edit Search | New Search    Did you mean: *alexandrian*

? Show Help ▼

Back To Results    ◀ Previous  Article 17 of 36  Next ▶    Save this Article ☐

# JUDGE SPARES W. PITTSTON DOCTOR, 78, JAIL IN DRUG SCHEME/ ONE CHARGE AGAINST DR. HARRY ALEXANDERIAN HAD CALLED FOR NINE TO 16 MONTHS IN PRISON

**Times Leader, The (Wilkes Barre, PA)** - Thursday, July 21, 2005

*Author: DAVID WEISS dweiss@leader.net*

WILKES-BARRE - For years, Dr. Harry **Alexanderian** doled out medication to hundreds of patients who had minimal medical problems.

On Wednesday, though, it was the doctor's claim of suffering from serious medical issues that might have played a role in keeping him out of jail.

**Alexanderian** 's attorney, Frank Nocito, rattled off a list of ailments plaguing his client, including depression, coronary artery disease, and being legally blind, in asking a judge to sentence **Alexanderian** to no jail time for illegally dispensing potent painkillers to drug-addicted clients from his West Pittston office.

Luzerne County Court of Common Pleas Judge Senior Judge Gifford Cappellini sentenced the 78-year-old doctor to serve two years of probation with the first six months on house arrest.

It didn't sit well with one woman.

She openly showed disgust with the sentence in court, and later put her emotion into words.

"I have never been so angry in my life," said the woman, who refused to identify herself. She said her son was a "victim" of **Alexanderian** , and she suggested a sentence she thought was more appropriate for the doctor.

"Scrubbing toilets in a detox center. That would be my idea of a sentence."

Deputy Attorney General Heather Albright wasn't so harsh with her words.

The prosecutor urged Cappellini to sentence **Alexanderian** to jail because of the seriousness of the crimes. She said one of **Alexanderian** 's charges carried a standard minimum sentence of nine to 16 months in prison.

Cappellini offered no explanation as to why he deviated from that sentence range.

"We thought jail time was appropriate," Albright said after court. "It's obviously up to the judge's discretion."

Nils Frederiksen, a spokesman for the state Office of Attorney General, said prosecutors "don't like" the sentence, but they saw nothing "appealable" in the decision.

All of **Alexanderian** 's other charges called for a standard minimum sentence of probation to a few months in prison, Nocito said.



**Related Articles**

**Tell us what you think...**

▸ DOCTOR GETS 5 TO 10 IN DRUG CASE - LAUREANO MANUEL...

▸ DOCTOR, 78, PLEADS GUILTY IN DRUG SCHEME/ DR. HARR...

▸ 'Mom! Mom! It's Not Right!' - Paris Hilton's Celeb...

▸ Paris and the Pokey - Listening In: Paris and the ...

▸ COURT MIGHT YANK LOCAL DOCTOR'S PROBATION FRANK PE...

▸ DOCTOR GETS LIGHT TERM IN PRISON/ DR. ABUL HUSSAIN...

▸ DUI PENALTY IS MONEY DRIVEN MICHAEL MISCAVAGE RECE...

▸ NO-SMOKING RULING BURNS UP INMATE WHEN A JUDGE ORD...

▸ JUDGE TRIMS SENTENCE OF MAN WHO BEAT 2-MONTH-OLD D...

▸ Lohan gets jail for probation violation



○ **4 Saved Articles**
● **this article**

✉ Email  ▼

🖨 Print  ▼

↗ Bibliography (export)

FELL-00002312

"Judge Cappellini weighed the evidence and I think his sentence was fair and appropriate under the circumstance," Nocito said.

The sentence stemmed from **Alexanderian** 's guilty plea to 16 charges connected to a drug-dealing scheme he operated from his office on Susquehanna Avenue.

The state Office of Attorney General accused **Alexanderian** of earning $2,000 to $4,000 per day by providing narcotics to patients, many of whom were drug addicts. Prosecutors said the doctor doled out painkillers and anxiety drugs to the patients, who had no legitimate need for the medications.

In each case, prosecutors said **Alexanderian** provided minimal medical care for the patients, typically taking their blood pressure, and made no effort to ascertain if the medical complaints were legitimate.

Nocito on Wednesday said **Alexanderian** was eligible for house arrest on the charges, but initially pushed for probation.

He also explained his client has accepted responsibility and remains remorseful for his actions. The doctor, Nocito said, will never again practice medicine.

Those factors, along with **Alexanderian** 's medical problems, showed the doctor deserved no jail time, Nocito told Cappellini. He said his client's medical conditions would only worsen in jail.

**Alexanderian** did not speak in court, but asked Nocito to express his remorse, the attorney said.

Prosecutors are not finished with **Alexanderian** , Frederiksen said.

They are seeking to have him forfeit more than $1 million in assets they believe are connected to his drug scheme, Frederiksen said. An agreement is expected to soon be ironed out.

**Memo:** David Weiss, a Times Leader staff writer, may be reached at 831-7397.

---

*Edition:* MAIN
*Section:* NEWS
*Page:* 1A
*Record Number:* 0507210210
Copyright (c) 2005 The Times Leader

To bookmark this article, right-click on the link below, and copy the link location:
JUDGE SPARES W. PITTSTON DOCTOR, 78, JAIL IN DRUG SCHEME/ ONE CHARGE AGAINST DR. HARRY ALEXANDERIAN HAD CALLED FOR NINE TO 16 MONTHS IN PRISON

**Back To Results**    ◀ Previous  **Article 17 of 36**  Next ▶

**Quick Links**
▶ Find articles by DAVID WEISS dweiss@leader.net
▶ Find more articles from page 1A
▶ Find more from section "NEWS"
▶ Find all articles from July 21, 2005

FELL-00002313



English ▼    **Other NewsBank Products**

Search History   Saved Articles

Search Results for **alexanderian** in All Text

Pennsylvania - Selected Source Types

Edit Search | New Search     Did you mean: *alexandrian*

❓ Show Help ▼

Back To Results      ◀ Previous  Article 16 of 36  Next ▶     Save this Article ☐

# DRUG CLASS FACTORS INTO SENTENCING/ EXCLUSIVE DEPUTY ATTORNEY GENERAL SAYS HOW ADDICTIVE SUBSTANCE PLAYS ROLE IN FIGURING PUNISHMENTS.

**Times Leader, The (Wilkes Barre, PA)** - Friday, July 22, 2005

*Author: DAVID WEISS dweiss@leader.net*

They both faced similar scenarios: Harry **Alexanderian** and Laureano Manuel were elderly doctors each charged with pedaling powerful painkillers to drug-addicted patients with little or no medical problems.

But their punishments were far from similar.

Manuel was 69 years old when he was sentenced in 2002 to five to 10 years in a state prison.

**Alexanderian** was 78 years old when he was sentenced Wednesday to two years probation.

The sentences remain on opposite ends of the spectrum, even though both doctors were convicted of nearly identical charges.

Deputy Attorney General Heather Albright said she could not pursue a Manuel-like sentence for **Alexanderian** because he sold a different class of drugs.

The state prosecutor said Manuel was dealing drugs such as percocet and methadone, considered, legally, to be schedule II drugs. **Alexanderian** prescribed drugs considered to be schedule III, IV, and V drugs, such as darvocet, Valium and xanax, she said.

The various schedules are determined, in part, on the level of their addictiveness, Albright said.

Because Manuel dealt schedule II drugs, Albright was able to seek a mandatory minimum sentence of three to six years in prison.

The mandatory minimum sentence does not apply to defendants, like **Alexanderian** , caught dealing scheduled III, IV, and V drugs, Albright said.

That creates a vast "gap in the law," said Manuel's attorney, Tom Marsilio.

Marsilio couldn't fathom how his client could be serving such a stiff sentence for his actions while **Alexanderian** , who was once the nation's largest physician purchaser of codeine, is serving probation for worse actions, the attorney said.

"It seems to be a gap in the law ... (that) the legislature should take a look at," Marsilio said.

State authorities said Manuel between 1998 and 2000 wrote prescriptions to drug addicts for various drugs. The patients never needed the medication for its proper use, but still



🆕 **Related Articles**

**Tell us what you think...**

▸ DRUG-STEALING DOCTOR SENTENCED ANESTHESIOLOGIST, W...

▸ DRUG-SELLING OFFICER'S SENTENCE UP IN AIR

▸ JUDGE SPARES W. PITTSTON DOCTOR, 78, JAIL IN DRUG ...

▸ CAPPELLINI ADMITS DRUG USE IN RECORDS THREE DAYS A...

▸ FORMER GUARDS GET DRUG SENTENCE - FOR BRINGING CON...

▸ DOCTOR GETS LIGHT TERM IN PRISON/ DR. ABUL HUSSAIN...

▸ STATE AIMS TO PREVENT HUGO MOVE ATTORNEY FOR DEPAR...

▸ JUDGE ISSUES TOUGHER SENTENCE / WOMAN GETS UP TO S...

▸ DOCTOR'S DIAGNOSIS COULD BE MEDICAID FRAUD STATE A...

▸ EX-DUPONT COP GETS 27 MONTHS



○ **4 Saved Articles**
◉ **this article**

✉ Email ▼

🖨 Print ▼

↗ Bibliography (export)

Manuel provided the prescriptions.

The same prosecutors accused **Alexanderian** of earning $2,000 to $4,000 per day by providing painkillers and anxiety drugs to many drug-addicted patients, who had no legitimate need for the medications. In each case, **Alexanderian** provided only minimal medical care for the patients and made no effort to determine if the medical complaints were legitimate.

A jury convicted Manuel and Luzerne County Court of Common Pleas Judge Peter Paul Olszewski Jr. sentenced him to five to 10 years in prison, including the 3- to 6-year mandatory sentence.

**Alexanderian** pleaded guilty and was sentenced Wednesday by Senior Judge Gifford Cappellini to two years probation with the first six months on house arrest.

Albright wanted **Alexanderian** to go to jail, but she had no option to ask for the mandatory sentence, even though she wanted to.

"We couldn't because it depends on the type of drug," Albright said. "If I had it I would."

**Memo:** David Weiss, a Times Leader staff writer, may be reached at 831-7397.

***

**Edition:** MAIN
**Section:** NEWS
**Page:** 1A
**Record Number:** 0507220082
Copyright (c) 2005 The Times Leader

To bookmark this article, right-click on the link below, and copy the link location:
DRUG CLASS FACTORS INTO SENTENCING/ EXCLUSIVE DEPUTY ATTORNEY GENERAL SAYS HOW ADDICTIVE SUBSTANCE PLAYS ROLE IN FIGURING PUNISHMENTS.

**Back To Results**    ◀ Previous  **Article 16 of 36**  Next ▶

**Quick Links**
▶ Find articles by DAVID WEISS dweiss@leader.net
▶ Find more articles from page 1A
▶ Find more from section "NEWS"
▶ Find all articles from July 22, 2005

FELL-00002315

# EXHIBIT 233

*Law and Human Behavior, Vol. 15, No. 6, 1991*

# Specialty Guidelines for Forensic Psychologists'

## Committee on Ethical Guidelines for Forensic Psychologists[2]

*The Specialty Guidelines for Forensic Psychologists,* while informed by the *Ethical Principles of Psychologists* (APA, 1990) and meant to be consistent with them, are designed to provide more specific guidance to forensic psychologists in monitoring their professional conduct when acting in assistance to courts, parties to legal proceedings, correctional and forensic mental health facilities, and legislative agencies. The primary goal of the Guidelines is to improve the quality of forensic psychological services offered to individual clients and the legal system and thereby to enhance forensic psychology as a discipline and profession. The *Specialty Guidelines* for *Forensic Psychologists* represent a joint statement of the American Psychology-Law Society and Division 41 of the American Psycholog-

---

[1] The *Specialty Guidelines* for *Forensic Psychologists were* **adopted by** majority vote of the members of Division 41 and the American Psychology-Law Society. They have also been endorsed by majority vote by the American Academy of Forensic Psychology. The Executive Committee of Division 41 and the American Psychology Law Society formally approved these *Guidelines on March 9, 1991.* The Executive Committee also voted to continue the Committee on Ethical Guidelines in order to disseminate the *Guidelines* and to monitor their implementation and suggestions for revision. Individuats wishing to reprint these *Guidelines* or who have queries about them should contact either Stephen L. Golding, Ph.D., Department of Psychology, University of Utah, Salt Lake City, **UT** *84 112, 80* 1-58 1-8028 (voice) or 80 1-58 1-584 1 (FAX) or other members of the Committee listed below. Reprint requests should be sent to Cathy Oslzly, Department of Psychology, University of Nebraska-Lincoln, Lincoln, NE 68588-0308.

[2] These Guidelines were prepared and principally authored by a joint Committee on Ethical Guidelines of Division 41 and the American Academy of Forensic-Psychology (Stephen L. Golding, [Chair], Thomas Grisso, David Shapiro, and Herbert Weissman [Co-chairs]). Other members of the Committee included Robert Fein, Kirk Heiibrun, Judith McKenna, Norman Poythress, and Daniel Schuman. Their hard work and willingness to tackle difficult conceptual and pragmatic issues is gratefully acknowledged. The Committee would also like to acknowledge specifically the assistance and guidance provided by Dort Bigg, Larry Cowan, Eric Harris, Arthur Lemer, Michael Miller, Russell Newman, Melvin Rudov, and Ray Fowler. Many other individuals also contributed by their thoughtful critique and suggestions for improvement of earlier drafts which were widely circulated.

0147-7307/91/1200-0655$06.50/0 © 1991 Plenum Publishing Corporation

FELL-00002316

ical Association and are endorsed by the American Academy of Forensic Psychology. The *Guidelines* do not represent an official statement of the American Psychological Association.

The Guidelines provide an aspirational model of desirable professional practice by psychologists, within any subdiscipline of psychology (e.g., clinical, developmental, social, experimental), when they are engaged regularly as experts and represent themselves as such, in an activity primarily intended to provide professional psychological expertise to the judicial system. This would include, for example, clinical forensic examiners; psychologists employed by correctional or forensic mental health systems; researchers who offer direct testimony about the relevance of scientific data to a psycholegal issue; trial behavior consultants; psychologists engaged in preparation of *amicus* briefs; or psychologists, appearing as forensic experts, who consult with, or testify before, judicial, legislative, or administrative agencies acting in an adjudicative capacity. Individuals who provide only occasional service to the legal system and who do so without representing themselves as *forensic experts* may find these *Guidelines* helpful, particularly in conjunction with consultation with colleagues who are forensic experts.

While the *Guidelines* are concerned with a model of desirable professional practice, to the extent that they may be construed as being applicable to the advertisement of services or the solicitation of clients, they are intended to prevent false or deceptive advertisement or solicitation, and should be construed in a manner consistent with that intent.

## I.   PURPOSE AND SCOPE

### A. Purpose

1. While the professional standards for the ethical practice of psychology, as a general discipline, are addressed in the American Psychological Association's *Ethical Principles of Psychologists,* these ethical principles do not relate, in sufficient detail, to current aspirations of desirable professional conduct for forensic psychologists. By design, none of the *Guidelines* contradicts any of the *Ethical Principles of Psychologists;* rather, they amplify those *Principles* in the context of the practice of forensic psychology, as herein defined.

2. The *Guidelines* have been designed to be national in scope and are intended to conform with state and Federal law. In situations where the forensic psychologist believes that the requirements of law are in conflict with the *Guidelines,* attempts to resolve the conflict should be made in accordance with the procedures set forth in these *Guidelines* [IV(G)] and in the *Ethical Principles of Psychologists.*

### B. Scope

1. The *Guidelines* specify the nature of desirable professional practice by forensic psychologists, within any subdiscipline of psychology

(e.g., clinical, developmental, social, experimental), **when engaged regularly** as forensic psychologists.

   a. "Psychologist" means any individual whose professional activities are defined by the American Psychological Association or by regulation of title by state registration or licensure, as the practice of psychology.

   b. "Forensic psychology" means all forms of professional psychological conduct when acting, with definable foreknowledge, as a psychological expert on explicitly psycholegal **issues, in direct** assistance to courts, parties to legal proceedings, correctional and forensic mental health facilities, and administrative, judicial, and legislative agencies acting in an adjudicative capacity.

   c. "Forensic psychologist" means psychologists who regularly engage in the practice of forensic psychology as defined in I(B)(l)(b).

2. The *Guidelines* do not apply to **a psychologist** who is asked to provide professional **psychological** services when the psychologist was not informed at the time of delivery of the services that they were to be used as forensic psychological services as defined above. The Guide-*lines* may be helpful, however, in preparing the psychologist for the experience of communicating psychological data in a forensic context.

3. Psychologists who are not forensic psychologists as defined in I(B)(l)(c), but occasionally provide limited forensic psychological services, may find the Guidelines useful in the preparation and presentation of their professional services.

## C. Related Standards

1. Forensic psychologists also conduct, their professional activites in accord with the ***Ethical Principles of Psychologists*** and the various other statements of the American Psychological Association that may apply to particular subdisciplines or areas of practice that are relevant to their professional activities.

2. The standards of practice and ethical guidelines of other relevant "expert professional organizations" contain useful guidance and should be consulted even though the present *Guidelines* take precedence for forensic psychologists.

## II.  RESPONSIBILITY

A. Forensic psychologists have an obligation to provide services in a manner consistent with the highest standards of their profession. They are responsible for their own conduct and the conduct of those individuals under their direct supervision.

FELL-00002318

B. Forensic psychologists make a reasonable effort to ensure that their services and the products of their services are used in a forthright and responsible manner.

## III. COMPETENCE

A. Forensic psychologists provide services only in areas of psychology in which they have specialized knowledge, skill, experience, and education.

B. Forensic psychologists have an obligation to present to the court, regarding the specific matters to which they will testify, the boundaries of their competence, the factual bases (knowledge, skill, experience, training, and education) for their qualification as an expert, and the relevance of those factual bases to their qualification as an expert on the specific matters at issue.

C. Forensic psychologists are responsible for a fundamental and reasonable level of knowledge and understanding of the legal and professional standards that govern their participation as experts in legal proceedings.

D. Forensic psychologists have an obligation to understand the civil rights of parties in legal proceedings in which they participate, and manage their professional conduct in a manner that does not diminish or threaten those rights.

E. Forensic psychologists recognize that their own personal values, moral beliefs, or personal and professional relationships with parties to a legal proceeding may interfere with their ability to practice competently. Under such circumstances, forensic psychologists are obligated to decline participation or to limit their assistance in a manner consistent with professional obligations.

## IV. RELATIONSHIPS

A. During initial consultation with the legal representative of the party seeking services, forensic psychologists have an obligation to inform the party of factors that might reasonably affect the decision to contract with the forensic psychologist. These factors include, but are not limited to

1 the fee structure for anticipated professional services;

2: prior and current personal or professional activities, obligations, and relationships that might produce a conflict of interests;

3 their areas of competence and the limits of their competence; and

4. the known scientific bases and limitations of the methods and procedures that they employ and their qualifications to employ such methods and procedures.

FELL-00002319

B. Forensic psychologists do not provide professional services to parties to a legal proceeding on the basis of "contingent fees," when those services involve the offering of expert testimony to a court or administrative body, or when they call upon the psychologist to make affirmations or representations intended to be relied upon by third parties.

C. Forensic psychologists who derive a substantial portion of their income from fee-for-service arrangements should offer some portion of their professional services on a pro bono or reduced fee basis where the public interest or the welfare of clients may be inhibited by insufficient financial resources.

D. Forensic psychologists recognize potential conflicts of interest in dual relationships with parties to a legal proceeding, and they seek to minimize their effects.

   1, Forensic psychologists avoid providing professional services to parties in a legal proceeding with whom they have personal or professional relationships that are inconsistent with the anticipated relationship.

   2. When it is necessary to provide both evaluation and treatment services to a party in a legal proceeding (as may be the case in small forensic hospital settings or small communities), the forensic psychologist takes reasonable steps to minimize the potential negative effects of these circumstances on the rights of the party, confidentiality, and the process of treatment and evaluation.

E. Forensic psychologists have an obligation to ensure that prospective clients are informed of their legal rights with respect to the anticipated forensic service, of the purposes of any evaluation, of the nature of procedures to be employed, of the intended uses of any product of their services, and of the party who has employed the forensic psychologist.

   1. Unless court ordered, forensic psychologists obtain the informed consent of the client or party, or their legal representative, before proceeding with such evaluations and procedures. If the client appears unwilling to proceed after receiving a thorough notification of the purposes, methods, and intended uses of the forensic evaluation, the evaluation should be postponed and the psychologist should take steps to place the client in contact with his/her attorney for the purpose of legal advice on the issue of participation.

   2. In situations where the client or party may not have the capacity to provide informed consent to services or the evaluation is pursuant to court order, the forensic psychologist provides reasonable notice to the client's legal representative of the nature of the anticipated forensic service before proceeding. If the client's legal representative objects to the evaluation, the forensic psychologist notifies the court issuing the order and responds as directed.

   3. After a psychologist has advised the subject of a clinical forensic evaluation of the intended uses of the evaluation and its work product, the psychologist may not use the evaluation work product for

other purposes without explicit waiver to do so by the client or the client's legal representative.

F. When forensic psychologists engage in research or scholarly activities that are compensated financially by a client or party to a legal proceeding, or when the psychologist provides those services on a pro *bono* basis, the psychologist clarifies any anticipated further use of such research or scholarly product, discloses the psychologist's role in the resulting research or scholarly products, and obtains whatever consent or agreement is required by law or professional standards.

G. When conflicts arise between the forensic psychologist's professional standards and the requirements of legal standards, a particular court, or a directive by an officer of the court or legal authorities, the forensic psychologist has an obligation to make those legal authorities aware of the source of the conflict and to take reasonable steps to resolve it. Such steps may include, but are not limited to, obtaining the consultation of fellow forensic professionals, obtaining the advice of independent counsel, and conferring directly with the legal representatives involved.

## V.    CONFIDENTIALITY AND PRIVILEGE

A. Forensic psychologists have an obligation to be aware of the legal standards that may affect or limit the confidentiality or privilege that may attach to their services or their products, and they conduct their professional activities in a manner that respects those known rights and privileges.

1. Forensic psychologists establish and maintain a system of record keeping and professional communication that safeguards a client's privilege.

2. Forensic psychologists maintain active control over records and information. They only release information pursuant to statutory requirements, court order, or the consent of the client.

B. Forensic psychologists inform their clients of the limitations to the confidentiality of their services and their products (see also Guideline IV E) by providing them with an understandable statement of their rights, privileges, and the limitations of confidentiality.

C In situations where the right of the client or party to cofidentiality is limited, the forensic psychologist makes every effort to maintain confidentiality with regard to any information that does not bear directly upon the legal purpose of the evaluation.

D Forensic psychologists provide clients or their authorized legal representatives with access to the information in their records and a meaningful explanation of that information, consistent with existing Federal and state statutes, the *Ethical Principles of Psychologists,* the *Standards for Educational and Psychological Testing,* and institutional rules and regulations.

FELL-00002321

# VI. METHODS AND PROCEDURES

A. Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional and legal developments within their area of claimed competence. They are obligated also to use that knowledge, consistent with accepted clinical and scientific standards, in selecting data collection methods and procedures for an evaluation, treatment, consultation or scholarly/empirical investigation.

B Forensic psychologists have an obligation to document and be prepared to make available, subject to court order or the rules of evidence, all data that form the basis for their evidence or services. The standard to be applied to such documentation or recording *anticipates* that the detail and quality of such documentation will be subject to reasonable judicial scrutiny; this standard is higher than the normative standard for general clinical practice. When forensic psychologists conduct an examination or engage in the treatment of a party to a legal proceeding, with fore-knowledge that their professional services will be used in an adjudicative forum, they incur a special responsibility to provide the best documentation possible under the circumstances.

1. Documentation of the data upon which one's evidence is based is subject to the normal rules of discovery, disclosure, confidentiality, and privilege that operate in the jurisdiction in which the data were obtained. Forensic psychologists have an obligation to be aware of those rules and to regulate their conduct in accordance with them.

2. The duties and obligations of forensic psychologists with respect to documentation of data that form the basis for their evidence apply from the moment they know or have a reasonable basis for knowing that their data and evidence derived from it are likely to enter into legally relevant decisions.

C. In providing forensic psychological services, forensic psychologists take special care to avoid undue influence upon their methods, procedures, and products, such as might emanate from the party to a legal proceeding by financial compensation or other gains. As an expert conducting an evaluation, treatment, consultation, or scholarly/empirical investigation, the forensic psychologist maintains professional integrity by examining the issue at hand from all reasonable perspectives, actively seeking information that will differentially test plausible rival hypotheses.

D Forensic psychologists do not provide professional forensic services to a defendant or to any party in, or in contemplation of, a legal proceeding prior to that individual's representation by counsel, except for persons judicially determined, where appropriate, to be handling their representation *pro se*. When the forensic services are pursuant to court order and the client is not represented by counsel, the forensic psychologist makes reasonable efforts to inform the court prior to providing the services.

1. A forensic psychologist may provide emergency mental health ser-

FELL-00002322

vices to a pretrial defendant prior to court order or the appointment of counsel where there are reasonable grounds to believe that such emergency services are needed for the protection and improvement of the defendant's mental health and where failure to provide such mental health services would constitute a substantial risk of imminent harm to the defendant or to others. In providing such services the forensic psychologist nevertheless seeks to inform the defendant's counsel in a manner consistent with the requirements of the emergency situation.

2. Forensic psychologists who provide such emergency mental health services should attempt to avoid providing further professional forensic services to that defendant unless that relationship is reasonably unavoidable [see **IV(D)(2)**].

E. When forensic psychologists seek data from third parties, prior records, or other sources, they do so only with the prior approval of the relevant legal party or as a consequence of an order of a court to conduct the forensic evaluation.

F. Forensic psychologists are aware that hearsay exceptions and other rules governing expert testimony place a special ethical burden upon them. When hearsay or otherwise inadmissible evidence forms the basis of their opinion, evidence, or professional product, they seek to minimize sole reliance upon such evidence. Where circumstances reasonably permit, forensic psychologists seek to obtain independent and personal verification of data relied upon as part of their professional services to the court or to a party to a legal proceeding.

1. While many forms of data used by forensic psychologists are hearsay, forensic psychologists attempt to corroborate critical data that form the basis for their professional product. When using hearsay data that have not been corroborated, but are nevertheless utilized, forensic psychologists have an affirmative responsibility to acknowledge the uncorroborated status of those data and the reasons for relying upon such data.

2. With respect to evidence of any type, forensic psychologists avoid offering information from their investigations or evaluations that does not bear directly upon the legal purpose of their professional services and that is not critical as support for their product, evidence or testimony, **except where such disclosure is required by law.**

3. When a forensic psychologist relies upon data or information gathered by others, the origins of those data are clarified in any professional product. In addition, the forensic psychologist bears a special responsibility to ensure that such data, if relied upon, were gathered in a manner standard for the profession.

G. Unless otherwise stipulated by the parties, forensic psychologists are aware that no statements made by a defendant, in the course of any (forensic) examination, no testimony by the expert based upon such

statements, nor any other fruits of the statements can be admitted into evidence against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has introduced testimony. Forensic psychologists have an affirmative duty to ensure that their written products and oral testimony conform to this Federal Rule of Procedure (12.2[c]), or its state equivalent.

1. Because forensic psychologists are often not in a position to know what evidence, documentation, or element of a written product may be or may lend to a "fruit of the statement," they exercise extreme caution in preparing reports or offering testimony prior to the defendant's assertion of a mental state claim or the defendant's introduction of testimony regarding a mental condition. Consistent with the reporting requirements of state or federal law, forensic psychologists avoid including statements from the defendant relating to the time period of the alleged offense,

2. Once a defendant has proceeded to the trial stage, and all pretrial mental health issues such as competency have been resolved, forensic psychologists may include in their reports or testimony any statements made by the defendant that are directly relevant to supporting their expert evidence, providing that the defendant has "introduced" mental state evidence or testimony within the meaning of Federal Rule of Procedure 12.2(c), or its state equivalent.

H   Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

# VII. PUBLIC AND PROFESSIONAL COMMUNICATIONS

A, Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will promote understanding and avoid deception, given the particular characteristics, roles, and abilities of various recipients of the communications.

1. Forensic psychologists take reasonable steps to correct misuse or misrepresentation of their professional products, evidence, and testimony .

2. Forensic psychologists provide information about professional work to clients in a manner consistent with professional and legal standards

fur the disclosure of test results, interpretations of data, and the factual bases for conclusions. A full explanation of the results of tests and the bases for conclusions should be given in language that the client can understand.

   a. When disclosing information about a client to third parties who are not qualified to interpret test results and data, the forensic psychologist complies with Principle 16 of the **_Standards for Educational and Psychological Testing._** When required to disclose results to a nonpsychologist, every attempt is made to ensure that test security is maintained and access to information is restricted to individuals with a legitimate and professional interest in the data. Other qualified mental health professionals who make a request for information pursuant to a lawful order are, by definition, "individuals with a legitimate and professional interest."

   b. In providing records and raw data, the forensic psychologist takes reasonable steps to ensure that the receiving party is informed that raw scores must be interpreted by a qualified professional in order to provide reliable and valid information.

B. Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special responsibility for fairness and accuracy in their public statements. When evaluating or commenting upon the professional work product or qualifications of another expert or party to a legal proceeding, forensic psychologists represent their professional disagreements with reference to a fair and accurate evaluation of the data, theories, standards, and opinions of the other expert or party.

C Ordinarily, forensic psychologists avoid making detailed public (out-of-court) statements about particular legal proceedings in which they have been involved. When there is a strong justification to do so, such public statements are designed to assure accurate representation of their role or their evidence, not to advocate the positions of parties in the legal proceeding. Forensic psychologists address particular legal proceedings in publications or communications only to the extent that the information relied upon is part of a public record, or consent for that use has been properly obtained from the party holding any privilege.

D When testifying, forensic psychologists have an obligation to all parties to a legal proceeding to present their findings, conclusions, evidence, or other professional products in a fair manner. This principle does not preclude forceful representation of the data and reasoning upon which a conclusion or professional product is based. It does, however, preclude an attempt, whether active or passive, to engage in partisan distortion or misrepresentation. Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position.

FELL-00002325

**E. Forensic** psychologists, by virtue of their competence and rules **of discovery**, actively disclose all sources of information obtained in the course of their professional services; they actively disclose which information from which source was used in formulating a particular written product or oral testimony.

F.  Forensic psychologists are aware that their essential role as expert to the court is to assist the trier of fact to understand the evidence or to determine a fact in issue. In offering expert evidence, they are aware that their own professional observations, inferences, and conclusions must be distinguished from legal facts, opinions, and conclusions. Forensic psychologists are prepared to explain the relationship between their expert testimony and the legal issues and facts of an instant case.

FELL-00002326

# EXHIBIT 234

## SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY

**Prepared by Committee on the Revision of the Specialty Guidelines for Forensic Psychology**

### FIFTH DRAFT 8/1/10

**1. INTRODUCTION**

1.01 History of the *Specialty Guidelines for Forensic Psychology*
1.02 Definitions and Terminology
1.03 Nature of Forensic Psychology
1.04 Services and Functions

**2. NATURE AND SCOPE OF THE *GUIDELINES***

2.01 Intended Users
2.02 Aspirational Model
2.03 Goals
2.04 Professional Discretion and Judgment

**3. RESPONSIBILITIES**

3.01 Integrity
3.02 Impartiality and Fairness
3.03 Avoidance of Conflicts of Interest

**4. COMPETENCE**

4.01 Scope of Competence
4.02 Gaining and Maintaining Competence
4.03 Representation of Competencies
4.04 Knowledge of the Legal System and the Legal Rights of Individuals
4.05 Knowledge of the Scientific Foundation for Testimony and Sworn Statements
4.06 Knowledge of the Scientific Foundation for Teaching and Research
4.07 Considering the Impact of Personal Beliefs and Experience
4.08 Appreciation of Individual Differences
4.09 Appropriate Use of Services and Products

**5. DILIGENCE**

5.01 Provision of Services
5.02 Responsiveness
5.03 Communication
5.04 Termination of Services

**6. RELATIONSHIPS**

6.01 Responsibilities to Retaining Parties
6.02 Multiple Relationships
6.02.01 Therapeutic-Forensic Role Conflicts
6.02.02 Expert Testimony by Practitioners Providing Therapeutic Services
6.02.03 Provision of Forensic Therapeutic Services
6.03 Provision of Emergency Mental Health Services

**7. FEES**

7.01 Determining Fees
7.02 Fee Arrangements

**8. NOTIFICATION, ASSENT, CONSENT, AND INFORMED CONSENT**

8.01 Timing and Substance
8.02 Communication with Those Seeking to Retain a Forensic Practitioner
8.03 Communication with Forensic Examinees
8.03.01 Persons Not Ordered or Mandated to Undergo Examination
8.03.02 Persons Ordered or Mandated to Undergo Examination
8.03.03 Persons Lacking Capacity to Provide Informed Consent
8.04 Communication with Collateral Sources of Information es
8.05 Communication in Research Contexts

**9. CONFLICTS IN PRACTICE**

9.01 Conflicts with Legal Authority
9.02 Conflicts with Organizational Demands
9.03 Resolving Ethical Issues with Fellow Professionals

**10. PRIVACY, CONFIDENTIALITY, AND PRIVILEGE**

10.01 Release of Information
10.02 Access to Information
10.03 Acquiring Third Party Information
10.04 Use of Case Materials in Teaching, Continuing Education, and Other Scholarly Activities

**11. METHODS AND PROCEDURES**

11.01 Use of Appropriate Methods
11.02 Use of Multiple Sources of Information
11.03 Opinions Regarding Persons Not Examined

**12. ASSESSMENT**

12.01 Focus on Legally Relevant Factors
12.02 Appropriate Use of Assessment Procedures
12.03 Appreciation of Individual Differences
12.04 Providing Assessment Feedback
12.05 Documentation and Compilation of Data Considered
12.06 Provision of Documentation
12.07 Record Keeping

**13. PROFESSIONAL AND OTHER PUBLIC COMMUNICATIONS**

13.01 Accuracy, Fairness, and Avoidance of Deception
13.02 Differentiating Observations, Inferences, and Conclusions
13.03 Disclosing Sources of Information and Bases of Opinions
13.04 Comprehensive and Accurate Presentation of Opinions in Reports and Testimony
13.05 Commenting Upon Other Professionals and Participants in Legal Proceedings
13.06 Out of Court Statements
13.07 Commenting Upon Legal Proceedings

FELL-00002327