**APPENDIX I: BACKGROUND OF THE *GUIDELINES* AND THE REVISION PROCESS**

A. History of the *Guidelines*
B. Revision Process
C. Need for the Guidelines
D. Developers and Support
E. Background Literature
F. Current Status

**APPENDIX II: DEFINITIONS AND TERMINOLOGY**

---

Submit comments regarding this draft to:

sgfpdraft@yahoo.com

  or

Randy Otto, PhD
FMHI
13301 N. 30th St.
Tampa, FL 33612
 (F): 813-974-6411

When submitting comments please identify the specific section you are referencing (e.g., 7.01, 8.03.03) and provide recommended alternative language when appropriate.

2

FELL-00002328

## SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY

### FOURTH DRAFT
### RELEASED SEPTEMBER 2, 2008

## 1. INTRODUCTION

### 1.01 History of the *Specialty Guidelines for Forensic Psychology*

This document replaces the 1991 *Specialty Guidelines for Forensic Psychologists* which were approved by the American Psychology-Law Society, Division 41 of the American Psychological Association (APA) and the American Board of Forensic Psychology. The current revision has also been approved by the Council of Representatives of the American Psychological Association. Appendix I includes a discussion of the revision process, enactment, and current status of these *Guidelines*.

### 1.02 Definitions and Terminology

Appendix II includes definitions and terminology as used for the purposes of these *Guidelines.*

### 1.03 Nature of Forensic Psychology

For the purposes of these *Guidelines*, forensic psychology refers to all professional practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive) when applying the scientific, technical, or specialized knowledge of psychology to the law to assist in addressing legal, contractual, and administrative matters. Application of the *Guidelines* does not depend on the practitioner's typical areas of practice or expertise, but rather on the service provided in the case at hand. These *Guidelines* apply in all matters in which practitioners provide forensic psychological expertise to judicial, administrative, and educational systems including, but not limited to, examining or treating persons in anticipation of or subsequent to legal, contractual, administrative, proceedings; offering expert opinion about psychological issues in the form of *amicus* briefs or testimony to judicial, legislative or administrative bodies; acting in an adjudicative capacity; serving as a trial consultant or otherwise offering expertise to attorneys, the courts, or others; conducting research in connection with, or in the anticipation of, litigation; or involvement in educational activities of a forensic nature.

Psychological practice is not considered forensic solely because the conduct takes place in, or the product is presented in, a tribunal or other judicial, legislative, or administrative forum. For example, when a party (such as a civilly or criminally detained individual) or another individual (such as a child whose parents are involved in divorce proceedings) is ordered into treatment with a practitioner, that treatment is not necessarily the practice of forensic psychology. In addition, psychological testimony that is solely based on the provision of psychotherapy and does not include psycholegal opinions is not ordinarily considered forensic practice.

For the purposes of these *Guidelines*, "forensic practitioner" refers to a psychologist when engaged in the practice of forensic psychology as described above. Such professional conduct is considered forensic from the time the practitioner reasonably expects to, agrees to, or is legally mandated to, provide expertise on an explicitly psycholegal issue.

### 1.04 Services and Functions

The provision of forensic services may include a wide variety of psycholegal roles and functions. For example, as researchers, forensic practitioners may participate in the collection and dissemination of data that are relevant to various legal issues. As advisors, forensic practitioners may provide an attorney with an informed understanding of the role that psychology can play in the attorney's case. As consultants, forensic practitioners may explain the practical implications of relevant research, examination findings, and the opinions of other psycholegal experts. As examiners, forensic practitioners may assess an individual's functioning and report findings to the attorney, a legal tribunal, an

FELL-00002329

employer, an insurer, or others. As treatment providers, forensic practitioners may provide therapeutic services tailored to the issues and context of a legal proceeding. As mediators or negotiators, forensic practitioners may serve in a third-party neutral role and assist parties in resolving disputes. As arbiters, special masters, or case managers with decision-making authority, forensic practitioners may serve parties, attorneys, and the courts.

## 2. NATURE AND SCOPE OF THE *GUIDELINES*

### 2.01 Intended Users

These *Guidelines* are intended for use by psychologists when engaged in the practice of forensic psychology as described above (1.02, 1.03, and 1.04), and may also provide guidance on professional conduct to the legal system, and other organizations and professions.

### 2.02 Aspirational Model

The *Guidelines* are aspirational in nature and recommend professional behavior and conduct for forensic practitioners. They are intended to inform the judgment of forensic psychologists and not replace it. Forensic practitioners adhere to applicable codes of ethics and laws, rules and regulations; and consider all appropriate sources of professional authority to inform their behavior in forensic settings.

### 2.03 Goals

The goals of the *Guidelines* are to improve the quality of forensic psychological services; enhance the practice and facilitate the systematic development of forensic psychology; encourage a high level of quality in professional practice; and encourage forensic practitioners to acknowledge and respect the rights of those they serve.

### 2.04 Professional Discretion and Judgment

Guidelines differ from practice standards and other required codes of conduct. Standards are mandatory and may be accompanied by an enforcement mechanism; guidelines reflect aspirations for accomplishment and are not accompanied by an enforcement mechanism.

These *Guidelines* should be considered in conjunction with the Ethical Principles of Psychologists and Code of Conduct (EPPCC). The *Guidelines* are advisory and are to be understood only as providing further guidance for forensic practitioners and others. In cases in which *obligations* of forensic psychologists are referenced in these Guidelines, reference to the section of the EPPC that imposes such an obligation is provided.

The *Guidelines* are not mandatory or exhaustive and may not be applicable to every forensic situation or jurisdiction. As such, the *Guidelines* are advisory in areas in which the forensic practitioner has discretion to exercise professional judgment that is not prohibited or mandated by the EPPCC or by applicable law, rules, or regulations. The *Guidelines* neither add obligations to nor eliminate obligations from the EPPCC, but provide additional guidance for psychologists.

The modifiers used in the *Guidelines* (e.g., reasonably, appropriate, potentially) are included in recognition of the need for professional judgment on the part of forensic practitioners; ensure applicability across the broad range of activities conducted by forensic practitioners; and reduce the likelihood of enacting an inflexible set of guidelines that might be inapplicable as forensic practice evolves. The use of these modifiers, and the recognition of the role of professional discretion and judgment, also reflects that forensic practitioners are likely to encounter facts and circumstances not anticipated by the *Guidelines* and they may have to act upon uncertain or incomplete evidence. The *Guidelines* may provide general or conceptual guidance in such circumstances. The *Guidelines* do not, however, exhaust the legal, professional, moral,

4

and ethical considerations that inform forensic practitioners, for no complex activity can be completely defined by legal rules, codes of conduct, and aspirational guidelines.

## 2.05 Limitations

The *Guidelines* are not intended to serve as a basis for disciplinary action or civil liability. The standard of care is established by a competent authority not by the *Guidelines*. No ethical, licensure, or other administrative action or remedy, nor any other cause of action, should be taken *solely* on the basis of a forensic practitioner acting in a manner consistent or inconsistent with these *Guidelines*.

In cases in which a competent authority references the *Guidelines* when formulating standards, the *Guidelines* advise that the authority consider that the *Guidelines* attempt to identify a high level of quality in forensic practice. Competent practice is defined as the conduct of a reasonably prudent forensic practitioner engaged in similar activities in similar circumstances. Professional conduct evolves and may be viewed along a continuum of adequacy, and "minimally competent" and "best possible" are usually different points along that continuum.

The *Guidelines* are designed to be national in scope and are intended to be consistent with state and federal law. In cases in which a conflict between legal and professional obligations occur, forensic practitioners make known their commitment to the EPPCC and the *Guidelines* and take steps to achieve an appropriate resolution consistent with the EPPCC and *Guidelines*.

## 3. RESPONSIBILITIES

### 3.01 Integrity

Forensic practitioners seek to promote accuracy, honesty, and truthfulness in the science, teaching, and practice of forensic psychology and they strive to resist partisan pressures to provide services in any ways that might tend to be misleading or inaccurate.

## 3.02 Impartiality and Fairness

When offering expert opinion to be relied upon by a decision maker, providing forensic therapeutic services, or teaching or conducting research, forensic practitioners demonstrate commitment to the goals of accuracy, objectivity, fairness, and independence. Forensic practitioners recognize the adversarial nature of the legal system and strive to treat all participants and weigh all data, opinions, and rival hypotheses objectively.

When conducting forensic examinations, forensic practitioners strive to beunbiased and objective, and to avoid partisan presentation of unrepresentative, incomplete, or inaccurate evidence that might mislead finders of fact. This guideline does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based.

When providing educational services, forensic practitioners seek to represent alternative perspectives, including data, studies, or evidence on both sides of the question, in an accurate, fair and professional manner, and demonstrate a willingness to weigh and present all views, facts, or opinions impartially.

When conducting research, forensic practitioners seek to represent results in a fair and objective manner. Forensic practitioners strive to utilize research designs and scientific methods that adequately and fairly test the questions at hand, and they attempt to resist partisan pressures to develop designs or report results in ways that might be misleading or unfairly bias the results of a test, study, or evaluation.

## 3.03 Avoiding Conflicts of Interest

Forensic practitioners refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to impair their objectivity, competence, or effectiveness, or expose others with whom a professional relationship exists to harm (EPPCC Section 3.06).

FELL-00002331

Forensic practitioners identify, make known, and address real or apparent conflicts of interest in an attempt to maintain the public confidence and trust, discharge professional obligations, and maintain responsibility, objectivity, and accountability. Whenever possible, such conflicts are revealed to all parties as soon as they become known to the psychologist. Forensic practitioners consider whether a prudent and competent forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is likely to become impaired under the immediate circumstances.

When a conflict of interest is determined to be manageable, continuing services are provided and documented in a way to manage the conflict, maintain accountability, and preserve the trust of relevant others (also see Section 6.02 below).

## 4. COMPETENCE

### 4.01 Scope of Competence

In determining one's competence to provide services in a particular matter, forensic practitioners consider a variety of relevant factors including the relative complexity and specialized nature of the service, relevant training and experience, the preparation and study they are able to devote to the matter, and the opportunities for consultation with a professional of established competence in the subject matter in question. Even with regard to subjects in which they are expert, forensic practitioners may choose to consult with colleagues.

### 4.02 Gaining and Maintaining Competence

Competence can be acquired through various combinations of education, training, supervised experience, consultation, study, and professional experience. Forensic practitioners planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies that are new to them are encouraged to undertake relevant education, training, supervised experience, consultation, or study.

Forensic practitioners make ongoing efforts to develop and maintain their competencies (EPPCC Section 2.03). To maintain the requisite knowledge and skill, forensic practitioners keep abreast of developments in the fields of psychology and the law and engage in continuing study and education.

### 4.03 Representing Competencies

Consistent with the EPPCC, forensic practitioners adequately and accurately inform all recipients of their services (e.g., attorneys, tribunals) about relevant aspects of the nature and extent of their experience, training, credentials, and qualifications, and how they were obtained (EPPCC Section 5.01

### 4.04 Knowledge of the Legal System and the Legal Rights of Individuals

Forensic practitioners recognize the importance of obtaining a fundamental and reasonable level of knowledge and understanding of the legal and professional standards, laws, rules, and precedents that govern their participation in legal proceedings and that guide the impact of their services on service recipients (EPPCC Section 2.01).

Forensic practitioners aspire to manage their professional conduct in a manner that does not threaten or impair the rights of affected individuals. They may consult with, and refer others to, legal counsel on matters of law. Although they do not provide formal legal advice or opinions, forensic practitioners may provide information about the legal process to others based on their knowledge and experience. They strive to distinguish this from legal opinions, however, and encourage consultation with attorneys as appropriate.

6

FELL-00002332

## 4.05 Knowledge of the Scientific Foundation for Opinions and Testimony

When providing opinions and testimony that are based on novel or emerging principles and methods forensic practitioners, when possible, make known the limitations of these principles and methods. Forensic practitioners seek to provide opinions and testimony that are sufficiently based upon adequate scientific foundation, and reliable and valid principles and methods that have been applied appropriately to the facts of the case.

## 4.06 Knowledge of the Scientific Foundation for Teaching and Research

Forensic practitioners engage in teaching and research activities in which they have adequate knowledge, experience, and education (EPPCC Section 2.01, and they acknowledge relevant limitations and caveats inherent in procedures and conclusions (EPPCC Section 5.01).

## 4.07 Considering the Impact of Personal Beliefs and Experience

Forensic practitioners recognize that their own attitudes, values, beliefs, opinions, or biases may diminish their ability to practice in a competent and impartial manner. Under such circumstances, forensic practitioners may take steps to correct or limit such effects, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 4.08 Appreciation of Individual Differences

When scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, socioeconomic status, or other relevant individual differences affects implementation or use of their services or research, forensic practitioners first consider the boundaries of their expertise, make an appropriate referral if indicated, or gain the necessary training,

experience, consultation, or supervision (EPPCC Section 2.01,

Forensic practitioners do not engage in unfair discrimination based on such factors or on any basis proscribed by law (EPPCC Section 3.01). They strive to take steps to correct or limit the effects of such factors on their work, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 4.09 Appropriate Use of Services and Products

Forensic practitioners make reasonable efforts to guard against misuse of their services and exercise professional discretion in addressing such misuses.

## 5. DILIGENCE

## 5.01 Provision of Services

Forensic practitioners are encouraged to seek explicit agreements that define the scope of, time-frame of, and compensation for their services. In the event that a client breaches the contract or acts in way that would require the practitioner to violate ethical, legal or professional obligations, the forensic practitioner may terminate the relationship.

Forensic practitioners strive to act with reasonable diligence and promptness in providing agreed-upon and reasonably anticipated services. Forensic practitioners are not bound, however, to provide services not reasonably anticipated when retained, nor to provide every possible aspect or variation of service. Instead, forensic practitioners may exercise professional discretion in determining the extent and means by which services are provided and agreements are fulfilled.

## 5.02 Responsiveness

Forensic practitioners seek to manage their workloads so that services can be provided thoroughly, competently, and promptly. They recognize that acting with reasonable promptness, however, does not require the forensic practitioner

7

FELL-00002333

to acquiesce to service demands not reasonably anticipated at the time the service was requested, nor does it require the forensic practitioner to provide services if the client has not acted in a manner consistent with existing agreements, including payment of fees.

### 5.03 Communication

Forensic practitioners strive to keep their clients reasonably informed about the status of their services, comply with their clients' reasonable requests for information, and consult with their clients about any substantial limitation on their conduct or performance that may arise when they reasonably believe that their clients anticipate a service that may not be consistent with the *Guidelines*. Forensic practitioners attempt to keep their clients reasonably informed regarding new facts, opinions, or other potential evidence that may be relevant and applicable.

### 5.04 Termination of Services

The forensic practitioner seeks to carry through to conclusion all matters undertaken for a client unless the forensic practitioner-client relationship is terminated. When a forensic practitioner's employment is limited to a specific matter, the relationship terminates when the matter has been resolved, when anticipated services have been completed, when the agreement has been violated.

## 6. RELATIONSHIPS

Whether a forensic practitioner-client relationship exists depends on the circumstances and is determined by a number of factors which may include the information exchanged between the potential client and the forensic practitioner prior to, or at the initiation of, any contact or service, the nature of the interaction, and the purpose of the interaction.

In their work, forensic practitioners recognize that a relationship is established with those who retain their services (e.g., retaining parties, employers, insurers, the court) and those with whom they interact (e.g., examinees, collateral contacts,

research participants, students). Forensic practitioners recognize that associated obligations and duties vary as a function of the nature of the relationship.

### 6.01 Responsibilities to Retaining Parties

Most responsibilities to the retaining party attach only after the retaining party has requested and the forensic practitioner has agreed to render professional services and an agreement regarding compensation has been reached. Forensic practitioners are aware that there are some responsibilities, such as privacy, confidentiality, and privilege that may attach when the forensic practitioner agrees to consider whether a forensic practitioner-retaining party relationship shall be established. Forensic practitioners, prior to entering into a contract, may direct the potential retaining party not to reveal any confidential or privileged information as a way of protecting the retaining party's interest in case a conflict exists as a result of pre-existing relationships.

At the initiation of any request for service, forensic practitioners seek to clarify the nature of the relationship and the services to be provided including the role of the forensic practitioner (e.g., trial consultant, forensic examiner, treatment provider, expert witness, research consultant); which person or entity is the client; the probable uses of the services provided or information obtained; and any limitations to privacy, confidentiality, or privilege.

### 6.02 Multiple Relationships

A multiple relationship occurs when a forensic practitioner is in a professional role with a person and, at the same time or at a subsequent time, is in a different role with the same person; is involved in a personal, fiscal, or other relationship with an adverse party; at the same time is in a relationship with a person closely associated with or related to the person with whom the forensic practitioner has the professional relationship; or offers or agrees to enter into another relationship in the future with the person or a person closely associated with or related to the person (EPPCC Section 3.05).

8

FELL-00002334

Forensic practitioners recognize the potential conflicts of interest and threats to objectivity inherent in multiple relationships. Forensic practitioners recognize that some personal and professional relationships may interfere with their ability to practice in a competent and objective manner and they seek to minimize any detrimental effects by avoiding involvement in such matters whenever feasible or limiting their assistance in a manner that is consistent with professional obligations.

### 6.02.01 Therapeutic-Forensic Role Conflicts

Providing forensic and therapeutic psychological services to the same individual or closely related individuals involves multiple relationships that may impair objectivity and/or cause exploitation or other harm. Therefore, when requested or ordered to provide either concurrent or sequential forensic and therapeutic services, forensic practitioners disclose the potential risk and make reasonable efforts to refer the request to another qualified provider. If referral is not possible, the forensic practitioner considers the risks and benefits to all parties and to the legal system or entity likely to be impacted, the possibility of separating each service widely in time, seeking judicial review and direction, and consulting with knowledgeable colleagues. When providing both forensic and therapeutic services, forensic practitioners seek to minimize the potential negative effects of this circumstance.

### 6.02.02 Expert Testimony by Practitioners Providing Therapeutic Services

Providing expert testimony about a patient who is a participant in a legal matter does not necessarily involve the practice of forensic psychology even when that testimony is relevant to a psycholegal issue that is before the decision-maker. For example, providing testimony on matters such as a patient's reported history or other statements, mental status, diagnosis, progress, prognosis, and treatment would not ordinarily be considered forensic practice even when the testimony is related to a psycholegal issue before the decision-maker. Rendering opinions and providing testimony about a person on psycholegal issues

(e.g., criminal responsibility, legal causation, proximate cause, trial competence, testamentary capacity, the relative merits of parenting arrangements) would ordinarily be considered the practice of forensic psychology.

Consistent with their ethical obligations to base their opinions on information and techniques sufficient to substantiate their findings (EPPCC Sections 2.04, 9.01), forensic practitioners provide testimony only on those issues for which they have adequate foundation and only when a reasonable forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is unlikely to be impaired. As with testimony regarding forensic examinees, the testimony identifies any substantial lack of corroboration or other substantive limitation that may affect the reliability and validity of the fact or opinion offered and communicates these to the decision maker.

### 6.02.03 Provision of Forensic Therapeutic Services

Although some therapeutic services can be considered forensic in nature, the fact that therapeutic services are ordered by the court or are delivered to someone does not necessarily make them forensic.

In determining whether a therapeutic service should be considered the practice of forensic psychology, psychologists consider the potential impact of the legal context on treatment, the potential for treatment to impact the psycholegal issues involved in the case, and whether another reasonable psychologist in a similar position would consider the service to be forensic and these *Guidelines* to be applicable.

Therapeutic services can have significant effects on current or future legal proceedings. Forensic practitioners are encouraged to consider these effects and minimize any unintended or negative effects on such proceedings or therapy when they provide therapeutic services in forensic contexts.

9

FELL-00002335

**6.03 Provision of Emergency Mental Health Services to Forensic Examinees**

When providing forensic examination services an emergency may arise that requires the forensic practitioner to provide therapeutic services to the examinee in order to prevent imminent harm to the examinee or others. In such cases, the forensic practitioner strives to limit disclosure of information to that which is consistent with applicable law, code, statute, and order of the court, and informs the retaining attorney, legal representative, or the court in an appropriate manner. Upon providing emergency treatment to examinees, forensic practitioners consider whether they can continue in a forensic role with that individual so that potential for harm to the recipient of services is avoided.

**7. FEES**

**7.01 Determining Fees**

When determining fees forensic practitioners may consider salient factors such as their experience providing the service, the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the service, the fee customarily charged for similar forensic services, the likelihood that the acceptance of the particular employment will preclude other employment, the time limitations imposed by the client or circumstances, the nature and length of the professional relationship with the client, and any legal requirements.

**7.02 Fee Arrangements**

Forensic practitioners seek to avoid undue influence that might result from financial compensation or other gains. Because of the threat to objectivity presented by the acceptance of contingent fees and associated legal prohibitions, forensic practitioners strive to avoid providing professional services on the basis of contingent fees.

Letters of protection, financial guarantees, and other security for payment of fees in the future are not considered contingent fees unless payment is dependent on the outcome of the matter.

**8. INFORMED CONSENT, NOTIFICATION AND ASSENT**

Because substantial rights, liberties, and properties are often at risk in forensic matters and because the methods and procedures of forensic practitioners are complex and may not be accurately anticipated by the recipients of forensic services, forensic practitioners strive to inform service recipients about the nature and parameters of the services to be provided.

Forensic practitioners carefully consider the appropriateness of conducting a forensic evaluation of an individual who is not represented by counsel.

**8.01 Timing and Substance**

Forensic practitioners strive to inform clients, examinees, and others who are the recipients of forensic services as soon as is feasible about the nature and extent of reasonably anticipated forensic services.
In determining what information to impart, forensic practitioners consider a variety of factors including the person's experience or training in psychological and legal matters of the type involved and whether the person is represented by counsel. When questions or uncertainties remain after they have made the effort to explain the necessary information, forensic practitioners may recommend that the person seek legal advice.

**8.02 Communication with Those Seeking to Retain a Forensic Practitioner**

As part of the initial process of being retained, or as soon thereafter as previously unknown information becomes available, forensic practitioners strive to disclose to the retaining party information that would reasonably be anticipated to affect a decision to retain or continue the services of the forensic practitioner.

10

FELL-00002336

This disclosure includes all information that the reasonably prudent recipient of service would desire to know and may include, but is not limited to, the fee structure for anticipated services; prior and current personal or professional activities, obligations and relationships that would reasonably lead to the fact or the appearance of a conflict of interest; the forensic practitioner's knowledge, skill, experience, and education relevant to the forensic services being considered, including any significant limitations; and the scientific bases and limitations of the methods and procedures which are expected to be employed.

## 8.03 Communication with Forensic Examinees

Forensic practitioners inform examines about the nature and purpose of the examination (EPPCC Section 9.03). Information they may includes the purpose, nature, and anticipated use of the examination; who will have access to the information; associated limitations on privacy, confidentiality, and privilege including who is authorized to release or access the information contained in the forensic practitioner's records; the voluntary or involuntary nature of participation, including potential consequences of participation or non-participation, if known; and, if the cost of the service is the responsibility of the examinee, the anticipated cost.

## 8.03.01 Persons Not Ordered or Mandated to Undergo Examination

If the examinee is not ordered by the court to participate in a forensic examination, the forensic practitioner seeks his or her informed consent (EPPCC Sections 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may consider postponing the examination, advising the examinee to contact his or her attorney, and notifying the retaining party about the examinee's unwillingness to proceed.

## 8.03.02 Persons Ordered or Mandated to Undergo Examination or Treatment

If the examinee is ordered by the court to participate, the forensic practitioner can conduct the examination over the objection, and without the consent, of the examinee (EPPCC Sections 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may, as appropriate, attempt to conduct the examination, postpone the examination, advise the examinee to contact his or her attorney, or notify the retaining party about the examinee's unwillingness to proceed.

When an individual is ordered to undergo treatment but the goals of treatment are determined by a legal authority rather than the individual receiving services, the forensic practitioner informs the service recipient of the nature and purpose of treatment, and any limitations on confidentiality and privilege (EPPCC Sections 3.10, 10.01).

## 8.03.03 Persons Lacking Capacity to Provide Informed Consent

For examinees adjudicated or presumed by law to lack the capacity to provide informed consent for the anticipated forensic service, the forensic practitioner nevertheless provides an appropriate explanation, seeks the examinee's assent, and obtain appropriate permission from a legally authorized person, as permitted or required by law (EPPCC Sections 3.10, 9.03).

For examinees whom the forensic practitioner has concluded lack capacity to provide informed consent to a proposed, non-court-ordered service, but who have not been adjudicated as lacking such capacity, the forensic practitioner strives to take reasonable steps to protect their rights and welfare (EPPCC Section 3,10). This maybe accomplished by suspending the proposed service or notifying the examinee's attorney or the retaining party.

11

FELL-00002337

## 8.04 Communication with Collateral Sources of Information

Forensic practitioners disclose to collateral sources of information relevant information that may include, but may not be limited to, who has retained the forensic practitioner; the nature, purpose, and intended use of the examination or other procedure; associated limits on privacy, confidentiality, and privilege; and whether their participation is voluntary (EPPCC Section 3.10).

## 8.05 Communication in Research Contexts

When engaging in research or scholarly activities conducted as a service to a client in a legal proceeding, forensic practitioners attempt to clarify any anticipated further use of such research or scholarly product, disclose their role in the resulting research or scholarly products, and obtain whatever consent or agreement is required. In advance of any scientific study, forensic practitioners seek to negotiate the circumstances under and manner in which the results may be made known to others. Forensic practitioners strive to balance the potentially competing rights and interests of the retaining party with the inappropriateness of suppressing data, for example, by agreeing to report the data without identifying the jurisdiction in which the study took place.

Forensic practitioners represent the results of research in an accurate manner (EPPCC Section 5.01).

## 9. CONFLICTS IN PRACTICE

In forensic psychology practice, conflicting responsibilities and demands may be encountered. When conflicts occur, forensic practitioners seek to maintain a disciplined, fair, and professional demeanor.

## 9.01 Conflicts with Legal Authority

When their responsibilities conflict with law, regulations, or other governing legal authority, forensic practitioners make known their commitment to the EPPCC, and take steps to resolve the conflict. When the conflict cannot be resolved by such means, forensic practitioners may adhere to the requirements of the law, regulations, or other governing legal authority, but only to the extent required. In situations where the EPPCC or *Guidelines* may be in conflict with the requirements of law, attempts to resolve the conflict are made in accordance with the EPPCC (EPPCC Section 1.02).

## 9.02 Conflicts with Organizational Demands

When the demands of an organization with which they are affiliated or for whom they are working conflict with their professional responsibilities and obligations, forensic practitioners clarify the nature of the conflict and, to the extent feasible, resolve the conflict in a way consistent with professional obligations and responsibilities.

## 9.03 Resolving Ethical Issues with Fellow Professionals

When an apparent or potential ethical violation has caused, or is likely to cause, substantial harm, forensic practitioners take action appropriate to the situation and consider a number of factors including the nature and the immediacy of the potential harm; applicable privacy, confidentiality, and privilege; how the rights of the relevant parties may be affected by a particular course of action; and any other legal or ethical obligations (EPPCC Section 1.04).

Steps to resolve perceived ethical conflicts may include, but are not limited to, obtaining the consultation of knowledgeable colleagues, obtaining the advice of independent counsel, and conferring directly with the attorneys involved.

When forensic practitioners believe that there may have been an ethical violation by another professional, an attempt is made to resolve the issue by bringing it to the attention of that individual, if that attempt does not violate any rights or privileges that may be involved, and if an informal resolution appears appropriate (EPPCC Section 1.04). If this does not result in a satisfactory resolution, the forensic practitioner

12

FELL-00002338

may take further action appropriate to the situation, including consideration of making a report to third parties of the perceived ethical violation. In most instances, in order to minimize unforeseen risks to the party's rights in the legal matter, forensic practitioners consider consulting with the retaining party before attempting to resolve a perceived ethical violation with another professional.

## 10.  PRIVACY, CONFIDENTIALITY, AND PRIVILEGE

Forensic practitioners recognize their ethical obligations to maintain the confidentiality of information relating to a client or retaining party, except insofar as disclosure is consented to by the client or retaining party, or required or permitted by law (EPPCC Section 4.01).

### 10.01 Release of Information

Forensic practitioners recognize the importance of complying with properly noticed and served subpoenas or court orders directing release of information, or other legally proper consent from duly authorized persons, unless there is a legally valid reason to offer an objection. When in doubt about an appropriate response or course of action, forensic practitioners may seek assistance from the retaining party, retain and seek legal advice from their own attorney, or formally notify the drafter of the subpoena of their uncertainty.

### 10.02 Access to Information

If requested, forensic practitioners seek to provide the retaining party access to, and a meaningful explanation of, all information that is in their records for the matter at hand, consistent with the relevant law, applicable codes of ethics and professional standards, and institutional rules and regulations. Forensic examinees typically are not provided access to the forensic practitioner's records without the consent of the retaining party. Access to records by anyone other than the retaining party is governed by legal process, usually subpoena or court order, or by explicit consent of the retaining party. Forensic

practitioners may charge a reasonable fee for the costs associated with the storage, reproduction, review, and provision of records.

### 10.03 Acquiring Collateral and Third Party Information

Forensic practitioners strive to request information or records from collateral sources with the consent of the relevant attorney or the relevant party, or when otherwise authorized by law or court order.

### 10.04 Use of Case Materials in Teaching, Continuing Education, and Other Scholarly Activities

Forensic practitioners using case materials for purposes of teaching, training, or research strive to present such information in a fair, balanced, and respectful manner. They attempt to protect the privacy of persons by disguising the confidential, personally identifiable information of all persons and entities who would reasonably claim a privacy interest; using only those aspects of the case available in the public domain; or obtaining consent from the relevant clients, parties, participants, and organizations to use the materials for such purposes (EPPCC Section 4.07; see Sections 13.06 and 13.07 of these guidelines).

## 11. METHODS AND PROCEDURES

### 11.01 Use of Appropriate Methods

Forensic practitioners strive to utilize appropriate methods and procedures in their work. When performing examinations, treatment, consultation, educational activities or scholarly investigations, forensic practitioners seek to maintain integrity by examining the issue or problem at hand from all reasonable perspectives and seek information that will differentially test plausible rival hypotheses.

### 11.02 Use of Multiple Sources of Information

Forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible. When relying upon data that have not been corroborated,

13

FELL-00002339

forensic practitioners seek to make known the uncorroborated status of that data, any associated strengths and limitations, and the reasons for relying upon it.

### 11.03 Opinions Regarding Persons Not Examined

Forensic practitioners recognize their ethical obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings (EPPCC Section 9.01). Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony.

When conducting a record review or providing consultation or supervision that does not warrant an individual examination, forensic practitioners seek to identify the sources of information on which they are basing their opinions and recommendations, including any substantial limitations to their opinions and recommendations.

### 12. ASSESSMENT

### 12.01 Focus on Legally Relevant Factors

Forensic examiners seek to assist the trier of fact to understand evidence or determine a fact in issue, and they provide information that is most relevant to the psycholegal issue. In reports and testimony forensic practitioners typically provide information about examinees' functional abilities, capacities, knowledge, and beliefs, and address their opinions and recommendations to the identified psycholegal issues.

Forensic practitioners are sensitive to the problems posed by using a clinical diagnosis in

forensic contexts and consider and qualify their opinions and testimony appropriately.

### 12.02 Appropriate Use of Assessment Procedures

Forensic practitioners use assessment procedures in the manner and for the purposes that are appropriate in light of the research on or evidence of their usefulness and proper application (EPPCC Section 9.02). This includes assessment techniques, interviews, tests, instruments, and other procedures and their administration, adaptation, scoring, and interpretation, including computerized scoring and interpretation systems.

Assessment in forensic contexts differs from assessment in therapeutic contexts in important ways that forensic practitioners strive to take into account when conducting forensic examinations. Forensic practitioners seek to consider the strengths and limitations of employing traditional assessment procedures in forensic examinations. Given the stakes involved in forensic contexts, forensic practitioners recognize the need to take special care to ensure the integrity and security of test materials and results.

When the validity of an assessment technique has not been established in the forensic context or setting in which it is being used, the forensic practitioner seeks to describe the strengths and limitations of any test results and explain the extrapolation of these data to the forensic context. Because of the many differences between forensic and therapeutic contexts, forensic practitioners are aware and seek to make known that some examination results may warrant substantially different interpretation when administered in forensic contexts.

Forensic practitioners consider and seek to make known that forensic examination results can be affected by factors unique to, or differentially present in, forensic contexts including response style, voluntariness of participation, and situational stress associated with involvement in forensic or legal matters.

14

FELL-00002340

**12.03 Appreciation of Individual Differences**

When interpreting assessment results, forensic practitioners consider the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational, personal, linguistic, and cultural differences that might affect their judgments or reduce the accuracy of their interpretations (EPPCC Section 9.06). Forensic practitioners strive to identify any significant strengths and limitations of their procedures and interpretations.

**12.04 Provision of Assessment Feedback**

Forensic practitioners take reasonable steps to explain assessment results to the examinee or a designated representative in language they can understand (EPPCC Section 9.10). In those circumstances in which communication about assessment results is precluded, the forensic practitioner explains this to the examinee in advance (EPPCC Section 9.10).

Forensic practitioners seek to provide information about professional work in a manner consistent with professional and legal standards for the disclosure of test data or results, interpretation of data, and the factual bases for conclusions.

**12.05 Documentation and Compilation of Data Considered**

Forensic practitioners recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties. This documentation includes, but is not limited to, letters and consultations; notes, recordings, and transcriptions; assessment and test data, scoring reports and interpretations; and all other records in any form or medium that were created or exchanged in connection with a matter.

When contemplating third party observation or audio/video-recording of examinations forensic practitioners consider any law that may control such matters, the need for transparency and

documentation, and the potential impact of observation or recording on the validity of the examination and test security.

**12.06 Provision of Documentation**

Pursuant to proper subpoenas or court orders, or other legally proper consent from authorized persons, forensic practitioners seek to make available all documentation described in 12.05, all financial records related to the matter, and any other records including reports (and draft reports if they have been provided to a party, attorney, or other entity for review), that might reasonably be related to the opinions to be expressed.

**12.07 Recordkeeping**

Forensic practitioners establish and maintain a system of recordkeeping and professional communication that is consistent with law, rules, EPPCC Standards, and regulations, and that safeguards applicable privacy, confidentiality, and privileges. When indicated by the extent of the rights, liberties, and properties that may be at risk, the complexity of the case, the amount and legal significance of unique evidence in the care and control of the forensic practitioner, and the likelihood of future appeal, forensic practitioners strive to inform the retaining party of the limits of recordkeeping times. If requested to do so, forensic practitioners strive to maintain such records until notified that all appeals in the matter have been exhausted or they send a copy of any unique components/aspects of the record in their care and control to the retaining party before destruction of the record.
**12.08**

**13. PROFESSIONAL AND OTHER PUBLIC COMMUNICATIONS**

**13.01 Accuracy, Fairness, and Avoidance of Deception**

Forensic practitioners make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional reports and testimony, are communicated in ways

15

that promote understanding and avoid deception (EPPCC Section 1.01).

When in their role as expert to the court or other tribunals, the role of forensic practitioners is to facilitate understanding of the evidence or dispute. Consistent with legal and ethical requirements, forensic practitioners do not distort or withhold relevant evidence or opinion in reports or testimony. When responding to discovery requests and providing sworn testimony, forensic practitioners strive to have readily available for inspection all data which they considered, regardless of whether the data supports their opinion, subject to and consistent with court order, relevant rules of evidence, test security issues, and professional standards.

When providing reports and other sworn statements or testimony in any form, forensic practitioners strive to present their conclusions, evidence, opinions, or other professional products in a fair manner. Forensic practitioners do not, by either commission or omission, participate in misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny or subvert the presentation of evidence contrary to their own position or opinion (EPPCC Section 5.01. This principle does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based.

### 13.02 Differentiating Observations, Inferences, and Conclusions

In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are prepared to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

### 13.03 Disclosing Sources of Information and Bases of Opinions

Forensic practitioners recognize their obligation to affirmatively disclose all sources of all information obtained in the course of their professional services, and to be prepared to identify the source of each piece of information

that was considered and relied upon in formulating a particular conclusion, opinion or other professional product.

### 13.04 Comprehensive and Accurate Presentation of Opinions in Reports and Testimony

Consistent with relevant law and rules of evidence, when providing professional reports and other sworn statements or testimony, forensic practitioners strive to offer a complete statement of all relevant opinions that they formed within the scope of their work on the case, the basis and reasoning underlying the opinions, the salient data or other information that was considered in forming the opinions, and an indication of any additional evidence that may be used in support of the opinions to be offered. The specific substance of forensic reports is determined by the type of psycholegal issue at hand as well as relevant laws or rules in the jurisdiction in which the work is completed.

Forensic practitioners limit discussion of background information that does not bear directly upon the legal purpose of the examination or consultation. Forensic practitioners avoid offering information that is irrelevant and that does not provide a substantial basis of support for their opinions, except when required by law (EPPCC Section 4.04).

### 13.05 Commenting Upon Other Professionals and Participants in Legal Proceedings

When evaluating or commenting upon the work or qualifications of other professionals involved in legal proceedings, forensic practitioners seek to represent their disagreements in a professional and respectful tone, and base them on a fair examination of the data, theories, standards and opinions of the other expert or party.

When describing or commenting upon clients, examinees, or other participants in legal proceedings, forensic practitioners strive to do so in a fair and objective manner. Forensic

16

practitioners strive to report the representations, opinions, and statements of clients, examinees, or other participants in a fair and objective manner.

## 13.06 Out of Court Statements

Ordinarily, forensic practitioners seek to avoid making detailed public (out-of-court) statements about legal proceedings in which they have been involved. However, sometimes public statements may serve important goals such as educating the public about the role of forensic practitioners in the legal system, the appropriate practice of forensic psychology, and psychological and legal issues that are relevant to the matter at hand. When making public statements, forensic practitioners refrain from releasing private, confidential, or privileged information, and attempt to protect persons from harm, misuse, or misrepresentation as a result of their statements (EPPCC Section 4).

## 13.07 Commenting Upon Legal Proceedings

Forensic practitioners strive to address particular legal proceedings in publications or communications only to the extent that the information relied upon is part of a public record, or when consent for that use has been properly obtained from any party holding any relevant privilege (also see Section 10.04).

When offering public statements about specific cases in which they have not been involved, forensic practitioners offer opinions for which there is sufficient information or data and make clear the limitations of their statements and opinions resulting from having had no direct knowledge of or involvement with the case (EPPCC Section 2.04).

17

FELL-00002343

## APPENDIX I:  BACKGROUND OF THE *GUIDELINES* AND THE REVISION PROCESS

### A.  History of the *Guidelines*

The previous version of the *Specialty Guidelines for Forensic Psychologists* (Committee on Ethical Guidelines for Forensic Psychologists, 1991) was approved by the American Psychology-Law Society, Division 41 of the American Psychological Association, and the American Board of Forensic Psychology in 1991.  The current  revision, now called the *Specialty Guidelines for Forensic Psychology* (referred to as *Guidelines* throughout this document), replace the 1991 *Specialty Guidelines for Forensic Psychologists.*

### B.  Revision Process

This revision of the *Guidelines* was coordinated by the Committee for the Revision of the Specialty Guidelines for Forensic Psychology, which was established by the American Academy of Forensic Psychology and the American Psychology-Law Society/Division 41 of the American Psychological Association in 2002 and operated through 200x.  This Committee consisted of two representatives from each organization (Solomon Fulero, PhD, JD, Stephen Golding, PhD, ABPP, Lisa Piechowski, PhD, ABPP, Christina Studebaker, PhD) a Chairperson (Randy Otto, PhD. ABPP), and a liaison from APA Division 42 (Jeffrey Younggren, PhD).

This document was revised in accordance with American Psychological Association Rule 30.08 and the APA policy document *Criteria for the development and evaluation of practice guidelines* (APA, 2001).  The Committee posted announcements regarding the revision process to relevant electronic discussion lists and professional publications [insert footnote to all list servers and publications here].  In addition, an electronic discussion list devoted solely to issues concerning revision of the *Guidelines* was operated between December 2002  and July 2007, followed by establishment of an e-mail address in

February 2008 (sgfp@yahoo.com).  Individuals were invited to provide input and commentary on the existing *Guidelines* and proposed revisions via these means.  In addition, [insert number] public meetings were held throughout the revision process at biennial meetings of the American Psychology-Law Society.

Upon development of a draft that the Revisions Committee deemed suitable, the revised *Guidelines* were submitted for review to the Executive Committee of the American Psychology-Law Society and Division 41 of the American Psychological Association, and to the American Board of Forensic Psychology.  Once the revised *Guidelines* were approved by these two organizations, they were submitted to the American Psychological Association for review, commentary, and acceptance, consistent with the American Psychological Association's Criteria for Practice Guideline Development and Evaluation (Committee on Professional Practice and Standards, 2001) and Rule 30-8.  The *Guidelines* were adopted by the American Psychological Association Council of Representatives on [insert date here].

### C.  Need for the Guidelines

Professional standards for the ethical practice of psychology as a discipline are addressed in the Ethical Principles of Psychologists and Code of Conduct (American Psychological Association, 2002, hereinafter EPPCC).  As such, codes of ethics are intended to describe standards for competent and adequate professional conduct.  In contrast to the EPPCC, these *Guidelines* are intended to describe the most desirable and highest level professional conduct for psychologists when engaged in the practice of forensic psychology.
The *Guidelines*, although informed by the EPPCC and meant to be consistent with them, are designed to be educative and to provide more specific and thorough guidance to psychologists who are determining their professional forensic conduct.

18

FELL-00002344

The 1991 *Specialty Guidelines for Forensic Psychologists* needed revision due to advancements in the field that have taken place and the need for a broader and more thorough document that addresses the wide variety of professional forensic practice areas that have developed and expanded since the adoption of the original guidelines.

### D. Developers and Support

The *Specialty Guidelines for Forensic Psychology* were developed by the American Psychology-Law Society, Division 41 of the American Psychological Association, and the American Board of Forensic Psychology, with additional financial support provided by the American Academy of Forensic Psychology.

### E. Background Literature

Resources reviewed in the development of the *Guidelines* include:

American Psychology-Law Society and American Academy Board of Forensic Psychology: Specialty Guidelines for Forensic Psychologists; American Academy of Psychiatry & Law: Ethical Guidelines for the Practice of Forensic Psychiatry; American Bar Association: Model Rules of Professional Conduct; American Psychiatric Association: The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry; American Psychological Association Committee on Psychological Tests and Assessment: Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision Making; American Psychological Association: Ethical Principles of Psychologists and Code of Conduct; American Psychological Association: Guidelines for Child Custody Evaluations in Divorce Proceedings; American Psychological Association: Guidelines for Psychological Evaluations in Child Protection Matters; American Psychological Association: Guidelines for Psychotherapy with Lesbian, Gay, & Bisexual Clients; American Psychological Association: Guidelines on Multicultural Education, Training, Research, Practice, and

Organizational Change for Psychologists; American Psychological Association: Professional, Ethical, and Legal Issues Concerning Interpersonal Violence, Maltreatment, and Related Trauma; American Psychological Association: Record Keeping Guidelines; American Psychological Association: Rights and Responsibilities of Test Takers: Guidelines and Expectations; Association of State & Provincial Psychology Boards: Supervision Guidelines; Joint Committee on Testing Practices: Code of Fair Testing Practices in Education; Mental Health Patient's Bill of Rights.

### F. Current Status

These *Guidelines* are scheduled to expire [insert date here]. After this date, users are encouraged to contact the American Psychological Association Practice Directorate to confirm that this document remains in effect.

**SUBMIT COMMENTS REGARDING THIS DRAFT TO:**

**Randy Otto, PhD**
**FMHI**
**13301 N. 30th St.**
**Tampa, FL 33612**
**rotto@fmhi.usf.edu**
**When submitting comments please identify the specific section you are referencing (e.g., 7.01, 8.03.03) and provide recommended alternative language when appropriate.**

FELL-00002345

## APPENDIX II:  DEFINITIONS AND TERMINOLOGY

For the purposes of these *Guidelines*:

*Appropriate*, when used in relation to conduct by a forensic practitioner means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is apt and pertinent and is considered befitting, suitable and proper for a particular person, place, condition, or function. "Inappropriate" means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is not suitable, desirable, or properly timed for a particular person, occasion, or purpose; and may also denote improper conduct, improprieties, or conduct that is discrepant for the circumstances.

*Agreement* refers to the objective and mutual understanding between the forensic practitioner and the person or persons seeking the professional service and/or agreeing to participate in the service.   See also Assent, Consent, and Informed Consent.

*Assent* refers to the agreement, approval, or permission, especially regarding verbal or nonverbal conduct, that is reasonably intended and interpreted as expressing willingness, even in the absence of unmistakable consent.  Forensic practitioners attempt to secure assent when consent and informed consent can not be obtained or when, because of mental state, the examinee may not be able to consent.

*Consent* refers to agreement, approval, or permission as to some act or purpose.

*Client* refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

*Conflict of Interest* refers to a situation or circumstance in which the forensic practitioner's objectivity, impartiality, or judgment may be jeopardized due to a relationship, financial, or any other interest that would reasonably be expected to

substantially affect a forensic practitioner's professional judgment, impartiality, or decision-making.

*Decisionmaker* refers to the person or entity with the authority to make a judicial decision, agency determination, arbitration award, or other contractual determination after consideration of the facts and the law.

*Examinee* refers to a person who is the subject of a forensic examination for the purpose of informing a decision maker or attorney about the psychological functioning of that examinee.

*Forensic Examiner* refers to a psychologist who examines the psychological condition of a person whose psychological condition is in controversy or at issue.

*Forensic Practice* refers to the application of the scientific, technical, or specialized knowledge of psychology to the law and the use of that knowledge to assist in resolving legal, contractual, and administrative disputes.

*Forensic Practitioner* refers to a psychologist when engaged in forensic practice.

*Forensic Psychology* refers to all forensic practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive).

*Informed Consent* denotes the knowledgeable, voluntary, and competent agreement by a person to a proposed course of conduct after the forensic practitioner has communicated adequate information and explanation about the material risks and benefits of, and reasonably available alternatives to, the proposed course of conduct.

*Legal Representative* refers to a person who has the legal authority to act on behalf of another.

*Party* refers to a person or entity named in litigation, or who is involved in, or is witness to, an activity or relationship that may be reasonably anticipated to result in litigation.

20

FELL-00002346

***Reasonable*** or ***Reasonably***, when used in relation to conduct by a forensic practitioner, denotes the conduct of a prudent and competent forensic practitioner who is engaged in similar activities in similar circumstances.

***Record*** or ***Written Record*** refers to all notes, records, documents, memorializations, and recordings of considerations and communications, be they in any form or on any media, tangible, electronic, hand-written, or mechanical, that are contained in, or are specifically related to, the forensic matter in question or the forensic service provided.

***Retaining Party*** refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

***Tribunal*** denotes a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.

***Trier of Fact*** refers to a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.

FELL-00002347

# EXHIBIT 235

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 2:01-CR-12-01 |
| DONALD FELL | : | |

## ORDER

The Court orders that the interview of Fell by the government mental health expert be subject to the following conditions:

1) Having filed notice that the defendant plans to introduce mental health evidence or testimony at any penalty phase, the defendant shall make himself available for an examination by a government retained mental health expert.  The government's examination shall take place before jury selection begins.  The examination shall take place where the defendant is detained.  The examination may be conducted by either Dr. Rabun or Dr. Wetzel, or both.  The examiner shall be permitted to conduct a complete psychiatric examination, including inquiry into defendant's state of mind before, during and after November 27, 2000.  During the examination, the defendant shall not be accompanied by members of the defense team.  However, the examination will be videotaped or tape-recorded and if desired, a contemporaneous audio-video feed will be provided to the defense team.

FELL-00002348

2) The report of the examination shall be released to the government only in the event that the jury reaches a verdict of guilty on a capital charge and only after the defendant confirms his intent to offer mental health or mental condition evidence in mitigation.

3) Even if the defendant confirms his intent to offer mental health evidence, he may withdraw notice of intent to raise a mental health or mental defense at any time before actually introducing evidence on it, and, in that event, neither the fact of notice, nor the results of reports of any mental examination, nor any facts disclosed only therein shall be admissible against him.

4) Failure of the defendant to participate in the examination contemplated herein or to confirm his first notice shall result in forfeiture of the right to present mental health testimony.

5) Prior to any mental health testing being conducted by any expert for the government, the government shall provide to counsel a list of any tests its expert wishes to perform.  The government's expert shall not identify more than one test for the purpose of measuring the same mental function(s).  Within one week of receiving the government's list, the defendant shall identify any such tests to which he objects.  The defendant and the government shall attempt to come to an agreement as to the

2

FELL-00002349

designation of specific testing measures to be administered by the defense and prosecution witnesses and shall consider sharing data between the experts. If a dispute exists which the government and the defense cannot resolve, the parties shall notify the Court and a hearing will be held. No mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert. In the event of such an unresolved conflict, nothing in this paragraph shall create a preference in favor of the government or a burden on the defendant at a hearing conducted pursuant to this paragraph.

6) The government shall provide counsel for the defendant one week's notice of its intended date(s) of examination. At least three days before the examination, the defense or the mental health expert(s) for the defendant, shall provide the expert for the government all of the defendant's medical or other records which the mental health expert(s) relies upon to any extent for their report(s). The records shall be treated by the government's mental health expert in the same fashion as above. Additionally, the government shall not use in its case-in-chief during the penalty phase of this prosecution any document described herein that the government received from the defendant or the defendant's mental health experts.

7)  The Court finds the fire-walling procedures in

3

United States v. Sampson, 335 F. Supp. 2d 166 (D. Mass. 2004), by which United States Attorneys from other jurisdictions are utilized, are unnecessary.

Dated at Burlington, Vermont this 7th day of April, 2005.

/s/ William K. Sessions III
William K. Sessions III
Chief Judge, U.S. District Court

4

FELL-00002351

# EXHIBIT 236

saying of argument that you were a member of the victim's family in this case, someone who strongly wanted the death penalty. If you were that person, would you want you as a juror to decide this case?

MR. PRIMOMO: Your Honor, I don't believe the victim's family is a party.

THE COURT: Well, that's correct. But it can be couched in terms of the government. And I think it's an appropriate question in terms of the government.

MR. KELLY: If you were me, if you were the government, who is seeking the death penalty --

JUROR NO. 64: Right.

MR. KELLY: -- and you wanted a juror there who could be fair to both sides, as they sit there, not lean one way or the other before the beginning of the case, before hearing the evidence, not have a personal bias one way or the other that would interfere or substantially interfere with their verdict, are you the person that you would choose for such a serious case?

JUROR NO. 64: Yes, I would.

MR. KELLY: And why is that?

JUROR NO. 64: Well, part of the type of work that I do, I, myself, have to work with people who sometimes have done things that are not good things, but part of my responsibility is to, is to deal with the

FELL-00002352

process and give them as fair -- as fair a

representation of that process, and not make that

judgment. I mean, that -- I found -- my experience that

if I just make a judgment about that person from what I

have heard, there are many times I turn out that that

isn't correct.

MR. KELLY: Fair enough. That's true of many,

many things.

JUROR NO. 64: Right.

MR. KELLY: But we are talking here about what

some people describe as the ultimate judgment.

JUROR NO. 64: Right.

MR. KELLY: The judgment to take someone

else's life. And I am just trying to really understand

how you feel about that. I am not trying to play word

games. I am not trying to do anything else. We are

trying to find jurors who can be really even and fair to

both sides. And candidly, I'm asking you these

questions out of a concern that you have expressed a

strong view one way.

JUROR NO. 64: Right.

MR. KELLY: And the question is, is that

personal view going to interfere, if you ultimately sat

in that stage of the process of making that ultimate

judgment about this man, Donald Fell, and whether or not

FELL-00002353

he is to be put to death, which could be the ultimate

decision you would have to make, are you the right, fair

juror to make that choice given your answers to these

questions?

JUROR NO. 64: I think that I could make that

decision.

MR. KELLY: Are you the fair juror to do that?

JUROR NO. 64: Well, I'm not going to be

someone that would rush into immediately saying, oh,

because someone has done something that someone else

might say is horrible, that they immediately deserve the

worst.

MR. KELLY: Completely, no one would just.

But in answer to some of your questions, you were asked

about the types of cases where you would think the death

penalty is appropriate, and you described them as you

did today, as genocide, mass murder and possible war

crimes. Those were the types of cases where you thought

capital punishment would be justified.

JUROR NO. 64: Right.

MR. KELLY: There's no genocide in this case.

There's no mass murder. There are no war crimes.

That's not what this case is about. So if you take

those off the table, the question is not that you

hypothetically could do it in those cases. The question

FELL-00002354

# EXHIBIT 237

# INTENTIONALLY LEFT BLANK

FELL-00002355

# EXHIBIT 238

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          )
    Plaintiff,                     )
                                   )
    v.                             )          Criminal No. 2:01-CR-12
                                   )
DONALD FELL,                       )
    Defendant.                     )

## MOTION TO DISMISS NOTICE OF INTENT TO SEEK DEATH PENALTY

TO THE HONORABLE UNITED STATES DISTRICT COURT:

INTO COURT COMES DONALD FELL, Defendant in the above-styled case and files this Motion to Dismiss Notice of Intent to Seek Death Penalty, and would show as follows:

I.

On February 1, 2001, Donald Fell was indicted in this case. Counts One (Carjacking) and Two (Kidnapping) alleged conduct which was facially sufficient to seek a capital sentence pursuant to 18 U.S.C. § 3591. At the time, the Department of Justice's (DOJ) protocol required United States Attorneys (USA) to submit potential capital cases to the United States Attorney General (AG) for review. The AG could either accept or overrule the USA's recommendation, but ultimately the USA had the authority to settle the case for a sentence less than death.

II.

On May 25, 2001, Fell's counsel met with local prosecutors in an effort to convince them to settle the case. Fell's counsel had completed a substantial mitigation investigation and provided that evidence to the prosecutors. Fell offered to plead guilty to Count Two in exchange for a sentence of life in prison without possibility of parole. A plea to kidnapping, resulting in a

1

A0048

*Federal Public Defender's Office*

FELL-00002356

death, has a minimum punishment of a life sentence. 18 U.S.C. § 1201 (a) (1). The prosecutors agreed to consider the offer.

III.

On June 7, 2001, DOJ changed its protocol in potential capital cases. In a letter from DOJ to local USAs, those changes were summarized as follows:

"A. In cases where the death penalty has been approved, approval of the Attorney General is now required to enter a plea withdrawing the death penalty.

B. In addition, in death eligible cases the U.S. Attorney may no longer authorize a plea prior to submitting the case to the Department without obtaining the approval of the Attorney General for the plea."

This meant a USA could be forced to try a potential capital case and seek a death sentence even though the USA did not believe the death penalty was appropriate.

IV.

In early October 2001, the USA for Vermont contacted Fell's counsel and agreed to settle the case, subject to approval from the AG. The USA drafted a plea agreement. Although a draft of the agreement was sent to counsel for review, no changes were requested and none were made. The agreement was written entirely by the USA, with no input from Fell. On October 24, 2001, Fell and his counsel signed the plea agreement and returned it to the USA.

V.

The plea agreement stated in part as follows:

"The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and

2

A0049

*Federal Public Defender's Office*



impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history."(See attached Plea Agreement).

### VI.

On November 9, 2001, the USA informed counsel that the Attorney General's Capital Case Review Committee had scheduled a meeting for November 19, 2001 to discuss the case. Counsel for Fell and the USA were invited to make presentations to the Committee by video-teleconference. Counsel met with the USA before appearing in front of the Committee. The USA and his Assistants repeated their support for the plea agreement. Although counsel for Fell was not allowed to attend the portion of the meeting where the USA spoke directly to the Committee, there is every reason to believe the USA strongly supported approval of the plea agreement.

### VII.

At all times during these negotiations, USA Peter Hall, preceding USA David Kirby, AUSA Gregory Waples and AUSA John Tavana, behaved in good faith and with honorable intentions. They acted within their roles as representatives of the United States Government, they made truthful representations, and they were reasonable in their actions.

### VIII.

On or before January 30, 2002, the AG informed the USA that the plea agreement was rejected and required the USA to try the case seeking a death sentence. This was the first time that an AG required a USA to try a capital case. Previously, when capital prosecutions were

3

A0050

Federal Public Defender's Office

authorized over the objection of the USA they were ultimately settled by plea agreement. The June 7, 2001 change in DOJ protocol removed this possibility. The USA filed the Notice of Intent to Seek Death Penalty.

IX.

On March 15, 2002, the parties met with the Court. Fell's counsel stated Fell's intent to plead guilty to the charges and allow the Court to determine punishment. Both Judge Sessions and local prosecutors agreed to this procedure. After the meeting, the local prosecutors were told by DOJ that only DOJ could approve the waiver of a jury at sentencing. DOJ promised to consider the matter. On April 16, 2002, the parties again met with the Court. Local prosecutors stated that they would try to get a decision from DOJ by May 1, 2002. Later, on the same day, Fell's counsel received a fax from the prosecutors stating that they had been told by DOJ that only Attorney General Ashcroft could make the decision, and that his schedule prevented him from deciding the matter until the week of May 5, 2002. On May 9, 2002, Fell's counsel received a voicemail message that the Attorney General had denied the request.

X.

The USA is the representative of the United States Government in the district that he or she serves, prosecuting all offenses against the United States. 28 U.S.C. § 547. Therefore, representations made by the USA in criminal prosecutions are official statements of the United States. The declarations made by the USA in Fell's plea agreement are official statements of the United States.

XI.

A statement by a party is an admission which may be introduced against the party under

4

A0051

Federal Public Defender's Office

FELL-00002359



the rules of evidence. FRE 801 (d) (2). Statements made by a USA during the prosecution of a criminal case may be introduced against the government. *United States v. GAF Corporation*, 928 F.2d 1253 (2d Cir. 1991).[1] The portion of the plea agreement excerpted in Paragraph V contains such admissions.

### XII.

The federal rules that limit the admissibility of plea negotiations are privileges that belong to the defendant, not the government. *See* FRE 410, FRCP 11 (e) (6). Justice Thomas writing for the Supreme Court in *United States v. Mezzanatto*, 513 U.S. 196 (1995), stated:

> "The Rules provide that statements made in the course of plea discussions are inadmissible 'against' the defendant, and thus leave open the possibility that a defendant may offer such statements into evidence for his own tactical advantage. Indeed, the Rules contemplate this result in permitting admission of statements made 'in any proceeding wherein another statement made in the course of the same ... plea discussions *has been introduced* and the statement ought in fairness be considered contemporaneously with it." *at* 205-206.

Therefore, the government's statements are admissible and violate no exclusionary rule.

### XIII.

The government's statements preclude the government from seeking the death penalty in this case. The government stated in the plea agreement that it sought a life sentence because of

---

[1] Government's original bill of particulars was admissible to support theory of defense when it was inconsistent with amended bill and government's argument. *See also United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) (Statement by agent in warrant affidavit was admission of government); *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) (Defense attorney's opening statement in prior trial was admission as to defendant).

5

A0052

*Federal Public Defender's Office*

substantial mitigating evidence. There is no reason to believe the USA was untruthful, mistaken, or acting beyond his authority in making those representations. Nothing has changed since that position was stated, except that Attorney General John Ashcroft has used an internal DOJ policy to force the USA to try the case. That administrative decision has no legal effect upon the authority of this Court.

## XIV.

The basis for this motion is not in contract. The plea agreement was contingent upon the AG's approval, and that was not given. Fell is not seeking to enforce a binding contract. However, the law does require that when facts have been admitted by a party then the party may not change its position unless there is a showing of changed circumstances that are not within the party's control. *See United States v. McKeon, supra,* at 31 ("A party thus cannot advance one version of facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change of stories"). A number of legal doctrines prohibit parties from changing positions to suit their needs: *United States v. Holloway,* 74 F.3d 249 (11th Cir. 1996) (Oral representation by AUSA that defendants would not be prosecuted barred later indictment); *United States v. Podell,* 572 F.2d 31 (2d Cir. 1978) (Criminal defendant who pleaded guilty could not later deny civil liability); *United States v. Abcasis,* 45 F.3d 39 (2d Cir. 1995) (Entrapment by estoppel barred conviction of defendant who relied upon government authorization); *United States v. Cox,* 964 F.2d 1431 (4th Cir. 1992) (Government could not renege on promise to pay defendant's psychiatric fees).

## XV.

6

A 0053

*Federal Public Defender's Office*

The Notice of Intent to Seek the Death Penalty stated: "The Government believes that the circumstances are such that if the defendant is convicted of either of those offenses [Counts One or Two], a sentence of death is justified." In its written plea agreement, the government stated it was entering into a disposition for a life sentence because of the "substantial mitigating evidence" (detailed in V) and "because it will ensure that DONALD FELL is imprisoned for the rest of his life." Implicit in that statement, is that a death sentence is not justified. The only change that occurred between the time those two statements were made is the ruling by the AG that the USA was prohibited from entering into the plea agreement.

## XVI.

Material evidence was lost to Fell during the time the government was considering Fell's offer to plead guilty. On September 20, 2001, co-defendant Robert Lee died while in custody. Lee was the only living person (besides Fell) to witness (1) the events leading up to the deaths of Debra Fell and Charles Conway; (2) Fell's state of mind on November 27, 2000; (3) Fell's ingestion of drugs and alcohol on that date; (4) the events leading up to the abduction and death of Teresca King; and (5) Fell's actions and state of mind before, during, and following those events. Besides law enforcement officers and Fell, Lee was the only witness to the stop and arrest of Fell and Lee on November 30, 2001. Although, the plea agreement was created after Lee's death, the discussions of a plea began months before.

## XVII.

Estoppel generally requires reliance by the defendant. In this case, Fell has lost time and the availability of evidence, but he has neither pleaded guilty nor waived a constitutional right. The difference between this case and other examples of estoppel is that the procedure in question

7

A0054

Federal Public Defender's Office

was completely within the government's control. Only the government could decide to file a potential capital case and only the government could choose to select alleged aggravating factors and file a Notice of Intent to Seek Death Penalty. An abuse of this discretion should be measured strictly against the government. The government will lose only the ability to end a life, not the ability to prosecute or imprison for life.

XVIII.

Allowing the government to change positions without consequence would deny Fell due process of law. Accepting the government's statements in the plea agreement as true, and weighed against the aggravating factors alleged by the government, no reasonable trier of fact could sentence Fell to death absent the influence of passion, prejudice, or an other arbitrary factor. For these reasons, the Court should hold the government to its initial position – that a life sentence is justified– and dismiss the Notice of Intent to Seek Death Penalty.

XIX.

In considering this Motion, the Court should order the government to provide to the Court in camera and ex parte, review of all materials in the government's possession that relate to its position on recommendation of the death penalty in this case, including: (1) all materials sent by the USA, or his Assistants, to DOJ or the AG, (2) all materials received from the AG or DOJ by the USA, or his Assistants, and (3) any recording or transcript of the November 19, 2001 conference between the USA and DOJ.

8

A0055

FELL-00002363

By:

Alexander Bunin
Federal Public Defender

Gene V. Primono
Assistant Federal Public Defender

39 North Pearl Street
Albany, NY 12207
(518) 436-1850
(518) 436-1780 FAX

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of this pleading was served upon Assistant United States Attorney Gregory Waples, on this _14th_ day of May, 2002.

9

A0056

Federal Public Defender's Office

FELL-00002365

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA     )
                                 )
        v.               )   Criminal No. 2:01CR12-01
                                 )
DONALD FELL                   )
     Defendant          )

## PLEA AGREEMENT

The United States of America, by and through the United States Attorney for the District of Vermont (hereafter "the United States"), and the defendant, DONALD FELL, agree to the following disposition of pending criminal charges. The United States has entered into this disposition due to substantial mitigating evidence that has been uncovered relating to the defendant's mental health and impaired capacity at the time of the events; his mental health history and background; his remorse and acceptance of responsibility; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King; and the fact that he does not have a substantial prior criminal history. The United States has also agreed to this plea because it will ensure that DONALD FELL is imprisoned for the rest of his life.

1.    FELL agrees to plead guilty to Count 2 of the indictment, which charges him with kidnapping with death resulting, in violation of 18 U.S.C. § 1201(a)(1), based on

A0057

Federal Public Defender's Office

his participation in the November 27, 2000 kidnapping and murder of Teresca King.

2.    FELL understands, agrees and has had explained to him by counsel that the crime to which he will plead guilty is a felony for which the Court must impose a sentence of life imprisonment without the possibility of release, pursuant to 18 U.S.C. § 1201(a). FELL thus understands that if the Court accepts his plea of guilty, he will never be released from prison. FELL further understands that the Court may also sentence him to pay a fine of not more than $250,000, pursuant to 18 U.S.C. § 3571(b) and a $100 special assessment. Full restitution must also be ordered.

3.    It is the understanding of the parties to this agreement that the plea will be entered under oath and in accordance with Rule 11 of the Federal Rules of Criminal Procedure. The defendant represents that he intends to plead guilty because he is, in fact, guilty of the crime to which he will enter a plea.

4.    FELL agrees and understands that it is a condition of this agreement that he refrain from committing any further crimes, whether federal, state or local.

5.    The United States agrees that in the event that FELL fully and completely abides by all conditions of this agreement, the United States will:

(a)    not seek the death penalty against FELL on any charges relating to the death of Teresca King;

2

A0058
Federal Public Defender's Office



(b)    not prosecute FELL, in the District of Vermont,
for any other offenses known to the United States
Attorney at the time this agreement is signed.

6.    If the United States determines, in its sole discretion, that the defendant has committed any offense between the date of this agreement and sentencing, the United States' obligations under paragraph 5 of this agreement will be void; FELL'S plea may be vacated on the motion of the United States, and the United States will then have the right to continue the prosecution of FELL on the present indictment or on any other charges and will have the right to seek any sentence authorized by law, including the death penalty.

7.    It is further understood and agreed by the parties that should the defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn or vacated, this agreement may be voided at the option of the United States and the defendant may be prosecuted for any and all offenses otherwise permissible.  FELL understands that if the plea is not accepted or if the plea is withdrawn, the United States will have the right, in its discretion, to seek the death penalty for any capital offenses he may have committed.  If the plea is withdrawn or vacated, the defendant herein expressly agrees that the entire period of time that elapses between the signing of this agreement and the withdrawal or vacatur of the plea

3

A0059

*Federal Public Defender's Office*

FELL-00002368

shall be disregarded in calculating whether the prosecution of any previously-dismissed charges is timely under the applicable statute of limitations, the Speedy Trial Act or the speedy trial guarantees of the Constitution.

8.   In voluntarily pleading guilty, FELL acknowledges that he understands the nature of the charge to which the plea is offered.  He also acknowledges that he has the right to plead not guilty or to persist in a plea of not guilty; that he has the right to be tried by a jury and at that trial a right to the assistance of counsel; that he has the right to confront and cross-examine adverse witnesses; that he has the right against compelled self-incrimination; that if a plea of guilty is accepted by the Court, there will be no further trial of any kind, so that by pleading guilty he waives the right to a trial and the other rights enumerated here.

9.   FELL expressly states that he makes this agreement of his own free will, with full knowledge and understanding of the agreement and with the advice and assistance of his counsel, Alexander Bunin and Gene Primomo.  FELL further states that his plea of guilty is not the result of any threats or of any promises beyond the provisions of this agreement.  Furthermore, FELL expressly states that he is fully satisfied with the representation provided to him by his attorneys and has had full opportunity to consult with his attorneys concerning this agreement, and, more

4

A0060

Federal Public Defender's Office

particularly, about the fact that if his plea is accepted pursuant to this agreement, he will be sentenced to life imprisonment without possibility of release.

10. No agreements have been made by the parties or their counsel other than those contained herein.

11. It is agreed that a copy of this agreement shall be filed with the Court before the time of the defendant's change of plea.

12. This agreement will not become effective until approved by the Attorney General of the United States or his delegate, and until thereafter signed by the United States Attorney for the District of Vermont.

5

A0061

Federal Public Defender's Office

Dated at Burlington, in the District of Vermont, this
___ day of _____, 2001.

UNITED STATES OF AMERICA

PETER W. HALL
United States Attorney


*10-24-01*
DATE

DONALD FELL
Defendant


I have read, fully reviewed and explained this agreement to
my client, DONALD FELL, and I hereby approve of it.


*10/24/01*
DATE

ALEXANDER BUNIN
Counsel for the Defendant


*10/24/01*
DATE

GENE V. PRIMOMO
Counsel for the Defendant


[ N:\CRFORMS\PLEANOCO.MRG ]                    6


A0062
Federal Public Defender's Office

# Exhibit 239

# Sealed pursuant to Stipulation

# Exhibit 240

DATE OF REQUEST: 11/18/2010

SUBJECT NAME:                          **JUROR 26**
                          REDACTED -FELL
SUBJECT DATE OF BIRTH:            1955

---

### RECORD OF CONVICTIONS

---

DATE OF CONVICTION        04/02/1996

COUNTY              ESSEX CO.

OFFENSE FOR WHICH
SUBJECT WAS CONVICTED    UNLAWFUL MISCHIEF $250 OR LESS

CONVICTION LEVEL        MISDEMEANOR

SENTENCE            FINED $100

---

END OF RECORD

ONLY MOTOR VEHICLE OFFENSES WHICH WERE ARRAIGNED IN A VERMONT
DISTRICT COURT AFTER SEPTEMBER 1, 1995 ARE INCLUDED IN THIS RECORD.
The criminal record information provided above represents case
disposition data reported by courts indicated. Charges that are supported by
fingerprints are designated with a "Y" in the "FP" column. All responses are
based on file search criteria provided by the requestor at the date/time
of the request. The requestor agrees to use Criminal Conviction Record
information received from the Vermont Information Center for the purposes
intended by law. The requestor agrees not to disclose the contents of any
criminal conviction record without the applicant's permission to any person
other than the applicant and properly designated employees who have a
documented need to know the contents of the record. A violation may result
in a civil penalty of up to $5,000. Each unauthorized disclosure shall
constitute a separate civil violation.
Authorized: J.Wallin - Director, Vermont Criminal Information Center
                Waterbury, Vermont

ONLINE VALIDATION CODE: e8e53418eb1317278545e4fa8cea0a1d

file:////nylit02/...E%20PRODUCTION/LIT%20DRIVE%20EXHBITS/1%20-%20Other/Frederick%20Hodgdon%20VCIC%2011_18_10.txt[3/20/2011 12:12:03 AM]

FELL-00002375

# Exhibit 241

# Sealed pursuant to Stipulation

# EXHIBIT 242

## DECLARATION OF SALLY FELL FRANCIS

Sally Francis hereby declares as follows:

1.  I, Sally (Fell) Francis, live at REDACTED - FELL Pasadena, California 91105. I was born on REDACTED - FELL 1941. I have lived in Pasadena for the past **35** years.

2.  I have worked as a nurse for **25** years. I currently work at **FLINTRIDGE SHARED HEART ACADEMY**. My husband and I have two grown sons.

3.  I attend church regularly and I sing in the choir. In my free time, I like to paint water colors.

4.  I am the younger sister of Donald Fell, Sr. Donald Fell, Sr. is the father of Donald Fell and Teri Fell. My brother Donald recently passed away on Christmas Eve. He was an alcoholic and as far as I know a very unhappy person throughout his life.

5.  I grew up in Wilkes-Barre, Pennsylvania with my parents, Donald Townsend Fell and Myrtle Jeanette Fell, and older siblings, Donald Fell Sr. and Geraldine Fell.

6.  I graduated from high school in Wilkes-Barre, Pennsylvania in 1958 and then went into a three-year nursing program at Einstein Medical Center in Philadelphia. I left Pennsylvania for good after I graduated from the nursing program. I have visited my family in Pennsylvania on very few occasions since then and have had little contact with my siblings ever since. My family was very dysfunctional. I could not wait to get away from home for this reason.

7.  My parents' first child was a daughter named Marilyn, who died before I was born. She died after a brief illness, a simple infection, something that would be easily curable now. She was not a sickly child, so her death was a shock to my parents, especially my mother.

The funeral was held at home. My mother suffered from depression and was never the same after Marilyn's death.

8. My sister Geraldine has told me that my mother was hysterical when she found out that she was pregnant with me because she did not want to have any more children. My mother and I were not close. My brother Donald never felt any love at home either. I did not have close relationships with my sister Geraldine nor my brother Donald. Geraldine favored my brother and they would gang up on me. I was the baby. I was not appreciated, not wanted.

9. My mother was the second of seven children, six girls and then the youngest, a boy named Harry, who was an alcoholic. ~~She was ignored by her parents~~ SLF. She never learned to swim, ride a bike or drive a car. She quit school in 11th grade to help support her family.

10. My parents were secretly married. My mother kept her wedding band under her mattress, but her sister found it and told their mother. My grandmother then kicked my mother out of the house for marrying my father.

11. Around the time of my parents' marriage, my father's parents, Elvina Townsend Fell and John Fell, split up and my grandmother Elvina moved in with my parents. Elvina lived with us for the next 17 years.

12. Elvina did not like children very much and spent most of her time alone in the attic. She never at any meals with us. I remember her brushing my hair with a metal brush and that I screamed out in pain because it really hurt.

13. When Elvina got sick with cancer, my mother had to take her to the doctor on the city bus. Elvina was weak after her cancer treatment and my mother basically had to carry

2

FELL-00002382

her onto the bus. My father did not take her to the doctor in our car because he was always at work.

14. My father resented his father, John Fell, for divorcing his mother Elvina. My father did not want us to see John Fell very often because he felt that he had abandoned the family. He eventually died in an institution.

15. My mother was subservient to my father. He had a way of speaking to her that made her feel inferior. She tried to work hard to keep the house clean. She cooked every night and worked her fingers to the bone. But still, my father would be very critical when he came home from work. If he saw a speck of dirt, he would say something.

16. My mother would take a nap every afternoon and I would often come home from school to find her sitting in the living room, staring out the window. She would ask me to walk to the store every day to get groceries, because she did not feel like going. I used to stop over at a friends house most days, until it got dark, so that it would be too late to go to the store. I didn't like going.

17. My mother was a severe alcoholic and suffered from chronic depression. My sister, Geraldine, had to put my mother to bed every night until she left Pennsylvania for college. She had to do this because my mother was drunk and passed out. My sister Geraldine is 10 years older than me. She gets upset when I talk about my mother's alcoholism. She is ashamed and doesn't want anyone to know. She minimizes it. It wasn't until Geraldine left the state that I realized she was putting my mother to bed every night. Geraldine didn't want me to know, and no one talked about it. When Geraldine left home to go to school in New Orleans, she told me I had to put my mother to bed every night, so I did.

3

FELL-00002383

*SELF*

*household*

18. My father worked long hours. My mother would save pennies from the ~~lunch~~ money my father gave her to buy herself port at the liquor store. She would put the alcohol in different bottles, drink beer in one room and then go to another room and drink port. When I was little, she would take me on walks with her to the liquor store.

19. My mother was also addicted to pills. She was friendly with a pharmacist who made bottles of pills available to her without a prescription. She constantly sent me to the drugstore to refill her bottles with pills.

20. When I was a young child, my sister, my brother and I stayed with my mother's sister Clara for a while, because my mother was institutionalized for depression and mental illness. Another time, we stayed with a friend of the family while she was institutionalized. At the hospital, she was treated with electro-shock therapy, beginning before I was born, and continuing during my childhood. She suffered brain damage from the treatment. It was very barbaric. They would hold her down and then zap her without measuring the electricity.

21. My mother tried to kill herself at least two times. She tried to overdose on prescription drugs one time, and cut her wrists the other time. On both occasions my father did not want to call the doctor. He tried to sweep my mother's suicide attempts under the carpet.

22. My mother would usually get up early in the morning to prepare breakfast for the family and help us kids get off to school. One morning, when I was about 10 years old, she did not get up from bed because she overdosed on pills. I called my father at work and told him that my mother hadn't gotten out of bed. He told me not to worry about it. I tried again and again to wake her up. I called my father again and insisted he call the family doctor. When the family doctor finally arrived, he found my mother unconscious. She

4

FELL-00002384

had consumed prescription pills together with alcohol. She had taken a full bottle of pills. She was rushed to the hospital in an ambulance. I was in the ambulance with her. My father did not come home from work while all this was happening. The hospital discovered that her stomach was filled with pills. My father came to the hospital after he got off work and then left. I spent the night alone with my mother at the hospital. I was just a child, 10 years old. It was a devastating experience for me. I can see her laying in the bed. I can still see the scene. I was scared that my mother was dying.

23. My older sister Geraldine was about 20 years old at the time, and she was going to school in New Orleans. She came up from Louisiana to take care of my mother.

24. Another time, when I was older, my mother called my father at work saying "Goodbye, Don" and then tried to kill herself by cutting her wrists. When my father arrived at home, he found her with her wrists cut, bleeding. She was just standing there, her wrists hanging over the kitchen sink. She didn't want to make a mess by bleeding all over the house. He taped up her wrists and refused to take her to the doctor. He didn't want anyone to know.

25. ~~My mother suffered from seizures. They may have been related to alcohol withdrawal and withdrawal from pills.~~ *SLF*

26. While my mother was in the hospital after the wrist-cutting suicide attempt, I realized that she was not taking her medication. She hoarded her pills in a bedside drawer. When I found her medications, I realized the hospital staff was not watching her closely, and I took a leave of absence from nursing school to take care of her for a few weeks.

27. After her suicide attempts, my mother saw a psychiatrist in Scranton, Pennsylvania. I was in nursing school at the time. ~~I would~~ *I TOOK A 2 WEEK* leave school to drive her ~~from~~ *from* Wilkes-Barre to *SLF*

5

FELL-00002385

Scranton two or three times a week. My father wouldn't drive her to her appointments because he had to work.

28. My mother's psychiatrist prescribed Thorazine, which turned her into a zombie. She could not talk, had a flat affect, and was totally useless while on this medication. One *when I was 9 child* SLF night, she got up to use the restroom and fell down the stairs. She fractured her skull and lost sight in one of her eyes. From that time, onwards, we had a baby gate that we would fasten to the top of the stairs, so that she wouldn't fall down in a stupor from her drinking ~~or her Thorazine, or both~~. SLF

29. My mother's depression intensified after her failed suicide attempts. She was mentally unstable for a very long time, spent a lot of time in bed and continued to abuse alcohol and pills throughout her life.

30. My mother was jealous of my relationship with my father. Growing up, he gave me more attention than anyone else in the family. We would go for walks on Sunday, and he would drive me to Philadelphia for ball games.

31. My mother remained depressed her entire life. As an adult, I lived in Texas, California and in England and my parents would come to visit me. My mother refused to go sightseeing and insisted on staying behind, by herself, in the hotel. She would hardly talk to me and did not care to be there.

32. When I was living in London, my parents came to visit once. I was waiting at the airport for them. They were coming out of customs. There was a huge flight of steps. My *as she* SLF father was walking way ahead of my mother. ~~He~~ was carrying his attaché case ~~but she~~ slf ~~had the suitcase~~. She ~~was tipsy~~ *TRIPPED* ~~and she~~ fell down ~~the~~ *a few* steps, with the ~~suitcase~~. It was very embarrassing and caused quite a stir. Everyone looked and was concerned for her. My

6

FELL-00002386

father just turned around and said, "Oh, come on Myrtle." He was excited to be there. I feel bad for my mother. She was neglected in some way.

33. She continued drinking until the day she died. Another time when my ~~parents~~ mother came to visit, my husband and I hid the few bottles of alcohol we had, to prevent my mother from drinking. We put it up on top of a cupboard. It was raining during much of their visit and ~~we~~ she stayed home mainly. The one time ~~my father and~~ I went out of the house for a while, my mother found the alcohol. When ~~we~~ I got home, she was inebriated.

34. As an adult, I talked to my mother about Alcoholics Anonymous and rehab, but she didn't recognize that she had a problem. One time, my mother's tooth was bothering her. Instead of going to the doctor, she just kept bothering it until it broke clear off.

35. My parents had very little interaction with my children. Many women, when they are about to have a baby, they ask their mother or their parents to come and help out. I didn't ask them to come and watch my children, or help me out with raising my children. A lot of people have that kind of relationship with their parents, but I did not.

36. My brother Don and I were only 19 months apart and competed for our parents' love. The sibling rivalry between us started very early. My mother stopped breastfeeding him when I was born. Later, he was always picking on me. When I was a baby, Don pushed me down the steps when I was in a baby carriage. Thankfully the carriage had bumpers on the back and the front, otherwise I would have fallen out.

37. I do not think Don ever felt loved by my parents, and he had lots of problems growing up. He was very disrespectful to my mother and frequently yelled foul words at her. My mother was not a disciplinarian; she would just groan and turn around and walk away.

7

FELL-00002387

My father, ~~on the other hand, would~~ pull down Don's pants and spank him, ~~which was humiliating.~~ *self* *in his life. I was never spanked* *once only*

38. My father was not the kind of guy who would go out and play ball, and he and Don did not have a good relationship. Don did not participate in the family very much. He had his own room and a radio, and he went to a different *elementary* school than ~~my sister and~~ I did. *SLR*

39. Don was an alcoholic all his life who started drinking and smoking at a very young age. He was younger and smaller built than his classmates, and I think he was trying to be a tough guy. When Don was a senior in high school, he was caught stealing cars, which was very embarrassing for our family. One of my teachers even pointed it out in front of my whole class. Don was sent away to a juvenile facility. My mother was very upset and depressed when my brother Don was sent away. My father talked to the teachers and tried to get him into a program, but Don did not want to go to college. All he wanted to do was get married to his high school girlfriend, Beatrice. They were young when they got married.

40. While Don was married to Beatrice, he would stop for a drink after work and come home inebriated. Beatrice's mother was married to an alcoholic and did not want Beatrice to go through the same thing she did. Don and Beatrice got divorced because his mother-in-law got involved.

41. I did not have much contact with Don after I left Pennsylvania. At one point, he wanted me to make an investment in a trailer on his behalf, but I turned him down because I knew I would never see that money again if I gave it to him. I would hear stories about Don from my sister Geraldine. Geraldine told me about violence between Don and his

8

wives and children, including a fight where Debra stabbed Don in the arm, causing a very serious injury.

42. My father used to drink. My sister Geraldine used to drink too. She may have been developing into an alcoholic. She stopped drinking in the late sixties after she had a serious bout of tuberculosis. She didn't take care of herself, and that's why she developed tuberculosis.

43. The Wilkes-Barre flood was hard on my parents. They lost everything and had to move into an apartment.

44. I was never contacted by the lawyers for Donald Fell, Jr., who is my nephew.

I have had the opportunity to review and correct the foregoing pages, and I find it true and accurate to the best of my knowledge.

Date: 1/10/2011

Sally Fell Francis

Witness

9

FELL-00002389

# EXHIBIT 243

My name is Ronald Cupano. For about six years, I lived in the Quiet Cove trailer park in Pittston, Pennsylvania, with my wife at the time, Rose, and our children. The Fells lived nearby in Inkerman. My son Brian played with Donny Fell, and my daughter Chrissy played with Donny's sister Teri. Donny and Teri came around our house to play with our kids.

Around this time, crank was very popular in the Inkerman Trailer Park. Crank is a higher grade speed, that you snort, like crystal meth. Several of the residents were hooked on it. It was cheap and readily available back in those days.

*Crank is another name for Crystal meth. RAC*

Donny's mother Debbie was sloppily dressed and very heavyset. Debbie and her husband were always partying and drinking. They had a lot of problems. They just did not live right. They were fighting and going at it all the time. Their trailer was run down and the porch was falling off.

One night, Debra and her husband got into a very serious fight, and Children and Youth Services placed Donny and Teri with us for the night. Chris Purcell and Marianne Czanker were the police officers who handled the Inkerman area.

One night, a neighbor of ours in the trailer park got drunk and shot his wife to death in their trailer. He shot her right in the liver with a 357. I went into the trailer, which was filthy, to look for his 3 year old son. The wife was lying in a pool of blood and the little boy was hiding under the bed. We found him hiding and

1

*RAC*

FELL-00002390

shaking, and we had temporary legal custody of him for maybe a week. The guy's family members came to the house and tried to take the child, but we did not give the baby to any family until they had approval from Children and Youth Services.

I was not contacted by Donny's lawyers or anyone connected to his case until recently. I would have been willing to share what I know about when I knew him.

I have had the opportunity to review and correct the foregoing pages, and I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: 2-20-11

Ronald Cupano

Melissa Thomas
Witness

2

FELL-00002391

# EXHIBIT 244

O'Hop  Ro

My name is Rose, O'Hop. I used to be married to Ronald Cupano, and my name

was Rose Cupano. I have remarried. I have two children, Brian and Chrissy Cupano.


In the late 1980s and early 1990s, I lived in the Quiet Cove trailer park in

Pittston, Pennsylvania, with my husband at the time and our children. My husband

used to take off for days at a time, and I would not see or hear from him. I left him in

1992, and I married my current husband in 1998.


During the time I lived in Quiet Cove, the Fells lived nearby in Inkerman. My

son Brian played with Donny Fell, and my daughter Chrissy played with Donny's

sister. My son Brian was a handful, so I used to threaten him that I would send him

to St. Michael's if he was bad. I would even take him up there and drive past, but

Brian would just laugh.


Teri was not just shy, she was backward. She was timid and kept to herself.

She was in my house a lot because I did not let Chrissy play outside then. Chrissy

and I used to do Teri's hair. We would have fun fixing it in ponytails or pigtails.

Chrissy and Teri used to play dress up.


Donny and Teri did not want to go home. They often asked to stay, but I

could not call the mom every night, night after night, to ask, not that the mother

would have cared. I used to feed them.



1

FELL-00002392

The Fell home was dirty, and the children did not look clean. They wore ratty, run-me-down clothes and had straggly hair. At first, I did not want my kids to play with them. It is sad to have your child look like that because it reflects poorly on you.

Donny and Teri had lice numerous times. I called the school nurse about Teri's lice, because her mother was not doing what she needed to do to get rid of the lice. It was ridiculous. I did the lice treatments for Teri and my daughter Chrissy, but it was not long before Teri was itching again. This was very frustrating because I spent a month dealing with it, cleaning my house each time, and the treatments were expensive. I was on Welfare at the time, so that was a lot of money for me. I had to clean out the bedrooms and all of Chrissy's clothes. You were not supposed to send your child to school when they had lice, but Teri was not removed from the school. Her mother kept sending her back to school, with the lice infestation.

Donny and Teri were placed in our custody for one night by the police because the father threatened the mother. I gave the kids a bath that night, and I gave them clothes too. The kids were totally out of it and scared that night. They were eventually placed with the grandmother.

We had problems with one set of neighbors in Quiet Cove. Our neighbor Diane thought her husband Joe had a crush on me, and she did not like me as a result. Diane scratched up my cars and threw nails down to flatten the tires. Diane



used to feed her baby beer to get her child to sleep. She called Children and Youth Services on me one time.

There was one family that lived on the same row as us in Quiet Cove. The child was still in diapers when his father killed his mother. Their house was disgusting. There was blood all over the kitchen, and the baby was hiding. After the shooting, we watched the child for a week.

No one from Donny's lawyers got in touch with me before his trial. The first time I have heard from anyone involved with Donny's case was this past year. I have been living in Luzerne County all my life. I was available prior to trial and would have been willing to talk with people who represented Donny.

I have had the opportunity to review and correct the foregoing pages, and I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: 2-20-11

_Rose O' Hop_

Rose Cupano Ohop  O' Hop

_(signature)_

**Witness**

3

FELL-00002394

# EXHIBIT 245

My name is Claudia Bublo. ~~My friends and family call me "Cookie."~~

*I used to have the nickname Cookie, but no one calls me that anymore. CB*

When I was 18-19 years old, I babysat Donny and Teri Fell at their house on East Bennett Street in Kingston. When I first went to the house to meet them, the mother said she needed someone that Donny liked, and he jumped right on me and grabbed my neck.

When I babysat for the Fells, I had just gotten married to Frank Bublo. He was 24-25 years old. We are no longer married.

*C.B.*

Most days, I rode my bike to work, but *when the weather was bad, occasionally* ~~sometimes~~ Frank dropped me off in the morning. I worked for the Fells for over a year, Monday through Friday. Since we were newlyweds, ~~sometimes~~ *one time   C. B.* Frank came over to spend time with me while I was babysitting.

The Fell's house was very dirty. Debbie did not do any housecleaning. There were clothes on the floor and a path of things you had to walk through. When I showed up, I had to clean the house. The toys were all over the floor. I had to clean the toy box every day. I complained to Debbie about the toys being everywhere and warned her that she might trip on them. Debbie showed me how she kicked the toys out of the way with her foot, rather than picking them up and putting them away in the toy box. I got really sick of going over there and cleaning all the time.

There was not enough food in the house for Donny and Teri. One time, I

*C.B*

1

FELL-00002395

accidentally dropped a large container of soup on the floor and it spilled all over. I

thought that I was going to get in trouble, but the father did not seem to care. The

floor hadn't been washed in so long that he was glad that I had washed it.

There was a fridge downstairs with a barrel of beer in it. The barrel did not

last long before they needed to get a new one. Debbie made it clear that it was not

for me to drink. Debbie was more worried about the beer than she was about the

children.

Debbie and Don had a mangy dog ~~tied up~~ running loose C.B. in the basement. The dog was not

walked regularly. The dog was depositing fecal matter + urine C.B. ~~There was dog mess and dog urine~~ all through the basement. The

floor down there was brown and thick and sticky.

.

The phone rang off the hook while I was babysitting. Bill collectors were

calling left and right, and there was a pile of late notices in the mail. Debbie told me

that they had previously been burned out by a fire, and they made charges on credit

cards for furniture and clothes. They had a lot of money problems due to the fire.

When I arrived in the mornings at 7am, Teri was jumping in the crib in a

dirty diaper. Donny was locked in his room.

Debbie did not change Teri's diaper in the mornings. When I arrived, Teri's

diaper was just dripping with urine. Teri was jumping up and down, wanting to get

C.B.

2

FELL-00002396

up out of the crib, but Debbie just left her there until I arrived. Teri's saturated diaper stunk up the crib. It was disgusting and happened over and over again. I didn't want to hold Teri because the diaper was so wet. I leaned her against me once, and my shirt got wet from her diaper. She was left in the same diaper from the time I left in the afternoon until I came back in the morning.

Teri was always irritated in her genital area. Her skin and bottom area stunk like pee. She was all red towards the front and the back. She had an infection and rash. Debbie did not take her to the doctor to treat her infection. I did not understand why Debbie did not take Teri out of her crib and change her diaper in the morning. Debbie just left Teri in the crib for me to deal with. I complained about it more than once and asked Debbie to change Teri before I got there, but she said she was too busy when she got up in the morning and had to go to work.

There was a metal hook-and-eye lock on the outside of Donny's bedroom door. The parents locked him inside his room at night, and he was still locked inside when I arrived in the morning. He was not allowed to come out until a certain time. Many times, when I arrived, I heard him banging on the door, saying, "Let me out! Let me out!" They put a bucket in his room for him to use the bathroom.

The parents told me that Donny had mental problems. He was bold, but he did not threw temper tantrums around me. When I let him out of his room, he ran back and forth, and back and forth in the house, and he yelled and carried on. He was not He violent. C.B.

3

was definitely hyper.

Donny spent a lot of time locked in his room. He did not have a lot of furniture in his room, and what he did have was busted. He had a mattress on the floor, but there were no toys in there. The toybox was downstairs.

I started working for the Fells in 1984. When I first started working there, it was the summer time, but when pre-school started, I used to walk Donny to pre-school. It was a half-day program. The teacher told me that he was having problems. She told me that Donny was disruptive in school. She told me she wanted Debbie to call her. Donny was hyper and seemed like he had ADHD.

One time, I saw Debbie grabbing Donny by the arm and pulling him upstairs because he did not want to sit and eat. I heard him banging on the door because he wanted to come out. Donny did not leave the house to go outside and play. He did not go out for a bike ride or have friends to come over and play.

Donny took his shirt off a lot. Teri ran around naked without anything on. She couldn't really talk then. She was only 2. Her hair was never brushed and was always a bird's nest, but she was a good girl.

I saw a few bruises and a black and blue mark on Teri's arm. I saw a black and blue mark on Donny's legs. The parents hit the children with a paddle with

*C.B.*

4

holes drilled in it.

I saw a ~~knot~~ puncture wound C.B. on Debbie's head one time that looked like she had been in a fight and maybe got caught by a screw or something. Debbie told me that she was drunk and fell in the bathroom. I asked her if she hit her head on the screw on the toilet because it looked like she got caught by a screw.

Don came on to me once. Normally, Debbie and Don left for work together in their junky car, but he stayed and tried to put the moves on me. He was trying to touch my behind. He made several sexual comments to me.

I called Children and Youth Services on Debbie about the way she treated her children and the conditions in the house. Children and Youth Services did not want to hear my story.

Before this year, I was not contacted by anyone involving Donny Fell's murder case. I had not heard from anyone about Donny in many years. I have lived in Luzerne County ~~all my life and~~ and Lackawanna County ~~for the past~~ since 1999 when I was available to talk with the lawyers. Since 1999, I was here in Pennsylvania and C.B. came back from North Carolina. C.B.

I have had the opportunity to review and correct the foregoing pages, and I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

2-21-11
Date

Claudia Buhlo C.B.
Claudia Buhlo

Witness

5

FELL-00002399

Date: 2-21-11

Claudia Bublo

Witness

6

FELL-00002400

# EXHIBIT 246

parole, but I think that if you did all those pieces, and I had to make that decision, that I would be able to make that decision, yes.

MR. KELLY: May I have a moment, your Honor?

THE COURT: Yes.

(Brief pause.)

MR. KELLY: Nothing further, Judge.

THE COURT: Okay? All right?

MR. PRIMOMO: Thank you.

Good afternoon.

JUROR NO. 64: Good afternoon.

MR. PRIMOMO: My name is Gene Primomo. I represent Donald Fell. He is sitting right here. This is Alex Bunin. He is one of the attorneys in the case. Paul Volk, he is another attorney on the case. And this is Beth Bochnak and she is helping us with this portion of the case.

MR. PRIMOMO: You in your own words, mentioned something that I would like to touch upon. You said "follow the laws of government," and I assume -- what do you mean by that? You feel obligated to follow the laws of government?

JUROR NO. 64: Well, the way our laws presently, in this type of case, allow for the death sentence. I'm not a supporter of that, but that is what

FELL-00002401

is allowed presently.

MR. PRIMOMO: That's, that's -- that's correct. And you understand that the law's part is going to be expressed to you by Judge Sessions. And as part of those laws, you will be asked to swear to an oath to follow those laws.

JUROR NO. 64: Yes.

MR. PRIMOMO: And it's pretty clear to me, and correct me if I am wrong, that you are willing to follow those laws as Judge Sessions expresses them to you?

JUROR NO. 64: Um hum.

MR. PRIMOMO: And even if those laws include your consideration, your honest consideration of imposing the death penalty; is that right?

JUROR NO. 64: Yes.

MR. PRIMOMO: That's all I have, Judge.

THE COURT: Well, I just gotta ask you some follow-up questions --

JUROR NO. 64: Sure.

THE COURT: -- just to make sure that I understand completely your views.

And I will just give you some, obviously some background information.

If the government proves guilt beyond a reasonable doubt of an intentional killing, and we get into the

FELL-00002402

# EXHIBIT 247

My name is Robert Fell, and I am Donald Fell's half-brother. Donny and I share the same father, Donald Fell, Sr. My mother, Beatrice Gelschleichter, was married to Don Sr. but they divorced when I was young. I was born on <sup>REDACTED - FELL</sup> 1965. I have two full sisters, Susan and Donna Fell, who are both older than me. I have two half-siblings, Donny and Teri Fell, who were born after my father married his second wife, Debbie Fell.

My parents divorced when I was about 11 years old. Prior to that, my father was drunk most of the time and there was always beer around, mostly cans of Gibbons. All through my adolescent years too, he was constantly drinking. He is a nasty drunk and has a mean streak – it went his way or no way. He was okay if he wasn't drunk, but that was rare. He didn't have much of a relationship with any of his kids.

After our parents divorced, my father would come and pick us up and take us to the bar. We would play pinball while he was getting hammered. Even then, I knew that the situation was not good.

When my father was working, he drank at lunch, and then came back to work. He worked at an auto parts store called Northeastern Auto Parts at one point. Once, he drove right through the wall of the store when he was trying to park the car. He was drunk, coming back from lunch. *RDF*

1

FELL-00002403

There were alcohol problems on my father's side of the family. His mother was an alcoholic, and she had some problems in her head too. My father argued with his parents, and there was an uncomfortable feeling at their house. I felt like we were to sit on the couch and don't move, don't do anything.

My dad was a violent man, too. That's one of the reasons my mother divorced him. Mostly he yelled at my mother, but she is a soft-spoken person and generally did not respond. She let him yell so he could get it out of his system. I saw him hit her in the face with his hand once. Then, one day he threw something in my direction. We left after that.

My mother rarely drank. It was rare that my father was sober, and he was nasty when he was drunk. I went to my mother when I needed anything, rather than deal with my father. She has been there for me when times have been rough in my life.

My father's second wife, Debbie Fell, was the complete opposite of my mother. She and my father liked to booze, and they fought a lot. Debbie was outspoken, and had quite a mouth on her. Whatever my father gave her in terms of arguing and fighting, she gave it right back to him. Some people are happy drunks and some are mean drunks. My father is a mean drunk. Debbie was a mean drunk too, and they clashed. My father would say a lot of nasty things, any four-letter word. He talked like that around kids – it didn't matter who was around. He talked

2

FELL-00002404

like that around me when I was growing up too.

*I saw Debbie drink and smoke throughout her pregnancy with Donny, and also her pregnancy with Teri. I said something to her about it, but she said barley was good for the baby. She first said that when she was pregnant with Donny. Then she said it again when she was pregnant with Teri. — R.D.F.*

My sister Susan lived with my father and Debbie for a short time. They let her get away with a lot more than my mother would let her get away with. Donny was a baby then and Susan took care of him most of the time while Debbie went boozing. When my father and Debbie fought, which was often, Susan had to hide Donny to get him out of the way, so he wouldn't get hurt. It was a violent home.

Debbie had a lot of partying in her family. Mouths would start flying and people take things wrong when they are drunk. It turns into a whole disaster. People get beer muscles and want to fight. That's one of the reasons I stopped drinking.

*I have seen my father and Debbie smoke marijuana when they were living in Kingston. I was in high school at the time but they still smoked in front of me. — R.D.F.*

Debbie wasn't a stable enough person to have kids. The first priority was alcohol, same with my father. It was a terrible environment for kids. My father went downhill when he was with Debbie. He couldn't hold a job and was homeless for quite a while.

My father and Debbie came to my first wedding in 1990. My father got drunk and belligerent, and started getting on Debbie. He was just being a complete idiot. We asked him to leave.

The Wilkes Barre area is known for alcoholism. I used to drink a lot myself,

3

*R.D.F.*

FELL-00002405

but I am on so much medication for epilepsy now that I can't drink anymore. I am on SSI disability for seizures. When I was drunk, I used to fight and use drugs, but I've straightened myself out. I could have gone down my dad's road and been like him, but I couldn't do that. My mother made the difference for me.

I haven't seen my father since I was 27. He used to hang out at a bar called the Amber Lantern on Market Street. I stopped by to say hello one day. The bartender told me he had moved to Florida. He never said goodbye to me or anything. At one point, I moved down to Florida and I spoke to him by phone. That was several years ago. That was the last time I spoke to him. He died recently, but I hadn't been in touch with him for many years.

I see my half-sister Teri every now and then. She says the same thing about my father. She went down to Florida to see him but he was nasty and arrogant to her while she was there. He worked down there, cleaning up a bar for drinks.

I am very concerned about my half-brother, Donny. I think about him a lot and I really don't want to see him killed. I haven't seen him for a long time, but he is still a part of me. People make bad choices and people get pushed over the edge sometimes. I have a temper. My dad had a temper. Part of my genes I got from my father I guess.

I was not contacted by Donny's trial lawyers. The first time I had any contact

4

with people who represented Donny was long after he was put on death row. I

would have been willing to testify at his trial if I had been asked. I have lived in
*except one year in Florida, during the 90's.* RDF
Luzerne County all my life, ~~and~~ would have been available if anyone wanted to talk
I
to me. I am listed in the phone book, and have been for the last several years. My mother still lives in the house I grew up in, in Kingston, PA. She always knows where to find me RDF

I have had the opportunity to review and correct the foregoing 4½ pages. I
RDF
have been given the opportunity to make any corrections, additions, and deletions

that I see fit. I declare under penalty of perjury that the above statement is true and

accurate to the best of my knowledge.


Date: 2-22-11

_____
Robert Fell

_____
Witness  Melanie Carr

FELL-00002407

# EXHIBIT 248

My name is Dorothy Grivner, but everyone calls me Dottie. I am _73_ years old. I am retired and I live with my husband Ray. My husband Ray is also retired. He worked 30 years for the state of Pennsylvania, first as a toll booth collector and then with the Department of Agriculture, in the Dog Law Enforcement division in Tunkhannock.

I met Donny Fell when he was a kid, through his grandmother Theresa Sharpe. I met Theresa because we were both foster parents. Theresa and I met at the foster parent meetings. We went to the meetings every two weeks. At the meetings, we sat around and discussed everything for about two hours, then had coffee and donuts afterwards. After a while, we became friends and started hanging around. She came up to my house and I came down her house. Even when I moved down to Nanticoke, Theresa came down here a lot to see me, and I went to see her. We went to go to bazaars and fairs together. I knew Theresa for about eight years, up until she got sick and later passed away. I went to her funeral.

I met all four of Theresa's daughters. I got to know Debbie, Donna, and Jackie best, because the other one lived down south. At one point, Theresa's daughter Debbie moved into the other half of Theresa's house, with her two children, Donny and his little sister. When Debbie lived next door, she came over sometimes when I was visiting.

Theresa had a foster child named Nicole at one point. Nicole was about 13 or so when she was placed with Theresa. She was up at Theresa's for a while and then

FELL-00002408

she came down here to my house. She liked it down here so she asked to be transferred to my house. She liked it at my house better than at Theresa's. Nicole begged and pleaded with her caseworker to get the transfer and ended up getting placed here permanently.

Theresa had a lot of problems with her daughters, all four of them. Theresa and her daughter Jackie fought a lot. They screamed at each other often. Jackie went to the Children's Service Center when she was a teenager because she needed help. Theresa had even more problems with Debbie. Theresa got frustrated with Debbie often and complained to me about it. Theresa often called her, "Oh, that God-damned Debbie!" and that kind of thing. Theresa didn't get along with her grandson Donny either. She felt like he wouldn't listen. Theresa's daughter Donna had a lot of problems with her boyfriends. Theresa seemed like she had a lot of problems in her house, lots of bad situations.

Theresa's boyfriend Jack Rhodes lived in the house with her and Jackie and whatever foster kids she had at the time. Jack lived there the whole time I knew Theresa. Their relationship seemed off and on. They argued a lot. Jack was a drinker. He drank all the time. Theresa and Jack argued over his drinking. She wanted him to cut back.

Theresa drank too. She liked beer. She drank at home. She didn't go to bars when I knew her. She seemed to stay at home a lot. She didn't have any other friends. I was her closest friend.

2

FELL-00002409

I met Stella, Theresa's aunt, several times. Stella was tough. She said what she meant and she meant what she said. Stella and Theresa didn't get along. Stella came to see Theresa from time to time, out of obligation. Stella didn't seem to have any affection for Theresa. Stella got on Theresa to throw her boyfriend Jack Rhodes out of the house, because he drank too much. Theresa didn't listen to Stella, and that made Stella mad. Theresa didn't talk back to Stella.

At one point, Theresa had a lot of problems with her family, and one of the Children and Youth caseworkers told her she should take a break from fostering, so that she could try to fix things in her own family. I agreed. I told her she should take a break, for her sanity. There was so much fighting going on with her daughters and their boyfriends and husbands. The police were called several times and Theresa was caught up in it. Debbie was fighting with her boyfriend Al, who lived on that side of the house with her. When I advised Theresa to take a break, she said she'd think about it, but she didn't take a break.

Theresa came to me with her problems. When things got real bad for her, she called me at night and talked on and on and on about her problems with her daughters and their families. I said the same thing each time. I told her she should not have all these problems. I told her to take a break. Fostering was too much for her because she had too much stress in her house already. I told her over and over again, for years, but she did not want to listen. I told her that she wasn't paying

3

attention to what I'm saying to her. I told her that everyone needs a break sometimes. She really needed a break, to try and straighten things out for herself, but she didn't take a break. When a foster child was taken out of her home, she just got another one, without taking a break.

She needed the money. She had trouble making ends meet. Some months she really struggled. When Debbie moved into the other side of Theresa's house, there was no furnace in the apartment, on Debbie's side. Theresa had a furnace on her side, but there wasn't one for Debbie's apartment. When it started getting cold, Debbie and her boyfriend Al and her kids started complaining. Theresa told Debbie she would get them a working furnace, but she did not. She couldn't afford to get Debbie a furnace, so they just went without heat.

We were not paid very much per foster child. I took in up to five foster children at a time, all ages. Whenever they had an opening, I was on the emergency list. I got calls at 2 or 3 o'clock in the morning and I accepted them at my home. Over 21 years I had around 85 children altogether. I took girls or boys at first, but then I decided to only take girls. Girls are easier. Theresa didn't have 5 at a time, but she took girls and boys. Back when I took in boys, they created problems for us. These two brothers we had once set the woods on fire near our house. Another time, some boys we had got into my husband's paint cans and painted a neighbor's house. I think Children and Youth had to pay for the damages.

D. M.

4

FELL-00002411

I didn't feel that the Children's Service Center did much for the foster children that I had. My girls had a lot of problems. They went to the Children's Service Center for help with their problems, but the Children's Service Center didn't do anything for them. The people at the Children's Service Center said that they would do something, but then they didn't do anything. When one of my girls had a problem with their Children and Youth caseworker, the people at the Children's Service Center promised to get her a new caseworker, but then that did not happen.

I have only heard about this case recently. Before 2011 I was not contacted about the case. I have been living in the same house for 25 years and would have been willing to talk about the case if anyone had asked me.

D.G.

I have had the opportunity to read over and have read to me the above 4 pages and make any changes I see fit. I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Date: 1/2-3/2011

_Dorothy Grivner_
Dorothy Grivner

_Raymond Grivner_
Witness

5

FELL-00002412

# EXHIBIT 249

My name is John Timek. I used to know Debbie Fell. I drank with her and crashed at her house in Wilkes-Barre for a while years ago.

I met Debbie at Tony's Bar in Pittston. It is now called Stephanie's Bar. I'm not allowed to go there anymore. That place was the bottom of the barrel, a place where downright alcoholics go to drink. People don't go there to have just one or two drinks. The people who went to Tony's at that time had a lot of problems. Back then, a lot of things went on. People got very messed up on drugs, were in and out of jail, and got very violent with each other. Debbie and I were hanging out with a group of people who are mostly dead now, or else they are homeless, in jail, or strung out on drugs.

I met Debbie when I was drinking a lot. I was into drinking and she was into me. I don't drink like that anymore. I was into cocaine real heavy, before I met Debbie. Debbie asked me to go drinking in Wilkes-Barre so I went with her. I needed a place to drink, and all we did was drink. I stayed at her house for a while. I barely knew her, we had just met. We both drank until we passed out. Then as soon as we woke up, whatever time it was, we started drinking again. Our drinking was really bad.

Debbie had been fighting with her ex-boyfriend at the time I knew her. He was an older guy who walked with a cane. Debbie had been letting her son drive her car. Her son was about 13 years old and he didn't go to school very much. Debbie

1

FELL-00002413

didn't seem to care what he did. Her drinking was more important than the kids, to her. That's what we did, drank morning til night.

Debbie's house looked like she never cleaned it. It looked like it should be condemned. They had a coal furnace, but it was ancient, and it was impossible to get it running. It was way, way out of date. There was no heat in the place. The pipes froze, and there was no running water. I let the Sheriff's Department in at the house one day. They were there to inspect to see if the place needed to be condemned. It was condemned later on, after Debbie went to jail. When Debbie went to jail, that was the last time I saw her.

I was not contacted by anyone involved with this case until a couple months ago. I was available and living in northeast Pennsylvania for the past several years. I would have been willing to talk to people about the case and what I know.

I have had the opportunity to review and correct the foregoing ___ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 02-24-11

_____
John Timek

_____
Witness

2

FELL-00002414

# EXHIBIT 250

My name is Florence Wallace. I am the sister of Lawrence Gilbert, who we call Louie. Debbie Fell was Louie's girlfriend, off and on, for a few years in the late 90s. I have tried to take care of my brother throughout his life, because he is mentally ill and has problems. He has bipolar disorder. He has been on social security disability because of his mental problems.

Louie is also an alcoholic and a drug addict. He has been homeless at times over the past couple of decades. He can't hold a job and has problems with a bad temper. I have tried to help him out many times. I have taken him into my home at times, but I have children at home, and when he acts up and starts to get violent, I have to kick him out. I can't have that around my children. I try to help him find a place to stay so that he isn't always living on the streets. I worry about him. He is so involved with the drinking and the drugs, he won't get help for it. I don't know if he is using drugs now, but he has in the past. F.W

Louie met Debbie at the railroad tracks in Wilkes-Barre. They were both homeless and drinking too much at the time. They got together but they fought constantly. Debbie acted a lot like my brother. My daughter has been diagnosed with bipolar disorder also. I know what people act like when they have bipolar disorder, and Debbie acted a lot like my daughter and my brother. One minute, Debbie was calm, but the next minute, she was snapping at my brother. She started screaming at him and throwing things at him.

I tried to help Louie and Debbie when they were together. I brought them

1   F.W

FELL-00002415

shopping one time, to the grocery store. They didn't have a lot of money so Louie was trying to prioritize what they would get. She just wanted to do it her own way. She started screaming at him in the car. She didn't listen to reason. My brother flips out like that too. He loses control. Even when Debbie was sober, she acted like that. Any little thing made her fly into a rage. *F.w*

At one point, Debbie was homeless and I tried to help her out. She was staying in a shelter for a few days. I tried to help her find some emergency assistance and housing assistance. I gave her a ride to the different agencies that could help link her up with assistance.

Both Louie and Debbie drank too much. When she was drinking, they fought. They had fistfights that got serious, and they hurt each other. Debbie threatened to kill Louie. Several different times, she threatened to stab him. She had a thing about stabbing people. Over and over again, when she and my brother had fights, she threatened to stab Louie. One time, she got into an argument in Wilkes-Barre. She thought someone stole something from her. She was furious and threatened to go stab them.

I told Louie he should drop Debbie off wherever it was that he found her. I got sick of hearing about their fights. She was dangerous when she was angry. I believed that she would kill my brother one day. At one point, she did stab him really bad. He had to get surgery on his arm after that. She sliced him up real bad.

*F.w* 2

FELL-00002416

At that time, Louie and Debbie were living in an apartment in Edwardsville. My brother got Debbie arrested for the stabbing, but then he later decided he didn't want her to go to jail. He dropped the charges. Later I went by to see my brother because I hadn't heard from him in a while. When I got to the apartment, the door was wide open and the place was totally trashed. No one was there. The place looked like a crime scene. There were dishes and glasses smashed on the floor. I found my brother's wallet there and some paperwork of his. I thought she killed him and he was lying dead somewhere. I didn't know where he was. I called the Edwardsville Police. They found Louie and Debbie up in Vermont. They had taken off to go up there, leaving their apartment like that.

When they were in Vermont, they fought and the police were involved many times. At one point, my brother went to jail and Debbie said she was going to stab the hell out of him when he got out. Eventually my brother came back down to Pennsylvania and he lived with me for a time. When he got back from Vermont, he was doing drugs. He had been an alcoholic for years but it wasn't until he got back from Vermont that I knew he was using drugs ~~like~~ cocaine, *including* crack, uppers, Percocets, Vicadins, and ecstasy. *f.w*

I didn't know that Debbie had died until someone came to see me about her son's case recently. I have lived in Luzerne County for ~~over~~ *over 30* *f.w* years now. I would have been available and willing to be interviewed about Debbie.

I have had the opportunity to review and make changes to the foregoing _3_ *f.w*

*f.w*  3

FELL-00002417

pages. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/25/11

Florence Wallace

Witness

4

FELL-00002418

# EXHIBIT 251

JAG 2-25-11

Tunkhannock

My name is John Gacek. I was born in ~~Wilkes-Barre~~, PA and have lived in
Luzerne County ~~all~~ most of my life. I work for Lowe's ~~a tree-trimming company.~~ I have worked
there for the past few months ~~1 years.~~ I am married and my wife and I have two children.

In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre,
Pennsylvania, with my mother, Adele Gacek, and stepfather, Ernie Schuldaski. My
friend, Donny Fell, lived across the street with his sister Teri, mother, and her
boyfriend, Al Wilcox.

I met Donny when I was around 7 years old. Donny was older, but he was
really small and skinny. When kids at school gave me a hard time, Donny looked out
for me and took me under his wing. I remember a kid at school was yelling at me,
and Donny told him to lay off. He was my first friend at this new school, and Donny
treated me like I was his little brother. We were not in the same grade, but we
walked to school together most days and played after school.

Donny showed me the hideout spots in the neighborhood. We played by the
dike or the train tracks, under the trestle. We went to the park by Dan Flood
Elementary School and to the Turkey Hill convenience store to buy baseball cards.
We traded cards with each other and at the hobby store.

We played baseball a lot and collected baseball cards. Donny had a really
good arm and was a really good pitcher. We did not play in a league, but we played

J.A.G
2-25-11

1

FELL-00002419

at the baseball fields on Chestnut or by Flood Elementary.

My mom took Donny and me to Frances Slocum Park and to the arcade. Donny loved that. He didn't want to go home.

My stepdad Ernie gave us batteries for a tape deck, and we liked to listen to music at the train tracks. We listened to Ernie's tapes. Donny liked Pink Floyd, REM, and Led Zeppelin.

Donny loved being at my house. We played Nintendo. I tried to make up excuses so Donny could come over. I invited him without even asking my mother. Donny and I tried be really good so that my mom did not send him home. If I ever talked back to my mom, he stopped me and said that I was lucky to have a good mom.

Donny's mom was a drinker, and when she wasn't drunk, she was passed out, sleeping. I did not see her without a beer can in her hand. She was not a happy person. She nitpicked at Donny. She was not a normal mom. She was not the type to be nice to neighborhood kids.

Donny had freckles, and his parents used to call him, "You freckle-faced piece of s---" or "you stupid a--hole." They did not calmly say, "Please come over here, Donny." Instead, it was: "Get the f--- over here you little a--hole, before I kick you're

J.AG
2-25-11

2

FELL-00002420

a--."

Donny did not want to be at his house, and he did not want for me to be there either. He did not want me to go inside his house. I stayed on the porch. In there, the music was really loud and there were beer cans all over. The house was very disorderly, and there was always stuff strewn about. His mother did not clean the house.

When we went to his house to pick up his baseball card folders, Donny told me to wait on the porch. When Donny needed to go upstairs to his room, it was like going through a firing squad. His parents sat on the couch drinking, and they just started screaming at him.

I remember the bigger, heavyset guy, Al, that he lived with. He was dirty and never took care of himself. I saw Al backhand Donny across the face. He slapped him and threw stuff at him and threw him around. Donny seemed to get the worst of what went on in that house. It all came down on Donny. I cannot imagine a peaceful moment in his house. I can only imagine what he went through behind closed doors. I was just a little boy, but I could see that what was happening was wrong.

I told my parents that Donny's parents were mean. You could tell he wanted to get away from what was going on at his house. I tried to go to bat for Donny. I

JAG
2-25-11

3

FELL-00002421

invited him over all the time.

Donny's parents called him names. He got upset with his parents. He got mad and threw things. He often left his house with his little sister Teri in tow. Donny was only 11 or 12 years old, but he was trying to be the adult in the situation. Donny was Teri's protector. When his parents got into an argument, he jumped in the middle, taking the blame and the beating. He stepped in so Teri did not get a beating. When Teri or Donny came over, one or both of them were crying. Teri was really quiet.

*JAG 2-25-11*

*Teri was scared a lot because of the screaming + the beatings. She used to run off + hide. Donny used to go try to find her to make sure she was okay. A couple times he asked me to come help him find Teri. One time we found her in a vacant lot with a bunch of old cars parked in it. She was sitting on the ground with her back up against the tire. She was crying. Donny comforted her and tried to reassure her that everything would be okay.*

One day in the spring, we were at a family get-together at my father's house. My mother and my stepfather Ernie were up at my sister's house, which was behind my father's house. Donny and I snuck down to my dad's house, because I wanted to show Donny my dad's gun. My father, Ken Gacek, was a police officer in Exeter Township, and he showed me how to shoot guns. My dad did not really know Donny personally. Donny spent more time with my mom, Ernie, and me. My dad had rules about guns, and I knew I was not supposed to use guns unsupervised. I broke that rule, and it was more my fault than it was Donny's. I tossed the magazine to Donny, and when he shoved it in the gun, the gun just went off. I forgot about the round in the chamber. It was a stupid mistake, and I still feel that it was my fault. My family didn't blame Donny for what happened. I hope Donny never went to bed one night thinking that I was mad at him for what happened, because I wasn't.

4

FELL-00002422

After the accident, I went to the hospital. My mother and father rode with me to the hospital. My brother was working at a restaurant in Wilkes-Barre, and he got to the hospital just before we did. I was standing very close to Donny when the gun went off, and the bullet went right through me. I was only in the hospital overnight.

When I got home from the hospital, Donny came to my house in tears. He told me over and over that he was sorry. He gave me a hug, and we cried together. I thought Donny was going to get in trouble, and I was crying because it was not his fault. It was my fault. My arm was in a sling. Donny felt so bad and he wanted to help me whatever way he could. He offered to help me get into the bathtub, but I was too embarrassed to let him help me.

My family teased Donny about the shooting accident. They tried to make light of it so he would not feel so bad about it. My brother was kidding around and pretended to frisk him.

Not long after the accident, Donny disappeared. At the time, I did not know where Donny was. One day, he just was not around anymore. I now understand that he was locked up in the psychiatric unit.

I knew Tony Tonte, Bobby Lee's brother. Bobby was a weird character. Donny and Bobby were two different people.

JAG
2-25-21

5

FELL-00002423

Donny's lawyers did not contact me prior to his trial in Vermont. I did not hear from anyone involved with Donny's case until 2009. I was available and would have been willing to testify at Donny's trial.

I have had the opportunity to read and have read to me the foregoing 5½    JAG    2-25-11
pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2-25-11

JOHN AARON GACEK

John Gacek

Witness

Jamie Kluk

6

FELL-00002424

# EXHIBIT 252

My name is Adele Gacek. I have lived in Kingston with my boyfriend Ernie

Schuldaski for the past _20_ years. I was married to a police officer named Kenneth

Gacek for _25_ years. We had five children. My oldest daughter died in a car accident

several years ago. Kenneth Gacek and I divorced and I have been with my boyfriend

Ernie for the past _20_ years.


In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre,

Pennsylvania, with my boyfriend Ernie Schuldaski and my son John Gacek. My older

children had grown up and were out of the house by then. My son John became very

close friends with the boy across the street, Donny Fell. Donny lived across the

street with his sister Teri, his mother and her boyfriend Al. We only lived across the

street from the Fells for a year or so.


Donny came over to our house often to play with my son John. We all ate

pizza and popcorn together. John and Donny made blanket forts and watched TV

and sports. Ernie and the boys danced around to music and play-wrestled together.

They were silly together.


Donny was older than my son John, but Donny looked younger than his age

because he was small and skinny. Donny was shy, but when you gave him a hug, he

just buried himself in it. He was affectionate at our home, and he hugged us goodbye

when it was time for him to go home.

1

FELL-00002425

Ernie and I both worked, but on Saturday or Sunday we went on outings to do something fun, like taking a drive or going fishing. We often brought Donny with us. We had dogs and cats in our house, and Donny played with them. He was good with them and seemed to love animals.

When it became clear to me that Donny and John were going to be good friends, Ernie and I went over to meet Donny's parents and to introduce ourselves. I then realized that Donny came from a very dysfunctional family. The parents were constantly drinking and screaming at each other, and it was just complete chaos over there. I could not stand to be at their house because it was so tense. I was very surprised to see where Donny came from. I don't know how any kid could ever thrive or even halfway grow up in that environment.

I was absolutely horrified by the way Donny and Teri were treated by Debbie and Al. They screamed at the kids and called them terrible names. Debbie was foulmouthed and treated the kids in a way I would never treat them. Al called Teri, who was small for her age and generally very quiet, a "b----," which I just could not believe. They threatened Donny, screaming at him that they would kick his a--. There was often some kind of commotion. The parents cursed at Donny and Teri. It was chaos.

We had a stable household. Donny used to eat up the family atmosphere. He was at our house four or five times per week, and he did not want to go home.

2

FELL-00002426

Donny told me more than once that he wished he could live with us. I wished he could too.

When anything happened at his house, Donny ran over to our house. There were many times when he was really upset. His mother treated him a lot worse than his sister. His parents locked him in his room for punishment.

Donny appreciated being around me because I was a more typical mother than he was used to. Whenever John tried to talk back to me, Donny stuck up for me. Donny told John not to talk to me that way, saying that I was a good mother, and John should appreciate that.

Donny was from a violent home. His parents were such heavy drinkers, he did not know what to expect from them at any moment.

My son John did not want to play at Donny's house. The boys played outside or at our house. I did not want John spending time at Donny's house.

Donny was close to his sister Teri. Donny brought Teri over to our house several times. Teri was nice, shy and very withdrawn, but she was less withdrawn at our home.

My ex-husband, Kenneth Gacek, was a police officer, and he lived in a house

3

in Exeter Township. He had an unsecured 9mm handgun in his home. My daughter and her husband lived in a house behind his. Ernie and I took John and Donny to visit my daughter in the country one day. The boys were off playing for a while, then John came running over saying he was shot. John and Donny had been playing together, and John showed him my ex-husband's gun. The gun went off accidentally. My family and I did not blame Donny for what happened. It was a fluke accident, and I blamed my ex-husband for leaving the gun unsecured. To this day, when we talk about the accident, we don't ever say, "When Donny shot John," we say, "when Johnny got shot."

Immediately after the accident, Donny was upset and scared. John spent the night in the hospital, and Donny came to see him at our house the next day. Donny ran over to John and put his arms around him, and they both started to cry. They held on to each other for a long time. To see two boys that age crying like that just broke my heart since most boys don't act like that.

A few days after the shooting, Donny just disappeared. I didn't know where he went. Later I found out that he was in a psychiatric unit.

I was not contacted by Donny's lawyers who represented him at his trial in Vermont. I was available to speak to the lawyers and I would have been willing to come to Vermont to testify.

4

FELL-00002428

I have had the opportunity to read and have read to me the foregoing _4_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: _2/28/11_

_Adele Gacek_

Adele Gacek

_Witness_

Witness

5

# EXHIBIT 253

*Kingston/Edwardsville [EM]*

My name is Ernie Schuldaski. I have lived in Kingston with my girlfriend, Adele Gacek, for the past 20 [EM] years. Adele and I have been together for 20 [EM] years.

In the early 1990s, I lived on E. Chestnut Street in Wilkes-Barre, Pennsylvania, with Adele Gacek and her youngest son John Gacek, who I call my stepson. Adele has other children who were grown and out of the house by that time. For several months, Debbie Fell lived across the street with her two children, Donny and Teri, and her boyfriend, Al. Donny was about 11 years old at this time.

John and Donny became good friends and often played together. Donny spent a lot of time at our home. Donny loved having meals with us. We ate at the table and sat down together for a home-cooked meal. He was well-behaved and treated everyone at our house with respect. He had sleepovers at our house at times.

One Sunday morning, Phil Collins was on the radio, and John, Donny and I danced around the house to the music. All three of us lined up and danced into the room, like a caterpillar, in step to the music. Adele laughed at us.

Adele and I took Donny with us when we were going on little day trips. We took John and Donny on fishing trips to Slocum Park. We gave the boys a rod, and we all fished. Sometimes we went to the creek and made a picnic. Back then, you were allowed to swim in the creek, and we brought the dog with us. Sometimes we

1 [EM]

FELL-00002430

went out for a ride on a Sunday afternoon.

Donny really gravitated toward Adele, and he seemed to really appreciate having a loving mother figure around. If John got mouthy, Donny spoke up and told him he shouldn't talk to his mother like that because she's a good mom.

Adele's ex-husband Ken Gacek was a cop. One day, we took John and Donny to Adele's old house in Exeter, where Adele's older daughter lived. John and Donny were playing together, and John showed Donny his father's gun. John knew they weren't supposed to be playing with the gun, and when they heard someone coming, they thought they were going to get into trouble. Donny went to slam the clip back in and the gun accidentally discharged. The gun going off was an accident. John was lucky because it missed his aorta and went clean through. We were all worried about John. Donny was scared and worried about John, who was his best friend. Donny felt terrible about what happened.

After John got home from the hospital, Donny came over to see him. Donny was very upset and remorseful. John and Donny were hanging on each other like two little girls, both crying. They kept saying, "You're still my friend. You're still my friend." We knew that Donny felt bad about what happened, and we thought joking about the accident would help him understand that it was going to be okay. Adele's oldest son joked around, putting Donny up against the wall and frisking him, saying "You got a gun?" And we all laughed about it.

2 *EM*

FELL-00002431

The accident with the gun really was not Donny's fault. It easily could have been the other way around.

When John and Donny got to be friends, Adele and I went over to Donny's house to meet his parents. We thought it was important to get to know anyone who our son was going to spend time with. Donny's mother Debbie was a full blown alcoholic. So was Al. I was horrified by the way Debbie treated Donny and Teri. I remember her boyfriend Al calling Teri a "little bitch." We did not let John spend time at Donny's house, but Donny was always welcome at our house.

Around that time, I was fixing TVs, and when I went to Debbie and Al's house to fix their TV, there was plenty of beer in the house. Al and Debbie stayed in the house and seemed to drink a lot of the time. Whenever I saw them, they always had a beer in their hand.

Debbie did not cook dinner for the kids. Donny had to fend for himself. He always got the blame for anything that happened in that house.

Al died of a heroin overdose. They found him frozen to death in his truck in Kingston.

Donny's grandmother was hard on him too. The grandmother's boyfriend,

3 *EM*

FELL-00002432

Jack Rhodes, spent a lot of time at a neighborhood bar called Spernoga's, which was next to the grandmother's house.

I was not contacted by anyone representing Donny before his trial. I have been living in Kingston Edwardsville for the past 20 years. I would have been available and willing to talk with anyone regarding Donny's case. I would have been available and willing to come up to Vermont and testify. The first time I had contact with anyone from Fell's defense team was during his appeal.

I have had the opportunity to read and have read to me the foregoing 4 pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/28/2011

_____
Ernie Schuldaski

_____
Witness

4

FELL-00002433

# EXHIBIT 254

JM

My name is Jon Migatulski, Sr. I was born in Wilkes-Barre, PA. I have lived in Luzerne County for most of my life. I work as a painter.

I met Donny Fell at Flood Elementary School when I was 5 or 6 years old. We were in the same grade until Donny was held back, and then I was one year ahead of him. We played football and baseball together and rode bikes. We played in the woods and chased squirrels.

When Donny and his family moved to Inkerman, I did not see him for a few years, but when he moved back to Wilkes-Barre, we became close friends again when were teenagers.

When we were teenagers, Donny and I hung out with a group of friends. Donny ate meals at my house often because there was rarely food at his home. He seemed ashamed to ask for food, but my mother was glad to feed him. My mother was close with many of my friends, but she seemed to have a special relationship with Donny.

We did not spend time at Donny's house. Donny said his parents were mean, and he did not talk about his family very often. Donny's aunt Jackie beat him regularly and was mean. His aunt Jackie tortured him and beat the crap out of him. He had black eyes and other injuries, including bruises on his arms and face, and that was just what was visible to me. Donny was ashamed of his bruises, so he

1 JM

FELL-00002434

pretended as if he had gotten into a fistfight with Gary or one of our other friends. Donny told me that his grandmother, Theresa, raised her hand to him too, when he was little.

Donny stayed at my mother's house for a while after he had dropped out of school. My mother passed away from cancer a few years ago. Donny acted like her nurse and helped her while she was sick. After her surgery and chemotherapy, Donny slept on the floor next to her bed in case she needed anything. He fixed dinner for her. He watched my little brother and my nieces and nephews. My mom trusted Donny around the kids. When my mother was sick, she became very disoriented and acted strangely. She seemed to be having a nervous breakdown, and I didn't know how to deal with her. Donny was patient with her. He didn't seem to mind that she acted out of her head a lot of the time. He tried to help her calm down.

A few of my other friends had troubled family situations, and my mom took them in sometimes as well. Donny, two of my other friends, and I all slept in my bedroom at REDACTED - FELL On Thursday nights, Donny and I sat in front of the television with our friends, watching wrestling.

Bobby Lee hung out with our crowd, but we were not close. I was friends with Bobby's brother Shane. I saw Bobby punch his father, who was a really large man, in the face in a convenience store parking lot over four dollars. We came to

2 JM

Bobby's aid and jumped his dad. A lot of my friends got beat up by their parents, so they weren't going to stand by and watch it happen to Bobby.

When we were teenagers, about half of our friends used heroin, and several died of heroin overdoses. Donny did not use cocaine, crack, or heroin in my presence. We drank and smoked weed. I saw him drop acid from time to time, and he popped pills, including Vicadin or Valium. One of our friends was an acid dealer, and he would give it to us. We did whatever pills that we could get our hands on.

Donny's lawyers did not contact me prior to his trial. I did not hear from anyone involved in Donny's case until after he was on death row. I was available and would have been willing to testify at Donny's trial.

I have had the opportunity to read and have read to me the foregoing ____ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 2/1/11

Jon Migatulski

Witness

3

FELL-00002436

# EXHIBIT 255

My name is Steve Ratte. I have been a Deacon with the Catholic church for 28 years. I live in Fairfax, Vermont with my wife. We have six children.

I ministered to prisoners at St. Albans prison from about 1980 to 2006. During this time, I performed services for inmates and also met with individual inmates one on one. Initially, I only performed services for state inmates, but I learned through the guards that a federal prisoner, Donny Fell, was requesting that services also be performed for the federal inmates in what was known as Echo Unit. When I learned of this request, I began performing weekly services for the federal inmates. I also began meeting with Donny on a weekly basis for one-on-one meetings, and I baptized him. I met with Donny regularly for several years before his trial began, and I still keep in touch with him often.

Donny took his involvement with religious services very seriously. I gave him the job of setting up for the services, and he seemed to enjoy fulfilling that responsibility each week. Donny also enjoyed performing readings during these services, and he encouraged other prisoners to attend. Several of the inmates did not speak English well, and Donny tried to explain the church services to them. It was obvious that the other inmates appreciated Donny's assistance.

When I first met Donny, he was in his early 20s, just a few years younger than my own children, so I viewed him as a kid. In our one on one conversations, Donny asked me about my family and took an interest in the events in my life. We also

1

FELL-00002437

discussed the scriptures. Donny cared for other inmates, and how they were being treated.

Donny and I mostly talked about "the now" and the events in his life as they were occurring. I like to let the inmates I visit talk to me about whatever they choose, so I never pushed Donny to talk about the crimes with me . Donny also did not spend a lot of time talking about his childhood. One thing that struck me was that Donny never made any excuses about his crimes. He never blamed drugs or alcohol or other problems in his past, as some prisoners do. He did not want pity. He just wanted someone to care about him. It took a while for Donny to trust me, and for him to learn that I was not going to abandon him because of his crime, but eventually, he started to trust me and opened up.

Shortly before Donny's trial, he told me that he did want me to attend the trial but cautioned me that I would hear some bad things that he had done in his past. I told Donny that nothing I would hear about the past would change how I saw him now. I attended as much of the trial as I could.

Donny seemed sincere about exploring his faith during services and in his meetings with me. Donny told me about his interest in learning about other religions during our meetings. I did not see anything inconsistent between his interest in other religions and our meetings together. Donny is a very intellectually curious person, who wanted to be involved in a lot of the limited activities the

2

FELL-00002438

prison offered, including exploring other religions and thinking critically about them.

On the night Donny was sentenced to death, I went to visit him. We were in a holding cell together, and I became very emotional about the sentence. Donny was more composed, and he tried to console me. He was very concerned about maintaining control and not letting his emotions show. This is something that he developed over time to protect himself.

Although I attended Donny's trial, his attorneys never met with me to learn what I knew about Donny, and they never asked me to testify. It would have been very difficult emotionally for me to testify at the trial because I had grown very fond of Donny, but I would have testified for him if they had asked me.

*AJK*

3

FELL-00002439

I have had the opportunity to read and have read to me the foregoing ___

pages. I have been given the opportunity to make any corrections, additions, and

deletions that I see fit. I declare under penalty of perjury that the above statement is

true and accurate to the best of my knowledge.

Date: _2 - 2 4 - 2011_

Stephen Ratte

Witness

4

FELL-00002440

# EXHIBIT 256

*My name is Marc Pelkey, and I am ___32___ years old. I started*

*working as a correctional officer at Northwest State Correctional Facility in*

*St. Albans, Vermont when I was 20. I am currently working as a Community*

*Correction Officer at FSU in St. Albans.*


*I worked at the Northwest State Correctional Facility from 2001 to*

*___2006___, so I was there nearly the entire time Donald Fell was*

*incarcerated there.*


*For most of that time Fell was housed in Echo Unit which is where all*

*of the federal detainees were housed. A lot of the federal detainees had*

*gang ties from New York City. A lot of the guys were running drugs from*

*New York City, Massachusetts and Connecticut. They had connections with*

*the Latin Kings and other gangs, so we tried to keep them separated from the*

*rest of the population. It seemed like Fell's attitude changed when he was*

*moved to Echo unit, like he might be trying to impress the new crowd.*


*I was working at the facility at the time Bobby Lee died, but I was not*

*on shift. I think Fell was going through a lot after his friend died.*


*Fell was pretty quiet when he first got here. It seemed that he started*

*to act out more when his case started evolving and when he started having*

*court proceedings. Some inmates tend to freak out at trial time.*

1

FELL-00002441

When the crime occurred, from my understanding, they were deep into drugs and alcohol, and a lot of those drugs can make or let you do a lot of things, and not even realize it.

Fell was involved in two incidents during the years that I worked at St. Albans. One incident started outside in the bullpen after he refused to put down a coffee cup and we took him to Delta unit. In the cell we crossed his legs over each other on the ground and I kneeled on them so we could get leg shackles on him. There was some yelling and Fell spit at me. At that point the other correctional officers pulled me out of the cell.

I was investigated for excessive force after that incident that started in the bullpen. The state talked to all of the staff and reviewed the videotape of the incident. I was not in the wrong in that incident. One time an inmate spit on me and I punched him in the face and another time I threw an inmate to the floor. I had to go to anger management classes after these events. I was also suspended once for using too much force with my shield against an inmate's face during an extraction. I've been questioned by Prisoners' Rights over a bunch of stuff, but everyone gets questioned at some point or another. I wasn't formally disciplined for the incident with Fell, but I was ordered by the Chief of Security not to have any more contact with him.

2

FELL-00002442

The other incident was during a cell extraction.  We practice cell extractions, but they can be very chaotic and people often get hurt.  Fell kicked Adam Barcomb during the cell extraction, but I do not think that Fell had anything personal against Adam.

Other than the incidents with the coffee cup and the cell extraction I am not aware of other things like this involving Fell.

Working there can be a pretty brutal environment.  I was drinking way too much.  I know a lot of them that do who work there.  I know I drank way too much when I'd get off work, just to get it out of my mind.

I was called by the prosecution to Fell's trial, but I never testified.  I went to court four or five times and sat in the hallway.



3

FELL-00002443

I have had the opportunity to read and have read to me the foregoing _3 (M)_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 3/9/11

_____        Marc Pelkey

_____        Witness

FELL-00002444

# EXHIBIT 257

5/13/2005 9:10:00 AM

and whether you do so fairly and impartially, and I guess, I am going to ask you for a very thoughtful, reflective response.

In light of your views, in light of your willingness to except the directives of the Court, more than that, just not following the Court's instructions, just the fundamental question about whether you can be fair to both sides, that's what I need to know. And so, do you think that, based upon your views, you might lean unfairly in one favor toward one side or the other? Or do you feel that you could put aside any views or you don't have any views which would prejudice you in any way and that you could be very impartial in your decision about whether the death penalty is appropriate or whether life imprisonment is appropriate?

And that's -- I am asking for quite an honest, reflective response.

JUROR NO. 64: I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes.

THE COURT: Okay. Any follow-up questions? Do you want to ask any follow-ups questions?

MR. KELLY: No, Judge.

MR. PRIMOMO: No, your Honor.

FELL-00002445

# EXHIBIT 258



**DELAWARE HEALTH
AND SOCIAL SERVICES**

OFFICE OF CHIEF MEDICAL EXAMINER
FORENSIC SCIENCES CENTER

RICHARD T. CALLERY, M.D., F.C.A.P.
CHIEF MEDICAL EXAMINER
DIRECTOR, FORENSIC SCIENCES LABORATORY

Richard T. Callery, M.D., F.C.A.P. declares the following to be true to the best of my knowledge:

1. Since 1994 I have been the Chief Medical Examiner for the State of Delaware and the Director of the Delaware's Forensic Sciences Laboratory.

2. I keep records of all cases on which I consult and my records date back to include 2003. My records reflect no consultation on Donald Fell's case. I have no record that I was ever asked to, and did not review any materials relating to the death of Teresca King, Debra Fell or Charles Conway.

3. Dr. Michael Sikirica and I are colleagues and I have consulted with him on cases. Occasionally, he refers cases to me. I do not remember receiving a referral from Dr. Sikirca about the Fell case, or otherwise discussing the case with Dr. Sikirica.

4. I also know Dr. Michael Baden. He is a colleague and we have taught together at conferences. I do not recall discussing the Fell case with him or reviewing any reports from him relating to the case.

I have had the opportunity to read the foregoing page. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the foregoing is true and correct the best of my knowledge.

Date: 3-7-11

Richard T. Callery, M.D., F.C.A.P.

FELL-00002446

# EXHIBIT 259

# INTENTIONALLY LEFT BLANK

FELL-00002447 - FELL-00002448

# EXHIBIT 260

## DECLARATION OF MARK J. MILLS, J.D., M.D.

Pursuant to 28 U.S.C. § 1746, Mark J. Mills hereby declares as follows:

1.      I am a licensed physician, with board certifications in psychiatry and forensic psychiatry, and am a Professor of Clinical Psychiatry at Columbia University's College of Physicians and Surgeons.

2.      I have served as the Commissioner of the Department of Mental Health for the Commonwealth of Massachusetts, as the Director of the Program in Psychiatry and Law at UCLA, and as Chief of Psychiatric Evaluation Unit at the Palo Alto Veterans Administration Center.  I have performed over 5,000 clinical examinations, and have been qualified as a psychiatric expert in over one hundred federal proceedings.  My curriculum vitae, attached hereto as Exhibit A, lists among other things, numerous academic and hospital appointments, Board Certifications, professional society memberships, publications, and presentations.  My practice is primarily forensic as opposed to treating patients clinically.  I am not currently treating patients on a regular basis, and I have not done so since 1987.

3.      I was retained in February 2001 by Alex Bunin, Esq. to conduct a forensic psychiatric evaluation of the defendant in the above-captioned action, Donald Fell.  Mr. Fell's counsel provided me with certain records it had obtained as of the Spring 2001, which are listed in footnote 1 of my report.  Generally, they included medical, social service, police and school records for Mr. Fell and draft observations regarding Mr. Fell's father and a few other family members prepared by the mitigation specialist on Mr. Fell's defense team.  At the time I was asked to perform my evaluation, Mr. Fell's counsel had not completed a full social history of Mr. Fell and did not provide me a complete social history of Mr. Fell.

FELL-00002449

4.      I completed my evaluation on March 26 and 27, 2001 and documented my findings in a report dated May 7, 2001.

5.      As I said in my report, "It is noteworthy that in fifteen hundred or so forensic evaluations, Mr. Fell is the most drug-abusing and chronically intoxicated individual whom I have evaluated."

6.      I was not asked to reexamine Mr. Fell after submitting my report in May 2001 or to revise or update my report in light of additional evidence collected by the trial team after that date. Nor was I asked whether the additional information could lead to different or other opinions. Aside from being sent the Government's expert reports, I was not shown additional documents or given additional information after May 2001. My work after May 2001 was limited to trial preparation.

7.      Generally speaking, I had less communication with Mr. Fell's defense counsel than with counsel that I have worked with on other cases. It was often difficult to get in touch with Mr. Fell's counsel, and they often failed to return my phone calls. I had very limited contact with defense counsel after submitting my report.

8.      I traveled to Vermont to testify on Friday, July 1, 2005. Counsel and I planned to meet on the morning I was scheduled to testify to prepare, but my flight was delayed and I did not arrive in Vermont as scheduled. Before we had a chance to prepare, counsel decided to pull my testimony for that day. My understanding is that due to scheduling difficulties, trial counsel considered putting me on for surrebuttal, if at all, the day after I returned from Paris. Had I been prepared to testify at trial, I would have offered the opinions set forth in my report of May 2001.

9.      I now understand that during the trial, the defense stipulated that: "(1) [Mr. Fell] had no cognitive or neurological defects; (2) his intellect and cognitive functions were intact; (3)

2

FELL-00002450

and he did not suffer from any mental disease or defect." I do not agree with this statement, and it is not supported by the expert report I submitted in this case, which concluded that Mr. Fell is an alcoholic with incipient psychosis or pre-psychotic breakdown. Defense counsel did not seek my advice on whether to stipulate to these facts.

I declare under penalty of perjury that the foregoing 3 page declaration is true and correct.

Date: _March 15, 2011_

_Mark J. Mills_

Mark J. Mills, J.D., M.D.

3

FELL-00002451

# EXHIBIT 261

# INTENTIONALLY LEFT BLANK

FELL-00002452 - FELL-00002454

# EXHIBIT 262

## DECLARATION OF ANDREW BARTNICK

Pursuant to 28 U.S.C. § 1746, Andrew Bartnick hereby declares as follows:

1. I am an investigator and have worked in the Office of the Federal Public Defender in Burlington, Vermont since September 1999. At the time of Donald Fell's trial, I had worked as an investigator for 13 years, 4 of which were spent working on his capital defense.

2. From the time Donny was arrested through his trial, the District of Vermont and the Northern District of New York were part of the same Federal Defender Office. I therefore reported to Alex Bunin, who was the Federal Defender for the office, although he was located in Albany and I was located in Burlington.

3. My primary responsibility on Donny's case was maintaining client contact, and I visited Donny frequently. My visits with Donny were very informal.

4. I did not do any forensic investigation into the crime scenes in Vermont or New York and to my knowledge no members of the team did.

5. We did not have regular team conference calls or team meetings. Since Alex and Gene were in Albany, and I was in Vermont, I often learned about things that were happening with Donny's case after the fact.

6. I was the member of the team who knew Donny best, but trial counsel did not ask me to have contact with any of the witnesses from Donny's hometown of Wilkes-Barre, Pennsylvania. Aside from the interviews I conducted to develop evidence of Donny's good adjustment to life in prison and investigation of the prison incidents, I was not involved in interviewing or preparing lay mitigation witnesses to testify or reviewing documents in connection with the mitigation investigation. I was not involved in the

1

decisions regarding which of the available lay witnesses would testify at trial. Trial counsel also did not give me any input into which mental health experts would evaluate Donny or would testify. I was not informed about the decision to pull the mental health case until after it was made.

7.    I was very frustrated that Alex and Gene did not visit Donny very often. At one point, over a year went by when they had no contact with Donny. In 2004, over three years into Donny's case, Donny even asked me which one was Alex and which one was Gene.

8.    I was the one on the team who delivered the government's notice of intent to seek the death penalty against Donny. In March 2004, I was the one who told him when the Second Circuit reversed the decision to declare the death penalty unconstitutional and he would have to proceed to trial and face a potential death sentence. Donny was more upset than I had ever seen him when the Second Circuit reversed the court's decision after a year and half, and I told him he would be facing a death penalty trial.

9.    I understand that, not long after I told Donny about the Second Circuit decision, he was involved in an incident where he used foul language against one of the guards. This incident was videotaped and presented at trial.

10.    I worked with Paul Volk to interview prison guards to try to establish that Donny had adjusted well to prison. We interviewed guards who I came to know had favorable things to say about Donny through my interactions with them during my prison visits. I was not asked to look into the disciplinary history of any of the officers as part of

2

FELL-00002456

the investigation, and as a result, I did not do so. I was not aware, and no one told me, that at least one of the guards had a disciplinary history.

11.    I was at the prison when the government's mental health expert, Dr. Wetzel, examined Donny in June 2005. I waited outside with Bill Darrow, the prosecutor on Donny's case, during the interview. At the end of the interview, Darrow took the videotapes of the interview and left with them.

I declare under penalty of perjury that the foregoing 3 page declaration is true and correct.

Dated: _3·16·11_

Andrew Bartnick

3

FELL-00002457

# EXHIBIT 263

Pursuant to 28 U.S.C. § 1746, Gene Primomo hereby declares as follows:

1.  I joined the Federal Defenders Office in Albany in August 1999, and have been working there for almost 12 years. Prior to that, I was an Assistant U.S. Attorney in the Eastern District of Oklahoma and was in private practice until 1999. My previous capital experience was in the Ray Molina case in 1993. I was appointed to represent Ray Molina by the federal district court in the Eastern District of Oklahoma. Mr. Molina was facing a potential death sentence, and was one of the first cases filed under the Federal Death Penalty Act. Four defendants went to trial, three facing death, including Molina. Molina got a life sentence.

2.  Mr. Bunin served as lead counsel on Mr. Fell's case, and I was his co-counsel. Mr. Bunin was responsible for the guilt phase, for all of the briefing in the case, and for choosing and communicating with most of our experts. I informally assumed responsibility for the mitigation investigation. Paul Volk was given a role on the case with regard to the development of positive prisoner evidence with witnesses in Vermont and voir dire. He also helped prepare trial witnesses. No one on the case was specifically focused on what the Government would present in aggravation.

3.  I was the primary contact with our mitigation specialist, Cynthia Ayres. I considered Ayres self-directed. To my knowledge, Cynthia Ayres was not assigned to help identify whether Mr. Fell had any mental health disorders.

4.  The early investigation in the case, up through when the government rejected the plea agreement in January 2002, was done with the expectation that it was likely that the case would resolve with a plea to life without parole.

5.  I did not prepare for trial from September 2002, when the death penalty was declared unconstitutional, until November 2004, after the Supreme Court denied Mr. Fell's petition for a writ of certiorari to the Second Circuit with respect to the Second Circuit's reversal of Judge Sessions' order ruling the federal death penalty unconstitutional. Nor to my knowledge did anyone else on the defense team.

6.  Mr. Bunin was generally the first contact with all expert witnesses. To my knowledge, he did not consult with Cynthia Ayres about choosing who the mental health experts would be in our case.

7.  Andy Bartnick was our fact investigator. He was located in the Burlington office. He was the person on the team who had the most responsibility for client contact with Mr. Fell. Except for when he helped Mr. Volk interview positive prisoner adjustment witnesses, he was not involved in helping to build our mitigation presentation for trial.

8.  To my knowledge, we did not interview the family of the boy who Donald Fell accidentally shot when he was a child.

9.  To my knowledge, we did not do any investigation into the Woodstock, New York incident where Donald Fell got into a fight with Chris Eike.

FELL-00002458

10. To my knowledge, we did not interview Sean Campbell or the Cupano family.

11. To my knowledge, we never specifically requested discovery about Mr. Fell's co-defendant, Robert Lee.

12. I was responsible for preparing for Dr. Mark Cunningham's testimony. Our first meeting with Dr. Cunningham was in January 2005. He interviewed Mr. Fell and was going to testify about historical factors in Mr. Fell's upbringing and how they impacted his decision-making. He came to Vermont for trial and I was prepared to present his testimony. But for our concern that Dr. Welner would testify, we would have called Dr. Cunningham as an expert for Mr. Fell.

13. After we received Dr. Welner's report on July 5, we made a motion to exclude his testimony on a number of grounds including that the government had engaged in misconduct, that the Court's order had been violated, and that Dr. Welner's testimony would be unreliable. I believed, and still believe, that the motion was meritorious. We made the decision to withdraw our mental health case and the testimony of our experts because we assumed that, notwithstanding the legal merit of our motion, the Court would reject it and would not permit us to have it heard before we had to decide whether to put on a mental health case. We did not make that assessment based on any actual ruling from the Court on our motion. We did not consider asking the Court for a continuance or to advance the date for the hearing on the motion.

14. I would have wanted to know if a juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly. I also would have wanted to know if jurors had been exposed to pretrial publicity about Bobby Lee's death, since this was prejudicial information I wanted excluded from the trial. I would have challenged any jurors with these experiences for cause.

I declare under penalty of perjury that the foregoing two page declaration is true and correct.

Date: 5/16/2011

Gene Primomo

2

FELL-00002459

# EXHIBIT 264

Pursuant to 28 U.S.C. § 1746, Alexander Bunin hereby declares as follows:

1.  I am currently the Public Defender for Harris County, Texas. I began my career as a criminal defense lawyer in Texas, where I was in private practice and then became an Assistant Federal Defender. I established the Federal Defender office in the Southern District of Alabama, and I was appointed in 1999 to establish the Northern District of New York and Vermont. The District of Vermont opened its own Federal Defender Office in 2006, but I remained the Federal Defender for the Northern District of New York. I left the Federal Defender office in 2010, to become the Public Defender for Harris County.

2.  I was the Federal Public Defender for the District of Vermont when Donald Fell and Robert Lee were arrested. Bobby Lee's family retained a private lawyer for him. As the Federal Defender, I recommended that my office be appointed to represent Donald Fell.

3.  In December 2000, I recommended that John Pacht and Brad Stetler be appointed to represent Bobby Lee and replace Bobby's private lawyer.

4.  Although I had some capital appellate and habeas experience during the early 1990s in Texas, this was my first capital trial.

5.  I served as lead counsel, and my colleague Gene Primomo was co-counsel. Gene and I divided most of the responsibilities between us. Gene was primarily responsible for preparing the mitigation case. I was primarily responsible for the guilt phase preparations and for all of the briefing associated with the case, but I oversaw all aspects of the case. Paul Volk, whom Judge Sessions appointed as co-counsel in 2002, assisted with the voir dire, the investigation into positive prisoner evidence, the preparation of witness examinations during trial, and certain direct and cross examinations.

6.  I retained Cynthia Ayres as a mitigation specialist in January 2001, shortly after Mr. Fell's arrest in 2000. I tasked Ms. Ayres to perform a preliminary mitigation investigation into Mr. Fell's life. Ms. Ayres was not involved in choosing mental health experts, but we discussed their reports.

7.  The remaining members of our trial team were Andy Bartnik, who was my investigator in Burlington, and Wanda Rivera, who was an investigator in the Albany office. Andy was tasked with client management, and conducted some of the investigation of the positive prisoner evidence. Wanda was responsible for the administrative component of the mitigation investigation, i.e., retrieving records and following up with various agencies about documents.

8.  Our initial strategy was to try to obtain a plea agreement to a sentence of life imprisonment without possibility of release. Based on Mr. Fell's statements at the time of his arrest and those of his co-defendant Robert Lee, I determined that it would be difficult for Mr. Fell to successfully contest guilt. I also determined that, given the potential for the death penalty in the case, a plea to life imprisonment was a reasonable resolution and an appropriate one. Mr. Fell was willing to agree to plead guilty in

FELL-00002460

exchange for a sentence to life imprisonment without possibility of release and I indicated that to the United States Attorneys Office.

9. From shortly after Mr. Fell's arrest, I believed that the U.S. Attorney's Office would be receptive to a plea to life imprisonment without parole instead of the death penalty. That understanding was based upon my belief that Mr. Fell's mitigation case was strong and upon the actions and statements of the United States Attorneys Office, which suggested to me that their Office would be receptive to a guilty plea to life imprisonment. I did not have any formal assurances that their Office would agree to a plea until October 2001.

10. Based upon my belief that a guilty plea to life imprisonment was an appropriate resolution and one that would be accepted by the United States Attorneys Office, I focused my attention on preparing a plea package for the U.S. Attorneys Office that I believed it would find helpful in justifying a decision not to seek the death sentence.

11. For this reason, in the time period from December 2000 to February 2001, I hired three mental health experts to prepare reports on Mr. Fell. I made the initial contacts and worked with these experts in developing their reports. At the time we retained these three experts, I believed that the United States Attorneys Office would accept a guilty plea to life imprisonment without possibility of release and I did not believe that the United States Attorneys Office would seek the death penalty or that the case would go to trial. At the time these experts were hired and by the time they rendered their reports, we had not completed a social history of Mr. Fell. I did not believe that we had the time to complete such a social history before Mr. Fell's guilty plea was accepted nor (based on my conversations with the U.S. Attorneys Office) did I believe it was necessary to complete such a history for Mr. Fell's guilty plea to be accepted.

12. I retained Dr. Jonathan Lipman, a neuropharmacologist, in December 2000. Among other things, Dr. Lipman took a hair sample from Mr. Fell to determine his historic drug use. I do not recall ever receiving results from the testing of his hair. We did not ask Dr. Lipman to analyze the historic drug use of Debra Fell and Charles Conway. We also did not ask Dr. Lipman to consider whether there was a diminished capacity defense for the guilt phase.

13. I also hired Dr. Mark J. Mills and Dr. Wilfred Van Gorp to evaluate Mr. Fell and issue reports. Dr. Mills evaluated Mr. Fell on March 26-27, 2001, and Dr. Van Gorp evaluated Mr. Fell on April 6, 2001. I made the decision to hire Dr. Van Gorp based upon the recommendation by Dr. Mills.

14. On May 18, 2001, I submitted a letter to the United States Attorney's Office advocating that that Office should accept a plea to a sentence of life imprisonment without possibility of release. The letter enclosed mental health reports from Drs. Lipman, Mills and Van Gorp and a summary of the mitigation evidence we had developed in the case because we continued to believe based on our conversations with the prosecutors that we would be successful in negotiating the plea agreement and that no trial would be necessary. We did not put any restrictions on the use of the information by the Government, except for the limitations under Federal Rule of Criminal Procedure 11(e) (6) and Federal Rule of

2

Evidence 410. I would not have submitted the letter if I had not believed that the United States Attorneys Office would accept a plea to a sentence of life imprisonment without possibility of release.

15. On May 25, 2001, I met with David Kirby, Esq., Greg Waples, Esq. and John Tavana, Esq. and discussed the possibility of a plea agreement. Messrs. Kirby, Waples and Tavana were Assistant United States Attorneys in the Office of the United States Attorney and David Kirby was acting U.S. Attorney for the District of Vermont. Although I do not recall now exactly what was said at the meeting, I left the meeting with the understanding that the United States Attorneys Office would be receptive to a guilty plea to life imprisonment without possibility of release. When we left the meeting, I got the impression that Mr. Kirby, Mr. Waples and Mr. Tavana were all in agreement that a plea agreement to life without parole was appropriate, and they only needed to get approval from the incoming U.S. Attorney Peter Hall in order to finalize the agreement.

16. After the May 25, 2001 meeting, the plea negotiation process was stalled because Mr. Fell's co-defendant, Robert Lee, was resisting entering into a plea agreement. It was not until after Bobby Lee's death in September 2001 that we were able to reach a plea agreement. It was my understanding that the U.S. Attorney's Office would not enter into a plea agreement unless both Mr. Fell and Mr. Lee agreed to plead guilty.

17. In October 2001, we reached an agreement with the United States Attorneys Office for Mr. Fell to plead guilty in exchange for a sentence of life imprisonment without possibility of release. Although the agreement was dependent upon approval by the Department of Justice based upon changes in the death penalty protocol on June 1, 2001, I believed that the Justice Department would support the decision of the United States Attorney. Specifically, I recall the United States Attorney Peter Hall assuring me that he would argue forcefully that the Justice Department should accept his Office's decision to accept the guilty plea to life imprisonment without possibility of release, that he believed that he would convince the Department of Justice to accept the guilty plea, and that I therefore did not need to meet in person with the Justice Department to plead Mr. Fell's case.

18. As a result, when the Justice Department officials involved in making the decision as to whether to accept the plea invited us to meet with them, we attended by teleconference. The teleconference was in November 2001. Even after the teleconference, I believed that the Justice Department would accept the guilty plea, that the United States Attorneys Office would not seek the death penalty and that Mr. Fell would not be proceeding to trial. I acted accordingly.

19. In January 2002, the Department of Justice under Attorney General John Aschroft rejected the plea agreement. The Government issued a Notice of Intent to Seek the Death Penalty on January 30, 2002. I was surprised by the decision and believe that everyone representing Mr. Fell was surprised by the decision.

3

FELL-00002462

20. While the plea agreement was pending, I believed and understood that the United States Attorneys Office fully supported the plea agreement, that the plea agreement would be accepted by the Department of Justice, and that the case would never go to trial.

21. In early 2002, within weeks after I received the Notice of Intent to Seek the Death Penalty, Greg Waples approached me and suggested that we reach an agreement whereby Mr. Fell would plead guilty pursuant to an understanding that the penalty phase would be tried before the Court by Judge Sessions. I agreed to the proposal on behalf of Mr. Fell because I believed, based on the investigation that had been done in early 2001, that the mitigation case was strong and that Judge Sessions would follow the facts and the law and impose a sentence of life imprisonment without possibility of release. I did not believe that the case would go to trial before a jury.

22. In March 2002, I was informed by the United States Attorneys Office that Attorney General Ashcroft himself would be making the decision whether to allow us to enter into an arrangement whereby the penalty phase would be tried before the Court rather than in front of the Jury. I continued to believe that the Department of Justice would accept the arrangement until it was rejected on May 9, 2002. During this time period, I did not prepare for a trial because I did not believe that the case would be going to trial in front of a jury.

23. On May 14, 2002, after the agreement was rejected, I filed a motion to dismiss the Notice of Intent to Seek the Death Penalty based upon the fact that the government admitted in the October 24, 2001 plea agreement that Mr. Fell did not deserve the death penalty because of the mitigating factors in our case. On May 28, 2002, I also filed a motion seeking to declare the death penalty unconstitutional. On June 11, 2002, the Court held a hearing on our motion to dismiss the Notice of Intent to Seek the Death Penalty. Based on the hearing, my understanding was that the Court was very interested in issues surrounding the constitutionality of the death penalty in light of legal developments in the federal courts, including Judge Rakoff's preliminary decision declaring the death penalty unconstitutional and that the Court wanted to spend the summer researching and considering the constitutional issues. I was therefore under the impression that no trial would be imminent.

24. After June 2002, I devoted all of my attention to preparing the briefs and the arguments for why the federal death penalty statute was unconstitutional. On September 24, 2002, the Court declared the federal death penalty statute to be unconstitutional.

25. I understood that even if this Court declared the federal death penalty statute to be unconstitutional, the United States Attorneys Office might appeal that decision. Accordingly, during the briefing on the motion to declare the federal death penalty statute unconstitutional, Mr. Waples and I continued to have discussions about the possibility of a potential plea agreement. The Department of Justice protocol provided that "if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances." Mr. Waples proposed that we make a submission to the Justice Department arguing that there were changed circumstances in the case and suggested

4

FELL-00002463

that, if we made Mr. Fell available to government experts for examination and those government experts believed that there were mitigating factors in Mr. Fell's life and background, that would strengthen Mr. Fell's argument that a guilty plea to life imprisonment without possibility of release should be accepted. Mr. Waples led me to believe that the United States Attorneys Office would be supportive of our proposal to have Mr. Fell agree to a guilty plea to life imprisonment without possibility of release, just as the United States Attorneys Office was supportive of that guilty plea agreement in 2001.

26. I agreed to that proposal based on those assurances and my own independent research into the Government's proposed experts, Dr. Richard Wetzel and Dr. John Rabun, which indicated that those doctors were fair-minded individuals who would take an open-minded view of the evidence. I believed that the combination of a decision striking down the federal death penalty with reports finding mitigating factors would lead the Justice Department to reconsider its decision and to accept a guilty plea to life imprisonment.

27. Dr. Richard Wetzel examined Mr. Fell on September 18-19, 2002. Dr. John Rabun examined Donald Fell on December 12, 2002. We restricted the Government mental health experts from discussing the crimes with Mr. Fell, but we did not otherwise place limitations on the testing because we thought we might be able to get a plea agreement and there would be no trial. We did not see any downside to allowing the evaluations since we trusted the prosecutors. If we had known that Greg Waples would not be the prosecutor on the case, we would not have allowed the evaluations.

28. Dr. Wetzel delivered his report on October 11, 2002. Dr. Rabun delivered his report on December 31, 2002. Both Drs. Wetzel and Rabun confirmed the existence of significant mitigation in Mr. Fell's background. We submitted these reports to the Attorney General in conjunction with our request for reconsideration in February 2005.

29. After the Court declared the federal death penalty statute unconstitutional, I worked on the Government's appeal to the Second Circuit. The Second Circuit reversed this Court's decision on March 2, 2004. On March 15, 2004, on behalf of Mr. Fell, I moved for reconsideration or rehearing en banc. That motion was rejected. On October 18, 2004, the Supreme Court denied Mr. Fell's petition for a writ of certiorari. On November 5, 2004, the case was remanded to the District of Vermont for trial.

30. I did not prepare for trial during this time period because I was hopeful that this Court's decision would be sustained. Furthermore, I did not believe that the Government would argue aggressively for the death penalty. Mr. Greg Waples was the Assistant United States Attorney in charge of the case and I did not think he would aggressively pursue the death penalty. Furthermore, based upon my previous communications with Greg Waples and the favorable mental health evaluation we received from the government's mental health experts, Dr. Wetzel and Dr. Rabun, I also had a false sense of assurance that Mr. Fell's mental health would not be a heavily contested issue at trial.

5

FELL-00002464

31. After the case was remanded to the District of Vermont in November 2004, Mr. Greg Waples withdrew as the lead prosecutor in the case, and I learned that Stephen Kelly and William Darrow would be trying the case.

32. Even after Stephen Kelly replaced Greg Waples, I pursued potential plea negotiations with David Kirby. On February 22, 2005, after John Ashcroft left the Bush administration and Alberto Gonzalez became Attorney General, I sent a letter to Mr. Kirby asking him to reconsider the decision to seek the death penalty based upon changed circumstances, including: 1) the fact that the Government's mental health experts found substantial mitigating evidence; 2) Donald Fell's positive adjustment to life in prison; and 3) changes in the law that would prevent the use of Bobby Lee's statements against Donald Fell. The government did not inform us until just before jury selection that they would not reconsider a plea agreement based upon changed circumstances. Mr. Kirby informed me that he spoke personally with Attorney General Gonzalez, who would not reconsider.

33. On December 1, 2004, on behalf of Mr. Fell, we filed a Rule 12.2 notice that we would be presenting mental health evidence. In 2002, I had initially contacted Dr. Mark Cunningham. Dr. Cunningham did not begin work in 2002 because Judge Sessions declared the death penalty unconstitutional. Prior to filing the motion, I did not talk to Dr. Cunningham, Dr. Mills or to any of the other doctors who had done examinations of Mr. Fell in the winter and spring of 2001. I did not consider whether we should hire additional or different experts. I did not ask any of our experts to update the reports they had prepared in the spring of 2001.

34. When we began to prepare for trial, I asked Dr. Mills, who performed the examination in preparation for the plea agreement, to be our mental health expert at trial. I did not ask Dr. Mills to update his report or to conduct an additional examination of Mr. Fell based upon new information we had received since May 2001. I also never provided him with a complete social history. We had only limited discussions regarding his potential testimony before trial.

35. Dr. Cunningham did not begin work on Mr. Fell's case again until June 2005, a few weeks before trial. He was planning to testify about historical factors in Mr. Fell's upbringing and how they impacted his decision-making.

36. The only other expert that we retained was James Aiken. In April 2005 we sent him information pertaining to the case including Mr. Fell's prison records from his period of incarceration. Mr. Aiken also interviewed Mr. Fell and delivered a report dated June 15, 2005 opining that Mr. Fell could be housed, managed and secured in a maximum security facility for the remainder of his life without causing an unusual risk of harm to staff, other inmates, or the community.

37. Our mitigation specialist Cynthia Ayers did most of the on-the-ground investigation for our mitigation case, though she was not given any assignments from mid-2002 to 2005. Her work was self-directed. She decided what records to collect and what witnesses to interview, and she told us which witnesses we should meet.

6

FELL-00002465

38. We never requested, and we did not receive, discovery related to the Government's investigation into Bobby Lee's criminal history, personal history, or mental health from the Government. We also never requested records relating to the investigation into Bobby Lee's death, and we never asked our mental health experts to examine the relationship between Mr. Fell and Mr. Lee.

39. I understood from Mr. Fell's post-arrest statements that, as a child, he had shot an individual named John Gacek and that the Government might seek to offer evidence regarding that shooting. I did not investigate that shooting. I did not speak to Mr. Gacek or to his parents.

40. I also understood from Mr. Fell's post-arrest statements that, in the summer before his arrest in this case, Mr. Fell had gotten into a fight with an individual named Chris Eike and I believed, based on those statements and information I received from the Government, that Mr. Fell had beaten Mr. Eike into a coma. I never sought to find Mr. Eike or speak to him or caused anyone else to find him or to speak to him. I never sought the hospital records for Mr. Eike. Based on the statements elicited by the Government at trial and its arguments, I believed and assumed that Mr. Eike was in a coma and had suffered serious injury. I did not do any investigation to determine whether that claim was true.

41. I did not meet Mr. Fell's sister, Teri, until she came up to Vermont for trial.

42. We kept all discovery and 302s that we received from the Government and maintained them in the files of the Federal Defender in Albany.

43. We never interviewed Frances Bellantoni, the man who reported to the New York State Police that he witnessed an argument on the side of the road near the Dover crime scene. To the best of my recollection, while we did receive reports of statements taken by the New York State Police in December 2000, I did not receive a 302 of an interview of Mr. Bellantoni.

44. I was involved in selecting jurors for the case. We asked the jurors questions on the juror questionnaire and in follow up questioning about their receptivity to mental health evidence.

45. I would have wanted to know if a juror was the victim of sexual abuse or had a history of alcohol abuse or domestic violence in the family, because this was important to me in determining whether the juror could evaluate the mitigation evidence in Mr. Fell's case fairly. I also would have wanted to know if jurors had been exposed to pretrial publicity about Bobby Lee's death, since this was prejudicial information I wanted excluded from the trial. I would have challenged any jurors with these experiences for cause.

46. I knew that the mental health evidence was important to our case, but we withdrew the mitigating factor that Mr. Fell was under mental and emotional disturbance when the crimes were committed to avoid the testimony of Dr. Welner.

7

FELL-00002466

47. We did not put on Dr. Mills' testimony because we believed that there was a risk that, if we called Dr. Mills, the Government would call Dr. Welner and we believed that the Court had already indicated that it would receive the testimony of Dr. Welner.

48. We did not get the Welner report until the evening of July 5, midway through the penalty phase and right before Dr. Cunningham was scheduled to testify on July 7.

49. We knew prior to trial that Dr. Welner was visiting witnesses with an FBI agent because Mr. Fell's family members informed Cynthia Ayres that they had spoken with him. However, we had not received all of the 302s from Dr. Welner's investigation before receiving his report, and I do not believe we ever received all of the 302s.

50. When we received the Welner report, we knew that Dr. Welner provided Dr. Wetzel questions to ask during his examination of Mr. Fell, and we knew this violated the Court's order preventing Dr. Welner from examining Mr. Fell. We also knew that Dr. Welner performed psychological testing on Mr. Fell in violation of the Court's order. We knew that it was important for us to challenge his proposed testimony, so on July 6, we filed a motion in limine seeking to exclude Dr. Welner's testimony based upon (1) Dr. Welner's use of Dr. Wetzel as a proxy during the 12.2 examination; (2) Dr. Welner's unnoticed testing; (3) statements in the report taken by Dr. Welner with the assistance of law enforcement from individuals who would not be called as witnesses in violation of the Confrontation Clause; (4) allegations of unnoticed misconduct irrelevant to any aggravating factor; (5) the bad science on which the report was based; and (6) the unduly prejudicial nature of the report. The Court scheduled a hearing to consider our motion on July 11, 2005.

51. I thought there were many good reasons why Dr. Welner should have been prevented from testifying on Daubert grounds, but rather than waiting for a ruling from the Court on whether Dr. Welner's testimony would be excluded, I decided to pull the testimony of Dr. Cunningham. It was my belief that the Court required us to decide to put on the testimony of Dr. Cunningham before the Court would decide whether to allow testimony from Dr. Welner. In retrospect, I now realize that I never asked the Court for a ruling about Dr. Welner's testimony before making a decision about whether Dr. Cunningham would testify. At the time, I was also under the impression that the Court would not do anything to sanction the Government for violating the Court's order and that in order to prevent Dr. Welner from testifying we had no choice but to withdraw our 12.2 notice and pull the testimony of our mental health experts. The decision was a difficult one. We had promised the jury that it would hear from Drs. Cunningham and Mills.

52. I never sought a promise from the Government that they would not put on any testimony from Dr. Welner, and I never asked the Court whether it would prevent Dr. Welner from testifying if we pulled the mental health testimony and withdrew our Rule 12.2 Notice. I was surprised when the Government argued that it would still seek to present Dr. Welner as a rebuttal witness to our lay mitigation case. I never made a motion seeking to exclude Dr. Welner thereafter. The decision not to pursue a motion to exclude Dr. Welner was not a result of any research in the law.

8

FELL-00002467

53. The Court suggested that if the defense stipulated that it was not asserting a diminished capacity defense, the Government might decide not to ask Dr. Welner to testify. I suggested that stipulation to the Government but it refused. I agreed to the stipulation that the Government suggested only because the Government demanded it and I believed that we had no alternative if we were going to keep Dr. Welner off the stand.

54. I would not have agreed to withdraw Dr. Mills and Dr. Cunningham's testimony, nor would I have agreed to the stipulation but for the threat by the Government to call Dr. Welner.

I declare under penalty of perjury that the foregoing nine page declaration is true and correct.

Date: March 17, 2011

Alexander Bunin

9

FELL-00002468

# EXHIBIT 265

## DECLARATION OF CYNTHIA AYRES

Pursuant to 28 U.S.C. § 1746, Cynthia Carter Ayres hereby declares as follows:

1.      I am a mitigation specialist working for the Capital Defense Unit of the Office of the Chief Public Defender in Hartford, CT. I have been at my current job since the fall of 2005. Prior to that, I was in private practice as a mitigation specialist and clinical social worker. I began working as a social worker and mitigation specialist in 1994.

2.      I was retained by counsel for Donald Fell in January of 2001. I was living in Williamsburg, VA at the time. On or about late 2001, I moved to Richmond, VA. Mr. Fell's case was difficult for me because of all the travel involved. None of the investigation was within easy driving distance from my home. In addition, the defense team members and the client were geographically distant from me. The original attorneys, Alex Bunin and Gene Primomo, were based in Albany, NY. Later, in 2002, Paul Volk was added to the defense team. He was based in Burlington, VT. I did not meet Mr. Volk until trial began in 2005.

3.      In some instances, I base the dates and events set forth in this declaration upon my review of my time sheets and records.

4.      My work on the case progressed in three distinct periods of time: in the first half of 2001, two months in 2002, and the first half of 2005. From January to June 2001, I did some preliminary investigation for use in the process of trying to avoid the death penalty. During this time period, I did not complete the social history investigation, because I did not think the case was going to trial. I took a few overnight trips to Mr. Fell's hometown, and another trip to see 3 of his other relatives in South Carolina and Florida. During this period in 2001, I met with his sister, Teri Fell, once. According to my records, I billed a total of 85 hours during that time, plus 41 hours of travel.

FELL-00002469

5.      I did not work on the case between June 28, 2001 and April 30, 2002, at which time, trial counsel told me that they had a trial date coming up. I spent four hours catching up on the case and meeting with the attorneys on April 30, 2002. I informed counsel that I had a trial in Virginia that was starting up in early May, but said I would be available after that to prepare for trial in Mr. Fell's case. In early June 2002, I worked on Mr. Fell's case for a week. I was later informed by counsel that trial in Mr. Fell's case was postponed indefinitely, and that I did not need to do any work to prepare the case for trial. I booked a total of 17 hours during June 2002, plus 25 hours of travel time. I did not become active in the case again until January 10, 2005, when we had a team meeting to plan for the upcoming trial. I did not actually resume my work on the case until March 29, 2005.

6.      In late 2004 as well as January and February of 2005, I was working primarily on Daryl Atkins's case. On February 7, 2005, the *Atkins* case was scheduled for a hearing where a jury would determine whether or not Mr. Atkins was mentally retarded. My role as mitigation specialist in Mr. Atkins' case was critical to the preparation required for this mental retardation hearing. The *Atkins* attorneys expected a lot of work from me in 2004 and 2005, leading up to the hearing date.

7.      I told Mr. Fell's counsel that I would be unavailable while preparing for the *Atkins* hearing in January and February, 2005. I told them that I could not travel to do investigation in Wilkes-Barre or elsewhere on Mr. Fell's case during that time period. The Atkins mental retardation hearing date of February 7, 2005 was postponed at the last minute, during a hearing only three days prior, on February 4, 2005. On February 17, 2005, the new hearing date of July 25, 2005 was scheduled for Mr. Atkins' mental retardation hearing.

8.      I continued working on Mr. Atkins' case through February and much of March,

2

FELL-00002470

then returned to working on Mr. Fell's case on March 29, 2005. Between March and July 2005, I was scrambling to prepare for both Mr. Fell's trial and Mr. Atkins' mental retardation hearing.

9.      In 2005, during the five weeks leading up to jury selection, I billed for 55 hours of work on Mr. Fell's case (not including travel time). This was not enough time to conduct a complete social history investigation in order to prepare a comprehensive mitigation presentation. Even counting from the time of my original hire, I did not spend a lot of time with any one witness, even those who were very important. For example, Teri Fell, who is Mr. Fell's sister and his closest witness, was interviewed for a total of seven hours, over three visits in four years.

10.     Nor did I spend much time with Mr. Fell himself. I traveled to see him three times during my five years working on the case prior to trial. Due to my lack of contact with Mr. Fell, I was unable to screen him for signs and symptoms of mental illness. I did not ask him about many areas of his life, particularly sensitive areas like his sexual history. My conversations with Mr. Fell on critical areas of the case—such as his relationship with his co-defendant and Mr. Fell's actions during crime itself—were superficial at best, due to the limited time I spent meeting with him.

11.     Although I often am in charge of records collection, I was told that Wanda Rivera from the Federal Defender's Office would do that here and I assumed she was collecting the relevant documents. I was not supervising Ms. Rivera's work; I understood that Mr. Bunin and Mr. Primomo were, and I did not generally follow up on her work. In 2005, I learned for the first time that we were missing many readily available documents that would be relevant to a mitigation case. Ms. Rivera's involvement in the case had dropped off sometime earlier. As a result, we had not completed our collection of school records and social services records. It was

3

FELL-00002471

very late by this point, but I spent some time trying to chase records down in Wilkes-Barre.

12.     On April 21, 2005, which was less than two weeks prior to jury selection, I visited the Victim's Resource Center in Wilkes-Barre for the first time. I could have visited earlier but did not because I understood that Ms. Rivera was collecting relevant records, and that the case would not go to trial. Prior to my visit, no one on the team had visited the Victim's Resource Center, even though it was obviously important to Mr. Fell's life and his case because he had been treated there after sexual assaults which happened when he was very young. I just showed up at the Victim's Resource Center, and the people there were helpful. During my visit, I learned that the Victim's Resource Center had therapy notes and other records regarding Mr. Fell that trial counsel should have sought to obtain earlier but did not. I was able to get the records released to trial counsel within two weeks but – because we had not requested the documents earlier – they were mailed out to trial counsel on May 4, 2005. Copies were not faxed to me until June 13, 2005. I read the documents, but by then I did not have time to do any follow-up investigation related to them, and no one asked me to. For example, I would have interviewed some of the witnesses named in the files had we obtained the records earlier.

13.     During trial, we received a large number of additional documents from Luzerne County Children and Youth Services (CYS). During the preliminary investigation in 2001, Ms. Rivera had received some CYS records. On March 31, 2005, I met with a CYS caseworker named Deanna German. No one on the defense team had previously spoken to her. She told me that her notes, referred to as "Contact Sheets," would have a lot of relevant information regarding Mr. Fell's case. No one had asked for them. She told me that trial counsel would have to get in touch with the legal department at CYS to get access to these materials as well as confidential referral reports and investigation reports.

4

FELL-00002472

14.    On July 3-4, 2005, in the middle of trial, after the defense mitigation presentation had begun already, I reviewed the CYS contact sheets for the first time. Had I gotten them earlier, I would have talked through the records with Mr. Fell, his sister Teri Fell, and his aunts Donna Williams, Jackie Sharpe, and Sandy Bowles to refresh their memories and get additional details on several different events that the records noted. I would have used the records to locate and interview a number of witnesses named in the records to get additional information. I would have collected mitigating records based on the information in the contact sheets. I would have wanted to hand the records over to mental health experts for a review. As trial had already started, I was unable to do these things.

15.    In April, 2005, I learned that Dr. Welner had been interviewing witnesses in Wilkes-Barre. I discussed this with trial counsel and we agreed that I should ask the witnesses about their interactions with Dr. Welner and report back, which I did.

16.    I was not involved in the process of identifying appropriate mental health experts for the case. No one asked me to review the records to determine whether Mr. Fell had any mental health issues or whether we should hire any particular kind of mental health experts, and I did not do so.

17.    In 2005, when Mr. Bunin chose to retain Dr. Mark Cunningham, again I was not involved or included in discussions regarding this decision, and was simply informed after the fact.

18.    Trial was already underway by the time I read the Victim's Resource Center records and CYS contact sheets and referral reports. No one on the team gave these materials to mental health experts to determine whether Mr. Fell suffered from mental impairments. No one asked me to read through the records in order to identify Mr. Fell's signs and symptoms of

5

FELL-00002473

mental illness.

19.    At no point during the investigation or trial of this case did we have regular defense team meetings or even regular phone calls regarding the case. In fact, we had very little communication.

20.    I was out on my own for most of the time I worked on the case. I was hardly given any direction on what they expected me to do. The attorneys expected me to figure out the direction of the mitigation investigation on my own, and did not give me ideas or input on which witnesses to interview, or how to prioritize tasks in the case. We did not have a master task list that was circulated to everyone for comments and edits. For the most part, I was not kept informed about what other team members were doing. Unlike in my other capital cases, the team did not coalesce and function as a unit.

21.    There were no team discussions on developing theories of the case for the guilt phase and the penalty phase. Decisions appeared to be made primarily by Alex Bunin. Leading up to trial, we did not have team discussions on how trial would be conducted, which witnesses would be put on, which documents would be admitted as exhibits, etc.

22.    I was not involved in any plans to create a Mitigation Binder in preparation for trial. I was not involved in making decisions about what documents would be included in the Mitigation Binder, which I understand was admitted into evidence. I was not asked for my input regarding documents to be entered into evidence.

23.    I was not asked to investigate aggravating factors in this case. Leading up to trial, there were no team discussions or strategies developed to deal with aggravating material or bad acts that the government had informed us about via discovery. I was not directed to interview witnesses with aggravating information nor was I asked to investigate prior bad acts in other

6

FELL-00002474

ways, e.g. collecting records or doing courthouse research.

24.    The defense team in Mr. Fell's case did not discuss the integration of culpability and mitigation theories. There were no team brainstorming sessions or meetings to discuss the way things would be handled at trial. In my other cases, attorneys and the mitigation specialists would get together and discuss how to integrate the two phases, because it's otherwise very easy for the phases to end up conflicting with one another.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 3/18/11

Cynthia Carter Ayres

7

FELL-00002475

# EXHIBIT 266

My name is Sandra Shum, and I am _~~54~~_ *55* years old. I currently live in Clarendon, Vermont, but in the late 1990s, I lived in Rutland at the Royal Motel for a little over a year. For many years, I worked as a machinist at a tool company.

Debbie Fell was my neighbor at the Royal Motel, and we were friends. Even when we had not known each other very long, she said I was her best friend because she did not have anyone else. The Royal Motel was a scary place to live because of the many drug deals and crime in the area. I saw that many of my neighbors were struggling financially, ~~but we partied together~~. *I got to know some of my neighbors, and while socializing I got to know their hard life stories, some of their vices and how they coped. SS*

Debbie lived with her boyfriend, Louie Gilbert. They lived in the room across the parking lot from me at the Royal Motel. Debbie and Louie had come to Rutland from Wilkes-Barre, Pennsylvania in their camper. When they first arrived in Rutland, they slept in their camper in the parking lot by the Bowl-A-Rama. Debbie and Louie worked at the Hawk Mountain Resort at the Killington Mountain. Debbie worked as a housekeeper, and I think Louie did security work around the motel.

I ~~saw~~ *heard* Debbie and Louie fight often. *I could hear them hollering from across the parking lot.* They drank heavily and then fought like cats and dogs. They *usually* drank every night and even more on ~~the weekends~~ *their days off. SS*. They usually drank Budweiser, and I saw large stacks of beer cans in their room at the Royal Motel.

1 *SS*

FELL-00002476

Debbie and Louie were verbally abusive with one another. Even with my windows closed, I could hear them yelling at each other from across the parking lot. The police were called several times as a result. Louie tried to control Debbie, and at times, he would not let her leave the hotel room. If they were hanging out with a large group of people, it seemed like he tried to get her to leave before she got out of control. Louie messed with Debbie's car by taking the spark plugs wires or ~~battery out~~ wire to the distributor SS. so she would not be able to get to work in the morning.

After she had been drinking, Debbie was often loud and aggressive, and she could be very mean. At times, she made a very big deal out of something small. She got in people's faces and made sure they listened to her. There were times when she would say very cruel things while intoxicated and then not remember what she had said the next day. Her speech was slurred after drinking. When Debbie was drunk, she often seemed depressed to me and cried. about her children, and her life in Pennsylvania. SS.

Debbie told me that her mother was a mean, abusive drunk. Debbie was angry that her mother got custody of her children. Debbie said her mother wanted the kids so that she would get extra money from the state. Debbie said her mother spent the money on alcohol rather than the children. Debbie believed her mother had turned her kids against her.

Louie left town at some point. Debbie moved in with a guy named Tim Reynolds at an apartment on Library Avenue. I visited her once at the new apartment, and it looked similar to her room at the Royal Motel with beer cans

2 SS.

FELL-00002477

stacked up high. After I moved out of the Royal Motel, Debbie and Tim came by my trailer with a group of scruffy looking guys in a car with the windows smashed out. After that, I told Debbie not to bring people like that to my house in the future because I did not want them to know where I lived.

I was interviewed by police officers and federal agents. I was not contacted by anyone representing Donald Fell before his trial. The first time I had contact with anyone from Donald Fell's defense team was in 2010 during his appeal. I have lived in Rutland County my whole life. I was available and would have been willing to talk to the defense lawyers before trial.

I have had the opportunity to read and have read to me the foregoing _2_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Between 2000 - 2005, I was living in North Clarendon, Vermont, just outside of Rutland. I was living at REDACTED - FELL No one ever attempted to contact me during that time, for trial.

SS.

3
SS.

Date: _March 3, 2011_

_Sandra F. Shum_

Sandra Shum

Witness

4

FELL-00002479

# EXHIBIT 267

My name is Deborah Wisell, and I am _55_ years old.  I currently live in Hinesburg, Vermont.  Alan Reynolds is my younger brother, but most people call him Tim.

Tim is an alcoholic who drinks very regularly.  I am familiar with most of the women that my brother has dated, and almost all of his relationships have been ~~violent~~ full of drama towards the end. D.W  I met Tim's girlfriend Debbie.  She seemed to drink as often as Tim did.

Tim and I knew Charlie Conway and his sister Tina since we were young.  Charlie was often drunk.  At times he would joke, but I also saw him act violently when drunk.  When my son was 7 or 8 years old, Charlie had been drinking at my house and verbally threatened my son.  I kicked Charlie out of my house as a result.

My husband, Rich, and I lived in an apartment above the Stoplite bar for around 2 years.  I saw and heard lots of fights while I was living there.  There was always drama at the Stoplite.  Tina Conway spent a lot of time at the Stoplite then.  She was drunk at 2:00 in the afternoon and I saw them cut her off.  Tina made sexual advances to my husband.  Once, I looked out the window at the Stoplite and Tina made sure that I saw them kissing.

Marsha Thompson was the bartender at the Stoplite.  She could be mean and aggressive.  While my husband and I were on and off again, he was with

1

FELL-00002480

Marsha. I was accused of scratching her car, and she would not serve me at the bar. She was abusive to my husband, and she threw beer cans at him. Once, she cursed me out and threatened my life.

A few months before Debbie was killed, my brother ended up in jail. Debbie and Tim had been drinking and fighting, then the cops got involved.

I was not contacted by anyone representing Donny before his trial. The first time I had contact with anyone from Donald Fell's defense team was in 2010 during his appeal.

I have had the opportunity to read and have read to me the foregoing

_____/_____ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

*I have lived in Vermont for my whole life. Between the years, 2000 – 2005, I lived in Middlebury and Whiting, Vermont. No one ever attempted to contact me.*

*D.W*

*D.W.*

2

FELL-00002481

Date: 3-6-11

_Deborah L. Wisell_

Deborah Wisell

_[signature]_

Witness

3

FELL-00002482

# EXHIBIT 268

My name is Anthony Mistretta. I live in Castleton, VT. I moved here from New York in 1995. I worked at Walmart in Rutland from about 1999 to 2004.

I saw the two boys who committed the murders on that night, sometime in the early morning hours. They came into the Walmart and they weren't supposed to be there because the store was closed. They both looked wet like they had just taken showers and thrown their clothes on. I told them that they had to leave. They looked high and had a blank look like a wide-eyed blank stare. They looked like they were wired like they had just been electrocuted but were still alive. They seemed like they were high on crack that night. I've seen it enough to know what people look like on crack.

Charlie Conway had actually worked at Walmart for a month or so in the dog food aisle. Debbie also worked at Walmart for a little bit. My wife knew her. My wife smelled alcohol on Debbie's breath when she came into work. I did not know Charlie very well, but we talked sometimes. He told me that he was going out with Debbie. They had been dating for a little while. Charlie was known around town as "Charlie the Painter." He was a heavy drinker, always red-faced and buzzed. I can't remember him not smelling like alcohol.

Sometime after he died, I dated Charlie's sister Tina, who I met through my brother Steven. She lived with me for a little while, but we were on and off. Tina had her problems. Drinking was her main thing, but she would do anything she could get her hands on after that, including pot and crack. She was a mess and was really crazy. She



1

FELL-00002483

would leave and you never knew if Dr. Jeckyll or Mr. Hyde would come home. She was violent and tried to stab me multiple times with knives and scissors. Once, she chased me around the house with scissors and then stabbed me in the side. I had to knock them out of her hand and throw her to the ground.

I recognized Teresa King from the Price Chopper. I used to go there to pick up lunch and go back to Walmart to eat.

I was interviewed by someone from the government a couple of times before the trial. I testified at the trial. The trial was a rough time for me. I was getting a divorce, and the day that I testified, I was in the hospital for chest pains and the FBI actually took me out of the hospital to go to court.

I was not contacted by anyone representing Donny Fell until 2011 in connection with his appeal. I have been living on the same street in Castleton since before the murders happened. I was not hard to find and would have been willing to speak with the lawyers if they wanted to talk to me.

I have reviewed the foregoing ___1___ pages and have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.



2

FELL-00002484

I have lived in Castleton since 1999, and did not move out of the state of Vermont.

Date: March 8, 2011

Anthony Mistretta

Witness

Anthony Mistretta

3

FELL-00002485

# EXHIBIT 269

My name is Dora Carter. I live in Rutland, VT and have lived here for ___30___ years. I knew Debbie Fell when she lived in Rutland. We were friends for a few years.

Debbie worked when she worked, but her life really wasn't good. She drank every day. I saw her get tremors when she didn't drink. She drank a lot of beer. She was a real mess. Her lifestyle was not good, not at all. She did not go to rehab or try to stop drinking. Her boyfriend Tim Reynolds drank as much as she did. Most of the people she hung out with in Rutland drank as much as she did. She was a chronic alcoholic, and then she got into other drugs.

Debbie didn't really know her kids. When her son moved up to Rutland, it was obvious that she really didn't know him. She was worried about their relationship, because she didn't really know who he was. And then they all got into the drugs, Debbie, her son, and his friend. They were drinking, smoking weed, and doing crack really bad. I saw Debbie smoking crack at her place on Robbins Street. I stopped hanging out with her when all that started. I saw her using and decided that was it. She was killed shortly after that.

I saw Debbie smoke crack more than once. She was living at REDACTED - FELL at the time. She was smoking crack a lot of the time. Her son and his friend who came up, and Charles Conway, all of them were smoking crack really bad. I saw it one time with all of them there, and then I never went back there once that started going on.

1

Between 2000 and 2005, I was living on REDACTED - FELL in Rutland, that whole time. I have lived in Rutland since _1980_. The FBI came to see me at one point. No one from Donny's defense came to see me or tried to contact me, as far as I know. I would have been willing and available to talk with them.

I have had the opportunity to read and have read to me the foregoing _1_ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 3-08-11

_____
Dora Carter

_____
Witness

2

# EXHIBIT 270

My name is Jeff Van Buren. I live in Rutland, VT with my girlfriend, Mary Bell. For many years, I worked hard labor jobs, but I am currently on disability due to a serious back injury. Although I formerly had a drug and alcohol addiction, I have been sober for the past 6 years.

In the late 1990s, I met Debbie Fell through Jerry Whitford, a friend of her boyfriend, Tim Reynolds. When we first met, we drank at a bar on the corner of State Street called Shucker's. It is now closed. At that time, Jerry, Tim, Debbie and I would work during the day and then drink all night. We all had financial trouble, so on Sunday afternoons, we would go to the bar to watch NASCAR races, eat free food, and drink beer.

Debbie and I were drinking partners. It was like a drink-a-thon with us two. Debbie lived a few doors down from where I lived at the time. Debbie was a blackout drinker, and so was I at the time. Debbie drank until the point when she would pass out and could not handle another drop. We would both pass out, and then we'd wake up in the morning and start drinking again. Debbie and I used to like to do the crossword puzzle in the Rutland Herald in the mornings. We would pop a beer and sit down and do the crossword.

Although Debbie lived with Tim, they broke up a lot. They argued and fought a lot. It seemed that Tim had trouble holding a job, and he rarely had money. At one point, Debbie left Tim and moved in with Kevin Bodette for a while. One time, when

FELL-00002488

Debbie had left Tim to go live with Kevin, I saw Debbie walking down the street pushing a grocery cart with a washing machine from Tim's apartment on top of it. She was taking it to Kevin's house. She said it was hers, not Tim's. Later, she and Tim got back together, and she moved back in with him. One time, I walked Debbie home from the bar, and she had lost her keys somehow. Tim had been drinking and was passed out in bed. We banged and banged on the door but he wouldn't wake up. I ended up helping her pry open a window with a screwdriver so she could break into her own apartment.

I was in a car accident with Debbie one day. After a night of drinking, we woke up and started drinking again, as usual. Debbie was driving and we were both wasted. The car had no business being on the road. The windows were busted out and there were no headlights. She was driving on the left-hand side of the road, and I saw a car coming. I yelled to her and tried to yank the wheel. She yanked it over to the other side, the car flipped, and we ended up in the ditch on the side of the road. I was on probation and did not want to get arrested so I disappeared into the crowd before the police arrived. Debbie got a DUI for that.

Debbie and I smoked crack together. A friend of Debbie's bought it and shared with us. Debbie liked to snort amphetamines, like Adderol or Ritalin. We called those ADHD drugs, "the poor man's coke," because they are cheap and available in Rutland. People steal them out of other people's medicine cabinets, or they get prescriptions for their kids and sell the pills. Those drugs make you stay up all night, filled with adrenaline. They make you quick to lose your temper, get aggressive, and smash

someone. You feel like you are invincible, like you can break through concrete walls. Your heart is pounding, you're sweating, and the adrenaline is just maxed. We also used other types of pills. I was using pain medication recreationally at the time. I had prescriptions from different doctors. I used to crush Percocets and snort them. I had a lot of pills and I shared them with Debbie. Later on, after Debbie's death, I ended up getting a severe addiction to pain medication.

Debbie's apartment was very dirty with garbage, clothes, dirty dishes and beer cans all over the apartment. There was a path through the middle of the mess, and Debbie had ashtrays overflowing on to the floor. The only times the beer cans would be picked up was when Debbie and Tim were so broke that they needed to trade in the beer cans for money to buy cigarettes. One night after Debbie had been drinking, she attempted to cook dinner and started a fire by turning the stove on high when something was on the burner. She could not stay sober long enough to finish cooking a meal.

When she heard Donny was coming to Vermont, Debbie tried to clean up her apartment and cut down on her drinking. Her apartment had been a disaster before that. She tried to clean it up before Donny came, so she could represent well to her son. She was even trying to do some home cooking again. She had not stopped drinking, but she tried to limit it to a few beers after work. That was a huge change from her regular drinking habits. Debbie said many times that she wanted to get sober. She only managed to stay sober for about a week before Donny got here. Donny was respectful to Debby until his friend, Bobby Lee, showed up. Then he was disrespectful to her in front of his friend.

FELL-00002490

It didn't last long. After Donny was up in Rutland just a couple of days, Debbie was hard partying again. She couldn't go without drinking for long. She went back to her blackout drunk ways, and she was using drugs again too. Her apartment was a wreck again pretty soon. It just went back to normal, which was filthy. There were beer cans all over the place, ashtrays overflowing again, garbage strewn around, and dirty dishes all over. There were clothes strewn around the apartment. The house smelled like a bar, not an apartment. It reeked of alcohol and cigarettes. She had a cat but she didn't change the kitty litter, so it was overflowing and smelled like cat urine. In Rutland, among our friends, there were a lot of gross apartments. Debbie's place was usually pretty gross. Occasionally, when Debbie was broke, she put all the beer cans in a bag and brought them down to cash them in. Usually though, there were beer cans all over the place.

Shortly after Donny arrived, I drove down to Fair Haven with Donny, Debbie, and Kevin Bodette. Kevin Bodette was a convicted pedophile. He talked about sex all the time and had a lot of porn. He was not shy when he talked about his conviction for molesting a child. We went to Fair Haven that day because Kevin wanted to show us his workplace and some of the equipment he used. During the trip, we were all drinking and snorting Percocets, which I crushed with a pill crusher. I brought the Percocets and I shared them with the other three. Donny seemed happy that day. We were all in a good mood, partying.

Kevin planned to steal a compressor from his worksite. It was a weekend day, so his workplace was closed, but he had the keys. He showed us around his workplace, then

4

FELL-00002491

we helped him load up the compressor in the trunk, but it did not fit. The trunk would not close, so we rode back to Rutland with the trunk open. Kevin had a buyer lined up to buy the compressor. We were going to party with the cash. We ran into Kevin's boss on the way back to Rutland, and since we were caught, we had to turn around and bring the compressor back to Fair Haven.

When Donny first arrived, the situation between Donny and Debbie appeared to be ok. But after Donny's friend Bobby showed up, things changed for the worse. Bobby was a whackjob. He was quiet and he looked and acted crazy. Donny acted differently around Bobby. Donny and Bobby acted like they had something to prove to each other. I stopped going over to Debbie's house as much after Bobby moved in because Bobby made me uncomfortable.

I spoke to Debbie on a daily basis, so I was surprised when I did not hear from her during the week after Thanksgiving. I went by her apartment to see her, but no one answered the door. I knew how Debbie liked to open a beer and do the crossword puzzle in the mornings, so when I saw the newspapers piled up at the door, I assumed she had taken off to Pennsylvania with Donny and Bobby. By then, she was already way behind on the rent.

Charlie Conway was an alcoholic. When he drank, he became loud and obnoxious, and I did not like to be around him when he was drinking. He drank so much. A lot of times, he was so drunk he could barely walk or stand up. In the middle of the

5

FELL-00002492

night, he stumbled around the neighborhood trying to find someone who would give him a beer. He went to people's houses that he knew and started banging on the doors and the windows, hollering until they opened up and gave him a beer. He didn't care if their lights were on, whether they were awake or asleep. He had a smart mouth when he was drunk. He was full of big talk. He got into arguments and threatened people, telling people he was going to kick their a--.

I have been sober now for more than five years. It was very hard to get sober. I went to rehab 6 different times. When I was drinking and on drugs, I couldn't dream of living without alcohol or drugs. I had to hit rock bottom first. My life is very different now.

I was interviewed by the FBI prior to Donny's trial, but Donny's lawyers from the trial did not contact me. I was subpoenaed by the government to testify, and I sat at the courthouse for a day but they did not call me to testify. The defense lawyers could have talked to me while I was sitting at the courthouse all day. No one representing Donny got in touch with me until 2010. I have lived in Rutland for the past _12_ JV. years and I know a lot of people in this town. I was available and it would not have been difficult to find me if the lawyers just asked around.

I have reviewed the foregoing _5_ JV. pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

6 JV.

FELL-00002493

J.V.

Debbie would often talk about her guilt and shame for leaving her children behind in Pennsylvania. She would say that she was not the mother she wanted to be. She had a lot of regret.

Date: MARCH 8 2011

*Jeff Van Buren*

Jeff Van Buren

*Mary Bell   3-8-11*

Witness

J.V.

FELL-00002494

# EXHIBIT 271

My name is Pat Johnson, and I am __73__ years old.  I currently live in Pittsford, Vermont, but I lived in Rutland for _____40_____ years up until _____2009_____, when I moved.

*P.J.*

REDACTED - FELL

Tim Reynolds lived directly above me at _____ and his girlfriend Debbie Fell lived there too.  Tim ended up in jail.  I did not speak to Debbie often, but I could hear things that happened in her apartment.  Tim and Debbie fought frequently.  I heard doors slam and the two of them screaming at each other.  There was often yelling or loud music coming from their apartment.  Neighbors often called the police about the noise, but I usually kept to myself.  Most nights, I just waited for the noise to end.  Eventually, they both passed out drunk.

Debbie drank often and there were frequently people coming and going from her apartment.  Many of Debbie's visitors arrived at night, and they often appeared to be bombed, very drunk.  Sometimes Debbie left the apartment for 2 or 3 days at a time.  I knew she was gone during those times because no one was coming or going from the apartment for a few days.

I knew Charlie Conway for years.  He was a very bad drunk.  He was a house painter, and I watched him paint the house across the street from me on REDACTED - FELL He drank beer all day long while he was painting.  I saw him wobbling on the ladder and the roof because he was drunk.  He drank beer all day long til he would pass out.

1

FELL-00002495

When Debbie's son was coming to visit, Debbie tried to change how much she drank. She seemed to be trying to cut down. She did not stop drinking, but things seemed more calm, for a short time. It wasn't long til things went back to normal for Debbie though, with her drinking heavily, people coming and going from her apartment, a lot of loud noise, arguing, fighting, doors slamming, and loud music and partying going on. My neighbors called the police several times.

On the night Debbie and Charlie died, it was very loud. I heard a lot of fighting and arguing. I heard both female and male voices get loud and angry with the yelling. There was a lot of thumping and it sounded like someone was playing the drums. It sounded like they were throwing things around. The slamming and banging noises and the yelling went on for hours. It sounded like someone was going to come through the ceiling. When it finally got quiet, I assumed that Debbie had gone to bed and the boys had either left or passed out. *JJ.*

I was interviewed by someone from law enforcement and signed a statement, *About a year after Debbie's death, two men came to* around the time the bodies were found. I was not contacted by anyone representing *interview me,* Donald Fell before his trial. The first time I had contact with anyone from Donald Fell's *I believe one was a* *U.S. Marshall,* defense team was in 2010 during his appeal. I would have been willing to talk to them *I'm not sure.* about the case before trial. I still lived in Rutland in the same apartment up until around *2007 - 2008.*

*JJ.*

*JJ.*
2

I have had the opportunity to read and have read to me the foregoing _____2_____

pages. I have been given the opportunity to make any corrections, additions, and

deletions that I see fit. I declare under penalty of perjury that the above statement is true

and accurate to the best of my knowledge.

Date: __3 - 8 - 11__

__Patricia Johnson__                        Pat Johnson

_____                        Witness

3

FELL-00002497

# EXHIBIT 272

My name is Mary Bell. I am __45__ years old. I knew Debbie Fell for a few years before she died. I used to hang out with her, Jeff Van Buren, Dora Carter, her boyfriend, and Dodi and Jerry Whitford. All of us were using crack cocaine at the time. Dodi and Jerry are deceased now. They both died from alcoholism.

I smoked crack with Debbie Fell. She was a big drinker also. She liked amphetamines too. Amphetamines put you completely out of your mind, for real. I saw Debbie snort powder cocaine a few times at my friend Jodi Stone's house. Jodi is dead now too. She overdosed. Since my boyfriend Jeff Van Buren and I got together about 10 or 11 years ago, we've lost over a dozen people that we've known together in Rutland. They all overdosed.

Gina Sparks was a crack dealer, and a lot of us got our crack and powder from her, and from her brother George Sparks. Debbie used to smoke a lot of crack with a guy in her building named Ray Bartley. His girlfriend was the one who ended up cleaning up the apartment after they had been killed. He would throw a $100 piece of crack on the pipe and suck it down. He finished it in one hit. Debbie and Ray smoked a lot of crack together.

I met all of these people through my boyfriend Jeff. I hadn't known Debbie for all that long before she was killed. I had seen Debbie and Tim together snorting powder cocaine. I went and got Debbie an 8-ball one time. An 8-ball is one eighth of an ounce of cocaine. This is a lot of cocaine for one person, enough to overdose on.

FELL-00002498

Debbie paid $250 for it. That night Debbie and I started getting high at my friend Jodi Stone's house and then we ended up at Debbie's house. I didn't party with Debbie that much so that night stands out. Jeff and Tim showed up when we got back to Debbie's. Tim was coming home from work so Debbie wanted to get back there. They had wall to wall beer cans in that place. Debbie and Tim would drink with each other beer for beer.

Debbie really liked to drink when I knew her. She was drunk most of the times I ever saw her. She drank an 18-pack or a 24-pack all by herself. At that time, I drank three 12-packs of Twisted Teas in one night. Then on top of all that booze, we were using crack cocaine and other drugs.

Before Debbie's son came up, Debbie tried to cut back on her drinking. She wanted to clean up for her son. She had been drinking a lot and she was drunk and high most of the times I saw her. But for a little while, she cut back tremendously from what she had been doing. She didn't stop drinking, but she cut down to a few beers each night. Her cutting down didn't last long though. A couple days after her son came up, she was back to normal, drinking a whole lot. And she was back to smoking crack, snorting powder cocaine, and using other drugs.

There were a couple other times I partied with her at her house while her son Donny was there, before his friend showed up. Debbie and I smoked crack together on those nights. I saw Donny smoking pot and snorting pills. He got the



FELL-00002499

pills from Kevin Bodette. They were amphetamines, maybe Adderol. I call them smurf pills because they make your nose blue on the inside. This was before that other kid came up.

After that other kid showed up, things changed at the house. Debbie and Donny weren't getting along. I had met Debbie right before her son Donny came up. Donny was all right in the beginning. It was after the friend came that it got a lot worse over there. That other kid gave me the creeps. I didn't like him one bit.

I saw Donny and his friend both smoking pot and snorting pills at Debbie's house. Debbie wasn't hiding her drug use from them and they weren't hiding their drug use from her. They would all use together in front of each other. I have seen a lot of the drugs they were using make people violent.

I used drugs for _30_ years and it was hard to finally get sober. I am eight years sober.

I was not contacted by anyone regarding the Donald Fell case until 2010 during his appeal. The police and the FBI did not contact me and the lawyers who represented him at trial did not contact me. I have been living in Rutland since _I was born_. I have been living with Jeff Van Buren for the past _12_ years. I know several people who testified or were questioned by police in the case. Any of them could have told the lawyers where to find me.

3

FELL-00002500

I have had the opportunity to review and correct the foregoing $3$ pages. I have been given the opportunity to make any corrections, additions, and deletions that I see fit. I declare under penalty of perjury that the above statement is true and accurate to the best of my knowledge.

Date: 3-11-2011

Mary Bell

Witness

4 MB

FELL-00002501